KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
JAN NIELSEN LITTLE - # 100029
jlittle@keker.com
BROOK DOOLEY - # 230423
bdooley@keker.com
KATE E. LAZARUS - # 268242
klazarus@keker.com
NICHOLAS D. MARAIS - # 277846
nmarais@keker.com
IAN KANIG - # 295623
ikanig@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendant
SUSHOVAN HUSSAIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>SUSHOVAN HUSSAIN,<br><br>  Defendant. | Case No. 3:16-cr-00462-CRB<br><br>**DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION TO ISSUE RULE 17 SUBPOENAS**<br><br>Date: July 21, 2017<br>Time: 11:00 a.m.<br>Dept.: Courtroom 6, 17th Floor<br>Judge: Hon. Charles R. Breyer<br><br>Date Filed: November 10, 2016<br><br>Trial Date: January 29, 2018 |

## I. INTRODUCTION

Through its June 16 motion, the government seeks to exploit HP's foreign lawsuit against Defendant Sushovan Hussain to get documents that it could not get in the United States: the transcript of a foreign compelled regulatory interview, during which Mr. Hussain was stripped of his Fifth Amendment rights; and documents that Mr. Hussain has been forced to turn over in U.K.-based civil litigation, where he enjoys fewer privileges and protections.

Earlier this year, Mr. Hussain was required to produce these documents to various Hewlett-Packard entities (collectively, "HP") that have sued him in the High Court of Justice in London (in what the government calls the "U.K. Action"). Mr. Hussain was unable to withhold documents from production based on his Fifth Amendment rights, standard U.S. litigation privileges, or spousal privilege; his only protections came from the English Civil Procedure Rules (which bar HP from sharing his documents with anyone) and from HP's own guarantees that it would not use or share those documents (or "information derived from such documents") with anyone, including the government. Now, though—and not for the first time—the government and HP have worked hand-in-hand to devise a workaround: the government will ask this Court to issue a subpoena, and then HP "will raise the subpoena before the Court in the U.K. Action." ECF No. 66 ("Gov't Mot."), 6:19–23.

The government is well aware of Mr. Hussain's concerns and objections. Mr. Hussain objected in 2014 when the SEC tried to get the FRC's transcript, and defense counsel informed the Department of Justice again earlier this year that (and why) it would be "improper—and a violation of Mr. Hussain's constitutional rights—for [the government] to receive or review" his documents. *See generally* ECF No. 67 at 4–6 (March 3, 2017 letter to AUSA Reeves).

The government's request for the FRC transcript should be denied because that testimony was compelled under threat of revocation of Mr. Hussain's professional license; because the FRC does not recognize, and would not allow Mr. Hussain to assert, any Fifth Amendment privilege; and because the FRC refused to allow Mr. Hussain's U.S. counsel to accompany him at that interview. If the government were to receive or review the transcript at this stage, its investigation would be tainted; if the government were to introduce this compelled, involuntary

1

1   testimony during its case-in-chief, it would abridge Mr. Hussain's Fifth Amendment rights.  The

2   defendant's primary concern is in preventing the government from using this transcript as

3   affirmative evidence.  If, at trial, Mr. Hussain waives his Fifth Amendment privilege by testifying

4   on his own behalf, the Court can decide at that time whether or not the government is entitled to

5   this transcript.[1]

6   The government's second request—for the civil discovery documents—should be denied

7   because the government could not gain access to those documents under the Federal Rules, and

8   because they, too, are subject to privileges and protections here that either do not exist or are

9   treated differently in England.

10  The government does not address any of the foregoing objections, despite having had

11  months to analyze and respond to Mr. Hussain's concerns.  Indeed, the government's entire

12  response to the serious Fifth Amendment and *Kastigar*[2] problems that Mr. Hussain first identified

13  three years ago comprises just one unexplained sentence.  Gov't Mot. at 5:26–27 ("[A] foreign

14  defendant's 'interview' with a foreign regulator would not violate the defendant's constitutional

15  rights in the United States").[3]

16  Just as the government has ignored Mr. Hussain's correspondence—and its motion

17  ignores his legal arguments—the proposed subpoenas would flout Mr. Hussain's constitutional

18  rights.  Respectfully, Mr. Hussain requests that the Court deny the government's motion.

