Pages 1 - 118

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE, JUDGE

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
  VS.                           )    No. CR 16-00462 CRB 1
SUSHOVAN TAREQUE HUSSAIN,       )
                                )
          Defendant.            )
_____ )    San Francisco, California
                                     Tuesday, February 6, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          ALEX G. TSE
                        Acting United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                  BY:   **ADAM REEVES**
                        **ROBERT LEACH**
                        **WILLIAM FRENTZEN**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:          KEKER, VAN NEST & PETERS LLP
                        633 Battery Street
                        San Francisco, California  94111-1809
                  BY:   **JOHN W. KEKER, ESQ.**
                        **JAN NIELSEN LITTLE, ESQ.**
                        **BROOK DOOLEY, ESQ**
                        **CODY GRAY, ESQ.**
                        **IAN KANIG, ESQ.**
                        **NIC MARAIS, ESQ.**

Also Present:           **SUSAN D. RESLEY, ESQ.**
                        Morgan Lewis


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

<u>**Tuesday - February 6, 2018**</u>                          <u>**10:00 a.m.**</u>

P R O C E E D I N G S

(The following proceedings were held outside of the presence of the Jury)

**THE CLERK:**  Calling Criminal Action CR-16-0462, USA versus Sushovan Tareque Hussain.  Counsel, please state your appearances for the record.

**MR. LEACH:**  Good morning, Your Honor.  Robert Leach, Adam Reeves and Will Frentzen for the United States.

**MR. KEKER:**  Good morning, Your Honor.  John Keker, Jan Little and Brook Dooley for Mr. Hussain, who is present in court.

And if I could introduce you to four other lawyers that are representing Mr. Hussain who have been working on these motions and will be arguing the motions, or at least some of them.

Kate Lazarus, of our firm.  Nic Marais -- all of our firm -- Ian Kanig, and Cody Gray, who I understand was last year just down the hall working for Judge Seeborg.

**THE COURT:**  Exactly.  Managed to recover from that experience.

**MR. KEKER:**  We'll see, Your Honor.

**THE COURT:**  Okay.  Good morning.  Thank you so much for being here this morning.  I wanted to take care of a lot of things this morning.  But the first one is the Alternate No. 6, Ms. Scheffix, or Scheffy.

1      And I asked the court reporter to give me the excerpt of her

2   voir dire, because, because, indeed, she had not identified this

3   vacation in her -- in her questionnaire.  But she did bring it

4   to the Court's attention in the voir dire.  In the verbal

5   voir dire.

6      And my -- my present inclination is to let her go.  I did

7   find out some other things about it, which was that she did not

8   know about this when she filled out the questionnaire, and

9   apparently in her conversations she had with Ms. Scott, she said

10   that when she got home that day or the next day, her husband

11   said:  I have arranged for a surprise trip to Canada, we have an

12   Airbnb, da, da, da, da, da, da, you know.

13      Look.  Lawyers should take vacations when they can.  I mean,

14   you know.  It's a difficult life being a trial lawyer.  So I'm

15   inclined to let her go.

16      I'm at a particularly awkward position in that the judge

17   announced to everybody that he is going on vacation.  And their

18   schedule will have to accommodate his schedule.  So, you know,

19   unless there's a strong view that I should keep her, I'll let

20   her go.

21     **MR. FRENTZEN:**  No objection.

22     **MR. KEKER:**  No objection, Your Honor.

23     **THE COURT:**  All right, thank you very much.  And I'll ask

24   Ms. Scott to simply give a call to her and tell her that she

25   need not -- she's excused from service.

 1          THE CLERK:  Okay.

 2          THE COURT:  Well, we have a lot of motions.  And I don't

 3     know of any other way simply to go through them all.

 4          MR. KEKER:  Your Honor, did you get -- we filed a list of

 5     them.  Do you have that?

 6          THE COURT:  I do have the list.

 7          MR. KEKER:  Yeah, we filed a pleading that we thought would

 8     help just walk through it.  We served it on the --

 9          THE COURT:  I don't know that I have it.  I do?  Is that --

10          (Document handed up to the Court)

11          THE COURT:  The clerk here has a list.  Oh, okay.

12          MR. KEKER:  You're welcome.

13          THE COURT:  I don't care.  We can go in any order anybody

14     wants to go in.

15          MR. LEACH:  We have no view, Your Honor.

16          THE COURT:  Okay.  So let's go through the order that is

17     suggested by the defendants.  And the -- so the first motion --

18     they approached the government's motions in limine first.  And

19     we'll take that.

20          The first one is to preclude evidence of agency charging

21     decisions.

22          MR. FRENTZEN:  I think that could be a short discussion,

23     Your Honor.

24          They agreed with our motion.  They asked for additional

25     things.  We said:  We're not prepared to commit to that at this

 1  point; file a motion if you want it.

 2      And that's where we are.  So we think the motion should be

 3  granted.

 4      **MR. MARAIS:**  Your Honor, we don't oppose the motion.  I

 5  would just note though that the government's wording in its

 6  original motion was a little loose, and there is no proposed

 7  order.

 8      We had suggested some clarification in our opposition in the

 9  conclusion on Page 4.  The government had some clarification in

10  their reply in the middle of Page 2.  Either of those is fine

11  but the distinction that we were drawing is that we understood

12  the government's motion to be an effort to exclude evidence

13  about charging decisions related to Mr. Hussain, only.

14      And with that, we're fine.

15      **MR. FRENTZEN:**  At this point that's where we are at, that's

16  what we asked for.

17      **THE COURT:**  I'm granting the motion.

18      **MR. FRENTZEN:**  Thank you, Your Honor.

19      **THE COURT:**  Motion No. 2, motion to admit Autonomy Systems

20  Limited restatement.

21      **MR. DOOLEY:**  Good morning, Your Honor, Brook Dooley for

22  Mr. Hussain.

23      **THE COURT:**  Yeah.

24      **MR. LEACH:**  So Your Honor this is a motion to admit a

25  restatement prepared by Chris Yelland and his team, the

successor CFO at Autonomy and one of its subsidiaries.  This
evidence is relevant because it shows the falsity and the
magnitude of some of the statements in the original accounting.
It's admissible as a business record under the leading Ninth
Circuit case in this area, *SEC versus Jasper*.

And for those reasons, the motion should be granted.

**MR. DOOLEY:**  Three points.  Number one, I think the Court at
the very least ought to defer ruling on this until the Court has
heard further evidence that puts the relevance of the
restatement into context and evidence regarding the preparation
of the restatement.

But two substantive points, Your Honor.  The first is the
403 point which is the defendant, Mr. Hussain is charged with
falsifying the accounts of the Autonomy Corporation, a
publicly-traded company operating under the international
financial reporting standards.  The restatement relates to a
different company, Autonomy Systems Ltd. that is not publicly
traded, that doesn't have shareholders, and that operates under
a different set of accounting rules.

Furthermore, the allegations in the indictment allege that
HP relied on the financial statements of Autonomy Corporation,
not Autonomy Systems Ltd.

There is no reference anywhere in the indictment to Autonomy
Systems Ltd. which is the company that restated its accounts.
To the extent that there is any relevance here, Your Honor, it

1    is attenuated and outweighed by the substantial confusion and

2    potential prejudice of introducing these accounts.

3        **THE COURT:**  Well, okay.  The only thing that deserves some

4    further discussion on that is, is whether the restatement is

5    really -- it really isn't apples and oranges.  Is the

6    restatement something other than what were the basic records at

7    issue here?  They say they are.

8        **MR. LEACH:**  And we say they are not, Your Honor.  And the

9    evidence will show that they're not.

10       **THE COURT:**  Okay, that's fine.  So the answer is it comes

11   in.  Number one, I'm not deferring the ruling.  I'm always sort

12   of deferring rulings in the sense that you can, you know,

13   through examination and so forth, if in fact it shows that it's

14   totally improper then I'll take a corrective action.

15       Maybe there's another way of saying it.  It's:  A lot of

16   these things come in subject to a motion to strike.  If it turns

17   out that they haven't laid the foundation or it turns out that

18   it is really an apples-and-oranges case and it's clear that it

19   is, then it's out.

20       But I can't sort of hide -- I can't tie up the hands of one

21   side or the other based upon a theory that ultimately it will be

22   shown to be different.  That is inadmissible.  Or of such

23   marginal relevance that it ought not to be limited -- it ought

24   not to be included.

25       I understand your argument.  I think basically, unless your

1    last argument is the argument, the rest of your arguments that I

2    see here where it basically go to weight, and how much weight do

3    you attribute to it.

4        But based upon their representation -- and I'm accepting

5    their recommendation, for the purposes of the commencement of

6    the trial, the opening statement and to see where we go in the

7    trial.  The trials are always changing things.  And it may be

8    that through examination, you show that this is totally some

9    other animal; I'll reconsider it.

10       So I'm going to grant the government's motion, subject to a

11   motion to strike.

12       **MR. LEACH:**  Thank you, Your Honor.

13       **MR. DOOLEY:**  Your Honor, may I be heard before we finalize

14   this?  I think there is substantial risk of prejudice, if the

15   government is allowed to refer to this in opening statements

16   before any testimony has come in, regarding preparation of --

17       **THE COURT:**  I understand that argument.  And it is with that

18   in mind that I am still allowing it to come in.  Okay?

19       **MR. DOOLEY:**  Thank Your Honor.

20       **THE COURT:**  All right.  Thank you.

21       As to the summary charts --

22       **MR. DOOLEY:**  This is me as well.

23       **THE COURT:**  As to the summary charts, I want to defer on

24   that.  I am -- I am not going to let them in, I'm not going to

25   not let them in.  I want to see whether the foundation has been

1  laid.  I want to see that the underlying information comes in in

2  some form or another.

3      **MR. DOOLEY:**  (Nods head)

4      **THE COURT:**  And then I'll make a decision as to whether or

5  not they come in.  I mean, you know, that old instruction, the

6  summaries are just as good as the underlying evidence, you have

7  to have the underlying evidence in.

8      Summaries are -- and my guess is summaries will be very

9  powerful in this case.  They will carry a lot of -- let's put it

10  this way -- the burden of demonstrating whatever needs to be

11  demonstrated, at least from the government's point of view.

12  Obviously, you will have your own.

13      But, so, it is with some caution that I want to proceed with

14  summaries.  And I don't take the same approach to the summaries

15  that I do with respect to the previous matter.  Okay?

16      **MR. REEVES:**  Understood.  Thank you, Your Honor.

17      **THE COURT:**  Deferred.

18      **MR. DOOLEY:**  Thank you, Your Honor.

19      **THE COURT:**  Okay, that then takes us to preclude evidence of

20  HP's tax treatment.

21      **MR. LEACH:**  Your Honor, throughout this litigation, the

22  United States has heard arguments that, you know, Autonomy

23  acquisition was in part, at best, a scheme by HP to avoid taxes

24  here in the United States.  And at worst, some form of scheme to

25  commit tax fraud here in the United States.  It ties in to a lot

1    of information out in the press right now and in current

2    legislation about whether lots of public companies are hoarding

3    cash in the United States.  It really has -- outside the --

4    outside the United States.  It really has absolutely no

5    relevance to what statements the defendant made to the market

6    and to HP to induce it to go through with this acquisition.

7        It will create a massive mini-trial on the tax implications

8    in Europe, in the United States, that really have no bearing on

9    the ultimate issue in this case.  And for those reasons, we

10   think it is appropriately excluded under 403.

11       **MR. GRAY:**  Thank you, Your Honor.  Just a few points in

12   response.  Cody Gray for the defendant, Sushovan Hussain.

13       Your Honor, evidence of HP's tax treatment of the Autonomy

14   acquisition is relevant to the materiality determination under

15   the wire fraud statute.  It's proper evidence under Rule 403.

16   And at the very least, this Court should defer ruling on the

17   motion until it's had the opportunity to hear from the relevant

18   HP witnesses on the stand.

19       Now, Your Honor, depending on the government's presentation

20   of evidence --

21       **THE COURT:**  Okay, I'll grant you that, I'll defer it.

22       **MR. GRAY:**  Okay.

23       **MR. LEACH:**  Thank you, Your Honor.

24       **MR. KEKER:**  First motion, and I call it a win, Your Honor.

25       **THE COURT:**  That's right.  Don't think this continues, by

1     the way.  You know better than that.  Okay.

2        Okay, next is the co-conspirators' out-of-court statements.

3     How would I -- how am I going to rule on that one?

4        **MR. FRENTZEN:**  I'm sorry, Your Honor, I think it's really

5     the Defendant's statements, for the most part.

6        **THE COURT:**  Defendant's --

7        **MR. FRENTZEN:**  Own statements, is the emphasis.

8        **THE COURT:**  Statements by Hussain and, quote,

9     "co-conspirators."  I don't know.  I'm reading off the

10    defendant's --

11       **MR. FRENTZEN:**  Oh, I got you.  This is our motion in limine,

12    Your Honor.

13       **THE COURT:**  Right.

14       **MR. FRENTZEN:**  It's simply based on 801, that on the

15    definition of hearsay, statements by the defendant or by a

16    co-conspirator are not within the definition of hearsay when

17    offered by a party opponent, us, but are defined as hearsay when

18    offered by the defendant, himself.  That was the simple point of

19    our motion.

20       We're trying to avoid getting offers of statements by the

21    defendant, an effort to admit it as non-hearsay.  They make the

22    point in their opposition that there may be other exceptions to

23    the hearsay rules.  We think that's true.

24       And if, in fact, there are statements offered by the

25    defendant that are his own statements that have a sponsoring

1    witness, and they're able to describe for the Court an exception

2    to the hearsay rule, then that is how trials work.

3        So I think it is a fairly simple motion.  We're just looking

4    to make sure that we, you know, have every opportunity to front

5    that issue and try to avoid the admission of inadmissible

6    hearsay statements.

7        **MR. KANIG:**  Your Honor, the government asked in its motion

8    for a blanket prohibition against admitting Mr. Hussain's

9    out-of-court statements and those of his alleged

10   co-conspirators, and we believe that's premature.  As the

11   government says just now, there may be hearsay exceptions that

12   apply to any of those statements.

13       **THE COURT:**  Okay, I'll defer on that.  I mean, I do think,

14   though, that the government's statement of the law is correct.

15   Okay?  That's number one.  So, in other words, just because a

16   defendant says X, it doesn't come in.  It's not an exception to

17   the hearsay rule.

18       **MR. KANIG:**  We're not arguing that the party opponent

19   exception --

20       **THE COURT:**  There may be other rules, there may be other

21   things, other responses.  I don't know.  Can't decide it, right,

22   right, can't decide it.

23       Now, I do want to -- I do want to just return to the

24   previous statement.  The previous motion.  Which is:  While I am

25   deferring -- this is on -- HP's tax treatment, your win?

1    **MR. KANIG:**  I'm sorry, Ian Kanig for Mr. Hussain.  Thank

2  you.

3    **MR. GRAY:**  Yes, Your Honor.

4    **THE COURT:**  While I'm deferring on that, it would be my

5  expectation that that would not be referred to in the opening

6  statements by the defense.

7    **MR. GRAY:**  That's our expectation.

8    **THE COURT:**  Good.

9    **MR. LEACH:**  Thank you for that clarification, Your Honor.

10  We were going to come back to you about that.

11    **THE COURT:**  Yeah.

12    **MR. LEACH:**  We appreciate that.

13    **THE COURT:**  Yeah, okay.  All right.  Thank you.

14    **MR. KEKER:**  Your Honor, could I ask for a clarification --

15    **THE COURT:**  Yes.

16    **MR. KEKER:**  -- to the opening statement.  If they say that

17  Hewlett-Packard acquired Autonomy, that's not true.  And so,

18  what can I say in the opening --

19    **THE COURT:**  You say that's not true.

20    **MR. KEKER:**  Pardon?

21    **THE COURT:**  You would say that's not true.

22    **MR. KEKER:**  Well, but can I say -- I mean, it's not true.

23  BidCo, who is suing Mr. Hussain and Mr. Lynch in England, BidCo,

24  Cayman Islands, BidCo acquired Autonomy.  So if they're going to

25  say that Hewlett-Packard -- and they've said Hewlett-Packard's a

1   victim, poor Hewlett-Packard, this, this, this, Hewlett-Packard

2   shareholders, if they are going to say that, I should be able to

3   say the contrary, because it is simply not true.

4       **THE COURT:**  Well, first of all, you can certainly -- I don't

5   know that you are asking me, but obviously, if the government

6   says something that you have some disagreement with, of course

7   you can say that.  Now, you know, I can't -- I'm not going to

8   have a dress rehearsal of opening statements here.  And, I'm

9   going to tell the jury, I always tell the jury, opening

10  statements are not evidence.

11      So you have to make a calculated judgment as to -- and you

12  do it all the time -- as to what you put in and what you don't

13  put in.  Because it may be that you're -- at the end, you're a

14  little bit hung to dry because the evidence hasn't come in.

15      And I think the law is -- again, I may be saying more than I

16  have to say -- but I think the law is that if something is

17  represented to occur in the opening statement and then there is

18  a failure of showing it in terms of evidence, I think the other

19  side can comment on it.  I think so.  I don't know, I'm not

20  there yet.

21      But I want to just caution both sides that you have to --

22  you know, you give your opening statement at risk.  At risk.

23  And we're all --

24      **MR. KEKER:**  (Inaudible)

25      **THE COURT:**  -- presumptively grown-ups here, so we are

1    willing to take whatever the risks are involved.  But when I go

2    back to the tax treatment and so forth, it really -- I have to

3    say that I have to be convinced that it is probative and

4    relevant of one of the issues.  The government takes a -- their

5    strong position that it is not.  So it may be, I'm going to

6    defer on it.  But, but I just caution the parties about that.

7         And I also would say, as to that particular issue, it

8    shouldn't be addressed in the opening statement.  Okay?

9         **MR. KEKER:**  Thank you, Your Honor.

10        **MR. LEACH:**  Thank you, Your Honor.

11        **THE COURT:**  Okay.  Finally, motion, blaming the victim.

12   Mr. Reeves.

13        **MR. REEVES:**  Thank you, Your Honor.

14        In this motion, the government is responding to a variety of

15   contentions that the defense has made over the course of this

16   case that have the effect of blaming HP.

