Volume 3
Pages 192 - 458

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

```
UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
   VS.                         )    NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
```

San Francisco, California
Tuesday, February 27, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

> ALEX G. TSE
> Acting United States Attorney
> 450 Golden Gate Avenue
> San Francisco, California  94102
> BY:  **ROBERT S. LEACH**
>      **ADAM A. REEVES**
>      **WILLIAM FRENTZEN**
>      **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

> KEKER & VAN NEST
> 633 Battery Street
> San Francisco  CA  94111
> BY:  **JOHN W. KEKER**
>      **JAN NIELSEN LITTLE**
>      **BROOK DOOLEY**
>      **KATE LAZARUS**
>      **NIC MARAIS**
>      **ATTORNEYS AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

1    **APPEARANCES**:  (CONTINUED)

2    For Hewlett Packard:

3                          MORGAN, LEWIS & BOCKIUS LLP
                          One Market - Spear Street Tower
                          San Francisco, California  94105
4                 BY:  **SUSAN D. RESLEY, ATTORNEY AT LAW**

5                          GIBSON, DUNN & CRUTCHER LLP
                          555 Mission Street - Suite 3000
6                          San Francisco, California  94105
                 BY:  **MICHAEL LI-MING WONG, ATTORNEY AT LAW**
7
                          CHOATE, HALL & STEWART LLP
8                          Two International Place
                          Boston, Massachusetts  02110
9                 BY:  **ROBERT S. FRANK JR., ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2    Tuesday, February 27, 2018 - Volume 3

 3    GOVERNMENT'S WITNESSES                          PAGE   VOL.

 4    SULLIVAN, MICHAEL (RECALLED)
      (PREVIOUSLY SWORN)                               202    3
 5    Direct Examination resumed by Mr. Leach          202    3
      Cross-Examination by Mr. Keker                   252    3
 6    Redirect Examination by Mr. Leach                348    3

 7    UPTON, NIGEL
      (SWORN)                                          356    3
 8    Direct Examination by Mr. Reeves                 357    3
      Cross-Examination by Ms. Lazarus                 372    3
 9    Redirect Examination by Mr. Reeves               389    3

10    BAIOCCO, JOHN
      (SWORN)                                          395    3
11    Direct Examination by Mr. Frentzen              396    3

12                          E X H I B I T S

13    TRIAL EXHIBITS                          IDEN   EVID   VOL.

14       22                                           322    3

15       32                                           409    3

16       52                                           417    3

17       70                                           426    3

18       100                                          432    3

19       243                                          287    3

20       301                                          304    3

21       328                                          301    3

22       974                                          202    3

23       1015                                         204    3

24       1072                                         208    3

25
```

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1267 | | 210 | 3 |
| 1272 | | 210 | 3 |
| 1286 | | 211 | 3 |
| 1307 | | 212 | 3 |
| 1322, Page 1 | | 214 | 3 |
| 1343 | | 216 | 3 |
| 1631 | | 219 | 3 |
| 1645 | | 220 | 3 |
| 1646 | | 222 | 3 |
| 1656 | | 225 | 3 |
| 1680 | | 226 | 3 |
| 1837 | | 227 | 3 |
| 1840 | | 235 | 3 |
| 1845 | | 230 | 3 |
| 1861 | | 232 | 3 |
| 1913 | | 233 | 3 |
| 2295 | | 363 | 3 |
| 2424 | | 247 | 3 |
| 2559 | | 420 | 3 |
| 2725 | | 242 | 3 |
| 2727 | | 361 | 3 |

1

**I N D E X**

2

**E X H I B I T S**

3    **TRIAL EXHIBITS**                   **IDEN**   **EVID**   **VOL.**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2728 | | 369 | 3 |
| 2733 | | 371 | 3 |
| 5302 | | 281 | 3 |
| 5305 | | 289 | 3 |
| 5306 | | 289 | 3 |
| 5307 | | 291 | 3 |
| 5308 | | 293 | 3 |
| 5310 | | 269 | 3 |
| 5313 | | 298 | 3 |
| 5314 | | 312 | 3 |
| 5315 | | 313 | 3 |
| 5319 | | 330 | 3 |
| 5331 | | 315 | 3 |
| 5332 | | 316 | 3 |
| 5334 | | 320 | 3 |
| 5338 | | 321 | 3 |
| 5340 | | 324 | 3 |
| 5343 | | 337 | 3 |
| 5344 | | 338 | 3 |
| 5346 | | 338 | 3 |
| 5348 | | 340 | 3 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 5350 | | 340 | 3 |
| 5352 | | 348 | 3 |
| 5353 | | 340 | 3 |
| 5369 | | 305 | 3 |
| 5380 | | 334 | 3 |
| 5382 | | 343 | 3 |
| 5385 | | 375 | 3 |
| 5527 as demonstrative | | 387 | 3 |

 1 | <u>**Tuesday - February 27, 2018**</u>                    <u>**8:57 a.m.**</u>

 2 |                     <u>**P R O C E E D I N G S**</u>

 3 |                       **---oOo---**

 4 |     (Proceedings were heard out of presence of the jury:)

 5 |         **MR. LEACH:**  Good morning, Your Honor.

 6 |         **THE COURT:**  Good morning.  Let the record show all

 7 | parties are present.  The jury is not present.

 8 |         **MR. LEACH:**  Your Honor, there was one matter the

 9 | Government was hoping to raise before the cross-examination of

10 | Mr. Sullivan.

11 |         **MR. KEKER:**  I can't hear what you are saying.

12 |         **MR. LEACH:**  There is one matter the Government wanted

13 | to raise before the cross-examination of Mr. Sullivan, and

14 | that's we anticipate the defense will attempt to elicit

15 | testimony regarding who is paying Mr. Sullivan's fees.

16 |     We object.  We think it's irrelevant and we also think

17 | it's excludable under 403(b), the reason being California law

18 | requires companies like HP, like other companies, to indemnify

19 | individuals in government investigations for acts within the

20 | scope of their employment, and if they're legally obligated to

21 | pay fees, we don't understand how that can go to bias.

22 |         **MR. KEKER:**  This is absolute nonsense, but I'm not

23 | going to raise it with Mr. Sullivan.  We don't need to deal

24 | with it now.  It's Egan and Scott that I'm going to be raising

25 | it with.

1          **THE COURT:**  So I have to address it at some point.

2      Look, the way I operate, so everybody gets it straight, is

3  I'm in the avoidance mode.  I don't decide things until I have

4  to decide them.  I let the lawyers run their case.  They use

5  their judgment as to whether or not they want to bring up --

6  I'm not faulting you at all.  I mean, believe me, you're right

7  to raise it.  Okay.

8      I think I need to know the answer to that question.  It's

9  not obvious on the face.  Maybe it's because I don't know

10  California law, but if you want to do a little brief on it or

11  give me a letter or something or cite some authority and so

12  forth, I'll take a look at it.  I think it might have some

13  complication to it.  I don't know.  Okay?  All right.  But it's

14  not going to be raised with this witness, which is great.

15          **MR. LEACH:**  Understood, Your Honor.  Thank you.

16          **THE COURT:**  Okay.  Thank you for raising it.  Okay.

17      Are we all set?

18          **THE CLERK:**  One more juror.

19          **THE COURT:**  One more juror.

20          **MR. KEKER:**  Your Honor, we have one matter, as long as

21  we're waiting for a juror.

22          **THE COURT:**  Just make sure it's on the record.  You

23  have to be loud.

24      Mr. Reeves, good morning.  You're also in this case?

25          **MR. REEVES:**  I am.  I look forward to finally making

1    an appearance eventually.

2         THE COURT:  One thing I'm sure of is we will get to

3    everybody in this case.  Just everybody.

4         MS. LAZARUS:  Your Honor, this relates to Nigel --

5         THE COURT:  You have to identify yourself.

6         MS. LAZARUS:  Kate Lazarus for Defendant Sushovan

7    Hussain.

8         This relates to some evidence we want to cover with Nigel

9    Upton, who is the second Government witness today.

10        THE COURT:  Okay.  Yeah.

11        MS. LAZARUS:  We have sent to the Government two

12   exhibits that summarize HP's share price through 2011 and 2012.

13   It's information we obtained from the Google finance website.

14   I can show you the charts.

15        THE COURT:  Okay.  Go ahead.

16        MS. LAZARUS:  We believe the evidence is admissible

17   under 803.17 or is subject to judicial notice.  And then we

18   would like to, after that, introduce a summary chart that shows

19   the stock price movement over those two years.  We believe it's

20   all admissible and/or subject to judicial notice, but I think

21   the Government may have another view.

22        THE COURT:  You think they might.  They might.

23        What's your view?

24        MR. REEVES:  We conferred about this.

25        I have no objection to the questions.  I have no objection

1  eventually to the stock prices and the stock chart coming in.

2      I question whether this witness is competent to do that as

3  an individual shareholder.  I think there are more appropriate

4  ways to do it.

5          THE COURT:  What difference does it make?  If it's

6  going to come in, what difference does it make who is the

7  witness?

8          MR. REEVES:  Well, I think the point I'm making is I'm

9  happy to have the exhibits used, questions asked, even used as

10  demonstratives and shown to the jury, and I would like to

11  proceed by stipulation so that we can double check the accuracy

12  of the information.  I think we can probably agree on that.  It

13  shouldn't be controversial.  But it doesn't need to be received

14  in evidence through this witness today.

15          MS. LAZARUS:  We're fine waiting to admit the evidence

16  through another witness, but we don't need the witness to

17  authenticate the information.  It's subject to judicial notice.

18  We have --

19          THE COURT:  What you are saying, what I'm hearing,

20  through my defective hearing, is that the parties will sit down

21  and discuss it and arrive at some stipulation?

22          MR. REEVES:  Yes, Your Honor.

23          THE COURT:  That's great.  Okay.  Thank you very much.

24      What else can we avoid?  Avoid the whole trial?  What else

25  can we avoid?  Anything else?  Let's see.

 1          THE CLERK:  Let's see if she's here.

 2          THE COURT:  By the way, you never have to ask whether

 3   you can approach the witness.  Just approach the witness.

 4          MR. LEACH:  Thank you.

 5          THE COURT:  That will save about a day.

 6      (Proceedings were heard in the presence of the jury:)

 7          THE COURT:  Let the record reflect all jurors are

 8   present.  The parties are present.  Mr. Sullivan is being

 9   examined.

10      And you may proceed.

11          MR. LEACH:  Thank you, Your Honor.

12      **MICHAEL SULLIVAN**, **GOVERNMENT WITNESS, PREVIOUSLY SWORN**

13               **DIRECT EXAMINATION**  (resumed)

14   BY MR. LEACH:

15   **Q.**  Good morning, Mr. Sullivan.

16   **A.**  Good morning.

17   **Q.**  I placed before you what has been marked as Exhibit 974.

18   Do you recognize this document?

19   **A.**  Yes.

20   **Q.**  Is this a true and correct copy of an email you received

21   from a woman named Linda Marbena at Zones attaching an invoice

22   for certain hardware that Autonomy had sold?

23   **A.**  Yes, it is.

24          THE COURT:  Admitted.

25      (Trial Exhibit 974 received in evidence)

1    BY MR. LEACH:

2    Q.    Who is Linda Marbena, Mr. Sullivan?

3    A.    She was, to the best of my recollection, a woman -- I

4    believe she was from Zones, but honestly, I don't know exactly

5    who she is.  I'm trying to piece it together by reading the

6    email.  I don't remember her.

7    Q.    Who was your most significant contact at Zones?

8    A.    I don't even remember.

9    Q.    Would you please look at the invoice that is attached to

10   this email, page 5.

11   A.    Okay.

12   Q.    And is this an invoice for Autonomy's sale of Dell

13   hardware to Zones?

14   A.    Let's see.  Yes.

15   Q.    What is the total amount of the invoice?

16   A.    7 million -- a little over $7 million.

17   Q.    I draw your attention to the left portion of the page

18   where there is a description of hardware.  Do you see that?

19   A.    Yes.

20   Q.    And in the comments, there's something -- it says "HR

21   Block."  Do you see that?

22   A.    Yes.

23   Q.    Does this refresh your recollection that Zones is a

24   distributor?

25   A.    Yes.  Zones is a distributor for H&R Block.

SULLIVAN - DIRECT / LEACH

1  Q.   Did you have any contact with H&R Block about this

2  transaction?

3  A.   I don't think so, no.

4  Q.   Did you have any contact with H&R Block about selling them

5  software?

6  A.   No.

7  Q.   How did this sale of hardware to Zones for H&R Block

8  advance any marketing objective to sell software to Autonomy

9  customers?

10 A.   I don't know.

11 Q.   Please look at Exhibit 1015.

12 A.   Okay.

13 Q.   Do you recognize this?

14 A.   Yes.

15 Q.   Is this a true and correct copy of an email that you sent

16 to Jorge Salazar attaching certain invoices and purchase orders

17 for Zone's transactions?

18 A.   Yes.

19          MR. LEACH:   Your Honor, I offer Exhibit 1015.

20          THE COURT:   Admitted.

21     (Plaintiff's Exhibit 1015 received in evidence)

22 BY MR. LEACH:

23 Q.   I direct your attention, Mr. Sullivan, to the top portion

24 of this email, the first half.  And I may have asked this, but

25 who is Jorge Salazar?

1  **A.**   He is in the legal department.  He was involved with the

2  logistics of processing the orders.

3  **Q.**   And you write to Mr. Salazar, "There are only two PO's

4  here for Zones.  Did we ever get the fourth for the monitors,"

5  and then below there is a reference to Zones/Block order for

6  7M.  Do you see that?

7  **A.**   Yes.

8  **Q.**   What is that a reference to?

9  **A.**   Let's see.  I think I'm just saying -- I'm just asking him

10 did the Zones/Block order for $7 million come in.

11 **Q.**   Okay.

12 **A.**   Because he processed the paperwork and the paperwork went

13 to him.

14 **Q.**   Beneath that there is a description, "The two orders

15 attached here are for Zones/Oracle."  What is that a reference

16 to?

17 **A.**   So I believe Zones was also a distributor for Oracle as

18 well.

19 **Q.**   Please look at page 4.

20 **A.**   Yes.

21 **Q.**   Is this an example of a Zones' purchase order for Dell

22 hardware to sell to Oracle?

23 **A.**   Yes.

24 **Q.**   What is the amount?

25 **A.**   2.9 million.  Almost 3 million.

**SULLIVAN - DIRECT / LEACH**

1  **Q.**   Did you have any contacts with Oracle about this hardware

2  order?

3  **A.**   Not that I can recall.

4  **Q.**   Did you bring up this hardware in any conversations with

5  Oracle in connection with selling them software?

6  **A.**   No.

7  **Q.**   How did this sale advance any marketing objective to sell

8  Autonomy software to an Autonomy customer?

9           **MR. KEKER:**   Objection, Your Honor.   No foundation.

10           **THE COURT:**   Sustained.

11  **BY MR. LEACH:**

12  **Q.**   Did you view this as advancing any marketing purpose to

13  sell software to Oracle or to Zones?

14           **MR. KEKER:**   Objection, Your Honor.   Irrelevant.

15           **THE COURT:**   I don't know that it's irrelevant.   On

16  that basis, I overrule the objection.

17       I don't know that he's laid a foundation.   I mean, I think

18  you have to lay more of a foundation going back to the first

19  objection.

20           **MR. LEACH:**   Thank you, Your Honor.

21  **Q.**   Were you involved in negotiating this transaction,

22  Mr. Sullivan?

23  **A.**   I'm sure I was, yeah.

24  **Q.**   Was anyone more involved than you in consummating this

25  transaction with Zones?

**SULLIVAN - DIRECT / LEACH**

1    **A.**    No.

2    **Q.**    Did you view this transaction as advancing any type of

3    marketing purpose?

4    **A.**    I viewed it as just trying to get the transaction done and

5    that the -- the pure fact that we were giving an extensive

6    discount was known to these customers and they would view that

7    as a benefit to them, and that however they viewed that,

8    whether they call that "marketing" or "I'm getting a discount"

9    or whatever they looked at that, that's the benefit for them,

10   is a discount, and they saved money.

11   **Q.**    Did you have any contact with Oracle?

12   **A.**    I don't believe so.

13   **Q.**    How do you know they even knew about this?

14   **A.**    Well, obviously they knew.  They were buying it -- this

15   was their stuff and they were getting a discount.  I'm

16   confident that they knew because I believe that they had to

17   sign off through their distributor.

18   **Q.**    Who did you speak to, Mr. Sullivan?

19   **A.**    No one, as I said.

20   **Q.**    So you don't know?

21   **A.**    Correct, as I said.  Yep.

22   **Q.**    Please look at what has been marked as Exhibit 1072.

23   **A.**    Uh-huh.

24   **Q.**    Do you recognize this?

25   **A.**    Yes.

**SULLIVAN - DIRECT / LEACH**

1  **Q.**   What is it?

2  **A.**   Another email to Zones.  It looks like it's copying Zones

3  and Dell and -- let's see.  It looks like they are talking

4  about a new opportunity they're trying to introduce us to that

5  they want to partner on, and I think it's with -- it appears

6  it's with Target.

7           **THE COURT:**  Admitted.

8       (Trial Exhibit 1072 received in evidence)

9           **THE WITNESS:**  And it's just talking about the details

10  of a deal, a potential deal.

11  **BY MR. LEACH:**

12  **Q.**   When you say Target, who do you mean?

13  **A.**   Target, the big retailer, I believe.

14  **Q.**   Let me draw your attention, please, to the middle portion

15  of the email.

16  **A.**   Uh-huh.

17  **Q.**   Under the line "Potential," do you see that?

18  **A.**   Yes.

19  **Q.**   And there's a reference to a, "5 or 10M of Dell client

20  product business."  What does that mean?

21  **A.**   It would have been the same thing, selling 5 to $10

22  million of Dell hardware.

23  **Q.**   Up at the top, there is some individuals named Dominic

24  Camden and John Niemier.  Who are they?

25  **A.**   I don't recall them.  I vaguely recall Dominic Camden, but

1  obviously they were from Zones from the email addresses here.

2  **Q.**   Did you have any contact with Target regarding this

3  hardware sale?

4  **A.**   No.

5  **Q.**   Did you ever bring up any hardware sales with Target in

6  any discussions about Autonomy software?

7  **A.**   No.

8  **Q.**   Please look at the second page of this, and I draw your

9  attention to the top portion where it says "Ground Rules."

10  **A.**   Yes.

11  **Q.**   Would you please read that for me.

12  **A.**   Sure.  "I will manage" -- this is from Randall Johnson,

13  the global account manager at Dell.

14      "I will manage all direct communications with the customer

15  until we have green lights on this partnership approach with

16  the customer.  Do not reach directly into Target.  I will bring

17  partner contacts into the deal as appropriate."

18  **Q.**   Thank you.

19      Did Autonomy ultimately sell Dell hardware to Zones to

20  resell to Target in the fourth quarter of 2010?

21  **A.**   I remember working on the deal.  I can't remember whether

22  it closed or not, but we certainly tried to get it closed.  I'm

23  sure there's a record in my Dell deal tracker of whether it did

24  or not, yeah.

25  **Q.**   Please look at Exhibit 1272.

1  **A.**   Okay.

2  **Q.**   I'm sorry.  Can we please start with 1261 -- or 1267.

3            **MR. KEKER:**  Where are we?  1267?

4            **MR. LEACH:**  1267.

5  **Q.**   Is this a true and correct copy of an email between you

6  and Dell relating to the sale of hardware to Zones for Target?

7  **A.**   Yes, it is.

8            **THE COURT:**  Admitted.

9            (Trial Exhibit 1267 received in evidence)

10  **BY MR. LEACH:**

11  **Q.**   Let me draw your attention to the middle portion of this

12  email, Mr. Sullivan.

13        Do you see where it says, "These PO's add up to about 3.2M

14  in orders.  Should we be expecting another 4.5M soon?"

15  **A.**   I do.

16  **Q.**   Does this refresh your recollection that you sold hardware

17  to Zones in the fourth quarter of 2010?

18  **A.**   Yes.  For Target's benefit.

19  **Q.**   Now please look at Exhibit 1272.  Is this a true and

20  correct copy of an email attaching additional purchase orders

21  from Zones?

22  **A.**   Yes.

23            **THE COURT:**  Admitted.

24            (Trial Exhibit 1272 received in evidence)

25  \\\

SULLIVAN - DIRECT / LEACH

BY MR. LEACH:

**Q.**   Please look at page 3 -- excuse me -- page 2 of this exhibit.

**A.**   Okay.

**Q.**   What is the amount of this purchase order?

**A.**   $4.1 million.

**Q.**   And this is for Dell equipment to go to Zones to ultimately go to Target?

**A.**   Correct.

**Q.**   What is the equipment in this purchase order?

**A.**   These are desktops, desktop computers.

**Q.**   Please look at what has been marked as Exhibit 1286.

      Is this a true and correct copy of an email that you sent to Sushovan Hussain regarding your efforts to resell hardware?

**A.**   Yes.

          **THE COURT:**  Admitted.

      (Trial Exhibit 1286 received in evidence)

          **THE CLERK:**  That's 1286?

          **MR. LEACH:**  Yes.

**Q.**   Mr. Sullivan, up at the top, there is the subject "Low Margin."  Do you see that?

**A.**   Yes.

**Q.**   What is that a reference to?

**A.**   That is the term that we use consistently to describe these type of transactions that were essentially the hardware

1  reselling, mostly through Dell.

2  **Q.**   Below you're writing, "We should reconcile these numbers.

3  Some of your totals by account are off.  Mine by a lot.  Where

4  do we get these numbers?  Here is what I have."  And then there

5  is a number of rows.

6      What does this reflect to you?

7  **A.**   I'm just trying to reconcile whatever number -- I was

8  comparing some number that Sushovan must have been using to my

9  numbers and trying to figure out why they were different.  So I

10  sent him a copy of my record, and I can't quite tell if there's

11  an attachment or if this is something copied in here, but, you

12  know, it looks like my typical Dell deal tracker log that I

13  kept that we reviewed yesterday.

14  **Q.**   Thank you.

15      Please look at 1307.  Is this a true and correct copy of

16  an email from Sushovan Hussain to you with the subject "Low

17  Margin"?

18  **A.**   Yes.

19          **THE COURT:**  Admitted.

20      (Trial Exhibit 1307 received in evidence)

21  **BY MR. LEACH:**

22  **Q.**   I draw your attention to the subject line, Mr. Sullivan.

23  What does "Low Margin" mean here?

24  **A.**   It consistently means the Dell reselling hardware deals.

25  **Q.**   Was it low margin sales or no margin sales?

1   **A.**   They were typically no margin sales.

2   **Q.**   What does that mean?

3   **A.**   That means we're selling the product for less than we're

4   buying it for.

5   **Q.**   In the email, Mr. Hussain wrote, "When do we get the MS

6   deal in and what can you reach?"  Do you see that?

7   **A.**   Yes.

8   **Q.**   What did that mean to you?

9   **A.**   MS would mean Morgan Stanley, and I think he's just --

10   there must have been a deal at that time that we were working

11   on with Morgan Stanley and he is asking for the status of that

12   deal.  We had lots of deals at Morgan Stanley almost every

13   quarter.

14       And "what can you reach?"  I would believe what he's

15   asking there is how much money do you think you can -- how much

16   revenue can you bring in in the quarter.

17   **Q.**   How much low margin revenue you can bring in in the

18   quarter?

19   **A.**   Correct.

20   **Q.**   Is that a reference to a forecast or a target that's been

21   set?

22   **A.**   Correct.  I would assume he's asking for a forecast.

23   **Q.**   Did you ever get updates from Mr.-- or requests for

24   updates from Mr. Hussain about marketing efforts relating to

25   reselling of hardware?

1  **A.**   Marketing efforts?  Not specifically in terms of

2  activities; just in terms of the deals themselves.

3  **Q.**   Please look at what has been marked as Exhibit 1322.  Do

4  you recognize this?

5  **A.**   Yes.

6  **Q.**   What is it?

7  **A.**   Well, it's a thread between Sushovan and I, and let me go

8  back to the beginning.  It looks like I'm just giving him a

9  forecast.  This is later in the same quarter that we just

10  discussed.  It starts off --

11       **THE COURT:**  Admitted.

12     (Trial Exhibit 1322, Page 1 received in evidence)

13       **THE WITNESS:**  I don't know why the back thread is

14  later than the front thread on a date.  That seems odd, but --

15  so it looks like this might be out of order a little bit,

16  but . . .

17       **MR. LEACH:**  Your Honor, I'm only interested in the

18  first page of this exhibit, so if we could -- we can fix the

19  exhibit and just limit it to the first page.

20       **THE COURT:**  Okay.

21       **THE WITNESS:**  It looks like I'm giving him an update

22  on just the deals that came in and the amounts that they add up

23  to.

24  **BY MR. LEACH:**

25  **Q.**   What deals do you mean, Mr. Sullivan?

SULLIVAN - DIRECT / LEACH

1   **A.**   The low margin deals with the same definition I've been

2   using.

3   **Q.**   Let me draw your attention to the initial email in the

4   thread at the bottom of page 1.  It says, "Closed and

5   yet-to-close."

6   **A.**   Uh-huh.

7   **Q.**   What did that mean?

8   **A.**   Well, that's just referring to the deals in the pipeline

9   that we're forecasting to come in, which ones have already

10   closed, and at this point, this is December 23rd, so we have,

11   you know -- the year and the quarter ends, Q4, in another week

12   or so; so, you know, we have a forecast for what's going to

13   come in.  I'm sure I've been providing that update and I'm

14   giving him an update on what's come in already and what's left

15   to come in.

16   **Q.**   I direct your attention to the middle portion of the email

17   where you report "27.86M to date."  Do you see that?

18   **A.**   Yes.

19   **Q.**   And beneath that is "Morgan, JPMC, SHI as estimates still

20   to come."  Do you see that?

21   **A.**   Yes.

22   **Q.**   What are those numbers?

23   **A.**   Those are dollar volumes of deals that have not come in

24   yet that we would expect to come in and add to that 27.86

25   total.

1  **Q.**  Can you please read for us Mr. Hussain's response at the
2  top?

3  **A.**  "I thought you said 29.5."

4  **Q.**  What did that mean?

5  **A.**  Somehow he has the impression that I was going to deliver
6  29.5, so we have a -- we're not aligned on what the forecast
7  number is.

8  **Q.**  The forecast as opposed to the 27.86 million that you've
9  reported as already come in?

10  **A.**  Correct.

11       And you can see below, I said 29 -- actually in the middle
12  thread there, you see the last line I wrote is "29 seems to be
13  the right forecast," and he is saying 29.5, so we are a
14  $500,000 difference, yeah.

15  **Q.**  So he's drawing your attention to a $500,000 difference --

16  **A.**  Yeah.

17  **Q.**  -- between your forecast of a low margin revenue?

18  **A.**  Yes.

19  **Q.**  Please look at what has been marked as Exhibit 1343.  Is
20  this a true and correct copy of an email exchange in December
21  of 2010 between you and Mr. Hussain about the low margin
22  hardware sales?

23  **A.**  Yes.

24            **THE COURT:**  Admitted.

25       (Trial Exhibit 1343 received in evidence)

1    BY MR. LEACH:

2    Q.   Let me draw your attention to the bottom portion of this

3    email, Mr. Sullivan, the email from Matt Stephan.

4    A.   Okay.

5    Q.   Who is Matt Stephan?

6    A.   Matt was in the accounting department, I believe.

7    Accounting or legal.  But he was involved with the processing

8    of these orders.

9    Q.   And the subject here is "Hardware Updates, 12/29/10."  Do

10   you see that?

11   A.   Yes.

12   Q.   And he's writing to Sushovan Hussain and ultimately to

13   you:  "Unfortunately the news so far is not good."

14        What's being described here?

15   A.   He's describing what -- it appears he's describing, based

16   on his language here, that there is no chance of getting a

17   hundred percent of these shipped on time, "but we can't get any

18   figures on what might drop until tomorrow."

19        So he's reporting that some of the product that we've sold

20   will not ship.  If it doesn't ship, as I described yesterday,

21   we wouldn't be able to recognize the revenue for it.  So he's

22   essentially giving a forecast update that is not a good

23   forecast update.  Usually you want the numbers to go up when

24   you give forecasts, not down.

25   Q.   And then Mr. Hussain writes, "Mike, is there a solution?"

1   What was Mr. Hussain asking you here?

2   **A.**   Well, occasionally we would be able to get back to the

3   vendors and put some pressure on them to give us priority for

4   shipping rather than someone else.  I mean, they clearly have

5   inventories and they are choosing who they can ship things to,

6   and so I think he's really referencing that.  We would do that

7   from time to time.

8   **Q.**   And do you respond to Mr. Hussain's request?

9   **A.**   Yes.  I'm saying -- let's see.  Is it a different date?

10   It's the same date.  So a few hours later, I said, "I have been

11   assured by Hitachi that the Morgan order will ship, other than

12   the real kits were not -- which are not a lot of money.  And

13   that it's also critical for Hitachi to get this deal done

14   because they need to recognize revenue," so I was confident

15   that we would do it.

16   **Q.**   And what was Mr. Hussain's direction to you?

17   **A.**   Well, specifically he wrote, "Let's get as much as

18   possible shipped."

19   **Q.**   I'd like to move forward, Mr. Sullivan, to the first

20   quarter of 2011, and draw your attention to what has been

21   marked as Exhibit 1631.

22       Is this a true and correct copy of an email between you

23   and Mr. Hussain relating to low margin revenue?

24   **A.**   Yes.

25       **THE COURT:**  Admitted.

1        (Trial Exhibit 1631 received in evidence)

2   **BY MR. LEACH:**

3   **Q.**   Let me please draw your attention to the initial email in

4   the thread, Mr. Sullivan.   Mr. Hussain writes to you, "Any news

5   on JPMC and others outside MS/Hitachi?   Need as much as

6   possible, please."

7        What did that mean?

8   **A.**   Well, he's obviously aware of the forecast having JPMC and

9   Morgan Stanley, Hitachi in it, and he's asking for an update

10  for other deals besides those, and obviously he's suggesting

11  that he wants as much as possible.

12  **Q.**   "As much as possible" meaning what?

13  **A.**   As possible.

14  **Q.**   I'm sorry.   I didn't hear your answer?

15  **A.**   As much revenue as possible.

16  **Q.**   What do you report to Mr. Hussain?

17  **A.**   I report all the status of the deals, essentially the

18  contents of that Dell deal tracker.

19  **Q.**   What was the amount as of March 23rd, 2011?

20  **A.**   I see.   So 19.7 million to date at that particular point

21  in time, and I also added that $2.6 million additional was

22  expected from JP Morgan.

23  **Q.**   Is this an additional example of where you would have an

24  initial forecast, and over time in the quarter, it would

25  change?

1  **A.**  I don't know what the original forecast was in this case,

2  but it's hard for me to read into this anything more than what

3  it says here.

4  **Q.**  Please look at Exhibit 1645.  Do you recognize this?

5  **A.**  Yes.

6  **Q.**  Is this a true and correct copy of an email thread among

7  you, Stouffer Egan, and Sushovan Hussain regarding hardware

8  sales?

9  **A.**  Yes.

10        **THE COURT:**  Admitted.

11     (Trial Exhibit 1645 received in evidence)

12  **BY MR. LEACH:**

13  **Q.**  Let me draw your attention to the bottom part of page 1 --

14  excuse me -- page 2.  The subject of the initial email is, "Is

15  the MS/Hitachi deal definitely off for us?"

16     What did that mean?

17  **A.**  Well, it appears that the deal is not going to hit the

18  quarter.  It's March 25th.  The quarter is going to end in five

19  days or six days, and we must have got a status that the deal

20  wasn't going to come in.

21     And I think the -- this email is from Stouffer to

22  Sushovan, but I think the question is clearly, from my

23  perspective, he's asking is it possible to get it in, do

24  something to get it in.

25  **Q.**  So up at the top, there's a line which appears to come

SULLIVAN - DIRECT / LEACH

1  from Mr. Hussain:  "Mike, is this the last part of the low

2  margin jigsaw?"  Do you see that?

3  **A.**    Yes.  Worded a little bit differently.  It's not a

4  question; it's a statement.  But, "Mike this is the last part

5  of the low margin jigsaw."

6  **Q.**    What does that mean?

7  **A.**    I think he's saying that we need that deal to hit the

8  forecast, I believe.

9  **Q.**    Please look at page 1, and would you please read for us

10  your reply to Mr. Hussain.

11  **A.**    "It is off."  So I said it's off the JP -- "but the JPMC

12  orders are in.  Trying to get more from HSI, but won't be the

13  same size."

14  **Q.**    Why were you trying to get more from SHI?

15  **A.**    To make up for the amounts that did not come from Morgan

16  Stanley.

17  **Q.**    And were you doing that to hit a revenue number or were

18  you doing that for marketing?

19          **MR. KEKER:**  Objection.  Leading, Your Honor.

20          **THE COURT:**  Overruled.

21          **THE WITNESS:**  I can answer?

22  BY MR. LEACH:

23  **Q.**    You may answer.

24  **A.**    I was trying to hit a revenue number.

25  **Q.**    What is Mr. Hussain's response to you?

1   **A.**   "Disappointing.  Please try to get $3 million.  I would

2   like to understand where it went wrong."

3   **Q.**   What did you understand that "please try to get 3M" to be?

4   **A.**   $3 million more, which would -- I don't know if that's the

5   exact amount of the Morgan Stanley order or not.

6   **Q.**   Please look at what has been marked as Exhibit 1646.  Do

7   you recognize this?

8   **A.**   Yes.

9   **Q.**   Is this a true and correct copy of an email between you

10   and Mr. Hussain relating to low margin revenue?

11   **A.**   Yes.

12       **THE COURT:**  Admitted.

13       (Trial Exhibit 1646 received in evidence)

14   **BY MR. LEACH:**

15   **Q.**   I direct your attention, Mr. Sullivan, to the initial

16   email in the thread from Mr. Hussain to you on March 25th.

17   Would you just read that for us.

18   **A.**   "I understand.  I assume you need orders, not shipped

19   product."

20   **Q.**   I'm sorry.  I don't mean to interrupt you, but I mean

21   Mr. Hussain's to you below that.

22   **A.**   "Need a Plan B.  Anything you can do on Hitachi is good.

23   Aggressively pursue SHI, JPMC, etc.  Really need to hit 25

24   million."

25   **Q.**   What did you understand "Need a Plan B" to be?

1   **A.**   This is the same day as the previous email, so I would

2   connect this back to the Morgan Stanley comments that the

3   Morgan Stanley deal fell through and this is a continuation of

4   the suggestion that we need to find a replacement for that

5   revenue that fell out.

6   **Q.**   He goes on to write, "Really need to hit 25M."  What was

7   that?

8   **A.**   25 million, so that would be the target.

9   **Q.**   Are you familiar with the term "plug number"?

10  **A.**   Yes, I guess.  Yeah.

11  **Q.**   What does that mean to you?

12  **A.**   Plug number would be the gap between what you would have

13  as a target and what would you need to close between, let's

14  say, a forecast and a target.

15  **Q.**   And did it feel to you like Mr. Hussain was using these

16  hardware sales to plug a number?

17         **MR. KEKER:**  Objection, Your Honor.

18         **THE COURT:**  Well, let me go back a minute because I'm

19  confused.

20      You say the difference between a forecast and a target?

21  I'm sorry.  Could you explain what that means?

22         **THE WITNESS:**  Well, there is a forecast here.  In this

23  case, there is a forecast to hit 25 million.

24         **THE COURT:**  A forecast by whom?

25         **THE WITNESS:**  I'm sorry.  A target for 25 million.

1    **THE COURT:** Let's stop for a minute and go back.

2    When you say "a target," explain by what you mean by who

3    sets a target --

4    **THE WITNESS:** A target would be -- let's call it -- it

5    would be set by Sushovan. This is how much low margin revenue

6    that we want to hit for the quarter.

7    **THE COURT:** And that's called a "target"?

8    **THE WITNESS:** Target. I'm not sure we use that name

9    consistently. That would be my -- my term.

10    **THE COURT:** And that's not the same as a forecast?

11    **THE WITNESS:** No. A forecast is based on the pipeline

12    and the deals, what I'm forecasting to actually come in. It

13    might be less.

14    **THE COURT:** So a forecast is your view of what deals

15    are coming in that would fulfill the target, that would

16    approach the target, exceed the target or not?

17    **THE WITNESS:** Correct.

18    **THE COURT:** It's like how it's going --

19    **THE WITNESS:** It's an update on -- here is the status

20    towards making the target, yes.

21    **THE COURT:** And the difference between the target and

22    the forecast is, as you understood it to be, something called a

23    plug?

24    **THE WITNESS:** Well, we didn't use that term, to be

25    clear. But I would say that this is just a typical sales, you

1   know -- sales activities that I would have at every company

2   I've ever been at.  You have a target, you have a pipeline, you

3   have a bunch of deals, and you're trying to hit it and there is

4   a forecast and then there is left-to-go to actually hit the

5   target.

6           THE COURT:  And the "left-to-go" is the plug?

7           THE WITNESS:  Arguably it could be a plug.  Yeah.  If

8   you want to call it a plug.  It's just a term.

9   BY MR. LEACH:

10  Q.   Is that what it felt to you?

11  A.   Clearly we had a gap to the target.  If you want to call

12  it a plug or a gap or left-to-go, that's what it is.

13  Q.   I want to know is that how it felt to you, sir?

14  A.   Sure.  I mean, it's just the amount left to go, yes.

15  Q.   Thank you.

16       Please look at what has been marked as Exhibit 1656.  Do

17  you recognize this?

18  A.   Yes.

19  Q.   Is this another email from March of 2011 between you and

20  Mr. Hussain relating to low margin revenue?

21  A.   Yes.

22           THE COURT:  Admitted.

23       (Trial Exhibit 1656 received in evidence)

24  BY MR. LEACH:

25  Q.   Let me draw your attention to the initial email in the

1   thread, Mr. Sullivan.  Do you see that?

2   **A.**   Yes.

3   **Q.**   What is the subject?

4   **A.**   "How are you getting on with replacing the MS/Hitachi.

5   Need as much as we can get from SHI."

6   **Q.**   What did that mean?

7   **A.**   Again, it's the same topic.  The Morgan Stanley/Hitachi

8   deal fell out, and we were trying to replace that revenue that

9   fell out so that we can get it from a different source.  In

10  this case, SHI was what I was working on.  It's another

11  customer that I was trying to get some business in quickly

12  before the end of the quarter to close that gap.

13  **Q.**   And what is Mr. Hussain's direction to you up at the top?

14  **A.**   "Please get the 1 million from BNY," which was Bank of

15  New York.

16  **Q.**   Thank you.

17      Please look at Exhibit 1680.  Is this a true and correct

18  copy of an email between you and Mr. Hussain on March 30th,

19  2011?

20  **A.**   Yes.

21      **THE COURT:**  Admitted.

22      (Trial Exhibit 1680 received in evidence)

23  **BY MR. LEACH:**

24  **Q.**   Let me draw your attention, Mr. Sullivan, to the middle

25  email where it says, "Did you find some hardware revenue?"  Do

SULLIVAN - DIRECT / LEACH

1   you see that?

2   **A.**   Yes.

3   **Q.**   And that's an email from Mr. Hussain to you?

4   **A.**   Yes.

5   **Q.**   And where he says, "I need it," what did that mean to you?

6   **A.**   That means he needs more hardware revenue.  I presume I've

7   been giving him an update on the hardware, and as you can see,

8   this is all very close in time, the emails that we've been

9   reviewing, so the previous days I was trying to get SHI,

10  apparently from the previous email we just read, which is, I

11  think, just a couple days before this, and I take this as he's

12  asking for an update.

13  **Q.**   Need it for what end?

14  **A.**   To plug the gap.

15  **Q.**   Let me move forward, Mr. Sullivan, to the second quarter

16  of 2011, and I'd like you to look at what has been marked as

17  Exhibit 1837.

18      Is this a true and correct copy of an email between you

19  and Mr. Hussain in June that touches on low margin hardware

20  sales?

21  **A.**   Yes.

22          **THE COURT:**  Admitted.

23      (Trial Exhibit 1837 received in evidence)

24  **BY MR. LEACH:**

25  **Q.**   Let me please draw your attention, Mr. Sullivan, to the

SULLIVAN - DIRECT / LEACH

1  first email in the thread on page 2.  Do you see beneath the

2  subject "Low Margin Update," it says "still on for 25M?"

3  **A.**   Yes.

4  **Q.**   What did that mean?

5  **A.**   Are we still forecasting 25 million.

6  **Q.**   25 million for revenue in the second quarter of 2011?

7  **A.**   Yes.

8  **Q.**   Beneath that, it says, "and Kraft, USPS, Abbott, Drinker

9  Biddle, others."  Do you see that?

10  **A.**   Yes.

11  **Q.**   What is the reference to Abbott?

12  **A.**   Abbott and all these other deals are software deals that I

13  was working on for the quarter.

14  **Q.**   Let's go back to page 1, please, and I draw your attention

15  to the first paragraph of your email to Mr. Hussain.  Do you

16  see that?

17  **A.**   Uh-huh.

18  **Q.**   Would you just read the first couple lines of your

19  response to Mr. Hussain for us.

20  **A.**   Sure.

21      "Not on for 25 million, as I told you yesterday.  Way more

22  moving parts than normal at this time of the quarter.  JPMC is

23  key.  I have put out extra points for deals over the last few

24  days and am engaging directly with JPMC procurement next week

25  to offer more incentive."

1        Do you want me to keep reading?

2   **Q.**   That's fine.

3        The "not on for 25M," what did you mean by that?

4   **A.**   We're not on target.  My forecast, to continue to use the

5   same terminology that we've been using here, is below the

6   target of 25 million.

7   **Q.**   Please look further down to the paragraph beginning

8   "Abbott."

9   **A.**   Okay.

10  **Q.**   You wrote, "Abbott is an existing Stratify customer with a

11  large case and some recent adverse rulings from the court."

12  What is Stratify?

13  **A.**   Stratify is an eDiscovery product that we had recently --

14  so this must have been after we purchased Iron Mountain

15  Digital.

16       So Autonomy had made an acquisition, probably shortly

17  before this, to the best of my recollection, and one of the

18  assets that came with that acquisition was a product called

19  Stratify.  That was also an eDiscovery product.

20       So, as you know, we already had an eDiscovery product.

21  This was an additional eDiscovery product.  So I think I'm just

22  describing a deal with Abbott, who was already a customer, of

23  Stratify where we were trying to sell more stuff.

24  **Q.**   Who is Abbott?

25  **A.**   Abbott Labs.

SULLIVAN - DIRECT / LEACH

1   **Q.**   Pharmaceutical company?

2   **A.**   Yes.

3   **Q.**   And what were you attempting to sell to Abbott?

4   **A.**   More eDiscovery.  More eDiscovery software and services.

5   Yeah.

6   **Q.**   Please look at what has been marked as Exhibit 1845.  Is

7   this a true and correct copy of an email from Sushovan Hussain

8   to you dated June 14th, 2011?

9   **A.**   Yes.

10          **THE COURT:**  Admitted.

11      (Trial Exhibit 1845 received in evidence)

12  **BY MR. LEACH:**

13  **Q.**   Mr. Sullivan, the subject of this email is "spiff for last

14  two weeks of efforts."  What is the general subject matter of

15  this email?

16  **A.**   This is -- spiff in the sales word is an incentive.

17  Consider it a bonus or commission that you would offer.  You

18  know, it's a fairly typical practice in the software world to

19  offer spiffs to incent people to achieve something specific,

20  usually some kind of sales.  So this is about a spiff that is

21  being offered to me to try to hit certain deals.

22  **Q.**   Deals for the second quarter of 2011?

23  **A.**   Correct.

24  **Q.**   Mr. Hussain wrote, "As you know, this is a key quarter.

25  So what I need from you is as follows."

1    Can you help me understand what is conveyed in those two

2   bullets beneath that?

3   **A.**   Sure.  So "low margin of $20.5 million net new."  So

4   closing new revenue from the hardware, Dell hardware sales,

5   that we've been talking about.

6       And then in parentheses, he says, "8.5 million is done

7   already," so that must have been the amount that I've been

8   telling him was already in.

9       And "we need to close Morgan Stanley and JPMC."  That

10  presumably would be -- make up the difference between the 8.5

11  and the 20.5, but I'm not absolutely sure about that.

12      The next line is 12-point -- "$12 million of net new

13  license from" -- these are the same deals in the previous

14  emails we just looked at.  And those are, you know, deals that

15  I was working on at the time that were software and hosting

16  deals.

17  **Q.**   And the reference to "Abbott 15M," what does that mean?

18  **A.**   $15 million.

19  **Q.**   And is that a reference to the license proposal you were

20  negotiating with Abbott?

21  **A.**   Yes.

22  **Q.**   Please look at what has been marked as Exhibit 1861.  Is

23  this a true and correct copy of an email you sent to David

24  Wilner, Neil Arajuo, and Sushovan Hussain and Jean Snider

25  relating to the Abbott deal?

 1   **A.**   Yes.

 2              **THE COURT:**  Admitted.

 3       (Trial Exhibit 1861 received in evidence)

 4   **BY MR. LEACH:**

 5   **Q.**   Let me direct your attention, Mr. Sullivan, to the initial

 6   email in the thread from David Wilner, and my first question is

 7   who is he?

 8   **A.**   He is a vice-president of sales, selling -- he actually

 9   came from the Stratify acquisition, so he was telling Stratify,

10   really.

11   **Q.**   He came from Iron Mountain?

12   **A.**   Yes.

13   **Q.**   And help us understand at this point what the proposed

14   transaction with Abbott is looking like?

15   **A.**   As I recall -- I'm not sure if the details are actually in

16   this email.

17       The details are not in this email, but to the best of my

18   recollection, Abbott was a customer who we did a lot of cases

19   with.  They had a lot of litigation, and they would pay

20   essentially by the case.

21       And we were trying to get them to buy a lot of software

22   and services in advance and sign a multiyear contract with us.

23   Give them a discount for buying volume, essentially.

24   **Q.**   And what is your response to Mr. Wilner at the top of this

25   thread?

1  A.    "I would like to be involved in any future calls," and if

2  you look below, he's inviting me to "come to join the call

3  tomorrow."

4  Q.    Why did you want to be involved?

5  A.    I wanted to close the deal.

6  Q.    Your bonus was on the line?

7  A.    I would have wanted to close the deal anyways.

8        Yes.

9  Q.    But you also had a bonus?

10  A.    I did, yes.

11  Q.    Did this deal with Abbott close?

12  A.    To my recollection, it did not.

13  Q.    Please look at what has been marked as Exhibit 1913.  Do

14  you recognize this?

15  A.    Yes.

16  Q.    Is this a true and correct copy of an email you sent to

17  Sushovan Hussain related to the proposed Abbott Labs deal on

18  June 30th?

19  A.    Yes.

20            THE COURT:  Admitted.

21        (Trial Exhibit 1913 received in evidence)

22  BY MR. LEACH:

23  Q.    Let me draw your attention to the top portion of the

24  email, Mr. Sullivan.

25  A.    Okay.

1    Q.   The subject of this is "Abbott Metrics."  What does that

2    mean?

3    A.   I -- from the email down below, you can see that's a term

4    that Jane Snider was using.

5         Jane Snider was the rep, the sales rep, that we had on the

6    account.  She reported to Dave Wilner, and she was tracking a

7    set of metrics which she actually lists here, and the metrics

8    are essentially a forecast of all the cases that Abbott had

9    been providing us.

10        She was working closely with Abbott.  Abbott was giving

11   her information about "here is what we have to do in the

12   future, here is the schedule, here is how much money it's going

13   to cost," and they invited us to essentially say, "Look, we're

14   going to spend this much money over the next couple of years,"

15   you know.  "Give us an offer we can't refuse."  And so that's

16   what we were trying to do.

17        So she is really sharing those metrics, so to speak.

18   Q.   Would you please read your comment to Mr. Hussain?

19   A.   Yeah.

20        "See below.  Amazing that they won't take our deal.  Has

21   nothing to do with the discount.  Just a policy not to pay in

22   advance for anything."

23   Q.   What did you mean by that?

24   A.   Well, ultimately they said no to the deal, and as I

25   recall, we had agreement from some of the lower-level managers

1  and Abbott to do the deal with us.  When they brought it up to

2  get a signature from somebody higher up in the organization,

3  that person did not want to pay for anything in advance.  They

4  wanted to only pay as you go.  So they decided not to do the

5  deal with us.  So we essentially lost the deal that we were

6  trying to close.

7  Q.   Please look at Exhibit 1840.  Is this a true and correct

8  copy of an email you sent to Mr. Hussain on June 30th, 2011,

9  relating to the Abbott deal?

10  A.   Yes.

11       THE COURT:  Admitted.

12       (Trial Exhibit 1840 received in evidence)

13  BY MR. LEACH:

14  Q.   Let me direct your attention to the first thread,

15  Mr. Sullivan.  Who is David Wilner?

16  A.   Again, David Wilner is the manager for Stratify and the

17  manager of the rep on the -- that was working the Abbott deal.

18  Q.   And will you please read what he communicated to you here.

19  A.   Yes.  He said -- do you want me to read the whole email?

20  Q.   Please.

21  A.   "Senior attorney vetoed by the GC," the general counsel,

22  "who says and has said in the past that they will never

23  authorize forward-looking commitment levels.  Nothing left to

24  be done.  Utterly ridiculous conclusion to a ridiculous

25  process.  Wish the news were better.  Sorry we couldn't get

SULLIVAN - DIRECT / LEACH

