Volume 4

Pages 459 - 721

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )        NO. CR 16-00462 CRB
                                    )
SUSHOVAN TAREQUE HUSSAIN,           )
                                    )
            Defendant.              )
_____)
                            San Francisco, California
                            Wednesday, February 28, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:     **ROBERT S. LEACH**
                    **ADAM A. REEVES**
                    **WILLIAM FRENTZEN**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:     **JOHN W. KEKER**
                    **JAN NIELSEN LITTLE**
                    **BROOK DOOLEY**
                    **KATE LAZARUS**
                    **NIC MARAIS**
                    **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

## I N D E X

Wednesday, February 28, 2018 - Volume 4

**GOVERNMENT'S WITNESSES**                                    **PAGE**  **VOL.**

**BAIOCCO, JOHN (RECALLED)**
(PREVIOUSLY SWORN)                                            474      4
Direct Examination resumed by Mr. Frentzen                    474      4
Cross-Examination by Mr. Keker                                601      4

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 44 | | 593 | 4 |
| 204 | | 593 | 4 |
| 232 | | 493 | 4 |
| 388 | | 494 | 4 |
| 427 | | 499 | 4 |
| 439 | | 501 | 4 |
| 525 | | 593 | 4 |
| 622 | | 578 | 4 |
| 690 | | 522 | 4 |
| 726 | | 593 | 4 |
| 833 | | 593 | 4 |
| 1071 | | 675 | 4 |
| 1096 | | 512 | 4 |
| 1124 | | 593 | 4 |
| 1249 | | 581 | 4 |
| 1374 | | 585 | 4 |
| 1445 | | 593 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1554 | | 661 | 4 |
| 1605 | | 516 | 4 |
| 1634 | | 520 | 4 |
| 1691 | | 525 | 4 |
| 1731 | | 593 | 4 |
| 1733 | | 545 | 4 |
| 1734 | | 548 | 4 |
| 1739 | | 536 | 4 |
| 1743 | | 551 | 4 |
| 1745 | | 553 | 4 |
| 1750 | | 556 | 4 |
| 1841 | | 563 | 4 |
| 1889 | | 583 | 4 |
| 1907 | | 567 | 4 |
| 1908 | | 567 | 4 |
| 1909 | | 567 | 4 |
| 1910 | | 567 | 4 |
| 1910 withdrawn | | 568 | 4 |
| 1962 | | 568 | 4 |
| 1983 | | 593 | 4 |
| 2216 | | 570 | 4 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2281 | | 574 | 4 |
| 2347 | | 589 | 4 |
| 2354 | | 590 | 4 |
| 2496 | | 529 | 4 |
| 2741 | | 588 | 4 |
| 2742 | | 511 | 4 |
| 2744 | | 489 | 4 |
| 2746 | | 511 | 4 |
| 5024 | 629 | | 4 |
| 5030 | 611 | | 4 |
| 5265 | 651 | | 4 |
| 5389 | 647 | 647 | 4 |
| 5404 | | 668 | 4 |
| 5405 | | 670 | 4 |
| 5444 | | 679 | 4 |
| 5471 | | 642 | 4 |
| 5474 | | 644 | 4 |
| 5480 | | 644 | 4 |
| 5487 | | 646 | 4 |
| 5488 | | 647 | 4 |
| 5496 | | 648 | 4 |

## **I N D E X**

### **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 5508 | | 703 | 4 |
| 5516 | | 681 | 4 |
| 5518 | | 699 | 4 |

1    <u>**Wednesday - February 28, 2018**</u>                    <u>**9:02 a.m.**</u>

2                         <u>**P R O C E E D I N G S**</u>

3                            ---oOo---

4         (Proceedings were heard out of presence of the jury:)

5         **MR. MARAIS:**  Nic Marais for the defendant, Sushovan

6    Hussain.

7         I had a couple of issues about two documents that the

8    Government has identified that I was hoping we could discuss

9    now.

10        **THE COURT:**  We can.

11        **MR. MARAIS:**  These are exhibits that have been

12   identified for use with Jim Fogo, a witness later today.

13        **THE COURT:**  Okay.  I don't have it.

14        **MR. MARAIS:**  I have copies.  The first is Exhibit

15   2737, a copy that I can pass up.  The highlighting is mine,

16   Your Honor.

17        Your Honor, I think Exhibit 2737 is hearsay.  It's an

18   out-of-court statement by a witness that the Government does

19   not intend to call.  The particular concern I have is with the

20   sentence that we've highlighted which is entirely speculative

21   and I think it's unduly prejudicial.  The Government's whole

22   allegation here is obviously Autonomy was quite cooking the

23   books, and so I would request that we redact the sentence that

24   we've highlighted.

25        **THE COURT:**  Who is -- is it Thai Lee?  I can't really

1   see it.

2           MR. MARAIS:  Thai Lee is the CEO at a company called

3   SHI.

4           THE COURT:  Which was a customer of Autonomy's?

5           MR. REEVES:  That is correct, Your Honor, yes.

6           THE COURT:  So a customer of Autonomy sends an email

7   to her?

8           MR. MARAIS:  Internally to people at SHI.

9           THE COURT:  One person at SHI sends an email to

10  another person at SHI and in it offers the opinion that it's

11  Autonomy that's cooking the books?

12          MR. MARAIS:  Correct.

13          THE COURT:  Your objection is that it's hearsay?

14          MR. MARAIS:  And speculative and unduly prejudicial.

15          THE COURT:  It's highly prejudicial.  The question is,

16  is it admissible.  The first question is, is it admissible.  I

17  mean, when you talk about something being prejudicial, what you

18  are saying is that notwithstanding the fact it may be

19  admissible, it's probative value is outweighed by its

20  prejudicial effect; right?

21          MR. MARAIS:  Correct, Your Honor.

22          THE COURT:  I've articulated your argument?

23          MR. MARAIS:  Well, I'm making both of those arguments.

24          THE COURT:  I know.  I know.  But we deal with the

25  first one first because if it's not admissible -- I don't let

 1   something in because it's inadmissible because wow, it's

 2   really -- it's really probative.  I mean, you can't do it that

 3   way.  Okay.

 4        How does it come in?  It looks like hearsay.

 5            **MR. REEVES:**  I think it would come in as a business

 6   record of SHI consistent with the Court's rulings.  There is

 7   sort of a more complexity around this that I actually think it

 8   would be appropriate for us to confer first before we bring it

 9   to the attention of the Court.

10            **THE COURT:**  Why don't you confer.  My inclination is

11   not to let it in.  I mean, I don't know.  I know it's part of

12   a, quote -- it comes out of an email which is part of a

13   business record, but it's not the company's business record.

14   It's not the defendant's business record.  It's not one

15   person --

16            **MR. REEVES:**  It's SHI.

17            **THE COURT:**  It might have been a very different story

18   if one person at Autonomy wrote to another person at Autonomy

19   and said "we know it's Autonomy that's cooking the books."  I

20   might let it in.  I might; I might not.  I don't know enough

21   about it.  But this is some third party.

22        I understand they have a relationship with Autonomy, but

23   they're not the agent of Autonomy.  They're not speaking on

24   behalf of Autonomy.  They're not making admissions on behalf of

25   Autonomy, and so I think it's hearsay, isn't it?

1          **MR. REEVES:**  Well, Your Honor, I think there's --

2          **THE COURT:**  It is hearsay.

3          **MR. REEVES:**  No.  I would say that this is a business

4     record of SHI.

5          **THE COURT:**  But a business record may be an exception

6     to the hearsay -- I don't know.  I have to think about it.

7     It's been so long since I've been to law school, I have no

8     idea.  But anyway --

9          **MR. REEVES:**  It really centers on the question that I

10    have for the defense about their intention to get into

11    discussions that allegedly occurred in September 2011 between

12    SHI and specifically the CEO, Thai Lee, and someone by the name

13    of Steve Procopi at HP which is discussed lower in the email.

14        If there is no discussion about Mr. Procopi with the

15    witness, Jim Fogo, then I'm probably fine with not getting into

16    this email.  But Mr. Procopi is on the -- I have reason to

17    believe that Mr. Procopi may be a defense witness and we could

18    hear more about this later, in which case it would be perfectly

19    appropriate to get into these issues now with Mr. Fogo.  That's

20    why I think conferring may be helpful.

21         **MR. MARAIS:**  Your Honor, I don't think we're here to

22    trade evidence.  Mr. Fogo was supposedly on a telephone call

23    with Mr. Procopi.  I think that that's fair game.  If Mr.--

24         **MR. REEVES:**  Also hearsay.

25         **THE COURT:**  Well, now we're going so far out of the

PROCEEDINGS

1    Court's context.  I mean, I have no context.  I have no way to

2    figure this out at all.  And I think Mr. Reeves is correct.  I

3    think the best thing that you ought to do is just have some

4    discussion about this document.

5        As it's presented to me, in the context in which it's

6    presented to me, I would have thought that it's hearsay.  It

7    doesn't seem to me an exception to the hearsay rule.  Business

8    records may be some sort of exception.  I have to figure that

9    out.  I think it went business records -- business records

10   essentially went more to authenticity, admissibility than it

11   does to hearsay, but it may go to hearsay.  I don't know.  I

12   have to look at the book again.

13       But that doesn't make any difference because it's highly

14   prejudicial, and even if it were a, quote, "business record,"

15   I'm not even sure I'd let it in.

16       So I'm not going to -- that's where I am right now.  There

17   may be other reasons to let it in.  I have no idea where the

18   case is going.  There may be doors that are opened and issues

19   that are presented which may make it or may not make it

20   relevant, but right now, thank you.  It's sort of out and

21   subject to some discussion.

22           MR. REEVES:  Would you like us to --

23           THE COURT:  I'm not asking you to trade.  I know you

24   don't trade.  That's not what's going on here.

25           MR. REEVES:  Can we confer and if we need to bring it

1    to the attention of the Court --

2            **THE COURT:**  Yes, yes.

3        (Counsel confer off the record.)

4            **MR. REEVES:**  Your Honor.

5            **THE COURT:**  Yes.

6            **MR. REEVES:**  We have conferred --

7            **THE COURT:**  Wait a minute.  Time out.

8            **MR. KEKER:**  We are back where we started, Your Honor.

9            **MR. REEVES:**  We have conferred.  That was less

10   successful than I had hoped.  It does seem that the defense

11   intends to plow into the subject of this email --

12           **THE COURT:**  Can I ask a question?  This is not even

13   this witness; right?

14           **MR. MARAIS:**  Right.

15           **THE COURT:**  It's like the next witness?

16           **MR. REEVES:**  This afternoon, probably.

17           **THE COURT:**  Well, let's deal with it -- well, I can

18   deal with it now.  Okay.

19       What's up?

20           **MR. REEVES:**  It sounds like the defense intends to

21   plow into a conversation that Mr. Fogo allegedly heard

22   involving this person Steve Procopi at HP in or around

23   September 2011.

24       This matters because I think the idea is SHI is acquiring

25   Dell hardware from Autonomy.

1          THE COURT:  September of 2000 --

2          MR. REEVES:  '11.

3          THE COURT:  Can I ask something?  Just context.

4    Context.

5       The closing -- the deal's announced in August; is that

6    right?

7          MR. REEVES:  Yes.

8          MR. MARAIS:  Correct.

9          THE COURT:  It closes when?

10          MR. MARAIS:  October.

11          MR. REEVES:  October 3rd.

12          THE COURT:  So arguably, arguably, events up to

13    October are relevant or not relevant?

14          MR. MARAIS:  Are relevant, Your Honor.

15          THE COURT:  Well, I mean, I think timelines are

16    important here, and I think this has some significance for your

17    case, so I think we all ought to be alert to it because a lot

18    has been said about post activities:  post;closing activities,

19    post-closing conduct, post-closing events.

20       And sitting here, listening to it all, I have to question

21    in my own mind exactly what is the relevance of post-closing

22    events.  It may be relevant.  All sorts of things can happen

23    subsequent to an event which becomes relevant.  Classic cases:

24    statements of defendants, other events and so forth can become

25    relevant, but they're not immediately apparent as relevant

1  because the purported -- the alleged crime occurred, if it did

2  occur, before the closing or at the -- up to the closing.

3  Okay?  Got that?

4      So I now need to focus -- if this happened in September,

5  again, I would need to know what is the relevance of it,

6  overall relevance of it, and then try to figure out more about

7  it.

8      So I don't know who to turn to because I'm not asking you

9  to unveil your cross-examination, but I didn't raise it, you

10  did, and I guess it's fair game, at least in part.

11      **MR. REEVES:**  I think the Court has identified a very

12  important issue.  I think there is a defense theory that we

13  heard in the opening that I suppose the defense will say is

14  relevant, but I think you raise the right point.

15      A claim of what HP does about the hardware after the fact,

16  after the crimes have been committed or not committed may be

17  irrelevant and I think we're --

18      **THE COURT:**  It may be relevant and it may be

19  irrelevant.

20      **MR. REEVES:**  Correct.

21      **THE COURT:**  I think that's right.  There are things

22  that can happen afterwards that may be relevant, but they're

23  not -- what I'm saying is that I sort of use a different

24  mindset with events that occur up to October -- we'll say

25  October of 2011 and then subsequent to it because there the

1   Court believes that it should exercise its discretion as to how

2   much post event would come into evidence.  And it's a slightly

3   different type of approach.

4        Whereas in the events up to the closing, it's unclear to

5   the Court, as you must appreciate in all the testimony that's

6   come in, that I don't know any document, I don't know how

7   relevant it would be, how cumulative it would be, but it's

8   before.

9        Afterwards, I look at it and say the event occurred, if it

10  did -- an event occurred.  Whether or not it was criminal or

11  not is another issue.  So how much post do we get into?

12       **MR. MARAIS:**  Your Honor, we can have that discussion,

13  but I'm not sure that we need to right now.

14       **THE COURT:**  Yeah.  I think you're right.

15       **MR. MARAIS:**  Because these conversations happened

16  before the close.  And, in any event, we're putting the cart

17  before the horse here because this is a Government witness,

18  this is a Government exhibit, and nothing about the sentence

19  that we've highlighted here is relevant to HP's awareness or

20  HP's lack of awareness.

21       This is internal speculation from a witness that the

22  Government does not appear likely to call and it has no basis

23  in fact.  It's being offered to prove the Government's

24  allegation, to prove the truth of the matter asserted.

25       I would submit that it's not a business record, but even

 1    if that's the Government's theory, they won't have Ms. Lee here

 2    to explain whether she created this email in the regular course

 3    of her business because she's not a witness.

 4        So it is hearsay, and even it weren't hearsay, as we've

 5    discussed, this sentence is highly prejudicial.

 6        **MR. REEVES:**  So first, yes, we identified this as an

 7    exhibit for Mr. Fogo, but, no, it is not automatic that the

 8    Government intends to introduce all exhibits that we identify

 9    through a witness.

10        This is a relevant document.  As I indicated, whether we

11    get into this subject will depend on whether the defense is

12    going to get into the issue about Mr. Procopi, which counsel

13    has said that he wants to.

14        The Court is one hundred percent correct, this is after

15    the fact in many senses --

16        **THE COURT:**  I've never been one hundred percent

17    correct.  I mean, I've looked at my record over 21 years and

18    I've actually never -- I've been close.  I've been really

19    close.  But since you commented about that, I just wanted to --

20    okay.

21        The jury is here.  Thank you very much.  I will hear some

22    further discussion of it.

23        **MR. REEVES:**  Thank you, Your Honor.

24        **MR. MARAIS:**  Thanks, Your Honor.

25        (Proceedings were heard in the presence of the jury:)

1           **THE COURT:**  Let the record show all jurors are

2    present.  The parties are present.

3        Would you call the witness, recall the witness.

4           **MR. FRENTZEN:**  Your Honor, the Government recalls John

5    Baiocco.

6           **THE COURT:**  While the witness is coming, Ladies and

7    Gentlemen, you know we are not meeting tomorrow and we're not

8    meeting Friday.  You understand that?  Okay.

9        Please be seated and let me remind you you're under oath.

10          **JOHN BAIOCCO**, **GOVERNMENT WITNESS, PREVIOUSLY SWORN**

11          **MR. FRENTZEN:**  Thank you, Your Honor.  May I proceed.

12          **THE COURT:**  Yes, please.

13                  **DIRECT EXAMINATION**  (resumed)

14   BY MR. FRENTZEN:

15   **Q.**   Good morning, Mr. Baiocco.

16   **A.**   Good morning.

17   **Q.**   I wanted to ask you, I believe we were on the TXU VAR

18   deal.  Do you recall that?

19   **A.**   I do.

20   **Q.**   That particular VAR deal with Autonomy, was that the first

21   deal that Capax handled?

22   **A.**   Yes, it was.

23   **Q.**   And can you describe for us what the proposal was on that

24   deal in terms of what Capax's role would be in reselling?

25   **A.**   Right.  Our role was purely that --

1          **MR. KEKER:**  Excuse me.  Objection, Your Honor.  No

2    foundation.  Somebody is saying something or telling this.

3    **BY MR. FRENTZEN:**

4    **Q.**   As proposed to you by who?

5    **A.**   As proposed to me by Autonomy.

6    **Q.**   Who at Autonomy?

7    **A.**   It was a combination, I believe, of Stouffer Egan and Mike

8    Mooney.

9    **Q.**   Who was Mike Mooney?

10   **A.**   Mike Mooney was somebody at Autonomy that had something to

11   do with the TXU deal.  But, I mean, as far as the VAR proposal,

12   it came from Stouffer Egan.

13   **Q.**   So what was Capax supposed to do in this reselling

14   agreement?

15   **A.**   Our role was simply to buy it on paper and then close it

16   on June 30th, I believe it was, and then down the road, we

17   would get paperwork from TXU to pay for the software.

18   **Q.**   Was Capax going to have any responsibility in terms of

19   selling the software to TXU?

20   **A.**   No.

21   **Q.**   Prior to the deal closing, was Capax expected to have

22   interactions with TXU?

23   **A.**   No.

24   **Q.**   Were you informed not to get involved in the actual sale

25   transaction?

BAIOCCO - DIRECT / FRENTZEN

1   A.   I was never invited to get involved and didn't know how to

2   get involved, so, no.

3        Yes, I was.

4   Q.   Can you tell us what about this arrangement was attractive

5   to you?

6   A.   Well, I mean, they were going to feed us business.  We

7   were going to have direct interaction down the road, we

8   thought, with the end client that would help us grow our

9   professional services business and our customer base.

10  Q.   So as it was proposed by Mr. Egan, in that proposal, was

11  there the promise of that kind of accessibility to the end

12  user?

13           MR. KEKER:  Objection.  Leading.

14           THE COURT:  Overruled.

15           THE WITNESS:  Absolutely.

16  BY MR. FRENTZEN:

17  Q.   So how was it, as it was proposed, that Capax would get

18  involved?

19  A.   You know, that they would bring us in on the -- to do

20  professional services and that sort of thing downstream.  So we

21  would get our benefit from the deal and potentially be

22  introduced to an end client where we would get billable hours

23  for which we make margin on.

24  Q.   Was that attractive to Capax?

25  A.   Absolutely.

BAIOCCO - DIRECT / FRENTZEN

1  Q.   To be clear, when you talk about having some interaction

2  on this deal, was your understanding that would be related to

3  eDiscovery work like we talked about yesterday or was this

4  different?

5  A.   Well, in these particular instances, it wasn't all

6  eDiscovery software so it was whatever the software that was

7  being sold to the end client.

8  Q.   So was this more in the category of support and

9  professional services that Capax was doing?

10  A.   Professional services, a hundred percent, yes.

11  Q.   To be clear, throughout your relationship in 2009, 2010,

12  2011 with Autonomy, was Capax continuing to provide those types

13  of services, support and professional services?

14  A.   Yes.

15  Q.   Billing for it?

16  A.   Billing for it, correct.  Both support, maintenance, and

17  professional services.

18  Q.   Was there a contract between Capax and Autonomy for that

19  type of support, the EAS support?

20  A.   Yes, there was.

21  Q.   In terms of this first deal, VAR deal, the TXU deal in

22  June of 2009, did Capax wind up having contact with the end

23  user?

24  A.   Well, we did have one person that actually worked on the

25  project, yes.  We had one professional service person that did

1    work, subcontracted from Autonomy on that project.

2    **Q.**    Prior to the deal closing, in other words, TXU buying the

3    software, did Capax actually have an interaction with TXU?

4    **A.**    No.

5    **Q.**    How did you learn that the deal had actually closed?

6    **A.**    I'm not sure I recall exactly how it closed.  Probably we

7    got a call from professional services saying they're going to

8    start or Stouffer let me know.

9            **MR. KEKER:**  Objection.  Calls for speculation and move

10    to strike the answer.

11           **THE COURT:**  I think he said he didn't know.

12           **THE WITNESS:**  Somebody from Autonomy informed me that

13    the deal had closed.

14    **BY MR. FRENTZEN:**

15    **Q.**    Why was that important to you?

16    **A.**    Because that solidified the fact that, you know, the deal

17    had closed and we were going to receive payment.

18    **Q.**    Just so we understand, why did the deal have to close for

19    Capax to receive a payment?

20    **A.**    Well, because we got billed immediately upon signing the

21    deals and, you know, the deal was that we weren't going to pay

22    them until we got paid, so . . .

23    **Q.**    Who billed Capax after the VAR deals closed?

24    **A.**    Autonomy.

25    **Q.**    The understanding about not paying Autonomy until the deal

1  closed, who did that understanding come from?

2  **A.**   Well, originally with Stouffer.

3  **Q.**   Why do you say "originally"?

4  **A.**   Because down the road, there certainly were other people

5  involved in that chain of, you know, "where are the payments,"

6  "where's the deal?"

7  **Q.**   Let's talk about that just a little bit.

8      After TXU, did you continue to do these types of VAR

9  deals?

10  **A.**   Yes, we did.

11  **Q.**   As you continued to do the VAR deals, in connection with

12  both the VAR deals and the EDD, did you become involved in

13  trying to get payments from Autonomy?

14  **A.**   Yes.

15  **Q.**   In what ways did you become involved in trying to get

16  payments from Autonomy?

17  **A.**   Well, I would pretty much call every day to find out

18  status on where those deals were because they were on our aging

19  and, you know, we needed to get them cleaned up for our banks,

20  so I would call nonstop to find out where the deals were as far

21  as closing with the end customer because when they were

22  presented to us, they were presented that they were 99.9

23  percent done.  So that was the premise for which we took them.

24  **Q.**   So meaning that you'd signed a VAR deal with Autonomy.  Is

25  that a "yes"?

BAIOCCO - DIRECT / FRENTZEN

1    **A.**    Yes.

2    **Q.**    Explain to us, if you own the software, why were you

3    waiting for the deal to close before you paid Autonomy?

4    **A.**    Well, because that was the arrangement that we had made,

5    that I would not sign for those deals and then pay up front for

6    them.

7    **Q.**    Was that in any of the VAR deal contracts?

8    **A.**    No, it wasn't.

9    **Q.**    And so, for example, we had, I believe, admitted

10    Government's Exhibit 100 yesterday.  I believe that's right.

11        Could we get Government's 100.

12        And, Mr. Baiocco, do you recognize what this is,

13    Government's 100 on the screen in front of you?

14        Could we just blow up the top, the very top part?

15    **A.**    Yeah.  That's the Value Added Reseller Contract.

16    **Q.**    All right.  And what you've been talking about in terms of

17    this setup, is there anything in this Value Added Reseller

18    Agreement that stated that Autonomy would pay Capax anything?

19    **A.**    No.

20    **Q.**    I'm sorry?

21    **A.**    No.

22    **Q.**    Or that the debt from Capax to Autonomy would be written

23    off?

24    **A.**    No.

25    **Q.**    So where was that -- where did that agreement come from?

1   **A.**   It's an arrangement I made with Stouffer.

2   **Q.**   You were talking now about sort of pursuing that aspect of

3   the deal, in other words, the part that's not in the contract.

4   Who else at Autonomy did you talk to about that aspect of the

5   arrangement?

6   **A.**   Well, throughout the years, I mean, I talked to pretty

7   much everybody:  I mean, Joel Scott, Andy Kanter, Jim

8   Crumbacher, Sushovan at some point.

9   **Q.**   Do you also know an individual by the name of Steve

10   Chamberlain?

11   **A.**   I'm sorry.  Yes.  Steve Chamberlain.

12   **Q.**   If you could just briefly tell us who Joel Scott was, as

13   you understood it?

14   **A.**   As I understood it, he was chief counsel for the

15   United States.

16   **Q.**   You mentioned Jim Crumbacher?

17            **THE COURT:**  I didn't hear that?  He was what?

18            **THE WITNESS:**  Chief counsel for U.S. for Autonomy.

19            **MR. FRENTZEN:**  Joel Scott.

20            **THE COURT:**  I got the name.  But United States

21   Autonomy.  What is -- I'm trying to get the entity that he was

22   chief counsel for.

23            **THE WITNESS:**  Chief counsel for Autonomy.

24   BY MR. FRENTZEN:

25   **Q.**   Mr. Baiocco, did you have an understanding about there

1  being sort of an Autonomy and Autonomy US?

2  **A.**    Yes.

3  **Q.**    Where does that understanding come from?

4  **A.**    Just different entities that we would see invoicing and

5  POs come out of.  There was Autonomy UK, Autonomy US.

6  **Q.**    Can you tell us who you dealt with that you understood was

7  Autonomy US?

8  **A.**    Stouffer, Jim Crumbacher, Joel Scott, Mike Mooney.  And

9  then I guess the overriding management was both.

10  **Q.**    All right.  And so did you also have an understanding that

11  there was an Autonomy in the UK?

12  **A.**    Yes.

13  **Q.**    What was your understanding about the relationship between

14  Autonomy UK and Autonomy US?

15  **A.**    Well, I mean, I just viewed them as one company, right,

16  just different divisions, basically.

17  **Q.**    Did you have an understanding of sort of who was -- in the

18  hierarchy, who was on top?

19  **A.**    Of course, yes.

20  **Q.**    Which?

21  **A.**    Well, I mean, from my understanding, it was Mike.

22         **MR. KEKER:**  Objection.  Foundation.

23  **BY MR. FRENTZEN:**

24  **Q.**    How many years did you do business with Autonomy?

25  **A.**    Three, three and a half.

BAIOCCO - DIRECT / FRENTZEN

1   **Q.**   And in that time, how often would you say you had

2   interactions with people from Autonomy?

3   **A.**   I mean, almost every day from, you know, the VAR deal and

4   the EDD deal.

5   **Q.**   Did you interact with people that worked in the U.S. for

6   Autonomy?

7   **A.**   Yes.

8   **Q.**   Did you interact with people who worked in the UK for

9   Autonomy?

10   **A.**   Yes.

11   **Q.**   During that time, did you develop an understanding of the

12   hierarchy at Autonomy between the folks in the UK and the folks

13   in the U.S.?

14   **A.**   Absolutely.

15   **Q.**   What was your understanding of that?

16   **A.**   That it was being run out of the UK essentially.

17   **Q.**   What was your understanding of who was in charge in the

18   UK?

19   **A.**   Mike, Sushovan, Andy, and Pete on the technology side, and

20   Chamberlain somewhere in there.

21   **Q.**   Can you give us last names for those?  I'm sorry.

22        But Mike who?

23   **A.**   Mike Lynch, Sushovan Hussain, Andy Kanter, Steve

24   Chamberlain.

25   **Q.**   Thank you, sir.

1    And in terms of the folks that you -- getting back, I

2  think, to the point of the folks that you would engage with to

3  try to get covered for the parts of the agreement that were not

4  in the contract, who did you engage with on those points over

5  the years?

6  **A.**   Over the years, in the beginning mostly Stouffer and

7  then -- Stouffer Egan.  Sorry.  And then Andy Kanter, Joel

8  Scott a little bit, Jim Crumbacher, and then ultimately near

9  the end, you know, Sushovan was in the mix as well.

10  **Q.**   So in terms of those folks, how many of them -- can you

11  tell us who were in the U.S. of that group that you just named?

12  **A.**   Stouffer, Jim, and Joel.  Stouffer Egan, Joel Scott, Jim

13  Crumbacher.

14  **Q.**   In terms of the folks in the UK that you engaged with over

15  this money, who were the ones in the UK?

16  **A.**   Chamberlain, Andy Kanter, Sushovan Hussain.

17  **Q.**   Thank you, sir.

18    Did this become sort of a regular routine for you?

19  **A.**   Absolutely.

20  **Q.**   Why was that?

21  **A.**   Well, because the deals never closed timely, and I would

22  get anxious, and we would, you know -- and I'd have accounts

23  receivable people calling us nonstop from Autonomy looking for

24  the money, and, you know, clearly I wasn't going to pay them

25  the money until we got paid from either the end customer or

1  Autonomy for those deals.

2  **Q.**   And was that an issue that you raised with those

3  individuals that you previously listed?

4          **MR. KEKER:**  Objection, Your Honor.

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  Sorry?

7          **MR. KEKER:**  The objection is, "is this an issue that

8  you raised with those individuals."  No foundation.

9          **MR. FRENTZEN:**  I said that he just previously

10 mentioned.

11         **THE COURT:**  Overruled.

12     Thank you.  Go ahead.

13         **THE WITNESS:**  Yes.

14         **MR. FRENTZEN:**  Thank you.

15 **Q.**   Now, with these VAR deals, was TXU a little unusual from

16 the ones that came later?

17 **A.**   Yes, it was.

18 **Q.**   Can you describe why?

19 **A.**   It was more the way we had hoped it was going to work.  We

20 got a direct purchase order from TXU so Capax actually

21 collected the money over 36 months from TXU.

22 **Q.**   Okay.  What does that mean?  In terms of when the deal got

23 closed, who did TXU actually pay for the software?

24 **A.**   They actually paid Capax.

25 **Q.**   So what was the arrangement between Capax and Autonomy on

1    that?

2    **A.**    That I would -- I had a payment plan that we owed

3    Autonomy.   It was 287,500 a quarter or something for three

4    quarters or something along that lines.   We were to pay

5    Autonomy and TXU was paying us.

6         **MR. FRENTZEN:**   And if we could just go to page 13 of

7    Government's 100, please, just to set this out.   Can we first

8    blow up the first half, the top half.

9    **Q.**    What's the date on this, Mr. Baiocco?

10   **A.**    June 30th, 2009.

11   **Q.**    And the end user is who?

12   **A.**    TXU Energy.

13   **Q.**    What does the end user refer to?

14   **A.**    The company that is actually buying and implementing the

15   software.

16   **Q.**    Under the terms of the contract, is that the entity that

17   Capax -- I'm saying under the terms of the contract, is that

18   the entity that Capax is supposed to be selling the software

19   to?

20   **A.**    Yes.

21        **MR. FRENTZEN:**   Could we go to the bottom half of this,

22   please.

23   **Q.**    Do you see item No. 9 where it says "license fee,"

24   Mr. Baiocco?

25   **A.**    Yes.

BAIOCCO - DIRECT / FRENTZEN

1  Q.   And what is the license fee there?

2  A.   That's the amount TXU was paying for the software.  I'm

3  sorry.

4  Q.   Then was there also a -- at the very bottom there, sort of

5  a payment schedule?

6  A.   Yes, there is.

7  Q.   The start of a payment schedule?

8  A.   Yes.

9  Q.   So the way that this played out, who paid -- after the

10 deal was closed, who paid Capax?

11 A.   TXU paid Capax.

12 Q.   Did that allow Capax to be able to pay these payments that

13 are -- this schedule that is listed here to Autonomy?

14 A.   Yes, it did.

15 Q.   What was Capax's profit on this type of deal?

16 A.   This one was a little unusual because of the fact that we

17 received the payments from TXU.  We collected $47,000 a month

18 from them for 36 months, and we paid Autonomy the fees, so we

19 had some inherent profitability into that.  I'm not sure

20 exactly the amount.

21 Q.   Did that setup -- did that ever happen again in any of

22 these VAR deals?

23 A.   Not like that, no.

24 Q.   Do you have any recollection about roughly what the profit

25 was on this?

**BAIOCCO - DIRECT / FRENTZEN**

1   **A.**   Somewhere in the couple hundred thousand dollar range.

2   **Q.**   You made reference, though -- did you also -- was this

3   also profitable for Capax in terms of that -- getting entree,

4   if you will, to TXU?

5   **A.**   This particular instance we did get one resource on the

6   project.

7   **Q.**   What does that mean, a resource on the project --

8   **A.**   Meaning that one of the Capax resources was subcontracted

9   from Autonomy to work on the implementation of that software.

10   **Q.**   So you made money on that as well?

11   **A.**   Made money on that as well.

12   **Q.**   In any of these other VAR deals, did that ever occur again

13   in?

14   **A.**   No.

15   **Q.**   The way that this one played out, did that -- I mean, was

16   this a positive event?

17   **A.**   Yes.

18   **Q.**   As a result of that, was this something that you were

19   interested in doing again?

20   **A.**   Yes.

21   **Q.**   I'd like to show you now Government's Exhibit 232.

22   **THE COURT:**   2?  Number 2?

23   **MR. FRENTZEN:**   I'm sorry.  232.

24   **THE COURT:**   232.  Sorry.

25   **MR. FRENTZEN:**   And, actually, I'm going to pull up one

1  other document.  One moment, Your Honor.

2  **Q.**  I'd also like to show you 27 -- Government's 2744.

3  Following the -- first of all, do you recognize those two

4  documents?

5  **A.**  I do.

6  **Q.**  What do you recognize -- let's start with 2744.  What do

7  you recognize that to be?

8  **A.**  Which one is 2744?  I'm sorry.  Where am I looking for

9  2744?

10  **Q.**  Sorry.

11  **A.**  My bad.

12  **Q.**  This exhibit.

13  **A.**  Oh, sorry.

14  2744 is the Value Added Reseller Agreement between Capax

15  and Autonomy.

16  **THE COURT:**  Admitted.

17  (Trial Exhibit 2744 received in evidence)

18  **MR. FRENTZEN:**  Can we pull up 2744.

19  **Q.**  Just so that we're clear, Mr. Baiocco, for the first

20  several or many pages of this, is this just the same VAR deal?

21  **A.**  Yes.

22  **Q.**  And then is there a purchase order attached at the back?

23  **A.**  That's what I'm looking -- I answered that when I saw the

24  front page.  Sorry.

25  **MR. FRENTZEN:**  Ms. Margen, could we put up page 13 of

1    this document.

2         **THE WITNESS:**  It looks like the Kraft deal is on this

3    page, yes.  It took me a while to find it.

4         **MR. FRENTZEN:**  Could we blow up the top with the date.

5    **Q.**   What was the date of this agreement?

6    **A.**   September 30, 2009.

7    **Q.**   And this is another VAR deal?

8    **A.**   Yes, it is.

9         **MR. FRENTZEN:**  Could we go to the next page, page 14.

10   And can we blow up the top half, please.

11   **Q.**   All right.  Is that on this page 14 -- is that what

12   informs you about who the end user was supposed to be here?

13   **A.**   Yes.

14   **Q.**   Is that at the top there, Kraft?

15   **A.**   Correct.

16   **Q.**   And do you remember entering into a VAR deal with Autonomy

17   where the end user was Kraft?

18   **A.**   I do.

19   **Q.**   What was the amount of this VAR deal?

20   **A.**   $4 million for the software.

21   **Q.**   Is that listed down here on No. 10, "license fee"?

22   **A.**   Yes.

23   **Q.**   What was the sort of -- on these VAR deals, was there a

24   license fee and then was there usually other fees?

25   **A.**   There was always first year of support/maintenance.

1   Support/maintenance is what you buy when you buy software that

2   allows you to, down the road, get updates to it, call in for

3   tech support help, and have somebody answer your questions and

4   help you fix it when you're using it yourself on prem, on your

5   customer location.

6   **Q.**   On any of these VAR deals, were those fees -- did those

7   engage Capax to perform any of those services?  I'm talking

8   after that first TXU deal.

9   **A.**   No.

10   **Q.**   Why did you enter into this agreement?

11   **A.**   I entered into it because I was asked to enter into it

12   from Stouffer and we were promised a ten percent commission for

13   doing it.

14   **Q.**   What about in terms of actually getting the software?  Did

15   you get the software?

16   **A.**   We didn't get it or deliver it to the end customer.  We

17   may have got a delivery here and there, but we never delivered

18   the software to the end customer.

19   **Q.**   Can you just describe for all of us here delivery of

20   software.  How does that work, the business?  What does it

21   mean?

22   **A.**   It just means how you get the software into the hands of

23   the people that purchased it.

24   **Q.**   How does that work in the business?

25   **A.**   Kind of a downloaded-type of situation or it could be hard

1  disk.  I'm not technical enough to know, but it's certainly

2  some kind of a download.  They go to a website and have a pass

3  code and pull it down, somewhere along that lines.

4  **Q.**   For most of these VAR deals, was Capax taking delivery of

5  any software?

6  **A.**   No.

7  **Q.**   Was Capax delivering, for example here, Kraft any

8  software?

9  **A.**   No.  We never delivered the software, ever.  I'm not sure

10  of any point they might -- sent an email to somebody in the

11  tech where we might have had our hands on it or something, but

12  we never delivered it to an end client ever.

13  **Q.**   After agreeing to this deal for $4 million, what was your

14  understanding from Mr. Egan about how Capax would cover the $4

15  million?

16  **A.**   That when the deal closed, we would collect $4 million and

17  get a $400,000 commission.

18  **Q.**   When the deal closed between who and who?

19  **A.**   Between Kraft and Autonomy.

20  **Q.**   Did Capax have any contact with Kraft about trying to sell

21  this software?

22  **A.**   No.

23  **Q.**   Can you take a quick look at Government's 232 there.

24  **A.**   Is that the other folder?

25  **Q.**   Yes.  I'm sorry.

1           What is 232?

2   **A.**    The first page is the payment schedule, the original

3   payment schedule for --

4   **Q.**    I mean, more generically, do you recognize what that is?

5   **A.**    It's an email from Autonomy receivables to me.

6   **Q.**    And what is contained --

7           **THE COURT:**  Admitted.  Admitted.

8           **MR. FRENTZEN:**  Thank you, Your Honor.

9       (Trial Exhibit 232 received in evidence)

10  **BY MR. FRENTZEN:**

11  **Q.**    Could we pull up the first page and just blow that up.

12          What is this email about, Mr. Baiocco?

13  **A.**    It's the payment schedule for TXU for how Capax was going

14  to pay Autonomy.

15  **Q.**    Was this -- what was the date of this?

16  **A.**    October 1st, 2009.

17  **Q.**    Was this for the Kraft deal?

18  **A.**    The first page is TXU.

19  **Q.**    Well, I'm sorry.  I'm on the first page.

20          Does the first page mention the Kraft deal?  I'm on the

21  first sentence here, "Dear John."

22  **A.**    Oh, yeah.  So this is two different ones.  So they're both

23  in here, TXU and Kraft.

24          Yes.  Kraft is in here, correct.

25  **Q.**    And then can we go to the next page.

1          What is this in reference to on this page?

2          Can we blow up the top part, please.

3     A.   This is the software that was being purchased.

4     Q.   Okay.  And so this is part of the Kraft deal?

5     A.   Yes.

6     Q.   Was this typical, in other words, these invoices?

7     A.   Yes.

8     Q.   So was this a -- as of the time of this invoice, was this

9     a debt from Capax to Autonomy?

10    A.   Yes, it was.

11    Q.   Let me show you now Government's 388.  See if you

12    recognize Government's 388.

13    A.   Yes.

14    Q.   What do you recognize Government's 388 to be?

15    A.   This is a letter from Autonomy to Capax telling us not to

16    attempt to collect from Kraft.

17    Q.   It's a letter to who?

18    A.   Me.

19         THE COURT:  Admitted.

20         THE WITNESS:  John Baiocco.

21    (Trial Exhibit 388 received in evidence)

22         MR. FRENTZEN:  Could we get the first page, please.

23    Can you blow up the first half, the top half.  Sorry.  Sorry.

24    Can we get the date, Ms. Margen.

25    Q.   All right.  So what is the date of this letter,

1    Mr. Baiocco?

2    **A.**    December 29th, 2009.

3    **Q.**    And what is this telling you?

4    **A.**    Basically that we're not going to collect from Kraft.

5    **Q.**    Who was going to collect from Kraft?

6    **A.**    Autonomy was going to collect from Kraft.

7    **Q.**    All right.  So what did this mean in terms of your debts

8    to Autonomy?

9    **A.**    It meant if Autonomy collected the 4 million, that they

10    would credit Capax for the 4 million.

11            **MR. FRENTZEN:**    Could we go to the numbered bullet

12    points below, please.

13    **Q.**    On point No. 3, Mr. Baiocco, does that include the fee

14    from Autonomy to Capax?

15    **A.**    Yes.  That's what the $400,000 is, correct.

16    **Q.**    That's in this top sentence?

17    **A.**    It's in 3.

18    **Q.**    I'm sorry.  Paragraph or item No. 3 in the top sentence?

19    **A.**    Yes.

20    **Q.**    Okay.  What was that?

21    **A.**    That was our commission for writing the -- writing the

22    deal on September 30th.

23    **Q.**    All right.  So that was your payment?

24    **A.**    Correct.

25            **MR. FRENTZEN:**    Could we just go to the second page of

**BAIOCCO - DIRECT / FRENTZEN**

1    this document.

2    **Q.**    And who was this letter from, Mr. Baiocco?

3        If we could blow up --

4    **A.**    Joel Scott.

5    **Q.**    Who, again, was Joel Scott, to your knowledge?

6    **A.**    Here it says chief operating officer.  He was an attorney.

7    **Q.**    Was this signed on your behalf?

8    **A.**    It was.

9    **Q.**    Who is that?

10   **A.**    Tom Leonard.  He ran sales for us.

11   **Q.**    So as this deal worked out, how did it work out for Capax,

12   in your view?

13   **A.**    Well, we didn't get any direct relationship with Kraft,

14   but we got the $4 million removed from our aging and we

15   collected a $400,000 commission, so . . .

16   **Q.**    And did you have to put any work into selling the software

17   to Kraft?

18   **A.**    No.

19   **Q.**    I'd like to move now to late 2009, and let me show you

20   Government's Exhibit 427.

21       In late 2009, was Capax at that point still trying to

22   develop eDiscovery business?

23   **A.**    Yes.

24   **Q.**    At that point in time, had Autonomy steered any work

25   Capax's way in the eDiscovery area?

BAIOCCO - DIRECT / FRENTZEN

1   **A.**   No.

2   **Q.**   At that point in time, was Capax capable of doing any

3   eDiscovery work?

4   **A.**   No.

5   **Q.**   Was this, however, after there had already been months of

6   billing -- I'm sorry -- purchase orders from Autonomy to Capax

7   for eDiscovery services?

8   **A.**   Yes.

9   **Q.**   Those are the things we looked at yesterday?

10  **A.**   Correct.  Those were the invoices that we turned around

11  based on the purchase orders received to pay the payment

12  schedule for the -- for the first software deal, 7 million

13  or . . .

14  **Q.**   Near the end of 2009, were you asked -- I'm sorry.  Strike

15  that.  I apologize.

16     In late 2009, were you still under the terms of the

17  original seven and a half million dollar licensing agreement

18  with Autonomy?

19  **A.**   Yes, we were.

20  **Q.**   Were you approached in December of 2009 to renew or make

21  an amendment to that original licensing agreement?

22  **A.**   Yes.

23  **Q.**   Can you describe who came to you about that?

24  **A.**   Stouffer Egan came to us.

25  **Q.**   What was the discussion that you had with Mr. Egan at that

1    point?

2    **A.**    We had been, up to that point, struggling to get the

3    software, struggling to get any Autonomy resources that were

4    supposed to be helping us implement and do it, and this was

5    sold to me as an extension of the contract.

6         We picked up a few extra products and -- but we had to pay

7    another $4 million and that they would cover the 4 million

8    exactly the same way they were covering the first seven and a

9    half.

10    **Q.**    So was this the very end of the year?

11    **A.**    Yes.

12    **Q.**    And take a look at Government's 427.  Do you recognize

13    what that is?

14    **A.**    The signature page?

15    **Q.**    I'm sorry.  Just what is 427, the whole document?  What is

16    that?

17    **A.**    That's the License Distribution Agreement for that second

18    purchase.

19    **Q.**    Between who and who?

20    **A.**    Between Capax and Autonomy.

21        **MR. FRENTZEN:**  Offer Government's 427, Your Honor.

22        **THE COURT:**  It's the amendment; is that right?

23        **THE WITNESS:**  Yeah.  It's the first amendment to the

24    agreement.

25        **THE COURT:**  Okay.  Admitted.

1          (Trial Exhibit 427 received in evidence)

2              **THE WITNESS:**  But it's still a new license sale.

3              **THE COURT:**  Okay.

4              **MR. FRENTZEN:**  Can we just blow up the first -- the

5      top part of this.  Thank you.

6      **Q.**   So the date -- is there a date listed there?

7      **A.**   December 31st, 2009.

8      **Q.**   So this is a first amendment to which deal?

9      **A.**   The original license purchase.

10     **Q.**   For how much?

11     **A.**   Seven and a half.

12     **Q.**   Million?

13     **A.**   Million.

14             **MR. FRENTZEN:**  Can we go down to the bottom half of

15     this.  Thank you.

16     **Q.**   So in part 3(a) here, how much was Capax signing on to pay

17     Autonomy on this deal?

18     **A.**   4 million.

19     **Q.**   Was that in addition to whatever the balance was on the

20     seven and a half million?

21     **A.**   Correct.

22     **Q.**   Was this something you were looking for?

23     **A.**   Not particularly.

24     **Q.**   Can you explain that?

25     **A.**   Well, I would have liked to have everything up and running

1  from the original purchase by then, but we did not have it up

2  and running for a multitude of reasons that I would blame on

3  not having the proper software, not having the proper help that

4  we were promised when we bought the original deal, so basically

5  what this did was do another deal and we'll extend your terms.

6  I think it took it from four years to six years, which gave us

7  a further extension of how long we would be able to do

8  eDiscovery because we had lost a full year, pretty much, on the

9  original purchase, so even though they had given us money to

10  pay it back, we weren't that far -- we weren't that close to

11  being ready.

12  **Q.**  Okay.  If you were going to pay the 4 million on this,

13  would you have entered into this deal?

14  **A.**  No.

15  **Q.**  So why did you do the deal?

16  **A.**  Because I had a guarantee that I was going to get paid on

17  the back end like the first deal to make the payments.

18  **Q.**  And was the schedule for Capax's payments set out here on

19  the bottom?

20  **A.**  Yes, it was.

21  **Q.**  It's about a million-dollar payment?

22  **A.**  Quarterly, correct.  Four quarterly payments of around a

23  million dollars.

24         **MR. FRENTZEN:**  If we could go to the next page, the

25  last page, and show the signature.

BAIOCCO - DIRECT / FRENTZEN

1   **Q.**   As a result of this deal, Mr. Baiocco, were -- did you

2   continue to get purchase orders from Autonomy for eDiscovery

3   work that you were not doing?

4   **A.**   Yes.

5   **Q.**   Did you continue to invoice them for eDiscovery work that

6   you were not doing?

7   **A.**   Yes.

8   **Q.**   Did they continue to pay you?

9   **A.**   Yes.

10   **Q.**   I want to move now and let me show you Government's

11   Exhibit 439.  Take a look at Government's 439 and see if you

12   recognize what that is, Mr. Baiocco.

13       Do you recognize what that document is?

14   **A.**   Yeah.  It's a VAR transaction for Eli Lilly.

15   **Q.**   Who is Eli Lilly?

16   **A.**   It was an end user of Autonomy, a pharmaceutical company,

17   I believe, in Indiana.

18   **Q.**   Was this another VAR deal?

19   **A.**   Yes, it was.

20   **Q.**   And when were you approached about this VAR deal?

21       I'm sorry, Your Honor.  I will offer 439.

22           **THE COURT:**  Admitted.

23       (Trial Exhibit 439 received in evidence)

24           **MR. FRENTZEN:**  Thank you.  Could we pull up page 2.

25           **THE WITNESS:**  December 31st, 2009.

1   BY MR. FRENTZEN:

2   Q.   And, again, is this, on page 2 -- is this one of these

3   purchase orders attached to the VAR deals?

4   A.   Yes.

5           MR. FRENTZEN:   Could we drop down into the --

6   Q.   So this is the same period of time at the end of the year

7   that the $4 million amendment is going on?

8   A.   Yes.

9   Q.   Does this list the end user?

10  A.   It does.

11          MR. FRENTZEN:   Could we go to the next page, please,

12  Ms. Margen.   Can you blow up the top there.

13  Q.   Mr. Baiocco, does this show the amount of the VAR deal?

14  A.   Yes, it does.

15  Q.   What was -- can -- what was the license fee,

16  approximately?

17  A.   Roughly 6 million, plus support and maintenance.

18  Q.   Plus support and maintenance?

19  A.   Correct.

20  Q.   The way that this deal worked out, do you recall, was this

21  a deal where -- well, first of all, did Capax do anything to

22  sell this software to Eli Lilly?

23  A.   No.

24  Q.   Were you -- or did you have an understanding that you were

25  not going to have to pay for this until the deal got closed?

1   **A.**   Yes.

2   **Q.**   Who was going to close the deal, to your understanding?

3   **A.**   Autonomy.

4   **Q.**   Was this a situation, to your recollection, where

5   Eli Lilly paid Autonomy directly or did they pay Capax?

6   **A.**   No.  In this particular instance, we worked through

7   Eli Lilly procurement and they paid us directly.  So Eli Lilly

8   paid Capax directly for the software.

9   **Q.**   Did it result in any of kind of what you were looking for,

10   the support or services relationship with Eli Lilly?

11   **A.**   We did not get any services, no.

12   **Q.**   But this was an instance where Eli Lilly paid Capax rather

13   than paying Autonomy directly?

14   **A.**   Correct.

15   **Q.**   Did there end up being a problem, if you will, in terms of

16   this particular deal?

17   **A.**   Yes.  The deal --

18   **Q.**   What was that?

19   **A.**   I'm sorry.

20   **Q.**   That's okay.  Sorry.

21   **A.**   The deal we signed was for the 6 million plus the support

22   and maintenance of 6.3 and it came in below that.

23   **Q.**   When you say "it came in," what does that mean?

24   **A.**   So when they actually closed it with the end user, the end

25   user paid less than $6.2 million.  They paid 5.4 million

1  instead of the 6.2.

2  **Q.**   Who negotiated the deal between Eli Lilly and Autonomy?

3  **A.**   Autonomy.

4  **Q.**   So when it comes in low, is that because of something

5  Capax did?

6  **A.**   No.

7  **Q.**   When the Eli Lilly deal came in low, did you reach out to

8  people about that?

9  **A.**   I did.

10  **Q.**   Because what's the problem there?

11  **A.**   Well, the problem is now I've signed up for -- to owe

12  6.4 million and Eli Lilly is only giving me a purchase order

13  for 5.4 million, so there was about a $700,000 shortfall.

14  **Q.**   Who did you raise that shortfall with, to your

15  recollection?

16  **A.**   Stouffer.

17  **Q.**   Did you raise it with other folks?

18  **A.**   I'm sure I probably raised it with Andy.  I don't --

19        **MR. KEKER:**  Objection, Your Honor, to "probably."

20        **THE COURT:**  Sustained.

21  **BY MR. FRENTZEN:**

22  **Q.**   Did anyone propose to you a way to make up the $700,000

23  shortfall?

24  **A.**   Yes.

25  **Q.**   Who proposed that to you?

1    **A.**    Stouffer and Andy -- or Stouffer proposed it.

2        **MR. FRENTZEN:**  The Court's indulgence, one moment,

3    Your Honor.

4    **Q.**    Is there anything I could show you that might help refresh

5    your recollection, Mr. Baiocco?

6    **A.**    Sure.

7        **MR. FRENTZEN:**  Counsel, I'm in the grand jury, page

8    55.

9    **Q.**    Mr. Baiocco, I'm going to ask you just to read -- this is

10   page 55.

11       Counsel, I'm on lines 4 through 8.

12       And you can actually back up, if you -- actually, let me

13   start you here.  Let me just start you on the page before so

14   you can be sure what the subject matter is.  And then

15   specifically lines 4 through 8.

16       Don't read that out loud.  Just read it to yourself and

17   then let me know when you're done.

18   **A.**    (Witness reviews document.)

19       Okay.

20   **Q.**    I'll just retrieve that.

21       Does that help to refresh your recollection about who

22   proposed --

23   **A.**    Yeah.  So it was both Stouffer and Andy.  Kanter.  Kanter.

24   **Q.**    Who is Andy Kanter?

25   **A.**    Andy Kanter was an executive at Autonomy based in the UK,

BAIOCCO - DIRECT / FRENTZEN

1   London.

2   **Q.**    Did you have any particular understanding of what

3   Mr. Kanter's role was?

4   **A.**    I mean, he was definitely one of the higher-ups:   COO,

5   CFO.  He was an attorney by trade.

6   **Q.**    Thank you.

7        So what did they propose to you?

8   **A.**    So what they proposed was they would make up the shortfall

9   with seven $100,000 payments for EDD processing.

10  **Q.**    Was that going to be different than the sort of regular

11  purchase orders and invoices for EDD processing that you were

12  already doing?

13  **A.**    Well, it was going to be in addition to.

14  **Q.**    What do you mean?

15  **A.**    Above and beyond what the other ones were.  This was

16  purely to cover the shortfall on Eli Lilly.

17  **Q.**    So this was the eDiscovery work that you were not doing?

18  **A.**    Correct.

19  **Q.**    Not capable of doing?

20  **A.**    Correct.

21  **Q.**    They proposed to do what to cover the $700,000 shortfall?

22  **A.**    Give us seven installments of $100,000 to use to pay back

23  the shortfall.  Or keep the shortfall.  I guess we didn't have

24  to pay it back.

25  **Q.**    Is that what happened?

1    **A.**    Yes.

2    **Q.**    Was there any particular code, to your recollection, as to

3    how you would be able to distinguish these purchase orders for

4    work you were not doing versus the normal purchase orders for

5    work you were not doing?

6    **A.**    Well, it was a separate purchase order that showed seven

7    installments of $100,000.

8    **Q.**    Was there any particular -- or was there any -- to your

9    recollection, was there any specific language on it that

10    distinguished it from some of the other regular purchase

11    orders?

12    **A.**    I think it might have been for European projects or

13    something along that lines.

14        **MR. FRENTZEN:**    If we could, could we pull up

15    Government's 2559 at page 37, please, Ms. Margen.

16        **THE COURT:**    2559?

17        **MR. FRENTZEN:**    It's in evidence, Your Honor.    It's the

18    totality.    I'm on page 37.

19        Could we please just blow up the top part to start with.

20        Great.    Thank you, Ms. Margen.

21    **Q.**    Mr. Baiocco, do you recognize what this document is?

22    **A.**    That's the document I was just referring to.

23    **Q.**    Is this something that came to Capax from Autonomy?

24    **A.**    Yes, it is.

25    **Q.**    And what does it mean, "General Purchase Request"?

BAIOCCO - DIRECT / FRENTZEN

1    **A.**    It was a purchase order for the $700,000 that they were

2    going to pay us in seven installments of a hundred thousand

3    dollars.

4    **Q.**    So do you see up here sort of in the middle where it says

5    "requested by" on the left-hand side about halfway down?

6    **A.**    I do.

7    **Q.**    What does it say there?

8    **A.**    Andrew Kanter.

9    **Q.**    And can we go -- can you look in the bottom right-hand for

10    total price.    What is listed there?

11    **A.**    700,000.

12    **Q.**    That was the shortfall on the Eli Lilly deal?

13    **A.**    Yes, it was.

14    **Q.**    Now, in terms of "quantity, item, and description," what

15    is listed there?

16    **A.**    Outsourced specialized EDD services for European projects.

17    **Q.**    Were you doing any projects in EDD for Autonomy?

18    **A.**    No.

19    **Q.**    Were you doing any projects in Europe?

20    **A.**    No.    Not for EDD.

21    **Q.**    I'm sorry.    For EDD?

22    **A.**    No.

23    **Q.**    As a result of this purchase request, did you submit seven

24    invoices to Autonomy for exactly what they listed in their

25    purchase request?

1    A.    Yes.

2         **MR. FRENTZEN:**  If we could just go to page -- I'm

3    sorry.  Same exhibit, 2559.  Can we go to page 30, please,

4    Ms. Margen.  And can we just blow up the middle part there.

5         Great.  Thank you.

6    Q.    Mr. Baiocco, is this one of the invoices that was issued?

7    A.    Yes, it is.

8    Q.    And the amount is how much?

9    A.    100,000.

10   Q.    Did you utilize the same language as the purchase request

11   that was sent to you from Autonomy?

12   A.    Yes.

13   Q.    And did you end up doing seven of these?

14   A.    Yes.

15   Q.    Did that make up for the shortfall?

16   A.    Yes.

17   Q.    So were you made whole effectively on the Eli Lilly deal?

18   A.    Yes.

19   Q.    I'd like to -- did the VAR deals sort of just continue to

20   come in?

21   A.    Yes, they did.

22   Q.    And following this Eli Lilly deal, were there any other

23   VAR deals in which Capax collected the money directly?

24   A.    No.

25   Q.    So for the remainder of the VAR deals, were these

1    situations -- well, first of all, did Capax do anything to sell

2    to the end user?

3    **A.**   No.

4    **Q.**   Did Capax receive any delivery of any software with the

5    exception maybe of one or two?

6    **A.**   No.

7    **Q.**   Did Capax ever make delivery to any end user?

8    **A.**   No.

9    **Q.**   Did Capax have any contact with end users, period, on the

10   VAR deals?

11   **A.**   No.

12   **Q.**   Why were you doing these deals?

13   **A.**   I was doing them for the purpose of the commission.

14   **Q.**   And the commission was what?

15   **A.**   Ten percent.

16   **Q.**   Were you doing anything for the commission other than

17   signing some paperwork?

18   **A.**   No.

19   **Q.**   I'd like to show you a couple of documents.  I'll just do

20   these maybe at the same time.

21       I'd like to show you Government's 2742 and 2746.  Take a

22   quick look at 2742 and 2746 and see if you recognize what those

23   are.

24   **A.**   It's -- this is another VAR deal from Merrill Lynch.

25   **Q.**   And I'm sorry.  Which number are you on, Mr. Baiocco?

 1              THE COURT:  2742.

 2              THE WITNESS:  2742.

 3              MR. FRENTZEN:  Offered, Your Honor.

 4              THE COURT:  Admitted.

 5         (Trial Exhibit 2742 received in evidence)

 6    BY MR. FRENTZEN:

 7    Q.   Can you take a look at 2746.

 8    A.   It looks like TXU Energy.

 9    Q.   Is that another deal with TXU Energy?

10    A.   I think TXU might have purchased the software in two -- in

11    two increments.

12    Q.   Two more VAR deals?

13    A.   Yeah.  They did two separate deals where they bought the

14    software and then must have added on to it, but we

15    maintained -- we signed the VAR for both.

16              THE COURT:  Admitted.

17         (Trial Exhibit 2746 received in evidence)

18              MR. FRENTZEN:  Thank you, Your Honor.

19    Q.   If you could -- I don't think we need to look at the whole

20    document.  Could you tell us with respect to each of those what

21    the dollar amount was?

22         If you are on 2746, the second deal with TXU, can you give

23    us the amount?

24    A.   $783,086.

25    Q.   What's the date of that agreement?

1  **A.**   June 30th, 2009.

2  **Q.**   Can you go to the other one and just tell us the date and

3  the amount?

4       I guess remind us of the entity first.

5  **A.**   It's Merrill Lynch.

6       December 31st, 2010; 1,830,000.

7  **Q.**   Okay.  And so far as you know, were those deals that

8  closed out, no issues, no problems there?

9  **A.**   As far as I know, yeah.  I know TXU for sure.

10  **Q.**   And you didn't end up selling the software to either of

11  those end users?

12  **A.**   No.

13  **Q.**   I want to show you now Government's 1096.

14       Sorry, Your Honor.  I've got two add-ons, late add-ons.

15  **A.**   Are you waiting for me to answer?

16  **Q.**   Sorry.  Do you recognize what that is?

17  **A.**   It was a VAR deal we signed for a company called Amgen.

18       **MR. FRENTZEN:**  I would offer Government's 1096,

19  Your Honor.

20       **THE COURT:**  Admitted.

21       (Trial Exhibit 1096 received in evidence)

22       **MR. FRENTZEN:**  Can we pull up 1096, please,

23  Ms. Margen.  Can we go to the following page, please.  And the

24  next page.  Sorry.  Just the next page.

25  **Q.**   Is this the purchase order?

BAIOCCO - DIRECT / FRENTZEN

1   **A.**   Yes, it is.

2        **MR. FRENTZEN:**   Could we blow up the top half.   Include

3   the -- that's fine.

4   **Q.**   The date was what?

5   **A.**   September 30th, 2010.

6   **Q.**   Who was the end user on this one?

7   **A.**   Amgen.

8        **MR. FRENTZEN:**   And can you go down to the amount.

9   Sorry.   It's the next page.   I apologize.   Down here.   Yeah.

10        Great.   Thank you.

11   **Q.**   How much was the Amgen deal for?

12   **A.**   $9 million, plus support and maintenance.

13   **Q.**   The Amgen deal, did you make any effort to sell software

14   to Amgen?

15   **A.**   No.

16   **Q.**   Did the Amgen deal, to your understanding, close?

17   **A.**   No.   To my understanding, it fell apart.

18   **Q.**   Meaning, since Capax wasn't involved, it fell apart

19   between who and who?

20   **A.**   It fell apart between Amgen and Autonomy.

21   **Q.**   What issues did that pose for you since that was the end

22   user on your VAR agreement?

23   **A.**   Right.   That I had signed up for $9 million in software

24   and that I owed Autonomy for and the deal had fallen through.

25   **Q.**   So what issues does that pose for you at Capax?

1    **A.**    I'm at risk of having to pay $9 million that I signed a

2    contract for.

3    **Q.**    When the deal fell apart, did anyone at Autonomy tell you

4    "pay us the money"?

5    **A.**    No.

6    **Q.**    What ended up happening with this particular deal?

7    **A.**    They did what they called a swap deal.  So it was always

8    their intention, if the deal fell through, they would give us

9    the next one, so they gave us Bank of America.  That was a

10    similar -- similar dollar amount.  They replaced it with that.

11    **Q.**    All right.  So meaning what?  I mean, in other words, when

12    the end user -- the deal didn't work out, what did they do to

13    be able to make you whole?

14    **A.**    They removed the -- they removed us from the -- our

15    obligation.

16         **MR. KEKER:**  Excuse me.  Foundation.  Could we find out

17    who he is talking about, "they"?

18         **THE COURT:**  Okay.  Lay a foundation.

19         **MR. FRENTZEN:**  I don't think my question was about a

20    conversation.  Maybe it was.  If so, I'll --

21         **THE COURT:**  Well, let's see.

22         **MR. FRENTZEN:**  I thought it was kind of how it played

23    out.

24         **MR. KEKER:**  He keeps talking about "they" and

25    "they" --

1          **MR. FRENTZEN:**  Autonomy.  Sorry.

2          **THE WITNESS:**  Autonomy.

3          **MR. KEKER:**  Autonomy is a company with three thousand

4    employees.

5          **THE COURT:**  Well, but he is not asking about a

6    conversation.  He is asking about what did the company do, I

7    think.  That's my understanding.

8          **MR. FRENTZEN:**  That was my question, yeah.  In terms

9    of the overall --

10         **THE COURT:**  And maybe the foundational -- the

11   foundational part would be "how do you know" or "what" --

12         **MR. FRENTZEN:**  Sure.

13         **THE COURT:**  You have to lay a foundation for it.

14         **MR. FRENTZEN:**  Sure.

15   **Q.**   How did you find out what happened with the Amgen deal?

16   **A.**   I got a call from Stouffer Egan.

17   **Q.**   And what did Mr. Egan tell you?

18   **A.**   That the deal had fallen through and that they were going

19   to ask me to sign a swap letter, which apparently would remove

20   our obligation on Amgen, and they were replacing it with the

21   Bank of America deal that they had cued up.

22   **Q.**   I'd like to show you what's been marked as Government's

23   1605.  Government's Exhibit 1605.

24        Take a look at 1605 and see if you recognize that,

25   Mr. Baiocco.

1    **A.**    Yeah.  This is a replacement purchase order relieving us

2    from Amgen and replacing it with Bank of America.

3              **THE COURT:**  Admitted.

4         (Trial Exhibit 1605 received in evidence)

5              **MR. FRENTZEN:**  Thank you, Your Honor.

6         Could we show Government's 1605, the first page.

7    **Q.**    Who is this email from?

8    **A.**    Jorge Salazar.

9    **Q.**    Do you know who that is?

10   **A.**    He was a contracts manager.  I think he might have been an

11   attorney as well.

12   **Q.**    At where?

13   **A.**    At Autonomy US.

14             **MR. FRENTZEN:**  Can we go to the next page, please.

15   And can we blow up the top part.

16   **Q.**    And what was the nature of this letter?

17   **A.**    This was basically a letter that they crafted for me to

18   request of them the replacement of Bank of America with Amgen.

19   **Q.**    So this is a letter from you to Autonomy?

20   **A.**    It is.

21   **Q.**    December 31st, 2010?

22   **A.**    Correct.

23   **Q.**    Where did you get the language or -- what to put in here?

24   **A.**    They created this letter, not I.  Stouffer created it.

25   His name is on it.

1    **MR. FRENTZEN:**  Can we drop down to the bottom to show

2    the remainder of the letter, please.

3    Q.   And so is that your signature?

4    A.   Yes.

5    Q.   And who acknowledged and agreed?

6    A.   Stouffer Egan.

7    Q.   In the body there at the top, does that indicate what was

8    going to happen to the original agreement?

9    A.   Yeah.  It was canceling out the original agreement with

10   Amgen.

11   Q.   And switching it to what?

12   A.   Switching it to Bank of America.

13   Q.   After it was switched from Amgen to Bank of America, did

14   Capax do anything to try to sell to Bank of America?

15   A.   No.

16   Q.   To your knowledge, did the Bank of America deal happen?

17   A.   Yes.

18   Q.   What happened in terms of resolution of the debt to

19   Autonomy related to the Bank of America deal?

20   A.   So in this particular instance, we actually got paid from

21   another -- another Value Added Reseller.  MicroTech, I believe,

22   was their name.

23       It was explained to me that they had done a larger deal at

24   Bank of America, and that since MicroTech had a better

25   relationship, they had collected the full monies from Bank of

1    America and that MicroTech was going to be paying Capax for

2    this one.

3    **Q.**    Did you know anybody at MicroTech?

4    **A.**    At that time, no.

5    **Q.**    Who told you that that is how it was going to happen?

6    **A.**    Stouffer Egan.

7    **Q.**    As a result, did MicroTech come in as basically another

8    reseller on this deal?

9    **A.**    That was my understanding.

10    **Q.**    Was Capax made whole?

11    **A.**    Yes.

12    **Q.**    And did Capax get a profit, if you will, off of this?

13    **A.**    Yes.

14    **Q.**    And what was that?

15    **A.**    Ten percent.

16    **Q.**    I want to go back to --

17            **THE COURT:**    Is this an appropriate time to take a

18    recess?

19            **MR. FRENTZEN:**    It is, Your Honor.

20            **THE COURT:**    Okay.

21    Ladies and Gentlemen, we will go to be in recess until 20

22    to 11:00.  Remember the admonitions given to you.  Don't

23    discuss the case, allow anyone to discuss it with you, form or

24    express any opinion.

25            (Proceedings were heard out of presence of the jury:)

1      **THE COURT:**  Let the record reflect the jury has

2   retired.

3      I filed an opinion as to yesterday's matter about the

4   subpoenas, so there's a copy, and I think counsel for Morgan

5   Lewis is here, is that right -- for HP, rather.  I thought I

6   saw them walk in.  Anybody here from HP?

7      **MR. FRANK:**  Yes, Your Honor.

8      **THE COURT:**  Give him a copy as well.

9      Okay.  We're in recess.

10                 (Recess taken at 10:26 a.m.)

11                 (Proceedings resumed at 10:41 a.m.)

12      (Proceedings were heard in the presence of the jury:)

13      **THE COURT:**  Okay.  Please be seated.

14      Let the record reflect all jurors are present, the parties

15   are present.

16      You may proceed.

17      **MR. FRENTZEN:**  Thank you, Your Honor.

18   **Q.**   Mr. Baiocco, I'd like for you to take a look at

19   Government's Exhibit 1634.

20   **A.**   (Witness examines document.)

21   **Q.**   Do you recognize what Government's 1634 is, sir?

22   **A.**   (Witness examines document.)  It was our Capax's bill to

23   Autonomy for the commission for the Bank of America VAR deal.

24   **Q.**   Okay.  So this is the Bank of America deal that switched

25   from Amgen to Bank of America that we just talked about?

1   **A.**   Correct.

2          **THE COURT:**  Admitted.

3      (Trial Exhibit 1634 received in evidence)

4          **MR. FRENTZEN:**  Thank you, Your Honor.

5      Could we just blow up the -- sorry -- the e-mail there?

6   **Q.**   What's the date of this?

7   **A.**   March 24th, 2011.

8   **Q.**   And who is that to?

9   **A.**   Stephen Chamberlain.

10  **Q.**   Who was Stephen Chamberlain again?

11  **A.**   He was an Autonomy employee and executive in the U.K.

12  **Q.**   All right.  And what was the -- were you cc'd on this?

13  **A.**   I was.

14  **Q.**   What is the message here from -- sorry.

15      First of all, who's Dave Spadone?

16  **A.**   Dave Spadone was a controller that worked for our company

17  at Capax.

18  **Q.**   And what is in the body here?

19  **A.**   (reading)

20          "Hi, Steve.

21          "Mr. Stouffer mentioned you could turn this around

22      properly, after which we would be happy to remit the

23      9 million Discovery owes Autonomy."

24  **Q.**   What was the 9 million Discovery owed Autonomy?

25  **A.**   That was the money that we had collected from MicroTech

1  that in turn we owed to Autonomy.

2  **Q.**   And that's Capax Discovery?  Is that a reference to

3  Capax Discovery?

4  **A.**   Correct.

5  **Q.**   Okay.  And what's the meaning of that message?

6  **A.**   It was an invoice to get paid our commission on that.

7  **Q.**   Can we go to the next page, page 2?  And can you blow up

8  what's there in the middle?

9      So what is listed there in terms of the description?

10  **A.**   (reading)

11          "Sales commission fee per VAR for Bank of America

12      agreement."

13  **Q.**   What was the amount?

14  **A.**   945,000.

15  **Q.**   What was that in relation to the amount of --

16  **A.**   10 percent.

17  **Q.**   All right.  You've got to let me finish for our court

18  reporter here.

19  **A.**   I'm sorry.

20  **Q.**   -- in terms of the overall amount?

21  **A.**   10 percent.

22  **Q.**   Thank you.

23  **A.**   Sorry.

24  **Q.**   Is that an example of how Capax would get paid for its

25  involvement in these VAR deals?

1    **A.**    Yes.

2    **Q.**    By Autonomy?

3    **A.**    Correct.

4    **Q.**    All right.  I'd like to show you what's been marked as

5    Government's Exhibit 690.  Take a look at that and see if you

6    recognize what that is.

7    **A.**    (Witness examines document.)  This is another VAR

8    transaction for FSA, Financial Services Authority.

9    **Q.**    Can you tell us, how did that -- do you remember how that

10    deal came to your attention?

11        **THE COURT:**  Well, admitted.

12    (Trial Exhibit 690 received in evidence)

13        **MR. FRENTZEN:**  Sorry.  Thank you.

14        **THE WITNESS:**  It came to my attention from Stouffer

15    Egan.

16    **BY MR. FRENTZEN:**

17    **Q.**    What were you told about this particular deal?

18    **A.**    Same as I've been told on all of them, that it was very

19    close to closing and that if we took it at this particular

20    moment in time, that we would make a 10 percent commission when

21    they ultimately closed it with the end user.

22    **Q.**    Were you told anything about what the FSA was?

23    **A.**    Yeah.  Well, I asked what it was, as I always did, because

24    I hadn't heard of this company, and they told me it was the

25    U.K. equivalent of the SEC.

**BAIOCCO - DIRECT / FRENTZEN**

1  **Q.**   Did that mean anything to you just in terms of your

2  dealings with Autonomy?

3  **A.**   Well, it just meant to me that if they're doing a deal

4  like that with the SEC, it had to be a real deal.

5  **Q.**   What do you mean by "a real deal"?

6  **A.**   Well, meaning when it closed, that, you know, whatever.

7  They're not going to make up stuff about doing business with

8  the SEC or the equivalent.  So it was -- in my opinion, it was

9  a very close-to-closing deal.

10  **Q.**   Okay.  All right.  Is this one of the deals that Capax

11  agreed to do?

12  **A.**   Yes, it is.

13  **Q.**   Could you please blow up sort of the top half there,

14  please?  Down a little further.

15       Thank you.  That's great.

16       What was the date of this deal?

17  **A.**   March 31st, 2010.

18  **Q.**   And who was the end user there?

19  **A.**   Financial Services Authority.

20  **Q.**   And that's what you knew as FSA?

21  **A.**   Correct.

22  **Q.**   And can we get -- sorry.  Can you blow back up?  Can we

23  get the price tag?  I don't have an extra copy of this one, so

24  if you can find the amount.  I think it's at the bottom.

25       Great.

1        And what was the amount of this VAR deal?

2   **A.**   4.5 million.

3   **Q.**   Was this a VAR deal that ended up being a problem for

4   Capax?

5   **A.**   Yeah.  This one took forever to get off our books.

6   **Q.**   What do you mean by that?

7   **A.**   Meaning we didn't get any resolution, whether it be

8   payment or credit memos or whatever, for a long time.  This

9   dragged on for a very long time.

10  **Q.**   What, if anything, did you do as a result of this dragging

11  on?

12  **A.**   I just escalated and asked questions pretty much on a

13  daily basis.

14  **Q.**   Of who?

15  **A.**   Stouffer -- Andy Kanter, Stouffer Egan, Sushovan, Steve

16  Chamberlain.  I mean, I -- Joel Scott.  I don't think I missed

17  anybody on this one.

18  **Q.**   Okay.  And, Mr. Baiocco, did you -- I mean, on this type

19  of arrangement, did you pay Autonomy for the software that you

20  were supposedly buying to resell on this deal?

21  **A.**   After it dragged on so long, Sushovan had asked us to make

22  a good faith payment of 1.5 because of how long it had dragged,

23  and we actually did go ahead and make a good faith payment of

24  1.5 million under the promise that when it got closed, we were

25  going to be reimbursed the entire 4.5 million, if it looked

**BAIOCCO - DIRECT / FRENTZEN**

 1  like it was going close through Autonomy, and that we would get

 2  a $4.5 million credit.

 3  **Q.**  Who asked you to make the good faith payment?

 4  **A.**  Sushovan Hussain.

 5  **Q.**  Who told you that you would get it back in the back end?

 6  **A.**  Sushovan, and I think Steve Chamberlain was very involved

 7  in this one.

 8  **Q.**  All right.  Did Capax make any efforts to try to sell

 9  software to the Financial Services --

10  **A.**  No.

11  **Q.**  -- Authority in the U.K.?

12  **A.**  No.

13  **Q.**  And we'll get back to some of this, but I just want to get

14  through some of these VAR deals first.

15      I'd like to show you now what's been marked as

16  Government's 1691 and see if you recognize Government's 1691.

17  **A.**  (Witness examines document.)  Yeah.  This is a VAR -- a

18  VAR deal for McAfee.

19          **MR. FRENTZEN:**  Offer it into evidence, Your Honor.

20          **THE COURT:**  Admitted.

21      (Trial Exhibit 1691 received in evidence)

22  **BY MR. FRENTZEN:**

23  **Q.**  Who is McAfee?

24  **A.**  McAfee was a software company in -- I believe they were in

25  Texas.  They do security -- network security or some kind of

BAIOCCO - DIRECT / FRENTZEN

1  security software.

2  **Q.**   That's great, Ms. Margen.

3       What was the date of this proposed VAR deal?

4  **A.**   March 31st, 2011.

5  **Q.**   Is the end user listed there?

6  **A.**   It is.  McAfee.

7  **Q.**   And can we blow up the bottom half to get the dollar

8  figure?  Thank you.

9       How much was this deal for?

10 **A.**   $5 million plus support and maintenance.

11 **Q.**   In terms of this VAR deal -- and we'll get into some of

12 the details in a minute -- but did this one sort of close out

13 quickly or close out -- was this a clean VAR deal?

14 **A.**   No.  This one, from what I understand, never closed with

15 McAfee.  It went dead.

16 **Q.**   When this goes dead, what impact does that have on you at

17 Capax?

18 **A.**   I still contractually owe $5 million to Autonomy.

19 **Q.**   Did Capax go ahead and pay $5 million to Autonomy on this

20 VAR deal?

21 **A.**   Ultimately we did.

22 **Q.**   Did you pay it from money that you received from Autonomy?

23 **A.**   Yes.

24 **Q.**   And we'll get into that in a minute.

25      I'd like to direct your attention -- sorry.  I have, I

 1   think, one other transaction that I want to talk about first.

 2            MR. FRENTZEN:  The Court's indulgence one moment,

 3   Your Honor.

 4                      (Pause in proceedings.)

 5            MR. FRENTZEN:  One second, Your Honor.

 6                      (Pause in proceedings.)

 7            MR. FRENTZEN:  I will -- I apologize.  I'll get back

 8   to that.  I just don't have the number I need, Your Honor.

 9   Q.   Let me direct your attention to mid-2011.

10        In mid-2011, was Capax still interested in doing

11   eDiscovery work for Autonomy?

12   A.   Yes, we were.

13   Q.   Were you expressing that to people at Autonomy?

14   A.   Yes.

15   Q.   In particular, did you have interactions with what I'll

16   refer to as tech people at Autonomy?

17   A.   Quite a bit.

18   Q.   And can you describe some of the people that you

19   interacted with at Autonomy about trying to get eDiscovery

20   work from them?

21   A.   Okay.  Well, me personally -- I'm sorry -- me personally,

22   I was working with Fernando Lucini and Pete Menell.

23   Q.   Who was Fernando Lucini?

24   A.   I don't really know his title.  He was like a chief

25   architect of some level.

BAIOCCO - DIRECT / FRENTZEN

1   **Q.**   What does that mean, "chief architect"?

2   **A.**   He was a technical person at one of the higher levels at

3   Autonomy.

4   **Q.**   Where was he based?

5   **A.**   Cambridge or London, both.

6   **Q.**   In the U.K.?

7   **A.**   In the U.K.

8   **Q.**   And who's Pete Menell?

9   **A.**   Pete Menell was, I think, the overall head of technology

10   for Autonomy.

11   **Q.**   Where was he based?

12   **A.**   U.K.

13   **Q.**   In mid-2011, by that point had Capax developed the ability

14   to do eDiscovery work in your opinion?

15   **A.**   Yes.

16   **Q.**   Can you describe for us what Capax had done and what sort

17   of abilities you had to do eDiscovery at that point in time?

18   **A.**   At that point we had sold our first customer direct.  We

19   had a customer called Global Colleague, where we actually were

20   doing eDiscovery work on their behalf.

21   **Q.**   Actually, let me -- is that your recollection?

22   **A.**   Yes.

23   **Q.**   Is there anything I can show you that might help to

24   refresh your recollection about --

25         **THE COURT:**  Well, show him.

1   BY MR. FRENTZEN:

2   Q.   -- when you got off the ground with Global Colleague?

3   A.   Yeah.  If you've got something, that would be helpful.

4        MR. FRENTZEN:  Counsel, I'm on Government's 2496.

5   Q.   Take a look at 2496, and see if that helps to refresh your

6   recollection.

7   A.   (Witness examines document.)  Okay.  Yeah, that's -- I'm

8   sorry.  I said 2010.  That's --

9   Q.   I'll do one better.  Do you recognize what 2496 is?

10  A.   Yeah.  That's an invoice to Global Colleague from Capax.

11       MR. FRENTZEN:  I'd offer that into evidence,

12  Your Honor.

13       THE COURT:  2496 admitted.

14       (Trial Exhibit 2496 received in evidence)

15       MR. FRENTZEN:  Can we just pull up the first page of

16  2496?

17       THE WITNESS:  So at that point we were not ready to

18  do eDiscovery work.  I misspoke.

19       MR. KEKER:  I'm sorry.  I didn't hear that last.

20       THE WITNESS:  I said, the question that he just asked,

21  at that particular moment in time, we were not able to do our

22  own eDiscovery.  I had my years crossed up.  It was December

23  of 2011 when we were finally able.

24       MR. FRENTZEN:  Can we just blow up the date on this?

25  Q.   All right.  And who was Global Colleague?

1    **A.**    They were just a company that was buying our services.

2    **Q.**    What kind of services?

3    **A.**    eDiscovery services.

4    **Q.**    Okay.  To your recollection was this your first

5    eDiscovery client?

6    **A.**    Yes, it was.

7    **Q.**    And the date here on this first invoice is December 1,

8    2011?

9    **A.**    Correct.

10    **Q.**    Okay.  And that helps you to recall --

11    **A.**    100 percent.

12    **Q.**    -- when you got your first eDiscovery customer at Capax?

13    **A.**    Yes.

14    **Q.**    All right.  So I want to go back to mid-2011.  In

15    mid-2011, were you still trying to generate eDiscovery work?

16    **A.**    Correct.

17    **Q.**    Were you working to build out the ability to do

18    eDiscovery work at that time?

19    **A.**    Yes.

20    **Q.**    Can you describe what the efforts were at Capax to do

21    that?

22    **A.**    Well, they were internal efforts to build the software on

23    hardware we had purchased that we put in our data center -- you

24    know, our rented data center space, and we were working with

25    Autonomy to -- to make sure that we had everything right, that

BAIOCCO - DIRECT / FRENTZEN

1   we had all the pieces of the software, and that what we were

2   doing was exactly how they were doing it.

3   **Q.**   Who were you working with at Autonomy to actually get the

4   eDiscovery working?

5   **A.**   It was a tech team of folks.  I don't know all the

6   fellows -- people that were working on the tech level.  I was

7   personally dealing with Fernando and Pete on getting -- getting

8   the business.  There was a bunch of tech guys, you know, at a

9   different level that were in the rooms doing the actual

10   technology work together.

11   **Q.**   Based on your discussions with Mr. Lucini and Mr. Menell,

12   did they express to you an interest in having Capax pick up

13   eDiscovery work from Autonomy at that time in, let's say,

14   March of 2011?

15   **A.**   In March of 2011, they came to me and offered up that they

16   were going to start giving us overflow for BP Amoco.

17   **Q.**   What's BP Amoco?

18   **A.**   That was that whole incident that occurred in the Gulf

19   with the oil spill, so that was a major discovery process and

20   they were telling us they needed help with overflow.

21   **Q.**   Meaning the litigation that came from the BP, the

22   Deepwater Horizon?

23   **A.**   Yes.

24   **Q.**   Okay.  All right.  And so were you -- at that time were

25   you interested in getting that work?

BAIOCCO - DIRECT / FRENTZEN

1   **A.**    Absolutely.

2   **Q.**    At that time did you begin to do things at Capax to be

3   able to pick up eDiscovery overflow from Autonomy related to

4   the BP incident?

5   **A.**    Yes, we did.

6   **Q.**    What did Capax do?

7   **A.**    We rented data center space in the U.K. that we didn't

8   previously have, we bought hardware for the U.K., and then we

9   set up the platform in the U.K.

10  **Q.**    Did Capax spend money on this?

11  **A.**    Absolutely.

12  **Q.**    So in mid-2011, were you working to sort of, you know,

13  make this happen?

14  **A.**    Yes.

15  **Q.**    I want to ask you about another issue in March of 2011.

16  In March of 2011, did something happen related to the U.S.

17  federal government that caused you to have an interest in

18  approaching Autonomy about sort of a joint venture, if you

19  will?

20  **A.**    Yes.  One of our -- one of our sister companies called

21  Autonomics had won a designation of one of 11 companies that

22  was allowed to have a federal security -- FedRAMP certification

23  that was going to allow them to host in government data

24  centers; meaning they had met the criteria, and they only chose

25  11 in the entire country.  And we had beat out some folks like

1  Microsoft and some of the bigger players that didn't -- didn't

2  cut the muster on it.  So it was a big win for our sister

3  company, Autonomics.

4      And at the time there was an initiative from the CIO of

5  the U.S. government that every agency was to move three

6  applications into the cloud, which to us made it even more

7  attractive because if they were going to start moving

8  everything to the cloud and we were only one of 11 vendors that

9  were going to be allowed to actually host for the government,

10  it was just a -- it was a massive win for us.

11  **Q.**    And in terms of the entity that actually got the rights,

12  if you will, to work on this U.S. government project, what was

13  the name of that entity?

14  **A.**    Autonomics Resources.

15  **Q.**    Can you spell "Autonomics" for our court reporter here?

16  **A.**    A-U-T-O-N-O-M-I-C-S, Autonomics.

17  **Q.**    Thank you, Mr. Baiocco.

18      And what was the relation between Autonomics and Capax?

19  **A.**    There was a -- mutual partners.  I was not a partner in

20  Autonomics, but some of my partners were mutual partners in

21  Autonomics.

22  **Q.**    So did you have -- or what was it about this opportunity

23  related to Autonomics that caused you to think that there might

24  be some reason to talk to Autonomy about it?

25  **A.**    Well, because they had a federal sales division, and I

**BAIOCCO - DIRECT / FRENTZEN**

1    thought it would be a great entree into them getting a ton of

2    work with the government.

3    **Q.**    Was there anybody in particular at Autonomy that you were

4    interested in talking to about this U.S. government

5    opportunity?

6    **A.**    Yeah.  I had asked Stouffer Egan and Andy, and they

7    directed me directly to talk with Sushovan about it.

8    **Q.**    Is that Sushovan Hussain?

9    **A.**    Correct.

10    **Q.**    Prior to that time, to your knowledge, had you met

11    Mr. Hussain?

12    **A.**    Not formally.

13    **Q.**    And when you say "not formally," what do you mean?

14    **A.**    Maybe I saw him in a room at a function or something but

15    never any interaction.

16    **Q.**    In terms of -- what was your understanding of what

17    Mr. Hussain's role was at Autonomy?

18    **A.**    He was the CFO.  You know, probably under Mike Lynch.  The

19    number one guy in charge after Mike.

20    **Q.**    Did you try to set up a meeting with Mr. Hussain?

21    **A.**    I did.

22    **Q.**    Can you tell us where that meeting was supposed to take

23    place?

24    **A.**    The meeting was to occur in Cambridge, U.K.

25    **Q.**    Was there at that time, other than this federal government

1  cloud opportunity, was there another reason why you were going

2  to travel to the U.K. at that time?

3  **A.**   Yeah.  The meeting was set because I was set to go for

4  something else.

5  **Q.**   What was the something else?

6  **A.**   It was the final stage of Capax and Autonomy running the

7  same datasets through to make sure we were getting the same

8  results.  That was on the eDiscovery stuff, to make sure that

9  Capax was 100 percent ready to go; that if you entered the same

10 data, you got the same results.

11 **Q.**   Okay.

12 **A.**   So that they could trust that we were ready -- so that

13 Autonomy could trust that Capax was ready to take the overflow

14 business.

15 **Q.**   So was this related to your actually setting up a data

16 center in the U.K --

17 **A.**   Yes.

18 **Q.**   -- to do the eDiscovery work?

19 **A.**   Yes.

20 **Q.**   Initially was the meeting set for late March of 2011?

21 **A.**   Yeah.  I think it was set for a couple of times.  It got

22 pushed.

23 **Q.**   I'd like to show you what's been marked as

24 Government's 1739.  Take a look at Government's 1739, please,

25 Mr. Baiocco.

**BAIOCCO - DIRECT / FRENTZEN**

1  **A.**   (Witness examines document.)

2  **Q.**   Do you recognize what that is?

3  **A.**   Yeah.  It's a thread between me and Fernando.

4  **Q.**   Who's Fernando?

5  **A.**   Lucini, Fernando Lucini, from Autonomy.

6          **THE COURT:**  Admitted.

7      (Trial Exhibit 1739 received in evidence)

8          **MR. FRENTZEN:**  Thank you, Your Honor.

9      Can we show 1739?  And can we blow up sort of the second

10 part?

11     Yeah.  Great.

12 **Q.**   Okay.  All right.  What is the date of sort of the e-mail

13 that's from you, the portion of this thread that's from you,

14 Mr. Baiocco?

15 **A.**   April 5th.

16 **Q.**   Of 2011?

17 **A.**   I'm sorry.  Yes, of 2011.

18 **Q.**   And what did you tell Mr. Lucini here about your phone?

19 **A.**   That it wasn't working.

20 **Q.**   What else did you say?

21 **A.**   Meeting with Sushovan as well.

22 **Q.**   When?

23 **A.**   The following day.

24 **Q.**   Where?

25 **A.**   In Cambridge.

1   **Q.**   And can we go to the very top e-mail?

2   **A.**   Yes.

3   **Q.**   Oh, sorry.  I was asking Ms. Margen, Mr. Baiocco.  You

4   too.

5        Okay.  What is the date on this?

6   **A.**   April 6th, 2011.

7   **Q.**   And in terms of -- is this an e-mail from you?

8   **A.**   (Witness examines document.)

9   **Q.**   At the very top part.

10  **A.**   No.  It's from Fernando to me.

11  **Q.**   The very top of the e-mail thread?

12  **A.**   Oh, I'm sorry.  From -- my apologies -- from me to

13  Fernando, correct.

14  **Q.**   And does this -- what did you say in this e-mail?

15  **A.**   (reading)

16        "I'm here," meaning I'm in the building at Cambridge.

17       "Sush said you and Pete want to meet."

18  **Q.**   Who is Pete again?

19  **A.**   Pete Menell.

20  **Q.**   Who is Sush?

21  **A.**   Sushovan Hussain.

22  **Q.**   Does this e-mail help to remind you of where you were and

23  what date it was that you met with Mr. Hussain?

24  **A.**   Yeah.  It was April 6th in Cambridge.

25        **THE COURT:**  England?

1          **THE WITNESS:**  England, yes.

2          **MR. FRENTZEN:**  Thank you, Your Honor.

3     **Q.**   Where did you meet?  Where were you on that day?  Where

4     did you meet with Mr. Hussain?

5     **A.**   I met him at the Autonomy offices in Cambridge.

6     **Q.**   Can you describe those offices for us please, sir?

7     **A.**   In what way?

8     **Q.**   Well --

9     **A.**   That was kind of their original headquarters, I guess.  It

10    was kind of a warehousey space where when their executives were

11    in that area, that's where they -- that's where they sat.

12    **Q.**   All right.  And can you describe for us on that day, to

13    the best of your recollection, sort of how did the meetings --

14    what kind of meetings took place that day?

15    **A.**   Okay.  Well, on that day, my team was there -- my

16    technical team was there with Autonomy's technical team

17    interacting over the EDD platform.

18    **Q.**   And how was it that you ended up meeting with Mr. Hussain?

19    **A.**   Well, I had asked because I wanted to pitch to him.  They

20    told me -- Stouffer and Andy or Fernando had told me he was the

21    guy to pitch the award we had just won to.  I was trying to

22    pitch it to Autonomy to purchase it from us.

23    **Q.**   All right.  Did you, in fact, have that meeting with

24    Mr. Hussain?

25    **A.**   Yes.

**BAIOCCO - DIRECT / FRENTZEN**

1  **Q.** When you met with Mr. Hussain, did you discuss this

2  potential U.S. government cloud deal?

3  **A.** Yes.

4  **Q.** Did Mr. Hussain bring up anything with you outside of the

5  cloud deal?

6  **A.** Yeah. At that meeting at Cambridge, he had brought up

7  that he had said Stouffer was supposed to be chasing me at the

8  end of the quarter for one of the VAR deals, and somehow he let

9  it slip through the cracks and would I -- you know, would I do

10 it.

11      And I denied it because we had just signed the first half

12 of another VAR deal, and our partners were getting a little

13 edgy because they hadn't closed out some of them so it started

14 to feel like a little too much.

15 **Q.** So Mr. Hussain proposed a VAR deal to you?

16 **A.** He proposed it, yes.

17 **Q.** Now, when you said "end of the quarter," do you know this

18 date, the date of this meeting, April 6, 2011, what would have

19 been the end of the quarter?

20 **A.** March 31st.

21 **Q.** So when he proposed an end-of-the-quarter VAR deal, what

22 was your response?

23 **A.** I just said we just took a big one at the end of March

24 already. My partners will never go for another one, whatever

25 it was.

1   Q.   We'll get into it in a second.

2        Was that other VAR deal a UBS deal?

3   A.   It was.

4   Q.   Okay.  Was that a large --

5   A.   It was 8 million par one.

6   Q.   Did Mr. Hussain tell you how much this quarter-end VAR

7   deal he was proposing was for?

8   A.   Around 1.6 million.

9   Q.   After you said no to the VAR deal, what, if anything, did

10  Mr. Hussain tell you?

11  A.   Well, then he brought up that we needed to talk about the

12  internal use license for us to be able to do eDiscovery work

13  in the U.K.

14  Q.   Was that a surprise to you?

15  A.   Yes.

16  Q.   Did you have any understanding that your existing license

17  deals wouldn't allow you to do any work in the U.K.?

18  A.   Up to that point, no.

19  Q.   And so up to that point, how much had you -- what was the

20  total ticket item at that point of the license deals for EDD

21  software between Autonomy and Capax?

22  A.   Around 12 million.

23  Q.   Was there anything in those contracts to your knowledge

24  that said you couldn't do EDD work outside of the U.S.?

25  A.   No.

**BAIOCCO - DIRECT / FRENTZEN**

1   Q.   So was this a little bit of a surprise to you?

2   A.   Yes.

3   Q.   Had you previously provided invoices to Autonomy for

4   European projects, as we just saw a minute ago, at this point

5   in time, April 6 of 2011?

6   A.   Yes, we had.

7   Q.   Had those invoices been paid by Autonomy?

8   A.   Yes.

9   Q.   Had anyone told you you're not supposed to do projects in

10  Europe?

11  A.   No.

12  Q.   Were you doing any projects in Europe?

13  A.   No.

14  Q.   Who came up with European projects in terms of what

15  entity?   In other words, did Capax come up with European

16  projects for the false invoices?

17  A.   No.

18  Q.   Where did that come from?

19  A.   Directly from Autonomy.

20  Q.   Were those invoices false invoices, the European projects?

21  A.   Yes.

22  Q.   All of the EDD purchase orders from Autonomy, were they

23  false?

24  A.   Yes.

25  Q.   At that point in time, during your meeting with

1    Mr. Hussain, did you respond to him talking about additional

2    licensing?

3    **A.**    I said, "Yeah, let's talk about it."  I didn't really know

4    what to say at that point.

5    **Q.**    Okay.  Did you agree to anything during the course of that

6    meeting?

7    **A.**    No.

8    **Q.**    Did you then actually discuss the cloud idea with

9    Mr. Hussain?

10   **A.**    I did.

11   **Q.**    Did he express at that time any interest in what you were

12   proposing?

13   **A.**    Yes, he did.  He expressed interest and expressed that he

14   was leaving to go to San Francisco, I think for an Autonomy

15   board meeting, and that he was going to discuss it with them.

16   **Q.**    At that time in Cambridge did you arrange to have any

17   further meetings with Mr. Hussain while you were in the U.K.?

18   **A.**    Yeah.  I was going to do the total pitch on it the next

19   day in London, the government award piece, FedRAMP.

20   **Q.**    Okay.  So when you say "the total pitch," was this -- the

21   meeting in Cambridge, was this a briefer meeting?

22   **A.**    Yeah.  That was probably less than ten minutes.

23   **Q.**    All right.  Did you arrange with Mr. Hussain to meet him

24   the following day?

25   **A.**    I arranged to meet the following day in London.

**BAIOCCO - DIRECT / FRENTZEN**

**Q.**   In London where?

**A.**   At Autonomy headquarters.

**Q.**   At some point did you leave -- I'm still on April 6,
2011 -- did you leave the Autonomy offices in Cambridge?

**A.**   I did.

**Q.**   If you recall, where did you go?

**A.**   Back to our London office for Capax.

**Q.**   And at that time the London office for Capax was supposed
to be doing what?  I mean, what business was -- what type of
business did you have in London for Capax?

**A.**   I mean, it was all wrapped around Autonomy, so it was all
professional services.  At that point we had support, sales.
So it was 100 percent an Autonomy-centric business in London.

**Q.**   At this point in time, had Capax laid out money to try to
get a data center going in the U.K. for this overflow BP work
from Autonomy?

**A.**   Probably just after that, or close to.  I'm not sure of
the exact date.

**Q.**   Well, did Capax end up trying to open a data center in the
U.K.?

**A.**   Oh, we did.  I signed a three-year lease ultimately.  I'm
just not sure exactly what -- what the timing is.  But, yes, we
signed a three-year data center lease.  We bought hardware, we
put hardware in that data center, and we loaded the discovery
software into that hardware to be able to do EDD processing.

**BAIOCCO - DIRECT / FRENTZEN**

1  Q.   Let me ask you the question that, as of the time you met

2  with Sushovan Hussain, was Capax exposed in the sense that you

3  had money out-of-pocket on --

4          **MR. KEKER:**  Objection.  Leading, Your Honor.

5          **THE COURT:**  Overruled.

6          **THE WITNESS:**  The answer is yes, thinking about it,

7  because I was assuming we were -- the work we were doing we

8  were doing probably tapping into our data center, so we

9  probably were set up at that point.  We didn't bring a box into

10 Autonomy to run the data so, yes.

11 **BY MR. FRENTZEN:**

12 Q.   Okay.  When you left the Cambridge office, did you receive

13 any paperwork from folks at Autonomy related to the

14 conversation you'd had with Mr. Hussain?

15 A.   Not when I left Cambridge, but it was waiting for me when

16 I got to our U.K. office.

17 Q.   What was waiting for you at your U.K. office?

18 A.   An internal use PO for $1.6 million that was written under

19 the guise of giving us the ability to do EDD work in the U.K.

20 Q.   I'm going to show you what's been marked for

21 identification as Government's 1733, and I'll go ahead and hand

22 you 1734, 1743 --

23         **THE COURT:**  1733, 1734, and what?

24         **MR. FRENTZEN:**  1743.

25         **THE COURT:**  1743.

1          MR. FRENTZEN:  -- 1745 and 1750.

2                    (Pause in proceedings.)

3    BY MR. FRENTZEN:

4    Q.   Let's start with 1733, Mr. Baiocco.  Can you take a look

5    at that, please, sir?

6    A.   (Witness examines document.)  Yep, that's the

7    second amendment to the license/distribution agreement.

8          THE COURT:  1733?

9          MR. FRENTZEN:  1733, Your Honor, yes.

10         THE COURT:  Is the -- okay.

11   BY MR. FRENTZEN:

12   Q.   And on page 1, is that an e-mail?

13   A.   It is.

14   Q.   With an attachment?

15   A.   Correct.

16   Q.   You recognize those things?

17   A.   Yes.

18   Q.   And the e-mail was sent to you?

19   A.   It was.

20         MR. FRENTZEN:  Offer it.

21         THE COURT:  Admitted.

22         (Trial Exhibit 1733 received in evidence)

23         MR. FRENTZEN:  Can we show the first page and blow up

24   the e-mail, please, Ms. Margen?

25   Q.   What's the date of this e-mail, Mr. Baiocco?

BAIOCCO - DIRECT / FRENTZEN

1   **A.**   April 6, 2011.

2   **Q.**   Who is it from?

3   **A.**   It is from Joel Scott to me cc'ing Stouffer Egan and James

4   Crumbacher.

5   **Q.**   What does it say in the body there, please?

6   **A.**   (reading)

7          "Attached is the document requested.  I am currently

8          in the office but am leaving momentarily so if you need to

9          reach me, please try my cell," blah, blah, blah, "or call

10          Jim Crumbacher."

11   **Q.**   And who was Joel Scott again?

12   **A.**   He was an attorney, high-up attorney, at Autonomy.

13   **Q.**   Can we take a look at at page 2 of this?

14          What was attached to that e-mail, Mr. Baiocco?

15          And can we blow up the top part first?

16   **A.**   It's the second amendment to the license/distribution

17   agreement.

18   **Q.**   Other than your conversation with Mr. Hussain where he

19   requested that you do a VAR deal and then said you had to talk

20   about the licensing, did you expect to get this document?

21   **A.**   No.

22   **Q.**   And this says "Second Amendment to the License and

23   Distribution Agreement."  Was the first amendment the one we

24   saw earlier for 4 million?

25   **A.**   Yes.

BAIOCCO - DIRECT / FRENTZEN

1  Q.   In other words, the original license agreement was how

2  much?

3  A.   The original license was seven something.  The second one

4  was four something.

5  Q.   Can we go down to the --

6  A.   Let me just -- I want to say one thing.  I wasn't not

7  expecting to get this document, but I had no idea how much the

8  dollar value was going to be.

9  Q.   Okay.  What do you mean by that?

10 A.   I mean, he had mentioned that we had to talk about

11 commercials for doing eDiscovery in Europe, and I kind of

12 said, "Yeah, okay."  So I didn't have a dollar value in my

13 head, but --

14 Q.   But you mean that was just in that conversation you had

15 earlier that day?

16 A.   Yes.  Yes.

17 Q.   Okay.  Can we go down and blow up the fees, please,

18 Ms. Margen?  All the way down to the bottom there.

19      Great.  Thanks.

20      What were the fees here that Capax would owe to Autonomy?

21 A.   Almost $1.7 million.

22 Q.   So that's --

23 A.   Two payments of 840,000.

24 Q.   And in terms of the initial fees in part 2a,

25 Second Amendment License Fee, how much was that for?

BAIOCCO - DIRECT / FRENTZEN

1    **A.**    1,600,000.

2    **Q.**    And so then with the fees, it would be 1.68 million?

3    **A.**    Correct.

4    **Q.**    How did this --

5    **A.**    Support fee.

6    **Q.**    How did this, the fees reflected in this license

7    agreement, compare to the VAR deal, the quarter-end VAR deal,

8    that Mr. Hussain had asked you to do earlier that day?

9    **A.**    Pretty much the same.

10   **Q.**    Let's go to Government's 1734, please, sir.  Do you

11   recognize what Government's 1734 is, sir?

12   **A.**    (Witness examines document.)  Yeah.  It's an e-mail to me

13   from Jim Crumbacher.

14   **Q.**    And is that --

15          **MR. FRENTZEN:**  I'd offer it.

16          **THE COURT:**  Admitted.

17   (Trial Exhibit 1734 received in evidence)

18          **MR. FRENTZEN:**  Thank you.

19          **THE WITNESS:**  Yeah, it's the second amendment again,

20   yes.

21          **MR. FRENTZEN:**  Could we blow up the top part there?

22   **Q.**    Okay.  What was the date on this one?

23   **A.**    The date of the e-mail?

24   **Q.**    Right.

25   **A.**    April 6th.

BAIOCCO - DIRECT / FRENTZEN

1    **Q.**    Same date?

2    **A.**    Yes.

3    **Q.**    And who was this one from?

4    **A.**    Jim Crumbacher.

5    **Q.**    Cc'ing who?

6    **A.**    Stouffer Egan to me, John Baiocco.

7    **Q.**    Okay.  What does it say in the body there?

8    **A.**    (reading)

9              "Per Stouffer, attached is an execution-ready version

10    of the second amendment dated March 31st.  Please let me

11    know if you have any questions."

12    **Q.**    All right.  And this says "dated March 31st."  This e-mail

13    was sent to you on what date?

14    **A.**    April 6th.

15    **Q.**    A week later?

16    **A.**    Yes.

17    **Q.**    As of March 31st, had you agreed to any second amendment

18    to the license with Autonomy?

19    **A.**    No, I hadn't.

20    **Q.**    Okay.  Can we show page 2?  And just blow up the first

21    part briefly.

22         Is this the same attachment as you had gotten on the same

23    date also from Joel Scott from Autonomy?

24    **A.**    Yes.

25    **Q.**    You're getting it from two different Autonomy folks?

BAIOCCO - DIRECT / FRENTZEN

1    **A.**   Right, two different attorneys.

2    **Q.**   And the date on this second amendment, is that there in

3    the first paragraph there?

4    **A.**   Yeah.  March 31st, 2009.

5    **Q.**   2000 what?

6    **A.**   Oh, wait.  That's -- I think that was referring to the

7    first one.

8    **Q.**   Right.

9    **A.**   I'm sorry.

10   **Q.**   In the very second line.  Sorry.

11   **A.**   Yeah, March 31st, 2011.

12   **Q.**   So that would be what?

13   **A.**   Six days prior to the meeting.

14   **Q.**   After you received multiple copies of this

15   second amendment, did you go ahead and sign?

16   **A.**   I did.

17   **Q.**   Why did you do that?

18   **A.**   Because it was our -- it was our gateway to getting the

19   U.K. overflow.  It felt like to me pay to play.  If I didn't do

20   it, there was a chance after all the money we invested, we

21   weren't going to get the work.

22   **Q.**   So as this came to you, did it come backdated?

23   **A.**   It did.

24   **Q.**   I'd like you to turn now to Government's 1743, please,

25   sir.

1   **A.**    (Witness examines document.)

2   **Q.**    Do you recognize what 1743 is, Mr. Baiocco?

3   **A.**    Yeah.   It's an e-mail of me sending over the signed

4   amendment to Jim Crumbacher.

5             **THE COURT:**   Admitted.

6        (Trial Exhibit 1743 received in evidence)

7             **MR. FRENTZEN:**   Thank you, Your Honor.

8        Could we show the -- blow up the e-mail there?

9   **Q.**    Okay.   Let's start with the first part.   Do you know who

10  vrobbins@capaxglobal is, Mr. Baiocco?

11  **A.**    She was our admin in the U.K. office.

12  **Q.**    All right.   And so she had sent you an e-mail -- right? --

13  on what date?

14  **A.**    April 6th.

15  **Q.**    And then did you go -- based on the top part, did you go

16  ahead and forward that on?

17  **A.**    I did.

18  **Q.**    Can you go to the -- who did you forward it to?

19  **A.**    James Crumbacher.

20  **Q.**    On what date?

21  **A.**    April 6.

22  **Q.**    Can we go ahead and go to the attachment?

23        And is this the same second amendment?

24  **A.**    It is.

25  **Q.**    Can we go to the third page, please, Ms. Margen, and can

**BAIOCCO - DIRECT / FRENTZEN**

1   you just blow up what's there?

2        Whose signature is that, Mr. Baiocco?

3   **A.**   Mine.

4   **Q.**   What date did you put?

5   **A.**   3/31.

6   **Q.**   Why did you do that?

7   **A.**   It was the effective date of the contract, and I knew they

8   wanted me to put 3/31 on there.

9   **Q.**   Well, in reality was it the effective date of the

10  contract?

11  **A.**   In reality, no.

12        **MR. KEKER:**  Objection.  That calls for a legal

13  conclusion, Your Honor.

14        **THE COURT:**  Sustained.

15  **BY MR. FRENTZEN:**

16  **Q.**   In your opinion, was that the effective date of the

17  contract?

18        **MR. KEKER:**  Objection.  Irrelevant.

19        **THE WITNESS:**  No.

20        **THE COURT:**  Overruled.

21  **BY MR. FRENTZEN:**

22  **Q.**   Why not?

23  **A.**   Because I hadn't had any discussion about it before that.

24  **Q.**   Was there any deal consummated between Capax and Autonomy

25  as of March 31st of 2011 for this $1.6 million?

1   **A.**   Absolutely not.

2   **Q.**   Okay.  Let's move to Government's Exhibit 1750, please.

3   **A.**   I don't think I have that one.

4          **THE COURT:**  Well, did we deal with 1745 --

5          **THE WITNESS:**  Right.

6          **THE COURT:**  -- or we're not?

7          **MR. FRENTZEN:**  Sorry, Your Honor.

8          **THE COURT:**  I marked it for identification I don't

9   know where.

10         **MR. FRENTZEN:**  One moment, Your Honor.

11                    (Pause in proceedings.)

12         **MR. FRENTZEN:**  Ah, yes.  Thank you.

13  **Q.**   Can you take a look at 1745, please, Mr. Baiocco?

14  **A.**   Yes.

15  **Q.**   Do you recognize what that is?

16  **A.**   Yes.

17  **Q.**   What is it?

18  **A.**   It was an e-mail from Sushovan to me thanking me for the

19  PO and --

20  **Q.**   Okay.  Hang on.

21         **MR. FRENTZEN:**  I'd offer it into evidence, Your Honor.

22         **THE COURT:**  Admitted.

23      (Trial Exhibit 1745 received in evidence)

24         **MR. FRENTZEN:**  Can we show the second --

25         **THE WITNESS:**  Wait a minute.  I'm sorry.  That's -- he

1    was thanking me for sending him the --

2    **BY MR. FRENTZEN:**

3    Q.   We'll get into it.  Sorry.  I understand.  We'll get into

4    it.

5    A.   Okay.

6    Q.   Okay.

7         All right.  So the first part of this e-mail, what date is

8    this?

9    A.   April 6th.

10   Q.   Of 2011?

11   A.   2011.

12   Q.   That's from you to who?

13   A.   Me to Sushovan Hussain.

14   Q.   And what was the subject here a reference to?

15   A.   That award that I had talked about Autonomics winning and

16   how it was relevant to this 25-point implementation program

17   that the government was rolling out.

18   Q.   The cloud project that you were actually interested in

19   talking to Mr. Hussain about?

20   A.   Correct.

21   Q.   Okay.  And did you also make reference to a meeting?

22   A.   Yes.  (reading)

23            "And thanks for your time today.  It was great to

24        finally meet you."

25   Q.   Did you then make reference to sending him some more

1   information?

2   **A.**   I did.

3   **Q.**   And what was that -- the information that you were

4   offering to send him here in this e-mail, what was that related

5   to?

6   **A.**   It was all related to the cloud project for the U.S.

7   government.

8   **Q.**   Could we go to the top part, then, the response?

9        Okay.  And I guess, do you know whether or not this time

10   is -- do you have any idea what time zone this is?

11   **A.**   I've been trying to -- I'm having a hard time figuring out

12   time zones.

13   **Q.**   Okay.  But, in any event, is this a response from

14   Mr. Hussain to you?

15   **A.**   It is on the next day, April 7th.

16   **Q.**   And could you read us what he said to you?

17   **A.**   (reading)

18            "Thanks for this," I guess regarding the information

19        I sent him on the cloud.  "You were sending some more?"  I

20        thought I had sent everything but he was looking for more

21        information.  "Also, if you have a few minutes, can I send

22        someone to collect the PO?"

23   **Q.**   What was the PO?

24   **A.**   It was the 1.6 second amendment that we just reviewed a

25   couple minutes ago.

1  Q.   So Mr. Hussain was asking if he could have someone come

2  and collect that?

3  A.   Correct.

4  Q.   And where were you around April 7th of 2011?

5  A.   In London.

6  Q.   Okay.  Does this last part mean anything to you?

7  A.   It was just Mike Mooney trying to check on where we were

8  on closing out another VAR deal.

9  Q.   And now I'd like to go to Government's 1750.  And do you

10  have that up there?  Did I hand you that?

11  A.   I do.  I do.

12  Q.   Okay.  Great.

13       Can you take a look at that and see if you recognize what

14  that is?

15  A.   Yeah.  The top half is an e-mail from me to Sushovan.

16       THE COURT:  Admitted.

17  (Trial Exhibit 1750 received in evidence)

18       MR. FRENTZEN:  Thank you, Your Honor.

19       Could we show the -- could we start with the -- from the

20  second group down?

21       Great.  Thank you.

22  Q.   Mr. Baiocco, do you recognize -- in other words, the

23  bottom two e-mails, are those ones we've previously seen?

24  A.   (Witness examines document.)  "Fully executed," that one,

25  "and confirm"?

BAIOCCO - DIRECT / FRENTZEN

1    **Q.**    Right.

2    **A.**    Yes.

3    **Q.**    Okay.

4    **A.**    That was me sending it to Jim Crumbacher, my executed

5    version.

6    **Q.**    After you had signed?

7    **A.**    After I had signed, correct.

8    **Q.**    And then did Mr. Crumbacher get back to you on April 6,

9    2011?

10    **A.**    "Fully executed attached."

11    **Q.**    What would that mean?

12    **A.**    That it was countersigned by Autonomy.

13    **Q.**    Can we now back out and show the top part?

14    Okay.  Great.  Thank you, Ms. Margen.

15    What did you do, if anything, to forward that fully

16    executed agreement on?  What did you do here?

17    **A.**    (Witness examines document.)  I had already sent it to

18    Crumbacher the night before.

19    **Q.**    Okay.  But, I mean, after he sent you the fully executed,

20    did you forward that on according to this e-mail?

21    **A.**    (Witness examines document.)

22    **Q.**    Are you looking at the top --

23    **A.**    Yeah.  I'm sorry.  I do see the attachment.

24    **Q.**    Are you looking at the top part?

25    **A.**    Yes, I did.

1  **Q.**   Okay.  Are you with me?

2  **A.**   Yep.

3  **Q.**   On what date?

4  **A.**   April 7, 2011.

5  **Q.**   And to who?

6  **A.**   Sushovan.

7  **Q.**   And what did you send Mr. Hussain?

8  **A.**   The fully executed, I think.  I mean, it's certainly the

9  second amendment.  It looks like it was the fully executed

10  version.

11  **Q.**   Why did you send that directly to Mr. Hussain?

12  **A.**   Because he asked me to have somebody come by and pick it

13  up, so I just wanted to show him that I'd taken care of it.

14  **Q.**   Okay.  And what did you ask?

15  **A.**   "Do you need more?"

16  **Q.**   Okay.  And then was there also some discussion about cloud

17  stuff?

18  **A.**   Correct.

19  **Q.**   Okay.

20      Can we go, Ms. Margen, to page 2 of this?

21      Mr. Baiocco, from page 2 was what you sent Mr. Hussain the

22  second amendment?

23  **A.**   Yes.

24  **Q.**   And can we go to the third page, please, Ms. Margen?

25  **A.**   Yes.

1  Q.  And can you blow that up?

2      Okay.  Was that the fully executed agreement?

3  A.  Correct.

4  Q.  And who countersigned for Autonomy?

5  A.  Stouffer Egan.

6  Q.  After you sent that second license to Mr. Hussain, on

7  April 7th, 2011, did you meet with Mr. Hussain again?

8  A.  I did.

9  Q.  Okay.  What was supposed to be the purpose of that

10  meeting?

11  A.  It was to go through the cloud initiative for the

12  government and really kind of get into a little bit more detail

13  on why I thought it would be valuable to them.

14  Q.  Did you do that during that meeting?

15  A.  Yes.

16  Q.  Incidentally -- I'm sorry -- while we've still got it up

17  here, what you sent to Mr. Hussain on April 7th of 2011, the

18  fully executed agreement, was that dated March 31st, 2011?

19  A.  Yes.

20  Q.  And on the countersign, was there any date listed?

21  A.  No.

22  Q.  When you met with Mr. Hussain on April 7th, 2011, where

23  was that meeting again?

24  A.  In London at the Autonomy office space.

25  Q.  What was that like?

1    **A.**    Really nice.  It was in St. James Square.

2    **Q.**    Anything more to say about it than that?

3    **A.**    Well, I mean, it looked like the Palace of Versailles.  I

4    don't know.  It was the nicest offices I've ever seen.

5    **Q.**    What was your meeting like with Mr. Hussain on that day in

6    terms of the cloud stuff?  Did you go through that?

7    **A.**    Yeah.  We went through it pretty well.

8    **Q.**    Who was present for that meeting?

9    **A.**    Just him and I.

10    **Q.**    When you say you went through it pretty well, what was

11    the --

12    **A.**    Just trying to explain it the best I could.  I really

13    wasn't the best person to explain it because it was a sister

14    company and I didn't really understand how it all worked, so it

15    was more about getting them excited and then having a greater

16    meeting at some point where we could really dig into the nuts

17    and bolts of it.

18    **Q.**    And what was your pitch to Autonomy about how they could

19    get in on that, the cloud thing?

20    **A.**    I just wanted them to -- it was a flat-out pitch, "Why

21    don't you guys buy this and then you'll have this distinction

22    inside the government that will give you a leg up on every

23    other software company if they're going to start moving apps to

24    a lot of the cloud initiative from the government?"

25          Stuff that looked like it was going to move first was all

1  e-mail and that kind of stuff that would be eDiscovery

2  related, so it felt like a perfect play.

3  **Q.**   During the course of that meeting, did Mr. Hussain express

4  any interest in what you were proposing in terms of the cloud?

5  **A.**   He did.

6  **Q.**   Did he propose any follow-up?

7  **A.**   Well, he mentioned he was going to San Francisco for an

8  Autonomy board meeting and that, you know, he was going to

9  bring it up with the -- with a larger group.

10  **Q.**   Did you ask Mr. Hussain anything about that

11  second amendment to the license when you met with him on

12  April 7th of 2011 after forwarding it to him?

13  **A.**   Yeah.  I mean, I just said, "Hey, we're going to get the

14  Deloitte work; right?  If not, we're good."  And he said,

15  "Yes."

16      I mean, I'm sorry.  Deloitte/BP Amoco.

17  **Q.**   What did that mean?

18  **A.**   Meaning they were going to give us the overflow EDD

19  processing; and if for some reason they didn't, that I was

20  going to be covered on this purchase order like previous times.

21  **Q.**   What was Mr. Hussain's response to that?

22  **A.**   Yes.

23  **Q.**   And what did you take that to mean?

24  **A.**   Not to worry about it.  Either we'd get the BP Amoco work,

25  which would more than cover this, or if something went wrong,

**BAIOCCO - DIRECT / FRENTZEN**

1    that they would make it up to us.

2    **Q.**   All right.  And is that pretty much the meeting with

3    Mr. Hussain --

4    **A.**   That's it.

5    **Q.**   -- related on that?

6    **A.**   Yeah.

7    **Q.**   Okay.  Great.

8        I'd like to move now to show you what's been marked as

9    Government's --

10        **MR. FRENTZEN:**  The Court's indulgence one moment,

11   Your Honor.  I want to make sure I've got the right e-mail.

12                    (Pause in proceedings.)

13        **MR. FRENTZEN:**  Yeah.

14   **Q.**   -- 1841.

15       Incidentally, did you ever get the BP work from Autonomy?

16   **A.**   We did not.

17   **Q.**   Did you ever do any work in the -- EDD work in the U.K.

18   for Autonomy?

19   **A.**   No, we didn't.

20   **Q.**   Was that $1.6 million license of any value to you?

21   **A.**   None.

22   **Q.**   I'd like to show you what's been marked as

23   Government's 1841.

24   **A.**   (Witness examines document.)

25   **Q.**   Do you recognize what that is, Mr. Baiocco?

A.   (Witness examines document.)  It's just -- it's an e-mail from me to Sushovan and cc'ing Andy Kanter.

Q.   And is there -- well, is there also originally an e-mail from Mr. Hussain to you?

A.   Okay.  I'm sorry.  Yeah.  We kind of jumped.

MR. FRENTZEN:  Your Honor, I'd offer Government's 1841 into evidence.

THE COURT:  Admitted.

(Trial Exhibit 1841 received in evidence)

MR. FRENTZEN:  Can we start with the bottom part, please, Ms. Margen?

THE WITNESS:  Sure.  All right.  So his e-mail to me --

BY MR. FRENTZEN:

Q.   Just if I could -- sorry.  I don't want to -- what was the date?

A.   June 13th.

Q.   2011?

A.   I'm sorry.  2011.

Q.   Okay.  And what was Mr. Hussain talking to you about here?

A.   All right.  So it's a two-fold e-mail.  One is at that point we had been given all the global support for EAS, which was one of the eDiscovery archive products.  It was a good contract for us.

     And they had bought Iron Mountain somewhere in between

**BAIOCCO - DIRECT / FRENTZEN**

1   there, and Iron Mountain had a product that pretty much did the

2   same thing as EAS, and they were about to turn over global

3   support of that to Capax as well.

4   **Q.**   All right.  In terms of this, Mr. Hussain, his e-mail to

5   you, were there a couple of, if you will, proposals to you

6   here?

7   **A.**   Correct.

8   **Q.**   Did one relate to NearPoint?

9   **A.**   It did.

10  **Q.**   Okay.  And what was that about?

11  **A.**   That was about Autonomy turning over support globally to

12  Capax -- support and maintenance to Capax for support for the

13  product NearPoint.

14  **Q.**   Is that something that eventually happened?

15  **A.**   It is.

16  **Q.**   Okay.  Was there also in there a reference at sort of the

17  bottom part of his e-mail -- so after the bullet points --

18  about a proposal?

19  **A.**   There was.

20  **Q.**   What's that about?

21  **A.**   We had built -- I don't know what's happening.  I'm not

22  touching that.  I'm sorry.

23  **Q.**   It's all right.

24  **A.**   We had built a tool set, staging tools, that were used in

25  the eDiscovery process and apparently when we used our tools,

1  it worked better than without our tools, and they wanted to

2  purchase that tool set from us.

3  **Q.**   All right.

4  **A.**   That's what the e-mail refers to.

5  **Q.**   All right.  And is Mr. Hussain proposing a dollar value in

6  here?

7  **A.**   Yeah.  He's proposing 5 or $6 million.

8  **Q.**   At this particular time in June of 2011, was Capax, let's

9  say, on paper pretty severely indebted to Autonomy?

10  **A.**   Yes.

11  **Q.**   Can you give us any idea of --

12  **A.**   20, 30 million maybe.  20 million.

13  **Q.**   Were there a couple of outstanding VAR deals that there

14  were issues with?

15  **A.**   Yes.

16  **Q.**   Okay.  Was one of those FSA still?

17  **A.**   Yes.

18  **Q.**   And was one of those McAfee?

19  **A.**   Yes.

20  **Q.**   And I think you previously described some of the issues

21  with those, but can you give us an idea of the dollar values,

22  if you recall, around those?

23  **A.**   Yeah.  McAfee was at 5 million and -- what was the other

24  one? -- FSA was about 4.5 million.

25  **Q.**   All right.  And, let's see -- if we could go up to the top

BAIOCCO - DIRECT / FRENTZEN

1   margin, Ms. Margen -- what your response was.

2        Okay.  And what were you explaining here?

3   A.   He was looking for some sort of proposal, I believe, for

4   the tools from us.  So I say (reading):

5            "I will have something to you shortly."

6        And then I'm asking on NearPoint (reading):

7            "I'm assuming you will get me a PO and support

8        contract?  We can add NP to the existing EAS ACA

9        contract?"

10       So that was just adding products we would do support

11  globally on their behalf.

12  Q.   Was this the beginning of, effectively, some conversations

13  with Mr. Hussain about coming up with this proposal?

14  A.   Yes, it was.

15  Q.   All right.  Before I get to the conclusion of that, I want

16  to show you a series of transactions around that time.

17       If I could show you Government's Exhibits 1907, 1908, 1909

18  and 1910, and maybe just ask you to go through those as a group

19  and see if you recognize what they are.

20  A.   (Witness examines document.)  The first one, 1907, is a

21  VAR transaction deal for UBS.

22  Q.   Let me just ask you this:  Do they all relate to a VAR

23  transaction for UBS?  Just if you can go through them.

24  A.   Sure.

25       (Witness examines documents.)  Yes, they do.

1       **THE COURT:**  1907, 1908, 1909, 1910 admitted.

2    (Trial Exhibits 1907, 1908, 1909, and 1910 received in

3    evidence)

4       **MR. FRENTZEN:**  Thank you, Your Honor.

5 **Q.**  And to be clear, are these -- I don't want to have to show

6 all these.

7    If you could just take a look, 1907 does the deal start

8 out being proposed to you at 5 and a half million on June 30,

9 2011?

10 **A.**  (Witness examines document.)  Yes.

11 **Q.**  5 and a half million with the end user being UBS?

12 **A.**  Yes.

13 **Q.**  Okay.  And then on June 30th, 2011, in 1908 does it go to

14 6 and a half million?

15 **A.**  (Witness examines document.)  Yes.

16 **Q.**  And then -- sorry.

17           (Pause in proceedings.)

18 **BY MR. FRENTZEN:**

19 **Q.**  Let me show you Government's 1962.  Take a look at that

20 and see if it relates to the same thing.

21       **MR. FRENTZEN:**  And, I'm sorry, Your Honor I'll

22 withdraw 1910.  I apologize.  That was an accident on my part.

23       **MR. KEKER:**  Withdraw which one, Your Honor?

24       **MR. FRENTZEN:**  1910 unless you want it in.  I don't

25 care.

1          **THE COURT:**  Okay.  It's withdrawn, 1910.

2       (Trial Exhibit 1910 withdrawn from evidence)

3          **THE COURT:**  Now we're on 1962.

4          **MR. FRENTZEN:**  Right.  Thank you, Your Honor.

5  **Q.**   All right.  Does 1962 appear to be sort of the final deal

6  on UBS, if you will, on June 30th, 2011?

7  **A.**   30th, yes.

8          **MR. FRENTZEN:**  I'd offer it, Your Honor.

9          **THE COURT:**  Admitted.

10      (Trial Exhibit 1962 received in evidence)

11         **MR. FRENTZEN:**  Thank you, Your Honor.

12      And if we can just show the page 3, please, Ms. Margen.

13  If you can blow up the top half.

14  **Q.**   This is another VAR deal with UBS?

15  **A.**   It is.

16  **Q.**   Okay.  And the next page, page 4, for the license fee?

17  **A.**   Right, 7.6 million.

18  **Q.**   So that was another large VAR deal?

19  **A.**   Correct.

20  **Q.**   Did you ever sell to UBS -- did Capax ever sell to UBS?

21  **A.**   Not previous to this, no.  No.

22  **Q.**   I mean, as a result of this deal, did Capax try to sell

23  any software to UBS --

24  **A.**   No.

25  **Q.**   -- almost $8 million worth?

1   **A.**   No.  No.

2   **Q.**   Okay.  All right.  I'd like to move now back to the

3   discussions with Mr. Hussain.

4       Can you tell us what happened in terms of the proposal on

5   NearPoint and on the staging tools that you had the e-mail

6   communication with him about?

7   **A.**   Sure.  I mean, the NearPoint -- NearPoint just got, you

8   know, added to our list of products that we were getting paid

9   to support, and then they ultimately paid $6 million for the

10   staging tools.

11   **Q.**   Paid what?

12   **A.**   $6 million for the staging tools.

13   **Q.**   Can you tell us anything about your discussions with

14   Mr. Hussain to develop those arrangements?

15   **A.**   He asked for a proposal and said, "Make it around 5 or

16   $6 million."

17   **Q.**   What was your understanding of what the 5 or $6 million

18   was supposed to be for?

19   **A.**   For tools that Capax had created.

20   **Q.**   Was that -- let's say, was -- the number 5 or $6 million,

21   was that -- did that relate at all to your -- Capax's debts to

22   Autonomy?

23   **A.**   Well, I mean, we owed them a lot of money at that point,

24   yes.

25   **Q.**   Was that any part of the conversation was with

1    Mr. Hussain?

2    **A.**    Not really.

3    **Q.**    What do you mean by that?

4    **A.**    No.  He offered 6 million for the tools.  I questioned the

5    value of the tools, but they --

6    **Q.**    What do you mean by that?

7    **A.**    It didn't smell right to me that they were coming to the

8    table without any negotiation offering me $6 million for a set

9    of tools, and I had owed them money on a VAR deal that I knew

10    was dead and that they were just blatantly ignoring my request

11    for any updates on.

12    **Q.**    Which deal was that?

13    **A.**    McAfee.

14    **Q.**    And how much was the -- if you can remind us, about how

15    much was the McAfee deal?

16    **A.**    5, 5 and a half.

17    **Q.**    I'd like to show you Government's 2216.  Do you recognize

18    what Government's 2216 is, Mr. Baiocco?

19    **A.**    (Witness examines document.)  Yeah.  This is the

20    commercial software license from Capax to Autonomy for those

21    tools.

22        **THE COURT:**  Admitted.

23    (Trial Exhibit 2216 received in evidence)

24        **MR. KEKER:**  Your Honor, could I look at it?  I don't

25    have it in this binder.

1          **THE COURT:**  Sorry.  Okay.

2          **MR. FRENTZEN:**  You can take a look.

3          **THE COURT:**  Take a moment.  Take a moment.

4                         (Pause in proceedings.)

5          **MR. KEKER:**  Thank you.

6          **THE COURT:**  Okay.

7          **MR. FRENTZEN:**  I forgot.  Was it admitted?

8          **THE CLERK:**  Yes.

9          **MR. FRENTZEN:**  Okay.  Could we show the first part of

10   this?  Page 1.  Sorry.  It's 2216.

11        Have the jurors got it?

12   **Q.**  All right.  When you say for your tools, what are you

13   talking about, Mr. Baiocco?

14   **A.**  A code set that we developed to fit into the eDiscovery

15   process for a hosted platform.

16   **Q.**  Was it worth $6 million?

17   **A.**  I questioned it.

18   **Q.**  Why do you say that?

19   **A.**  Because it just was kind of arbitrary they came to the

20   table looking to buy tools for $6 million.

21   **Q.**  Did you have to negotiate them up?

22   **A.**  No.

23   **Q.**  Were you -- okay.

24        All right.  And so could we just go to page 6, please,

25   Ms. Margen?

1        So is that your signature?

2    **A.**    (Witness examines document.)  I don't think it is.  I

3    mean, I certainly authorized whoever might have signed it; but,

4    yeah, I don't know *per se* if I can say that's my signature.

5    **Q.**    Okay.  Somebody signed it on your behalf?

6    **A.**    Somebody signed it on my behalf a hundred percent, yes.

7    **Q.**    Certainly this was not something that you were not

8    interested in doing?

9    **A.**    Correct.

10   **Q.**    Okay.  Who countered -- who signed for Autonomy?

11   **A.**    Joel Scott.

12   **Q.**    And could you just give us the date again from the first

13   page?

14   **A.**    August 10th, 2011.

15   **Q.**    Did this $6 million deal allow you to -- allow Capax to

16   pay the $5 million that was due on the McAfee deal that had

17   fallen apart?

18   **A.**    Yes.

19   **Q.**    Is that what you did?

20   **A.**    Yes.

21   **Q.**    In the course of the discussions about this $6 million

22   deal for your staging tools, did you raise your suspicions

23   about this with anybody at Autonomy?

24   **A.**    Yeah.  I had a little bit of a to-do with Stouffer over

25   it, "You know, what the heck's going on here?  Nobody's

1   answering my questions on McAfee and all of a sudden you're

2   showing up at the table at $6 million for tools?"

3       I said, "This feels dirty.  Is this some kind of a scam?"

4   And then we just got in a large argument, and that was pretty

5   much the end of it.

6   Q.   Did you have any -- other than negotiating this with

7   Mr. Hussain, did you have any conversations with Mr. Hussain

8   about any thoughts about this licensing agreement?

9   A.   Well, I mean, I think I made it pretty clear across the

10  board that I wasn't buying into the fact that this wasn't to

11  cover-up McAfee, but...

12  Q.   In this time period in August of 2011, did you start to

13  have suspicions about what was going on at Autonomy?

14  A.   Absolutely.

15  Q.   Why do you say that?

16  A.   Because there was -- they never really come to the table

17  that often to, like, pay us and clear things up, and there was

18  obviously some rush to a certain date to get everything cleaned

19  up and off our books and paid up and settled.  So -- on both

20  sides of the equation:  What we owed them, what they owed us.

21  It was clearly a different behavior.

22  Q.   Okay.  In terms of your business at Capax, did that cause

23  you any kind of concerns?

24  A.   Of course it caused me concerns on multiple levels; that,

25  you know, if all this stuff wasn't cleaned up, if they got

1    sold, you know, where were we going to be hanging in the

2    balance; and, B, they were our number one -- we were their

3    number one partner.  It was a very profitable relationship

4    across the board for Capax, and somebody else could have come

5    in and bought them and we could have lost all their business,

6    the professional services, the support, everything.  So, of

7    course, it was a major concern.

8    Q.   I'd like to show you what's been marked as

9    Government's 2281.  Do you recognize Government's 2281,

10   Mr. Baiocco?

11   A.   (Witness examines document.)  Yeah.  Just a thread between

12   Sushovan, myself, and Steve Chamberlain talking about different

13   various open items as far as payments.

14            THE COURT:  Admitted.

15       (Trial Exhibit 2281 received in evidence)

16            MR. FRENTZEN:  Thank you, Your Honor.

17       Could we go, Ms. Margen, to the bottom part of page 1 just

18   to get the heading on this e-mail?  Okay.

19   Q.   All right.  Is this the first e-mail in the thread?

20   A.   It is.

21   Q.   All right.  So this is from who to who?

22   A.   Sushovan to me.

23   Q.   With a cc?

24   A.   With a cc -- I'm sorry.  With a cc of Steve Chamberlain.

25   Q.   Great.  And this is what date?

1    **A.**    August 17th, 2011.

2    **Q.**    And what was the subject?

3    **A.**    "Cash."

4    **Q.**    Can we go to the second page, Ms. Margen, and just get the

5    text on that?

6         What was Mr. Hussain asking you here, Mr. Baiocco?

7    **A.**    To make final payments for the TXU and the rest of McAfee

8    because we had paid half of McAfee at that point.

9    **Q.**    All right.  Is this part of the sense you were getting

10   that books were getting -- things were getting all cleaned up?

11   **A.**    Absolutely.

12   **Q.**    Can we go now to the first page, Ms. Margen, and

13   Mr. Baiocco's response?

14        What was your response to Mr. Hussain?

15   **A.**    (Witness examines document.)  (reading)

16             "Should be all set," meaning those payments should

17        have been made.  "Can I bill for my 10 percent sales

18        referral for McAfee?"

19   **Q.**    Okay.  And did you refer any sales to McAfee from

20   Autonomy?  In other words -- I mean --

21   **A.**    No.

22   **Q.**    -- for McAfee to buy Autonomy products?

23        Okay.  So far as you knew, had that deal gone through?

24   **A.**    It did not go through.

25   **Q.**    All right.  But you wanted your 10 percent?

1    **A.**    That was the deal I had.  I bought it and ultimately I

2    paid for it.

3    **Q.**    Okay.  Can we go to Mr. Hussain's response?  You can just

4    blow up the full top part, Ms. Margen.

5         What was Mr. Hussain's response to you?

6    **A.**    "Yes."

7    **Q.**    And then you responded back what.

8    **A.**    "Can I call you?  What number?"

9    **Q.**    Do you recall if you had a conversation with Mr. Hussain

10   following this e-mail?

11   **A.**    I did.

12   **Q.**    Can you tell us what your conversation was with

13   Mr. Hussain?

14   **A.**    I just asked him, "What the hell's going on?"  It felt

15   imminent that there was going to be some kind of deal that

16   Autonomy was going to get bought out or something.  I think I

17   made a reference saying, "When I talk to you tomorrow morning,

18   just tell me one thing.  Are you going to be Sushovan Hussain

19   from Autonomy?"  It just felt imminent.

20   **Q.**    What was his response when you asked that?

21   **A.**    He didn't really give me any response and ended the call.

22   **Q.**    Okay.  Following that conversation, did you learn the

23   following day that Autonomy had been acquired by -- or was

24   going to be acquired by HP?

25   **A.**    Yes.

1  Q.   After the --

2        THE COURT:  Well, maybe we should take our noon

3  recess.

4        MR. FRENTZEN:  Oh, I'm sorry, Your Honor.  That's

5  great and then I can finish up.

6        THE COURT:  Ladies and gentlemen, we're going to take

7  our recess at this time.  Remember the admonition given to you:

8  Don't discuss the case or allow anyone to discuss it with you,

9  form or express any opinion.  And we will resume at 1:00 p.m.

10       (Proceedings were heard out of the presence of the jury:)

11       THE COURT:  Okay.

12       MR. FRENTZEN:  I'm close, Your Honor.  I'm going to

13  try to put some documents in in bulk --

14       THE COURT:  Okay.

15       MR. FRENTZEN:  -- and get out.

16       THE COURT:  Okay.  Thank you.

17            (Luncheon recess taken at 12:00 p.m.)

18

19

20

21

22

23

24

25

 1    **Afternoon Session**                                    **1:02 p.m.**

 2         (Proceedings were heard in the presence of the jury:)

 3         **THE COURT:**  Please be seated.

 4    Let the record reflect all jurors are present, the parties

 5    are present.

 6         You may proceed.  The witness is on the stand.

 7         **MR. FRENTZEN:**  Thank you, Your Honor.

 8    Q.  Mr. Baiocco, one of the issues we talked about earlier was

 9    that you would -- you reached out to a lot of people -- or, I'm

10    sorry -- you named some people at Autonomy that you would reach

11    out to about the debts that were there.

12         I want to show you a couple of exhibits to see if you can

13    tell us if these are examples of that.  I want to show you

14    Government's Exhibit 622 and see if you recognize what

15    Government's 622 is.

16    A.  (Witness examines document.)

17    Q.  Do you recognize what that is, sir?

18    A.  Yeah.  This is me asking Andy Kanter for money.

19         **THE COURT:**  Admitted.

20         (Trial Exhibit 622 received in evidence)

21         **MR. FRENTZEN:**  Can we show the first page?  And can we

22    blow up the first part from Mr. Baiocco?  I'm sorry,

23    Ms. Margen.  Down here at the bottom.  Thanks.

24    Q.  What's the date of this?

25    A.  March 4th, 2010.

1  Q.   And did you attach to this sort of a payment history at

2  that point in time?

3  A.   I did.

4  Q.   What was that payment history?

5  A.   Well, what was it in general?  It was a record I kept of

6  how much we owed, how much we collected, and how much we paid.

7  So it was, like, my internal balance to where we were based on

8  the deals.

9  Q.   Okay.  And so when you say "the balance," on the deals

10 with Autonomy?

11 A.   I'm sorry.  Yes.

12 Q.   Okay.  And you were looking to these to sort of

13 effectively balance out; is that right?

14 A.   Balance out and have a little extra.

15 Q.   Your profit?

16 A.   Correct.

17 Q.   Okay.  Did you send that to anyone at Autonomy, your sort

18 of payment history?

19 A.   Yes.  I definitely sent it to Mr. Kanter.

20 Q.   And, again, Mr. Kanter was who?

21 A.   Executive in the U.K. from Autonomy.

22 Q.   I'm sorry, what's that?

23 A.   From Autonomy.

24 Q.   Can we go to the top part of this e-mail, please?

25      All right.  And this is from you to Mr. Kanter; right?

1    **A.**   Yes.

2    **Q.**   You followed up?

3    **A.**   Yes.

4    **Q.**   And what did you say here?

5    **A.**   (reading)

6        "Sorry to hit you here again.  Just wanted to

7    reiterate that we were promised more than dollar for

8    dollar on this.  We were promised a profit as well.

9    Trying not to sound ungrateful in any way, just that we

10    are nowhere near ready to do a deal like this."

11    **Q.**   So safe to say that your agreements with Mr. Egan, you

12    didn't keep those secret from other people in management at

13    Autonomy?

14    **A.**   No.

15    **Q.**   For example, that's what you're describing here with

16    Mr. Kanter?

17    **A.**   Correct.

18    **Q.**   I want to go now to Government's 1249.  Take a look at

19    Government's 1249, please, Mr. Baiocco.

20    **A.**   (Witness examines document.)

21    **Q.**   Do you recognize 12 --

22        **MR. FRENTZEN:**  Sorry.  What number is that?

23        **THE COURT:**  1249.

24        **MR. FRENTZEN:**  Thank you, Your Honor.

25    **Q.**   -- 1249?

1    **A.**    Yeah.  This is me asking Steve Chamberlain for monies.

2        **THE COURT:**  Admitted.

3        (Trial Exhibit 1249 received in evidence)

4        **MR. FRENTZEN:**  Can we publish for the jurors, please,

5    Ms. Margen?

6        Okay.  And just if we can blow up the bottom part just to

7    get sort of what this is about.

8    **Q.**    All right.  And this is you reaching out to who?

9    **A.**    Stephen Chamberlain.

10   **Q.**    And he is who?

11   **A.**    He was from Autonomy, VP of Finance.

12   **Q.**    In the U.S. or the U.K.?

13   **A.**    In the U.K.

14   **Q.**    And here what was the subject?

15   **A.**    "Quarterly True-up on Support."

16   **Q.**    Oh, okay.  And in terms of the subject, what was the

17   subject listed here in the e-mail --

18   **A.**    Oh, I'm sorry.  The subject was "FSA."

19   **Q.**    Okay.  FSA is the deal that we talked about earlier that

20   had some issues?

21   **A.**    Right.

22   **Q.**    Okay.  And so was this something that you were sort of

23   perpetually chasing?

24   **A.**    More than -- yeah, completely perpetually.

25   **Q.**    Okay.  And with Mr. Egan?

BAIOCCO - DIRECT / FRENTZEN

1   **A.**   With everybody.

2   **Q.**   All right.  And here Mr. Chamberlain?

3   **A.**   Correct.

4   **Q.**   Okay.  Can we go to the top of this, please, and see -- if

5   we could blow up all this and see what Mr. Chamberlain

6   responded to you.

7        Okay.  And it looks like there might be a typo in there,

8   but can you tell us what Mr. Chamberlain's response to you was?

9   **A.**   He said (reading):

10          "Apologies for the delay.  Sushovan and I keep

11          missing each other and I do not to walk through this with

12          him.  Will come back as soon as I can."

13  **Q.**   And so was this relating to you that in some way

14  Mr. Chamberlain was expressing something about that he wanted

15  to do with Mr. Hussain?

16  **A.**   Yeah.  He obviously needed some kind of approval for some

17  of my requests.

18  **Q.**   I want to talk about FSA just a little bit in terms of

19  sort of clearing that up.

20       We talked about your discussions with Mr. Hussain about

21  the $6 million deal for the staging tools.  In the e-mail that

22  set that up, there was also discussion about NearPoint.  Do you

23  recall NearPoint discussions?

24  **A.**   Yes.

25  **Q.**   Did you also have an arrangement that you worked out

1  related to NearPoint that could relate to the payment that you

2  were being asked to make by Mr. Hussain on the FSA deal?

3  A.   Well, in my opinion, yes.

4  Q.   Why do you say that?

5  A.   Well, they gave me -- they handed over NearPoint support,

6  which was part of -- you know, we had already been doing EAS

7  and other support, so they were turning over the NearPoint

8  support globally, which was going to be a very profitable thing

9  for us; but they added $2 million as a ramp-up fee to hire

10 people and set up offices, and that sort of stuff.

11 Q.   Who did you negotiate the ramp-up fee thing with?

12 A.   I don't know if it was Andy and Sushovan.  I didn't --

13 Q.   Was this one of the subject matters of the e-mail that we

14 saw from June of 2011 with Mr. Hussain?

15 A.   Yes.

16 Q.   Okay.  I want to show you Government's 1889 and see if you

17 recognize 1889, Mr. Baiocco.

18 A.   (Witness examines document.)

19 Q.   Do you recognize what Government's 1889 is, sir?

20 A.   Yeah.  It's the sixth amendment and they're adding

21 NearPoint as a product for support it looks like.

22       THE COURT:  Admitted.

23       (Trial Exhibit 1889 received in evidence)

24       MR. FRENTZEN:  Can we show the first part?

25 Q.   All right.  And so is this -- what's the date on this

1   agreement, if you can make it out there, Mr. Baiocco?

2   **A.**    June 29th, 2011.

3   **Q.**    So was that -- that was a couple of weeks after your

4   e-mail with Mr. Hussain about NearPoint?

5   **A.**    Yes.

6   **Q.**    And can we go down to the body in part 2, all of part 2?

7   **A.**    Uh-huh.

8   **Q.**    Thank you, Ms. Margen.

9          Okay.  Can you see in part 2b, is there an agreement of

10  Autonomy to pay $2 million to Capax?

11  **A.**    Yes.

12  **Q.**    Does it further indicate that that shall constitute

13  compensation in full for all expenditures necessary for VAR to

14  obtain resources necessary to provide NearPoint customers with

15  support?

16  **A.**    Yes.

17  **Q.**    Okay.  And so is that something you had to negotiate with

18  Mr. Hussain after that e-mail?

19  **A.**    No.  This was not a negotiation.

20  **Q.**    What do you mean by that?

21  **A.**    Getting the actual support contract was a negotiation.

22  The ramp fee was just kind of arbitrarily pushed through, to

23  the best of my recollection.

24  **Q.**    Okay.  And after you negotiated this, did Autonomy pay to

25  Capax the 2 million?

BAIOCCO - DIRECT / FRENTZEN

1   **A.**   Yes.

2   **Q.**   Did you then pay the 1.5 on FSA that Mr. Hussain had asked

3   you about?

4   **A.**   Yes.

5   **Q.**   All right.  I just have a few more questions for you,

6   Mr. Baiocco.

7        Is Capax Discovery an 8(a)?  Do you know what an 8(a) is?

8   **A.**   I do know what 8(a) is.  Capax Discovery is not an 8(a).

9   **Q.**   Were they back in 2009, 2010, 2011?

10  **A.**   No.

11  **Q.**   What's an 8(a)?

12  **A.**   Small business disadvantaged.

13  **Q.**   Capax -- during all of this time period, Capax Global,

14  Capax Discovery, were those public companies?

15  **A.**   No.

16  **Q.**   To your knowledge, during this time period was Autonomy a

17  publicly traded company?

18  **A.**   Yes.

19  **Q.**   I show you what's been marked as Government's 1374.  Can

20  you take a look at 1374, Mr. Baiocco, and see if you recognize

21  what that is?

22  **A.**   (Witness examines document.)  This is a VAR transaction

23  from December 31st, 2010.

24          **THE COURT:**  Admitted.

25      (Trial Exhibit 1374 received in evidence)

1          **MR. FRENTZEN:**  Thank you, Your Honor.

2     **Q.**   And is there anything about the front page of this

3     facsimile that you recall, Mr. Baiocco?

4     **A.**   You mean the Fairmont in Pittsburgh?

5     **Q.**   Yeah.  Can we blow up the top part, including the fax

6     line, Ms. Margen?  I'm sorry.  The fax line all the way at the

7     top and then down through the "Fairmont."

8          Great.

9          Okay.  Can you tell when this fax was sent, Mr. Baiocco?

10    **A.**   11:39 p.m. on December 31st.

11    **Q.**   Of what year?  If you can make it out.

12    **A.**   2000 -- 2010.

13    **Q.**   Do you recall your New Year's in Pittsburgh --

14    **A.**   I do.

15    **Q.**   -- on December 31st, 2010?

16         What was going on?

17    **A.**   I was there with my family to go to the Winter Classic

18    Hockey Game, annual hockey game, that was going to be played

19    the next afternoon in Heinz Field.

20    **Q.**   And what caused you to have to be using the fax at that

21    time on New Year's Eve?

22    **A.**   This purchase order for DKO.

23    **Q.**   Okay.  If we could, could we go to the second page,

24    please, Ms. Margen?  Can you blow up from the top down through

25    item number 8?

1          Thank you, Ms. Margen.

2          Okay.  What was this?  Is this another VAR deal?

3    **A.**   Yes.

4    **Q.**   Who was this with?

5    **A.**   Defense Knowledge Online.  It was a division of one of

6    the -- one of the military branches.  Maybe Air Force.  I'm not

7    sure.  Army I guess.

8    **Q.**   All right.  And is this for 1.95 million?

9    **A.**   Yes.

10   **Q.**   Can we go to page 5 of this same document, please,

11   Ms. Margen?  And can you just blow up from the top down again

12   through the license fee?

13         Great.

14         And who was the end user on this VAR deal?

15   **A.**   Merrill Lynch.

16   **Q.**   For how much?

17   **A.**   1.8 million.

18   **Q.**   1.8 million?

19   **A.**   Yes.

20   **Q.**   Okay.  Two more VAR deals that you were asked to do by

21   Autonomy?

22   **A.**   Correct.

23   **Q.**   I'm going to show you a series of documents:

24   Government's 2741, Government's 2347, and Government's 2354.

25         Let's start with 2741.  Can you take a look at that,

1    please?

2    **A.**    (Witness examines document.)   This is a VAR deal for UBS.

3         **MR. FRENTZEN:**  Offer 2741, Your Honor.

4         **THE COURT:**  Admitted.

5    (Trial Exhibit 2741 received in evidence)

6         **MR. FRENTZEN:**   Okay.   Can we go to page 13 of 2741,

7    please, Ms. Margen?   And can you blow up just the date and the

8    end user at the top?

9    Great.

10   **Q.**    What was the date of this particular order?

11   **A.**    June 30th, 2011.

12   **Q.**    Who was the end user?

13   **A.**    UBS.

14   **Q.**    And was this an additional VAR deal to the previous one we

15   saw to UBS for almost 8 million?

16   **A.**    Correct.

17   **Q.**    Can we go to the next page of this, page 14, and just show

18   the license fee, please, Ms. Margen?

19   How much was this VAR deal for?

20   **A.**    7,664,000.

21   **Q.**    And then license fees?

22   **A.**    License fees.

23   **Q.**    In connection with this VAR deal, did Capax try to sell

24   anything to anyone at UBS?

25   **A.**    No.

1  Q.  Can you take a look, please, at 2347, Mr. Baiocco?

2  A.  (Witness examines document.)

3  Q.  Do you recognize 2347?

4  A.  Yes.

5  Q.  What is 2347?

6  A.  It's the commission fee for UBS.

7        THE COURT:  Admitted.

8  (Trial Exhibit 2347 received in evidence)

9        MR. FRENTZEN:  Thank you, Your Honor.

10  Can we show 2347?  Okay.  And can we show at the top the

11  date and down through the body of the letter, if we could?

12  Great.  Thank you.

13  Q.  Who is this -- oh.  Sorry.  I cut that part off.

14  All right.  What's the date on this?

15  A.  August 31st, 2011.

16  Q.  Okay.  And from where you can see on the hard copy, who is

17  this a letter from?

18  A.  Joel Scott, General Counsel.

19  Q.  All right.  And what's the substance of this letter?

20  A.  It's basically saying UBS paid Autonomy, and this was my

21  marketing assistant fee, my commission of 10 percent on the two

22  $8 million VAR deals we did.

23  Q.  So, in other words, Autonomy was successful in selling

24  software to UBS, so that's off your books?

25  A.  It's off my books, yes.

1   **Q.**   Okay.  And you got your --

2   **A.**   Yeah.

3   **Q.**   -- and as it describes it down here, payment to Capax for

4   marketing assisted services related to the transaction?

5   **A.**   Yes.

6   **Q.**   Did you assist any marketing?

7   **A.**   No.

8   **Q.**   Okay.  And then 2354 I think is up there.

9   **A.**   (Witness examines document.)

10  **Q.**   Take a quick look at 2354 and see if you recognize what

11  that is.

12  **A.**   (Witness examines document.)  Well, there's two in here.

13  The first one is the UBS one again, and the second one is

14  McAfee.

15  **Q.**   Is there actually a third one there?

16  **A.**   Yeah, I'm sorry, there is.  And that's Merrill Lynch.

17          **MR. FRENTZEN:**  Okay.  I'd offer --

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 2354 received in evidence)

20          **MR. FRENTZEN:**  Thank you, Your Honor.

21  **Q.**   I don't think we need to see these, but were these letters

22  related to Autonomy -- what was the date of the letter -- or,

23  I'm sorry -- the e-mail attaching the letter?

24  **A.**   September 1, 2011.

25  **Q.**   Okay.  And then in terms of the three letters, were these

BAIOCCO - DIRECT / FRENTZEN

1   notifications that you'd be getting a marketing assistance fee

2   for UBS, McAfee, and Bank of America Merrill Lynch?

3   **A.**   Yes.

4   **Q.**   And I want to show you a large series of exhibits.

5        **MR. FRENTZEN:**  And, Your Honor and Counsel, these are

6   Government's 44, 204, 525 --

7        **THE COURT:**  Wait.  Wait.  Wait.  Slow down.

8        **MR. FRENTZEN:**  Sorry, Your Honor.

9        **THE COURT:**  44.

10       **MR. FRENTZEN:**  204, 525.

11       **THE COURT:**  525.  Wait.  Wait.  Wait.

12                 (Pause in proceedings.)

13       **MR. FRENTZEN:**  726, 83 -- oh, sorry.

14       **THE COURT:**  726.

15       **MR. FRENTZEN:**  833.

16       **THE COURT:**  833.

17       **MR. FRENTZEN:**  1124.

18       **THE COURT:**  1124.

19       **MR. FRENTZEN:**  1445.

20       **THE COURT:**  1445.

21       **MR. FRENTZEN:**  1731.

22       **THE COURT:**  1731.

23       **MR. FRENTZEN:**  And 1983.

24       **THE COURT:**  1983.

25       **MR. FRENTZEN:**  And if I could ask, Your Honor, if

1    Mr. Baiocco could take a look through those and just let us

2    know if he knows -- if he recognizes what those are

3    collectively.

4           THE WITNESS:  (Witness examines documents.)  Yeah.

5    These are all audit letters I would get from Autonomy on a

6    quarterly basis.

7           MR. FRENTZEN:  Your Honor, I'd offer all of those

8    exhibits into evidence.

9           THE COURT:  Okay.  So they are -- just give me the

10   numbers again.

11          MR. FRENTZEN:  44.

12          THE COURT:  44.

13          MR. FRENTZEN:  204.

14          THE COURT:  204.

15          MR. FRENTZEN:  525.

16          THE COURT:  525.

17          MR. FRENTZEN:  726.

18          THE COURT:  726.

19          MR. FRENTZEN:  833.

20          THE COURT:  833.

21          MR. FRENTZEN:  1124.

22          THE COURT:  1124.

23          MR. FRENTZEN:  1445.

24          THE COURT:  1445.

25          MR. FRENTZEN:  1731.

 1          THE COURT:  1731.

 2          MR. FRENTZEN:  1983.

 3          THE COURT:  1983.  They're all admitted.

 4      (Trial Exhibits 44, 204, 525, 726, 833, 1124, 1445,

 5       1731, and 1983 received in evidence)

 6          MR. FRENTZEN:  Great.  Thank you, Your Honor.

 7  **Q.**   Can we go to the first one, please, Mr. Baiocco,

 8  Government's 44, to start with?

 9  **A.**   What number is it?

10          THE COURT:  44.

11  BY MR. FRENTZEN:

12  **Q.**   44.

13  **A.**   (Witness examines document.)  Oh, 44.  I'm sorry.  It made

14  its way at the bottom.

15  **Q.**   And, Ms. Margen, if you could bring that up, it would be

16  great.

17      Okay.  First of all, this is a letter to Capax Discovery

18  from who based on the letterhead?

19  **A.**   Autonomy.

20  **Q.**   And can you, Ms. Margen, blow up everything down past that

21  first signature?

22      Great.

23      All right.  This particular document, what's the date on

24  this?

25  **A.**   April 2nd, 2009.

BAIOCCO - DIRECT / FRENTZEN

1   **Q.**   Was this shortly after the first licensing deal that Capax

2   did with Autonomy?

3   **A.**   Yes.

4   **Q.**   And who is named as the individual signing and sending the

5   letter?

6   **A.**   Steve Chamberlain.

7   **Q.**   What is Mr. Chamberlain asking of Capax in the second

8   paragraph?

9   **A.**   (Witness examines document.)  (reading)

10        "We've confirmed directly to our auditors

11        Deloitte & Touche" -- blah, blah, blah -- "that these

12        invoices selected from your account and listed below were

13        proper and were unpaid on March 31st, 2009."

14   **Q.**   So what do you take this to mean?  What is this about?

15   **A.**   It's confirmation that I signed a contract and I owe them

16   money.

17   **Q.**   And the confirmation in the last paragraph of the letter

18   is supposed to go to who where it says "Your prompt attention

19   to this request"?

20   **A.**   (Witness examines document.)  Steve Chamberlain.  Do

21   not -- yeah, to Steve Chamberlain.

22   **Q.**   Okay.  And then if we could track down -- right.  But does

23   it ask you to fax it to a number there?  I'm sorry.

24   **A.**   Yeah, it does.  "Fax your response to," yeah.  It has a

25   U.K. number 44.

1    Q.    Okay.  All right.  And then if we could, could we show the

2    bottom part of this letter?

3         And just so we're clear, the amount in there in the

4    invoice there, what does that relate to?

5    A.    The original license deal.

6    Q.    All right.  Do you know who signed this?

7    A.    It says Steve Chamberlain.

8    Q.    I'm sorry.  In the bottom part, the affirmation there,

9    does it ask for somebody to sign it?

10   A.    Dave Spadone.

11   Q.    Who's Dave Spadone?

12   A.    He was a controller at our company.

13   Q.    So he actually signed this?

14   A.    He did.

15   Q.    What was he asked to confirm in the text of the letter

16   here?

17   A.    The amount owed and then obviously were there any side

18   letters or other agreements.

19   Q.    Okay.  So what it's asking is, was the amount listed above

20   properly charged and unpaid, and that there were no side

21   letters or other agreements?

22   A.    Yes.

23   Q.    With respect to this, whether Mr. Spadone knew it or not,

24   as to the original licensing fee, was there a side letter or

25   agreement?

1    **A.**    Yeah, there was a deferrable agreement.

2    **Q.**    And that was the --

3    **A.**    EDD processing was going to pay it back.

4    **Q.**    Okay.  So was this statement to the auditors true or

5    false?

6    **A.**    False.

7    **Q.**    I'd like to move now to -- I don't want to show all of

8    these, but I'd like to move now to Number 525, Government's

9    525.

10    **A.**    (Witness examines document.)

11    **Q.**    I'm sorry.  That's really tiny print.  Maybe you can take

12    a look on the screen.  It will help you out there.

13         What's the date of this confirm letter?

14    **A.**    January 7th, 2010.

15    **Q.**    And is this of the same nature?

16    **A.**    Yes.

17    **Q.**    By this point in time, were there additional transactions

18    where Capax was indebted to Autonomy?

19    **A.**    Yes.

20    **Q.**    For example, does this include 4,200,000 for the second

21    EDD deal?

22    **A.**    It does.

23    **Q.**    And other things that we've talked about before?

24    **A.**    Correct.

25    **Q.**    And here does it have rather than a fax number, an e-mail

BAIOCCO - DIRECT / FRENTZEN

1    address to send to?

2    **A.**   It does.

3    **Q.**   Is that L. Welham at Deloitte?

4    **A.**   Yes.

5    **Q.**   Do you know what Deloitte is?

6    **A.**   Yes.

7    **Q.**   Who is Deloitte?

8    **A.**   They're the house accountants for Autonomy.

9    **Q.**   All right.  I want to go now to --

10   **A.**   It's outside accountants I guess I should say.

11   **Q.**   -- Government's 1124.  And -- well, we can go to 1124.

12        But, again, were there -- at that point in time were there

13   side agreements for those debts that were owed to Autonomy?

14   **A.**   Yes.

15   **Q.**   Can we blow up the -- yeah, this page.  Thank you.

16        Again, all of these appear to be from Mr. Chamberlain?

17   **A.**   Yes.

18   **Q.**   So October 6 of 2010?

19   **A.**   Yes.

20   **Q.**   Is there also a long list of debts -- transactions between

21   Capax and Autonomy?

22   **A.**   Yes.

23   **Q.**   Do you see that it should be e-mailed to the same e-mail

24   address, L. Welham?

25   **A.**   I do.

1   **Q.**   Can we go to the second page of this?  And can you blow

2   that up, please, Ms. Margen?

3        All right.  Thank you.

4        All right.  Does this require you to affirm the same

5   information that these debts are due and that there's no side

6   letters or other agreements at the top?

7   **A.**   It does.

8   **Q.**   Okay.  Did you sign it?

9   **A.**   I did.

10  **Q.**   Was that false?

11  **A.**   Yes.

12  **Q.**   And in terms of the bottom now, can you tell us what it

13  says there where it says "We acknowledge"?

14  **A.**   (reading)

15       -- "that Autonomy Corporation retains no continuing

16       managerial involvement in the delivery of this product

17       or service, other than stipulated in the license

18       agreement."

19  **Q.**   Was that true related to the VAR deals?

20  **A.**   No.

21  **Q.**   So that was false as well?

22  **A.**   Yes.

23  **Q.**   And sort of with respect to all of these affirmations to

24  the auditors, the auditor confirm letters, with respect to the

25  side letters or agreements, and with respect to the continuing

1    managerial involvement in delivery, were these all false?

2    A.   Yes.

3    Q.   I'd actually like to turn just briefly, if we could get

4    1983, Government's 1983, of this group.

5    A.   Do I have it?

6    Q.   Yeah.  I think you should, Mr. Baiocco.

7    A.   (Witness examines documents.)

8    Q.   Can we just get the date?

9    A.   July 12th, 2011.

10   Q.   And can we blow up the list of sort of debts there?

11       Thank you.  Thank you, Ms. Margen.

12       And, Mr. Baiocco, can you make out the total, just to give

13   us an idea, in July of 2011?

14   A.   31,729,000.

15   Q.   And so that's what -- was that what sort of had to get

16   cleared up before August?

17   A.   Yes.

18   Q.   Okay.  And the affirmation that there were no side letters

19   or agreements and no continuing managerial involvement as to

20   the VAR deals, was that false as to this letter?

21   A.   Yes.

22   Q.   Mr. Baiocco, after Hewlett Packard acquired Autonomy and

23   after all these sort of debts were cleared up between Capax and

24   Autonomy but following the acquisition, were you ever asked by

25   Autonomy to engage in any of these end-quarter VAR deals again?

BAIOCCO - DIRECT / FRENTZEN

1    **A.**    No.

2    **Q.**    Were you asked to pay for licenses and offered to be

3    reimbursed through false EDD purchase orders?

4    **A.**    No.

5    **Q.**    And just so we're clear, it was after HP acquired Autonomy

6    that you developed a relationship -- or that you were able to

7    eventually get your EDD business going?

8    **A.**    We actually bought most of the software from HP.

9    **Q.**    Okay.  And so since that -- the document I think we saw in

10   December of 2011 when you got your first eDiscovery customer,

11   have you been in the eDiscovery business since then?

12   **A.**    Yes.

13   **Q.**    Has it been good to you?

14   **A.**    Yes, it has.

15              **MR. FRENTZEN:**  May I have one moment, Your Honor?

16                        (Pause in proceedings.)

17   **BY MR. FRENTZEN:**

18   **Q.**    Prior to December of 2011, did you do any EDD eDiscovery

19   work for any customers?

20   **A.**    No.

21   **Q.**    And the first customer that you got, the Global Colleagues

22   out of Texas, was that a referral from Autonomy or was that a

23   client you found on your own?

24   **A.**    A client we found on our own.

25              I just want to fix one thing I said.  We didn't buy it

BAIOCCO - CROSS / KEKER

1    from HP.  We obtained the rights, so it's more like a 99-year

2    lease that we own all the software.  We have the source code

3    and we were able to carry it forward and make enhancements.  We

4    didn't pay for it.  They didn't transfer the intellectual

5    property, but we have the exclusive rights to it in the source

6    code so we are the ones that now develop it and enhance it and

7    resell it under our own brand.

8    Q.   That's the deal you entered into with Hewlett Packard in

9    2000 and --

10   A.   One in 2014 for EAS and one in 2015 or '16 for HPCA.

11         MR. FRENTZEN:  Thank you, sir.

12      Nothing further, Your Honor.  Thank you.

13         THE COURT:  Cross.

14         MR. KEKER:  Thank you, Your Honor.

15                        **CROSS-EXAMINATION**

16   BY MR. KEKER:

17   Q.   Good afternoon, Mr. Baiocco.  I'm John Keker.  We haven't

18   met, have we?

19   A.   No.

20   Q.   I represent Mr. Hussain.

21      Let's go right to where Mr. Frentzen ended.  Are you

22   allied at this point with HP?

23   A.   Am I what?

24   Q.   Are you allied with HP, Hewlett Packard, in this case?

25         MR. FRENTZEN:  Objection.  Vague.

1            THE WITNESS:  I'm sorry?

2            THE COURT:  Sustained.

3    BY MR. KEKER:

4    Q.    Are you -- well, are you involved right now in a strong

5    economic relationship with Hewlett Packard?

6    A.    I'm involved in a relationship.  We still OEM one of their

7    products for our product.

8    Q.    At least as of 2013, you attributed great value to the

9    steady stream of professional services work that you got --

10   that Capax got from Hewlett Packard, didn't you?

11   A.    Yes.

12   Q.    And they have you support both EAS and NearPoint; right?

13   A.    Well, Autonomy did and HP, correct.

14   Q.    HP.  And in 2013, your support of EAS brought you about

15   9 -- brought Capax about $9.8 million and then another

16   $6.8 million for professional services; right?

17   A.    Yes.

18   Q.    That was the economic relationship you had in 2013?

19   A.    Yes.

20   Q.    And now you say that this discovery, the eDiscovery

21   platform that you've talked about, at some point became a

22   lucrative business for Capax?

23   A.    Yes.

24   Q.    When was that?

25   A.    In the last year, year and a half.

BAIOCCO - CROSS / KEKER

1  Q.   It wasn't lucrative before that?

2  A.   Well, we weren't really in it that much till we were able

3  to buy the software because all the software that we had

4  originally bought, HP end of lifed, and then we pulled it out

5  of end of life and redeveloped it into our platform.

6  Q.   You sold millions of dollars worth of it, didn't you?

7  A.   Yes.

8  Q.   In March of 2013, Hewlett Packard invited you to join its

9  Partner Advisory Board?

10  A.   Correct.

11  Q.   And Hewlett Packard granted Capax preferred status and

12  accelerated processing of all billing and invoices?

13  A.   Yes.

14  Q.   Back in 2013, on February 5th to be exact, you spent about

15  four hours with Hewlett Packard lawyers, didn't you?

16  A.   I don't remember the exact date but, yes, I did.

17  Q.   Do you remember a session with about four hours with

18  Hewlett Packard lawyers answering questions?

19  A.   Which firm?

20  Q.   Morgan, Lewis & Bockius?

21  A.   Yes.

22  Q.   And then you had a follow-up phone interview after that?

23  A.   I believe I did, yes.

24  Q.   And then you had another session with them on March 18th?

25  Do you remember another session of about an hour and a half?

BAIOCCO - CROSS / KEKER

1   **A.**   I don't remember it a hundred percent, but it seems right.

2   **Q.**   And then after that, you met with a gentleman, this

3   Mr. Frank back here, who represents Hewlett Packard, you met

4   with him for a while?  How long did that last?

5   **A.**   Three, four hours.

6   **Q.**   This is all back in 2013; right?

7   **A.**   I guess, yeah.

8   **Q.**   And then since 2013, you have met -- beginning in 2013,

9   you have met with the prosecutors and their agents how many

10   times?

11   **A.**   A half a dozen.

12   **Q.**   Okay.  Maybe six times that you had interviews and then

13   one time you went before the Grand Jury?

14   **A.**   Correct.

15   **Q.**   And the Grand Jury you swear under oath that you're

16   telling the truth and you give -- and they keep a transcript;

17   right?

18   **A.**   Correct.

19   **Q.**   Okay.  Do you think all these sessions with Hewlett

20   Packard lawyers and the prosecutors have affected your

21   testimony?

22   **A.**   I do not.

23   **Q.**   Do you believe that you have changed your testimony during

24   those sessions?

25   **A.**   I don't know that I've changed my testimony.

BAIOCCO - CROSS / KEKER

1  Q.   Okay.  Let's start with one of the highlights, the first

2  time you met Sushovan Hussain.  Okay?

3  A.   All right.

4  Q.   You had never met Sushovan Hussain before April of 2011?

5  A.   Maybe I'd seen him like I said, but I never met with him.

6  Q.   All of these negotiations or discussions with Egan, most

7  of the VAR deals had already happened by the time you first met

8  him; right?

9  A.   Correct.

10  Q.   Okay.  And you never talked to him ever about this

11  original eDiscovery software license, did you?

12  A.   I did not.

13  Q.   And you never talked to him about reseller deals that had

14  happened before you met him?

15  A.   I did not.

16  Q.   And before April of 2011, your primary communications had

17  been with Mr. Egan and Mr. Scott; right?

18  A.   Yes, and others.

19  Q.   You'd become a good friend of Mr. Egan's?

20  A.   Never.  I wouldn't consider us good friends.

21  Q.   When you met Mr. Hussain in Cambridge for the first time,

22  you were there to get overflow eDiscovery business from this

23  British Petroleum huge case that was going on; right?

24  A.   Yes.

25  Q.   And you had had -- a month before, you'd had your

1  engineers there demonstrating tools and demonstrating the

2  capabilities of Capax so that you could get this business?

3  **A.**   Yes.

4  **Q.**   All right.  But you're telling the jury that at the time

5  you were making those demonstrations, you couldn't do it; it

6  was all just a hoax?

7  **A.**   No.  I'm just saying we needed to make sure we were

8  completely in sync with the Autonomy platform if we were going

9  to do their overflow because both companies were going to be

10  running the datasets, so we needed to make sure they matched.

11  **Q.**   So you had a platform?  You were up and running on a

12  platform at the time you were over there with your tech team;

13  right?

14  **A.**   At that point just, yes.  We hadn't had a customer yet

15  but, yes.

16  **Q.**   Okay.  And you were pitching -- you were there to pitch

17  your ability to do this EDD work you've told us?

18  **A.**   Yes.

19  **Q.**   And now you met Mr. Hussain, you just told us.  Where did

20  you meet him for the first time?

21  **A.**   In Cambridge in their offices.

22  **Q.**   And who was present when you first met him?

23  **A.**   I think he stopped by a conference room that a bunch of

24  the tech guys were in with Pete and myself, and then I met him

25  a little later on one on one.

BAIOCCO - CROSS / KEKER

1   **Q.**   That same day?

2   **A.**   Same day.

3   **Q.**   Cambridge?

4   **A.**   Yes.

5   **Q.**   Okay.  Now, when did he tell you that Egan was supposed to

6   sign you up to a $1.6 million VAR deal at the end of the

7   quarter?  When did he tell you that?

8   **A.**   In the meeting when we were alone.

9   **Q.**   Okay.  So this was not in front of the tech people.

10  You're alone, and he tells you about a $1.6 million VAR deal?

11  **A.**   Right.

12  **Q.**   Now, you were asked about meeting with Mr. Hussain in

13  every single interview you gave, weren't you?

14  **A.**   Yeah.

15  **Q.**   Right.  And you didn't come up with this VAR deal until

16  February 20th, 2018, when you met with Mr. Frentzen, your last

17  meeting?  This is the first time you mentioned this VAR deal;

18  right?

19  **A.**   It's the first time anybody asked me *per se*, so...

20  **Q.**   Okay.  We're going to get to that.

21       So this is the first time you ever had a chance to mention

22  that?

23  **A.**   In my opinion, yeah.  I mean --

24  **Q.**   Because you hadn't been asked about what happened at this

25  meeting before?  That's what you're telling us?

1    **A.**    No.   I guess I was asked.  I don't know.  I wasn't asked

2    specifically.   I was asked -- I was answering the questions I

3    was specifically asked.   I don't know where you're going, but

4    go ahead.

5    **Q.**    But it's true that you never told -- so you talked to the

6    Hewlett Packard lawyers three or four times, you talked to the

7    Government seven times before you had this -- or six times

8    before you had this meeting with Mr. Frentzen just a week ago,

9    and that's the first time you mentioned this VAR deal; is that

10   right?

11   **A.**    I'm not a hundred percent positive, but -- I don't know.

12   **Q.**    Do you remember ever telling anybody that before?

13   **A.**    I don't know if anybody asked me that specifically so, no.

14   **Q.**    So the answer -- I'm just asking yes or no.  Do you

15   remember ever saying Sushovan Hussain said something about a

16   $1.6 million VAR deal during this first meeting you ever had

17   with him?  Do you remember ever having said that?

18   **A.**    I do not remember.

19   **Q.**    And you also told us today that before April 6th you had

20   no idea that you needed a license to use the eDiscovery

21   software in Europe?

22   **A.**    I said I didn't -- I wasn't expecting it.

23   **Q.**    The first time you learned that was on April 6, 2011;

24   right?

25   **A.**    First time I learned it, yeah.

BAIOCCO - CROSS / KEKER

1   Q.    Okay.  You knew from Steve Williams -- who's Steve

2   Williams?

3   A.    He was one of our executives.

4   Q.    You knew from Steve Williams that you were going to have

5   to get a license to operate in Europe, didn't you?

6   A.    I don't know that I knew for sure.

7   Q.    Did you -- okay.  For sure?

8   A.    I had never been approached by anybody from Autonomy about

9   a license.

10  Q.    Did Steve Williams tell you -- let me put it another way.

11        Did you tell the FBI that Steve Williams had let you know

12  you were going to need a license well before this meeting with

13  Sushovan Hussain?

14  A.    I think they had mentioned it here and there, but then

15  nobody ever pressed on it.  So I didn't bring it up until they

16  pressed.

17  Q.    Oh, okay.  So somebody had mentioned this -- you just told

18  the jury that the license first came up April 6.  Now, who had

19  mentioned it before?

20  A.    I don't know.  I mean, maybe Steve had mentioned it.  I

21  don't know.  It was never etched in stone at any point that we

22  were going to absolutely have to buy a license.  There was talk

23  about commercials.  To me, commercials meant how much were we

24  going to get paid to do the EDD processing, not necessarily how

25  much were we actually going to pay for more licensing, so...

1  Q.  Here's a copy of, among other things, your Grand Jury

2  testimony.

3  A.  Uh-huh.

4  Q.  And I'd like you to look -- well, do you remember going to

5  the Grand Jury on June 30, 2016?

6  A.  I do.

7  Q.  A year and a half ago; right?

8  A.  Uh-huh.

9  Q.  You were with your lawyer?  Mr. Belter was there with you?

10  A.  Yeah.

11  Q.  He couldn't come into the Grand Jury; right?

12  A.  Right.

13  Q.  You were sworn to tell the truth?

14  A.  Uh-huh.

15  Q.  And who asked you questions?

16  A.  Mr. Leach.

17  Q.  Mr. Leach asked you questions.

18      Okay.  Take a look at page 78 of your Grand Jury

19  testimony.

20  A.  Where are the numbers?

21  Q.  Down at the bottom right of the transcript.

22      Oh, here, I beg your pardon.  It is -- let me -- can I see

23  that for a second?

24  A.  Sure.

25          MR. KEKER:  Your Honor, we premarked the Grand Jury

 1 | testimony of Mr. Baiocco as 5030, five zero three zero.

 2 |      **THE COURT:**  So that will be marked for identification.

 3 |      **MR. KEKER:**  For identification.

 4 |      **THE COURT:**  5030.

 5 |     (Trial Exhibit 5030 marked for identification)

 6 | **BY MR. KEKER:**

 7 | **Q.**  Okay.  Were you asked by Mr. Leach in this meeting --

 8 |      **MR. FRENTZEN:**  Can I get a page and line?

 9 |      **MR. KEKER:**  Sure.  I'm starting at 78:9.

10 |      **THE COURT:**  I'm sorry.  Where?

11 |      **THE WITNESS:**  Where do you want me to look?

12 | **BY MR. KEKER:**

13 | **Q.**  I'm starting at 78:9, but I'm asking you --

14 |      **MR. FRENTZEN:**  78 what?

15 |      **MR. KEKER:**  78, line 9, the question, "Okay.  Who was

16 | there?"

17 | **Q.**  Do you see it?

18 | **A.**  Yeah.

19 | **Q.**  Do you see where the numbers are?

20 | **A.**  Yeah.

21 | **Q.**  Okay.  Were you asked by Mr. Leach who was at this meeting

22 | in Cambridge?

23 |      **THE COURT:**  Well, which meeting?

24 |      **MR. FRENTZEN:**  Objection, Your Honor.

25 |      **THE COURT:**  Which meeting?

BAIOCCO - CROSS / KEKER

1          MR. KEKER:  Excuse me?

2          THE COURT:  I'm sorry.  This is a meeting with

3   Mr. Menell?

4          MR. KEKER:  Well, that's what he -- that's the answer.

5          THE COURT:  No.  The question was were you asked

6   something at a meeting, and I'm just --

7          MR. KEKER:  I beg your pardon.  Yes, sir.

8          THE COURT:  And they were --

9   BY MR. KEKER:

10  Q.   Were you asked who was at -- did Mr. Leach ask you who was

11  at this meeting in Cambridge that you and the tech guys had?

12  A.   Yes.

13  Q.   Were you asked that?

14  A.   Yes.

15  Q.   And what did you tell him?

16         THE COURT:  Well, wait.  Timeout.

17         MR. FRENTZEN:  I'm sorry, Your Honor.  I don't know

18  what this is serving a function.  I have no objection to this,

19  but it's not --

20         THE COURT:  Well, I do.  I mean, I want to make sure

21  that we follow a certain protocol with respect to questioning,

22  and I don't want -- and the protocol is if the witness in the

23  opinion of the counsel has said something inconsistent, then

24  it's appropriate to cross him on it.

25         MR. KEKER:  At this point I'm asking -- well, that's

1   certainly true, but at this point I'm asking him to refresh his

2   recollection by looking at the transcript about what he told

3   Mr. Leach.

4        **MR. FRENTZEN:**  Well, then he should refresh rather

5   than read from it; or ask questions directly about what was

6   said, he should refresh.

7        **THE COURT:**  Correct.  So do you want him to read it,

8   Mr. Keker, to himself?

9        **MR. KEKER:**  To start with.

10       **THE WITNESS:**  10?

11       **MR. KEKER:**  I'd like -- Your Honor, I'm going to ask

12   him about 78 and 79 -- going over to 79 --

13       **THE COURT:**  Why don't you read through.  That's

14   useful.

15       **MR. KEKER:**  -- 79:5.

16       **THE WITNESS:**  I'll read it to myself.

17       **MR. KEKER:**  Yeah.

18       **THE COURT:**  Yeah.  Where are we starting and where are

19   we ending?

20       **MR. KEKER:**  78:10 and I'm going to go over to 79:5,

21   and then I'm going to go to --

22       **THE COURT:**  Okay.  Well, let's do that first, and then

23   you can --

24       **MR. KEKER:**  All right.

25       **THE WITNESS:**  So am I reading aloud, is that --

1              THE COURT:  No.  You're reading to yourself.

2              MR. KEKER:  No.  You're reading to yourself.

3              THE WITNESS:  Okay.  (Witness examines document.)

4              MR. KEKER:  Actually, Your Honor, I would ask you to

5     read it and I'd like to read it.  I think it's inconsistent

6     with what he's just said.

7              THE COURT:  Well, I'm reading it right now.

8              MR. KEKER:  Okay.  It would be quicker just for me to

9     read it than him to read it.

10             THE WITNESS:  All right.

11             MR. FRENTZEN:  I don't -- well.

12             THE COURT:  I don't understand it to be inconsistent.

13             MR. FRENTZEN:  I don't either, Your Honor.

14             THE COURT:  Sorry.

15             MR. FRENTZEN:  That's why I had the objection.

16             THE COURT:  I'm not going -- you know, I'll deal with

17    an offer of proof, but I'm not going to -- it's not

18    inconsistent.  It does not appear to the Court to be

19    inconsistent with his testimony.

20    BY MR. KEKER:

21    Q.  Did you tell Mr. Leach that at this meeting with the tech

22    people, Sushovan came by?

23    A.  Yes, I did.

24    Q.  And that was the first time you met him?

25    A.  Yes.

1    Q.    And were you asked by Mr. Leach whether or not there was a

2    discussion of a need for Capax to license additional software?

3    A.    Yes, I was.

4    Q.    And --

5            MR. FRENTZEN:    Same objection, Your Honor.    Just in

6    terms of how or why we're doing this.

7            THE COURT:    Sustained.

8    BY MR. KEKER:

9    Q.    Did you tell Mr. Leach that you weren't sure if it was in

10   that meeting "but that Sushovan grabbed me after and basically

11   told me, 'Hey, this was supposed to be done two weeks ago'"?

12   A.    I did say that.

13   Q.    And what does that refer to?

14   A.    Well, I guess from reading this, it could refer to the

15   license, the work in the U.K., but it didn't start that way.

16   So I got crossed up in that a little bit potentially because he

17   started with the VAR deal and it moved to -- it moved to the

18   1.6 million for the licensing, absolutely.

19   Q.    When Mr. Leach asked you was there need for discussion for

20   Capax to license additional software in order to process and

21   you said, "Mr. Hussain grabbed me and basically told me, 'Hey,

22   this is supposed to be done two weeks ago'" --

23           MR. FRENTZEN:    He left out the sentence immediately

24   before that.

25           MR. KEKER:    I sure did.    That's because I just didn't

1    read the sentence immediately before that.

2            **MR. FRENTZEN:**  Well, Rule 106, Your Honor.

3            **THE COURT:**  This is what happens -- anyway, why don't

4    you read -- if you want to read, you can read from lines 19

5    through 24.  Just read it, Mr. Keker, if you want to read it.

6            **MR. KEKER:**  Okay.  I will.

7            **THE COURT:**  Okay.

8            **MR. KEKER:**  (reading)

9       **"QUESTION:**  Was there a discussion of a need for Capax to

10          license additional software in order to process data in

11          the U.K. data center?

12      **"ANSWER:**  I'm not sure if in that meeting but, yes,

13          Sushovan grabbed me after and basically told me, 'Hey,

14          this is supposed to be done two weeks ago.'"

15      And I'd like to continue reading over to --

16          **THE COURT:**  Go ahead.

17          **MR. KEKER:**  Okay.  (reading)

18      **"QUESTION:**  Okay.  And what happened after that?

19      **"ANSWER:**  We signed this agreement we brought to be able

20          to use the software in the U.K.

21      **"QUESTION:**  You went back to your office and an agreement

22          was waiting for you?

23      **"ANSWER:**  Yeah."

24   **Q.**   Is that the conversation that you've been referring to

25   where he talked to you about a VAR deal?

**BAIOCCO - CROSS / KEKER**

1   **A.**   Yes.

2   **Q.**   Okay.  And remember you said that that was the first you'd

3   heard of any need to license it?

4   **A.**   Well, it was the first that it solidified in having to

5   license it.  There was always just out there.  Nobody ever

6   discussed anything with me about licensing it technically.

7           **MR. KEKER:**  Okay.  I'd like to read from 79:19 over to

8   86, Your Honor --

9           **MR. FRENTZEN:**  I have objection, Your Honor.

10          **MR. KEKER:**  -- 80, line 6.

11          **MR. FRENTZEN:**  It skips over pertinent information.

12          **THE COURT:**  Wait a minute.

13  I'm sorry.  From line 19, you want to read --

14          **MR. KEKER:**  On 79:19 to 80, line 6.

15          **THE COURT:**  Okay.  Let me read it.

16                     (Pause in proceedings.)

17          **THE COURT:**  Okay.  You may read that.

18          **MR. FRENTZEN:**  Your Honor, I'm sorry.  If I may, just

19  a 106 objection that he's skipping over the part in the middle

20  that seems to relate to the same subject matter.

21          **THE COURT:**  Well, why don't you read it because I

22  didn't allow counsel to read the rest of it.  So why don't you

23  read --

24          **MR. KEKER:**  I'll read the whole thing.

25          **THE COURT:**  Okay.  Go ahead.

 1   BY MR. KEKER:

 2   **Q.**   So you said, Sushovan grabbed you, "Basically told me,

 3   'Hey, this is supposed to be done two weeks ago'" --

 4           **THE COURT:**  Well, wait.  Where are we starting?

 5           **MR. KEKER:**  I'm starting back at 78:22.

 6           **THE COURT:**  78?

 7           **MR. KEKER:**  Line 22.

 8           **THE COURT:**  Okay.  You have to ask the question.  So

 9   start at line 19.

10           **MR. KEKER:**  All right.  I will.  (reading)

11       "QUESTION:  Was there a discussion of a need for Capax to

12       license additional software in order to process data in

13       the U.K. data center?

14       "ANSWER:  I'm not sure if in that meeting but, yes,

15       Sushovan grabbed me after and basically told me, 'Hey,

16       this is supposed to be done two weeks ago.'

17       "QUESTION:  Okay.  And what happened after that?

18       "ANSWER:  We signed this agreement we brought to be able

19       to use the software in the U.K.

20       "QUESTION:  You went back to your office and an agreement

21       was waiting for you?

22       "ANSWER:  Yeah.

23       "QUESTION:  What was the amount of the agreement?

24       "ANSWER:  1.6 million.

25       "QUESTION:  Okay.  Prior to that point, in or around

1      April 5 or 6, had you seen any version of a draft

2      agreement?

3      ▪**ANSWER:**  No.

4      ▪**QUESTION:**  Had you agreed to pay 1.6 million in software?

5      ▪**ANSWER:**  I did.

6      ▪**QUESTION:**  Prior to that date, had you --

7      ▪**ANSWER:**  No.  Prior to that date, no.

8      ▪**QUESTION:**  Okay.

9      ▪**ANSWER:**  By executing it, yes, I did.

10     ▪**QUESTION:**  So prior to April 5th, had Capax agreed to

11     license 1.6 million in software from Autonomy?

12     ▪**ANSWER:**  We had agreed to license it, but we were fully

13     aware -- but we were fully aware at some point that we

14     were going to have to buy licensing for the U.K.

15     ▪**QUESTION:**  When did the first time the price, the $1.6

16     million price, come up?

17     ▪**ANSWER:**  I guess my guys might have been kicking it

18     around a little bit, but the first time I heard about any

19     kind of price is either with Sushovan at the meeting at

20     Cambridge or when I saw the document.  I'm not a hundred

21     percent sure, but somewhere in that 24-hour period."

22  Q.   Was that your testimony?

23  A.   Yes.

24  Q.   A year and a half ago under oath?

25  A.   Yes.

**BAIOCCO - CROSS / KEKER**

1   **Q.**   Now, another thing you said to the jury just a few minutes

2   ago was that Sushovan Hussain said to you in a meeting sometime

3   that the $1.6 million would be covered just like the past

4   deals.  Where did that conversation happen?

5   **A.**   Well, because after I signed for the 1.6 million, I was

6   concerned.  So the next day I said, "We're good on the

7   1.6 million," meaning am I either going to get Deloitte -- I

8   mean, I'm sorry.

9   **Q.**   Slow down a little bit, Mr. Baiocco.  Everybody's got to

10   hear you.

11   **A.**   Yeah.  I asked, "Are we good on the 1.6 either through

12   getting BP Amoco overflow or, you know, the normal way?"  And I

13   was -- we were told that we were going to be fine either way.

14   **Q.**   But this is a conversation with Mr. Hussain?

15   **A.**   Yes.

16   **Q.**   And what did you say to him about this 1.6 million?

17   **A.**   "Am I covered on this?"

18   **Q.**   "Am I covered on this?"

19   **A.**   Meaning if I don't get the BP Amoco overflow, which would

20   be money to us for doing the overflow work, am I going to be

21   covered in the way we've been being covered, and the answer is

22   yes.

23   **Q.**   Is that the way you said to Mr. Hussain that, "Am I

24   covered on this meaning," and then went on and gave that long

25   explanation?

**BAIOCCO - CROSS / KEKER**

1    **A.**    What do you mean "long explanation"?

2    **Q.**    What did -- it's not so much what you say --

3    **A.**    It was about two seconds.  I said, "Are we good on this?"

4    And he said, "Yes."

5              **THE COURT:**  Wait.  Timeout.  Timeout.

6         Let Mr. Keker ask and then you can respond --

7              **THE WITNESS:**  All right.

8              **THE COURT:**  -- if you understand the question.  If you

9    don't, you can seek a clarification.

10              **THE WITNESS:**  All right.

11              **THE COURT:**  Go ahead.  Ask it.

12    **BY MR. KEKER:**

13    **Q.**    Sometimes it's not what you say; it's what the other

14    person hears.  What did you say so that he could hear it in his

15    ears?

16    **A.**    "Are we good on this?  Are we covered?"

17    **Q.**    And what did he say?

18    **A.**    He said, "Yes."

19    **Q.**    Okay.  And when you were saying "Are we good on this,"

20    what were you -- what did you -- did you say what you were

21    referring to?

22    **A.**    Well, I mean, it was clear what I was referring to.  Are

23    we either going to get the Amoco overflow, or are you going to

24    make sure I get paid for this money like I had been for the

25    last three years?

BAIOCCO - CROSS / KEKER

1    Q.    As recently as February 7 -- I mean, first of all, until

2    February 7, you never said anything like this, did you?

3    A.    I don't understand that question.

4              MR. FRENTZEN:  Objection.

5    BY MR. KEKER:

6    Q.    In all the interviews with the Hewlett Packard lawyers and

7    the prosecutors and the FBI agents, you never said that in a

8    meeting with Mr. Hussain in April in London you said words to

9    the effect that you just told us?

10   A.    Probably not.  I don't think I was ever asked in a way

11   that would bring -- allude that sort of an answer, but that's

12   what happened.

13   Q.    So this is something that just arrived full-blown today

14   with the jury that never came out with the Government, did it?

15             MR. FRENTZEN:  Objection.  That misstates the

16   testimony.

17   BY MR. KEKER:

18   Q.    Well, as of February 7th --

19             THE COURT:  Well, okay.  Sustained.

20             MR. KEKER:  I'm sorry, Your Honor.

21             THE COURT:  No.  Sustained.  Okay.

22   BY MR. KEKER:

23   Q.    As of February 7th -- on February 7 you had a meeting with

24   the FBI -- with Mr. Frentzen and the FBI; right?

25   A.    I had a meeting.  I don't know if February 7th but, yeah.

 1   **Q.**    And they asked but this conversation?

 2   **A.**    Right.

 3   **Q.**    And you said basically, "I assumed that this would be

 4   taken care of."  You didn't say he said anything.  You said "I

 5   assumed"; right?

 6   **A.**    Well, I didn't assume.  I assumed based on our

 7   conversation, so it wasn't a deep-rooted conversation.  It was

 8   like, "We good?"  The answer was yes, and I moved on.

 9   **Q.**    Did you tell the FBI as of February 7, 2018, that you

10   simply assumed that you'd be taken care of?

11          **MR. FRENTZEN:**  Object to that characterization,

12   Your Honor.

13          **THE COURT:**  Sustained.

14   **BY MR. KEKER:**

15   **Q.**    Did you --

16          **THE COURT:**  If I sustain the objection, you don't

17   answer the question.

18          **THE WITNESS:**  Okay.

19          **THE COURT:**  If I overrule the objection, you answer

20   the question.

21          **THE WITNESS:**  Thank you.

22   **BY MR. KEKER:**

23   **Q.**    Did you tell the FBI on February 7, 2018, and Mr. Frentzen

24   that you assumed that you would be covered?

25   **A.**    I don't know if I used the word "assumed."

**BAIOCCO - CROSS / KEKER**

1   **Q.**   Okay.  Would you look in 5250 --

2   **A.**   Is this Grand Jury?

3   **Q.**   Yeah -- no, it's not Grand Jury.

4   **A.**   All right.

5   **Q.**   5250 is the --

6           **MR. KEKER:**  Could I just point out to him what I'm

7   asking him to refresh his recollection?

8           **THE COURT:**  Yes.  52?

9           **MR. KEKER:**  5250.

10          **MR. FRENTZEN:**  Where are you at?

11          **THE WITNESS:**  Okay.

12          **MR. KEKER:**  On page 3, I think, at the top.

13  **Q.**   But my question is:  Does that refresh your recollection

14  that what you told him on February 7 is that you assumed you'd

15  be covered?

16  **A.**   You know what?  If I said "assumed," I didn't mean

17  assumed.  So I -- I was sure I was covered.  So for me to say

18  "assumed," you're in the room, you're nervous, you don't maybe

19  use your words properly all the time.

20  **Q.**   The words -- never mind.

21          Okay.  Let's go on to another one.

22          This deal with Egan --

23          **MR. FRENTZEN:**  I'm sorry.  Counsel, I'm on page 3.

24          **THE COURT:**  What are we looking at?  I'm still back at

25  5250.  What page am I supposed to look at?

BAIOCCO - CROSS / KEKER

1           MR. FRENTZEN:  That was what my question was,

2    Your Honor.

3           THE COURT:  What am I looking at?

4                    (Pause in proceedings.)

5           MR. KEKER:  Page 4.  I'm sorry, Mr. Frentzen.  I beg

6    your pardon.

7           THE COURT:  Page 4.

8    BY MR. KEKER:

9    Q.    Let's move to a different subject --

10          THE COURT:  Well, where?  I'm -- okay.  Go ahead.

11   BY MR. KEKER:

12   Q.    -- and that's your testimony today about what this deal --

13   this side deal, this handshake deal, that you made with Egan

14   was.

15          You told us today that the deal that you made with Egan

16   was that you would not pay for any of these VAR transactions

17   until --

18          MR. FRENTZEN:  I actually -- I'm sorry, Your Honor.

19   I'm going to object to that prior line of questioning.  Based

20   on what's in this 302, that is off topic.

21          THE COURT:  Well, I don't know whether it's -- I

22   looked at it.  I don't know.  I can't identify why it's on

23   topic, so I'm going to strike the responses to that series of

24   questions relating to 5250, I guess.  Is it 5250?  We can

25   return to it outside the presence of the jury.

```
 1              MR. FRENTZEN:  Thank you, Your Honor.

 2              THE COURT:  Okay.  So the jury is admonished to

 3   disregard that testimony.  It's stricken.

 4         Okay.  So we're now on a new subject anyways.  Go ahead.

 5   BY MR. KEKER:

 6   Q.   Let's go back to that subject then.  Did you tell -- do

 7   you remember talking to them on February 7 about this meeting

 8   with Mr. Hussain?

 9   A.   Yes.

10   Q.   Did you say to them that you said out loud what you just

11   told the jury you said out loud?

12              THE COURT:  Well, he said a lot of things.  So --

13              MR. KEKER:  Well --

14              THE COURT:  -- can you be more specific?

15   BY MR. KEKER:

16   Q.   At the top of page 4 -- I don't have the thing in front of

17   me is my problem -- at the top of page 4 --

18              THE COURT:  Well, let's take a look at it.

19              THE WITNESS:  I'm assuming I would be paid back, sure,

20   absolutely.

21   BY MR. KEKER:

22   Q.   Yeah.  In the second paragraph on page 4 is what I'm

23   asking about.

24   A.   Right.  That I assumed I would be paid back, is that what

25   you're asking me?
```

1  Q.   No.  What I'm -- now I'm asking:  Did you tell him that

2  you had this verbal outwards tumbling over each other

3  conversation with Hussain?  Did you tell them about that in

4  that interview?

5          MR. FRENTZEN:  Objection.  Mischaracterization.

6          THE COURT:  Wait.  Tell him about what?

7          MR. KEKER:  He's described a conversation with

8  Mr. Hussain where he said, "Are we covered?"

9          THE COURT:  Yes.

10         MR. KEKER:  And Mr. Hussain said, "Yes, we're

11 covered," and so on.

12 Q.   Did you --

13         THE COURT:  But the response in the 302 doesn't

14 describe -- at that sentence doesn't describe the conversation.

15 It describes what he concluded as a result of the conversation.

16         MR. KEKER:  Agreed.  Agreed.  And you've just -- okay.

17 And that was my original question.

18         THE COURT:  Well, I think that's fine, but that's --

19         MR. KEKER:  Okay.

20 Q.   My original question was:  Did you just assume that you

21 were covered as opposed to actually say it in words?

22         THE COURT:  Oh, that's a different question.

23    Do you understand the question?

24         THE WITNESS:  No, I did not just assume.  I was

25 confident based on my conversation with Mr. Hussain and the

**BAIOCCO - CROSS / KEKER**

1    history of the overall Capax/Autonomy relationship that I would

2    be made whole.

3    **BY MR. KEKER:**

4    **Q.**   Just tell us one more time.   What did you say and what did

5    he say about this subject?   What words were actually used?

6    **A.**   I don't know the exact words.   It was a 30-second

7    conversation.   I said, "Okay.   You got the PO?"

8          "Yes."

9          "Are we good?"

10         "We're good."

11         So it was --

12   **Q.**   Okay.   So -- okay.   That was it, 30 seconds, "Are we

13   good?"   "Yeah, we're good"; right?

14   **A.**   Right.

15   **Q.**   Okay.   All right.   Separate subject.

16         You told us this morning that the deal you made with

17   Mr. Egan, the handshake deal, was that Capax would not pay

18   unless the end user paid either Capax or paid directly?

19   **A.**   Well, we weren't going to pay, right.

20   **Q.**   You weren't going to pay.   You told them you were going to

21   sign -- you were going to enter into these contracts but you

22   weren't going to pay?

23   **A.**   Right.

24   **Q.**   And you discussed that with Mr. Egan and later you said

25   the same thing to Mr. Kanter, Mr. Chamberlain, Mr. Scott, and

1    in some way to Mr. Hussain?

2    **A.**    Yes.

3    **Q.**    Would you look, please, sir, at the first interview you

4    had with Morgan Lewis, which is there in your book?

5    Morgan Lewis are lawyers for Hewlett Packard; right?

6    **A.**    Yep.

7            **MR. KEKER:**    And we've marked that as 5024, Your Honor.

8            **THE COURT:**    Okay.

9            (Trial Exhibit 5024 marked for identification)

10    **BY MR. KEKER:**

11    **Q.**    And this was the four-hour interview you had?

12    **A.**    I guess, yes.

13            **THE COURT:**    And what page would you like him to look

14    at?

15            **MR. KEKER:**    I'd like him to look at page 7.

16            **THE COURT:**    And any particular paragraph?

17            **MR. KEKER:**    And I'd like him to look at the

18    next-to-the-last paragraph from the bottom, the one that begins

19    "On the one hand."

20            **THE COURT:**    Okay.  So let's read it.

21    **BY MR. KEKER:**

22    **Q.**    Why don't you read that to yourself?

23    **A.**    Okay.  Starting with "On one hand"?

24    **Q.**    Yeah.

25    **A.**    (Witness examines document.)

**BAIOCCO - CROSS / KEKER**

1   Q.   Well, actually start with the paragraph before that,

2   please.

3   A.   (Witness examines document.)

4   Q.   Tell me when you've read it.

5   A.   Okay.

6   Q.   Do you remember being asked and responding to the

7   Morgan Lewis lawyers for Hewlett Packard that first meeting,

8   which took place back in 2013, about what your conversation was

9   with Mr. Egan?

10   A.   I don't remember.

11   Q.   Okay.  Do you remember telling them that at the eleventh

12   hour, Egan would convince you unequivocally that the deal was

13   imminent, that it was 99 percent going to close, and that you'd

14   agree to do the deal with the expectation that it would close

15   in 15 to 30 days?

16   A.   That sounds reasonable, yes.

17   Q.   Okay.  And do you remember telling him, insisting

18   actually, that Capax took some risk on these deals, they had to

19   be, quote, "good for it," close quote, if the direct deal

20   between Autonomy and the end user fell through?

21   A.   I'm sorry.  Say that one more time.

22   Q.   Yeah.

23   A.   It sounds like --

24   Q.   Did you insist that Capax was at risk on the deals, Capax

25   had to be good for it if the direct deal between Autonomy and

 1   the end user fell through?

 2           MR. FRENTZEN:  I'd just ask that it be read

 3   accurately, which is "some risk," Your Honor.

 4           MR. KEKER:  I thought I did.

 5           MR. FRENTZEN:  No.  You skipped that word.

 6           THE COURT:  Okay.

 7   BY MR. KEKER:

 8   Q.   I'll do it again.  (reading)

 9           "On the one hand, did you insist that Capax took some

10       risk on these deals they had to be 'good for it' if the

11       direct deal between Autonomy and the end user fell

12       through?"

13   A.   Yeah.  I mean, we did our best to get a guarantee but, I

14   mean, in my opinion there was always some latent risk it could

15   fall apart and they could turn back on their handshake deal and

16   I'd be left with nothing.  So, yeah, absolutely there was risk.

17   Q.   Did you say, although it was never expressly stated by

18   Egan or others, you understood that if a deal fell apart,

19   Autonomy would have helped Capax resell the product to another

20   customer or would have slotted in Capax to the next customer

21   who wanted IDOL?

22   A.   Yes.

23   Q.   And you told him it was never expressly stated even by

24   Mr. Egan; right?

25   A.   Let's say that one more time.

BAIOCCO - CROSS / KEKER

1   **Q.**   Did you tell him that it was never expressly stated by

2   Egan or others but you understood that if a deal fell apart,

3   Autonomy would have helped Capax resell the product to another

4   customer or would have slotted in Capax for the next customer

5   that wanted IDOL?

6   **A.**   I don't think it was ever expressly stated that it would

7   be a guarantee, but it was always expressed that they would do

8   everything in their humanly power to make it work.

9   **Q.**   You told them it was a guarantee, didn't you?

10  **A.**   Well, it is a -- it was a verbal guarantee.  I mean,

11  what's a guarantee?  It was a verbal guarantee pretty much.

12  **Q.**   Was it a verbal --

13  **A.**   They wouldn't memorialize it.

14  **Q.**   It was a verbal guarantee that was never expressly stated?

15  **A.**   I don't -- those are -- this is somebody else writing down

16  my words, so I don't know that I would say it was never

17  expressly stated.  So if that's --

18  **Q.**   You think the Hewlett Packard lawyers were misconstruing

19  your words?

20  **A.**   It's possible.  I'm telling you what I -- what I know.

21  **Q.**   Look at -- and then they talked to you again on April 5th,

22  and if you would look at, please, sir, page 6 of that next

23  exhibit.

24  **A.**   What's the next exhibit?  I've never done this before.

25  **Q.**   The next exhibit should be marked --

**BAIOCCO - CROSS / KEKER**

1  **A.**    025?

2            **THE COURT:**  Yes.  5025.

3            **THE WITNESS:**  5025.  And then what page?

4        **MR. KEKER:**  5025.

5        **THE COURT:**  Page 6.

6        **MR. KEKER:**  And I'm asking about page 6.

7        **MR. FRENTZEN:**  What's the date?

8        **MR. KEKER:**  The date is April 5, 2015.

9      I beg your pardon.  I beg your pardon.  I'm talking about

10  a 302.  Yeah, I'm sorry.  I beg your pardon.  Not that.

11  **Q.**  Go to the next one, which is your first interview --

12  **A.**  5026?

13  **Q.**  -- with the FBI?  Pardon?

14  **A.**  5026?

15  **Q.**  Yes.  This is the 9/17/2013 at page 6.

16        **THE COURT:**  At page 6.

17        **MR. KEKER:**  And I'm looking at the second and third

18  full paragraphs.

19  **Q.**  Do you remember this first interview with the prosecutors?

20  **A.**  Yeah.

21  **Q.**  Okay.  And in this interview, which happened in 2013, did

22  you tell them that you believed that Capax would have to pay

23  Autonomy even if the end user did not pay Capax?

24  **A.**  There was a possibility of that.

25  **Q.**  I'm just asking right now, did you tell the Government

1    investigators that you believed that Capax would have to pay

2    Autonomy even if the end user did not pay Capax?

3    **A.**    I think I said if everything else went wrong, there was

4    always a possibility that we would have to pay since we had

5    signed a contract.

6    **Q.**    Did you tell them that the amount of e-mails and phone

7    calls to Autonomy when Capax did not receive money from the end

8    users was proof that Capax was worried about these deals,

9    specifically paying Autonomy when the end user had not paid?

10   **A.**    Well, I was worried about getting caught up, yes.

11   **Q.**    Did you say Autonomy did not state that they would not

12   invoice Capax or require payment but Capax was still concerned

13   that they would be stuck with the payment?

14   **A.**    I'm sorry.  Say that one more time slower.

15   **Q.**    Did you say that Autonomy did not state that they would

16   not invoice Capax or require payment?

17   **A.**    I'm not understanding that a hundred percent.  Where is

18   it?  Can I read it myself?

19   **Q.**    It's right in the middle of that paragraph.

20   **A.**    Under what page?

21   **Q.**    Page 6.

22   **A.**    Page 6.  (Witness examines document.)

23           **MR. KEKER:**  Let me show him.

24           **THE WITNESS:**  Yeah.  Can you show me, please?

25                      (Pause in proceedings.)

BAIOCCO - CROSS / KEKER

1    BY MR. KEKER:

2    Q.   This paragraph (indicating).

3    A.   All right.

4         (Witness examines document.)  I mean, it was proof that we

5    were worried about the deals.

6    Q.   Okay.  And did you tell the investigators that Capax had a

7    line of credit to pay for these VAR licenses?

8    A.   We said what ultimately would happen if everything went

9    wrong; and we said, "Well, ultimately we had a line of credit.

10   We might have been able to do it."

11   Q.   You said you could pay it through your line of credit; it

12   would have been painful, but you could pay for it?

13   A.   That was my thought at the time.

14   Q.   Okay.  Do you remember when some authorities from the

15   United States Air Force asked questions of Capax about a couple

16   of these reseller deals?

17   A.   I do.

18   Q.   And they were asking about the UBS deal and they were

19   asking about the Defense Online --

20   A.   Correct.

21   Q.   -- Defense Knowledge Online DKO deal, which is the

22   Department of the Army one?

23   A.   Correct.

24   Q.   Okay.  And did you cause your lawyer to write a letter to

25   the Department of the -- to the United States Air Force

BAIOCCO - CROSS / KEKER

1   explaining things about those deals?

2   **A.**   Yes.

3   **Q.**   And was that Mr. Belter, who's sitting back here?

4   **A.**   It was Mr. Belter or his -- somebody in his firm.

5   **Q.**   Okay.  And did you review the letter before it went out?

6   **A.**   My partner might have.  I don't know that I actually

7   reviewed it.  I mean, I certainly read it at some point.

8   **Q.**   Okay.  And he sent it on -- you were the CEO and the COO

9   of Capax Global at that point?

10  **A.**   I don't know if I was ever COO but, yeah, CEO.

11  **Q.**   You were the CEO?

12  **A.**   Managing partner.

13  **Q.**   And Mr. Belter sent it on your behalf for Capax Global;

14  right?

15  **A.**   Yeah.

16  **Q.**   Okay.  Let me show you Exhibit 5499.

17          And you were --

18  **A.**   Oh.  Another book?

19  **Q.**   Oh, sorry.

20  **A.**   Which volume?

21          **THE COURT:**  54?

22          **MR. KEKER:**  5499.

23          **THE COURT:**  '99.  Sorry.

24          **THE WITNESS:**  What volume is that in?

25  \\\

**BAIOCCO - CROSS / KEKER**

1   BY MR. KEKER:

2   **Q.**   That's -- I think it's in Volume 2.  Let me look.  In

3   fact, I can look here.

4           **MR. FRENTZEN:**  It's Volume 2.

5   BY MR. KEKER:

6   **Q.**   It's Volume 2.

7   **A.**   All right.  5499?

8   **Q.**   Yeah.

9   **A.**   (Witness examines document.)  All right.

10  **Q.**   And you authorized Mr. Belter to say the things that he

11  said in this letter on behalf of your company Capax; right?

12  **A.**   Yeah.  Not me alone but, yes.

13  **Q.**   And you didn't want him to say anything that was false or

14  wrong, did you?

15  **A.**   No.

16  **Q.**   Okay.  And did the letter to -- in the letter to the Air

17  Force, did Capax explain to the Air Force what its role as a

18  value-added reseller was?

19  **A.**   It did.

20  **Q.**   And did you describe that role as taking an existing

21  product and adding value of its own in the computer industry,

22  you might add value to a product by customizing or implementing

23  software or by being a guarantor?

24          **MR. FRENTZEN:**  Where are you reading?

25          **MR. KEKER:**  I'm looking at page 2, paragraph -- second

1  paragraph below A, "VAR Transactions."

2          **THE WITNESS:**  Yeah.  I mean, if it's in there, then,

3  yes.

4  **BY MR. KEKER:**

5  **Q.**  And did you tell the Air Force that Capax was a guarantor,

6  as well as a provider of services and support, that allowed

7  Autonomy software to function effectively in its clients'

8  environments?

9  **A.**  Well, I think we were the guarantor on the VAR deals.

10  **Q.**  You were a guarantor?

11  **A.**  Well, we signed the deal.

12  **Q.**  You signed the deal, which meant if the deal didn't close,

13  you were paying for it?

14  **A.**  Ultimately.

15  **Q.**  Okay.  That's what the agreement was, you were on the hook

16  for the deal?

17  **A.**  Under that term, yes, I was on the hook for the deal.

18  **Q.**  And that's what you told the Air Force?

19  **A.**  That's true.  In the worst case scenario, we were on the

20  hook.

21  **Q.**  And then look down the next -- the VAR risks include

22  revenue loss caused by the inability to collect payables;

23  right?

24  **A.**  Right.

25  **Q.**  Capax also viewed being a VAR as a way to potentially

1  create direct and valuable relationships with new clients in

2  order to sell them additional products and services?

3       **MR. FRENTZEN:**  I'm sorry.  At this point, Your Honor,

4  I'm going to object unless -- is this being offered?  I don't

5  know why we're just reading off of this.  Sorry.

6       **MR. KEKER:**  Well --

7       **THE COURT:**  Well, I think the question is, as I

8  understand it, did this witness authorize certain statements to

9  be made to the Air Force in connection with the VAR deals; and

10 it's counsel's view that that may or may not be consistent with

11 the testimony that he's given.  Is that --

12      **MR. KEKER:**  That's correct, Your Honor.  I could just

13 ask him if he -- I'll just ask him questions.

14      **THE COURT:**  You can ask him the question.  Did he make

15 statements that are inconsistent with his testimony?

16      **MR. FRENTZEN:**  I understand the question, Your Honor,

17 but if we're reading off the document, is the document being

18 offered?

19      **THE COURT:**  No idea.

20    Is it being offered?

21      **MR. KEKER:**  I'll just ask him questions.

22      **THE COURT:**  The answer is no.

23      **MR. FRENTZEN:**  I would offer the document.

24      **THE COURT:**  Well, I don't know that you can in the

25 cross-examination of the witness.

1          MR. FRENTZEN:  Understood, Your Honor.

2          THE COURT:  Okay.  You can offer it in your own

3    redirect.

4          MR. FRENTZEN:  Thank you, Your Honor.

5    BY MR. KEKER:

6    Q.   Did Capax view being a VAR as a way to potentially create

7    direct and valuable relationships with new clients in order to

8    sell them additional products and services?

9    A.   Yes.

10   Q.   Yes?

11   A.   Yes.

12   Q.   Did Capax take substantial risk on every VAR deal with

13   Autonomy?

14   A.   In the eyes of the law, yes.

15   Q.   Okay.  I get the eyes of the law.  What other eyes are

16   there?

17   A.   Well, I mean, if everything went wrong and somebody came

18   to me, I had my name -- we had our name signed on that

19   contract.  So ultimately, you're right, we would have owed it

20   or not paid it, but that was never the arrangement.

21   Q.   When the purchase order was signed, the financial -- is

22   this true that when the purchase order was signed by Capax, the

23   financial risk of the deal was transferred to Capax?

24   A.   In the eyes of the law, yes.

25   Q.   In the event the deal with the government end user did not

BAIOCCO - CROSS / KEKER

1  close, Capax would own the software licenses and ultimately

2  have to pay Autonomy for them; is that true?

3  **A.**    In the eyes of the law, yes, it is.

4  **Q.**    Capax's only option -- if the transaction didn't

5  materialize, Capax's only option would be to resell the

6  software licenses to another customer; is that right?

7  **A.**    Well, that wouldn't be our only option, but that was an

8  option.

9  **Q.**    And Capax evaluated the risk in these VAR transactions and

10  decided the upside was worth the inherent risk.  Right or

11  wrong?

12  **A.**    Correct.

13  **Q.**    Another thing you told the jury is the software was never

14  delivered; right?

15       **MR. FRENTZEN:**  Actually, I think that misstates the

16  testimony.

17       **MR. KEKER:**  All right.  I beg your pardon.

18  **Q.**    Then Capax never got the software from Autonomy on these

19  VAR deals?

20       **MR. FRENTZEN:**  I believe that misstates the testimony.

21       **THE WITNESS:**  I said I didn't know if we got the

22  software.  I said we never delivered the software for sure.  I

23  was not positive had we ever been delivered the software to us.

24  That was not in my world, but we never delivered it to the end

25  user was what I was sure of.

1    BY MR. KEKER:

2    Q.   Would you look at 5471, please, sir.  That's in volume --

3         THE COURT:  2.

4    BY MR. KEKER:

5    Q.   -- 2, and it's an e-mail --

6    A.   Hang on.  54 --

7         THE COURT:  5471.

8         THE WITNESS:  All right.

9    BY MR. KEKER:

10   Q.   And it's an e-mail from Autonomy to you dated December 31,

11   2009.

12        MR. KEKER:  I move it in, Your Honor.

13        THE COURT:  Okay.  5471 admitted.

14   (Trial Exhibit 5471 received in evidence)

15        THE WITNESS:  (Witness examines document.)  All right.

16        MR. KEKER:  Okay.  Could we highlight the first line?

17   I'm sorry, the subject.  The subject.

18   Q.   Do you see that?  It says "Autonomy Autometer Software

19   Information for Capax Discovery LLC on behalf of Eli Lilly."

20   Does that refer to the Eli Lilly VAR transaction?

21   A.   Yes.

22   Q.   Is this the transfer -- they give you a password, log-in

23   information -- is this the transfer of the software license,

24   giving you a key to go get the software off of their server?

25   A.   Yes.

1    Q.    So is this delivery of the software to Capax?

2    A.    Yes.

3    Q.    Okay.  This one's for Eli Lilly.

4          Look at 5474.  I won't bore the jury with this, but 5474,

5    is that delivery of the Kraft license?

6    A.    Where does it say "Kraft"?  I don't see "Kraft" on here.

7              MR. KEKER:  One second, Your Honor.

8              THE COURT:  Sure.  Well, first for a sales order;

9    right?  So Kraft there's a sales order.

10             MR. KEKER:  I didn't turn the page.

11         Can we see the second page?

12             THE WITNESS:  I only have one page.

13             THE COURT:  I only have one page.

14             MR. KEKER:  Well, no.  You've got a blue page.  You

15   should -- all right.  Let me look.

16             THE COURT:  Behind the blue page.

17             THE WITNESS:  Oh, all right.

18   BY MR. KEKER:

19   Q.    Behind the blue page is the --

20   A.    Yes.

21   Q.    So is this delivery for Kraft?

22   A.    Yes.

23   Q.    Ms. Lazarus had to help me out.

24         All right.  5480, take a look at that and tell me if

25   that's delivery of the software for TXU.

1          THE COURT:  Which one now are we looking at?  I'm

2    sorry.

3          MR. KEKER:  5480, Your Honor.

4          THE COURT:  54?

5          MR. KEKER:  5480.

6          THE COURT:  5480.  Are you moving these into evidence

7    or what are we doing?

8          MR. KEKER:  Yes, Your Honor, I am.

9          THE COURT:  So going back at 5474.

10         MR. KEKER:  And before that 5471.

11         THE COURT:  Okay.  5471 has already been admitted.

12    5474 is admitted.

13    (Trial Exhibit 5474 received in evidence)

14   BY MR. KEKER:

15   Q.   And 5480, is that the delivery of the software license for

16   the TXU -- one of the TXU transactions?

17   A.   Yes.

18         THE COURT:  5480 is admitted.

19    (Trial Exhibit 5480 received in evidence)

20         MR. FRENTZEN:  I'm sorry, Your Honor.  If we can

21    clarify delivery to who?

22         THE COURT:  Pardon me?

23         MR. KEKER:  Delivery to Capax.

24         MR. FRENTZEN:  Well, if we could clarify delivery to

25    who?

1          Your Honor, I'm sorry.  I don't know if this witness has

2    personal knowledge is my point.  I don't have any objection to

3    this coming into evidence.  I'm simply making a point about

4    the --

5               THE COURT:  Well, the e-mail is going to him.

6               MR. FRENTZEN:  On -- maybe I'm missing something,

7    Your Honor.  I'm on 5480.

8               THE COURT:  Well, I was looking at 5474.

9         Okay.  5480?

10                         (Pause in proceedings.)

11               THE COURT:  Okay.  The e-mail is not going to him

12    according to the document.

13               MR. FRENTZEN:  I don't have an objection to it coming

14    in.

15               THE COURT:  Okay.  So they're all in.  Those three are

16    in.

17    BY MR. KEKER:

18    Q.   So take 5480 -- can we put this up -- and look at the

19    bottom e-mail.  This one.

20         This is -- the original message is between somebody at

21    Autonomy to somebody at Capax Global, and it's dated June 30,

22    2009, "Software availability for TXU per your reseller purchase

23    order."

24    A.   Yes.

25    Q.   And it says (reading):

1                "Autonomy Qfiniti software part number" -- blah

2         blah -- "has been loaded on our FTP server for download.

3         The FTP account you have requested is now active.  Account

4         access will expire such and such a time.  Here's how you

5         get it."

6         User name and password; right?

7    A.   Yes.

8    Q.   That's delivery of the software to Capax?

9    A.   Correct.

10   Q.   Look at 5487.  Is that delivery of the software to Capax

11   for the McAfee VAR transaction?

12   A.   (Witness examines document.)  Yes.

13   Q.   Look at --

14             THE COURT:  5480 --

15             MR. KEKER:  87.

16             THE COURT:  Are you offering it?

17             MR. KEKER:  I'm offering it, yes, sir.

18             THE COURT:  Admitted.

19        (Trial Exhibit 5487 received in evidence)

20   BY MR. KEKER:

21   Q.   And then 5488 is delivery of the software to Capax for the

22   Defense Knowledge Online transaction; isn't it?

23   A.   Yes.

24   Q.   And then 5489 --

25             THE COURT:  Are we done with 5488?  You're admitting?

1        **MR. KEKER:** Move it in.  Sorry, Your Honor.

2        **THE COURT:** Okay.  Admitted.

3     (Trial Exhibit 5488 received in evidence)

4  BY MR. KEKER:

5  Q.   5389 --

6  A.   Volume 1?

7  Q.   -- going back to Volume 1 -- oh, we don't have -- yeah.

8  These are new exhibits.  I'm sorry.  Without Ms. Lazarus, I'd

9  be lost.

10       **MR. KEKER:** Your Honor, we have a new exhibit marked

11 5389 that we would like to --

12       **THE COURT:** Okay.  Show it to Government counsel.

13       **MR. KEKER:** The Government has one.

14       **MR. FRENTZEN:** I've got it, Your Honor.

15       **THE COURT:** A copy to the Court.

16    (Trial Exhibit 5389 marked for identification)

17 BY MR. KEKER:

18 Q.   Is 5389 another delivery of software for Kraft?

19 A.   Yes.

20       **MR. KEKER:** Move it in, Your Honor.

21       **THE COURT:** Okay.  5389 dated September 30th, '09,

22 admitted.

23    (Trial Exhibit 5389 received in evidence)

24       **MR. KEKER:** Thank you.

25 Q.   And then, finally, 5496.

BAIOCCO - CROSS / KEKER

1   **A.**   (Witness examines document.)  All right.

2   **Q.**   And about --

3          **THE COURT:**  What do you want to do with 5496?

4   **BY MR. KEKER:**

5   **Q.**   5496 you need to go in about -- you need to go to page 6,

6   and does this -- does page 6 of 5496 show delivery of the

7   software to Capax for the end user Financial Services

8   Authority?

9   **A.**   Yes.

10         **THE COURT:**  Admitted.

11         (Trial Exhibit 5496 received in evidence)

12  **BY MR. KEKER:**

13  **Q.**   Why did you tell them that the software wasn't delivered?

14  **A.**   I said I wasn't sure if it got delivered to us.  My answer

15  was I was pretty sure we didn't deliver -- we never delivered

16  it to the end client.

17  **Q.**   Okay.

18  **A.**   Specifically I said that.

19  **Q.**   Tell us because I didn't thoroughly understand it.  This

20  NearPoint transaction, NearPoint is something that Capax has

21  made a lot of money off of, hasn't it?

22  **A.**   Yes.

23  **Q.**   All right.  And NearPoint is a product that came from

24  Iron Mountain, and it does a lot of the same things that the

25  EAS product, which came from Zantaz, does; right?

1  A.    Correct.

2  Q.    And you've gotten -- Capax has gotten contracts.  First

3  they had them with Autonomy and they've continued on with

4  Hewlett Packard Autonomy to provide support for the users of

5  EAS and NearPoint?

6  A.    Yes.

7  Q.    Right.  And Autonomy bought Iron Mountain in the summer of

8  2011; isn't that right?

9  A.    If you say so.  I don't actually know the date of that.

10  Q.    Okay.  But at some -- and do you remember that NearPoint

11  had about 1200 to 1300 customers that needed to be serviced and

12  Autonomy didn't want to do it?

13  A.    I do.

14  Q.    And that Mr. Hussain suggested -- at this point the Capax

15  was already supporting the EAS customers, weren't they?

16  A.    Yes.

17  Q.    Because Autonomy didn't want to do services for those

18  customers; they wanted you to do it?

19  A.    Correct.

20  Q.    And now NearPoint with 12- to 1300 customers, Mr. Hussain

21  suggested to you you do the services for NearPoint just like

22  you do it for EAS?

23  A.    Correct.

24  Q.    And you made millions and millions of dollars off of that,

25  haven't you?

1   **A.**    We've done well.

2   **Q.**    Now, you made a deal to get NearPoint with Mr. Kanter;

3   right?

4   **A.**    Yes.

5   **Q.**    And the deal, what you needed, you needed to get some --

6   hire some new employees.  You needed to open an office in

7   India.  You needed to open an office in Campbell, California.

8   You had expenses; right?

9   **A.**    Uh-huh.

10  **Q.**    And Mr. Kanter agreed to a ramp-up fee to get you into

11  this business to take care of their customers for $2 million?

12  **A.**    Yes.

13  **Q.**    Okay.  Now, are you telling us that that $2 million is

14  related to something else?

15  **A.**    I'm saying I assimilate it to be related to something else

16  but, yeah, I don't have direct proof of that, but...

17  **Q.**    But you're saying it's related to something else.  What's

18  it -- what are you --

19  **A.**    Because they were stalking me --

20  **Q.**    Didn't you tell them it was related?

21  **A.**    They were stalking me for a payment of FSA; and then all

22  of a sudden, besides giving me the NearPoint support contract,

23  they added in an additional $2 million ramp-up fee.  So that's

24  all I'm stating.

25  **Q.**    Do you remember an interview on November 27, 2013, with

1    Mr. Frank, a Hewlett Packard lawyer?

2    **A.**    Yes.

3    **Q.**    And did you talk -- did he suggest to you that this

4    NearPoint transaction must be related to the money that they

5    wanted to get you to pay on FSA?

6    **A.**    I don't remember.

7    **Q.**    Okay.  Would you look at 5265, please?

8            **MR. KEKER:**  Do we have it?  Is it in the binders?

9    5265?  No.  It's here.

10           **THE COURT:**  I don't have that.  Do we have it?

11           **MR. KEKER:**  I'm sorry, Your Honor.  This is something

12   we just got last night --

13           **MR. FRENTZEN:**  What's the date of this one?

14           **MR. KEKER:**  -- as a result of your order.

15           **THE WITNESS:**  Do I have it?

16           **THE COURT:**  No, no, no.  He's going to hand it to you.

17           **THE WITNESS:**  Oh, all right.

18           **THE COURT:**  He's going to hand it to you.

19           **MR. KEKER:**  5265.

20      (Trial Exhibit 5265 marked for identification)

21           **THE COURT:**  Thank you.  Let me take a look at it.

22      What do you want him to look at?

23           **MR. KEKER:**  I want him to look at pages -- just a

24   second.

25                      (Pause in proceedings.)

 1          MR. KEKER:  Page 9.

 2          THE COURT:  Page 9, okay.  And which bullet point?

 3          MR. FRENTZEN:  And is the question if this refreshes?

 4          MR. KEKER:  Well --

 5          THE COURT:  Well, let's find out where on page 9 are

 6   you --

 7          MR. KEKER:  Under FSA.

 8          THE COURT:  Under FSA?

 9          MR. KEKER:  The two paragraphs that are there FSA,

10   especially the bottom one.

11          THE COURT:  I'm sorry.  I must be looking at the wrong

12   page.  I'm looking at page 9 --

13          MR. KEKER:  Oh, 8.  I'm sorry.  I'm sorry.

14          THE COURT:  Page 8.

15          MR. KEKER:  8 and 9.  We're going to go 8 and 9.

16          THE COURT:  Okay.  So you want him to look at --

17          MR. FRENTZEN:  Is this to refresh, Your Honor?

18          THE COURT:  I don't know what it is, but you want him

19   to look at --

20          MR. KEKER:  I want him to refresh his recollection at

21   this point.  I want to ask him --

22          THE COURT:  We're going to take a little recess.

23   We've been going for some period of time.

24       So, ladies and gentlemen, let's recess until five to 3:00.

25   Remember the admonition given to you:  Don't discuss the case,

1    allow anyone to discuss it with you, form or express any

2    opinion.  And see you back here at five to 3:00.  Thank you.

3         (Proceedings were heard out of the presence of the jury:)

4         **THE COURT:**  Okay.  Let the record reflect the jurors

5    have retired.

6         You can step down.

7         Let me address the issue of cross on purportedly

8    inconsistent statements because I think every judge does it

9    differently, so I want to tell you how I do it and then we can

10   go from there because I really don't want to interrupt

11   cross-examination.  There's a flow to it and an intention

12   behind it.

13        If there is a statement, a direct statement, from a

14   witness that appears to be inconsistent, that almost always

15   would come in.  That almost always would come in.  I don't

16   think we need much to get that in.

17        If it's a statement that is of another individual

18   purporting to write the statement of the individual, I look at

19   that to see whether it's directly contradictory of the witness'

20   statement.  There may be some other indicia of it that would

21   allow it to come in, but basically I look at it and say, "Is

22   that inconsistent with his testimony?"

23        As an example -- well, I don't know that I need to give

24   any examples because I know you'll figure it out yourselves,

25   but that's basically the way I do it.

**PROCEEDINGS**

1    Therefore, generally there's very little cross-examination

2    about other people's statements, other notes, other

3    recitations, other whatever it is, of the witness' statement.

4    It just doesn't come in.

5    And the reason it doesn't come in is that it is frequently

6    collateral in the sense that -- not collateral -- it frequently

7    would involve, entail further testimony by the witness -- by

8    the person who created the notes.

9    Now, I know that can happen.  I'm not saying these people

10   are unavailable, but it's enormously time-consuming and

11   inexact; and I have found -- maybe your experiences are

12   different -- that the witness gets up on the stand, that is the

13   creator of the document, and he says, "Well, maybe he could

14   have said that," or, "I interpreted it a particular way," and

15   so forth so you end up with mush.  That's mush and it's mush

16   that takes a lot of time.

17   Okay.  That's my view of how we ought to proceed with

18   cross-examining a witness based upon prior inconsistent

19   statements.

20   Now, I don't for a moment think that it's not important

21   for a party to be able to impeach the credibility of a witness.

22   That's crucial in any cross-examination of somebody who

23   purportedly gave adverse testimony to the party, but there is a

24   way to do it.  That's the way I've approached it.

25   The Government has the advantage, I suppose, in having

1  seen me in other trials and followed that procedure.  The

2  Defense has not, to the extent that the Government has.  So I

3  just simply want to lay that out because I think that that's

4  helpful to the Defense in how they want to approach it in

5  making the judgments that they're going to make in cross.

6      Okay.  Let's take a recess.

7          **MR. KEKER:**  Thank you, Your Honor.

8          **MR. FRENTZEN:**  Thank you, Your Honor.

9          **MR. REEVES:**  Thank you, Your Honor.

10              (Recess taken at 2:41 p.m.)

11          (Proceedings resumed at 2:57 p.m.)

12      (Proceedings were heard in the presence of the jury:)

13          **THE COURT:**  Let the record reflect all jurors are

14  present.  The parties are present.

15      You may proceed, Mr. Keker.

16  **BY MR. KEKER:**

17  **Q.**  Mr. Baiocco, let's go back to the NearPoint transaction

18  where you were paid a ramp-up fee of $2 million.  Did you

19  believe that the $2 million ramp-up fee was justified by the

20  costs that you were going to incur to get ready to take care of

21  these 12- to 1300 NearPoint customers?

22  **A.**  I thought it was excessive.

23  **Q.**  And did you believe that the NearPoint transaction was

24  unrelated to Mr. Hussain's request for payment on the Financial

25  Services Authority deal?

1    **A.**    I don't know either way.  I collected the money, and the

2    next day, they were asking me for a payment.

3    **Q.**    Okay.  Do you recall -- I think you said you did --

4    talking to Mr. Frank in November of 2013, a HP lawyer, and

5    talking about the relationship between the NearPoint deal and

6    the -- and the payment for FSA?

7    **A.**    Yes.

8    **Q.**    And at the time, do you recall that you were emphatic that

9    they were unrelated?

10   **A.**    I don't know that I was emphatic.  I'm trying to read -- I

11   remember being with Mr. Frank.  I don't remember that exact

12   conversation.  So is that FSA-4?

13   **Q.**    Well, I'm asking you to refresh your recollection.  I'd

14   direct your attention to the bottom of page 8.

15   **A.**    8.

16   **Q.**    Of 5265.

17        Do you remember being emphatic that they were unrelated in

18   2013?

19   **A.**    Those are somebody else's description of my words, but

20   that's what they wrote.

21   **Q.**    Well, so they got it wrong?

22   **A.**    I don't know if they got it wrong or right.  I don't

23   really know if the $2 million was designated for the -- pay the

24   FSA or not.  The timing was suspect, but . . .

25   **Q.**    Okay.  What I'm trying to understand, that was 2013, and

1  at 2013, you thought that they were unrelated and now you're

2  telling the jury that they were related or that you think they

3  were related?

4  **A.**   Well, going back over time and looking at notes and

5  different email threads and timing on stuff, I made an

6  assumption that they were related.  Nobody told me they were

7  related.  Different email.

8  **Q.**   Mr. Hussain certainly didn't tell you they were related,

9  did he?

10  **A.**   No.

11  **Q.**   Mr. Hussain said he needed somebody to do services for

12  NearPoint and he was willing -- or Mr. Kanter said he was

13  willing to give you a ramp-up fee?

14  **A.**   Yes.

15  **Q.**   And that's Mr. Kanter, and then Mr. Hussain is saying "pay

16  us some money on FSA"?

17  **A.**   Correct.

18  **Q.**   And in 2013, you thought those two things were unrelated

19  and now you say that they're related?

20          **MR. FRENTZEN:**  Objection.  Vague as to 2013 because

21  there is multiple interviews on this subject.

22          **THE COURT:**  I think --

23          **MR. KEKER:**  Okay.

24          **THE COURT:**  No, no, no.  I think in the interview that

25  you just related, that that date -- right?  That is the date

1  you are referring to, Mr. Keker?

2          **MR. KEKER:**  The November interview with Mr. Frank.

3          **MR. FRENTZEN:**  Thank you.

4          **THE WITNESS:**  What about it?  That's what -- I'm

5  reading what it says.  You lost me for a minute.

6  **BY MR. KEKER:**

7  **Q.**  Do you also -- you said that you thought that the price of

8  $2 million for the ramp-up fee was excessive.  Did you have to

9  open offices in India and California?

10 **A.**  Yes.

11 **Q.**  Did you have to hire some NearPoint employees away from

12 Iron Mountain?

13 **A.**  Yes.

14 **Q.**  Would you look there on page 9, that last bullet point.

15 In 2013, did you think that the costs were not excessive?  Or

16 the amount was not excessive?  In fact, did you think that the

17 $2 million payment was warranted based on the costs that you

18 were going to incur?

19 **A.**  I guess I said it was warranted, but it was warranted that

20 there would be a ramp-up fee.  I guess in retrospect, it felt

21 excessive.

22 **Q.**  In retrospect.  The retrospect is helped along by the fact

23 that you talked to Hewlett-Packard lawyers and Government

24 lawyers multiple times; right?

25 **A.**  I talked to them multiple times, but --

**BAIOCCO - CROSS / KEKER**

1    **Q.**    And you are very involved with Hewlett-Packard now?

2    **A.**    Not very involved, but involved, yes.

3    **Q.**    Do you know that Hewlett-Packard has a lawsuit pending

4    against Mr. Hussain and Mr. Lynch in England?

5    **A.**    Yes.

6    **Q.**    Do you feel the need to help them in that lawsuit?

7    **A.**    I don't feel the need to help anybody.

8    **Q.**    Well, okay.  Let's -- remember the Global Colleague

9    business about how -- you said you thought the Global Colleague

10   was your first EDD customer, EDiscovery customer?

11   **A.**    Right.

12   **Q.**    When did you think it happened?

13   **A.**    I thought I said 2010.  I misspoke.  It was 2011.

14   **Q.**    Mr. Frentzen then showed you that document.  It was 2496

15   that's dated 12/1/11?

16   **A.**    Correct.

17   **Q.**    And then you corrected your testimony and told the jury

18   that you didn't have Global Colleague as a client until at

19   least December 1st, 2011?

20   **A.**    Correct.

21   **Q.**    And was that true?

22   **A.**    Yes.

23   **Q.**    Would you look at 1554 in the Government's binder, not in

24   ours.  Actually --

25           **THE COURT:**  Is that in front of him?  1554.

1              MR. KEKER:  1554 in the Government's binder.

2              THE WITNESS:  Which one is the Government's binder?

3              MR. KEKER:  I'm not sure you have it up there.  That's

4    what I'm looking for.

5              THE COURT:  The email dated February 11?

6              MR. KEKER:  Yes.  February 11, 2011.

7         Can we get a binder, the Government's binder, for the

8    witness?

9              MR. FRENTZEN:  No objection.

10             THE COURT:  Okay.  Well, do you want it --

11             MR. KEKER:  Why don't you close that one.

12        Sure, I will move this in, Your Honor.

13             THE COURT:  Okay.  Admitted.

14             MR. KEKER:  Can we display it.

15             THE COURT:  That's the easy way then.

16   BY MR. KEKER:

17   Q.   That's an email to you from Allen Gurney and Steve

18   Williams dated February 11, 2011 about a Capax hosting

19   opportunity.  Does that relate to this client, Global

20   Colleague?

21   A.   It appears to, yes.

22   Q.   And Williams and gurney are the people at Capax that you

23   had hired to start this eDiscovery program?

24   A.   Correct.

25   Q.   And they're reporting to you great news.  In talking in

**BAIOCCO - CROSS / KEKER**

1    follow up with global colleague they want us to Assistant

2    United States Attorney up the hosted platform for them to use

3    for their services right?

4    **A.**    Yes.  Yes.

5    **Q.**    That's your first customer?

6    **A.**    That is our first customer, yes.

7    **Q.**    That happened in February of 2011, just like you

8    remembered?

9    **A.**    Well --

10         **MR. FRENTZEN:**  Objection.  That mischaracterizes the

11    evidence.

12         **THE WITNESS:**  The first time we actually did work was

13    December of 2011.  So we might have been -- we were negotiating

14    at this point and still working towards getting it ready.

15    **BY MR. KEKER:**

16    **Q.**    Look at 1795, please.  In the Government's binder.

17    **A.**    It doesn't seem to go that far.

18    **Q.**    In the Government's binder.

19         **THE COURT:**  Hold on.  Any objection?  1795, any

20    objection?

21         **MR. FRENTZEN:**  No objection.

22         **THE COURT:**  Okay.  Admitted.

23       (Trial Exhibit 1554 received in evidence)

24    **BY MR. KEKER:**

25    **Q.**    You can look at it on the screen.

BAIOCCO - CROSS / KEKER

1    **A.**    Okay.

2    **Q.**    And it is a -- it says at the top "Global Colleague

3    Hosting Update," and it's got a date on it of April 25, 2011?

4    **A.**    Right.

5    **Q.**    This is about something that you just told them didn't

6    happen until December of 2011.

7    **A.**    Well, no.  It says they were accessing the system, "mostly

8    testing, exploration right now," so they were exploring to make

9    sure it was going to work right for them.

10   **Q.**    You didn't have this customer?

11   **A.**    At this point, we were working to attain this customer.

12   **Q.**    Was there something about that -- did you feel the need to

13   give Mr. Frentzen the answer that he was looking for before?

14   **A.**    No.

15   **Q.**    All right.  Some questions about the VAR deals.

16        They were all brought to you by Egan?

17   **A.**    Correct.

18   **Q.**    And they -- we've been through this, the 11th hour, and he

19   would say they're 99 percent certain to close?

20   **A.**    Yes.

21   **Q.**    One example, the UBS deal, he said they need 12

22   signatures.  They have 11.  One person is on vacation or

23   something like that?

24   **A.**    Right.

25   **Q.**    And you would never take a deal if Egan was equivocal

1   about whether or not the deal would close, would you?

2   **A.**   I'm sorry?

3   **Q.**   You would never take a deal if Egan was equivocal about

4   whether the deal would close?

5   **A.**   What does that mean?  If he was like "I'm not sure it's

6   going to close"?

7   **Q.**   Yeah.

8   **A.**   Yeah.  I don't think I would have taken one if he had

9   presented that this isn't a real deal.  No, I wouldn't have

10  taken it.  It never happened, but . . .

11  **Q.**   Did he tell you that he wanted to close these transactions

12  to make his sales quotas?

13  **A.**   He told me he wanted to close them so they could keep

14  negotiating with the customer to keep their price up versus

15  dropping their price in the 11th hour.

16  **Q.**   Did he ever say anything about sales quotas?

17  **A.**   I think he might have mentioned sales quotas at one point.

18  **Q.**   That he wanted to meet his sales quotas?

19  **A.**   I don't remember offhand, but, yeah, sales quotas, but

20  mostly it was to keep the price up on the software.

21  **Q.**   Let's look at the reseller agreement that there has been

22  quite a bit of testimony about, and that is -- you can put the

23  Government exhibit aside.  Let me give it back to Mr. Frentzen.

24       And if you would, please, sir, look at Exhibit 100.

25  **A.**   What book is that in?

1    **Q.**    100 in Volume 1 of the cross-examination binder.

2    **A.**    Which one is the cross-examination binder?

3    **Q.**    They're the black ones.

4    **A.**    The black ones.  Volume 1.

5    **Q.**    Volume 1, Exhibit 100.  It's in evidence.

6            **MR. FRENTZEN:**  This is the same as our --

7            **MR. KEKER:**  Yeah.

8            **THE COURT:**  They're the same numbers; right?

9            **MR. KEKER:**  They're the same.  It's in our binder.

10            **THE WITNESS:**  Okay.

11    BY MR. KEKER:

12    **Q.**    And just to orient the jury, the first paragraph is --

13    it's a deal -- it's a Value Added Reseller Agreement dated May

14    of 2009 between Autonomy and Capax; right?

15    **A.**    Yes.

16    **Q.**    And let's look at page 4, if you would, please.  Actually,

17    let's look at page 3 first.  And on page 3, the first paragraph

18    that says "purchase orders."

19    **A.**    Right.

20    **Q.**    Let's -- it's hard to read, but what this -- "Once the

21    Autonomy products on a purchase order have been shipped by

22    Autonomy, VAR may not cancel or amend the purchase order

23    without the prior written consent of Autonomy."

24            Did you understand that the deal, once you signed a VAR

25    deal, it was -- it was a final deal and couldn't be changed

1    without the consent of Autonomy?

2    **A.**    Yes.

3    **Q.**    Okay.  And then if you'd look over on page 4 under

4    "payments," let's blow that up, the second -- I think it's the

5    second sentence.

6    **A.**    I don't see "payments."

7    **Q.**    Under C.

8              **THE COURT:**  You can look at the screen.

9    **BY MR. KEKER:**

10   **Q.**    You can look at the screen.  It's easier to look.

11            "VAR shall not be relieved of its obligations to pay fees

12   owed to Autonomy hereunder by the nonpayment of fees by an end

13   user."

14        You knew that that was in the -- this agreement that you

15   were signing; right?

16   **A.**    Correct.

17   **Q.**    Okay.  And that you knew, in your words, in the eyes of

18   the law, you were stuck.  You can't change the agreement, side

19   agreement.  That was it, what's written down there?

20   **A.**    If it went that far, you're right, yes.

21   **Q.**    And for every one of these VAR transactions, the

22   auditors -- I'm not going to go through them again, but the

23   auditors wrote -- had Mr. Chamberlain send out something and

24   say, "Here's what we think you owe and please report to the

25   auditors if you disagree, and, by the way, tell us if there are

1  any side agreements," and every one of those, Capax affirmed;

2  right?

3  **A.**   Yes.

4  **Q.**   No exceptions, no side agreements, no exceptions, no

5  nothing?

6  **A.**   No exceptions.

7  **Q.**   And you understood that in the eyes of the law, that meant

8  you were accepting what they said you owed them?

9  **A.**   Yes.

10  **Q.**   Let's talk about these reseller transactions.

11       Every penny that you owed was eventually received by

12  Autonomy, wasn't it?

13  **A.**   Yes.

14  **Q.**   Okay.  Either the money came to you and you paid Autonomy

15  or they ended up making a direct deal with the end user and

16  credited the debt that you had, but they got all the money for

17  these transactions; right?

18  **A.**   Yes.

19  **Q.**   In some VAR deals, you dealt directly with the end user,

20  didn't you?

21  **A.**   Not pre close.  Post close.

22  **Q.**   Let's talk about TXU, the first TXU deal.

23  **A.**   All right.

24  **Q.**   That was a hardware and software deal which -- wasn't it?

25  **A.**   I think so.  I don't remember what -- exactly what the

1  nature of the deals were from a technology point, but if that's

2  what it says, then yes.

3  **Q.**    Do you remember that Capax built hardware and software

4  together for TXU?

5  **A.**    Yeah.  I remember that we had a gentleman working on the

6  project, but that was after it was sold.  I don't think it was

7  before it was sold.

8  **Q.**    Okay.  And one of the reasons in this deal that you were

9  there is that Autonomy didn't want -- TXU didn't want to pay in

10  one year.  They wanted to stretch the payments out over three

11  years; correct?

12  **A.**    Right.

13  **Q.**    And Autonomy wanted to be paid in one year?

14  **A.**    Correct.

15  **Q.**    So Capax stepped in and said, "We'll take the three years

16  of payments and be able to -- and Autonomy can get paid

17  sooner"?

18  **A.**    Yes.

19  **Q.**    "We'll pay Autonomy within a year and we'll take the

20  three-year stretch"?

21  **A.**    Yes.

22  **Q.**    You're like factoring; right?

23  **A.**    Yes.

24  **Q.**    Providing financing?

25  **A.**    Yes.

**BAIOCCO - CROSS / KEKER**

1  Q.   Let's go to the next -- so you did some hardware and

2  software putting-together work and you had the role of the

3  financier.

4       Eli Lilly.  You actually interacted with Eli Lilly on

5  billing and other things, didn't you?

6  A.   Yes.

7  Q.   And they ended up billing you?

8  A.   They ended up paying me.

9  Q.   Or paying you?

10 A.   Correct.

11 Q.   You wanted to be an Eli Lilly vendor, didn't you?

12 A.   Yep.

13 Q.   Look at 5404.

14      MR. FRENTZEN:  What volume?

15      MR. KEKER:  5404 is in Volume 1.

16 Q.   Is this a memo from you to Daryll Fisher?

17 A.   Yes.

18      THE COURT:  Admitted.

19      (Trial Exhibit 5404 received in evidence)

20      MR. KEKER:  Can we put it up.

21 Q.   One of the motivations for the VAR deals, as you said

22 in -- as your lawyer said in that Air Force letter, is that you

23 wanted relationships with these big companies?

24 A.   Yes.

25 Q.   You saw that as an advantage to Capax and a way to grow?

**BAIOCCO - CROSS / KEKER**

1    **A.**    Yes.

2    **Q.**    And so with Eli Lilly, you -- who is Daryll Fisher?

3    **A.**    He was somebody in procurement.

4    **Q.**    At Eli Lilly?

5    **A.**    At Eli Lilly.  I think he might have been like a

6    contractor, a procurement person.  I'm not sure, though, but he

7    was in procurement at Eli Lilly.

8    **Q.**    So what you're telling the person at Eli Lilly is "the

9    biggest reason I've been calling" -- and this is right around

10    the deal.  This is when the deal is happening; right?

11    **A.**    Absolutely.

12    **Q.**    "The biggest reason I've been calling you is to get

13    connected as a vendor to Lilly.  I can promise you that if you

14    can get us in front of your folks, we will blow them away with

15    our capabilities in both the MS" -- that's Microsoft?

16    **A.**    Correct.

17    **Q.**    -- "and discovery Autonomy lines."

18    **A.**    Correct.

19    **Q.**    "We are the largest partner of both of those organizations

20    and are truly a solutions leader," on and on and on.

21        You're trying to get a relationship with Lilly?

22    **A.**    Yes.

23    **Q.**    This is an opportunity that you're using -- this reseller

24    deal is an opportunity to get in with Lilly?

25    **A.**    Yes.

BAIOCCO - CROSS / KEKER

1  Q.   And when you got in with Lilly, you were very excited

2  about it.   Look at 5405.   This is from you to Jerry Hawk

3  dated --

4  A.   Right.

5  Q.   -- July of 2010?

6        THE COURT:   Admitted.

7        (Trial Exhibit 5405 received in evidence)

8  BY MR. KEKER:

9  Q.   Will you put that up.

10     Jerry Hawk is -- the jury will remember is your partner

11  and the person who came from Associated Press and was the

12  technical part of your --

13  A.   Correct.

14  Q.   -- organization.   And you're writing -- well, Jerry Hawk

15  writes back to you, "Woo hoo."   What is he woo hooing about?

16  A.   My email that we got approved as a vendor for Eli Lilly.

17  Q.   "Spoke to the guy in charge of issuing the PO.   He

18  promised it to us" and so on?

19  A.   Right.

20  Q.   So you had high hopes that the VAR deal with Eli Lilly

21  would lead to some good things?

22  A.   Right.   But we needed to be a vendor in order to get paid

23  the $5.4 million.   So we needed to get vendorship in order for

24  them to pay us.   They wouldn't randomly pay us.

25  Q.   So you became a vendor, but there are other advantages to

1  being a vendor once you get certified; right?

2  A.   Yep.

3  Q.   And sometimes in these VAR deals, Autonomy would insist

4  that you make a down payment, wouldn't they?

5  A.   I think we made a down payment once and then I guess the

6  good faith payment, FSA, correct.

7  Q.   What about Kraft?

8  A.   That's -- I said once, right.  We put down, I think, a

9  $400,000 deposit on Kraft.

10  Q.   On Kraft when they came to you for a VAR deal, they said,

11  "In order to make sure that this is going to be collectible, we

12  want a down payment"; right?

13  A.   Yes.

14  Q.   And the down payment was $400,000?

15  A.   I believe, 4, 450.  I'm not sure of the exact amount.

16  Q.   You wanted a relationship with Kraft, didn't you?

17  A.   Yep.

18  Q.   And what did you want to do with Kraft?  Kraft's a big

19  company.

20  A.   Anything we could have.  Microsoft services, Autonomy

21  services, whatever -- whatever there was.

22  Q.   For that -- okay.  So that's why you were willing to put

23  down $400,000 and go into this relationship with Autonomy to be

24  a Value Added Reseller for Kraft?

25  A.   I'm pretty sure at that point we had already been

BAIOCCO - CROSS / KEKER

1    collecting in EDD processing money that helped me pay the

2    $400,000 down deposit, but, you know . . .

3    Q.   The Merrill Lynch, Bank of America -- Merrill Lynch was at

4    the time you did a Value Added Reseller deal with them -- was a

5    part of the Bank of America as result of the fiscal crisis?

6    A.   Yes.

7    Q.   And you were very excited about getting close to Merrill

8    Lynch and Bank of America, two big companies?

9    A.   Absolutely.

10   Q.   That's one of the reasons you wanted to do VAR work with

11   them?

12   A.   Yep.

13   Q.   And the same for McAfee.  You were going to get the

14   support and maintenance contract for McAfee, weren't you?

15   A.   Yep.

16   Q.   So the VAR contract would lead -- you would sell them the

17   software, but then you would have a support and maintenance

18   contract that would be ongoing?

19   A.   Yes.

20   Q.   There were some end users that you were already working

21   with, weren't there?

22   A.   Yeah.  We had previously worked with McAfee on

23   professional services engagement only, unrelated to this VAR

24   transaction of our own.

25   Q.   Okay.  So you had previously worked with McAfee.  This was

1    going to be a further connection to McAfee, and as a result,

2    you were going to get the support and maintenance contract and

3    then you hoped more work than that; right?

4    A.    Yes.

5    Q.    Develop a relationship with McAfee?

6    A.    Totally.

7    Q.    UBS, huge bank.  Did you want -- were you doing

8    installation work for UBS?

9    A.    I don't remember if we were doing work at the time, but it

10   falls under the same category of we wanted to be a vendor, we

11   wanted to do work.

12   Q.    You had heard from people that you had embedded in England

13   that UBS was going to sign a $30 million deal with Autonomy?

14   A.    Yes.

15   Q.    You wanted a piece of it?

16   A.    Yep.

17   Q.    You wanted the services part?

18   A.    Yep.

19   Q.    So one of the reasons for doing these UBS VAR transactions

20   was to get in with UBS and do the installation work and the

21   services work?

22   A.    Yes.

23   Q.    There was an Autonomy product called WorkSite?

24   A.    Right.

25   Q.    Did you want to do something with WorkSite with UBS?

**BAIOCCO - CROSS / KEKER**

1    **A.**    I don't remember -- I mean, we wanted to do whatever

2    services on any Autonomy product.  I mean, we were specialized

3    pretty much in the professional services arena with their

4    entire suite.

5    **Q.**    And then there is this Financial Services -- FSA,

6    Financial Services Authority, which you have described as the

7    SEC kind of financial regulator of England.

8    **A.**    Somebody described it to me that way, but, yes.

9    **Q.**    And you were doing implementation work already for FSA,

10    weren't you?

11    **A.**    I don't remember that, if we were or we weren't.

12    **Q.**    Look at 1071.

13    **A.**    Where is it?

14    **Q.**    It's in --

15        **THE COURT:**  The Government's.

16    **BY MR. KEKER:**

17    **Q.**    The first of two binders.

18    **A.**    1071?

19    **Q.**    Yes.

20        **THE COURT:**  Is this yours?  The Government's?  What?

21        **MR. KEKER:**  No.  This is the defense binders.

22        **THE COURT:**  1071?

23        **MR. KEKER:**  One-zero-seven-one, yes, sir.

24        **THE COURT:**  Wait, wait, wait.

25        **MR. KEKER:**  I'll find it for you.

1              **THE WITNESS:**  Sorry.  This is really confusing.

2       I got it.

3   **BY MR. KEKER:**

4   **Q.**   Okay.  This is an email from you to Jerry Hawk?

5   **A.**   Right.

6   **Q.**   Dated September 22, 2010; right?

7   **A.**   Right.

8              **MR. KEKER:**  Move it in, Your Honor.

9              **THE COURT:**  Admitted.

10      (Trial Exhibit 1071 received in evidence)

11  **BY MR. KEKER:**

12  **Q.**   Let's look at that.

13      Jerry Hawk, we know who that is.  And you were writing to

14  Mr. Hawk and you say -- this is in September of 2010 -- "Having

15  working lunch at Autonomy London in 30.  We have SO," capital

16  S-O, "much going on here.  It's unbelievable.  I mean,

17  unbelievable."

18      What did you have going on in England in September of 2010

19  with Autonomy?

20  **A.**   They were just starting to turn over all their

21  professional services work to us in the UK and Europe.

22  **Q.**   And further down, the FYI, "Glen Peracchio, Mike Mooney of

23  UK in a meeting yesterday told us that we were getting a huge

24  SOW for FSA.  Said they bought 6 mil.  Good news.  It is

25  closed."

BAIOCCO - CROSS / KEKER

1          What does that refer to?

2          What is an SOW, first of all?

3    **A.**    Statement of work.

4    **Q.**    Tell the jury what a statement of work is?

5    **A.**    Well, statement of work is a list of professional

6    services, duties that you perform for a customer that you bill

7    by the hour or by a fixed price for what you're going to

8    deliver.

9    **Q.**    So somebody -- so this man told you that you were getting

10   a big professional services contract for the FSA?

11   **A.**    He did.

12   **Q.**    That they "bought 6 mil.  Good news.  Is it closed?"  What

13   does that refer to?

14   **A.**    That's a typo.  It should have been, "Good news.  It's

15   closed" because that was one of the VAR transactions that we

16   had purchased.

17   **Q.**    Okay.  "Real good news is that we own the deal.  Great

18   news, we bought it 4.5 mil so no delta issues like Lilly.  If

19   they don't lie, we should make an extra 150,000."  What's that

20   about?

21   **A.**    Just about the commission on the size of the deal that we

22   signed for versus the size of the deal that came in.  That's

23   all.  I was looking for extra -- not extra, but on-the-top

24   number.

25   **Q.**    Were you doing any --

BAIOCCO - CROSS / KEKER

1   **A.**   Although actually Glen told me 6 million and they had said

2   something like 5.5.  I hadn't confirmed at that point with

3   Autonomy management that the deal had closed higher than what

4   we had signed up for.  Glen indicated that it closed for more

5   than we signed for on the VAR.  That's what this is.

6   **Q.**   Okay.  And now some of these deals ended up instead of

7   going through you, through Capax, they ended up being sold,

8   being done directly between Autonomy and the end user; right?

9   **A.**   Yes.

10  **Q.**   And some that went direct you had to pay anyway, Capax had

11  to pay Autonomy?

12  **A.**   Well, if they went direct, they would just credit it to

13  our account.  A credit memo.

14  **Q.**   What about McAfee?

15  **A.**   Yep.  That one went dead, and you're right, we paid for

16  it.

17  **Q.**   Did FSA go dead?

18  **A.**   No.  They ended up -- we gave them the 1.5 million good

19  faith payment we've been speaking about and then they credited

20  us the rest.

21  **Q.**   But FSA was a deal that closed directly with Autonomy?

22  **A.**   Yes, it was.

23  **Q.**   And Autonomy -- Mr. Hussain still said you got to pay;

24  right?

25  **A.**   Yeah.

1   **Q.**   And you paid a million five, Capax did?

2   **A.**   Correct.

3   **Q.**   And then you still owed the 3 million?

4   **A.**   Yes.

5   **Q.**   And eventually, Autonomy wrote that off and credited you

6   for the 3 million?

7   **A.**   They credited us for the 3 million.

8   **Q.**   They didn't credit you for the money that you had already

9   paid, the 1.5, did they?

10   **A.**   No.   But they were supposed to.

11   **Q.**   You were furious that they didn't credit you, that you had

12   to pay 1.5 of that debt?

13   **A.**   I mean, yes.

14   **Q.**   You've said back there when you're doing these things,

15   doing these deals, you didn't think you were doing anything

16   wrong back then.   Is that true?

17   **A.**   Uh-huh.

18   **Q.**   Okay.   Egan told you that the auditors were reviewing each

19   of these deals?

20   **A.**   He told me that there's a process that it had to go

21   through to pass whatever things.   I never had any real

22   conversation with him on that sort of level.

23   **Q.**   You knew that Autonomy needed information about Capax to

24   show the auditors so that the auditors could play their

25   function?

BAIOCCO - CROSS / KEKER

1    **A.**    I mean, yes.

2    **Q.**    Okay.  Look at 5444, please.

3    **A.**    Same book?

4    **Q.**    Yes.  Volume 1.  Right at the end of Volume 1.

5    **A.**    I got it.

6    **Q.**    5444, the bottom email is from you to --

7    **A.**    Cut off on mine.

8    **Q.**    It's cut off on mine, too.

9            Do you recognize the -- do you recognize the second page,

10   a letter from you?  The back page, flip over to the back.

11   **A.**    Yeah.  The one about the line of credit?

12   **Q.**    Yeah.

13   **A.**    Yep.

14           **THE COURT:**  So that -- are you moving that --

15           **MR. KEKER:**  Yes, Your Honor.

16           **THE COURT:**  Okay.  So that's a letter of April 14th,

17   2010.  Admitted.

18       (Trial Exhibit 5444 received in evidence)

19   **BY MR. KEKER:**

20   **Q.**    So let's look at the letter first, the second page.  This

21   is from you to Steve Chamberlain, VP of Finance, April 14,

22   2010.

23   **A.**    Right.

24   **Q.**    And you're reporting on the financial position of Capax?

25   **A.**    My name is on there, yeah, but I did not draft that

 1  letter, but, yes.

 2  **Q.**    Okay.  Do you know why you were reporting on Capax's

 3  financial condition to Mr. Chamberlain?

 4  **A.**    Probably because of the money we owed.

 5  **Q.**    Well, do you know whether or not Mr. Chamberlain wanted to

 6  have information about Capax to be able to assure the auditors

 7  that they -- it was probable that they could pay what they

 8  owed?

 9          **MR. FRENTZEN:**  Objection.  Foundation.

10          **THE COURT:**  Sustained.

11  **BY MR. KEKER:**

12  **Q.**    Do you know why you were asked to write that letter?

13  **A.**    I don't remember exactly why I was asked to write the

14  letter, no.  But we wrote it.

15  **Q.**    Look at 1122 then.

16  **A.**    All right.

17          **THE COURT:**  1122?

18          **MR. KEKER:**  1122, yes, Your Honor.

19          **THE WITNESS:**  Same book?

20  **BY MR. KEKER:**

21  **Q.**    Same book.  Well, I'll withdraw that.

22          **THE COURT:**  Okay.

23          **MR. KEKER:**  He's not on that.

24  **Q.**    Did you also have to send financial information to the end

25  users who you were trying to get business with?

**BAIOCCO - CROSS / KEKER**

1  A.    I don't recall that we ever sent --

2  Q.    Look at 5516.

3          THE COURT:  That's in the second volume.

4          MR. KEKER:  Yes.

5          THE COURT:  Fifty-five --

6          MR. KEKER:  Sixteen.

7          THE WITNESS:  All right.

8  BY MR. KEKER:

9  Q.    5516 is a letter -- is an email from Dave Spadone.  He is

10 your financial person at Capax?

11 A.    Yeah.  At that time, yes.

12 Q.    And it's to somebody at Lilly, Eli Lilly?

13 A.    Yes.

14 Q.    And you're copied on it?

15 A.    Correct.

16 Q.    What's that about?

17         THE COURT:  Well, do you want to admit it?

18         MR. KEKER:  Yes.  Move it in.

19         THE COURT:  5516 admitted.

20     (Trial Exhibit 5516 received in evidence)

21 BY MR. KEKER:

22 Q.    You are sending financials, "attached are financial

23 statements at Capax"?

24 A.    Correct.

25 Q.    Sending them to Lilly?

BAIOCCO - CROSS / KEKER

1    **A.**    Yes.

2    **Q.**    Why?

3    **A.**    Because we needed to become a vendor and they needed them

4    in order to process our payment.  They needed financials to

5    make us a vendor.

6    **Q.**    Let's shift focus to eDiscovery.

7    **A.**    New book?

8    **Q.**    No.  I'm going to ask you some questions about eDiscovery.

9    **A.**    All right.

10    **Q.**    You told us Capax and Autonomy started working together in

11    2008?

12    **A.**    Yes.

13    **Q.**    And you were basically a professional -- Capax was a

14    professional service vendor of Autonomy and its key customers?

15    **A.**    That's how we started with them, correct.

16    **Q.**    And in 2009, you wanted to get into eDiscovery?

17    **A.**    Yes.

18    **Q.**    You hired Mr. William, Steve Williams, and Allen Gurney?

19    **A.**    Yes.

20    **Q.**    You personally knew nothing about the eDiscovery business?

21    **A.**    No.

22    **Q.**    They told you that it was going to become a hundred

23    billion dollar business.  That's why you wanted to get in?

24    **A.**    Makes sense.

25    **Q.**    And in order to do that, to get into that business, you

1  needed to license some software so that you could participate

2  in eDiscovery; right?

3  **A.**   Correct.

4  **Q.**   You told us you asked for some quotes.  How did Mr. Egan

5  get into this process?

6  **A.**   I don't know --

7  **Q.**   Where did he come from?

8  **A.**   -- exactly.  I'm guessing through T.J. Lepore because when

9  I met Stouffer for the first time, T.J. was the introducer.  It

10  was -- the three of us were at the meeting.

11  **Q.**   You had never met him before?

12  **A.**   No.  Not a hundred percent sure of that, but 99 --

13  **Q.**   How many meetings did you have with Mr. Egan before you

14  agreed to the license that we just saw, the one that said you

15  have to pay --

16  **A.**   I don't know.  Maybe three to five.

17  **Q.**   Okay.  And were you haggling about price?

18  **A.**   No.  I was more haggling over trying to get my partners to

19  accept it.

20  **Q.**   Trying to get what?

21  **A.**   My partners to agree with me on it, fighting terms and

22  conditions and, you know, whatever, How it was going to work.

23  It was new to us, so none of the partners in the company at the

24  time were really eDiscovery knowledgeable at all.

25  **Q.**   Who are these partners?

 1   **A.**   Well, I'm mean, they are not there now.   It was Joe Cruz.

 2   It's a different partner-set these days, so . . .

 3   **Q.**   These are people from Buffalo?

 4   **A.**   Yes.

 5   **Q.**   Look at Exhibit 32, please.

 6          **THE COURT:**  Government's Exhibit 32?

 7          **MR. KEKER:**  It's -- yes.   I thought we were just

 8   calling it by number.

 9          **THE COURT:**  That's right.   I have collections of

10   exhibit lists.

11          **MR. KEKER:**  32 is in our book.

12          **THE COURT:**  32.   Okay.   It's in evidence.

13          **MR. KEKER:**  Right.

14          **THE WITNESS:**  All right.

15   **BY MR. KEKER:**

16   **Q.**   And 32 is the Software License Agreement entered into

17   between Autonomy and Capax dated March 31, 2009; right?

18   **A.**   Yes.

19   **Q.**   What was the deal?   You were going to pay them

20   7.5 million?

21   **A.**   Correct.

22   **Q.**   Let's just look at what is written down as the deal.

23   **A.**   All right.

24   **Q.**   Look at page 2.

25          And if we could highlight the top of page 2.

1          This is what you were buying?

2     A.   Yes.

3               MR. KEKER:  Just the first four lines, Jeff, if you

4     can get them bigger.  Good.

5     Q.   Introspect EDD software, Introspect Review and Production

6     software, EAS software, including various things, a VideoLogger

7     and Softsound.

8          Do you know what those last two are?  Did you know what

9     you were buying actually?

10    A.   I personally did not know what I was buying, but Steve and

11    Allen knew what we were buying.

12    Q.   Did Jerry Hawk get involved in this and look it over?  He

13    was the one knowledgeable about Autonomy; right?

14    A.   He was knowledgeable -- he wasn't knowledgeable about

15    eDiscovery.

16    Q.   Who decided what you needed?

17    A.   Steven Williams and Allen Gurney.

18    Q.   They knew what they were doing.  They knew what they

19    wanted to buy and this is what they bought?

20    A.   Right.

21    Q.   And then if you go to -- I'm looking for the part of it

22    that says you're going to -- if you sell more than $25 million

23    worth of eDiscovery, then you're going to split above that

24    80/20 with Autonomy.

25    A.   Yes.

BAIOCCO - CROSS / KEKER

1   Q.   And that was the deal; right?  I mean, you were going to

2   get into the business.  Once you hit 25 million, there would be

3   a royalty paid back to Autonomy?

4   A.   Correct.

5   Q.   Now, as of the date of this contract, you and Egan and I

6   guess anybody that knew about it knew that you did not have the

7   ability at that point to do eDiscovery?

8   A.   Right.

9   Q.   Okay.  The point of this deal was to have Autonomy's

10  partner, Capax, capable of doing overflow work for eDiscovery,

11  wasn't it?

12         MR. FRENTZEN:  I object.  Vague.  Whose point?  His

13  point?

14  BY MR. KEKER:

15  Q.   Start with you.

16         MR. FRENTZEN:  Thank you.

17         THE COURT:  Sustained.

18  BY MR. KEKER:

19  Q.   What did Mr. Egan tell you the point of the deal was?

20  A.   The point of the deal was we were going to get set up to

21  be in the business.

22  Q.   You were going to set up to be in the business.  You were

23  going to buy the software from them and you were then going to

24  get set up?

25  A.   Yes.

BAIOCCO - CROSS / KEKER

1    Q.    And why did Mr. Egan -- first of all, Autonomy was doing

2    eDiscovery itself; right?

3    A.    Right.

4    Q.    So Capax would be a competitor of -- with this capability,

5    would be a competitor of Autonomy in the eDiscovery space?

6    A.    I mean, I guess you could say that.

7    Q.    Okay.  But the point was from Mr. Egan's point of view,

8    that you were getting -- what they needed was backup capacity.

9    If they had more eDiscovery work than they could handle, they

10   needed somebody they trusted, a partner, to do eDiscovery work.

11   Wasn't that the point?

12   A.    Yeah.  I mean -- yes.

13   Q.    They were buying capacity, weren't they?  You've used that

14   word?

15   A.    Yeah.

16        MR. FRENTZEN:  Excuse me.  Sorry.  I object.  Is that

17   his understanding?  It's vague otherwise.

18        THE COURT:  I think he is saying, as I interpret it,

19   that is the witness' understanding of Autonomy's interest in

20   pursuing this arrangement.

21   BY MR. KEKER:

22   Q.    Can you --

23        THE COURT:  Simply his understanding.

24        MR. FRENTZEN:  Thank you, Your Honor.

25        THE COURT:  He asked why did you think that Autonomy

1    wanted to do this, and he is saying, "I think Autonomy wanted

2    to do it because of X or Y or Z" or whatever.

3         THE WITNESS:  Right.

4    BY MR. KEKER:

5    Q.   What did you mean when you said that they wanted to get

6    more capacity?

7    A.   They wanted to not -- so they didn't have to turn down EDD

8    work if they didn't have enough capacity to do it.  They would

9    have to say no or back it up so far that maybe they didn't get

10   the business; that somebody might go to a new vendor.

11   Q.   And having Capax to do the overflow work, if it ever were

12   necessary to farm out some overflow work, would be a great

13   advantage to Autonomy; right?

14         MR. FRENTZEN:  I object.  Foundation.

15         THE COURT:  Sustained.

16   BY MR. KEKER:

17   Q.   Did you believe that Autonomy's -- it would be an

18   advantage to Autonomy to have a trusted partner that they could

19   turn overflow work to rather than turn down more business that

20   they couldn't handle?

21   A.   Yes.

22   Q.   Now, you -- so you licensed this software.  Autonomy also

23   agreed to buy you some hardware to set this platform up; right?

24   You needed both?

25   A.   Yes.

1    Q.    Okay.  And I think you used the word on direct examination

2    "assist."  They were going to assist Capax with hardware for

3    eDiscovery work?

4    A.    Hardware and knowledge.

5    Q.    Okay.  They were going to help you get into the business?

6    A.    Right.

7    Q.    And if you look at Government Exhibit 70, which is in

8    evidence -- can we put that up?  You can look at the screen.

9          This is the list of hardware in June.  The contract was in

10   late March.  Now this is June of -- can we go back to the date,

11   Jeff at the top.

12         June 15, 2009.  This is the list of hardware that you

13   needed and that they were going to -- they were going to

14   finance for you or get for you; right?

15   A.    Yes.

16   Q.    Okay.  And it was $821,000 worth of hardware?

17   A.    On the sheet, yeah, correct.

18   Q.    And, again, once you got set up and once you were in a

19   position to do this business, there was going to be an 80/20

20   split above 25 million?

21   A.    Yes.

22   Q.    And that was all written into the contract?

23   A.    Yes.

24   Q.    You and Egan both knew that it would take some time and it

25   would take some money to get this platform set up, didn't you?

BAIOCCO - CROSS / KEKER

1    A.    Yep.

2    Q.    You signed this contract that you knew you couldn't get

3    out of; right?

4    A.    Right.

5    Q.    And you knew it said no side agreements.  Look at page 32.

6    A.    Right.

7    Q.    Or -- excuse me.  But you knew.

8          And in the contract, it said there is no side agreements.

9    This is the entire agreement; right?  Page 4, Exhibit 32.

10          Let's show it to the jury.  Under "termination."

11          If you would blow up "termination."  It's really hard to

12    read.

13          I may have the wrong paragraph.

14          Excuse me, Your Honor.  Let me try to find this.

15          I'll have to come back to that.

16          But your understanding was it was an enforceable agreement

17    and forbade side agreements?

18    A.    I'm sorry.  It was an enforceable agreement, yes.

19    Q.    And forbade side agreements?

20    A.    Yes.

21    Q.    That the contract said --

22    A.    Yes.

23    Q.    -- everything that we've agreed to is here and anything

24    else doesn't apply.

25          But then you -- so this man that you had just met -- I

**BAIOCCO - CROSS / KEKER**

1  guess you had met him five times -- you entered into what you

2  called a handshake agreement?

3  **A.**    Yes.

4  **Q.**    And what was the handshake agreement?

5  **A.**    That they were going to give us money to make the payments

6  for the installments.

7  **Q.**    They were going to --

8  **A.**    Autonomy was.

9  **Q.**    They were going to give you money to help you get set up?

10  **A.**    Well, get set up and make the payments on the

11  $7.5 million.

12  **Q.**    Did Mr. Egan refer to this as a retainer or advance

13  payments to get you set up so that they could get to a point

14  where you could do the work?

15  **A.**    I don't remember how he worded it exactly.

16  **Q.**    Okay.  You knew that the side agreement that you -- you

17  claim you've made was unenforceable, didn't you?

18  **A.**    Yes.

19  **Q.**    You knew you owed the money under the terms of the

20  contract?

21  **A.**    Yes.

22  **Q.**    And you knew that Mr. Egan didn't tell his collections

23  department that he had this side agreement, didn't you?

24  **A.**    Yep.

25           **MR. FRENTZEN:**  Objection -- well, withdrawn.

1    BY MR. KEKER:

2    Q.   Yes, you knew that, didn't you?

3    A.   Well, I learned it, yeah.

4    Q.   Okay.  You learned it, that Egan didn't tell the

5    collections department that "don't worry, this is not a real

6    agreement" or "we have a side agreement" or anything like that?

7    A.   Right.

8    Q.   And you learned that because the collections department

9    would hound you like mad, wouldn't they?

10   A.   Yes.

11   Q.   Joel Scott is the person that handled Mr. Egan's paperwork

12   in the United States?

13           MR. FRENTZEN:  Objection.  Foundation.

14           THE COURT:  Sustained.

15   BY MR. KEKER:

16   Q.   Well, who is Joel Scott?  What does he do?

17   A.   I don't know.  I've looked at a couple of documents that

18   he had two different titles, chief operating officer, chief

19   counsel, U.S.

20   Q.   What did you understand he actually did?

21   A.   He was an attorney, so I understood him to be chief

22   counsel for the United States.

23   Q.   And he was based, as was Mr. Egan -- he was based here in

24   the Bay Area?

25   A.   Yes.

**BAIOCCO - CROSS / KEKER**

1    **Q.**   And you were told by Mr. Scott or by Mr. Egan, one of

2    them, that billing --

3             **MR. FRENTZEN:**  Objection.

4    **BY MR. KEKER:**

5    **Q.**   That the way to do it was bill as EDD processing -- that

6    that was the way it should be done?

7             **MR. FRENTZEN:**  Withdrawn.

8             **THE WITNESS:**  No.  I wasn't told anything.  I was

9    supplied purchase orders saying "this is how you bill us."

10   **BY MR. KEKER:**

11   **Q.**   Would you look at 5030 -- excuse me, 50 --

12            **MR. FRENTZEN:**  Is this an exhibit?

13            **MR. KEKER:**  I want to make sure I've got the right

14   number.

15   **Q.**   At Exhibit 5028 in this binder of statements here.

16            **MR. FRENTZEN:**  It's a statement.

17            **THE WITNESS:**  This is Volume 1 to 2?

18            **THE COURT:**  No.

19   **BY MR. KEKER:**

20   **Q.**   In this book.  Yeah.

21   **A.**   Okay.

22   **Q.**   5028.

23   **A.**   5028.  All right.

24            **MR. FRENTZEN:**  Which statement is it?

25            **MR. KEKER:**  And I'm referring to page 5.

1          **MR. FRENTZEN:**  I'm sorry, John.  What is it?

2          (Mr. Keker shows Mr. Frentzen a document.)

3          **MR. FRENTZEN:**  What page?

4          **MR. KEKER:**  Page 5.

5          **THE COURT:**  Which paragraph?

6          **MR. KEKER:**  The second full paragraph, the last

7   sentence.

8          **THE COURT:**  Okay.

9          **THE WITNESS:**  Which one?

10  **BY MR. KEKER:**

11  **Q.**   Well, my question is were you told by either Joel Scott or

12  Stouffer Egan how to bill the EDD processing?

13         **MR. FRENTZEN:**  I object to the question as hearsay,

14  and that's not actually what it says here.

15         **THE COURT:**  Well, it uses the word "internally."  I

16  don't know -- that's not what he's --

17         **THE WITNESS:**  I don't know what they told me.  I just

18  know that they sent purchase orders saying "this is how you

19  bill us to get the money."

20  **BY MR. KEKER:**

21  **Q.**   All right.  Start with that.

22      They sent purchase orders, but before that, did Egan or

23  Scott -- were they the ones that told you how they were going

24  to handle this retainer for eDiscovery services while you were

25  getting set up?

1  **A.**    I don't remember Joel having much to do with that, but

2  Stouffer was the one that was involved.

3  **Q.**    So you think it was Stouffer who told you that was how

4  they were going to do it?

5              **MR. FRENTZEN:**  I object.  That's not what he said.

6              **THE WITNESS:**  I'm not sure.  Honestly, I'm not sure.

7  **BY MR. KEKER:**

8  **Q.**    Were you, in the beginning -- did you understand that

9  Autonomy was going to make cash payments to Capax so that Capax

10 in turn had enough cash to pay Autonomy what it owed on the

11 licenses?

12 **A.**    Yes.

13 **Q.**    Did you tell Mr. Frank, Hewlett-Packard, when he

14 interviewed you in 2013, "in no way was that the intent"?

15 **A.**    I can't comprehend I would have said that.

16 **Q.**    Let's look at 5265 again, sir.

17              **THE COURT:**  I'm sorry?

18              **MR. KEKER:**  5265.

19              **THE COURT:**  5265.

20              **THE WITNESS:**  What book is that?

21              **THE COURT:**  5265?

22              **MR. KEKER:**  Yes, sir.

23              **THE COURT:**  And where do you want me to look,

24 Mr. Keker?

25              **MR. KEKER:**  I need a second, Your Honor.

**BAIOCCO - CROSS / KEKER**

1          Page 4.

2    **Q.**   Do you have 5265, sir?  Page 4, second full paragraph,

3    third sentence.

4    **A.**   I must have misunderstood the question.  It was clear and

5    obvious that they were giving me purchase orders to invoice

6    against to pay them, so I'm losing track here.

7    **Q.**   Did Mr. Frank ask you if Autonomy made cash payments to

8    Capax so that Capax in turn had enough cash to pay Autonomy

9    what it owed on the EDD licenses and you answered -- not an

10   answer -- insisted that, quote, "in no way was that the

11   intent."  Is that what you told Mr. Frank?

12   **A.**   I don't remember saying that.

13          **MR. FRENTZEN:**  Your Honor, I think he should finish

14   that sentence.

15          **THE WITNESS:**  I don't remember.

16          **THE COURT:**  Read the whole sentence.

17          **THE WITNESS:**  That's not what it was, so I don't

18   remember saying that.

19          **MR. FRENTZEN:**  I don't think counsel should stop at

20   mid-sentence.

21          **THE COURT:**  Read the whole sentence.

22          **MR. KEKER:**  "But he conceded" -- the whole sentence

23   is, "Baiocco insisted that, quote, in no way was that the

24   intent, but he conceded that Frank's characterization proved to

25   be accurate in the end."

1        **THE COURT:**  Okay.

2    **BY MR. KEKER:**

3    **Q.**   Okay.

4    **A.**   I conceded that that was accurate, yes.

5    **Q.**   Mr. Frank was giving you the Hewlett-Packard scenario for

6    this saying that it was cash?

7            **MR. FRENTZEN:**  Objection.  Object to the

8    characterization.  Also as to Mr. Frank's -- any

9    representations as to that are total hearsay.

10   **BY MR. KEKER:**

11   **Q.**   Was Mr. Frank trying to get you to see the evidence

12   that -- your experience HP's way?

13           **MR. FRENTZEN:**  Objection.

14           **THE WITNESS:**  Not at all.

15           **MR. FRENTZEN:**  Excuse me, Mr. Baiocco.

16       Foundation and argument.

17           **THE COURT:**  Sustained.

18   **BY MR. KEKER:**

19   **Q.**   Okay.  You said on direct examination that the -- you

20   had -- you bought the hardware and you put it in your data

21   centers?

22   **A.**   Correct.

23   **Q.**   When did you buy the hardware?

24   **A.**   I don't know.  Fairly soon afterwards.  I don't have exact

25   timing.

**BAIOCCO - CROSS / KEKER**

1  **Q.**  We saw that document in mid 2009.  Does that meet with

2  your recollection that you got the hardware?

3  **A.**  No.  That was the list of the hardware we needed.  I don't

4  know if that's actually when we got it, but that's hardware we

5  needed to do -- according to Autonomy, that was their list of

6  the hardware we needed to run the software.

7  **Q.**  What data centers did you put it in?

8  **A.**  I think at the time we were in Charlotte in a co-location

9  data center.

10  **Q.**  Charlotte, North Carolina?

11  **A.**  Yes.

12  **Q.**  Did you put the software on it?

13  **A.**  Yes.

14  **Q.**  Did you have it up and running?

15  **A.**  Eventually, yes.

16  **Q.**  Look at 5518 please, sir, in the back of Volume 2.  Is

17  this a promotional --

18  **A.**  Hang on.  Give me a second.

19  **Q.**  First, do you recognize it?  Tell me what it is.

20  **A.**  All right.  55 --

21  **Q.**  55 --

22  **A.**  18?

23  **Q.**  18.

24          **THE COURT:**  Are you offering it?

25          **MR. KEKER:**  Yes, Your Honor.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 5518 received in evidence)

3    **BY MR. KEKER:**

4    **Q.**    Then let's put it up.  The first page says this is from

5    Bill Cox to Tom Rimmer and the one below is Thomas Leonard to

6    Bill Cox, Pete Mellett and Steve Williams, cc John Baiocco.

7          Who were all these people?

8    **A.**    Those were all people that worked for Capax.

9    **Q.**    Are they all in the eDiscovery space?

10   **A.**    Yes.

11   **Q.**    Who is Bill Cox?

12   **A.**    He was a salesperson.  Ran our London office at that time.

13   **Q.**    Okay.  And they're enclosing -- what are they enclosing?

14   **A.**    It looks like a sales slick, showing our capabilities.

15   **Q.**    And so this is something that began -- what is the date of

16   the email?

17   **A.**    August 3rd, 2009.

18   **Q.**    Were you using this brochure shortly after August 3rd,

19   2009?

20   **A.**    Probably.

21   **Q.**    All right.  Let's look at the first page, eDiscovery

22   Solutions.

23   **A.**    Yep.

24   **Q.**    About Capax Discovery, and then it goes on to talk about

25   eDiscovery Solutions?

**BAIOCCO - CROSS / KEKER**

1    A.    Right.

2    Q.    And then on the next page among, those are -- let's get

3    the top, the label of it.  Yeah.

4    A.    Early Case Assessment.

5    Q.    Early Case Assessment.  That's an eDiscovery tool?

6    A.    Yes.

7    Q.    "Within the first 48 hours of anticipated litigation or

8    investigation, we are able to rapidly retrieve and analyze

9    relevant data to answer the initial question:  'Is there a

10    case?'"

11        Was that true?

12    A.    No.  We were selling a high capability and we were going

13    to be able to run it through Autonomy if we sold something

14    prior to -- prior to being ready ourselves.  If we found our

15    own customer and we weren't ready, Autonomy was going to white

16    label the solution for us and let us do it, and we were going

17    to come to some terms on a margin.

18    Q.    Okay.  Down the next half a page.

19    A.    Yep.

20    Q.    It deals with Early Case Assessment.

21    A.    Right.

22    Q.    That's eDiscovery, isn't it?

23    A.    Yes.

24    Q.    Did you have that capability?

25    A.    Nope.  Not then.

1  **Q.**   But you were passing this brochure around in England?

2  **A.**   Uh-huh.

3  **Q.**   The next page says, "Introspect EDD review and

4  production."  What's that?  That's eDiscovery, isn't it?

5  **A.**   It is.

6  **Q.**   And Introspect is the old Zantaz product that the jury has

7  heard about?

8  **A.**   Right.

9  **Q.**   What is Introspect EDD Review and Production?  That's a

10  different product; right?

11  **A.**   Yeah.

12  **Q.**   Under -- go to page 5.

13  **A.**   Yes.

14  **Q.**   Under "hosted," the second full paragraph, the first line.

15  **A.**   Right.

16  **Q.**   It says, "Our team of seasoned veterans performs the

17  critical process of collecting and loading

18  electronically-stored information from a variety of sources."

19  It goes on.

20       Did you have a team of seasoned veterans at that time?

21  **A.**   Yeah.  I would say we did.

22  **Q.**   And then on the next page, it says at the top under the

23  pictures -- it says, "Capax Discovery Hosting Service provides

24  a state-of-the-art tier 2 data center, diesel generators, fully

25  redundant connectivity, architecture, storage, and server

**BAIOCCO - CROSS / KEKER**

1  configurations." There is a picture of the building. Do you

2  know what the building is?

3  **A.**   I don't know. It could just be a clip art building. I

4  don't know if that was our actual data center or it wasn't. I

5  have never been there.

6  **Q.**   Where was the state-of-the-art tier 2 data center as of

7  August 2009?

8  **A.**   It would have been in Charlotte. I don't think we had a

9  data center before Charlotte. I'm pretty sure it was Charlotte

10  at that time.

11  **Q.**   Okay. Would you look at Exhibit 5508, please, sir.

12  That's in that same binder.

13  **A.**   All right.

14  **Q.**   Do you recognize that?

15          **MR. FRENTZEN:**  Your Honor, at this point --

16          **THE WITNESS:**  I do not.

17          **MR. FRENTZEN:**  -- I'm going to object to the relevance

18  of this.

19  **BY MR. KEKER:**

20  **Q.**   I didn't hear what you said.

21  **A.**   I said I do not recognize it.

22          **MR. FRENTZEN:**  I'm going to object to the relevance of

23  this at this point.

24          **THE COURT:**  I have no idea. I mean, it's a report.

25  \\\

 1   BY MR. KEKER:

 2   Q.   Do you know if you were pitching business -- if Capax was

 3   pitching business to the Serco Peterborough City Council, one

 4   of the largest National Health -- NHS trusts in the UK

 5   employing 7,000 people?

 6   A.   I have no firsthand knowledge of that pitch, but this

 7   clearly looks like something that we put together that would be

 8   a pitch.

 9   Q.   You know who Bill Cox and Tom Rimmer are?

10   A.   Of course.

11   Q.   Who were they?

12   A.   Bill Cox worked for Capax Discovery and Tom Rimmer worked

13   for Autonomy.

14   Q.   You don't recognize this as a business promotional

15   record --

16   A.   I said I did.  I said I don't recognize it personally, but

17   I do recognize it as a business promotional.

18          MR. KEKER:  We would move it in, Your Honor.

19          THE COURT:  Admitted.

20       (Trial Exhibit 5508 received in evidence)

21   BY MR. KEKER:

22   Q.   Look at the cover page.  This is October 14, 2009?

23   A.   Right.

24   Q.   Where is Peterborough?

25   A.   No clue.

**BAIOCCO - CROSS / KEKER**

1   **Q.**   What?

2   **A.**   I don't know.

3   **Q.**   Do you know whether it's in the United States or England?

4   **A.**   Canada or England would be my guess.  I know a

5   Peterborough in Canada.  I do not know --

6   **Q.**   Look at the third page and the first line of the second

7   paragraph.  If we can highlight "Peterborough City Council"?

8   **A.**   In the UK.

9   **Q.**   It's in the UK?

10  **A.**   Yes.

11  **Q.**   This deals with some National Health Trust that currently

12  employs 7,000 people in three geographic areas; right?

13  **A.**   That's what it says.

14  **Q.**   And this is pitching -- let me look through it, but this

15  is pitching Capax's ability to do eDiscovery, isn't it?

16  **A.**   I object to the characterization, Your Honor.

17  **BY MR. KEKER:**

18  **Q.**   Then let me go over to -- look at page 8.

19          **MR. FRENTZEN:**  If it's Capax and Autonomy, I will

20  withdraw the objection.

21          **THE COURT:**  I'm sorry.  I got lost in the exhibit

22  number.  What exhibit number is it?

23          **MR. KEKER:**  This is 5508, Your Honor.

24          **THE COURT:**  Okay.  5508.

25          **MR. KEKER:**  Page 8.

 1          **THE COURT:**  I don't know what the status is of this.

 2  However, it's 4:00.

 3          **MR. KEKER:**  Can I ask one question so I don't have to

 4  come back to this, Your Honor?

 5          **THE COURT:**  Yes.

 6  BY MR. KEKER:

 7  **Q.**   Page 14, top lines here.

 8  **A.**   Okay.

 9  **Q.**   "The Capax Discovery Hosting Services provides a

10  state-of-the-art tier 2 data center, diesel generators, fully

11  redundant connectivity, architecture, storage, and server

12  configurations."

13          Did such a thing exist in October of 2009?

14  **A.**   Data center existed.  The platform wasn't in its existence

15  at that point.

16          **MR. KEKER:**  That's all I have for now.  It's a good

17  place to break.

18          **THE COURT:**  Ladies and Gentlemen, we are going to take

19  our recess, and obviously this is an extended break, somewhat

20  extended break in the proceedings.  So it's important for me to

21  caution you again about not discussing the case, form or

22  express any opinion.

23          And there are, from time to time, newspaper articles about

24  the case, so I ask you not to read those articles, not to do

25  any research, not to go on the internet.  I'm sure you could

 1    appreciate, after sitting here all day -- you can appreciate

 2    the fact that you hear all the evidence and then there's a

 3    report, accurate, not accurate, I don't know, that sort of

 4    capsulizes some points of the evidence, and that may or may not

 5    be accurate.

 6        But the views that you ought to take into consideration

 7    when you arrive at a verdict are the views of you -- that you

 8    have and your fellow jurors have, not what some observer may

 9    have seen or not seen in a short period of time or longer.

10        So with that, thank you very much.  I appreciate your

11    courtesy.  We will start sharp at 9:00 on Monday.  Leave your

12    pads here, and I'll see you then.  Have a nice couple of days.

13        (Proceedings were heard out of presence of the jury:)

14        **THE COURT:**  Let the record reflect the jurors have

15    left.

16        So about how much longer do we have of examination,

17    Mr. Keker?

18        **MR. KEKER:**  Not much, Your Honor.  Half an hour.

19        **THE COURT:**  Okay.  I'm not going to hold anybody to

20    it.  But just for planning purposes, I think it's useful.

21        **MR. FRENTZEN:**  I wish I had known.  We could have

22    finished Mr. Baiocco off, perhaps.

23        **THE COURT:**  Well, I don't know.  I don't want to

24    force -- you know --

25        **MR. KEKER:**  I'm really not -- actually, now that I

**PROCEEDINGS**

1    think about it --

2        **THE COURT:** Don't make it longer just by virtue of

3    what he said.

4        **MR. KEKER:** I think over the weekend -- I've got much

5    more than a half hour --

6        **THE COURT:** You decide what you want to do, and we all

7    know that shorter is better. So we leave that -- I'm just

8    trying to -- I'm trying to assist in planning the days. So you

9    want to be ready with your next witness.

10       **MR. FRENTZEN:** Absolutely.

11       **THE COURT:** Right.

12      Now, is there an issue about the next witness that I can

13    take care of now because I have time now, if there is. There

14    seems to be some unhappiness about the next witness.

15       **MR. KEKER:** No. Mr. Marais has the next witness.

16       **MR. REEVES:** Well, the next witness --

17       **THE COURT:** Wait until Mr. Marais comes forward.

18      You are free. Please come back on Monday.

19       **MR. REEVES:** You might want to direct him to be here

20    Monday at 9:00.

21       **THE COURT:** Would you return Monday at 9:00 a.m.

22       **THE WITNESS:** Not tomorrow?

23       **MR. FRENTZEN:** No.

24       **THE COURT:** Sorry. What was the question?

25       **MR. FRENTZEN:** The witness didn't understand we were

1    dark tomorrow, Your Honor.  I'll explain it.

2         THE COURT:  Give him the bad news.

3         MR. REEVES:  Before we plunge back into Mr. Fogo and

4    the issue that was raised this morning, I think it would be

5    appropriate to talk about the witness order.  I think I'm not

6    certain at this point that Mr. Fogo will now be next.  In fact,

7    I expect him to travel home to New York tonight and I'm not

8    sure when he will be back.

9         THE COURT:  Why does he want to go to New York?

10        MR. REEVES:  He lives in New York.

11        THE COURT:  Yeah.  But it's horrible in New York.  I

12   mean, I can't believe that -- just put him up at, you know --

13   the Government has access to the -- you know, what is that --

14   what's that hotel right outside the --

15        MR. REEVES:  The Van Ness?

16        THE COURT:  No, not the Van Ness.

17        MS. LITTLE:  The Embassy.

18        THE COURT:  The Embassy, which has a very nice bar now

19   downstairs.  But there is also the one with the swimming pool.

20        MS. LITTLE:  The trendy one, yeah.

21        THE COURT:  The trendy one.  I can't believe that

22   somebody would want to stay at the Pierre versus one of these

23   fine places around the city, but, you know.  Okay.

24        Anyway, you are going to call whomever you are going to

25   call.  Just please let the Government -- the defense know

1    according to whatever understanding we have.

2         **MR. REEVES:**  I will.

3      I'm happy to talk about Mr. Fogo and I think it might be

4    helpful and I think the Court's point --

5         **THE COURT:**  Then let's talk about Mr.-- we will talk

6    now about Mr. Fogo because I have some time.  Let's talk about

7    it.

8         **MR. REEVES:**  I guess the first point is --

9         **THE COURT:**  Who is he?

10        **MR. REEVES:**  Mr. Fogo is a principal at SHI who -- and

11   SHI, as you heard from Mr. Sullivan, bought millions of dollars

12   worth of hardware from Autonomy.  I think two things.

13     First, the Court raises a very good question that will

14   apply to Mr. Fogo but also to other witnesses about when is the

15   crime completed, how far are we going to go into the narrative

16   and the set of events that happened after the announcement of

17   the acquisition.

18        **THE COURT:**  Wait a minute.  I don't think there is

19   uncertainty.  If the Government is uncertain as to when the

20   crime is completed, I'm a little surprised.  Don't you have a

21   position that the crime was completed upon the publication of

22   statements?

23        **MR. REEVES:**  Yes, we do.

24        **THE COURT:**  Maybe there is some ongoing thing.  I read

25   the indictment.  I thought it sort of ended at -- with the

1    purchase of Autonomy.

2         MR. REEVES:  And that's correct and that's exactly why

3    the email --

4         THE COURT:  Wait.

5       That's when the crime was completed?

6         MR. REEVES:  Our charges go through the closing of the

7    deal in around October 2011.

8         THE COURT:  Okay.  Fine.  Now, that doesn't mean that

9    everything -- or anything that is -- that occurred subsequently

10   might not -- is or is not admissible.  But that's -- as I'm --

11   as I said earlier, I look at it through a slightly different

12   lens.  I look at it as to what extent does it shed light, one

13   way or the other, on the conduct that is charged in the -- as

14   criminal conduct.

15      You look back and you see well, for example, somebody

16   makes a confession or somebody destroys some evidence or

17   somebody does something else and so forth.  You look back and

18   you say okay, that's admissible because it sheds light as to

19   whether the offense occurred as alleged in the indictment.

20      And obviously -- let's say a criminal act occurred

21   subsequent to October of 2011.  I don't think that's

22   cognizable.  I don't think that would be the basis of a

23   criminal conviction.

24      So I'm not looking at acts subsequent to 2011 except

25   insofar as they shed light on what happened up to October of

PROCEEDINGS

1    2011.  That's the operative date.  Okay.  Here we are.

2        Now, what's the story?

3        **MR. REEVES:**  The story is that on the one hand, we

4    would like to call Mr. Fogo to establish the scale of the

5    hardware that SHI bought from Autonomy.

6        And I think in assuming everything would go as we would

7    like it to go, the testimony would probably end at or about the

8    time of the acquisition, in or around August 2011.  Okay.  And

9    I would not be pressing into the email, even though we marked

10   it as a possible exhibit.  My intention is not to press into

11   that.

12       However, if the defense wants to press into that --

13       **THE COURT:**  Well, wait a minute.  This isn't a -- this

14   isn't an unfettered free-for-all where the parties get to

15   decide what they want to do and what they don't want to do

16   because either they're interested or they -- they prepared for

17   it or they've got this dynamite email that would say something

18   about what happened before.  No.  There is a structure to it.

19       And the reason the Court is interested in the structure is

20   because the Court can only be here for its lifetime and it's

21   important that the jury -- the Court's responsibility is with

22   respect to the jury, to make sure that they get whatever

23   evidence is necessary, given the circumstances of the criminal

24   offense as alleged has or has not been proven by the

25   Government.

1        And what happens afterwards, after the commission of the

2    crime, is only admissible, if at all, because it sheds light on

3    the activities that occurred prior to the so-called commission

4    of the crime.

5        So you look -- you're looking backwards.  But you're

6    looking backwards through a different lens at that point.

7    You're looking backwards to see whether or not Event No. 6 that

8    occurred two months later sheds light and relevant and

9    admissible light on something that happened earlier.  That's

10    it.

11        And it's not the parties' decision.  I want -- so I don't

12    have to tell you, Mr. Reeves, because you say, "Well, if

13    they're interested in doing this, we're going to do that."  No.

14    No.  No.  That's not the way -- things can evolve that way like

15    opening doors and so forth, but the question isn't whether they

16    are going to open the door.  The question is am I going to let

17    them get near the door.

18            **MR. REEVES:**  I think that is very helpful, Your Honor.

19            **THE COURT:**  I don't know how helpful it is.  That's

20    it.  That's the rule.

21        Now, given that rule, what is the problem?

22            **MR. REEVES:**  No problem.

23            **MR. MARAIS:**  Well, Your Honor, if I may, I think that

24    the issues about conduct, HP's conduct post the closing are a

25    discussion for another day.  Obviously, we have our position on

1    those.

2        The Government has already elicited testimony from

3    Mr. Upton that he lost money as a result of the writedown when

4    he sold his shares, so information that sheds light on that

5    writedown I think is relevant.

6        But we don't need to discuss any of that today because the

7    document and the testimony we're talking about happened in

8    September --

9        **THE COURT:** Wait, wait, wait.  Just so I'm clear,

10    because you mentioned Upton, he sold his shares before the

11    closing, did he?

12        **MR. MARAIS:**  He bought his shares before the closing.

13    He testified that --

14        **THE COURT:**  And he sold --

15        **MR. MARAIS:**  He sold his shares when he heard about

16    the writedown.

17        **THE COURT:**  Sorry.  You're absolutely right.  Thank

18    you.

19        **MR. MARAIS:**  And I think there will be more testimony

20    about things that HP did or didn't do in between the closing

21    and the writedown, but again for purposes of Mr. Fogo --

22        **THE COURT:**  Okay.  Got it.  You're right.  Thank you

23    for refreshing my recollection.  Okay.

24        **MR. MARAIS:**  The conversation that Mr. Reeves has

25    alluded to is a telephone call between SHI and Hewlett-Packard

1   that took place in September of 2011 that is before the closing

2   during which SHI told HP about the hardware sales.

3       Now, one of the Government's allegations is that Autonomy

4   concealed the hardware sales, so the fact that Hewlett-Packard

5   was on notice from SHI is relevant.  But that conversation --

6           **THE COURT:**  Stop there.  Stop there.

7       Isn't that correct?  Just take that sentence.  Isn't that

8   correct?

9           **MR. REEVES:**  Isn't that correct?

10          **THE COURT:**  Yeah.

11          **MR. REEVES:**  It's really a matter of scale, but I

12  accept the point.  If we go there -- and this is what I'm

13  talking about opening doors and pursuing issues.  I'm happy to

14  go there.  I'm happy to let all of these facts be presented to

15  the jury.  I would just want to present all the facts about

16  them and I think that will necessitate --

17          **THE COURT:**  I don't know what that means.  You see, I

18  don't know what that means, Mr. Reeves.  I mean, there -- let's

19  say -- what counsel is saying is this is a transaction in which

20  it is alleged that certain false statements were made in order

21  to induce Hewlett-Packard to purchase Autonomy for $11 billion.

22  That's what the case is about, as I understand it.  Okay.  Full

23  stop.

24      Next, if in fact false statements were made -- let's just

25  take a hypothetical -- and before the closing, if there was any

1    opportunity to get out of the transaction -- I don't know

2    whether there was or not or what it means, I don't know how

3    locked in HP was once they announced it, but putting that aside

4    for a moment because that would be some interpretation of the

5    closing agreements and all the legal stuff which I don't have

6    before me -- but if, in fact, Hewlett-Packard is told, you

7    know, that 11 billion -- I mean, whatever their revenues

8    were -- "that's untrue; we have to tell you, we cooked the

9    books; it's a lot less than that" -- let's say they told them

10    that.  That would certainly be relevant.

11        So if SHI comes in and says to Hewlett-Packard, "By the

12    way, one of the components that went into their statement was X

13    or Y or Z," something different from or at least says one of

14    the major components is this or that or whatever they're going

15    to say, I don't know why that wouldn't be relevant because it

16    would disclose to HP what the, quote -- a portion of the true

17    state of affairs is.

18        So I think that does go to the issue of whether HP -- I

19    guess it goes to the issue of the materiality of the

20    misrepresentation because we know that -- maybe I take issue

21    with the defense.  I don't think you have to show reliance.  I

22    know that's the Government's position and it's the Court's

23    tentative position as well.  That under the law, you don't have

24    to show reliance, but you still have to show materiality, I

25    think.  You can't have an immaterial statement be subject to a

1    criminal prosecution.

2        So their argument would be, as I would assume it to be,

3    that therefore the fact that they were put on notice of X, Y or

4    Z has some impact on the materiality of the, quote,

5    overstatement or incorrect statement.  I think that's their

6    position.

7        Now, my question is, just stopping it, full stop right

8    there, why wouldn't that come in?

9        **MR. REEVES:**  It's fine for all of that to come in,

10   Your Honor.  Probably not through Mr. Fogo because he's only

11   competent to testify about a hearsay statement.

12       If the Court --

13       **THE COURT:**  What hearsay statement?  Are we talking

14   about whether they cooked the books?  That one.

15       **MR. MARAIS:**  No, Your Honor.

16       **MR. REEVES:**  So Mr. Fogo is a witness to a

17   conversation with an HP hardware sales rep, as I understand it,

18   a competitor to Dell.  SHI is in the middle, has major

19   relationships with both -- both HP and Dell, is learning about

20   this acquisition of Autonomy from whom SHI has been buying Dell

21   computers and realizes right away they're going to have a

22   problem continuing to do business in this way because of their

23   similar strategic relationship with HP and the contention and

24   competition between HP and Dell.

25       So there is then a phone call involving the SHI CEO,

1  Thai Lee, and an HP hardware representative, Steve Procopi,

2  that Mr. Fogo just hears pieces of.

3      My point is if counsel wants to get into that

4  conversation  -- I'll stop at that point.

5           **THE COURT:**  Stop there.

6           **MR. REEVES:**  It's hearsay.

7           **THE COURT:**  Yeah.  It's hearsay because it's a

8  statement out of court, but it's not being introduced for the

9  truth of the matter.  It's being introduced to show the state

10 of mind of people who overhear the conversation or part of the

11 conversation.

12          **MR. REEVES:**  I think you should call Mr. Procopi

13 Procopi and Thai Lee.

14          **THE COURT:**  Call whoever you want to call.  I'm trying

15 to deal with what we have in front of me now and -- I don't

16 know.  Maybe it's not a problem.  That's the way the Court --

17 the Court is going to rule as the Court indicated, so plan your

18 examination in accordance with those strictures.

19     I can't tell you how to ask questions or what subjects to

20 go into at this point.  But if it as you purport it to be --

21 I'm now talking to the defense -- then I think it would

22 probably be admissible, some portion of it.

23          **MR. MARAIS:**  Your Honor, if I may, there are two

24 demonstrably different statements at issue here.  The one we

25 have been discussing is one Mr. Fogo will say he heard on that

 1  telephone call, and I completely agree that isn't hearsay.  It

 2  may be an out-of-court statement, but it isn't offered to prove

 3  the truth of what was asserted during that statement.  That's

 4  statement one, and that's not the subject of, as I understand

 5  it, any request for exclusion.

 6      When I stood up this morning, it was to discuss an

 7  entirely different statement that was made in an email by the

 8  SHI CEO, Ms. Lee, who, as I understand, it will not be here.  A

 9  statement not --

10          **MR. REEVES:**  She's coming soon.

11          **THE COURT:**  What?

12          **MR. MARAIS:**  Well, she hasn't been identified on the

13  Government's witness list.

14      And the statement that Ms. Lee made that we were looking

15  at earlier today that I highlighted in Exhibit 2737 is a

16  speculative comment, quote, "it is Autonomy who is cooking the

17  books, not SHI or Dell."

18      Now, I don't believe that is offered to introduce the

19  state of mind of anybody relevant to these proceedings.  I

20  think that that statement is hearsay because I assume that the

21  Government thinks that it proves the truth of the matter

22  asserted.

23      But whether it is hearsay or isn't, it's prejudicial and

24  should be excluded under 403.

25          **MR. REEVES:**  I think whether Autonomy is cooking the

1    books or not because of the scale of the hardware sales to SHI

2    is directly relevant to SHI's willingness to continue to do

3    this business.  So -- and I --

4         **THE COURT:**  I'm sorry.  You lost me.  Yes.  Of course.

5    Whether -- I sort of agree with everything, except I don't

6    understand how that comes in.  I mean, I don't -- isn't it --

7    what I hear the defense saying is they want to -- if you are

8    going to introduce that document, it should be redacted to

9    eliminate the statement "Autonomy is cooking the books," even

10   though arguably it was said.  I guess it is.  It's in the

11   email, so it was stated.

12        And what I'm trying to figure out is, number one, it is

13   hearsay.  It doesn't seem to be an exception to the hearsay

14   rule.  But even if it were an exception -- even if you said,

15   "Look, I'm not introducing it for the truth of the matter.  I'm

16   introducing it for X, Y or Z," wouldn't I -- I would exclude it

17   because it's highly prejudicial.

18        It's this person's opinion as to what Autonomy has done.

19   So I don't understand why I would even let it in anymore than I

20   would let in somebody from the -- somebody else coming in and

21   saying -- I mean, let's say she's here and you ask the

22   question, "Tell me, you're the president of SHI."  "Yeah."

23   "You were dah,dah, dah, dah."  "Do you think Autonomy was

24   cooking the books?"

25        Do you think I'd let that in?  Well, the answer is no, to

1  end the suspense.  The answer is no.  I wouldn't let it in and

2  I don't -- I'm not going to let it in in this case.  If you

3  have -- if you think I should let it in, give me a brief.

4  Okay.  We're all finished with that.

5          MR. MARAIS:  Your Honor I have a second document.  We

6  can address it on Monday morning if you prefer.

7          THE COURT:  Oh, no.  I've got nothing but time.  I

8  prefer getting rid of these things.  I don't want to take jury

9  time.  I really want to use the jury and you can see that I am

10  running the jury as -- trying to be clockwork here.

11      So I'm handed a document which is called 2377-0001.

12          MR. MARAIS:  Your Honor, this is in a similar vein.

13  This is an out-of-court statement by Mr. Fogo.  The email that

14  I would draw the Court's attention to is the section under the

15  heading "original message."

16          THE COURT:  They added a letter to SHI.

17          MR. MARAIS:  Once again, Your Honor, I think that this

18  document is irrelevant.  It's an observation about things that

19  were going on at a nonparty, and even if it were relevant, I

20  think that the Government would be introducing it to inflame

21  the jury and that it's prejudicial and should be excluded under

22  403.

23          MR. REEVES:  I think the bottom line is, Your Honor,

24  these are business records.  That is our position.  That's why

25  a lot of the emails have been received into evidence.  They

1  reflect their understanding of transactions at the time.

2  They're maintained in the normal course of SHI's business.

3      But the deeper point is the simple fact that a company

4  like Autonomy that is selling as much hardware as it is to SHI

5  immediately identifies to people the extent to which they may

6  have been falsifying their financial disclosures.

7      And I -- so I do think it is relevant.  My view.  My

8  position is that these are business records and it would be

9  consistent with the Court's rulings.

10         **THE COURT:**  Okay.  Well, there are two emails here.

11         **MR. MARAIS:**  Correct, Your Honor.

12         **THE COURT:**  You are only objecting to the original

13  message?

14         **MR. MARAIS:**  Correct.

15         **THE COURT:**  Okay.  So I'm going to exclude the

16  original message subject to a brief on the subject.  Okay.

17         **MR. REEVES:**  Understood.  Thank you, Your Honor.

18         **THE COURT:**  Anything else now that we're --

19         **MR. MARAIS:**  Nothing from us.  Thanks, Your Honor.

20         **THE COURT:**  Anything from the Government?

21         **MR. REEVES:**  I don't think so.

22         **THE COURT:**  All right.  Thank you.

23             (Proceedings adjourned at 4:25 p.m.)

24                    ---oOo---

25

1

2

3          **CERTIFICATE OF REPORTERS**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Wednesday, February 28, 2018

8

9

10

11   _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                     U.S. Court Reporter

13

14

15   _____

16          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                     U.S. Court Reporter

17

18

19

20

21

22

23

24

25