**Volume 7**

                           **Pages 967 - 1191**

                  UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,            )
                                 )
   VS.                           )        **NO. CR 16-00462 CRB**
                                 )
SUSHOVAN TAREQUE HUSSAIN,        )
                                 )
            Defendant.           )
_____)
                              San Francisco, California
                              Wednesday, March 7, 2018

                     __TRANSCRIPT OF PROCEEDINGS__

__APPEARANCES:__
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **ROBERT S. LEACH**
                 **ADAM A. REEVES**
                 **WILLIAM FRENTZEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  **JOHN W. KEKER**
                 **JAN NIELSEN LITTLE**
                 **BROOK DOOLEY**
                 **KATE LAZARUS**
                 **NIC MARAIS**
                 **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Pamela Batalo, CSR No. 3593, FCRR
             Official Reporters

# I N D E X

Wednesday, March 7, 2018 - Volume 7

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| | | |
| **GEALL, MARC (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 973 | 7 |
| Cross-Examination resumed by Ms. Little | 973 | 7 |
| Redirect Examination by Mr. Leach | 999 | 7 |
| Recross-Examination by Ms. Little | 1008 | 7 |
| | | |
| **SNIDER, JANE** | | |
| (SWORN) | 1009 | 7 |
| Direct Examination by Mr. Frentzen | 1010 | 7 |
| Cross-Examination by Mr. Dooley | 1061 | 7 |
| Redirect Examination by Mr. Frentzen | 1098 | 7 |
| | | |
| **BLANCHFLOWER, SEAN** | | |
| (SWORN) | 1100 | 7 |
| Direct Examination by Mr. Reeves | 1100 | 7 |
| Cross-Examination by Ms. Little | 1138 | 7 |
| Redirect Examination by Mr. Reeves | 1154 | 7 |
| | | |
| **TRUITT, DAVID MORELAND** | | |
| (SWORN) | 1159 | 7 |
| Direct Examination by Mr. Leach | 1160 | 7 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 179 | | 1107 | 7 |
| 229 | | 1118 | 7 |
| 283 | | 1131 | 7 |
| 309 | | 1170 | 7 |
| 330 | | 1179 | 7 |
| 356 | | 1182 | 7 |
| 379 | | 1183 | 7 |
| 408 | | 1125 | 7 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 410 | | 1187 | 7 |
| 411 | | 1186 | 7 |
| 420 | | 1190 | 7 |
| 429 | | 1188 | 7 |
| 445 | | 1126 | 7 |
| 589 | | 1146 | 7 |
| 768 | | 1152 | 7 |
| 824 | | 1152 | 7 |
| 1025 | | 1135 | 7 |
| 1655 | | 1017 | 7 |
| 1831 | | 1136 | 7 |
| 1832 | | 1074 | 7 |
| 1842 | | 1035 | 7 |
| 1859 | | 1037 | 7 |
| 1863 | | 1041 | 7 |
| 1869 | | 1044 | 7 |
| 1890 | | 1046 | 7 |
| 1891 | | 1049 | 7 |
| 1915 | | 1051 | 7 |
| 1976 | | 1054 | 7 |
| 2043 | | 1054 | 7 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2324 | | 1057 | 7 |
| 2747 | | 1111 | 7 |
| 5751 | | 1148 | 7 |
| 5754 | | 1147 | 7 |
| 5765 | | 1142 | 7 |
| 5770 | | 1140 | 7 |
| 5804 | | 990 | 7 |
| 5805 | | 992 | 7 |
| 5807 | | 995 | 7 |
| 5808 | | 995 | 7 |
| 5809 | | 995 | 7 |
| 5810 | | 995 | 7 |
| 5811 | | 995 | 7 |
| 5812 | | 995 | 7 |
| 5813 | | 995 | 7 |
| 5814 | | 995 | 7 |
| 5815 | | 995 | 7 |
| 5816 | | 995 | 7 |
| 5817 | | 995 | 7 |
| 5818 | | 995 | 7 |
| 5819 | | 995 | 7 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 5826 | | 985 | 7 |
| 5827 | | 981 | 7 |
| 5838 | | 1082 | 7 |
| 5841 | | 1084 | 7 |
| 5844 | | 1083 | 7 |
| 5848 | | 1088 | 7 |
| 5849 | | 1067 | 7 |

```
 1   Wednesday - March 7, 2018                        9:01 a.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4      (Proceedings were heard out of presence of the jury:)

 5           MR. KEKER:  I have one quick matter.

 6           THE COURT:  Quick.

 7           MR. KEKER:  Last night at 8:45, as I was preparing for

 8   the witness that is due today, Mr. Cronin, I got an email from

 9   them that the witness that was Witness No. 6 instead of No. 4,

10   Dave Truitt, had been substituted.  That can't happen.

11           THE COURT:  I can't deal with it right now.  I mean, I

12   could deal with it right now, but I'm not going to deal with it

13   right now.  We will do this witness right now and then

14   figure --

15           MR. KEKER:  We would like them to be ordered to put

16   Mr. Cronin on in the order that they told us.  That's the

17   request.

18           THE COURT:  Bring in the jury.  Let's finish the

19   cross.

20           MR. REEVES:  Okay.  That sounds good.

21      (Proceedings were heard in the presence of the jury:)

22           THE COURT:  Good morning, ladies and gentlemen.

23   Again, thank you for being so prompt.  I really do appreciate

24   it.

25       And we will now continue with the cross-examination of the
```

1    witness.

2         Ms. Little.

3                        **MARC GEALL**,

4    called as a witness for the Government, having been previously

5    duly sworn, testified further as follows:

6                   **CROSS-EXAMINATION**   (resumed)

7    BY MS. LITTLE:

8    Q.   Good morning, Mr. Geall.

9    A.   Good morning.

10   Q.   I think we left off yesterday talking about hardware.

11        You testified on direct that around September 30th of

12   2009, you learned of a significant hardware contract between

13   Autonomy and EMC.  Do you recall that testimony?

14   A.   Correct.  Yep.

15   Q.   You said it was around $45 million?

16   A.   I believe that to be the case, yes.

17   Q.   And you said that Peter Goodman told you about it?

18   A.   That is correct.

19   Q.   And you told -- you testified that you told Mr. Goodman to

20   go see if Andy Kanter was in the office, and Mr. Goodman said

21   Kanter wasn't there, so you told Mr. Goodman to either shred

22   the contract or lock it up.  Do you recall that testimony?

23   A.   Correct.

24   Q.   And you told Mr. Leach and the jury that this hardware

25   contract that Mr. Goodman had told you about caused you concern

1   because it was $45 million and you, in your mind, questioned

2   whether it was related to SPE.  Do you recall that testimony?

3   **A.**   I do.

4   **Q.**   Let's bring up on the screen Exhibit 289, which is in

5   evidence.  And looking at the top, this is the press release

6   for Q3 of '09; is that right?

7   **A.**   Correct, yeah.

8   **Q.**   What's the date on that?

9   **A.**   October 20th, 2009.

10  **Q.**   So, Mr. Geall, in the three weeks between September 30th,

11  when you had this phone call, and the issuance of these

12  quarterly results on October 20th, did you tell anybody about

13  that hardware contract that you were so concerned about?

14  **A.**   No.

15  **Q.**   Did you follow the advice that you gave Mr. Goodman and go

16  talk to Mr. Kanter about it?

17  **A.**   No.

18  **Q.**   Were you concerned that Autonomy might be issuing results

19  that would be incorrect?

20  **A.**   Potentially, yes.

21  **Q.**   Did you tell anybody about that concern?

22  **A.**   No.

23  **Q.**   Let's look at the last page of Exhibit 289.  And going

24  down to the bottom, this is a certification by Deloitte; is

25  that right?

1   **A.**   It would appear so, yes.

2   **Q.**   Let's just read the conclusion.  It says:  "Based on our

3   review, nothing has come to our attention that causes us to

4   believe that the accompanying quarterly financial information

5   is not prepared, in all material respects, in accordance with

6   the recognition and measurement criteria of IFRS," etc.

7        Did you bring anything to Deloitte's attention before they

8   did this certification?

9   **A.**   I wasn't in discussion with Deloitte.

10  **Q.**   Could you pick up the phone and call them?

11  **A.**   I've never picked up the phone to call Deloitte, so, no, I

12  didn't.

13  **Q.**   Did you ask anybody in Autonomy management for permission

14  to talk to Deloitte?

15  **A.**   No.

16  **Q.**   And, by the way, this last page of this press release --

17  Deloitte would certify every press release; correct?

18  **A.**   Not press release.  Every report of accounts, correct.

19  **Q.**   Every report of the financials, they would certify it?

20  **A.**   Yeah.  Uh-huh.

21  **Q.**   And these quarterly releases, the rules about quarterly

22  releases are different in the United Kingdom than in the

23  United States; right?

24  **A.**   In what way?  I don't know.

25  **Q.**   You don't know the difference?

GEALL - CROSS / LITTLE

1    **A.**    No.

2    **Q.**    Are you aware that in the United States, quarterly reports

3    are required, but in the UK, they are not required?

4    **A.**    That's correct.  You have to do half yearly results in the

5    UK, yes.

6    **Q.**    So quarterly reports like this, that is something extra

7    that Autonomy was doing; right?

8    **A.**    That is correct, yes.

9    **Q.**    Again, on Exhibit 289, would you look at page 6, please.

10    Mr. Leach spent some time yesterday going over with you the

11    difference between the Q3/'08 results and the Q3/'09 results.

12    Do you recall that testimony?

13    **A.**    I do, yes.

14    **Q.**    You also testified yesterday about the fact that Autonomy

15    made a major acquisition in the first part of 2009; right?

16    **A.**    Correct.

17    **Q.**    They acquired Interwoven?

18    **A.**    That is right.

19    **Q.**    The $775 million acquisition?

20    **A.**    That is correct.

21    **Q.**    It's true, isn't it, that when one company acquires

22    another company, that can have an effect on the financials year

23    over year; correct?

24    **A.**    Absolutely, yes.

25    **Q.**    It can affect the revenue and it can affect the costs;

GEALL - CROSS / LITTLE

1  right?

2  **A.**    Uh-huh.

3  **Q.**    We can take that down.

4      You also testified on direct, sir, about a statement on

5  the bulletin board about no barter transactions.  Do you recall

6  that testimony?

7  **A.**    Correct, yes.

8  **Q.**    I'm sorry?

9  **A.**    Correct, yes.

10  **Q.**    Okay.  Are you aware, sir, that whenever Autonomy made a

11  major purchase from one of its customers, that Deloitte would

12  review that?

13  **A.**    Okay.  Yeah.  That's good practice.

14  **Q.**    Are you aware that Deloitte did that?  Yes or no?

15  **A.**    No.

16  **Q.**    You're not aware?

17  **A.**    No.

18  **Q.**    Are you aware of the accounting standards that govern

19  whether or not a purchase and a sale with a customer are

20  related under the accounting standards?

21  **A.**    No.

22  **Q.**    Are you familiar with the IAS 18?

23  **A.**    Yes.

24  **Q.**    And is that the rule that covers the analysis of whether

25  two transactions are related?

1    **A.**    I don't recall.

2    **Q.**    Are you aware of the testing that Deloitte did whenever

3    there were two transactions between a customer and Autonomy?

4    **A.**    No.

5    **Q.**    Are you aware of product demonstrations that they

6    reviewed?

7    **A.**    No.

8    **Q.**    Are you aware of memoranda that they reviewed and

9    memoranda that they prepared?

10   **A.**    No.

11   **Q.**    In response to one of my questions yesterday about whether

12   you'd raised any of your concerns about Autonomy before you

13   left, you said that you told Rob Webb; right?

14   **A.**    Correct.  Yes.

15   **Q.**    Who is Rob Webb?

16   **A.**    Rob Webb was a chairman of Autonomy.

17   **Q.**    Let's pull of Exhibit 428, which is in evidence, and take

18   a look at page 20.

19        Jeff, if you can pull that up.  Page 20.  That's page 22,

20   Jeff.  Let's find page 20.  There we go.  Can you just blow up

21   the profile of Rob Webb on the top left.  There we go.

22        Is that Mr. Webb?

23   **A.**    It is, yes.

24   **Q.**    It indicates here that Mr. Webb is a Queen's Counsel.  Do

25   you know what a Queen's Counsel is?

**GEALL - CROSS / LITTLE**

1   **A.**   I do, yes.

2   **Q.**   What is a Queen's Counsel?

3   **A.**   He is a barrister.

4   **Q.**   Well, he is a barrister as opposed to a solicitor.  What

5   is the difference between a barrister and a solicitor?

6   **A.**   A barrister is Queens Counsel; a solicitor isn't.

7   **Q.**   Well, Queen's Counsel is actually a special kind of

8   barrister; right?

9   **A.**   I don't know.  I'm not a law specialist.

10  **Q.**   Not all barristers are Queen's Counsel; right?

11  **A.**   Okay.

12  **Q.**   In fact, only about 10 percent of barristers are Queen's

13  Counsel; right?

14  **A.**   I don't know.

15  **Q.**   It's considered an honorific; right?

16        **MR. LEACH:**  Objection, foundation.

17  **BY MS. LITTLE:**

18  **Q.**   Do you know whether it's an honorable title?

19        **THE COURT:**  Sustained.  He has no knowledge in this

20  area.

21  **BY MS. LITTLE:**

22  **Q.**   It says here that Mr. Webb also was general counsel to

23  British Airways.  Do you see that on the fourth line?

24  **A.**   Yes.

25  **Q.**   And he was responsible in that capacity for oversight of

1    government and industrial affairs; correct?

2    **A.**   Correct.  Yeah.

3    **Q.**   And further down, it says that he also was on the board of

4    the BBC; is that correct?

5    **A.**   Correct, yeah.

6    **Q.**   And he was also on the board of the London Stock Exchange;

7    is that correct?

8    **A.**   I can't see that -- yes.  Correct.

9    **Q.**   And you met with Mr. Webb -- we can take that down.

10        You met with Mr. Webb just as you were leaving Autonomy;

11   correct?

12   **A.**   Correct.

13   **Q.**   Your conversation with him was on May 24th of 2010;

14   correct?

15   **A.**   I don't remember the dates, no.

16   **Q.**   Okay.  Well, I would ask you to look in your book -- let

17   me back up.

18        When you met with Mr. Webb, you met him over drinks;

19   right?

20   **A.**   Correct, yes.

21   **Q.**   Take a look in your book, if you would, at Exhibit 5827.

22           **THE COURT:**  58 --

23           **MS. LITTLE:**  5827.

24           **THE COURT:**  5827.  Wait, wait, wait.

25   \\\

1    BY MS. LITTLE:

2    Q.    Sir, is that an Outlook calendar entry for you relating to

3    this meeting with Mr. Webb?

4    A.    It could be.

5              THE COURT:  Admitted.

6         (Trial Exhibit 5827 received in evidence)

7              MS. LITTLE:  Thank you.  Let's put it up on the

8    screen.

9    Q.    So this is a calendar entry for you on May 24, 2010, "meet

10   Rob Webb for a drink"; correct?

11   A.    Correct, yes.

12   Q.    And it's your claim to this jury that when you met with

13   Mr. Webb, you told him about all of these concerns that you had

14   about Autonomy?

15   A.    Correct.

16   Q.    And you think that the way to tell Mr. Webb about all

17   these terrible concerns is to have a drink with him?

18   A.    That was what he offered to me -- offered me as an

19   opportunity to meet with him, so I took that opportunity.

20   Q.    You have spoken with the FBI and the prosecutor in this

21   case five times before you testified today; right?

22   A.    Correct.

23   Q.    You spoke with them on May 16th, 2016 in London; right?

24   A.    Correct.

25   Q.    That was a very lengthy interview, was it not?

GEALL - CROSS / LITTLE

1   **A.**   Correct.

2   **Q.**   You spoke with them again on June 27, 2016 by phone;

3   right?

4   **A.**   Right.

5   **Q.**   You spoke with them again on December 16, 2016 in London;

6   correct?

7   **A.**   Correct.

8   **Q.**   You spoke with them again on September 28, 2017 here in

9   San Francisco; correct?

10  **A.**   Correct.

11  **Q.**   And you spoke with them again just this past Monday,

12  March 5th, here in San Francisco?

13  **A.**   Correct.

14  **Q.**   And it's true, sir, isn't it, that the first time you

15  talked to the FBI and these prosecutors, you never mentioned to

16  them that you had raised any of these concerns with Mr. Webb?

17  **A.**   Correct.

18  **Q.**   And the second time you talked to them on the phone, you

19  never mentioned to them that you supposedly raised these

20  concerns with Mr. Webb?

21  **A.**   Correct.

22  **Q.**   And, in fact, in your fourth and fifth interview, you

23  described the concerns a little differently; right?

24         In the fourth interview, you said it related to hardware.

25  In the fifth interview, you said it related to organic growth;

1   correct?

2   **A.**   No, not correct.

3   **Q.**   Incorrect.

4       Let's take a look at your fourth interview, Exhibit 5075,

5   which is --

6           **THE COURT:**  Wait, wait, wait.  Slow down.

7           **MS. LITTLE:**  It's in the little booklet there.

8           **THE COURT:**  Five-zero-seven-five.

9           **MS. LITTLE:**  It's in this thin booklet, Your Honor.

10          **THE COURT:**  Thin book.

11  **BY MS. LITTLE:**

12  **Q.**   Take a look at page 6, sir, and just read to yourself the

13  second paragraph.

14          **THE COURT:**  Page what?  Sorry?

15          **MS. LITTLE:**  Page 6.  Second paragraph.

16          **THE COURT:**  The second paragraph.

17          **MS. LITTLE:**  Second paragraph, page 6.

18          **THE COURT:**  Okay.  I'll read it.

19          **THE WITNESS:**  Yes, I see it.

20  **BY MS. LITTLE:**

21  **Q.**   Does that refresh your recollection that the fourth time

22  you talked to the FBI, the only thing you claimed you told

23  Mr. Webb was about hardware?

24  **A.**   It doesn't refresh my memory because my memory was that

25  whenever I discussed Rob Webb with the FBI, I mentioned the

1  same four characteristics.

2  **Q.**  So the FBI got it wrong here?

3  **A.**  This is a transcript from the discussion that we had, so I

4  don't know how they take the notes.

5  **Q.**  You think the FBI got it wrong?

6          **MR. FRENTZEN:**  Objection.

7          **THE COURT:**  Sustained.

8      And the jury is admonished to disregard any inference that

9  the FBI got it right or got it wrong.  That document is not in

10 evidence.

11     And we'll move on.

12 **BY MS. LITTLE:**

13 **Q.**  In any event, Mr. Geall, you are telling this jury that

14 this man with all these credentials, you had a drink with him,

15 you bared your sole to him, and nothing happened?  Is that

16 your --

17 **A.**  I don't know what action he took with the information I

18 gave him.

19 **Q.**  Well, he never went back and talked to you about it again?

20 **A.**  I didn't speak to him after I left Autonomy, no.

21 **Q.**  And you claim that you went to Mr. Webb because you didn't

22 feel comfortable talking to Dr. Lynch; is that right?

23 **A.**  I went to Rob Webb because Rob Webb, during his time at

24 Autonomy, he had reached out to me on a number of occasions and

25 said, "If you ever have any concerns or any issues, come to me

1   and discuss them."

2   **Q.**   And what about Mr. Hussain, your former office mate, did

3   you say anything to him?

4   **A.**   No.

5   **Q.**   And we already established you said nothing to Deloitte?

6   **A.**   Correct.

7   **Q.**   Or the audit committee, other members of the board;

8   correct?

9   **A.**   Correct.

10  **Q.**   How about Mr. Kanter, did you feel uncomfortable talking

11  to him, too?

12  **A.**   No, I didn't feel uncomfortable talking to Mr. Kanter.

13  **Q.**   So did you tell Mr. Kanter any of your concerns?

14  **A.**   I don't remember.

15  **Q.**   Okay.  Well, let's take a look in your book at Exhibit

16  5826.

17          **THE COURT:**  5826.

18  **BY MS. LITTLE:**

19  **Q.**   Sir, is that an email that you sent to Mr. Kanter on

20  May 24, 2010?

21  **A.**   It appears to be, yes.

22          **MS. LITTLE:**  Move it in, Your Honor.

23          **THE COURT:**  Admitted.

24      (Trial Exhibit 5826 received in evidence)

25          **MS. LITTLE:**  Let's put it up on the screen.

GEALL - CROSS / LITTLE

1   Q.   So going to the bottom of the email -- first of all,

2   May 24th is the same day that you were having drinks with

3   Mr. Webb; right?

4   A.   So it appears, yes.

5   Q.   Okay.  Well, it doesn't just appear.  It is; right?

6        THE COURT:  That's a way that people answer questions.

7   BY MS. LITTLE:

8   Q.   Take a look at the email at the bottom from you to Yvette

9   Hutchinson and Andrew Kanter, and it says, "copy of expenses."

10       This is your last day and you are sending in your final

11  expense report; right?

12  A.   Okay.  Potentially, yes.

13  Q.   And then you also say "physical in post."  In other words,

14  you are emailing it to them and you are putting the physical

15  copy, the hard copy, in the mail; right?

16  A.   Correct.

17  Q.   Mr. Kanter responds in the next email up, "okay"; right?

18  A.   Yes.

19  Q.   And then the top email, you respond back to Mr. Kanter,

20  "Thanks.  Let me know when you are next in the Big Smoke so I

21  can take you out for a farewell drink."

22       What is the Big Smoke?

23  A.   It's London.

24  Q.   You are saying, "Let me know the next time you're in town,

25  I'll take you out for a drink"?

1    **A.**    Correct.

2    **Q.**    You didn't use this opportunity to raise any of your

3    concerns with Mr. Mr. Kanter, did you?

4    **A.**    This was an email to say "next time you're around, it

5    would be good to catch up."

6    **Q.**    Okay.  We can take that down.

7            **THE COURT:**  Why do you call London *the Big Smoke*?

8            **THE WITNESS:**  Just a colloquial term.  The Big Smoke.

9    Big city.

10           **MS. LITTLE:**  I think it has to do with air quality.

11           **THE WITNESS:**  I think now Beijing has that title.

12           **THE COURT:**  Yes.  I would give it to Beijing, hands

13   down.

14   **BY MS. LITTLE:**

15   **Q.**    After the acquisition was announced, you met with Leo

16   Apotheker, did you not?

17   **A.**    Leo Apotheker, yes.

18   **Q.**    You met with him at the Deutsche Bank 2011 Tech Conference

19   in Las Vegas?

20   **A.**    That is correct, yep.

21   **Q.**    At the Cosmopolitan Hotel?

22   **A.**    That is correct, yep.

23   **Q.**    Mr. Apotheker's company, HP, had just acquired Autonomy,

24   right, or announced the acquisition?

25   **A.**    They had announced the acquisition.

1  **Q.**    But the acquisition hadn't yet closed; correct?

2  **A.**    Correct.

3  **Q.**    Did you take that opportunity when you met with

4  Mr. Apotheker to tell him about your concerns about Autonomy?

5  **A.**    I asked Leo whether he read the research report that I

6  published on October 20th, expecting him to say that he had,

7  given that he had known me for a long time, and he said that

8  hadn't.

9  **Q.**    But that research report also didn't express your concerns

10  about Autonomy, about the hardware and SPE and all the things

11  we've been talking about?

12  **A.**    No.  Because that was deemed inside information and not

13  something I could publish in that note.

14  **Q.**    Okay.  So if you have inside information and you write

15  something and you're not disclosing that inside information,

16  isn't that a problem?

17  **A.**    No.  I didn't -- I had no factual evidence.

18  **Q.**    Let's talk about your work at Deutsche Bank.

19       After you let Autonomy, you did go to work as an analyst

20  at Deutsche Bank; correct?

21  **A.**    Correct.

22  **Q.**    And we saw yesterday Exhibit 996, which was the July 22nd,

23  2010 report that you did with Mr. Bori?

24  **A.**    Correct, yes.

25  **Q.**    Let's put that up on the screen.  Let's take a look at the

1    top right-hand corner.  Just blow up that little box there.

2         I think you testified that Mr. Bori was primarily

3    responsible for this report, but you signed off on it as well;

4    correct?

5    **A.**    I didn't sign off on it because if you take a look at the

6    analyst signature at the back, you will see that it's Josep

7    Bori's.

8    **Q.**    But your name is on it?

9    **A.**    Correct.

10   **Q.**    At this point -- let's highlight the price at 1648 and the

11   price target at 2000.  What does that mean, sir?

12   **A.**    The price on the 22nd of July was 16 pounds and 48 pence

13   and the price target that justified the buy rating was a price

14   target of 20 pounds.

15   **Q.**    So, in other words, Mr. Bori and you were expressing that

16   you think Autonomy was worth more than it was actually selling

17   for?

18   **A.**    Correct.

19   **Q.**    And that's why you say buy?

20   **A.**    That is why it is a buy, yes.

21   **Q.**    And at any place in this report, did you or Mr. Bori talk

22   about these concerns that --

23         **THE COURT:**  Excuse me.  Can I ask, GBP, what does that

24   stand for?

25         **THE WITNESS:**  Great British Pounds.

1          THE COURT:  Sorry?

2          THE WITNESS:  It's pounds.  Pounds sterling.  GBP.

3    Great British Pounds.

4          MS. LITTLE:  Great Britain Pounds.

5    BY MS. LITTLE:

6    Q.   As opposed to U.S. dollars; right?

7    A.   Correct.

8          THE COURT:  Thank you.  I got it.

9          MS. LITTLE:  Thank you, Your Honor.

10   Q.   In any case, in this note, which is Exhibit 996, you

11   didn't -- you and Mr. Bori said nothing about the concerns that

12   you had supposedly had about Autonomy; right?

13   A.   As I mentioned yesterday, this was a results note looking

14   at the Q2 results and it was a direct commentary on the second

15   quarter results.

16   Q.   Okay.  But you didn't express any of the concerns that you

17   talked to Mr. Webb about and that you've told the jury about?

18   A.   It wouldn't have been appropriate to, no.

19   Q.   Let's take a look at Exhibit 5804, which is not in

20   evidence yet, so just take a look at it in your book.

21        Is this a company alert that you and Mr. Bori put together

22   and published on July 22nd, 2010?

23   A.   It is, yes.

24          THE COURT:  Admitted.

25        (Trial Exhibit 5804 received in evidence)

1   **BY MS. LITTLE:**

2   **Q.**   Let's take a look again on the top right.  Again you have

3   a buy recommendation; right?

4   **A.**   Correct.  Yeah.

5   **Q.**   And over on the left, the column about the price and price

6   target, once again you're recommending that this is a bargain,

7   basically; it's worth more than it's selling for?

8   **A.**   Correct.  It is a buy, yes.

9   **Q.**   And then the third full paragraph that begins "the margin

10  profile," let's take a look at that.

11      So here it's written, "The margin profile is a concern.

12  Gross margin of 86 percent was below the 89 percent guidance,"

13  etc, "due to additional costs associated with hardware sales."

14  Do you see that, sir?

15  **A.**   I do, yes.

16  **Q.**   So you and Mr. Bori are telling the market that the change

17  in gross margins is associated with hardware sales; right?

18  **A.**   Correct.  Because that was what management had discussed

19  on the call.

20  **Q.**   You don't, in this note, reveal any of these other

21  concerns that we've been talking about?

22  **A.**   Correct.

23  **Q.**   We can take that down.

24      Now, by mid August, you took over from Mr. Bori covering

25  Autonomy; correct?

1   A.   Correct, yeah.

2   Q.   Look in your book, if you would, at Exhibit 5805.  Is this

3   a company alert that you published on behalf of Deutsche Bank

4   on August 13th, 2010?

5   A.   Correct, yes.

6          THE COURT:  Admitted.

7          (Trial Exhibit 5805 received in evidence)

8   BY MS. LITTLE:

9   Q.   Let's blow that up.

10          And down at the bottom, we have your name all by yourself

11   now.  Mr. Bori is gone; right?

12   A.   Correct, yes.

13   Q.   The top right, you still have a buy recommendation?

14   A.   Correct, yes.

15   Q.   And over on the left, the price and the price target,

16   you're still saying it's a bargain; right?

17   A.   I'm saying the share price was below the target price.

18   Q.   It's worth more than it's selling for; right?

19   A.   Yes.

20   Q.   Again, nowhere in this do you talk about the concerns that

21   you supposedly had?

22   A.   Correct, yes.

23   Q.   Let's take a look at Exhibit 1154, which is in evidence.

24   This was your October 10th, 2010 report that you just mentioned

25   a few minutes ago?

1    **A.**    Correct.

2    **Q.**    And this is the report where you changed the

3    recommendation to a hold; right?

4    **A.**    Correct, yes.

5    **Q.**    And I think you testified on direct that this report was

6    issued four days after Autonomy had announced that it was

7    reducing its revenue predictions for the quarter; right?

8    **A.**    Correct, yes.

9    **Q.**    Okay.  And, again, nowhere in this report do you talk

10   about your concerns about hardware and SPE; right?

11   **A.**    Correct, yes.

12   **Q.**    And take a look, if you would, at page 3 where it mentions

13   risks.  No mention there about the concerns that you've been

14   talking about?

15   **A.**    Correct.

16   **Q.**    And take a look at page 27, if you would, sir.  You see

17   the -- is that it?  Maybe I've got the wrong page.  Hang on.

18   Bear with me for a second.

19        Here we go.  Page 8.  Sorry about that.

20        No, Jeff, that's not it.  It's page 8 of the report.  It's

21   called Appendix 1.

22           **THE COURT:**  Well, that's what this is, I think.

23           **MS. LITTLE:**  That was it?

24           **THE COURT:**  I think it was.

25           **MS. LITTLE:**  There we go.  Okay.  There we go.

1  Q.   And down at the bottom where it says "analyst

2  certification," let's blow that up.

3       This is your certification about the integrity of the

4  information that you're putting in this report; correct?

5  A.   Correct, yes.

6  Q.   And you said in here, "The views expressed in this report

7  accurately reflect the personal views of the undersigned lead

8  analyst about the subject issuer and the securities of the

9  issuer"; correct?

10 A.   Correct.

11 Q.   Is that certification true or false?

12 A.   That certification is true.

13 Q.   But yet you didn't reveal any of your concerns that you

14 supposedly had about Autonomy?

15 A.   Because I didn't have any factual evidence to support.

16 Q.   I'd like you now -- we can take that down.

17      I'd like you to just look -- I'm not going to do these one

18 by one.  If you would look in your book, please, at Exhibits

19 5807 through 5819.  They should be in a whole line in a row.

20 And I'm going to ask you whether all of these exhibits

21 represent notes or company alerts that you prepared and

22 published while you were at Deutsche Bank.

23 A.   Correct.

24           MR. DOOLEY:  I move them in, Your Honor.

25           THE COURT:  Admitted.

1          (Trial Exhibits 5807 through 5819 received in

2      evidence)

3  BY MS. LITTLE:

4  Q.    I'm not going to go through them one by one.

5      Would you agree with me that these are reports that you

6  wrote in 2010 or 2011?

7  A.    Correct, yes.

8  Q.    And nowhere in these reports do you reveal any of your

9  grave concerns about Autonomy?

10  A.    Correct, yes.

11  Q.    Now, Mr. Geall, you've told this jury that you left

12  Autonomy because of these concerns you had, but there was

13  another more fundamental reason that you left Autonomy; right?

14  A.    What was that?

15  Q.    You weren't making enough money; right?

16  A.    No.  I'd made a decision to go to Autonomy and took a

17  reduction in pay to learn from Autonomy and to learn from Mike

18  and Sushovan.

19  Q.    You told the FBI that one reason you left Autonomy was

20  because you weren't making enough money; right?

21  A.    I didn't get paid as much as I had done prior, no.

22  Q.    Okay.  And you told the FBI that at Autonomy, you were

23  making only 125,000 pounds a year, whereas as an analyst, you

24  had been making 400,000 pounds a year; right?

25  A.    That is correct, yes.

GEALL - CROSS / LITTLE

1  Q.   And 400,000 pounds a year is what in U.S. dollars?

2  A.   I don't know what the current exchange rate is.  Probably

3  about 600,000.

4  Q.   So when -- that's what you were making at Citibank.  You

5  were making 600,000 a year at Citibank, and you took basically

6  a 60 percent pay cut to go to Autonomy; is that right?

7  A.   No.

8       So what actually happened was I took the same basic

9  salary, and Mike, as part of my discussions, had said I would

10 get a bonus.  Never paid me a bonus.

11      Sushovan generously did give me some stock options, so

12 that made up a difference.

13 Q.   You took a significant pay cut to go to Autonomy; right?

14 A.   Correct, yes.

15 Q.   You testified on direct that you left Citibank because you

16 had a falling out with your head of research.  Do you recall

17 that testimony?

18 A.   Yes, I do.  Yes.

19 Q.   That's not what you told the FBI in your interviews, is

20 it?

21 A.   Why?  What did I tell hem?

22 Q.   I'm sorry?

23 A.   I don't recall what I told them.

24 Q.   Let's take a look, if you would, at Exhibit 5072, which is

25 in your little thin booklet.  Take a look at page 2, if you

GEALL - CROSS / LITTLE

```
 1   would.
 2            THE COURT:  And what paragraph?
 3            MS. LITTLE:  I'm sorry.  The first full paragraph at
 4   the top.
 5            THE COURT:  Thank you.  Okay.  Read that to yourself.
 6       What is the question?
 7   BY MS. LITTLE:
 8   Q.   Do you recall telling the FBI that you left Citibank
 9   because you had mistakenly stayed too long there as opposed to
10   some falling out with your boss?
11   A.   Sorry.  Where am I reading this?
12            THE COURT:  The first paragraph.
13            MS. LITTLE:  The first paragraph.
14            THE WITNESS:  What page?
15            THE COURT:  Page --
16            MS. LITTLE:  Page 2 --
17            THE COURT:  Sorry.  I'll let you do it.  Okay.  Go
18   ahead.
19   BY MS. LITTLE:
20   Q.   Page 2, the first full paragraph that says, "In 2008,
21   Geall became bored."  Do you see that?
22   A.   I do, yes.
23   Q.   So does that refresh your memory that you gave the FBI a
24   different reason for why you left Citibank?
25   A.   No.  All those reasons are valid.
```

1   Q.   Okay.  You told the FBI that you left because you were

2   bored and because you had mistakenly stayed too long; right?

3   A.   I had been at Citigroup for nine years doing exactly the

4   same job, yes --

5   Q.   You didn't tell the --

6   A.   And I had about become bored.

7   Q.   I'm sorry.  Go ahead.  Finish.

8   A.   I had stayed at Citigroup for nine years covering the same

9   stocks.  I was doing effectively the same role, which is why I

10  had the discussion with my head of research about trying to

11  find another role internally and also why, you know, the

12  opportunities weren't there, and that's when I started to have

13  some discussions internally with Charlie Lytle, he -- accused

14  of being my boss yesterday.  He was working on the capital

15  market side, and he said, "Look, there are some opportunities

16  for you in Citigroup on this side of the business."

17       But I wasn't sure whether that was enough of a change.  So

18  when Mike had a discussion with me, that's why I took that

19  opportunity.

20  Q.   Okay.  So you took the significant pay cut because you

21  were bored and you thought you had mistakenly stayed too long?

22  A.   No.  I took the pay cut because I thought I had a lot to

23  learn from Mike Lynch, who was one of the top technology

24  entrepreneurs in the UK.

25  Q.   What was this falling out with your boss that you told the

1    jury about yesterday?  What was that about?

2    **A.**    He was unhappy with my performance.

3    **Q.**    In what way?

4    **A.**    He felt I'd been there too long, and I had brought on a

5    strong number two to follow up, and he wanted to basically try

6    and give more responsibility to him so he was trying to make me

7    redundant.

8    **Q.**    Trying to make you redundant.  What does that mean some?

9    **A.**    He wanted to basically give my job to somebody else.

10    **Q.**    So you were fired, basically; right?

11    **A.**    No.  That's why when the capital markets team -- they

12    offered me a role, so I didn't need to leave Citigroup.

13            **MS. LITTLE:**  That's all I have, Your Honor.

14            **THE COURT:**  Thank you.

15        Redirect.

16            **MR. LEACH:**  Thank you, Your Honor.

17                    <u>**REDIRECT EXAMINATION**</u>

18    **BY MR. LEACH:**

19    **Q.**  Good morning, Mr. Geall.

20    **A.**  Good morning.

21    **Q.**  Ms. Little asked you about a conversation that you had

22    with Rob Webb in May of 2010 as you were leaving Autonomy.  Do

23    you recall that --

24    **A.**    I do.

25    **Q.**    -- exchange?

1    Take a moment and describe what you said to Mr. Webb.

2  **A.**   So I'd called for the meeting as part of my departure from

3  Autonomy.  As highlighted, he was at an event, so I went to

4  visit him at that event.

5    We were out in -- out in a courtyard behind the event that

6  he'd been at.  I don't recall exactly the location, but it was

7  in Central London.

8    He asked why, you know, I wanted to meet, and I said that,

9  you know, over the -- over the -- my period at Autonomy, there

10  were a number of areas that were causing me concern.  I

11  discussed with him, you know, concerns around the OEM business

12  and some of the discussions I had with Harold Collette.  I

13  discussed with him some of my concerns over how M&A or the

14  acquisition strategy of Autonomy was being used to potentially

15  accelerate the organic growth rate, and the organic growth rate

16  was an important KPI for the performance of the business and

17  something that the financial community was looking at.

18    I sort of commented on potentially some concerns over

19  restructuring of contracts, particularly relating to the

20  Interwoven acquisition and mentioned my concerns over this

21  contract that I saw or Pete Goodman saw that he told me about

22  and the concerns that this was maybe related to IDOL SPE.

23  **Q.**   You described something relating to OEM and Harold

24  Collette.  What did you tell Mr. Webb about that?

25  **A.**   That, you know, from what I understood, the OEM business

1    was not as large as it was purported to be.  OEM was a critical

2    component of the growth story of Autonomy, and, you know, maybe

3    that is something that needed to be checked.

4    **Q.**    Why did you think that?

5    **A.**    Because, you know, the OEM business was about driving and

6    delivering a very high gross margin for the business.  It was

7    also what was going to scale the business.

8         You know, Mike Lynch described it as the piña colada sales

9    model where his sales guys could sit on the beach drinking

10   piña coladas and you had the rest of the industry selling

11   software on your behalf, so OEM was a critical component to the

12   growth story of Autonomy.

13   **Q.**    You also spoke to Rob Webb about your concern that merger

14   and acquisitions were being used to accelerate the organic

15   growth rate; is that fair?

16   **A.**    Correct, yes.

17   **Q.**    What is the organic growth rate?

18   **A.**    So the organic growth rate is the underlying growth a

19   business generates based on its own products.

20        When an acquisition is acquired, analysts will strip out

21   the contribution from the acquisition so you still understand

22   what the underlying growth is because that's -- that's what

23   drives ultimately cash and that's ultimately what drives the

24   performance of the business.

25        What Autonomy --

1          **MS. LITTLE:**  Your Honor, I'm going to object.  He can

2   talk about what he told Mr. Webb, but he can't go on an

3   exposition about everything else.

4          **THE COURT:**  Overruled.  I think he can say what

5   motivated him to say the things that he said.  I think that's

6   appropriate.

7          **MR. LEACH:**  Thank you, Your Honor.

8          **THE WITNESS:**  So the organic growth rate is always a

9   number that every analyst is trying to get to.  And, you know,

10  one of the -- one of the two things that I saw at Autonomy,

11  one, was there was a desire to integrate IDOL as quickly as

12  possible into -- into the acquired business, so, for instance,

13  within the Interwoven portfolio, the content management

14  solution, IDOL was integrated or needed to be integrated within

15  90 days.

16      And the reason that speed of integration was required was

17  so that when new sales were done of the Interwoven product, the

18  argument could be made to the auditors that this was because of

19  IDOL.  So it wasn't acquired growth.  It was organic growth.

20  The fact that it was the Interwoven product that was being

21  sold, the reason that deal was there was because of IDOL.

22      So, you know, that was then effectively distorting what

23  was acquired growth versus what was organic growth, in my mind.

24  **BY MR. LEACH:**

25  **Q.**   You also described to Mr. Webb the hardware contract that

GEALL - REDIRECT / LEACH

1  you had potentially learned about in the third quarter of 2009?

2  **A.**    Correct, yeah.

3  **Q.**    What concerns were you expressing to him there?

4  **A.**    I mean, again, you know, Autonomy was a pure software

5  business model, you know, 90 percent based on software product,

6  10 percent on services.

7       Up until, you know, very late in 2010 and 2011, early

8  2011, hardware had never even been a consideration.  And when

9  it was, it was always a very small contribution of hardware

10  relating to this IDOL SPE Quick Start program.

11       So, you know, having what looked like a contract that was

12  potentially, you know, loss-making for Autonomy and that wasn't

13  coming up in the P&L, as far as I could see, was -- was a

14  concern and worthy of follow-up by Rob Webb.

15  **Q.**    Why did you choose to go to Rob Webb?

16  **A.**    Rob Webb was the independent chairman.  Mike Lynch had

17  brought him onto the board to demonstrate a strong degree of

18  corporate governance for Autonomy, which had been a concern

19  that many investors had raised in the past.  They felt that the

20  board was not independent.  Sushovan and Mike Lynch were, you

21  know, long-time friends.

22       Rob Webb was brought in to basically ensure that corporate

23  governance.  And, you know, Rob, over the time, as I mentioned

24  before -- you know, I had met up on a number of occasions, and,

25  you know, he'd always said, "If there is anything you want to

1    discuss, discuss with me."

2        So from my perspective, he had the right role on the board

3    and he'd also made that offer to me to discuss whatever was

4    relevant.

5    **Q.**   Why did you not go to Mike Lynch?

6    **A.**   Mike Lynch would have just laughed at me.  Right?  So

7    there was, you know -- to go to Mike and say, "Look, Mike, I

8    think all these things are a concern" -- you know, a lot of

9    answers that he had given me up until that point were, you

10   know -- were part of that.  I saw no reason why he would say

11   something different now.

12   **Q.**   Was Autonomy the type of culture where you would question

13   Mike Lynch?

14   **A.**   No.  Never.

15   **Q.**   Explain that.

16   **A.**   Mike is a, you know -- probably one of the most

17   intelligent people I've ever met.  It is almost impossible to

18   have a structured argument with him because he's always five

19   moves ahead of you in terms of how -- in terms of his thought

20   process.  People just didn't question him.  I don't know of

21   anyone who really questioned him, including other board

22   members.

23   **Q.**   Why did you not go to Sushovan Hussain?

24   **A.**   For the same reason.  You know, I'd have discussions with

25   Sushovan.  A lot of the answers that were causing me concerns

GEALL - REDIRECT / LEACH

1    were from Sushovan.  I saw no reason why he would give me a

2    different answer.

3    **Q.**    If we could please go to Exhibit -- as I'm looking for the

4    exhibit, Mr. Geall, do you recall questioning on

5    cross-examination relating to SOP 97-2?

6    **A.**    I do, yes.

7    **Q.**    What is that?

8    **A.**    SOP 97-2 is the U.S. GAAP accounting standard for

9    recognition of software.  Software recognition.

10   **Q.**    And I think you said previously it's the gold standard for

11   software accounting; is that correct?

12   **A.**    Correct, yeah.

13   **Q.**    Did you hear Sushovan Hussain say on more than one

14   occasion that Autonomy followed SOP 97-2?

15   **A.**    No.

16   **Q.**    Did you hear him refer to this gold standard that Autonomy

17   looked to?

18   **A.**    Yes, indeed.

19   **Q.**    Explain that.

20   **A.**    So although, as has been pointed out, Autonomy published

21   it's reporting accounts under IFRS, discussions with the

22   financial community, mostly by Mike Lynch, was that, you know,

23   effectively Autonomy adhered to SOP 97-2, so it wasn't formally

24   signed off, but it adhered to those principles, the rationale

25   being that Mike wanted to ensure that financial -- financial

GEALL - REDIRECT / LEACH

1    companies or investors, you know, treated it in the same way

2    that they did other U.S. companies that followed 97-2.

3    **Q.**    And why was it important to be perceived that way?

4    **A.**    Mike Lynch always positioned Autonomy as a super

5    high-quality business, and so 97-2 was a backing of that.

6    **Q.**    You were questioned on cross-examination about

7    Mr. Hussain's involvement in sales.  Do you recall that

8    testimony?

9    **A.**    I do, yes.

10    **Q.**    And did you perceive him to be essentially leading the

11    sales effort on behalf of Autonomy?

12    **A.**    I did, yes.

13    **Q.**    Why?  What did you observe?

14    **A.**    I mean, I think there's a difference between being on top

15    of the numbers and being involved in a significant number of

16    the deals personally, and my experience was that Sushovan was

17    in constant contact, daily contact, probably, with Mike Mooney.

18        He used to comment on the fact that he used to go home

19    after work, go on the treadmill, and have a daily call with

20    Mike to discuss deals and opportunities that were there, so,

21    you know, that was, in my mind, more than the insights a CFO

22    would look for.

23    **Q.**    Did you also observe him leading the SMS calls?

24    **A.**    He did lead some of the SMS calls.

25    **Q.**    What are the SMS calls?

GEALL - REDIRECT / LEACH

1   **A.**   These were the internal sales calls with the account

2   executives at SAP -- at Autonomy, sorry.

3   **Q.**   Now, I want to understand your employment chronology.

4        You start off as an analyst at Citigroup.  You go to

5   Autonomy.  Then you go to Deutsche Bank at some point in 2010?

6   Do I have that right?

7   **A.**   Correct.  Yeah.

8   **Q.**   What do you do after going to Deutsche Bank?

9   **A.**   I went to SAP.

10  **Q.**   SAP.  When you went to join Deutsche Bank, did you -- were

11  there issues related to the fact that you had been an employee

12  at Autonomy and were now going to be covering Autonomy?

13  **A.**   There weren't issues.  There were concerns that I raised

14  with the compliance team.  My initial feeling would have been

15  that the compliance team would have liked there to have been a

16  certain period of time before I published on Autonomy if I was

17  to take back coverage, and, you know, we went through at least

18  one set of results because we felt that that was -- that was

19  appropriate.

20       But ultimately, they were -- they were happy with me

21  following Autonomy.  It was an important stock in the UK market

22  and it would have been difficult to not follow Autonomy.

23  **Q.**   Did you feel free to disclose information you had learned

24  while you were at Autonomy as part of your Deutsche Bank

25  reports?

GEALL - RECROSS / LITTLE

1    **A.**   No.

2    **Q.**   Why was that?

3    **A.**   You're always having to make a judgment call between what

4    is publicly-available information that you're getting either

5    from financial statements or from discussions with management

6    as an analyst versus, you know, what you may know as having

7    been part of a management team.

8        So this is why the compliance team wanted to make sure

9    that we put some time between me formally taking coverage so

10   that that wasn't a risk.

11           **MR. LEACH:**   Thank you, Mr. Geall.

12       Thank you, Your Honor.   I have nothing further.

13           **MS. LITTLE:**   One question.

14                    **RECROSS-EXAMINATION**

15   **BY MS. LITTLE:**

16   **Q.**   Mr. Geall, did you ever tell the compliance team at

17   Deutsche Bank that you had all these concerns and information

18   that you were going to withhold as you wrote your reports?

19   **A.**   I don't remember.

20   **Q.**   You don't remember?

21   **A.**   No.

22           **MS. LITTLE:**   Thank you.

23           **THE COURT:**   Okay.   You're excused.   Thank you very

24   much.

25       Can I see the parties at sidebar?

1          And, ladies and gentlemen, you can stand up, stretch,

2     talk, whatever.

3          (The following proceedings were heard at the sidebar:)

4          **THE COURT:**  So do you want to state your concerns?  I

5     assume we are talking about the next witness?

6          **MR. KEKER:**  No.

7          **THE COURT:**  Oh, we're not.  We will deal with it

8     later.

9          **MR. KEKER:**  Third witness.

10     (Sidebar conference ended and proceedings held in open court)

11          **MR. FRENTZEN:**  Your Honor, the Government calls Jane

12     Snider.

13          **THE CLERK:**  Please raise your right hand.

14                        **<u>JANE SNIDER</u>**,

15     called as a witness for the Government, having been duly sworn,

16     testified as follows:

17          **THE CLERK:**  Thank you.  Please be seated.

18          Please state your full name for the record and spell your

19     last name.

20          **THE WITNESS:**  Okay.  My name is Jane Elizabeth

21     Cavanaugh Snider, and my last name is S-N-I-D-E-R.

22          **THE CLERK:**  Can you spell your middle name.

23          **THE WITNESS:**  My full middle name is Elizabeth

24     Cavanaugh, E-L-I-Z-A-B-E-T-H C-A-V-A-N-A-U-G-H.  No hyphens.

25          **MR. FRENTZEN:**  May I proceed, Your Honor?

1      **THE COURT:**  Sure.

2                    **DIRECT EXAMINATION**

3  **BY MR. FRENTZEN:**

4  **Q.**   Good morning, Ms. Snider.

5  **A.**   Good morning.

6  **Q.**   Where do you live?

7  **A.**   Minneapolis, Minnesota.  Wayzata, actually.

8  **Q.**   What's that?  I'm sorry.

9  **A.**   Wayzata, Minnesota.  It's a suburb of Minneapolis.

10 **Q.**   Can you do us a favor of spelling that?

11 **A.**   W-A-Y-Z-A-T-A.

12 **Q.**   And what do you currently do for a living?

13 **A.**   I'm a senior consultant with Deloitte Consulting in the

14 technology, strategy and transformation practice.

15 **Q.**   And the jury has heard some stuff about Deloitte.  Are you

16 an accountant?

17 **A.**   I am not.

18 **Q.**   Do you perform any type of auditing or audit functions at

19 Deloitte?

20 **A.**   I do not.  I sit within the consulting group.

21 **Q.**   Could you just give us some idea of what that consulting

22 group does.

23 **A.**   My -- my group within consulting is responsible for

24 helping companies make software better, faster, and cheaper.

25 **Q.**   Okay.  How long have you been at Deloitte?

SNIDER - DIRECT / FRENTZEN

1    A.    It will be two years in May.

2    Q.    I'd like to take you back, if I could.  Could you tell us

3    a little bit about your education, please.

4    A.    Sure.

5        I graduated from the University of Minnesota in the mid

6    '90s with a degree in political science.

7    Q.    What type of work did you pursue after graduating college?

8    A.    I was a paralegal.

9    Q.    For about how long?

10   A.    Roughly ten or eleven years.

11   Q.    What law firm?

12   A.    Two different law firms.  Dorsey & Whitney and then and

13   Plant Mooty and then back to Dorsey & Whitney.

14   Q.    At some point in time, did you go to work for a company

15   called Stratify?

16   A.    I did.

17   Q.    When was that?

18   A.    2007, early 2007.

19   Q.    What was Stratify?

20   A.    Stratify was an eDiscovery software as a service company.

21   Q.    All right.  Can you describe for us what that means,

22   what's software as a service?

23   A.    Sure.  It's a web-based application, similar to Google or

24   Facebook where you log on through your computer to review

25   documents.

SNIDER - DIRECT / FRENTZEN

1    Specifically eDiscovery is for lawyers and investigators

2    to review documents pursuant to some piece of litigation or

3    investigation.

4    **Q.**    And in terms of working at Stratify, what was your job?

5    **A.**    I was a sales executive.

6    **Q.**    A what?

7    **A.**    A sales executive.

8    **Q.**    What were you responsible for as a sales executive?

9    **A.**    Business development and delivering sales.

10    **Q.**    How do you deliver sales?

11    **A.**    You prospect new clients, you build relationships,

12    long-term client relationships, and serve those relationships

13    by selling software to them.

14    **Q.**    And at Stratify, when you say "selling software to them,"

15    was this selling software in the sense of "here is some

16    software, you're buying it from us, we're giving it to you, see

17    you later"?  Or was it more in the vein of what you were

18    talking about before, software as a service?

19    **A.**    No.  It was entirely software as a service.  So they

20    worked with -- for a particular investigation or lawsuit that a

21    client would have, there would be a set of documents that need

22    to be reviewed.

23    We would take those documents and process them into the

24    system using duplication methods, perhaps keyword search terms

25    that had been negotiated and filtered, removing white space,

SNIDER - DIRECT / FRENTZEN

1  and things of that nature to define a document set that would

2  be hosted on Stratify's servers and then reviewed in a

3  web-based interface where the reviewers, either the lawyers or

4  investigators, would log in and review those documents online.

5  **Q.**   So if you at Stratify -- if you sold to a customer, they

6  would get this web-based access, but the data was hosted by

7  Stratify?

8  **A.**   That's correct.  They would receive a user ID and

9  credentials and they would log in to the servers.  Stratify did

10  all of the data management and data handling, and they would --

11  the client would work hand and hand with the Stratify project

12  manager.

13  **Q.**   While you were at Stratify, did you have a customer that

14  was Abbott Labs?

15  **A.**   I did.

16  **Q.**   What is Abbott Labs?

17  **A.**   They are a pharmaceutical company.  They make things like

18  Similac and HUMIRA and Depakote, different drugs and products

19  for the end consumers.

20  **Q.**   Was Abbott Labs one of your customers?

21  **A.**   Yes.

22  **Q.**   Starting when?

23  **A.**   The time I joined Stratify, they became my -- my customer.

24  They had signed their initial contract with Stratify in the

25  months preceding my joining.

SNIDER - DIRECT / FRENTZEN

1  Q.   So when you came into Stratify, did you inherit Abbott as

2  a customer, basically?

3  A.   I did.

4  Q.   Do you know where Abbott is based?

5  A.   They are based in Abbott Park, Illinois.  Waukegan,

6  Illinois, just north of Chicago.

7  Q.   Can you describe for us in terms of Abbott Labs'

8  relationship with Stratify, how did they -- what was the --

9  what was the engagement in terms of how they would pay or how

10 they agreed to pay Stratify, if that makes sense?

11 A.   Sure.

12      About six months before I joined Stratify, a Master

13 Professional Services Agreement, an MPSA, was entered into

14 between Stratify and Abbott.  That agreement was, you know,

15 dictated the governing terms of the relationship and set forth

16 a pricing structure that then would be used, tied to a

17 statement of work for each individual database.  So each

18 lawsuit or investigation would have its individual database.

19      Those pricing terms would time to time be negotiated given

20 volumes and things like that.  But it was based on an MPSA with

21 statements of work tied to each.

22 Q.   With the MPSA and the statements of work, was this a "pay

23 us up front" model or was it a "pay as you go and as you need

24 us" type of model?

25 A.   No.  It was always a pay on services rendered.

1   Q.   So what does that mean?

2   A.   So each month, Abbott would receive an invoice for the

3   work that had been done in the previous month.  So the number

4   of -- the gigabytes of data hosted, number of documents

5   produced, the actual hosting fee, any professional services

6   that went along with that, they would be billed for the month

7   before.

8   Q.   As your work at Stratify continued, from time to time was

9   there reason to update the MPSA with Abbott?

10  A.   Yes.  For several reasons.

11       Number one, the agreement had a two-year term, so every

12  two years, it would be renegotiated for -- globally.

13       But also the market was under a lot of compression at that

14  time.  EDiscovery were becoming commoditized and so actual data

15  processing fees were coming down.

16       So to keep up with market rates and to do the right thing

17  to Abbott as my customer, we would renegotiate that pricing

18  from time to time.

19       And also if a particular matter was exceptionally large,

20  volume discounts would come into play.

21  Q.   Okay.  And what sorts of things might trigger that sort of

22  a large volume?

23  A.   Would you say that again?

24  Q.   Yeah.  What sort of events are we talking about that might

25  trigger the need for Abbott to have a large volume and thus

1   renegotiate, potentially?

2   **A.**    There could have been a particular case that was requiring

3   a lot of custodial or individual data to be reviewed.  So that

4   might -- or there could be a very large intellectual property

5   case that came up.  Those are two examples of things that did

6   happen.

7   **Q.**    So Abbott's needs relied on the extent to which Abbott was

8   involved in litigation?

9   **A.**    Yes.  Litigation or some sort of investigation.

10   **Q.**    All right.

11        At some point in time after you started at Stratify, was

12   Stratify acquired by another business?

13   **A.**    Yes.  Perhaps around two, two and a half years after I

14   joined Stratify, Stratify was acquired by Iron Mountain and

15   then subsequently by Iron Mountain Digital -- moved into Iron

16   Mountain Digital.

17   **Q.**    What was Iron Mountain Digital?

18   **A.**    Well, Iron Mountain, as probably many people know, they

19   are a document retention system and destruction company.  They

20   had digital assets which they moved into sort of a subdivision

21   of that company called Iron Mountain digital.

22   **Q.**    When Stratify was acquired by Iron Mountain Digital, for

23   you as a sales executive, did things change materially in terms

24   of your day-to-day?

25   **A.**    No, not -- not really at all.  We were kept separate.

SNIDER - DIRECT / FRENTZEN

1   Q.   Did things change in terms of your relationship with
2   Abbott Labs as a customer?
3   A.   No.
4   Q.   I'd like to now, if I could, direct your attention to --
5   actually, before I do that, let me show you a document that's
6   been marked as Government's 1655.  Take a look at 1655, please.
7              MR. DOOLEY:  We have no objection, Your Honor.
8              THE COURT:  Admitted.
9        (Trial Exhibit 1655 received in evidence)
10  BY MR. FRENTZEN:
11  Q.   Ms. Snider, we've got -- do you see the screen there in
12  front of you?  Can you read that?
13       Do you see where -- or see the heading on this email?  Can
14  you place this -- tell us what date this is, please?
15  A.   March 28, 2011.
16  Q.   It's from you?
17  A.   It's from me.
18  Q.   To who?
19  A.   Terri Martorana.
20  Q.   Who is Terri Martorana?
21  A.   Terri was the vendor relations manager for Abbott Labs.
22  Q.   And this particular document, does it -- I mean, this
23  email, did it attach certain documents for Terri?
24  A.   Yes.  This email was me sending her a copy of the most
25  recent event -- amendment to the master professional services

1    agreement, along with the pricing model that was in place at

2    that time and the template work order or statement of work form

3    that had -- that we were using at that time.

4         **MR. FRENTZEN:**  And if we could, please, Ms. Margen,

5    could we go to page 5 of this document.and can we just scroll a

6    little bit up.  Great.

7    **Q.**  Ms. Snider, is this sort of an example of how Abbott liked

8    to engage with Stratify and then Iron Mountain Digital in terms

9    of how they handled the work done and how they paid for it?

10   **A.**  Yes.  Absolutely.  This -- this pricing schedule lays out

11   all the possible areas that we would engage with them on a

12   particular matter, and those -- from this pricing schedule,

13   those would be captured in a statement of work.

14        But as I said earlier, this just outlies -- lays out, you

15   know, the fees around the possible things that would be charged

16   in a given month on a given invoice.

17   **Q.**  Okay.  And are these -- in other words, sort of for lack

18   of a better phrase, à la carte?

19   **A.**  This is an à la carte price list, cafeteria plan pricing.

20   **Q.**  So the payment month to month depends on what it is that,

21   at this time, Iron Mountain Digital does for Abbott?

22   **A.**  That's correct.

23   **Q.**  And does this remind you that in March of 2011, you were

24   having conversations with Abbott Labs about the MPSA and sort

25   of negotiating future terms?

1    A.    We would have -- we were renegotiating or beginning the

2    renegotiation process.  Going through procurement and legal

3    takes time, so we typically started those processes six months

4    or so in advance of them coming due.  So this would have been

5    the sort of initial conversation.

6    Q.    Shortly after late March of 2011 -- I'd like to direct

7    your attention to May of 2011.  Was Iron Mountain Digital

8    acquired by another company?

9    A.    I can't confirm the exact month, but somewhere around that

10   time frame, we were acquired -- it was announced that we were

11   being acquired by Autonomy.

12   Q.    And so in 2011, did Autonomy acquire --

13   A.    Yes.

14   Q.    -- iron Mountain Digital?

15   A.    Yes.

16        MR. FRENTZEN:  Your Honor, I don't know if there will

17   be an objection or not.  I will represent it was in May of

18   2011.

19        MR. DOOLEY:  No objection.

20   BY MR. FRENTZEN:

21   Q.    Can you tell us after Autonomy --

22        THE COURT:  Maybe we should take a recess now.

23        Ladies and gentlemen of the jury, we will be in recess

24   until 10:20.  Remember the admonitions given to you.  Don't

25   discuss the case, allow anyone to discuss it with you, form or

1    express any opinion.

2         (Proceedings were heard out of presence of the jury:)

3         **THE COURT:**  Let the record reflect the jurors have

4    retired.

5         So what is the issue about the witness after -- you can

6    step down, Ms. Snider.

7         **MR. KEKER:**  Your Honor, the -- it's not the next

8    witness.  Ms. Snider, and then Mr. Blanchflower and then either

9    Mr. Truitt or Cronin.

10        The order had been the next witness was Cronin.  The two

11   witnesses after that is David Truitt, who is a big witness.

12        At 8:45 last night, I get this notice from Mr. Reeves that

13   they are flipping the order.  They working on Cronin.  This is

14   huge number of documents, as you know, with all of these

15   witnesses, and then he tells me he is moving up Truitt and

16   postponing Cronin to where Truitt was going to be.

17        I objected last night and said, "If you don't put it back

18   I'm going to raise it with the Court."  This isn't the way this

19   trial ought to run.  Everybody is working hard, doing our best,

20   but --

21        **THE COURT:**  Okay.  All that's true.  Go ahead.

22        **MR. REEVES:**  The Government gave the defense notice --

23        **THE COURT:**  What happened?  I mean, the problem is --

24   okay.  I should let you finish because I don't know -- give me

25   times.  Tell me what happened.  Okay.

1          **MR. REEVES:**  The Government gave notice to the defense

2     that we would be calling Mr. Truitt two weeks ago, and we gave

3     the list of the exhibits we would be using with him two weeks

4     ago.

5          Mr. Truitt traveled to California last week.  Because of

6     the schedule and the way things happened, he had to go home to

7     the East Coast or to Chicago.  He certainly traveled out of the

8     district.

9          He has now come back, and I think at the rate we're going,

10    he will be the -- not the next witness, but the witness

11    thereafter.  I don't think the direct for Mr. Truitt will end

12    today.

13         And so I think on this record, it's difficult for me to

14    see what real prejudice there is in proceeding in this manner,

15    which is an accommodation to his travel when we are juggling

16    multiple people's schedules and trying to get him done by

17    tomorrow so he doesn't have to travel out here a third time.  I

18    think that's reasonable, Your Honor.

19         **MR. KEKER:**  And my question is did they just figure

20    out that Mr. Truitt was going to travel at 8:45 last night.

21    This sounds like something they could have told me a week ago.

22         **MR. REEVES:**  I was preparing a witness until 8:45 last

23    night.  So let me figure out when we learned that.

24         **MR. KEKER:**  And we got a new 302 this morning for

25    Mr. Truitt.

PROCEEDINGS

1        THE COURT:  Well, I don't know -- my way of looking, I

2   mean, there are a number of factors, but I think we have to

3   really try to accommodate witnesses' travel schedules, and that

4   means to some extent inconveniencing the counsel.

5        I appreciate what you were doing.  I am concerned that we

6   don't require him to go out a third time.  Can we call him like

7   the next witness?  How long is this witness going to be?

8        MR. FRENTZEN:  Not long.

9        THE COURT:  That is my sense.  Maybe you don't want

10  that.

11       MR. KEKER:  I don't want that.  I want to examine

12  Mr. Cronin.

13       THE COURT:  How long will Mr. Truitt be?

14       MR. REEVES:  I think he will be one to two hours on

15  the direct.  I'm thinking one to two hours on the cross.  Very

16  broad numbers.

17       The goal, just as the Court has identified, is to get him

18  done by Thursday so he does haven't to come out here again.

19  And I am concerned that if we put in some of the other

20  witnesses whose schedule is more flexible, that is precisely

21  what will happen.

22       This is not unreasonable.  We are all working hard --

23       THE COURT:  Nobody has to keep saying that.  I know

24  you're all working hard.

25       MR. FRENTZEN:  Your Honor, may I just say briefly,

1   I've never seen -- I've seen, okay, here are witnesses for the

2   days that are coming up, but, you know, we see what happens on

3   the fly and can we pack this witness in and get this witness

4   out.  The order, exact order, I've never been required to do.

5   We've been giving them --

6           THE COURT:  And I'm not requiring.

7           MR. FRENTZEN:  -- the notice that we were required to

8   give them, and things change on us at the last minute.

9           MR. KEKER:  If Mr. Frentzen is breaking the deal that

10  was made really clearly, let him tell us now.  We had a deal,

11  and the deal was three days' notice and you give order and so

12  on.  We had a deal.  If they're breaking it, I would like to

13  know right now.

14          MR. FRENTZEN:  Three days' notice, good faith, right,

15  and order, always subject to change based on folks -- how long

16  the cross goes, how long the direct goes.

17          THE COURT:  I would like the record to reflect that it

18  only took about nine days before the two of you would start

19  arguing about all of this.  Anyway --

20          MR. KEKER:  I consider myself very restrained.

21          THE COURT:  You have shown -- both sides have shown

22  great restraint.  Not only are you working hard, you are

23  showing great restraint.

24          MR. KEKER:  But the --

25          THE COURT:  Anyway, Mr. Keker, I'm going to allow it

```
 1   in, not because of anything other than the fact that I sit up
 2   here as the person who tries to get witnesses least
 3   inconvenienced.  I think that is important, provided that the
 4   parties can prepare.
 5       So if you were standing in front of me and saying, "Look,
 6   we didn't know this guy was coming" or "we didn't think he was
 7   coming this week," that might be a different story.  I want you
 8   to be prepared, but I'm going to be flexible.
 9       Anyway, this is now cutting into my valuable recess time.
10   Thank you.
11                   (Recess taken at 10:11 a.m.)
12                (Proceedings resumed at 10:25 a.m.)
13       (Proceedings were heard in the presence of the jury:)
14       THE COURT:  Okay.  Please be seated.
15       Let the record reflect all jurors are present, the parties
16   are present.
17       You may proceed.
18       MR. FRENTZEN:  Thank you, Your Honor.
19   Q.  Ms. Snider, after Autonomy acquired Iron Mountain Digital,
20   can you tell us whether or not things changed in terms of your
21   business at Iron Mountain, now Autonomy?
22   A.  My role functionally stayed the same.  I was a sales
23   executive in the eDiscovery software as a service business
24   unit of now Autonomy responsible for sales business development
25   in the Midwest.
```

SNIDER - DIRECT / FRENTZEN

1    **Q.**    Okay.  And did the culture change, to your observation,

2    after Autonomy acquired Iron Mountain Digital?

3    **A.**    It did, yes.

4        **MR. DOOLEY:**  Objection.  Vague.  Culture.

5        **THE COURT:**  Sustained.

6        **MR. FRENTZEN:**  I'd like to get into that.  Sorry,

7    Your Honor.

8    **Q.**    Did your day-to-day life at work change after Autonomy

9    acquired Iron Mountain Digital?

10        **MR. DOOLEY:**  Objection to relevance, Your Honor.

11        **THE COURT:**  Overruled.

12        **THE WITNESS:**  Yes.

13    **BY MR. FRENTZEN:**

14    **Q.**    Can you tell us how?

15    **A.**    It became much more stressful.

16    **Q.**    In what way?

17    **A.**    The culture was not transparent.

18    **Q.**    What do you mean by that?

19    **A.**    The reasons for doing things, the processes, and things of

20    that nature, were opaque to me.

21    **Q.**    Are you familiar with something called an SMS call?

22    **A.**    Yes.  I believe it stands for sales management system

23    call.

24    **Q.**    Was that new for you after Autonomy acquired Iron Mountain

25    Digital?

**SNIDER - DIRECT / FRENTZEN**

1    **A.**   The sales management call -- the SMS call, yes, was new.

2    **Q.**   Can you describe those for us, please?  First of all, what

3    were they?

4    **A.**   They were effectively pipeline calls.  That is, you would

5    have to review the deals in -- your top number of deals that

6    were scheduled to close within a period of time.

7    **Q.**   Can you tell us how those calls took place?

8    **A.**   Yes.  About a day before the call, you'd receive an e-mail

9    that said, you know, "Be available in this window," it was

10   usually a two- to three-hour window, "the next day."  So "Be

11   available from 7:00 to 9:00 a.m. tomorrow morning, and here's

12   the dial-in number."

13        You would dial into a number, a web -- like a Skype or

14   something like that, a WebEx-type of environment, and you'd sit

15   in a virtual waiting room until your name was called.  They

16   would say, "Jane Snider, you're on deck.  Bill Smith, you know,

17   make-up person, you're up next."

18        And then they would let you into the room, to the virtual

19   room, where there would be a number of people on the other side

20   of the line that did not identify themselves asking questions

21   about the deals you had.

22   **Q.**   Can you describe the tone of the calls?

23   **A.**   Aggressive, stressful.  It was a very high-pressure, very

24   high-stress environment where they would drill down and pick

25   apart your deals.  There were a lot of stories running around

SNIDER - DIRECT / FRENTZEN

1   at that time about the nature of those calls.

2           **MR. DOOLEY:**  Objection, Your Honor.  Speculation.

3   Stories.

4           **THE COURT:**  Sustained.

5   **BY MR. FRENTZEN:**

6   **Q.**   Ms. Snider, after Autonomy acquired Iron Mountain Digital,

7   did you know people who were laid off or fired?

8   **A.**   Yes.

9   **Q.**   And in terms of your dealing with these sales calls, was

10  there something about that that intensified your stress during

11  the sales calls?

12          **MR. DOOLEY:**  Objection to leading, Your Honor.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  Yes.  Pardon me.  Yes.  Those calls were

15  something I'd never seen or heard of before.  Certainly

16  pipeline calls are standard as a salesperson to be able to

17  report on your deals, but they were conversations.  They were

18  about, you know, how you were looking to close, what resources

19  you needed, what support you needed.

20          These calls, the SMS calls, were an interrogation of, you

21  know, who you were speaking with, what you were doing, how you

22  were going to be doing it, what the close plan was, and what --

23  why wasn't it done yesterday.

24  **BY MR. FRENTZEN:**

25  **Q.**   Did you feel comfortable pushing back in these SMS calls?

SNIDER - DIRECT / FRENTZEN

1   **A.**   No.

2   **Q.**   Why not?

3   **A.**   Firstly, I didn't know who was on the calls.

4   **Q.**   Can you --

5   **A.**   It could have been 5 people or 15.  I don't know.

6   **Q.**   Can you describe that for us?  I mean, in other words, was

7   there an introduction at the beginning of the call as to who

8   was on the call?

9   **A.**   No.

10  **Q.**   Are you aware of some of the people that were on the SMS

11  calls that you were on?

12  **A.**   Dave Wilner, who was my boss' boss, so my regional

13  managers -- the SVP of sales, the senior vice president of

14  sales, was on those calls, and he would guide some of the --

15  ask some of the initial questions.

16      I became familiar with some of the other voices, but I

17  never knew exactly who was on the calls.

18  **Q.**   Did you come to recognize any of the voices from the SMS

19  calls subsequently to realize who had -- who some of the people

20  had been on those calls?

21  **A.**   Over time, yes; but, recall, I was new to the organization

22  and I had not met most of these persons -- most of these

23  individuals in person.

24  **Q.**   As you continued to meet people in person or hear them

25  otherwise, did you figure out who some of the folks were on the

SNIDER - DIRECT / FRENTZEN

1    calls?

2    **A.**    Yes.

3    **Q.**    Who did you come to figure out were on these calls?

4    **A.**    There was always someone from Sales Operations on the

5    call, a woman.  I don't know the name.  I can't recall the

6    name.  Mike Sullivan, who was I believe the general manager at

7    the time, was on the calls.  I recognized his voice after I met

8    him.  I can't recall for sure.

9    **Q.**    Anyone else that you can recall?

10    **A.**    Not for sure.

11    **Q.**    Did you, in hearing these voices, hear any accents?

12    **A.**    Many.

13    **Q.**    Can you describe some of the accents that you heard on

14    these calls?

15    **A.**    An East Coast accent certainly, several British accents.

16    **Q.**    All right.  After Autonomy acquired Iron Mountain Digital,

17    was there any pressure applied to change, let's say, the nature

18    of sales from software as a service?

19    **A.**    Yes.  We were told there are now a lot of new mechanisms

20    to sell software as a service.

21            **MR. DOOLEY:**  Objection to foundation.  Who was telling

22    the witness this?

23            **THE COURT:**  Sustained.

24    **BY MR. FRENTZEN:**

25    **Q.**    How did you get the information that you received about

SNIDER - DIRECT / FRENTZEN

1    changing sort of the sales methodology?

2    **A.**    Through my immediate sales leadership, Dave Wilner.

3    **Q.**    And what, if anything, did Mr. Wilner tell you about how

4    sales were going to change in this new company?

5    **A.**    We were now able to sell as a license and capture revenue

6    upfront.

7    **Q.**    What does that mean?

8    **A.**    Well, as I previously said, we were a "software as a

9    service" organization that billed on invoice, so took

10   revenue -- recognized revenue on collection of the invoice.

11   Now I had understood it that Autonomy was able to sell licenses

12   of software, and I had understood that that just meant you look

13   at whatever the quarterly or annual dollar figure would have

14   been based on the statement of work, and they captured that

15   revenue somehow; but I just understood it to just be a

16   different terminology.

17   **Q.**    All right.  But was there -- in addition to terminology,

18   were you asked by anyone to change, for example, the nature of

19   the contract that you had -- or the MPSA with Abbott Labs?

20   **A.**    Yes.  We were asked -- told to -- that all contracts would

21   need to be rewritten on Autonomy paper.

22          **MR. DOOLEY:**  Your Honor, same objection.  Who is

23   asking these questions?

24   **BY MR. FRENTZEN:**

25   **Q.**    Was this Mr. Wilner?

1        THE COURT:  Go ahead.  You're laying a foundation.

2        THE WITNESS:  Was this Mr. Wilner who was --

3   BY MR. FRENTZEN:

4   Q.   Who asked you or who told you that --

5   A.   Mr. Wilner.

6   Q.   Okay.  Go ahead.  What did he tell you about the way in

7   which the nature of your contracts needed to change?

8   A.   Just that they needed to be -- excuse me, pardon me -- on

9   Autonomy paper at this time and that there were more available

10  vehicles to sell contracting terms.  So in sort of just

11  software as a service, we would now be able to sell it as a

12  license.

13  Q.   Did Mr. Wilner say anything to you about -- was this just

14  sort of a different option, or were you told to try to do

15  things in a certain way?

16  A.   It was an option and it was suggested that that was the

17  favorable option.

18  Q.   That what was the favorable option?

19  A.   To sell as a license.

20  Q.   Did you, after getting those directions, try to make that

21  happen with Abbott Labs, for example?

22  A.   There were a number of things going on at Abbott Labs at

23  that time, so it became one of the options that we offered to

24  them as we were renegotiating the MPSA; and there was a

25  particular statement of work that was coming into question

1   about a particular piece of litigation that was coming up, so

2   we were -- we were able to offer different pricing structures

3   that they might consider.

4   **Q.**   All right.  And what was the litigation that was coming up

5   for Abbott?

6   **A.**   There was a large sales subpoena -- we call it -- we refer

7   to it as a sales subpoena.  It was about -- I can't even say

8   what it was about, but they had put something like 800

9   custodians on legal hold and all of their custodial data, which

10  was something like 11- or 1200 custodians -- pardon me --

11  custodial data that would be needed to review.

12  **Q.**   What is that?  When you say they put custodians on legal

13  hold, what does that mean?

14  **A.**   The simplest way to describe that is if I am a custodian,

15  you are a custodian, each custodian has their own e-mail box

16  and an amount of server size, data size, available to store on

17  the system.  That data expanded to 76 terabytes of data to be

18  held and potentially reviewed in this sales subpoena, this DOJ

19  subpoena that was coming up.

20  **Q.**   Was Abbott Labs involved in some litigation as you

21  understood it or an investigation?

22  **A.**   There was an investigation by the Department of Justice

23  into some of Abbott Labs' sales practices; therefore, we

24  called -- we referred to this as the sales subpoena.

25  **Q.**   Okay.  And as a result of that, had Abbott Labs done

SNIDER - DIRECT / FRENTZEN

1  anything in terms of this legal hold for their employees?

2  **A.**   They had put these -- somewhere between 800 and 1100

3  custodians, the entire sales organization, on legal hold, which

4  means they had to preserve their data and not delete any

5  e-mails or delete any documents, or anything like that.

6  **Q.**   And that legal hold, in what way did that relate to at

7  this time Autonomy and what Autonomy might be doing for them?

8  **A.**   So at that time we -- we Stratify/Autonomy -- was hosting

9  approximately 25 to 35 terabytes of Abbott's data.  This

10 particular case was now contemplating an additional

11 76 terabytes of data to be hosted on our service.  So it was

12 extremely large and it was a very big case.

13 **Q.**   All right.  And were you asked to try to restructure the

14 relationship between Autonomy and Abbott Labs in terms of how

15 you guys might offer to do that size job for them?

16        **MR. DOOLEY:**  Same objection, Your Honor.  Foundation.

17        **THE COURT:**  Overruled.

18    Oh.  Do you mean in terms of foundation?

19        **MR. DOOLEY:**  Foundation.  Who's asking?

20        **MR. FRENTZEN:**  That's what I was going to get to after

21 I asked the first question, which is did that happen.

22        **THE COURT:**  Okay.  Go ahead.

23        **MR. FRENTZEN:**  Thanks.

24        **THE WITNESS:**  Yes.

25 \\\

1    **BY MR. FRENTZEN:**

2    **Q.**   And who talked to you about reframing the relationship

3    with Abbott Labs?

4    **A.**   When you say "reframing the relationship," could you say

5    more about what you mean?

6    **Q.**   I'm sorry.  Who asked you to do what you just said you

7    were asked to do?

8    **A.**   Abbott asked us to put together, you know, what's this

9    going to cost based on our current rates and the MPSA, so we

10   put together -- you know, we ran the numbers basically on what

11   that was going to cost.

12       In reviewing my pipeline with Dave Wilner, he said, "Okay.

13   We can now put together all these other options.  Let's put

14   together some other options," and so sales management

15   leadership was coming with different options to put together.

16   **Q.**   And when you say "other options," what types of options

17   are you talking about?

18   **A.**   Well, if you recall the price list that was up on the

19   screen earlier, options other than that.  So not standard price

20   list options, but licensed pay-upfront models, things of that

21   nature, pay upfront for a discount, things like that.

22   **Q.**   I'm going to show you what's been marked as Government's

23   1842.  Take a look at that, please, Ms. Snider, and see if you

24   recognize what that is.

25       **MR. DOOLEY:**  No objection to that, Your Honor.

1          **THE COURT:**  1842 admitted.

2       (Trial Exhibit 1842 received in evidence)

3          **MR. FRENTZEN:**  Show 1842, please.  And can you blow up

4    the top part?

5    **Q.**   Ms. Snider, do you see the date here on this document?

6    **A.**   June 13th, 2011.

7    **Q.**   This is from who?

8    **A.**   From me to Jason Fliegel and Constance Mockaitis.

9    **Q.**   Who are Jason Fliegel and Constance Mockaitis?

10   **A.**   Jason was -- I don't remember his exact title but he was

11   the lead attorney with Abbott Labs, and Connie was the records

12   and information manager and lead paralegal.

13   **Q.**   So in this document -- can we scroll up just a little

14   bit? -- what were you proposing to Abbott Labs in terms of

15   structuring this deal?

16   **A.**   So as I said earlier, based on the 76 terabytes of data

17   contemplated against the current pricing structure, it would

18   have been something like $25 million just to process and load

19   and host the data without even having attorneys' eyes on it.

20       So we looked at for a discount of roughly $10 million,

21   $15 million prepayment, we would do the following:  The data

22   handling, which is the unpacking, the filtering, all the things

23   that are referenced here; the storage, the user IDs to review

24   the documents, standard project management.

25   **Q.**   All the work?

SNIDER - DIRECT / FRENTZEN

1   **A.**   All the work.  That we would do the services that would be

2   required to host and manage this database.  So it goes back to

3   the "software as a service" notion.

4   **Q.**   All right.  And, again, this is an offer for them to pay

5   upfront how much?

6   **A.**   15 million prepayment.

7   **Q.**   And then at the bottom there's a note there.  What's that

8   a reference to?

9   **A.**   This is suggesting that they could break that 15 million

10  out over three quarters.

11  **Q.**   So three $5 million increments?

12  **A.**   That's right.

13  **Q.**   Did Abbott take this deal?

14  **A.**   No.  No.

15  **Q.**   Was there an issue in terms of -- did you have an

16  understanding in relation to this deal from Abbott that part of

17  their -- part of their reason for not wanting to pay upfront

18  was because they thought that the litigation or the

19  investigation might go away?

20  **A.**   Yes, certainly; but also just by matter of practice, their

21  accounting requirements, they could not take -- they could not

22  pay for any services not received.  So they were required to

23  pay an invoice on a monthly basis.  So this structure was not

24  in keeping with their accounting processes.

25  **Q.**   Did you know that at the time that you were proposing

1  these type of pay a big dollar figure upfront?

2  **A.**   Yes.

3  **Q.**   So why were you going through this exercise with them

4  anyway?

5  **A.**   Because it was an unusual circumstance to receive a

6  subpoena for 76 terabytes of data.  That's highly unusual.  And

7  so they were looking at, you know, other potential options.

8       They were negotiating -- then, secondly, they were

9  negotiating with the Government to potentially settle this case

10 or narrow the custodial field, and so they wanted to be able to

11 show this was extremely costly to do this this way, so let's

12 focus on a subset.

13 **Q.**   If they had -- for example, if they had settled with the

14 Government, would they need to still do this work?

15 **A.**   No.  If they were able to settle, they wouldn't need to do

16 any of this.

17 **Q.**   I'd like to show you now what's been marked as

18 Government's 1859.

19      Look at 1859, please, Ms. Snider.

20      **MR. DOOLEY:**  No objection, Your Honor.

21      **THE COURT:**  Admitted.

22      (Trial Exhibit 1859 received in evidence)

23      **MR. FRENTZEN:**  Can we -- yeah.  Great.  Thanks.

24 **Q.**   Ms. Snider, who is this from?

25 **A.**   This is from Dave Wilner, David Wilner.

1    Q.    And he was again who?

2    A.    He was my SVP, senior vice president of sales.  My boss'

3    boss.

4    Q.    What is the date on this?

5    A.    June 20th, 2011.

6    Q.    Who was this sent to?

7    A.    Mike Sullivan, Neil Araujo, and Sushovan Hussain, and I

8    was copied.

9    Q.    Right.  And what -- could you just -- if you can, can you

10    summarize this for us?  What was this communication about?

11    A.    Dave had had a call with Jason Fliegel -- there's his

12    title, Senior Counsel of Discovery and Records -- about this

13    case in particular and potentially different ways to structure

14    the pricing for it.

15    Q.    This is an update on the Abbott Labs negotiation?

16    A.    That's correct.

17    Q.    Could we just go down to this paragraph down below?

18          And in I guess the third sentence here, maybe the second

19    sentence, is there an indication here about closing this before

20    the month's end?

21    A.    Are you referring to the italics area?

22    Q.    Yeah, and then right after that.

23    A.    (Witness examines document.)  Yes.  Yes.  Yes.  This is

24    referring to asking Jason for some type of commitment to make

25    this deal happen.

1    Q.    This is in -- this is on June 20, 2011.  So is the end of

2    that month the end of a quarter?

3    A.    The fiscal year ended October 31st so, yes.

4    Q.    Did you -- after Autonomy came in and bought out

5    Iron Mountain, did you receive direction related to the end of

6    quarters?

7              MR. DOOLEY:  Same objection.  Foundation.

8              THE COURT:  Overruled.

9              THE WITNESS:  Yes.

10   BY MR. FRENTZEN:

11   Q.    From whom?

12   A.    Sales management.

13   Q.    Was this the same -- by the way, in all these

14   instructions, were these the same sales managers that you had

15   had when it was Iron Mountain Digital?

16   A.    Yes.  The unique piece on this particular project, this

17   Abbott Labs DOJ subpoena, sales subpoena, was that I was

18   interfacing or interacting with Dave Wilner directly, my senior

19   vice president, and not my regional manager, Shaun Murphy.

20   Dave had said he was going to take this one on.

21   Q.    Okay.  And in terms of this, you know, trying to get this

22   done by the end of the quarter, did Mr. Wilner attribute that

23   to anybody else above him?

24             MR. DOOLEY:  Objection.  Hearsay.

25             THE COURT:  Well --

1    **MR. FRENTZEN:**  Statement by an agent, Your Honor.

2    **THE COURT:**  Overruled.

3    **THE WITNESS:**  Could you repeat the question, please?

4    **BY MR. FRENTZEN:**

5    **Q.**   Yeah.  As Mr. Wilner was expressing to you the interest in

6    getting this done by the end of the quarter, did he attribute

7    that to anyone above him?

8    **A.**   It was, I guess, sales -- the sales leadership was asking

9    to -- you know, this was -- this was potentially a large

10   deal -- to get it done.

11   **Q.**   By when?

12   **A.**   End of the quarter.

13   **Q.**   Okay.  And if we could, can we -- oh, I'm sorry.

14   I'm going to show you what's been marked as Government's

15   18 -- I don't have 1861.

16   **MR. FRENTZEN:**  One moment, Your Honor.

17   (Pause in proceedings.)

18   **MR. FRENTZEN:**  Is there any objection to 1861?

19   **MR. DOOLEY:**  No, no objection.

20   **MR. FRENTZEN:**  Okay.  Put up 1861.  Thank you.

21   **THE COURT:**  1861 has already been admitted.

22   **MR. FRENTZEN:**  It was?  Did I put it in?

23   Ah.  Okay.  Thanks.

24   All right.  And if we could just blow up the top part

25   that's already in evidence.

1    **Q.**   I don't want to belabor the point but, Ms. Snider, can you

2    tell us in the top here, who's this e-mail from?

3    **A.**   From Mike Sullivan.

4    **Q.**   To who?

5    **A.**   Dave Wilner, Neil Araujo, and Sushovan Hussain.  I'm

6    copied again.  I'm copied.

7    **Q.**   All right.  And what is the information here in the text,

8    the very first, the top one?

9    **A.**   (reading)

10         "I would like to be involved in any future calls.

11   Thanks."

12   **Q.**   I'd now like to show you what's been marked as

13   Government's 1863.  If you would look at that.

14        **MR. DOOLEY:**  No objection, Your Honor.

15        **THE COURT:**  Admitted.

16   (Trial Exhibit 1863 received in evidence)

17        **THE WITNESS:**  (Witness examines document.)

18        **MR. FRENTZEN:**  All right.  Can we blow up the top?

19   Yeah, great.

20   **Q.**   Ms. Snider, do you recognize what this is?

21   **A.**   Yes.

22   **Q.**   What is it?

23   **A.**   This is an e-mail to me from -- well, it's addressed to me

24   from Dave Wilner copying Mike Sullivan, but the e-mail body

25   itself is clearly addressed to Mike Sullivan, and it refers to

1    four different options -- four pricing options at Abbott.

2    **Q.**   All right.  And was there an attachment to this e-mail?

3    **A.**   (Witness examines document.)  There is.

4    **Q.**   Who put together -- and could we go to page 3?

5        Who put together this Abbott license proposal?

6    **A.**   On the first page in the body of the e-mail it references

7    "Jane using the same template we used for JPMC put together a

8    5-terabyte and 10-terabyte option."  So this is the template

9    that was used for JPMC.  It was provided to me by Mike

10   Sullivan, and I updated the names and volumes and dates for the

11   specific Abbott terms.

12   **Q.**   Okay.  And can you just tell us what the goals were in the

13   top part of this?

14   **A.**   (reading)

15           "Goals:

16           A.  Simplify pricing scheme and contract amendment

17       process.

18           B.  Revenue certainty for Autonomy.

19           C.  Cost certainty and discounts for Abbott."

20   **Q.**   Can we go to page 6 of this document, please?

21       And, Ms. Snider, what is depicted here in this chart?

22   **A.**   (Witness examines document.)  This is the table that shows

23   the 5-terabyte and 10-terabyte options that Dave referenced

24   before -- or earlier in the body of his e-mail.  5 terabytes --

25   the first column is 5 terabytes clean, the second terabytes --

SNIDER - DIRECT / FRENTZEN

1  the second column is the terabytes, the number of terabyte with

2  productions included.

3  **Q.**    Can we go to the next page, please?

4       Did you hear in this proposed a total cost for license for

5  each of those options?

6  **A.**    They were referring to this as a license, but it was -- it

7  was still, you know, the "software as a service" model.  So the

8  term "license" was just a term that they were using.

9  **Q.**    All right.  But did you --

10  **A.**    Meaning, you know, they weren't going to be licensing the

11  software to install it on their servers or anything like that.

12  **Q.**    Okay.  But along with calling it a license, did you then

13  propose different total costs for Abbott?

14  **A.**    Yes.

15  **Q.**    So, again, this would be kind of this pay-upfront model

16  and call it a license in your view?

17  **A.**    Yes, pay upfront to receive a discount in the shape of a

18  license.

19  **Q.**    Were these options communicated to Abbott?

20  **A.**    Not all of them but many of them.

21  **Q.**    Let's go to 1868.

22       **MR. FRENTZEN:**  Just one moment, Your Honor.

23            (Pause in proceedings.)

24       **MR. FRENTZEN:**  I'm sorry.  1869.  I apologize.

25       **THE WITNESS:**  Thank you.

1          **MR. DOOLEY:**  1869?

2          **MR. FRENTZEN:**  Yeah.

3          **MR. DOOLEY:**  No objection.

4          **THE COURT:**  Admitted.

5          (Trial Exhibit 1869 received in evidence)

6   **BY MR. FRENTZEN:**

7   **Q.**   Ms. Snider, is this communication between yourself and

8   Jason Fliegel at Abbott?

9   **A.**   This is, yes.

10  **Q.**   June 22nd, 2011?

11  **A.**   Correct.

12  **Q.**   And what was this e-mail about?

13  **A.**   We picked a number.  The 10 terabytes is really an

14  arbitrary number of the 76 terabytes based on assumptions

15  around the amount of data that could really potentially go, but

16  it was low enough that we thought it was reasonable.

17        And when I say "go," I mean the number of custodians that

18  were ultimately being negotiated and the number of documents

19  and things that actually would be loaded for review -- loaded

20  into the database for review.

21  **Q.**   Can we go to page 6 of this proposal?

22        Did you have a proposed total cost of this license for

23  Abbott?

24  **A.**   (Witness examines document.)  Yes.  In the

25  second-to-the-last total "Cost for License," 9,750,000.

SNIDER - DIRECT / FRENTZEN

1  Q.   What was the projected savings for Abbott as a result of
2  this proposed deal?
3  A.   $4,180,000.
4  Q.   When you sent this, did you think Abbott was going to take
5  it?
6  A.   Not in a structure that they would pay upfront.
7  Q.   Did they take it?
8  A.   No.
9  Q.   All right.  I'd like to go now to Exhibit 1890.
10 Ms. Snider, I'm going to show you Government's 1890.
11 A.   Thank you.
12      MR. DOOLEY:  Your Honor, I have an objection to the
13 first three pages of this exhibit are e-mails that Ms. Snider
14 is not included on.  I have no objection to Mr. Frentzen asking
15 Ms. Snider about the portion of the document she's on and
16 showing that part to the jury, but otherwise I don't think it's
17 pertinent.
18      MR. FRENTZEN:  I -- well, let me ask this:
19 Q.   Ms. Snider, on June 29th of 2011, were you working at,
20 effectively, Autonomy?
21 A.   Yes.
22 Q.   And if you could, could you focus on the fourth page of
23 this document?  Was this a -- was this portion of the e-mail a
24 communication that you were involved in?
25 A.   On page 4, halfway through?

1   **Q.**   I'm sorry.  3 and 4.

2   **A.**   (Witness examines document.)

3   **Q.**   If you could take a look at the bottom of 3 and then onto

4   page 4 and 5.

5   **A.**   (Witness examines document.)  I was, yes.  Back and forth

6   from me and others.

7   **Q.**   In terms of -- could you focus for just a minute on the

8   first page without getting into the substance of any of it?

9        Were these individuals that you recognize as employed at

10  Autonomy at the same time, June 29th of 2011?

11  **A.**   I do now, yes.

12  **Q.**   And was this string of e-mails in connection with the

13  potential Abbott deal that we've been talking about here today?

14  **A.**   Yes, absolutely.

15          **MR. FRENTZEN:**  Your Honor, I'll --

16          **THE COURT:**  Admitted.

17          **MR. FRENTZEN:**  Thank you.

18          **THE COURT:**  The document is admitted.

19       (Trial Exhibit 1890 received in evidence)

20  **BY MR. FRENTZEN:**

21  **Q.**   Could we just start with page 4, please?

22  **A.**   Yes, sir.

23  **Q.**   And this is on June 23, 2011.  Can you tell us what this

24  communication is about?

25  **A.**   Dave Wilner is asking me to pull together the current

SNIDER - DIRECT / FRENTZEN

1    Master Service Agreement and a summary of the current offer

2    forwarding -- and introducing me to Joel Scott.  He says

3    (reading):

4         "Joel is an attorney" -- or "Joel is a counsel at

5         Autonomy.  He's going to start pulling paperwork together

6         so we're prepared for the likely last-minute rush to get

7         the deal papered."

8    **Q.**   Okay.  And is this in connection with the proposal that we

9    just saw a moment ago about the proposed $9 million deal?

10   **A.**   Yes.

11   **Q.**   And can we go to page 2 of this document?

12        All right.  And, Ms. Snider, do you see up here -- I'm

13   sorry, go back -- right, okay -- that on June 27th, 2011, Poppy

14   Prentis from Autonomy talked about the payment terms here?

15   **A.**   Yes.

16   **Q.**   And could you just tell us what she said here after she

17   says "Okay"?

18   **A.**   (reading)

19        "Okay.  We need Sushovan's okay on the payment

20        terms."

21   **Q.**   Can we go to page 1?  And the next one down.

22        All right.  Okay.  And here, and we'll get into this in a

23   second, but June 29, 2011, Ms. Snider, do you have a

24   recollection of the deal basically being reduced from 9 million

25   to proposing a smaller amount upfront?

1   **A.**   Yes.

2   **Q.**   All right.  And then do you see a question here, "How

3   aggressive can we be on payment terms?"

4   **A.**   Yes.  It says (reading):

5          "Customer wanted to continue to pay as you go, but I

6       know that doesn't work."

7   **Q.**   Can we then see just the last -- the very top part?

8       And can you tell us what Mr. Chamberlain, VP Finance of

9   Autonomy, said about that?

10  **A.**   (reading)

11         "They are creditworthy so aggressive as SH is willing

12      to approve."

13  **Q.**   I'd like to turn now to 1891.  Take a look at that,

14  please, Ms. Snider.

15  **A.**   Thank you.

16      **MR. DOOLEY:**  Same objection, Your Honor.  There's

17  portions that Ms. Snider is not copied on.

18      **THE COURT:**  Well, is there any question that this is a

19  document of Autonomy's?  Is that an issue here?  Is it

20  authenticity?  Is it relevance?  What's the objection?

21      You don't have to have the individual -- you don't have to

22  have the individual who authored the document to be asked

23  questions about the document.

24      **MR. DOOLEY:**  No authenticity question, Your Honor.

25  It's a relevance and it's a foundation.  No basis to testify

```
 1   about what other people are writing in communications that
 2   she's not copied on.
 3           THE COURT:  I don't know that that's correct.  I mean,
 4   you can show a person a document from the defendant -- from a
 5   company, assuming that there aren't authenticity objections,
 6   even if she's not authored it and say, "What do you understand
 7   this to be?"  You can ask those questions.
 8           MR. FRENTZEN:  And so that it's clear, Your Honor, I'm
 9   offering this as a statement of agent and 801(d)(2)(E).
10           THE COURT:  Okay.  Objection overruled.
11           MR. DOOLEY:  Thank you.
12           THE COURT:  And what document is that?  18 what?
13           MR. FRENTZEN:  '91, Your Honor.
14           THE COURT:  1881 --
15           MR. FRENTZEN:  '91.  Sorry, Your Honor.
16           THE COURT:  1891 admitted.
17       (Trial Exhibit 1891 received in evidence)
18           MR. FRENTZEN:  Thank you, Your Honor.
19       All right.  Can we go to the bottom of this, please?
20   Q.  And, Ms. Snider, what is this e-mail on June 29th, 2011,
21   about?
22   A.  It says subject line "Abbott Laboratories - Amendment
23   Four-Track - JES Edits."  Track would be the track changes.
24   JES is me, Jane Elizabeth Snider.  These are my edits to the
25   document (reading):
```

1              "Please turn this around ASAP.  We're approved by

2        Wilner and Sullivan."

3   **Q.**   Can we go to page 3 of the document?

4        Was there an attachment to this?

5   **A.**   Yes.  It says the "Fourth Amendment to the Master

6   Professional Services Agreement."

7   **Q.**   All right.  And if we can go to page 4, please, and go

8   down to "Compensation."  Great.

9        Can you see under "Compensation" in this full paragraph

10  here, does there seem to be -- this is a redlined version,

11  Ms. Snider?

12  **A.**   I'm sorry.  It took me a moment to get where you were.

13  **Q.**   Yeah.

14  **A.**   Yes.  This is the track changes, the redlined version of

15  this document, that's correct.

16  **Q.**   Okay.  So this is downgrading the payment upfront from

17  9,750,000 to how much?

18  **A.**   (Witness examines document.)  Oh, I see.

19  **Q.**   Under "Compensation," do you see the --

20  **A.**   2,400,000.

21  **Q.**   And could we just now go back to page 1 and the top part

22  of page 1?

23       All right.  Ms. Snider, does this appear to be a

24  communication about your sort of latest amended proposal?

25  **A.**   It is.  I believe that to be true, yes.

1    Q.    Okay.  I'd like to go now to -- and, Ms. Snider, to your

2    recollection, after the payment upfront was reduced from

3    9 million-plus to 2,400,000, did Abbott Labs take that deal?

4    A.    No.

5    Q.    Why not?

6    A.    They were not in a position to pay upfront for services

7    not received.

8    Q.    Same reason we talked about before?

9    A.    Correct.

10   Q.    Can we have 1915?  I don't have a hard copy.

11          MR. FRENTZEN:  Is there an objection to 1915?

12          MR. DOOLEY:  No.

13          MR. FRENTZEN:  So is it maybe already in?  I don't

14   know.

15          MR. DOOLEY:  I don't know if it's in, but there's no

16   objection.

17          MR. FRENTZEN:  Okay.  Can we just pull it up, then,

18   because I'm --

19          THE COURT:  1950?

20          MR. FRENTZEN:  '15, one nine one five.

21          THE COURT:  1915 admitted.

22      (Trial Exhibit 1915 received in evidence)

23          MR. FRENTZEN:  Thank you.

24      Can we go to the bottom first, please?

25      I'm sorry.  Yeah.  Okay.  No, that's great.  That's great.

1           Actually, if you can scroll down and get both on the same
2    page, that would be... Good.  Yeah.  That's good.
3    Q.   Okay.  Who is this from, Ms. Snider?
4    A.   Rick Winkler, Richard Winkler.
5    Q.   Who is he?
6    A.   He is one of the contracts attorneys from Autonomy.  He
7    came over from Iron Mountain.
8    Q.   And what's the date?
9    A.   June 30th, Thursday, 2011.
10   Q.   What was the question in the subject line to you from
11   Mr. Winkler?
12   A.   (reading)
13           "Abbott Labs - Any updates?  Thanks."
14   Q.   Can we scroll up to the response?
15        What was your response to Mr. Winkler?
16   A.   (reading)
17           "Client pulled the plug.  They are not comfortable
18        making any commit at this time.  I'm very disappointed.
19        Thank you for your help.  I really, really appreciate it."
20        We worked some long hours getting this done.
21   Q.   All right.  And it didn't happen?
22   A.   It did not happen.
23   Q.   I want to ask you about the end of that quarter around
24   June 30, 2011.  Within a couple days around there, did anyone
25   ever come to you and tell you that an outfit called

1  Discover Tech was going to act as a reseller to sell software
2  to Abbott Labs?
3  **A.**   No.
4  **Q.**   To your knowledge, did Discover Tech come into the picture
5  and sell software to Abbott Labs on behalf of Autonomy?
6  **A.**   No.
7  **Q.**   Did you have any idea what Discover Tech was around this
8  time at the end of the quarter?
9  **A.**   No.  I'd never heard of them.
10  **Q.**   If a reseller was going to come in and make the sale of
11  software to Abbott Labs for Autonomy as a reseller, would you
12  expect to be told about that?
13  **A.**   I would have been intimately involved in any conversation
14  like that.
15  **Q.**   And, again, at this point in time in June of 2011, how
16  long had Abbott Labs been your client or customer?
17  **A.**   Since I joined Stratify in early 2007.
18  **Q.**   Safe to say, of the people at either Stratify,
19  Iron Mountain, or Autonomy, you had the closest relationship
20  with the folks at Abbott that got the eDiscovery work done?
21  **A.**   Absolutely.
22  **Q.**   I want to show you now what's been marked as
23  Government's 1976.  Look, please, at 1976.
24  **A.**   Thank you.
25  **Q.**   Do you recognize what that is?

SNIDER - DIRECT / FRENTZEN

1    **A.**    (Witness examines document.)

2              **MR. DOOLEY:**  No objection, Your Honor.

3              **THE COURT:**  Admitted.

4         (Trial Exhibit 1976 received in evidence)

5              **MR. FRENTZEN:**  Thank you, Your Honor.

6         Could we just blow up the top part of it?

7    **Q.**   Ms. Snider, my question for you is basically just in July,

8    so after -- a week after the quarter is closed, were you still

9    negotiating with Abbott Lab to renegotiate the MPSA?

10   **A.**   Yes.  This goes back to the very original document, the

11   very first document you showed me today, the communication

12   between Terry Martorana and myself around starting the process

13   to renegotiate the Master Professional Services Agreement that

14   would have come up for renewal at the end of the calendar year.

15        This is referring to a privacy and security vendor

16   assessment that was done on any vendors that we would have had

17   to go through.  For hosting the data on our servers, they

18   wanted to make sure that we passed all of their risk and

19   security requirements.

20   **Q.**   I'm going to show you now what's been marked as 2043.

21        Do you recognize Government's 2043, Ms. Snider?

22             **MR. DOOLEY:**  No objection.

23             **THE COURT:**  Admitted.

24        (Trial Exhibit 2043 received in evidence)

25   \\\

SNIDER - DIRECT / FRENTZEN

1  BY MR. FRENTZEN:

2  Q.   Can you tell us what this is, Ms. Snider?

3  A.   Sure.  This is -- as I described in the beginning, there's

4  a Master Professional Services Agreement that sort of governs

5  the terms of the relationship and the work that's done, and

6  then each case or database has its own statement of work.

7       There was a separate piece of -- there was a separate

8  database referred to as the Humira database.  ABL900 you'll see

9  in the fourth line of the top paragraph.  This was referred to

10 as the ABL900 database.  This is a separate database that we --

11 it was a patent protection suit, an IP suit, and the patent was

12 said to expire I believe in 2017.

13      We knew we were going to be able -- we knew we were going

14 to be hosting quite a bit of data and there was a lot of

15 fluctuation in their spend depending on how many documents were

16 produced in a given month, and so we offered them a fixed rate

17 to pay monthly of $25,000.

18 Q.   Okay.  Can we just go to the second page, please?

19      All right.  And at the bottom here, is that the fee in

20 connection with this amendment?

21 A.   Yes.  So I can't recall what their actual monthly fee had

22 been prior to this, but there was a fluctuation, whether it was

23 25 or 35,000 a month.  So we just locked them -- we offered

24 them a locked rate for 25,000 a month for, I believe, two

25 years, that they would pay -- they would pay monthly, a monthly

1    fixed fee.

2    **Q.**    All right.  And do you see a total of that there?

3    **A.**    600,000.

4    **Q.**    All right.  So that was the eventual negotiated license

5    fee with Abbott?

6    **A.**    This was what was referred to as a license agreement but

7    had nothing to do with the 76 terabyte case that we've been

8    talking about.  This was a different drug.  This is their

9    Humira drug, not their Depakote drug.

10   **Q.**    Got it.

11         And in terms of -- how long did Abbott remain your client?

12   **A.**    Until I left Autonomy.

13   **Q.**    When was that?

14   **A.**    June of 2015.

15   **Q.**    And so other than this licensing deal, did Abbott

16   basically continue to be on an a la carte, pay-as-you-go kind

17   of relationship with Autonomy?

18   **A.**    Entirely, yes.

19   **Q.**    I'm sorry?

20   **A.**    Entirely, yes.

21   **Q.**    All right.  And in terms of you trying to sell what you

22   were trying to sell to Abbott, how do you make your money?

23   **A.**    At the time?

24   **Q.**    Right.

25   **A.**    I had a base salary plus commissions.

SNIDER - DIRECT / FRENTZEN

1   Q.   To your knowledge, was anyone else -- I mean, other than

2   in the line of folks we've talked about, was anyone else trying

3   to sell Autonomy products or Autonomy software as a service to

4   Abbott other than you?

5   A.   May I ask a clarifying question?

6   Q.   Sure.

7   A.   Are you referring to other sales executives trying to

8   sell eDiscovery services to Abbott other than me?

9   Q.   Right.

10  A.   No.  I was the account manager, the client manager, on

11  that account and no one else was involved selling services to

12  them.

13  Q.   I want to show you now Government's 2324.  Do you

14  recognize 2324?

15  A.   (Witness examines document.)

16          MR. DOOLEY:  No objection, Your Honor.

17          THE COURT:  Admitted.

18      (Trial Exhibit 2324 received in evidence)

19          THE WITNESS:  I do.

20  BY MR. FRENTZEN:

21  Q.   All right.  Is this a string of e-mails that you were

22  involved in?

23  A.   It is a string of e-mails.

24  Q.   All right.  Can we go to the last -- page 3, please, on

25  the bottom?

1        Okay.  Yeah.  Great.

2        All right.  Can you tell us -- this is August 21st of --

3    2011 -- what was Mr. Wilner asking about?

4    **A.**    (reading)

5              "Can you guys send the name, address, account number

6         for the third-party billing company we'll be using for our

7         work at Abbott?

8              "Livius/Joel, Jane will give our primary contact in

9         Legal at Abbott a call on Monday and ask if he needs any

10         paperwork from us or if he can simply call the billing

11         company and instruct them to pay."

12    **Q.**    What was your understanding about this communication and

13    why there would need to be a third-party billing company?

14    **A.**    Well, two things.  One, Abbott had recently started to use

15    a new invoicing or accounts payable system, an online system.

16    They refer to it as Corgard; but, secondly, the fixed fee rate

17    that we had set on ABL900 of $25,000 a month, I thought that it

18    was just being invoiced through that online billing system.

19    **Q.**    Okay.  So to your understanding and your contractual

20    relationship with -- I should say between at that time Autonomy

21    and Abbott, other than sort of a change in the billing system,

22    did you have any understanding that there was any third party

23    involved in negotiating that contract?

24    **A.**    There was no other third party involved in negotiating a

25    contract.

SNIDER - DIRECT / FRENTZEN

1   Q.   I'd like to -- could we just go to the bottom of page 1

2   and the beginning of page 2, if that works?

3   A.   (Witness examines document.)

4   Q.   Okay.  Do you know who Livius -- I'm sorry, this name I

5   would otherwise butcher?

6   A.   Livius Guaio.  He was Rick Winkler's boss in Legal so he

7   was one of the counsels that Rick, as a contracts attorney,

8   reported to.

9   Q.   And what was he communicating to you here on August 22nd?

10  A.   (reading)

11          "I haven't forgotten about the third-party info.  I'm

12       just waiting for the correct individual contact.  I should

13       have it shortly."

14  Q.   Then let's scroll up to the top e-mail here.

15       Is this the same individual sending you another e-mail?

16  A.   (Witness examines document.)  Yes.  Livius is now sending

17  me the name of the party.  It says (reading):

18          "The party who will be invoicing Abbott (and whom

19       Abbott should pay, until we otherwise notify them) is as

20       follows:

21          "Discover Technologies."

22       And then the attention and address.

23  Q.   Okay.  And who was the individual in the attention there?

24  A.   Dave -- David Truitt.

25  Q.   And, again, to your knowledge, had Dave Truitt or

SNIDER - DIRECT / FRENTZEN

1  Discover Tech made any kind of sale to Abbott at all in -- I'm
2  sorry -- in connection with the relationship between Autonomy
3  and Abbott?
4  **A.**   No.  They were not involved at all in any way, and to my
5  knowledge they were not one of the even parties that Abbott
6  worked with.
7  **Q.**   Did anyone ever congratulate you for making, let's say, a
8  large, upfront license deal with Abbott Labs?
9  **A.**   I don't recall.  I mean, a $600,000 license deal for
10 software as a service in eDiscovery would have been large,
11 so...
12 **Q.**   Okay.  Were you ever congratulated for the type of deal we
13 just saw there that you had proposed for 9 million?
14 **A.**   Not to my knowledge.  I don't remember, no.
15 **Q.**   Did anyone ever congratulate you for making that size of a
16 deal to Discover Tech?
17 **A.**   No.
18 **Q.**   And, again, when you saw Discover Tech here, this
19 information about the party who will be invoicing, what did you
20 think that was?
21 **A.**   I thought they were an invoicing system, some sort of
22 third-party billing software.
23 **Q.**   After Hewlett Packard acquired Autonomy, did you continue,
24 then, to work for effectively Hewlett Packard?
25 **A.**   I did.

SNIDER - CROSS / DOOLEY

1    Q.    And was there yet another sort of culture change there, or

2    did things stay the same as they had been under Autonomy?

3            MR. DOOLEY:  Objection for relevance, Your Honor.

4            THE COURT:  Sustained.

5    BY MR. FRENTZEN:

6    Q.    Did the SMS calls continue after Hewlett Packard acquired

7    Autonomy, Ms. Snider?

8    A.    They did not.

9            MR. DOOLEY:  Same objection, Your Honor.

10           THE COURT:  Well, I'll allow that.

11   BY MR. FRENTZEN:

12   Q.    Sorry?

13   A.    They did not.

14           MR. FRENTZEN:  Can I have one moment, Your Honor?

15                   (Pause in proceedings.)

16           MR. FRENTZEN:  That's all I have.  Thank you very

17   much, Ms. Snider.

18           THE COURT:  Cross?

19      Ladies and gentlemen, if you want to stand up and just

20   stretch for a minute?

21                   (Pause in proceedings.)

22           THE COURT:  Yes.  You may proceed.  Go ahead.

23                   **CROSS-EXAMINATION**

24   BY MR. DOOLEY:

25   Q.    Good morning, Ms. Snider.

**SNIDER - CROSS / DOOLEY**

1   **A.**   Good morning.

2   **Q.**   Let me introduce myself.  My name is Brook Dooley, and I

3   represent Sushovan Hussain.

4        You and I have never met before today, have we?

5   **A.**   No.

6   **Q.**   No.

7        Ms. Snider, I want to start with some of the testimony you

8   gave about the change when you arrived at Autonomy.

9        You talked about -- you gave some testimony about closing

10  deals by the end of the quarter, by June 30th.  Do you recall

11  that testimony?

12  **A.**   Yes.

13  **Q.**   There's nothing wrong or improper, in your experience as a

14  sales executive, about a company encouraging salespeople to

15  close deals by the end of the quarter, is there?

16  **A.**   No.

17  **Q.**   That's not unusual?  A lot of companies do that, encourage

18  their sales executives to close deals by the end of the

19  quarter?

20  **A.**   Public companies do, yes.

21  **Q.**   And Iron Mountain was a public company when you were

22  there?

23  **A.**   Yes.

24  **Q.**   Autonomy was a public company obviously?  Yes?

25  **A.**   Yes.

SNIDER - CROSS / DOOLEY

1   Q.   And companies will sometimes offer discounts to their

2   customers to close deals at the tend of the quarter?  That

3   happens, doesn't it?

4   A.   Yes.

5   Q.   Companies will sometimes come up with new structures for

6   deals in order to close them by the end of the quarter; isn't

7   that right?

8   A.   Yes.

9   Q.   Nothing wrong with any of that?

10  A.   No.

11  Q.   You testified about these -- the sales management -- the

12  SMS calls.  Do you remember that testimony?

13  A.   I do.

14  Q.   And I think you referred to them as pipeline calls?

15  A.   They were similar to a pipeline call.

16  Q.   Similar to a pipeline call.  And what is a pipeline call?

17  A.   They take various forms, but typically it's a conversation

18  between your manager, your direct manager, your line manager,

19  and you about the deals that you have in the pipeline that are

20  scheduled to close over the next, you know, coming weeks,

21  months, quarters, whatever.  It's about resource allocation,

22  bringing the right supports, getting those deals done.

23  Q.   And there's nothing wrong or improper about a company

24  checking on a sales executive's deals in the pipeline, is

25  there?

**SNIDER - CROSS / DOOLEY**

1   A.   No.

2   Q.   And as you've testified, these pipeline calls, checking on

3   deals in the pipeline, that's fairly standard in your

4   experience as a salesperson?

5   A.   Yes.

6   Q.   And I think you testified that -- well, when you were at

7   Iron Mountain, your direct supervisor was Mr. Murphy,

8   Shaun Murphy; is that right?

9   A.   Yes.

10  Q.   And then he reported up and you also reported up to

11  Mr. Wilner at Iron Mountain?

12  A.   Yes.

13  Q.   And they both came over to Autonomy?  Those were

14  Iron Mountain folks who came over to Autonomy?

15  A.   Yes.  Mr. Wilner actually joined Stratify.

16  Q.   Okay.  So he was with you at Stratify, made the move to

17  Iron Mountain, and then made the move to Autonomy?

18  A.   Correct.

19  Q.   And they were here in the United States, not in England?

20  A.   Correct.

21  Q.   And was Mr. Murphy on the SMS calls?

22  A.   I don't --

23  Q.   If you remember.

24  A.   I don't recall.  I don't believe so.

25  Q.   But Mr. Wilner was?  That was your testimony earlier?

SNIDER - CROSS / DOOLEY

1    **A.**    Yes, Mr. Wilner was.  I don't believe Mr. Murphy was.

2    **Q.**    And Mr. Wilner was one of the people who was asking you

3    questions on these SMS calls; correct?

4    **A.**    Yes.

5    **Q.**    I think you testified to experiencing some pressure or a

6    different environment when you were at Autonomy.  None of

7    that -- none of what you experienced came directly from

8    Mr. Hussain, did it?

9    **A.**    No.

10   **Q.**    In fact, during your time at Autonomy and then at HP, you

11   never spoke with Mr. Hussain, did you?

12   **A.**    No.

13   **Q.**    And you've never in your life spoken to Mr. Hussain?

14   **A.**    I don't believe so.

15   **Q.**    Ms. Snider, let's talk about Abbott Labs.  They were a

16   long-time customer of yours when you were a sales executive;

17   correct?

18   **A.**    That's true.

19   **Q.**    So you're pretty familiar with their business?

20   **A.**    I was very familiar with their business, yes.

21   **Q.**    Very familiar.

22       And Abbott was and remains one of the largest

23   pharmaceutical and medical device companies in the world.  Fair

24   to say?

25   **A.**    Yes.

SNIDER - CROSS / DOOLEY

1   Q.   They make some of the top-selling name-brand prescription

2   drugs and other medical devices and products?

3   A.   Correct.

4   Q.   You identified some of them.  Humira and then Depakote?

5   A.   Uh-huh.

6   Q.   And Similac, that's like baby formula and such?

7   A.   Uh-huh.

8   Q.   And as a drug company, as a pharmaceutical company, Abbott

9   was involved in a lot of lawsuits investigation litigation;

10  correct?

11  A.   And protective actions against their -- to protect their

12  patents.

13  Q.   And some of that was intellectual property litigation; is

14  that what you were saying?

15  A.   Yes.

16  Q.   And as a result of these lawsuits and investigations, they

17  were required to collect huge amounts of electronic data; is

18  that fair to say?

19  A.   Yes.

20  Q.   And when I'm talking about electronic data, I think the

21  jury is beginning to understand that, but we're talking about

22  e-mails, Word documents, sales databases, just all the stuff

23  that lives on computers these days; right?

24  A.   That's correct.

25  Q.   And so let's look at -- if we could put up -- if you could

SNIDER - CROSS / DOOLEY

1    look in your -- you've got -- you should have a black binder

2    there, a spiral binder there.

3         Yep.  If you could look at what's been tabbed as

4    Exhibit 5849.  It should be the last tab.

5    **A.**    (Witness examines document.)

6    **Q.**    It will also be on your screen.

7    **A.**    Yes, sir.

8    **Q.**    The print is a little small, but do you recognize

9    Exhibit 5849 as a June 30th, 2011, e-mail between you, your

10   boss Dave Wilner, and his boss Mike Sullivan, with the subject

11   "Abbott Metrics"?

12   **A.**    (Witness examines document.)  Give me a moment.

13   **Q.**    Sure.

14              **THE COURT:**  Is this in evidence?

15              **MR. DOOLEY:**  It is not, Your Honor.

16              **THE COURT:**  Okay.  Well, admitted.  50 -- sorry, what

17   number is it?

18              **MR. DOOLEY:**  5849.

19              **THE COURT:**  5849.

20        (Trial Exhibit 5849 received in evidence)

21   **BY MR. DOOLEY:**

22   **Q.**    Ms. Snider, do you recognize that as an e-mail exchange

23   between you, Mr. Wilner, and Mr. Sullivan?

24   **A.**    (Witness examines document.)

25              **THE COURT:**  Is it better to put it up?  Is it up?  Oh,

```
 1   it is up.
 2        You can see it on the -- Ms. Snider, you can see it on the
 3   screen, perhaps, better.
 4            THE WITNESS:  I'm just reading through it.
 5            THE COURT:  Okay.
 6            THE WITNESS:  And I'm thinking I need bifocals.
 7            THE COURT:  I think you need something to look at
 8   this.
 9            MR. DOOLEY:  Can we blow that up, Jeff, any more?
10   Q.   This is not an eyesight test, that's for sure.
11   A.   Thank you.
12        (Witness examines document.)  It's coming to my
13   recollection, but this is from 2011 and I've not seen it since,
14   so...
15   Q.   Sure.  Let me direct your attention to the e-mail on the
16   bottom of the first page from you to Mr. Sullivan, and do you
17   see that you write (reading):
18            "As discussed below, you'll find two slides detailing
19        Abbott total cases to date, not including the Depakote
20        sales subpoena and two quarterly billing metrics for Q1
21        2011"?
22        Do you see that?
23   A.   I do.  I do.
24   Q.   And if you look, then -- if you flip the page, there is a
25   table on the second page.
```

 1          If we could blow that up, Jeff.

 2          And does that table reflect a summary of Iron Mountain or

 3     Autonomy's -- it was Autonomy at this point -- Autonomy's

 4     billings to Abbott in Q1 of 2011?

 5     **A.**   (Witness examines document.)  That is what it appears to

 6     be.

 7     **Q.**   And this table in Exhibit 5849 shows that in Q1 2011, not

 8     including this big 76-terabyte subpoena that we talked about,

 9     and we'll talk about more, Iron Mountain was working on 14

10     separate lawsuits or investigations for Abbott?  Those are the

11     matters?

12     **A.**   (Witness examines document.)  Yeah, that sounds right.

13     ABL900 and ABL005R were two separate -- they were integrated

14     databases, so you could argue it was 14 or 15 but, yes.

15     **Q.**   Okay.  So 14 or 15 cases that you were working on for

16     Abbott in Q1 2011?

17     **A.**   That's what it looks like.  That's what this looks like at

18     the time, yeah.

19     **Q.**   And the table shows in the bottom right-hand corner that

20     Abbott was charged over $1.3 million for eDiscovery work on

21     those cases just in the first quarter of 2011; is that right?

22     **A.**   Yes.

23     **Q.**   And then if you can flip back to the first page where we

24     were reading before, the e-mail on the bottom, it reads

25     (reading):

**SNIDER - CROSS / DOOLEY**

1              "Finally, directly below are the estimated billings

2        for June."

3        Do you see that?  Again, apologies for the tiny print.

4    **A.**    I do, yeah.

5    **Q.**    And there's a series of case numbers with dollar figures

6    next to them.  Do you see that?

7    **A.**    Yes.

8    **Q.**    And what that shows there, it shows June estimated total

9    of just over $800,000; correct?

10   **A.**    Correct.

11   **Q.**    And what that reflects is that in June, Abbott -- just for

12   June, Abbott was going to be billed over $800,000 for

13   electronic discovery work on the different matters?

14   **A.**    For the work that had been done in the month ending

15   June 30th, that would have been the amount of billings for

16   processing, loading, hosting, and production of data.

17   **Q.**    And even one case could generate millions of dollars of

18   eDiscovery work; right?

19   **A.**    Over the lifetime of a case, yes.

20   **Q.**    Sure.  So we talked about -- or you talked about on your

21   direct the Depakote investigation, the Department of Justice in

22   2011 was investigating Abbott in connection with its sales of

23   the drug Depakote?

24   **A.**    Yes.

25   **Q.**    And just one document request from the Government in that

1   case called for Abbott to collect, I think, 850 employees'

2   e-mails and 1200 computer hard drives.  Does that sound about

3   right?

4   **A.**   It does.

5   **Q.**   And Abbott estimated that between loading, filtering,

6   processing that data, that could cost them between 20 and

7   $25 million.  That's what they were estimating at the time;

8   right?

9   **A.**   Yes.

10  **Q.**   And that's just one document request in one case?

11  **A.**   Yes.  Highly unusual.

12  **Q.**   And in your work as a sales executive selling eDiscovery

13  services, Abbott was a pretty good client to have, wasn't it,

14  with all this work?

15  **A.**   I had some very deep relationships at that client, and we

16  did a lot of good work together over time.

17  **Q.**   And if one were selling eDiscovery software services,

18  products, you'd agree that Abbott would be a pretty good

19  prospect, wouldn't you?

20  **A.**   Part of my job -- yes.  Part of my job was to identify the

21  top prospects in my territory and have a working -- building a

22  working relationship with them.  Certainly a pharmaceutical

23  company is someone you would prioritize.

24  **Q.**   In June of 2011, you testified that Autonomy and Abbott

25  were operating under a master contract, the MPSA; is that

SNIDER - CROSS / DOOLEY

1    right?

2    **A.**    That's correct.

3    **Q.**    And Abbott was paying for its electronic discovery on a

4    pay-as-you-go basis.  I think that was your testimony?

5    **A.**    That's correct.

6    **Q.**    But in June, the time period we're talking about, Abbott

7    was looking for ways to reduce the amount that it had to spend

8    on eDiscovery; right?

9    **A.**    They were looking for ways.  We were also looking to offer

10   them ways because of just market competition.

11   **Q.**    So fair to say that Abbott was looking for ways to perhaps

12   restructure their arrangement to reduce their costs, and you

13   were looking -- you at Autonomy were looking at alternative

14   ways to structure the relationship in June 2011; is that fair?

15   **A.**    Because of the renegotiation of the Master Service

16   Agreement that was coming due, we were looking at all options.

17   **Q.**    One option that you were looking at was that Abbott would

18   still pay monthly but would commit to send a certain volume of

19   work to Autonomy, and then they'd get a reduced rate in

20   exchange for that commitment; right?

21   **A.**    Yes.  So a low -- a low threshold.

22   **Q.**    You were also discussing proposals where Abbott would just

23   agree to pay upfront in exchange for reduced rates.  I think we

24   looked at one of those proposals -- or you looked at one of

25   those proposals on your direct.

1    **A.**    Yes.    That was related to the -- the Depakote sales

2    subpoena.

3    **Q.**    And you and others at Autonomy were also discussing

4    proposals where Abbott would pay upfront for a license to

5    Autonomy's software.    Those were discussions that were

6    happening in June 2011?

7              **MR. FRENTZEN:**    Objection.    Vague as to who.

8              **THE COURT:**    What is the objection?

9              **MR. FRENTZEN:**    Vague as to who, the individuals.

10             **THE COURT:**    Well, let's see if she's had those

11   discussions, and then you can --

12             **MR. FRENTZEN:**    Thank you, Your Honor.

13             **THE COURT:**    -- inquire into who she had them with.

14             **THE WITNESS:**    Would you repeat the question?

15   **BY MR. DOOLEY:**

16   **Q.**    Sure.    You and others at Autonomy were discussing

17   proposals whereby Abbott would pay an upfront -- upfront for a

18   license to Autonomy's software; right?

19   **A.**    Pay upfront, yes, but not for a license.

20   **Q.**    No one was discussing a license in --

21   **A.**    They were using the term "license," but it wasn't license

22   in the standard industry speak that they would license a

23   software and put it on their servers.    That was never

24   contemplated.

25   **Q.**    Well, we'll look at that.

SNIDER - CROSS / DOOLEY

1         Jeff, would you put up Exhibit 1832?

2         I don't have a hard copy of this one, but it will appear

3    on your...

4    **A.**    Thank you.

5    **Q.**    Do you have Exhibit 1832 in front of you on the monitor?

6    **A.**    No, I don't.

7              **THE CLERK:**  It's not admitted.

8              **THE COURT:**  1832, any objection?

9              **MR. FRENTZEN:**  I'm sorry, Your Honor.  Hang on a

10   second.  I'm assuming this is one of mine.

11             **MR. DOOLEY:**  It is.  That's why I don't have the hard

12   copy.

13             **MR. FRENTZEN:**  Sorry.  No objection.

14             **THE COURT:**  Admitted.

15        (Trial Exhibit 1832 received in evidence)

16   **BY MR. DOOLEY:**

17   **Q.**    Ms. Snider, do you recognize Exhibit 1832 as an e-mail

18   exchange between you and Mr. Wilner and others on June 10th,

19   2011?

20   **A.**    (Witness examines document.)  I recognize this, yeah.

21   **Q.**    If you could direct your attention to the second page of

22   the exhibit.  At the bottom there's an e-mail from you to

23   Mr. Wilner, copy to Mr. Murphy.  Do you see that?

24   **A.**    (Witness examines document.)

25   **Q.**    Do you see that e-mail, Ms. Snider?

1    **A.**    I do.  I do.  I'm reading it now.

2    **Q.**    And you're writing to Mr. Wilner about the Department of

3    Justice subpoena that we've been talking about regarding the

4    drug Depakote; correct?

5    **A.**    That's correct.

6    **Q.**    And you're describing the amount of electronic data that

7    Abbott was going to have to collect; correct?

8    **A.**    That's correct.

9    **Q.**    And Abbott estimated that it was going to have to collect

10   76 terabytes of data?  That's what TB is?

11   **A.**    That's correct.

12   **Q.**    What is a terabyte?

13   **A.**    Roughly 1100 gigs, 1200 -- 1160 gigs of data.

14   **Q.**    Can you give the jury just some sense of how many boxes of

15   paper that is?

16   **A.**    A typical e-mail is, like, megabytes, so it could be -- it

17   could fill this room with paper.

18   **Q.**    Thank you.

19        And you go on, based on conversations with Abbott, they're

20   estimating this costing them around 20 to 25 million for

21   handling, filtering, processing, and so forth.  Do you see

22   that?

23   **A.**    Yes.

24   **Q.**    Now, if you look at the first page of this e-mail or this

25   exhibit, rather, at the bottom there's a response from

1    Mr. Wilner.  Do you see that?  Or rather a forward.  He's

2    forwarding the e-mail chain.  Do you see that?

3    **A.**    I don't see that it's forwarded because it's cut off but,

4    "Hey, Mark."

5    **Q.**    In the subject line there's an "FW."

6    **A.**    Thank you.

7         (Witness examines document.)  I see, yes.

8    **Q.**    Okay.  And this is from Mr. Wilner, who you had worked

9    with at Iron Mountain, and he writes to Mr. Daoust.  Who's

10   Mr. Daoust?

11   **A.**    I believe he was an Autonomy sales operations leader or

12   part of the sales operations team.

13   **Q.**    And he writes (reading):

14        "I'd like to put a license option in place for them

15        or some kind of minimum commit number that will count

16        towards Q2."

17        Do you see that?

18   **A.**    I do.

19   **Q.**    So he's proposing offering Abbott a license or a discount

20   for committing to sending certain amount of work to Autonomy;

21   correct?

22   **A.**    (Witness examines document.)  No.  He's --

23   **Q.**    He wasn't --

24   **A.**    He's suggesting that for this case, just this subpoena, if

25   they are able to commit a low figure amount of data to be

1  loaded -- processed and loaded and hosted, that we can offer a

2  discounted rate.

3      This does not refer to other -- the other databases that

4  we were talking about before.  So this was not a cumulative

5  across the entire universe of data they were hosting, but only

6  contemplating options as it related to the sales subpoena.

7  **Q.**  Fair.  And thank you for that clarification.

8      But with respect to the sales subpoena, he writes

9  (reading):

10      "I'd like to put a license option in front of them."

11  Correct?

12 **A.**  He does write that.

13 **Q.**  And he goes on (reading):

14      "Bottom line is Abbott can now quantify the data they

15      need to produce to the DOJ, have put an estimated dollar

16      value next to it, and have expressed interest in

17      evaluating what they could save if they prepaid or at

18      least signed up for the commit before month end."

19  Do you see that?

20 **A.**  I see that.

21 **Q.**  So you understood that Abbott was considering paying

22  upfront as a way to save money over the long haul?

23 **A.**  They had expressed interest in understanding what options

24  were available to them.

25 **Q.**  And as part -- in connection with that, you sent them a

1  proposal for an upfront license to Autonomy software; correct?

2          MR. FRENTZEN:  Objection.  Foundation as to that.

3          MR. DOOLEY:  Well, that's --

4          MR. FRENTZEN:  It's coming from Abbott.

5  BY MR. DOOLEY:

6  Q.    You personally, Ms. Snider, sent Abbott a proposal along

7  these lines, for an upfront license to Autonomy software;

8  correct?

9  A.    The intention wouldn't have been licensing the software.

10 That was not contemplated.

11 Q.    Well -- I didn't mean to cut you off.

12 A.    That was the end of my statement.

13 Q.    Okay.  Well, let's look at Exhibit 1869, which is in

14 evidence.  This is an e-mail from you to

15 jasonfliegel@abbott.com.  Do you see that?

16 A.    I do.

17 Q.    And he was a fairly senior, I think you testified,

18 in-house attorney at Abbott?

19 A.    He was our most senior day-to-day contact.

20 Q.    And do you know who he reported to?

21 A.    He reported to the general counsel, Laura, but I can't

22 remember her last name right now.

23 Q.    Did he also report to Karen Hale?

24 A.    Karen was the lead attorney on this case.

25 Q.    Got it.  Okay.

1          And then there was a Ms. Mockaitis or Mockaitis?

2    **A.**    Connie Mockaitis, Constance.

3    **Q.**    Okay.  And she worked beneath Mr. Fliegel or with him?

4    **A.**    In a different function but both part of the Legal

5    Services Group.

6    **Q.**    And the subject of this e-mail is "Proposal," and you

7    write (reading):

8              "Please find the attached proposal for a 10-terabyte

9          capacity license to be used for any new data loaded,

10         regardless of matter."

11         Do you see that?

12   **A.**    I do.

13   **Q.**    And this is a proposal for Abbott to buy a license to use

14   Autonomy software for up to 10 terabytes of data on any case

15   they're working on; correct?

16   **A.**    Correct, but it clearly says "data loaded."  We're

17   contemplating data loaded onto the Autonomy servers to be

18   reviewed for whatever piece of litigation.

19   **Q.**    They would have a license to use the software?

20   **A.**    They would use the license.

21   **Q.**    They would have a license to use the software and it would

22   be hosted on your servers?  That's what the idea is here?

23   **A.**    That's correct.

24   **Q.**    Okay.  And if you look at page 4 of the exhibit.

25   **A.**    (Witness examines document.)

SNIDER - CROSS / DOOLEY

1  Q.   Under the "Key Deal Terms," it says "License Deal."

2  A.   Yes.  I believe that's in here, so I can see it.

3       (Witness examines document.)  Yes.

4  Q.   (reading)

5            "Abbott receives significant discounts in exchange

6       for a revenue commitment and signed order/agreement by

7       June 30, 2011."

8       Right?

9  A.   Yes.

10 Q.   And then under -- if you could look at page 5 of the

11 exhibit, there's a chart that says "Baseline Calculator."

12 A.   (Witness examines document.)

13 Q.   Do you see that?

14 A.   I do.

15 Q.   And that's an estimate that under the existing agreement

16 with Abbott, Abbott was paying almost $1400 per gigabyte over

17 two years for filtering, processing, and hosting all this data;

18 correct?

19 A.   That's the fully loaded estimate.

20 Q.   And then on the next page there's another chart.  Do you

21 see that?  And in the middle there's a proposed license

22 discount of 30 percent?

23 A.   (Witness examines document.)  Yes.

24 Q.   And Autonomy was offering a 30 percent discount if Abbott

25 would buy an upfront license; correct?

SNIDER - CROSS / DOOLEY

1    **A.**    If they committed to these volumes, yes.

2    **Q.**    And over the life of the deal, that upfront license would

3    have saved Abbott over $4 million is what you're projecting

4    here?

5    **A.**    You say over the life of the deal.  I would clarify that

6    this was the period governed in this proposal rather than the

7    life of a particular piece of litigation.

8    **Q.**    Fair enough.

9        But over the period covered by this proposal, over

10   $4 million in savings for the upfront license?

11   **A.**    Yes.

12   **Q.**    All right.  And do you recall that Abbott was very

13   interested in this offer?

14   **A.**    They were interested in saving money.

15   **Q.**    And do you recall that you discussed with Mr. Fliegel how

16   to write up the paperwork for this license?

17   **A.**    He asked to see proposals not for how the paperwork was

18   structured.

19   **Q.**    Okay.  Could you look at, in your binder, Exhibit 5838?

20   **A.**    (Witness examines document.)  I don't have a 5830.  It

21   starts at 5835.

22   **Q.**    I'm sorry.  5838.  I wasn't -- my fault.

23        **THE COURT:**  5838?

24        **MR. DOOLEY:**  '38, yeah.

25        **THE WITNESS:**  (Witness examines document.)

1          **MR. FRENTZEN:**  No objection.

2          **THE COURT:**  Admitted.

3          (Trial Exhibit 5838 received in evidence)

4          **MR. DOOLEY:**  All right.

5    **Q.**   Do you recognize this as an e-mail from you to

6    Mr. Sullivan and Mr. Wilner on June 23rd, 2011?

7    **A.**   I do, yes.

8    **Q.**   And this is the next day after you sent the proposal over

9    that we just looked at in the last exhibit?  That was on

10   June 22nd and now this is the next day, June 23rd.

11   **A.**   Okay.  Yes.

12   **Q.**   And you write (reading):

13          "I just spoke with Jason.  He's discussed the offer

14          with Karen and several others.  Karen is very interested

15          in the offer."

16          Right?

17   **A.**   She's interested in the discount certainly.

18   **Q.**   And as you testified a moment ago, Ms. Hale is another

19   person in the Legal Department who works with Mr. Fliegel?

20   **A.**   She was the division lead, so the lead attorney for that

21   drug.

22   **Q.**   And in the next paragraph you write (reading):

23          "We discussed how we would paper the License should

24          they pull the trigger.  Jason's thought is we amend the

25          MPSA.  He is confident they (Legal) can contain the

SNIDER - CROSS / DOOLEY

1      process and not involve Procurement."

2      Correct?

3  **A.**    (Witness examines document.)  Yes, I see that.

4  **Q.**    Does this refresh your recollection that you and

5  Mr. Fliegel discussed how to structure this deal as a software

6  license?

7  **A.**    Yes.  I mean -- yes.

8  **Q.**    Would you look at Exhibit 5844?

9          **MR. DOOLEY:**  Not in evidence, Your Honor.

10          **THE COURT:**  5844 admitted.

11      (Trial Exhibit 5844 received in evidence)

12  **BY MR. DOOLEY:**

13  **Q.**    If you could look at the middle of the page, Ms. Snider.

14  Again, apologies for the font size.

15  **A.**    (Witness examines document.)

16  **Q.**    You're forwarding your proposal to Ms. Mockaitis.  Do you

17  see that?

18  **A.**    I do.

19  **Q.**    And then at the top of the page Ms. Mockaitis writes back

20  to you (reading):

21          "This looks like the information that DVPs" --

22      division vice presidents, I guess -- "would need to decide

23      whether or not to proceed.  The total spend outlined

24      versus the spend we anticipate regarding the Depakote

25      matter alone make it appealing."

1          Right?  That's what she writes?

2     A.   That's what she writes.

3     Q.   She viewed it as -- the offer as appealing?

4     A.   She views it as appealing, but clearly states that the

5     DVPs need to make the decision.  Karen Hale was one of the

6     DVPs.

7     Q.   And then a couple days later, you sent an actual formal

8     license agreement, proposed license agreement, to Abbott;

9     correct?  Do you remember that?

10    A.   I would have to see it.

11    Q.   Okay.  Well, why don't you look at Exhibit 5841 in your

12    binder there.

13    A.   (Witness examines document.)

14         THE COURT:  5841 admitted.

15         (Trial Exhibit 5841 received in evidence)

16    BY MR. DOOLEY:

17    Q.   And you write to Mr. Fliegel (reading):

18              "Please find attached contract for your review and

19         approval."

20         Do you see that?

21    A.   I do.  Yep.  Yes.

22    Q.   And if you look at the attachment, it's a proposed

23    agreement to amend the master agreement between Autonomy and

24    Abbott; right?

25    A.   This is the same one referred to -- referenced earlier,

 1    yes.

 2    **Q.**    And if you look at page 2 in Section 3a, it says "License

 3    Grant."  Do you see that?

 4    **A.**    Yes.  Yes.

 5    **Q.**    You write (reading):

 6            "Autonomy hereby grants" -- in the middle of that

 7        paragraph -- "hereby grants to customer a limited

 8        nonexclusive, nontransferable, and nonassignable license

 9        to use the licensed software."

10    Do you see that?

11    **A.**    This was the legal template language, yes.

12    **Q.**    And then on the next page in Section 3c, there's an

13    underlined "Hosting of licensed software."  Do you see that?

14    **A.**    (Witness examines document.)  Yes.

15    **Q.**    And the language reads in the middle of that paragraph

16    (reading):

17            "Autonomy shall host the licensed software and case

18        documents associated therewith."

19    **A.**    Yes.

20    **Q.**    And this proposed agreement is that Abbott would own the

21    software but the data would be hosted on Autonomy's servers;

22    correct?

23    **A.**    They would own the license to the software.

24    **Q.**    Correct.  Thank you for that.

25        They would own a license to the software but Autonomy

SNIDER - CROSS / DOOLEY

1   would host the data?

2   **A.**   Yes.

3   **Q.**   And in exchange, Abbott would pay an upfront fee of

4   9.75 million in two installments?

5   **A.**   Yes.  Yes.

6   **Q.**   And we looked -- you looked when you were on your direct

7   examination at a subsequent draft of this agreement that you

8   sent after this one, correct, that had changes to some of

9   the --

10  **A.**   Yes.

11  **Q.**   -- some of the numbers?

12  **A.**   Yes.

13  **Q.**   Okay.  So you sent a couple of draft license agreements to

14  Abbott in late June 2011?

15  **A.**   Yes.

16  **Q.**   Despite your efforts, however, you were not able to close

17  this license deal with Abbott by June 30th, were you?

18  **A.**   No.

19  **Q.**   You were exchanging draft contracts kind of right up to

20  the end, but it didn't get over the line, did it?

21  **A.**   It did not.

22  **Q.**   If you could look at 1915.  If we could call that up.

23  It's in evidence.

24          **THE COURT:**  Well, let's take a break now, do you

25  think?  Is this a -- what would you like?  I mean, if we go a

PROCEEDINGS

1   few more minutes and you're finished, then that's fine.  What

2   would you like to do?

3           **MR. DOOLEY:**  It's really up to the Court.

4           **THE COURT:**  No.  It's really up to you.  What do you

5   want to do?

6           **MR. DOOLEY:**  I probably only have, you know, 10, 15

7   minutes absolute max, but I --

8           **THE COURT:**  We'll take a break.

9           **MR. DOOLEY:**  Okay.

10          **THE COURT:**  Ladies and gentlemen, we're going to take

11  our recess now.  Remember the admonition given you --

12          **MR. DOOLEY:**  I tried.

13          **THE COURT:**  -- don't discuss the case, don't allow

14  anyone to discuss it with you, form or express any opinion.

15      Yeah, that's fine.  I mean, I don't want to rush you

16  through it, but I do want the jurors to be able to get to the

17  cafeteria before the massive lines occur of people who are

18  looking for epicurean delights.

19              (Luncheon recess taken at 12:00 p.m.)

20      (Proceedings were heard in the presence of the jury:)

21          **THE COURT:**  Let the record reflect all jurors are

22  present, parties are present, and Ms. Snider will resume the

23  witness stand.

24      Mr. Dooley, you may proceed.

25  \\\

PROCEEDINGS

1    BY MR. DOOLEY:

2    Q.    Good afternoon, Mr. Snider.  Welcome back.

3    A.    Thank you.  Good afternoon.

4    Q.    Good afternoon to the jury.

5          I want to return to the end of June, 2011.  This morning

6    on your direct testimony, I think you testified you worked some

7    long hours in June on this contract with Abbott Labs; is that

8    right?

9    A.    Yeah.

10   Q.    Would you take a look in your binder at Exhibit 5848.

11   This is not in evidence yet.  Just take a look at that.

12         Does that look like an email exchange between you and

13   Mr. Wilner on June 29th, 2011?

14   A.    Yes.

15             THE COURT:  Admitted.

16         (Trial Exhibit 5848 received in evidence)

17             THE WITNESS:  Yes.

18   BY MR. DOOLEY:

19   Q.    If you look at the bottom of the email, on the second page

20   at the bottom, there is an email from Mr. Wilner to Mr. Fliegel

21   at 5:45 p.m. on June 29th.  Do you see that?

22   A.    Yes.

23   Q.    And I won't go through all the details, but the subject is

24   "payment terms for license"; is that right?

25   A.    Yes.

**PROCEEDINGS**

1    Q.    And he goes through -- Mr. Wilner writes, "Just a quick

2    note to confirm our conversation earlier today," and then he

3    discusses some details about how this license agreement would

4    be billed.   Is that a fair characterization?

5    A.    Yes.

6    Q.    And at the very top of that second page, you write back to

7    Mr. Wilner, "thanks," exclamation point.

8    A.    Yes.

9    Q.    And then there's a further email exchange between you and

10   Mr. Wilner, and Mr. Wilner writes at 5:47, "Dear Lord, is he

11   going to sign it now?"   And you respond, "That's what he said,

12   though I'll believe it when I see it."   Is that right?

13   A.    Yes.

14   Q.    That's at -- the timestamp, at least on that last email,

15   is at 10:47 p.m. on the next to the last day of June 2011;

16   right?

17   A.    Yes.

18   Q.    Is this an example, an illustration, perhaps, of the long

19   hours that you worked on this deal, emailing at 10:30 at night,

20   10:45 at night?

21   A.    Yes.

22   Q.    As we discussed, despite the long hours you put in on this

23   deal with Abbott Labs, this contract, this software license

24   agreement that you sent them, that deal didn't close on

25   June 30th, did it?

**PROCEEDINGS**

1    **A.**    I don't believe -- no.

2          **MR. DOOLEY:**  If we could put up Exhibit 1915, please,

3    Jeff.  This is already in evidence.  We've seen this.

4          **THE WITNESS:**  So it's not here?

5          **THE COURT:**  It will be on your --

6    **BY MR. DOOLEY:**

7    **Q.**    It will be on your screen.

8          And in the middle there, at 12:45ish on June 30th, you

9    wrote to Mr. Winkler, "Client just pulled the plug.  They are

10   not comfortable making any commit at this time."  Do you see

11   that?

12   **A.**    Yes.

13   **Q.**    In your experience as a sales executive, it's certainly

14   true that customers sometimes change their mind; right?

15   **A.**    Yes.

16   **Q.**    They reject a deal one day, and then later on, they decide

17   to take the deal.  That happens sometimes, doesn't it?

18   **A.**    Yes.

19   **Q.**    And it is certainly true, in your experience as a sales

20   executive, that sometimes customers reject deals as a

21   negotiating tactic, as a way to get a better deal down the

22   line.  That is a negotiating tactic; right?

23   **A.**    Yes.

24   **Q.**    And in your June 30th email, you didn't write that Abbott

25   would never do this deal, did you?  You wrote "they're not

1  comfortable making any commit at this time"; right?

2  A.   Yes.

3  Q.   And you didn't write that Abbott would never agree to an

4  upfront license, did you?

5  A.   Not -- no.

6  Q.   And, in fact, about a month later, Abbott did sign a

7  license agreement with Autonomy; correct?

8  A.   (No response.)

9  Q.   Do you recall that?

10 A.   They signed -- yes.  I mean, are you referring to the

11 agreement we talked about earlier?

12 Q.   I am.  We'll get there, but I was --

13 A.   Yeah.

14 Q.   So you weren't able to close the license agreement on

15 June 30th, but then essentially at the end of July, you did

16 close a license agreement with Abbott?

17 A.   Yes.

18 Q.   And let's look at that one.  That's Exhibit 2043.  It's

19 already in evidence.

20      And this is -- at the top, it's captioned as the "First

21 Amendment to the Master Professional Services Agreement";

22 correct?

23 A.   Yes.

24 Q.   And I think that may be a typo.  I think it's later

25 referred to as the fifth amendment.  It's actually the fifth

1  amendment to the MPSA; right?

2  **A.**    That is correct.

3  **Q.**    But, in any event, if you look at Section 4(a) of this

4  agreement where it says "license grant" -- if we could blow

5  that up.   Again, we have very tiny font here.

6       We see the same language we saw in the earlier agreement

7  you sent over, "Autonomy hereby grants to customer a personal

8  non-exclusive, non-transferable, non-assignable,

9  non-sublicensable term license to use the licensed software

10  during the license term"; right?

11  **A.**    Yes.

12  **Q.**    Okay.   And then on the next page, there's Section 4(e),

13  "hosting of licensed software."   Do you see that?

14  **A.**    Yes.

15  **Q.**    And what that says is, "Autonomy shall host the licensed

16  software and make such licensed software available to customer

17  in connection with Autonomy's provision of the SLD services

18  pursuant to the agreement."   Do you see that?

19  **A.**    Yes.

20  **Q.**    And so, again, this is a license agreement whereby Abbott

21  was buying a license to Autonomy's software and then Autonomy

22  was going to host Abbott's data on its servers; correct?

23  **A.**    Yes.

24  **Q.**    Just like the proposal that you were working long hours on

25  in June; correct?

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    And Abbott agreed to pay a total of $600,000 for this

3    license?

4    **A.**    Yes.

5    **Q.**    So in sum, even though Abbott didn't agree to sign the

6    larger license deal with Autonomy on June 30th, Abbott did

7    agree to sign this smaller license deal about a month later?

8    **A.**    Yes.

9    **Q.**    You were asked some questions about a company called

10   Discover Tech and Discover Tech acting as a payment agent or

11   invoicing Abbott.  Do you remember those questions?

12   **A.**    Yes.

13   **Q.**    All right.  You don't remember why Discover Tech was being

14   discussed as a possible payment agent between Abbott and

15   Autonomy, do you?

16   **A.**    No.

17   **Q.**    And you don't remember whether Discover Tech actually

18   billed Abbott or whether any invoices went through Discover

19   Tech, do you?

20   **A.**    No.

21   **Q.**    If we could call up Exhibit 2324, which is in evidence and

22   you were shown on your direct.

23       Just down at the very -- the original email on the bottom

24   of the last page, this is the email from Mr. Wilner to someone

25   named Ms. Dhillon, copied to you with the subject "Abbott

**PROCEEDINGS**

1  contract."  Do you see that?

2  **A.**    I do, yes.

3  **Q.**    And asking, "Can you send along the name/account for the

4  third-party billing company and Jane will give you our primary

5  contact in legal at Abbott" -- sorry -- "Jane will give our

6  primary contact in legal at Abbott a call on Monday."  Do you

7  see all that?

8  **A.**    Yes.

9  **Q.**    That request came from Mr. Wilner; right?

10 **A.**    Yes.

11 **Q.**    He came over -- just to remind the jury, he came over from

12 Iron Mountain with you; right?

13 **A.**    Yes.

14 **Q.**    He was based here in the U.S.?

15 **A.**    Yes.  Seattle.

16 **Q.**    And you never talked to Mr. Hussain about any of this

17 Discover Tech billing stuff, did you?

18 **A.**    No.

19 **Q.**    I'd like to direct your attention to Exhibit 1890, which

20 is in evidence.  I'll call it up on the screen for you.

21       And just if you could roll down to the original email at

22 the bottom, you were asked about this on your direct.  I just

23 have a couple follow-ups.

24       This is an email from -- again, from Mr. Wilner to you

25 with the subject "Abbott contract," June 23rd.  Do you see

PROCEEDINGS

1    that?

2    **A.**    Yes.

3    **Q.**    And copied to Joel Scott?

4    **A.**    Yes.

5    **Q.**    And Joel Scott, he was the general counsel of Autonomy; is

6    that right?

7    **A.**    I don't know if he was general -- he was an attorney.  I

8    know that.

9    **Q.**    Fair enough.

10        He was a lawyer who worked at Autonomy here in the

11   United States; right?

12   **A.**    Yeah.  Yes, yes, yes.

13   **Q.**    Then flipping to the next page -- sorry.  Let's go to page

14   2 of the exhibit at the bottom.  There's an email from -- just

15   the email header and the email is coming from Mr. Guaio.

16   **A.**    Livius Guaio.

17   **Q.**    Guaio.  I apologize.  Mr. Guaio.

18        And he is also a lawyer?

19   **A.**    I presume so, yes.

20   **Q.**    And this email is to -- well, you say you presume so.  Did

21   you work with him when you were at Autonomy?

22   **A.**    He stepped -- Rick Winkler was out on leave on vacation or

23   something, and he was Rick's -- Rick directly reported to him,

24   so he worked as part of the contracts organization in, I

25   believe, some sort of lawyering function, but I don't know what

1    his actual -- I can't say affirmatively yes or no if I know

2    that he's an attorney.

3    **Q.**    Fair enough.  Thank you for that clarification.

4         It's copied to a Stephen C.  Do you see that?  The email

5    is actually directed to Stephen C.

6    **A.**    I see that.

7    **Q.**    That is Stephen Chamberlain; is that right?

8    **A.**    I think so.

9    **Q.**    Do you know who Steve Chamberlain is?

10   **A.**    He was in finance.

11   **Q.**    He worked in finance at Autonomy; correct?

12   **A.**    Yes.  That's my understanding.

13   **Q.**    And the next person in the "to" line there is a woman

14   named Poppy Prentis.  Do you see that?

15   **A.**    Yes.

16   **Q.**    Did you understand she also worked in finance?

17   **A.**    Finance, accounting, on the deal desk of some sort.

18   **Q.**    And if you look up in the email, her title, just above

19   that, is corporate controller.  Does that sound about right?

20   **A.**    I don't see that.

21        **MR. DOOLEY:**  Jeff, if you could just -- there we go.

22        **THE WITNESS:**  Yes.  I see that.

23   BY MR. DOOLEY:

24   **Q.**    If you would -- if you could go to Exhibit 1891, we looked

25   at this one as well.  If you blow up the middle -- right there,

PROCEEDINGS

1   Jeff.  That would be great.

2       You see there is an email from Mr. Winkler.  You testified

3   he is another in-house lawyer; correct?

4   **A.**   Yes.

5   **Q.**   When you were at Autonomy, Ms. Snider, it was common that

6   the finance department and the legal department would review

7   contracts before they went out to customers; correct?

8   **A.**   That's what I recall, yes.

9   **Q.**   And, in fact, is it your recollection that finance and

10  legal reviewed all contracts before they were sent to

11  customers?

12      **MR. FRENTZEN:**  I'm sorry.  Objection.  Just as to her

13  personal --

14  **BY MR. DOOLEY:**

15  **Q.**   To your knowledge --

16      **MR. FRENTZEN:**  -- experience?

17  **BY MR. DOOLEY:**

18  **Q.**   In your experience, did finance and legal review all

19  contracts before they went to the customers?

20  **A.**   Yes.

21  **Q.**   And in your experience, you couldn't sign a contract with

22  a customer unless the finance people and the lawyers had

23  approved it; is that right?

24  **A.**   Yes.

25      **MR. DOOLEY:**  Ms. Snider, thank you.  I have no further

**SNIDER - REDIRECT / FRENTZEN**

1    questions.

2                **THE COURT:**  Redirect.

3                **MR. FRENTZEN:**  Thank you, Your Honor.

4                          **REDIRECT EXAMINATION**

5    BY MR. FRENTZEN:

6    **Q.**   Good afternoon, Ms. Snider.

7         This licensing notion, was that something that was new to

8    you after Autonomy acquired Iron Mountain?

9    **A.**   Yes.

10   **Q.**   Can you tell us about that?  How did this licensing thing

11   first start coming up in what you were proposing to clients?

12   **A.**   Well, as I said earlier, in the case of Abbott, we had

13   only -- well, in all cases, rather, we -- Stratify, Iron

14   Mountain, Iron Mountain Digital, we only offered software as a

15   service that was invoiced upon receipt, so over the course of a

16   month, whatever we billed, we then invoiced.

17        The notion of licensed contracts or licensed offering of

18   software was something that came up as we became part of

19   Autonomy as another construct for delivering services or

20   selling the software.

21   **Q.**   And as a new construct, was that something that you

22   were -- that you were requested to ask clients to do?

23   **A.**   Yes.

24   **Q.**   So was it your idea to phrase all of these proposals to

25   Abbott as licenses?

1    **A.**    It was not my idea, no.

2    **Q.**    And, again, because of Abbott's historic resistance to

3    payment up front, was that something that you expected that

4    they would resist?

5    **A.**    Yes.  I didn't expect them to pay up front.

6    **Q.**    Why did you go ahead and keep proposing what you were

7    proposing to them then?

8    **A.**    I was asked to.

9         **MR. FRENTZEN:**  May I have one moment, Your Honor?

10         (Pause in proceedings.)

11         **MR. FRENTZEN:**  That's all I have.  Thank you,

12    Ms. Snider.

13         **MR. DOOLEY:**  No.

14         **THE COURT:**  I have a question.  I'm trying to figure

15    this out.

16       Was the service that was given to Abbott before, in a

17    general way -- before it was acquired by Autonomy and after it

18    was acquired by Autonomy, any different, the service, what you

19    did for Abbott?

20         **THE WITNESS:**  No.

21         **THE COURT:**  Okay.  Thank you.

22       Okay.  Next witness.

23         **MR. REEVES:**  Thank you, Your Honor.  The United States

24    calls Sean Blanchflower, please.

25         **THE CLERK:**  Hello.  Please raise your right hand.

1        **SEAN BLANCHFLOWER**,

2    called as a witness for the Government, having been duly sworn,

3    testified as follows:

4           **THE CLERK:**  Thank you.  Please be seated.

5       Please state your full name for the record and spell your

6    last name.

7           **THE WITNESS:**  Sean Mark Blanchflower.

8    B-L-A-N-C-H-F-L-O-W-E-R.

9           **MR. REEVES:**  May I inquire?

10          **THE COURT:**  Yes, please.

11                    **DIRECT EXAMINATION**

12   BY MR. REEVES:

13   **Q.**   It's Dr. Blanchflower; right?

14   **A.**   That's right.

15   **Q.**   Good afternoon, Dr. Blanchflower.

16   **A.**   Good afternoon.

17   **Q.**   Where are you from?

18   **A.**   I'm from Cambridge in the UK.

19   **Q.**   What is your educational background?

20   **A.**   At university, I studied a Bachelor's degree in

21   mathematics, followed by a Master's in mathematics, and then a

22   Ph.D. in applied mathematics, all at the University of

23   Cambridge.

24   **Q.**   After you completed your Ph.D., please describe your

25   career.

BLANCHFLOWER - DIRECT / REEVES

**A.**    I did a year as postgraduate -- postdoctoral studies, and during that year, I looked for jobs in the southwest sector and received a job at Autonomy.

**Q.**    And approximately what year did you join Autonomy?

**A.**    It was 2000.

**Q.**    And in what position did you join Autonomy in or around 2000?

**A.**    My initial role was R&D engineer.

**Q.**    What were your duties and responsibilities as an R&D engineer?

**A.**    We oversaw the main product, which is now known as IDOL Server, and our job was to try to add new functionality to the product by extending its capabilities.

**Q.**    What does the term "R&D" mean?

**A.**    It stands for "research and development."

    In the software sector, there is a research phase where you try to determine how and whether a piece of functionality can be made to work.

    And then in the development phase, you code that up into a working piece of software ready for giving to your customers.

**Q.**    Let me direct your attention to the year 2004.  At or around that time, were you promoted?

**A.**    Yes, sir.  I became head of research and development.

**Q.**    And what does it mean to be head of research and development at Autonomy?  What did you do in that capacity?

BLANCHFLOWER - DIRECT / REEVES

1    A.    My primary role was to act as the conduit between senior

2    management and the research and development team to receive

3    requests for new products or for changes to the existing

4    products and to help make them happen.

5    Q.    All right.  I'd like to focus on the time period 2008 to

6    2011.  Is that time period clear to you?

7    A.    Yes.

8    Q.    In or around that time, were you still working at

9    Autonomy?

10   A.    Yes, I was.

11   Q.    Were you also still then the head of R&D at Autonomy?

12   A.    I was.

13   Q.    All right.  And where did you actually work in that time

14   period?

15   A.    I was always working in the Cambridge office.

16   Q.    And by the time period 2008 to 2011, how large, how big,

17   was the R&D group within Autonomy?

18   A.    Over the years from 2003 onwards, Autonomy had acquired

19   other companies which grew the team around the world; thus, the

20   Cambridge team had around maybe 70 R&D engineers around the

21   world.

22       By the time -- by 2011 when we were acquired by

23   Hewlett-Packard, the team had reached 650 developers.

24   Q.    Thank you.

25       Now, you said you were, as head of R&D -- you were a

1  conduit to senior management.  Do you recall that testimony?

2  A.   Yes.

3  Q.   And who were you referring to when you say "senior

4  management"?  What did you mean by that?

5  A.   The person I most often dealt with was Peter Menell, my

6  direct manager, the chief technology officer.

7  Q.   And what was, as you understood it -- were Mr. Menell's

8  responsibilities as chief technology officer at Autonomy?

9  A.   He oversaw the whole of the technical process, which

10 included research and development, as well as overseeing the

11 technical presales team who implemented things once a customer

12 had bought it.

13      And so he -- he would -- he would pass down -- I'm not

14 sure where they came from, to be honest, but they would reach

15 me by him making a request for a change to the existing

16 products or to work on new products.

17 Q.   Okay.  And were those the types of things with which you

18 would interact with Mr. Menell about, changes in existing

19 products, for example?

20 A.   Yes.

21 Q.   All right.  And what was it like to work with Mr. Menell

22 in the years 2008 to 2011?

23          MS. LITTLE:  Objection.  Vague.  And I'm not sure why

24 it's relevant, what it was like --

25          THE COURT:  Sustained.

BLANCHFLOWER - DIRECT / REEVES

1  BY MR. REEVES:

2  Q.   Did you have any interactions with other members of senior

3  management besides Mr. Menell?

4  A.   During what time period?

5  Q.   My questions will be around 2008 to 2011, so it's in that

6  time period, please.

7  A.   During that time period, very little, indeed.  For one

8  particular project, I had involvement with the chief executive

9  officer, but other than that, almost everything was through

10 Mr. Menell.

11 Q.   Okay.  And who are you referring to as the chief executive

12 officer?

13 A.   That's Michael Lynch.

14 Q.   Okay.  And what was your -- what were your interactions

15 with Dr. Lynch like or what was the subject that you were

16 working with him on?

17 A.   He had a great interest in the new technology he wanted to

18 create, which was some technology around augmented reality, so

19 he worked with us on -- as we developed the technology and

20 helped to showcase it to some initial customers.

21 Q.   Did you have -- withdrawn.

22      Were you familiar with Mr. Sushovan Hussain?

23 A.   Yes.

24 Q.   Did you have any interactions with Mr. Hussain?

25 A.   In a work sense, very little.  I spoke to him maybe half a

BLANCHFLOWER - DIRECT / REEVES

1  dozen times over the whole time between joining Autonomy and
2  being acquired by HP, and they were predominantly on non-work
3  matters.
4  **Q.**   Okay.  Are you familiar with a software from a company
5  called NCorp?
6  **A.**   Yes.
7  **Q.**   What was NCorp?
8  **A.**   It was a company founded by Mike Lynch prior to the time I
9  joined Autonomy and it -- it subsequently folded and the
10 technology was acquired by Autonomy.
11 **Q.**   And what was the software or technology from NCorp that
12 was eventually acquired by Autonomy?
13 **A.**   It tried to solve what is known as the zero hit database
14 problem which is when you're searching a database, perhaps the
15 criteria you have given it are too narrow, you have done too
16 tight a search, and so instead of giving any useful results, it
17 just says "no hits."
18       So what it would try to do, it would try to add little
19 fuzzy searching to that to say, well, there aren't any matches
20 that match all of the criteria, but perhaps if we loosen one of
21 them, then we can find a match that is very nearly what you're
22 after, which is very often useful to the person doing the
23 query.
24 **Q.**   Okay.  Prior to 2008, was the NCorp software being used in
25 any way within Autonomy, to the best of your knowledge?

1  **A.**   Not to my knowledge, no.

2  **Q.**   Let me direct your attention now, if I could, to the

3  summer of 2009 in or around July, August, 2009.  Is that time

4  period clear?

5  **A.**   Yes.

6  **Q.**   Okay.  At or around that time, were you familiar with what

7  became a launch of a new product in or around September 2009

8  known as SPE?

9  **A.**   Yes.

10  **Q.**   Did you have any involvement in the development of SPE

11  beginning in the summer of 2009?

12  **A.**   I did.

13  **Q.**   Okay.  What did you do with regard to SPE?  What was your

14  involvement in developing it?

15  **A.**   The Cambridge R&D team was asked by probably Peter Menell

16  to create a demonstration, so a showcase of some new technology

17  that we would create to demonstrate effectively the same kind

18  of functionality that the NCorp had, so to try to show in the

19  same way how we could use technology to solve the zero hit

20  database problem.

21  **Q.**   What does "SPE" stand for again, please?

22  **A.**   Structured Probabilistic Engine.

23  **Q.**   So was there any relationship between SPE and the software

24  from NCorp, or were they aimed at solving the same problem?

25  **A.**   They were certainly aimed at solving the same problem.

1   Q.   Technically, was there any relationship between the two

2   softwares?

3   A.   I was pointed towards the source code for NCorp, which

4   Autonomy owned at that point, to see whether there was any

5   technology that could be reused.

6        I found that there wasn't, and IDOL Server was largely

7   capable of the functionality that we wanted to show, and so I

8   used IDOL Server instead.

9   Q.   I would like to show you what has been marked for

10  identification as Exhibit 179.  I put a set of exhibits in

11  front of you.

12       Do you see Exhibit 179 on the top there?

13  A.   I do.

14  Q.   Do you recognize Exhibit 179?

15  A.   Yes.

16  Q.   Is this an email from you, Dr. Blanchflower, to Fernando

17  Lucini on or a around August 25, 2009, relating to a new

18  product launch?

19  A.   It is.

20            MR. REEVES:  At this time I would --

21            THE COURT:  Admitted.

22       (Trial Exhibit 179 received in evidence)

23            MR. REEVES:  Thank you, Your Honor.

24       If we could please enlarge the top half.  That's perfect.

25  Q.   Let's start with the lower email, Dr. Blanchflower.  Who

**BLANCHFLOWER - DIRECT / REEVES**

1    are you writing to?  Who is Mr. Fernando Lucini?

2    **A.**    I'm not sure of his job title, but among his many roles

3    was he would look after the technical presales team to help

4    smooth any technical work that needed doing in preparation for

5    a sale.

6        But he was also -- he would also work with senior

7    management on important technical projects.

8    **Q.**    Did you work closely with Mr. Lucini?

9    **A.**    Yes.

10    **Q.**    And you're writing to him on or around August 25th,

11    "Subject:  Urgent new product launch."  What product are you

12    referring to there?

13    **A.**    The demonstration that became known as SPE.

14    **Q.**    All right.  And you write, "We need to prepare in advance.

15    As surprises will come as the demo gets close, yet no demo

16    exists," etc.  Do you see that?

17    **A.**    I do.

18    **Q.**    What do you mean by that?  What are you doing here?

19    **A.**    It was -- it was clear that when -- when the final -- the

20    final criteria that became known as -- what exactly we needed

21    to create, there would be a great time pressure on delivering

22    it.  We needed to have it ready by a certain time, but perhaps

23    it wasn't clear then.

24        I'm saying that we know there is a need for a demo coming.

25    We just don't have all the details to be able to make it yet,

1    so get ready.

2    **Q.**   What exactly is the demo, as you're using that term here?

3    What do you mean?

4    **A.**   When new technology is created, one of the best ways of

5    getting it out into the field is to show it to either

6    prospective customers or existing customers, hoping they will

7    like it.  They often give feedback.  Or it gets them interested

8    in it.  If they are interested, then we can develop it further

9    or sell it to them.

10   **Q.**   Up above in the email, you write to Mr. Lucini, "This is

11   the demo we've been making for a couple weeks and are with

12   Vance/Al still."  Do you see that?

13   **A.**   Yes.

14   **Q.**   What did you mean by that?

15   **A.**   I'm tying the two ends together and saying that the demo

16   that is being requested is the one that -- that we've already

17   been working on for the past couple of weeks and so will be

18   useful in what it needs.

19   **Q.**   If this email is dated on or around August 25th and you'd

20   been working on the demo for a couple of weeks, when do you

21   estimate your development team first began to work on the

22   SPE -- what became the SPE product?

23   **A.**   Certainly no earlier than the start of August.

24   **Q.**   All right.  Where was the work being done on SPE beginning

25   in or around August 2009?

1   **A.**    In the R&D team in Cambridge.

2   **Q.**    And other than working on the demo, were you working on

3   other things, you and your team?

4   **A.**    Many other things, yes.

5   **Q.**    What other sorts of things were you working on or were

6   involved in?

7   **A.**    Well, IDOL is an extremely big product and has a lot of

8   different components to it that are constantly in development.

9   There would be specific requests from customers for features

10  and there would be issues and problems to investigate and fix.

11  Beyond that, I don't know any other specifics.

12  **Q.**    Prior to early August 2009, had any work been done on SPE

13  before you began to work on it in the manner you've described?

14  **A.**    Not by the Cambridge team, no.

15  **Q.**    Do you have any reason to think that any of the other

16  members of the R&D group outside of Cambridge but within

17  Autonomy were working on SPE?

18  **A.**    I don't.

19  **Q.**    And as head of research and development for Autonomy in

20  this time period, do you think you would have known if other

21  engineers or people in the R&D group within Autonomy were

22  developing SPE prior to August 2009?

23  **A.**    I would have thought so, yes.

24  **Q.**    I'd like to show you what has been marked as Exhibit 2747,

25  please.  Do you have that?

BLANCHFLOWER - DIRECT / REEVES

1    **A.**    I do.

2    **Q.**    Do you recognize this email, Dr. Blanchflower?

3    **A.**    I do.

4    **Q.**    Is this an email exchange again between you and Mr. Lucini

5    and others in or around September 2009 relating to SPE?

6    **A.**    It is.

7              **MR. REEVES:**  At this time I offer --

8              **THE COURT:**  Admitted.

9         (Trial Exhibit 2747 received in evidence)

10             **MR. REEVES:**  Thank you, Your Honor.

11        If we could again just enlarge the top half of the email.

12   Let's start with -- if we could go to Dr. Blanchflower's email.

13   That's great right there.  That's fantastic.

14   **Q.**    Do you see the email, Dr. Blanchflower, that it appears,

15   according to the document, that you wrote on or around

16   September 4th, 2009?

17   **A.**    I do, yes.

18   **Q.**    And this is the British dating system, is it not, this

19   04/09/2009?

20   **A.**    The 4th of September.

21   **Q.**    The 4th of September, 2009.  Okay.

22        And you write, "Indeed, looks good, though it's not much

23   change."  And then you talk about a few key points.

24        Are you discussing your work on SPE here?

25   **A.**    On the demo, yes.

BLANCHFLOWER - DIRECT / REEVES

1  **Q.**   On the demo.

2      And what are some of the key points that you are pointing

3  out in this email to Mr. Lucini?

4  **A.**   Well, at this stage, we had been asked that the demo show

5  three different ways of querying the system, interrogating the

6  system.  One was via SQL, structured query language, which is

7  the standard way of talking to databases in the industry.  One

8  is by natural language, by using human text by just writing an

9  answer in human language.  And the third is structured by

10  selecting items from drop-down boxes.

11  **Q.**   And is this some type of user interface that you're

12  considering or evaluating?

13  **A.**   It is, yes.

14  **Q.**   And what is a user interface?  What does that mean?

15  **A.**   It's -- the communication between computer -- their

16  components is generally not very human-friendly.  It's designed

17  to be understood by computers, but not by humans, really.

18      And so user interfaces mark them up on a screen, generally

19  in a web browser, you know, in a way that makes sense to a

20  human being.  For example, instead of having a string of

21  numbers, you could put them in a pie chart or on a line graph

22  or something like that.

23  **Q.**   By September 2009, overall, how big a project would you

24  say your work on SPE was for you and your development team?

25  **A.**   It was clearly a very important one in that we needed to

1   do it rapidly, but in terms of the resources it took, that was

2   relatively minor.

3   **Q.**   Relatively minor in terms of resources and costs?

4   **A.**   Yes.

5   **Q.**   On or around September 16th, 2009, to your knowledge, was

6   there a public announcement about the launch of this new

7   product, SPE by Autonomy?

8   **A.**   I don't recall seeing it at the time, but I believe there

9   was, yes.

10  **Q.**   I'd like to show you what has been received in evidence as

11  Exhibit 199.

12      If I could please display that, Your Honor.

13      Great.  Maybe we could just -- that's fantastic,

14  Ms. Margen.  Thank you very much.  That's fine.

15      Do you recognize this document, Dr. Blanchflower?

16  **A.**   I would doubt I saw it at the time, but it looks like a

17  press release by Autonomy to announce a new piece of

18  technology.

19  **Q.**   Okay.  And is it consistent with your recollection that on

20  or around September 16th, 2009, Autonomy announced the launch

21  of this new SPE product?

22  **A.**   Yes.

23  **Q.**   All right.  We can keep the press release up for the

24  moment, and I'm going to ask a few questions about the work

25  that went into it.

1  Are you able to estimate between early August 2009 and the

2  date of this launch, on or around September 16th, 2009,

3  approximately how much research and development time and work

4  was done in order to establish the launch of the SPE product?

5  **A.**  I can try, yes.

6  **Q.**  Okay.  Take your time and tell us how you would estimate

7  the costs associated with the launch of this new SPE product.

8  **A.**  There were two main facets of what we were working on.

9  One was the user interface and the demo.  The second one was

10  the preparation of IDOL Server for a -- an SPE installer

11  release at the end of September.

12  So breaking those down, the user interface work, including

13  the preparation of data for the demo, I would say was perhaps 8

14  person weeks.  The changes to IDOL Server to allow the kind of

15  queries that we were showing was no more than one or two weeks.

16  In addition, there was some work on something known as the

17  SQL proxy that allowed us to query it using the SQL language,

18  and that was maybe -- maybe 10 or 12 person weeks, at most.

19  **Q.**  Anything else?

20  **A.**  There was a little -- there was some documentation written

21  for the new installer, maybe one or two weeks.  Some graphic --

22  the graphical work -- some graphical work for the demo, but

23  that was less than a week.

24  **Q.**  Okay.  I want you to be over-inclusive, please.

25  Can you think of any other work that was done by any of

BLANCHFLOWER - DIRECT / REEVES

1  the development team relating to SPE?

2  **A.**   I can't.

3  **Q.**   So we're going to draw on your skills as a mathematician,

4  if we may.  Can you add up how many person weeks or estimate in

5  terms of the total number of person weeks the development team

6  spent working on SPE?

7  **A.**   So -- did you write down the numbers I gave you?

8  **Q.**   I did.  I can help, if you want.

9  **A.**   Yes, please.

10  **Q.**   So we have 8 plus 2.  10?

11  **A.**   Yes.

12  **Q.**   And we have 10 plus 10 to 12 person weeks.  We will add

13  12.  So 10 plus 12 is what?

14  **A.**   22.

15  **Q.**   Okay.  And then we have, we'll say, two weeks for the

16  documentation and graphical work.  How many weeks is that?

17  **A.**   24.

18  **Q.**   24.  Now, what does a person week cost --

19          **THE COURT:**  What is a person week?

20  **BY MR. REEVES:**

21  **Q.**   What is a person week?

22  **A.**   A person week is one person working for one week.

23  **Q.**   How many hours?

24  **A.**   It's not really measured, but I would -- the standard

25  hours were 9:30 to 6:00, which is 37 1/2 hours of work time.

BLANCHFLOWER - DIRECT / REEVES

1    **Q.**    What do you estimate the value of -- the maximum value of

2    a development person's week in terms of cost or salary?

3    **A.**    The standard salary for an engineer in Cambridge, UK at

4    that time was between 30 and 40,000 pounds per annum.  If we

5    add then what are called the overheads to what is known as the

6    fully-loaded cost, the all-in cost of employing somebody for a

7    year --

8    **Q.**    Please.

9    **A.**    -- then it would be maybe 50,000 pounds per year.

10   **Q.**    Can we say -- is it over-inclusive to say a thousand

11   pounds per person week?

12   **A.**    A thousand pounds per person week would be 52,000 so that

13   is an over-estimate, yes.

14   **Q.**    An over-estimate.  We are being over-inclusive.  Okay?

15   **A.**    Yes.

16   **Q.**    So we have a thousand pounds times 24 person weeks is how

17   many pounds?

18   **A.**    24,000 pounds.

19   **Q.**    All right.  And in terms of dollars -- now I'm going to

20   test your exchange rate knowledge -- do you have an

21   understanding of the pound to dollar in this time frame?

22   **A.**    I don't know it exactly, no, but I'm pretty sure it has

23   never been over -- over $2 to the pound in my -- in my time --

24   my working career.  So --

25   **Q.**    Let's call it $2 then.  So one pound is equal to $2.

1    Let's round up to 25,000 pounds times $2 is approximately

2    $50,000.  Would you agree?

3    **A.**    Yes.

4    **Q.**    In this estimation, have you been over-inclusive, as best

5    you can?

6    **A.**    I believe so, yes.

7    **Q.**    Can you describe any other costs that should be properly

8    included in the development of the SPE that we haven't

9    calculated today?

10   **A.**    No.

11   **Q.**    Would it be fair to say that all, in your judgment, based

12   on what you know, Dr. Blanchflower -- that the maximum amount

13   of R&D costs that you were aware of associated with SPE was

14   $50,000?

15   **A.**    Well, work done by the Cambridge team during Q3 of 2009,

16   yes.

17   **Q.**    Do you have any reason to believe that there was any

18   significant work done by other teams outside of Cambridge?

19   **A.**    I don't.

20   **Q.**    All right.

21        I'd like to show you, if I could, a document that is not

22   in evidence and which I'd like to have displayed, with the

23   Court's permission subject to connection.  One of the audit

24   work papers that we anticipate offering later in the trial.

25        **MS. LITTLE:**  No objection.

1          **THE COURT:**  Does it have a number?

2          **MR. REEVES:**  It does have a number.  Exhibit 229,

3    please.

4          **THE COURT:**  229.

5          **MR. REEVES:**  And, again, with the Court's permission,

6    I would like to have this displayed.

7          **MS. LITTLE:**  No objection.

8          **THE COURT:**  Fine.  Admitted.

9          (Trial Exhibit 229 received in evidence)

10   **BY MR. REEVES:**

11   **Q.**   Did you have any direct dealings on a regular basis,

12   Dr. Blanchflower, with Autonomy's auditors?

13   **A.**   Not on any regular basis, no.  There were times when I was

14   asked to -- in fact, I'm not sure who I spoke to, so, no.  I

15   have to say no.

16   **Q.**   You don't remember today?  You're not sure?

17   **A.**   There were times when Peter Menell would ask me to talk to

18   somebody about R&D projects.  It was clearly financial-related.

19   But they would ask some questions; I would answer them.  But

20   they only happened two or three times and it was around 2006,

21   2007, I think.

22   **Q.**   Okay.  In your preparation for your testimony today, did

23   you have an opportunity to look at the details of Exhibit 229?

24   **A.**   Yes.

25   **Q.**   Okay.  But do you think you saw this document in or around

1    2009?

2    **A.**   I'm pretty sure that I did not.

3    **Q.**   All right.  I'm representing to you that this is a work

4    paper that relates to costs around SPE, and I'm going to ask

5    some questions about it.  Is that clear?

6    **A.**   Yes.

7    **Q.**   I'd like to show you -- if we could drop down a little bit

8    and enlarge this -- this is great right here.  If you would

9    enlarge -- withdrawn.  I'm so sorry.  If you would highlight,

10   please, the number 2.5 million right here next to "development

11   team."  Do you see that?  That's great.  Okay.

12       In this document, there is an estimation that the

13   development team, with the additional effort in Q3, had R&D

14   costs of $2.5 million.  Do you see that?

15   **A.**   I do.

16   **Q.**   If that was the information that was given to the

17   auditors, is that consistent with your understanding of the

18   amount of costs that were associated with the SPE launch?

19   **A.**   I can't -- I don't understand where it came from, no.

20   **Q.**   Because you estimate the costs are only approximately

21   $50,000?

22   **A.**   Yes.

23   **Q.**   All right.

24       If we go, please, to the fourth page of Exhibit 229 and

25   the summary is what I would like to enlarge, and if you'd

1    highlight the $7.3 million figure, Ms. Margen.  Thank you very

2    much.

3         This is a further summary of R&D costs related to the

4    development of SPE.  Do you see that?

5    **A.**    I do.

6    **Q.**    And according to this document, those costs are

7    $7.3 million.

8    **A.**    Yes.

9    **Q.**    Do you have any understanding of that number,

10   Dr. Blanchflower?

11   **A.**    I do not.

12   **Q.**    Does that in any way correlate to the costs that you

13   observed as the head of R&D overseeing the launch of the SPE

14   product?

15   **A.**    No.

16   **Q.**    Thank you.  I'm done with that.

17        In the third quarter of 2009, during the time that you

18   were working on the development of SPE, did you consider it to

19   have some very difficult technical challenges that you had to

20   overcome in dealing with structured data?

21   **A.**    No.

22   **Q.**    In your view, based on your familiarity with IDOL and

23   Autonomy's products, was this new SPE product launched in

24   September 2009 the second most important in the history of the

25   company?  Would you agree with that statement?

1          **MS. LITTLE:**  Objection.  Foundation.

2          **MR. REEVES:**  I'm quoting from the earnings release

3    that is reflected in Exhibit 291, the public statement by the

4    company to investors on or around October 20th --

5          **THE COURT:**  That is not the objection.  The objection

6    is, as I understand it, that you have to lay a foundation that

7    he was familiar with Autonomy's release for some period of time

8    and then ask him whether he agrees with the statement that this

9    is of that magnitude.

10          **MR. REEVES:**  Okay.

11   **Q.**   Were you familiar with the IDOL product for Autonomy in

12   2009?

13   **A.**   Yes.

14   **Q.**   Did you work with it most days and --

15   **A.**   Yes.

16   **Q.**   Why don't you explain, if you would, please, your

17   familiarity with Autonomy's IDOL software in this time period,

18   2009.

19   **A.**   The IDOL Server was Autonomy's primary piece of software.

20   Even when we acquired other companies, they would always have

21   IDOL behind the scenes doing the work.

22          And it was the Cambridge team in particular, a small team

23   of which I was part, that did all of the work on IDOL Server.

24   So the first version of IDOL Server I helped write.

25   **Q.**   And are you proud of that work, Dr. Blanchflower?

**BLANCHFLOWER - DIRECT / REEVES**

1  **A.**   Very much so, yes.

2  **Q.**   And are you proud of the technical capabilities of IDOL?

3  **A.**   Yes.

4  **Q.**   Why?  Why don't you tell us why, please.

5  **A.**   There are very few pieces of technology like it.  It's --

6  it does a huge amount in a very elegant way and it's -- it's

7  proven by the -- the use across the industry that it's -- that

8  it's a valuable piece of software.

9  **Q.**   All right.  Were you familiar with some of the other

10 products that were offered by Autonomy in this time period?

11 **A.**   Yes.

12 **Q.**   Okay.  Going back to SPE, did you consider SPE, as you

13 understood it and you worked on it through September 2009, to

14 be a radical technology?

15 **A.**   The technology itself, I would have to say no.  I mean, it

16 primarily used the technology of IDOL Server.

17 **Q.**   That's the existing IDOL technology?

18 **A.**   Yes.

19 **Q.**   Go on.

20 **A.**   And one could say that the -- the technology of IDOL

21 Server is radical, yes.

22 **Q.**   But the technology of IDOL Server had been in existence

23 for a number of years prior to 2009, had it not?

24 **A.**   Yes.

25 **Q.**   And you were developing new applications and ways to use

BLANCHFLOWER - DIRECT / REEVES

1  it?

2  **A.**    Yes.

3  **Q.**    All right.  All in, do you think SPE, such as it was, was

4  a radical form of technology?

5  **A.**    I find that hard to answer.  I'm not sure how to answer

6  that.

7  **Q.**    Okay.  All right.

8        Was SPE the second most important product that Autonomy

9  had ever launched, in your judgment, from what you could see?

10 **A.**    Again, I considered it part of IDOL Server, so I didn't

11 consider it a new product.  It had the potential to grow an

12 entire new market, which would have been extremely valuable.

13 **Q.**    All right.  Let's shift gears a little bit and talk about

14 another software known as Storhouse by a company known as

15 FileTek.

16       Are you familiar with that type of software?

17 **A.**    Yes.

18 **Q.**    Let me direct your attention, if I can, to in or around

19 December 2009.  Did you have an opportunity or occasion to

20 evaluate software from FileTek known as Storhouse?

21 **A.**    We -- yes.  Yes.

22 **Q.**    What did you do, Dr. Blanchflower?

23 **A.**    I was asked to look for use cases of the Storhouse

24 technology within the Autonomy product suite.  How could we use

25 Storhouse to augment the product offering that we had.

BLANCHFLOWER - DIRECT / REEVES

1  Q.   When you say "use cases," what do you mean?

2  A.   Just what it would be useful in the software.  We were

3  handling a lot of different data, so how could some of that be

4  passed to the Storhouse software in a way that was valuable to

5  customers.

6  Q.   How much time did you spend working on this evaluation or

7  consideration of use cases relating to Storhouse?

8  A.   I don't recall exactly, but it was certainly within one

9  day, so we were probably asked in the morning and we delivered

10  the results in the afternoon.

11  Q.   What form did the results take?  What do you mean by

12  "delivering the results"?

13  A.   Again, it was Peter Menell who asked -- who made the

14  request for the use cases.  And I sent the -- the results to

15  Darren Gallagher, one of my senior colleagues, and then he

16  passed them back via email to Peter Menell.

17  Q.   I would like to show you what has been marked for

18  identification as Exhibit 408.  Do you have that in front of

19  you?

20  A.   I do.

21  Q.   Do you recognize that document?

22  A.   Yes.

23  Q.   Did you write a piece of it?

24  A.   I wrote the first two-thirds of the first page.

25         THE COURT:  Admitted.

1        (Trial Exhibit 408 received in evidence)

2            **MR. REEVES:**  Thank you, Your Honor.

3        If I could have that displayed, please.  If we could

4   enlarge the -- maybe a little bit more, down through the dotted

5   line.  That's good.

6   **Q.**   What is this document, Dr. Blanchflower?

7   **A.**   This is the results of my finding.  Each of the paragraphs

8   there starts with a -- one of Autonomy's products and then I

9   tried to described how one of the FileTek products, either

10  Storhouse or TrustedEdge, could be used by that Autonomy

11  product.

12  **Q.**   What are some of the suggestions you're making?

13  **A.**   So the FileTek product deals with structured data, data

14  that is going to go into a database of some sort.  And so I

15  tried to find areas that -- that needed database.

16      So, for example, in IDOL SPE, then given SPE was aimed to

17  deal with structured data, then clearly there was some way in

18  which Storhouse could -- could help that by -- by acting as an

19  interface to database storage.

20  **Q.**   Okay.  How deep a dive did you take, so to speak, into

21  the -- into the Storhouse software at the time you're looking

22  at it?

23  **A.**   We didn't have a copy of the software and so we had to

24  look on the web, do a web search, look at the website of

25  FileTek itself to try to find product information, briefings

1    and any other hits that we could find that would tell us more

2    about the technology.

3    **Q.**    From the work that you did, house useful a technology

4    could this have been for Autonomy, if you know?

5    **A.**    The -- the use cases I came up with were potentially

6    valuable, so, yes, if -- if Autonomy could unlock structured

7    data in the same way that it had unlocked the market of

8    unstructured data, which was Autonomy's primary market, then

9    that could be potentially very valuable.

10   **Q.**    All right.

11        Let me show you what has been marked for identification as

12   Exhibit 445, please.  Do you have that document in front of

13   you?

14   **A.**    I do.

15   **Q.**    Do you recognize this document, Exhibit 445?

16   **A.**    It's a purchase request.

17   **Q.**    Does it have your name on it as one of the signatories or

18   persons to give a signature on the bottom there?

19   **A.**    With purchaser's requests, there were a number of

20   signatories.  I wasn't a signatory to this purchase request,

21   but it does have my name on it as one of the people who, in

22   theory, is allowed to sign purchase requests.

23        **THE COURT:**  Admitted.

24        (Trial Exhibit 445 received in evidence)

25        **MR. REEVES:**  Thank you, Your Honor.

1          If I could display this.  Let's just enlarge the top half.

2    This is fine.  And if you would highlight the figure -- yes.

3    Right there is great.

4    **Q.**   Okay.  So this is a General Purchase Request.  What type

5    of document is that, Dr. Blanchflower?  What is that?

6    **A.**   When Autonomy wished to buy something, it needed to go

7    through the proper approval process to ensure the correct

8    number of signatures were received, and this is the document

9    showing that.

10   **Q.**   According to the document, it looks like Autonomy is

11   spending approximately $10.3 million on the Storhouse software.

12   Do you see that?

13   **A.**   I do.

14   **Q.**   Okay.  Did you know that in or around this time period,

15   early 2009 -- withdrawn -- in or around December 2009, that

16   Autonomy was acquiring the Storhouse software for approximately

17   $10.3 million?

18   **A.**   No.

19   **Q.**   What do you think of the expenditure of that amount of

20   money for the software as you reviewed it in or around this

21   time period?

22              **MS. LITTLE:**  Objection.  Vague and foundation.

23              **THE COURT:**  Overruled.

24              **THE WITNESS:**  Could you repeat the question, please?

25   \\\

BLANCHFLOWER - DIRECT / REEVES

1    BY MR. REEVES:

2    Q.    The question is what do you think of the expenditure of

3    $10.3 million for the software from FileTek's Storhouse in or

4    around December 2009?  The expenditure of that amount of money

5    for the software that you reviewed in or around this time

6    period?  What did you think of that?

7              MS. LITTLE:  Objection.  He said he didn't even know

8    about it at the time, so how could he have thought about it?

9              MR. REEVES:  I will ask a different question.

10    Q.    Did there come a time when you learned that Autonomy had

11    spent $10.3 million on that software?

12    A.    Yes.  Some years later.

13    Q.    Were you surprised?

14    A.    I was surprised, yes.

15    Q.    Why were you surprised?

16    A.    Autonomy was very good at creating new technology

17    in-house, and so whenever there were needs for new technology,

18    we would always try to do it ourselves, if possible.  And I

19    would have -- I would have thought that we would have tried to

20    create it ourself if it was a market we wanted to move into.

21    Q.    Did you think that spending $10.3 million for a technology

22    you could create yourself was a good use of money?

23    A.    Well, I'd have to say no.

24    Q.    After Autonomy acquired the Storhouse software, to your

25    knowledge, did Autonomy ever use it in any of its products?

1  **A.**   There were attempts made to use it in DigitalSafe, which

2  is one of the Autonomy products, but I've been led to believe

3  that that was unsuccessful --

4          **MS. LITTLE:**  Objection.  Hearsay.

5          **THE COURT:**  Well, I'm going to permit it.  Lay a --

6  you are going to have to ask him.

7  **BY MR. REEVES:**

8  **Q.**   Were there efforts to try to use the Storhouse software?

9  **A.**   I believe so, yes.

10  **Q.**   And how do you know that?

11  **A.**   Members of the Cambridge R&D team were asked to -- to try

12  to determine how the FileTek product could be used within

13  DigitalSafe.

14  **Q.**   Are these some of the people that you worked with within

15  your R&D team?

16  **A.**   Yes.

17  **Q.**   And do you know what happened as a result of their efforts

18  to try to use the Storhouse software?

19  **A.**   I don't know directly, no.

20  **Q.**   From them, do you know whether it was ever used?

21          **MS. LITTLE:**  Objection.  Hearsay.

22          **THE COURT:**  Overruled.

23          **THE WITNESS:**  They tell me that it was not.

24  **BY MR. REEVES:**

25  **Q.**   Okay.  Last topic.

BLANCHFLOWER - DIRECT / REEVES

1    Are you familiar with a sales effort to the Vatican
2    Library in Rome?
3    **A.**    I am, yes.
4    **Q.**    Did you have any personal involvement in that sales
5    effort?
6    **A.**    Yes.
7    **Q.**    Is it somewhat unusual or not an everyday occurrence for
8    you to be involved in a sales effort?
9    **A.**    Well, big or strategically valuable deals, we would always
10    put the best people on helping to ensure that the best effort
11    was done to land that deal, and this was, as far as we could
12    tell, a very important deal, and so, yes, I was involved,
13    but -- whenever there were important deals, the right people
14    would be involved, and so maybe four or five times a year I
15    would travel out and help to smooth the process of a new deal.
16    **Q.**    And the Vatican sales process was one of those important
17    deals?
18    **A.**    Yes.
19    **Q.**    All right.  So what did -- withdrawn.
20    I think my questions are in the time period 2009 to 2011.
21    Is that the time period that you recall working on this deal?
22    **A.**    My recollection is slightly earlier, 2008/2010, but around
23    then.
24    **Q.**    All right.  Let's go to a document to maybe work on the
25    time frame.

1    Let me show you what has been marked as Exhibit 283,

2    please.  Do you recognize that, Dr. Blanchflower?

3    **A.**   Yes.

4    **Q.**   Is this an email from you or an email chain from you

5    relating to the Vatican to, again, Mr. Lucini and others within

6    Autonomy on or around October 19th, 2009?

7    **A.**   Yes.

8         **THE COURT:**  Admitted.

9         (Trial Exhibit 283 received in evidence)

10        **MR. REEVES:**  Thank you, Your Honor.

11        If we could enlarge the top half.

12   **Q.**   So according to the document, there is a Vatican tech

13   meeting report that's being circulated by you on or around

14   October 19th, 2009.

15        What is happening in terms of your involvement in this

16   effort to sell to the Vatican Library in or around October

17   2009?  What are you doing?

18   **A.**   Well, this happens before a deal goes ahead.  We try to

19   show the technology to the customer in a way that will lead

20   them to buy the software, and so that's going ahead.

21        The team on site who are recipients of the email here are

22   setting up a system in which we can show the Autonomy

23   technology with help from the R&D team back in Cambridge.

24   **Q.**   Okay.  And by this point in time, approximately how long

25   would you estimate that you were working -- you personally had

1  been working on this sales effort associated with the Vatican

2  Library?

3  **A.**   On and off, for most of the year, but it would come in

4  waves.   There would be short periods of a lot to do and then

5  long periods with nothing to do.

6  **Q.**   All right.   Now, were there any trips to Rome?

7  **A.**   Yes.

8  **Q.**   What was the purpose of your trips to Rome?

9  **A.**   As a start, it was just to be present at a technical

10  meeting in case there were technical questions and I was called

11  upon to answer those.   I remember that I didn't.   I sat in both

12  meetings and didn't say a word.

13       After that, I would meet with the -- the -- the Autonomy

14  presales team on site, the technologists who were helping to

15  set it up, and I would help them to make sure it was set up

16  correctly.

17  **Q.**   Who were some of the senior people within Autonomy that

18  you were working with with regard to this effort to sell

19  software to the Vatican Library?

20  **A.**   Well, certainly all my instructions came from Peter

21  Menell, as usual.   Fernando Lucini was involved because this

22  was a big deal.   And then at one of the meetings, Will flew

23  over as did Sushovan Hussain, to try to finalize the deal.

24  **Q.**   To try to finalize the deal, did you say?

25  **A.**   I wasn't fully aware -- certainly there was a hope that at

1    some point, the Vatican would sign a deal and we would -- would

2    have made a sale.  And so I think we were hoping that the

3    meeting would go ahead and they would be able to sign.

4    **Q.**   Is that the meeting that you recall Mr. Hussain joining

5    you for?

6    **A.**   Yes.

7    **Q.**   Okay.  And was that in Rome?

8    **A.**   Yes.

9    **Q.**   And as you understood it, what was the purpose of

10   Mr. Hussain joining for this meeting in Rome with the Vatican?

11   **A.**   Well, the most important sales deals, I believe -- and I

12   played very little part in the sales process, but I believe

13   that -- that he would help to smooth the transition just to

14   make sure that it went ahead correctly.

15   **Q.**   Close the deal, for example?

16   **A.**   Yes.  Quite.

17   **Q.**   Did the deal close as a result of that trip?

18   **A.**   I believe the meeting didn't go ahead and I don't think

19   there was any -- any deal at that point.

20   **Q.**   Was that frustrating for you or did you enjoy a nice

21   weekend in Rome or something?

22   **A.**   Well, me personally -- for all the technical team, we were

23   so far removed from the sales process that we just concentrate

24   on the technical side of things.

25        Obviously, we wanted it to be a success because it very

1  prestigious deal for IDOL Server, so, yes, it was frustrating,

2  but there had been many times when it could have gone ahead and

3  hadn't and so it was just another one of those at the time.

4  **Q.**  Okay.  Other than this one trip, do you recall any other

5  occasions relating to the Vatican when you interacted with

6  Mr. Hussain about this Vatican sale?

7  **A.**  No.

8  **Q.**  And no other -- you remember the one trip?

9  **A.**  There was only one trip in which Sushovan was present.

10  But there -- I went five, six times in total to meet with the

11  technical team.

12  **Q.**  At any point in your involvement in the Vatican deal, do

13  you recall Stouffer Egan being involved?

14  **A.**  No.

15  **Q.**  Did you know Mr. Egan during the time that you worked at

16  Autonomy?  Do you know who he was?

17  **A.**  I knew who he was, yes.

18  **Q.**  But it's your recollection that -- from what you could

19  see, was Mr. Egan involved at all in the Vatican deal?

20  **A.**  I don't think so, no.

21  **Q.**  All right.

22      I'd like to show you what has been marked as Exhibit 1025

23  for identification, please.  Do you have that document?

24  **A.**  Yes.

25  **Q.**  Is this another email -- withdrawn.

1        Do you recognize this?

2    **A.**    I do.

3            **MS. LITTLE:**  No objection.

4            **THE COURT:**  Admitted.

5        (Trial Exhibit 1025 received in evidence)

6            **MR. REEVES:**  Thank you, Your Honor.

7        And if we could perhaps enlarge -- yes.  Just that email

8    right down -- the email from Dr. Blanchflower right in the

9    middle down here.  That's great.  Thank you very much.

10   **Q.**    So what is the date of this email, Dr. Blanchflower?

11   **A.**    The 3rd of August, 2010.

12   **Q.**    By August -- you write in this email -- why don't you read

13   what you write with regard to the Vatican update, August 3rd,

14   2010.  What do you write, please?

15   **A.**    To read it exactly?

16   **Q.**    Please.

17   **A.**    "So it's coming down to money?  If they find more, then

18   we'll carry on.  What else would we want to do?"

19   **Q.**    What is going on by this point in time, August 2010, with

20   regard to a possible sale to the Vatican Library?

21   **A.**    Well, I had initiated the thread just to ask Marco, who

22   was the key technical resource on site, how it was going

23   because we would do a lot of work setting things up correctly

24   and get very excited about this potentially huge project, and

25   then we would hear nothing, and so I was asking him for an

1    update.  "What has happened to it?  Is it still alive?  Can you

2    give me an update?"

3        And so it -- it -- from his response, he made it sound

4    like it was stalled and it wasn't going any further.

5    **Q.**   Let me show you another email, please, Exhibit 1831.  Do

6    you have that?

7    **A.**   Yes.

8    **Q.**   Is this another email from you to Mr. Menell, "Subject:

9    Vatican" in or around June 10th, 2011?

10   **A.**   Yes.

11           **THE COURT:**  Admitted.

12       (Trial Exhibit 1831 received in evidence)

13           **MR. REEVES:**  Thank you, Your Honor.

14       If we could just enlarge the top email.

15   **Q.**   This is from you, Dr. Blanchflower, roughly a year later

16   in June 2011, is it not?

17   **A.**   It is.

18   **Q.**   And what are you discussing in this email?  You're talking

19   about cameras and kits here.  What do you mean?

20   **A.**   The Vatican project was to digitize the library which

21   involved taking high definition photographs of a lot of the

22   manuscripts in the library.

23       And so to start the project, we had bought a very

24   expensive camera that we then shipped to -- to Rome to be used

25   in the -- in the project.  So I'm talking about the camera that

**BLANCHFLOWER - DIRECT / REEVES**

1    we gave them to use.

2    **Q.**    And talking about the camera to what end?

3    **A.**    In the -- by this stage, it was fairly clear that the

4    project had stalled and yet they still had the camera.  And so

5    it was just -- it was clearly owned by Autonomy.

6         So I was just intrigued and asking are they ever going to

7    give the camera back.  Basically can we have the camera back.

8    **Q.**    It looks like it was a pretty valuable camera?

9    **A.**    Yes.  We thought so.

10   **Q.**    Is that a 30,000-pound or 20,000-pound camera?

11   **A.**    The camera cost 20,000 pounds, yes.

12   **Q.**    There are references in some of the emails relating to the

13   Vatican to BAV.  Do you know what BAV means?

14   **A.**    Yes.

15   **Q.**    What does that mean?

16   **A.**    It's the abbreviation in Italian for Vatican Library.

17   *Biblioteca Antigua Vaticana*, perhaps.  It means "Vatican

18   Library."

19   **Q.**    Thank you very much.  I won't make you spell it.

20        So by June 2011, had there been any sale to the Vatican?

21   **A.**    To my knowledge, no.

22   **Q.**    Was the deal dying and you were pulling your equipment

23   out, from what you could tell?

24   **A.**    Yes.

25             **MR. REEVES:**  No further questions.

1     THE COURT:  Cross.

2         Do you want to stand up, ladies and gentlemen, just take a

3   little stretch?

4          MS. LITTLE:  May I proceed, Your Honor.

5          THE COURT:  Yes.

6                    **CROSS-EXAMINATION**

7   BY MS. LITTLE:

8   **Q.**   Good afternoon, Dr. Blanchflower?

9   **A.**   Good afternoon.

10  **Q.**   We haven't met before other, than saying "hello" out in

11  the hallway a few minutes ago; right?

12  **A.**   No.

13  **Q.**   Dr. Blanchflower, before you came here to testify, you've

14  been interviewed at least ten times by representatives of

15  Hewlett-Packard or the Government about this case, have you

16  not?

17  **A.**   Yes.

18  **Q.**   You were interviewed by Morgan Lewis & Bockius, HP's

19  attorneys, twice in 2012 and 2013; is that right?

20  **A.**   Yes.

21  **Q.**   You were interviewed by phone by Hewlett-Packard's

22  attorney and their forensic auditors in September of 2012?

23  **A.**   Uh-huh.

24  **Q.**   And you were interviewed by the law firm of Proskauer in

25  connection with a derivative lawsuit working with HP three

**BLANCHFLOWER - CROSS / LITTLE**

1  times:  May 30th, June 3rd of 2013, and again in November of

2  2013?

3  **A.**   That sounds about right.

4  **Q.**   And you had an interview with the FBI and the Securities &

5  Exchange Commission in June of 2014?

6  **A.**   Yes.

7  **Q.**   And again by HP's forensic auditors in June of 2016?

8  **A.**   Yes.

9  **Q.**   And again with the FBI and Mr. Reeves in London in

10 December of 2016?

11 **A.**   Yes.

12 **Q.**   And an additional meeting in London with Mr. Leach and

13 Mr. Frentzen in January of 2018; is that right?

14 **A.**   Yes.

15 **Q.**   And for the first nine of those ten interviews, you were

16 employed in some capacity by Hewlett-Packard?

17 **A.**   Yes.

18 **Q.**   And right now, you're with Micro Focus, which is the

19 company that Hewlett-Packard sold off its software division to;

20 right?

21 **A.**   Correct.

22 **Q.**   Let's talk about SPE.

23      As a general matter in the 2008/2009 time frame, Autonomy

24 was interested in increasing its capabilities in structured

25 data, was it not?

**BLANCHFLOWER - CROSS / LITTLE**

1    **A.**    Yes, I would say so.

2    **Q.**    In particular, in September of 2008, you and

3    Mr. Gallagher, another engineer at Autonomy, were involved in

4    evaluating a company called Kognitio, were you not?

5    **A.**    Yes.

6    **Q.**    And if you would look in your book, please, sir, at tab

7    5770, it should be in the very back of the book, the big book.

8    It's all the way in the back.  Sorry.

9    **A.**    Is it behind or in front of the number?

10    **Q.**    It will be behind the number, sir.

11    **A.**    Yes.

12    **Q.**    Is this an email from Mr. Menell to you concerning

13    Kognitio in September of 2008?

14    **A.**    It is.

15            **THE COURT:**  Admitted.

16        (Trial Exhibit 5770 received in evidence)

17            **MS. LITTLE:**  If we can put that up on the screen.  And

18    the second sentence in the second paragraph.

19    **Q.**    First of all, what is this document?  What's going on in

20    this document with respect to Kognitio?  Is this an evaluation

21    of Kognitio's technology?

22    **A.**    Yes.  So it looks like Peter Menell is sending his summary

23    so far back to us to check that there are no errors or anything

24    that could be added to it.

25    **Q.**    And this was in connection with Autonomy's interests in

1    Kognitio; is that correct?  Or at least Dr. Menell's?

2    **A.**    We were never told what form the interest takes.  When --

3    we were often asked to evaluate companies.  Peter Menell would

4    come to us and say "could you evaluate" or "could you find out

5    what you could about Company X," and then we'd -- we'd write it

6    up.

7         As to what the involvement ever was, we -- as a rule, we

8    never really knew and I don't think we knew what we were being

9    asked to do -- sorry -- why we were being asked to evaluate

10   Kognitio.  We were just asked to find out what we could about

11   them.

12   **Q.**    That's because your job is in the technical area, not in

13   business strategies or in sales or in any of those other areas;

14   right?

15   **A.**    Correct.

16   **Q.**    And the second sentence in the paragraph that begins

17   "Efforts," it says, "Coupled with this NCorp or any quasi BI

18   functionality we wish fold into IDOL place a premium on this

19   paradigm."

20        I'm not going to ask you to translate for me, but is it

21   fair to say that in looking at Kognitio, you were -- Autonomy

22   was thinking about coupling it with NCorp technology?

23   **A.**    There was no effort to do so, but it's describing how the

24   Kognitio technology could be coupled with the NCorp

25   functionality, yes.

1          **MS. LITTLE:**  Thank you.  We can put that one down.

2     **Q.**   That was in September of 2008.

3          In October of 2008, Dr. Lynch was asking you and other

4     engineers to look into database archiving products to extend

5     IDOL's capabilities into structured data; correct?

6     **A.**   I don't recall that, but it may have been.

7     **Q.**   Would you take a look in your book at Exhibit 5765.  I

8     have to go backwards.

9     **A.**   I have it.

10    **Q.**   Is this an email from Dr. Lynch to Dr. Menell and others,

11    including you, in October of 2008?

12    **A.**   Yes.

13         **THE COURT:**  Admitted.

14         (Trial Exhibit 5765 received in evidence)

15         **MS. LITTLE:**  If we can put that up on the screen.

16    Thank you, Jeff.

17    **Q.**   So this is talking about database archiving products

18    gaining market traction.  Do you see that in the highlighted

19    section?  Do you see that?

20    **A.**   Yes.

21    **Q.**   And Dr. Lynch writes to you, "Guys, you need to read this

22    carefully.  We should have one."  Do you see that?

23    **A.**   Yes.

24    **Q.**   And this is, again, Dr. Lynch encouraging the technical

25    folks to be looking at data archiving products moving into the

BLANCHFLOWER - CROSS / LITTLE

```
1   structured data world; correct?

2   A.    Correct.

3   Q.    Thank you.

4         We can put that down.

5         This move into unstructured data, was that sometimes

6   referred to within the company as "Project X"?

7   A.    Do you mean structured data?

8   Q.    Yes.

9   A.    I don't recognize that term, no.

10  Q.    Mr. Reeves spoke with you about Exhibit 179.  Maybe we can

11  just pull that up on the screen.

12        And he talked to you about the first part of this exhibit,

13  but I want to direct your attention to a different part.  Let

14  me just find it.

15        If we can take a look at the second page, Jeff, which is

16  an email from Nicole Egan.

17        That's the beginning of the chain where it begins, "Good

18  question, Mariana," and the one, two, three, four -- fifth

19  paragraph of that email from Ms. Egan, she talks about "for

20  your information, you might be able to garner some insight from

21  the previous incarnation of this-NCorp."  Do you see that?

22  A.    Yes.

23  Q.    So NCorp was considered a previous incarnation of what

24  eventually became SPE; correct?

25  A.    Yes.
```

1    Q.    But there were significant -- you can take that down.

2          There were significant advancements in what SPE could do

3    versus NCorp's technology; would you agree?

4    A.    It was backed by the rest of the power of IDOL, so, yes, I

5    might say it was capable of a lot more than NCorp was.

6    Q.    That actually is a good segue into my next question.

7          SPE really is a marketing term for what is, in essence, a

8    set of IDOL functions; right?

9    A.    Yes.

10   Q.    And IDOL SPE is really a new way of using IDOL in

11   connection with structured data; right?

12   A.    Yes.

13   Q.    And the development of IDOL SPE involved developing new

14   ways to use and combine existing IDOL functions to work with

15   structured data; right?

16   A.    Yes.

17   Q.    And you'd agree with me that due to IDOL SPE's reliance on

18   existing IDOL functionality, that all the development work that

19   was being done on IDOL could, in theory, be considered

20   development work for IDOL SPE; right?

21   A.    It was a necessary precursor.

22   Q.    A necessary precursor?

23   A.    Yes.

24   Q.    IDOL SPE didn't just spring from the head of Zeus like

25   Athena; right?  It took a lot of work to develop it; right?

BLANCHFLOWER - CROSS / LITTLE

1    A.    Yes.

2    Q.    So in that sense, IDOL SPE had been years in the making?

3    A.    Yes.

4    Q.    And any development work related to IDOL SPE, such as

5    changes to the IDOL source code, that wouldn't be separately

6    labeled in development records as IDOL SPE versus IDOL; right?

7    A.    It would not, no.

8    Q.    IDOL SPE was launched in September of 2009.  We've talked

9    about that.  And the work that you were doing in connection

10   with the launch -- well, the work you were doing in Q3 of 2009

11   was directed specifically to the launch; right?

12   A.    Yes.

13   Q.    The work in Q3 was not all the other previous development

14   work that had been done; right?

15   A.    Correct, yes.

16   Q.    And Mr. Reeves had you go through a bunch of calculations

17   about the user interface and developing the SQL and he had you

18   to do math.  It wasn't really math.  It was arithmetic.  But he

19   had you add up some figures.  Do you recall that?

20   A.    Yes.

21   Q.    You were very careful to say this was the work being done

22   by Cambridge in Q3/'09; right?

23   A.    Yes.

24   Q.    Not the whole development of the product?

25   A.    Correct.

1    Q.   And, Dr. Blanchflower, you did view IDOL SPE as a

2    significant initiative for the company, didn't you?

3    A.   I did, yes.

4    Q.   And, in fact -- well, take a look in your book, would you,

5    at Exhibit 589.  This is not yet in evidence.

6         I would ask you, is this an email that you sent to various

7    folks at Autonomy in February of 2010?

8    A.   Yes.

9              THE COURT:  Admitted.

10        (Trial Exhibit 589 received in evidence)

11   BY MS. LITTLE:

12   Q.   And the subject line of this email is "IDOL SPE update";

13   correct?

14   A.   It is.

15   Q.   And what you write here is, "Great work in setting it up

16   over there.  This will be the first of a potentially huge new

17   product line that we can -- so that we can all be proud";

18   correct?

19   A.   Yes.

20   Q.   Those are your words?

21   A.   They are.

22   Q.   Okay.

23        You can put that down.

24        Mr. Reeves also asked you a question whether or not you

25   viewed IDOL SPE as a radical piece of technology.  You did,

1    didn't you?

2    **A.**    I viewed it as a potentially large market, but in terms of

3    technology, there was nothing new or very limited new

4    technology.  So I wouldn't class it as a -- as radical

5    technology any more than IDOL is radical.

6    **Q.**    Would you look in your book, please, sir, at Exhibit 5754.

7    Do you have that?

8    **A.**    I do.

9    **Q.**    Is that an email from you to Mr. Goodman at the

10    foundation.org in the UK?

11    **A.**    Yes.

12        **THE COURT:**  Admitted.

13        (Trial Exhibit 5754 received in evidence)

14    **BY MS. LITTLE:**

15    **Q.**    First of all, Dr. Blanchflower, who is Mr. Goodman or

16    Dr. Goodman?  Is he part of the Science and Technology

17    Foundation?

18    **A.**    Yes.  Yes.  He's certainly -- he's not a customer, but

19    he's some foundation, as it says, an organization that I had

20    been asked to contact.

21    **Q.**    And if we can take a look at the one, two, three, fourth

22    paragraph, the last sentence of the fourth paragraph, you say

23    to Mr. or Dr. Goodman, "IDOL SPE represents a radical shift in

24    managing structured data"; correct?

25    **A.**    Yes.

BLANCHFLOWER - CROSS / LITTLE

1    **Q.**   Those are your words?

2    **A.**   Yes.

3    **Q.**   Did you also, Dr. Blanchflower, seek to nominate IDOL SPE

4    for a UK industry award?

5    **A.**   Not personally, no.

6    **Q.**   Well, let's take a look at Exhibit 5751.  Is this an email

7    between you and a number of people at Autonomy concerning the

8    UK IT industry awards?

9    **A.**   Yes.

10             **MS. LITTLE:**  Move it in, Your Honor.

11             **THE COURT:**  Admitted.

12        (Trial Exhibit 5751 received in evidence)

13   **BY MS. LITTLE:**

14   **Q.**   Let's start at the very end of the chain, which is an

15   email from Mr. Aysun to you:  "Hi, Sean, it's nice to E-meet

16   you.  I've just started in the marketing team and am working at

17   the moment on the application for UK IT industry awards 2010.

18   It would be great for Autonomy to be nominated for the R&D

19   Achievement of the Year Award."  Do you see that?

20   **A.**   Yes.

21   **Q.**   Let's turn to the very top email on the first page.  You

22   write back, "IDOL SPE is the ideal candidate, Sophie.  You'll

23   want to get MRL's approval, but I would suggest that we should

24   put it forward."

25   **A.**   Yes.

1    **Q.**    So you were recommending that IDOL SPE be nominated for

2    this industry award; correct?

3    **A.**    I was, yes.

4    **Q.**    You can put that down.

5         Now, Dr. Blanchflower, you had limited knowledge of how

6    the accounting rules worked for capitalizing R&D costs; right?

7    **A.**    Limited.  Could you define "limited"?

8    **Q.**    Well, do you have any knowledge of the rules about

9    capitalizing R&D costs?

10   **A.**    Yes.  Because we had to -- yeah.  We were given rules by

11   the financial and accounting team as to how to determine

12   whether a -- some of the efforts we were making were

13   capitalizable or not.

14   **Q.**    But you have told the FBI in one of your interviews that

15   you had limited knowledge of capitalizing R&D; is that right?

16   **A.**    Well, the -- the -- the details of how it was then used I

17   was never involved in, so, yes.  I'm no accountant, that's for

18   sure.

19   **Q.**    Maybe you can take a look, if you would, in that little

20   thin binder you have there.  Look at Exhibit 5035.  And I'm

21   going to direct you to page 3.

22              **THE COURT:**  Page what?

23              **MS. LITTLE:**  3, Your Honor.  I hope that's right.

24              **THE COURT:**  What paragraph?

25              **MS. LITTLE:**  You know, I don't think I have the right

BLANCHFLOWER - CROSS / LITTLE

1    cite here.

2            **THE COURT:**  Let's move on.

3    **BY MS. LITTLE:**

4    **Q.**   You've told the Morgan Lewis lawyers that the financial

5    aspects of your department were a mystery to you.  Do you

6    recall that?

7    **A.**   Yes.

8    **Q.**   And the judgments on capitalization of R&D are made by

9    accounting -- accountants, not engineers; right?

10   **A.**   Yes.  Certainly.

11   **Q.**   Are you aware of any policy changes that were made by the

12   HMRC -- what's the HMRC?

13   **A.**   Her Majesty's Revenue and Customs.  The UK tax -- the UK

14   Inland Revenue.

15   **Q.**   What we call the IRS?

16   **A.**   Yes.

17   **Q.**   Are you aware of any policy changes in the third quarter

18   of 2009 that affected how R&D costs could be capitalized?

19   **A.**   I'm not.

20   **Q.**   Are you aware of the rules about the time period that

21   could be looked to in the capitalization of R&D costs?

22   **A.**   No.

23   **Q.**   Or what kind of costs could be included?

24   **A.**   No.

25   **Q.**   FileTek.  You've indicated that you played a fairly

BLANCHFLOWER - CROSS / LITTLE

1    peripheral role in the analysis of the Storhouse software?

2    A.   Yes.

3    Q.   And you had no involvement at all in the second purchase

4    of Storhouse software in Q2 of 2010; correct?

5    A.   No.

6         MS. LITTLE:   I'm trying to skip through, Your Honor.

7    Q.   And you don't know what other research may have been done

8    by Dr. Menell in connection with the FileTek product; right?

9    A.   I find it hard to imagine that he would have done any

10   research himself, but whether he ordered any, I don't know.

11   Q.   Do you recall telling the FBI that Dr. Menell could have

12   reached out on the subject matter to experts at Zantaz?

13   A.   I don't recall that.

14   Q.   And you've testified that the engineers working with you

15   did make efforts to work with the Storhouse product and try to

16   integrate it into various Autonomy products; correct?

17   A.   Yes.

18   Q.   And I'd like to just show you -- if you would take a look

19   in your binder at Government's Exhibit 768, which is not yet in

20   evidence.

21   A.   I have it.

22   Q.   Is that an email between you and Darren Gallagher and

23   others concerning Storhouse database archiving?

24   A.   Yes.

25        THE COURT:   Admitted.

1          (Trial Exhibit 768 received in evidence)

2     BY MS. LITTLE:

3     Q.    Just directing yourself to the very first sentence,

4     Mr. Gallagher writes, "I have got both key parts of Storhouse

5     SM, the storage component, and RM, the database component, up

6     and running now and I'm getting to grips with the basics of

7     using it as a database"; correct?

8     A.    Yes.

9     Q.    We can take that down.

10         And take a quick look, if you would, at Exhibit 824 in

11    your book.  And going -- start looking at the third page, if

12    you would.  This is where the email starts where you're

13    involved.

14         Is this email an email between Darren Gallagher and

15    others, including you, concerning Storhouse?

16    A.    Yes.

17          THE COURT:  Admitted.

18          (Trial Exhibit 824 received in evidence)

19    BY MS. LITTLE:

20    Q.    And there on the third page toward the bottom,

21    Mr. Gallagher writes, "Below is a summary of what Kraft is

22    looking for in archiving SAP data."  Do you see that?

23    A.    Yes.

24    Q.    Kraft is a customer of Autonomy's?

25    A.    Of DigitalSafe, I believe, yes.

1  **Q.**  And looking a little further up in the email, Darren

2  responds on May 25th at 19:32, he says, "Bojan reminded me that

3  this is a perfect opportunity to introduce Storhouse.  What do

4  you think?"  Do you see that?

5  **A.**  I do.

6  **Q.**  And Mr. Gallagher writes, "Go for it"; right?

7  **A.**  Yes.

8  **Q.**  You can put that one down.

9      Do you have any knowledge, sir, of a requirement in Q10 --

10  Q2 of 2010 to buy additional Storhouse services in connection

11  with government or federal projects?

12  **A.**  No.

13  **Q.**  Are there occasions when unlimited licenses are needed

14  when you're doing work with classified or federal projects

15  because you can't audit?

16  **A.**  I have to say I'm unaware of that.  Yeah.  The federal

17  world was several levels removed from R&D, so I couldn't really

18  say with any confidence.

19  **Q.**  Okay.  With respect to the Vatican deal, you are not

20  familiar with the details of the negotiations or ultimate sales

21  that may have been made in connection with the Vatican;

22  correct?

23  **A.**  That's correct.

24  **Q.**  And you've no information about the accounting treatment

25  for the Vatican transaction?

1    **A.**    Correct.

2    **Q.**    And you testified on direct that you had very little

3    interaction with Mr. Hussain, maybe half a dozen times, mostly

4    on non-work matters?

5    **A.**    Correct.

6    **Q.**    And you never had communications with Mr. Hussain about

7    Storhouse; correct?

8    **A.**    Correct.

9    **Q.**    Or about SPE?

10    **A.**    Correct.

11    **Q.**    Or about the Vatican, other than the one trip you

12    described?

13    **A.**    Correct.

14            **MS. LITTLE:**  Thank you.  That's all I have.

15            **THE COURT:**  Anything further?  Briefly?

16            **MR. REEVES:**  Thank you, Your Honor.

17                        <u>**REDIRECT EXAMINATION**</u>

18    **BY MR. REEVES:**

19    **Q.**    You testified about technologies that were years in the

20    making.  Do you remember that, Dr. Blanchflower?  There was

21    some questions about IDOL was years in the making.  Do you

22    recall?

23    **A.**    Did I say that today?  Yes.

24    **Q.**    I think so.

25    **A.**    So, yes, yes.

1  Q.   So was the IDOL technology years in the making?

2  A.   Well, yes.  Absolutely.

3  Q.   Okay.  And so why don't you describe us the years or the

4  evolution and what you meant by it being years in the making.

5  Please tell us.

6  A.   The -- the fundamental start of the technology that became

7  IDOL started before -- well before I was in Autonomy and

8  underpinned the products from the start.  So every version of

9  the core product was an iteration of the previous and so built

10 on the technology that was already there.

11       So by the time, say, in 2008 or 2009, there would have

12 been 12, 13 years of research building up to the IDOL that

13 existed then.

14 Q.   That relates to IDOL, the core product for Autonomy, does

15 it not?

16 A.   Yes.

17 Q.   And the search for unstructured data; correct?

18 A.   Yes.  Yes.  I mean, because -- because IDOL stores

19 structured and unstructured data.  The unstructured is its

20 differentiation.  That's it's bread and butter.

21 Q.   Why do you mean by that?  Why don't you tell us, please.

22 A.   There were many database products out there.  It's what

23 you might call a saturated market where there are many very

24 large leaders that dominate the area, so to try to compete with

25 them is extremely difficult.

1    On the other hand, the unstructured data world is far more

2  open and it certainly was when Autonomy was founded.  So the

3  idea was to create a product to meet that gap.

4  **Q.**   Was the creation of the IDOL SPE demo that you testified

5  working on -- was that years in the making?

6  **A.**   The creation of the demo was not, no.

7  **Q.**   Was the work that you did beginning in August 2009

8  relating to this new application of IDOL SPE -- was that years

9  in the making?

10  **A.**   No.

11       **MR. REEVES:**  No further questions.

12       **THE COURT:**  Thank you.

13       **MS. LITTLE:**  Nothing further.

14       **THE COURT:**  Okay.  Thank you.  You are excused.

15    Ladies and gentlemen, we are going to take our recess now.

16  We will be in recess until 3:00 p.m.

17    Remember the admonitions given to you, don't discuss the

18  case, allow anyone to discuss it with you, form or express any

19  opinion.

20            (Recess taken at 2:42 p.m.)

21            (Proceedings resumed at 3:07 p.m.)

22    (Proceedings were heard out of the presence of the jury:)

23       **MR. KEKER:**  Your Honor, could I see you for a moment?

24    I'm still on this Truitt/Cronin thing.  They have -- in

25  their exhibits for Dave Truitt, they have a tremendous amount

1  of hearsay from Cronin and Rizek, to which I would be objecting

2  a lot.  I think -- what I'm worried about -- if they commit

3  that they're calling Cronin and Rizek down the line and they

4  will be witnesses in this trial, I don't have to make the

5  objections.

6          **MR. REEVES:**  We are certainly planning to call

7  Mr. Rizek and Mr. Cronin.

8          **MR. KEKER:**  Not planning.  They're going to call them.

9          **MR. REEVES:**  They were here.  Both -- Mr. Cronin --

10         **THE COURT:**  Are you -- well, I don't know planning.

11  Do you mean it is your intention as of now to call these people

12  and you've made arrangements, you've spoken to them about

13  coming --

14         **MR. REEVES:**  Yes.

15         **THE COURT:**  -- and they're coming; and as far as you

16  know they're coming; and as far as you know, you are calling

17  them?

18         **MR. REEVES:**  Yes.

19         **THE COURT:**  As of this moment?

20         **MR. REEVES:**  Correct.

21         **THE COURT:**  Yeah.  Okay.  Well, I can't do anything

22  more than that.

23         **MR. KEKER:**  All right.  And should I -- I'm going to

24  rely on that in not objecting to hearsay.  I know you've been

25  letting in documents because this person's name is on it, and

1    that's fine if they're going to come; but if they're not going

2    to come, I need to object, and I don't want to have to object

3    to every document.

4         THE COURT:  Okay.  Is it that there's no exception to

5    the hearsay rule that it will come in in their absence?  I

6    mean, I don't know.  I'm just -- and maybe I'm -- are they

7    agents?  What are they?  I don't even know who these people

8    are.

9         MR. LEACH:  I think they are -- I'm not sure what

10   e-mails Mr. Keker is referring to.  I think there are a number

11   of exceptions that would apply; but I also think if there's a

12   document from Mr. Cronin or Mr. Rizek that he has an objection

13   to, we would be fine with letting it in subject to a motion to

14   strike.  We anticipate calling Cronin and Rizek and they will

15   testify.

16        THE COURT:  Normally I don't take running objections.

17   I mean, normally I don't just say, "Oh, just sit down"; but it

18   would speed things up.  And if you want to reserve on these

19   two -- on these sets of --

20        MR. KEKER:  These witnesses.

21        THE COURT:  -- these kinds of documents -- with this

22   witness as to those documents in which those two other people

23   are apparently the authors or --

24        MR. KEKER:  The documents would be admissible if

25   Cronin and Rizek testify.

1    THE COURT:  Okay.  So they could all come in subject

2  to a motion to strike and any other curative instruction.

3    MR. KEKER:  Right.  That's fine.

4    THE COURT:  And any other remedy -- and any other

5  remedy that's appropriate.

6    MR. KEKER:  That's fine.  I appreciate that.

7    THE COURT:  All right.  It will move things along.

8    MR. KEKER:  It will go faster.

9    THE COURT:  Thank you.  Bring in the jury.

10    (Proceedings were heard in the presence of the jury:)

11    THE COURT:  Please be seated.

12  Let the record reflect all jurors are present, the parties

13  are present.

14  You may call your next witness.

15    MR. LEACH:  Thank you, Your Honor.  The United States

16  calls David Truitt.

17    THE CLERK:  Please raise your right hand.

18                **DAVID MORELAND TRUITT**,

19  called as a witness for the Government, having been duly sworn,

20  testified as follows:

21    THE WITNESS:  I do.

22    THE CLERK:  Thank you.  Please be seated.

23  Please state your full name for the record and spell your

24  last name.

25    THE WITNESS:  It's David Moreland Truitt, and it's

1   T-R-U-I-T-T.

2           **MR. LEACH:**  May I inquire?

3           **THE COURT:**  Yes.  Go ahead.

4                   **DIRECT EXAMINATION**

5   **BY MR. LEACH:**

6   **Q.**   Good afternoon, Mr. Truitt.

7   **A.**   Good afternoon.

8   **Q.**   Did you previously testify before a Grand Jury in a

9   proceeding in this matter?

10  **A.**   I did.

11  **Q.**   And during that testimony, did you indicate to the

12  Government that you intended to invoke your Fifth Amendment

13  right against self-incrimination in response to questions?

14  **A.**   I did.

15  **Q.**   And did the Court issue an order compelling you to testify

16  before the Grand Jury?

17  **A.**   They did.

18  **Q.**   Did that order provide that the testimony you provided and

19  any information derived directly or indirectly from that

20  testimony could not be used against you?

21  **A.**   That's my understanding.

22  **Q.**   As you sit here today, has the Court issued a similar

23  order compelling your testimony today?

24  **A.**   No.

25  **Q.**   Are there any agreements between you and the Government in

TRUITT - DIRECT / LEACH

1  respect of your testimony here today?

2  **A.**    No.

3  **Q.**    Has the Government made any promises to you that you will

4  not be prosecuted for an offense?

5  **A.**    No.

6  **Q.**    Where are you from, sir?

7  **A.**    I'm from Great Falls, Virginia.

8  **Q.**    Would you please briefly describe your educational and

9  professional background?

10  **A.**    Sure.  I graduated from the University of North Carolina

11  in 1987 with degrees in economics and industrial relations.

12      I have approximately 30 years of experience working within

13  the IT industry.  In 1998 I started my first company and it was

14  called MicroLink.  That company I worked for about 12 years.

15  We were primarily a services company.  We did a lot of federal

16  government work; and we had specialized practice areas, one of

17  which was around Autonomy technology.  So we had 70, 80 people

18  that were skilled and cleared within that specific technology.

19      In January of 2010, that company MicroLink was acquired by

20  Autonomy; and at that same time I started another company

21  called Discover Technologies, and I've been working there ever

22  since.  So that's about eight years in.

23  **Q.**    Thank you.

24      So you formed MicroLink in or around 1998?

25  **A.**    Correct.

TRUITT - DIRECT / LEACH

1  Q.    And it started off as a services company?

2  A.    Yes, that's right.

3  Q.    What do you mean by that?

4  A.    Well, we would partner with software companies, large

5  software companies like Autonomy, like Microsoft, big

6  companies, and we would take that software and we would make it

7  work within the agencies, the federal agencies, that bought it.

8  So we would customize it for their purposes.

9  Q.    At the time in the early 2000 period, approximately how

10  many employees did MicroLink have?

11  A.    In the early, early 2000s, probably had 20 or 30.

12  Q.    Where was MicroLink based?

13  A.    We were in Reston -- actually, we were in Vienna,

14  Virginia.

15  Q.    You were the owner of the company?

16  A.    Yes.

17  Q.    Were there any co-owners?

18  A.    I had a partner named Tim Wharton, and he was a minority

19  owner in the company.

20  Q.    Describe for me the work MicroLink did for Microsoft.

21  A.    We were very good around collaboration software.  So they

22  had a -- they had a product called SharePoint, which is an

23  enterprise-based collaboration tool.  So we did a lot of work

24  implementing that software for various customers.

25       And then we also started to build some products around

1  that technology to make it better, fill holes, help Microsoft

2  demonstrate that software.  So that's primarily what we were

3  doing with it.

4  **Q.**  Did you resell software on behalf of Microsoft?

5  **A.**  No.  Microsoft only sold software through large

6  distributors.

7  **Q.**  You mentioned a company called Autonomy.  How did you

8  become familiar with Autonomy?

9  **A.**  I believe it was back in 2006.  My younger brother Dan

10  went to work for Autonomy; and through speaking with him, he

11  was telling me a bit about what it did and the fact that they

12  had a very small channel of partners.  So I was interested to

13  go in and speak with them about what they had and what they

14  were trying to accomplish.

15      So I went in and met with John Cronin, who was running

16  their federal sales at the time, and that's how we -- how we

17  got started.

18  **Q.**  You mentioned Autonomy had a small channel of partners.

19  What did you mean by that?

20  **A.**  I mean it was not -- they were looking for partners.  They

21  didn't have good partners who had committed to the technology

22  who could really help them sell the technology.

23  **Q.**  You mentioned someone named John Cronin.  Who is he?

24  **A.**  Well, as I mentioned, John was the vice president in

25  charge of Autonomy's federal team at the time that I met him.

1  I believe John worked there for about five years; and when he

2  left Autonomy, I then hired him to come over and run my sales

3  team.

4  **Q.**   When you say "hired him," was he an employee of MicroLink

5  or was there some other arrangement?

6  **A.**   He was not technically an employee.  He had a -- he had a

7  business, and he -- we paid him through that business, but he

8  acted as our VP of Sales.

9  **Q.**   So you start to engage with Autonomy in or around 2006?

10  **A.**   Correct.

11  **Q.**   And what were you doing for them initially?

12  **A.**   Well, we were trying to understand it.  We had -- you

13  know, we had a couple of different interests in it.  One was

14  simply to and we did immediately hire a couple of folks who had

15  worked with the product and brought them in, so engineers who

16  could implement it.  So we wanted to do services around it, and

17  we wanted to resell it.

18  **Q.**   What do you mean by "resell it"?

19  **A.**   Well, we wanted to help Autonomy sell that software and as

20  a partner, especially in the federal space where we were most

21  aligned, many times the federal government doesn't buy direct

22  from the manufacturer.  They want to buy through an established

23  reseller.  They also want to buy from a company who can both

24  resell and deliver the services.  So that's what we were

25  looking to do.

1    **Q.**    In the early days, 2006 to 2007, describe the manner by

2    which you would resell Autonomy software.

3    **A.**    Well, the first -- the first sale that we ever had was

4    actually an end-of-quarter scenario.  Mr. Cronin called me up

5    and described a deal.  It was about $200,000 and, quite

6    frankly, I can't remember exactly who that was, but I remember

7    that the scenario was the deal was just about to close.  You

8    know, they were confident in it, and he asked whether I'd be

9    interested in writing a purchase order for that -- for that

10   particular customer prior to the end of the quarter.

11        And at that time I scheduled a meeting to have a

12   discussion with the customer.  So we talked through the fact

13   that they were indeed looking to purchase it.  It was just a

14   matter of a signature.  Somebody was out of town or something

15   like that.  And we went ahead and wrote the PO.  That was our

16   first experience in doing it.

17        After that, it was, you know, kind of a mix of us finding

18   opportunities, bringing them to the table.  It was us helping

19   Autonomy with demonstrating their software, doing things

20   that -- you know, showing it in different ways that we were

21   able to show that, you know, Autonomy didn't have necessarily.

22   So we could build a user interface for it for a particular

23   customer to show it a bit -- a bit more specifically than they

24   might have.

25        And, of course, there were also end-of-quarter --

1    end-of-quarter scenarios that we were -- continued to get

2    approached by Autonomy as to whether we'd be interested in

3    doing some of those deals.

4    **Q.**   These end-of-quarter scenarios that you described, do you

5    distinguish that from other reseller arrangements you had on

6    behalf of Autonomy?

7    **A.**   I'm not sure I understand the question.

8    **Q.**   What did you mean by "end-of-quarter scenarios"?

9    **A.**   "End of quarter" for me would mean deals that Autonomy had

10   been working on their own, that they would -- they'd be

11   similar, you know, to the one I just described in the sense

12   that they were supposed to be far down the line in the sales

13   process, and they would ask whether we would be interested in

14   issuing orders for those -- for those scenarios.

15        So they would present a -- you know, a particular

16   opportunity, they would talk to us about what it was, where it

17   was in the sales cycle, and then we would decide whether to

18   issue an order or not.

19   **Q.**   The $200,000 order that you described that started this

20   end-of-quarter scenario, why did you call the customer about

21   that?

22   **A.**   I wanted to make sure that it was going to indeed close

23   quickly and that, you know, the agreement with Autonomy on

24   those deals was -- you know, once you issue the order, it's

25   your order.  So there was, you know, an at-risk scenario.  So,

1    you know, I didn't know Mr. Cronin very long at that point and

2    wanted to make sure that what he was telling me was correct.  I

3    didn't want to be out 200,000.

4    Q.    Are you familiar with a company called MicroTech?

5    A.    I am.  MicroTech is a company that I helped kind of get

6    started as an investor.  I believe it was back in 2004.  So I

7    was an investor in that company for about 10 years.

8    Q.    Up through 2014?

9    A.    I believe that's right.

10   Q.    After the acquisition of Autonomy by HP?

11   A.    Yes.

12   Q.    Okay.  What was your ownership percentage of MicroTech?

13   A.    I owned 32 percent.

14   Q.    Who were the other owners?

15   A.    Tony Jimenez owned 60 percent and then my partner at

16   MicroLink, Tim Wharton, owned the other 12 -- I'm sorry -- the

17   other 8.

18   Q.    Who was Mr. Jimenez?

19   A.    Tony Jimenez is a retired Army colonel.  He's somebody

20   that I met.  I was actually looking to hire Tony.  I met him as

21   he was retiring; and through really over the course of about a

22   year or so, he actually turned me down to come to work for

23   MicroLink.  He went and worked for somebody else, and then we

24   decided after about a year it made more sense to start a

25   company.

1     And Tony had some -- you know, beyond his other talents,

2   he also could have -- you know, could apply for and get some --

3   you know, he was a service-disabled veteran, he could apply for

4   8(a).  It made sense for him to be in charge of a company.

5   **Q.**   What do you mean by that term "8(a)"?

6   **A.**   It's a program that the federal government runs that gives

7   preferences to minority-owned companies.

8   **Q.**   And were you eligible for that status?

9   **A.**   I was not.

10  **Q.**   But Mr. Jimenez was?

11  **A.**   Correct.

12  **Q.**   And did that somehow drive the ownership percentages of

13  MicroTech?

14  **A.**   Well, yes.  You know, we were investing some time and

15  money into the company, but we weren't -- we weren't managers

16  within the company.  We didn't work it every day.  Tony was

17  there working it actively, so I think that also helped drive

18  the percentages.

19     But if you didn't own at least 51 percent of a company,

20  then you wouldn't be eligible for the set-aside business.

21  **Q.**   Did any of your relatives work for MicroTech?

22  **A.**   Yes.  My older brother Steve was their COO for five or six

23  years.

24  **Q.**   Roughly what time period?

25  **A.**   I believe he left there around 2012.

TRUITT - DIRECT / LEACH

1    **Q.**    So 2007 to 2012?

2    **A.**    I think that's correct, yeah.

3    **Q.**    What did Steve Truitt do for MicroTech?

4    **A.**    He ran all their operations.  So he was an executive

5    within the company, and he was responsible -- you know, had a

6    big job.  He was probably number two in the company while he

7    was there.

8    **Q.**    Did you have a hand in bringing him to MicroTech?

9    **A.**    I handed Tony his résumé.

10   **Q.**    Okay.  What was the business of MicroTech?

11   **A.**    MicroTech was similar to -- to what MicroLink did.  They

12   did -- they did services and technical integration workaround

13   software, but they also resold a lot of software.  They had

14   some large -- large contracts with the government for the

15   acquisition of hardware and software.  So that was a big part

16   of their business.

17   **Q.**    Let me direct your attention to the time period September

18   or October of 2009.  Do you have that time period in mind?

19   **A.**    Yes.

20   **Q.**    Would you please look at what has been marked as

21   Exhibit 309?

22   **A.**    (Witness examines document.)  Okay.

23   **Q.**    Is this a true and correct copy of an e-mail from John

24   Cronin to you and Alan Rizek with the subject "Outstanding

25   Trans."

1    **A.**    Yes.

2    **THE COURT:**  Admitted.

3    (Trial Exhibit 309 received in evidence)

4    **BY MR. LEACH:**

5    **Q.**    Let me please draw your attention to the top portion of

6    the e-mail, Mr. Truitt.  There's someone listed here named Alan

7    Rizek.  Who is he?

8    **A.**    Alan was our chief financial officer at MicroLink.

9    **Q.**    And this is from johncronin@fedbd.com.  What is FedBD?

10   **A.**    That's the company that I mentioned that John had that he

11   was paid through.  I think he, you know, may have had one or

12   two other small customers that he did some BD work for.

13   **Q.**    Mr. Cronin appears to be sending you an attachment called

14   "Outstanding Trans 10/30/09 XLS."  Do you see that?

15   **A.**    Yes.

16   **Q.**    And is that Excel spreadsheet attached to this document?

17   **A.**    Yes, it is.

18   **Q.**    What is this spreadsheet?

19   **A.**    It appears to be an update of orders that we had taken,

20   and it appears to be orders that had not yet closed.

21   **Q.**    One moment, Mr. Truitt, while we get to page 2.

22   And if we could please expand the left portion.

23   Wonderful.  Thank you, Ms. Margen.

24   Mr. Truitt, to the left there's a column "Trans" and then

25   as you move right there's columns "AU Rev," "ML Rev," "ML POs"

1    and "Notes."  Can you please explain what you understood these

2    columns to represent?

3    **A.**   Autonomy revenue I believe would be what the customer --

4    what the -- what we would charge those customers on the left

5    side of the spreadsheet.

6        And then the difference between that and the MicroLink

7    revenue would be our margin, what we expect to make on that

8    deal.

9    **Q.**   So in the column to the left, there's some names:

10   Langley #2, CMDR Subforces #1, House of Reps, IBM, Ameriprise.

11   Do you see those?

12   **A.**   Yes.

13   **Q.**   Those are the end users for the software that MicroLink

14   had acquired to resell?

15   **A.**   Correct.

16   **Q.**   And the AU revenue, that's the amount you anticipate the

17   software will be sold for?

18   **A.**   That's right.

19   **Q.**   And what does the column "ML Rev" represent?

20   **A.**   That would be -- ML Rev... I'm sorry.  So it's flipped.

21   It looks like ML Rev is actually what we would charge the

22   customer, and then what we would -- Autonomy revenue to the

23   left of that would be what we would then send back to Autonomy,

24   and then the margin would be the delta.

25   **Q.**   Thank you.  I think my question was imprecise.  Thank you

1    for clarifying that.

2        In the middle row there's something called "EDD Contract

3    Remaining."

4    **A.**    Yes.

5    **Q.**    And to the right the AU Rev is 8.25 million.  What is

6    meant by the EDD contract?

7    **A.**    Autonomy had acquired a company.  I believe it was called

8    Zantaz.  They had EDD software.  We acquired the rights to that

9    software.  We were looking to build an EDD services firm that

10   would utilize Autonomy EDD software.

11       So my recollection is that it was around a $10 million

12   deal originally, and that we had effectively payment terms over

13   like a three-year period that we were supposed to then pay that

14   down.

15       So we went out and we hired somebody to sell that service,

16   and we hired a bunch of folks to -- technicians to get -- to

17   get trained up on that technology.

18   **Q.**    At this point in time, October of 2009, who -- strike

19   that.

20       Who were some of the individuals that you hired to create

21   an EDD platform for MicroLink?

22   **A.**    So Preston Fischer was the gentleman that was running our

23   BD efforts.  He was kind of managing that practice for us.

24       In terms of the individual technicians, I know

25   Michael Moon, I saw his name the other day.  I don't recall the

1    other folks, but they were known to Preston.  He kind of -- he

2    came out of that -- that type of business, so he brought in

3    some folks that he was familiar with and that he liked working

4    with.

5    **Q.**   At this point in time, October of 2009, how would you

6    characterize MicroLink's efforts to develop its EDD platform?

7    **A.**   We were learning a lot, so we had -- we had taken those

8    technicians and we worked with Autonomy.  They allowed us to

9    put those folks in their Boston Data Center.  So they were up

10   there actually doing work.  So we were learning a lot about the

11   software.  We were, you know, also actively pursuing leads as

12   they came up.

13        I believe that we -- we had worked out a deal where, you

14   know, we could do work in our own data center.  So we had

15   installed the software.  We were looking at the software,

16   learning about the software.

17        If we found customers that wanted that service, we

18   could -- we could perform it in-house, or we also had a deal

19   with Autonomy where we could bring that work to them and get a

20   split on the revenue.

21        So we weren't overly successful.  I think we were running

22   into challenges in terms of what software that we actually

23   owned versus what we began to see we needed.

24   **Q.**   Did you have any customers at this point?

25   **A.**   We did not.  Well, I'm sorry.  I think we did -- we did do

1  some work for Iovate.

2  **Q.**    Beyond Iovate, did you have any customers?

3  **A.**    Not that I recall.

4  **Q.**    And describe for me the challenges with the software that

5  you were having in October of 2009?

6  **A.**    I think that what we had been licensed for, our experience

7  from the folks who were actually doing the work in Boston was

8  that there were other components that they were using there to

9  actually get the work done, and that we -- so one of our -- one

10  of our issues was trying to work with Autonomy to get the rest

11  of that -- you know, those software pieces that we needed to be

12  able to truly be able to do the work the way -- the way that

13  they were doing the work.

14  **Q.**    The EDD contract you described, was it approximately

15  originally 10 to $11 million?

16  **A.**    I think that's right.

17  **Q.**    And am I right at this point, October of 2009, MicroLink

18  owed approximately $8.25 million on that agreement?

19  **A.**    Correct.

20  **Q.**    Down at the bottom of this spreadsheet there is a row "Net

21  Outstanding 21 million."  What does that represent?

22  **A.**    That appears to be what we owed.

23  **Q.**    At the time in October of 2009?

24  **A.**    Yes, that's right.

25  **Q.**    At some point in October of 2009, were you approached by

1  anybody at Autonomy about Autonomy potentially acquiring

2  MicroLink?

3  **A.**    Yes.  I believe I received a call from Stouffer Egan.  He

4  asked whether we would be interested in having a conversation

5  about that prospect, and I said sure.

6  **Q.**    And did you meet with Mr. Egan and others from Autonomy in

7  San Francisco about a potential acquisition?

8  **A.**    We did.  I believe it was a week or two later we went out.

9  Alan -- Mr. Rizek and I went out and met with Mr. Hussain and

10 Mr. Egan, and I believe that was really the first kind of

11 face-to-face discussion that we had about the acquisition.

12 **Q.**    Where was the meeting?

13 **A.**    It was at their corporate headquarters here in

14 San Francisco, Mission Street.

15 **Q.**    Take a moment and describe for us what was said.

16 **A.**    It was really just an informational kind of -- you know, I

17 think Mr. Hussain wanted to hear from Alan kind of what our

18 finances were on a high level, and they talked about -- you

19 know, I talked about what we do and how we do it.

20     I know one of the areas that we talked about was the fact

21 that I believe Autonomy had -- had lost their corporate

22 facility clearance, and that was something that we had at

23 MicroLink.  We had a top secret security clearance to do work

24 with the DOD and intell space.  So I know we talked about that.

25     I think we gave them, you know, a presentation on who we

1    were effectively; and, I mean, they had some idea because we

2    were partnering, but it was just kind of a pitch on who we

3    were.

4    **Q.**    What were MicroLink's revenues at the time?

5    **A.**    Well, around services our revenues were about 25 million.

6    If you add resale revenue on top of that, probably another

7    25 million.  So you could say it's 50 million or you could say

8    it's 25, whichever.

9    **Q.**    Why do you separate those two?

10   **A.**    It just depends on whether you want to hear about resale

11   revenue or not.

12   **Q.**    How did you view it?

13   **A.**    I like 50 million.  I mean, but, again, it's just -- you

14   know, you very quickly will get asked, "Okay.  How much of that

15   is services -- true services revenue versus, you know,

16   pass-through resale revenue?"

17   **Q.**    What do you mean by "pass-through"?

18   **A.**    Just meaning that you're -- you're taking, you know, in

19   our case I believe it was 10 percent; in some cases when you're

20   reselling other products, it's even less.  And there can be a

21   lot, millions and millions of dollars that run through your

22   company that aren't impacting you in the way that 25 million

23   extra dollars would, if that makes sense.  It's a low margin,

24   quick transactions, and it's not, you know, for us true

25   services work.

1  **Q.**   After this meeting in San Francisco in or around October

2  of 2009, did your discussions about, say, potential acquisition

3  of MicroLink progress?

4  **A.**   They did.  We continued to have discussions.  I think

5  Mr. Hussain called me a week or two later, and we had a -- you

6  know, a general discussion.  He threw out a number, as I

7  recall, and he threw out a number of 45 million, you know, kind

8  of what he thought the company was worth.  And I told him that

9  I wasn't interested at that number.

10 **Q.**   At some point did you and Mr. Hussain discuss the prospect

11 of Autonomy purchasing MicroLink and a new company --

12         **MR. KEKER:**  Objection.  Leading, Your Honor.

13         **THE COURT:**  Sorry?

14         **MR. KEKER:**  Leading.

15         **THE COURT:**  Overruled.

16         **MR. KEKER:**  He can just say what he remembers rather

17 than have Mr. Leach say it.

18 **BY MR. LEACH:**

19 **Q.**   Describe for us, Mr. Truitt, how the negotiations evolved

20 from there.  Did you take the deal for 45 million?  What

21 happened?

22 **A.**   So I rejected the deal for 45 million.  I believe perhaps

23 a week or so later, I got back on the phone with Mr. Hussain.

24 We chatted about a $50 million scenario, which was much more

25 interesting to me.

1    We had not -- you know, I hadn't accepted 50 million but

2    we were talking about it; and I think through continued

3    discussions, we -- I had some questions regarding how they

4    would use the company, what their interests really were.

5    We had started to build some of our own software products,

6    and I was interested to know whether they would continue with

7    the development on those products, whether they would need the

8    people that were building those products.

9    So through that discussion, it became clear to me that

10    they weren't really interested in the product side of our

11    business as much as they were the services side.  So at that

12    point, you know, looking at product that I believed in and

13    people who may or may not be valued within a new structure, I

14    threw out a suggestion that he allow me to carve out the

15    software and some people and start a new company, and

16    ultimately that's what we did.

17    We settled on a number of 55 million with an agreement

18    that the new entity was going to purchase some Autonomy

19    technology that we could utilize within our product at

20    Discover.

21    **Q.**    Did you settle on an amount for that product that the new

22    company would acquire?

23    **A.**    We did.  It was a $10 million order.

24    **Q.**    So explain to me how that related to the $55 million

25    purchase price of MicroLink?

1    **A.**    Well, it didn't -- it didn't relate to it in any specific

2    way other than the fact that, you know, if we didn't do the

3    first deal, then I wouldn't have had the money to buy the

4    software.  I mean, it was -- that's really the only relation I

5    can think of.

6    **Q.**    Did you have any interest in acquiring the software if

7    MicroLink wasn't being acquired?

8    **A.**    No.  No.  Because, again, MicroLink's business was

9    different than the one that I really envisioned with the new

10   company at Discover.

11   **Q.**    Please look at what has been marked as Exhibit 356.

12   **A.**    (Witness examines document.)

13   **Q.**    Is this a true and correct copy of an e-mail you sent to

14   Sushovan Hussain on or about November 18th, 2009?

15           **MR. KEKER:**  356?

16           **THE WITNESS:**  I think we skipped --

17           **MR. LEACH:**  Oh, excuse me.  330.  I'm sorry.

18           **THE COURT:**  I'm sorry.  What is it?

19           **MR. LEACH:**  Three three zero.  330.

20           **THE WITNESS:**  Yes.  This is -- Exhibit 330 is that

21   e-mail.

22           **THE COURT:**  Admitted.

23       (Trial Exhibit 330 received in evidence)

24   **BY MR. LEACH:**

25   **Q.**    Do you recognize your e-mail address up at the top,

1    Mr. Truitt?

2    **A.**    Yes, I do.

3    **Q.**    And what is the general subject matter of this e-mail?

4    **A.**    This is an e-mail that is kind of summarizing our last

5    conversation.  He had -- Mr. Hussain had -- Mr. Hussain had

6    indicated that he was okay with either scenario and was

7    interested to know which way I wanted to go with this, and I

8    was telling him here that I'm very much interested in the

9    carving out the Discover folks and doing the software deal.

10   **Q.**    You wrote (reading):

11           "You might think I'm crazy to pay 5 million for an

12       unproven product, but I think I would like to give it a

13       shot.  What I was thinking was we would include the

14       purchase of DiscoverPoint in with the ControlPoint OEM."

15       Do you see that?

16   **A.**    Yes.

17   **Q.**    What is DiscoverPoint?

18   **A.**    DiscoverPoint is the software that we had been building at

19   MicroLink.  Effectively it was adding some search capabilities

20   on top of -- on top of Microsoft's SharePoint product, and we

21   were leveraging some Autonomy technology on the back end of

22   that to help us do that.

23   **Q.**    What did you mean by "ControlPoint OEM"?

24   **A.**    This was just an idea that I was throwing out.  Clearly

25   this kind of evolved over the next week or two.  I wasn't

TRUITT - DIRECT / LEACH

1  exactly sure how the carve-out was going to work, but this was

2  my first attempt at kind of crafting what that might look like.

3  **Q.**   My question is a little more basic, Mr. Truitt.  What is

4  ControlPoint OEM?

5  **A.**   Well, ControlPoint was -- was software that Autonomy had.

6  It was a governance platform.  They -- you know, it was

7  something that we could incorporate into DiscoverPoint, and OEM

8  is a way to license that technology.

9  **Q.**   Further on in the e-mail you write (reading):

10        "So total at closing for the MicroLink purchase would

11        be $55 million with an immediate purchase of DP and

12        ControlPoint OEM for 10 million from the New Company."

13        Is "DP" an abbreviation for DiscoverPoint?

14 **A.**   Yes.

15 **Q.**   Okay.  And can you please explain what you meant by this?

16 What's the concept you're articulating?

17 **A.**   The concept is simply I'm establishing what the sale price

18 would be on one side, and then I'm saying that Discover

19 Technologies would buy ControlPoint for 10 million.

20 **Q.**   Buy it from Autonomy?

21 **A.**   Yes.

22 **Q.**   And did you have any interest in buying ControlPoint

23 without the MicroLink being acquired?

24 **A.**   Again, no.  It was a completely different scenario.  It

25 was a new company with software and people and money.  So, no,

1    I would not have had that -- had MicroLink not been acquired, I

2    would have continued to do what we were doing at MicroLink.

3    **Q.**    Please look at what has been marked as Exhibit 356.

4    **A.**    (Witness examines document.)

5    **Q.**    Is this a true and correct copy of an e-mail you received

6    from Andy Kanter on or about December 18th, 2009?

7    **A.**    Yes, it is.

8            **THE COURT:**  Admitted.

9           (Trial Exhibit 356 received in evidence)

10   **BY MR. LEACH:**

11   **Q.**    Mr. Truitt, the subject of this e-mail is "Signed LOI."

12   Do you see that?

13   **A.**    Yes.

14   **Q.**    What is "LOI" an abbreviation for?

15   **A.**    Letter of intent.

16   **Q.**    And is the attachment a letter of intent from Autonomy to

17   acquire MicroLink for $55 million?

18   **A.**    (Witness examines document.)  Yes.

19   **Q.**    Please look at what has been marked as Exhibit 379.

20   **A.**    (Witness examines document.)  Okay.

21   **Q.**    Do you recognize this document?

22   **A.**    Yes, I do.

23   **Q.**    What is it?

24   **A.**    This is a purchase order that we issued -- or that

25   MicroTech issued to Autonomy for Discover to purchase

1    ControlPoint --

2              **THE COURT:**  Admitted.

3              **THE WITNESS:**  -- and other software.

4        (Trial Exhibit 379 received in evidence)

5    **BY MR. LEACH:**

6    **Q.**   Let me draw your attention to the top portion of the

7    e-mail, Mr. Truitt.  The subject is "MicroTech/Autonomy

8    Purchase Quotation."  Do you see that?

9    **A.**   Yes.

10   **Q.**   And this is from someone named Joel Scott.  Were you

11   familiar with Joel Scott?

12   **A.**   Yes.

13   **Q.**   Who was he?

14   **A.**   I believe he ran operations for Autonomy U.S. at this

15   time.  He was an attorney, a general counsel, but I believe

16   that he also was a COO.

17   **Q.**   And he's writing to you (reading):

18              "Hi, Dave.

19              "Please find the MicroTech purchase quote for

20        ControlPoint."

21        Why is this a MicroTech/Autonomy purchase quotation?

22   **A.**   I believe that because Discover Technologies was such a

23   young company and just starting out, the thought was to

24   purchase it from an established company and reseller.  So

25   MicroTech would be the vehicle with which to do that.

1    So I don't know this for a fact, but my assumption would

2    be that Autonomy's -- Autonomy would want to buy from

3    established companies, and this would be a way to accomplish

4    that.

5    **Q.**    Was it your suggestion for the new company, Discover

6    Technologies, to buy from MicroTechnologies?

7    **A.**    I don't believe it was my suggestion.  I think it came

8    from Autonomy, but I don't recall who called and said run it

9    through them.  It could have been Mr. Scott or Mr. Egan.  I'm

10   not sure.

11   **Q.**    And how does this purchase quotation relate to the

12   discussion you were having with Mr. Hussain about selling

13   MicroLink for $55 million and buying $10 million worth of

14   product?

15   **A.**    It was part of -- it was one side of that scenario; right?

16   This is the -- this is the purchase of the software side.

17   **Q.**    Why was Mr. Scott sending this to you?

18   **A.**    So we could review the terms I'm assuming.

19   **Q.**    Okay.  Why was he sending a MicroTech purchase order to

20   Dave Truitt of MicroLink and Discover Technologies?

21   **A.**    I'm not exactly sure, but MicroTech may have sent over a

22   draft and this is coming back from Mr. Scott.

23   **Q.**    Do you know that?

24   **A.**    I don't know that.

25   **Q.**    Who did you negotiate this $10 million purchase with?

1   **A.**    Mr. Hussain.

2   **Q.**    Let's look at the attachment, please, page 2.

3          And I draw your attention, Mr. Truitt, to the top portion

4   of the document.  Do you see the "To" line that this purchase

5   quotation is to MicroTech?

6   **A.**    Yes.

7   **Q.**    And in the description, the software is "ControlPoint

8   Module - 40,000 Client Access Licenses, IDOL, SharePoint

9   Connector."  What is that?

10  **A.**    Well, the first line is ControlPoint and it's giving us

11  the ability to distribute up to 40,000 seats of the

12  ControlPoint software.  And then IDOL is kind of the core

13  search engine that was a core kind of Autonomy product.

14  **Q.**    Thank you.

15         Please look at what has been marked as Exhibit 411.

16  **A.**    (Witness examines document.)

17  **Q.**    Is this a true and correct copy of an e-mail you received

18  from Joel Scott on or about December 30th, 2009, relating to

19  the $10 million software purchase?

20         **MR. KEKER:**  Excuse me, Your Honor.  I just missed the

21  number.

22         **MR. LEACH:**  379.

23         **MR. KEKER:**  Thank you.

24         **MR. LEACH:**  Or, I'm sorry, 411.  Sorry, Mr. Keker.

25         **MR. KEKER:**  Thank you.

1          THE WITNESS:  Yes.

2          THE COURT:  It's admitted.

3      (Trial Exhibit 411 received in evidence)

4  BY MR. LEACH:

5  Q.   What does this e-mail relate to, Mr. Truitt?

6  A.   (Witness examines document.)  It's an updated purchase

7  order similar to what we just went over.

8  Q.   Okay.  Is this a further iteration of what you're trying

9  to get from Autonomy for this $10 million?

10 A.   Correct.

11 Q.   Let me draw your attention to page 2, please.

12 A.   Okay.

13 Q.   Thank you, Ms. Margen.

14      And I draw your attention to -- well, strike that.

15      How does this iteration differ from what we just looked at

16 previously?

17 A.   (Witness examines document.)  It appears here that they

18 have swapped out full-blown IDOL with Retrieval Lite, which was

19 kind of a lighter version of IDOL.

20 Q.   And there's two other things called Categorization

21 Clustering, SharePoint Connector.  What are those?

22 A.   They're just various features of the product of IDOL.

23 Q.   How did you -- what was your reaction to this change in

24 what you were getting?

25 A.   I wasn't happy.  This was a significant change from our

1  perspective.  You know, full-blown IDOL was -- would have been

2  much more valuable to us in what we were trying to accomplish

3  with our software.

4  **Q.**  And does this draft purchase order also differ in that now

5  the end user is Discovery Tech LLC in paragraph one?

6  **A.**  Correct, yes.

7  **Q.**  And that's the new company you were forming?

8  **A.**  Technically that's misspelled but, yes, I think that's the

9  idea.

10  **Q.**  Please look at Exhibit 410.

11  **A.**  (Witness examines document.)

12  **Q.**  Mr. Truitt, is this a true and correct copy of an e-mail

13  exchange among you and Joel Scott relating to the $10 million

14  software purchase?

15  **A.**  Yes.

16      **THE COURT:**  Admitted.

17  (Trial Exhibit 410 received in evidence)

18  **BY MR. LEACH:**

19  **Q.**  Let me please draw your attention to page 2.  In this

20  e-mail, Mr. Truitt, Joel Scott writes (reading):

21      "Attached please find an updated document.  As to

22      your question about IDOL, providing Categorization

23      Clustering and Retrieval Lite is the best we can do.  I

24      should note ControlPoint does not ship with IDOL - full

25      blown or otherwise."

1          What did you understand this to mean?

2     **A.**    Well, this is what we were discussing and we had several

3     phone calls about that.  You know, our understanding and the

4     draft POs that had gone back and forth included full-blown

5     IDOL.  So we were -- we were surprised and I was, again, not

6     happy that they could not provide that software.

7     **Q.**    You pressed to get more?

8     **A.**    I pressed for the PO to be the PO that was originally sent

9     back and forth, which included IDOL.

10    **Q.**    Where did that end from your perspective?

11    **A.**    It ended just like this, with Retrieval Lite instead of

12    the full-blown IDOL capability.

13    **Q.**    Please look at what has been marked as Exhibit 429.

14    **A.**    (Witness examines document.)

15            **THE COURT:**  Admitted.

16        (Trial Exhibit 429 received in evidence)

17    **BY MR. LEACH:**

18    **Q.**    What is this document, Mr. Truitt?

19    **A.**    It appears to be the final purchase order.

20    **Q.**    What is the software being licensed?

21    **A.**    It's Retrieval Lite, not full-blown IDOL.  It's also the

22    ControlPoint module.

23    **Q.**    Please look at page 2.

24    **A.**    (Witness examines document.)

25    **Q.**    Whose signature is on this purchase order?

1  A.   That is my brother Steve who was, again, the COO of

2  MicroTech at the time.

3  Q.   What is the date?

4  A.   The date is 12/30/2009.

5  Q.   Was there some level of anxiety in your mind on

6  December 30th when you committed to this $10 million software

7  purchase?

8  A.   There was.  We -- my understanding was that the -- the

9  MicroLink transaction was going to close at that same time.  It

10 ended up not closing until the following Monday on the 4th of

11 January, I believe.  So we had -- we had sent an order for the

12 software, but we did not have our other side of the equation

13 yet.

14 Q.   And the other side of the equation was where you were

15 going to get the money to pay for all of this?

16 A.   Correct.

17 Q.   Please look at what has been marked as Exhibit 420.

18 A.   (Witness examines document.)  I don't see 420.  I don't

19 have it.

20          MR. LEACH:  May I approach, Your Honor?

21          THE COURT:  Yes.

22                    (Pause in proceedings.)

23          THE WITNESS:  Oh.  Thank you.

24 BY MR. LEACH:

25 Q.   Are you familiar with this document, Mr. Truitt?

1  A.    Yes.

2  Q.    As best you can recall, when did you first see it?

3  A.    My first recollection of this was in preparation for a

4  meeting that I was going to have with you, and I can't recall

5  the date but it was several years after the date of this order.

6  Q.    So at some point after 2012?

7  A.    Yes.

8          THE COURT:  Admitted.

9      (Trial Exhibit 420 received in evidence)

10 BY MR. LEACH:

11 Q.    What does this purport to be, Mr. Truitt?

12 A.    This is a MicroLink purchase order to Autonomy on behalf

13 of Discover Technologies to purchase $2.3 million worth of IDOL

14 and something called Profiling, which is another feature.

15 Q.    What is the date of this purchase order?

16 A.    December 31st, 2009.

17 Q.    What is the amount?

18 A.    $2.3 million.

19 Q.    And if I could draw your attention to page 2.

20 A.    (Witness examines document.)

21 Q.    Do you see where it says Discover Technologies is the end

22 user?

23 A.    Yes.

24 Q.    And do you see the date of December 31st, 2009?

25 A.    Yes.

**TRUITT - DIRECT / LEACH**

1  **Q.**    And the software that purportedly is being licensed in

2  this is something called Profiling?

3  **A.**    IDOL server with Profiling, yes.

4  **Q.**    Okay.  Did you agree to this order, sir?

5  **A.**    I did not.

6          **THE COURT:**  Shall we take our recess now?

7          **MR. LEACH:**  Yes, Your Honor.

8          **THE COURT:**  Okay.  Ladies and gentlemen, we're going

9  to be in recess for the day.  Remember the admonition given to

10  you:  Don't discuss the case, allow anyone to discuss it with

11  you, form or express any opinion.

12      We will resume tomorrow.

13          **MR. LEACH:**  Thank you, Your Honor.

14              (Proceedings adjourned at 4:08 p.m.)

15                      ---oOo---

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, March 7, 2018

8

9

10

11    _____

12        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

13

14

15    _____

16        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                  U.S. Court Reporter

17

18

19

20

21

22

23

24

25