**Volume 8**

**Pages 1192 - 1407**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )        **NO. CR 16-00462 CRB**
                                    )
SUSHOVAN TAREQUE HUSSAIN,           )
                                    )
            Defendant.              )
_____    )
                          San Francisco, California
                          Thursday, March 8, 2018

**TRANSCRIPT OF PROCEEDINGS**

**<u>APPEARANCES:</u>**
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
           **BY:   ROBERT S. LEACH**
                    **ADAM A. REEVES**
                    **WILLIAM FRENTZEN**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
           **BY:   JOHN W. KEKER**
                    **JAN NIELSEN LITTLE**
                    **BROOK DOOLEY**
                    **KATE LAZARUS**
                    **NIC MARAIS**
                    **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

## I N D E X

Thursday, March 8, 2018 - Volume 8

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **TRUITT, DAVID MORELAND (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1198 | 8 |
| Direct Examination resumed by Mr. Leach | 1198 | 8 |
| Cross-Examination by Mr. Keker | 1289 | 8 |
| Redirect Examination by Mr. Leach | 1396 | 8 |
| Recross-Examination by Mr. Keker | 1406 | 8 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 312 | | 1379 | 8 |
| 421 | | 1304 | 8 |
| 510 | | 1203 | 8 |
| 535 | | 1313 | 8 |
| 582 | | 1204 | 8 |
| 624 | | 1208 | 8 |
| 670 | | 1215 | 8 |
| 674 | | 1217 | 8 |
| 786 | | 1219 | 8 |
| 835 | | 1222 | 8 |
| 928 | | 1224 | 8 |
| 1042 | | 1225 | 8 |
| 1173 | | 1227 | 8 |
| 1199 | | 1230 | 8 |
| 1204 | | 1233 | 8 |
| 1292 | | 1335 | 8 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1293 | | 1334 | 8 |
| 1314 | | 1236 | 8 |
| 1320 | | 1237 | 8 |
| 1354 | | 1242 | 8 |
| 1356 | | 1241 | 8 |
| 1438 | | 1357 | 8 |
| 1446 | | 1254 | 8 |
| 1485 | | 1244 | 8 |
| 1488 | | 1244 | 8 |
| 1490 | | 1244 | 8 |
| 1491 | | 1244 | 8 |
| 1492 | | 1244 | 8 |
| 1499 | | 1244 | 8 |
| 1500 | | 1244 | 8 |
| 1510 | | 1244 | 8 |
| 1511 | | 1244 | 8 |
| 1516 | | 1244 | 8 |
| 1529 | | 1251 | 8 |
| 1684 | | 1256 | 8 |
| 1687 | | 1257 | 8 |
| 1725 | | 1261 | 8 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1726 | | 1264 | 8 |
| 1730 | | 1266 | 8 |
| 1769 | | 1268 | 8 |
| 1901 | | 1275 | 8 |
| 1902 | | 1279 | 8 |
| 1971 | | 1271 | 8 |
| 1972 | | 1274 | 8 |
| 2059 | | 1280 | 8 |
| 2381 | | 1283 | 8 |
| 2454 | | 1285 | 8 |
| 2459 | | 1286 | 8 |
| 2784 | | 1202 | 8 |
| 5561 | | 1315 | 8 |
| 5569 | | 1297 | 8 |
| 5575 | | 1298 | 8 |
| 5583 | | 1317 | 8 |
| 5584 | | 1320 | 8 |
| 5587 | | 1317 | 8 |
| 5588 | | 1323 | 8 |
| 5592 | | 1371 | 8 |
| 5605 | | 1350 | 8 |

## **I N D E X**

### **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 5626 | | 1364 | 8 |
| 5669 | | 1319 | 8 |
| 5737 | | 1336 | 8 |
| 5739 | | 1337 | 8 |
| 5741 Demonstrative Purposes Only | | 1323 | 8 |
| 5742 - Demonstrative | | 1350 | 8 |
| 5744 - Demonstrative | | 1362 | 8 |
| 5854 | | 1301 | 8 |
| 5855 | | 1303 | 8 |
| 5869 | | 1310 | 8 |
| 5885 | | 1361 | 8 |

<u>**Thursday - March 8, 2018**</u>                              <u>**9:04 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---000---**

(Proceedings were heard in the presence of the jury:)

        **THE COURT:**  Please be seated.

    Let the record reflect all jurors are present, the parties
are present.

    Good morning, ladies and gentlemen.  Again, thank you for
being so prompt.  The Court and the parties really appreciate
it.

    Let me just go over scheduling.

    Have a seat, sir, if you will.

    The schedule is, as you know, we have a full day today and
we'll have close -- not tomorrow.  Okay.  I've got to get this
all straight in my own mind.  Not tomorrow.

    Monday we are meeting -- we'll probably adjourn around
1:00, 1:15, 1:00, right around there.

    Then nothing Tuesday, nothing Wednesday, nothing Thursday;
but Friday we are meeting, which is a change in how we
originally set up, and I don't want to lose a whole day of
testimony.

    So there we are.  If there are other scheduling things,
I'll be pleased to address them.

    Okay.  So let's continue with the examination.

\\\

1    <u>**DAVID MORELAND TRUITT**</u>,

2    called as a witness for the Government, having been previously

3    duly sworn, testified further as follows:

4         **THE COURT:**  I remind you you're under oath.

5         **MR. LEACH:**  Thank you, Your Honor.

6              <u>**DIRECT EXAMINATION**</u>  (resumed)

7    **BY MR. LEACH:**

8    **Q.**   Good morning, Mr. Truitt.

9    **A.**   Good morning.

10   **Q.**   When we broke yesterday, we were discussing the

11   $55 million sale of MicroLink to Autonomy.  Do you recall that?

12   **A.**   Yes, sir.

13   **Q.**   And do you also recall a $10 million purchase of Autonomy

14   software by MicroTech for resale to Discover Technologies?

15   **A.**   Yes.

16   **Q.**   And if we could please display, Ms. Margen, Exhibit 429

17   and Exhibit 420 at the same time.

18        Let me draw your attention to the right side of the

19   screen, Mr. Truitt.  It's a little hard to make out there, but

20   is this the order by MicroTech for certain Autonomy software?

21   **A.**   Yes.

22   **Q.**   What, again, is the software being licensed?

23   **A.**   Right -- the right side shows it's IDOL Retrieval Lite, so

24   it's a lite version of the IDOL product.

25   **Q.**   So it's certain functionality within the IDOL product; is

1   that fair?

2   **A.**   Yes.

3   **Q.**   And that functionality is Categorization Clustering,

4   Retrieval Lite, and SharePoint Connector?

5   **A.**   Right.

6   **Q.**   Did you have discussions with Mr. Joel Scott about what

7   Discover Tech had wanted to license as part of this software

8   purchase?

9   **A.**   Yes.  And I think that was indicated in the initial

10  purchase orders that went back and forth between Autonomy with

11  Mr. Scott and myself, and that was full -- it was ControlPoint

12  but it was also shipping with IDOL -- full IDOL.

13  **Q.**   If we could please look at Exhibit 420.  This is the

14  $2.3 million order from Autonomy to MicroLink.  What is the

15  software that is purportedly the subject of this purchase

16  order?

17  **A.**   Sorry.  Do I have that here?

18  **Q.**   I think it's on the screen, sir.  I think it's already in

19  evidence.

20  **A.**   (Witness examines document.)  Can you repeat the question?

21  **Q.**   What is the software that is the subject of the

22  $2.3 million order reflected in Exhibit 420?

23  **A.**   IDOL server with Profiling.

24  **Q.**   If we could zoom back out to Exhibit 420, please?

25          **MR. KEKER:**  Excuse me, Your Honor.  We don't have a

1    record of 429 in evidence.  We have no objection, but I want to

2    make sure it's in.

3         **THE COURT:**  I think I did admit it but if I didn't,

4    429 admitted.

5         **MR. KEKER:**  And 420 as well.

6         **THE COURT:**  I'm sorry?

7         **MR. KEKER:**  And 420 as well.  We have no objection to

8    that either.

9         **THE COURT:**  420 is also admitted.

10        **THE CLERK:**  They were admitted yesterday.

11        **THE COURT:**  Pardon?

12        **THE CLERK:**  Yesterday.

13        **THE COURT:**  Yes.  Okay.  So thank you.  Those

14   documents are in evidence.

15        **MR. LEACH:**  Thank you, Your Honor.

16        If we could zoom out, please, to the first page of

17   Exhibit 420.

18   **Q.**   Mr. Truitt, I think you testified yesterday that you did

19   not agree to this $2.3 million order?

20   **A.**   That's correct.

21   **Q.**   Did you authorize anybody to agree to this $2.3 million

22   order?

23   **A.**   I did not.

24   **Q.**   Did anyone at MicroLink, other than you, have authority to

25   agree to a multimillion-dollar purchase order?

**TRUITT - DIRECT / LEACH**

1   **A.**   No.

2   **Q.**   Did MicroLink ever deliver Profiling software to Discover

3   Technologies?

4   **A.**   No.

5   **Q.**   Did Discover Technologies ever pay MicroLink for this

6   Profiling software?

7   **A.**   No.

8   **Q.**   Did MicroLink ever ask Discover Tech for payment for this

9   $2.3 million worth of software?

10   **A.**   No.

11   **Q.**   When did you first learn of this $2.3 million order?

12   **A.**   My first recollection of it was preparing for a meeting

13   with yourself.  I was going through a spreadsheet with

14   Mr. Rizek, who is our CFO, and we were looking at a spreadsheet

15   similar to what you showed earlier, which had a list of

16   outstanding orders, and I asked him what the $2.3 million order

17   was, and that's when I first recall it.

18   **Q.**   Were you surprised by it?

19   **A.**   I was.

20   **Q.**   Going back to the 10 million -- strike that.

21        If you could, please, look at what has been marked as

22   Exhibit 2784.  It's right in front of you, sir.

23   **A.**   (Witness examines document.)

24   **Q.**   Is this a true and correct copy of a closing statement

25   summarizing some of the money flow for the MicroLink

1  acquisition?

2  **A.**   Yes, it is.

3  **Q.**   Is that your signature on page 4 of the exhibit?

4          **MR. KEKER:**  I don't have 274.

5          **THE COURT:**  2784.

6          **THE WITNESS:**  Yes, it is my signature.

7          **MR. KEKER:**  Sorry.

8          **THE COURT:**  Admitted.

9          (Trial Exhibit 2784 received in evidence)

10 **BY MR. LEACH:**

11 **Q.**   Do you see up at the top the date January 4th, 2010,

12 Mr. Truitt?

13 **A.**   Yes, I do.

14 **Q.**   And is that consistent with your memory of when MicroLink

15 was acquired by Autonomy?

16 **A.**   Yes, it is.

17 **Q.**   Further below there's a purchase price, $55 million.  Do

18 you see that?

19 **A.**   I do.

20 **Q.**   And the closing payments to sellers, $48,828,955, what

21 does that represent?

22 **A.**   That's what was going to be transferred to our respective

23 bank accounts.

24 **Q.**   Please look at page 2.  What is the amount of money that

25 was going to you as a result of this sale?

1   **A.**   39,063,164.

2   **Q.**   What was the amount going to Mr. Wharton?

3        If we could please scroll down just a little bit.

4   **A.**   9,765,791.

5   **Q.**   Please look at what has been marked as Exhibit 510.

6   **A.**   (Witness examines document.)

7   **Q.**   Is this a true and correct copy of a bank statement for a

8   bank account in your name at M&T Bank?

9   **A.**   Yes, it is.

10        **MR. LEACH:**  Your Honor, I offer Exhibit 510.

11        **MR. KEKER:**  No objection.

12        **THE COURT:**  Admitted.

13        (Trial Exhibit 510 received in evidence)

14   **BY MR. LEACH:**

15   **Q.**   Mr. Truitt, I draw your attention to the "Account Summary"

16   row in the top portion of this document.  This was a bank

17   account that you controlled?

18   **A.**   Yes, that's correct.

19   **Q.**   Okay.  What was the beginning balance as of December 23rd,

20   2010?

21   **A.**   Zero.

22   **Q.**   And I draw your attention to the account activity on

23   1/4/10.  There appears to be a $39,063,164 deposit.  Do you see

24   that?

25   **A.**   Yes.

1  **Q.**  What does that represent?

2  **A.**  That's the incoming wire from Autonomy to myself.

3  **Q.**  From the sale of MicroLink?

4  **A.**  Correct.

5  **Q.**  Further below there's an outgoing wire transfer on

6  1/5/10 for $8 million.  Do you see that?

7  **A.**  I do.

8  **Q.**  And what is that for?

9  **A.**  That was me wiring funds into my new Discover Technologies

10  bank account to fund Discover, which ultimately we could then

11  purchase that software that we had agreed to buy.

12  **Q.**  So you're transferring some of the proceeds of the

13  MicroLink acquisition to pay for the $10 million worth of

14  software?

15  **A.**  Correct.

16  **Q.**  Please look at what has been marked as Exhibit 582.

17  **A.**  (Witness examines document.)

18  **Q.**  Is this a true and correct copy of bank records for

19  January 2010 for Discover Technologies?

20  **A.**  Yes, it is.

21          **MR. LEACH:**  Your Honor, I offer Exhibit 582.

22          **THE COURT:**  Admitted.

23      (Trial Exhibit 582 received in evidence)

24  **BY MR. LEACH:**

25  **Q.**  Up at the top there's a statement summary and account

1  number ending in 56799, commercial checking.  Do you see that,

2  Mr. Truitt?

3  **A.**    Yes, I do.

4  **Q.**    What was the purpose of this account?

5  **A.**    A simple checking account for the new business.

6  **Q.**    Did the new business have any other checking accounts at

7  this point in time?

8  **A.**    No.

9  **Q.**    I draw your attention to the two entries -- or the two

10 deposits/credits on 1/5 for $8 million and $2 million.  Do you

11 see those?

12 **A.**    I do.

13 **Q.**    What do those represent?

14 **A.**    Those were wires that came from me.  The 8 million was

15 from myself and then 2 million from Mr. Wharton, my partner in

16 that business, and effectively representing our ownership

17 interests in the company.  So I put in 8 and he put in 2, and

18 that's, again, what we were going to use to purchase the

19 software.

20 **Q.**    The ControlPoint software that MicroTechnologies had

21 licensed from Autonomy?

22 **A.**    Correct.

23 **Q.**    Further below there's a $10 million wire to

24 MicroTechnologies LLC.  Do you see that?

25 **A.**    I do.

TRUITT - DIRECT / LEACH

1    **Q.**    What is that?

2    **A.**    That is our payment for the software that we licensed from

3    Autonomy through MicroTech.

4    **Q.**    What was the starting balance for Discover Technologies

5    checking account on December -- or January 1st, 2010?

6    **A.**    Zero.  It was a brand new checking account.

7    **Q.**    Did you have discussions with Tim Wharton about the

8    $2 million that was coming into this account?

9    **A.**    Sure.  Of course.  We both agreed that we were --

10        **MR. KEKER:**  Objection, Your Honor.  Hearsay.

11        **THE COURT:**  Okay.  So I think what you can testify to

12   is not what he said to you, unless there's some exception to

13   the hearsay rule, so I'm sustaining the objection.  But you can

14   introduce the conversation, and I would admonish the jury as

15   follows:

16       I believe that this question calls for what we call

17   hearsay.  That is a statement made by an individual out of

18   court -- okay -- and he's not here to be cross-examined about

19   that statement.

20       Now, what can you consider it for?  You can consider it

21   for -- if you believe it occurred -- for explaining the

22   witness' actions or state of mind; that is, that what he did or

23   what he said was in response to something that was told to him.

24       You cannot consider it for what's called the truth of the

25   matter; that is, that whatever that person said is true.  It

**TRUITT - DIRECT / LEACH**

1   may be true, it may not be true, but we're not admitting it for

2   that purpose.

3        Now, if you master that concept, you have done more than

4   most law students do in a lifetime of them practicing law, but

5   that's the concept and I'm quite sure you can grasp that part.

6   Therefore, it is not being introduced for the truth of the

7   matter.  It is being introduced for the -- to explain the state

8   of mind and the subsequent conduct of the witness.

9        Okay?

10            **MR. LEACH:**  Thank you, Your Honor.

11   **Q.**   Did you and Mr. Wharton have an understanding that you

12   were going to use the money from the MicroLink acquisition to

13   fund the software purchase?

14   **A.**   Yes, we did.

15   **Q.**   So as of January 2010, Discover Technologies has licensed

16   $10 million worth of ControlPoint software?

17   **A.**   Correct.

18   **Q.**   Was Discover Technologies successful in selling any

19   ControlPoint software?

20   **A.**   No.

21   **Q.**   Let me move forward in time, Mr. Truitt, to April of 2010

22   or the closing dates of March 2010, early 2000 -- April 2010.

23   Do you have that time period in mind?

24   **A.**   I do.

25   **Q.**   Would you please look at what has been marked as

1    Exhibit 624?

2    **A.**    (Witness examines document.)  Okay.

3    **Q.**    Do you recognize this document?

4    **A.**    It's a copy of my phone records for that period.

5             **MR. LEACH:**  Your Honor, I offer Exhibit 624.

6             **THE COURT:**  Admitted.

7         (Trial Exhibit 624 received in evidence)

8    **BY MR. LEACH:**

9    **Q.**    These are your phone records for the period March 5th,

10   2010, to April 4th, 2010, Mr. Truitt?

11   **A.**    That's right.

12   **Q.**    Your provider was AT&T?

13   **A.**    Correct.

14   **Q.**    I draw your attention to page 33 of the exhibit.

15   **A.**    (Witness examines document.)  Okay.

16   **Q.**    Up near the top in bold there's a phone number

17   703-915-1829.  Do you see that?

18   **A.**    Yes.  That's my phone number.

19   **Q.**    Thank you.

20        Further down below I draw your attention to item 923 and

21   924.  Do you see the entries at 3:02 p.m. and 3:20 p.m.?

22   **A.**    I do.

23   **Q.**    To the right there's a phone number 415-370-2207.  Do you

24   see that?

25   **A.**    I do.

1   **Q.**   Do you recognize that phone number?

2   **A.**   Yes.  That is Mr. Egan's cell phone number.

3   **Q.**   Now if we could please go back to page 15, some of the

4   call details.

5   **A.**   (Witness examines document.)  Okay.

6   **Q.**   I draw your attention to item 364, roughly halfway down

7   the page.

8   **A.**   Yes.

9   **Q.**   Do you see a phone call from the same phone number,

10  415-370-2207?

11  **A.**   Yes.

12  **Q.**   On April 1st, 2010, did you have a discussion with

13  Mr. Egan about a potential software transaction?

14  **A.**   I did.

15  **Q.**   Take a moment and describe what happened.

16  **A.**   Mr. Egan called me.  It was, as you say, one day after the

17  end.  So this is April 1st.  I happened to be on vacation.  It

18  was spring break.  I was down in West Palm Beach with my

19  family.

20       I received a phone call from Mr. Egan.  He asked

21  whether -- whether I could have a conversation with the

22  executives at MicroTech and whether they would be interested in

23  talking about an order -- an order that they wanted processed

24  for the end of that prior quarter, and that was an order with

25  the Vatican.

1  **Q.**  Prior to April 1st, 2010, had you heard of any potential

2  transaction with the Vatican?

3  **A.**  I had not.

4  **Q.**  And did Mr. Egan mention any type of dollar value or what

5  he wanted MicroLink -- MicroTech to do?

6  **A.**  He did.  He gave me some basics on the deal.  He mentioned

7  that it was a 10- to $11 million opportunity, I believe; that

8  it was a deal that Mr. Hussain was working personally; that it

9  was pretty exciting work.  They were digitizing.  They had

10  people, engineers, that were working in the Vatican

11  performing -- performing work to digitize all of the Vatican's

12  records.  And that's about the extent of the phone call.

13      So at that point I -- I did reach out to my brother Steve,

14  who, again, was running operations for MicroTech, explained the

15  situation.  He then had a conversation -- or he told me that he

16  had a conversation with Mr. Jimenez, who was the owner of the

17  company MicroTech.  They indicated that they would be

18  interested in having a phone call to discuss that order.

19      I believe at that point I also called Mr. Cronin, who was

20  also helping MicroTech process orders; and that's kind of where

21  I -- my involvement stopped.

22  **Q.**  You said you were on vacation when you got this phone

23  call?

24  **A.**  I was.

25  **Q.**  And why does this phone call stand out in your mind?

1  **A.**    Well, it was something that was out of the norm.

2  Normally, you know, everybody works hard through the end of the

3  quarter and you don't continue.

4      And I also happened to be on the beach.  I just recall it

5  very clearly that I was, you know, sitting on a chair on the

6  beach and I got a call from Mr. Egan.

7  **Q.**    Did Mr. Egan indicate when he wanted the order to be -- in

8  which quarter he wanted the order to be in?

9  **A.**    Yes, he did.  He mentioned that he would like the order to

10  be in the first quarter of the year.

11  **Q.**    What significance did you attach to that?

12  **A.**    Well, it was obviously after the quarter had ended, so

13  that was unusual.

14  **Q.**    Further down below in the phone records there's a

15  22-minute phone call to 415-625-1494.  Do you see that?

16  **A.**    Yes.

17  **Q.**    Are you familiar with that number?

18  **A.**    I'm assuming that that is an Autonomy work phone, but I'm

19  not sure.

20  **Q.**    Below that there's a number to -- a call to 703-674-9185.

21  Do you see that?

22  **A.**    Yes.  I believe that would be Mr. Cronin's cell phone

23  number.

24  **Q.**    And there's another 703 phone number, 891-1073.  What is

25  that?

1    **A.**    I -- I don't know for sure.

2    **Q.**    Okay.  The opportunity at the Vatican, did MicroTech have

3    any relationship with the Vatican at this point in time?

4    **A.**    Not that I'm aware of.

5    **Q.**    Did it do any international work?

6    **A.**    Not at that -- not -- I do not believe so.

7    **Q.**    Did MicroTech ultimately sign a purchase order to license

8    software from Autonomy to sell to the Vatican?

9    **A.**    They did.

10   **Q.**    Was MicroTech ever successful in selling software to the

11   Vatican?

12   **A.**    No.

13   **Q.**    Was Autonomy ever successful in selling software to the

14   Vatican?

15   **A.**    No.

16   **Q.**    At this point in time -- I want to go back briefly out of

17   April to the end of March 2010 and talk a little bit about

18   Discover Technologies.

19        At this point in time how long had Discover Technologies

20   been in business?

21   **A.**    A full quarter.

22   **Q.**    How many employees did it have?

23   **A.**    We had probably eight or so employees at the time.

24   **Q.**    Did you consider Discover Technologies to be a startup?

25   **A.**    Yes.  That's fair.

**TRUITT - DIRECT / LEACH**

1  **Q.**   When you started Discover Technologies, was it your plan

2  to resell Autonomy software in the manner that MicroLink had

3  done?

4  **A.**   No, that was not part of our original business plan.

5  **Q.**   Near the end of March 2010, were you approached by

6  Autonomy seeking Discover Technologies' agreement to resell

7  software to certain end users?

8         **MR. KEKER:**  Objection.  Foundation.  Autonomy is 3,000

9  people, Your Honor.

10  **BY MR. LEACH:**

11  **Q.**   Were you --

12         **THE COURT:**  Lay a foundation.

13  **BY MR. LEACH:**

14  **Q.**   Were you approached by someone from Autonomy at the end of

15  March 2010 asking whether Discover Technologies would resell

16  software to certain end users?

17  **A.**   Yes.  I was approached by Mr. Egan and we had that

18  discussion.

19  **Q.**   Describe for us what happened.

20  **A.**   He -- he called and wanted to discuss two opportunities.

21  He wanted to understand if we would be interested in

22  potentially issuing orders.  They were fairly -- fairly large

23  orders, but they were also existing Autonomy customers.

24  Citibank and Philip Morris, I believe, were the orders that he

25  wanted to discuss.  I was interested in, you know, potentially

1    participating with that.

2        We discussed how that might happen.  The issue that came

3    up, because we were such a new company without much of a track

4    record, I know there's a vetting process that occurs when

5    Autonomy considers a new company.  What was expressed to me by

6    Mr. Egan was that we would be looked at more favorably as a

7    participant in those orders if we could come up with some

8    upfront cash.  So effectively show that we had the ability to

9    participate with those deals.  And between the two of them, I

10   believe that we ultimately settled on a number just north of

11   $2 million.

12       Based on everything that I had learned about the

13   opportunities, I was interested.  Me and Mr. Wharton funded the

14   company with some additional cash with which we could then send

15   over as a prepayment for those purchase orders.

16   **Q.**  At this point in time, the end of March 2010, you were

17   also the CEO of MicroLink; is that right?

18   **A.**  Yes.  As part of our -- part of our deal, given the fact

19   that I was being allowed to start a new company, I remained at

20   MicroLink as its CEO, but I was also allowed to work 25 percent

21   of my time on the new company at the same time.

22   **Q.**  As the CEO of MicroLink, who was your boss?

23   **A.**  Mr. Hussain I guess was my boss.

24   **Q.**  At this point in time, end of March 2010, did Discover

25   Technologies have any meaningful sales of product on its own?

1  **A.**   We had -- we had one or two.  By meaningful, they were

2  meaningful to us.  You know, a couple hundred thousand dollars

3  I believe was the first one that we did with a Canadian

4  company, Tech Resources.

5  **Q.**   Let me draw your attention to what has been marked as

6  Exhibit 670.

7  **A.**   (Witness examines document.)  Okay.

8  **Q.**   Do you recognize this?

9  **A.**   Yes, I do.  This is an agreement that we were sent by

10 Autonomy that shows the agreement that they were putting in

11 place with Philip Morris.  So this gave us some -- some

12 background and some knowledge around the existing relationship

13 that Autonomy had with Philip Morris.

14      **THE COURT:**  Admitted.

15   (Trial Exhibit 670 received in evidence)

16 **BY MR. LEACH:**

17 **Q.**   Let me please draw your attention, Mr. Truitt, to the

18 bottom portion of Exhibit 670.  There's an e-mail from someone

19 named Rachel Haverfield at autonomy.com.  Do you see that?

20 **A.**   Yes.

21 **Q.**   And the subject is "PMI Contract."  What's your

22 understanding of what "PMI" is an abbreviation for?

23 **A.**   That's Philip Morris, Incorporated.

24 **Q.**   That's the tobacco company?

25 **A.**   Correct.

1  **Q.**  And she's writing to StoufferE at autonomy.com (reading):

2         "Stouffer, Andy asked me to send you the Philip

3     Morris Agreement, which is the USD4.5 mill possible deal

4     for Q1."

5     Do you see that?

6  **A.**  Yes.

7  **Q.**  And if we look above that, Mr. Egan forwards this to you

8  and to Mr. Cronin, and he wrote (reading):

9         "Gentlemen, this is the deal for FedBD."

10     What did you understand that to mean?

11  **A.**  FedBD was Mr. Cronin's company, and I believe that when

12  Mr. Egan had called me, he was also looking at potential other

13  companies who might be interested in that purchase order as

14  well.

15  **Q.**  If we could please scroll up to the top to your e-mail to

16  Tim Wharton and John Cronin.  You write (reading):

17         "This is the second deal, Philip Morris."

18     What did you mean by "the second deal"?

19  **A.**  Citibank was the first deal, and this was the second one

20  that we talked about.

21  **Q.**  (reading)

22         "Told Stouffer that we would not be doing the FedBD

23     route as we do not have enough time to figure out how that

24     would work."

25     What did you mean by that?

1  **A.**  I think that John really made that decision, and I was

2  relaying it.  You know, he -- he didn't have the infrastructure

3  or the funds that would allow him to participate in that order.

4  **Q.**  You then wrote (reading):

5            "I broached the working cap issue.  He is checking

6       with Sush and calling me back."

7       What do you mean by "Sush"?

8  **A.**  Mr. Hussain.

9  **Q.**  And what did you mean by "the working cap issue"?

10 **A.**  That's what I was describing regarding our ability, again,

11 to show that we could play, that we had the resources necessary

12 to participate in a deal of that size with Autonomy.

13 **Q.**  Please look at what has been marked as Exhibit 674.

14 **A.**  (Witness examines document.)

15 **Q.**  Is this a true and correct copy of an e-mail from Malcolm

16 Hyson to Autonomy with a copy to you attaching certain executed

17 reseller agreements?

18 **A.**  Yes.

19       **THE COURT:**  Admitted.

20       (Trial Exhibit 674 received in evidence)

21 **BY MR. LEACH:**

22 **Q.**  Mr. Truitt, I draw your attention to the top portion of

23 this e-mail.  It's from someone named Malcolm Hyson.  Who is

24 he?

25 **A.**  Malcolm is our chief technology officer at Discover

1    Technologies.

2    **Q.**    Is he someone you worked with closely?

3    **A.**    Yes.  He was one of the employees that we worked with at

4    MicroLink.  He was heading up our software group, and he was

5    one of the folks we brought over to Discover.

6    **Q.**    The subject of this is "Reseller Agreements."  What does

7    that mean?

8    **A.**    These were agreements that were put in place specific to a

9    deal, so they would do kind of one-off agreements that would

10   describe the particular deal that we were focused on.

11   **Q.**    Let me draw your attention to page 2.

12   **A.**    (Witness examines document.)

13   **Q.**    And do you see the words "Citigroup Technology" in the

14   first paragraph?

15   **A.**    Yes.

16   **Q.**    Is this the reseller agreement in respect of Discover

17   Technologies reselling software to Citigroup?

18   **A.**    Yes, it is.

19   **Q.**    What was the amount of this order?

20   **A.**    (Witness examines document.)  $5.5 million.

21   **Q.**    Please look at page 5.

22   **A.**    (Witness examines document.)

23   **Q.**    Do you have page 5 of Exhibit 674 in front of you?

24   **A.**    Yes.

25   **Q.**    And is this the first page of the reseller agreement with

1  respect to Philip Morris International Management SA?

2  **A.**   Yes, it is.

3  **Q.**   What is the amount of this order?

4  **A.**   4,185,000.

5  **Q.**   Put that to the side, Mr. Truitt, and please look at what

6  has been marked as Exhibit 786.

7  **A.**   (Witness examines document.)

8  **Q.**   Is this a true and correct copy of bank records for an

9  account in the name of Discover Technologies LLC for the month

10  ending April 30th, 2010?

11  **A.**   Yes, it is.

12           **THE COURT:**   Admitted.

13       (Trial Exhibit 786 received in evidence)

14  **BY MR. LEACH:**

15  **Q.**   I draw your attention, Mr. Truitt, to the account number

16  56798.  Do you see that?

17  **A.**   Yes.

18  **Q.**   Is this the same account that you used to fund the

19  $10 million purchase back in January?

20  **A.**   Yes, it is.

21  **Q.**   What is the starting balance for April of 2010?

22  **A.**   $131,322.47.

23  **Q.**   At this point in time did Discover Technologies have any

24  other bank accounts?

25  **A.**   No.

1    **Q.**    Beyond the ControlPoint software that it bought and the

2    software Discover was developing, did it have any significant

3    assets?

4    **A.**    No.  Our IP was probably our biggest asset at the time.

5    **Q.**    I draw your attention to the two wires -- the two

6    deposits/credits on April 5th, one in the amount of

7    1.627 million and the other for 406,000.

8    **A.**    Yes.

9    **Q.**    What do those represent?

10    **A.**    That was Mr. Wharton and myself funding again with our

11    respective percentages and ownership in the company to place

12    funds in the company such that we could send those off to

13    Autonomy as our agreed-upon prepayment.

14    **Q.**    Further below on April 7th there's a $2 million check

15    going out.  Do you see that, approximately $2 million?

16    **A.**    Yes.

17    **Q.**    What is that?

18    **A.**    Those are the $2 million funds that we sent to prepay for

19    the orders.

20    **Q.**    Without these $2 million in capital contributions or

21    loans, did Discover Tech have the means to pay for the software

22    if it didn't sell through?

23    **A.**    No.  We would have had to fund, you know, with additional

24    cash if the orders didn't go through.

25    **Q.**    Did Discover Tech have any relevant contacts at Citi?

1    **A.**    No.

2    **Q.**    Did it have any relevant contacts at Philip Morris?

3    **A.**    No.

4    **Q.**    Did it do any demonstrations of software for Citi?

5    **A.**    No, we did not.  But, you know, to be fair, again, these

6    were existing customers of Autonomy's.  They were already

7    running this technology.  So my understanding is that it was

8    more of a capacity issue.  But, no, we did not participate in

9    any sales -- any sales efforts on either of these accounts.

10    **Q.**    Would you say that Autonomy exercised control over what to

11    sell to Citi, when, and at what price?

12    **A.**    I would say that at this point in the sales cycle, that

13    was already determined by the time we were involved.

14    **Q.**    So is the answer yes?

15    **A.**    Is the answer were they in control, yes, I would say

16    that's fair.

17    **Q.**    Please look at what has been marked as Exhibit 835.

18    **A.**    (Witness examines document.)

19         **MR. KEKER:**  '30 or '45?

20         **MR. LEACH:**  835.

21         **THE WITNESS:**  (Witness examines document.)

22    **BY MR. LEACH:**

23    **Q.**    Mr. Truitt, is this a -- do you see the signature down at

24    the bottom of Exhibit 835?

25    **A.**    Yes.  That is Mr. Hyson's signature.

1        **THE COURT:**  Admitted.

2        (Trial Exhibit 835 received in evidence)

3    **BY MR. LEACH:**

4    **Q.**   What is this document, Mr. Truitt?

5    **A.**   This is a -- this is a letter from Deloitte wanting us to

6    indicate that we, indeed, did issue a purchase order for

7    these -- for these deals.

8    **Q.**   And if we could scroll down, please, to the signature

9    line.

10        It says "Company Discover Technologies" and there's a

11    signature.  Is that Mr. Hyson's signature?

12   **A.**   Yes.

13   **Q.**   And his title was CTO at the time?

14   **A.**   Yes.

15   **Q.**   And the date is July 6, 2010?

16   **A.**   Correct.

17   **Q.**   And is this a fair summary of what Discover Technologies

18   owed to Autonomy in respect of the Philip Morris and Citigroup

19   deals?

20   **A.**   I believe so, yes.

21   **Q.**   If we could go up to the top to the amounts, please.

22        There's one invoice numbered 4710ASL in the amount of

23   $3,515,400.  Is that the PMI deal?

24   **A.**   I believe so, yes.

25   **Q.**   And what are the two other invoices numbers below that?

**TRUITT - DIRECT / LEACH**

1  **A.**  I believe that they must be the combined the total we owed

2  for the Citi deal.

3  **Q.**  I'd like to move forward in time, Mr. Truitt, to the end

4  of June 2010.  We're refocused to the end of June 2010.  And

5  you mentioned a company called Tech Resources earlier.  What is

6  Tech Resources?

7  **A.**  It was a Canadian firm that -- mining company, and they

8  were interested in DiscoverPoint technology.  They were a

9  SharePoint shop, and they were also interested in Autonomy

10  software.  So we were really working as a team to demonstrate

11  DiscoverPoint with Autonomy to sell them our software.

12  **Q.**  When you say "we were working as a team," can you explain

13  a little bit about what you mean there?

14  **A.**  Yeah.  I meant Autonomy was looking to sell their IDOL

15  product, I believe, and we were looking to -- you know, our

16  product was kind of a user interface that would be on the front

17  of that that would assist around SharePoint, which was what

18  their -- you know, their technology had.  So we were -- you

19  know, the customer was interested in both our software --

20  "ours" being Discover -- Discover Technologies -- and

21  Autonomy's software, and so we were demonstrating those

22  together.

23  **Q.**  Please look at what has been marked as Exhibit 928.

24  **A.**  (Witness examines document.)

25  **Q.**  Is this a true and correct copy of an e-mail you received

1  on or about June 30th, 2010, attaching contracts relating to

2  the licensing of DiscoverPoint?

3  **A.**   Yes, it is.

4         **THE COURT:**  Admitted.

5         (Trial Exhibit 928 received in evidence)

6  **BY MR. LEACH:**

7  **Q.**   My first question, Mr. Truitt, at the top, there's someone

8  named Joel Mountain and the signature line indicates he was

9  from MicroLink.  Who was he?

10 **A.**   He was one of our sales reps.  He actually lived out here

11 in San Francisco.

12 **Q.**   You say "our sales rep."  He worked for MicroLink?

13 **A.**   That's correct.

14 **Q.**   Okay.  Please look at page 2.

15 **A.**   (Witness examines document.)

16 **Q.**   Up at the top it says "Software Distributor Agreements."

17 Do you see that?

18 **A.**   Yes.

19 **Q.**   Is this the first page of the distributor agreement

20 between Discover Technologies and Autonomy?

21 **A.**   Yes.

22 **Q.**   Please look at the last page, page 928 -- or page 8 of

23 Exhibit 928.

24 **A.**   (Witness examines document.)

25 **Q.**   What is this?

**TRUITT - DIRECT / LEACH**

1    **A.**   This appears to be a signed order.   I guess Autonomy was

2    going to purchase DiscoverPoint and then provide their software

3    and ours to Tech Resources.

4    **Q.**   What was the amount of the price of the software that

5    Autonomy was ordering?

6    **A.**   $213,800.

7    **Q.**   And to the left, what was the number of users that it was

8    licensing software for?

9    **A.**   4,000.

10   **Q.**   Thank you, Mr. Truitt.   You can put that to the side.

11        Did Discover Technologies ever resell software to

12   Citigroup?

13   **A.**   We did not ever resell it directly.   Citigroup decided to

14   work directly with Autonomy.

15   **Q.**   Please look at what has been marked as Exhibit 1042.

16   **A.**   (Witness examines document.)   Okay.

17   **Q.**   Is this a true and correct copy of an e-mail exchange

18   among you, Mr. Cronin, and Tim Wharton in August of 2010

19   relating to the Citigroup transaction?

20   **A.**   Yes.

21        **THE COURT:**   Admitted.

22        (Trial Exhibit 1042 received in evidence)

23   **BY MR. LEACH:**

24   **Q.**   Mr. Truitt, the date of this e-mail is August 10th, 2010.

25   Do you see that?

1    **A.**   Yes.

2    **Q.**   And at this point did Discover Technologies continue to

3    owe money to Autonomy relating to the March 2010 agreement with

4    respect to Citigroup?

5    **A.**   Yes.

6    **Q.**   Please look at the bottom of this page.  There's an e-mail

7    from someone named Robert Mark to John Cronin.  Do you see

8    that?

9    **A.**   Yes.

10   **Q.**   Who is Robert Mark?

11   **A.**   I do not know Mr. Mark, but he's an Autonomy employee.

12   **Q.**   He wrote (reading):

13          "John, we are working on a different approach that

14       would have us act as agents for collecting and forwarding

15       to you."

16       Do you see that?

17   **A.**   Yes.

18   **Q.**   And then further up above -- all the way up at the top,

19   please -- Mr. Cronin is writing (reading):

20          "It appears that a method is being worked where DT

21       would be the reseller, Autonomy would be acting as a DT

22       agent and executing an agreement with Citi directly."

23       Can you help us understand what that means?

24   **A.**   Not -- not specifically but, you know, they were -- we

25   were looking to -- Discover was having conversations with

1    procurement at Citi.  We were trying to figure out what it

2    would take for them to deal with us directly, and what we found

3    was that they had concerns about that.  It was a very long

4    process -- excuse me -- to get -- to get put on their approved

5    vendor list.

6        I think this is strategy in terms of how -- you know, how

7    we could get it done.  It wasn't a factor of whether they

8    wanted to buy the capacity.  It was really an exercise around

9    how -- how will they buy it, and that's what we're discussing

10   here.

11   Q.   What was the solution that's being discussed here?

12   A.   Well, I can read what it says.  It says here that Discover

13   would be the reseller, that Autonomy would be acting as an

14   agent for Discover executing an agreement with Citi directly.

15   So ultimately they wanted to deal directly with Autonomy as

16   opposed to dealing with a reseller.

17   Q.   So Citi would pay Autonomy and your debt goes away?

18   A.   Correct.

19   Q.   Please look at what has been marked as Exhibit 1173.

20   A.   (Witness examines document.)

21   Q.   Is this a true and correct copy of an e-mail you sent to

22   Andrew Kanter and Stouffer Egan on or about October 15th, 2010?

23   A.   Yes.

24           **THE COURT:**  Admitted.

25       (Trial Exhibit 1173 received in evidence)

1    BY MR. LEACH:

2    Q.    Please look at page 2, Mr. Truitt.  What is this document?

3    A.    This is an agreement that reflects a referral partnering

4    agreement where -- and the net effect of this is where we could

5    get paid our margin for the Citi deal even though it went

6    direct to Autonomy.

7    Q.    What do you mean by your margin?

8    A.    Our margin would be the 10 percent that we expected upon

9    closure of the software deal.  So our perspective is, you know,

10   we issued the order, did our best to close the order.  We took

11   the risk by issuing the order, and that we expected to be paid

12   a margin when the deal closed.

13   Q.    Did Discover Technologies ever deliver software to

14   Citigroup?

15   A.    Not directly.

16   Q.    I draw your attention to paragraph two of this agreement.

17   This says (reading):

18            "Referral partner will (1) Introduce Autonomy into

19        the deals with Citigroup."

20        Do you see that?

21   A.    Yes, I do.

22   Q.    Who is the referral partner?

23   A.    That would be Discover.

24   Q.    Did Discover introduce Autonomy into the deals with

25   Citigroup?

1   **A.**   We did not.

2   **Q.**   (reading)

3          "(2) Obtain quotes from Autonomy on behalf of the end

4   user."

5   Did Discover Technologies do that?

6   **A.**   We did not.

7   **Q.**   In the third paragraph it says (reading):

8          "Autonomy will pay referral partner commissions in

9   the amount of 497,000."

10  How was that $497,000 figure arrived at, Mr. Truitt?

11  **A.**   I believe it was 10 percent of what was ultimately sold to

12  Citi.

13  **Q.**   Beyond signing the purchase order in March of 2010 and

14  taking the risk as you described, did Discover Tech provide any

15  marketing assistance to Autonomy?

16  **A.**   No.  Again, these existing customer deals, there really

17  wasn't much to do.  We did not.

18  **Q.**   I'd like to move forward in time, Mr. Truitt, to the

19  fourth quarter of 2010.  Are you familiar with someone named

20  Roger Channing?

21  **A.**   Yes, I am.

22  **Q.**   Who is he?

23  **A.**   He was hired as a MicroTech employee.  His job title

24  escapes me, but he was a MicroTech employee.

25  **Q.**   Prior to Mr. Channing becoming a MicroTech employee, did

1  he approach you about possibly doing some work for MicroLink?

2  **A.**   Yes.  Mr. Channing had some ideas around data center

3  development, and he was referred to me I forget by whom.  We

4  brought him in.  We had a discussion with him.  He was a -- he

5  was a very impressive, smart gentleman.  He had some

6  interesting ideas, but we were not in the business of building

7  data centers.

8       And after I spoke with him, I referred his résumé up to

9  Mr. Jimenez, who was interested in that type of business.  So

10  that's how we -- that's how I met him for the first time, was

11  really an interview.

12  **Q.**   Please look at what has been marked as Exhibit 1199.

13  **A.**   (Witness examines document.)

14  **Q.**   Is this a true and correct copy of an e-mail from you to

15  John Cronin forwarding an e-mail from Dr. Roger Channing with

16  an attachment, Mr. Truitt?

17  **A.**   (Witness examines document.)  Yes.

18          **THE COURT:**  Admitted.

19       (Trial Exhibit 1199 received in evidence)

20  **BY MR. LEACH:**

21  **Q.**   Let me draw your attention, Mr. Truitt -- have you had a

22  chance to review that, Mr. Truitt?

23  **A.**   Yes.

24  **Q.**   Okay.  I draw your attention to the initial e-mail in the

25  chain on October 12th, 2010.  Do you see that?

**TRUITT - DIRECT / LEACH**

1  **A.**   Yes, I do.

2  **Q.**   And the -- further up, please.  Thank you, Ms. Margen.

3       What is the date of that e-mail?

4  **A.**   October 12th, 2010.

5  **Q.**   What is the subject?

6  **A.**   This is a PowerPoint it appears that Mr. Channing had put

7  together to kind of put down on paper what he had come in and

8  talked to us about the week before.

9  **Q.**   Okay.

10  **A.**   His ideas --

11  **Q.**   Ideas to --

12  **A.**   -- around --

13  **Q.**   -- build a data center?

14  **A.**   Yes, that's correct.

15  **Q.**   Please look at page 3.

16  **A.**   (Witness examines document.)  Okay.

17  **Q.**   I draw your attention to the first paragraph where

18  Mr. Channing writes (reading):

19       "You indicated that MicroLink/Autonomy might consider

20       implementing a KM/C4I Innovation and Integration (I2)

21       business strategy."

22       What is that?

23  **A.**   I think the KM/C4I is kind of what he was calling his

24  idea.  I don't -- I don't necessarily recall saying that

25  MicroLink was interested, but this is him following up on our

1  meeting and showing us, you know, more information around what

2  he wanted to do.

3  **Q.**   At this time, October 2010, were you still affiliated with

4  MicroLink?

5  **A.**   I was.

6  **Q.**   What was your title?

7  **A.**   CEO.

8  **Q.**   And who was your boss at this point in time?

9  **A.**   Mr. Hussain.

10 **Q.**   If we could please go back to the first page of the

11 document.

12      You forward this to Mr. Cronin on or about November 2nd,

13 2010; is that right, Mr. Truitt?

14 **A.**   Yes.

15 **Q.**   In early November 2010, did you have a meeting with

16 Mr. Hussain and Joel Scott?

17 **A.**   Yes, I did.

18 **Q.**   Where was the meeting?

19 **A.**   It took place in New York City.

20 **Q.**   How did that come about?

21 **A.**   I understood that Mr. Hussain was in New York City, and I

22 was wanting to let him know that I was going to resign from

23 MicroLink and focus my attention on Discover.  So I thought I

24 would go up and have that conversation with him face to face.

25 **Q.**   Please look at what has been marked as Exhibit 1204.

1    A.    (Witness examines document.)   Okay.

2    Q.    Is this a true and correct copy of an e-mail you sent to

3    Joel Scott on November 5th, 2010, attaching something titled

4    "MicroTech Proposal"?

5    A.    Yes, it is.

6              MR. LEACH:   Your Honor, I offer Exhibit 1204.

7              THE COURT:   Admitted.

8        (Trial Exhibit 1204 received in evidence)

9    BY MR. LEACH:

10   Q.    Before we jump into the substance of this, Mr. Truitt, at

11   this time, November 2010, had MicroTech been successful in

12   selling software to the Vatican?

13   A.    No.

14   Q.    Did MicroTech owe monies to Autonomy in respect of the

15   purchase order?

16   A.    Yes.

17   Q.    Roughly how much?

18   A.    I don't know specifically, but I would imagine that it

19   was -- it was millions.   It was 8, 10.   I'm not sure whether

20   they had made any payments towards what they owed or not at

21   that point.

22   Q.    Okay.   Did that outstanding obligation become a source of

23   frustration with your brother and others at MicroTech?

24   A.    I'm sure that they were concerned about it.

25   Q.    Going back to the e-mail, the date is November 5th, 2010.

1   Is that at or around the time you met with Mr. Hussain and

2   Mr. Scott?

3   **A.**   Yes.

4   **Q.**   Why were you sending this e-mail to Mr. Scott?

5   **A.**   As it says here, MicroTech had provided it to me.  I'm not

6   sure whether they knew I was going up to meet with them in

7   person and perhaps that's why they sent it to me.

8       Oftentimes because I was an investor within MicroTech,

9   they would -- you know, MicroTech would use me to get questions

10  answered because I had a longer-standing relationship with

11  Autonomy.

12      At the same time Autonomy would use me in that same way

13  sometimes if they needed an answer from MicroTech.  They just

14  kind of -- I acted as a liaison sometimes between the two

15  companies.  So they forwarded this to me and I forwarded it up

16  to Mr. Scott.

17  **Q.**   What was the proposal you were forwarding to Mr. Scott?

18  **A.**   This is a proposal for something called the ATIC, the

19  Advanced Technology Innovation Center.  So this is something

20  that MicroTech was presenting as a possibility of something

21  that they could do for Autonomy.

22  **Q.**   What were they proposing to do?

23  **A.**   Effectively build out a center that would focus on

24  introducing Autonomy software to the federal government.  So

25  the center would be full of hardware and software and a

 1    dedicated team of engineers to facilitate that.  So the

 2    proposal was -- you know, it was -- it was a business

 3    development marketing center for Autonomy.

 4    **Q.**   Please look at page 31 of the -- or page 29 of this

 5    exhibit.

 6    **A.**   (Witness examines document.)

 7            **THE COURT:**  It's on the screen.

 8            **THE WITNESS:**  Oh, thank you.

 9        Okay.

10    **BY MR. LEACH:**

11    **Q.**   What was the amount of money that MicroTech was proposing

12    Autonomy pay to MicroTech for this Advanced Technology

13    Innovation Center?

14    **A.**   It looks like it was $3,747,500.

15    **Q.**   And under the heading "Labor," do you see Dr. Channing's

16    name there?

17    **A.**   Yes.

18    **Q.**   Is this essentially an iteration of Mr. Channing's idea

19    that he had brought to you initially back in October?

20    **A.**   I think that there are certainly some similarities between

21    what he was talking about and what they are offering here.  You

22    know, the Autonomy focus is probably a bit different than what

23    he had -- he had originally talked about but, yes, it was quite

24    similar.

25    **Q.**   So you send this to Mr. Scott in advance of your meeting

1    with Mr. Hussain.  Please describe for us the meeting you had

2    with those two gentlemen in New York in early November.

3    **A.**    It was a dinner.  I don't recall really talking about

4    this -- this particular proposal.  I'm not sure that

5    Mr. Hussain had even had a chance to review it, or Mr. Scott

6    for that matter.  I think it was just a few days earlier that I

7    had sent it to them.

8         So the dinner was really focused more around the fact that

9    I was -- I was moving on.  We talked about when that would

10   happen, how that would happen; and that was the extent of the

11   conversation.

12   **Q.**    When was your departure scheduled to happen?

13   **A.**    The last day of December of that year, 2010.

14   **Q.**    Please look at what has been marked as Exhibit 1314.

15   **A.**    (Witness examines document.)

16   **Q.**    Is this a true and correct copy of an e-mail Joel Scott

17   sent to you on December 22nd, 2010, relating to the MicroTech

18   proposal we just looked at?

19   **A.**    Yes.

20              **THE COURT:**  Admitted.

21        (Trial Exhibit 1314 received in evidence)

22   **BY MR. LEACH:**

23   **Q.**    Let me draw your attention to the e-mail from -- first of

24   all, the subject of this is "MicroTech Proposal"; is that

25   right?

**TRUITT - DIRECT / LEACH**

1  **A.**   Yes.

2  **Q.**   Why is Mr. Scott sending this to you?

3  **A.**   Most likely because I was the one who sent him the

4  original proposal.  And, again, they viewed me as a part of the

5  MicroTech team.  You know, that wasn't necessarily correct, but

6  I was happy to help in any way that I could.

7  **Q.**   Okay.  Between the November 10th e-mail -- or the November

8  e-mail that we looked at and December 22nd, do you recall any

9  discussions with anyone from Autonomy about this ATIC proposal?

10  **A.**   I can't recall specific discussions that I may or may not

11  have had.

12  **Q.**   Did you have conversations with anyone other than

13  Mr. Scott?

14  **A.**   I do not believe so.  I think I was dealing primarily with

15  Mr. Scott.

16  **Q.**   Mr. Scott writes to you in the last line (reading):

17        "In line with our discussion, can you please provide

18        us an updated proposal with best and final?"

19        Do you see that?

20  **A.**   Yes.

21  **Q.**   And is your best and final proposal reflected in what has

22  been marked as Exhibit 1320?

23  **A.**   (Witness examines document.)

24        **THE COURT:**  1320 admitted.

25        (Trial Exhibit 1320 received in evidence)

1          **THE WITNESS:**  (Witness examines document.)  Yes.

2     BY MR. LEACH:

3     Q.   Let me draw your attention to the first line of the e-mail

4     (reading):

5               "Hi, Joel.  Here is the updated best and final

6          proposal from MicroTech, with the out year scenario

7          included."

8          What did that mean?

9     A.   It means that they were -- they were moving from -- I

10    believe the first proposal was for three years, and I think

11    this one added years four and five.

12    Q.   Please look at what has been -- or please look at page 29

13    of the exhibit.

14    A.   (Witness examines document.)  Okay.

15    Q.   I draw your attention to the row "Total Cumulative Price

16    With Prepayment."  Do you see that?

17    A.   Yes.

18    Q.   What does this represent?

19    A.   These were the options that they -- MicroTech was

20    proposing for years three, four, and five, I guess allowing

21    them to choose which -- which they would go with.

22    Q.   Who asked for that?

23    A.   I believe Mr. Scott asked for that.

24    Q.   And did Autonomy ultimately agree to pay MicroTech

25    $9.6 million to develop the ATIC?

TRUITT - DIRECT / LEACH

 1   **A.**    Yes.

 2   **Q.**    Were you hopeful that this would enable MicroTech to get

 3   money to pay down the Vatican debt?

 4   **A.**    I think that that certainly was --

 5            **MR. KEKER:**  Objection.  Calls for speculation,

 6   Your Honor.

 7            **THE COURT:**  Overruled.

 8            **THE WITNESS:**  I believe --

 9            **MR. KEKER:**  No foundation.

10            **THE COURT:**  Overruled.

11            **THE WITNESS:**   I believe that MicroTech was able to

12   utilize some of these funds to make payments for the Vatican.

13   **BY MR. LEACH:**

14   **Q.**    Let me please draw your attention to the end of

15   December 2010.

16            **THE COURT:**  Well, maybe we'll take a recess.  I mean,

17   is this --

18            **MR. LEACH:**  This is a convenient stopping point,

19   Your Honor.

20            **THE COURT:**  Okay.  Ladies and gentlemen, we're taking

21   our recess.  We'll be in recess until 10:30.

22       Remember the admonition given to you:  Don't discuss the

23   case, allow anyone to discuss it with you, form or express any

24   opinion.  And we'll resume at 10:30.

25       You can step down.

1    (Proceedings were heard out of the presence of the jury:)

2        **THE COURT:**  About how much longer do you have?

3        **MR. LEACH:**  45 minutes to an hour.

4        **THE COURT:**  Thank you.

5            (Recess taken at 10:15 a.m.)

6            (Proceedings resumed at 10:32 a.m.)

7    (Proceedings were heard in the presence of the jury:)

8        **THE COURT:**  Let the record reflect all jurors are

9    present, parties are present.

10       You may proceed.

11       **MR. LEACH:**  Thank you, Your Honor.

12   **Q.**   Before we broke, Mr. Truitt, I was drawing your attention

13   to the end of December, 2010.  Do you have that time period in

14   mind?

15   **A.**   Yes.

16   **Q.**   At or around December 31st, 2010, were you approached

17   about another end-of-quarter deal by Mr. Egan?

18   **A.**   Yes.

19   **Q.**   Describe for us what happened.

20   **A.**   Mr. Egan spoke to me about a deal with Bank of America, a

21   large deal.  He indicated again that it was another kind of

22   existing -- existing large customer of Autonomy's, that they

23   were -- I believe that they were increasing the number of seats

24   to 25,000, I believe.

25       He asked if I'd be interested in participating in that

1    deal, and I agreed to participate.

2    **Q.**    Please look at what has been marked as Exhibit 1356.

3         Do you recognize this?

4    **A.**    Yes.

5    **Q.**    What is it?

6    **A.**    This is a -- this is a one-off agreement for us to take --

7    or to participate in the Bank of America deal.

8         **THE COURT:**  Admitted.

9         (Trial Exhibit 1356 received in evidence)

10   **BY MR. LEACH:**

11   **Q.**    Let me draw your attention, Mr. Truitt, to the initial

12   email in the chain.  Do you see the subject, "one-off reseller

13   agreement"?

14   **A.**    Yes, sir.

15   **Q.**    What is the date?

16   **A.**    December 31st, 2010.

17   **Q.**    Someone named Livius Guaio was writing, "John, I've been

18   working with Stouffer on the deal involving Bank of America,

19   and attached for your review is a one-off reseller letter

20   agreement authorizing the sale of an additional 25,000 user

21   licenses to BofA."

22        Do you see that?

23   **A.**    Yes.

24   **Q.**    Is that what you meant by the term "seats"?

25   **A.**    Yes.

1  Q.   Please look at page 3 of the draft agreement.

2       What is the date at the top?

3  A.   December 31st, 2010.

4  Q.   In paragraph 2, "fees and payments," what is the total

5  dollar amount being proposed in this draft license agreement?

6  A.   7 million.

7  Q.   Please look at page 3 -- excuse me -- page 5.  Sorry.  And

8  up at the top, do you see the heading "Autonomy Software

9  Products"?

10 A.   Yes.

11 Q.   And to the right, there's a column "quantity."

12 A.   Yes.

13 Q.   And there's a reference to "an additional 25,000

14 identifiable users."

15      Is that the seats you were mentioning?

16 A.   Correct.

17 Q.   Did Discover Tech agree to this?

18 A.   We did.

19 Q.   Is that agreement reflected in what has been marked as

20 Exhibit 1354?

21 A.   Yes.

22      **MR. LEACH:**  Your Honor, I offer Exhibit 1354 in

23 evidence.

24      **THE COURT:**  Admitted.

25      (Trial Exhibit 1354 received in evidence)

1   **BY MR. LEACH:**

2   **Q.**   What is the date of the agreement, Mr. Truitt?

3   **A.**   December 31, 2010.

4   **Q.**   What is the amount in paragraph 2?

5   **A.**   7 million.

6   **Q.**   Did Discover Tech have the ability to pay $7 million to

7   Autonomy if it was unable to resell this software?

8   **A.**   Not without recapitalizing the company.

9   **Q.**   On or before December 31, 2011, were there any other

10  agreements between Discover Tech and Autonomy in respect of

11  selling software to BofA?

12          **THE COURT:**   I'm sorry.   You said 2011.

13          **MR. LEACH:**   I misspoke, Your Honor.   Let me ask that

14  again.

15  **Q.**   On December 31, 2010 -- December 31, 2010, were there any

16  other agreements between Discover Tech and Autonomy relating to

17  the sale of software to BofA?

18  **A.**   No.

19  **Q.**   At some point in time after December 31st, 2010, were you

20  approached by someone in Autonomy to execute an additional

21  agreement relating to the sale of software to BofA?

22  **A.**   Yes.

23  **Q.**   If you could please look briefly at what have been marked

24  as Exhibits 1488, 1490, 1492, 1485, 1491, 1510, 1500, 1499,

25  1511, and 1516.

1      **MR. KEKER:**  Your Honor, I'm sorry.  Can I get those

2  again?

3          **THE COURT:**  So let's -- you are going to offer them?

4          **MR. LEACH:**  I am going to offer them en masse,

5  Your Honor.

6          **THE COURT:**  We have to get the numbers right.

7      1488, 1490, 1492, 1485, 1491, 1510, 1500, 1499, 1511, and

8  1516.

9      Any objection to any of these exhibits?

10         **MR. KEKER:**  Can I just --

11         **THE COURT:**  Yes.  Take your time, take a look at them.

12         (Mr. Keker reviews documents.)

13         **THE WITNESS:**  Okay.  I've gone through them.

14         **MR. KEKER:**  No objection, Your Honor.

15         **THE COURT:**  Okay.  They are all admitted.

16      (Trial Exhibits 1488, 1490, 1492, 1485, 1491, 1510,

17       1500, 1499, 1511 and 1516 received in evidence)

18         **MR. LEACH:**  Thank you, Your Honor.

19  **Q.**   If we could please display 1488.

20      And I draw your attention, Mr. Truitt, to the top portion

21  of this email.

22      Do you see Stouffer Egan's name at the top?

23  **A.**   I do.

24  **Q.**   What is the date of this email?

25  **A.**   January 25th, 2011.

TRUITT - DIRECT / LEACH

1   **Q.**   What is the subject?

2   **A.**   The subject is "Another reseller agreement signed by

3   Discover."  Effectively the order has grown, is the subject of

4   this email and exhibits.

5   **Q.**   The $7 million order has grown to something larger; is

6   that what you're saying?

7   **A.**   Correct.

8   **Q.**   Mr. Egan writes to you, "Dave, I'll call you about this

9   around 4:00 p.m. your time.  It will be important that it be

10  signed as is with no additions or modifications late today and

11  scanned and emailed back."

12        Do you see that language?

13  **A.**   Yes.

14  **Q.**   And then it says, "This covers the excess amount of the

15  order."

16        What did you understand that to mean?

17  **A.**   That is the amount that the order was expanding at that

18  time.

19  **Q.**   Okay.  Please look at page 2.

20        What is the date of the draft agreement that Mr. Egan was

21  sending to you on January 25th, 2011?

22  **A.**   December 31st, 2010.

23  **Q.**   What is the amount of the order in paragraph 2?

24  **A.**   $3,675,000.

25  **Q.**   Would you please look at page 4 of the exhibit.

1      What is the software that is the subject of this draft

2  agreement?

3  **A.**   It doesn't indicate specifically what they are.

4  **Q.**   It says in "quantity" --

5  **A.**   Any -- are you asking about the quantity or what the

6  software --

7  **Q.**   I'm asking about the quantity.

8  **A.**   There is no quantity, but it says "for use in connection

9  with unlimited" -- I'm sorry.  Okay.  So we went from 25,000 to

10  a larger unlimited number.

11  **Q.**   Prior to January 25th, 2011, had Discover Tech agreed to

12  this additional $3.6 million order?

13  **A.**   No, we hadn't.

14  **Q.**   Please look at what has been marked as Exhibit 1490 and is

15  in evidence.

16      What is the date of this email?

17  **A.**   January 25th, 2011.

18  **Q.**   At 2:02 p.m.?

19  **A.**   Yes, sir.

20  **Q.**   Is this Mr. Scott also sending you an unexecuted version

21  of a draft agreement dated December 31st, 2010 for

22  $3.675 million?

23  **A.**   Yes.

24  **Q.**   If we could please display 1492.

25      What is the date of this email?

1   **A.**   January 25th, 2011.

2   **Q.**   What are you sending to Mr. Hyson?

3   **A.**   I'm sending him the order, the agreement, so that he could

4   sign it and send it back.

5   **Q.**   Why did you have Mr. Hyson execute agreements on behalf of

6   Discover Technologies?

7   **A.**   As our CTO, I think it made sense to us to have him sign

8   these documents.  He would be the one that would receive the

9   software.

10      There was also, I believe, in the beginning of our

11  relationship with Autonomy -- and I don't recall who suggested

12  it, but they wanted us to not just be a one-person company with

13  me signing everything.  So that's what was, I believe --

14  initially why we wanted him to start signing, but it also made

15  sense.

16          **MR. KEKER:**  Your Honor, excuse me.  Does this exhibit

17  have an attachment --

18          **THE COURT:**  Which one are we talking about?

19          **MR. KEKER:**  Mine doesn't.  1492.  Is it there in the

20  original?  That's all I'm asking.

21          (Mr. Leach hands Mr. Keker a document.)

22          **MR. KEKER:**  Thank you.

23  **BY MR. LEACH:**

24  **Q.**   Mr. Truitt, are there four pages to Exhibit 1492?

25  **A.**   Yes.

1   **Q.**   If we could please now display 1485.

2        What is the date and time of this email?

3   **A.**   January 25th, 2011 at 5:01 p.m.

4   **Q.**   The attachment -- and this is from Mr. Hyson to you?

5   **A.**   Yes.

6   **Q.**   There's an attachment reference autn_boa.  Do you see

7   that?

8   **A.**   Yes.

9   **Q.**   What is the attachment to this email?

10  **A.**   The order, the updated order.

11  **Q.**   Could we please look at page 2.

12       What is the date at the top?

13  **A.**   December 31st, 2010.

14  **Q.**   What is the amount?

15  **A.**   3,675,000.

16  **Q.**   If we could please look at page 3.

17       Is that Mr. Hyson's signature?

18  **A.**   Yes, it is.

19  **Q.**   How did he date this order?

20  **A.**   He dated it the day of -- the day that he was signing it.

21  **Q.**   And the day when Discover Technologies agreed to it?

22  **A.**   Correct.

23  **Q.**   If we could please display 1491.

24       What is the date and time of this email?

25  **A.**   January 25th, 2011, 5:32 p.m.

1    **Q.**    And what is Mr. Scott sending to you in this email?

2    **A.**    I think he's sending a revised order, and if I remember

3    correctly, the order has December 31st as the date for

4    signature.

5    **Q.**    Please look carefully at page 2.

6          What is it Mr. Scott was sending to you?

7    **A.**    This is a -- this is a Deloitte audit letter.

8    **Q.**    What do you mean by "Deloitte audit letter"?

9    **A.**    They would send us letters and they would -- they would

10   ask us whether we indeed agreed to do the -- whether we issued

11   an order and -- you know, for the amount.

12   **Q.**    If we could please display 1500.

13          What is the date and time of this email?

14   **A.**    January 26th, 2011, at 8:46 a.m.

15   **Q.**    The day after Mr. Hyson executed the agreement?

16   **A.**    Correct.

17   **Q.**    If we could please look at page 2.

18          What is the date of the agreement?

19   **A.**    December 31st, 2010.

20   **Q.**    What is the amount?

21   **A.**    3,675,000.

22   **Q.**    And if we could please look at the signature line.

23          Did you essentially forward the order as is to Mr. Egan at

24   Autonomy?

25   **A.**    Yes.

1    Q.    Please look at -- if we could please display 1516.

2          What is the date and time of this email?

3    A.    Wednesday, January 26th, 1:28 p.m.

4    Q.    This is from Mr. Hyson to you?

5    A.    Yes.

6    Q.    There's an attachment, autn_boa.pdf.  Do you see that?

7    A.    Yes.

8    Q.    Please look carefully at pages 2 through 4 and let me know

9    what this is.

10   A.    Are you going to display or am I going to -- what's the

11   number?

12   Q.    1516.

13   A.    2 through 4?  Okay.

14   Q.    What is the attachment in 1516?

15   A.    It is the order again.  And this time it has a date of

16   December 31st, 2010.

17   Q.    If we could please display page 2.

18          What is the date at the top?

19   A.    December 31st, 2010.

20   Q.    What is the amount?

21   A.    3,675,000.

22   Q.    And if we could please go to page 3 of the exhibit, you

23   noted that the date underneath Mr. Hyson's signature has

24   changed; is that right?

25   A.    Yes.

TRUITT - DIRECT / LEACH

1   **Q.**   How did that come about?

2   **A.**   I believe this was sent back to us by Mr. Scott or

3   Mr. Egan.  I don't recall which.  But when it came back, it had

4   the date obviously typed in.

5   **Q.**   And did you or Mr. Hyson cause this executed order to be

6   re-sent to Autonomy?

7   **A.**   We did.

8   **Q.**   Please look at what has been marked as Exhibit 1529.

9   **A.**   Sorry.  Was that within this group of exhibits?

10          **THE COURT:**  No.

11          **THE WITNESS:**  Or is this different?

12          **THE COURT:**  This wasn't previously admitted; right?

13          **THE WITNESS:**  I see it.

14          **MR. LEACH:**  1529 has not yet been admitted.

15          **THE COURT:**  Any objection?

16          **MR. KEKER:**  No, Your Honor.

17          **THE COURT:**  Admitted.

18          (Trial Exhibit 1529 received in evidence)

19   **BY MR. LEACH:**

20   **Q.**   Is this a true and correct copy of bank records relating

21   to Discover Technologies' commercial checking accounts for the

22   period ending January 31st, 2011?

23   **A.**   Yes.

24   **Q.**   To the right, there are -- if we could scroll down just a

25   little please, Ms. Margen.

1          There is a deposit credit for $400,000 on January 4th.  Do

2     you see that?

3     **A.**   Yes.

4     **Q.**   What does that represent?

5     **A.**   I don't recall.

6     **Q.**   Okay.  The $1 million transfer down at the bottom, wire

7     Autonomy, Inc., in the amount of $1 million, what does that

8     represent?

9     **A.**   I believe that we -- for this particular deal, it was

10    similar to the last Citi and PMI deals where we -- in this

11    case, we put up $1 million as a prepayment.

12    **Q.**   Did Discover Tech ever deliver software to Bank of

13    America?

14    **A.**   Not directly.

15    **Q.**   Did it make any efforts to sell software to Bank of

16    America?

17    **A.**   No.  We were not working with the customer.

18    **Q.**   Did Discover Tech have any relevant contacts with Bank of

19    America?

20    **A.**   No.

21    **Q.**   Would you say that Autonomy controlled what to sell to

22    Bank of America on what terms and when?

23    **A.**   I would say that's -- that's fair; that the documents that

24    we signed were the terms of the agreement.

25          **THE COURT:**  I'm sorry.  Let me ask a question.

1        You said in response to one of the earlier questions that

2   you were not -- you and your company were not involved directly

3   in the delivery of software to Bank of America.  Is that

4   accurate?

5            THE WITNESS:  Yes.

6            THE COURT:  Well, do you distinguish between directly

7   and indirectly?  Are you making a distinction?

8            THE WITNESS:  Well, the distinction, I think, would be

9   that the order happened.  They ultimately did purchase --

10           THE COURT:  Speak up.

11           THE WITNESS:  They ultimately did purchase the

12   software in the amounts that we had ordered them.  But we did

13   not directly acquire the software and then hand it to the -- to

14   the bank.  So they bought it directly from Autonomy.

15       Or actually that's not even true in this case.  I believe

16   they bought it from MicroTech.  I'm sure we are getting here in

17   a minute.

18           MR. LEACH:  We will get there soon.

19       Is that responsive to the Court's question?

20           THE COURT:  Thank you.

21   BY MR. LEACH:

22   Q.   Did Discover Technologies make any efforts to resell

23   software to Bank of America?

24   A.   No.

25   Q.   Did Autonomy control what to sell to Bank of America at

```
 1   what price and when?
 2            MR. KEKER:  Objection.  Asked and answered.
 3            THE COURT:  Overruled.
 4            THE WITNESS:  Yes.
 5   BY MR. LEACH:
 6   Q.   Please look at what has been marked as Exhibit 1466.
 7   A.   Okay.
 8   Q.   I'm sorry.  I misspoke.
 9        1446, Mr. Keker.
10        Is this a true and correct copy of an email from Steve
11   Truitt with a copy to you, to Stouffer Egan, on or about
12   January 14th, 2011?
13   A.   Yes, it is.
14            THE COURT:  Admitted.
15        (Trial Exhibit 1446 received in evidence)
16   BY MR. LEACH:
17   Q.   Mr. Truitt, what is the subject of this email exchange?
18   A.   Autonomy indicated that Bank of America would be
19   interested in working with a company that had 8(a) designations
20   so they preferred to set aside business for 8(a) companies,
21   much like we talked about earlier.
22        MicroTech, as we discussed, is -- was an 8(a) company, and
23   so this -- this is a -- this is effectively proving that we
24   have our 8(a) -- MicroTech had their 8(a) certification from
25   the Small Business Administration.
```

1   **Q.**   Did Discover Technologies have this 8(a) status?

2   **A.**   No.

3   **Q.**   How come?

4   **A.**   I do not qualify.

5   **Q.**   Did you ever tell anybody at Autonomy that Discover

6   Technologies had this 8(a) status?

7   **A.**   No.

8   **Q.**   Please look at what has been marked as Exhibit 1585.

9   **A.**   Okay.

10  **Q.**   Strike that, Mr. Truitt.  I don't -- you're not on the top

11  portion of this email, so I don't think it's a topic for your

12  examination.

13      I'd like to move forward in time to the end of the first

14  quarter of 2011 and the start of the second quarter of 2011.

15  Do you have that time period in mind?

16  **A.**   Yes.

17  **Q.**   At the end of March of 2011, were you again approached by

18  someone at Autonomy about doing an end-of-quarter deal?

19  **A.**   Yes.  Mr. Egan contacted me and we discussed a number of

20  potential deals.

21  **Q.**   What did Mr. Egan say to you?

22  **A.**   He went through, again, the deals one at a time.  We

23  talked specifics about where they were in the sales cycle,

24  amounts, when they expected to close.  You know, that was kind

25  of generally the discussion that we had, and that could have

1  been, you know, within the last few days of the quarter.

2  **Q.**   Please look at what has been marked as Exhibit 1684.

3  **A.**   Okay.

4  **Q.**   Is this a true and correct copy of an email you received

5  from Joel Scott on or about March 31st, 2011?

6  **A.**   Yes.

7          **THE COURT:**  Admitted.

8          (Trial Exhibit 1684 received in evidence)

9  **BY MR. LEACH:**

10 **Q.**   What is the subject of this email, Mr. Truitt?

11 **A.**   This is a one-off reseller agreement for the purposes of a

12 deal with ThinkTech.

13 **Q.**   Is there another draft other than ThinkTech?

14 **A.**   Yes.  I'm sorry.  There is also one for -- for FINRA.

15 **Q.**   What did Mr. Egan tell you about FINRA and ThinkTech?

16 **A.**   I don't remember the specifics, other than we went through

17 them at the time and he gave me indication that they were very

18 close to closing, and, you know, we talked about the specifics,

19 but I can't recall the . . .

20 **Q.**   Were you interested in doing these deals if they weren't

21 very close to closing?

22 **A.**   No.  That would not have been my interest.

23 **Q.**   Did Discover Technologies ultimately sign purchase orders

24 in respect of FINRA and ThinkTech?

25 **A.**   Yes.

1    **Q.**    Do you recognize what has been marked as Exhibit 1687?

2    **A.**    Yes.

3    **Q.**    Is this a true and correct copy of an email from Malcolm

4    Hyson to you dated March 31st, 2011, attaching executed

5    versions of orders for FINRA and ThinkTech?

6    **A.**    Yes.

7              **THE COURT:**  Admitted.

8         (Trial Exhibit 1687 received in evidence)

9    **BY MR. LEACH:**

10   **Q.**    Let me draw your attention to the top portion of this

11   email, Mr. Truitt.

12        Do you see the date, March 31st, 2011, 10:33 p.m.?

13   **A.**    Yes.

14   **Q.**    On or before March 31st, 2011, were there any other

15   agreements between Discover Technologies and Autonomy in

16   respect of reselling software, other than these two and the

17   ones we've seen previously?

18   **A.**    No.

19   **Q.**    Please look at page 2.

20        Is this the FINRA order?

21   **A.**    Yes, it is.

22   **Q.**    What is the amount?

23   **A.**    Sorry.  Trying to find it.

24              **THE COURT:**  Look at the screen.

25   \\\

1  BY MR. LEACH:

2  Q.   It's in paragraph 2 on the screen.

3  A.   One million.

4  Q.   Please look at page 4.  Do you see the Attachment A?

5  A.   Yes.

6  Q.   And do you see the software in respect of this order is

7  Introspect Discovery Solution, Autonomy Investigator ECA,

8  Autonomy Legal Hold, etc.?

9  A.   Yes.

10 Q.   And if you look in the "authorized use" in paragraph 8, do

11 you see a reference to "200 End User"?

12 A.   Yes.

13 Q.   Please look at page 6.

14      Is this the ThinkTech order?

15 A.   Yes, it is.

16 Q.   What was the amount?

17 A.   1,800,000.

18 Q.   At March 31st, 2011, did Discover Tech have the ability to

19 pay for the ThinkTech and FINRA orders if they didn't sell

20 through?

21 A.   Probably not.  I have to look at our bank statement, but I

22 would say probably not.  We probably would have had to make

23 additional contributions to the company.

24 Q.   Did Discover Tech have any relevant contacts with FINRA or

25 ThinkTech?

1    **A.**   We had no contacts with either organization.

2    **Q.**   Did Discover Tech make any efforts to resell software to

3    FINRA or ThinkTech?

4    **A.**   No.

5    **Q.**   Would you say that Autonomy exercised control over what to

6    sell to those folks when and at what price?

7    **A.**   Yes.  Again, you know, those -- those are kind of stated

8    here in these agreements.  I think that that -- that was

9    determined.

10   **Q.**   Do you recall testifying before a grand jury, Mr. Truitt?

11   **A.**   Yes, I do.

12   **Q.**   And you swore an oath to tell the truth?

13   **A.**   Yes, sir.

14   **Q.**   And you take that oath very seriously?

15   **A.**   Yes, sir.

16   **Q.**   And this was on June 9th, 2015?

17           **THE COURT:**  Is it an exhibit?

18           **MR. LEACH:**  It's not an exhibit, Your Honor.  It's

19   grand jury testimony.

20           **THE COURT:**  Will you identify what page and so forth

21   so I can look at it?

22           **MR. LEACH:**  I'm laying a foundation and then I'll

23   identify the page.

24           **THE CLERK:**  Do you have a copy?

25           **THE COURT:**  I don't have a copy, but I'll be handed

 1   one in a minute.

 2           **MR. LEACH:**  Please hand this to the Court.  It's page

 3   58.

 4           **THE COURT:**  What page and what lines?

 5       Mr. Keker, do you have a copy of it?

 6           **MR. KEKER:**  I do, Your Honor.

 7           **THE COURT:**  What page?

 8           **MR. LEACH:**  Page 58, line 20 to line 23.

 9           **THE COURT:**  All right.  You may ask the question on

10   line 20 and the response on line 23.  Just read it.  Just read

11   it.  You don't have to go up.

12   **BY MR. LEACH:**

13   **Q.**   Mr. Truitt, were you asked the question:  "Is it fair to

14   say that Autonomy exercised control over what to sell to FINRA

15   and ThinkTech when and on what terms?"

16   **A.**   Yes.  I believe I'm --

17           **THE COURT:**  Well, wait.  The answer --

18   **BY MR. LEACH:**

19   **Q.**   And did you answer "yes"?

20   **A.**   Yes.

21           **THE COURT:**  Okay.

22           **THE WITNESS:**  I'm saying the same thing here.

23           **THE COURT:**  Actually that's the question.  Okay.

24   **BY MR. LEACH:**

25   **Q.**   That was your testimony, sir?

 1    **A.**    And it's still my testimony.

 2            **THE COURT:**  Okay.  Thank you.

 3        Lashanda, do you want to give that back, please.

 4            **THE CLERK:**  Yes.

 5    **BY MR. LEACH:**

 6    **Q.**    Did you have an understanding at the time that Autonomy

 7    would have responsibility for consummating the sales with FINRA

 8    and ThinkTech?

 9    **A.**    Yes.  That is the way it worked.

10    **Q.**    At some point after April 1st, 2011, did Stouffer Egan

11    approach you about doing another deal for the first quarter of

12    2011?

13    **A.**    Yes, he did.

14    **Q.**    Please look at what has been marked as Exhibit 1725.  Do

15    you recognize this?

16    **A.**    Yes.

17    **Q.**    Is this a copy of an email that includes an Instant

18    Message exchange between you and Malcolm Hyson on April 4th,

19    2011?

20    **A.**    Yes.

21            **THE COURT:**  Admitted.

22        (Trial Exhibit 1725 received in evidence)

23    **BY MR. LEACH:**

24    **Q.**    Let me draw -- this appears to be an email, Mr. Truitt,

25    but there is a back and forth dialogue between you and

1  Mr. Hyson.  Can you explain what you understand to be?

2  **A.**   I believe that this is an IM session that Mr. Hyson and I

3  had, and perhaps those were captured in email form.  I'm not

4  exactly sure why it's in the form of an email, but it appears

5  to be an IM conversation.

6  **Q.**   Okay.  Mr. Hyson begins, "Are you in the office?"

7           **THE COURT:**  Could you explain what IM is?

8           **THE WITNESS:**  Instant --

9           **THE COURT:**  For those of us who are less enlightened

10  by technology.

11          **MR. LEACH:**  Excellent point, Your Honor.  Thank you.

12  **Q.**   What do you mean by IM?

13  **A.**   Instant Messaging within an organization so that it

14  doesn't go through an official email process.  It just kind of

15  pops up on the screen, and you can go back and forth.  It's

16  kind of like texting might be with phones, but it's occurring

17  on your computer.

18          **THE COURT:**  Thank you.

19  **BY MR. LEACH:**

20  **Q.**   Mr. Hyson begins here:

21          "Are you in the office tomorrow?"

22          "Ya" -- and you respond:  "Ya, we have that meeting in the

23  afternoon."

24          "Cool, want to do an impromptu happy hour after work?"

25          You answer:  "Sure."

1    And you write:  "Hey, question, if someone says 'pdf me an

2    email', does that simply mean email with a pdf attachment?"

3    What are you referring to there, Mr. Truitt?

4    **A.**    I was asking a question.  I had never -- I had never heard

5    that kind of request before, so from a technical perspective, I

6    was asking my CTO what he thought it meant because I was

7    confused.

8    **Q.**    When Mr. Egan reached out to you to take another order for

9    March 2011, what did he say to you?

10   **A.**    He said that he wanted me to -- "pdf me an email," and --

11   and I -- I believe that it had something to do with the date

12   not changing on the pdf.  He wanted to get a pdf; not a Word

13   document or an email.  So send him a pdf in an email of -- of

14   the order.

15   **Q.**    You then wrote, "Autonomy wants to pdf an order.  Said it

16   will not change the date on the document if it is a pdf."

17   Do you see that?

18   **A.**    Yes.

19   **Q.**    Is that a reference to your conversation with Mr. Egan?

20   **A.**    Yes.

21   **Q.**    Okay.  Please look at what has been marked as Exhibit 726.

22   **A.**    1726?

23   **Q.**    1726, please.

24   **A.**    Okay.

25   **Q.**    Is this a true and correct copy of an email from you to

1    Malcolm Hyson on April 4th, 2011?

2    **A.**   Yes.

3           **THE COURT:**  Admitted.

4        (Trial Exhibit 1726 received in evidence)

5    **BY MR. LEACH:**

6    **Q.**   Let me draw your attention to the attachment, Mr. Truitt.

7    It says, "Prisa VAR letter agreement."  What does that refer

8    to?

9    **A.**   That refers to a new deal with an organization called

10   Prisa that we were going to issue a purchase order for.

11   **Q.**   What is Prisa?

12   **A.**   They're an organization up in New Jersey, I believe, that

13   was an Autonomy customer at the time.

14   **Q.**   Had you heard of them before?

15   **A.**   I had not.

16   **Q.**   Did you have any relevant contacts with them?

17   **A.**   No.

18   **Q.**   Let's please look at the attachment.

19        Mr. Truitt, you testified you believed that Prisa was

20   based in New Jersey.  Could they be a Spanish media company

21   somewhere in Europe?

22           **MR. KEKER:**  Objection.  Leading, Your Honor.

23           **THE WITNESS:**  I don't know anything about Prisa, so --

24           **THE COURT:**  Sustained.

25           **THE WITNESS:**  So for whatever reason, I thought they

1  might be in New Jersey.  I thought perhaps Mr. Egan had said

2  that, but I could be wrong.

3  **BY MR. LEACH:**

4  **Q.**   In any event, you had never heard of them?

5  **A.**   Correct.

6  **Q.**   What is the date of this draft agreement?

7  **A.**   March 31st, 2011.

8  **Q.**   What is the amount in paragraph 2?

9  **A.**   3.8 million.

10  **Q.**   That's the 3.6 licensing fee with the $200,000 in

11  maintenance?

12  **A.**   3.6 million.

13  **Q.**   Please look at page 3 of the exhibit.

14       Are those the blank signature lines for Autonomy and

15  Discover Technologies?

16  **A.**   Yes, sir.

17  **Q.**   Please look at page 4.

18       What is the software that is the subject of this draft

19  agreement?

20  **A.**   Introspect Discovery Solution, Autonomy Investigator and

21  ECA.  It's their legal hold, their EDD software.

22  **Q.**   Was this the software that was being -- that was the

23  subject of the FINRA order?

24  **A.**   Yes.

25  **Q.**   And further down in the "authorized use," Row 8, there is

1  a reference to "200 End User."  Do you see that?

2  **A.**  Yes.

3  **Q.**  Was that the amount of the FINRA order as well?

4  **A.**  Yes.

5  **Q.**  Were you concerned about what Mr. Egan was asking you to

6  do?

7  **A.**  Yes, I was.

8  **Q.**  Why?

9  **A.**  Because it was out of the normal course of what I had seen

10  over many years of business in terms of respecting the end of

11  the quarter.

12      I've testified to kind of the Vatican call because that

13  was a MicroTech deal.  That one really didn't resonate too much

14  with me, and the Bank of America one was so far after the end

15  of the quarter I really didn't even consider it to be an

16  end-of-quarter scenario.

17      But this one to me was very concerning because it was out

18  of the norm of what I knew business to be.

19  **Q.**  Please look at what has been marked as Exhibit 1730.

20      Is this a true and correct copy of an email from Jorge

21  Salazar to you attaching executed versions of reseller

22  agreements for ThinkTech, FINRA and Prisa?

23  **A.**  Yes.

24          **THE COURT:**  Admitted.

25      (Trial Exhibit 1730 received in evidence)

BY MR. LEACH:

Q.   Let me please draw your attention to page 9 -- excuse me -- page 2.

     What is the date at the top, Mr. Truitt?

A.   March 31st, 2011.

Q.   Who is the end user listed in the first paragraph?

A.   Prisa.

Q.   What is the amount in paragraph 2?

A.   3.6 million.

Q.   And if you could please look at page 2 or page 3 of the exhibit, is that Mr. Hyson's signature?

A.   Yes, it is.

Q.   What is the date listed?

A.   March 31st, 2011.

Q.   Is that Mr. Egan's signature to the left?

A.   Yes.

Q.   What is the date?

A.   March 31st, 2011.

Q.   At some point after your conversation with -- well, you testified that you were concerned about what Mr. Egan was asking you to do; is that right?

A.   Yes.

Q.   Did you do anything about it?

A.   I did.  I -- I reached out to both Mr. Egan and Mr. Scott and let them know that I was concerned about what I had been

 1   asked to do.

 2        They indicated that Mr. Hussain happened to be in

 3   San Francisco, so he was in the country, and I requested a

 4   meeting with Mr. Hussain to discuss my concerns.

 5   **Q.**   Why did you want to meet with Mr. Hussain?

 6   **A.**   I wanted to make sure that I wasn't doing anything

 7   improper.  I did not want to put myself in a situation where I

 8   could be in trouble.

 9   **Q.**   Please look at what has been marked as Exhibit 1769.

10        Is this a true and correct copy of an email that you sent

11   to Mr. Hussain and Mr. Egan on April 14th, 2011?

12   **A.**   Yes, it is.

13           **THE COURT:**  Admitted.

14        (Trial Exhibit 1769 received in evidence)

15   **BY MR. LEACH:**

16   **Q.**   The subject of this email is "Today's Meeting."  Do you

17   see that, Mr. Truitt?

18   **A.**   Yes.

19   **Q.**   Did you meet with Mr. Hussain on or about April 14th,

20   2011?

21   **A.**   I did.

22   **Q.**   Who was there?

23   **A.**   Mr. Hussain and Mr. Egan.

24   **Q.**   Where was it?

25   **A.**   In the corporate headquarters here in San Francisco.

**TRUITT - DIRECT / LEACH**

1   Q.   Down in the Financial District?

2   A.   Yes, sir.

3   Q.   Take a moment and describe for us what happened.

4   A.   Well, I started out simply saying that, you know -- that I

5   was concerned; that, you know, what I experienced -- what I was

6   asked to do with this order seemed to be out of the normal

7   course of business that I was used to, and I wanted to, you

8   know -- to hear why, you know, that was okay.  So I put that

9   question to Mr. Hussain.

10       The answer was -- he indicated that -- first of all, that

11  Autonomy was -- was not traded on a U.S. exchange; it was

12  traded out of the UK.  They were under international accounting

13  rules.  It was really the first time that IFRS had been brought

14  up to me and, you know, potential differences in accounting

15  between IFRS and GAAP.

16       He also indicated that, you know, being on the UK

17  exchange, that it really wasn't a -- under the purview of the

18  SEC.  This was international accounting and that -- and that

19  there were some flexibility there where they could account for

20  this properly.

21  Q.   You mentioned something called the SEC.  What is the SEC?

22  A.   The Securities and Exchange Commission.

23  Q.   What is that?

24  A.   That is a federal organization that regulates -- regulates

25  trade and financial matters within -- that affect United States

**TRUITT - DIRECT / LEACH**

1  citizens.

2  **Q.**   And what did Mr. Hussain say with respect to the SEC?

3  **A.**   He said that -- that this does not fall within the purview

4  of the SEC.

5  **Q.**   You also testified that you didn't want to do anything

6  that could get you in trouble; is that correct, Mr. Truitt?

7  **A.**   That's correct.

8  **Q.**   Did you express that concern to Mr. Hussain?

9  **A.**   I did.

10  **Q.**   What did you say to him?

11  **A.**   I believe what I said exactly was I didn't want to do

12  anything that could have me wind up on front page of *The Post*.

13  **Q.**   What did you mean by *"The Post"*?

14  **A.**   *The Washington Post*.

15  **Q.**   That's a newspaper?

16  **A.**   Yes, sir.

17  **Q.**   And did you -- the concern that you're raising to

18  Mr. Hussain, did you mention Prisa?

19  **A.**   We spoke specifically about Prisa.  I -- that was the deal

20  that I was concerned about.  I wasn't -- I was concerned about

21  other deals.  You know, that deal had just happened.  This was

22  a -- the meeting was, you know -- was about ten days later.

23      I knew that we were going to have to sign off on an audit

24  letter.  I wanted to have this conversation prior to doing

25  that.

1   **Q.**   And did you articulate that it was the dating of the Prisa

2   agreement that was causing you concern?

3   **A.**   Yes.  Very specifically.

4   **Q.**   Let me move forward in time, Mr. Truitt, to the end of

5   June, 2011.

6        At the end of that quarter, were you approached about

7   doing additional end-of-quarter deals?

8   **A.**   Yes.

9   **Q.**   Who approached you?

10  **A.**   Mr. Egan.

11  **Q.**   Please look at what has been marked as Exhibit 1971.

12       Is this a true and correct copy of an email from Jorge

13  Salazar to you attaching a purchase order relating to Abbot

14  Labs?

15  **A.**   Yes, it is.

16            **THE COURT:**  Admitted.

17       (Trial Exhibit 1971 received in evidence)

18  **BY MR. LEACH:**

19  **Q.**   Do you see the subject "Discover Tech/Abbot Labs

20  Agreement," Mr. Truitt?

21  **A.**   Yes.

22  **Q.**   Was this one of the possible deals that Mr. Egan

23  approached you about?

24  **A.**   Correct.

25  **Q.**   What did he tell you?

1    **A.**    Again, he told me that this was an existing customer of

2    Autonomy; that I believe it was another just increase of, you

3    know -- of what they were already performing that was going to

4    be necessary in the next -- you know, in the near term.

5    **Q.**    What did he tell you about the prospects of the deal

6    closing?

7    **A.**    You know, he always -- they were always close, right, so

8    the deal was going to happen sometime soon.

9    **Q.**    Please look at page 2 of this agreement.

10    Do you see the reference to Abbot Labs in the first

11    paragraph?

12    **A.**    Yes.

13    **Q.**    What was the amount of this agreement?

14    **A.**    This was 9 million.

15    **Q.**    Did Discover Tech have the money to pay for that if the

16    software didn't sell through?

17    **A.**    No.  Not within the company.

18    **Q.**    Did Discover Tech make any efforts to resell software to

19    Abbott?

20    **A.**    No.

21    **Q.**    Would you say Autonomy exercised control over what to sell

22    to Abbott and on what terms?

23    **A.**    Yes.

24    **Q.**    I'd like to show you what is already in evidence as

25    Exhibit 1840.

1          THE COURT:  1840?

2          MR. LEACH:  Yes.  It's already in evidence.

3          THE COURT:  Thank you.

4   BY MR. LEACH:

5   Q.   Mr. Truitt, do you see the subject line "Abbott" in the

6   initial email in this chain?

7   A.   Yes.

8   Q.   And there's someone named David Wilner at Autonomy.  Do

9   you have any idea who he is?

10  A.   No.

11  Q.   Okay.

12          At any point in time, were you told that a senior attorney

13  was vetoed by the general counsel of Abbott who said that they

14  will never authorize forward-looking commitments and that there

15  was nothing left to be done?

16  A.   I'm sorry.  Are you asking whether I was told that?

17  Q.   Yes.

18  A.   No, I was not.

19  Q.   Would this information have been relevant to you in

20  deciding whether to sign a purchase order relating to selling

21  software to Abbott?

22  A.   Yes.  If -- if that had been presented in that manner, I

23  would not have been interested in a deal.

24  Q.   Why not?

25  A.   Well, I wanted these deals to close in a quick period of

1    time so that we could make our margin and move on.

2    **Q.**  Please look at what has been marked as Exhibit 1972.

3    Is this a true and correct copy of an email from Jorge

4    Salazar to you attaching another reseller agreement for the end

5    of June 2011?

6    **A.**  Yes, it is.

7    **THE COURT:**  Admitted.

8    (Trial Exhibit 1972 received in evidence)

9    **BY MR. LEACH:**

10    **Q.**  I draw your attention to page 2, Mr. Truitt.

11    Who is the end user that is the subject of this agreement?

12    **A.**  This is Dell Hyatt.

13    **Q.**  What is the amount of this order?

14    **A.**  This one is 5,333,914.

15    **Q.**  Did Discover Tech have any relevant contacts at Dell or

16    Hyatt?

17    **A.**  No, sir.

18    **Q.**  Did it make any efforts to resell them software?

19    **A.**  No.

20    **Q.**  Would you say that Autonomy exercised control over what to

21    sell to Dell or Hyatt and on what terms and at what price?

22    **A.**  Yes.

23    **Q.**  Please look at what has been marked as Exhibit 1901.

24    Do you recognize this document?

25    **A.**  It's hard for me to read.

1    **Q.**    Is this a Software Distributor Agreement with an effective

2    date of June 30th, 2011?

3    **A.**    I'm sorry.  The print is so small, I can't read it.

4    **Q.**    Is that your signature on page 4?

5             **THE COURT:**  Any objection?

6             **MR. KEKER:**  No, Your Honor.

7             **THE COURT:**  Admitted.

8             **THE WITNESS:**  Yes, that's my signature.

9        (Trial Exhibit 1901 received in evidence).

10   **BY MR. LEACH:**

11   **Q.**    Do you have a memory of licensing Discover Tech software

12   to Autonomy at the end of June, 2011?

13   **A.**    Yes.

14   **Q.**    Describe that negotiation for us.

15   **A.**    Well, that's actually the other thing that we -- we did

16   discuss when I went out to meet with Mr. Hussain several months

17   earlier.  We talked about our software.

18       This software is the -- what we called at the time our

19   Discover Engine product.  It was designed to improve indexing

20   and crawling for -- for Autonomy software.  So it was relevant

21   to -- to Autonomy's business.

22       And this appears to be a signed agreement that they are

23   going to purchase some amount of that software.

24   **Q.**    Let me draw your attention to page 5, and perhaps we can

25   use the screen where it's a little easier to see, Mr. Truitt.

1    What is the software product in Item 1?

2  **A.**    DiscoverPoint Engine.

3  **Q.**    And if we look further below under the license fee, in the

4  last line of that first paragraph, it says, "Payable net 30

5  days after effective date subject to a 1 percent discount if

6  payment is made upon execution of the agreement."

7    Do you see that?

8  **A.**    Yes.

9  **Q.**    And then there are two options: 2.75 million and

10  2.4 million.  Do you see that?

11  **A.**    Yes.

12  **Q.**    How were these -- during the negotiations for this, was

13  there any discussion about how Discover Tech would use the

14  money for this software agreement?

15  **A.**    I'm not sure that there was ever a discussion -- a

16  specific discussion about how the funds would be used, but it

17  was clear that we owed money to Autonomy, and so if we could

18  put together a deal that was relevant to both companies, it

19  certainly would give me an opportunity use those funds to pay

20  down some of those debts.

21    **MR. LEACH:**  May I approach the witness, Your Honor?

22  **Q.**    Mr. Truitt, I'm showing you your grand jury testimony.  If

23  you could please read from page 69, line 14, to line 8 on the

24  next page.

25  **A.**    It says, "Can you describe for us" --

1           **THE COURT:**  Just read it to yourself.  Just read it to

2    yourself.  You don't need to read it out loud.

3           **THE WITNESS:**  (Witness reviews document.)

4      4.4.  That's not what you're showing here, but, okay.

5      Okay.

6    **BY MR. LEACH:**

7    **Q.**  Have having read that, Mr. Truitt, does that refresh your

8    recollection about how the pricing was determined for the

9    software purchase at the end of 2011?

10   **A.**  Yes.  What is on the screen now were some initial options

11   that we had talked about.

12         The software was purchased by the instance, and instances

13   were determined by how fast -- how fast a -- an Autonomy IDOL

14   customer would want to crawl and index content.

15         So, for example, at the time, Autonomy software was --

16   Autonomy software was limited to one server for crawling

17   purposes.  Our software enabled organizations to apply dozens

18   of servers, if they wanted to.  So if they had lots of data,

19   they could crawl through it much quicker.

20         So that is what "instances" mean here.

21         This proposal for 2.4 million ultimately increased.  I

22   think the -- the ultimate that we settled on at this point was

23   4.4 -- 4.4 million, so they purchased more instances than is

24   shown here.

25         The discussion in terms of the increase from 2.4 million

1    to 4.4 million did center around --

2            **MR. KEKER:**  Objection, Your Honor.  Foundation.  Who's

3    talking?

4    **BY MR. LEACH:**

5    **Q.**    You're describing a conversation with someone, Mr. Truitt?

6    **A.**    With -- with Mr. Egan, I believe.  That's who I was -- I

7    was having these discussions with.

8    **Q.**    Okay.

9    **A.**    The question came would we be willing to -- if they were

10   to purchase more instances and taking this from 2.4 up to 4.4,

11   would Discover -- would we be willing to take 2.4 million of

12   those proceeds and work the additional funds through MicroTech,

13   and what I did -- and effectively MicroTech would then be able

14   to pay down some of their Autonomy debts.

15           I agreed -- after speaking with MicroTech, I came up with

16   my own deal with them to effectively -- if I were to make this

17   contribution, I could -- I could benefit when the deal -- we

18   still expected this deal to close, so I could get some -- some

19   margin on my investment, and they also said that I could

20   participate in the services when and if those services actually

21   arrived within the Vatican.

22           So from my perspective, they were buying more instances,

23   and I was happy to invest in that Vatican deal, and I think

24   what MicroTech did was use those funds to pay down that --

25   their debt.

1    **Q.**   So the idea you discussed with Mr. Egan was pay

2    4.4 million and you would transfer part of that -- Discover

3    Tech would transfer part of that to MicroTech.  Is that what

4    you're saying?

5    **A.**   That's what I'm saying.

6    **Q.**   And MicroTech would use that money to do what?

7    **A.**   Pay down their Vatican debt.

8    **Q.**   Please look at what has been marked as Exhibit 1902.

9         Are these Discover Tech's -- are these records, bank

10   records, for Discover Technologies for the end of June, 2011?

11   **A.**   Yes.

12        **THE COURT:**  Admitted.

13        (Trial Exhibit 1902 received in evidence)

14   **BY MR. LEACH:**

15   **Q.**   I draw your attention, Mr. Truitt, to page 2.  There's a

16   $4.4 million wire into Discover Technologies on June 30th.  Do

17   you see that?

18   **A.**   Yes.

19   **Q.**   What was that for?

20   **A.**   That was for our software, Discover Engine, that Autonomy

21   purchased.

22   **Q.**   Now, could you please look at Exhibit 2059.

23        Are these bank records for Discover Technologies for July

24   2011?

25   **A.**   Yes, they are.

1            **THE COURT:**  Admitted.

2        (Trial Exhibit 2059 received in evidence)

3    **BY MR. LEACH:**

4    **Q.**   I draw your attention to the debit on July 1st in the

5    amount of $2.4 million.  Do you see that?

6    **A.**   Yes.

7    **Q.**   What was that for?

8    **A.**   Those were funds going from our bank account over to

9    MicroTech.

10   **Q.**   And what did you understand MicroTech was going to do with

11   that money?

12   **A.**   They were going to pay down the Vatican debt.

13   **Q.**   Were there any written agreements between you and others

14   at MicroTech relating to your ownership interest in the Vatican

15   deal?

16   **A.**   No.

17   **Q.**   I draw your attention to the time period after

18   August 18th, 2011.

19        At some point, did you learn that Autonomy was being

20   acquired by HP?

21   **A.**   I did.

22   **Q.**   How did you learn about that?

23   **A.**   I heard it on the news.

24   **Q.**   At some point between August 18th, 2011, and the end of

25   September, 2011, did you have a discussion with Sushovan

1  Hussain about some of the outstanding debts for Discover Tech?

2  A.   Yes.

3  Q.   Take a moment and tell us what happened.

4  A.   Well, we -- you know, I was concerned as to how those

5  would be handled with the news that HP was taking over.

6      He informed me that for the last two deals, I believe that

7  was Abbott and Dell Hyatt, that they were going to cancel those

8  deals.

9          THE COURT:   I'm sorry.  Who is speaking to you?  You

10  said "they."  Who is the --

11          THE WITNESS:   This is a conversation I had with

12  Mr. Hussain by telephone.

13      So he indicated that they were going to cancel -- cancel

14  those deals.  And in that discussion, you know, I wasn't really

15  overly happy about that outcome.  You know, we had written the

16  purchase orders.  Not knowing whether they were going to close

17  those deals and kind of cut me out of the loop or -- you know,

18  I wasn't really sure what was going to happen with them.

19      But the way that the conversation ended, Mr. Hussain said

20  that he would pay me margin on those canceled deals, even

21  though we weren't going to be involved.  And that was -- I was

22  very happy about that outcome.

23      So that's the way that -- we left that conversation.

24  BY MR. LEACH:

25  Q.   Was there also a discussion about any --

1          **MR. KEKER:**  Objection.  Leading.

2          **THE COURT:**  Overruled.

3    **BY MR. LEACH:**

4    **Q.**   Did the topic of Prisa or ThinkTech come up?

5    **A.**   Yes.  Those were still outstanding as well, and we -- we

6    had a discussion regarding potentially more instances of our

7    product, which would enable me to then pay down some of that

8    obligation.

9          They did go back, and over a period of a week or two, they

10   determined, you know, how much more of that they could buy, and

11   we did a few more of those purchases over the next month or so.

12   **Q.**   Would you please look at what has been marked as Exhibit

13   2381.

14   **A.**   Okay.

15   **Q.**   Before I ask you questions about this document,

16   Mr. Truitt, let me just make sure I'm clear.

17         The conversation about additional purchases of instances

18   of discover software, that was in your phone conversation with

19   Mr. Hussain; is that right?

20   **A.**   Yes.

21   **Q.**   Do you recognize Exhibit 2381 as a true and correct copy

22   of an email you received from Joel Scott on or about

23   September 26th, 2011?

24   **A.**   Yes.

25         **THE COURT:**  Admitted.

1          (Trial Exhibit 2381 received in evidence)

2    **BY MR. LEACH:**

3    **Q.**   Let me draw your attention to the bottom portion of this

4    email, Mr. Truitt.   The subject is "Cancellation of VAR

5    agreements."   What did that refer to?

6    **A.**   After my conversation with Mr. Hussain where he told me

7    that they were going to cancel those deals, I had a

8    conversation with -- with Mr. Egan.   He asked me to formally

9    write an email requesting that the orders be canceled, and

10   that's -- this was my attempt to do that.

11   **Q.**   You wrote, "I am writing to formally request that VAR

12   agreements signed June 30th between Discover Technologies and

13   Autonomy regarding Abbot Labs and Dell Hyatt be canceled.   Per

14   my discussions with Stouffer, under the condition that the end

15   user, end customer, did not ultimately license the proposed

16   Autonomy software, the agreements would be canceled with no

17   further obligation on the part of Discover Technologies."

18          What did you mean by that?

19   **A.**   I was simply trying to write an email canceling these

20   deals.   In all of the years that we had done deals going back

21   to 2006, we had never canceled a deal.

22          The wording that I used here, I would say, is not correct

23   in the sense that there was never an understanding that if an

24   end customer didn't buy, that I could cancel the deals with no

25   further obligation.

1    Clearly once I sent this over, Mr. Scott shot back

2    immediately and said that I must have misunderstood, but given

3    that I haven't closed the deals and -- probably the way they

4    wanted me to write it -- there is no prospect of us getting

5    paid, we're prepared to write these off.

6        So I simply didn't capture the spirit of what they wanted

7    me to say in that email.

8    **Q.**   Did you ever pay $9 million to Autonomy for software at

9    Abbot Labs?

10   **A.**   No.

11   **Q.**   Did you ever pay $5 million for software to -- did you

12   ever pay Autonomy $5 million for software relating to Dell

13   Hyatt?

14   **A.**   No.  I -- I received credit memos back saying that the

15   deals were canceled.

16   **Q.**   After this email, did you continue to pursue Mr. Hussain

17   for the margin you felt you were owed on those two deals?

18   **A.**   Ad nauseam, yes.  I continued to try and collect on the

19   margin.

20   **Q.**   Do you recognize what has been marked as Exhibit 2454?

21   **A.**   Yes, I recognize it.

22   **Q.**   Is this a true and correct copy of an email that you sent

23   to Mr. Hussain and Mr. Kanter?

24   **A.**   Yes.

25        **THE COURT:**  Admitted.

1          (Trial Exhibit 2454 received in evidence)

2     **BY MR. LEACH:**

3     **Q.**   You write at the top, Mr. Truitt, "I have attempted

4     multiple times to start a dialogue regarding outstanding

5     issues."

6          Do you see that?

7     **A.**   Yes.

8     **Q.**   What are you referring to?

9     **A.**   I'm referring to the margin that I believed that I was

10    owed, and it also indicates that there was an outstanding last

11    payment to Prisa -- for Prisa.

12    **Q.**   You wrote, "Sushovan has given me his commitment that the

13    margin for these POs would be paid in full, and while I

14    appreciate and trust his commitment, I need to have specific

15    discussions as to how and when those payments will be made."

16         Do you see that?

17    **A.**   Yes.

18    **Q.**   What did you mean by that?

19    **A.**   Well, I had had no contact for several months regarding

20    this issue, so I -- I had -- I had reached out, I had made

21    phone calls, you know, I had sent texts.  I just hadn't had any

22    response.

23         So I was, once again, trying to initiate a conversation

24    around collecting what I -- what I thought I was owed.

25    **Q.**   After Mr.-- did Mr. Hussain ever get back to you?

1   **A.**   No, he didn't.

2   **Q.**   Did you continue to pursue Mike Lynch?

3   **A.**   I did.

4        Ultimately after -- after I learned -- eventually

5   Mr. Kanter got back to me and told me we had a meeting in

6   Baltimore -- I believe he was flying through the country --

7   that they were not going to pay me anything in the way of

8   margin on these deals.

9        At that point, I reached out to Mr. Lynch a few times

10  through emails and wanted to make sure that he was in agreement

11  with the -- with what their decision was around it.

12  **Q.**   Please look at what has been marked as Exhibit 2459.

13       Do you recognize this?

14  **A.**   Yes.

15  **Q.**   Is this a true and correct copy of an email to you from

16  Mr. Hyson with your dialogue with Mike Lynch?

17  **A.**   Yes.

18            **THE COURT:**  Admitted.

19       (Trial Exhibit 2459 received in evidence)

20  **BY MR. LEACH:**

21  **Q.**   I draw your attention to page 2, Mr. Truitt.

22       Do you see where it says, "Sushovan, I've waited patiently

23  over the past four months for you to engage with me concerning

24  the margin fees owed to Discover"?

25  **A.**   Yes.

TRUITT - DIRECT / LEACH

1   **Q.**   What did you mean by that?

2   **A.**   That I had waited patiently over the last four months for

3   him to engage with me over margin fees that were owed to

4   Discover.

5   **Q.**   Thank you.

6        Further down below, you say, "Based on you saying 'I am a

7   man of my word, you will be paid', I made investments in my

8   company, hired personnel whose jobs are now in jeopardy without

9   a payment from Autonomy."

10       First of all, did Mr. Hussain say that, "I'm a man of my

11  word, you will be paid"?

12  **A.**   Yes, he did, on the phone when we were discussing the

13  cancellation of the deals.

14  **Q.**   And what did you mean by this?

15  **A.**   I meant that I had made investments in my company,

16  including hiring personnel, significant investments, and I had,

17  you know -- would not have done that -- now we're four months

18  in.  I was expecting to get a large payment, and truly those

19  folks were now in jeopardy because -- and actually I was at

20  that point much worse off because I just simply would not have

21  hired those folks if I wasn't sure that those funds were coming

22  my way.

23  **Q.**   You go on to write, "I went above and beyond as your

24  trusted partner to put Autonomy in a position to close that

25  revenue."

1     What did you mean, "close that revenue"?

2  **A.**   I'm talking about in that sentence -- I'm talking about

3  the -- not the two that were canceled, but ThinkTech and Prisa

4  where -- and by "closed," I mean they recognized the revenue

5  for that based on my ability to make those payments with them

6  having had purchased my software.

7     And what I'm saying, I went above and beyond.  The last

8  deal that we did for my Discover Engine product was literally

9  to sell them my source code, which I wasn't a big fan of doing,

10  but I think they felt like at that point, that was really the

11  way they had to go to justify continued investment in that

12  product.

13     So effectively I had to give up a product that we had

14  built and that, you know, had high hopes for, but, you know, I

15  was willing to do it because we were able to clear our debt.

16  **Q.**   Mr. Truitt, one more point on this email.

17     You wrote, "It was recently assigned to Andy to handle,

18  and he has effectively told me that, 'Things have changed.  We

19  are not in the budget.  Our hands are tied.  You will not be

20  paid'."

21     What did you understand that to mean, "things have

22  changed, we are not in the budget"?

23  **A.**   Andy told me that the budget was submitted in September up

24  the HP chain and that these margin payments were not in that

25  budget, and as such, there was just no way for them to

 1 | accommodate a payment.

 2 |     So I'm not sure if that was true or whether that was just

 3 | something Kanter said, but that's what he told me and that's

 4 | what I'm reiterating here.

 5 |         **MR. LEACH:**  Thank you, Mr. Truitt.

 6 |     Thank you, Your Honor.  I have nothing further.

 7 |         **THE COURT:**  Okay.  Ladies and gentlemen, we are going

 8 | to take our noon recess.  Remember the admonition previously

 9 | given to you:  Don't discuss the case, allow anyone to discuss

10 | it with you, form or express any opinion.

11 |     We'll resume at 1:00.

12 |         (Luncheon recess was taken at 11:57 a.m.)

13 | **Afternoon Session**                              **1:04 p.m.**

14 |     (Proceedings were heard in the presence of the jury:)

15 |         **THE COURT:**  Please be seated.

16 |     Let the record reflect all jurors are present, the parties

17 | are present.

18 |     Cross-examination.

19 |         **MR. KEKER:**  Thank you, Your Honor.

20 |     Good afternoon, ladies and gentlemen.

21 |                     **CROSS-EXAMINATION**

22 | **BY MR. KEKER:**

23 | **Q.**   And good afternoon, Mr. Truitt.

24 | **A.**   Good afternoon.

25 | **Q.**   I'm John Keker.  I'm one of the lawyers representing

1    Mr. Hussain.

2        Mr. Truitt, you were subpoenaed by the Government to

3    testify before the Grand Jury in this case?

4    **A.**    Correct.

5    **Q.**    And you told them that you would assert your privilege

6    against self-incrimination?

7    **A.**    Yes, sir.

8    **Q.**    And they got an order from a judge saying that you had

9    immunity during that testimony?

10   **A.**    Correct.

11   **Q.**    That was back in June of 2015?

12   **A.**    Yes, sir.

13   **Q.**    Why did you want immunity?

14   **A.**    I was taking the advice of my counsel.

15   **Q.**    Did you think you needed it?

16   **A.**    Not necessarily, no.

17   **Q.**    Can you explain to the jury what you understand immunity

18   means?  What did you get?

19   **A.**    It means that the words that I use can't be used against

20   me or derivatives of those words.

21   **Q.**    Okay.  And right now you said you're testifying without an

22   order of immunity?

23   **A.**    Yes, sir.

24   **Q.**    This is now three years later?

25   **A.**    Yes.

**TRUITT - CROSS / KEKER**

1  Q.   And now you know it's too late for them to prosecute you

2  because of the statute of limitations; right?

3         MR. LEACH:  Objection.  Calls for speculation.  Legal

4  conclusion.

5         THE COURT:  I think -- I think --

6  BY MR. KEKER:

7  Q.   Let me ask you --

8         THE COURT:  No, no, no.  I think it's a proper

9  question; however, you're asking about his state of mind, not

10 what the law is.

11        MR. KEKER:  I'm not asking about the law.  I'm asking

12 about Mr. Truitt's --

13        THE WITNESS:  I don't know the specifics of the law,

14 but I would answer that saying that my thought would be that,

15 yes, it would be very late to come after me for something like

16 that.

17 BY MR. KEKER:

18 Q.   Okay.  So you don't feel exposed in any way to prosecution

19 by these people?

20 A.   No, I do not.

21 Q.   But you did back in 2015?

22 A.   More so than today.

23 Q.   Okay.  Let's talk about some specific transactions that

24 you have testified about; and then when I finish those, I'm

25 going to go to more general things.

1    But let's go back and talk about the acquisition of your

2    company MicroLink at the end of 2009 and/or the beginning of

3    2010 when it was acquired by Autonomy.  Do you have that time

4    frame in mind; end of 2009, beginning of 2010?

5    **A.**   Yes, sir.

6    **Q.**   The acquisition actually happened on January 4, 2010;

7    right?

8    **A.**   Correct.

9    **Q.**   And you were discussing it during December of 2009 and

10   maybe earlier?

11   **A.**   Yes.

12   **Q.**   Okay.  Now, as part of that negotiation, the back and

13   forth, somebody came up with this idea of you taking an asset

14   of MicroLink out of MicroLink and starting a new company with

15   that asset; right?

16   **A.**   Yes, sir.

17   **Q.**   Whose idea was that?

18   **A.**   My idea.

19   **Q.**   Okay.  And the asset that you wanted to take out was the

20   software called DiscoverPoint that you'd been developing in

21   MicroLink?

22   **A.**   Correct.

23   **Q.**   And you wanted to take out DiscoverPoint and start a new

24   company, Discover Technologies, with it?

25   **A.**   Yes, sir.

1    Q.    And in order to make DiscoverPoint the product that you

2    wanted to make it, you needed some software from Autonomy?

3    A.    It could have been helpful to us, yes.  We didn't need it

4    but, yes, it was -- it was helpful to have it.

5    Q.    But you made a deal to buy $10 million worth of Autonomy

6    software around that period?

7    A.    Yes.

8    Q.    And you've told the jury you made that deal and you paid

9    for it?

10   A.    Yes.

11   Q.    And the reason you had to buy it from MicroTech was that

12   Autonomy couldn't really sell it to a startup; it could only --

13   it needed to sell it to a reseller that had collectibility

14   issues, I mean, who could say, "Look, I can pay for this"?

15   A.    I think that's correct, yes.

16   Q.    And so they sold it to MicroTech for the end user

17   Discover Tech, and then Discover Tech bought from MicroTech?

18   A.    Correct.

19   Q.    All right.  Now, you told us that you wanted full-blown

20   IDOL, and the prosecutor showed you the back and forth with

21   Mr. Scott.  You didn't end up getting full-blown IDOL, did you?

22   A.    No.

23   Q.    And you were annoyed about that?

24   A.    Yes.

25   Q.    I think what you said was you were surprised.  You pressed

1    to get more.  You didn't like it.  At the last moment they gave

2    you less than you were expecting.

3    **A.**    Yes.

4    **Q.**    And this was after Mr. Scott had said to you -- there had

5    been some back and forth between and you Mr. Cronin.  Who was

6    Mr. Cronin?

7    **A.**    Mr. Cronin was running our Sales Department.  He was the

8    VP of sales for MicroLink.

9    **Q.**    Okay.  So the VP of sales had been advising you on what

10   you ought to get in this negotiation, but you couldn't get all

11   that you wanted?

12   **A.**    Correct.

13   **Q.**    All right.  And the product that the new company was going

14   to make involved profiling, didn't it?

15   **A.**    That was one aspect of what it could do.

16   **Q.**    Could you explain to the jury what profiling -- what

17   DiscoverPoint Profiling was going to be about?

18   **A.**    Yes.  Profiling enabled us to automatically understand

19   what individual users of this SharePoint platform -- as they

20   worked, we could understand the meaning of documents that they

21   authored even to the extent of anything they read.  So we would

22   take that information and we could automatically suggest it to

23   other like people within an organization.

24        So if somebody on the West Coast was working on a

25   particular issue and somebody on the East Coast is writing

1  something, you could automatically understand that there's

2  information about that.

3  **Q.**  Did you get the profiling function that you needed from

4  Autonomy?

5  **A.**  No.

6  **Q.**  Never?

7  **A.**  Not that I recall.

8  **Q.**  Okay.  On December 31st, 2009, four days before the

9  acquisition, you were still the CEO of MicroLink; right?

10 **A.**  Yes.

11 **Q.**  Okay.  And Mr. Leach showed you Exhibit 420.

12      Could we get 420 up?

13      This is the invoice from Autonomy to MicroLink for

14 $2.3 million worth of software.  Do you remember being shown

15 that?

16 **A.**  Yes.

17 **Q.**  And then the next page describes what the software is, and

18 it shows (reading):

19          "This is IDOL server software for the following

20      functionality:  Profiling."

21      And the price is $2 million and then the servicing of it

22 is another $300,000.

23      Is that something that you saw around December 31, 2009?

24 **A.**  I do not think I did see it on December 31st, 2009.

25 **Q.**  You've told the jury you did not agree to pay $2.3 million

**TRUITT - CROSS / KEKER**

1  for profiling back at the end of 2009?

2  **A.**   That's correct.

3  **Q.**   Profiling was a program that had been -- you described it

4  as having been stripped away from you in this IDOL sale?

5  **A.**   Yes.

6  **Q.**   And you said it was very important?

7  **A.**   Yes.

8  **Q.**   And you said you were very unhappy not to get this program

9  in the original deal?

10  **A.**   Correct.

11  **Q.**   And you did not agree to buy it?

12  **A.**   That's correct.

13  **Q.**   When was this -- keep 420 up there, Jeff.

14       When was this prepared, if you know?

15  **A.**   I have no idea.

16  **Q.**   Do you know who prepared it?

17  **A.**   I believe Alan Rizek and Mr. Cronin may have prepared it,

18  but I can't tell you for sure.

19            **MR. LEACH:**  Objection.  Foundation.

20            **THE COURT:**  Overruled.

21  BY MR. KEKER:

22  **Q.**   Mr. Cronin is the vice president of sales at MicroLink;

23  right?

24  **A.**   The answer is I don't know who prepared it.

25  **Q.**   Okay.  But just let's get that straight.  Cronin is the

**TRUITT - CROSS / KEKER**

1   vice president of sales at MicroLink; right?

2   **A.**   Yes.

3   **Q.**   You're the CEO, and Mr. Rizek is the chief financial

4   officer --

5   **A.**   Correct.

6   **Q.**   -- on this date December 31?

7        Did you tell Mr. Cronin to prepare this purchase order?

8   **A.**   No.

9   **Q.**   Did Mr. Cronin know how important profiling was?

10  **A.**   Yes, I'm sure he did.

11  **Q.**   Okay.  Can we see 5569?

12       It's in your book -- that first book.  There's three

13  volumes in front of you piled up.

14           **THE COURT:**  You said in the black binder?

15           **MR. KEKER:**  In the black binder, yes, sir.  It's

16  Volume 1.

17       5569 is a memo from John Cronin to David Truitt dated

18  October 17, 2009.  I'd move it in, Your Honor.

19           **THE COURT:**  Admitted.

20       (Trial Exhibit 5569 received in evidence)

21  **BY MR. KEKER:**

22  **Q.**   Okay.  Do you have it, Mr. Truitt?

23  **A.**   I'm sorry.  50 --

24           **THE COURT:**  Look at the screen.

25  \\\

1  BY MR. KEKER:

2  Q.    5569.

3  A.    Okay.  I'm looking at it on the screen.

4  Q.    Okay.  And, basically, it shows from Cronin to you and to

5  Malcolm Hyson.  Who's he?

6  A.    He's our chief technology officer.

7  Q.    And it's October of 2009, and in the second paragraph it

8  says (reading):

9              "The Profiling, of course, is what makes DP special,

10      and we are not adequately conveying this."

11      He's talking about trying to convey it to the marketplace;

12  right?

13  A.    Yes.

14  Q.    And around the same time -- well, let me show you another

15  exhibit.  5575.

16          THE COURT:  Admitted.

17      (Trial Exhibit 5575 received in evidence)

18  BY MR. KEKER:

19  Q.    5575 is a memorandum from the Word Center to David Truitt.

20  It's a scan of a Xerox Word Center and attached to it -- could

21  we see the next page? -- is something called "Recommendation

22  Rebuild v. Buy for DiscoverPoint Concept-Based Profiling" and

23  it's dated December 12th, 2009.  Do you see that?

24  A.    Yes.

25  Q.    Did you see that at or about the time that appears on it,

1    December 12th, 2009?

2    **A.**    I imagine I did.

3    **Q.**    Okay.  And let's just go through it a little bit.

4          The second sentence he's talking about (reading):

5                "This Profiling enables DP to proactively deliver

6          information."

7          The next sentence talks about profiling all users.  The

8    next sentence talks about automated profiling.  The next

9    paragraph criticizes manual profiling in the third sentence.

10          So this is all about why you're spending a lot of money to

11    get profiling; right?

12    **A.**    We're spending a lot of money to get a lot of capability

13    and profiling was certainly important.

14    **Q.**    Look at the last paragraph on the first page (reading):

15                "The build-versus-buy question is both an economic

16          one and a practical one.  Autonomy, for example, has

17          invested (estimated) in excess of 100 million in R&D over

18          the past 10 years on the underlying Bayesian-based

19          algorithms and its intelligent profiling engine of the

20          IDOL server product set."

21          Do you know what that means?

22    **A.**    It means that Autonomy was spending a lot of money in R&D

23    on their product.

24    **Q.**    The next, on the back page it says (reading):

25                "There's no reason to believe that Discover

1      Technologies or any other company could recreate this

2      Autonomy capability for substantially lower cost."

3      Right?

4   A.   Yes, I see that.

5   Q.   And then the last paragraph is (reading):

6           "In summary, the build approach to automated

7      concept-based profiling is high risk and very high cost.

8      If an agreement with Autonomy can be reached that would

9      make the necessary technologies available on an OEM basis

10     and do so in a relatively economic price, then the buy

11     approach is not only recommended but it's quite probably

12     the only reasonable alternative available to Discover

13     Technologies."

14     What does that mean?

15  A.   It's suggesting that we should buy the technology as

16  opposed to build it ourselves.

17  Q.   Do you know who wrote this?

18  A.   I'm sure Mr. Cronin wrote it.

19  Q.   Do you know why he wrote it?

20  A.   I don't recall why he -- why he wrote it, except perhaps

21  to validate our $10 million investment.

22  Q.   Did he write it for the auditors, to explain to the

23  auditors why you were spending --

24  A.   I don't recall what auditors those would have been, but it

25  appears to me to be written for that purpose somehow.  I don't

**TRUITT - CROSS / KEKER**

1    know who was asking for the information.

2    **Q.**    Do you know when he wrote it?

3    **A.**    I don't remember when he wrote it, no.

4    **Q.**    Did -- well, let me show you 5850 -- do you know what

5    metadata?

6    **A.**    Yes.

7    **Q.**    What is it?

8    **A.**    It's information surrounding a document that tells you

9    bits and pieces of information about the document.

10   **Q.**    And does, among other things, it tells you who created the

11   document or at least whose computer it was created on and when

12   it was created?

13   **A.**    Yes, I believe so.

14   **Q.**    Okay.  Would you look, please, sir, at 5854?  That's in

15   Volume 3 and it's way at the back.

16   **A.**    (Witness examines document.)

17           **MR. LEACH:**  I'm sorry.  What number?

18           **MR. KEKER:**  5854.

19           **THE WITNESS:**  Okay.

20           **MR. KEKER:**  And I'd move it in, Your Honor.

21           **THE COURT:**  Any objection?

22           **MR. KEKER:**  It's the metadata for 420.

23           **MR. LEACH:**  No objection, Your Honor.

24           **THE COURT:**  Admitted.

25           (Trial Exhibit 5854 received in evidence)

1          **MR. KEKER:**  All right.  Can we put up the first page?

2   **Q.**  This is the -- this is a copy of Exhibit 420.  It's the

3   $2.3 million purchase order from MicroLink to Autonomy, the one

4   that you'd never seen until you were shown it by Mr. Leach;

5   right?

6   **A.**  Mr. Rizek, yes.

7          **MR. LEACH:**  Objection, Your Honor.  Misstates the

8   testimony.

9   **BY MR. KEKER:**

10  **Q.**  Okay.  Well, when did you first see this?

11  **A.**  I testified that I saw it with Mr. Rizek preparing for a

12  meeting with Mr. Leach.

13  **Q.**  Okay.  Look at the next page, which is the metadata.  And

14  the custodian is John Cronin and down at the bottom is the date

15  that it's created.  Date created is January 2, 2010.  Do you

16  see that?

17  **A.**  Yeah.

18  **Q.**  So Mr. Cronin created this purchase order in early

19  January 2010, but you didn't know about it?

20          **MR. LEACH:**  Objection.  Foundation.

21          **THE COURT:**  I'm sorry.  What?

22          **MR. LEACH:**  Foundation, Your Honor.

23          **THE COURT:**  Well, no.  I think he's asking him was he

24  aware of it.  It may assume a fact not in evidence, but the

25  question is:  Were you aware that this document was apparently

 1  created on or about January 2nd?

 2          THE WITNESS:  No, I do not believe I was aware of it.

 3          THE COURT:  Okay.

 4  BY MR. KEKER:

 5  Q.   Okay.  Would you look at 5855?

 6  A.   (Witness examines document.)

 7          MR. KEKER:  And I'd move that in.  That's the metadata

 8  for the Attachment A for the purchase order.

 9          THE COURT:  Admitted.

10     (Trial Exhibit 5855 received in evidence)

11  BY MR. KEKER:

12  Q.   So the jury has seen this before attached to 420, but here

13  you've got the profiling software, $2 million plus another

14  $3 million [sic].

15      And can we see the metadata for that?

16      When was this created?  First of all, the custodian was

17  Mr. Cronin and the date it was created is January 1st, 2010.

18  So this metadata says that Mr. Cronin, your vice president of

19  sales, is creating this $2.3 million purchase order for

20  profiling software in the first days of January 2010?

21  A.   Yes.

22  Q.   Why would your vice president of sales be preparing this

23  purchase order without telling you about it?

24  A.   That's a great question.  I'm sure you're going to have an

25  opportunity to ask him.

1  Q.   We're looking forward to it.

2       Exhibit 421, could you look at that, please?  That's in

3  Volume 1 of your binder.

4  A.   (Witness examines document.)

5            THE COURT:  Admitted.

6       (Trial Exhibit 421 received in evidence)

7            MR. KEKER:  Put that up.

8            THE WITNESS:  I'm sorry.  What was the number?

9  BY MR. KEKER:

10 Q.   421.  We've got it on the screen.

11 A.   Okay.

12 Q.   Let's look at this.  This is an Autonomy invoice to

13 MicroLink for the two -- can we highlight the $2.3 million?

14      And if you go -- okay.

15      Have you ever seen this document?

16 A.   Yes, I've seen it.

17 Q.   When did you see it for the first time?

18 A.   Can you go back up to the top, please?

19 Q.   Yeah.  Or you can find it -- if you want to see the whole

20 thing, it's 421 in your book.

21 A.   (Witness examines document.)  I'm not sure -- actually,

22 I'm not sure that I did -- I've ever seen this invoice from

23 Autonomy.  I was thinking this was related to the purchase

24 order.

25 Q.   Okay.  Well, let's just go through it.

1           Can we highlight over here?

2           The company MicroLink is -- Autonomy is billing MicroLink

3    for something that's going to go to Discover Technologies LLC

4    and the bill is for $2.3 million; right?

5    **A.**   Yes.

6    **Q.**   And the software they're getting is profiling, IDOL Server

7    Profiling; right?

8    **A.**   Yes.

9    **Q.**   And the date of the invoice is 12/31/2009, a day before

10   Mr. Cronin has created 420; correct?

11   **A.**   Yes.

12   **Q.**   Now, let's go down to the bottom and see where this came

13   from.  All the way to the bottom.

14          This is a -- you were subpoenaed for documents.  The

15   Grand Jury subpoenaed you and said, "Give me documents relating

16   to matters that you've discussed here"; right?

17   **A.**   Yes.

18   **Q.**   And you turned over a lot of documents?

19   **A.**   Yes.

20   **Q.**   And they got stamped with "Truitt" stamps on them so that

21   you'd know what documents you'd turned over; right?

22   **A.**   Yes.

23   **Q.**   And this is a document that you turned over, you had in

24   your files, and you gave the Government; right?  It says

25   "Confidential treatment requested by Dave Truitt."  It's got a

1    "Truitt" and a Bates stamp number.

2    **A.**    Yes.

3    **Q.**    So -- okay.

4        So you didn't see the purchase order, but you had in your

5    files the invoice from Autonomy to MicroLink; correct?

6    **A.**    Apparently.

7    **Q.**    And you didn't know that MicroLink had bought $2.3 million

8    worth of profiling software from Autonomy?

9    **A.**    No.

10   **Q.**    Where did you get this invoice?

11   **A.**    I'm not sure where it came from.  I don't know.

12   **Q.**    But according to the invoice at least, the effect of this

13   is that days before this acquisition is going to close,

14   MicroLink bought profiling software for $2.3 million and owes

15   Autonomy $2.3 million for that software; right?

16          **MR. LEACH:**  Objection.  Foundation.  Confusing.

17          **MR. KEKER:**  It is confusing, I'll agree with that.

18          **THE COURT:**  Yeah, but you're asking him for his

19   interpretation of this document?

20          **MR. KEKER:**  Yes, sir.

21          **THE COURT:**  Okay.  You may proceed.

22          **THE WITNESS:**  This document certainly does say that

23   MicroLink -- not Discover but MicroLink owes Autonomy

24   $2.3 million.

25   \\\

TRUITT - CROSS / KEKER

1   BY MR. KEKER:

2   **Q.**   Okay.  And this is two or three days before MicroLink

3   becomes part of Autonomy?

4   **A.**   Yes.

5   **Q.**   It's when you're still the president, Mr. Cronin is still

6   the vice president of sales, and Mr. Rizek is the CFO?

7   **A.**   Correct.

8   **Q.**   And somebody has created a debt from MicroLink -- excuse

9   me, from -- yeah, from MicroLink to Autonomy of $2.3 million

10  and moved profiling software to MicroLink; right?

11  **A.**   Yes.

12  **Q.**   Okay.  And let me ask you about after the acquisition

13  because you told us that Sushovan Hussain was your boss.

14  **A.**   I would say that's correct, yeah.

15  **Q.**   Okay.  After the acquisition, was there any impediment in

16  people in London at Autonomy dealing with the people that were

17  running the MicroLink division of Autonomy?

18  **A.**   Yes, there was.

19  **Q.**   Tell the jury about the way that worked.

20  **A.**   Because Autonomy was a foreign company and we had a top

21  secret facility clearance, our Government forces some kind of

22  a -- it's like a firewall between executives.  So we had to

23  get -- we generally had to get permission to have

24  conversations.  So we would have to go to our security officer

25  and say, "I need to speak about this."

**TRUITT - CROSS / KEKER**

1    The issues are just around making sure that none of our

2    top secret work leaves the U.S. for foreign-owned companies.

3    **Q.**    MicroLink was doing work for, for example, we saw the name

4    Langley was one of the clients?  Langley is the CI -- the

5    Central Intelligence Agency --

6    **A.**    Yes, sir.

7    **Q.**    -- referred to as Langley?

8    You were doing work for the National Reconnaissance

9    Office?  You were doing work for the National Security Agency?

10   **A.**    Yes.

11   **Q.**    What other intelligence agency?  Were you doing work for

12   Homeland Security?

13   **A.**    We did work for Homeland Security.  We did work for DIA, a

14   number of intell.  We did work for the NGO, National Geospatial

15   Organization.  So there was a lot of -- we did work for the

16   Army.  We had a lot of DOD and intell-type work.

17   **Q.**    All right.  A lot of intelligence work and a lot of top

18   secret security-cleared engineers at MicroLink, and there were

19   a lot of -- the firewall was to make sure that there wasn't

20   free communication with a foreign owner; right?

21   **A.**    Yes, that's right.

22   **Q.**    That was part of what had to be negotiated when the

23   acquisition was going to happen?

24   **A.**    Correct.

25   **Q.**    Okay.  So, then, after MicroLink was acquired,

1  communication between Autonomy and its subsidiary MicroLink was

2  limited, wasn't it?

3  **A.**    It was.  It took probably six months or so, I think, for

4  that to get implemented.  We had to -- you know, it wasn't just

5  day one kind of thing but, yes, eventually that was put in

6  place.

7  **Q.**    Did you know that the chief financial officer Alan Rizek

8  refused to let the auditors -- Autonomy's auditors Deloitte

9  look at MicroLink's books?

10         **MR. LEACH:**  Objection.  Vague as to Deloitte.  Which

11 part of the firm?

12         **MR. KEKER:**  The auditors.  The auditors asked to look

13 at the --

14 **Q.**    Did you know that the auditors asked to look at the books

15 and Rizek said, "No, you can't look at our books because we're

16 cleared"?

17         **MR. LEACH:**  In the U.S. or U.K., Your Honor?

18         **THE COURT:**  He's asking does he know that.

19         **THE WITNESS:**  I don't recall that at all.

20 **BY MR. KEKER:**

21 **Q.**    I'm sorry.  Look at 5869, please.

22 **A.**    (Witness examines document.)

23 **Q.**    And Mr. Rizek will be with us.

24 **A.**    And this -- I'm sorry.  What's the timing of that?  Is

25 that -- are you talking about before the acquisition?  Are you

1  talking about at some point afterwards?

2  **Q.**   I'm talking about April 14, 2010, when auditors asked

3  Rizek to look at some books and he told them that they

4  couldn't.

5       Look at 5869.

6  **A.**   (Witness examines document.)

7            **THE COURT:**  And what is that, Mr. Keker?

8            **MR. KEKER:**  This is a memo from Alan Rizek to Laura

9  Blake.

10           **THE WITNESS:**  I'm sorry.  Which volume?

11           **MR. KEKER:**  It's in Volume 3.

12           **THE COURT:**  Well, we may be able to put it on -- if I

13  know where it comes from, I may be able to admit it and then

14  put it on the --

15           **MR. KEKER:**  I would move it in, Your Honor.  It's from

16  Rizek, who will be a witness, to Ms. Blake, and Ms. Blake is

17  the Deloitte person making a Deloitte audit request to

18  Mr. Rizek.

19           **THE COURT:**  Admitted.

20      (Trial Exhibit 5869 received in evidence)

21           **MR. KEKER:**  Can we put it up so we can show the jury?

22  **Q.**   Down at the bottom in April 2010, this is four -- three

23  months after the acquisition, Ms. Blake is saying (reading):

24           "Hi, Alan.

25           "I am part of the U.K. Deloitte audit team.  As part

1      of our quarterly audit procedures, we do a review of each

2      entity's P&L and balance sheet."

3          And goes on and asks some questions about MicroLink.

4          And then if you go up to the top, Mr. Rizek responds to

5   her (reading):

6              "Laura,

7              "I am sorry, but U.S. Government security

8      requirements placed upon us forbid your auditing of our

9      books and records."

10         Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  Did you know that that was the situation, you had

13  this walled-off company and the auditors couldn't come in and

14  look at what was there?

15  **A.**   I didn't specifically remember this, but it doesn't

16  surprise me.

17  **Q.**   Okay.  Do you know what happened -- so now we've got

18  MicroLink with a $2.3 million debt to Autonomy.  Do you know

19  what happened to that debt after the acquisition?

20  **A.**   I can't be sure what happened.  I don't see the accounting

21  on the Autonomy side.

22  **Q.**   Well, let's start with --

23  **A.**   I can tell you that Discover never purchased it, if that's

24  what you're asking.

25  **Q.**   You can tell me Discover never bought this profiling

**TRUITT - CROSS / KEKER**

1  function from MicroLink?

2  **A.**   Correct.

3  **Q.**   You're sure about that?

4  **A.**   Yes, I'm sure.  Are you asking whether I paid $2.3 million

5  for profiling?

6  **Q.**   I'm asking you whether or not Discover ever purchased from

7  MicroLink the profiling function that MicroLink had bought from

8  Autonomy for $2.3 million?

9  **A.**   Not to my knowledge or recollection.  So I can -- again, I

10  can tell you maybe if they sold it to us for $10 or something

11  like that, perhaps, but I didn't pay $2.3 million for the

12  software.

13  **Q.**   So what you remember is that maybe MicroLink sold the

14  software to Discover Tech for a much lower price than the 2.3?

15  They bought something for 2.3 and then after the acquisition

16  sold it to your company outside for much less money; is that

17  right?

18  **A.**   I don't remember that, sir.  I don't remember this

19  transaction.

20  **Q.**   That would be ripping off Autonomy, wouldn't it?  You're

21  now -- MicroLink -- if MicroLink once it's part of Autonomy

22  takes a debt that it has, $2.3 million, and writes it off but

23  then goes ahead and sells to Discover Tech some technology for

24  a lesser amount, that's ripping off Autonomy, isn't it?

25         **MR. LEACH:**  Objection.  Argumentative.  He said he

TRUITT - CROSS / KEKER

 1  doesn't know.

 2          THE COURT:  Sustained.

 3          THE WITNESS:  Ripping off Autonomy... I don't know how

 4  to answer that question.

 5          MR. LEACH:  Excuse me, Your Honor.

 6  BY MR. KEKER:

 7  Q.  All right.  Look at --

 8          THE COURT:  Actually, if I sustain the objection, you

 9  don't have to answer the question.

10          THE WITNESS:  Okay.

11  BY MR. KEKER:

12  Q.  Look at 535, please, sir.

13          THE COURT:  What number?

14          MR. KEKER:  535.  It's in Volume 1.

15          THE COURT:  535.  Okay.  Let me look at it.

16                  (Pause in proceedings.)

17          THE COURT:  Admitted.

18      (Trial Exhibit 535 received in evidence)

19          MR. KEKER:  Put it up.

20  Q.  Is this Mr. Rizek confirming -- look over at page -- let's

21  go over to page 4 of the exhibit -- your chief financial

22  officer -- go down and show his signature, please, Jeff.

23      Is that Mr. Rizek's signature?

24  A.  Yes, it is.

25  Q.  And on January 11, which is a few days after Autonomy has

1  bought MicroLink, the MicroLink subsidiary signed off by Alan

2  Rizek is confirming that (reading):

3        "The items listed above were properly charged to our

4     account and were unpaid as of January 11, 2010, and there

5     are no side letters or other agreements in respect of the

6     subject matter of this request, except as noted below."

7     And then it's blank.

8     And what they're talking about is a debt of $2.3 million

9  that was invoiced on December 31, '09.  So he's affirming the

10 debt?

11 A.   Yes, Mr. Rizek is affirming the debt.

12 Q.   Why would Mr. -- why would your chief financial officer of

13 your company Discover Tech -- excuse me -- of MicroLink, of

14 which you were now the president, why would he affirm this

15 $2.3 million debt if you didn't even know about it?

16 A.   Well, first of all, he affirmed all of these letters; and,

17 second of all, I think he's the one who was responsible for

18 putting this together.  Mr. Cronin obviously helped him with

19 the PO and Mr. Rizek put it on our books and he is affirming

20 it.

21 Q.   And did Mr. Rizek also tell Autonomy that Discover Tech

22 would never buy this software and, therefore, they had to write

23 this debt off the books?

24 A.   You're asking me whether I know what Mr. Rizek told --

25 Q.   I want to know whether or not he told Autonomy that

1    Discover Tech would never pay anything for this and, therefore,

2    it will never close and so write it off your books as bad debt?

3    **A.**    I have no idea.

4    **Q.**    Look at 5561, please, sir.

5    **A.**    (Witness examines document.)

6    **Q.**    5561, the middle e-mail is from Mr. Rizek to Cynthia

7    Watkins.  Do you know who she is?

8    **A.**    I know she worked in accounting at Autonomy.

9    **Q.**    All right.  And it's dated May 13, 2010.

10   **A.**    I'm sorry.  What number?

11   **Q.**    55 --

12        **THE COURT:**  Admitted.

13        (Trial Exhibit 5561 received in evidence)

14   **BY MR. KEKER:**

15   **Q.**    5561.

16   **A.**    What volume?

17   **Q.**    Put it up.

18   **A.**    Okay.

19   **Q.**    Let's go up to the top e-mail first.  Cynthia Watkins of

20   Autonomy is reporting to another -- do you know who Laura Dann

21   is at Autonomy?

22   **A.**    No.

23   **Q.**    She says (reading):

24        "I just had another discussion with Alan.  He

25        confirmed that none of the below deals except for

```
 1        Ameriprise, which may come through INC, are expected to
 2        close."
 3        And then drop down to what deals he's talking about.
 4        And one of the deals is a deal with Discover, where the
 5   end user was supposed to be Discover, $2.3 million, and he's
 6   saying this will never close.
 7   A.   Okay.
 8   Q.   And then after that it was written off; right?
 9            MR. LEACH:  Your Honor, I object on foundation.  Does
10   this witness know anything about this?
11            THE COURT:  I don't -- apparently not.
12            MR. KEKER:  Well, then let's look at something more.
13            THE COURT:  I mean, I think this will come in with
14   Mr. Rizek; right?
15            MR. KEKER:  It will, but --
16            THE COURT:  But let's -- but in the interest of time,
17   maybe we shouldn't spend a lot of time asking him about things
18   of which he has no knowledge.
19   BY MR. KEKER:
20   Q.   Well, Mr. Truitt, you know that after MicroLink was
21   purchased by Autonomy, you and Mr. Rizek and Mr. Cronin sold
22   the profiling software out to Discover Tech so that your new
23   company would have it; right?
24   A.   I do not know that.  I do not recall that.
25   Q.   Look at 5583, please, sir.
```

1    **A.**    (Witness examines document.)

2          **THE COURT:**  55 what?

3          **MR. KEKER:**  '83.  5583.  This is a --

4          **THE COURT:**  Okay.  Admitted.

5    (Trial Exhibit 5583 received in evidence)

6          **MR. KEKER:**  All right.  Can we put this up?

7    **Q.**  What we have here is an e-mail on January 6, 2010, two

8    days after the acquisition, and it's enclosing a Discover Tech

9    PO and it's from John Cronin to Dave Truitt.

10         Is that an e-mail that Mr. Cronin sent you?

11   **A.**  I'm assuming so.

12   **Q.**  Let's look at the next page.

13         The next page is a purchase order from Discover Tech to

14   MicroLink.

15         And let's go over -- and so the next page that's attached

16   to that is a SPIFF.

17         And now let's look at 5587, which is a memo from Cronin.

18         **THE COURT:**  Admitted.

19   (Trial Exhibit 5587 received in evidence)

20         **MR. KEKER:**  -- Cronin to Truitt that I would move in.

21         **THE COURT:**  Admitted.

22   **BY MR. KEKER:**

23   **Q.**  And so the same purchase order, 2010, from Cronin to

24   Truitt, but the bottom one says, as the one before it, John

25   Cronin to Dave Truitt (reading):

1           "For your review.  Dave, take a look.

2           "John."

3       And then you say (reading):

4           "Was there an attachment?"

5       And he says (reading):

6           "Yes.  Here it is."

7       And now let's go over and look at the attachment.

8       And this is a January 7, 2010, attachment to a purchase

9   order in which the resell -- the person getting it is Discover

10  Technologies.  They're getting profiling software -- this is

11  from MicroLink -- and they're getting it for $1,000 per

12  customer; right?

13  **A.**   (Witness examines document.)  Okay.

14  **Q.**   Have you ever seen that before?

15  **A.**   I don't recall it.

16  **Q.**   This is MicroLink, now part of Autonomy, selling for

17  $1,000 per customer the profiling software that you needed so

18  badly and that you were so mad about not getting; right?

19  **A.**   That's what it appears to be.  I'm not even sure what

20  $1,000 per customer means.  I don't recall this order.

21  **Q.**   Let's look at 5669.

22  **A.**   (Witness examines document.)

23  **Q.**   Excuse me.  5669?

24          **THE COURT:**  56?

25          **MR. KEKER:**  5669.

1          THE COURT:  5669.  Admitted.

2      (Trial Exhibit 5669 received in evidence)

3          THE WITNESS:  What volume?

4          MR. KEKER:  Volume 3.

5          THE COURT:  It will pop up.  It will be faster.

6      Okay.  I mean, obviously if you want to look at the

7  document itself, feel free to.

8          THE WITNESS:  I don't need to look at the document.

9  If you guys are going to put them up every time, that's great.

10         THE COURT:  I think they probably are most of the

11 time.

12 BY MR. KEKER:

13 Q.    All right.  Now, this -- so before we looked at January 6.

14 Now, on January 7 Cronin is sending something to Rizek.  VP

15 sales sending something to CFO; right?

16 A.    Yes.

17 Q.    And he says (reading):

18         "Alan, does this look okay to you?"

19     And let's see what's attached.

20     It's that purchase order; right?  Let's blow it up.  The

21 purchase order that we just looked at where Discover

22 Technologies is getting from MicroLink for a thousand dollars.

23     What's the next page?  The profiling software.  Do you see

24 that?

25 A.    Yeah.

1  Q.   And you didn't know anything about this?

2  A.   As I have said, I don't remember dealing with this at all,

3  so it -- you know, it was eight years ago and, you know,

4  clearly I'm not on this one but I was on the last one.  So, you

5  know, I must have had some recollection -- or some involvement.

6  I don't remember it.

7  Q.   Would you look at 5584 in terms of your involvement?  This

8  is an e-mail from John Cronin to Dave Truitt.

9          MR. KEKER:  Move it in, Your Honor.

10          THE COURT:  Well, does this go to the witness?

11          MR. KEKER:  Yeah.  It's from Cronin to Truitt.

12          THE COURT:  Oh, sorry.  Admitted.

13     (Trial Exhibit 5584 received in evidence)

14  BY MR. KEKER:

15  Q.   So later on in the month, Cronin is sending to you

16  something that says "Autonomy Profiling SW."  Is that Autonomy

17  profiling software?

18  A.   It looks that way, yes.

19  Q.   (reading)

20          "I've asked for the Autometer account to be set up

21      for mhyson@discovertechnologies.com."

22      Do you see that?

23  A.   Yes.

24  Q.   What does that mean?

25  A.   It means we would have access to the software.

**TRUITT - CROSS / KEKER**

1    Q.    Okay.  This is delivery of the software to Discover Tech?

2    That you're getting the profiling software; right?

3    A.    Yes.

4    Q.    Okay.  And did you know that this -- I mean, first of all,

5    let's just go back for a second.

6         Profiling software was very important, you were very

7    unhappy, and now you're getting the profiling software, but

8    this is something you completely forgot about?

9    A.    Yes, sir.  And if I could, you know, clearly this is

10   embarrassing to me that I don't recall this at all; but in

11   March of 2010, our software was based on Microsoft technology.

12   Microsoft introduced new search called FAST in March of 2010.

13   We were able to leverage that technology, and we -- and we did

14   leverage that technology; and in terms of how important this

15   was or was not to us, it became way less important to us at

16   that time, and maybe that's why I don't recall it.

17        I don't recall this order and I don't recall, you know,

18   utilizing it, and that's all -- you know, I'm sorry, that's all

19   I can say.  I don't recall it.

20   Q.    Is it important for you to tell this jury the truth?

21   A.    Yes.

22   Q.    Okay.  And you told them unequivocally without blinking,

23   without any hesitation that you -- yesterday and again today

24   that you knew nothing about this $2.3 million purchase of

25   profiling software by MicroLink from Autonomy which then once

1  you're running MicroLink gets written off the books and sold to

2  Discover for 1,000.  You completely forgot about that; right?

3  **A.**   Yes.  I'm being as honest as I can possibly be.

4  **Q.**   Okay.  But this is the delivery.  This is Autonomy -- this

5  is your new company Discover Tech getting exactly what it

6  needs, the profiling software; right?

7  **A.**   Yes, that's the way it appears.

8  **Q.**   Let's look at this another way.  You said your phone

9  number is 713-915-1829; right?

10 **A.**   703, yes.

11 **Q.**   703.  I beg your pardon.  703.

12      And your phone records were produced to the Government as

13 part of their subpoena power; right?

14 **A.**   Yes.

15 **Q.**   Look at 5588.  Those are your phone records, which I think

16 are already -- are they in evidence?  Maybe not.

17      These are your phone records for the early part of 2010,

18 the period we're talking about; right?

19 **A.**   I don't have it on the screen.

20      **MR. LEACH:**   No objection, Your Honor.

21      **MR. KEKER:**   All right.  Let's put them up on the

22 screen.  The first page -- let's go to the first page.

23      **THE CLERK:**   One moment.

24      Is it admitted?  Judge, is this admitted?

25      **THE COURT:**   Sorry.  I'm doing -- pardon me.

```
1              THE CLERK:  That's okay.

2              THE COURT:  What's up?

3              THE CLERK:  5588, is it admitted?

4              THE COURT:  No objection?

5          MR. LEACH:  No objection.

6              THE COURT:  It's in.

7          (Trial Exhibit 5588 received in evidence)

8              THE CLERK:  Thank you.

9          MR. KEKER:  The third page.  One more, Jeff.  No, not

10   that one.  I'm sorry.  The one that's marked 5.

11   Q.   Okay.  Mr. Truitt, why don't you get out your phone

12   records and look at them if you need to.  Are these your phone

13   records that you sent in?

14   A.   Yes.

15   Q.   Okay.

16          MR. KEKER:  And, Your Honor, we have a demonstrative

17   that picks out of these phone records some calls that were --

18   that they show were made on January 1st, and I would like to

19   use that demonstrative.  It's 5741.

20              THE COURT:  Okay.  So 5741 is admitted for

21   demonstrative purposes only.

22          (Trial Exhibit 5741 Demonstrative Purposes Only

23           received in evidence)

24              THE COURT:  50 -- what number is it?

25          MR. KEKER:  5741.
```

1          THE COURT:  5741.

2    BY MR. KEKER:

3    Q.   Okay.  So, look, this is January 1st, 2010, the same

4    day --

5          THE COURT:  Ladies and gentlemen, let me just tell you

6    what a demonstrative is.

7          MR. KEKER:  Yeah.

8          THE COURT:  My understanding of a demonstrative is

9    it's actually not evidence.  What it is, it's a collection of

10   certain items that the party believes are in evidence to

11   demonstrate a particular point.  So it's not like the original

12   document, and it is to be considered by you only insofar as you

13   believe that the underlying information that's contained on the

14   demonstrative is true and correct.

15      Okay.

16         MR. LEACH:  Your Honor, I'm not sure this

17   demonstrative is based just on the exhibit that's been

18   admitted.  I see some --

19         THE COURT:  Well, what is it?

20         MR. LEACH:  I see some calls between Mr. Rizek and

21   Hussain.

22         THE COURT:  Okay.  So it's coming in provisionally

23   subject to a motion to strike, and I'm charging the parties

24   with the responsibility of monitoring it; but if, in fact,

25   there isn't underlying evidence admitted on those calls or

1  those contacts, then, of course, it's stricken.

2        MR. KEKER:  Mr. Rizek --

3        THE COURT:  Is there any problem with that procedure?

4  I mean, I'm just trying to figure out --

5        MR. LEACH:  No, Your Honor.  That's all right.

6        MR. KEKER:  We have Mr. Rizek's phone records, too, so

7  between Mr. Rizek and this --

8        THE COURT:  So I don't think it's changed anything

9  I've said --

10       MR. KEKER:  No.

11       THE COURT:  -- which, in other words, a demonstrative

12 can be used.  You have to start somewhere in this process.

13 This is the witness who is here.

14    Yes, Mr. Leach?

15       MR. LEACH:  May we approach, Your Honor, on this?

16       THE COURT:  Sure.

17    Okay.  Ladies and gentlemen, in order to focus my

18 attention on the case, you are invited to have a conversation

19 and I will have my own conversation at sidebar.

20       **(The following proceedings were heard at the sidebar:)**

21       THE COURT:  See this is what Judge Legge did.  What he

22 did is when he tried a case, he would come out, in criminal

23 cases, he would come out with piles of his law and motion and

24 his other motions, as I did today, and try to get through them

25 thinking that everything will go just swimmingly between the

1    parties, sort of establish the way things are happening.

2        Anyway, what's the problem?

3        MR. KEKER:  This demonstrative is based on two sets of

4    phone records:  One is 5588 that we just identified that are

5    Truitt's phone records, and then there are going to be records

6    from Rizek, which we will introduce through Mr. Rizek.

7        MR. FRENTZEN:  Well, if I can just --

8        THE COURT:  Yes, go ahead.

9        MR. FRENTZEN:  -- since Mr. Rizek is my witness.

10       The problem is this is a demonstrative that we just got

11   and was never shown to us before.  I'm going to have to go back

12   and compare.  I have no idea if the non-Truitt calls are

13   accurate or not and/or if there are other calls; but, in any

14   event, this witness is not going to have a foundation for the

15   calls --

16       MR. KEKER:  I think he is.

17       MR. FRENTZEN:  -- between Rizek and Hussain.

18       THE COURT:  And the answer is he may or may not.  I

19   don't know, but I've got to start somewhere.  I have to always

20   believe that the attorneys are offering it in good faith

21   because they believe the evidence will ultimately support a

22   reasonable inference.

23       If it turns out that those calls aren't admitted -- you

24   know, there isn't independent evidence of it, then I'll strike

25   the -- I'll ask the defendants to withdraw the exhibit and put

1    in a new exhibit.

2         Nobody is going to remember -- they may or may not

3    remember, but I don't think in closing anybody's going to argue

4    that and it's not going to be there if it's not supported.

5         I think we have to give some leeway in a two-month case

6    where it comes in piece by piece by piece.  If you believe,

7    Mr. Frentzen, that there is no evidence to support the

8    occurrence of these calls, that's a little different from you

9    have to review it.

10        **MR. FRENTZEN:**  I know at least some of these calls

11   took place.  I think the bigger issue is questioning this

12   witness about Alan Rizek's phone records.

13        **THE COURT:**  Well, he's not going to say -- he's going

14   to say he doesn't know.

15        **MR. KEKER:**  But he's going to say he knows what

16   Rizek's doing I think.  I mean, that's the whole point of this.

17        **THE COURT:**  I don't know.

18        **MR. FRENTZEN:**  Well, that's contrary to what he's so

19   far said --

20        **THE COURT:**  Okay.

21        **MR. FRENTZEN:**  -- and so --

22        **MR. REEVES:**  I have one last piece.  I think we'll

23   have other demonstratives.  I'd just like a clear record about

24   the exact exhibits that support the demonstrative.  That's all

25   we ask for.

 1          THE COURT:  We're not going to go through it right

 2    now.

 3          MR. REEVES:  No.

 4          THE COURT:  I'm not going to deal with it now.  Oh,

 5    this whole group, nobody appreciates that literary reference,

 6    Biblical reference.  Nevertheless, okay, my ruling stands.

 7          MR. FRENTZEN:  I understand.

 8          THE COURT:  It is the way it's going to work and

 9    that's it; and believe me, if it turns out to be different,

10    we'll address it.

11          MR. FRENTZEN:  Great.  Thank you.

12          MR. LEACH:  Thank you, Your Honor.

13       (The following proceedings were heard in open court:)

14          THE COURT:  Thank you very much.  You may proceed.

15    BY MR. KEKER:

16    Q.  If we could put up 5741, which is a demonstrative that's

17    based on your phone records and then a couple of the calls are

18    based on Mr. Rizek's phone records, but let's start and get

19    oriented.

20          This is January 1st, 2010, the day before the $10 million

21    deal, which did not get you profiling software and left you

22    unhappy, had closed; right?

23    A.  Yes.

24    Q.  And so you were unhappy on January 1st because you got

25    IDOL Lite and you didn't have the profiling function?

1    **A.**    Yes.

2    **Q.**    So at 3:52 p.m. you called Mr. Egan.  What did you talk to

3    Mr. Egan about?

4    **A.**    I have no idea.

5    **Q.**    Did you talk to him about your frustration and being angry

6    about not having the profiling software?

7    **A.**    I was probably asking when is our deal going to close

8    because we were at that point supposed to settle a $55 million

9    deal the day before.

10    **Q.**    Did you talk to Mr. Egan about your inability to get the

11    profiling software and your anger about that?

12    **A.**    I don't believe so.  I certainly don't recall it if I did.

13    **Q.**    Okay.  Then the next call, not -- I mean, a call at

14    4:06 p.m. after talking to Mr. Egan for 14 minutes, you talked

15    to -- actually, you got off the phone with Mr. Egan, 14 minutes

16    would put you at 4:06, and you immediately called Mr. Cronin

17    and talked to him for 8 minutes.

18    **A.**    These are eight years ago, sir.  I don't know any specific

19    conversation that I had that day.

20    **Q.**    Is that when you told him to prepare this phony purchase

21    order?

22    **A.**    I don't recall the order.  I don't recall saying anything

23    like that to Mr. Cronin.

24    **Q.**    Did you and Mr. Egan and Mr. Cronin agree that "What we'll

25    do is pretend like we bought the profiling software in the last

1  quarter, this 2.3 million deal had been made in the last

2  quarter between MicroLink and Autonomy"?  Is that what you all

3  agreed to?

4  **A.**   Why would that benefit me to backdate an order?

5  **Q.**   You're asking --

6  **A.**   In any scenario, why would I agree to put it back in the

7  prior quarter?

8  **Q.**   Because you --

9        **THE COURT:**  No.  Wait.  Wait.  Wait.  Wait.

10  Okay.  You actually can't ask --

11        **THE WITNESS:**  Okay.

12        **THE COURT:**  -- questions.

13        **THE WITNESS:**  Sorry.

14        **THE COURT:**  However, if you don't understand a

15  question, you certainly can ask that -- you don't have to

16  answer it.  You can say, "Can you clarify it," or, "What do you

17  mean by it," or something of that nature; but it's all a

18  question of argument that will be addressed at some point as to

19  what the meaning of the testimony is.  Do you understand?

20      And as well counsel for the Government after Mr. Keker is

21  concluded will be able to ask you further questions.

22        **THE WITNESS:**  Okay.

23        **THE COURT:**  Okay?

24        **THE WITNESS:**  Then I would answer it this way:  Given

25  the fact I don't remember the conversation, I don't know what

TRUITT - CROSS / KEKER

1    was said.  However, I find it highly unlikely that I would have

2    been discussing backdating an order because it would not have

3    benefited me to do so.

4    **BY MR. KEKER:**

5    **Q.**    Would it have benefited Mr. Egan?

6    **A.**    I have no idea.

7    **Q.**    Was Mr. Egan trying to hit some sales numbers, make

8    quotas, that kind of thing?

9    **A.**    If he -- if he did, I have no idea about Mr. Egan's

10   compensation.  Whether he was paid on commission or a salary, I

11   don't know.

12   **Q.**    Was it Mr. Egan's idea to say that this $2.3 million deal

13   had settled in the last quarter?

14   **A.**    You'll have to ask Mr. Egan that question.

15   **Q.**    We will.

16       Why did Mr. Cronin prepare this purchase order on

17   January 1st?

18   **A.**    You would have to ask Mr. Cronin that question.

19   **Q.**    You didn't have anything to do with it?

20   **A.**    I don't recall it.  I can't answer a question around a

21   subject that I don't remember.

22   **Q.**    Then you called Mr. Rizek --

23   **A.**    Perhaps if I had some documents around this, prior to

24   this, maybe I could have gone back and tried to figure it out.

25   I haven't seen it.  I don't remember it.

1    **Q.**    Then -- well, you talked to Mr. Egan, you talked to

2    Mr. Cronin, and then you call your CFO, Mr. Rizek, for

3    1 minute.  That's probably a call that didn't go through.  But

4    then you get him at 4:18 and talk to him for 11 minutes.  What

5    did you talk about?

6    **A.**    I have no idea.

7    **Q.**    And then you talked to Mr. Egan again.  What did you talk

8    to him about?

9    **A.**    I have no idea.

10   **Q.**    At this point had you put together this scheme of

11   $2.3 million to get the profiling software knowing that you

12   could put it into this fenced-off MicroLink and write it off

13   later?

14            **MR. LEACH:**  Objection.  Asked and answered.

15   Argumentative.

16            **THE COURT:**  Overruled.

17            **THE WITNESS:**  I never would have done that.

18   **BY MR. KEKER:**

19   **Q.**    Then you talked to Mr. Cronin for 8 minutes and then

20   Mr. Rizek for 8 minutes, and then Mr. Rizek called Mr. Hussain.

21   Do you see that?

22   **A.**    Yes.

23   **Q.**    What did you talk to Mr. Cronin and Mr. Rizek about?

24   **A.**    I have no idea.

25   **Q.**    Did Mr. Rizek tell Mr. Hussain that, "Oh, by the way, we

1   had another $2.3 million deal that closed in the last quarter"?

2           MR. LEACH:  Objection.  Foundation.

3           THE COURT:  Sustained.

4           THE WITNESS:  I have no idea what --

5           THE COURT:  I understand that, and that's why I

6   sustained the objection; but if I do sustain the objection, you

7   don't answer the question.  Okay?

8           THE WITNESS:  Okay.

9           THE COURT:  Thank you.

10  BY MR. KEKER:

11  Q.  And then after Mr. Rizek talked to Mr. Hussain, he called

12  you?

13  A.  Yes.  We were, again, trying to close -- we were trying to

14  sell our company that day.  We had lots to talk about.  We were

15  probably asking questions of Mr. Hussain, "Why didn't our deal

16  close yesterday?  When will it close?  What information do you

17  need from us?"  That's what I was focused on.

18  Q.  And then at some point you talked -- further down you

19  talked to Mr. Rizek for 64 minutes.  What was that about?  You

20  had more than an hour phone conversation with him.

21  A.  Maybe "What did Mr. Hussain tell you about when our deal

22  is going to close?"  I don't know.  I don't remember.  These

23  calls were -- were eight years ago.

24  Q.  You thought about this $2.3 million deal again in late

25  2010 when you were dealing with Discover Tech's auditors,

1    didn't you?

2    **A.**    I don't recall anything like that, but I'm not sure what

3    you're referring to.

4    **Q.**    Well, this 5575, we can put that back up again?

5         That had to do with your auditors in late 2010, didn't it?

6    **A.**    What auditors are you referring to?

7    **Q.**    Look at -- let's look at 1293 in your first volume.

8         **THE COURT:**    1293 admitted.

9         (Trial Exhibit 1293 received in evidence)

10        **MR. KEKER:**    If we can put that up.

11   **Q.**    This is an e-mail from you to somebody named Cassie

12   Hartogs; right?

13   **A.**    Yes.

14   **Q.**    And it's dated December 16, 2009?

15   **A.**    Yes.

16   **Q.**    And who's Ms. Hartogs?

17   **A.**    She is our Discover Technology accounting.  She works for

18   BDO.  She's our accountant.

19   **Q.**    Okay.  And was she also -- was her firm also the auditors?

20   **A.**    No.  We weren't even getting audits at this point.

21   **Q.**    It says "MicroTech PO OEM Agreement Buy v. Build.pdf."

22   And then it says (reading):

23         "Hi, Cassie.

24         "Here is the purchase order and OEM license and

25   distribution agreement for the Autonomy software

1     transaction.  I have also included a working paper that

2     sheds some lights on our thought process for the buy v.

3     build scenario last year prior to making the investment."

4        Was that you telling her that this buy-versus-build

5  scenario was written back in 2009, as the jury has seen it's

6  dated?

7  **A.**   I don't know if it's saying that I said it was written

8  back in 2009, but it clearly is a -- she simply needed to

9  understand what the software did so she could account for it

10 properly.  That's my recollection of this.

11 **Q.**   And you sent her the buy-versus-build memo?

12 **A.**   Yes.

13 **Q.**   Do you know when the buy-versus-build memo was created?

14 **A.**   I remember that Mr. Cronin wrote it.  I don't remember

15 exactly when it was created.

16 **Q.**   It's got a date on it of December 2009; right?

17 **A.**   Okay.

18 **Q.**   Let's look at it.  It's 1292.  It's a memo from John

19 Cronin to Dave Truitt attaching the buy-versus-build memo.

20        **MR. KEKER:**  Move it in, Your Honor.

21        **THE COURT:**  Admitted.

22     (Trial Exhibit 1292 received in evidence)

23 **BY MR. KEKER:**

24 **Q.**   And it's dated December 16, 2009.  And look at the next

25 page.  When is the --

 1           MR. LEACH:  Objection, Your Honor.  Misstates the

 2   evidence.

 3           MR. KEKER:  Excuse me.  2010.  You're absolutely

 4   right.  I beg your pardon.

 5   Q.   But the buy-versus-build memo is dated -- look at the next

 6   page -- December 12, 2009.  Do you know when that was written?

 7   A.   I don't know.  I didn't write it, sir.

 8   Q.   Was it backdated by a year?  Was it written right around

 9   December 2010?

10   A.   It could have been.  I don't know.  I didn't write the

11   document.

12   Q.   Did you tell your auditors that the document, which

13   purported to describe your thinking back in 2009, was actually

14   written in 2010?

15   A.   I don't recall telling them that, and I don't know that it

16   would have mattered.

17   Q.   Look at 5737.

18   A.   (Witness examines document.)

19           THE COURT:  Admitted.

20       (Trial Exhibit 5737 received in evidence)

21           MR. LEACH:  What was the exhibit number again?

22           MR. KEKER:  5737, and I'm having trouble finding it.

23           MR. LEACH:  The judge has admitted it, so we're both

24   in trouble.

25           MR. KEKER:  I know.

1        **MR. LEACH:**  I don't have it either.

2        **THE COURT:**  I can change my mind, especially if nobody

3   finds it.  It will be one of the most important documents in

4   this case I'm sure.

5        Are we trying to locate it?

6        **MR. KEKER:**  We are trying to locate it, Your Honor.  I

7   beg your pardon.

8        **THE COURT:**  Okay.  It's all right.

9                         (Pause in proceedings.)

10       **MR. KEKER:**  We'll have to come back to it.  We've got

11  confusion here.

12       **THE COURT:**  Okay.

13  **BY MR. KEKER:**

14  **Q.**  Did you tell your auditors about buying the profiling

15  software?

16  **A.**  I don't recall talking to anyone about the profiling

17  software, including my auditors.

18  **Q.**  Okay.  I'm going to go back and see if I can get lucky.

19  5739.

20       Ah.  5739 is a memorandum from you -- from Mr. Cronin to

21  you dated December 15, 2010.

22       **THE COURT:**  Admitted.

23       **MR. KEKER:**  Move it in, Your Honor.

24       (Trial Exhibit 5739 received in evidence)

25  \\\

1    BY MR. KEKER:

2    **Q.**    Do you have that in front of you?

3    **A.**    Yes.

4    **Q.**    Okay.  The first page is -- it's dated 2010, Discover Tech

5    OEM PO, and attached is a purchase order that says it's from

6    MicroTech to Discover Technologies, the $10,100,000; and then

7    attached to it is a purchase order dated January 7, 2010.

8         Next page.

9         It's got that same 2010 number on it, and it says that

10   that $10,100 [sic] got you profiling software; right?

11   **A.**    That's what it says.

12   **Q.**    And that's just not true, is it?

13   **A.**    You would have to ask Mr. Cronin.  He wrote this document.

14   I don't know.

15   **Q.**    Were you trying to persuade your auditors that you had

16   gotten the -- that you legitimately had the profiling software

17   and that was part of the purchase?

18   **A.**    They weren't our auditors, sir.  These were my accountants

19   and they just wanted to correctly know how to depreciate the

20   software.

21   **Q.**    All right.  But what you're telling them is that you had

22   gotten for that $10 million the profiling software?

23   **A.**    I'm not telling them anything.  Mr. Cronin wrote this.  I

24   guess I forwarded -- I forwarded it to my accountants.  This is

25   Mr. Cronin's attempt to describe what our software was so they

1  could account for it properly.

2  **Q.**   Is this subject of the $2.3 million sale of profiling

3  software something that you have talked to Mr. Rizek about

4  since this investigation began?

5  **A.**   Yes.

6  **Q.**   And have you also talked to Mr. Cronin about it?

7  **A.**   I don't recall talking to Mr. Cronin about it.

8  **Q.**   Have you talked to Mr. Egan about it?

9  **A.**   I don't recall talking to Mr. Egan about it.

10  **Q.**   You had a lawyer back in the old days when you got

11  immunity; right?

12  **A.**   Yes.

13  **Q.**   And how long ago -- have you had your lawyer right up to

14  now?

15  **A.**   Yes.

16  **Q.**   Okay.  Is your lawyer talking to Cronin and Egan's lawyers

17  about what's going on?

18  **A.**   Yes.

19  **Q.**   They're exchanging information about what people are

20  saying and that kind of thing?

21  **A.**   Yes.

22  **Q.**   All right.  Separate subject.

23         **THE COURT:**  Well, okay, different subject.

24      Ladies and gentlemen, we're going to take our recess now.

25  Remember the admonition given to you:  Don't discuss the case,

1    allow anyone to discuss it with you, form or express any

2    opinion.

3        We'll be in recess until 2:30.

4        (Proceedings were heard out of the presence of the jury:)

5        **THE COURT:**  Okay.  You may step down.

6        So two things.  First of all, how long do you think you're

7    going to be?

8        **MR. KEKER:**  Probably the rest of the afternoon,

9    Your Honor.

10       **THE COURT:**  So the witness will have to come back on

11   Monday in all likelihood.  Okay.

12       **MR. LEACH:**  That would be very unfortunate,

13   Your Honor.  Mr. Truitt was here last week.

14       **THE COURT:**  Well, I know.  What do you want me to do?

15       **MR. LEACH:**  We would be prepared to go till 4:30.  I

16   right now don't have a great deal of redirect.

17       **THE COURT:**  Well, I'll go a bit longer if we can

18   conclude; but, on the other hand, he was on for an extended

19   period of time and asked a lot of things, and I'm not going to

20   deny Defense the right to cross-examine or circumscribe it.

21       I mean, I don't see any delay in the examination.  It

22   appears that it's focused and proceeding, and so I'm going to

23   allow it to continue.

24       If it turns out that Mr. Keker concludes in a reasonable

25   time in terms of the day's schedule, I certainly would go for a

1  little bit extra time in order so that the witness can be

2  excused; but if that doesn't happen, the witness has to come

3  back on Monday.  So that's the game plan.

4      Now, I wanted to raise the question, in light of the

5  witness' last testimony about discussions --

6          **MR. KEKER:**  Do you want him to hear?

7          **THE COURT:**  Well, he can hear this because I don't

8  think it ought to be out of his presence, in any event, about

9  his lawyer talking to some other lawyer for a witness about

10 what's going on.

11     I don't know -- you know, the questions were somewhat

12 vague in terms of time period, but if they were to include the

13 period of time that this case is presently being tried -- that

14 is, within the last week or so of testimony -- that is of

15 concern to the Court in light of the order.  The order was that

16 witnesses be excluded, and there's -- you know, it would be --

17 in the Court's view initially, it would raise a question as to

18 whether that order was being complied with.

19     If the witness has a conversation with his or her lawyer

20 and that lawyer then has a conversation with the lawyer of

21 another witness, that's an indirect way, in the Court's view,

22 of circumventing the Court's order.

23     I don't know if any of this has happened.  Okay?  But I

24 don't want to blindside anybody, which means the Government in

25 this case, that there isn't concern.  I think that there might

1    be.

2         However, I don't know the facts, and so I just wanted to

3    say what I'm going to say.  It's up to you to determine what

4    the facts are, but I think we need some clarification in light

5    of the testimony of the witness.  Okay?

6         I mean, you don't have to say anything.  That's just what

7    I'm suggesting.  It's up to you to do whatever you want to do.

8         I certainly am going to permit counsel to inquire.  You

9    know, maybe the remedy is you simply ask the next witness "Have

10   you had a conversation with your lawyer about X, Y, or Z?"  And

11   if that's the case, I don't know that it's protected by the

12   attorney-client privilege.  It raises questions.

13        So, anyway, I just want to put all that out on the table.

14   I've not made up my mind about anything because, by the way, I

15   really don't know the facts.  I don't know when this happened,

16   if it did happen, and so forth; but the witness has raised

17   that -- I don't know whether he's raised it -- Mr. Keker has

18   raised it and it's been discussed.

19        Anybody can answer if you want to answer.

20        **MR. LEACH:**  I guess I would like clarity from the

21   Government's side about what the Court's order is in terms of

22   our obligations to instruct lawyers for witnesses about what to

23   do.

24        **THE COURT:**  Oh, I think it's clear.  Is it not?  I

25   mean, I think the order of excluding witnesses -- now, again,

1    this may be inadvertent and it may not -- and the Government

2    may have had a different view of the scope of the Court's order

3    than the Court had, and I'll invite some discussion on that

4    point if that becomes irrelevant -- if it's relevant in the

5    time period.

6        But I'm sitting here thinking, as occasionally I do, what

7    can you do?  I mean, if you have an order excluding witnesses,

8    what does it mean in terms of communicating the substance or

9    any of the points of the testimony to the witness?

10       I don't think it's like -- well, at your peril.  I don't

11   think it's -- I don't think the rule is:  Well, here's the rule

12   and if you break the rule, there's a remedy, which is, you

13   know, telling the jury all about it.  Maybe.  Maybe that's it.

14   I don't know.  I've never been confronted with this situation

15   in this particular form.

16       So if you want to ask me anything, you do know I don't

17   know.  I don't even -- I'm not certain that his testimony

18   related to conversations that may have taken place during the

19   course of this trial.  It may not be.  It may be earlier.

20           **MR. FRENTZEN:**  And if I can just clarify, Your Honor.

21           **THE COURT:**  Yes.

22           **MR. FRENTZEN:**  First of all, I have -- I think --

23   well, I don't know, but I think -- certainly I speak on behalf

24   of myself -- I think that we don't know what those

25   conversations are; but just as a point of clarification, this

1  is the first of these three witnesses to testify.

2      So the rule on witnesses, as I've always understood it, is

3  when the witness is on the stand, other witnesses are excluded.

4  I'm not aware of any rule barring, nor do I think I could

5  bar -- I'll be happy to communicate to any lawyer out there the

6  Court's concerns --

7          THE COURT:  That may be the answer.

8      MR. FRENTZEN:  -- but I don't know -- in other words,

9  if communications took place after trial began but before

10  Mr. Truitt testified --

11         THE COURT:  Yeah.

12     MR. FRENTZEN:  -- I don't know that the exclusion of

13  witness rules even applies to that, nor do I think that I could

14  bar those lawyers from communicating with each other.  So I

15  don't --

16         THE COURT:  I think that's probably right.

17     MR. FRENTZEN:  So that's the only point I wanted to

18  raise.

19         THE COURT:  Okay.  That may be right and this may be

20  much ado about nothing.

21     MR. FRENTZEN:  So to let the Court know, I'm happy

22  going forward to communicate that to the lawyers involved, that

23  Mr. Truitt is on the stand and we expect that there's not going

24  to be some way around the Court's rule on witnesses; but the --

25         THE COURT:  Okay.

1    **MR. FRENTZEN:**  -- pretestimony communications, I think

2    they're out of our hands.

3        **THE COURT:**  And that's a significant distinction, and

4    I certainly would think, without the benefit of argument, that

5    you should instruct the witness and his counsel that he's not

6    to discuss the testimony with -- the witness can certainly talk

7    to his lawyer about his testimony.  That's -- I'm not

8    preventing that.  What I am saying is that neither the witness

9    nor the witness' attorney can speak to some prospective witness

10   about what this witness has said during the course of his

11   testimony.

12       **MR. FRENTZEN:**  Understood, and we're happy to

13   communicate that out, Your Honor.  I just wanted to clarify.

14       **THE COURT:**  So that may take care of the problem.

15   Thank you.

16       **MR. KEKER:**  Thank you.

17               (Recess taken at 2:24 p.m.)

18             (Proceedings resumed at 2:35 p.m.)

19      (Proceedings were heard in the presence of the jury:)

20       **THE COURT:**  Let the record reflect all jurors are

21   present.  Thank you.

22       **MR. KEKER:**  Thank you, Your Honor.

23   **Q.**  Mr. Truitt, let's shift to the Vatican deal.  You were

24   sitting in a deck chair in West Palm Beach on the beach on what

25   day when you first heard this about deal?

1    **A.**    April 1st, 2010.

2    **Q.**    April 1st, 2010.  One day after the quarter closed; right?

3    **A.**    Yes, sir.

4    **Q.**    And how long had you been at West Palm Beach with your

5    family?

6    **A.**    A few days.  I don't know exactly.

7    **Q.**    So were you there on the 29th?

8    **A.**    I don't remember --

9    **Q.**    Of March.  Excuse me.

10    **A.**    I don't remember when I left.

11    **Q.**    Were you there -- well, was the day that you were sitting

12    there that you remember so vividly as April 1st -- was that the

13    first day you had gotten to the beach?

14    **A.**    I don't believe so, but I don't remember.  I don't

15    remember my travel itinerary for 2010.  I don't know.

16    **Q.**    So you don't know where you were the 31st of March?

17    **A.**    I believe that I was already there, but I -- I could be

18    wrong, so I'm not going to --

19    **Q.**    The 30th of March, where were you the 30th of March?

20    **A.**    I'm not sure, sir.

21    **Q.**    You said Mr. Egan called and you told you about the

22    Vatican deal and asked if MicroTech was interested?

23    **A.**    That's right.

24    **Q.**    He wasn't asking you about Discover Tech; is that right?

25    **A.**    Correct.

1   **Q.**   He was asking about MicroTech.

2       Did he tell you why he was asking you to talk to MicroTech

3   about the Vatican deal?

4   **A.**   He didn't tell me why, but I -- again, he did that

5   routinely.  Folks from Autonomy would utilize me as kind of a

6   go-to for MicroTech.

7   **Q.**   And what did he tell you and ask you to do during this

8   telephone conversation?

9   **A.**   He asked me to have a conversation with MicroTech and see

10  if they would be interested in talking to them more about that

11  deal.

12  **Q.**   Did he tell you that -- that he had been in touch with

13  MicroTech already?

14  **A.**   No.  He did not mention that.

15  **Q.**   So your understanding was the first time MicroTech was

16  going to hear about this deal was when you called your brother

17  and told him about it; right?

18  **A.**   Yes.

19  **Q.**   And, in fact, is that what happened?

20      Was your brother surprised to hear about the Vatican deal

21  when you called him?

22  **A.**   He didn't indicate that he had heard about the deal prior

23  to my call.

24  **Q.**   Okay.  And tell us again, what did Mr. Egan tell you the

25  deal was?

1  **A.**   He said it was a deal at the Vatican.  He gave me the --

2  just the basics.  How big -- you know, what the number was,

3  what the order was.  He gave me a little bit of background that

4  I gave you this morning.  It was a very short call.

5  **Q.**   He said that Autonomy had people in the Vatican Library

6  digitizing records and so on?

7  **A.**   Yes, sir.

8  **Q.**   Did he say anything about when the deal was expected to

9  close?

10  **A.**   I don't recall specifically when he said it was supposed

11  to close, but he indicated that it was going well and

12  anticipated that it would close soon.

13  **Q.**   And then did you pass on all the information that Mr. Egan

14  had given you to your brother when you called him?

15  **A.**   Yes.

16  **Q.**   And did you call him that same day?

17  **A.**   Yes.

18  **Q.**   So your brother is learning about this on April 1st?

19  **A.**   Correct.

20  **Q.**   Did you call Mr. Cronin and talk to him about it?

21  **A.**   I believe I did call Mr. Cronin after I spoke to my

22  brother, after my brother had talked to Mr. Jimenez.

23  **Q.**   And you called Mr. Cronin for what reason?

24  **A.**   To let him know that MicroTech was interested in

25  potentially pursuing that -- that deal.

1          Mr. Cronin was working with MicroTech, much the way he was

2     with me in terms of helping to process orders, and so he got in

3     touch with -- with MicroTech at that point, Mr. Cronin.

4     **Q.**    So Mr. Cronin was just -- learned about it from you on

5     April 1st?  That was the first Mr. Cronin knew about it?

6     **A.**    Yes.

7     **Q.**    Would it surprise you if you -- if Mr. Cronin testified he

8     had been working on this for a couple of months?

9     **A.**    Yes, that would surprise me.

10    **Q.**    Would it surprise you if your brother testified that

11    they'd been working on it at the end of the quarter?  They met

12    the 27th, 28th, 29th, working on this Vatican deal?

13    **A.**    That would surprise me.

14    **Q.**    Would it surprise you to know that your brother was very

15    excited about the deal and was worried that Autonomy would be

16    able to close it in the quarter so that they wouldn't get to

17    participate?

18    **A.**    That would surprise me.

19    **Q.**    Okay.  So if the two of them said that they'd been working

20    on it in the past quarter and discussing it and preparing

21    papers, that would be something that's just contrary to your

22    recollection?

23    **A.**    Yes.  I -- I would find it highly unusual that they would

24    not have mentioned that to me when I spoke with them about

25    that.

**TRUITT - CROSS / KEKER**

1    Q.   Did you have discussions with Mr. Egan towards the end of

2    that quarter in late March?

3    A.   Yes.

4    Q.   Would you look at 5605, which I'll represent to you are

5    your phone records during this period.

6         Move them in, Your Honor.

7              **THE COURT:**  5605 admitted.

8         (Trial Exhibit 5605 received in evidence)

9              **MR. KEKER:**  And we have a demonstrative, 5742, which I

10   would like to present to the jury for demonstrative purposes

11   rather than looking at those tiny little phone records.

12             **THE COURT:**  Admitted for those purposes.

13        (Trial Exhibit 5742 - Demonstrative received in

14         evidence)

15             **MR. KEKER:**  Could we put up the demonstrative.

16   Q.   Let's start back on the 29th of March.

17        You and Mr. Egan talked for 13 minutes that day.  Do you

18   know what you talked about?

19   A.   That would have been about Citi and PMI.

20   Q.   The Citi and PMI deals were closing with Discover Tech in

21   that same quarter?

22   A.   Yes, sir.

23   Q.   And then you talked to him again on the 30th for 18

24   minutes?

25   A.   Yes.

**TRUITT - CROSS / KEKER**

1  Q.   And then you talked to Mr. Cronin for 10 minutes and then

2  eventually Mr. Egan down at the bottom for 16 minutes?

3  A.   Yes.

4  Q.   During any of those calls, did you talk about the Vatican?

5  A.   No.

6  Q.   Are you sure?

7  A.   Yes.  The first I'd heard of it was the 1st.

8  Q.   On the 31st, were you in -- let's go to the next page.

9  Were you in West Palm Beach on the 31st?

10 A.   I believe that I was.

11 Q.   Okay.  Did you have calls from Mr. Cronin in the morning?

12 A.   It appears that I did.

13 Q.   And did you talk to Mr. Egan on the 31st?

14 A.   Yes.

15 Q.   What did you talk to him about?

16 A.   PMI and Citi.

17 Q.   Did you call your brother on the 31st?

18 A.   It looks like I either called him or tried to call him for

19 one minute.

20 Q.   Did you get -- did you ever get through to him?

21 A.   I -- it doesn't look like -- I don't know what one minute

22 means, whether that was a call that got through or not.

23 Q.   Okay.  Why did you want to talk to your brother on the

24 31st?

25 A.   It's possible that -- it's possible that Mr. Egan was

1  wondering whether MicroTech would be interested in hearing

2  about deals, but I don't know.

3  **Q.**   Like the Vatican deal?

4  **A.**   Well, he hadn't talked to me about the Vatican yet, so I

5  don't think it would have been about that specifically.

6  **Q.**   So then the next page, you talked to Mr. Egan again for 9

7  minutes at 5:20?

8  **A.**   Yes.

9  **Q.**   And then again at the end of the -- at 1:03 p.m., 9

10  minutes with Mr. Egan?

11  **A.**   Correct.

12  **Q.**   None of those calls were about the Vatican?

13  **A.**   No, sir.

14  **Q.**   Was Mr. Egan working with your brother and John Cronin on

15  the Vatican during those days?

16  **A.**   If he was, he didn't indicate it to me.

17  **Q.**   He called you on April 1st and said, "I want you to bring

18  something to the attention of MicroTech"?

19  **A.**   Yes.

20  **Q.**   And what were you and Mr. Cronin talking about all those

21  times?

22  **A.**   We were probably talking about Citibank and PMI.  They

23  were big deals and they required lots of paperwork and drafts

24  and, you know, what we had to do to get those orders in on

25  time.

**TRUITT - CROSS / KEKER**

1  **Q.**   Did you learn from your brother that MicroTech got a

2  letter from the Air Force questioning their participation in

3  the Vatican deal?

4  **A.**   I was aware of that.

5  **Q.**   And you're a 32 percent owner of MicroTech; right?

6  **A.**   Yes.

7  **Q.**   Did you look at the letter that the lawyers sent on behalf

8  of MicroTech?

9  **A.**   I did.

10  **Q.**   Okay.  Would you look at 5740.

11       **THE COURT:**  Admitted.

12  **BY MR. KEKER:**

13  **Q.**   Why don't you get that in front of you rather than rely on

14  the screen.  5740 in Volume 3.

15  **A.**   Okay.

16  **Q.**   And you didn't want your company to submit an inaccurate

17  letter to the Air Force, did you?

18  **A.**   Well, I had nothing to do with the response to this.  I

19  read this response after it had been submitted.

20  **Q.**   Okay.  And when you read it, did you notice -- look over

21  on page 5, which is part of the description of the Vatican

22  Library transaction.

23  **A.**   Yes.

24  **Q.**   And do you see that the lawyer for MicroTech represented

25  to the Air Force that Steve Truitt approved MicroTech's

1   software purchase from Autonomy for 11.55 million on

2   March 31st, 2010?

3   **A.**   Yes.

4           **MR. LEACH:**  Your Honor, that is not what Exhibit 5740

5   says.

6           **THE COURT:**  One moment, please.

7       That's a question for redirect, isn't it?

8           **MR. LEACH:**  Your Honor, my 5740 is a letter from the

9   Air Force to Mike Lynch, Sushovan Hussain, Steve Chamberlain,

10  Andy Kanter.

11          **MR. KEKER:**  A mistake has been made in the binders,

12  Your Honor.  I'm looking at --

13          **THE COURT:**  You're looking at a letter from MicroTech

14  to the Air Force?  That's not 5740.

15          **MR. KEKER:**  I'm looking at a letter from Jeffrey

16  Newman, Timothy Sullivan, Scott Lane, counsel for

17  MicroTechnologies, to Rodney Grandin, and I guess we're just

18  going to have to get this straightened out with another --

19          **THE COURT:**  Exhibit.  Okay.

20      So I'm going to strike it unless it's already in.  My

21  recollection that something like this is already in, 5740.

22          **MR. KEKER:**  But apparently I'm looking at a document I

23  thought was 5740, and we put the wrong one in the binders,

24  apparently.  And so I would like to use the one that I thought

25  was 5740 and mark it 5740.

 1          THE COURT:  Well, something else is marked 5740.  I

 2  think something else is marked 5740.  A letter -- at any rate,

 3  in order to continue this, just show it to him, and we'll

 4  straighten out the number later.  Okay?

 5          THE WITNESS:  I remember the response.  I mean, I know

 6  what you're asking about, if that helps.

 7          THE COURT:  Well, it may or may not.

 8          MR. KEKER:  It does help.

 9          THE COURT:  Why don't you look at the letter that

10  Mr. Keker has, and then he'll ask you a question about it.

11  BY MR. KEKER:

12  Q.   Is this the letter from MicroTech's lawyers to the

13  Air Force?

14  A.   Yes, sir.

15          THE COURT:  What is the date of the letter?

16          THE WITNESS:  November 6, 2013.

17          THE COURT:  November?

18          THE WITNESS:  November.

19          MR. KEKER:  6, 2013.

20          THE COURT:  The document on your exhibit list is

21  September 6.

22          MR. KEKER:  That's a mistake and it --

23          THE COURT:  It will be remedied.

24          MR. KEKER:  It will be rectified.

25       This is the document that I asked him about, which is the

 1 | letter to the Air Force, and I think what we put in is the

 2 | letter from the Air Force, which was a mistake.

 3 |          **MR. LEACH:**  Your Honor, is there an extra copy, just

 4 | so I can read along?

 5 |          **MR. KEKER:**  I don't have an extra copy, but I'm happy

 6 | to share this one.

 7 |          **THE WITNESS:**  I'm looking at the paragraph that you

 8 | were referencing where it says that Steve Truitt approved

 9 | MicroTech software purchase on March 31st, 2010.

10 | **BY MR. KEKER:**

11 | **Q.**   Look at the next page, too, where it says it again.

12 | **A.**   Yes.  Okay.

13 | **Q.**   Did you correct that when you saw it?

14 | **A.**   No.

15 | **Q.**   Different subject.

16 |     And that is the Q4, fourth quarter, 2010, Bank of America

17 | purchase that you testified about before; right?

18 | **A.**   Right.

19 | **Q.**   And one thing you testified about was a 7.35 or $7 million

20 | purchase with Discover Tech as the reseller with the end user

21 | the Bank of America that Egan brought you?

22 | **A.**   Yes.

23 | **Q.**   And you agreed to do it?

24 | **A.**   Yes.

25 | **Q.**   And you were -- and Discover Tech was at risk?

1    **A.**    Yes, sir.

2    **Q.**    What does "at risk" mean?  Explain that to the jury.

3    **A.**    It means if the deal doesn't happen, we still have to pay

4    for the software that we've agreed to purchase.

5    **Q.**    Okay.  You have agreed to purchase and own some software,

6    whether or not it sells on to the end user?

7    **A.**    Yes, sir.

8    **Q.**    And "at risk" means you can get stuck with it and you

9    still have the debt?

10    **A.**    Yes.

11    **Q.**    And that's the basis on which you made this agreement with

12    Mr. Egan and Autonomy?

13    **A.**    Correct.

14    **Q.**    And Mr. Hyson confirmed that debt?

15    **A.**    Yes.

16    **Q.**    On your behalf?

17          Let's look at 14 -- I want to put in 1438.  1438 is a memo

18    from Malcolm Hyson to Steve Chamberlain returning the --

19    **A.**    What volume are we in?

20    **Q.**    Volume 1.

21          **THE COURT:**  1438 made.

22          (Trial Exhibit 1438 received in evidence)

23    **BY MR. KEKER:**

24    **Q.**    Can we put up the date.

25          This is Mr. Hyson, January 12th, 2011.  Now the $7 million

1    sale was at the end of 2010.  And this is Mr. Hyson saying here

2    is the signed scanned image and it's the Autonomy debtor

3    confirmation request that relates to this $7 million, doesn't

4    it?

5    **A.**    Yes.

6    **Q.**    And then on January 25th, 2011, you got an email from

7    Mr. Egan, which the jury saw this morning as Exhibit 1188.  Can

8    we get that back.

9              **MR. LEACH:**  I think it's 1488, Your Honor.

10             **MR. KEKER:**  I beg your pardon, 1488.

11   **Q.**    And this is -- refers to a one-off reseller agreement to

12   be signed by Discover Tech, and Mr. Egan is writing you saying,

13   "I'll call you this afternoon around 4:00 p.m.  It will be

14   important that this be signed as is with no additions or

15   modifications late today and scanned and emailed back."

16        What did you understand he was saying to you?

17   **A.**    Simply that the agreement was going to need to be agreed

18   to as is, meaning we weren't going to negotiate anything, we

19   weren't going to do anything to it, other than -- other than

20   scan it or sign it and send it back.

21   **Q.**    Well, he didn't say "sign it and send it back."  He said

22   "scan it and send it back."  What did you understand he was

23   saying there?

24   **A.**    Well, I understood that to mean that we would sign it and

25   send it back.

1  **Q.**   Okay.  And then it says, "This covers the excess amount of

2  the order."  What does that refer to?

3  **A.**   He said that the size of the deal was increasing and

4  that -- and that -- so it went from that 25,000 users up to

5  unlimited users and that it had grown and they wanted to add --

6  yeah.  They wanted to add this order to the original order.

7  **Q.**   Did he say that he had made a mistake and he needed to fix

8  it?

9  **A.**   I'm sorry.  To fix -- to fix what?

10  **Q.**   To fix the size of the order.  It should have been

11  10,375,000 instead of 7,375,000.

12  **A.**   No.  I don't recall him saying that there was a mistake.

13  **Q.**   But he said he needed to fix the order -- he needed to

14  cover the excess amount?

15  **A.**   Yes.

16  **Q.**   What is the excess amount?

17  **A.**   The difference between 7 million and the additional

18  3.6 million.

19  **Q.**   Was that an amount that should have been in the original

20  order?  Is that what he said to you?

21  **A.**   No.  He -- I don't recall Mr. Egan saying that to me.

22  **Q.**   You had this -- this order signed by Mr. Hyson.  Let's

23  look at 1485, which is in evidence.  Next page.  Let's go to

24  the signature page of 1485.

25      This is the one Mr. Hyson signed and dated it January

1    25th; right?

2    **A.**    Yes.

3    **Q.**    Let's look at 1500, which is in evidence,

4    one-five-zero-zero.  And the second page -- the third page is

5    Mr. Hyson's signature, again January 25th.

6        Go back to the first page, please.  First page of the

7    exhibit.  Yeah.

8        And that is a memo that you sent to Stouffer Egan on the

9    next day, January 26th; right?

10   **A.**    Yes.

11   **Q.**    And then somebody called you and said, "No, you've got to

12   modify the date"?

13   **A.**    Yes.

14   **Q.**    Who called?

15   **A.**    I believe that was Mr. Egan.

16   **Q.**    And did he tell you why you had to modify the date?

17   **A.**    Because it was going to be part -- it was supposed to be

18   part of that first -- it was an add-on to the first deal that

19   we did, and as part of that first order.

20   **Q.**    You started to say, "It was supposed to be part of that

21   first deal that we did"; right?

22   **A.**    What he said was the deal is growing and that this

23   3.6 million is the amount that it's growing and that it should

24   be -- yes.  It should be viewed as part of the original deal.

25   **Q.**    Do you remember Mr. Egan's exact words, Mr. Truitt?

1    **A.**    No, sir.

2    **Q.**    Okay.  Where do you get the words that you just used?

3    **A.**    That's just me trying to explain what I heard, what was

4    going on.  I'm using my own words.

5    **Q.**    And what Mr. Egan had said was, "This was supposed to be

6    part of the original deal that we made with you for the Bank of

7    America" -- it was supposed to be 10.675?

8    **A.**    Well, the original 7 million included 25,000 licenses, so

9    if the original deal was supposed to be unlimited, I could see

10   that that would be a reason to have it be 10-point-some-odd

11   million.  But what it looked like to me was that the deal size

12   was growing and it changed the terms of the -- of the deal.

13   **Q.**    Did you tell Mr. Hyson to sign the documents with the

14   earlier date?

15   **A.**    Yes.

16   **Q.**    Okay.  And did he?

17   **A.**    Eventually.  He made the --

18   **Q.**    Why did you have Mr. Hyson do it and not you?

19   **A.**    He signed all of those routinely.  That was his role.

20   **Q.**    Let's look at your phone records, 5885.

21          Your Honor, I'd move in, phone records for this period.

22             **THE COURT:**  Admitted.

23          (Trial Exhibit 5885 received in evidence)

24   **BY MR. KEKER:**

25   **Q.**    Let's look at the relevant -- and then we have a

1    demonstrative, which is 5744, to show the jury.

2            THE COURT:  Admitted.

3        (Trial Exhibit 5744 - Demonstrative received in

4         evidence)

5    BY MR. KEKER:

6    Q.   Can --

7            THE COURT:  5744 or 43?

8            MR. KEKER:  I have 44 in my notes, but I've been

9    wrong.   5744.

10            THE COURT:  Okay.  Admitted for demonstrative.  And

11    the records were what number?

12            MR. KEKER:  The records are 5885.

13            THE COURT:  Admitted.

14    BY MR. KEKER:

15    Q.   So let's look on the 25th.

16        You had some calls with Mr. Scott, and then we remember

17    that email that says "call me at 4:00" or "call me after 4:00."

18        You tried to call Mr. Egan and he called you back and you

19    talked for 19 minutes?

20    A.   Yes, sir.

21    Q.   And that's when he explained what the problem was with the

22    original deal; right?

23    A.   Yes.

24    Q.   Okay.  And then the next day, starting in the morning, you

25    had calls with Mr. Scott.  He called -- you called him; he

1  called you back.  You had calls from Mr. Egan a couple of

2  times.  And this is when you were trying to get all of this

3  straightened out; right?

4  **A.**   Correct.

5  **Q.**   And then you also had, on the 26th, a lot of text

6  messaging with Mr. Scott and Mr. Egan; right?

7  **A.**   Yes.

8  **Q.**   And your records don't show how long the text messages are

9  or how much -- how much there was in them; right?

10  **A.**   No.

11  **Q.**   It just shows text messaging and the times.

12       And then look at the next page.

13       What was all that about, this text messaging between Scott

14  and you and Egan and back and forth, back and forth, back and

15  forth?

16  **A.**   I think they were just looking to get the paperwork

17  correct and back to them.

18  **Q.**   And the correct paperwork was -- well, I guess -- let's

19  finish.  More text messaging that day.

20       Next page.

21       And the correct paperwork was the deal signed as of

22  December 31 that you sent to Mr. Hyson; right?

23  **A.**   Yes.

24  **Q.**   Now, you've told us that you were concerned about

25  backdating and all that business.  Were you concerned about

1   this?

2   **A.**   I honestly wasn't.

3   **Q.**   Would you look at 5626.

4        **THE COURT:**   Admitted.

5        (Trial Exhibit 5626 received in evidence)

6   **BY MR. KEKER:**

7   **Q.**   And can we see the next page.   And this is the same deal,

8   the signature page.

9        And this is Mr. Hyson signing that the deal happened on --

10  signing it December 31, 2010.

11       Did you direct him to do that?

12  **A.**   Yes.

13  **Q.**   And why did you direct him to do that?

14  **A.**   Because I was asked to do that.

15  **Q.**   By whom?

16  **A.**   By Mr. Egan.

17  **Q.**   And did Mr. Egan explain to you what problem of his he was

18  going to solve by you having Mr. Hyson do that?

19  **A.**   It was -- it was explained in such a way that it -- it was

20  simply adding to the original deal.   I believe that he said

21  something along the lines of, you know, the maintenance for the

22  order would have -- would, you know -- would have been off if

23  we had two -- if we had two dates, so having it all on

24  December 31st made sense.

25       But, again, it was so late, it was, you know, late

1    January.  I did not -- I just -- it didn't occur to me that

2    this could be a -- you know, we're trying to squeeze it in the

3    later quarter scenario.  Never crossed my mind.

4        So we gave them the paperwork the way they wanted it

5    filled out.

6    **Q.**   Okay.  I'm looking for one exhibit.  Excuse me.  I'm not

7    finding it.

8        Anyway, you sent off the document to Mr. Scott after all

9    that communication with him dated December 31?

10   **A.**   Yes.

11   **Q.**   You never talked to Mr. Hussain about any of this, did

12   you?

13   **A.**   No.

14   **Q.**   Let's talk about one more deal, and that is this Prisa

15   deal.

16       In late March of 2011, you were no longer employed by

17   MicroLink?

18   **A.**   Correct.

19   **Q.**   And you no longer were an Autonomy employee?

20   **A.**   Yes.

21   **Q.**   On April -- on -- and this is one in which your memory has

22   gotten better with the passage of time; right?

23   **A.**   I'm not sure what you mean.

24   **Q.**   Well, what I mean is when you met with Mr. Leach back in

25   October of 2014, four years ago, you said that Autonomy

1    approached you within the last days of the quarter and it could

2    have been the last day.  Do you remember that?

3    **A.**    Yeah.

4    **Q.**    And you said that ThinkTech was -- they had some deals,

5    slate of deals?

6    **A.**    Yes.

7    **Q.**    And they said that ThinkTech was -- and this was Egan;

8    right?

9    **A.**    Yes.

10   **Q.**    ThinkTech was an existing customer, FINRA was a near term

11   thing, and your best recollection was that they talked about

12   Prisa and agreed they would do it, but you were not a hundred

13   percent certain of that.  That's what you told him the first

14   time you talked to him about this?

15   **A.**    Yeah.  I couldn't say one hundred percent that we did not

16   discuss Prisa in a slate of deals.  I just know that we didn't

17   paper the deal until Monday.

18   **Q.**    Okay.  And you understand or understood by this point that

19   under the IFRS, the English accounting rules, if you agree to

20   the deal and it's a real deal, then it's okay to paper it

21   later?

22            **MR. LEACH:**  Objection.  Foundation.

23            **THE COURT:**  Sustained.

24            **THE WITNESS:**  I had no knowledge of that --

25            **THE COURT:**  Wait.  Sustained.

1          THE WITNESS:  That was one of the things that I was --

2          MR. LEACH:  Your Honor --

3          THE WITNESS:  I was -- sorry.

4    BY MR. KEKER:

5    Q.   The objection was sustained.

6          Let me ask you this:  Did you understand that under these

7    English accounting rules, the international accounting rules,

8    that if you made a deal and you papered it the next day or the

9    day after, whatever, as long as you made the deal timely, it

10   could be -- that's when it happened?

11   A.   No.  I -- I was not under that understanding at that time,

12   which is why I was concerned.

13   Q.   All right.

14         Prior to April 4 -- you were asked in the grand jury,

15   prior to April 4, had you heard of Prisa, and you said you

16   weren't sure; right?

17   A.   Yes.

18   Q.   And so let me ask you now, was Prisa part of the slate of

19   deals discussed at the end of the quarter, along with

20   ThinkTech, FINRA, so on?

21   A.   It could have been, I do not -- I can't say for certainty

22   one way or the other.

23   Q.   And did you agree to act as a reseller for Prisa at the

24   same time you agreed to FINRA and ThinkTech?

25   A.   They -- we talked about a slate of deals, the deals that

1    they asked me to act upon and send paperwork for that day where

2    ThinkTech and -- I'm sorry -- FINRA and ThinkTech.

3        Had they asked me to do -- to send them paperwork on

4    Prisa, there's a good chance I would have sent it.  I just

5    don't think that they had asked at that point for that

6    paperwork.

7    **Q.**    Did you tell the grand jury --

8            **THE COURT:**  Would you cite to the page and line?

9            **MR. KEKER:**  61.

10           **THE COURT:**  Line?

11           **MR. KEKER:**  6 through 14.

12           **THE COURT:**  Let the Government read it.

13           **MR. LEACH:**  I don't think it's inconsistent.

14           **THE COURT:**  Pardon?

15           **MR. LEACH:**  I don't think it's inconsistent.

16           **THE COURT:**  Okay.  Now I have to look at it.  Does

17   somebody want -- Mr. Keker, if you want to ask him the

18   question, you have to hand it up to me.

19           **MR. KEKER:**  I'm sorry, Your Honor.  It's exhibit --

20           **THE COURT:**  Oh, it is an exhibit?

21           **MR. KEKER:**  5199.

22           **THE COURT:**  All right.  Sorry.  Again, page?

23           **MR. KEKER:**  5199, page 61, Your Honor.

24           **THE COURT:**  Hold on.

25           **MR. KEKER:**  I'm asking whether or not --

1          **THE COURT:**  And lines --

2          **MR. KEKER:**  Lines 6 -- the question starts at 6, but

3     what I'm looking at is 10 through 14 is the answer.

4          **THE COURT:**  Okay.  Okay.  Let me read it.

5       I'm not going to allow you to ask it?

6          **MR. KEKER:**  Pardon?

7          **THE COURT:**  I'm sustaining the objection.  I don't

8     think it's inconsistent with his testimony.  If you want to

9     argue that, we can do it later.  Okay.

10    **BY MR. KEKER:**

11    **Q.**   Can you say one way or the other whether or not you agreed

12    to the Prisa deal before April 1st; in other words, in the

13    quarter?  Can you say one way or the other?

14    **A.**   Not a hundred percent.

15    **Q.**   How about 50 percent?

16    **A.**   I -- I can tell you when I agreed to send him the

17    paperwork, which is the request I got on Monday.  On Friday, it

18    very well could have been in a slate of deals that we talked

19    about.  I cannot say for sure.

20    **Q.**   Okay.  And so on Friday is the day that you were talking

21    about the slate of the deals and that was the last day of the

22    quarter, was it --

23    **A.**   Yes.

24    **Q.**   Or Thursday?

25    **A.**   Yes.

1    Q.    And then on -- after the weekend on Monday, Mr. Egan sent

2    you paperwork and asked you to date it correctly March 31?

3    A.    Yes.

4    Q.    Okay.  Who prepared that purchase order?

5         THE COURT:  What year is this?

6         MR. KEKER:  2011.

7         THE WITNESS:  Are you talking about the one-off

8    agreement?

9    BY MR. KEKER:

10    Q.    The Prisa agreement.  The Prisa purchase order.

11    A.    Someone -- someone at Autonomy, Mr. Scott, perhaps.

12    Mr. Egan.  I'm not sure.

13    Q.    Okay.  This is the one that your IM chat, Instant

14    Messaging chat, with Mr. Hyson is about?

15    A.    Yes, sir.

16    Q.    Let's look again at 1725, which is in the Government's

17    binder, I think.  1725 is in evidence so we can just put it up.

18         And this says, "Autonomy wants me to pdf an order.  Said

19    that it will not change the date on the document if it's a

20    pdf."

21         And you're asking Mr. Hyson about that in an Instant

22    Messaging that looks like it happened on -- that you put into

23    an email on April 4th; right?

24    A.    Yes.

25    Q.    Did Mr. Egan explain to you why he wanted this pdf so that

1    it won't change the date?

2    **A.**    I don't recall an explanation for that.  Just that he

3    wanted to protect the date so that it would show the end of the

4    quarter, 31st.

5    **Q.**    He wanted it to show the end of the quarter?

6    **A.**    Yes, sir.

7    **Q.**    Did he say that he wanted it to show the end of the

8    quarter because that's when you made the deal?

9    **A.**    I don't recall exactly what was said, but he certainly

10   wanted to include it with the rest of the deals for that

11   quarter.

12   **Q.**    And Mr. Hyson -- look at 5592.  If it's not in evidence.

13       I would move it in.  It's Hyson to Stouffer Egan.

14           **THE COURT:**    5592 admitted.

15       (Trial Exhibit 5592 received in evidence)

16           **MR. KEKER:**    Can we put up the first page.

17   **Q.**    This is on April 4th.  Mr. Hyson is sending to Stouffer

18   Egan a signed copy of the Prisa VAR agreement, and turn over

19   the page and let's look at the signature page.  And Mr. Hyson

20   has signed it March 31, 2011.

21       Did you tell him to do that?

22   **A.**    Yes, sir.

23   **Q.**    Can we go back to the first page.  And he's emailing to

24   stouffere@comcast.net.  What is that?

25   **A.**    I believe that was Stouffer Egan's personal email account.

1   Q.   He had an Autonomy email account that we've seen in a lot

2   of these emails; right?

3   A.   Yes.

4   Q.   But he's asking that this be sent to his personal email

5   account?

6   A.   Yes.

7   Q.   Did he explain to you why he wanted that to happen?

8   A.   I don't know that he explained it, but to me that was

9   another -- it was another difference from the way we would

10  normally conduct business.

11       So he wanted it sent to his personal account, and that's

12  what we did.

13  Q.   Okay.  So what we've got is the Prisa discussions that you

14  don't really remember when they started, you don't really

15  remember when the deal was made -- was agreed to, but you do

16  know that Egan is telling you "I need this paperwork done as of

17  March 31"?

18  A.   Yes.

19          MR. LEACH:   Objection.  Compound, argumentative.

20  Misstates the testimony.

21          THE COURT:   Overruled.

22  BY MR. KEKER:

23  Q.   And he's asking you to scan it so that it doesn't have a

24  date on it.  That's the back and forth with Hyson; right?

25  A.   Yes.

1   Q.   And then he's asking you to send it to his private email

2   account?

3   A.   Yes.

4   Q.   And did he tell you why he wanted all that trouble to

5   go -- to be gone to?

6   A.   I don't recall him saying it specifically, send it -- why

7   he wanted me to send it there.

8   Q.   Okay.  Now, after this, you were very interested in

9   selling your software to Autonomy; right?

10  A.   Sure.

11  Q.   Let's look at 1769.  That's in evidence.  And this is the

12  email that the jury saw earlier about "today's meeting" and

13  it's to Sushovan Hussain and Stouffer Egan.

14       And you're saying, "I wanted to thank you both for taking

15  the time to meet with me today regarding expanding our

16  partnership.  Discover Technologies' software solutions will

17  augment Autonomy's industry leading technology and give our

18  joint customers increasing value.  I look forward to working

19  with you in the coming weeks to structure a distribution

20  agreement and continuing to build our partnership in the years

21  to come."

22       What distribution agreement are you talking about?

23  A.   For our DiscoverEngine product that we ultimately did sign

24  a few months later.

25  Q.   So you have a product -- it used to be DiscoverPoint and

1  now it's evolved through framework and now it's DiscoverEngine;

2  is that right?

3  **A.**    Not exactly.  It's a separate product.

4       DiscoverPoint is more of a front-end interface.  This

5  Engine product is all server, back end.  There is no front-end

6  user interface.  It's a different -- completely different

7  product that does a completely different thing.

8  **Q.**    You heard that Mr. Hussain was in town and you wanted to

9  try to get him interested in buying it; right?

10  **A.**    Sure.

11  **Q.**    So one of the reasons for -- at least one of the reasons

12  for this meeting was to set up a -- basically a sales meeting

13  where you could pitch Mr. Hussain on this distribution idea?

14  **A.**    Yes.

15  **Q.**    Okay.  And you asked Mr. Egan to set up a meeting with

16  Mr. Hussain so you could pitch him on this distribution idea?

17  **A.**    Yes.

18  **Q.**    And your testimony is that you walked into the meeting and

19  you started bracing Mr. Sushovan Hussain about -- about

20  backdating?

21  **A.**    Yes.

22  **Q.**    You were very upset about this, but you weren't upset

23  about the Vatican, which you told us was backdated or the -- or

24  the thing that had happened with Hyson back in January, but now

25  you're upset?

TRUITT - CROSS / KEKER

1   A.    Yes.

2   Q.    And you're upset enough so that you're going to use this

3   sales meeting to tell Mr. Hussain that you're upset?

4   A.    Well, the -- the meeting had two purposes, the first of

5   which I was very clear to Mr. Scott and Mr. Egan that I really

6   wanted to have that discussion with Mr. Hussain.

7   Q.    This is --

8   A.    And, yes, while I have his ear, yeah, I'm going to try to

9   sell him our software, which I think he is going to be

10  interested in.

11  Q.    Why didn't you say in this email about "today's meeting,"

12  "Thank you for your reassurance about the accounting issues,

13  and, by the way, I want to have a great partnership"?  Why

14  didn't you put in both, if that actually had happened?

15  A.    I was reassured at that point and I didn't see the point

16  of -- of continuing down that path.

17  Q.    Had you ever met Mr. Hussain before?

18  A.    Before April 2011, yes.

19  Q.    Okay.  How many times?

20  A.    Oh, I don't know.  Half a dozen, maybe.

21  Q.    Did you talk to Mr. Egan since this investigation began

22  about this meeting?

23  A.    I haven't had any discussions with Mr. Egan.

24  Q.    Have your lawyers had discussions with his lawyers, if you

25  know?

**TRUITT - CROSS / KEKER**

1    **A.**   My lawyers have had discussions with his lawyers, and are

2    you asking specific to this meeting?

3    **Q.**   No -- well, do you know if they've specifically talked

4    about meeting?

5    **A.**   I -- I can't be a hundred percent sure, but I think it's

6    likely.

7    **Q.**   Okay.  And you know that the lawyers are communicating to

8    each other "this is what Dave remembers," "what does Stouffer

9    say," that kind of thing?

10   **A.**   Yeah.

11            **MR. LEACH:**  Objection.  Foundation.

12   **BY MR. KEKER:**

13   **Q.**   All right.  Thank you.

14       Let me ask some questions about the MicroLink acquisition.

15   Just so that -- to make sure the jury understands, MicroLink,

16   as far as you were concerned, was a very successful company,

17   wasn't it, at the time it was acquired?

18   **A.**   Yes, sir.

19   **Q.**   And it had customers in the federal government, including

20   NASA, the Air Force, Army, State Department, Secret Service,

21   the TSA folks that brace us all at the airport, the Federal

22   Reserve, Joint Forces Command, Department of the Energy, and

23   the Navy; right?

24   **A.**   Yes.

25   **Q.**   And commercial customers, including GlaxoSmithKline,

1  Lockheed Martin, Medtronic, Linklaters, and I'm sure others?

2  **A.**    Yes, sir.

3  **Q.**    Okay.  Now, you said that at some point in 2009, Mr. Egan

4  approached you about Autonomy buying MicroLink?

5  **A.**    Yes.

6  **Q.**    No one at Autonomy ever mentioned MicroLink's debt to

7  Autonomy as the reason that they wanted to buy the company, did

8  they?

9  **A.**    No.

10  **Q.**    What happened was that Mr. Hussain and Mr. Egan met with

11  you and Mr. Rizek, and somebody said to Mr. Hussain and

12  Mr. Egan, "We understand Autonomy -- Autonomy's subsidiary has

13  lost its security clearance"?

14  **A.**    That was part of our conversation, yes.

15  **Q.**    Who said that to them?

16  **A.**    I'm sorry?  Who said that to whom?

17  **Q.**    Who said to Egan and Hussain, "I understand Autonomy has

18  lost its security clearance"?

19  **A.**    It came up in the meeting that Mr. Rizek and I had with

20  Mr. Hussain.  I don't recall who brought it up or who knew

21  what.

22  **Q.**    Was Mr. Hussain surprised that you knew that?

23  **A.**    I remember having a discussion with him about it and I

24  remember him being excited about the fact that we had one and

25  could help solve that problem.  I don't remember, again,

1    exactly how it -- how the --

2    **Q.**    Tell the --

3    **A.**    Whether he was surprised or not.

4    **Q.**    Tell the jury what you remember about the conversation

5    about what Mr. Hussain saw as a problem for Autonomy that you

6    could help solve.

7    **A.**    They had a company -- they had acquired a company called

8    Verity.  Verity had a top secret facility clearance at one

9    time.

10        When Autonomy took over that company, eventually they lost

11   it.  My understanding was it was mismanaged.  It was -- the

12   government watches very carefully, and, you know, for whatever

13   reason -- I don't know the exact details -- they -- they took

14   that away from them, which impacted Autonomy's ability to

15   interface and do services work for these intel and DOD

16   customers.

17   **Q.**    Or to sell software to them?

18   **A.**    Or to sell software to them.

19   **Q.**    So Autonomy, an English company, needed access to these

20   highly-cleared federal customers, and they had just lost their

21   access; right?

22   **A.**    Yes.

23   **Q.**    MicroLink had that access?

24   **A.**    Correct.

25   **Q.**    Mr. Hussain was very excited about the possibility of

1    getting that access back by acquiring MicroLink?

2    **A.**    Yes.

3    **Q.**    And the way they got the access back, you've already

4    described, was they had to put a fence around MicroLink, and

5    MicroLink had its own little board of directors of generals?

6    **A.**    Yes.

7    **Q.**    And the communications were very limited between the two

8    companies, but at least they had access to the federal sales?

9    **A.**    And it was the communication and the firewall issue, as I

10    recall, that was really what kind of did them in.  They didn't

11    adhere to that strictly enough the first go-around.

12    **Q.**    Okay.  And this is a huge market.  The selling this kind

13    of software for unstructured data into the federal intelligence

14    agencies is an enormous market, isn't it?

15    **A.**    Yes, sir.

16    **Q.**    They are gathering phone calls and photographs and video

17    and trying to make sense of it; right?

18    **A.**    Yes.

19    **Q.**    Look at 312, please, sir.

20    **A.**    Are we going to put it up?  Which volume?

21    **Q.**    It's from -- the middle one is from David Truitt, Sushovan

22    Hussain and Stouffer Egan.

23            **THE COURT:**    Admitted.

24        (Trial Exhibit 312 received in evidence)

25    \\\

BY MR. KEKER:

Q.    And at the bottom, your email dated November 2, 2009 --
which is about two months before the acquisition; right?

A.    Yes.

Q.    (Continuing) -- says, "Hi, Sushovan, you had asked me to
put together a few thoughts on how to deal with the potential
issues related to the proposed transaction.  Issues identified
included current cleared contracts, novation issue," and the
jury can read the rest of it.

      Let's start with that one.  What does that mean, "current
cleared contracts, novation issue"?

A.    When companies are acquired, sometimes the contracts that
you own or you're working on have to be novated over to the
acquiring company by the contracting officer within the agency
that you're working with.

      So that -- sometimes they will novate it over to the new
buyer and sometimes they won't.

Q.    So the concern was that an acquisition could lead to the
loss of a lot of MicroLink's contracts?

A.    Yes.  Especially if you weren't going to be handling it
the way we ended up handling it in terms of the firewall and
security clearances and so forth.

Q.    And the next concern -- the next issue was facility
security clearance.  What was that about?

A.    Well, again, we're just having early discussions, so the

**TRUITT - CROSS / KEKER**

1  question is, you know, are we going to be the facility security

2  clearance for Autonomy or are they going to try to go after

3  that as a company in some other manner?  You know, we were

4  still trying to figure out how to organize.

5  **Q.**  On the next page, the type changes.  Do you see at the

6  top, the same type, "The purchase of MicroLink in its entirety.

7  I had discussion today with attorneys who specialize" and then

8  there is some bigger type.

9      What's going on there in that email?  Is somebody

10  answering these questions?

11  **A.**  It looks like, again, we were -- we were trying to

12  determine whether MicroLink would just become part of Autonomy

13  or whether we needed to keep it as a subsidiary and if so,

14  keeping it separate like that could, you know -- could be an

15  advantage to deal with some of these security-related issues.

16  **Q.**  And can we highlight No. 4, the first sentence.

17      "In listening to you and Stouffer in our discussion on

18  Friday, it became evident that you were looking for a fresh

19  solutions-based approach to the federal space."

20      What does that mean?

21  **A.**  Is this the -- what -- which meeting are we -- are we

22  referencing here?  Was it just --

23  **Q.**  Well, if you --

24  **A.**  It was --

25  **Q.**  Look in your book.  You can look at the whole thing.  312

1    in Volume 1.  You don't have to look on the screen.  You can

2    look at the hard copy.

3        You tell me.

4    A.    312?

5    Q.    Yes.

6        **THE COURT:**  What is the date of the document?

7        **MR. KEKER:**  The date of document, Your Honor, is

8    November 9 -- well, the one we're talking about is November 2,

9    2009.

10        **THE COURT:**  November 2, 2009.

11        **MR. KEKER:**  That's the middle email.  The top email is

12    also November 2, 2009.

13        **THE WITNESS:**  All right.

14        So the meeting that is being referenced was the meeting

15    that me and Mr. Rizek had with Mr. Egan and Mr. Hussain.

16        And could you repeat your question, please?

17    **BY MR. KEKER:**

18    Q.    My question is what does that first sentence mean?  It

19    became evident that you were looking for fresh solutions-based

20    approach to the federal space.

21    A.    So I believe that would just mean more of a full-blown

22    solutions approach so that we could leverage other -- other

23    platforms like Microsoft who was a big partner of -- of

24    MicroLinks at the time.

25        So rather than just going in and trying to sell IDOL by

1    itself, let's blend IDOL into SharePoint or other technologies

2    and take a solutions-based approach to that -- to the intel

3    community, to the DOD.

4        So a different approach than their current approach to

5    sales.

6    **Q.**    If we could go back to the first page of this exhibit and

7    the top email.  This is from Mr. Hussain to Mr. Egan, and in

8    the second paragraph, he's talking about valuation, but he's

9    also saying, "and a cleared facility is very strategic for us."

10       You knew that that's what he thought, didn't you?

11   **A.**    Yes.

12   **Q.**    Now, at the time of the acquisition, Autonomy was owed

13   money by MicroLink; correct?

14   **A.**    Yes.

15   **Q.**    Do you know how much they were owed?

16   **A.**    I think we saw yesterday, it was around 22 million,

17   somewhere in that range.

18   **Q.**    Do you know how much of that was not yet due under the

19   terms of the agreements?

20   **A.**    I don't know all of it, but I do know that the largest

21   piece of it, which was our EDD purchase, which was over

22   $8 million, was -- was not all due and was not going to be due

23   for another year or two.  It was -- it was kind of in the

24   middle of the -- we had very long terms for that segment.

25       In terms of the other ones individually, I couldn't tell

1   how much were overdue.

2   **Q.**   Would it surprise you that of the 23 million, more than

3   16 million was not due?

4   **A.**   It wouldn't surprise me.

5   **Q.**   And would it surprise -- and that more than -- or almost

6   7 million was due for less -- had been due for less than 30

7   days?

8   **A.**   No.  It wouldn't -- wouldn't surprise me.

9   **Q.**   You were the president or the CEO of MicroLink for a year

10  while it was owned by Autonomy; right?

11  **A.**   Yes, sir.

12  **Q.**   Did Autonomy keep -- did MicroLink, once it was in

13  Autonomy, continue to collect money and pay MicroLink back --

14  excuse me -- pay Autonomy back?

15  **A.**   I know that there were some efforts to do that, yes.

16  **Q.**   Did they pay -- was about 18 of that 23 million paid back

17  after the acquisition?

18  **A.**   I couldn't tell you for sure.  I know some was paid back.

19  I don't -- I couldn't tell you whether it was 18 or not.

20  **Q.**   The acquisition didn't wipe out the debt, did it?

21  **A.**   We were actively trying to sell and collect money around

22  those deals.  In terms of how it was accounted for and

23  whether -- you know, I'm not sure that we were on the hook for

24  it, necessarily, but we were actively trying to solve the

25  issue.

1    Q.   But Autonomy collected money on most of those deals,

2    didn't they?  About 18 million?

3              MR. LEACH:  Objection.  Asked and answered.

4    Foundation.

5              THE COURT:  Sustained.

6              THE WITNESS:  Again, I --

7    BY MR. KEKER:

8    Q.   You don't have to -- the judge sustained the objection.

9    A.   Sorry.

10   Q.   Let me ask you this:  Of the 66 million total debt over

11   time that MicroLink had accumulated with Autonomy, 61 million

12   of that was collected by Autonomy, wasn't it?

13   A.   I can only say I know a lot of it was collected.

14   Q.   Okay.  And part of it -- the part that wasn't collected

15   was this $2.3 million that we started this examination with?

16   That was written off?

17   A.   I -- yeah.  I can't say specifics.

18   Q.   Let me ask some questions about the ATIC.

19        What does ATIC stand for?

20   A.   Advanced Technology Innovation -- I'd have to look it up.

21   Sorry.

22   Q.   Tell us about Dr. Channing.  What is his background and

23   education?

24   A.   Well, he is a doctor, and he was, when I met him, I guess,

25   just leaving CSC where he was employed for a relatively long

TRUITT - CROSS / KEKER

1    period of time.

2        He was an expert in building and running data centers.

3    That's what his passion was.  That's, you know -- I -- I

4    interviewed him one time before I referred him over to

5    Mr. Jimenez, so I don't have a lot of information on

6    Mr. Channing, but I was certainly impressed with him when I met

7    with him.

8    **Q.**   Who did the negotiation -- you said that you carried the

9    proposal up to a dinner meeting you had with Mr. Hussain and

10   Mr. Scott when you told Mr. Hussain you were leaving.  But you

11   didn't talk about the --

12   **A.**   Yeah.  I didn't carry it.  I mean, they had it.  It was

13   forwarded to them days before.

14   **Q.**   Who carried out the negotiation for how much Autonomy

15   would pay for MicroTech building and servicing that data

16   center?

17   **A.**   As I recall, there were several proposals that went back

18   and forth.  I think Mr. Cronin was involved in terms of helping

19   to generate those, so, you know, it was really -- it was really

20   more "here are some options that are available," and I believe

21   at the end of the day, they selected one.

22   **Q.**   And who negotiated on the Autonomy side for how much they

23   were going to pay?

24   **A.**   I recall that Mr. Scott was involved and I just assumed

25   that Mr. Hussain ultimately would have made that decision, but

1    I can't say with a hundred percent certainty.

2    **Q.**   You know Scott was involved.   You don't know what

3    Mr. Hussain's role was?

4    **A.**   Correct.

5    **Q.**   Could we see 1320 that's in evidence, page 29.   The jury

6    saw this earlier.   And if we can blow up the bottom down here

7    so it's a little easier to see.

8         These were the choices.   There could be -- the choices

9    that were presented were two years, base year, three years, and

10   so on.   And at the very bottom, there's prices, but at the very

11   bottom, they're talking about the discount, how much of a

12   discount you get if you take it for one year -- go up to the

13   top, Jeff, if you would, so that we can see.

14        So there's Base Year, Year 2, Year 3, Year 4, Year 5.

15   Good.

16        And so the base year, you get a discount of almost -- of a

17   little bit more than 11.   Year 2, discount is less than 9.

18        What's the highest discount that you get?

19   **A.**   Year 3, 16.77 percent.

20   **Q.**   That's the one Mr. Scott picked?

21   **A.**   Yes.   Or someone picked.

22   **Q.**   And you believe that the -- this was fairly priced, don't

23   you?

24   **A.**   I do.

25   **Q.**   Okay.   And you know that this was built?

1    **A.**    Yes.

2    **Q.**    You've seen it?

3    **A.**    Yes.

4    **Q.**    Where -- MicroTech's offices are in the same office as

5    MicroLink used to be?

6    **A.**    That's correct.

7    **Q.**    And were -- is it the same office as Discover Tech?

8    **A.**    No.

9    **Q.**    Was Dr. Channing's facility that he built on the ground

10    floor of the MicroTech office building?

11    **A.**    Yes.

12    **Q.**    Was there a grand opening in July of 2011?

13    **A.**    Yes.

14    **Q.**    Were you there?

15    **A.**    I was.

16    **Q.**    Were there hundreds of people there?

17    **A.**    I don't know if there were hundreds, but it was

18    well-attended.  There were -- there were -- had to be at

19    least -- at least 50 or so, as I recall, but, you know, I think

20    it was kind of open, so it could have been running all day.

21    But there were a lot of people there.

22    **Q.**    And were some of them, at least, from the federal

23    government, procurement people from the federal government?

24    **A.**    I'm sure.  They -- they -- you know, that's who we were

25    targeting, so I wasn't involved in -- in inviting people there.

 1    I attended.

 2    **Q.**    Some general questions about the at risk sales.

 3          You've been shown here a lot of documents, and they have

 4    Stouffer Egan's name on them, they have Joel Scott's name on

 5    them, they have Mr. Cronin's name on it, Mr. Rizek, Mr. Hyson.

 6          Not many of what you have been seeing are documents that

 7    Mr. Hussain is on, are they?

 8                **MR. LEACH:**    Objection.    Counsel is testifying.

 9    Mischaracterizes the evidence.

10                **THE COURT:**    Sustained.

11    **BY MR. KEKER:**

12    **Q.**    You said that these reseller deals were at risk and you

13    explained to us what you meant.

14          Let me ask you about collectability.    You were asked a lot

15    of questions about your bank account.

16          You were paid, when the acquisition of MicroLink happened,

17    $39 million; right?

18    **A.**    Yes, sir.

19    **Q.**    You could fund your Discover Tech business to the extent

20    that you wanted to; right?

21    **A.**    Correct.

22    **Q.**    And Mr. Wharton could help you.    He had 20 percent.    He

23    had money.    He could put in what he wanted to?

24    **A.**    Yes.

25    **Q.**    The fact that there is no money in the bank account didn't

1  mean that you couldn't make good on your promise to pay what

2  you owed; right?

3  A.    That's correct.

4  Q.    And, in fact, Discover Tech, when it started as a

5  reseller -- Autonomy, being concerned about collectability,

6  insisted on some down payments; right?

7  A.    Yes.

8  Q.    So for the first deal, the Citi and the Philip Morris

9  deal, you had to put down $2 million prepayment, basically?

10  A.    Yes.  That's correct.

11  Q.    To let -- you had to have some skin in the game?

12  A.    Yes.

13  Q.    You couldn't just get credit out.

14        And for the Bank of America deal, you had to put down a

15  million?

16  A.    Yes.

17  Q.    And then some questions about -- you keep asking

18  about control, who controlled what.  And your answers were,

19  "The documents we signed were the terms of the agreement.  The

20  terms are stated in the agreement."  Do you remember that

21  testimony?

22  A.    Yes.

23  Q.    And is what you meant is that once you made the agreement,

24  you, be it Discover Tech, MicroTech, whoever made the

25  agreement, owned the software?  It was your software?

1   **A.**    Yes.

2   **Q.**    And was -- if it didn't close, it's still your software

3   and you owed money; right?

4   **A.**    Yes.

5   **Q.**    If you sold it to the end user, the terms were already

6   set.  It was there in the agreement; right?

7   **A.**    Correct.

8   **Q.**    So you had control of the software, you owed the money,

9   and you were fully the owner; right?

10  **A.**    Yes.

11  **Q.**    In the first deal, the Citi deal, did Mr. Cronin make a

12  lot of efforts to get involved with Citi?

13  **A.**    He definitely reached out to -- to procurement folks that

14  we were referred to.  He -- you know, there was a vendor list

15  that we were attempting to try and get on.  So there were

16  conversations that he was having with some folks within Citi.

17  **Q.**    One of the reasons that Discover Tech wanted to be the

18  reseller on this Citi deal was that you hoped that it would

19  lead to sales of software and services with Citi?

20  **A.**    Yes.  That's correct.

21  **Q.**    And a small company getting a relationship with a big

22  company like Citibank would be an advantage, as far as you were

23  concerned?

24  **A.**    Absolutely.

25  **Q.**    And that's why you wanted to be a reseller on the deal?

1    **A.**    Yes.  That was very enticing to us.

2    **Q.**    What Mr. Cronin eventually learned that -- to become an

3    approved vendor for Citi was a very cumbersome and

4    time-consuming process; right?

5    **A.**    Yes.

6    **Q.**    But still Autonomy tried to use or did use Discover Tech

7    as the payment agent, let you have -- so you had some role in

8    the deal?

9    **A.**    My recall is that the -- I know there was some talk about

10   payment agent, but I believe that what -- what happened was

11   they simply dealt directly with Autonomy and Autonomy collected

12   the -- the cash.

13   **Q.**    You were shown an email earlier -- and I'm not going to

14   pull it up again because I can't remember what the number is,

15   but it's in evidence -- that said that Discover was going to

16   collect the cash and pay Autonomy?

17   **A.**    Yeah.  I don't think that ended up happening.

18   **Q.**    Let's talk a little bit about the Dell Hyatt and Abbot

19   Labs deals in the third quarter of 2011.

20        Again, this is all Mr. Egan.  Mr. Egan came in and

21   convinced you to do it; right?

22   **A.**    Yes.

23   **Q.**    Told you that these deals were about to close?

24   **A.**    Yes.

25   **Q.**    Told you that these were long-term customers of Autonomy

 1  who were going to have to buy eventually --

 2  **A.**    Yes.

 3  **Q.**    -- right?

 4       And persuaded you that this was something that you wanted

 5  to do?

 6  **A.**    Yes.

 7  **Q.**    And to the extent that -- you didn't talk to Mr. Hussain

 8  about the Abbott deal, did you?

 9  **A.**    No.

10  **Q.**    Mr. Egan didn't tell you that the -- they were having

11  problems getting the general counsel to agree to a license?

12  **A.**    No.

13  **Q.**    Okay.  Did you know that eventually they did get Abbott to

14  agree to a license?

15  **A.**    No.

16  **Q.**    But, again, these were deals that you accepted the risk on

17  and you owed the money on?

18  **A.**    Yes, sir.

19  **Q.**    Some questions about sales of your product, DiscoverPoint.

20       You sold DiscoverPoint to Autonomy both in the first

21  quarter of 2011 and in the third quarter of 2011; right?

22  **A.**    I believe we're talking about DiscoverEngine.

23  **Q.**    Okay.

24  **A.**    But, yes.

25  **Q.**    DiscoverEngine was a Discover Tech product?

1    A.    Yes, sir.

2    Q.    And you were selling it in the first quarter of 2011 --

3    excuse me -- yeah, 2011 and the third quarter of 2011 to

4    Autonomy?

5    A.    I -- I think -- I think the first agreement for that

6    software was -- was in the second or third quarter of 2011.

7    Q.    In any -- this is a product that you thought had advanced

8    features that Autonomy's solutions did not have?

9    A.    Yes.

10   Q.    And you were selling it to companies like Lockheed Martin?

11   A.    Yes.

12   Q.    Allstate Insurance?

13   A.    Yes.

14   Q.    GlaxoSmithKline?

15   A.    Yes.

16   Q.    You sold it to NATO?

17   A.    Different product, but, yes.

18   Q.    You sold to Johns Hopkins, the university?

19   A.    Again, we're mixing products here, but they were all in

20   our product sale list.

21   Q.    What was it you sold to Tech Resources?

22   A.    That was DiscoverPoint.

23   Q.    Okay.  And for DiscoverPoint, the prosecutors made a point

24   of saying that you -- you sold for 4,000 users for $213,000;

25   right?

1   **A.**   Yes.

2   **Q.**   And tell the jury again what an instance is.

3   **A.**   An instance for DiscoverEngine is really how many servers

4   were going to apply to a problem.  So if Lockheed Martin, who

5   we sold that product to, or GlaxoSmithKline has a ton of data,

6   Autonomy at the time could only apply one server at a time to

7   crawl through all of that information, understand it, and put

8   it into the IDOL server index.

9        So ours was what we call distributable.  So if a customer

10  wanted to buy 15 instances, then they could rip through and

11  make that process much quicker.

12       The other advantage that we -- other major advantage that

13  we had with that product over Autonomy at the time was that we

14  were certified with Microsoft in their Cloud environment, which

15  was called BPOS at the time, and that meant that our indexes

16  could live in Microsoft's Cloud.  They had certified us for

17  that purpose.

18       So GlaxoSmithKline, who wanted to crawl their Cloud-based

19  SharePoint, could use our product, where Autonomy's product

20  would not have been able to be used.

21  **Q.**   So one instance for GlaxoSmithKline could be as many as

22  4,000 users, couldn't it?

23  **A.**   Well, it really has nothing to do with users.  It's all

24  about the servers and the instances.

25       So it's really apples and oranges.  We wouldn't sell that

1    product by the user.  We sell it by the instance.

2        So to give you some perspective, though, we sold to Glaxo

3    and to Lockheed Martin -- an instance cost $25,000.  The deal

4    that we ended up cutting with Autonomy averaged $5,000 per

5    instance.

6    Q.   All right.  So as far as you're concerned, Autonomy got a

7    good deal on the --

8    A.   Not only did they get a good deal, but they were not any

9    other customer.  They were the manufacturer of the software

10   that we were trying to support.  So they had all of the

11   Autonomy customers that they could go and give this solution

12   to.

13          MR. KEKER:  Could I have just a moment, Your Honor, to

14   check?

15          (Pause in proceedings.)

16          MR. KEKER:  Thank you, Mr. Truitt.  I have no further

17   questions.

18          THE COURT:  Redirect.

19          MR. LEACH:  Thank you, Your Honor.

20                     <u>REDIRECT EXAMINATION</u>

21   BY MR. LEACH:

22   Q.   Good afternoon, Mr. Truitt.  You were asked a number of

23   questions about the meeting in San Francisco with Mr. Hussain

24   and Mr. Egan.  Do you recall that testimony?

25   A.   Yes, sir.

1  **Q.**   And do you recall in that meeting making it clear to

2  Mr. Hussain you believed the Prisa order had been backdated?

3  **A.**   Yes.  I was very clear that I was concerned about the way

4  that it occurred.

5  **Q.**   Okay.  Did he deny that it had been backdated?

6  **A.**   I don't think he denied that it had been backdated.  I

7  think he was explaining -- what he did was explained from his

8  perspective the differences between accounting under GAAP and

9  IFRS.

10 **Q.**   Did he say Mr. Egan had acted contrary to instructions?

11 **A.**   No.  No.  He made me feel like we were -- we were okay and

12 that things were being accounted for properly.

13 **Q.**   Well, did he look at Egan and say what were you doing on

14 this?

15 **A.**   No.

16 **Q.**   Anything like that?

17 **A.**   No.

18 **Q.**   Did you make reference to Prisa?

19 **A.**   Yes.

20 **Q.**   Did he say "I don't know what Prisa was"?

21      **MR. KEKER:**  Objection.  Leading, Your Honor.

22      **THE COURT:**  I'll allow it.

23      **THE WITNESS:**  I specifically talked about Prisa and

24 specifically the deal that we had just -- had just done.  You

25 know, again, I was not wanting to sign off on an audit letter

TRUITT - REDIRECT / LEACH

1  for that specific deal.  So we did talk about my concern.

2  **BY MR. LEACH:**

3  **Q.**  Had you agreed to purchase $3.6 million of software from

4  Autonomy to resell to Prisa on March 31st, 2011?

5  **A.**  I can't say that I had agreed to -- to purchase software

6  on March 31st.  I can say that we may have discussed that as an

7  option.

8  **Q.**  You saw it on a slate of deals, possibly?

9  **A.**  Yes.

10  **Q.**  But you don't have a memory?

11  **A.**  Correct.

12  **Q.**  We talked briefly about the relationship between MicroLink

13  and Autonomy after the acquisition.  Do you recall that

14  testimony?

15  **A.**  Yes.

16  **Q.**  Was there anything prohibiting you from picking up the

17  phone and calling Sushovan Hussain during this time period?

18  **A.**  There was a process that we had to follow, but there was

19  no reason that we could not have discussions.

20  **Q.**  And you had discussions with Mr. Egan about commercial

21  deals all the time; isn't that fair?

22  **A.**  Yes.  And -- and there were -- there were -- there were

23  different rules for -- for different executives.  There were --

24  you know, obviously we couldn't have had dinner in New York if

25  we hadn't been allowed to talk at all.  We just had to get the

TRUITT - REDIRECT / LEACH

1    meeting blessed by our facility officer, security officer.

2    **Q.**   Who was that?

3    **A.**   Her name was Amy Solan.

4         **MR. LEACH:**   Could we please display Exhibit 1293,

5    which is in evidence.  Excuse me.  If we could please start

6    with 1292.

7    **Q.**   I want to go back to this issue of profiling, Mr. Truitt.

8    Do you recall a number of questions about whether you did agree

9    or didn't agree to buy profiling?

10   **A.**   Yes.

11   **Q.**   And you were shown this email, which is dated December 16,

12   2010, from Mr. Cronin to you.  Do you see that?

13   **A.**   Yes.

14   **Q.**   And the subject is "Recommendation paper attached."  Do

15   you see that?

16   **A.**   Yes.

17   **Q.**   Now, is Discover Technologies a public company?

18   **A.**   No.

19   **Q.**   Did it have audited financial statements?

20   **A.**   No.

21   **Q.**   You had a tax accountant; is that right?

22   **A.**   Yes.

23   **Q.**   What were your tax accountant's -- what was your

24   relationship with your tax accountants?

25   **A.**   They would really just do our taxes.  That was their role

TRUITT - REDIRECT / LEACH

1    at that time.

2    Q.    Okay.  And if we could -- and this is an email between you

3    and Mr. Cronin, not the tax accountants; is that fair?

4    A.    Yes.

5    Q.    Can we please look at page 2.

6         Could we please now go to document 5739, which is in

7    evidence.  If we could please go to the top.

8         Is this another email from Mr. Cronin to you relating to

9    this build/buy approach relating to profiling?

10   A.    Yes.

11   Q.    And this is an email between you and Mr. Cronin, right,

12   not the tax accountants?

13   A.    Yes.

14   Q.    Let's look at the attachment, please.  And what is the

15   amount in the attachment?

16   A.    10,100,000.

17   Q.    That's roughly the purchase of the -- all the ControlPoint

18   software that you acquired on December 30th, 2009; is that

19   right?

20   A.    Yes.

21   Q.    Do you have any reason to believe this particular piece of

22   paper was shared with your tax accountants?  Do you have a

23   memory of that?

24   A.    I don't know why it would have been.  They had the

25   records.  You know, they had our -- they had our financial

1  records, so they knew how much we paid for the software.

2  **Q.**   Is this a draft?  Do you have a memory of it?

3  **A.**   I do not have a memory of this.

4  **Q.**   Let's look at what was sent to the tax accountants.  Can

5  you look at what's marked as 1293, which is in evidence.

6      Who is Cassie Hartogs?

7  **A.**   She was our -- kind of our head accountant, and at the

8  time -- I said BDO, but BDO had bought this Argy Wiltse &

9  Robinson company, so she was an accountant.

10 **Q.**   What was she doing for you?

11 **A.**   She was determining how the software that we purchased

12 would be depreciated over time.  And at issue, I believe -- the

13 only real issue is whether this was -- is whether this was a --

14 an agreement that would allow us to sell it to others or

15 whether this was infrastructure software that was used to run

16 our internal business.

17     So the case that we're making here is simply to have her

18 understand that this is an OEM software and so that we would

19 have it accounted for and depreciated properly on our books.

20 **Q.**   Did this relate at all to revenue recognition?

21 **A.**   No.

22 **Q.**   Please look at page 9 of the exhibit.

23     Is this a signed version of an OEM agreement between

24 MicroTech and Discover Tech in relation to the licensing of

25 certain software?

1    **A.**    Yes.

2    **Q.**    Now please look at page 11.

3         What's the software listed there?

4    **A.**    It's IDOL Server with Retrieval Lite SharePoint connector.

5    So the same software that we had purchased through MicroTech.

6    **Q.**    But not the profiling software?

7    **A.**    Yes.

8    **Q.**    Now please look at page 17.

9         What is the amount of this order?

10   **A.**    10,100,000.

11   **Q.**    And what is the licensed software on the next page?

12   **A.**    Same.  It's what we purchased from MicroTech.

13   **Q.**    Not the profiling?

14   **A.**    Not profiling.

15   **Q.**    And sitting here today, are you aware of any documents

16   going to the auditors or your accountants relating to that

17   profiling software?

18   **A.**    I'm not aware.

19   **Q.**    Let's go back to the $2.3 million order.  It's Exhibit

20   420.

21        Do you recall questioning about this, Mr. Truitt?

22   **A.**    Yes.

23   **Q.**    I draw your attention to the date, December 31st, '09 up

24   at the top.

25        Did you, Mr. Truitt, have any reason to backdate a

TRUITT - REDIRECT / LEACH

1  purchase order into December of 2009?

2  **A.**   No.

3  **Q.**   What reasons can you think of to backdate a $2.3 million

4  purchase order into that quarter?

5           **MR. KEKER:**  Objection, Your Honor.

6           **THE COURT:**  Sustained.

7  **BY MR. LEACH:**

8  **Q.**   What was the concern that you had relating to Prisa?

9  **A.**   I was concerned that it was an order that was done after

10  the end of the quarter and backdated.

11  **Q.**   To what consequence would that have for your revenues?

12  **A.**   None.

13  **Q.**   What consequence would it have for Autonomy's revenues?

14  **A.**   It would allow them to report earnings for that quarter

15  that would help their numbers.

16  **Q.**   Did this $2.3 million order allow you to report earnings

17  in a particular quarter?

18  **A.**   No.

19           **THE COURT:**  How much longer?

20           **MR. LEACH:**  I think about five minutes, Your Honor.

21           **THE COURT:**  Okay.  Well, I will ask the jury to

22  indulge us because the witness will be excused after that.

23           **MR. LEACH:**  Thank you, Your Honor.

24           **THE COURT:**  Subject to examination.

25      Okay.  Go ahead.

1    BY MR. LEACH:

2    **Q.**    With respect to the Prisa order, are you aware of any

3    documents before March 31, 2011, relating to that order?

4    **A.**    No.

5    **Q.**    Was there any back and forth between Mr. Egan and

6    Mr. Scott that you're aware of prior to April 4th, 2011,

7    relating to that Prisa order?

8    **A.**    Information going between those two that I'm aware of?

9    **Q.**    No.  Between you and them.

10    **A.**    Oh, no.

11    **Q.**    With respect to Bank of America, ThinkTech, Abbot Labs,

12    Dell Hyatt, FINRA, you didn't sell the software to those

13    customers, did you?

14    **A.**    No.

15    **Q.**    You didn't deliver any software to those customers, did

16    you?

17    **A.**    No.

18    **Q.**    You didn't set the price for that software with them, did

19    you?

20    **A.**    No.

21    **Q.**    You didn't set the terms?

22    **A.**    No.

23    **Q.**    And you didn't set the delivery -- you didn't deliver

24    anything to them?

25    **A.**    No.

**TRUITT - REDIRECT / LEACH**

1  **Q.**   And when it didn't sell, it got taken care of; isn't that

2  right?

3  **A.**   Well, yes.  We generally -- we figured out ways to meet

4  our obligations.

5  **Q.**   And that became a practice over time, did it not?

6  **A.**   There certainly were several -- several items that were --

7  that helped us meet those obligations.

8  **Q.**   And at the time, the reason you're not trying to resell

9  the software is because you understood Autonomy had control

10 over what to sell, when, and at what price; isn't that right?

11      **MR. KEKER:**  Objection.  Compound question and

12 argumentive.

13      **THE COURT:**  Overruled.

14      **THE WITNESS:**  My feeling with those commercial deals

15 was that they were set.  Many were -- many were existing

16 customers.  There simply wasn't a lot for us to do.

17     I would have been happy to do anything.  I would have been

18 happy to go meet with any of these companies because that would

19 have helped me.

20     But where we were with those deals, there really wasn't

21 anything for us to do.  We did not do anything.  We were hoping

22 that the customers would close and then we would be able to go

23 in and meet and, you know, talk to them about how we could help

24 them.

25      **THE COURT:**  I think this has been covered.

 1          MR. LEACH:  Thank you, Your Honor.  May I have one

 2   moment?

 3              (Pause in proceedings.)

 4          MR. LEACH:  That's all I have, Your Honor.  Thank you

 5   very much.

 6          MR. KEKER:  Less than a minute, Your Honor.

 7          THE COURT:  Less than one minute.

 8      Less than one minute, ladies and gentlemen.

 9                       **RECROSS-EXAMINATION**

10   BY MR. KEKER:

11   Q.   You said there was no back and forth with Egan or Scott

12   about Prisa before the end of the quarter, but there was a lot

13   of back and forth with Egan and Scott about a slate of deals;

14   right?

15   A.   We did have conversations regarding the end of quarter

16   slate of deals, yes.

17   Q.   And Prisa -- you've testified Prisa may have been part of

18   that discussion?

19   A.   Yes.

20          MR. KEKER:  Thank you.

21      Nothing further, Your Honor.  Less than a minute.

22          THE COURT:  And my suggestion is since you're excused,

23   I'd leave.

24      Ladies and gentlemen of the jury, we are going to take our

25   recess now.  As you know, we're not meeting tomorrow, but we

 1   will meet on Monday.  Bring a snack or something that you can

 2   get through the morning if the food isn't adequate there, which

 3   it may not be.  So I'll see you on Monday.

 4        Don't form or express any opinions, allow anyone to

 5   discuss the case with you.

 6        Thank you very much.  You can leave your pads in the jury

 7   room.

 8               (Proceedings adjourned at 4:11 p.m.)

 9                         ---oOo---

10

11               **CERTIFICATE OF REPORTERS**

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:   Thursday, March 8, 2018

16

17

18

19   _____

20        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              U.S. Court Reporter

21

22

23   _____

24      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              U.S. Court Reporter

25