**Volume 9**

                                **Pages 1408 - 1565**

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )        **NO. CR 16-00462 CRB**
                                 )
SUSHOVAN TAREQUE HUSSAIN,        )
                                 )
          Defendant.             )
_____)
                                  San Francisco, California
                                  Monday, March 12, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                         ALEX G. TSE
                         Acting United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
                  BY:    **ROBERT S. LEACH**
                         **ADAM A. REEVES**
                         **WILLIAM FRENTZEN**
                         **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                         KEKER & VAN NEST
                         633 Battery Street
                         San Francisco  CA  94111
                  BY:    **JOHN W. KEKER**
                         **JAN NIELSEN LITTLE**
                         **BROOK DOOLEY**
                         **KATE LAZARUS**
                         **NIC MARAIS**
                         **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR, RMR
              Official Reporters

<u>**I N D E X**</u>

Monday, March 12, 2018 - Volume 9

<u>**GOVERNMENT'S WITNESSES**</u>                                    <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**LUCINI GONZALEZ-PARDO, FERNANDO**</u>
(SWORN)                                                  1412      9
Direct Examination by Mr. Reeves                         1412      9
Cross-Examination by Ms. Little                          1479      9
Redirect Examination by Mr. Reeves                       1515      9

<u>**RIZEK, ALAN**</u>
(SWORN)                                                  1518      9
Direct Examination by Mr. Frentzen                       1518      9

**E X H I B I T S**

<u>**TRIAL EXHIBITS**</u>                              <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

16                                                        1452      9

27                                                        1522      9

60                                                        1526      9

147                                                       1453      9

182                                                       1425      9

249                                                       1528      9

293                                                       1439      9

317                                                       1533      9

320                                                       1454      9

322                                                       1537      9

396                                                       1537      9

489                                                       1542      9

657                                                       1455      9

816                                                       1560      9

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1662 | | 1471 | 9 |
| 1727 | | 1464 | 9 |
| 1914 | | 1462 | 9 |
| 2013 | | 1477 | 9 |
| 2106 | | 1442 | 9 |
| 2373 | | 1476 | 9 |
| 5452 | | 1507 | 9 |
| 5486 | | 1508 | 9 |
| 6001 | | 1488 | 9 |
| 6003 | | 1509 | 9 |
| 6013 | | 1492 | 9 |

```
1   Monday - March 12, 2018                         9:06 a.m.

2                        P R O C E E D I N G S

3                            ---oOo---

4       (Proceedings were heard out of the presence of the jury:)

5           THE COURT:  Okay.  Before you bring in the jury, let

6   the record reflect all parties are present.

7       Who's the next witness?

8           MR. REEVES:  Fernando Lucini, Your Honor.

9           THE COURT:  Oh, okay.  I'm going to sign the immunity

10  order.  I just wanted -- but he's not affected.

11          MR. REEVES:  No.

12          THE COURT:  Okay.  Bring in the jury.

13      (Proceedings were heard in the presence of the jury:)

14          THE COURT:  Please be seated.

15      Let the record reflect all jurors are present, all jurors

16  are prompt, and the Court appreciates very much your courtesy.

17      And now we're ready to proceed with a new witness.

18      Mr. Reeves.

19          MR. REEVES:  Thank you, Your Honor.  Good morning.

20      Good morning, ladies and gentlemen.

21      At this time the United States calls Mr. Fernando Lucini,

22  please.

23          THE CLERK:  Please raise your right hand.

24  \\\

25  \\\
```

1          **FERNANDO LUCINI GONZALEZ-PARDO**,

2    called as a witness for the Government, having been duly sworn,

3    testified as follows:

4          **THE WITNESS:**  I do.

5          **THE CLERK:**  Thank you.  Please be seated.

6        Please state your full name for the record and spell your

7    last name.

8          **THE WITNESS:**  My name is Fernando Lucini

9    Gonzalez-Pardo.

10          **THE COURT:**  Spell it.

11          **THE WITNESS:**  I'll spell it.  Lucini is L-U-C-I-N-I;

12   Gonzalez-Pardo is G-O-N-Z-A-L-E-Z dash P-A-R-D-O.  First name

13   Fernando.

14                        **DIRECT EXAMINATION**

15   BY MR. REEVES:

16   **Q.**   Good morning, Mr. Lucini.

17   **A.**   Good morning.

18   **Q.**   I want you to do us a favor, please, and pull that

19   microphone very close to you, pour yourself a glass of water if

20   there is one, and I'm going to give you some of the exhibits

21   we're going to use this morning.

22        Where are you from, sir?

23   **A.**   I am from Spain.

24   **Q.**   Okay.  And where do you reside today?

25   **A.**   I reside in Cambridge in the U.K.

LUCINI - DIRECT / REEVES

1  **Q.**   And what is your educational background, sir?

2  **A.**   I have a degree in electronic engineering and an MBA.

3  **Q.**   After you got your MBA, please describe your career after

4  school?

5  **A.**   After school, I joined a consultancy for a couple of

6  years.  Thereafter, I joined a company called Autonomy where I

7  worked for 16 years.

8  **Q.**   In approximately what year did you join Autonomy?

9  **A.**   April 2000.

10  **Q.**   And in what capacity?  What did you do when you joined

11  Autonomy in April 2000?

12  **A.**   I was sent to help open the offices of Autonomy in Asia.

13  **Q.**   And take us through your early career at Autonomy.  What

14  sorts of jobs were you doing at Autonomy, please?

15  **A.**   So at the very beginning I opened up these offices and was

16  technical, mostly helping customers understand the technology

17  and helping sell the technology.  I subsequently moved to

18  Cambridge to run the support organization.

19  **Q.**   When you say your jobs were primarily technological,

20  helping customers understand the technology, what do you mean,

21  Mr. Lucini?

22  **A.**   I was a presales person originally.  My role was to know

23  the technology intimately and then help customers see the value

24  in applying it to use cases they might have.

25  **Q.**   What is this word "presales"?  What does "presales" mean

1  as it was used at Autonomy while you were working there?

2  **A.**   Presales is the technology selling arm of the company.  So

3  we would have a salesperson who would understand the business

4  of our customers.  We would have a presales person who

5  understood our technology very deeply and the technology

6  environments the technology would live in and would help

7  connect the dots between the technology and the use case.

8  **Q.**   All right.  Let me direct your attention to the time

9  period 2008 to 2011.  During that time period, you were still

10  working at Autonomy, were you not?

11  **A.**   I was.

12  **Q.**   And what was your position within Autonomy in 2008 to

13  2011?

14  **A.**   Chief architect.

15  **Q.**   Chief architect of Autonomy, what does that mean?

16  **A.**   I was a senior technology leader.  I also oversaw the

17  presales organization.

18  **Q.**   Where were you physically working in those days?

19  **A.**   In Cambridge in the U.K.

20  **Q.**   All right.  And with whom did you work on a regular basis

21  in Cambridge between 2008 and 2011?

22  **A.**   I worked with the technology leaders in the Cambridge

23  office, so the heads of development:  Dr. Sean Blanchflower,

24  Darren Gallagher, and others in the organization.  I worked

25  with the senior leaders of the company:  Dr. Lynch, Sushovan

1    Hussain, Andy Kanter, Pete Menell, and so on.

2    **Q.**   Good.  All right.  Thank you.

3         And did you supervise the presales sales engineers within

4    Autonomy in 2008 to 2011?

5    **A.**   At a senior level, yes, and then I had teams that managed

6    locally for each region.

7    **Q.**   And how many presales sales engineer teams were you

8    managing or supervising?

9    **A.**   The team at the time it was probably 200, 250 or so.

10   **Q.**   You said you worked with Mr. -- or Dr. Pete Menell.  Do

11   you recall that?

12   **A.**   I do.

13   **Q.**   What were your interactions with Mr. -- withdrawn.

14        How did you interact with Mr. Menell?

15   **A.**   Dr. Menell was my manager.  I worked for Pete so I would

16   interact with him on accounts, on HR issues, on people, on

17   technology.

18   **Q.**   On a regular basis?

19   **A.**   Fairly regular.

20   **Q.**   All right.  And Mr. Sushovan Hussain, how did you interact

21   with Mr. Hussain between 2008 and 2011?  How frequently?

22   **A.**   I think I had fair interaction.

23   **Q.**   And on what sorts of topics or issues?

24   **A.**   From accounts most happening in the sale.  Our technical

25   people were doing technology -- or what technology does or

1  doesn't do.  When we were presenting to leaders of other

2  companies, material we were presenting, that kind of thing.

3  **Q.**   And Dr. Mike Lynch, did you say you interacted with

4  Dr. Lynch?

5  **A.**   I did.

6  **Q.**   Again, on what sorts of issues between 2008 and 2011?

7  **A.**   I would -- we would go and see senior leaders in other

8  companies and I'd prepare material, and I would present it with

9  Dr. Lynch and we would discuss those things.  I would build

10  demos for Dr. Lynch.

11       I opened up one of the new divisions of the company, the

12  healthcare division, in which he took an interest, so we would

13  talk about that division and what we were doing and how we were

14  doing it.

15  **Q.**   Between 2008 and 2011, how much involvement did you have

16  in any of the sales efforts by Autonomy to sell its products

17  around the world?

18  **A.**   A fair amount.  A fair amount.

19  **Q.**   And as part of that, were you familiar with what's been

20  known as SMS sales calls?

21  **A.**   I am.

22  **Q.**   Okay.  And, again, what is an SMS sales call?

23  **A.**   The SMS calls were a process that we run on Mondays where

24  we would talk to all of the salespeople in the world starting

25  from Asia and finishing with the United States, and we would

LUCINI - DIRECT / REEVES

1    ask them their top three accounts:  What are they doing, what

2    the compelling events are, whether the proofs of concept are

3    going well, whether they are in commercials.  So it was a way

4    to run through the top deals for each sales for each region.

5    **Q.**    And did you personally participate in those calls in those

6    years?

7    **A.**    I did.

8    **Q.**    All right.  And what was your purpose for participating in

9    the SMS calls between 2008 and 2011?

10   **A.**    To look at the presales organization and see that they

11   were being effective.

12   **Q.**    All right.  And were you in a position to observe who was

13   leading or managing those calls on the calls that you

14   participated in?

15   **A.**    Yes.

16   **Q.**    Who led the calls?

17   **A.**    Sushovan Hussain mostly.

18   **Q.**    And how did he do that?  Describe what happened, please.

19   **A.**    He would -- we would start a call for a particular region,

20   and we would go through the list of sales individuals, and we

21   would ask them:  What are your top three deals?  Sushovan would

22   ask them:  What are your top three deals?  And, again, the

23   detail of each one.

24        And we would listen and we would qualify what was being

25   said.  We would in some cases give advice, in some cases judge

1  whether the right things were being done, and we would take

2  actions that would be covered later to help either resolve or

3  move or whatever was required.

4  **Q.**   Okay.  How detailed were the discussions about the status

5  of sales involving these SMS calls led by Mr. Hussain?

6  **A.**   Fast but detailed.

7  **Q.**   Fast but detailed?

8  **A.**   Yes.  We would --

9  **Q.**   What do you mean by that?

10 **A.**   We would try to get -- it was an entire day from early in

11 the morning to late in the evening so we were trying not to

12 stop the conversations or get stuck, but the detail was

13 required for each of your top three and an understanding of

14 whether that was moving in the right direction; and if it

15 required slightly more detail, that will be asked.  If it was

16 very clear, it will be moved on fairly quickly.

17 **Q.**   You said that at certain points you would judge the status

18 of the deals.  Do you remember using that word?

19 **A.**   I did.

20 **Q.**   What did you mean by "judge the status of the deals"?

21 **A.**   So if we take an example, if a particular deal, the POC,

22 was not going well, we were not demonstrating the technology

23 well, we could ask the questions:

24      Is it that we -- the people are not doing a great job?  Is

25 it that we have not agreed on a set of agreed criteria with the

1  customer and that's why it's not going well?

2      Is it the sales leader hasn't agreed again with the

3  customer on some criteria?

4      So we would ask some of these difficult questions in order

5  to judge whether in our understanding we were actually going

6  towards a sale or there was issues or not even a sale at all.

7  **Q.**  And if a sale was not going well, what sorts of things

8  would happen on these SMS calls?

9  **A.**  Corrective action, if possible.  So if we had to ship

10  technologies -- a specialist in technology to help or

11  supplement, we would do that.  If we had to send a senior

12  leader to talk to the customer to try to understand what was

13  going on, we would do that.  In some cases when it was clear

14  there was no deal or something was not right, we could ask the

15  salesperson to not bring it anymore to the top three and move

16  on to other accounts.

17  **Q.**  Let me direct your attention, if I could, to the summer

18  and fall of 2009.  At or around that time you were the chief

19  architect for Autonomy's products, were you not?

20  **A.**  Correct.

21  **Q.**  In or around that time were you familiar with the

22  development and launch of a new product known as SPE?

23  **A.**  I was.

24  **Q.**  Were you involved in any way in or around the summer and

25  fall of 2009 in the launch of SPE?

1    **A.**    I was involved, yes.

2    **Q.**    What did you do regarding SPE, Mr. Lucini?

3    **A.**    I did a number of things.  I created some of the marketing

4    material that was going to be presented to the press and to the

5    outside world.  I also played a part in the demonstrations that

6    were created that went together with the presentations, and I

7    worked on those two things.

8    **Q.**    Okay.  And did you work with Dr. Sean Blanchflower with

9    regard to the launching of this SPE product?

10    **A.**    I did.

11    **Q.**    Describe your interactions with Dr. Blanchflower about

12    SPE, please.

13    **A.**    So Sean and his team were building a demonstration so we

14    had to align my presentation that explained what it was, what

15    wasn't, the features and the examples, and we would align that

16    with the demo that Sean was building.  So I needed to make sure

17    that that demo reflected my material.  So we would look at

18    technology examples, data, that kind of thing.

19    **Q.**    And did you work at all with Dr. Pete Menell on this SPE

20    project, if you recall?

21    **A.**    Not that I recall.

22    **Q.**    Okay.  And what is the -- again, what is the nature of

23    SPE?  What type of product was this in or around the summer and

24    fall of 2009?

25    **A.**    It was just a set of features that helped process

**LUCINI - DIRECT / REEVES**

1    unstructured -- structured information so that IDOL could do

2    some analysis.

3    **Q.**    Are you familiar with a company known as NCorp?

4    **A.**    I am.

5    **Q.**    And software developed by NCorp?

6    **A.**    I am.

7    **Q.**    Was there any connection between the NCorp software and

8    SPE as you understood it?

9    **A.**    No connection.   Same use case.

10   **Q.**    Same use case, no technological connection?

11   **A.**    Not that I can remember.

12   **Q.**    Please tell us what you mean by that.

13   **A.**    So NCorp was developed earlier in the life of Autonomy to

14   solve the problem of processing structured information and

15   finding answers.   That -- that didn't really mature, it didn't

16   really come to fruition, so that company was folded and the

17   technology put away.

18        And as we came to build SPE, we built some features onto

19   the -- onto the engine that would help do things like SQL and

20   understand things like that.   But in the summer as we were

21   building the initial demonstrations and the presentations,

22   there was no work, that I recall, on recovering all the NCorp

23   packs and using it *per se*.

24   **Q.**    Okay.   But when you say "use case," what do you mean by

25   "use case"?   Is that a problem to be solved by technology?

LUCINI - DIRECT / REEVES

1   **A.**   Correct.

2   **Q.**   And would it be fair to say that NCorp and that software

3   was trying to solve the same problem as the SPE technology

4   using a different technology?

5   **A.**   Correct.  I used the same marketing material to build my

6   presentations.

7   **Q.**   As the NCorp marketing materials such as they were?

8   **A.**   I took -- I took most of the marketing material from NCorp

9   to create the SPE marketing too.

10  **Q.**   Okay.  Now, did you have any discussions with Mr. Hussain

11  around the time that you were working on this SPE launch, if

12  you recall?

13  **A.**   I don't recall.

14  **Q.**   I'd like to show you what has been marked for

15  identification as Exhibit 179.  If things have gone according

16  to plan, that should be -- that set of exhibits there should be

17  in the order that I hope to go through with you, Mr. Lucini.

18  **A.**   Should I turn it over?

19  **Q.**   Do you see Exhibit 179?

20  **A.**   I do.

21  **Q.**   Okay.  Good.

22          **THE COURT:**  It's in evidence.

23          **MR. REEVES:**  It is in evidence.

24      Could I please have it displayed?  And if we could please

25  enlarge -- thank you very much.

1          And, Ms. Margen, if you'd be kind enough to highlight the

2    first sentence in the first -- in that top e-mail.  Fantastic.

3    **Q.**   So, Mr. Lucini, this is an e-mail to you from Sean

4    Blanchflower sent on or around August 25th, 2009.  Do you see

5    that?

6    **A.**   I do.

7    **Q.**   And does this pertain to the new product launch or the SPE

8    launch?

9    **A.**   It does.

10   **Q.**   And this is being sent in or around August, late August,

11   2009.  Is that time period consistent with your recollection of

12   the work you did on the SPE launch?

13   **A.**   It is.

14   **Q.**   Okay.  And at least according to the e-mail,

15   Dr. Blanchflower is saying (reading):

16          "This is the demo we've been making for a couple of

17          weeks and are with Vance/Al still," et cetera.

18        Do you see that?

19   **A.**   I do.

20   **Q.**   Is that a reference to a demo associated with the SPE

21   product?

22   **A.**   Yes.

23   **Q.**   Okay.  That you talked about a little bit this morning?

24   **A.**   Yes.

25   **Q.**   All right.  So approximately when did you first begin to

1    work on the SPE launch, Mr. Lucini?

2    **A.**   It must have been a couple of weeks before this thread.

3    **Q.**   In August 2009?

4    **A.**   Correct.

5    **Q.**   All right.  Were you in a position to observe how much

6    work others were doing on SPE around you in the development

7    team at Cambridge and the sales engineers throughout Autonomy?

8    **A.**   Yes.

9    **Q.**   Okay.  And why were you in a position to see how much work

10   others were doing on the SPE launch?  Tell us that.

11   **A.**   I was -- I was creating the material that described the

12   thing, and I was then asking these nice people to build these

13   things for me.  So I was giving them direction on what was

14   needed to represent the product.

15   **Q.**   Okay.  Now, prior to August 2009, was any work being done

16   on what became the SPE launch?

17   **A.**   I don't recall, no.

18   **Q.**   Is it that you don't recall or you don't think so?

19   **A.**   I don't -- I don't think it did, no.

20   **Q.**   Why don't you think no work was done on the SPE launch

21   before you began working on it in August 2009?

22   **A.**   I remember clearly getting a -- getting a call to get the

23   work started, and -- and I sent off a set of threads to start

24   mobilizing on this, which were very literally part of this

25   story that you see here.  So it was pretty much around that

LUCINI - DIRECT / REEVES

1   time that it all kicked off.

2   **Q.**   Around August 2009?

3   **A.**   Right.

4   **Q.**   Yes?

5   **A.**   Correct.

6   **Q.**   Let me show you what has been marked for identification as

7   Exhibit 182, please.  Do you have that document?

8   **A.**   I do.

9   **Q.**   You can look inside.

10  **A.**   Okay.

11  **Q.**   Please tell us if you recognize the e-mail.

12  **A.**   (Witness examines document.)  I do.

13          **THE COURT:**  Admitted.

14  (Trial Exhibit 182 received in evidence)

15          **MR. REEVES:**  Thank you, Your Honor.

16  **Q.**   Is this another e-mail that pertains to the SPE launch?

17  **A.**   It is.

18  **Q.**   It looks like -- if we could please -- if we could go down

19  to Mr. Lucini's.  Perfect.  And if you'd be kind enough to

20  highlight the middle sentence that begins "We might survive

21  that..."

22      It looks like on or around September 2nd, 2009, you're

23  writing to Dr. Blanchflower, "Subject Structured."  Is that a

24  reference to Structured Probabilistic Engine, SPE?

25  **A.**   Yes.  Correct.

**LUCINI - DIRECT / REEVES**

1  Q.   All right.  And you're talking about "... but get everyone

2  pedal to the metal."  Do you see that?

3  A.   Yes.  Correct.  Yes.

4  Q.   What do you mean by "get everyone pedal to the metal"

5  relating to structure here?

6  A.   It literally means, "Please get on with it and finish the

7  work."

8  Q.   There's urgency to get it done?

9  A.   Correct.

10  Q.   What was the urgency?  What was the timetable that you

11  were trying to accomplish by getting everything pedal to the

12  metal?

13  A.   My recollection is we had a briefing in and around that

14  time to Mike so I wanted to make sure that that got done well

15  in lieu of launching the product, so the demo was needed before

16  the launch.

17  Q.   All right.  Thank you very much.

18       Let me show you what has been received in evidence as

19  Exhibit 199.

20  A.   (Witness examines document.)

21  Q.   If we could just enlarge the top half of this.  Do you

22  have that before you?

23  A.   I do.

24  Q.   Okay.  Do you -- is this the press release announcing the

25  launch of the SPE product on or around September 16, 2009?

**LUCINI - DIRECT / REEVES**

1   **A.**    Yes.

2   **Q.**    Okay.  Is that consistent with your recollection that

3   there was an announcement of the product launch?

4   **A.**    Yes.

5   **Q.**    All right.  And did you do any work around the issuance of

6   this press release relating to media coverage or marketing

7   through the press relating to the product?

8   **A.**    I did.

9   **Q.**    What did you do?

10  **A.**    I participated in some of the drafting of this and then I

11  participated in presenting it to the press in many, many calls

12  and online presentations.

13  **Q.**    All right.  I'm going to ask a couple questions about the

14  press release in a minute, but first I'm going to ask you:  As

15  a general matter, as the architect of the Autonomy product in

16  this year 2009, Mr. Lucini, were you familiar with the costs

17  for R&D, research and development, and sales engineers

18  associated with product launches like SPE?

19  **A.**    Yes.

20  **Q.**    Okay.  And why was it that in that position you were

21  familiar with costs associated with a product development like

22  SPE?

23  **A.**    Again, I was -- I started the process with the material

24  and creating the specification for it, and then I would ask

25  people to build this thing to that specification.  So I was

1   working closely with -- with the research team to do so and the

2   development team; and obviously I was overseeing the presales

3   organization, so I would know whether they are participating in

4   this effort or not.

5   **Q.**   So are you in a position to estimate for us the

6   approximate cost that Autonomy spent on the work done to launch

7   the SPE product?

8   **A.**   I can estimate it in people time, which is the way I would

9   see it.  We probably used six to seven weeks of man time to do

10  it.

11  **Q.**   And approximately what does that cost in dollars?

12  **A.**   I tend to think about it in about $2,000 a day average.

13  It's pretty industry standard.  So about $70,000.

14  **Q.**   When you add that up, approximately what do you estimate

15  is the cost for the SPE launch?

16  **A.**   $70,000, 100,000 if we stretch it a bit.

17  **Q.**   Okay.  And by "stretching," are you being overinclusive?

18  **A.**   Yeah.  Being slightly generous, yes.

19  **Q.**   Slightly generous.  Okay.  Good.  Thank you.

20       Let's take a look, if we can, at the press release and

21  let's move down, if we could, to the second paragraph.  If we

22  could enlarge the second paragraph, and if you could highlight

23  the words, I think it's in the last sentence (reading):

24            "This technology represents a radical shift in the

25       intelligence businesses can gain from information,"

1      et cetera.

2      Do you see this?

3  **A.**   I do.

4  **Q.**   Okay.  Did you consider the SPE product to be a radical

5  shift for Autonomy?

6  **A.**   I don't think so, no.

7  **Q.**   Why not?

8  **A.**   It was -- it was great for us to participate in that

9  market, which had very, very big companies doing lots of work

10 and lots of depth, so I don't think it was a radical shift as

11 others were solving this problem in one way or another; but I

12 thought it was interesting for us to participate in it, but I

13 didn't think it was a radical shift, no.

14 **Q.**   Thank you.  I'm done with that.

15     I'd like to show you what has also been received in

16 evidence as Exhibit 229.

17     If I could please have that displayed, Your Honor.

18     In your preparation for your testimony, did you have an

19 opportunity to look at this document carefully, Mr. Lucini?

20 **A.**   I did.

21 **Q.**   All right.  And I'm representing to you that this is part

22 of the work paper that Deloitte had, the auditors for Autonomy

23 had, about costs associated with the R&D for SPE.  Okay?

24     You had a chance to look at this carefully, did you not?

25 **A.**   I did.

**LUCINI - DIRECT / REEVES**

1    Q.   I'd like to go through some of the statements in here and

2    ask if they're consistent with your recollection.  All right?

3         MS. LITTLE:  Objection on foundational grounds.  This

4    is not a document that the witness prepared or is familiar with

5    other than having been shown it by the prosecutor, and he

6    shouldn't be allowed to just comment on the evidence.

7         THE COURT:  Well, you are asking him whether these

8    statements comport with his recollection of whatever it's

9    commenting on at or about that time?

10        MR. REEVES:  Yes, sir.

11        THE COURT:  Overruled.

12   BY MR. REEVES:

13   Q.   I'd like to direct your attention, if I could, to the

14   center summary here describing development team additional

15   costs in the quarter.  Do you see that?

16   A.   I do.

17   Q.   And if we could highlight, please, the numbers 2.5 and

18   down below.  Down to right there.  Super.

19        Let's just focus on those numbers.  It would appear in

20   this document that the estimate for the development team

21   additional effort relating to the new product launch for SPE

22   was $2.5 million, Mr. Lucini.  Is that number in any way close

23   to your understanding of the costs associated with the SPE

24   launch for the development team?

25   A.   It is not.

LUCINI - DIRECT / REEVES

1   **Q.**   Does that number make any sense to you based on what you

2   observed in your participation in the development and presales

3   efforts associated with the SPE launch?

4   **A.**   It does not.

5   **Q.**   And it looks like there's a description of costs in

6   Q1 2009 of $700,000.  That would be in the months January

7   through March 2009.  To your knowledge was any work being done

8   on SPE in January, February, March 2009?

9   **A.**   Not to my knowledge.

10  **Q.**   That work began in August 2009 according to your

11  testimony; is that correct?

12  **A.**   Yes, sir.

13  **Q.**   And then for the sales engineers in the second quarter,

14  there's an estimate of $1.4 million of work.  That would be in

15  the months April, May, June 2009.  Do you recall any sales

16  engineers doing any work on SPE in April, May, and June of

17  2009?

18  **A.**   I do not.

19  **Q.**   If we could go to the bottom, please.  I'm sorry.  You

20  know what?  I got ahead of myself.

21      And there's an estimate also for the third quarter for the

22  sales engineers of $2.7 million.  Okay.  You were supervising

23  the sales engineers in the months of June, July, and August --

24  I'm sorry -- July, August, and September 2009 around the SPE

25  launch, were you not?

LUCINI - DIRECT / REEVES

1    A.    Correct.

2    Q.    Does this number $2.7 million for the time spent by sales

3    engineers make any sense to you, sir?

4    A.    It does not.

5    Q.    Is that much larger than you observed or you would

6    estimate?

7    A.    It is.

8    Q.    If we go to the bottom -- let's go to the second page, and

9    if we could highlight the last full sentence, please, "As

10   such..."

11        Okay.  Great.  Let's talk about this sentence.  There's a

12   claim in this document that the development of SPE is the first

13   time in which a SE's role is that of developing the software.

14   Do you see that?

15   A.    I do.

16   Q.    Does that statement comport with -- is it consistent with

17   your recollection of the roles of the SEs in developing SPE

18   that you supervised?

19   A.    No.

20   Q.    Why is it not consistent with what you observed and what

21   you did relating to the SPE launch?

22   A.    The role of the SEs did not change at all in the period

23   before or after.  It kept consistent.

24   Q.    Okay.  It was consistently what?  Sales effort?

25   A.    They would sell to customers, of course.  They would also

LUCINI - DIRECT / REEVES

1    help us understand the features that the product may or may not

2    have that the customers desired because they would be listening

3    to customers.  So they would feed the development team with

4    these features -- explanations of these features, data

5    associated with these features, so that the development team

6    could create new features.  This happened before, through,

7    after, and I suspect it continues to this day.  It is the

8    normal way that they operate.

9    Q.   Would the development, then, be done by the development

10   team?

11   A.   Correct.

12   Q.   And that's why it's not the case that the SEs had a role

13   in the development of the software?

14   A.   Correct.  The access to the development environment is

15   only held by developers.

16   Q.   What do you mean by that?

17   A.   There is an environment where developers work in where

18   they write their code, they commit this code to the build

19   systems that create the products and the testing systems.  This

20   access is for the development teams alone.

21   Q.   Where was that?

22   A.   In Cambridge.

23   Q.   In Cambridge.  And is there a reason or a logic behind why

24   the actual development or changes to the software are

25   controlled and kept in a controlled environment in the way

1   you've described?

2   **A.**   It is.   It is so that as you -- as you add new lines of

3   code and features and functions, they can be tested and they

4   can be built and they can be put on our Autometer system, which

5   is the system the customers took the software from.   And this

6   was a strong process, and then -- so it had to be -- it had to

7   be run in a certain way by development staff.

8   **Q.**   And who within Autonomy is in charge of that process as

9   you recall?

10   **A.**   Dr. Sean Blanchflower would run that process.

11   **Q.**   Down below if we go to the very last sentence.   That's

12   great.   Right here.   If you could highlight -- withdrawn -- if

13   you could enlarge, please, Ms. Margen, the paragraph that

14   begins "From discussions."   Right there.   That's good.   And

15   we'll enlarge that.

16        I need more coffee this morning.   If you could please

17   highlight the whole paragraph for me, please.   Thank you very

18   much.

19        Let's talk about this paragraph.   According to the

20   document, it says (reading):

21        "From discussions with Pete Menell, a list was

22        provided showing SEs who spent all of their technical time

23        in Q3 09 developing SPE through trialing the software with

24        real databases.   75 percent of the Q3 SE costs have

25        therefore been capitalized in line with the

1        production [sic] measured and agreed with HMRC."

2        Was it true that in the third quarter of 2009, 75 percent

3   of the SEs time was capitalized and included -- I'm sorry --

4   was spent on the SPE launch?  Is that true?

5   **A.**   No, it's not.

6   **Q.**   Okay.  How close to being true is that figure, 75 percent,

7   based on what you observed, Mr. Lucini?

8   **A.**   It's far from -- far from what I have in my mind.

9   **Q.**   How many sales engineers were actually working on SPE from

10  what you could observe in August and September 2009?

11  **A.**   I recall one single SE, Rajiv Kala, helping with some of

12  the promote work.

13  **Q.**   So what is one sales engineer in proportion to all of the

14  sales engineers at Autonomy?

15  **A.**   A small percentage.  Half a percentage.

16  **Q.**   Half a percentage?

17  **A.**   Maybe.

18  **Q.**   Okay.  Can you offer any explanation for the statement

19  that 75 percent of the Q3 SE costs were devoted to SPE?

20          **MS. LITTLE:**  Objection.  Foundation.

21          **THE COURT:**  Sustained.

22          **MR. REEVES:**  All right.

23  **Q.**   Down below it says -- in the last paragraph there's a

24  sentence that says (reading):

25          "SEs have been working on SPE since the start of

1       2009."

2           Was that true?

3   **A.**    Not to my knowledge.

4   **Q.**    On the second page -- excuse me -- on the third page of

5   Exhibit 229, page 3, there is a set of locations within

6   Autonomy.  Do you see that?

7   **A.**    I do.

8   **Q.**    All right.  Are you familiar generally with these

9   locations within Autonomy?

10  **A.**    I am.

11  **Q.**    What are they?

12  **A.**    They're some of our development teams, some referred to by

13  name of the function, some of them by the location.

14  **Q.**    There's a reference to ATG and in the third quarter the

15  amount $192,903.  Do you see that?

16  **A.**    I do.

17  **Q.**    What is ATG?

18  **A.**    ATG is the Advanced Technology Group, which was a team of

19  developers in Boston that were devoted to a U.S. government

20  contract.

21  **Q.**    Okay.  And did they have any role whatsoever in the SPE

22  launch?

23  **A.**    Not to my knowledge.

24  **Q.**    Are there reasons why they couldn't have a role in the SPE

25  launch?

1    **A.**    They were devoted to this contract with the U.S.

2    government, and that was their purpose.  That's what they did.

3    **Q.**    Did they work on anything else other than work for the

4    U.S. government?

5    **A.**    Not to my knowledge.

6    **Q.**    All right.  I'd like to go to the last page of

7    Exhibit 229, page 4, please.  There's a statement at the bottom

8    that in summary, development of SPE costs approximately

9    $7.3 million.  Do you see that?

10    **A.**    I do.

11    **Q.**    Is that figure consistent with your recollection of the

12    costs associated with the SPE launch, Mr. Lucini?

13    **A.**    It is not.

14    **Q.**    Okay.  Is it too large?

15    **A.**    It is.

16    **Q.**    How much larger than what you observed is the

17    figure $7.3 million?

18    **A.**    My observation is that, as we said, maybe $100,000, maybe

19    70,000 was what we spent in pure costs just looking at the

20    amount of people that worked on it.  So it feels very large

21    compared to that.

22    **Q.**    Thank you very much.  I'm done with that exhibit.

23        I'd like to show you what has been marked for

24    identification as Exhibit 293, please.  Do you have that before

25    you?

1    **A.**   I do.

2    **Q.**   Were you familiar with Autonomy's practice of announcing

3    its performance on a quarterly basis to the market?

4    **A.**   I was.

5    **Q.**   Okay.  And did you pay attention to those earnings

6    announcements by the company on a quarterly basis?

7    **A.**   Sometimes.

8    **Q.**   Were you familiar with the process by which Autonomy would

9    have meetings, phone calls with financial analysts who were

10   following the company at or around the time that it issues its

11   earnings announcements?

12   **A.**   I was, yes.

13   **Q.**   I'd like to show you a portion of a presentation that was

14   given to the analyst community at or about the time of the

15   announcement of Autonomy's financial results on or about

16   October 20th, 2009.  Okay?

17        **MS. LITTLE:**  I would object to questioning the witness

18   about this document.  Again, it's a document that he had no

19   involvement with and he's just being asked to comment on.

20        **THE COURT:**  Well, first you have to establish some

21   foundation.

22        **MR. REEVES:**  I'm going to offer this subject to

23   connection with the analyst witnesses that we anticipate

24   having.

25        **THE COURT:**  Okay.  It's admitted subject to a motion

LUCINI - DIRECT / REEVES

1    to strike.

2          (Trial Exhibit 293 received in evidence)

3          **MR. REEVES:**  Thank you very much, Your Honor.

4          **MS. LITTLE:**  I still object.  This witness has no

5    knowledge of this document.  He's just commenting on some

6    random document.

7          **THE COURT:**  Well, he's commenting on a document based

8    upon what his understanding was at the time the document was

9    issued.

10         **MR. REEVES:**  That's correct, Your Honor.

11         **THE COURT:**  Overruled.

12         **MR. REEVES:**  If we could, please, go to page 3 of

13   Exhibit 293.  And if we could, please, enlarge the bullet point

14   that reads "New Product Related Spend at c. $22 million."  Do

15   you see that?

16   **A.**   I do.

17   **Q.**   Okay.  Do you have any reason to believe that Autonomy

18   spent anywhere close to $20 million on the SPE new product?

19         **MS. LITTLE:**  Objection.  Foundation.

20         **THE COURT:**  Overruled based upon his understanding of

21   what he saw, and I think you've laid a foundation.

22         Go ahead.

23         **THE WITNESS:**  No.

24   BY MR. REEVES:

25   **Q.**   You estimate the costs from what you could tell were in

1   the neighborhood of $100,000 or something?

2   **A.**   Yeah.  We might have some marketing and PR on top and some

3   ads, but...

4   **Q.**   Even if you add that in, does it come anywhere close to

5   $20 million?

6   **A.**   Not to my experience.

7   **Q.**   Could it possibly exceed even $1 million?

8   **A.**   It may get close to 1 million, but certainly not close to

9   20 million.

10  **Q.**   Certainly not 20 million?

11  **A.**   Right.

12  **Q.**   Thank you.

13       I'd like to move forward, if I could -- thank you.  I'm

14  done with that -- to another topic.  Are you familiar,

15  Mr. Lucini, with software created by a company known as FileTek

16  with the name StorHouse?

17  **A.**   I am.

18  **Q.**   How do you know FileTek's StorHouse software?

19  **A.**   I did a review of the technology at one point and I

20  created a demonstration for it.

21  **Q.**   All right.  And did you do that while you were at

22  Autonomy?

23  **A.**   I did.

24  **Q.**   Do you think that was in the period of time we've been

25  talking about, sometime between 2008 and 2011?

1    **A.**    I can't recall the exact time.

2    **Q.**    All right.

3    **A.**    In the ballpark.

4    **Q.**    In the ballpark.  Okay.  You don't remember exactly when

5    this first happened.

6         Well, why don't you tell us what you first did, your first

7    contact with evaluating for Autonomy FileTek's StorHouse

8    software.  What do you recall happening?

9    **A.**    I got asked by Dr. Menell to have a look at the

10   technology, to review it, to tell him what I thought.  So I

11   spent a couple of days looking at it, manuals, what the

12   Internet had to say, just to forage an understanding of the

13   technology.

14   **Q.**    Okay.  And to what end or what purpose, if you knew?

15   **A.**    I didn't know.  It was -- I got a lot of these kind of

16   things.

17   **Q.**    Like all --

18   **A.**    I got a lot of these kind of requests, and I didn't always

19   understand what the objective was.

20   **Q.**    Did you work with anyone on this Today Review or

21   evaluation of StorHouse?

22   **A.**    Not in that work, no.

23   **Q.**    Did you observe anyone else also working on it at or

24   around the time that you were doing it?

25   **A.**    Yes.  Darren Gallagher also was asked to do a more

**LUCINI - DIRECT / REEVES**

1  detailed analysis of the technology.

2  **Q.**   All right.  And after you did this review in the manner

3  you've described, did anything come of it or did anything

4  happen that you could see?

5  **A.**   No.

6  **Q.**   All right.  What happened next?  Did there come a time,

7  perhaps much later in time, when you did more with regard to

8  FileTek's StorHouse software?

9  **A.**   Yes.

10 **Q.**   What happened, please?

11 **A.**   I was asked by Dr. Menell to build a demonstration of the

12 technology in our data center.

13 **Q.**   I'd like to show you what has been marked for

14 identification as Exhibit 2106.  Do you have a copy of that?

15 **A.**   I do.

16 **Q.**   Do you recognize Exhibit 2106?

17 **A.**   (Witness examines document.)  I do.

18 **Q.**   Does this relate to a demo relating to the FileTek

19 software?

20 **A.**   It does.

21       **THE COURT:**  Admitted.

22       (Trial Exhibit 2106 received in evidence)

23       **MR. REEVES:**  Thank you, Your Honor.

24 **Q.**   And what is the date of this e-mail, Exhibit 2106,

25 Mr. Lucini?

1  **A.**   August the 3rd, 2011.

2  **Q.**   And August 2011, is that time period consistent with --

3  for the second set of work or go-around of work that you had

4  relating to StorHouse?

5  **A.**   Yes.

6  **Q.**   And in or around this August 2011 time period, what did

7  you do?

8  **A.**   I was asked to build a demonstration so I contacted Mark

9  Kaufmann, who was one of the development leads in one of our

10  products in our data center, and I gave him some guidance and

11  some -- and we created a script and we built a demo.  And this

12  e-mail is the end of that process.

13  **Q.**   And if we drop down a little bit on the e-mail just to the

14  e-mail below this.  Stop right there.  Thank you very much,

15  Ms. Margen.  If you highlight, if you would, please, the first

16  full sentence of Mr. Kaufmann's e-mail.

17      There's a reference in here to demonstrating of LiveVault

18  integrated with FileTek's StorHouse.  Do you see that?

19  **A.**   I do.

20  **Q.**   Do you have an understanding as to what that means,

21  Mr. Lucini?

22  **A.**   Yes, I do.

23  **Q.**   What does that mean?

24  **A.**   It means that Mark created a recording of the process, the

25  demonstration that he had built, which showed an integration of

1  the Autonomy LiveVault product with FileTek's StorHouse.

2  **Q.**   Okay.  And did you create the demo in or around this time

3  period?

4  **A.**   Yes.

5  **Q.**   Okay.  And what happened next?  Did it go anywhere?

6  **A.**   Not to my recollection.

7  **Q.**   Okay.  To your knowledge, at any point was the StorHouse

8  software from FileTek ever integrated into any of Autonomy's

9  products?

10  **A.**   Not to my knowledge.

11  **Q.**   Did there come a time when you eventually learned what

12  Autonomy had spent for FileTek's software StorHouse?

13  **A.**   I did.

14  **Q.**   Okay.  And I'd like to show you what is marked as

15  exhibit -- withdrawn.

16      I'd like to show you what is in evidence as Exhibit 445,

17  please.

18  **A.**   (Witness examines document.)

19  **Q.**   If I could have that displayed, please.  And if we

20  could -- that's great.  Thank you, Ms. Margen.  Good.

21      Now, this is a general purchase request indicating that

22  the StorHouse software costs approximately $10.3 million.  Do

23  you see that?

24  **A.**   I do.

25  **Q.**   Did you have any understanding that Autonomy had spent

1   that kind of money on the StorHouse software at the time you're

2   evaluating it or preparing the demo in the manner you've

3   described?

4   **A.**   I did not.

5   **Q.**   Okay.  Did there come a time when you learned about this

6   amount of money and what had been spent by Autonomy for

7   StorHouse?

8   **A.**   I did.

9   **Q.**   Were you surprised in any sense to learn about that?

10  **A.**   I was.

11  **Q.**   Why were you surprised?

12  **A.**   I had built a demo and I had to ask for licenses and I had

13  to figure out how it worked and the whole team had to figure

14  this out, and we had to have a lot of help so it didn't occur

15  to me that this was something we owned at all.

16  **Q.**   Does the value or the amount of money spent by Autonomy

17  make any sense to you as you understand it?

18  **A.**   No.

19  **Q.**   Why not?

20  **A.**   It looks like a very large license.  We tended to build

21  our own products and we were very defensive about our

22  technology, and our IP was our technology so very rarely did we

23  even contemplate.  So it -- it just feels like a very large

24  license number.

25  **Q.**   What do you mean Autonomy tends to build its own products?

1    What do you mean by that point, Mr. Lucini?

2    **A.**    We were very proud that we built our own technology so our

3    customers didn't depend on a third-party relationship.  So we

4    would build our own character recognition technology or our own

5    speech recognition technology; and the general principle was

6    that if our customers required a change in the technology,

7    we -- the buck stopped with us.  We were the responsible

8    entity.  We could build that for them.  We didn't have to call

9    another company and ask them to build it for us.

10    **Q.**    So was there a preference in designing the Autonomy

11    technological products to develop them yourself?

12    **A.**    Yes.

13    **Q.**    Rather than acquire software from outside companies and

14    integrate it?

15    **A.**    Yes.

16    **Q.**    Thank you very much.

17        Over the time period 2009 to 2011, were you familiar with

18    a strategic sales effort by Autonomy to sell software to the

19    Vatican Library in Rome?

20    **A.**    I am.

21    **Q.**    Did you have any involvement in that sales process?

22    **A.**    I did.

23    **Q.**    What was your involvement, please?

24    **A.**    I created the proposal that was used to initially put this

25    to the Vatican.  I also got feedback from my teams how the

1    process was going.

2    **Q.**    All right.  And as you understood it, what was the nature

3    of the project or the Vatican's interest in software from

4    Autonomy?

5    **A.**    The Vatican Library has a lot of old manuscripts,

6    illuminated manuscripts with fancy language, medieval language

7    and such, and they wanted to digitize that very important

8    library, so they wanted us to take pictures of each of those

9    pages and take those pictures and put it in a computer and also

10   extract the text so somebody could search for that text.  That

11   was the need.

12   **Q.**    And how long did this sales effort go on with regard to

13   the Vatican?

14   **A.**    A very long time.

15   **Q.**    Multiple years?

16   **A.**    Yes.

17   **Q.**    Okay.  And what eventually happened with regard to

18   Autonomy's ability to sell software to the Vatican?

19   **A.**    Well, nothing really happened at the end.  I called the

20   Vatican through one of our presales and asked for the hardware

21   to be given back to us since I found another vendor had won the

22   deal.

23   **Q.**    Had you loaned hardware, in a sense, to the Vatican?

24   **A.**    As part of the presales process, we loaned them some very

25   expensive cameras and hardware and software.  We had loaned it

**LUCINI - DIRECT / REEVES**

1   to them as part of our presales, as part of our effort.

2   **Q.**   And you needed to get it back why?

3   **A.**   Because it was -- we had lost the deal.  I was informed

4   that that deal was won by somebody else who was using our

5   equipment, and I felt that it was -- I owed it to the company

6   to bring this hardware back.

7   **Q.**   And with whom did you work on this sales effort, this

8   long-term strategic sales effort to the Vatican?

9   **A.**   We had the local salesperson, Corado, who was locally

10   leading; and Sushovan Hussain was there, Pete Menell was there,

11   Chris Goodfellow was there, Paddock Wheat (phonetic) was there,

12   Al Martin was there, Monaco (phonetic) was there.  That was our

13   local SEs and, of course, the development team who helped out.

14   **Q.**   All right.  What was Mr. Hussain's role in the sales

15   effort to the Vatican Library?

16   **A.**   Mr. Hussain took an interest in the account and was quite

17   active in it.

18   **Q.**   Are you familiar with a Mr. Stouffer Egan?

19   **A.**   I am.

20   **Q.**   Did you interact with Mr. Egan over the years that you

21   worked at Autonomy?

22   **A.**   I did.

23   **Q.**   On what sorts of things would you interact with Mr. Egan?

24   **A.**   Mr. Egan was running the United States operation, so he

25   would call me and ask me to help in accounts or in issues that

LUCINI - DIRECT / REEVES

1    he'd found, or help use my skill to explain technology or to

2    help with a sale or in presales, to tell me there was an issue

3    in presales in the United States and that he needed help.

4    Q.    From what you could observe, was Mr. Egan involved in any

5    way in this long-term strategic sales effort to the Vatican

6    Library?

7    A.    Not to my knowledge.

8    Q.    Would it make sense to you that someone in charge of U.S.

9    sales would be working on a European sale in Italy?

10             MS. LITTLE:  Objection.  Foundation.

11             THE COURT:  Sustained.

12   BY MR. REEVES:

13   Q.    Is there a reason why, as you understand the organization

14   of Autonomy, Mr. Egan would not be involved?

15             MS. LITTLE:  Objection.  Foundation.

16             THE COURT:  Sustained.

17   BY MR. REEVES:

18   Q.    Do you know why Mr. Egan was not involved in this --

19             MS. LITTLE:  Objection.  Foundation.

20             THE COURT:  You have to lay a foundation.  You have to

21   lay a foundation.  The foundation --

22   BY MR. REEVES:

23   Q.    What sorts -- thank you, Your Honor.  I will.

24             THE COURT:  Okay.

25   \\\

1  BY MR. REEVES:

2  **Q.**   What sorts of sales was Mr. Egan involved?

3          **MS. LITTLE:**  Objection.

4          **THE COURT:**  No, that's not a foundational question.  A

5  foundational question is:  Do you have any firsthand knowledge

6  or were you aware of what Mr. Egan was doing during some period

7  of time?

8          **MR. REEVES:**  I think he testified about his role in

9  the U.S., but I can develop that if you'd like.

10          **THE COURT:**  Well, he said he's in charge of U.S.

11  sales.

12          **MR. REEVES:**  I'll develop that.

13  **Q.**   What was Mr. Egan's role with regard to U.S. sales?

14          **THE COURT:**  As far as you -- were you in a position to

15  see what Mr. Egan did with respect to U.S. sales?

16          **THE WITNESS:**  Yes, sir.

17          **THE COURT:**  And how were you in that position?  How

18  did you know that?

19          **THE WITNESS:**  I would participate in U.S. sales myself

20  personally.

21          **THE COURT:**  Okay.  So you saw Mr. Egan participate in

22  U.S. sales?

23          **THE WITNESS:**  Yes, sir.

24          **THE COURT:**  Okay.

25  \\\

LUCINI - DIRECT / REEVES

1    BY MR. REEVES:

2    Q.   What sorts of things did you work with him on?

3    A.   Accounts -- particular accounts that he'd want me to fly

4    over to help with, overseeing some accounts where his view was

5    that maybe we weren't performing very well as a technical team,

6    sometimes to accent an account where he felt we needed more

7    people working or more smart people, or whatever the case may

8    be.

9    Q.   Did you work with Mr. Egan on any sales to European

10   customers?

11   A.   No.

12   Q.   Is there a reason why, as you understood it, you would not

13   work with him on European sales?

14   A.   Because he was running the United States.

15   Q.   For all of us, was Rome in Europe?

16   A.   Rome -- there is a Rome in Italy, which is where the

17   Vatican is.

18   Q.   And where the Vatican is, that's in Europe; right?

19   A.   That is correct.

20   Q.   Thank you very much.

21        Okay.  Let me show you what has been marked as Exhibit 16

22   for identification, please.

23   A.   (Witness examines document.)

24        MS. LITTLE:  16?

25        MR. REEVES:  16.

LUCINI - DIRECT / REEVES

1   **Q.**   Do you have that before you, Mr. Lucini?

2   **A.**   I do.

3   **Q.**   Do you recognize this document?

4   **A.**   I do.

5   **Q.**   Is this an e-mail relating to the Vatican's sales effort

6   in or around January 2009?

7   **A.**   Yes.

8           **MR. REEVES:**  At this time I offer --

9           **THE COURT:**  Admitted.

10      (Trial Exhibit 16 received in evidence)

11          **MR. REEVES:**  Thank you, Your Honor.

12      And if we could --

13  **Q.**   So the date of the e-mail is on or around January 26,

14  2009.  Do you see that?

15  **A.**   I do.

16  **Q.**   Is that time period -- where is that in relation to the

17  work you did regarding to the Vatican?

18  **A.**   As I remember it, it is the beginning.

19  **Q.**   Toward the beginning, all right.

20      And it looks like there's a discussion about the scope of

21  the potential project down in the e-mail at the bottom that

22  reads (reading):

23          "The Vatican Library is to be closed for three years,

24      time they are going to use to digitize all their content,"

25      et cetera.

**LUCINI - DIRECT / REEVES**

1      Is that consistent with your understanding?

2   **A.**   Yes.

3   **Q.**   And that would be the time in which you would work with

4   them on the development of the software to preserve and

5   digitize the library contents; correct?

6   **A.**   Correct.

7   **Q.**   All right.  I'd like to show you what has been marked as

8   Exhibit 147 for identification.

9   **A.**   (Witness examines document.)

10  **Q.**   Do you recognize this document?

11  **A.**   I do.

12  **Q.**   What is this?

13  **A.**   This is the proposal that I created for the Vatican.

14      **THE COURT:**  Admitted.

15      (Trial Exhibit 147 received in evidence)

16      **MR. REEVES:**  Thank you, Your Honor.

17  **Q.**   And what is the date of the proposal?

18  **A.**   (Witness examines document.)

19  **Q.**   Is that July 13, 2009 -- or the date of your e-mail is

20  July 13, 2009?

21  **A.**   The date of the e-mail to Mr. Geall is the 13th, yes.

22  **Q.**   All right.  And what is this proposal that you're

23  creating, which is on -- let's go to page 3, if we could,

24  please.

25      Describe your proposal, please.

LUCINI - DIRECT / REEVES

1    **A.**    So this is the proposal that, as I described before,

2    explains what the definition of the problem is as we understand

3    it and proposes a solution using some of our technology to that

4    problem.

5    **Q.**    All right.  I'd like to show you what has been marked for

6    identification as 320, please.  Do you have that document

7    before you?

8    **A.**    (Witness examines document.)  I do.

9    **Q.**    Do you recognize Exhibit 320?

10    **A.**    I do.

11    **Q.**    Is this another e-mail relating to the Vatican in or

12    around November 11th, 2009?

13    **A.**    Yes.

14            **MR. REEVES:**  At this time --

15            **THE COURT:**  Admitted.

16    (Trial Exhibit 320 received in evidence)

17            **MR. REEVES:**  Thank you, Your Honor.

18    **Q.**    And you're communicating to -- or withdrawn.

19        Mr. Goodfellow is communicating with you about the Vatican

20    in this November time period on the subject of pricing, is he

21    not?

22    **A.**    Yes.

23    **Q.**    Who was Mr. Goodfellow again, please?

24    **A.**    Chris Goodfellow is one of our senior technologists that

25    specialized in our Digital Safe storage system.

1  **Q.**  All right.  And when it says "updated pricing," et cetera,

2  what is the purpose of this e-mail?  What do you mean by

3  "pricing"?  Or as you understood, what did Mr. Goodfellow mean

4  by "pricing"?

5  **A.**  This was an update of the pricing in the original proposal

6  that I wrote.  So we required fine-tuning after talking to the

7  customer, so this was that fine-tuning of that pricing.

8  **Q.**  Let's go to page 4 of Exhibit 320 and look at the total

9  10-year cost.  If we could enlarge that amount.

10      What is the total 10-year cost for the proposed project of

11  digitizing the Vatican Library?

12  **A.**  74 million and change Euros.

13  **Q.**  Euros.  Is that a big project?

14  **A.**  That's a large number, yes.

15  **Q.**  Was this one of the largest sales efforts that you were

16  involved with, Mr. Lucini?

17  **A.**  Yes.

18  **Q.**  I'd like to show you what has been marked for

19  identification as Exhibit 657.

20  **A.**  (Witness examines document.)

21      **MR. REEVES:**  Your Honor, this is another document that

22  I'd like to offer subject to connection.

23      **THE COURT:**  Okay.  Admitted subject to a motion to

24  strike.

25      (Trial Exhibit 657 received in evidence)

1          **MS. LITTLE:**  I would just object.  Again, this is a

2     document that this witness knows nothing about.

3          **MR. REEVES:**  We agree.

4      If I could please display Exhibit 657.

5     **Q.**    This is a purchase order from a reseller in Vienna,

6     Virginia, in the United States, MicroTech, to Autonomy,

7     relating to software for the Vatican Library dated in or about

8     March 31, 2010.  Do you see that, Mr. Lucini?

9          **MS. LITTLE:**  Objection.  Foundation.  He's just

10    reading the document.  This witness knows nothing about this

11    document.

12         **THE COURT:**  Well, he's looking at a document that is

13    in evidence subject to a motion to strike, and then he's going

14    to be asked a question about the contents of the document.  He

15    didn't create the document.  He maybe -- I don't know that he's

16    ever seen the document, but the question is:  In his

17    understanding of the situation at the time, was the statement

18    that's in the document true?  That's what he's being asked.

19         **MR. REEVES:**  Yes, Your Honor.

20         **THE COURT:**  He can ask that.

21         **MR. REEVES:**  Thank you, Your Honor.

22    **Q.**    Okay.  Have you had an opportunity to look at this

23    document in your preparation?

24    **A.**    I did.

25    **Q.**    All right.  This is a sale of the software associated with

LUCINI - DIRECT / REEVES

1    the Vatican to a reseller in the United States, Mr. Lucini.

2    Does such a sale make sense to you, the use of a reseller in

3    the United States, based on your understanding of the sales

4    effort with the Vatican?

5            MS. LITTLE:  Objection.  Foundation and relevance

6    whether it makes sense or not.

7            THE COURT:  Well, I think he was involved in sales; is

8    that correct?

9            MR. REEVES:  Yes.

10           MS. LITTLE:  He was not involved in this sale.

11           THE COURT:  True enough, but he's being shown a sale

12   and asked whether this is consistent; that is, that there's

13   some understanding he has that this is the way sales were

14   structured for a project such as the project that he worked on.

15   He can answer that question.

16   BY MR. REEVES:

17   Q.   Do you understand the question?

18   A.   Can you repeat it again, please?

19   Q.   The question is:  Based on your understanding of your

20   long-term sales effort with the Vatican that you worked on over

21   a number of years, do you have any reason to understand why a

22   reseller in the United States would be used in relation to the

23   sale of the software to the Vatican?

24   A.   No.

25   Q.   Okay.  Are there resellers in other parts of the world

 1   that would make more sense as you understood it?

 2   **A.**   Selex is already in the material you have shown me and is

 3   an Italian partner.   There's plenty of partners in Europe and

 4   Italy.

 5   **Q.**   Selex is an Italian reseller?

 6   **A.**   Yes.

 7   **Q.**   And we saw that in one of the earlier e-mails?

 8   **A.**   Correct.

 9   **Q.**   Are there problems that could arise, as you understand the

10   sales process, that could occur with the use of a reseller in

11   the United States?

12          **MS. LITTLE:**  Objection.   Foundation.   I don't know

13   that this witness knows anything about resellers in the

14   United States.

15          **THE COURT:**  Lay a foundation.

16   **BY MR. REEVES:**

17   **Q.**   Are you familiar with the use of resellers to sell some of

18   Autonomy's software?

19   **A.**   I am.

20   **Q.**   Okay.   And what is your understanding of their role and

21   why Autonomy will do business with resellers?

22   **A.**   In some cases, for example, in places where we don't have

23   a presence and we can't deploy our product, resellers can be

24   used to not only resell the product but also to implement the

25   product in a local setting.

1    In this case, for example, in Italy where we need a local

2    knowledge of the market, it's -- it's great to have a partner

3    that is embedded and understands the way the Italian market

4    works, obviously knows the language, and that can have a

5    continued presence with a customer.

6    Q.    So are there potential benefits to using local resellers

7    for sale like the Vatican?

8    A.    Yes.

9    Q.    Would there be any benefits to using a reseller in the

10   United States that you could perceive?

11   A.    Not that I can perceive.

12   Q.    Again, did Autonomy ever sell any software to the Vatican?

13   That was a deal you lost, was it not?

14   A.    Correct.

15   Q.    I'd like to move to another European deal.  Do you have

16   any familiarity with a strategic sales effort to an entity

17   known as Prisa in Spain?

18   A.    Yes.

19   Q.    What is Prisa?

20   A.    Prisa is a holding company for a number of newspapers and

21   TV and radios in the Spanish-speaking world.

22   Q.    Spanish newspapers, Spanish TVs, Spanish media company?

23   A.    Correct.

24   Q.    All right.  And what, if anything, did you do with regard

25   to this sales effort to the Spanish media company Prisa?

1    **A.**    I participated in the sale of our Web content management

2    products to Prisa where we proposed our products.  We presented

3    them.  We did the orals.  We won the deal.

4        I also did work as that deal evolved and it went

5    slightly -- implementation went slightly wrong.  I helped audit

6    that and manage that.

7        And I also helped on a second sales event where the client

8    was asking for outsourcing of their IT infrastructure.

9    **Q.**    Do you speak Spanish?

10    **A.**    I do, sir.

11    **Q.**    Is that one of the reasons that you believe you were

12    involved in this sales effort?

13    **A.**    I believe so.

14    **Q.**    All right.  And I think you said in your prior answer that

15    there was one successful sale and then there was another sale.

16    Did I understand that correctly?

17    **A.**    Yes, sir.

18    **Q.**    Could you break that down for us?  What was the first sale

19    that was successful?  What did you mean by that?

20    **A.**    So the first sale, the client was looking for -- to move

21    to digitize their platforms from a traditional paper-based

22    newspaper to a more digital Web-based product, and they needed

23    a platform to do that.  They needed technology that they could

24    put all their pictures up and put all their news up and manage

25    that process, what's traditionally called Web content

1  management.  So that was the first deal.

2  **Q.**  Okay.  And what was the second deal that sounded like

3  something else happened in the second deal?  What was the

4  second deal you mentioned?

5  **A.**  So the second deal the customer was looking to take their

6  many hundreds, if not thousands, of machines, servers, and

7  outsource them to a vendor to manage that for them so they

8  didn't have to manage it in-house.

9  **Q.**  And is there a name for that?

10  **A.**  It's IT outsourcing is a fair description.

11  **Q.**  Or hosting?

12  **A.**  Hosting is part of IT outsourcing, correct.

13  **Q.**  All right.  Okay.

14       So by 2011, do you have an understanding of where Autonomy

15  was in its relation with Prisa?

16  **A.**  I can't recall the date exactly, I'm afraid.

17  **Q.**  Let me show you what has been marked for identification as

18  Exhibit 1914.  Do you have that?

19  **A.**  I do.

20  **Q.**  Do you recognize Exhibit 1914?

21  **A.**  I do.

22  **Q.**  Is this an e-mail in or around June 30th, 2011, relating

23  to your efforts to sell to Prisa, the Spanish media company?

24  **A.**  It is.

25       **THE COURT:**  Admitted.

1          (Trial Exhibit 1914 received in evidence)

2          **MR. REEVES:**  Thank you, Your Honor.

3     And if we could enlarge the top part.  And if we could,

4     please, highlight the second paragraph of the e-mail.  Great.

5     **Q.**   So it looks like Mr. Etcheverry is writing to you,

6     Mr. Lucini.  Did you know Mr. Etcheverry, if I'm saying that

7     correctly?

8     **A.**   Yes, sir.

9     **Q.**   And what is this -- what is happening in this e-mail?

10    What is the status of the Autonomy sales effort to Prisa by

11    late June 2011?

12    **A.**   So at this stage we had given our proposal for our IT

13    outsourcing and hosting, and they were asking us to do the

14    orals so we would present our offer and we would get a chance

15    to talk to the client and defend our offer and talk about it

16    and detail it with the customer.

17    **Q.**   There's a reference in here that says (reading):

18              "Are you happy to do the proposal defense considering

19         the agenda and the Spanish language request?  We believe

20         that your participation in this meeting is critical and

21         could make the difference towards Autonomy solution,"

22         et cetera.

23         Do you see that?

24    **A.**   I do.

25    **Q.**   This was in preparation for a meeting or presentation that

LUCINI - DIRECT / REEVES

1  you did with Prisa sometime in early July?

2  **A.**   Correct.

3  **Q.**   Okay.  And how did that presentation go in July?

4  **A.**   It didn't go very well.

5  **Q.**   What happened?

6  **A.**   We had not really understood what was being asked of us,

7  so the procurement team at Prisa made it felt very clearly that

8  we had missed the mark.

9  **Q.**   That you'd missed the mark?

10 **A.**   We misunderstood what they were asking.  The exam question

11 was one and our response was not aligned with the exam

12 question.

13 **Q.**   It doesn't sound like it went well.

14 **A.**   No, it didn't go well at all.

15 **Q.**   All right.  And with whom were you working on this -- the

16 sales effort to Prisa during this time?

17 **A.**   Alvaro Etcheverry, James Murray, Emmanuel, and Dominic.

18 **Q.**   And who, if anyone, were the senior members of the sales

19 team or senior people within Autonomy that were involved, if

20 you recall?

21 **A.**   So James Murray would be the senior sales leader and, of

22 course, Sushovan would be aware also.

23 **Q.**   Do you recall having discussions with Mr. Hussain about

24 Prisa?

25 **A.**   I remember discussing after this meeting that we had

LUCINI - DIRECT / REEVES

1    actually missed the mark.  It was a very uncomfortable meeting.

2    Q.   And what did he say, if anything, when you told him how

3    the meeting had gone?

4    A.   He was dismayed and disappointed.

5    Q.   All right.  Is this another sale in Europe, in Spain?

6    A.   Correct.

7    Q.   To your knowledge did Mr. Egan have any involvement in the

8    sales effort to Prisa?

9    A.   Not to my knowledge.

10   Q.   For some of the reasons we went through with regard to the

11   Vatican?

12   A.   Correct.

13   Q.   Okay.  Now, I'd like to show you, if I could, what has

14   been marked for identification as Exhibit 1727, please.

15   A.   (Witness examines document.)

16   Q.   Do you have that document?

17   A.   I do.

18   Q.   Attached to Exhibit 1727 is a sale to a U.S. reseller,

19   Discover Technologies.  Do you see that?

20   A.   I do.

21   Q.   Relating to --

22         THE COURT:  Admitted.

23         (Trial Exhibit 1727 received in evidence)

24         MR. REEVES:  Thank you, Your Honor.

25   Q.   So you're not on this e-mail, are you, Mr. Lucini?

1    **A.**    No, I'm not.

2    **Q.**    All right.  I'd like to show you what's attached to this

3    e-mail being circulated in or around April 4, 2011.

4         This is -- if we could go to page 3.  Just stop there.

5         This is a reseller agreement, according to the document,

6    between Autonomy and Discover Technologies relating to the end

7    user Prisa.  Do you see that in the first paragraph?

8    **A.**    I do.

9    **Q.**    And the amount of the reseller agreement is down in the

10   fees, approximately $3.6 million?

11   **A.**    Yes.

12   **Q.**    Let's go to the -- that's just to orient you.  I'm going

13   to ask you some questions about the products that are attached

14   to Exhibit 1727 on page 5.  If we could please go there.

15        And if we could -- so there's -- withdrawn.

16        There's a description of the software that's being sold in

17   this reseller agreement.  Do you see that?

18   **A.**    The list you're referring to?

19   **Q.**    Yes.

20   **A.**    Yes.

21   **Q.**    All right.  And according to the document -- if we could

22   highlight "Introspect, Autonomy Investigator, Autonomy Legal

23   Hold, Autonomy Investigator."  Thank you, Ms. Margen.  That's

24   great.

25        Okay.  Those are some of the products that are being sold

1    in this reseller agreement according to the document.  Do you

2    see that?

3    **A.**    I do.

4    **Q.**    Mr. Lucini, based on your involvement with Prisa --

5    withdrawn.

6        Are you familiar with these products:  Introspect

7    Discovery Solution, Autonomy Legal Hold, Autonomy Investigator?

8    Are you familiar with those products?

9    **A.**    I am.

10    **Q.**    What type of products are these?

11    **A.**    So Introspect is an eDiscovery product, Investigator and

12    ECA is a subset for Early Case Assessment, Legal Hold is a

13    product to execute on legal holds for companies as the name

14    implies, and Investigator is obviously said twice in that list

15    but it is an Early Case Assessment tool.

16    **Q.**    Are you familiar with the types of customers of Autonomy

17    that would regularly buy these types of products?

18    **A.**    Yes.

19    **Q.**    And who are those?  What types of customers are those?

20    **A.**    Law firms, regulators, corporate with large legal

21    departments.

22    **Q.**    Regulators like the Financial Services Authority in the

23    U.K.?

24    **A.**    Correct.

25    **Q.**    All right.  And for what purpose would a law firm buy

 1  these types of products?

 2          MS. LITTLE:  Objection.  Foundation.

 3          THE COURT:  Sustained.

 4  BY MR. REEVES:

 5  Q.   If you know.  Do you have any understanding, based on your

 6  involvement with regard to the sale of these products, why

 7  certain law firms or regulators would buy them?  Do you know?

 8          MS. LITTLE:  Same objection.

 9          THE COURT:  Overruled.

10          THE WITNESS:  I do.

11  BY MR. REEVES:

12  Q.   Why would they want to buy them?

13  A.   It's a tool designed to take data pertaining to a case, to

14  forensically look into it.  If it's e-mailed, to re-duplicate

15  it; to look at the family tree, parent-childing, an e-mail of

16  an e-mail of an e-mail; and ultimately prepare it so that a set

17  of experts can literally review it in preparing productions to

18  court.  So it seems within the boundaries of what these firms

19  do.

20  Q.   In preparing for productions to court?

21  A.   Correct.

22  Q.   What do you mean by that?

23  A.   A package of documents with Bates numbering, such as --

24  such as these you've presented me with.

25  Q.   Okay.  Based on your involvement with Prisa, the Spanish

1    media company, to your knowledge did they have any need for

2    this type of product relating to productions to courts or

3    Autonomy Legal Hold, the types of products that are listed

4    here?

5    **A.**    Not to my knowledge.

6    **Q.**    Okay.  Is that consistent with the discussions you had

7    with Prisa about their needs to outsource their archiving?

8    **A.**    I never -- I never spoke to them about any of this.

9    **Q.**    You never spoke to them about any of these types of

10   products?

11   **A.**    No.

12   **Q.**    Two more topics.

13        Are you familiar, Mr. Lucini, with Autonomy's eDiscovery

14   business?

15   **A.**    I am.

16   **Q.**    And what is your familiarity with the eDiscovery

17   business that Autonomy had?  How were you involved?

18   **A.**    I was the chief technology officer of a group called

19   Aungate, which was the founding group for the eDiscovery

20   products.  So we built that product when I was the leader of

21   that.

22        We subsequently purchased a company called Zantaz that had

23   an existing business, EDD business, so we integrated our

24   technology into the Zantaz business.

25        Subsequently I worked on large deals, like the FSA and the

 1    FSO and others, so I had technical knowledge of how the

 2    products worked and scaled and did their job.

 3    **Q.**   All right.  Were you familiar with the scale of -- in

 4    Autonomy's eDiscovery business and what it could and could

 5    not handle in the time period that you were the architect for

 6    Autonomy's products?

 7    **A.**   I had -- I had foundational knowledge.

 8    **Q.**   All right.  Between 2008 and 2011, did Autonomy have

 9    excess eDiscovery that it couldn't handle for any reason?

10    **A.**   Not to my knowledge.

11    **Q.**   Okay.  Between 2008 and 2011, did Autonomy outsource any

12    excess eDiscovery work to third parties?

13    **A.**   Not to my knowledge.

14    **Q.**   Between 2008 and 2011, did Autonomy subcontract any

15    excess eDiscovery work to third parties?

16    **A.**   Can you clarify?

17    **Q.**   I think it means the same thing as "outsource" but it's

18    another word for "outsourcing."

19    **A.**   If it is wholesale giving to another vendor a piece of our

20    business, then, no.

21    **Q.**   The answer is no?

22    **A.**   Correct, no.

23    **Q.**   Are there reasons why Autonomy is not in a position to

24    outsource eDiscovery to a third party?

25         **MS. LITTLE:**  Objection.  Foundation.

1          **THE COURT:**  Lay a foundation.

2          **MR. REEVES:**  Okay.

3     **Q.**   Do you have an understanding of whether there are

4     restraints or limitations on the ability of Autonomy to

5     outsource eDiscovery work?

6     **A.**   I do, yes.

7     **Q.**   What is your understanding, sir?  What are those

8     limitations?

9     **A.**   The way that the service works and the product works, if

10    you can think about it as a factory, everything has to go in

11    through the door of the factory and everything gets pushed

12    through this factory and it comes out at the other end.

13         It's not designed for pieces to be given outside our

14    factory.  So a simple example might be the e-mail

15    re-duplication.  You can only re-duplicate the things when you

16    see all the things.  You can't duplicate if those things are in

17    several places that are not within your factory.

18         So there were several of these types of issues, including

19    re-duplication, parent-childing, the parent and childing of

20    e-mails, which would be disconnected.  So it was -- the

21    software was not really designed to manage this and, thus, the

22    service reflected that it couldn't manage it.

23    **Q.**   All right.  Are you familiar with a company known as

24    Capax?

25    **A.**   I am.

**LUCINI - DIRECT / REEVES**

1   **Q.**    And one of its principals, Mr. Baiocco?  Did you know

2   Mr. Baiocco?

3   **A.**    I do.

4   **Q.**    Did you have any interactions with Mr. Baiocco about

5   eDiscovery in or around 2011?

6   **A.**    I did.

7   **Q.**    Okay.  Tell us what you recall speaking or working with

8   Mr. Baiocco about.

9   **A.**    John -- John and I spoke, and he told me that he'd set up

10  a capability for outsourcing EDD, and he was anxious to get

11  some business from us to feed through this capacity.

12  **Q.**    Did that make any sense to you when that arose?

13  **A.**    No.  No.

14  **Q.**    I'd like to show you what has been marked for

15  identification -- unless it's already in evidence -- as

16  Exhibit 1662, please.  Do you have that before you?

17  **A.**    I do.

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 1662 received in evidence)

20          **MR. REEVES:**  Thank you, Your Honor.

21      If we could enlarge the top two e-mails.

22  **Q.**    And let's go through this slowly, Mr. Lucini.  It looks

23  like on or around March 29th, 2011, Mr. Baiocco is writing to

24  you with a copy to Mr. Kanter, "Subject Any Word?"  And then he

25  says (reading):

LUCINI - DIRECT / REEVES

1           "???? We have 2TB" --

2       Is that terabytes?  Is that the way you read that.

3   A.  That's my interpretation.

4   Q.  Okay.  (reading)

5       -- "waiting for us, correct?  Fernando, that's exactly

6       what you told us?"

7       Do you see that?

8   A.  I do.

9   Q.  Do you have an understanding of what it is Mr. Baiocco is

10  asking you about in or around this late March 2011 time period?

11  A.  Yes, I do.

12  Q.  What is your understanding, sir?

13  A.  That, once again, that he was looking to take some of our

14  excess business as he put it -- excess business is the way he

15  put it -- to run it through a platform that he had created.

16  Q.  All right.  And he says down below that (reading):

17          "I just spent $70,000 on hardware for U.K. based on

18      the 2-terabyte order you have waiting for us."

19          THE COURT:  I think it's 700,000.  He says, I think,

20  is it 70?

21          MR. REEVES:  700K.

22          THE COURT:  Yeah.  You said "70."

23          MR. REEVES:  Thank you, Your Honor.  I'm sorry.  I'll

24  go more slowly.

25  Q.  It looks like Mr. Baiocco wrote (reading):

1           "I just spent 700K on hardware for U.K. based on the

2       2-terabyte order you have waiting for us."

3       Do you see that?

4  **A.**   I do.

5  **Q.**   Did you speak with Mr. Baiocco about this issue during

6  this time period?

7  **A.**   I did.

8  **Q.**   Is that in part reflected in some of the dialogue that

9  you're having in the e-mail above?

10 **A.**   It is.

11 **Q.**   In that e-mail it looks like you're writing to Mr. Kanter

12 within Autonomy, are you not?

13 **A.**   I am.

14 **Q.**   All right.  And you're writing -- in or around March 29,

15 2011, you write (reading):

16          "Spoken to John."

17      That's a reference to John Baiocco; correct?

18 **A.**   Correct.

19 **Q.**   All right.  (reading)

20          "We do not have 2-terabyte or any other measure of

21      data waiting for him."

22      What did you mean by that?

23 **A.**   I -- I made some calls and there was no such data waiting

24 for somebody to process.

25 **Q.**   Okay.

**LUCINI - DIRECT / REEVES**

1    **A.**    Nobody recognized that.

2    **Q.**    Okay.  And you didn't recognize that?

3    **A.**    I did not.

4    **Q.**    All right.  (reading)

5              "We have not established that the cooperation is

6        mechanically possible."

7        Do you see that?

8    **A.**    I do.

9    **Q.**    What do you mean by that?

10   **A.**    As I just explained, it was the incompatibility of the

11   software to be able to separate the case into pieces.

12   **Q.**    That's the factory analogy that you offered before?

13   **A.**    Correct.

14   **Q.**    You couldn't outsource this to Capax for the reasons

15   you've explained; is that correct?

16   **A.**    Correct.

17   **Q.**    All right.  And so what -- as a result of this issue,

18   what, if anything, do you remember happening vis-a-vis Capax

19   and Mr. Baiocco's question?  What happened?

20   **A.**    I offered to have somebody look into whether it was even

21   mechanically possible, and I think it petered out from there.

22   I don't think I heard again.

23   **Q.**    It petered out?

24   **A.**    I think so, yes.

25   **Q.**    Finally, let me ask you if you're familiar with software

LUCINI - DIRECT / REEVES

1   from a company known as Discover Tech known as DiscoverPoint

2   Engine?

3   **A.**   I am.

4   **Q.**   And how did you become familiar with Discover Tech

5   software known as DiscoverPoint Engine?

6        Thank you.  I'm done with that.

7   **A.**   I was asked by Dr. Menell to evaluate it, to have a look

8   at it, and get somebody to test it and see what we thought --

9   **Q.**   All right.

10  **A.**   -- whether it was a useful technology or not.

11  **Q.**   And what did you do?

12  **A.**   I did exactly that.  I called Micro -- Discover Tech and I

13  asked them for a license, and I got a presales person that was

14  not busy at the time to take it for a spin and tell me what

15  they thought.

16  **Q.**   All right.  And what did you think of it?

17  **A.**   It was very similar to the connectors we had for

18  SharePoint at the time.  It was difficult to comment that it

19  was in any way beyond what we were already doing in the

20  connectors.

21  **Q.**   When you say connectors to SharePoint that you already had

22  at the time, what do you mean, Mr. Lucini?

23  **A.**   At the time SharePoint, the Microsoft product for content

24  management, had two versions that were overlapping, a new one

25  and an old one, and we happened to have connectors for both.

LUCINI - DIRECT / REEVES

1   Q.   Autonomy already had a way to connect to Microsoft

2   SharePoint?

3   A.   Correct.

4   Q.   All right.  Let me show you what has been marked for

5   identification as Exhibit 2373, please.

6   A.   (Witness examines document.)

7   Q.   Do you have a copy of that document?

8   A.   I do.

9   Q.   Is this an e-mail from you to Malcolm Hyson on or around

10  September 14, 2011, about the DiscoverPoint Engine software?

11  A.   It is.

12      THE COURT:  Admitted.

13      (Trial Exhibit 2373 received in evidence)

14      MR. REEVES:  Thank you, Your Honor.

15      If we could just -- that's perfect.

16  Q.   So are you working on this evaluation of DiscoverEngine,

17  also known as DiscoverPoint Engine, in or around the

18  September 2011 time frame, Mr. Lucini?

19  A.   Correct.

20  Q.   That's when you did the evaluation that you described?

21  A.   Correct.

22  Q.   All right.  And what wound up happening as a result of

23  your evaluation of DiscoverPoint Engine?  Did it go anywhere?

24  A.   Not that I know of.

25  Q.   I'd like to show you what has been marked for

1    identification as Exhibit 2013.

2          **MR. REEVES:**  This is a final document that I would

3    offer subject to connection, Your Honor.

4          **THE COURT:**  Admitted subject to motion to strike.

5       (Trial Exhibit 2013 received in evidence)

6          **MR. REEVES:**  I'd like -- if we could enlarge the first

7    page.  That's great, Ms. Margen.  Thank you.

8    **Q.**   Mr. Lucini, I'm showing you what is a report to the Audit

9    Committee on the 30th of June 2011 by Autonomy Corporation.  Do

10   you see that?

11   **A.**   I do.

12   **Q.**   This is another document relating to the audit process for

13   Autonomy.  Did you have an opportunity to look at this document

14   in your preparation for your testimony today?

15   **A.**   I did.

16   **Q.**   So at this point are you familiar with it?

17   **A.**   I am.

18   **Q.**   All right.  I'd like to show you a piece that talks about

19   the DiscoverPoint Engine software on page 15, please.

20       And if we could enlarge maybe -- that's great.  If you

21   would please highlight the first how about two sentences in

22   that paragraph starting right there.  Great.  Thank you,

23   Ms. Margen.

24       All right.  There's a discussion of DiscoverPoint Engine

25   software in this submission to the Audit Committee, Mr. Lucini.

1   I'm going to read a piece of it and ask you if this is

2   consistent with your understanding of the software.  Okay?

3   **A.**   Okay.

4   **Q.**   (reading)

5           "During Q2 2011, Autonomy purchased a $4.4 million

6       perpetual reseller license from Discover Technologies LLC

7       for their product DiscoverPoint.  This purchase was made

8       such that Autonomy could complete a number of IDOL-based

9       license revenue sales with Bloomberg, National Bank of

10      Canada, and Met Life, who all required the advanced

11      Microsoft SharePoint connectivity provided by the

12      DiscoverPoint product and not currently offered by the

13      Autonomy products they were purchasing."

14      Do you see that?

15  **A.**   I do.

16  **Q.**   Is that statement consistent with your understanding of

17  whether Autonomy's products provided the connectors to

18  Microsoft SharePoint?

19          **MS. LITTLE:**  Objection.  Foundation.

20          **THE COURT:**  Overruled.

21          **THE WITNESS:**  This is not consistent.

22  **BY MR. REEVES:**

23  **Q.**   Why is it not consistent with your understanding of

24  Autonomy's existing capability to connect to Microsoft

25  SharePoint?

1    A.    We could connect to Microsoft SharePoint.

2    Q.    Okay.  And did you need in any way Discover Technologies'

3    DiscoverPoint software in order to accomplish that?

4    A.    Not in my view.

5                    (Pause in proceedings.)

6            MR. REEVES:  No further questions.

7            THE COURT:  Okay.  Ladies and gentlemen, we're going

8    to take our recess.  Remember the admonition given to you:

9    Don't discuss the case, allow anyone to discuss it with you,

10   form or express any opinion.

11       We'll be in recess until 10 minutes to 11:00, a 20-minute

12   recess.

13                    (Recess taken at 10:31 a.m.)

14       (Proceedings were heard in the presence of the jury:)

15           THE COURT:  All right the record reflect that all

16   jurors are present, parties are present.

17       Ms. Little.

18           MS. LITTLE:  Thank you, Your Honor.

19                    **CROSS-EXAMINATION**

20   BY MS. LITTLE:

21   Q.   Good morning, Mr. Lucini.

22   A.   Good morning.

23   Q.   My name is Jan Little.  I'm one of Sushovan Hussain's

24   lawyers.

25   A.   Good morning.

1    **Q.**    Mr. Lucini, the first time that you spoke about the

2    matters you've been talking about today with HP's lawyers was

3    in November of 2012.  Do you recall that?

4    **A.**    I don't recall the exact date.

5    **Q.**    Do you recall speaking with HP's lawyers shortly after the

6    writedown of Autonomy was announced?

7    **A.**    Shortly after, yes.

8    **Q.**    And since that first meeting, you've talked with attorneys

9    and investigators for HP and for the Government a number of

10   times, have you not?

11   **A.**    Correct.

12   **Q.**    You spoke three times to HP's lawyers, Morgan Lewis &

13   Bockius.  Do you recall that?

14   **A.**    Correct.  Sounds right.

15   **Q.**    And twice in 2012 and again in 23013?

16   **A.**    Sounds correct.

17   **Q.**    And you spoke two times to attorneys for the Proskauer

18   firms in 2013?

19   **A.**    Sounds about right again.

20   **Q.**    And you spoke three times to HP's forensic accountants,

21   Price Waterhouse Coopers?

22   **A.**    That sounds correct as well.

23   **Q.**    2014, 2015, and 2016?

24   **A.**    Again, I think is correct.

25   **Q.**    And you've met four times with the FBI and either the

**LUCINI - CROSS / LITTLE**

1    Securities and Exchange Commission or the prosecutors here?

2    A.    Correct.

3    Q.    That was in 2014, twice in 2015, one time before the grand

4    jury; correct?

5    A.    That sounds about right, yes.

6    Q.    And you met with them again yesterday; right?

7    A.    Yes.

8    Q.    So you've had a total of 12 sessions meeting with HP's

9    lawyers and the Government representatives?

10   A.    Correct.

11   Q.    Let's talk about SPE for a minute.

12         As a general matter in 2008 and 2009, Autonomy was

13   interested in increasing its capabilities in structured data,

14   was it not?

15   A.    2009 mostly is what I remember, but . . .

16   Q.    And let me -- if you look in your book, please, there

17   should be a black binder --

18   A.    This one in front of me?

19   Q.    Take a look at Exhibit 5765, which is in evidence.

20         Jeff, can we put that up on the screen.

21         This is an email from Dr. Lynch to you and other

22   engineers.

23         You received this email; correct?

24   A.    Correct.

25   Q.    And this is in October of 2008?

**LUCINI - CROSS / LITTLE**

1   **A.**   Correct.

2   **Q.**   And Dr. Lynch has pasted in some information about

3   database archiving products are gaining market traction.  That

4   refers to analysis of structured data; right?

5   **A.**   It does.

6   **Q.**   Dr. Lynch writes, "Guys, you need to read this carefully.

7   We should have one"; correct?

8   **A.**   Correct.

9   **Q.**   Does that refresh your recollection that as early as 2008,

10  Autonomy was interested in moving into the structured data

11  world?

12  **A.**   I did not remember this email, but I accept what I see.

13  **Q.**   Okay.  Are you familiar with the term Project X that was

14  used at Autonomy?

15  **A.**   I'm not.

16  **Q.**   Are you aware that was a project to have Autonomy move

17  into structured data?

18  **A.**   I have no recollection of Project X.

19  **Q.**   Are you aware of statements that Dr. Lynch made to the

20  market about Project X and the desire to move into structured

21  data?

22  **A.**   I have no recollection of Project X.  I cannot remember it

23  at all.

24  **Q.**   So it's fair to say you might not know everything about

25  Autonomy's move into structure data?

1              **MR. REEVES:**  Objection.

2              **THE COURT:**  Overruled.

3              **THE WITNESS:**  Yes.

4    **BY MS. LITTLE:**

5    **Q.**    Now, in the past when you've been interviewed about this,

6    five years ago, you described IDOL SPE as an incredible

7    proposition, do you recall that?

8    **A.**    I do.

9    **Q.**    And you described it as a beautiful and compelling story

10   about a great product.  Do you recall that?

11   **A.**    I do.

12   **Q.**    And can we take a look at Exhibit 589, which is in

13   evidence and you can find it in your book and it will also be

14   on the screen there.  You can take a look at it.

15       This is an email from Dr. Blanchflower to you and others

16   in 2010 concerning "IDOL SPE update."  Do you see that?

17   **A.**    I do.

18   **Q.**    And Dr. Blanchflower, he's one of your colleagues; right?

19   **A.**    Correct.

20   **Q.**    He writes, "Great work in setting it up over there.  This

21   will be the first of a potentially huge new product line, so we

22   can all be proud."  Do you see that?

23   **A.**    I do.

24   **Q.**    Did you share that sentiment?

25   **A.**    I'm trying to remember.  I think this is with VMS.  This

1  was the installation of SPE at VMS.

2  **Q.**   It's talking about IDOL SPE update and a demo presentation

3  that had just been done.  And I do believe it's at VMS.  That's

4  right?

5  **A.**   Excuse me.  Can you ask the question again?

6  **Q.**   Do you recall sharing the sentiment that IDOL SPE was a

7  huge new product line about which you could be proud?

8  **A.**   I think it had great potential, yes.

9  **Q.**   Let's take that down.

10      Mr. Reeves showed you Exhibit 199, the September 2009

11  press release.

12      Let's put that up on the screen.

13      And you testified that you helped draft this press release

14  in some measure?

15  **A.**   That's my -- that's my recollection.

16  **Q.**   And you also used this press release in various

17  presentations that you made?

18  **A.**   Correct.

19  **Q.**   You never took any steps to correct any of the language in

20  that press release, did you?

21  **A.**   Not to my recollection.

22  **Q.**   You've testified on direct that you had some disagreement

23  with the term in here about there being a radical shift in the

24  move to structured data?

25  **A.**   Correct.

1    **Q.**    But you never told anybody that you disagreed with that

2    language, did you?

3    **A.**    No.

4    **Q.**    If we could take -- we can take that down.

5         Let's take a look at Exhibit 5754, which is in evidence.

6    And this a document that you weren't copied on, but it's an

7    email from Dr. Blanchflower, your colleague; correct?

8    **A.**    Correct.

9    **Q.**    And if we take a look -- let me find the right paragraph.

10   It's the bottom of the 1, 2, 3 -- fourth paragraph.

11        Dr. Blanchflower writes, "IDOL SPE represents a radical

12   shift in managing structured data."  Do you see that?

13   **A.**    I haven't spotted it yet.

14   **Q.**    It's the paragraph beginning, "Although the relational

15   database," the very last sentence of that paragraph.

16   **A.**    I see it now, yes.

17   **Q.**    So Dr. Blanchflower certainly believed that IDOL SPE

18   represented a radical shift in managing structured data;

19   correct?

20   **A.**    I can't assume what he was thinking or not, but that's

21   what it says there.

22   **Q.**    Okay.

23        Let's go back if we could, Jeff, to Exhibit 199, the press

24   release.  Down at the bottom, the last paragraph.

25        This is one that Mr. Reeves did not show you.  It talks

1  about IDOL SPE is a self-learning solution.  What does that

2  mean, "a self-learning solution"?

3  **A.**    In this instance, it would take existing patterns and use

4  those patterns to form the hypothesis for future responses.

5  **Q.**    That's what we call "machine learning"; is that right?

6  **A.**    It is a form of machine learning, correct.

7  **Q.**    And so as SPE is tested with customers by the sales

8  engineers or other people, that testing itself causes SPE to

9  learn, doesn't it?

10  **A.**    Not quite, no.

11  **Q.**    Okay.  Explain it.

12  **A.**    So the -- the algorithms never changed because of the

13  data.  The whole point was if we had to learn from every

14  customer, there would be thousands of -- I would say millions

15  of databases in the world.  It would be impossible to learn

16  from every one, so the point of the algorithms is that they had

17  to work for most use cases in a very generic way, without

18  having a dependency on data.

19      That doesn't mean that you can't learn from what you find,

20  and if you find a pattern that is interesting, you wouldn't

21  necessarily code it into the algorithm.  You would have an

22  algorithm that can see patterns better as opposed to the

23  pattern being built into the algorithm, so it's a slight back

24  to front thing.

25  **Q.**    So, in other words, there is some learning that is done as

1    SPE is tested and used with customers; correct?

2    **A.**    There is -- I would challenge that.  There is no -- the --

3    there is no learning per se in the scientific definition.  It's

4    finding patterns.

5         We did not use neural nets or any of these things that

6    actually do learning and actually continue to learn from the

7    data set.  It could just continue probabilistically to find

8    better patterns.  It became better at finding patterns, is the

9    statement, as opposed to learning specifically.

10    **Q.**    So it got better at finding patterns; right?

11    **A.**    Right.

12    **Q.**    Which made it a better product; right?

13    **A.**    One hopes, yes.

14    **Q.**    I think you testified on direct that IDOL SPE is a

15    marketing term for what is, in essence, a set of functions

16    within IDOL; correct?

17    **A.**    Correct.

18    **Q.**    And if we could take a look, please, at Exhibit 6001,

19    which -- wait.  Excuse me.  It's not in evidence yet.

20         Look in your book, please, if you would, at Exhibit 6001.

21         Is this an email -- it's sort of a blast email that goes

22    out by Dr. Blanchflower.

23         This is an email you would have received in January of

24    2010?

25    **A.**    I was part of that list.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 6001 received in evidence)

3    **BY MS. LITTLE:**

4    **Q.**   So the subject matter of this email is "IDOL SPE," and

5    Dr. Blanchflower, in the first sentence, writes, "To remove any

6    confusion on the subject, SPE is a module of IDOL Server and

7    has been available since the 7.5 release."  Do you see that?

8    **A.**   I do see that.

9    **Q.**   Do you agree with that, that IDOL -- IDOL SPE builds on

10   IDOL; correct?

11   **A.**   It is a set of features that could be used with IDOL.

12   **Q.**   And the development of IDOL SPE involved developing new

13   ways to use and combine IDOL functions to work with structured

14   data; correct?

15   **A.**   In a particular period or just in general?

16   **Q.**   In general.

17   **A.**   Yes.  It would be trying to understand better how you get

18   insights from structured data.

19   **Q.**   And the jury has heard from Dr. Blanchflower that IDOL SPE

20   relied on existing IDOL functionality.  Do you agree with that?

21   **A.**   I do agree with that.

22   **Q.**   And the jury has heard that the development of IDOL was --

23   of IDOL was a necessary precursor to the development of IDOL

24   SPE.  Do you agree with that?

25   **A.**   I don't.

1    Q.    You mean you can have IDOL SPE without IDOL?

2    A.    IDOL was created for the premise of unstructured data.

3    That was always the premise.  Its job was to deal with

4    unstructured data, and if it, through serendipity, could be

5    used for another use case, that's fabulous, but the premise was

6    just to make it the best unstructured engine in the world.

7    That was the treatment.

8    Q.    Right.  But you can't have IDOL SPE that worked with

9    structured data unless you also have IDOL; right?

10   A.    As it is a set of features of IDOL, yes, in that respect,

11   correct.

12   Q.    So in that sense, the development of IDOL is a necessary

13   precursor to the development of IDOL SPE?

14   A.    In that logic, correct.

15   Q.    And developmental work that relates to IDOL SPE that

16   involves changes in the IDOL service code is not necessarily

17   going to be marked down as work on IDOL SPE; right?  It's going

18   to be marked down as work on IDOL?

19   A.    As a topic, it would have to be related to structured

20   default in some way.  A feature associated with understanding

21   faces in pictures has no relationship, no bearing to structured

22   data, whereas as a feature that specifically allows you to

23   order structured data in a particular way is -- would be

24   considered in that field, whereas most of the features of IDOL

25   are -- have all to do with unstructured data, the feature list,

1    the backlogs, the kind of things developers use to build

2    features and functions.  So I think you would have indications

3    of structured versus unstructured.

4    **Q.**    Right.  But my point is if you're working on IDOL to make

5    it use -- work with structured data, that is basically work on

6    IDOL; correct?

7    **A.**    Correct.

8    **Q.**    Okay.  Let's talk about the September 2009 period.

9         You and Mr. Gallagher and Dr. Blanchflower worked toward

10   the launch of SPE in Q -- in September 2009; correct?

11   **A.**    Correct.

12   **Q.**    And Mr. Reeves had you go through and do some

13   calculations, and you came up with a figure of $70,000 for the

14   launch.  Do you recall that testimony?

15   **A.**    I do recall that.

16   **Q.**    And that was money that you calculated simply for the

17   launch; right?

18   **A.**    Correct.

19   **Q.**    And that has nothing to do with the overall development of

20   IDOL which eventually was -- was changed to be used with IDOL

21   SPE; right?

22   **A.**    It is -- it is only the effort associated with what we

23   called SPE.

24   **Q.**    The launch?

25   **A.**    And the features and functions.

**LUCINI - CROSS / LITTLE**

1  Q.   Right.  But it doesn't take into account underlying

2  development work of the underlying product, IDOL; correct?

3  A.   So the examples we just used, the video or -- it wouldn't

4  take into account those.

5  Q.   And you worked -- you worked conscientiously on that demo.

6  We saw that pedal to the metal; right?

7  A.   Yes.

8  Q.   All your work really was focused on the launch in

9  September 2009; right?

10  A.   And the support thereafter.

11  Q.   You were not involved in the underlying development work

12  related to IDOL and eventually IDOL SPE?

13  A.   I was involved in both those things.

14  Q.   Are you a developer?

15  A.   No.  I'm the technology lead, and many of the features and

16  functions would come through me and my teams and my contacts

17  with customers and the needs and requirements so --

18  Q.   Did you write any of the code?

19  A.   No, I did not.

20  Q.   And were you aware that as of November of 2009, IDOL SPE

21  had been installed and tested on 10 platforms?

22  A.   I don't recall.

23  Q.   So you weren't necessarily following how IDOL SPE was

24  being integrated and used with customers?

25  A.   I was with the customers that came through my desk.

**LUCINI - CROSS / LITTLE**

1    **Q.**    Only the ones that came through your desk?

2    **A.**    Correct.

3    **Q.**    And there are things that happened in the company that

4    don't go through your desk; right?

5    **A.**    Correct.

6    **Q.**    And you didn't have day-to-day responsibility for managing

7    SPE as it was being marketed; correct?

8    **A.**    I can't recall anybody having -- no.  I did not personally

9    have single . . .

10    **Q.**    And it was Eloy Avila who was responsible for overseeing

11    SPE; is that right?

12    **A.**    Not to my knowledge.

13    **Q.**    Well, would you take a look in your book, please, at 6013.

14         **THE COURT:**  Admitted.

15         (Trial Exhibit 6013 received in evidence)

16    **BY MS. LITTLE:**

17    **Q.**    It's way in the back.

18    **A.**    Found it.

19    **Q.**    This is an email that you received as sort of another

20    blast email from Andrew Kanter to you and various other people

21    regarding major group level roles.  Do you see that?

22    **A.**    I do see it.

23    **Q.**    If we look down toward the bottom of the third

24    paragraph -- this is in September of 2009.  It says, "Eloy

25    Avila is steering the probabilistic manipulation of structured

1    data."  That is what eventually became SPE; right?

2    **A.**    I assume so.

3    **Q.**    Well, is the probabilistic manipulation of structured

4    data -- that is SPE; right?  Structured probabilistic engine?

5    **A.**    I understand all the words independently, but together --

6    it's a complicated sentence.  I assume so.  My inference is

7    that it does.

8    **Q.**    It couldn't mean anything else, could it?

9    **A.**    I said my inference is that's what it means.

10   **Q.**    And Mr. Avila was steering that effort; right?

11   **A.**    That's what it says, yeah.

12   **Q.**    Not you?

13   **A.**    No.

14   **Q.**    By the way, take a look at that exhibit one more time.

15   Your name is not listed anywhere in there as having a major

16   group level role, is it?

17   **A.**    I have not seen it.

18   **Q.**    Okay.  We can take that down.

19        Mr. Lucini, you don't have any expertise in the accounting

20   standards that apply to the capitalization of research and

21   development costs, do you?

22   **A.**    No, I do not.

23   **Q.**    Those are judgments that are made by accountants, not

24   engineers; right?

25   **A.**    Correct.

LUCINI - CROSS / LITTLE

1   **Q.**    Do you have any expertise with the IFRS standard known as

2   IAS-38?

3   **A.**    I have not.

4   **Q.**    Are you familiar with the rule that development costs can

5   be capitalized only after commercial feasibility is met?

6   **A.**    I have not.

7   **Q.**    Do you understand that, that you can't capitalize costs

8   until a product is ready to go to market, is commercially

9   feasible?

10  **A.**    I understand what you are saying.

11  **Q.**    And you have no familiarity with those rules or accounting

12  standards?

13  **A.**    I'm not an accountant, no.

14  **Q.**    If we could take a look at Exhibit 229, which the

15  Government showed you and is in evidence.

16      You never saw that before you met with the Government and

17  started preparing your testimony; correct?

18  **A.**    Correct.

19  **Q.**    I'd like to direct your attention to a few places in here

20  that the Government didn't show you.

21      First of all, undercapitalization of SE costs, paragraph

22  No. 1, you will see it says during Q3/09 several meetings took

23  place with senior management and HMRC.

24      Who is HMRC?

25  **A.**    Her Majesty's Revenue and Customs.

**LUCINI - CROSS / LITTLE**

1   **Q.**   Is that the tax man?

2   **A.**   It is the tax man, correct.

3   **Q.**   Did you have any involvement with these meetings with

4   HMRC?

5   **A.**   I did not.

6   **Q.**   Do you have any knowledge of advice or an agreement that

7   was reached with HMRC about the ability to capitalize certain

8   R&D costs?

9   **A.**   I'm not aware.

10   **Q.**   And are you aware that in September of 2009, the HMRC

11   adopted a more expansive view of what could be capitalized in

12   the way of R&D costs?  Are you familiar with that?

13   **A.**   I'm not familiar.

14   **Q.**   Are you familiar with the fact that under the -- as of

15   September of 2009, indirect activities could also be

16   capitalized as R&D costs?

17   **A.**   I'm not aware.

18   **Q.**   And are you aware of the time period that could be

19   captured in R&D capitalization under the rules in effect then?

20   **A.**   I'm not aware.

21   **Q.**   And are you -- do you have any visibility into the review

22   that Deloitte did when it looked at this capitalization of R&D

23   costs?

24   **A.**   No.

25   **Q.**   Are you aware that these issues were discussed within

LUCINI - CROSS / LITTLE

1    Deloitte at the national accounting and audit level --

2    **A.**    I'm not aware.

3    **Q.**    -- the highest technical people?

4          You're not aware of that?

5    **A.**    No.  No, ma'am.

6    **Q.**    We can take that down.

7          Are you aware of work that Deloitte did reviewing time

8    sheet and employee pay data for the sales engineers?

9    **A.**    I'm not.

10   **Q.**    Are you aware of consulting that Deloitte did with the VP

11   of technical operations, Mr. Marsella, about projects,

12   including SPE and the engineers that worked on them?

13   **A.**    I'm not.

14   **Q.**    Are you aware of sampling and testing work that Deloitte

15   did with respect to these issues?

16   **A.**    I am not.

17   **Q.**    You basically don't know anything about how the accounting

18   works with respect to SPE?

19   **A.**    I am not an accountant.

20   **Q.**    And, sir, you also did not work in the marketing

21   department; correct?

22   **A.**    I was not part of marketing, no, correct.

23   **Q.**    And the marketing department has a few hundred people in

24   it?

25   **A.**    I couldn't tell you the number exactly.

LUCINI - CROSS / LITTLE

1   Q.   So you don't even know how many people worked there?

2   A.   A ballpark sounds correct, but I wouldn't be able to tell

3   you the exact number.

4   Q.   It's fair to say you don't have any personal knowledge

5   about what kind of marketing work would have been done in

6   association with or by the marketing department with respect to

7   SPE?

8   A.   I was in the middle of that launch, so I was taking part

9   in the briefs, I was taking part in the conversations, so I had

10  some inside knowledge there.

11  Q.   But as we've established, not everything came across your

12  desk; right?

13  A.   Correct.

14  Q.   There could be things that people were doing that you

15  didn't know about?

16  A.   Correct.  In marketing, I would get a list, rundown of all

17  of the press clippings, all of the mentions, so I did see the

18  echo of the effort because we would get these reports that

19  explained what we do and didn't do, but that would be my way of

20  understanding.

21  Q.   You saw the echo, but maybe you didn't see all the effort;

22  right?

23  A.   It would reflect where we put advertisement.  It would

24  reflect where we have been mentioned.  It would reflect the

25  interviews that we've done.

1   **Q.**   Let's talk about FileTek.

2         Again, we were discussing earlier that Autonomy was

3   interested in making a move into the area of unstructured data;

4   right?

5   **A.**   Uh-huh.

6   **Q.**   And were you aware that in the summer and fall of 2009,

7   Autonomy was thinking about acquiring a company called

8   Informatica?

9   **A.**   I was not.

10  **Q.**   And are you aware that Informatica has similar software to

11  FileTek?

12  **A.**   I'm not aware of Informatica.

13  **Q.**   You're not aware?

14  **A.**   I am aware.

15  **Q.**   Do they have a product that is similar to FileTek?

16  **A.**   There is some parallels there, some similarities, correct.

17  **Q.**   But you had no information about inquiries into possibly

18  acquiring Informatica?

19  **A.**   No.

20  **Q.**   And you've told the Government that -- you've testified to

21  the jury here that there -- you initially did an evaluation of

22  FileTek software and then Dr. Menell had Mr. Gallagher and

23  Dr. Blanchflower also look at it; right?

24  **A.**   That's my recollection, yes.

25  **Q.**   And you testified that Dr. Menell would make requests like

1    this and you didn't always understand the objective; right?

2    A.    Correct.

3    Q.    So, again, there may be things about business and

4    strategic initiatives within the company that you just didn't

5    know; right?

6    A.    Yes.  And there would be plenty of things that Pete would

7    say and do that didn't make sense to me either way, whether

8    they had consequence or not, but correct.

9    Q.    Because not everything goes across your desk; right?

10   A.    No.

11   Q.    Are you aware that Dr. Blanchflower and Mr. Gallagher did

12   look into the capabilities of FileTek and they prepared a

13   memorandum with thoughts about the potential overlap between

14   FileTek and Autonomy products?

15   A.    Yes.

16   Q.    Would you take a look, if you would, at Exhibit 408 in

17   your binder.  It's not in evidence and it's not something

18   you've seen.

19        But I will ask Mr. Reeves if you have any objection to its

20   admission?

21           MR. REEVES:  What number?

22           MS. LITTLE:  408.

23           THE COURT:  It is in evidence.

24           THE CLERK:  It is.

25           MS. LITTLE:  It is in?

1      THE COURT:  I know it's marked for identification.  Is

2  it in?

3      THE CLERK:  Yes.

4      THE COURT:  It's in.

5      MR. REEVES:  I have no objection.

6      THE COURT:  It's in.

7  BY MS. LITTLE:

8  Q.   Have you ever seen this memorandum before?  It's a

9  memorandum with thoughts on the product overlap for Storhouse?

10 A.   I can't recall.

11 Q.   You've not seen it?

12 A.   I can't recall.  It does look vaguely familiar, but I

13 can't recall exactly.

14 Q.   Is it something that you reviewed when you met with the

15 prosecutors?

16 A.   Possibly.

17 Q.   Take a look at the very first paragraph talking about SPE

18 and Storhouse.  And it says, "Storhouse/Relational Manager acts

19 as an interface to RDBMS" -- That's relational database; right?

20 A.   Yeah.  It's a relational database management system, yes.

21 Q.   -- "of all varieties extending the potential reach and

22 market of SPE."  Do you see that?

23 A.   I do.

24 Q.   And these -- so, in other words, Dr. Blanchflower and

25 Mr. Gallagher concluded that Storhouse could be used to extend

1  the potential reach and market of SPE; correct?

2  **A.**  That's what they are saying there.

3  **Q.**  Okay.  And if we could take a look at the very end of this

4  memorandum.

5  So the memorandum goes through various applications for

6  Storhouse, and at the very end, Mr. Gallagher writes that "This

7  alone" -- referring to this diagram that I confess I don't

8  completely understand.  He says, "This alone would appear to be

9  a very useful piece of technology."  Do you see that?

10  **A.**  I do see it.

11  **Q.**  And you yourself have told Hewlett-Packard's lawyer that

12  you thought FileTek's product was a genuinely good tool.  Do

13  you remember telling him that?

14  **A.**  I do.

15  **Q.**  Do you recall telling him that "FileTek made a big, good

16  product that we couldn't make ourselves."  Do you recall that?

17  **A.**  I recall saying that, yes.

18  **Q.**  And you recall telling them that "there was a true use

19  case and that using Storhouse was still a project that we'd

20  like to do today."  This was in 2013.  Do you recall saying

21  that?

22  **A.**  I do.  I recall it.

23  **Q.**  You also told Hewlett-Packard's lawyers that "Sometimes

24  the need for a product may not have been obvious, but Dr. Lynch

25  would sometimes make connections about products and also would

1    sometimes take bets on products."  Do you recall telling them

2    that?

3    **A.**    I do recall that, yes.

4    **Q.**    And Mr. Reeves showed you the purchase order that

5    established that this software was purchased in December of

6    2009.

7        Are you aware that Autonomy got a 45 percent discount on

8    the purchase price?

9    **A.**    I'm not aware.

10   **Q.**    And, again, you have no knowledge of how transactions with

11   FileTek were accounted for in the books; correct?

12   **A.**    Correct.

13   **Q.**    And you have no knowledge of Deloitte's review of the

14   circumstances of this purchase?

15   **A.**    I have not.

16   **Q.**    And are you aware that Storhouse was used or -- and looked

17   at to be used in connection with one of Autonomy's customers,

18   Kraft?

19   **A.**    I was aware.

20   **Q.**    If we could take a quick look at Exhibit 824 that is in

21   evidence.  This is not an email that you're a part of.

22       If we could take a look down at the bottom.  Start at the

23   very bottom, Jeff.  Not the very bottom.  There is -- the place

24   where it says, "Darren/Sean, below is a summary," on the bottom

25   of page 3.  There we go.

**LUCINI - CROSS / LITTLE**

1      So Dr. Wang -- is it "Wang" or "Wong"?

2  **A.**   Wang.

3  **Q.**   Dr. Wang writes, "Below is a summary of what Kraft is

4  looking for in archiving SAP data.  The item we're looking for

5  is a solution" -- "for a solution on is the historical data

6  that they want to archive into Digital Safe."

7      And then if we go up the email to page 2, Mr. Wang writes,

8  "Bojan reminded me that this is a perfect opportunity to

9  introduce Storhouse.  What do you think?"

10  **A.**   I can see it, yes.

11  **Q.**   And then Mr. Gallagher respond right above that, "Go for

12  it."

13  **A.**   I haven't seen the last one -- now I've seen it, yes.

14  **Q.**   There we go.  "Go for it."

15      And then to the very top of the email, the end of the

16  chain from Mr. Wang to Dr. Menell, Mr. Wang writes, "We are

17  planning on introducing FileTek to Kraft."

18      Do you see that?

19  **A.**   I do see it.

20  **Q.**   You are not part of this email chain; right?

21  **A.**   I'm not.

22  **Q.**   This is another example of something that didn't come

23  across your desk?

24  **A.**   This email didn't, but I did speak to Roger and I did

25  speak to Brian Weiss about this use case.

**LUCINI - CROSS / LITTLE**

1  Q.  Let's take a look at 851, which is also in evidence.  This

2  is another email about Storhouse and Kraft that you were not

3  part of.

4      And up at the top, Mr. Wang -- excuse me.  Mr. Deroeshe --

5  Mr. Wang writes to Mr. Deroeshe, "This is the database

6  archiving software that we've OEM'd to deploy in the hosting

7  environment.  The first targeted customers are Kraft and BofA."

8      Do you see that?

9  A.  Yes.

10 Q.  This is not something you were involved in?

11 A.  Correct.

12 Q.  You did know Kraft did a lot of professional services that

13 required a lot of archiving; right?

14 A.  I did.

15 Q.  You told Hewlett-Packard's lawyers that Autonomy did not

16 have a product that satisfied Kraft and so it needed to

17 integrate FileTek.  Do you recall that?

18 A.  That was my understanding.

19 Q.  And then in 2011, you've testified that you worked -- in

20 2011 Autonomy bought Iron Mountain Digital Storage; right?

21 A.  I don't remember the exact date, but it sounds about

22 right.

23 Q.  And when it did that, it also got the LiveVault product;

24 correct?

25 A.  Correct.

1    **Q.**    You were involved in 2011 in preparing a demo to show how

2    Storhouse could be used with LiveVault?

3    **A.**    Not necessarily with LiveVault.  The requirement was that

4    we would use Storhouse in our data center.  There was no

5    requirement for the target.

6    **Q.**    Okay.  But it could be used with LiveVaultIt?

7    **A.**    It was used with LiveVault.  That was the thing I chose,

8    but it could have been Digital Safe.  It could have been

9    anything that was asked, but nothing was asked.

10    **Q.**    Okay.  But you -- what you put together was for use with

11    LiveVault; right?

12    **A.**    Correct.

13    **Q.**    And you mentioned on direct that you had no knowledge of

14    any integration of FileTek with -- of the Storhouse product

15    with LiveVault before August of 2011.  Do you recall that

16    testimony?

17    **A.**    I recall.

18    **Q.**    But there was integration after August of 2011; right?

19    **A.**    With LiveVault?

20    **Q.**    With -- with archiving products.

21    **A.**    Not to my knowledge.

22    **Q.**    Didn't you tell the FBI just yesterday that you weren't

23    aware of integration of Autonomy products with archiving

24    products before August of 2011, but there were integrations

25    after August of 2011?

**LUCINI - CROSS / LITTLE**

1    **A.**    That's not my recollection, no.

2    **Q.**    Okay.  So if that's what the FBI said you said, that's not

3    right?

4    **A.**    That's not my recollection, no.

5    **Q.**    Okay.

6         You testified about a company called Capax and your

7    conversations with John Baiocco.  Do you recall that?

8    **A.**    I do recall.

9    **Q.**    You knew Capax had taken over support for an Autonomy

10   product called EAS?

11   **A.**    I did know that, yes.

12   **Q.**    You thought that was a decision that made sense; right?

13   **A.**    That seems reasonable at the time with the knowledge I

14   had, yes.

15   **Q.**    Capax really understood the software; right?

16   **A.**    I -- I think I had a little bit of judgment, but they were

17   enthusiastic to take it over.

18   **Q.**    And you were always impressed with the people you worked

19   with at Capax, weren't you?

20   **A.**    Generally speaking, yes.

21   **Q.**    You testified about some events in 2011 concerning

22   eDiscovery, but you had actually been in touch with Mr. Baiocco

23   much earlier about that, about Capax doing EDD work, were you

24   not?

25   **A.**    I can't recall that.

 1   **Q.**   Would you take a look at Exhibit 5452 in your book.

 2            **THE COURT:**  I'm sorry.  Fifty --

 3            **MS. LITTLE:**  5452.

 4            **THE COURT:**  Okay.  Admitted.

 5       (Trial Exhibit 5452 received in evidence)

 6   **BY MS. LITTLE:**

 7   **Q.**   This is an email exchange, sir, between you and Tim Young

 8   up at the top.

 9       And then before that, down below, you're communicating

10   with Mr. Baiocco.  Do you see that?

11   **A.**   I can see it, yes.

12   **Q.**   And let's start at the very bottom, an email from you to

13   Mr. Baiocco.  You said, "John, meet Tim Young, CTO of our legal

14   tech group.  Tim has some resources to train your guys in

15   San Francisco next week."

16       Do you see that?

17   **A.**   I do see it.

18   **Q.**   And then Mr. Baiocco responds, "Tim, nice to meet you.  We

19   would love to get some of our team into San Francisco for

20   training next week"; correct?

21   **A.**   I do see that.

22   **Q.**   So you were speaking with Mr. Baiocco as early as 2009

23   about doing training for EDD work; correct?

24   **A.**   Well, it's ECA.  It's the archiving product.  He is asking

25   is it ECA, is it Introspect or is it LegalHold, so it seems

1    like a generic training for a bunch of products.  But, yes.

2    **Q.**    But that relates to eDiscovery; right?

3    **A.**    Not all of it.  Introspect 6 of course does.  ALH may not

4    necessarily.

5    **Q.**    And by the spring of April -- by the spring of 2011, we've

6    seen some emails.  Capax was ready and eager to do EDD

7    processing work; right?

8    **A.**    If this related to the emails we've seen earlier and those

9    dates and those are those emails, then correct.

10   **Q.**    And in April, Mr. Baiocco confirmed to you that they were

11   ready to go on EDD and looking for work; correct?

12   **A.**    If this is the emails that we saw earlier -- again, I

13   don't remember the exact dates, but that's correct.

14   **Q.**    Let me show you a different email.  5486 in your binder.

15          **THE COURT:**  Admitted.

16       (Trial Exhibit 5486 received in evidence)

17   **BY MS. LITTLE:**

18   **Q.**    It's an email from Mr. Baiocco to you talking about the

19   "Scotch and Cigar."

20       What is the reference to the "Scotch and Cigar"?  Any

21   idea?

22   **A.**    I don't drink and I don't smoke, so I -- I think that

23   might be the reference.

24   **Q.**    Okay.  But Mr. Baiocco writes, "All good.  We're ready to

25   go on EDD.  Got anything to get us going?"

1          Do you see that?

2   **A.**   I do see that.

3   **Q.**   So he was ready to go; right?

4   **A.**   That's what it says there.

5   **Q.**   And then in May of 2011, you also helped Mr. Baiocco with

6   additional training for his EDD team.  Do you remember that?

7   **A.**   Can't recall those dates.

8   **Q.**   Let's take a look at Exhibit 6003 in your book.

9          **THE COURT:**  Admitted.

10      (Trial Exhibit 6003 received in evidence)

11  **BY MS. LITTLE:**

12  **Q.**   So looking at the bottom email from Mr. Baiocco to you, he

13  says, "Fernando, I'm desperate here.  We now have three deals

14  pending we can't execute without a couple of days in Boston.

15  Please, can you get me what we need here ASAP."

16          So he is asking for some help with training; right?

17  **A.**   I think so, yes.

18  **Q.**   Okay.  And you mentioned in your direct testimony that the

19  BP case -- that Autonomy was doing work for BP, British

20  Petroleum.  Do you remember that?

21  **A.**   I didn't mention them direct.

22  **Q.**   Okay.  Was Autonomy doing work for BP?

23  **A.**   We were doing, yes.

24  **Q.**   And you told HP's investigators that BP was the biggest

25  electronic discovery deal in Autonomy's history?

1   **A.**   That was my recollection, yes.

2   **Q.**   Autonomy had a lot of people dedicated to that project?

3   **A.**   That was my recollection, yes.

4   **Q.**   And a number of Autonomy people were working on the BP

5   project nonstop?

6   **A.**   Correct.

7   **Q.**   Let's talk just for a minute about the Vatican.

8        You testified that Autonomy wanted to sell a large

9   software deal to the Vatican; correct?

10  **A.**   Correct.

11  **Q.**   And Autonomy committed a lot of time and resources to

12  that; right?

13  **A.**   That's my recollection.

14  **Q.**   And you have indicated before when you've talked to the

15  prosecutors that you were involved only at the very beginning

16  preparing presentation material and at the end recovering the

17  hardware; correct?

18  **A.**   I created the proposal as opposed to presentation.  The

19  proposal.  And kept in touch with the team, as you saw in

20  the -- in the emails presented to me on updates of how things

21  were going, and at the very end, I took a more direct action,

22  yes.

23  **Q.**   Your involvement was in 2009; right?

24  **A.**   I believe so.

25  **Q.**   And just really quickly, the exhibits that you were shown

**LUCINI - CROSS / LITTLE**

1    in Exhibit 16, if we can bring that up -- let's look at the

2    date.

3         That's 2009?

4    A.   Correct.

5    Q.   Okay.  And then Exhibit 147 that you were shown, that's

6    also 2009?

7    A.   Correct.

8    Q.   Okay.  And so you had -- you didn't have any involvement

9    with negotiations that may have been occurring in 2010;

10   correct?

11   A.   I don't recall.

12   Q.   And you had no role with respect to any reseller deal in

13   2010 to have MicroTech participate in a portion of the

14   transaction?

15   A.   I have no involvement.

16   Q.   Okay.  And you don't know anything about MicroTech's

17   business, do you?

18   A.   Not beyond the obvious.

19   Q.   And you don't know about services that MicroTech provided

20   to major Autonomy customers?

21   A.   I was aware.

22   Q.   I'm sorry?

23   A.   I was aware.

24   Q.   You were aware of that.  Okay.

25        And were you aware that MicroTech was interested in

1  providing customization and support services to the Vatican?

2  **A.**   I wasn't aware.

3  **Q.**   You also testified that you reviewed a product from

4  Discover Tech called Discover Engine.  Do you recall that

5  testimony?

6  **A.**   I do.

7  **Q.**   And Discover Engine is a product that can enhance the

8  speed of IDOL searches in SharePoint; is it not?

9  **A.**   No.

10  **Q.**   No.  Well, Discover Engine is part of the Discovery Point

11  suite of products; right?

12  **A.**   Correct.

13  **Q.**   And you testified that you thought it was similar to

14  Autonomy's connector to SharePoint.

15       What is SharePoint, by the way?

16  **A.**   The SharePoint is a content management system that

17  Microsoft Corporation sells to their clients, so you would put

18  documents inside and you would share those with others and

19  collaborate.

20       It's quite an extensive suite of products, but at its

21  essence, it's a way to store documents and boards and wikis and

22  other things so people can collaborate.

23  **Q.**   And Autonomy had a product that was a connector to

24  SharePoint; right?

25  **A.**   Correct.

**LUCINI - CROSS / LITTLE**

1    **Q.**   And then Discover Engine was also a connector to

2    SharePoint; right?

3    **A.**   Right.

4    **Q.**   And Discover Engine had some important features that

5    Autonomy's product didn't have; right?

6    **A.**   I didn't think at the time they were material.

7    **Q.**   Well, for example, Discover Engine, it was

8    Microsoft-certified.  Were you aware of that?

9    **A.**   I wasn't aware.

10   **Q.**   Is that an important consideration for a customer using

11   SharePoint, to deal with a Microsoft-certified product?

12   **A.**   Let me rephrase that.  I can't remember whether they were

13   certified or not.

14        In my mind, it's an interesting thing for a customer.  Is

15   it important?  If it works, great.  We didn't certify

16   everything, for good reason.

17        It's an interesting thing I think our customers would have

18   like, that it was certified.

19   **Q.**   Some customers would have liked that it was certified.

20   **A.**   Some customers would have liked, yes.

21   **Q.**   Also Discover Engine had an encryption factor; did it not?

22   **A.**   I beg your pardon?

23   **Q.**   It had the ability to encrypt?

24   **A.**   Encrypt what?

25   **Q.**   Encrypt the data?

**LUCINI - CROSS / LITTLE**

1    **A.**    We encrypted the data as well.  I don't understand the

2    question.

3    **Q.**    Did Autonomy's connector to SharePoint have the ability to

4    encrypt?

5    **A.**    The connectors for Autonomy encrypted the data in transit,

6    which has been a feature for many, many years.

7    **Q.**    Okay.  And the evaluation that you did on Discover Engine

8    was in September of 2001; right?

9    **A.**    Apologies.  I can't remember the date.

10   **Q.**    Did you know that Autonomy paid significantly less per

11   instance for that purchase than other customers would have made

12   for the Discover Engine software?

13   **A.**    No.

14   **Q.**    That it got it at a steep discount?

15   **A.**    No.

16   **Q.**    You testified about the Prisa transaction and you were not

17   aware of Discover Tech having been involved as a reseller on

18   that transaction; correct?

19   **A.**    Correct.

20   **Q.**    You don't know whether Discover Tech signed a binding

21   contract for the software; right?

22   **A.**    No.

23   **Q.**    You don't know anything about the obligations for payment

24   that Discover Tech took on in signing that; correct?

25   **A.**    No.

LUCINI - REDIRECT / REEVES

1   Q.   You weren't involved in those negotiations at all, were

2   you?

3   A.   Not to my knowledge.

4   Q.   And with respect to -- you said you had some

5   communications with Mr. Hussain, but you never discussed with

6   Mr. Hussain the purchase of Storhouse; correct?

7   A.   Correct.

8   Q.   And you never discussed with Mr. Hussain anything about

9   the development or launch of SPE; correct?

10  A.   Not to my -- not to my recollection, no.

11  Q.   You didn't discuss with Mr. Hussain any of these

12  transactions that we've talked about with Capax and MicroTech

13  and DiscoverPoint?

14  A.   Not to my recollection.

15       MS. LITTLE:  May I have a moment, Your Honor?

16  (Defense counsel confer off the record.)

17       MS. LITTLE:  Nothing further.

18       THE COURT:  Okay.  Redirect?

19       MR. REEVES:  Just a couple things, Your Honor.

20              <u>REDIRECT EXAMINATION</u>

21  BY MR. REEVES:

22  Q.   Mr. Lucini, to your knowledge, was Storhouse ever actually

23  used for Kraft?

24  A.   Not to my knowledge.

25  Q.   To your knowledge, was Storhouse actually ever used for

1    anyone?

2    **A.**    Not to my knowledge.

3    **Q.**    In your cross-examination, you were asked some questions

4    about Dr. Pete Menell.  Do you recall those questions?

5    **A.**    I do.

6    **Q.**    Specifically, you said plenty of things Peter said and did

7    did not make sense.  Do you remember that testimony?

8    **A.**    I do.

9    **Q.**    What did you mean by that?

10   **A.**    Dr. Menell would -- would have a particular way to explain

11   his needs and they were very roundabout and not very direct and

12   sometimes difficult to understand the importance, so in many --

13   in my experience, in my personal experience, in many cases,

14   most of the requests would be random and unimportant and some

15   of them would be important to him or to others.  It was

16   sometimes difficult to figure that out.

17       So I tended to filter out so, and in some cases -- for

18   example, in the case of the demo, just build a demo.  I like

19   building demos.  There is no problem in building demos.  So I

20   built a demo.

21       The "why" or "how," it just got filtered.

22   **Q.**    Did you have difficulties working with Dr. Menell?

23   **A.**    I did.

24           **MS. LITTLE:**  Objection.  Relevance.

25           **THE COURT:**  Overruled.

1    BY MR. REEVES:

2    **Q.**    Did you have difficulties working with Dr. Menell?

3    **A.**    I did.

4    **Q.**    Of what variety?  What do you mean?

5    **A.**    He was a difficult manager to work with in that it was

6    difficult to have a working relationship of trust that we could

7    build upon.  I always felt he didn't trust any of us at all,

8    and in that way, it was difficult to have a team spirit when

9    one felt that at any point that trust could be broken.

10            **MR. REEVES:**  Nothing further.  Thank you, Your Honor.

11            **THE COURT:**  Anything further?

12            **MS. LITTLE:**  No, Your Honor.

13            **THE COURT:**  Thank you very much for coming.  You're

14    excused.

15        Call your next witness.

16            **MR. FRENTZEN:**  Your Honor, the Government calls Ala

17    Rizek.

18            **THE COURT:**  Stand up and stretch a bit.

19        Can I see the parties at sidebar?

20            (Sidebar conference heard but not reported.)

21            **THE COURT:**  So you know what we're doing, we have a

22    witness.  We are not going to be able to finish totally with

23    that witness today in the total amount of time.

24        So what we're going to do is the direct examination of the

25    witness, and then you're going to be excused.  So you will

1    probably be out of here before 1:00.  And then, of course, we

2    are resuming on Friday at 9:00.

3        I would rather not take another break, if you could all

4    sit for about an hour.  Anybody can't?  You want to take a

5    break now?  Okay?  All right.  Okay.  Thank you.

6        Mr. Frentzen, you may proceed.

7        Swear in the witness.

8                            **ALAN RIZEK**,

9    called as a witness for the Government, having been duly sworn,

10   testified as follows:

11           **THE CLERK:**  Please be seated.  Please state your full

12   name for the record and spell the last name.

13           **THE WITNESS:**  Alan Bartlett Rizek, R-I-Z-E-K.

14                       **DIRECT EXAMINATION**

15   **BY MR. FRENTZEN:**

16   **Q.**   Where do you live, sir?

17   **A.**   Oakton, Virginia.

18   **Q.**   Where is that in Virginia?

19   **A.**   In Northern Virginia, in Fairfax County.

20   **Q.**   Where do you currently work?

21   **A.**   A company called Sysnet Technologies.

22   **Q.**   I'm sorry.  What is that called?

23   **A.**   Sysnet Technologies.

24   **Q.**   Can you spell that for the court reporter?

25   **A.**   S-Y-S-N-E-T Technologies.

**RIZEK - DIRECT / FRENTZEN**

1  **Q.**  What do you do for them?

2  **A.**  I'm a controller.

3  **Q.**  What does that mean?

4  **A.**  I handle the finances for the company, manage HR and

5  contracts.

6  **Q.**  I want to take you back a ways.  Can you tell us about

7  your education, sir?

8  **A.**  Yes.  I've got a Bachelor's in science from Virginia Tech

9  and accounting.

10  **Q.**  And can you tell us a little bit -- take us through your

11  work history.

12  **A.**  I've worked since 1989 in various accounting roles.

13  Started off as a staff account, Kiplinger Washington Editors.

14  Promoted to senior accountant.  Worked through being accounting

15  manager, controller, and CFO for three companies.

16  **Q.**  At some point in time, did you begin working at a place

17  called MicroLink?

18  **A.**  Yes.  In September of 2006.

19  **Q.**  When you started at MicroLink, can you give us some idea

20  of the size of the business?

21  **A.**  The company was a $16 million consulting company doing

22  staffing and professional services for corporate and U.S.

23  government clients.

24  **Q.**  And what role were you hired into?

25  **A.**  I was hired into the CFO role.

**RIZEK - DIRECT / FRENTZEN**

1   **Q.**   What are your responsibilities as a CFO?

2   **A.**   Accounting, contracts, HR.

3   **Q.**   Who was your -- who was your boss at MicroLink?

4   **A.**   David Truitt.

5   **Q.**   How long did you stay employed with MicroLink?

6   **A.**   Just about -- just shy of nine years.

7   **Q.**   So just to give us an overview, at some point in time

8   while you were employed at MicroLink, was MicroLink acquired by

9   another company?

10  **A.**   Yes.  We were acquired in January of 2010 by Autonomy.

11  **Q.**   And at some point after that, was Autonomy acquired and

12  thus MicroLink acquired by another company?

13  **A.**   Yes.  Autonomy was acquired by HP and we were thus

14  acquired by HP, and then they transferred all of our employment

15  to HP employments.

16  **Q.**   And then following that, did you stay employed at

17  MicroLink, in other words, after Hewlett-Packard acquired

18  Autonomy?

19  **A.**   I stayed employed until they decided to shut down

20  MicroLink and they gave me an eight-month transfer contract to

21  transfer over.

22  **Q.**   So when was -- when did you leave working at, by that

23  point, Hewlett-Packard?

24  **A.**   Two years ago in September.

25  **Q.**   I want to take you back to that -- your work at MicroLink.

RIZEK - DIRECT / FRENTZEN

1    Could you give us -- I know you gave us an overview.

2       Could you give us a sense of your day-to-day as CFO for

3    MicroLink and let's say prior to the acquisition by Autonomy.

4    **A.**   Sure.  I worked with the staff of two accountants and two

5    or three contracts personnel.  We would receive contracts from

6    the federal government, set up projects, set people up on time

7    sheets, process the time sheets, process payroll, process

8    accounts receivable, accounts payable, and provide the tax

9    information for the CPAs for the year-end audits and for taxes

10   to be filed.

11   **Q.**   All right.  At some point in 2008, did you become aware of

12   a -- in late 2008, a sizeable deal between MicroLink and

13   Autonomy?

14   **A.**   Yes.  I think at the end of the fourth quarter, there was

15   an EDD purchase, a quarterly subscription purchase of Autonomy

16   software.

17   **Q.**   What was your understanding of the purpose of the purchase

18   of that software?

19   **A.**   That there was a substantial amount of work that could be

20   done or to be done in EDD LegalHold, more work than -- it was a

21   good market for us to get into and to buy the software to

22   support it.

23   **Q.**   What market was that that you understood that MicroLink

24   would be getting into by purchasing this Autonomy software?

25   **A.**   That we would resell the services and software to legal

1    firms to shrink their document discovery processes.

2    **Q.**   Do you recall what the dollar figure of that deal was?

3    **A.**   I believe it was above $10 million or at $10 million or

4    $12 million.

5    **Q.**   Can you take a look at those exhibits in front of you.  Do

6    you have an Exhibit 27 in there?

7    **A.**   Yes.

8    **Q.**   Could you take a look at that and see if you recognize

9    what that is.

10   **A.**   (Witness reviews document.)

11          **THE COURT:**  This is the email from Helen Ku to Steve

12   Chamberlain?  Am I looking at the right one?

13          **MR. FRENTZEN:**  Yes.

14          **THE COURT:**  Admitted.

15      (Trial Exhibit 27 received in evidence)

16          **MR. FRENTZEN:**  Can we show the front page and down at

17   the bottom, please.

18          **THE COURT:**  You can look on the screen.

19          **THE WITNESS:**  Yes.

20   **BY MR. FRENTZEN:**

21   **Q.**   Mr. Rizek, does this appear to be an email from you?

22   **A.**   Yes.

23   **Q.**   Who is it to?

24   **A.**   This is to the Deloitte auditors.

25   **Q.**   Is there a date on there?

RIZEK - DIRECT / FRENTZEN

1    **A.**    Yes.  March 24th, 2009.

2    **Q.**    All right.  Do you recall this type of subject matter

3    while you were employed at MicroLink?

4    **A.**    Yes.  Quarterly as to confirm the payables due to their

5    auditors.

6    **Q.**    Could we take a look at page 8, please, of this document.

7    **A.**    Okay.

8    **Q.**    Mr. Rizek, again, what I'm referencing hopefully will be

9    up on the screen for you to look at, whatever is easier for

10   you.

11        Could we go down to the bottom there.

12        Do you recognize the signature here?

13   **A.**    That is my signature.

14   **Q.**    And what is the purpose of signing this?

15   **A.**    To confirm that these are owed by us.

16   **Q.**    Could we go to the next page, page 9, please.

17        Do you see the list there?  What is that?

18   **A.**    That's the list of open outstanding payables to Autonomy.

19   **Q.**    And I'd like to direct your attention, if I could, to the

20   line -- do you recognize what that is?

21   **A.**    That would be the EDD deal.

22   **Q.**    At that point in time, having insight into MicroLink's

23   books, was that something that MicroLink had the ability to pay

24   for?

25   **A.**    No.

**RIZEK - DIRECT / FRENTZEN**

1    **Q.**    To your knowledge, was an EDD platform developed to be

2    able to do this kind of work --

3    **A.**    No.

4    **Q.**    -- at MicroLink?

5    **A.**    No.

6    **Q.**    Can you describe for us, did MicroLink work as a reseller

7    for Autonomy?

8    **A.**    Yes.  We only resold Autonomy software.

9    **Q.**    What do you mean by that?

10   **A.**    Autonomy software was the only software that we resold.

11   **Q.**    And in terms of reselling, as CFO, were you involved at

12   all in negotiating -- well, let me ask this.

13          Were you involved in sales?

14   **A.**    No.

15   **Q.**    Were you involved in negotiating reseller agreements?

16   **A.**    The reseller agreement was established before I got there.

17   **Q.**    In terms of specific reseller arrangements, in other

18   words, to resell to a particular customer, were you involved in

19   those negotiations?

20   **A.**    My staff would receive the contracts and I would review

21   the contracts with them.

22   **Q.**    Were you part of the, let's say -- were you a

23   decision-maker about what reselling deals to take or not take?

24   **A.**    No.

25   **Q.**    What was your understanding about who was responsible for

RIZEK - DIRECT / FRENTZEN

1    that at MicroLink?

2    **A.**    David Truitt.

3    **Q.**    Was there anybody else involved with Mr. Truitt in

4    arranging reseller deals?

5    **A.**    Yes.   John Cronin.

6    **Q.**    Who was John Cronin?

7    **A.**    John Cronin was our head of sales.

8    **Q.**    At some point in time, was Mr. Cronin sort of a

9    contractor?

10   **A.**    He was always a contractor.   He was never --

11   **Q.**    What do you mean by that?

12   **A.**    Mr. Cronin always had his own company, F -- Fed Bid, and

13   he had some other companies that he helped manage their sales,

14   but most of the time, he worked just for us as a part-time

15   consultant, managing our sales staff and the reselling process.

16   **Q.**    Was -- and I know we've had some testimony about this

17   before, but was MicroLink's -- who was MicroLink's main

18   customers, clients?

19   **A.**    Federal government.

20   **Q.**    When MicroLink was negotiating to do a reselling deal, who

21   would you receive information about that from?

22   **A.**    If --

23           **MR. KEKER:**  Objection.  Foundation.

24           **MR. FRENTZEN:**  I thought it was a foundational

25   question.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Repeat the question, please.

 3   BY MR. FRENTZEN:

 4   Q.   Yes.  If you were to receive information about a reselling

 5   deal, who would you receive that information from?

 6   A.   Either John Cronin, Dave Truitt, or the sales rep who had

 7   sold the product.

 8   Q.   What was the point in involving you or informing you about

 9   the various deals that were going on at MicroLink?

10   A.   I managed entering them into the accounting system and

11   managed the payments on them.

12   Q.   I'd like to direct your attention, if I could, to

13   Government's Exhibit 60, six-zero.  Do you have that there?

14              THE COURT:  Admitted -- oh, it already is in evidence.

15              MR. FRENTZEN:  It is?

16              THE COURT:  60?

17              THE CLERK:  No.

18              THE COURT:  It isn't?

19              MR. FRENTZEN:  I will offer it, just in case.

20              THE COURT:  Admitted.

21        (Trial Exhibit 60 received in evidence)

22              MR. FRENTZEN:  Thank you, Your Honor.

23   Q.   What is this?  And I'm more looking at the first page

24   here.  What is this, Mr. Rizek?

25   A.   This is an email from myself to John Cronin listing the
```

1    second quarter 2009 payables to Autonomy.

2    **Q.**   What does that mean?

3    **A.**   Quarterly we'd look over the payables, the open payables

4    to Autonomy, to determine which ones had sold and which ones we

5    could pay on.

6    **Q.**   Could we go to the second page, please.  And just in terms

7    of -- I know this is small print here, but just in terms of

8    what's at the top, and if we could blow that up maybe.

9    Great -- well, great.

10         Can you take us across this and tell us -- first of all,

11   who created this?

12   **A.**   This looks like my work.

13   **Q.**   Can you tell us what this is?

14   **A.**   This is a list of all the open payables to Autonomy that

15   we -- that were either due or coming due.

16   **Q.**   All right.  If we can track over to the right, what are

17   these different columns over at the right?  What do these mean?

18   **A.**   Okay.  So the "total" would be the total amount of the

19   bill.  And then the next column is how much was due in that

20   second quarter, the second quarter of 2009.  And then the third

21   column there is the amounts that were due, but we had not

22   closed the sale to the final end user.  And then the third

23   amount would be what the sales price of that would be.

24   **Q.**   Can we track down to the bottom of this, please.

25         And, Mr. Rizek, is there sort of a "total" figure?  And

1    this is May of 2009.  Is there a "total" figure here about

2    payables due to Autonomy?

3    **A.**    Yes.

4    **Q.**    What -- can you give us -- what type of number?

5    **A.**    4,027,000.

6    **Q.**    I want to move forward to Exhibit 249.  Do you have that

7    in front of you, sir?

8            **THE COURT:**  Admitted.

9        (Trial Exhibit 249 received in evidence)

10   **BY MR. FRENTZEN:**

11   **Q.**    Can you we go to the first page.

12       Mr. Rizek, what is this?

13   **A.**    It looks like the next quarter's confirmation for the

14   auditors.

15   **Q.**    And can we go to page 3, please.  Can you scroll down.

16       Mr. Rizek, does this appear to be debts owed by MicroLink

17   to Autonomy in October of 2009?

18   **A.**    Yes.

19   **Q.**    All right.  And the following page, page 4, did you --

20   keep going.  Sorry.

21       Is that your signature?

22   **A.**    It is.

23   **Q.**    Did you certify these debts?

24   **A.**    Yes.

25   **Q.**    Can we go to Government's Exhibit 309, please.

1          **THE COURT:**  Already in evidence.  Admitted.

2          **MR. FRENTZEN:**  It is, great.  Thank you, Your Honor.

3     Can we go to the --

4  **Q.**  What is this in reference to, Mr. Rizek?

5  **A.**  These are the outstanding transactions as of October 29,

6  2009 from John Cronin to David Truitt and myself.

7  **Q.**  Can we go to the following page.  Thank you.

8     Is there -- what is the net outstanding between MicroLink

9  and Autonomy as of October 30, 2009, according to this?

10 **A.**  21,880,000.

11 **Q.**  Were you involved in a meeting in October of 2009 about

12 the potential to sell MicroLink to Autonomy?

13 **A.**  I was.

14 **Q.**  Can you give us some idea in terms of how that first came

15 to your attention?

16 **A.**  I went to work.  Dave informed myself and Tim Wharton, who

17 was another owner of the company, that he was in discussions

18 with Autonomy to sell them the company.  That they had a --

19 another transaction they were looking to buy that fell through

20 and they told the investors they were looking to bring in a

21 company.

22    We prepared the next two days' financials and a package to

23 go present and then flew out here on, I believe, a Tuesday or a

24 Wednesday.

25 **Q.**  Can you give us -- do you recall around when in October

1  2009 this was?

2  **A.**  It was the week before Halloween.

3  **Q.**  Who went to meet with -- you said we flew out.  Who flew

4  out?

5  **A.**  Sorry.  Mr. Truitt and myself.

6  **Q.**  That's Dave Truitt?

7  **A.**  Dave Truitt.

8  **Q.**  Where did you fly to?

9  **A.**  Here.  San Francisco.

10  **Q.**  Who did you meet with?

11  **A.**  I met with Sushovan Hussain and Stouffer Egan.

12  **Q.**  Where?

13  **A.**  At the Autonomy offices on One Market.

14  **Q.**  Can you describe for us that meeting, what took place?

15  **A.**  We had a meeting where we went over the -- what we thought

16  was the value of the company, the -- what our product was, who

17  we were selling to and what our product lines were.

18  **Q.**  All right.  And what sort of reaction did you get from

19  Mr. Hussain or Mr. Egan?

20  **A.**  Let's -- most of the reaction was from Mr. Hussain, that

21  the -- that our consulting was cheap, not at a high value.

22  That, you know, the -- that was my takeaway.

23  **Q.**  I'm sorry.  What's that?

24  **A.**  That our value -- we were probably underselling our

25  services to the -- you know, we're selling for cheaper than

1    they were for the services.

2    **Q.**    And what does that mean when Mr. Hussain is telling you

3    that in terms of negotiating this transaction?

4    **A.**    I think he was trying to lower the value of the company.

5    That they sold services for $300 an hour when we were selling

6    services for $150, $160 an hour.

7    **Q.**    What else, if anything, do you recall about how this

8    meeting with Mr. Hussain and Mr. Egan?

9    **A.**    I recall being asked why we thought they were looking to

10   buy the company, and --

11   **Q.**    I'm sorry.  Who asked you --

12   **A.**    Mr. Hussain asked us why they were buying the company, and

13   I mentioned that it was due to the fact that they were losing

14   their clearances to sell to the federal government; that they

15   were losing their top secret facility clearance, and thus, they

16   couldn't sell or support consultants to the federal government.

17   **Q.**    What was your understanding about that, if any?

18   **A.**    My understanding was all hearsay from Dave Truitt.  That

19   they were not following the proper security procedures to

20   maintain a facility service -- a facility clearance and, thus,

21   were losing it.

22   **Q.**    When you said that, what reaction, if any, did you get

23   from Mr. Hussain or Mr. Egan?

24   **A.**    Surprise from Mr. Hussain, and David and I were asked to

25   take a break, and we left the room and went to the men's room,

1    and I had a feeling that we had just sold the company.

2    **Q.**    Did the meeting continue after you were asked to take a

3    break?

4    **A.**    It did.

5    **Q.**    And what occurred during the continuation of the meeting?

6    **A.**    We didn't drill into what we were selling.  We only pretty

7    much talked price.

8    **Q.**    What sort of price was discussed?

9    **A.**    I remember 45, 55, and $65 million.

10   **Q.**    What sort of discussion, if any, took place -- I mean, in

11   other words, who was asking for what and who was the individual

12   on the other side, on the Autonomy side, negotiating?

13   **A.**    Mr. Hussain and Dave Truitt.  I didn't negotiate the

14   price.

15   **Q.**    At the conclusion of that meeting, was a -- to your

16   understanding, was a price agreed on?

17   **A.**    No.

18   **Q.**    But what were the figures that were being thrown around

19   during the course of the meeting?

20   **A.**    I think Dave was asking for 65 million.

21   **Q.**    And what sort of figures were being discussed, if any, by

22   Mr. Hussain?

23   **A.**    I don't recall.

24   **Q.**    Were you involved -- after that meeting, were you further

25   involved in negotiating the sale price of MicroLink directly

1    with Autonomy?

2    **A.**   No.  Mr. Truitt took all the negotiations upon himself.

3    He was the majority owner.  I flew out that night.  He stayed

4    an extra night in San Francisco, and he had all the phone calls

5    himself about the price.

6    **Q.**   I'd like to direct your attention now to Government's

7    Exhibit 317.  Do you have that in front of you, sir?

8    **A.**   I don't see it.

9             **THE COURT:**  317?

10            **MR. FRENTZEN:**  Yes, sir.

11            **THE COURT:**  Admitted.

12       (Trial Exhibit 317 received in evidence)

13            **THE WITNESS:**  I don't see it in here.

14            **THE COURT:**  It's on the screen.

15   **BY MR. FRENTZEN:**

16   **Q.**   All right.  What is this?

17   **A.**   This is an email from myself to Mr. Hussain that -- I had

18   been requested to provide him a grossed-up version of our P&L.

19       In recording the resell of Autonomy product, because it

20   wasn't our main business line, our accountants, CPA firm, had

21   us -- advised us that we should only book the net of any

22   transaction, just our profit.  We shouldn't book -- so if we

23   sold a million dollars of software, we should only report the

24   10 percent profit we have or one hundred thousand and not

25   report one million in costs -- one million in revenue and

**RIZEK - DIRECT / FRENTZEN**

1   900,000 in costs.

2       So David asked me to provide a financial statement where I

3   grossed up the numbers by adding in all of the cost of software

4   and the sale -- the original sale value.

5   **Q.**   Okay.  Let's break this down a little.

6       In terms of what "grossed up" means, are you saying that

7   prior to this email, the way that MicroLink handled its books

8   or that you handled MicroLink's books, it was not,

9   quote/unquote, "grossed up"?

10  **A.**   Yes.  We had a net -- just a net sale in the book.

11  **Q.**   Can you provide the jury and myself an example of

12  recording a transaction in a way that is not grossed up; in

13  other words, how MicroLink was keeping its books?

14  **A.**   So if we sold a million dollars and we always got 10

15  percent of the margin, of the million dollars, we would only

16  book the hundred thousand dollars in our books.

17  **Q.**   Why was that?

18  **A.**   Because it misstated our financials by overstating --

19  using something that wasn't our main business line, product

20  resale.  It overstated the revenues that we got from consulting

21  services.

22      So we were about 25 million in consulting services, and if

23  we booked the full 25 million of product sales, it would

24  look -- make us look double what size we really were.

25  **Q.**   All right.  So can you tell us, just breaking down the

1  origin of this email, who asked you to send this email?

2  **A.**   Mr.-- David Truitt.

3  **Q.**   And the request that he conveyed to you was what?

4  **A.**   That Mr. Hussain would like to see our statements grossed

5  up showing the full value that if we booked a hundred percent

6  of the sales as revenue and a hundred percent of the costs on

7  our books.

8  **Q.**   Do you have a recollection of what the effect of that was

9  in terms of MicroLink's revenues?

10 **A.**   On revenues, it would increase our revenues about 20 to --

11 24-, 25-, $26 million.

12 **Q.**   So taking the visibility of your revenues from about what

13 number?

14 **A.**   From about 25 million.

15 **Q.**   To about what?

16 **A.**   To about 48 million.

17 **Q.**   After the meeting in San Francisco, this email, did you --

18 or were you involved in the effort to sell MicroLink to

19 Autonomy?

20 **A.**   I was involved in preparing -- answering any due diligence

21 questions.

22 **Q.**   What does that mean?

23 **A.**   So they wanted copies of our financial statements, copies

24 of our contracts, copies of our leases, so I was involved in

25 preparing a due diligence pack which had every corporate

1  document in it, list of all employees, list of every

2  asset/liability that we had.

3  **Q.**  All right.  Did you or were you involved in providing

4  those and who did you provide them to?

5  **A.**  We set up a portal and so we put them into the portal and

6  sent Autonomy the password.

7  **Q.**  What does that mean?

8  **A.**  It's a file -- a set of files on a computer that they

9  could log in and download the files that they needed.  Set up

10  share drives, effectively.

11  **Q.**  Could we take a look at -- can you take a look, sir, at

12  Government's 322.  Do you have that in front of you?

13  **A.**  No.  I don't see it.

14  **Q.**  322?  You don't have that up there?

15  **A.**  I go from 249 to 350.

16      **MR. FRENTZEN:**  May I have one moment, Your Honor?

17      **THE COURT:**  Yes.

18  **BY MR. FRENTZEN:**

19  **Q.**  Take a look at this, please, sir.  Do you recognize what

20  that is?

21  **A.**  It's an email from John Cronin to David Truitt with the

22  fourth quarter payables.  The fourth quarter payment sent on

23  November 13th.

24  **Q.**  And is there a second page?

25  **A.**  Yes.

RIZEK - DIRECT / FRENTZEN

1  **Q.**   What's on the second page?

2  **A.**   Second page is all of the -- I assume it's all of the

3  payables that we had to Autonomy at that time, dollar amounts

4  and the status of those contracts.

5          **MR. FRENTZEN:**  Offer it into evidence, Your Honor.

6          **THE COURT:**  Admitted.

7      (Trial Exhibit 322 received in evidence)

8          **MR. FRENTZEN:**  Can we call it up.

9  **Q.**   And, again, the date is what?

10 **A.**   The date is November 13th.

11 **Q.**   Can we just take a look at the second page, please.

12       And does this capture the debts of MicroLink to Autonomy

13 at that time?

14 **A.**   Yes.

15 **Q.**   What's the total?

16 **A.**   24 million.

17 **Q.**   I want to now -- can you take a look at Government's 396,

18 please.

19 **A.**   Yes.

20 **Q.**   What is Government's 396?

21 **A.**   It's the Autonomy confirmation dated 17th December, 2009.

22          **MR. FRENTZEN:**  I'd offer Government's 396, Your Honor.

23          **THE COURT:**  Admitted.

24      (Trial Exhibit 396 received in evidence)

25 \\\

RIZEK - DIRECT / FRENTZEN

1    BY MR. FRENTZEN:

2    Q.    Let me show the top page.

3          What is the date that you sent this confirmation out on?

4    A.    Wednesday, the 30th, 2009.

5    Q.    Is that -- do you know if that is a UK-like -- in other

6    words, December 30 --

7    A.    Yeah.  I think it's December 30th.

8    Q.    Okay.  And could we go ahead and show page 3 of this.

9          What's listed here, Mr. Rizek?

10   A.    This is all the payables that we had outstanding at that

11   time.

12   Q.    To who?

13   A.    To Autonomy.

14   Q.    And on page 4, is that your signature?

15   A.    Yes, it is.

16   Q.    All right.  Can you describe for us the end of December,

17   2009, what were you working on?

18   A.    I was working on closing the financials for the pendent

19   sale on January 4th.  The sale was closing on January 4th, so I

20   was working on completing all the financials, closing the

21   books.

22   Q.    And at that particular time, were you continuing to share

23   information about MicroLink's books and records with Autonomy?

24   A.    Yes.

25   Q.    Could you describe for us your contact, your

**RIZEK - DIRECT / FRENTZEN**

1  communications, up to the end of December 2009 with folks at

2  Autonomy?

3  **A.**    Yes.  It was mostly to Stephen Chamberlain and Lisa

4  Harris.

5  **Q.**    What was your understanding of who Lisa Harris was?

6  **A.**    Accounting manager, controller.

7  **Q.**    What about what was your understanding of who

8  Mr. Chamberlain was?

9  **A.**    Vice-president of finance for Autonomy.

10  **Q.**    Who did they work for?

11  **A.**    Mr. Hussain.

12  **Q.**    Was there any -- how do I put this?

13       Was there any sort of firewall, if you will, between

14  MicroLink and Autonomy in terms of what was in MicroLink's

15  books?

16  **A.**    Not at that time.

17  **Q.**    I'm sorry?

18  **A.**    Not at that time.

19  **Q.**    Did something occur later to set up sort of a safeguard?

20  **A.**    We were forced to do it by the DSS, the Defense Department

21  Security Services, a proxy agreement where we had three

22  members -- a federal judge, a long-term CIA employee and

23  another banker who was known to our lawyers -- as a proxy board

24  between us and Autonomy to maintain our security clearances so

25  that no undue influence from a foreign national or foreign

1  country could be put over our security -- maintain our

2  security.

3  **Q.**  I want to get into that in a minute.

4      Was that in place as of the end of 2009?

5  **A.**  No, it wasn't.

6  **Q.**  Do you have a recollection about when that came about?

7  **A.**  Probably about two months later.

8  **Q.**  In terms of the trying to close the deal with Autonomy, do

9  you have a recollection of putting in a lot of time and work?

10 **A.**  Yes.  We condensed a bunch of work that would normally be

11 done in the next week into that week.  We worked until 10:00 on

12 New Year's Eve to get the numbers done and to close the books.

13 **Q.**  As of the end of New Year's Eve working late into the

14 night -- I guess, first of all, were you in contact with

15 Autonomy folks at Autonomy as you were carrying out this work?

16 **A.**  Yes.

17 **Q.**  Were you in contact with other folks, obviously, at

18 MicroLink?

19 **A.**  Yes.

20 **Q.**  Including who?

21 **A.**  Dave Truitt, John Cronin, Tim Wharton, our HR team, my

22 contracts department.  Every employee.  We reached out to every

23 employee to get their time early and on time so that we

24 weren't -- we were able to close our books because most of our

25 revenue was consulting, so based on how many hours they worked

RIZEK - DIRECT / FRENTZEN

1    or whether or not they were on leave or sick.

2    **Q.**    As of December 31st, 2009, were you aware of a -- say, a

3    last-minute deal for MicroLink to buy $2.3 million of software

4    from Autonomy in order to resell it to Discover Tech?

5    **A.**    I was not.

6    **Q.**    Following -- and, incidentally, did the sale of MicroLink

7    to Autonomy -- did it take place by December 31st, 2009, or did

8    it take some additional time?

9    **A.**    It was scheduled -- it -- the paperwork was signed on the

10   4th, so January 4th.

11   **Q.**    I want to direct your attention now to January 1st of

12   2010.

13       On that date, were you still dealing with trying to -- the

14   due diligence, etc., to fulfill your part in MicroLink being

15   sold to Autonomy?

16   **A.**    Yes.

17   **Q.**    In connection with that, were you on the phone on

18   January 1st?

19   **A.**    I was.

20   **Q.**    Do you recall where you were on January 1st, 2010?

21   **A.**    I was at home.

22   **Q.**    On January 1st, 2010, did you have conversations with Dave

23   Truitt?

24   **A.**    I did.

25   **Q.**    On January 1st, 2010, did you have conversations with

 1  Sushovan Hussain?

 2  **A.**   Yes.

 3  **Q.**   Can you take a look at Government's 489, which should be

 4  in front of you.

 5          **THE COURT:**  Admitted.

 6      (Trial Exhibit 489 received in evidence)

 7  **BY MR. FRENTZEN:**

 8  **Q.**   What is 489, Mr. Rizek?

 9  **A.**   This is a copy of my phone bill, my personal cell phone

10  bill.

11  **Q.**   For around what time?

12  **A.**   January 7, 2009 to -- I mean December 7, 2009, to

13  January 6, 2010.

14  **Q.**   And is this your number here, for the record,

15  703-624-5169?

16  **A.**   It is.

17  **Q.**   Could we go now to page 8 of this document.  Can we scroll

18  down just a little bit.

19      Well, Mr. Rizek, can you see here starting with Item 296,

20  what is the date for that block that I've --

21  **A.**   January 1st, 2010.

22  **Q.**   On January 1st, 2010 -- first of all, do you recognize

23  this number of 703-915-1829?

24  **A.**   Yes.

25  **Q.**   Who is that?

1    **A.**    The phone number of David Truitt.

2    **Q.**    During the course of that day, did you have a number of

3    calls with Mr. Truitt?

4    **A.**    I did.

5    **Q.**    In terms of the earlier calls, do you have a recollection

6    of what those were about?

7    **A.**    Not really.

8    **Q.**    Do you have a recollection of what you were talking to

9    Mr. David Truitt about, generally speaking, on January 1st,

10    2010?

11    **A.**    The close.  Just issues around the close of the sale.  The

12    financials.

13    **Q.**    And do you see over where it says this word right here --

14    do you know what that refers to?

15    **A.**    Incoming call.

16    **Q.**    Does it appear that on two occasions during the 4:00 hour,

17    you received calls from David Truitt?

18    **A.**    Yes.

19    **Q.**    The item here that's 298, 4:49 p.m., do you recognize what

20    that is?

21    **A.**    That is the -- my outgoing call to Mr. Hussain.

22    **Q.**    Do you have a recollection of why you called Mr. Hussain?

23    **A.**    I recalled before that he had called me, but --

24          **MR. KEKER:**  Objection, Your Honor.  Unresponsive.  He

25    recalled it before --

1          THE COURT:  Overruled.  Go ahead.

2          MR. KEKER:  Maybe we could hear about what he recalled

3  before.

4          MR. FRENTZEN:  I'm getting into that.

5          THE COURT:  Go ahead.

6          THE WITNESS:  Please repeat the question I should

7  answer.

8  BY MR. FRENTZEN:

9  Q.   I believe my question was do you have a recollection about

10  why you called Mr. Hussain on that date?

11  A.   To go over the financials, to go over the working capital

12  at the close of the financial statements.

13  Q.   Do you recall whether or not anyone requested that you

14  call Mr. Hussain?

15  A.   No, I don't recall.

16  Q.   And I believe you just said you had previously recalled.

17  Can you describe for us, did you previously have a recollection

18  of Mr. Hussain calling you?

19  A.   Yes.

20  Q.   Can you describe that, please, for the jurors?

21  A.   I had remembered this as I had been called by Mr. Hussain.

22  I remembered it incorrectly, probably because I wasn't wanting

23  to make any call out --

24          MR. KEKER:  Excuse me.  Could eh say what he

25  remembered.  He just started to tell us and now he is wandering

```
 1   off.
 2            MR. FRENTZEN:  Is this a legal objection?
 3            THE COURT:  I don't know yet.
 4            MR. KEKER:  Unresponsive.
 5            THE COURT:  Be that as it may, let's stop a minute and
 6   let's start.  Okay.
 7        What is his recollection?
 8   BY MR. FRENTZEN:
 9   Q.   What is your recollection?
10   A.   My recollection of the calls is we went over the
11   financials, and I was directly asked could we take another deal
12   at risk.
13   Q.   Who asked you could you take another deal at risk?
14   A.   Mr. Hussain.
15   Q.   Can you recall for us, as best you can -- first of all,
16   what date is this again?
17   A.   January 1st.
18   Q.   When does the quarter end?
19   A.   December 31st.
20   Q.   Was Mr. Hussain asking you to take another deal in Q1 of
21   2010 or in Q4 of 2009?
22   A.   My assumption would be Q4 of 2009.
23   Q.   When he asked you whether or not you could take another
24   at-risk deal, was that something that came to you unexpected
25   during the course of this call?
```

RIZEK - DIRECT / FRENTZEN

1    A.   Yes.

2    Q.   Why is that?

3    A.   The quarter is done.  I didn't take the at-risk deals that

4    we had sold to Autonomy -- purchased from Autonomy, and I

5    wasn't the owner of the company who made those decisions.

6    Q.   When you used the phrase "at risk," what do you mean by

7    that?

8    A.   That would be that we would purchase software, that we

9    would hopefully or potentially sell to a client.

10   Q.   What did you -- or were you asked by Mr. Hussain an amount

11   of money for this deal?

12   A.   $2 million.

13   Q.   Did Mr. Hussain tell you what it was going to be for?

14   A.   No.

15   Q.   What was your response to Mr. Hussain about this proposal?

16   A.   That that wasn't my role.

17   Q.   What do you mean by that?

18   A.   I didn't accept deals at risk for the company.  That would

19   have been Mr. Truitt.

20   Q.   Did you say anything about the books being closed?

21   A.   I didn't stress the point that it wouldn't be, like,

22   impossible.

23   Q.   What's that?

24   A.   I did not stress the point that it would be impossible.

25   Q.   I'm not sure what you're saying.

RIZEK - DIRECT / FRENTZEN

1    **A.**    I told him the books were closed, but I didn't say that

2    they couldn't be reopened to add things.

3    **Q.**    I gotcha.

4        Would you describe for us, were you telling Mr. Hussain

5    "no" or were you saying "I'm not the guy"?

6            **MR. KEKER:**  Objection.  Leading.

7            **THE COURT:**  Overruled.

8            **THE WITNESS:**  I answer?

9    **BY MR. FRENTZEN:**

10   **Q.**    Yes.

11   **A.**    I was saying I'm not the guy.

12   **Q.**    To your recollection, again -- sorry.  Previously it was

13   your recollection that Mr. Hussain called you?

14   **A.**    Yes.

15   **Q.**    Okay.  A couple weeks ago looking at these records, were

16   you able to determine that you had, in fact, called him?

17   **A.**    Yes.

18   **Q.**    When you got off the phone with Mr. Hussain, who did you

19   call?

20   **A.**    Mr. Truitt again.

21   **Q.**    When you called Mr. Truitt, what, if anything, did you say

22   about the conversation that you just had with Mr. Hussain?

23   **A.**    I told him that he wanted to take -- us to take another

24   at-risk deal.  I told him I'm not the guy for that, and my

25   recollection is Mr. Truitt stated it's going to be their

1   company -- if this is the way they are going to want to run it,

2   it's going to be their company in three days.

3   Q.   When Dave Truitt said that to you, what, if anything -- I

4   mean, what did that cause you to think?

5   A.   I needed to get a new job.

6   Q.   What do you mean by that?

7   A.   I had been wondering whether or not I had been kept on --

8   would be continuing employment with the company.  There was

9   talk about a -- an agreement to stay, transitional agreement to

10  stay six months, but I had already started looking for new

11  employment and was talking to my -- my friends who had jobs or

12  know companies that are hiring.

13  Q.   Following your conversation with Dave Truitt -- and,

14  again, do we see that here indicated on Item 299?

15  A.   Yes.

16  Q.   That's an outgoing call --

17  A.   And then Dave called me back on 300.

18  Q.   And it looks like it's a long conversation at that point?

19  A.   It is.

20  Q.   Do you have a recollection of what else you were

21  discussing with Mr. Truitt, other than Mr. Hussain asking you

22  to take an at-risk deal?

23  A.   Not really.

24  Q.   What else -- what other topics were of issue on the 1st of

25  January, 2010?

1   **A.**   Just the sale of the business.

2   **Q.**   Were there a lot of different issues attached to the sale

3   of the business?

4   **A.**   I thought we were closed with all the issues.

5   **Q.**   All right.  Was there then another additional outgoing

6   call to the UK?

7   **A.**   Yes.  Three-minute call.

8   **Q.**   What's the time of that three-minute call?

9   **A.**   6:10 p.m.

10  **Q.**   And, incidentally, the call, the initial call to

11  Mr. Hussain, does it indicate how long that call was for?

12  **A.**   Ten minutes.

13  **Q.**   Do you have any recollection, Mr. Rizek, of what occurred

14  in your follow-up call with Mr. Hussain?

15  **A.**   I don't even know if we talked.  I don't know if I left a

16  message or not.

17  **Q.**   Do you have any recollection of that subsequent phone

18  call?

19  **A.**   Not really, no.

20  **Q.**   Did you, in re-calling Mr. Hussain -- did you tell him

21  that you were willing to do an at-risk deal?

22  **A.**   No.

23  **Q.**   There's then another an additional call with Mr. Truitt;

24  is that right?

25  **A.**   Yes.

RIZEK - DIRECT / FRENTZEN

1  Q.   And then, if I could -- are there a number of calls there,

2  and do you recognize or do you recall calling Steve Wiltse,

3  Mark Moore or Joe Romagnoli?

4  A.   The next three calls are to those two.  Two of them are

5  managing partners of CPA firms that I was looking to get

6  employment with or employment with their customers, and Mark

7  Moore was the person who got me the job with Dave and I was

8  calling him to see who he might have who would need another

9  accountant.

10  Q.   What was the nature of these subsequent calls?

11  A.   "Get me out of here."

12  Q.   Did you, in fact, leave?

13  A.   No.

14  Q.   Following this conversation with Mr. Hussain, did you

15  subsequently learn that MicroLink had engaged in another

16  $2.3 million transaction to resell software to Discover Tech?

17  A.   I -- I recall the transaction coming in, but at the time,

18  I knew of no potential to sell it to Discover Tech.

19  Q.   All right.

20       Could we take a look at Government's 420, which I believe

21  is in evidence, Your Honor?

22            THE COURT:  420 is in evidence.

23            MR. FRENTZEN:  Thank you, Your Honor.

24  Q.   Mr. Rizek, on January 1, 2010, why did you -- when you say

25  you wanted to get out of there, why did you want to get out of

RIZEK - DIRECT / FRENTZEN

1    there?

2    **A.**    I didn't want to be responsible for doing things that

3    weren't right.

4    **Q.**    In connection with your -- have you previously met with

5    representatives of the Government and the FBI?

6    **A.**    Yes.

7    **Q.**    In connection with those meetings, did you -- were you

8    given a proffer letter?

9    **A.**    I was.

10   **Q.**    What is your understanding of what a proffer letter is?

11   **A.**    It means I need to tell the truth here.

12   **Q.**    What does it mean in terms of what can or can't be done

13   with the things that you told the Government in those meetings?

14   **A.**    That they can't be used against me.

15   **Q.**    Did you also receive immunity when you testified before

16   the grand jury?

17   **A.**    I did.

18   **Q.**    What is that?  What is your understanding of what that

19   means, "immunity"?

20   **A.**    That was to compel me to answer the questions truthfully

21   and honestly, not to claim the Fifth Amendment.

22   **Q.**    What's your understanding of what immunity means for you

23   in terms of what can or can't be done with your statements

24   before the grand jury?

25   **A.**    Could not be used against me.

RIZEK - DIRECT / FRENTZEN

1    **Q.**    Do you have immunity for testimony here today?

2    **A.**    I do.  My understanding is yes.

3    **Q.**    Is your understanding that that's the same -- that

4    immunity has the same meaning as you already described?

5    **A.**    Yes.

6    **Q.**    Related to the grand jury?

7    **A.**    Yes.

8    **Q.**    Okay.  All right.

9         Government's 420, Mr. Rizek, do you know of your own

10    personal knowledge -- do you know how this document was

11    created?

12    **A.**    My assumption is that John Cronin created this.

13    **Q.**    What is it about looking at this document that makes you

14    assume that?

15    **A.**    This was the format that he used for doing purchase

16    orders.  This format was only used for purchase orders for

17    Autonomy software.  And the P.O. Box, the electronic delivery

18    account, was an account that went to him.

19    **Q.**    Did you create this document?

20    **A.**    No, sir.

21    **Q.**    Did you tell Mr. Cronin to create this document?

22    **A.**    No, sir.

23    **Q.**    Can we just take a look at the second page of this

24    purchase order.

25         What does this appear to be for?

**RIZEK - DIRECT / FRENTZEN**

1    **A.**    For profiling for the -- for Discover Technologies.

2    **Q.**    Were you aware of whether or not -- I guess, first of all,

3    let me -- did you eventually have any relationship with

4    Discover Technologies?

5    **A.**    I did.

6    **Q.**    Can you describe that, please, for us.

7    **A.**    I set up their initial accounting for them.  I paid their

8    first payroll for them.  They were seven or eight employees

9    starting day one.  I trained up actually John Cronin's daughter

10   who was a college graduate to be their bookkeeper and I helped

11   her when she had questions.

12   **Q.**    Did you ever actually sort of formally move over to work

13   at Discover Tech?

14   **A.**    That was the plan, but it never happened.

15   **Q.**    Why not?

16   **A.**    I don't know.  I think maybe this case, but it never

17   happened.

18        I left employment from a firm around June of last year and

19   I was told they didn't have room for me.

20   **Q.**    Did this notion of buying -- MicroLink buying Autonomy

21   software to sell through to Discover Tech, did that make any

22   sense to you?

23   **A.**    No.

24        **MR. KEKER:**  Objection.  Relevance.

25        **THE COURT:**  Overruled.

RIZEK - DIRECT / FRENTZEN

1  **BY MR. FRENTZEN:**

2  **Q.**   Did you ever put this transaction, let's say, on the books

3  at MicroLink?

4  **A.**   I did.

5  **Q.**   Could we take a look at Government's 421, which I don't

6  think is in evidence.

7         **THE COURT:**  It is in evidence.

8         **MR. FRENTZEN:**  It is?  I'm sorry.  Can we take a look

9  at the first page then, please.

10 **Q.**   What is this, Mr. Rizek?

11 **A.**   That's the bill from Autonomy to us for the 2.3 million.

12 **Q.**   And the purchase order and the invoice here, does that

13 relate to the conversation you had with Mr. Hussain?

14 **A.**   I believe it does.

15 **Q.**   I want to go now to Government's 535.

16     Do you recognize what 535 is, Mr. Rizek?  Do you have that

17 in front of you?

18 **A.**   I do.

19 **Q.**   Do you recognize it?

20 **A.**   I do.

21 **Q.**   What is it?

22 **A.**   It's the confirmation for just this one transaction dated

23 January 11th.

24 **Q.**   This is to who?  From you to who?

25 **A.**   It was from me to their auditors.

RIZEK - DIRECT / FRENTZEN

1   **Q.**   Can we go --

2   **A.**   And Matt Stephan and Stephen Chamberlain.

3   **Q.**   Those are employees at Autonomy?

4   **A.**   Yes.

5   **Q.**   Could we go to page 4, please.  Can we slide it up just a

6   little bit.  Well, that's fine.

7          What is -- actually, can we go back down.  I'm sorry.

8          What is this, Mr. Rizek?

9   **A.**   It's a confirmation for the $2.3 million transaction with

10  my signature on the 11th.

11  **Q.**   So this is specifically for that one purchase order?

12  **A.**   Yes.

13  **Q.**   When you got this, did this cause you any concern?

14  **A.**   My concern came before this when I had -- or I thought my

15  lack of concern was before this when I had a confirmation that

16  did not have this on it, and then that prompted both the

17  invoice to show up hours later and this confirmation all on its

18  own.

19  **Q.**   In the intervening time period, did you become aware of a

20  purchase order related to selling this profiling to Discover

21  Tech for a thousand dollars per use?

22  **A.**   Yes.

23  **Q.**   Can you tell us, how did that come to your attention?

24  **A.**   I must have had conversations about it with John and Dave

25  Truitt, but I was emailed a purchase order for a thousand

1  dollars for per use per sale of this functionality.

2  **Q.**   Can you describe for us what that means?

3  **A.**   Discovery Technologies -- as part of the sale, Dave

4  decided to spin out to a separate company some software he was

5  working on called Discovery or Discover and it had two -- it

6  had a profiling option.

7       The base software would look at traffic on a company and

8  try to match people that are doing similar work in a large

9  organization, and he wanted the profiling option as an option

10  on it when he sold it.

11 **Q.**   So this $1,000 per use, what was the relationship?  What

12  was the arrangement there, as you understood it?

13 **A.**   That any time he sold his software with the profiling,

14  that he would have to pay MicroLink, thus Autonomy, a thousand

15  dollars.

16 **Q.**   To your knowledge, did that purchase order ever turn into

17  an actual invoice?

18 **A.**   I do not believe so.

19 **Q.**   What do you mean by that?

20 **A.**   I don't know of any instances of Mr. Truitt selling his

21  software with the Discovery -- with the profiling in it.

22 **Q.**   All right.  And this audit confirm, when you did receive

23  this, what was your thoughts about it?

24 **A.**   That they did actually take that at-risk deal and put

25  through the at-risk deal, Autonomy.

1   **Q.**   And if we could scroll down to the signature.

2        What were you asked to do with this, Mr. Rizek?

3   **A.**   To fax it back.

4   **Q.**   Did you sign it?

5   **A.**   Yes.

6   **Q.**   Did that cause you concern about yourself?

7   **A.**   No more than signing any of the other ones.

8   **Q.**   What do you mean?

9   **A.**   You know, transactions that we -- I was worried about

10  at-risk transactions and whether or not they would be, you

11  know -- if they were proper.

12  **Q.**   Well, this one here, did you have reason to think this was

13  also backdated?

14  **A.**   Yes.

15  **Q.**   Why?

16  **A.**   The invoice wasn't sent to us before and the phone call

17  with Mr. Hussain.

18  **Q.**   Did you sign it anyway?

19  **A.**   Yes.

20  **Q.**   Why?

21  **A.**   I didn't think it would be good if I didn't sign it.

22  **Q.**   What do you mean?

23  **A.**   I don't think I would be employed the next day.

24  **Q.**   To your knowledge, as of -- were you aware that as of

25  December 21st of 2009, that Mr. Hussain wanted to let you go?

1    **A.**    I saw an email that led me to believe that later.

2    **Q.**    I'm saying at the time here, were you aware that you were

3    sort of an at-risk employee?

4    **A.**    I understood I was at risk.

5    **Q.**    What does that mean?

6    **A.**    That I assumed that after they purchased the company, they

7    would be wanting to cut overhead and cut positions they didn't

8    see as valuable or worth their money.

9    **Q.**    Did you end up being retained?

10    **A.**    I wasn't -- I was retained.

11    **Q.**    Could you tell us, just briefly, about the -- you've

12    already described the proxy arrangement and that it came along

13    a couple months later.

14        Can you describe for us in terms of what sort of firewall,

15    if any, that created between Autonomy and MicroLink in terms of

16    MicroLink's books.

17    **A.**    Every month, we'd send financials, trial balance,

18    receivables, payables, a full financial package -- would send

19    those to either Matt Stephan, Lisa Harris, or Stephen

20    Chamberlain, and so the main part of the firewall is that they

21    couldn't ask us details, they couldn't say "what are you doing

22    for the CIA company, what are you working on," but it didn't

23    stop them from knowing how many dollars were spent on a

24    project, how many -- how much revenue we were doing for a

25    customer.

**RIZEK - DIRECT / FRENTZEN**

1          We didn't particularly send, you know, labor -- a bill

2     to -- if we were working for the CIA or FBI, the dollars we

3     spent.  We did on each job, but they could look at the

4     receivables and see how much work was there, but they wouldn't

5     know the nature or who was working on those jobs.

6     **Q.**    In terms of what MicroLink's overall financial picture

7     was, was Autonomy allowed insight into that?

8     **A.**    Yes.

9     **Q.**    Was there any prohibition on your conversations with, for

10    example, Stephen Chamberlain?

11    **A.**    No.

12    **Q.**    Was there any prohibitions on your conversations with a

13    Lisa Harris?

14    **A.**    No.

15    **Q.**    At the time that MicroLink was acquired by Autonomy, what

16    kind of debt was owed by MicroLink to Autonomy?

17    **A.**    Something near $24 million.

18    **Q.**    Did you -- I'm sorry.

19         Was that known to the financial folks at Autonomy that you

20    dealt with?

21    **A.**    Yes.

22    **Q.**    Did it, in fact, show up in spreadsheets that they

23    prepared?

24    **A.**    Yes.  That I prepared, they prepared, we sent back and

25    forth.

1    **Q.**    And that would be with who?

2    **A.**    That would be with Stephen Chamberlain mostly.

3    **Q.**    He worked for or reported to who?

4    **A.**    Mr. Hussain.

5    **Q.**    Did you participate in writing off about $16 million on

6    MicroLink's books that was owed to Autonomy?

7    **A.**    I did.

8    **Q.**    Can you describe for us, in general terms, what happened

9    in connection with that?

10   **A.**    So in my discussions with Mr. Chamberlain, he said that we

11   couldn't keep any -- when we put the transactions that had not

12   sold onto our financials, we recorded them as both an asset and

13   a payable, payable to Autonomy and an asset like they were a

14   car or, I mean, just a piece of a tool -- a tool or equipment.

15   And he said that we couldn't keep Autonomy assets on our books

16   after the sale, so they had to be written off.

17        And that included writing off our payables to them, the

18   asset on our books, which wrote off dollar for dollar, and then

19   they, in turn, had to write off the receivables from us.

20   **Q.**    Could you take a look, if you could, please, at

21   Government's 816.

22            **THE COURT:**    816, admitted.

23        (Trial Exhibit 816 received in evidence)

24   **BY MR. FRENTZEN:**

25   **Q.**    What is 816?

1    **A.**    816 is an email to Ken Wong from Lisa Harris.

2    **Q.**    What is the date?

3    **A.**    The date is 5/18/2010.

4    **Q.**    Were you one of the people cc'd on this?

5    **A.**    I am.

6    **Q.**    What was Ms. Harris asking be done?

7    **A.**    She was asking for them to post what they call a good

8    dummy cash entry to write off the amounts that we owed them

9    that we were not going to be paying to them.

10    **Q.**    What does that mean, "posting dummy cash"?

11    **A.**    I assume that they're --

12            **MR. KEKER:**    Objection to his assumption, Your Honor.

13            **THE COURT:**    I think the question is "what is your

14    understanding of it?"

15    **BY MR. FRENTZEN:**

16    **Q.**    What is your understanding of what is meant by "posting

17    dummy cash"?

18    **A.**    My understanding is their accounting system would allow

19    either writeoffs or posting of cash as we are not going to be

20    paying them these balances, that they had to write it off, but

21    instead of writing it off, they posted a dummy cash entry and

22    then did a journal entry to move it to their intercompany

23    account.

24    **Q.**    All right.  And what is -- do you know what NA Holdings

25    is?

RIZEK - DIRECT / FRENTZEN

1    **A.**    That is the subsidiary we were under.

2    **Q.**    What?

3    **A.**    The subsidiary of their North American assets that

4    MicroLink was under.

5    **Q.**    So in terms of the effect on MicroLink -- does this email

6    relate to -- can we scroll down some.  Keep going.  Right

7    there -- back.  There.

8        Does this email relate to posting dummy cash in the amount

9    that is reflected here?

10    **A.**    Yes.

11    **Q.**    In terms of the effect on MicroLink, what was the effect

12    on MicroLink as a result of this?

13    **A.**    This removed $15,962 of payables to Autonomy and assets

14    off our books.

15    **Q.**    I think you said "thousand"?

16    **A.**    I'm sorry.  16 million.  16,900,000.

17    **Q.**    15,960,000?

18    **A.**    15,962,000.  It removed them off our books -- it removed

19    both the assets and the payables off the books.

20    **Q.**    Could we go to the 5 page of this.  It may be the part

21    that is in native format.

22            **THE COURT:**  Shall we recess now?

23            **MR. FRENTZEN:**  If the Court -- if the Court -- I

24    didn't want --

25            **THE COURT:**  No, no, no.

1    **MR. FRENTZEN:**  I have a fair amount left.

2    **THE COURT:**  I don't know how much longer you have.

3    **MR. FRENTZEN:**  I might finish at 1:00.

4    **THE COURT:**  We are going to take our recess.

5    Ladies and gentlemen, we are taking our recess now.  We

6  will resume on Friday at 9:00.

7    Remember the admonitions given to you.  Don't discuss the

8  case, allow anyone to discuss it with you, form or express any

9  opinion.  We are in recess.

10    (Proceedings were heard out of presence of the jury:)

11    **THE COURT:**  You may step down.

12    Mr. Keker, you wanted to raise -- let the record reflect

13  the jury has retired.

14    I've read the motion or the -- or the request for a case

15  management assistance.

16    **MR. KEKER:**  And let me say, I recognize this is

17  unusual, but this case is unusual, and I think you just saw the

18  effort that you go through to try to put together the exhibits

19  and the necessity -- I mean, you can't imagine what the

20  paralegals have to do, how to get the things, try to get it

21  involved.

22    So what we had in the beginning was a very forthright and

23  useful statement from Mr. Reeves about these witnesses are in

24  the beginning, these are in the middle, these are in the end,

25  and we've basically run through that, the beginning part.

1    When we started to do what we understood was going to be

2    the middle and the end so that we could do our planning, as you

3    heard, they said "no, no, we can do it, but we're not going to

4    tell you unless you tell us about your defense" --

5    **THE COURT:**  That part.  Okay.  So you have three

6    requests.  Okay.  On page 5.  Okay.  Do you see them:  1, 2,

7    and 3.

8    I'm granting your first request and I'm denying 2 and 3

9    with the understanding that the Government will use its best

10   efforts to comply with 2 and 3, to the extent it can at this

11   point in the trial.

12   I mean, this is all occasioned, not really by virtue of

13   the parties, but by virtue of the witnesses and the Court, in

14   my view, anyway.  I mean, obviously a party has some control

15   over the matter, but this is a classic example today.  We had

16   to get rid of the witnesses going back to England.  I don't

17   even know the order.  I mean, you do.  I mean, you have to have

18   it.

19   **MR. KEKER:**  If we can get the bunch --

20   **THE COURT:**  Anyway --

21   **MR. KEKER:**  This order is fine.

22   One other thing, Your Honor, that I just ask you to think

23   about --

24   **THE COURT:**  That's a good idea.

25   **MR. KEKER:**  -- between now and Friday, this witness,

**PROCEEDINGS**

```
 1    Cronin, these people are being paid by HP.  They don't need to
 2    be paid by HP.  There is no 403 issue about --
 3              THE COURT:  I thought I decided that.
 4         MR. KEKER:  You did --
 5              THE COURT:  Oh, you think I'm wrong?
 6         MR. KEKER:  I mean, for people that there is no 403
 7    issue with because there's no compulsion under anybody's --
 8    there is no bylaw requirement or anything, for these people to
 9    be able to testify without the jury knowing their lawyers are
10    paid by HP is -- takes away from the --
11              THE COURT:  Well, I will hear -- I will hear further
12    discussion from the Government on that issue in light of --
13         MR. KEKER:  We can do it Friday.
14              THE COURT:  I'm not doing it now.  Believe me, I'm not
15    doing it now.
16         Thank you everybody.  Have a good week.  Okay.
17                   (Proceedings adjourned at 12:46 p.m.)
18
19
20
21
22
23
24
25
```

```
1                    CERTIFICATE OF REPORTER

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5    DATE:   Monday, March 12,2018

6

7

8

9    _____

10        Jo Ann Bryce, CSR No. 3321, RMR, CRR
              U.S. Court Reporter
11

12

13

14   _____
          Pamela Batalo, CSR No. 3593, FCRR
15            U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25
```