Volume 10

Pages 1566 - 1786

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )       NO. CR 16-00462 CRB
                                )
SUSHOVAN TAREQUE HUSSAIN,       )
                                )
            Defendant.          )
_____)
                                San Francisco, California
                                Friday, March 16, 2018

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**
For Plaintiff:
                        ALEX G. TSE
                        Acting United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                BY:     **ROBERT S. LEACH**
                        **ADAM A. REEVES**
                        **WILLIAM FRENTZEN**
                        **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                        KEKER & VAN NEST
                        633 Battery Street
                        San Francisco  CA  94111
                BY:     **JOHN W. KEKER**
                        **JAN NIELSEN LITTLE**
                        **BROOK DOOLEY**
                        **KATE LAZARUS**
                        **NIC MARAIS**
                        **ATTORNEYS AT LAW**


Reported By:   Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
               Pamela Batalo, CSR No. 3593, FCRR
               Official Reporters

<u>**I N D E X**</u>

Friday, March 16, 2018 - Volume 10

| <u>**GOVERNMENT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**RIZEK, ALAN (RECALLED)**</u> | | |
| (PREVIOUSLY SWORN) | 1572 | 10 |
| Direct Examination resumed by Mr. Frentzen | 1572 | 10 |
| Cross-Examination by Mr. Keker | 1590 | 10 |
| Redirect Examination by Mr. Frentzen | 1661 | 10 |
| Recross-Examination by Mr. Keker | 1677 | 10 |
| Further Redirect Examination by Mr. Frentzen | 1683 | 10 |
| | | |
| <u>**GOODFELLOW, CHRISTOPHER JAMES ROBIN**</u> | | |
| (SWORN) | 1686 | 10 |
| Direct Examination by Mr. Frentzen | 1687 | 10 |
| Cross-Examination by Ms. Little | 1741 | 10 |
| Redirect Examination by Mr. Frentzen | 1776 | 10 |
| Recross-Examination by Ms. Little | 1784 | 10 |
| Further Redirect Examination by Mr. Frentzen | 1785 | 10 |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 249 | | 1657 | 10 |
| 309 | | 1592 | 10 |
| 350 | | 1574 | 10 |
| 351 | | 1651 | 10 |
| 432 | | 1698 | 10 |
| 444 | | 1696 | 10 |
| 464 | | 1691 | 10 |
| 490 | | 1676 | 10 |
| 529 | | 1670 | 10 |
| 534 | | 1672 | 10 |
| 711 | | 1711 | 10 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 716 | | 1707 | 10 |
| 733 | | 1708 | 10 |
| 792 | | 1709 | 10 |
| 804 | | 1747 | 10 |
| 809 | | 1712 | 10 |
| 814 | | 1747 | 10 |
| 815 | | 1714 | 10 |
| 1299 | | 1718 | 10 |
| 1344 | | 1720 | 10 |
| 1345 | | 1721 | 10 |
| 1378 | | 1725 | 10 |
| 1398 | | 1722 | 10 |
| 1400 | | 1733 | 10 |
| 1402 | | 1731 | 10 |
| 1403 | | 1732 | 10 |
| 2228 | | 1735 | 10 |
| 2790 | | 1582 | 10 |
| 2791 | | 1588 | 10 |
| 2798 | | 1663 | 10 |
| 2799 | 1665 | 1665 | 10 |
| 2940 | 1669 | 1669 | 10 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 5561 | | 1647 | 10 |
| 5562 | | 1646 | 10 |
| 5584 | | 1635 | 10 |
| 5669 | | 1611 | 10 |
| 5729 | | 1653 | 10 |
| 5730 | | 1659 | 10 |
| 5731 | | 1654 | 10 |
| 5733 | | 1632 | 10 |
| 5734 | | 1655 | 10 |
| 5739 | | 1637 | 10 |
| 5753 | | 1749 | 10 |
| 5758 | | 1744 | 10 |
| 5768 | | 1744 | 10 |
| 5777 | | 1744 | 10 |
| 5869 | | 1644 | 10 |
| 5874 | | 1642 | 10 |
| 5875 | | 1643 | 10 |
| 5940 | | 1757 | 10 |
| 5943 | | 1767 | 10 |
| 5944 | | 1765 | 10 |
| 5946 | | 1758 | 10 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 5950 | | 1769 | 10 |
| 5961 | | 1760 | 10 |
| 5962 | | 1761 | 10 |
| 6024 | | 1771 | 10 |
| 6086 | | 1773 | 10 |
| 6090 | | 1772 | 10 |
| 6092 | | 1768 | 10 |

<u>**Friday - March 16, 2018**</u>                                    <u>**8:57 a.m.**</u>

P R O C E E D I N G S

---oOo---

(Proceedings were heard out of the presence of the jury:)

**THE COURT:**  I think we're waiting for a juror.

**THE CLERK:**  Yes, we are.

(Pause in proceedings.)

**THE COURT:**  I think the only thing Wednesday is that we'll start at 9:15 because I have Volkswagen at 9:00.  So I'll tell the jury 9:15 for Wednesday.

(Pause in proceedings.)

**THE CLERK:**  They're all here.

**THE COURT:**  Great.  Bring them in.

Will you call your witness, Mr. Frentzen.

**MR. FRENTZEN:**  Yes, Your Honor.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Please be seated.

Let the record reflect all jurors are present, the parties are present.

You may be seated.

Good morning.  Ladies and gentlemen, thank you for being so prompt.  I appreciate it.

And, Mr. Frentzen, you may continue with your examination.

**MR. FRENTZEN:**  Thank you, Your Honor.

\\\

1            **ALAN RIZEK**,

2    called as a witness for the Government, having been previously

3    duly sworn, testified further as follows:

4                 **DIRECT EXAMINATION**   (resumed)

5    **BY MR. FRENTZEN:**

6    **Q.**   Good morning, Mr. Rizek.

7    **A.**   Good morning.

8    **Q.**   Mr. Rizek, in connection with the sale of MicroLink to

9    Autonomy in early 2010, did you have -- or did you get anything

10   out of that sale?

11   **A.**   Not directly, no.

12   **Q.**   Did you basically get some sort of a bonus?

13   **A.**   I got a bonus.

14   **Q.**   Okay.  And what bonus was that?

15   **A.**   End of 2009, approximately $200,000.

16   **Q.**   Was that in some way in connection with the sale of

17   MicroLink to Autonomy?

18   **A.**   Part of it was.

19   **Q.**   All right.  I want to now direct your attention to

20   Government's Exhibit 350, which I think is in native file

21   format, Your Honor.  I don't know if --

22            **THE COURT:**  Okay.  I'm sorry.  It's in --

23            **MR. FRENTZEN:**  Native format.  I don't have -- we

24   don't have -- it's a spreadsheet so we don't have a paper

25   version.

 1           **THE CLERK:**  It has to be admitted before it's shown.

 2           **MR. FRENTZEN:**  Sorry.  Can you take that down?

 3           **THE COURT:**  There's something there.  Is this in

 4    evidence, by the way?

 5           **MR. FRENTZEN:**  It's not.  I'm trying to show it to the

 6    witness on the screen.  Is there a way -- I don't know if

 7    there's going to be an objection.

 8           **THE COURT:**  We'll let it come in subject to a motion

 9    to strike.

10           **MR. KEKER:**  Wait.  What number?

11           **MR. FRENTZEN:**  350.

12           **MR. KEKER:**  350.

13           **MR. FRENTZEN:**  Your Honor, I think we can just display

14    it to the witness and counsel, if that works for the Court.

15           **THE COURT:**  Yes, of course.

16           **MR. FRENTZEN:**  Thank you, Ms. Scott.  Wonders of

17    modern technology.

18        Great.  It's just not on mine.

19    **Q.**  All right.  Mr. Rizek, do you recognize what this is?

20    **A.**  I do.  It's a spreadsheet on the working capital.  It's

21    our balance sheet, assets, liabilities, owners' equity.

22    **Q.**  When you say "our," who are you referring to?

23    **A.**  MicroLink.  Sorry.

24           **MR. FRENTZEN:**  Your Honor, I'd offer Government's 350

25    into evidence.

```
 1            THE COURT:  Admitted.

 2        (Trial Exhibit 350 received in evidence)

 3            MR. FRENTZEN:  Briefly, Ms. Margen, can you go to file

 4    just to show...

 5    Q.   Do you see, Mr. Rizek, an author over here?

 6    A.   No.

 7    Q.   On your screen?

 8    A.   I see that, yes.  It's not me.

 9    Q.   I know.  Do you see a person listed as author?

10    A.   Yes.

11    Q.   Who?

12    A.   I believe that to be Stephen Chamberlain.

13    Q.   Can you get rid of that box that's up there?  Thanks.

14        Do you see a created date?

15    A.   Yes.  12/16/2009.

16    Q.   Great.

17        Could we go back to the document itself?

18        All right.  Mr. Rizek, what is this?

19    A.   This would be a balance sheet probably December pre-close.

20    The "per Alan" would have been what I provided to Stephen

21    Chamberlain.

22    Q.   Do you know what the rest of that is?

23    A.   Differences, meaning things that we owed them at that

24    time.

25    Q.   Can we go scroll down to "Liabilities"?
```

1        All right.  And do you see on here, Mr. Rizek, the line

2   that I've just underlined here?

3   **A.**   Yes, the accounts payable, 23,961,000.

4   **Q.**   And do you see what is off on the right-hand side, what's

5   written there?

6   **A.**   Yeah.  The "Excludes Autonomy Balances" or "ATN," which

7   would be the -- you know, our -- that would be the accounts

8   payable we owed -- that we did not owe to Autonomy.

9   **Q.**   So of the liability to Autonomy, some 112,000 was not what

10  was owed to Autonomy?

11  **A.**   Right.  Yes.  It was regular accounts payables, phone

12  bills, employee benefits.

13  **Q.**   And in terms of what's listed on the left-hand column, the

14  far left-hand column, so far as you know, was this accurate?

15  **A.**   Yes.

16  **Q.**   So at that time in mid-December of 2009, did Autonomy have

17  insight into MicroLink's books and debts?

18  **A.**   Yes.

19        **MR. FRENTZEN:**  I'd like to move now to Government's

20  816, which, Your Honor, I believe was admitted at the end of

21  the day on Monday.

22        **THE COURT:**  Yeah, it was.

23        **MR. FRENTZEN:**  Great.  Thank you.

24        Could we show just briefly the first page and blow that

25  up?

1  **Q.**    Okay.  Now, Mr. Rizek, this e-mail, do you recognize it

2  from what you can see up there?

3  **A.**    Yes.  I recognize this as an e-mail from Lisa Harris to

4  Ken Wong and I was copied.

5  **Q.**    Again, who was Lisa Harris?

6  **A.**    She was the controller/accounting manager of Autonomy.

7  **Q.**    Who did she work for?

8  **A.**    She worked for Stephen Chamberlain and --

9  **Q.**    Who did Stephen Chamberlain work for?

10  **A.**    Mr. Hassan [sic].

11  **Q.**    Mr. what?

12  **A.**    Mr. Hussain.

13  **Q.**    Can we scroll down a little bit.

14      All right.  Now, this is the e-mail we looked at that's

15  about posting dummy cash?

16  **A.**    Yes.  I believe their system -- accounting -- accounts

17  receivable systems are set up to receive cash or to at least

18  have write-offs.  My understanding is that they had to post it

19  as cash and then the other side of the cash transaction, which

20  would be the intercompany account, and then they would write it

21  off from there.

22  **Q.**    And can we scroll just to bridge the gap between these two

23  pages?  Great.  Thanks.

24      Does this show, Mr. Rizek, how much dummy cash was being

25  posted by MicroLink -- I mean, I'm sorry -- by Autonomy?

1    **A.**    Yes.  It would be the 15,962,000.

2    **Q.**    So what -- and what amount -- what did that relate to,

3    15,962,000?

4    **A.**    That would be transactions, purchases on our books that we

5    were not paying Autonomy as we had not sold them.

6    **Q.**    This is probably a stupid question, but as an accountant,

7    when one party owes money to another party, in that

8    relationship who can write it off?

9    **A.**    We were owned by them at that time, so either company

10    could have written it off because it was all one company.

11    **Q.**    Let's talk about in a standard debt situation.  If I owe

12    the bank money on my student loans, can I tell the bank I'm

13    writing that off?

14    **A.**    If they bought you and owned you; but, no, you're two

15    separate parties.  We were one party at this time.  We were

16    solely owned.

17    **Q.**    Understood.

18         If you could, just for a moment, would it make any sense

19    for me to tell the bank I'm writing off my loans?

20    **A.**    I don't think they'd let you.

21    **Q.**    Okay.  So could MicroLink just inform Autonomy, "Hey,

22    we're writing this off"?

23    **A.**    The reason we had to write it off is that we could not

24    hold Autonomy inventory.  We could not hold an inventory of

25    Autonomy software and so, thus, it had to be written off.

1   **Q.**   Who wrote it off, Mr. Rizek?

2   **A.**   I believe Stephen Chamberlain or Lisa Harris.

3   **Q.**   Who worked for who?

4   **A.**   Mr. Hussain.

5   **Q.**   Can we go to page -- I'm sorry -- the native file portion

6   of this, which would be page 5 effectively?

7       Okay.  Can we scroll down a little bit?  Well, all right.

8   Never mind.  Maybe back up a little bit.  That's fine.

9       Mr. Rizek, what is this page of Government's 816?

10  **A.**   This, I believe, is the list of all transactions.  The

11  ones on the right in column L are the ones that they are

12  writing off.  The ones in column K that are not present in

13  column L we actually paid.

14  **Q.**   And when you say "we paid" --

15  **A.**   Sorry.  MicroLink paid Autonomy.

16  **Q.**   With respect to many of these transactions, Mr. Rizek, do

17  you know if MicroLink paid Autonomy or if Autonomy just closed

18  the deals?

19  **A.**   On the ones in the column L?

20  **Q.**   Correct.

21  **A.**   The row 11, I believe they closed separately.  They sold

22  it to us and also sold it to the federal government directly.

23  **Q.**   What's row 11?

24  **A.**   The one with the name of "U.S. Federal Government."

25  **Q.**   Okay.  All right.

RIZEK - DIRECT / FRENTZEN

1  So meaning Autonomy had a VAR -- one of these VAR
2  relationships with MicroLink but Autonomy sold direct?
3  **A.**   The customer sort of refused to buy from us even though
4  we'd bought the inventory product earlier.
5  **Q.**   Okay.  So this was not money paid by MicroLink to
6  Autonomy; this is a deal Autonomy closed and, thus, canceled
7  out the debt?
8  **A.**   Yes.
9  **Q.**   Do you know about IBM-Ameriprise?  Do you have any
10  recollection about that one?
11  **A.**   A little bit.
12  **Q.**   Do you recall whether or not that was another direct sale
13  by Autonomy and then written off --
14  **A.**   I believe so.
15  **Q.**   -- or canceled out?
16  **A.**   I believe so.
17  **Q.**   So in terms of the total debts, how much of that was
18  written off by Autonomy?
19  **A.**   The 15,900,000.
20  **Q.**   By posting this dummy cash?
21  **A.**   Yes.
22  **Q.**   Do you see listed in the 16 million that Autonomy wrote
23  off, do you see the 2.3 million that was supposed to go through
24  MicroLink to Discover Technology?
25  **A.**   Yes.

1    **Q.**    So Autonomy wrote that off?

2    **A.**    Yes.

3    **Q.**    Autonomy knew about that?

4    **A.**    Yes.

5    **Q.**    I want to go now to your conversation -- sorry, but I'm

6    going to go back to your conversation with Sushovan Hussain on

7    January 1st of 2010.

8        Immediately after you called Mr. Hussain and he asked you

9    to take the two point -- the deal we just talked about here,

10    who did you call?

11    **A.**    Mr. Truitt.

12    **Q.**    Is that Dave Truitt?

13    **A.**    Yes.

14    **Q.**    Sorry.  There's a couple of Truitts; right?

15    **A.**    Too many.

16    **Q.**    All right.

17    **A.**    Mr. David Truitt.

18    **Q.**    And when you called Dave Truitt, what, if anything, did

19    you say to Mr. Truitt about what Mr. Hussain had talked to you

20    about?

21    **A.**    I passed on the conversation and -- just passed on the

22    conversation to him.

23    **Q.**    Is that when he -- and his response to you was what?

24    **A.**    It's their company.  They can do what they want to.

25    **Q.**    After that conversation January 1, 2010, did you, years

1    later, have a conversation again with Mr. Truitt about that?

2    **A.**   Yes.   It came when we were -- I was trying to help

3    Mr. Truitt go over the records that I had provided him at the

4    end of -- at the end when we sold the company, and he was

5    trying to understand the purchases that he'd done taken at

6    risk.

7         It had been a few years, and I mislabeled the Discover

8    Technologies, this $2.3 million transaction, as an EDD

9    transaction.   Neither one of us had the invoice, the hard copy

10   of the invoice; and when it was provided to him from his

11   counsel, he had said that he had not ordered it.   And that's

12   when I reminded him of the conversation, and that this was

13   that -- must have been that transaction.

14   **Q.**   When you tried to remind Dave Truitt of the conversation

15   you'd had with Mr. Truitt by phone on January 1st, 2010, what,

16   if any, reaction did you get from him?

17   **A.**   That the call didn't happen, that we didn't talk.

18   **Q.**   I want to show you Government's Exhibit 2790.   Do you have

19   that up there, sir?   Probably near the end.

20   **A.**   (Witness examines document.)

21        **MR. KEKER:**   2790?

22        **MR. FRENTZEN:**   Yeah.

23        **THE COURT:**   2790.

24        **THE CLERK:**   Do you have a copy?

25        **THE COURT:**   No.

1    **MR. FRENTZEN:**  It's not in your binder, Your Honor?

2         **THE COURT:**  Oh.  Maybe it is.

3    Yeah, it is in my binder.  Sorry.  It wasn't on the sheet.

4    It's not on the exhibit list.

5         **MR. FRENTZEN:**  I guess we've got to update that then,

6    Your Honor.

7         **THE COURT:**  Yeah.

8         **MR. FRENTZEN:**  Sorry.

9         **THE COURT:**  Maybe there is an updated one that I

10   haven't looked at.

11   Okay.  2790.  One moment, please.

12                      (Pause in proceedings.)

13        **THE COURT:**  Admitted.

14   (Trial Exhibit 2790 received in evidence)

15   **BY MR. FRENTZEN:**

16   **Q.**  Mr. Rizek, what is 2790 generally speaking?

17   **A.**  It starts off with an e-mail from myself to Mr. Truitt.

18   **Q.**  Are there some e-mails between yourself and Mr. Truitt?

19   **A.**  Yes.

20   **Q.**  Okay.  Can you describe for us in general terms what was

21   going on around this time, December of 2014, between you and

22   Mr. Truitt?

23   **A.**  I was trying to go over the history with him from the

24   general ledger data that we had.

25   **Q.**  Did you have an understanding of why Mr. Truitt was

1    interested in doing that?

2    **A.**    Yes.  Because he had been contacted by attorneys for

3    records.

4    **Q.**    Did you agree to help Mr. Truitt try to put back together

5    the financials?

6    **A.**    Yes.  Well, it was -- he had copies of the financials.

7    I'd given him a dump of all the GL detail at the time.

8    **Q.**    Of the what?

9    **A.**    The general ledger detail, all the general ledger detail.

10   He couldn't run the accounting system because he didn't have

11   the servers or the files or licenses, but he could have the

12   data because he had the data when he left.

13   **Q.**    Okay.  And other than the e-mails, are there also some

14   text messages back and forth?

15   **A.**    On page 4, yes.

16   **Q.**    And do you recognize those as text messages between

17   yourself and Mr. Truitt?

18   **A.**    Yes.

19   **Q.**    I'd like to go to page 9 of this document, please.

20       Mr. Rizek, did you produce all of these to the Government?

21   **A.**    Yes.

22   **Q.**    All right.  Can you --

23   **A.**    Upon your request.

24   **Q.**    Can you tell us what's here on page 9 in terms of what

25   conversation by text between yourself and Mr. Truitt?

1    A.    This is a text from David saying (reading):

2             "There was a bunch of calls going back on the 1st,

3        January 1st, 2010.  We are closing the sales of business.

4        I still maintain that this was not a topic discussed with

5        me."

6        That's from him to me.  He just wanted me to -- and I

7    said, you know, "Understood," because I didn't want to have a

8    conversation.  I thought he was trying to tell me what

9    happened, not what I knew what happened.

10   Q.    Okay.  So, in short, when Mr. Truitt says, "I still

11   maintain that it was not a topic discussed with me," what did

12   you take that to be a reference to?

13   A.    He was trying to direct me in what I should think.

14   Q.    About what?

15   A.    That the call didn't happen.

16   Q.    Okay.  On what?  What call?

17   A.    The call with Mr. Hussain.

18   Q.    The call with Mr. Hussain or the call with Mr. Truitt?

19   A.    The call with Mr. Hussain or the call with him, that it

20   was not discussed with him, that he had no knowledge.

21   Q.    Understood.

22       All right.  I'd like to show you now -- what I want to do

23   is go back briefly to Government's Exhibit 489.  If we could

24   just get the first page of that.

25       Can you blow up the top there?  Okay.

1      This is in evidence, Mr. Rizek.  If you could just remind

2  us, what is 489?

3  **A.**   It's my phone bill, my personal cell phone bill.

4  **Q.**   This is something else that you produced to the

5  Government?

6  **A.**   Yes.

7  **Q.**   Can we go to page 8 again, please?

8      Can you blow up the activity here on the 1st?

9      Okay.  Great.  Thank you.

10     Mr. Rizek, could you just remind us on this document at

11 what time you called Mr. Hussain during which Mr. Hussain

12 proposed the $2 million deal with MicroLink?

13 **A.**   It would be the call of -- at 4:49.

14 **Q.**   And what duration was that call again?

15 **A.**   Ten minutes.

16 **Q.**   So what time would that take us to if -- what time did

17 that call conclude approximately?

18 **A.**   4:59.

19 **Q.**   No, what time did it conclude if it started at 4:59?

20 **A.**   It started at 4:49, concluded at 4:59.

21 **Q.**   Now can you take a look at the documents in front of you?

22 Do you see a Government's Exhibit 2791?

23 **A.**   (Witness examines document.)  No.  I don't have it.

24 **Q.**   At the very end, 2791?

25 **A.**   Oh.  2791.  Sorry.

1   **Q.**   If not, I'll give you a copy.

2   **A.**   There it is.

3        **THE COURT:**  Admitted.

4        **MR. KEKER:**  No.  Objection, Your Honor.  Hearsay.

5        **THE COURT:**  Okay.  Wait a minute.

6        **MR. KEKER:**  This is total hearsay.

7        **THE COURT:**  Okay.  Let me take a look at it.

8                    (Pause in proceedings.)

9        **THE COURT:**  2791.

10       **MR. FRENTZEN:**  It might be a different objection,

11   Your Honor, but it's not hearsay; and as to any other

12   objection, I think I can lay a foundation, but it's clearly not

13   hearsay.

14       **THE COURT:**  Well, so we're all talking about the same

15   document, this is a document from the defendant to Mr. Kanter;

16   is that correct?

17       **MR. FRENTZEN:**  And others, yes, Your Honor, but not to

18   this witness, I agree with that.

19       **THE COURT:**  Well, that doesn't make any difference.

20       **MR. FRENTZEN:**  I don't think it's hearsay.  It's from

21   the defendant.

22       **THE COURT:**  It's not hearsay.

23       **MR. KEKER:**  No foundation, Your Honor.  This witness

24   is not somebody that can testify about this document.

25       **MR. FRENTZEN:**  I'm ready to lay a foundation.

1      THE COURT:  Okay.

2      MR. FRENTZEN:  Sorry.

3      THE COURT:  Lay a foundation.

4   BY MR. FRENTZEN:

5   Q.   Mr. Rizek, did you -- or were you an employee of Autonomy?

6   A.   No.  I was always an employee of MicroLink.

7   Q.   Was MicroLink owned by Autonomy?

8   A.   Yes.

9   Q.   Who were your bosses?

10  A.   My boss was David Truitt, then Tim Wharton, and then I

11  reported to Bob Harokopus but never reported directly to

12  Autonomy.

13  Q.   Well --

14  A.   We had a proxy board for security reasons between us and

15  them.

16  Q.   I understand --

17      THE COURT:  Wait.

18  BY MR. FRENTZEN:

19  Q.   I understand you had a proxy board, but who owned

20  MicroLink?

21  A.   Autonomy.

22  Q.   Did you interact with people at Autonomy?

23  A.   Yes.

24  Q.   Did you e-mail folks at Autonomy?

25  A.   Yes.

1   Q.   Do you recognize the e-mails that are reflected on this

2   document?

3   A.   Yes.

4   Q.   Do you --

5            THE COURT:  Admitted subject to a motion to strike.

6        (Trial Exhibit 2791 received in evidence)

7            MR. FRENTZEN:  Thank you, Your Honor.

8            THE COURT:  Okay.

9   BY MR. FRENTZEN:

10  Q.   And could you remind us again of the time that your call

11  with Mr. Hussain ended on January 1st, 2010?

12  A.   4:59.

13  Q.   Now, can you see the time -- or, I'm sorry -- the date on

14  this e-mail?

15  A.   Yes.

16  Q.   What is it?

17  A.   5:50.

18  Q.   That's the date?

19  A.   Sorry.  1/1/2010.

20  Q.   What's the time?

21  A.   5:50.

22  Q.   Who is this from?

23  A.   Mr. Hussain.

24  Q.   Who is it to?

25  A.   To Andy Kanter, Stephen Chamberlain, and Joel Scott.

1  Q.   Who were they?

2  A.   Stephen Chamberlain worked for Mr. Hussain as a

3  vice president of finance, Joel Scott was a lawyer in

4  San Francisco, and Andy Kanter I think is the C -- was chief

5  operating officer, a lawyer working for Autonomy.

6  Q.   And the subject was MicroLink?

7  A.   Yes.

8  Q.   (reading)

9       "We received an order from them last Q which will be

10      transferred to discover - speak to Joel for more info

11      tomorrow re acquisition impact.  Shouldn't be any."

12      Was MicroLink the company that you were working for

13  January 1st, 2010?

14  A.   Yes.

15  Q.   And is this approximately an hour after Mr. Hussain asked

16  you to take an order that would be sold through MicroLink to

17  Discover Tech?

18  A.   Yes.

19  Q.   Mr. Rizek, in January of 2010, did you have any interest,

20  personal interest, in MicroLink taking on another $2 million

21  deal on January 1st, 2010?

22  A.   None whatsoever.

23  Q.   Did you have any personal interest in Autonomy writing

24  that deal off and basically making it go away?

25  A.   None whatsoever.

1        **MR. FRENTZEN:**  May I have a moment, Your Honor?

2        **THE COURT:**  Yes.

3                  (Pause in proceedings.)

4        **MR. FRENTZEN:**  That's all I have for now.  Thank you

5   very much, Mr. Rizek.

6        **THE COURT:**  Cross.

7                  <u>**CROSS-EXAMINATION**</u>

8   BY MR. KEKER:

9   **Q.**   Good morning, Mr. Rizek.  I'm John Keker.  I represent

10  Mr. Hussain.

11  **A.**   Good morning.

12  **Q.**   Do you know how to pronounce his name?

13  **A.**   Sorry.

14  **Q.**   Yeah.  I mean, you don't even know him; right?

15  **A.**   No.

16  **Q.**   Let's start with this 816, the dummy cash that you were

17  talking about.  You said that $16 million of debt was written

18  off of MicroLink's books in connection with this acquisition by

19  Autonomy.  That's what you told us; right?

20  **A.**   Yes.

21  **Q.**   Are you saying that that debt went poof?

22  **A.**   Poof, yes.

23  **Q.**   Poof.  Okay.

24       So nobody collected -- that debt represented deals that

25  MicroTech had pending --

1  **A.**   MicroLink.

2  **Q.**   MicroLink, excuse me.

3      -- MicroLink had pending with the federal government, with

4  IBM-Ameriprise, with Allstate, with a lot of other entities?

5          **MR. FRENTZEN:**  Objection.  That actually misstates

6  the --

7          **THE WITNESS:**  Is that a question?

8          **MR. FRENTZEN:**  Excuse me.  Sorry.

9          **THE WITNESS:**  I'm sorry.

10          **MR. FRENTZEN:**  The federal government and the IBM were

11  not on the 16 million.  They were part of the 24.  They're the

12  other 8 that weren't written off because they closed.

13  **BY MR. KEKER:**

14  **Q.**   Are you saying that the $16 million was not -- that those

15  deals weren't in the main collected by Autonomy after the

16  acquisition?

17  **A.**   Those deals were deals at risk, that we took the deals at

18  risk.  We did not have a client.  We were hoping to sell it to

19  those clients.  We did not sell to the clients, so we could not

20  keep the software on our books.  So the sale -- it was almost

21  like the sale was reversed, but they did not reverse the sale.

22  They had us eliminate both the asset and the liability on our

23  books, and they wrote off the receivable from us.

24  **Q.**   And did the obligations of these people that you were

25  trying to sell to move over to Autonomy's books?

1   A.   There was no obligation.

2   Q.   Okay.  Are you sure that they didn't end up on Autonomy's

3   books?

4   A.   I don't know what happened on Autonomy's books.  I didn't

5   have any view -- visibility of Autonomy's books.

6   Q.   Okay.  Let's look at Exhibit -- excuse me.

7        Let me -- do we have a binder?  Have you got a black

8   binder up there?

9   A.   Yes.

10  Q.   Look at Exhibit 309.

11  A.   (Witness examines document.)

12       THE COURT:  309 admitted.

13       (Trial Exhibit 309 received in evidence)

14  BY MR. KEKER:

15  Q.   That's a memorandum dated October 2009 before the

16  acquisition from John Cronin to David Truitt and you about

17  outstanding transactions; right?

18  A.   Yes.

19  Q.   And if you turn the page, let's look at the next page, you

20  had outstanding transactions listed there that hadn't closed

21  yet.  One with Langley.  What's Langley?

22  A.   That would be CIA.

23  Q.   Okay.  And one -- that was for 3,450,000; right?

24  A.   Yes.

25  Q.   And you had one with the Commander of the Sub Forces?

RIZEK - CROSS / KEKER

```
 1    A.    Yes.

 2    Q.    And you've got -- and we can read them, but one with the

 3    House of Representatives?

 4    A.    Agreed.

 5    Q.    You had the electronic discovery contract.  The remaining

 6    amount was $8,250,000; right?

 7    A.    Yes.

 8    Q.    You've got IBM-Ameriprise further down there?

 9    A.    Yes.

10    Q.    You've got Postal Service?

11    A.    Yep.

12    Q.    You've got Allstate?

13    A.    Yes.

14    Q.    Okay.  Now, at the time of the acquisition, a lot of that

15    debt was not yet due; is that right?

16    A.    Some of the debt was not yet due, no.

17    Q.    Look at 322, please.

18    A.    (Witness examines document.)

19    Q.    This is a list of payables.  I think the jury --

20          MR. KEKER:  I think this is in, Your Honor, and I

21    think the jury has seen it.

22          THE COURT:  Yes, you're right.

23          MR. KEKER:  All right.  Can we see the second page?

24    And if you blow up the highlighted portions over there.

25    Q.    There was about 10 million that was due in the last
```

1  quarter of '09; right?

2  **A.**  Agreed.

3  **Q.**  Not overdue.  It was due coming up.  There was another

4  5 million that was going to be due the following quarter in

5  2010; right?

6  **A.**  Yes.

7  **Q.**  And then there was 8 million that was due after the

8  following quarter?

9  **A.**  Yes.

10  **Q.**  And you're telling us that that debt -- or, excuse me --

11  that those -- that the transactions that that debt represented

12  never happened?

13  **A.**  Anything that has "closed" on here actually happened, we

14  sold to the end user.  Anything that is "open" or stated with

15  "EDD contract" was never sold.

16  **Q.**  Would you be surprised to learn that the accountants have

17  come up with about 20 million of the $24 million in debt that

18  was eventually collected after the acquisition?

19         **MR. FRENTZEN:**  Objection.  States facts not in

20  evidence.

21         **MR. KEKER:**  It will be in evidence.

22         **MR. FRENTZEN:**  Well --

23         **MR. KEKER:**  Through your witness.

24         **THE COURT:**  Okay.  Wait.  Okay.  I'm going to --

25  there's no foundation that he would -- that he knows what the

```
 1   books were and how it was treated.

 2        Is that correct?  I mean, you don't know how Autonomy

 3   treated it and you haven't seen that?  You haven't had access

 4   to their books and records?

 5            THE WITNESS:  No.  After they transferred it to the

 6   intercompany --

 7            THE COURT:  Yes.

 8            THE WITNESS:  -- I only saw one instance when I was

 9   being interviewed with the HP lawyers or HP accountants that

10   looked like they capitalized it.  But other than that, I've not

11   seen anything else.

12   BY MR. KEKER:

13   Q.   What was the instance that you saw was capitalized?

14   A.   They were asking me -- our write-offs, they showed me a

15   document showing them being capitalized in good will.

16   Q.   Let's go back to 309 and look at the list.

17   A.   Okay.

18   Q.   You were the chief financial officer of MicroLink when it

19   was a subsidiary of Autonomy; right?

20   A.   Yes.

21   Q.   And you had this walled-off situation with these three

22   generals that were your proxy board?

23   A.   No generals, but three people with high security

24   clearances.

25   Q.   You know that the CIA contact closed, don't you?
```

1    **A.**   It closed directly with Autonomy.

2    **Q.**   Well, Autonomy and MicroLink are the same after January 4,

3    2010.

4    **A.**   Not when it closed.

5    **Q.**   When did it close?

6    **A.**   I believe it closed before.

7    **Q.**   Okay.  We'll get to that.

8         How about the deal with the Commander of the Sub Forces?

9    Did that pay off?

10   **A.**   No.

11   **Q.**   You're sure?

12   **A.**   My understanding, no.

13   **Q.**   Okay.  How about the IBM-Ameriprise deal?

14   **A.**   It might have one day after we closed, but I don't know.

15   **Q.**   Okay.  So sometime after MicroLink is acquired by

16   Autonomy, the IBM-Ameriprise deal closed and Autonomy slash

17   MicroLink, which is one unit now, got the money?

18   **A.**   Not after -- I was not involved in any closing of that

19   deal.

20   **Q.**   What about Allstate?  Did you get money in Allstate?

21   **A.**   Not when -- not through us.

22   **Q.**   Well, not for us.

23   **A.**   Not that I know of.

24   **Q.**   Okay.  Autonomy owned MicroLink and when money -- when

25   deals would close, money would come into Autonomy; right?

RIZEK - CROSS / KEKER

1  **A.**  When they owned us, we sold some things.  If it was sold

2  through our GSA schedule, we still sold it and sent them the

3  money; but what they sold outside of us, I had no view to.

4  **Q.**  Okay.  Mr. Rizek, you were interviewed -- excuse me.

5      You worked for Hewlett Packard until 2015; right?

6  **A.**  After this sale, I worked -- I continued working for

7  MicroLink when it was owned by HP through the proxy board; and

8  then when they shut down MicroLink, I was offered an

9  eight-month employment with them to close out the -- to close

10  out the company.

11  **Q.**  Can you just tell us yes or no?  Did you work for Hewlett

12  Packard until 2015?

13  **A.**  Yes.  I worked for them for eight months.

14  **Q.**  When you were working for Autonomy/MicroLink, once it was

15  acquired by Hewlett Packard, whose name was on your paycheck?

16  **A.**  MicroLink, except for the last eight months.

17  **Q.**  Did you own Hewlett Packard stock?

18  **A.**  I got some through employee restricted stock grants.  I

19  think Mr. Hussain granted me those or was on the approval of

20  that, and then I purchased some through the employee stock

21  purchase plan.

22  **Q.**  How much HP stock do you hold?

23  **A.**  I hold approximately $90,000 in HP stock.

24  **Q.**  All right.  You were interviewed by Hewlett Packard

25  lawyers in 2013?

1  **A.**    Lawyers, accountants.

2  **Q.**    Okay.  This is before you had a lawyer?

3  **A.**    Yes.

4  **Q.**    And you didn't say anything about any backdating or any

5  call with Mr. Hussain or anything in that interview, did you?

6  **A.**    No.

7  **Q.**    All right.  And then since then you have had several

8  sessions with Mr. Truitt talking about things getting your

9  ducks in a row; right?

10  **A.**    No.  I wasn't getting my ducks in a row.  I was helping

11  him get his understanding of his accountant -- of his accounts.

12  **Q.**    Have you yourself used the phrase in reference to your

13  conversations with Dave Truitt that you were "getting your

14  ducks in a row"?

15  **A.**    Possibly.

16  **Q.**    Okay.  Look at -- I'll give you --

17          **MR. KEKER:**  Can I give the witness his statements?

18          **THE COURT:**  Sure.

19  **BY MR. KEKER:**

20  **Q.**    Did you testify before the Grand Jury in this case?

21  **A.**    Yes, I did.  You know that.

22  **Q.**    If you look at -- excuse me.  Let me look at that number.

23  **A.**    I already have a copy of this.

24  **Q.**    Oh, you already have a copy?

25  **A.**    Yeah.

| | |
|---|---|
| 1 | **Q.**  All right.  Good. |
| 2 | Look at Exhibit 5144, page 70. |
| 3 | **THE COURT:**  Page 70? |
| 4 | **MR. KEKER:**  Seven zero, and lines 17 through 22. |
| 5 | **THE COURT:**  Okay.  Let me look at it. |
| 6 | (Pause in proceedings.) |
| 7 | **BY MR. KEKER:** |
| 8 | **Q.**  Do you see page 70, lines 17 through 22 |
| 9 | **A.**  (Witness examines document.)  Okay. |
| 10 | **Q.**  Have you used the words about your meetings with |
| 11 | Mr. Truitt as "trying to get your ducks in a row"? |
| 12 | **A.**  Possibly. |
| 13 | **Q.**  Did you tell the Grand Jury under oath that those were |
| 14 | words that you used? |
| 15 | **A.**  I said I think you're -- yes.  I said, yes, I said that. |
| 16 | It's in the answer column. |
| 17 | **Q.**  Was it true when you said yes? |
| 18 | **A.**  No.  That's a question.  Sorry.  It's in the question |
| 19 | there, and I said yes. |
| 20 | **Q.**  Okay. |
| 21 | **MR. KEKER:**  Can I read it, Your Honor? |
| 22 | **THE COURT:**  Yes. |
| 23 | **MR. KEKER:**  (reading) |
| 24 | **"QUESTION:**  And have you ever described the meeting with |
| 25 | Mr. Truitt as 'trying to get your ducks in a row'?" |

```
 1              And the answer is yes; right?

 2   A.    Yes.

 3              MR. FRENTZEN:  Can we get the --

 4              THE COURT:  You have to read the rest of the answer.

 5              MR. FRENTZEN:  I actually think there was only one

 6   meeting that it was in reference to that counsel read the

 7   statement.

 8   BY MR. KEKER:

 9   Q.    Did you only have one meeting?

10        Let me read it (reading):

11             "Yes, because it's five years -- four years ago and

12        trying to make -- make sure we understand what we did,

13        what was out there."

14        That's the rest of your answer.

15              MR. FRENTZEN:  The singular was in the question,

16   though.

17   BY MR. KEKER:

18   Q.    And so the prosecutor just said you only had one meeting

19   with Mr. Truitt?

20              MR. FRENTZEN:  No, that's not what I said.

21              THE COURT:  That's not what he said.

22              MR. FRENTZEN:  What I said is you read it wrong and it

23   was only in reference to one meeting.

24   BY MR. KEKER:

25   Q.    Okay.  How many meetings did you have with Mr. Truitt to
```

1    get your ducks in a row?

2    **A.**    There was one meeting when we went out, we looked at the

3    transactions; and then there was probably two subsequent

4    meetings when we were trying to figure out what one transaction

5    was.

6    **Q.**    You told the Government that you met with Mr. Truitt four

7    or five times, didn't you?

8    **A.**    That's -- I just added up to three.  I don't remember

9    exactly how many times we met.  I was squeezing this in for him

10   for free while I was working a full-time job.

11   **Q.**    Would you look at your Government interview with the

12   prosecutors?

13              **THE COURT:**  What exhibit number is it?

14              **MR. KEKER:**  This is 5142 at page 2.

15              **THE COURT:**  Page 2.

16   **BY MR. KEKER:**

17   **Q.**    And under -- well, I don't know how to say it.

18        The second full paragraph from the bottom, did you tell

19   the Government that you and Mr. Truitt met four or five times

20   by themselves for this purpose?

21              **MR. FRENTZEN:**  Your Honor, I'm going to ask that we

22   have time to read this unless the witness is a lot faster at

23   reading than I am.

24              **THE COURT:**  Let's wait a minute.  Don't answer the

25   question yet.

1           (Pause in proceedings.)

2           THE COURT:  Okay.  And your question is?

3    BY MR. KEKER:

4    Q.   My question is:  Did you tell the Government that you and

5    Truitt met four or five times by themselves, these meetings

6    occurred over a period of a year, and occurred before Rizek

7    received notice that he was going to be interviewed as well?

8    A.   Yes.  It's in this report.  I said it.

9    Q.   And the four or five meetings were because Truitt had been

10   subpoenaed or was dealing with the prosecutors; right?

11   A.   They had requested information from him.

12   Q.   Well, they said, "Come and talk to us"; right?

13   A.   I didn't get a copy of what they sent him.

14   Q.   And so he met with you --

15   A.   Yes.

16   Q.   -- four or five times over the course of a year, and this

17   was all before they contacted you too?

18   A.   Yes.

19   Q.   Now, for these Government interviews, you demanded

20   something called a proffer agreement?

21   A.   I didn't demand.  I was advised by counsel that the best

22   thing would be to have immunity.

23   Q.   Okay.  And did you need immunity?

24   A.   I don't know.  You know, I'm not a lawyer and I don't

25   know -- like, you know, what I do sometimes might be construed

 1  by lawyers as being illegal.

 2  **Q.**   Did you think when you were working for MicroLink that you

 3  were committing crimes?

 4  **A.**   I thought that we'd -- some of the things we did were

 5  probably not right.

 6  **Q.**   Okay.  And what did you think you did that wasn't right

 7  when you worked for MicroLink?

 8  **A.**   Taking some of the at-risk deals.

 9  **Q.**   Anything about your relationship to the banks?

10  **A.**   Possibly.

11  **Q.**   What did you do with your bank that you thought might put

12  you at risk of criminal liability and need immunity?

13  **A.**   The receivables -- the -- the way we kept our books, we

14  didn't put the transactions, the at-risk transactions, on our

15  financials so I was worried that there could be some risk

16  there.

17  **Q.**   Okay.  Let's make sure everybody can understand that.  You

18  agree that these at-risk transactions meant that you were

19  obliged to pay Autonomy the money that you'd agreed to pay;

20  right?

21  **A.**   Yes.

22  **Q.**   And you would sign confirmation slips to the Autonomy's

23  auditor saying, "Yep, we owe that money"?

24  **A.**   We did owe that money.

25  **Q.**   You had a bank and a line of credit?

1   **A.**   Yes.

2   **Q.**   And the bank demanded, in order to support the line of

3   credit, that you kept it informed of your financial situation,

4   MicroLink's financial situation?

5   **A.**   Yes.

6   **Q.**   So what they wanted to know is what liabilities, what have

7   you taken on as debt?  That's what your bank wanted to know?

8   **A.**   Agreed.

9   **Q.**   And so you took on this debt and affirmed the debt to

10  Autonomy's auditors but you lied to your own bank and said, "We

11  don't have that debt"?  That's what happened; right?

12  **A.**   It was not on the financials, no.

13  **Q.**   Pardon?

14  **A.**   It was not on our financials, no.

15  **Q.**   Okay.  And another way of saying it's not on your

16  financials is to say that you lied to your bank; right?  Those

17  are synonymous?

18  **A.**   It was not on our financials.  We probably misstated our

19  liabilities to the banks and also our assets.

20  **Q.**   Okay.  And you recognize that that was a crime?

21  **A.**   I believe it could be.

22  **Q.**   Did you explain that to the Government, say, "I committed

23  this crime of bank fraud which has nothing to do with

24  Autonomy"?

25  **A.**   No.

 1          **MR. FRENTZEN:**  Objection to it having nothing to do

 2   with Autonomy.  It has everything to do with Autonomy.

 3          **MR. KEKER:**  Oh, really?

 4          **MR. FRENTZEN:**  Yeah.

 5          **THE COURT:**  Well, rather than getting into the

 6   argument at this point, why don't you move on to the next

 7   question.

 8          **MR. KEKER:**  Okay.

 9   **Q.**   Did you tell the prosecutors that you had committed bank

10   fraud with your bank?

11   **A.**   No.

12   **Q.**   Did they ever ask you?

13   **A.**   I don't recall them asking me.

14   **Q.**   But you said, "I want immunity from anything that I might

15   have done," and they said, "Fine.  Here's immunity"; right?

16   **A.**   I don't remember the conversation going that way.  The

17   conversation was with my attorneys and the federal government.

18   **Q.**   So how you got immunity is something that happened between

19   your attorneys and the Government?

20   **A.**   Yes.

21   **Q.**   Okay.  And did you also -- were your attorneys also in

22   touch with other potential witnesses in this case, like Dave

23   Truitt's lawyers?

24          **MR. FRENTZEN:**  I'm going to object to that,

25   Your Honor.

1          **THE COURT:**  Sustained.

2   **BY MR. KEKER:**

3   **Q.**   Did you provide your attorney -- or did Truitt provide to

4   you his attorney's number so that your attorney and his

5   attorney could work together?

6   **A.**   I believe his attorneys have contacted my attorneys.  I do

7   not believe that they've worked together in any way, shape, or

8   form.

9         Also, I believe Mr. Hussain's attorneys contacted my

10  attorneys, and I believe there was -- Stephen Chamberlain

11  reached out to contact them.

12  **Q.**   Before you -- well, before you first talked to the

13  prosecutors, did David Truitt let you know that he was

14  concerned about this $2.3 million sale from Autonomy to

15  MicroLink of profiling software, the function of profiling?

16  **A.**   The conversation on that transaction happened after I'd

17  mislabeled that transaction as an EDD transaction.  He did not

18  have a copy of the transaction.  I didn't have a copy of the

19  transaction.  Through his lawyers, he got a copy of the

20  transaction, and he said that -- told me in one of those

21  meetings when we were meeting at lunch that he didn't agree to

22  that transaction.  He never ordered that transaction for

23  Discover.

24  **Q.**   Truitt got a copy before any of this -- well, back in the

25  four or five times that you were meeting, he got a copy of the

 1    invoice from Autonomy to -- can we put up 421?  421 is in

 2    evidence.

 3         421 is an invoice from Autonomy to MicroLink with the end

 4    user for Discover Technologies, and it's the $2.3 million

 5    invoice and it's dated December 31, 2009; right?  Right?

 6    **A.**    That's what's on there, yes.

 7    **Q.**    And Truitt got a copy of that invoice and put it in front

 8    of you when you were having these meetings to get your ducks in

 9    a row?

10    **A.**    At one of the meetings, yes.

11    **Q.**    And you understand that he was saying that he didn't have

12    anything to do with that transaction, didn't know about it,

13    never told him, nothing ever happened?

14    **A.**    Yes.

15    **Q.**    Okay.  And then that's what you were talking about in the

16    instant messaging that the jury just saw -- I won't show them

17    again -- but the instant messaging where he's saying it

18    happened on a Friday, there was a lot going on, he was trying

19    to persuade you, that you never talked to him about any

20    $2.3 million transaction; right?

21         **MR. FRENTZEN:**  I just want to get -- I think that

22    misstates.  I believe they were text messages, if I understood

23    them correctly, rather than IMs.

24    **BY MR. KEKER:**

25    **Q.**    Were these texts or instant messaging?

1   **A.**   Text messages.

2   **Q.**   Okay.  Does that make any difference to what we're talking

3   about?

4   **A.**   I don't know what an IM is anymore.

5   **Q.**   Okay.

6          **MR. FRENTZEN:**  I think it makes a difference to be

7   accurate, Your Honor.

8          **THE COURT:**  Okay.  Here we go, ladies and gentlemen.

9   The colloquy between lawyers, while it's interesting, is

10   actually not evidence and should not be considered by you in

11   arriving at a determination, and we're moving right ahead.

12          **MR. KEKER:**  Yes, sir.  And I --

13          **THE COURT:**  Here we are, moving right ahead.  The next

14   question.

15   **BY MR. KEKER:**

16   **Q.**   The text messages that the jury just saw about back and

17   forth on Friday, that was -- your interpretation was he was

18   trying to get you to say that you never told him about the

19   $2.3 million?

20   **A.**   I don't believe -- is that a Friday?  Can I see it?

21   **Q.**   Yeah.  Let me get it.

22          **MR. FRENTZEN:**  2790, John.

23          **MR. KEKER:**  2790.  Thank you.

24          Can we put up 2790?  And I think it's page 9.

25   **Q.**   This conversation -- this text message on April 9, 2015,

1    Dave Truitt is saying (reading):

2         "A bunch of calls going back and forth that day."

3    And you just told us that that day is January 1, 2010;

4    right?

5    A.   Yes.  I just wanted to be clear that this wasn't happening

6    on the Friday of the 2001, that this happened on a Thursday in

7    April 9, 2015.

8    Q.   Okay.  But when it says, "It was a Friday, we were closing

9    on the sale of the business," he was referring to April 1,

10   2010; right?  Excuse me, January 1.

11   A.   January 1st, 2010.

12   Q.   Right.  And that was a Friday?

13   A.   Yes.

14   Q.   Okay.  And he says (reading):

15        "I still maintain that it was not a topic discussed

16   with me."

17   Right?

18   A.   That's what he stated, yes.

19   Q.   Okay.  You knew that the purchase order for that

20   transaction was backdated, didn't you?

21   A.   I know that there was no transaction on the close of

22   business on December 31st when I left the office at 8:00 or

23   9:00 o'clock that night.

24   Q.   You know that Mr. Cronin prepared a backdated purchase

25   order on January 1st, don't you?

1    **A.**    I believe that Mr. Cronin did it.

2    **Q.**    Okay.  And you knew that you had signed a confirmation for

3    that purchase; right?

4    **A.**    Yes.

5    **Q.**    And you knew that you were misleading Autonomy's auditors

6    by signing that confirmation?  You weren't saying that that

7    was -- anything was wrong with that purchase order that

8    Mr. Cronin had created?

9    **A.**    I think that both Autonomy knew the transaction was wrong

10   and I knew the transaction was wrong.

11   **Q.**    Are you here to try to sell something, Mr. Rizek?

12   **A.**    No, sir.

13   **Q.**    Okay.  Can you just answer the question I asked?

14   **A.**    I did answer the question you asked.

15   **Q.**    That you knew that Autonomy -- I asked you did you know

16   that you were misleading Autonomy's auditors, and your answer

17   was what?

18   **A.**    My answer is that both -- that I knew that both Autonomy

19   and myself were misleading their auditors.

20   **Q.**    You knew that the profiling software, which had been

21   purchased for 2.3 -- or the purchase order was for $2.3 million

22   had been sold on to Dave Truitt's company Discover Tech for

23   $1,000 per instance?

24   **A.**    I know that on January -- on January 7th, John Cronin gave

25   me a purchase order for $1,000 per use of that in his software

```
 1  when he sold going forward.
 2  Q.   Let's look at 5669, please, which I believe is in
 3  evidence?
 4           THE COURT:  I'm sorry.  56?
 5           MR. KEKER:  5669.  If it's not in evidence, I'd move
 6  it in, Your Honor.
 7           THE COURT:  Admitted.
 8       (Trial Exhibit 5669 received in evidence)
 9  BY MR. KEKER:
10  Q.   This is on January 7, 2010, Mr. Cronin sends you a
11  Discover Tech purchase order and says (reading):
12           "Alan -
13           "Does this look okay to you?
14           "John."
15       And let's look at what was attached.  This is a purchase
16  order from Discover Technologies -- or, excuse me, it's --
17  yeah, a purchase order from Discover Technologies to MicroLink
18  for it says "See Attachment A," $1,000 per instance.  What's
19  Attachment A?  Can we see the next page.
20       So on January 7, 2010, Discover Technologies is getting
21  from MicroLink for $1,000 an instance the profiling software
22  that MicroLink had sold just before the acquisition had closed
23  to Discover Technologies?
24           MR. FRENTZEN:  I think that misstates it.
25           MR. KEKER:  No.  I've got it wrong.
```

RIZEK - CROSS / KEKER

1    **Q.**   That Autonomy had sold to MicroLink.  MicroLink bought

2    from Autonomy for $2.3 million and now MicroLink is selling on

3    that software to Discover Tech for $1,000 an instance?

4    **A.**   Yes.

5    **Q.**   Okay.  Did -- okay.

6         So you knew all those things.  You knew that Truitt said

7    that he never -- you never had a conversation with him, and you

8    decided that you would blame Sushovan Hussain for the

9    backdating that Cronin did; right?

10   **A.**   No.

11   **Q.**   Okay.  You made up a story, didn't you?

12   **A.**   No, sir.

13   **Q.**   When Hewlett Packard lawyers interviewed you in May of

14   2013, you didn't say anything about the 2.3 million, the

15   backdating, any of that; right?

16   **A.**   When I was there, my whole goal was never to be sitting in

17   a room like this.  So I did not bring this up on purpose, but I

18   didn't -- I was there answering their questions.  I was not

19   there trying to pile facts against anyone.

20   **Q.**   But then once the Government got to you, you told them

21   that Mr. Hussain had called you on New Year's Day and told

22   Rizek that MicroLink was making a 2.3 million PO to Autonomy

23   for an at-risk resale transaction in which Discover Tech was

24   the end user.  That's what you told them?

25   **A.**   I didn't say it to them in those words, no.

1   Q.   Look at 5142, page 11, please, sir.

2   A.   (Witness examines document.)

3           THE COURT:  Page 11.

4   BY MR. KEKER:

5   Q.   Page 11, the last full paragraph.

6   A.   (Witness examines document.)

7           THE COURT:  Okay.  Read that to yourself first.

8           THE WITNESS:  (Witness examines document.)  Okay.

9   BY MR. KEKER:

10  Q.   You told them that Hussain called you on New Year's Day

11  and told you that MicroLink was making a 2.3 million PO for

12  Autonomy for an at-risk resale transaction in which

13  Discover Tech was the end user.  That's what you told them,

14  isn't it?

15  A.   I believe this is paraphrased.  I did have it wrong as to

16  who called who.  I'd remembered it wrong.  And it was -- you

17  know, what I said was, and I've said this, that Mr. Hussain

18  asked if we could take another one at risk, another deal at

19  risk.

20  Q.   Okay.  And so the FBI wrote it down wrong?

21  A.   I think they paraphrased.

22          MR. FRENTZEN:  Objection.  Argument.

23  BY MR. KEKER:

24  Q.   I mean, did --

25          MR. FRENTZEN:  Objection, Your Honor.

 1   BY MR. KEKER:

 2   Q.   You're saying that this is wrong?  What they wrote down is

 3   wrong?

 4          MR. FRENTZEN:  Object to him pointing at me.  I wasn't

 5   there.

 6          MR. KEKER:  I didn't.  I was pointing generally.  I'm

 7   sorry.  All of you.

 8          THE COURT:  The Government's side.

 9          MR. FRENTZEN:  I don't think any of us wrote it.

10          THE COURT:  Okay.

11          THE WITNESS:  Is there a question?

12          THE COURT:  Yeah.  The question is -- you've now read

13   a report of the meeting and Mr. Keker is asking you:  Do you

14   believe that it was incorrectly -- that the report incorrectly

15   stated what you told the Government at that time?  I think

16   that's the question.

17          THE WITNESS:  I think this -- this report is

18   paraphrase -- is putting together a bunch of things.  At the

19   time of the call, I did not know that the at-risk transaction

20   was for Discover at the time of the call.  I put -- pieced that

21   together later, and I had the call wrong on who called who.

22   BY MR. KEKER:

23   Q.   Okay.  So did you tell them that Mr. Hussain had called

24   you?

25   A.   Yes, I did.

1    Q.   Did you say you were sitting on your couch New Year's Day

2    and the call came out of the blue?

3    A.   Yes.

4    Q.   Right.  And now you're telling us that he didn't say

5    what's written here, that MicroLink was making a 2.3 million PO

6    to Autonomy for an at-risk resale transaction in which

7    Discover Tech was the end user?  They just wrote it down but

8    you didn't say it?

9    A.   They put together the pieces of the puzzle, but that's not

10   how I remembered it because I told them that the call was not

11   whether or not we were going to take a Discover Tech; it was

12   could we take another at-risk deal.

13   Q.   You told this same story again in 2015 when they

14   interviewed you with immunity; right?

15   A.   Yes.

16   Q.   And you told the Grand Jury the same story when the

17   Grand Jury -- when you gave your testimony in 2015; right?

18          MR. FRENTZEN:  Objection.

19          THE COURT:  Sustained.

20          MR. FRENTZEN:  Vague.

21          THE COURT:  Sustained.  Same story.

22   BY MR. KEKER:

23   Q.   You told him that you called -- excuse me -- Mr. Hussain

24   called you out of the blue New Year's Day and said, "You're

25   taking a $2.3 million deal"?

1          **MR. FRENTZEN:**  Objection.  Hearsay.  It's also

2   improper to paraphrase it like this.

3          **THE COURT:**  Well, I assume you're going to tie it to

4   the testimony.

5       Where do you want me to take a look at the testimony?

6          **MR. KEKER:**  Well, you can look --

7          **THE COURT:**  At the Grand Jury.  Let's start with the

8   Grand Jury --

9          **MR. KEKER:**  Grand Jury, look at page --

10         **THE COURT:**  -- because we have the words which were

11  actually used.

12      Go ahead.

13                    (Pause in proceedings.)

14         **MR. KEKER:**  51, line 10, through 52:9.

15         **THE COURT:**  You can read that.

16         **MR. FRENTZEN:**  Well, I'd ask that we go down to

17  line 16.

18         **MR. KEKER:**  That's fine.  That's fine.

19         **THE COURT:**  Okay.  So why don't you read -- Mr. Keker,

20  read question-answer.

21  **BY MR. KEKER:**

22  **Q.**   Before the Grand Jury in 2015, line 10 --

23  **A.**   Which page?

24  **Q.**   Page 51.

25         **THE COURT:**  Do you have that in front of you?

```
 1              THE WITNESS:  5144 --

 2              THE COURT:  No.  It's Exhibit Number 5144 and in that

 3     exhibit is page 51.  Do you see that?

 4              THE WITNESS:  Thank you.

 5              THE COURT:  And start with line 3, line 3, so it's

 6     complete.

 7              THE WITNESS:  Yes.

 8              THE COURT:  Okay.  Now, question, go ahead.

 9              MR. KEKER:  You want me to start at line 3,

10     Your Honor?

11              THE COURT:  If you would, please, yes.

12              MR. KEKER:  (reading)

13          "QUESTION:  I want to bring your attention to New Year's

14          Day January 1st, 2010.  Do you have that date in mind?

15          "ANSWER:  Yes, I do.

16          "QUESTION:  Did you understand this was the first day of

17          Autonomy's fiscal year 2010?

18          "ANSWER:  I believe I understood that, yes.

19          "QUESTION:  Okay.  And do you recall receiving a phone

20          call from Autonomy's chief financial officer Sushovan

21          Hussain?

22          "ANSWER:  I did.

23          "QUESTION:  Where were you?

24          "ANSWER:  Sitting on my couch.

25          "QUESTION:  At home in Virginia?
```

1    ■**ANSWER:**  At home in Virginia.

2    ■**QUESTION:**  What time was it?

3    ■**ANSWER:**  About 1:00 to 2:00 o'clock, maybe as early as

4    noon.

5    ■**QUESTION:**  In the afternoon?

6    ■**ANSWER:**  In the afternoon.

7    ■**QUESTION:**  Okay.  What happened?

8    ■**ANSWER:**  I received a call from Sushovan.  I was a little

9    shocked that he was calling me.  And he asked that if we

10   could take another deal, and I told him I was not

11   responsible for deals or taking deals and, you know, that

12   he should talk to Dave, that's not -- or John, it's not my

13   place.  And he said, 'Well, could we" -- I said, 'I' --

14   that was my recollection of the call.

15   ■**QUESTION:**  Is it fair to say that this call came out of

16   the blue?

17   ■**ANSWER:**  Yes.

18   ■**QUESTION:**  Had you heard anything at all about another

19   possible sales transaction between Autonomy and MicroLink?

20   ■**ANSWER:**  No.

21   "And am I right that Mr. Hussain was asking" --

22        **THE COURT:**  Question.

23   ■**QUESTION:**  And am I right that Mr. Hussain was asking you

24   to agree to it?

25   ■**ANSWER:**  Yes."

 1              **THE COURT:**  Okay.  Thank you.

 2   **BY MR. KEKER:**

 3   **Q.**    And you told the story again in 2017 when you talked to

 4   the Government, the prosecutors, with your grant of immunity;

 5   right?  The story being that Mr. Hussain had called you, it was

 6   out of the blue, and so on?

 7   **A.**    I remembered it as being called, yes.

 8   **Q.**    Okay.  And the Government finally showed you your phone

 9   bills; right?

10   **A.**    I provided them to the Government, yes.

11   **Q.**    Okay.  And so when they showed you the phone bills showing

12   that Mr. Hussain had not called you out of the blue or

13   otherwise, you quickly shifted and say, "Well, it must have

14   been in response -- I must have called him in response to an

15   e-mail or phone call from him"; right?

16   **A.**    I don't know why I called him.

17   **Q.**    Well --

18   **A.**    I don't remember the reason behind it.  It was not

19   something I wanted to do or that I normally did.

20   **Q.**    Could you just answer my questions, please, sir --

21   **A.**    Sorry.

22   **Q.**    -- rather than just go on and talk about whatever you want

23   to talk about.

24              **MR. FRENTZEN:**  Objection.  I object to the

25   characterization and arguing with the witness.  The witness is

1    answering his questions.

2          **THE COURT:**  Ask your question.

3    **BY MR. KEKER:**

4    **Q.**   When you were -- when they finally showed you the phone

5    bill and said, "Gee, it doesn't look -- it looks like you

6    called him," you quickly shifted to say, "Oh, well, ah, it must

7    have been in response to an e-mail or phone call from him";

8    right?

9    **A.**   I was trying to think about what -- what prompted my call

10   to him.

11   **Q.**   So the answer is, yes, you told them, "Oh, well, he must

12   have e-mailed or called me"?

13   **A.**   You know, I don't remember the reason why I called him.

14   It's been a long time.  It's been nine years now, and it could

15   have been the call that I was talking to David Truitt that I

16   needed to call him to talk about financials.  I know we talked

17   about the close, where we closed during the month.  I know we

18   talked -- that he brought up an issue about could I take -- can

19   we take one more deal at risk.

20   **Q.**   So another way to put this is that you're just making this

21   up; you don't know what happened?

22   **A.**   No, sir.

23   **Q.**   Okay.

24   **A.**   From what I remember is that we talked about financials

25   and that I was asked could we take a deal at risk.

1    **Q.**   No.  Let's --

2    **A.**   That is the key parts that I remember.

3    **Q.**   Okay.  I get the key part, but let me just see what you

4    remember.

5         When they confronted you with the phone records and said,

6    "You know, you didn't know -- he didn't call you," you quickly

7    shifted and said, "There must be an e-mail or a phone call";

8    right?

9              **MR. FRENTZEN:**  Objection.

10   **BY MR. KEKER:**

11   **Q.**   That was your --

12             **MR. FRENTZEN:**  Asked and answered multiple times and

13   argumentative at this point.

14             **THE COURT:**  Overruled.

15        Go ahead.

16             **THE WITNESS:**  Question?  Sorry.

17   **BY MR. KEKER:**

18   **Q.**   The question is you immediately told, "Oh, well, it must

19   have been a phone call or an e-mail from him?

20   **A.**   I threw that out there's a potential, yes.  I don't --

21   **Q.**   And you threw that out.  And then you know that in the

22   millions and virtually a courtroom full of e-mails and

23   documents, and so on, there's no such phone call or e-mail

24   where he's reaching out to you; right?

25   **A.**   I don't believe so, no.

1   **Q.**   Okay.  And so then last Monday when the jury was here, you

2   said that now you remembered and you told them under oath that

3   you called them and you were talking about the closing

4   financials, and then he raised could you take another deal.

5   That's what you told them on Monday?

6   **A.**   Uh-huh, yes.

7   **Q.**   You were just making that up; right?

8   **A.**   No, sir.

9   **Q.**   What?

10  **A.**   No, sir.

11  **Q.**   You remember the conversation?

12  **A.**   I remember the two parts, that we talked about the working

13  capital, where we closed because that was important for the

14  deal to be closed, and that they asked could we take another

15  deal at risk.  And I did not know whether or not we could take

16  the deal at risk until the next week that there was a

17  confirmation that did not have the deal on it, and I raised the

18  question "I guess that we didn't need to take the deal at

19  risk?"  And then the deal came through, the invoice came

20  through.

21  **Q.**   All right.  Could we see 5741?  That's a demonstrative

22  that we've shown earlier.

23         **THE COURT:**  Is it 5741?

24         **MR. KEKER:**  '41.  And it's a demonstrative,

25  Your Honor, that we used with Mr. Truitt.

1          **THE COURT:**  It's in evidence?

2          **MR. KEKER:**  I think it's admitted as a demonstrative.

3          **THE COURT:**  Okay.  Go ahead.

4    **BY MR. KEKER:**

5    **Q.**   So let's talk about what happened on -- what actually

6    happened on January 1st.

7          Do you remember Mr. Truitt being very upset the day before

8    that he didn't get all the software he needed to start his new

9    company?

10   **A.**   I think he and John were talking about that there needed

11   to be changes made to the order.

12   **Q.**   Do you remember him being upset that he didn't get

13   full-blown IDOL to use with his DiscoverPoint technology?

14   **A.**   I would not call it upset.

15   **Q.**   Would you call it agitated?

16   **A.**   No.

17   **Q.**   Would you call it angry?

18   **A.**   No.

19   **Q.**   What would you call it?

20   **A.**   He was happy.  He was closing his company for a lot of

21   money.  He was in a great mood.

22   **Q.**   Okay.  Was he concerned about not having the profiling

23   software that he needed to start his new company Discover Tech?

24   **A.**   I don't think we ever got a copy -- purchased a copy from

25   Autonomy that the license that we purchased day one didn't

1   change by the end when we sold it to the end client.  So they

2   were going to work out a fix to make it work, to the order.

3   **Q.**   This is a conversation you remember having with

4   Mr. Truitt?

5   **A.**   No.  This is an attitude I had about every Autonomy sale.

6   When we purchased any Autonomy software --

7   **Q.**   Okay.  Excuse me, sir.  I didn't ask you about your

8   attitude.  I asked about -- I'd really like to know what was

9   said.

10          **MR. FRENTZEN:**  Objection.  Interrupting the witness,

11  Your Honor.

12          **MR. KEKER:**  I'd move to strike.

13          **THE COURT:**  Ladies and gentlemen, let's do this:

14  Let's take our morning break.  It's 10:10.  We will resume at

15  10:25.  10:25.

16      Remember the admonition given to you:  Don't discuss the

17  case, allow anyone to discuss it with you, form or express any

18  opinion.

19      (Proceedings were heard out of the presence of the jury:)

20          **THE COURT:**  Okay.  Let the record reflect all jurors

21  have left.

22      About how much longer do you have?  And I'm not asking in

23  a critical way.  I'm just trying to make some plans.

24          **MR. KEKER:**  Can I answer that when you come back?

25          **THE COURT:**  Yes, of course.

1          **MR. KEKER:**  Because I need to look at it.

2          **THE COURT:**  Sure.  No problem.

3      Okay.  Everybody have a nice recess.

4          **MR. KEKER:**  It's not infinite.  I mean --

5          **THE COURT:**  Pardon?

6          **MR. KEKER:**  -- is it an hour?  Is it 45 minutes?

7          **THE COURT:**  Well, here is why:  I mean, I have some

8   sentencings coming in at 11:50.

9          **MR. KEKER:**  Ah.

10         **THE COURT:**  What I was thinking about doing is not

11  even calling them at 11:50, calling them around noon or a

12  little bit after noon, like 12:05.

13         **MR. KEKER:**  I should be certainly done by 11:50.

14         **THE COURT:**  Okay.  All right.  Okay.

15         **MR. KEKER:**  I think.  Please don't --

16         **THE COURT:**  Well, that's okay.  You don't have to

17  promise.  It's all right.

18         **MR. KEKER:**  I'll try.

19         **MR. FRENTZEN:**  Thank you, Your Honor.

20               (Recess taken at 10:13 a.m.)

21             (Proceedings resumed at 10:28 a.m.)

22      (Proceedings were heard in the presence of the jury:)

23         **THE COURT:**  Let the record reflect all jurors are

24  present; the parties are present.

25      You may proceed.

1      **MR. KEKER:**  Thank you, Your Honor.

2  **Q.**   Mr. Rizek, how did you learn that Mr. Truitt was concerned

3  about not getting the profiling function of IDOL?

4  **A.**   I think there was some discussions that they needed to mod

5  the purchase order, the actual -- the actual invoice or what

6  the attachments were for the -- for the -- for the software.

7  **Q.**   When were those discussions?

8  **A.**   A week or weeks before the close, so the last two weeks of

9  December.

10 **Q.**   Mr. Truitt testified that he didn't learn he didn't get

11 full-blown IDOL until the last minute.  That's not what you

12 remember?

13      **MR. FRENTZEN:**  Objection to the characterization of

14 prior testimony and it's irrelevant to this witness.

15      **THE WITNESS:**  I'm just -- to me wasn't --

16      **MR. FRENTZEN:**  Hang on a second.

17      **THE COURT:**  I'll allow him to answer.

18      Go ahead.  He's answering.

19      **THE WITNESS:**  I'm saying there is a range of time

20 there.  I don't know which date.  I don't know what date it was

21 he knew that he didn't get what he thought he needed.

22      I do know that during that period, during that close

23 period, he -- he realized that the license he was sold was

24 restrictive and he needed some mods to it.  As I testified

25 earlier, just about every single order that we --

1        **MR. KEKER:**  Object and move to strike the --

2        **THE COURT:**  Let's move on.

3        **MR. KEKER:**  Yes.  Could we put back up 5741.

4   **Q.**   On January 1st, did you know that Mr. Truitt was upset

5   or -- excuse me -- concerned that he didn't have the profiling

6   function of IDOL for his DiscoverPoint product?

7   **A.**   On January 1st, I thought I was done with the financials

8   and I was at home not worried about work.

9   **Q.**   My question is did you know that Mr. Truitt was concerned

10  that he didn't have the profiling function of IDOL?

11  **A.**   I understood before that on the 31st or the 30th or some

12  time before that, he was working to make the changes to the

13  purchase -- what he purchased.

14  **Q.**   He was working on getting profile functions?

15  **A.**   I believe so, yes.

16  **Q.**   So you think he'd been working on it for some time?

17  **A.**   I don't know how many days.  I just know it was during

18  that period of time.

19  **Q.**   Do you know if he talked to Mr. Egan about it, about his

20  concern?

21  **A.**   I do not know who he talked to.

22  **Q.**   Do you know what you talked to Mr. Egan about in the

23  afternoon of January 1st?

24  **A.**   No.  I'm not aware of that call until I looked at this

25  sheet.

**PROCEEDINGS**

1  Q.   And then Mr. Truitt called Mr. Cronin and then he called

2  you.

3       What did you talk about?  He called you twice.  It looks

4  like he missed you and then talked for 11 minutes.  What did

5  you talk about?

6  A.   I don't know about the miss on the call.  We talked -- I

7  believe we talked about numbers, and I don't know.

8  Q.   You talked about numbers?

9  A.   Talked about where we were at the close, when everything

10 was done.

11 Q.   I thought you testified last Monday that you thought that

12 all issues regarding the deal were done by then.  Didn't you

13 tell us that last Monday?

14 A.   I think the deal -- the deal didn't change.  The deal for

15 the purchase of MicroLink did not change.

16 Q.   All issues regarding the deal were done by then.  That's

17 what you said; right?

18 A.   Yes.

19 Q.   So what did you talk to him about?

20 A.   We talked a lot during this period of time.  I don't know.

21 Q.   Did he suggest -- and then he called Truitt again --

22 excuse me -- called Egan again and then he called you -- called

23 Cronin again and then he called you back and talked to you for

24 eight minutes; right?

25 A.   Yes.

**PROCEEDINGS**

1  Q.   What did you talk to him then about?

2  A.   I think that's -- I'm assuming that's when I was told to

3  call Mr. Hussain.

4  Q.   And you were told to call Mr. Hussain and tell him that,

5  "Oh, by the way, we had a $2.3 million deal that closed in the

6  last quarter and so there's another $2.3 million that will be

7  being put on the books"?

8  A.   No.  I was not told to do that.

9  Q.   The reason that they had you call is that Mr. Hussain

10  wouldn't be suspicious because you didn't really have anything

11  to do with him; right?

12  A.   I don't believe so, no.

13  Q.   You didn't tell Mr. Hussain during that ten-minute call

14  that there was another deal for $2.3 million that hadn't --

15  that had been agreed to in the last quarter?

16  A.   No.  That's not my job.

17  Q.   It's not your job?

18  A.   No.

19  Q.   Okay.

20      Look at 2791, please, the call here at 4:49 and then 4:59.

21  It was a ten-minute call that ends at 4:59.  And then an hour

22  later, Mr. Hussain is saying, "We received an order from them

23  last quarter which will be transferred to Discover.  Speak to

24  Joel for more info tomorrow or acquisition impact.  Shouldn't

25  be any."

1          So he's reporting to Joel Scott and Andy Kanter that there

2    was another deal last quarter; right?

3    **A.**   Okay.  That's --

4    **Q.**   You didn't tell him that?

5    **A.**   No.

6    **Q.**   Did he ask you for details when you told him so that he

7    could make sure it was properly booked?

8    **A.**   What he asked me was if we could take another --

9    **Q.**   Can you answer that question.  Did he ask you for details

10   about the deal so that he could see if it was properly booked?

11   **A.**   No.

12          **MR. FRENTZEN:**  Objection.  Assumes facts not in

13   evidence.

14          **MR. KEKER:**  Let's --

15          **MR. FRENTZEN:**  Hearsay.

16   **BY MR. KEKER:**

17   **Q.**   Let's go back to 5741, please.

18          After the call -- after you called him, you called

19   Truitt -- why did you call Truitt?

20   **A.**   Because I wanted to tell him about the -- that he asked

21   that we take another deal at risk.

22   **Q.**   You didn't call him to say, "The deed is done; I've said

23   there is another $2.3 million last quarter"?

24   **A.**   Definitely not.

25   **Q.**   And then Truitt called Cronin and then Truitt called you

1  back and talked to you for 64 minutes; right?

2  **A.**   Yes.

3  **Q.**   What were you talking about?

4  **A.**   I don't recall.

5  **Q.**   Were you feeling badly about being involved in this sort

6  of scheme with Egan and Truitt about backdating a contract and

7  making it look like it happened last quarter?

8  **A.**   No.  What I was thinking at that time is I did need a new

9  job.

10  **Q.**   Okay.  You needed -- okay.  You needed a new job.  Why did

11  you need a new job?

12  **A.**   I assumed they were going to get rid of me once the

13  transition from our accounting to their accounting had

14  happened.

15  **Q.**   You've said that several times.

16        Had you signed an employment agreement that promised you a

17  $40,000 bonus if you stayed for six months?

18  **A.**   Yes.

19  **Q.**   You'd signed that on --

20  **A.**   I believe the week right before the -- either the 30th or

21  31st.

22  **Q.**   So at the end of 2009, you had signed -- could we,

23  Your Honor, I would move in 5733.  Let me give you a copy.

24        **THE COURT:**  57 --

25        **MR. KEKER:**  5733 is the first amendment to the

1  employment agreement.  I don't think you have it in there.

2        **MR. FRENTZEN:**  No objection.

3        **THE COURT:**  Admitted.

4     (Trial Exhibit 5733 received in evidence)

5  **BY MR. KEKER:**

6  **Q.**   And is this the agreement that promises you a $40,000

7  bonus -- it's there in 1(a).  You get a $40,000 bonus if you

8  stay for six months.  And it was signed by you and Mr. Wharton,

9  and the date of it is December 31st.  Look at the first page.

10       Is that your writing -- did you write in the "31," "31

11  December"?

12  **A.**   That would be Tim's writing, I believe.

13  **Q.**   So you'd signed this employment agreement the day before

14  you were sitting on the couch and got this call out of the blue

15  and so on -- you'd just signed this thing; right?

16  **A.**   Uh-huh, yes.

17  **Q.**   And you were worried about losing your job?

18  **A.**   I had been worried about it going into that week.  I made

19  calls to recruiting individuals, partners at CPA firms, and I

20  started discussions about going to a new job.

21  **Q.**   Can we go back to 5741, please.  And back -- my

22  question -- what did you talk to Mr. Truitt about for 64

23  minutes?

24  **A.**   On the second call, I don't remember.

25  **Q.**   Okay.  And then after talking to him for 64 -- was he

**PROCEEDINGS**

1  trying to persuade you to get over your scruples or anything

2  like that?

3  **A.**   I don't believe so, no.

4  **Q.**   Were you telling him you were concerned, you were about to

5  call all your buddies and see if you could get a new job

6  because --

7  **A.**   I didn't disclose that to him, no.

8  **Q.**   But something happened after that 64 minutes that caused

9  you to call Mr. Hussain back?

10  **A.**   I believe so, yes.

11  **Q.**   And what did you talk to him about?

12  **A.**   I don't remember what we discussed on the second call.

13  **Q.**   Were you giving him the details that he had asked for in

14  the first call?

15  **A.**   No.

16  **Q.**   Were you talking to Mr. Truitt before that about not

17  wanting to do what he was asking you to do?

18  **A.**   No.

19  **Q.**   Were you talking to Mr. Truitt about the fact that you

20  thought this was dirty business and you didn't really want to

21  have anything to do with it?

22  **A.**   Possibly about that.  If it was going to continue this

23  way, that this would not end well.

24  **Q.**   Okay.  You didn't know Mr. Hussain very well at all, did

25  you?

1    **A.**    No, sir.

2    **Q.**    You'd met him one time when you did the acquisition?

3    **A.**    Yes, sir.

4    **Q.**    And you had shocked him by letting him know that you knew

5    that Verity had lost its security clearance and that is why

6    they were interested in MicroLink?

7    **A.**    I did state that at that meeting.

8    **Q.**    Since then, had you met him?  Had you been in personal

9    contact?

10   **A.**    No personal contact.

11   **Q.**    And you're an accountant; right?

12   **A.**    Yes.

13   **Q.**    And he's an accountant; right?

14   **A.**    I believe so, yes.

15   **Q.**    And your testimony is that he -- at first you thought that

16   he called you, but now your testimony is that you called him,

17   and he said, "Hey, can you take a deal and backdate it," two

18   accountants chatting with each other, one in England, one in --

19   where were you?

20   **A.**    Virginia.

21   **Q.**    And one in Virginia.  Just go, "Hey, let's backdate a

22   deal."  People who don't know each other were doing that.

23   That's your testimony?

24   **A.**    Yes.

25   **Q.**    Now, as recently as February 12th, Lincoln's birthday

1    actually this year, in a conversation with

2    Mr. Frentzen/Mr. Reeves, you told them that the sale of this

3    profiling software from MicroLink to Discover Tech never

4    happened, didn't you?  You told them that two weeks ago?

5    **A.**    Yes.

6    **Q.**    But you now -- it did happen, didn't it?

7    **A.**    No.  They got -- they gave us a purchase order for the

8    rights to buy it for $1,000 for every time they sold it.

9    **Q.**    And it was delivered and Mr. Hyson downloaded it; right?

10   **A.**    I don't -- I don't know.

11   **Q.**    Who is Mr. Hyson?

12   **A.**    He's the -- the chief -- CIO for Discover Technologies.

13   **Q.**    Chief technology officer?

14   **A.**    CIO.

15   **Q.**    For Discover Technologies, for Mr. Truitt's new company?

16   **A.**    Yes.

17   **Q.**    And let's look at 5584, please, sir.

18          **THE COURT:**  5584?

19          **MR. KEKER:**  84, yes, sir.

20       It may be in -- I think it's -- it could be in through

21   Mr. Truitt.  If it's not --

22          **THE COURT:**  Admitted.  Admitted.

23       (Trial Exhibit 5584 received in evidence)

24   **BY MR. KEKER:**

25   **Q.**    5584 is David Truitt to John Cronin on January 26th, and

1    he's asked for the -- and it's -- the "Autonomy profiling

2    software" is the subject.  And Truitt's telling Cronin, "I have

3    asked for the Automater account to be sent up for M. Hyson

4    discovertechnologies.com."

5        The Automater account is how the software is delivered;

6    right?

7    A.    Yes.

8    Q.    It goes from Autonomy -- I mean, you get a key to the

9    account and that's how you deliver software?

10   A.    Yes.

11   Q.    So here in January of 2010, the profiling software is

12   being delivered to Discover Technologies?

13   A.    Yes.

14   Q.    Who is going to pay a thousand dollars per instance for

15   something that costs MicroLink $2.3 million?

16   A.    We sent a purchase order for $2.3 million, but we never

17   paid $2.3 million.

18   Q.    Okay.  Did you believe that what Discover Technologies was

19   doing was ripping off Autonomy?

20   A.    No.

21   Q.    Years later, Mr. Cronin and Mr. Truitt created documents

22   that tried to make it look like Discover Technologies had

23   gotten the profiling software as part of the $10 million

24   purchase of software that they had made from Autonomy; right?

25   A.    I'm not aware of that, no.

1    **Q.**    Look at 5739, please.   5739 is a -- we move it in,

2    Your Honor?

3             **THE COURT:**   Admitted.

4        (Trial Exhibit 5739 received in evidence)

5    **BY MR. KEKER:**

6    **Q.**    5739 is a memo from Cronin to Truitt dated December 15,

7    2010, relating to "simple OEM approach" and attached is a

8    purchase order from MicroTech to Discover Technologies and it

9    says it's for $10,100,000; right?

10   **A.**    That's what it says, yes.

11   **Q.**    The $10,100,000 was the $10 million deal that had been

12   made at the end of 2009 when Discover Technologies started and

13   bought from MicroLink --

14            **MR. FRENTZEN:**   Objection.

15   **BY MR. KEKER:**

16   **Q.**    Excuse me.

17        -- bought from Autonomy through MicroTech --

18            **MR. FRENTZEN:**   Objection.  The witness has said he is

19   not aware of this document, and this is a MicroTech document,

20   not a MicroLink document.

21            **THE COURT:**   Sustained.

22   **BY MR. KEKER:**

23   **Q.**    Look at the attachment A.

24   **A.**    Okay.

25   **Q.**    It says it's got profiling --

1        **MR. FRENTZEN:**  Why, Your Honor?  The witness is not

2   aware of this document and it's a MicroTech document, not a

3   MicroLink document.

4        **THE COURT:**  Well, I guess my question is:  Is it

5   coming in with some other witness?

6        **MR. KEKER:**  Certainly Cronin, Your Honor.  It's

7   Cronin --

8        **MR. FRENTZEN:**  I'm sorry.  I think it was already in

9   evidence, Your Honor.

10       **MR. KEKER:**  It is in evidence.

11       **MR. FRENTZEN:**  I get that.  My point is he has already

12  said he never saw it, and this goes to MicroTech, so basically

13  counsel is just testifying to a witness who --

14       **THE COURT:**  Well, he's not testifying.  I mean, he's

15  asking the witness questions.

16       **MR. FRENTZEN:**  He is assuming a lot --

17       **THE COURT:**  The witness either recognizes it or

18  doesn't recognize it.  I think the jury knows that questions of

19  a counsel are not evidence.  What the witness says is evidence.

20  However, if the witness -- what the witness says may give

21  meaning to the question that is being asked or vice versa, is a

22  better way of putting it.

23       Anyway, there we are.

24  **BY MR. KEKER:**

25  **Q.**   Looking at attachment A, it says on January 7, 2010, which

1  is the date -- that is the date that you saw the purchase order

2  for a thousand dollars per instance; right?

3  **A.**   I've seen a purchase order, sent a purchase order for a

4  thousand dollars per instance.

5  **Q.**   It was dated January 7, 2010?

6  **A.**   Yes.

7  **Q.**   And here is something that says that same profiling

8  software was part of the $10 million transaction; right?

9  **A.**   That's what it says here.

10 **Q.**   Do you know why Mr. Cronin and Mr. Truitt were trying to

11 make it look like they got the profiling software in that $10

12 million transaction?

13 **A.**   No.

14 **Q.**   Is that something you and Mr. Truitt talked about during

15 these meetings you would have before your -- before you began

16 to meet with the Government?

17 **A.**   No.  All of our meetings were about the 30 -- 30 to 40

18 character description put on purchase orders and trying to

19 match purchase orders -- not purchase orders, but invoices to

20 actual deals.

21 **Q.**   Mr. Rizek, I would like to ask you some questions about

22 what happened and what you did with this $2.3 million

23 obligation that MicroLink had to Autonomy after Autonomy took

24 over MicroLink.  Okay?

25       So when the sale closed, there was a $2.3 million

1  obligation on MicroLink's books saying it owed $2.3 million to

2  Autonomy; right?

3  **A.**   Yes.   I entered that when I got the invoice and the -- and

4  the confirmation the next week, sometime during the next week.

5  **Q.**   If we could look at 5880, please, sir.

6       Move it in, Your Honor.

7            **MR. FRENTZEN:**  I don't have 5880.

8            **THE COURT:**  I don't either.   I don't have it.

9            **MR. KEKER:**  Let me show you --

10           **THE COURT:**  Before you show it to him, give it to the

11  Government.   Do they have it?

12           **MR. KEKER:**  They have it.   It's attached to

13  something -- it may be attached to something else.   It's

14  attached to 421.

15           **THE COURT:**  I'm sorry.   What is it attached to?

16           **MR. KEKER:**  I think it's attached to 421, I'm being

17  told by --

18           **THE COURT:**  Wait.   Let me look at 421.   Well, if it's

19  in evidence -- is it in evidence as 421?

20           **MR. KEKER:**  And as usual, you're right.   Got it.   421.

21  **Q.**   The second page of 421, what is that?

22           **THE COURT:**  It's going to be shown on the screen for

23  you.

24       Oh, that's terrible.   I'm not commenting on what it says.

25  I just can't read -- even begin to read it.

1          **THE WITNESS:**  I normally work with a bigger screen.

2          **MR. KEKER:**  Try to blow up line --

3          **THE COURT:**  Do we have a better copy?

4          **MR. KEKER:**  -- 1200.

5     We don't, Your Honor.

6     1200 is way down here, down at the bottom.  The 2.3 one.

7          They are all 1200.  I'm sorry.  The second to the last --

8     the one that says -- well, it says $2.3 million over here.

9          **THE WITNESS:**  I can read it.  I can see it.

10         **MR. KEKER:**  That one.

11    **Q.**   Okay.  What is this?

12    **A.**   This is a dump of the GO detail out of our accounting

13    system.  The $2.3 million would be the deal, the deal that we

14    took at -- this deal, the deal we're discussing, and we put it

15    in as deposits on software, which is an asset.

16         It means like we bought, using the analogy I used with the

17    E&Y orders, a gallon of milk and it's sitting on our inventory

18    and we also had a payable equal to the $2.3 million to

19    Autonomy.

20    **Q.**   Is this your handwriting on the exhibit?

21    **A.**   Yes.

22    **Q.**   Can you tell when this -- what the date of this accounting

23    document is?

24    **A.**   I don't think that's a date.  It could be 5/31.  This

25    could be as of May.  But 2011 would have been a year later.

1      If it is 2011, it would be data that I pulled for David

2   Truitt when I gave it to him, but I don't think so.

3      I don't know what the date is on this.

4   **Q.**   Well, it says "deposits on software" and it says

5   "3/1/2010."  What does that mean?

6   **A.**   3/1/2010?

7   **Q.**   The fifth column --

8   **A.**   Oh, there.  That's probably -- that's a due date.

9   **Q.**   Okay.  Was the $2.3 million obligation on MicroLink's

10  books when they closed with Autonomy, when the purchase closed

11  with Autonomy?

12  **A.**   I don't believe it was on our books when we closed with

13  Autonomy.  I don't believe I had received it and entered it by

14  then.

15  **Q.**   Did you put it -- at some point, did you put it on the

16  books of MicroLink?

17  **A.**   Yes.  After -- after I was talking to Steve Chamberlain, I

18  said I guess we didn't need that deal that was at risk and then

19  the deal was sent to me.

20  **Q.**   Okay.  Let's look at 5874, please, sir.

21      **MR. FRENTZEN:**  No objection.

22      **THE COURT:**  5874 admitted.

23      (Trial Exhibit 5874 received in evidence)

24  **BY MS. LITTLE:**

25  **Q.**   5874 is a email from you to somebody at Autonomy named

1   Matt Stephan in March of 2010 and talks about "Provision

2   against deposits on software.  The list below shows deals that

3   we understand have little chance of ever closing and thus

4   require a provision as part of the acquisition accounting."

5        And you have not listed there the $2.3 million, have you?

6   **A.**   No.

7   **Q.**   Look at the next page.

8        And, in fact, you have deposits on software, and one of

9   them -- some of them you say it probably won't close, but the

10  $2.3 million is there as a debt and you -- and you're not

11  saying it won't close; right?

12  **A.**   Not on this sheet, no.

13  **Q.**   And then let's look at 5875.  This is the final closing

14  balance sheet.

15        **THE COURT:**  Admitted.

16      (Trial Exhibit 5875 received in evidence)

17  **BY MR. KEKER:**

18  **Q.**   And it's from you to Mr. Chamberlain -- to Steve

19  Chamberlain on April 5, and it's the final closing balance

20  sheet; right?

21  **A.**   Uh-huh.

22  **Q.**   And attached is an Excel spreadsheet, but we've just

23  pulled out one page which is the 1200 category, deposits on

24  software.  And there is the $2.3 million deposits on software,

25  the debt, from -- in the final closing balance sheet; right?

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    Okay.  And then Deloitte -- you learned that Deloitte

3    would accept your refusal to let them audit your books?

4    **A.**    They did send an auditor so they were allowed to audit our

5    books, but they had to have it be a U.S. citizen and they could

6    not promise they would provide a U.S. citizen.

7    **Q.**    Look at 5869, please, sir.

8         And I'd move that into evidence.  It's an email from --

9    chain from you.

10         **THE COURT:**  Admitted.

11         (Trial Exhibit 5869 received in evidence)

12    **BY MR. KEKER:**

13    **Q.**    The bottom email is from -- the jury has seen this before,

14    from Laura Blake of Deloitte at Cambridge, and they say, "I'm

15    part of the UK audit team.  As part of our quarterly audit

16    procedures, we do a review of each entities' P&L and balance

17    sheet."

18         And you responded on April 14, 2010, "I'm sorry, but U.S.

19    government security requirements placed on us forbid your

20    auditing of our books and records"; right?

21    **A.**    We used U.S. citizens to audit our books.

22    **Q.**    Well, that's not what you said.  Does it say there you

23    have to be a U.S. citizen?

24    **A.**    We did have one of their auditors come out.

25    **Q.**    Sir, just -- simple question.  Does it say there that you

1  have to be a U.S. citizen?

2  **A.**    No.

3  **Q.**    What did you say?

4  **A.**    I'm saying that they, being the UK auditors for Deloitte &

5  Touche, could not audit our books.

6  **Q.**    You said, "The U.S. government security requirements

7  placed upon us forbid your auditing of our books and records."

8  **A.**    "Your" meaning those individuals.

9  **Q.**    Does it -- I can't -- I just can't read, I guess.

10      It says in there "your," meaning -- I mean, there is

11  something in here that you -- you do a mind meld and you get

12  out of this?

13  **A.**    Well, we had a discussion with Lee.  It says that on the

14  next line there, that we discussed, you know -- we discussed

15  this with him.

16  **Q.**    And they were going -- and then you talk about contacting

17  a U.S. accounting firm, but it doesn't say -- never mind.

18  **A.**    Well, then we go down, "So you might have assurances on

19  our book, we are planning to contact a U.S. accounting firm to

20  perform the agreed-upon procedures."  The agreed-upon

21  procedures could have been everything.

22  **Q.**    So after you told Deloitte what is written there -- we

23  won't argue about what it says -- and you knew that they

24  weren't going to come and audit your books, you caused the 2.3

25  to be written off as uncollectible; right?

1  **A.**   The timeline could have been there, but there was no A

2  equals B equals C in this.

3  **Q.**   Look at 5562, please, sir.

4         **THE COURT:**  5562?

5         **MR. KEKER:**  5562.

6         **MR. FRENTZEN:**  I don't have that.  Oh, wait.  Sorry.

7         **MR. KEKER:**  Five-five-six-two.

8         **MR. FRENTZEN:**  I've got it.

9         **THE COURT:**  One minute, please.

10 **BY MR. KEKER:**

11 **Q.**   This is an email from you to Cynthia Watkins.

12        Who is she?

13        **THE COURT:**  Admitted.  Admitted.

14        (Trial Exhibit 5562 received in evidence)

15        **THE WITNESS:**  Let me find it first.

16 **BY MR. KEKER:**

17 **Q.**   It's on your screen.

18 **A.**   Cynthia Watkins was a controller here in San Francisco for

19 Autonomy North America.

20 **Q.**   Okay.  And you're writing to her saying that "old deals"

21 and you list the $2.3 million transaction; right?

22 **A.**   The old deals I believe is the bolded ones there, not the

23 non-bolded ones.  That would have been a new deal.

24 **Q.**   Well, why -- you had -- you said "old deals" and then you

25 put in a list of deals.  You meant -- you're saying it means

1    something other than all of these are old deals?

2    **A.**   Is there anything else on the side?  I don't know if you

3    are going to zoom out.

4    **Q.**   No.  This is it.

5    **A.**   Okay.  Thank you.

6    **Q.**   Why did you call Discover an old deal?

7    **A.**   It was never -- there was no purchase order for Discover

8    for $2.3 million.

9    **Q.**   For $2.3 million.  There was a purchase order for a

10   thousand dollars an instance though?

11   **A.**   Yes, there was.

12   **Q.**   You didn't tell her that?

13   **A.**   No.

14   **Q.**   Look at 5561, please, sir.  The date -- the date of that

15   was -- was May 13th, the 1042, and now look at 55 --

16          **THE COURT:**  Admitted.  Admitted.

17          **MR. KEKER:**  -- 61.

18       (Trial Exhibit 5561 received in evidence)

19   **BY MR. KEKER:**

20   **Q.**   This is your email, and does Cynthia Watkins say -- go up

21   to the top.

22       A couple hours later, she says, "Just had another

23   discussion with Alan.  He confirmed that none of the below

24   deals, except for Ameriprise, which may come through INC, are

25   expected close."

1    So you were telling Cynthia Watkins that this deal wasn't

2    going to close and could be written off?

3    **A.**    That none of these -- none of these deals have been sold

4    to the end user.

5    **Q.**    None of them had been sold to the end user?

6    **A.**    Yes.

7    **Q.**    Except we've seen that the $2.3 million deal between

8    Autonomy and MicroLink had been sold to the end user for a

9    thousand dollars an instance; right?

10    **A.**    Well, it had been sold in a different way, so when they

11    sold 2,300, we could pay this deal.

12    **Q.**    So the result of you telling her that was that this was --

13    the 2.3 was written off of Autonomy's books?

14    **A.**    I don't know if it was as a result of this email or what.

15    I think it was probably due to other discussions I had with

16    Stephen Chamberlain.

17    **Q.**    This is three months after Dave Truitt got the profiling

18    software in the ways that the jury understands --

19    **A.**    Yes.

20    **Q.**    -- right?

21    **A.**    He got access to it.

22    **Q.**    So now Dave Truitt has the profiling software for Discover

23    Tech and you have got then debt written off because it's not

24    going to close with Discover Tech; right?

25    **A.**    Dave Truitt had access to that software before Dave Truitt

1  got access to Discover -- Discover to that software, you know,

2  afterwards and a purchase order to buy it for a thousand

3  dollars per instance, and we were not allowed to keep the asset

4  that was sitting in our books.  So it's not just the payable.

5  It's also the asset.

6      So this asset was sitting in our books as $2.3 million,

7  and that asset would have gone down by a thousand dollars every

8  time he sold it, so it wasn't just writing off the receivable,

9  it was writing off the asset.  They have to go in total  in --

10  together; otherwise, you've going to have a profit or a loss.

11      We were told we could not keep any assets of Autonomy

12  software on our books so that both of them had to get written

13  off together.

14  **Q.**  Did you help Dave Truitt steal the profiling software from

15  Autonomy?

16  **A.**  No.  Never.

17  **Q.**  You were -- let me talk to you about something different.

18      You were shown an email -- 317.  Let's put that one up.

19  That's the one that uses the term "grossed up."  We've talked

20  about this a little bit of already.

21      Where does it say "grossed up"?  Yeah.

22      "David informed me that you were looking for P&L that is

23  grossed up."

24      And you told the jury that if you added the products sold

25  and then balanced them by the cost of the products, that would

1    double your revenues from 25 million to 48 million.  Do you

2    remember telling them that?

3    **A.**    In that range.  Somewhere in those numbers.

4    **Q.**    Were you trying to imply that would be misleading people

5    by saying that the revenues were -- were that much?

6    **A.**    Our accountants advised us --

7    **Q.**    Can you answer my question, please, sir.

8            **MR. FRENTZEN:**  Objection.

9            **THE COURT:**  I think he can answer it.

10           **MR. KEKER:**  He is starting to talk about what somebody

11   else told him.

12           **THE COURT:**  But you are asking him about "What did you

13   believe?  Did you believe?"  And I'm going to permit him.

14       Go ahead.

15           **THE WITNESS:**  I believe in 2008, 2007 time frame, our

16   accountants, our CPA firm, advised us that by booking our

17   product sales that was not our primary business at the gross

18   amount, it was misstating our value as a company by

19   overstating -- by making something that was minor in our

20   product -- in our product mix and making it look material.

21       So we were advised to start recording all of our sales

22   transactions of -- of product at the net amount.  So we -- we

23   booked only the margin that we got off the sale as revenue, and

24   it flowed down to the bottom line.  We did not book the product

25   sale or the cost in revenue.  Those only went on the balance

PROCEEDINGS

1  sheet.

2  **BY MR. KEKER:**

3  Q.   So you deemed that MicroLink's revenues around the time of

4  the purchase for the year before the purchase were $25 million

5  as opposed to 48?

6  A.   Yes.

7  Q.   And that's what you told Mr. Hussain when you were meeting

8  with him about the purchase of the company?

9  A.   There's a document in here that has the exact amounts on

10  it.

11  Q.   Okay.

12  A.   There's a sheet with all three years.

13  Q.   Are you aware that in reporting to his board on this

14  acquisition, Mr. Hussain told them that the revenues of

15  MicroLink were $25 million?

16  A.   I was not a party to that meeting.

17  Q.   Could we see 351 please.  351 is a memorandum from

18  Mr. Hussain to Mr. Kanter dated 16 December 2009 to the board

19  of directors of Autonomy Corporation regarding the acquisition

20  of MicroLink.

21      I would move it in, Your Honor.

22          **MR. FRENTZEN:**  No objection.

23          **THE COURT:**  Admitted.

24      (Trial Exhibit 351 received in evidence)

25  \\\

1    BY MR. KEKER:

2    **Q.**    Can we turn the page and look at page 2 down at the bottom

3    where the revenues are reported.

4        It looks like Mr. Hussain is reporting -- and Mr. Kanter

5    are reporting revenues in 2009 of 25 million not 48 million;

6    right?

7    **A.**    It says 25 million here, yes.

8    **Q.**    Now, the line of -- the -- you told us that you only --

9    your accountants had told you to not report sales of product.

10   **A.**    No.

11   **Q.**    What did they tell you not to report?

12   **A.**    They told us to report it at net.  So only to report our

13   margin on our revenue.  So our revenue -- so if we sold a

14   million dollars of software, we would take ten percent of that,

15   one hundred thousand, and we would put that in revenue.  We

16   would not book one million dollars of revenue and nine million

17   of cost.  We only booked the net --

18   **Q.**    Let's just go through how that works.  Look at -- and this

19   is in a file folder.  5729 are some -- collection of invoices.

20       These are in file folders, Your Honor.

21           **THE COURT:**  I'm just trying to get my copy.  5729?

22           **MR. KEKER:**  5729.

23           **MR. FRENTZEN:**  No objection.

24           **THE COURT:**  Pardon me?

25   \\\

1   **BY MR. KEKER:**

2   **Q.**   It's a collection of invoices.  Let me go through it

3   quickly so then we can summarize --

4          **THE COURT:**  Admitted.

5          **MR. KEKER:**  Thank you.

6      (Trial Exhibit 5729 received in evidence)

7   **BY MR. KEKER:**

8   **Q.**   Let me show you 5731 -- let me ask you a question first.

9          Did you -- we talked about your reporting to the bank.

10  Did you have to make monthly reports to the bank about what

11  your liabilities were, what MicroLink's liabilities were?

12  **A.**   No.  Our bank loan was a borrowing base loan so they were

13  lending us on our actual bills.  So we weren't borrowing at

14  this time, I believe.  We had an open line of credit, but the

15  line of credit was secured by the receivables to the federal

16  government.

17         They gave us, I believe, 80 cents on the dollar on those,

18  and I think they gave us 70 or 60 cents on commercial

19  receivables, but we did a borrowing base that had the -- that

20  had the receivables from the federal -- anything that we sold,

21  actually sold, and we could borrow on those.

22  **Q.**   Were you required to report to the bank monthly on your

23  business activities?

24  **A.**   Our borrowing base.  Our borrowing base.

25  **Q.**   Were you required to report to the bank monthly on your

1    business activities?

2    **A.**    I don't -- like what we sold?  What we --

3    **Q.**    Let me show you what's been marked as 5731, please.

4            **THE COURT:**    5731, admitted.

5            (Trial Exhibit 5731 received in evidence)

6    **BY MR. KEKER:**

7    **Q.**    Tell the jury what 5731 is, please, sir.

8    **A.**    This is our -- my Christmas Grinch signature there.

9    **Q.**    Your what?

10   **A.**    My Christmas Grinch signature there.

11           This is our receivables that we were allowed to borrow on.

12   **Q.**    Are they -- is it all your receivables?

13   **A.**    Yes.

14   **Q.**    Okay.  And --

15   **A.**    This would be anything we actually sold.

16   **Q.**    Look at 5731B, page 1.  It's about two pages in.

17           No.  The one before that.  Yes.

18           What is this?  Down at the bottom it says "Autonomy" and

19   it's got a bunch of invoice numbers.

20   **A.**    These are the actual payables for the bills that we --

21   we'd actually sold.

22   **Q.**    This is -- this is what you owed Autonomy?

23   **A.**    Not the entire amount, no.

24   **Q.**    So you reported -- and what does it say at the top?  It

25   says, "Period sensitive aged AP detail"?

PROCEEDINGS

 1  **A.**    Yes.

 2  **Q.**    As of -- for the period 11-09.

 3         So as of November 30th, you're saying -- you're reporting

 4  what you owed to Autonomy, but you're not reporting everything

 5  you owed to Autonomy?

 6  **A.**    Not the transactions that hadn't closed, no.

 7  **Q.**    All right.

 8         Now, when you -- when MicroLink did a value added reseller

 9  transaction with Autonomy, they signed an agreement, didn't

10  they?

11  **A.**    The agreement was done before I started there.

12  **Q.**    But the Master Reseller Agreement; right?

13  **A.**    Yes.

14  **Q.**    And the Master -- I better move it in.

15         I would move in 5734, which is the Master Reseller

16  Agreement.

17             **THE COURT:**  Admitted.

18         (Trial Exhibit 5734 received in evidence)

19  **BY MR. KEKER:**

20  **Q.**    The Master Reseller Agreement made very clear in the

21  agreement that this was final, couldn't be changed, except by

22  agreement of both parties; right?

23  **A.**    I -- quite frankly, I've never read the master sales

24  agreement.  Never had it.

25  **Q.**    Did you read in the Master Reseller Agreement that it

1   cannot -- that the debt -- you're on risk, you're on the hook,

2   you have to pay no matter what happens with the end user?

3   **A.**   I think I just said since I never read it, I don't know

4   what it says.

5   **Q.**   Can we see 5734 and paragraph 5.5.

6         First -- I'm sorry.  We better look at the headline, Jeff.

7         This is the Master Reseller Agreement, first page, between

8   Autonomy and MicroLink, and it is dated -- if we can go to the

9   last page.

10        Dave Truitt signed it, and it's dated 11/20/2003.

11        You never read it?

12  **A.**   Never read it.

13  **Q.**   Look at 5.5 --

14  **A.**   Never was provided a copy of it.

15  **Q.**   Pardon?

16  **A.**   I was never provided a copy of it.

17  **Q.**   Are you saying that Dave Truitt's Master Reseller

18  Agreement that he was doing these transactions with was not

19  part of the business records of the company?

20  **A.**   He had a copy of it, yes.

21        **MR. FRENTZEN:**  That's actually not what he said.  I'm

22  going to object on relevance grounds at this point, Your Honor.

23  **BY MR. KEKER:**

24  **Q.**   Look at 5.5 please.

25        **MR. FRENTZEN:**  He says he didn't read it.

1          **THE COURT:**  Overruled.

2   **BY MR. KEKER:**

3   **Q.**   Were you aware that "Government resellers shall not be

4   relieved of its obligations to pay fees owed to Autonomy

5   hereunder by the nonpayment of such fees by an end user."

6          Were you aware that that was the deal with Autonomy?

7   **A.**   I was not aware of that.

8   **Q.**   You were the CFO of MicroLink?

9   **A.**   Yes.

10  **Q.**   Okay.  Let's go back to 5731 and the Autonomy debt down

11  here.

12  **A.**   Yes.

13  **Q.**   You say you didn't -- in reporting to your bank, you did

14  not report all the obligations that MicroLink had to Autonomy?

15  **A.**   No, I did not.

16  **Q.**   Could we go to 249.  And if 249 -- I think 249 is in.  If

17  it's not, I move it in.  It's the confirmation?

18          **THE COURT:**  Admitted if it's not in.  249?

19          **MR. KEKER:**  Right.

20      (Trial Exhibit 249 received in evidence)

21          **MR. KEKER:**  Could we see the list of what's being

22  confirmed.

23  **Q.**   All of these -- all of these -- we can just scroll down.

24          All of these invoices are the subject of this confirmation

25  which, on the next page, is signed in October of 2009 by you;

1  right?

2  **A.**   Yes.

3  **Q.**   Are all of those invoices that you're confirming to

4  Autonomy's auditors being reported to your bank as debts of

5  MicroLink?

6  **A.**   No.

7  **Q.**   Okay.  We've looked at 5731.

8       Look at 5730, please, and that's in a binder here.

9            **THE COURT:**  Admitted.

10  **BY MR. KEKER:**

11  **Q.**   This is the December report.

12            **MR. FRENTZEN:**  Sorry, Your Honor, but if I could just

13  take a look at it.

14            **THE COURT:**  Yes.  It's part of the whole thing here.

15  5730?

16            **MR. FRENTZEN:**  Your Honor, at this point, I'm going to

17  object on relevance and 608(b).

18            **THE COURT:**  608(b)?

19            **MR. FRENTZEN:**  Extrinsic evidence as to collateral

20  matters, Your Honor.

21            **THE COURT:**  Oh, well, I'm going to allow it subject to

22  a motion to strike.

23            **MR. FRENTZEN:**  More of a 403 --

24            **THE COURT:**  I don't know.  I have to see where it's

25  going.

1          MR. FRENTZEN:  Understood.

2   BY MR. KEKER:

3   Q.    Is Exhibit 5730 an email from you to your bank, similar to

4   the November one?

5   A.    Yes.  Sent on January 20th, 2010.

6   Q.    Yeah.

7          Move it in, Your Honor.

8              THE COURT:  Admitted.

9          (Trial Exhibit 5730 received in evidence)

10  BY MR. KEKER:

11  Q.    We have a demonstrative that is taken from these exhibits

12  that -- 249, 5730, 5731 that -- to make the point that I think

13  would be a lot faster.

14             THE COURT:  I'm going to sustain the objection to the

15  demonstrative.

16             MR. FRENTZEN:  I'm objecting to the demonstrative,

17  Your Honor.  We just got these.  I have had no time to check

18  it.

19             THE COURT:  I'm going to sustain the objection at this

20  point.

21             MR. FRENTZEN:  Also 608(b).

22             THE COURT:  I understand.  We can talk about it when

23  the jury doesn't have to listen to it, the dialogue.

24  BY MR. KEKER:

25  Q.    Well, just --

PROCEEDINGS

1        THE COURT:  I think the witness has testified that he

2   misrepresented the receivables, if that's what it is, to the

3   bank, or the payables.  I don't know which side it is.

4        MR. FRENTZEN:  Stipulated.

5        THE COURT:  Moreover, he said he asked for immunity

6   because he was concerned about that.

7   BY MR. KEKER:

8   Q.   And the same -- all right.

9        It wasn't just a few receivables.  For example, the

10  MicroLink eDiscovery receivable, which was an $11 million

11  purchase back in 2008, you misrepresented that to the bank,

12  didn't you?

13  A.   I did not include it to the bank, no, until the -- we

14  actually paid those transactions.  One -- one thing about all

15  of this is our --

16  Q.   I actually didn't ask you about one thing or two things.

17  A.   I won't answer.

18       MR. KEKER:  I object, Your Honor.

19  Q.   You told the jury how agonizing it was when you were

20  sitting on your couch on April 1st and you were asked to

21  backdate a transaction?

22       THE COURT:  I think it was January 1st.

23       MR. KEKER:  January.  I'm sorry.

24       THE WITNESS:  I never used the word "agonizing," I

25  don't believe.

1    BY MR. KEKER:

2    Q.   Well, but you were so upset that you called people.  You

3    wanted a new job.  You were very upset?

4    A.   That day was not -- I thought we were done.  I was ready

5    to have New Year's Day and be done with all of this, and this

6    was, you know, a shenanigan.  I didn't want any part of it.

7    Q.   Did any of this misrepresentation to the bank cause you

8    any agony to call up people?

9    A.   I really didn't think the at-risk deals we purchased were

10   really deals until we sold them.

11        MR. KEKER:  If I could just have a second, Your Honor,

12   I think I'm done.

13        (Defense counsel confer off the record.(

14        MR. KEKER:  Your Honor, I have no further questions.

15        Thank you Mr. Rizek.

16        MR. FRENTZEN:  May I proceed with redirect,

17   Your Honor?

18        THE COURT:  Yes.

19                   <u>REDIRECT EXAMINATION</u>

20   BY MR. FRENTZEN:

21   Q.   Mr. Rizek, why didn't -- why didn't you put deals with

22   Autonomy on the books of MicroLink?

23   A.   They would change.  They might not close.  And we weren't

24   going to pay them if they didn't close.  And they would get

25   fixed.  And by that I mean, Autonomy would buy software from us

1    that we actually developed and invested money in and then we

2    would use those funds to pay Autonomy those bills.

3    **Q.**    I think we've seen already some of the deals that didn't

4    close that Autonomy wrote off the books.  Was that another

5    instance?

6    **A.**    Yes.  They put it to -- to intercompany holdings, I

7    believe, and then they wrote it off.

8    **Q.**    In the process of the acquisition of MicroLink by

9    Autonomy, did you share with the financial folks at Autonomy

10   that you had these unposted debts and assets?

11   **A.**    We were fully open with that to them, that we had not

12   entered the at-risk transactions that happened at the end of

13   the quarters onto our financial statements, and they told us

14   that they had to be on our financial statements before we

15   closed, and we -- I had no problems with that.

16            **MR. FRENTZEN:**  Ms. Margen, what is our very last

17   exhibit?

18            **MS. MARGEN:**  2798.

19            **MR. FRENTZEN:**  This should be 2798?

20       Your Honor, if I could hand up to the Court and what I

21   have given to defense counsel just now is Government's Exhibit

22   2798.

23       May I approach the witness?

24            **THE COURT:**  Yes.

25            **MR. FRENTZEN:**  Your Honor, I apologize, but can I go

 1  old-school and switch to the ELMO?

 2          **THE COURT:**  Yes.  Sure.

 3          **MR. FRENTZEN:**  No.  I have one.  I will show it to the

 4  witness, but I'm going to have to -- wait.  It's not hooked up.

 5          **THE COURT:**  Admitted.

 6          **MR. FRENTZEN:**  Sorry, Your Honor.  I was counting on

 7  old-school technology -- is that it?  Beautiful.

 8      May I approach, Your Honor?

 9  **Q.**  Mr. Rizek, take a look at Government's 2798.  See if you

10  recognize what that is, please, sir.

11  **A.**  Yes, I do.

12  **Q.**  What is Government's 2798?

13  **A.**  It's a spreadsheet.  The title is "Working Capital

14  Adjustments," and it has our balance sheets for 2007, 2008,

15  2009 -- and then October of 2009.  It was presented to the --

16  Autonomy.

17          **MR. FRENTZEN:**  Move it in, Your Honor.

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 2798 received in evidence)

20          **MR. FRENTZEN:**  Thank you, Your Honor.

21  **Q.**  Does this spreadsheet list something called "unposted,"

22  Mr. Rizek?

23  **A.**  Yes.

24  **Q.**  First let's start with who got this?

25  **A.**  I -- let's see.  From Stephen Chamberlain to myself and --

1   **Q.**   Hang on, Mr. Rizek.  Give me a second to zoom in on this

2   nice and tight.  All right.

3        Now, this went to Mr. Chamberlain?

4   **A.**   From Mr. Chamberlain.

5   **Q.**   I'm sorry.  To who?

6   **A.**   To Andy Kanter and Sushovan -- Sushovan -- Mr. Hussain.

7   **Q.**   As well as yourself?

8   **A.**   Yes.

9   **Q.**   This is December 16th of 2009?

10  **A.**   Yes.

11  **Q.**   So was this during the time period in which Autonomy was

12  considering buying MicroLink?

13  **A.**   Yes.

14  **Q.**   And is there -- the note that they have excluded amounts

15  due to or from Autonomy?

16  **A.**   Yep.  Yes.

17  **Q.**   And does this document actually list a column -- sorry.

18  I'm trying to get all this on one -- that is unposted?

19  **A.**   Yes.  Those are the at-risk transactions.

20  **Q.**   All right.  And what does "unposted" mean?

21  **A.**   It's not been entered into our accounting system.

22  **Q.**   So this was known by Mr. Chamberlain?

23  **A.**   Yes.

24  **Q.**   And this was sent to Mr. Hussain?

25  **A.**   Not -- not on the prior sheet, I don't think -- is it?

1    Yes.  Yes.  It was there.

2    **Q.**   Take a look at the first page.

3    **A.**   Yes.  He is on the copy.

4    **Q.**   So that was not hidden from the folks at Autonomy?

5    **A.**   Not -- not whatsoever.

6    **Q.**   They could have pulled out of buying MicroLink knowing how

7    you'd kept your books?

8    **A.**   They knew about this before this date.  It was -- we had

9    told them this back in early -- early in the process, probably

10   in early November.

11   **Q.**   Government's -- what I'll mark as Government's 2799.

12        (Trial Exhibit 2799 marked for identification)

13   **BY MR. FRENTZEN:**

14   **Q.**   Mr. Rizek, see if you recognize what that is, please, sir.

15           **THE COURT:**  Admitted.

16        (Trial Exhibit 2799 received in evidence)

17   **BY MR. FRENTZEN:**

18   **Q.**   Don't worry about my last question, Mr. Rizek.

19        Can you tell us what this is?

20   **A.**   I believe these are transactions that have not closed and

21   are unlikely to close.

22   **Q.**   Let's start with this.  This is an email?

23   **A.**   Yes.  This is an email.

24   **Q.**   From who to who?

25   **A.**   Mr. Chamberlain to myself.

1   **Q.**   What's the topic?

2   **A.**   "Outstanding deals."

3   **Q.**   And is Mr. Chamberlain communicating to you that the

4   purpose of the conversation is to establish deals that are

5   unlikely to close and hence should be written off in the

6   acquisition accounting?

7   **A.**   Yes.

8   **Q.**   So during the course of the negotiations to purchase

9   MicroLink, was -- were Autonomy's financial people already

10  talking about writing off debts?

11  **A.**   Yes.

12  **Q.**   I want to ask you a little bit about immunity, Mr. Rizek.

13       What did you think you needed immunity from?

14  **A.**   The -- I didn't know if by not representing these at-risk

15  deals to the bank, if I had committed any bank fraud.  The

16  reason wasn't to commit bank fraud.  I never did it to defraud

17  a bank.

18       I saw our line of credit with the bank as a receivables

19  line.  They were loaning us money that we paid salaries to sell

20  services to the federal government, not for purchase of the

21  product.  And it was backed by those receivables and they had

22  first right of those receivables.

23       The reason that we didn't report that was just because it

24  got -- the accounting got messed up, putting the transactions

25  in and having them changed or having them get divided into two

1    or three transactions.  So that -- I was worried about that.

2        I was worried about what -- other things you do when you

3    use electronic means to disseminate things, whether I had done

4    wire fraud.  When we -- when Autonomy bought our software so

5    that we could pay an at-risk deal that closed, whether or not

6    by accepting their payment that we then turned around the same

7    day to pay back to them, had I committed wire fraud or any

8    other type of fraud.  I didn't know what I could have done

9    wrong and I did -- didn't want to be here.

10   **Q.**   Did you have any concerns about what you had done that did

11   not relate to Autonomy?

12   **A.**   No.  We paid our taxes, we did our taxes on time, we did

13   all our local state filings.  It was just this at-risk

14   transactions that were not good.

15   **Q.**   Mr. Rizek, you were trained as an accountant?

16   **A.**   Yes.

17   **Q.**   In the course of your -- the dealings between MicroLink

18   and Autonomy, were you concerned that you had facilitated

19   channel stuffing?

20   **A.**   Yes.  I was a party to it.  I wasn't -- I facilitated it

21   because I made sure the transactions got entered.

22   **Q.**   Were you concerned that in the course of MicroLink's

23   dealings with Autonomy, that there had been backdating?

24   **A.**   Not until this transaction.

25   **Q.**   I'm talking about when you asked for immunity.

1    **A.**    Yes.

2    **Q.**    Were you concerned about whether or not --

3            **MR. KEKER:**  Objection.  Leading, Your Honor.

4            **THE COURT:**  Overruled.

5        Go ahead.

6    **BY MR. FRENTZEN:**

7    **Q.**    Did you have concerns, if any, that you were involved in

8    side agreements?

9    **A.**    Yes.

10    **Q.**    Were you concerned that you had misled Deloitte, the

11    auditors, for Autonomy about the true relationship between

12    MicroLink and Autonomy?

13    **A.**    Probably.  Although that wasn't coming into my mind when I

14    was -- sought counsel for getting immunity.

15            **MR. FRENTZEN:**  And, Your Honor, I would like to mark

16    this now as Government's 27 -- I'm sorry.  2800.  I'm going to

17    pass it up.

18            **MS. MARGEN:**  The next available is 2940.

19            **MR. FRENTZEN:**  What did I say?  29 -- I thought I just

20    marked 2700.

21            **MS. MARGEN:**  2940 is the next available now.

22            **MR. FRENTZEN:**  I will write whatever you tell me to

23    write.  What should I write?

24            **MS. MARGEN:**  2940.

25            **MR. FRENTZEN:**  2940.  Thank you, Ms. Margen.

 1          Sorry about that, Your Honor.

 2          (Trial Exhibit 2940 marked for identification)

 3   BY MR. FRENTZEN:

 4   Q.   Mr. Rizek, you were asked about your immunity?

 5          THE COURT:  Admitted.

 6          (Trial Exhibit 2940 received in evidence)

 7          MR. KEKER:  This is 29 --

 8          THE COURT:  2940.

 9   BY MR. FRENTZEN:

10   Q.   If we could just show it to the jurors briefly.

11          Mr. Rizek, do you recognize what this is?

12   A.   Immunity order.

13   Q.   And do you have an understanding, Mr. Rizek, about whether

14   or not your -- you had to be compelled to testify?

15   A.   On advice of counsel, I wasn't going to testify.

16   Q.   You weren't going to testify unless you got this?

17   A.   Yes.

18   Q.   So you had to compelled?

19   A.   Yes.

20   Q.   And what is the one thing that the immunity does not

21   protect you against?

22   A.   Lying in this Court.

23   Q.   Is that down here, "perjury, false declaration" --

24   A.   Yes.

25   Q.   -- "or otherwise failing to comply with this order"?

1    **A.**    Yes.

2    **Q.**    I'd like to show you a couple of documents related to this

3    notion of delivery of profiling to Discover Tech.  And -- okay.

4    Great.  This one's marked.

5          Can we get -- I'll show the witness, but -- oh, no.  We're

6    already on the ELMO.  I'll just use the ELMO.

7          5941.  I'm sorry.  This is already marked.  I'm all over

8    the place.  This is 529, Your Honor, but it wasn't previously

9    marked for this witness.

10          **THE COURT:**  Five --

11          **MR. FRENTZEN:**  529.  It was on our list, but not

12    previously marked.

13          **THE COURT:**  529, admitted.

14    (Trial Exhibit 529 received in evidence)

15          **MR. FRENTZEN:**  Thank you, Your Honor.  Can you pull up

16    529.

17    **Q.**    All right.  Mr. Rizek, what is this?

18    **A.**    It's an email sent from Mr. Hussain to Stephen

19    Chamberlain.

20    **Q.**    And on what date?

21    **A.**    On 1/7/2010.

22    **Q.**    Can we scroll down a little bit.

23          Is the earlier email from Mr. Chamberlain to Pete Menell

24    and Sushovan Hussain?

25    **A.**    Yes.

1  **Q.**  It says "focus on call."

2  **A.**  Yes.

3  **Q.**  Do you see what it lists here where it says "Discover"?

4  **A.**  Yes.

5  **Q.**  And that's, "why two deals, one through ML" -- is ML -- is

6  that how you referred to MicroLink sometimes?

7  **A.**  I've seen us refer to it as MicroLink and MT as MicroTech.

8  **Q.**  "And one through MicroTech.  Commercial rationale.

9  Different products.  MicroTech have paid, so less of an issue."

10     Do you know whether or not the -- that the $10 million

11  deal that went through MicroTech and the $2.3 million deal that

12  Mr. Hussain asked you about on the 1st, were those for

13  different aspects of IDOL?

14  **A.**  I don't -- I -- my understanding is that one is for the

15  profiling, but I don't know what was in the first one that was

16  purchased.

17  **Q.**  Okay.  But this is -- this is an internal discussion about

18  it being a different product on January 7, 2010?

19         **MR. KEKER:**  Objection, Your Honor.  No foundation.  He

20  didn't have anything to do with this.

21         **MR. FRENTZEN:**  That's fine.  I've read it.  I'll move

22  on.

23     Let's go to Government's exhibit 534.  That wasn't

24  previously marked for this witness, so I'll hand it up to the

25  Court and counsel.

```
 1            THE COURT:  534, admitted.

 2        (Plaintiff's Exhibit 534 received in evidence)

 3   BY MR. FRENTZEN:

 4   Q.   And if we could scroll down to the top of page 2.

 5            MR. KEKER:  No foundation, Your Honor.  I object.

 6            MR. FRENTZEN:  Well, I don't know how many documents

 7   Mr. Keker showed him that he'd never seen before, and here I

 8   can actually lay a foundation --

 9            THE COURT:  Well, well, well, I don't -- I'm not

10   keeping track.

11            MR. FRENTZEN:  I can lay a foundation, Your Honor.

12            THE COURT:  Okay.

13   BY MR. FRENTZEN:

14   Q.   At this point in time, Mr. Rizek, were you -- at this

15   point in time -- I'm sorry -- were you yet -- was Autonomy now

16   owning MicroLink?

17   A.   What's the date on this one?

18   Q.   January 7 -- January 9th, 2010.

19   A.   Yes.  They own us.

20   Q.   Are you familiar with the emails that are in this

21   particular document?  Mr. Chamberlain --

22   A.   Yes.

23   Q.   Matt Stephan?

24   A.   Stephan, yes.

25   Q.   The UK auditors?
```

1  **A.**   Matt is an accountant that worked for Stephen Chamberlain.

2         **THE COURT:**  Admitted.

3         **MR. FRENTZEN:**  Thank you, Your Honor.

4  **Q.**   If we could scroll down a little bit.

5         Is there a question here from the Tom Murray from Deloitte

6  saying, "Just to help me understand how this works, the deal

7  with MicroLink looks like it is selling DT," Discover Tech, "a

8  license to use the profiling function within IDOL.  Is this a

9  function that can be switched on remotely then without the need

10 for further delivery of any software?  Kind regards."

11        **MR. KEKER:**  Excuse me, Your Honor.  I don't have what

12 he's reading from.  He handed me 534.

13        **THE COURT:**  It's missing a page.

14        **MR. FRENTZEN:**  Oh, I'm sorry.

15        **THE COURT:**  Page 2.

16        **MR. FRENTZEN:**  Copy machine.  This is 534, though.

17        **THE COURT:**  Why don't you show Mr. Keker because his

18 copy is like my copy and we're missing page 2.

19        **MR. FRENTZEN:**  Sorry, Your Honor.  Copier error.

20        **THE COURT:**  Show it to Mr. Keker now.

21        **MR. FRENTZEN:**  Okay.

22        **MR. KEKER:**  Could we take this down?

23        Same objection.  No foundation with this witness,

24 Your Honor.

25        **THE COURT:**  Overruled.

1        Go ahead.

2   BY MR. FRENTZEN:

3   Q.   So does it appear here the auditor is asking is this

4   something that can be switched on without delivery?

5   A.   Yes.

6   Q.   And they are openly discussing or asking about the

7   profiling?

8   A.   Yes.

9   Q.   That's the subject of the $2.3 million deal?

10  A.   Yes.

11  Q.   Could we scroll up, please, I think, although -- all

12  right.  Sorry, scroll back down.  Keep going.  All right.  Keep

13  going a little bit.  All right.  Great.

14       Is this from Mr. Chamberlain to Matt Stephan?

15  A.   Yes.

16  Q.   Do you see that?

17  A.   On the 8th.

18  Q.   And deal 170, Discovery Tech.  "Nothing in the paperwork

19  suggests that this was January.  There are email exchanges

20  sorting out carve-out rates post 31 December when we process

21  all invoices.  Not possible to invoice everything before people

22  go home for New Year's Eve.  No delivery.  This just adds extra

23  functions to the license they already purchased."

24       Does that appear to be what's said here?

25  A.   That's what I read there.

1    **Q.**    To your knowledge, did there have to be delivery to get

2    the profiling out of IDOL?

3    **A.**    I'm not technical.  I don't know.

4    **Q.**    But in any event, this is what Mr. Chamberlain and

5    Mr. Stephan are discussing amongst themselves in response to

6    the auditors?

7    **A.**    Yes.

8    **Q.**    Can you go all the way to the top, please.

9         And do you see here they're asking "is this the case"?

10   **A.**    Yes.

11   **Q.**    Who are they asking?

12   **A.**    Mr. Hussain.and Peter Menell.

13   **Q.**    I'd like to go now -- may I have just one moment,

14   Your Honor?  I think I'm almost done.

15        (Government counsel confer off the record.)

16        **MR. FRENTZEN:**  Your Honor, with the Court's

17   permission, could I actually briefly switch over to the defense

18   table because I don't have that 5741, the defense

19   demonstrative.  Thank you.  Appreciate it.

20   **Q.**    All right.  Mr. Rizek, do you remember Mr. Keker asking

21   you about this demonstrative here?

22   **A.**    Yes.

23   **Q.**    And you recall that he asked you did you suggest to

24   Mr. Hussain or tell him that they're going to do the

25   $2.3 million deal here during your call at 4:49 p.m.?

1    **A.**   Definitely not and I would have remembered something like

2    that.

3    **Q.**   Now, we previously looked at an email shortly after that,

4    about an hour after that, with Mr. Hussain emailing about that

5    MicroLink $2.3 million deal.  Do you recall that?

6    **A.**   Yes.

7    **Q.**   So following that phone call, Mr. Hussain was discussing

8    or was emailing about this $2.3 million deal.  That's what we

9    went over on direct?

10   **A.**   Yes.

11   **Q.**   And Mr. Keker has suggested to you that you were the

12   person in this particular phone call at 4:49 p.m. who told

13   Mr. Hussain that you had to do an extra $2.3 million deal.  Do

14   you remember him asking you about that?

15   **A.**   Yes.

16   **Q.**   I'd like to show you now what's been marked as

17   Government's 490.

18        **THE COURT:**  490, admitted.

19        (Trial Exhibit 490 received in evidence)

20        **MR. FRENTZEN:**  Do you have it, Your Honor?

21        **THE COURT:**  Admitted.

22        **MR. FRENTZEN:**  Great.  Thank you, Your Honor.

23   **Q.**   Do you see what date this is Mr. Rizek?

24   **A.**   Yes.  It's January 1, 2010, at 2:30 p.m.

25   **Q.**   So 2:30 p.m. would be approximately two-plus hours before

RIZEK - RECROSS / KEKER

1  your call to Mr. Hussain; is that right, Mr. Rizek?

2  **A.**   Yes.

3  **Q.**   Do you see that Mr. Hussain at that time is sending an

4  email to Mr. Chamberlain and Mr. Stephan?  Do you see that?

5  **A.**   Yes.

6  **Q.**   And the subject is what?

7  **A.**   "I forgot to add a $2 million deal."

8  **Q.**   "That was closed but paperwork O/S."  Maybe outstanding.

9  Sorry?

10  **A.**   Yes.

11  **Q.**   That's what it says?

12  **A.**   Yes.

13  **Q.**   So two and a half hours before the phone call in which

14  Mr. Keker says you told Mr. Hussain you were doing this deal,

15  Mr. Hussain was already discussing a $2 million deal that he

16  forgot to add?

17  **A.**   Yes.

18        **MR. FRENTZEN:**  May I have a moment, Your Honor?

19     (Government counsel confer off the record.)

20        **MR. FRENTZEN:**  That's all I have.

21     Thank you, Mr. Rizek.

22        **MR. KEKER:**  Can you keep that up, 490.

23                    <u>**RECROSS-EXAMINATION**</u>

24  BY MR. KEKER:

25  **Q.**   If you look at the email, it says, "By the way, Stouffer

1    overheard," blah, blah, blah.

2        Do you know if Mr. Egan talked to Mr. Hussain sometime

3    before 2:30 p.m.?

4    **A.**   Unless he showed it to me on --

5    **Q.**   Pardon?

6    **A.**   Unless it was on the sheet of calls, but I wasn't --

7    **Q.**   Do you know if Mr. Egan called Mr. Hussain before you

8    talked to him?

9    **A.**   No idea.

10   **Q.**   Do you know if Mr. Egan called and said, "There's another

11   deal.  You're going to get a call from Mr. Rizek"?

12   **A.**   No idea.

13   **Q.**   Okay.  But your testimony is that two hours after that, he

14   called you and said could you take another deal?

15       **MR. FRENTZEN:**  Objection.  Misstates.  He has now

16   corrected that he called him.

17       **MR. KEKER:**  Okay.

18   **Q.**   That you called Mr. Hussain and said "could you take

19   another deal"?

20       **MR. FRENTZEN:**  I'm sorry.  That misstates it, too.  He

21   didn't ask that.

22       **THE COURT:**  I think the question is there was a

23   conversation two hours later.

24       Go ahead, Mr. Keker.

25   \\\

1    BY MR. KEKER:

2    Q.    Two hours later when you were -- when you called

3    Mr. Hussain, your testimony was he asked you if you could take

4    another deal?

5    A.    Yes.  He raised the issue -- raised the -- was it possible

6    for us to take another deal.

7    Q.    You weren't talking to him about something that Mr. Egan

8    had already told him was coming?

9    A.    I wouldn't know what Mr. Egan talked to him about.

10           MR. FRENTZEN:  Objection.  Calls for speculation and

11   foundation.

12   BY MR. KEKER:

13   Q.    You wouldn't know?  You wouldn't know?

14   A.    I never talked to Mr. Egan.

15   Q.    But you talked to Mr. Truitt several times that day,

16   didn't you?

17   A.    I did talk to Mr. Truitt.

18   Q.    And Mr. Truitt told you what he and Mr. Egan were

19   planning?

20   A.    No.  I did not remember Mr. Egan, Stouffer, being involved

21   in any discussions --

22   Q.    And that's what led to the 64-minute call that you had

23   with Mr. Truitt where he had to persuade you to keep going with

24   this thing?

25           MR. FRENTZEN:  Objection.  Argument and compound.

RIZEK - RECROSS / KEKER

BY MR. KEKER:

Q.   Exhibit 2798, which is this -- this spreadsheet that talks about "unposted."  When you told Mr. Chamberlain that you were not posting some of the obligations of MicroLink, he told you you had to, didn't he?

A.   He said that -- he said that by the close, we would have to have all liabilities to -- to Autonomy on our books, and I agreed to it.

Q.   So it was Autonomy that was insisting that you put on your books of MicroLink all your obligations, not just a few of them?

A.   Yes.  And we were fine -- I was fine with them.  I was very happy to get them off.

Q.   Did you -- when did you first talk to the Government about this particular exhibit?

A.   I can't recall.

Q.   Did you --

        MR. FRENTZEN:  Wait.  Which one?  This one?

        MR. KEKER:  2798.

Q.   Did you meet with any of the prosecutors or representatives of the Government since you began your testimony last Monday?

A.   No.

Q.   Did anybody tell you anything about Dave Truitt's testimony in this case?

1    **A.**    No.  Mr. Truitt and I have not talk -- spoken for

2    almost -- almost a year now.

3    **Q.**    Do you know if your lawyers have talked about that

4    testimony?

5    **A.**    I know that anything they talked to anyone is protected or

6    if they talked to me about it, but I've not heard anything

7    about anyone else's -- they protected me from anyone else's

8    testimony.

9    **Q.**    Now, the immunity that you -- that Mr. Frentzen showed

10    you, the immunity order, when did you ask for that?

11    **A.**    Lawyers stated to the Government when we met for the first

12    time to go over the -- any -- the documents, that I would be

13    testifying -- I would be taking the Fifth Amendment if we

14    didn't get immunity.

15    **Q.**    When was that meeting?

16    **A.**    I don't remember the date.

17    **Q.**    Was it recently?

18    **A.**    No.  Two -- two years ago, three years ago.

19    **Q.**    Two what?

20    **A.**    Two or three years ago.

21    **Q.**    Two or three years ago.  But the immunity order we just

22    saw was signed March 12?

23    **A.**    The one for this here?

24    **Q.**    Yes.

25    **A.**    So they wanted to extend that immunity to cover this

1  testimony here.

2  **Q.**   When did they ask the Government to extend that immunity?

3  **A.**   I don't know exactly when my lawyers asked for that, but

4  it did get delayed.  We didn't know whether or not my prior

5  immunity covered this testimony or not.

6  **Q.**   When did you ask the Government to make -- to get a new

7  order?

8  **A.**   I don't know the date.  My lawyers asked for that.

9  **Q.**   Was it within -- since Mr. Truitt has testified?

10  **A.**   I don't know.  I don't know which day Mr. Truitt

11  testified.

12  **Q.**   Is it in the last week?

13  **A.**   I don't remember the date that they asked.  I didn't deal

14  with it.  They dealt with it.

15  **Q.**   Do you know whether or not your lawyer or you was asking

16  for this recent immunity order within the last week?

17  **A.**   I don't know the date they asked.  I know they -- I know

18  they had been talking with -- since we met, since we -- they --

19  they asked us questions back in February whether or not that

20  prior immunity order covered this and whether or not we needed

21  a new agreement for this testimony.  I leave that all up to the

22  lawyers.  I'm not a lawyer.

23  **Q.**   So you were talking about this in February of this year,

24  2018?

25  **A.**   Whether or not the prior immunity order was covering

1    this -- this testimony or if there needed to be a new document.

2    I don't know.

3    **Q.**   And then since -- and when did you meet with the

4    Government to have that discussion?

5    **A.**   Sometime in February.  They --

6    **Q.**   February 12th, I think, Lincoln's birthday?

7    **A.**   The 12th or 14th.

8    **Q.**   14th or 12th.

9         And so the request for this immunity order has come since

10   then?

11   **A.**   I think the issue was brought up.  Whether or not the

12   prior immunity order would cover this testimony because it says

13   "all subsequent actions" or whether or not we needed a new --

14   I'm not a lawyer.  So . . .

15             **MR. KEKER:**  Okay.  Thank you, Mr. Rizek.

16             **THE WITNESS:**  You're welcome.

17                    <u>**FURTHER REDIRECT EXAMINATION**</u>

18   BY MR. FRENTZEN:

19   **Q.**   Mr. Rizek, fair to say that the conversation -- did you

20   always intend to be covered by immunity one way or the other

21   for your testimony here today?

22   **A.**   Yes.

23   **Q.**   So in terms of any discussions, is it your understanding

24   that the discussions were whether you were covered by the

25   original immunity order from your grand jury or whether you

1   needed a new order to testify or to be compelled to testify

2   starting on Monday?

3   **A.**    Yes.    It was whether or not the prior one covered this or

4   if we needed a new one.

5   **Q.**    So that was not a new request?

6   **A.**    Not a new request.

7   **Q.**    Mr. Keker asked you whether or not you -- when you'd first

8   seen that document about "unposted."  Is there anything that

9   might help to refresh your recollection about when it was first

10  shown to you?

11  **A.**    I can't remember which of the times we -- that you guys

12  have shown me documents that that was first shown to me.

13          **MR. FRENTZEN:**  May I approach, Your Honor?

14      Counsel, I'm on page 11 of the 302 of September 30th,

15  2014.

16  **Q.**    Take a look at the bottom of that on to the next page,

17  Mr. Rizek, and just see if that -- read it to yourself and see

18  if it refreshes your recollection.

19  **A.**    (Witness reviews document.)

20      Yes.

21  **Q.**    So was that document shown to you back in 2014?

22  **A.**    I can't -- can't recall.

23  **Q.**    So it didn't refresh your recollection?

24  **A.**    No.

25  **Q.**    Okay.

1      May I have one moment, Your Honor?

2      (Government counsel confer off the record.)

3          **MR. FRENTZEN:**  That's all I have.  Thank you very

4  much, your Mr. Rizek.

5          **MR. KEKER:**  Nothing further.

6          **THE COURT:**  You are excused.  Thank you very much.

7      The next witness -- I know everyone is interested in

8  lunch, but let me tell you what we're doing -- what I'm doing.

9      I do have another matter on my calendar, so I'm going to

10 excuse you until 1:00 today.  Unfortunately it's raining

11 outside or sort of miserable, but it will give you some extra

12 time.

13     I'm just wondering whether I ought to start now with

14 whomever you have and then go to about noon or before noon and

15 then let them out.

16         **MR. FRENTZEN:**  Your Honor, I never want to get between

17 the jury and lunch --

18         **THE COURT:**  Ladies and gentlemen, we are going to take

19 a recess now.

20     Remember the admonitions given to you:  Don't discuss the

21 case, allow anyone to discuss it with you, form or express any

22 opinion.  I will see you at 1:00 today.

23         (Luncheon recess was taken at 11:49 a.m.)

24

25

PROCEEDINGS

 1    <u>**Afternoon Session**</u>                                    **1:09 p.m.**

 2        (Proceedings were heard out of the presence of the jury:)

 3            **THE COURT:**  Are you all set?

 4            **MR. FRENTZEN:**  Yes, Your Honor.

 5            **THE COURT:**  Okay.

 6        (Proceedings were heard in the presence of the jury:)

 7            **THE COURT:**  Please be seated.

 8    Let the record reflect all jurors are present, parties are

 9    present.

10        You may call your next witness.

11            **MR. FRENTZEN:**  Your Honor, the Government calls Chris

12    Goodfellow.

13            **THE CLERK:**  Please raise your right hand.

14                <u>**CHRISTOPHER JAMES ROBIN GOODFELLOW**</u>,

15    called as a witness for the Government, having been duly sworn,

16    testified as follows:

17            **THE WITNESS:**  I do.

18            **THE CLERK:**  Thank you.  Please be seated.

19        Please state your full name for the record and spell your

20    last name.

21            **THE WITNESS:**  Christopher James Robin Goodfellow,

22    G-O-O-D-F-E-L-L-O-W.

23            **MR. FRENTZEN:**  Proceed, Your Honor?

24            **THE COURT:**  Oh, yes.

25            **MR. FRENTZEN:**  Thank you.

1          **DIRECT EXAMINATION**

2    **BY MR. FRENTZEN:**

3    **Q.**   Where do you live, Mr. Goodfellow?

4    **A.**   Near Cambridge in the United Kingdom.

5    **Q.**   And what are you currently doing for a living?

6    **A.**   I'm currently taking some time out from work for the last

7    few months.

8    **Q.**   All right.  Where were you working before you took some

9    time out?

10   **A.**   I was working for Micro Focus.

11   **Q.**   What's Micro Focus?

12   **A.**   Micro Focus is the company that acquired the software

13   business of Hewlett Packard Enterprise.

14   **Q.**   I want to go all the way back to your education.  Can you

15   tell us a little bit about that, please?

16   **A.**   Yeah.  So I studied computer science in Cambridge, and

17   after that is when I started at Autonomy.

18   **Q.**   When was that that you started at Autonomy?

19   **A.**   October 2004.

20   **Q.**   When you were in school at Cambridge, what did you study?

21   **A.**   Computer science.

22   **Q.**   When you got to Autonomy in 2004, what was your first job

23   there?

24   **A.**   My first role was a technology specialist.  It could also

25   be thought of as a presale engineer, so basically working with

GOODFELLOW - DIRECT / FRENTZEN

1    the sales team to provide more technical depth when needed with

2    the customer to understand the problems, how the software can

3    be used, and apply it to them.

4    **Q.**    And if you could, could you take us through your career at

5    Autonomy from 2004 up to, let's say, late 2009, which is where

6    we're going to start focusing in on specific things?

7    **A.**    Certainly.  So from that role, I moved into a role

8    managing presales engineers.

9        Then in about 2007, I moved into a role that was more what

10   was called global account management.  So looking at both the

11   presales, so customers who had not yet bought, and postsales,

12   customers after they had purchased, looking after the top 20

13   customers and making sure we were doing the best we could from

14   a technical point of view for those customers.

15       We acquired a company called Zantaz late in 2008, and

16   because they had a few small number of very large customers,

17   those customers came under my purview; and my job evolved into

18   what was CTO infrastructure technology, which was primarily

19   doing a lot of the same things but also looking more broadly at

20   the R&D and the operations side of the Digital Safe business.

21   **Q.**    And Digital Safe, what was Digital Safe?

22   **A.**    Digital Safe was a compliant archiving product primarily

23   used for financial services.  So if anyone was ever sent an

24   e-mail to Citigroup and they bank with Citigroup, a copy of

25   that e-mail would have been sent to Zantaz.  That's basically

1    kept.  And so if the regulator wishes to see anything or

2    wishes -- there's a court case where information needs to be

3    presented, that information has been preserved and can be

4    produced.

5    **Q.**    In the role that you had, were you relied on around

6    Autonomy for any sort of technical knowledge or technical

7    assistance?

8    **A.**    Yes.  So that role was a technical role primarily focused

9    around that product.

10   **Q.**    And in the course of your work with Zantaz, did you also

11   become familiar with EDD work that was being done after

12   Autonomy acquired Zantaz?

13   **A.**    It wasn't my primary focus, but it was on the periphery.

14   **Q.**    Just from the technological standpoint, if you have a view

15   on it, were you aware of any -- specifically aware of any

16   efforts to try to outsource EDD work, eDiscovery processing,

17   by Autonomy to other entities?

18   **A.**    I was aware that Capax were looking to do some of that

19   kind of work, yes.

20   **Q.**    To your knowledge was any of that work ever outsourced by

21   Autonomy to Capax?

22   **A.**    Not to my knowledge, but...

23   **Q.**    In terms of doing eDiscovery work, are there any issues

24   with outsourcing eDiscovery work to other entities?

25   **A.**    So the way I look at it is the best way to do that would

1    be to bring those bodies in and to work on the existing

2    systems.  So EDD you can split into kind of three parts.

3    There's the hosting of the system itself, so the IT systems

4    where the data and the files sit and where they're made

5    searchable and where the processing happens from a technical

6    point of view; and then there are some fundamental services

7    around that, what's the actual commonly called EDD part of the

8    process whereby EDD is loaded into that system; and, secondly,

9    the production part, that process where data is exported out of

10   that for production in court or so on and so forth.

11   **Q.**   Go ahead.

12   **A.**   So you wouldn't want to split that central piece.  Those

13   other two pieces, the ingest and the production do -- did

14   typically involve a degree of manual effort.  And so if you

15   were going to outsource those, it would be what I would think

16   of as a body shopping where you'd want to bring in a body to

17   work on the same system, but...

18   **Q.**   Would there be issues, for example, with having a single

19   client and splitting the actual processing of the eDiscovery

20   work between Autonomy and some other entity?

21   **A.**   So if you had a single case, you wouldn't want the data to

22   be in two places for practical reasons, such that obviously if

23   you're working on that as an end user, you're an attorney or a

24   paralegal, you'd want to be able to go to one place.  If you're

25   doing things like deduplication and you want to find similar

 1  documents, you don't want -- you want to be able to do that in

 2  one system.

 3      You can't -- if the two systems are separate and you've

 4  got one document in one place and there's actually a document

 5  in the other place, then when you'd end up reviewing the same

 6  document twice, you'd cause confusion is a better way of

 7  putting it.

 8  **Q.**  I'd like to direct your attention now to December of 2009.

 9      In December of 2009, were you asked for input involving

10  deals between Autonomy and a company called FileTek?

11  **A.**  Yeah.  I was asked by our internal counsel to look at a

12  contract between Autonomy and FileTek for the licensing of

13  software.

14  **Q.**  Can you take a look in front of you and see if you have

15  Government's 464, Exhibit 464, there in front of you?

16  **A.**  (Witness examines document.)  I do.

17  **Q.**  Could you take a look at that and see if you recognize

18  what it is?

19  **A.**  (Witness examines document.)  This is a member of internal

20  counsel asking me to look at the said contract.

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 464 received in evidence)

23          **MR. FRENTZEN:**  Thank you, Your Honor.

24      If we could bring up the first page and blow it up.

25  **Q.**  And, Mr. Goodfellow, it should be on the screen in front

GOODFELLOW - DIRECT / FRENTZEN

1    of you if you want to refer to there.

2         All right.  What is the date of this e-mail?

3    A.   The 31st of December 2009.

4    Q.   And if we could go to the -- and, I'm sorry.  Who's it

5    from?

6    A.   This is from Jim or James, as it's written here, but

7    commonly known as Jim Crumbacher.

8    Q.   Who is he?

9    A.   He's an internal counsel.

10   Q.   In the U.K.?

11   A.   In the U.S.

12   Q.   Okay.  And then if you could tell us, who's it going to?

13   A.   To myself and Stouffer Egan.

14   Q.   All right.  And a cc to who?

15   A.   Joel Scott.

16   Q.   All right.  And if you could, can you just summarize when

17   it was sent to you, what was the question -- in your role, what

18   was the question to you about this?

19   A.   Basically looking at the paperwork and making sure that it

20   matches our expectations and matches our needs.

21   Q.   Are you aware of any significance that December 31st,

22   2009, holds other than New Year's Eve?

23   A.   It's also the last day of our financial year.

24   Q.   And if you could go to the second page of this document,

25   please?

1    Okay.  And then scroll down just a little bit.  Great.

2    Okay.  And, Mr. Goodfellow, is there a listed -- is there

3    a discussion here of some stuff from FileTek and then a listed

4    price?

5    **A.**  There is, yes.

6    **Q.**  What's the price listed?

7    **A.**  $10,367,280.

8    **Q.**  Okay.  What was this proposal?  What did it relate to when

9    it was presented to you?

10   **A.**  This relates to the licensing of the FileTek StorHouse

11   product.

12   **Q.**  What is StorHouse?

13   **A.**  StorHouse basically is an archiving product primarily used

14   in this context for archiving of databases.

15   **Q.**  Why would this information -- and, actually, can we just

16   scroll through to pages -- sorry -- page 4?

17   Okay.  Was sort of a blank copy of the agreement also

18   provided to you, Mr. Goodfellow?

19   **A.**  Can you clarify what you mean by "blank"?  Sorry.

20   **Q.**  Was a copy of the deal and what was going to be purchased

21   also provided to you?

22   **A.**  So obviously a copy of the contract was provided to me.

23   **Q.**  Right.

24   Okay.  And so you as at that time chief technology

25   officer, when you were asked about this, why would you be

1  involved in this deal, if you know?

2  **A.**    Obviously it's related to an archiving business, so it

3  would make sense from the lawyer's point of view to ask my

4  opinion and see if I was happy with what was written.

5  **Q.**    Happy how?  You mean happy with the price?  Happy with

6  what was being purchased?  Happy how?

7  **A.**    So obviously at this point the price had been negotiated

8  separately.  This was primarily whether I was happy with the

9  terms and the conditions.

10  **Q.**    Why?  What were you looking for?

11  **A.**    To make sure that things like support or obligations from

12  FileTek were appropriate.

13  **Q.**    When you saw this potential deal and were asked about it

14  on December 31st, 2009, what was your reaction to the notion of

15  Autonomy buying this software from FileTek, this StorHouse?

16  **A.**    My initial reaction was it was a bit unusual.  Autonomy

17  did not typically license third-party software.  So that was

18  the primary reason why it was unusual.

19  **Q.**    Anything about the nature of the software that also caught

20  your attention?

21  **A.**    Not particularly.  I mean, I'd say the most unusual piece

22  is that's not typically how Autonomy developed software.

23  **Q.**    All right.  Did you at that time foresee any use in

24  licensing StorHouse for Autonomy?

25  **A.**    There are certainly potential use cases.  Whether on that

GOODFELLOW - DIRECT / FRENTZEN

1    day I'd considered those, but there are use cases.

2    **Q.**    All right.    Normally or in the purchasing of software,

3    would a proof of concept be done?

4    **A.**    Yeah.    Normally you would expect to carry out proof of

5    concept, so you'd want to check that what you're purchasing,

6    you can use it; that it does what, for want of a better way of

7    putting it, it says on the tin; and that you can integrate that

8    into whatever you're looking to achieve.

9    **Q.**    Were you asked to do a proof of concept?

10   **A.**    No.

11   **Q.**    When you saw that Autonomy was thinking about purchasing

12   the StorHouse, did you ask any questions of anybody about that?

13   **A.**    I discussed it with Peter Menell.

14   **Q.**    Who's Pete Menell?

15   **A.**    He was the group CTO.

16   **Q.**    At that time was he your boss?

17   **A.**    Correct.

18   **Q.**    What did you ask Mr. Menell about after you saw this deal?

19   **A.**    I asked him basically what it was about.

20   **Q.**    Meaning what?    Why did you ask that?

21   **A.**    Because, as I said, it was unusual.    We were licensing

22   software.    It's not something we typically did.

23   **Q.**    What reaction did you get from Mr. Menell about why it was

24   being purchased?

25   **A.**    I don't recall any satisfactory answer to my question.

1   **Q.**   Could we take a look at Government's Exhibit 444?

2         **MR. FRENTZEN:**  And I believe it's in evidence,

3   Your Honor.  If we could just hold on.

4         **THE COURT:**  444 admitted.

5         **MR. FRENTZEN:**  Oh, it was not?  Okay.  I apologize.

6      (Trial Exhibit 444 received in evidence) **(Frentzen)**

7   **BY MR. FRENTZEN:**

8   **Q.**   Can you take a look at 444?

9   **A.**   (Witness examines document.)

10  **Q.**   Do you recognize what 444 is, Mr. Goodfellow?

11  **A.**   The bulk of the document is basically a document outlining

12  potential use cases for FileTek and Autonomy.

13  **Q.**   This document, Government's 444, what's the date on it?

14  **A.**   The 31st of December 2009.

15  **Q.**   And it's from Mr. Menell?

16  **A.**   Correct.

17  **Q.**   All right.  To who?

18  **A.**   To Mike Lynch, Sushovan Hussain, and Andy Kanter, copy to

19  Stouffer Egan and Steve Chamberlain.

20  **Q.**   And if we could just scroll to the second page to the top,

21  please.

22      All right.  And I believe you said this is a -- what did

23  you call this?

24  **A.**   A potential use case.

25  **Q.**   Use case.  What's a use case?

1   **A.**    So a way you could use that software to deliver business

2   value.

3   **Q.**    Was this use case, to your recollection, ever shown to

4   you, Mr. Goodfellow?

5   **A.**    I don't recall seeing this document.

6   **Q.**    Now, is a use case the same as a proof of concept or are

7   those different?

8   **A.**    Those would be different.

9   **Q.**    Can you describe how are they different?

10  **A.**    So a use case is a way that you could use something.    A

11  proof of concept you're looking to prove out that you could use

12  it in that way.

13  **Q.**    Can you describe that for us?   What do you mean?   I mean,

14  in other words, what's the distinction?

15  **A.**    So if I'm looking at a use case, I've got a piece of

16  software that is database archiving.   One could potentially use

17  that piece of software to archive database into, say, the

18  Digital Safe.   That's a potential idea.

19       There's been no work done to understand if that's

20  practically feasible.   It's an idea at that point, and a proof

21  of concept you'd look out to prove that your idea is a good

22  idea and that it's feasible.

23  **Q.**    So a use case is this is something we could do, but it's

24  without a proof of concept means nobody's looked to see if you

25  really could do that?

1   **A.**   Correct.  Nobody's gone to the effort of working out if

2   it's actually achievable.

3   **Q.**   All right.  To your knowledge, did this deal happen?

4   **A.**   Yes, it did.

5   **Q.**   I'd like to show you now Government's 432.  Do you see

6   that?

7   **A.**   (Witness examines document.)

8   **Q.**   Take a look through 432 and see if you --

9           **THE COURT:**  Admitted.

10  (Trial Exhibit 432 received in evidence)

11          **MR. FRENTZEN:**  Thank you, Your Honor.

12  **Q.**   All right.  Now, in the beginning here this is some -- do

13  you see this is some e-mailing between Mr. Crumbacher and

14  somebody at FileTek?

15  **A.**   Correct.

16  **Q.**   And what's the date here?

17  **A.**   The 31st of December 2009.

18  **Q.**   So the same day that you were asked to comment on it?

19  **A.**   Correct.

20  **Q.**   Okay.  Could we go to page 12 of the document, please?

21          Do you see page 12 there, Mr. Goodfellow?

22  **A.**   Yeah.

23  **Q.**   Okay.  All right.  Now, is this a deal -- let me ask it

24  this way:  Were you aware that on the same day as the purchase

25  of the -- as Autonomy was purchasing StorHouse, that Autonomy

1    was also selling software to FileTek?

2    **A.**   I don't recall knowing at the time.

3    **Q.**   All right.  But does this appear to be a standard Autonomy

4    agreement to license software?

5            **MS. LITTLE:**  Objection.  He said he wasn't familiar

6    with it.

7            **MR. FRENTZEN:**  It's in evidence, Your Honor.  It's a

8    business record of Autonomy.

9            **MS. LITTLE:**  Foundation.

10           **MR. FRENTZEN:**  It's already in.

11           **THE COURT:**  Overruled.

12   **BY MR. FRENTZEN:**

13   **Q.**   Does this appear to be the way that Autonomy goes about

14   selling software to people?

15   **A.**   It looks like a typical contract.

16   **Q.**   Great.

17           And do you see a date there up at the top?

18   **A.**   December 31st, 2009.

19   **Q.**   And can you see there in the fees -- actually, yeah, thank

20   you -- the amount of the contract?

21   **A.**   $8 million.

22   **Q.**   And then are there also something else added in there?

23   **A.**   That is support and maintenance, $480,000.

24   **Q.**   And now if we could, could we go to page 17 of

25   Government's 432?

GOODFELLOW - DIRECT / FRENTZEN

1          Do you recognize what this is, Mr. Goodfellow?

2     **A.**   (Witness examines document.)  This appears to be the

3     license from FileTek to Autonomy.

4     **Q.**   All right.  So this is Autonomy buying the StorHouse

5     product from FileTek?

6     **A.**   Correct.

7     **Q.**   What's the date?

8     **A.**   31st of December 2009.

9     **Q.**   And do you see if we go to page -- sorry -- let's go to

10    page 31 of this document.

11         Do you see a total on page 31?

12    **A.**   Correct, 7.4 million approximately.

13    **Q.**   And if we could go to page 33.

14         Do you see a total on this page?

15    **A.**   Approximately 2.9 million.

16    **Q.**   So grand total of about 10.3 million?

17    **A.**   Correct.

18    **Q.**   All right.  And to your recollection was that the first

19    purchase of StorHouse software by Autonomy?

20    **A.**   Correct.

21    **Q.**   Shortly after this in January of 2010, did StorHouse -- or

22    was this StorHouse software brought back to your attention by

23    anyone at Autonomy?

24    **A.**   It was.

25    **Q.**   Could you tell us, first of all, where were you?

GOODFELLOW - DIRECT / FRENTZEN

1   A.   In Miami.

2   Q.   Miami, Florida?

3   A.   Correct.

4   Q.   What were you doing in Miami in January of 2010?

5   A.   It was the annual Autonomy sales conference.

6   Q.   What is that?

7   A.   So, obviously, once a year beginning of -- typically

8   beginning of the financial year, all the people involved in

9   selling to customers would get together, talk about the plans

10  for the next year, so on and so forth.

11  Q.   Go to the beach?

12  A.   Some of that, yeah.

13  Q.   All right.  While you were in Miami for the sales

14  conference, was this StorHouse software brought back to your

15  attention?

16  A.   It was.

17  Q.   Who brought it to your attention?

18  A.   Peter Menell.

19  Q.   What, if anything, did Mr. Menell say to you to bring this

20  back up to your attention?

21  A.   He asked me to put together a demonstration of a use case

22  for StorHouse.

23  Q.   All right.  And I think you've already kind of talked

24  about this, but what does that mean?

25  A.   So it was taking -- obviously in the document you showed

GOODFELLOW - DIRECT / FRENTZEN

1  earlier, you had a written use case.  It was putting together

2  something a bit more visual to demonstrate a potential use

3  case.

4  **Q.**   Did Mr. Menell tell you what this use case for the

5  software that had already been purchased, who that was for?

6  **A.**   Who the demonstration was for do you mean?

7  **Q.**   Correct.

8  **A.**   For Deloitte.

9  **Q.**   All right.  And to sell it to Deloitte?

10 **A.**   To help explain the use case to them.

11 **Q.**   Meaning Deloitte in what role?

12 **A.**   As Autonomy's auditors.

13 **Q.**   So did Mr. Menell describe to you basically that you had

14 to come up with the reason why they had bought this FileTek

15 software for the auditors?

16         **MS. LITTLE:**  Objection to characterization.

17         **THE COURT:**  Overruled.

18         **THE WITNESS:**  So he -- he asked me to put together a

19 demonstration of the use case.  So can you repeat the question,

20 sir?

21 **BY MR. FRENTZEN:**

22 **Q.**   Yeah.  For the auditors?

23 **A.**   Correct.

24 **Q.**   For the software that they'd already paid -- or they'd

25 purchased for 10 million-plus?

1    A.    Correct.

2             **THE COURT:**  I think the question is:  Did he tell you

3    why?

4    **BY MR. FRENTZEN:**

5    Q.    Did he tell you why?

6    A.    So I don't know if he explicitly told me why, but putting

7    together a demonstration to demonstrate a use case I would have

8    considered self-explanatory.  You were doing it to show -- to

9    give additional -- make it easier to understand.

10   Q.    Meaning you had a reason to do -- to purchase what you

11   purchased?

12   A.    Correct.

13   Q.    But you're being asked to do it weeks after it's

14   purchased?

15   A.    Correct.  To build a demonstration, yeah.

16   Q.    Did he tell you what the use case was?

17   A.    I don't recall him giving me the use case, no.

18   Q.    What, if anything, did you do to put this demonstration

19   together?

20   A.    So I asked a couple of colleagues to help me build that

21   demonstration over the course of that weekend.

22   Q.    How many days did it take you?

23   A.    About two days.

24   Q.    And it was yourself and how many other?

25   A.    Two others.

1    **Q.**    Other -- were these tech people, or --

2    **A.**    Yeah.  They were technical specialists.

3    **Q.**    Also that happened to be in Miami?

4    **A.**    Correct.

5    **Q.**    At the end of that, did you come up with a demonstration?

6    **A.**    Correct.

7    **Q.**    What did you think of the demonstration?

8    **A.**    It was -- it was a simple demonstration, but it was a

9    demonstration.

10    **Q.**    To you did it seem like a --

11            **MS. LITTLE:**  Objection.  Leading.

12            **THE COURT:**  Overruled.

13    **BY MR. FRENTZEN:**

14    **Q.**    Was it something you thought would sell, that you would

15    pitch it to customers?

16            **MS. LITTLE:**  Objection.  Leading.

17            **THE COURT:**  I think he can say yes or no to that.

18            **MR. FRENTZEN:**  I don't think I'm leading him,

19    Your Honor.

20            **THE WITNESS:**  Yes.

21    **BY MR. FRENTZEN:**

22    **Q.**    I'm sorry.  Yes what?

23    **A.**    Yes, it was a use case that could potentially be sold to

24    customers.

25    **Q.**    Okay.  Was it something that you believed in, thought

1    "We're going to make a lot of money on this," Autonomy?

2    **A.**    I don't think I had a strong opinion at the time.

3    **Q.**    Why not?

4    **A.**    It was -- it was very preliminary at that point.

5    **Q.**    Did it seem to you to be something that would be

6    commercially viable or new?

7    **A.**    There was a potential use case there, yes.

8    **Q.**    All right.  The demonstration that you put together, did

9    you show that to anyone?

10   **A.**    I showed it to Peter Menell.

11   **Q.**    Do you know whether or not it was shown to anyone else?

12   **A.**    I don't know for certain, no.

13   **Q.**    And so basically you turned it over to Mr. Menell?

14   **A.**    Correct.

15   **Q.**    Do you know what happened to it after that?

16   **A.**    I do not.

17   **Q.**    Okay.  And when you put something like that together, what

18   does that take?

19   **A.**    Sorry, in terms of time or in terms of --

20   **Q.**    What do you have to do?

21   **A.**    So basically obviously the main thing typically with a

22   demo is creating something visual, a user interface that

23   somebody can see, and so that was the bulk of the work.

24   **Q.**    Were you then put in charge of trying to actually develop

25   some use for StorHouse at Autonomy?

1    **A.**    Yes.  So we did subsequently over a number of months try

2    and integrate StorHouse into the Digital Safe product.

3    **Q.**    Did you follow the use case or the demonstration that you

4    had put together for Deloitte?

5    **A.**    No, we did not.

6    **Q.**    Why not?

7    **A.**    The demonstration to Deloitte was one use case.  We later

8    on focused on a different use case.

9    **Q.**    And so why did you shift from the first one?

10    **A.**    The second one was -- as we proceeded, seemed more useful.

11    **Q.**    Let me ask you this:  Did it seem -- as you were working

12    on it, did it seem useful to you?

13    **A.**    So the use case had potential use.  We never -- we never

14    got to achieve that, but the use case --

15    **Q.**    What does that mean?

16    **A.**    So the integration never got to a point where I considered

17    it successful.

18    **Q.**    Why not?

19    **A.**    The -- the nature of the integration meant trying to fit

20    something into Digital Safe that didn't necessarily work

21    particularly well.  Some of the functionalities that perhaps

22    would have helped on the import side, on bringing data in,

23    weren't quite as much as we expected.

24    **Q.**    At the end of the day, were you ever able to integrate

25    StorHouse in a way that was commercially appealing to anyone?

GOODFELLOW - DIRECT / FRENTZEN

1    A.   Not in a way that I consider commercially successful, no.

2    Q.   All right.  I want to look at a couple of instances to get

3    the timing down.

4         Can you take a look at Government's 716, please?

5    A.   (Witness examines document.)

6    Q.   Do you recognize what 716 is?

7    A.   Yes, I do.

8    Q.   What is 716?

9    A.   It's an e-mail from Darren Gallagher to myself after I've

10   passed him contact details of somebody at FileTek.

11            THE COURT:  Admitted.

12       (Trial Exhibit 716 received in evidence)

13            MR. FRENTZEN:  And can we just blow up the top part?

14   BY MR. FRENTZEN:

15   Q.   What is the date of this, Mr. Goodfellow?

16   A.   April 1st, 2010.

17   Q.   And this is between -- who sent this to you?

18   A.   Darren Gallagher.

19   Q.   Who was Darren Gallagher?

20   A.   He was an engineering manager in Cambridge, U.K.

21   Q.   Was he working on trying to integrate or install

22   StorHouse?

23   A.   Yes.  He was one of the people working on it.

24   Q.   All right.  And just from this can you tell, as of

25   April 1st, 2010, were you still working on the integration?

1   **A.**   Correct.

2   **Q.**   Take a look, if you would, please, at Government's 733.

3            **THE COURT:**  Admitted.

4   (Trial Exhibit 733 received in evidence)

5            **MR. FRENTZEN:**  Would you blow up the top part, please?

6   **Q.**   Mr. Goodfellow, does this represent communication between

7   Autonomy and folks at FileTek?

8   **A.**   It does.

9   **Q.**   What was the -- and are you included on here?

10  **A.**   Yes, I am.

11  **Q.**   And what was the point of this?

12  **A.**   This is FileTek introducing someone more local than the

13  person previously mentioned.

14  **Q.**   This is a tech person from FileTek?

15  **A.**   Yeah.  And this person is in the U.K.  So obviously

16  they're on the same time zone as Darren and other people like

17  myself.

18  **Q.**   And this is to do what?

19  **A.**   Provide additional support.

20  **Q.**   To help you do what?

21  **A.**   To do the integration.

22  **Q.**   I'd like to take a look -- if you could, could you take a

23  look at, please, Government's 792?

24  **A.**   (Witness examines document.)

25  **Q.**   Do you recognize 792, Mr. Goodfellow?

1    **A.**    I don't recall it at the time.

2    **Q.**    You don't recall it now?

3    **A.**    Correct.

4    **Q.**    Okay.  Can you take a look at the top line there?  Does it

5    appear to be something that was sent to you?

6    **A.**    It was, yes.

7            **THE COURT:**  Admitted.

8        (Trial Exhibit 792 received in evidence)

9            **MR. FRENTZEN:**  Thank you, Your Honor.

10        All right.  And blow it up.

11    **Q.**    And this is what date?

12    **A.**    30th of April 2010.

13    **Q.**    From who?

14    **A.**    From Stouffer Egan.

15    **Q.**    To who?

16    **A.**    To myself and Pete Menell.

17    **Q.**    Okay.  And I know you say you don't recall this, but can

18    we go to page 4 of this and show the attachment?

19        What does this appear to be?

20    **A.**    It's a proposal.

21    **Q.**    A proposal for what?

22    **A.**    If you want to scroll down.

23    **Q.**    Yeah.  Can we keep going to the next page?  Great.

24    **A.**    This is for additional StorHouse capacity.

25    **Q.**    What does that mean?

1  **A.**   So StorHouse was licensed on the basis of how much data

2  you can put in it.   This is -- this is to increase that limit,

3  so...

4  **Q.**   Up to this point, had you yet integrated StorHouse with

5  Digital Safe?

6  **A.**   No.

7  **Q.**   Or any other Autonomy products?

8  **A.**   No.

9  **Q.**   Did you -- or if you haven't even integrated it, have you

10  used any of the volume that you paid 10 million-plus dollars

11  for?

12  **A.**   No.

13  **Q.**   Was there any purpose whatsoever to purchasing more volume

14  from FileTek?

15          **MS. LITTLE:**   Objection.   Foundation.

16  **BY MR. FRENTZEN:**

17  **Q.**   Are you the guy leading the project to try to make this

18  work?

19  **A.**   I'm closely involved, yes.

20  **Q.**   Okay.   If you hadn't even integrated it, did you have any

21  reason to buy more volume than you already had which you

22  weren't using?

23  **A.**   Not that I can see.

24  **Q.**   If we could, now, could you take a look at

25  Government's 711, please.

GOODFELLOW - DIRECT / FRENTZEN

1  **A.**    (Witness examines document.)

2  **Q.**    And my question on this is:  Does this appear to be

3  correspondence within Autonomy and then invoices prepared by

4  Autonomy?

5  **A.**    This appears to be an invoice being sent to FileTek.

6         **THE COURT:**  Admitted.

7      (Trial Exhibit 711 received in evidence)

8         **MR. FRENTZEN:**  If we could show page 2, please.

9  **Q.**    All right.  What does this appear to be, Mr. Goodfellow?

10 **A.**    This is an invoice for Autonomy software.

11 **Q.**    So this is FileTek buying more Autonomy software?

12 **A.**    Yes.  So presumably, according to this, on the 31st of

13 March 2010, they had purchased some software and

14 correspondingly this is the invoice to pay for that.

15 **Q.**    Okay.  Could we go to the third page and get the bottom

16 line?  Great.

17     What was the total?

18 **A.**    $9,010,000.

19 **Q.**    And now could you take a look, please, at Government's

20 Exhibit 809?

21 **A.**    (Witness examines document.)

22 **Q.**    Mr. Goodfellow, do you recognize what 809 is?

23 **A.**    I haven't seen it before, no.

24 **Q.**    What's that, sir?

25 **A.**    I haven't seen it before, no.

1    **Q.**   Do you recognize what it is?  If you can just flip

2    through.

3    **A.**   It appears to be --

4          **MS. LITTLE:**  I don't have 809.  Can you show me what

5    it is?

6          **MR. FRENTZEN:**  Yeah.  Sorry.

7          **THE WITNESS:**  (Witness examines document.)  It appears

8    to be a purchase of further FileTek software.

9    **BY MR. FRENTZEN:**

10   **Q.**   Are you aware that Autonomy did purchase -- pursuant to

11   that proposal, that Autonomy did make an additional purchase

12   for more volume from FileTek?

13   **A.**   I don't recall this at the time.

14         **THE COURT:**  Admitted.

15      (Trial Exhibit 809 received in evidence)

16   **BY MR. FRENTZEN:**

17   **Q.**   Sorry.  Listen to my question.

18      Working on this project, did you become aware that

19   Autonomy had, in fact, purchased additional volume from

20   FileTek?

21   **A.**   I don't recall knowing that, no.

22   **Q.**   All right.  Well, take a look at page 3 of this,

23   Mr. Goodfellow.  What does this indicate?

24      And if we could get -- I'm sorry, if we could get the

25   date.

1          What's the date?

2    A.    The 10th of May 2010.

3    Q.    All right.  And then scroll down.

4          What is the total on this page?

5    A.    $3,290,918.

6    Q.    Okay.  And what seems to be getting purchased here?

7    A.    Unlimited capacity of StorHouse.

8    Q.    Could we go to now page -- let's go ahead and go to the

9    next page just to -- all right.

10         Who is Andy Kanter?

11   A.    He was the COO and chief legal counsel for Autonomy.

12   Q.    Let's go now to page 5, please.

13         What's the date on this page?

14   A.    10th of May 2010.

15   Q.    All right.  And what appears to be getting purchased from

16   FileTek here?

17   A.    Additional licenses again.  I'd have to compare the two.

18   They seem to be similar things, but I'd have to compare the two

19   to see the difference.

20   Q.    All right.  But is there a total, then, for this page?

21   A.    $8,227,296.

22   Q.    All right.  So 8-plus million and then 3-plus million

23   total?

24   A.    Approximately, yeah.

25   Q.    A little over 11 million?

1  **A.**   Correct.

2  **Q.**   Did Autonomy, based on your work on trying to integrate

3  StorHouse at that time, did it need this extra volume?

4  **A.**   Not to my knowledge, no.

5  **Q.**   I'd like to -- could you take a look, please, now, sir, at

6  Government's 815?

7  **A.**   (Witness examines document.)

8         **THE COURT:**  Admitted.

9         (Trial Exhibit 815 received in evidence)

10        **MR. FRENTZEN:**  Thank you, Your Honor.

11        Show the first page of that.  Can we blow up the top?

12 **Q.**   What's the date of this, Mr. Goodfellow?

13 **A.**   17th of May 2010.

14 **Q.**   All right.  And this is from who?

15 **A.**   This is from Darren Gallagher to myself.

16 **Q.**   And at the subject line, what is it saying?

17 **A.**   It's "Options for Integrating Digital Safe and StorHouse."

18 **Q.**   Meaning you're still looking at how many different options

19 at this point?

20 **A.**   In this particular document, there's four options.

21 **Q.**   So it's still -- have you -- as of May 17th, 2010, had you

22 integrated them yet?

23 **A.**   No.

24 **Q.**   Did you eventually integrate them?

25 **A.**   Not to what I consider a satisfactory level, no.

GOODFELLOW - DIRECT / FRENTZEN

1  Q.    What does that mean?

2  A.    So there was -- there was a basic integration but it's not

3  something that I believe delivered value.

4  Q.    You did not believe that what?

5  A.    It delivered value.

6  Q.    What does that mean?

7  A.    So the StorHouse was installed within the Digital Safe but

8  it wasn't doing anything that reduced costs from our side or

9  delivered value to the customer.

10  Q.    All right.  I'd like now to move -- if we could, to direct

11  your attention to the end of the year in 2010, December of

12  2010.

13       In December of 2010, were you asked to participate in a

14  sale of hardware to a customer called VMS?

15  A.    I was.

16  Q.    Could you describe for us in your role at Autonomy, in

17  what way, if at all, did you get involved in purchasing

18  hardware?

19  A.    So the Digital Safe business involved purchasing

20  significant amounts of hardware.  So where it came up outside

21  of that business, it was not uncommon for me to be involved.

22  Q.    Prior to this time in late December 2010, what was the

23  largest purchase of hardware you think you'd been involved in

24  in terms of dollar value?

25  A.    Probably about 200,000, quarter of a million dollars.

1  Q.   All right.  And primarily -- I mean, were you involved in

2  hardware as a reseller or were you involved in purchasing

3  hardware for Autonomy's uses?

4  A.   So primarily it was purchased for our use, but also we'd

5  occasionally sell it with software to customers as well.

6  Q.   And is that some of these -- you'd talked about nothing

7  bigger than 200,000.  So are you saying prior to that time,

8  you'd never done anything bigger than that, including for

9  reseller deals?

10  A.   Correct.

11  Q.   That you were involved in?

12  A.   Correct.

13  Q.   Okay.  Do you have a recollection of about how much --

14  what the dollar value was of what you were asked to essentially

15  resell to VMS?

16  A.   Approximately $6 million.

17  Q.   So was this outside of your ordinary job?

18  A.   It was certainly larger than typical.

19  Q.   Okay.  Who asked you to do it?

20  A.   Peter Menell.

21  Q.   What is VMS?

22  A.   VMS was an abbreviation of Video Monitoring Services.

23  They provide services to businesses -- or they did, sorry --

24  whereby if you wanted to know when your brand or your company

25  was mentioned on TV or radio or in the newspaper, they would

**GOODFELLOW - DIRECT / FRENTZEN**

1  basically look out for that for you and provide you with a

2  summary where your name had been mentioned.

3  **Q.**   Was VMS a company, to your knowledge, that utilized any

4  Autonomy software?

5  **A.**   They were.

6  **Q.**   All right.  And so in connection with trying to do this

7  sale of hardware to VMS, who did you deal with at VMS?

8  **A.**   A gentleman called Gerry Louw.

9  **Q.**   And I think for the court reporter is that G-E-R-R-Y

10  L-O-U-W?

11  **A.**   That sounds correct.

12  **Q.**   Okay.  To your knowledge, did VMS have a preference about

13  what type of hardware they liked to use?

14  **A.**   Yes, they did.

15  **Q.**   What was it?

16  **A.**   It was for HP hardware.

17  **Q.**   Hewlett Packard?

18  **A.**   Correct.

19  **Q.**   And after getting this request, did you set out to try to

20  get hardware to resell to VMS?

21  **A.**   I did, yes.

22  **Q.**   Just did you have any understanding about why you were

23  doing a resale of hardware to VMS?

24  **A.**   So I knew they were also doing, I believe, a software deal

25  at the same time and this was part of that total package.

1  Q.   Any of this hardware that you were getting, was any of it

2  going to be loaded, to your knowledge, with Autonomy software,

3  or do you know?

4  A.   It would have had Autonomy's software installed on some of

5  it, yes.

6  Q.   On some of it?

7  A.   Correct.

8  Q.   Do you know -- do you have any idea about how much, or any

9  of that?

10  A.   I couldn't put a number on it at this stage.

11  Q.   Okay.  I'd like to show you, if you could, take a look at

12  Government's 1299.  It's hopefully in front of you.

13  A.   (Witness examines document.)

14       **THE COURT:**  Admitted.

15       (Trial Exhibit 1299 received in evidence)

16       **MR. FRENTZEN:**  Show that, please.

17  Q.   Mr. Goodfellow, what is -- can we scroll a little bit up?

18  Great.  Thanks.

19       What are you -- what's the date of this, first of all?

20  A.   17th of December 2010.

21  Q.   All right.  And what were you communicating here?

22  A.   This is basically asking others that I work with to help

23  me get quotes for the hardware that VMS is looking to purchase.

24  Q.   Okay.  And when you say "Already speaking to HP," who were

25  you speaking to at that time about HP hardware?

1  **A.**    A reseller by the name of Insight.

2  **Q.**    What does that mean?

3  **A.**    So Insight is somebody who basically is a retailer of HP

4  hardware, so obviously they sell to the customer and then they

5  buy it from HP and sell it -- pass it onto the customer.

6  **Q.**    Did -- all right.

7      So when you say "Already speaking to HP," are you talking

8  about HP directly or are you talking about to this Insight who

9  resells HP?

10 **A.**    In this context, to Insight.

11 **Q.**    All right.  And can we just scroll down?

12     What is this listing here, Mr. Goodfellow?

13 **A.**    This is basically specifications for different hardware.

14 **Q.**    And if you could just scroll through the next couple pages

15 just to -- are you basically listing here the hardware you're

16 looking for for VMS?

17 **A.**    Correct.

18 **Q.**    All right.  Can you take a look at Government's 1344,

19 please, Mr. Goodfellow?

20 **A.**    (Witness examines document.)  Yes.

21 **Q.**    Do you recognize what that is?

22 **A.**    (Witness examines document.)  This is an offer from

23 somebody at VMS asking if there's a final -- basically a final

24 bill of materials.

25 **Q.**    Does it go to you?

1    A.    It does, yes.

2              MR. FRENTZEN:  I'll offer it.

3              THE COURT:  Admitted.

4         (Trial Exhibit 1344 received in evidence)

5              MR. FRENTZEN:  Thank you, Your Honor.

6         If we could show the top part.

7    Q.    What's the date of this, Mr. Goodfellow?

8    A.    30th of December 2010.

9    Q.    All right.  And do you recall, to your recollection, were

10   you still working on this deal right up until the end of that

11   period, that quarter?

12   A.    I was, yes.

13   Q.    All right.  So this is the day before?

14   A.    Correct.

15   Q.    All right.  And just if you could, I don't think we need

16   to read the whole thing here, but does it appear that you guys

17   are close to finalizing a deal on this hardware at that point

18   in time?

19   A.    It does look like we're getting close, yes.

20   Q.    People are talking about a final look through and --

21   A.    Correct.

22   Q.    -- wants to get it done because he's going to be skiing?

23   A.    Correct.

24   Q.    Could you take a look at 1345, Mr. Goodfellow?

25   A.    (Witness examines document.)

1          **THE COURT:**  Admitted.

2       (Trial Exhibit 1345 received in evidence)

3          **MR. FRENTZEN:**  Thank you, Your Honor.

4   **Q.**   What is 1345?

5   **A.**   Sorry.  What was the number?

6   **Q.**   1345.  We've got it up on the screen now I think.

7   **A.**   (Witness examines document.)  This is basically a contract

8   for the purchase of the hardware.

9   **Q.**   Okay.  Can we just scroll down?

10      All right.  And then if you could just show the next page.

11  Oh, great.  Sorry.

12      And does this -- how much was this deal for,

13  Mr. Goodfellow?

14  **A.**   $6,004,066.90.

15  **Q.**   All right.  And then the next page, does that show, again,

16  what's going to be purchased in terms of the hardware?

17  **A.**   It does, yes.

18  **Q.**   All right.  I'd like to direct your attention now to

19  Government's 1398, please.

20  **A.**   (Witness examines document.)

21  **Q.**   Do you have that up there?

22  **A.**   I don't have 1398.

23  **Q.**   You don't have 1398?  Hold on a second.

24                  (Pause in proceedings.)

25          **MS. LITTLE:**  I have no objection to it if you want to

1    put it on the screen.

2         **THE COURT:**  Admitted.

3         (Trial Exhibit 1398 received in evidence)

4         **MR. FRENTZEN:**  Great.  Can we pull up 1398?

5    Can you blow that up, please?

6    All right.  Can we scroll down a little bit, a couple

7    pages down?

8         Okay.  All right.  Do you see here -- actually, sorry.

9    Can we just get the top lines of that e-mail?

10        Okay.  No, no, no.  Back where we were.  Great.

11   **Q.**   All right.  What's the date of this, Mr. Goodfellow?

12   **A.**   31st of December 2010.

13   **Q.**   Okay.  So is that the last day it can get done?

14   **A.**   Correct.

15   **Q.**   And who are you sending this to?

16   **A.**   Mike Lynch, Sushovan Hussain, and Peter Menell.

17   **Q.**   And it's about what?

18   **A.**   I'm asking for approval for the PO to Insight to purchase

19   the hardware to sell to VMS.

20   **Q.**   All right.  So are you asking to sell the stuff that you'd

21   gone out and found?

22   **A.**   Yeah.  So this is I've got a quote for approximately

23   5.8 million from Insight for the hardware that we would then

24   resell to VMS.

25   **Q.**   All right.  So you had found the hardware that was going

GOODFELLOW - DIRECT / FRENTZEN

1    to fulfill the contract to VMS?

2    **A.**    Correct.

3    **Q.**    And here you're just asking for approval ASAP?

4    **A.**    Correct.

5    **Q.**    That's so you can get out of there on New Year's Eve?

6    **A.**    And so we can get the paperwork issued.

7    **Q.**    Okay, great.

8         If you can just scroll down a little bit, please, to the

9    next page.

10        Okay.  And what is that?  You make reference here

11   (reading):

12            "In order to bond the stock, we need to issue the PO

13       this evening."

14       What does that mean?

15   **A.**    So in order for us to take ownership of that stock from

16   the reseller, we need to -- we need to issue them a PO.  So

17   what I'm basically saying is potentially in the next couple of

18   days we might negotiate further discount on the price, but we

19   need to contractually agree to pay now.

20   **Q.**    All right.  And what's the effect of bonding the stock?

21   **A.**    So the title transfers to us and we can, therefore,

22   transfer the title to VMS.

23   **Q.**    That's how you do delivery --

24   **A.**    Correct.

25   **Q.**    -- basically on one of these deals?

GOODFELLOW - DIRECT / FRENTZEN

1       Okay.  Can we scroll up, please?

2       All right.  Who's Richard Eads?

3   A.  Richard Eads was the head of procurement.

4   Q.  The head of what?

5   A.  Procurement.

6   Q.  What does that mean?

7   A.  He was responsible for making sure that when we were

8   purchasing things, we were getting a good deal basically.

9   Q.  He says, "Okay"?

10  A.  Yeah, correct.

11  Q.  Keep going.

12      And Mr. Hussain says what?

13  A.  (reading)

14          "FYI we are buying the hardware."

15  Q.  Okay.  And then could we go to the top, please?

16      All right.  Do you see what's here from Mr. Hussain on

17  December 31st, 2010?

18  A.  Yes.

19  Q.  What did Mr. Hussain ask?

20  A.  He's saying (reading):

21          "Is there any hardware we can repurpose?"

22  Q.  What does that mean?

23  A.  Is there -- simply he's asking do we have anything in

24  stock.

25  Q.  In what?

GOODFELLOW - DIRECT / FRENTZEN

1    **A.**    In stock.

2    **Q.**    Okay.  What does that mean?

3    **A.**    Do we have anything that we've purchased that we aren't

4    currently using that we can use instead of buying new.

5    **Q.**    Okay.  Were you asked just about stuff in stock or were

6    you asked "Is there any hardware we can repurpose?"

7    **A.**    At this point, I mean, what's there is quite generic I

8    guess.

9    **Q.**    All right.  "Is there any hardware we can repurpose?"

10   **A.**    Correct.

11   **Q.**    Okay.  And as a result of this, what, if anything, did you

12   do?

13   **A.**    So not directly as a result of this but subsequent to this

14   I was asked by Peter Menell to review the Fixed Asset Register

15   and look and see if there's any hardware similar to that which

16   we were planning to sell to VMS.

17   **Q.**    Let's take a look at Government's 1378.

18            **THE COURT:**  Admitted.

19       (Trial Exhibit 1378 received in evidence)

20            **MR. FRENTZEN:**  Thank you, Your Honor.

21       And if we could scroll down to the bottom first.  No, I

22   mean the bottom of the next e-mail.  Great.

23   **Q.**    All right.  What is this?

24   **A.**    So this is an e-mail between two people in finance, one of

25   them asking another to send me a copy of the Fixed Asset

GOODFELLOW - DIRECT / FRENTZEN

1    Register.

2    **Q.**    What's the Fixed Asset Register?

3    **A.**    A list of all the basically assets -- typically service,

4    although it could be a bit more broader -- that the company

5    owns and has on its books.

6    **Q.**    Can you scroll up to the top, please.

7         All right.  And what is -- does it appear that somebody

8    sent you the Fixed Asset Register?

9    **A.**    It does, yes.

10   **Q.**    All right.  So that went to you?

11   **A.**    Correct.

12   **Q.**    What, if anything, did you do with the Fixed Asset

13   Register?

14   **A.**    I produced a list of what was on there that was similar to

15   what we were selling to VMS.

16   **Q.**    The Fixed Asset Register, is that all stuff in boxes

17   that's stashed away at Autonomy?

18   **A.**    It includes things that are in boxes.  It also includes

19   things that are in use.

20   **Q.**    That what?

21   **A.**    That are in use.

22   **Q.**    Did you put together a list of things that were both in

23   use and not in use?

24   **A.**    Correct.

25   **Q.**    All right.  So what does that mean?

1    **A.**    It was both things that were, as you say, sitting in

2    boxes, as well as things that were being used for internal

3    purposes or for delivery to customer.

4    **Q.**    Are you talking about things that were plugged into the

5    wall?

6    **A.**    Correct.

7    **Q.**    What issues, if any, are there in trying to sell

8    Gerry Louw at VMS the things that are plugged into the wall at

9    Autonomy?

10   **A.**    First, it would be one of age.  Secondly, some of that

11   would have customer data on them.  The customers who own that

12   data would not want that to be given to anyone else.  They'd

13   want it destroyed if it was leaving our possession.

14   **Q.**    Okay.  Meaning the stuff in use was used?

15   **A.**    Correct.

16   **Q.**    The stuff in use had people's data on it because Autonomy

17   was hosting or providing other services to them?

18   **A.**    Correct.

19   **Q.**    Would it also -- would Autonomy be able to get up and

20   running the next morning without replacing it?

21   **A.**    No.

22   **Q.**    So could you actually sell this stuff to VMS?

23   **A.**    No.

24   **Q.**    Were you, nonetheless, asked to do this?

25   **A.**    Correct.

GOODFELLOW - DIRECT / FRENTZEN

1   Q.   Who does Pete Menell answer to?

2   A.   Mike Lynch.

3   Q.   I'd like to show you now Government's 1398.  Could you

4   take a look at that, please, sir?

5   A.   (Witness examines document.)

6   Q.   Do you recognize 1398?

7   A.   I don't think I have 1398.

8   Q.   I'm sorry?  You don't have it?

9         THE COURT:  It's admitted.

10         MR. FRENTZEN:  It's already in?

11         THE COURT:  1398?

12         MR. FRENTZEN:  Oh, okay.  Sorry.

13         THE COURT:  It's already in.

14         MR. FRENTZEN:  Oh, okay.  I understand now.  Sorry,

15   Your Honor.  There's two parts to that.

16      Okay.  Can we go back to 1398?

17                  (Pause in proceedings.)

18   BY MR. FRENTZEN:

19   Q.   Why were you doing this?

20   A.   Because I'd been asked to.

21   Q.   Okay.  But, I mean, in terms of what you're supposed to be

22   doing in terms of the contract with VMS, is this what VMS

23   ordered?

24   A.   No.

25   Q.   So why are you doing this?

GOODFELLOW - DIRECT / FRENTZEN

1   **A.**   Because I've been asked to.

2   **Q.**   Did you ask any further than that?

3   **A.**   No.

4   **Q.**   I'd like to go now to page 4 of Government's 1398.

5   Mr. Goodfellow, can you take a look at the -- can we go to

6   the very bottom?

7   Okay.  And do you recognize on page 4 of 1398 the

8   beginning of the same e-mail chain that we looked at on the

9   first two pages of 1398?

10  **A.**   I do.

11  **Q.**   All right.  And that's this -- this is when you said Okay.

12  Is this in reference, again, to you putting together the actual

13  new hardware that was supposed to be sold, 6 million worth?

14  **A.**   Correct.

15  **Q.**   Then what is Mr. Lynch's response on December 31st?

16  **A.**   He's approving that amount.

17  **Q.**   And then can we scroll down a little further?  A little

18  further than that.  A little more.

19  All right.  And Mr. Eads says what?

20  **A.**   (reading)

21  "Need your approval to proceed."

22  **Q.**   And can we go up a little to see who responds to that?

23  All right.  Hang on.

24  Okay.  The response to that, Mr. Goodfellow, is from who?

25  **A.**   Sushovan Hussain.

1  **Q.**  All right.  And this is still December 31st, 2010?

2  **A.**  Correct.

3  **Q.**  Scroll back up.

4  What is Mr. Hussain's response?

5  **A.**  (reading)

6  "Not yet.  Still working out the number.  We can

7  repurpose from stock.  Will get back to you in a while."

8  **Q.**  Okay.  So is this a reference to your repurposing?

9  **A.**  Correct.

10  **Q.**  All right.  Can we scroll up?

11  All right.  Mr. Eads says what?

12  **A.**  (reading)

13  "Understood.  Thank you for the update."

14  **Q.**  Keep scrolling up.

15  Do you get a response from Mr. Hussain again?

16  **A.**  Yes.

17  **Q.**  What did he say?

18  **A.**  (reading)

19  "Speaking with Pete and Steve I believe we are buying

20  less circa 2 million and repurposing the rest from

21  existing stock.  Spreadsheet being prepared."

22  **Q.**  Did you have 4 million worth of hardware sitting in boxes

23  that you could have repurposed for this?

24  **A.**  No.

25  **Q.**  Okay.  And speaking with Pete, who was it that asked you

1    to just go ahead and repurpose from the stuff that was -- also

2    from the stuff that was plugged into the walls?

3    **A.**   That was Pete.

4    **Q.**   Okay.  All right.  So did you go ahead and put together a

5    list of hardware?

6    **A.**   Yes, I did.

7    **Q.**   All right.  And could we go to Government's Exhibit 1402?

8    Do you see that, Mr. Goodfellow?

9    **A.**   (Witness examines document.)

10            **THE COURT:**  Admitted.

11        (Trial Exhibit 1402 received in evidence)

12   **BY MR. FRENTZEN:**

13   **Q.**   What is 1402?

14   **A.**   1402 appears to be that same spreadsheet.

15   **Q.**   Which spreadsheet?

16   **A.**   Listing all the items from the Fixed Asset Register.

17   **Q.**   Okay.  So this is the stuff that is either in stock or

18   plugged into the walls that you put on a list?

19   **A.**   Correct.

20   **Q.**   All right.  And if you could, could we just -- oh, I'm

21   sorry.

22            **MR. FRENTZEN:**  Is it in, Your Honor?  Can we bring it

23   up?

24            **THE COURT:**  Yes, I did say it.

25            **MR. FRENTZEN:**  All right.  Thanks.

1   Q.   This is still December 31st, 2010?

2   A.   Correct.

3   Q.   All right.  And if you could scroll down just to the

4   second page to get -- or, I'm sorry, the third page -- just to

5   get an example.  Just blow up a segment of that.

6        All right.  What is this?

7   A.   These are entries from the Fixed Asset Register.

8   Q.   This is the hardware at Autonomy?

9   A.   Correct.

10  Q.   Did you know what the purpose of this list was?

11  A.   I could surmise, yes.

12  Q.   What was the purpose of this list?

13  A.   As a proof of delivery.

14  Q.   As a what?

15  A.   Proof of delivery.

16  Q.   Was there any way this was ever going to get delivered to

17  VMS?

18  A.   No.

19  Q.   Could we go to 1403, please?

20          THE COURT:  Admitted.

21       (Trial Exhibit 1403 received in evidence)

22  BY MR. FRENTZEN:

23  Q.   What's 1403, Mr. Goodfellow?

24       Could we blow up the top part?

25       Is this an additional list sent by you?

1   **A.**   It is, yes.

2   **Q.**   And what is this portion, or what is this list?

3   **A.**   These are -- these are additional servers.  These were --

4   these were the new ones.  Basically these were new and in

5   boxes.

6   **Q.**   Okay.  Meaning this is the stuff that wasn't already

7   plugged into the wall?

8   **A.**   Correct.

9   **Q.**   To your knowledge, any of this stuff, the stuff plugged

10  into the wall or the stuff that was still in boxes, did any of

11  it get sent to VMS?

12  **A.**   Not to my knowledge, no.

13  **Q.**   Was this what VMS wanted?

14  **A.**   Some of it was similar but not -- so in the case of the

15  ones we have on the screen at the moment, these are not HP

16  machines.

17  **Q.**   As a result, how much did you actually purchase from

18  Insight to deliver to VMS?

19  **A.**   Approximately 2 and a half million.

20  **Q.**   And if you could, please, sir, can you take a look at --

21  sorry -- Government's 1400?

22  **A.**   (Witness examines document.)

23         **THE COURT:**  Admitted.

24      (Trial Exhibit 1400 received in evidence)

25         **MR. FRENTZEN:**  Thank you, Your Honor.

1          Blow up the top part.

2    **Q.**   All right.  This is still December 31st, 2010, going to

3    you from Mr. Eads.  What is Mr. Eads communicating to you?

4    **A.**   (reading)

5               "I think my contact at Insight just had a stroke.

6         Trying to bring him back to life now."

7    **Q.**   What does that mean?

8    **A.**   So Mr. Eads has just told the Insight sales rep that we no

9    longer wish to purchase almost 6 million; we wish to purchase

10   approximately 2 and a half million.

11   **Q.**   Okay.  Meaning that the hardware that you were going to

12   purchase from them to fulfill the contract with VMS, now you're

13   only doing about a third of that?

14   **A.**   Correct.

15   **Q.**   All right.  And if we could take a look there at page 3.

16   Just blow up the top.

17        What does this show, Mr. Goodfellow?

18   **A.**   This is a quote from Insight.

19   **Q.**   For what?

20   **A.**   For the hardware that we were looking to deliver to VMS.

21   **Q.**   Could we take a look at page 4 of this and on the top

22   right there should be something called "Order Total."  Yeah.

23        Do you see what's there, Mr. Goodfellow?

24   **A.**   Yeah.  1,622,584, 1.6 million pounds approximately.

25   **Q.**   All right.  To your knowledge, after this, was this amount

1    of hardware, the HP hardware from Insight, was that actually

2    delivered to VMS?

3    **A.**  It was, yes.

4    **Q.**  And what about with respect to the other 4 million?

5    **A.**  I don't believe that was delivered.

6    **Q.**  Were you actually -- through the course of that next year,

7    2011, were you trying to fulfill the order?

8    **A.**  I was, yes.

9    **Q.**  Did you have communications with Mr. Louw?

10   **A.**  Yes, I did.  Yes.

11   **Q.**  What was Mr. Louw asking you?

12   **A.**  He was looking for delivery of his purchase.

13   **Q.**  Can we take a look at Government's 2228, please -- or, I'm

14   sorry, can you take a look at that, please, sir?

15   **A.**  (Witness examines document.)

16   **Q.**  Do you have that in front of you?  Sorry.  2228.

17   **A.**  I don't appear to have it, no.

18   **Q.**  You don't have it?

19   **A.**  Oh, sorry.

20          **THE COURT:**  Admitted.

21   (Trial Exhibit 2228 received in evidence)

22          **MR. FRENTZEN:**  Can we pull that up and blow up the

23   top?

24   **Q.**  Okay.  What's the date of this e-mail, Mr. Goodfellow?

25   **A.**  This is the 10th of August 2011.

1   **Q.**   All right.  From who?

2   **A.**   From Sushovan Hussain.

3   **Q.**   To who?

4   **A.**   To myself and Steve Chamberlain.

5   **Q.**   All right.  What is the subject?

6   **A.**   "Need Urgent Chat Re VMS.

7   **Q.**   All right.  Did you have that urgent chat with

8   Mr. Hussain?

9   **A.**   Yes, I believe I did.

10  **Q.**   Do you recall what that chat was about?

11  **A.**   So two pieces around that time partly buying back some of

12  the hardware and also the fact that eventually VMS went

13  bankrupt shortly after that.

14  **Q.**   That what?

15  **A.**   They went bankrupt.

16  **Q.**   Okay.  Were you informed of that by Mr. Hussain?

17  **A.**   I believe so.

18  **Q.**   That they had gone bankrupt?

19  **A.**   Correct.  Yes.

20  **Q.**   Okay.  What was the effect of that in terms of the

21  4 million in hardware that was outstanding to VMS?

22  **A.**   So some of the hardware was never delivered, and I believe

23  there was outstanding payments.  I don't know if they were ever

24  collected.

25  **Q.**   All right.  And two more just very quick.

GOODFELLOW - DIRECT / FRENTZEN

1          Are you familiar with a deal or an effort to make a deal

2     with an outfit called Prisa?

3     A.   Yes.

4     Q.   What was Prisa?

5     A.   Prisa is basically the news international of the Spanish

6     speaking worlds in television, newspapers, and radio; and they

7     were an Autonomy customer for Web content management products.

8     Q.   All right.  And were you involved in an effort to try to

9     sell to Prisa hosting services?

10    A.   I was, yes.

11    Q.   Okay.  And who was sort of the lead on the effort to make

12    that deal?

13    A.   A gentleman by the name of James Murray and a gentleman, I

14    apologize, I forget his surname, but his first name was Alvaro.

15    Q.   Okay.  And who was overseeing that deal, if any?  I mean,

16    above -- was there anybody above you guys sort of overseeing on

17    that deal?

18    A.   I believe Mr. Hussain was involved, yes.

19    Q.   To your knowledge, did that deal close; in other words,

20    the effort to do hosting for Prisa?

21    A.   Not to my knowledge, no.

22    Q.   And to your knowledge, at any point in time -- what kind

23    of software was or what kind of hosting services was Prisa

24    looking for?

25    A.   For Web content management.  They're a media company.

1    They have various websites pertaining to their TV, radio, and

2    newspaper assets.

3    **Q.**    To your knowledge, was Stouffer Egan involved in the

4    effort to sell the hosting to Prisa?

5    **A.**    Not to my knowledge, no.

6    **Q.**    To your knowledge was there any reseller -- in other

7    words, another third-party entity from the U.S. -- involved in

8    trying to sell to Prisa?

9    **A.**    Not to my knowledge, no.

10   **Q.**    Okay.  At any point in time was Prisa interested in

11   purchasing eDiscovery software from Autonomy?

12   **A.**    Not to my knowledge.

13   **Q.**    All right.  And were you also involved in a potential deal

14   or an effort to make a deal with the Vatican?

15   **A.**    I was, yes.

16   **Q.**    And what was your role with respect to that?

17   **A.**    So I was working alongside the local sales team, Peter

18   Menell, Sushovan Hussain, in negotiating that deal.

19   **Q.**    To your knowledge, did any reseller, like I've talked

20   about, become involved and intervene between Autonomy and the

21   Vatican and try to negotiate that deal?

22   **A.**    Not to my knowledge.

23   **Q.**    Did that deal close?

24   **A.**    Not to my knowledge, no.

25            **MR. FRENTZEN:**  May I have one moment, Your Honor?

PROCEEDINGS

1          (Pause in proceedings.)

2  BY MR. FRENTZEN:

3  Q.  Are you aware of Stouffer Egan having any involvement in

4  the effort to close the deal with the Vatican?

5  A.  I am not, no.

6  Q.  I think I asked this but just in case, to your knowledge

7  was the 4 million additional in hardware ever delivered to VMS?

8  A.  I do not believe so, no.

9  Q.  Would you be aware if anybody had gone around Autonomy and

10  unplugged all the machines and shipped them to VMS?

11  A.  I would have, yes.

12          MR. FRENTZEN:  Thank you.  I have nothing further at

13  this time.

14          THE COURT:  Okay.  Ladies and gentlemen, we're going

15  to take a recess now till 2:35.

16      Remember the admonition given to you:  Don't discuss the

17  case, allow anyone to discuss it with you, form or express any

18  opinion.

19      We'll resume at 2:35.

20      (Proceedings were heard out of presence of the jury:)

21          THE COURT:  Let the record reflect the jurors have

22  retired.

23      About how long will your cross be, Ms. Little?

24          MS. LITTLE:  I know you want to leave at 3:30, so I'm

25  going to aim to get done before that.

 1              THE COURT:  Okay.

 2              MR. FRENTZEN:  That would be great to get him back to

 3     the U.K.

 4              THE COURT:  Okay.  I'm going to try to.

 5              MR. KEKER:  Your Honor, can I bring up one quick

 6     thing?  He keeps talking about Government --

 7              THE COURT:  Sorry?

 8              MR. KEKER:  He keeps talking about Government exhibits

 9     and I thought the deal was exhibits are exhibits.

10              THE COURT:  Okay, yes.  Exhibit number.

11              MR. KEKER:  Yeah, just exhibit number.

12              THE COURT:  Okay.  Don't use the word "Government."

13              MR. FRENTZEN:  I think I've also referred to

14     "Defense," but I won't.

15              THE COURT:  Just don't use that word "Government."  It

16     gets everybody upset.

17              MR. FRENTZEN:  I'll stop talking about the Government,

18     Your Honor.

19                      (Recess taken at 2:19 p.m.)

20                  (Proceedings resumed at 2:36 p.m.)

21        (Proceedings were heard in the presence of the jury:)

22              THE COURT:  Let the record reflect all jurors are

23     present, parties are present.

24         You may proceed.  Cross.

25              MS. LITTLE:  Thank you, Your Honor.

<u>**CROSS-EXAMINATION**</u>

**BY MS. LITTLE:**

**Q.**   Good afternoon, Mr. Goodfellow.

**A.**   Good afternoon.

**Q.**   I'm Jan Little, and I'm one of Mr. Hussain's lawyers.  I have a cold, so I'm sorry if I don't sound very good.

Mr. Goodfellow, you worked for HP from the time of the acquisition in 2011 until a few months ago; right?

**A.**   And successor companies, yes.

**Q.**   About six years altogether?

**A.**   Correct, yes.

**Q.**   And during those six years, you were interviewed by the prosecutors and the FBI and HP's lawyers and investigators about seven times; is that right?

**A.**   Between all the parties, yes, correct.

**Q.**   And you never met me before?

**A.**   No, I haven't met you.

**Q.**   Okay.  Let's talk about the FileTek transaction.

You testified on direct that when you were participating in the evaluation of the StorHouse product, you said a number of times that you thought there were potential use cases for it; correct?

**A.**   That's correct, yes.

**Q.**   And we looked at the memo that Dr. Menell had written, and certainly it was his recommendation that there were use cases

1    for the FileTek software; right?

2    **A.**    Yes.

3    **Q.**    And you testified that Autonomy often built its own

4    software as opposed to acquiring third-party softwares, but

5    there were occasions where Autonomy did buy other software;

6    correct?

7    **A.**    Correct, yeah.

8    **Q.**    And the jury has heard about the concept of buy versus

9    build.  Are you familiar with that concept?

10   **A.**    Correct.

11   **Q.**    Sometimes it's easier to build it in-house and sometimes

12   it's easier to buy it; correct?

13   **A.**    Correct.

14   **Q.**    Like I can cook dinner at home or get take-out?

15   **A.**    Right.

16   **Q.**    I usually get take-out.

17          And the reasons to buy rather than build include some of

18   the costs relating in delay in getting to market; right?

19   **A.**    Correct.

20   **Q.**    Or the costs of testing a product; right?

21   **A.**    Correct.

22   **Q.**    Or the costs of having engineers diverted from some

23   project to another; right?

24   **A.**    Correct.

25   **Q.**    Let's pull up Government 4 -- excuse me, Exhibit 464,

1  which is in evidence which you looked at.  It will be up on the

2  screen.

3      This was when you first got the contract to take a look

4  at; correct?

5  A.  Correct.

6          MS. LITTLE:  Let's take a look at the second page,

7  Jeff, if we could.  Sort of the calculations in the middle

8  there.

9  Q.  You see where it says 45 percent discount?

10  A.  Correct, yes.

11  Q.  Are you aware that FileTek gave Autonomy a 45 percent

12  discount on this product?

13  A.  I was, yes.

14  Q.  And you testified that the price here is $10 million.

15  When you looked at this contract, you didn't complain about

16  this purchase; right?

17  A.  Correct.  No.

18  Q.  You didn't complain about the price?

19  A.  No.

20  Q.  Okay.  We can take that down.

21      And you're aware that pretty immediately after the

22  purchase, Autonomy downloaded the FileTek software; correct?

23  A.  Correct.

24  Q.  And let's just take a look quickly at Exhibit 5768.  If

25  you could find that in your book.  It's an email that you're

1    copied on on December 31, 2009.

2    **A.**    What was the number.  Sorry?  57 --

3    **Q.**    5768.  It will be way in the back.

4              **THE COURT:**  It will be on the screen.  Is this in?

5              **MS. LITTLE:**  It's not in yet.  It's an email that he

6    was copied on on December 31 concerning the FileTek software.

7              **THE COURT:**  Admitted.

8         (Trial Exhibit 5768 received in evidence)

9    **BY MS. LITTLE:**

10   **Q.**    You can take a look on the screen.  It's really, really

11   tiny print.

12        Does this email show that on December 31, the FileTek

13   software was downloaded.  Mr. Hahn says, "I have downloaded all

14   the files"?

15   **A.**    Correct.

16   **Q.**    And Autonomy engineers pretty immediately undertook to

17   start working with this software; correct?

18   **A.**    I guess it depends on immediate, but obviously we did work

19   over the course of the next year with our software, yes.

20   **Q.**    If you will look quickly in your book at Exhibits 5777 and

21   also 5758, and those are emails that you were involved in.

22             **THE COURT:**  Admitted.  Both.

23        (Trial Exhibits 5777 and 5758 received in evidence)

24   **BY MS. LITTLE:**

25   **Q.**    Let's look at 5758 first.

1    So here, Mr. Gallagher is asking you for some information

2  about a FileTek contact; correct?

3  **A.**   Correct.

4  **Q.**   And then 5777, again, this is January 5th, Mr. Gallagher

5  is asking for that FileTek contact because he wants to get

6  information from FileTek about how best to use the software;

7  correct?

8  **A.**   Correct.

9  **Q.**   Okay.  And then you testified -- you testified that in

10  January when you were down in Miami, you and your colleagues

11  put together a demonstration of the StorHouse product; right?

12  **A.**   Correct.

13  **Q.**   And you worked with Mr. Connally and Mr. Kim; is that

14  right?

15  **A.**   Ms. Kim, but, yes.

16  **Q.**   And you told Mr. Frentzen that you created a user

17  interface.  You also wrote code; right?

18  **A.**   Correct.

19  **Q.**   And you had to input some sample data; correct?

20  **A.**   There was sample data involved, yes.

21  **Q.**   And you told the FBI earlier that the three of you down in

22  Miami, when you should have been on the beach, spent about 16

23  hours each working on this product; right?

24  **A.**   Sounds about right.

25  **Q.**   So about 48 hours?

1    **A.**    Correct.

2    **Q.**    And, again, you thought at this point that it had real

3    potential use; right?

4    **A.**    Correct.  There are use cases, correct.

5    **Q.**    And are you aware that Deloitte did receive that

6    demonstration?  Mr. Gallagher flew out and did the

7    demonstration for that?

8    **A.**    I wasn't aware how it was received, but it doesn't

9    surprise me.

10   **Q.**    Are you aware that Deloitte reviewed the purchase of the

11   FileTek software and also the sale of Autonomy software to

12   FileTek?

13   **A.**    That's what I would have expected, yes.

14   **Q.**    And you were contributing to that evaluation process;

15   correct?

16   **A.**    Obviously I built the demo that was presented.

17   **Q.**    You talked about how, in the spring of 2010, the

18   developers were still working on this and the use case still

19   had -- you said there was still a potential use case for this;

20   correct?

21   **A.**    Correct.

22   **Q.**    Now, the Government showed you Exhibit 850. I want to show

23   you two related emails.

24         If we could take a look at Exhibit 814.  This is an email

25   to you and others from Jonathan Hayman?

1        THE COURT:  814 admitted.

2        (Trial Exhibit 814 received in evidence)

3    BY MS. LITTLE:

4    Q.   Who is Mr. Hayman?

5    A.   He was a developer.

6    Q.   He was working on trying to figure out how to integrate

7    StorHouse with Digital Safe?

8    A.   Correct.

9    Q.   At the top of this email, he says that the -- he lays out

10   an analysis, and he says the intention is to talk through some

11   of the ideas of how Digital Safe and StorHouse can be put

12   together; correct?

13   A.   Correct.

14   Q.   And if we look at page 3 of this email, up in the middle,

15   he says, "Here are some concrete options for database archival

16   systems integrating StorHouse and Digital Safe"?

17   A.   Correct.

18   Q.   I'm going to show you another version of this same email

19   which is Exhibit 804.

20        THE COURT:  804 admitted.

21        (Trial Exhibit 804 received in evidence)

22   BY MS. LITTLE:

23   Q.   So this is sort of a better version of the same email.  He

24   says, "Here are some concrete options for database archival

25   systems integrating StorHouse and Digital Safe"; right?

 1   A.   Correct.

 2   Q.   And Mr. Hayman goes through four possible options.  Down

 3   at the bottom, he has got Option 1:  Keeping a direct copy of

 4   the data imported into StorHouse and Digital Safe; correct?

 5   A.   Correct.

 6   Q.   And then on the next page, he's got a nice picture and

 7   talks about an Option 2; right?

 8        And the next page, he's got another picture and an Option

 9   3?

10   A.   Correct.

11   Q.   And then the next page, he's got more pictures and an

12   Option 4?

13   A.   Correct.

14   Q.   So is it fair to say that there was fairly serious

15   consideration about the various ways this product could be used

16   with Digital Safe?

17   A.   Correct.

18   Q.   StorHouse was considered a good candidate for use with

19   Kraft, was it not?

20   A.   Kraft was a potential customer, yes.

21   Q.   And the jury has seen some exhibits about that.

22        Let me show you in your book -- if you would take a look

23   at Exhibit 5753, which is an email from Roger Wang to you and

24   others.

25             THE COURT:  Admitted.

1          (Trial Exhibit 5753 received in evidence)

2          **THE WITNESS:**  What was the number?  Sorry --

3          **THE COURT:**  It's on the screen.

4   BY MS. LITTLE:

5   Q.   It will be on the screen there, 5753.

6          And in this email in June, Mr. Wang is telling you and

7   others "StorHouse has been set up in Kraft's production safe

8   and has customer data stored on it"; correct?

9   A.   Correct.

10  Q.   Okay.  And when you were interviewed by Hewlett-Packard's

11  lawyers, you told them that you saw the StorHouse product

12  included in several contracts.  Do you recall that?

13  A.   Correct.

14  Q.   You were asked on direct about the second purchase in 2010

15  of the StorHouse product.  And you -- we took a look at Exhibit

16  792.  Let's pull that up on the screen.

17         Up at the top, Mr. Egan is describing various additional

18  volume needed for various other customers:  Merrill Lynch,

19  MetLife, Newedge, Lilly.

20         You weren't involved in any of the business discussions

21  with those customers, were you?

22  A.   I was involved in some of those customers, but nothing

23  pertaining to FileTek, no.

24  Q.   So you don't know, one way or the other, whether those

25  customers might have had the advantage of using the FileTek

1  software?

2  **A.**    Certainly as they were Digital Safe customers, I would

3  have been aware if they ever did, but there is potential it was

4  discussed without me knowing.

5  **Q.**    Was StorHouse also considered for use with various federal

6  projects?

7  **A.**    Not to my knowledge.

8  **Q.**    Did you have deep vetted clearance for federal projects?

9  **A.**    No, I did not.

10  **Q.**    So if there were discussions that required deep vetted

11  clearance, you wouldn't have known about it?

12  **A.**    Correct.

13  **Q.**    "Deep vetted," is that what we call "top secret" in the

14  U.S.?

15  **A.**    Yes.

16  **Q.**    Okay.  And are you aware, sir, that also in 2011, after

17  Autonomy acquired Iron Mountain Digital Storage, that StorHouse

18  was installed in a number of data centers for use with

19  LiveVault, Iron Mountain's product?

20  **A.**    I was not aware -- not aware of that.

21  **Q.**    Okay.  Mindful of you wanted to get back to England, let's

22  talk about VMS.

23      The software that VMS bought from Autonomy was intended to

24  be deployed on the hardware; correct?

25  **A.**    To some of the hardware, yes, correct.

1   **Q.**   Customers like VMS benefited from buying a hardware and

2   software from one source; right?

3   **A.**   Correct, yes.

4   **Q.**   That's sort of one-stop shopping?

5   **A.**   Correct.  One throat to choke.

6   **Q.**   One throat to choke?  Okay.

7        This is the customers choking your throat?

8   **A.**   Yep.

9   **Q.**   So once you had a set of what hardware VMS wanted, you

10  spoke to HP and other companies, and we saw Exhibit 1299.

11  Let's pull that up.  It's in evidence.

12       And it says down here, "Already speaking to HP.  Can we

13  get White Label and Dell quotes?  Bonded warehouse before end

14  of year."

15       Do you see that?

16  **A.**   Correct.

17  **Q.**   And then going up toward the top of the email, Mr. Brown

18  from Autonomy writes back, "Chris, we need the customer name

19  and location for resale.  Dell requires that information."

20       In your experience, was it common for hardware vendors

21  like Dell to ask the customer for the name and customer of the

22  location where it will ultimately be delivered?

23  **A.**   Certainly if there was a large discount involved, it would

24  be quite common, yes.

25  **Q.**   Was it HP's practice to also ask who the customer would be

1   for hardware that they were selling?

2          **MR. FRENTZEN:**  Objection.  Foundation.

3   **BY MS. LITTLE:**

4   **Q.**  If you know.

5          **THE COURT:**  You have to lay a foundation.

6          **THE WITNESS:**  Sorry?

7          **THE COURT:**  Your question is did HP do the same thing?

8   **BY MS. LITTLE:**

9   **Q.**  Yes.  Here they are saying Dell requires information about

10  where the hardware would be delivered.

11      Do you know whether HP also, as a hardware vendor, would

12  seek such information?

13         **MR. FRENTZEN:**  Foundation, Your Honor.

14         **THE COURT:**  Foundation is he wasn't at HP at the time.

15  Are you asking him when he was at HP?

16         **MS. LITTLE:**  No.

17  **Q.**  I'm asking when you were dealing with hardware vendors,

18  such as here you are contacting HP and White Label and you are

19  getting Dell quotes, in your experience with dealing with

20  hardware vendors, such as Dell, HP and White Label, it says

21  Dell requires the information about the customer.  In your

22  experience, did HP also require that information --

23         **MR. FRENTZEN:**  Objection.  Sorry.  I have the same

24  objection which is foundation, but also it misstates who he was

25  communicating with.

1    **THE COURT:**  Well, I think you should lay a foundation

2  that -- as to who he -- how he gained whatever knowledge he has

3  of HP.

4    **MS. LITTLE:**  I will get to it another way.  That's

5  fine.

6    **THE COURT:**  Okay.

7  **BY MS. LITTLE:**

8  **Q.**  We've talked about the issue of an effort to find -- to

9  have re-purposed hardware within Autonomy that would be used to

10  satisfy some of this purchase order.  Do you recall that?

11  **A.**  Correct.

12  **Q.**  And let's take a look at Exhibit 1398, which is in

13  evidence and let's see.

14    Going down, it's where Mr. Hussain is saying, "Steve and I

15  believe we are buying less than 2 million and re-purposing the

16  rest from existing stock."  Where is that?

17    **MR. FRENTZEN:**  Page 3.

18    **MS. LITTLE:**  I think it's on page 3.

19    **MR. FRENTZEN:**  But that's not exactly what it says.

20  **BY MS. LITTLE:**

21  **Q.**  Okay.  Well, actually this is what I wanted to look at.

22    "We are still negotiating the final pricing so this is

23  likely to improve."  This is what you wrote.  "In order to bond

24  the stock, we need to issue the PO this evening."

25    You talked about the word "bond the stock"?

1   A.   Correct.

2   Q.   And bonding the stock basically means guaranteeing it;

3   right?

4   A.   Yes.  So you are -- if you have some equipment in the

5   warehouse, you're saying that belongs to you, so whatever

6   comes, that's yours.

7   Q.   It's called "bonded inventory"?

8   A.   Correct.

9   Q.   And a bond is a promise; right?

10  A.   Correct.

11  Q.   It's a guarantee?

12  A.   Correct.

13  Q.   Okay.  It's a guarantee that the product that is

14  designated will be available for the customer?

15  A.   Correct.

16  Q.   Even if it's not physically delivered to the customer yet?

17  A.   Correct.

18  Q.   And sometimes a customer wants to get delivery later, they

19  don't want it right now; correct?

20  A.   Correct.

21  Q.   And VMS was in that category, they didn't want all of it

22  right away?

23  A.   It wasn't practical to deliver it the same day.

24  Q.   There was nothing that would prevent -- once Autonomy

25  guarantees "okay, we've got hardware available for you," there

1  would be nothing to prevent Autonomy from later acquiring more

2  HP hardware and satisfying its promise that way; correct?

3  **A.**    I guess that would be an accounting question.  I'm not

4  sure I could answer that.

5  **Q.**    Okay.  Let's take a look at Exhibit 1378.  This was the

6  fixed asset register that you testified about.

7      And the Government showed you this initial email where --

8  it's being discussed -- if we could take a look, Jeff, at the

9  attachment, which is a very lengthy spreadsheet.

10     So this is the fixed asset listing that you were looking

11  at; correct?

12  **A.**    Correct.

13          **MS. LITTLE:**    And, Jeff, if we could go all the way

14  down at the bottom to get the total of what is listed on here.

15  We are on the right.

16     Can you highlight the total and blow it up.  That's a big

17  spreadsheet.  There we go.  Up at the top there.

18  **Q.**    So the total that's in inventory is $53 million worth of

19  hardware; right?

20  **A.**    The purchase value is 53.  The depreciated value is 26.

21  So its current value is 26.

22  **Q.**    Current value is 26.  It was purchased for 53?

23  **A.**    Correct.

24  **Q.**    And it's your testimony -- well, there was -- there was

25  certainly, amid that 53 or 26 million -- there would be enough

1  to satisfy a $3.5 million obligation; correct?

2  A.    There is over $3 million worth of hardware, yes.

3  Q.    Okay.  There were other occasions where you re-purposed

4  Autonomy hardware, are there not?

5  A.    There is other cases where we took stuff from stock,

6  correct, yes.

7  Q.    Okay.  For example, were you involved in re-purposing some

8  servers that were designated for Citibank and then ended up

9  being used for UBS?

10  A.    Potential.  I don't know all offhand, but sounds

11  potentially possible.

12  Q.    And Autonomy had a lot of hardware that was available

13  for -- in its inventory, right, for use at data centers?

14  A.    So typically we'd have about a half -- most of the time,

15  we would have about a half million in stock unused.

16  Q.    Okay.

17  A.    That would be a typical volume.

18  Q.    Okay.  And you're aware that Autonomy's auditors,

19  Deloitte, examined this hardware sale and approved the

20  accounting treatment?

21       MR. FRENTZEN:  Objection.  Foundation.

22  BY MS. LITTLE:

23  Q.    Do you know, sir?

24  A.    I don't know particularly, no.

25  Q.    You don't --

1    **A.**    I would expect, but I don't know for certain.

2    **Q.**    I'm sorry?

3    **A.**    I would expect, but I don't know for certain.

4    **Q.**    It was standard practice for Deloitte to review

5    transactions like this?

6    **A.**    Correct.

7    **Q.**    You have no reason to think that wasn't done here?

8    **A.**    Correct.

9    **Q.**    Are you aware whether Deloitte looked at samples from this

10   schedule that we've just looked at?

11   **A.**    I'm not aware.

12   **Q.**    After this purchase from Insight of the two and a half

13   million dollars, you helped supervise the delivery and

14   installation of that hardware; correct?

15   **A.**    The delivery, yes; not the installation.

16   **Q.**    Certainly the delivery?

17   **A.**    Correct.

18   **Q.**    Let's take a look, if you would, in your book at Exhibit

19   5940.

20           **THE COURT:**  Admitted.

21       (Trial Exhibit 5940 received in evidence)

22   **BY MS. LITTLE:**

23   **Q.**    That makes it easier.  Then we can put it on the screen.

24       This is an email from you to Mr. Haverstock.  Who is

25   Mr. Haverstock?

1    **A.**    He worked for Gerry Louw.

2    **Q.**    He is at VMS?

3    **A.**    Correct.

4    **Q.**    In this email, you are setting forth the current schedule

5    for DL360s based on the concept of 50 a week.  You are here

6    setting out a schedule for the delivery of this HP hardware;

7    correct?

8    **A.**    Correct.

9    **Q.**    You talk about how you can combine the shipments.  "HP

10    would prefer to send it all out together.  Let me know if you

11    would rather combine or keep it 50 a week"?

12    **A.**    Correct.

13    **Q.**    The deliveries were going to start in March; correct?

14    **A.**    Correct.

15    **Q.**    Look at Exhibit 5946, which is an email that was forwarded

16    to you up at the top --

17        **THE COURT:**  Admitted.

18        (Trial Exhibit 5946 received in evidence)

19        **MS. LITTLE:**  So, Jeff, let's start in the middle

20    before it's forwarded.

21    **Q.**    There is an email from James Haverstock to Richard Maksym.

22    Do you see that?

23    **A.**    Yes.

24    **Q.**    Who is Mr. Maksym?

25    **A.**    It's not somebody I'm familiar with.

1  Q.   Okay.  If you -- let's go up to the email above that where

2  it says from Mr. Maksym to Mr. Haverstock.  Do you see that?

3  A.   Correct, yes.

4  Q.   And Mr. Maksym -- Mr. Maksym's email address is at hp.com?

5  A.   That is correct.

6  Q.   Does that suggest to you that Mr. Maksym works at HP?

7  A.   It would, yes.

8  Q.   So going back to the first one from Mr. Haverstock to

9  Mr. Maksym, he says, "Any clue on when I can get the EVA

10 installed?"

11      What is the EVA?

12 A.   It's the SAN, basically.

13 Q.   The SAN, S-A-N.  What is SAN?

14 A.   A collection of disks that can then be connected through

15 basically some clever cables to different computers so you

16 don't have to have local storage in each computer.

17 Q.   So it's hardware, basically?

18 A.   Yes.

19 Q.   And then up to the email above that, Mr. Maksym responds,

20 "Let's catch up tomorrow.  I'll set up a call," blah, blah,

21 blah.

22      And then that in turn gets forwarded to you at the top

23 where Mr. Haverstock asks Mr. Maksym at HP, copy to you,

24 "Chris, do you have the actual order and configuration details

25 of the SAN?  We need to proceed with the installation"; right?

1  **A.**   Correct.

2  **Q.**   All right.  You can put that away.

3       This conversation then continues a couple weeks later on

4  May 18th.

5       If you would look in your book at Exhibit 5961.

6          **THE COURT:**  Admitted.

7       (Trial Exhibit 5961 received in evidence)

8  **BY MS. LITTLE:**

9  **Q.**   And starting at the bottom of that email, we have an email

10 from Mr. Haverstock at VMS to Mr. Maksym at HP with a copy to

11 you, and Mr. Haverstock asks, "Any word on the schedule for the

12 SAN install?  Any other information you need?  It's been over a

13 week.  We'd like to get moving," and then he says, "I've

14 included Chris Goodfellow on this message.  He was the original

15 procurer of the SAN."

16      Do you see that?

17 **A.**   Correct.

18 **Q.**   So this is Mr. Haverstock telling HP that Autonomy was the

19 original purchaser of this HP hardware; right?

20 **A.**   Correct.

21 **Q.**   And then moving on to the front page, Mr. Haverstock

22 responds -- excuse me -- Mr. Maksym from HP responds with a cc

23 to you, "I now have an open ticket that I placed with support

24 and should have an idea on install tomorrow"; correct?

25 **A.**   Correct.

1  **Q.**   So Mr. Maksym at HP is telling you that he's going to

2  arrange for this HP software -- hardware to go on to VMS?

3  **A.**   Well, so he is telling James that now he's found the

4  order, so I guess what's happening here is James is asking

5  someone he knows at HP.  Obviously the gentleman at HP is

6  struggling because VMS -- he's not aware of a direct order from

7  VMS, so the person at HP has been struggling, so once we've

8  provided the details, he can then help James with getting the

9  system installed.

10 **Q.**   So once HP understood that it was Autonomy that was

11 procuring the hardware, that --

12 **A.**   Once he had the purchase number, he could find that in

13 their systems, but from -- just because he knew it was VMS and

14 Autonomy, clearly he was struggling to know what James was

15 talking about basically.

16 **Q.**   Okay.  And this would explain it to him?

17 **A.**   Yep.

18 **Q.**   Okay.  Do you recall that around that time, there was a

19 mixup in the delivery of some of the power cords for the

20 hardware?  Do you remember that?

21 **A.**   Rings a bell, but I don't remember any --

22 **Q.**   Let's take a look at the next Exhibit 5962.

23        **THE COURT:**  Admitted.

24      (Trial Exhibit 5962 received in evidence)

25 \\\

**BY MS. LITTLE:**

**Q.**    Starting at the bottom of that email, there is an email from Mr. Haverstock at VMS to Mr. Maksym at HP, with a copy to you, where he says, "Chris Goodfellow is with Autonomy, the company that we purchased the EVA from.  The power connectors are European C-style plugs."

     Do you see that?

**A.**    Correct, yes.

**Q.**    That's the plugs that have three prongs rather than the two like we have in the U.S.  So basically the wrong power connectors got sent; right?

**A.**    Correct.

**Q.**    And you were enlisted to help fix this; right?

**A.**    Correct.

**Q.**    And just moving up to the next email from you to Mr. Haverstock, "Richard" -- you are communicating here with Richard at HP; right?

**A.**    Correct.  Yeah.

**Q.**    "We're arranging with our HP contacts for new power strips to ship out today."  Do you see that?

**A.**    Correct.

**Q.**    And we'll just move up to front of the email.  I won't go through all the ins and outs of getting the power cords fixed, but finally at the very top, it looks like the issue has been resolved.

1           Mr. Rice from HP Services says, "Yes, I have time on

2   Wednesday and Friday and all of next week.  Shoot me some time

3   and I will gather local resources to team up on this project."

4           So HP is stepping in to fix this problem; right?

5   **A.**   Well, so -- to explain what happens in this email chain,

6   the people on HP here are the services people, so they're

7   helping VMS use this equipment.  But, of course, us, through

8   Insight, purchased the equipment, so it's ours and Insight who

9   have to fix the delivery because you basically -- HP is a big

10  company and unfortunately the people they're dealing with are

11  down doing services, and it would all be very nice in big

12  companies if people could get things sorted, but you end up in

13  a situation where we are having to go around and help get the

14  delivery sorted because two parts of HP aren't talking to each

15  other.

16  **Q.**   There is various other people at HP that are copied on

17  this email; right?

18  **A.**   Correct.

19  **Q.**   And so HP was well aware that Autonomy was selling this HP

20  hardware to VMS; right?

21           **MR. FRENTZEN:**  Objection.  Vague.  HP.  Are we talking

22  about some guy in New York and some tech guy?

23           **THE COURT:**  Are you talking about the guy in New York?

24           **MS. LITTLE:**  I'm talking about the six HP people on

25  this email at least.

 1              THE WITNESS:  So --

 2              THE COURT:  The people who got the email knew about

 3     it.

 4              MR. FRENTZEN:  Thank you, Your Honor.

 5              THE COURT:  Is it like adapter kits like airport

 6     travel -- I mean, just a little adapter?

 7              THE WITNESS:  Like, when you buy a computer, you

 8     get -- often the computers are the same, but the cables are

 9     different because it was --

10              THE COURT:  Couldn't go on either end?

11              THE WITNESS:  It could go in the computer, but it

12     couldn't go in the other end.

13              THE COURT:  Why didn't you use a little adapter --

14              THE WITNESS:  In this case, you would send a new

15     cable.  It costs the same, so you'd send a new cable.  It would

16     be -- this is 600 adapters.

17              THE COURT:  That's why I'm not in your business.

18     BY MS. LITTLE:

19     Q.   Mr. Goodfellow, do you recall telling HP's lawyers when

20     you met with them in 2016 that you expected HP would have known

21     that the hardware was going to VMS because the hardware was

22     being shipped from HP?

23              MR. FRENTZEN:  Objection.  Vague, foundation,

24     speculation.

25              THE COURT:  I'll allow it.

1      **THE WITNESS:**  So certainly individuals at HP would

2   have been aware.  It's kind of a philosophical question, what

3   it means for HP to know.

4   **BY MS. LITTLE:**

5   **Q.**   In early August, did Autonomy receive another quote from

6   Insight for more HP hardware that could be supplied to VMS?

7   **A.**   It did, yes.

8   **Q.**   Would you take a look, sir, at Exhibit 5944 in your book.

9      **THE COURT:**  Admitted.

10      (Trial Exhibit 5944 received in evidence)

11   **BY MS. LITTLE:**

12   **Q.**   Starting at the bottom, there is an email from Mark

13   Reynolds at Insight to various people at HP and there is

14   information on the next page about a quote.  Do you see that?

15   **A.**   Correct, yes.

16   **Q.**   And the "sold to" party is Autonomy; right?

17   **A.**   Correct.

18   **Q.**   And then the "shipped to" address, it says Autonomy eTalk

19   but then VMS, James Haverstock.  Do you see that?

20   **A.**   Correct, yes.

21   **Q.**   And then looking at the third page, the total amount of

22   the quote here is 2.8 million?

23   **A.**   Correct.  Sounds about right.

24   **Q.**   And then moving to the first page, Mr. Reynolds -- this

25   email gets forwarded on to you from Mr. Eads.  Who is Mr. Eads?

1    **A.**    He was the head of procurement.

2    **Q.**    At Autonomy?

3    **A.**    Correct.

4    **Q.**    So Mr. Eads, the head of procurement at Autonomy, forwards

5    this to you and says, "Chris, quote from Insight for the VMS

6    deal.  Tax will be removed as this is for resale."

7          What does he mean by that, tax will be removed?

8    **A.**    So sales tax -- the quote includes sales tax because it's

9    coming to us and we would apply sales tax when we ship it to

10   the end customer.  There wouldn't be any sales tax between

11   Insight and ourselves.  So the quote assumes we're the end

12   customer, but because we're not that, there is an amount to be

13   removed.

14   **Q.**    So because you're just sort of the middleman, it's going

15   from HP to you and then you on to VMS; correct?

16   **A.**    In this case, it's going from HP to Insight to us to VMS.

17   **Q.**    That's why it's for resale to VMS so there would be no

18   tax?

19   **A.**    Correct.

20   **Q.**    And then you respond to Mr. Eads up at the top, "Need to

21   work out with customer.  Nothing from your side."

22          So you are telling Mr. Eads you need to go figure this

23   out?

24   **A.**    Correct.

25   **Q.**    Okay.  The next email in your book is not one that you are

1    on, but it's basically a part of the same email chain, and I

2    would offer it as a business record.  It's Exhibit 5943.

3            THE COURT:  Admitted.

4        (Trial Exhibit 5943 received in evidence)

5    BY MS. LITTLE:

6    Q.    So, again, about a third of the way down, we have that

7    original message from Mr. Reynolds with the quotation that

8    we've just looked at; right?

9    A.    Right.

10   Q.    And then up at the top, Mr. Eads, the head of procurement,

11   forwards that to Mr. Reynolds and says, "This is for resale.

12   What does that tax represent" -- "what does the tax represent"?

13   A.    Correct.

14   Q.    So he's informing Mr. Reynolds that this is again an

15   Autonomy resale?

16   A.    Correct.

17   Q.    On to VMS.

18         You can take that down.

19         Did Autonomy sell HP hardware to other customers?

20   A.    I believe so, yes.

21   Q.    Did they sell it to the Serious Fraud Office, the SFO, in

22   2009?

23            MR. FRENTZEN:  Objection.  Foundation.

24            THE COURT:  Does he know.

25   \\\

1    BY MS. LITTLE:

2    Q.    Do you know whether they sold -- whether Autonomy sold HP

3    software to the SFO, Serious Fraud Office, in June of 2009?

4    A.    I can't remember the exact customers.

5    Q.    Okay.  Do you want too a look at Exhibit 6092.

6          THE COURT:  6092 admitted.

7          (Trial Exhibit 6092 received in evidence)

8    BY MS. LITTLE:

9    Q.    Let's look at -- flip ahead to the fourth page of Exhibit

10   6092.  This is a contract between Autonomy and the Serious

11   Fraud Office.

12   A.    Correct.

13   Q.    What is the Serious Fraud Office as opposed to nonserious

14   fraud?

15   A.    It's a government organization.  It's a government --

16   three letter in the UK, I guess.  Same as the FBI, but

17   obviously they focus on fraud, as you can gather from the name.

18   Q.    And if we can jump ahead to page 47 of this contract.  It

19   should be up on the screen there.  It's probably easier to see.

20         In the middle, it talks about Autonomy supplied hardware,

21   171,000 pounds.  Do you see that?

22   A.    Correct.

23   Q.    And then looking at page 50, it describes the hardware as

24   HP hardware.

25   A.    Correct.

1    Q.    So does this refresh your recollection that Autonomy sold

2    HP hardware to the Serious Fraud Office?

3    A.    This would seem to confirm that, yes.

4    Q.    And then looking back at page 1 of the invoice, there is

5    an invoice from Autonomy to the Serious Fraud Office for that

6    same amount, 171,000 pounds of hardware.

7    A.    Correct.

8          MS. LITTLE:    In the middle, if you can highlight that.

9    Q.    Okay.  Did Autonomy also sell HP hardware to Zenith

10   Security Systems?

11   A.    Potentially, yes.

12   Q.    Would you take a look at Exhibit 5950.

13         MR. FRENTZEN:    Objection, Your Honor.  There may be a

14   witness for this, but I'm not sure why we are doing this

15   through somebody who wasn't involved in these transactions.

16         MS. LITTLE:    I think these are business records,

17   Your Honor.

18         THE COURT:    Okay.  I'm going to allow it.  Go ahead.

19         MS. LITTLE:    I would offer Exhibit 5950.  It's a

20   contract.

21         THE COURT:    Admitted.

22     (Trial Exhibit 5950 received in evidence)

23   BY MS. LITTLE:

24   Q.    Exhibit 5950, sir, is up on the screen.  Up at the top,

25   it's a September 30, 2011 contract between Autonomy and Zenith.

1    Do you see that?

2    **A.**    Correct.

3    **Q.**    If we look at page 3 of the contract up at the top --

4    first of all, let's go back to page 2.

5         So this contract is for software; right?  We've got

6    Teleform software and Virage software?

7    **A.**    Correct.

8    **Q.**    And then looking at page 3, it's also for hardware;

9    correct?

10    **A.**    Correct.

11         **MR. FRENTZEN:**  Your Honor, this is September of 2011.

12    I fail to see the relevance.

13         **THE COURT:**  Oh, okay.  Well, let me just ask a

14    question.

15         Do you have any knowledge of this transaction?

16         **THE WITNESS:**  No.

17         **THE COURT:**  Okay.  So I'm going to deal with it as

18    subject to a motion to strike.  We will deal with it later, but

19    let's not ask anymore questions about this.

20         **MR. FRENTZEN:**  I'm simply pointing out the date --

21         **THE COURT:**  I know.  I saw the date.  It's subsequent

22    to the acquisition.

23    **BY MS. LITTLE:**

24    **Q.**    Let's talk about the UBS contract.  You were involved in

25    the UBS contract; correct?

 1    **A.**    Correct.

 2    **Q.**    If you would take a look at Exhibit 6024, which I

 3    represent to you is a July 20, 2001 correct.

 4              **THE COURT:**  2011.

 5              **MS. LITTLE:**  It is 6024.

 6              **THE COURT:**  Yes.  It's 2011, isn't it?

 7              **MS. LITTLE:**  Yes.  July 2011.  That's before the HP --

 8              **THE COURT:**  No.  I understand.  I thought you said

 9    "2001," but maybe --

10              **MS. LITTLE:**  I may have.  I'm sorry.

11              **THE COURT:**  Anyway, admitted.

12        (Trial Exhibit 6024 received in evidence)

13    **BY MS. LITTLE:**

14    **Q.**    If you would take a look, sir, at page 5 of that contract.

15    **A.**    Yeah.

16    **Q.**    It talks about hardware charges, $4.25 million.

17    **A.**    For appliances, correct.

18    **Q.**    For storage cells; right?

19    **A.**    Correct.

20    **Q.**    That's hardware?

21    **A.**    Correct.

22    **Q.**    And you were involved in working on this contract, were

23    you not?

24    **A.**    I was, yes.

25    **Q.**    If you would take a look at Exhibit 6090.

1          THE COURT:  Admitted.

2          (Trial Exhibit 6090 received in evidence)

3    BY MS. LITTLE:

4    Q.    This is an email from Mike Sullivan to you about storage

5    and servers.  Does this relate to the UBS contract?

6    A.    It does, yes.

7    Q.    Okay.  And going down to the third page of that email,

8    Mr. Sullivan is writing to Jack Brown, Scott Byron, with a copy

9    to you.  Do you see that?

10          MR. FRENTZEN:  This is December of 2011, Your Honor.

11    Relevance.

12          THE COURT:  I understand that, but I think it relates

13    back to the transaction that purportedly occurred before the

14    closing; is that right?

15          MS. LITTLE:  That is correct.

16          THE COURT:  Is this part of the same one?

17          MS. LITTLE:  That's correct.

18          THE COURT:  So I'm going to allow it in.  Thank you.

19    BY MS. LITTLE:

20    Q.    Mr. Sullivan writes to you and others, "Guys, I'm now

21    working directly with Dave Donatelli who runs ESSN Enterprise

22    Storage."

23          Do you know who Dave Donatelli is?

24    A.    Yes, I do.

25    Q.    Who was he?

1    **A.**    He was the head of HP Enterprise Group.

2    **Q.**    HP's what?

3    **A.**    Enterprise Group.  The server and storage part.

4    **Q.**    And going back to the bottom of page 2 of this email,

5    Mr. Sullivan writes, "We need to make sure that the UBS server

6    order gets included in this."  And that's the same contract

7    that we're talking about?

8    **A.**    Correct.

9    **Q.**    And then finally, if you take a look at Exhibit 6086, this

10    is an email that was from Mr. Sullivan to you that again refers

11    to this UBS contract?

12    **A.**    Correct.

13            **MS. LITTLE:**  Move it in, Your Honor.

14            **THE COURT:**  Admitted.

15        (Trial Exhibit 6086 received in evidence)

16    **BY MS. LITTLE:**

17    **Q.**    If you take a look at page 3 of this email, this is from

18    Dr. Lynch to Mr. Donatelli at HP.  Do you see that?

19    **A.**    Correct.

20    **Q.**    And Dr. Lynch writes, "Hi, Dave.  Would appreciate some

21    help on this.  UBS is a strategic account, and if this hardware

22    fails to arrive, it will be a board level regulatory issue for

23    them"?

24    **A.**    Correct.

25    **Q.**    And that email was forwarded to you, as we see on the top

1    of page 1?

2    A.    Correct.

3    Q.    So this is another example of Autonomy selling hardware,

4    HP hardware, to one of its customers?

5    A.    In this case, when the priority acquisition, it would have

6    been non-HP hardware.  Obviously once we were acquired by HP,

7    we would have made the decision to switch from using non-HP

8    hardware to HP hardware, and in this case, it wasn't appliance,

9    so the hardware was very much being sold as part of a managed

10   Digital Safe service.

11   Q.    All right.  And let me just wrap up with a couple of very

12   quick questions.

13         You talked about Capax, and you said to your knowledge,

14   you weren't aware of any electronic discovery work, but when

15   you answered, you said "not to my knowledge, but."  And I was

16   curious to know, are you -- what was after the "but"?

17   A.    Well, so I recall Capax asking questions about EDD, but I

18   don't, to my knowledge, know whether they actually did

19   anything.

20   Q.    Because you weren't personally involved; right?

21   A.    Correct.

22   Q.    And were you aware of training that Autonomy provided to

23   Capax employees?

24   A.    That's the kind of thing I was aware of, that they were

25   asking for training.

**Q.**    Okay.  But this was basically not something that you had a lot of visibility into?

**A.**    Correct.

**Q.**    You were also asked about the Prisa deal that you were working on in the spring of 2011.  Those were real negotiations.  You were really trying to get that deal, weren't you?

**A.**    Correct, yes.

**Q.**    And finally, the Vatican.  You said that you had no knowledge of any reseller, but you weren't intimately involved in that deal, were you?

**A.**    Well, I spent a significant amount of time in Rome and I had my own tour of the Vatican Secret Library, so, yes, I was quite involved in it.

**Q.**    But you wouldn't have been involved in any decision for business reasons to put that through some kind of a reseller?

          **MR. FRENTZEN:**  Objection.

          **THE COURT:**  I think the question was he involved in the transaction or what -- what is your question?

**BY MS. LITTLE:**

**Q.**    You wouldn't have any visibility into any reason why part of that transaction would go through a reseller; right?  You would have no reason to have visibility into that?

          **THE COURT:**  Do you mean does he know about it or what?
I'm not quite sure what the term "would you have any

1  visibility" --

2  **BY MS. LITTLE:**

3  **Q.**  Would you have had any reason to participate in a resale,

4  part of that transaction going through a reseller?

5  **A.**  So if a customer I was dealing with, the transaction was

6  going through a reseller, that would not be visible to the

7  customer, and for that reason, I would normally be aware, yes.

8  **Q.**  Again, you have no knowledge of any review that Deloitte

9  may have done with any of these transactions?

10  **A.**  No.

11        **MS. LITTLE:**  Nothing further.

12                **REDIRECT EXAMINATION**

13  **BY MR. FRENTZEN:**

14  **Q.**  Mr. Goodfellow, let's get you out of here and get us out

15  of here and maybe watch some basketball.

16        All right.  Mr. Goodfellow, Ms. Little was just asking you

17  about these emails from 2012.  And I'm not sure I caught -- can

18  you explain to us what you meant by this switch to HP hardware?

19  **A.**  Yes.  So prior to the acquisition of HP, we used White

20  Label equipment, so basically non-branded equipment for the

21  Digital Safe service.  Obviously, once we were acquired by HP,

22  we made a switch to using HP hardware.

23  **Q.**  So what you were communicating is prior to the

24  acquisition, you were not utilizing HP hardware on most deals?

25  **A.**  Correct.

1  Q.   On this particular deal, you believe there was a switch to

2  HP, but only after the acquisition?

3  A.   Correct.

4  Q.   So that would not be an HP hardware deal that would be

5  known about at the time of the acquisition?

6  A.   Correct.

7  Q.   Because it wouldn't be an HP deal at that time?

8  A.   Correct.

9  Q.   Ms. Little also showed you a couple other deals, and if I

10  could get some assistance there on -- I just want to run

11  through a couple of these.

12      Could we take a look at 6092, please, if you don't mind.

13      Can we blow up the middle part of that page right there.

14  All right.

15      Do you see where the hardware is here at 171,000?

16  A.   Correct.

17  Q.   What's the bulk of this deal for?

18  A.   Software.

19  Q.   How much for software?

20  A.   Approximately 95 percent.

21  Q.   All right.

22  A.   90, 95.

23  Q.   And in terms of the software world, are there -- is there

24  a difference between a deal that's just straight-up hardware,

25  especially at a loss, and a deal where you are throwing in some

1  hardware with a bunch of software?

2  **A.**   Correct, yes.

3  **Q.**   What's the difference?

4  **A.**   Well, so obviously where you are selling both, coming back

5  to the earlier point, there is a potential value of single

6  throat to choke, but obviously if you are selling just hardware

7  on its own at a loss, there is not much value to anybody other

8  than the customer getting a discount that you are basically

9  paying for.

10 **Q.**   Or maybe your revenues?

11 **A.**   Correct.

12 **Q.**   But this is not that kind of deal; right?

13 **A.**   Correct.

14 **Q.**   This is a bunch of mostly software at a profit,

15 presumably?

16 **A.**   Correct.

17 **Q.**   Can we take a look, please, at -- I think we dealt with

18 the one that was after the fact which would have been -- okay.

19 Great.  Can we take -- well, never mind.  I guess it speaks for

20 itself there.

21      This deal, the hardware is only 171,000?

22 **A.**   Correct.

23 **Q.**   That's it?

24      Could we take a look at 6024, if you don't mind, please.

25 If we could just blow this up.

1          This is another one where Ms. Little asked you about

2    hardware being some HP hardware.  Do you have that in mind

3    some?

4    A.    Correct.

5    Q.    Could you take a look at the second page, please.

6          Blow up that at the bottom part.

7          Does it appear that there is some software deal in here?

8    A.    Yeah.  I mean, this is a sale of Digital Safe so it's the

9    Digital Safe software.  It's the hardware that goes with that

10   which is delivered as an appliance.  And it's the services that

11   go alongside that as well.

12   Q.    All right.  And so at least -- so 7 million of this deal

13   is this ACA?

14         Could we go to the next page.  And if you can blow up that

15   middle part, all this down here.  Great.  Thank you.  All

16   right.

17         And this is software?

18   A.    It is, yes.

19   Q.    All right.  2.8 million, 1.6 million?

20   A.    Correct.

21   Q.    All right.

22         Let's go to the following page, please.  All right.

23         More software?

24   A.    Correct.

25   Q.    Let's go to the next page, page 5, please.  All right.

1  Can you blow up the total right here.  All right.

2      So what is the total there in terms of the software?

3  **A.**  About 13 1/2 million.

4  **Q.**  All right.  And that's a decent sale; right?

5  **A.**  Right.

6  **Q.**  Let's go to the bottom.  This is where it starts talking

7  about hardware.

8      Now, do you see what -- Ms. Little asked you about

9  appliance?

10  **A.**  Correct.

11  **Q.**  What does an appliance mean?

12  **A.**  An appliance is a combination of hardware and software

13  delivered together.  So in the case of something like UBS as

14  opposed to, say, VMS -- in the case of VMS, you would ship the

15  hardware and the software and the customer would be responsible

16  for putting those together.

17      In the case of a contract like UBS, we would basically

18  ship the hardware pre-installed ready to go.

19  **Q.**  All right.  So for both of these deals, if HP was to go

20  and dig around in this, this would not be straight-up sales of

21  hardware at a loss?

22  **A.**  Correct.

23  **Q.**  They both had nice big, fat software --

24  **A.**  Correct.

25  **Q.**  -- connected to it?

**GOODFELLOW - REDIRECT / FRENTZEN**

1    And do you know -- the VMS deal where you sold about

2  2 million of HP hardware -- did VMS also have a software deal

3  with Autonomy?

4  **A.**    That's my understanding, yes.

5  **Q.**    All right.  About 5 million worth?

6  **A.**    I'm not aware of the value.

7  **Q.**    You weren't involved in that part.  All right.

8       But as you said, they were going to get the software and

9  they were going to get the hardware and then put them together?

10  **A.**    Correct.

11  **Q.**    So, in other words, if HP was to go dig around on that and

12  say, "well, they're selling some HP hardware," they'd see also

13  well, there was software connected to that?

14  **A.**    Correct.

15  **Q.**    And just incidentally, I mean, when you bought through

16  Insight and then in the follow-up communications where you

17  needed a cord or cords, did you have problems with the internal

18  communication within HP just to get from the account manager to

19  the guy who would give you the right cord?

20  **A.**    As we said, not necessarily between the account manager

21  and the guy to get the right cord, but obviously VMS was

22  dealing with people at HP and they weren't able to solve the

23  problem because they weren't talking to the right people.

24  **Q.**    In other words, the people in HP weren't talking to the

25  right people?

1    **A.**    Correct.

2    **Q.**    Okay.  I want to go back just briefly then to this issue

3    of re-purposing the stock.

4        Could you tell us again how much generally was kept at

5    Autonomy in terms of stock that was not in use, in other words,

6    just in a box in a closet somewhere, not being used?

7    **A.**    Typically around about a half a million pounds worth.

8    **Q.**    So about 500,000.  So on a deal for 6 million with VMS,

9    2 million you actually got, right, from Insight?

10    **A.**    Right.  Correct.

11    **Q.**    So of the other 4 million that you needed to fill, there

12    was approximately only an eighth of that that wasn't already in

13    use?

14    **A.**    Correct.

15    **Q.**    Did VMS bargain for used hardware?

16    **A.**    They did not.

17    **Q.**    Did VMS bargain for hardware that was -- already had other

18    people's data on it?

19    **A.**    They did not.

20    **Q.**    I want to ask you about FileTek and the potential use

21    cases and so on.

22        Were you ever able to come up with a viable use for

23    StorHouse?

24    **A.**    I never -- never anything that I believe delivered value,

25    no.

GOODFELLOW - REDIRECT / FRENTZEN

1   Q.   Is there any doubt in your mind that when that second deal

2   was done, there was absolutely, positively no use for any

3   additional volume on StorHouse?

4   A.   Correct.

5   Q.   Have you -- could you tell us just a little bit about -- I

6   mean, you're a smart guy.  You had a bunch of smart guys

7   working for you.  Why couldn't you turn this into something

8   that made money?

9   A.   Because in -- in Digital Safe, we had a product that

10  worked in a particular way.  As I said previously, when we

11  looked into it, some of the functionalities we were expecting

12  to see in terms of import weren't quite as complete as we would

13  have expected.

14      Database archiving is inherently complicated because any

15  database in a commercial enterprise, they're almost always

16  custom and they have unique things, so there is always

17  typically some services involved in them, so there is a whole

18  number of factors.

19  Q.   Have you previously utilized an analogy to describe what

20  you were asked to do with StorHouse?

21  A.   So the way I've explained what we ended up with with Kraft

22  is we stuck another -- we got a car.  We stuck an engine in --

23  we bought another engine.  We stuck the engine in the boot, but

24  it's not connected particularly and we still got the other

25  engine, so, yes, we've to two engines, but the car is probably

1    slower because now we are having to carry around two engines

2    and we don't have the extra horsepower.

3    **Q.**    For those of us who live here, what is the boot?

4    **A.**    The trunk.

5    **Q.**    You are saying you dropped another engine into the trunk

6    of the car, but it's not giving you any extra power?

7    **A.**    Correct.

8    **Q.**    So that's what you were able to do with StorHouse?

9    **A.**    Correct.

10           **MR. FRENTZEN:**  I have nothing further.

11           Thank you very much.

12                           **RECROSS-EXAMINATION**

13    BY MS. LITTLE:

14    **Q.**    Mr. Goodfellow, the VMS transaction that we talked about,

15    that was before the acquisition; right?

16    **A.**    Correct, yes.

17    **Q.**    And that involved HP hardware?

18    **A.**    Correct, yes.

19    **Q.**    And you testified on redirect something about if HP had

20    been mucking around, they would have seen evidence of these

21    hardware sales?

22    **A.**    If they had looked into that.

23           **MR. FRENTZEN:**  I believe it was software sales.

24    BY MS. LITTLE:

25    **Q.**    Well, they would have seen the software sales and they

1   would have seen the hardware sales; right?

2   **A.**   They would have seen both, correct.

3   **Q.**   Thank you.

4                   **FURTHER REDIRECT EXAMINATION**

5   **BY MR. FRENTZEN:**

6   **Q.**   They would have seen both connected in the same

7   transactions?

8   **A.**   Correct.

9            **MR. FRENTZEN:**  Nothing further.

10           **THE COURT:**  You are excused.

11       Ladies and gentlemen, let's take a recess, and remember

12   the admonition given to you:  Don't discuss the case, allow

13   anyone to discuss it with you, form or express any opinion.

14       You know we're going four days next week:  Monday,

15   Tuesday, Wednesday, Thursday.  And Wednesday we are starting at

16   9:15.

17       Thanks.  Leave your books in the jury room.  You are

18   excused.

19           (Proceedings adjourned at 3:28 p.m.)

20                   ---oOo---

21

22

23

24

25

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, March 16, 2018

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter