**Volume 11**

                              **Pages 1787 - 2001**

                 UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,            )
                                 )
   VS.                           )        **NO. CR 16-00462 CRB**
                                 )
SUSHOVAN TAREQUE HUSSAIN,        )
                                 )
            Defendant.           )
_____  )
                            San Francisco, California
                            Monday, March 19, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
              BY:   **ROBERT S. LEACH**
                    **ADAM A. REEVES**
                    **WILLIAM FRENTZEN**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
              BY:   **JOHN W. KEKER**
                    **JAN NIELSEN LITTLE**
                    **BROOK DOOLEY**
                    **KATE LAZARUS**
                    **NIC MARAIS**
                    **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

## I N D E X

Monday, March 19, 2018 - Volume 11

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **PURI, RAHUL** | | |
| (SWORN) | 1797 | 11 |
| Direct Examination by Mr. Frentzen | 1798 | 11 |
| Cross-Examination by Ms. Puri | 1817 | 11 |
| Redirect Examination by Mr. Frentzen | 1831 | 11 |
| Recross-Examination by Ms. Lazarus | 1837 | 11 |
| | | |
| **ARAUJO, NEIL** | | |
| (SWORN) | 1840 | 11 |
| Direct Examination by Mr. Leach | 1840 | 11 |
| Cross-Examination by Mr. Dooley | 1875 | 11 |
| Redirect Examination by Mr. Leach | 1906 | 11 |
| | | |
| **EGAN, CHRISTOPHER** | | |
| (SWORN) | 1914 | 11 |
| Direct Examination by Mr. Reeves | 1915 | 11 |

## E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1319 | | 1852 | 11 |
| 1326 | | 1855 | 11 |
| 1329 | | 1857 | 11 |
| 1361 | | 1866 | 11 |
| 1392 | | 1863 | 11 |
| 1560 | | 1871 | 11 |
| 1729 | | 1835 | 11 |
| 1800 | | 1872 | 11 |
| 2556 | | 1812 | 11 |
| 2600 | | 1934 | 11 |
| 2797 as demonstrative | | 1989 | 11 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 2930 | | 1941 | 11 |
| 2933 | | 1926 | 11 |
| 2934 | | 1930 | 11 |
| 2935 | | 1811 | 11 |
| 2937 | | 1804 | 11 |
| 2938 | | 1825 | 11 |
| 2944 | | 1918 | 11 |
| 2945 | | 1950 | 11 |
| 5966 | | 1890 | 11 |
| 5968 | | 1900 | 11 |
| 5969 | | 1901 | 11 |
| 5970 | | 1903 | 11 |
| 6015 | | 1818 | 11 |
| 6016 | | 1824 | 11 |

```
 1   Monday - March 19, 2018                        9:27 a.m.

 2                       P R O C E E D I N G S

 3                          ---000---

 4        (Proceedings were heard out of presence of the jury:)

 5            THE COURT:  Let the record reflect that the jury is

 6   not present but the parties are and we are waiting for a juror

 7   who had car trouble.  Hopefully the juror will show up.

 8            MR. KEKER:  Your Honor --

 9            THE COURT:  We might as well fill the time.

10            MR. KEKER:  One of the -- the third witness, who will

11   be a long witness, is Mr. Stouffer Egan, and we have three

12   matters with respect to him that we would like addressed before

13   he testifies.  So I'm ready to go ahead now if you want to hear

14   it.

15            THE COURT:  Go ahead.

16            MR. KEKER:  The first one we filed a very brief brief

17   on and that is the issue of payment of Mr. Egan's legal fees.

18        Mr. Egan has admitted in his Deferred Prosecution

19   Agreement to committing the crime of conspiracy to commit wire

20   fraud.  There's a whole laid-out indictment.  You've seen it.

21   He is essentially in the position of a criminal defendant,

22   except a cooperating criminal defendant.

23        The idea that Hewlett-Packard is paying his fees is

24   something that the jury should consider in determining whether

25   or not he has a bias, whether or not he is -- his testimony has
```

**PROCEEDINGS**

1   shifted, as the evidence will show it has, as a result of

2   Hewlett-Packard or partly in result of Hewlett-Packard being

3   involved in the payment of his fees.

4        So with respect -- we understand your concern about 403.

5   Let me just say the idea that Hewlett-Packard or any other

6   corporation has to pay fees to somebody who has pled guilty

7   basically is absurd.  I've never heard of that and I would like

8   to -- if somebody gets up and tries to explain that, I would

9   like to cross-examine him.

10       But I don't think -- I don't think this indemnity issue --

11  if he --

12            **THE COURT:**  I don't think that is the real issue.  I

13  mean, the real issue, I think, is -- that can be an issue, but

14  I think the real issue is if this were the corporate lawyer or

15  the lawyer for Hewlett-Packard, not independent counsel, paid

16  by Hewlett-Packard, but the lawyer for Hewlett-Packard, I think

17  there is a very good argument that I would allow it in because

18  then there -- there is at least a recognition, I have to assume

19  that there is an identity of interest, that there is no

20  conflict that exists, and therefore the lawyer for the company

21  can represent this particular individual.

22       But that's not what we have here.  And I would let it in.

23  I think that's an unlikely scenario, by the way, but I would

24  let it in.

25       Here the question is that a lawyer, who I have no idea --

PROCEEDINGS

1    I don't even know the identity of a lawyer, but the lawyer

2    comes in and is paid by Hewlett-Packard, but the argument is

3    that somehow the payment destroys the independence of the

4    attorney, that is the attorney -- it's not the argument?

5            **MR. KEKER:**   That is not the argument at all,

6    Your Honor.

7            **THE COURT:**   Okay.   Then I miss it.

8            **MR. KEKER:**   The argument is that Mr. Egan is talking

9    to Hewlett-Packard lawyers.   At some point, they make a

10   recommendation to him of one of their former colleagues.   These

11   are people who were in this office, the Hewlett-Packard lawyers

12   were in the U.S. Attorney's Office here.   They recommend a

13   former colleague, and he is now going to be Mr. Egan's lawyer.

14        Mr. Egan is beholding to some extent in his mind or could

15   be -- the jury can assess this -- to Hewlett-Packard for paying

16   his fees in a very expensive operation which eventually gets

17   him a Deferred Prosecution Agreement.

18        And their interests are aligned.   Hewlett-Packard is very

19   interested in paying fees and keeping the lawyer happy because

20   they want a conviction in this case and they want Mr. Egan to

21   keep doing what the lawyer is trying to do for him, which is

22   get a deal and be able to testify against Mr. Hussain, and

23   Mr. Egan is very grateful to Hewlett-Packard for doing that.

24        We're not besmirching the lawyer at all or the lawyer's

25   independence, but we are saying that the idea that

1  Hewlett-Packard --

2      **THE COURT:**  Okay.  But I'm with you.  You can

3  certainly bring out that his interests are the same as

4  Hewlett-Packard's interests and you have with other witnesses:

5  "Isn't it a fact that, you know, if there's a judgment in favor

6  of the Government here, Hewlett-Packard will get untold

7  millions" or whatever it is, money back and so forth and so on

8  and "that's why you're testifying" or whatever it is.  I

9  understand that.

10     But the question is the payment itself that

11 Hewlett-Packard is paying for this attorney, to which I say

12 you're suggesting that somehow the attorney won't exercise --

13 and I do go back to that because I think we're not -- you're

14 not understanding me or I'm not understanding you.

15     **MR. KEKER:**  I hear you.  I'm not --

16     **THE COURT:**  You may not agree.  I mean, I understand

17 that, but I'm just trying to make sure I really understand the

18 argument.

19     And the argument I think is premised in part on the part

20 of -- and you disagree with this -- that somehow that lawyer

21 won't give independent advice.  Like the lawyer says, "Look, I

22 think -- look, this may not be in Hewlett-Packard's interest,

23 but I think you've got to tell them about X, Y and Z.  X, Y and

24 Z.  It's going to hurt Hewlett-Packard, but as your lawyer, you

25 swore -- you're going to be up there testifying.  You have got

1    to tell them about X, Y and Z."  You are suggesting that's not

2    going to happen.

3         MR. KEKER:  "I don't want to tell them X, Y and Z

4    lawyer because otherwise Hewlett-Packard will cut off my fees."

5    I mean, why can't the jury decide this?

6         THE COURT:  That's wrong because now you're saying --

7    and this is again where we part.  You are saying the lawyer

8    won't be independent, won't render professional independent

9    advice because he is afraid of the fees being cut off.

10        MR. KEKER:  No.  I'm saying --

11        THE COURT:  Or are you saying -- maybe I understand

12   it -- maybe this is your point.  You're saying if the witness

13   talks about X, Y and Z, he is afraid that Hewlett-Packard will

14   cut off his attorneys' fees.  Is that the argument?

15        MR. KEKER:  That's the argument.

16        The other part of the argument is if he doesn't talk about

17   X, Y and Z and say, "Oh, this guy is the criminal, Mr. Hussain

18   did it all, he made me do it," blah, blah, blah -- if he

19   doesn't act like that, Hewlett-Packard's not going to be

20   interested in taking care of him.  That's the argument.  And

21   that's something I -- we're saying -- they can argue about it,

22   we can argue about it.  But the jury should know it.

23        The idea that he can testify at great length and say, "I

24   did all these things, but Mr. Hussain made me do them" or "told

25   me to do them," that he could be in that position with this

1   Deferred Prosecution Agreement beholding to the Government and

2   Hewlett-Packard who is paying the fees is something the jury

3   should be able to consider.

4        **THE COURT:**  Does the jury also know that lawyers have

5   an independent duty, notwithstanding who is paying their fees,

6   to render advice solely to the interests of the client and --

7   and explain all the options to the client, advise the client

8   what to do?

9        It is, to me -- and, you know, I ask that question because

10  I know what the answer is, but to me, it is quintessential 403.

11  In other words, I think that -- I think you can get in a

12  certain amount of that in terms of is he trying to curry the

13  favor of the witness, curry the favor of HP.  "And isn't it a

14  fact that he got this agreement as a result of his willingness

15  to cooperate with HP or assist HP or assist the Government?"

16  All of that.  All of that comes in.  All of that is fair

17  cross-examination.

18       But not the fact that his attorneys are paid because I

19  think it introduces a collateral issue, though it could be

20  relevant so I'm not going to box myself into some non-403

21  thing, but in order to put it in complete context, you'd have

22  to know a lot about the lawyer.  You'd have to know is this --

23  is this a company hack or is this -- is this a John Keker, you

24  know.  There, you see, I'm trying to make it easy for you.

25       Is it a -- you know, is it somebody who is going to carry

**PROCEEDINGS**

1  out the -- you know, the responsibilities under the bar?  Does

2  the defendant or witness understand that?  Does the witness

3  understand that he is entitled to independent counsel, even

4  though fees may be paid?

5      I think it's so collateral, such a consumption of other

6  issues, and also I think that there are ways that you can, in

7  cross-examination, impeach the credibility of the witness by

8  virtue of the fact that maybe he stands to -- maybe he's

9  accommodating Hewlett-Packard.

10      But the piece of who pays his fees, that I'm not going to

11  allow in.

12      So what are your other --

13      **MR. KEKER:**  Understood, Your Honor.  But for the

14  record, this -- Stouffer Egan -- we're not impugning the

15  integrity of his lawyer or his lawyer's sense of professional

16  responsibility.  We are impugning Mr. Egan's sense of his own

17  self-preservation and the way he's acting.

18      A perfectly good lawyer could say -- an independent lawyer

19  could say, "The best thing for you would be to do something to

20  get the Government on your side, get this Deferred Prosecution

21  Agreement" and so on.

22      Mr. Egan has two reasons to do that.  One is to get

23  himself out of their clutches, the Government's clutches, and

24  then the second reason is to keep Hewlett-Packard on his side

25  paying his legal fees.  For the jury not to know that, we think

PROCEEDINGS

1    is highly prejudicial.  But I hear you.  You've ruled.

2         The second is they have this demonstrative exhibit, 2797

3    which we think is misleading.  There is no basis for it.  I

4    don't know what they plan to do with it as a definition of

5    organic growth.  It's wrong.  It's a 403 issue, and so at some

6    point, I don't know how they plan to use it, but we object and

7    think they shouldn't be able to use it as a demonstrative.

8              MR. REEVES:  Would you like to see it, Your Honor?

9              THE COURT:  Yes, please.

10        (The Court and clerk confer off the record.)

11             THE DEFENDANT:  I'll rule on it later.  Is it with

12   this witness?

13             MR. REEVES:  No.

14             THE COURT:  No.  Okay.

15        (Proceedings were heard in the presence of the jury:)

16             THE COURT:  Let the record reflect all jurors are

17   present.

18        I understand somebody had car trouble, but they're back.

19   I'm glad we recovered.

20        Let's get going.  Call your witness.

21             MR. LEACH:  Your Honor, the Government calls Rahul

22   Puri.

23                          RAHUL PURI,

24   called as a witness for the Government, having been duly sworn,

25   testified as follows:

PURI - DIRECT / FRENTZEN

1    **THE CLERK:**  Please state your full name for the record

2  and spell your last name.

3    **THE WITNESS:**  My name is Rahul Puri, and my last name

4  is P-U-R-I.

5    <u>**DIRECT EXAMINATION**</u>

6  BY MR. FRENTZEN:

7  **Q.**  Where do you currently live, sir?

8  **A.**  I currently live in Saint Joseph, Missouri.

9  **Q.**  Where are you originally from?

10  **A.**  New York.  So I grew up in Hicksville and then lived in

11  Brooklyn for a while.

12  **Q.**  You can tell us a little bit about your education, please.

13  **A.**  Yeah.  I graduated with a degree in chemistry from

14  Binghamton University in Upstate New York, and in 2014, I

15  completed my MBA from IE Business School in Spain, as well as

16  Brown University.

17  **Q.**  Can you tell us when you first hit the job market?

18  **A.**  Maybe 22 years ago, like around 1997, 1998.

19  **Q.**  All right.  And at some point in time, did you work for

20  the City of New York?

21  **A.**  Yes, I did.

22  **Q.**  Could you tell us just a little bit about that, please.

23  **A.**  Yeah.  I started in the City of New York as a programmer,

24  and I worked my way up to eventually being -- becoming the

25  Chief Software Architect for the Health and Human Services

PURI - DIRECT / FRENTZEN

1    organization in New York City.

2    **Q.**    What does "Chief Software Architect" mean?

3    **A.**    I was responsible for the entire technology architecture

4    and platform for the nine Health and Human Services

5    organizations in New York City, so it's about a $9 billion

6    organization with about a 1.8, $1.9 billion technology spend.

7    **Q.**    How long did you do that?

8    **A.**    Around two years, at that specific position in the city.

9    **Q.**    While you worked for the City of New York, did you have

10    any or gain any familiarity with a software company called

11    Autonomy?

12    **A.**    Yeah.  So when I was the Director of Application

13    Development and Support for New York City and I was running

14    nyc.gov, we used the Autonomy web content management platform

15    to publish and manage the website for the entire City of

16    New York.

17    **Q.**    And at some point in time, did you leave working for the

18    City of New York to go work somewhere else?

19    **A.**    Yeah.  So once I was done as the Chief Software Architect

20    for Health and Human Services, I took a position as Chief

21    Software Architect/CTO for a media group in Madrid Spain called

22    Grupo Prisa.

23    **Q.**    Called what?

24    **A.**    Grupo Prisa.

25    **Q.**    If you could, could you spell that for our court reporter,

PURI - DIRECT / FRENTZEN

1    please?

2    **A.**    Yes.  G-R-U-P-O, space, Prisa, P-R-I-S-A.

3    **Q.**    What was Prisa?

4    **A.**    They were a global media conglomerate that spanned four

5    primary business units at the time.  One was news and editorial

6    content with El País being their larger paper.

7            They had a television, satellite television business,

8    called -- what was the name of it at the time?  I don't

9    remember the -- the name is drawing a blank, but it was the

10   largest pay TV operations in Spain.

11           There was another unit which was based around education,

12   Santillana, and they were the largest publisher of textbooks in

13   Spanish and Portuguese-speaking markets.

14           And then the other one was radio.  So they had about 13-,

15   1400 radio stations globally.  I think they were the number two

16   radio operator in the world.

17   **Q.**    In connection with -- what year or when did you start

18   working at Prisa?

19   **A.**    I want to say sometime in the spring of 2010, April, May

20   time frame.

21   **Q.**    When you got hired to work for Prisa -- first of all,

22   where were you living?

23   **A.**    Well, I was living in Brooklyn, but then for the position,

24   I moved to Madrid, Spain.

25   **Q.**    How long did you work for Prisa?

PURI - DIRECT / FRENTZEN

1  A.   I want to say three years and eight months, give or take.

2  Q.   So until -- do you have a recollection of when you left

3  working at Prisa?

4  A.   I want to say September of 2014 -- August, September,

5  2014.

6  Q.   What was the role that you were hired into at Prisa?

7  A.   So I was hired as a chief software architect, and my

8  overall responsibility was really the -- the technology

9  transformation of the company.

10      So the company had to move from a traditional media

11 organization where it was analogue print and satellite TV and

12 traditional radio to more of a digital centric organization,

13 and to do that, we had to revamp the entire technology

14 platform.

15 Q.   So what does that mean?  What type of things were you

16 doing for Prisa in order to make that happen?

17 A.   So one was improving on the data analytics so making sure

18 we were capturing the customer behavior, editorial behavior,

19 and how people were interacting with the content.

20      The other piece of it was really implementing web content

21 management systems and recommendation systems to enable the use

22 of our apps that we also were building, so we were building

23 brand new websites, mobile apps and so forth, so it was a full

24 top-down technology transformation.

25 Q.   And maybe the name sort of captures the meaning, but what

PURI - DIRECT / FRENTZEN

1    is -- can you describe for us web content management systems?

2    A.    Yeah.   I mean, it's essentially -- it's a platform that

3    enables organizations to manage their sites, so when you create

4    a web page, it consist of HTML and JavaScript and other coding

5    languages.

6         So rather than requiring a technical person every single

7    time you need to add a new page or make a change to a page, you

8    implement a web content management system that contains all the

9    templates and the sections that -- as well as the navigation

10   that you want to have for your site.

11        This way a nontechnical person can go in, type in some

12   content, publish it without the need of a technology resource.

13   Q.    In connection with your efforts to set this up for Prisa,

14   did you have conversations with any different software

15   companies about the software that you needed?

16   A.    Yeah.   We had conversations with Autonomy, with Oracle,

17   IBM, and there was another fourth one which ended up being

18   acquired by Oracle on the end, but I don't recall the name of

19   the fourth one that we used -- that we looked at.

20   Q.    In terms of your contacts at Autonomy, do you have a

21   recollection of who you were dealing with?

22   A.    My main contact there was James Murray.   He was our

23   account executive for Grupo Prisa.

24   Q.    In the course of your initial conversations and then

25   ongoing relationship with Autonomy, did you have any

PURI - DIRECT / FRENTZEN

1  interactions with Sushovan Hussain?

2  A.   I recall one telephone call.  It was about ten minutes.  I

3  think when we were kind of finalizing some basic terms of a

4  contract.  I don't remember where I was when the call -- I just

5  remember being in a hotel lobby taking the call with him.

6  Q.   But that was a call about terms of the contract?

7  A.   Yeah.  Some of the pricing and the monetary terms, yeah.

8  Q.   Do you recall anything further about that particular

9  conversation?

10 A.   No.  I don't recall -- it was a really short conversation.

11 Q.   At some point in time, did you have a meeting with an

12 individual by the name of Mike Lynch?

13 A.   That was more -- it was at the very beginning of the

14 relationship and it was mainly like a walk-by, you know,

15 "hello, hi, how are you," when we were in their offices in

16 Cambridge.

17 Q.   No in-depth conversation about the terms or the

18 agreement --

19 A.   No.  I've never had that conversation with him.

20 Q.   Did Prisa decide to go with Autonomy for software related

21 to the web content management?

22 A.   Yes.

23 Q.   And I'd like to show you first a document that's been

24 marked as Exhibit 2937.  Would you take a quick look at that,

25 please, sir, and see if you recognize what that is.

PURI - DIRECT / FRENTZEN

1   **A.**   (Witness reviews document.)

2       Yeah.  It looks like it's the agreement that we had in

3   place for the initial software purchase and I think maybe

4   subsequent purchases that we might have done as well.  Yeah.

5   Okay.

6           **MR. FRENTZEN:**  I'd offer 2937, Your Honor.

7           **THE COURT:**  Admitted.

8       (Trial Exhibit 2937 received in evidence)

9   **BY MR. FRENTZEN:**

10  **Q.**   All right.  Can we blow up the top portion of this

11  document, please.

12      Can you tell us what the date of this agreement is?

13  **A.**   December 10th, 2010.

14  **Q.**   All right.  And this is a deal between who and who?

15  **A.**   Between Autonomy and Grupo Prisa.

16  **Q.**   There is a reference there to "Autonomy Spain."  Do you

17  have a recollection of there being a sort of a subsidiary or

18  some entity in Spain that you were dealing with?

19  **A.**   I mean, they told us that the contract had to be run

20  through the subsidiary in Spain, but that's the extent that I

21  recall.

22  **Q.**   Okay.  And if we could, could we go to -- start with the

23  third page.  And just -- do you recognize the signature on

24  Prisa's side of this document?

25  **A.**   Yeah.  That's Kamal Bherwani.

PURI - DIRECT / FRENTZEN

1    **Q.**    Who was that?

2    **A.**    He was the chief digital officer of Grupo Prisa.  He was

3    my boss.

4    **Q.**    Do you have any recollection or idea what -- whose

5    signature this is on the other side on behalf of Autonomy

6    Spain?

7    **A.**    No.  It doesn't sound -- look familiar to me.

8    **Q.**    Can we go to the next page, please.  Can we scroll down a

9    little bit.  Can you go back up a little.  There you go.

10        Does this begin the list of software licenses --

11   **A.**    Yes.

12   **Q.**    -- that were purchased?

13   **A.**    Yes.

14   **Q.**    All right.  And one here is IDOL Server with certain

15   functionalities; is that right?

16   **A.**    Yep.

17   **Q.**    What is that?

18   **A.**    So it's a -- what's the best way to describe it?  It's

19   really -- at the time it was an intelligence engine where it

20   could build relationships between unstructured content.

21        So if you think of the internet, it's a bunch of

22   unstructured content.  There is no real taxonomy to the

23   internet besides the content that exists.

24        So IDOL at the time was able to build relationships

25   between that content and maybe other types of data, whether

1  it's, you know, customer behavior or -- or what a specific

2  journalist may have been typing in at the time.

3  Q.   That was something that Prisa was interested in having and

4  purchased?

5  A.   Yes.

6  Q.   Can we go to the next page, please.

7       And the -- what you can see on the screen there, are these

8  additional types of software that you -- that Prisa was

9  interested in for the purpose of its website or designing or

10 updating its web content?

11 A.   That's right, yep.

12 Q.   If you could scroll down.

13      Same thing here?

14 A.   Yeah.  We wanted -- we had them throw in the Virage stuff

15 for more of our media video-based stuff.

16 Q.   What's that, Virage?

17 A.   So what I recall -- I mean, it's a little fuzzy.  It's

18 been some time, but it was really a platform to manage your

19 video assets.

20      So if you look at it, there is an encoder, a software

21 piece of it, a video logger piece of it.  So we wanted a

22 platform to be able to manage our video assets.  We were a

23 media group, and each one of our properties had quite a bit of

24 video that needed to be dealt with.

25 Q.   All right.  And in terms of the software that we've just

1    scrolled through, is any of this in the category of what you

2    would consider to be eDiscovery or EDD-type software?

3    **A.**    No.

4    **Q.**    Did Prisa have any interest in that, so far as you knew,

5    for the things you were doing?

6    **A.**    No.  I mean, we used IDOL for search on the website, but

7    nothing in terms of eDiscovery like when we're talking about

8    document management or -- or matter management or anything like

9    that.

10   **Q.**    And do you see the part I just made a circle around right

11   here?

12   **A.**    Yes.

13   **Q.**    What is -- what is Prisa's digitalization project?

14   **A.**    That's the digital transformation.  So how do we -- how --

15   all the technology and tools that are required to make sure

16   that we take the company from a media -- from a traditional

17   media space into a digital media organization.

18   **Q.**    Could we go to the following page, please.

19        And at the bottom of that page, do you see where it

20   indicates languages?

21   **A.**    Yep.

22   **Q.**    Are you fluent in Spanish?

23   **A.**    I used to be but not so much anymore.

24   **Q.**    All right.  There's sort of a long list of different

25   languages there.  Was that important to Prisa?

1  **A.**    Yeah.  Because we spanned -- we operated in all

2  Spanish-speaking and Portuguese-speaking countries, so it was

3  important that -- because we were a global company, that we

4  were able to cater to our users in those markets.

5  **Q.**    Could we now go to page 8 of this document, please.  And

6  scroll down some.  That's great.

7       Do you see different types of fees and amounts due here --

8  **A.**    Yep.

9  **Q.**    -- Mr. Puri?

10  **A.**    Uh-huh.

11  **Q.**    Does this sort of fit with your recollection of the price

12  tag on all this software?

13  **A.**    Yeah.  It looks about right.

14  **Q.**    Do you have a ballpark figure for this agreement?

15  **A.**    I mean, so I -- around 7 million euros was the initial

16  software fees and then it was around 2, 2.2 million for

17  services, and the services were to be paid as they were used.

18  **Q.**    Meaning it wasn't pay up front?

19  **A.**    That's right.

20  **Q.**    All right.  After this initial purchase, did you receive

21  the software in order to get started?

22  **A.**    Yeah.

23  **Q.**    Okay.

24  **A.**    Yeah.

25  **Q.**    And after December of 2010, let's say moving into the

PURI - DIRECT / FRENTZEN

1    early part of 2011, was there any continued efforts on the part
2    of Autonomy to sell to Prisa?
3    A.   Yeah.  I mean, throughout the duration of the
4    relationship, there was always attempts to sell more technology
5    and software.
6    Q.   Okay.
7    A.   And services.
8    Q.   And what about were there any efforts to sell hosting?
9    A.   Yes.
10   Q.   Can you describe that for us?
11        First of all, what does that mean, the hosting part?
12   A.   So we had most of our technology on premise.  So the web
13   content management systems and the IDOL implementations were --
14   we owned the servers that the software lived on.  And at the
15   time, they were -- Autonomy was proposing for us -- for them to
16   host all the software in their data centers to eliminate the
17   need for us to actually manage the infrastructure and
18   technology.
19   Q.   Did that result in conversations between you and folks at
20   Autonomy?
21   A.   Yeah.  But not -- they weren't super in-depth, the
22   conversations.  I think we had a few conversations and then we
23   pretty much said, "No thanks.  That's not something we're
24   interested in at the moment."
25   Q.   Did you or were you involved in those conversations?

PURI - DIRECT / FRENTZEN

1  **A.**    Yep.

2  **Q.**    Do you have a recollection about who you were dealing with

3  on behalf of Autonomy?

4  **A.**    James Murray was the person I was in contact with when it

5  came to all software sales and ...

6  **Q.**    Do you have any recollections about interacting with a guy

7  by the name of Chris Goodfellow?

8  **A.**    No.  That name doesn't sound familiar to me.

9  **Q.**    Do you have a recollection of Autonomy trying to close

10 some sort of a deal out with Prisa near the tail end of March

11 of 2011?

12 **A.**    The only additional deal that we did with Autonomy was for

13 their multivariate, their website optimization.  I think that

14 was around five-, six-hundred-thousand euro, as I recall, and

15 that deal was to essentially have them help us do the tests.

16     When we did the initial software purchase, we weren't

17 aware that this software we couldn't host on our own and that

18 we couldn't get our own skill sets, that we needed Autonomy's

19 services and they had to do everything.  So we negotiated a

20 small or relatively small amount for them to project manage and

21 do the web optimization tests.

22 **Q.**    We will get into that in a second.

23     Do you have a recollection of that being a little later in

24 2011?

25 **A.**    I believe so, yeah.

PURI - DIRECT / FRENTZEN

1  **Q.**  Do you recall Autonomy approaching you to try to close out

2  a deal in March of 2011?

3  **A.**  No.  I think this was -- I mean, this was all at ...

4  **Q.**  Is there anything I might be able to show to help refresh

5  your recollection?

6  **A.**  Okay.

7        **MR. FRENTZEN:**  Counsel, I'm in 2935, although I would

8  just offer it.  If there is an objection, I won't.

9        **MS. LAZARUS:**  No objection.

10        **THE COURT:**  Admitted.

11    (Trial Exhibit 2935 received in evidence)

12        **MR. FRENTZEN:**  If we could get 2935.  Blow up the top

13  part.  Great.

14  **Q.**  All right.  Mr. Puri, you're not on this email, but I'm

15  going to see if this refreshes your recollection.

16    Do you see this coming from James Murray in mid March of

17  2011?

18  **A.**  Yep.

19  **Q.**  All right.  And it's to who?

20  **A.**  To Sushovan and Peter Wyse.

21  **Q.**  And do you know who "Rahul" is --

22  **A.**  Me.

23  **Q.**  -- in the text?

24  **A.**  I assume that's me, yeah.

25  **Q.**  Do you have any recollection of a conversation about them

PURI - DIRECT / FRENTZEN

1  laying it on the line they would love to swipe the hosting

2  business away from IBM?

3  **A.**   I mean, I did tell James that IBM was our provider for our

4  infrastructure as a company, right.  It was kind of -- I don't

5  want to say hosting, but it was more of like a managed service

6  offering, but that was the extent of that conversation.

7  **Q.**   Do you recall them expressing that they would want to try

8  to squeeze it into this quarter?

9  **A.**   No.  I mean, I didn't put any timeline on it necessarily.

10  **Q.**   Were they asking you to try to --

11  **A.**   Yeah, I mean, but they were also asking me to try to

12  squeeze in something for the quarter, so ...

13  **Q.**   All right.  To your recollection, was any deal struck at

14  the end of March of 2011 with Autonomy?

15  **A.**   Not that I recall.  Like I said, the only other one was

16  the web optimization piece.

17  **Q.**   Let me go ahead and show -- I think you may be talking

18  about -- I'm going to show you Exhibit 2556.  Take a look at

19  that.

20  **A.**   (Witness reviews document.)

21  **Q.**   Do you recognize what 2556 is?

22           **THE COURT:**  Admitted.

23       (Trial Exhibit 2556 received in evidence)

24           **THE WITNESS:**  Yeah.  This was for the web optimization

25  piece.

PURI - DIRECT / FRENTZEN

1    BY MR. FRENTZEN:

2    Q.    Okay.  So let's just quickly -- do you see it's the second

3    amendment?

4    A.    Yep.

5    Q.    All right.  So this would be the -- and the date was what?

6    A.    September 30th, 2011.

7    Q.    Okay.  So is that the next deal that you recall --

8    A.    Yeah.

9    Q.    -- doing with Autonomy?

10    A.    Uh-huh.

11    Q.    If we could just take a quick look at the second page,

12    please, at the top.  All right.

13          Is this what you recall the fees being on this deal?

14    A.    Yeah.

15    Q.    All right.  And, again, if you could -- well, let's show

16    the next page, page 3.

17          What was this deal for?

18    A.    Yeah.  So it was for the web optimization, so that was a

19    primary function for it and then we had some recommendations

20    that we needed created for our TV business.

21    Q.    All right.  At any point in time during your dealings with

22    Autonomy, did you ever deal with a reseller?

23    A.    No.

24    Q.    Did you ever become aware of an entity by the name of

25    Discover Tech?

PURI - DIRECT / FRENTZEN

1    **A.**   No.

2    **Q.**   Did you ever become aware of an individual by the name of

3    David Truitt?

4    **A.**   No.  That name doesn't sound familiar.

5    **Q.**   I'd like to show you now what's been admitted into

6    evidence as Exhibit 1730 and specifically pages 2 through 5.

7         Blow up the top part of that.  Great.

8         Do you see the date on this, Mr. Puri?

9    **A.**   March 31st, 2011.

10   **Q.**   Okay.  And if you could, could you take a look at the

11   first paragraph and see if you can see on here who the end user

12   for this reseller deal was?

13   **A.**   It says Prisa.

14   **Q.**   Were you ever involved in any negotiations or purchasing

15   any software from Discover Technologies?

16   **A.**   No.  All of my interactions were with James Murray and

17   Autonomy directly.

18   **Q.**   So to your knowledge, did this resale to Prisa ever take

19   place?

20   **A.**   No.

21   **Q.**   Can we take a look at the second page, please.

22        Can you make out who signed this document, Mr. Puri?

23   **A.**   Christopher Egan from the Autonomy side and Malcolm Hyson

24   from Discover Technologies.

25   **Q.**   Are you aware or did you ever meet either of those

PURI - DIRECT / FRENTZEN

1  individuals?

2  **A.**   I don't recall meeting either of those individuals.  I

3  could have met Christopher Egan as part of my -- but I don't

4  remember it.  And I don't recall meeting anyone from Discover

5  Technologies or ever hearing of them.

6  **Q.**   When you say you could have met him, are you saying you

7  have some recollection of that, or are you just saying since

8  you met with the people from Autonomy, that possibly he was one

9  of them?

10  **A.**   Because I met people from Autonomy, he could have been one

11  of them.

12  **Q.**   But you don't recall meeting anybody?

13  **A.**   I don't recall meeting him, no.

14  **Q.**   Can we go to the next page, please.  Can we take a look at

15  the top there.

16      Do you see the software that, according to this, Prisa was

17  going to be the end user for?  Does any of that look like

18  anything that Prisa was interested in, as far as you knew?

19  **A.**   No.

20  **Q.**   All right.  Can we actually just -- in terms of the

21  languages, what is listed there?

22  **A.**   Yeah.  I mean, yeah.  It's English, but for us, it would

23  have to be in Spanish and Portuguese and those other languages.

24  **Q.**   If we could -- I'm sorry, I missed one thing.  Could we go

25  back to page 1 and, if you could, go to paragraph 2.

1      And just, Mr. Puri, do you see that this is a deal for

2   $3,600,000 and then a support fee of $200,000?

3   A.   Uh-huh.

4   Q.   So 3.8 total?

5   A.   Yep.

6   Q.   How did the deal that you -- deals that you did do with

7   Autonomy -- how did that work out for Prisa?

8   A.   Like in terms of the execution side or --

9   Q.   How did it work out?  How was the relationship?

10  A.   I mean, the relationship soured in the end because the

11  project just couldn't get implemented.  We couldn't get the

12  software and the technology to work.

13  Q.   What does that mean?

14  A.   I mean, we just -- everything -- so the project just went

15  terribly wrong.  It started off where they didn't send us the

16  right resources to do the implementation and the expertise and

17  then there are limitations on the software, and the project

18  just kept on dragging on and on, whereas up until -- it got

19  pretty far in where the CEO and the CFO decided to kill the

20  project.

21  Q.   The CEO and CFO of --

22  A.   Grupo Prisa.

23  Q.   Of Prisa.

24       May I have one moment, Your Honor?

25       (Government counsel confer off the record.)

1          **MR. FRENTZEN:**  That's all I have for now.

2     Thank you, Mr. Puri.

3          **THE COURT:**  Ms. Lazarus.

4               <u>**CROSS-EXAMINATION**</u>

5  **BY MS. LAZARUS:**

6  **Q.**  Good afternoon, Mr. Puri.  My name is Kate Lazarus.  I

7  represent Mr. Hussain.

8     You testified that Prisa is a large media company;

9  correct?

10 **A.**  Yes.

11 **Q.**  It had an education business, newspapers, radio, TV

12 stations?

13 **A.**  That's right.

14 **Q.**  Business in Spain, Portugal, Latin America, and the

15 United States?

16 **A.**  That's right.

17 **Q.**  And Prisa originally bought software from Autonomy in

18 March 2010; isn't that right?

19 **A.**  Well, I believe it was December 2010.  Right.  That was

20 what the contract said.

21 **Q.**  Let's look at Exhibit 6015 in your book, please.  You've

22 got a black binder with a number of exhibits in there.

23 **A.**  Okay.

24 **Q.**  Thank you.

25     Do you recognize this --

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 6015 received in evidence)

3    **BY MS. LAZARUS:**

4    **Q.**    Do you recognize this document, Mr. Puri?

5    **A.**    I don't recognize this document.

6    **Q.**    Does it look to you like an agreement between Prisa and

7    Autonomy for a software license?

8    **A.**    Yeah.  It looks like it was made by the technical director

9    of El País.

10   **Q.**    Do you know what this license covered?

11   **A.**    Yeah.  It covered the use of IDOL.

12         So now I recall.  So it was a small IDOL implementation

13   that was used by El País to do search on their website.

14   **Q.**    Search for the El País newspaper's website?

15   **A.**    Yes.

16   **Q.**    And do you see the fee amount on page 2?

17   **A.**    Yep.

18   **Q.**    100,000 euros; is that correct?

19   **A.**    That's correct.

20   **Q.**    And you testified about a second agreement in December of

21   2010; correct?

22   **A.**    That's right.

23   **Q.**    And this was a much larger deal?

24   **A.**    That's right.

25   **Q.**    And that's Exhibit 2937, which was previously admitted,

PURI - CROSS / LAZARUS

1    also in your binder.

2         This was in connection with the digitization of all of

3    Autonomy -- of all Prisa's media content; right?

4    A.   That's right.

5    Q.   Major project?

6    A.   Yeah.

7    Q.   You were buying Autonomy search functionality and back-end

8    support to make the content available online?

9    A.   That's right.  The web content management systems, Virage.

10   Q.   And Autonomy was also going to do the implementation of

11   the project for you; correct?

12   A.   That's right.

13   Q.   So if you can look at page 8 of this agreement, please.

14   This is the fee section that you looked at earlier.

15   A.   That's right.

16   Q.   And you testified that the license fee was about 7 million

17   euros; correct?

18   A.   That's right.

19   Q.   You also paid a separate amount for customization

20   services?

21   A.   That's right.

22   Q.   That was over 2 million euros?

23   A.   Well, I don't know if we spent the full 2 million, but it

24   was a pay-as-you-use.

25   Q.   And your understanding was that regardless of what

1    happened with the customization, you couldn't return the

2    software; correct?

3    **A.**    I mean, it's a license fee, so I think we had paid for it

4    before the implementation was complete anyway.

5    **Q.**    And there was no way to get a refund on the license fee,

6    was there?

7    **A.**    Not that I know of, but that would be something that our

8    CFO and legal side would have handled.

9    **Q.**    You've never pursued trying to get a refund on the

10   license, did you?

11   **A.**    Me personally, no.

12   **Q.**    And if we can turn back to page 4 of the agreement.  This

13   lists the functionalities that you bought; right?

14   **A.**    Yeah.  But it's just a laundry list of the things that

15   IDOL does.

16   **Q.**    So you bought a whole long laundry list of IDOL

17   functionalities; correct?

18   **A.**    Yes.  Yeah.

19   **Q.**    And then you also bought some additional software listed

20   on page 56 of the agreement?

21   **A.**    Yep.

22   **Q.**    Something called TeamSite, OpenDeploy and Optimization

23   software?

24   **A.**    That's right.

25   **Q.**    You mentioned also you bought Virage software?

PURI - CROSS / LAZARUS

1   **A.**   That's right.

2   **Q.**   That included an archiving component; correct?

3   **A.**   For video, yeah.

4   **Q.**   Video archiving?

5   **A.**   Yeah.

6   **Q.**   And this agreement you said did not include any eDiscovery

7   software; right?

8   **A.**   No.

9   **Q.**   No Introspect from Autonomy?

10  **A.**   No.

11  **Q.**   So at this point, Prisa didn't own any eDiscovery software

12  from Autonomy?

13  **A.**   Not that I'm aware of.

14  **Q.**   If you could look at page 8 of this agreement, please --

15  whoops.  I'm sorry.  Go to page 2, paragraph 8, please.

16       Do you see the provision called "marketing and publicity"?

17  **A.**   Yep.

18  **Q.**   Do you recall that this was a provision for a joint

19  marketing effort between Autonomy and Prisa?

20  **A.**   Yeah.

21  **Q.**   Do you recall that Autonomy was going to establish a media

22  steering committee and Prisa was going to be a member?

23  **A.**   That's right.

24  **Q.**   So this was a -- such an important project that Autonomy's

25  CEO was going to be the project sponsor.  Do you see that?

PURI - CROSS / LAZARUS

1    **A.**    Yep.

2    **Q.**    And Prisa was going to provide input to Autonomy so that

3    together they could improve the software?

4    **A.**    That's right.

5    **Q.**    So as of this point of time, the parties were expecting a

6    strong and ongoing relationship; right?

7    **A.**    Yep.

8    **Q.**    And Prisa was heavily invested in Autonomy's technology?

9    **A.**    Yeah, heavily.  Yeah.

10   **Q.**    And implementing the Autonomy solution was a major

11   project; correct?

12   **A.**    Yeah.  It was one of the most important ones that we had.

13   **Q.**    Do you recall working with any Autonomy partners in the

14   implementation of software?

15   **A.**    Yeah.  There was one partner.  I don't recall the name off

16   the top of my head, but they were specific -- so they came in

17   under the Autonomy umbrella, and we didn't realize they were a

18   partner until later on in the project, but they specialized in

19   implementing Autonomy software.

20   **Q.**    So these were partners of Autonomy that had specialized

21   skills in Autonomy software?

22   **A.**    Yes.

23   **Q.**    And they helped do the implementation work?

24   **A.**    Yeah.

25   **Q.**    So Prisa did have some familiarity with working with

PURI - CROSS / LAZARUS

1    Autonomy partners; correct?

2    **A.**    From an execution perspective, from an implementation.

3    That was the one -- but we threw them off the project.

4    **Q.**    Use of software partners is pretty common in your

5    industry, isn't it?

6    **A.**    Yeah, it is.

7    **Q.**    Moving ahead to March 2011, you testified that you were

8    looking for a proposal for a hosting platform for Prisa's

9    content; correct?

10    **A.**    I mean, I wasn't looking for a proposal, but they offered

11    that option of saying "we'll host everything."

12    **Q.**    Autonomy came forward with the proposal?

13        And you were interested in this proposal, weren't you,

14    sir?

15    **A.**    Yeah.  I'm interested in hearing all proposals really.

16    **Q.**    You said your primary contact was an Autonomy sales

17    manager named James Murray?

18    **A.**    That's right.

19    **Q.**    You exchanged some emails back and forth with him in March

20    2015 and had some conversations with him then?

21    **A.**    I assume so, yeah.

22    **Q.**    We looked previously at Exhibit 2935.  If you want to turn

23    back to that, please.

24    **A.**    2935?

25    **Q.**    Correct.

PURI - CROSS / LAZARUS

1    And you said the "Rahul" in this email is yourself, you

2  think; right?

3  **A.**    Yeah.  I think so.

4  **Q.**    And so Mr. Murray is relaying that he told you that

5  Autonomy would love to swipe the hosting business away from IBM

6  for Prisa?

7  **A.**    Yep.

8  **Q.**    You talked about that proposal?

9  **A.**    Yeah.  We had conversations.

10  **Q.**    And if you could go to Exhibit 6016, please, Mr. Puri.  Do

11  you recognize this as an email from Mr. Murray to yourself?

12          **MR. FRENTZEN:**  No objection.

13          **THE COURT:**  Admitted.

14      (Trial Exhibit 6016 received in evidence)

15          **THE WITNESS:**  (Witness reviews document.)

16    I don't specifically recall this email, but I know that we

17  were asking them for a list of patents because we were applying

18  for a grant with the Spanish government at the time.

19    But then the rest of it I just don't recall it.

20  **BY MS. LAZARUS:**

21  **Q.**    Do you see that Mr. Murray is asking you about the

22  dimensions for the hosting initiative?

23  **A.**    Yes.

24  **Q.**    And that he's asking you to send the RFI or the RFP for

25  the bigger picture?

1    **A.**    Yes.

2    **Q.**    What's an RFI or an RFP?

3    **A.**    RFI is request for information and RFP is request for

4    proposal.

5    **Q.**    Is Mr. Murray asking you for more information about this

6    hosting project?

7    **A.**    It seems that way.

8    **Q.**    Could you go to Exhibit 2938, please.

9          Do you recognize this as an email from Mr. Murray to

10   yourself?

11   **A.**    Yeah.  It looks familiar.

12          **THE COURT:**  Admitted.

13          (Trial Exhibit 2938 received in evidence)

14   **BY MS. LAZARUS:**

15   **Q.**    And in this email, Mr. Murray is sending you a proposal

16   for the hosting project; right?

17   **A.**    Yes.

18   **Q.**    And at the bottom of the email at the bottom of page 1, do

19   you see where Mr. Murray says he would welcome your feedback

20   and a counter-proposal based on a decision and agreements by

21   the end of March?

22   **A.**    Yep.

23   **Q.**    And then back on page 1, you responded "a few things" and

24   you provided some feedback to Mr. Murray, didn't you?

25   **A.**    Yes.

**PURI - CROSS / LAZARUS**

1  Q.   And you never told him that March wasn't a feasible goal

2  for the project, did you?

3          MR. FRENTZEN:  Objection.  Vague.  Ever?  It didn't

4  happen.

5  BY MS. LAZARUS:

6  Q.   You didn't say in this email that March wasn't going to be

7  feasible; right?

8  A.   I mean, I don't mention that in the email, no.

9  Q.   In fact, you provided some feedback for Mr. Murray to take

10 back?

11 A.   Yeah.  Around the MVT and the web optimization piece.

12 Q.   It was your impression that Autonomy was taking seriously

13 this opportunity for the hosting project; correct?

14          MR. FRENTZEN:  Objection.  Speculation.

15          MS. LAZARUS:  I was asking about his understanding.

16          THE COURT:  Overruled.

17          THE WITNESS:  Can you repeat the question?

18 BY MS. LAZARUS:

19 Q.   Sure.

20      It was your understanding that Autonomy was taking this

21 hosting project opportunity with Prisa quite seriously;

22 correct?

23 A.   Yeah.  I mean, they were pursuing it.

24 Q.   Do you recall that there was a presentation in Spain in

25 2011 in connection with the hosting project?

PURI - CROSS / LAZARUS

1   A.   I don't recall a specific presentation on the hosting

2   project itself.   I do remember a presentation about Iron

3   Mountain, but not specific to the hosting itself.   I just don't

4   remember it.

5   Q.   And you've come to learn that Autonomy sold some software

6   to Discover Tech where Prisa was a designated end user;

7   correct?

8   A.   Uh-huh.

9   Q.   You didn't know about this at the time, you said?

10  A.   No.   I mean, we did not or at least I did not purchase

11  that software.

12  Q.   You don't know what plans Discover Tech had for the

13  software then; right?

14  A.   No.

15  Q.   You don't know what commercial reasons they may have had

16  for buying the software from Autonomy?

17  A.   No.

18  Q.   And you don't know anything about the terms of the license

19  agreement between Discover Tech and Autonomy?

20  A.   No.

21  Q.   You testified that you didn't need the Introspect software

22  for the hosting project in 2011; correct?

23  A.   Well, we didn't -- we didn't ask for it.

24  Q.   You didn't ask for the Introspect software.   Okay.

25       You didn't handle compliance or litigation at Prisa, did

PURI - CROSS / LAZARUS

1    you?

2    **A.**    No.

3    **Q.**    You don't know what was happening on the compliance side

4    of the business?

5    **A.**    No.  I was in the digital side.

6    **Q.**    You'd agree that a large company like Prisa must have had

7    some litigation involvement; correct?

8    **A.**    Yeah.

9    **Q.**    And as a big company and a major purchaser of Autonomy

10   software, Prisa might have been an eDiscovery customer for

11   Autonomy at some point; correct?

12   **A.**    I mean, theoretically they could have, but if they would

13   have done an acquisition that large of Autonomy, I'm confident

14   I would have known about it.

15   **Q.**    You could understand that it might make sense for an

16   Autonomy partner to try to upsell Prisa on additional software?

17   **A.**    Yeah.

18   **Q.**    Moving ahead to September of 2011, let's look at Exhibit

19   2556, which you saw earlier.

20        You recognize this as a September of 2011 license

21   agreement?

22   **A.**    Uh-huh.

23   **Q.**    And on page 2, you see the license fees?

24   **A.**    Yep.

25   **Q.**    And so you see that Prisa spent another 1.2 million euros

1   on Autonomy's software for the fees, for the license fees?

2   **A.**   Yeah.  And it was really for the -- the web optimization

3   pieces, which was a managed service more than anything else.

4   **Q.**   What does that mean?

5   **A.**   So they were actually running the test for us so they're

6   project managing running the tests, doing the art for the

7   tests, stuff like that.

8   **Q.**   And these were tests to see what impact changes on your

9   web page had with user engagement?

10  **A.**   That's right.

11  **Q.**   And do you see this deal involves some data hosting by

12  Autonomy; right?

13       If you look at page 6 of the agreement and if you look at

14  provision 7.18 and 7.19, do you see the primary site refers to

15  a data center in Vegas; the secondary site, a data center in

16  Sacramento?

17  **A.**   Which -- which section are you referring to?

18  **Q.**   I'm under section 7 on page -- let's see.  What page am I

19  on?  Page 6.

20  **A.**   Oh, page 6.

21  **Q.**   I'm sorry.

22  **A.**   Yep.

23  **Q.**   So there was some hosting component of this agreement as

24  well?

25  **A.**   Yeah.  For the -- the web optimization pieces.

**PURI - CROSS / LAZARUS**

1  Q.   You testified earlier that there ended up being some

2  problems with the implementation work from Autonomy; right?

3  A.   That's right.

4  Q.   You said the relationship soured in the end?

5  A.   That's right.

6  Q.   I take it the relationship was still fine in September

7  2011 when you bought additional software?

8  A.   That's right.

9  Q.   So the problems with the implementation occurred after HP

10  acquired the company in the fall of 2011?

11  A.   No.  I mean, they had started beforehand, but they weren't

12  at -- we felt that they were still manageable, the issues, and

13  then when HP acquired Autonomy, they brought in new project

14  managers and a new team at that point.

15  Q.   That's when things soured?

16  A.   No.  It was souring beforehand, but we thought it was

17  manageable, that we'd be able to get through it and it did, and

18  then they brought -- HP brought in a new team to do the

19  implementation so -- and then it just continued to sour from

20  there.  But it was happening before the acquisition.

21  Q.   It became unmanageable after the acquisition?

22  A.   I mean, all projects take time to get to that point, but

23  we had forecasted it beforehand.

24  Q.   And sometime after HP took over, Prisa stopped paying for

25  customization services; correct?

PURI - REDIRECT / FRENTZEN

1    A.    Because we didn't get the product we wanted.

2    Q.    But as far as you know, you never pursued a license refund

3    when you stopped paying for the customization services?

4    A.    Yeah.  Not that I'm aware of.  I know there was some talk

5    of about it, but I don't know what the final outcome of that

6    was.

7    Q.    And you testified before that you only ever had one

8    conversation with Mr. Hussain; correct?

9    A.    That I recall, yeah.

10   Q.    It was about a ten-minute conversation?

11   A.    Uh-huh.

12   Q.    And that was in connection with the 2010 license

13   agreement?

14   A.    Yep.

15   Q.    So you never talked to Mr. Hussain about the March 2011

16   proposal?

17   A.    No, not that I recall.

18   Q.    And you never talked to him about the amended agreement in

19   September of 2011?

20   A.    No.

21        MS. LAZARUS:  No further questions.  Thank you.

22                      REDIRECT EXAMINATION

23   BY MR. FRENTZEN:

24   Q.    Mr. Puri, do you happen to know whether or not Mike Lynch

25   and Sushovan Hussain stayed on at Autonomy after HP acquired

PURI - REDIRECT / FRENTZEN

1    Autonomy, if you know?

2    **A.**   I think Mike Lynch may have stayed on.   I'm not aware of

3    Sushovan.

4    **Q.**   You just don't know?

5    **A.**   Yeah.   I just don't know.   Yeah.

6    **Q.**   Okay.   And in the original agreement that you were just

7    shown -- sorry.   What number was that?   6015?   Do you mind just

8    popping it up real quick.   Could we get page -- why are they

9    all page 1?   Well, could we get what I think is page 3?   Does

10   that make sense?   They all have the same page number.

11        Yeah.   Okay.   If you could blow that up, please.

12        Just so we understand, Mr. Puri, is this a deal between

13   Autonomy and Prisa, if you know, or is this a deal between

14   Autonomy and another entity?   Does that make sense?

15   **A.**   Yeah.   So it was a deal with one of the businesses, one of

16   the entities underneath Prisa, El País.

17   **Q.**   That is the newspaper you were referring to earlier?

18   **A.**   That's right.

19   **Q.**   The original deal was not with Prisa, it was with El País

20   which was owned by Prisa?

21   **A.**   That's right.

22   **Q.**   Could we get the second page of that, please.   And if we

23   could just blow up the fees there.

24        So this was a deal for how much, Mr. Puri?

25   **A.**   It looks like a hundred thousand euro.

PURI - REDIRECT / FRENTZEN

1   Q.   A small smaller deal than the one you ended up being a

2   part of that was technically sort of called the first

3   amendment?

4   A.   That's right.  So this one was very specific to the

5   business unit.  I recall now these licenses could not be used

6   outside El País, whereas the deal that we did with Autonomy was

7   an enterprise agreement for the entire company.

8   Q.   And just so I understand, you were asked about whether or

9   not another partner came in.  Do you know -- in other words,

10  some other partner of Autonomy.  Do you have any recollection

11  who that was?

12  A.   I don't remember the name off the top of my head, but it

13  was a small consulting shop.

14  Q.   Do you recall when they came in?

15  A.   When we started the implementation, so I want to say maybe

16  January, February time frame.

17  Q.   January, February of?

18  A.   2011.

19  Q.   All right.  And maybe I missed this, but I thought you

20  said you threw them off the project?

21  A.   Yeah.  Like in 2012, we finally threw them off.

22  Q.   After they had been there for a little while?

23  A.   Yeah, yeah, yeah.

24  Q.   But you don't recall the name?

25  A.   I don't recall the name of that services company.

PURI - REDIRECT / FRENTZEN

1  Q.    Were they trying to sell you software?

2  A.    No.

3  Q.    One of the documents that you were shown, I think 2938 --

4  could we get 2938.  All right.

5        At the bottom part, this is your email, right, to

6  Mr. Murray.?

7  A.    Uh-huh.

8  Q.    And you said "a few things."  On these few things, was

9  this, you know, "let's go ahead and do it" or are these a few

10 things that were a problem for you?

11 A.    No.  I mean, these were things that I wanted -- not "let's

12 do it," but these were the things that I wanted to change,

13 right?  So, for example, the second bullet point, they were

14 asking for another 2.8 million euro which I explicitly state

15 it's a lot of money and needs to come down.

16 Q.    Okay.  And can we just go to the very top part of that

17 document.

18       And do you see in late March, that was forwarded to

19 somebody?

20 A.    To Sushovan.

21 Q.    And -- actually, give me one second.

22       I'd like to show you what's been marked as Exhibit 1729.

23       Counsel, is there going to be an objection to this?  So

24 I'll use it to refresh.

25              THE COURT:  1729?

1          **MR. FRENTZEN:**  Yes.  I'm going to see if there is an
2    objection, Your Honor.  Otherwise --
3          **MS. LAZARUS:**  No objection.
4          **THE COURT:**  Admitted.
5      (Trial Exhibit 1729 received in evidence)
6          **MR. FRENTZEN:**  Great.  Thank you.
7    **Q.**   And if you recall, Mr. Puri -- and obviously we've taken a
8    look at the next deal, but these conversations about the Prisa
9    deal not happening, did those extend into April?
10   **A.**   (No response.)
11   **Q.**   If we could go to the second part of this, please.
12        Do you see this email that's on the screen from Mr. Murray
13   to a guy by the name of Chris Goodfellow and some other folks?
14   **A.**   Uh-huh.
15   **Q.**   And "Spoke with Sushovan.  He wants you to drive this deal
16   this Q."
17   **A.**   Uh-huh.
18   **Q.**   And in your biz, is that "quarter," usually?
19   **A.**   Yeah.
20   **Q.**   "Have agreed with Rahul we need to put in place a
21   timetable.  Started with a conference call," blah, blah, blah,
22   "and a visit to Madrid."
23        So in April, this still -- you had not agreed to anything;
24   is that right?
25   **A.**   Yeah.  Nothing.

1  **Q.**   Other than further conversations?

2  **A.**   Yeah.

3  **Q.**   So as of April 4, there was not a deal in place between

4  Autonomy and Prisa?

5  **A.**   No.

6  **Q.**   I mean, there was the deal from December, but there was

7  not a new deal?

8  **A.**   No.

9  **Q.**   All right.

10      May I have one moment, Your Honor?

11      (Government counsel confer off the record.)

12  **BY MR. FRENTZEN:**

13  **Q.**   I just want it clarify one thing.  I mean, as the chief

14  software architect --

15  **A.**   Yep.

16  **Q.**   Okay.

17      -- and also having -- I mean, who would you say at Prisa

18  had the primary relationship with Autonomy?

19  **A.**   I mean, I had the -- I guess there was two different

20  relationships to be had, so I had the more tactical

21  relationship as -- I mean, as you can tell by the emails and

22  the execution, and then my boss had a -- the more strategic

23  relationship, which was with Mike Lynch and that respect.  So

24  it was split into two different roles.

25  **Q.**   Who was your boss?

PURI - RECROSS / LAZARUS

1  **A.**    Kamal Bherwani.

2  **Q.**    In terms of, you know, you negotiating in this same time

3  period, had Prisa been interested in doing a large eDiscovery

4  deal for about $3.8 million with Autonomy, is that something

5  that would have been discussed with you or brought to your

6  attention?

7  **A.**    It would have been discussed with me and brought to my

8  attention, yeah.

9  **Q.**    Did that happen?

10  **A.**    No.

11       **MR. FRENTZEN:**  That's all I have.

12       Thank you very much, Mr. Puri.

13       **MS. LAZARUS:**  Briefly, Your Honor.

14                      **RECROSS-EXAMINATION**

15  BY MS. LAZARUS:

16  **Q.**    Mr. Puri, if you could look back at 1729, which the

17  Government just showed you.  And you see that Mr. Murray's

18  email says he's "agreed with Rahul that we need to put in place

19  a timetable starting a conference call and then a visit to

20  Madrid."

21       Does this refresh your recollection that there was a

22  presentation in Madrid from Autonomy?

23  **A.**    It still doesn't recall a presentation.  It just says,

24  "starting with a conf call and a visit to Madrid," so that

25  request mean anything from a presentation to just a meeting

1    face-to-face.

2    **Q.**    Does it refresh your recollection that there were some

3    ongoing negotiations and discussions with Autonomy about the

4    hosting deal?

5    **A.**    In relation to the web optimization and MVT, yeah.

6    **Q.**    And the hosting project as well?

7    **A.**    At that point, I wasn't really interested in the hosting

8    project.

9              **MS. LAZARUS:**    One second.

10        (Pause in proceedings.)

11    **BY MS. LAZARUS:**

12    **Q.**    Mr. Puri, could you go to Exhibit 1914, which has been

13    previously admitted.

14        Do you see that there is an agenda here for a meeting with

15    Autonomy attached to this email?

16    **A.**    Yep.

17    **Q.**    Does this look familiar?

18    **A.**    I don't recall this agenda, but it's possible.

19    **Q.**    Is it possible there were meetings with Autonomy in

20    relation to the project that you weren't involved with?

21    **A.**    I mean, usually typically with Autonomy, there wasn't much

22    that was happening, so it was eight years ago, but it could

23    very well be -- I know at that time Prisa was going through a

24    process of looking at their managed services infrastructure,

25    but I was not directly involved in that process because I was

1    back office IT.

2         **MS. LAZARUS:**  Thank you, Mr. Puri.  Nothing further.

3         **THE COURT:**  Thank you very much for coming in.  You're

4    excused.

5         Call your next witness.

6         Ladies and gentlemen, do you want to stand up, stretch a

7    bit?

8         **MR. LEACH:**  Thank you, Your Honor.  The United States

9    calls Neil Araujo.

10        **MR. FRENTZEN:**  Your Honor, I'm sorry.  I think we have

11   a lost witness maybe on the run.  He's here, but maybe on the

12   wrong floor.

13        **THE COURT:**  Ladies and gentlemen, why don't we take a

14   recess.  We will take a short one, ten-minute recess.

15        Remember the admonition given to you:  Don't discuss the

16   case, allow anyone to discuss it with you, form or express any

17   opinion.

18                    (Recess taken at 10:38 a.m.)

19                    (Proceedings resumed at 10:50 a.m.)

20        (Proceedings were heard in the presence of the jury:)

21        **THE COURT:**  Please be seated.

22        Let the record reflect all jurors are present, the parties

23   are present.

24        You may call your next witness.

25        **MR. LEACH:**  Thank you, Your Honor.

ARAUJO - DIRECT / LEACH

```
1        The United States calls Neil Araujo.
2             THE CLERK:  Mr. Araujo, please stand to be sworn.
3   Please raise your right hand.
4                          NEIL ARAUJO,
5   called as a witness for the Government, having been duly sworn,
6   testified as follows:
7             THE WITNESS:  Yes, I do.
8             THE CLERK:  Thank you.  Please be seated.
9        Please state your full name for the record and spell your
10  last name.
11            THE WITNESS:  Neil Araujo.  Last name is A-R-A-U-J-O.
12            THE CLERK:  Thank you.
13            MR. LEACH:  May I inquire?
14                       DIRECT EXAMINATION
15  BY MR. LEACH:
16  Q.   Where do you live, sir?
17  A.   I live in Willamette, Illinois.  It's close to Chicago.
18  Q.   Would you please briefly describe your educational
19  background?
20  A.   I have an EE degree in engineering, a master's degree in
21  computer science, and an MBA.
22  Q.   Would you please pull the microphone a little bit closer
23  to everybody can hear you?
24  A.   Okay.  Is that better?
25  Q.   Much better.  Thank you.
```

1       Where did you get your degrees?

2  **A.**   I got my undergrad at the National Institute of Technology

3  in India, my master's in computer science at the University of

4  Illinois in Chicago, and my MBA at Northwestern in Evanston,

5  Illinois.

6  **Q.**   When did you obtain your MBA from Northwestern?

7  **A.**   2000.

8  **Q.**   After obtaining your MBA -- or strike that.

9       Did you also found a business at sometime before your MBA?

10 **A.**   That's correct, yeah.

11 **Q.**   What was the name of that business?

12 **A.**   It was called iManage.

13 **Q.**   What is iManage?

14 **A.**   So iManage, it's a software company that makes software

15 for managing documents for law firms, accounting firms, anyone

16 with highly sensitive documents.

17 **Q.**   And you were a founder of iManage?

18 **A.**   I was one of the cofounders, that's correct.

19 **Q.**   What were your contributions at the time of the founding?

20 **A.**   Primarily engineering.  I was -- I used to write code.

21 **Q.**   In or around 2004, was iManage bought by another

22 company?

23 **A.**   Yes.  iManage was bought by Interwoven.

24 **Q.**   What is Interwoven?

25 **A.**   Interwoven was a software company based out of the

ARAUJO - DIRECT / LEACH

1  Silicon Valley, San Jose, in the web-content management

2  business.

3  **Q.**   What is web content?

4  **A.**   Web content is for companies that have large complex

5  websites that need -- that have multiple computers, and you

6  need to manage how those websites are put in place.  That's

7  what Interwoven did.

8  **Q.**   And at the time of the Interwoven acquisition, in or

9  around 2004, what did that mean for you?  How did your role

10  change?

11  **A.**   My role evolved from purely technical to more on the

12  business side, marketing, product management.  So I stopped

13  writing code and was focused more on the business side of the

14  products.

15  **Q.**   When you say more marketing, more on the business side,

16  what do you mean?

17  **A.**   Figuring out the strategy for the products and figuring

18  out who was going to buy it and why and how do we message it to

19  them.

20  **Q.**   So you were a founder of iManage.  What were some of the

21  products you assumed some responsibility for after the

22  Interwoven acquisition?

23  **A.**   It was the same iManage products.  So I've -- since the

24  founding until now, I still look after the same.  The primary

25  product is called WorkSite, W-O-R-K-S-I-T-E.

ARAUJO - DIRECT / LEACH

1   Q.   And what, again, did WorkSite do?

2   A.   So WorkSite was a document and e-mail and a records

3   management product.

4   Q.   In or around 2009, was Interwoven bought by another

5   company?

6   A.   That's correct.  Interwoven was bought by Autonomy.

7   Q.   After the Autonomy acquisition of Interwoven, what did

8   that mean for you?  How did your role change?

9   A.   Initially my role was very similar and over probably six

10  or seven months it evolved into having more of revenue

11  responsibility.  So I was responsible for hitting the numbers

12  for my business.

13  Q.   And at this point in time, 2009 going forward to 2011,

14  what products did you have revenue responsibility for?

15  A.   So it was the traditional iManage document management

16  products, plus there were a few products that were owned by --

17  that came into Autonomy through an acquisition, Liquid Office

18  and TeleForm were two of those products.  Interwoven Universal

19  Search, or what was called IUS, which was an enterprise search

20  application sold into the professional services world, that was

21  also one of the products under my purview.

22  Q.   I'm sorry.  Enterprise search, is that --

23  A.   Enterprise search, yeah.

24  Q.   Okay.  Thank you.

25       And when you say you had responsibility for revenue, does

1    that mean you were selling the product?

2    **A.**    Well, not selling it myself, but the team that was

3    responsible was selling it reported in to me.

4    **Q.**    Who did you report to after Interwoven was acquired by

5    Autonomy?

6    **A.**    The -- we did not have a fixed reporting structure at

7    Autonomy.  Okay?  To the extent I reported to someone, it

8    was -- there was someone by the name of Anthony Bettencourt

9    that I believe I reported in to first.  I reported in to the

10   head of marketing at one point, Nicole Eagan, and then I

11   reported in to Mike Lynch later on.

12   **Q.**    Okay.  While you were at Autonomy, did you have occasion

13   to interact with Sushovan Hussain?

14   **A.**    Yes, I did.

15   **Q.**    What was his title?

16   **A.**    CFO.

17   **Q.**    Did you observe him to have a role in sales?

18   **A.**    Yes.  He had a very active role in sales.

19   **Q.**    What do you mean by that?

20   **A.**    We were very engaged -- he was engaged in the sales

21   promotions, ensuring revenue and -- you know, to a large

22   degree.

23   **Q.**    Okay.  And describe for me in some detail how you observed

24   Mr. Hussain to be involved in sales.

25   **A.**    So, you know, if there was a large deal, for example, he'd

1  be involved in figuring out how we structure that deal and, you

2  know, how do we determine, you know, discounts, you know,

3  payment plans, et cetera; but also reporting the numbers,

4  rolling up the numbers and reporting it to him on a regular

5  basis, you know, so that he could figure out what the total

6  business was doing.

7  **Q.**    Did you also participate in SMS calls?

8  **A.**    Occasionally, yes.

9  **Q.**    What are SMS calls?

10  **A.**    SMS I believe stood for sales management system.  It was

11  the system that was used to track -- track opportunities and

12  where they were in the sales process.  And SMS calls used to be

13  weekly calls with the entire team, entire sales team, where we

14  would forecast -- each salesperson would forecast the deals for

15  the quarter and what the next steps were for that specific

16  deal.

17  **Q.**    Who ran the SMS calls?

18  **A.**    For my business, it was -- it was run by the chap that was

19  heading sales for our business.  His name was Duane Harris.

20  **Q.**    Okay.  Let me direct your attention, Mr. Araujo, to the

21  time period the summer and fall of 2010.  Do you have that time

22  period in mind?

23  **A.**    Summer-fall... Yes.

24  **Q.**    And are you familiar with a company called KPMG?

25  **A.**    Yes.  Yes, I am.

ARAUJO - DIRECT / LEACH

1    **Q.**   What is KPMG?

2    **A.**   They're a global accounting firm.

3    **Q.**   Were they a customer of Autonomy at the time?

4    **A.**   Yes, they were.

5    **Q.**   What Autonomy products was KPMG using?

6    **A.**   They were using iManage WorkSite.

7    **Q.**   Any other Autonomy products?

8    **A.**   KPMG was also using IDOL but it was a much smaller

9    implementation of IDOL.

10   **Q.**   Okay.  And before going too far into those products, I

11   have one more question about the SMS calls.  What did you

12   observe Mr. Hussain's participation to be -- in those calls to

13   be?

14   **A.**   In my business, Mr. Hussain -- Sushovan's participation

15   was limited.  He -- I'm not sure why, but it was limited for --

16   you know, for my business.

17   **Q.**   Okay.  Putting aside your business, the iManage

18   business, what did you observe?

19          **MR. DOOLEY:**  Objection.  Foundation.  Lack of

20   foundation.

21   BY MR. LEACH:

22   **Q.**   Were you familiar with other aspects of the SMS calls

23   besides your business?

24   **A.**   Yes.  There was a reputation around SMS calls.

25   **Q.**   What was that?

1          **MR. DOOLEY:**  Objection.  Vague as to reputation.

2    Foundation.  Relevance.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  Can you repeat the question?

5    **BY MR. LEACH:**

6    **Q.**   Outside of your business, what did you observe from the

7    SMS calls?

8    **A.**   Well, the SMS calls were tough.  They were -- you know, I

9    know that, you know, salespeople would fear getting on those

10   calls.  The accountability levels were very high.  You know,

11   occasionally I've heard of people being fired on those calls.

12   It did not happen on calls that were involved with my business.

13   **Q.**   Okay.  But you did observe that on other calls involving

14   Mr. Hussain and other businesses; is that fair?

15         **MR. DOOLEY:**  Objection.  Leading.

16         **THE COURT:**  Overruled.

17         **THE WITNESS:**  I heard about them.  I did not observe

18   them.

19         **MR. DOOLEY:**  Objection.  Move to strike.

20         **THE COURT:**  Well, sustained.

21   **BY MR. LEACH:**

22   **Q.**   From the calls that you remember with Mr. Hussain on the

23   SMS calls, describe them for us, please.

24   **A.**   Well, the calls -- each call -- you know, so each account

25   executive -- this is a sales representative -- would get on the

1    call.  They would go through the list of deals that they have

2    for the quarter.  They would identify where the deal is.  There

3    would be notes in the SMS system that said:  What is it that

4    you were expecting to happen that week?  You were asked to

5    provide an update to say whether that whatever was going to

6    happen.  You know, so, for example, you were in a call and sent

7    a proposal, did that happen?  If it did not, then why did that

8    not happen?  And then what's the next step?

9    Q.    Okay.  Going back to KPMG, what products were they using

10   in the time period summer-fall 2010?

11   A.    They were using iManage WorkSite; and, as I said, they

12   had a small insulation of Verity, which was a search engine

13   that was acquired by Autonomy.

14   Q.    In or around this time period, were you trying to persuade

15   KPMG to adopt a larger volume and a different aspect of

16   Autonomy's products?

17   A.    That's -- that's correct.  So it wasn't necessarily a

18   larger volume.  They were licensed for the entire firm for

19   WorkSite, but they wanted additional modules of iManage

20   WorkSite, and we were also engaged in selling them iManage

21   Universal Search, which is the enterprise search system.  It's

22   a different product.

23   Q.    What do you mean by "additional modules"?

24   A.    So WorkSite is a product suite.  It's got a whole bunch of

25   bells and whistles that are sold separately, and there were

ARAUJO - DIRECT / LEACH

1   some bells and whistles that they did not own that they wanted

2   to be incorporated into their license.

3   **Q.**   And the enterprise search product that you described, was

4   there some type of process that you went through with KPMG to,

5   for lack of a better word, sell them?

6   **A.**   Yes.  It was a multimonth evaluation process, but we had

7   to respond to written -- provide written responses to

8   questions.  They had a technical proof of concept and a

9   negotiation on budgets and price.

10   **Q.**   What is a proof of concept?

11   **A.**   A proof of concept is installing the product in their

12   environment with some of their data to show that it can meet

13   the needs that they have from a technical standpoint.

14   **Q.**   Who were you dealing with from KPMG?

15   **A.**   I don't -- so there was one gentleman by the name of Bob

16   Armacost, who was the head of knowledge, and there were -- I

17   don't remember the other names.  But the organizations that we

18   were dealing with were Global -- their Global Technology Group

19   and the Global CKO.  So these were two organizations that were

20   involved.

21   **Q.**   Moving forward to the end of 2010, December of 2010, were

22   you optimistic that KPMG was going to sign a license agreement

23   with Autonomy?

24   **A.**   Yes, we were fairly confident that we would -- that they

25   would be moving forward with the opportunity.

ARAUJO - DIRECT / LEACH

1  **Q.**   What were the broad outlines of the deal at this time

2  period in December of 2010?

3  **A.**   It was -- there were three components to the deal.  There

4  was additional modules for WorkSite; there was iManage

5  Universal Search, which was the knowledge management -- the new

6  knowledge management product; and there was a restructuring of

7  the maintenance and support.  So this is money that KPMG

8  projected annually for supporting them on the WorkSite product.

9  So those were the three components, and it was roughly in the

10 10-plus, 10 to 12 or maybe $13 million range.

11 **Q.**   Were you able to strike a deal with KPMG by the end of

12 2010?

13 **A.**   No, we were not.

14 **Q.**   What happened?

15 **A.**   They're a big organization, and they just didn't move fast

16 enough.

17 **Q.**   Okay.  Did you explore solutions to bringing in revenue

18 for Autonomy at the end of 2010?

19 **A.**   Yes, we did.  Are you referring to the Tikit or are you

20 referring to -- yes, we did.  We tried pushing KPMG in multiple

21 ways.  And the relationship with KPMG, to be clear, was there

22 was me that had the relationship on the WorkSite side but, you

23 know, there was also a sales manager that wasn't reporting in

24 to me that was -- also had a relationship with them.  So I had

25 a lot of visibility but not 100 percent visibility into the

ARAUJO - DIRECT / LEACH

1    conversations with KPMG.

2    **Q.**   You mentioned a $2 million maintenance payment.  Do you

3    recall that testimony?

4    **A.**   That's correct, yeah.

5    **Q.**   Did you attempt to leverage that $2 million maintenance

6    payment in any way?

7    **A.**   Yes.

8    **Q.**   What did you do?

9    **A.**   Well, we -- we -- the structure of the deal was such that

10   KPMG could leverage the $2 million for that year, as well as

11   subsequent years, towards -- towards building a return on

12   investment.  You know, that showed them that, hey, they can get

13   new product, they can -- and over a period of, you know, 10

14   years or whatever the time, there was a time period that we

15   built the model for, they would end up spending less money

16   than, you know, buying just the product outright.

17   **Q.**   Did KPMG go for that?

18   **A.**   Well, they were certainly interested in that because they

19   would be saving money over the long term.

20   **Q.**   Okay.  Did they agree to that by the end of 2010?

21   **A.**   No.

22   **Q.**   And did you pursue other solutions within Autonomy to

23   bring in revenue for the quarter?

24   **A.**   Yes.  So we explored a partner buying the product and then

25   reselling it to KPMG the next quarter when the deal was -- when

ARAUJO - DIRECT / LEACH

1    KPMG actually would buy the products.

2    **Q.**   Will you please look at what has been marked as

3    Exhibit 1319?

4    **A.**   (Witness examines document.)

5    **Q.**   Is this a true and correct copy of an e-mail between you

6    and Sushovan Hussain dated December 23rd, 2010?

7    **A.**   Yes.  It's addressed to me.

8        **THE COURT:**  It's admitted.

9        (Trial Exhibit 1319 received in evidence)

10       **MR. LEACH:**  Ms. Margen, if we could please go to the

11   top part.  Perfect.

12   **Q.**   Mr. Araujo, I draw your attention to the initial e-mail in

13   the chain.  In the subject line there's something called

14   "Tikit," and I think you mentioned them previously.  What is

15   Tikit?

16   **A.**   So Tikit is a reseller of -- it was a reseller of iManage

17   products.  So what they did was they sold our product to the

18   end customer and they also implemented that product for the end

19   customer.

20   **Q.**   Where is Tikit located?

21   **A.**   In London.

22   **Q.**   What relationship did you have with Tikit?

23   **A.**   Well, they were one of iManage's largest resellers, so I

24   had a pretty strong relationship with them.

25   **Q.**   What do you mean you had a strong relationship with them?

ARAUJO - DIRECT / LEACH

1   **A.**   We did several million in business annually.  So there was

2   a lot of interaction on individual deals, on technical issues.

3   So it was a mutually beneficial partnership.

4   **Q.**   Were you close to the individuals who ran Tikit as opposed

5   to others at Autonomy?

6   **A.**   Yes.  I was probably the closest to Tikit.

7   **Q.**   What do you mean by that?

8   **A.**   So Tikit had resold only iManage WorkSite products, and

9   so to that degree they did not need to interact with anybody

10  else other than my team.  There were others on my team that had

11  closer relationships with Tikit, but I was -- within Autonomy

12  management, I was the -- I had the closest relationship.

13  **Q.**   I draw your attention to the bottom portion of this

14  e-mail.  Mr. Hussain is writing to you (reading):

15          "Important that we have the 9M not the 5M."

16      What did you understand that to mean?

17  **A.**   (Witness examines document.)  There was a phone

18  conversation that probably happened prior to this e-mail chain

19  where my understanding is I didn't believe that Tikit could

20  sustain a $9 million purchase and that 5 million was more of --

21  more in line with what they could accommodate on their books,

22  and so that's what it meant.

23  **Q.**   What was the size of the contemplated transaction with

24  KPMG at this time period?  Closer to 9 or closer to 5?

25  **A.**   It was closer to 9.  As I said, it was in the 10-plus

1    range.

2    Q.   Okay.  Up at the top, Mr. Hussain writes to you (reading):

3         "Please reach out to your partners and explain the

4    deal -- because they are smaller, we can break down the

5    deal to say two lots of 4.5M."

6    What does that mean?

7    A.   So we had other partners in the U.K. and worldwide, so my

8    understanding of that was, you know, besides Tikit, instead of

9    Tikit carrying the whole deal, you know, you can break the deal

10   up into two and have two parties carry the deal.

11   Q.   What did you understand Mr. Hussain to be directing you to

12   do?

13   A.   To reach out to other partners besides Tikit.

14   Q.   To what end?

15   A.   To solicit them to resell or, you know, prebuy this -- you

16   know, these products as part of the KPMG.

17   Q.   Okay.  Did you do that?

18   A.   I did not.  I did not reach out to anybody other than

19   Tikit.

20   Q.   Why not?

21   A.   Because there's inherent risk in this type of a deal.  I

22   just didn't think that there was anybody else that was big

23   enough to sustain, you know, in case something went wrong.

24   Q.   Would you please look at what has been marked as

25   Exhibit 1326?

1   **A.**   (Witness examines document.)

2          **THE COURT:**  1326 admitted.

3          (Trial Exhibit 1326 received in evidence)

4   **BY MR. LEACH:**

5   **Q.**   Mr. Araujo, I draw your attention to the top portion of

6   this e-mail from Mr. Hussain to Julie Dolan and yourself.  Who

7   is Julie Dolan?

8   **A.**   She was a lawyer in the legal team at Autonomy.

9   **Q.**   And is this another e-mail relating to the contemplated

10  KPMG transaction and the involvement of Tikit?

11  **A.**   That's correct.

12  **Q.**   Okay.  In the cc line there's someone named Stephen

13  Chamberlain.  Who is he?

14  **A.**   Stephen Chamberlain was the finance director at Autonomy.

15  **Q.**   Is he someone you had interaction with?

16  **A.**   Some -- somewhat.  Not a whole lot.

17  **Q.**   Okay.  Mr. Hussain is writing (reading):

18          "Tikit PLC.  Please prepare a draft contract as

19       follows..."

20       Do you see that?

21  **A.**   Yes.

22  **Q.**   And beneath that it says (reading):

23          "6.3M with 5 percent maintenance."

24       What does that mean?

25  **A.**   So 6.3 million was the total deal value.  It could mean

ARAUJO - DIRECT / LEACH

1    one of two things.  6.3 is the license amount and 5 percent is

2    the annual software subscription, or it could mean 6.3 which

3    includes 5 percent maintenance.  I'm not sure which of those

4    two.

5    **Q.**    Beneath that it says (reading):

6            "Payment terms 2M end of March 2011, 2M end of

7        September 2011, 2.3M January 2012."

8        What does that mean?

9    **A.**    Yeah.  So what that means is -- okay.  So reading that

10   line, 6.3 million is the total deal value including

11   maintenance; that Tikit did not owe any cash until the end of

12   March, end of September, and the end of Jan. 2012.

13   **Q.**    And then the products in the line below, it says

14   (reading):

15           "To be specified by Neil but should include WorkSite,

16       WorkSite additions, limited search, extranet extension."

17       Could you please explain what those products are?

18   **A.**    So WorkSite is the document management product.  WorkSite

19   additions are the add-ons to the additional modules to

20   WorkSite.  Limited search I'm assuming means enterprise

21   iManage Universal Search.  Extranet extensions, I don't know

22   what that means.

23   **Q.**    Okay.  Please look at Exhibit 1329.

24   **A.**    (Witness examines document.)

25   **Q.**    Is this another e-mail from Mr. Hussain relating to Tikit

1   and KPMG?

2   **A.**   (Witness examines document.)  Yes.

3         **MR. LEACH:**  Your Honor, I offer Exhibit 1329.

4         **THE COURT:**  Admitted.

5         (Trial Exhibit 1329 received in evidence)

6   **BY MR. LEACH:**

7   **Q.**   Mr. Araujo, I draw your attention to the top portion of

8   the e-mail from Mr. Hussain on December 29th.  There are two

9   additional e-mails there, andrewk@autonomy.com,

10  joncoy@autonomy.com.  Who are they?

11  **A.**   So "andrewk" is Andrew Kanter.  He was the general

12  counsel.  And Jon Coy is -- was a lawyer on the legal team.  I

13  believe he reported in to Andrew Kanter.

14  **Q.**   In the second paragraph Mr. Hussain writes (reading):

15         "I also need a side letter (which will be disclosed)

16      that has that in the highly unlikely event that KPMG do

17      not extend, then Tikit can resell similar software, part

18      of partnership, et cetera."

19      Do you see that language?

20  **A.**   Yes.

21  **Q.**   What is a side letter?

22  **A.**   A side letter is -- are terms that you agree with another

23  party that are not in the main agreement but in an auxiliary

24  agreement.

25  **Q.**   In the time period 2009 to 2011, had you had any occasion

**ARAUJO - DIRECT / LEACH**

1    to use a side letter in connection with any of the deals you

2    were involved with?

3    **A.**    I don't believe so.  I don't remember using one.

4    **Q.**    Okay.  And when you say the side letter is separate from

5    the other terms of the agreement, what do you mean by that?

6    **A.**    Well, these are -- in this specific context or --

7    **Q.**    Generally.  What did you understand the term to mean?

8    **A.**    Well, it's -- in this particular case, Tikit was buying a

9    set of products that it would hold to then resell to KPMG at a

10   later point in time.  Tikit needed some protection in case

11   things went wrong, and the side letter had the terms that

12   determined what happens if something goes wrong.

13   **Q.**    What do you mean Tikit needed some protection?

14   **A.**    Well, if KPMG, for example, decided not to buy because

15   KPMG had no obligation to buy, then Tikit still owes us the

16   money for the deal, and how do you protect them from -- from

17   taking a huge loss, you know, if KPMG did not buy?

18   **Q.**    How did this idea of a side letter with Tikit come up?

19   **A.**    I can't speak to the exact origin, but Tikit would have

20   not done this deal without those assurances.

21   **Q.**    Okay.  In the parenthetical Mr. Hussain wrote "which will

22   be disclosed."  Do you see that language?

23   **A.**    Yes.

24   **Q.**    What did you understand that to mean?

25   **A.**    That will be disclosed to the auditors.  So when auditors

ARAUJO - DIRECT / LEACH

1    are looking at the deal, they look at the whole thing as one

2    unit.

3    **Q.**    And at this point in time, December 29th, 2010, did you

4    take some comfort in Mr. Hussain's language that the side

5    letter would be disclosed?

6              **MR. DOOLEY:**  Objection.  Relevance.

7              **THE COURT:**  Overruled.

8              **THE WITNESS:**  Yes, I did.

9    **BY MR. LEACH:**

10   **Q.**    Why is that?

11   **A.**    Because it -- one, it legitimizes the construct of the

12   deal for me, which was important; and Tikit was engaged in this

13   deal as a result of my relationship so, you know, it was

14   important for me to -- you know, to make sure that, you know,

15   while this was a complex deal, that it was -- it was

16   constructed in legitimate form.  So it legitimized the

17   construct for me.

18   **Q.**    You said the side letter was an important construct of the

19   deal.  What do you mean by that?

20   **A.**    You know, I'll go back to my earlier response.  Tikit

21   would not have done this deal if they did not have the

22   assurances provided in the side letter.

23   **Q.**    Was it your usual practice to do side letters in the deals

24   that you did?

25   **A.**    No.

ARAUJO - DIRECT / LEACH

1  **Q.**   Why not?

2  **A.**   They were not required.

3  **Q.**   What do you mean by that?

4  **A.**   99.9 percent of the deals that we did, the customer signed

5  an agreement, they got a product, and they paid the money.

6  That was it.  There was nothing else to it.

7  **Q.**   Down at the bottom portion of this e-mail Mr. Hussain

8  writes (reading):

9         "Separately I want a heads of agreement that says we

10        will negotiate and buy 500 man days at £550 pounds to be

11        used over 18 months."

12       What does that mean?

13  **A.**   (Witness examines document.)  I don't know.  I don't

14  believe we ever signed any other agreement with -- or I'm not

15  aware.

16       You know, what it means is that we were prebuying --

17  prebuying services from -- from Tikit at £550 a day that could

18  be used over that same period of time.

19  **Q.**   Up at the top Mr. Hussain wrote (reading):

20        "Neil is flying overnight to be in London tomorrow to

21        close out this deal."

22       Do you see that?

23  **A.**   Yes, I do.  Yeah.

24  **Q.**   And did you fly to London near the end of December 2010 to

25  negotiate a transaction with Tikit?

1   **A.**   Yes, I did.

2   **Q.**   Does this trip stand out in your mind for some personal

3   reasons?

4   **A.**   Yeah.  December 29th is my wedding anniversary, and I've

5   always been there for it so, yes, it -- yeah, I remember the

6   trip.

7   **Q.**   You missed your anniversary for this trip?

8   **A.**   Yeah.  My wife missed my anniversary for that trip.

9   **Q.**   And did you meet with Tikit in London at some point before

10  the end of the year?

11  **A.**   Yes.  Yes, I did.

12  **Q.**   Where did you -- where was the meeting?

13  **A.**   It was in the Autonomy offices.

14  **Q.**   Who was there?

15  **A.**   So I remember it was me, Sushovan, David Lumsden who was

16  the CEO of Tikit.  I believe there were a couple of other folks

17  that I don't -- I don't remember.  There was someone from the

18  legal team and potentially somebody else from Tikit.  I

19  don't -- but it was me, David Lumsden, Sushovan.

20  **Q.**   Okay.  Who, again, is Mr. Lumsden?

21  **A.**   He was the CEO of Tikit.

22  **Q.**   Okay.  And at this meeting what happened?

23  **A.**   Well, there was a few things that I recall we talked

24  about.  Number one, Tikit and David wanted to understand is the

25  KPMG deal real; right?  So, you know, they're buying product

1    that they can resell to KPMG in a few months, is this deal

2    real?  Because they were not involved in this transaction, and

3    so we spent some time talking about -- about that and giving

4    them an explanation for the fact that this is a real deal.

5         And then we spent the rest of the time talking about how

6    can we can construct -- construct a deal that would benefit

7    them, provide them the economic benefit.  So there was a margin

8    or commission that they would get for taking this deal, what

9    were the protections that we could put in place to make sure

10   that their downside was protected in case KPMG actually did not

11   buy the products.

12   Q.   When you say putting in some protections, what do you

13   mean?

14   A.   It's what was in the side letter.  Primarily what was in

15   the side letter.

16   Q.   Okay.  Did this concept of a side letter come up in the

17   meeting with Tikit in London?

18   A.   The constructs that went into the side letter came up.

19   You know, how -- whether it went into the side letter or the

20   main agreement, you know, that -- I'm not sure whether that was

21   specifically discussed during the meeting that I had with them,

22   but all the concepts were certainly discussed.

23   Q.   Why were you at this meeting, Mr. Araujo?

24   A.   Well, I had the relationship with Tikit.  I had been -- my

25   business unit was the one who was forecasting this deal.  You

1    know, we knew it was going to happen so we had committed for

2    this deal to come in.  So I felt a sense of responsibility for

3    bringing that revenue in.

4         And Tikit needed the assurance that, you know, if things

5    went wrong, there was someone that had their back.  And, you

6    know, I felt I needed to be there, and I was asked by -- you

7    know, by -- you know, by Sushovan, by -- probably primarily by

8    Sushovan, you know, to come there because it was important

9    enough for the business.

10   Q.   After this meeting with Tikit and Mr. Hussain in London,

11   did Tikit ultimately submit a purchase order to Autonomy?

12   A.   Yes, they did.

13   Q.   Would you please look at what has been marked as

14   Exhibit 1392?

15   A.   (Witness examines document.)

16        THE COURT:  1392 admitted.

17        (Trial Exhibit 1392 received in evidence)

18   BY MR. LEACH:

19   Q.   What is the date of this purchase order, Mr. Araujo?

20   A.   31st December 2010.

21   Q.   And do you see Autonomy Systems Limited in the "To" line?

22   A.   Yes.

23   Q.   And Tikit Limited in the "From" line?  In the second box?

24   A.   Yes.

25   Q.   Okay.  Let me draw your attention to paragraph B, the

1    software licenses.  What is the software that's being licensed?

2    **A.**    It's -- it's WorkSite and all of its components.  Some of

3    them were owned by KPMG, some of them were the add-ons that

4    they required, and it's IUS are the enterprise search

5    application.  That's line items e and g.

6    **Q.**    So in item g, "IUS enterprise base volume package (one

7    license only)," that's a reference to the enterprise search you

8    were describing?

9    **A.**    Yeah.  The enterprise search was licensed in two

10   components.  You needed one unit of the base package and then

11   you needed as many client licenses as you had users, so...

12   **Q.**    Okay.  Please look at page 2.  There's a description of

13   various software license rights, and in paragraph 4 it says

14   (reading):

15            "Number and named client access user licenses."

16        Do you see that?

17   **A.**    Page 2?

18   **Q.**    Page 2 of the exhibit.

19   **A.**    Yes.  So Number 4, okay.

20   **Q.**    What is described here?

21   **A.**    So that's the total number of end user license units.  So

22   that's 122,700 whatever.

23   **Q.**    What's an end user license unit?

24   **A.**    It's that many number of users that are entitled to using

25   the software.

ARAUJO - DIRECT / LEACH

1    Q.    Using each of the functions --

2    A.    Yes.

3    Q.    -- described in paragraph B?

4    A.    Yes.

5    Q.    And in paragraph 7, "Authorized Use," there's something

6    called "IUS enterprise base volume package."  Do you see that?

7    A.    Uh-huh.

8    Q.    What is that?

9    A.    It's the central component of the enterprise search

10   application, and any entity that licenses needs just one

11   license, one of those licenses.

12   Q.    Further down below in paragraph D there's a license fee.

13   Do you see that?

14   A.    Yes.

15   Q.    What is the amount of the license?

16   A.    It's £4,050,000.

17   Q.    Is this the entire agreement related to Tikit's purchase

18   of certain WorkSite licenses?

19   A.    Well, you know, as we know, there's a side letter.  So

20   this is one of them.

21   Q.    Are there other parts to the agreement?

22   A.    The side letter.

23   Q.    Okay.  Is that side letter reflected in Exhibit 1361?

24   A.    (Witness examines document.)  Yes.

25          THE COURT:  Admitted.

1          (Trial Exhibit 1361 received in evidence)

2    **BY MR. LEACH:**

3    **Q.**   What is the date of this document?

4    **A.**   31st December 2010.

5    **Q.**   Okay.  And if I could draw your attention to page 2.  Who

6    signs this agreement on behalf of Tikit?

7    **A.**   David Lumsden.

8    **Q.**   Who is listed in type as the proposed signatory on this

9    agreement?

10   **A.**   Sushovan.

11   **Q.**   And are those Mr. Hussain's initials in the signature

12   line?

13   **A.**   It looks like Andy Kanter but, you know, I don't remember

14   Sushovan's -- Andy Kanter would sign most agreements.

15   **Q.**   Okay.  Why are these terms in a side letter?

16          **MR. DOOLEY:**  Objection.  Foundation.

17          **THE COURT:**  What's his understanding of the reason for

18   a side letter?

19          **MR. LEACH:**  Thank you, Your Honor.

20   **Q.**   What's your understanding of the reason for the side

21   letter?

22   **A.**   The purpose of the side letter was to protect Tikit from

23   downside in case the deal did not go through with KPMG as

24   anticipated.

25   **Q.**   What's your understanding of why this is in a separate

**ARAUJO - DIRECT / LEACH**

1    document as opposed to the purchase order we saw in

2    Exhibit 1392?

3              **MR. DOOLEY:**  Same objection.

4              **THE COURT:**  Overruled.

5              **THE WITNESS:**  I -- you know, I don't know why this

6    would be.  It's -- our purchase orders would have a particular

7    structure.  These things were outside the scope of what would

8    typically go in a purchase order.

9    **BY MR. LEACH:**

10   **Q.**   Outside the scope of what would typically go in a purchase

11   order.  What do you mean by that?

12   **A.**   You know, a typical purchase order is going to have no

13   language about what happens if -- if the product doesn't get

14   resold.  I mean, I've done one of these in my life so, you

15   know, I don't know.  I can't tell you other than conjecture,

16   you know, why this is in a separate letter.

17   **Q.**   Please look at the first page of the side agreement, and I

18   draw your attention to the fourth paragraph.  Do you see where

19   it says (reading):

20              "Further, in the event that Tikit does not consummate

21        the original transaction to at least the value set forth

22        in the PO by 30 March 2011, then Autonomy and Tikit shall

23        enter into an arrangement whereby Tikit shall be appointed

24        as the second line support and maintenance provider to

25        KPMG under the existing maintenance agreement between KPMG

1          and Interwoven for three quarters from 1 January 2011 for

2          a fee of up to £320,000 per quarter."

3          Do you see that?

4     A.   Yeah.

5     Q.   What does that language mean?

6     A.   Well, so, the basic construct of this side letter was in

7     case KPMG actually does not buy the products, then Tikit gets

8     paid its fee and Tikit gets to resell whatever inventory that

9     they have to other customers.

10         I was not involved in the specifics of how this language

11    was drafted.  What this is meant to do is to provide a vehicle

12    to pay Tikit by routing the support and maintenance for KPMG

13    through Tikit.  So Tikit provides that first and second line of

14    support, and for that they collect the entire $2 million --

15    $2 million that KPMG would pay us, you know, for support.

16    Q.   So if KPMG doesn't buy the software from Tikit, the

17    obligations change; is that fair?

18    A.   Yes.

19    Q.   Let me draw your attention to the second paragraph

20    beginning with the line "In the event that Tikit does not

21    consummate the original transaction..."  Do you see that?

22    A.   (Witness examines document.)  Yep.

23    Q.   What does this -- it says (reading):

24         "Tikit shall be permitted to utilize prepurchased

25         software under the PO and offset amounts to Autonomy under

ARAUJO - DIRECT / LEACH

1        other orders placed by Tikit related to such software and

2        maintenance under the agreement."

3        Do you see that?

4   A.   Yeah.

5   Q.   So what does that mean?

6   A.   What that means is if KPMG does not purchase the software,

7   they decide that, you know, we are not going to buy -- do this

8   deal that we thought was going to happen, then Tikit is still

9   bound to pay us whatever they signed for in the PO but they

10  could take that software and they could sell it to other

11  customers up to a maximum value of £3.1 million, and during the

12  period of January 2011 to June 2012.  So I guess 18 months.

13  Q.   Are you familiar with the term "SKU"?

14  A.   SKU?  S-K-U?

15  Q.   Yes.

16  A.   Yes.

17  Q.   What does SKU stand for?

18  A.   It stands for stock control -- stock keeping unit, I

19  guess.

20  Q.   And what does that mean?

21  A.   So each -- in the purchase, in the previous exhibit where

22  you saw, you know, base volume package -- DeskSite, FileSite --

23  those are SKUs.  It's an individual unit product.

24  Q.   Okay.  Did you have an understanding that Tikit could sell

25  other SKUs of Autonomy product and offset that against the

ARAUJO - DIRECT / LEACH

1  prepayment amount?

2  **A.**   When you say "other SKUs," can you clarify that?

3  **Q.**   Well, SKUs other than the specific ones for the order that

4  Tikit placed.

5  **A.**   I believe the way this agreement reads is they could take

6  what they bought prepurchased and they could sell those to

7  other customers but it has to be within the list that was

8  bought.

9  **Q.**   Could it sell what's within the list at different amounts

10  at different prices up to the total amount?

11  **A.**   I'm not sure what the letter of the agreement says.  The

12  spirit of it was they bought X amount worth of software from

13  us, they can sell X amount to somebody else.

14  **Q.**   In different amounts and in different SKUs; is that right?

15  Is that the spirit of the agreement?

16  **A.**   Yeah.  We wouldn't care about it.  It's software so we

17  wouldn't care.  We care the value, not the number of units.

18  **Q.**   Did you have any interactions with Autonomy's auditors

19  with respect to this side letter?

20  **A.**   I've never met them, never seen them.

21  **Q.**   Okay.  At the time the purchase order was placed and the

22  side letter was executed, did you have an expectation that the

23  side letter would be disclosed to Autonomy's auditors?

24  **A.**   Well, you know, reading the previous exhibit, the answer

25  is yes.  The other reason why it probably had to be disclosed

1    was, you know, Tikit was a public company and I know that Tikit

2    had some discussions around how this would show up in their

3    books.  So, yes, my understanding was it had to be disclosed.

4    **Q.**    Did you take some comfort in that?

5    **A.**    Yes.

6    **Q.**    Why?

7    **A.**    Because disclosing it legitimizes the transaction.  You

8    know, as I said before, while this was complicated and, you

9    know, from my view I was trying to do the best thing for the

10   company.  Ensuring that it is not out of line with what's --

11   what was acceptable by the lawyers and the auditors was

12   important.

13   **Q.**    Moving forward in time, Mr. Araujo, would you please look

14   at what has been marked as Exhibit 1560?

15   **A.**    (Witness examines document.)

16          **THE COURT:**  Admitted.

17          (Trial Exhibit 1560 received in evidence)

18   **BY MR. LEACH:**

19   **Q.**    What is the date of this e-mail, Mr. Araujo?

20   **A.**    It's February 22nd, 2011.

21   **Q.**    Okay.  What is the subject?

22   **A.**    "I am in New York City this week."

23   **Q.**    "NYC," that's an abbreviation for New York City here in

24   the United States?

25   **A.**    Yes.

ARAUJO - DIRECT / LEACH

1   Q.   Mr. Hussain is writing you (reading):

2         "Can you call me to go through revenue, please."

3        What does that mean?

4   A.   So our SMS calls, what you called SMS, would typically

5   happen on Mondays.  And so Sushovan was e-mailing me and this

6   is -- Duane Harris was the person who was running sales and

7   would run SMS calls, you know, looking for an update on what

8   the revenue's going to be for the quarter.

9   Q.   Did Tikit ultimately sell software to KPMG?

10  A.   No.

11  Q.   What happened?

12  A.   Well, KPMG -- so the deal actually with KPMG actually

13  happened.  It happened in March of that year, but KPMG refused

14  to buy through Tikit.  Tikit was too small of an organization

15  for them to do business with.

16       We tried to convince them to buy it through Tikit, but

17  there's a limit to which we could push them, you know, to do

18  that and so we ended up taking the deal directly.

19  Q.   Did you convey that information to Mr. Hussain?

20  A.   Oh, he was very involved in that.  It was a multiweek

21  discussion, so...

22  Q.   Please look at what has been marked as Exhibit 1800.

23  A.   (Witness examines document.)

24       THE COURT:  Admitted.

25       (Trial Exhibit 1800 received in evidence)

1    BY MR. LEACH:

2    Q.    Let me draw your attention to the bottom portion of this

3    e-mail, Mr. Araujo.  Do you see the e-mail from Stephen

4    Chamberlain to you with a copy to -- or to Ms. Dolan with a

5    copy to you and Sushovan Hussain?

6    A.    (Witness examines document.)  Is it the "Julie forgot to

7    e-mail"?  Is that the one?

8    Q.    Yeah.  Down at the bottom on page 1.

9    A.    Okay.

10   Q.    And is this after KPMG has decided to purchase software

11   from Autonomy rather than Tikit?

12   A.    Yes, that's correct.

13   Q.    Okay.  And Mr. Chamberlain writes (reading):

14         "I need you to draft a letter that will be signed by

15    Tikit and Autonomy.  When they issued the PO in Dec., we

16    also signed a letter effectively allowing them to

17    repurpose if KPMG deal did not close via them.  They have

18    received a bunch of orders for circa £1.5M pounds.  They

19    want to offset those against the outstanding debt, which

20    we are happy to do."

21    Do you see that?

22   A.    Yes.

23   Q.    Is this a fair summary of what you understood the purchase

24   of the side letter to be?

25   A.    Yes.

1    Q.    He then writes (reading):

2              "Effectively the £4M pounds will act like a prepay

3         and they will allocate orders to burn through it."

4         Do you see that?

5    A.    Yes.

6    Q.    Is that a fair summary of what you understood the side

7    letter to be?

8    A.    Yes.

9                        (Pause in proceedings.)

10   BY MR. LEACH:

11   Q.    If you could briefly look back at Exhibit 1329.  We'll

12   display it on the screen, Mr. Araujo.  And I draw your

13   attention to the last paragraph, which we touched on briefly

14   (reading):

15             "I want a heads of agreement that says we will

16        negotiate and buy 500 man days at £550."

17        Do you see that?

18   A.    Yes.

19   Q.    And how much is 500 man days at £550, roughly?

20   A.    It's about 2 million.

21   Q.    £2 million?

22   A.    Yeah, about 2 and a quarter.

23   Q.    Okay.  And the proposal here, at least in this e-mail at

24   this time, is we'll prebuy that level of services?

25   A.    Right.

ARAUJO - CROSS / DOOLEY

1    **MR. LEACH:**  Okay.  Thank you, Your Honor.  I have

2    nothing further.

3        **THE COURT:**  Cross.

4                    <u>**CROSS-EXAMINATION**</u>

5    **BY MR. DOOLEY:**

6    **Q.**   Good morning, Mr. Araujo.

7    **A.**   Good morning.

8    **Q.**   My name is Brook Dooley and I represent Sushovan Hussain.

9        Good morning to the jury as well.

10       Mr. Araujo, I want to start off with the topic of these

11   SMS calls.  Do you remember those questions and answers you

12   gave on that topic?

13   **A.**   Yeah.

14   **Q.**   The purpose of these SMS calls was to check on the sales

15   pipeline; correct?

16   **A.**   That's correct.

17   **Q.**   These are sales forecast calls; right?

18   **A.**   That's correct, yeah.

19   **Q.**   And there's nothing wrong or improper about a company

20   conducting this kind of sales forecast call; is that right?

21   **A.**   That's correct.

22   **Q.**   In fact, would you agree that it's common for companies to

23   conduct sales pipeline or sales forecast calls?

24   **A.**   Yeah.  Yeah.

25   **Q.**   Fairly common business practice?

**ARAUJO - CROSS / DOOLEY**

1  A.    Yes.

2  Q.    And I think you testified that the SMS calls were tough

3  and people were held accountable.  Was that your testimony?

4  A.    That's correct.

5  Q.    You have previously said, Mr. Araujo, I believe, that --

6  well, first of all, do you know who Stouffer Egan is?

7  A.    Yes.

8  Q.    Who is Stouffer Egan?

9  A.    So Autonomy had more CEOs than products.  He was one of

10  the CEOs.  He was a CEO of Autonomy America.

11  Q.    Okay.  And did he participate in these SMS calls to your

12  knowledge?

13  A.    He would but for -- not for my business.

14  Q.    Not for your business.

15      Okay.  But did you have occasion to listen to SMS calls

16  when Stouffer Egan was participating?

17  A.    No.

18  Q.    No.

19      Okay.  I believe you said that -- previously said that

20  Mr. Egan came down very hard on salespeople; is that right?  Do

21  you remember saying that?

22  A.    No.

23  Q.    He came down hard on people on the SMS calls and by

24  e-mail?  Have you ever said that?

25  A.    So my response earlier was -- I don't believe he was

1    asking me about Stouffer Egan specifically -- the calls in

2    general would be tough, you know, based on whoever was running

3    those calls.

4    **Q.**   And do you recall giving an interview in this matter to

5    HP's lawyers, Hewlett Packard's lawyers, back in --

6    **A.**   Yes, that's correct.

7    **Q.**   Okay.  Let me show you --

8           **MR. DOOLEY:**  May I approach, Your Honor?

9           **THE COURT:**  Yes.  What exhibit is this?

10          **MR. DOOLEY:**  This is 5018 that I can hand up to the

11   Court.  This is refreshing.

12          **THE COURT:**  Well, I don't know that he needs his

13   recollection refreshed.  I mean, that's the question.

14   **BY MR. DOOLEY:**

15   **Q.**   Mr. Araujo, let me ask you to look at this memorandum on

16   the second page.  The third full paragraph under subheading A,

17   it begins "Even before..."  If you could just read that to

18   yourself.

19   **A.**   Oh, on the second page?

20   **Q.**   Second page of the document, third full paragraph under

21   subheading A.  The paragraph begins "Even before..."

22   **A.**   (Witness examines document.)  Yeah.

23   **Q.**   Mr. Araujo, does this refresh your recollection that

24   Stouffer --

25          **THE COURT:**  I don't think -- I don't think -- I didn't

1  see that he didn't have a recollection.  Did he say he didn't

2  have a recollection?  I didn't hear him say it.

3         MR. DOOLEY:  Why don't I just ask the question, then,

4  a different way.

5         THE COURT:  I mean, you can ask -- yeah, but this is

6  cross-examination.  You get to lead him.  You get to cross him,

7  but you don't have to -- if he doesn't say he's forgotten

8  something, he can't remember, then I don't think you show him

9  anything to refresh his recollection.

10      Go ahead.

11         MR. DOOLEY:  Fair.

12         THE COURT:  Okay.

13  BY MR. DOOLEY:

14  Q.  Mr. Araujo, isn't it true that Stouffer Egan came down

15  very hard on sales representatives on the SMS calls?

16  A.  Yes, but not on my -- not in my business unit.  He was

17  never in my business unit calls.

18  Q.  He came down hard on sales representatives?

19  A.  He had that reputation, yeah.

20  Q.  Okay.  And it's true that Stouffer Egan came down very

21  hard on sales representatives through e-mail as well; isn't

22  that right?

23  A.  Yes.

24  Q.  You testified earlier about the KPMG negotiations.  Did

25  Mr. Egan have a relationship with KPMG as well?

1   **A.**   Possibly.   He was not -- he was, I think, peripherally

2   involved in this deal because it was being run by -- the deal

3   itself was being run by one of his main sales leads.   So to

4   that degree, he was involved and was knowledgeable of the deal,

5   and I believe he -- you know, if I -- I think Stouffer met

6   with -- he had met with some folks at KPMG as part of the

7   process.

8   **Q.**   And during the course of the negotiations with KPMG, it's

9   true that you were concerned that Mr. Egan would try to get the

10  deal done sooner by discounting it so much that Autonomy would

11  no longer make money; right?

12  **A.**   I -- I don't recollect that.

13  **Q.**   Would you look at page 4 of Exhibit 5018?

14  **A.**   (Witness examines document.)

15  **Q.**   If you read the last sentence in the last full paragraph

16  on the bottom of page 4, the sentence begins "Because both..."

17  **A.**   (Witness examines document.)   Can you repeat that?   The

18  last?

19  **Q.**   I'm sorry.   The last full paragraph.

20  **A.**   "Because both Araujo..."?

21  **Q.**   Yeah.

22  **A.**   Okay.

23      (Witness examines document.)   You know, let me try to give

24  you my explanation for what that might mean.

25  **Q.**   Mr. Araujo, there's no question pending.   Let me just ask

ARAUJO - CROSS / DOOLEY

1   the question.

2       It's true that you were concerned that Stouffer Egan would

3   try to get this KPMG deal done sooner by discounting it so much

4   that Autonomy would no longer make money?  That's true; right?

5   **A.**   My concern -- so I knew that KPMG -- because I was

6   involved in the proof of concept and what they were trying to

7   do, I knew that they were ready to -- to spend, you know, close

8   to $10 million on this; and -- but because Autonomy had various

9   business units, Stouffer Egan was in a different business unit

10  from me, there were competing -- potentially competing

11  interests.  I don't -- I don't necessarily recall the specifics

12  of them; but, yeah, I can see how I could have a concern that,

13  you know, this -- that we try to get the deal sooner and

14  discount the heck out of it and, you know, we leave money on

15  the table effectively.

16  **Q.**   Okay.  And, in fact, it was not uncommon for Stouffer Egan

17  to interject himself in a deal and offer a discount to a

18  customer even after a customer had agreed to a higher price;

19  correct?

20  **A.**   Not in my business, no.

21  **Q.**   Can you look at the next page, Footnote 1?  Just read that

22  to yourself.

23  **A.**   (Witness examines document.)  Yeah.  Again, not in my

24  business.

25  **Q.**   But it's true, isn't it, Mr. Araujo, that it was not

1    uncommon for Stouffer Egan to interject himself into deals;

2    correct?

3              MR. LEACH:  Objection.  Foundation.  Hearsay.

4              THE COURT:  I'll allow it.

5              THE WITNESS:  He had that reputation outside, but

6    certainly not in my business.

7    BY MR. DOOLEY:

8    Q.   And the reason he was doing that was to close deals and be

9    able to take credit for them himself; is that right?

10             THE COURT:  You have to lay a foundation.

11   BY MR. DOOLEY:

12   Q.   Do you have an understanding of why Mr. Egan was

13   interjecting himself in deals?

14             THE COURT:  No.  I think you have to lay a foundation

15   that he has knowledge of why Mr. Egan did what he heard

16   Mr. Egan had done.

17   BY MR. DOOLEY:

18   Q.   Mr. Araujo, do you have an understanding -- do you know

19   why Stouffer Egan interjected himself in deals?

20             THE COURT:  That's not a foundational question.  It's

21   not does he know why.  The question is:  How does he know what

22   he knows?  That's foundation.

23             MR. DOOLEY:  Okay.

24   Q.   Do you have -- Mr. Araujo, do you have a basis for your

25   understanding for why Stouffer Egan was interjecting himself in

1  these deals?

2  **A.**   No.  It could be --

3       **THE COURT:**  No, don't -- I don't want to hear you

4  guess.

5       The question is:  Did anybody -- do you have any

6  observation, did you see Mr. Egan doing this?

7       **THE WITNESS:**  Not in my business, but he had a --

8       **THE COURT:**  Did you see him -- listen to my question.

9  Okay?

10      Did you see him do it?  Did you hear him do it?  Did you

11 watch him do it?  That's the question.

12      **THE WITNESS:**  No.

13      **THE COURT:**  Okay.  So if you know about it, it's

14 because somebody told you?

15      **THE WITNESS:**  That's correct.

16      **THE COURT:**  Thank you.

17      Okay.  It's hearsay.  Go ahead.

18      **MR. DOOLEY:**  I'll move on, Your Honor.  Thank you.

19 **Q.**   Mr. Araujo, you talked a little bit -- you testified a bit

20 on direct about your relationship with Dr. Lynch.  Dr. Lynch

21 respected you; correct?

22 **A.**   That's correct.

23 **Q.**   And it was your understanding that one of the reasons he

24 respected you is that you were not afraid to push back with

25 him?

1  **A.**   That's correct.

2  **Q.**   And what did you mean by that, that you were not -- that

3  you weren't afraid to push back on Dr. Lynch?

4  **A.**   If I thought something was wrong, you know, stand up for

5  it.

6  **Q.**   So you wouldn't have agreed to do something wrong just

7  because Dr. Lynch asked you?

8  **A.**   That's -- that's correct.  It's more complicated than that

9  in reality.  So, yes, I would stand up for things that I

10 believed were in the best -- were in the best interest of the

11 company, the employees, the customers, whoever the stakeholders

12 might be.

13 **Q.**   And you wouldn't have agreed to do something that you

14 thought was wrong or improper just because Mr. Hussain asked

15 you to do it either; right?

16 **A.**   That's correct.

17 **Q.**   And you wouldn't have agreed to participate in an

18 illegitimate deal just because Mr. Hussain asked you; correct?

19 **A.**   That's correct, if I knew it was illegitimate.

20 **Q.**   I want to direct your attention now to December of 2010

21 and your discussions with Tikit.

22      You were -- you participated in the negotiations to sell

23 software to Tikit in December 2010; correct?

24 **A.**   That's correct.

25 **Q.**   And the general idea was that Tikit would buy software

1    from Autonomy and sell it on to KPMG; correct?

2    **A.**    That's correct.

3    **Q.**    And KPMG is a big global accounting firm?

4    **A.**    That's correct.

5    **Q.**    And they were a big customer of Autonomy's?

6    **A.**    They were -- yes.

7    **Q.**    And at this point in December 2010, Autonomy and KPMG had

8    been negotiating a sale of software for a couple months?

9    **A.**    Uh-huh.

10   **Q.**    But now in December 2010, you were negotiating with Tikit

11   directly?

12   **A.**    I was --

13   **Q.**    You participated in negotiations with Tikit in

14   December 2010?

15   **A.**    That's correct, yeah.

16   **Q.**    Right?

17   **A.**    That's correct.

18   **Q.**    So the jury understands, Tikit is a large public company

19   in the United Kingdom; correct?

20   **A.**    They're not large.  They're -- you know, they're fairly

21   small.  They were public but they were not large.

22   **Q.**    But a public company that reports its financials and has

23   shareholders?

24   **A.**    That's correct, yeah.

25   **Q.**    And Tikit was an existing Autonomy reseller?

ARAUJO - CROSS / DOOLEY

1   **A.**   That's correct.

2   **Q.**   Tikit in particular was a reseller for your company

3   iManage; right?

4   **A.**   That's correct.

5   **Q.**   And you testified on direct that you had a strong

6   relationship with Tikit?

7   **A.**   That's correct.

8   **Q.**   I think you said Tikit had done several million dollars in

9   revenue for iManage?

10  **A.**   That's correct.

11  **Q.**   And that means that Tikit had paid iManage several

12  million dollars --

13  **A.**   Yes.

14  **Q.**   -- for software?

15       Tikit also had a relationship with KPMG; correct?

16  **A.**   They had -- so the KPMG is a large global organization.

17  This deal was with KPMG Global.   KPM -- Tikit had relationships

18  with some individual member countries; like, if I remember the

19  country, it was KPMG Germany, but not with KPMG Global.

20  **Q.**   But Tikit had relationships with some of the KPMG

21  companies.   That's fair to say; right?

22  **A.**   Yes.

23  **Q.**   And, in fact, when you were at Interwoven, Tikit had

24  helped Interwoven win a $15 million deal with one of these KPMG

25  companies; right?

ARAUJO - CROSS / DOOLEY

1    **A.**    They played a role in it.

2    **Q.**    They played a role of facilitating that sale?

3    **A.**    Of bringing it in -- they helped out, yeah.

4    **Q.**    So it's fair to say --

5          **THE COURT:**  Now is -- I don't want to interrupt you,

6    but we should take our noon recess.  I don't know how much

7    longer you're going to be, but --

8          **MR. DOOLEY:**  I think this is probably a good time to

9    break.

10          **THE COURT:**  Okay.  That's great.

11       Ladies and gentlemen, we're going to take our noon recess.

12    We'll be in recess until 1:00 p.m.

13       Remember the admonition given to you:  Don't discuss the

14    case, allow anyone to discuss it with you, form or express any

15    opinion.

16       See you at 1:00 o'clock.

17              (Luncheon recess taken at 12:03 p.m.)

18

19

20

21

22

23

24

25

PROCEEDINGS

1    **Afternoon Session**                                    **1:01 p.m.**

2          (Proceedings were heard out of presence of the jury:)

3          **THE COURT:**  The jury is not here.

4    So these two charts, is that the concern?

5          **MR. KEKER:**  Yes.

6          **THE COURT:**  Well, they're not tethered to anything --

7    I don't see, like, years and -- it's just pure argument.  It's

8    not bad, but isn't it just argument?  Okay.  Anyway, that's my

9    concern, so we will discuss it.

10          **MR. KEKER:**  The other concern I wanted to raise is

11   they've got in there a -- 592 is a transcript of the fourth

12   quarter 2009 earnings call, and the transcript is, according to

13   the author on the back -- it says, "Disclaimer material

14   inaccuracy," blah, blah, blah.

15          In short, we object to using a transcript instead of the

16   actual tape if they're going to get into that.  And this

17   transcript doesn't have any indicia of accuracy.

18          **THE COURT:**  I have to think about that.  I mean,

19   usually when I get to a transcript, everybody has agreed that

20   that's what is said.

21          Is it that you don't agree that's what is said?

22          **MR. KEKER:**  We have never been produced -- they never

23   produced the audiotape to us.

24          **THE COURT:**  Do you have the audiotape?

25          **MR. REEVES:**  I believe that we have produced the

PROCEEDINGS

1    audiotape.

2            THE COURT:  We will have this discussion a little bit

3    later.

4            MR. KEKER:  We have looked all over for it.  We don't

5    have it.

6            THE COURT:  It's between Document No. 3,000,463 --

7            MR. KEKER:  Well, I checked that.  I already looked at

8    that specifically.

9            THE COURT:  Well, I may have my numbers transposed.

10    Okay.  Bring in the jury.

11    (Proceedings were heard in the presence of the jury:)

12            THE COURT:  Let the record reflect all jurors are

13    present.  Parties are present.

14    You may continue.

15            MR. DOOLEY:  Thank you, Your Honor.

16    Q.  Good afternoon, Mr. Araujo.

17    A.  Good afternoon.

18    Q.  We left off discussing the negotiations for a sale to

19    Tikit for the end user KPMG in December 2010.

20    Autonomy finalized the sale to Tikit on December 31st,

21    2010; is that right?

22    A.  That's correct.

23    Q.  And if we could look at Exhibit 1392 very briefly.  It's

24    in evidence.  It should be on your screen, Mr. Araujo, as well

25    as in your binder.

PROCEEDINGS

1          And this is the purchase order from Tikit to Autonomy for

2    software for the identified end user, KPMG International;

3    correct?

4    **A.**    That's correct.

5    **Q.**    And if you look down at Section B, it specifies the

6    software that Tikit was purchasing to resell to KPMG; correct?

7    **A.**    That's correct.

8    **Q.**    That's the same software that KPMG was considering in

9    connection with the negotiations that had been ongoing with

10   Autonomy; correct?

11   **A.**    That's correct.

12   **Q.**    And then on the next page of the purchase order, page 2,

13   the purchase order provides that Tikit acquires the right to

14   resell this software to KPMG for a license fee of approximately

15   4 million pounds.  That was the deal; right?

16   **A.**    Yes.  Yes.

17   **Q.**    And, Mr. Araujo, maybe if you can bring the microphone

18   just a little closer so everybody can hear you.  Thanks.

19          And if you look at the third page of the exhibit, it's

20   signed -- the purchase order is signed on Autonomy's side by

21   Andrew Kanter.  That's his signature there?

22   **A.**    Yes.  That looks like his.

23   **Q.**    You recognize that as Andrew Kanter's signature?

24   **A.**    That's correct.

25   **Q.**    Pursuant to this purchase order, Autonomy delivered this

PROCEEDINGS

1  software to Tikit; correct?

2  **A.**   That's correct.

3  **Q.**   And Tikit in fact publicly disclosed in its financial

4  statements that it had taken the Autonomy software into its

5  inventory; right?

6  **A.**   I believe so.  I did not verify it myself.

7  **Q.**   Okay.  That was your understanding, though?

8  **A.**   Yes.

9  **Q.**   If I could ask you to look at Exhibit 5966 in your binder.

10 It's not in evidence, but I would move it in.

11          **MR. LEACH:**  No objection.

12          **THE COURT:**  Admitted.

13      (Plaintiff's Exhibit 5966 received in evidence)

14 **BY MR. DOOLEY:**

15 **Q.**   This is an email from Mr. Lumsden of Tikit to you on

16 March 8th, 2011; right?

17 **A.**   I don't remember this email, but it is from him to me.

18 **Q.**   And the subject is "Extracts," and Mr. Lumsden writes,

19 "Hi, Neil.  Extracts from main text as discussed."  And then

20 there is some text that is in italics.  Do you see that?

21 **A.**   Yes.

22 **Q.**   And the first sentence reads, ".... there was an increase

23 in inventories of 4.0 million pounds.  The stock increase has

24 arisen from a strengthening of our relationship with a key

25 software partner."  Do you see that?

1   **A.**   Yes.

2   **Q.**   Do you recall that this -- in this email, Mr. Lumsden is

3  advising you that Tikit had disclosed the Autonomy software as

4  inventory on its books?

5   **A.**   Yes.

6   **Q.**   That's the substance of this email?

7   **A.**   Yes.

8   **Q.**   So there was nothing hidden or secret about this

9  transaction with Tikit; correct?

10   **A.**   That's -- that's correct.

11   **Q.**   And the purchase order that Tikit and Autonomy entered

12  into, that was non-cancelable; correct?

13   **A.**   That's correct.

14   **Q.**   So Tikit couldn't just cancel its order; right?

15   **A.**   No.

16   **Q.**   So whatever happened with KPMG or didn't happen with KPMG,

17  Tikit owned the Autonomy software and owed Autonomy for the

18  software; right?

19   **A.**   That's correct.

20   **Q.**   Tikit didn't just kind of blindly sign onto this deal;

21  correct?  There was discussions between you and folks from

22  Tikit?

23   **A.**   Between Autonomy, so me and other folks and folks from

24  Tikit.

25   **Q.**   Okay.  There were some discussions that -- certainly there

PROCEEDINGS

1   was at least one discussion that you were part of; correct?

2   A.   That's correct, yes.

3   Q.   Where you talked about the terms of the deal and what

4   would happen if KPMG didn't buy the software; right?

5   A.   Correct.

6   Q.   Do you remember that Tikit also separately conducted its

7   own due diligence into the deal?

8   A.   Yes.  So Tikit was constantly in touch with its -- with

9   other folks behind the scenes looking at the mechanics of the

10  deal.

11  Q.   And that included folks behind the scenes at KPMG; right?

12  A.   If they were their auditors.  I'm not -- they may have

13  been speaking to the auditors.  I'm not aware who they were

14  talking to.

15  Q.   Do you remember that people at Tikit called their contacts

16  at KPMG to check on the status of this deal?

17  A.   No.

18  Q.   And it was your understanding that Tikit was represented

19  by lawyers in connection with the deal?

20  A.   I'm not aware of lawyers being involved.  I know that they

21  had accounting and legal advice, but I'm not -- I didn't have

22  any attraction to that.

23  Q.   But fair to say, Mr. Araujo, if you thought there was

24  something improper or illegitimate about this sale to Tikit,

25  you would have pushed back against it?  You would have said

1  something; right?

2  **A.**    If it was illegitimate, illegal, yes, I would have.

3  **Q.**    And you didn't think the deal was illegitimate or illegal,

4  did you?

5  **A.**    I did not.

6  **Q.**    Now, at the same time that Autonomy and Tikit signed the

7  purchase order that's in Exhibit 1391, Autonomy and Tikit also

8  signed a letter agreement, what the Government has called a

9  side letter; correct?

10  **A.**    Which -- you said 1391?

11  **Q.**    Well, 1391 is the purchase order, but 1361 is the letter

12  agreement.

13  **A.**    Okay.  Yeah.

14  **Q.**    And that was entered into at the same time as the purchase

15  order; correct?

16  **A.**    That's correct.

17  **Q.**    And if you look at the second page of this letter

18  agreement, it says that it is signed by Sushovan Hussain, but

19  that's Andrew Kanter's signature; right?

20  **A.**    That's correct.

21  **Q.**    And you testified about this on direct so I don't want to

22  spend too much time on it, but there were basically two

23  provisions in this letter agreement reflected on the first

24  page; right?

25  **A.**    That's correct.

**PROCEEDINGS**

1    Q.   And the first provision contained in the second paragraph

2    was that if Tikit wasn't able to close the sale with KPMG, they

3    could resell the software that they had bought from Autonomy to

4    other customers; right?

5    A.   That's correct.

6    Q.   And there was some questions and answers on your direct

7    about SKUs, but it was your understanding that the deal was

8    Tikit had bought the software and they were going to try to

9    sell it to KPMG, but if they couldn't sell it to KPMG, they

10   could sell it to other customers; right?

11   A.   Can I clarify that?

12        So Tikit would not try to sell it.  We would try to sell

13   it.  Tikit did not have the relationship with KPMG.  So it

14   would be sold via Tikit to KPMG.

15   Q.   Okay.  But if it wasn't -- if it couldn't be sold via

16   Tikit to KPMG, Tikit could sell the software to its other

17   customers; correct?

18   A.   That's correct.

19   Q.   So that was provision number one.  And then provision

20   number two is in the fourth paragraph, and that provided that

21   if Tikit didn't close a deal with KPMG, it could perform a

22   limited amount of maintenance work for KPMG on Autonomy's

23   behalf.  Is that about right?

24   A.   That's -- that's -- that's correct.

25   Q.   Okay.  Now, even with this letter agreement -- again, what

1  the Government calls a side letter -- there was no guarantee

2  that Tikit was going to make money on this deal; right?

3  **A.**    According to this side letter, Tikit was guaranteed that

4  they would -- there would be no downside for them in this deal.

5  **Q.**    Well, didn't Tikit have to -- if the deal didn't close

6  with KPMG, didn't Tikit have to find customers to sell the

7  software to?

8  **A.**    That's -- that's true.    That's why I said there's no

9  downside for them.

10  **Q.**    Well, they owned -- let's just take it one step at a time,

11  Mr. Araujo.

12        They owned the software; right?

13  **A.**    That's correct.

14  **Q.**    They owed Autonomy 4 million pounds for the software?

15  **A.**    That's correct.

16  **Q.**    If they weren't able to sell it to KPMG, they still owed

17  the money to Autonomy; correct?

18  **A.**    That's correct.

19  **Q.**    And their -- what this agreement provides is in that

20  event, if they can't sell it to KPMG, they can sell the

21  software to somebody else; right?

22  **A.**    That's correct.

23  **Q.**    But in order to be made whole, they would have to go out

24  and find some customers to sell the software to; right?

25  **A.**    That's correct.

**PROCEEDINGS**

1  Q.    There is no guarantee they would be able to do that;

2  right?

3  A.    There is no guarantee, but they would -- you know, they

4  would be -- they sold about that much amount of software every

5  year anyways, so it was -- if you looked at the history, it was

6  very feasible that they would have sold that software to

7  somebody else.

8  Q.    Feasible, fair, but not a guarantee?

9  A.    Possibly.

10 Q.    Mr. Araujo, isn't it true that the letter agreement only

11 reduced, but did not eliminate, the risk to Tikit?

12 A.    It -- you know, that's a subjective call.  It -- it -- it

13 substantially reduced the risk.  There is always risk in any

14 deal.  It substantially reduced the risk.

15 Q.    Mr. Araujo, could you look at Exhibit 15 -- I'm sorry.

16 5018 in front of you.  It's in the folder, not in the binder.

17         **MR. LEACH:**  I'm sorry, Counsel.  May I have a copy?

18         **MR. DOOLEY:**  I have provided you with one.

19         **THE WITNESS:**  Is it this one?

20 BY MR. DOOLEY:

21 Q.    Correct.  Yes.  If you look at -- let me just --

22 Mr. Araujo, you were interviewed by lawyers from

23 Hewlett-Packard in January of 2013; correct?

24 A.    They were lawyers at Morgan Lewis.

25 Q.    Morgan Lewis and they represent Hewlett-Packard?

1    **A.**    Yes.

2    **Q.**    They asked you a bunch of questions about this

3    transaction; right?

4    **A.**    Yes.

5    **Q.**    Probably what they spent most of their time on; right?

6    **A.**    It was a long time back.  Yes.  Probably.

7    **Q.**    Look at page 6, please.  There is a second full paragraph

8    that begins, "Araujo said" and in the middle, there is a

9    sentence that begins "however."  Just read that to yourself.

10   **A.**    (Witness reviews document.)

11          **THE COURT:**  I think that's what he said.  I think

12   that's what his testimony was.

13   **BY MR. DOOLEY:**

14   **Q.**    Is that your testimony, Mr. Araujo?

15   **A.**    Yes, that is.

16   **Q.**    That this side letter only reduced, but did not eliminate,

17   the risk to Tikit.  That's your testimony today?

18   **A.**    Yes, it is.

19   **Q.**    And, again, if you thought there was something improper or

20   illegal about this side agreement, you would have pushed back

21   and said something; right?

22   **A.**    Yes.

23   **Q.**    And there was nothing secret within Autonomy, at least,

24   about this side agreement, was there?

25          **MR. LEACH:**  Objection.  Foundation.

1    **THE COURT:**  Sustained.

2    **BY MR. DOOLEY:**

3    **Q.**   Well, let's look at Exhibit 1329, which is in evidence.

4    The jury has seen this before.  If you would just blow up the

5    whole thing.  It's a short email.

6        You have seen this email before, Mr. Araujo?

7    **A.**   Yes.

8    **Q.**   And just directing your attention to the first sentence of

9    the second paragraph, Mr. Hussain writes, "I also need a side

10   letter which will be disclosed."  Do you see that?

11   **A.**   (No Response.)

12   **Q.**   Your testimony on direct was it was your understanding

13   that Mr. Hussain was saying that this side letter would be

14   disclosed to Autonomy's auditors at Deloitte; right?

15   **A.**   That's correct.

16   **Q.**   And the people on this email, in addition to yourself and

17   Mr. Hussain, are Julie Dolan, Andrew Kanter, and John Coy;

18   right?

19   **A.**   Yes.

20   **Q.**   Those are all lawyers at Autonomy?

21   **A.**   That's correct.

22   **Q.**   And your testimony earlier was that Andrew Kanter was the

23   general counsel of the entire company?

24   **A.**   That's correct.

25   **Q.**   And Mr. Hussain is openly discussing this side letter with

PROCEEDINGS

1   the company's lawyers; right?

2   **A.**   That's correct.

3   **Q.**   And nobody ever told you that the side letter would not be

4   disclosed; right?

5   **A.**   That's correct.

6   **Q.**   And nobody ever told you not to disclose the side letter;

7   right?

8   **A.**   I wasn't responsible for disclosures, so I wouldn't know.

9   I wouldn't expect to.

10  **Q.**   But whether you expected it or not, no one ever told you

11  "don't disclose this side letter"; right?  Did anyone ever tell

12  that you?

13  **A.**   No.  I was never responsible.  I have never talked to the

14  auditors.  I don't even know who they are.

15  **Q.**   At the time Autonomy sold this software to Tikit as

16  reflected in the purchase order, you expected that KPMG would

17  accept Tikit as a reseller; right?

18  **A.**   That's correct.

19  **Q.**   And Tikit had an existing relationship with at least some

20  parts of KPMG, so you thought the chances were pretty good that

21  the deal would ultimately close through Tikit; is that fair?

22  **A.**   That's correct.

23  **Q.**   And you testified earlier that Autonomy tried to close the

24  deal through Tikit; right?

25  **A.**   That's correct.

PROCEEDINGS

1    Q.    But it didn't work out.    KPMG wasn't willing to include

2    Tikit in the deal?

3    A.    That's correct.

4    Q.    And ultimately, KPMG decided to do the deal directly with

5    Autonomy?

6    A.    Yes.

7    Q.    After KPMG decided to buy directly from Autonomy, however,

8    Tikit still owed Autonomy for the software that it had

9    purchased; right?

10   A.    That's correct.

11   Q.    These are really two separate transactions, a transaction

12   with Tikit and a transaction with KPMG; correct?

13   A.    That's how it turned out to be.

14   Q.    And, in fact, Autonomy chased Tikit for payment on this

15   purchase; right?

16   A.    Yes.    That's correct.

17   Q.    If we could put up -- if I could show you what's been

18   marked Exhibit 5968.    And I would move it into evidence.

19          THE COURT:    Admitted.

20       (Trial Exhibit 5968 received in evidence)

21   BY MR. DOOLEY:

22   Q.    Mr. Araujo, just take a second to look at Exhibit 5968.

23   Does this appear to be an email from Stephen Chamberlain to

24   you, copy to Mr. Hussain and creditcontrol@autonomy.com,

25   subject "Tikit"?

1    **A.**    Yeah.

2    **Q.**    And Mr. Chamberlain writes, "Neil, please advise of result

3    of conversation yesterday.  1.8 million is now overdue and we

4    need to collect this ASAP"; correct?

5    **A.**    What's the exhibit number again?  I'm not sure I'm looking

6    at the --

7    **Q.**    5968.  It should be an April 27th -- do you have that one

8    in front of you?  It should also be on the screen, if that's

9    easier for you.

10    **A.**    Yes.

11    **Q.**    So Mr. Chamberlain was following up with you on Tikit's

12    overdue payment; right?

13    **A.**    That's -- that seems like the case here.

14    **Q.**    If you could look at Exhibit 5969, please.

15        **THE COURT:**  Admitted.

16        (Trial Exhibit 5969 received in evidence)

17    **BY MR. DOOLEY:**

18    **Q.**    This is an email from a month later from Steve

19    Chamberlain.  Now he is writing to Mike Kent at Tikit.  That's

20    a name we've seen before.  Copied to you.

21        And Mr. Chamberlain writes to Mr. Kent, "Mike, when are

22    you available to meet and discuss the amounts due to Autonomy?"

23        So Mr. Chamberlain is now chasing Mr. Kent from Tikit

24    directly for the overdue payment; right?

25    **A.**    Uh-huh, yes.

1  Q.  And what he says -- Mr. Chamberlain goes on to write, "My

2  understanding of what we have agreed is that you will be

3  allowed to offset POs against the 4.05 million-pound December

4  purchase order.  For this to hold, you need to start to pay

5  down the balance owing against that order."

6      Do you see that?

7  A.  Yes.

8  Q.  That's a reference to the agreement in the side letter;

9  right?

10 A.  Uh-huh.

11 Q.  We looked, during your direct testimony -- we looked at

12 Exhibit 1800.  If we could just look at that again very

13 briefly.

14     Jeff, if you could focus on the email at the bottom from

15 Steve Chamberlain.

16     And this is Steve Chamberlain writing to Julie Dolan, a

17 lawyer, copied to you and Mr. Hussain, subject "Tikit," and in

18 the second full paragraph, he talks about a draft letter to be

19 signed by Tikit and Autonomy.  He says, "When they issued the

20 PO in December, we also signed a letter effectively allowing

21 them to re-purpose if the KPMG did not -- deal did not close

22 via them."

23     And that -- I think you testified on direct, that was your

24 understanding of the deal; right?

25 A.  That's correct.

1  **Q.**   Do you recall that at one point in this time period, Tikit

2  tried to get Autonomy to do a different deal to actually just

3  buy the software back from Tikit?

4  **A.**   There was -- so when KPMG determined that they didn't want

5  to buy through Tikit, there was -- we did explore canceling the

6  order completely, you know, so whatever the mechanics were for

7  that, whether it was buying back or, you know -- but canceling

8  that order.

9  **Q.**   But that's not what you did.  You told them they had to

10  live by the deal that they had struck in December; right?

11  **A.**   That's not -- I did not have that conversation with them.

12  It was probably had by others at Autonomy.

13  **Q.**   Well, let's look at Exhibit 5970.

14       It's not in evidence, but I would move it in.

15          **THE COURT:**  Admitted.

16       (Trial Exhibit 5970 received in evidence)

17  **BY MR. DOOLEY:**

18  **Q.**   And I direct your attention to the second page.  There is

19  an email from Mr. Kent on May 3rd to Steve Chamberlain, and

20  you're not on this email, but you'll join the thread in a

21  minute.

22       And Mr. Kent writes to Mr. Chamberlain, "Hope you're well.

23  Following our conversation of April 26, we discussed a sale of

24  the stock to Autonomy.  Did you manage to speak to Sushovan

25  regarding this route?  It would be the most straightforward

1  solution for both parties, and after a conversation with Neil

2  Araujo, I know this is his preferred option."

3      Do you see that, Mr. Araujo?

4  **A.**  Yes.

5  **Q.**  And then if you flip to the first page of the exhibit,

6  Mr. Chamberlain forwards this email to you, and he writes,

7  "Thought we agreed that they would re-purpose.  Has he got his

8  wires crossed?"

9      Mr. Chamberlain is saying sounds like Mr. Kent

10  misunderstood the deal; right?

11  **A.**  Yeah.  I -- there was a fair amount of back and forth at

12  that time about how to unwind the deal.  So, you know, Steve

13  may have not -- you know, there were a couple of ways to do it,

14  you know, so that was the gist of what was going on.

15  **Q.**  Okay.  But in your response to Mr. Chamberlain -- let's

16  look at that.  That's the next email up.  You write, "We should

17  get on a call with him together.  I spoke to David on Thursday

18  and was crystal clear to him" -- that's David Lumsden from

19  Tikit; right?  The reference to "David"?

20  **A.**  Yeah.

21  **Q.**  So "I spoke to David on Thursday and was crystal clear to

22  him that we were moving forward with the plan as laid out in

23  our agreement in December"; right?

24  **A.**  That's what it says, yep.

25  **Q.**  So you were communicating to Mr. Chamberlain your

1  understanding that Tikit was going to be held to this deal in

2  the side letter that they were -- they could resell the

3  software and pay back Autonomy that way; correct?

4  **A.**    Yeah.   I -- I guess what I was saying over there was that

5  instead of having separate conversations, let's get on a call

6  together and clarify the path forward.

7  **Q.**    And the path forward was that you were going to hold them

8  to the deal in December.   That's what you wrote?

9  **A.**    That's what -- yep.

10  **Q.**    As far as you know, that's what ended up happening, right?

11  Tikit resold the Autonomy software that it had purchased to

12  other customers and then paid Autonomy back based on those

13  sales?

14  **A.**    I don't know exactly the mechanics of how it was unwound,

15  but it wasn't canceled.   That's -- the deal wasn't canceled.

16  It was unwound in some form.   I wasn't part of the

17  day-to-day -- which deals were mapped against this formal deal.

18  **Q.**    But you know that Tikit, in fact, paid back Autonomy for

19  the purchase --

20  **A.**    Oh, absolutely.   Yeah.

21  **Q.**    -- of the software?

22  **A.**    They would have had to.

23  **Q.**    Your testimony is that Tikit would have had to pay

24  Autonomy back?

25  **A.**    Yes.

```
 1   Q.    And they did pay Autonomy back?

 2   A.    That's my understanding.

 3            MR. DOOLEY:  Nothing further.

 4            THE COURT:  Redirect.

 5            MR. LEACH:  Thank you, Your Honor.

 6                    REDIRECT EXAMINATION

 7   BY MR. LEACH:

 8   Q.    Good afternoon, Mr. Araujo.

 9   A.    Good afternoon.

10   Q.    You were asked questions about the term "side letter."  Do

11   you recall that testimony?

12   A.    Yes.

13   Q.    Is that a term that the Government gave to you?

14   A.    No.

15   Q.    Had you heard that term before?

16   A.    Yes.

17   Q.    Is that how you referred to the letter agreement that we

18   looked at previously?

19   A.    I don't -- I believe that's the terminology that's used in

20   the email chain, if I remember correctly.

21   Q.    Is that what you considered it to be at the time?

22   A.    Yes.

23   Q.    Would you please -- if we could please display what is in

24   evidence as Exhibit 1329.

25        If we could please look at the top portion of the page.
```

ARAUJO - REDIRECT / LEACH

1          And do you see the paragraph from Mr. Hussain where he

2   writes, "I also need a side letter which will be disclosed."

3   That's the term Mr. Hussain used at the time, is it not?

4   A.   That's correct.

5   Q.   Is that a word that the Government gave to you?

6   A.   What do you mean?

7   Q.   Did the Government in any way suggest that the agreement

8   between Tikit and Autonomy was a side letter or was that --

9   A.   No.

10  Q.   -- what you considered it at the time?

11  A.   Well, that -- yeah.  It was language that would be used

12  internally.

13  Q.   And you were asked a number of questions about whether you

14  would be involved in something that was wrong or illegal.  Do

15  you recall that questioning?

16  A.   Yes.

17  Q.   Was it your belief that this side letter would be

18  disclosed to the auditors?

19  A.   Yes, it was.

20  Q.   Did that factor into your belief that you weren't doing

21  anything wrong?

22  A.   It certainly legitimized the transaction for me.  I'm not

23  an accounting expert so, you know, the fact that we had lawyers

24  and accountants looking at it was -- legitimized it for me.

25  Q.   Would you be comfortable doing an undisclosed side

ARAUJO - REDIRECT / LEACH

1    agreement?

2    **A.**    In what context?

3    **Q.**    In this context.

4    **A.**    No.

5    **Q.**    You were also asked questions about the SMS calls.  Do you

6    remember that questioning?

7    **A.**    Yes.

8    **Q.**    And you were asked questions about Stouffer Egan's

9    reputation on the SMS calls?

10   **A.**    Yes.

11   **Q.**    What was Mike Lynch and Sushovan Hussain's reputation on

12   the SMS calls?

13              **MR. DOOLEY:**  Objection to foundation.

14              **MR. LEACH:**  He opened the door, Your Honor.

15              **THE COURT:**  Sustained.

16              **MR. DOOLEY:**  Still as to the foundation.

17              **THE COURT:**  Well, you have to lay a foundation.

18   **BY MR. LEACH:**

19   **Q.**    You participated in the SMS calls?

20   **A.**    For my business unit, yes.

21   **Q.**    You also listened in with respect to other business units,

22   even if you weren't participating?

23   **A.**    Very, very -- I -- very rarely.  I may have.

24   **Q.**    Did you ever hear Mike Lynch on an SMS call?

25   **A.**    I don't recall hearing Mike Lynch on an SMS call.

**ARAUJO - REDIRECT / LEACH**

1   **Q.**   Did you hear Sushovan Hussain on an SMS call?

2   **A.**   Yes.

3   **Q.**   How many times?

4   **A.**   Very few.  Very few.  I wouldn't -- you don't wake up in

5   the morning wanting to be on SMS calls.

6   **Q.**   Why not?

7   **A.**   They were tough.

8   **Q.**   What do you mean?

9   **A.**   The style on SMS calls is not something that I would, you

10  know -- it wouldn't suit my style personally, so, you know ...

11  **Q.**   Do you differentiate these pipeline calls from pipelines

12  you've experienced in other environments?

13  **A.**   Yes.

14  **Q.**   How so?

15  **A.**   The -- the degree of detail, the -- let me put it this

16  way.  That the calls in other environments were probably more

17  respectful to the individual than some of the calls that would

18  happen at Autonomy.

19  **Q.**   You also testified -- I think I got this right -- that

20  Tikit was guaranteed there was no downside.  What did you mean

21  by that?

22          **MR. DOOLEY:**  Objection.  Mischaracterizes the

23  testimony.

24          **THE WITNESS:**  Well --

25          **THE COURT:**  Go ahead.

ARAUJO - REDIRECT / LEACH

1              THE WITNESS:  The -- the side agreement that we had

2    provided protection for the error margin and the deal, as well

3    as in real terms, the -- any potential that they owed Autonomy

4    the money without having a vehicle to recoup that through other

5    deals.

6    BY MR. LEACH:

7    Q.    If we could please display what has been marked as Exhibit

8    5969.  Thank you so much.

9         Do you recall being asked questions about this exhibit,

10   Mr. Araujo?

11   A.    Yes.

12   Q.    And I draw your attention to the language "My

13   understanding of what we have agreed is that you will be

14   allowed to offset POs against the 4.05M."  Is that 4 million

15   pounds?

16   A.    That's correct.

17   Q.    "For this to hold, you need to start to pay down the

18   balance owing in said order.  To the extent that orders already

19   issued are intended to be offset against this balance, we

20   should review and discuss together."

21        What did you understand that language to mean?

22   A.    So my interpretation, just looking at this paragraph

23   independently, is that there were orders that were already

24   placed by Tikit that were not offset against this balance and

25   that were already booked by Autonomy separately, and so, you

ARAUJO - REDIRECT / LEACH

1  know, to the extent that Tikit has already placed these things

2  before, you know, we need to go -- they need -- they were going

3  to go and discuss it.

4  **Q.**   So these are orders that Tikit had placed to Autonomy and

5  Autonomy had delivered on?

6  **A.**   Yes.

7  **Q.**   And those could be software in X amounts, Y amounts, with

8  these connectors; is that right?

9  **A.**   That's right.

10  **Q.**   That could be offset against what was owed?

11  **A.**   Right.

12  **Q.**   Is that within the spirit of the side agreement that you

13  reached at the end of December, 2010?

14  **A.**   Well, this specific sentence says that you can look back

15  and it doesn't say over what period.  Look back and, you know,

16  orders that were already placed in the past, not in the future.

17  And you can try and figure out which ones of those will be used

18  to offset against the 4.05 million pounds.

19  **Q.**   Was that consistent with the spirit of what you agreed to

20  at the end of 2010?

21  **A.**   The spirit of what we agreed to was that they -- they

22  could offset all future orders.  So I don't know the timing

23  specifically on this one.

24  **Q.**   Okay.  You testified earlier about a meeting you had in

25  London with representatives of Tikit and Mr. Hussain.  Do you

ARAUJO - REDIRECT / LEACH

1  recall that testimony?

2  **A.**   Yes.

3  **Q.**   Was Mr. Egan at that meeting?

4  **A.**   No.

5  **Q.**   Was Mr. Egan involved in any way in the discussion with

6  Tikit or the ultimate consummation of the deal with KPMG?

7  **A.**   He was not directly involved.   I -- he was probably aware

8  that I was flying to London and what was going on.

9      But in the ultimate deal that was done with KPMG, the

10  individual that was driving the deal, the sales individual,

11  reported into Stouffer's organization.

12  **Q.**   And in the SMS calls that you participated in with

13  Mr. Hussain, who made the calls so difficult?  Was it Mr. Egan?

14  **A.**   Mr. Egan or Mr. Hussain were very rarely on the calls for

15  my business.   I believe that they were run differently from the

16  other business unit.

17  **Q.**   The pressure or the toughness that you associate with

18  these, where is it coming from?

19        **MR. DOOLEY:**  Objection.   Foundation.

20        **THE COURT:**  Overruled.

21        **THE WITNESS:**  It -- it comes from the culture that --

22  that was more prevalent in the -- across -- across the

23  business.

24  **BY MR. LEACH:**

25  **Q.**   Who did you believe was responsible for that culture?

1          **MR. DOOLEY:**  Objection.  Foundation and vague and

2    irrelevant.

3          **THE COURT:**  Sustained.

4    **BY MR. LEACH:**

5    **Q.**    Did you associate Mr. Egan with that culture?

6          **MR. DOOLEY:**  Same objection.

7          **THE COURT:**  Well, overruled.

8       Go ahead.

9          **THE WITNESS:**  He was certainly one of the -- one of

10   the persons associated with that culture, yep.

11   **BY MR. LEACH:**

12   **Q.**    Who were the others?

13         **MR. DOOLEY:**  Same objection.

14         **THE COURT:**  Well, you are asking him what did he

15   believe at the time?

16         **MR. LEACH:**  Yes.

17         **THE COURT:**  Overruled.

18         **THE WITNESS:**  It -- it was -- it was other folks in

19   management, you know, at Autonomy.

20   **BY MR. LEACH:**

21   **Q.**    Other folks who, Mr. Araujo?

22   **A.**    Andrew Kanter, Ian Black, Fernando Lucini, Sushovan, to

23   some degree.  There were a bunch of individuals that

24   represented that -- that culture.

25   **Q.**    Thank you.

1    You also testified on cross-examination -- I think I heard

2  you say that Autonomy had more CEOs than products.  Do you

3  recall that testimony?

4  **A.**   Yes.

5  **Q.**   What did you mean by that?

6  **A.**   Well, there were a lot of people with the title of -- CEO

7  title.  I didn't have any of the power or authority of -- you

8  know, of a CEO.  There were plenty of people with CEO titles.

9  We actually had more products than -- I was -- it was a common

10  joke that there is too many CEOs at Autonomy.

11  **Q.**   Thank you, Mr. Araujo.

12    Thank you, Your Honor.  I have nothing further.

13        **MR. DOOLEY:**  Nothing further.

14        **THE COURT:**  Okay.  You are excused.  Thank you.

15    Call your next witness.

16    Ladies and gentlemen, if you want to stand up, you can.

17  Stretch.

18        **MR. REEVES:**  At this time, the United States calls

19  Stouffer Egan.

20            **CHRISTOPHER EGAN**,

21  called as a witness for the Government, having been duly sworn,

22  testified as follows:

23        **THE CLERK:**  Please be seated.  Please state your full

24  name for the record and spell your last name.

25        **THE WITNESS:**  Christopher Bradley Egan, E-G-A-N.

1          **MR. REEVES:**  May I inquire?

2          **THE COURT:**  Yes.  Go ahead.

3                 **DIRECT EXAMINATION**

4    **BY MR. REEVES:**

5    **Q.**  Good afternoon, Mr. Egan.

6    **A.**  Hello.

7    **Q.**  Pull that microphone all the way up so we can hear you,

8    please.

9        Let me direct your attention, if I can, to on or around

10    November 28, 2017.  On or about that time, did you enter into

11    an agreement known as a Deferred Prosecution Agreement with the

12    Department of Justice?

13    **A.**  I did.

14    **Q.**  And in the Deferred Prosecution Agreement, did you admit

15    wrongdoing?

16          **MR. KEKER:**  Objection.  Leading.

17          **MR. REEVES:**  Yes.

18          **THE COURT:**  Overruled.

19    **BY MR. REEVES:**

20    **Q.**  And in your Deferred Prosecution Agreement, did you admit

21    wrongdoing and accept responsibility relating to your work at

22    Autonomy?

23          **MR. KEKER:**  Same objection.

24          **THE COURT:**  Overruled.

25          **THE WITNESS:**  I did.

1    BY MR. REEVES:

2    **Q.**    Did you agree to cooperate with the U.S. Attorney's

3    Office?

4    **A.**    I did.

5    **Q.**    And did that cooperation include appearing to testify in a

6    trial, just like today?

7    **A.**    It did.

8    **Q.**    Did the United States agree not to prosecute you for the

9    wrongdoing to which you admitted in the Deferred Prosecution

10    Agreement?

11    **A.**    It did.

12    **Q.**    In your own words, Mr. Egan, would you please take a

13    moment and tell us what was the wrongdoing to which you

14    admitted.

15    **A.**    I put together deals and documented them that allowed the

16    company to report inflated revenue numbers, including selling

17    deals to resellers when there was not an end user on the other

18    side of that deal.

19         In one case, I backdated a deal one.

20         I pursued and completed quid pro quo deals.

21         And I wrote misleading emails to document some of these

22    deals.

23    **Q.**    Did you do that with other people at Autonomy?

24    **A.**    I did.

25    **Q.**    Were you also charged in or around 2016 by the

1   United States Securities and Exchange Commission?

2   **A.**   Yes.

3   **Q.**   And did you resolve or settle the enforcement action

4   brought by the United States Securities and Exchange

5   Commission?

6   **A.**   I settled.

7   **Q.**   You settled it.  Did that happen in or around November

8   2016, approximately?

9   **A.**   It did.

10  **Q.**   And as part of that resolution with the SEC, did you

11  disgorge profits?

12  **A.**   I did.

13  **Q.**   I'd like to show you what has been marked for

14  identification as Exhibit 2944.  There is a set of two binders

15  there.  I think they're organized numerically.  Probably in the

16  second one you'll find Exhibit 2944.

17      Take a moment and tell us if you find it.

18  **A.**   I will review this and find it.  I'm sorry.  What was the

19  number again?

20  **Q.**   2944.

21      **THE COURT:**  Admitted.

22      **MR. KEKER:**  Objection, Your Honor.  This is hearsay.

23      **THE COURT:**  Okay.  Wait.  Hold on.  Let me look at it.

24      **MR. KEKER:**  What's in it is hearsay, self-serving

25  statements that he and the SEC worked out.  And I object to it

1    as hearsay.

2          **MR. REEVES:**  I'm happy to strike the portions that

3    pertain to the facts, if that would satisfy the objection.

4    It's the terms and conditions of the settlement that I'm trying

5    to introduce into evidence, please.

6          **MR. KEKER:**  And that's fine.  That's fine with me.

7          **THE COURT:**  Okay.  Then admitted as agreed as

8    redacted.

9          **MR. KEKER:**  Yes, sir.

10          **MR. REEVES:**  Thank you, Your Honor.

11          (Trial Exhibit 2944 received in evidence)

12    **BY MR. REEVES:**

13    **Q.**   With the Court's permission then I would like to display

14    the first page of Exhibit 2944, the caption, and then -- if we

15    could enlarge -- okay.

16          Is this the first page of Exhibit 2944, Mr. Egan?

17    **A.**   Yes.

18    **Q.**   And is this the caption of the case brought by the SEC

19    against you?

20    **A.**   Yes.

21    **Q.**   All right.

22          Let's go to the portion relating to disgorgement on page

23    8, please.  If we could enlarge perhaps paragraph B.  That's

24    great.  Thank you very much.

25          Is this the portion of the order and settlement that

1    addresses the amount of your disgorgement?

2    **A.**   Yes.

3    **Q.**   What is the approximate amount of money that you

4    disgorged?

5    **A.**   $922,000.

6    **Q.**   And was that money paid by you to the SEC?

7    **A.**   Yes.

8    **Q.**   Who calculated that amount of money?

9    **A.**   The SEC.

10   **Q.**   What is your understanding of what that amount of money

11   represents?

12          **MR. KEKER:**   Objection, Your Honor.  This is hearsay.

13          **MR. REEVES:**   I'm asking for the witness'

14   understanding, Your Honor.

15          **MR. KEKER:**   His understanding is irrelevant.

16          **THE COURT:**   No, I don't think it is.

17       Overruled.

18   **BY MR. REEVES:**

19   **Q.**   What is your understanding of what that $922,000

20   represents, Mr. Egan?

21   **A.**   It was a calculation that the SEC made by taking all of

22   the deals that they had a negative judgment of and calculating

23   their impact on my earnings and then summing it up.

24   **Q.**   Are those the deals that are the subject of the wrongdoing

25   you've described?

1    **A.**    Those and I think even some additional deals.

2    **Q.**    All right.

3         **THE COURT:**  So, ladies and gentlemen, let me explain

4    this testimony because it's not being introduced for the truth

5    of the matter; that is to say, it's not being introduced that

6    that is the figure that represents what the witness said was

7    his understanding.  In other words, the SEC said, "Okay, we

8    think this is the appropriate amount under these

9    circumstances."

10        Whether they think it's the appropriate amount or not is

11   not in evidence.  What is in evidence is the fact that the

12   witness, I assume, paid that amount or disgorged that amount.

13        **THE WITNESS:**  I did.

14        **THE COURT:**  Okay.  So it is -- it is an amount of

15   money that he had to pay in connection with the settlement of

16   the dispute.  That's all it's to be considered for.

17        Okay.  Go ahead.

18        **MR. REEVES:**  Thank you, Your Honor.

19        **MR. KEKER:**  I would ask to strike his understanding of

20   what the SEC thought it was.  I completely agree with

21   everything you said, but I would ask you to strike his

22   description of what the SEC thought.

23        **THE COURT:**  Well, except they told him that's what

24   they thought it represented, so it does go to his state of

25   mind, so as to that part of the objection, it's overruled.

1          Go ahead.

2          But it still is hearsay; that is to say, what they thought

3     is what they thought, period.

4          Okay.

5               MR. REEVES:  Thank you, Your Honor.

6               MR. KEKER:  Well, I guess -- I'm sorry.  I keep --

7     what they thought is being -- is -- if they take it as the

8     truth of the matter --

9               THE COURT:  No.  I told them they can't.  I just got

10    finished saying you cannot accept what they thought as the

11    truth of the matter.  You can only accept that that is what the

12    witness thought -- it's going to sound silly -- thought they

13    thought.

14         So, in other words, it is -- and it makes no difference

15    what they thought.  It's what the witness believed it to be;

16    that is, somebody can say something to you and you can react a

17    certain way, and if asked the question "why did you react this

18    certain way," you can tell it.  "I reacted because I thought

19    that person was mad at me" or "I reacted because that person

20    thinks I owe him money" or "I reacted because I think that that

21    person said something or did something."

22         Well, that he did something, said something, thought

23    something, that's not evidence.  What is evidence is what this

24    witness believed it to be because it goes to this witness'

25    state of mind, and that is relevant.

1          Okay.

2               **MR. REEVES:**  Thank you, Your Honor.

3     **Q.**   Mr. Egan, where are you from?

4     **A.**   Originally, Syracuse, New York.

5     **Q.**   And what is your educational background, please?

6     **A.**   I did a four-year degree, BA in economics,

7     college-educated.

8     **Q.**   And after you completed college, please describe your

9     career.

10    **A.**   I originally went straight to work for Glaxo

11    Pharmaceuticals as a salesperson, and then I went to work in

12    the software industry.

13    **Q.**   And --

14    **A.**   And I've been doing that ever since.

15    **Q.**   Where did you begin your career in the software industry?

16    **A.**   For a company called Dataware Technologies.

17    **Q.**   How long did you work at Dataware?

18    **A.**   About 11 years.

19    **Q.**   Did there come a time when you joined Autonomy?

20    **A.**   Yes.

21    **Q.**   Approximately when did that happen?

22    **A.**   March 2001.

23    **Q.**   In what capacity did you join Autonomy?

24    **A.**   I was in charge of business development and partnerships

25    on the East Coast of the United States.

1  Q.   Out of what location were you working in those days?

2  A.   Boston, Massachusetts.

3  Q.   Describe your early career at Autonomy, beginning in or

4  around March 2001.  The next few years, how did things

5  progress, please?

6  A.   I joined and immediately started selling with the

7  representatives on the East Coast.  Very quickly I was given

8  responsibility to manage the salespeople on the East Coast, and

9  pretty quickly, relative to how long I worked there, I was

10 given responsibility to manage sales across the whole of the

11 U.S.

12 Q.   So how quickly did that series of promotions and evolution

13 take place within your career at Autonomy?

14 A.   The first move to manage sales in the East Coast was

15 within months, single-digit months, low single-digit months.

16      The second where I took responsibility for the U.S. was

17 less than a year.  Pretty quickly.

18 Q.   In or around 2004, did you move locations as part of your

19 job at Autonomy?

20 A.   I did.

21 Q.   What happened?

22 A.   I moved from my -- my family and I both moved from

23 Massachusetts to San Francisco, California.

24 Q.   And for what purpose did you move to San Francisco within

25 your job at Autonomy?  Why did you do that?

**A.**    At that point, the company had just made an acquisition
which increased the number of headcount in San Francisco, so
the U.S. organization went from being pretty virtual and with
some base in San Francisco to being much more heavier on the
base of employees in San Francisco.  It was getting bigger and
more San Francisco-based.

**Q.**    And what was your role going to be as a result of this
move to San Francisco in or around 2004?

**A.**    My role was the same.  My title was CEO of the Americas,
but what it largely translated into was I was in charge of the
sales motion in the Americas.

**Q.**    Let's focus on that.  As CEO of the Americas within
Autonomy, beginning in or around 2004 and moving to about 2008,
would you please describe your duties and responsibilities, the
focus of your job, what you did.

**A.**    I would hire salespeople, define how they were
incentivized with pay, manage their forecasts, go on sales
calls with them, close deals, kind of meet with customers.
Heavily focused on customer facing and forecast-based activity,
as well as hiring in various spurts.

**Q.**    In these years, 2004 to 2008, did Autonomy have
headquarters in various locations?

**A.**    Yes.

**Q.**    Where was Autonomy headquartered?

**A.**    In Cambridge in the UK and San Francisco in the U.S.

1   Q.   So dual headquarters in two locations?

2   A.   Correct.

3   Q.   Was there any type of strategic need, as you understood

4   it, for Autonomy to be headquartered in California?

5   A.   We touted the fact that we were dual headquartered in

6   Cambridge and San Francisco for sort of marketing and brand

7   purposes.

8   Q.   What purpose did touting Autonomy's being headquartered in

9   California serve for Autonomy?

10  A.   San Francisco or the Bay Area was kind of where the best

11  software companies or many of the best software companies or

12  most of the best or biggest software companies were

13  headquartered, so it was a -- sort of an association thing:  To

14  be dual headquartered in Cambridge, obviously with a great

15  reputation for academics and math and science, and

16  San Francisco, with a great reputation for technology

17  companies.

18  Q.   I'd like to show you, if I could, please, what has been

19  marked as Exhibit 2933, please.  Three photos here.

20       THE COURT:  29 --

21       MR. REEVES:  33.

22  Q.   Do you recognize these photos Mr. Egan?

23  A.   I'm looking at one.

24       (Witness reviews documents.)

25       Yes.

1    **Q.**    What are they?

2    **A.**    They are each Autonomy offices.

3              **MR. REEVES:**  At this time, I offer Exhibit 2933 in

4    evidence, please.

5              **THE COURT:**  Admitted.

6        (Trial Exhibit 2933 received in evidence)

7    **BY MR. REEVES:**

8    **Q.**    We are looking at 2933, page 1.  What is that a photo of?

9    **A.**    The outside of one of Autonomy's London offices.

10   **Q.**    In what part of London, if you know?

11   **A.**    Central London.  Mayfair, I think it's called.

12   **Q.**    Did you have an opportunity to go there as part of your

13   job during your career at Autonomy?

14   **A.**    I did.

15   **Q.**    With what kind of frequency or how often?

16   **A.**    There were a couple London offices.  This specific office,

17   I don't remember how many times specifically, but I would go

18   probably three times a year to a London office.

19   **Q.**    For what purpose would you go to Autonomy's London

20   offices?

21   **A.**    A management meeting.

22   **Q.**    With whom?  What individuals?

23   **A.**    It varied some, but there was a core group of us that were

24   mostly always present at those meetings.

25   **Q.**    And who was that core group?

**A.**    Myself, Mike Lynch, Sushovan Hussain, Andy Kanter, Nicole

Eagan, Pete Menell.  That would be one core.  And then there

was another group of people that were very frequently there.

**Q.**    Okay.  We'll come to those in due course.

Let's take a look at the next photo, please, Exhibit 2933.

Do you recognize this?

**A.**    I do.

**Q.**    What is this?

**A.**    This is the Cambridge headquarters building.

**Q.**    Is that in Cambridge, England?

**A.**    It is.

**Q.**    Is that located to the north of London, if you know?

**A.**    It is.

**Q.**    All right.  And what type of offices did Autonomy maintain

in Cambridge, England?

**A.**    If memory serves, I think we had two floors.  One floor at

one time and then two floors at a later time of a three- or

four-floor building.

**Q.**    Okay.  Are you related to Nicole Eagan?

**A.**    I am not.

**Q.**    Different "Egan"?

**A.**    Different Egan; different spelling.

**Q.**    Very good.  Thank you very much.

Did you have occasion to go to Autonomy's office in

Cambridge?

1    A.    I did.

2    Q.    With what frequency or what basis?

3    A.    Similar frequency, probably averaging about three times a

4    year.

5    Q.    Finally, let's take a look at Exhibit 2933, page 3,

6    please.  Do you recognize this beautiful city?

7    A.    I do.

8    Q.    And does Autonomy have an office located in downtown

9    San Francisco?

10    A.    They did.

11    Q.    All right.  Is that depicted here?

12    A.    It is.

13    Q.    Can you show us where it is, please.

14    A.    It's the -- the smaller of the two identical buildings.

15    Yes.  It's circled.

16    Q.    What was the address of that location, if you recall?

17    A.    1 Market.

18    Q.    Is that where you worked?

19    A.    It is.

20    Q.    For how long were you working at 1 Market Street in

21    San Francisco, California?

22    A.    I don't recall when we moved in there.  When I first

23    moved, we had a different address, but a number of years.

24    Q.    A number of years?

25    A.    Yeah.

EGAN - DIRECT / REEVES

1  Q.   During the years 2008 to 2011, is that where you were

2  working?

3  A.   Yes.

4  Q.   That was your headquarters?

5  A.   Yes.

6  Q.   And was that the Autonomy headquarters in the

7  United States?

8  A.   Yes.

9  Q.   So as CEO of the Americas at Autonomy, approximately how

10 many people did you supervise during the time period 2008 to

11 2011?  Roughly how many people?  How big an organization were

12 you managing or supervising during that time period?

13 A.   From 2008 to 2011, it changed quite a bit.  So there were

14 times when I would have been supervising more than a hundred

15 people and times when I would have been supervising fewer than

16 five.

17 Q.   Okay.  Was that a period of growth for the company?

18 A.   It was.

19 Q.   And did -- were you supervised by people within Autonomy?

20 A.   I was.

21 Q.   By whom were you supervised?

22 A.   Primarily a combination of Richard Gaunt, Sushovan

23 Hussain, and Mike Lynch.

24 Q.   In the time period 2008 to 2011, who were your

25 supervisors, your principal supervisors?

1    **A.**    Mike Lynch and Sushovan Hussain.

2    **Q.**    I would like to show you what has been marked for

3    identification as Exhibit 2934, please.  Do you recognize the

4    photos on this page?

5    **A.**    I do.

6            **THE COURT:**  Admitted.

7            **MR. KEKER:**  Your Honor, for the record, I object to

8    it.  It's argumentative and it's 403.  I mean, it's like a

9    bullseye.

10            **THE COURT:**  Well, it's actually not a bullseye.  It

11    could have been --

12            **MR. KEKER:**  Well, it's close.  It's got the red and

13    everything.

14            **THE COURT:**  Thank you.  Overruled.

15        (Trial Exhibit 2934 received in evidence)

16    **BY MR. REEVES:**

17    **Q.**    Let's go through some of the people depicted in Exhibit

18    2943, please.  Let's start with Dr. Lynch.  Do you recognize

19    him in the photo at the top, Mr. Egan?

20    **A.**    I do.

21    **Q.**    Between 2008 and 2011 -- that will be the time period that

22    I'll be focusing on -- why don't you describe, please, your

23    level of interaction with Dr. Lynch.

24    **A.**    High level of interaction.

25    **Q.**    On what types of topics at a high level, please.

1    **A.**    Everything from personal to deals to the company.

2    **Q.**    All right.  And down below him is Mr. Hussain.  Do you

3    recognize that photo?

4    **A.**    I do.

5    **Q.**    And between 2008 and 2011, describe, please, your level of

6    interaction with Mr. Hussain?

7    **A.**    Very high.

8    **Q.**    On what types of issues, please.

9    **A.**    Everything.  Again, from personal daily, heavily, heavily

10   around sales and deals and the sales side of the business.

11   **Q.**    All right.  To the left of Mr. Hussain is Andrew Kanter.

12   Do you recognize that photo?

13   **A.**    I do.

14   **Q.**    Is that Mr. Kanter?

15   **A.**    It is.

16   **Q.**    In this time period, 2008 to 2011, how much contact did

17   you have with Mr. Kanter?

18   **A.**    Reasonable contact.

19   **Q.**    On what types of issues?

20   **A.**    Contracts, management meetings, personal some, just on a

21   less frequent basis.

22   **Q.**    What was Mr. Kanter's role within Autonomy between 2008

23   and 2011?

24   **A.**    He was the general counsel, legal.

25   **Q.**    To the right is Dr. Peter Menell.  Do you recognize him?

1  **A.**    I do.

2  **Q.**    Is that his photo?

3  **A.**    It is.

4  **Q.**    What was Mr. Menell's -- Dr. Menell's role within Autonomy

5  in this time period?

6  **A.**    He was CTO.

7  **Q.**    And what was your level of interaction with Dr. Menell?

8  **A.**    Between Andy's and, say, Sushovan's and Mike's.

9  **Q.**    On what types of issues?

10 **A.**    On deals, on tech, on personal, on the sales engineers who

11 were counterparts to the salespeople that I interacted with who

12 worked for Pete.

13 **Q.**    When you say "on tech," what do you mean?

14 **A.**    Meaning if we had technical questions or were working on

15 technical proofs of concepts, all of the technical proof effort

16 that we would put into a sale ultimately reported into Pete.

17 So he was an escalation point for that.

18 **Q.**    When you say "escalation point," what do you mean?

19 **A.**    If I -- if I wanted a different sales engineer or a

20 different opinion or answer or needed more -- if it was

21 technical, he was just the ultimate person to ask the question

22 of.

23 **Q.**    In the lower left-hand corner, do you recognize the photo

24 of Mr. Joel Scott?

25 **A.**    I do.

**EGAN - DIRECT / REEVES**

1   **Q.**   Did you work with Mr. Scott?

2   **A.**   I did.

3   **Q.**   Is that a fair depiction of his photograph there?

4   **A.**   Yes.

5   **Q.**   Okay.  On what sorts of issues did you work with

6   Mr. Scott?

7   **A.**   Legal, deal terms.

8   **Q.**   Where was Mr. Scott located?

9   **A.**   In the San Francisco office.

10  **Q.**   And on the lower right-hand corner, do you recognize

11  Mr. Michael Sullivan?

12  **A.**   I do.

13  **Q.**   What was Mr. Sullivan's role during 2008 to 2011?

14  **A.**   He was the CEO of the Zantaz division.  He was in charge

15  of compliance products.

16  **Q.**   What was your level of contact with Mr. Sullivan?

17  **A.**   Again, in the middle, so reasonable.  Quarterly meetings,

18  probably monthly at the longest and sometimes weekly.

19  **Q.**   I'd like to show you what has been marked as Exhibit 2600

20  if I could, please.  Actually, 2600, page 1.

21      Do you have that in your binder?

22          **MR. KEKER:**  I don't have 2600.

23          **THE WITNESS:**  No.  I don't think so.  This is the

24  binder that goes the highest.

25          **THE COURT:**  It's an organization chart?

1              THE WITNESS:  I don't have that.

2              MR. REEVES:  Yes.

3    Q.   Do you not have Exhibit 2600?

4              THE COURT:  I don't.  It's okay.

5              THE WITNESS:  I don't have a tab with that number on

6    it.  It goes to 2951.

7              THE COURT:  Any objection?

8              MR. KEKER:  Let me just get it, Your Honor.  I'm

9    sorry.  We just got these last night.

10        I don't have any objection to the first page.

11             THE COURT:  Admitted.

12        (Trial Exhibit 2600 received in evidence)

13   BY MR. REEVES:

14   Q.   If we could please display that.  And are we able to

15   rotate it?  Great.

16        Okay.  Mr. Egan, are you comfortable using the screen?

17   A.   Yes.

18   Q.   Okay.  It looks like this is some type of org chart in --

19   at Autonomy during, I think, approximately 2009 or so.  Does

20   that make sense to you?

21   A.   It sounds right.  We didn't -- I didn't see many org

22   charts.

23   Q.   Do you see yourself noted here as someone who, according

24   to the terminology and logic of the org chart, is reporting up

25   to Dr. Lynch?

1    **A.**    I do.

2    **Q.**    Your title here is "CEO NA."  Do you see that?

3    **A.**    I do.

4    **Q.**    Is that North America?

5    **A.**    Yes.  I would think.

6    **Q.**    Are there other CEOs also at Autonomy in this time period?

7    **A.**    Yes.

8    **Q.**    Who were some of the other, quote, CEOs at Autonomy in

9    this time period?

10   **A.**    Well, going off the document, I could say Mike Sullivan,

11   James Murray, Nick Hough-Robbins, Andrew Joiner, Neil Araujo,

12   Rafig Mohammadi, if I've got them all.

13   **Q.**    While you were at Autonomy, were there, in fact, multiple

14   persons with the CEO title?

15   **A.**    Oh, and Mike, obviously.

16   **Q.**    While you were at Autonomy, were there multiple people

17   with the title of CEO at Autonomy?

18   **A.**    With CEO in their title, yes.

19   **Q.**    And did that serve any type of purpose, as you understood

20   it, to have multiple CEOs within Autonomy?

21   **A.**    In my opinion, it served two purposes:  One, it gave us

22   greater entrée and ability to represent things to customers.

23   It was a very sales-minded company and a very sales-minded

24   choice to use that title.  And it also served to kind of imply

25   people's importance relative to where they stood in the company

1    and Mike.

2    **Q.**    All right.    How would having the title CEO as part of your

3    title enhance your opportunity to sell, if I'm paraphrasing

4    your last answer?    How would that help?

5    **A.**    Well, a lot of the deals that I did personally or that

6    were done in general were very large, multimillion dollar

7    deals.    You're meeting with very senior people in the company

8    that you're selling to, and it -- it gave them the sense that

9    they were interacting, so as to find a good deal, the

10    negotiation, the leveling was useful in selling.

11    **Q.**    A boss-to-boss type transaction?

12    **A.**    Yep.

13    **Q.**    That served a certain sales purpose, did it not?

14            **MR. KEKER:**    Objection.    Leading, Your Honor.

15            **THE COURT:**    Overruled.

16    **BY MR. REEVES:**

17    **Q.**    Did it serve a certain sales purpose to have the title

18    CEO?

19    **A.**    To have the title CEO did serve a sales -- it had sales

20    value to it, in my experience.

21    **Q.**    Thank you very much.

22            In the time period 2008 to 2011, how closely did you work

23    with Sushovan Hussain?

24    **A.**    Very.

25    **Q.**    And you said before that that was -- that related to

1    strategic deals and sales management and forecasting?

2    **A.**   All three of those things, yep.

3    **Q.**   Can you elaborate on the types of things you were working

4    closely with Mr. Hussain on in this time period, 2008 to 2011?

5    **A.**   We would work on the forecast together closely.  We would

6    often both participate on the sales forecast calls.  We would

7    often both participate on singular deals.  We would often

8    participate in exchanging information about the parameters of a

9    deal, the willingness to discount or price strategy payment

10   terms, how much software to give or not give, all manner of

11   parameters around deals.

12   **Q.**   In this time period, 2008 to 2011, what was Mr. Hussain's

13   title within Autonomy?

14   **A.**   CFO and I believe he may have been a board director for a

15   part of that time.  I'm not sure about the whole time.

16   **Q.**   Did you work with Mr. Hussain directly in any of the

17   finance-related duties that are associated with being CFO?

18   **A.**   No.

19   **Q.**   You worked with him on sales-related activity, did you

20   not?

21   **A.**   Sales and the financial aspects of doing sales, yeah.

22   **Q.**   All right.  And how heavily involved, from what you could

23   see, was Mr. Hussain in the sales process that you've

24   described?

25   **A.**   In the overall sales process, he was very involved.  But

1  in parts of sales, he was not involved at all.

2  Q.    All right.  So when you say that you worked with

3  Mr. Hussain between 2008 and 2011 on the forecast, what do you

4  mean by that?

5  A.    Meaning I would give him deals to forecast.  He would

6  register his opinion about the forecast.  He would pass me

7  input about the forecast.  It was just a constant rapport about

8  where we had stood relative to a forecast.

9  Q.    Was that in relation to reporting periods in any sense?

10  A.    In the ultimate sense, yes.

11  Q.    Quarters, for example?

12  A.    Yeah.  It was quarterly.

13  Q.    Was there a quarterly cycle to some of this forecasting

14  work?

15  A.    It was only quarterly.  We did not do monthly or anything

16  shorter.  We forecasted on a quarterly basis.

17  Q.    Describe how you would forecast in conjunction with

18  quarterly reporting.  What do you mean by that?

19  A.    Meaning we had quarters.  They were the same as the

20  calendar quarters in a year.  January, February, March was Q1,

21  etc.  And we would manage the sales teams.  Myself, the

22  Americas team.  At times, subsets of it.  We would manage them

23  to a quarterly forecast.  In other words, what deals were each

24  rep forecast -- or was each rep forecasting for that quarter.

25  And then they would roll up.  So one group would -- we would

1  sort of calculate all of their deals and forecast them for the

2  quarter.

3  **Q.**    Roll up to whom?

4  **A.**    Multiple roll-ups.  So there were different contributors

5  to a number that I would communicate to Sushovan and then

6  Sushovan had a larger scope.  He had more people giving him

7  different numbers.

8  **Q.**    Okay.  And did you use sales calls as part of this

9  forecasting and sales management practice?

10 **A.**    We did.

11 **Q.**    Did Mr. Hussain participate in those sales calls?

12 **A.**    At times.

13 **Q.**    And how would you describe the sales management calls that

14 you participated in with Mr. Hussain in the 2008 to 2011 time

15 frame?

16 **A.**    How would I describe them?

17 **Q.**    Yes.  What happened?

18 **A.**    It was a process of we had a time period set up, multiple

19 hours, and we would have reps and their managers dial into the

20 call and effectively tell us about the deals that they were

21 forecasting for the quarter.  And we would kind of test those

22 deals:  Had they passed through this part of a process, had

23 they passed through that part of a process.  Were we thinking

24 about this.  Had we done technical.

25      It was kind of a -- well, it was all an oral process of

1  accounting for all the deals that could make up the quarter and

2  testing them for some level of stability or likelihood to

3  close.

4  **Q.**   And how did Mr. Hussain participate in those sales

5  management calls that you participated in with him?  What was

6  his role?

7  **A.**   Sometimes entirely silent and passive.  Sometimes he would

8  lead it.

9  **Q.**   Sometimes he would lead it?

10 **A.**   Sometimes he would lead it.  Sometimes he would just ask

11 questions of a select group of deals.

12 **Q.**   What does it mean to lead a sales call?

13 **A.**   Well, every week when we entered a sales call, we would

14 establish one leader or possibly even part of it because

15 sometimes you weren't in the office or couldn't -- weren't

16 available, needed to go to another meeting, something like

17 that.

18 **Q.**   You said that you also worked with Mr. Hussain on singular

19 deals between 2008 and 2011.  What did you mean by that?

20 **A.**   Meaning that different from working on the overall

21 forecast or sales force getting a number together, we would

22 work on a specific deal together.

23 **Q.**   Strategic deals, for example, large-dollar deals?

24 **A.**   Generally larger dollar deals.

25 **Q.**   So you tell us, what types of deals would you work on

1    directly with Mr. Hussain?

2    **A.**    We worked on a very, very large Bank of America deal.

3    **Q.**    That's an example?

4    **A.**    Yep.

5    **Q.**    So between 2008 and 2011, from what you could see, how

6    much attention to detail did Mr. Hussain show with regard to

7    sales at Autonomy?

8    **A.**    Very high level.  He was enthusiastic about it, very well

9    informed, passionate about it.  He was the hardest working guy

10   in the company, so ...

11   **Q.**    I'd like to show you, if I could, please, what has been

12   marked as Exhibit 2930.  Do you have Exhibit 2930?

13          **THE COURT:**  2930, admitted.

14   (Trial Exhibit 2930 received in evidence)

15          **MR. REEVES:**  Thank you, Your Honor.

16   **Q.**    Do you have that, Mr. Egan?

17   **A.**    I do.

18   **Q.**    Do you recognize Exhibit 2930?

19   **A.**    I do.

20   **Q.**    What is it?

21   **A.**    It's an email from Sushovan to myself, including an

22   attachment.

23   **Q.**    Okay.  Do you recognize the attachment?

24   **A.**    Not specifically.

25   **Q.**    Are you familiar with spreadsheets maintained by

1    Mr. Hussain?

2    **A.**    Yes.

3    **Q.**    What did those spreadsheets -- withdrawn.

4         Did you know based on discussions you had with him about

5    spreadsheets?

6    **A.**    Some spreadsheets.

7    **Q.**    Okay.  And what's your understanding of the spreadsheets

8    that Mr. Hussain had?

9    **A.**    Well, one spreadsheet that I was particularly familiar

10   with that Mr. Hussain had we just referred to as his sheets or

11   his forecast and it was a spreadsheet of the forecast.

12   **Q.**    Let's take a look, if we could, please, at the first full

13   page of the document, of the attached document.

14   **A.**    I don't have that.

15         **MR. REEVES:**  We're going to go old school, Your Honor,

16   if I may.

17   **Q.**    Okay.  I'm showing you the attachment to the exhibit on

18   the ELMO.  Can you see that, Mr. Egan?

19   **A.**    I can see it.

20   **Q.**    Okay.  Do you recognize this type of document?

21   **A.**    I do.

22   **Q.**    Okay.  So tell us what you understand this type of

23   document to be.  What is this?

24   **A.**    This looks like an example of the forecast spreadsheet.

25   **Q.**    And do you have an understanding -- so what's listed on a

 1  forecast spreadsheet like this?

 2  **A.**    A deal name, the value of the deal, the status of the

 3  deal, any notes that we wanted to remind ourselves were a

 4  follow-up or a concern.

 5  **Q.**    All right.

 6  **A.**    Currency.

 7  **Q.**    And did you discuss these sheets that Mr. Hussain

 8  maintained in the course of your work with him on sales in the

 9  years 2008, 2009, 2010, 2011?

10  **A.**    We did.

11  **Q.**    Okay.  And from time to time, would he send you copies of

12  those spreadsheets, to the best of your knowledge?

13  **A.**    Yes.

14  **Q.**    Is that what you referred to as "Sush's sheets"?

15  **A.**    Yes.

16  **Q.**    Do you know if others within Autonomy also did the same,

17  referred to these spreadsheets by Mr. Hussain as "Sush's

18  sheets"?

19  **A.**    I do.

20  **Q.**    Does this in any way, as you understood them, track the

21  progress of sales in a quarter as maintained by Mr. Hussain?

22  **A.**    Yes.

23  **Q.**    Do you have an understanding, based on your discussions

24  with Mr. Hussain, about what, for example, purple deals are as

25  reflected in this exhibit?

1   A.   Purple was a color we used to indicate that a deal was

2   closed.

3   Q.   So that's a good thing; right?

4   A.   Good thing.

5   Q.   And are there dollar amounts in here for the deals?

6   A.   There are.

7   Q.   And are the tracking of the deals and the dollar amounts

8   used to assess how close or the progress of sales over the

9   course of a quarter?

10  A.   Yes.

11  Q.   And did you discuss that as needed with Mr. Hussain in

12  your tracking of deals on a quarterly basis as part of your

13  sales management?

14  A.   Yes.

15  Q.   In any sense, do the spreadsheets for Mr. Hussain roll up

16  toward an overall revenue objective, if you know?

17  A.   They do.

18  Q.   And explain how they do that.

19  A.   Well, I would have a sheet.  Sushovan would break off my

20  portion.  I might update it.  We would exchange it or talk

21  about it.  But it was only a part of a whole, so it would get

22  combined with other parts of the company's sheets.

23  Q.   Would you agree that these spreadsheets are very detailed?

24  A.   Yes.

25  Q.   Was Mr. Hussain involved in the details of the sales

1    management at Autonomy while -- in the 2008 to 2011 time

2    period?

3    **A.**    Many, yes.  Some, no.

4    **Q.**    And was he involved in a lot of the higher level

5    decision-making around strategic sales?

6    **A.**    Yes.

7    **Q.**    Did Mr. Hussain, in managing sales within Autonomy between

8    2008 and 2011, hold people accountable for the details of their

9    sales process?

10    **A.**    He did.

11    **Q.**    How did he do that?

12    **A.**    He -- I mentioned he was very, very hard working.  He had

13    an excellent memory and he would keep great notes on deals, so

14    he was a very powerful force in terms of keeping you

15    accountable to what you said you were going to do or pledged or

16    what should be done in our general judgment about whether a

17    deal should happen or not happen.

18         **THE COURT:**  Maybe we should take a recess.

19         Ladies and gentlemen, we are going to take our recess now.

20    We will be in recess until a quarter of 3:00.  Remember the

21    admonition given to you:  Don't discuss the case, allow anyone

22    to discuss it with you, form or express any opinion.

23         (Proceedings were heard out of presence of the jury:)

24         **THE COURT:**  The jury has retired.

25         Mr. Reeves.

PROCEEDINGS

 1          MR. REEVES:  Yes, Your Honor.

 2          THE COURT:  The document that has been characterized

 3   as a bullseye --

 4          MR. REEVES:  Yes?

 5          THE COURT:  -- would you substitute a neutral color

 6   for the red that one sees in it.  Everybody else is in blue or

 7   some other color.

 8          MR. REEVES:  Yes, we will, Your Honor.

 9          THE COURT:  So I think -- just pick all the same color

10   and show everybody in the same color.

11          MR. REEVES:  We will do that.

12          MR. KEKER:  Your Honor, if you look at 6200 or what

13   the --

14          THE COURT:  What?

15          MR. KEKER:  If you look at the organization chart

16   which Mr. Reeves showed Mr.-- can Mr. Egan be excused?

17          THE COURT:  Oh, sure.  Yeah.  You're excused.

18       (Mr. Egan leaves the courtroom.)

19          THE COURT:  Okay.  What am I looking at?

20          MR. KEKER:  If you look at the -- I've got it right

21   here.

22          THE COURT:  Why don't you put it up on the ELMO.  I

23   mean, the --

24          MR. KEKER:  Jeff, could you put up -- or somebody put

25   up 2600.

1          2600 is their exhibit, their organization chart.

2              THE COURT:  The one we were just looking at.

3              MR. KEKER:  The little one that we were looking at it

4    and it shows everybody reporting up to Mr. Lynch and it shows

5    nobody reporting to Mr.-- can you turn it so we can read it.

6              THE COURT:  Can you blow it up.  There you go.

7              MR. KEKER:  Everybody -- I mean, Mr. Hussain reports

8    to Mr. Lynch.  No question about that.  But Mr. Egan doesn't

9    report to Mr. Hussain.  Mr. Scott reports to Mr. Egan.  I mean,

10   that other one is just completely wrong, and this is actually

11   an org chart that came from Autonomy's files.  The other one is

12   just a made-up demonstrative --

13             THE COURT:  Are you arguing about this one or are you

14   arguing about the other one?

15             MR. KEKER:  I'm arguing about the other one on 403

16   grounds.  It shouldn't come in with any color.  I get it for

17   argument.  I mean, put him in the middle, blow him up, make it

18   look like he's the only person in the organization.

19             THE COURT:  No, no, no.  Basically, as I saw it, it

20   was sort of for identification purposes to attach a photograph

21   to the name and to see where they were in this process.

22          So I thought that that was fine.  The only thing that

23   bothered me about it, marginally, was that Mr. Hussain was in

24   red and everybody else was in blue so it singled him out, and

25   as you characterized it, it made it look like a bullseye.  It's

```
1   not a bullseye, it's something else, but it's like --

2           MR. KEKER:  Would you look at 2933, Your Honor?

3           THE COURT:  Okay.  What do you want me to look at now?

4           MR. KEKER:  This is the bullseye.  2933.  If they

5   could put that up.  And my point -- I got the wrong number.

6           THE COURT:  We have to get it up before you make your

7   point.

8        There it is.

9           MR. KEKER:  No, it's -- here it is.  Yeah.  Yeah.

10  These reporting lines are wrong.  I mean, these people don't

11  report -- if you just looked at the other one, these people

12  don't report to Sushovan Hussain.  I mean, this -- you've got

13  Sullivan reporting to Sushovan Hussain, Egan reporting to

14  Sushovan Hussain, Joel Scott reporting to -- in fact, Joel

15  Scott reports to Egan.  Egan and Sullivan report to Mike Lynch,

16  looking at the other one.

17       These reporting lines are just --

18          THE COURT:  What about that?  I mean, I ignored the

19  lines, but what about that?

20          MR. REEVES:  I think there are, A, multiple org charts

21  within the company, and, B, this is consistent with --

22          THE COURT:  Is this an organizational chart within the

23  company or did the Government make this up?

24          MR. REEVES:  That's our chart.

25          THE COURT:  Okay.  Great.  Since you're going to do it
```

1    again, get rid of the lines.

2         MR. REEVES:  Get rid of the lines.  Thank you,

3    Your Honor.

4         MR. KEKER:  Get rid of the lines and the color and

5    we'll move on to try to get rid of the whole thing.

6         THE COURT:  No.  No.  These are important issues.

7         MR. KEKER:  But it's progress.

8              (Recess taken at 2:29 p.m.)

9              (Proceedings resumed at 2:45 p.m.)

10      (Proceedings were heard in the presence of the jury:)

11         THE COURT:  Please be seated.

12         MR. REEVES:  Thank you, Your Honor.

13   Q.   Mr. Egan, if you were located in California between 2008

14   and 2011, where was Mr. Hussain principally located when you

15   were working with him?

16   A.   In the U.K.

17   Q.   And if he was in England and you were in California, how

18   did you communicate with him?

19   A.   Largely by phone call.

20   Q.   I'd like to show you what has been marked for

21   identification as Exhibit 2945.  Do you have a copy of that

22   summary chart in front of you?

23   A.   (Witness examines document.)

24        I do.

25   Q.   All right.  And in your -- and in advance of your

1    testimony today, did you have an opportunity to look at phone

2    records marked for identification as Exhibit 2946 to identify

3    your cell numbers?

4    **A.**    I did.

5    **Q.**    And did you identify your cell phone numbers that you were

6    using in the time period 2008 to 2011 in your review of the

7    phone records?

8    **A.**    I did.

9    **Q.**    Okay.  And did you have an opportunity to look at the

10    summary of those records that's marked for identification as

11    Exhibit 2945, the summary chart?  Did you look at it?

12    **A.**    I did.

13    **Q.**    Is there anything about the summary chart that appears to

14    be inaccurate based on your recollection of the level and

15    timing of phone contact you had with Mr. Hussain during the

16    periods indicated on the summary chart?

17    **A.**    No.

18             **THE COURT:**  Admitted.

19         (Trial Exhibit 2945 received in evidence)

20             **MR. REEVES:**  Thank you, Your Honor.

21             **MR. KEKER:**  What year on this, Your Honor?

22             **THE COURT:**  This is 2008 to 2011; is that right?

23             **MR. KEKER:**  His phone calls -- he remembered he looked

24    at it and he saw it was accurate about his phone calls over a

25    three-year period?  I think there's thousands, and I'd just

1    like to ask a couple -- we just got the phone records recently

2    and saw this summary chart two days ago, and we haven't been

3    able to check it, but where we have checked it, I don't know

4    that it's accurate.

5              **THE COURT:**  Then check it.

6         Go ahead.

7              **MR. REEVES:**  Thank you, Your Honor.  I think there

8    will be further testimony about this chart from another

9    witness.

10        Thank you.

11   **Q.**   If we could please look at page 2 of Exhibit 2945.

12        So, Mr. Egan, the summary is entitled "Egan and Hussain

13   daily phone call history, January 1st, 2009, to August 18,

14   2011."

15        Do you see that?

16   **A.**   I do.

17   **Q.**   And then there are totals indicated in the upper

18   right-hand corner.  Do you see that?

19   **A.**   I do.

20   **Q.**   At least according to the records as summarized in

21   Exhibit 2945, there were approximately 1,414 calls between your

22   cell phones and phones with Mr. Hussain.  Is that consistent

23   with your recollection about the volume of calls over this

24   period of time?

25   **A.**   Between cell phones, yes.

**EGAN - DIRECT / REEVES**

1  **Q.**   Were there even more phone calls than that?

2  **A.**   Yes.

3  **Q.**   On land lines, for example?

4  **A.**   Yes, on my end.

5  **Q.**   So with this as a sort of baseline, describe the frequency

6  of your contact by telephone with Mr. Hussain as part of your

7  work in this time period we've been zeroed in on.

8  **A.**   Most days we would talk.  I think it was more rare that we

9  would not talk by phone.  And many days we would talk many

10  times.

11  **Q.**   Was there any kind of pattern in terms of increased

12  frequency as you rolled through a quarter and got to the end of

13  a quarter, for example?

14  **A.**   At the end of a quarter, we would talk more.  At the

15  culmination of a big deal, we would talk more, regardless of

16  whether it was at the end of a quarter.

17  **Q.**   And in your review of this summary, is that pattern

18  reflected, if we look on page 3 of Exhibit 2945 -- looking, for

19  example, on or around June 30th, 2009, as depicted here,

20  there's a spike in the level of contact at the very end of the

21  quarter?

22  **A.**   Yes.

23  **Q.**   Is that consistent with your recollection?

24  **A.**   The increase at the end of a quarter is consistent with my

25  recollection.

1  Q.   Why would there be increased phone contact, increased

2  communication, at the end of a quarter?

3  A.   Because in our business, at the end of the quarter, you

4  did a much higher frequency of deals at the end of a quarter.

5  Many of the deals that we would do for the whole quarter would

6  be completed at the end of the quarter.

7  Q.   Why would that necessitate your direct communication with

8  Mr. Hussain?

9  A.   Two reasons.  One, he would want updates on the status, so

10  for the forecasting purpose that we talked about earlier.  And

11  also because he would have to approve aspects of the deals that

12  would affect whether they could be recognized or not, so things

13  like payment terms or, you know, negotiate, like, big

14  discounts.

15  Q.   When you say "be recognized," what do you mean?

16  A.   I mean for a deal -- the whole point of what we were doing

17  was to do software deals that could be recognized as software

18  revenue.  So there was sort of strict aspects as to how you

19  could make sure a deal was recognized in that period.

20       You could still get a deal signed, but if it somehow had

21  something in it that didn't allow it to be recognized, it would

22  just be recognized in the next period or over time, which was

23  the less preferred way of getting any kind of deal done.

24  Q.   Okay.  We'll come back to that topic and talk about it

25  some more.

1           How often in this time period, 2008 to 2011, did

2    Mr. Hussain travel to the United States for business, if you

3    know?

4    **A.**   I would -- approximately three to four times a year.

5    **Q.**   And how often to California, for example?

6    **A.**   Probably one less than that.  Two to three times a year.

7    **Q.**   For what types of purposes, as you understood it?

8    **A.**   Meetings, management meeting.  We had a management meeting

9    at times.  Customer events maybe once or twice.

10   **Q.**   Did you enjoy working with Sushovan Hussain?

11   **A.**   I did.

12   **Q.**   Did you learn from him?

13   **A.**   I did.

14   **Q.**   Tell us what you learned.

15   **A.**   I mean, many things.  As I've said, very hard-working,

16   incredibly enthusiastic, positive attitude about hard work and

17   delivering.

18   **Q.**   Let's go back to the topic of revenue.

19           Did you, as a sales manager, have sales or revenue targets

20   each quarter?

21   **A.**   I did.

22   **Q.**   Okay.  And was there any correlation, as you understood

23   it, between those sales or revenue targets and the earnings

24   estimates that the company announced to its shareholders in the

25   market?

1   **A.**   Did they correlate?

2   **Q.**   In any sense.

3   **A.**   They related to each other.

4   **Q.**   How did they relate?

5   **A.**   One was a subset of the other.

6   **Q.**   What does that mean?

7   **A.**   Meaning my goal or any sales goal that I was striving

8   towards or aware of was one part of an overall goal to hit a

9   number for the company, a revenue goal for the company.

10  **Q.**   When you say "hit a revenue goal for the company," what do

11  you mean?

12  **A.**   I mean if you have a goal and it's 100, "hit it" would

13  mean to get a 100; not 99, not 101.  Well, 101 would count as

14  hitting it as well.

15  **Q.**   All right.  Was there pressure for you to meet your sales

16  or revenue targets on a quarterly basis?

17  **A.**   Yes.

18  **Q.**   How much pressure or how would you describe that pressure?

19  **A.**   I'd describe it as ever-present, very significant, part of

20  our culture as a company.

21  **Q.**   Where did that pressure come from, if you know?

22  **A.**   A lot of it came from Mike Lynch.

23  **Q.**   Describe what you mean, please.

24  **A.**   Mike's a very demanding guy of himself and everyone around

25  him, very driven, workaholic.  You could have a debate whether

1    Mike or Sushovan worked harder.

2    **Q.**   I'm sorry?  You said --

3    **A.**   You could have a debate about who worked harder.

4    **Q.**   They're both very hard-working professionals?

5    **A.**   They're both very hard working, driven.

6    **Q.**   Okay.  Did you, from time to time, have occasion to speak

7    with Mr. Hussain about the subject of pressure as it related to

8    you and to him?

9    **A.**   I did.

10   **Q.**   Okay.  Taking those conversations as a group, what do you

11   recall discussing with him about the pressure at Autonomy?

12           **MR. KEKER:**  Objection, Your Honor.  Foundation.  Can

13   we find out when these calls -- these conversations were?

14   **BY MR. REEVES:**

15   **Q.**   My questions are for the time period 2008 to 2011.

16           **MR. KEKER:**  More specifically.

17   **BY MR. REEVES:**

18   **Q.**   Did you have a --

19           **THE COURT:**  Does he recall a conversation during that

20   time?

21   **BY MR. REEVES:**

22   **Q.**   Do you recall a conversation in that time, Mr. Egan?

23   **A.**   I do.

24   **Q.**   Okay.  Tell us what you recall discussing with Mr. Egan --

25   excuse me -- with Mr. Hussain about the subject of pressure,

1  sales pressure?

2        **MR. KEKER:**  Can we learn when the conversation was?

3  Foundation, please.

4        **THE COURT:**  If he can remember.  Can he remember with

5  any greater specificity as to when it occurred in that time?

6  **BY MR. REEVES:**

7  **Q.**  Are you recalling a specific conversation?

8  **A.**  Not that I could tell you the time of.

9  **Q.**  Okay.  Did you talk about that topic from time to time

10  with him?

11  **A.**  I did.

12  **Q.**  More than once?

13  **A.**  More than once.

14  **Q.**  Between the years of 2008 and 2011?

15  **A.**  Yes.

16  **Q.**  Go ahead and tell us what you remember talking about.

17  **A.**  I, at times, complained about the pressure.

18  **Q.**  What did you say?

19  **A.**  I said it's too much pressure.  I would complain about the

20  goal, the reasonableness of the goal, and Sushovan would do the

21  same.

22  **Q.**  What would he say?

23  **A.**  He would -- he would -- when he was really tired of

24  hearing me complain about pressure, which I appreciated, he

25  would say, "It's worse for me."

1    **Q.**    Did you believe him?

2    **A.**    I knew it.

3    **Q.**    You knew it to be true?

4    **A.**    I knew he had more pressure on him than I had on me.  I

5    viewed mine as a subset of what he had.

6    **Q.**    All right.

7        Now, when you first joined Autonomy in the time period

8    2001 to 2004, early in your career, was Autonomy a

9    publicly-traded company in those days?

10   **A.**    It was.

11   **Q.**    And was its stock traded on the Stock Exchange in the

12   United States known as the NASDAQ?

13   **A.**    It was.

14   **Q.**    Okay.  And what is a public company?  What does that term

15   mean to you, Mr. Egan?

16   **A.**    A company, a portion of which is owned by the public, as

17   opposed to privately owned.

18   **Q.**    Shareholders?

19   **A.**    Shareholders, yeah.

20   **Q.**    Who own stock?

21   **A.**    Yes.

22   **Q.**    And as a public company, was Autonomy required to make

23   publicly-filed financial statements about its financial

24   performance?

25   **A.**    Yes.

1  Q.   Now, in or around 2004, was there a switch about the

2  market on which Autonomy's securities and stock was traded?

3  A.   I remember a switch.  I don't remember the exact date.

4  Q.   Okay.  What did -- it switched from the NASDAQ to what, if

5  you know?

6  A.   The company was delisted off of the NASDAQ.

7  Q.   And where was it listed?

8  A.   On the London Stock Exchange.

9  Q.   On the London Stock Exchange.  Okay.

10       And did it -- for the time period we've been focused on,

11  2008 to 2011, to the best of your knowledge, was its stock

12  traded on the London Stock Exchange?

13  A.   Yes.

14  Q.   All right.

15       And for its stock performance, are you aware of whether

16  there were quarterly projections about how Autonomy would do on

17  a quarterly basis in the market, in the stock market?

18  A.   I am aware of that.

19  Q.   And what is your understanding about projections about

20  financial performance made by Autonomy to its shareholders and

21  others in the market?

22  A.   I'm not aware of projections made by Autonomy as much.

23  Q.   Are you aware of analysts who followed the stock and

24  followed Autonomy's performance?

25  A.   I am.

1    Q.    Okay.  And did analysts have a role in estimating

2    Autonomy's performance, if you know?

3    A.    They did.

4    Q.    And how did that work, as you understood it?

5    A.    My understanding is they would analyze the company and

6    basically project certain numbers that they felt were -- that

7    was their prediction of what the company could or should do

8    over the course of a quarter or a year.

9    Q.    What type of numbers?

10   A.    Amongst others, the revenue number, the earnings per share

11   number; and after that, other numbers, but less familiar with

12   them.

13   Q.    Okay.  Let's focus on the revenue number.  Did the revenue

14   number projected by outside analysts about Autonomy's financial

15   performance have an effect or have a bearing on any of the

16   revenue targets and work you're doing to meet revenue targets

17   on a quarterly basis?

18   A.    It did.

19   Q.    How did -- how did that work?  Describe that interplay

20   between market expectations and your sales revenue targets on a

21   quarterly basis.  Go ahead.

22   A.    My goal and forecast would be a subset of the company's

23   goal and forecast, and the company's goal and forecast would be

24   aimed at something called consensus or an interpretation of

25   consensus by generally Mike and Sushovan.  More so probably

1    Mike.

2    **Q.**    Did you discuss revenue goals correlating to market

3    expectations with Dr. Lynch?

4    **A.**    Yes.

5    **Q.**    Did you discuss them with Sushovan Hussain?

6    **A.**    Yes.

7    **Q.**    Is that a topic that came up recurrently between 2008 and

8    2011?

9    **A.**    Yes.

10   **Q.**    Tell us what you remember talking about with Mr. Hussain

11   and Dr. Lynch on the subject of revenue goals rolling up to

12   meet market expectations.

13   **A.**    One very specific recollection I have is how I would

14   explain to someone whose number rolled up to mine, so it could

15   be an individual contributor or a manager, when we would give

16   them their quota, if you will, which is the same thing as a

17   goal, they would sometimes object to the reasonableness of it;

18   like, how many percentage points was it larger than the prior

19   period.

20        And if they thought that was unreasonable, I would

21   explain, as it was explained to me, that it's not like we're

22   doing this from the bottom up.  It's coming from the top down.

23   It starts with what the analysts expect of the company.  That's

24   what we have to strive for so that's what we need to split up

25   and apportion amongst all of us trying to get to a number.

1  Q.   Was there a concern that if you missed market

2  expectations, something would happen?

3  A.   Yes.

4  Q.   Okay.  And what is that concern?

5  A.   If you missed market expectations, your stock price should

6  go down.

7  Q.   And by contrast, if you hit market expectations, what is

8  the hope that will happen?

9  A.   That it will either stay the same or go up.

10  Q.   The stock price?

11  A.   Correct.

12  Q.   All right.

13        Let's turn to the subject of products.  What were some of

14  the products that you were selling as a sales manager within

15  Autonomy between 2008 and 2011?

16  A.   In that time, I probably at some point sold everything.

17  Q.   What was the principal product for Autonomy in those

18  years?

19  A.   IDOL, Digital Safe, Supervisor.  I mean, it's a lot of

20  products.

21  Q.   All right.

22  A.   I'm trying to give you them from sort of impact.  Those

23  are the ones that had the biggest impact on my number and

24  activities.

25  Q.   Okay.  And did you sell licenses for this software?

1    **A.**    Correct, and services and maintenance.

2    **Q.**    Well, let's talk about the difference amongst those three.

3    Are there differences between selling license and selling

4    service and selling maintenance?

5    **A.**    Yes.

6    **Q.**    What are some of the differences, please?

7    **A.**    A license is the right for the customer to use the

8    software product that you're selling them.

9          Services would be sometimes human beings doing work on the

10   product.  Sometimes it could be a fee for human beings doing

11   work on information with a product.

12         And maintenance is a fee that the customer pays to the

13   company for the right to -- well, it's called "support and

14   maintenance," but support and maintenance is part of what we

15   sold where the customer had the right to ring you up and say,

16   "This isn't working," or, "This is broken," and have the right

17   to have that get fixed by you or have your question answered.

18   **Q.**    And when you sold either licenses or service or

19   maintenance, did you contract for that?  Were those sales

20   usually in writing?

21   **A.**    Yes.

22   **Q.**    At Autonomy were you required to document your sales in a

23   contract, for example, or some other form of sales order?

24   **A.**    Yes.

25   **Q.**    As a sales executive at Autonomy, were you familiar with

1   any of the rules for recognizing revenue as a result of your

2   sales?

3   **A.**   I was.

4   **Q.**   Okay.  And did you discuss those rules with Mr. Hussain?

5   **A.**   Yes.

6   **Q.**   It would be fair to say that you discussed them on many

7   occasions with Mr. Hussain between 2008 and 2011?

8   **A.**   Fair to say I discussed the rules on multiple occasions.

9   Fair to say I discussed where something fell in the rules more

10  often.  More often we work on an actual deal.

11  **Q.**   Okay.  And at a high level, what is your understanding of

12  what some of the revenue recognition rules were for the

13  products you were selling?  It's not meant to be a quiz.  It's

14  just meant to explore your understanding of the rules.  Go

15  ahead.

16  **A.**   There were a few very basic aspects to the rules that were

17  oftentimes taught to the whole company.  I will try to do my

18  best.

19       That you had to have a binding evidence of an arrangement.

20  That's a reference to having a contract.

21       That you had to make delivery.  So you had to send the

22  software or make it available to the customer.

23       And that you had to have probability of collection.  So

24  evidence or to the best of your information they would pay,

25  that the customer would pay.

**EGAN - DIRECT / REEVES**

1    Those were the big three criteria that you kind of

2    expected most people in the sales force to know.

3    **Q.**   Okay.  In your work at Autonomy, did you sometimes use

4    terms like "upfront recognized revenue" versus "revenue

5    recognized over time"?

6    **A.**   Not those exact terms, but we discussed that.

7    **Q.**   Concepts like that?

8    **A.**   Concept, yeah.

9    **Q.**   Okay.  Were certain of the products, products that allow

10   you to recognize revenue upfront, so to speak?

11   **A.**   Yes.

12   **Q.**   Which of the products allowed you to do that?

13   **A.**   License sales.  License was the main component of what

14   would be recognized upfront.

15   **Q.**   Did that make license sales preferable in comparison with

16   other products that you were selling?

17   **A.**   Absolutely.

18   **Q.**   Why did it absolutely make licenses preferable?  Tell us

19   what you mean.

20   **A.**   Why did it make?

21   **Q.**   Yes.

22   **A.**   Because --

23   **Q.**   Was there anything about the upfront nature of the revenue

24   recognition for licenses that made them preferable?

25   **A.**   I lived in a very short-term world, so generally every

1    quarter all I cared about was that quarter, and, therefore, the

2    license revenue was going to count towards the goal for that

3    quarter.  So it made it a priority, almost a singular one, for

4    me.

5    **Q.**    All right.

6         By contrast, how did the revenue recognition rules work

7    for other products, like service or maintenance?  Are they

8    spread out over time, for example?

9    **A.**    They are spread out over time.

10   **Q.**    Does that make them less desirable in terms of meeting

11   your revenue targets?

12   **A.**    Well, they're smaller generally, relative to license.

13   They're usually sold with license.  They're smaller and

14   recognized over time.  So I viewed them as -- you know, they

15   came along with it, but I was focused on the license.

16   **Q.**    Because you could recognize the revenue up front?

17   **A.**    Correct.

18   **Q.**    All right.

19        Now, Mr. Egan, as the CEO of the Americas for Autonomy,

20   did you have any direct responsibility for the preparation of

21   Autonomy's financial statements?

22   **A.**    No.

23   **Q.**    And do you have an understanding, based on your work at

24   Autonomy, as to who was responsible at Autonomy for the

25   preparation of Autonomy's financial statements between 2008 and

1   2011?

2   **A.**   I have a general understanding, yes.

3   **Q.**   What is your understanding?

4   **A.**   That Sushovan and the Finance Department were responsible

5   for preparing that.

6   **Q.**   In addition to Mr. Hussain, were there other senior

7   members of the Finance Department with the responsibility for

8   preparing Autonomy's financial statements?

9   **A.**   Not that I know specifically.

10  **Q.**   Are you familiar with a person by the name of Stephen

11  Chamberlain?

12  **A.**   I am.

13  **Q.**   And what is your understanding of Mr. Chamberlain's role

14  within Autonomy in the period we've been talking about?

15  **A.**   My understanding is he was second in command to Sushovan

16  in the Finance Department.

17  **Q.**   Okay.  Assisting him, perhaps, in preparation of the

18  financial statements?

19  **A.**   Perhaps.

20  **Q.**   All right.

21      Did you have any direct contact with Autonomy's outside

22  auditors Deloitte?

23  **A.**   I did.

24  **Q.**   Okay.  On sort of -- on what types of issues or for what

25  reasons?

1    **A.**   Approximately once every two years, they would come by our

2    office and I would do a meeting with them, tell them about the

3    sales, the company, the product, demonstrate the product, show

4    them the office, that sort of thing.

5    **Q.**   The U.K. auditors would come to California?

6    **A.**   They were the U.K. auditors, I think.

7    **Q.**   And they would come -- how often did you say?

8    **A.**   They may have come once a year or once every two years,

9    but then not again for three, so it's a very general -- it felt

10   like three to four times in that period that we are talking

11   about.

12   **Q.**   All right.  And you'd show them around, so to speak?

13   **A.**   Yep.

14   **Q.**   Was it at any greater depth?  Was there any greater detail

15   to the work that you did with the auditors beyond that?

16   **A.**   No.

17   **Q.**   All right.

18       Let me direct your attention, if I could, to in or around

19   July 2007, slightly earlier than the time period we've been

20   talking about.

21       At or around that time, did Autonomy acquire a company

22   known as Zantaz?

23   **A.**   I know we acquired Zantaz around that time.  I don't

24   remember the date specifically.

25   **Q.**   All right.  And are you familiar generally with the

1  acquisition of Zantaz?

2  **A.**    Yes, very.

3  **Q.**    And why don't you tell us what happened when Autonomy

4  acquired Zantaz?  Is that one of the ways that the company

5  grew, for example?

6  **A.**    It did contribute to the company's growth.

7  **Q.**    All right.  And did that affect your work at Autonomy in

8  any direct way?

9  **A.**    It did.

10  **Q.**    In what ways?

11  **A.**    Immediately when we acquired them, I was asked to kind of

12  fly into a couple -- they had a couple locations -- fly in and

13  meet people, make sure they felt welcomed, get an understanding

14  of whom was whom; and then very quickly after that, understand

15  some of the biggest customer relationships and go on a bit of a

16  tour to meet the customers and tell them that they were

17  important and would be looked after.

18      Basically a lot of like making sure that the company

19  didn't change materially after the acquisition, that there

20  wasn't some misinterpretation that, "hey, a British company has

21  purchased us and you're going to be abandoned," or something

22  like that.

23  **Q.**    What products did Zantaz have that were now acquired by

24  Autonomy as a result of the acquisition?

25  **A.**    What products did Zantaz have?

1  Q.   Yes.

2  A.   Digital Safe was a very big product.  EAS was a product.

3  Supervisor was a product.  I'm forgetting the name.  Introspect

4  was another product.

5  Q.   Okay.  Did these become valuable products in your work in

6  the coming years?

7  A.   Yes.  Some more than others.

8  Q.   Okay.  Good.

9       Between 2008 and 2011, who were some of Autonomy's major

10 customer relationships that you were working with, Mr. Egan?

11 Where was your focus on major customers?

12 A.   When I consider the whole period, my strongest memory is

13 the significance of the Wall Street customers.  I spent the

14 greatest amount of my time relating to and selling to large

15 banks.

16 Q.   In the United States?

17 A.   Yes.

18 Q.   Major banks in New York, for example?

19 A.   Yes.  Largely in New York.  Some in mid-Atlantic.

20 Q.   Who were some of those banks, if you recall?

21 A.   Morgan Stanley, JPMorgan Chase, Deutsche Bank,

22 Bank of America.

23 Q.   Were there other major corporate customers that you were

24 also selling to in addition to this financial sector group?

25 A.   Yes.

1  **Q.**   And who were some of the other major customers that you

2  worked with?

3  **A.**   I mean, dozens and dozens and dozens.

4  **Q.**   All right.  Many major corporations?

5  **A.**   Over a hundred, over 200 probably, yeah.

6  **Q.**   Let me draw your attention, if I could, to the 2008

7  financial crisis.  Okay?

8       In or around the fall of 2008, the worst period of the

9  financial crisis, did that have an effect on business at

10  Autonomy?

11  **A.**   It did.

12  **Q.**   In what ways did the 2008 financial crisis affect sales

13  and work at Autonomy for you?

14  **A.**   It was very disruptive to your average everyday sale.

15  That whole event and period caused CFOs of our clients to just

16  put on hold or cut expenditure.  Across the board, we were

17  having to just be caught in that net.

18  **Q.**   Did sales become more difficult in the financial downturn

19  associated with the 2008 financial crisis?

20  **A.**   Most sales, yes.

21  **Q.**   Sales of IDOL, for example, were they more difficult?

22  **A.**   Stand-alone, yes.

23  **Q.**   Why were stand-alone sales of IDOL more difficult for

24  Autonomy as a result, in your view, of the 2008 financial

25  crisis?

EGAN - DIRECT / REEVES

1    A.    Because stand-alone IDOL sales fell in the bucket of that

2    which would have been paused or delayed by the majority of

3    CFOs.

4    Q.    Why, as you remember it?

5    A.    Because it was just like everything else.  I want to

6    express that a CFO at that period of a typical corporation just

7    hit "pause" or "no" on a vast majority of buying pretty

8    indiscriminately.  So on some basis, we were caught in that.

9    Q.    That sounds difficult for you in your role; would you

10   agree?

11   A.    Yeah.  It was no good.

12   Q.    Okay.

13         Let's contrast, if we can, the product Digital Safe that

14   Autonomy acquired from Zantaz.

15         Did you observe a difference in terms of demand for

16   Digital Safe in this period following the 2008 financial

17   crisis?

18   A.    I did.

19   Q.    What type of difference did you observe?

20   A.    Just a minute.  I'm going to get a little water.

21   Q.    Take your time.

22   A.    Digital Safe had the opposite effect.  It was a specific

23   proposition to regulated businesses, like banks, where they had

24   a requirement to archive and retain information and messaging;

25   and the financial crisis effectively put more pressure on them

1  to archive, more carefully, more, and a greater group of

2  companies had to do that.  So it was a positive thing for that

3  particular product offering.

4  **Q.**    Okay.  These compliance-related products, like a

5  Digital Safe, rose in a period of regulation following the

6  crisis?  Do you see those issues as being correlated?

7  **A.**    The market for it rose, yeah.

8  **Q.**    Okay.  And, similarly, in a market downturn, was there any

9  type of increase for eDiscovery-type products that might be

10  called upon for litigation following the financial crisis?

11  **A.**    Yes.

12  **Q.**    Okay.  Describe how that would work, given your position

13  in terms of selling some of the Autonomy eDiscovery products.

14  **A.**    Same concept.  The banks were being sued more often, there

15  was more litigation, more demand for those offerings.

16  **Q.**    In 2008 and 2009, did Autonomy use partners known as

17  resellers?

18  **A.**    We did.

19  **Q.**    Okay.  "Value-added resellers," are you familiar with that

20  term?

21  **A.**    I am.

22  **Q.**    What does a value-added reseller or a VAR mean in your

23  business in that time period, Mr. Egan?

24  **A.**    It's a third party who goes out and sells your software

25  product with your authorization to their customer and then

1  places an order with you for that product and charges more for

2  it than they get charged by you, so they make money on that.

3  **Q.**   Okay.  They make a margin?

4  **A.**   They make a margin, yeah.

5  **Q.**   And did you observe any type of increase in the amount of

6  business that Autonomy was doing between 2008 and 2009 in terms

7  of business with these resellers?

8  **A.**   I did.

9  **Q.**   Okay.  And so how -- describe that increase.  What

10  happened, please?

11  **A.**   Well, we were selling through resellers when I joined the

12  company way back in 2001, but around 2008-2009, I was

13  personally managing or I was primary, at least, on the

14  relationship between Autonomy and a few resellers so I

15  personally knew that we were doing more business with them.

16      And around that time I started doing deals with them that

17  involved not what I described before where they would sell the

18  product to an end customer and then place an order with

19  Autonomy, we started selling deals to them where they would

20  effectively buy the product on behalf of the customer and then

21  sell it to the customer subsequently.

22  **Q.**   So was there some type of shift in this time period?

23  **A.**   Yes.

24  **Q.**   Okay.  And did you discuss that shift with Mr. Hussain in

25  this time period?

1    **A.**    I did.

2    **Q.**    Describe again, if you would, the shift that you are

3    perceiving in terms of Autonomy's business with the VARS.  What

4    did you mean by that?

5    **A.**    The shift was whether the VAR had sold the software

6    product that your -- that Autonomy was selling to them, whether

7    they had completed an agreement to sell that product to their

8    end customer before or simultaneous to placing an order with

9    Autonomy.

10    **Q.**    Before this shift that you're describing, the value-added

11    reseller would already have closed a sale to the end user?

12    **A.**    Yeah.  We effectively required that.  We would only take

13    their order if they had already sold -- if they had a signed

14    agreement and had sold the product to their end customer.

15    **Q.**    Who required that?

16    **A.**    We as a company.  It was a policy or it felt like a

17    policy.  It was just how we did it.  You never questioned

18    otherwise.

19    **Q.**    Did you ever discuss that policy or that requirement with

20    Mr. Hussain in that time period?

21    **A.**    Prior?

22    **Q.**    Prior, yes.

23    **A.**    I don't remember if I specifically did.  It was -- it was

24    an inherent policy.

25    **Q.**    It was an inherent --

1    **A.**    It was a policy.

2    **Q.**    It was an inherent policy that you followed?

3    **A.**    Yeah.

4    **Q.**    Okay.  That the value-added reseller had already sold to

5    the end user and -- this is before the shift -- and then what

6    would happen?  If they've already closed the sale with the end

7    user, how would Autonomy become involved?

8    **A.**    Then they would place their order with Autonomy --

9    **Q.**    Okay.

10    **A.**    -- before the end of a quarter.

11    **Q.**    Before the end of a quarter?

12    **A.**    Yeah.

13    **Q.**    All right.  And they would get paid a margin for having

14    completed the sale, et cetera, in the way you've described?

15    **A.**    They actually kept what -- they kept their own margin.  So

16    they sold the products to their customer and then bought it

17    from us and the difference was their margin, what they kept.

18    **Q.**    And then this shift happened?

19    **A.**    Uh-huh.

20    **Q.**    Was this shift in any way, from what you could tell,

21    related in any way to the sale slowdown associated with the

22    2008 financial crisis?

23    **A.**    Not to my memory.

24    **Q.**    Okay.  Well, after the shift happened, what began -- what

25    happened in terms of the sales by the resellers to the end

1  users?  What was different?

2  **A.**    It would not be completed at the time that the reseller

3  would buy the product from Autonomy.

4  **Q.**    And did you discuss this shift with Sushovan Hussain?

5  **A.**    I did.

6  **Q.**    Okay.  Do you recall the substance of what you and

7  Mr. Hussain talked about with regard to Autonomy sales to

8  resellers involving resellers who had not yet sold through to

9  the end user?  What do you recall discussing with Mr. Hussain

10  about that?

11  **A.**    The very first time I discussed whether we could do it.

12  **Q.**    What did he say?

13  **A.**    He said, "Yes, if," and then gave a certain number of

14  criteria.

15  **Q.**    Do you remember the substance of any of those criteria or

16  what the considerations may be?

17  **A.**    I do.

18  **Q.**    What were some of the things he said?

19  **A.**    The reseller had to be aware of and be signing up to buy

20  that product no matter what happens.  Whether the -- whether

21  they -- it gets sold to the end customer or not, they had to

22  sign up for that and they had to pay the bill, and then the

23  other criteria had to be in place as well.

24  **Q.**    Are you familiar with the term "at risk"?

25  **A.**    Yes.

EGAN - DIRECT / REEVES

1  Q.   Is this terminology "at risk" part of what you're

2  discussing here?

3  A.   Yes.  It was a term I used.

4  Q.   Okay.  So tell us what you mean by a deal being at risk.

5  A.   Meaning that the reseller was taking the risk by buying

6  the product that if it didn't get sold to the end user, they

7  would be at risk.  They would have to pay that bill and not

8  have income or, you know, they wouldn't have the end sale.

9  Q.   So there's a shift, then, to the so-called at-risk deals;

10  is that what you're describing?

11  A.   There was a shift to being willing to do that kind of

12  deal.

13  Q.   And did you see -- and you discussed that shift with

14  Mr. Hussain, and was he okay with that?

15  A.   Yes.

16  Q.   All right.  And thereafter did you begin to do more of

17  these at-risk reseller deals where the reseller had not yet

18  succeeded in selling the software to the end user?

19  A.   We did.  Over a period, it may have gone up and down a

20  little bit, but in general over the period you're asking about,

21  it went up.

22  Q.   Okay.  And as we go from 2008 to 2009 into 2010, did you

23  see an increased use of these at-risk reseller deals?

24  A.   Yes.

25  Q.   Did they grow and expand over time as far as you could

1  tell?

2  A.    Yes.

3  Q.    When you began to do these types of deals, did you discuss

4  with Mr. Hussain whether you could give any type of verbal

5  assurance to the value-added resellers about what would happen

6  if the software was never sold all the way through to the end

7  user?

8  A.    We did.

9  Q.    Okay.  What did you and Mr. Hussain discuss?

10 A.    We discussed the fact that I could say that we would have

11 great intent and would be willing to take other deals from our

12 pipeline and channel them.  So let's say if the -- if the deal

13 wasn't going to happen for the reseller, that we would prefer

14 to keep them as a reseller and not make them pay the whole

15 amount and then just be out, which would probably burn that

16 relationship.  We would prefer to take another deal from our

17 pipeline and give it to them as backfill.  That would be a

18 preferred outcome versus kind of leaving them holding the bag

19 for the full amount payable and no offsetting business for

20 them.

21 Q.    Were you trying to provide assurance about the level of

22 risk associated with these at-risk deals?

23 A.    Yes.

24 Q.    Okay.  Who were some of the value-added resellers that you

25 were doing some of these deals with during -- that you observed

1    this shift for?  Who were some of the value-added resellers

2    you're talking about?

3    **A.**    I did it for the very first time with a company called

4    MicroLink.

5    **Q.**    Now, we'll come back to that and MicroLink.

6         Over time, after the shift, did these type of deals begin

7    to cause you problems as a sales executive, Mr. Egan?

8    **A.**    Yes.

9    **Q.**    Okay.  What type of problems did this shift to at-risk

10   deals cause for you?

11   **A.**    The biggest problem was it was -- it meant that when a

12   quarter ended, I didn't just have to start the new quarter with

13   a new set of objectives, which was hard enough; it meant that I

14   was carrying obligations from the prior quarter into that

15   quarter with me.

16        So I felt a very deep personal obligation.  If I'd asked a

17   reseller to speak up and take a deal at risk, I felt very

18   personally obligated to make sure that deal happened as they

19   contemplated so that they would be made whole on the purchase

20   and so forth.

21        So it was, like, taking on extra work and carrying it in

22   what had been a period-to-period sort of hard work, relief,

23   hard work, relief, I was carrying obligation from one period to

24   the next, which over time became really unpleasant.

25   **Q.**    What does it mean that you carry extra work into another

1    quarter?  What are you describing?

2    **A.**    For better or for worse, the license software business

3    ends on the end of the quarter; and so even if I missed my goal

4    massively, like I could fail massively, I might be yelled at or

5    feel badly or otherwise, but that next Monday you started

6    fresh.

7        That's one aspect of the software business which you could

8    say you love or hate.  But once you start taking a deal from a

9    reseller and whether I needed to or not, feeling personally

10   committed to make the other -- the sort of end user portion of

11   that deal happen, I'm now carrying that work into the next

12   period.

13   **Q.**    So you think you've closed a deal by the cutoff, but when

14   it's an at-risk deal after the cutoff, you still need to

15   continue working on the sale to the end user?

16   **A.**    I would even say more so I felt even more obligated to get

17   that deal closed because somebody was personally out if it

18   didn't.

19   **Q.**    So you're starting the subsequent quarter and you're still

20   working on the last quarter's work?

21   **A.**    Correct.

22   **Q.**    Does that create a hole for you or problem for you in any

23   way?

24   **A.**    Yeah.  It's like if I was starting a quarter, I've got a

25   hill to climb, it's like I now am starting in a hole as opposed

1  to at sea level.

2  **Q.**   Were there other problems that you observed with these

3  at-risk deals in terms of their effect on revenue targets and

4  sales targets on a quarterly basis?

5  **A.**   Yes.

6  **Q.**   What type of other problems would these at-risk deals

7  cause for you in terms of revenue targets?

8  **A.**   The fact that the deal was taken in the -- in the prior

9  period, it was effectively accelerating revenue that naturally

10  would have fallen in the next period.

11      Once you start doing that, you are effectively setting

12  your own goals higher because you're performing a bit

13  artificially better in the prior period, which is what sets

14  your next period's goal.  So it has effectively like a

15  turbocharged effect on setting your own goals.  So you're kind

16  of working against your own abilities to close that gap.

17  **Q.**   When you first described this, what you experienced with

18  regard to this shift to the Government, did you feel it

19  assisted you and aided you in describing what you just

20  testified to to draw a diagram?

21  **A.**   Yes.

22  **Q.**   Okay.  I'd like to show you what has been marked for

23  identification as Exhibit 2797.

24          **THE COURT:**  For demonstrative purposes, 2797 admitted.

25          **MR. REEVES:**  Thank you, Your Honor.

1            **MR. KEKER:**  This is the one we object to, Your Honor,

2    that we raised earlier.

3            **THE COURT:**  Oh.

4            **MR. REEVES:**  I would like to use it only for

5    demonstrative purposes, though.

6            **THE COURT:**  No, no, no, but it's not tied to anything.

7    I mean, it's not --

8            **MR. KEKER:**  403.

9            **THE COURT:**  Well, I mean, there are no -- there's no

10   evidence in there.  I mean, there's no -- this is the one where

11   he just simply shows what happened over time; is that right?

12           **MR. REEVES:**  Yes, Your Honor.  Would you like a copy

13   to --

14           **THE COURT:**  I think I saw it.

15           **MR. REEVES:**  Yeah.  I think these are difficult

16   concepts, and the witness himself has already testified that

17   his ability to explain them is enhanced by a diagram that he

18   created, and we --

19           **THE COURT:**  Well, I think he can do a diagram -- I

20   think he can do a diagram of what he perceived to be the effect

21   of these agreements.

22           **MR. REEVES:**  Okay.  Is that page 2?

23           **THE COURT:**  Let me look at it.  Let me look at it.

24           **MR. KEKER:**  I'd like to *voir dire* on this.

25           **THE COURT:**  Well, let's wait.

1          MR. KEKER:  He didn't do it.  This is not his diagram.

2    It's their diagram.

3          THE COURT:  What exhibit number is it, please?

4          MR. REEVES:  This is Exhibit 2797.  And in response to

5    what I think was an objection by Mr. Keker, I have some more

6    foundational questions while the Court finds the exhibit.

7    Would that be okay?

8          THE COURT:  Sure.

9          MR. KEKER:  But I have more 403 objections.  I can

10   make them right here in front of the jury or not.

11         THE COURT:  Okay.  I'm not going to -- I'm going to

12   overrule the 403 objection.  The question is whether or not he

13   is -- see, there are no dates on any of this.

14         MR. REEVES:  That's right, Your Honor.

15         THE COURT:  You have a chart which shows an increase

16   in what is -- I'm looking at the second page -- in what is

17   called "Organic and Nonorganic Growth."  Okay?  That's what it

18   is.

19         MR. REEVES:  I think these are terms the witness will

20   explain.

21         THE COURT:  Well, he has to describe that, but there

22   are no dates.  It says -- oh, I guess -- oh, well, wait a

23   minute.  There are.  Q1 -- I can't see it on mine.

24         MR. REEVES:  This is more conceptual.  I accept that

25   the diagram as the witness has prepared it doesn't have dates.

**EGAN - DIRECT / REEVES**

1    I think it's --

2              THE COURT:  Well, I see Q1, Q2, Q3, Q4.

3              MR. REEVES:  Yes, Your Honor.

4              THE COURT:  So there are dates.

5              MR. REEVES:  But not specified to a specific year.  I

6    think this is an aid.  We offer it as a demonstrative, and I'd

7    like to lay a foundation as to --

8              THE COURT:  Well, let's here hear the foundation and

9    I'll figure out whether I'll let it in.  Okay.

10   BY MR. REEVES:

11   Q.   Mr. Egan, when you met with the Government --

12   A.   I need some more water.  So is there any way there's some

13   more?

14             THE COURT:  Would you get him some more water?

15             THE CLERK:  Yes.

16             THE WITNESS:  I apologize, but I have dry mouth.

17             THE COURT:  It's going to rain tomorrow.  The drought

18   will be addressed.

19   BY MR. REEVES:

20   Q.   When you met with the Government, Mr. --

21             THE COURT:  Wait.  Wait.  Wait.

22             MR. REEVES:  Okay.

23             THE COURT:  He needs some water.

24             MR. REEVES:  Okay.

25             THE WITNESS:  I'm okay for a question or two, but I'm

1    out.

2            THE COURT:  No, no, no.

3                    (Pause in proceedings.)

4            THE WITNESS:  Thank you very much.

5            THE COURT:  Do you want to just stand up for a minute

6    and stretch?

7                    (Pause in proceedings.)

8            THE COURT:  Okay.  Go ahead.

9            MR. REEVES:  Thank you, Your Honor.

10   Q.   When you first described this shift and the effect that it

11   had on you to the Government, did you reach for a pad of paper

12   and diagram what you were talking about, Mr. Egan?

13   A.   I found it a very hard concept to explain and ultimately

14   after failing to explain it a few times, I did reach for a pen

15   and a pad and drew a drawing.

16   Q.   Okay.  And do you think that -- and withdrawn.

17       The summary chart marked for identification as 2797,

18   pages 1 and 2, who prepared this chart?

19   A.   I'm sorry.  I didn't turn to it.  What was the --

20   Q.   2797.

21   A.   (Witness examines document.)  Okay.

22   Q.   Who prepared that chart?

23   A.   The actual sheet?

24   Q.   Uh-huh.

25   A.   My attorney.

1  Q.    Your attorney?  Did you direct the attorney about what to

2  do?

3  A.    I'd drawn it in paper.

4  Q.    You'd drawn it in paper?

5  A.    Yeah.

6  Q.    Okay.  And is this a maybe nicer, prettier version of the

7  diagram that you were trying to convey when you first described

8  it to the Government?

9  A.    The lines are certainly straighter.  I mean, it's just

10  professional.

11  Q.    Okay, good.

12      Now, does this summary assist you in explaining some of

13  the concepts associated with both the shift, its effect on

14  revenue targets for you over time, and this concept of

15  accelerating deals from future quarters into a current quarter

16  and the hole that that creates in the next quarter?  Does it

17  help you explain these concepts?

18  A.    It did in two forms, but this particular form did not

19  communicate all of what you said.

20  Q.    What about the second page?

21  A.    Yes.

22      MR. REEVES:  Okay.  I'd like, with the Court's

23  permission, to please display --

24      THE COURT:  Well, you have to explain what is it --

25  there are certain things on here.

1    MR. REEVES:  Okay.

2    THE COURT:  -- for example, there's something called

3    "Organic Growth" --

4    BY MR. REEVES:

5    Q.   What does "organic" --

6    THE COURT:  -- and then there's "Organic and

7    Nonorganic Growth."  These terms haven't been explained by this

8    witness.

9    MR. REEVES:  Sure.  Okay.

10   Q.   Mr. Egan, in your diagram, what did you mean by "Organic

11   Growth"?  What does that mean?

12   A.   I meant the revenue that would be the case if we didn't

13   pull anything forward or didn't do a *quid pro quo* or didn't do

14   any of the kinds of deals that I was talking about at the time.

15   Q.   And these are the deals that you've talked about with the

16   value-added resellers?

17   A.   Not just, no.

18   Q.   Okay.

19   A.   They were a portion of them.

20   Q.   All right.  And what do you mean by the line that has the

21   designation "Organic Plus Nonorganic Growth"?  What do you mean

22   by that?

23   A.   That would be a combination of the organic, which I just

24   mentioned, and the types of deals that I was talking about,

25   reseller deals, *quid pro quo* deals.

1    Q.    And in this way are you conceptualizing the greater growth

2    rates associated with these additional deals that you've been

3    talking about with the resellers?

4    A.    What I'm conceptualizing is that it pulled revenue

5    forward.  That was one of the concepts I was expressing.  The

6    other concept I was expressing was that it started me below

7    zero in the subsequent quarter.

8    Q.    And is that reflected in the second summary, page 2 of

9    Exhibit 2797?

10   A.    It is.

11   Q.    And you have some nifty green arrows there.  What are

12   those green arrows demonstrating?

13   A.    At the time I showed that it was the borrowing from the

14   future period into the period that was that block.

15           MR. REEVES:  With the Court's permission, I'd like to

16   please display Exhibit 2797-2, please.

17           MR. KEKER:  I object, Your Honor.  "Organic growth"

18   has definition in economics.  He has just said something that

19   is not "organic growth."  He's making it up.

20           THE COURT:  I think he's saying this is what he means

21   by "organic growth."  You can cross-examine him on it.

22       All right.  I'll allow it in for demonstrative purposes.

23       (Trial Exhibit 2797 as demonstrative received in

24        evidence)

25           THE COURT:  Let me explain what I mean by letting it

1    in for demonstrative purposes.

2        The witness has testified what he believes to be a set of

3    circumstances which had a particular result and he said, "This

4    is what was happening, this is what I felt, this is what I

5    thought was going to happen as a result of a set of facts."Now,

6    whether these facts occurred or not, that's up to you to make a

7    determination.

8        Similarly, he is explaining, as this chart attempts to

9    explain, a diagram of what he thought was occurring.  So it is

10   up to you -- this reflects his state of mind as he perceives

11   these events -- the impact of these events.  That's what he's

12   saying.

13       However, you should reserve judgment for cross-examination

14   because we have to take things one at a time, and this is not

15   being introduced as a fact.  It's simply being introduced as a

16   picture or a depiction of what he thought was occurring.

17   That's all it comes in for.  So when you look at it, they're

18   not measurements, at least not on mine.  It is done for graphic

19   demonstrative purposes and not as the evidence of the events.

20       Okay.  You may show it to the jury.

21       **MR. REEVES:**  Thank you, Your Honor.  At this time,

22   with the Court's permission and that instruction, we're

23   displaying Exhibit 2797, page 2.

24   **Q.**   Is this the summary that you directed your attorneys to

25   prepare?

1   **A.**    Yeah.  This is a representation of my drawing.

2   **Q.**    All right.  Let's start with the white line, the white

3   line.  What is that white line, Mr. Egan?

4   **A.**    I drew that to represent what would have been my targets

5   or what would have been what I was aiming for if I hadn't

6   borrowed any revenue from the future period.

7          **THE COURT:**  When you say "white line," you're talking

8   about a dotted white line?

9          **MR. REEVES:**  Yes, I am.  Thank you, Your Honor.

10          **THE WITNESS:**  That's right.

11  **BY MR. REEVES:**

12  **Q.**    I'm talking about the dotted white line, and it has the

13  title next to it of "Organic Growth."  What did you mean by

14  that?

15  **A.**    I was referring to the revenue that the company would have

16  done on a normal course of continuing without any of the deals

17  that I was referring to in our discussion:  Reseller without

18  end user, *quid pro quo*.  There may have been another kind.

19  **Q.**    Okay.  That's a normal growth trajectory over time; is

20  that what's depicted there?

21  **A.**    Correct.

22  **Q.**    And a healthy company growing at that rate?

23  **A.**    Yes.

24  **Q.**    There's the yellow line, the yellow dotted line.  It looks

25  like it goes at a higher trajectory.  Do you see that?

1  **A.**    I do.

2  **Q.**    And that's your intention, is it not?

3  **A.**    Yes.  I drew it.

4  **Q.**    All right.  And it has the designation "Organic and

5  Nonorganic."  What did you mean by that?

6  **A.**    I was trying to express the concept that the minute I

7  pulled revenue from, in this case, Q3 and added it to our Q2,

8  it set a new line that was going to set my future goals.

9  **Q.**    That's how the yellow dotted line intersects with the red

10  box at the top of Q2; is it not?

11  **A.**    Correct.

12  **Q.**    Okay.  And conceptually this shift is occurring, this

13  change is occurring, where at or around the time following

14  immediately the two, white dotted line and yellow line,

15  intersect?  That's what changes there; correct?

16  **A.**    I'm not sure I understand that.

17  **Q.**    Where's the shift in your diagram?  Let's say, when we

18  were talking about earlier about the shift, is that depicted in

19  the summary here?

20  **A.**    Yes.  When the -- whenever the two dotted lines are

21  together, that would represent the shift for the first time

22  that I took a nonorganic deal, which was a deal through

23  MicroLink with no end user.

24  **Q.**    Okay.  And once that happened, that's what sets the

25  trajectory for the yellow dotted line, does it not?

**EGAN - DIRECT / REEVES**

1  **A.**   Yes.

2  **Q.**   Now, explain this concept of pulling quarter -- revenue

3  from a future quarter into the current quarter, the green line

4  and what you mean by that, Mr. Egan.

5  **A.**   Well, as I said, I was trying to express two separate

6  concepts.  It just so happens to be that the drawing worked to

7  communicate both because they're related.

8      One is that if you pull from a future period, it sets your

9  goals higher.  The other is that you start the new period with

10  a hangover or an obligation, extra work.  As opposed to

11  starting at ground level, I'm starting in the basement, if you

12  will.  I've got another -- I've got a deal in the very first

13  case.  Later, many deals, to close out before I'm even at

14  ground level in the next quarter.

15  **Q.**   And what is -- this hangover is coming from what?  Why do

16  you have to close those deals out in the new quarter?  Why do

17  you feel that need?

18  **A.**   Well, specifically in the case of the reseller deal, it's

19  not closed yet with the end reseller so I need that to close.

20  If you recall, if I don't close that, I'm probably going to

21  need to take another deal from my pipeline and channel it

22  through that reseller.  That would then cannibalize that deal,

23  which brings my gray box down.

24  **Q.**   Okay.  And does this phenomenon compound or, in your

25  experience, did it compound or get worse over time?

1    **A.**    Yes.

2    **Q.**    How would it get worse, please?

3    **A.**    I'm not sure "compound" is the right word --

4    **Q.**    Okay.

5    **A.**    -- but it got worse.

6    **Q.**    It got worse?

7    **A.**    Yeah.

8    **Q.**    And are you trying to depict how it gets worse over time

9    by the second and the third green line?

10    **A.**    I was.

11    **Q.**    And tell us what you mean by that.

12    **A.**    What I was conveying to you at the time was if you get a

13    goal trajectory that's set more aggressively, then we were more

14    tempted to take more from a future period, and so on and so

15    forth.

16    **Q.**    That type of phenomena, is that sustainable?

17    **A.**    No.

18    **Q.**    Thank you.  I'm done with that.

19         Let me -- let's go back to MicroLink.  Let me direct your

20    attention to in or around 2008, in or about December 2008.  At

21    or around that time, were you doing business with one of these

22    resellers known as MicroLink?

23    **A.**    Yes, I was.

24    **Q.**    And why don't you describe, if you would, please, the

25    level of conduct or the nature of the business that you'd done

**EGAN - DIRECT / REEVES**

1  with MicroLink prior to in or around December 2008.

2  **A.**    By December of 2008, we had been doing lots of deals with

3  MicroLink.  They were probably our primary reseller to the

4  federal government.  We'd done, I would think, hundreds of

5  deals with them at that point.  I had already started doing

6  deals that were without the end user.  I don't know how many

7  but some.

8  **Q.**    The at-risk deals you described?

9  **A.**    The at-risk deals, yeah.

10  **Q.**    Had already begun by this point in time with MicroLink?

11  **A.**    Yes.

12  **Q.**    All right.  And with whom did you deal vis-a-vis

13  MicroLink?

14  **A.**    Primarily Dave Truitt.

15  **Q.**    And what was your level of contact or interaction with

16  Mr. Dave Truitt?

17  **A.**    Pretty frequent and I considered him a friend and a really

18  close business associate.

19  **Q.**    All right.

20  **A.**    It was a closer relationship than most customers or...

21  **Q.**    Where was Mr. Dave Truitt located in this time period?

22  **A.**    In the D.C. area.

23  **Q.**    Washington, D. C.?

24  **A.**    Washington, D. C., area.

25  **Q.**    All right.  And in or around 2008-2009, did Mr. Dave

1    Truitt have more than one value-added reseller business that he

2    owned or controlled?

3    A.    Yes.

4    Q.    What were some of the other businesses that Mr. Dave

5    Truitt controlled to your knowledge?

6    A.    To my knowledge, at that time I can say that I know that

7    he had interest in MicroTech.  So ownership interest in

8    MicroTech.

9    Q.    Okay.  Ownership interest in MicroTech?

10   A.    Uh-huh.

11   Q.    And also ownership and control of MicroLink?

12   A.    Correct.

13   Q.    All right.  And did you discuss Dave Truitt and your

14   dealings with Dave Truitt with Mr. Hussain?

15   A.    Yes.

16   Q.    Did you do that on a regular basis, on a sort of

17   deal-by-deal, quarter-by-quarter basis?

18   A.    Not every deal but his name would definitely come up every

19   quarter.

20   Q.    All right.  And did you discuss with Sushovan Hussain the

21   fact that Dave Truitt had an ownership interest in MicroTech?

22   A.    I did but not sure it was at that period.

23   Q.    Okay.  In what period are you sure that you talked to

24   Mr. Hussain about the fact that Dave Truitt had an ownership

25   interest in MicroTech?

1    **A.**    I don't recall what period I would have discussed that.

2    **Q.**    Okay.  Even if you're not sure of the period, are you sure

3    you told him that or spoke with him about that?

4    **A.**    I'm not even sure I was the one who told him, so I'm not

5    sure I was the person who informed him for the first time but

6    we discussed it.

7    **Q.**    You discussed it?

8    **A.**    Uh-huh.

9    **Q.**    All right.  Now, in time -- and we'll get to this -- did

10   Mr. Dave Truitt have an interest in a third value-added

11   reseller known as Discover Tech?

12   **A.**    I know he did have an interest in a third reseller called

13   Discover Tech.  I don't remember specifically what time he

14   formed that.

15   **Q.**    All right.  We'll come to that in a little bit.

16        Let me show you what has been marked as Exhibit 12.  Do

17   you have that?  That should be right in the beginning of the

18   first binder.

19   **A.**    (Witness examines document.)  Yeah.  It's the first one.

20   **Q.**    Do you recognize Exhibit 12?

21   **A.**    (Witness examines document.)  It's pretty tiny.  Hang on

22   one second.

23        (Witness examines document.)

24   **Q.**    I withdraw the question.

25        In December --

1        **THE COURT:**  Maybe this is a good time to take a

2   recess.  We've been going a long time today.

3        So, ladies and gentlemen of the jury, remember the

4   admonition given to you:  Don't discuss the case, allow anyone

5   to discuss it with you, form or express any opinion.

6        We'll start at 9:00 o'clock tomorrow.

7        (Proceedings were heard out of the presence of the jury:)

8        **THE COURT:**  Okay.  The jury has retired.

9        So back to this chart for a minute.

10       **MR. KEKER:**  Can Mr. Egan be excused, Your Honor?

11       **THE COURT:**  He can stay.  It doesn't make any

12   difference.  What difference does it make?

13       I think it stands for two very unremarkable propositions,

14   and I'm trying to figure out why we need a chart, but the

15   chart's there so I don't really care.

16       The chart, point number one is the higher you list your

17   revenues, the higher the goal is going to be for the next

18   quarter, the expectations.  Okay.  Yeah.  Right.  No one is

19   going to argue with that, I mean, given a set of assumptions

20   that the economy is not going to change.  I mean, there are a

21   lot of unstated assumptions but as a general rule, you meet

22   your expectations.  I mean, you generate revenues, that becomes

23   your expectation.  He's testified a lot about that.

24       Okay.  Number two is that because of the VAR deals, which

25   may be legally and may be from an accounting point of view have

1    closed book, so forth, may be perfectly all right, from his

2    point of view, he's saying, "Now I have to find customers for

3    closing those things out or satisfying those things, and so I

4    start from in the hole or behind."

5        Okay.  And that's the two things that I get out of this

6    chart.

7        Now, what's unfortunate is that it talks about things like

8    organic growth and inorganic growth -- I mean, not inorganic

9    growth.  I didn't do well in chemistry, both organic and

10   inorganic chemistry.

11       So anyway, you know, maybe we'll get to that, but that's

12   neither here nor there and I'll let you do it.

13       However, I'm sitting up here thinking:  Are you really

14   going to go through every single transaction all over again and

15   ask him what his -- you know, is this the example of the

16   transaction?  Look at these e-mails.  You went through these

17   e-mails.  Is this what you're talking about, and so forth?

18   Because we'll be here for months.

19       I mean, you've gone through -- I don't know, how many

20   transactions have you set forth?  How many?  20?  15?  I don't

21   know, whatever that number is.

22       I'm not being critical.  I'm just trying to figure out

23   where they're going with this thing because I think you just

24   simply lose the jury if you go through all the transactions all

25   over again, the MicroTech, and this and that and so forth.

**PROCEEDINGS**

 1   You're going to lose them.  You know, they're just going to

 2   fall off the chairs.  I'm going to fall off the chair.

 3       So, you know, I don't know what your game plan is, but it

 4   seems to me that there are ways that you can examine this

 5   witness collectively and say:

 6       "Look at the MicroTech thing or look at this or that.  Is

 7   that an example of the VAR that you were talking about?  Are

 8   you familiar with MicroTech.  Did you do that?

 9       "Yeah.

10       "Okay.  Are these the transactions?  Looking at these

11   things, have you reviewed them?"

12       That's why I think you ought to sit down with him tonight

13   and go through these things and collect them, collect them in

14   piles.  You're not going to get the jury convinced that it

15   either did or didn't happen by virtue of going document by

16   document by document.  You've done that.

17       And, by the way, that's important.  I'm not -- I'm not

18   saying you shouldn't -- you shouldn't dissect -- you

19   shouldn't -- I'm not saying you shouldn't dissect a

20   transaction, but when it's a cadaver, one time is probably

21   pretty good, you know.

22       You've got it in the record.  You can make your argument,

23   whatever argument you want to, but I'm not going to listen here

24   to this gentleman testify for three days or two days about

25   every single transaction.

PROCEEDINGS

1          Now, after having said that, if the Defense gets up and

2     they start attacking transaction A, B, C, of course, you can go

3     back to it.  Of course, you can.  I'm not foreclosing you.

4          I know it's dangerous when judges decide they want to be

5     trial lawyers, but I'm telling you that you're going to lose

6     these people, or at least one of them, and that's me.

7          Okay.  Good night, everybody.  I'll see you tomorrow.  And

8     talk to your witness and figure out what to do.

9          **MR. REEVES:**  Thank you, Your Honor.

10               (Proceedings adjourned at 3:57 p.m.)

11                         ---oOo---

12                **CERTIFICATE OF REPORTERS**

13          I certify that the foregoing is a correct transcript

14     from the record of proceedings in the above-entitled matter.

15

16     DATE:   Monday, March 19, 2018

17

18

19     _____

20          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

21

22

23     _____

24          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter

25