**Volume 13**

**Pages 2243 - 2465**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )
                                     )
  VS.                                )        **NO. CR 16-00462 CRB**
                                     )
SUSHOVAN TAREQUE HUSSAIN,            )
                                     )
          Defendant.                 )
_____)
                          San Francisco, California
                          Wednesday, March 21, 2018

                    <u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          BY:  **ROBERT S. LEACH**
               **ADAM A. REEVES**
               **WILLIAM FRENTZEN**
               **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
          BY:  **JOHN W. KEKER**
               **JAN NIELSEN LITTLE**
               **BROOK DOOLEY**
               **KATE LAZARUS**
               **NIC MARAIS**
               **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

<u>**I N D E X**</u>

Wednesday, March 21, 2018 - Volume 13

<u>**GOVERNMENT'S WITNESSES**</u>                                    <u>PAGE</u>  <u>VOL.</u>

<u>**EGAN, CHRISTOPHER (RECALLED)**</u>
(PREVIOUSLY SWORN)                                       2246  13
Cross-Examination resumed by Mr. Keker                   2246  13
Redirect Examination by Mr. Reeves                       2364  13
Recross-Examination by Mr. Keker                         2413  13

<u>**LOOMIS, WILLIAM**</u>
(SWORN)                                                  2419  13
Direct Examination by Mr. Reeves                         2419  13

**E X H I B I T S**

<u>**TRIAL EXHIBITS**</u>                              <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

157                                                 2316  13

401                                                 2428  13

407                                                 2300  13

434                                                 2429  13

436                                                 2426  13

615                                                 2422  13

667                                                 2433  13

668                                                 2436  13

694                                                 2432  13

782                                                 2441  13

810                                                 2443  13

1090                                                2444  13

1093                                                2312  13

1229                                                2456  13

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1886 | | 2458 | 13 |
| 1906 | | 2460 | 13 |
| 2279 | | 2462 | 13 |
| 2280 | | 2460 | 13 |
| 2953 | | 2450 | 13 |
| 2954 | | 2452 | 13 |
| 2955 | | 2450 | 13 |
| 2957 | | 2453 | 13 |
| 2958 | | 2452 | 13 |
| 5625 | | 2348 | 13 |
| 6107 | | 2297 | 13 |
| 6114 | | 2251 | 13 |
| 6115 | | 2253 | 13 |
| 6170 | | 2317 | 13 |
| 6198 | | 2273 | 13 |
| 6209 | 2354 | 2355 | 13 |
| 6211 | 2354 | 2356 | 13 |
| 6213 | 2354 | 2360 | 13 |
| 6215 | 2354 | | 13 |
| 6264 | 2279 | | 13 |
| 6266 | 2264 | 2265 | 13 |
| 6267 | 2265 | 2266 | 13 |

1  <u>**Wednesday - March 21, 2018**</u>                    <u>**9:22 a.m.**</u>

2                    P R O C E E D I N G S

3                       ---oOo---

4     (Proceedings were heard in the presence of the jury:)

5          **THE COURT:**  Please be seated.

6     Okay.  Let the record reflect all parties are present, the

7  jury is present.

8     You may proceed.

9          **MR. KEKER:**  Thank you, Your Honor.

10                    <u>**CHRISTOPHER EGAN**</u>,

11  called as a witness for the Government, having been previously

12  duly sworn, testified further as follows:

13                <u>**CROSS-EXAMINATION**</u>    (resumed)

14  **BY MR. KEKER:**

15  **Q.**   Good morning, Mr. Egan.

16     Good morning, ladies and gentlemen.

17  **A.**   Good morning.

18  **Q.**   Mr. Egan, when we broke yesterday, we were talking about

19  Capax.

20     And if I can just go back, you were the one -- you

21  personally were the one who made the verbal side effect with

22  Mr. Baiocco; right?

23  **A.**   That's correct.

24  **Q.**   And you personally approved payments pursuant to that side

25  agreement?

EGAN - CROSS / KEKER

1   A.   I did some, yes.

2   Q.   And you lied to Mr. Sullivan to get him to approve the

3   payments?

4   A.   I'm not sure I did.

5   Q.   Did you tell Mr. Sullivan to approve those payments?

6   A.   I'm not sure I did.

7   Q.   Did you tell Mr. Sullivan that the work was done?

8   A.   No.

9   Q.   Do you know why Mr. Sullivan approved those payments?

10  A.   I do not.

11  Q.   Do you know -- the jury has seen a lot of e-mails saying

12  that Stouffer says -- or Mr. Sullivan testified that you told

13  him to approve the payments, did you?

14  A.   I asked -- I may have forwarded to him to ask him to

15  approve as well.

16  Q.   And he approved work being done by Capax?

17  A.   Not work but the POs.  I never represented that work had

18  been done.

19  Q.   But Mr. Sullivan represented that work had been done.  We

20  saw that yesterday, "Work has been completed."

21  A.   I did see that.

22  Q.   Where did he get that?

23  A.   I don't know.

24  Q.   From you; right?

25  A.   Not to my memory.

1  Q.    Okay.  And you lied to the Air Force about it.  You said

2  you didn't know anything that had been done that was wrong.

3  You didn't tell them about this side agreement?

4  A.    That's not the way I would characterize the Air Force

5  letter.

6  Q.    You wouldn't characterize it -- when you said that you

7  weren't aware of any impropriety, were you -- to the Air Force,

8  were you thinking about this verbal agreement, which was

9  unauthorized and improper?

10  A.    In a letter from my lawyers to the Air Force, I approved

11  the language of the letter.  I was not thinking about

12  specifically this -- what you're referring to.

13  Q.    Do you know that lying to the federal government in an

14  official way like that is a crime, federal crime?

15  A.    I would assume it is.

16  Q.    And you were the one who asked the Finance Department to

17  increase the payments to Capax because of all the work they

18  were doing; right?

19  A.    I may have done that at one time, yes.

20  Q.    And Baiocco, I think you testified, was your good friend?

21  A.    Yes.  He was a good friend, yeah.

22  Q.    And you're the one who wrote misleading e-mails about

23  Capax; right?

24  A.    I did write misleading e-mails about Capax.

25  Q.    Okay.  And you call them misleading.  Another way to say

1   it would be lies.  You wrote lies about Capax?

2   **A.**   Yes.

3   **Q.**   And you benefited from the sales to Capax because they

4   helped you meet your target and get a bigger bonus and more

5   options; right?

6   **A.**   No, I don't agree with that.

7   **Q.**   You don't agree that you benefited from sales to Capax?

8   **A.**   Ultimately in the revenue reporting I did, yes, but not

9   with bonuses or recognition.

10   **Q.**   In terms of reaching your sales target, did the Capax

11   sales help you reach your sales target?

12   **A.**   They -- some of them.  Reseller deals, if they were done

13   through Capax, they would initially, before the sale to an end

14   user, help with the company's sales targets, which I benefited

15   from as an option holder; and later when a deal would close

16   through to the end user, I may benefit from that deal in my

17   variable pay or bonus.  Sometimes, sometimes not.

18   **Q.**   Yesterday we ended with looking at 6116.  I moved it in.

19          **MR. KEKER:**  And this is what we were talking about at

20   the end of the day.  If it's not in, I move it, Your Honor,

21   6116.

22          **THE CLERK:**  It's in.

23          **MR. KEKER:**  It's in.

24       Can we put it up, please?

25   **Q.**   And this is Mr. Hussain telling people in June of 2009

1    when he's asked, "Can you confirm in writing that Phil can

2    release the PO request to Capax," Mr. Hussain is saying, "No.

3    I have many questions."  Do you see that?

4    **A.**   I do.

5    **Q.**   And your testimony is at this time he should have no

6    questions because he understood what was going on?

7    **A.**   I don't know which POs we're referring to here.

8    **Q.**   Okay.  Could we look at 6114?

9              **MR. KEKER:**  I'd move that in, Your Honor.

10                      (Pause in proceedings.)

11             **MR. KEKER:**  6114 is an October 23rd, '09, e-mail.

12             **THE COURT:**  Yeah, I'll admit it subject to a motion to

13   strike.

14        You're talking about 61 --

15             **MR. KEKER:**  6114.

16             **THE COURT:**  -- 14.

17   **BY MR. KEKER:**

18   **Q.**   Is that an e-mail from Mr. --

19             **MR. REEVES:**  I'm sorry.  We object.  This is hearsay.

20   We object.

21   **BY MR. KEKER:**

22   **Q.**   This is Mr. Hussain writing to you; right?

23   **A.**   Which one?

24   **Q.**   Well, the top one.  It's an e-mail string that --

25   **A.**   I'm sorry.  Just I'm not sure if I'm supposed to be

 1  looking at the document that just disappeared or the one that

 2  we started with.

 3      **MR. REEVES:**  I object to Exhibit 6114 as a hearsay

 4  statement, Your Honor.

 5      **THE COURT:**  I don't have it in front of me, so --

 6      **MR. KEKER:**  6114 is a memorandum from Sushovan Hussain

 7  to Stouffer Egan on October 24, 2009, and I want to ask

 8  Stouffer Egan about it.

 9                  (Pause in proceedings.)

10      **MR. REEVES:**  I don't object to questions about the

11  document.

12      **THE COURT:**  Okay.  So admitted.

13      **MR. KEKER:**  Okay.  Put it up.

14      **MR. REEVES:**  I object to the document coming into

15  evidence as hearsay, Your Honor.  I don't object to questions

16  based on the document.  It's hearsay.

17      **THE COURT:**  Well, okay.

18      Ladies and gentlemen, this document is being admitted not

19  for the truth of the matter but, rather, since this witness

20  received the document, what was his -- what -- how did that

21  affect his state of mind as to the receipt of the document, the

22  information in the document.

23      (Trial Exhibit 6114 received in evidence)

24      **MR. KEKER:**  Okay.  Could we see 6114?

25  **Q.**   The bottom e-mail is from Mr. Smolek to Sushovan Hussain

1   and Joel Scott, and they're saying (reading):

2          "Hi, Sushovan.

3          "We are awaiting your approval for the two Capax PO

4      requests as generated by Stouffer in early December

5      [sic]."

6   Do you know what you're they're talking about there?

7   **A.**   Early September.  I do know what they're talking about.

8   **Q.**   What?

9   **A.**   Two POs raised for Capax EDD processing.

10  **Q.**   eDiscovery?

11  **A.**   Correct, yeah.

12  **Q.**   All right.  And somebody's asking Mr. Hussain for

13  approval?

14  **A.**   That's correct.

15  **Q.**   And then he writes to you after getting that saying

16  (reading):

17         "Rather than rush this - would like to run this

18     through with you again on Monday."

19  Did you have a conversation with Mr. Hussain about what

20  was going on here?

21  **A.**   I'm sure I did.

22  **Q.**   Do you remember it?

23  **A.**   I don't.

24  **Q.**   And did Mr. -- did you explain to Mr. Hussain that he was

25  paying for nothing?

EGAN - CROSS / KEKER

1    **A.**   I would have reminded him -- well, whatever he was wanting

2    to ask me, I would have answered.

3    **Q.**   Could we see 6115?

4         **MR. KEKER:**  And I move that in.  That's from

5    Mr. Hussain to Smolek and Stouffer Egan with copies to

6    Sullivan, Scott, Menell, and Andrew Kanter.

7         **THE COURT:**  6150?

8         **MR. KEKER:**  Yes.

9         **THE REPORTER:**   Was that 6150 or 6115?

10        **MR. KEKER:**  6115.  I'm sorry.

11        **THE COURT:**  6115.

12                  (Pause in proceedings.)

13        **THE COURT:**  Is it up so I can look at it?

14        **MR. KEKER:**  We move it in.

15        **THE COURT:**  I don't know whether there's any objection

16   or not, and --

17        **THE WITNESS:**  I think I went to the wrong document.

18   What are we on?

19        **THE COURT:**  Pardon?

20        **MR. REEVES:**  There's no objection.

21        **MR. KEKER:**  6115?

22        **THE COURT:**  Admitted.

23        **THE WITNESS:**  6115.

24      (Trial Exhibit 6115 received in evidence)

25   \\\

1    BY MR. KEKER:

2    Q.   In 6115 Mr. Hussain, with a copy to a lot of people,

3    including you -- Mr. Sullivan, Mr. Scott, Mr. Menell, Andrew

4    Kanter -- says (reading):

5              "Thanks, Phil.

6              "Mr. Baiocco," he spelled it wrong, "is calling

7         everyone and expressing discuss, et cetera.  However

8         there's no one here who is giving me confidence that the

9         process for handover is well understood, that the numbers

10        are being monitored, that the cash flow is being

11        monitored, that the lists are being monitored, et cetera."

12             "I have asked that the process is spelled out before

13        but I have not seen it.  Do you want me to do it?  A bit

14        busy on revenue so I would ask AK to help me here."

15        Who's "AK"?

16   A.   Andy Kanter.

17   Q.   Okay.  And then he talks about questions for the EAS part,

18   and then down at the bottom regarding the EDD, "I'd like Andy

19   to approve"; right?

20   A.   Correct.

21   Q.   All right.  And your testimony is that at the time he

22   wrote this e-mail, Mr. Hussain understood whatever dirty deal

23   you were doing with Baiocco?

24   A.   I disagree with the characterization, but I agree that at

25   this point I understand Sushovan understands every aspect of

**EGAN - CROSS / KEKER**

1   the Capax agreement.

2   **Q.**   What do you disagree with about my characterization it is

3   a dirty deal?

4   **A.**   Correct.

5   **Q.**   What do you disagree with about that?  What's not dirty

6   about it?

7   **A.**   It was an agreement to contract Capax on a month-by-month

8   basis for EDD processing retainer.

9   **Q.**   It's an --

10  **A.**   It was --

11  **Q.**   I'm sorry.  Go ahead.

12  **A.**   It was agreed at the time that that was okay to do.

13  **Q.**   Okay.  And you were paying him -- well, first of all, this

14  oral agreement was a violation of very clear company policy,

15  wasn't it?

16  **A.**   It was, yeah.

17  **Q.**   And this oral agreement was a violation of the very

18  contract that you entered into with Capax, which said no side

19  agreements, this is everything and the terms?

20  **A.**   I don't know as I know what you mean.

21  **Q.**   Well, you knew that side agreements were not permitted by

22  the contracts that you entered into to people that you sold

23  software to?

24  **A.**   I'm not sure about that.  It was not -- it was not allowed

25  as an Autonomy policy.  So if Sushovan or Mike Lynch relieved

1   me from that policy, that was okay.

2   **Q.**   And so --

3   **A.**   I think you're saying that it was in violation of the

4   actually Ts and Cs of the deal, other deal, side deal with

5   Capax?

6   **Q.**   Well, didn't Capax have to confirm each quarter that it

7   owed the money for the eDiscovery software and that there

8   were no side agreements?  Didn't they have to confirm that in

9   writing?

10  **A.**   I don't know.

11  **Q.**   Do you know whether or not these resellers had to confirm

12  that they owed the money to the auditors?

13  **A.**   I do know that, yep.

14  **Q.**   And you don't know if Capax as a reseller, as a purchaser

15  of Autonomy software, had to confirm that debt?

16  **A.**   I know that they did it, not always, but on occasion they

17  did confirm that debt.

18  **Q.**   And when they confirmed the debt, they had to say that

19  there were no side agreements; right?

20       **MR. REEVES:**  I object.  I think that misstates the

21  evidence because those letters change over time.  I'd

22  appreciate using the correct letter in the correct time period.

23       **MR. KEKER:**  I'm trying to get through this before

24  Thanksgiving, Your Honor.

25  **Q.**   Just tell us if you know.  Do you know -- the jury has

1    seen these confirmations over and over again.  Do the

2    confirmations say, "I confirm the debt and there's no side

3    agreements"?

4            MR. REEVES:  I object.  The question is ambiguous as

5    to its time period and changes over time.  Objection.

6            THE COURT:  I think it can be asked:  Did any of the

7    side agreements...

8    BY MR. KEKER:

9    Q.   Did any -- well, at the time you entered into this side

10   agreement with Mr. Baiocco, it was against company policy?

11   A.   It was.

12   Q.   And you didn't get anybody to put in writing, "Mr. Egan,

13   you can violate company policy with respect to Mr. Baiocco"?

14   A.   I did not.

15   Q.   And at the time you entered into this side agreement with

16   Mr. Baiocco, you knew that Capax and Mr. Baiocco would have to

17   affirm that they owed Autonomy the money for the eDiscovery

18   software and that there were no side agreements, didn't you?

19   A.   I knew that they needed to affirm or would have a high

20   likelihood of needing to affirm.  I can't say I was familiar

21   with the detailed questions in that confirm.

22   Q.   All right.  Let me ask you some questions about the

23   meetings that you've told us about yesterday.

24           You told us that you met with prosecutors all day Tuesday,

25   all day Wednesday, half of Saturday, and half of Sunday, but

1    you didn't practice your testimony?

2    **A.**    That's correct.

3    **Q.**    And you weren't coached in any way?

4    **A.**    That's correct.

5    **Q.**    Who was present when you were having these sessions?

6    **A.**    At times both of my lawyers, at times only one of my

7    lawyers, Bob Leach, Adam Reeves, Alex whose last name I don't

8    know, occasionally one or two other people would walk in and

9    out of the room to correspond with these individuals.

10    **Q.**    And what were you doing that whole time?

11    **A.**    Answering questions.

12    **Q.**    Okay.  They would ask you questions and then show you a

13    document?

14    **A.**    Yes, very frequently.

15    **Q.**    And then you would answer the question?

16    **A.**    I would.

17    **Q.**    And you didn't consider that sort of rehearsal for your

18    testimony?

19    **A.**    I don't.

20    **Q.**    And was there any feedback on the way you were answering

21    questions?

22    **A.**    No.  For clarification questions, I was asked questions

23    repeatedly.

24    **Q.**    So they'd ask you a question over and over again and you'd

25    work on your answer?

1    **A.**    I would rephrase my answer.

2    **Q.**    Until they were satisfied?

3    **A.**    Until they asked the next question.

4    **Q.**    Okay.  You said things yesterday --

5          **MR. KEKER:**  Can we put up this board?  Karen, can you

6    help me?

7          Excuse me, Your Honor, if we may.

8                        (Pause in proceedings.)

9    **BY MR. KEKER:**

10   **Q.**   I put the board back up to remind you and all of us how

11   many times you had talked to the prosecutors and how many times

12   you talked to the Hewlett Packard lawyers, and we're missing

13   four dates from last week.  We're missing Tuesday, Wednesday,

14   Saturday, and Sunday; right?

15   **A.**   Correct.

16   **Q.**   So we have to take that and add four conversations.

17   **A.**   Correct.

18   **Q.**   You said things yesterday that you had never said --

19   things -- bad things about Mr. Hussain, things that you had

20   never said in any of these interviews before; right?

21   **A.**   I don't know.

22   **Q.**   Well, for example, you said that you discussed not putting

23   the Capax deal in writing with Mr. Hussain.  Do you remember

24   saying that yesterday?

25   **A.**   I did say that.  That is the truth.

1   Q.   Okay.  That's the truth but that truth had not emerged in

2   any of the interviews that you've been doing all the time

3   working on your deal and ever since until yesterday in court?

4   A.   I would find that impossible to believe.

5   Q.   Okay.  Do you have your statements up in front of you?

6   A.   I do.

7   Q.   Okay.  If it's impossible to believe, I mean, we can't

8   take too much time, but you go find in there at lunchtime or

9   something, you find were you ever said that before in the

10  history of you talking to him.

11          MR. REEVES:  I object.  These are reports, not

12  transcripts.  I object, Your Honor.  The question is improper

13  about homework.

14          THE COURT:  Sustained.

15  BY MR. KEKER:

16  Q.   You said yesterday for the first time ever that

17  Mr. Hussain told you not to put this side agreement in writing?

18  A.   I disagree with that.

19  Q.   You disagree that you said it yesterday for the first

20  time?

21  A.   "For the first time" part is what I disagree with.

22  Q.   Okay.  When did you say it?  Tell us when you said it, and

23  I can then look and see if it's written down.

24  A.   I don't have a memory of when I said it.

25  Q.   Did you say it to the Hewlett Packard lawyers when you

1  were telling them that Mr. Hussain was a very ethical person?

2  A.   I don't recall.

3  Q.   Did you tell it to the prosecutors when you first started

4  talking to them trying to get your deal?

5  A.   I don't recall.

6  Q.   Did you talk to them before you made your deal after

7  talking to them 11 times?

8  A.   As I say, I don't recall when I said it.

9  Q.   Did it just come up recently?

10 A.   I don't recall if it's come up recently.

11 Q.   Do you consider that you get bonus points from the

12 prosecutors by saying things that you did that were wrong and

13 then say, "Oh, Mr. Hussain told me to do it"?

14 A.   I don't think that way at all.

15 Q.   This memory of him telling you not to put the side

16 agreement in writing just came up eight years later?

17 A.   Again, I disagree with that.

18 Q.   Do you feel any pressure to help the Government win their

19 case?

20 A.   I do not.

21 Q.   You have reacted to pressure before.  The jury saw

22 yesterday that very -- that letter you wrote to Mr. Lynch

23 saying how you didn't want to live anymore, you were so upset

24 with the pressure; right?

25 A.   I definitely react to pressure.

**EGAN - CROSS / KEKER**

1  **Q.**   Okay.  You definitely react to pressure?

2  **A.**   I do, yes.

3  **Q.**   You reacted, for example, that we saw that memo to

4  Mr. Lynch and Mr. Hussain about Andy Kanter where you swore and

5  said you were going to unload on him?

6  **A.**   I don't consider that pressure, but I know what you're

7  talking about.  I wouldn't consider that an example of reacting

8  to pressure *per se*.

9  **Q.**   Are you on any medication today?

10  **A.**   I've taken an allergy pill, yes.

11  **Q.**   But nothing else?

12  **A.**   No.

13  **Q.**   You didn't feel pressure in meeting with the Government

14  trying to get your deal?

15  **A.**   No.

16  **Q.**   And you've told us that you expressed little interest in

17  what could happen to you if you didn't get your deal.

18  **A.**   I didn't say "little interest."  I said I was willing to

19  accept whatever happened to me.

20  **Q.**   Okay.  You never looked into it?

21  **A.**   What do you mean?  Sorry.

22  **Q.**   Well, I mean, did you ever find out that wire fraud, for

23  example, carries a penalty of up to 20 years in prison?

24  **A.**   I did not look that up.

25  **Q.**   And nobody told you that?

1   **A.**   They may have.  I had discussions with my lawyers about

2   this whole -- this has been a very long iterative process.

3   **Q.**   Okay.  Some questions about hardware, please, Mr. Egan.

4         You told us yesterday you were surprised to hear that

5   Bank of America was buying hardware through Autonomy?

6   **A.**   Yes.

7   **Q.**   You signed off on all the hardware sales in the

8   United States, didn't you?

9   **A.**   I don't think I did.

10  **Q.**   Did you tell the Hewlett Packard lawyers that you signed

11  off on all the hardware sales in the United States?

12  **A.**   I do not think I did.

13  **Q.**   Could you look at the very first memo in the book?  That

14  is Number 5235, the first time you talked to them, November 21,

15  2012, and look at page 3.

16  **A.**   (Witness examines document.)

17  **Q.**   And look at the third full paragraph down and read that to

18  yourself, the one that begins "Egan would sign off."

19  **A.**   (Witness examines document.)  I've read it to myself.

20  **Q.**   Did you tell the Hewlett Packard lawyers that you would

21  sign off on almost every purchase in San Francisco and would

22  sign off on hardware sales?

23  **A.**   Again, this is a very long time ago so I don't have a

24  memory of exactly what I said, but I can tell you from a

25  characterization perspective, I did sign off on a great deal of

 1  things, and I would have represented that truthfully to the HP

 2  lawyers, and I did sign off on hardware sales.  I would not

 3  have characterized that I signed off on all hardware sales

 4  because I didn't sign off on all of anything.

 5  **Q.**    Okay.  But you did sign off on hardware sales?

 6  **A.**    I did, and I recall doing so.

 7  **Q.**    The invoices would be for both internal use and resale?

 8  **A.**    I'm not sure I understand.  The invoices?

 9  **Q.**    Well, that's -- the invoices would be for both internal

10  use and resale.

11  **A.**    Oh, sorry.  Yeah.  I think you asked me to read

12  paragraph 3, but are you asking about paragraph 4?

13  **Q.**    I'm asking you the next sentence from the one I asked you

14  to read.

15  **A.**    I'm just trying to make sure I'm on the paragraph that you

16  asked me to be on.

17      (Witness examines document.)  I don't really know what

18  that statement means.  And, again, these are notes -- somebody

19  else's notes from meetings from over five years ago.

20          **MR. KEKER:**  We've got a new exhibit, Your Honor, that

21  I'd like to mark, 6266.

22      (Trial Exhibit 6266 marked for identification)

23          **THE COURT:**  Will you show it to --

24          **THE CLERK:**  Thank you.

25          **MR. KEKER:**  And 6267.

1          (Trial Exhibit 6267 marked for identification)

2          **THE COURT:**  6266 and 6267.  Would you show it to the

3     Government.

4          **MR. KEKER:**  I did.  Thank you.

5        And here's a copy for you, Mr. Egan.

6        6266 is a memorandum from Mike Sullivan to you and to

7     Sushovan Hussain dated July 22, 2009.  I move it in.

8          **MR. REEVES:**  No objection.

9          **THE COURT:**  Admitted.

10          **MR. KEKER:**  And 62 -- what did I say, '66 or '67.

11          **THE COURT:**  You said '66.

12          **MR. KEKER:**  Oh.  Then I made a mistake.  That was '67.

13     6267 I move in with that.

14          **THE COURT:**  What do you want to do it with?  Let's go

15     back.

16          **MR. KEKER:**  Okay.

17          **THE COURT:**  What do you want to do with 6266?

18          **MR. KEKER:**  I would like to move that in.  That's an

19     e-mail from Mike Sullivan to Sushovan Hussain, Stouffer Egan,

20     and Mike Mooney.

21          **THE COURT:**  Okay.  6266 is admitted.

22          (Trial Exhibit 6266 received in evidence)

23          **MR. KEKER:**  And 6267 is the e-mail I just mentioned,

24     Mike Sullivan to Stouffer Egan and Sushovan Hussain dated

25     July 22, 2009.

1           **MR. REEVES:**  No objection.

2           **THE COURT:**  Admitted.

3       (Trial Exhibit 6267 received in evidence)

4           **MR. KEKER:**  Okay.  Can we see '66 first?

5   **Q.**   And Mr. Hussain -- well, down at the bottom Mike Sullivan

6   is saying (reading):

7               "We want to identify our mutual large customers where

8           we can become their EMC reseller."

9       You understand that that's reselling EMC hardware?

10  **A.**   I do and I did.

11  **Q.**   And this is the easiest path and then he lists some banks:

12  Deutsche Bank, Citibank, JPMC are very large EMC customers, and

13  so on.

14      And then above, let's look at the e-mail above, he

15  really -- Sullivan says (reading):

16              "I really need this information from you to start

17          identifying the opportunities."

18      And then above Mr. Hussain writes about the opportunities,

19  all the ones you mention plus -- various banks and other

20  companies plus the B of A.  And you got that; right?

21  **A.**   I did.

22  **Q.**   And did you know from reading that that Autonomy was

23  thinking about selling hardware to Bank of America?

24  **A.**   I knew that Autonomy was not just thinking but acted on

25  selling EMC hardware, and I recall getting together candidate

1    lists.

2    **Q.**    To the Bank of America?

3    **A.**    Well, these candidate lists, which included

4    Bank of America.

5    **Q.**    Look at 6667.  6667 is you responding to that earlier

6    e-mail.

7         If we could blow up the second e-mail here.

8         That's you giving this contact information where you can;

9    and when it comes to Bank of America, it says (reading):

10         "I'm going to get you name of a guy I haven't met yet

11         but who knows us and of me well."

12         Who's the guy at Bank of America?

13   **A.**    I'm not sure.

14   **Q.**    Okay.  Bank of America bought $34 million worth of

15   hardware through SHI and you didn't know about it?

16   **A.**    I did not.

17   **Q.**    Did you tell -- the very first time in July of 2012, when

18   you talked to Mr. Schweiker, the in-house counsel, did you tell

19   Mr. Schweiker that for hardware sales, the goal was to sell

20   hardware with Autonomy software?

21   **A.**    I don't recall.

22   **Q.**    Look at the interview notes, if you would, please.  I

23   think it's 5283 in your book.

24              **THE COURT:**  Okay.  5283?

25              **MR. KEKER:**  Correct.

1              THE COURT:  And what page?

2              MR. KEKER:  Page 2 at the bottom, last paragraph

3     that's cut off.

4              THE COURT:  And you want him to read that paragraph to

5     himself?

6              MR. KEKER:  Yes.

7              THE COURT:  Starting with "Autonomy"?

8              MR. KEKER:  Yes, sir.

9              THE COURT:  Okay.  Got it.

10             THE WITNESS:  (Witness examines document.)

11    BY MR. KEKER:

12    Q.   Well, actually start in the paragraph above that.  Did you

13    tell him that the goal was to sell hardware with Autonomy

14    software?

15    A.   (Witness examines document.)  I've read the above

16    paragraph, the second-to-the-last paragraph as you say.

17    Q.   My question is:  Did you tell the Hewlett Packard lawyer

18    that the goal was to sell hardware with Autonomy software?

19    A.   Again, I don't recall the conversation specifically at

20    all.  What's written in that paragraph, I agree with the

21    statements and the characterization.

22    Q.   Did you tell them that they wanted to sell heavy in

23    software and services, not hardware?

24    A.   I expressed that preference.  That would be what --

25    something I would say.

EGAN - CROSS / KEKER

1    Q.    Did you say that the value up to the hardware was to sell

2    hardware bundled up with software that would have search and

3    storage capabilities?

4    A.    Again, I want to be very clear.  This was, like, seven

5    years ago.  I don't recall the conversation at all in terms

6    of -- and I have not looked back on any notes or anything.  So

7    I can answer whether it's something I agree with, but I can't

8    make a statement about whether I recall.

9    Q.    Do you understand that it's important for the jury to

10   remember how your memory has been affected by these seven or

11   eight years?

12   A.    I absolutely do.

13   Q.    Okay.  And you're remembering things now that you couldn't

14   remember in 15 interviews back then; right?

15   A.    I just disagree with that characterization.

16   Q.    In any event, did you tell him that generally the goal was

17   to sell the hardware to facilitate software sales?

18   A.    Yes.

19   Q.    You told him that the customers were banks and big pharma

20   companies, drug companies?

21   A.    Again, I don't want to answer if I told him because I

22   don't recall, and I can keep saying that and I can also happily

23   answer if that's something I agree with.

24   Q.    Okay.  You told him that with the discount on hardware,

25   sometimes you lost profit but the big margin -- with the big

1    margin on software, you make up the loss?

2              **THE COURT:** Well, let's get the --

3              **MR. KEKER:** Well, let me ask you --

4              **THE COURT:** Here is the problem: He says he does not

5    recall the conversation because it was seven years ago. And

6    then he says, however, if you ask me a question as to something

7    that was raised in the conversation, I can testify as to

8    whether or not I agree with that or it happened or it didn't

9    happen.

10        But I don't want to spend more time, because I don't think

11   it's proper, to ask him did he say X, did he say Y when, in

12   fact, he does not recall whether he said X or he said Y, but

13   you can certainly ask him. I don't want to foreclose you.

14             **MR. KEKER:** Sure.

15             **THE COURT:** This general conversation is fine.

16   There's no problem with it. I mean, this line of testimony is

17   fine as long as it's not tied back to this conversation of

18   which he has no recollection of, save and except if in this

19   statement, the notes of the lawyer, there is something that is

20   inconsistent with his testimony and then we'd have to explore

21   that.

22             **MR. KEKER:** All right.

23   **Q.**   Then let me ask you: With the discount on hardware sales,

24   Autonomy would sometimes lose profit but with the big margin on

25   the software, you'd make up the loss; right?

**EGAN - CROSS / KEKER**

1  **A.**   Yes.

2  **Q.**   And with respect to Morgan Stanley, Morgan -- Autonomy

3  sold hardware to Morgan Stanley at a discount, but Morgan

4  Stanley bought huge amounts of software at the same time;

5  correct?

6  **A.**   I agree with that statement, yes.

7  **Q.**   The hardware was sold with the intention that the customer

8  would buy software that had huge margins?

9  **A.**   That's correct.

10  **Q.**   The reason for the hardware VAR agreement was to increase

11  software sales?

12  **A.**   A reason, yes.

13  **Q.**   Autonomy was a pure software model.  It was never your

14  concern that hardware sales were inconsistent with that model;

15  is that correct?

16  **A.**   Is the statement correct?

17  **Q.**   Yes.

18  **A.**   Yes.

19  **Q.**   And Deloitte and Legal at the time that you were doing

20  this, you believed that the auditors Deloitte and the

21  Legal Department, the many lawyers at Autonomy, had looked at

22  the revenue recognition questions about hardware sales?

23          **MR. REEVES:**  Foundation.  Objection.  Foundation,

24  Your Honor.

25          **THE COURT:**  I think the question can be answered.  Did

EGAN - CROSS / KEKER

1  you have that belief?

2          **THE WITNESS:**  Could I ask you to repeat it?

3  **BY MR. KEKER:**

4  **Q.**   Yeah.  Did you have a belief that Deloitte and Legal had

5  looked at the revenue recognition questions of the hardware

6  sales?

7  **A.**   I did.

8  **Q.**   Okay.  And you were primed, as I think you said, to Morgan

9  Stanley, JPMorgan Chase, and UBS; right?

10 **A.**   To Morgan Stanley and JPMorgan Chase, yes, not to UBS.

11 **Q.**   Okay.  Would you look at your -- let me find it.

12         Look at, please, Exhibit 5243 -- I take it back.

13         Okay.  Do you recall trying to sell hardware to UBS?

14 **A.**   I do.

15 **Q.**   Did you believe that the sales to these banks of hardware

16 had the extended benefit of enhancing the relationship with the

17 banks?

18 **A.**   I did believe that.

19 **Q.**   Who were big customers for software?

20 **A.**   Some, yes; some targets.

21 **Q.**   Did you consider it a relationship builder to sell the

22 hardware to these targets or customers for software?

23 **A.**   I did.

24 **Q.**   And did you see it as a benefit to future software

25 purchases?

1    **A.**    Absolutely.

2    **Q.**    Did you believe that hardware and software were leveraged

3    together with these big customers?

4    **A.**    Often, yes.

5    **Q.**    And did you believe it increased Autonomy's standing with

6    the big financial institutions that bought their software?

7    **A.**    The hardware sales?

8    **Q.**    Yes.

9    **A.**    Absolutely.

10   **Q.**    Okay.  Can we see 6198, please?

11        And is this a memorandum that you wrote to Mr. Hussain and

12   then Mr. Hussain wrote back to you?

13            **THE COURT:**  Admitted.

14       (Trial Exhibit 6198 received in evidence)

15            **THE WITNESS:**  (Witness examines document.)

16   **BY MR. KEKER:**

17   **Q.**    And I'm asking about -- I just want to get your thinking

18   at the time.

19        Your memo to Mr. Hussain was dated December 23, 2009, and

20   you say (reading):

21            "Regarding the Dell/reseller deal:

22            "This is a purely commercial deal done on a lost

23        leader basis by Autonomy."

24        Does that mean they were selling the hardware at a

25   discount and losing profit on it?

1   **A.**   That's what that means, yes.

2   **Q.**   And you go on to say (reading):

3           "We gain greatly by seeing faster adoption of our

4       software and we view Morgan Stanley as one of the fastest

5       innovators in the space."

6       Is that right?

7   **A.**   Yes.  Are you asking if I wrote it or I agree with it?

8   Both are true.

9   **Q.**   Okay.  And there's nothing pretextual or misleading about

10  this e-mail, is there?

11  **A.**   No, not so far.

12  **Q.**   Let me know when we get to the phony part.

13  **A.**   I'm just -- I can't tell you.  I haven't read ahead, so

14  I'm just...

15  **Q.**   Okay.  You go on to say (reading):

16          "Dell appreciates the relationship and it greases the

17      process of lucrative OEM bundling of Autonomy software on

18      Dell kit.  This is strategic and we pride ourselves on

19      getting our OEMs to move fast and adopt IDOL as a

20      standard."

21                      (Alarm going off.)

22          **THE COURT:**  This is just a test of the system, and to

23  tell you the truth, it's the only part of the system that

24  works.

25                      (Laughter)

1          **THE COURT:**  So don't be alarmed.

2          **MR. KEKER:**  I thought I'd said something, Your Honor.

3          **THE COURT:**  Any further questions?

4    BY MR. KEKER:

5    **Q.**   I just read this.  What do you mean by "this is

6    strategic"?  What are you talking about?

7    **A.**   At this time we were trying very hard to get Dell to OEM

8    Autonomy software.  It was another point about why we wanted to

9    have this relationship.  That's all.

10   **Q.**   And then go up to the top e-mail.  This is Mr. Hussain

11   writing back and he says (reading):

12          "Christian's one point was relative valuations of

13       software and hardware.  This is important to meet head-on.

14          "I said loss leader but that our software would save

15       a lot of money and, therefore, be very valuable.  Hardware

16       is basic.  Software is the value."

17       Who was Christian?

18   **A.**   I believe he's referring to Christian Lucas.

19   **Q.**   And Christian Lucas was a Morgan Stanley person?

20   **A.**   Yes.

21   **Q.**   In the U.K.?

22   **A.**   Yes.

23   **Q.**   And do you know if Mr. Hussain had met with him?

24   **A.**   I know he had met with him.  I don't know about the dates

25   of whether -- yes, he had met with him.

1   **Q.**   Okay.  Do you know if Mr. Lynch knows Christian Lucas?

2   **A.**   I do know that.

3   **Q.**   Okay.

4   **A.**   He does.

5   **Q.**   And does he?

6   **A.**   Yeah.

7   **Q.**   Okay.  And what did Mr. Christian Lucas tell Mr. Lynch

8   about the Morgan Stanley reason for purchasing that software

9   with SPE in it that Mr. Lynch was talking about to the

10  analysts?

11  **A.**   I don't know.

12  **Q.**   Okay.  So do you know what the foundation or the basis was

13  for Mr. Lynch's statement saying that the SPE was a big part of

14  that $12 million sale?

15  **A.**   I do not.

16  **Q.**   Mr. Lynch had very high-level contacts at Morgan Stanley,

17  didn't he?

18  **A.**   He did.

19  **Q.**   And he would talk to them?

20  **A.**   Absolutely.

21  **Q.**   And they'd give him information about why they did things,

22  why they didn't do things, and so on?

23  **A.**   I agree with that, yeah.

24  **Q.**   So if he said that the $12 million sale -- the

25  differential -- the differentiator for the $12 million sale was

 1  that SPE part of the package, that could be something that was

 2  told to him by a Morgan Stanley person; right?

 3           **MR. REEVES:**  Objection.  Foundation, Your Honor.

 4           **THE COURT:**  Sustained.

 5           **MR. KEKER:**  Okay.

 6  **Q.**   You have no foundation for what you said about -- I mean,

 7  about what was in Mr. Lynch's state of mind when he made that

 8  statement, do you?

 9           **MR. REEVES:**  Objection.  Misstates the testimony.

10           **THE COURT:**  Well, the question is does he have any

11  basis.  I don't know.  Why don't you ask it again.

12           **MR. KEKER:**  I'll back up and start over.

13  **Q.**   You don't know what Mr. Lynch knew when he made that

14  statement, do you?

15  **A.**   I do not.

16  **Q.**   You don't know what he'd been told by people at Morgan

17  Stanley, do you?

18  **A.**   I do not.

19  **Q.**   In fact, there was a lot you didn't know.  You didn't know

20  about the Zantaz acquisition until it happened; right?

21  **A.**   No, I believe I did know about the Zantaz acquisition

22  prior to it happening.

23  **Q.**   How long before?

24  **A.**   Weeks if not months.  I drove out to the facilities with

25  the investment banker at the time I recall.

EGAN - CROSS / KEKER

1   **Q.**   Did you know about the Hewlett Packard acquisition before

2   it happened?

3   **A.**   No.

4   **Q.**   Did you know about something called Project Dynamo?

5   **A.**   I don't know.

6   **Q.**   Did you know about a project with EMC to make appliances?

7   **A.**   It doesn't ring a bell.

8   **Q.**   Did you know about an investigation of a $2.4 billion

9   purchase of the EMC software division Documentum?

10   **A.**   I did know about that.

11   **Q.**   And tell us what you knew about that.

12   **A.**   I knew discussions were going on.

13   **Q.**   And did you know the price tag?

14   **A.**   I did not.

15   **Q.**   Did you know why the thing fell apart?

16   **A.**   I did not.

17   **Q.**   Did you know about the efforts to develop a strategic

18   relationship with EMC?

19   **A.**   I know about discussions with EMC.  I don't know if what

20   I'm thinking of is what you're referring to.

21   **Q.**   Okay.  Did you know about something called Project Blue

22   Jay?

23   **A.**   That does not sound familiar.

24   **Q.**   Did you know about a project that was designed to develop

25   appliances with Dell hardware and Autonomy software?

1    **A.**   That does not ring -- again, no.

2    **Q.**   Okay.  Did you know about the negotiations with a company

3    called Informatica?

4    **A.**   I tried to sell to Informatica.  It doesn't sound like

5    what you're referring to.

6    **Q.**   Was Informatica a company that was in -- that had software

7    that would help Autonomy get into the structured data space as

8    opposed to unstructured data?

9    **A.**   Informatica is -- was a business intelligence, so

10   structured data.  Yes, that sounds right.

11   **Q.**   And did Autonomy investigate buying Informatica so they

12   could get into structured data?

13   **A.**   I don't know.

14   **Q.**   Let me show you 6264, which is another exhibit that's in a

15   file folder.

16       (Trial Exhibit 6264 marked for identification)

17           **MR. KEKER:**  Your Honor, this is just something we

18   found last night, so it's just got a handwritten number on it.

19           **THE WITNESS:**  Thank you.

20           **THE COURT:**  Let me take a moment.

21                   (Pause in proceedings.)

22   **BY MR. KEKER:**

23   **Q.**   This is an e-mail from T.J. Lepore to Al Marsella,

24   "Subject:  Morgan Stuff," dated 10/21/2009.  Who is Mr. Lepore?

25   **A.**   He was a sales rep at Autonomy.

1    **Q.**   Did he work for you?

2    **A.**   At times, yes.

3    **Q.**   And who was Al Marsella?

4    **A.**   He was a point-of-contact customer at Morgan Stanley.

5    **Q.**   He's got an Autonomy address?

6    **A.**   Oh, Al Marsella.  I'm sorry.  I was thinking Al Furman.

7    Al Marsella is an Autonomy employee.

8    **Q.**   Is he a salesperson?

9    **A.**   He was a sales engineer, so the technical counterpart to a

10   salesperson.

11   **Q.**   So a salesperson who -- Lepore is a salesperson reporting

12   to you and Marsella is a sales engineer.  Did you work with

13   him?

14   **A.**   I did work with him.

15   **Q.**   All right.  And then it's attaching -- it's an FYI

16   attaching this e-mail from David Bolla (phonetic).  Who's he?

17   **A.**   I don't know the name David Bolla.

18   **Q.**   From his e-mail address, does it appear he's with Morgan

19   Stanley?

20   **A.**   It does.

21   **Q.**   And you copied -- he copied Al Furman, and you know he's

22   at Morgan Stanley?

23   **A.**   I do know that.

24   **Q.**   All right.  Looking at this e-mail, do you know whether or

25   not Morgan Stanley at the time of the e-mail, October 16, 2009,

1  was interested in SPE?

2          **MR. REEVES:**  Objection.  Foundation as to the e-mail.

3  No problem --

4          **THE COURT:**  Sustained.

5          **MR. KEKER:**  Your Honor, I move it in as a business

6  record.

7          **THE COURT:**  Overruled -- I mean, I'm not permitting it

8  in.

9          **MR. KEKER:**  Okay.

10 **Q.**  Do you know if at the time of October 16, 2009, Morgan

11 Stanley was very interested in SPE?

12 **A.**  Do I know if they were?

13 **Q.**  Yeah.

14 **A.**  No.

15 **Q.**  Okay.  Would you look at the third paragraph -- fourth

16 paragraph and see if that refreshes your recollection?

17 **A.**  The fourth paragraph -- I'm sorry.

18 **Q.**  The second --

19         **THE COURT:**  He doesn't say he doesn't have a memory of

20 it.  He said no, so I don't know that -- I mean, I know you can

21 give anything to a witness to refresh their recollection but

22 they can say they have no recollection.

23     I don't know.  Is your answer it didn't happen or you

24 simply don't have a recollection of it?

25         **THE WITNESS:**  I don't think it was a happening.  You

**EGAN - CROSS / KEKER**

```
 1  asked me if I knew if there was interest in SPE on the part of

 2  Morgan Stanley at this time.

 3  BY MR. KEKER:

 4  Q.    Yes.

 5  A.    My answer is I don't know if they did.

 6  Q.    Would you look at -- see if it refreshes your recollection

 7  by looking at the last sentence of that fourth paragraph?

 8  A.    (Witness examines document.)

 9        THE COURT:   In other words, the question is:  Now do

10  you have a memory that it was?  Do you have a different memory?

11        THE WITNESS:   (Witness examines document.)  I've read

12  the paragraph.  It doesn't change my answer.

13  BY MR. KEKER:

14  Q.    Okay.  You said yesterday several times that Mr. Hussain,

15  you thought of him as ethical?

16  A.    Correct.

17  Q.    And you've said you thought of him as highly ethical?

18  A.    Correct.

19  Q.    What did you mean by that?

20  A.    I had an overall in every sense positive opinion of

21  Mr. Hussain.

22  Q.    Did he try very hard to follow the rules as were given to

23  him?

24  A.    It sure looked like it to me, yes.

25  Q.    Did he make sure at Autonomy that the revenue recognition
```

EGAN - CROSS / KEKER

1    was done right?

2    **A.**    I thought so, yes.

3    **Q.**    Did he seem -- was he very concerned about getting his

4    ducks in a row so that he could satisfy the auditors and their

5    concerns?

6    **A.**    Yes.

7    **Q.**    Okay.  You said that the VAR deals started after the 2008

8    financial crisis; right?

9    **A.**    I did not say that.

10   **Q.**    You didn't, okay.  When did they start?

11   **A.**    Earlier than that.

12   **Q.**    Earlier.  Okay.  That's the point.

13          They started -- well, among other places they started was

14   with MicroLink?

15   **A.**    My memory is that they started with MicroLink.

16   **Q.**    Okay.  And MicroLink was a cleared company that had access

17   to highly classified parts of the federal government?

18   **A.**    Yes.

19   **Q.**    And Autonomy couldn't sell to those highly classified

20   parts of the U.S. federal government except through a reseller

21   who was cleared; right?

22   **A.**    That's true.

23   **Q.**    And that's one of the reasons that they used MicroLink?

24   **A.**    Yes.

25   **Q.**    And that's one of the reasons they needed somebody like

1    MicroLink, they needed somebody that was cleared?

2    A.    Yes.

3    Q.    And Autonomy couldn't get cleared because it was a foreign

4    company?

5    A.    That's correct.

6    Q.    All right.  And these customers that they used MicroLink

7    as -- Autonomy used MicroLink to sell to included a laundry

8    list of the intelligence agencies; right?  Tell the jury a few

9    of them.

10   A.    I'm not sure I can come up with a few that I know

11   MicroLink sold to, but I can come up with at least one.  I know

12   they sold to Army Knowledge Online, which was an Army-based

13   entity.  And I know that they sold to a number of -- and,

14   shoot, I'm going to forget the acronym -- but the coms, like

15   these are regional branches of Department of Defense.  The

16   commands.  Sorry, coms.  Something coms.  Something com.

17   Again, I'm not going to be able to remember the acronyms.

18   Q.    They sold to the CIA, didn't they?

19   A.    I don't think MicroLink sold to CIA.

20   Q.    They sold to Homeland Security?

21   A.    They may have.  I don't have a specific memory of that.

22   Q.    National Reconnaissance Office?

23   A.    That sounds right to me.  Again, I don't -- I don't want

24   to pledge that I have a specific memory of that, but that

25   sounds correct.

1  Q.    All of these are classified agencies, or to work with them

2  you need classification clearances; right?

3  A.    I can't vouch for that in each of those cases, but in many

4  you do.

5  Q.    You didn't have any classified clearances, did you?

6  A.    No.

7  Q.    And you knew that Autonomy was also working with British

8  intelligence agencies, selling their software to British

9  intelligence agencies, didn't you?

10 A.    I did.

11 Q.    And Australian intelligence agencies?

12 A.    I believe I was aware of that.

13 Q.    What other countries' intelligence agencies were buying

14 Autonomy software to get this unstructured data so that they

15 could do searches?

16 A.    Canada at least.

17 Q.    Canada, Australia, U.K., U.S.  Anybody else?

18 A.    I can't remember at the moment.

19 Q.    Now, there was a time in the past when --

20 A.    Singapore.

21 Q.    Excuse me?

22 A.    Singapore.

23 Q.    Singapore.  They sold to Singapore?

24 A.    Uh-huh.

25 Q.    There was a time in the past when Autonomy was on the

1  NASDAQ Stock Exchange.  That's a U.S. Stock Exchange; right?

2  **A.**    Correct.

3  **Q.**    And U.S. accounting rules applied to it when it was on

4  NASDAQ?

5  **A.**    That's my understanding.

6  **Q.**    And at some point Autonomy moved to London and was on the

7  London Stock Exchange?

8  **A.**    They were on both at one point, then solely on London.

9  **Q.**    All right.  When they were solely -- when were they solely

10  on London?

11  **A.**    I don't remember the date.

12  **Q.**    And when they were solely on London, the rules changed.

13  They had to follow something callid IFRS; right?

14  **A.**    That is correct.

15  **Q.**    All right.  And under IFRS, a sale, unlike in the

16  United States, under IFRS, you understood, Mr. Hussain

17  explained to you, that a sale to a reseller could be recognized

18  as revenue?  That was different; right?

19  **A.**    That had changed, yes.

20  **Q.**    Okay.  And he explained that to you?  He was telling you

21  what the new rules were?

22  **A.**    He explained multiple specific things to me, yes.

23  **Q.**    And those were the rules that he applied to all your deals

24  here in the United States?

25  **A.**    That was my understanding.

1   **Q.**   Okay.  And one of the things that he insisted on was that

2   the reseller understand that they were on risk, there was no

3   return, no cancellation, no side agreements; right?

4   **A.**   That's correct.

5   **Q.**   It was a firing offense to not follow that rule; right?

6   **A.**   That's correct.

7   **Q.**   And another thing he insisted on was analyzing the

8   collectibility, which you told us is the probability that the

9   reseller is going to be able to pay you; and he was a stickler

10  on that, wasn't he?

11  **A.**   He was.

12  **Q.**   All right.  And sometimes he'd have Mr. Chamberlain or

13  Mr. Chamberlain would on his own ask for information to assure

14  the collectibility part of the equation for revenue

15  recognition?

16  **A.**   That is correct.

17  **Q.**   All right.  And sometimes a reseller deal would have to be

18  downsized because it would -- if it were bigger, the

19  collectibility issue would raise its ugly head?

20  **A.**   Absolutely.

21  **Q.**   Okay.  And Mr. Chamberlain said dozens of times during SMS

22  calls that he needed approved payment terms, they had to be in

23  black and white, nonrefundable, he needed delivery, he needed

24  signed contracts before the end of the quarter?  You heard that

25  dozens of times?

1    A.    Mr. Chamberlain saying it on SMS calls?

2    Q.    Yeah.

3    A.    I don't have a great memory of that, but the statements

4    are all true.

5    Q.    Okay.  And Mr. Hussain said it on SMS calls?

6    A.    I would think so, yes.

7    Q.    He said dozens and dozens of times he needed signed

8    contracts before the end of the quarter?

9    A.    If the characterization is that over the course of dozens

10   and dozens, if not hundreds, of SMS calls when discussing

11   specific deals, yes, Mr. Hussain would say things about payment

12   terms, absolutely.

13   Q.    And he would say -- I'm sorry.

14   A.    I mean, it's one statement here, one statement there.

15   Q.    Okay.

16   A.    In that sense, that statement's true.

17   Q.    But Mr. Hussain emphasized the payment terms had to be

18   fixed and the contract had to be signed before the end of the

19   quarter?

20   A.    Correct.

21   Q.    He was -- those were the rules.  He wanted everybody to

22   play by them; right?

23   A.    Correct.

24   Q.    These rules were taught at numerous sales meetings in

25   Miami to all the people working in sales for Autonomy, weren't

1  they?

2  **A.**    That's correct.

3  **Q.**    Okay.  Binding agreement, probability of collection,

4  delivery of the product before the end of the quarter in order

5  to recognize the revenue, that's what people were taught;

6  right?

7  **A.**    Right.  That's what I was referring to when I talked about

8  Mr. Kanter giving those points.

9  **Q.**    And then the other thing that was taught is that the

10  customer was going to have to sign an unqualified confirmation

11  that they owed the money and there weren't any side agreements;

12  right?

13  **A.**    I'm aware owed the money.  I don't recall the "no side

14  agreements" portion of that particular confirm but, as I say,

15  it was part of the deal prior, so I understood the rule.

16  **Q.**    Okay.  And when it came to collectibility, that wasn't

17  just Mr. Hussain's decision.  Lots of people in the Finance

18  Department would look at the financials and the level of debt

19  and the payment history to decide whether or not there was

20  probability of collection; right?

21  **A.**    I don't know as I would say "lots," but I'm aware of at

22  least more than Sushovan himself.

23  **Q.**    Who else?

24  **A.**    As I said earlier, Steve Chamberlain.  That could have

25  extended to a U.S. resourcer, too.  I don't know.

1    Q.    Okay.  Now, with respect to what you call *quid pro quo*

2    deals, that's where you're selling something and you're also

3    buying something, either close in time or at the same time,

4    that happens all the time in business, doesn't it?

5    A.    I would assume.

6    Q.    A big bank loans you money, they want you to bank with

7    them; right?

8    A.    That makes sense.

9    Q.    You work for an auto company, the auto company wants you

10   to buy its cars, not drive the other guys' cars; right?

11   A.    You work for an auto company, they wanted you to drive

12   their car?  I'm not following that.

13   Q.    Buy their cars.  It's a reciprocal --

14   A.    That makes sense to me, yeah.

15   Q.    You sell legal services to a computer company.  If I

16   get -- want to get hired by a big computer company, they're

17   going to want me to buy their computers; right?

18   A.    Correct.  Yeah.

19   Q.    Okay.  HP does it, doesn't it?

20   A.    HP does it?

21   Q.    Yeah.

22   A.    In at least one case that I saw, yes.

23   Q.    Okay.  What case was that?

24   A.    Between DreamWorks and HP.

25   Q.    Okay.  It's not illegal, it's not even wrong, is it?

1    **A.**    Not to my knowledge.

2    **Q.**    Okay.  Now, for revenue recognition purposes, the two

3    sides of this deal, they have to stand on their own two feet,

4    they have to be independently fair valued; right?

5    **A.**    They do.

6    **Q.**    Okay.  And that's what Mr. Hussain was very concerned

7    about about these deals that happened at the same time, when

8    you're buying and selling?  He wanted them to stand on their

9    own two feet and be able to prove that they stood on their own

10   two feet; right?

11   **A.**    Correct.

12   **Q.**    Okay.

13   **A.**    There was extra effort put into that.

14   **Q.**    You said they shouldn't -- that he said they shouldn't be

15   linked in paperwork, but what he said was they have to be

16   justified independently; didn't he say that?

17   **A.**    He said both of those things.

18   **Q.**    Did he say that what you needed to do was to show fair

19   value for what you're selling or buying?

20   **A.**    He made that very clear.

21   **Q.**    And that's what a lot of people at Autonomy would put a

22   lot of effort into when they would do what you're calling

23   *quid pro quo* deals and I'm calling simply buying and selling

24   with your customer.  A lot of people at Autonomy put a lot of

25   effort documenting why it was a fair deal and why the price was

1  right, and so on; right?

2  **A.**   I can't vouch for a lot of people, but I'm aware of

3  multiple people putting a lot of effort into that, yes.

4  **Q.**   Well, let's look at one that you've been talking about,

5  which is FileTek.

6       There was some buying and selling.  Autonomy would buy

7  StorHouse software and FileTek would buy Autonomy software;

8  right?

9  **A.**   Correct.

10  **Q.**   Okay.  And you said you found FileTek as a customer?

11  **A.**   I did.  Well, no, I shouldn't say that.  I -- for the deal

12  that we talked about, I found and pursued that deal.  They were

13  already a customer.

14  **Q.**   All right.  They were already a customer because back

15  before you came up with this idea in late 2009, they had bought

16  a license from Autonomy for a product -- their product called

17  Trusted Edge, which required them every time they sold a

18  Trusted Edge, to pay $2500 to Autonomy; right?

19  **A.**   I don't know about the detail.

20  **Q.**   Okay.  But that was -- at this point when they were trying

21  to expand Trusted Edge, they wanted a different deal for the

22  royalty that they had to pay Autonomy?

23  **A.**   I suggested a different deal.

24  **Q.**   Okay.  And you suggested a different deal in December of

25  2009?

1  **A.**    That's right.

2  **Q.**    You said, I think you told us yesterday, that you saw it

3  as a great opportunity?

4  **A.**    I did.

5  **Q.**    And you talked to Mr. Hussain about whether or not it

6  would meet his criteria; right?

7  **A.**    I did.

8  **Q.**    And his criteria was establishing fair value for both

9  sides of the deal; right?

10  **A.**    That was part of the criteria, yes.

11  **Q.**    Okay.  And you talked about he needed to rationalize fair

12  value; right?

13  **A.**    Correct.

14  **Q.**    And then there was a little sideshow about the competitive

15  quote.  Is there anything wrong with getting a competitive

16  quote after the end of the quarter, after you've made the

17  decision, but to show that the decision was at fair value?  Is

18  there anything wrong about getting that quote later?

19  **A.**    Not to my knowledge.

20  **Q.**    Okay.  Can we see 537.

21          **THE COURT:**  Is it in evidence?  537?

22          **MR. KEKER:**  Yes.

23      537 is the year-end audit, and for some reason I don't

24  have it.

25          **THE COURT:**  Yeah, it's in evidence.

1              (Pause in proceedings.)

2         **MR. KEKER:**  So I will use the screen.

3      Okay.  This is a memo from Thomas Murray of Deloitte

4 regarding the Autonomy 2009 year-end audit.

5      And if we could go to page 5, which is what the jury was

6 shown before, and let's blow up the FileTek.  All the way down,

7 yeah.

8      Okay.  And then keep going, "FileTek Purchase of Software

9 from Autonomy."

10      Okay.  And, I'm sorry, let's keep going down.  There's

11 someplace in here that talks about the quotes.  Page 5.  Still

12 on page 5.

13      Go up, Jeff, please.

14      Oh, here.  Okay.  Right here.

15 **Q.**   (reading)

16          "So we have audited the above information by agreeing

17       through to the quote documentation from the relevant

18       companies."

19      And it talks about a quote from CommVault.  It talks about

20 a quote from HP.  When did the quote from HP come in according

21 to the auditors?

22 **A.**   You're asking me the date there?

23 **Q.**   Yes.

24 **A.**   It says dated 5 January 2010.

25 **Q.**   So the auditors knew that the quote came in after the deal

1  was done, didn't they?

2  **A.**    Yes, it would seem.

3  **Q.**    And then they got a quote from Informatica.  It doesn't

4  say exactly, but the quote expires on 30 January.  That

5  certainly suggests it came in later, didn't it?

6  **A.**    I don't know if it suggests when it came in but --

7  **Q.**    All right.  But apparently the auditors didn't have any

8  problem --

9  **A.**    -- it looks like the last 30 days.

10 **Q.**    -- with when the quotes were gathered to justify fair

11 value?

12         **MR. REEVES:**  Objection.

13         **THE WITNESS:**  I can't speak for the auditors, but I

14 agree with them.

15         **MR. REEVES:**  I object.  Foundation, Your Honor.  It

16 calls for what the auditors think.

17         **THE COURT:**  Sustained.

18 **BY MR. KEKER:**

19 **Q.**    With respect to these FileTek opportunities, you wanted to

20 maximize the software sale; right?

21 **A.**    I did.

22 **Q.**    Anything wrong with that?

23 **A.**    Not to my knowledge.

24 **Q.**    It helped you meet your target?

25 **A.**    Helps the company meet its target.

1   **Q.**   It helps you meet your target too; right?

2   **A.**   No.  That kind of deal didn't help me with my target.

3   **Q.**   You wanted to establish the fair value of what was bought,

4   didn't you?

5   **A.**   I did.

6   **Q.**   And in this case you got a 45 percent discount?  Do you

7   recall that?

8   **A.**   I do.

9   **Q.**   StorHouse was valuable to Autonomy, wasn't it?

10  **A.**   I thought it was.

11  **Q.**   Let's look at 407, please.

12          **THE COURT:**  Is this a good time for a recess?

13          **MR. KEKER:**  Yes, sir.

14          **THE COURT:**  Okay.  Ladies and gentlemen, we're going

15  to take our recess now.  We'll be in recess until a quarter of

16  11:00.

17      Remember the admonition given to you:  Don't discuss the

18  case, allow anyone to discuss it with you, form or express any

19  opinion.

20              (Recess taken at 10:28 a.m.)

21          (Proceedings resumed at 10:46 a.m.)

22      (Proceedings were heard in the presence of the jury:)

23          **THE COURT:**  Please be seated.  Let the record reflect

24  all jurors are present; parties are present.

25      You may proceed.

1          **MR. KEKER:**  Thank you, Your Honor.

2  **Q.**   Mr. Egan, I want to show you Exhibit 6107, which will be

3  in the last volume you have.  That's an email from -- down at

4  the bottom is from you to Pete Menell.

5  **A.**   6107?

6  **Q.**   6107, yes.

7          And I move it in, Your Honor.

8  **A.**   That's going to be in an earlier book.

9  **Q.**   It will be in the last binder.

10 **A.**   I don't think so.  It will be in the third binder for me.

11         **MR. REEVES:**  No objection.

12         **THE COURT:**  Admitted.

13         (Trial Exhibit 6107 received in evidence)

14 **BY MR. KEKER:**

15 **Q.**   The bottom email is from you to Mr. Menell in late

16 December, December 29, 2009, and you say to him, "In response

17 to all your investigations into tech to support the right way

18 to deliver on the Kraft-style RDBS archiving demand, a company

19 called FileTek has come forward with a pitch about their

20 StorHouse product, as well as a module called Relational

21 Manager.  It sounds like they may have a very good solution to

22 the things you have been looking at build/buy on.  I may recall

23 that you had already shortlisted them, but their president

24 called me this AM to pitch, as they were quite keen and he

25 knows Autonomy."

1          Was that email true?

2    A.    I think most of it is true, yes.

3    Q.    What parts aren't true?

4    A.    I can't attest to whether he called me that day with

5    details.

6    Q.    This is not a pretextual email?

7    A.    It is a bit pretextual in that I'm writing it to imply

8    that Pete has been looking into this software and I don't have

9    any knowledge that he had.

10   Q.    Why are you trying to mislead Pete Menell?

11   A.    I'm not trying to mislead Pete Menell, but I had conceived

12   of and pitched both sides of this FileTek deal, so I'm trying

13   to give people the material and the ideas for the rationale of

14   making their purchase.  So I'm feeding him my opinion of why

15   FileTek software would belong inside of Autonomy software.

16   Q.    And so what you're trying to do is build sort of a dossier

17   to show fair value?

18   A.    To show even sort of upstream of the value.  Not fair

19   value per se.  Not into dollars at this point.  Just fit.

20   Q.    And the attachment -- turn over to the next page.

21   "Autonomy Proposal to FileTek."  This is something you wrote?

22   A.    To 6108?  Oh, no.  I'm sorry.

23   Q.    6107, the next page.

24   A.    Okay.

25   Q.    It says "Autonomy Proposal To FileTek."  Is this something

**EGAN - CROSS / KEKER**

1  you wrote?

2  **A.**    I'm not seeing "Autonomy Proposal to FileTek."  I'm seeing

3  "initial thoughts on product overlap," is the first.

4  **Q.**    I may be confused.  One second.  All right.  "Initial

5  thoughts on product overlap."  Let's look at the third page,

6  then.

7  **A.**    Third page of that?

8  **Q.**    No.  Of the exhibit, which says "initial thoughts on

9  product overlap."

10  **A.**    Okay.

11  **Q.**    I'm sorry.

12     One page back, Jeff, please -- two pages back.  Now --

13  there.  Can we blow up the top.

14     Whose initial thoughts were these?

15  **A.**    I don't recall.

16  **Q.**    It says, "SPE, StorHouse/Relational Manager acts as an

17  interface to RDBMS of all varieties."  It goes on to say, "The

18  archiving of SQL is a huge market for them.  IDOL brings

19  advanced search to the table."

20     So that's a suggestion that selling IDOL to FileTek is

21  going to open up a huge market for them; right?

22  **A.**    Correct.

23  **Q.**    Okay.  We can take that down.

24     And let's look at 407, please.  And 407 is an email from

25  you to Mr. Chamberlain and then sent on by you to Mr. Hussain,

1    "FYI, regarding material for FileTek."

2    **A.**    Is it going to come up here or should I try and find it?

3    **Q.**    Well, I've got to get it in first.

4    Move in 407, please.

5          **MR. REEVES:**    I would like to see it first.

6          **THE COURT:**    Admitted.

7    (Trial Exhibit 407 received in evidence)

8          **MR. KEKER:**    We can put that up.    Here is the email.

9    **Q.**    Stouffer Egan writes to Steve Chamberlain, "Material for

10   FileTek.    The attached will go into much more elaborate

11   proposal with a lot of additional language and boilerplate,"

12   etc., "but I wanted to send you the custom material to see if

13   you can review and determine that it is what you need."

14   What are you saying there?    Are you saying this is going

15   to be documenting the sale, the need for it?

16   **A.**    Not the sale, but my memory is that this is me sending

17   Steve -- and I'm trying to remember which side of the deal, but

18   I think it was the material about our propositions to FileTek

19   in a more raw form before they go in a big, you know,

20   graphic-oriented boilerplate proposal.    Just the core specifics

21   to them.

22   **Q.**    Turn the page, please, to the next page.    This is what I

23   was looking at before, the Autonomy proposal to FileTek.    Did

24   you write that?

25   **A.**    I believe I did.

1  Q.   And the last sentence of the first paragraph says, "As

2  such, TrustedEdge has approached Autonomy to address two needs

3  for their five-year planning," and then they talk about the two

4  needs.

5       And then the next paragraph says, "FileTek also wishes to

6  invest in its flagship product StorHouse so as to grow revenues

7  in the management of unstructured information assets as well as

8  improve what StorHouse offers the management of relational

9  information."

10      Did you write that?

11 A.   I believe I did.

12 Q.   And is what you're talking about -- FileTek had a product

13 that was useful for structured information search and it was

14 called StorHouse; right?

15 A.   That was for structured information, kind of archiving,

16 and I was proposing putting better search in it so it could

17 search better.

18 Q.   So IDOL was going to add to their product so that it could

19 search better in structured data?

20 A.   Correct.

21 Q.   And what Autonomy was interested in at the time was they

22 had very good IDOL searching unstructured data, but the holy

23 grail would be to put it together and also be able to search

24 structured data; right?

25 A.   I'm not sure I agree with that.  Can you break it up a

1  little bit?  You switched to what Autonomy wanted from FileTek.

2  **Q.**    Autonomy wanted the ability to get into structured data

3  and StorHouse was going to help them do that; right?

4  **A.**    That's true, yep.  Well -- yeah.  That's true.

5  **Q.**    And you're making the case for it -- look at the next

6  page, the licensed software.  The price is going to be

7  $8 million, and it's going to include SPE Basic and various

8  other IDOL server retrieval softwares; right?

9  **A.**    That's right.

10  **Q.**    The purpose of that memorandum was to show that the deal

11  would stand up; right?

12  **A.**    Correct.

13  **Q.**    That there was substance behind this deal?

14  **A.**    Correct.

15  **Q.**    Sushovan Hussain and Steve Chamberlain were not

16  technologically sound enough to know if the deal fit?

17        **MR. REEVES:**  Objection.  Foundation.

18        **THE COURT:**  Sustained.

19  **BY MR. KEKER:**

20  **Q.**    Did you -- have you -- well, did you tell HP's -- excuse

21  me.

22      Did you tell the prosecutors that Sushovan Hussain and

23  Steve Chamberlain were not technologically sound enough to know

24  if the deal fit?

25        **MR. REEVES:**  I object.  We still lack foundation.

```
 1              THE COURT:  Sustained.
 2         Because he said something doesn't make it -- or didn't say
 3    it doesn't make it admissible.
 4    BY MR. KEKER:
 5    Q.   Do you recall that Sushovan Hussain and Steve Chamberlain
 6    were technologically sound enough to know whether or not this
 7    deal fit?
 8              MR. REEVES:  We need to have foundational questions,
 9    Your Honor.
10              THE COURT:  Overruled.
11              THE WITNESS:  Do I believe that they were
12    technologically --
13    BY MR. KEKER:
14    Q.   Sound enough to know if the deal fit.
15    A.   No.  I don't believe that.
16    Q.   Did you believe that by writing this proposal, you were
17    changing the commercial -- you had to change the commercial
18    relationship between what Autonomy and FileTek had been before
19    and what it was going to be in the future?
20    A.   Do I believe by writing the proposal it would change the
21    relationship?
22    Q.   Well, not writing, but that you needed to describe a
23    different commercial relationship.
24    A.   I -- I'm not sure I understand the question.
25    Q.   Did you believe that for this deal, you needed to change
```

1  the royalty arrangement that had been between the two

2  companies?

3  **A.**   I proposed to change the royal -- yes.

4  **Q.**   Did you believe that you needed to add product to what was

5  being exchanged between the two companies?

6  **A.**   Yes.

7  **Q.**   Did you think you needed to add breadth so that it would

8  apply in more countries than the original license had applied

9  to?

10  **A.**   I believe so, yes.

11  **Q.**   Okay.  And all of that was related to establishing fair

12  value, building support for fair value?

13  **A.**   Yes.

14  **Q.**   And you wanted Steve Chamberlain to have the information

15  so that he could support the notion that this transaction had

16  been done for fair value; right?

17  **A.**   I did, yep.

18  **Q.**   So this was -- this FileTek transaction was your idea?

19  **A.**   Correct.

20  **Q.**   Lots of people were involved in establishing fair value;

21  right?

22  **A.**   A number of people, yeah.

23  **Q.**   And you got what you paid for and you got it for a 45

24  percent discount?

25  **A.**   That's correct.

EGAN - CROSS / KEKER

1  Q.   It was below the list price that FileTek sold StorHouse

2  for?

3  A.   That's correct.

4  Q.   Now, there was another transaction in late March, 2010,

5  where FileTek bought some more IDOL for approximately

6  $9 million on March 31; right?

7  A.   That sounds correct.

8  Q.   Right.  And at that point, they were buying unlimited --

9  an unlimited capacity license?

10 A.   I don't remember the details.

11 Q.   This was -- it was your idea that they should buy some

12 more StorHouse capacity?

13 A.   It was my idea to do a second deal, yes.

14 Q.   And this is the one where you said you had gotten

15 significant business from Merrill Lynch?

16 A.   That's right.

17 Q.   Right.  And you reached out to FileTek in this instance,

18 didn't you, to do this deal?

19 A.   I believe I did.

20 Q.   Look at 792, please.  This is an email from -- the bottom

21 one is from the president of FileTek to you and the top one is

22 from you to Pete Menell.

23      I move it in, Your Honor.

24      **THE COURT:**  It's in.  792?

25      **MR. KEKER:**  Yes, sir.

1              **THE COURT:**  It's in.

2              **MR. KEKER:**  Okay.  That makes it even easier.

3    **Q.**   Mr. Szukalskis writes in the lower email, "Thank you for

4    your correspondence.  We have been tracking your continued

5    success" and so on and then sends you a proposal.  "You will

6    notice a significant increase in the amount of storage manage

7    for each of your Digital Safe customers, as well as a

8    significant reduction in the cost/TB."  What's that?

9    **A.**   Per terabyte.  That's a reference to storage.

10   **Q.**   "Of both RFS and RM.  I look forward to your comments."

11   And you send that on to Chris Goodfellow and Pete Menell

12   saying, "This is the first proposal for additional volume we

13   asked about as a result of winning the Merrill Lynch, MetLife

14   and New Edge deals.  I don't know about Lilly volume, BNPP, the

15   new larger JPMC volumes and the rate at which volumes are

16   growing," and so on.

17          Is that an honest email or a misleading email?

18   **A.**   It's an honest email.

19   **Q.**   If you got more business from FileTek, you would be more

20   able to meet your targets, your bonus would go up, your ability

21   to get options would go up; right?

22   **A.**   No.

23   **Q.**   You called -- this man on here, Loomis, Bill Loomis, who

24   is he?

25   **A.**   He was the CEO of FileTek.

1  **Q.**   And you called him offline to tell him how to negotiate

2  the price on this deal, didn't you?

3  **A.**   No.  I think you are referring to Gary Szukalski I did

4  that with.

5  **Q.**   You called the president of FileTek to tell them how to

6  negotiate the price of the Autonomy software?

7  **A.**   I don't know if Gary was the president, but Gary is who I

8  called.

9  **Q.**   You told him to start high so that the people in London

10  could beat the price down and he'd still get a good price?

11  **A.**   That's correct.  Not so that he would get a good price.

12  The first part of the statement you said is correct.

13  **Q.**   But you did -- this was something you did on your own.

14  You said, "Gary, why don't you start at $13 1/2 million and let

15  them beat you down and we'll close at $11 million," or

16  something like that?

17  **A.**   I said that, approximately.  I don't remember the numbers,

18  but I effectively pre-negotiated it with him.

19  **Q.**   Okay.  And the deal went through?

20  **A.**   It did.

21  **Q.**   Yesterday you said that there were no revenues from

22  StorHouse?

23  **A.**   Yesterday I said -- can you be more specific?

24  **Q.**   Well, could we see 979.  I think it's in evidence,

25  Your Honor?

1          THE COURT:  979?

2          MR. KEKER:  Let the judge check -- yes.  This is the

3    audit committee that the Government showed you yesterday.  979.

4          THE COURT:  It's in evidence.

5          MR. KEKER:  Right.

6      Can we go to page 12.  And blow up the -- under "Purchase

7    of Software from FileTek" and then blow up the Deloitte

8    response, please.

9    Q.   And it was pointed out to you that the auditors say, "We

10   note that the initial software purchased from FileTek in

11   Q4/2009 is already generating revenues, namely, through the

12   deal signed with Kraft in December 2009.  We concur with the

13   accounting treatment," and you said that was false?

14   A.   I said the -- the implication that revenues had been

15   generated via that Kraft deal was false.

16   Q.   Okay.  This is at the end of 2010.

17       Could we see 851, which is in evidence.  And let me find

18   it.

19       Who is Roger Wang?

20   A.   He was a technical resource at Autonomy.  I believe a

21   sales engineer.

22   Q.   So in -- I can't find the date on it.  But he -- go

23   down -- the bottom email is June 9, 2010, so let's go back up.

24       Roger Wang says, "This is the database archiving software

25   that we've OEM'd to deploy in the hosted environment.  The

 1   first target customers are Kraft and BofA."

 2        Is that a reference, the database archiving software -- is

 3   that a reference to FileTek?

 4   **A.**   I don't know.

 5   **Q.**   Go down to the bottom, please, of this email.  The next

 6   page.

 7        Ganesh Vaidyanathan, who is he?

 8   **A.**   I don't know.

 9   **Q.**   Is he in accounting?

10   **A.**   I don't know.

11   **Q.**   He says he's in accounting.

12        He writes to Mike Sullivan, "Hi, Mike, this is Ganesh from

13   accounting and finance.  I work with Brent Hogenson."  It says,

14   "I was reviewing some purchase agreements and noticed we had a

15   large software license purchased from a company called

16   FileTek."

17        Go up to the top again.

18        Does that help you understand that the Wang email is an

19   answer, the database archiving software is the FileTek

20   software?

21           **MR. REEVES:**  Objection.  Foundation.

22           **THE COURT:**  Sustained.

23   **BY MR. KEKER:**

24   **Q.**   Well, let's walk through it.  This is in evidence.

25        Let's go back to the bottom.

 1          He is asking about the large software license purchased

 2     from a company called FileTek.  And now let's go to the next

 3     one up.

 4          And Sullivan says, "I'm not aware that we're using this.

 5     Can anyone shed light on this," in response to the one before.

 6          And then the next one.  Somebody named Robert Desroches

 7     says, "Nothing that I'm aware of."

 8          And then up.  And here is Roger Wang weighing in, "This it

 9     the database archiving software that we have OEM'd to deploy in

10     the hosted environment.  The first target customers are Kraft

11     and BofA."

12          Do you know whether or not StorHouse was used with Kraft?

13     **A.**   I don't.

14     **Q.**   Do you know if it generated revenue with Kraft?

15     **A.**   I know that it did not.

16     **Q.**   Look at 5753 in evidence.  It's also in June of 2010.

17     Mr. Wang is saying, "StorHouse has been set up in Kraft's

18     production Safe and has customer data stored in it."  Do you

19     see that?

20     **A.**   I do.

21     **Q.**   Is Kraft paying for the hosted data?

22     **A.**   Not to my knowledge.

23     **Q.**   Okay.  Yesterday --

24     **A.**   In December of 2009, I sold Kraft a deal.  It was an

25     on-premises deal, so maybe that helps.

**EGAN - CROSS / KEKER**

1  **Q.**   Yesterday I asked you whether or not some of these emails

2  that you were shown were nauseating -- whether or not you said

3  before that they were nauseating to you, and you said you had

4  no idea if you used that.

5  **A.**   I don't know if I said that in regards to any specific

6  email.

7  **Q.**   Is that a word that you use?  Do you say things are

8  nauseating?

9  **A.**   I have definitely said that before, yeah.

10  **Q.**   Would you look at your book and look at 5240, page 21.

11  **A.**   Which is the page number?

12  **Q.**   Page 21 up at the top.  At the top right, it says 21 of

13  23.

14  **A.**   Okay.  Got it.

15  **Q.**   And you were asked about an email --

16         **THE COURT:**  What paragraph?

17  **BY MR. KEKER:**

18  **Q.**   Well, just read it.

19         Last paragraph, Your Honor, on page 21.

20         **THE COURT:**  What is your question?

21  **BY MR. KEKER:**

22  **Q.**   My question is did you use the word "nauseating" with

23  respect to some of these emails about FileTek?

24  **A.**   I don't remember these conversations, but what I'm reading

25  here rings true to me.  I also don't know what email I'm

```
 1   referring to because I'm out of context, but ...

 2   Q.    Just one second.

 3         Is 1093 in evidence?

 4             THE COURT:  Let's see.  1093?

 5             THE CLERK:  No.

 6             MR. KEKER:  Then 1093 is an email from Stouffer Egan

 7   to Mike Mooney with copies to Mike Lynch and Sushovan Hussain.

 8   I would move it in.

 9             THE COURT:  Admitted.

10         (Trial Exhibit 1093 received in evidence)

11   BY MR. KEKER:

12   Q.    Mr. Egan, the embedded email from you, September 28, what

13   is that about?

14   A.    I haven't read it yet.  Sorry.  We are in September of

15   2010?

16   Q.    Uh-huh.  And you're writing to Tom Flanagan at Amgen?

17   A.    Okay.

18   Q.    What's it about?

19   A.    Could I read it?

20             THE COURT:  Yes.  Read it.

21   BY MR. KEKER:

22   Q.    Well, are you asking him for a partnership.

23   A.    I've got to read it.  I don't know what I'm doing yet.

24         And Tom Flanagan, I don't remember who that is.

25             THE COURT:  Do you need the whole document?
```

1            THE WITNESS:  There is a lot here I can read so I'll

2   just get familiar with it.

3   BY MR. KEKER:

4   Q.   Are you proposing --

5            THE COURT:  Wait.  Mr. Keker, let him just read the

6   document.

7            THE WITNESS:  (Witness reads document.)

8        Okay.  I'm generally familiar with the email.

9   BY MR. KEKER:

10  Q.   What are you proposing?

11  A.   My memory is that I'm pitching a very large last-minute

12  discount, couching it in all sorts of reasons why that would

13  make sense.

14  Q.   Is it a truthful email or is it misleading?

15  A.   No.  It's truthful so far, from what I read.

16  Q.   Mr. Flanagan responded to you, "Thanks, Stouffer.  I asked

17  my team to look into your offer.  We can't do this in Q3, but

18  we could in Q4," and so on; right?

19  A.   I remember that, yeah.

20  Q.   And then look at 1120, which I believe is in evidence,

21  Your Honor.

22            THE COURT:  It is.

23            MR. KEKER:  Let's put up 1120.

24  Q.   And that's an email the jury has seen before.  In October,

25  you're giving Mr. Hussain more detail about the Amgen deal;

EGAN - CROSS / KEKER

1  right?

2  **A.**    That's correct.

3  **Q.**    And did you refer to that email as farcical?

4  **A.**    I don't recall.

5  **Q.**    Well, I'll come back to that.

6      Let's talk about VMS quickly.  What is -- VMS is Video

7  Monitoring Services?

8  **A.**    That's correct.

9  **Q.**    And was VMS an existing Autonomy customer in 2009?

10  **A.**    They were.

11  **Q.**    Had Autonomy purchased a -- did Autonomy purchase a

12  three-year license for their news feed for $13 million?

13  **A.**    I believe so.

14  **Q.**    And you also sold VMS a suite of software licenses for

15  9 million?

16  **A.**    That could be right.  I'm not sure.

17  **Q.**    And you were the man, you were the principal negotiator of

18  both those deals?

19  **A.**    The majority, yes.

20  **Q.**    Anything wrong with them?

21  **A.**    Not to my knowledge.

22  **Q.**    Did you sell VMS something that it needed and valued?

23  **A.**    Yes.

24  **Q.**    And did you get from VMS something that Autonomy needed

25  and valued?

**EGAN - CROSS / KEKER**

1  **A.**  I would say valued, not need.  In both cases, need is up

2  to the buyer.

3  **Q.**  Well, is that --

4  **A.**  I mean, you're asking me if I --

5  **Q.**  Are you talking about what -- what Jerry Brown would call

6  the difference between desire and need?

7  **A.**  I'm not.  I'm just trying to be very, very truthful, and

8  it's a lot for me to say somebody needed something.

9  **Q.**  Well, Autonomy had had a company called Moreover that was

10  giving it news feeds and it had a deal with, and they had lost

11  that contract and they needed a new one; right?

12  **A.**  I don't know.  I know we had a feed from -- from Moreover

13  and I know we replaced it with the VMS feed.

14  **Q.**  Did you call this deal logical and well-rationalized?

15  **A.**  I don't remember, but I would have.

16  **Q.**  And did you think that VMS had a huge need for Autonomy

17  products?

18  **A.**  I did feel that way.

19  **Q.**  Do you know that the auditors at Deloitte were told about

20  both transactions?

21  **A.**  I did not.

22  **Q.**  You just don't know?

23  **A.**  I just don't know, yeah.

24  **Q.**  Okay.  Well, you've been -- I mean, let's do what the

25  Government does.  Put up 157, please.

1          I move it in, Your Honor, if it's not in, 157.

2          **MR. REEVES:**  What is 157?

3          **MR. KEKER:**  Q2/2009 report to the audit committee from

4     Deloitte.

5          **MR. REEVES:**  There is no objection.

6          **THE COURT:**  Admitted.

7          (Trial Exhibit 157 received in evidence)

8          **MR. KEKER:**  Can we go to page 3, please.  That's not

9     the right page.  The next page, please.  Just one second.

10         Sorry, Your Honor.  I don't have it.

11         There it is.  Jeff, you're a genius.

12    **Q.**  Video Monitoring Systems of America.  The auditors are

13    reporting, "This is a 9 million deal to supply VMS with a

14    perpetual license for a suite of Autonomy software products,"

15    dot-dot-dot.  "Also in the quarter, Autonomy has separately

16    purchased 13 million of software and associated services from

17    VMS.  Given that there is a clear commercial rationale for the

18    separate transactions, separate contractual arrangements and

19    evidence that both transactions have been made at fair value,

20    management has confirmed and concluded that there are no links

21    between the contracts that would impact the accounting."

22         Do you see that?

23    **A.**  I do.

24    **Q.**  That's what you understood about fair value.  It's not

25    that something was done at the same time; it's that somehow one

1  depended on the other?

2        **MR. REEVES:**  I object, Your Honor.  I think this is

3  outside the scope of the direct examination.  It's talking

4  about a deal with VMS in 2009 when the VMS deal that was

5  inquired about in the direct was in 2010.  We object.

6        **THE COURT:**  Sustained.

7  **BY MR. KEKER:**

8  **Q.**  Let's go to the VMS deal in 2010.

9      In 2010, December 30th, Autonomy purchased additional

10  rights to this VMS news feed, didn't it?

11  **A.**  I know we purchased from VMS in the second time period.  I

12  don't remember specifically what product or which time period.

13  **Q.**  Well, you extended the license for two years for a charge

14  of $8.4 million, didn't you?

15  **A.**  I don't have a memory of that, but I think that sounds

16  right.  If you show me a document, I'm sure I can confirm it.

17  **Q.**  6170 is the first amendment to the data licensing

18  agreement between VMS and Autonomy dated December 31, 2010.

19  Put up the top.

20        **THE CLERK:**  It's not in.

21        **MR. KEKER:**  6170?  Oh, I'm sorry.

22      Your Honor, we move it in.

23        **THE COURT:**  Admitted.

24      (Trial Exhibit 6170 received in evidence)

25  \\\

EGAN - CROSS / KEKER

1   BY MR. KEKER:

2   **Q.**   Is this the agreement in late December 2010 that you

3   testified about on direct examination?

4   **A.**   It looks like it.

5   **Q.**   And did it extend the license for a couple of years for a

6   price of $8.4 million?

7   **A.**   I think so.  I don't think that's displayed for me right

8   now, but --

9   **Q.**   You can look in your book.  6170, if you have a question

10  about it.

11        You don't remember this?

12  **A.**   I do remember doing the deal.  I'm just hesitant to

13  confirm amounts and dates without either the information in

14  front of me --

15  **Q.**   If you need to look at the agreement to tell us that it

16  extended the license for a couple of years for $8.4 million, go

17  ahead and do it.

18        **MR. REEVES:**  I object to the form of this question,

19  Your Honor.

20        **THE WITNESS:**  I'm happy to do it.  I'm also happy to

21  confirm that it sounds right.

22        **MR. REEVES:**  Object.  Let him ask a proper question.

23        **THE COURT:**  Okay.  Moving on.  New question.

24  BY MR. KEKER:

25  **Q.**   Do you need to look at the document fully to answer that

1  question about what that deal was?

2  **A.**   I do.

3  **Q.**   Okay.  Well, then go ahead.  6170.

4        **MR. REEVES:**  What is the pending question?

5        **THE COURT:**  The pending question is, "Would you please

6  look at 6170?"

7        **MR. REEVES:**  To what end?

8        **THE COURT:**  Oh, to what end?  To moving the

9  examination along.

10  **BY MR. KEKER:**

11  **Q.**   The pending pending question is does the deal extend the

12  2009 license for two years for a price of $8.4 million?

13  **A.**   Did you say 6170?

14  **Q.**   Yes.

15  **A.**   I don't think I have that.  I end at 6115.

16  **Q.**   Next binder.

17  **A.**   Sorry.  This was the third of four.  Sorry.

18        This is a contract from December 31st, 2010 --

19  **Q.**   My question is does it extend the license from three to

20  five years -- does it extend it by two years at a cost of

21  $8.4 million?

22  **A.**   If you know where it is, could you call my attention to

23  where it extends it so I can just read it?

24  **Q.**   I give up.  It's in evidence.  The jury can look for it.

25  **A.**   Yep.

1    **Q.**    Let me do something that's a little bit easier.  Look at

2    1295, which is an email from you explaining this deal.  Do you

3    have it?

4    **A.**    I do.

5    **Q.**    You can look at it in your book, too, if you want to, but

6    the bottom email is from you to Nicole Eagan, Sushovan Hussain,

7    James Crumbacher, Pete Menell, "VMS actions," dated December

8    16, 2010.

9         You said, "Good meeting today.  Here is a summary and

10    actions.  There is a $10 million deal here.  We need to verify

11    we can supply approximately 5 to 6 million in hardware through

12    bonded warehouse."

13        The next page goes on about the deal.  The second bullet

14    point is, "VMS will be buying hardware and software from

15    Autonomy."

16        1295 justifies to your team the commercial rationale for

17    this transaction; right?

18    **A.**    What is 1295?  The exhibit number?

19    **Q.**    Yep.

20    **A.**    It's me sketching out the specifics of the deal that I've

21    been discussing, yes.

22    **Q.**    In the top email, Mr. Menell is writing to others in the

23    company, not you, saying "VMS actions.  I already have the

24    proper rev rec language for equipment purchases.  All I need is

25    a list of the equipment that we are selling and confirmation

1    that we will have it in-house or in a bonded warehouse as it

2    were this quarter.  Revenue will be recognized and the title

3    will pass at Autonomy's bonded warehouse."

4         There were lots of people in the company concerned about

5    getting revenue recognition, right, weren't there?

6    **A.**   Yes.

7    **Q.**   Look at 6180, please, sir.

8         I would move it in, Your Honor.

9              **MR. REEVES:**  Objection.  Hearsay.

10             **THE COURT:**  One moment.  6180.  Well, I need to look

11   at it.

12             **MR. KEKER:**  I'll just ask a question.

13   **Q.**   Did Mr. Hussain ask you to add color and help with the

14   valuation of this deal?

15   **A.**   Yes.

16   **Q.**   Did he tell you that in general, given the commercial

17   success of the previous acquisition of data, he was okay with

18   it?

19             **MR. REEVES:**  I object.  Are we refreshing recollection

20   and asking for recollection or is he reading the document?

21             **MR. KEKER:**  I think if you listen to the question, he

22   could answer that himself.  I'm asking him did Mr. Hussain say

23   to him, "Given the commercial success of the previous

24   acquisition of data, I'm okay with it"?

25             **MR. REEVES:**  I object.  Based on this process, I would

 1  like the witness to be instructed that he is being asked for a

 2  memory, not to read the document that is not in evidence.  We

 3  object.

 4          THE COURT:  Well, the document is not in evidence.

 5  The question is do you remember -- do you remember the

 6  statement that Mr. Keker has just stated.  The answer is "yes"

 7  or "no," and if it helps to refresh your recollection, you can

 8  look at the document, but the question is -- the first question

 9  is do you remember Mr. Hussain saying what Mr. Keker just

10  stated?

11          THE WITNESS:  Okay.  And just so I'm clear --

12          THE COURT:  So the first question is --

13          THE WITNESS:  -- either remember outright or look at

14  the document to help?

15          THE COURT:  Well, the answer is "I remember it."  Then

16  you can -- "I don't remember it."  If you say "I don't remember

17  it," you can look at the document and then ask the question,

18  "well, now, having looked at the document, does that refresh

19  your recollection," to which you'd say "yes" or "no."

20          THE WITNESS:  Could you please just ask me the

21  question again.

22  BY MR. KEKER:

23  Q.   Did Mr. Hussain say to you about this deal, "Given the

24  commercial success of the previous acquisition of data, I'm

25  okay with it"?

1   **A.**   I don't remember the specific conversation, so I'd like to

2   look at the email.

3         **THE COURT:**  Look at the email.

4         **MR. KEKER:**  Let's move to a different subject.

5         **THE COURT:**  Well, wait.  I think, in fairness, he can

6   look at the email.

7   **BY MR. KEKER:**

8   **Q.**   Okay.  Look at the email and see if that refreshes your

9   recollection that Mr. Hussain said that.

10  **A.**   The document refreshes my memory.  He says what you said

11  right in the email.

12  **Q.**   Okay.  And so you remember him saying that?

13  **A.**   I read the email.

14  **Q.**   Okay.

15  **A.**   I don't remember him saying it out loud.

16  **Q.**   Let's go to a separate subject.  The Vatican.

17        You said that you weren't involved, except in limited

18  ways, with the Vatican transaction.  It was a foreign

19  transaction.  It wasn't part of the U.S. sales; right?

20  **A.**   Correct.

21  **Q.**   But you have talked to -- you did at the time talk to Dave

22  and Steve Truitt at length about it, didn't you?

23  **A.**   I believe I did.

24  **Q.**   Okay.  And Steve Truitt got very excited about it, didn't

25  he?

1    **A.**    I don't recall.

2    **Q.**    Do you know whether or not Steve Truitt saw it as a great

3    opportunity for MicroTech to offer its services to the Vatican

4    Library?

5    **A.**    I don't recall.

6    **Q.**    Do you recall that Steve Truitt worked on it with John

7    Cronin in the latter days of the month, March 27, 28, 29, of

8    the first quarter of 2010?

9    **A.**    I don't recall that.

10   **Q.**    Okay.  And you certainly don't remember calling Mr. Dave

11   Truitt on some beach a day after the quarter ended and telling

12   him for the first time about this deal, do you?

13   **A.**    I don't recall that.

14   **Q.**    All right.  Let's talk about the $2.3 million.  That's

15   another deal that you have no recollection of, you told us?

16   **A.**    I'm sorry.  What was the --

17   **Q.**    The $2.3 million purchase from MicroLink for resell to

18   Discover Tech of the profiling function so that Discover Tech

19   could have what they need.

20   **A.**    Related to Vatican?

21   **Q.**    No.  I'm sorry.  Different -- different transaction.

22          Do you remember that MicroTech was the reseller of

23   $10 million of Autonomy software to a company called Discover

24   Tech when it was first being formed?

25   **A.**    I do remember that.

1    Q.    And that went through MicroTech because Discover Tech had

2    no track record, couldn't establish credibility, they

3    couldn't -- it couldn't be sold directly to them at that time?

4    A.    I believe that's right.

5    Q.    So MicroTech got the software and then sold it to Discover

6    Tech, and Discover Tech, Dave Truitt's new company, now has

7    $10 million worth of Autonomy software?

8    A.    That sounds right.

9    Q.    And do you recall that it was -- it was "IDOL Light," as

10   Mr. Truitt would call it?

11   A.    I don't recall that.

12   Q.    Do you recall that Mr. Truitt had something of a fit about

13   not getting what he needed in the $10 million transaction?

14   A.    I don't recall that.

15   Q.    Do you recall that after he didn't get what he wanted, he

16   had MicroLink buy from Autonomy what it was he needed at

17   Discover Tech, namely, the profiling function of IDOL?

18   A.    I don't recall that.

19   Q.    And that that was a $2.3 million transaction?

20   A.    I don't recall it.

21   Q.    Do you recall that you were talking to him on the morning

22   of January 1st, 2010, about -- excuse me -- on the morning of

23   April 1st, 2010, about his upset at not getting all he needed?

24   A.    I don't recall that.

25   Q.    I take it back.  I screwed that up.  On the morning of

1    January 1st.

2        Discover Tech was spun out right around the end of the

3    year, 2009.  The MicroTech $10 million transaction was at the

4    end of 2009.  And do you recall talking to him New Year's Day,

5    2010?

6    **A.**   Your first two statements are correct, I believe.  I don't

7    recall speaking to Dave on New Year's Day, but that would not

8    have been uncommon.

9    **Q.**   Do you remember him being very upset that he didn't get

10   the profiling of IDOL?

11   **A.**   I do not.

12   **Q.**   Do you remember working out with him some way to get the

13   profiling function of IDOL for his new company, Discover Tech?

14   **A.**   I do not.

15   **Q.**   Let's talk about Prisa.

16       Did you do your homework?

17   **A.**   I actually asked my attorneys to do the homework.

18   **Q.**   Did you determine that the first time you talked -- you

19   had -- this late-stage memory was in the sixth interview on

20   November 7, 2014 with the Government?

21   **A.**   They determined by searching for the term "Prisa" that the

22   first time it appears in the documents that we have is November

23   of 2011.

24   **Q.**   Of 2011 --

25   **A.**   Sorry.  Of -- I don't remember the date, to be honest.

1    **Q.**    November of 2014?

2    **A.**    That sounds right.  Yep.

3    **Q.**    Okay.  So this -- you told us that this Prisa deal was --

4    the fact that you were asked to do something wrong, to backdate

5    a document, was very significant to you?

6    **A.**    It was.

7    **Q.**    It was very upsetting to you?

8    **A.**    It was.

9    **Q.**    Something you felt really bad about?

10   **A.**    I did.

11   **Q.**    Okay.  And did you forget it when you were talking to the

12   Hewlett-Packard lawyers?

13   **A.**    No.

14   **Q.**    Why didn't you tell them about it?

15   **A.**    They didn't ask me about it.

16   **Q.**    Did you tell the prosecutors about it when you were trying

17   to get your deal?

18   **A.**    Only when asked about it.

19   **Q.**    Okay.  So you didn't tell them for the first five

20   sessions, and then in November of 2014, how long -- at least

21   three years, three and a half years after it happened, all of a

22   sudden you told them about it?

23   **A.**    As with everything, I told them the answers to their

24   questions truthfully and in good faith.

25   **Q.**    Okay.  Did you learn that Mr. Truitt had told them about

1    it one month before you told them about it?

2    A.    No.

3    Q.    Did you know -- did you learn that Mr. Truitt had told the

4    Government that you, Stouffer Egan, called up -- called him and

5    asked him to backdate a transaction, Prisa transaction?

6    A.    I didn't learn anything about that, no.

7    Q.    Did you talk to Mr. Truitt?

8    A.    When?

9    Q.    Since this investigation began.

10   A.    I believe I talked to him when HP announced the -- their

11   theory that it was a fraud in the press, right after.

12   Q.    Did you talk -- did you talk about Prisa then?

13   A.    Well predating this --

14   Q.    Did you talk about Prisa?

15   A.    I don't recall.

16   Q.    Did you talk to Mr. Truitt after that?

17   A.    I may have talked to him one other time after that.

18   Q.    Do you know if your lawyer talked to his lawyer?

19   A.    I don't know.

20   Q.    Do you know if your lawyers exchanged information about

21   what you're saying to the Government?

22   A.    I don't know.

23   Q.    Did the Government tell you what Mr. Truitt had said?

24   A.    Nope.  No one has told me what Mr. Truitt said.

25   Q.    You described, when you came up with -- when you started

1    talking about Prisa in November of 2014, you described it as a,

2    quote, "late-stage memory."  Those were your words; right?

3    **A.**    I don't know.

4    **Q.**    Would you look at 5244 in your book, please, sir.

5             **THE COURT:**  What page?

6             **THE WITNESS:**  Which number?  Sorry.

7    **BY MR. KEKER:**

8    **Q.**    5244, which is the November 7, 2014 --

9             **THE COURT:**  Page what?

10            **MR. KEKER:**  I'm about to tell you, Your Honor.

11            **THE COURT:**  Okay.

12            **MR. KEKER:**  Page 14 of 19.

13            **THE COURT:**  Page 14.  Okay.

14   **BY MR. KEKER:**

15   **Q.**    Down at the bottom.

16        On November 7th, 2017, after ten interviews, did you tell

17   the Government that you had a, quote, "late-stage memory,"

18   close quote, of Prisa?

19   **A.**    I don't know.

20   **Q.**    You -- there's -- you see what's written there?

21            **THE COURT:**  Well, the question is does he now have a

22   recollection of having said that he had a late-stage memory of

23   Prisa.  That's the question.

24        Now, do you have that memory?  Do you not have that

25   memory?

1           THE WITNESS:  No, I don't have that memory.

2           THE COURT:  Okay.

3    BY MR. KEKER:

4    Q.   Do you deny telling the Government that you had a

5    late-stage memory?

6    A.   I don't know if I told the Government that.

7    Q.   Okay.  If some FBI agent wrote down in quotes that you

8    said you had a late-stage memory of Prisa, would you say that

9    they were wrong?

10          MR. REEVES:  I object, Your Honor.

11          THE COURT:  Objection --

12          MR. KEKER:  We are going to have to call the agent --

13          MR. REEVES:  I object.

14          THE COURT:  Now, here we go.  Okay.

15       Ladies and gentlemen, in an interview conducted in this

16   case by the FBI, agents take notes.  At some point after taking

17   the notes, they write a memorandum based upon their

18   recollection in the notes.

19       The notes are not a statement of the defendant -- I mean,

20   of the witness.  They are the statements of the agent who

21   took -- who wrote the report.

22       So it does not come into evidence.  Let's move on.

23   BY MR. KEKER:

24   Q.   Just one more question about that.  Do you remember an FBI

25   agent named Leland Castro and Keegan Park, two FBI agents,

1    being present at that interview?

2    **A.**    I remember both of those individuals.  I don't know which

3    or who was present at the interview and I don't know which

4    interview you're talking about.

5    **Q.**    And when Mr. Castro or Mr. Park would be present at

6    interviews with you, would they be taking notes?

7    **A.**    I believe so.

8    **Q.**    Anyway, it was -- it was you that asked Truitt to send

9    this backdated purchase order to your home email address;

10   right?

11   **A.**    Yes.

12   **Q.**    And you did that because you wanted to hide the timestamp?

13   **A.**    I wanted to avoid any timestamp.

14   **Q.**    And the 3.6 -- because you did that and hid the timestamp

15   so the timestamp looked like 3/31, this 3.6 million was

16   reported in revenue in the last quarter of 2009; right?

17   **A.**    That's my understanding.

18   **Q.**    And you knew it had been reported in revenue -- your

19   sales, U.S. sales, $3.6 million; right?

20   **A.**    I did not actually know.

21   **Q.**    You didn't check at the end of the quarter whether or not

22   your sales had been appropriately accounted for?

23   **A.**    No.

24   **Q.**    So when did you learn that $3.6 million -- excuse me --

25   $2.3 million -- excuse me.  I'm sorry.  I'm getting confused.

1        Prisa is $3.6 million; right?

2   **A.**   I believe so.

3   **Q.**   When did you learn that $3.6 million had been reported in

4   Q1 of 2011, the previous quarter?

5   **A.**   I've never learned that.

6   **Q.**   You had a target for that quarter; right?

7   **A.**   I probably did, yeah.

8   **Q.**   Did you check to see how you were doing against your

9   target?

10  **A.**   Nope.

11  **Q.**   Did you check to see what sales you were credited for

12  against your target?

13  **A.**   I may have at bonus time, as we discussed.

14  **Q.**   And at bonus time or whenever you checked, did you see

15  that there was $3.6 million that were credited in 2011?

16  **A.**   I don't know when that would have been credited.

17  **Q.**   Excuse me.  In Q1/2011.

18  **A.**   I don't know when it was credited.  I don't recall

19  checking in that period.  As you've seen my sit-downs about my

20  bonus were every three quarters or so.

21  **Q.**   Okay.  But you were having a lot of bonus discussion in

22  that first quarter of 2011, weren't you?

23  **A.**   I believe that is the period in which I was doing the one

24  that we looked at here.

25  **Q.**   And that's because the Bank of America deal had closed and

1  you were angling for a very big bonus?

2  **A.**    That's right.

3  **Q.**    Which you got; right?

4  **A.**    That's correct.

5  **Q.**    And you wanted that bonus for the first quarter of 2011,

6  which is when the Bank of America deal closed?

7  **A.**    I wanted a bonus for multiple quarters, one of which was

8  Q1/2011.

9  **Q.**    And as of August -- excuse me, April 1st or even April --

10  excuse me -- even August 14 -- I'm getting punchy -- you had

11  not been paid any bonus for Q1/2011?

12  **A.**    I don't know if that's true.

13  **Q.**    Well, look at 2932.  We saw that yesterday.

14      I think it's in evidence, Your Honor.  It's the email

15  where Mr. Hussain authorizes your bonus to be paid.  2932.

16      We've seen -- you can look at the screen.

17          **THE COURT:**  It's in evidence.

18          **MR. KEKER:**  Yeah.  It is in evidence.

19  **Q.**    Sushovan Hussain writes to Lisa Harris and copies you

20  saying, "Based on confirmation below, please pay Stouffer his

21  commission as per attached schedule."

22      That's what we looked at.  The date of that is April 26,

23  2011.

24      So you hadn't -- as of April 1st or April 14th, you hadn't

25  been paid your bonus?

1  **A.**   That looks right.  I may be getting punchy.  I thought you

2  said August.  That sounded too long for me.

3  **Q.**   I probably did.

4      Where did you learn this trick of sending things to your

5  home email in order to avoid getting a timestamp on it?

6  **A.**   I didn't -- it wasn't something I learned.  I specifically

7  asked for that email to get sent to my home email address.

8      To be clear, the choice of email address was not to avoid

9  the timestamp.  The PDFing of the document was what would avoid

10  a fax-based timestamp on the document.

11  **Q.**   The PDFing is the text messaging that we've seen before

12  between Mr. Hyson and Mr. Truitt; right?

13  **A.**   I wouldn't call it text messaging.  It's the format of

14  sending the document.  It makes it into a document that can be

15  printed out off the email and --

16  **Q.**   But the jury --

17  **A.**   Doesn't get --

18  **Q.**   The jury has seen some chat between Mr. Hyson and

19  Mr. Truitt saying what does it mean to PDF a document and so

20  on.

21      **MR. REEVES:**  I object to the form of this question.

22  We are mixing two concepts --

23      **THE COURT:**  Sustained.

24  **BY MR. KEKER:**

25  **Q.**   Okay.  But where did you learn this way of avoiding

**EGAN - CROSS / KEKER**

1  timestamps and getting something dated a different date than it

2  actually happened?

3  **A.**   That characterizes it as anything -- as something

4  different.  It's just a -- if you fax a document, the faxing

5  process itself puts a date on the document of when the fax was

6  sent.  So even if a document is signed and valid on one date,

7  it ends up getting imprinted with another date.

8      I was avoiding that process by having the signed contract

9  emailed in the form of an attachment.  That's what the PDF

10  accomplished.

11  **Q.**   Had you done that before?

12  **A.**   I don't know.  I was aware of it.  It was done other times

13  as well, yeah.  Not for the purpose -- not for the same

14  purpose, but just to avoid marring a document.

15  **Q.**   The only thing Sushovan Hussain saw was a purchase order

16  dated properly at the end of the quarter; right?

17  **A.**   The only thing he saw?

18  **Q.**   Yeah.

19  **A.**   That's correct.

20  **Q.**   Two weeks later on April 14th, you said that you and

21  Mr. Truitt met with Mr. Hussain in San Francisco?

22  **A.**   That's right.

23  **Q.**   And at that meeting, was Mr. Truitt pitching his

24  DiscoverPoint software to Autonomy to buy?

25  **A.**   I don't recall.

EGAN - CROSS / KEKER

1    Q.    Would you look at 1769, which is in evidence.

2          If we can blow it up here on the screen, Mr. Egan.

3          Mr. Truitt, on Thursday, April 14, with a copy to you, is

4    talking about "today's meeting."  Is that the meeting that

5    you've been telling the jury about?

6    A.    I think so, yes.

7    Q.    And Mr. Truitt says, "I wanted to thank you both for

8    taking the time to meet with me today regarding expanding our

9    partnership.  Discover Technologies' software solutions will

10   augment Autonomy's industry-leading technology and give our

11   joint customers increased value.  I look forward to working

12   with you in the coming weeks to structure a distributor

13   agreement and continuing to build our partnership in the years

14   to come.  Thanks again.  Dave."

15         Is what he's talking about there what the meeting was

16   about?

17   A.    There's a large portion of what the meeting was about

18   that's not talked about here, if that's what you're asking.

19   Q.    Well, did you talk about expanding the partnership?

20   A.    We may have.

21   Q.    Did you talk about augmenting Autonomy's industry-leading

22   technology and giving joint customers increased value?

23   A.    We may have.  It would make sense to do that.

24   Q.    Did you talk about looking -- okay.  It would make sense?

25   A.    Uh-huh.

EGAN - CROSS / KEKER

1  Q.   If you were talking about expanding your partnership and

2  structuring a distribution agreement and "continuing to build

3  our partnership," would it make sense to start the meeting by

4  dumping all over the person you're trying to sell to?

5  A.   No.

6  Q.   It didn't happen, did it?

7  A.   What?

8  Q.   Dumping all over the person you were trying to sell to?

9  A.   No.  I don't think that did happen.

10 Q.   Okay.  Let's -- and so he's writing at 3:25 p.m. "what's

11 on your mind that day."  Let's look at 6146.  The jury has seen

12 that.  You were writing at 9:21 a.m. to Mr. Hussain about your

13 bonus and options, which was much on your mind that day; right?

14 A.   It was on my mind that day, yes.

15 Q.   Even though you're meeting with him, you want to send him

16 an email, a reminder, "I really want this dealt with today."

17 "I really want this dealt with today."  Your bonus and options;

18 right?

19 A.   That's right.

20 Q.   Being -- were you always that demanding with Mr. Hussain?

21 A.   I don't -- I didn't think of it as being demanding.  I

22 really wanted to have that dealt with.  It was overdue.

23 Q.   Okay.  So it was overdue.  You really wanted it dealt

24 with.  That was on your mind and you went to a meeting and you

25 talked to him about backdating something that you and

1   Mr. Truitt had done?

2   **A.**   Both those things are true.

3   **Q.**   Why didn't you put someplace in writing, just to cover

4   yourself, you know, "Sush, I really feel bad about the

5   backdating and you promise never to do it again" or something?

6   Why did put that in writing?

7   **A.**   That wasn't my mindset.  I trusted Sushovan and I really

8   wanted to kind of purge my association with that event.

9   **Q.**   Did you want to purge your association with that event

10  when you talked to the HP lawyers five times and the Government

11  five times before you told them anything about this event?

12  **A.**   I would have liked to have, yeah.

13  **Q.**   You --

14  **A.**   I would still like to.

15          **THE COURT:**  Are we moving to a new subject?

16          **MR. KEKER:**  Just one second on this, Your Honor.

17          **THE COURT:**  Sure.

18  **BY MR. KEKER:**

19  **Q.**   So you don't remember that you called this a late-stage

20  memory?

21  **A.**   I don't.

22  **Q.**   Was there anything about this that led you to remember it

23  in November of 2014 -- did something trigger your memory in

24  2014 after you talked to the Government and HP ten times?

25  **A.**   I don't remember.

1  **Q.**   At this meeting, was there anything about the *Washington*

2  *Post* discussed?

3  **A.**   At which meeting?

4  **Q.**   At the meeting that you say you had -- the meeting we have

5  just been referring to, the meeting on April 14?

6  **A.**   The Dave Truitt meeting?

7  **Q.**   Yes?

8  **A.**   Was there anything about the *Washington Post* --

9  **Q.**   Yes.

10 **A.**   Not that I'm aware of.

11 **Q.**   Was there anything about the SEC?

12 **A.**   I don't recall.

13 **Q.**   Anything about IFRS?

14 **A.**   I don't recall.

15 **Q.**   Anything about English accounting rules?

16 **A.**   I don't recall.

17        **MR. KEKER:**   That's a good place, Your Honor.

18        **THE COURT:**   Okay.  Ladies and gentlemen, we are going

19 to take our recess.  We be in recess until 1:00.

20     Remember the admonition given to you:  Don't discuss the

21 case, allow anyone to discuss it with you, form or express any

22 opinion.

23     (Proceedings were heard out of presence of the jury:)

24        **THE COURT:**   Let the record reflect the jury has

25 retired.

1          Mr. Keker, about how much longer do you have?

2          **MR. KEKER:**  Not that long, Your Honor.  About, I would

3    say, 45 minutes.

4          **THE COURT:**  Okay.  Thank you very much.

5          **MR. KEKER:**  And, Your Honor, we have -- the next

6    witness is Loomis, Bill Loomis from FileTek, and we have an

7    issue to raise, which we raised before.  We thought we worked

8    it out.  Now they've added --

9          **THE COURT:**  Let's deal with it now.  I have some time.

10   Let's deal with it now.

11         Everybody can sit down.  You don't have to stand up.

12         **MR. KEKER:**  This is the issue of the way FileTek

13   accounted for the transactions that it was involved in.  And we

14   say because they're under U.S. GAAP and because they had

15   different ways of looking at these transactions than Autonomy

16   did, that getting into that was not something that the

17   Government should do.

18         They put a couple of exhibits in their original list.  We

19   said we objected to these.  They said fine, okay, but now

20   they've gone back and apparently are going to get into the

21   accounting, accounting under completely different structure,

22   different system, and it is irrelevant and it's also confusing

23   and time-wasting and prejudicial under 403.

24         **THE COURT:**  Anything else?

25         **MR. KEKER:**  Nope.

1      THE COURT:  Okay.

2      MR. REEVES:  I do not think this will take very long.

3  We're talking about one transaction and how it should be

4  accounted for in generally the same way as to value, and much

5  more importantly, the exhibits we have --

6      THE COURT:  Wait.  I just actually didn't understand

7  your last sentence.

8      MR. REEVES:  It's one transaction.

9      THE COURT:  Okay.  I got that part.

10      MR. REEVES:  It is probative of the values to

11  understand how each side is looking at the same transaction as

12  a general matter.

13      Much more importantly, as a second matter, Autonomy is

14  asking questions about how FileTek accounted for the, I think,

15  2001 -- first quarter 2009 transaction before the FileTek VAR

16  VA transaction that happens in Q3/2009.  They are asking for

17  their financial statements, their profit and loss, and

18  questions come up about how FileTek accounted for the second

19  StorHouse deal.

20      So that -- Mr. Chamberlain was asking some of those

21  questions, and I think it's relevant to their knowledge about

22  how their counter-party is valuing the same deal.  They are

23  evaluate -- they're valuing it in a different way it and it's

24  probative as to what the value is.

25      MR. KEKER:  They are valuing under U.S. GAAP, a

1    completely separate set of rules, and we are going to have

2    to --

3         THE COURT:  Well, my understanding -- I understand

4    that argument.  But my understanding is the evidence is that

5    Autonomy asked them how they valued it.

6         MR. KEKER:  I'm not sure that's true.

7         THE COURT:  Well, let's -- is that correct?  Is there

8    evidence --

9         MR. KEKER:  Yes.  This exhibit says that Stouffer --

10   the sale and maintenance to Autonomy is being amortized --

11        THE COURT:  Okay.  It's admitted.

12        MR. REEVES:  Thank you, Your Honor.

13            (Luncheon recess was taken at 11:55 a.m.)

14   **Afternoon Session**                          **1:03 p.m.**

15       (Proceedings were heard in the presence of the jury:)

16        THE COURT:  Okay.  Please be seated.

17       Let the record reflect all jurors are present, the parties

18   are present.

19       You may proceed.

20        MR. KEKER:  Thank you, Your Honor.

21   **Q.**  Good afternoon, Mr. Egan and ladies and gentlemen of the

22   jury.

23       Mr. Egan, in the fourth quarter of 2010, so that's heading

24   towards December of 2010, there was this big deal with the

25   Bank of America; right?

1   **A.**   That's correct.

2   **Q.**   And you said it was a very complicated deal for

3   $19.5 million?

4   **A.**   Yes.

5   **Q.**   And because -- and Bank of America was a repeat buyer of

6   Autonomy software; right?

7   **A.**   That's correct.

8   **Q.**   Their need for archiving software was increasing rapidly;

9   right?

10  **A.**   Yes.

11  **Q.**   They were involved in a lot of litigation, a lot of

12  regulatory problems?

13  **A.**   That's correct.

14  **Q.**   They got a bailout from the Government, that led to a need

15  for storing more material?

16  **A.**   I'm not sure about the direct association of that.

17  **Q.**   All right.  And you thought it was going -- the deal was

18  going to close in the last quarter of 2009 but it didn't.  It

19  closed in the next quarter.  It closed in February, you think,

20  of 2011?

21  **A.**   It was the end of 2010 and then it closed in the beginning

22  of 2011, yeah.

23  **Q.**   And so this $19.5 million piece was sold to resellers

24  before the end of the quarter so that the revenue could be

25  recognized in 2010; right?

1  **A.**   No, that's not correct.

2  **Q.**   What was sold to -- was a decision made to sell the

3  $19.5 million to resellers at the end of the quarter?

4  **A.**   Parts of it, yes.

5  **Q.**   Okay.  The decision was made to sell 9 million to Capax;

6  right?

7  **A.**   That sounds right, yeah.

8  **Q.**   And that happened and that deal went through and the

9  revenue was recognized; right?

10  **A.**   Again, I don't know if the revenue was recognized, but we

11  did sell a large portion of that deal to Capax.

12  **Q.**   And that left 12 -- excuse me -- $10.5 million, 9 to

13  Capax.  $10.5 million would add to 19.5; right?

14  **A.**   I don't know which numbers you're adding.

15  **Q.**   Well, I'm adding -- you were supposed to sell

16  $10.5 million to another reseller, a different reseller?

17  **A.**   I think if you could start with what we did sell to

18  resellers, I could confirm it.  I don't have all the numbers

19  memorized.

20  **Q.**   Well, what you ended up doing is selling $7 million to

21  Discover Tech; right?

22  **A.**   That sounds right.

23  **Q.**   And you were supposed to sell $10.5 million to another

24  reseller?

25  **A.**   Supposed to?

1  **Q.**   Yeah.  I mean, that was what you were asked to do.

2  **A.**   I don't recall that.

3  **Q.**   Okay.  Well, in January having sold 7 million to

4  Discover Tech, you amended that purchase order to make it

5  $10.5 million by adding another 3.675, some of which was for

6  services?

7  **A.**   That sounds right.

8  **Q.**   And you did that later, three weeks into January, three or

9  four weeks into January?

10  **A.**   That sounds correct.

11  **Q.**   And you believe that backdating is common in the sales

12  industry when amendments are made to agreements; right?

13  **A.**   That's -- that happens a lot, yeah.

14  **Q.**   Okay.  And you believe that that's fine; if you're

15  amending an agreement, you can do the paperwork later but

16  you're amending an agreement and the agreement is still dated

17  the time that the agreement was made?

18  **A.**   You can have an effective date and an amendment date and

19  do it, yes, that's my understanding.

20  **Q.**   And what's an amendment to an agreement?

21  **A.**   A change to the contract, like software product or rights

22  or even names.

23  **Q.**   Okay.  And so did somebody tell you in January that the

24  contract that had been sold to Discover Tech should have been

25  10.5 instead of 7?

1    **A.**    As if it was an error to do it 7 versus 10?

2    **Q.**    Yeah.  Yeah.

3    **A.**    Not to my memory, no.

4    **Q.**    All right.  Well, later in January -- let's look at 1488,

5    please, sir, and we'll put it up on the screen.

6    **A.**    Hang on one second.  There was an old water up here that

7    just got knocked.

8            **THE COURT:**  1488?

9            **MR. KEKER:**  1488.  And I move it in, Your Honor.  I

10   think it's in evidence but if not, I'd move it in.

11       This is an e-mail from Mr. Egan to Dave Truitt dated

12   January 25, 2011.  I'm sure it's in.

13           **THE COURT:**  It's in.

14       You can just look at it on the screen.

15           **THE WITNESS:**  I'm sorry.  I just had a little spill.

16           **THE COURT:**  That's all right.

17           **THE WITNESS:**  Just look up here?

18           **THE COURT:**  Sure.

19           **THE WITNESS:**  Okay.

20   **BY MR. KEKER:**

21   **Q.**    In this e-mail you say (reading):

22            "Dave.

23            "I'll call you about this around 4:00 p.m. your time.

24       It will be important that it be signed as is with no

25       additions or modifications late today and scanned and

1          e-mailed back.  This covers the excess amount of the

2          order.  I'll call you when I land."

3          What are you saying to Mr. Truitt?

4    **A.**   I'm telling him that I'll call him, I'm sending him the

5    amendment that you're referring to, that it's an excess amount

6    of the order, and I'll call him when I land.

7    **Q.**   And when you say "the excess amount of the order," this is

8    the amount that should have been included back when the deal

9    was originally made?  You were asked to do it for 10.5?

10   **A.**   Again, I can't tell you that I was, no.  I don't know.

11   **Q.**   Okay.  Well, let's look at what you sent him.  Oh, excuse

12   me.  Let's just focus -- you ask him to do it with no additions

13   or modifications and scanned and e-mailed back.  Is that -- was

14   that this procedure that you used to avoid the date?

15   **A.**   Again, it's the same procedure, yes, if it's scanned and

16   e-mailed back.

17   **Q.**   Okay.  So you wanted him to do this in a way you couldn't

18   tell the date that it was actually done?

19   **A.**   Just that there wouldn't be conflicting dates.

20   **Q.**   Okay.

21   **A.**   Again, I mentioned earlier this is a normal way to get

22   things moved around.  If you have a date from a prior or

23   different period, you don't want two dates on the same

24   document.

25   **Q.**   Okay.  And this was going to be an amendment to a document

1  that had already been entered?

2  **A.**    I believe it was, yes.

3  **Q.**    All right.  And then the next page -- the jury I think has

4  seen this -- this is -- what you're sending him is this

5  agreement between Autonomy and Discover Technologies.  And if

6  you look in the "Fees and Payment Terms," paragraph 2 down

7  here, it's for $3.675 million?

8  **A.**    Correct.

9  **Q.**    And the date that you're sending him this is January 25th,

10  2011?

11  **A.**    I think that's right, yeah.

12  **Q.**    All right.  So would you look at Exhibit 5625, please?

13       **MR. KEKER:**  If that's not in evidence, I move it in.

14  I think it's in evidence.

15       **MS. LITTLE:**  It's not.

16       **MR. KEKER:**  If it's not in evidence, I move it in.

17       **THE COURT:**  I'm looking.  Admitted.

18     (Trial Exhibit 5625 received in evidence)

19  **BY MR. KEKER:**

20  **Q.**    This is Mr. Truitt on the next morning at 8:46 in the

21  morning sending you back the January 26, 2011, purchase order.

22       And now let's turn it over and see that it's the same one,

23  the next page.

24       This is the same one with Discover Technologies and it's

25  for 3.675.

1        And then let's go to the signature page.

2        Mr. Hyson of Discover Tech has signed it and dated it the

3    date that he signed it, January 25, 2011; right?

4    **A.**    Correct.

5    **Q.**    Okay.  And that's after you have instructed Mr. Truitt to

6    scan and so on, scan and e-mail it back so it won't have a

7    different date on it?

8    **A.**    Correct.

9    **Q.**    So you called Mr. Truitt and told him he had to change the

10   date; right?

11   **A.**    I may have.

12   **Q.**    Okay.  Let's look at 5744, and if we could look at the

13   page that has January 26 on it.

14       Mr. Egan, this is a demonstrative to show certain phone

15   calls that have been taken from phone records that are in

16   evidence.  And look at -- let's look at, yeah, the 26th.

17       So you called -- first of all, Truitt's calling Scott,

18   Scott's calling Truitt, and then you call Truitt the morning of

19   January 26 at 11:45 for six minutes, and then you called him

20   again and he called you back for seven minutes.

21       Let's go on.  That's all before noon.

22       And then there's a whole lot of text messaging that day

23   between Egan and Truitt.  Do you remember what all that -- and

24   Scott and Truitt.  Do you remember what all that text messaging

25   was about?

1    **A.**    I don't remember specifically, no.

2    **Q.**    Was it about the date on this contract?

3    **A.**    I don't know.  We were doing a lot of B of A organizing at

4    that time.

5    **Q.**    And so Mr. -- so you don't remember talking to Mr. Truitt

6    about this; but you do know, don't you, that Mr. Truitt fixed

7    the purchase order and put the December 31 date on it?

8    **A.**    I do.

9    **Q.**    Okay.  And let's look at 5626, which is in evidence.

10    This is Mr. Truitt sending to Joel Scott at 1:42.  Did you

11    talk to Mr. Scott about this problem?

12    **A.**    I don't remember.

13    **Q.**    Did you tell Mr. Scott to get this date fixed?

14    **A.**    I don't remember.

15    **Q.**    Did Mr. Scott say anything to you about, "Gee whiz, what

16    are we doing putting a December 31 date on something that's

17    happening later in January?"

18    **A.**    I don't remember.

19    **Q.**    Did you give Mr. Scott any explanation for why you were

20    doing this?

21    **A.**    I don't remember.  I don't remember doing this

22    specifically.

23    **Q.**    Did you tell Mr. Scott about this scanning and faxing to

24    try to keep the date stamp off the document?

25    **A.**    I don't remember.

1   **Q.**   Turn it over and let's see what it is.

2       This is the same purchase order to Discover Technologies

3   for 3.675; right?

4   **A.**   Yes.

5   **Q.**   And look at the signature page, please.

6       And Mr. Hyson has now signed it and it's a typed date of

7   December 31, 2010; right?

8   **A.**   Yep.

9   **Q.**   Did you consider that backdating?

10  **A.**   It is by definition backdating, yes.

11  **Q.**   At the time did you consider it backdating?

12  **A.**   You've asked --

13  **Q.**   You told us backdating upset you so much.  You couldn't --

14  **A.**   No, this is not.  This is an amendment being dated and

15  effective a prior date.

16  **Q.**   So you thought this was perfectly legal?

17  **A.**   I did.

18  **Q.**   Okay.  And Mr. Hussain thought it was an amendment; right?

19          **MR. REEVES:**  Objection.  There's no foundation.

20          **THE COURT:**  Sustained.

21  BY MR. KEKER:

22  **Q.**   Look at 1484, please.

23          **THE COURT:**  Okay.  14?

24          **MR. KEKER:**  '84.  1484.

25          **THE COURT:**  Okay.  One moment, please.

1          MR. KEKER:  There's no foundation --

2          THE COURT:  I need to look at it.

3          MR. KEKER:  I'm sorry.

4                    (Pause in proceedings.)

5          MR. KEKER:  1484 is a memorandum from Sushovan Hussain

6    to Stouffer Egan dated January 25th, 2011.

7          MR. REEVES:  It's also hearsay.  We object.

8          THE COURT:  I'm sustaining the objection, but you can

9    ask him questions about it.

10         MR. KEKER:  Well --

11         THE COURT:  I'm sustaining the objection to the

12   introduction of the document; however, if you want to -- he can

13   look at it and you can ask him questions about it.

14   BY MR. KEKER:

15   Q.   Did Mr. Hussain think that this was an amendment?  Do you

16   have it in front of you?

17         THE COURT:  I don't think he can testify as to what

18   Mr. Hussain thought.  He can testify as to what he thought

19   Mr. Hussain may have thought.

20         MR. KEKER:  I will ask him that.  But, Your Honor, we

21   would offer it for Mr. Hussain's state of mind and as a

22   business record involving this transaction.

23         THE COURT:  Overruled -- I mean, I'm not going to

24   permit it.

25         MR. KEKER:  Okay.  Got it.

1          THE COURT:  Okay.

2    BY MR. KEKER:

3    Q.   Would you look in your books -- we're not going to put it

4    on the screen -- would you look at 1484, please, sir?

5    A.   (Witness examines document.)  I'm familiar with this

6    e-mail.

7    Q.   Okay.  Why?  The Government showed it to you?

8    A.   Yes.

9    Q.   The people who just said there's no foundation for

10   Mr. Hussain thinking that it's an amendment --

11          MR. REEVES:  Objection.

12   BY MR. KEKER:

13   Q.   -- showed it to you and talked to you about it; right?

14          THE COURT:  Sustained.

15          MR. KEKER:  Okay.

16   Q.   When did they show it to you?

17   A.   I don't remember.

18          MR. REEVES:  I object.  How is that relevant?

19          MR. KEKER:  Well, I asked the question:  When did they

20   show it to you?

21          THE COURT:  Sustained.

22   BY MR. KEKER:

23   Q.   Did you believe that Mr. Hussain believed that this was an

24   amendment to an existing purchase order?

25   A.   Yes.

 1  Q.   Thank you.

 2       Different subject and I'm sure to the jury's

 3  disappointment, I'm winding down.  A couple more items.

 4       The Hewlett Packard/USPS discussion that you had on direct

 5  examination.

 6            MR. KEKER:  Your Honor, if I could pass up a series of

 7  documents.  The first one is 6209, which is a memo dated May 9,

 8  2011, from Stouffer Egan to Sushovan Hussain entitled "Ideas."

 9            THE COURT:  Okay.  Let me look at it.

10            MR. KEKER:  And then the second one is 6211.  I'm

11  sorry that these aren't in the book.

12            THE COURT:  6209, 6211 marked for identification.

13       (Trial Exhibits 6209 and 6211 marked for

14        identification)

15            MR. KEKER:  6211.

16       I'm getting a set for you here too, Mr. Egan.

17       The next one is 6213.

18            THE COURT:  6213 marked for identification.

19       (Trial Exhibit 6213 marked for identification)

20            MR. KEKER:  And just one more.  6215.

21            THE COURT:  Marked for identification.

22       (Trial Exhibit 6215 marked for identification)

23  BY MR. KEKER:

24  Q.   Okay.  I'm going to put them in front of you in order.

25  A.   Thank you.

 1    Q.   You were asked on direct examination about an effort to

 2    get Postal Service business by working with Hewlett Packard;

 3    right?  Do you remember that?

 4    A.   Sorry.  I was just reading.

 5         I was asked on direct about?

 6    Q.   About a US -- trying to get Postal Service business by

 7    working with Hewlett Packard.

 8    A.   That's correct.

 9    Q.   Hewlett Packard had the contract.  USPS, the Postal

10    Service was dissatisfied with what they had.  You were

11    interested in selling your software to the Postal Service,

12    Autonomy software, and you could either do it by working with

13    Hewlett Packard or do it directly; right?

14    A.   That's right.

15    Q.   Okay.  Would you look at 6209?

16    A.   Yes.

17    Q.   That's a May 9, 2011, e-mail from you to Mr. Hussain.

18              MR. KEKER:  I move it in.

19              MR. REEVES:  No objection.

20              THE COURT:  Admitted.

21         (Trial Exhibit 6209 received in evidence)

22    BY MR. KEKER:

23    Q.   Okay.  So what you're talking about here are ideas, short

24    list of ideas and must do, and the first one is (reading):

25              "HP/USPS (Stouffer has reached out for meeting this

1        week.)"

2        That was a meeting with whom?

3   **A.**   I don't know.  Either HP or USPS I would think.

4   **Q.**   And then must dos (reading):

5            "Have a senior HP conversation re USPS and larger

6        archiving strategy."

7        Do you see that?

8   **A.**   I do.

9   **Q.**   Okay.  You can put that aside.

10       And then the next one about a month later is you to

11   Mr. Hussain re Postal dated June 9, 6211.

12           **MR. KEKER:**  I move that in, Your Honor.

13           **MR. REEVES:**  No objection.

14           **THE COURT:**  Admitted.

15       (Trial Exhibit 6211 received in evidence)

16           **MR. KEKER:**  Let's see that.

17   **Q.**   Down at the bottom, Stouffer Egan from Bill Veghte.  Who's

18   Bill Veghte at HP?

19   **A.**   He was a senior executive at HP.

20   **Q.**   And what was he responsible for?

21   **A.**   I don't know at the time.

22   **Q.**   Was he responsible for their software business?

23   **A.**   That sounds right, yeah.

24   **Q.**   Was he responsible for the software that they had sold to

25   the Postal Service that the Postal Service was dissatisfied

**EGAN - CROSS / KEKER**

1    with?

2    **A.**    That was my understanding ultimately.

3    **Q.**    Okay.  And Mr. Veghte is -- and you were in direct touch

4    with Mr. Veghte in June of 2011; right?

5    **A.**    Yes.

6    **Q.**    And whatever else might be going on at some different

7    level between Autonomy and Hewlett Packard, you and Mr. Veghte

8    didn't talk about it?

9    **A.**    No.

10   **Q.**    You didn't know about it?

11   **A.**    I did not.

12   **Q.**    Do you know if Mr. Veghte knew anything about it?

13   **A.**    I don't.

14   **Q.**    Okay.  Mr. Veghte, the head of software, is telling you

15   (reading):

16            "We finally got a letter from them midweek.  I have

17        been on the road all week at HP's customer conference,"

18        and so on.  "The gist of it is that they want to migrate

19        and they would like our help with making this happen."

20        What's that about?

21   **A.**    I think he's referring to HP getting a letter from the

22   Postal Service, and the gist of it being that they want to

23   migrate and that they want HP's help.

24   **Q.**    Okay.  They want to migrate to a different software

25   solution?

1    **A.**    I believe that meant they wanted to migrate to ours, yes.

2    **Q.**    And were you at that point in conversations with Hewlett

3    Packard representatives about working together to move

4    Autonomy's software into the Postal Service?

5    **A.**    No.  We were more so in conversations about two threads.

6    One, HP being helpful in migrating the data if it came to

7    Autonomy, and I was representing that that was not the best

8    way.  It would be better for HP to take Autonomy software and

9    fix U.S. Postal Service directly.

10   **Q.**    Okay.  So did the Postal Service have a lot of Hewlett

11   Packard hardware?

12   **A.**    I believe they did.

13   **Q.**    And so one route would be for Autonomy to sell its

14   software to Hewlett Packard so that Hewlett Packard could use

15   that software with its hardware at the Postal Service?

16   **A.**    That's correct.

17   **Q.**    And that might satisfy the Postal Service who wasn't

18   satisfied at this point with Hewlett Packard's software?

19   **A.**    Correct.

20   **Q.**    Okay.  And then look up at the top.  You write to

21   Mr. Hussain "Re Postal," this is on June 9, and you say

22   (reading):

23        "I don't honestly know but it does mean that

24        intentions are set so we can improvise with what is known.

25        I am trying to say Postal Monday and can let them know O

1      their options to avoid FRP, one of which is allow HP to

2      pitch them a cure and migrate package that includes our

3      SW," software, "and a path to our data center subbed to us

4      under current contract and with no contract change to

5      Postal."

6      Explain that just briefly what that means.

7  **A.**   It's a very complicated e-mail, but I'll do my best.

8      Sushovan asked if this meant that the deal is more likely,

9  and I believe he was referring to the fact that Mr. Veghte had

10 said they want to migrate.

11     And I wrote that I don't actually know whether it means

12 more or less likely, but it meant that the Postal Service's

13 intentions were set, that they knew they wanted to use Autonomy

14 software.

15     So if you think of it in kind of the order of things, at

16 least you've got Postal decided that they want to use our

17 software, and I've got that relatively confirmed.

18     I was trying to get a meeting with Postal on Monday, and I

19 would have been able to let them know their options.  They were

20 wanting to avoid having to do a big RFP, so I was trying to

21 help make that happen.

22     One of the options was to allow HP to just fix the

23 situation, and they were in kind of a contractual breach and

24 certainly had a dissatisfied customer.  I was wanting to pitch

25 them something that would let them migrate and install our

1    software and effectively not even have to change their contract

2    is what I'm saying in the end.

3    **Q.**    Okay.  So you thought this was a real deal you were

4    working on with real possibilities?

5    **A.**    I knew it was a real deal.

6    **Q.**    Okay.  And then 6213 is the last one I'll show you, the

7    bottom --

8             **MR. KEKER:**  I'd move it in, Your Honor.  This is from

9    Mr. Egan to Mr. Veghte.

10            **MR. REEVES:**  No objection.

11            **THE COURT:**  Admitted.

12       (Trial Exhibit 6213 received in evidence)

13   **BY MR. KEKER:**

14   **Q.**    Look at the bottom e-mail.  This is Stouffer Egan to the

15   Hewlett Packard software chief, Mr. Veghte (reading):

16            "Let's keep it on e-mail then for now.  I want to

17       send you a specific proposal that is actionable

18       immediately and solves a lot of issues for everyone

19       involved tactically on USPS.  I also think it's a perfect

20       way for us to initiate a more broad strategic

21       relationship.  I'll send it to you as early as tomorrow."

22       And this is you saying to Mr. Veghte you wanted a

23   strategic relationship that included selling Autonomy software

24   to somebody for use by the Postal Service?

25   **A.**    That's right.

1   **Q.**   Okay.  Thank you.  You can put those down.

2       And the final area that I want to ask you about is

3   MicroLink.

4       Now, when you were talking to the Hewlett Packard lawyers,

5   did you believe that Autonomy bought MicroLink because Autonomy

6   was struggling to do federal business and MicroLink seemed to

7   be handling it for Autonomy?

8   **A.**   Partially, yes.

9   **Q.**   But when they asked you why did Autonomy buy MicroLink,

10  did you give them that reason?

11  **A.**   Yes.

12  **Q.**   And did you give them any other reason?

13  **A.**   I don't know.

14  **Q.**   Autonomy -- and I think you said yesterday that you don't

15  remember being present at the discussion between Mr. Truitt and

16  Mr. -- I can't remember who was with him -- Mr. -- I've lost

17  it, his financial guy -- I guess Cronin and Truitt and you and

18  Mr. Hussain talking about the acquisition of MicroLink?

19          **MR. REEVES:**  I think that misstates the evidence.  I

20  think it's Mr. Rizek.

21          **MR. KEKER:**  Mr. Rizek.  I'd forgotten about Mr. Rizek.

22  **Q.**   Mr. Truitt, Mr. Rizek, Mr. -- I cross-examined him, but I

23  can't remember him -- Mr. Truitt, Mr. Rizek, and you and

24  Mr. Hussain in a meeting.  Do you remember such a meeting to

25  talk about the acquisition of MicroLink?

1    **A.**    I don't.

2    **Q.**    You don't?

3    **A.**    I don't, no.

4    **Q.**    Do you remember a situation where Mr. Truitt knew that

5    Autonomy's Verity subsidiary, which used to have a federal

6    clearance, had lost its federal clearance?

7              **MR. REEVES:**  Objection.  Foundation as to what

8    Mr. Truitt knows.  Are we talking about a conversation?  We

9    object.

10             **MR. KEKER:**  I'll back up.

11   **Q.**    Do you know that before the acquisition, Verity, which is

12   an Autonomy subsidiary, had a federal clearance for it to be

13   able to try to sell to the federal government?

14   **A.**    I do know that.

15   **Q.**    And do you know that they had lost their clearance?

16   **A.**    I was aware of that.

17   **Q.**    So that no entity at Autonomy had a clearance to sell

18   software to the federal government where you needed a

19   clearance?

20   **A.**    I believe that's true.

21   **Q.**    Okay.  And you remember that one of the reasons that you

22   suggested buying MicroLink was to get that clearance because

23   MicroLink had it?

24   **A.**    It wasn't quite as simple as you say but, yes, I remember

25   that being part of the idea, yeah.

1    Q.    And you don't remember any meeting where you and

2    Mr. Hussain were surprised to find out that the MicroLink

3    principals knew that you had lost your federal clearance?

4    A.    Can you say it again?

5    Q.    Yeah.  You don't remember attending a meeting where you're

6    sitting there with Truitt and/or Rizek and being surprised that

7    they knew that you'd lost your federal clearance?

8    A.    I don't remember that.

9    Q.    You don't remember having to leave the room or them

10   leaving the room because you were shocked by that?

11   A.    No.

12   Q.    But you do remember that Autonomy ended up purchasing

13   MicroLink?

14   A.    I do.

15   Q.    Okay.  And do you remember that after the purchase, there

16   was some division between MicroLink owned by Autonomy and the

17   rest of Autonomy?

18   A.    I do.

19   Q.    What was that division?

20   A.    I think what you're talking about is special care taken to

21   create a gap that allowed for clearances to be had or

22   maintained by that entity.

23   Q.    Okay.

24   A.    I think that's what --

25   Q.    You weren't eligible to sell to MicroLink's customers,

1  were you?

2  **A.**   Say that again.  I'm sorry.

3  **Q.**   You weren't eligible to sell to at least their cleared

4  customers, their security agency customers?

5  **A.**   There were certain of their customers that we were not

6  able to sell directly to, correct.

7  **Q.**   Okay.  Now, there was some debt that MicroLink had.  Was

8  it all due at the time of the acquisition?

9  **A.**   I don't know.

10  **Q.**   Do you know that it was collect --

11  **A.**   I doubt it, by the way.

12  **Q.**   Do you know that it was moved over onto the MicroTech

13  books -- excuse me -- onto the Autonomy books?

14  **A.**   I don't know what happened to it.

15  **Q.**   And you don't know whether it was collected after the

16  acquisition, whether or not the end users paid the money into

17  Autonomy, the money that they had owed MicroLink?

18  **A.**   I don't know how it was accounted for at all, no.

19       **MR. KEKER:**  That's all I have, Your Honor.

20  Thank you, Mr. Egan.

21       **THE WITNESS:**  You're welcome.

22       **THE COURT:**  Redirect.

23       **MR. REEVES:**  Thank you, Your Honor.

24                    <u>**REDIRECT EXAMINATION**</u>

25  \\\

**BY MR. REEVES:**

**Q.**   Mr. Egan, do you still have the smaller binder that says "Witness Statements"?

**A.**   I do.

**Q.**   Okay.  Keep that handy if you would, please.

Just a few areas of inquiry, please.

You were asked some questions in your cross-examination, Mr. Egan, about your Deferred Prosecution Agreement.  Do you recall that?

**A.**   I do.

**Q.**   Could I please have displayed what's been received in evidence as Exhibit 2525, the Deferred Prosecution Agreement?

And if we could, please, go to the second page down to "The Defendant's Promises."  That's fine.  Thank you very much. And if we could highlight paragraph -- subparagraph 4c, please.

Are you familiar with this portion of the Deferred Prosecution Agreement, Mr. Egan?

**A.**   I am.

**Q.**   Okay.  It says in the DPA that you promise to cooperate fully and in good faith by doing, among other things, c (reading):

"Appearing at any trial or any other proceeding when requested to do so by this Office and providing complete and truthful testimony..."

Is that part of your agreement?

EGAN - REDIRECT / REEVES

1    **A.**    It is.

2    **Q.**    Is that the promise that you've made to the Government?

3    **A.**    It is.

4    **Q.**    Okay.  Are you obligated in any way to make the Government

5    happy?

6    **A.**    No.

7    **Q.**    Are you obligated to tell the truth in this proceeding?

8    **A.**    I am.

9    **Q.**    Is your agreement contingent in any way on any outcome in

10    any other case?

11    **A.**    Not that I'm aware of.

12    **Q.**    Your obligation is to tell the truth?  That's what you

13    promised to do?

14    **A.**    That's what I'm aware of.

15    **Q.**    There have been a series of questions asked about the

16    Statement of Facts that were attached to your Deferred

17    Prosecution Agreement.  Do you recall that?

18    **A.**    I recall there being questions, yes.

19    **Q.**    All right.  And do you recall that portion of your -- of

20    the DPA, the attachment, the Statement of Facts?

21    **A.**    I do.

22    **Q.**    Who wrote those facts?

23    **A.**    I did.

24    **Q.**    Are those your words?

25    **A.**    They are.

1  **Q.**    Okay.  Did you authorize your lawyers to discuss your

2  Statement of Facts with the Government?

3  **A.**    I did.

4  **Q.**    Okay.  But in the end, were those words in the Statement

5  of Facts your own, Mr. Egan?

6  **A.**    They were.

7  **Q.**    You were also asked some questions about the Proffer

8  Agreement.  Do you remember those questions?

9  **A.**    I do.

10  **Q.**    Okay.  That's exhibit --

11  **A.**    I don't remember the questions.  I remember being asked

12  questions.

13  **Q.**    Excuse me?

14  **A.**    Sorry.  I'm just being technical.  I remember being asked

15  the questions.  I don't remember the questions.

16  **Q.**    Thank you for that clarification.

17      In Mr. Keker's questions yesterday, do you remember being

18  asked questions about the Proffer Agreement?

19  **A.**    I do.

20  **Q.**    That's the document that was executed in your meetings

21  with the Government before you entered into the Deferred

22  Prosecution Agreement?

23  **A.**    That's correct.

24  **Q.**    And in that Proffer Agreement, which I'm happy to show you

25  again -- just let us know if you want that -- do you recall

1  that nothing in the Proffer Agreement protected you against

2  false statements to the Government?  Did you understand that?

3  **A.**    I remember not being protected at all in the

4  conversations.

5  **Q.**    Okay.  You were not protected against false statement or

6  perjury or obstructing an investigation?  Did you understand

7  that?

8  **A.**    I did.

9  **Q.**    I'm done with that.

10       You have been asked a great many questions about the

11  meetings that you've had in this case, have you not?

12  **A.**    I have.

13  **Q.**    There's a defense theme emerged in the cross-examination

14  that somehow you changed your story as a result of all these

15  meetings.  Would you agree?

16  **A.**    I'm not even trying to judge --

17            **MR. KEKER:**  I object to the defense theme.  He's

18  answered questions about it.

19            **MR. REEVES:**  I withdraw the question.

20            **MR. KEKER:**  I don't object to asking whether or not

21  he's changed his story.

22  **BY MR. REEVES:**

23  **Q.**    Do you think you've changed your story?

24  **A.**    I do not.

25  **Q.**    All right.  Let's begin right off the bat, please, with

1    your very first meeting with the Government.  Okay?

2         I'd like you to get that binder out, please, and I'd like

3    you to go to Exhibit 5240, page 23.  Let's just have that open.

4         Do you have that open?

5    A.   I do.

6    Q.   All right.  This morning counsel for the defendant said

7    that you had never said that you discussed that Capax would not

8    be put in writing with the Government.  Do you remember that

9    sweeping statement this morning?

10   A.   I remember a reference to my having never discussed it

11   before this -- before today, or something like that.  I don't

12   remember specifically.

13   Q.   And you remarked that you found that impossible to

14   believe?

15   A.   I did.

16   Q.   Okay.  In your very first meeting with the Government

17   memorialized in this report marked for identification as

18   Exhibit 5240, did you answer questions put to you by the agents

19   and other Government representatives on that day about Capax

20   EDD?  That's what this portion of the report is about, is it

21   not?

22   A.   I'm just going to point out that the first thing I read on

23   this page is "Second Interview of Christopher Egan," so I don't

24   know if we're not looking at the right document -- or if I'm

25   not looking at the right document.

1  **Q.**  Thank you, Mr. Egan.

2      It's the very first time you were asked questions about

3  Capax EDD, and I'll get into that in a moment.

4  **A.**  Okay.

5  **Q.**  But the very first time you were asked questions about

6  Capax EDD, did you, in fact, make the statement to the

7  Government that the two deals were documented in a way to not

8  suggest the transactions were related?  Isn't that a fact what

9  you said as reflected in the middle of page 23, second full

10  paragraph, last sentence?  Isn't that what you told the

11  Government in your first meeting about Capax EDD?

12      **MR. KEKER:**  Excuse me.  This is not proper

13  impeachment.  What I understood --

14      **THE COURT:**  Well, first of all, it's not impeachment;

15  but the confusion in my mind is you've referred to it as the

16  first meeting with the Government.  The document says the

17  second meeting with the Government.  So I -- and that's what

18  the witness pointed out.

19      This was an interview, if you're -- the exhibit you have

20  referenced are notes or a report of an interview on May 20th,

21  2014, which is entitled "Second Interview of Christopher Egan."

22  Is that the document that you want him to reference?

23      **MR. REEVES:**  Yes, it is.  And I misspoke because I

24  meant it's the first time he was asked questions about Capax

25  EDD.

1          THE COURT:  Well, I think you have to establish that.

2          MR. REEVES:  Okay.

3          THE COURT:  Was that the first time?  And then --

4          MR. REEVES:  I'll ask a different question.

5          THE COURT:  Well, why don't you just ask him:  Was

6    this the first time you were asked questions about Capax?  Or

7    whatever your question is.

8          MR. REEVES:  I'll use the dates, and I'll use the

9    board, if that's okay with the Court.

10         THE COURT:  Use whatever you'd like.

11         MR. REEVES:  Thank you very much, Your Honor.

12         MR. KEKER:  Excuse me, Your Honor.

13         THE COURT:  Sure.

14         MR. KEKER:  The objection is the questions that I

15   asked him were:  Was this the first time you ever said that

16   Sushovan Hussain told you not to talk to Sullivan or the first

17   time that you ever said Sushovan Hussain said don't put it in

18   writing?

19         THE COURT:  Okay.

20         MR. KEKER:  If he can find that in these documents, he

21   should bring it out.  Please do.

22         MR. REEVES:  I found it.

23         THE COURT:  Okay.  Now, let's deal with it this way:

24   I'm going to permit the question, permit the answers.  The jury

25   heard the evidence.  Whatever the jury heard, if they heard

 1   just your questions or if they agree with that's the way it was

 2   stated or that was their impression, that's up to the jury to

 3   make a determination.

 4        But hundreds and hundreds of questions have been asked of

 5   this witness.  I for one don't remember all the questions asked

 6   of this witness.  Maybe the jury does.  They're paying close

 7   attention.

 8        So ask your question, but just get the dates right.  Okay?

 9        **MR. REEVES:**  Thank you, Your Honor, I will.  I'll try

10   certainly.

11   **Q.**   On the May 20th, 2014, interview you were asked questions

12   about Capax EDD, were you not?

13   **A.**   I don't recall specifically.

14   **Q.**   All right.  In your meeting with the Government on

15   May 20th, 2014, did you tell the Government that the two Capax

16   deals, the *quid pro quo* deal that you have testified about,

17   were documented in a way to not suggest the transactions were

18   related?

19        **MR. KEKER:**  Objection, Your Honor.  That's not

20   impeaching.

21        **THE COURT:**  Overruled.  Overruled.  He doesn't have to

22   impeach.  He's not impeaching.  It's nothing to do with

23   impeachment.

24        Go ahead.

25        **THE WITNESS:**  Is it okay if I read the --

1              THE COURT:  Yes.

2              MR. REEVES:  Sure.  Please.

3              THE COURT:  Well, first you should say:  Do you recall

4     telling the Government that these two transactions were

5     documented in a way not to suggest that they were related?  Do

6     you have that recollection as you sit there?

7              THE WITNESS:  I do.  I don't remember what meeting it

8     was, but I recall telling them.

9              THE COURT:  Okay.

10             THE WITNESS:  Yeah.

11             THE COURT:  Now, do you believe it was on or about

12    May 20th of 2014?

13             THE WITNESS:  It could have been, but I really don't

14    remember.

15             THE COURT:  Was it one of your earlier meetings with

16    the Government.

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.  Thank you.

19        Next.

20             MR. REEVES:  Thank you, Your Honor.

21    Q.  And did you go on to say in that very meeting at or around

22    the time you made the statement that the deals were documented

23    in a way to not suggest the transactions were related, did you

24    add that Mr. Hussain and others within Autonomy knew all about

25    the deal?

**A.**    I did.

**Q.**    Have you been consistent, Mr. Egan, in your meetings with the Government on the point about the documentation relating to the Capax deals in your view?

**A.**    Yes, both about documentation and the lack of documentation.

**Q.**    In your meetings with the Government, did anyone ever tell you what to say other than to tell the truth?

**A.**    No one ever told me what to say, and I was repeatedly told to tell the truth.

**Q.**    Did anyone ever tell you in your meetings with the Government that you had to give someone up in order to get a deal, as the Defense has suggested?  Did that ever happen?

**A.**    No.

**Q.**    In your meetings with the Government, did you try to answer the questions that were put to you by the Government?

**A.**    I did.

**Q.**    Today in the portion of the cross-examination we heard today, you seemed to emphasize that you cooperated by answering all the questions that you were asked.

**A.**    Yes.

**Q.**    Okay.  And if you were not asked about a particular deal or transaction, did you insist on talking about it anyway in your meetings with the Government?

**A.**    No.

**EGAN - REDIRECT / REEVES**

1   **Q.**  You tried to answer the questions that were put to you,

2   did you not?

3   **A.**  That was the format, yes.

4   **Q.**  All right.  Now, there were lots of meetings because there

5   were lots of *quid pro quo* deals and other transactions that the

6   Government was investigating, would you agree?

7            **MR. KEKER:**  Objection.  Leading.

8            **THE COURT:**  Overruled.

9            **THE WITNESS:**  Yes, there were.

10   **BY MR. REEVES:**

11   **Q.**  That was one of the reasons, there were lots of deals --

12   excuse me -- lots of meetings about the deals.  Okay?

13      And on each of those deals, were you asked to go into them

14   in detail?  On many occasions were you asked --

15   **A.**  Many occasions amongst many deals I was asked to go into a

16   lot of detail.

17   **Q.**  All right.

18   **A.**  Often repetitively.

19   **Q.**  I'm going to ask you a difficult question.  I'm going to

20   ask you to estimate the number of documents the Government

21   showed to you and asked you questions about in the course of

22   your cooperation.  Are you able to estimate how large a number

23   of documents those are?

24   **A.**  Just the ones the Government showed me or asked me about?

25   **Q.**  Yes, sure.

1    **A.**    I really don't know.  Thousands.

2    **Q.**    Thousands.  Does that take awhile?

3    **A.**    Yes, it took awhile.

4    **Q.**    Okay.  And from what you could observe in your meetings

5    with the Government, was the Government trying to investigate

6    this case using those documents with care?

7    **A.**    Yes.

8    **Q.**    Did that require a lot of questions of you as one of the

9    participants or people at Autonomy in order to understand the

10   details of those documents?

11   **A.**    I didn't get the question.

12   **Q.**    From what you could observe in your meetings with the

13   Government, with the agents and the lawyers for the Government,

14   did you observe an effort by the Government to use the

15   documents to inquire about the details of these transactions?

16   **A.**    I did.

17   **Q.**    All right.  Now, Mr. Keker asked you to do a homework

18   assignment.  I wasn't sure if you were going to do it so I

19   worked on it over the evening, and I'd like to ask you a few

20   questions about the first time you talked about Prisa.  Do you

21   remember that homework assignment?

22   **A.**    I remember the homework assignment, yes.

23   **Q.**    All right.  Let's go through each of the meetings with the

24   Government and look at the questions the Government -- the

25   subjects the Government was asking you about.

1          THE COURT:  Well, wait.  Wait a minute.

2          MR. REEVES:  It won't take that long, Your Honor.

3          THE COURT:  Right, it's not going to take that long

4    because what I'd like you to do is just summarize in some way

5    without him going through the entire -- there were how many

6    meetings with the Government?

7          MR. REEVES:  I think at least -- until we get to

8    Prisa, it was in the sixth meeting, I believe.

9          THE COURT:  All right.

10         MR. REEVES:  I will summarize.

11         MR. KEKER:  We'll stipulate it was the sixth meeting.

12         THE COURT:  Sixth meeting.

13         MR. KEKER:  That's the first time.

14         THE COURT:  Okay.  What meeting -- the suspense is

15   killing me.  What meeting did he discuss Prius, or whatever it

16   is?

17         MR. KEKER:  November 7, Your Honor, with the

18   Government.

19         THE COURT:  Whatever this thing is.  What is it?

20   Prius?

21         MR. REEVES:  Prisa.

22         THE COURT:  Prisa.

23         MR. REEVES:  I believe it is the sixth meeting on

24   November 7th.

25         THE COURT:  Okay.  Is that your understanding, that

 1  you didn't discuss it until the sixth meeting on November 7th?

 2  You weren't asked any questions about it?

 3        THE WITNESS:  I asked my lawyers to look for Prisa in

 4  the notes, and they first found a reference to it on the 7th.

 5        THE COURT:  On the 7th?

 6        THE WITNESS:  Yeah.

 7        THE COURT:  And does that comport with your

 8  understanding; that is, that you didn't discuss it before the

 9  7th?

10        THE WITNESS:  I really don't recall when we discussed

11  it.  We discussed thousands of things.

12        THE COURT:  You discussed it when you were asked a

13  question about it?

14        THE WITNESS:  Yes.

15        THE COURT:  And the notes indicate you were asked on

16  the seventh?

17        THE WITNESS:  That's correct.

18        THE COURT:  Okay.  Now we've done that.  I did the

19  homework assignment, ladies and gentlemen, and there it is and

20  we can move on.

21        MR. REEVES:  With the Court's permission, just a

22  couple more?

23        THE COURT:  Go ahead.

24        MR. REEVES:  Thank you very much.

25  Q.   In the first meeting you were asked about -- just please

1    let me know if you disagree or any part of your memory

2    disagrees with any of the points I'll make as we get to the

3    first time you're asked about Prisa.

4         In the first meeting that you have on May 5th, 2014, the

5    topic was FileTek.  Is that consistent with your recollection?

6    Does that make sense that there were questions about FileTek?

7    **A.**    It makes sense.  I don't know.

8    **Q.**    Okay.  You'd have to look at the reports to refresh your

9    recollection and see for sure, would you not?

10   **A.**    I would.

11   **Q.**    All right.  And in the second meeting --

12        **MR. KEKER:**  Oh, my Lord.

13   **BY MR. REEVES:**

14   **Q.**    -- on or about May --

15        **MR. KEKER:**  We're going to have to go through this

16   word by word.  That is the biggest misrepresentation.

17        **THE COURT:**  Well, wait a minute.  Wait a minute.

18        **MR. KEKER:**  We're talking about --

19        **THE COURT:**  We're not going to have any argument.

20        **MR. REEVES:**  We can put them in evidence.  We would be

21   happy to have them all come into evidence, Your Honor.

22        **MR. KEKER:**  I'm sure you would.

23        **THE COURT:**  All right.  Let's --

24        **MR. REEVES:**  The suggestion has been made that he

25   somehow was sitting on this issue and didn't talk about it.

1    The answer is that he was not asked questions about it, and the

2    record is clear and I'd like to establish that, please.

3            THE COURT:  Well, I think it's -- I think that's a

4    fair point, which is -- but there's a way to deal with it.

5        Is it the agreement of the counsel that the notes do not

6    reflect any mention of this transaction, either by way of

7    question or response, until the 6th of November?  Is that the

8    date?

9            MR. REEVES:  November 7, 2014, Your Honor.

10           THE COURT:  November 7th.  Then we don't have to go

11   through it.

12           MR. REEVES:  That's the first time the Government

13   asked questions about Prisa.

14           THE COURT:  Okay.  Is that an accurate representation

15   of the record as far as you know it?

16           MR. KEKER:  Yes, Your Honor.

17           THE COURT:  Okay.

18           MR. REEVES:  That's a stipulation.

19           THE COURT:  Yes.

20       Ladies and gentlemen, we've saved hours of your time and

21   mine because the parties have arrived at an agreement.  You are

22   to accept it as a proven fact.

23           MR. REEVES:  Okay.

24   Q.  So were you somehow holding back about Prisa, Mr. Egan, in

25   any way until that moment when the Government, as a result of

1    its investigation, its discovery of documents, raised the topic

2    with you for the first time?

3    **A.**    No.  I was just answering questions.

4    **Q.**    All right.  Let's go to the very first meeting you had

5    with outside counsel.  You were also asked some questions about

6    your statement about Mr. Hussain as an ethical person.  Do you

7    remember those questions?

8    **A.**    I do.

9    **Q.**    All right.  That remark or that -- withdrawn.

10   **A.**    Can I just be clear?  I remember the questions from this

11   proceeding.  I don't remember the questions that were referred

12   to --

13   **Q.**    Understood.

14   **A.**    -- just to be correct.

15   **Q.**    Let me help you with that.

16          Please take a look at what's been marked for

17   identification as Exhibit 5236, page 10.

18          **MR. REEVES:**  Your Honor, I'm offering portions of this

19   pursuant to Federal Rules of Evidence 801(d)(1)(B)(ii).

20   **Q.**    In this meeting that you --

21          **MR. KEKER:**  I object.

22          **THE COURT:**  Wait a minute.

23          5236.  Here we go.  Okay.

24          **MR. REEVES:**  5236.

25   **Q.**    In the meeting that Mr. Keker asked you about in which you

1  remarked that --

2         **THE COURT:**  What page are we looking at?

3         **MR. REEVES:**  Page 10.

4         **THE COURT:**  And what portion do you want -- are you

5  seeking to introduce?

6         **MR. REEVES:**  The second and third paragraph, please.

7         **THE WITNESS:**  Of page 10 of that exhibit?

8         **MR. REEVES:**  Yes.  It's Exhibit 5236, page 10.

9         **THE COURT:**  And what's the first word of the

10 paragraph?

11        **MR. REEVES:**  The first word of the paragraph was "Egan

12 was previously asked"; and then below it goes, "Egan also saw

13 Hussain."

14        **THE COURT:**  So it's under subdivision i?

15        **MR. KEKER:**  I have no objection to him reading those

16 two paragraphs, Your Honor.

17        **THE COURT:**  Okay.

18        **MR. REEVES:**  Thank you very much.

19        **THE COURT:**  You may read it.

20 **BY MR. REEVES:**

21 **Q.**   Okay.  I'm going to read those two paragraphs and ask if

22 this is consistent with your recollection, Mr. Egan.  Okay?

23 **A.**   Sure.

24 **Q.**   Exhibit 5236, page 10 (reading):

25         "Egan was previously asked if Hussain was a Capax

1        owner, which Egan flatly rejected.  Egan said that

2        information would shock him more than HP's recent

3        announcement.  Although he acknowledged it might be crazy,

4        Egan maintains the view Hussain is a highly ethical person

5        who would be incensed by such an accusation.  Egan further

6        stated that Hussain didn't really make much money and Egan

7        thought he was massively under the spell of one of the

8        most powerful human characters on the planet."

9        Was that a reference to Dr. Lynch?

10   **A.**   It was.

11        **MR. KEKER:**  Can he read it?

12   **BY MR. REEVES:**

13   **Q.**   (reading)

14        "Egan thought Hussain got screwed into doing

15        something but that Hussain would never do something

16        self-beneficial.  Egan also thought Baiocco was

17        transparent and a good friend of his.  Egan thought

18        Baiocco would have offered a part ownership of Capax to

19        Egan before Egan [sic] offered it to Hussain."

20        **THE COURT:**  No, no.  "Before Baiocco."  You didn't

21   read it right.

22        **MR. REEVES:**  Want me to read it again?

23        **THE COURT:**  Start with "Egan also felt."

24        **MR. REEVES:**  (reading)

25        "Egan also felt Baiocco was transparent and a good

1      friend of his.  Egan thought Baiocco would have offered a

2      part ownership of Capax to Egan before Baiocco offered it

3      to Hussain.  Baiocco is nervous about appearing in the

4      newspaper in connection with this and Egan thought that

5      would bring out Hussain's ownership too."

6   Q.   Did you say that in your meeting with the lawyers for HP?

7           MR. KEKER:  Could you read the next paragraph, please?

8           MR. REEVES:  I intend to.

9           THE WITNESS:  Some of that sounds true.  The last bit

10  doesn't make any sense to me.  It feels as though someone took

11  their notes wrong.

12  BY MR. REEVES:

13  Q.   What part doesn't make sense to you?

14          MR. KEKER:  Could he read it?  He said he was going to

15  read it.

16          MR. REEVES:  I will read it.

17          THE COURT:  He can ask the question in two parts.

18      Go ahead.

19  BY MR. REEVES:

20  Q.   What part doesn't make sense to you, Mr. Egan?

21  A.   The last sentence (reading):

22          "Baiocco is nervous about appearing in the newspaper

23      in connection with this and Egan thought that would bring

24      out Hussain's ownership too."

25  Q.   That part doesn't make sense?

1   **A.**   It doesn't make any sense, no.

2   **Q.**   Let's go to the next paragraph (reading):

3           "Egan also saw Hussain push back on Lynch's unethical

4       ideas.  Egan didn't think he was particularly privy to

5       those conversations, but Egan saw Hussain be worked by

6       Lynch just as hard as the rest of management was worked.

7       In describing this pressure, Egan choked up and almost

8       began to cry.  Egan described how management was often

9       forced to travel last minute and stay there in case a

10      client needed them despite their families being far away.

11      Egan thought Lynch would push his employees until the

12      point Lynch truly felt they would quit."

13      Do you recall saying that in your meeting with the lawyers

14  for HP?

15  **A.**   I expressed much of that.  This is all consolidated.  It's

16  not like it was discussed like that.

17  **Q.**   Do you believe that Dr. Lynch asked people at Autonomy to

18  do unethical things?

19  **A.**   Yes, at times.

20  **Q.**   And do you believe, based on all the facts and

21  circumstances that you witnessed while you were at Autonomy,

22  that Dr. Lynch somehow screwed Sushovan Hussain into doing some

23  of those unethical things?

24  **A.**   I don't know as I would say it that way now.

25  **Q.**   How would you say it?

1    **A.**    I think he put a lot of pressure on him.

2    **Q.**    To do what?

3    **A.**    All sorts of things:  Travel, be away from family, die on

4    the hill of a deal.  I mean, just a lot of pressure.

5    **Q.**    Recognize revenue, meet revenue targets?

6            **MR. KEKER:**  Objection.  Leading.  Can't the witness

7    testify?

8            **THE COURT:**  Overruled.

9        Go ahead.

10    **BY MR. REEVES:**

11    **Q.**    Extreme pressure by Dr. Lynch --

12    **A.**    Extreme pressure, yes.

13    **Q.**    -- for Sushovan Hussain to meet revenue targets set by the

14    market for the company?

15    **A.**    On Sushovan and on all of us, yes.

16    **Q.**    You were asked some questions about your decision to stay

17    at HP when Dr. Lynch and Mr. Hussain left HP in or around

18    May 2012.  Do you recall that?

19    **A.**    I do.

20    **Q.**    Okay.  Why, in your own words, Mr. Egan, did you choose to

21    stay at HP and not continue to work for whatever business or

22    venture Dr. Lynch began?

23    **A.**    Two main reasons.  One, I just had it in my head that the

24    right thing to do was to stay anywhere that has bought you for

25    a year.  Just someone buys your company, they're buying

1  everything about it, including your work, and you owe them a

2  year of hard work towards that end.

3       The second reason, I wasn't interested in continuing to

4  work for Mike, which was the alternative.

5  **Q.**   Why were you not interested in continuing to work for

6  Mike?

7  **A.**   I was tired of it.  It was too much pressure.  I didn't

8  like that system anymore, and it wasn't -- the reasons that we

9  talked about when I -- when my letter was up.

10 **Q.**   All right.  And at that time, in or around May 2012 when

11 Dr. Lynch and Mr. Hussain and others are leaving HP, did you

12 think that you were somehow picking sides in some type of

13 battle between them?

14 **A.**   A little bit, yes.

15 **Q.**   Okay.  Well, what did you think about that?  How were you

16 picking sides?

17 **A.**   Well, anything I did was effectively picking a side on

18 some level because it was a battle.  So the fact that there was

19 a big battle or fight and the fact that I felt I should stay at

20 HP made me feel as though I was picking that side.

21 **Q.**   Are there former employees of Autonomy who today continue

22 to work for Dr. Lynch?

23 **A.**   I believe so.

24       **MR. KEKER:**  Objection.  Outside the scope of cross.

25 Improper redirect, Your Honor.

1          THE COURT:  Sustained.

2     BY MR. REEVES:

3     Q.    Are you aware of what venture Dr. Lynch began after he

4     left?

5          MR. KEKER:  Same objection.

6          THE COURT:  Sustained.

7     BY MR. REEVES:

8     Q.    You were asked a series of questions about what you termed

9     were your misleading e-mails.  Do you remember that?

10    A.    I remember being asked the questions, yes.

11    Q.    Okay.  I'm going to go into some of the specifics of some

12    of them, but I want to ask you generally.

13         What would happen if you put the true justifications that

14    you've described having for certain of the *quid pro quo* deals

15    into the e-mails that you wrote?  What would happen?

16    A.    Meaning if I put the -- whether they were related or

17    whether I was trying to maximize revenue?

18    Q.    Let's say hypothetically you want to say "The reason we

19    want to do purchase orders for EDD processing for Capax is so

20    that Capax will have enough money for us to pay for the EDD

21    license that we just sold them."

22         You've testified that that was one of the reasons you

23    worked out that agreement with Mr. Baiocco; correct?

24    A.    Correct.

25    Q.    And discussed it with Mr. Hussain in the manner you've

1  described; correct?

2  **A.**   Correct.

3  **Q.**   If you simply wrote that out in an e-mail, "This is the

4  reason why we need to issue purchase orders for EDD outsourcing

5  services to Capax is so that they can pay us for our license,"

6  if you simply wrote that out, what would happen?

7  **A.**   The deal wouldn't be recognizable.

8  **Q.**   Okay.  And what else might happen?  Do you think --

9  **A.**   I would get in trouble.

10  **Q.**   Why would you get in trouble?

11  **A.**   For explicitly tying the deals together in writing.

12  **Q.**   Trouble from whom?

13  **A.**   Mike and Sushovan.

14  **Q.**   Okay.  Why?  Why?  You're simply telling the truth.  Why

15  would that be a problem?

16  **A.**   Because I was aware that for *quid pro quo* deals they

17  needed to be established as separate, fair value, all the

18  things we've talked about, and not linked in a writing or an

19  agreement.

20  **Q.**   Did you sometimes use the term to describe these e-mails

21  as a group as so-called "make the case" e-mails?  Have you ever

22  used that term?

23  **A.**   I've used that term for some e-mails, not so much the ones

24  you were just referring to.

25  **Q.**   What e-mails are "make the case" e-mails?

1  **A.**   E-mails where I would document the rationale for doing a

2  deal that was the other rationale besides just the pursuit of

3  the revenue.

4  **Q.**   So what is the case that you're making in these "make the

5  case" e-mails?  Why do you need to make the case?

6  **A.**   Sometimes explicitly to -- to answer a question from Steve

7  or Sushovan.  So "Why would we choose Capax as a reseller?  I

8  need bullet points about that."  So I would make that case in

9  bullet points.

10     Other times it could be "Why would we need to buy more

11  FileTek?"  I would make that case, write up that argument, that

12  rationale.

13  **Q.**   Now, when you did that, was the rationale always the true

14  rationale for the transaction as you understood it?

15  **A.**   It was a rationale.

16  **Q.**   What do you mean -- you've emphasized sometimes "a

17  rationale" versus "the rationale."  What do you mean by that?

18  **A.**   Because I always felt as though the main rationale was to

19  get the revenue --

20  **Q.**   Why not --

21  **A.**   -- but that was just so --

22  **Q.**   Why not simply say that, "We're doing this in order to get

23  the revenue?"  Why not write that in an e-mail?

24  **A.**   Two main reasons.  Well, why not write it?  It didn't need

25  to be written.  It was implicit, obvious the point of it.

EGAN - REDIRECT / REEVES

1  Q.   Mr. Hussain is relying on your e-mails, Mr. Egan.  He's

2  reading them and relying on your e-mails.  Are you intending to

3  mislead him by these pretextual misleading e-mails?

4  A.   No.

5  Q.   Explain this.  This is going to be an important issue for

6  the jury to figure out here.  Take a moment and please explain

7  what you're doing with these pretextual e-mails.

8  A.   In the case of -- I'm providing material that is to make

9  the case for the alternative rationale to buy the software in

10  the case of a *quid pro quo* deal or to choose a reseller in some

11  cases as opposed to speaking directly to the -- I'm looking to

12  make a big deal here.

13  Q.   Make the case to whom?

14  A.   Internally for -- to document, at times to be used with

15  the auditors.  It depended.  There was a lot of variation to

16  it.

17  Q.   Are you making the case to Mr. Hussain?

18  A.   No.

19  Q.   Were there other people in Autonomy who would also have

20  pretextual or misleading or "make the case" e-mails?

21  A.   Were other people ever creating them?

22  Q.   Yes.

23  A.   Yes.

24  Q.   Who else created these kinds of e-mails in case the

25  auditors or outsiders might read them?

1  **A.**    I can't speak to why they were doing it specifically,

2  but --

3  **Q.**    Who?  The question was a who question.

4  **A.**    -- I've read -- okay.

5        Myself, Andy Kanter I believe, Pete Menell, Sushovan

6  himself.

7  **Q.**    Let's take a look at Exhibit 50, please.  I believe it's

8  in evidence, Your Honor.

9        Exhibit 50, page 2.  If we could go to the second page.

10  That's fantastic.  Right there.  And if we could highlight "PO

11  for outsourcing EDD processing."

12        So this is one of the e-mails in or around April -- on or

13  around April 16, 2009, from Mr. Hussain following up on the

14  purchase orders issued to Capax; correct, Mr. Egan?

15  **A.**    Yes, it is.

16  **Q.**    All right.  And this is approximately how many days after

17  you've just sold the EDD software to Capax?  How many days have

18  gone passed since you gave him that expensive software package?

19  **A.**    I don't know exactly what day we completed the Capax deal,

20  but I believe it was at the end of the quarter.  So end of

21  March.  So in the range of 16 plus-or-minus days.

22  **Q.**    16, 17 days?

23  **A.**    That's what I would think.  Again, I don't know exactly

24  when we finished the Capax deal.

25  **Q.**    Do you think there's any scenario in which they could

1    actually have gotten that license up and running, a platform up

2    and running, a data center up and running in order to outsource

3    EDD processing?  Do you think that could feasibly happen?

4    **A.**    No.

5    **Q.**    Do you have any reason to believe, based on your

6    discussions with Mr. Hussain, that he thought that 16 days

7    after you sold the software to Capax that somehow Capax could

8    actually really be doing outsourcing EDD processing?  Is there

9    anything in your conversations with them that suggest that he

10   might have thought that?

11   **A.**    No.

12   **Q.**    Mr. Hussain writes on April 16th, 2009 (reading):

13               "Create a PO for outsourcing EDD."

14       Is this an example of a pretext that is being circulated

15   within Autonomy to justify the payment of money by Autonomy to

16   Capax in order to underwrite their ability to pay for the

17   license that they bought approximately two weeks earlier?

18   **A.**    That's a lot to say.  I'm not sure it's a pretext.  It's a

19   command to create a PO for the outsourcing of EDD processing.

20   **Q.**    Was there a need for Autonomy to actually pay for this

21   outsourcing EDD processing other than the need to get money to

22   Capax so that they could pay for the license?

23   **A.**    No.

24   **Q.**    Is Mr. Hussain contributing to this pretextual explanation

25   of why Autonomy needs to issue these purchase orders in the

1   context of Capax?

2   **A.**    He's contributing to the -- to processing the PO, and it's

3   not mentioned that it was a retainer-based.  So you could argue

4   it leads you to believe that work was actually being done.

5   **Q.**    When no work was being done?

6   **A.**    Correct.

7   **Q.**    Nor work could be done?

8   **A.**    Correct.

9   **Q.**    Now, Autonomy was involved in the eDiscovery business,

10  was it not?

11  **A.**    It was.

12  **Q.**    And are you aware of software that goes to things like

13  Legal Hold and other compliance software?

14  **A.**    I am.

15  **Q.**    Okay.  And part of this eDiscovery business that

16  Autonomy actually sold to its clients provided all kinds of

17  services around the preservation of e-mails, did it not?

18  **A.**    It did.

19  **Q.**    Preservation, archiving, processing of e-mails in

20  litigation; correct?

21  **A.**    Correct.

22  **Q.**    And this software allowed the e-mails so that they could

23  be preserved and never destroyed, among other things?

24  **A.**    Yes.

25  **Q.**    Okay.  So that they could be searched and ensure the

1    completeness of information in the e-mail archives being

2    maintained by the software?

3    **A.**    Be searched and ensure the completeness of information?

4    **Q.**    That's two things.

5    **A.**    Yes.

6    **Q.**    But did it do both those things?

7    **A.**    Yes.

8    **Q.**    Okay.  So that eventually e-mails could be produced in a

9    litigation or compliance matter or regulatory matter?  That's

10   part of the product's purpose; right?

11   **A.**    Yes.  We'd been -- you're talking about different products

12   as you go through this.

13   **Q.**    Okay.

14           **MR. KEKER:**  Objection, Your Honor.  Can we approach?

15           **THE COURT:**  Okay.  Well, let's see...  Yeah.

16       Ladies and gentlemen, if you want to stretch, go ahead.

17       **(The following proceedings were heard at the sidebar:)**

18           **MR. KEKER:**  Your Honor, I think they're about to get

19   into something that is well outside the scope of

20   cross-examination and also prejudicial and it shouldn't be part

21   of the case.  They're getting into whether or not some e-mails

22   at Autonomy were destroyed.

23           **MR. REEVES:**  No, no.

24           **MR. KEKER:**  No?

25           **MR. REEVES:**  We're not going there.

 1          **MR. KEKER:**  Okay.  If you're not --

 2          **MR. DOOLEY:**  Are you going to ask questions about

 3    whether Autonomy had an e-mail preservation system of its own,

 4    preserved e-mails of its own?

 5          **MR. REEVES:**  No, I'm going to ask questions about the

 6    fact that they knew full well that e-mails would be looked at

 7    in the litigation context.

 8          **MR. KEKER:**  Okay.  That's fair.

 9      Sorry.  Thank you.

10      **(The following proceedings were heard in open court:)**

11          **THE COURT:**  You may proceed.

12          **MR. REEVES:**  Thank you, Your Honor.

13    **Q.**  Given the nature of the very products that you sold --

14    litigation hold, compliance products, archiving, ensuring the

15    completeness of e-mails and e-mail protection -- would you

16    agree that there was a sensitivity within Autonomy about what

17    was and what was not written in an e-mail?

18    **A.**  There was a sensitivity about what was written or not in

19    an e-mail.  I'm not sure how much of it was informed by the

20    business.

21                    (Pause in proceedings.)

22    **BY MR. REEVES:**

23    **Q.**  A couple more topics here.

24      Quickly on the subject of hardware, you were asked some

25    questions in your cross-examination about your knowledge of

1  hardware and the purpose that Autonomy had for reselling

2  hardware.  Do you recall that?

3  **A.**    I do.

4  **Q.**    You were also asked a lot of questions about things you

5  didn't know, Project Blue Jay and stuff like that.  Do you

6  remember those questions?

7  **A.**    I do.

8  **Q.**    Okay.  Do you believe that you knew all of the

9  hardware-related transactions that Autonomy was getting into in

10  the time that you were working there?  Did you know all of

11  them?

12  **A.**    No.

13  **Q.**    Okay.  You said that, a -- again I'm focusing on the word

14  "a" as you used it versus whatever else you may have meant --

15  "a reason for hardware was to promote software."  Do you

16  remember saying that?

17  **A.**    Yes.

18  **Q.**    And you emphasized "a reason."  Do you remember doing

19  that?

20  **A.**    I do.

21  **Q.**    Okay.  Were there other reasons for Autonomy to sell

22  hardware other than to promote future software sales?

23  **A.**    Yes.

24  **Q.**    What were the other reasons?

25  **A.**    For the revenue would be one main one.

1    **Q.**    Topline revenue in a particular quarter?

2    **A.**    Correct.

3    **Q.**    Okay.  Are you responsible for all of the sales of

4    hardware that had to do with topline revenue in a particular

5    quarter?

6    **A.**    Am I responsible for them?

7    **Q.**    Yes.

8    **A.**    No.

9    **Q.**    No.  Someone else is responsible?

10   **A.**    Mostly.  I did a couple deals that were contributing to

11   topline in hardware.

12   **Q.**    You did a couple of deals?

13   **A.**    Yes.

14   **Q.**    And you know what you know; correct?

15   **A.**    I know some I did.  I know some I pursued that didn't work

16   out.

17   **Q.**    In 2010 did you have any idea, Mr. Egan, that Autonomy

18   resold in excess of $100 million worth of hardware devoid of

19   software, simply resold a monitor like this (indicating), a

20   mouse, a hardware component that had no Autonomy software on

21   it?

22           **MR. KEKER:**  Object --

23   BY MR. REEVES:

24   **Q.**    Were you aware?

25           **MR. KEKER:**  -- to the form of the question as

1  argumentative, Your Honor.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  I was not.

4  **BY MR. REEVES:**

5  **Q.**  Are you in any way surprised at the scale of that number,

6  if it's true?

7  **A.**  I am.

8  **Q.**  Why are you surprised?

9  **A.**  Because it's a huge number.

10  **Q.**  What are the implications of that number?

11          **MR. KEKER:**  Objection, Your Honor.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  If we sold $100 million worth of

14  hardware in that year, it reinforces how much of the business

15  was software to me.

16  **BY MR. REEVES:**

17  **Q.**  What do you mean by that?

18  **A.**  Meaning I knew approximately how big the company was.  I

19  knew what the reported numbers were.

20  **Q.**  And if it was the case that Autonomy resold hardware

21  devoid of software from Autonomy in excess of $100 million,

22  does that change your basic understanding about Autonomy in any

23  way?

24  **A.**  If that revenue was recognized as topline revenue --

25  **Q.**  Yes.

1   **A.**    -- then it would change my understanding of the

2   composition of the company -- of the business, yes.

3   **Q.**    Okay.  In any dramatic way or sort of unexpected way?

4   **A.**    By a significant amount.  I think I would have thought

5   that number would be about 25.

6   **Q.**    25 max?

7   **A.**    Maybe 30, I don't know, but not 100.

8   **Q.**    Okay.  Thank you.

9        You were asked a lot of questions about your compensation.

10  Do you remember that?

11  **A.**    I was, yeah.

12  **Q.**    Okay.  Were you compensated in a bonus for any of the VAR

13  deals that had not yet sold to end users?

14  **A.**    Prior to their selling to an end user, no.

15  **Q.**    I need to create a bright line between a sale to a

16  value-added reseller at the close of the quarter in the way

17  you've described that allows Autonomy to recognize revenue on

18  the sale to the value-added reseller.  That's the scenario I'm

19  talking about.  I'm not talking about a subsequent sale and

20  sales process to the end user.  Is that clear?

21  **A.**    It is, but -- it is.  There are deals that were sold to

22  the reseller without yet being sold through.  There were also

23  deals sold to the reseller that had already sold through.  So

24  that portion could have been factored into my bonuses.

25  **Q.**    Let me clarify.  It will be deals that had not yet been

1   sold through to an end user.  Okay?

2   **A.**   Understood.

3   **Q.**   The suggestion has been made in the cross-examination in

4   certain questions that somehow you had a financial incentive,

5   you got money in some way, for some of the *quid pro quo* deals

6   involving the value-added resellers that you did and that

7   you've testified to working on.  Do you recall those questions?

8   **A.**   I do.

9   **Q.**   Okay.  Let me put it to you directly.  Were you getting

10  any additional compensation, any bonus -- let's leave aside

11  stock for the moment based on the performance of the company --

12  were you getting any kind of additional compensation if you

13  close a deal with MicroLink that has not yet sold through to

14  the end user?

15  **A.**   No.

16  **Q.**   Are you getting any additional bonus, bump, money, dough,

17  if you close a deal with MicroTech at the end of the quarter at

18  Sushovan Hussain's request that has not yet sold through to the

19  end user?

20  **A.**   No.

21  **Q.**   In fact, your compensation, when and if it comes, is

22  contingent on a sale to the end user, is it not?

23  **A.**   Yes.

24  **Q.**   And is this part of the concept that you described in your

25  direct examination about the hole, the sales hole, you were put

1  into as a result of these deals with the value-added resellers?

2  **A.**    It's related.

3  **Q.**    Okay.  Explain to us how it's related.

4  **A.**    As I stated, when you sold a deal to a reseller and took

5  the revenue in one period, say Q3, I would start Q4 with the

6  mission to do a good number in Q4 but also with the obligation

7  to close the deal that had not yet closed from Q3.

8      So my mental way of thinking about it visually is I'm

9  starting underground, like underwater, in a hole if you will,

10  and needing to try and make up for that in addition to perform

11  in the subsequent quarter.

12  **Q.**    And part of your motivation for working through a sale to

13  the end user in this underwater-hole scenario that you're

14  describing is that you have an opportunity to earn a commission

15  when there's finally -- a commission or a bonus, a performance

16  reward, when you close the sale to the end user?

17  **A.**    That is true, but I would say my bigger feeling of

18  motivation for closing deals from prior quarters was to make

19  good on the arrangement; like, the fact that the reseller had

20  gone at risk to take the deal was highly motivating to me to

21  try and make sure that worked out for them.

22  **Q.**    But do you have -- if Sushovan Hussain asked you to close

23  a deal with Dave Truitt on December 31st, do you have any

24  financial motive to do that where you're selling to a

25  value-added reseller and there's no sale yet to an end user?

1  Do you have any financial motive for doing that?

2  **A.**   Well, technically, yes.  You said setting aside the stock

3  performance?

4  **Q.**   I'm setting aside the stock.  We'll come to that.  Thank

5  you.

6  **A.**   I thought that was asked and I want to be complete and

7  100 percent honest.

8  **Q.**   Thank you for making that distinction.  Set aside stock.

9  We'll come to that in a second.

10  **A.**   Aside from stock, no.

11  **Q.**   No.  In fact, it creates problems in the manner you have

12  described, would you agree?

13  **A.**   Sometimes, yes.

14  **Q.**   All right.  Separately, yes, you have stock that is

15  dependent on the performance of Autonomy as a whole in the

16  stock market?

17  **A.**   Options which have the same effect as stock, yes.

18  **Q.**   Okay.  And its value will go up and down with Autonomy's

19  price?

20  **A.**   Correct.

21  **Q.**   Okay.  So who at Autonomy made the decisions about whether

22  you received a bonus or not?

23  **A.**   A combination of Mike and Sushovan.

24  **Q.**   All right.  You were paid well while you were at Autonomy,

25  were you not?

**A.**    I was paid extremely well.

**Q.**    Okay.  Did Mr. Hussain and Dr. Lynch pay you well because they appreciated the revenue that you were able to bring in through *quid pro quo* deals do you think?

**A.**    No.

**Q.**    Okay.

**A.**    I think they appreciated that.  I think they would not associate it with compensation.

**Q.**    Why would they not associate it with compensation?

**A.**    Because it would be -- it was an undesirable sort of second choice thing.  Anything to do with incentivizing me or directing me was to do with not needing to do that.  That was a last resort.

**Q.**    The value-added reseller deals that you've talked so much about were a last resort?

**A.**    Correct.

**Q.**    In order to do what?

**A.**    To hit a revenue number.

**Q.**    Hit topline revenue in a quarter?

**A.**    Correct.

**Q.**    Now, are you an accountant?

**A.**    I am not.

**Q.**    Were you -- Mr. Egan, at any point in your career at Autonomy, were you responsible for how these deals were treated on the company's books and records?

1   **A.**   I was not.

2   **Q.**   Who at Autonomy had that responsibility for what the

3   accounting treatment would be for these deals that you've

4   described in some detail in your testimony?  Who was

5   responsible for that?

6   **A.**   Sushovan and the committee that did that.

7   **Q.**   Did you understand exactly how Mr. Hussain treated the

8   deals that you worked on with him on Autonomy's books and

9   records?

10  **A.**   I had a general understanding, yeah.

11  **Q.**   Of when something would be recognized or not recognized?

12  **A.**   I more had an understanding of whether it was eligible to

13  be recognized.

14  **Q.**   Okay.  But did you in any way know, as was suggested in

15  the cross-examination, exactly which deal got credited or

16  recognized in which way?

17  **A.**   No.

18  **Q.**   Whose job was that?

19  **A.**   Sushovan's.

20  **Q.**   It rolled up to Mr. Hussain and his responsibility was the

21  financial -- the preparation of the financial statements?

22  **A.**   I believe so, yes.

23  **Q.**   Was that ever your work to do?

24  **A.**   No.

25  **Q.**   Were you ever in a position to check if Mr. Hussain did,

1  in fact, account for the deals that you worked on with him

2  properly?

3  **A.**    No.

4  **Q.**    Do you know exactly what Mr. Hussain did and did not tell

5  Autonomy's outside auditors about the deals that you worked on

6  with him?

7  **A.**    No.

8  **Q.**    Okay.  In March 2009, at or around the time that you

9  worked on the deal and transaction involving Capax EDD, were

10  you following the rules that Autonomy had with regard to

11  deal-related transactions when you made an oral promise to

12  Capax to underwrite their license payments?  Were you following

13  Autonomy's rules?

14  **A.**    No.

15  **Q.**    Okay.  Did you get permission from anyone in any way to

16  deviate or not follow Autonomy's rules?

17  **A.**    Yes, but it was not that.

18  **Q.**    Excuse me?

19  **A.**    Yes, but it wasn't phrased that way.

20  **Q.**    From whom did you get permission -- we'll come to how it

21  was phrased in a minute.

22      From whom did you get permission to violate or deviate

23  from Autonomy's revenue recognition rules?

24  **A.**    Sushovan.

25  **Q.**    How was it phrased by Mr. Hussain?

1    **A.**    It wasn't phrased to deviate.  It was simply counseled

2    that the way we would do the reciprocal side of the deal for

3    Capax would be a monthly at-will fee for EDD services, and that

4    would be not documented.  And it was important that it be at

5    will -- in other words, we could stop doing it at any point we

6    wanted to -- and it would be monthly.

7    **Q.**    Did you take that direction and execute on that basis, so

8    to speak?

9    **A.**    I did.

10   **Q.**    Okay.  And did you let Mr. Hussain decide how this deal

11   would be accounted for in Autonomy's books and records?

12   **A.**    I did.

13   **Q.**    In or around March 2010, were you in any way following the

14   rules for revenue recognition at Autonomy when you made an oral

15   promise to FileTek to buy even more StorHouse at some point

16   after the quarter had closed in order to facilitate their

17   ability to pay for the license?

18   **A.**    I was not.

19   **Q.**    Okay.  Did you get permission from anyone within Autonomy

20   in order to violate or deviate those revenue recognition rules

21   at Autonomy?

22   **A.**    Again, less permission, more direction.

23   **Q.**    From whom did you get direction?

24   **A.**    From Sushovan.

25   **Q.**    And did you let Mr. Hussain decide, independent of you,

1  how to account for that FileTek transaction in March 2010?

2  **A.**   I didn't let him do anything, no.  That's not the right --

3  that's not the correct characterization.

4  **Q.**   What would be the correct characterization?  He did it?

5  **A.**   I didn't have anything to do with that.

6  **Q.**   You didn't have anything to do with that?

7  **A.**   No.

8  **Q.**   Who did have anything to do with that?

9  **A.**   I believe Sushovan does all of the accounting.

10                    (Pause in proceedings.)

11            **THE COURT:**  Anything further?

12                    (Pause in proceedings.)

13            **MR. REEVES:**  Thank you, Your Honor.  One more topic.

14  Thank you.  It won't take very long.

15  **Q.**   You were asked some questions about the B of A deal.  Do

16  you remember that?

17  **A.**   I do.

18  **Q.**   And in or around late January 2011, were you involved in a

19  so-called reapportioning of the B of A deal?

20  **A.**   Yes.

21  **Q.**   Okay.  What was being reapportioned?  What do you mean by

22  that?

23  **A.**   I was involved in taking the B of A deal in through a

24  reseller and then apportioning the whole of it out to the

25  reseller group who had taken portions of it at risk earlier.

1    Q.    So now you have a very big deal?  We went through the

2    dollars before.  It was roughly a $20 million deal, one of your

3    biggest.  Do you recall?

4    A.    Correct.  There was about $21 million to distribute.

5    Q.    $21 million.  And you're reapportioning it to the

6    resellers in or around late January 2011?

7    A.    That's correct.

8    Q.    Okay.  And for what purpose are you reapportioning it to

9    the resellers?  Why are you doing that?

10   A.    A big reason is so that B of A didn't have to do it.  In

11   other words, I couldn't go to B of A and say, "Could you please

12   divide your purchase up amongst these players?"

13   Q.    All right.  And if we could, please, display what's been

14   marked -- or received in evidence as Exhibit 1488.  This is the

15   $3.65 million contract on or around January 25th, 2011.

16        Do you remember your testimony about this?

17   A.    I do.

18   Q.    All right.  Now, at the time that -- did you view --

19   withdrawn.

20        Did you view this process relating to this contract as

21   part of this reapportionment of B of A as you've described it?

22   A.    I did.

23   Q.    And how does this fit into your understanding of the

24   reapportionment of the B of A deal?

25   A.    The whole deal was coming in from B of A to MicroTech, and

1    MicroTech was going to give Discover Tech 3.6 plus 7, so

2    10-point something plus the margin on that; another 9-point

3    something was going to Capax, which was a bit complicated in

4    that it replaced Amgen at the same time, or relatively

5    approximately at the same time plus a margin.

6         And --

7    **Q.**   And -- were you finished?  Go ahead.

8    **A.**   And then I believe MicroTech kept a margin, a small

9    margin, for doing that.

10   **Q.**   Are you making certain that now all the pieces of the deal

11   account for the deal as a whole in a sense?

12   **A.**   Correct.

13   **Q.**   All right.  Is that a complex process?

14   **A.**   Yes.

15   **Q.**   Did it require a lot of phone calls?

16   **A.**   It did.

17   **Q.**   Did you speak to Mr. Hussain about that process?

18   **A.**   I did.

19   **Q.**   In any detail or at any length?

20   **A.**   Absolutely, yeah.

21   **Q.**   On multiple occasions?

22   **A.**   Yes.

23   **Q.**   In this time period around January 25th, 2011, are you

24   talking to him a great deal about this process?

25   **A.**   I believe so.

1    Q.    All right.  Now, if we could go to the next page, to the

2    contract.  Great.

3        Did you view this contract as any type of mistake that

4    you'd made?

5    A.    This is the 3.6?

6    Q.    Yes, the 3.6.

7    A.    No.

8    Q.    No.  And you've used the word "effective date."  Do you

9    remember that?

10   A.    I do.

11   Q.    What did you mean by an "effective date"?

12   A.    A date in which an agreement is in effect.  So if it's a

13   service arrangement or something with rights, they would be in

14   effect on that date or from that date.

15   Q.    So parties today can agree that an agreement that we make

16   today is effective a week ago if they choose to do that; is

17   that correct?

18   A.    Yes.

19   Q.    Is that what you mean by an effective date?

20   A.    That's an example of how an effective date could be used,

21   yes.

22   Q.    And why would you want to have an effective date for

23   B of A in this manner?

24   A.    Why would we want to have an effective date that predated

25   doing the agreement?

EGAN - REDIRECT / REEVES

1  Q.    Yeah.

2  A.    I don't know.

3  Q.    At whose direction were you following with regard to the

4  dating of this particular part of the reapportionment?

5  A.    Sushovan's.

6  Q.    Okay.  And did you completely understand why he wanted it

7  that way?

8  A.    No.  I don't remember.

9  Q.    Let's go back out to the e-mail, please.

10      On January 25th, 2011, how many days after the close of

11  Autonomy's year-end 2010 is January 25th?

12  A.    25.

13  Q.    25 days.  Did you have any reason to think that this

14  document that was agreed to in the manner you've described in

15  or around January 25th, 2011, would somehow be used to support

16  revenue for the prior quarter ending December 31, 2010?

17  A.    I did not think that.

18  Q.    Did you even think that was possible to do three weeks

19  later?

20  A.    I would not have thought that.

21  Q.    Okay.

22                      (Pause in proceedings.)

23  BY MR. REEVES:

24  Q.    Last question.  Prior to January 25th, 2011, at the time

25  that you're working on this contract, do you believe

EGAN - RECROSS / KEKER

1   Discover Tech had agreed to this deal in any way?

2   **A.**   I don't know.

3   **Q.**   Okay.

4        **THE COURT:**  Thank you.

5        Okay.  Mr. Keker, anything further?

6        **MR. KEKER:**  A few.  Short, I promise.

7                    <u>**RECROSS-EXAMINATION**</u>

8   BY MR. KEKER:

9   **Q.**   Why did you scan and send that Hyson thing back to -- why

10  did you ask him to scan it and run it through your system to

11  avoid having it dated properly?

12  **A.**   Which one are we talking about?  This same one?

13  **Q.**   The 3.675 we just looked at.

14  **A.**   Because I was asked to get it as is, meaning the document

15  itself dated and without time stamp -- different time stamps on

16  it.

17  **Q.**   And with respect to your financial motivations you were

18  asked about, I think you said yesterday that you made

19  $16 million on your options?

20  **A.**   I think you said that.  I think that sounds about right.

21  I've never actually added it.

22  **Q.**   And they were quite important to you, weren't they?

23  **A.**   They were, yeah.

24  **Q.**   And to the wealth of your family and so on?

25  **A.**   Yes.

1  Q.   Okay.  Exhibit 50 was shown to you.  We don't need to put

2  it up again.  But that's the one 16 days after the Capax EDD

3  thing, and Sushovan is saying, "I don't know why this is so

4  complicated, you know, to do a PO for EDD processing."

5       The deal was that they were -- that Capax was going to set

6  up the ability to do EDD processing itself; right?

7  A.   That was the deal.  That was the intent of the deal, yeah.

8  Q.   And sometime in the future, once they were set up, they

9  would be able to handle overflow, which was anticipated; right?

10 A.   Correct.

11 Q.   So that Autonomy would not get into a problem with

12 eDiscovery customers where they couldn't handle the great

13 volume of documents which people wanted yesterday; right?

14 A.   That's correct.

15 Q.   Okay.  So you enter into the deal, you sell them the

16 software, and they are going to have expenses, fairly

17 substantial expenses, to get up and running, people trained,

18 and so on, aren't they?

19 A.   They are.

20 Q.   And Sushovan knew that, you knew that, Mr. Baiocco knew

21 that; right?

22 A.   Correct.

23 Q.   So he said, "I need money," you keep talking about as a

24 retainer, "but I need to get paid so I can get my people set up

25 and get this platform up and running."

1  **A.**   Is that a question?  I'm not sure how to answer.

2  **Q.**   Well, I mean, isn't that what the money was for, to get

3  the platform up and running?

4  **A.**   Yes.

5  **Q.**   Okay.  And then eventually he said, "How about helping us

6  pay for the hardware?"  And in the summer they -- Autonomy paid

7  for hardware and everybody knew that?

8  **A.**   We did.

9  **Q.**   Right.  And everybody knew that you were prepaying them

10 for what they were going to be doing in the future while they

11 were setting it up?

12 **A.**   I wouldn't say everybody knew that, no.

13 **Q.**   Okay.  Well, Mr. -- that's what Mr. Hussain thought --

14 right? -- that you were prepaying him, you were getting them

15 hardware, they were getting themselves set up, they were using

16 the money to set themselves up, and then they would be

17 available for capacity?

18 **A.**   What I knew and what Sushovan knew -- and I wouldn't want

19 to use the term "everybody" because it was a small group of

20 people, but we knew we were paying them a retainer monthly to

21 fund -- I used the term "underwrite -- their investment in EDD.

22 **Q.**   Okay.  They wanted to get into eDiscovery.  It was going

23 to cost them money to get into it.  You were going to help them

24 get into it and then have them available for overcapacity?

25 **A.**   That's correct.

**EGAN - RECROSS / KEKER**

1  Q.   That was the reason behind this agreement?

2  A.   Plus get the revenue, yeah.

3  Q.   It wasn't an agreement to pay them money to be able to pay

4  for their license?  It was an agreement to give them money to

5  get them set up as a retainer, and then they were going to do

6  EDD processing; right?

7  A.   It depends on how they used their dollars, but it was an

8  agreement to underwrite at least the software portion of the

9  investment.  We then later also agreed to pay for the hardware

10  as you know.

11  Q.   Well, certainly people -- everybody at Autonomy knew that

12  if they didn't get the hardware until the summer, they didn't

13  have the platform right then; right?

14  A.   Again, not everybody even knew this deal existed.

15  Q.   Okay.  But in the meantime, people were -- Capax people

16  were going and doing eDiscovery work in Boston at

17  Mr. Sullivan's center; right?

18  A.   They were -- what -- I'm aware of Capax people coming and

19  training in Boston, yes.

20  Q.   And they were getting paid for coming and training?

21  A.   I don't know about that.

22  Q.   A couple of questions about hardware and then I'm done, I

23  promise.

24       The hardware that was sold, even when it was sold devoid

25  of software, it was being sold to banks; right?

**EGAN - RECROSS / KEKER**

1    **A.**    Some was that I'm aware of.

2    **Q.**    It was being sold to customers of Autonomy's software?

3    **A.**    I don't know.  I'm clearly not aware of all hardware

4    sales, but --

5    **Q.**    But you were aware of a lot of them because you signed the

6    purchase orders; right?

7    **A.**    I'm aware of many of them, yeah.

8    **Q.**    And the ones that you signed purchase orders for were

9    hardware that was being offered to banks and other customers of

10   Autonomy software?

11   **A.**    I don't know.  I've -- I signed things at times when I

12   would get back to the office that people would put in front of

13   me that were contracts that needed countersignature.  I didn't

14   review every contract, so I can't answer that 100 percent.

15   **Q.**    Okay.  But you said starting back in the very first

16   interview with Hewlett Packard's lawyers, the goal was to sell

17   hardware with Autonomy software?

18   **A.**    Yes.

19   **Q.**    Right.

20   **A.**    And to be -- I think to answer the point of your question,

21   most all of the hardware sales I knew about were to existing

22   customers, heavily financial services.

23   **Q.**    Okay.  And the motivation was, "Let's give them a good

24   deal on hardware and they'll buy more software"?

25   **A.**    Correct.

1          **MR. KEKER:**  Thank you.  Nothing further, Your Honor.

2          **MR. REEVES:**  Nothing further.

3          **THE COURT:**  Thank you.  You're excused.

4                          (Witness excused.)

5          **THE COURT:**  Okay, ladies and gentlemen, we're going to

6     take a recess now.  We'll be in recess until 3:00 o'clock.

7        Remember the admonition given to you:  Don't discuss the

8     case, allow anyone to discuss it with you, form or express any

9     opinion.

10         **MR. KEKER:**  Your Honor, could we take up one matter?

11         **THE COURT:**  All right.  Go ahead, ladies and

12    gentlemen.  You're excused.  Go ahead.  You're excused and I'm

13    not.

14       (Proceedings were heard out of the presence of the jury:)

15         **MR. KEKER:**  I just wanted to get something about this

16    Deferred Prosecution Agreement on the record.

17       2525, which is their version, was never admitted.  The one

18    that was admitted yesterday, 6161, that we were arguing

19    about -- so I don't care if it's 2525 or 6161, but I want to

20    make sure that whatever is admitted doesn't have Attachments A

21    and B, which they agreed to yesterday.

22         **THE COURT:**  Right.

23         **MR. REEVES:**  We'll figure that out.

24         **MR. KEKER:**  Thank you.

25                     (Recess taken at 2:45 p.m.)

1          (Proceedings resumed at 3:05 p.m.)

2      (Proceedings were heard in the presence of the jury:)

3          THE COURT:  Let the record show that all jurors are

4  all present; parties are all present.

5      You may proceed.

6          MR. REEVES:  Thank you, Your Honor.  At this time the

7  United States calls Mr. Bill Loomis.

8                      **WILLIAM LOOMIS**,

9  called as a witness for the Government, having been duly sworn,

10 testified as follows:

11         THE CLERK:  Please be seated.  Please state your full

12 name for the record and spell your last name.

13         THE WITNESS:  William -- I go by Bill -- P as in

14 "Peter, Loomis, L-O-O-M-I-S.

15         MR. REEVES:  May I inquire?

16                    **DIRECT EXAMINATION**

17 BY MR. REEVES:

18 Q.   Good afternoon, Mr. Loomis.  Where do you live, sir?

19 A.   Silver Spring, Maryland.

20 Q.   What's you educational background, please?

21 A.   Received an undergraduate degree from the University of

22 Maryland in business administration, major in accounting, and

23 received an MBA from Virginia Tech.

24 Q.   What was your career after you finished school?

25 A.   After undergraduate, I went to work for a public

1  accounting firm.  Worked there from 1976 to 1979.  And from

2  there, I was hired from a client and I went to work for a

3  company called Sentenial.  As I mentioned previously, a client,

4  Sentenial.  That was 1979.  And then after that, in 1987 I

5  transferred to a related company called FileTek.

6  Q.  And how long did you work for FileTek?

7  A.  I started in 1987 until we sold the company in 2013.

8  Q.  2013.  What does FileTek do?

9  A.  FileTek had two products.  The first was called StorHouse,

10  which was a storage virtualization data management product,

11  primarily software in later years.  It also had a product

12  called Trusted Edge, which was for remediation and data

13  classification.

14  Q.  And in the time period 2008 to 2011, what was your

15  position at FileTek?

16  A.  My position was a dual of CEO and CFO, chief executive

17  officer and chief financial officer.

18  Q.  Sounds like a lot of work.

19  A.  It was.

20  Q.  All right.  In that time period, 2008-2011, how big a

21  company was FileTek?

22  A.  In 2008, I believe it was approximately 15 million.  We

23  then spun out part of the company, and as a result of that

24  spinout, we were along the lines of 7 to 8 million per year of

25  revenue.

1   Q.   Are you familiar with a person known as Mr. Gary

2   Szukalski?

3   A.   Yes.

4   Q.   How do you know Mr. Gary Szukalski?

5   A.   Gary started working for FileTek in 1986, originally in

6   the technical area.  He then, over the years, moved to sales

7   and marking, and he was lastly in his first day at FileTek

8   vice-president of sales until he left in the year 2000.

9        In January 2009, I hired him as chief operating officer

10  and chief marketing officer.  Chief marketing officer and chief

11  operating officer.

12  Q.   Are you familiar with a company known as Autonomy?

13  A.   Yes.

14  Q.   And in the time period 2008 to 2011, how did you --

15  withdrawn.

16       What was your interactions with Autonomy?

17  A.   Originally it started with our technical area of the

18  company that they had selected Autonomy to be an integral part

19  of our product Trusted Edge.  We had an OEM agreement with some

20  prepaid licenses and development -- some development software

21  that our technical people were working with.  And that's how --

22  that's how it first started.

23  Q.   Okay.  Thereafter, did you have other business dealings

24  between FileTek and Autonomy?

25  A.   Yes.

1  **Q.**  Let's go into some of those.  Let me show you what has

2  been marked for identification as Exhibit 615, pages 3 through

3  7.  That should be in the set of exhibits you have there.  615,

4  pages 3 through 7.

5       Is this a contract or first amendment to Autonomy OEM

6  agreement that was executed between Autonomy and FileTek on or

7  about December 31, 2009?

8  **A.**  Yes.

9       **MR. REEVES:**  At this time I offer it into evidence,

10 please, Your Honor.

11      **THE COURT:**  Admitted.

12      (Plaintiff's Exhibit 615 received in evidence)

13      **MR. REEVES:**  If we could highlight the date and the

14 dollar amount.  The date is up here.  Excellent.  The dollar

15 amount is in the middle of the first paragraph.  It's a bigger

16 dollar amount up here.  Thank you so much.

17 **Q.**  All right.  Are you familiar with this contract,

18 Mr. Loomis?

19 **A.**  Yes.

20 **Q.**  Did you, on behalf of FileTek, help negotiate it?

21 **A.**  I wasn't a significant part of the negotiation, but I was

22 involved with it, yes.

23 **Q.**  Well, why don't you tell us what you did with regard to

24 this transaction in late December 2009 with Autonomy.  Go

25 ahead.

1  A.   It was originally proposed by Autonomy.   The background of

2  it was that we were looking to solve our next set of issues

3  with our Trusted Edge product.   We were starting to run out of

4  our prepaid license agreement, which we had done previous to

5  this agreement, and we were in search of a replacement.

6       We were concerned that the Autonomy software was going to

7  be too expensive for our product and our marketplace and so we

8  were looking into other alternatives, and this was proposed to

9  us as a part of a, say, barter transaction, if you may, as a

10 way that would address our needs, our market requirements.

11 Q.   How was this deal part of a barter transaction?   What do

12 you mean?

13 A.   It was proposed to Gary Szukalski by Autonomy as a result

14 of, I think, Autonomy knew we were searching for what to do

15 next to solve our technical requirements in this area.   And

16 that they may or may not have known that we were concerned

17 about the economic structure and that we were looking at other

18 alternatives as a result of that, including freeware and

19 shareware.

20      So it was proposed to Gary Szukalski on this part to solve

21 our Trusted Edge problem, and at the same time, Gary had been

22 promoting our StorHouse product to Autonomy for purposes of its

23 customers because they had a lot of data and they showed

24 interest in procuring StorHouse for some other customers as

25 part of what I'm calling a barter transaction.

1  **Q.**   Okay.  So are there two pieces to this barter transaction?

2  **A.**   Yeah.  The Trusted Edge procurement on the one side and

3  the sale of StorHouse on the other side.

4  **Q.**   Okay.  So is FileTek buying software from Autonomy on one

5  side and also simultaneously selling StorHouse software to

6  Autonomy?

7  **A.**   Yes.

8  **Q.**   What is a barter --

9  **A.**   Licensing as opposed to selling, but yes.

10  **Q.**   Licensing.  Thank you.

11      What is a barter transaction?  What does that term mean,

12  as you use it?

13  **A.**   The term I'm getting really from certain accounting

14  literature.  It's when really there is a two-sided transaction

15  which occurs from time to time in the marketplace, and the

16  accounting literature addresses, you know, how to account for a

17  barter transaction.  You know, when there's a barter, meaning,

18  you know, there's -- the supplier is also a -- a purchaser on

19  both sides.

20  **Q.**   And there are accounting rules around that concept of

21  barter transaction, are there not?

22  **A.**   There is certain guidance under United States

23  generally-accepted accounting principles, yes.

24  **Q.**   All right.  And with whom were you working, if you know --

25  withdrawn.

1          With whom at Autonomy was Mr. Szukalski or yourself

2    working to work through the details of this barter transaction?

3    A.    I don't know who Gary originally was talking with.    My

4    primary contact with -- was Stouffer Egan.    And Gary would also

5    often talk to Stouffer Egan, as well as, I believe, some

6    others.

7    Q.    Let me show you what has been marked for identification as

8    Exhibit 615, page 25 to 41.    Again, Exhibit 615, page 25 to --

9    I'm sorry -- 42 is the final page.

10         Is this the second piece of the barter transaction, the

11   sale of the StorHouse software by FileTek to Autonomy on or

12   around December 31, 2009?

13   A.    Yes.

14         MR. REEVES:    At this time, I offer that in evidence.

15         THE COURT:    615?

16         MR. REEVES:    615, pages 25 --

17         THE COURT:    615 is in evidence.

18         MR. REEVES:    Okay.    I think --

19         MR. KEKER:    That's fine.

20         MR. REEVES:    Thank you, Your Honor.

21   Q.    So this StorHouse sale or licensing deal was part of the

22   barter transaction that you worked out in this time period with

23   Autonomy, was it not?

24   A.    It was.

25   Q.    All right.    Let me show you, if I could, please, Exhibit

LOOMIS - DIRECT / REEVES

1    436.  Is this the FileTek invoice to Autonomy for the amount

2    associated with a licensing of the StorHouse software?

3    **A.**  436 -- if these are in order --

4    **Q.**  436.

5    **A.**  I can't find 436.

6           **THE COURT:**  Admitted.

7           (Trial Exhibit 436 received in evidence)

8           **MR. REEVES:**  Thank you, Your Honor.  With the Court's

9    permission, we can use the screen, Mr. Loomis, if that's okay

10   for you.

11   **Q.**  Do you recognize this document?

12   **A.**  It's an invoice from FileTek to Autonomy.

13   **Q.**  Okay.  For the sale or licensing of the StorHouse software

14   that we've been talking about?

15   **A.**  Yes.

16   **Q.**  What was the amount of the license at the very bottom?  If

17   we go to the bottom of the document, what's the total amount of

18   the deal?

19   **A.**  10,367,280.

20   **Q.**  So that's the amount that you are selling or licensing to

21   Autonomy; is that correct?

22   **A.**  Yes.  And includes maintenance.

23   **Q.**  Thank you.

24         What was the approximate amount of the purchase by FileTek

25   of the Autonomy software?

1    **A.**    It was somewhere approximately 8 to 9 million.

2    **Q.**    Okay.  Was there a differential between who made more

3    money on these -- this barter transaction?

4    **A.**    Yes.

5    **Q.**    And who made more money?

6    **A.**    We had net cash flow, positive.  FileTek.

7    **Q.**    Is that another way of saying you made some money on this

8    deal?

9    **A.**    Yes.

10    **Q.**    Okay.  Good.

11          Roughly how much?

12    **A.**    It was roughly 2 million.

13    **Q.**    Okay.  And in your negotiations with Autonomy, did you

14    talk about this differential or this spread as part of your

15    negotiation?

16    **A.**    I believe that was initially part of the discussions with

17    Gary Szukalski, yes.

18    **Q.**    I would like to show you what has been marked for

19    identification as Exhibit 401.  Do you have that document

20    before you?

21    **A.**    401.

22    **Q.**    Is this an email from you, Mr. Loomis, within FileTek to

23    others within FileTek about the deal relating to Autonomy?

24    **A.**    Yes.

25          **MR. REEVES:**  I offer it in evidence, please.

```
 1            THE COURT:  Admitted.

 2       (Trial Exhibit 401 received in evidence)

 3  BY MR. REEVES:

 4  Q.   And if we could, please, just highlight the first deal

 5  point here.  Are you comfortable using the monitor, Mr. Loomis?

 6  A.   Yes.

 7  Q.   Would you please explain what this document is, as you

 8  recall it?

 9  A.   This was my first reading of some of the paperwork, and I

10  was just summarizing kind of the high-level points on an email

11  to Howard Patrick, Gary Szukalski, Mark Seamans:  Howard being

12  our in-house contracts person; Gary we've talked about; and

13  Mark being the chief technical officer.

14  Q.   You write, "As I understand the initial conversation Gary

15  had with Stouffer, the spread was to be $2 million."

16       Is that a reference to the spread or profit that you just

17  described a moment ago?

18  A.   Yes.

19  Q.   All right.  Thank you.  I'm done with that.

20       I would like to show you what has been marked as Exhibit

21  434 for identification.  Is this an email, Mr. Loomis, again to

22  Mr. Szukalski and others within FileTek on or about

23  December 31, 2009 describing the transaction with Autonomy?

24  A.   Yes.

25            THE COURT:  Admitted.
```

1          **MR. REEVES:**  Thank you, Your Honor.

2          (Trial Exhibit 434 received in evidence)

3      **BY MR. REEVES:**

4      **Q.**    Are you familiar with this email, Mr. Loomis?  Do you

5      remember it?

6      **A.**    Yes, generally.

7      **Q.**    Okay.  Point No. 3 here says, "Confirm there's no way of

8      being burned."  Do you see that?

9      **A.**    Yes.

10     **Q.**    What did you mean by that?

11     **A.**    Well, my concern, given this was a barter transaction, I

12     was viewing it as a barter transaction, that we would not have

13     a situation where we were obligated to pay 8 or $9 million and

14     all of a sudden there was a cancellation of the StorHouse side

15     of the barter transaction.

16     **Q.**    Okay.  How dependent were you on the StorHouse side of the

17     transaction to go forward with the purchase of the Autonomy

18     software?

19     **A.**    We were dependent on it.

20     **Q.**    Okay.  And for FileTek, given its size, how big a

21     transaction would you say this was for FileTek in this time

22     period in terms of size and risk and things of that nature?

23     **A.**    It was large.

24     **Q.**    Okay.  Were you concerned about the risk that might be

25     associated with a large deal like this?

1   **A.**   If -- if we didn't have the other side, yes.

2   **Q.**   If you didn't have the other side, would that create

3   problems and difficulties for FileTek in terms of payment of

4   the license fees for your purchase of the Autonomy software?

5   **A.**   It would have been challenging.

6   **Q.**   When you say "challenging," what do you mean?   How

7   challenging?

8   **A.**   Well, we were always dependent on revenue forecasts, and

9   revenue forecasts, by their nature, have a large degree of

10   uncertainty, and so the question would be would a revenue come

11   in to pay for it.

12       We only had so much money in our account.   You know, we

13   did -- could have gone to the bank to borrow, but, again, if

14   all of a sudden our sales were going to start decreasing, that

15   would have put stress on the business.

16   **Q.**   Would you have done the deal if FileTek had not been able

17   to sell the software to Autonomy?

18   **A.**   I would not have done the deal at this price, no.

19   **Q.**   Okay.   When you say "at this price," what do you mean?

20   **A.**   Very interested in what the deal was providing for us.   It

21   was solving a technical requirement that we had, so I was very

22   interested in the deal, but it was early stage in the marketing

23   aspect of marketing the Trusted Edge product.   A lot of

24   uncertainty in the revenue projections, and so it was -- would

25   have been too risky to do for that amount of money at that

LOOMIS - DIRECT / REEVES

1    stage of the company.

2    Q.    Okay.  Was this, the price of this deal, unusually high in

3    any way for FileTek in these days?

4    A.    Yes.

5    Q.    In what sense was the price at which you're selling the

6    StorHouse software unusually high?

7    A.    Oh, I'm sorry.  The StorHouse software.  It was high -- we

8    had done large deals in the past, a number of large deals.  In

9    more recent times, in this time frame, the large deals were

10   getting not as large as they used to be, so this would have

11   been our largest deal during this time frame.

12   Q.    Okay.  And what, if anything, do you know about how the

13   price was negotiated for these two barter transactions?

14   A.    Well, the price on the StorHouse side, we were priced

15   based on the amount of data that we managed, price per

16   terabyte, and we also priced it differently for we had two

17   different products, so to speak, utilizing the same core

18   technology.  One was called StorHouse RM; one was called

19   StorHouse RFS.  They each had their own price per terabyte.

20        So we were trying to get to a certain price point.  And

21   then the other variables were what the price was per terabyte

22   and how many terabytes were licensed and the mix between the

23   two products.

24   Q.    Okay.  Did you wind up getting burned on this deal?

25   A.    No.

1    **Q.**   All right.  Let's move forward, if we could, please, to

2    the next quarter, to in or around March 2010.  At or around

3    that time, did you negotiate into another type of transaction

4    with Autonomy?

5    **A.**   In approximately that time, yes.

6    **Q.**   All right.  I'd like to show you what has been marked for

7    identification as Exhibit 694, please.  This is a March 31,

8    2010 second amendment to Autonomy OEM agreement between

9    Autonomy and FileTek in the amount of 8 million --

10   $8.5 million.

11              **THE COURT:**  Admitted.

12              **MR. REEVES:**  Thank you, Your Honor.

13        (Trial Exhibit 694 received in evidence)

14   **BY MR. REEVES:**

15   **Q.**   Okay.  If we could, again, highlight the date and the

16   dollar value.

17        Are you familiar with this contract, Mr. Loomis?

18   **A.**   Yes.

19   **Q.**   What is this contract?

20   **A.**   This was a second amendment to our OEM agreement providing

21   additional technical capability, which I'm not as familiar with

22   as far as what it was precisely, but during our development

23   efforts, integration efforts, if you may, we had identified

24   additional requirements, and so this was adding additional

25   functionality potentially, and I don't recall if it added

1  perhaps a little longer of a period and maybe some more

2  development software, but I don't recall the specifics.

3  **Q.**   And was this another barter transaction?

4  **A.**   Yes.

5  **Q.**   And what was the other piece of the equation, as you

6  recall?

7  **A.**   Similarly, we would be selling more StorHouse.

8  **Q.**   And is that what happened, to the best of your knowledge?

9  **A.**   Yes.

10 **Q.**   All right.  And in or around this time period, with whom

11 were you negotiating this second barter transaction in March

12 2010?

13 **A.**   As best as I can recall, it was primarily Stouffer Egan,

14 and in then our contracts person may have had a different

15 person he was dealing with, and I think Gary often would talk

16 to Stouffer Egan.

17 **Q.**   Okay.  Let me show you what has been marked for

18 identification as Exhibit 667, please.  This is an email from

19 you, Mr. Loomis, on March 31, 2010, to Mr. Szukalski, subject

20 "Autonomy FileTek StorHouse price list and transaction."

21         **THE COURT:**  Admitted.

22         **MR. REEVES:**  Thank you, Your Honor.

23     (Trial Exhibit 667 received in evidence)

24 BY MR. REEVES:

25 **Q.**   And are you familiar with this email, Mr. Loomis?

1   **A.**   Yes.

2   **Q.**   All right.  So you're writing to your colleague,

3   Mr. Szukalski, at the end of the quarter, March 31, 2010, are

4   you not?

5   **A.**   Yes.

6   **Q.**   And what is this set of comments that you have listed

7   here?  Does this relate to the barter transaction in late

8   March, 2010?

9   **A.**   Yes.

10  **Q.**   Okay.  Let's talk about point No. 2.  Point No. 2.  "Does

11  not want quote today."  What does that mean?

12  **A.**   Autonomy asked that we not provide the quote at that time.

13  **Q.**   As you used the word "quote" there, what do you mean?

14  **A.**   Proposal that includes details like the number of

15  terabytes, RFS versus the RM mix -- product mix, the dollar

16  amount.

17  **Q.**   A quote of the proposed sale of StorHouse to Autonomy in

18  this time period?

19  **A.**   Yes.

20  **Q.**   All right.  And did you have an understanding why Autonomy

21  did not want the quote today, at this point in time?

22            **MR. KEKER:**  Objection.  No foundation.

23            **MR. REEVES:**  If he has an understanding --

24  **Q.**   Well, based on discussions with Mr. Egan and your contacts

25  with anymore at Autonomy, did you have an understanding as to

1  why Autonomy did not want a quote today?

2  **A.**    He basically said he did not want the quote today.

3  **Q.**    So is that the way it worked?

4  **A.**    Correct.

5  **Q.**    You did not give him a quote?

6  **A.**    No.

7  **Q.**    Did you talk in this time period -- even if you didn't

8  give them a quote or a formal proposal, did you talk about the

9  scale or size or type of sale by FileTek of StorHouse to

10  Autonomy in conjunction with this barter transaction?

11  **A.**    In very general terms.

12  **Q.**    What was your understanding of that proposed sale?

13  **A.**    The proposed sale would be in a dollar amount that was in

14  excess of the dollar amount that was in the second amendment to

15  the OEM agreement.

16  **Q.**    Okay.  And, again, that would be profitable to FileTek in

17  the manner you described for the deal in the preceding quarter?

18  **A.**    Netting the two out, yes.

19  **Q.**    All right.

20       I'd like to show you, please, what has been marked for

21  identification as Exhibit 668.  This is an email from

22  Mr. Loomis to Mr. Szukalski, subject "Autonomy," dated March

23  31, 2010.

24           **THE COURT:**  Admitted.

25           **MR. REEVES:**  Thank you, Your Honor.

1          (Trial Exhibit 668 received in evidence)

2     BY MR. REEVES:

3     Q.   And in this email, Mr. Loomis, it looks like you're --

4     let's talk about point No. 1 -- withdrawn.

5          There's a reference here, "telecon with S904P."  Do you

6     see that?

7     A.   Yes.

8     Q.   Do you have an understanding of what that refers to?

9     A.   It's my shorthand for telecon or telephone conversation

10    with S being Stouffer at 9:04 p.m.

11    Q.   Is that when you were discussing and negotiating this

12    barter transaction in this time period?

13    A.   From this email, yes.

14    Q.   You write in point No. 1, "they will ask for quotes in

15    about a week."  What does that mean?

16    A.   Stouffer would have said they will ask for quotes in about

17    a week for the StorHouse side.

18    Q.   That would be sometime in April 2010?

19    A.   Yes.

20    Q.   And No. 2 quotes "S/B 10-20 percent higher than target."

21    What does that mean?

22    A.   S/B abbreviating for "should be" and that Stouffer was

23    basically coaching us that some procurement people might be

24    trying to drive the price lower than what we proposed because

25    that's what procurement people do, and he was coaching us to

1    propose something higher than what we would ultimately want to

2    come away with.

3    **Q.**    Okay.  And No. 7 addresses sort of how much higher where

4    you might wind up, does it not?

5    **A.**    Yes.

6    **Q.**    Okay.  What do you mean by No. 7, "new target is 11.5M."

7    What does that mean?

8    **A.**    That would have been the target after, I guess, the 15 to

9    20 percent increase for the price of a StorHouse transaction.

10   11.5 was dollars.  M was abbreviating for "million."

11   **Q.**    So the purchase by FileTek of the Autonomy software was

12   approximately 8.5 million, was it not?

13   **A.**    Approximately.

14   **Q.**    And the discussions you had with Mr. Egan at Autonomy was

15   that there would be a purchase by Autonomy with a -- of the

16   StorHouse software with a target price 15 to 20 percent higher

17   in the range of $11.5 million or so?

18   **A.**    Could you repeat that?  I'm sorry.

19   **Q.**    Trying to pull some of those elements together for us.

20        I'll break it up.  Sure.

21        The deal with Autonomy, the purchase by Autonomy of

22   FileTek software, was for $8.5 million, was it not?

23   **A.**    Yes.

24   **Q.**    And in this time period, you're talking about a sale, a

25   discussion of a sale of StorHouse software to Autonomy in the

1  neighborhood of 15 to 20 percent higher than the amount of the

2  license fee that FileTek is paying for -- to license the

3  software from Autonomy, are you not?

4  **A.**    As I recall, it was somewhat different than that.

5  **Q.**    Okay.  Go ahead.

6  **A.**    The reference to 15 to 20 percent was referring to if we

7  wanted to have a StorHouse sale of 11.5 million, to actually

8  propose an amount 15 to 20 percent higher than that to allow

9  for their procurement people to beat us down.

10 **Q.**    Thank you very much.

11      So the 15 to 20 percent higher is 15 to 20 percent higher

12 than what figure?

13 **A.**    Than the 11.5 million, I believe.

14 **Q.**    Okay.  So it sounds like -- you're the CPA.  Roughly how

15 much is that?  Around 13 million or so?

16 **A.**    Approximately, yes.

17 **Q.**    Nevertheless, in this time period, there was a discussion

18 involving Mr. Egan and Mr. Szukalski in the manner you've

19 described of Autonomy purchasing software from FileTek in the

20 amount of approximately $11.5 million; correct?

21 **A.**    Generally, yes.

22 **Q.**    All right.  Good.

23      Now, would you, on behalf of FileTek, have bought the

24 $8.5 million license from Autonomy in March 2010 if Autonomy

25 had not agreed to a barter transaction in which it bought even

1  more StorHouse from FileTek, you know, eventually in the period

2  that was discussed -- would you have bought that license from

3  Autonomy if there had not been the other side of the equation?

4  **A.**   We would have bought the license, but not at that dollar

5  amount.  We needed the extra capability.  And we would have

6  bought the license if the StorHouse sale was the same exact

7  dollar amount also.  We didn't need that extra dollar amount to

8  do it, but it was, of course, attractive.

9  **Q.**   Okay.  That made it more attractive to you at that price?

10  **A.**   Of course.  Of course.

11  **Q.**   Okay.  So when you say you would have bought the license

12  anyway but not at that price, what do you mean?

13  **A.**   It was solving a technical requirement or newly-identified

14  technical requirements for our product, Trusted Edge, so if it

15  was at a much lower amount of something that we could

16  rationalize with our short-term revenue forecast and that we

17  felt comfortable with that amount, we would have just done that

18  part of the transaction.

19  **Q.**   What amount of money do you think you would have been

20  comfortable with if there had been no reciprocal barter

21  transaction?  How much are we talking about?

22  **A.**   I don't know.  It would be significantly less.

23  **Q.**   How much significantly less?

24  **A.**   Well, it would be less than a million, put it that way,

25  and could be substantially less than that.  I don't -- I would

1  have to review all my sales forecasts back in those days.

2  **Q.**   That's fine.

3      But at $8.5 million as the license fee that you agree in

4  the contract to pay, was that a large transaction for a -- for

5  FileTek in a business of its size?

6  **A.**   Yes.

7  **Q.**   And would it have been difficult for you to pay that

8  amount of money if there had been no assurance that there would

9  be a reciprocal sale by FileTek to Autonomy in the manner that

10 you've described today?

11 **A.**   Once again, it would be challenging because we were

12 dependent on our forecasts.

13 **Q.**   Did that eventual purchase by Autonomy of the StorHouse

14 software from FileTek happen approximately five weeks later?

15 **A.**   Approximately.

16 **Q.**   Okay.  Sometime in May?

17 **A.**   I'd have to look at the documents to confirm that.

18 **Q.**   Fortunately I have them right here.  Let me show you what

19 is in evidence as Exhibit 782, please.

20     If we could display that.  Thank you.

21     On or around April 26, 2010, do you recall the circulation

22 by Mr. Szukalski of the proposal that -- and the quote that you

23 were talking about?

24         **THE CLERK:**  Did you say 782?

25         **MR. REEVES:**  I said 782, yes.

 1          **THE CLERK:**  That's not in.

 2          **MR. REEVES:**  Okay.  I thought it was.  But I'm happy

 3   to fix that.

 4   **Q.**   Mr. Loomis, I'm showing you what has been marked for

 5   identification as Exhibit 782.  This is an email from

 6   Mr. Szukalski to Mr. Egan and to you on or around April 26,

 7   2010.

 8        I offer it in evidence, please.

 9          **THE COURT:**  Admitted.

10          **MR. REEVES:**  Thank you, Your Honor.

11        (Trial Exhibit 782 received in evidence)

12   **BY MR. REEVES:**

13   **Q.**   Is this Mr. Szukalski circulating the proposal in the

14   manner that you had talked about with Mr. Egan in late March,

15   2010?

16   **A.**   Yes.

17   **Q.**   Okay.  And what is the amount of the proposal?  That's on

18   page 6, if we look at page 6, please.  If we highlight that

19   $13 million figure down there.  Is that the amount of the

20   proposal?

21   **A.**   Yes.

22   **Q.**   Does that include the pre-negotiation that you seem to be

23   describing about the inflated price in order to bring it down

24   to 11.5?

25   **A.**   It appears so.

1  **Q.**   Okay.  So is everything sort of working out the way you

2  were expecting it would?

3  **A.**   Yes.

4  **Q.**   All right.

5       Let me show you what has been marked for identification as

6  Exhibit 809.  This is an email from Howard Patrick to you,

7  Mr. Loomis.

8       Do you know Mr. Patrick?

9  **A.**   Yes.

10 **Q.**   Who is he?

11 **A.**   He worked for me as our in-house attorney and contracts

12 person.

13 **Q.**   It looks like he is forwarding emails from Autonomy that

14 appear to attach the signed contract whereby Autonomy is buying

15 more StorHouse from FileTek in around May.  Would you agree?

16 **A.**   It's not on my screen.  I don't have the exhibit, 809.

17      **THE COURT:**  It's in evidence.

18      **MR. REEVES:**  Sorry, Your Honor.

19 **Q.**   Let's go -- if we go to the page 3 of the exhibit, please.

20      Do you recognize this document, Mr. Loomis?  Is this part

21 of the sales contract?

22 **A.**   Yes.

23 **Q.**   Did you sign it on the next page, page 4?

24 **A.**   Can you scroll down?

25 **Q.**   We will scroll down to the next page.

1    A.    Yes.

2    Q.    Were there two pieces to this deal, if you remember, that

3    totaled around approximately 11.5 million?

4    A.    I don't recall, but typically it would be a license fee as

5    well as a maintenance fee.

6    Q.    All right.  Let's look at the next document.  I think that

7    might help with that.  Let me show you what has been marked for

8    identification as Exhibit 810.

9              **THE COURT:**  Admitted.

10             **MR. REEVES:**  Thank you, Your Honor.

11        (Trial Exhibit 810 received in evidence)

12   **BY MR. REEVES:**

13   Q.    And display the second page, please.

14        Is this the invoice to Autonomy for this May 2010 sale of

15   StorHouse to Autonomy?

16   A.    Can you scroll up, please?  Just so I can see the date.

17   Q.    Sure.

18   A.    Yes.

19   Q.    Okay.  And what's the total amount?

20   A.    Approximately 11.5 million.

21   Q.    Is that the amount that you had discussed with Mr. Egan on

22   or around March 31st, 2010?

23   A.    Approximately, yes.

24   Q.    All right.  Okay.  All right.  Thank you very much.  I'm

25   done with that.

1    Let's shift gears a little bit and move forward to in or

2 around September 2010.  At or around that time, did you

3 consider entering into another transaction of a different type

4 with Autonomy as a possible reseller for Autonomy software?

5 **A.**   They had proposed that, yes.

6 **Q.**   I'd like to show you what has been marked for

7 identification as Exhibit 1090, please.  This are is an email

8 from Mr. Loomis to a Bill Thompson on September 30th, 2010,

9 subject, "Autonomy transaction."

10          **THE COURT:**  Admitted.

11          **MR. REEVES:**  Thank you, Your Honor.

12    (Trial Exhibit 1090 received in evidence)

13          **MR. REEVES:**  If we could highlight bullet point 1 and

14 6, please.  Thank you so much.

15 **Q.**   Are you familiar with this email?

16 **A.**   Yes.

17 **Q.**   All right.  And -- well, let's talk a little bit about

18 this.

19    In or around September, late September, 2010, were you

20 approached in any way -- was FileTek approached in any way by

21 Autonomy about another transaction?

22 **A.**   Yes.

23 **Q.**   Were you involved in that?

24 **A.**   Yes.

25 **Q.**   What did you do?

1    **A.**    What did I do?

2    **Q.**    What type of deal was this?

3    **A.**    This was to be a reseller for Autonomy, for Autonomy

4    software, that was targeted for the Veteran's Administration.

5    **Q.**    Had you been in that type of relationship or done a deal

6    like that with Autonomy before?

7    **A.**    No.

8    **Q.**    So this was something new, in a sense?

9    **A.**    Yes.

10   **Q.**    All right.

11          And in your email here, you say "Targeted end user is

12   Veteran's Administration."  What is that a reference to?

13   **A.**    The reference was that Autonomy was supplying or going to

14   supply their software to the Veteran's Administration, which

15   was already a current customer of their software.  Autonomy was

16   going to be supplying it to the systems integrator, and there

17   was six -- five or six systems integrators that were all

18   proposing Autonomy software to the Veteran's Administration.

19   **Q.**    All right.  And what sort of benefit would FileTek get out

20   of a transaction like this?

21   **A.**    A markup.

22   **Q.**    A margin on the --

23   **A.**    Yes.

24   **Q.**    -- license sold to the VA?

25   **A.**    Yes.

1   Q.   Do you know approximately how much of a markup or margin?

2   A.   If I recall correctly, approximately a million dollars or

3   10 percent.

4   Q.   Okay.  And item 6 talks about "Autonomy is confident that

5   EAS will be selected.  However, the procurement has dragged.

6   Autonomy expects order in calendar Q4.  Best guess being in 45

7   days."  What does that mean?

8   A.   That they were late in the sales cycle.  That it was being

9   delayed because of the government procurement issues with the

10  systems integrators, but they were very confident that it was

11  going to be concluded very shortly.

12  Q.   As a reseller, were you in any way concerned about the

13  status of the sale to the VA?

14  A.   Yes.

15  Q.   Why were you interested in the status of the sale?

16  A.   Because we would be an investor of that status, in effect.

17  Q.   What does that mean?

18  A.   That if we procured the software from Autonomy for

19  purposes of selling to the Veteran's Administration, we would

20  be dependent on the closure of that sale to the Veteran's

21  Administration for us to receive a revenue.

22  Q.   Okay.  And if the sale was close, was that beneficial to

23  you as a possible reseller?

24  A.   Yes.

25  Q.   If it dragged on and didn't close for months at a time,

LOOMIS - DIRECT / REEVES

1   would that have been a problem, do you think?

2   A.   Yes.

3   Q.   Okay.  So did you seek any type of reassurance from

4   Autonomy in this time period about the status of the sale to

5   the VA?

6   A.   It was either proposed to us or we specifically requested

7   that we have a conversation with a few others within Autonomy

8   at recently high level to talk about the status to make sure

9   that everybody was on the same page.

10  Q.   In or around this time period, in or about the very end of

11  September 2010, did you have a telephone call with Sushovan

12  Hussain, the CFO from Autonomy, and other people from within

13  Autonomy about this transaction?

14  A.   Yes.

15  Q.   Okay.  Do you have a recollection of that phone call and

16  the discussion that you had?

17  A.   Vague.

18  Q.   Okay.  Well, tell us what you do recall with confidence

19  about that conversation, please.

20  A.   It was basically all the points that are in this email.

21  These were the high-level points that I was highlighting for

22  the primary owner of -- of FileTek, and we covered pretty much

23  all these points.

24  Q.   Okay.  All the points that are set forth in Exhibit 1090?

25  A.   Approximately, yes.

1    Q.    Okay.  Was it important to you to connect on the phone

2    with someone of the stature within Autonomy of Mr. Hussain as

3    CFO?

4    A.    Yes.

5    Q.    Why was that important to you?

6    A.    To hear, really, the same story that we were hearing from

7    Stouffer Egan, I believe is who we heard it from, to make sure

8    that we had really a consistent story.

9    Q.    Okay.  And did you have a consistent story from

10   Mr. Hussain?

11   A.    Yes.

12   Q.    What did he say, in substance?

13   A.    Well, I don't recall what he said.  I recall the

14   conversation, and the conversation was the points that are

15   summarized in this email.

16   Q.    Okay.  And he didn't disagree at any point in the course

17   of the conversation?

18   A.    There was no disagreement, no.

19   Q.    Okay.  Good.

20        Did you agree to become a reseller --

21   A.    Yes.

22   Q.    You did.  Okay.

23        Let me show you what has been marked as Exhibit 1085,

24   please.  This, I believe, attaches the agreement between

25   FileTek and Autonomy with regard to the VA software dated on or

1    about September 30th, 2010.

2              **THE CLERK:**  It's already admitted.

3              **MR. REEVES:**  Already admitted?  Okay.  If I could

4    please display it.  If we could go to the second page, please,

5    of Exhibit 1085.

6    **Q.**   Is this the reseller agreement, Mr. Loomis?

7    **A.**   Yes.

8    **Q.**   And the price of the reseller deal is $10 million?

9    **A.**   Yes.

10   **Q.**   All right.  Thank you.  I'm done with that.

11             In or around this time period, do you recall whether

12   Autonomy asked for your balance sheet or other financial

13   information with regard to the financial performance of

14   FileTek?

15   **A.**   I don't recall the time period.  I do recall that they

16   requested our financial information.

17   **Q.**   Let me show you what has been marked as Exhibit 2953,

18   please.  This is an email from Mr. Loomis to Stouffer Egan on

19   September 30th, subject, "FileTek balance sheet."

20             I offer it in evidence, please.

21             **THE COURT:**  Admitted.

22             **MR. KEKER:**  Can I just find it, Your Honor?

23             **THE COURT:**  Yes.  2953?

24             **MR. REEVES:**  2953, please.

25             **MR. KEKER:**  Okay.  I'm sorry.  Excuse me.  No

 1   objection.

 2           **MR. REEVES:**  Thank you.

 3       (Trial Exhibit 2953 received in evidence)

 4   **BY MR. REEVES:**

 5   **Q.**   If we could just display the first page.

 6       Did you have an understanding, based on your discussions

 7   with the people at Autonomy with whom you were speaking, about

 8   why they were asking for your balance sheet?

 9   **A.**   It's a typical request for credit review purposes.

10   **Q.**   Is that what's attached to this document, to the best of

11   your knowledge?

12   **A.**   The balance sheet, yes.

13   **Q.**   All right.  I'd like to show you, please, what has been

14   marked for identification as Exhibit 2955.  This is an email

15   chain that begins with Mr. Egan and proceeds, I believe, to

16   Mr. Loomis, back to Mr. Egan on or about October 14, 2010.

17           **THE COURT:**  Admitted.

18           **MR. REEVES:**  Thank you, Your Honor.

19       (Trial Exhibit 2955 received in evidence)

20   **BY MR. REEVES:**

21   **Q.**   If we could highlight the lower email and work our way up,

22   please.  It looks like -- and if you would please, Ms. Margen,

23   highlight the portion that begins "Steve Chamberlain," etc.

24   Thank you.  Thanks so much.

25       It looks like, according to the email, Mr. Egan is writing

**LOOMIS - DIRECT / REEVES**

1    to you, Mr. Loomis, on or about October 14, 2010, subject,

2    "confirm letter and one more request."  Do you see that?

3    **A.**    Yes.

4    **Q.**    And according to the email, he writes, "Steve Chamberlain

5    has asked for one more piece of information from FT" -- FT is

6    FileTek; right?

7    **A.**    Correct.

8    **Q.**    -- "in relation to the deal.  Would you be able to provide

9    us with a recent P&L for the business."  Do you see that?

10   **A.**    Yes.

11   **Q.**    Do you have an understanding of what the purpose of that

12   request was?

13   **A.**    Similarly for credit review purposes.

14   **Q.**    Credit review purposes?

15   **A.**    And it's an assumption on my part.  I mean, it's just a

16   standard procedure.

17   **Q.**    That's what you thought they were asking for; right?

18   Okay.  And that would be to assess whether or not FileTek would

19   be in a position to pay for the reseller license; correct?

20   **A.**    Yes.

21   **Q.**    All right.  Let's -- thank you very much.

22       I'd like to show you what has been marked as Exhibit 2954,

23   please.  This is, again, an email chain between Mr. Egan and

24   Mr. Loomis on or around October 14, 2010 relating to this

25   transaction.

1          **THE COURT:**  Admitted.

2          **MR. REEVES:**  Thank you, Your Honor.

3      (Trial Exhibit 2954 received in evidence)

4  **BY MR. REEVES:**

5  **Q.**   It looks like you are responding here, Mr. Loomis, in the

6  middle email.  "Attached is an interim income statement per

7  your request."  Do you see that?

8  **A.**   Yes.

9  **Q.**   So are you complying with Autonomy's request for credit

10  information?

11  **A.**   Yes.

12  **Q.**   Let me show you, please, Exhibit 2958, please.

13          **THE COURT:**  Admitted.

14          **MR. REEVES:**  Thank you, Your Honor.

15      (Trial Exhibit 2958 received in evidence)

16  **BY MR. REEVES:**

17  **Q.**   It looks like the exchange of credit information -- if you

18  go down below, it's proceeding from you to -- if we come down

19  just a little bit -- I'm sorry.  I misspoke.

20      Start at the bottom email from you, Mr. Loomis, to

21  Mr. Egan.  You are forwarding along the balance sheet.  Do you

22  see that?

23  **A.**   Yes.

24  **Q.**   If we go up, please.  Then it goes from Mr. Egan to

25  Mr. Chamberlain.  Do you see that?

1   **A.**    Yes.

2   **Q.**    That's within Autonomy, and you were not on that email.

3        We follow the document to the top.  It looks like it goes

4   from Mr. Chamberlain to Mr. Egan and Mr. Hussain within

5   Autonomy.  Is that what the document says?

6   **A.**    Yes.

7   **Q.**    All right.  And then there's some dialogue about this

8   within Autonomy that you did not participate in; correct?

9   **A.**    Yes.

10  **Q.**    Okay.  Let's go to this document, Exhibit 2957.  This is

11  an email from you to Mr. Egan on or about October 14th,

12  subject, "2009 income statement."

13              **THE COURT:**  Admitted.

14            **MR. REEVES:**  Thank you, Your Honor.

15       (Trial Exhibit 2957 received in evidence)

16  **BY MR. REEVES:**

17  **Q.**    If we could please just enlarge the top two emails.  It

18  looks -- let's tighten it so that we can see the whole

19  sentence.  That's fine.  That's good.  Thank you very much.

20       In the second to the last email, Mr. Loomis, it looks like

21  Mr. Egan is writing to you, subject, "2009 income statement."

22  He writes, "bill, does this not include the sale to Autonomy,"

23  question mark.  Do you see that?

24  **A.**    Yes.

25  **Q.**    Do you have an understanding of what Mr. Egan is asking

1    you here?

2    **A.**    I believe it's, you know, we provided the income

3    statement.  He was questioning if the sale of our StorHouse

4    system was not in our income statement.

5    **Q.**    Okay.  And that's the earlier sales that we've been

6    talking about?

7    **A.**    Yes.

8    **Q.**    All right.  And up above, you respond to Mr. Egan,

9    "Stouffer, the sale and maintenance to Autonomy is being

10    amortized."  Do you see that?

11    **A.**    Yes.

12    **Q.**    What did you mean by that?

13    **A.**    There's some technical accounting requirements for revenue

14    recognition under U.S. generally-accepted accounting principles

15    for software revenue recognition.

16        **MR. KEKER:**  Objection, Your Honor.  I object to his

17    talking about revenue principles that don't apply to the rules

18    of this case.

19        **THE COURT:**  Overruled.

20    Go ahead.

21        **THE WITNESS:**  And there's a requirement for something

22    called VSOE, which is an abbreviation for vendor-specific

23    objective evidence of fair value.

24        For virtually all of our revenue, we did not view that we

25    had something called VSOE.  As a result, the accounting

1    literature would require us to amortize the revenue over the

2    whole period.  If there is maintenance included, over the

3    maintenance period or what was called in the literature PCS or

4    post-contract support period.

5        So the fact that the StorHouse sale to Autonomy had

6    maintenance in it for a designated term -- and I don't recall

7    the term, if it was two years or five years, for example -- it

8    would have amortized revenue over that two-year or five-year

9    term, again by way of example.

10   **BY MR. REEVES:**

11   **Q.**   By amortizing, do you mean spread out in some sense?

12   **A.**   Yes.  Pro rata.  Straight line pro rata.

13   **Q.**   For those of us who are not CPAs or accountants, what do

14   you mean by "pro rata"?

15   **A.**   By way of example, if it was a million-dollar transaction

16   that was to be amortized over 10 months, it would be a hundred

17   thousand dollars per month taken into revenue.

18   **Q.**   Thank you very much.

19       After you agreed and contracted with Autonomy to be a

20   reseller of the software with the end user VA, as we go forward

21   into October, November, how does the deal work out?

22   **A.**   We -- nothing was happening.  We did not have any updates.

23   **Q.**   Let me show you what's marked as Exhibit 1229, please.

24   This is an email from you to Mr. Egan on or November 23rd,

25   2010, subject, "Updates."

1          I offer it in evidence, please.

2               **THE COURT:**  Admitted.

3          (Trial Exhibit 1229 received in evidence)

4   **BY MR. REEVES:**

5   **Q.**   What did you mean by this email, Mr. Loomis?  What are you

6   doing?

7   **A.**   I'm asking about updates on the VA transaction.  On

8   September 30, it was anticipated at that time to close in

9   approximately 45 days.  The 45 days had passed and I'm

10  inquiring as to the status.

11  **Q.**   Okay.  And what was the status?  Did you get an answer to

12  your question?

13  **A.**   As best as I can recall, the answer is no, not at that

14  time.

15  **Q.**   No, you did not get an answer?

16  **A.**   That's correct.

17  **Q.**   Did you begin to get frustrated in any sense by a lack of

18  communication?

19  **A.**   Yes.

20  **Q.**   Okay.  So take us out.  What happens as we move into 2011,

21  into the spring of 2011?  Does the final transaction with the

22  VA get any closer?

23  **A.**   Not to the best of our knowledge.

24  **Q.**   Over time, as we move into 2011, does this become a source

25  of frustration or a problem for FileTek in any way?

LOOMIS - DIRECT / REEVES

1   **A.**    Yes.

2   **Q.**    And in your own words, describe whatever -- what concern

3   you had about the status of the VA deal.

4   **A.**    First of all, not having information is concerning.

5   Secondly, that it was elongated.  The -- elongation of the

6   period is not a significant surprise in the government

7   marketplace.  That happens.  There are big transactions.  Got a

8   lot of government paperwork, but we did not have the status

9   update, so the combination of both of those was concerning.

10  **Q.**    Okay.  In this time period, were you concerned about the

11  debt that you owed to Autonomy?

12  **A.**    Yes.

13  **Q.**    And were you making payments on that debt?

14  **A.**    No.

15  **Q.**    And why not?

16  **A.**    For a variety of reasons.  I'd say, one, it was a lot of

17  money; two, we did not have status updates, and it was a way to

18  help leverage getting the status update, was the view.

19  **Q.**    Okay.  Let me direct your attention to in or around June

20  2011 and show you what has been marked for identification as

21  Exhibit 1886, please.  This is an email chain involving

22  Mr. Egan and Mr. Szukalski that is circulated within FileTek on

23  or about June, 2011.

24          **THE COURT:**  Admitted.

25          **MR. REEVES:**  Thank you.

1          (Trial Exhibit 1886 received in evidence)

2    **BY MR. REEVES:**

3    **Q.**   If we drop down, it looks like -- we drop down to this

4    email in or around -- what is the status of the VA deal by in

5    or around June 2011, Mr. Loomis?  Has the deal still not

6    closed?

7    **A.**   As I recall, correct.

8    **Q.**   It looks like -- what is your understanding of what

9    Mr. Egan is saying when he says, "Gary, as discussed in our

10   calls, can you provide a quote for the software that would fit

11   the requirement described for the following customers," and

12   then he lists some customers.  Do you see that?

13   **A.**   Yes.

14   **Q.**   Do you have an understanding as to what they're talking

15   about here?

16   **A.**   This would have been requesting quotes for additional

17   StorHouse software for these three customers of Autonomy.

18   **Q.**   So Autonomy's considering buying more StorHouse in or

19   around June 2011?

20   **A.**   Yes.

21   **Q.**   Okay.  And did that relate in any way to, as you

22   understood it -- to the debt that FileTek owed to Autonomy

23   relating to the reseller license for VA?

24        **MR. KEKER:**  Objection.  No foundation -- I'm sorry.

25   \\\

1    BY MR. REEVES:

2    Q.   Did this transaction, this possible sale of StorHouse,

3    relate in any way to the existing debt that FileTek owed to

4    Autonomy on the VA deal?

5            MR. KEKER:   Objection.   Foundation, Your Honor.

6            THE COURT:   Overruled.

7            THE WITNESS:   I don't recall the time frame, but the

8    arrangement was that we would take the proceeds from the sales

9    and utilize those proceeds or a substantial portion of those

10   proceeds to pay down the liability we had to Autonomy for the

11   VA transaction.

12   BY MR. REEVES:

13   Q.   Autonomy would buy more StorHouse, FileTek would use that

14   money to pay down the obligation to Autonomy on the value-added

15   reseller deal?

16   A.   Yes.

17   Q.   Is that what happened?

18   A.   As I recall, yes.

19   Q.   I'd like to show you -- I have three more documents,

20   Your Honor.   I think they will be pretty quick, and then we can

21   break for the day, if that's okay with the Court.

22           THE COURT:   Sure.

23   BY MR. REEVES:

24   Q.   I would like to show you what is marked as Exhibit 1906.

25   This is a license and support contract dated June 30th, 2011

1    between Autonomy and FileTek.

2            **THE COURT:**  Admitted.

3            **MR. REEVES:**  Okay.

4            **MR. KEKER:**  Could I see it, please.  Never mind.

5        (Mr. Keker examines document.)

6        (Trial Exhibit 1906 received in evidence)

7    **BY MR. REEVES:**

8    **Q.**    Do you recognize this document, Mr. Loomis?

9    **A.**    Can you make it a little bit bigger, please.

10        Yes.  That would have been another StorHouse transaction.

11   **Q.**    Okay.  Is that the one you were talking about a moment ago

12   in or around this time period?

13   **A.**    Seemingly, yes.

14   **Q.**    Because of the date?

15   **A.**    Yes.

16   **Q.**    Thank you.

17        Let me show you what is marked for identification as

18   Exhibit 2280.  Is this another invoice dated on or about

19   August 17, 2011, from FileTek to Autonomy in the amount of

20   $7.8 million?

21           **THE COURT:**  Admitted.

22           **MR. REEVES:**  Thank you, Your Honor.

23        (Trial Exhibit 2280 received in evidence)

24   **BY MR. REEVES:**

25   **Q.**    Do you recognize this -- do you recognize this invoice,

1   Mr. Loomis?

2   **A.**   That would be another invoice, yes.  The StorHouse sale or

3   StorHouse license.

4   **Q.**   And the amount -- let's go to the amount at the bottom.

5   **A.**   7.8 million.

6   **Q.**   So in this time period, was there, in fact, another sale

7   of StorHouse to Autonomy?

8   **A.**   Yes.

9   **Q.**   And did you use that money at FileTek in order to pay down

10  the debt that you owed to Autonomy on the reseller license

11  relating to the VA?

12  **A.**   We used either all of it or a substantial part of it.

13  **Q.**   Finally, I'd like to show you what has been marked for

14  identification as Exhibit 2279, please, page 2.  2279, page 2.

15       Is this a spreadsheet relating to the FileTek contracts

16  with Autonomy/billings to Autonomy as customer, maintained by

17  FileTek in the normal course of your business?

18  **A.**   I'm sorry.  I was looking for the document.  Repeat the

19  question, please.

20  **Q.**   The question is:  Is this a spreadsheet -- is this a

21  business record maintained by FileTek with regard to its

22  transactions relating to Autonomy?

23  **A.**   It's a business analysis, yes.

24           **THE COURT:**  Admitted.

25           **MR. REEVES:**  Thank you, Your Honor.

1          (Trial Exhibit 2279 received in evidence)

2    **BY MR. REEVES:**

3    **Q.**    And does this summarize the transactions between Autonomy

4    and FileTek in the time periods we've been talking about this

5    afternoon?

6    **A.**    It summarizes the StorHouse sales, a side of those

7    transactions.

8    **Q.**    Okay.  Good.

9          (Government counsel confer off the record.)

10         **MR. REEVES:**  I think those are all the questions I

11   would like to ask now.  I would technically like to think about

12   it over the evening to see if I have anymore questions in the

13   morning.

14         **THE COURT:**  Okay.

15         Ladies and gentlemen, we are going to take a recess now.

16   Remember the admonition given to you:  Don't discuss the case,

17   allow anyone to discuss it with you, form or express any

18   opinion.  I will see you at 9:00 tomorrow.

19         (Proceedings were heard out of presence of the jury:)

20         **THE COURT:**  Let the record reflect the jurors have

21   left.

22         So we have this witness, cross tomorrow, which I doubt if

23   it's going to be too lengthy.  You never know.  But it doesn't

24   seem to be.  Then who is the next witness?

25         **MR. LEACH:**  The next witness, Your Honor, is Dominic

1    Camden from a company called Zones, and then Joel Scott.

2         THE COURT:  Okay.  All right.  And where is Zones

3    from?  The witness, where is he from?

4         MR. FRENTZEN:  Chicago.

5         THE COURT:  We can get through him tomorrow, too.

6         MR. FRENTZEN:  I don't expect he is going to take all

7    that long, Your Honor.

8         THE COURT:  And then we have -- Mr. Scott may take

9    longer.  And so that's where we are.

10        MR. KEKER:  He's a long witness.

11        THE COURT:  He's a long witness?

12        MR. KEKER:  I would like to know how long the direct

13   is going to be because my cross will be as long as the direct.

14        THE COURT:  Oh, that's interesting.  Okay.  I will

15   give you both 20 minutes.

16        MR. KEKER:  We'll take it.

17        THE COURT:  Okay.  Anyway, there we are.  We have

18   witnesses to fill tomorrow and move into Monday.  We go Monday

19   and Tuesday of next week.

20        MR. LEACH:  Yes, Your Honor.

21        MR. FRENTZEN:  Your Honor, actually, there is one --

22   we've got one witness here from the UK on Monday that I guess,

23   depending -- I assume Scott is going to finish, but if it looks

24   like we are not going to finish Scott, we might ask to take out

25   of order --

1      **THE COURT:** Yeah.  I think that's fine.  That's fine.

2  Sure you can do that because I'd like to get -- you know,

3  unless it's some major, major witness, I'd like to get people

4  in and out so they don't spend a weekend or weeks.

5      **MR. KEKER:** Your Honor, I just want to check

6  absolutely for certain before I give my tickets away, I take it

7  we are going to be in court on opening day.

8      **THE COURT:** Well, I was trying to avoid that subject.

9  The answer is yes, we are going to be in court on opening day

10  until noon.  At that point --

11      **MR. LEACH:** Your Honor --

12      **THE COURT:** Some of us may be leaving.  I have never

13  missed an opening day.

14      **MR. KEKER:** That's good to know, Your Honor.

15      **MR. LEACH:** Your Honor, I'm so focused on the trial,

16  I'm embarrassed to ask, when is opening day?

17      **THE COURT:** Oh, April 3rd.  April 3rd.

18      **MR. KEKER:** I was going to give my tickets away, so

19  I'm glad I asked.  Thank you.

20      **THE COURT:** You can give them away, but -- but I'll be

21  there over in the cheap seats, Mr. Keker, in the cheap seats.

22      **MR. REEVES:** Should be plan on ending at noon on

23  April 3rd, Your Honor?

24      **THE COURT:** Yes.

25      **MR. KEKER:** Can we dress accordingly.

1          **THE COURT:**  Absolutely.  Absolutely.  I should tell --

2    by the way, I should tell the jury that, too.  Remind me to

3    tell them that tomorrow.

4          **MR. LEACH:**  We will, Your Honor.

5          **MR. KEKER:**  Don't tell them why.

6          **THE COURT:**  We're now off the record.

7               (Proceedings adjourned at 4:07 p.m.)

8                       ---oOo---

9

10                    **CERTIFICATE OF REPORTERS**

11          I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   DATE:   Wednesday, March 21, 2018

15

16

17

18   _____

19          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

20

21

22   _____

23          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter

24

25