## II.   BACKGROUND

### A.   The FRC Interview

The Financial Reporting Council (the "FRC") is a quasi-governmental body that regulates and disciplines accountants and auditors in the United Kingdom.  It is funded in part by the U.K.

---

[1] To facilitate that, Mr. Hussain is prepared to lodge an under-seal copy of the transcript with the Court.

[2] *Kastigar v. United States,* 406 U.S. 441 (1991).

[3] The government makes no attempt to address any of the arguments Mr. Hussain has raised in prior correspondence; while it promises to "set out" its disagreements, it never does. Instead, it appears content to let Mr. Hussain set out his opposition first, so that it can then enlist lawyers at HP and the FRC to help present its case on reply. *See, e.g.*, Gov't Mot. at 2:9–11. That approach is a transparent and improper attempt to shift the burden on its Rule 17 requests.

1173704

government, which appoints its Board of Directors, and it is "delegated powers by the Secretary of State for Department for Business, Energy and Industrial Strategy."[4]  The FRC is responsible for setting the U.K.'s "standards for accounting, audit and actuarial work."[5]

Because Mr. Hussain was (and is) a chartered accountant, he was (and is) "regulated by the Financial Reporting Council or FRC."[6]  As a member of the FRC, he is required, "at all times," to "co-operate fully with [its] Executive Counsel"—including attending interviews when the FRC so demands.[7]  In early 2013, around the time the Department of Justice commenced its investigation, the FRC wrote to Mr. Hussain to explain that it was investigating Autonomy and that it anticipated that Mr. Hussain would "be *required* to provide information and documentation relating to the matters under investigation…."[8]

On July 18, 2013, the FRC told Mr. Hussain that it was "seeking to interview [him] in accordance with paragraph 14 of the Accountancy Scheme."  As that regulation makes clear:

- Every member—that is, every licensed accountant—is required, "at all times," to "co-operate fully with the Executive Counsel";[9]

- The FRC "*shall* have the power by notice served on any Member … to call on him … to provide … such information and explanation relevant to any matter under investigation….";[10] and

- Failure to cooperate with such a demand will lead to separate disciplinary proceedings, sanctions for which could include an "[o]rder that a Member's practicing certificate or registration or authorisation or license be withdrawn"—that is, that he be barred from the profession.[11]

---

[4] *See, e.g.*, Declaration of John W. Keker ("Keker Decl."), Ex. 1.  The FRC exercises "the … functions of the Secretary of State under Part 42 Companies Act 2006…." *Id.*, Ex. 2 at 6.  Its Conduct Committee—which handles investigations and "determine[s] the scope of any such inquiry and what, if any, action [is] to be taken on its conclusion"—"exercis[es] the functions delegated to [it] by the Secretary of State under the Companies Act 2006 and the Companies (Audit, Investigations and Community Enterprise) Act 2004." *Id.* at 6–7.

[5] *Id.*, Ex. 2 at 2.

[6] Gov't Mot. at 3:19–20.

[7] Keker Decl., Ex. 3.

[8] *Id.*, Ex. 4 (emphasis added).

[9] *Id.* Ex. 3 ("FRC Scheme"), ¶ 14(1).

[10] *Id.* at ¶ 14(2).

[11] *Id.* at Appendix 1.

3
DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION TO ISSUE RULE 17 SUBPOENAS
Case No. 3:16-cr-00462-CRB

1173704

On August 12, 2013, the FRC wrote to Mr. Hussain again, explaining that he was "*required* to attend at the FRC offices … to be interviewed…." And in September, it stressed that, simply by virtue of being an accountant, Mr. Hussain had "agreed to be bound by [the FRC's] rules" and had therefore "waive[d] rights and privileges he might otherwise enjoy…."[12] Plainly, the FRC compelled Mr. Hussain to attend its interview under threat of potential expulsion from the profession and serious financial penalties.[13]

Worse, the FRC refused to allow Mr. Hussain's U.S. lawyers to attend. It ignored Mr. Hussain's oft-repeated concerns that the FRC's compelled interview would compromise his Fifth Amendment rights; it rejected his forecast that the Department of Justice ("DOJ") would inevitably seek a transcript of the interview; and it reminded him that it wanted "to make it clear" that he would be "expected" to meet his compulsory obligations under the Scheme.[14]

On November 12, 2013, at the FRC's insistence and without U.S. representation, Mr. Hussain attended the compulsory interview. Yet again, the FRC made its position clear on the record:

> Mr. Hussain, you've been required to attend this interview … and you are obliged to cooperate fully with this investigation. Any failure to cooperate fully to the best of your ability could of itself form the basis of disciplinary action.[15]

The interview was barely over before the United States began trying to exploit it. Late on November 12—the very day of Mr. Hussain's interview—the Securities and Exchange Commission wrote to the FRC to schedule "a conference call soon to discuss all of our respective

---

[12] Keker Decl. at ¶ 7.

[13] *See, e.g.*, Keker Decl. Ex. 5. (Patrick Gower, *Deloitte, Partner Get Record U.K. Fine for Audit Misconduct*, Bloomberg (Nov. 10, 2016) available at https://www.bloomberg.com/news/articles/2016-11-10/deloitte-partner-get-record-u-k-fine-for-accounting-misconduct (describing FRC's fines of £4 million to Deloitte and £150,000 to individual), last accessed June 28, 2017).

[14] *See, e.g.*, *id.*, Ex. 6.

[15] At the same time, Mr. Hussain's English representative again made clear that he objected to "the product of this interview … being provided to other agencies in the UK and in the US"; that Mr. Hussain was concerned "that his rights are being undermined by this process"; and that he "wanted US Counsel present … to protect those rights which he has in the US."

1  investigations and the plan going forward."[16]  Less than three months later, the FRC wrote to
2  Mr. Hussain's counsel because it had "received a request from the [SEC]" for the transcript of
3  Mr. Hussain's interview.  Mr. Hussain explained to both the FRC and the SEC that sharing the
4  transcript with the United States would eviscerate Mr. Hussain's Fifth Amendment rights and
5  taint the government's investigation.  To the best of Mr. Hussain's knowledge, after receiving his
6  letter, the SEC backed down because it was concerned about the *Kastigar* implications, and, to
7  date, neither the SEC nor the DOJ has received or reviewed the transcript.[17]

8  At around the same time, in late 2013, the SEC also sought to subpoena documents from
9  Mr. Hussain on a broad range of topics, before conceding that it did not have jurisdiction to do so
10 and indicating that it would "consider other methods for obtaining his documents."

### B.     Mr. Hussain's Documents

12 As the government notes in its motion, Mr. Hussain and Dr. Michael Lynch are currently
13 defending against a civil suit in the United Kingdom—a suit that, in the government's telling, is
14 "based on some of the same facts and circumstances supporting the pending Superseding
15 Indictment…."  Gov't Mot. at 4.

16 As part of those proceedings, Mr. Hussain has faced various discovery (or "disclosure")
17 obligations and turned certain documents over to the plaintiffs (or "claimants").[18]  Those
18 documents include (*a*) the transcript of his interview with the FRC, (*b*) Mr. Hussain's personal
19 emails and other documents in his possession that might be relevant to the English civil

---

[16] The government and the FRC have continued to coordinate over the years. On January 12, 2017, for example—the same day the parties appeared before this Court—the government sent the Court's minute order to the FRC to "reflect[] what happened in today's hearing" and offered to "flesh out any details for you … when we connect by telephone." *Id.* at Ex. 7 (USAO-EMAIL 016986).  The next month, across a series of emails and telephone calls, the government answered questions the FRC had about "senior Autonomy employee[s]," emails they had sent, and what documents the government had gathered. *See, e.g.*, USAO-EMAIL 016934.

[17] On March 3, 2017, defense counsel asked the DOJ to "[p]lease confirm that neither the SEC nor the U.S. Attorney's Office has ever received or reviewed the transcript of the FRC's interview of our client."  ECF No. 67 at 5 n2.  Some four months later, the DOJ has still not responded.

[18] The government alleges that Mr. Hussain "stated that HP does, in fact, have [these] documents."  Gov't Mot. at 4:11–13.  In the interests of precision, what defense counsel told the government was that he produced documents to Bidco and various Autonomy entities—not to HP or HPE.  ECF No. 67 at 4.

5
DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION TO ISSUE RULE 17 SUBPOENAS
Case No. 3:16-cr-00462-CRB

1173704

proceedings; and (*c*) documents that would be privileged from production in the United States but were not in the United Kingdom, including, for example, spousal communications.

Those documents are all subject to strict confidentiality obligations, including under English Civil Procedure Rules that prohibit their use for anything other than "the purpose of the proceedings in which [they are] disclosed." Moreover, the plaintiffs in that case—from whose parent company the government now seeks Mr. Hussain's documents—have "expressly confirmed … that this restriction on use applies not only to the disclosed documents themselves, but also to information derived from such documents."[19]

## III.   ARGUMENT

Through its motion, the government seeks access to transcripts and documents that it would never have been able to obtain but for foreign regulatory proceedings and foreign civil litigation. Doing so would circumvent Mr. Hussain's protections under the Federal Rules, would infringe on his Fifth and Sixth Amendment rights, and would run the serious risk of tainting the government's entire investigation.

### A.   Giving the government access to the FRC transcript will violate Mr. Hussain's Fifth Amendment rights.

The Fifth Amendment protects a defendant from being "compelled in any criminal case to be a witness against himself," U.S. Const., amend. V, and "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).[20] Where an individual feels he "had no real choice but to speak"—and any "reasonable person in [his] position would have felt the same way"—his testimony has been compelled and will violate his Fifth Amendment rights if used against him. *United States v. Stein*, 440 F. Supp. 2d 315, 328 (S.D.N.Y. 2006); *see also United States v. Anderson*, 79 F.3d

---

[19] *See, e.g.*, ECF No. 67 at 11 (June 13, 2017 email to Reeves). In HP's counsel's view, the restrictions are so stringent that they cannot even confirm or deny whether documents exist. *Id.*

[20] Although the government emphasizes that Mr. Hussain is a "*foreign* defendant," there is no doubt that he enjoys the same Fifth Amendment protection as anyone else. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 199 (2d Cir. 2008) ("[I]t does not matter whether the defendant is a U.S. citizen or a foreign national….").

1522, 1526 (9th Cir. 1996) ("The test is whether, considering the totality of the circumstances, the free will of the witness was overborne.") (citing *United States v. Washington*, 431 U.S. 181, 188 (1977)).

Courts have held that the threat of losing one's job or livelihood can be a "powerful form[] of compulsion" and can violate one's Fifth Amendment rights. *See, e.g.*, *Spevack v. Klein*, 385 U.S. 511, 520 (1967) ("The threat of disbarment and the loss of professional standing … is indeed as powerful an instrument of compulsion as 'the use of legal process to force from the lips of the accused individual the evidence necessary to convict him….'"); *Lefkowitz*, 414 U.S. at 85; *U.S. ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974) ("The controlling factor is not the public or private status of the person from whom the information is sought but the fact that the state had involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement."); *Stein*, 440 F. Supp. 2d at 331 (finding that statements made at proffer session were compelled where KPMG threatened to fire defendant-employee and cut off payment of his legal fees).

Here, there is no doubt that the FRC is a quasi-governmental organization that exercises "statutory powers delegated to [it] by the Secretary of State";[21] that it had the power to, and did, require Mr. Hussain to appear before it under threat of disbarment, sanction, or fine; that it insisted that he provide "such information and explanation relevant to any matter under investigation"; that it repeatedly reminded him that he was "required to attend" the interview; and that, as a member of the regulatory body, he was forced to "waive rights and privileges he might otherwise enjoy," including any privilege against self-incrimination. As a result, Mr. Hussain did not have the "free choice to admit, to deny, or to refuse to answer" a question, *Garner v. United States*, 424 U.S. 648, 656–57 (1976), and his statements to the FRC constitute compelled testimony. Allowing the government to access and use those statements—for the stated purpose of introducing them against him at trial, *see* Gov't Mot. at 5:23–24—will violate his Fifth Amendment rights. *See, e.g.*, *Bram v. United States*, 168 U.S. 532, 547 (1897) ("A confession,

---

[21] *See, e.g.*, Keker Decl., Ex. 8 (*FRC Roles and Responsibilities*) at 2.

therefore, whether made upon an official examination or in discourse with private persons, which is obtained from a defendant … by the impressions of fear, however slightly the emotions may be implanted, … is not admissible evidence….") (citations omitted); *Brulay v. United States*, 383 F.2d 345, 349 n5 (9th Cir. 1967) ("[I]f the statement is not voluntarily given, whether given to a United States or foreign officer,— the defendant has been compelled to be a witness against himself when the statement is admitted."); *In re Terrorist Bombings*, 552 F.3d at 188 ("[I]t naturally follows that, regardless of the origin—i.e., domestic or foreign—of a statement, it cannot be admitted at trial in the United States if the statement was 'compelled.'") (citation omitted); *United States v. Allen*, 160 F. Supp. 3d 684, 688 (S.D.N.Y. 2016) (finding testimony "compelled" where witnesses were required to attend U.K.-based interview and holding a two-day *Kastigar* hearing).

In the meantime, if the transcript were produced to the government now, it would taint its ongoing investigation and its preparation for trial. *See, e.g.*, *Kastigar*, 406 U.S. at 460 ("This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."); *see also Allen*, 160 F. Supp. 3d at 695 (two-day *Kastigar* hearing to satisfy court that the prosecution had indeed maintained a "strict and effective wall of separation" from the compelled testimony). Indeed, the government may already have a *Kastigar* problem: what little evidence Mr. Hussain has at this early stage suggests close intra-agency coordination between the government and the FRC. For instance, on November 12, 2013—the very day Mr. Hussain was interviewed—the SEC and DOJ wrote to FRC staff who attended the interview to schedule a telephone call "to discuss all of our respective investigations and the plan going forward."[22]

The government seeks to steer its investigation by exploiting the fruits of an interview that

---

[22] Although Mr. Hussain does not have access to all communication between the SEC, the DOJ, and the FRC, it is clear that these entities maintained frequent contact to discuss their "respective investigations"—including in November 2016, when the DOJ forwarded its recently filed indictment and asked to schedule a call "regarding our respective investigations"; and in March 2017, when the FRC updated the DOJ on its own investigation and promised to "keep in touch during this time."

8
DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION TO ISSUE RULE 17 SUBPOENAS
Case No. 3:16-cr-00462-CRB

it could never have conducted itself—by asking this Court to help it access documents to which it is not entitled under the Federal Rules of Criminal Procedure or the *Jencks* Act.  (This is not the government's first end-run attempt: the SEC and the DOJ have previously asked the FRC and Mr. Hussain to produce this transcript.)  The Court should not endorse those efforts.

### B. The government's request for Mr. Hussain's documents would violate various rights and privileges.

The government's motion also seeks "all documents produced by the defendant to HP." Gov't Mot. at 2:1.  It appears that the government knows little more about these documents than what Mr. Hussain has explained to it in correspondence: that these are documents, including Mr. Hussain's own emails and personal documents, that he was required to produce in foreign civil litigation.  The government moves to subpoena these documents without knowing what they are, and in so doing, its request falls short on several fronts.

First, the government is looking to have HP turn over Mr. Hussain's personal documents—documents that it could not get from Mr. Hussain himself.  The Federal Rules of Criminal Procedure require only that a defendant produce documents that are "within [his] possession, custody, or control" *and* which he "intends to use … in [his] case-in-chief at trial." Fed. R. Crim. P. 16(b).  Most, if not all, of Mr. Hussain's disclosure documents (including the FRC transcript) fall outside that category (and to the extent they do not, Mr. Hussain will comply with his Rule 16 obligations). The government should not be able to circumvent the Federal Rules by exploiting foreign litigation.

Second, Mr. Hussain is entitled to privileges in the United States that he does not enjoy (or the precise contours of which differ) in the United Kingdom: privileges against self-incrimination under the Fifth Amendment and the Act of Production Doctrine; various attorney- and litigation-related protections; and spousal privilege.  He has produced documents to the UK plaintiffs that he would never be required to produce to either the government or in civil litigation in the United States.  As with the FRC transcript, if the government receives and reviews these documents, it will jeopardize not only Mr. Hussain's Constitutional rights—but its entire

9

investigation.[23]

## IV. CONCLUSION

For the reasons set forth above, Mr. Hussain respectfully requests that the Court deny the government's request for subpoenas that would give it improper access to compelled testimony and privileged documents.

Dated: June 29, 2017

KEKER, VAN NEST & PETERS LLP

By: /s/ *John W. Keker*
JOHN W. KEKER
JAN NIELSEN LITTLE
BROOK DOOLEY
KATE E. LAZARUS
NICHOLAS D. MARAIS
IAN KANIG

Attorneys for Defendant
SUSHOVAN HUSSAIN

---

[23] If the Court is inclined to grant the government's request for a subpoena for "documents that [he] produced to HP in the U.K.," Mr. Hussain respectfully requests an opportunity to review those documents to identify any that are privileged under U.S. law but not under U.K. law.