17        In our judgment, evidence of a victim's alleged negligence

18   or intentional disregard is irrelevant and unduly prejudicial

19   under Federal Rules of Evidence 401, 402, and 403, and is

20   properly excluded under the ruling by the Ninth Circuit in

21   *United States v. Lindsey*.

22        **THE COURT:**  But isn't it a question of -- as a general

23   proposition, of course you're absolutely right.  But the

24   question is:  How does it come in?  What are they intending to

25   show?

1    I think what they're going to say to me, though I'm

2    anticipating it, is:  It's going to show there was not reliance,

3    okay, whatever that means in the context of this, and then it

4    wasn't -- maybe they're going to say it wasn't material.  So

5    forth.  I don't know quite what it's going to show.

6    I think they can't say or they shouldn't say:  Well, look,

7    Hewlett-Packard was negligent.  They were careless.  They could

8    have done this, they could have done that.

9    I don't know that that's relevant.  That's your point.

10    **MR. REEVES:**  That is my point.

11    **THE COURT:**  So I don't know -- when you say "blaming the

12    victim," I don't know what you're saying.  What are you saying?

13    **MR. MARAIS:**  Well, Your Honor, I'm not suggesting anyone's

14    blaming the victim.  This is the government's motion.  I will

15    note we spent months last year asking the government to identify

16    its victim.  And now they've filed a four-page motion that says

17    "HP" 18 times, so we've learned something.

18    I think that the case that the government relies on here,

19    *Lindsey*, is really beside the point.  As we have set out in the

20    opposition brief, what we need to introduce as evidence is

21    questions that HP asked, questions that they chose not to ask

22    during due diligence.  The negligence in *Lindsey* is post-fact,

23    it is negligence about information that was provided.

24    One of the examples that the government cited in its motion

25    is the idea that HP may or may not have been interested in

Autonomy's hardware sales.  If somebody during due diligence expressed that HP was not interested in Autonomy's hardware sales, well, that is plainly relevant to disproving an allegation, an allegation that's in the indictment, that Mr. Hussain and others concealed hardware sales.

So, Your Honor is obviously right that this goes to reliance and it goes to materiality.  But this is a much more complicated case than *Lindsey* and it also goes to explaining the back-and-forth during due diligence.  I think it's impossible to assess whether an answer that was given, information that was provided, is misleading or a misstatement unless the jury understands what the questions were, what the context was, what Autonomy understood HP to be interested in, and what information it understood HP to be asking for.

So I think Your Honor is right that this needs to be deferred, and assessed as the evidence comes in.

**MR. REEVES:**  I agree with a lot of that.

**THE COURT:**  Good.  Okay, then that will be the ruling.

**MR. REEVES:**  Okay.  I -- if I could just --

**THE COURT:**  I'm just deferring because I think -- I need a context.  I think I need to hear more about it before I can -- before I can --

**MR. REEVES:**  Just two points.

**THE COURT:**  Yes, go ahead.

**MR. REEVES:**  The Court is correct and I accept much of

1    counsel's argument.  We invite a full discussion of all the

2    evidence around the due diligence and the decision-making at HP

3    to acquire Autonomy.  That's fine.

4        It is arguments that go to sloppiness, negligence, lack of

5    care that are improper.  That's Point No. 1.

6        Drawing that line in this case, we accept that's something

7    that should be done over the course of trial.

8        **THE COURT:**  But it could be, it could be.  I just would say

9    this.  Whatever those terms are -- sloppiness, inattention, and

10   so forth -- could be evidence of whether or not they considered

11   it important.  You see.

12       In other words, you could say:  Well, they could have

13   checked this out or they could have checked that out.  And they

14   didn't.  Given fact.  They didn't check out A, B and C.  Okay?

15       Now, why didn't they do so?  Well, one thing is they just --

16   careless.  Two is they didn't care.  It meant nothing to them.

17   So, it's not a question of carelessness; it's a question of

18   indifference.  And indifference may turn to materiality, and

19   maybe other things as well.

20       So I think I need a context in order to rule on it.  Okay?

21       **MR. REEVES:**  That's fine.  Thank you, Your Honor.

22       **MR. MARAIS:**  Thank Your Honor.

23       **THE COURT:**  Thank you.  Turning now to the defense motions.

24       **MS. LAZARUS:**  Kate Lazarus for Mr. Hussain.

25       **THE COURT:**  So this is the motion to exclude 404(b) evidence

1    related to Mr. Khan.  Is that right?

2        **MS. LAZARUS:**  That's correct, Your Honor.  And our first and

3    second 404(b) motions really are on similar grounds.  The second

4    motion relates to termination of certain Autonomy employees.

5    The motion as to Mr. Khan, Mr. Khan was a securities analyst who

6    covered Autonomy and whom, according to the government, had some

7    disagreements with Autonomy management back in 2008.  In both of

8    these cases --

9        **THE COURT:**  Let me, give me a moment, I just want to read my

10    notes on it.

11        **MS. LAZARUS:**  Okay.

12        **THE COURT:**  Then we can --

13        (The Court examines document)

14        **THE COURT:**  Okay, Ms. Lazarus.

15        **MS. LAZARUS:**  The issue with Mr. Khan occurred in 2008 prior

16    to the beginning of the alleged scheme to defraud, and the

17    interactions that are described in Mr. Khan's statements to the

18    governemtn do not involve Mr. Hussain.  Allegedly the CEO of

19    Autonomy made some kind of threat to him in a meeting.

20    Allegedly the COO of Autonomy informed Mr. Khan that he was

21    under investigation by UK regulators.

22        None of these decisions or actions are attributed to Mr.

23    Hussain, who is on trial here.  The government has not charged

24    any -- Mr. Hussain's other colleagues.  So we think this is

25    evidence that's improperly seeking to invite the jury to blame

1    Mr. Hussain for his colleagues' actions.  We think that's

2    prejudicial and inadmissible under 404(b) because 404(b)

3    evidence has to involve the defendant, himself.

4        **MR. REEVES:**  Well, Your Honor, I think it's a little bit

5    more complicated than that.  We do anticipate that Mr. Khan will

6    testify.  I accept the fact that he was excluded in 2008 for

7    criticisms he made in the course of his analysis.

8        But in 2009, he was excluded from a series of the earnings

9    calls that Mr. Hussain and others from Autonomy participated in,

10   and I think for him to explain his return to his analysis, it's

11   going to be necessary to explain why he was excluded.

12       It gets further complicated in the sense that there is

13   another piece of evidence in which the defendant, himself, is

14   joking with his co-conspirators about Cazenove, which is the

15   investment bank that Mr. Khan worked at.

16       And I think this is part of a broader pattern that reflects

17   itself in still more of the evidence that the defense seeks to

18   exclude in the form of retribution and silencing of critics, as

19   exemplified by the testimony of Frank Hogenson.

20       **THE COURT:**  Your argument is basically that it shows

21   Mr. Hussain's state of mind, that actually to take these actions

22   or to participate in these actions or know of these actions

23   relating to Mr. Khan is evidence that Mr. Hussain was aware of

24   the significance of these actions.

25       Is that it?

1      **MR. REEVES:**  That is absolutely correct.

2      **THE COURT:**  That is what I understood it to be.

3      **MR. REEVES:**  You said it vastly better than I did.  Thank

4  you.

5      **THE COURT:**  Well, I don't know that I said it so well, but

6  anyway.

7      **MS. LAZARUS:**  I don't think that any of that points to

8  evidence that Mr. Hussain, himself, was responsible --

9      **THE COURT:**  I don't know.

10      **MS. LAZARUS:**  -- for this conduct.

11      **THE COURT:**  I mean, I don't know.  The question is -- it's

12  actually significant evidence.  The question is whether it will

13  be tied to Mr. Hussain.  I don't know that it will.  I don't

14  know.  I don't know whether a jury could draw a reasonable

15  inference that it was.  That's a question.

16      If they can't, then I think it is prejudicial.  I think it

17  has to be stricken and the jury admonished.  But if a reasonable

18  inference could be drawn from it, then I think it comes in.

19      And again, and why I hate motions in limine is because they

20  ask judges to decide things in vacuums where it's very hard to

21  make that determination.

22      I understand your concern.  But again, we have to just let

23  it flesh out.  And the government represents that they can --

24  that they can make these connections.  Maybe they can, maybe

25  they can't.  Yeah.

1          This is going to be a long trial.  I think that motions to

2    exclude and so forth, to strike evidence and so forth, if I do

3    that sort of thing may have -- I mean, I think the jury will be

4    glad to forget something.  Maybe that's another way of saying

5    it.

6          Anyway, it comes in, subject to a motion to strike.

7          **MS. LAZARUS:**  Your Honor, could I just ask for one point of

8    clarification?

9          Is the standard going to be that Mr. Hussain knew about his

10   colleagues' actions vis-à-vis Mr. Khan, or that he was in some

11   way responsible for them?

12         **THE COURT:**  And the answer to that is I'm not quite sure.  I

13   have to see what it is.  I have to see what the evidence is.

14         I think there has to be some reasonable inference that

15   either, one, he knew, or that the actions, themselves, that is,

16   what they were concealing, themselves, is some evidence of

17   misrepresentation.

18         You know, there are a number of steps here.  They have to

19   show that -- they have to show, I think the government has to

20   show:  What is the reality?  If everything were out in the open,

21   totally reported, clearly defined and so forth, what are the

22   facts?  And then, what did Mr. Hussain know?  And, what did he

23   do?  What did he know, what did he do, and what are the facts?

24   The underlying facts.  Those are all parts of it.

25         And I can't sit here and tell you that, well, it wouldn't

1    come in for this purpose, which is what you are asking me to do,

2    to cabin it in a way.  I don't know that I can cabin it to what

3    exactly did Mr. Hussain know.  Because it may come in for other

4    purposes.  And I have to sort of sit back, let the jury, let it

5    unfold.  And then decide:  Is it a -- you know, what are the

6    reasonable inferences that could be drawn?

7        A little bit -- I understand.  I just can't do it in

8    advance.  So I'm going to -- it's a defense motion.  I'm going

9    to deny the motion, but subject to a motion to strike.

10       And that would also be true -- I guess we should talk about

11   the terminations of Hogenson and Tejada and Prasad.  Because

12   that's another motion, right?

13   **MS. LAZARUS:**  Yes, Your Honor.  Again, it is a similar

14   concern here.  One of the government's witnesses, Mr. Scott,

15   told the government that he, alone, was responsible for the

16   terminations of these employees.  So again, we think that

17   through 404(b) the government's seeking to invite the jury to

18   punish Mr. Hussain for his colleagues' actions.

19       And I also think we have an even more significant 403

20   problem with these terminations because our understanding is

21   that these individuals were terminated because there was payroll

22   fraud going on in their department.  There was an SFPD

23   investigation, there was a jail sentence, there were millions of

24   dollars that were stolen from the company.

25       And if the government's going to introduce evidence that

these people were terminated, we're going to be required to introduce evidence about the reasons why, about this investigation into payroll fraud, and into other policy violations by Mr. Hogenson and his department.

**THE COURT:** That may be true.  I don't know.  Let's hear what the government says.

**MR. REEVES:** We think this was retribution, Your Honor, as to Mr. Hogenson.  There was a payroll fraud.  It is extraneous, based on our investigation, the facts that we intend to prove that Mr. Hogenson was somehow responsible for it.

The sequencing of what happened here is quite important. Mr. Hogenson is a newly arrived CFO as a result of the acquisition from -- of -- Interwoven by Autonomy.  He, over the course of about six to nine months, observes a series of problems that are highly consistent with the allegations in the government's indictment.  He raises this in a whistleblower format to auditors and to the audit committee, et cetera.

Mr. Hussain and others directly engage with him about some of those complaints, and within days thereafter, there is this alleged allegation that Mr. Hogenson is responsible for this payroll fraud.  Which ultimately Mr. Scott attributes as a form of retribution, the firing of Mr. Hogenson was a form of retribution for the whistleblowing.

So, again, it is complicated.  There's a lot of nuance, there are moving pieces.  But I don't see this as seguing into

1    payroll fraud.

2        **THE COURT:**  Well, isn't the answer to all of this that they

3    come in and they say these people were terminated, you know,

4    because they were whistleblowers or that they were aware of what

5    was going on or something in connection with the underlying

6    fraud here.

7        And you say no, no.  They were terminated for other reasons.

8        And you know what?  You might be right.  That's what the

9    jury does.  You know, I mean, unless you were to argue, unless

10   there was just no evidence that somehow a jury could draw a

11   reasonable inference that they were fired because of X, and it's

12   clear that they were fired because of Y, then if that's the

13   case, then of course I would not -- I would have to address

14   that.

15       But the government says no, there will be evidence, and it

16   will be sequential, it depends on the context, dates are

17   important, timing is important and so forth, we'll demonstrate

18   exactly what happened along the lines.

19       Now, they may be right, they may be wrong.  I don't know.

20   We'll see.  Denied.  Thank you.

21       Okay, moving ahead.  The Autonomy correspondence with the

22   FRRP.

23       And by the way, I have no problem, since I'm not so inclined

24   to buy your argument, I have no problem giving a limiting

25   instruction, which I think is important here, that -- to limit

```
1    it that it may not be -- you know, it's not evidence of the --
2    what is it, fraud --
3         MR. LEACH:  Of the crime, it's evidence of intent, motive,
4    et cetera.
5         THE COURT:  That's right.  So if I permit it, it would be
6    with a limiting instruction.
7         MR. LEACH:  Understood.
8         MS. LAZARUS:  Thank Your Honor.
9         THE COURT:  Okay.
10        MS. LAZARUS:  This next motion refers to some letters that
11   were exchanged between Autonomy and regulators in the United
12   Kingdom.  Those letters ultimately did not lead to a complaint
13   against Autonomy or our client so we think it is a distraction
14   and prejudicial and will invite speculation about an
15   investigation that occurred overseas.
16        MR. LEACH:  These are statements by the defendants to his
17   accounting regulator in the UK, relating in part to some of
18   Mr. Hogenson's complaints.  The government intends to prove that
19   some of those statements are false and that the defendant knew
20   they were false.  They were made during the scheme.  The
21   indictment specifically alleges the defendant misled regulators
22   in the UK.  These are the defendant's own statements.  It is
23   hard to imagine something more probative, Your Honor.
24        THE COURT:  I'm going to permit it.
25        Okay.
```

1    **MR. LEACH:**  Thank you.

2    **THE COURT:**  Let's move to the motion to exclude evidence of

3    the FRC investigation.  My understanding is that the

4    government's not going to introduce any such evidence.  Is that

5    correct?

6    **MR. LEACH:**  Your Honor, the government does not intend to

7    introduce evidence of the investigation that the FRC started

8    after the HP announcement of the write-down.  I can imagine some

9    circumstances where witnesses are testifying who are involved in

10   that investigation where the fact of the investigation and the

11   fact that they are witnesses in that investigation could be

12   relevant, but other than that -- to bias and other reasons.

13   Other than that, we have no interest in getting into it.

14   **THE COURT:**  Well, let me pin you down a bit.  Is it your

15   intention with your witnesses to bring out the fact of this

16   investigation?

17   **MR. LEACH:**  No.

18   **THE COURT:**  Or are you saying that it may be that the

19   defense in cross-examination would -- would ask questions that

20   would be relating to bias and prejudice and so forth?

21   **MR. LEACH:**  We have no intention of getting into --

22   **THE COURT:**  Okay, so it really is in your court.  At least

23   that aspect of it.  You know, I don't think that opens the door

24   to everything else and so forth, you know.  It doesn't open the

25   door.  Unless you get into the substance.  If you start getting

```
 1   into the substance then obviously you open the door.  But you
 2   are not going to do that.
 3        MR. LEACH:  I can give an example, Your Honor.  One --
 4        THE COURT:  I don't need an example.  Thank you.
 5        MR. LEACH:  Thank you.
 6        THE COURT:  Okay.  Moving ahead.
 7        Motion to exclude testimony concerning Chamberlain and
 8   Kanter laptops.  The government does not oppose?
 9        MR. REEVES:  Correct, Your Honor.
10        THE COURT:  Granted.  Okay.  Next is a motion to exclude
11   evidence of prejudicial "antics."  The government doesn't
12   oppose?
13        MR. REEVES:  Oh, we oppose.
14        THE COURT:  What are the antics?  What are the antics?  A
15   parody video.
16        MR. REEVES:  I would like to hand up, if I could
17   (Indicating) --
18        (Document handed up to the Courtroom Deputy)
19        THE COURT:  I'm not -- what?
20        MR. REEVES:  Would you like --
21        THE COURT:  This is some parody video that the defendant
22   created?
23        MR. REEVES:  It's a sales video that they play at the sales
24   conference in which the defendant and Dr. Lynch, Mr. Kanter and
25   Mr. Monell (Phonetic) pretend to be American Mafiosos.  And it
```

```
 1   is entirely --

 2        THE COURT:  And it could really offend people.  I mean, I

 3   haven't seen it, but couldn't it really offend people?

 4        MR. REEVES:  I acknowledge that this is a very interesting

 5   piece of evidence.

 6        THE COURT:  Well, call it "interesting."

 7        MR. REEVES:  I suggest the following.  I would like the

 8   Court to look at it.  It is only about four minutes long.  So I

 9   don't think it is going to be easy to rule on this evidence

10   without seeing it.  And I also think this is a very good thing

11   for us to defer to see how they --

12        THE COURT:  Okay, I'll look at it, I'll defer it.  My

13   inclination is not to let it in.  You know -- my inclination is

14   not to let it in, but again, I have to look at it so I'll --

15        MR. REEVES:  Could I offer a couple comments on that?

16        THE COURT:  Yes.

17        MR. REEVES:  There are aspects of the humor that are

18   directly relevant to the trial evidence, like -- my witness

19   stand is over here (Indicating) -- like Cazenove, like Daud

20   Kahn.  There's joking about intimidating a person from Cazenove.

21   Okay?  So that's the defendant there, joking about this.  We

22   have to wait and see how this evidence really develops.

23        THE COURT:  I'll look at it.

24        MR. REEVES:  Okay, good.

25        THE COURT:  I'll look at it.
```

1        **MS. LAZARUS:**  We would just note our disagreement of your

2   characterization of the evidence.  It's a comedy video.  It's

3   very light on specifics about anything, much less anything

4   relevant to this case.  It's purely entertainment.

5        **THE COURT:**  I think this is a classic document.  Whether the

6   probative effect outweighs its prejudicial nature -- because I'm

7   always concerned about jokes.  Obviously, I'm not concerned

8   about my jokes, though I should be.  But I'm concerned about how

9   it's all taken by people who don't think anything is funny.  You

10  know.  And I'm sure there is -- most of this case is not funny.

11  Especially to the parties.  And I appreciate that.  So, and

12  we're giving the jury a serious matter.  So, I'm just -- I'm

13  concerned about introducing this sort of thing.  I'll look at

14  it, though, because it does -- if it shows an attitude -- as an

15  example, a statement is made that shows an attitude towards an

16  -- an issue here, it could be relevant.

17       **MR. REEVES:**  I think that's exactly right.

18       **THE COURT:**  There may be ways to -- if it -- number one,

19  we'll have an argument about that before it comes in.  Number

20  two, there may be ways to sanitize it, if it even does come in.

21  Okay?

22       (Off-the-Record discussion between counsel)

23       **MR. REEVES:**  Can I just confer for one second?

24       **THE COURT:**  Yes, conference.

25       (Off-the-Record discussion between counsel)

1    **MR. REEVES:**  Okay.  First, thank you, Your Honor.  The

2    government is sensitive to this evidence.  You know, I

3    understand the Court's comments.

4        And there's one other piece of substance that I would like

5    to alert the Court to in the video.  And that is Mr. Hussain

6    functioned as the *de facto* head of sales at Autonomy.  That is

7    what the government intends to prove.

8        And I think there will be abundant evidence showing that.

9    That he may have had the title of "CFO," but he was really

10   running, on a day-to-day basis, the sales operation for this

11   company.  And that is clearly collected and fully corroborated

12   in the video.  That is the source of the humor in the video, I

13   would say.

14       So again, depending on how the evidence unfolds, there could

15   be lots of ways in which this becomes relevant, responsive.  And

16   I think it is appropriate, as the Court has said, for the Court

17   to review it in advance, and see how the evidence develops at

18   trial.

19   **MS. LAZARUS:**  We just submit that we don't believe the video

20   proves any such thing.  But in any event, there are any number

21   of Autonomy witnesses who are going to testify.  So if the

22   government needs evidence of the role that Mr. Hussain played, I

23   don't think they need to get it through a highly prejudicial

24   video in which the defendant is dressed up as a member of the

25   Mafia.

1    **THE COURT:**  Okay.  Got it.

2    **MR. REEVES:**  Thank you.

3    **MS. LAZARUS:**  Thank you.

4    **THE COURT:**  So now we are -- motion to exclude aspects of

5    Steven Brice's testimony.

6    **MR. GRAY:**  Yes, Your Honor.  Your Honor, there are two

7    issues with respect to the government's accounting expert,

8    Mr. Steven Brice.  First, he asserts that Autonomy's accounting

9    was incorrect for 67 transactions but he only disclosed analysis

10   for 22 of them.  And he provides no explanation, much less

11   conducts any analysis to demonstrate that the 22 transactions he

12   examined are somehow representative of the larger group of 67.

13   Second, Your Honor, Mr. Brice --

14   **THE COURT:**  So why isn't that -- why isn't that something

15   that is subject to appropriate cross-examination?  I guarantee

16   you, the government believes that the witness will say why those

17   22 are representative, right?  Or whatever that number is.

18   **MR. LEACH:**  Yes, Your Honor.

19   **THE COURT:**  Okay.  So they'll say that.  Now, my question

20   is:  Yeah, and you disagree?

21   **MR. GRAY:**  Yes, yes, Your Honor, we disagree.

22   **THE COURT:**  All right.  Well, that is called

23   cross-examination.  Isn't it?

24   **MR. GRAY:**  Well, Your Honor, under Rule 702 they have to

25   demonstrate that Mr. Brice's opinion is based on the product of

1    reliable principles and methods, and reliably apply those to the

2    facts of the case to support this opinion that 67 transactions

3    were improperly accounted for.  There is no analysis of 45 of

4    those transactions at all.  And we can't effectively

5    cross-examine them or the government's accounting expert without

6    any indication of what the accounting analysis was.

7        **THE COURT:**  Actually, I don't understand that.  If it's

8    inadequate, if they don't lay an appropriate foundation, why

9    can't you demonstrate that it is inadequate and they haven't

10   laid a proper foundation?  I mean, in a sense it is almost like

11   a *Daubert* hearing.

12       You know -- I think that I'm concerned about, you know, sort

13   of seriatim hearings here where, you know, where we're going to

14   stop the trial and bring into question something that, you know,

15   isn't -- that -- that something is simply going to -- for the

16   purposes of a delay or sort of like discovery and so forth.

17       But, go ahead.

18       **MR. GRAY:**  Well, Your Honor, it's not enough that -- the

19   opinion itself is just not supported by any analysis.  And so,

20   it wouldn't be proper to allow the expert to offer the opinion

21   that there was 67 transactions that were improperly accounted

22   for.

23       Your Honor, I also want to talk to you about the list of

24   Autonomy's top contracts and top customers.

25       **THE COURT:**  Before we get there, let's try to finish this

1    point.

2        **MR. GRAY:**  Sure.

3        **MR. LEACH:**  This is about notice, Your Honor.  This is

4    contending that they don't have notice about what Mr. Brice is

5    going to testify about or the transactions that he thinks are

6    inappropriately accounted for and will offer opinions on.

7        For example, he has five categories.  And by the way, there

8    is a 95-page report summarizing what his opinions are, putting

9    transactions into various buckets.

10       An example is one category, he will testify his opinion that

11   22 hosting transactions are inappropriately accounted for

12   because it's basically accelerating revenue.  He has an opinion

13   on that.  He's expressed it.  He's given his three examples of

14   why these 22 fall into that category.  And they have notice.

15   And they have cross-examination.  This is -- this is -- this is

16   about notice.

17       **THE COURT:**  I really do think it goes to weight, and not to

18   admissibility.  If it turns out that you are right that there is

19   nothing there, there, to allow that, quote, in your view, leap

20   from X to Y, then I can take action at that time.

21       **MR. GRAY:**  Your Honor, I do want to push back, though, a

22   little.  This is not about notice.  This is about the fact that

23   there is no underlying analysis to support the opinion.  So --

24       **THE COURT:**  Frequently there isn't, is there?  I mean in a

25   sampling, there's not going to be an analysis of the non-sampled

1  matters.

2      Are you saying that for the 22 matters or whatever they

3  picked, there's no discussion of what was relied upon?

4      **MR. GRAY:**  No, they have disclosed a range of documents that

5  the expert consulted, but there is no analysis to support the

6  extrapolation from 22 observations to 67.

7      **THE COURT:**  Well, they are going to have to justify it.  And

8  if they don't, they can't -- they tell me they can.  I don't

9  know.  If they don't and you are saying they won't be able to,

10  fine.  Then I can stop him, dead in the water.

11      **MR. GRAY:**  Okay.

12      **THE COURT:**  Okay?

13      **MR. GRAY:**  Sure.

14      **THE COURT:**  But I'm not going to stop them in advance dead

15  in the water, and I'm not going to have a *Daubert* hearing on it,

16  because it doesn't seem appropriate.

17      Now we are on to the top 40.

18      **MR. GRAY:**  Yes, Your Honor.  The second issue, Mr. Brice's

19  discussion of the lists of Autonomy's top contracts and top

20  customers should be excluded because it's not expert opinion.

21  His analysis entails nothing more than simply comparing two

22  spreadsheets or two lists with his eyeballs, and simply noting

23  the apparent omissions.  That is not an exercise that requires

24  any demonstrable expertise.  It's certainly not an exercise that

25  lies beyond the province of an ordinary juror.

1          And in addition, it would be unfair to permit Mr. Brice to

2     offer that testimony as an expert because it would lend his

3     views unmerited creditability and weight.

4          For those reasons, I would ask that Mr. Brice not be allowed

5     to opine about the lists of Autonomy's top contracts and top

6     customers.

7          **MR. LEACH:**  This is complicated evidence, Your Honor.

8     Without summaries, without some analysis of what these very

9     complicated documents mean, it becomes very difficult for people

10    to follow and to understand.  I'm not sure exactly what bucket

11    this falls into.

12         But we are perfectly fine with an instruction that says:

13    This aspect of Mr. Brice's testimony is not expert testimony;

14    you shouldn't lend any weight to his status as an expert because

15    of that.

16         But it's critical to find a way to --

17         **THE COURT:**  Well, I'm a little confused here.  I was with

18    you until you said it's not part of his expert testimony.

19    What's he doing?  You are either an expert or you're a

20    percipient witness.  You're not -- you are not a volunteer to

21    opine on -- you know, you don't come in off the street:  Well,

22    let me tell you what I think.  You know, that is not who what

23    this is about.  So I'm confused.  Maybe regroup on that one,

24    because that doesn't make sense to me.

25         (Off-the-Record discussion between counsel)

1    **MR. GRAY:**  Your Honor, this is a very important part --

2    **THE COURT:**  What I don't understand is why an expert can't

3   give -- say:  By way of example, I want to say let's take these

4   20 customers, or 40 customers, or whatever it is.  This is --

5   and here they are.  Looking at the records, that's what I glean,

6   that they're the top 40 customers.  Now, let me tell you

7   something about them in terms of the accounting.

8        And he says:  Da, da, da, da, da, da, da.  And he gives his

9   opinion that there was -- where -- why it's significant.  Maybe

10  it's not. I don't know.

11       So I think it is a question of -- it's -- isn't it by way of

12  example to illustrate his expert opinion as to whether something

13  occurred or not?  I thought it was.  But if you're telling me

14  it's not --

15   **MR. LEACH:**  I have no desire to bolster this evidence

16  through an expert opinion, Your Honor.  We have other means to

17  get this in, and so we're perfectly fine if this aspect of

18  Mr. Brice's work does not come into evidence through him.

19   **THE COURT:**  Fine, they're agreeing not to do it.  Thank you,

20  you won.

21   **MR. GRAY:**  Thank you, Your Honor.

22   **THE COURT:**  That's two out of three.

23   **MR. GRAY:**  Two out of two.

24   **THE COURT:**  How many?

25   **MR. GRAY:**  Two out of two.

1    **THE COURT:**  Two out of two, I don't think so.  You only won

2    half of that one.  I'll give you 1.5.  All right.

3    Finally, and that's the wrong word to use here, we have the

4    defense motion for discovery.

5    **MR. KEKER:**  There's really two of them.  We filed one on

6    December 8, and we filed another one in January.  And I'm -- the

7    first one --

8    **THE COURT:**  Which one are we now -- what is it that you want

9    to discuss?

10    **MR. KEKER:**  The first one I want to talk about is --

11    involves *Brady/Giglio* issues for credibility.  And what I want

12    to tell the Court is that the government's prime witness,

13    Stouffer Egan, CEO of the Americas of Autonomy Corporation, who

14    did most of the deals that you are going to hear about, Stouffer

15    Egan coming to people and doing things.  He has been interviewed

16    four times by HP lawyers.  He's been interviewed, that we know

17    of, eleven times by the government.

18    The breadth of the interviews has resulted in a radical

19    change in his testimony over time.  And it has resulted in an

20    extraordinary deferred prosecution agreement which he finally

21    got when they got his -- when his testimony got straight so the

22    government wanted to give it to.

23    Him.  And what's extraordinary about the deferred

24    prosecution agreement is that they have attached his script.

25    Exhibit B says if you want to keep your -- you know, you have to

1    do what we -- what we tell you in the deferred prosecution

2    agreement, and here's how you are going to testify.

3        So it's got a script attached to it.  Needless to say, we'll

4    bring all of that out on cross-examination.

5        We are seeking as *Brady/Giglio* material, given this

6    extraordinary cooperation with the government, a list of all the

7    meetings that they have had with him or his counsel --

8        **THE COURT:**  They?

9        **MR. KEKER:**  "They" being the government, the prosecutors,

10   the meetings that they're having with him that aren't recorded

11   in a 302.  If we have got a 302 or if we have got --

12       **THE COURT:**  I'm sorry, let me just get his -- I need to know

13   exactly what you want.

14       You want the government to provide you with a list of

15   meetings that they had with -- now, is it with the witness?

16   With Hewlett-Packard?  With the attorneys for Hewlett-Packard?

17       **MR. KEKER:**  No, with Egan and his counsel.  His counsel is

18   Mr. Ehrlich, Miles Ehrlich.

19       **THE COURT:**  So you want a list of all the times that they

20   met with the witness and -- who is accompanied by his counsel or

21   not accompanied by his counsel.

22       **MR. KEKER:**  Correct, but we know of 11 of them because we

23   have got 302s.  What we are asking for are the meetings where we

24   don't know there was a meeting, and how long it lasted.

25       For example, we would like to know, because his testimony

has changed over time, we would like to know what meetings were held with -- maybe with his counsel, because that's the way this works.  The government says:  We're very dissatisfied with what he's saying, we think he's liar, go back and -- blah, blah.

And then the next time the guy comes in who wants a deferred prosecution agreement or immunity, all of a sudden his testimony is different than it was before, and is more in line.

We can't get at that with him because of the attorney/client privilege.  But we certainly can bring out to the jury the series of meetings that we are concerned about.  And if any notes were taken at those meetings we would like them.  And we'd also like -- not "like," we're asking for all drafts of this deferred prosecution agreement which includes the script that's in the back, in Exhibit B.  "Here's what you are supposed to say."

We would like to see how that developed.  And we believe that's is *Brady/Giglio* material.  And then we would like, of course, any agreements that or promises that have been made to Mr. Egan or his counsel that aren't revealed in the deferred prosecution agreement.  And we would like as they go into trial preparation -- I'll explain this separately.

We would like that basically for all the other witnesses too, because there is something extraordinary going on here, Your Honor, in my experience.  They are giving the lawyers for the witnesses whom they have immunized and made agreements with,

1 they are giving the lawyers for the witnesses the 302s and the

2 witness interviews that -- that we have, too, to make sure that

3 the lawyers know what their clients have said before, according

4 to the FBI agent who wrote the 302 or the lawyer for

5 Hewlett-Packard who wrote the memo.  And they're giving them to

6 them with a request that the lawyers don't show these to the

7 client.

8   Well, okay.  Fine.  I'll assume that the lawyers are abiding

9 by that.  But there's nothing to keep them from saying:  Here's

10 what the 302 says, here's what you -- they say you said before.

11 Here's what -- here's -- no, you can't say that, as I prepare

12 you for testimony you can't say that because this is what the

13 FBI guy wrote down before.

14   We should get all of that under *Brady* and *Giglio*.  They have

15 provided us in the main with a -- let's back the truck up and

16 dump it all and you find the *Brady/Giglio*, which is fine.  I'm

17 not complaining about that.  We are.

18   But this, we can't get at.  And it is clearly evidence that

19 goes to the credibility of these witnesses.  Or could.

20   **MR. REEVES:**  I think we produced a lot of this stuff,

21 Your Honor.  And I think the Court was exactly right to be

22 specific in the questions.

23   I'm not aware of any meeting with Mr. Egan for which there

24 is an, A, FBI 302 report which has not been produced.

25   We have gone further, although not required to do so by

Rule 16.  I have produced my notes, my work product, made it available to the defense to review of my meetings with Mr. Egan. Okay.  We have gone further still.  We have produced emails of our email dialogue with Mr. Egan's counsel.  They can glean from those if they wish, if it is relevant to them, meetings that we have had with counsel.

I will not, unless the Court orders me to do so -- and I ask you to please not do that -- I will not prepare a list of the times I met with Mr. Egan's counsel or spoke to them on the telephone.

And otherwise, all the information that counsel is seeking has been produced.

**MR. KEKER:**  So this, this ought to be granted, and, and to the extent it turns out later that Mr. Reeves has forgotten some of these things, then it's on him.  This ought to be granted. This is why we asked for a *Brady* order.

**THE COURT:**  I'm not quite sure, but I think what you are saying is what I should grant is an order directing the government to produce all *Brady* and *Giglio* material.  That is what you are asking.

**MR. KEKER:**  Yes, and I'm asking specifically under *United States versus Agurs* for these things about, about when they meet with witnesses --

**THE COURT:**  But that's -- the problem I see is that if, for example, the government had a conversation with Lawyer X on a

 1    particular day, and they haven't disclosed that to you, you

 2    would argue that that's -- that that's a failure to disclose

 3    potentially *Giglio* or *Brady* material.

 4        **MR. KEKER:**  We would.

 5        **THE COURT:**  Right.  I think that really invites, it takes an

 6    event.  And it charges it in a sense that it's a *Brady-Giglio*

 7    event, when I'm not sure it is at all.  I'm just not sure it is

 8    at all.

 9        So you could say the way to be cautious about this -- I

10    appreciate it -- is to tell us all the events, and then we can

11    make a determination whether it is *Brady* and *Giglio*, because it

12    could be.  And the answer is yes, it could be.  I understand

13    that.

14        But to burden the government, especially in an investigation

15    of this type, in which it was far-reaching, existed over two

16    years, involved -- I don't need to exaggerate, but my guess is

17    hundreds, perhaps even a thousand contacts with various counsel,

18    parties and so forth, over the period of time, and to charge

19    them with a potential *Brady* violation, if they failed to

20    disclose the contact, seems to me an enormous burden to put on

21    the government, and one that I'm not willing to do.

22        I am willing because of course you have to, and it's

23    appropriate, to say:  Look.  You had a contact with Witness X.

24    Why -- and in that process, there was *Brady* or *Giglio* material

25    created.  You didn't turn it over.  That's a violation.

1          Yes, indeed.  That could be a violation.  Whether it's a

2    material violation or not depends on what it is.  But I'm not

3    going to enter an order, I'm not -- though I understand your

4    concern, I'm not going to enter an order.  They have their

5    obligation.  If it turns out that they haven't fulfilled their

6    obligation, obviously I'll deal with it.

7          And I would also say, in the context of this case, a lot of

8    material was turned over.  Counsel has been able to devote

9    substantial resources to the development of the defense case.

10   Witnesses will be brought forward.  Cross-examination will be

11   expansive.  And full.

12         I would be surprised -- though I'm always surprised, but I

13   would be surprised if, in fact, the defense couldn't ferret out

14   a *Brady* violation or a *Giglio* violation if it occurs.  Now, I

15   understand "How do you know about something that you don't know

16   about?" is always a problem.

17         But the contrary is:  Well, the government has to say what

18   they did at every moment of their investigation, who they talked

19   to, and exactly what was said.  And I think that side of the

20   equation places too much of a burden on -- on the government.

21         **MR. KEKER:**  Let me back off --

22         **THE COURT:**  And I also would say I don't know of any

23   authority to support that type of order --

24         **MR. KEKER:**  Let me back off about everybody except Mr. Egan.

25   You have just been told that all the contacts that they have had

1    have been reported to us.  That doesn't seem like too much of a

2    burden.

3        Mr. Egan is a terribly important witness.  If they are going

4    to be meeting with him between now and the evidence, before now

5    and his testimony, the U.S. Attorney manual and the FBI follows

6    a procedure, I believe, that if nothing new comes up in a

7    meeting, they don't make a 302 of it.

8        So they can sit for hours with Mr. Egan, and work with him,

9    and if their position is:  Well, nothing here is new; there's no

10   report of it.

11       We ought to be able to find out with respect to Stouffer

12   Egan who has this extraordinary DPA --

13       **THE COURT:**  What that does essentially is puts you in the

14   room, because why do a 302?  Lets tape-record it.  Let's make

15   sure we are completely accurate, completely complete.  It

16   basically puts the defense in the room with the government as

17   they are preparing their witnesses.

18       **MR. KEKER:**  Well, no --

19       **THE COURT:**  Well I think it does.

20       **MR. KEKER:**  At least I know --

21       **THE COURT:**  Oh, you will know if they meet.

22       **MR. KEKER:**  How will I know?

23       **THE COURT:**  You simply ask.

24       **MR. KEKER:**  Ask Mr. Egan?  I don't trust Mr. Egan to tell me

25   any- -- "I've met with the government a lot.  I don't remember.

1    I'm sure, I mean, yes, we did meet, but I don't know how long it

2    was, I don't remember."  We are not --

3        THE COURT:  He's already had 11 meetings or something like

4    that.

5        MR. KEKER:  I agree.

6        THE COURT:  Pardon?

7        MR. KEKER:  I agree.

8        THE COURT:  I mean, oh, 15?  Oh, 20?

9        MR. KEKER:  How do we get to 15 or 20?  That is what I want

10    them to they will me.

11        THE COURT:  Well, ask the question.  It seems -- if I hear:

12    "Gee, I don't recall, I have no idea how many times I met with

13    them in the month of February," I may take some action.  I may

14    request the government to disclose that information to you.

15        Okay.  Moving ahead.

16        MR. KEKER:  All right, separate issue, completely separate

17    from what we were just talking about, Your Honor --

18        THE COURT:  Yes.

19        MR. KEKER:  -- is this issue of notes.

20        Mr. Reeves just told you that he has disclosed to us the

21    notes.  The way we get these notes, of which there are 4,000

22    pages, and we're still -- we got some more in December, we got

23    some more in January.

24        We appreciate being able to see the notes, but we have to go

25    to the U.S. Attorney's office, make an appointment, have

1    somebody go down there and read the notes and take whatever

2    notes we take.  It is absurd, and it's not going to work during

3    the trial.  You know from trying cases that something that

4    wasn't important before, or you want to go back and check, and

5    you want it, that's why we have all these documents.  We have a

6    protective order.  We have asked them over and over again to let

7    us copy those notes and put them in our office and files and so

8    that we can use them in the middle of the night when we're

9    preparing cross-examination.  And they won't do it.  They say:

10    No, you've got to come to our office.

11        We ask you to order them to let us have copies of those

12    notes.

13        **MR. REEVES:**  When we invited them to review these notes, I

14    -- I know in my dialogue with counsel on this topic, I invite

15    them to bring a Dictaphone.  I expect them to take detailed

16    notes.  It is their work product.  I'm making our work product

17    available to them.

18        It is -- we are going above and beyond.  They have already

19    come in twice and done it, at length.  They got 12 lawyers --

20        **THE COURT:**  These are exactly the sort of discussions I

21    don't particularly want to get too engaged in.  Take notes.  You

22    have -- your struggling firm can possibly --

23        **MR. KEKER:**  It's not --

24        **THE COURT:**  Like the new kid, you know, send him out.  He

25    knows where the federal building is.

1     **MR. KEKER:**  They can't take notes --

2     **THE COURT:**  And send him out, have him sit there taking

3  notes and talking into a --

4     **MR. KEKER:**  They can take notes all they want, and it

5  doesn't do me --

6     **THE COURT:**  Yeah, but --

7     **MR. KEKER:**  -- who has to be on his feet with a witness any

8  good when I need to check or look into something.  This is

9  slightly absurd.  It is a burden --

10    **THE COURT:**  But they have given you something that I don't

11 think I would have ordered.  Okay?  They have gone, taken that

12 step.  Now, your complaint is:  Well, it's not as helpful -- and

13 true -- as if they simply just shipped them all off to me.

14    And I would say, I would say, I just don't have a lot of

15 sympathy for that argument.

16    **MR. KEKER:**  Your Honor --

17    **THE COURT:**  Anyway, let's move on, because I do have some

18 sympathy for other arguments that I think you will find more

19 interesting than the one that we are now pursuing.

20    **MR. KEKER:**  Okay.

21    **THE COURT:**  Here we are.

22    **MR. KEKER:**  Yes, sir.

23    **MR. REEVES:**  Thank you, Your Honor.

24    **THE COURT:**  Okay.  So --

25    **MR. KEKER:**  Do you want to go to -- the next one is the

 1  defense motion on Rule 16 *Brady* and *Giglio* for other matters.

 2  There's another discovery motion.

 3      **THE COURT:**  We didn't just talk about that?  What are we

 4  talking about --

 5      **MR. KEKER:**  No, this is different.

 6      **THE COURT:**  Okay, go ahead.

 7      **MR. LEACH:**  This is II B under the defendant's Document 227.

 8      **THE COURT:**  Well, I thought we also were talking about

 9  *Brady* and *Giglio* material.  I mean it was my -- you have now

10  heard what my view is about issuing orders and so forth with

11  respect to *Brady* and *Giglio*.

12      Is there anything left to discuss that would be different

13  from what I have just discussed?

14      **MR. KEKER:**  Well, I don't know, Your Honor.  I mean --

15      **THE COURT:**  Well then, let's go.  Go ahead.

16      **MR. KEKER:**  There is four examples that we have said is why

17  we need a *Brady* order but the examples, the specific examples

18  are:  The SEC and the Department of Justice investigated, or at

19  least the SEC investigated and we believe the Department of

20  Justice investigated HP for making false statements in November

21  of 2012, more than a year after the merger when they said:  Oh,

22  my Lord, we have been defrauded to the tune of $5 billion.

23      They have no basis for saying that.  Their own accountants

24  said:  You don't have a basis for doing that.  And disavowed it.

25   We want to know what happened to that investigation, what the

1    deal with HP was that was struck, how does it affect the

2    credibility of Hewlett-Packard witnesses.

3        So that's one.

4        So the request is for all communications from witnesses or

5    lawyers connecting, amplifying -- or excuse me, that's one.

6        The second is:  Hewlett-Packard and its lawyers and

7    accountants -- and the accountants are PwC which Juror No. 1's

8    wife works at (Indicating) -- role in the preparation of the

9    Brice report.  They're telling us about the triangulization

10   going through the government.  We want to know what direct

11   contact there was between Hewlett-Packard and its agents, Morgan

12   Lewis & Bockius and --

13       **THE COURT:**  Well, its agents.  That's a review.

14       **MR. KEKER:**  I mean, lawyers and accountants.

15       **THE COURT:**  Yeah.

16       **MR. KEKER:**  HP and its lawyers and accountants helping Brice

17   prepare his report.  Same thing with Yelland.  What

18   involvement -- Yelland is the one who says:  PriceWaterhouse

19   prepared these summaries for me that I want to testify about.

20       **THE COURT:**  Okay, now, why is that?  First of all, it seems

21   to me it is subject to cross-examination.  But why is that

22   within the government's --

23       **MR. LEACH:**  I have produced the government communication

24   with Morgan Lewis; I have produced the government's

25   communications with HP.  We have produced the government's

1   communications with Mazars and Mr. Brice.  We have no additional
2   information to disclose on that topic, Your Honor.
3        **THE COURT:**  Okay.  What about the first one?  The first one
4   being the government's investigation of Hewlett-Packard with
5   respect to statements that it made in connection with the
6   Autonomy acquisition.
7        **MR. LEACH:**  I understand what the defense is asking for,
8   Your Honor.  We have produced any communication between the SEC
9   and a third party.  We have produced or made available all of
10  the notes that the SEC lawyers took during interviews.  We have
11  produced all of the statements made by witnesses to the SEC.
12  We've even produced SEC work product to the defendants,
13  including the SEC's action memo, including PowerPoints
14  summarizing its evidence.
15       The small category that we have not produced is exclusively
16  internal SEC dialogue about its investigation, which is entirely
17  derivative of all of its interactions with third parties, and
18  entirely duplicative of the massive amount of information that
19  we've given to the defense.
20       If there's something that they think we're missing, I invite
21  direction on this point.  But honestly, given the volume that we
22  have produced to them, I have no idea what they're looking for.
23  And I have no idea how what an SEC lawyer tells to another SEC
24  lawyer could be *Brady*, *Giglio* or *Jencks*.
25       **MR. KEKER:**  There was an investigation of Hewlett-Packard's

1    false statements in November -- I mean, that they were made by

2    Meg Whitman in 2012.  What happened to that investigation?

3    Where are the records, where are the memos?  We haven't gotten

4    anything about that.

5        **THE COURT:**  Well, what they're saying, what I hear counsel

6    saying is -- he's not saying there aren't memos.  He's not

7    saying there isn't a discussion among SEC attorneys as to what

8    the appropriate course of action is.  To the contrary, he's

9    saying, as I read it, of course there are memos.  Of course

10   there is a decision.  They made a decision.  I don't know what

11   -- X, Y, Z, whatever it was.

12       Well, of course, they made their decision based upon any

13   number of things, including the advice that they get from the

14   lawyers who work there.  That, in my view, is protected.

15       But they have gone further to say:  We're not saying the

16   investigation's not relevant.  We've given you -- whatever

17   counsel has said we've given you.  But we're not -- what we've

18   carved out are the internal memoranda among SEC counsel which

19   led up to the decision, whatever that decision was.

20       Fine, they don't have to turn that over.  And he, government

21   counsel understands that that's what you are seeking.  And if

22   you are not seeking -- if you are seeking that, it's denied.  If

23   you are not seeking that, then I don't know what else you are

24   seeking.

25       **MR. KEKER:**  We're seeking -- *Brady* and *Giglio* go to

1    information, Your Honor.  Not just documents, not internal

2    documents; they go to information.  What happened to these

3    investigations?  What did DOJ do about it?  What did the SEC do

4    about it?  Tell us that.  Why did HP get off the hook?

5        **THE COURT:**  Okay, why did they get off the hook?  They may

6    have gotten off the hook, I don't know if that is correct or

7    not, because one lawyer in the SEC feels they should get off the

8    hook or that it means this or that or it doesn't give -- doesn't

9    attribute wrongdoing to A, B, C, D, Fact A, B, C, D.  I think

10   actually we're all communicating, we all understand what you

11   want.  And I'm not going to give it to you.

12       Okay.  Moving ahead.

13       **MR. KEKER:**  Okay.

14       **THE COURT:**  Okay.  Anything else in that collection?

15       **MR. KEKER:**  This is where I raise the issue of the evidence

16   and witnesses correcting their 302s.  I do find it extraordinary

17   that all these lawyers for witnesses who are being prepared to

18   testify are getting the 302s, can go over them carefully, can

19   check with their clients --

20       **THE COURT:**  And to all of that, I think I want to hear what

21   the cross examination is on this.  I don't know -- you know, we

22   could be endless.  In any investigation that takes years, we

23   could be involved in an endless trial of trying the

24   investigation.  And that's not what we're doing, in my view.  We

25   are not trying -- the investigation is the investigation.  It

1    was either adequate or inadequate.  It was either appropriate or

2    inappropriate.  But that's not on trial.

3        Though, I'm not saying that the defense can't raise issues

4    as to the adequacy of the investigation.  If it's appropriate

5    cross-examination.  And it seems it might be, with respect to

6    particular witnesses.

7        **MR. KEKER:**  Your Honor as a just jury-trial matter, the idea

8    of getting up and conducting tedious cross-examination of each

9    witness about when you met, what you did, like a deposition, is

10   something that is a non-starter in a jury trial.  Their

11   obligation is to tell us information that is covered by *Brady*

12   and *Giglio* ahead of time.  It's not for me to have to

13   cross-examine the witness --

14       **THE COURT:**  And either they will have done it or not.  I

15   understand that.  And I understand --

16       **MR. KEKER:**  And we will probably never find out what they

17   didn't give us, is what I'm saying.  And so they have got --

18   they have got a setup --

19       **THE COURT:**  Your answer to that complaint -- if I

20   understand, the answer to that complaint is take the entirety of

21   the investigation, and document it, and, and, and disclose it on

22   a -- like a day-to-day basis.

23       **MR. KEKER:**  That's not what we're asking for.

24       **MR. LEACH:**  It's exactly what they're asking for,

25   Your Honor.

1    **MR. KEKER:**  Excuse me.

2    **MR. LEACH:**  In their motion, they are saying we met with

3    witnesses last week.  "Where is the 302 for that?  Tell me how

4    long that meeting lasts."

5    That is exactly what they are asking for.  And it is exactly

6    the assumption that the government is not going to prepare a 302

7    in the ordinary course of what it does.

8    **MR. KEKER:**  That is exactly what we're talking -- we are not

9    talking about going through your whole investigation.  We are

10   saying:  When you met last week with a witness, and the witness

11   said "The witness statements you sent me are wrong," tell us.

12   Write it down.  Do something.  Give us notes.  Tell us.

13   **THE COURT:**  I got it.  I have to make a decision here.  It

14   has to be tried in my lifetime.  It will be.

15   **MR. KEKER:**  Well, that --

16   **THE COURT:**  In both our lifetimes.

17   Okay.  Now we go to -- where are we now in this collection

18   of 300 motions?

19   **MR. KANIG:**  Your Honor, I believe that the defendant's

20   motion for review of the HP and Morgan Lewis's files by the

21   government is up next.

22   **THE COURT:**  And the answer is no.  I'm not going to grant

23   it.  It is not an obligation of the government to look at the

24   files.  I understand the theory.  So it's not like -- the theory

25   is essentially that these people are acting as agents of the

1    government.  Right?

2        **MR. KANIG:**  Correct.

3        **THE COURT:**  And, like the police department or this or that.

4        **MR. KANIG:**  (Nods head)

5        **THE COURT:**  And therefore they have a duty to review the

6    files of the private -- the non-governmental entity.

7        **MR. KANIG:**  That's right, Your Honor.

8        **THE COURT:**  Okay and I'm denying it because I don't find

9    them to be the agents in the sense that it gives rise to that

10   duty.  I appreciate the argument.  It's -- this isn't the first

11   time I have heard the argument.  Okay?  But it will be the last

12   time today.

13       **MR. KANIG:**  Well, Your Honor, if I could just point to

14   something you said at the last hearing --

15       **THE COURT:**  Oh, you are going to -- you are going to impeach

16   me by my own -- by my own statement.

17       **MR. KANIG:**  No, Your Honor, I would never seek to impeach

18   you.  I just want to point to a statement that you made at the

19   hearing last year.

20       **THE COURT:**  Sure, go ahead.

21       **MR. KANIG:**  You said that at some point the government

22   crosses a line with requests they make to a private party and

23   that makes them members of the prosecution team.  And --

24       **THE COURT:**  And actually I'm going to get to that in a

25   minute.  But it's not this -- it's not this case.  It's not

1    this.  I am -- I know the suspense is killing us all, so let me

2    get to it right away.

3        I am interested in the question of two witnesses coming to

4    the United States who are the witnesses from Deloitte.  And I

5    would like to sort of address that because I think that's an

6    issue that I want to try to determine now, because I think it's

7    an important issue.  And not that anything that has been said

8    here is any less important.  But I want to deal with that.  And

9    I think I want to start out by saying that I need to inquire of

10   the government -- I have before me the motion of the defense to

11   take steps that will ensure the presence of two witnesses,

12   Mr. Knights and Mr. Mercer, two witnesses who are employed by --

13   or were, I don't know their present status -- by Deloitte, who

14   are outside the subpoena powers of the Court.  That's the --

15   that's the motion.  Okay.

16       And what they assert are a couple of things.  Number one,

17   that they are material witnesses.  I assume they're important,

18   but I don't know how important they are in the context of the

19   entire case.

20       **MR. KEKER:**  They were the audit partners, one through 2009

21   and the other starting in 2010.  These are the audit partners

22   that Mr. Hussain had to report to on these transactions.  And

23   they're the ones who approved it, approved the accounting.  They

24   couldn't be more important.

25       **THE COURT:**  So I don't know that the government would take

 1    the position that they are unimportant or not material.  But it
 2    appears that they are important and are material.  Which is not
 3    the same thing as -- well, that's enough to say on that.
 4        Now, turning to the second, to their argument, because their
 5    argument isn't:  Judge, you ought to expand the subpoena powers
 6    of the Court, because I can't, and I wouldn't, and that doesn't
 7    work.  Their argument is a different argument.  Their argument
 8    is that the government executed an agreement with Deloitte that
 9    provided for certain things.  As a result of that agreement,
10    they are under an obligation, if requested by the defense, to
11    take steps to bring about the attendance of these two witnesses.
12    I think that's their argument in a nutshell.
13        So, of course, I looked at the agreement.  The agreement,
14    it's an exhibit.  It's a Latham & Watkins letter to Mr. Reeves
15    of April 28, 2016.
16        So we're all in agreement that that's the agreement?  That's
17    the letter that we're all talking about?
18        **MR. KEKER:**  Yes.
19        **MR. REEVES:**  Yes, Your Honor.
20        **MR. LEACH:**  Yes, Your Honor.
21        **THE COURT:**  Okay.  And my first question, Mr. Reeves, is:
22    If the government wanted and felt it was in their interests in
23    the production -- in their proof of the case to have either or
24    both of these witnesses, is it correct that their attendance
25    would be subject to the terms and conditions of the letter of

1    April 28th?

2        **MR. REEVES:**  Yes, Your Honor.

3        **THE COURT:**  Okay.  So, in other words, if you want either

4    Mr. Knights or Mr. Mercer to appear in this action, what you

5    have to do is send a letter -- I don't know, is that the right

6    word?

7        **MR. KEKER:**  Send a subpoena.

8        **THE COURT:**  Send a grand jury or trial subpoena by email to

9    Latham & Watkins, asking that they -- asking -- I don't know --

10   demanding, whatever word you want to use, their presence at

11   trial.  And it is your understanding that pursuant to this

12   agreement, they would appear at trial and testify at trial.

13       Is that correct?

14       **MR. REEVES:**  That is largely correct.  There are a few

15   nuances, Your Honor.

16       **THE COURT:**  Okay, let's go to the nuances.

17       **MR. REEVES:**  First I think there is going to be an abundance

18   of Deloitte-related auditing evidence.

19       **THE COURT:**  Okay.  So you say it's cumulative.

20       **MR. REEVES:**  It will be cumulative.

21       **THE COURT:**  That is not a test for you.  I'm now not -- I am

22   not focusing on the defense.  I'm focusing on the government.  I

23   want to see what the government believes to be its rights with

24   respect to this agreement.

25       **MR. REEVES:**  If we ask them, they will come, Your Honor.

```
 1    And I think the concept is that within the government's

 2    case-in-chief, that if we asked for one, two, three or four of

 3    the witnesses listed in the letter, that they would come.  And I

 4    have --

 5        THE COURT:  By the way, that is not limited to

 6    case-in-chief, is it?

 7        MR. REEVES:  It is limited --

 8        THE COURT:  In other words, if we get into rebuttal you can

 9    also use this agreement to bring them as rebuttal witnesses.

10        MR. REEVES:  Hmm, let me offer the following.  I think --

11    the bottom line is, in our case, we sought this agreement from

12    Deloitte in order to --

13        THE COURT:  Yeah, but it's not limited.  Is it?  I mean, I

14    don't see a limitation.

15        MR. REEVES:  I think, as to a rebuttal case, I think it was

16    never really discussed or contemplated, and the only reason --

17        THE COURT:  Well, just look at the words.  And by the way,

18    this is by the bye.  In other words I don't think it really

19    makes any difference whether you said in the case-in-chief or

20    you said throughout the trial, but since you raise it and you

21    are looking at nuances, I -- I just, I look at it and see that

22    --

23        MR. REEVES:  I raise it because it's a point that the

24    lawyers for Deloitte have made.  Okay?  And so, just to sequence

25    this, Your Honor --
```

1      **THE COURT:**  Well, look at the agreement and tell me, in the

2  agreement, am I look -- is there something that I'm missing that

3  -- that limits the scope of the agreement to the case-in-chief?

4      **MR. REEVES:**  I need to get a copy of the agreement.

5      **THE COURT:**  Yeah, okay, let's do that, because I want to

6  work off the agreement.

7      **MR. KEKER:**  Here, here.

8      (Document tendered)

9      **MR. REEVES:**  Thank you.  Thank you, John.

10      Okay.  So I think the relevant portion, having contributed

11  to the language here, is Subparagraph C as to the individuals

12  Knights, Mercer, Welham, and Murray, appearing in person at any

13  trial or any proceeding as requested by the office and

14  testifying truthfully.

15      **THE COURT:**  That is not limiting.

16      **MR. REEVES:**  I accept that.

17      **THE COURT:**  Okay, so I look upon this that a trial's a

18  trial, and it goes from A to B, A to Z, whatever we want to say.

19  And it includes every stage of the proceeding.

20      Because if X came out during the course of

21  cross-examination, or the defense case, I couldn't believe that

22  the government wouldn't -- and you thought Mr. Mercer,

23  Mr. Knights, could clear it all up or present other evidence, I

24  can't believe you wouldn't trot out the agreement and say:  We'd

25  like this person to come in next week or two weeks.  I'm sure

1    you would.

2        Anyway, I think that's all by the bye, because I don't see

3    anything limiting in it and it doesn't make any difference to

4    our argument.  Because I don't think you could -- I don't know

5    that you -- maybe you could have written the document to say

6    that these people will cooperate in the case-in-chief as

7    presented by the prosecution.  Yes, you could say that, and that

8    might raise a different kind of issue.

9        But it doesn't say it, so why bother?

10       Now, here is my concern, because we haven't gotten to that

11   yet.  You would agree with me, wouldn't you, that all that is

12   necessary for you to bring these witnesses to the United States

13   to testify is to email a trial subpoena.  And when I say that,

14   all I'm saying is from the government's point of view, the

15   burden on the government would be to send an email.  Period,

16   full stop, end of discussion.

17       Is there any other burden that is imposed on you in order to

18   ensure their presence?

19       **MR. REEVES:**  In our judgment, no, Your Honor.  You are

20   absolutely correct.

21       **THE COURT:**  Okay.

22       **MR. REEVES:**  And that's exactly what we did do.

23       **THE COURT:**  Oh.  Then I have missed this.

24       **MR. REEVES:**  Let me --

25       **THE COURT:**  That you have subpoenaed these people?

1      **MR. REEVES:**  I have requested them to appear.  So let me

2  just explain.

3      **THE COURT:**  Oh.  Why did I go through that long-winded

4  discussion if they're going --

5      **MR. KEKER:**  They did not send a subpoena.

6      **MR. REEVES:**  I'm happy to send a subpoena.

7      **THE COURT:**  Oh.

8      **MR. REEVES:**  But I think there is a disagreement.  Okay?

9  And --

10     **THE COURT:**  Okay, all right, let's -- okay.  And I'm sorry,

11  I didn't know that to be the case.  All right.

12     **MR. REEVES:**  Attachment B to our response is precisely the

13  type of email the Court is alluding to.

14     It is a request by --

15     **THE COURT:**  I'm sorry I didn't read that, and, I should have

16  read that.

17     **MR. REEVES:**  That is okay.

18     **THE COURT:**  Not really okay.  What is your response?  What

19  have you done?

20     **MR. REEVES:**  Let me just explain, if I could.  I have asked

21  Deloitte for Mr. Knights and Mr. Mercer to come.  I made it

22  clear in my request that we were relaying a request from the

23  defense, all right.  This is also --

24     **THE COURT:**  Oh, I don't know.  Well, that's a big

25  difference, right there.

1    **MR. REEVES:**  Well, it's true.  We are relaying their

2    request, because we -- we're deciding what witnesses we would

3    like to call.

4         Parenthetically, Lee Welham, the manager, the No. 2 in the

5    audit, spans a longer period of time than the two engagement

6    partners.  Among other considerations, there's utility in using

7    him.  This is a long trial --

8    **THE COURT:**  Mr. Reeves.

9    **MR. REEVES:**  Uh-huh.

10   **THE COURT:**  Let me try to take this in pieces.

11   **MR. REEVES:**  Sure.

12   **THE COURT:**  The first piece is -- the government says it's

13   already done.

14   **MR. KEKER:**  Can I pass up what they have done, Your Honor

15   (Indicating)?

16   **THE COURT:**  Yes.  Show it to Mr. Reeves.

17   **MR. KEKER:**  (Inaudible) their opposition.  That's the memo.

18   (Document handed up to the Court)

19   **THE COURT:**  No, I have their opposition.

20   **MR. KEKER:**  And that is Exhibit B, and that is what he says

21   he's done.

22   **THE COURT:**  Okay, let me just, let me read this.  Okay.

23   Have you seen this?

24   **MR. REEVES:**  I wrote it.

25   **THE COURT:**  It's yours, you wrote it.  Okay.  Well, have you

1    seen it, though?  Okay.

2        (The Court examines document)

3        **THE COURT:**  All right.  I think that this should be marked

4    as an exhibit in these proceedings.

5        (Court Exhibit 1 marked for identification)

6        **THE COURT:**  So let's start with  the first question:  Is a

7    request the same thing as a subpoena?  And the letter of April

8    28th uses both terms.  In the beginning it talks about a

9    request, and at the end it talks about service of a subpoena.

10       So, is it correct that the government would have no

11   objection to emailing to Latham & Watkins a trial subpoena for

12   these individuals to appear?

13       Is that correct?  Have I got that?

14       **MR. REEVES:**  Yes, that's correct.

15       **THE COURT:**  No objection.

16       **MR. REEVES:**  We are happy to do that.

17       **THE COURT:**  Okay, then they do it.  That's fine.  That will

18   be the order of the Court.

19       Next -- I don't know, so I don't want to have to decide

20   issues today that I don't have to decide -- is if they refuse to

21   comply.  That's a totally different issue.  And I understand

22   that the defense will take the position with respect to that.

23       I think what I would like to do is in your cover letter or

24   however you are going to it, request that these individuals

25   reply by a particular date, whether they'll appear.  Pursuant to

1   the April 28th letter and the enclosure.

2      **MR. KEKER:**  Could we --

3      **THE COURT:**  If they say yes --

4      **MR. KEKER:**  Could we have that date be --

5      **THE COURT:**  Yeah, well, we'll figure it out.

6      **MR. KEKER:**  The 22nd or something.

7      **THE COURT:**  Well, we will figure out when to do it.

8      If they say yes, then, that's a -- that issue is taken care

9   of.  And if they say no, then I have to deal with the Court's

10  role, if any, if any, in compliance with the April 28th letter.

11  Okay?

12     **MR. REEVES:**  That's fine.

13     **THE COURT:**  So let's now talk about the day -- today is

14  February something or 'nother.  6th?  7th?  I don't know what

15  the date is.

16     **MR. KEKER:**  It's the 6th.

17     **MR. LEACH:**  The 6th, Your Honor.

18     **THE COURT:**  Okay.  So you will send out the letter in the

19  next 24, 48 hours.  And I assume that you can get a response by

20  -- when do you want to know?  I know you want to know early, but

21  I'm not even going to be here.  So --

22     **MR. KEKER:**  I think we ought to know so that we can plan

23  enough in advance of the pretrial conference, which is the 23rd.

24     **THE COURT:**  Yeah.

25     **MR. KEKER:**  So if they will get us the answer by the 18th or

```
 1   19th, --
 2      THE COURT:  Just ask that they will respond to you by the
 3   18th or 19th.
 4      MR. REEVES:  I will ask them to do that.  I think we already
 5   know the answer, but I'm happy do that.
 6      THE COURT:  Well, I guess I'm the only one in the court in
 7   suspense.
 8      MR. KEKER:  Well, no, Mister --
 9      THE COURT:  That is okay, that is all right because I sort
10   of like suspense.
11      MR. KEKER:  Good.  Then, to add to the suspense, I would --
12   I mean, just, I hope that they will tell -- we'll tell
13   Mr. Farrell, we'll tell Mr. Farrell.
14      If Mr. Farrell doesn't want the auditors who worked with
15   Mr. Hussain talk to the audit committee and so on to come over
16   here, and if he obstructs that, we are going to ask for
17   sanctions, we are going to ask for testimony from him and from
18   -- anyway.  We will see --
19      THE COURT:  This is Mr. Keker's King Lear moment.
20      MR. KEKER:  Right.  Sorry.  I have a lot of King Lear
21   moments.
22      THE COURT:  It's okay, I sort of like to see it, because,
23   because I'm a fan of King Lears.  But we won't go there yet.  We
24   can just -- we can wait for the Ashland production.  Okay.  All
25   right.  Fine.  Okay.
```

1    So we have sort of taken care of that issue.

2    **MR. REEVES:**  I'm going to email two subpoenas.

3    **THE COURT:**  Well, do what you said you are going to do and

4    that's fine.

5    **MR. REEVES:**  And I'm going ask for a response by the 18th or

6    19th.  Thank Your Honor.

7    **THE COURT:**  Trial subpoenas.

8    **MR. REEVES:**  Trial subpoenas.

9    **THE COURT:**  In compliance with the --

10   **MR. REEVES:**  With the letter agreement.

11   **THE COURT:**  Okay.  Then I think you need to have a return

12   date of when they would appear.  I mean, is that by agreement of

13   the parties?  Or something like that?  Because they are not --

14   they are not going to call them in their case-in-chief.

15   **MR. KEKER:**  If we call them in our case-in-chief we will

16   work with their counsel whom we're in touch with, Mr. Farrell,

17   to give him notice of the date and so on.

18   **THE COURT:**  All right, it will be like any other subpoena.

19   **MR. KEKER:**  Yeah.

20   **THE COURT:**  That by agreement they can --

21   **MR. REEVES:**  I propose a date in April and I can confer with

22   counsel about --

23   **THE COURT:**  Confer.  Whatever date -- well, actually,

24   whatever date the defense wants.

25   **MR. KEKER:**  Well, it's when the defense case starts is when

1    we want them.

2        THE COURT:  Yeah.

3        MR. KEKER:  And --

4        THE COURT:  Well, think about that.  I mean you can talk

5    about that.

6        MR. KEKER:  We will.

7        THE COURT:  Okay.  So we dealt with that.

8        MR. LEACH:  (Nods head)

9        MR. KEKER:  The next motion is the defense motion for

10   defense witness immunity, Your Honor, which has some

11   similarities.

12       THE COURT:  It also has some dissimilarities.

13       MR. KEKER:  I agree.  I agree.

14       THE COURT:  Okay.

15       MR. KEKER:  Your Honor, this motion involves the government

16   using immunity and other agreements, including the deferred

17   prosecution agreement, to cherry-pick the evidence in the case.

18   They have alleged a long list of co-conspirators who are outside

19   the subpoena power of the Court, as we've said.

20       Those witnesses all have favorable testimony to give that

21   would directly contradict evidence that comes in in the

22   government's case.

23       The -- they brokered a deal with, as we just talked about,

24   with Deloitte, and cherrypicked certain witnesses there.  It's a

25   huge case, as the Court knows, in which basically they are

saying everything that Autonomy did or most things that Autonomy did with respect to accounting was a fraud, that many people are part of it.  And they have identified several of those people who, as I say, are outside the subpoena power of the Court.

We think that justice requires that all of the impugned witnesses should be heard.

They have already said, the government has said that they are going to be using -- arguing that these are co-conspirators and that they get to put in what they want of what they said or did, and that we shouldn't be able to respond.  That's not fair.

**THE COURT:**  I don't know that they have said that.  Have they said that?  I don't --

**MR. KEKER:**  Well, they said in opposing this defense witness immunity, they're saying that:  We get to put in -- we say who the co-conspirators are, we get to put in statements from them. And you can't put in any other statements from them.

What we are saying is:  Let us have these people as witnesses.  Unless we can call whatever ones of these witnesses we could persuade to come, then we're not going to be able to have a fair trial.

This in-camera declaration, we haven't seen it.  We think that it should either be shown to us or stricken.  It is designed to intimidate witnesses because they don't know what -- I mean, what's the government saying about us in private.

If they claim that they still want to prosecute these people

1    you should ask them:  Why in the world haven't you done it?

2    If they say they have the evidence all ready to prosecute

3    anybody, again:  Why haven't they done it?

4    And more importantly, giving these people use immunity won't

5    make a bit of difference because they already have the evidence

6    in the can, which, we believe they don't, but that would be the

7    answer to it.

8    And if they don't have the evidence to prosecute these

9    people, then whatever is in that declaration is just baloney.

10    They are not going to get it.

11    And the standard we believe and we've cited is *Straub* -- we

12    hold -- the Ninth Circuit case -- for the defendant to compel

13    use immunity, the defendant must show the defense witness's

14    testimony is relevant.  We have done that.  And you will see

15    that more as the case goes on.

16    And then either they intentionally caused -- which we think

17    they have by their conduct.  But the one we are really relying

18    on is the prosecution granted immunity to government witness

19    Mr. Egan, the CEO of the Americas who did most of these

20    transactions, in order to obtain that witness's testimony -- and

21    I'm equating immunity in the DPA -- but denied immunity to a

22    defense witness whose testimony would have directly contradicted

23    that of the government witness.  And all of these people would

24    directly contradict Mr. Egan's testimony.

25    So we believe that we are entitled to defense witness

1    immunity for the people designated.  I'm not saying because of

2    the publicity problem.

3        They have also offered a safe passage letter, that is as far

4    as they have gone.  If we don't get the defense witness

5    immunity, we would like you to get them to commit, give us safe

6    passage letter so we can try to work with that.  But what we

7    need to get them here is defense witness immunity, I think.

8        **MR. FRENTZEN:**  Thank you, Your Honor.

9        The defendant has failed to show the exceptional

10   circumstances in this particular case exist.  It fails on

11   basically every level of the appropriate test.

12       If the Court considers what's been presented to it, it has

13   not been presented with any actual relevant contrary evidence.

14   What it's been presented with is blanket statements by counsel

15   for these various individuals that are effectively self-serving,

16   blanket exculpatory statements, like:  Autonomy did nothing

17   wrong; there's nothing wrong with the accounting at Autonomy.

18       And that's it.  There's been no demonstration that any of

19   these witnesses would provide any particular contrary or

20   relevant testimony to the testimony that the government seeks to

21   present.

22       This is not an example of cherrypicking.  This is simply an

23   effort to get a bunch of alleged co-conspirators and co-workers

24   currently to have immunity to come in here and then, frankly,

25   say whatever it is they want to say.

1       There is -- in terms of the legal test, in the government's
2   view, there is the important ruling the Ninth Circuit has
3   recognized, with approval, the Second Circuit's test in *Turkish*,
4   which basically says if somebody is the potential target of an
5   investigation, subject of an investigation, then that process
6   should not be interfered with.
7       We provided a declaration to the Court.  I don't know that I
8   need to make more comment on it than that, other than that what
9   was contained in there was absolutely accurate and correct.  So
10  it fails on those grounds.  And I think that's pretty much the
11  full extent of the test.
12      I'm happy to get into this in more detail.  But I think the
13  other aspect of this that's problematic outside of just the
14  legal test from the government's perspective, is, you know, if
15  you take at face value the representations, in other words, what
16  counsel for these prospective witnesses supposedly are saying
17  that their clients are going to say, they are as the government
18  has described them, and there was in the reply no contrary
19  description.  They're just sort of blanket denials of any
20  wrongdoing.
21      Now, as the Court knows and as we have had hearings about in
22  the past, it's not enough to come in and say:  I want to take
23  the Fifth.
24      In other words, prior to that, there has to be an assertion
25  that the testimony, in and of itself, is something that would

1    require an individual to take the Fifth.  It is not enough to

2    say:  Well, the government has an investigation.

3        So prior to -- in other words, there is absolutely nothing

4    in here, in this representation, that would require immunity in

5    the first place.

6        In other words, if they're going to come in here and say "We

7    did nothing wrong," which is all that the Court has in front of

8    it at this particular time, based on the filing by the defense,

9    and again, it's bare-bones, and it's not the prospective

10   witnesses saying something; it is their counsel.  And it's -- it

11   appears to be taken from various filings.  We're not even at the

12   point where immunity should be conferred on these people.  If

13   they are going to come in here and say:  "I did nothing wrong,"

14   then that's perfectly fine.

15       Now if they are going to come in here and say:  "I need

16   immunity because I did something wrong," well, let's talk about

17   it.  Then, that's a different analysis.  But we think the --

18   legally, the test is the same, which is to say, based on *Turkish*

19   and the Ninth Circuit approval of *Turkish* and I think the name

20   of the case escapes me right now, I think it's *Condo*, *United*

21   *States versus Condo*, it is cited in our papers, we go no

22   further.  And there is no Ninth Circuit case, certainly that I

23   can find, in which *Straub* was applied in contravention of *Condo*.

24       In other words, where the Ninth Circuit said these are

25   targets of the investigation, potential targets of the

investigation, and we're going to hold that the test is the same.

In other words, every case we can find is distinguishable just on that basis, but even getting to the *Straub* test, this is nowhere near enough to force the government to immunize the witnesses.

Unless the Court has any specific questions, that's all I have.

**THE COURT:** I don't.

**MR. FRENTZEN:** Thank you, Your Honor.

**MR. KEKER:** What I just heard is that they filed some secret pleading that says these people are targets.

**THE COURT:** Yes.

**MR. KEKER:** Then I heard that they can come in, that they can't take the Fifth, because --

**THE COURT:** No, he didn't say that.

**MR. KEKER:** He did say that.

**THE COURT:** He said that if they do take the Fifth, they have to have a basis for taking the Fifth.  And that is something that has to be explored at the time that they assert the Fifth.

**MR. KEKER:** And that's wrong.  If these people don't -- there is no right in this court, the prosecutors' or anybody else's, to explore the basis of people taking the Fifth who the government has already said are targets of the investigation.

1    It's --

2        **THE COURT:** Well, that may be sufficient, in and of itself.

3        **MR. KEKER:** But they don't have to explain that to you.

4    They say "I'm not going testify, I'm going to assert..."  And

5    let me add, their witnesses have taken the Fifth and they have

6    given them immunity, and their witnesses --

7        **THE COURT:** Yeah.

8        **MR. KEKER:** Okay.

9        **THE COURT:** Not talking about those people.  You are not

10   talking about the people that are already immunized, you are

11   talking about people who have yet to be immunized, right?

12       **MR. KEKER:** What I'm talking about is the cherrypicking of

13   witnesses by the government, that's exactly what's wrong, as

14   described by *Straub*.

15       **THE COURT:** And what counsel is saying --

16       **MR. KEKER:** And --

17       **THE COURT:** Okay, he denies it.  But that's not the point.

18   That is not the test, that the government denies it.

19       The question the government asserts, as I understand their

20   position, is:  Look.  In order to assert the Fifth Amendment,

21   there has to be a basis for it.  And, and, and as to some, in

22   the -- in the defendant -- in the government's view, there would

23   be a basis.  And we have supplied that information to the Court

24   in the secret document.

25       As to others, it is the government's view there is not a

 1    basis.  And the answer is:  I don't know.  I don't know.  We

 2    just have to see how that unfolds.

 3        **MR. KEKER:**  How can --

 4        **MR. FRENTZEN:**  Well --

 5        **THE COURT:**  But there has to be some showing, based upon the

 6    investigation or the evidence, other than a defendant simply

 7    saying:  It's Tuesday, I'm taking the Fifth.

 8        I, mean it's got to have some basis in, in the reality of

 9    the case.

10        **MR. KEKER:**  Your Honor, I feel like I'm in a different

11    planet.

12        **THE COURT:**  Okay.

13        **MR. KEKER:**  The six people that we're talking about have

14    been identified by the government as co-conspirators in this

15    case.

16        And the idea that somebody is up here talking about:  Oh, we

17    don't have to take -- I mean, the six people we are talking

18    about have been identified as co-conspirators.  What more do you

19    want?

20        I don't know what's in that document.  But I -- I am very

21    suspicious that it overstates the case.  The government made the

22    decision not to prosecute one of those people two years ago, in

23    2015.

24        **MR. FRENTZEN:**  Not accurate, not true.

25        **MR. KEKER:**  Okay, I would love to see that and I'll look at

it in camera.

**THE COURT:**  I don't -- you can see it if they want to give it to you, but I'm not giving it to you.  It's -- it's -- I mean, that would be -- that wouldn't be appropriate for the Court to do.

**MR. FRENTZEN:**  And to be clear, Your Honor, that was -- I mean, I know that -- I know there's citation to notes that don't say what they contend they say.  There's a citation to a document created by the SEC that is temporal.

In other words, at that time, which of course is not a mystery, because at that time, no indictment was brought.  That does not, as the Court knows, mean ever.  And that's not what the document says.

And the notes simply refer to two individuals being charged.  It says nothing about anyone else.  And I think as the Court knows, one of those was and one of those was not at that particular time.

So those notes are worth what they're worth.  But they don't say -- none of them say that a decision has been reached not to do X for an extended period of time.

So that's simply inaccurate.

**MR. KEKER:**  If --

**THE COURT:**  Well, I think all I'm saying is the showing that the government made, which of course you weren't privy to, is adequate and sufficient to justify the government's decision not

1    to immunize these witnesses at this time.

2        **MR. FRENTZEN:**  Thank you, Your Honor.

3        **THE COURT:**  That's all I'm saying.

4        **MR. KEKER:**  And that we can accept.  We get that.  That's

5    the government's decision.

6        What we're saying to you is that you have the power and you

7    have the duty under *Straub* to look at not whether or not the --

8    the witness's Fifth Amendment invocation would be appropriate as

9    part of the defense witness immunity analysis, but instead, at

10   the *Straub* test.

11       And the *Straub* test that -- yes, we get it, that the

12   government doesn't want these people immunized.  But we're

13   saying the prosecution has granted immunity to government

14   witnesses in order to obtain the witness's testimony, but denied

15   immunity -- they've said that -- to defense witnesses whose

16   testimony would have directly contradicted that of the

17   government's witnesses.

18       And in that sense, let me just go through Stouffer Egan.

19   Stouffer Egan is going to say nasty things about hardware.  We

20   have direct contradiction of whatever he and others would say

21   about disclosure of hardware and the reason for hardware sales.

22   He is going to say things about the use of value-added resellers

23   and the recognition of the revenue at the end of the quarter

24   that would be directly contradicted by this, that, that list of

25   witnesses who were in a position to know.  We can go through it

1    in detail.

2        But you have already heard -- I mean, we've got -- there's

3    60, 60 transactions that this expert wants to talk about.  And

4    we can go transaction by transaction and witness by witness

5    within this, and we need this defense witness immunity, people

6    who were in the finance department and were there in England

7    knowing about what was going on, to directly contradict the

8    government witnesses.

9        **MR. FRENTZEN:**  Well, the expert is not immunized, so that is

10   totally irrelevant.

11       And again, this has got to be the most bare-bones showing of

12   -- these are statements by lawyers saying:  My client's going to

13   say he's completely innocent and that Autonomy did nothing

14   wrong.

15       That's it.

16       **MR. KEKER:**  He can't --

17       **MR. FRENTZEN:**  And so --

18       **THE COURT:**  Okay, so the argument, if the argument is that

19   you have to make more of a showing.

20       **MR. FRENTZEN:**  Well, that's part of my argument.

21       **THE COURT:**

22       **MR. KEKER:**  Well, the argument --

23       (Simultaneous speakers)

24       **THE COURT:**  You haven't made a sufficient showing.  I think

25   the two arguments the government has advanced both are correct.

1        One, as to their written submission which I don't think you

2    are really arguing about, that's adequate.

3        I mean, I have looked at it, read it.  It seems adequate.

4    And you're not contesting that because you haven't seen it.  How

5    could you contest it if you haven't seen it?

6        **MR. KEKER:**  (Inaudible)

7        **THE COURT:**  As to the second point, which I also agree with

8    the government, is you have to make more of a showing.  You have

9    to make more of a showing to show that this witness is key, it's

10   -- he is, he or she is going to say, da, da, da, da, da, da

11   which you will directly rebut.

12       I understand your point that -- and I take it as your

13   point -- that it could prolong the trial because you have to go

14   into particular transactions that that proposed witness has some

15   information about, and so forth.  And I don't quite know what to

16   say.  I hope it won't prolong it too much.  But, you know, we're

17   not where you -- we're not where you want to be or --

18       **MR. KEKER:**  (Inaudible)

19       **THE COURT:**  You are not where I want you to be in order for

20   me to grant your motion, so I'm not granting your motion.

21       **MR. KEKER:**  Okay, well, we --

22       **THE COURT:**  It is without prejudice.

23       **MR. KEKER:**  We will wait for the trial to start, listen to

24   the opening statement and then make a further showing.

25       I just --

1    THE COURT:  You can make a further showing.  You can make a

2    further showing.

3        MR. KEKER:  Okay, we will and --

4        THE COURT:  I'm denying without prejudice.

5        MR. FRENTZEN:  (Inaudible)

6        MR. KEKER:  And I just want to say --

7        THE COURT:  Sure.

8        MR. KEKER:  For these people in England, they have to get

9    visas and so on.  So we will be coming back to make a showing,

10   but we don't want to delay anything.  And we want to have them

11   available in the defense case.

12       THE COURT:  Are we still issuing visas to the United

13   Kingdom?

14       MR. KEKER:  Mr. Hussain goes through the agonies of --

15       THE COURT:  Well, the government will cooperate in that

16   regard.

17       MR. FRENTZEN:  We will, Your Honor.  And my point is simply

18   that it -- if there are steps that need to be taken, then the

19   defense should take those steps now.

20       And may I have one moment, Your Honor --

21       MR. KEKER:  And can we get --

22       MR. FRENTZEN:  -- confer with counsel.

23       THE COURT:  Yeah.

24       MR. KEKER:  Can we get a commitment --

25       THE COURT:  Wait, wait, he's having a conference.

1          (Off-the-Record discussion between counsel)

2      **THE COURT:**  You need more time, counsel?  Because I want to

3  take a recess.  So I can -- if you would like further

4  discussions you can do that, and we can come back.

5      **MR. REEVES:**  That would be nice.

6      **THE COURT:**  Okay, we are in recess until 12:15.  Thank you.

7      **MR. FRENTZEN:**  Thank you, Your Honor.  I apologize.

8      **THE COURT:**  No, no, that's all right.

9      (Recess taken from 11:58 a.m. to 12:15 p.m.)

10      **THE COURT:**  Okay, let the record reflect, all parties are

11  present, the defendants are present.

12      **MR. FRENTZEN:**  Thank you, Your Honor.  Sorry, after

13  consulting with my co-counsel, I have decided not to go there.

14      **THE COURT:**  Not to say anything further.

15      **MR. KEKER:**  Your Honor, we would like the government to say

16  on the record that they will do what they offered to do, which

17  is provide safe passage letters promptly to us, to be able to

18  give to these witnesses.

19      So that if we can persuade them to come --

20      **THE COURT:**  I'm not going to require them to say it on the

21  record.

22      Here's the point.  You ask the government.  If the

23  government doesn't do it, come to me and I'll try to figure out

24  what the problem is.

25      **MR. FRENTZEN:**  And to be clear, Your Honor, our offer is we

1    will offer safe passage if these witnesses are willing to come

2    and testify without immunity.  That's what we have offered.  So.

3        **MR. KEKER:**  Well, can we -- okay.  And can we get these

4    letters to at least show the witness, to consider?

5        **THE COURT:**  Well, request it.

6        **MR. KEKER:**  I'm requesting it.

7        **THE COURT:**  No, no.

8      **MR. FRENTZEN:**  We'll work with counsel but I just want to be

9    clear that that was our offer.  And we'll work with counsel, and

10   hopefully the Court will not hear about this again.

11       **THE COURT:**  Hopefully.

12       **MR. KEKER:**  Well, don't count on it.  I think you will hear

13   about it again.  But thank you.

14       **THE COURT:**  Who knows?

15       **MR. FRENTZEN:**  Thank Your Honor.

16       **THE COURT:**  All right.  What's next?

17       **MR. DOOLEY:**  Your Honor, I think there is one remaining

18   motion from the defense on Mr. Yelland, to exclude testimony of

19   Mr. Yelland before we get to items in IV on the pretrial order.

20       Your Honor, there are a couple of issues with respect to

21   Mr. Yelland.  But the primary issue relates to his expert

22   opinion testimony regarding accounting issues.

23       The government wants to use Mr. Yelland, who was until

24   recently an HP employee, to offer expert opinion testimony, but

25   dress it up as lay testimony.  They claim he's just going to

testify to what he saw, what he did, what he heard.

But just looking at the government's motion, or looking at their opposition, it's clear that he is going to come in and testify that Autonomy improperly -- these are the government's words (As read):

> "...Improperly inflated revenue by approximately
> $156 million."

He's going to offer an opinion on the accounting of Autonomy.  And he shouldn't be allowed to do that.  And there are two reasons.

Number one, it's not lay opinion testimony under Rule 701. As Your Honor surely knows, lay opinion can come in when it's -- you know, when it's an opinion formed through reasoning --

**THE COURT:**  It's not lay opinion.

**MR. DOOLEY:**  It's not lay opinion.  I agree.  And it's not expert testimony that he can offer for two reasons, Your Honor.

Number one, recall that there are two separate accounting systems or two separate set of accounting rules here.  There's international financial reporting standards, IFRS, and then UK GAAP.  And this is detailed, but it's important.  Mr. Yelland is not an expert with respect to IFRS.  He's never worked at a company that reported under IFRS.  And the evidence will show that he's admitted that he is not an expert.

So there is no way that he should be able to offer an opinion that Autonomy's accounting was improper under IFRS.

1    That is a straight *Daubert* issue that I think the Court can

2    resolve now.

3        With respect to his opinion under UK GAAP, which we have

4    argued in connection with the restatement is irrelevant and

5    should be excluded for that reason -- but I don't want to

6    revisit that issue -- we believe that Mr. Yelland's testimony is

7    inadmissible because the -- the method that he used to reach

8    that conclusion that the accounting was improper under U.K. GAAP

9    is not reliable.  And that's the method that went into the

10   restatement.  The restatement was not signed off by the

11   accountants.  Ernst & Young refused to sign off on the

12   restatement.

13       **THE COURT:**  Isn't this a repeat of the argument about the

14   restatement?  How is it different from that?  We have already

15   had the argument about the restatement.  Okay.  And --

16       **MR. DOOLEY:**  It is different.

17       **THE COURT:**  I ruled.  Now you say:  By the way, they can't

18   call the witness who is going to talk about the restatement.

19       So it seems to me that that's a rehash of that argument.

20   Not the first part, but the second part.

21       **MR. DOOLEY:**  It's obviously similar, Your Honor.  We're

22   talking about the restatement and Mr. Yelland is the -- the HP

23   employee who prepared the restatement, and so it's obviously

24   similar.  However, I think there are important differences.

25       There's the IFRS issue, which is that he cannot testify to

1    the accounting under IFRS because he is not an expert, that's

2    not what the restatement was about.  So I think that is a

3    separate issue.

4         And then the other issue was whether the opinion that the

5    accounts at Autonomy were improper, whether that opinion comes

6    in under 702, and whether he can testify to that.  And that's

7    our argument.

8         **THE COURT:**  So respond to those two arguments.

9         **MR. REEVES:**  Okay.  Let me take the second one first.

10        If the government elicits from Mr. Yelland a view that the

11   accounting was, quote, improper, or fraudulent, yes.  We accept

12   that it would be preferable for us to qualify him as an expert.

13   That takes us into a judgment more consistent with expert

14   testimony.

15        And I have appreciated the articulation of the argument by

16   counsel because as a lay opinion, I think it would be entirely

17   appropriate for Mr. Yelland to come in and testify to

18   adjustments that he made in the ASL financial statements as a

19   result of his reevaluation of certain --

20        **THE COURT:**  But that is as a percipient witness, isn't it?

21        **MR. REEVES:**  Correct.

22        **THE COURT:**  I think it's a little late in the game to

23   qualify him as an expert opinion -- that he ought to give an

24   expert opinion, isn't it?

25        **MR. REEVES:**  No.

1    **THE COURT:**  Oh it's not, okay.

2    **MR. REEVES:**  We have given them notice.  They are not

3    objecting to the adequacy of our notice.  I would argue that

4    he's entirely qualified as an expert.  He has the qualifications

5    as a UK-chartered accountant that the defendant does.

6    **THE COURT:**  So you are saying he can give it either as a

7    percipient witness or as an expert witness.

8    **MR. REEVES:**  Depending on the choice that the government

9    makes about essentially the character of the testimony he would

10   give, whether he's just making adjustments to the financial

11   statements or going further and relying on his special skills to

12   identify those adjustments as improper or fraudulent, yes.

13   So that is a choice we can make in our judgment, but I

14   accept that the testimony needs to be hewed in that respect in

15   terms of --

16   **THE COURT:**  You believe that you have complied with the

17   requirements for expert opinion.

18   **MR. REEVES:**  Yes.

19   **THE COURT:**  As to this witness on that subject.

20   **MR. REEVES:**  We do.

21   **THE COURT:**  Okay.

22   **MR. DOOLEY:**  Your Honor.

23   **THE COURT:**  What is your response?

24   **MR. DOOLEY:**  We don't dispute that the government has

25   provided us with a disclosure of Mr. Yelland's testimony.  And

1   our argument is -- I thought that the Court agreed with this --

2   is that we're in the realm of expert testimony here.  This is

3   not lay witness testimony that the accountants don't comply with

4   IFRS or UK GAAP.  That's not something a lay witness can offer

5   an opinion on.

6       The distinction that I understand counsel to be making is:

7   Well, he can come in as a percipient witness and testify as to

8   the fact of the restatement.  But the fact -- but that is a

9   distinction without a difference.  He is going to come in and

10  say:  We adjusted these -- we took out all these transactions.

11  The obvious implication of that is that the transactions are

12  improper --

13      **THE COURT:**  Okay, this is where you are losing me, actually,

14  you're losing me.  I can't figure it out.

15      This witness prepared the restatement.  Right?

16      **MR. REEVES:**  Yes.

17      **THE COURT:**  Okay, and you've objected to that, but that's --

18  that's been decided, the statement comes in.

19      Okay.  So he goods up and he says:  I did X, Y and Z.  Okay.

20  Now, what does he testify?  As a percipient witness, he --

21  change this, change that.  So then the government says:  Why'd

22  you do it?  Why?  Why did you do that?  Why did you change X, Y

23  and Z?

24      And then he says -- and now he's giving an expert opinion.

25  He's now saying:  I changed it because it's not in compliance --

1    my view is, my opinion is it's not in compliance with da, da,

2    da, da, da, da, da.

3        So he's doing both.  He's doing both.  And I don't see what

4    the problems is, as long as you have received notice as to,

5    number one, what is he going to say, that's important.  Because

6    that has to be disclosed as an expert.  And number two, what the

7    bases are for his reasoning, that has to be disclosed as well.

8    And the other things associated with an expert have to be

9    disclosed.

10       So you see why I'm not understanding what you are saying?

11   You may not like what they are doing.  But haven't they done

12   that which is required in a pretrial setting with respect to

13   disclosures?

14       **MR. DOOLEY:**  The argument isn't -- I agree with your -- the

15   argument is not a disclosure point, Your Honor.  They have made

16   disclosures.  Our argument is when you get to the second step

17   that you described.

18       **THE COURT:**  Yeah.

19       **MR. DOOLEY:**  Where he goes beyond saying:  This is what we

20   did, and he says:  This is why we did it because it's improper,

21   and it's clear from their disclosure that that is what they

22   intend to do with him, that is expert testimony.  And our

23   argument is he is not qualified to say it was improper under

24   IFRS.  There is no argument from the government on that point.

25   I haven't heard that he is an expert on IFRS.  We're talking

1    about two separate accounting systems here.

2        If he's going to get up and say it's improper under IFRS --

3        **THE COURT:**  Well, then --

4        **MR. DOOLEY:**  -- he's not qualified to do that.

5        **THE COURT:**  Well, stop.  You're saying he didn't say that in

6    his disclosure.

7        **MR. DOOLEY:**  I'm saying he did, he did say that in his

8    disclosures, but he's not qualified to say that.  It is a

9    *Daubert* issue.

10       **THE COURT:**  I see, okay.  So it is not a question of

11   disclosure; it is a question of qualification.  So the argument

12   is this person isn't qualified to give an opinion on the I --

13   whatever it is.

14       **MR. DOOLEY:**  IFRS, Your Honor.

15       **THE COURT:**  IFRS.  Okay, what's your answer to that?

16       **MR. REEVES:**  My answer is that he is a UK-chartered

17   accountant and the fact that he's 's not been in a business

18   situation where he is required to do disclosure under IFRS does

19   not make him disqualified as an expert with regard to IFRS.

20       And the defense, although he hasn't emphasized it today, has

21   suggested that somehow this is really a junk-science *Daubert*

22   issue.  It is not.  There's nothing about it that is junk

23   science.  That there are divergences in the opinions of certain

24   experts with regard to the correct accounting treatment is just,

25   I think, consistent with a lot of expert testimony on a lot of

1    different subjects.

2    So, we disagree; that we think he is well qualified as an

3    expert on the topics that he would be testifying about.  He is a

4    percipient --

5    **THE COURT:**  Let me ask you this.  You have an American

6    accountant, an accountant in America.  And he's doing the books.

7    And he does something.  You ask him:  Why did you do this?

8    He said:  Well, because GAAP requires it.

9    Could he testify as an accountant as to what GAAP is?

10   **MR. DOOLEY:**  Your Honor --

11   **THE COURT:**  Could he?  Just, that's sort of like yes, or no,

12   or I don't know, or something.

13   **MR. DOOLEY:**  If you had a U.S. trained accountant.

14   **THE COURT:**  Yes, he is an accountant, certified to be a

15   Certified Public Accountant in the United States.

16   **MR. DOOLEY:**  And he had experience applying U.S. GAAP, yes.

17   That person could be qualified as an expert.  But this is a

18   person who has no experience.  The government has the burden of

19   establishing the expertise of their expert.  They have not met

20   that.

21   **THE COURT:**  I think this, I think -- this is why I don't

22   like these motions.  Why don't I wait and hear what he's going

23   to say is his experience and so forth, and I'll make some

24   determination.  So, denied without prejudice.

25   **MR. DOOLEY:**  Thank you.  Your Honor, may I raise just two

1    other issues with respect to Mr. Yelland, just to get some

2    guidance from the Court and to flag the issue that I expect to

3    be coming?

4        **THE COURT:**  Sure.

5        **MR. DOOLEY:**  Which is based on the witness statements.

6        Mr. Yelland is another one who has been interviewed umpteen

7    times, we have a ton of 302s.  And I expect that Mr. Yelland in

8    addition to saying:  "Here is what happened with the

9    restatement," is going to get up and try to narrate some of

10   these underlying transactions.  "Here's what happened, so-and-so

11   did this, so-and-so did that, there is an email that says this."

12       And our view is that is completely inappropriate for an

13   expert to do.

14       **THE COURT:**  Really?  I have to tell you, of all the people

15   that I basically allow narration from, it's experts.  I mean,

16   really.  They have a story to tell.  They're paid to tell the

17   story.  And the fastest way to get it out is just tell your

18   story.

19       And, I mean, I want to give a lot of leeway to narrative

20   statements.  Leading questions.  I don't want to be here for two

21   years.  And this "What happened next, what happened next" will

22   drive everybody crazy.

23       So, it's -- if he can give a narrative -- I mean, you are

24   sitting here, you know exactly what he is going to say.  At

25   least in that sense you know what he said on eleven other

1    occasions so maybe you don't know exactly what he's going to

2    say, but you have a pretty good idea.  Let him say it.  Cross

3    him on it.  And that will be useful.

4        **MR. DOOLEY:**  I hear you, Your Honor.  Your Honor, this is a

5    case where --

6        **THE COURT:**  So you want guidance?  You got it.

7        **MR. DOOLEY:**  I got guidance.

8        **THE COURT:**  Got a lot of guidance, got a lot of guidance.

9        **MR. DOOLEY:**  I respectfully disagree with that, Your Honor,

10   but --

11       **THE COURT:**  Well, that's okay.

12       **MR. DOOLEY:**  I made the point.

13       **THE COURT:**  I don't take it too personally.

14   Okay.

15       **MR. DOOLEY:**  I think that's it, Your Honor, for motions.

16   There are a couple of issues out of the pretrial conference

17   statement that we wanted to flag for the Court.

18       **THE COURT:**  Okay.  Are there any more motions that I have to

19   deal with?

20       **MR. REEVES:**  No.

21       **THE COURT:**  Ms. Little, you have been silent during this,

22   during this -- rising to address the pretrial issues?  What are

23   you -- or are you just going to shove him aside and --

24       **MR. DOOLEY:**  I got us in trouble with the last one,

25   Your Honor, so --

1        **MS. LITTLE:**  I think I'm the master of ceremonies for this

2   portion, but I'm going to yield my time on the first three to

3   Mr. Dooley.

4        **THE COURT:**  Okay, so where are we?  Anything else?

5        **MR. DOOLEY:**  We're on IV on the agenda here, Your Honor

6   (Indicating), just talking about some issues in the pretrial

7   that were raised in the pretrial conference statement that I

8   need to flag for you.

9        **THE COURT:**  All right, let me see -- okay.  Hold on.

10       All right.  First is a court review of HP witness summaries

11   produced in camera.

12       Question:  Have I gotten them?  I haven't looked at

13   anything.  Have I gotten them?

14       **MR. DOOLEY:**  Well, that is actually a question that we have,

15   Your Honor, which is confirmation -- Your Honor has ordered HP,

16   pursuant to two subpoenas, to lodge summaries.

17       **THE COURT:**  Do I have them?  Does anybody know whether I

18   have them?

19       **MR. DOOLEY:**  They are HP --

20       **THE COURT:**  Somebody's here.

21       **MS. RESLEY:**  Yes.

22       **THE COURT:**  Come on up.  I promise you won't be indicted.

23   Come on up.  The government has offered you safe passage.

24       **MS. RESLEY:**  Thank you, thank you.

25       **THE COURT:**  All right, okay.

1    **MS. RESLEY:**  Good morning.  Susan Resley of Morgan Lewis on

2    behalf of -- R-E-S-L-E-Y.

3       Your Honor, we have lodged all of the summaries.  There is a

4    set of summaries that, as we speak, is being couriered, that is

5    pursuant to those --

6       **THE COURT:**  Will you bring them to the attention of

7    Ms. Scott, so she knows, and I'll take a look at them.  Okay?

8       **MS. RESLEY:**  Okay.

9       **THE COURT:**  But really what I need to do, and I guess this

10   sort of morphs into what Ms. Little is going to talk about in

11   terms of order of witnesses -- I don't know if you are going to

12   talk about it or not.  I have got to make sure that I don't

13   have, you know, a thousand pages to read before a witness

14   testifies or is in the process of testifying.

15      So I need some helpful guidance from the parties, as:  This

16   person's going to testify, on such and such a date.  This is,

17   this is the length of the testimony, and so forth.  So I can

18   prepare myself to deal with it.

19      So let's all understand that's what's got to be done.

20      **MR. DOOLEY:**  Your Honor --

21      **THE COURT:**  Actually, for -- all you have to do is lodge

22   them, you don't have do anything else.

23      **MS. RESLEY:**  Yes.

24      **THE COURT:**  Okay.

25      **MR. DOOLEY:**  And Your Honor, in that regard, it would also

be helpful for us to get a list perhaps from HP of the summaries that have been lodged with the Court.  I don't know that we have a list of the summaries that have been lodged.  That would expedite the process you are describing.

**THE COURT:**  Well, I'm not quite sure that's true, but is there any objection to providing a list?

**MS. RESLEY:**  Your Honor, there are some witnesses -- as you know, there is a -- a proceeding that is in the UK, and there are some just identifying some of the witnesses who may have been interviewed by UK counsel, could itself be attorney work product.

**THE COURT:**  Well, I don't think there's an obligation for them to do so.  I think there is an obligation if Witness X testifies, or is on the witness list to testify, then I think it would be useful to, for the government -- you're not going to know?

**MR. LEACH:**  I don't have these, Your Honor.

**MS. RESLEY:**  No.  We have only provided --

**THE COURT:**  Right.

**MS. RESLEY:**  -- the information to the Court.

**THE CLERK:**  (Nods head)

**MS. RESLEY:**  There is one exception --

**THE COURT:**  Are you going to be monitoring this situation? I just wonder whether -- well, look.

**MS. RESLEY:**  Yes, Your Honor.

1    THE COURT:  Well, of course, the government will provide --

2    is going to provide defense, as to witnesses.

3    Would you please advise counsel if, in fact -- which

4    witnesses you are intending to call and so forth.  And if there

5    is a statement, you can then advise the parties if there is a

6    statement.  You can provide both the defense and prosecution a

7    statement.

8    MR. LEACH:  Happy to do that, Your Honor.

9    THE COURT:  Okay, great.  Maybe that takes care of the

10   logistical issue.

11   MR. DOOLEY:  I think it does.  If we get a list of the

12   witnesses who are on the government's witness list for which --

13   for whom a summary has been provided, that would be helpful.

14   THE COURT:  No. 2, identification of HP attorney witnesses

15   who authored the interview memoranda.  That's not going to occur

16   at this time.

17   Now, if I find something which I believe to be inconsistent

18   and so forth, it may become an issue, and it may be necessary to

19   find out who the author of the memorandum is.  But it's

20   premature at this time.

21   MR. DOOLEY:  And Your Honor, I believe we have resolved it

22   with Ms. Resley, and we will be getting the identity of the

23   relevant witnesses.

24   THE COURT:  Okay.  Authenticity stipulations.

25   MR. DOOLEY:  Your Honor, we have had ongoing discussions

both with counsel for the government, also counsel for HP and
counsel for Deloitte, about authenticity issues.

The only issue that I wanted to raise here is our request,
which is pending with the government, for a stipulation that
certain transcripts of interviews conducted of Deloitte
witnesses by UK investigators be stipulated as authentic.  We
are not arguing that they come into evidence, unless there is an
inconsistent statement.  All we are asking is for a stipulation
that these are true and accurate transcripts.

**MR. LEACH:**  At this point, Your Honor, the government is
unwilling to enter into that stipulation.  These are materials I
received from the SFO and the FRC.  I don't know how they were
created, by whom.  I also see absolutely no way that these are
coming into evidence without the SFO and the FRC investigator
coming to the United States to testify about what they are.

So at this point the government's unwilling to stipulate but
--

**THE COURT:**  Yeah, but they are not asking what they are.  I
mean they're not asking -- what they're asking for is:  Would
you agree that this document is what it purports to be.  That
is, it is a document prepared by Agent X or Place Y or Z and
that it isn't some --

**MR. DOOLEY:**  We're asking --

**THE COURT:**  -- some other things.

**MR. DOOLEY:**  We're asking for a stipulation that it's a true

1    and accurate transcript of these interviews that were conducted

2    by government investigators who we have no access to --

3        THE COURT:  Well.

4        MR. DOOLEY:  -- for purposes of putting up -- (Inaudible)

5        THE COURT:  But they may not be.

6        MR. DOOLEY:  But it is within their power to figure it out,

7    Your Honor.  It is not within our power to figure out from --

8        THE COURT:  I don't know even if it's within their power to

9    figure it out.  Some third party prepared something; it

10   purported to be a transcript of an interview.  I don't know that

11   they can find out whether it's accurate or not.  I mean, they

12   could ask somebody, but I don't know that it's, quote, in their

13   power.

14       MR. LEACH:  The answer is:  I don't know, Your Honor.  It

15   hasn't really been an issue we have needed to pursue.  I don't

16   have a proposed stipulation from the defense at this point.

17       THE COURT:  Anyway.

18       MR. LEACH:  I'm happy to look at it.

19       THE COURT:  Okay.

20       MR. LEACH:  I just don't see any way these are coming into

21   evidence, and don't really understand what the point of the

22   stipulation --

23       THE COURT:  Well, the point of the stipulation would be to

24   save time.

25       MR. LEACH:  And we are all for that, Your Honor.

1          **THE COURT:**  And I guess, um, I can't force the government to

2     stipulate.  Especially in something that's not within their

3     control or knowledge.  However, if this -- if all things are --

4     come to fruition, that is, actually it is admissible or some

5     portion is admissible or so forth, then I'll deal with it at the

6     time.  I'll just have to deal with it at the time.

7          **MR. DOOLEY:**  Your Honor, I appreciate that ruling,

8     Your Honor.  Just to underscore the issue, these are documents

9     that the government obtained from investigative authorities in

10    England demand --

11         **THE COURT:**  But they didn't create them.

12         **MR. DOOLEY:**  That's true, but they've had the benefit of

13    them for their investigation for years --

14         **THE COURT:**  But that doesn't make them admissible.

15         **MR. DOOLEY:**  I understand --

16         **THE COURT:**  And it doesn't make them authentic.

17         **MR. DOOLEY:**  I understand.

18         **THE COURT:**  It doesn't do any of the things you need to

19    first -- that they have them, they get all sorts of things.

20    Most of what you get isn't so valuable.

21         But who knows?  They may be very valuable.  Can't do it in

22    the abstract.

23         **MR. DOOLEY:**  All right.  Nothing else on that, Your Honor.

24         **THE COURT:**  Okay.

25         **MS. LITTLE:**  The last housekeeping issues I think were

1     pretty much resolved.  The issue about emails and possibly

2     having emails come in as business records, we just wanted to

3     flag that issue for the Court.

4          There's nothing to decide now, but we wanted to just alert

5     the Court to the issue and alert the Court to the *Deepwater*

6     *Horizon* case, which I think has a good test for evaluating

7     emails coming in as business records.  So there is nothing to

8     decide now.  We just wanted to alert you to the issue.

9          **THE COURT:**  Well, what I'm concerned about when you start to

10    highlight things for me, is if you didn't think it wouldn't be

11    an issue you probably wouldn't highlight it.  So, and that means

12    it probably will be an issue.

13         And now my question is, I look at these things in terms of

14    the flow of the trial.  And, I like to be sure that if there is

15    an objection to an exhibit, that the objection is essentially

16    well-founded.  That is, isn't based on -- on what I call the

17    authenticity dilemma.  You know, is it what it purports to be?

18         And then, is there a basis for it coming in in terms of its

19    admissibility, which the government argues it is all business

20    records.  I actually operate on the proposition that any

21    document referred to -- unless I hear an objection can come in,

22    I mean, obviously.  I don't want to slow down, I don't want to,

23    you know, is this a true and accurate representation of da, da,

24    da, da.  I mean, it just takes forever to do it.

25         So maybe, if there are exhibits that the parties believe may

create some issues as to whether or not they're admissible, I

would like to highlight that and try to resolve that outside the

presence of the jury, you know, at different times, as the case

progresses.

**MS. LITTLE:**  (Nods head) And we can try to bring to the

Court's attention in the morning, if there are documents as to

which we believe there will be issues, we can certainly do that.

**THE COURT:**  Sort of a good idea to bring it 24 hours before.

So I can rule on it, if that -- that day, so then the next day

it's smooth.  Smooth as anything can be.

**MR. LEACH:**  The concern from the government, Your Honor, is

people write emails for lots of different reasons.  And if we

have a sponsoring witness up there who can testify about what it

means, why it was sent, what the context is, that's one thing.

But if the defense is trying to put in emails between two

people who are not here on the stand, where we cannot

cross-examine them, where we don't know what the words mean,

where we don't have the ability to test the foundation for the

business records exception, we are go-slow on agreeing to the

admissibility of that.  And I think that's the issue.  It is

very hard to decide in the abstract --

**THE COURT:**  You start with the proposition that, in terms of

authenticity, in terms of the business record, the witness who

created the document, the email, it satisfies that prong.  That

person can testify.

1    **MS. LITTLE:**  Presumably, yes, right.  Where the issue is

2    going to come up is so the government, because they have

3    designated 13 co-conspirators, they have pretty much full

4    license to admit emails at will under the co-conspirator

5    exception.  From the defense side, we're not able to do that.

6    Ironically, in a civil case, if HP were the opposing party we

7    could bring them in as party admissions.  Because HP -- this is

8    a criminal case, we don't have that option.  So we have to rely

9    on other exceptions to the hearsay rule to admit emails.  And

10   the most likely one would be either state of mind or business

11   records.

12       So, we just simply wanted to alert the Court that there are

13   other hearsay exceptions that we are going to have to be relying

14   on, emails coming in as business records can be tricky, and

15   there's law on it that we have cited to the Court.  And we just

16   wanted to flag that.

17       **THE COURT:**  I had better review that law.  Because if it's

18   going to be tricky, I'd better understand what the trick is.

19   Okay.  I mean obviously, state of mind, those are easy

20   determinations.

21       **MS. LITTLE:**  Right.

22       **THE COURT:**  Okay.

23       **MS. LITTLE:**  Okay.  Good-faith witness list.  We have been

24   conferring with the government.  The government provided a new

25   witness list a couple of weeks ago, with 69 substantive

witnesses or -- excuse me, 64 -- no, 69 witnesses, of which 53

they say are more likely than not to be called.

    We would simply ask that that good-faith witness list be

updated as it can be.  I think there may be some people on there

that the government may know that they're not going to call;

there may be additional people that they are adding.

    **MR. REEVES:**  I have agreed to do that.

    **MS. LITTLE:**  With respect to order of witnesses.  We have

agreed to a three-day notice period, three-trial-day notice of

witnesses and their accompanying exhibits, which is terrific.

Mr. Reeves has also given us, as to about a dozen key witnesses,

whether they're likely to be at the beginning, middle or end.

    For the remaining 40 witnesses, we would again ask the

government to give us -- we won't hold them to it, but a

good-faith kind of order of witnesses so that we're not

preparing for 53 witnesses on the first day of trial.  It's a

long trial.  And to the extent the government has even the

vaguest idea of this is kind of how it's going to go, it would

be extremely helpful to us to understand what we should be

preparing for, for the first week or two of trial.

    **MR. REEVES:**  I've agreed to confer with them about that.

And when they asked the first time, we answered their questions.

We're happy to keep talking.

    **MS. LITTLE:**  The next issue has a to do with exclusion --

sequestration of witnesses.  We have agreed with the government,

we both agree that witnesses should be excluded.  We also just

talked at the break, and we agree that once a witness is on

cross-examination, they will be sequestered from the sponsoring

attorney.

In other words, once Mr. Egan starts cross-examination, he

can't confer with the prosecutors about how it's going.

The last point on sequestration is that to the extent that

there are --

**THE COURT:**  You agreed to that?

**MS. LITTLE:**  I think he agreed.

**MR. REEVES:**  I agreed --

**THE COURT:**  I just never heard the government agree to that.

So I -- I -- I mean --

(Off-the-Record discussion between counsel)

**THE COURT:**  Look, if they have agreed to it, they have

agreed to it, and that's the end of the matter.

**MR. REEVES:**  I have --

**THE COURT:**  I'm not -- but, I just want to make sure you

have agreed to it.  Have you agreed to that?

**MR. REEVES:**  Once my witness hits the stand, unless there's

an issue that is specific -- which I will alert counsel to, I'm

happy to -- I will not talk to that witness again until they are

done.

**THE COURT:**  That is an exception that you could drive a Mack

truck through.  I mean, the reason -- the reason that you talk

1    to the witness is because you have got to get a clarification --

2    you know, the witness gives his direct.  Now he's on cross.  He

3    says X.  Catching one of the parties by surprise.

4        Okay.  Is the government saying -- and that could be

5    nothing, it could be medium, it could be large, it could be

6    extra large.  I don't know.

7        Now, is the government saying, because I think we have to --

8    this is exactly one of the rules that the lawyers start to shout

9    at each other during the course of the trial about, "You told us

10    this, and now it's Y."

11        I want to make sure there's absolutely a clear rule as to

12    whether or not either side can talk to their witness who is

13    undergoing cross-examination.  So either you can or you can't.

14    And I need to know that.

15        **MR. REEVES:**  I will follow the Court's direction --

16        **THE COURT:**  No, I'm not directing in any way.

17        **MR. REEVES:**  Okay.

18        **THE COURT:**  I'm out of this.  I -- I am -- it's a question

19    of whether you have an agreement to do so.  If you have an

20    agreement to do so, then I will enforce that agreement.

21        **MR. REEVES:**  The practice --

22        **THE COURT:**  If you do not -- Listen to me, Mr. Reeves.

23        **MR. REEVES:**  Okay.

24        **THE COURT:**  Because I don't want to -- if you don't have an

25    agreement, I'm not going to order that to be done.  Because I

1    never have, in any case.  I -- much to the dismay of the

2    defense.  I got that.  So, what, did you agree or did you not

3    agree?

4        **MR. REEVES:**  I think we did agree.  I have agreed to do the

5    following.  Once the witness hits the stand, I will not be

6    talking to them directly, the government will not speak with

7    them directly.  If --

8        **THE COURT:**  What does "directly" mean?  Is that you send out

9    your agent, you say, "Hey..."

10       **MR. REEVES:**  Directly or indirectly.  I'm trying to

11   establish a bright line.

12       **THE COURT:**  No, no, no, no.  Maybe you ought to just answer

13   yes or no.  "We agree to not talk to the witness."  "We," that

14   means everybody.  "We agree not to talk to that witness."  Or

15   "We don't agree that we won't talk to the witness."

16       Obviously, if you talk to the witness, that's a fact I

17   may -- I may impose an obligation on a party to disclose that to

18   the -- to the opposite side before cross-examination is

19   concluded, or during the course of cross-examination.  I may

20   order disclosure.

21       And then, of course, you could ask any questions you want

22   to.  Because I don't like, quote, "secrets" going on.  But this

23   isn't a secret.  This is just a question of:  What, what are you

24   going to do?  What are you going to do, Mr. Reeves?  Which way

25   are you going on this issue?

1    **MR. REEVES:**  I agree not to talk to the witness once they

2    hit the stand, Your Honor.

3        **THE COURT:**  Okay.  There we are.

4        **MS. LITTLE:**  Thank you.

5        The only remaining point on sequestration is on the

6    indirect-direct point, is that witnesses should also not be

7    provided transcripts or otherwise be told, you know, what's

8    happening in the courtroom.  What the other testimony is.

9        **THE COURT:**  I'm trying to get this, exactly what these --

10       **MS. LITTLE:**  Well, witnesses are excluded.  They also can't

11   be provided transcripts, for example.

12       **THE COURT:**  Of the -- of the --

13       **MS. LITTLE:**  Of other witnesses' testimony.

14       **THE COURT:**  Yeah.  I think that's right.  They certainly can

15   be given their 302s or something else or another declaration or

16   anything else they said in order to prepare.  I don't want to

17   curtail the preparation of a witness.  After all, we're talking

18   about a two-month trial.  So, yeah.  I don't want to hear a lot

19   of "I can't recall."

20       **MS. LITTLE:**  Right.

21       **THE COURT:**  Okay.

22       **MS. LITTLE:**  The Court has asked that the parties be

23   prepared to discuss the "formats in which exhibits such as

24   voluminous financial data should be admitted."

25       **THE COURT:**  Right, yeah.

1    **MS. LITTLE:**  I'm not sure what the Court has --

2    **THE COURT:**  Okay.  I'm now talking about pieces of paper.

3    Or drives or electronic stuff or all the things I can't figure

4    out.  And, and I'm trying to figure out, in my mind, what

5    procedural are we going to use to show the jury what the

6    evidence is in the case.

7    **MS. LITTLE:**  On the --

8    **THE COURT:**  And that's what I need to know.

9    In other words, are you going to put it on a hard drive or

10   whatever they call those things?  Are you going to -- how are

11   you going to do it?  How are they going to see the exhibits?

12   How are they going to be admitted?  How are they going to use it

13   during the course of deliberations?

14   This isn't like we have six documents, you simply give them

15   to Ms. Scott, she'll mark them A through, you know, F, and

16   that's it.  That's easy.  Those days are behind us, I guess.  At

17   least in this case.

18   **MS. LITTLE:**  (Nods head) I can answer for the defense.  If

19   you want to ask the government first --

20   **THE COURT:**  Well, what I do want is the parties to have a

21   single system.  And I don't even care -- you know, I never care

22   about it's Government's A and it's Defense 2.  You know, I don't

23   care about the numbering system, I don't care about any of that

24   except one system, one way of doing it.  No duplication of

25   documents and so forth.

1          And so that they can be pulled up quickly, I like the

2     technical people on both sides to agree to help each other out.

3     Use the same system so we don't:  Oh, now we're changing over to

4     system A and then system B.  Very little works in this

5     courtroom, anyway, so you're going to have to deal with that.

6     Right?

7          **MR. REEVES:**  We'll go first because it's our case?

8          **THE COURT:**  Yeah.

9          **MR. REEVES:**  Okay.  I expect most of the witnesses -- most

10     of the exhibits will be paper documents, like the Court and

11     Counsel are familiar with.

12          Certain of them are special spreadsheets that are too

13     voluminous to be replicated on pieces of paper, and we would

14     settle on a fixed CD that is -- we would use in court,

15     electronically and would be made available to the jury in their

16     deliberations, electronically, in a secured or appropriate

17     computer for the jury deliberation.  I have seen that done in

18     other cases, and I think it could be done reasonably easily

19     here.

20          **THE COURT:**  Could I do this?  Because this is all going to

21     go over my head shortly, can I just have the parties meet and

22     confer?

23          **MR. REEVES:**  Yes.

24          **THE COURT:**  And agree upon a system.

25          **MS. LITTLE:**  Yes.

 1    **MR. LEACH:**  Yes.

 2    **THE COURT:**  I mean, you understand what has to be done.

 3    **MS. LITTLE:**  Yep.

 4    **MR. REEVES:**  The only question I have in this vein is:  What

 5    does the Court want in advance of the testimony on a particular

 6    day, in the form of witness binders and things of that nature?

 7    **THE COURT:**  Well, we're talking about in terms of documents?

 8    **MR. REEVES:**  Yes.

 9    **THE COURT:**  I haven't thought about it.

10    **MS. LITTLE:**  We can meet and confer and figure that out too.

11    But I don't know.

12    **THE COURT:**  I mean, it helps that I can follow through --

13    **MR. REEVES:**  We'll give you a witness binder.

14    **THE COURT:**  Yeah, I think that's right.

15    **MR. REEVES:**  All right.

16    **MS. LITTLE:**  I also should just ask, do we need an order

17    from the Court to get permission to bring electronic equipment

18    in?

19    **THE CLERK:**  (Nods head)

20    **THE COURT:**  Yes.

21    **MS. LITTLE:**  So we should discuss with Ms. Scott how to do

22    that.

23    **THE COURT:**  Right.

24    **MS. LITTLE:**  All right, I think that is it.

25    **MR. REEVES:**  I have one last question, Your Honor.

1          **THE COURT:**  Sure.

2      **MR. REEVES:**  The defense had asked that counsel -- not

3  witnesses, counsel be excluded from the trial.  I do not think

4  that that's an appropriate application of the witness exclusion

5  rule.  And I wanted to make certain there was no ambiguity about

6  that.

7          **THE COURT:**  So you're talking about a witness's attorney.

8          **MR. REEVES:**  Correct.

9          **THE COURT:**  And can a witness's attorney be excluded -- if

10  you exclude witnesses, can you also exclude their counsel.

11      **MS. LITTLE:**  Either that, or you can give an admonishment

12  that the counsel should not reveal the testimony --

13      **THE COURT:**  Well, that is rather dangerous.  I mean, then

14  I'm really wading into -- maybe I have to.  I haven't figured it

15  out.  But to -- it is a difficult -- if I had a rule which said

16  a lawyer can't tell his client something, I have to figure that

17  out.  I mean, we do it all the time in protective orders, but I

18  haven't quite figured out whether you do that in terms of

19  witnesses and during court proceedings.

20      And I guess what you are saying is it would defeat the

21  purpose of the exclusion if in fact, they're sitting here with

22  their lawyers, writing all this down, and then if a witness has

23  been excluded they go back and they say:  Well, look, here are

24  the five issues that you ought to be aware of, and this is what

25  Jones says and this is what Smith says, and so forth, you have

1   actually circumvented the rule.

2       So your position is that if an attorney comes in who

3   represents a prospective witness, they should be instructed not

4   to disclose what occurs in testimony prior to their client's

5   testifying.  Their appearance.  That's what you are saying.

6       **MS. LITTLE:**  Correct.

7       **THE COURT:**  Has that been done?  I don't know.

8       **MR. REEVES:**  No, I don't think it's ever been done.  And I

9   think the Court has a --

10      **THE COURT:**  Why shouldn't it be done, I guess is the

11  question.

12      **MR. REEVES:**  I think -- um, why shouldn't it be done?  I

13  think there are very good reasons not to do it.  First of all,

14  this is a public proceeding.  Second of all, there could be lots

15  of interest associated with a witness's counsel that are

16  relevant in the -- by allowing the lawyer to witness relevant

17  pieces --

18      **THE COURT:**  No, I don't think I can exclude the lawyer.  I

19  mean, the question is can I -- can I order the lawyer -- and I

20  guess everybody knows who the lawyers are for these parties and

21  so forth.  But can I direct the lawyer not to discuss the

22  testimony that was elicited during the course of the proceeding?

23  That is the -- that is the question.

24      **MR. REEVES:**  I think the Court is right to be cautious with

25  regard to such direction.  I think the remedy's already there,

which is cross-examination.  And I think the lawyer --

**THE COURT:**  How does that go?  Does it go like:  Now,
Ms. Jones, you see that -- that lawyer out there -- Ms. Smith?
Is that your lawyer?

Yeah.

And Ms. Smith's been here every day.

Yeah.

Well, let me ask you, did you have a conversation with your
lawyer, Ms. Smith?

Yes.

Well, what did you say?

I think it's privileged.  I have sense it might be
privileged.

**MR. REEVES:**  I'm sure those wouldn't be the questions that
these counsel would ask.

**THE COURT:**  No, they are my questions.

**MR. REEVES:**  Those might be privileged questions.

**MR. KEKER:**  (Inaudible)

**MR. REEVES:**  But the question:  Isn't it a fact that you
know what Mr. Jones, Ms. Smith said yesterday?  Isn't it a fact
you've just adjusted your testimony?

You don't have to get into the how but there is a remedy,
with the witness.  And I think there's a long custom and
practice --

**THE COURT:**  It's okay until she says no.  So then you say:

1    Okay, now I'm going call the lawyer who is here writing it all

2    down, because it's clear that this testimony has changed as a

3    result of a conversation.

4        I don't know.  I don't know that there's another remedy.  I

5    need to think about it.  If you people want to -- want me to

6    issue an order, propose one.  I don't need to do the work.

7        **MR. REEVES:**  Okay.

8        **THE COURT:**  Even though my billable rate is actually more

9    reasonable than some other attorneys' billable rates -- I'm not

10   singling out anybody here, just saying that it is a reasonable

11   rate.  Reasonable advice at a reasonable rate.

12       **MS. LITTLE:**  Fair enough.

13       **THE COURT:**  Okay.  You will write something if you want me

14   to do it.

15       **MS. LITTLE:**  Will do.

16       **MR. REEVES:**  I think that's all for the government,

17   Your Honor.

18       **THE COURT:**  Is that it?  Only three hours?

19       **MS. LITTLE:**  Two days scheduled -- so we are doing pretty

20   well.

21       **THE COURT:**  We are doing extremely well.  Now, my question

22   is:  How long is your opening going to be?  Roughly.

23       **MR. REEVES:**  One hour.

24       **THE COURT:**  One hour.

25       And the defense will not be making an opening?  You will

1    simply reserve --

2        **MR. KEKER:**  Your Honor, if I do, I would estimate an hour,

3    too.

4        **THE COURT:**  Okay.  So, get ready with witnesses.  We'll move

5    quickly.  And you know my rule.  You all know my rule?

6        **MR. KEKER:**  (Shakes head)

7        **THE COURT:**  When you ran out of witnesses, you rest.

8        **MR. REEVES:**  (Nods head)

9        **MR. LEACH:**  (Nods head)

10       **MR. REEVES:**  We know your rule.

11       **THE COURT:**  Unless you have a very good reason for running

12   out of witnesses.  So, you know, you have got to be prepared by

13   things like:  No, we don't have any questions.  That sort of

14   cross.  That happens every now and then.  Especially if the

15   witness isn't going to help them.  Yeah.  No, we don't have

16   anything.

17       **MR. REEVES:**  We know the rule, Your Honor.

18       **THE COURT:**  We don't have any questions for that.  Right?

19   So, be prepared.  Have them lined up.

20       I know it's an inconvenience.  I understand that.  But it's

21   nothing, it doesn't equal the inconvenience for everybody else.

22   And of course, I'm thinking about myself.  Okay?

23       **MR. REEVES:**  Understood, Your Honor.

24       **THE COURT:**  All right.  Okay.  All right.  Thank you.  We

25   are in recess.

1         **MR. REEVES:**  Thank you.

2         **MR. FRENTZEN:**  Thank Your Honor.

3         **MR. KEKER:**  Thank Your Honor.  Have a good vacation.

4         **THE COURT:**  Yeah.

5         (Conclusion of Proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Thursday, February 15, 2018