```
 1   this one done."
 2   Q.   Why were you forwarding this to Mr. Hussain?
 3   A.   Well, any time I got an update on any deal at all, I would
 4   always forward it to Mr. Hussain.  You know, he was the -- he
 5   was in charge of sales, so we would give him an update on every
 6   single deal, good or bad.
 7   Q.   At any point in time, did you recommend that Autonomy
 8   license software to a reseller for resale to Abbott in this
 9   time period?
10   A.   No.
11   Q.   Please look at what has been marked -- I placed before you
12   a folder with Exhibit 2725.  There should also be a CD in the
13   folder.
14            MR. KEKER:  Excuse us, Your Honor.
15        (Counsel confer off the record.)
16   BY MR. LEACH:
17   Q.   What is the piece of paper that you're looking at,
18   Mr. Sullivan?
19   A.   The email is from Poppy -- the top email is from Poppy
20   Prentis to me.
21        Poppy, to refresh your memory from yesterday, was the --
22   she's in the -- in accounting and handles the revenue.
23        And this is a thread where again I'm asking -- I don't
24   know if this is the same -- it looks like a different time
25   where I'm saying, you know, "My records are different than
```

1    yours.  What's the gap?"  And the thread is --

2           **MR. KEKER:**  Excuse me, Mr. Sullivan.

3       I object to this on the grounds of hearsay.

4           **THE COURT:**  Well, okay.  Let me go back.  Let me

5    understand this.  Let me try to follow it.  Okay.

6       What is this?

7    **BY MR. LEACH:**

8    **Q.**   Mr. Sullivan, is the piece of paper that you're looking at

9    an email that attaches your Dell deal tracker?

10   **A.**   Yes.

11   **Q.**   And were you sending your Dell deal tracker to someone

12   named Poppy Prentis?

13   **A.**   Yes.

14   **Q.**   Did you maintain the Dell deal tracker in the ordinary

15   course of business?

16   **A.**   Yes.

17   **Q.**   And was the purpose of maintaining the Dell deal tracker

18   so you could monitor all of these hardware resales with her?

19   **A.**   Yes.

20   **Q.**   Or all these hardware resales?

21   **A.**   Yes.

22           **THE COURT:**  And was it made at or about the time?

23           **THE WITNESS:**  I kept it up to date all the time.

24           **THE COURT:**  Okay.  Objection overruled.  Document

25   admitted.

1      **MR. LEACH:**  Well, I want to make sure the record is

2   clear.

3   **Q.**   There is also a CD attached to the piece of paper that

4   you're looking at.  Prior to testifying today, did you have a

5   chance to review that CD?

6   **A.**   Yes.

7      **THE COURT:**  I'm sorry.  Okay.  So I'm looking at a

8   three-page document.  And you're saying that there's a CD?

9      **MR. LEACH:**  The witness --

10      **THE COURT:**  You are holding it up so we can all see

11   it.

12      For the record, it's a CD that is attached to the

13   three-page document.

14      Is the document a printout of the CD or is it something

15   else or what?

16      **MR. LEACH:**  I believe the witness will testify it's

17   the attachment to the email, which is very cumbersome to print

18   out, and that he reviewed it, that he assured himself it's --

19   what the attachment is and that it's authentic.

20      **MR. KEKER:**  Your Honor, this is an email from

21   Ms. Prentis sending this.  That's hearsay.  I don't --

22      **THE COURT:**  Yeah.  Okay.  I don't even understand this

23   document.  I'm not saying I don't understand what it says.  I'm

24   saying I don't understand what it is.

25      You're saying there is a CD and there's a document, and

1    the CD was referenced in the document, or is it something

2    that's been taken from documents and placed into a CD or what?

3            **MR. LEACH:**  I'm not the witness, Your Honor --

4            **THE COURT:**  No, no, no.  I understand that.  But

5    you're offering it, so my question to you is you can -- this is

6    not testimony.  This is an explanation of what it is.

7            **MR. LEACH:**  My proffer, Your Honor, is the CD includes

8    the attachments to the email that he's looking at, and the

9    purpose of doing it this way is it's too cumbersome to print,

10   to view in a way that is meaningful to the jurors and to us.

11   So it's really just an Excel file on a disk.

12           **THE COURT:**  Okay.  But when the email was sent --

13   maybe I can approach it this way.

14       When the email was initially sent, was it sent with an

15   attachment?

16           **MR. LEACH:**  Yes.

17           **THE COURT:**  And the CD is the attachment?

18           **MR. LEACH:**  Yes.

19           **THE COURT:**  So it's like I send an email and I say, "I

20   have attached bop, bop, bop, bop," and that's what it is?

21           **MR. LEACH:**  Yes.

22           **THE COURT:**  So it was created, that is to say, it was

23   part of the original email that went to the person?

24           **MR. LEACH:**  Yes.

25           **THE COURT:**  Okay.  Now, Mr. Keker raises the objection

1    that that's not what -- it doesn't appear that that was what

2    Poppy Prentis sent.  It's not Poppy Prentis' attachment.  It's

3    Mr. Sullivan's attachment.  Or do I not understand that?

4         **MR. LEACH:**  As I understand the objection, it's Poppy

5    Prentis is sending the attachments and there is a hearsay

6    objection that it's not a business record.

7         I think I can lay that foundation with Mr. Sullivan.

8         **MR. KEKER:**  My objection --

9         **THE COURT:**  Go ahead.

10        **MR. KEKER:**  My objection is hearsay, and it's Poppy

11   Prentis didn't send a CD.  Whatever Poppy Prentis sent --

12        **THE COURT:**  Let's find that out.  I mean, that's

13   testimony.  Okay.  Go ahead.  See if you can lay a foundation

14   and then -- because I don't know why the CD wouldn't be a

15   business record, just as the email itself, but I hear a

16   different objection.  I hear that.  And a different objection

17   as well.

18        And as to that, I think you have to create the foundation.

19        (Mr. Reeves and Mr. Leach confer off the record.)

20        **THE COURT:**  Take your time.

21   **BY MR. LEACH:**

22   **Q.**   Mr. Sullivan, from time to time, did you provide your Dell

23   deal tracker to other people within Autonomy?

24   **A.**   Yes.

25   **Q.**   And what was the purpose of doing that?

**A.**    Just to reconcile the records, especially for shipping

purposes, because, you know, what I was really tracking was we

were closing deals, and the legal group and the people that

processed the orders would track when things shipped.  They

would actually work with the vendors to find out when did

things ship because we couldn't really recognize the revenue

until something shipped.

And so I wasn't really tracking that.  I was getting

updates from that group.

So the Dell deal tracker -- occasionally I might have

updated that information if I got an update, but what I was

really tracking in the Dell deal tracker is the deals that

closed, the pieces of paper that I signed that committed, you

know, the customers to pay us money for the hardware we were

selling.

**BY MR. LEACH:**

**Q.**    And did you rely on the Dell deal tracker in the ordinary

course of business?

**A.**    I did.  That was my record.  That was what I used.  It was

something I created and maintained.

**Q.**    And are you satisfied the disk before you contains a true

and correct copy of the attachments to the email in Exhibit

2725?

**A.**    I -- I looked at this yesterday or recently and I reviewed

the file on this disk and I signed it and I know it to be a

1   copy of the Dell deal tracker.

2           MR. LEACH:  Your Honor, I offer --

3           THE COURT:  Okay.  So one other question I would have,

4   is your deal tracker a document created by you?

5           THE WITNESS:  Yes.

6           THE COURT:  And is it your understanding that that

7   document that you created, you sent off to Poppy Prentis?

8           THE WITNESS:  Well --

9           THE COURT:  Or to somebody else?  There is a whole

10  series of emails here.

11          THE WITNESS:  The document is created by me and I

12  forward it off.

13      What I don't know, frankly, in this thread, because I

14  can't tell, is which email was it attached to.

15          THE COURT:  Okay.  It looks to me like there are six,

16  seven emails in this stream.

17          THE WITNESS:  Right.

18          THE COURT:  And you're saying that the disk, which is

19  an exhibit, purported exhibit -- I mean, it is an exhibit --

20  was created by you and it was attached to one of these emails?

21          THE WITNESS:  Correct.

22          THE COURT:  Okay.  All right.  Objection overruled and

23  the document is admitted.

24      (Trial Exhibit 2725 received in evidence)

25  \\\

1  BY MR. LEACH:

2  Q.   Mr. Sullivan, we're looking at a copy of the Excel

3  spreadsheet, and I draw your attention to the tab for Q4 down

4  at the bottom.  Do you see that?

5  A.   Yes.

6  Q.   What does that refer to?

7  A.   That would be Q4 of this particular quarter in 2011.

8  2011.

9  Q.   Is it 2011 or 2010?

10 A.   I'm sorry.  It's 2010 in this case because it's before the

11 Q1/2011, right.

12 Q.   And there are certain columns in this spreadsheet:

13 "Account," "Vendor," "Probability," "Rev to Autonomy."

14     Can you describe those for us?

15 A.   The left-hand column is the list of customers we sold to.

16 The vendor is Dell.  That's the equipment we were selling.  It

17 was Dell equipment.

18     Sometimes I would put a probability in there if it was --

19 usually later in the quarter, you know, you have more deals

20 done, so the probability is very high.  Earlier in the quarter,

21 the probability is lower because, you know -- it's really just

22 an estimate.  It's very subjective, my subjective estimate of

23 what the probability of the deal coming in is, depending on,

24 you know, the -- the nature of the sales dynamic.

25     The revenue to Autonomy is the revenue that we would get

SULLIVAN - DIRECT / LEACH

1    if we -- if we did close the deal, the forecasted revenue.

2    That would change from time to time because customers would

3    increase their order, make it bigger or smaller.

4         Shipping is the shipping that would go along with that as

5    well.

6         And the total is the combination of the two.

7         Would you like me to keep going?

8    Q.   That's fine.

9         There is a company in the account column, Amulet Hotkey.

10   Do you see that?

11   A.   Yes.

12   Q.   Who were they?

13   A.   They were a customer as well that we sold to.

14   Q.   Are they a distributor?

15   A.   I can't remember, frankly, if they were a distributor or

16   the end user.

17   Q.   Did you have any contacts with anyone from Amulet Hotkey?

18   A.   I probably did.  You know, very transactional in nature, I

19   would assume.

20   Q.   Who do you most associate with Amulet Hotkey?

21   A.   I don't have a name.  I mean, you know, whatever

22   contact -- I would have contact with anyone that we sold to

23   because ultimately we signed a contract with those companies,

24   and I was the one doing that.

25        So I always had a contact.  Whether it was a relationship

1  is a different question.  I mean, I had to work with somebody

2  to get a contract done.

3  **Q.**  What do you mean "whether it was a relationship is a

4  different question."

5  **A.**  Well, for example, you're asking me do I remember, and I

6  don't remember, you know, because it was very transactional in

7  nature.  We would get on the phone, we would talk about what we

8  were buying, what the price was, what is the paperwork we need

9  to sign, what's the price, what's the discount, you negotiate,

10 and also this is almost a decade ago for me, so it's hard to

11 remember.

12 **Q.**  If we could scroll down on Q4 to the black line or the

13 total at the bottom.  What is that number?

14 **A.**  $29 million.

15 **Q.**  And is that the amount of low margin hardware sales in the

16 fourth quarter of 2010?

17 **A.**  Yes.  And given that it's green, that usually means that

18 it was final.  That's the way I coded it.

19 **Q.**  Could we please look at the sheet for Q1/11.  What is

20 this, Mr. Sullivan?

21 **A.**  It's the same thing, but for a different quarter.

22 **Q.**  And could we please scroll down to the -- what is that

23 number?

24 **A.**  $23 million.

25 **Q.**  And this is in the row titled "Total"?

**SULLIVAN - DIRECT / LEACH**

1   **A.**   Correct.

2   **Q.**   What does that represent?

3   **A.**   The total amount of low margin hardware reselling we did

4   in Q1 of 2011.

5   **Q.**   Please look at the sheet for Q2/11.  And if we could

6   scroll down to the row "Total."  What is that number?

7   **A.**   $15 million. $15.8 million.

8   **Q.**   There is some rows in white just above that for JPMC,

9   Insight, Citi, Amulet.  What does that represent to you?

10   **A.**   Well, usually that meant maybe it didn't come in, but, you

11   know, it doesn't mean anything significant to me at this point.

12   Because we were moved on to Q3, usually I closed out the tab,

13   and it was probably -- I suspect that it was accurate, 15.8.

14   **Q.**   Please look at Q3/11.  And if we could please go back to

15   the piece of paper in front of you, Mr. Sullivan.  I draw your

16   attention to page 2.

17   **A.**   Yes.

18   **Q.**   The email at the top.  Do you see where Ms. Prentis wrote

19   "Mike has 45M"?

20   **A.**   Yes.

21   **Q.**   What do you understand that to mean?

22   **A.**   Well, I was forecasting $45 million.

23   **Q.**   For Q3/2011?

24   **A.**   Correct.

25   **Q.**   How did you learn that Autonomy was being acquired by HP?

1   **A.**   The day that they were being acquired, I received -- the

2   day that it was publicly announced, a few hours before that, I

3   received a call from Mike Lynch to tell me.

4   **Q.**   After the HP acquisition, did you continue to sell Dell

5   hardware?

6   **A.**   Yes.

7   **Q.**   Please look at what has been marked as Exhibit 2424.  Do

8   you recognize this?

9   **A.**   Yes.

10  **Q.**   Is this an email between you, Mr. Lynch, and Sushovan

11  Hussain relating to Dell hardware reselling?

12  **A.**   Yes.

13       **THE COURT:**  Admitted.

14       (Trial Exhibit 2424 received in evidence)

15  **BY MR. LEACH:**

16  **Q.**   You wrote to Mr. Hussain, Mr. Sullivan, "Reselling.  I am

17  still taking reselling orders from Dell.  Do you have a

18  reselling revenue goal for the quarter through January?"

19       Why were you writing this to Mr. Hussain?

20  **A.**   Because by this point, it's October of 2011.  I don't

21  believe we've actually been acquired yet, if my memory serves

22  me.  But it has become public knowledge that we're going to be

23  acquired by HP Autonomy.

24       I'm selling Dell hardware.  Dell is the archenemy, you

25  know, rival of -- they're the two big companies that sell

1  hardware, so I'm selling Dell and we're about to be bought by

2  HP, so I thought it was a reasonable question to ask, you know,

3  do you want to keep selling -- it's not quite the question I'm

4  asking here.  I'm asking, "Do you have a goal for me to

5  continue to sell this for the quarter?"

6  **Q.**   Okay.  The Dell hardware that you sold throughout 2010,

7  did you consider those to be appliances?

8  **A.**   No.

9  **Q.**   And at any point in the Dell hardware selling, did

10  Autonomy take physical possession of the Dell hardware or did

11  it have Dell ship it off to somebody else?

12  **A.**   Well, the distinction that we very clearly tried to

13  legally make sure was clean was that we took -- we did take

14  legal possession.

15      When you say "physical," you mean did we have it shipped

16  into our physical facilities?

17  **Q.**   That's what I meant.

18  **A.**   We did -- never did that.  We had Dell ship it directly to

19  the customer, but legally, we were very careful to have it set

20  up that we took possession in between and then we sold it to

21  the customer.

22          **MR. LEACH:**  Thank you, Mr. Sullivan.

23      Thank you, Your Honor.  I have nothing further.

24          **THE COURT:**  Ladies and Gentlemen, we are going to take

25  a recess now.  We will be in recess until 10:35.

1          Remember the admonition given to you.  Don't discuss the

2     case or allow anyone to discuss it with you, form or express

3     any opinion.

4          We will go until 5 to 12:00.  I have a conference call at

5     noon, so I just want to alert the parties and the jury.  Okay.

6     We're in recess.

7          (Proceedings were heard out of presence of the jury:)

8          **THE COURT:**  Let the record reflect the jurors have

9     retired.

10         Do we have -- you may step down, Mr. Sullivan.

11         Do we have an attorney representing Hewlett-Packard here?

12         **MS. RESLEY:**  Yes, Your Honor.  You have several.

13         **THE COURT:**  Why don't you come forward.

14         The Court has received a submission by Hewlett-Packard.  I

15     don't know whether you were the creator of it.  And you raise

16     an objection to the disclosure of the memo that I disclosed

17     yesterday.

18         I guess I have a couple of questions first in terms of

19     avoidance.

20         First question I have is is it the intention of the

21     defense to use any of the information that was disclosed to

22     them in that memorandum in cross-examination of this witness?

23         **MR. KEKER:**  I may, depending on the answers,

24     Your Honor.  I'm not willing to say I'm not going to point to

25     it, but I don't currently think I'm going to need to, but --

1              **THE COURT:**  You want to reserve the right, depending

2      on the questions that are --

3              **MR. KEKER:**  Right.

4              **THE COURT:**  The answers that are given.

5          Because I would like to address this issue of disclosure

6      of these documents actually around 4:00 or 4:30 today.  4:00

7      today rather than right now.

8          I want to give the parties the opportunity to review your

9      memorandum and take a look at those issues.  You raise two

10     issues.

11         First of all, that it's not really Jencks Act, and

12     secondly, that in any event, the second argument independent of

13     the first argument is that it's privileged.  And I think I

14     anticipate that this will be coming up with some frequency

15     throughout the case, at least the Government's case.

16         So I want to give the parties the opportunity.  They've

17     got a lawyer that is here who can respond to that issue during

18     the noon hour and so forth, and we can address it at 4:00,

19     unless there is some real problem.

20         I don't want to curtail the cross-examination; that is, I

21     don't want to just let everything stop dead in the tracks.  I'd

22     rather go ahead.  Hopefully it won't come up in cross, and we

23     can then address it in a more appropriate --

24             **MR. KEKER:**  If I think I need it, I'll let you know.

25             **THE COURT:**  Okay.  And Mr. Sullivan will be here

1    anyway.  I mean, we can -- well, he's from Boston, right?  I

2    mean, he can stay another day if we need to deal with it.

3    Hopefully we don't.  Hopefully it won't come up and then we can

4    deal with it otherwise.

5        I do want to clarify one thing.  When I say "clarify," I

6    want to -- I'm not trying to escape my ruling.  I'm simply -- I

7    said that it was produced as Jencks Act material.  I'm not

8    certain in my mind that that would be the only or even

9    appropriate basis for disclosing it.  You raise an objection.

10   You say it's not really Jencks Act material.

11       So in that respect, I want to make sure that the parties

12   address both prongs of your objection rather than just focusing

13   on what the Court said and saying, "Well, this is what the

14   Court said, so therefore."  In other words, there may be a

15   legitimate issue to be addressed in terms of the work product.

16       And so there we go.

17           MR. LI-MING WONG:  Yes, Your Honor.  We will be

18   prepared to address it at 4:00.  And just for the record,

19   Michael Li-Ming Wong, Susan Resley, and Robert Frank for HP.

20       I think the clarification we will make at 4:00 is that

21   there is different categories or universes of witness interview

22   memos.  There are those that have been turned over to the

23   Government.  They have them and so --

24           THE COURT:  Well, this is not one of them.

25           MR. LI-MING WONG:  That is exactly right --

1          **THE COURT:**  So it wasn't in possession of the

2    Government.

3          **MR. LI-MING WONG:**  Exactly.

4          **THE COURT:**  That is what your first objection is.

5      I don't want to argue it right now because everybody needs

6    a break.

7                    (Recess taken at 10:23 a.m.)

8                 (Proceedings resumed at 10:37 a.m.)

9        (Proceedings were heard in the presence of the jury:)

10         **THE COURT:**  Please be seated.

11     Okay.  Oh, we're missing a juror.

12                    (Pause in proceedings.)

13         **THE COURT:**  Okay.  Let the record reflect all jurors

14   are present, the parties are present.

15     Cross-examination.

16         **MR. KEKER:**  Thank you, Your Honor.

17                    **CROSS-EXAMINATION**

18   BY MR. KEKER:

19   **Q.**   Mr. Sullivan, I'm John Keker.  I represent Sushovan

20   Hussain.  We haven't met; right?

21   **A.**   Correct.

22   **Q.**   There's nothing illegal about a software company selling

23   hardware, is there?

24   **A.**   No.

25   **Q.**   In fact, it's quite common in the industry, isn't it?

1   **A.**   Yes.

2   **Q.**   When you were at Zantaz, which was a software company, did

3   Zantaz sell some hardware to customers?

4   **A.**   Yes.

5   **Q.**   And when you were at SteelPoint, which is the company you

6   founded and was a software company, did you sell some hardware

7   to customers?

8   **A.**   Yes.

9   **Q.**   Autonomy sold some hardware to customers at a profit,

10  didn't it?

11  **A.**   Yes.

12  **Q.**   I'm thinking Citigroup.  They sold hardware to Citigroup,

13  which was a big software customer, but they sold some hardware

14  at a profit to Citigroup?

15  **A.**   Lots of it.

16  **Q.**   Lots of hardware?

17       And how about Bank -- I'm not sure I'll pronounce it

18  right, but the Paribas Bank, the French bank?

19  **A.**   Yes.

20  **Q.**   They sold hardware at a profit to Paribas?

21  **A.**   Yes.

22  **Q.**   And Paribas was also a software company -- excuse me -- a

23  software customer?

24  **A.**   Yes.

25  **Q.**   Okay.  Now, you told us that in mid-2009 after this

**SULLIVAN - CROSS / KEKER**

1    meeting in London, you started selling what you called

2    low-margin software -- hardware, but what I understand you to

3    mean by that is hardware that was basically discounted by

4    10 percent below your cost?

5    **A.**    Correct.

6    **Q.**    Okay.  And when you started, you only sold it to big

7    software customers of Autonomy, people who already bought a lot

8    of software; right?

9    **A.**    Yes.

10   **Q.**    Okay.  And the customers included Citigroup, Citibank,

11   which is a huge bank; right?

12   **A.**    Yes.

13   **Q.**    They were a big software customer, and you began

14   reselling, in this case, EMC hardware to them at a discount?

15   **A.**    Yes.

16   **Q.**    And then same with the Bank of New York, software

17   customer, you began selling software to them at a discount?

18   **A.**    Yes.

19   **Q.**    Bloomberg, which is not a financial institution but a

20   big -- people know Bloomberg -- software customer, began

21   selling them hardware at a discount?

22   **A.**    Yes.

23   **Q.**    And then we saw in that Exhibit 2725 -- I won't put it up

24   again, but the jury just saw that long tracker list that you

25   had on the disk, and there was a lot of software sold to

**SULLIVAN - CROSS / KEKER**

1  somebody -- or a company called Insight for Citi.  And is

2  Insight the purchasing agent of Citi's hardware?

3  **A.**   Yes.

4  **Q.**   So when you're selling to Insight, you're basically

5  selling to your customer Citi; right?

6  **A.**   Correct.  The only reason Insight would buy it is because

7  they had a customer who needed it, yeah.

8  **Q.**   Thank You.

9       And then we saw a lot of SHI in that tracker chart.  SHI

10  plays the same function that Insight does for Citi for

11  Bank of America; right?

12  **A.**   Correct.

13  **Q.**   So if you're selling to SHI, it means you're selling to

14  Bank of America?

15  **A.**   Correct.

16  **Q.**   All of those are software customers of Autonomy before

17  this program started?

18  **A.**   Yes.

19  **Q.**   Was H&R Block a software customer of Autonomy?

20  **A.**   I believe so.

21  **Q.**   Okay.  And so those Zones bought for H&R Block?

22  **A.**   Yes.

23  **Q.**   This selling hardware at a discount to customers that

24  already were buying software was a way to develop good

25  relationships and to induce further business; is that right?

1    **A.**    Yes.

2    **Q.**    You described it as an investment in the relationship in

3    prior testimony?

4    **A.**    Yes.

5    **Q.**    And I think -- well, did Autonomy at the time that it

6    started this program want a bigger share of the financial

7    market and used discounted hardware as a means to that end?

8    **A.**    That's specifically the rationale that I was given by

9    Michael and Sushovan when they -- when I started that

10    reselling.

11    **Q.**    Fair enough.

12        What Dr. Lynch said is that "In order to get a bigger

13    share of the big banks' software business, we're going to

14    develop relationships with them by giving them discounted

15    hardware or selling them discounted hardware"?

16    **A.**    That's right.

17    **Q.**    And you thought that the link between hardware and

18    software sales was most plausible when it came to these big

19    banks, financial institutions?

20    **A.**    That was my largest customers for the portion of the

21    business that I ran.

22    **Q.**    Okay.  Thank you.

23        Mr. Hussain, Dr. Lynch, Mr. Kanter in London, and even

24    Stouffer Egan, talked about these hardware sales as a marketing

25    program, didn't they?

SULLIVAN - CROSS / KEKER

1    **A.**   Yes.

2    **Q.**   And the marketing aspect of these hardware sales was --

3    you knew it was important to Dr. Lynch and to Mr. Hussain?

4         **MR. LEACH:**  Objection.  Foundation.

5         **THE COURT:**  Sustained.

6    **BY MR. KEKER:**

7    **Q.**   Do you know whether or not the marketing aspects of these

8    discounted hardware sales were important to Mr. Hussain, for

9    example?

10   **A.**   I know because of their words and that's what they told

11   me.

12   **Q.**   Okay.  He said that to you?

13   **A.**   Yes.

14        **MR. LEACH:**  Objection.  Hearsay.

15        **THE COURT:**  Overruled.

16   **BY MR. KEKER:**

17   **Q.**   And Dr. Lynch said that to you?

18   **A.**   Yes.

19   **Q.**   And were you told that you should tell customers that you

20   were selling discounted hardware to that it was a promotional

21   program?

22   **A.**   Absolutely.  In fact, it actually said that in the

23   contracts and it said it on all the POs.  Or most of the POs I

24   should say.  I think it started maybe in the second quarter or

25   something like that, yeah.

SULLIVAN - CROSS / KEKER

1   Q.   But certainly for all of these sales from first EMC and

2   then later Dell, you told the customers that this was part of a

3   marketing program?

4   A.   Yes.

5   Q.   And at the time and now you thought there was nothing

6   wrong or illegal about selling hardware at a loss as part of a

7   marketing program?

8   A.   Not at all, right.

9   Q.   And there is nothing -- I mean, even they don't think

10  there's anything wrong with it; right?

11  A.   I can't speak for what they think.

12          THE COURT:  Well --

13          MR. KEKER:  All right.  They think everything's wrong.

14  Q.   All right.  Anyway, it is something that happens in the

15  software and hardware industries frequently, isn't it?

16  A.   Absolutely.  I mean, companies sell printers at a loss to

17  sell ink.  Companies sell razors to sell blades.  You know, we

18  were a software company.  We gave away professional services

19  for free to get software deals.  We gave away training for free

20  to get software deals.  I mean, in the end what matters is you

21  make more than you don't make when you add it all up and group

22  it together.  That's the way I looked at it.

23  Q.   And do you know whether or not back in England

24  Mr. Chamberlain was trying to track that, trying to relate the

25  low-cost software -- low-margin hardware deals with software

**SULLIVAN - CROSS / KEKER**

1  sales, increased software sales?

2  **A.**   No, I don't know.

3  **Q.**   And also based on your experience with Autonomy and other

4  businesses, there's nothing wrong with once you've decided to

5  start a program like low-margin hardware sales for setting

6  targets or forecasting what you're going to do; right?

7  **A.**   I don't know why you would do it any other way.

8  **Q.**   And then once you set a target, you try to meet it?

9  **A.**   Right.

10  **Q.**   And if you're back in England head of sales, you're trying

11  to meet that target; right?

12  **A.**   Absolutely.

13  **Q.**   And you're writing e-mails to the field and saying, "We've

14  got to get more.  Let's get to the target"?

15  **A.**   I had the same e-mails on software and posting as I did on

16  hardware, yep.

17  **Q.**   Okay.  Now, you said after the acquisition by Hewlett

18  Packard, after Hewlett Packard bought Autonomy, Autonomy

19  continued to sell Dell hardware to customers as part of this

20  program, right, low margin?

21  **A.**   Yes.

22  **Q.**   And did anybody at Hewlett Packard say, "Stop"?

23  **A.**   No, not specifically.  No.

24  **Q.**   And Dell, as you said, was the arch enemy of Hewlett

25  Packard and vice versa.  They competed in the same space;

1    right?

2    **A.**    That's right, yes.

3    **Q.**    Did you make any effort or did anybody suggest to you that

4    you should conceal the fact that you were selling hardware?

5    **A.**    No.   I never concealed it and never thought there was a

6    reason to.   In fact, I tried to make it clear.

7    **Q.**    You thought it was public knowledge that companies in the

8    business knew that Autonomy was selling hardware?

9              **MR. LEACH:**   Objection.   Foundation.

10             **THE COURT:**   Well, wait a minute.

11             **MR. KEKER:**   Did you --

12             **MR. LEACH:**   Calls for speculation.

13   **BY MR. KEKER:**

14   **Q.**    Did you think that it was public knowledge?   Just yes or

15   no first.

16   **A.**    I didn't know whether it was public knowledge or not.

17   Within the company -- it certainly was well known within our

18   company.   That's really the only vantage point I would have.

19   **Q.**    Was there mention of it in one of the earnings releases

20   that you saw?

21   **A.**    I believe so, yes.

22   **Q.**    Okay.   Public earnings release?

23   **A.**    Yes.

24             **MR. LEACH:**   Objection.   Vague.

25             **THE COURT:**   Well, that's not -- I mean, on that

 1  objection, I would overrule it.  The question is whether it's

 2  hearsay.  That's the question.

 3          **MR. KEKER:**  That wasn't the objection, Your Honor.

 4          **THE COURT:**  Quite right, it was not the objection.

 5      Okay.  You may continue.

 6          **MR. KEKER:**  I have one opponent.

 7          **THE COURT:**  You don't want two.

 8          **MR. LEACH:**  Your Honor --

 9          **THE COURT:**  Especially if it's me.  I understand that,

10  but I'm trying to filter it all through at the same time.

11      But let's move on because I don't think --

12          **MR. KEKER:**  All right.

13  **Q.**  Just a side thing before I forget it.  At the end of the

14  examination you were asked -- of the direct examination you

15  were asked whether or not Autonomy ever took physical

16  possession of the hardware that it resold to other companies.

17  Do you recall that --

18  **A.**  Yes.

19  **Q.**  -- discussion?

20      And you said that they took legal possession of the

21  hardware before they resold it.  What did you mean by that?

22  **A.**  Well, I testified to this yesterday.  When I first started

23  selling the hardware, I was briefed on what was required for

24  Autonomy to be a recognized revenue on the hardware.  And one

25  of the things, amongst -- you know, there was a number of

1  things, but one of those things was that we had to take the

2  risk on the hardware; and so, in other words, we had to own it

3  and then sell it.

4      So if you look at all the paperwork that we actually

5  created and signed, we bought the hardware from EMC and then we

6  sold it to the customers.  We owned the receivables risk.  So,

7  in other words, the customer never paid -- we still had an

8  obligation to pay Dell or EMC even if they didn't pay us.  We

9  held the risk.

10     It was important, as I understand it.  That's what I was

11 advised.  And so we took possession of the hardware even if it

12 was a short period of time; and even if we didn't ship it, we

13 owned it legally.

14 Q.  And did the contracts have a provision in them that talked

15 about the legal title to the hardware shifts to Autonomy when

16 EMC ships the hardware to wherever it's going to go?

17 A.  That's right.  It's -- actually the technical term is "FOB

18 shipping point" and that would have been on every -- you know,

19 it's an industry term that basically means as soon as they ship

20 it, it's ours.

21 Q.  Okay.  And the risk passes right when they start shipping;

22 right?

23 A.  To us, correct.  Yeah.

24 Q.  Were there lawyers involved in the revenue recognition

25 part of this to your knowledge?

1    **A.**   Yeah.  I mean, I was being advised on whether -- you know,

2    what to put in the contracts.  I had lawyers work on that.

3    They would work on the details to achieve the things that I

4    just described.

5          You know, they really did the contracts.  I was involved,

6    you know, for the business discussions, but they really papered

7    it, so to speak.

8    **Q.**   And you said in the beginning you got advice or

9    instruction from people at Autonomy about what was required to

10   recognize revenue on hardware sales?

11   **A.**   Yes.

12   **Q.**   Who did you get that advice from?

13   **A.**   As I recall, it was mainly Steve Chamberlain.

14   **Q.**   Steve Chamberlain is the controller?

15   **A.**   Yes.

16   **Q.**   He's in England?

17   **A.**   Yes.

18   **Q.**   And he told you that you have to take title, you have to

19   have the risk, you have to ship to the user?  He gave you the

20   elements that had to be met?

21          **MR. LEACH:**  Objection.  Hearsay.

22          **THE COURT:**  Well, okay.  Sustained.  However, I think

23   that you could -- if you're asking him what is his state of

24   mind, what is his understanding, he can testify as to that; and

25   you could also ask him how he got that understanding --

1        **MR. KEKER:**  Yes, sir.

2        **THE COURT:**  -- without asking him what the

3   understanding was.

4        **MR. KEKER:**  Yes, sir.

5        **THE COURT:**  That is, what the other person said.

6        **MR. KEKER:**  Got it.

7   **Q.**   What was your understanding of what it took to recognize

8   revenue on hardware sales?  And by that I mean under the

9   accounting rules that were applicable.

10  **A.**   Well, I mean, I recall having specific discussions with

11  Steve Chamberlain, and there might have been an attorney

12  involved too, somebody from our Legal Department, about we had

13  to ship the product.  It had to ship to be recognized in the

14  period.  We had to take the risk.  We had to own it.  You know,

15  we had to take title of the hardware and then ship it.  We had

16  to hold the receivables risk.

17        And there may -- there may have been one or two other

18  things that I'm forgetting at this point as well, but there

19  were a few things.  And we made sure that every time we sold

20  anything, we -- that was part of the deal.  That was in the

21  paperwork.  That's what we discussed with the customers when we

22  bought it and, you know, we created standard forms that had all

23  that language in there.

24  **Q.**   And did you understand that the Finance Department in

25  England wanted those Is dotted and Ts crossed to make the

**SULLIVAN - CROSS / KEKER**

1    revenue recognition proper?

2    **A.**    Absolutely, yes.

3    **Q.**    And if you couldn't ship on time or if something got

4    delayed, you'd have to defer revenue, wouldn't you --

5    **A.**    Absolutely.

6    **Q.**    -- to the next quarter?  If you can't recognize it this

7    quarter but it actually ships in the next quarter, then you can

8    recognize the revenue when it actually ships?

9    **A.**    Yes.

10   **Q.**    And that happened sometimes, there was deferred revenue?

11   **A.**    It happened regularly, yes.

12   **Q.**    Okay.  Mr. Hussain and Mr. Chamberlain sometimes needed

13   information from you about hardware sales so that they could

14   properly account for them; isn't that true?

15   **A.**    Yes.

16   **Q.**    Okay.  And you knew that they needed that information so

17   that they could present to the auditors the information that

18   you gave them so that the auditors could do their work and

19   decide whether or not the revenue recognition was correct?

20   **A.**    Just like on any deal.

21   **Q.**    Okay.

22   **A.**    Yes.

23   **Q.**    And one accounting judgment that had to be made was how

24   much of a sale of hardware could be treated as cost of goods

25   sold and how much could be treated as marketing expense.  Was

SULLIVAN - CROSS / KEKER

```
 1   that a judgment that had to be made?
 2              MR. LEACH:  Objection.  Foundation.
 3              THE WITNESS:  You know, I wasn't --
 4              THE COURT:  Sustained.
 5   BY MR. KEKER:
 6   Q.   Okay.  Well, if you give away a product for free, that's
 7   all marketing, isn't it?
 8              MR. LEACH:  Objection.  Foundation.
 9              THE COURT:  Sustained.
10       The issue is what this witness -- this witness is not
11   called as an accountant.  He's called as a person who put the
12   deal together.
13              MR. KEKER:  Okay.
14   Q.   Let's look at, if we can, Exhibit 5309, which actually is
15   the same as 195 in evidence.  If you --
16              THE COURT:  Well, let's try to use, if we can --
17              MR. KEKER:  We can use --
18              THE COURT:  I understand that, but I want to try to
19   use --
20              MR. KEKER:  But he's -- all right.
21              THE COURT:  -- the one set of exhibits and not get
22   into the duplications.
23       So you said -- I'm sorry, Mr. Keker, what else is it?
24              MR. KEKER:  Maybe we can put it up on the screen.
25              THE COURT:  Sure.
```

1    **MR. KEKER:**  195 in evidence, Your Honor.

2    **THE COURT:**  Okay.

3    **MR. KEKER:**  And, Jeff, can you blow up -- this is Jeff

4    Dahm, ladies and gentlemen, who's working the screen -- can you

5    blow up the bottom e-mail?

6    **Q.**   In this e-mail, which is in evidence, from Mr. Hussain to

7    you, he's saying (reading):

8           "In addition, you will receive a special bonus of

9           $50,000 if you were able to extract an e-mail that allows

10          us allocate the associated costs appropriately in my

11          opinion."

12   What did you understand he was offering you an incentive

13   to get done?

14   **A.**   I didn't know.  I didn't know what that meant really.  I

15   mean, at the time I thought it was revenue recognition or

16   something; but I just read it and said, "Okay.  You're going to

17   need some accounting -- some accounting evidence for

18   something."

19       And that wasn't unusual for any deal to be asked for --

20   you know, prove to me that this shipped, prove to me that the

21   customer accepted.  That was another thing you had to have all

22   the time, the customer sign off that they accepted things,

23   stuff like that.  So I didn't really know what that meant at

24   the time I received it.

25   **Q.**   Look at another one, 5310, which is in those binders.

1    There's two binders in front -- there's a lot of paper in front

2    of you.  No, not that.  The exhibits.

3          THE COURT:  Before we get to 5310, is it an

4    earlier-received?

5          MR. KEKER:  No, Your Honor.  This one's not.  I get

6    the rule.

7          THE COURT:  It's not a rule.  I'm just trying to --

8    you know, in a case that has a million documents, I'm trying to

9    limit it to 100,000, that we don't have duplicates.  That's

10   all.

11       I mean, but if it's a different document, please feel

12   free.

13         MR. LEACH:  Your Honor, I believe it's in evidence as

14   Exhibit 326.

15         THE COURT:  Well, how do we want to deal with this?

16   Because this will come up --

17         MR. KEKER:  Then let's put up 326 on the --

18         THE COURT:  326.

19         MR. KEKER:  -- screen.

20         THE COURT:  That's useful.

21         MR. KEKER:  If it's in evidence.

22         UNIDENTIFIED SPEAKER:  We don't believe it's the same.

23         THE COURT:  Even if it's not in evidence, let's

24   receive it in evidence.

25       326?

 1           MR. KEKER:  No.  Not 326.  It's not the same as what
 2    I'm showing him.  5310.
 3           THE COURT:  What do you want to show him?
 4           MR. KEKER:  I want to show him --
 5    Q.   Is 5310 an e-mail from Sushovan Hussain to you dated
 6    November 15, 2009?
 7    A.   Yes.
 8           MR. KEKER:  I move it in, Your Honor.
 9           THE COURT:  Okay.  Admitted.
10       (Trial Exhibit 5310 received in evidence)
11           THE COURT:  Is there a Government analog to this in
12    the binder or is there not?
13           MR. KEKER:  Not one that is the exact same.  They have
14    a different -- they have some pieces of this.
15           THE COURT:  Okay.  5309.  I just need -- I also need
16    from the Defense that I don't think I have is an exhibit list.
17    I mean, I've got to keep track of these exhibits as we go
18    through.
19       Well, anyway, let's not -- you'll get me one at some
20    point.
21           MR. KEKER:  Yes, sir.
22           THE COURT:  Okay.  But let's keep track of it.  This
23    is 5309.
24           MR. KEKER:  No.  This is 5310.
25           THE COURT:  Pardon me.  It's 5310.

1             **MR. KEKER:**  5310.

2             **THE COURT:**  And it's admitted.

3             **MR. KEKER:**  And can we blow up the top e-mail, and

4    particularly paragraph 3?

5    **Q.**    That says (reading):

6             "For Q4" -- this is from Mr. Hussain to you -- "For

7         Q4 for newly constructed and recognized appliance-related

8         revenue from EMC and HDS" --

9         Is "HDS" Hitachi?

10   **A.**    It is.

11   **Q.**    (reading)

12        -- "amounting to 10 million you will receive 100,000

13        plus an additional linearly calculated commission from

14        Q3 of 54,000.  This will require the necessary

15        confirmations for the allocation of costs and also

16        inclusion of Autonomy software in the sale as we have

17        already discussed."

18        What's that about?  What's he saying?

19   **A.**    Well, so this is in Q4.  The previous e-mail that offered

20   a bonus was for Q3 and the first two lines are about the

21   previous quarter and what I had achieved for that bonus, which

22   has been reviewed.

23        This is offering a new bonus for Q4, which I don't believe

24   I actually achieved, but it's -- it's, you know, offering a new

25   bonus to sell additional hardware.  And it has a very similar,

**SULLIVAN - CROSS / KEKER**

1    you know, language saying -- getting the necessary -- you know,

2    the allocation of costs, and I have the same -- I assume I had

3    a better understanding at this point because I just received

4    those -- I just achieved those sign-offs for the previous

5    quarter.

6    Q.   But the allocation of costs had to do with allocation

7    between marketing and cost of goods sold; did you understand

8    that?

9    A.   I didn't understand exactly what was -- I thought -- I

10   think I thought there was revenue recognition we were trying to

11   work on.

12        But in the previous quarter, what I was specifically asked

13   to do was to get an e-mail from EMC in this case confirming

14   that they understood that this was a marketing program

15   essentially and acknowledging that.

16   Q.   Okay.  We can take that down.

17        If I haven't moved it in, I'd move it in, Your Honor.  Did

18   I -- I guess I moved it in.

19        Let me ask you about EMC then.  EMC is the largest storage

20   company in the world; right?

21   A.   That's right.

22   Q.   And it's up there in your neck of the woods?  It's not far

23   from Boston?

24   A.   I live in the same town as their headquarters, yes.

25   Q.   Most of Autonomy's software customers used EMC hardware,

SULLIVAN - CROSS / KEKER

1   didn't they?

2   **A.**   I think that's fair to say.

3   **Q.**   And Autonomy itself was a big, big customer of EMC?

4   **A.**   Correct.

5   **Q.**   It bought hardware from EMC on a regular basis?

6   **A.**   All the time.

7   **Q.**   Okay.  And in mid-2009 -- if we could put up Exhibit 73,

8   which is in evidence, and blow up the top e-mail.  Thank you.

9        This is an e-mail from you to Kevin -- is it Scannell or

10  Scannell?

11  **A.**   Kevin Scannell, yeah.

12  **Q.**   And you identified him as the head of sales at EMC?

13  **A.**   No.

14  **Q.**   Who is he?

15  **A.**   There's two Scannells and they're brothers, and the head

16  of sales is Bill Scannell.  Kevin is his younger brother who

17  ran a portion of sales.  He was lower on the totem pole, so to

18  speak.

19  **Q.**   And you're writing to him, this is in June 2009 (reading):

20          "We would commit to the current deal (subject to some

21      details) plus make an additional commitment for more

22      hardware related to DS" --

23      That's Digital Safe; is that right?  DS?

24  **A.**   Digital Safe, correct.

25  **Q.**   (reading)

1          -- "and/or Introspect (to be determined).  Since we

2          would be making a very large investment in EMC, we

3          would like a more strategic relationship with EMC so

4          that you could also drive revenue to us.  We would

5          also be looking for a commitment this quarter."

6          What were you saying to Mr. Scannell at that time?

7  **A.**   Oh, we were -- we were in the middle of negotiating -- I

8  believe we already covered this e-mail yesterday -- and we were

9  negotiating a deal to buy -- we're in the middle of a

10 negotiation to buy a bunch of hardware for them actually for

11 our data centers.  And, well, I was just really saying what I

12 said here is we wanted a more strategic relationship.

13         I think we are -- you know, we had some discussions about

14 partnerships.  We were -- you know, we had had, you know, brief

15 conversations about appliances and building appliances and

16 working together, and things like that.

17         We had -- they were a customer as well so I was aware --

18 and, again, as mentioned yesterday, there was activity we were

19 selling to EMC.  So, yeah, we were a customer.  We were a

20 partner.  We were -- they were a customer of ours.  You know,

21 we had kind of a many-pronged relationship with them.

22 **Q.**   Anything wrong with that that you thought of at the time

23 having a multiprong relationship buying and selling between

24 each other?

25 **A.**   No.  We were trying to encourage that.

SULLIVAN - CROSS / KEKER

1   **Q.**   And what you wanted them to do in this more strategic

2   relationship, you were buying a lot of hardware from them, you

3   wanted them to drive some revenue to you; right?

4   **A.**   Absolutely.

5   **Q.**   And what did that mean?  Did that mean get some of their

6   hardware customers to buy Autonomy software?

7   **A.**   Yes.

8   **Q.**   I mean, that was the goal of this --

9   **A.**   Right.

10   **Q.**   -- strategic relationship at the time?

11   **A.**   Right.  We would have loved to have them, for example,

12   push our Digital Safe project.

13   **Q.**   And you were working on a similar strategic relationship

14   with Hitachi at that time, weren't you?

15   **A.**   Yes.  A little bit different but, yes.

16   **Q.**   Did EMC want to be introduced to Autonomy's customers and

17   become certified, have their hardware be certified for Autonomy

18   products?

19   **A.**   We didn't really have a certification program so I'm not

20   sure that's the right way I would put it, but we were a big

21   storage -- we essentially sold storage.  In a way we'd compete

22   with them in some sense because we hosted storage and we

23   charged for people to use storage in the cloud.  And, you know,

24   you could buy your own or license your own software and buy

25   their hardware and run it.  As a matter of fact, our

**SULLIVAN - CROSS / KEKER**

1    competitors would do that.

2        In the Digital Safe we didn't use EMC.  We used them for a

3    small section of what we did for databases and things like

4    that, but for our main storage we didn't use their product.  So

5    they were very much eager to get us to use their product so

6    that every time we charged a customer for a gigabyte of

7    storage, we would have to buy a gigabyte from them.

8        So that was -- a lot of the storage vendors in the space

9    because we were such a big consumer, they were after us to get

10   our business.

11   **Q.**   And let's look back at 2009.  In 2008 there had been this

12   big financial crisis which everybody remembers; right?

13   **A.**   Yes.

14   **Q.**   And the banks were being sued, regulators were coming

15   after them, and people were demanding document production and

16   discovery from the banks; right?

17   **A.**   Yeah.

18   **Q.**   And at that time the banks had a need to store their

19   records, their phone calls, lots of things; right?

20   **A.**   Yes.

21   **Q.**   And the volume of that was rising, wasn't it?

22   **A.**   Yes.

23   **Q.**   And so the need of banks to store their data was growing,

24   and your product Digital Safe, which you brought over from

25   Zantaz, was what they needed; right?

1   **A.**   Yeah.  Most of the businesses in the software world were

2   suffering, and we had something that was really doing very,

3   very well in that period of time because, you know, as

4   bankruptcies and regulations and, you know, the whole

5   regulatory environment, lawsuits, I mean, those things were

6   increasing; and when they increased, we got more business.  So

7   my particular business that I ran was doing very, very well.

8   **Q.**   Okay.  Now, as you were negotiating with EMC, you were not

9   just buying hardware from them.  Let me show you Exhibit 90.

10          **MR. KEKER:**  And I don't know if Exhibit 90 is in

11  evidence or not.

12          **THE COURT:**  Exhibit 90?

13          **MS. LITTLE:**  Yes, it is.

14          **MR. KEKER:**  Exhibit 90, it is in evidence?

15          **MS. LITTLE:**  Yes, sir.

16          **MR. KEKER:**  Good.  Let's put it up and look at the

17  second e-mail, the one in the middle.

18  **Q.**   This is an e-mail from you to Mr. Hussain and to Pete

19  Menell, the chief technology officer, in the middle of 2009;

20  and you were talking about a meeting you had at EMC in the

21  middle of 2009 where good progress was made, and most of the

22  day was spent trying to negotiate what we were going to buy and

23  the price.  That's you buying hardware from EMC?

24  **A.**   Correct.

25  **Q.**   (reading)

1          "And their starting point had us only getting the

2      Digital Safe piece plus Introspect quotes for $9 million."

3      What does that mean?

4  **A.**   Well, we were in the middle of negotiating a price for a

5  whole bunch of stuff we wanted to buy.  They wanted to charge

6  us $9 million.  Eventually through the negotiation we got a

7  better deal.

8  **Q.**   Okay.  (reading)

9          "We also convinced them to create a custom

10      configuration for us that will be useful for the Digital

11      Safe.  Roger Wang is involved."

12      What does that mean?

13  **A.**   Yeah.  So they -- as I described earlier, they were one of

14  the companies that was very interested in getting our Digital

15  Safe business because it was a huge, you know, storage business

16  that we ran in the cloud.  And, again, if they could get that

17  business, if we used EMC hardware for that product, we would

18  have to buy a lot more product from them in the future.

19      And just to be clear, we used them at that point in time

20  for e-Discovery but we didn't use them for archiving.  So --

21  and both of those were large, you know, businesses that had a

22  lot of momentum.

23  **Q.**   And if EMC could have gotten your archiving business,

24  could have become the go-to hardware provider for Digital Safe,

25  that would have been a home run for them; right?

1   **A.**   We would have had to buy a lot more from them in the

2   future, yes.

3        So they were -- they came out with a new product.  I can't

4   remember whether we mentioned it yesterday or not, but it was

5   called -- we called it the HULK.  I think the official name of

6   the product in their product line was called Atmos, and I think

7   they had just acquired a company.

8        In any case, they were saying, "Look, this is" -- the

9   Digital Safe is kind of a unique storage use case.  It has very

10  specific requirements because there's a lot of regulations that

11  it has to meet.  And so you couldn't just use normal storage,

12  and that's one of the reasons why we hadn't used EMC up to that

13  point.

14       But this particular product was supposed to be good at,

15  you know, these specific technical things that we needed the

16  product for.

17  **Q.**   You mentioned this yesterday.  Will you tell the jury what

18  the technical things were in general?

19  **A.**   Well, there was -- mostly it was that you needed immutable

20  storage.  So, you know, when you sell to big banks, they have

21  to actually -- we have to store their records and we would

22  actually sign paperwork -- I would actually sign the paperwork

23  for the banks and say we attest that we are keeping the data in

24  an immutable format in compliance with certain SEC rules,

25  17a-3, 17a-4, which are these bank rules, called the "books and

1    records rules," that they need to comply with.

2        And one of the obligations we had was to make sure there

3    were multiple copies in multiple locations that you couldn't

4    tamper with it, that nothing would ever be disturbed, and then

5    we signed off that that was the case.

6        And in order to make, you know, sure that that hardware

7    was immutable, it had to have a certain capability that was

8    called WORM capability, which stands for write once read many.

9    So you could only write it once.  You can't change it.  It

10   would be very clear if anybody tried to delete something or

11   change it.  In fact, you wouldn't even be able to do it.

12       So we had to make sure we could do that.  We had a lot of

13   software that was our software that we built to achieve that,

14   but the hardware needed certain characteristics of that as

15   well.

16       So EMC had this new product called Atmos.  We called it

17   the HULK.  They called it the HULK too.  So if you see e-mails

18   talking about the HULK, it's not the Super Hero.  So we, you

19   know, agreed with them that we would try it.  They were really

20   pushing to get us to try it, so we agreed to try it.

21       We asked them for some changes.  I had my technical team

22   looking at it and seeing if it could work.  And part of this

23   particular deal was that we would buy a bunch of that and try

24   it with the Digital Safe, and we negotiated that they had to

25   make some changes to the product, and so forth, as part of the

1  deal.

2  **Q.**   Now, as you were developing these strategic ideas with

3  EMC, a man named Stouffer Egan pushed his way into that

4  relationship, didn't he?

5  **A.**   He was trying, yes.  Yeah.

6  **Q.**   Okay.  Did you consider Mr. Egan a sort of political

7  animal?

8  **A.**   I don't know if that's -- I don't know how to --

9  **Q.**   Did he try to take credit for everything?

10 **A.**   I think there's an e-mail where he tried to take credit

11 for some of this stuff, yeah.

12 **Q.**   Yeah.

13        **MR. KEKER:**  And, Your Honor, there is an e-mail from

14 Mr. Egan to Mike Lynch that I will be asking Mr. --

15        **THE COURT:**  What number is it?

16        **MR. KEKER:**  It is 5302.

17        **THE COURT:**  Let me look at it first.  Okay?

18 **BY MR. KEKER:**

19 **Q.**   Why don't you look at 5302, Mr. Sullivan, in the binder.

20 **A.**   (Witness examines document.)

21        **MR. KEKER:**  And I'll be asking about it, and I'd like

22 to ask this witness.  He's from far away and I certainly don't

23 want to call him back to ask him once this is admitted, but it

24 will be admitted.

25        **THE COURT:**  Well, I'm...

SULLIVAN - CROSS / KEKER

```
 1                    (Pause in proceedings.)

 2          MR. KEKER:  It's the lower e-mail from Egan to Lynch

 3   that I'm talking about.

 4          THE COURT:  The lower e-mail.

 5          MR. KEKER:  Well, the one that at the top it says

 6   "Authentication Results."

 7          MR. LEACH:  Your Honor, we have no objection to the

 8   admission of this.

 9          THE COURT:  Fine.  Admitted.

10       (Trial Exhibit 5302 received in evidence)

11          MR. KEKER:  All right.

12          THE COURT:  5302?

13          MR. KEKER:  Yes.

14          THE COURT:  Admitted.

15   BY MR. KEKER:

16   Q.  And this is from -- it's hard to read in here.  Can you

17   blow up the "from-to" right here in the middle, Jeff?

18       This is from Stouffer Egan to Mike Lynch, subject

19   "EMC/Sullivan."  The date is 31 August 2009.

20       And now could we go down to the text?  It's the first

21   paragraph.

22       He says (reading):

23           "Had a very good talk with Mike re EMC."

24       And he says (reading):

25           "I think we have ways of triangulating with the
```

```
 1           customer buyer and EMC in the next two weeks such that we
 2           have good visibility."
 3           What do you -- do you have any understanding of what that
 4      means?
 5      A.   Well, obviously this is -- you know, these e-mails are
 6      not -- I'm not on this e-mail chain.
 7      Q.   Right.  Right.
 8      A.   It's always interesting to see what other people are
 9      saying about you, so --
10      Q.   Well, the "Mike" is you, you understand that; right?
11      A.   Yes.
12           So you want my impression of what that he is talking about
13      here?
14      Q.   Yeah, please.
15      A.   Okay.  Let me just read it for a moment.
16           (Witness examines document.)  Well, I think he's just
17      saying --
18               MR. LEACH:  Your Honor, I don't object to the
19      admission of this.  I don't object to using this to refresh the
20      witness' recollection, but I don't think it's appropriate to
21      have this witness speculate about what two other people are
22      saying.
23               MR. KEKER:  He's been asked to speculate about what
24      e-mails mean a lot.  I'm asking him about a meeting in which --
25               THE COURT:  You're asking him what did A mean when he
```

 1  said something to B, and even though it involved him.  Now, I

 2  think that he can read it.  He can -- the Government says he

 3  can use it to refresh his recollection if he recalls this

 4  episode or what this relates to, what's his understanding in

 5  terms of his understanding; but I don't know that he can

 6  testify as to what somebody else was intending to do.

 7       So with that stricture, do you understand what I've just

 8  said?

 9            THE WITNESS:  Yes.

10       THE COURT:  If you do, you're ahead of most people,

11  including my spouse.

12       Can you answer the question that way?

13            THE WITNESS:  Can I answer it --

14       THE COURT:  Yeah.  Looking at this, does this refresh

15  your recollection as to what was occurring at that time --

16            THE WITNESS:  Yes.

17       THE COURT:  -- or what this related to at that time?

18            THE WITNESS:  Sure.

19       THE COURT:  And you can answer it that way.

20       THE WITNESS:  Yeah.  I mean, this was -- you know, I

21  was giving a -- it was a period of time -- and this is Q3 2009,

22  so it's the one quarter we did the -- you know, the large set

23  of EMC transactions that were reselling based, and there was a

24  lot of money that I was working on, you know, with a variety of

25  deals.

1    So I think Stouffer is obviously saying, "Hey, maybe I

2    should get involved with this and help Mike out and I have the

3    relationships," which he did.  You know, Stouffer had the

4    relationships with JPMC, Bloomberg, Citi, and Deutsche Bank,

5    and so forth.  He talked to those customers a lot about

6    software deals.

7    So the idea that he would, as he puts it, triangulate

8    between what I'm doing and connecting the value proposition on

9    the software side is a reasonable thing to do.

10    I think it's funny that he said you don't try to meet --

11    he's not an Irish golfy-bar person, but...

12    **BY MR. KEKER:**

13    **Q.**    Look at the next page.

14    **A.**    The next page, yep.

15    **Q.**    And if we could blow the second page up.  Yeah, blow up

16    the top, please, Jeff.  (reading)

17            "If he's secure enough to let them point out, it

18        would be good for him to get me in there triangulating

19        with Billy and the customers on two bases:

20            "We should know each other better strategically.

21            "The more people Billy knows and is working with on

22        this, the more committed he inherently becomes so less

23        cancellation factor."

24        Who's Billy, if you know?

25    **A.**    It's Billy Scannell, the person we mentioned earlier from

**SULLIVAN - CROSS / KEKER**

1    EMC.

2    **Q.**    And then the last paragraph he's saying (reading):

3            "I have no doubt if I get in with Billy, we can

4        chummily give him many more reasons to really follow

5        through to full potential, but I think a nudge from you is

6        necessary for Mike to set it up.    Factually this only

7        happens based on Mike's relationship, so I would play that

8        card to please him."

9        What did you understand that to mean, if you do?

10    **A.**    I think he's just asking -- let's see, I guess this is to

11    Mike Lynch.    He's asking Mike Lynch to give me a nudge and say,

12    "Hey, bring Stouffer in with you and have him work this deal

13    with you."

14    **Q.**    Okay.    Now, around the same time were you discussing with

15    EMC them building an appliance or appliances?    I think you said

16    yesterday an appliance is hardware and software together.

17    **A.**    We had discussions with them about building an appliance.

18    **Q.**    Do you consider Digital Safe an appliance?

19    **A.**    Digital Safe could be sold as an appliance.    I wouldn't

20    say it's exclusively an appliance.    We hosted it in our data

21    centers and ran it as what I would call a SAS, a software to

22    service business model.

23        But we did have customers, some of whom you mentioned

24    earlier -- Bank Paribas, Citigroup, and a couple of others --

25    where we didn't host it.    We put it in their data centers and,

1    you know, we sold them the hardware with the software on it

2    and, you know, we provided them the services separately but not

3    in their data center.  So technically it was a different model.

4    It was a different business model.  It was a different delivery

5    model as well.

6    **Q.**   We looked at 243 yesterday.  That's in evidence.  Could we

7    get that up?

8              **THE CLERK:**  Which number again?

9              **MR. KEKER:**  243.

10             **THE CLERK:**  Thank you.

11   **BY MR. KEKER:**

12   **Q.**   This was in October of 2009 and this is you writing to

13   Bill Scannell at EMC saying (reading):

14             "I just left you a voice mail to say thanks for

15        partnering with us in Q3 and participating in our key

16        customer marketing program."

17        What were you referring to there?  What does that mean?

18             **MR. LEACH:**  Oh, Your Honor, I don't believe this is in

19   evidence yet.

20             **THE CLERK:**  Excuse me.

21             **MR. LEACH:**  Objection.

22             **THE COURT:**  One moment, please.  243?

23             **MR. KEKER:**  If it's not in evidence, I beg your

24   pardon.  I move it in, Your Honor.  It's a memo from Mr. --

25   **Q.**   Mr. Sullivan, you recognize this is a memo from you to

SULLIVAN - CROSS / KEKER

1    Mr. Scannell?

2    **A.**   Yes.

3            **THE COURT:**  Any objection?

4            **MR. LEACH:**  No, Your Honor.

5            **THE COURT:**  Okay.  243 admitted.

6        (Trial Exhibit 243 received in evidence)

7    **BY MR. KEKER:**

8    **Q.**   What did you mean when you said, "Thanks for partnering

9    with us in Q3 and participating in our key customer marketing

10   program"?

11   **A.**   I was referring to the exact reselling program that we've

12   been talking about to resell their hardware, which we just

13   completed in the previous quarter.

14   **Q.**   Well, and then it goes on (reading):

15           "Per our previous conversations, I would like to get

16           together to discuss the continuation of the program to

17           include:  Development of an appliance bundle, mutual

18           cross-referrals, account introductions, reselling, and

19           other opportunities."

20       Can you tell us what each one of those means?

21   **A.**   Yeah.  I mean, we were talking about an appliance --

22   building potentially an appliance, so something like

23   potentially shipping a Digital Safe or actually e-Discovery on

24   bundling it on their hardware and shipping it.  We talked about

25   that.

1          At the time EMC was letting me know that they were

2     thinking about getting into servers, which I don't think they

3     ever did until they merged with Dell, but -- and that was

4     interesting to them as well.

5          Mutual cross-referrals, hopefully that's obvious; but

6     bringing each other into each other's accounts, linking up our

7     sales team.

8          Account introductions would be a very similar thing, which

9     we were already doing.

10         Reselling, of course, we had already started in the

11    previous quarter.

12         And other opportunities could have been any number of

13    things.

14    Q.   Okay.  So this relationship, at this point at least, with

15    EMC was not just hardware reselling, it was a more strategic,

16    general discussion of possibilities to work together; right?

17    A.   That's right.

18    Q.   5305.  Would you look at that, please, sir?  Just 10 days

19    later.

20    A.   5305?

21    Q.   5305.

22    A.   (Witness examines document.)  Yes.

23              MR. KEKER:  I move it in, Your Honor.

24              MR. LEACH:  No objection.

25              THE COURT:  Admitted.

 1          (Trial Exhibit 5305 received in evidence)

 2   BY MR. KEKER:

 3   Q.   Could we look at the middle e-mail from Mike Sullivan to

 4   Bill Scannell?  It's 10 days later.

 5          And can we blow up the second full paragraph?

 6          And you're saying (reading):

 7              "I wanted to follow-up again to see if we could spend

 8          some time talking about other ways we could help each

 9          other.  Amongst other things, we are going to launch some

10          appliance products and will need hardware to bundle into

11          the product."

12          What appliance products were you going to launch?

13   A.   Again, we were talking about e-Discovery and Digital Safe

14   archiving bundles.

15   Q.   And then about a month later, 5306, if you'd look at that.

16   A.   (Witness examines document.)

17   Q.   And this is another --

18          MR. KEKER:  Well, first of all, I'd move it in,

19   Your Honor.

20          THE COURT:  Any objection?

21                  (No response.)

22          THE COURT:  Admitted.

23          (Trial Exhibit 5306 received in evidence)

24   BY MR. KEKER:

25   Q.   This is a series of e-mails that you're on.  Let's look at

1    the middle one.  This is somebody from EMC writing you saying

2    (reading):

3              "On behalf of EMC, thank you for the opportunity to

4        work with Autonomy Zantaz."

5        You were the CEO of Zantaz; right?

6    A.   Right.

7    Q.   (reading)

8              "We have reviewed the B of M documents that you

9        provided and have several additional questions."

10       What's B of M?

11   A.   BoM is bill of materials.  So it was really just a list of

12   equipment.

13   Q.   And the bottom e-mail is headlined "Appliance" in the

14   subject line.

15   A.   Uh-huh.

16   Q.   And this was some technical back and forth about this

17   potential appliance that was going to be built; right?

18   A.   Correct.  We were evaluating -- I had given to my team, my

19   technical team, and put them in contact with some technical

20   people from EMC and they were -- we were evaluating hardware,

21   you know, that they -- that was potentially possible for us to

22   use in an appliance.

23   Q.   And then go over to 5307, an e-mail from you to Roger Wang

24   at Autonomy on December 1st.

25             MR. KEKER:  I move that in, Your Honor.

1          THE COURT:  Admitted.

2          MR. LEACH:  Your Honor --

3          THE COURT:  Oh, yes?

4          MR. LEACH:  I think the witness should identify it

5     first and make sure he recognizes it.

6          THE COURT:  Go ahead.

7     BY MR. KEKER:

8     Q.   Is this a document that -- did I write it?  Who wrote it?

9     A.   This is a document from me to Roger Wang that I recognize.

10         THE COURT:  Admitted.

11    (Trial Exhibit 5307 received in evidence)

12         MR. KEKER:  Can we blow up the first line?

13    Q.   This says you -- it says (reading):

14         "The people you were meeting with are mainly focused

15    on appliance sales so better to keep on that track."

16    So who's Roger Wang and what were you saying to him in

17    this e-mail in December of '09?

18    A.   Well, Roger Wang was a person who was kind of the head of

19    engineering for Digital Safe, or he was one of the main

20    engineers I should say.  He had been with the company for a

21    long time.  He's a person that we turned to for technical

22    questions.  He was a leader in that regard.

23         So actually in that point in time, Roger Wang, he reported

24    to Pete Menell, and he was the head of engineering.  And you

25    can see there's another person, Sam Yan, who was one of the top

1    engineers as well.  So they were evaluating this hardware.

2         Let's see, and I forget the second half of your question.

3    Q.    Well, that's it.  That's what --

4    A.    That's who they are, yeah.

5    Q.    And the people you were meeting with were mostly focused

6    on appliance sales.  What was the appliance that was being

7    evaluated?

8    A.    Well, if you look at the second sentence, they -- I'm

9    saying to Roger, "Same drill as the others, first of all,"

10   which means "I need you to evaluate this product."

11        They supposedly have a new product that's similar to a

12   cell.  A cell was the key part of Digital Safe that did all the

13   storage.  We called them cells.  As a matter of fact, the

14   term -- marketing term we had used is called "split cell

15   technology," and that's what we sold to customers.  It was all

16   about having storage in multiple locations and immutability

17   that I described earlier.  So this is really evaluating EMC for

18   the purposes of them being the hardware provider for our cell.

19   Q.    And that would be a Digital Safe appliance?

20   A.    Digital Safe, correct.  It would have been a Digital Safe

21   appliance potentially or also to be used in our hosted

22   offering.

23   Q.    Okay.  If you'd look at 5308 and that moves over into the

24   next year.  That's an e-mail from you to Mike Hannigan and some

25   other people at EMC; right?

SULLIVAN - CROSS / KEKER

1   **A.**   Yes.

2          **MR. KEKER:**  Move it in, Your Honor.

3          **THE COURT:**  Admitted.

4      (Trial Exhibit 5308 received in evidence)

5   BY MR. KEKER:

6   **Q.**   What's happening in this e-mail?  You want to introduce

7   Sam?

8   **A.**   Sam Yan, same guy in a previous e-mail, you know, top

9   techie for the Digital Safe, just really introducing him to

10  Mike Hannigan, who is our sales rep at EMC, so that they could

11  evaluate this new offering that EMC had.

12  **Q.**   And the new offering was this thing that was going to go

13  with Digital Safe?

14  **A.**   Potentially.

15  **Q.**   Was that eventually the HULK?

16  **A.**   I'm not sure if this is.  It probably is.  We evaluated

17  multiple things over the time period.

18  **Q.**   Well, there's also a -- just one second.  Excuse me.

19      Look at 5371 if you would, please.  And I'm afraid it's in

20  the second volume.

21  **A.**   (Witness examines document.)

22  **Q.**   No.  That's not -- never mind.  That's not what I want.

23      All right.  Well, while this was going on, while you were

24  doing this and technical teams were meeting and discussing

25  these appliances, were there other discussions that you knew

**SULLIVAN - CROSS / KEKER**

1    about?  I think you mentioned yesterday something called

2    Project Dynamo?

3    A.    Yes.

4    Q.    What was Project Dynamo?

5    A.    The only way I knew anything about it was between Sushovan

6    and Mike, they had informed me that they had strategic

7    discussions going on with EMC that had something to do with M&A

8    activity, potentially us buying a chunk of EMC and potentially

9    EMC investing in us.  And I think they told me about it because

10   they knew I had, you know, high-level relationships in EMC.

11   Q.    Okay.  So, now, slow down.  You said yesterday that EMC

12   had bought some software companies at some point?

13   A.    They did.

14   Q.    And then did they form them into a subsidiary called

15   Documentum?

16   A.    Well, Documentum was one of the many assets that they had

17   acquired.  That was just one of them, but there were a number

18   of them that were in a software business unit inside of EMC.

19   Q.    And was Documentum in particular a competitor of

20   Autonomy's?

21   A.    In some way, yes.  With certain products, yes.

22   Q.    And was the software business at EMC struggling?  Have you

23   described it as struggling?

24   A.    From what I heard.  I don't have direct knowledge of that,

25   but I had heard that.

**SULLIVAN - CROSS / KEKER**

1  Q.   And what you heard from Mr. Lynch and Mr. Hussain is that

2  they were thinking about buying what?  What were they -- what

3  was Autonomy going to buy?

4  A.   I heard that they were going to buy potentially that

5  software business unit.

6  Q.   And then Autonomy -- then EMC was going to invest in

7  Autonomy?

8  A.   That's what I heard, yeah.  Again, I don't have direct

9  knowledge of these things.

10 Q.   Did you know this was a $2.4 billion deal that they were

11 talking about?

12 A.   No.

13 Q.   Did you know that people from Deloitte in England came

14 over to do due diligence on that possible acquisition?

15 A.   No.  I was not involved in that.

16 Q.   And you never saw the due diligence report?

17 A.   No.

18 Q.   Now, right around this time with all this going on, the

19 Documentum -- or something happened at EMC where they said they

20 don't want to do business with you anymore; right?

21 A.   Yes.

22 Q.   What happened?

23 A.   They told me they didn't want to do business with us

24 anymore.

25 Q.   Did they say why?

**SULLIVAN - CROSS / KEKER**

1   **A.**    Yes.  They said that they had -- there were people inside

2   EMC that had concerns that we were -- you know, that I was

3   working with the hardware people.  Obviously there was another

4   division with EMC that this particular software division that

5   we were competing with, and they said that group wasn't

6   comfortable with us working so closely with the hardware

7   division.

8       I think that the dynamic that I understood within EMC is

9   that the software business within EMC would rather have EMC

10  bringing them into the deals rather than -- rather than us.  So

11  that was a bit of a struggle for them.

12  **Q.**    And then we saw an exhibit yesterday 345, I think, where

13  they say, "I'm sorry.  We're not going to do anymore business"?

14  **A.**    Right.

15  **Q.**    Okay.  Would you describe the relationship between

16  Autonomy and EMC through this period as that of a typical

17  hardware reseller or was it more than that?

18  **A.**    It was more than that.

19  **Q.**    Let me ask about Dell.  When the EMC relationship ended,

20  then you shifted over to Dell -- right? -- and began to do more

21  business with them?

22  **A.**    Yes.

23  **Q.**    And you had many discussions, high-level meetings about

24  various projects with Dell as well, didn't you?

25  **A.**    Yes, we did.

**SULLIVAN - CROSS / KEKER**

1  Q.   Including one where Autonomy software would run on Dell's

2  new storage product?

3  A.   That's right.

4  Q.   Tell the jury about that one.

5  A.   Dell was -- well, first of all, Dell was the largest EMC

6  reseller in the world at the time as well.  So, you know, there

7  was a connection there.  But Dell was looking at building their

8  own storage products, and they had -- they had some products in

9  the storage space.

10      But one of the things that the industry was really trying

11  to do at that time was build intelligent storage.  So, you

12  know, today -- at that point in time you'd really store stuff

13  away on a system and it would just be there, and you could call

14  it back just like you could on your laptop or a computer

15  system.

16      But what companies were -- the storage companies were

17  trying to do at the time was to build new storage systems that

18  indexed everything and made it searchable and provided

19  analytics and things like that.  They wanted it so that when

20  you put something on the disk, there was a lot more value.

21      And they were evaluating technology for that, to bring a

22  new product to market.  And one of the pieces of technology

23  that they were evaluating was our IDOL product.  And we were

24  talking to them about -- I forget, there was a -- there was

25  actually a code name for their internal project like BlackBerry

1    or something like that.

2    **Q.**    Blue Jay?

3    **A.**    Blue Jay, there you go.

4    **Q.**    Project Blue Jay?

5    **A.**    Project Blue Jay.

6    And we were very engaged with them doing pilots and, you

7    know -- you know, working with their product team and their R&D

8    team about, you know, running our software on their product,

9    this Project Blue Jay, for them to sell it.

10    And we really wanted to win that because that would mean

11    every time they sold this, we would get a little piece of it.

12    It was an OEM project.  So really that's what we were working

13    on.

14    **Q.**    Okay.  You weren't just dealing with Dell as a reseller of

15    hardware?  You were dealing with them on a lot of things,

16    weren't you?

17    **A.**    Yeah.  That would have been a very large software deal if

18    it closed, which it didn't.

19    **Q.**    You were -- well, let's look at 5319 -- excuse me, 5313.

20    **A.**    (Witness examines document.)

21    **Q.**    This is an e-mail from you to Sushovan Hussain and then

22    one from him back to you.

23    **MR. KEKER:**  And I move it into evidence.

24    **THE COURT:**  Admitted, 5313.

25    (Trial Exhibit 5313 received in evidence)

SULLIVAN - CROSS / KEKER

BY MR. KEKER:

Q.    Okay.  Let's look at the bottom e-mail, please.  The date
is November 4, 2009, and you're telling Mr. Hussain that you
were having some meeting and it had been moved to the 12th.

        And then the headline is "Potential Components of
Autonomy/Dell Deal."  Could you go through each one and explain
to the jury what you were thinking in this e-mail about
potential components of a deal?

A.    Sure.

        Autonomy to launch and market.  So this is what we were
talking to Dell about, a broad kind of -- you know, a broader
strategic relationship.

        Autonomy to launch and market an archived appliance with
Dell Equipment and Storage.  I think hopefully that's obvious.

        Autonomy to launch and market e-Discovery appliance with
Dell Equipment and Storage.

        Autonomy to launch and market a search appliance, which
would have been the IDOL product with Dell Equipment and
Storage, and would have competed directly with a Google
appliance, which is a product that was popular in the market.
It competed with us and we didn't have a good offering to
combat that.

        Dell to OEM the Autonomy IDOL search platform for Bluebird
and other Dell storage offerings.  So that's what I just
described a moment ago.

1          Dell to resell Autonomy appliances and storage and

2     software.  So the idea was we would get -- you know, build the

3     appliance and then Dell would put it on their price list and

4     have their salespeople sell it.

5          Dell to license Autonomy Discovery and Governance

6     solutions for internal use.  So they are actually a customer as

7     well.  They were an e-Discovery customer, and we were just

8     trying to get them to use more of our e-Discovery products.

9          Autonomy to utilize Dell equipment and storage for hosted

10    offerings including the world's largest archiving and discovery

11    offerings, which is what we were at the time.

12         And we already, by the way, used Dell for years, you know,

13    going back to my SteelPoint days.  They were our standard

14    vendor for servers.  So we already were a big Dell customer and

15    we were buying a lot of stuff from Dell.  So that was already

16    happening.  All the servers in our data centers were Dell

17    servers, thousands of servers at the time.

18         Autonomy to provide Dell Q4 marketing incentive to

19    kickstart the reselling relationships.  So that would have

20    been, you know, the stuff that we've been talking about all

21    morning.  You know, the reselling.

22         And then both companies to make revenue commitments for

23    the current calendar quarter.

24    Q.   Okay.  So lots of mutual activity back and forth was being

25    discussed at least or considered?

1   **A.**    That's right.

2   **Q.**    In late 2009, were there meetings between tech teams,

3   technology teams, at Autonomy and Dell about a product called

4   Arcpliance?

5   **A.**    Yes.

6   **Q.**    What's Arcpliance?

7   **A.**    Arcpliance was really -- had a couple of pieces to it.

8   And the time frame you mentioned was what?

9   **Q.**    Late 2009.  You can look at Exhibit 328 if you want.

10  **A.**    328.  Is that 5328?

11  **Q.**    No.  328.  Just 328 --

12  **A.**    328.

13  **Q.**    -- which is in the beginning.

14        Well, let's -- I would -- look at 328.

15            **MR. KEKER:**  And I would move it in.  It's a memo from

16  Mike Sullivan to -- e-mail from Mike Lynch to Mike Sullivan and

17  others.

18            **THE COURT:**  Admitted.

19        (Trial Exhibit 328 received in evidence)

20  **BY MR. KEKER:**

21  **Q.**    And the second -- the top just says Mr. Lynch is saying,

22  "Okay," or whatever.  "Bring me some ideas."

23        But the second e-mail is something that you wrote --

24  right? -- on 11/13/2009?

25  **A.**    Yes.

1    Q.    Okay.  (reading)

2            "We're getting inquiries about Arcpliance pricing and

3        so on."

4        Just tell us about what was going on in this time period

5    about Arcpliance and what Arcpliance is.

6    A.    Arcpliance, so we had -- so I've been talking a lot about

7    the Digital Safe.  We also had other archiving products.  So at

8    Zantaz we had a licensed archiving product.  It was called EAS.

9    Over time we called it -- what did we call it?  It had --

10    Q.    ACA too?

11    A.    ACA.  Thank you.  There was --

12    Q.    Let's stop on that one because we're going to hear about

13    that one too.

14        EAS, it stood for Enterprise Archiving Solution; is that

15    right?

16    A.    That's correct.

17    Q.    And that was a Zantaz product?

18    A.    That's right.  Zantaz, when I was there, we acquired a

19    company up in Canada called Educom and their product was EAS,

20    and that was also an archiving product, and we ended up buying

21    a lot more archiving products over the years.

22    Q.    And did EAS have a discovery function where once you

23    archived, there was a discovery function where you could pull

24    out, go find things in it?

25    A.    Yeah.  Yeah.  Every archiving -- I wouldn't call it

1   complete e-Discovery, but it had some features, yeah.

2   **Q.**   Okay.  And then eventually that morphed into something

3   called ACA Autonomy or, no, A --

4   **A.**   Autonomy Consolidated Archiving.

5   **Q.**   Okay.  And that was the old EAS but added video and some

6   other capability?

7   **A.**   Well, what happened is we bought a lot of companies.  We

8   bought Computer Associates' regulatory compliance business.

9   That was an archiving product.

10       When we bought Iron Mountain, they had two archiving

11   products.  There was one called Mimosa.  There was another one

12   called DRCCM, digital records and compliance manager.  And I

13   think there was even another archiving product in there

14   somewhere.

15       So the problem is we had a lot of archiving products, and

16   so ACA, Autonomy Consolidated Archiving, was our technical

17   response to that.  It was really merging the best of all those

18   products to get one unified product that we'd bring to market.

19   Because it was -- frankly, it was confusing to our customers

20   that we had, you know, more than one product in the space.

21   **Q.**   It's confusing to me.

22       Okay.  So back to Arcpliance.  What is Arcpliance?

23   **A.**   Arcpliance was the brand name that was used internally and

24   externally for our archiving appliance.  And it was really not

25   for the Digital Safe; it was for these other products that I

1   just described.  It was really to sell our licensed products

2   bundled with hardware and deliver it, you know, as an appliance

3   solution.

4   Q.   And whose software was going to -- excuse me.

5        Whose hardware was going to go into this appliance?

6   A.   We used Dell, I believe, yeah.

7   Q.   So this is an appliance deal with Dell?

8   A.   Yes.

9   Q.   Okay.  Look at, if you would, 301, which is a memo from

10  you to somebody named Robert Desroches.

11  A.   Yes.

12  Q.   And it attaches a press release.  Do you recognize the

13  press release?  Do you recognize the whole memo?

14  A.   I remember the announcement, yeah.

15  Q.   And is the announcement attached to this e-mail?

16  A.   Yes.

17           MR. KEKER:  I'd move it in, Your Honor, 301.

18           THE COURT:  Admitted.

19       (Trial Exhibit 301 received in evidence)

20           MR. KEKER:  Okay.  Let's look at the announcement on

21  page -- four pages in, Jeff.  More than four.

22       Yeah, that's it.  If we could just blow up the top.

23  Q.   This is (reading):

24           "Autonomy announces new archiving appliance.

25       Autonomy Arcpliance combines power of Autonomy's Digital

1        Safe, and easy-to-use, turn-key appliance."

2        And goes on to talk about it.  On the next page you're

3   quoted.

4        Right there, yeah.

5        That's you talking about this new product and being quoted

6   in the press release; right?

7   A.   Yes.

8   Q.   Okay.  And you say this is a marketing term for -- for

9   what?  For --

10  A.   Well, it's -- we had a -- one of our key competitors at

11  the time was a company called Barracuda and they were selling

12  an appliance for archiving, and we were trying to compete with

13  them.  So this is our offering to do that, to compete with

14  them.

15  Q.   Okay.  And would you look at 5369?

16  A.   (Witness examines document.)

17  Q.   That's in the second volume.

18  A.   Okay.

19  Q.   And 5369 is a memorandum from Sam Yan, who you identified

20  before, to you.

21          MR. KEKER:  I'd move it in, Your Honor.

22          THE COURT:  Admitted.

23       (Trial Exhibit 5369 received in evidence)

24  BY MR. KEKER:

25  Q.   The third page is a memorandum -- is an e-mail -- of the

1   string is an e-mail from you to Roger Erickson and others and

2   says (reading):

3           "I want to keep pushing" -- "I want to keep pushing

4       on the Arcpliance" -- excuse me -- "on the appliance so

5       that we can get it out the door ASAP."

6       Is that a reference to a different -- this is three months

7   after the Arcpliance announcement.  Is that a different

8   appliance?

9   **A.**   No.  It's really the same appliance.  Our marketing was a

10  little ahead of our capabilities to deliver, so we would -- you

11  know, we would announce these things conceptually and then, you

12  know, start selling and building.

13      We knew we could do it and we had it pulled together, but

14  we were really trying to get it packaged up.

15  **Q.**   But, again, with Dell, as with EMC, the relationship was

16  far more than simply being a reseller of hardware?  There was a

17  lot going on, wasn't there?

18  **A.**   There was a lot going on, yes.

19      **MR. KEKER:**  Your Honor, I'm about to shift to a new

20  subject.

21      **THE COURT:**  Okay.  So let's take a recess now.

22      Ladies and gentlemen of the jury, we will take our noon

23  recess.  Remember the admonition given to you:  Don't discuss

24  the case, allow anyone to discuss it with you, form or express

25  any opinion.  And we will resume at 10 to 1:00.

1          (Proceedings were heard out of the presence of the jury:)

2          **THE COURT:**  About how much longer with this witness?

3          **MR. KEKER:**  I would say another 45 minutes.

4          **THE COURT:**  Thank you.

5              (Luncheon recess taken at 11:51 a.m.)

1    **Afternoon Session**                                    **12:53 p.m.**

2         (Proceedings were heard in the presence of the jury:)

3              **THE COURT:**  Okay.  Please be seated.

4         Let the record reflect all jurors are present, parties are

5    present.

6         You may proceed.

7    **BY MR. KEKER:**

8    **Q.**   Good afternoon, Mr. Sullivan --

9    **A.**   Good afternoon.

10   **Q.**   -- and ladies and gentlemen.

11        I'm going to shift focus to e-Discovery.  What is

12   e-Discovery?

13   **A.**   e-Discovery is the -- it's the legal -- it's a legal

14   process or it's actually a technical process to help facilitate

15   the legal discovery process, which allows both sides in a

16   litigation, for the most part, to exchange information.

17        So there's a lot of information, usually communications,

18   that are in electronic form -- e-mails, text messages, and it

19   could also be paper documents that are scanned in, and things

20   like that -- and e-Discovery is the process of capturing all

21   that information, storing it, making it searchable.  There's a

22   lot of extra features, like things of --

23   **Q.**   I'm going to ask you about some of those features, but

24   will you pull that mic a little bit to make sure that folks in

25   the back --

SULLIVAN - CROSS / KEKER

1    A.    Sure.  Is that better?

2    Q.    Yeah.  So everybody can hear you.

3          We've mentioned some e-Discovery products.  One of them

4    you talked about yesterday was Introspect, which was a product

5    developed at Zantaz, or at least that came from Zantaz into

6    Autonomy.  What does Introspect do?

7    A.    It is the name of our e-Discovery product that allowed a

8    lot of that stuff that I just described.

9    Q.    Is there also a product called Autonomy Legal Hold?

10   A.    Yes.

11   Q.    And what is that product?

12   A.    That was a product that would -- when you do have a

13   discovery obligation as a company or any entity, you're

14   obligated to preserve any information that might be relevant.

15   So in a big company, you've got to have a product that can go

16   out and search and lock that information down, or at least

17   capture it so that you have a copy of it so that you don't

18   delete anything.

19   Q.    And that's part of the e-Discovery process, is locking

20   up the information so that it's not deleted while you're going

21   through the process; right?

22   A.    Correct.  Yeah.

23   Q.    And that product was abbreviated ALH?

24   A.    Right.

25   Q.    And that was also a Zantaz product that came into

1  Autonomy?

2  **A.**   No.  No, it wasn't.

3  **Q.**   Where did it come from?

4  **A.**   That was created at Autonomy.

5  **Q.**   Okay.  And then there's something called Early Case

6  Assessment that was called ECA.  What's that?

7  **A.**   ECA is really for a company to make an early assessment

8  before you did an expensive collection of information, which

9  can be very expensive to collect all this information.  ECA was

10 kind of a way to quickly look at information in place to see

11 what you have, and it was -- it's kind of an intelligent

12 product that's smart enough to group things that are similar

13 together.  And, you know, you can do a lot of things like "Show

14 me the data just from this person or this subject," and things

15 like that.  And it will automatically create timelines and

16 things like that.  It's -- you know, it's a way to get an early

17 case assessment of your data.

18 **Q.**   And that's an e-Discovery product, isn't it?

19 **A.**   It would all be -- all these would be considered part of

20 an e-Discovery suite of products, yes.

21 **Q.**   And then, finally, I wanted to ask about what we talked

22 about earlier, EAS, this enterprise archiving solution that has

23 a discovery function in it.  Can you explain that to the jury?

24 **A.**   Yeah.  EAS is an archiving product, but all archiving

25 products on the market, a standard capability in those products

SULLIVAN - CROSS / KEKER

1  for many years now would be not just to store the information

2  away but be able to search it and pull information out.

3      So it doesn't have a full-featured e-Discovery

4  capability, which allows you to do things like Bates numbering

5  and so forth, which is a court-required stamping process, but

6  it would have the searching component.  So you could really

7  search through these repositories and find the information that

8  you needed.

9  **Q.**   And so just in general, e-Discovery requires software,

10 it requires hardware to run the software on, and then it

11 requires people to check it and do what they need -- feed it

12 and do what they need to do; right?

13 **A.**   That's right.

14 **Q.**   Okay.  Were you worried about Autonomy -- as the

15 e-Discovery world grew after 2008, were you concerned about

16 the capacity of Autonomy to deliver e-Discovery services?

17 **A.**   Was I concerned about the capacity?

18 **Q.**   Well, let me ask you to look at 2314 -- 2314, yes.

19 **A.**   2314.  (Witness examines document.)

20 **Q.**   Is this an e-mail from you to Mr. Hussain and others dated

21 May 22, 2008?

22          **THE COURT:**  I'm sorry.  Which -- what number is it?

23          **MR. KEKER:**  2314, Your Honor.  I mean, excuse me.

24 5314.  I'm getting dyslexic.

25          **THE COURT:**  53, that's right.

1           MR. KEKER:  5314.

2           THE COURT:  5314.  Thank you.

3   BY MR. KEKER:

4   Q.   You got it, Mr. Sullivan?

5   A.   I do.

6   Q.   And that's an e-mail you wrote?

7   A.   Yes.  This is the one from myself to Sushovan and Anthony

8   Bettencourt on May 22nd?

9   Q.   Yes.

10          THE COURT:  Admitted.

11          MR. KEKER:  Thank you.

12      (Trial Exhibit 5314 received in evidence)

13          MR. KEKER:  Could we put it up, please?

14  Q.   So this is back in 2008.  The fourth paragraph down says

15  (reading):

16          "We have a backlog of EDD work now and can only

17      recognize as fast as we can process.  Any improvement in

18      throughput could raise the forecast.  In addition, there

19      are some old cases that are being outsourced that are

20      waiting for approval to continue.  This is holding up

21      revenue."

22      What were you talking about there?  What backlog of EDD

23  work?

24  A.   Well, you'd get a lot of documents in, so we might get

25  terabytes of information delivered to us and typically the

1    other side, the customer, will want us to produce and process

2    that information very quickly.  You know, they'll ask for the

3    next day, and we may say it's going to take us a week to do

4    this.

5        So that's what I mean by backlog.  At any time your

6    backlog is very much about the volume of work that's coming in.

7    **Q.**    Look at the next one, 5315, and tell me if that's an

8    e-mail you wrote on September 5th, 2008, to Mr. Lynch and

9    Mr. Hussain.

10   **A.**    (Witness examines document.)

11           **MR. KEKER:**  And if it is, I'll move it in, Your Honor.

12           **THE WITNESS:**  Yes, it is.

13           **THE COURT:**  It's admitted.

14       (Trial Exhibit 5315 received in evidence)

15   **BY MR. KEKER:**

16   **Q.**    And there you're reporting to them in the second paragraph

17   that you've got another big case for Wachovia.  Wachovia is one

18   of the banks that crashed in the financial crisis; right?

19   **A.**    Correct.

20   **Q.**    And it got sued a lot.

21       But in the next paragraph (reading):

22           "Staffing.  We lost three very strong experienced

23       people recently that we need to replace."

24       Were there staffing shortages in your e-Discovery world

25   at Autonomy in 2008?

1    **A.**    From time to time there would be -- you know, we would

2    have peaks and valleys of work and people to do the work.

3    **Q.**    Okay.  And then at some point Autonomy was hired to

4    provide e-Discovery in the British Petroleum Horizon --

5    Deepwater Horizon case.  Do you remember that?

6    **A.**    Yes, I do.

7    **Q.**    Tell the jury -- just remind the jury what the Deepwater

8    Horizon case was.

9    **A.**    Well, that was the big BP oil spill that was well

10   publicized.  It was the -- it was at the time anyways and may

11   still be the largest litigation in history.  So it was a very

12   big project.

13   **Q.**    And largest in the sense of more documents, more

14   information that had to be exchanged?

15   **A.**    Right.  Yes.

16   **Q.**    This was down in the Gulf of Mexico, that case?

17   **A.**    Yes.

18   **Q.**    And did Autonomy get the contract to do e-Discovery for

19   the BP case, for the British Petroleum case?

20   **A.**    We did, yes.

21   **Q.**    And were there -- when did you first start working for

22   British Petroleum?  By "you" I mean Autonomy.

23   **A.**    Oh, boy.  It would be hard for me to pinpoint the time but

24   probably I'm going to guess six months after the spill,

25   something like that.

1   Q.   Were you doing it as early as 2009, or is it --

2   A.   It's hard for me to place a time on it.  I can't remember

3   when the spill was, but --

4   Q.   Okay.  Look at 5331, please.

5   A.   (Witness examines document.)

6   Q.   And this is an e-mail that you were copied on on May 25,

7   2010, that says "Top" -- the subject is "Top EDD Risks to BP."

8   A.   Right.

9             MR. KEKER:  Move it in, Your Honor.

10            THE COURT:  Admitted.

11        (Trial Exhibit 5331 received in evidence)

12   BY MR. KEKER:

13   Q.   And I won't go through all the people that are on it, but

14   you're a cc and the subject is "Top EDD Risks to BP."  And then

15   it says, "Brian" -- who's Brian DaRosa.

16   A.   Brian worked for me.  He ran a lot of the production for

17   e-Discovery.

18   Q.   All right.  And this is an e-mail identifying

19   e-Discovery risks like deduping issues and production issues

20   that were involved in this gigantic case; right?

21   A.   Correct.

22   Q.   Okay.  And do you recall that it was so gigantic that it

23   caused problems, that Autonomy had trouble keeping up?

24   A.   It was a very challenging case, yes.

25   Q.   And by August 2009, do you remember that it got to the

1   point that British Petroleum escalated to Autonomy that their

2   lawyers weren't happy and that they didn't have enough

3   capacity?

4            MR. LEACH:  Objection.  Vague as to time.  This is a

5   2010 e-mail.  And compound.

6   BY MR. KEKER:

7   Q.   Would you look at 53 -- I'll withdraw it, Your Honor --

8   5332, please?

9   A.   Okay.

10  Q.   And is that an e-mail you were copied on from Brian

11  DaRosa, the person who works for you you just said?

12  A.   Yes.  Yes, it is.

13  Q.   And is it dated August 25th, 2010?

14  A.   Yes.

15           MR. KEKER:  And I'd move it in.

16           THE COURT:  Admitted.

17  (Trial Exhibit 5332 received in evidence)

18           MR. KEKER:  Can we blow up the top paragraph?

19  Q.   In that paragraph Mr. DaRosa is saying (reading):

20            "This week BP escalated to our exec team that their

21       outside counsels are not satisfied with the current state

22       of delivery on the Horizon project.  Rob Miller met with

23       Stouffer yesterday at ILTA and voiced the concerns from

24       BP's perspective outlined below and made it very clear

25       that the project was at risk if Autonomy did not show

1          significant improvement in the immediate future."

2          Was there a capacity problem at that time at Autonomy,

3     capacity to do the work?

4     **A.**   I would say it was a more technical problem, but I'm sure

5     there were capacity challenges too.  We were hiring very

6     aggressively to keep up.

7     **Q.**   Okay.  And then look at 313, please.

8     **A.**   5313?

9     **Q.**   313.

10    **A.**   313.

11         **THE COURT:**  313?

12         **MR. KEKER:**  313, yes.

13    **Q.**   And this is not an e-mail you're on, but it's an e-mail --

14    but people on it include Sushovan Hussain, Pete Menell, Andy

15    Kanter, and Joel Scott.

16         **MR. KEKER:**  Joel Scott will be a witness, Your Honor.

17    We're going to ask him about this, and I would like to ask

18    Mr. Sullivan about some of the information here and then --

19         **THE COURT:**  Any objection --

20         **MR. KEKER:**  -- tie it up with Mr. Scott.

21         **THE COURT:**  -- to the document?

22         **MR. LEACH:**  I object to the admission at this point,

23    Your Honor.  I have no problem showing it to the witness and

24    asking him appropriate questions about it.

25         **THE COURT:**  Okay.  You're objecting to its admission.

1   Okay.  Well --

2           MR. KEKER:  We'd ask that it be --

3           THE COURT:  I'm quite unsure how we're proceeding.

4           MR. KEKER:  We'd ask it be admitted conditionally.  If

5   we don't put it in through Mr. Scott, if Mr. Scott doesn't

6   remember it or recognize it, then, fine, but he's going to be a

7   witness.

8           THE COURT:  Okay.

9           MR. KEKER:  And the only other thing I can think of is

10  to say Mr. Sullivan isn't going to be excused because I may

11  need to call him back to ask him about this document, and that

12  seems completely unfair.

13          MR. LEACH:  Ask him if he remembers something in the

14  document.  Ask him if this refreshes his recollection.

15          MR. KEKER:  I'd like to show the jury the document.

16          THE COURT:  Well, before you show the jury, why don't

17  you ask him about the document.

18          MR. KEKER:  Okay.

19  Q.   Did you know -- well, look at the e-mail and see if

20  there's information in it that you knew about in November of

21  2009.

22  A.   (Witness examines document.)  I mean, obviously I'm not on

23  this e-mail so I --

24  Q.   Right.

25  A.   He mentioned -- I'm assuming you're talking about the

1  e-mail from Andy Kanter mentioning that we have --

2          MR. LEACH:  Objection.  Hearsay.

3          THE COURT:  I think the question is:  Looking at the

4  e-mail and looking at that section of the e-mail, does that

5  refresh your recollection as to any conversations or

6  information that you had at or about the time of the e-mail?

7  Answer that one first.

8          THE WITNESS:  Yes.  So I guess we are -- he's

9  mentioning the BP case, I believe, or he mentions volume

10 issues.  So this is around the time of the BP case.  He

11 mentions Capax EDD processing.  And as already described in my

12 previous testimony, I signed off on things for Capax to make

13 them payments.  That's the only thing I can say about this that

14 makes it relevant to me.

15 BY MR. KEKER:

16 Q.  Do you remember whether or not Autonomy was considering

17 subcontracting out e-Discovery work to Capax around this

18 time?

19 A.  We did pay Capax.  As I said, I didn't do it for the BP, I

20 know that.

21 Q.  Okay.  Do you know if Capax went to England to set up an

22 e-Discovery place in England to do work on BP?

23 A.  Not to my knowledge.

24 Q.  All right.  Did you know that Mr. Menell wanted to move

25 all the other cases to free up your resources for BP -- excuse

1    me -- move the other cases to Capax so that Autonomy would have

2    more resources to work on BP?

3    A.    I've never heard of that.

4    Q.    Okay.  Did you put together a plan for Dr. Lynch about how

5    the EDD work was going to improve -- the e-Discovery work was

6    going to improve?

7         Look at 5334.  I'm not trying to test your memory.  5334.

8    A.    (Witness examines document.)

9    Q.    Is that an e-mail from you to Dr. Lynch dated March 16,

10   2011?

11   A.    Yes.

12        THE COURT:  Admitted.

13   (Trial Exhibit 5334 received in evidence)

14        MR. KEKER:  And could we see just the first sentence

15   is all we need?

16   Q.    (reading)

17         "Mike, the following improvements would make a huge

18         impact on our discovery customers and operations.  These

19         were vetted by our discovery managers, people on the

20         ground at BP, and Mitur, who is aware of the details."

21    Do you remember working on a plan that would make a huge

22   difference in vetting it with discovery managers, and so on, as

23   it says here?

24   A.    Yes.

25   Q.    The bandwidth -- well, look at 5336, please.  That's not

 1    right.  5338, please.

 2    **A.**    (Witness examines document.)

 3            **THE COURT:**  5338?  For some reason it's not on your

 4    list.

 5            **MR. KEKER:**  It's in -- it should be in the binder,

 6    Your Honor.  It's in mine.

 7            **THE COURT:**  It is in the binder.  It's just not on

 8    your document list.

 9            **MR. KEKER:**  It's not on the list?

10            **THE COURT:**  That's all right.  I don't know, maybe I

11    just don't see it.  5338.

12            **MR. KEKER:**  This is a memorandum from you to Mr. Lynch

13    and it's an e-mail string.  I'd move it in, Your Honor.

14            **THE COURT:**  Okay.  Admitted.

15        (Trial Exhibit 5338 received in evidence)

16    **BY MR. KEKER:**

17    **Q.**    Would you look, Mr. Sullivan, at the second e-mail down

18    where it says "Mike Sullivan wrote Pete, Mohit"?

19    **A.**    Yes.

20    **Q.**    And then it says (reading):

21            "The performance issues have hit a critical level at

22        BP."

23        What was the issue there?  What are you talking about?

24    **A.**    The issues are technical issues with the software not

25    working correctly.

1  Q.   Okay.  Let's go back -- I mean, first let me ask you.  Is

2  it relatively common that e-Discovery work is outsourced,

3  sent out to a vendor?

4  A.   Yes.

5  Q.   And did that happen at Zantaz?  Did you outsource

6  e-Discovery work when you were at Zantaz?

7  A.   No.

8  Q.   Would you look at Exhibit 22, which I don't think you're

9  on?

10  A.   22.

11  Q.   22.  It's the first one in the binder.

12  A.   (Witness examines document.)

13  Q.   And if you'd look -- you're not on this e-mail, but if you

14  look at the second page --

15          THE COURT:  I'm sorry.  Exhibit 22?

16          MR. KEKER:  Yes, sir.

17          THE COURT:  It says e-mail from Michael Sullivan.

18          MR. KEKER:  Oh, okay.  I'm sorry.

19          THE COURT:  I mean, maybe I'm looking at the wrong

20  one.

21          MR. KEKER:  The part I'm looking at -- so it's part of

22  an e-mail string from you.  I'd move it in.

23          THE COURT:  Okay.  Exhibit 22 admitted.

24      (Trial Exhibit 22 received in evidence)

25  \\\

1    BY MR. KEKER:

2    **Q.**   All right.  Now, going down the second page, which is an

3    embedded e-mail, there's an e-mail from John Cronin to Joel

4    Scott, and it refers to (reading):

5           "I just got a call from Dave Truitt, who is in Utah

6        with Stouffer and Mike Sullivan."

7    Do you remember meeting in Utah at or around February 2009

8    with Stouffer Egan?

9    **A.**   I believe I was at a customer conference and Dave Truitt

10   was there.

11   **Q.**   Okay.

12   **A.**   So I probably met him.

13   **Q.**   And then down at the bottom of that e-mail, bottom of the

14   page, it says (reading):

15          "Dave and Mike S are talking about getting some

16       MicroLink resources involved in the Boston Data Center

17       near term."

18   Do you recall talking to Dave Truitt about getting some of

19   Dave Truitt's resources, wherever they came from, involved in

20   the Boston Data Center?

21   **A.**   I don't recall that.

22   **Q.**   And what is the Boston Data Center?

23   **A.**   We didn't really have a Boston Data Center.  We had a

24   Boston office.

25   **Q.**   Okay.  And was there -- but there wasn't servers, there

1  wasn't any way to do e-Discovery in Boston Data Center in

2  Boston?

3  **A.**   We called it a lab, which is different than a data center;

4  but, yeah, we had people that worked on e-Discovery.  That

5  was our main e-Discovery processing facility.  That's

6  probably what's -- what he's referring to.

7  **Q.**   All right.  And then look at 5340.  This is an e-mail from

8  you to Sushovan Hussain, and parts of this the jury saw

9  yesterday.

10          **MR. KEKER:**  I move it in, Your Honor.

11          **THE COURT:**  Admitted.

12     (Trial Exhibit 5340 received in evidence)

13  **BY MR. KEKER:**

14  **Q.**   Okay.  Look at the bottom e-mail first.  This, the jury

15  will remember, this is the one where you said, "It's likely" --

16  this is to Menell and to Sushovan (reading):

17          "Pete, Soush.  It's likely that the new expanded

18      sales force selling our EDD and hosted services, that we

19      will need the ability to add capacity through

20      subcontractors."

21     Do you remember what you were -- what new expanded sales

22  force selling EDD?  What are you referring to?

23  **A.**   Well, when -- we had at one time an EDD sales force but

24  when we got to Autonomy, the entire worldwide sales force of

25  Autonomy could start selling e-Discovery.  So we were getting

SULLIVAN - CROSS / KEKER

1    new deals and new inquiries from people all over the place,

2    which is great.

3        And we were also -- you had people like Stouffer

4    introducing this capability to partners, which happened in this

5    case.  And as I had described earlier, you know, Stouffer came

6    to me and said, "We've got these partners that want to get into

7    e-Discovery," and this is what this thread is about.

8    Q.    Okay.  And he came to you about MicroLink?

9    A.    MicroLink and Capax, yes.

10   Q.    And Capax Global?

11   A.    Yeah.

12   Q.    And this is dated April 2nd.  So that's what you're

13   referring to, "We have strong partners with EDD capabilities,"

14   and you mention MicroLink and Capax Global; right?

15   A.    That's right.

16   Q.    But you didn't know at this point that the Capax Global

17   had signed a license agreement a week before for getting

18   e-Discovery products?

19   A.    That happened?  I just learned it right now, yeah.

20   Q.    Okay.  All right.  The jury will be seeing more about

21   that.

22       Do you remember after this e-mail you helping Capax with a

23   possible EDD job for Iovate?

24   A.    I do.

25   Q.    Okay.  Tell the jury about that, please.

1  **A.**    Yeah.    That was a -- I'm not sure.    There was a customer

2  called Iovate, who was an e-Discovery potential customer.    I

3  think we actually did win that and do some work.    And I'm not

4  sure if we found that deal or Capax found that deal, but

5  somehow it came to me already assigned to Capax through -- with

6  I think it was -- I believe it was in partnership with

7  Stouffer.    The customer again was called Iovate.

8      And Capax needed a lot of help to, you know, execute that

9  deal.    So they came to me largely to say, "How do I price this?

10  How do I build a proposal to do this?    What are the things we

11  should put in the contract?"

12      So I engaged with them to help them get started.    That's

13  when I kind of realized they were a really good partner for

14  IDOL but they, you know, were kind of green to the

15  e-Discovery space.

16  **Q.**    That was my next question.    You told us yesterday they

17  were a good partner.    What did you know about Capax?

18  **A.**    Capax had a great reputation.    They were a big partner for

19  Autonomy.    So I had heard of them.    They were a company that

20  did a lot of IDOL work.    And IDOL was, you know, the main

21  product; and if you remember, I also said that our

22  e-Discovery product was rewritten from the bottom up with

23  IDOL.

24      So the fact that they had really good IDOL experience made

25  them, you know, have the basis for being a really good company

1  that could do e-Discovery.

2      And at this time I thought they actually had e-Discovery

3  capability as well, but I later found out they needed a lot of

4  help to get started.

5  **Q.**   Okay.

6  **A.**   They hired a lot of people away from us, from our

7  e-Discovery group, and were clearly building a capability.

8  **Q.**   Okay.  So they were hiring from Autonomy, kind of taking

9  your employees and putting them in Capax?

10 **A.**   Yes.

11 **Q.**   And you were also doing some training of Capax employees

12 in Boston?

13 **A.**   That's right.  They came to me and said, "How do we get

14 our teams up to speed so that we can, you know, learn how to do

15 e-Discovery processing?"

16      Because e-Discovery, it's not just like our normal

17 software where you install it and run it.  It's kind of like a

18 factory.  You have to run and process the data, and it's a

19 very -- you have to have a very forensically sound process, you

20 know, to prove nothing's been tampered with, and there's a

21 whole set of production capabilities at the other end.

22      So when they asked for help, I said, "Look, the best way

23 you can get help is just take some of your people, put them in

24 our shop, have them work next to our people, and just absorb

25 what we're doing."  So we did that.  And I didn't work on the

SULLIVAN - CROSS / KEKER

1   deal, but part of that was we would actually pay them for their

2   usage of that time.

3   Q.   Okay.  So they would come to Boston, get trained, and get

4   paid by Autonomy?

5   A.   Correct.

6   Q.   And was the reason that you understood you were paying

7   them to get trained in e-Discovery was that you needed Capax

8   to be there in case you needed more capacity to do some of

9   these big deals like British Petroleum, trying to expand a

10  partner that could help with e-Discovery projects?

11          MR. LEACH:  Objection.  Vague as to time.

12          THE WITNESS:  I don't remember there being any

13  connection to BP, but -- sorry.

14          THE COURT:  I'm sorry.  I didn't hear.

15          MR. LEACH:  I'll withdraw it, Your Honor.

16          THE COURT:  Pardon me?

17          MR. LEACH:  I withdraw the objection.

18  BY MR. KEKER:

19  Q.   I didn't hear you.

20  A.   I didn't recall any connection to BP to do that.

21  Q.   Okay.  Not BP.

22  A.   That was really a training exercise.

23  Q.   More generally, did you understand that Autonomy was

24  interested in having people that could run its e-Discovery

25  products and provide e-Discovery services in case it needed

to outsource?

**A.**   Well, let me -- maybe -- we had partners -- I think I mentioned this as well, so we had partners that were doing this work.  We had Deloitte, Huron.  There was a number of partners doing that.

And part of the business model that was good for us is if they bought our software and used it and they were prominent companies in the business, they could win a lot more cases.

We charged them by the volume.  So we were happy to have other companies who were service providers and would actually compete with our services company.  We were happy to have them license our software and win lots of business out there and pay us for the volumes that they processed if they were winning cases.  And, you know, companies like Deloitte and Huron were big companies and we made a lot of money off of them.

You know, these were two new -- Capax and MicroTech or MicroLink were, you know, new partners getting into the game.  And the question is:  Did I need them for capacity?  It is true that we ran out of capacity from time to time.  That was the whole idea, is to sell as much as you can and run out of capacity.  But my first option would always be to add the capacity and build it myself, hire the people, expand.  I mean, that's -- you know, that's what we built the business for.

**Q.**   Did you meet a person named Steve Williams who worked at Capax?

1    **A.**    I remember I believe he was the head of sales, yeah.

2    **Q.**    And he was running their e-Discovery business?

3    **A.**    I didn't know him as that.  I knew him as the head of

4    sales, but...

5    **Q.**    Look at 5319 if you would.

6    **A.**    (Witness examines document.)

7    **Q.**    This is an e-mail from you to Steve Williams dated

8    April 7, 2009.

9         **MR. KEKER:**  I'd move it in, Your Honor.

10         **THE COURT:**  Admitted.

11    (Trial Exhibit 5319 received in evidence)

12    **BY MR. KEKER:**

13    **Q.**    And if you could put up the middle e-mail from Mike

14    Sullivan to Steve Williams where you say (reading):

15         "Thanks, Steve.  I'm in touch with Al Marsella, who

16         will probably be your primary source of help on this.

17         Also, do you want to send some people to Boston to have

18         them work on our team to get some training?"

19         Do you remember what that was about?

20    **A.**    Yeah.  It was really what I had described.  I had

21    suggested to them multiple times because we were -- I think if

22    you saw our other e-mails in here, you'd see, you know, some

23    frustration on our side that we were doing a lot of things for

24    them, and it was in our best interest to get them trained so

25    they would be more self-sufficient.  So it wasn't -- there's

SULLIVAN - CROSS / KEKER

1    probably a few occasions where I suggested to them that they

2    should come in and learn.

3    **Q.**    Okay.  And would you look at 5324, please?

4    **A.**    Sure.  (Witness examines document.)

5    **Q.**    This is an e-mail that you're copied on.  Do you remember

6    this e-mail or is this one that you received at the time?

7    **A.**    (Witness examines document.)  I was on it, yeah.

8    **Q.**    Is this an e-mail you would have received around

9    August 3rd, 2009, copied from Philip Smolek to Joel Scott?

10    **A.**    Yes.

11            **MR. KEKER:**  I'd move it in, Your Honor.

12            **THE COURT:**  Admitted.

13            **MR. LEACH:**  Objection.  Hearsay.

14            **THE COURT:**  Oh.  Well, one minute then.

15        Okay.  Hold off.  That's 5324?

16            **MR. KEKER:**  5324.

17                        (Pause in proceedings.)

18            **THE COURT:**  Okay.  So the objection is sustained.

19    However, if you want to give it to refresh his recollection --

20    you're going to ask him about the middle e-mail?

21            **MR. KEKER:**  Yes.

22            **THE COURT:**  Well, why don't you show it to him and ask

23    him whether he recalls that conversation.

24            **MR. KEKER:**  Well --

25            **THE COURT:**  What?

1          **MR. KEKER:**  I mean, Joel Scott is going to be sitting

2    here and the document will come in then.

3          **THE COURT:**  Everything in its time.

4          **MR. KEKER:**  Mr. Sullivan doesn't want to come back I

5    know.

6          **THE COURT:**  He's not going to have to come back.

7        Just to yourself read the e-mail that's dated August 3rd,

8    2009.

9          **MR. KEKER:**  The one in the middle, Mr. Sullivan.

10         **THE WITNESS:**  Yes.  Yeah.

11         **THE COURT:**  And see --

12   **BY MR. KEKER:**

13   **Q.**   Did you have a conversation with Joel Scott on August 3rd,

14   2009, in the morning and explained to him that there's several

15   Capax employees who were providing consulting services in the

16   Boston facility --

17         **MR. LEACH:**  Objection.

18   **BY MR. KEKER:**

19   **Q.**    -- while getting their arms around the systems?

20         **MR. LEACH:**  Objection, Your Honor.

21         **MR. KEKER:**  I'm just asking a question.

22         **THE COURT:**  Okay.  Well, he's objecting to it.

23       So the question is -- the objection is that it's hearsay.

24         **MR. KEKER:**  I'm just asking the question.  Did he have

25   a conversation?

1        **THE COURT:**  What does that mean?

2      Do you recall having -- looking at that, does that -- do

3    you recall having that conversation that's described there?  I

4    mean that's sort of yes or no.

5        **THE WITNESS:**  It's hard for me 10 years ago to

6    understand all the conversations I had.

7        **THE COURT:**  Okay.  All right.  So I'm not going to let

8    it in, and we'll move on.

9    **BY MR. KEKER:**

10   **Q.**  You can't remember every conversation you had 10 years

11   ago?

12                    (Laughter)

13       **THE COURT:**  All right.  Next question.

14       **MR. KEKER:**  I can't either.

15       **THE COURT:**  And the objection to the document is

16   sustained at this point.

17   **BY MR. KEKER:**

18   **Q.**  Would you look at Exhibit 5380?  And is that an e-mail

19   exchange you had with Mr. Stephen Cho on or about October -- on

20   October 19, 2009?

21   **A.**  (Witness examines document.)  My 5380 is missing.

22   **Q.**  That's in the second volume in the back I'm afraid.

23   **A.**  Right.  I have a tab that says 5380 and there's no

24   document in the tab.

25   **Q.**  Let me show you mine.  This is Exhibit 5380.

```
 1   A.    (Witness examines document.)

 2   Q.    And the question is:  Was that an e-mail exchange you had

 3   with Mr. Cho on October 19th, 2009?

 4   A.    (Witness examines document.)  Yes.

 5             THE COURT:  Admitted.

 6             MR. KEKER:  I move it in, Your Honor.

 7             THE COURT:  Admitted.

 8        (Trial Exhibit 5380 received in evidence)

 9   BY MR. KEKER:

10   Q.    Can I have it back so I can remember what it says?

11   A.    Sure.

12             MR. KEKER:  Here, can I just stand here and share it?

13             THE WITNESS:  Do you mind handing me that while you're

14   there?  Thank you.

15             MR. KEKER:  Do we have it up on the screen?

16   Q.    There.  Okay.

17   A.    Okay.  Good.  I can use the screen, yes.

18   Q.    The KBR contract, that's Kellogg Brown Root?

19   A.    That is correct.

20   Q.    And it was for an e-Discovery or an EDD data ingestion

21   process and Mark's team will be doing the data ingestion.  What

22   does that mean?

23   A.    That was my -- Mark Doust is likely who he's talking about

24   there, you know, which is that was my team that did the

25   processing of the EDD work.
```

1   **Q.**   And then he's asking -- Mr. Cho is asking (reading):

2           "Can we use a portion of that for subcontracting

3       Capax to help with the I6 implementation?"

4       What does that mean?

5   **A.**   I6 was Introspect 6.  So Introspect, again, just to

6   remind, is the e-Discovery software that we sold.  KBR bought

7   or licensed that software, and it was -- they were not hiring

8   us to do the processing.  They were licensing the software to

9   set it up in their shop on their own; and he's asking if we

10  could use Capax to do that, and that would be a reasonable

11  thing to do.

12  **Q.**   To ask Capax to go out to their shop and help them set it

13  up?

14  **A.**   Right.  Setting stuff up is different than processing but,

15  yeah.

16  **Q.**   Do you know whether or not Capax did that sort of work for

17  a lot of clients of Autonomy during this period of time?

18  **A.**   That's the type of work that they were good at.  You know,

19  they were a systems integrator.  That's the way I think of

20  them, anyway.  And it's different than having an EDD shop

21  installing software and setting it up and running it, you know,

22  and servers and things like that.

23  **Q.**   Okay.  So they were -- okay.

24      Do you remember installing e-Discovery software at the

25  Federal Reserve Board or a contract for the Federal Reserve

1  Board to put in an e-Discovery system?

2  **A.**  I don't recall that.

3  **Q.**  All right.  Look at 5329, please.

4  **A.**  (Witness examines document.)

5  **Q.**  I'll withdraw it.  I'll withdraw it.

6      Do you recall being concerned that you needed to keep

7  track of time working with Capax or MicroLink in order to give

8  a possible credit?

9  **A.**  Credit?

10  **Q.**  Look at 5330.  It's not -- see if it refreshes your

11  recollection.

12  **A.**  (Witness examines document.)  I don't remember this, no,

13  but it doesn't mention credit or anything in here, so I'm not

14  sure.

15  **Q.**  Well, look --

16  **A.**  The 5330 -- oh, I'm sorry.  Maybe I'm on 5329.  Sorry.

17  I'm looking at the wrong e-mail.

18  **Q.**  5330.  Who's Mark Doust?

19  **A.**  Mark Doust is the same Mark that was in the previous

20  e-mail.  He was the person that ran e-Discovery operations

21  for me.

22  **Q.**  And would you look down at the bottom e-mail and see if

23  that refreshes your recollection about working off a credit

24  with MicroLink and Capax?

25  **A.**  (Witness examines document.)  I don't remember that.  It

1   seems to be related to the Iovate contract, you know, just

2   looking at this.

3   **Q.**   Okay.  You told us already, and I just want to go through

4   this quickly, that you approved a lot of Capax invoices based

5   on Stouffer Egan's say-so; right?

6   **A.**   Correct.

7   **Q.**   It wasn't Sushovan Hussain's say-so; it was Stouffer

8   Egan's say-so?

9   **A.**   That's right.

10  **Q.**   Would you just go through the binder, and I'm just going

11  to ask you to identify them and move them in?

12      We already got in April 17, 2009.  That's Exhibit 50.

13      Would you look at Exhibit 5343, which is April 24, 2009,

14  and tell us whether or not that's a purchase order that you

15  approved on Stouffer Egan's say-so?  5343.

16  **A.**   (Witness examines document.)  Yep.  It clearly says that,

17  yep.

18          **MR. KEKER:**  Move it in, Your Honor.

19          **THE COURT:**  Admitted.

20      (Trial Exhibit 5343 received in evidence)

21  **BY MR. KEKER:**

22  **Q.**   And then look at 5344, please, same question.  That's

23  April 24.  Is that a purchase order you approved at Stouffer

24  Egan's say-so?

25  **A.**   I'm sorry.  Could you give me the number again?

SULLIVAN - CROSS / KEKER

1  **Q.**   5344.

2  **A.**   (Witness examines document.)  Yes.

3  **Q.**   And then look at --

4          **THE COURT:**  Admitted.

5          (Trial Exhibit 5344 received in evidence)

6          **MR. KEKER:**  I'm sorry.  I move it in.

7          **THE COURT:**  Admitted.

8          **MR. KEKER:**  I just got the order messed up.

9  **Q.**   5346, was that a purchase order that you --

10 **A.**   Yes.

11 **Q.**   -- approved on Stouffer Egan's say-so?

12 **A.**   It says that right in the e-mail, yes.

13         **THE COURT:**  Admitted.

14         (Trial Exhibit 5346 received in evidence)

15 **BY MR. KEKER:**

16 **Q.**   And then Exhibit 136 --

17         **THE COURT:**  136?

18         **THE WITNESS:**  136?

19         **MR. KEKER:**  136, going back to the bottom.

20         **THE WITNESS:**  (Witness examines document.)

21         **THE COURT:**  It's in evidence.

22         **MR. KEKER:**  Well, let's stop on that one.

23         **THE COURT:**  136 --

24 **BY MR. KEKER:**

25 **Q.**   136, is that an e-mail from you to Philip Smolek with a

SULLIVAN - CROSS / KEKER

1    chain of e-mails below that?

2    **A.**    Yes.

3            **MR. KEKER:**    I'll move that in.

4            **THE COURT:**    It's in.

5            **MR. KEKER:**    Could we see --

6            **THE COURT:**    I mean, it's already in.

7            **MR. KEKER:**    I'm sorry.  I beg your pardon.

8        Could we see the bottom e-mail?

9    **Q.**    And this is Egan to Smolek with copy to Pete Menell and

10   you, saying (reading):

11           "We have a large volume of EDD processing at the

12       moment and will be subbing quite a bit with them.  I am

13       with Mike Sullivan and Pete this evening and we will get

14       you details quickly."

15       Do you remember anything about those conversations or if

16   you had them?

17   **A.**    I don't remember.  I mean, I remember having discussions

18   with Stouffer where he assured me we owed money to Capax and I

19   should sign off.  I don't remember having a discussion with him

20   and Pete Menell, and I don't remember any discussions about

21   selling hardware to Capax, but I'm not on those e-mails, so...

22   **Q.**    Look at 5348.

23   **A.**    5348.  (Witness examines document.)

24   **Q.**    And, again, is that you approving a purchase order based

25   on what Stouffer Egan told you?

```
 1    A.    Yes, and it indicates the requester is Stouffer Egan here.

 2              THE COURT:  Admitted.

 3         (Trial Exhibit 5348 received in evidence)

 4    BY MR. KEKER:

 5    Q.    And then 5350, same question.  Is that a purchase order

 6    that you approved based on Stouffer Egan's representations?

 7    A.    Yes.

 8              THE COURT:  Admitted.

 9         (Trial Exhibit 5350 received in evidence)

10    BY MR. KEKER:

11    Q.    And then 5352 -- we're almost done -- same -- well,

12    first -- no, 5352 is an e-mail you're not on.

13              THE COURT:  I think he is.

14              MR. KEKER:  So I'm not moving that in.

15              THE COURT:  No, I think he is.

16    BY MR. KEKER:

17    Q.    5353, is that an e-mail that you approved -- is that a

18    purchase order that you approved for Capax based on Stouffer

19    Egan's representations?

20    A.    (Witness examines document.)

21    Q.    5353.

22    A.    Yes.

23              THE COURT:  Admitted.

24         (Trial Exhibit 5353 received in evidence)

25              MR. KEKER:  I'm almost done.
```

**SULLIVAN - CROSS / KEKER**

1  Q.   You worked with -- you stayed with Hewlett Packard until

2  August of 2017?

3  A.   Correct.

4  Q.   Did Capax continue to do -- or did Capax do e-Discovery

5  work for Hewlett Packard or while Autonomy was part of Hewlett

6  Packard?

7  A.   I don't recall any.

8  Q.   Do you recall whether or not they got their platform up

9  and running so that they could do e-Discovery work?

10  A.   To be clear, Capax continued to be a good partner to HP

11  and did -- was -- still continued to be a partner that HP

12  worked with; but specifically for e-Discovery, I'm not aware

13  that they ever got it going or not.  It's not --

14  Q.   Okay.  All right.

15       What did they do at HP?

16  A.   They continued to do the same kind of work.  They -- we

17  outsourced support for some archiving product.  I think that

18  was just a pre -- you know, a contract that was already in

19  place from the Autonomy days.

20       And then actually HP ended up selling some businesses to

21  Capax.

22  Q.   Okay.  Were they e-Discovery businesses?

23  A.   They were archiving businesses.

24  Q.   Okay.  A few questions about this HULK product that you

25  were asked about yesterday.  The Exhibit 117, which is in

1    evidence, can you look at that?  That should be in your binder.

2    No, it's in the Government binder.  Maybe we can just put it

3    up.

4         This is the signature pages for equipment purchase, and

5    then look at the second page of this.  I think the jury will

6    remember this.  This is the order for the Morgan Stanley

7    hardware, and it was -- EMC was going to ship to the following

8    locations.  The jury I think will remember that.

9         Can we go down to the bottom of that page?  Well, shoot.

10   Show me the second page, please.

11             MR. KEKER:  Could I have just one moment, Your Honor?

12                  (Pause in proceedings.)

13   BY MR. KEKER:

14   Q.  What I'm getting at, Mr. Sullivan, is that this document

15   is a larger document than the one you saw yesterday; right?

16   A.  I don't know but I'm happy to look at it.

17   Q.  Yesterday they showed you I think a three-page document,

18   but that three-page document says it's got six pages.

19   A.  I see the bottom says 1 of 6.

20   Q.  Look at the full document, 5382, which should be in the

21   back of your binder, the second binder.

22   A.  (Witness examines document.)

23   Q.  And remember the issue here was what actually was

24   purchased for this $9 million, and part of the purchase was

25   going to be the HULK but you couldn't tell how much was HULK

SULLIVAN - CROSS / KEKER

1   and how much was other products.

2   **A.**   That's right.

3   **Q.**   Remember the testimony yesterday?

4   **A.**   Yes.

5   **Q.**   So you told us that it wasn't all for HULK and then you

6   made the point that to the extent it was for HULK, then it

7   wouldn't have been useful to Morgan Stanley, but you told us it

8   wasn't all for HULK.

9       The missing pages show what it was for, don't they?  Do

10  you see page 3 of 6?

11  **A.**   Yeah.  The missing pages seem to show --

12          **THE COURT:**  Is 5382 --

13          **MR. KEKER:**  I'm sorry.  Can I move it in?

14          **THE COURT:**  -- in evidence?  Pardon me?

15          **MR. KEKER:**  Can I move it in?

16          **THE COURT:**  Yes.

17          **MR. KEKER:**  This is the full exhibit of the one that's

18  already in.

19          **THE COURT:**  Yeah.  5382 admitted.

20      Go ahead.

21      (Trial Exhibit 5382 received in evidence)

22  **BY MR. KEKER:**

23  **Q.**   Okay.  So page 3, the thing we didn't see yesterday, let's

24  look at that.  That lists what the hardware is that's being

25  shipped, doesn't it?

SULLIVAN - CROSS / KEKER

1    **A.**    Yes.  It seems to be a listing of the hardware.  Well,

2    specifically it's Installment Payment Contract, Certificate of

3    Delivery and Acceptance between Zantaz and the leasing company.

4    **Q.**    And then the fourth page is a further list?

5    **A.**    Yeah.  These are lists of stuff we're buying and where

6    they're going to get shipped to.

7    **Q.**    Right.  And the fifth page is a further list?

8    **A.**    Yes.

9    **Q.**    And the sixth page is a further list?

10   **A.**    Correct.

11   **Q.**    Okay.  And all these were left out of the exhibit you

12   looked at yesterday.

13            **THE COURT:**  Okay.  Well, go ahead.

14   **BY MR. KEKER:**

15   **Q.**    Can you tell how much of this hardware was for the HULK

16   and how much was for other purposes?

17   **A.**    No, not from looking at this.  But I could tell you just

18   from memory that substantially more of it was other things

19   other than the HULK.

20   **Q.**    Okay.  Look at Exhibit 115, please, sir.

21   **A.**    (Witness examines document.)  115.

22   **Q.**    That's in the front of Binder 1.

23            **THE COURT:**  It's in evidence.

24            **MR. KEKER:**  It's in evidence?  Yes, it is in evidence.

25   **Q.**    And this is -- so this is an e-mail that you saw

1  yesterday, and in this e-mail Mr. Keaveney sent you a

2  spreadsheet specifically analyzing the HULK component; right?

3  **A.**   (Witness examines document.)  Correct.  Yes, that's right.

4  **Q.**   And if I -- I mean, the jury can do this for themselves,

5  but if you add up all these numbers, you get about $1.8

6  million?

7  **A.**   Right.

8  **Q.**   Would that meet your recollection of the amount of this

9  $9 million --

10 **A.**   Sounds about right.

11 **Q.**   -- sale that was the HULK as opposed to anything else?

12 **A.**   That sounds about right.

13 **Q.**   Okay.  So the remaining $7.2 million of hardware was for

14 other storage, other storage components?

15 **A.**   Right.

16 **Q.**   And that was for use in the Digital Safe Data Center,

17 wasn't it?

18 **A.**   Digital Safe and Discovery.

19 **Q.**   Now, Mr. Sullivan, you did not manage the relationship

20 with Morgan Stanley, did you?

21 **A.**   I was very involved but to say I managed it, probably not.

22 **Q.**   Okay.  They worked with Stouffer Egan and others?

23 **A.**   Yes, they did.

24 **Q.**   Did you know how they were -- how Morgan Stanley was using

25 Autonomy software?

**SULLIVAN - CROSS / KEKER**

1   **A.**   Yes.

2   **Q.**   Okay.  Were they trying to bring Digital Safe in-house,

3   take it out of your hosted data centers and bring it in-house?

4   **A.**   No.

5   **Q.**   Okay.

6   **A.**   They did have IDOL software that they ran in-house.

7   **Q.**   Okay.  That's all I have about that one.  One other area

8   and I'm done, and that's hosting.

9        I just want -- you talked yesterday about hosting, and

10  hosting was something that Zantaz did a lot of; right?

11  **A.**   Yes.

12  **Q.**   And hosting means you bring the data to your data center

13  and you process it and the customer can deal with it remotely,

14  and so on?

15  **A.**   That's right.

16  **Q.**   You told us that yesterday.

17       And one way to pay for hosting is to have a monthly fee

18  for what you're doing, and then you have a nice stream of

19  income over time; right?

20  **A.**   Yes.

21  **Q.**   But another way to pay for hosting is licensing, by buying

22  rights to be hosted upfront and then pay less as you go along;

23  right?

24  **A.**   Right.

25  **Q.**   And the advantage of that is, one, is that you get to

1  recognize the revenue sooner if you want to recognize revenue.

2  That's one advantage, but it's also an advantage because you

3  lock the customer in.  The customer can't in month nine decide

4  he's going to move to some other hosted environment because

5  he's already bought this license upfront; right?

6  **A.**    That's correct.

7  **Q.**    So you're locking in the customer and making it less

8  likely that they will switch to a competitor?

9  **A.**    That's right.

10         **MR. KEKER:**  Can I have one second, Your Honor, to

11  check with the team?

12                    (Pause in proceedings.)

13         **MR. KEKER:**  Okay.  I think I'm done.  Thank you very

14  much.

15      Mr. Sullivan, thank you.

16         **THE COURT:**  Redirect?

17      Ladies and gentlemen, do you want to stand up, stretch?

18  You don't have to, but if you do.

19         **THE WITNESS:**  Am I free to step down?

20         **THE COURT:**  Sure.  But, I mean, you're going to be

21  asked further questions.  You're not finished.

22         **THE WITNESS:**  Oh, I didn't know that.  Okay.  My first

23  time.

24         **MR. KEKER:**  I'm being corrected.

25                    (Pause in proceedings.)

1          MR. KEKER:  I'm sorry, Your Honor.  Could I ask one --

2   could I reopen to ask one question that I fouled up?

3          THE COURT:  Okay.  Let's resume.  Go ahead.

4   BY MR. KEKER:

5   Q.   And that is, look at 5352, please, which I did not get

6   into evidence.  It's the first in the second binder, Binder 2,

7   first e-mail.

8   A.   Okay.  Got it.

9   Q.   And I said you weren't on it, but you are on it.  It was

10  from Stouffer Egan to you and to Mr. Smolek; right?

11  A.   Right.

12         MR. KEKER:  I'd move it in, Your Honor.

13         THE COURT:  Admitted.

14     (Trial Exhibit 5352 received in evidence)

15         MR. KEKER:  Thank you very much, Mr. Sullivan.

16         THE COURT:  Okay.  Redirect.

17         MR. LEACH:  Briefly, Your Honor.  Thank you.

18     Could we please display 5313, please, which is in

19  evidence?

20                    <u>**REDIRECT EXAMINATION**</u>

21  BY MR. LEACH:

22  Q.   Mr. Sullivan, do you recall this e-mail exchange in

23  November of 2009 relating to some prospects involving Dell?

24  A.   I do.

25  Q.   The first bullet point reads (reading):

1              "Autonomy to launch and market archiving appliance

2       with Dell Equipment and Storage."

3       Did that happen?

4  **A.**   We did use Dell equipment for the Arcpliance I recall.

5  **Q.**   Okay.  How would you ballpark the sales of that?

6  **A.**   I think probably pretty low.  Probably in the low millions

7  I would guess, but...

8  **Q.**   (reading)

9              "Autonomy to launch and market e-Discovery

10      appliance with Dell Equipment and Storage."

11      Did that happen?

12 **A.**   I don't believe we successfully launched that.

13 **Q.**   (reading)

14             "Autonomy to launch and market search appliance with

15      Dell Equipment and Storage."

16      Did that happen?

17 **A.**   I was not involved that much with the search side, so I

18 don't -- I don't recall it happening but I'm not sure.  I

19 wouldn't be the best person to ask.

20 **Q.**   This Bluebird project, did that happen?

21 **A.**   That did not happen.

22 **Q.**   (reading)

23             "Dell to resell Autonomy appliances."

24      Did that happen?

25 **A.**   No.

SULLIVAN - REDIRECT / LEACH

Q.   (reading)

         "Dell to license Autonomy Discovery and Governance

     solutions for internal use"?

A.   I can't remember whether they actually did that or not.

I'm not sure.

Q.   (reading)

         "Autonomy to utilize Dell Equipment and Storage for

     hosted offerings, including world's largest archiving and

     discovery offerings"?

A.   Yes, we did that extensively.

Q.   And you have been doing that extensively?

A.   That's correct.

Q.   Even well before this November e-mail?

A.   That is true.

Q.   Okay.  (reading)

         "Autonomy to resell Dell equipment."

     That happened a lot, didn't it?

A.   It did.

Q.   Okay.  Roughly 20 million in the first quarter or

20 million per quarter in low-margin revenue?

A.   Yes.

Q.   All the way from 2010 to the end of August of 2011?

A.   Yes.

Q.   When Autonomy was acquired by HP in or around the fall of

2011, who did you report to?

1  **A.**   When Autonomy was acquired right away?  Initially I

2  reported to the CEO of Zantaz.  When he left, I ended up

3  reporting really to Mike Lynch.

4  **Q.**   I'm sorry.  That was a bad question.

5       When Autonomy was acquired by HP, for the time period

6  October of 2011 through May of 2012, who did you report to?

7  **A.**   Mike Lynch.

8  **Q.**   Did you also have interactions with Sushovan Hussain?

9  **A.**   Yes.

10  **Q.**   Is it fair to say for the first two quarters after the HP

11  acquisition of Autonomy, that Autonomy remained, for lack of a

12  better word, autonomous?

13  **A.**   I think that's fair to say, yes.

14  **Q.**   I'd like to show you some of the e-mails that Mr. Keker

15  blew through at the end there.  They're in evidence, but I

16  don't believe we actually displayed them.

17  **A.**   Okay.

18  **Q.**   Could we please call up Exhibit 5348.

19       Do you recall this document, Mr. Sullivan?

20  **A.**   Yes.

21  **Q.**   Is this one of the examples of you approving a purchase

22  order request to pay Capax?

23  **A.**   Yes.

24  **Q.**   And would you please read what Mr. Smolek wrote in the

25  initial e-mail in the exchange?

SULLIVAN - REDIRECT / LEACH

1   **A.**   (reading)

2           "Per policy, please review the below PO req, detail,

3       and reply with your approval as first authorization,

4       Sushovan and MRL will need to approve post your OK."

5   **Q.**   So the "Sushovan" there is Mr. Hussain?

6   **A.**   Yes.

7   **Q.**   And the "MRL" was Mike Lynch?

8   **A.**   Correct.

9   **Q.**   And was it your anticipation that your approval wouldn't

10  be enough for these POs?

11  **A.**   Yes.

12  **Q.**   I'd also like to look at 5350, which was admitted but not

13  displayed.  And I draw your attention to the bottom portion of

14  the e-mail from Mr. Smolek.  Who is this e-mail to?

15  **A.**   It's to both Sushovan and myself.

16  **Q.**   And would you please read what Mr. Smolek wrote?

17  **A.**   (reading)

18          "Hi, Sushovan and Mike.  See detailed below PO

19      requests for outsourced EDD work via vendor

20      Capax Discovery.  Per corp policy, please review and reply

21      with authorization.  I will solicit MRL's approval to post

22      gathering yours."

23  **Q.**   So this was going both to you and Mr. Hussain at the same

24  time?

25  **A.**   Yes.

SULLIVAN - REDIRECT / LEACH

1   **Q.**   And did you understand that he was in the approval link

2   for these as well?

3   **A.**   Yes.

4   **Q.**   Would you please look at what is in evidence as

5   Exhibit 50?

6   **A.**   (Witness examines document.)

7   **Q.**   Do you recall this document from your direct testimony?

8   **A.**   Yes.

9   **Q.**   Is this one of the initial e-mails that you received to

10  approve POs for outsourced EDD service?

11  **A.**   Yes.

12  **Q.**   And if we could, please, go to page 2 --

13  **A.**   Okay.

14  **Q.**   At the bottom Mr. Hussain's e-mail to you, do you see

15  where it says (reading):

16          "Create a PO for outsourcing EDD processing as we did

17      last year.  Send details of PO to Stouff, Pete, Sullivan

18      and me.  We'll approve"?

19  **A.**   Yes, except this e-mail wasn't to me.  It was to Phil

20  Smolek.

21  **Q.**   Okay.  But it ultimately made it's way to you, is that

22  fair?

23  **A.**   I'm on the chain.

24  **Q.**   And you approved after Mr. Hussain has approved all this;

25  is that fair?

1    **A.**    Yes.

2    **Q.**    You talked a little bit about systems integration for

3    Introspect and how that differs from actually processing the

4    EDD work.

5    **A.**    Yeah.

6    **Q.**    Can you explain that for me?

7    **A.**    Sure.  You know, installing computer systems, setting up

8    software, you know, hooking it up to the network, connecting

9    the security, making sure it fits in with the company's

10   policies, IT policies, and so forth, that's, you know, normal

11   systems integration work setting up and installing things.

12       I described earlier the difference -- or really the

13   e-Discovery process, which we used to call a factory.  It was

14   much more of an assembly-line process.  You were actually

15   taking pieces of media that had collected data forensically,

16   you know, removing the data on that, processing it through a

17   computer system, auditing and checking everything you do all

18   along the way so that there's a clear audit trail; and then,

19   you know, using the software to actually do the processing,

20   track the records, and execute the productions all the way

21   through, which is -- it's really using the software as opposed

22   to setting it up and getting the most out of the software.

23       So hopefully that helps.  That's really the difference.

24   **Q.**    Thank you.

25       In that latter type of work, the actual EDD processing,

1   did you ever have Capax do any of that work?

2   **A.**    I personally didn't other than the times that I spoke

3   about where we had them in for training.  I don't recall

4   them -- I have no firsthand knowledge of any specific work

5   other than the work that's referenced in these POs that, again,

6   I don't specifically know what that was for.

7   **Q.**    Do you have a memory of when the BP Horizon spill was?

8   **A.**    Well, my memory is from a few questions ago when I was

9   just asked about it, and it looked like I saw an e-mail that it

10  was in the Q -- late 2009.

11  **Q.**    If you don't have a memory, sir, you don't have a memory.

12  **A.**    No.

13              **MR. LEACH:**  Nothing further, Your Honor.

14              **MR. KEKER:**  No questions.

15              **THE COURT:**  Thank you very much.  You're excused.

16              **THE WITNESS:**  Thank you.

17                          (Witness excused.)

18              **THE COURT:**  Next witness.

19          **MR. REEVES:**  Thank you, Your Honor.  At this time the

20  United States calls Mr. Nigel Upton.

21                      (Pause in proceedings.)

22          **MR. REEVES:**  May I approach to get the other binders,

23  Your Honor?

24              **THE COURT:**  Sorry?

25          **MR. REEVES:**  May I approach to get the other binders?

SULLIVAN - REDIRECT / LEACH

```
 1            THE COURT:  Yes, of course.  You don't have to ask.
 2    Just do it.
 3         There are a lot of files right over there too.
 4            MR. REEVES:  Do you want them over there?
 5            THE COURT:  No, no.  I don't want them.
 6            MR. REEVES:  Do you want me to take those as well?
 7            THE COURT:  Well, I mean, unless we're redecorating,
 8    yeah.  Unless the witness is using -- is he going to refer to
 9    those?
10            MR. REEVES:  I don't think so.
11            THE COURT:  All right.  Then just take them.  Thank
12    you.
13         And then you can -- do you want them?
14            THE CLERK:  Not yet.
15            THE COURT:  Not yet.  No, no, not yet.
16         Okay.  Go ahead.
17            THE CLERK:  Please raise your right hand.
18                           NIGEL UPTON,
19    called as a witness for the Government, having been duly sworn,
20    testified as follows:
21            THE WITNESS:  I do.
22            THE CLERK:  Thank you.  Please be seated.
23            THE WITNESS:  Thank you.
24            THE CLERK:  Please state your full name for the record
25    and spell your last name.
```

1      **THE WITNESS:**  My name is Nigel Upton, U-P-T-O-N.

2      **MR. REEVES:**  May I inquire?

3                    <u>**DIRECT EXAMINATION**</u>

4    BY MR. REEVES:

5    **Q.**   Good afternoon, Mr. Upton.  Where are you from, sir?

6    **A.**   I was born in England but raised in what is now Zimbabwe.

7    It used to be Rhodesia.  But I'm now a U.S. citizen, and I've

8    been here for 20 years.

9    **Q.**   All right.  And what is your educational background,

10   please?

11   **A.**   I attended school in Rhodesia, left school at 17; did

12   national service in the military for three years.  Then went to

13   the UK, did night school and got a degree in business and

14   marketing.

15   **Q.**   What do you do for a living?

16   **A.**   I currently work at Hewlett Packard.

17   **Q.**   How long have you worked at Hewlett Packard?

18   **A.**   For this particular stint, about two and a half years, but

19   I did work for Hewlett Packard for 33 years before that.

20   **Q.**   In approximately what year did you first join and begin

21   working at Hewlett Packard?

22   **A.**   1980 in the UK.

23   **Q.**   And thereafter you left for a period and then returned and

24   you're currently there?

25   **A.**   Correct.

**UPTON - DIRECT / REEVES**

1   **Q.**    When did you first leave Hewlett Packard?

2   **A.**    I first left Hewlett Packard in August 2012.

3   **Q.**    So 1980 to 2012?

4   **A.**    Correct.

5   **Q.**    And then when did you rejoin?

6   **A.**    In September 2015.

7   **Q.**    All right.  And you're there now?

8   **A.**    Correct.

9   **Q.**    All right.  Thank you.

10          Let me direct your attention to the beginning of your

11  career at HP.  What were you doing at HP for sort of the first

12  10, 15 years that you were there, please?

13  **A.**    Yeah.  When I first joined, I think I joined the Inventory

14  Department, and then I did accounting, software production

15  engineering, product management, business development, sales.

16  So I did a number of jobs.

17  **Q.**    I'd like to direct your attention, if I could, to the year

18  2011.  At or around that time were you still at HP?

19  **A.**    Yes, I was.

20  **Q.**    And what were you doing at HP in 2011?

21  **A.**    I was the general manager of a series of software products

22  in our Telecommunication Business Unit.

23  **Q.**    And where within HP were you working?  In what location?

24  **A.**    I was based in Cupertino.

25  **Q.**    That's here in the Bay Area?

1   **A.**   Correct.

2   **Q.**   Let me direct your attention, if I could, to in or around

3   August 2011.  At or about that time, did you learn about HP's

4   announcement about its intention to acquire a company known as

5   Autonomy?

6   **A.**   Yes, I did.

7   **Q.**   Tell us how that happened, sir.

8   **A.**   Every time HP usually did a large acquisition, there would

9   be an e-mail broadcast to all employees with information about

10  that.

11  **Q.**   So you learned through this e-mail process?

12  **A.**   Correct.

13  **Q.**   And after you received the e-mail, what, if anything, did

14  you do?

15  **A.**   I looked at the details that were available on the

16  website.  I think it was a press release.  And I liked what I

17  saw, and so I purchased some HP stock.

18  **Q.**   What did you like about the idea of HP's acquiring

19  Autonomy?

20  **A.**   I thought Autonomy was really interesting because it was

21  getting into unstructured data.  Before it was quite easy to

22  understand how to put structured data into databases, but that

23  was only a very small percentage of the data available in the

24  world; and this was being able to get into a much, much bigger,

25  much more exciting market, around voice and video and

1    unstructured data.  So I thought that was pretty interesting.

2    **Q.**   Were there other things about this announced acquisition

3    besides the innovativeness of the technology that attracted you

4    to the acquisition and the idea?

5    **A.**   Yes.  The growth of the software company.  I think it

6    referred to 55 percent growth over the last five years.  That,

7    to me, was really interesting because it was in the middle of a

8    very tough time in 2008-2009 during the downturn; and so for an

9    annualized growth of 55 percent over the last five years, it

10   was, to me, very impressive.

11       Also, the software margins, as you'd expect, are very high

12   so, to me, it was a good move for HP to get into an area of

13   high-margin software in a growing market that had so much

14   potential and was with a company that was growing so rapidly.

15   **Q.**   So was your interest in this acquisition based in your

16   role as an employee or as a possible shareholder or both?  You

17   tell us.

18   **A.**   I treated that as a personal investment out of my

19   investment account that I held with Schwab.

20   **Q.**   A personal investment?

21   **A.**   Correct.

22   **Q.**   So like any other person buying stock in the stock market?

23   **A.**   Correct.

24   **Q.**   All right.  I'd like to show you, if I could, please, what

25   has been marked for identification as Exhibit 2727.

1        **MR. REEVES:**  May I please approach?

2        **THE COURT:**  Yeah.  You don't have to ask.

3        **MR. REEVES:**  Thank you, Your Honor.

4   **Q.**   I've given you a set of the exhibits I intend to use,

5   Mr. Upton.

6   **A.**   Uh-huh.

7   **Q.**   I hope, if I've done it correctly, the first one is

8   Exhibit 2727.  Can you please take a look at that and tell us

9   if you recognize it?

10  **A.**   (Witness examines document.)  Yes, I do.

11  **Q.**   What do you recognize it to be?

12  **A.**   This looks like the communication that was sent out to HP

13  employees dated 18th of August 2011.

14       **MR. REEVES:**  At this time I offer Exhibit 2727 in

15  evidence, please.

16       **THE COURT:**  Admitted.

17       (Trial Exhibit 2727 received in evidence)

18       **MR. REEVES:**  If we could display the first page.

19  **Q.**   This is an internal e-mail within HP announcing HP's

20  intention to acquire Autonomy?

21  **A.**   Correct.

22  **Q.**   And if we go to the second page, there's a discussion

23  about Autonomy specifically, is there not?

24  **A.**   Yes, there is.

25  **Q.**   If we could enlarge the middle portion of the second page

1   of Exhibit 2727.  That's fantastic, Ms. Margen.  That's great.

2         Do you see the portion that says (reading):

3             "Here are the actions we are announcing:  An

4         announced recommended all-cash offer for Autonomy, a

5         global leader in information management software for the

6         enterprise"?

7         Do you see that?

8   A.   Yes, I do.

9   Q.   That's one of a series of things that are being announced

10  in this e-mail, is it not?

11  A.   Correct.

12  Q.   And do you see down below there's an indication of where

13  you can get further information?

14  A.   Yes, a link to the HP portal.

15  Q.   Okay.  And with this announcement as the beginning, you

16  then went and what did you obtain?  Is that when you looked at

17  the press release?

18  A.   Yes.  That's where I saw the press release.

19  Q.   Let me show you what has been marked for identification as

20  Exhibit 2295, please.  It should be the second exhibit that you

21  have there.

22  A.   (Witness examines document.)

23  Q.   Do you recognize Exhibit 2295?

24  A.   Yes, I do.

25  Q.   Is that the press release that you reviewed on or around

1  August 18th, 2011?

2  **A.**   Yes.

3          **MR. REEVES:**  At this time I offer Exhibit 2295 in

4  evidence, please.

5          **THE COURT:**  Admitted.

6     (Trial Exhibit 2295 received in evidence)

7          **MR. REEVES:**  If we could please display that.

8     We can just -- we're going to go through this carefully so

9  we'll go slowly, but let's talk about it as a whole document.

10 **Q.**   So, Mr. Upton, did you read this publicly filed press

11 release carefully at or around the time that you were

12 considering buying stock in HP?

13 **A.**   Yes, I did.

14 **Q.**   And did you rely on the accuracy of the information in the

15 press release as a whole to make your investing decision?

16 **A.**   Yes.

17 **Q.**   Was the information in this press release relevant to your

18 decision whether or not to buy HP stock?

19 **A.**   Absolutely.

20 **Q.**   Let's go through portions of the press release, please.

21    Do you see the second bullet point there (reading):

22         "Expected to be accretive to non-GAAP earnings per

23    share for HP shareholders in the first full year following

24    completion"?

25    Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    Was this information relevant or important to your

3    investing decision?

4    **A.**    Yes.

5    **Q.**    Why is that, Mr. Upton?

6    **A.**    It would increase the value of HP.

7    **Q.**    What is your understanding of the word "accretive"?

8    **A.**    That it was going to be in addition.  That it was going to

9    grow.

10    **Q.**    And does this take us back to your consideration of the

11    financial strength of Autonomy and how it may have added to

12    HP's financial strength?

13    **A.**    Correct.  Yes.

14    **Q.**    Okay.  So in your own words, explain why this acquisition

15    being accretive was important to you as an investor.

16    **A.**    It was important to me because, A, it was getting into an

17    area that I thought was a huge market.  Well, it still is a

18    huge market.  And, B, it was software, which is high margin and

19    capable of scaling very rapidly rather than hardware.

20        So when I combined those two reasons, I thought that was a

21    good move for HP to get into much more profitable and higher

22    value and more strategic areas like software.

23    **Q.**    Let's go to the second page, if we could, of the press

24    release, Exhibit 2295, page 2, please.

25        And, Ms. Margen, if you'd be kind enough to enlarge the

1    top paragraph.  That's right.  That's great.  And if you'd be

2    kind enough to highlight, please, the last two full sentences

3    that begins "Autonomy's recent operating financial

4    performance..."

5         Fantastic.  Thank you very much.

6         Do you see the portion of the press release that is

7    talking about Autonomy's financial performance that's been

8    highlighted here, Mr. Upton?

9    A.   Yes, I do.

10   Q.   Okay.  The first sentence reads (reading):

11            "Autonomy's recent operating and financial

12        performance has been strong, including its most recent

13        results for the quarter ending June 30, 2011."

14   Was that information important or relevant to your

15   investing decision, Mr. Upton?

16   A.   Yeah.  It was important because while 50, 55 percent

17   growth over the last five years, it was important to understand

18   that the company was continuing to grow rapidly versus perhaps

19   not growing as rapidly or even shrinking.

20   Q.   Is that why its performance in the most recent quarter

21   would be important to you?

22   A.   Yes, because you want to acquire a company where the

23   revenue and the profitability are going up, not down.

24   Q.   If it were the case that Autonomy's Q2 2011 financial

25   performance was not strong, would that have been capable of

1   influencing your decision to invest money in HP shares?

2   **A.**   Yes, because if it was not strong, that would show a

3   business that was not growing at that rate; and if the growth

4   rate was slowing, then there would -- I would need to

5   understand why.

6   **Q.**   The second sentence reads (reading):

7          "Over the last five years, Autonomy has grown its

8          revenues at a compound annual growth rate of approximately

9          55 percent and adjusted operating profit at a rate of

10         approximately 83 percent."

11         Was this information relevant to you in your investing

12  decision, Mr. Upton?

13  **A.**   Yes, it was very relevant because, as I said, during that

14  previous five years, the whole industry had gone through a very

15  tough time in 2008 and 2009 with the economic downturn with the

16  financial crisis; and so for those sort of numbers over that

17  period of time was impressive.

18  **Q.**   If the figure of 55 percent annual growth rate was false,

19  would that have been capable of influencing your decision to

20  invest money in HP shares?

21  **A.**   Yes.

22  **Q.**   Why would it matter if that number was false?

23  **A.**   If that number was false, then what else could be false?

24  I assumed the information was correct; but if the information

25  wasn't correct, then I would hesitate.  I wouldn't have made

1    the same decision.

2    **Q.**   If the 55 percent annual growth rate was inflated by

3    approximately 10 percent, would that have been capable of

4    influencing your decision to invest money in HP shares?

5    **A.**   Possibly.  When I looked at this at 55 percent, those are

6    the numbers that I expected to be true and thought were true,

7    and that's why I invested at 55 percent.

8        Quite frankly, I'm not sure what I would have done if the

9    number was 49 percent or 50 percent, but I went with that

10   55 percent, which struck me as a very impressive figure and

11   that's why I decided to invest.

12   **Q.**   And you relied on that, did you not?

13   **A.**   I absolutely relied on that.

14   **Q.**   Let's go to the next page if we could.  There's further

15   discussions about Autonomy's strong growth on page 3.  That's

16   Exhibit 2295, page 3.  It's the last bullet point on the

17   bottom.  If we could enlarge that.

18       Do you see the portion of the press release that --

19   withdrawn.

20       Ms. Margen, would you be kind enough to highlight the last

21   full sentence?  A little bit of the yellow on the last sentence

22   if you can.  Thank you.  Thank you very much.

23       So the last bullet point reads (reading):

24           "Enhances HP's financial profile."

25       Does it not?  Do you see that?

1    **A.**    Yes.

2    **Q.**    Then the last sentence in this portion of the press

3    release says (reading):

4              "Autonomy has a consistent track record of

5         double-digit growth."

6         Do you see that?

7    **A.**    Yes, I do.

8    **Q.**    Was that information relevant or important to your

9    investing decision, Mr. Upton?

10    **A.**    Yes, because it signified that it was continuing to have

11    aggressive growth.

12    **Q.**    If Autonomy did not have a track record of double-digit

13    growth, would that have been capable of influencing your

14    decision to invest money in HP shares?

15    **A.**    It depends.  If the -- if the revenue growth was very low

16    five years ago when it had been accelerating ever since in year

17    four, year three, year two, year one, so a track record of

18    aggressive growth leading up to the time that I bought the

19    stock, I would have still made that decision because it would

20    have shown ever-increasing aggressive growth.

21    **Q.**    But if that were not the case and it had not grown in the

22    manner you described, would that be relevant to you?

23    **A.**    Yes.

24    **Q.**    Did you rely on the accuracy of this information?

25    **A.**    Yes.

1   **Q.**   After you reviewed the press release, did you make a

2   decision to invest personally in HP shares?

3   **A.**   Yes, I did.

4   **Q.**   All right.  Tell us what you did, please.

5   **A.**   The next day I purchased 1,000 HP shares.

6   **Q.**   I'd like to show you what has been marked for

7   identification as Exhibit 2728.  Do you see that?

8   **A.**   Yes, I do.

9   **Q.**   Do you recognize that document?

10  **A.**   Yes.

11  **Q.**   What is that?

12  **A.**   It's a copy of my Schwab account.

13  **Q.**   Does it --

14          **THE COURT:**  Admitted.

15          (Trial Exhibit 2728 received in evidence)

16          **MR. REEVES:**  Thank you.

17          **THE WITNESS:**  It's my personal investment Schwab

18  account.

19  **BY MR. REEVES:**

20  **Q.**   We've redacted the account number, sir.

21  **A.**   Thank you.

22  **Q.**   All right.

23          **MR. REEVES:**  And it's admitted, Your Honor?  May I

24  please display it?

25          **THE COURT:**  Yes.

1           **MR. REEVES:**  Okay.  If we could please display the

2    first page of Exhibit 2728.

3    **Q.**    So this is your brokerage account?

4    **A.**    That's correct.

5    **Q.**    If we could please go to page 8, and if you could

6    highlight maybe in yellow, Ms. Margen, the top trade.  That's

7    right there.  Fantastic.  That's great.

8           Okay.  Do you see the highlighted portion of your account

9    statement, Mr. Upton?

10   **A.**    Yes, I do.

11   **Q.**    Does this reflect your purchase of HP shares on or around

12   August 19th, 2011?

13   **A.**    Yes, it does.

14   **Q.**    How many shares did you acquire?

15   **A.**    1,000.

16   **Q.**    And what was the amount of your investment approximately?

17   **A.**    Just under $24,000.

18   **Q.**    Thereafter how did your investment perform?  What happened

19   next with regard to your investing decision relating to HP

20   shares?

21   **A.**    The stock continued to rise slightly, so I was pleased

22   with that.  In fact, I then decided to purchase another block

23   of shares about -- it was the following year in 2012.

24   **Q.**    All right.  Let me direct your attention to in or around

25   November 2012.  At or around that time, what happened to your

1  investment as it was motivated in the manner you've described

2  by the Autonomy acquisition?

3  **A.**   I'm sorry.  I'm not sure I fully understand the question.

4  **Q.**   Sure.  Let me direct your attention to approximately a

5  year-plus later, sometime in November 2012.  At or around that

6  time, did you undertake any further decision-making with regard

7  to your investing in HP?

8  **A.**   Yes.  I then sold the shares.

9  **Q.**   And what prompted you to sell the shares?

10 **A.**   The press release that announced the write-down of the

11 value of Autonomy purchased by HP.

12 **Q.**   And that was a press release issued by whom?

13 **A.**   I believe it was issued by HP, but I can't recall.

14 **Q.**   Okay.  Let me show you lastly, if I could, what's been

15 marked for identification as Exhibit 2733.  Do you have that?

16 **A.**   Yes.

17 **Q.**   This is the second one of your Schwab brokerage accounts?

18 **A.**   (Witness examines document.)  Yes, it is.

19     **MR. REEVES:**  At this time I offer Exhibit 2733 in

20 evidence, please.

21     **THE COURT:**  Admitted.

22   (Trial Exhibit 2733 received in evidence)

23     **MR. REEVES:**  If we could, please, display it again.

24 And if you could please go to page 8.

25   And, Ms. Margen, if you'd be kind enough there, the two

**UPTON - CROSS / LAZARUS**

1  trades that begin with Hewlett Packard toward the top.  Yeah,

2  right up -- great.  If you could highlight those.  Super.

3  Thank you very much.

4  **Q.**   In this portion of Exhibit 2733, does this reflect your

5  sale of the thousand shares in two trades of your Hewlett

6  Packard securities, Mr. Upton?

7  **A.**   Yes, it does.

8  **Q.**   Okay.  And this is happening on or around November 21,

9  2012?

10  **A.**   Correct.

11  **Q.**   That's consistent with your recollection?

12  **A.**   Yes.

13  **Q.**   And how did your thousand-share investment in HP perform

14  when you decided to sell these shares?

15  **A.**   Not very well.  I lost about 50 percent of the value of

16  the shares.

17                    (Pause in proceedings.)

18          **MR. REEVES:**  No further questions.  Thank you.

19          **THE WITNESS:**  Thank you.

20          **THE COURT:**  Cross.

21          **MS. LAZARUS:**  Ready, Your Honor?

22          **THE COURT:**  Oh, yes.  Please.

23                    **CROSS-EXAMINATION**

24  BY MS. LAZARUS:

25  **Q.**   Good afternoon, Mr. Upton.  My name is Kate Lazarus.  I

1    represent Mr. Hussain.  How are you?

2    **A.**    Hi.

3    **Q.**    You testified that you currently work for Hewlett Packard;

4    is that right?

5    **A.**    Correct.

6    **Q.**    And you've worked there for many years?

7    **A.**    Two periods, one from 1980 to 2012, and then from 2015 to

8    today.

9    **Q.**    So over 30 years working for HP; right?

10    **A.**    Yes.

11    **Q.**    Did you know that HP is suing the defendant, Mr. Hussain,

12    in England for money damages?

13    **A.**    I didn't at the time I was first contacted, but I saw that

14    this morning in the press actually.

15    **Q.**    So do you understand that HP has an interest in the result

16    of this case here?

17    **A.**    I believe so.

18    **Q.**    Did you know that HP has been working with the Government

19    in preparing this case?

20            **MR. REEVES:**  I object.

21            **THE WITNESS:**  No, I didn't.

22            **THE COURT:**  He answered.  Go ahead.

23    BY MS. LAZARUS:

24    **Q.**    Did you know that HP's lawyers are in this courtroom

25    watching your testimony today?

1  **A.**   No.

2  **Q.**   Given how long you've worked for HP, you'd agree that

3  you're not really a neutral third-party witness here, are you?

4  **A.**   This is done as a private investment, and I don't normally

5  purchase HP stock.  In fact, this is the first time I've ever

6  purchased HP stock as a private investor because I'm already

7  vested there.  That's where my salary comes from and because we

8  get -- or used to get stock options.  So this investment was

9  unusual for me, but I liked the investment because of what I

10 saw.

11 **Q.**   After you sold your HP shares in 2012, you never reached

12 out to the Government to claim that you were some kind of

13 victim, did you?

14 **A.**   No, I didn't.

15 **Q.**   You didn't reach out in 2012 or 2013 or 2014?

16 **A.**   No, I didn't reach out to anybody.  In fact, I was quite

17 surprised when somebody came knocking on my door and said they

18 were from the FBI.  My wife was equally surprised.

19 **Q.**   So the Government found you, not the other way around; is

20 that right?

21 **A.**   Correct.

22 **Q.**   Could you turn to Exhibit 5385, please, Mr. Upton.

23 **A.**   (Witness examines document.)

24 **Q.**   It's the binder rather than the --

25 **A.**   Oh, okay.  5385?  (Witness examines document.)

1   Q.   Do you recognize this as a letter that you got from the

2   FBI?

3   A.   Yes, I do.

4          MS. LAZARUS:  Move it into evidence, Your Honor.

5          MR. REEVES:  No objection.

6          THE COURT:  Admitted, 5385.

7          (Trial Exhibit 5385 received in evidence)

8   BY MS. LAZARUS:

9   Q.   Page 1 is a letter to you from the FBI; is that right?

10  A.   Yes.

11  Q.   And then do you see attached to it a survey that you

12  responded to at page 3?

13  A.   Yes, I do.

14  Q.   So you got involved in this case because the Government

15  was looking for HP shareholders; is that right?

16  A.   That's correct.

17  Q.   And you've spoken to the Government at least five times

18  before today regarding your testimony; correct?

19  A.   Correct.  It's been over an extended period of time.

20  Q.   And over the course of those interviews, has your story

21  about why you bought the HP shares changed at all?

22  A.   No.

23  Q.   When you first spoke to the Government, you said you liked

24  the idea of HP buying a software company; isn't that right?

25  A.   That's correct.

**UPTON - CROSS / LAZARUS**

1   **Q.**   You said that again today?

2   **A.**   Yeah.

3   **Q.**   You thought that Autonomy sounded like a unique company?

4   **A.**   I hadn't heard of Autonomy before, to be honest, because

5   that wasn't in the field I was in; but from what I read, it

6   sounded wonderful.

7   **Q.**   You liked that Autonomy was in the unstructured data

8   space?

9   **A.**   Yes, I did.

10   **Q.**   You thought there would be demand for Autonomy's

11   technology in HP's markets?

12   **A.**   Yes, I did.

13   **Q.**   And you believed Autonomy would help HP drive more

14   services businesses?

15   **A.**   I believed there was going to be a leverage effect on the

16   services, yeah.

17   **Q.**   And in addition to that, HP's share price was falling

18   quite a bit the day that the acquisition was announced; isn't

19   that right?

20   **A.**   I don't recall.  I just purchased the shares.  I think it

21   was at $23 something.

22   **Q.**   Didn't you tell the Government that one of the reasons

23   that you bought the shares in August of 2011 was that the price

24   was falling?

25   **A.**   No, I don't believe so.

1  **Q.**  Do you remember meeting with the Government in September

2  of 2015, Mr. Upton?

3  **A.**  To be honest, I don't recall the exact dates.  I mean,

4  it's -- I have trouble remembering yesterday.  So, no, it's --

5  I don't recall exactly, but I met with them three or four

6  times.

7          **MS. LAZARUS:**  Your Honor, could I direct the witness

8  to a summary of his interview from September 2015?

9          **THE COURT:**  Yes.  I mean, it's an exhibit number?

10          **MS. LAZARUS:**  Yes.  5206.

11          **THE COURT:**  5206.  What page?

12          **MS. LAZARUS:**  And it's in this separate packet that

13  has all the witness statements.

14          **THE COURT:**  I have that.  What page is it?  Is it

15  page 2?

16          **MS. LAZARUS:**  The first page.

17          **THE COURT:**  The first page.  And what paragraph do you

18  want him to read?

19          **MS. LAZARUS:**  The last paragraph on the first page.

20          **THE COURT:**  So you should read this to yourself, not

21  out loud.  All right?  Just read it to yourself.

22          **THE WITNESS:**  (Witness examines document.)

23          **THE COURT:**  You may ask the question.  Go ahead.

24  BY MS. LAZARUS:

25  **Q.**  When you're ready, Mr. Upton, does this refresh your

1    recollection that you bought HP shares because the price was

2    falling after the announcements that HP made in August 2011?

3    **A.**    (Witness examines document.)  Yeah, but it doesn't ring a

4    bell that the actual stock was falling substantially because

5    when I bought this in 2015 and '11 -- yeah, I just can't recall

6    exactly what the stock price was doing at that time.

7    **Q.**    When you first met with the Government in 2015, you didn't

8    mention anything about relying on Autonomy's financial

9    performance when you bought HP shares, did you?

10    **A.**    What I relied on was the information in the press

11    statement saying that it was growing and that it was highly

12    profitable.

13    **Q.**    Do you remember mentioning the press release when you were

14    first interviewed by the Government?

15    **A.**    I can't recall exactly, but that's the only place I would

16    have got the information from.

17    **Q.**    Are you sure that you read the press release when you

18    decided to buy the shares in August 2011?

19    **A.**    Yes.

20    **Q.**    Didn't you tell the Government back in 2015 that you

21    believed you'd seen the press release?  You didn't say so with

22    any confidence, did you?

23          **THE COURT:**  That's two questions.  Okay.  As to the

24    first question, I'm not going to allow that question because

25    there's no real difference between he believed and he thought

**UPTON - CROSS / LAZARUS**

1    or he said he said.

2        The second question is what?

3    **BY MS. LAZARUS:**

4    **Q.**   You weren't actually that confident when you spoke to the

5    Government for the first time that you had read the press

6    release that HP issued in August 2011; isn't that right?

7    **A.**   I have no idea whether I felt confident or not.  I just

8    don't recall my level of confidence.

9    **Q.**   In any event, you understand that the press release we've

10   been discussing was issued by HP; correct?

11   **A.**   Yes.

12   **Q.**   If we could turn back to Exhibit 2295, which was

13   previously admitted.

14       You see that it's HP's logo in the corner there?

15   **A.**   Yes.

16   **Q.**   And you have no reason to think that anybody from Autonomy

17   drafted this press release, do you?

18   **A.**   No.

19   **Q.**   And you don't have any reason to think that anybody at

20   Autonomy had any control over the issuance of this press

21   release?

22   **A.**   I don't know.

23   **Q.**   And you didn't consider any other information about

24   Autonomy before you purchased the HP shares, did you?

25   **A.**    No.   I went with what was in the statement, the press

**UPTON - CROSS / LAZARUS**

1  statement.

2  **Q.**   You didn't do any Internet research or anything like that

3  about Autonomy?

4  **A.**   No.  I read it, liked it, and made a decision.

5  **Q.**   So you didn't consider any statements from Mr. Hussain

6  when you purchased HP shares, did you?

7  **A.**   No.

8  **Q.**   In fact, you never heard of Mr. Hussain when you bought

9  the shares?

10  **A.**   That would be correct.

11  **Q.**   You also testified earlier that you relied on the

12  statement in this press release that HP expected the

13  acquisition to be accretive within the first year.  Do you

14  remember that?

15  **A.**   Yes.

16  **Q.**   If we can go back to exhibit, I think it's 52 -- oh,

17  excuse me -- 2295, again at page 4.  And the statement says

18  (reading):

19          "HP expects the acquisition to be accretive to

20      non-GAAP earnings per share for HP shareholders in the

21      first full year following completion."

22      Do you see that?

23  **A.**   Yes, I do.

24  **Q.**   So you understand that this was HP's expectation that the

25  acquisition was going to be accretive?

1    **A.**    Yes.

2    **Q.**    You understand this wasn't necessarily the expectation of

3    anyone at Autonomy?

4    **A.**    I have no idea, I'm afraid.

5    **Q.**    You don't know if it was Mr. Hussain's expectation that

6    the acquisition would be accretive within a year?

7              **MR. REEVES:**  Objection, Your Honor, as to

8    Mr. Hussain's expectation.

9              **THE COURT:**  I think what we're asking the witness is

10   did he know what Mr. Hussain's statements were or expectations

11   were, and he said he did not.  So that's his testimony.  He's

12   never met him.

13         I don't know.  Have you ever met him?

14             **THE WITNESS:**  No, I haven't.

15             **THE COURT:**  Have you ever discussed anything with him?

16             **THE WITNESS:**  No.

17             **THE COURT:**  There we go.

18   **BY MS. LAZARUS:**

19   **Q.**    The point is, when you were relying on this press release,

20   you understood that you were relying on HP's opinions and not

21   Mr. Hussain's opinions?

22   **A.**    I understood that this is on HP letterhead and, therefore,

23   attributed to HP; but as to the information in there, I have no

24   idea who provided what to HP.

25   **Q.**    You understand the sentence "HP expects the acquisition to

1  be accretive" is a reference to HP's expectations?

2  **A.**   Yes.

3  **Q.**   And you also understand that whether or not an acquisition

4  is accretive or adds value depends on a number of factors?

5  **A.**   Yes.

6  **Q.**   It might depend in part on how much the acquiring company

7  paid for the acquired company?

8  **A.**   Sorry.  Is that a question of --

9  **Q.**   Do you understand that if the acquisition is to be

10  accretive, one factor that will determine that is how much HP

11  paid for Autonomy?

12  **A.**   Yes.

13  **Q.**   And you know that HP paid a 64 percent premium for

14  Autonomy; correct?

15  **A.**   Yes, I believe that's correct.

16  **Q.**   You know that this means that HP paid 64 percent more than

17  the public markets valued Autonomy at?

18  **A.**   I'm not a financial expert but from my superficial

19  knowledge, that's what it meant.

20  **Q.**   So whether or not the acquisition was going to be

21  accretive depended in part on whether HP was right to pay such

22  a high premium; correct?

23  **A.**   I would assume so, yeah.

24  **Q.**   And you also understand that whether or not an acquisition

25  adds value depends on how well the company is managed after the

**UPTON - CROSS / LAZARUS**

1    acquisition?

2    **A.**    I would assume so, yeah.

3    **Q.**    So if HP didn't do a good job managing and integrating

4    Autonomy, it was less likely that the acquisition would be

5    accretive; correct?

6         **MR. REEVES:**    I object.    We're well beyond the

7    investment decision.    It's irrelevant.    Objection.

8         **MS. LAZARUS:**    The witness testified that he relied on

9    the statement in the press release.

10        **THE COURT:**    Yeah.    Overruled.

11    **BY MS. LAZARUS:**

12   **Q.**    Shall I repeat the question?

13   **A.**    Yes, please.

14        **THE COURT:**    I think the question is:    Did you

15   understand that whether the acquisition of Autonomy is

16   accretive or not depends in part on how it is managed

17   subsequent to its acquisition?

18        **THE WITNESS:**    Yes, I do understand it.

19        **THE COURT:**    Okay.

20   **BY MS. LAZARUS:**

21   **Q.**    And you testified that you sold your HP shares in November

22   of 2012; correct?

23   **A.**    Yes.

24   **Q.**    And you testified that you lost some money on this sale?

25   **A.**    I lost about 50 percent of the value, yeah.

1   Q.   This was -- you considered this a medium-size deal for

2   you, not the end of the world?

3   A.   Yeah, medium-size, not the end of the world.

4   Q.   And do you recall why you sold the shares in 2012?

5   A.   Yeah.  It was a reaction to the release about the

6   write-down of the price paid for Autonomy.

7   Q.   Is that what you said the first time that you met with the

8   Government in 2015?

9   A.   I can't recall the exact conversation, but I believe so,

10  yeah.

11  Q.   Do you recall saying that it might have just been what you

12  saw in terms of the stock market that caused you to sell the

13  shares?

14  A.   No.  It was the announcement of the write-down.  As soon

15  as I saw that, I sold the shares the next day.

16          MS. LAZARUS:  Your Honor, could I direct the witness

17  back to the same summary exhibit?

18          THE COURT:  Is it 5206?

19          MS. LAZARUS:  Yes.  The second page, Your Honor.

20                  (Pause in proceedings.)

21          THE COURT:  He can read that paragraph to himself.

22      Read the paragraph to yourself, the first full paragraph

23  on the second page.

24          THE WITNESS:  (Witness examines document.)  All right.

25          THE COURT:  And your question?

**UPTON - CROSS / LAZARUS**

1    BY MS. LAZARUS:

2    **Q.**   Does this refresh your recollection that as of 2015, you

3    couldn't really recall why you sold your HP shares in 2012?

4    **A.**   It recollected my conversation with the FBI at that time,

5    yeah.

6    **Q.**   And do you remember telling the FBI that you couldn't

7    recall why you had sold your shares in 2012?

8    **A.**   I didn't make a note of exactly what I said in that

9    conversation, but it sounds roughly correct.

10   **Q.**   Do you recall telling the FBI that one of the reasons you

11   sold your shares might have been what was happening in the

12   stock market at the time?

13   **A.**   To be honest, I don't recall saying that.  This was a

14   reaction from the write-down, which is why it took place the

15   next day.

16   **Q.**   And you're not in any position to comment on the causes of

17   HP's write-down of its Autonomy acquisition, are you?

18        **THE COURT:**  Well, that's fine.  I mean, we don't need

19   to go into that.  No, he's not.  He's not called for that.

20        So anything else?

21        **MS. LAZARUS:**  Just a few more things, Your Honor.

22        **THE COURT:**  Sure.

23   BY MS. LAZARUS:

24   **Q.**   You said that the price had fallen between -- that HP's

25   share price had dropped between August 2011 and November 2012;

1    right?

2    **A.**    Yes.

3    **Q.**    But you don't have any opinion as to why the HP share

4    price fell, do you?

5    **A.**    I would suspect that the acquisition or the write-down had

6    something to do with it but, no, I don't know enough about why

7    the HP share price fell.

8    **Q.**    You understand that other intervening events had occurred

9    for HP in the 15 months that you held the HP shares?

10    **A.**    I would imagine so.  It was the largest technology company

11    in the world at the time.

12         **MS. LAZARUS:**  Your Honor, could we display the summary

13    chart that we discussed earlier?  I don't think there will be

14    any objection if we use it as a demonstrative.

15         **MR. REEVES:**  Is this the stock chart?

16         **MS. LAZARUS:**  This is the stock chart.

17         **MR. REEVES:**  No objection.

18         **THE CLERK:**  Exhibit?

19         **MS. LAZARUS:**  5527.

20         **THE COURT:**  Sorry.  5527, is that it?

21         **MS. LAZARUS:**  Correct.

22         **THE COURT:**  Sorry?

23         **MS. LAZARUS:**  Yes, that's correct.

24         **THE COURT:**  All right.  So that's admitted for

25    demonstrative purposes.

1          (Trial Exhibit 5527 as demonstrative received in

2           evidence)

3    BY MS. LAZARUS:

4    Q.   Mr. Upton, I can represent to you that this is a summary

5    of the movement of the HP share price from the beginning of

6    2011 to the end of 2012.  Does that look right to you?

7    A.   I'm sure it is correct.

8    Q.   And you bought the shares in August of 2011; right?

9    A.   August 2011, yes.

10   Q.   So you can see from this chart that the HP share price was

11   falling well before you bought the shares; right?

12   A.   Yes, I can see that.

13   Q.   And you sold your shares in November of 2012; right?

14   A.   Yes.

15   Q.   And the stock price was generally moving down for the

16   entire period you held the shares; isn't that correct?

17   A.   I don't think so.  It seems to rise between 8/3/2011 and

18   the beginning of 2012 from 23 when I bought it back up to 30, I

19   guess, in -- what is it? -- looks like maybe February-March

20   2012.

21   Q.   Okay.  You'd agree that the price was falling between

22   February 2012 and when you sold your shares in November of

23   2012?

24   A.   Yes.  I managed to sell at the bottom of the market.

25   Q.   And you haven't done any kind of analysis to determine

1    what caused that price to decline throughout 2012?

2    A.    No.

3    Q.    Did you know that HP had several other write-downs during

4    that time period?

5    A.    No.

6    Q.    You didn't know that HP had written down the Compaq

7    acquisition in May of 2012?

8    A.    To be honest, I don't recall.  I mean, HP made many, many

9    acquisitions and some it wrote down and some it didn't.

10   Q.    You recall the write-down of a company called EDS, don't

11   you?

12   A.    Yes, I do.

13   Q.    That was in August 2012?

14   A.    I don't recall.

15   Q.    Do you recall that HP wrote $8 billion down from its

16   acquisition of EDS in August 2012?

17   A.    I don't recall the date, but I do recall the announcement

18   of the write-down.

19   Q.    So you recall generally that there were several other

20   write-downs during the period that you held your HP shares?

21   A.    As I said, I don't recall the specifics of write-downs

22   while I held the HP shares.

23   Q.    But you recall that there were other write-downs during

24   that time period?

25   A.    I'm sure there were.

1  **Q.**  And would you agree that those other write-downs could

2  have had a negative impact on the HP share price?

3  **A.**  I just don't know.  The stock price seems to have a mind

4  of its own at times.

5  **Q.**  So in short, you don't know what caused the stock price to

6  fall between August 2011 and November of 2012?

7  **A.**  What I do know is that when I bought the shares, I thought

8  it was a good thing.  When I sold the shares, I lost confidence

9  and I had had enough of that; and I thought if there's that

10  much of a write-down, I don't want to hold them anymore.  I've

11  lost confidence as to why I bought them in the first place.

12  That's why I sold them straight after the announcement of the

13  write-down of the reason I bought those shares.

14  **Q.**  And as you testified earlier, you don't know what caused

15  the write-down of the Autonomy acquisition?

16  **A.**  No, I don't.

17        **MS. LAZARUS:**  No further questions, Your Honor.

18        **THE COURT:**  Thank you.

19  Anything further?

20        **MR. REEVES:**  Just a couple questions, Your Honor.

21  If I could please have what's been received in evidence as

22  Exhibit 5385 displayed with the Court's permission.

23        **THE COURT:**  Yes.  Go ahead.

24                    <u>**REDIRECT EXAMINATION**</u>

25  \\\

1  BY MR. REEVES:

2  **Q.**   I think that might be in the black binder up there,

3  Mr. Upton.  5385.  This is the letter from the FBI.

4  **A.**   5385.

5  **Q.**   You can use the screen if you wish.

6  **A.**   Uh-huh.

7  **Q.**   Do you remember being asked some questions about the

8  letter you received from the FBI?

9  **A.**   Yes, I do.

10  **Q.**   Is this where your contact with the FBI began in some

11  sense?

12  **A.**   Well, it actually started with my wife telling me the FBI

13  had been to the house and was asking for me, and she was quite

14  surprised.  We had only just got married, and so she was

15  wondering what on earth was going on.

16  **Q.**   Sounds like a very good question.

17      In or around 2015, you got this letter, did you not?

18  **A.**   Yes.

19  **Q.**   And you answered it and returned it to the FBI, did you

20  not?

21  **A.**   Yes, I did.

22  **Q.**   Let's take a look at your answers in 2015, please.  On

23  page 3 -- if we could go to page 3 of Exhibit 5385.  If we

24  could -- fantastic.  Thank you.

25      Do you see the first question that you're asked by the FBI

UPTON - REDIRECT / REEVES

1    (reading):

2         "Did you purchase HP securities in whole or in part

3    based on the information on the attached press release" --

4    according to the document, it's attached -- "announcing

5    HP's acquisition of Autonomy dated August 18, 2011?"

6    How did you answer that question in 2015, Mr. Upton?

7  **A.**   Yes.

8  **Q.**   Question two (reading):

9         "If so, was HP's decision to buy Autonomy relevant to

10   your investment decision?"

11   How did you answer that?

12 **A.**   Yes.

13 **Q.**   Question three (reading):

14        "Did you sell HP securities in whole or in part based

15   on the information on the attached press release (see

16   Attachment C) announcing the impairment HP realized

17   relating to Autonomy dated November 20, 2012?"

18   How did you answer?

19 **A.**   Yes.

20 **Q.**   Question four (reading):

21        "If so, was the impairment HP realized relating to

22   Autonomy relevant to your decision to sell?"

23   How did you answer?

24 **A.**   Yes.

25        **MR. REEVES:**  No further questions.

**PROCEEDINGS**

 1           **THE COURT:**  Ms. Lazarus?

 2           **MS. LAZARUS:**  Nothing further.

 3           **THE COURT:**  Thank you very much.  You are excused.

 4           **THE WITNESS:**  Thank you.

 5                          (Witness excused.)

 6           **THE COURT:**  So, ladies and gentlemen, let's take our

 7   recess.  We will be in recess until five after 3:00.

 8       Remember the admonition given to you:  Don't discuss the

 9   case, allow anyone to discuss it with you, form or express any

10   opinion.

11       We're in recess.

12                     (Recess taken at 2:48 p.m.)

13                  (Proceedings resumed at 3:04 p.m.)

14       (Proceedings were heard out of presence of the jury:)

15           **THE CLERK:**  Come to order.  Court is now in session.

16   You may be seated.

17           **THE COURT:**  Okay.  Let the record reflect all parties

18   are present.  The jury is not present.

19       Mr. Reeves.

20           **MR. REEVES:**  Yes.  Just a couple quick little things.

21   Your Honor.

22       There were some questions in the cross-examination of

23   Mr. Upton or at least one question about an allegation that the

24   Government is, quote, "working with HP."  I think that given

25   the Court has considered and ruled on motions about whether HP

1    is part of the Government's prosecution team, those questions

2    are inappropriate.  And I just want -- I sense that this might

3    happen again, and I wanted to raise it with the Court.

4         THE COURT:  I think that's -- I don't subscribe to

5    the -- I understand that's how the defense feels, but -- you

6    have a problem -- and in any case, you have a problem in any

7    case where you say that the Government is working with the

8    alleged victim.  Yeah.  Of course they are.  That's their job.

9         But in the way it's characterized is that -- it's an

10   unfavorable characterization, at least an inference can be

11   unfavorable, and I don't think that's fair, actually, because

12   they do it in every case.  So I just don't think it's fair.

13        MR. KEKER:  Not like this, Your Honor.

14        THE COURT:  Maybe -- okay.  That may be the case.  I'm

15   not arguing with you, but that's not what is going to be

16   presented to the jury.  And if you feel that they've acted

17   inappropriately in this case, that would be the subject of a

18   separate motion outside the presence of the jury and for me to

19   determine whether or not I agree and whether it constitutes

20   misconduct or something of that type.

21        All I'm saying is we have to be very careful here, as we

22   would in any case, to what I call let the jury decide the

23   things that they have to decide or should decide, and if there

24   are these types of subjects, it's not a jury determination.

25   I'm sure we agree on that.

1      So --

2           MR. KEKER:  I think -- I think there is something --

3           THE COURT:  Go ahead.

4           MR. KEKER:  -- more going on here.  When the

5      accounting witnesses --

6           THE COURT:  Step before the microphone.

7           MR. KEKER:  When the accounting witnesses come, the

8      evidence -- we should submit a brief on this along with the

9      fees.

10          When the accounting witnesses come, what is clear is that

11     HP lawyers, HP accountants have provided materials, have set --

12     have worked with the expert and given him --

13          THE COURT:  You may be able to bring all that out.  I

14     don't know.  I'm not saying -- I'm saying I don't want the

15     characterization that is with the inference that I think is

16     unfair.

17          I don't know if an exhibit comes in or is presented, that

18     it would be inappropriate to ask who prepared the exhibit or

19     from what was the exhibit prepared or were you assisted in the

20     preparation of the exhibit by X, Y, or Z.  The facts are the

21     facts.  The inferences are not -- the inference that I have

22     identified is, in my view -- is not appropriate for the jury to

23     consider.

24          You may be in a position at the end of the case to

25     question any number of exhibits based upon -- as one would with

1    any exhibit, you know.  I'm not going to try to limit your

2    ability or the opportunity you have to question the evidence

3    that's coming in as it relates to your client.  I think that's

4    appropriate to go into.  I just don't want that

5    characterization.

6         Okay?

7              MR. KEKER:  Yes, sir.

8              THE COURT:  Got it?  Here we are.

9              MR. KEKER:  I think we understand it.  If we get

10   confused about it, we will raise it separately with you again.

11             MR. REEVES:  Thank you, Your Honor.

12             THE COURT:  Okay.  Let's bring in the jury.  Let's get

13   going.

14        (Proceedings were heard in the presence of the jury:)

15             THE COURT:  Let the record reflect all jurors are

16   present, parties are present.  Mr. Frentzen is about to make

17   his inaugural appearance in front of the jury.

18             MR. FRENTZEN:  Thank you, Your Honor.  The Government

19   calls John Baiocco, who has already beat me to it.

20             THE CLERK:  Please raise your right hand.

21                         JOHN BAIOCCO,

22   called as a witness for the Government, having been duly sworn,

23   testified as follows:

24             THE CLERK:  Please be seated.  Please state your full

25   name for the record and spell your last name.

1          THE WITNESS:  John Francis Baiocco, B-A-I-O-C-C-O.

2          THE CLERK:  Thank you.

3          MR. FRENTZEN:  May I proceed, Your Honor?

4          THE COURT:  Yes.

5                    DIRECT EXAMINATION

6     BY MR. FRENTZEN:

7     Q.    Good afternoon, Mr. Baiocco.

8     A.    Good afternoon.

9     Q.    Where do you live?

10    A.    New Jersey and New York City.

11    Q.    How long have you lived there?

12    A.    Since 1998.

13    Q.    Where are you originally from?

14    A.    Buffalo, New York.

15    Q.    Could you tell us a little bit about your education,

16    please, sir.

17    A.    I went to high school outside of Buffalo, New York, and

18    did a couple semesters of college and that's it.

19    Q.    After you left college, what did you do?

20    A.    I was in the restaurant business.

21    Q.    What did you do in the restaurant business?

22    A.    Well, I was anywhere from waiter to banquet director to

23    eventually owner of four restaurants.

24    Q.    Did you eventually leave the restaurant business for

25    something else?

1   **A.**   I did.

2   **Q.**   What did you leave the restaurant business to do?

3   **A.**   I left the restaurant business to go to work for a company

4   called Advantage Professionals that was a headhunting,

5   recruiting firm.

6   **Q.**   When did you go to Advantage Professionals?

7   **A.**   1998.

8   **Q.**   Could you tell us about Advantage Professionals when you

9   first got there?  What type of work did they do and what size

10  business was it?

11  **A.**   Sure.  They started as a temporary placement business in

12  the accounting field:  Receivables, payables, temp accountants,

13  that sort of thing, doing both temp placements and permanent

14  placements, and then they moved into doing staff augmentation,

15  temp work in the IT space.  That's when I joined.

16  **Q.**   When you joined, they were already making that shift, if

17  you will?

18  **A.**   Correct.

19  **Q.**   When you joined Advantage Professionals, what was your

20  first job, what was your responsibility?

21  **A.**   I was a recruiter.  It was my job to look for talent to

22  fill the positions that the salespeople would get the openings

23  for.

24  **Q.**   Could you just take us through sort of your time at

25  Advantage Professionals and sort of how the business developed

1    and how your role there developed.

2    **A.**    Sure.

3        So I started as a recruiter, and then one of our big

4    customers at the time was the Associated Press, and through

5    that relationship, I had placed some independent contractors

6    there for -- which is what we did.

7        And then one of them was a gentleman named Jeffrey Hawk

8    who stayed on there for a couple of years as a resource for us

9    billing.  Eventually took a full-time position at the

10    Associated Press.  And then ultimately got his way to the

11    CIO-type level there, and then one day opted to quit and we --

12    he came and joined us at that point to start kind of a

13    technical solutions practice, which was his specialty.

14    **Q.**    Is that something that Mr. Hawk was doing when he was at

15    the Associated Press?

16    **A.**    Yeah.  He was running technology so, yeah, pretty much.

17    **Q.**    Describe for us, if you can, how that, Mr. Hawk being at

18    the Associated Press and then coming back to Advantage

19    Professionals -- if that modified the business at all.

20    **A.**    Sure.  So, I mean, when Jerry was there, as the CIO or

21    whatever his title was, director of technology, he was very

22    good to us as far as giving us a lot of their openings.  So we

23    made a lot of placements there.  Kind of salted our friendship.

24        He was a very bright individual, and when he decided to

25    leave and come on with us, that opened the door to us to do

1    more than just temporary placement and staff augmentation.  It

2    allowed us to do solution selling as far as the professional

3    services business.

4    Q.    What does that mean?

5    A.    That means when you sign up for a particular task or with

6    a company on an SOW where you are taking the risk of doing the

7    completion of the project where staff aug is -- somebody else

8    is running the project and you're just putting bodies on it so

9    it's not really your ultimate responsibility.  If it fails, you

10   may not get paid for one of your guys, but you're not

11   responsible for the ultimate delivery of the project.

12   Q.    But just in terms of when you talk about projects in plain

13   speak, what kind of projects?

14   A.    Well, when Jerry first joined, we were doing mostly

15   Microsoft-related stuff.  Lotus Notes to exchange migrations,

16   Sybase to SQL migrations, Windows-related work, anything to do

17   with Exchange email that -- Microsoft related.

18   Q.    So to give us an idea, if you had a project, your people

19   would go out and do what kind of work?

20   A.    The work I just described.  Basically do a Sybase to SQL

21   migration or Notes to Exchange.  All technical custom

22   application, mostly that kind of work.

23   Q.    What's an Exchange?  What is a custom application?

24   A.    Custom application is just developing code to make

25   software work at a, you know -- for a particular need, whatever

1    the project direction was.

2    **Q.**    When Mr. Hawk came back to Advantage Professionals, can

3    you describe where the business headed at that point?

4    **A.**    Right.  So when Jeffrey came on, we started what we called

5    Advantage Solutions to sort of separate ourselves so that we

6    didn't look like just a staff aug company.  That we had a

7    solutions practice and we connected with Microsoft based on his

8    knowledge of their products.  And they would bring us in to all

9    their big customers and they would basically subcontract --

10    most of our work at that point came from directly Microsoft

11    paper.

12    **Q.**    As you got involved in work withing Microsoft, can you

13    describe how that changed the business in terms of the size and

14    what kind of business you were doing?

15    **A.**    Yeah.  I mean, it certainly increased our business.  In

16    staff aug, you would get paid a margin of 15 or $20 an hour for

17    a guy for two or three months.  On a large project like that,

18    you could have 40 people billable at 80 or 90-dollar margins

19    for a year, you know.

20        We did a Notes to Exchange migration at JPMorgan that

21    lasted almost two years with a full team, anywhere from 20 to

22    40 people on it.

23    **Q.**    So at that point, where was most of your business coming

24    from?

25    **A.**    From that avenue.

BAIOCCO - DIRECT / FRENTZEN

1  Q.  Is that Microsoft?

2  A.  Microsoft, yes.

3  Q.  At some point -- and when was this?  What year are we

4  talking about?

5  A.  2006, 2007.

6  Q.  At some point in time, did the business -- well, at some

7  point in time, did it change the name to Capax?

8  A.  Yes.  At a certain point, we changed it to Capax to kind

9  of disassociate ourselves completely with the temporary

10  practice, and I think we were on a list at American Express and

11  there was another vendor there named Advantage Professionals

12  and we just opted to change the name rather than fight.

13  Q.  Do you remember around when the name changed to Capax?

14  A.  I don't know.  2008, somewhere in that time frame.

15  Q.  And at that time, was it just Capax or was it Capax

16  something else?

17  A.  It was Capax Global.

18  Q.  In terms of Capax Global, at some point did you become

19  aware of a software company called Autonomy?

20  A.  Yes.

21  Q.  Can you tell us how that awareness began?

22  A.  Yeah.  Well, it came through Jerry Hawk, who we just spoke

23  about at the Associated Press.

24  Q.  What was your understanding of Mr. Hawk's knowledge of

25  Autonomy?

1   **A.**   Oh, his knowledge was that him and his team at the

2   Associated Press had done a bake-off, which is like a

3   competition to see who would win software business at a

4   company, and it was for enterprise search.  They were going

5   through a bunch of vendors and ultimately chose the Autonomy

6   software, and I think at the time it was the largest

7   implementation to date, so it was a big deal.

8   **Q.**   Okay.  If you could break that down for us.  Mr. Hawk was

9   at that time still at the Associated Press?

10   **A.**   No.  He was with us at that point.  Oh, wait, when he did

11   the bake-off, yes, he was at the Associated Press and chose

12   that product as the IT director of the Associated Press.

13   **Q.**   Chose what product?

14   **A.**   IDOL.

15   **Q.**   And that was a product of what company?

16   **A.**   Autonomy.

17   **Q.**   As a result of that, did Mr. Hawk's familiarity with IDOL

18   or with Autonomy -- did that play into Capax trying to develop

19   business there?

20   **A.**   Yes, it did.

21   **Q.**   Can you describe that for us, please.

22   **A.**   Well, once Jerry came over, he also ultimately brought

23   like four or five other of the Associated Press people with

24   him, and they were all people that were working on the

25   implementation of the IDOL product so they were all essentially

1    experts at that point, so --

2    **Q.**    And they were working on implementing it with what entity

3    at that time?

4    **A.**    At the Associated Press and they were all full-time

5    employees at the Associated Press while they were doing that.

6    **Q.**    How did that turn into a potential for business at Capax?

7    **A.**    Well, because Jerry was so high on the product, I think he

8    went out and did speaking engagements on behalf of Autonomy.

9    He was an advocate for them, so . . .

10   **Q.**    At some point, did Autonomy -- did you develop a

11   relationship with Autonomy, let's say, similar to the one that

12   you had with Microsoft?

13   **A.**    Yes, we did.

14   **Q.**    Can you describe that -- around when that was?

15   **A.**    Yeah.  It was pretty early on.  The salesperson at -- that

16   had sold the deal at the Associated Press, T.J. Lepore, used to

17   ask Jerry to go with him on certain sales calls as a subject

18   matter expert to help him move deals forward, so they came to

19   us and they started giving us professionals services business

20   because they knew we had a team of people that had worked with

21   the product extensively.

22   **Q.**    And this was Mr. Hawk and the people he had brought from

23   the Associated Press?

24   **A.**    Correct.

25   **Q.**    Can you describe for us what in the initial stages -- what

1  Capax would do with Autonomy for Capax's business?

2  **A.**    Right.  So we would subcontract from Autonomy and they

3  would sell somebody their software and then they would

4  subcontract Capax to go in and do the implementation work or

5  upgrades, you know, any kind of professional services work.

6  **Q.**    For those of us not in the business, what is

7  implementation?  What are professional services?

8  **A.**    All right.  So professionals services are when you go out

9  and have people in the field that go to the client or install

10  the product or work on the product as a billable hour resource.

11  Or maybe under an SOW as an all-in project that has a delivery

12  at the end.

13  **Q.**    All right.  So if Autonomy sells a software to somebody,

14  how does Capax get involved?

15  **A.**    Their professional services team would come to us and ask

16  for manpower.

17  **Q.**    And Capax would do what?

18  **A.**    We would supply the manpower.

19  **Q.**    What about support?  Did Capax get involved in support?

20  **A.**    We did down the road, yes.

21  **Q.**    Can you describe what that means, what "support" means?

22  **A.**    Well, support maintenance is not when you go out and do

23  the implementation and the work in the field.  It's call-in.

24  So people buy software, they pay X amount per year for support

25  and maintenance which gives them all the ability to get all the

1   upgrades to the product for free and the ability to call in

2   when something is not working right.  They would call hotline

3   or the tech serve line and you would -- Capax would answer.

4   **Q.**    So when somebody had a problem with Autonomy and they

5   tried to call about it, who would they be calling often?

6   **A.**    Often Capax once we were subcontracted.

7   **Q.**    Were there particular software programs that Capax focused

8   on in its work for Autonomy?

9   **A.**    Yes.  It was EAS and NearPoint were the two that they

10  subbed the support to us on.

11  **Q.**    What was ESA?

12  **A.**    Enterprise Archive Solution.  It was an archive solution

13  for doing eDiscovery.

14  **Q.**    What was NearPoint?

15  **A.**    It was basically the same, just from a different vendor.

16  **Q.**    Okay.

17  **A.**    They were both done through acquisition.

18  **Q.**    Did Capax -- and let's say before 2009 -- did Capax have

19  involvement with Autonomy or get work from Autonomy outside of

20  EAS work and NearPoint work?

21  **A.**    Well, the IDOL work that we spoke about before.

22  **Q.**    And that was what type of services provided?

23  **A.**    Professional services for enterprise support.

24  **Q.**    During the course of all of this -- and I'm now still

25  before getting into 2009 -- was Capax doing any eDiscovery work

1  itself?

2  **A.**    No.

3  **Q.**    Was that something that you became interested in trying to

4  get into?

5  **A.**    Yes.

6  **Q.**    Can you describe for us sort of how that idea developed?

7  **A.**    Well, we brought on one of -- one of the guys that did one

8  of the first consulting engagements for us.  He was a

9  subcontractor to us out in an Autonomy project.  It was a

10  gentleman named Stephen Williams, and he was kind of a subject

11  matter expert, and I don't know if he was a lawyer, but he had

12  some kind of JD degree.  He was a technology guy, knew the

13  Autonomy product inside out.

14      We ended up hiring him full time, and it was really his

15  idea to -- that we could -- the space was hot and that we would

16  make a play to go to that next level.

17  **Q.**    And in terms of -- I mean, if EAS was already involved in

18  eDiscovery, how do you distinguish this new idea from what you

19  were already doing in supporting that software?

20  **A.**    Well, that we would be able to set up our own platform on

21  the software and do actual eDiscovery versus professional

22  services and support.

23  **Q.**    So instead of providing professional services and support

24  to other folks, you wanted to do the eDiscovery work yourself

25  at Capax?

1  **A.**   Correct.

2  **Q.**   What, if anything, did you do to try to launch that

3  concept?

4  **A.**   Well, we asked for, you know, a quote at one point, and we

5  got kind of in a pickle.  We got two quotes from two different

6  salespeople.  We had kind of misfired on our side and asked two

7  separate people, so we got two quotes.

8  **Q.**   Two quotes from who?

9  **A.**   One from T.J. Lepore and I believe the other one came from

10  a guy named Jeff Cornelius.

11  **Q.**   Who did they work for?

12  **A.**   They worked for Autonomy.

13  **Q.**   When you say you got two quotes, you got two different

14  quotes from two people at Autonomy?

15  **A.**   Yeah.  We got two people involved in the same thing, but

16  looking for the same quote to give us.  They actually gave us

17  two separate quotes, but there was two sales guy that thought

18  they were the sales guy on it.

19  **Q.**   I want to direct your attention to early 2009.  Is that

20  the time period in which you were asking for quotes from

21  Autonomy?

22  **A.**   Yeah.

23  **Q.**   Do you have any recollection about how much the quote was

24  that you received from Autonomy?

25  **A.**   Yeah.  My recollection is somewhere -- it was around four,

 1  four and a half million dollars.

 2  **Q.**   So just so that we understand, that four, four and a half

 3  million dollars, that would have been to purchase what?

 4  **A.**   That would have been to purchase the EDD suite so that we

 5  could set it up at our own data center and build a platform to

 6  be able to take in data and do discovery.

 7  **Q.**   So you wanted to purchase Autonomy's software and then

 8  develop your own capacity?

 9  **A.**   Yeah.  Put it -- correct.  And put it in our data center

10  and sell it as a service, as opposed to a non-planned sale.

11  **Q.**   At that point, when you got the quote of four, four and a

12  half million, what happened with that price tag?

13  **A.**   We just -- our partnership just wouldn't go for it on the

14  idea, so we opted not to move forward.

15  **Q.**   At that time, in early 2009, was that a lot of money to

16  Capax?

17  **A.**   Yes.

18  **Q.**   Following getting those quotes and figuring you couldn't

19  do it, did you receive a different -- were you approached about

20  a different way to possibly do it?

21  **A.**   I was.

22  **Q.**   Can you tell us around when that was?

23  **A.**   That was somewhere between early 2009 and mid 2009.

24  **Q.**   Let me, if I could -- and, Your Honor, I'll just go ahead

25  and work backwards from this.

BAIOCCO - DIRECT / FRENTZEN

1          Mr. Baiocco, this is Government's Exhibit 32.  Take a

2    quick look at that and see if you recognize what that is, sir.

3    **A.**    Yep.  This is the first license deal we signed.

4    **Q.**    And if you could -- well, if you could, turn to page 9.

5    Do you recognize the signatures on there?

6    **A.**    I do.

7    **Q.**    Whose signatures do you recognize?

8    **A.**    My own and Christopher Egan, Stouffer.

9    **Q.**    Is that an agreement you signed with Autonomy?

10   **A.**    It is.

11   **Q.**    Your Honor --

12         **THE COURT:**  Admitted.

13         (Trial Exhibit 32 received in evidence)

14   **BY MR. LEACH:**

15   **Q.**    If we could put up Government's Exhibit 32.  Take a quick

16   look at the first page.

17         All right.  What is this document?

18   **A.**    That's the License and Distribution Agreement.

19   **Q.**    Between who and who?

20   **A.**    Between Autonomy and Capax.

21   **Q.**    And if you could, could you just flip to page 9 of that

22   document.

23   **A.**    Is that the signature page?

24   **Q.**    Yeah.  Right.

25         And are those the signatures there?

1    **A.**    Yes.

2    **Q.**    And so what date was this document signed on?

3    **A.**    March 31st, 2009.

4    **Q.**    So moving backwards from that, do you have a sense of

5    around when you were approached to enter into this agreement?

6    **A.**    Four to six weeks, probably, prior to that.

7    **Q.**    As a result -- well, who approached you about this?

8    **A.**    Well T.J. called me and told me that Stouffer Egan wanted

9    to meet with me to talk about how to possibly get a deal done.

10   **Q.**    Did you have a meeting with Mr. Egan?

11   **A.**    I did.

12   **Q.**    Where did that take place?

13   **A.**    At the London Hotel in New York City.

14   **Q.**    What was the pitch during the course of that meeting?

15           **MR. KEKER:**    Objection, Your Honor.   Hearsay.

16           **THE COURT:**    Overruled.

17   **BY MR. FRENTZEN:**

18   **Q.**    What did Mr. Egan propose to you?

19   **A.**    He proposed that they would give us the software and --

20   well, give us the software for a price and that then they would

21   make sure on the back end that we got taken care of to pay it

22   until we were up and running and able to do the actual work

23   ourselves.

24   **Q.**    So what was the price that you were -- that Capax was

25   supposed to pay?

1   **A.**   Seven and a half million plus support and maintenance.

2   **Q.**   So it was more than the original quote?

3   **A.**   Yes.

4   **Q.**   All right.  And so in what way was it that Mr. Egan was

5   proposing that you could now do this deal for more money than

6   you were -- that you had already not been able to do?

7   **A.**   Well, he was proposing it because we weren't going to have

8   to write a check for it.  They were going to actually, you

9   know, give us the EDD sort of processing money to give us the

10  ability to make the payments to them for the software.

11  **Q.**   So was the proposed deal that Autonomy would give you the

12  money to pay to them for the licensing of the software?

13  **A.**   Yes.

14  **Q.**   What were you going to do with the software once you

15  received it at Capax?

16  **A.**   Well, we were going to set it up and build the business

17  that we wanted to build around it.

18  **Q.**   Was there an understanding of -- or was there an agreement

19  about if you were able to do the eDiscovery work, how that

20  would proceed in terms of the relationship between Capax and

21  Autonomy?

22  **A.**   Yeah.  Well, once we were going to be up and running, they

23  were going to feed us overflow and then there was like a

24  royalty on the back end that said after we hit a certain

25  threshold, that they would collect X amount of any eDiscovery

1    that we would do going forward for the term of that license.

2    **Q.**   Was part of this discussion or did part of this discussion

3    involve the potential that Capax would actually get EDD work

4    sent their way by Autonomy?

5    **A.**   Yes.  When we were ready.

6    **Q.**   And that was my question.  At this time in early 2009, was

7    Capax prepared to do any EDD work?

8    **A.**   No.  We couldn't have been until we had the software.  We

9    didn't even own the software prior to that, so, no.

10   **Q.**   And so this document, Government's 32, was this the

11   agreement by which the software would be transferred to Capax?

12   **A.**   Yes.

13   **Q.**   If we could go to page 11, please.

14   **A.**   Is that Exhibit B?

15   **Q.**   I'm sorry.  Page 32 of Exhibit -- I'm sorry.  Page 11 of

16   Exhibit 32.

17   **A.**   All right.  Sometimes the page numbers on the top aren't

18   matching the ones on the bottom.

19   **Q.**   I'm sorry.  I'm referencing at the bottom there --

20   **A.**   Okay.

21   **Q.**   -- it says "exhibit" and then there is a 32 and a number.

22   Does that make sense?

23   **A.**   Yep.

24   **Q.**   So page 11.  It's actually -- can we get the top part

25   here?  And if you could, Ms. Margen, can you highlight that

1    initial license fee.

2        So was this the proposed deal, Mr. Baiocco?

3    A.    Yes.

4    Q.    And, well, this is actually the agreed-upon deal as of

5    March of 2009; is that right?

6    A.    Correct.

7    Q.    Was there also embodied in here, in addition to the seven

8    and a half million, a royalty fee?

9    A.    I don't know what -- it wasn't embodied in there.  It was

10   going to be on the back end.  There is language to the royalty

11   fee that says above 25 million, right, that they would get 20

12   percent of the net revenues.

13   Q.    After the 25 million?

14   A.    After we had billed 25 million, correct.

15   Q.    Now, could we just scroll down to the chart about

16   two-thirds of the way down.

17       What was this part of Government's 32?

18   A.    That was the payment schedule for how we were -- and

19   timelines for which we were going to pay them the money.

20   Q.    So the timeline, was that delayed out to the point at

21   which you were going to be able to be performing EDD work as

22   you estimated it?

23   A.    No.  I mean, the payments started pretty much immediately.

24   Q.    When was the first payment going to be due on this?

25   A.    April 30th, 2009.

1  Q.   That schedule of payments, was that -- was that something

2  that Capax could have done at that time, March of 2009?

3  A.   No.

4  Q.   Meaning what?

5  A.   I mean, we probably couldn't have -- we couldn't have

6  afforded to make those quarterly payments of almost a million

7  dollars.

8  Q.   You could not have?

9  A.   Could not have.

10      I'm sorry.  Terrible sore throat.  I apologize.

11  Q.   What was it that gave you reassurances --

12          MR. KEKER:  Objection.  Leading, Your Honor.

13          THE COURT:  I'm sorry?

14          MR. KEKER:  Leading.

15          THE COURT:  That's all right.

16  BY MR. FRENTZEN:

17  Q.   What was it that gave you reassurances that you could

18  enter into this agreement even if you couldn't make that

19  payment schedule?

20  A.   I had a handshake agreement from Stouffer that they were

21  going to make sure that we got the money to us to be able to

22  make the payments to them.

23  Q.   To be clear, the money for these payments was going to

24  come from who?

25  A.   From Autonomy.

**BAIOCCO - DIRECT / FRENTZEN**

1  **Q.**   With that understanding, did you agree to this?

2  **A.**   Yes.

3  **Q.**   Now, immediately after this agreement, did Autonomy send

4  you any -- by "you," I'm sorry, I mean Capax.

5      Did Autonomy send Capax the software needed to begin to

6  establish the platform to do the EDD work?

7  **A.**   Some of it, yeah.

8  **Q.**   How long did it take before you started getting the

9  software?

10  **A.**   I'm not sure of the exact time frame.  It was a long

11  process to get everything we needed.  It was a grind to be able

12  to get all the pieces of the puzzle we needed to be able to

13  actually get it set up properly.

14  **Q.**   Could you give us some estimate of about how long it took

15  before Autonomy got you the software that you needed to be able

16  to start building the platform?

17  **A.**   I mean, I think we were still struggling with small stuff

18  a year out.  I mean, there is a lot of pieces to the software,

19  so . . .

20  **Q.**   Did Autonomy start sending you any EDD work to do

21  immediately after you entered into this agreement in March 31st

22  of 2009?

23  **A.**   No.

24  **Q.**   Between March 31st of 2009 and this first payment date of

25  April 30, 2009, what, if anything, did you do to try to get the

1  money to pay for the first payment?

2  **A.**    I would just call Stouffer on a regular basis.

3  **Q.**    When you would call Mr. Egan, what were you -- what was

4  your conversation with him?

5  **A.**    That he was working on it.

6  **Q.**    I'm sorry.  What would you ask him?

7  **A.**    I would say, "Hey, I'm getting calls from collections at

8  Autonomy that I owe the first payment.  Where's -- where is the

9  money coming from to make the payment?"

10  **Q.**    Did you eventually get an understanding of how Capax was

11  going to be able to make these payments?

12  **A.**    Yes.

13  **Q.**    How did you get that understanding?

14  **A.**    Well, they started sending purchase orders for the EDD

15  processing ones and then we would invoice and collect the money

16  and make the payment.

17  **Q.**    Can you explain to us how that worked?  Who sent purchase

18  orders?

19  **A.**    Autonomy would send a purchase order to Capax with, you

20  know, eDiscovery, some sort of ultimate dollar amount, and then

21  we would invoice directly off of that.

22  **Q.**    I would like to show you what's been marked as

23  Government's Exhibit 52.  Take a quick look at that and see if

24  you recognize what Government's exhibit 52 is.

25        Is Government's 52 -- is that an email that was sent to

1   you from Phil Smolek at Autonomy?

2   **A.**   It was.

3       **MR. FRENTZEN:**  Your Honor, I would offer Government's

4   52 into evidence.

5       **THE COURT:**  Admitted.

6   (Trial Exhibit 52 received in evidence)

7       **MR. FRENTZEN:**  Can we publish the first page.  And we

8   just blow up the top part.

9   **Q.**   Does that appear to be addressed to your email address?

10  **A.**   Yes.

11  **Q.**   I'm sorry.  One question that I should have asked you

12  about.

13      In order to enter into this deal between the time that it

14  was first proposed to you and the time that you signed the

15  agreement, the license agreement, what, if anything, did you do

16  in terms of your corporate structure at Capax?

17  **A.**   We created an entity called Capax Discovery.

18  **Q.**   Was that a separate entity from Capax Global?

19  **A.**   Yes, it was.  Separate and new.

20  **Q.**   Why did you do that?

21  **A.**   Because we wanted to put this particular arrangement in

22  there.

23  **Q.**   Why?

24  **A.**   Well, just in case they didn't follow through on their --

25  on their handshake promise that it wouldn't affect Capax

1    Global.

2    **Q.**    So the agreement was actually between Autonomy and Capax

3    Discovery?

4    **A.**    Correct.

5    **Q.**    Can you take a look at what was sent to you here on

6    April 22nd of 2009?

7        Can we go to the third page of this, please.

8    **A.**    Right.

9    **Q.**    Thank you.  Okay.

10        Mr. Baiocco, what is this page of Government's 52?

11    **A.**    This is a purchase order from Autonomy to Capax for

12    $250,000 for specialized EDD processing.

13    **Q.**    Can we -- Ms. Margen, can we blow up -- there you go.

14    Great.  Thanks.  Well, it's not a whole lot bigger.

15        Okay.  Mr. Baiocco, starting on the left-hand side here,

16    it says "outsourced services."  Did Capax get any services

17    outsourced from Autonomy or Zantaz or anybody related to

18    Autonomy related to this purchase order?

19    **A.**    No.

20    **Q.**    Was there any specialized EDD processing done by Capax for

21    Autonomy or for Zantaz?

22    **A.**    No.

23    **Q.**    And in terms of the ordered quantity over here on the

24    right-hand side, does that make any sense to you?

25    **A.**    No.

1   **Q.**   In terms of the unit cost, does that mean anything?

2   **A.**   I mean, it wasn't even relevant to me.  All that mattered

3   to me was extended cost.  That was -- that was how much I was

4   going to get to pay back.

5   **Q.**   That's the bottom line, the 250,000?

6   **A.**   All the way to the right and then again on the bottom,

7   yeah.

8   **Q.**   If we can just quickly blow up the bottom just to show --

9   this bottom right corner.  Thank you.

10      That's the number you were looking for?

11  **A.**   Yes.

12  **Q.**   Okay.  So this purchase order that was sent to you to

13  submit or to turn around into an invoice, was that -- was

14  that -- was any of that accurate?  Was any of that ordered from

15  Capax?

16  **A.**   No.

17  **Q.**   Could Capax have done that at that point if they wanted

18  to?

19  **A.**   No.

20  **Q.**   Why did you -- or did you eventually start turning around

21  these purchase orders into invoices?

22  **A.**   Yes.

23  **Q.**   Why?

24  **A.**   Well, that was how we were going to get our money on the

25  back side to pay for the -- for the seven and a half million

1   dollar software deal.

2   **Q.**   All right.  At that -- did you eventually start to receive

3   purchase orders and turn them around into invoices?

4   **A.**   Yes.

5   **Q.**   I want to show you Government's Exhibit 2559.  Take a

6   quick look through this.  I know there's a lot of pages there.

7          Is 2559, Government's Exhibit 2559, something you've seen

8   before?

9   **A.**   Yes.

10  **Q.**   Did you review it before we came here today?

11  **A.**   I did.

12  **Q.**   And did you satisfy yourself that the -- that the

13  documents in there are purchase orders and corresponding

14  invoices?

15  **A.**   Yes.  Correct.

16  **Q.**   The purchase orders are from who to who?

17  **A.**   From Autonomy to Capax.

18  **Q.**   And the invoices are from who to who?

19  **A.**   Capax to Autonomy.

20          **MR. FRENTZEN:**  Your Honor, I would offer Government's

21  2559 into evidence.

22          **THE COURT:**  Admitted.

23          (Trial Exhibit 2559 received in evidence)

24  **BY MR. FRENTZEN:**

25  **Q.**   Could we just publish a couple of pages, please, just to

1    see how this works.

2         One second, Your Honor.

3         If you will actually take a look at page 2 first.

4    **A.**   Is that the second side of the first one?

5    **Q.**   For you, yes.  Or you can look at the screen.  All right.

6         And is this similar to what we just went through, a

7    purchase order?

8    **A.**   Yes.

9    **Q.**   And this is for a total of $250,000 for EDD processing

10   that you were not going to do?

11   **A.**   Yes.

12   **Q.**   Can we then take a look at page 1.

13   **A.**   Yes.

14   **Q.**   And is page 1, Mr. Baiocco -- this is an invoice?

15   **A.**   It is.

16   **Q.**   From who to who?

17   **A.**   From Capax to Autonomy or Zantaz.

18        **MR. FRENTZEN:**  Ms. Margen, could we just blow up this

19   middle portion here.

20        **THE WITNESS:**  I'm going to grab a water here.  Sorry.

21   **BY MR. FRENTZEN:**

22   **Q.**   Do you need some water?

23   **A.**   I got it, I got it.

24   **Q.**   In terms of your invoices from Capax to -- back to

25   Autonomy, what did you use to list information on the invoices

1  of what you were invoicing for?

2  **A.**    I'm sorry.  What?

3  **Q.**    That's a bad question.

4  **A.**    All right.

5  **Q.**    Where did you get the information from to invoice Autonomy

6  for what's listed here?

7  **A.**    From the purchase order they would send to us.

8  **Q.**    So with respect to each of these, was there a purchase

9  order from Autonomy prior to you, to Capax, issuing an invoice

10  for those -- for that EDD work?

11  **A.**    Yes.

12  **Q.**    Was any of that EDD work being done?

13  **A.**    No.

14  **Q.**    Were you capable of doing it?

15  **A.**    No.

16  **Q.**    Just to move ahead for a minute and then come back, during

17  the course of developing an EDD platform, was that something

18  that you were interested in doing to do legitimate eDiscovery

19  work?

20  **A.**    Yes.  A hundred percent.

21  **Q.**    Eventually, was Capax able to put together a platform to

22  be able to do eDiscovery work?

23  **A.**    Yes.

24  **Q.**    Can you give us a sense of the time at which you were --

25  if you can recall, that you were capable, that Capax was

1  capable of doing eDiscovery work?

2  **A.**   We had our first customer, Global Colleague, I think

3  around December of 2010, I think.

4  **Q.**   Do you recall whether it was -- let me ask you this.

5       Do you recall when Autonomy was acquired by

6  Hewlett-Packard?

7  **A.**   Yeah.  Well, August of 2011.

8  **Q.**   Does that help you to figure out when you got your first

9  EDD customer that you provided discovery services for at Capax?

10  **A.**   I mean, I don't remember specifically.  I think it was

11  around December of 2010.  Right?  It was Global Colleague,

12  so --

13  **Q.**   Okay.

14  **A.**   -- there's invoices.

15  **Q.**   That's your recollection?

16  **A.**   That's my recollection.

17  **Q.**   Let me ask you this:  At any time before Autonomy was

18  acquired by Hewlett-Packard, did you do any eDiscovery work for

19  Autonomy?

20  **A.**   No.

21  **Q.**   Did Autonomy ever send you any customers so you could do

22  EDD work for them?

23  **A.**   No.

24  **Q.**   Did they ever outsource any EDD work to Capax before they

25  were acquired?

BAIOCCO - DIRECT / FRENTZEN

1    **A.**    No.

2    **Q.**    And just to zoom out a little more, are you currently in

3    the eDiscovery business at Capax?

4    **A.**    Yes.

5    **Q.**    Briefly, could you describe kind of how that played out.

6    **A.**    Well, after HP acquisition, they put an end to life to EAS

7    which was a component of the eDiscovery platform, and we went

8    in and made a deal with HP to actually take ownership of the

9    software.  So I say ownership.  It was a license deal, but it

10   was like a 99-year lease.  So it gave us the source code and

11   the ability to enhance and update and upgrade and keep it

12   alive, where they were going to sunset it.

13   **Q.**    Was this well after the HP acquisition of Autonomy?

14   **A.**    2014.

15   **Q.**    Has that been a profitable business for Capax?

16   **A.**    Yes.

17   **Q.**    But at least during the time period between March of 2009

18   when you signed this agreement with Autonomy and the time at

19   which HP acquired Autonomy, did Autonomy ever send you any EDD

20   business?

21   **A.**    No.

22   **Q.**    Were any of those purchase orders in the entirety of 25 --

23   Government's Exhibit 2559, were any of those for actual EDD

24   work to be performed?

25   **A.**    No.

BAIOCCO - DIRECT / FRENTZEN

1    Q.    Were any of your invoices for EDD work that was actually

2    performed?

3    A.    No.

4    Q.    In that particular --

5    A.    Correct.  No.

6    Q.    Was it -- was it a business that you wanted to do?

7    A.    Yes.

8    Q.    What prevented you from doing it?

9    A.    Nothing other than how long it took to get the software

10   stood up.

11   Q.    Shortly after the deal that we've talked about,

12   Government's Exhibit 32, was there a further discussion with

13   Autonomy about Autonomy assisting Capax with hardware, getting

14   hardware to do the EDD work?

15   A.    Yes.

16   Q.    Could you describe that for us, please.

17   A.    I think a couple of the first POs they sent us were given

18   to us to procure hardware which we would have needed to load

19   the software into in our data center.

20   Q.    I'd like to show you what's been marked as Government's

21   Exhibit 70.  Take a quick look at this, please, sir.

22         Do you recognize what Government's 70 is?  Do you

23   recognize what that is?

24   A.    Yeah.  It's a list of hardware that I guess we would have

25   needed to build our platform on.

1            MR. FRENTZEN:  I would offer Government's 70 into

2   evidence, Your Honor.

3            THE COURT:  Admitted.

4       (Trial Exhibit 70 received in evidence)

5            MR. FRENTZEN:  Can we take a quick look at

6   government's 70?  And if we could just blow up the body here of

7   "hardware summary" down to the number there.

8   Q.   What is this list here, Mr. Baiocco?

9   A.   It's a list of hardware and stuff that we would need to

10  build our platform.

11  Q.   Where did the money come from for the hardware for the

12  platform?

13  A.   From Autonomy.

14  Q.   Was this separate and apart from -- in other words, did

15  Capax buy this hardware to set up?

16  A.   I don't know if we bought all of that.  We bought hardware

17  to set up, yes.

18  Q.   So this was part of your efforts to actually develop the

19  eDiscovery business?

20  A.   Right.

21  Q.   And at some point following the initial agreement and the

22  submission of purchase orders and invoices, were you approached

23  to do a second deal or agreement with Autonomy related to EDD

24  services?

25  A.   Yes.

**BAIOCCO - DIRECT / FRENTZEN**

1  **Q.**  Do you recall around when that happened?

2  **A.**  Can you tell me when we signed it?

3  **Q.**  One second.  Actually, I'll come back to that.

4  At some point prior to that, were you approached about

5  becoming a reseller for Autonomy?

6  **A.**  Yes.

7  **Q.**  Who approached you about becoming a reseller for Autonomy?

8  **A.**  Stouffer Egan.

9  **Q.**  Do you recall -- do you have any recollection about the

10  first time that that conversation took place?

11  **A.**  Yeah.  I think it was around June or May of 2010.  It was

12  related to a deal around a company called TXU.

13  **Q.**  We'll get into the TXU deal in a second.

14  What was the proposal made to you about becoming a

15  reseller?

16  **A.**  That we would have the ability generally to sell Autonomy

17  software at a profit.

18  **Q.**  What does that mean, generally speaking, being a reseller?

19  **A.**  Well, I mean, the general VAR agreement gives you overall

20  rights to sell the software, right?  That's not specific to

21  like the TXU deals or the other deals that we're referring to.

22  **Q.**  Are you talking about sort of a general reseller deal?

23  **A.**  Yes.

24  **Q.**  Has Capax worked as a reseller?

25  **A.**  Yes.

**BAIOCCO - DIRECT / FRENTZEN**

1  **Q.**  With what kind of entities?

2  **A.**  Well, I mean, with Autonomy.  Right?

3  **Q.**  With any other entities?

4  **A.**  No.

5  **Q.**  Was the proposal to become a reseller for Autonomy -- was

6  it what you would describe as a general reseller agreement?

7  **A.**  Well, there was a general reseller agreement.  It wasn't

8  necessarily a general reseller relationship.

9  **Q.**  Can you describe that for us?  How was it proposed to you?

10  **A.**  We had the ability to sell it, but they would come to us

11  with the deals and ask us if we would take them under our VAR.

12  **Q.**  What does that mean?

13  **A.**  That we would sign the deal for the customer and then

14  hopefully they would close it within like a short time frame

15  and then pay it off.

16  **Q.**  At what -- at what intervals would this come?  What time

17  periods?

18  **A.**  Pretty much right near the end of every quarter.

19  **Q.**  What was proposed to you about the end of quarters?

20         **MR. KEKER:**  No, foundation Your Honor.  We would like

21  to know who proposed it.

22         **THE COURT:**  Sustained.

23  BY MR. FRENTZEN:

24  **Q.**  Who proposed this reseller agreement to you?

25  **A.**  Stouffer.

1  **Q.**  What did Mr. Egan propose to you in relation to the end of

2  quarters?

3  **A.**  His deal was it's 99 percent closed.  We don't want to

4  lower our price at the end of the quarter.  Will you take it

5  and hold it and when we close it, we'll get you paid and you'll

6  get a ten percent fee.

7  **Q.**  For those of us not in the software business or support

8  business or anything like that, what does that mean?  What was

9  expressed to you about how this relationship would work?

10 **A.**  Well, it would be they would come to us and say okay --

11        **MR. KEKER:**  Excuse me.  Same objection.

12 **BY MR. FRENTZEN:**

13 **Q.**  Who is "they"?

14        **MR. KEKER:**  Foundation.  If he is going to talk about

15 what some person said, we would like to know who said it.

16        **MR. FRENTZEN:**  I thought we were in the conversation

17 with Mr. Egan.

18        **THE WITNESS:**  Just to be clear, Mr. Egan.

19 **BY MR. FRENTZEN:**

20 **Q.**  He said what was proposed was they would come to them.

21        Who was the "they" in that context?

22 **A.**  Autonomy.

23 **Q.**  What would happen?

24 **A.**  They would say this is a very close to closing deal.

25 Would you buy it as the VAR and we are going to continue to

**BAIOCCO - DIRECT / FRENTZEN**

1  work the deal to get it closed.  We should be, you know, any

2  day.

3  **Q.**   All right.  Let's move into the more concrete.  Did these

4  eventually happen?

5  **A.**   Yes.

6  **Q.**   Did you agree to do this?

7  **A.**   Yes.

8  **Q.**   Can you describe for us, as you would get close to the end

9  of a quarter, what was the proposal here?

10 **A.**   The proposal was if you sign here at the end of the

11 quarter, we'll get it closed and you'll get a ten percent

12 profit.

13 **Q.**   By "you," are you talking about Capax Discovery?

14 **A.**   I'm sorry.  Yes.  Capax would get a ten percent profit.

15 **Q.**   So Capax would buy what?

16 **A.**   They would buy the ultimate software that was going to the

17 end customer.

18 **Q.**   And so the situation was Autonomy was in the course of

19 selling software to somebody else?

20 **A.**   Yes.

21 **Q.**   Why is the end of the quarter important?

22 **A.**   Well, it was proposed to us at -- it was important because

23 most deals get done at the end of the quarter and you have to

24 lower your price, and by us taking it, it would allow them to

25 negotiate better to keep their price up.

**BAIOCCO - DIRECT / FRENTZEN**

1   **Q.**   When you say "take it," does that mean that Capax would

2   buy the software from Autonomy?

3   **A.**   Yes.

4   **Q.**   Why do you make that face?

5   **A.**   Well, because we would sign for it.  Right?  We didn't pay

6   for it up front.

7   **Q.**   I gotcha.

8       So you would sign that you were purchasing the software.

9   Would you actually purchase the software?  Would you receive

10  the software?

11  **A.**   Maybe once in a while we would get a download, but, no, we

12  weren't doing anything with it.

13  **Q.**   And in terms of their being another buyer, was that what

14  was close to closing?

15  **A.**   Correct.

16  **Q.**   If you, Capax, bought it for another buyer, would you then

17  go out and actually resell to that buyer?

18  **A.**   No.

19  **Q.**   As it was described to you by Mr. Egan, who would do that

20  part?

21  **A.**   Autonomy would still continue to maintain the selling to

22  the end customer.

23  **Q.**   Would you have any contact with the end user in the course

24  of selling it, the software, to the end user?

25  **A.**   Prior to closing it, no.

1  Q.   And so -- all right.  Let's try to get into the concrete

2  and see if we can go through this here.

3       I'll give you Government's 100.  Take a look at

4  Government's 100 and see if you recognize what that is.

5  A.   Yeah.  This was the reseller agreement.

6            THE COURT:  Admitted.

7            MR. FRENTZEN:  Thank you, Your Honor.

8       (Trial Exhibit 100 received in evidence)

9  BY MR. FRENTZEN:

10 Q.   This is a reseller agreement with what end user?

11 A.   This is just -- I believe this is just the general

12 reseller agreement that lays out how it works, what products we

13 were allowed to sell.

14 Q.   Hang on a second, Mr. Baiocco.  Let's go, so we know which

15 one it is first -- let's go to page 13.

16 A.   I'm sorry.  All right.

17           MR. KEKER:  Fifteen?

18           MR. FRENTZEN:  Thirteen.

19      And if you could blow up the end user here about halfway

20 down.  There you go.

21 Q.   Do you see that, Mr. Baiocco?

22 A.   Yes.  TXU Energy.

23 Q.   Who was TXU Energy?

24 A.   An energy company somewhere in Texas.

25 Q.   And as -- could we blow up the date at the top there,

1    please.

2        So when was this agreement made?

3    **A.**    June 30th, 2009.

4    **Q.**    All right.  So can you describe for us in this deal, what

5    was Capax agreeing to do under this deal in terms of Autonomy?

6    **A.**    We were agreeing to sign on June 30th that we were

7    responsible for this -- the purchase of the TXU software prior

8    to it being closed with TXU.

9    **Q.**    If you were actually reselling, what would you, as Capax,

10    have done after signing onto this agreement?

11    **A.**    Well, I mean, under a normal resell, normal, you wouldn't

12    have something signed from the customer and then negotiate the

13    price with the vendor on the back side.

14    **Q.**    Would you have been negotiating with TXU Energy?

15    **A.**    Correct.  Yes.

16    **Q.**    In order to resell Autonomy software that you had

17    purchased to TXU?

18    **A.**    Yes.

19    **Q.**    Did Capax do that after signing this agreement?

20    **A.**    No.

21    **Q.**    Why not?

22    **A.**    Autonomy maintained control.  We weren't allowed to get

23    involved.

24    **Q.**    So who was actually selling the software that you had

25    bought to TXU?

 1    **A.**    Autonomy.

 2            **MR. FRENTZEN:**  Your Honor --

 3            **THE COURT:**  Okay.  Ladies and Gentlemen, let's take

 4    our recess for the evening.  Remember the admonition given to

 5    you.  Don't discuss the case, allow anyone to discuss it with

 6    you, form or express any opinion, and we will start at 9:00

 7    Wednesday, tomorrow.  Thank you.

 8        (Proceedings were heard out of presence of the jury:)

 9            **THE COURT:**  You may step down.

10    Let the record reflect the jury has retired.  The parties

11    are present.

12            **THE CLERK:**  You may be seated.

13            **THE COURT:**  So I thought we would have some discussion

14    on the documents to which HP claims are not producible to the

15    defense.

16    Will you identify yourselves for the record?

17            **MR. LI-MING WONG:**  Good afternoon, Your Honor.

18    Michael Li-Ming Wong and Susan Resley for HP.

19            **MR. MARAIS:**  Nic Marais for the defendant.

20            **THE COURT:**  What I understand is that there are

21    several categories of witness interview statements, and when I

22    say "statements," what I'm actually talking about are memoranda

23    prepared by attorneys of interviews that they conducted with a

24    potential witness.

25        So that's -- and I think "statement" does have a term of

1    art and we have to be careful when we use it, but these are

2    essentially, as I again look at it, attorney notes because they

3    are not -- they don't purport to be verbatim representations of

4    what a witness said, but they appear to be a -- an attorney's

5    summary of at least some points that were covered in the course

6    of the interview.  So that's the type of document that we're

7    talking about.

8        And we're talking about categories of documents; that is,

9    that -- or series of productions or however one wants to

10   characterize it.  There were interviews of Hewlett-Packard

11   employees in late 2013 that were conducted by outside counsel,

12   Morgan Lewis and Proskauer Rose.

13       As I understand it, those interviews were turned over to

14   the Government but that they contained redactions in those

15   interviews as being -- as portions of which being either

16   privileged -- I guess "privileged" is the word.  Either

17   attorney-client privilege or work product privilege.  I'm not

18   sure attorney-client privilege.  And they're not at issue here.

19           **MR. LI-MING WONG:**  Correct, Your Honor.

20           **MS. RESLEY:**  That is correct.

21           **THE COURT:**  And then there is a second set of

22   interview notes and these are interviews of former Autonomy

23   personnel, that is, former Autonomy employees who became

24   Hewlett-Packard employees after the acquisition.

25       These notes were prepared by internal Hewlett-Packard

 1   counsel in mid 2012.  These notes were subject to a Rule 17

 2   subpoena and they were furnished to the Court in an unredacted

 3   fashion for the Court to examine and they are the ones that are

 4   subject to this discussion.

 5        **MR. LI-MING WONG:**  Correct, Your Honor.

 6        **THE COURT:**  As to those notes, they were subpoenaed by

 7   the defense with the argument that they were going to be used

 8   by impeachment or they were for purposes of impeachment, for

 9   which Hewlett-Packard responded that it is inappropriate to

10   require the production of impeachment materials pursuant to a

11   Rule 17 subpoena.

12        **MR. LI-MING WONG:**  Exactly, Your Honor.  And pursuant

13   to *Nixon* with which the Court is very familiar.

14        **THE COURT:**  Some time ago.

15        As to that argument, I don't think I need to get into that

16   argument today because they're not being sought pretrial.

17   They're now being -- if produced, they are being produced

18   because the case is in trial now and a witness has either

19   testified or will testify and it's now not discovery or

20   pretrial discovery.  It's sort of a discovery, but it's a -- in

21   a different posture because the case is presently ongoing.  So

22   I'm just trying to set --

23        **MR. LI-MING WONG:**  Yes, Your Honor.  As the Court, I

24   think, observed this morning, another difference -- and with

25   respect to the different categories, it's also important to

 1   note the purpose of the interviews.

 2        So the Court correctly noted that there were interviews of

 3   HP employees conducted or former employees conducted in late

 4   2013 by outside counsel.  Morgan Lewis conducted the interviews

 5   for the purpose of the Government investigation.  And Proskauer

 6   represented the Demand Review Committee.

 7        So these were the purposes of the interviews and they were

 8   all turned over to the Government at the Government's request.

 9   And the Government specifically stated that it wanted only

10   factual information, not privileged information, and as the

11   Court correctly observed during today's proceedings, very

12   frequently, victims will comply with reasonable Government

13   requests.  That's exactly what HP did.

14        Now, with respect to the 2012 memos, these have never been

15   given to the Government.  They have never been given over to

16   any governmental entity.  And so the sorts of doctrines that

17   would apply to testifying witnesses during trial, like the

18   Jencks Act, we would suggest would not apply in the

19   circumstance when even the Government does not have these

20   materials.

21        THE COURT:  Okay.  So if we look at -- if we look at

22   the rules --

23        MS. RESLEY:  Your Honor, if I could add one additional

24   point.

25        THE COURT:  Of course.  Go right ahead.

1      **MS. RESLEY:**  It relates specifically to the document

2  which was at issue, and at the bottom, it had "attorney

3  thoughts and impressions."  So, you know, there were -- the

4  bottom of the -- at the very end of the May 29, 2012 memo that

5  was summarizing communications, and so the privilege issue is

6  obviously where we're most concerned.

7      **THE COURT:**  Well, okay.  But before -- rather than it

8  being characterized and my accepting a characterization of it,

9  I have to see in what category it would fit in terms of

10  production; that is to say, as I understand HP's position,

11  they're not Jencks Act materials.  They don't come within 26.2,

12  Rule 26.2 or -- 26.2 or the Jencks Act.  They're simply not --

13  they were never in the Government's possession.

14      **MR. LI-MING WONG:**  Exactly.

15      **THE COURT:**  Okay.  And so they don't fall within that.

16  That appears to be correct.

17      I'm going to go to the next thing about Rule 17, but do

18  you take issue with that?  They were --

19      **MR. MARAIS:**  No, Your Honor.  No one has ever

20  suggested that HP's obligation to turn these documents over to

21  the Court flowed from the Jencks Act.  We litigated this back

22  in the middle of last year, and the issue was whether the

23  documents were admissible, and as Your Honor has noted in this

24  case, as in *Reyes*, the position that you took was that they

25  would probably become admissible once the witnesses took the

1    stand, and so the intermediate measure, the solution was for HP

2    to lodge all of those documents with the Court until the

3    witnesses took the stand, which is where we are now.

4        **THE COURT:** And I would subscribe to most of what you

5    said, and the reason I would qualify it is I don't know whether

6    it's admissible. I mean, all I'm saying is it's not ripe for

7    determination under pretrial for the reasons that I stated. I

8    don't think you -- you may have quarreled at the time and I'm

9    not faulting that, but we're now in a different procedural

10    posture.

11        But I think we are in agreement that it's not Jencks Act

12    or 26.2 information.

13        So then the question becomes is it nevertheless

14    discoverable or producible -- I don't know that "discoverable"

15    is the right word -- producible under Rule 17 because now you

16    want this material as impeachment material, potentially

17    impeachment material, and that becomes the issue, to which

18    Hewlett-Packard says, "Wait a minute, okay, that's what you

19    want, but you can't get it and the reason you can't get it is

20    because it's privileged." That's the argument.

21        **MR. LI-MING WONG:** Right, Your Honor.

22        I would also point out that the question is whether it's

23    discoverable in the first place, and the Court will recall that

24    Rule 17 is a rule about discoverability, not admissibility, and

25    we would contend that impeachment and admissibility are

1  different things and that *Nixon* does clearly say that

2  impeachment is not a proper purpose --

3          **THE COURT:**  Yeah.  But haven't -- what I'm trying --

4  what I'm trying to address here is while that's a good

5  argument, you know, congratulations.  That was yesterday's

6  argument.  You won it in some form or another.  But now it's

7  today's argument.

8       Today's argument is we're in trial.  And the Court -- the

9  argument is the Court may have possession of materials that's

10  impeaching.  I'm not doing a qualitative analysis.  And does

11  the Court then have an obligation to turn that material over to

12  the defense, to which Hewlett-Packard responds no, you don't

13  because it's protected.  And it's protected under attorney -- I

14  don't know whether -- they are separate privileges:  Work

15  product privilege, attorney-client privilege.

16          **MR. LI-MING WONG:**  Yes.

17          **THE COURT:**  And that's what I want to have the

18  discussion about, because as I again go back to where I think

19  we are, the argument that the defense raises is that the

20  privilege, the work product privilege, has been waived.

21          **MR. MARAIS:**  Your Honor, even before that argument, I

22  think I would challenge the assertion of private at the outset.

23       Ms. Resley and Mr. Wong have just pointed out that the

24  summaries that they turned over to the Government, 200 witness

25  summaries that they turned over to the Government, were not

1    privileged.  In their view, those summaries contained only

2    factual statements about the case.

3         Now, I've looked at those summaries.  I've looked at the

4    summary that Your Honor gave to us yesterday.  There is no

5    difference qualitatively between the factual summaries that

6    counsel here have just said were not privileged and the kinds

7    of factual information bulleted in the summary of Mike

8    Sullivan's interview that you turned over to us last night.

9         I take Ms. Resley's point that there is a line at the very

10   end of that memorandum which says nothing about what

11   Mr. Sullivan did or didn't tell HP that is an opinion of

12   counsel as to his credibility, and that line may be privileged,

13   but what we're interested in is the bulk of the memorandum

14   here, these bulleted points which are just factual

15   observations.

16        **THE COURT:**  Again, let me just say it so we don't beat

17   it to death.  I don't care what you said in your document, that

18   it's privileged, not privileged.  Lawyers do that.  That's like

19   the standard of care.  You know, I mean, they do it with

20   everything.  Everything.  Secret, sealed, confidential, highly

21   protected.  I mean, those things are just lawyers saying

22   things.  I don't want to demean lawyers.  I used to be one.

23        But that's -- you do that.  That doesn't make it

24   necessarily privileged.

25        So I think really what you have to address is why is that

1   protected by the attorney-client or the work product privilege?

2        MS. RESLEY:  So, Your Honor, the materials that we

3   lodged with the Court were summaries that were prepared in

4   anticipation of litigation.  That was a very different purpose

5   than the witness summaries that were prepared by Morgan Lewis,

6   and in the case of Proskauer, where some of the --

7        THE COURT:  I'm trying to find the thing that I --

8   that I produced.  Sorry.  I just don't seem to have it in front

9   of me right now.

10       Go ahead.

11       MS. RESLEY:  So there is -- there has been no waiver.

12       Now, what we lodged with the Court, the summaries that

13  were prepared not only by HP in-house counsel but also other

14  outside counsel, were prepared solely in connection with

15  various litigations that HP was involved with relating to

16  Autonomy.

17       So with the HP in-house counsel summaries, for example,

18  those were prepared following -- in the course of interviews

19  with personnel as HP was assessing whether or not to bring an

20  action against current, former Autonomy personnel, including

21  Mr. Hussain at that point in time.

22       That was a very different purpose than the Morgan Lewis

23  summaries that were prepared, the factual summaries that were

24  prepared and produced, as well as the Proskauer summaries that

25  were prepared and produced.

1    And so as a result, we have argued and we've made the

2    argument both in our Rule 17 motion to quash and then in the

3    accompanying submissions that what we were submitting was

4    privileged and there has not been any selective waiver at all.

5        **THE COURT:**  But you have turned over interview

6    summaries done by the Morgan Lewis and Proskauer firms.  You

7    have turned them over to the Government.

8        **MS. RESLEY:**  Yes.  In a redacted form.  They are

9    witness summaries.  They do not contain any --

10        **THE COURT:**  Their point is, as I understand it,

11    actually, the, quote, redaction wasn't -- doesn't make sense or

12    is inconsistent.  That you take the document unredacted, you

13    compare it to the redacted document, and you see in the

14    redacted document things that one would have thought should

15    have been included in the unredacted document; that is to say,

16    save and except for I think this guy's telling the truth, that

17    sort of thing, which no one is arguing.  They're not arguing

18    that that's something that either they should have or that

19    they're going to use.  But I didn't -- I wasn't careful what I

20    turned over, perhaps.

21        But they're saying there is a whole other category of

22    information out there that really there is no distinction in

23    kind between that which was disclosed and that which was not,

24    to which their point is therefore, without casting any

25    aspersions, there was some either cherrypicking or selectivity

1    in what was disclosed that legally would constitute a waiver;

2    that is to say, that if you gave information A, bullet point A

3    about the witness interview, the fact that you concealed or

4    didn't disclose point B doesn't fit in terms of a waiver.  You

5    can't -- we all agree you can't just waive the first part of

6    the sentence and the second sentence makes sense in terms of

7    understanding what was going on.  You can't do that unless the

8    second sentence has like an impression.  "I think he's telling

9    the truth," "I don't think he's telling the truth."  But

10   they're not asking for that.

11       So that's where you are sort of losing me in your

12   argument.

13       MR. LI-MING WONG:  Well, Your Honor, our position --

14   first of all, HP has not waived anything, and every

15   communication with the Government, the Government has been very

16   clear about saying "we are not seeking privileged information,"

17   and what we have provided them is not -- is not privileged.

18       And that's very different from -- from a -- even a

19   witness -- a witness memo or an interview in anticipation of

20   litigation where the purpose is to prepare for potential

21   litigation.  Even the questions, observations, that reveals

22   something about litigation strategy, and that's why I pointed

23   out the difference between the purposes of the different sets

24   of interviews.

25       The --

1          THE COURT:  Wasn't a set of interviews occurring even

2   before the writedown of the Autonomy --

3          MR. MARAIS:  No, Your Honor.

4          THE COURT:  So the first set of interviews is an

5   internal investigation?

6          MS. RESLEY:  Yes.

7          MR. MARAIS:  That's right.

8          MS. RESLEY:  In May when HP first learned of the

9   fraud, that's correct.

10          MR. LI-MING WONG:  That's right.  All done in a

11   one-month period.

12          THE COURT:  When they learned -- what everyone wants

13   to characterize it.  That's when the first internal

14   investigation started.

15      Now, is it your position that well, it started an internal

16   investigation.  That's in contemplation of litigation, and

17   therefore it's work product.

18          MR. LI-MING WONG:  Well, absolutely, absolutely.  It's

19   for a different purpose.  It's in anticipation of litigation.

20          THE COURT:  Is it?

21          MR. LI-MING WONG:  That's classic work product.  And

22   in that sense, the questions and answers reveal something about

23   an attorney's mental processes.  It's not just well, I think

24   he's credible or in-house counsel -- you know inside counsel,

25   outside --

PROCEEDINGS

1          THE COURT:  However, your view is that every internal

2    investigation -- because any internal investigation could lead

3    to some type of litigation.  But any internal investigation

4    before there's -- before there's a firm view as to what

5    happened is protected because it's in contemplation of --

6          MR. LI-MING WONG:  Yes.  Until and unless the point of

7    a waiver, and that's the *Reyes* case that was before this Court.

8    In that case, same thing, except the attorneys turned over the

9    or gave the Government downloads of the content of the internal

10   investigation --

11         THE COURT:  But you gave a partial download.

12         MR. LI-MING WONG:  Correct.

13         THE COURT:  That's the question, whether the partial

14   download -- whether you should have downloaded the whole thing.

15         MR. LI-MING WONG:  Exactly.

16         THE COURT:  And "simply excluded from the memo, I

17   think the guy's telling the truth," that sort of thing.

18         MR. LI-MING WONG:  And our contention is it's a very

19   different situation here.  There has been no partial waiver.

20   There has not even been a foot in the door.  We have not waived

21   anything.  The Government has not asked us to waive anything,

22   and producing memos by law firms for two different law firms

23   for two different purposes don't open the door to producing

24   in-house counsel's work product.

25         THE COURT:  You know, that's sort of an interesting

1  thing.  You have two different law firms conducting a set of

2  interviews at the same time?

3       MS. RESLEY:  No.  There was some overlap.  Morgan

4  Lewis began the process of conducting its internal -- you know,

5  being brought in to look at the issues in more the second half

6  of 2012, and then Proskauer was engaged by the Demand Review

7  Committee in 2013.

8       THE COURT:  Go ahead.

9       MR. MARAIS:  Your Honor, there are, in fact, more than

10  just the two law firms, which was the point of the second

11  subpoena.

12      But it seems to me that you can't hide from selective

13  waiver by employing half a dozen law firms and then deciding

14  that two of them don't matter that much and you're willing to

15  turn over there hundreds of memoranda but you're going to

16  withhold the others.  I mean, every point that Mr. Wong makes

17  about the questions that the attorneys chose to ask, the

18  answers that they chose to write down, that's equally true of

19  Morgan Lewis and Proskauer as it is of in-house lawyers or any

20  of the other firms that were contracted by HP.

21      MS. RESLEY:  No.  The difference is that with Morgan

22  Lewis and Proskauer, there were discussions with the Government

23  discussing what some of the witnesses said.

24      THE COURT:  So what?

25      MS. RESLEY:  So --

1          **THE COURT:**  Why isn't that a waiver?

2          **MS. RESLEY:**  That wasn't a waiver.  It was a factual

3     situation of what happened and what a person said.  And so

4     those were produced.  The factual summaries were therefore

5     produced.

6          **THE COURT:**  But that's not my question.  My question

7     is you produced half the interview.  Why isn't that a waiver?

8     Regardless of what was said, the half you produced -- I mean,

9     if you took the other half and it was just impressions, I got

10    that.  Or maybe -- I'll give you even this.  Lawyer A turns --

11    says, "I now think that we have -- that we should do X.  We

12    should do Y.  We should bring a lawsuit.  We should construct

13    this.  We should do that."  I got all that.  I understand all

14    that.  But that's not what they're talking about.

15         They're talking about the other half of the conversation,

16    and I'm -- I'm being overly -- perhaps overly inclusive, but

17    I'm just trying to figure out if, for example, in the

18    interview, witness says, "A didn't happen."  Okay.  "A didn't

19    happen."  Or "A happened."  And then the second statement is,

20    "I'm not sure if A happened.  I was under the impression that

21    it did, but I can't tell you what that's based on."

22         So you turn over the first part.  Wouldn't you have to

23    turn over the second part?  Isn't that -- is that correct?  Am

24    I wrong there, right there?  What do you think about that.

25         **MR. MARAIS:**  I think that's right, Your Honor.

1            **THE COURT:**  I know you agree.  Of course you agree.

2            **MR. LI-MING WONG:**  Well, so --

3            **THE COURT:**  I'm just trying to figure out -- I'm

4    trying to identify exactly -- I think it's very important here

5    to be as clear, if I'm ever clear -- but as clear as possible

6    in terms of what everybody is saying.  What everybody is

7    saying.  And I've tried to identify what I thought you were

8    saying, and I'm trying to identify what I think the defense is

9    saying, and then I have a question in my mind if you're --

10   about what everybody is saying.

11        Or what I don't understand is why it wouldn't be a waiver

12   if in the interview, a witness said X, which you produced, and

13   said Y, which you didn't produce.  I'm just trying -- on the

14   same general subject.  I'm trying to figure out why that

15   wouldn't be a waiver.  Why isn't it?

16        And I'll tell you, it's certainly not not a waiver because

17   the lawyers said it's not a waiver.  I mean, you know, Abraham

18   Lincoln took care of that one.  So you can't just call

19   something "something."  It's what you did, what your actions

20   were.

21            **MR. LI-MING WONG:**  Right.  So the purpose of privilege

22   logs is to test assertions such as that.  So let's say in the

23   same memo, let's say X is produced and we don't like what Y

24   says.  We just -- we just redact that and it's not privileged

25   or it is privileged and the question is whether it's privileged

1    or not, but there would be no basis to say "you get X but not

2    Y."  So that's the Court's point.

3        But that's not the case here.  What we're talking about is

4    something that is in a completely different memo, not the same

5    memo, completely different memo, completely different

6    investigation, completely different purpose.

7            THE COURT:  Well --

8            MR. LI-MING WONG:  So you produce --

9            THE COURT:  So the argument --

10           MR. LI-MING WONG:  Does that waive -- does that waive

11   the privilege --

12           THE COURT:  Yes.  I think it waives it enough.  I just

13   look at it in terms of fundamental fairness.  A lawyer comes in

14   and interviews a witness.  Witness says A happened.  New lawyer

15   comes in a week later and interviews the witness and the

16   witness says A didn't happen.  I'm just trying to figure that

17   one -- and you turn over A happened to the Government.  You

18   don't turn over A didn't happen to the Government.  Really?

19   What is that -- because they're different lawyers.

20       Lawyers are tremendously creative, which is unusual, in my

21   view, because I think law school takes the creativity out of

22   everybody, and that's what I tell law students.  Law is a great

23   profession, but you're going to lose your creativity.  That

24   doesn't always happen.  I am always entertained by the defense

25   testing that theory; not in this case, but in other cases.

1    Anyway, I'm trying to figure out why -- if your point is

2    that it happened at two different times with two different law

3    firms and that's your point, okay, I'll address that.  But is

4    your point something else?

5         MS. RESLEY:  And it was for different purposes as

6    well, different litigation, different issues that were arising.

7         THE COURT:  I have a real problem with fundamental

8    fairness in this; that is to say, if the witness is saying A --

9    says A and then turns around and says not A, they say, well

10   it's protected -- I don't have to disclose not A because it was

11   obtained for a different purpose.  I mean, that -- the waiver

12   is a waiver, I think.

13   Anyway, I'm going to write something about this.

14   Is there anything else you want --

15        MR. LI-MING WONG:  Yes, Your Honor.  I wonder whether

16   there is some way we can compromise because another problem is

17   the Government -- the Government doesn't have these materials

18   and --

19        THE COURT:  They do now.

20        MR. LI-MING WONG:  Well --

21        THE COURT:  You gave it to them.

22        MR. LI-MING WONG:  They have it for one witness, but I

23   think we're talking about standards that will apply to all the

24   witnesses.

25        THE COURT:  Well, but then the answer -- I'm not sure

1    what your compromise is, but I think that I can do it a couple

2    of ways.  And I don't know how to do it.

3        One is I can wait until the witness is called.  The

4    argument is it's impeachment.  That's the argument, as I

5    understand it.

6        And traditionally you don't turn over impeachment material

7    to the Government before the witness has testified or during

8    the witness' direct examination.  So I could sit back, wait

9    until the -- wait until the witness has concluded his or her

10    testimony and then furnish to the parties.

11        MR. LI-MING WONG:  But the problem, Your Honor, is

12    that in those situations, the Government has the material.

13    Here they don't, and so as a point of fairness, they won't have

14    had the opportunity to refresh the witnesses on what they may

15    or may not have said in 2012, five and a half years ago.  And

16    so there --

17        THE COURT:  That's right.  That's what trials are

18    about.

19        MR. LI-MING WONG:  It is.  But trials are also about

20    fairness.

21        THE COURT:  Well, fairness --

22        MR. LI-MING WONG:  They're not memory contests.  My

23    suggestion would be --

24        THE COURT:  I would guarantee the defense thinks this

25    is unfair.  They think the prosecution is unfair.  They

1    think -- they have a whole set of views about fairness that may

2    not comport with your set of views.

3           MR. LI-MING WONG:  I appreciate that.  And as the

4    victims, we have our views on fairness, but in the spirit of

5    compromise, there are some, like the Sullivan memo --

6           THE COURT:  You want to sit down with the parties and

7    try to effectuate a compromise, I'm delighted.  Absolutely

8    delighted, but the Court is not going to start splitting

9    babies.

10          MR. KEKER:  We are too busy.

11          THE COURT:  I'm sure they are willing to have any

12   discussion with you that you -- that you would like.  I advise

13   you not to have it with Mr. Keker.  You might try to have it

14   with somebody else over there because I think Mr. Keker, his

15   mind is made up on this subject, but there are other people

16   there who can have that conversation.  I'm not getting involved

17   in a compromise.

18          MR. LI-MING WONG:  I find Mr. Keker to be very

19   reasonable, but if he wants to delegate someone on his team to

20   talk to me, we are happy to talk.

21       There are observations like assessments of uncredibility.

22   I don't know that they want --

23          THE COURT:  I wouldn't produce that or if I --

24          MR. LI-MING WONG:  That's work product --

25          THE COURT:  Inadvertently I'm not waiving my objection

1    to it.

2         MR. MARAIS:  Your Honor, I mean, we have had months

3    and months and months to discuss this and certainly we've

4    tried.  This is an issue that's upon us now.  Mr. Baiocco is on

5    the stand.  I understand that Your Honor has a summary of an

6    interview that was conducted with Mr. Baiocco.  So this issue

7    is here and it's going to keep coming and I think that

8    Your Honor ruled on it in October.  We are where we knew we

9    would be.

10        THE COURT:  Okay.  So I'm going to --

11        MS. RESLEY:  Your Honor, there is one point I would

12   like to make about a category of witness statements.

13        THE COURT:  Sure.

14        MS. RESLEY:  And those are the statements that were

15   prepared in connection with the ongoing UK litigation, and as

16   we have submitted, there are significant issues, namely --

17        THE COURT:  Are they the ones prepared by Wachtell?

18        MS. RESLEY:  Travers Smith.  Travers Smith.

19        THE COURT:  Well, I need to have some guidance on

20   that.  Are we on the same page?

21        MS. RESLEY:  Yes.  There is ongoing litigation.  That

22   by disclosing --

23        THE COURT:  Okay.  I see them.  They run from Exhibit

24   77 through --

25        MS. RESLEY:  Yes.  And there is also a submission,

1    including some declarations from lawyers that set forth the

2    basis as to the sensitivity of that category of documents in

3    particular.

4             MR. MARAIS:  Your Honor, that's fine with us.  These

5    are --

6             THE COURT:  Great.

7             MR. MARAIS:  -- statements that would be prepared

8    today.  We are interested in the contemporaneous ones.

9             THE COURT:  Okay.  You won one.  Okay.  So I am going

10   to turn over the documents.  I may have to look at them in

11   terms of impressions.  If I -- when -- what's the view --

12   actually, now I think I have to ask the Government, because

13   you're just a supplier.

14        So I want to ask the Government, what is your view as to

15   when I would turn over these documents?  And what is your view

16   as to whether you're entitled to them?

17            MR. REEVES:  I would like to answer the first question

18   first, if I may.  And that is as to the timing, I think if

19   there's going to be a production of further information, I

20   think it should be done sooner rather than later, so I sense we

21   may join the defense in that.  We just would appreciate knowing

22   about the --

23            THE COURT:  Okay.  Well, that's good.  All right.

24            MS. RESLEY:  And to the extent these are turned over,

25   HP would certainly need to redact thoughts and impressions and

1  attorney work product like language that is contained in these

2  additional summaries.

3         **MR. KEKER:**  Your Honor, to not delay things, we will

4  represent that any opinions -- we're just not going to go

5  there.  It's not going to be a problem.  And if this redaction

6  is going to delay things --

7         **THE COURT:**  Well, I don't think it's going to delay

8  things.  I mean, my question is -- I mean, there are --

9         **MR. KEKER:**  Well --

10        **THE COURT:**  There are quite --

11        **MR. KEKER:**  There is only one person at a time that is

12  cross-examining the witness.  I need to know --

13        **THE COURT:**  Yeah.  No.  No.  No.  I understand that.

14  My question is the Government will tell you, if they haven't

15  already, or the parties who is being called and so forth.

16     How quickly can you get, for example, this witness'

17  testimony?

18        **MR. KEKER:**  Baiocco --

19        **THE COURT:**  Yes.  How quickly can you redact that

20  interview?

21        **MS. RESLEY:**  We could review it and redact it as the

22  Court orders.  We could certainly do that.

23        **THE COURT:**  Okay.  And then just turn to the other

24  interviews and -- sure.  I think you're more than entitled to

25  redact impressions and things that ought to be protected.

1    Okay.

2            **MR. MARAIS:**  Can I raise one last quick issue, which

3    is it would be helpful for us to get some kind of inventory of

4    what interviews have been lodged with the Court.  I had

5    previously asked for this and Ms. Resley had provided one, but

6    I realized yesterday that the summary the Court turned over

7    was -- appeared to be an in-house summary of an interview with

8    Mr. Sullivan that was not on HP's inventory --

9            **THE COURT:**  Discuss it with them.

10           **MR. MARAIS:**  Thanks.  Thank you, Your Honor.

11           **THE COURT:**  Anything else?  No.

12           **MS. RESLEY:**  So, Your Honor, are you limiting this to

13   the HP in-house summaries that will be turned over?  We just

14   want to clarify.  That were the subject of the Rule 17

15   subpoena?

16           **MR. MARAIS:**  No.  The Rule 17 subpoena went much

17   further than just to HP in-house.  It reached all sorts of

18   other firms as well.  I think what we just agreed is to carve

19   out the UK, Traverse Smith interviews, but everything else

20   would fall within the disclosure --

21           **THE COURT:**  Yes, it would.  Everything else would

22   fall -- that was covered by the Rule 17 subpoenas.

23           **MR. MARAIS:**  Two Rule 17 subpoenas.

24           **THE COURT:**  Two subpoenas.  You look at the subpoenas.

25   If it covered, it's covered, it's producible, save and except

**PROCEEDINGS**

1  for Travers, and go ahead and redact, you know, attorneys';

2  impressions or a discussion of a strategy, if it's in there.  I

3  don't know whether it is or not.  And then try to address them

4  as quickly as you can, but in order of the -- in order of the

5  witnesses that are being called.  The Government will tell you.

6  Then furnish directly to the Government and the defense a copy.

7  Okay.

8          **MR. LI-MING WONG:**  Very well.  We will do so.

9          **THE COURT:**  Thank you.  See you tomorrow.

10              (Proceedings adjourned at 4:39 p.m.)

11                      ---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, February 27, 2018

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter