```
                                        Volume 19

                                     Pages 3644 - 3902

                        UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

           Before The Honorable Charles R. Breyer, Judge

           UNITED STATES OF AMERICA,      )
                                          )
                     Plaintiff,           )
                                          )
             VS.                          )     NO. CR 16-00462 CRB
                                          )
           SUSHOVAN TAREQUE HUSSAIN,      )
                                          )
                     Defendant.           )
           _____)
                                        San Francisco, California
                                        Wednesday, April 4, 2018

                            TRANSCRIPT OF PROCEEDINGS
           APPEARANCES:
           For Plaintiff:
                                ALEX G. TSE
                                Acting United States Attorney
                                450 Golden Gate Avenue
                                San Francisco, California  94102
                         BY:    ROBERT S. LEACH
                                ADAM A. REEVES
                                WILLIAM FRENTZEN
                                ASSISTANT UNITED STATES ATTORNEYS


           For Defendant:
                                KEKER & VAN NEST
                                633 Battery Street
                                San Francisco  CA  94111
                         BY:    JOHN W. KEKER
                                JAN NIELSEN LITTLE
                                BROOK DOOLEY
                                KATE LAZARUS
                                NIC MARAIS
                                ATTORNEYS AT LAW


           Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                         Pamela Batalo, CSR No. 3593, FCRR
                         Official Reporters
```

## I N D E X

Wednesday, April 4, 2018 - Volume 19

**GOVERNMENT'S WITNESSES**                                    **PAGE**  **VOL.**

**SARIN, MANISH (RECALLED)**
(PREVIOUSLY SWORN)                                             3651     19
Cross-Examination resumed by Mr. Marais                       3652     19
Redirect Examination by Mr. Reeves                            3716     19
Recross-Examination by Mr. Marais                             3734     19

**APOTHEKER, LEO**
(SWORN)                                                       3736     19
Direct Examination by Mr. Reeves                              3736     19
Cross-Examination by Mr. Keker                                3811     19
Redirect Examination by Mr. Reeves                            3863     19
Recross-Examination by Mr. Keker                              3869     19

## E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1041 | | 3698 | 19 |
| 1502 | | 3814 | 19 |
| 1519 | | 3744 | 19 |
| 1541 | | 3745 | 19 |
| 1546 | | 3746 | 19 |
| 1596 | | 3751 | 19 |
| 1622 | | 3747 | 19 |
| 1865 | | 3846 | 19 |
| 1992 | | 3655 | 19 |
| 2008 | | 3827 | 19 |
| 2010 | | 3659 | 19 |
| 2037 | | 3668 | 19 |
| 2044 | | 3660 | 19 |

## I N D E X

### E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2047 | | 3680 | 19 |
| 2089 | | 3678 | 19 |
| 2140 | | 3724 | 19 |
| 2153 | | 3684 | 19 |
| 2171 | | 3701 | 19 |
| 2198 | | 3791 | 19 |
| 2200 | | 3681 | 19 |
| 2231 | | 3695 | 19 |
| 2246 | | 3796 | 19 |
| 2283 | | 3860 | 19 |
| 2301 | | 3804 | 19 |
| 2376 | | 3810 | 19 |
| 2561 | | 3697 | 19 |
| 2627 | | 3690 | 19 |
| 2991 | | 3806 | 19 |
| 2992 | | 3798 | 19 |
| 6510 | | 3714 | 19 |
| 6517 | | 3711 | 19 |
| 6518 | | 3664 | 19 |
| 6523 | | 3675 | 19 |
| 6527 | | 3672 | 19 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 6532 | | 3677 | 19 |
| 6558 | | 3821 | 19 |
| 6560 | | 3848 | 19 |
| 6566 | | 3854 | 19 |
| 6567 | | 3857 | 19 |
| 6573 | | 3815 | 19 |
| 6582 | | 3856 | 19 |
| 6608 | | 3847 | 19 |
| 6615 | | 3853 | 19 |
| 6619 | | 3856 | 19 |

```
 1   Wednesday - April 4, 2018                          9:11 a.m.

 2                        P R O C E E D I N G S

 3                             ---000---

 4       (Proceedings were heard out of the presence of the jury:)

 5           THE COURT:  Okay.  Please be seated.

 6       Let the record show that the jury is not here.  The

 7   parties are present.

 8       So there are a number of issues that we have to deal with

 9   in terms of evidence, but I'd like to conclude or at least

10   allow the Defense to conclude with this examination of the

11   witness.

12       There is one document that the Defense has proffered or

13   will -- wishes to examine this witness about; is that correct?

14   That's part of the submission or the offer of proof?  I think

15   is it 2451.  Is that the one?

16           MR. REEVES:  Yes, Your Honor.  We believe so.  Yes,

17   Your Honor.

18           THE COURT:  I think it is according to what I --

19           MR. REEVES:  The November 2011 document.

20           THE COURT:  That's right.

21       Okay.  So I'm -- at this point I'm not going to allow the

22   Defense to inquire into that.  I will excuse this witness --

23   you'll complete your examination.  I'll excuse this witness

24   subject to being re-called once I make a final determination as

25   to whether or not that or all these other matters come in.
```

**PROCEEDINGS**

1    Okay?  Is that -- will that work with you?

2          **MR. KEKER:**  Yes, Your Honor.

3          **MR. MARAIS:**  Yes, Your Honor.

4          **THE COURT:**  Okay.  So let's bring in the --

5          **MR. REEVES:**  Very quickly as to a scheduling matter.

6    It will only take one second.

7      We have two witnesses, Mr. Apotheker and Mr. Welham, who

8    are both traveling; Mr. Apotheker this evening to Hong Kong and

9    Mr. Welham tomorrow evening to Spain.  We have talked about --

10         **THE COURT:**  Well, that's sad.

11         **MR. REEVES:**  Well, it's --

12         **THE COURT:**  That's sad that they're going somewhere,

13    but I think they're going to be here as far as I'm concerned.

14         **MR. REEVES:**  I think we've worked it all out.

15         **THE COURT:**  Oh, good.  Okay.

16         **MR. REEVES:**  I think the point is we will finish

17    Mr. Sarin this morning.  We will proceed to Mr. Apotheker.

18         **THE COURT:**  That's fine.  Because I don't know that --

19    but before we get to Mr. Apotheker, I think I need to have some

20    further discussion about all of this stuff.

21         **MR. REEVES:**  That will be fine.

22         **THE COURT:**  By "stuff" I mean evidence.  So --

23         **MR. REEVES:**  The Defense -- your Honor, I just want to

24    complete my record.

25      The Defense has committed to work through Mr. Welham

PROCEEDINGS

 1  through tomorrow so that he can travel at the end of the day

 2  tomorrow.  We think we've worked that out.

 3       THE COURT:  Look, look, in the Court's view, I've got

 4  to get some agreement as to the scope of the examination of

 5  these witnesses with respect to post-October 3rd events, and

 6  it's clear that there is a wide diversity of opinion as to what

 7  would come in and what would not come in.

 8       Now, after having said all that, if we can -- of course, I

 9  want to move ahead.  I've got the jury out there, I'd love to

10  move ahead and put in all the evidence pre-October 3rd, but

11  most of the time attorneys don't want to start chopping up

12  their examinations.

13       So I don't care how we work it out.  It's fine with me if

14  we just proceed witness to witness and not inquire into events

15  that occurred post-October 3rd because there's been a lot of

16  evidence about all sorts of things that happened

17  pre-October 3rd.

18       So we can do it that way, and then we can have an extended

19  discussion about whether we go back and go into these events

20  that occurred post-October 3rd.

21       MR. REEVES:  I think for Mr. Apotheker and Mr. Welham,

22  that will not be as meaningful an issue; for Mr. Sarin it is,

23  and we are ready to talk about it whenever the Court wishes.

24       THE COURT:  I actually don't understand what you said.

25       MR. REEVES:  I think what I'm trying to say is that we

1   have conferred with the Defense counsel and settled on a

2   schedule that will complete Mr. Welham's testimony by the end

3   of tomorrow.

4            THE COURT:  Even if we don't get into the

5   post-October 3rd?

6            MR. REEVES:  Yes, Your Honor.

7            THE COURT:  Oh, okay.  Well, then it may not be a

8   problem.

9            MR. REEVES:  I agree.

10           THE COURT:  Okay.  All right.  Well, that -- listen,

11  that's fine.  That's good.

12      Okay.  Bring in the witness.

13           MR. REEVES:  Thank you, Your Honor.

14           THE COURT:  And we now have the ground rule with

15  respect to this.

16      (Proceedings were heard in the presence of the jury:)

17           THE COURT:  Please be seated.

18      Let the record reflect all jurors are present and the

19  parties are present.

20      You may proceed with your cross.

21           MR. MARAIS:  Thank you, Your Honor.

22      Ladies and gentlemen of the jury, good morning.

23                        **MANISH SARIN**,

24  called as a witness for the Government, having been previously

25  duly sworn, testified further as follows:

1    <u>CROSS-EXAMINATION</u>   (resumed)

2    BY MR. MARAIS:

3    Q.   Mr. Sarin, good morning.

4    A.   Good morning.

5    Q.   I promise to use fewer spreadsheets today for everyone's

6    sake.

7        We spent some time yesterday discussing your financial

8    models, and at some point you said you might typically ask a

9    target company to provide you with its own forecast for the

10   future; correct?

11   A.   Correct.

12   Q.   But in this case you said that didn't happen?

13   A.   They didn't have one, yes.

14   Q.   Have you ever worked on an acquisition based in England

15   before?

16   A.   I have worked with an English acquirer, but the target was

17   somewhere else.

18   Q.   Okay.  Have you worked on a -- prior to the Autonomy

19   acquisition, had you worked on an acquisition governed by the

20   U.K. takeover code?

21   A.   No.

22   Q.   Are you familiar with the U.K. takeover code?

23   A.   I'm familiar that a takeover code exists, which has

24   certain rules or procedures, so, yes.

25   Q.   And you understood that that code, the U.K. takeover code,

**SARIN - CROSS / MARAIS**

1    those rules and procedures governed this transaction between HP

2    and Autonomy; correct?

3    **A.**    Correct.

4    **Q.**    And as a result, HP, in fact, was reluctant to see

5    nonpublic information from Autonomy; correct?

6    **A.**    HP was reluctant to see lots of nonpublic information

7    because that same information would need to be made available

8    to other potential parties.

9    **Q.**    And part of that was HP being reluctant to see financial

10   forecast models from Autonomy; correct?

11   **A.**    Not really.  I asked for them because I wanted to see

12   them.

13   **Q.**    Can you take a look at Exhibit 6535?  It should be in the

14   black binder in front of you.

15   **A.**    (Witness examines document.)

16   **Q.**    There's a lot of paper here, but I just want to focus on

17   pages 3 and 4, which is headed "Project Tesla."  Do you see

18   that?

19   **A.**    I do.

20   **Q.**    This is an internal HP guide about the Autonomy

21   acquisition.  Have you seen this before?

22   **A.**    (Witness examines document.)

23   **Q.**    Again, I'm only going to focus on pages 3 and 4, which was

24   circulated in this e-mail by Emma Walton.

25        **MR. REEVES:**  Your Honor, I object.  I think the last

1   question is an important one, whether the witness has seen this

2   before.  He's not on the e-mail.

3          **THE WITNESS:**  Yes, I don't know if I've seen this

4   before.  I wasn't on --

5   **BY MR. MARAIS:**

6   **Q.**   You were HP's point person --

7          **MR. REEVES:**  I object to the interruption.

8   **BY MR. MARAIS:**

9   **Q.**   Please, continue.

10  **A.**   I don't know if I've seen this before.  I certainly wasn't

11  on the e-mail.  There were many conversations between HP

12  counsel and external counsel.  I wasn't privy to all of those

13  conversations.

14  **Q.**   Can you tell us who Emma Walton was?

15  **A.**   Emma Walton was an internal HP lawyer who was working on

16  the deal along with Sergio Letelier and Paul Porrini.

17  **Q.**   Emma Walton was an HP lawyer; correct?

18  **A.**   Correct.

19  **Q.**   An in-house lawyer?

20  **A.**   Correct.

21  **Q.**   And she was working with you on the due diligence process;

22  right?

23  **A.**   Correct.

24  **Q.**   And she is circulating a guide, a two-page guide, related

25  to the Project Tesla acquisition.  Do you see that?

1    **A.**    Yes.

2    **Q.**    And you were the point person at HP for due diligence on

3    the acquisition?

4    **A.**    Correct.

5    **Q.**    And you're telling us that you haven't seen this document

6    before?

7    **A.**    Correct.

8    **Q.**    Did you understand that HP was particularly concerned

9    about secrecy in connection with the Autonomy due diligence

10   project?

11   **A.**    Yes.

12   **Q.**    And that HP was very concerned that news might get out

13   that it was looking to acquire Autonomy?

14   **A.**    Yes.

15   **Q.**    And you understand that HP was very worried about leaks at

16   the time?

17   **A.**    Yes.

18   **Q.**    I turn your attention to Exhibit 1992.

19   **A.**    Is it in the same binder?

20   **Q.**    It is not in the same binder.

21          **THE COURT:**  Well, let me look at it.  19 --

22                  (Pause in proceedings.)

23          **THE COURT:**  Admitted.

24      (Trial Exhibit 1992 received in evidence)

25          **MR. MARAIS:**  Thank you, Your Honor.

1          **MR. REEVES:**  I don't have it.

2          **MR. MARAIS:**  It's on your screen now, Adam.

3   **Q.**   This is a copy of an e-mail from Andy Johnson to you;

4   right?

5   **A.**   (Witness examines document.)

6   **Q.**   Do you see your name in the "To" field at the top of the

7   e-mail, sir?

8   **A.**   I do.

9   **Q.**   This is an e-mail that you received from Andy Johnson;

10  correct?

11  **A.**   Correct.

12  **Q.**   And Mr. Johnson was your boss?

13  **A.**   Correct.

14  **Q.**   And a little further down in the chain on this screen is

15  an e-mail from Mr. Robison.  Do you see that?

16  **A.**   I do.

17  **Q.**   And Mr. Robison was your boss' boss; right?

18  **A.**   Correct.

19  **Q.**   And Mr. Robison writes:

20          "At this point because of the U.K. laws, we don't

21      want to see any nonpublic information."

22      Do you see that?

23  **A.**   I do.

24  **Q.**   And was that sentiment conveyed to you in July of 2011?

25          **MR. REEVES:**  I object as to the date, which is vague

 1    in relation to the creation of the data room and so what can

 2    and cannot be public.  The question is vague.  We object.

 3                THE COURT:  I'm sorry.  What exhibit is it again?  I

 4    wanted to --

 5                MR. MARAIS:  1992, Your Honor.

 6                THE COURT:  Okay.  Hold on.

 7                        (Pause in proceedings.)

 8                THE COURT:  And the question is?

 9    BY MR. MARAIS:

10    Q.   The question is:  In July of 2011, was the instruction

11    conveyed to you that HP was anxious not to see any nonpublic

12    information?

13                THE COURT:  You can answer the question.

14                THE WITNESS:  This is July 15th before the second

15    July 29th meeting.  So at this time we weren't exactly clear if

16    we were going to pursue Autonomy, so at this time we didn't

17    want to see any nonpublic information.

18    BY MR. MARAIS:

19    Q.   Thank you.

20         Let's take a step back and talk about due diligence at a

21    high level just to make sure we all understand.

22         Due diligence is the process whereby HP in this case tries

23    to get an understanding of the target's business; correct?

24    A.   Correct.

25    Q.   And HP comes up with a set of questions.  It sends them

1    over.  You get on the phone and you discuss those questions;

2    right?

3    A.    Yes.

4    Q.    And if Autonomy wants, it can say, "We're not prepared to

5    give you that information"; right?

6    A.    Correct.

7    Q.    And at that point HP has to decide, either we'll go ahead

8    without the information or we'll ask more questions; right?

9    A.    Correct.

10   Q.    There's no obligation on Autonomy to volunteer information

11   that HP hasn't asked for?

12         THE COURT:  Well, I'm sorry.  You're asking at what

13   time?

14         MR. MARAIS:  During the due diligence process,

15   Your Honor.  In early August 2011, there are a set of daily

16   calls during which HP puts a set of questions to Autonomy, and

17   my question to Mr. Sarin is simply:

18   Q.    Your understanding of the process was that you would ask

19   questions and Autonomy would answer those questions; right?

20   A.    Yes.

21   Q.    You wouldn't expect anybody at Autonomy to try to read

22   your mind; right?

23   A.    Correct.

24   Q.    You've testified that things really started to happen in

25   late July, early August of 2011; right?

**SARIN - CROSS / MARAIS**

1   **A.**   Yes.

2   **Q.**   Let's take a look at Exhibit 2010.

3   **A.**   (Witness examines document.)

4   **Q.**   This, too, unfortunately is in one of the other binders,

5   but this is an e-mail --

6          **THE COURT:**  Admitted.

7          (Trial Exhibit 2010 received in evidence)

8          **MR. MARAIS:**  Thank you, Your Honor.

9   **Q.**   -- an e-mail from Marge Breya to you and others on at HP.

10  It's on the screen now.

11         And I want to focus on your e-mail at the bottom of this

12  page.  This is dated July 21st; correct?

13  **A.**   Correct.

14  **Q.**   And you write (reading):

15         "We have approval to start a process with Atlantis."

16  **A.**   Correct.

17  **Q.**   "Atlantis" here is Autonomy?

18  **A.**   Yes.

19  **Q.**   And so this is the time, late July of 2011, when HP is

20  really beginning the due diligence process with Autonomy?

21  **A.**   Correct.

22  **Q.**   Did you know whether at this point in time the price for

23  the deal had already been set?

24  **A.**   I don't remember.

25  **Q.**   And you knew before you began due diligence, that HP

1  planned to announce the deal on August 18; correct?

2  **A.**   I don't remember when that date was set.

3  **Q.**   Let's take a look at Exhibit 2044.

4        **MR. MARAIS:**  This is an e-mail from Ms. Hsiao to

5  Mr. Sarin and others.  I'd move it in, Your Honor.

6        **THE COURT:**  Admitted.

7        (Trial Exhibit 2044 received in evidence)

8  **BY MR. MARAIS:**

9  **Q.**   And you'll see underlined there there's a link to a

10  PowerPoint presentation that says "Project Tesla Due Diligence

11  Kickoff."  Do you see that?

12  **A.**   I do.

13  **Q.**   And "Tesla," that's Autonomy; right?

14  **A.**   Right.

15  **Q.**   And so July 29th, 2011, as you've said, is about the time

16  that the due diligence begins?

17  **A.**   Correct.

18  **Q.**   And if we go to page 3 of this exhibit -- no.  Next page,

19  I think.

20        This is an internal HP presentation; correct?

21  **A.**   Correct.

22  **Q.**   And the first bullet point here says (reading):

23        "Confidentiality is absolutely essential and is

24        paramount to successfully completing the transaction."

25  **A.**   Correct.

**SARIN - CROSS / MARAIS**

1  **Q.**  Once again, that's HP stressing internally the importance

2  of keeping the deal confidential; right?

3  **A.**  Yes.

4  **Q.**  Can we go to page 13 of the presentation?

5  I'm sorry.  I have a cold.

6  This is a set of dates and deadlines that you had

7  established internally at this time; right?

8  **A.**  Correct.

9  **Q.**  Do you see on August 17th and August 18th you have

10  "Signing of definitive agreement"?

11  **A.**  Yes.

12  **Q.**  Does that refresh your recollection that before you began

13  due diligence, your understanding was that the deal was going

14  to close and be announced on August 18th?

15  **A.**  Yeah, this refreshes my memory that it was going to be

16  announced on August 18th but not close on August 18th.

17  **Q.**  That's a good clarification.  I appreciate that.

18  It didn't close until October?

19  **A.**  Right.

20  **Q.**  But before you began due diligence, you knew that the deal

21  was going to be announced on August 18th?

22  **A.**  Correct.

23  **Q.**  Wasn't it your view that this deal was going to get done

24  no matter what happened during due diligence?

25  **A.**  Not really.

1  **Q.**  Do you remember telling HP's lawyers that you thought this

2  deal was going to get done because Mr. Apotheker wanted it to

3  no matter what happened during due diligence?

4  **A.**  I remember telling them that there was significant deal

5  momentum, which is true for any deal.  Once you're a week or

6  two into diligence, there is momentum in a transaction and, of

7  course, you're always looking to confirm all the elements of

8  diligence.  So to the extent there were no red flags, if you

9  will, or nothing untoward is found in diligence, deal momentum

10  normally carries a deal through.

11  **Q.**  Do you remember when you met with HP's lawyers the term

12  "window dressing" was discussed?

13  **A.**  I don't remember.

14  **Q.**  Do you remember saying that you could feel a sentiment

15  that the due diligence process was window dressing?

16  **A.**  I remember saying exactly what I just said, which is deal

17  momentum is what normally carries deals through; and there was

18  significant deal momentum by the time we got to middle of

19  August.

20      **MR. MARAIS:**  Your Honor, can I direct the witness'

21  attention to what I believe is marked as Exhibit 6489?

22      **THE COURT:**  Let me look at that.

23              (Pause in proceedings.)

24      **THE COURT:**  What page?

25      **MR. MARAIS:**  It should be the Proskauer interview

**SARIN - CROSS / MARAIS**

 1   notes.  This is page 10.

 2                    (Pause in proceedings.)

 3        **MR. MARAIS:**  And in particular I'm focused on the

 4   fourth paragraph down, which begins "Mr. Sarin said."

 5        **MR. REEVES:**  Are we refreshing recollection,

 6   Your Honor?  I object to the form of the question.

 7        **THE COURT:**  No, he's not refreshing recollection.

 8   He's impeaching.

 9                    (Pause in proceedings.)

10        **THE COURT:**  Okay.  You may read that paragraph.

11        **MR. MARAIS:**  Thank you, Your Honor.

12        Let me set it up first.

13   **Q.**   Do you remember meeting with HP's lawyers on October 17th,

14   2013?

15   **A.**   I've met HP's lawyers on many occasions.  I don't remember

16   the dates.

17   **Q.**   How many times have you met with HP's lawyers?

18   **A.**   A few times.

19   **Q.**   How many times have you met with the prosecutors?

20   **A.**   A few times.

21   **Q.**   All right.  Let me read the paragraph that we've been

22   discussing (reading):

23            "Mr. Sarin said that he felt that the Autonomy

24        acquisition was going to happen no matter what occurred

25        during due diligence because Mr. Apotheker wanted it to;

 1    and whether it could be said that the diligence process

 2    merely provided window dressing for Mr. Apotheker's

 3    dictate, Mr. Sarin stated that nobody ever specifically

 4    put those sentiments into words but he could feel it."

 5         THE COURT:  Read on.  Read on.

 6         MR. MARAIS:  (reading)

 7          "Absent a big red flag, Mr. Sarin said he believed

 8    that the deal would happen."

 9  Q.    Does that refresh your recollection that you expressed a

10  sentiment that due diligence was window dressing?

11  A.    I don't think I said those words, but I remember having

12  that conversation which said there was significant deal

13  momentum.  Normally that's what carries deals through; and

14  unless we found a big red flag, we were going to get a deal

15  here.

16  Q.    Let's take a look at Exhibit 6518.

17  A.    (Witness examines document.)

18  Q.    This is an e-mail you received that attaches what's called

19  a letter of intent.  Do you see that?

20         THE COURT:  Admitted.

21    (Trial Exhibit 6518 received in evidence)

22         THE WITNESS:  I do.

23         MR. MARAIS:  Jeff, if we could focus on the first page

24  of the attachment.

25  Q.    Do you see that this letter is dated July 28, 2011?

**SARIN - CROSS / MARAIS**

1    **A.**    Yes.

2    **Q.**    That's before you began due diligence; correct?

3    **A.**    Yes.

4    **Q.**    And a little further down under paragraph 1, HP is

5    discussing the strategic rationale of the deal.  Do you see

6    that?

7    **A.**    I do.

8    **Q.**    It says (reading):

9            "We believe a unified analytic solution can be built

10           around HP's technology assets coupled with Autonomy's

11           structured and unstructured capabilities."

12       Do you see that?

13   **A.**    I do.

14   **Q.**    And these are the synergies that we were discussing

15   yesterday; correct?

16   **A.**    Correct.

17   **Q.**    Under paragraph 2, there's a price range:  HP would be

18   prepared to make an all cash offer, and the price range is

19   between £24.94 and £26.94 per share.  Do you see that?

20   **A.**    I do.

21   **Q.**    So was it your understanding that before due diligence

22   began, HP had already established this narrow price range for

23   the acquisition?

24   **A.**    Yeah.  This is a nonbinding term sheet and most targets

25   would want the acquirer to show that they are committed to a

1    transaction before they spend a lot of time in diligence.  So

2    this was sent to me the night before the second meeting in

3    London as part of that process.

4    **Q.**    This is an HP document; right?

5    **A.**    Correct.

6    **Q.**    And so the night before the meeting in London, you see an

7    HP document that explains that the price range for the

8    transaction has already been established; right?

9    **A.**    Correct.

10    **Q.**    If we could go to paragraph 6 and highlight the last

11    sentence of the first paragraph, Jeff, starting "Furthermore."

12    (reading)

13            "We are conscious of the implications of Rule 20.2

14        and would not want to put Autonomy in a position where it

15        might have to disclose sensitive information to an

16        interloper."

17        Do you see that?

18    **A.**    I do.

19    **Q.**    Is Rule 20.2 a reference to the takeover code that we've

20    been discussing?

21    **A.**    Yes.

22    **Q.**    And, again, the sentiment here is concern about sharing

23    nonpublic information; right?

24    **A.**    Yes.

25    **Q.**    And the concern is if Autonomy shares sensitive nonpublic

SARIN - CROSS / MARAIS

1    information with HP, if another buyer comes along, it would

2    have to share the same information with that other buyer;

3    right?

4    **A.**    Correct.

5    **Q.**    And so it's reasonable, isn't it, for Autonomy to focus

6    solely on the questions that HP asked and to try to narrow the

7    information that it provided to you; right?

8    **A.**    Correct.

9    **Q.**    So the meeting in July took place on July 29th, correct,

10   right at the end of the month?

11   **A.**    Yes.

12   **Q.**    And that's in London?

13   **A.**    Yes.

14   **Q.**    And I think you said the plan was to stay there for at

15   least a week?

16   **A.**    Correct.

17   **Q.**    And HP was going to conduct a week of due diligence in

18   person; right?

19   **A.**    Yes.

20   **Q.**    And then there were some concerns that if HP was going in

21   and out of Autonomy's office, somebody might notice, the press

22   might get interested?

23   **A.**    That's the way it was described to us.

24   **Q.**    And so your boss, Shane Robison, decided that what HP was

25   going to do was come back to California and conduct the

1  diligence remotely; correct?

2  **A.**   That's what he told me.  I don't know whether he decided

3  or somebody else decided.  That's what he asked us to do.

4  **Q.**   Let's take a look at Exhibit 2037.

5        **MR. MARAIS:**  This is an e-mail from Mr. Robison to you

6  and others.  I'd move it in, Your Honor.

7        **THE COURT:**  Admitted.

8    (Trial Exhibit 2037 received in evidence)

9  **BY MR. MARAIS:**

10  **Q.**   And, again, the date here is July 29th; correct?

11  **A.**   Correct.

12  **Q.**   And Mr. Robison writes (reading):

13        "It looks like we may be able to do what we need from

14      Palo Alto next week using the data rooms and conference

15      calls."

16  **A.**   Correct.

17  **Q.**   And then he goes on to discuss travel logistics.

18  **A.**   Yes.

19  **Q.**   So as far as you understood, Mr. Robison's decision was

20  that you could do due diligence remotely?

21  **A.**   That's what he wants us to do.

22  **Q.**   You didn't discuss anything substantive at the July 29

23  meeting; right?

24  **A.**   That's what I remember.

25  **Q.**   You didn't discuss any financial data?

SARIN - CROSS / MARAIS

1   **A.**   That's what I remember.

2   **Q.**   If we look at Exhibit 2585, which is in evidence, these

3   are your notes; right?

4   **A.**   Yes.

5   **Q.**   And you've written "document" or "call" to indicate your

6   understanding that that information would be conveyed at a

7   later date; right?

8   **A.**   Yes.

9   **Q.**   Can we focus in on B)1)?  Do you remember discussing this

10  request with the Government yesterday?

11  **A.**   Yes.

12  **Q.**   And this was a request that you sent to Autonomy in

13  writing; right?

14  **A.**   Correct.

15  **Q.**   And Mr. Reeves asked you a series of questions and in the

16  end asked you to agree that what you were trying to get here

17  was information about all Autonomy product categories.  Do you

18  remember that?

19  **A.**   Yes.

20  **Q.**   You didn't use the word "all" in this question; right?

21  **A.**   I used the word "major."

22  **Q.**   "Major"?

23  **A.**   Yes.

24  **Q.**   So the question you put to Autonomy was "Describe your

25  major product categories"?

1  **A.**   Correct.

2  **Q.**   And so if hardware was not a major product category for

3  Autonomy, it would be reasonable for them to assume that you

4  were not interested in that category?

5  **A.**   I think we went over yesterday that hardware was more than

6  the services business, and by that definition itself would be

7  considered one of the main product lines, certainly bigger than

8  appliance, which they have said in their annual report was

9  small.  So I just -- I didn't want to know about anything that

10 was small, but something that comprises 15 percent of revenues

11 is certainly major.

12 **Q.**   Well, let's set the annual reports aside because we've

13 discussed them at some length already.  And you agreed

14 yesterday that the annual reports were audited by Deloitte;

15 right?

16 **A.**   Probably reviewed by Deloitte.  The financial statements

17 were audited by Deloitte.

18 **Q.**   And you took comfort in knowing that Deloitte had looked

19 at those reports and statements; correct?

20 **A.**   Correct.

21 **Q.**   Now, this question here that you put to Autonomy, all

22 you've asked them to do is provide an overview of their major

23 product categories; right?

24 **A.**   Correct.

25 **Q.**   You understand that Autonomy didn't make hardware; right?

SARIN - CROSS / MARAIS

1    **A.**    Well, at that time I didn't know they sold any hardware,

2    but they --

3    **Q.**    Today you understand that Autonomy never made any

4    hardware?

5    **A.**    They were a pure software business so, yes, they did not

6    make any hardware.

7    **Q.**    Hardware was not an Autonomy product; right?

8    **A.**    Correct.

9    **Q.**    Do you know how many HP personnel were working on the due

10    diligence project?

11          **THE COURT:**  I'm confused.  You used the word

12    "product."  Do you mean -- a product is something that's sold,

13    but are you using the term in the meaning that a product is

14    something that is produced --

15          **MR. MARAIS:**  Correct, Your Honor.

16          **THE COURT:**  -- that is created?

17          **MR. MARAIS:**  Correct.

18          **THE COURT:**  So something can be a product of a company

19    even if they don't make it, if they sell it.

20          **MR. MARAIS:**  Well, I'm using the word "product" in the

21    sense of produced as Your Honor has pointed out.

22          **THE COURT:**  Create.

23          **MR. MARAIS:**  Created.

24          **THE COURT:**  Okay.  So that's -- but that's -- so

25    the -- I think we have -- I think there should be some

 1  clarification in the response because I think I hear something

 2  different from what I think was the response given to the

 3  question.

 4          **THE WITNESS:**  I agree.  I think I understood your

 5  question to be does Autonomy create hardware, and they don't.

 6  But do they sell hardware?  Whether they create it, they

 7  procure it, however they do it, do they sell hardware, the

 8  answer is yes.  You said as I know it today.

 9  **BY MR. MARAIS:**

10  **Q.**  That's fine.

11      Do you know how many people were working on the diligence

12  project?

13  **A.**  Will you clarify for me when you say working in diligence

14  itself, in potential integration later on, how do you define

15  "working"?

16  **Q.**  Let me cut to the chase.  Let's take a look at

17  Exhibit 6527.

18  **A.**  (Witness examines document.)

19  **Q.**  The top e-mail here, which I'm not interested in, is an

20  e-mail from Mr. Kanter but he's forwarding an e-mail from you,

21  Mr. Sarin.

22          **THE COURT:**  Admitted.

23      (Trial Exhibit 6527 received in evidence)

24          **MR. MARAIS:**  Thank you, Your Honor.

25  **Q.**  And you understand that in this e-mail exchange, you had

1  sent Autonomy what's known as a working group list; right?

2  **A.**  Correct.

3  **Q.**  It's a list of the HP people who are going to be working

4  on due diligence or who would have access to the data room;

5  right?

6  **A.**  Correct.

7  **Q.**  And I'm not going to make you count, but I will represent

8  to you that there are 78 names on this list, including 17

9  people from HP.  Does that sound right to you?

10 **A.**  Correct.

11 **Q.**  And in addition to the people who worked at HP, you had

12 people from Barclays working on diligence; right?

13 **A.**  Yes.

14 **Q.**  People from Perella Weinberg?

15 **A.**  Yes.

16 **Q.**  Gibson Dunn?

17 **A.**  Yes.

18 **Q.**  Freshfields?

19 **A.**  Yes.

20 **Q.**  KPMG?

21 **A.**  Yes.

22 **Q.**  And these are outside bankers, lawyers, and accountants

23 who were helping you with the process; right?

24 **A.**  Correct.

25 **Q.**  How many of those 78 people did you speak to during the 10

**SARIN - CROSS / MARAIS**

1  days or two weeks of due diligence?

2  **A.**    A lot of people are listed in a working group list,

3  particularly from external advisers who may have smaller roles

4  in a transaction.   I probably spoke to maybe 10 or 15.

5  **Q.**    10 of the 78?

6  **A.**    10 or 15 people.

7  **Q.**    And during the 10 days or two weeks of due diligence,

8  there were a host of calls taking place; right?

9  **A.**    Correct.

10  **Q.**    And you weren't on all of those calls?

11  **A.**    Correct.

12  **Q.**    So there may have been things discussed on those calls

13  that you're not aware of?

14  **A.**    Correct.

15  **Q.**    The first of the daily diligence calls took place on

16  August the 1st; right?

17  **A.**    Correct.

18  **Q.**    And that was the same day that you got access to the data

19  room?

20  **A.**    I don't remember when I got access to the data room, but

21  the first call was August 1st.

22  **Q.**    I'm trying to be as efficient as I can.   Do you have any

23  recollection that you got access to the data room before the

24  calls began?

25  **A.**    I don't remember, but it must have been right around that

SARIN - CROSS / MARAIS

1   date.  So I don't know whether a day before, a day after, I

2   don't remember; but I know the first call was August 1st, and

3   we got access to the data room in that time period.

4   **Q.**   And this process of daily due diligence calls wrapped up

5   right around August 10; correct?

6   **A.**   Thereabouts.  There was also a daily evening call amongst

7   all the HP participants.  So around 5:00 o'clock in the evening

8   every day, to the point you were making earlier, if the HP

9   legal team or some other team was having diligence calls with

10  Autonomy, they would update the corporate development team on

11  all those activities.  So there was a way for us to understand

12  what was going on without participating on every call.

13  **Q.**   Could you turn to Exhibit 6523?

14  **A.**   (Witness examines document.)

15  **Q.**   These are a set of internal HP reports on the due

16  diligence process; correct?

17  **A.**   Correct.

18  **Q.**   And you've seen all of these; right?

19  **A.**   Yes.

20       **MR. MARAIS:**  Your Honor, I'd move them in.

21       **THE COURT:**  Admitted.

22       (Trial Exhibit 6523 received in evidence)

23       **MR. MARAIS:**  If we could just quickly pull up the

24  front page.

25  **Q.**   Next to the numbers, are these the leads for these various

1    categories:  Sales, product, legal, and HR?

2    **A.**    Yes.

3    **Q.**    You weren't the lead on any of these categories?

4    **A.**    No.

5    **Q.**    You were the coordinator of due diligence, the point

6    person?

7    **A.**    Correct.

8    **Q.**    And if we turn to, say, page 3, you'll see that the last

9    updated date here is August 10th.  And, again, I'll represent

10    to you that that same date, August 10th, appears on the other

11    reports in here.  Is that consistent with your memory that the

12    diligence process was essentially wrapped up by August 10?

13    **A.**    These reports were constantly updated depending on what

14    else -- what other conversations they were having.  So it's

15    entirely possible that a set of draft reports was prepared

16    August 10th but they were updated subsequently.

17    **Q.**    If you look at the front page of this e-mail, you'll see

18    that this is an internal e-mail circulating these reports on

19    the 26th of August; right?

20    **A.**    Yes.

21    **Q.**    After the deal was announced?

22    **A.**    Yes.

23    **Q.**    And presumably at that time if someone was circulating the

24    reports, they would have sent the most up-to-date reports;

25    right?

1    **A.**    Correct.

2    **Q.**    Okay.  Did you feel there was a rush for you to get things

3    done by August 10th?

4    **A.**    Not by August 10th but certainly get everything done by

5    announce date, which is August 18th.

6        And just like any other transaction, there is a flurry of

7    activity in the first couple of weeks, whether it's a small

8    transaction or a big transaction.  So this was no different.

9    **Q.**    Let me turn you to Exhibit 6532.

10   **A.**    (Witness examines document.)

11   **Q.**    This is another of these internal message chats between

12   you and Mr. Levadoux.

13            **MR. MARAIS:**  I'd move it in, Your Honor.

14            **THE COURT:**  Admitted.

15        (Trial Exhibit 6532 received in evidence)

16   **BY MR. MARAIS:**

17   **Q.**    Do you see the date and time here, August 9th, 11:49 p.m.?

18   **A.**    Yes.

19   **Q.**    Mr. Levadoux asks why you're still up?

20   **A.**    Yes.

21   **Q.**    And you tell him (reading):

22            "Reviewing data room for materials, chasing down

23        Tesla on DD, managing the clown posse we have."

24        Do you see that?

25   **A.**    I do.

1  **Q.**  What did you mean by "the clown posse we have"?

2  **A.**  It's when you're working till midnight, you're a little

3  wound up.

4  **Q.**  Was that a reference to HP's team?

5  **A.**  It was the external advisers, other members on the team

6  that weren't probably integral to the process but were still on

7  the team.

8  **Q.**  And so does this refresh your memory that there was a

9  major rush to get things done on August 9th of 2011?

10  **A.**  There was a ton of stuff to do in the first couple of

11  weeks as I've said before.  We were all working pretty late

12  into the night most nights trying to get everything done.

13  **Q.**  Do you remember how many due diligence calls there were?

14  **A.**  I haven't counted.

15  **Q.**  Let's take a look at Exhibit 2089.

16       **THE COURT:**  Admitted.

17       (Trial Exhibit 2089 received in evidence)

18       **MR. MARAIS:**  Thank you, Your Honor.

19  **Q.**  Do you see in the middle here, this is an e-mail from Emma

20  Walton to Andy Kanter?

21  **A.**  Yes.

22  **Q.**  And Ms. Walton worked with you; correct?

23  **A.**  She worked for Sergio Letelier and she was part of the

24  diligence team.

25  **Q.**  At HP?

SARIN - CROSS / MARAIS

1    **A.**    At HP.

2    **Q.**    And she's e-mailing a set of due diligence questions over

3    to Autonomy; correct?

4    **A.**    Correct.

5    **Q.**    And, Jeff, if we could go to page 4.

6         This is what the questions would look like; right?

7    **A.**    Yes.

8    **Q.**    This is for a call on August 3?

9    **A.**    Right.

10   **Q.**    There are 95 questions in this list.  How long would the

11   call have been on August 3?

12   **A.**    Was I on the call?

13   **Q.**    Were you on the call?

14   **A.**    I don't know.

15   **Q.**    How long were these calls typically?

16   **A.**    They were scheduled for an hour or 90 minutes.

17   **Q.**    And so would you intend to cover 95 questions in an hour

18   or 90 minutes?

19   **A.**    This is a legal diligence call.  I'm not sure I was on the

20   call, but I don't remember.

21   **Q.**    You testified yesterday about a couple of top 40 lists.

22   Do you remember that?

23   **A.**    I do.

24   **Q.**    Do you remember that HP was pretty vague with its requests

25   about the top 40 list?

```
 1              MR. REEVES:  I object.

 2              MR. MARAIS:  That's fine.  We can do this the

 3     hardware.

 4     Q.   Let's take a look at Exhibit 2047.

 5              THE COURT:  20?

 6              MR. MARAIS:  '47.

 7              THE COURT:  2047.

 8              MR. MARAIS:  This is an e-mail from Mr. Sarin to

 9     members of his team.

10              THE COURT:  Admitted.

11         (Trial Exhibit 2047 received in evidence)

12     BY MR. MARAIS:

13     Q.   And if we focus on page 2 under legal and contracts, at

14     the end of July you said that (reading):

15              "Autonomy will upload approximately 80 of their

16          largest contracts into the data room."

17         Do you see that?

18     A.   I do.

19     Q.   So as of July 29th, you were discussing 80 contracts;

20     right?

21     A.   No.  This is, if you look back to the question lists from

22     July 29th meeting, when I posed these questions to Mr. Hussain

23     and Dr. Lynch, Dr. Lynch offered up that they would be happy to

24     give us top 80 contracts assuming there's a $5 million cutoff.

25     He felt at that cutoff level there would be approximately 80
```

1    contracts; and that's why, when I was flying back from the

2    U.K., that's why I wrote this in the e-mail and in the end we

3    received 40 contracts.

4    **Q.**    Let's turn to Exhibit 2200.

5    **A.**    (Witness examines document.)

6              **THE COURT:**  Admitted.

7         It's a due diligence set of slides?

8              **MR. MARAIS:**  Thank you, Your Honor.

9         This is a copy of a KPMG report sent to HP about the due

10   diligence.

11             **THE COURT:**  I'm sorry.  What date is this?

12             **MR. MARAIS:**  This is August 11, August 10.

13             **THE COURT:**  August 9th?

14             **MR. MARAIS:**  That sounds right, Your Honor.

15             **THE COURT:**  Admitted.

16        (Trial Exhibit 2200 received in evidence)

17   **BY MR. MARAIS:**

18   **Q.**    This is a report that your advisers at KPMG prepared for

19   you; correct?

20   **A.**    Correct.

21   **Q.**    And you had asked KPMG to perform certain tasks, to look

22   into certain things in connection with diligence?

23   **A.**    HP had asked KPMG to perform certain things.

24   **Q.**    Correct.  And if we go to page 69 of this report, this

25   sets out the statement of work for KPMG; correct?

SARIN - CROSS / MARAIS

1    **A.**    Correct.

2    **Q.**    And these would have been tasks that HP had asked KPMG to

3    perform?

4    **A.**    Correct.

5    **Q.**    Could we go back a page, Jeff?

6          Okay.  That's great.  Can we highlight Number 7?

7          So the request that KPMG received was to read the

8    financial terms of the 20 largest contracts for 2010 and 2011;

9    right?

10    **A.**    Yes.

11    **Q.**    Again, a slightly different question from the top 40?

12    **A.**    Sure.

13    **Q.**    Let's turn to Exhibit 2152, which is in evidence.

14          There was a lot of discussion about this e-mail yesterday.

15    This is an internal e-mail from Mr. Binns who works at HP;

16    right?

17    **A.**    Correct.

18    **Q.**    And everybody on this e-mail is at HP; correct?

19    **A.**    Correct.

20    **Q.**    And I take it you've never seen a version of this e-mail

21    that went to Autonomy; right?

22    **A.**    I don't know.

23    **Q.**    You don't know that this e-mail ever went to Autonomy?

24    **A.**    This e-mail was sent to us.  I don't know if anybody

25    forwarded it to Autonomy.  I don't know.

1    **Q.**    And this e-mail is dated August 5th, which is after the

2    top 40 contracts were loaded into the data room; right?

3              **MR. REEVES:**  I object.  I think that misstates the

4    evidence.

5              **THE COURT:**  Well, I don't know that he has -- you have

6    to lay a foundation that he knows when they were loaded into

7    the databank, or whatever it's called, data room.

8    **BY MR. MARAIS:**

9    **Q.**    Do you know when the contracts were loaded into the data

10   room?

11   **A.**    I don't recall.

12   **Q.**    Do you know if you looked at the contracts in the data

13   room?

14   **A.**    The HP legal team was responsible for reviewing the

15   contracts, so I didn't review them.

16   **Q.**    You didn't look at the contracts?

17   **A.**    No.

18   **Q.**    Why don't we look at the request that you did send to

19   Autonomy, Exhibit 2153.

20             **THE COURT:**  And what is that?

21             **MR. MARAIS:**  This is an e-mail exchange between

22   Ms. Walton, who was on Mr. Sarin's team, and Mr. Kanter at

23   Autonomy.

24             **THE COURT:**  And the date?

25             **MR. MARAIS:**  August 5th, 2011, Your Honor.

SARIN - CROSS / MARAIS

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 2153 received in evidence)

3          **MR. MARAIS:**  Thank you.

4   **Q.**   Do you see that this is an exchange between your team and

5   Mr. Kanter at Autonomy?

6   **A.**   (Witness examines document.)  Yes.

7   **Q.**   And Mr. Kanter writes (reading):

8              "A few comments below in the meantime."

9          Do you see that?

10  **A.**   I do.

11  **Q.**   We'll see he's interlineated, he's put some comments of

12  his own in the document.

13  **A.**   Yes.

14  **Q.**   If we could go to page 2 and focus in on the section

15  "Updated Commercial Questions."

16         And Ms. Walton writes (reading):

17             "As discussed on the call on 3 August..."

18         Do you see that?

19  **A.**   I do.

20  **Q.**   Do you understand that you discussed these requests with

21  Autonomy on the call on August 3rd?

22  **A.**   That's what she discussed with Autonomy on August 3rd.

23  **Q.**   You weren't on the call?

24  **A.**   I don't remember.

25  **Q.**   You don't remember if you were on the call when the

 1  parties discussed the top 40 lists?

 2  **A.**    I was on many diligence calls, and I'm sure I was on a

 3  call on August 3rd.  I'm not sure if this call where Emma is

 4  referring to talking to Andy Kanter if I was on that call.

 5  **Q.**    You may not have been on the call in which the parties

 6  discussed the top 40 lists?

 7  **A.**    I discussed the top 40 contracts with Autonomy on the

 8  calls that I had.  You're asking me was I on this call that

 9  Emma had with Andy Kanter.  I'm not sure.

10  **Q.**    Is this a fair summary of the requests that HP put to

11  Autonomy related to the top 40 lists?

12  **A.**    Yes.

13  **Q.**    And Ms. Walton asks for a copy of the top 40 customer

14  contracts.  Do you see that?

15  **A.**    (Witness examines document.)  Yes.

16  **Q.**    And you don't think that you reviewed those contracts;

17  correct?

18  **A.**    Correct.

19  **Q.**    And then she asks for a list of the top 40 customers by

20  revenue.  Do you see that?

21  **A.**    I do.

22  **Q.**    And you don't know that you ever reviewed that list;

23  right?

24          **THE COURT:**  I'm sorry.  The first question was did he

25  review the contracts.

1          MR. MARAIS:  Correct.

2          THE COURT:  And the second question is did he review

3    the list.

4          MR. MARAIS:  Of the top 40 customers, Your Honor.

5          THE COURT:  Right.  Okay.  So those are different

6    questions.

7          MR. MARAIS:  Correct.

8          THE COURT:  So the question to you is:  Did you look

9    at the list?  That's the question.

10          MR. MARAIS:  Of the top 40 customers.

11          THE COURT:  Of the top 40 customers.

12          THE WITNESS:  I reviewed a list that we reviewed

13    yesterday -- I forget it's top 40 contracts or top 40

14    customers -- that has my handwritten notes.  That's the one I

15    remember reviewing.

16    BY MR. MARAIS:

17    Q.   Well, the distinction is important.  There's no request

18    here for a list of the top 40 contracts; right?

19          THE COURT:  I'm sorry.  I'm just trying to understand

20    the distinction you're drawing.

21          MR. MARAIS:  Sure, Your Honor.

22      There are two lists that the Government has talked about.

23    One is the list of the top 40 customers that Autonomy had.

24          THE COURT:  Right.

25          MR. MARAIS:  The other is a list of the top 40

```
 1   contracts, individual contracts, that Autonomy had entered
 2   into.
 3        This list -- the request here is for a list of the top 40
 4   customers.  There is no request here for a list of the top 40
 5   contracts.
 6           MR. REEVES:  Your Honor, I think the --
 7           THE COURT:  Oh, so if I understand the distinction
 8   you're drawing is if I say -- what is being asked here are the
 9   top 40 contracts.
10           MR. MARAIS:  "Give us the contracts."
11           THE COURT:  Number one -- okay, we identify (i), I
12   guess is fine --
13           MR. MARAIS:  Right.
14           THE COURT:  What's being asked:  "Give us the
15   contracts."
16           MR. MARAIS:  Correct.
17           THE COURT:  "Give us the top 40 contracts."
18           MR. MARAIS:  Correct.
19           THE COURT:  "Don't give us necessarily a list of the
20   top 40 contracts.  Give us the contracts themselves."
21        And, number two is:  "Give me a list of the top 40
22   customers by revenue," because ostensibly that wouldn't just
23   be -- that could be 1,000 contracts or 5 contracts, or whatever
24   it is.
25           MR. MARAIS:  Exactly right, Your Honor.
```

 1          THE COURT:  It has to be more than five maybe, but

 2   maybe not.  Yeah -- yeah, I think you'd have to have 40 people

 3   there somehow.

 4          MR. REEVES:  Your Honor --

 5          THE COURT:  Okay.  I think I understand the

 6   distinction.

 7       So do you understand the distinction?

 8          THE WITNESS:  Sir, I understand the distinction.

 9       I remember reviewing a list, which we also saw yesterday.

10   What I don't remember is, is that list of top 40 customers or

11   top 40 contracts.

12          THE COURT:  Okay.  That's fine.

13   BY MR. MARAIS:

14   Q.   We'll come back to that.  But my question right now is:

15   These questions that were sent to Autonomy do not include a

16   request for a list of the top 40 contracts; correct?

17          MR. REEVES:  I object to the extent it misstates the

18   evidence that this was the only request.  We saw evidence of a

19   list from Autonomy.

20          THE COURT:  Well, wait.  Wait.  Wait.  That's not his

21   question.  You'll have your opportunity.

22          MR. REEVES:  All right.

23          THE COURT:  Objection overruled.

24          THE WITNESS:  Could you repeat it?

25   \\\

SARIN - CROSS / MARAIS

1  BY MR. MARAIS:

2  Q.   There's a lot of fuss about this question.

3       In this exhibit --

4  A.   Do you mind going through it again?

5  Q.   In this exhibit, the request that Ms. Walton sent to

6  Autonomy, there is no request for a list of the top 40

7  contracts; correct?

8  A.   Correct.

9  Q.   What there is is a list for copies of the contracts;

10 right?

11 A.   Correct.

12 Q.   Which you didn't look at?

13 A.   Which I didn't look at.

14 Q.   And there's a request for a list of the top 40 customers;

15 correct?

16 A.   Correct.

17 Q.   And you told the Government that you were not sure that

18 you ever saw that list?

19 A.   Which list now?

20 Q.   Of the top 40 customers.

21      MR. REEVES:  Objection.  That misstates the evidence

22 today and yesterday.

23      THE COURT:  Well, okay.

24 BY MR. MARAIS:

25 Q.   Do you remember meeting with the Government a couple of

1  weeks ago to have a conversation about your testimony?

2  **A.**   Sure.

3  **Q.**   And do you remember during that meeting telling the

4  Government that you could not remember if you ever saw a list

5  of Autonomy's top 40 customers?

6  **A.**   Sir, there were two lists shown to me.  One list has my

7  handwritten notes.  I don't know now, because seven years have

8  gone by, is that a list of top 40 customers or top 40

9  contracts.  I distinctly remember reviewing a list.  I don't

10 remember reviewing the other list.

11          **THE COURT:**  Let's move on.

12          **MR. MARAIS:**  I will, Your Honor.

13 **Q.**   Let's take a look at Exhibit 2627, which is a list of the

14 top 40 customers.

15          **MR. MARAIS:**  I believe it's in evidence, but --

16          **THE COURT:**  Pardon me.  Sorry.

17          **MR. MARAIS:**  2627.  It's not in evidence.  I'd move it

18 in.

19          **THE COURT:**  Let me just look at it for one minute,

20 please.

21               (Pause in proceedings.)

22          **THE COURT:**  Okay.  Admitted.

23      (Trial Exhibit 2627 received in evidence)

24          **MR. MARAIS:**  Thank you, Your Honor.

25 **Q.**   Is it your understanding that this exhibit is one of the

1    top 40 lists we've been discussing?

2    **A.**    Yes.

3    **Q.**    And as you sit here today, do you know whether this is a

4    list of the top 40 customers or the top 40 contracts?

5    **A.**    It says on top "Customer Name."  So I'm assuming it is top

6    40 customers.

7    **Q.**    And have you ever seen this document before?  Let me

8    strike that.  I know you've seen it in meetings with the

9    Government.

10        Did you look at this Government -- did you look at this

11    document at the time that HP was conducting due diligence?

12    **A.**    I've always said I don't remember.

13    **Q.**    There are no customer names on here; right?

14    **A.**    Correct.

15    **Q.**    I mean, if I said to you, "Let's highlight row 17," which

16    looks like a $10 million customer in the pharmaceutical

17    industry -- do you see that?

18    **A.**    I do.

19    **Q.**    -- you have no idea who the customer is; right?

20    **A.**    Correct.

21    **Q.**    It's fairly standard practice in due diligence for a party

22    to redact sensitive information like the identity of its

23    customers; right?

24    **A.**    Correct.

25    **Q.**    And at no point during the due diligence did you ask for

1    an unredacted copy of this list; right?

2    **A.**    I don't remember.

3    **Q.**    But you never saw one; correct?

4    **A.**    I never saw one.

5    **Q.**    You understand that software companies frequently use

6    resellers; right?

7    **A.**    Most companies use resellers.

8    **Q.**    And what you're trying to understand through these lists

9    is which markets, which industries Autonomy's software products

10   have been sold into; correct?

11   **A.**    That and then customer concentration as I've said before.

12   **Q.**    Customer concentration within a particular industry?

13   **A.**    Or could be one customer accounting for 100 million of

14   their revenues, yeah.

15   **Q.**    Okay.  That makes sense.

16       So what you're interested in is the customer who's using

17   the software product; right?

18   **A.**    The end customer that is using the software product,

19   that's right.

20   **Q.**    The end customer?

21   **A.**    Yes.

22   **Q.**    What you want from this list is to know the identity of

23   the end customer; correct?

24   **A.**    Correct.

25   **Q.**    And so if a software company like Autonomy sold a deal

 1   through a reseller, the piece of information you would be

 2   interested in in these lists is not the reseller but the end

 3   user; right?

 4   **A.**   Correct.

 5   **Q.**   Let's turn to Exhibit 2548, which, I think is in evidence.

 6   It's a list of the top 40 contracts with Mr. Sarin's

 7   handwriting.

 8           **THE CLERK:**  No.

 9           **THE COURT:**  It is in evidence.

10           **MR. MARAIS:**  Thank you, Your Honor.

11   **Q.**   Do you understand that although it says "Customer" at the

12   top, this is a list of the top 40 contracts?

13   **A.**   Okay.

14   **Q.**   Well, do you know?

15   **A.**   I don't remember now.

16   **Q.**   This is the one you reviewed; right?

17   **A.**   Yeah.  So this is the one I said I've reviewed.  I walked

18   through the tick marks.  I walked through the percentages at

19   the bottom.

20   **Q.**   And this is your handwriting on the list?

21   **A.**   Yes.

22   **Q.**   But as you sit here now, you don't know whether this is a

23   list of the top 40 contracts or the top 40 customers?

24   **A.**   I'm looking at it says "Customer" on top and, as I've

25   said, seven years have gone by.  I'm just going by what it says

1   now.  I don't remember what was told to me at that time.

2   **Q.**   When you discussed these lists -- the request for these

3   lists with Autonomy in early August, didn't you and Autonomy

4   agree that they should focus on their core software business?

5   **A.**   Repeat the question, please.

6   **Q.**   When you discussed the request for these lists on a phone

7   call with Autonomy, didn't you and Autonomy agree that what

8   they should focus on in these lists was their core software

9   business?

10  **A.**   No.  We were looking for top 40, so all their customers

11  that comprised the bulk of their revenues.

12  **Q.**   Didn't you agree with Autonomy that the top 40 list should

13  focus on license, maintenance, and services?

14  **A.**   That's the response I got back from Andy Kanter saying the

15  dollar values shown here comprise license, maintenance, and

16  services, but I --

17  **Q.**   Let's take a look --

18        **MR. REEVES:**  I object.  Let him finish.

19        **THE WITNESS:**  I understood that to be that because

20  they're not selling any hardware, that is the full extent of

21  revenue from that customer.

22        **MR. MARAIS:**  Let's take a look at Exhibit 2231.  This

23  is an e-mail exchange between Mr. Sarin and Mr. Kanter dated

24  August 11th.  I'd move it in.

25        **THE COURT:**  Wait.

1       **MR. MARAIS:**  2231, Your Honor.

2                       (Pause in proceedings.)

3       **THE COURT:**  Okay.  Admitted.

4       (Trial Exhibit 2231 received in evidence)

5       **MR. MARAIS:**  Thank you.

6   **Q.**   This is an e-mail you wrote to Mr. Kanter; correct?

7   **A.**   Correct.

8   **Q.**   And if we scroll down to "Contracts," you write (reading):

9           "We've reviewed the top 40 contracts in the data

10          room.  Should the revenue customer shown on the page

11          include license plus maintenance plus service?"

12          Do you see that?

13  **A.**   I do.

14  **Q.**   Those are your words, right?

15  **A.**   Correct.

16  **Q.**   Isn't that what you agreed the list should include?

17  **A.**   Sir, the way they described their products is license,

18  cloud, OEM, which is a separate set of customers on the OEM

19  side.  So by definition, based on the way they described their

20  customers, the only product that customer would have would be

21  license, maintenance, and service.  So I'm only repeating what

22  I understand that they do.

23  **Q.**   You didn't ask them to provide hardware revenue in these

24  top 40 lists; right?  There's no reference to hardware in your

25  e-mail here?

SARIN - CROSS / MARAIS

1    **A.**    Because there's no reference to hardware in any of their

2    pub lib filings either.

3    **Q.**    So your testimony is that at this time you had no idea

4    that Autonomy was selling hardware; is that right?

5    **A.**    I viewed them at this time to be selling a small number of

6    appliances.

7    **Q.**    When you say "license" here, that means software licenses;

8    correct?

9    **A.**    Correct.

10    **Q.**    And so licenses would not include hardware revenue; right?

11    **A.**    The term "license" denotes to software license.

12    **Q.**    Software, not hardware; right?

13    **A.**    Hardware is just not sold as a license.

14    **Q.**    Okay.

15    **A.**    It's just sold as a box.

16    **Q.**    You understand that Autonomy uploaded 40 or 50 contracts

17    into the data room; right?

18    **A.**    I don't know 40 or 50, but the top 40.

19    **Q.**    And you had access to those contracts; correct?

20    **A.**    Correct.

21    **Q.**    Let's take a look at a couple of them quickly.

22    Exhibit 2561 is a contract with UBS.

23              **THE COURT:**    25 --

24              **MR. MARAIS:**    '61, Your Honor.

25              **THE COURT:**    2561.

**SARIN - CROSS / MARAIS**

```
 1              (Pause in proceedings.)
 2         THE COURT:  Okay.  Now, my question to you is:  Is
 3   this one of the documents that was uploaded and furnished to
 4   Autonomy during the due diligence?
 5         MR. MARAIS:  It is, Your Honor.  You'll see that --
 6         THE COURT:  Admitted.
 7       (Trial Exhibit 2561 received in evidence)
 8         MR. MARAIS:  Thank you.
 9       -- it has a KPMG date stamp on it.
10         THE COURT:  Well, whatever.  I accept your
11   representation.
12         MR. MARAIS:  Thank you, Your Honor.
13   Q.   You see on the bottom right-hand corner it's got a KPMG
14   number there?
15   A.   Yes.
16   Q.   Okay.  So KPMG was helping you during due diligence;
17   right?
18   A.   Correct.
19   Q.   And KPMG had access to the same contracts that you had
20   access to in the data room?
21   A.   Correct.
22   Q.   And this is one of those contracts.  You can't tell --
23   it's been redacted.  You can't tell that it's a contract with
24   UBS, but I'll represent to you that that's who the customer is
25   here.
```

1          Could we take a look at paragraph 5.1?

2          And supplier here in this contract is Autonomy.  This

3   paragraph 5 reads (reading):

4               "Supply of Hardware.  Supplier shall supply any of

5          the hardware specified in the supply order."

6          Do you see that?

7   A.     Yes.

8   Q.     Let's take a look at paragraph 6.1.

9          This one requires that (reading):

10              Autonomy shall deliver and install the hardware in

11         accordance with the delivery program."

12         Do you see that?

13  A.     Yes.

14  Q.     Let's take a look at paragraph 6.7.

15         Again, discussing the installation of the hardware on

16  various installation dates.  Do you see that?

17  A.     Yes.

18  Q.     You didn't read any of this during the due diligence

19  period?

20  A.     No.

21  Q.     Let's take a look at Exhibit 1041.

22              **MR. MARAIS:**  This is another contract that was in the

23  data room, Your Honor.

24              **THE COURT:**  Admitted.

25         (Trial Exhibit 1041 received in evidence)

1          **MR. MARAIS:**  Thank you.

2    **Q.**    This is a purchase order between an Autonomy company

3    Zantaz and an end user Citi.  Again, the name is redacted,

4    which is fairly standard practice in diligence; right?

5    **A.**    Correct.

6    **Q.**    And if we take a look at paragraph 3 of this agreement,

7    you see the paragraph is discussing title or ownership of

8    archive storage cells?

9    **A.**    (Witness examines document.)

10   **Q.**    Do you see that?

11   **A.**    I do.

12   **Q.**    Storage cells are a service; right?

13   **A.**    Say that one more time.

14   **Q.**    Storage sells are service, hardware?

15   **A.**    Yeah.  It could be cloud-based storage, but I don't know

16   what this refers to; but, by and large, it could be an

17   on-premise server or it could be a cloud-based archive.

18   **Q.**    Jeff, could we just go to what I'm hoping is the last page

19   of this exhibit?

20        All right.  And you see this is an annex to the purchase

21   order that sets out what's being ordered from Autonomy?  Do you

22   see that?

23   **A.**    I do.

24   **Q.**    And on the left-hand side all of this discussion is about

25   archive storage cells; correct?

1  **A.**   (Witness examines document.)  Correct.

2  **Q.**   Again, this is hardware; right?

3  **A.**   Could be.  Could be cloud-based archive.  I don't know.

4  **Q.**   And although the amount is redacted, you said yesterday

5  your understanding was that any contract in the data room was

6  worth at least $2.9 million; right?

7  **A.**   That's what the list showed me.

8  **Q.**   Well, you understood that this was one of the largest

9  contracts that Autonomy had signed; right?

10  **A.**   If it's in the archive, it is one of the top -- not

11  archive -- data room, it's the top 40 contract; therefore, it

12  should be on the list; therefore, it should be more than

13  2.9 million.

14  **Q.**   And this contract, this purchase order was available to

15  you in the data room during due diligence; right?

16  **A.**   Yes.

17  **Q.**   You just didn't look at it?

18  **A.**   There was a team of HP lawyers looking at this along with

19  KPMG.

20  **Q.**   Did any of the HP lawyers tell you that they'd seen

21  hardware contracts in the data room?

22       **MR. REEVES:**  Your Honor, I object.  The witness has

23  clearly not seen this, so there's a lack of foundation.

24       **THE COURT:**  But that wasn't the question.

25       **MR. REEVES:**  Well, he's asking what the other lawyers

 1    saw.

 2            **THE COURT:**  No.  He said -- that wasn't the question

 3    either.  The question was:  Did any of the lawyers tell you

 4    that they had seen this contract?

 5        Was that the question?

 6            **MR. MARAIS:**  It was, Your Honor.

 7            **THE COURT:**  Yeah.  Okay.

 8            **THE WITNESS:**  I don't recall.

 9    **BY MR. MARAIS:**

10    **Q.**  And you said that you asked KPMG to look at these

11    contracts as well?

12    **A.**  HP asked KPMG to review the contracts.

13    **Q.**  Could we look at Exhibit 2171?  This is an e-mail from

14    Andy Gersh.  He was at KPMG; right?

15    **A.**  Correct.

16    **Q.**  And the e-mail is a set of questions that get circulated

17    within your team.

18            **MR. MARAIS:**  I'd move it in, Your Honor.

19            **THE COURT:**  Admitted.

20        (Trial Exhibit 2171 received in evidence)

21    **BY MR. MARAIS:**

22    **Q.**  Mr. Gersh writes (reading):

23            "Manish -

24            "Attached are questions for management around their

25        contracts and revenue recognition."

1      Do you see that?

2  **A.**   I do.

3  **Q.**   And "management" here is a reference to Autonomy; correct?

4  **A.**   Correct.

5  **Q.**   So Mr. Gersh is sending you a set of questions that he

6  thinks you should ask of Autonomy; right?

7  **A.**   That I should send to Autonomy, yes.

8  **Q.**   To discuss with them?

9  **A.**   Correct.

10 **Q.**   And if we turn over to page 4 of this exhibit and focus in

11 on the second bullet, Jeff.

12      Agreement 2 here is the UBS contract we were just looking

13 at.  Mr. Gersh writes (reading):

14          "This is a contract for hardware and software

15      development."

16      Do you see that?

17 **A.**   I do.

18 **Q.**   And then he goes on (reading):

19          "You, Autonomy, are required to provide hardware

20      support."

21      Do you see that?

22 **A.**   I do.

23 **Q.**   And then he asks (reading):

24          "When do you, Autonomy, recognize hardware revenue?"

25 **A.**   I see.

1    Q.    And if we turn over to page 6 and look at Agreement 19, in

2    the second bullet Mr. Gersh says (reading):

3         "This contract includes implementation of networking,

4         hardware, and infrastructure."

5         Do you see that?

6    A.    I do.

7    Q.    And a little further down on the page for Agreement 28 in

8    the last bullet, Mr. Gersh suggests that you ask Autonomy

9    whether revenue is recognized upfront for the archive storage

10   cells, the hardware.  Do you see that?

11   A.    I do.

12   Q.    Did you read these questions?

13   A.    I did at that time.

14   Q.    Did you put these questions to Autonomy?

15   A.    A subset of these questions were sent to Autonomy.

16   Q.    Do you recall whether you discussed these questions with

17   Autonomy?

18   A.    I don't remember.  KPMG was having several discussions

19   with the finance team at Autonomy.

20   Q.    So it's possible that they discussed the hardware sales

21   with Autonomy directly?

22   A.    It's entirely possible.

23   Q.    You testified yesterday that when you were working on your

24   financial models, you looked at analyst reports.  Do you

25   remember that?

**SARIN - CROSS / MARAIS**

1   **A.**    I do.

2   **Q.**    Can we to a look at a couple of those?  Can we display

3   Exhibit 5804, which is in evidence?

4       If we focus on the third paragraph about the margin

5   profile.

6       So let me start with the date.  Do you see that this is

7   dated July 2010?

8   **A.**    Uh-huh.

9   **Q.**    This is before you did any of your financial modeling;

10  correct?

11  **A.**    Correct.

12  **Q.**    And you said yesterday the gross margins were important to

13  you; right?

14  **A.**    Correct.

15  **Q.**    And in this report this analyst writes (reading):

16          "Gross margins of 86 percent were below guidance due

17      to additional costs associated with hardware sales."

18      Do you see that?

19  **A.**    I do.

20  **Q.**    Did you read this report before due diligence began?

21  **A.**    Now, this is in 2010, well before we started looking at

22  Autonomy, so I don't believe I read this particular report.

23  **Q.**    You don't think you saw this one?

24  **A.**    No.

25  **Q.**    Let's take a look at Exhibit 1535, also in evidence.

SARIN - CROSS / MARAIS

1           This report is dated February 2011, a little closer in

2     time to your financial models.

3     **A.**    Uh-huh.

4     **Q.**    And you see in the third and fourth lines this analyst

5     writes (reading):

6                "Revenue is potentially flattered by hardware sales."

7           And then he goes on to say that (reading):

8                "Prior quarters, Q3 '09 and Q2 '10, also saw elevated

9           hardware."

10          Do you see that?

11    **A.**    I do.

12    **Q.**    Did you read this report before conducting due diligence

13    for Autonomy?

14    **A.**    No.

15    **Q.**    I'm sorry.  You did?

16    **A.**    I didn't.

17    **Q.**    Okay.

18    **A.**    This is from a small brokerage.  We read all the bigger

19    investment banks.

20    **Q.**    Look at one more of these, Exhibit 1649, also in evidence.

21          This is dated March 2011.  Do you see that?

22    **A.**    Yes.

23    **Q.**    Right around the time that you were doing your financial

24    models; correct?

25    **A.**    Yes.

**SARIN - CROSS / MARAIS**

1   Q.   And we can agree that JP Morgan is a big bank; right?

2   A.   Correct.

3   Q.   Do you know if you read this report or not?

4   A.   I don't recall.

5   Q.   And so despite these contracts, despite the analyst

6   reports that we've looked at, you never said to anyone at

7   Autonomy, "I'd like you to tell me how much revenue Autonomy

8   makes from hardware sales"; right?

9   A.   I asked the question around appliances, and I was told it

10  was small, and I took this to mean that this was part of what

11  the analyst community was talking about.

12  Q.   You never asked anybody at Autonomy, "Could you tell me

13  whether you sell pass-through hardware"; right?

14  A.   I didn't.

15  Q.   You never asked them to explain to you what portion of

16  their revenues came from hardware sales; right?

17  A.   I asked them what portion of their revenues -- or, rather,

18  if they sold -- well, let me back up.

19       I asked them if appliances were significant, and they said

20  it's small, and that was the extent of the questioning around

21  hardware.

22  Q.   You didn't ask them what "small" means?

23  A.   I didn't.

24  Q.   Were you aware that prior to the acquisition, HP was

25  selling its own hardware to Autonomy for resale?

1  **A.**   I'm not aware.

2  **Q.**   Let's take a look at Exhibit 5943, which is in evidence.

3        The date on this is August 4th, 2011.  Do you see that?

4  **A.**   (Witness examines document.)  Yes.

5  **Q.**   And give or take a day, this is right at the time when

6  Autonomy uploaded its top 40 lists and contracts into the data

7  room; correct?

8  **A.**   Correct.

9  **Q.**   If we scroll down a little -- you might have to go to the

10 next page, Jeff.  That's great -- you see that this is an order

11 for $2.8 million of various HP hardware components.  Do you see

12 that?

13 **A.**   Right.

14 **Q.**   And if we go back to the front page and focus in just on

15 the metadata up at the top and the first two lines, Jeff.

16       Mr. Eads, who works at Autonomy, is sending this e-mail to

17 various people, including a couple of people at HP; right?

18 **A.**   Yes.

19 **Q.**   And describing the hardware he writes (reading):

20           "This hardware is for resale."

21       Do you see that?

22 **A.**   Yes.

23 **Q.**   And your testimony is that at this time on August 4th,

24 Autonomy was trying to hide its hardware sales from HP?

25 **A.**   What I said is HP was not aware that Autonomy was

SARIN - CROSS / MARAIS

1    reselling plain hardware without any software uploaded on it.

2    **Q.**    Even though here we have a purchase order for $2.8 million

3    worth of hardware bought from HP for resale?

4    **A.**    It doesn't say there isn't going to be any software on it.

5    It just says it's going to be for resale.  It could be with

6    Autonomy software on it.

7    **Q.**    You never saw this e-mail at the time?

8    **A.**    I didn't.

9    **Q.**    And if you had, would that have led you to ask a question

10   about what this hardware was going to be used for?

11   **A.**    Potentially.

12   **Q.**    Would it have led you to ask Autonomy how much hardware

13   they were selling?

14   **A.**    Potentially.

15   **Q.**    Before HP spent $11.7 million, did you, as the guy in

16   charge of diligence, did you ask anybody at HP to work out

17   whether HP had sold any products to Autonomy?

18   **A.**    I didn't.

19   **Q.**    Did you ever ask anybody at HP to take a look in the HP

20   systems and see what deals HP and Autonomy had done before?

21   **A.**    I personally didn't.

22   **Q.**    Did anybody else that you're aware of?

23   **A.**    I don't know.

24   **Q.**    Let's take a look at Exhibit 6529.

25   **A.**    I'd like to use the restroom, Your Honor.

 1          **THE COURT:**  Yeah.  I think we all would.

 2      Let's take a recess now.  We'll be in recess for 15

 3  minutes, till a quarter of 11:00.

 4      Remember the admonition given to you:  Don't discuss the

 5  case, allow anyone to discuss it with you, form or express any

 6  opinion.

 7      Sir, you're excused.

 8      (Proceedings were heard out of the presence of the jury:)

 9          **THE COURT:**  About how much longer do you have?

10          **MR. MARAIS:**  I just want to take a look at my notes,

11  Your Honor.

12          **THE COURT:**  Sorry?

13          **MR. MARAIS:**  I'll take a look at my notes now.  Not

14  that much longer, Your Honor.  Thank you.

15          **THE COURT:**  Okay.  Thank you.

16              (Recess taken at 10:28 a.m.)

17          (Proceedings resumed at 10:46 a.m.)

18          **THE CLERK:**  Come to order.  Court is now in session.

19      (Proceedings were heard in the presence of the jury:)

20          **THE COURT:**  Yes.  You may continue.

21          **MR. MARAIS:**  Thank you, Your Honor.

22  **BY MR. MARAIS:**

23  **Q.**  Mr. Sarin, just a few more things.  Could we turn back to

24  Exhibit 1649.  This is the JPMC report on Autonomy dated

25  March 25, 2011.  I think you said this was right in the period

1    when you were working on your financial models; correct?

2    **A.**    This is when we would have started working on our

3    financial models, yes.

4    **Q.**    If we could go to page 6 and focus on the bottom section,

5    the heading is "Reduction in Gross Margin and the Cloud."  Do

6    you see that?

7    **A.**    I do.

8    **Q.**    And JPMorgan writes "The company," that's Autonomy,

9    "explains the reduction in gross margin by the unexpected shift

10   to the Cloud, but it could also be explained by the sale of

11   additional hardware in the quarter, which would have increased

12   revenue but had little impact on gross profit."

13        Do you see that?

14   **A.**    I do.

15   **Q.**    JPMorgan is describing Autonomy's earnings for the first

16   quarter of 2011; right?

17   **A.**    Right.

18   **Q.**    Did you ever read this report?

19   **A.**    I don't recall, but the next sentence is also informative

20   here.

21   **Q.**    My question is just whether you read this report or not --

22   **A.**    I don't recall.

23   **Q.**    -- in 2011?

24        **MR. REEVES:**  I object, Your Honor.

25        **THE COURT:**  Go ahead.

1    BY MR. MARAIS:

2    **Q.**   As I understand your testimony, you've been drawing a

3    distinction between appliances and the sale of hardware like

4    servers or computers that don't come with software

5    pre-installed; correct?

6    **A.**   Correct.

7    **Q.**   And that second category, the sale of hardware like

8    servers and laptops, is that sometimes referred to as

9    pass-through hardward?

10   **A.**   I don't know.

11   **Q.**   Are you familiar with the term "pass-through hardward"?

12   **A.**   In what context?

13   **Q.**   If somebody had said to you during due diligence Autonomy

14   makes some revenues from pass-through hardward sales, would you

15   have understood what that meant?

16   **A.**   Yes.

17   **Q.**   I'd like to look at Exhibit 6517.  This is an email

18   exchange between Andy Gersh and his colleagues at KPMG.

19       Mr. Gersh is going to be here in a couple of days to

20   testify, and this exhibit will come in then.  I would like to

21   use it now to ask the witness a question about the references

22   in here.

23           **MR. REEVES:**  No objection.

24           **THE COURT:**  6517, admitted.

25               (Trial Exhibit 6517 received in evidence)

1                      (Exhibit published to jury.)

2    **BY MR. MARAIS:**

3    **Q.**    Mr. Gersh was your primary contact at KPMG; correct?

4    **A.**    Correct.

5    **Q.**    And KPMG was helping Autonomy during due diligence to

6    review documents in the data room; right?

7    **A.**    Yes.

8    **Q.**    Mr. Gersh writes here in the last sentence, "I am working

9    through the ones," that's the contract, "that they," that's

10   other members of his team, "did not review, and I will change

11   the template since as far as I can tell, they," again, members

12   of his team, "they have not captured free software or hardware

13   pass-through."

14        Do you see that?

15   **A.**    I do.

16   **Q.**    Did Mr. Gersh ever talk to you at this time about hardware

17   pass-through?

18   **A.**    I don't recall.

19   **Q.**    You don't remember whether you ever had a discussion with

20   him about Autonomy making revenues from hardware pass-through

21   sales?

22   **A.**    Yes.  I don't recall.

23   **Q.**    But to be clear, August 7th is still in the middle of due

24   diligence; correct?

25   **A.**    Correct.

1   Q.   When did you learn that Autonomy made money selling

2   hardware to its customers?

3   A.   Plain hardware without any software on it?

4   Q.   Correct.

5   A.   Quite late into 2011.  I would say maybe November/December

6   time frame.

7   Q.   You learned the scope of the revenues that Autonomy had

8   generated from hardware sales; correct?

9   A.   Correct.

10  Q.   I believe in your meetings with the Government, you've

11  told them that you were shocked when you discovered that fact;

12  right?

13          MR. REEVES:   Your Honor, I object based on scope.

14          MR. MARAIS:   That's my last question on this topic.

15  Q.   You told the Government that when you learned that fact in

16  November 2011, you were shocked; right?

17  A.   Yes.

18  Q.   Isn't the truth that even after you had the precise

19  hardware numbers, you weren't really surprised?  Didn't you ask

20  Autonomy for a job in the beginning of 2012?

21  A.   I had a conversation with Cathy Lesjak, who was the CFO of

22  HP, and because of the role that corporate development played,

23  people from the corporate development team would get -- would

24  be put in senior positions in other divisions of HP, so at her

25  suggestion, I had a discussion with Dr. Lynch.

SARIN - CROSS / MARAIS

1   **Q.**   In early 2012?

2   **A.**   Yes.

3   **Q.**   And you were angling for the position of CFO at Autonomy;

4   right?

5   **A.**   I was having a discussion with Dr. Lynch about that

6   because HP was -- used to put its own people in divisions that

7   it acquired.

8   **Q.**   That was Mr. Hussain's job, right, CFO at Autonomy?

9   **A.**   Correct.

10   **Q.**   Let's look at Exhibit 6510, which is an email from you to

11   Mike Lynch.  Dated January 12th, 2012.

12        I would move it in, Your Honor.

13           **THE COURT:**  Admitted.

14        (Trial Exhibit 6510 received in evidence)

15              (Exhibit published to jury.)

16   **BY MR. MARAIS:**

17   **Q.**   Do you recognize this document, Mr. Sarin?

18   **A.**   Please give me a moment to review it.

19        (Witness reviews document.)

20   **Q.**   This is an email you sent to Dr. Lynch?

21   **A.**   Correct.

22   **Q.**   In the first paragraph, you write, "I had mentioned to you

23   that I may begin exploring new opportunities."

24        Do you see that?

25   **A.**   I do.

1  **Q.**   And that means you're looking for other jobs; right?

2  **A.**   Yes.  Because that's the way the SCD team was organized.

3  You were, after a few years, expected to move on to different

4  parts of HP.

5  **Q.**   And in the second paragraph, you write, "In our limited

6  interaction, I have developed a lot of respect and admiration

7  for the Autonomy team."

8  **A.**   Correct.

9  **Q.**   Do you see that?

10  **A.**   Yes.

11  **Q.**   And you go on at the end of the paragraph, "I'm not sure

12  if there are any roles within Autonomy that you're looking to

13  fill, but I would very much welcome a conversation at a time

14  convenient for you."

15  **A.**   Yes.

16  **Q.**   And this is all two months after you told the Government

17  you were shocked to learn about the hardware revenues; is that

18  right?

19  **A.**   So when I first became aware of the hardware revenues per

20  the email from Kathryn Harvey, I thought she had her facts

21  wrong because in all our diligence in the run-up in August and

22  thereafter, we were unaware of sale of pure hardware.

23       So, sure, I was shocked when I learned from Kathryn Harvey

24  that there was hardware sales, but I assumed, per my email to

25  her, she was incorrect in her facts.

**SARIN - REDIRECT / REEVES**

1    And at this time when I wrote in January of 2012, I was

2    still unaware of the extent of the issues at Autonomy.

3    **Q.**    You've told the Government that in November of 2011, you

4    were shocked; right?  Those are your words?

5    **A.**    Yes.

6    **Q.**    And this is two months after that; correct?

7    **A.**    Yes.  Because I assumed Kathryn was wrong.

8    **Q.**    But in January of 2012, you are emailing Dr. Lynch to see

9    if you can get Mr. Hussain's job; right?

10   **A.**    Correct.

11        **MR. MARAIS:**  Your Honor, subject to the discussion we

12   had before about the Kathryn Harvey email, I have no further

13   questions.

14        **THE COURT:**  Okay.  Redirect.

15        **MR. REEVES:**  Thank you, Your Honor.

16                      <u>**REDIRECT EXAMINATION**</u>

17   BY MR. REEVES:

18   **Q.**    Good morning, Mr. Sarin.

19   **A.**    Good morning.

20   **Q.**    Just a few questions here.

21        In the course of your cross-examination, you were asked a

22   number of questions about your discussions with Mr. Hussain

23   about appliances and whether they did or did not extend into

24   discussions about hardware.  Do you recall that?

25   **A.**    I do.

**SARIN - REDIRECT / REEVES**

1  **Q.**   You had how many direct conversations with Mr. Hussain,

2  would you estimate, in late July, early August through the time

3  of the announcement on the 18th of August?

4  **A.**   Several.   Ten.

5  **Q.**   Approximately ten?

6  **A.**   Yeah.   Approximately ten.

7  **Q.**   And they were hours-long conversations each time, were

8  they not?

9  **A.**   Yes.

10  **Q.**   And in the course of those conversations, I think you've

11  testified that Mr. Hussain discussed the subject of appliances.

12  Do you recall that part of your testimony?

13  **A.**   Yes.   I asked him if they sold any appliances.   This is as

14  we were going through the financial model.   And his view was it

15  was a very small number.

16  **Q.**   All right.   And is that where it came to rest with regard

17  to your discussion about appliances?

18  **A.**   As far as I recall.

19  **Q.**   Why didn't you follow up further?

20  **A.**   Because in the annual report, as well as what Mr. Hussain

21  told me because it was said to be small, it didn't warrant any

22  further questioning.

23  **Q.**   In your cross-examination, you were also asked questions

24  about your questions, Mr. Sarin, to Mr. Hussain about the sale

25  of Autonomy's products.   Do you recall those questions?

1   **A.**   Could you repeat your question?

2   **Q.**   In the course of your cross-examination, you were asked

3   questions about your testimony about the questions that you put

4   to Mr. Hussain about the sale of Autonomy products.  Do you

5   recall that?

6   **A.**   Yes.

7   **Q.**   Okay.  And I think in -- in your answers, you drew a

8   distinction between products that Autonomy created or made, did

9   you not?

10  **A.**   Yes.

11  **Q.**   And products that Autonomy sold for revenue.  Do you

12  remember that distinction?

13  **A.**   Yes.

14  **Q.**   In your conversations, your multiple conversations with

15  Mr. Hussain about the sale of Autonomy products, did you

16  endeavor to account for, in the way you've described, one

17  hundred percent of the sale of Autonomy's products?

18  **A.**   Yes.

19  **Q.**   All right.  And because Autonomy doesn't make hardware but

20  Autonomy did resell hardware that others made, do you believe

21  that your questions about the sale of Autonomy products would

22  encompass the reselling of somebody else's hardware?  Do you

23  believe that one way or the other?

24  **A.**   Yes.

25  **Q.**   Why do you believe that, Mr. Sarin?

**SARIN - REDIRECT / REEVES**

1  **A.**   Because the questions were meant to elicit how Autonomy

2  derived its revenues.  We could argue does it use the word

3  "all" or "major," but the intent is walk me through how does

4  Autonomy derive revenue.

5       And therein lies the opportunity to inform the HP team

6  that there is a significant amount of plain hardware being

7  sold.

8  **Q.**   And that didn't happen --

9  **A.**   No.

10  **Q.**   -- during your conversations with Mr. Hussain?

11  **A.**   Correct.

12  **Q.**   You were also asked a series of questions about the

13  so-called UBS contract that was in the data room.  Do you

14  recall those questions?

15  **A.**   Yes.

16  **Q.**   Okay.  Do you have any reason to believe that that was an

17  appliance contract?

18  **A.**   Because I wasn't responsible for reviewing the contracts,

19  as we would get together -- "we" as in the HP team, internal

20  team, as well as the advisers -- on the evenings to make sure

21  everybody was up to speed, what I remember being discussed is

22  that the contracts related to hardware were probably all

23  appliance sales.

24  **Q.**   Do you have any reason to believe that the hardware in

25  that UBS contract is small in comparison with the software in

SARIN - REDIRECT / REEVES

1    that UBS contract?  Do you know one way or the other?

2    **A.**    I don't know one way or the other, but that was our

3    working assumption.

4    **Q.**    Okay.  And therefore, it would not draw further scrutiny

5    or raise any of the issues you've described in relation to

6    hardware.  Is that your logic?

7    **A.**    That is my logic.

8            **MR. MARAIS:**  Objection to foundation, Your Honor,

9    given that the witness testified he never saw any of these

10   contracts.

11           **THE COURT:**  Sustained.

12   **BY MR. REEVES:**

13   **Q.**    Let's go, if we could, please, to Exhibit 6603A, page 10,

14   the waterfall we went through yesterday.

15           Could I get the help of the defense team to put that up,

16   please.

17                   (Exhibit published to jury.)

18   **BY MR. REEVES:**

19   **Q.**    Do you remember the questions about this, Mr. Sarin?

20   **A.**    Yes.

21   **Q.**    All right.  There's a lot of discussion about synergies in

22   the last column on the right.  Do you recall that?

23   **A.**    Yes.

24   **Q.**    I'd like to talk about the first column on the left.

25   **A.**    Sure.

**SARIN - REDIRECT / REEVES**

1  **Q.**   Are you oriented?  Do you see that before you?

2  **A.**   Yes.  The 7,117 number?

3  **Q.**   Yes.  What is that again?

4  **A.**   That is the enterprise value, which is the value of the

5  business on a stand-alone basis.

6  **Q.**   Okay.  And is that somehow associated with the total value

7  of all the Autonomy stock?

8  **A.**   Yes.

9  **Q.**   How does that work?

10  **A.**   So if you take the fully-diluted share count, which is the

11  number of shares outstanding, multiply that by the stock price,

12  you get the equity value of the business, which is what is the

13  stock in the company worth.  You add to that the debt that the

14  company has on its books and you take out from it the cash that

15  the company has.  It should give you the enterprise value of

16  the business.

17  **Q.**   Your calculations about synergies and the value of

18  acquiring Autonomy in the manner that is reflected in this

19  chart are dependent on the calculation of the market

20  capitalization of Autonomy, are they not?

21        **MR. MARAIS:**  Objection.  Leading, Your Honor.

22        **THE COURT:**  Sustained.

23  **BY MR. REEVES:**

24  **Q.**   What relationship is there between your calculation of the

25  synergies and the market capitalization?

SARIN - REDIRECT / REEVES

1  **A.**    The synergies are calculated dependent on what new

2  products and sales would the -- would be derived from the use

3  of Autonomy software and HP technologies being brought to

4  market.  It is independent of the 7,117 number.

5      That 7,117 number is all driven by Autonomy on its own.

6  And the addition of the various waterfall bars with 7,117 will

7  give you the 12,178 number.

8  **Q.**    Is the calculation of the 7,117, a figure of the

9  stand-alone value of Autonomy, dependent on the financial

10  statements and the financial reporting as reflected in the

11  stock price of the -- of Autonomy?

12  **A.**    Correct.

13  **Q.**    Okay.  If the revenues in the financial reporting for

14  Autonomy were inflated by approximately 15 percent, would you

15  expect that that would have an effect on the stock price?

16          **MR. MARAIS:**  Argumentive, Your Honor.

17          **THE COURT:**  Overruled.

18          **THE WITNESS:**  Absolutely.

19  **BY MR. REEVES:**

20  **Q.**    Why would it absolutely have an effect on the stock price

21  and thus the overall stand-alone valuation of Autonomy?

22  **A.**    Because the way the financial models for Autonomy are

23  constructed, it is all around the sale of software, either

24  stand-alone or value-added hardware, if I could use that term,

25  where Autonomy software is powering some server and the value

1    from all of those things is captured both in our financial

2    model as well as what Wall Street understands Autonomy to be

3    selling.

4         And to the extent that isn't true and if there isn't, as I

5    understand, margin associated with selling plain vanilla

6    hardware, that would -- that would just question the validity

7    of the existing financial statements and the margin profile of

8    the business.

9    **Q.**   Okay.  And if that happened, would that have any effect on

10   the analysis relating to synergies that you're undertaking at

11   HP with regard to this combination?

12   **A.**   I think even before we go into synergies, it would just

13   question the desirability of the asset as it is.

14   **Q.**   Desirability in what sense?  What do you mean?

15   **A.**   As I testified yesterday, HP was looking at predominantly

16   software businesses.  We had spent a fair bit of time looking

17   at Tacoma, which is TIBCO.  Given that didn't come to pass, we

18   were looking at other largely software businesses.

19        If Autonomy was known at that time to have significant

20   amount of pass-through or plain vanilla hardware, that would

21   not make the asset as attractive.

22   **Q.**   You were also asked a series of questions about your

23   discussions of the valuation model that you had with

24   Mr. Hussain directly on or around August 4, 2011.  Do you

25   recall that?

**SARIN - REDIRECT / REEVES**

1   **A.**   I do.  The financial model.

2   **Q.**   The financial model, yes.  I'd like to show you a new

3   exhibit, if I could, please.

4              **THE COURT:**  What exhibit is this?

5              **MR. REEVES:**  This is Exhibit 2140.

6        Could I please approach?

7              **THE COURT:**  2140?

8              **MR. REEVES:**  Yes.

9        Your Honor, Exhibit 2140 is an email between Steve

10  Chamberlain at Autonomy and Mr. Hussain at Autonomy.

11             **THE COURT:**  Admitted.

12             **MR. REEVES:**  Thank you, Your Honor.

13             (Trial Exhibit 2140 received in evidence)

14             **MR. REEVES:**  If I could please display it.

15                   (Exhibit published to jury.)

16  **BY MR. REEVES:**

17  **Q.**   Let's pause there.  The subject is "snapshots."  Do you

18  see that?

19  **A.**   I do.

20  **Q.**   This was not an email that apparently went to you,

21  Mr. Sarin, is it, according to the document?

22  **A.**   Correct.

23  **Q.**   But it is on the day that you believe you had the

24  discussion with Mr. Hussain about the financial model that you

25  walked through in the course of your testimony; correct?

1    **A.**    Yeah.  It's 4th of August, so, yes, that same date.

2    **Q.**    Let's take a look at the next page.  This is page 2 of

3    Exhibit 2140.

4         Does this appear to be a snapshot of the financial model

5    that you discussed with Mr. Hussain?

6    **A.**    Correct.

7    **Q.**    Okay.  And were you aware that Mr. Hussain and/or

8    Mr. Chamberlain were taking snapshots of your financial model

9    in the course of your conversation?

10    **A.**    I wasn't.

11    **Q.**    Okay.  Were you holding this information close to the vest

12    in the manner that was suggested in the cross-examination?

13    Were you trying to hide anything from Mr. Hussain?

14              **MR. MARAIS:**  Objection.  Scope, Your Honor.

15              **THE COURT:**  I'll allow it.

16              **THE WITNESS:**  No.

17    **BY MR. REEVES:**

18    **Q.**    No.  Okay.

19         And to your knowledge, was he, using these snapshots, able

20    to keep copies of the financial model that you discussed with

21    him that day?

22    **A.**    If he wanted to, I was fine with it.

23    **Q.**    Okay.  Let's take a look, if you would, please, at a

24    portion of the snapshot that pertains to 2008 and 2009.  Do you

25    see that?

**SARIN - REDIRECT / REEVES**

1   **A.**   I do.

2   **Q.**   In your financial model, did you go back and analyze the

3   financial reporting for Autonomy in year 2008?

4   **A.**   We looked at the public filings to get a sense of the

5   scale of the business by these product lines going back all the

6   way to 2008, then 2009, and then by quarter for 2010.

7   **Q.**   All right.  And did you rely on the accuracy and

8   reliability of the financial statements that Autonomy issued

9   publicly in 2008 to perform your analysis?

10  **A.**   Yes.

11  **Q.**   Same question for year 2009?

12  **A.**   Yes.

13  **Q.**   Did you endeavor to grab as much historical financial

14  information in that three-year time period as you could from

15  Autonomy in order to do your financial analysis?

16  **A.**   Correct.

17  **Q.**   Thank you.

18        You were also asked some questions about the data room.

19  Do you remember that?

20  **A.**   Yes.

21  **Q.**   And more specifically, questions about when you did and

22  did not ask for non-public information.  Do you recall that?

23  **A.**   Yes.

24  **Q.**   There came a time in or around late July, early August,

25  2011, when the HP diligence team, including yourself, reviewed

SARIN - REDIRECT / REEVES

1  non-public information; is that correct?

2  **A.**  Correct.

3  **Q.**  All right.  And what -- and you used a data room to

4  accomplish that, did you not?

5  **A.**  Yes.

6  **Q.**  What purpose did the data room serve with regard to the

7  confidentiality of the information, if you know?

8  **A.**  The contents in the data room are limited to the people

9  who have access to the data room, so any person cannot just get

10  access to a data room.  You need to petition or ask for

11  permission from the owner, if you will, of the data room.

12      The data room was set up by Autonomy and its counsel, so

13  we had to send over email addresses of people who would need

14  access to the data room, and they would give access to only

15  those individuals.

16  **Q.**  And --

17          **THE COURT:**  Could you explain something to me?  A data

18  room, is that a room?  I mean, like this is a room.  Okay.  Is

19  a data room a room, or is it in that cloud somewhere?

20          **THE WITNESS:**  It is an only storage so --

21          **THE COURT:**  Oh, wait.  It's not a room?

22          **THE WITNESS:**  It's not a room.

23          **THE COURT:**  Okay.  So it's a data -- it's like a vault

24  or something that -- it's not like a vault because -- but it's

25  a -- it's something that is created in our digital world that

SARIN - REDIRECT / REEVES

1   stores information that people have to have the digital code to

2   view it on their computer; is that it?

3           THE WITNESS:  That is correct, sir.

4           THE COURT:  If I am -- want to get into the data room,

5   you give me some numbers and I can get it on my computer?

6           THE WITNESS:  Correct.

7           THE COURT:  I can be anywhere?  I can be anywhere and

8   get it as long as I have the numbers?

9           THE WITNESS:  Correct.

10          THE COURT:  Okay.  I think I got it.  And for all of

11  us who are over 50 years of age in the courtroom.

12          MR. REEVES:  Thank you, Your Honor.

13  Q.   A couple more questions about the data room.

14       Once the data room is set up and once you have access, is

15  that a safe way for Autonomy to review confidential non-public

16  information relating to Autonomy?

17  A.   Correct.

18  Q.   Okay.  And that's the whole purpose of the data room, is

19  it not?

20  A.   Correct.

21  Q.   And in the course of your due diligence, did you ask a

22  great many questions about confidential non-public information

23  possessed by Autonomy in order to do your diligence?

24  A.   Yes.

25  Q.   And then you reviewed it safely within the confines of the

SARIN - REDIRECT / REEVES

1  data room?

2  **A.**  Correct.

3  **Q.**  One last topic area.

4      You were asked some questions about what you phrased as

5  "momentum."  Do you remember that?

6  **A.**  Yes.

7  **Q.**  The momentum for the deal?

8  **A.**  Uh-huh.

9  **Q.**  And you were shown a timeline in the course of your

10  diligence that anticipated a possible announcement on or around

11  the date that happened, August 18th, 2011 --

12  **A.**  Correct.

13  **Q.**  -- correct?

14      Was that also the date that HP intended to announce its

15  third-quarter results, if you know?

16  **A.**  Yes.

17  **Q.**  Okay.  So was that a date that you used as a potential

18  deadline for your decision-making?

19  **A.**  What public companies tend to do, which is what HP was,

20  all material information is published at the same time because

21  you don't want to dribble out market-moving information on

22  various different dates.

23      So to the extent the earnings date is set, which they

24  always are, several weeks or months ahead of time, you try to

25  time all material information to that date.

1  **Q.**   So if Autonomy was -- excuse me.  If HP was going to go

2  forward and acquire Autonomy, would that, the date of the

3  earnings announcement on August 18th, 2011, be a desirable or

4  appropriate time for you to announce such a decision?

5  **A.**   Yes.

6  **Q.**   Does the fact that you had that type of timeline

7  associated with the scheduled Q3 results announcement

8  foreordain or make automatic that you are going to say "yes,

9  we're going to buy Autonomy"?

10 **A.**   No.  Because you were trying to set a timeline for the

11 various HP and external advisers to give them a sense for

12 should everything come to pass, we would like to announce

13 concurrent with HP's earnings.

14 **Q.**   Okay.  Let's go to that small binder, please, and if you

15 would pull out Exhibit 6489, page 10.

16     You were asked a series of questions about the extent to

17 which you could feel that the deal was going to happen.  Do you

18 remember those questions?  Page 10, Exhibit 6489.

19 **A.**   Give me a minute to get there.

20     Yes.  6489, page 10.

21 **Q.**   Do you remember being asked questions about this meeting

22 with the lawyers for HP?

23 **A.**   Yes.

24 **Q.**   And the questions about whether you could or could not

25 feel that the deal was going to happen?

SARIN - REDIRECT / REEVES

1   **A.**   Yes.

2   **Q.**   And your description of the momentum associated with the

3   deal?

4   **A.**   Yes.

5   **Q.**   In this very same meeting with the lawyers for HP, did you

6   also tell them that if HP had known that Autonomy was not a

7   pure software company, that that would have raised a big red

8   flag?

9   **A.**   I believe so.

10   **Q.**   You were asked a series of questions about the top 40

11   list.  Do you remember that?

12   **A.**   Yes.

13   **Q.**   And in your discussions with Autonomy about the top 40

14   list for contracts and customers, did you intend to exclude any

15   revenue-generating contracts that were in the top 40?

16   **A.**   No.  The term "top 40" means top 40.  Everything included.

17   **Q.**   Okay.  Did you intend to exclude hardware contracts in any

18   way, if they existed?

19   **A.**   No.

20   **Q.**   Okay.  When you say "the top 40 means the top 40," I

21   think -- what do you mean by that, Mr. Sarin?  I think it's

22   important, so why don't you tell us what you mean by "the top

23   40."

24   **A.**   What I mean by top 40 -- and I assume it would be well

25   understood -- is if you had a customer that has bought multiple

1  products from Autonomy, could be software licenses, could be

2  appliances, could be the maintenance to pay Autonomy for prior

3  purchase of software, could be services, could be anything else

4  that they've bought from Autonomy, all of that in the aggregate

5  should be added up as the total contract value of that customer

6  and be on the list of top 40.

7  **Q.**   Thank you very much.

8       Last topic, I think.

9       You were asked some questions about Exhibit 1649.

10      If we could please have that displayed.  And I'm on page

11  6.

12              (Exhibit published to jury.)

13  **BY MR. REEVES:**

14  **Q.**   This is the JPMorgan Cazenove Analyst Report.  Do you

15  remember questions about that?

16  **A.**   Yes.

17  **Q.**   And just to give this some context, it would appear, based

18  on the analyst notes, that some questions are being asked by

19  some of the analysts about possible hardware sales at Autonomy

20  correct?

21  **A.**   Correct.

22  **Q.**   Stepping back for a moment, how does an analyst question

23  about the possibility of certain hardware sales square with the

24  public disclosures of Autonomy in its financial statements

25  about being a pure software company and not disclosing that it

1  was reselling hardware?  How do those two things square?

2  **A.**    They don't square, and therefore, reading this, one would

3  conclude the hardware that they're referring to here is what

4  I've been using the term "appliance" and that's what the

5  analysts seem to suggest in the sentence after the sentence

6  that was read.

7  **Q.**    Is that the last sentence that's displayed up here on

8  Exhibit 1649, page 6 -- do you see the last sentence?  Is that

9  the sentence that you're referring to, Mr. Sarin?

10  **A.**    Yes.

11  **Q.**    Why don't you read that sentence, please.

12  **A.**    Sure.  So this is after they talk about hardware.  They

13  are saying, "Clearly this is our own assumption and not

14  supported by commentary from management, but examples of

15  appliance sales," in brackets, "hardware mixed with software,"

16  close brackets, "early in the year sets a precedent."

17  **Q.**    Is this an example of analysts doing their job to ask

18  tough questions about the companies they cover, do you think?

19  **A.**    Yes.

20        **MR. REEVES:**  Nothing further.

21    Thank you, Your Honor.

22        **THE COURT:**  Recross?

23        **MR. KEKER:**  Your Honor, may we approach for just a

24  minute?  We don't need the record.

25        **THE COURT:**  Okay.  Why don't you have a conversation.

**SARIN - RECROSS / MARAIS**

1                    (Sidebar conference heard but not reported.)

2                              **RECROSS-EXAMINATION**

3    **BY MR. MARAIS:**

4    **Q.**   Mr. Sarin, do you understand that the term "pure

5    software," as used in the annual reports, is a term of art in

6    the software business?

7    **A.**   I assume the word -- I understand the word "pure software"

8    to mean pure software.

9    **Q.**   Do you understand that in the business and in the annual

10   reports, Autonomy explains that what it means by pure software

11   is a company that sells software without needing to do

12   professional services work?  Do you understand that?

13   **A.**   I don't remember.  If you're referring to a specific

14   section in the analysts -- the annual report.

15   **Q.**   You don't remember what the annual report says about that?

16   **A.**   The annual report is a long document.  I don't remember

17   everything in the annual report.

18   **Q.**   Did you understand that under the takeover code that

19   governed this transaction, if confidential information was

20   provided to HP, it would also need to be provided to other

21   suitors, other companies that were interested in buying

22   Autonomy?

23   **A.**   Correct.

24   **Q.**   And nobody wanted that; right?

25   **A.**   Correct.

1  **Q.**   And Autonomy doesn't want its confidential information

2  getting into the hands of competitors who come along and claim

3  to be interested; right?

4  **A.**   Correct.

5  **Q.**   And if HP is going to buy Autonomy, it doesn't want that

6  situation either; right?

7  **A.**   Correct.

8  **Q.**   So there was sensitivity about making sure that the

9  information that was provided to HP was carefully controlled

10  and restricted; right?

11  **A.**   Yes.

12  **Q.**   Mr. Reeves asked you a series of questions about what you

13  believe your questions meant and what you intended to say by

14  your questions.  Do you remember that?

15  **A.**   Yes.

16  **Q.**   Isn't it fair for Autonomy during due diligence to rely

17  instead on the words that you put down on paper?

18  **A.**   Those questions were asked on phone calls.  The questions

19  were sent the night before so they had access to the questions

20  and then we would ask the questions verbally, so I don't think

21  there was room for any confusion as to what I believed versus

22  what they heard.

23          **MR. MARAIS:**  Thank you.  I have nothing further.

24          **THE COURT:**  Thank you.  You're excused, subject to

25  recall.  Okay.  Thank you.

```
 1        Your next witness.
 2             MR. REEVES:  Thank you, Your Honor.  The United States
 3   calls Mr. Leo Apotheker.
 4             THE CLERK:  Good morning.  Please raise your right
 5   hand.
 6                       LEO APOTHEKER,
 7   called as a witness for the Government, having been duly sworn,
 8   testified as follows:
 9             THE CLERK:  Thank you.  Please be seated.  Please
10   state your full name for the record and spell your last name.
11             THE WITNESS:  Leo Apotheker, A-P-O-T-H-E-K-E-R.
12             MR. REEVES:  May I inquire, please?
13             THE COURT:  Yes.
14                     DIRECT EXAMINATION
15   BY MR. REEVES:
16   Q.   Good morning, Mr. Apotheker.
17   A.   Good morning, Mr. Reeves.
18   Q.   Where do you live, sir?
19   A.   In London, UK.
20   Q.   What is your educational background, please?
21   A.   I graduated from Hebrew University in Jerusalem, economics
22   and international relationships.
23   Q.   What was your career after school, please.
24   A.   I worked as an economist, and then in 1980, I worked for
25   an interbank network in computer systems.  I joined McCormick &
```

APOTHEKER - DIRECT / REEVES

1   Dolch, which was a U.S. software company, and in '88, I joined

2   SAP, which was -- which still is a very large software company.

3   In those days it was a bit small.  And I worked there for 21

4   years.

5   **Q.**   Until what year at SAP?

6   **A.**   2010.

7   **Q.**   2010.  And what is SAP, please?

8   **A.**   SAP is a global leading enterprise software provider.

9   **Q.**   And describe your career at SAP through 2010, please.

10  **A.**   I started as the managing director of a small subsidiary

11  and worked my way gradually up until I became the CEO of the

12  company.

13  **Q.**   How long did you serve as the CEO of SAP?

14  **A.**   About three years.

15  **Q.**   And would you describe your duties as CEO of a company of

16  that size?  What were your duties and responsibilities, please?

17  **A.**   You are the most senior executive of a software company

18  when you are the CEO and you supervise its operations, its

19  strategy and its human resources, its products.  You are

20  ultimately responsible for everything.

21  **Q.**   Will you agree that SAP is a major software company

22  internationally?

23  **A.**   It's one of the largest in the world.

24  **Q.**   All right.  Let me direct your attention to sometime later

25  in 2010, in or around the fall of 2010 after you left SAP.  Is

1  that time period clear?

2  **A.**   Yes.

3  **Q.**   In or around that time, did you consider the possibility

4  of going to HP?

5  **A.**   I did.

6  **Q.**   Would you please describe that process.

7  **A.**   I was contacted by a headhunter who was working on behalf

8  of the search committee of the board of HP who reached out and

9  wanted to know if I had any interest in having a conversation,

10  which I did.

11      I met the search committee members.  I don't recall

12  precisely when, but I would guess somewhere in early September

13  or late August of 2010.

14      We had a -- we had a good meeting.  I was asked by the

15  search committee to put together some thoughts about my view on

16  the company, my outside-in view of the company.  I brought that

17  document together.  Sent it over.  Was invited back.  Had a

18  series of conversations with the various board members.  And

19  ultimately received an offer to join the company as chairman

20  and CEO.

21  **Q.**   That occurred in approximately what month in 2010?

22  **A.**   September, October.

23  **Q.**   Okay.  And after you were made the offer to be both CEO

24  and chairman of the board, what did you do?

25  **A.**   I thought about it and finally accepted the offer but

1   suggested to the board not to appoint me as chairman, only as

2   CEO.

3   **Q.**   Why did you make that suggestion?

4   **A.**   Because I'm a firm believer that a company should have a

5   chairman, independent chairman, who has a -- who can manage the

6   board from an independent point of view.  I believe that board

7   should have, you know, a lot of strong-willed people so that

8   they can make up their own mind.

9   **Q.**   If you held both positions as CEO and chairman of the

10  board, within the corporate governance of a company like HP,

11  would you be more powerful in a certain sense?

12  **A.**   You are.

13  **Q.**   And yet you chose not to do that?

14  **A.**   Deliberately, yes.

15  **Q.**   So you got -- withdrawn.

16      You were offered the position in or around September,

17  October, 2010.  When did you begin as CEO at HP?

18  **A.**   Official start date was November 1st.

19  **Q.**   All right.  And let's go back to the point I think you

20  made earlier in the so-called hiring process for your decision

21  to go to HP and that was your point about an outside-in view.

22      Was that some type of strategic assessment about HP and

23  its needs and things that you might do?

24  **A.**   You know, when you get a job offer like that, you want to

25  do some due diligence, so you try to collect as much public

1    information that you can.

2        I should add for the record that in my time at SAP, I was

3    the executive sponsor of HP on the SAP side, so I knew at least

4    part of the business a little bit better.  And I wanted to, you

5    know, formulate my own thoughts.  And that's why I wrote the

6    document.

7    **Q.**   So what was some of the strategic considerations that you

8    were considering as you transitioned to become CEO at HP in or

9    around November 2010?

10   **A.**   So my in-going hypothesis and analysis was that HP had

11   turned into a lower value, and forgive me for the words,

12   commodity-type hardware manufacturer.  It had not participated

13   in a series of major IT revolutions, dot com, the clouds,

14   things like that.  And that I saw it was really important to

15   change that so that the company would create more value, would

16   become more valuable for its shareholders by adding more added

17   value, higher margin capabilities to the company.

18   **Q.**   And so as you envisioned it, how would HP go about doing

19   that?

20   **A.**   It needed a number of things.  It needed to be more in the

21   solution business and not in the -- on different shaded

22   hardware business.  It needed to create solutions in order to

23   add value to hardware.  These are usually software solutions.

24   It needed work inside the company so that the way it would go

25   to market would be more effective.  And it needed a

1    rejuvenation of its research and development capabilities.

2    **Q.**   Did the possibility of acquiring software companies or

3    other software assets play a part in the strategy that you

4    contemplated?

5    **A.**   At that point, no.

6    **Q.**   Did there come a time when you began to consider the

7    possibility of acquiring software companies as we moved from

8    2010 into 2011?

9    **A.**   Well, the first thing I needed to do was to validate if my

10   hypothesis was correct.  It was an outside in view so I needed

11   to make sure it wasn't just a theoretical view.

12       I did a pretty sophisticated process in order to do a

13   strategic assessment of the company.  I actually went to all of

14   the subsidiaries.  I traveled around the world and presented to

15   the board, way back already in January, first thoughts on that,

16   a project called Project Zero, which was also then approved and

17   supported by the board, and that included the possibility to

18   also acquire software companies.

19   **Q.**   So in what time period is this strategic assessment going

20   on?

21   **A.**   November -- end November until January, February.

22   **Q.**   All right.  And as a result of this strategic assessment

23   you're describing, were you at that point then considering the

24   possibility of acquiring software companies as a way to execute

25   on this strategy?

1   A.   Yes, sir.

2   Q.   So help us for a moment, before we move into some of the

3   topics relating to Autonomy, with your view about why acquiring

4   software companies would enhance or achieve the strategy that

5   you contemplated.

6   A.   Well, I was trying to create value for shareholders.  And

7   in those days, the relative value of HP compared to all of its

8   peers was the lowest on the stock market.

9        So what we were trying to do was to find places where --

10  where HP could really differentiate itself, and our search for

11  software companies was part of that approach to try to lift HP

12  up.

13  Q.   Let me direct your attention to in or around January 2011,

14  January/February, 2011 time frame.  Is that time period clear

15  to you?

16  A.   Yes, it is.

17  Q.   In or around that time period, were you familiar with a

18  company known as TIBCO?

19  A.   Yes, I was.

20  Q.   Was TIBCO a company you were considering as a possible

21  strategic acquisition in this time period?

22  A.   Yes, it was.

23  Q.   Tell us about, please, your thinking with regard to the

24  possibility of acquiring TIBCO in this early 2011 time period.

25  A.   So we had formulated a enterprise information management

1    strategy.  TIBCO fit really well into that.  We -- the team,

2    the strategic team of HP, did some analysis and did some work,

3    and we went back to the board and solicited approval to pursue

4    TIBCO.

5    **Q.**  All right.  And I'm going to try to do this

6    chronologically, so I'll come back to TIBCO in one moment.

7        In this time period in early 2011, were you familiar with

8    an investment banker in Silicon Valley known as Frank

9    Quattrone?

10   **A.**  I knew Frank Quattrone.

11   **Q.**  And so what role did Frank Quattrone play in Silicon

12   Valley as you understood it in this time period?

13   **A.**  He was one of the investment bankers in the Silicon

14   Valley.

15   **Q.**  Did there come a time when you understood that

16   Mr. Quattrone represented Autonomy with regard to possible

17   advice about an acquisition or combination?  Did that happen at

18   some point in 2011?

19   **A.**  Yes.  Early in 2011.

20   **Q.**  I'd like to show you what has been marked, please, as

21   Exhibit 1519.  Do you have that?

22   **A.**  I do.

23   **Q.**  This is an email from Mr. Quattrone to Mr. Raymond Lane on

24   or about January 26, 2011, that is then forwarded by Mr. Lane

25   to you, Mr. Apotheker.

```
 1              THE COURT:  Admitted.  Admitted.

 2              MR. REEVES:  Thank you, Your Honor.

 3              (Trial Exhibit 1519 received in evidence)

 4                    (Exhibit published to jury.)

 5   BY MR. REEVES:

 6   Q.   Let's start at the bottom, if we could.  Who is

 7   Mr. Raymond Lane?

 8   A.   Chairman of the board of HP.

 9   Q.   All right.  And did you work with Mr. Lane on some of the

10   strategics issues that you've described in this time period?

11   A.   All the time.

12   Q.   And in or around this time period, Mr. Quattrone is

13   writing to Mr. Lane, "Hi, Ray, nice to catch up with you.  Here

14   are the slides as discussed.  Please let me know how best to

15   follow up."

16        And then there are attached materials relating to

17   Autonomy, are there not?

18   A.   Yes, indeed.

19   Q.   And then this gets forwarded to you on or around

20   January 26, 2011.  Do you see that?

21   A.   Yes.

22   Q.   In this January time frame, how closely were you watching

23   with regard to any interest HP had in the possibility of

24   combining or acquiring Autonomy?

25   A.   Not at all.
```

APOTHEKER - DIRECT / REEVES

1  **Q.**   Somebody -- others, for example, Mr. Lane or others within

2  HP may have been doing that?

3  **A.**   I wouldn't even be able to tell you.

4  **Q.**   Okay.  Let me show you what is marked as Exhibit 1541,

5  please.  This is another email from Mr. Quattrone to Shane

6  Robison on or around February 1st, 2011.

7              **THE COURT:**  Admitted.

8              **MR. REEVES:**  Thank you, Your Honor.

9              (Trial Exhibit 1541 received in evidence)

10             **MR. REEVES:**  If we could have that displayed.

11                  (Exhibit published to jury.)

12  **BY MR. REEVES:**

13  **Q.**   It looks like in or around February 2nd, 2011, Mr. Robison

14  is forwarding you other information that had come from

15  Mr. Quattrone.  Do you see that, Mr. Apotheker?

16  **A.**   I do.

17  **Q.**   Does that refresh your recollection about any involvement

18  you may have had with regard to Autonomy in this time period?

19  **A.**   I am pretty sure that at that moment in time, I had no

20  involvement with Autonomy.

21  **Q.**   Okay.  It looks like -- who is Mr. Robison in this time

22  period?

23  **A.**   Mr. Robison is the chief strategy officer and the CTO of

24  HP.

25  **Q.**   And did you work closely with Mr. Robison?

1   **A.**   Yes, I did.

2   **Q.**   Why don't you describe how you worked with Mr. Robison

3   within HP in this 2011 time frame, please.

4   **A.**   Mr. Robison was in charge of all of the technology at HP

5   and of course of the strategy.  It was actually his job to do

6   things like that, to look at --

7   **Q.**   Things like what?  I don't mean to interrupt you.

8   **A.**   Sorry.  It was his job to look at companies outside of the

9   HP environment.  That was part of his normal duties.

10  **Q.**   And interact with investment bankers like Mr. Quattrone in

11  the manner that is reflected in this exhibit?

12  **A.**   Absolutely.

13  **Q.**   All right.  Let me show you, if I could, please, what is

14  marked for identification as Exhibit 1546.  This is another

15  email in this time period from Mr. Quattrone to Mr. Robison on

16  February 3rd, 2011, that's forwarded to Mr. Apotheker.

17       I offer it in evidence.

18            **THE COURT:**  Admitted.

19        (Trial Exhibit 1546 received in evidence)

20                (Exhibit published to jury.)

21  **BY MR. REEVES:**

22  **Q.**   Again, it looks like Mr. Robison is providing more

23  information about Autonomy to you that came from Mr. Quattrone

24  in this early February 2011 time period, Mr. Apotheker.

25       Does this refresh your recollection in any way about

1  information that was making its way up to you about Autonomy in

2  this time period?

3  **A.**   Not specifically, no.  You need to understand that at any

4  moment in time, HP was looking at a long list of 10, 15, 20

5  companies.

6  **Q.**   Okay.  All right.  So is it fair to say you get emails

7  like this or information like this often?

8  **A.**   On a regular basis.

9  **Q.**   On a regular basis.  Okay.

10      Let's go back to the subject of TIBCO.  Let me show you

11  what has been marked for identification as Exhibit 1622,

12  please.  This looks like this is an email from Mr. Robison in

13  March, on or about March 19th, 2011, to you, Mr. Apotheker,

14  subject "Atlantis slides and attaching Tacoma versus Atlantis,

15  etc."

16      Do you see that?

17  **A.**   Yes, I do.

18          **THE COURT:**  Admitted.

19          **MR. REEVES:**  Thank you, Your Honor.

20          (Trial Exhibit 1622 received in evidence)

21              (Exhibit published to jury.)

22  **BY MR. REEVES:**

23  **Q.**   Let's pause here.

24      Does this relate in any way to your evaluation in this

25  time period relating to TIBCO?

1    **A.**    Yes, it does, because when you negotiate a deal, you want

2    to make sure that you have options.

3    **Q.**    All right.  What do you mean by that?

4    **A.**    Well, at that moment in time, the team had been doing some

5    work and actually had reached the conclusion that Atlantis or

6    Autonomy could be an alternative to TIBCO should the

7    negotiations with TIBCO fail.

8    **Q.**    So which -- withdrawn.

9         At this time period in March 2011, which company, TIBCO

10   versus Autonomy, is -- are you and HP looking more closely at?

11   **A.**    We had only -- we had only received authorization from the

12   board to look at TIBCO.

13   **Q.**    All right.  But Autonomy is there as a potential

14   alternative if that becomes necessary?

15   **A.**    Yes.

16   **Q.**    All right.  Let's take a quick look, if we could, please,

17   at the slides that relate to project Atlantis.  That's

18   Autonomy, which is at this point an alternative for you;

19   correct?

20   **A.**    Yes, sir.

21   **Q.**    Page 3 of Exhibit 1622, if we could look at that, please.

22   And if we could -- if you could enlarge, please, the financial

23   profile as much as possible in the upper right-hand side.

24   Right there.  Fantastic.  And let's look closely at --

25   withdrawn.

1           This is a financial profile for Autonomy, code name

2     Atlantis, in this March 2011 time period; right?

3     A.    Yes, sir.

4     Q.    And are you familiar with financial profiles like this,

5     Mr. Apotheker?

6     A.    Yes, I am.

7     Q.    So what purpose do they serve for someone in your

8     position?

9     A.    They serve to give you the financial background on this

10    company.  It's important to have some history, so the previous

11    years, so you can see trends, and it's possible to see what the

12    market estimates, which are the E -- the financial years marked

13    as E going forward.

14    Q.    So it looks like the financial profile includes Autonomy's

15    fiscal year 2008 with an A.  What does A stand for?

16    A.    Actuals.

17    Q.    So that's historical, that is what Autonomy has reported?

18    A.    Yes, sir.

19    Q.    And the same thing for fiscal year 2009 with an A?

20    A.    Yes.

21    Q.    Okay.  Again, that's what Autonomy reported in its

22    publicly-filed financial statements?

23    A.    That's what -- that's what the report says, yes.

24    Q.    And then fiscal year 2010A, it's -- that's the third year.

25    A.    Yes.

1  **Q.**   Is it customary or normal for you in reviewing possible

2  companies that HP may be acquired -- interested in acquiring to

3  look back on three years of historical financial data?

4  **A.**   Two, three years, it's absolutely normal.

5  **Q.**   And why would you do that?

6  **A.**   So that you get a sense of the evolution of the company.

7  **Q.**   Let's go, if we could, now, to the last page, please, page

8  11 and the Tacoma versus Atlantis slide here.

9       Are you familiar with this kind of slide, this kind of

10 comparison?

11 **A.**   Certainly.

12 **Q.**   Okay.  And in this time period, help us with the context

13 for the comparison between TIBCO and Autonomy.  What are some

14 of the considerations that you're thinking about?

15 **A.**   Well, you try to understand -- I mean, the consideration

16 is where the simple -- you look at the provisioning of each

17 company, what they bring to you, the key technological assets.

18 Cloud SaaS was an important factor for us.

19      And then you can see at the bottom, TAM means "total

20 addressable market," so what kind of a market could you serve

21 with that product and the potential estimated growth of that

22 market.

23 **Q.**   Thank you.

24      Let me show you what has been marked for identification as

25 Exhibit 1596.  This is an HP document on or about March 4th,

1   2011, project Tacoma.

2           **THE COURT:**  Admitted.

3           **MR. REEVES:**  Thank you, Your Honor.

4           (Trial Exhibit 1596 received in evidence)

5                   (Exhibit published to jury.)

6   BY MR. REEVES:

7   **Q.**   In or around this time period in March 2011, did you go to

8   HP's board with regard to the possibility of pursuing a -- a --

9   an acquisition with TIBCO?

10  **A.**   Yes.

11  **Q.**   Tell us what happened, please.

12  **A.**   We presented the business case for Tacoma -- sorry -- for

13  TIBCO.  I have it right here.  And the board approved.

14  **Q.**   The board approved you to do what?

15  **A.**   To pursue a deal with -- an acquisition of TIBCO up to --

16  up to a certain price.

17  **Q.**   All right.  And what did you do, after you had that

18  approval -- what did you do next?

19  **A.**   Well, the team and I engaged with -- with TIBCO, entered

20  into a negotiation and tried to reach agreement.

21  **Q.**   Go on.  What happened next?

22  **A.**   TIBCO's price ambitions were very high.

23  **Q.**   Price?

24  **A.**   Price.  The price.  The chairman of TIBCO demanded a high

25  price for his company, which I thought was unreasonable, even

1  though it was authorized by the board, and somewhere around

2  early April, I decided to stop the conversation.  Called them

3  and broke off the deal.

4  **Q.**    Because it was too expensive?

5  **A.**    In my opinion, it was too expensive.

6  **Q.**    In or around this time period, in or around mid April,

7  2011, did you have a meeting with Dr. Mike Lynch, the CEO of

8  Autonomy?

9  **A.**    Yes, I did.

10  **Q.**    What were -- how did that meeting come to take place?

11  What was the context, please?

12  **A.**    I was asked by Shane to have this meeting.  I think Shane

13  was having a conversation with Frank Quattrone.  Mike happened

14  to be in town in Palo Alto.  It's customary for CEOs to meet.

15  Mike was a well-known figure in the industry, so I was happy to

16  meet him.

17  **Q.**    Had you met him before?

18  **A.**    Actually, I don't believe so.

19  **Q.**    Okay.  And so did Dr. Lynch come to Palo Alto?

20  **A.**    Yes, he did.

21  **Q.**    And how long was your meeting with Dr. Lynch?

22  **A.**    I don't recall precisely.  I would say an hour, hour and a

23  half.

24  **Q.**    Do you remember if anyone else was there?

25  **A.**    I don't recall exactly.  I don't believe so.

1    **Q.**    So it's just the two of you?

2    **A.**    I would think so.

3    **Q.**    Okay.  Why don't you take your time and tell us what you

4    and Dr. Lynch discussed in or around mid April, 2011.

5    **A.**    Well, we had changed views on the state of the industry.

6    In those days, the industry was already pretty much in flux.

7    We actually had a, you know -- we agreed on the potential of

8    technologies that are qualified as unstructured data, a strong

9    point of Autonomy.  So we had a conversion of use there.

10       I -- Mr. Lynch promoted Autonomy explaining how well they

11    were doing.  I was promoting HP and explaining where we were in

12    our strategy of repositioning, and we shook hands and that was

13    it.

14    **Q.**    Okay.  At this time, were there any discussions about a

15    possible combination?

16    **A.**    No.

17    **Q.**    Okay.  And when you say that Dr. Lynch promoted Autonomy,

18    what do you recall him saying?  What's the substance of what he

19    may have said about that?

20    **A.**    He was very proud of the financial results.  They had

21    released 2010 numbers, which were good.  He mentioned that they

22    were a -- I believe he used the term "pure software company."

23    That they were growing, good organic growth, good margins.

24    Yeah.  A success story.

25    **Q.**    As a long-time and experienced software executive

1  yourself, what impression did this make on you with regard to

2  Autonomy?

3  A.    A well-run, successful software company.

4  Q.    After you had the meeting with Dr. Lynch, did you have an

5  occasion to review the 2010 annual report for Autonomy?

6  A.    Sometime after that, on or around the May -- end of May

7  board meeting of HP.

8  Q.    Okay.  Why don't you fill in that time period.  Withdrawn.

9         After the meeting with Dr. Lynch in around mid April, now

10  beginning to focus on the events as they relate to Autonomy,

11  what happened next?

12  A.    So as the TIBCO deal was not going to happen, the teams

13  continued to work on other strategic alternatives.  As we know,

14  Autonomy was one of them.

15         So a little bit more work was done on Autonomy.  Also on

16  some other companies, among them Software AG.

17         And as we were going to have this discussion with the

18  board, I wanted to make sure that I understood Autonomy a

19  little bit better, and there is no better document to do that

20  than the annual report.

21  Q.    Did you review the annual report in preparation for going

22  to meet with HP's board?

23  A.    Either before or after.  I don't remember precisely.

24  Q.    All right.  And that's sometime in May 2011?

25  A.    I would think so, yes, but I don't recall precisely.

1    **Q.**    Okay.  Fine.

2         Your Honor, I'm about to press into the annual report.  We

3    could stop for lunch, or I'm happy to do that, if you wish.

4         **THE COURT:**  Let's stop for lunch.

5         Ladies and gentlemen, we will resume at 1:00.  Remember

6    the admonition given to you:  Don't discuss the case, allow

7    anyone to discuss it with you, form or express any opinion.

8         (Proceedings were heard out of the presence of the jury:)

9         **THE COURT:**  Okay.  Let the record reflect that the --

10   have a seat -- that the jury has retired.

11        I now want to address a number of the issues that have

12   been raised by the parties with respect to evidence of post

13   October 3rd events.  And I have read the -- I've read the offer

14   of proof from the defense.  I've read the Government's

15   response, which prompted me to go back and review the motion in

16   limine, in particular the restatement motion in limine, which

17   the Government came in and which I ruled would be admissible

18   after a lot of discussion.

19        In my review of the motion in limine and in particular my

20   review of the opposition to the restatement, I have serious

21   concerns whether the Court was correct in allowing in the

22   restatement or indicating I would allow in the restatement.  I

23   think we have to sort of review exactly where we are now.

24        The Government correctly says, I believe, based upon the

25   record, that the only -- there's sort of two things that may

1   have come in about the restatement, other than opening

2   statements.  I'm putting that aside on both sides.

3        One is that there has been evidence as to the fact of a

4   restatement, that is, a restatement occurred, when it occurred,

5   and one of the witnesses actually testified -- I think it was a

6   shareholder -- that upon receiving news that there was a

7   restatement, he sold his shares.

8        **MR. KEKER:**  Writeoff.  He said writeoff.  He was

9   talking about the writeoff, not the restatement per se.

10        **THE COURT:**  Okay.  The writeoff.  The writeoff.

11        **MR. LEACH:**  It's a very important distinction,

12   Your Honor.  He sold on the impairment charge where Autonomy --

13   HP is writing down the value of Autonomy, not the restatements

14   where HP is saying --

15        **THE COURT:**  Well, I want to get into -- of course

16   there is a distinction between the two, but I want to get into,

17   I guess, both of them in terms of -- in terms of where we are.

18   Because -- because evidence as to the scope, magnitude of the

19   impairment or the restatement, both of which occurred

20   subsequent to October 3rd, implicates the scope of the evidence

21   that would be permitted both in the case in chief and in the

22   cross-examination.

23        **MR. KEKER:**  We couldn't agree more and my argument was

24   going to be if you're letting --

25        **THE COURT:**  You don't have to make your argument.  You

1    made it already -- we will turn to that because I think that --

2    I'm reconsidering it to try to figure out exactly -- as I

3    indicated two days ago, my mind is open on the subject, but I

4    think one of the great dangers of motions in limine -- I have

5    said it repeatedly and it only has enforced my view of motions

6    in limine -- is that they are always decided in a vacuum and

7    without a full appreciation of what the evidence is and where

8    it goes.

9          Now, if you look at the opposition that the defense has

10   filed to the restatement -- and I have it right in front of

11   me -- it says sort of two things, one of which I completely

12   disagree with and one of which I actually agree with.  And I

13   don't think they care which.

14         But they say the restatement does not fall within the

15   business records exception or the hearsay rule.  I've already

16   ruled on that.  I think actually it would fall within it.

17         However, they say the restatement's probative value is

18   substantially outweighed by dangers of unfair prejudice,

19   confusing the issues, misleading the jury.  Introduction of the

20   restatement would also improperly invade the province of the

21   jury.  I'm not sure about that.

22         But they go on to say page after page -- and I think --

23   and what I see by way of offer of proof is the opening salvo,

24   in my view, of how they would approach all of this information

25   is to say, number one, the restatement or even the impairment

1    for that matter -- I'm not quite sure in my mind how I would

2    distinguish the two -- was erroneous.  That the asset was

3    valued correctly, that -- that people come in doing audits

4    afterwards and so forth which resulted in the restatement.  Did

5    so for a variety of reasons.

6        The asset may have changed in value depending on how the

7    asset was integrated in the company, how the asset was run,

8    changes of direction, misperceptions as to how the market would

9    react to A, B, C, D, E, F, G.  All of those things -- all of

10   those things would impact the, quote, "truth" of the

11   restatement.

12          MR. LEACH:  Your Honor, that is not correct.  And I'm

13   sorry to interrupt you.  But the restatement, it's not a change

14   of assets, it's not --

15          THE COURT:  They say this asset, which -- I'm sorry.

16   Do I not get it?  This asset which we believe to be worth

17   11 billion we now believe to be worth 3 billion.

18          MR. LEACH:  That is the impairment.  That is an

19   accurate description of the impairment that is announced in

20   November.

21          THE COURT:  Let's talk about the impairment first and

22   then you can try to educate me about the restatement because I

23   think the impairment, whether we get into the impairment or

24   not -- I thought what the defense is saying is that the

25   impairment was inappropriately calculated.

**PROCEEDINGS**

1          **MR. KEKER:**  We are saying both.

2          **MR. LEACH:**  They are saying that.

3          **THE COURT:**  I know.  But you're saying the

4    impairment --

5          **MR. KEKER:**  Restatement and --

6          **THE COURT:**  A lot of the evidence that they want to

7    introduce with respect to the restatement or impairment affects

8    both, does it not?

9          **MR. KEKER:**  We have believe it does, Your Honor.

10          **MR. LEACH:**  I think they have an argument, Your Honor,

11    that what starts out as the impairment process where

12    Mr. Yelland is looking at the future projections of the

13    company, that in the course of that, it dawns on him not just

14    that our future projections are wrong, but the original

15    accounting is wrong, too.  The numbers that were presented in

16    ASL's financial statements were wrong under the same accounting

17    standards.

18       So they do relate in that way, but they are different

19    analyses and what the Government was articulating in our

20    opposition is if they want to cross-examine Mr. Yelland about

21    how this process starts, that's fine with us.

22          **THE COURT:**  How which process starts?

23          **MR. LEACH:**  How the restatement process starts.

24          **THE COURT:**  Fine.  I know it's all fine for you.  But

25    that's not the question, what's fine and what isn't fine.

1          The question is why is any of that stuff, any of it,

2    though it may be arguably relevant, but any of it -- why does

3    any of it really come in or why is it required to come in?

4          The fraud, if there was a fraud, occurred on August 8th,

5    October 3rd, I don't know, whatever date it was.  Done.

6    Completed.  That was it.  The misstatements that were made were

7    made, if they were misstatements, up to August 8th, I guess, or

8    11th or whatever that date is and October 3rd.  The crime, if

9    it's a crime, occurred then.

10          Now, then the question is well, what happened afterwards,

11    and you had a series of reactions afterwards.  And you had --

12    you had HP's reaction, you had the auditors' reaction, you had

13    impairment statements, you had restatements.  All of that --

14    which, by the way, is somebody's opinion after the fact of what

15    it all means -- is -- while it might be under -- while it might

16    be admissible or might not, I don't know yet.  I'm not looking

17    at it from that point of view.  I'm looking at it from a 403

18    point of view because it appears to me that it introduces a

19    whole host of testimony, evidence, documents, and while they

20    come in and they say look, we just have six documents or eight

21    documents, well, the answer to that is the Government has got

22    20 documents and further witnesses and then we look at what is

23    the motive, what was going on here, was Mr. Apotheker or any of

24    those people not running -- all you had to do is listen to

25    Mr. Keker's opening statement.  He said they ruined Autonomy.

1    They got a perfectly valuable asset that they paid fair price

2    for and they killed it.  That's his argument.

3        And I don't understand if you come in and show this and

4    that why they can't -- why they can't produce that.  I just

5    don't -- in my mind, I can't -- I mean, I can't let in the

6    Government's case and not allow in cross-examination as to

7    whether or not the Government's read on its own evidence is

8    accurate because that's what cross-examination is all about.

9        So then the question is in fairness to the defense, if the

10   Government produces this evidence, don't I have to let all this

11   other evidence in?  I think the answer to that is absolutely

12   yes, from where I sit now in having listened to all of this.

13       So the question is okay, you can run a trial that way.  If

14   we had a couple of years or so, we could have everything come

15   in and let the jury sort through that which is really key and

16   that which is not.

17       And I'm sitting here -- number one, I've got a jury who

18   would get up and leave in a nanosecond if they could, not that

19   this isn't a gripping tale, but I have got to be careful about

20   losing them because there are double jeopardy issues that

21   are -- this is a criminal case.  This is not a civil case.

22       And so even if it were a civil case and one might be

23   concerned about re-trying it and so forth, in a criminal case,

24   it's a whole different thing.  Defendant is subjected, he is in

25   jeopardy, and one has to be very concerned that -- that it

1   moves along sort of as promised and as represented.

2       And the Government has said oh, we can get our case in --

3   we can get our case in, you know, by Friday or Tuesday or so

4   forth and so on.  I don't even see that that's going to happen,

5   based upon cross-examination of these witnesses, number one.

6       And number two, the response to all of that evidence would

7   be all of these other people coming in and testifying as to

8   what happened post October 11th -- I get all my dates wrong.

9   October 3rd.

10      So I'm actually sort of not going to ask for comment right

11  now because I think I'm springing it on everybody, but I am

12  inclined not to have Mr. Yelland testify -- first of all, I'm

13  inclined to make whatever statement I need to to the jury about

14  anything that they have heard, if it is appropriate, for them

15  to either disregard or limit.  I'm prepared to give limiting

16  instructions.  Okay.

17      Nobody remembers the openings.  And besides, I think that

18  if any attorney is concerned about what was promised and so

19  forth, I can deal with that.  I can deal with that.  It's not

20  evidence, and I can -- I can address that, and it was months

21  ago.  So I'm not concerned about that.

22      I am -- I think that also under 403, there is some

23  cumulative -- now, I haven't -- of course I've seen some of

24  your expert's testimony, and to some it may rely on post

25  events, but then I think you have to go back to your expert and

**PROCEEDINGS**

1    see whether or not that testimony can be adjusted so that it

2    reflects what occurred at the time, what was known at the time

3    or upon an examination of the contracts.

4        So that is my tentative thinking in the matter.  And I

5    thought that I wanted to tell you that because I don't even

6    know whether Yelland testifies or not, if I leave it all out.

7    You know, I don't know what else I have to say.

8        Do you have any -- anybody have questions of me now that

9    could be helpful to your thought processes?  And I

10   understand -- listen, I understand I said X and the Government

11   relied on X.  But I've now watched the case unfold.  We are

12   basically at the point -- we haven't talked about accounting

13   standards or any of that, which is highly relevant, but we are

14   essentially at the point where all, sort of -- almost all the

15   evidence of what happened up to the transaction has come in,

16   and the question is what more evidence comes in.

17       So that's -- that's a classic 403 issue.  I think, you

18   know, looking at all of this, it looks like it will lead to

19   confusion, it will be an undue waste of time, it may be

20   duplicative, and I really do question its probative value.  For

21   somebody to come back and say, oh, look what happened to me,

22   says oh, well, is this genuine, you know, are you really

23   shocked?  Let's look at what was happening at the time you went

24   oh, my goodness.  I'll tell you what was happening at the time.

25   This company was being sold.  This was happening, the market

1   changed, dah, dah, dah, dah.  That's why I think -- not to get

2   off -- totally off on a tangent, but I think loss measurements

3   in fraud cases -- it's absurd to look at what happened to the

4   market when the stock -- when the disclosure of the fraud

5   occurred.

6       The sentencing commission used the most ridiculous formula

7   because there are a thousand variables, and so you have to go

8   through each variable and say -- and even -- what's it called?

9   Regressive analysis doesn't work really.

10      So I am very concerned about what I would say are the

11  unknowns, are the variables which the good lawyers will say,

12  "Oh, Judge, this is important.  Wouldn't it be important to

13  you?"  And I would sit up here and say yeah, it might be.

14      So I'm not the trier of fact, remember.  Remember, I'm not

15  the trier of fact.  So the question is well, do I think it's

16  that important or most important or very important.  I've got

17  to be careful of things like that because I take away from the

18  jury their basic responsibility to adjudicate the facts.

19      So think about it over the lunch hour.  I don't know -- I

20  know it would change the case from what you planned to do going

21  forward, but take a deep breath and figure out -- I mean, I

22  almost would say this to the Government.  You know, I don't

23  know what the expert is going to testify -- the accountant

24  person, but if you haven't proven your case based upon what's

25  happened up to date in this, I don't know how -- how the -- the

```
 1   restatement and the impairment does it because neither of them
 2   are pure in the sense that neither of them come out and have
 3   the -- the -- I can't now think of the word.  It must be a
 4   senior moment.  The -- the force, perhaps, of that -- that will
 5   give credence to an "ah-hah" moment, you see.
 6        You have either done it or you haven't.  I have no
 7   opinion.  You've either done it or you haven't.  You need some
 8   other parts, but that doesn't do it.
 9        Okay.  So if you want to resume -- if you want to resume
10   at 10 to 1:00 or quarter to 1:00, I can come back, or we can
11   finish with Mr. Apotheker, with the limitation that I don't
12   want to get into the post stuff and --
13             MR. KEKER:  We don't need Mr.-- Mr. Apotheker was
14   fired.  He was fired before it even closed --
15             THE COURT:  Okay.  That's fine.  And then we can have
16   a discussion later on this afternoon.
17             MR. KEKER:  Fine.
18             MR. LEACH:  That's fine with the Government,
19   Your Honor.  We appreciate the Court's comments.
20             THE COURT:  Up to a point.
21             MR. KEKER:  That's not true.  He doesn't appreciate
22   the Court's comments.
23             THE COURT:  What?
24             MR. KEKER:  I said he doesn't appreciate the Court's
25   comments.
```

1        THE COURT:  I'm not sure --

2        MR. KEKER:  I'm just teasing.

3        THE COURT:  I'm not sure.  I'm not a trial lawyer.

4   Thank you very much.

5        MR. KEKER:  Thank you, Your Honor.

6            (Luncheon recess was taken at 12:11 p.m.)

7   **Afternoon Session**                          **1:02 p.m.**

8       (Proceedings were heard out of the presence of the jury:)

9        THE COURT:  Please be seated.

10   Let the record reflect the jurors are not present.

11   Yes, Mr. Reeves?  Somebody want to talk to me?

12        MR. REEVES:  Did you want to proceed with the

13   testimony or --

14        THE COURT:  Yes, I want to proceed with the testimony.

15        MR. REEVES:  Then, obviously, we have things we would

16   like to bring to the Court's attention, but we'll do it after

17   the testimony.

18        THE COURT:  Okay.  Thank you.

19   (Proceedings were heard in the presence of the jury:)

20        THE COURT:  Please be seated.

21   Let the record reflect all jurors are present, the parties

22   are present.

23   You may proceed.

24        MR. REEVES:  Thank you, Your Honor.

25   Q.  Mr. Apotheker, do you have a copy of what has been marked

APOTHEKER - DIRECT / REEVES

1   for identification as Exhibit 1352, the 2010 Autonomy

2   Corporation Annual Report?

3   **A.**   No, I don't think so.

4                        (Pause in proceedings.)

5              **THE COURT:**   It's in evidence.

6              **MR. REEVES:**   Could we please have it displayed,

7   Your Honor, Exhibit 1352?

8              **THE COURT:**   Yes.

9              **MR. REEVES:**   Pop back out to the front page.

10  **Q.**   Are you comfortable using the screen, Mr. Apotheker?

11  **A.**   Certainly.

12  **Q.**   Okay.  Do you recall this document?

13  **A.**   I do.

14  **Q.**   All right.  And in or around May 2011, did you read this

15  annual report?

16  **A.**   I did.

17  **Q.**   How carefully?

18  **A.**   Very carefully.

19  **Q.**   Okay.  And what were you looking for?  What was your

20  reason for reviewing the annual report carefully?

21  **A.**   Well, the annual report is a very official document

22  published by a company that is publicly traded.  It's signed by

23  all of the officers of the company.  It's signed by the

24  chairman.  It's signed by the chair of the Audit Committee, the

25  Reparation Committee, and all of the accounts are there; and

1    equally important, all of the notes to the accounts are in

2    there.  So if you really want to understand a business, it's

3    good reading.

4    **Q.**  Did you spend time reading it carefully?

5    **A.**  I did.

6    **Q.**  All right.  Let's go through pieces of this.

7        I'd like to show you what has been page 8 of Exhibit 1352,

8    the portion about acquisitions.

9        If we could enlarge the lower right-hand corner, those

10   paragraphs in the bottom, and highlight, please, the second

11   paragraph.  So the "Acquisitions" piece.  Super.

12       And let's actually highlight the words in the middle here

13   "pure high-margin software business model."

14       Did you read this portion of the annual report,

15   Mr. Apotheker?

16   **A.**  I did.

17   **Q.**  All right.  And this talks about Autonomy's history of

18   acquisitions, does it not?

19   **A.**  It does.

20   **Q.**  And what was your understanding of the points being made

21   by the company in this portion of its annual report?

22   **A.**  Autonomy acquired a number of businesses, that they

23   managed to get these businesses very quickly integrated

24   particularly into the IDOL platform; and that they would

25   continue only down that path, that they would not go after any

1    other type of software company or whatever other company.

2    **Q.**    It says that (reading):

3              "It is not part of Autonomy strategy to acquire

4        vertical applications or businesses that are founded on a

5        professional services engagement model.  This makes

6        traditional software style acquisitions difficult to do

7        because Autonomy sells a horizontal platform and wants to

8        retain a pure, high-margin software business model."

9        Were those words important to you as you considered

10   Autonomy in this time period?

11   **A.**    Yes, they were.

12   **Q.**    Why were they important?

13   **A.**    Because I was looking for a pure-play software company

14   that was going to add value to HP's different businesses and,

15   therefore, it being a pure-play software company was actually

16   very important.

17   **Q.**    How would a pure-play software company add value like

18   Autonomy?

19   **A.**    Pure-play software companies have high margins and if they

20   are done well, usually also drag along other capabilities; but

21   the really important thing is it's a high-margin, high-growth

22   business.

23   **Q.**    Let's go to page 14 of Exhibit 1352.

24            **THE COURT:**  Well, before you do that, what's your

25   understanding of the difference between a vertical acquisition

1   and a horizontal acquisition in terms of your understanding as

2   you looked at this report?

3          THE WITNESS:  So vertical applications are

4   applications that serve one purpose; for example, billing, just

5   to give you an example, telecommunication billings, human

6   resource software.  These are vertical applications that serve

7   a particular purpose.

8          Horizontal applications, on the other hand, are usually

9   pure technology plays that can be extended to a vast number of

10  things and can become a platform for future growth.  So it's

11  actually more interesting to try to buy a horizontal platform

12  than a vertical capability.

13         MR. REEVES:  If we could, please, go to page 14 of the

14  2010 annual report, Exhibit 1352, and the portion discussing

15  appliance.  And if you'd be kind enough, Ms. Margen, to enlarge

16  that piece.

17  Q.   Okay.  Mr. Apotheker, did you read the portion of the

18  annual report that pertained to appliance sales by Autonomy?

19  A.   Yes, I did.

20  Q.   All right.  Was this important to you?

21  A.   It was interesting information.

22  Q.   Okay.  And what did you learn?  What was your take-away

23  from this piece of Autonomy's business?

24  A.   "Appliance" is an industry term, so in the industry

25  everybody understands what an appliance is.  It's a piece of

1  hardware onto which software has been loaded so it fulfills a

2  specific role.  So it's a combination of the two that's

3  important.

4       And I thought it was a good idea on behalf of Autonomy to

5  actually use appliances to sell the software faster.

6  **Q.**  The last sentence of this portion of the annual report

7  reads (reading):

8          "The value of these solutions is attributable almost

9       entirely to the functions offered by the license, so

10      although there are some hardware costs involved, the

11      high-margin profile is not widely dissimilar to our

12      traditional license business."

13      Do you see that?

14 **A.**  Yes, I do.

15      **MR. KEKER:**  I object.  He read it wrong, "the high

16 margin."  That's not what he said.

17 **BY MR. REEVES:**

18 **Q.**  (reading)

19      "... the margin profile is not widely dissimilar to

20      our traditional license business."

21      Okay.  Did you consider this portion of the disclosures

22 about appliance?

23 **A.**  I read it, yes.

24 **Q.**  Okay.  And there's a discussion in here about some

25 hardware costs, is there not?  What was your understanding

APOTHEKER - DIRECT / REEVES

 1   about some hardware costs in relation to the margin profile

 2   associated with appliance?

 3   **A.**   Well, any appliance has a hardware element.  You actually

 4   put software on the piece of hardware, but the value is created

 5   by the software, not by the hardware.

 6   **Q.**   And so the margin is not skewed because of the value of

 7   the software?

 8   **A.**   Marginally so.

 9   **Q.**   Marginally so.

10        Okay.  Let's go to page 15 of Exhibit 1352, the discussion

11   of the financial model.  If we could enlarge that portion, that

12   paragraph, and highlight the words "pure software model" in the

13   upper right-hand corner, please.  And then also highlight the

14   last sentence of the -- of this portion of the annual report.

15        Is this another reference to the pure software model that

16   Autonomy claimed it had?

17   **A.**   Yes.

18   **Q.**   All right.  And in its discussion of its financial model

19   at the bottom, the annual report reads (reading):

20             "What this offers is a business model with a proven

21        record of strong operating leverage and that is expected

22        to continue to deliver industry leading operating margins

23        and revenue to cash conversion."

24        Do you see that?

25   **A.**   Yes, I do.

APOTHEKER - DIRECT / REEVES

1  Q.   Was that information relevant to your consideration of

2  Autonomy?

3  A.   It was what I would have expected of a pure software

4  company.

5  Q.   And did you attach weight to it as you're evaluating

6  Autonomy in terms of its meaning and implication in terms of

7  possibly acquiring this company?

8  A.   It demonstrated that Autonomy was a software company and

9  met our requirements what we were looking for.

10 Q.   All right.  Let's go to page 18, please, of Exhibit 1352,

11 in a discussion of the operating results that begins on page 17

12 but that continues on page 18 and discusses services.  We'll

13 highlight the "Services" paragraph.  Great.

14      Is there another reference in here to pure software model?

15 A.   Yes.

16 Q.   Okay.  If we could highlight that, please.

17      All right.  So this is part of your core take-away, is it

18 not, with regard to Autonomy and the nature of its business,

19 would you agree?

20 A.   Yes.

21 Q.   Let's go to page --

22          THE COURT:  What did you understand the terms -- it

23 says "Autonomy operates a rare," quote, "'pure software'

24 model" -- "'pure software,'" end quote, "model."

25      What did you understand that to mean, those terms, "pure,"

1    quote -- or, quote, "'pure software,'" end quote, "model"?

2    What did you understand "rare" too mean?

3         **THE WITNESS:**  It means that Autonomy makes essentially

4    all of its revenues and profits out of the development,

5    marketing, and sales of software.  Nothing else.

6    **BY MR. REEVES:**

7    **Q.**   Is that point reinforced on page 21, Exhibit 1352, in the

8    discussion of risks, technological risks?  So this is a --

9    let's just pause here for a second.

10        There's a discussion in the annual reports about risks to

11   the company, are there not?

12   **A.**   Yes.

13   **Q.**   What are the purpose of disclosures around risk?

14   **A.**   To alert investors to the potential risks that the company

15   is facing that might impact the share price.

16   **Q.**   All right.  And here there's a discussion about risk

17   associated with its technology, is there not?

18   **A.**   Yes, sir.

19   **Q.**   Let's enlarge the middle column portion of impact and

20   sensitivity.  Thank you so much.

21        And so this is a disclosure by Autonomy about its risk

22   around its technology that reads (reading):

23            "Since substantially all of revenues derive from

24        licensing our core technology, if unable to maintain and

25        enhance the competitive value of our core technology, our

1    business will be adversely affected."

2    What was Autonomy's core technology as disclosed in this

3    annual report, if you know?

4    **A.**   Software.

5    **Q.**   Software.  So what is your understanding of the risk

6    disclosure that Autonomy is making here with regard to revenues

7    derived from licensing software?

8    **A.**   Exactly what it says.  If they can't continue to develop

9    the software, they will be serially impacted.

10   **Q.**   And, finally, let's go to page 65 of the 2010 annual

11   report, Exhibit 1352 at page 65.

12   These are some of the footnotes I believe you mentioned.

13   Did you read these carefully?

14   **A.**   I did.

15   **Q.**   Do you sometimes find valuable information in the

16   footnotes?

17   **A.**   I do.

18   **Q.**   All right.  Good.

19   Let's take a look at the costs down here.  If we could go

20   down a little bit and enlarge, please, the whole costs

21   paragraph.  Great.  And if you could highlight, please, the

22   words "pure software model" at the end.

23   It looks like there's a further disclosure about pure

24   software model here, is there not?

25   **A.**   Yes.

1  Q.    All right.  And it reads (reading):

2              "Expenses have been assumed to remain a constant

3        percentage of sales throughout the forecast period with

4        minor reductions in the percentages as revenues grow given

5        the primarily fixed cost nature of the business.  The

6        percentages are based on 2010 levels.  The directors

7        consider this a conservative assumption as historic

8        results have shown that as results [sic] increase, these

9        percentages decline due to the operating leverage within

10       the pure software model."

11       What is your understanding of this disclosure by Autonomy,

12  Mr. Apotheker?

13  A.    This is a very accurate description of how a software

14  company operates.

15  Q.    What do you mean by that?

16  A.    Software is developed, and we have fixed costs to

17  developers; and the more you sell software, the higher your

18  margins, the higher your profits.

19  Q.    Now, after reading the annual report, what did you think

20  of this company?

21  A.    I thought that I was reading about a very successful,

22  well-growing, high-profit, high-margin, pure software company.

23  Q.    Did that make you more interested?

24  A.    Yes, it did.

25  Q.    Okay.  Did you rely on the accuracy of the statements made

1  in the 2010 annual report?

2  **A.**   Of course.

3  **Q.**   All right.  If in 2010 Autonomy had recognized revenue of

4  approximately $100 million as a result of reselling hardware

5  made by manufacturers like Dell and EMC, hardware that was

6  devoid of Autonomy software, would that have been relevant in

7  any way to your consideration about whether to acquire

8  Autonomy?

9  **A.**   Yes, it would.

10  **Q.**   Why would that be relevant?

11  **A.**   Well, first of all, they would -- they would contradict

12  the statement that they are a pure software company.

13  **Q.**   How?

14  **A.**   Because 100 million represents about 12 percent of their

15  revenues, 10, 11 -- 11 percent of their revenues.  That's

16  substantial.  The margin profile of hardware per definition is

17  much lower than software, and HP was a hardware manufacturer.

18  We really didn't need more hardware.

19  **Q.**   Would it fundamentally change your consideration relating

20  to Autonomy?

21  **A.**   It would have raised a lot of questions.

22  **Q.**   All right.  If in 2010 Autonomy's total revenues were

23  inflated by approximately 17 percent, would that information

24  have been relevant to you?

25          **MR. KEKER:**  Objection.  There's no basis for that.

1          **MR. REEVES:**  Oh, there's a basis.

2          **THE COURT:**  Well, it's a hypothetical.  I mean, you're

3    asking him as a hypothetical?  What are you -- you're now

4    moving -- you're now asking him if revenues were inflated -- I

5    mean, that's a different question.

6          As I understand the hardware sales, hardware sales didn't

7    inflate the revenues.  They simply weren't defined as -- you

8    looked at $800 million and the argument is it was

9    undifferentiated as distinct from hardware versus software;

10   that is, that some percentage, as the witness testified, he

11   thought maybe 11 percent of that number actually was generated

12   from hardware sales and there are consequences to that.  That's

13   what I understand the witness' testimony to be.

14         Now you're asking a different question.  You're saying,

15   "You know, it says $800 million in revenues" -- I'm making up

16   that number.  I don't know, whatever the number is.  It says

17   800 million.  Let's assume for a moment that the real number is

18   not 800 million but it's 700-and-something million.  Right?  Is

19   that the question?

20         **MR. REEVES:**  That is.

21         **THE COURT:**  And you're saying, "Does that make a

22   difference?"

23         **MR. REEVES:**  Yes, Your Honor.

24         **THE COURT:**  Okay.  So I think in order to avoid the

25   objection, you just say:  In the event that the revenues were

1  over -- let's assume for a moment the revenues were overstated

2  by 17 percent.  Would that have made a difference to you?

3      Okay.  That's the question.

4          **MR. REEVES:**  Great question.  Thank you, Your Honor.

5          **THE COURT:**  Well, it's not such a good question.  I

6  don't know if it's a good question or a bad question, but

7  that's the question.

8          **MR. REEVES:**  It's a well-rephrased question,

9  Your Honor.

10 **Q.**  I'll ask that question again.  If it were the case,

11 Mr. Apotheker, that Autonomy's total revenues were overstated

12 by approximately 17 percent in 2010, would that have been

13 relevant to you?

14 **A.**  Well, it would have also raised questions, of course.

15 **Q.**  Okay.  Why?  Help us understand why a differential of that

16 amount might make a difference to someone in your position.

17 **A.**  Because it would have basically meant that there was no

18 growth or hardly any growth between 2010 and 2009, and that in

19 itself would have raised a question.

20 **Q.**  What kind of question?

21 **A.**  Why didn't you grow?

22 **Q.**  Okay.  And how interested is HP in acquiring a company

23 that might not be growing very fast?

24 **A.**  Probably less than acquiring a company that is growing

25 fast.

1   **Q.**   All right.   Now, as you considered Autonomy and as you

2   reviewed the 2010 annual report in the manner you described,

3   was it relevant to you that the annual report had been audited

4   by outside auditors?

5   **A.**   Of course.

6   **Q.**   Why?   Why was that relevant?

7   **A.**   Because it's just another proof that you're looking at the

8   accurate reflection of the company, that these numbers are a

9   fair and accurate description of the company.

10  **Q.**   And if for any reason the auditor had not issued a clean

11  audit opinion, if you're familiar with that term, would that

12  have been relevant to you in any way?

13  **A.**   Yes.

14  **Q.**   Why?

15  **A.**   Because that would have meant there is a doubt about the

16  accuracy of the accounts.

17        **THE COURT:**   You better explain to the jury what this

18  witness' understanding is of a clean audited report rather than

19  one that's not.

20        **MR. REEVES:**   Sure.

21  **Q.**   Do you have an understanding about a so-called clean audit

22  opinion versus one that is qualified in some way?

23  **A.**   Well, qualified would mean that the auditors have some

24  reserves about this or the other part of the financial

25  statements or about the process; and clean basically means

1  unreserved and, therefore, that they are absolutely fine with

2  the accounts.

3  **Q.**  All right.

4  **A.**  And, by the way, in the annual -- in the annual report

5  there is -- they are signed by the auditors.

6  **Q.**  Did you review that part of the 2010 annual report?

7  **A.**  I just checked if their signature was in there.

8  **Q.**  And was it?

9  **A.**  Yes, it was.

10  **Q.**  Did that reassure you?

11  **A.**  It would have been very surprising otherwise.

12  **Q.**  All right.  After you reviewed the annual report in or

13  around May 2011, was there a meeting of HP's Board of Directors

14  at which the subject of a possible consideration of a

15  combination or transaction involving Autonomy was discussed?

16  **A.**  Yes.

17  **Q.**  Okay.  Tell us what happened, please.

18  **A.**  So we presented as part of a longer and broader strategy

19  presentation the possibility for HP to investigate the

20  acquisition of Autonomy, as was another company.  The board

21  gave us the green light to proceed.

22  **Q.**  Do you recall the name of the other company?

23  **A.**  I think so, yes.

24  **Q.**  Okay.  Do the best you can.  What do you remember?

25  **A.**  Software AG.

1  **Q.**   Okay.  So you're still looking at multiple software

2  possibilities in or around this May 2011 time period?

3  **A.**   Yes, sir.

4  **Q.**   Well, as a result of the Board of Directors direction in

5  the board meeting, what did you do next?

6  **A.**   We actually started to dig a little bit deeper into the

7  possibility of acquiring Autonomy.

8      Something really interesting in the meantime appeared in

9  our R&D Department.  People had been looking at some of

10  Autonomy's technology.  We had acquired a very fast database

11  called Vertica, and people came to the conclusion that if we

12  could combine Autonomy's technology with Vertica and some HP

13  technology, we would certainly have a very, very competitive

14  and very different shaped offer for our enterprise customers.

15  So that actually pushed Autonomy to the top of the list.

16  **Q.**   The possibilities associated with Vertica?

17  **A.**   It's the combination of all of these things.

18  **Q.**   Okay.  Good.

19      Let me direct your attention to in or around mid-June

20  2011.  At or about that time, did you have a second meeting

21  with Dr. Lynch?

22  **A.**   Yes, I did.

23  **Q.**   All right.  And do you have a recollection of where you

24  were?

25  **A.**   In Paris.

APOTHEKER - DIRECT / REEVES

1  Q.   All right.  And do you recall if anyone else was present?

2  A.   I don't recall.

3  Q.   How long did you meet with Mike Lynch?

4  A.   I don't recall precisely either, but I would guess an hour

5  and a half, two hours.

6  Q.   Did you share a meal together or something like that?

7  A.   Yes.  Yes, we did have lunch together.

8  Q.   All right.  And do you recall the conversation that you

9  had with Dr. Lynch in your lunch in Paris in June 2011?

10 A.   Yes.  Not in precise terms of course, but a general sense

11 of the meeting was, again, we discussed our views.  I actually

12 started to talk to him about what our R&D people had come up

13 with.  He thought it was a very, very good idea.  He mentioned

14 that they had a good quarter the preceding one.  He actually

15 mentioned that they were doing pretty well in Q2 as well.

16      And I asked him hypothetically how he would feel if

17 eventually there would be a possibility for us to come closer

18 strategically, and he thought that was a good idea.

19 Q.   All right.  Do you recall anything else about the

20 conversation or are those the core take-aways?

21 A.   I believe these are the core take-aways.

22 Q.   Okay, good.

23      Well, after you had this lunch with Dr. Lynch in Paris,

24 what happened next in terms of your consideration of a possible

25 acquisition with Autonomy?

APOTHEKER - DIRECT / REEVES

1   **A.**   So now that I knew that Autonomy was open for a

2   transaction, I told that to my team, to Shane Robison and his

3   team, that there was a potential opening to pursue this

4   opportunity, and we started to work a bit harder even on this

5   case.

6   **Q.**   What does that mean?  What were you asking -- withdrawn.

7        What does it mean for HP to work a little harder on this

8   case?

9   **A.**   Well, you start to really look at the financials, try to

10  understand what the price could be.  You dig deeper into the

11  technology and you start to actually do some work on potential

12  synergies.  Synergies are opportunities on what you could

13  generate by bringing these two companies together.

14  **Q.**   All right.  Let me direct your attention to in or around

15  July to another -- was there another board meeting at HP in

16  which the subject of Autonomy was discussed further?

17  **A.**   That is correct.  Somewhere third week of July we had a

18  strategy board meeting, a two-day board meeting, where we

19  presented not only Autonomy but also the potential disposal or

20  spinoff of the PC business, and to combine all of these things

21  in order to reshape HP to a different sort of company.

22  **Q.**   So it was a two-day meeting?

23  **A.**   Yes.

24  **Q.**   A lot of important topics?

25  **A.**   Very important topics.

1  Q.    Okay.  And with regard to Autonomy, what was the outcome,

2  if anything, vis-a-vis the board meeting and your further

3  interest in Autonomy?

4  A.    So the Autonomy -- so the board also heard from our

5  financial advisers, heard what they thought about Autonomy; and

6  after an in-depth discussion where we reviewed a lot of

7  details, the board gave us its unanimous consent to proceed

8  with an acquisition of Autonomy.

9  Q.    Okay.  So you got the green light from the board?

10  A.    I did.

11  Q.    Were there other options, other business options, around

12  software assets that were being discussed, if you recall?

13  A.    I don't recall.

14  Q.    All right.  After you get the green light from the board,

15  what do you do next in terms of your interest -- pursuing your

16  interest now in Autonomy?

17  A.    So I informed Mike Lynch via phone call that the board had

18  given its authorization to enter into a negotiation for an

19  acquisition and suggested that we meet to talk about it.

20  Q.    And did that meeting happen?

21  A.    Yes, sir.

22  Q.    Where did that happen?

23  A.    In Deauville in Normandy, France.

24  Q.    Okay.  And was this in July?

25  A.    End of July.

1    Q.    End of July 2011 in Deauville and you met with Dr. Lynch.

2    Was anyone else present?

3    A.    Shane Robison.

4    Q.    All right.  So it was just the three of you?

5    A.    Yes.

6    Q.    Do you recall today the substance of what was discussed in

7    your meeting in Deauville?

8    A.    Again, I don't recall the exact words, but substantially

9    we talked about the strategic rationale, and we quickly agreed

10    on that.

11        We talked about how we would integrate Autonomy

12    potentially if a deal would happen, and then we talked about a

13    price and due diligence.

14    Q.    Well, let's break those down a little bit.  When you say

15    you talked about the strategic rationale, what do you mean?

16    A.    Why the combination of our assets and Autonomy assets in

17    that particular field of enterprise information management

18    would create substantial value and how we would go about that,

19    and I think we had a very quick meeting of the minds there,

20    also on the competitive landscape.

21    Q.    Okay.  And "integration," what do you mean by that term as

22    it was used in this conversation with Dr. Lynch?

23    A.    So when you buy a company, you have to think very

24    carefully about what happens once the deal closes, how will

25    these two organizations work together.

1    And what was discussed was that Autonomy would, of course,

2    be subject to all of HP's financial, human resources,

3    procurement procedures and systems.  So they would be managed

4    by HP like any other entity of HP; but that from a business

5    perspective and development perspective, they would keep their

6    autonomy, if I may say so, and that Mr. Lynch would also be put

7    in charge of all of the software assets of HP.

8    Q.   So realistically, leaving aside the internal control issue

9    that you mentioned, what does it mean for a business unit like

10   Autonomy to operate autonomously?  How would that work?

11   A.   They would be able to continue to drive their own sales

12   force.  They would set their priorities when it comes to -- to

13   what they want to develop first or second, things like that.

14   Q.   Are they operating in any sense in terms of their sales

15   and their business strategy at arm's length from the rest of

16   HP?

17   A.   "Arm's length" is not exactly the term I would want to use

18   because you also wanted to make sure that they could benefit

19   from the scale of HP.  So "coordinated arm's length" might be a

20   better term.

21   Q.   Coordinated arm's length.  Long arm's length, I guess.

22   Okay.  Coordinated arm's length.  Okay.  Thank you.

23        And you said you also discussed in this late July 2011

24   meeting in France the subject of price.

25   A.   Yes.

1  Q.   What was discussed between you and Dr. Lynch and

2  Mr. Robison on the subject of price?

3  A.   Well, we needed to come to some form of a consensus on

4  price, otherwise we couldn't start due diligence; and we

5  basically agreed to disagree, and we settled on, I don't

6  remember the exact numbers, but roughly 25 to £27 a share.

7  Q.   Why is it necessary to have some consensus on price before

8  you begin due diligence?  What did you mean by that?

9  A.   Well, if the -- if the other party doesn't agree, they

10  won't allow you to do due diligence.

11  Q.   All right.  But here in this instance you agreed to

12  disagree about the subject of price.  What do you mean?

13  A.   Well, at least we agreed on a range.  So that's another

14  way of saying it if you want to.  We agreed on this range, 25

15  to 27, and we agreed that that would allow us to start due

16  diligence.

17  Q.   25 to £27?

18  A.   Roughly.  I don't remember the exact number.

19  Q.   Roughly.  And is that an acquisition of Autonomy share

20  price?  Is that what that pertains to?

21  A.   Yes.

22  Q.   Now, in this meeting, did you agree on the specific price

23  that you would buy Autonomy for?

24  A.   No.

25  Q.   No.  You agreed on a range of possible prices?

APOTHEKER - DIRECT / REEVES

1    **A.**    Yes.

2    **Q.**    All right.

3    **A.**    Subject to due diligence I should add.

4    **Q.**    Subject to due diligence.

5         Did you in any way commit HP to buy Autonomy even at a

6    price within this range?

7    **A.**    No.

8    **Q.**    No.  Because you were going to perform due diligence

9    before you get to that point, are you not?

10   **A.**    And I also needed board approval, of course.

11   **Q.**    Of course.  Thank you.

12        Let's move forward.  After you had the meeting in late

13   July with Dr. Lynch, what happened next for you?

14   **A.**    Well, we started to put the due diligence team together.

15   We used the HP due diligence method, which had been tried many

16   times before.

17        I cautioned the team to be very careful and to look in

18   particular at revenue recognition.  That's the most important

19   part in a software company.

20   **Q.**    Why did you do that and why do you say that's the most

21   important part for a software company?

22   **A.**    Because ultimately software is a business that generates

23   very high margins and, therefore, every dollar of revenue that

24   you recognize creates, in the case of Autonomy for example,

25   almost 45 percent profit.

1  Q.    So why the need to look at it carefully?

2  A.    There's a history in the software industry that revenue

3  recognition has not always been perfect.

4  Q.    What do you mean by that?

5  A.    That certain revenues were recognized in a way that they

6  should not have been recognized.

7  Q.    You were trying to be --

8  A.    Inflated revenues.

9  Q.    Excuse me?

10 A.    Inflated revenues.

11 Q.    So that was a concern that you had about that possibility

12 going into the due diligence?

13 A.    I just wanted to make sure that Autonomy had done its

14 proper revenue recognition.

15 Q.    Very good.

16       And so what was your role?  As the others within HP are

17 pushing into the due diligence, what are you doing,

18 Mr. Apotheker?

19 A.    I was trying to manage HP.

20 Q.    Okay.  So what level of contact do you have with the work

21 that's being done by your corporate development team and the

22 advisers for HP?

23 A.    So I was actually -- I would meet with the team every week

24 to monitor progress, in particular of the due diligence.

25 Q.    All right.

1   **A.**   And I was also the one that would continue to negotiate

2   with Mike Lynch.

3   **Q.**   With Mike Lynch, yes.

4   And were you satisfied with the way the due diligence

5   process proceeded?

6   **A.**   Yes.  We had to put in place a substantial team.  We had

7   put in place a traffic light system that indicated if there

8   were issues.  The team would float up issues that were not

9   resolved or would signal that, would indicate what measures

10   were being taken.

11   **Q.**   Did you believe that HP had enough time and personnel to

12   properly conduct the due diligence that you wanted?

13   **A.**   Yes.

14   **Q.**   All right.  I'd like to show you what has been marked as

15   Exhibit 2198, please.

16   **MR. REEVES:**  This is an e-mail from Mr. Robison to

17   Mr. Apotheker on or about August 9th, 2011, "Subject:

18   Diligence Updates."

19   **THE COURT:**  Admitted.

20   (Trial Exhibit 2198 received in evidence)

21   **MR. REEVES:**  Thank you, Your Honor.

22   And if we could actually back up, it looks like this

23   e-mail is forwarding an e-mail from Mr. Kanter originally that

24   gets relayed to HP by Dr. Lynch.  So if we could back up to the

25   e-mail on page 3.

1          Great.  And if we could highlight the first full
2     paragraph, please.
3     **Q.**   Are you familiar with this e-mail, Mr. Apotheker?
4     **A.**   Yes, I am.
5     **Q.**   All right.  So we'll just work through the e-mail train as
6     it gets to you.  Okay?
7          It looks like Mr. Kanter is writing to his CEO, Mike
8     Lynch, (reading):
9               "A quick update on the due diligence process.  To
10         date we've had 28 group calls covering at least as many
11         hours.  There are a few more calls tomorrow but that
12         should be about it.  Documents provided total over 750 and
13         documents alone (no video demos) are over 1" --
14         Is that gigabyte?
15    **A.**   (Nods head.)
16    **Q.**   All right.  Thank you for that.
17         Is this consistent with your understanding of the level of
18    scrutiny that your due diligence teams was involved with with
19    regard to their consideration of Autonomy?
20    **A.**   Yes.
21    **Q.**   Okay.  And it looks like Mr. Kanter is complaining in the
22    next paragraph about the materiality of some of your questions.
23    Do you see that?
24    **A.**   I do.
25    **Q.**   Okay.  (reading)

1          "As we reach what should be the tail end, we are,

2      however, struggling with questions of materiality,"

3      et cetera.

4      And then he lays out some issues that he sees.  Did this

5  make its way up to you eventually?

6  **A.**    I got a copy of this e-mail, yes.

7  **Q.**    All right.  And it looks like -- let's go to the next

8  e-mail from Dr. Lynch to Mr. Robison.

9      In the second paragraph here Dr. Lynch on August 9th,

10  2011, is writing to Mr. Robison (reading):

11          "I would appreciate some help with the diligence

12      process.  We are getting some pretty irrelevant requests.

13      (See Andy's e-mail below.)"

14      Do you see that?

15  **A.**    Yes.

16  **Q.**    Okay.  And then this e-mail eventually makes its way to

17  you, does it not, on or about August 9th?

18  **A.**    Yes.

19  **Q.**    Do you remember, is this consistent with your recollection

20  that there were some level of complaint coming from Autonomy

21  about the level of detail associated with HP's due diligence?

22  **A.**    Yes.

23  **Q.**    And how did you react or what did you do in that posture?

24  **A.**    I instructed the team to continue as if nothing has

25  happened.

APOTHEKER - DIRECT / REEVES

1    **Q.**   Excuse me?

2    **A.**   I instructed the team to ignore the complaint.

3    **Q.**   Why did you do that?

4    **A.**   Because we wanted to do our due diligence.

5    **Q.**   Okay.  Let's move forward, if we could, to in or around

6    August 14th, 2011.

7         At or about that time did you have another meeting with

8    Mike Lynch?

9    **A.**   A telephone conversation.

10   **Q.**   A telephone call?

11   **A.**   Yes.

12   **Q.**   Okay.  In which the subject of price was discussed?

13   **A.**   Yes.

14   **Q.**   All right.  Why don't you take your time, please, and

15   describe what you and Dr. Lynch discussed on or around

16   August 14, 2011, about the acquisition.

17   **A.**   So in a previous board meeting -- and you should know that

18   at that time the HP board would meet on this topic once and

19   sometimes twice a week -- I had received authorization from my

20   board to propose 25 to 25.50 per share -- pounds per share.  My

21   objective was in these price negotiations to make sure that all

22   future synergies that would be generated by combining Autonomy

23   and HP would be to the benefit of the HP shareholders because

24   they're basically paying for that.

25   **Q.**   Help us.  Please explain the point that you're making.

1  **A.**   So by bringing these two companies together, we were

2  hoping that we would be able, by after a few years, to generate

3  1.5 to $2 billion extra revenues with the corresponding

4  margins.  That did require some work and some efforts on behalf

5  of HP, and it would have been very fair that the benefits of

6  those financial flows would be going to the credit of the HP

7  shareholders and not to the Autonomy shareholders because they

8  were not part of this anymore.

9       So it demonstrated that at around 25.50, roughly, by

10  memory, and I don't remember the exact number, but about 90,

11  95 percent of the benefits of these synergies would go to the

12  HP shareholders, which is why I was very much focused on

13  getting that price.

14  **Q.**   Okay.  If the price were higher, less of the benefits

15  would go to HP shareholders?

16  **A.**   Yes.

17  **Q.**   All right.  So you were authorized by the board to

18  negotiate a price between £25 and £25.50?

19  **A.**   Yes.  And so we started to negotiate --

20  **Q.**   Now you're in a conversation with Dr. Lynch?

21  **A.**   Sorry.  Excuse me.

22  **Q.**   Please continue.  Go ahead.

23  **A.**   I had a conversation with Dr. Lynch.  We negotiate.  It's

24  classical negotiation.  He accepts 26 and we don't agree.  And

25  after, I don't remember how long, we finally settled on 25.50.

1    **Q.**    Okay.  Before that moment, had you agreed to a specific

2    price with Dr. Lynch?

3    **A.**    No.

4    **Q.**    Let me show you, please -- withdrawn.

5        What happened next?  After you finished this price

6    negotiation you've described with Dr. Lynch, what did he need

7    to do as far as you knew and what did you need to do?

8    **A.**    Well, he needed to get the approval of his board and, of

9    course, I needed to get the approval of my board.

10    **Q.**    Let me show you what has been marked as Exhibit 2246.

11    This is an e-mail from Dr. Lynch to Shane Robison on or about

12    August 14th, 2011, that is then forwarded -- oh, it is copied

13    to you, Mr. Apotheker, and then you forward it along to Mike

14    Lynch on August 14th.

15        **MR. REEVES:**  I offer it in evidence, please.

16        **THE COURT:**  Admitted.

17        (Trial Exhibit 2246 received in evidence)

18    **BY MR. REEVES:**

19    **Q.**    So let's go through this a little more slowly.

20        The bottom e-mail is from Dr. Lynch to Shane Robison and

21    to you, is it not?

22    **A.**    Yes.

23    **Q.**    Okay.  And it looks -- in paragraph two Dr. Lynch writes

24    (reading):

25            "The price of 25.50" --

1        I think "P" stands for pounds?

2   A.   Yes, sir.

3   Q.   (reading)

4        -- "25.50 pounds per share for a transaction announced

5        on the 18th of August.  This price now being fixed."

6        What is your understanding of what he meant by that?

7   A.   That we would stop negotiating on price.

8   Q.   All right.  And at this point has Dr. Lynch -- is he

9   relaying in any way that he's now authorized by his board to

10  proceed on this basis?

11  A.   Yes.  That's how he starts his e-mail.

12  Q.   All right.  Good.

13       And then you write back (reading):

14           "Mike -

15           "I just want to say thank you.  I look forward to a

16       long and strong partnership."

17       You're excited about this possibility now?

18  A.   Yes, I am.

19  Q.   All right.  Let's move to on or around August 16th, 2011.

20  Was there another Board of Directors meeting for HP on or

21  around that time?

22  A.   Yes, sir.

23  Q.   To discuss the possibility of the Autonomy acquisition?

24  A.   Yes.

25  Q.   I'd like to show you what has been marked as Exhibit 2992,

 1    please.  This looks like a Board of Directors update.  Do you

 2    have a copy of that?

 3    **A.**    Yes.

 4    **Q.**    Is this part of the information that was provided to the

 5    board?

 6                **MR. KEKER:**  I'm sorry.  What number are we talking

 7    about?

 8                        (Pause in proceedings.)

 9                **MR. REEVES:**  Okay.  Your Honor, do you have it?

10                **THE COURT:**  2992?

11                **MR. REEVES:**  Right here.

12                **THE COURT:**  Thank you.

13                **THE CLERK:**  Is it in the binder?

14                **MR. REEVES:**  I thought so.  It's sort of a late

15    entrant.

16    **Q.**    But do you have Exhibit 2992 before you, Mr. Apotheker?

17    **A.**    Yes, I do.

18    **Q.**    Do you recognize this document?

19    **A.**    It's a bit redacted but, yes.

20    **Q.**    Okay.  I think your lawyers want it that way.

21                **THE COURT:**  Admitted.

22          (Trial Exhibit 2992 received in evidence)

23                **MR. REEVES:**  Thank you very much, Your Honor.

24    **Q.**    All right.  Is this part of the presentation to the board

25    on or around August 16th, 2011, about Project Tesla?

1    **A.**    I believe so, yes.

2    **Q.**    And specifically their consideration of Autonomy?

3    **A.**    Yes.

4    **Q.**    All right.  Was "Tesla" the code name for the Autonomy

5    acquisition?

6    **A.**    Yes.

7    **Q.**    All right.  Let's go to page 9, please.

8          And why don't you take us through a little bit of the

9    information that's being given to the board, and then we'll

10   talk about what happened in the board meeting.  Okay?

11         Is this part of the presentation about the proposed

12   acquisition on page 9?

13   **A.**    Yes.  It's an update on where we are in the negotiation

14   with Autonomy.

15   **Q.**    And was there a calculation of the approximate price of

16   the acquisition and the transaction value?

17         Highlight the figure "11.5 billion."

18   **A.**    Yes.

19   **Q.**    Okay.  Is that the price in dollars that HP was

20   considering paying for Autonomy?

21   **A.**    Yes.

22   **Q.**    All right.  And there's a reference down below -- if we

23   highlight the bullet in the last section -- to a Rule 2.5

24   announcement.  Okay.  It reads (reading):

25               "Once the firm intention to make an offer is

1            announced, the Rule 2.5 announcement, HP will be obliged

2            to make an offer on the terms described in the

3            announcement."

4            Do you have an understanding as to what that means?

5    **A.**    I actually don't really recollect, to be honest.

6    **Q.**    Okay.  Is the announcement there the public announcement

7    of the acquisition do you think?

8    **A.**    I don't want to speculate.

9    **Q.**    You don't want to speculate.  Okay, fine.

10            All right.  We're in the board meeting.  Do you recall the

11    reaction of the board and what was discussed in the board with

12    regard to this proposed acquisition?

13    **A.**    So we represented to the board also the entire logic,

14    including, of course, the financial logic, projected P&L,

15    projected synergies, et cetera.  We gave the board an update on

16    the due diligence, on all the key elements of the due

17    diligence, which, if I remember correctly, were all green by

18    that time.

19    **Q.**    Would you like to go to that slide, perhaps?  And let's

20    take a look at -- page 10 I think addresses the point you're

21    making.

22            Are these some of the summary of the key due diligence

23    findings by the due diligence team?

24    **A.**    At that point in time, yes.

25    **Q.**    All right.  And in the middle there is a -- the board is

 1  being informed about legal IP, the review of customer

 2  contracts, including top 40.  Do you see that?

 3  **A.**   Yes.

 4  **Q.**   All right.  Is that consistent with your recollection?

 5  **A.**   Yes.

 6  **Q.**   All right.  So there's a presentation about the work done

 7  in the diligence, and I think I interrupted you a little bit

 8  about sort of the information relating to the due diligence

 9  that was given to the board.

10  **A.**   Which is the page that you're looking at and that we had

11  reached a preliminary agreement on price.  Of course, I didn't

12  negotiate that price without consulting the chairman before.

13       And at that meeting, the CFO of HP explained to the board

14  that she was unhappy with this deal, not because of any

15  findings but because she felt that HP was not capable to afford

16  such a deal.  That provoked another discussion, which was very

17  good.

18       I suggested to the board to have an Executive Session in

19  order to discuss this; specifically told the board that if the

20  board would reach the conclusion that we should not do this

21  deal, I would, of course, walk away, and I left the room.

22  **Q.**   What does "Executive Session" mean?

23  **A.**   It's a meeting of the board without any executives

24  present.

25  **Q.**   Would that include you?

1    **A.**    It includes me.

2    **Q.**    And would that include the CFO and other members of

3    management?

4    **A.**    Yes.

5    **Q.**    Thank you.

6         All right.  And after the Executive Session, what

7    happened?

8    **A.**    The chairman told me that the board had decided

9    unanimously to proceed.

10   **Q.**    All right.  Before we leave the information given to the

11   board, let's take one last look at slide -- or page 11, the

12   summary P&L forecast proforma with synergies.

13        All right.  Let's, if we could -- you've used this term

14   "synergies" in your testimony so far, Mr. Apotheker, I think.

15   Very quickly, can you tell us again what that is?

16   **A.**    It is additional revenues and profits that you generate by

17   bringing two businesses together.  So it's not a proforma

18   addition.  It's on top things that you would generate.

19   **Q.**    Okay.  On top of?

20   **A.**    On top of.

21   **Q.**    All right.  And it looks like there's a calculation over

22   time of what those synergies may be as presented to the board

23   in or around August 16, 2011, is there not?

24   **A.**    That's correct.

25   **Q.**    Okay.  Is that spread over how many years, if you're able

APOTHEKER - DIRECT / REEVES

1    to read this?

2    **A.**    Actually, I'm not able to read it, but --

3    **Q.**    Will you please enlarge the portion of this as much as

4    possible?  That's -- okay.  That's good.

5         So it's for years 2011, 2012, 2013, 2014, 2015, 2016, is

6    it not?

7    **A.**    Yes.

8    **Q.**    And what is the projected synergy by year 2016 according

9    to the information that was given to the board?

10   **A.**    About 1.4 billion.

11   **Q.**    That's for revenues?

12   **A.**    That's revenues, yes.

13   **Q.**    And if we slide back over so we can see the beginning of

14   the row on the left-hand side.

15        And then there's a total revenue estimation.

16        Now we need to slide back to the right.

17        Do you see that?

18        And if we can highlight that figure in the middle of the

19   right there.  All right.  Good.

20        What was the total revenue synergy estimation according to

21   this presentation, if you can read it?

22   **A.**    Excuse me.  Total revenue estimation, that includes also

23   the Autonomy revenues.  So the 3.5, roughly, billion-dollar

24   expected revenues includes 1.974 billion of Autonomy revenues,

25   pure Autonomy revenues.

APOTHEKER - DIRECT / REEVES

1   **Q.**   That was a good answer.  We need it in the microphone so

2   all of us can hear it.  Can you say it again, please?

3   **A.**   Certainly.  So 3.5 billion total revenues out of which

4   1.9, roughly, Autonomy revenues.  So not synergy.

5   **Q.**   All right.  And that's the information that went to the

6   board?

7   **A.**   Yes.

8   **Q.**   All right.  Good.  Thank you.

9        I'd like to show you, if I could, please, Exhibit 2301.

10  This is a document dated August 18, 2011, that is signed by

11  representatives of HP and Autonomy.

12        **THE COURT:**  Admitted.

13        (Trial Exhibit 2301 received in evidence)

14        **MR. REEVES:**  Thank you, Your Honor.

15  **Q.**   Are you familiar with this document, Mr. Apotheker?

16  **A.**   By looking at it, I remember it.

17  **Q.**   Let me do better.  I've got a better question for you.

18        There's a portion of this -- is this one of the documents

19  that's being executed at the culmination of this negotiation?

20  **A.**   Yes.

21  **Q.**   All right.  Now, let's go to page 2.  There is a payment

22  of inducement fee.

23        If we could drop down a little bit.

24  **A.**   Uh-huh.

25  **Q.**   Drop down to Section 2 and right there.  Let's highlight

1    "Payment of Inducement Fee" and 1.1 [sic].

2         Okay.  Are you familiar with inducement fees in the

3    context of an acquisition like this?

4    **A.**   Yes.  It's also called a break-up fee.

5    **Q.**   A break-up fee.  What does that mean?

6    **A.**   It means that if the deal doesn't get consummated because

7    of some action or nonaction undertaken by the selling party,

8    the buying party gets a fee.

9    **Q.**   Gets a fee, okay.

10        Let's go to page 11 and look at the signature block.  Do

11   you recognize your signature?

12   **A.**   (Witness examines document.)  Yes, I do.

13   **Q.**   And are you signing on behalf of Hewlett Packard Company

14   here?

15   **A.**   Yes.

16   **Q.**   All right.  Good.

17            **THE COURT:**  If the buying party decides not to go

18   through with the deal, is there a fee that is paid to the

19   selling party?

20            **THE WITNESS:**  No.

21   **BY MR. REEVES:**

22   **Q.**   Let's go to on or about August 18th, 2011, the day that

23   the deal was eventually announced.  Are you familiar with that

24   day?

25   **A.**   Yes, I am.

1  **Q.**   At or around that time, prior to the announcement, had HP

2  obtained a so-called fairness opinion, if you're familiar with

3  that term?

4  **A.**   So at that board meeting on the 18th in the morning --

5  actually there were two meetings.  There was a Finance and

6  Investment Committee meeting that suggested to go ahead and

7  supported the acquisition; and that was followed by a full

8  board meeting where, among other things, the board heard the

9  fairness opinion of two banks.

10  **Q.**   What is a fairness opinion?

11  **A.**   It's analysis by two independent banks that informs the

12  board if the price that one is willing to pay is fair, is

13  reasonable.

14  **Q.**   All right.  Let me show you what has been marked for

15  identification as Exhibit 2991, please.  This is an e-mail from

16  you to a Mr. Steven Fieler and Bill Wohl within HP.  Do you

17  know those people?

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 2991 received in evidence)

20          **MR. REEVES:**  Thank you, Your Honor.

21          **MR. KEKER:**  Can I have a copy, Your Honor?

22          **MR. REEVES:**  We gave you a copy.

23                  (Pause in proceedings.)

24  **BY MR. REEVES:**

25  **Q.**   Are you familiar with this document?

1  **A.**  I am.

2  **Q.**  Okay.  And who is Mr. Fieler?

3  **A.**  Mr. Fieler is the head of -- or was the head of investor

4  relationships at HP.

5  **Q.**  Okay.  And who is Mr. Wohl?

6  **A.**  Head of communications at HP.

7  **Q.**  It looks like you're writing early in the day on

8  August 18th, 2011, the date of the announcement?

9  **A.**  Yes.

10  **Q.**  All right.  And you write (reading):

11          "With the wild gyration of the EU stock market this

12      morning, there is a possibility that Tesla isn't going to

13      happen.  Please prepare for this eventuality.  New script

14      for Cathie and I," et cetera.

15      What do you mean by that?

16  **A.**  So just to put things into context, in the same day in the

17  afternoon HP was going to announce not only the deal but also

18  its quarterly results.  That's something that the CFO,

19  Cathie Lesjak, and I would be doing, and that morning I was

20  told they were considering the possibility to not do this deal.

21  **Q.**  To walk away if you needed to?

22  **A.**  To just walk away.

23  **Q.**  All right.  And there were a lot of other pieces of news

24  that HP was announcing on this day; is that correct?

25  **A.**  Yes.  HP was announcing the possibility of spinning out or

1  disposing of the PC business.  We were going to write-down the

2  disastrous touchpad.  We were going to announce a pretty poor

3  quarter and the Autonomy deal.

4  **Q.**   And so help us understand how you viewed the quantum or

5  significance of this array of news that HP is announcing.  You

6  know, how much news is that?

7  **A.**   Well, there's a lot of things to digest for our

8  shareholders and for the financial markets.  On top of that, if

9  the jury and everybody here would remember, this was a month

10 where the stock market was going through pretty wild

11 fluctuations, and I wanted to have the opportunity to discuss

12 with the board on that morning if we should maybe decide not to

13 do this deal.

14 **Q.**   What happened?

15 **A.**   We came to the conclusion that we should do this deal.

16 **Q.**   All right.  So, then, after the trading day, HP formally

17 announced its intention to acquire Autonomy, did it not?

18 **A.**   Actually, the information leaked pretty soon and so we had

19 to do a few things.  So the information was actually out before

20 we even made all of the announcements.

21 **Q.**   So there were press releases indicating that there were

22 discussions, but at some point in the day of August 18th, 2011,

23 HP announced its intention to acquire Autonomy, did it not?

24 **A.**   Yes, it did.

25 **Q.**   All right.  And you did that at or about the time that you

1  announced the other corporate activity that you've described?

2  **A.**    At the same time.  Same announcement.

3  **Q.**    Same announcement.

4      Okay.  And as we move into the next day, were you aware of

5  the stock market reaction?

6  **A.**    As predicted, the team --

7  **Q.**    What happened?  Remind us what happened and tell us what

8  you mean by "as predicted."

9  **A.**    Well, in the July strategy board meeting when we looked at

10  all of these options, we informed the board, who understood as

11  we will, that it was a high likelihood that if we would make

12  all of these announcements, that the stock market -- that the

13  stock price of HP would go down.

14  **Q.**    And did that happen?

15  **A.**    And it did, indeed, happen.

16  **Q.**    So you were not surprised by the stock price drop?

17  **A.**    I was a bit surprised by the extent of it, but the drop,

18  no.

19  **Q.**    All right.  Let me show you what has been marked for

20  identification as Exhibit 2376.  This is an e-mail from you,

21  sir, to everyone at HP on or about September 22nd, 2011.

22          **MR. REEVES:**  I offer it in evidence.

23          **THE COURT:**  23?

24          **MR. REEVES:**  2376, please.

25                  (Pause in proceedings.)

1          **THE COURT:**  Admitted.

2      (Trial Exhibit 2376 received in evidence)

3          **MR. REEVES:**  And if we could -- we can stop right

4  there.  Just highlight the word "resignation," please, in the

5  first sentence.

6  **Q.**   On or about September 22nd, 2011, Mr. Apotheker, did you

7  resign from HP?

8  **A.**   I was asked to resign, yes.

9  **Q.**   You were asked to resign.  Tell us what happened.

10 **A.**   That morning -- actually, I don't remember it was that day

11 or the day before, I was called by a journalist who had heard

12 from two reliable sources that the board was going to meet in

13 order to consider my departure.  I wasn't aware of that, so I

14 confronted my chairman who confirmed, gave me a chance to

15 explain my position to the board.  The board had made up its

16 mind and asked me to resign.

17 **Q.**   Okay.  Were you surprised by this?

18 **A.**   Yes, I was.

19 **Q.**   Okay.  And today do you have an understanding as to what

20 happened?

21 **A.**   No.

22 **Q.**   No.

23                  (Pause in proceedings.)

24          **MR. REEVES:**  Thank you.  I have no further questions.

25          **THE COURT:**  Okay.  Do you want to stand up, ladies and

```
 1    gentlemen, just stretch a bit?

 2                        (Pause in proceedings.)

 3          THE COURT:  Ladies and gentlemen, let's take five

 4    minutes.  You can go in here for five minutes.  We'll be in

 5    recess.

 6        Remember the admonition.

 7        If you want to use the facilities, go right ahead.

 8        You may as well.

 9          THE WITNESS:  Thank you.

10                      (Recess taken at 2:06 p.m.)

11                   (Proceedings resumed at 2:15 p.m.)

12        (Proceedings were heard in the presence of the jury:)

13          THE COURT:  You may proceed.

14          MR. KEKER:  Thank you, Your Honor.

15          THE COURT:  The record should reflect everyone is

16    present.  Parties, attorneys.

17                        CROSS-EXAMINATION

18    BY MR. KEKER:

19    Q.  Good afternoon, Mr. Apotheker.

20    A.  Hello.

21    Q.  How should I say it?

22    A.  You said it very well.

23    Q.  Apotheker.

24        And good afternoon, ladies and gentlemen.

25        Mr. Apotheker, you never met Sushovan Hussain during this
```

1    acquisition process, did you?

2    **A.**    No, sir, I didn't.

3    **Q.**    And you never talked to him?

4    **A.**    No, I didn't.

5    **Q.**    You met him when you visited Cambridge after the

6    acquisition and met all the people there?

7    **A.**    I'm not entirely sure about that either.

8    **Q.**    Okay.  Tell the jury -- you wanted to buy Autonomy.  Why

9    did you want to buy Autonomy?  Tell them your strategic

10    thinking.

11    **A.**    Autonomy was a recognized leader in the particular

12    technology to understand unstructured data.  If I'm not being

13    clear, please tell me so.

14    **Q.**    We'll go through it piece by piece, but go ahead and tell

15    it in your words.

16    **A.**    And we wanted to develop a -- a business around a

17    combination of structured and unstructured data that we would

18    provide to enterprise customers around the world in the cloud.

19    **Q.**    Did you think that the IDOL technology was something that

20    was special?

21    **A.**    Yes.

22    **Q.**    And what was special about it?

23    **A.**    It was the leading technology in its field.

24    **Q.**    Where -- did you think when you came to Hewlett-Packard

25    that Hewlett-Packard needed transformation?

APOTHEKER - CROSS / KEKER

1  **A.**    Yes.

2  **Q.**    And did you tell the people that hired you that you

3  thought that Hewlett-Packard needed transformation?

4  **A.**    That was my hypothesis, yes.

5  **Q.**    And eventually -- transformation from what to what?

6  **A.**    From an undifferentiated hardware provider to a company

7  that would help people make much more out of information.

8  **Q.**    You mentioned a company called Vertica.  In March of 2011,

9  Hewlett-Packard bought a company called Vertica; right?

10  **A.**    Yes, sir.

11  **Q.**    What does Vertica have to do with your strategic vision

12  for buying Autonomy?

13  **A.**    Not a lot, actually.  Vertica was a company that had

14  developed a particular technology for a very fast way of

15  reading databases.

16  **Q.**    Was Vertica specializing in structured data?

17  **A.**    Yes.  It was.

18  **Q.**    And was your vision to put Vertica and Autonomy, and some

19  of the products that HP had, together to make a dent in this

20  marketplace?

21  **A.**    At a later stage, yes.

22  **Q.**    And what was the marketplace that you were going to make a

23  dent into that you saw the future?

24  **A.**    The combination of these two elements of structured and

25  unstructured data would give companies and customers a

 1  significantly better insight into information.

 2  **Q.**    And did you see that as a very large growing market?

 3  **A.**    I saw that as a very large market.

 4  **Q.**    How would you -- well, how did you see -- what did you

 5  think of Dr. Lynch?

 6  **A.**    What do you mean?

 7  **Q.**    Did you see Dr. Lynch as having a future, as being a

 8  future part of this vision that you had for Hewlett-Packard

 9  once it had Vertica and Autonomy?

10  **A.**    Yes.  At a given moment in time when we actually started

11  to talk about the merger of these two companies, I thought that

12  Mr. Lynch would be the appropriate person to manage the entire

13  software business.

14  **Q.**    You -- you learned from Mr. Robison, didn't you, that

15  Hewlett-Packard had long been interested in Autonomy, but it

16  was too expensive, and you don't have to guess.  Look at 1502

17  in those books that you have up there, please.  And I'd offer

18  that into evidence.

19          **THE COURT:**  Okay.  Admitted.

20          (Trial Exhibit 1502 received in evidence)

21               (Exhibit published to jury.)

22          **MR. KEKER:**  If we could put that up --

23          **THE COURT:**  It's on the screen.  1502.

24  BY MR. KEKER:

25  **Q.**    And in the top email -- this is back in January of 2011 --

1  Mr. Robison is writing to you about "connecting with Frank this

2  evening."  This is a reference to Frank Quattrone and Autonomy,

3  isn't it?

4  **A.**  It is.

5  **Q.**  All right.  And he says, "As you know, this has long been

6  a favorite, just toooo," zero, zero, zero -- to O, O, O

7  "expensive."  Do you remember getting that?

8  **A.**  By looking at it, yes, I do.

9  **Q.**  And then we talked about the acquisition of Vertica in

10 March, and then look at 6573, please.  And now you have to

11 switch, I'm afraid, to the second book.

12         **THE COURT:**  Admitted.

13         (Trial Exhibit 6573 received in evidence)

14               (Exhibit published to jury.)

15 **BY MR. KEKER:**

16 **Q.**  6573 -- you can look at it on the screen -- and the bottom

17 email is Mr. Robison writing to you about Atlantis, and

18 Atlantis is the -- what eventually was changed to Tesla; right?

19 **A.**  Right.

20 **Q.**  And he says, "Leo, we had a really good meeting today.

21 More opportunity than I thought."  This is in late June.  "They

22 have a very good team.  Over dinner" -- and so on.

23     And he suggests this idea -- if you look on the next

24 page -- well, at someplace in here, he suggests the idea, and

25 you write, "I very much like your idea," in the top email, "of

1  folding Vertica and Atlantis into one.  Makes huge sense."

2      So Mr. Robison and you were talking about folding Vertica

3  with its unstructured data capabilities and Autonomy with

4  its -- with its -- excuse me.  Vertica was structured, Autonomy

5  was unstructured.  Folding them together as part of HP?

6  **A.**  Yes.

7  **Q.**  Now, by July, the July board meeting, you had decided that

8  you wanted to acquire Autonomy, hadn't you?

9  **A.**  By "you," you mean me --

10 **Q.**  No.  I mean HP.  I'm sorry.

11     But you had decided that you wanted HP to acquire

12 Autonomy?

13 **A.**  It was my recommendation to acquire Autonomy.

14 **Q.**  Let's go through some of the bases for that.

15     6604, I believe, is in evidence, Your Honor?

16         **THE COURT:**  Yes.

17         (Exhibit published to jury.)

18 **BY MR. KEKER:**

19 **Q.**  And 6604 is in your --

20         **THE COURT:**  It's on the screen.

21 **BY MR. KEKER:**

22 **Q.**  It's in your second binder.  And this is from the -- the

23 email says it's from Mr. Robison to you, and he's sending a

24 slide deck for project Atlantis.

25     Can we go to the next page, please, Jeff.

1          This is a July slide -- July 13, 2011 slide deck for

2    project Atlantis, and I want to take some time with it.

3          Could we go to page 2, please.

4          "The Combination of Atlantis, Vertica, and HP's Open Stack

5    DB" -- Is that database?

6    **A.**    Yes.

7    **Q.**    -- "Provides HP a unique disruptive Data Stack."

8          Can you explain to us what that means, please?

9    **A.**    Well, there wasn't such a thing in the market and

10   therefore it would have been very disruptive and very

11   annulative in a file value.

12   **Q.**    Disruptive means it would displace what was there now and

13   take it to some higher level?

14   **A.**    Conventional database technology.

15   **Q.**    Okay.  Larry Ellison wouldn't have liked it at Oracle;

16   right?

17   **A.**    Among others.

18   **Q.**    Look at the next page, please.  It says, "The Rationale

19   for Acquiring Atlantis."  And let's focus on the second sort of

20   paragraph there, "The combination of Vertica, HP's organic open

21   stack database and Atlantis provides HP a unique disruptive

22   data stack," and then it goes through each one.

23          "Atlantis is the industry leader for unstructured data.

24   Vertica is a leading realtime analytics platform.  The

25   combination of these assets enables HP to integrate structured

APOTHEKER - CROSS / KEKER

1  and unstructured information to enable enterprise search."

2  Just what you said.  "HP can also optimize Atlantis' technology

3  to develop horizontal and vertical-specific business process

4  and analytical solutions."

5      That was in July the rationale, in your mind, for why this

6  was a good idea; right?

7  A.   Yes.

8  Q.   Can we see 5, please, page 5.  And this is -- this is -- I

9  want to go back.  No.  I'm sorry.  The next one, Jeff, please.

10 Page 5.

11     "Unified analytics is driving the key synergy with

12 Atlantis."  What does that mean?

13 A.   When we analyzed the synergies, we looked at various

14 possibilities of synergies.  We don't derive them just from one

15 thing.  When you find analytics, is what we were just talking

16 about, that would have been a big component.

17 Q.   And it says, "Unified analytics is analytics derived from

18 structured and unstructured data," and then the third bullet

19 point is, "With Atlantis, HP can lead in this emerging market";

20 right?

21 A.   Right.

22 Q.   And you thought it was a huge market?

23 A.   I thought it was an important market.

24 Q.   And then the next page, page 6, shows key areas of

25 synergies, and can you just summarize those -- the three key

1   levers for HP to build a leading position in enterprise

2   software through the Atlantis acquisition?  Can you summarize

3   what's -- what the three key areas of synergies are?

4   **A.**   If I may correct you, if you don't mind?

5   **Q.**   Yeah.  Please correct me.

6   **A.**   That's the analyses at that particular date.  That is not

7   the final analysis.

8   **Q.**   As of July when this presentation is put together, what

9   did you -- what did -- you and your staff think the key areas

10  of synergies were?

11  **A.**   So we thought there were two in fact.  One was the unified

12  business analytics, the one that you have just described.  And

13  the other one was the information life cycle management.

14  **Q.**   Okay.

15  **A.**   Which is more traditional, which is the entire industry

16  where you do -- where you provide backup archiving, electronic

17  discovery, and record management.  But it's not disruptive.

18  That is more traditional.  That is actually the core

19  business -- at least part of the core business of Autonomy.

20  **Q.**   Okay.  And then the next page, you're predicting --

21  predicts future earnings.  This is the summary P&L forecast of

22  Autonomy standing alone, just what people thought the future

23  would bring for Autonomy if it were all by itself; right?

24  **A.**   That's correct.

25  **Q.**   And then page 8 is the synergy assumptions, and we don't

1  have to go through it, but the jury can see what the synergy

2  assumptions were in July.  That's what's written there; right?

3  **A.**  To be very precise, mid July.

4  **Q.**  Mid July.  Mid July.  I understand this is fast moving.

5      And then on page 9, this is a summary P&L forecast with

6  synergies, and this is the one where if you look at the

7  adjusted revenue line -- can we blow that up -- that goes --

8  with synergies, the prediction, total revenue goes from about a

9  billion dollars to $11 billion over a five-year period.  Am I

10  reading that correctly?

11  **A.**  You are reading it correctly for that particular moment in

12  time.  Ultimately, the synergies came down significantly.

13  **Q.**  I realize that.

14      This is going to end up with $46 million worth of

15  enterprise value, right, as we go through this stack?

16  **A.**  I don't remember.

17  **Q.**  All right.  I'll show you.  So can we look at the

18  operating profits further down.  At this point, mid July, the

19  operating profits with synergies go from 435 million to almost,

20  you know, 7 or 8 times that, 3.5 billion in five years; right?

21  That's what this says.

22  **A.**  At this moment in time, yes, indeed.

23  **Q.**  And if you look at page 10 -- the jury has seen this, I

24  think -- next page.  And this -- this leads with synergies to

25  an enterprise value of $46 billion?

APOTHEKER - CROSS / KEKER

1   A.   At that moment in time, that's correct.

2   Q.   And the market capitalization, how much the market was

3   paying for all of the stock at that time, was about $6 billion?

4   Am I right about that?

5   A.   You are comparing apples and bananas, if you don't mind.

6   Q.   I'm sure, but was the market capitalization 6 billion?

7   A.   Yes.

8   Q.   And so the idea was that 6 billion -- something the market

9   thought was $6 billion now with these synergies, there was some

10  analysis that led to $46 billion?

11  A.   At that moment in time, that's correct.

12  Q.   And on March -- excuse me -- on July 20th, this was

13  presented to the board; right?

14  A.   Right.

15  Q.   At the board meeting?

16  A.   Yes.

17  Q.   If you would look at 6558 --

18  A.   Excuse me.  What number did you say?

19  Q.   6558.  This is the July 20, 2011 presentation to the

20  board.

21       And if it's not in, I move it in, Your Honor.

22            THE COURT:  Admitted.

23         (Trial Exhibit 6558 received in evidence)

24              (Exhibit published to jury.)

25  \\\

BY MR. KEKER:

Q.   And in this board meeting -- you said it was a two-day board meeting.  You can get that in front of you, 6558.

A.   I'm not so sure I have it.

Q.   It should be in Volume 1, towards the back.  6558.

A.   Yes.  Thank you.

Q.   Got it?

A.   Excuse me.

Q.   This is the presentation on portfolio to the board of directors at this two-day board meeting, and the issue at this board meeting was to strategically -- to discuss this transformation of Hewlett-Packard?

A.   That's correct.

Q.   And so if we look at page 5, we're talking about, as transformation options -- one of them is the "status quo." There is a cross through that.  "Only acquired," "divest and acquire," "only divest."

     Can you explain just at a very high level to the jury what options, strategic options, were being considered at this board meeting?

A.   Three.  One would be only to acquire, in this case, Autonomy.  Diverse and acquire would be the divestiture of the PC business and the acquisition of Autonomy.  And only divest is divestiture of the PC business.

Q.   The PC business had been purchased from Compaq how long

1  before this?

2  **A.**   I don't recall exactly.

3  **Q.**   Okay.  But --

4  **A.**   Many years before.

5  **Q.**   That was a big Carly Fiorina acquisition.  Do I remember

6  that correctly?

7  **A.**   That's correct.

8  **Q.**   And so one of the things being considered at this board

9  meeting was getting rid of the acquisition of a PC business,

10  which had happened some years before?

11  **A.**   That's correct.

12  **Q.**   And another thing was acquiring Autonomy?

13  **A.**   That's correct.

14  **Q.**   And would you look at page 13, please.  And here, we don't

15  have to go through it, but the second paragraph, the rationale

16  for acquiring Atlantis now is the same as it was before.  We

17  looked at that, the three-prong thing.

18       And then could we see page 15.  And here we're talking

19  about HP can build a leading position in enterprise solutions

20  through Atlantis acquisition via two key levers.  One is

21  analytics, which is the most significant capability from

22  Atlantis, and then second is the synergies; right?

23  **A.**   Yes.

24  **Q.**   And in this presentation, the idea of divesting the PC --

25  the personal computer business is called Poseidon; right?

1  **A.**    That is correct.

2  **Q.**    So the issue is "should we divest Poseidon and acquire

3  Atlantis."

4       Page 70.  This is the executive summary.  I want to

5  highlight in the first paragraph, "We believe Hawk's strategic

6  vision of leveraging cloud connectivity and software to provide

7  seamless, secure and context-aware computing to enterprises and

8  consumers as articulated in March is credible and

9  well-conceived."

10      "Hawk" is what you were calling Hewlett-Packard?

11  **A.**    I wasn't calling.

12  **Q.**    I'm sorry.  Whoever wrote this slide was calling

13  Hewlett-Packard?

14  **A.**    The bankers wrote this slide.

15  **Q.**    Bankers.  Okay.

16      And then the bankers wrote, "Hawk is currently in a

17  precarious position."

18      Did you agree with that?

19  **A.**    I wouldn't phrase it exactly like that.

20  **Q.**    Excuse me?

21  **A.**    I would not have phrased it exactly like that, but it's

22  the bankers speaking, not me.

23  **Q.**    Did you agree that Hewlett-Packard, whether you call it

24  precarious or not, was in a shape where it had to transform

25  itself?

1  **A.**    If -- if Hewlett-Packard wanted to create significantly

2  better value for its shareholders, it needed to do something

3  about its offers, yes.

4  **Q.**    Okay.  And then the bankers are also saying, "Release of

5  Q3 results potentially an important catalyst."

6      What did you understand them to be saying to the board?

7  **A.**    By then, it was clear that HP was going to have a poor Q3

8  and they would have an impact on the share price.

9  **Q.**    And then the next big headline is, "Given the nature of

10  these challenges, Hawk will find it very hard to," quote,

11  "execute out," close quote, "of this predicament on a timely

12  basis."  What does that mean?

13  **A.**    What they mean is that it's very difficult in a very short

14  time frame to address all of the challenges that HP has just by

15  sheer execution.

16  **Q.**    And then the next page of the summary, which is page 7 of

17  the exhibit, begins -- the first bullet is, "In light of these

18  circumstances, we believe that Hawk needs to take a proactive

19  and deliberate approach to clearly-identified strategic

20  initiatives that will transform Hawk mid- to long-term," and

21  then they go on to recommend the Poseidon getting rid of PCs

22  and the Atlantis project bringing in Autonomy to HP.

23  **A.**    Yes, they do.

24  **Q.**    And then the last bullet point there says, "Given UK

25  takeover framework" -- no.

1        Just above that, please.  Jeff.

2        "Given UK takeover framework and potential interloper

3   interest, the acquisition of Atlantis is not without risk.

4   However, strength of Hawk's strategic rationale and value

5   creation potential provide for very competitive positioning and

6   firepower."

7        What did you understand they were saying about UK takeover

8   framework and potential interloper interest?

9   **A.**   Well, the UK has a very specific and very strict takeover

10  code, and what they meant by saying this is that it's very hard

11  to keep any formal shape confidential and there was a risk that

12  somebody else would offer higher price.

13  **Q.**   At page 81, Atlantis is described as "a transformational

14  opportunity."

15  **A.**   The page numbers are not very clear.

16       **MR. KEKER:**  While we are finding that, Your Honor

17  could we approach for a second here.

18       (Sidebar conference not reported.)

19  **BY MR. KEKER:**

20  **Q.**   So at page 81, the -- this -- this deal is referred to as

21  a transformational opportunity and that's the way you saw it;

22  is that right?

23  **A.**   Yes.

24  **Q.**   And then page 83, the synergies have been toned down some

25  to make the enterprise value at the end of five years only 17

1   billion; right?

2   **A.**   Yes.  But that still wasn't the end of the work.

3   **Q.**   Okay.  All right.  But at this time in July when the board

4   is considering this in July, they've moved -- were not using

5   the 46 billion anymore.  They were using the 17 billion?

6   **A.**   That is correct.

7   **Q.**   And then at page 85, there's a whole analysis of the UK.

8   It's hard to read here, but the UK takeover rules summary and

9   they're talking about what the rules are and the access to

10  information of other interlopers and so on; right?  Never mind.

11  The jury can review that if they want to.

12      The result of all of this is that the board on July 20th

13  approved the acquisition of Autonomy; right?

14  **A.**   That's correct.

15  **Q.**   And they approved it at a very specific price of

16  $11.7 billion?

17  **A.**   Yes, sir.

18  **Q.**   And look at 2008, please.  And I move that into evidence,

19  Your Honor.

20          **THE COURT:**  Admitted.

21          (Trial Exhibit 2008 received in evidence)

22                (Exhibit published to jury.)

23  **BY MR. KEKER:**

24  **Q.**   I have the wrong number -- yeah.  2008 is the redacted

25  minutes of the board of directors meeting on July 19 through

1  21, 2011, and on the third page in the middle, it says, "After

2  a full discussion, the board authorized Apotheker, Robison, and

3  other members of HP management to pursue Project Tesla with a

4  maximum acquisition price of 11.7 billion"; right?

5  A.   Correct.

6  Q.   And that actually happens to be the number eventually that

7  you bought it for almost exactly, isn't it?  That's 25.50

8  pounds a share?

9  A.   I don't remember exactly.

10 Q.   All right.  All of this was before any due diligence?

11 A.   That's correct.

12 Q.   And it was also before you had discussed a price with

13 anybody at Autonomy?

14 A.   That is also correct.

15 Q.   And then after this board meeting where the board had said

16 you can pay 11.7 billion, you met with Dr. Lynch in Doville,

17 and Mr. Robison was there, and you all agreed on this price

18 range of 20 -- 25 to 27, you said -- it was actually 24.96 to

19 26.96, wasn't it?

20 A.   Something like that.  I don't remember the exact number.

21 Q.   Okay.  And that was after the board had approved this?

22 A.   Yes.

23 Q.   All right.  Now, I want to ask some questions that -- by

24 the time this decision was made, what -- what you knew about

25 Autonomy.

1            You had read the 2010 annual report, you told us?

2   A.    Yes.

3   Q.    And had you read analyst reports?

4   A.    I had received a summary of the analysts' thoughts.

5   Q.    Who did you receive the summary from?

6   A.    From corporate development.

7   Q.    Had you read any quarterly press releases that Autonomy

8   put out, if you remember?

9   A.    I didn't.

10  Q.    Had you read any trade press about Autonomy?

11  A.    I don't remember.

12  Q.    Did anyone report to you that the analysts had mentioned

13  hardware sales on several occasions?

14  A.    No.  The only thing that was reported to me were appliance

15  sales.

16  Q.    So did people say that the analysts had mentioned

17  appliances?

18  A.    People had mentioned that Autonomy was selling appliances,

19  yes.

20  Q.    Okay.  But was it reported to you -- what did people tell

21  you about what the analysts were reporting when it came to

22  hardware?

23  A.    Nothing.

24  Q.    Okay.  All right.

25            Let's look at -- 1352 is the first in your book, and that

1    is the annual report that Mr. Reeves asked you about, and I

2    want to ask you some questions, too.

3    A.    Excuse me.  Could you please -- I have it.  Sorry.

4    Q.    1352 is the annual report, which is the first exhibit in

5    your book.

6    A.    Thank you.

7    Q.    And page 14, if you would join me in looking at that.

8    We'll put page 14 up.

9                    (Exhibit published to jury.)

10    BY MR. KEKER:

11    Q.    I'm sorry.  Page -- it's page 12 of the -- of the report

12    and page 14 of the exhibit.

13          So down at the bottom where the -- it says exhibit

14    1352-0014, but actually it's the page 12 of the -- that says 12

15    and that says 14, but we're on the same page.

16          Can we highlight "product" and then "The Cloud SaaS hosted

17    and appliance."

18          So you -- in carefully reading this report, you knew --

19    you read this paragraph about products.  You read this

20    paragraph about the Cloud and SaaS.

21          What is SaaS?

22    A.    Software-as-a-service.

23    Q.    So is software-as-a-service pure software?

24    A.    Yes.

25    Q.    And then "appliance," is appliance pure software?

1    **A.**    Appliance is software installed on the piece of hardware.

2    The -- the -- the benefit is derived from the software.  The

3    hardware is just a distribution vehicle.

4    **Q.**    All right.  So if the benefit is if -- if you sold

5    hardware and made no profit in order to get a customer to buy a

6    lot of software and put on the hardware, would that be an

7    appliance?

8    **A.**    No.

9    **Q.**    Why not?

10    **A.**    Because it wasn't installed on the hardware.

11    **Q.**    What if it got to the customer -- you have a big bank

12    customer, you sell them millions and millions of dollars, and

13    now you sell them from hardware to put your software on.

14    That's not an appliance?

15    **A.**    It would only mean it's an appliance if the transaction

16    occurred at the same time and if somebody actually, probably

17    from the vendor itself, installed the software on the hardware.

18    It's a bit of a complicated way of going about it.

19    **Q.**    I understand.  We are getting your perspective in reading

20    this.

21        The -- do you -- have you said that selling hardware is

22    not necessarily a concern because everyone sells hardware?

23    **A.**    I don't recall ever saying that.

24    **Q.**    Look at -- when you were talking to the Hewlett-Packard

25    lawyers -- this is 5017, which is in this small book, 5017, and

```
 1   if you'd look -- it's a May 23, 2013 discussion with Morgan

 2   Lewis.

 3          They were Hewlett-Packard lawyers; right?

 4   A.   I don't remember.

 5   Q.   Do you remember talking to Hewlett-Packard lawyers back in

 6   the day?  Look just quickly at page 5, please.

 7              THE COURT:  5017?

 8              MR. KEKER:  5017, yes, sir.

 9              THE COURT:  Admitted.

10              MR. REEVES:  Your Honor, this isn't --

11              THE COURT:  I don't know what this is.  I don't have

12   it in my book.

13              MR. KEKER:  I'm sorry.  It's in this book.  You should

14   have a book of statements.

15              THE COURT:  Well, maybe I have.  Is there an

16   objection?

17              MR. REEVES:  Well, Your Honor, these -- this is a

18   write-up of an interview --

19              THE COURT:  Oh, wait, wait, wait.  This is a

20   statement?

21              MR. KEKER:  Yes.  I'm sorry.

22              THE COURT:  Okay.  Hold on.

23   BY MR. KEKER:

24   Q.   Do you have it in front of you --

25              THE COURT:  I have it.
```

1    **MR. KEKER:**  He's got it, too.

2    **THE COURT:**  Okay.  So what --

3    **MR. KEKER:**  I'm asking about.

4    **THE COURT:**  Not admitted.

5    **MR. KEKER:**  I'm not moving it in.

6  **Q.**  Roman Numeral VII, the second sentence, did you tell the

7  Hewlett-Packard lawyers that reselling hardware is not

8  necessarily a concern because everyone sells hardware?

9  **A.**  I don't recollect saying it in that way.

10  **Q.**  Okay.  I mean, for example -- if -- do you know that

11  Autonomy had an eDiscovery product called Legal Hold?

12  **A.**  No, I don't.

13  **Q.**  If -- if I told you Legal Hold was an eDiscovery product

14  that allowed you to lock down documents that were going to be

15  called for in litigation and that that software ran on laptops

16  in a customer's place, if Autonomy sold laptops to the customer

17  and at the same time sold -- or at a future time or previously

18  had sold Legal Hold software and the customer put it together,

19  that wouldn't be an appliance?

20  **A.**  No, it's not an appliance.

21  **Q.**  Now, your estimate of hardware sales --

22    **THE COURT:**  I just want to lock this down.

23  So your definition of an appliance is an appliance is --

24  is that the software has to be installed on the hardware before

25  the -- the hardware is delivered to the customer.  Is that your

1  understanding?

2          **THE WITNESS:**  Yes, Your Honor.  Or at the same time

3  or --

4          **THE COURT:**  Or at the same time.

5          **THE WITNESS:**  But they can't be two distinguished

6  operations because if I may, Your Honor, the best example I can

7  give you is an iPhone.  An iPhone is a piece of hardware.  It's

8  just a piece of hardware without a software that turns it into

9  an iPhone.  Okay?  So in a certain sense, by analogy, an iPhone

10 is an appliance.

11         **THE COURT:**  Okay.

12 **BY MR. KEKER:**

13 **Q.**   Okay.  And then the analogy would be if I got -- if Apple

14 shipped me an iPhone and then separately sent me the software

15 and I put it together, that's not an appliance?

16 **A.**   If you would have bought the two things together and you

17 would have declared your desire to put them together and if

18 they would be willing to sell it to you, that's different, but

19 then Apple is also a hardware manufacturer.  I was just

20 trying --

21 **Q.**   Yes.  And Apple is a hardware manufacturer; right?

22 **A.**   I was just trying to give an example to His Honor so he

23 would understand what an appliance is.

24 **Q.**   Fair enough.

25      But if I'm a big software supplier and my customer says,

1    "I'm trying to consolidate vendors" or something, "I'm tired of

2    dealing with so many people; can you get me some cheap hardware

3    to use with your software," that wouldn't be an appliance?

4    **A.**    No, it's not an appliance.

5            **MR. REEVES:**  I object, Your Honor.

6    **BY MR. KEKER:**

7    **Q.**    Your estimate --

8            **THE COURT:**  Wait, wait, wait.  I'm sorry the objection

9    is overruled.

10        What was your answer?

11           **THE WITNESS:**  Excuse me?

12           **THE COURT:**  What was your answer to Mr. Keker's

13   question?

14           **THE WITNESS:**  I believe I answered no, that's not an

15   appliance.

16   **BY MR. KEKER:**

17   **Q.**    Your estimate of what you thought the hardware sales at

18   Autonomy must be because they sold appliances, you thought they

19   must by five to seven percent of Autonomy's business, didn't

20   you?

21   **A.**    I thought, to be very precise, that they had to be less

22   than five percent because in the annual report, they actually

23   break down the services revenues which was less than 5 percent

24   of the sales.  So that implies that they would report anything

25   bigger than that, and they didn't, so ...

1  Q.   Did you tell the Government the first time you talked to

2  them that you -- your estimate of hardware sales, based on

3  reading the report, was five to seven percent?

4  A.   I don't recollect precisely.

5  Q.   Would you look back at this little book of your

6  statements.  And the one I'm asking about is the one marked --

7  is the one marked --

8       THE COURT:  Are we asking him this because of the

9  difference between five and seven?  Is that right?

10      MR. KEKER:  I want to establish -- we've have been

11 using words about "essentially" and "substantially," and I

12 think Mr. Apotheker at some point had said that he thought they

13 were five to seven percent software sales.

14      THE COURT:  Go ahead.

15      MR. KEKER:  I mean hardware sales.  It's marked 5013

16 in your small book.  These are statements.  And this is

17 relating to a March 13, 2014 interview with the FBI.

18      THE COURT:  Okay.

19 BY MR. KEKER:

20 Q.   And at page 3 -- let me find it.

21      THE COURT:  Third paragraph.

22 BY MR. KEKER:

23 Q.   Third paragraph.  Yeah.

24      With regards to the appliance section, did you estimate

25 that that would be five to seven percent of Autonomy's

1  business?

2  **A.**   I don't recollect exactly, but as I read this, yes, it's

3  possible.

4  **Q.**   Okay.  Thank you.

5       And, in fact, you talked to Dr. Lynch about the hardware

6  sales, didn't you?

7  **A.**   No.  I talked to Dr. Lynch about the appliance sales.

8  **Q.**   Appliance sales.  And he said it was a small part of the

9  business?

10  **A.**   Yes, he did.

11  **Q.**   Do you remember his exact words?

12  **A.**   No, I don't.

13  **Q.**   Do you remember where you were when you talked to him

14  about it?

15  **A.**   No, I don't.

16  **Q.**   Do you remember if anybody else was there when you talked

17  to him about it?

18  **A.**   No, I don't.

19  **Q.**   Okay.  Did you ask him who he bought the hardware -- or

20  who Autonomy bought the hardware from?

21  **A.**   No, I didn't.

22  **Q.**   Did you know that Hewlett-Packard sold Autonomy

23  software -- I mean hardware for resale?

24  **A.**   I did, yes.  But not for resale.

25  **Q.**   Okay.  You knew that Autonomy -- excuse me -- that

1    Hewlett-Packard sold Autonomy hardware.

2    **A.**    I knew that -- I knew specifically that HP had sold

3    hardware to Autonomy for the creation of an appliance that went

4    to a customer.

5    **Q.**    Okay.  And did you also know that they sold hardware to

6    Autonomy for purposes of resale?

7    **A.**    No, I didn't.

8    **Q.**    All right.  And did you know -- well, you knew from the

9    annual report that hardware, however much it was, was not

10   broken out in the financial statements?

11   **A.**    That's correct.

12   **Q.**    Okay.  And you knew that Autonomy reported on its

13   financial statement as one operating segment; right?

14   **A.**    But there is a note in the financial statements that

15   breaks out these revenues.

16   **Q.**    Okay.  But tell us what -- what you understood "one

17   operating segment" means.

18   **A.**    It means that there is no breakout of the different

19   segments, different operating entities within Autonomy.

20   **Q.**    Okay.  And that's stated very clearly in the annual

21   report?

22   **A.**    Yes.

23   **Q.**    It talks about "we report one operating segment"?

24   **A.**    That's correct.

25   **Q.**    That's at page 60, if anybody ever wants to look.

1       Okay.  All right.  Let me ask about -- what you knew about

2   the reseller sales.  You knew from reading the annual report

3   that Autonomy used resellers?

4   **A.**   Yes.

5   **Q.**   And, in fact, on that page 14 -- we could go back and look

6   at it.  I don't think we need to, but they said -- well,

7   actually, let's look at it.  Page 14 of 1352.  Now we are going

8   to the column just to the left and down here where it says

9   "indirect."

10  **A.**   Page 14 or -- of the document or --

11  **Q.**   That's a good question, but --

12  **A.**   Yes, I have it.

13  **Q.**   Page 12 of the document.  I've got it on the screen.

14  **A.**   I have it.  Excuse me.

15  **Q.**   "Autonomy has over 400 value-added resellers such as

16  Accenture, IBM, Global Services, Cap Gemini, HP and Wipro."

17       What reselling did HP do for Autonomy?  Do you know?

18  **A.**   Yes, I do.

19  **Q.**   What was it?

20  **A.**   So HP would buy software from Autonomy, add some HP

21  capability to it, and usually put it on an HP server or data --

22  data server and sell that to a customer.

23  **Q.**   Okay.  And as part of the workup and decision to buy

24  Autonomy, did you or had -- did you have your team talk to the

25  people at Hewlett-Packard that worked with Autonomy?

APOTHEKER - CROSS / KEKER

1   **A.**   I actually went to see a customer.

2   **Q.**   Which customer did you go see?

3   **A.**   United States Postal Services.

4   **Q.**   Okay.  And did you -- did you go to any of the banks?

5   **A.**   No.

6   **Q.**   Did you know that they were -- that Autonomy software,

7   their biggest customers were big banks?

8   **A.**   I did.

9   **Q.**   Does Hewlett-Packard have relations with the big banks?

10  **A.**   Yes.

11  **Q.**   Sells them hardware?

12  **A.**   Essentially.

13  **Q.**   Why not talk to the big banks about their relations with

14  Autonomy?

15  **A.**   Because the United States Postal Service was a very good

16  example of where real value was created, and I happened to be

17  in Washington, so I used the opportunity.

18  **Q.**   Okay.  Anyway, back to this.  This is Autonomy's primary

19  revenue channel, the resellers.  And use of resellers is

20  standard in the industry; is that right?

21  **A.**   That's correct.

22  **Q.**   You said you paid special attention to the revenue

23  recognition criteria in the annual report?

24  **A.**   Yes I did.

25  **Q.**   Those notes.

1          And you knew that they reported under IFRS rather than

2    GAAP?

3    **A.**    Yes, I did.

4    **Q.**    That's in the report at page 52 and page 51.  No question

5    about it.

6          And then you knew -- you saw in the notes -- look at page

7    53, if we can, how they accounted for the sale of goods to

8    resellers.  And we can put it up here and blow up the top.

9          Okay.  And this begins at the top -- the first paragraph

10   is, "The group sells its products as licenses to resellers,

11   OEMs and direct to end users with associated support and

12   maintenance."

13         The next paragraph says, "Revenues from software license

14   agreements are recognized when there is persuasive evidence of

15   an agreement with a customer, contract and/or binding purchase

16   order, delivery of the software has taken place, collectability

17   is probable, and the fee has been contractually agreed and is

18   not subject to adjustment or refund."

19         You read that as part of your scrutiny of their -- their

20   revenue recognition criteria; right?

21   **A.**    Yes.

22   **Q.**    And then the next paragraph says -- talks about reseller

23   arrangements, the third paragraph.

24   **A.**    Yes.

25   **Q.**    And that the -- for that, it says, "Sales are recognized

1    if all products subject to resale are delivered in the current

2    period.  No right-of-return policy exists.  Collection is

3    probable and the fee is fixed and determinable."

4         So you knew, from reading that, that the sale to the

5    reseller was what was recognized as revenue without waiting for

6    it to pass through to an end user?

7    A.    That is correct.

8    Q.    And you knew that was different between IFRS and GAAP?

9    A.    That is correct.

10   Q.    And then if we go down to the "cost of revenues" on the

11   same page in these notes, the cost of revenues, cost of

12   licensed revenues, includes various things, but it includes

13   hardware; right?

14   A.    Yes.

15   Q.    What hardware did you think they were talking about?

16   A.    Appliances.

17   Q.    Appliances.  Okay.

18        Another thing -- based on your experience in the software

19   industry, there is nothing unusual about a software company or

20   really any company setting sales targets for a quarter, is it?

21   A.    Perfectly normal.

22   Q.    A little bit about the due diligence.

23        You assigned the work to others and expected them to

24   report to you?

25   A.    Yes.

1   **Q.**   And you weren't on any of the due diligence calls?

2   **A.**   No, I wasn't.

3   **Q.**   Did you know that they -- that there was some kerfuffle

4   about the Deloitte work papers, that they asked for them and

5   Autonomy said, "No, you can't see the work papers"?

6   **A.**   I don't recollect that.

7   **Q.**   You knew that KPMG was hired to help with the due

8   diligence?

9   **A.**   Yes.

10  **Q.**   Okay.  Exhibit 2200, which is in your book -- before you

11  look at that, let -- I think you've said this, but before a

12  final decision was made by Hewlett-Packard to buy Autonomy, at

13  any point, you could have walked away if you wanted to?

14  **A.**   Yes.

15  **Q.**   And if you thought you weren't getting enough information,

16  could you walk away?

17  **A.**   That would have been a possibility, yes.

18  **Q.**   And if you weren't getting answers to questions

19  satisfactorily, you could walk away?

20  **A.**   Yes.

21  **Q.**   All right.  The KPMG report is 2200.  Did you -- if that's

22  not in evidence, I move it in.  The one I have is Manish

23  Sarin's copy.

24          **THE COURT:**  What number is it?

25          **MR. KEKER:**  2200.

1           THE COURT:  It's in.

2                       (Exhibit published to jury.)

3    BY MR. KEKER:

4    Q.    This is dated August 9, 2011.  Did you read it,

5    Mr. Apotheker?

6    A.    I never saw it.

7    Q.    Did you know they had made a report?

8    A.    No, I didn't.

9    Q.    Did you know that they -- well, just look at page 13.  I

10   mean, page -- of the exhibit.  I mean page 14.

11          And there they are reporting on revenue recognition, and

12   the top line -- I mean, it couldn't be more -- "Target records

13   revenue in accordance with IFRS."  And then KPMG is calling the

14   attention to -- "Based on limited discussions with management

15   and the data provided, we believe there may be differences

16   which could impact the historical growth rate and the timing".

17   That's differences between IFRS and GAAP, and one of them, if

18   you go down three, is sell-in versus sell-through.  Do you see

19   that?

20   A.    I do.

21   Q.    "Target recognizes revenues for license sales upon sell-in

22   to its VARs rather than on a sell-through basis to end

23   customers."

24          That's something that you knew, KPMG knew, everybody knew?

25   A.    I -- as I said, I've never seen this report before.

1   **Q.**   Okay.  Did you know -- page 67 of this report says what

2   they didn't do, what they didn't either have time to do or

3   weren't asked to do.

4       Turn to page 67.  And if we could highlight up there on

5   the upper left-hand corner all the way to the left where it

6   explains -- oh, for crying out loud.  Wait a minute.  Excuse

7   me, Mr. Apotheker.  I have screwed up.

8       It's page -- it's page 68 of the exhibit.  Not 67.  That's

9   entitled "Appendix 1 SOW," statement of work procedures.  And

10  in the upper left-hand corner, it says, "Procedures that could

11  not be performed appear in bold."  Do you see that?

12  **A.**   Yes, I do.

13  **Q.**   And then over on the right-hand side, there are a number

14  of -- under "financial due diligence," there's a lot of bold

15  type of things that couldn't be done; correct?

16  **A.**   It says so.

17  **Q.**   And on the next page, procedures that could not be

18  performed -- performed appear in bold, and they include No. 10

19  "Obtain and read an analysis of target's expenses and inquire

20  about" -- and one of them is the cost of revenues.

21      Go over to the next -- the next column, "financial due

22  diligence assistance," No. 11 is, "Obtain and read an analysis

23  of target's accounts receivable.  Inquire about' -- and it

24  lists a long series of things that couldn't be done.  It goes

25  on for pages.

1    Did you know that they couldn't do a lot of things that

2    they were hired to do?

3    **A.**    No, I didn't.  I never saw this report.

4    **Q.**    Okay.  And nobody told you that -- that KPMG either didn't

5    have time or didn't carry out its statement of work?

6    **A.**    No, sir.

7    **Q.**    All right.

8    Now, before the due diligence, there was concern about

9    interlopers; right?

10   **A.**    Yes.

11   **Q.**    1865.  If you would look at that, please.  It is a memo

12   from you to Mr. Robison, and if you go down in the string, the

13   middle email from you to Mr. Robison dated June 18 -- I move

14   this in, Your Honor.  I'm sorry.

15          **THE COURT:**  Admitted.

16          **MR. KEKER:**  1865.

17          (Trial Exhibit 1865 received in evidence)

18                  (Exhibit published to jury.)

19   **BY MR. KEKER:**

20   **Q.**    The middle email from you dated June 18, 2011, it says

21   "Shane, Atlantis CEO" -- that's Dr. Lynch?

22   **A.**    Yes.

23   **Q.**    "Wants to do the deal with HP and he believes that we are

24   the ideal partner.  His concern -- the concern is an interloper

25   will turn the deal into a public takeover battle with a chance

1    that Atlantis would be in the wrong hands."

2        And then Mr. Robison writes back, "This will be

3    interesting, given that they are public and subject to very

4    tight rules."

5        So that was a concern going all the way back to June;

6    right?

7    **A.**    The concern was that we wanted to avoid a costly takeover

8    battle.

9    **Q.**    And you were particularly concerned about Oracle?

10   **A.**    Not particularly.

11   **Q.**    Look at 6608, please.  That's in the second binder.  And

12   that's from Mr. Porrini to Mr. Apotheker and others.

13       I move it in, Your Honor.

14           **THE COURT:**  Admitted.

15           (Trial Exhibit 6608 received in evidence)

16               (Exhibit published to jury.)

17   **BY MR. KEKER:**

18   **Q.**    The bottom email is Andy Johnson from corporate

19   development writing to Shane Robison, and then this whole email

20   gets forwarded to you.

21       But what Johnson is saying to Robison in July, "I've asked

22   Barclays to do some analysis of how the O company might

23   interfere with our process, a few of the key highlights."

24       Who is the O company?

25   **A.**    I would guess Oracle.

1  Q.   He says, "O can say that they are interested after we

2  announce and get access to all the diligence we have received

3  so the takeaway is to be careful about our diligence so we

4  don't enable O to get a deep dive on sensitive data."

5       Do you see that?

6  A.   Yes, I do.

7  Q.   Does that indicate a concern on Mr. Johnson's part that if

8  you get sensitive data, the interloper, Oracle, will be able to

9  get it too?

10          MR. REEVES:   I object on foundation and ask the

11 question --

12          THE COURT:   Sustained.

13 BY MR. KEKER:

14 Q.   Look at the above email to you from Mr. Robison.   He

15 wrote, "Interesting additional information with some points the

16 other firms didn't cover."

17       Did you get this email and consider it?

18 A.   I got the email.

19 Q.   Did you consider it?

20 A.   I don't remember.

21 Q.   Okay.   And then we've talked about an August 5th

22 presentation.   That's 6560.

23       If that's not in evidence, I move it in.

24          THE COURT:   Admitted.

25          (Trial Exhibit 6560 received in evidence)

1              (Exhibit published to jury.)

2   BY MR. KEKER:

3   Q.    If you look at page 31 of that exhibit --

4   A.    Give me a second.

5   Q.    January -- excuse me -- August 5, 2011, and the number is

6   6560.  And page 30 actually is entitled "Interlopers" and then

7   the next page shows all the possible interlopers and the next

8   page -- excuse me.  We'll go over to page 35.

9          And then 35 is talking about the UK process

10  considerations; right?

11  A.    Right.

12  Q.    And then page 38 talks about key process considerations,

13  and the second one is "interloper risk" here in the big bullet;

14  right?

15  A.    Yes.

16  Q.    Okay.  Were you or your team greatly concerned about leaks

17  during the due diligence period?

18  A.    We were concerned about leaks for the entire process.

19  Q.    Did you or -- excuse me.

20         Did your team seek to limit the information it asked for

21  to avoid this leak and interloper risk?

22  A.    I don't believe so.

23  Q.    Did -- was there a concern about commercially-sensitive

24  information getting out?

25  A.    There was a concern, yes.

 1   Q.   Now, I'm almost done, Mr. Apotheker.  I promise.

 2        The -- the board, we learned, decided in July, before any

 3   due diligence, that the acquisition could -- could go forward

 4   at a certain price.

 5        Did it also decide at that July meeting that it had to get

 6   done and announced on August 18, which was the earnings report?

 7   A.   If I may just give you the accurate answer.

 8   Q.   Yes, please.

 9   A.   A, the board, by definition, approved an acquisition

10   subject to due diligence, which isn't always the case; and, B,

11   the targets were -- announcement was indeed August 18 unless we

12   can't come to a deal, for example.  So it's not cast in stone.

13   Q.   So in July, you targeted August 18, but subject to due

14   diligence and whether or not you could finally agree on a

15   price?

16   A.   Or something else happens.  These things are never cast in

17   stone.

18   Q.   Okay.  And -- and you -- you knew that August 18, the

19   earnings announcement date, was going to be a tough day for HP,

20   didn't you?

21   A.   I did.

22   Q.   Because you weren't going to meet the market's

23   expectations?

24   A.   Yes.

25   Q.   And you were going to have to adjust down the projections

1    for the rest of the year?

2    **A.**    Yes.

3    **Q.**    Okay.  And you referred to those in writing to the

4    employees on August 18.  You wrote to them and said, "Our

5    results are not acceptable."  That's the way you felt about it?

6    **A.**    They were not acceptable.

7    **Q.**    And you knew that you were -- well, you were -- you were

8    considering looking -- announcing that you were considering

9    getting out of the PC business, and you knew that would cause a

10   flurry, didn't you?

11   **A.**    Actually that would cause the stock to go up.

12   **Q.**    I'm sorry?

13   **A.**    That would have caused the stock to go up.

14   **Q.**    Okay.  You thought that announcing that Hewlett-Packard

15   was getting out of the PC business would cause the stock to go

16   up?

17   **A.**    Yes.

18   **Q.**    Did you -- you were also going to announce that you were

19   shutting down the Palm division that HP had bought for

20   $1.2 billion just a little before?

21   **A.**    Yes.

22   **Q.**    And did you think announcing that you were shutting down

23   the Palm division for -- which had been purchased in April of

24   2010 was going to cause the stock to go up or down?

25   **A.**    Probably down.

APOTHEKER - CROSS / KEKER

1  Q.   And what about discontinuing the operations for webOS

2  devices?

3  A.   That's the same thing.

4  Q.   Okay.  Same thing.  Beg your pardon.

5       And I think it's been established the stock market was

6  gyrating madly, I think that email said, both before and up to

7  the 18th.

8  A.   Yes, sir.

9  Q.   And you wanted to go ahead with the acquisition?

10 A.   The board wanted to go ahead with the acquisition.

11 Q.   Okay.  Was there any controversy about that?

12 A.   Not to the best of my knowledge.

13 Q.   Well, what -- what happened was that at this August 16

14 meeting where you went over it, Ms. Lesjack, who was the chief

15 financial officer of Hewlett-Packard, had been there for quite

16 a while, came in and completely blindsided you by saying she

17 was against the purchase of Autonomy?

18 A.   Yes.

19 Q.   She hadn't told you ahead of time?

20 A.   No, she hadn't.

21 Q.   She stands up in front of the board and says, "I think

22 we're paying too much for Autonomy, I'm against it"?

23 A.   That's not what she said.

24 Q.   What did she say?

25 A.   She said, "We can't afford it."

1  Q.  "We can't afford it."

2      And that led you to want to keep her out of the meeting to

3  make the decision on August 18th?

4  A.  No, sir.

5  Q.  Look at 6615.  Is this an email exchange between you and

6  the chairman of the board, Ray Lane?

7          THE COURT:  Admitted.

8          (Trial Exhibit 6615 received in evidence)

9              (Exhibit published to jury.)

10 BY MR. KEKER:

11 Q.  The bottom is you to Mr. Lane.  It says, "Ray, I would

12 appreciate it if Cathie and Mike are not participating in

13 tomorrow's meetings," and this is the day before the 8/18

14 meeting.  And ray writes back, "Unprecedented.  I would think

15 better to have them in the room."

16     That wasn't an effort to keep the chief financial officer

17 out of the room?

18 A.  I wanted to fire her.

19 Q.  Okay.  All right.  That would really keep her out of the

20 room.

21 A.  Yes.

22 Q.  Actually, let me just ask you a question about the only

23 thing that the jury may find interesting in all of this.

24     That TIBCO that you kept talking about buying, that was --

25 Vivek -- Vivek Ranadive, he ended up buying the Sacramento

1  Kings?

2  **A.**    That's correct.

3  **Q.**    And they just hired, with his money -- they just hired

4  Shaquille O'Neal to run the joint; right?  That's the same?

5  **A.**    The same, yes.

6  **Q.**    All right.  That is more interesting than a lot of this.

7        Okay.  So the board went ahead and approved the deal on

8  April 18th?

9  **A.**    Yes, sir.

10  **Q.**    For $11.7 billion.  You can look at 6566.  And that's the

11  minutes of the board meeting of August 18, 2011.

12            **THE COURT:**  Admitted.

13            (Trial Exhibit 6566 received in evidence)

14                  (Exhibit published to jury.)

15  **BY MR. KEKER:**

16  **Q.**    It shows the affirmation of the purchase price at 24,

17  25.50 pounds, which multiplies out to close to 11.5 or 11.7

18  billion.

19      And you hoped that the news about the Autonomy acquisition

20  would soften some of the bad news that was coming out on

21  August 18?

22  **A.**    Actually it's the exact opposite.

23  **Q.**    Really?

24  **A.**    I knew that by announcing Autonomy, it would get worse.

25  **Q.**    Okay.  And it did get worse.

1          Let's look at 5527, which is in evidence.  This is the

2     stock chart.  And this straight line here -- it's a little

3     hard, but where it just plummets, that's the announcement of

4     the Autonomy -- that's the big announcement.  And then a month

5     later, you were fired?

6     **A.**    That's correct.

7     **Q.**    And shortly afterwards, Mr. Robison, who had been your

8     right-hand man in this, was fired, too?

9     **A.**    That's correct, too.

10    **Q.**    All right.  Now, at the time you were fired, your vision

11    remained what it was in July, didn't it?  About putting things

12    together and getting synergies and so on?

13    **A.**    Yes.

14    **Q.**    It remained what it was when the board had authorized

15    buying this for $11.7 billion?

16    **A.**    Yes, sir.

17    **Q.**    You knew that to achieve your vision, integration of

18    Autonomy into Hewlett-Packard would be important, didn't you?

19    **A.**    To achieve that particular vision, yes.

20    **Q.**    And you were preparing for integration when you were

21    fired?

22    **A.**    Yes.  There was a lot of work going on for integration,

23    yes.

24    **Q.**    Look at 6582, please.

25          **THE COURT:**  Admitted.

1          (Trial Exhibit 6582 received in evidence)

2              (Exhibit published to jury.)

3   BY MR. KEKER:

4   Q.   This is a memorandum from Andy Johnson to you and others

5   in closing an initial draft of the integration plan.  "There is

6   still a lot to do on this front.  We need to identify a lead

7   integration executive" and so on.

8       The last section down here is the synergy planning

9   templates and so on.  And there was an integration plan

10  generated.  That's 6619.  If you would look at that, please.

11          THE COURT:  Admitted.

12          (Trial Exhibit 6619 received in evidence)

13              (Exhibit published to jury.)

14  BY MR. KEKER:

15  Q.   And that's Project Autonomy integration dated September 2,

16  2011.  You're still there; right?

17  A.   Yes.

18  Q.   And page 3 shows that you were going to be on the steering

19  committee, which means you would run the steering committee.

20  You would be the executive, kind of, leading the integration;

21  right?

22  A.   No.

23  Q.   No?  Who would?

24  A.   It's a committee, so a committee.

25  Q.   The committee would.  Okay.

1        And then on the next page, it talks about what some of

2   these projects are.  1-A is revenue synergy capture, and you're

3   talking about cross-selling of Autonomy and HP products across

4   each other's customer bases.  Geographic expansion of Autonomy

5   products.  Under "deliverables," you are talking about detailed

6   revenue synergy capture plan.  Sales incentives for synergy

7   revenue and so on.

8        You were planning for integration?

9   **A.**   That's correct.

10  **Q.**   Now, the -- a few days after this, you and Mr. Lane had

11  either a conversation or an email conversation; right?  Look at

12  6567.  It's the last item in the book.

13       And I move that in.  It's --

14            **THE COURT:**  65 --

15            **MR. KEKER:**  6567.  Excuse me.  It's the last -- in

16  Volume 1, I should say.

17            **THE WITNESS:**  Yes, sir.

18            **THE COURT:**  Admitted.

19        (Trial Exhibit 6567 received in evidence)

20                (Exhibit published to jury.)

21  **BY MR. KEKER:**

22  **Q.**   So this is the internal -- the top email is Mr. Lane

23  sending this on to Meg Whitman on September 25.

24        Meg Whitman took over from you after you were fired;

25  right?

1  A.    Yes.

2  Q.    She had been on the board during all this decision-making

3  that we've talked about?

4  A.    Yes.

5  Q.    And she agreed with purchasing Autonomy?

6  A.    Absolutely.

7  Q.    And now she is taking over after you're excused.  But what

8  Mr. Lane is sending her is an email you had written earlier in

9  the month on the 5th of September, and you're saying, "In

10  addition to my previous comments, it is important" -- first of

11  all, the board is in turmoil because the stock has gone down

12  and they're being criticized, right, around this time?

13  A.    I'm not so sure I understand to which time period you're

14  referring to.

15  Q.    Let's say September 5th.

16  A.    Well, the stock market is in turmoil, but there are things

17  happening that we are undertaking to explain things to

18  shareholders.

19  Q.    Okay.  But there were -- there were a lot of shareholders

20  who were saying "what are you doing?"  And you had to go out

21  and talk to shareholders?

22  A.    Yes.

23  Q.    And some of the board members were getting sort of cold

24  feet and saying "I don't like this."

25  A.    I don't know about the cold feet.

1  Q.   Okay.  Well, let's go through this, and I will go back and

2  show you one other letter before we quit.

3       But you're saying, "In addition to my previous comments,

4  it's important that we remind ourselves of what we presented to

5  the board and what the board ultimately decided."

6       And then halfway through that next paragraph, "During the

7  strategy board meeting, as well as the subsequent board

8  meetings" -- the strategy board meeting is back in July; right?

9  A.   Yes.

10 Q.   -- "as well as subsequent board meetings, we always

11 presented to the board our full business case, a case hinging

12 more on the synergies that the combined companies can generate,

13 than on Autonomy's stand-alone capabilities."

14      And in the next paragraph, you go on to say that you still

15 believe "therefore Autonomy makes total sense if one believes

16 that HP can generate the synergies we build into our business

17 plan.  The quality of the synergies high.  You will remember

18 that they exclude any drag on," blah, blah.

19      And down at the bottom, you say "firmly believe that we

20 can achieve these synergies and in allotted time frame";

21 correct?

22 A.   Yes.

23 Q.   Do you know if the -- if the integration that you

24 contemplated was ever done?

25 A.   I don't know.

1  Q.   Do you know if Vertica and Autonomy were ever combined

2  within HP?

3  A.   I don't know.

4  Q.   Do you know if any -- if any effort was made to build a

5  disruptive data stack?

6  A.   I don't know.

7         MR. KEKER:  Could I have one moment, Your Honor.

8         (Pause in proceedings.)

9         MR. KEKER:  One more exhibit.

10  Q.   Would you look at 2283, please.  That's an email from Ray

11  Lane to the Hewlett-Packard board.  Mr. Apotheker is not on it,

12  but he's referenced in it.

13  A.   Excuse me.  Could you please repeat the number?

14  Q.   2283.  It's dated August 17, 2011, the day before the

15  board meeting approving the merger.

16         THE COURT:  Admitted.

17         (Trial Exhibit 2283 received in evidence)

18            (Exhibit published to jury.)

19  BY MR. KEKER:

20  Q.   All right.  This is Ray Lane to the board, and he is

21  saying, "This is still sitting in my draft file.  I spoke to

22  Leo, gave him the following sense from the BOD."  That's "board

23  of directors"; right?

24  A.   Yes.

25  Q.   This is the night -- August 17 is the night before the

1    final decision?

2    **A.**    Yes, sir.

3    **Q.**    And then he says, "We were surprised about shutting down

4    device business and writing off intangibles in Palm."

5         Could that possibly be true, that they were surprised by

6    that?

7    **A.**    It's surprising that he says so.

8    **Q.**    Excuse me?

9    **A.**    I said it's surprising that he is surprised.

10   **Q.**    Because you've been talking about it for a long time?

11   **A.**    The shutdown of the Palm business?

12   **Q.**    Yeah.

13   **A.**    No.

14   **Q.**    What about shutting down the device business?

15   **A.**    Well, it's the same thing.

16   **Q.**    Okay.  "We were shocked by Cathie's statement."  That's a

17   reference to her coming up and saying, "It cost too much."

18        "We are very concerned about how poorly this announcement

19   will be perceived and how it will reflect on Leo and the board

20   of directors.  We wouldn't be -- we would be," quote,

21   "relieved," close quote, "if you would decide to defer Tesla

22   announcement.  Many of us believe it will be there in a month

23   or two."

24        Now, he is saying, "I spoke to Leo and said these things."

25   Do you remember such a conversation?

1   **A.**   No, I don't.

2   **Q.**   And then on the next page, he says -- he's reporting to

3   the board.  "He hears and understands the board on Tesla but

4   does not believe we will be able to purchase after all the

5   negotiations and committed that we have already been made.  And

6   because he believes this, he feels he doesn't have an

7   alternative to begin changing HP's business to higher value

8   business.  He thinks this is critical."

9        Do you remember telling Mr. Lane that the night before the

10  final decision?

11  **A.**   I didn't even spoke to Mr. Lane the night before.  I spoke

12  to Mr. Lane the day before.

13  **Q.**   Okay.  Well, this is the day before.  This is August 17 is

14  when he wrote this?

15  **A.**   Yes.

16  **Q.**   So did you speak to him that day?

17  **A.**   I spoke to him in the morning of that day.

18  **Q.**   Okay.  And did you say what he says here, that he doesn't

19  have an alternative to begin changing HP's business to higher

20  value business.  He thinks this is critical?

21  **A.**   What I told Mr. Lane was that if the board felt -- by the

22  way, he didn't indicate that.  But should the board feel that

23  you should not proceed with the acquisition of Autonomy, I'll

24  be happy not to execute and not to buy Autonomy.

25  **Q.**   Okay.  And then the next day, you went into a board

1  meeting, and the board decided they wanted to buy Autonomy at

2  the price --

3  **A.**   And the next day, the board voted again unanimously -- I

4  stress the word "again" -- unanimously to purchase Autonomy.

5  **Q.**   And then there was a negative reaction from shareholders

6  and they all blamed you?

7  **A.**   Probably.

8  **Q.**   Okay.  Thank you, Mr. Apotheker.  I have nothing further.

9  **A.**   Thank you.

10                    **REDIRECT EXAMINATION**

11  **BY MR. REEVES:**

12  **Q.**   Just a few questions, please.

13        In your cross-examination, you were asked about how much

14  you thought the appliances accounted for revenues for Autonomy.

15  Do you recall that testimony?

16  **A.**   Yes, sir.

17  **Q.**   And I think you testified that -- there was some

18  discussion about whether you estimated it around 5 percent or

19  so.  Do you recall that?

20  **A.**   I do.

21  **Q.**   Okay.  You indicated that -- you correlated -- withdrawn.

22        You correlated the appliances revenue with service revenue

23  in describing and quantifying the amount of the appliances in

24  your review of the annual report?

25  **A.**   Yes, I did.

1  Q.   Could you explain why, in your own mind, you were

2  correlating the amount of service revenue with what you

3  estimated might be the amount of the appliance revenue for

4  Autonomy?

5  A.   It is customary to disclose in an annual report and the

6  financial statements things that have some importance, some

7  material importance to the business.  It was therefore very

8  relevant for me that Autonomy, that described itself as a

9  software business, pointed out that they had roughly 5

10 percent --

11          THE COURT REPORTER:  Excuse me.  "Five percent" --

12          THE WITNESS:  Roughly about five percent in service

13 revenues, and that's important information and was good to

14 know.  You can -- you can conclude from this that anything less

15 than that is immaterial.

16 BY MR. REEVES:

17 Q.   And therefore appliance doesn't appear.  It's not broken

18 out.  It's, therefore, less than services.  Is that the

19 inference you're drawing?

20 A.   And if you remember the definition of the appliance page,

21 whatever it was, it is -- actually we called it as a software

22 sale because they, by definition, also record the sales -- the

23 cost of hardware and cost of goods sold.

24 Q.   Is it fair to say that you're drawing an inference that

25 given the size of the services, the appliance revenues had to

1   be smaller than services?

2   **A.**   Yes.

3   **Q.**   All right.  And I think before we leave the 2010 annual

4   report, there was also questions about the reporting of one

5   segment.  Do you remember those questions?

6   **A.**   Yes.

7   **Q.**   I think you were beginning to make a point about how some

8   of the revenues are broken out in other parts of the 2010

9   report.

10  **A.**   Yes.  If I just may open up the annual report.

11  **Q.**   I'll help you by trying to put it on the screen.  I think

12  I know the page you're talking about.

13  **A.**   Thank you.

14  **Q.**   If we could please display Exhibit 1352, page 17.  And if

15  we go down a little bit, down to the right, is this the

16  portion -- are you able to read this well enough,

17  Mr. Apotheker?

18  **A.**   Yes, I am.

19  **Q.**   Is this the portion of the annual report you were

20  referring to?

21  **A.**   Yes.  Actually, it's an interesting exercise because what

22  I did in those days was I added up all of these revenues,

23  which, by the way, are all software revenues.

24  **Q.**   Go on.

25  **A.**   And if you add to that the service revenues, you come to a

1   hundred percent of the reported revenues.

2   **Q.**   The point being that even if there is the reporting as one

3   segment, etc., there are other parts of the disclosures in the

4   annual report that break out the revenues?

5   **A.**   Yes.

6   **Q.**   And they're all software revenues?

7   **A.**   Yes.

8   **Q.**   And when you add them up, they add up to one hundred

9   percent of the revenue for 2010?

10  **A.**   That's correct.

11  **Q.**   With that as a baseline, are you in a position to review

12  this and understand that a substantial amount of revenue in

13  excess of the amount of services was revenue that Autonomy

14  derived from reselling other people's hardware?

15  **A.**   No.

16  **Q.**   No, you're not able to do that, are you?

17  **A.**   I'm not.

18  **Q.**   Finally, you were asked a few questions about what effect

19  you thought certain pieces of the news that HP was announcing

20  on or around August 18th, 2011, would have on the stock price.

21  Do you remember that?

22  **A.**   Yes.

23  **Q.**   And I think you said that you believed that announcing the

24  Autonomy acquisition, you thought, would have the effect of

25  HP's stock going up.  Do you remember making that point?

1          THE COURT:  I'm sorry?

2          MR. REEVES:  Oh, I'm so sorry.

3   Q.   Knew by announcing Autonomy stock would get worse.  I'm

4   sorry.  I confused myself.

5        Do you remember your statement that you thought by

6   announcing Autonomy, the Autonomy acquisition, that the stock

7   would get worse?

8   A.   Yes.

9   Q.   Okay.  For all of us, including my benefit, will you

10  please explain what you meant by that?

11  A.   It -- the -- the multiple -- the multiples of HP, the

12  PE -- I mean, all the financial ratios, the stock market ratios

13  of HP were low, which was one of the reasons why we were trying

14  to do all of these deals in order to lift that.

15       From a value investor point of view, any deal that one

16  would do that would have a higher multiple than the HP

17  valuation was not good news.  And Autonomy had a significantly

18  higher price tag, multiple at that store, than what HP was able

19  to obtain for its own, and therefore mechanically almost it

20  would have had a negative impact on the share price.

21  Q.   In the short term?

22  A.   In the short term.

23  Q.   What's your calculation, if looking and estimating the

24  effect that the announcement of the acquisition of Autonomy

25  would have on the stock price for HP in the short term, maybe

1  negative or it would go down -- what is your calculation about

2  the long-term value of this?

3  **A.**   My calculation is that if we managed to demonstrate to the

4  share -- to the stock market, to our shareholders, that quarter

5  after quarter we start to generate the synergies that we were

6  hoping to generate, on the basis of the performance of the

7  Autonomy business, people would re-evaluate HP and would change

8  their mind.

9  **Q.**   All right.  And similarly, you thought, again in this time

10 frame when there are multiple pieces of news that HP is a

11 announcing -- you thought that announcing that you were

12 shutting down the PC business might cause the stock price to go

13 up?

14 **A.**   Yes.

15 **Q.**   Why did you think that?

16 **A.**   Because the PC business is a lower margin business and the

17 shareholders would view this as a cleanup of the portfolio that

18 would add value to them.

19     And if you're interested, the first information that

20 actually leaked that morning was that the PC business was going

21 to be sold and the share price jumped up.

22 **Q.**   Okay.  So that's some external validation for your theory?

23 **A.**   Yes.

24 **Q.**   All right.  Give me one second, please.

25     (Government counsel confer off the record.)?

1          **MR. REEVES:**  Thank you, Your Honor.

2       Thank you, sir.

3          **THE WITNESS:**  Thank you.

4          **MR. KEKER:**  A couple of questions about the -- get

5    1352 in front of you, please.

6                    <u>**RECROSS-EXAMINATION**</u>

7    BY MR. KEKER:

8    **Q.**   The one operating segment rule is in there at page 60.

9    Could we put up -- it's 60 of the exhibit.  58 of the -- and

10   the next-to-the-last paragraph states -- the whole thing

11   explains it, but at bottom it says, "As a consequence of the

12   above factors, the group has one operating segment in

13   accordance with IFRS 8 operating segments."

14   **A.**   Yep.

15   **Q.**   What did you understand that to mean?

16   **A.**   A segment is a P&L of a business.  And clearly the company

17   had only one business and therefore there was only one segment.

18   **Q.**   So if you're Starbucks, you are going to report revenues

19   of sales of coffee.  You're not going to split out cups and how

20   much profit you make on cups and how much profit you make on

21   sandwiches.  You are just going to report one operating

22   segment; right?

23   **A.**   I can't tell you about Starbucks.

24   **Q.**   All right.  But for this, they are reporting one operating

25   segment, no matter what the products are?  That's what it says,

1   isn't it, according to IFRS 8?

2   **A.**   Well, not really, no.  It actually states right up front

3   that they're a software company and that their revenues are all

4   software.

5   **Q.**   If -- well, you know that the revenue is not all software

6   because they sell hardware and they sell appliances.

7   **A.**   Apparently for very small amount because, as I said, if

8   you look at their own report, it's not me saying that; it's

9   Autonomy saying that.

10  **Q.**   Okay.

11  **A.**   On page -- on page 15, you have the operating results and

12  there is a breakout of the sales, and if you would do the math,

13  you will see there is about 50 million missing, and those 50

14  million are explained afterwards from services.  So it's clear,

15  they are a very good software business.

16  **Q.**   Okay.  That's -- if you go -- if you go back to page 17,

17  you were just shown and they're listing that sales during 2010

18  were as follows.  And you were shown -- there is IDOL product,

19  there is IDOL Cloud, there is IDOL OEM.  There is a list;

20  right?

21  **A.**   Yes.

22  **Q.**   And you say that adds up to a hundred percent of the

23  revenues?

24  **A.**   Plus services.

25  **Q.**   Okay -- no.  If you turn the page, they talk about

1   services.  They list IDOL product, IDOL Cloud, IDOL OEM,

2   deferred revenue, release services, foreign exchange impact on

3   revenues.  Those are the five items they list as making up

4   their revenues?

5   **A.**   That's correct.

6   **Q.**   That is a hundred percent of their revenues?

7   **A.**   That is correct.

8   **Q.**   Where is appliance?  Where is hardware?

9   **A.**   Nowhere.

10  **Q.**   Well, a hundred percent of their revenues, if they're

11  selling appliances, where is it in this list of revenues that

12  adds to a hundred percent?

13  **A.**   Because they are not selling appliances.  They are just

14  using appliances to distribute software.  And the revenues are

15  recognized as software.

16  **Q.**   The IDOL product doesn't include appliances?

17  **A.**   Probably is very small part of it, yes.

18  **Q.**   Do you know under -- under IFRS 8 if you have a segment of

19  your business that is different from other things, what

20  threshold, what -- we talked about very small -- what threshold

21  do you have to reach before you report it separately?

22  **A.**   I don't know.

23  **Q.**   Do you know if it's ten percent?

24  **A.**   I don't know.

25  **Q.**   Do you know whether or not Deloitte analyzed the hardware

PROCEEDINGS

1  sales according to the one operating segment rule of IFRS 8?

2       **THE COURT:**  Objection sustained.

3       **MR. KEKER:**  Mr. Apotheker, I thank you very much.

4       **THE COURT:**  Anything further?

5       **MR. REEVES:**  No, thank you, Your Honor.

6       **THE COURT:**  You are excused.

7       Ladies and gentlemen, we are taking our evening recess.

8  Remember the admonition given to you:  Don't discuss the case,

9  allow anyone to discuss it with you, form or express any

10 opinion.

11      I will see you tomorrow morning at 9:00.

12      (Proceedings were heard out of presence of the jury:)

13      **THE COURT:**  Let the record reflect the jurors have

14 left.

15      Mr. Leach.

16      **MR. LEACH:**  Thank you, Your Honor.  I want to make

17 essentially five points in response to some of the Court's

18 comments, and the first one is I want to address what I think

19 is some confusion about the restatement versus the impairment.

20      The restatement is like an autopsy.  It's looking at

21 historical numbers and what was actually reported by the

22 company.  The restatement is looking at whether revenues were X

23 or not X.  It has nothing to do with the value of Autonomy in

24 2012.  It has nothing to do with how HP managed Autonomy.  It's

25 evidence of what the correct accounting was in 2009 and what

PROCEEDINGS

1    the correct accounting was in 2010.  Nothing more and nothing

2    less.

3         And it's direct evidence of falsity and materiality, which

4    are two of the elements that the Government is required to

5    prove in this case.

6         They think the restatement is wrong.  And the solution to

7    that is to cross-examine the gentleman who signed off on it,

8    Chris Yelland, but I can't emphasize enough, this is a

9    historical look-back.  It's whether the numbers in 2009 and

10   2010 were correct.

11        It's not an assessment of what value is.  It's not an

12   assessment of whether this company is going to perform in a

13   certain way in a certain time.  It's were the revenues a

14   hundred million dollars or were they something else.  It's

15   literally a restatement of what the correct number was.

16        And Mr. Yelland may be right, he may be wrong, but that's

17   for the jury to decide, and that's what cross-examination is

18   all about.

19        I want to make that first fund --

20        **THE COURT:**  Let me stop you there.  I understand what

21   you're saying.  So what you are saying is -- and when was it

22   done?

23        **MR. LEACH:**  I believe the restatement is filed

24   January 13th or January of 2013.  Could be 2014.

25        **THE COURT:**  I'm just trying to figure out how many

**PROCEEDINGS**

1    months after the acquisition.

2             MR. LEACH:  Many months after the acquisition.

3             THE COURT:  12, 24?  How many months?

4             MR. KEKER:  It's January 14.  It's January 14.

5             MR. LEACH:  From October --

6             THE COURT:  Has anybody done the math?

7             MR. KEKER:  Seventeen months later.

8             THE COURT:  Seventeen months later.  Okay.  A year and

9    a half later, the victim comes in and says, "I want to tell you

10   what the real numbers are.  I have conducted a study, an

11   inquisition, as to the real numbers, and here is what they are.

12   By the way, it's my opinion that these are the real numbers."

13        That's -- that's -- and so the question is do I allow

14   evidence that was created a year and a half after the sale --

15            MR. KEKER:  Three and a half years.  I screwed up.

16   It's 2014.

17            THE COURT:  This is why it's an accounting case.

18            MR. KEKER:  I beg your pardon?

19            THE COURT:  This is why lawyers should never even get

20   near these things.  They have no idea what math is.  Okay.

21        Three years?

22            MR. KEKER:  All of '12, all of '13, and four months of

23   '11.

24            MR. MARAIS:  Two and a half.

25            MR. KEKER:  Two and a half.  We are settled at two and

PROCEEDINGS

1    a half years later.

2         THE COURT:  You will accept that.

3         Two and a half years after the acquisition, they say, "Now

4    we looked at all this and we want to tell you," but first of

5    all, they may have an obligation to do it.  They may have a

6    legal obligation to do it.  I understand that.

7         Because now they own Autonomy.  They're making statements

8    about Autonomy, and they have a legal obligation -- if they

9    think that the numbers that were used by Autonomy are

10   incorrect, they may have a legal obligation to state it.

11        So I'm not saying it's self-serving or they just did it

12   because they wanted to do it.  They may have been required to

13   do it.

14        But that doesn't change the nature of it.  The nature of

15   it is that it is the victim's thought, maybe well-informed or

16   not, as to what the real numbers really are.  Okay.  I

17   understand that.

18        I'm just trying to figure out why that opinion two and a

19   half years later is -- how -- it may be relevant because it

20   goes to the issues in a sense, but -- but so what?

21        MR. LEACH:  Your Honor --

22        THE COURT:  So what?

23        MR. LEACH:  Your Honor, any restatement is done after

24   the fact.

25        THE COURT:  I understand that.

1          **MR. LEACH:**  The restatement was done after the fact.

2          **THE COURT:**  I got that.  But I'm just -- look, I'm not

3    saying it's irrelevant.  I'm just trying to figure out whether

4    something done two and a half years later is necessarily --

5    how -- whether or not 403 would keep it out.  Because then, as

6    you will admit, as you just said to me -- then we have the

7    cross-examination as to everything that was -- that was done in

8    order to achieve those numbers, which, by the way, would entail

9    motivation, bias, what was the purpose of it, sure.

10         He can come in and say, "I had to do it because the law

11   requires me."  And then Ms. Little will ask, "Well, isn't it a

12   fact that you were engaged in litigation at the time and you

13   wanted to use this for purposes of litigation to sue Autonomy?"

14         **MR. KEKER:**  This is true.

15         **THE COURT:**  Sue the accountants, sue this, sue that.

16   And so you went into it in a situation where the business did

17   very, very poorly, for whatever reason, and -- and you then did

18   these numbers.

19         You know, nobody is suggesting that this was an out --

20   well, I don't care.  I don't have to go that far.  Just stop.

21   Stop there.  Okay.

22         Have I got that right?  Have I -- have I got that concept

23   right?

24         **MR. LEACH:**  You've got that concept right, Your Honor.

25   And all of those arguments were made and rejected in the Ninth

**PROCEEDINGS**

 1  Circuit *Jasper* case, but that was only the first point I wanted

 2  to make.

 3          **THE COURT:**  I will go re-look at the *Jasper* case,

 4  since I relied on it in letting it in in the first place.  And

 5  I want to try to figure out what was going on in the *Jasper*

 6  case.

 7          **MR. LEACH:**  If the restatement remains in evidence,

 8  Your Honor, my second point, the Government is prepared --

 9          **THE COURT:**  It's not actually in evidence now, is it?

10          **MR. LEACH:**  It is.

11          **MR. KEKER:**  It is.

12          **THE COURT:**  Okay.  Maybe it will go out.

13     If it remains in evidence, yeah.

14          **MR. LEACH:**  If it remains in evidence, Your Honor,

15  it's the Government's current intention not to call Stephen

16  Brice in its case in chief, so we avoid some of the expert

17  testimony that we would otherwise be required to present if the

18  restatement stays in evidence.

19     We also think we are on time, Your Honor.  The

20  Government --

21          **THE COURT:**  I'm not so concerned -- yeah, I am.  You

22  think you're moving ahead.  Okay.  You're not going to call

23  Brice.  You're moving ahead.  And for the reasons -- basically

24  you're saying for the reasons articulated in the *Jasper* case,

25  it should be admitted.  Is that it?

1          **MR. LEACH:**  I'm saying that, Your Honor.

2      I also want to reassure the Court we are on time.  We

3  expect to rest on April 13th, except for one witness from the

4  UK who can only be here on the 16th, but we are on time, and if

5  the restatement is excluded, the Government will have to

6  rethink whether it's calling Steve Brice.  That could make our

7  presentation longer, not shorter.

8      And I also have some points about the impairment, if the

9  Court will indulge knowledge me.

10     The impairment is different from the restatement.  The

11 impairment is an estimate in 2012 about what the value of

12 Autonomy really is.

13     We are not trying to get into that.  It is different from

14 the restatement, which is a historical look-back, what the

15 numbers really are, and the Government has two ways to prove

16 that.

17     We can prove that to the person who lived it, who breathed

18 it, who knows the books and records, who worked for HP and can

19 be impeached on that bias, or we will call an expert to prove

20 that as well.

21     But this is an important piece of evidence.  It's in.  The

22 Government has relied on it.  And I think excluding it at this

23 point actually creates more problems than it solves.

24          **THE COURT:**  Let's explore the impairment.

25     Why is it important?

1          **MR. LEACH:**  It's not.

2          **THE COURT:**  Oh, sorry.  I thought you said it was

3   important.

4          **MR. LEACH:**  The restatement is important.

5          **THE COURT:**  The impairment is not important?

6          **MR. LEACH:**  We do not care about the impairment.

7          **THE COURT:**  That's out, save and except for the

8   testimony that we said -- the fact that there was an

9   announcement that the asset was impaired; did, as I understand

10  it, trigger the shareholder for selling his stock; right?

11         **MR. KEKER:**  That's what he said.

12         **THE COURT:**  It remains in for that reason, but not for

13  the truth of the matter, and I could say anything about it.

14         **MR. LEACH:**  Absolutely.

15         **THE COURT:**  So now we are down to the restatement.

16  Down to the restatement.  Okay.

17      Mr. Keker, go ahead.

18         **MR. KEKER:**  If they want to try to prove something

19  about the books, they should call an expert.

20      Mr. Yelland is not an expert.  They didn't -- they offered

21  him as a percipient witness.  And let me just say he opens

22  every can of worms, every door that we've been complaining

23  about.

24      Deloitte was working with him hand and glove not on a

25  restatement, but on setting up the ASL accounts, statutory

1   accounts.  There was no talk about fraud, there was no talk

2   about problems with the VARs, and all of a sudden Meg Whitman

3   gets up and says, "Oh, we have been defrauded," and that's when

4   Yelland turns from what he was working on and all of a sudden

5   begins to discover whatever he wants to -- this so-called

6   historical look.

7       It's a lot of nonsense that is from an HP witness who was

8   actively involved in the civil case, who was providing

9   information from all of HP's lawyers and accountants, and we

10  need to get into all of that if the restatement comes in.

11      **THE COURT:**  Let me -- let me stop you there.

12      Isn't he right?  If -- if it comes in, isn't he --

13  shouldn't he be -- "he" -- shouldn't defense be entitled to do

14  all of the things, attempt to do all of the things he's just

15  said?

16      Here's a percipient witness.  Unheard of that you can't

17  establish bias of a witness.  You can't establish motivation of

18  a witness.  So can't he do all those things?  I don't know how

19  successfully.  But he can't do all that.

20      **MR. LEACH:**  He can.  It's cross-examination.

21      **THE COURT:**  Yeah.  Okay.

22      **MR. KEKER:**  And it's also other --

23      **THE COURT:**  And then, by the way -- by the way, are

24  you saying to me that if you think that -- if he does all those

25  things, you don't care what this witness says, you're not going

1    to bring in any witnesses to try to rehabilitate it or try to

2    explain any of the circumstances that were going on at that

3    time?  You'll just accept the cross-examination for whatever it

4    is?  Because that would be unheard of, in my view, especially

5    making that promise in advance.

6         MR. KEKER:  They've got an expert.  They ought to call

7    the expert --

8         THE COURT:  I don't know whether they call the expert

9    or not.

10        MR. KEKER:  I don't care either.

11        THE COURT:  Isn't it -- I'm trying to figure out,

12   isn't the expert that we need to hear from the accounting

13   expert?  Like, isn't the question in this case whether or not

14   Autonomy followed the accounting rules?  Have I missed that?

15   What do I care about the restatement?

16        MR. LEACH:  The restatement is evidence of whether

17   Autonomy followed the accounting rules, Your Honor.

18        THE COURT:  No.  It's somebody's opinion that they

19   didn't.  Two and a half years later, somebody comes in and

20   says, "It's my opinion I didn't and let me tell you how I came

21   to my opinion.  I looked at 10 documents, 50 documents, a

22   thousand documents, and I decided and I tested them and I'm

23   very bright and I did all those things that you have to do.

24   And you know what?  They don't meet muster.  They don't --

25   they're not done the right way.  It ain't kosher.  And,

1   therefore, I told my company you got to restate because we have

2   a legal obligation to restate if we think it should be

3   restated."  I think that's clear.

4        But that's irrelevant.  As a matter of fact -- I mean,

5   that's irrelevant that they have a legal obligation to do it.

6   Or maybe -- maybe -- listen, the defense may conjure up an

7   argument and say, "Look, this is doing very badly."  You know,

8   you better -- you've got to assign -- you've got to figure out

9   a way to dig yourself out of this hole, and one way to dig

10  out -- say it's a restatement, their fault.  Say it's their

11  fault.  Boy, that introduces a host of issues.

12       The crime occurred, if it was a crime, by August 11th;

13  right?

14           MR. LEACH:  Yes, Your Honor.

15           THE COURT:  Okay.  The -- the -- the shenanigans with

16  the books, if they are shenanigans, occurred by August 11;

17  right?

18           MR. LEACH:  The conspiracy runs through October --

19           THE COURT:  October.

20           MR. LEACH:  We agree with the Court's comments.

21           THE COURT:  October.  So all the wrongdoing for which

22  you would rely on occurred before October 13.  You know, this

23  isn't like -- well, it all -- it all occurred before

24  October 13.  So I have to figure out whether an individual --

25  an employee of the company who -- who comes in two and a half

1  years later and does a report is admitted and here is what I'm

2  a little concerned about.  Is -- I mean, I'm concerned about a

3  lot of things.

4      I'm trying to figure out how probative it is of -- I mean,

5  it's further evidence.  It's further evidence of -- of -- of

6  that.  Would they be allowed, for example, to bring in -- well,

7  we just looked at the -- why wouldn't they get a rebuttal to

8  that?  I guess they would.  I guess the cross is the rebuttal

9  to that.  And maybe they have a witness that is going to rebut

10 it.

11         MR. LEACH:  They have an expert, Your Honor.  They've

12 hired an expert --

13         THE COURT:  Who is going to say -- the expert, who is

14 going to say -- is that Mr.-- what's his name?

15         MR. LEACH:  There expert is --

16         THE COURT:  No, no, no.  What is the restater's name?

17         MR. KEKER:  Yelland.

18         MR. LEACH:  Chris Yelland.

19         THE COURT:  Mr. Yelland's wrong.  You have somebody

20 who is going to say Mr. Yelland is wrong.  I assume if I don't

21 let Mr. Yelland testify, nobody is going to come in and say

22 "Mr. Yelland is wrong" --

23         MR. KEKER:  That would be very --

24         THE COURT:  Also I have to say I'm a little

25 dumbfounded because in many, many fraudulent schemes, it's very

PROCEEDINGS

1    unusual that you go post scheme and then bring in the victim to

2    say exactly -- I'm now talking about a securities fraud where

3    you don't have to show either reliance or damages and to show

4    how off base they were, in the victim's opinion.

5        I see nothing wrong in bringing in an expert to say "I

6    looked at all of these documents up to October 13th and all --

7    they're all wrong.  They didn't follow any of the rules."

8        I'll read *Jasper* or whatever it is.  *Jasper*?

9        **MR. LEACH:**  *SEC vs. Jasper*.  A Ninth Circuit case

10   holding restatements are admissible.

11       **THE COURT:**  I'm not arguing this is inadmissible.  I'm

12   arguing whether under 403 -- we should go into it.  And I

13   think -- I mean, I read through the motion in limine, and while

14   they make a half-hearted attempt to say it's inadmissible, the

15   thrust of their argument is exactly the argument that I am

16   raising today.

17       So I'll look at it.  Okay.

18       But, Mr. Leach, do you want to add something to it?

19       **MR. LEACH:**  One other thing I want to add, Your Honor,

20   there are multiple ways to prove falsity and materiality.  Yes.

21   We can call an expert.  We have an expert.  We're prepared to

22   do that.  I think it's equally fine to call the person who was

23   most familiar with these documents, who lived and breathed

24   this, who is most familiar with the reasons for the

25   restatement.

1      **THE COURT:**  The whole living and breathing.  You know

2  what that reminds me of?  You're much too young, but we had

3  this evidence professor who used to talk about *res gestae*.  He

4  said, "If it's part of the *res gestae*, it comes in, doesn't

5  it?"

6      That was -- it was only one ruling in evidence.  It is it

7  part of the *res gestae*, so we all learned at an early age to

8  say *res gestae* if we wanted something in.

9      So "living and breathing the documents," which is part of,

10 in my view, *res gestae*, is fine, as long as it's not going to

11 invite whether it's on life support or any of the other things

12 that you would look at.

13     I will read *Jasper*, but if it's only *Jasper* -- if *Jasper*

14 is going to tell me it's admissible, I know that already.  If

15 *Jasper* is going to say somehow it's essential to the proof of

16 the case, which I don't hear you saying -- you are just saying

17 it's further evidence, and you're also saying something else.

18 You said, "look, if we do that, we don't have to call an

19 expert."  But that suggests to me that if I say, "No, you can't

20 do it," you will call the expert.  And that's the way life is.

21     I mean, now if they do something to open up the door,

22 they're crazy.  They're not going to do that.  They're not

23 going to talk -- if I rule it out, they are not going to talk

24 basically about post October 13th.  Other than, you know,

25 occasional mention here or there of something behind the

1    Sacramento Kings or something.  I don't know.  But nothing that

2    goes right to the heart of it.

3         But, you see, I don't think I'm sitting here saying the

4    Government can't prove its case because I think the proof, to

5    the extent it's there, has already been established.

6         I do think you need the expert.  You certainly need an

7    expert to talk about accounting.  You can't -- so that's not

8    who you're thinking about not calling.  I don't know who you

9    are thinking about not calling, to tell you the truth.  But

10   maybe you ought to call the person you're thinking about not

11   calling.

12        Mr. Frentzen, do you want to join in on this?  I mean, you

13   are so uncharacteristically quiet that I'm a bit alarmed that

14   I'm going off in some horrible direction.

15        **MR. FRENTZEN:**  Your Honor, all I wanted to add is

16   the -- in our view, the -- whether it's the restatement or

17   whether it's the expert is sort of the, in a summary fashion,

18   if you will -- and with the -- and with the knowledge of the

19   accounting, whether you want to call it expertise or just want

20   to call it here's how you apply IFRS, that that is going to

21   enable us to encompass the full picture.

22        And the Court is correct, we have sat through reseller

23   after reseller and so on, but this is -- in other words, this

24   case unbelievably, I think to us and to the Court, could have

25   gone on longer, but these are the witnesses to say taking a

**PROCEEDINGS**

 1    look at the overall picture, these are the portions of the

 2    accounting that are in -- that were done inaccurately.

 3        And the Court is correct, is it in some variety either an

 4    opinion or "I look at this document, I apply this rule and this

 5    is how it should have been done."  The Court's correct.

 6        But whether the witness comes from Hewlett-Packard or

 7    whether it comes from an expert opinion, we view it's

 8    effectively a very, very similar outcome.  That's why our view

 9    is we would prefer to do it with the individual who examined

10    and had --

11            **THE COURT:**  So pinning you to the wall --

12            **MR. FRENTZEN:**  Yes?

13            **THE COURT:**  -- you will tell me that one way or the

14    other, the evidence comes in.  But you would prefer to have

15    Hewlett-Packard do it.

16            **MR. FRENTZEN:**  I think that's correct, and if I could

17    just -- part of that is -- and I think the attack on the expert

18    in many respects is that, as I understand it, the expert relies

19    in part -- I'm not sure this is exactly correct, but he

20    certainly studies the restatement.  The expert then also takes

21    pieces of the transactions, examines those and extrapolates.

22            **THE COURT:**  Of course.

23            **MR. FRENTZEN:**  The restatement, as I understand it --

24    the restatement is actually going through every single or close

25    to every single transaction.  A lot of time was spent, more

1  than the expert.  I don't think we could afford the expert

2  doing all of that.

3      And so for those reasons, we want to do this through the

4  restatement versus doing it through the expert.

5      And, again, it is -- I think it's exactly right that it's

6  similar to an autopsy.  An autopsy occurs months after,

7  sometimes months after the murder occurs, but it's testimony

8  about what occurred during the time of the offense.

9          **THE COURT:**  The autopsy is essential, and I think you

10  have -- I think either -- I think -- I think it's essential

11  that you have one or the other.  And I don't -- that's not

12  where the disagreement is.

13      The disagreement -- what you are telling me is that you

14  feel that the quality of the evidence that would be adduced by

15  the Hewlett-Packard person is more persuasive than that which

16  is the expert because the Hewlett-Packard person took -- looked

17  at, I don't know, a hundred transactions, two hundred, I don't

18  know what that number is, three hundred, whatever it is, and

19  the expert did 26 or something like that.

20      And you also are saying that the expert relied in part for

21  his or her opinion on what the -- on what the Hewlett-Packard

22  person did.

23          **MR. FRENTZEN:**  It is sort of a tactical choice and

24  it's a tactical choice saying of course would we like to call

25  both, we would like to call both, but given that we all want to

1    bring this in for a landing, we would like to put on the

2    restatement versus the expert.  At least that's our view of it.

3         And, again, that's a tactical decision, but it comes down

4    to the same effect.

5         And the upshot also is this, I think.  If the expert

6    testifies, the expert will be attacked, perhaps, on only having

7    done -- only having taken pieces and extrapolating.  I've read

8    their expert's opinion, and that's, thus far, been his attack

9    or one of them.

10        And so if that were to occur, then we do, in fact, have

11   Mr. Yelland, who, as I understand it, examined -- I don't want

12   to say "all" -- but a vast amount more of the underlying

13   documents in each and every transaction versus pieces and then

14   extrapolating.

15        So for all those reasons -- again, we don't think it

16   invites a plethora -- I mean, in other words, we have already

17   called witnesses from Hewlett-Packard.  The fact that

18   Mr. Yelland is employed by Hewlett-Packard does not, to us,

19   invite this, you know, what happened after the fact, when he is

20   strictly testifying to here's --

21            THE COURT:  I don't think that's true.  I mean,

22   because -- because the facts and circumstances surrounding what

23   was going on in two and a half years down the road may be

24   highly relevant to his motivation of his inquiry.

25            MR. KEKER:  Autopsies, Your Honor, are not conducted

1    by paid agents of the victim who was trying to achieve

2    something.

3        MR. FRENTZEN:  That's a separate issue.  And it's

4    not -- it doesn't go --

5        THE COURT:  Well, I'm not looking at whether it's an

6    autopsy or not.  I'm looking at this to try to figure out --

7    I -- a number of things.

8        So let me go back to the HP person.  How long is this

9    person's testimony going to be?

10        MR. REEVES:  Less than an hour, Your Honor.  Really,

11    it could --

12        THE COURT:  You don't have to say more, unless you

13    want to qualify it.

14        MR. REEVES:  I feel left out.  That's all.

15        THE COURT:  The cross will be the cross.  I'm not

16    asking about the cross.  I mean, I'm sure the cross will be

17    fairly extensive.

18        MR. KEKER:  If he is going to do 200 -- if he is going

19    to do what they describe, we are going to challenge everything

20    he has done and we are going to challenge his motivation and we

21    are going to challenge the circumstances under which he is --

22    has been given this task and we are going to challenge what

23    he's done it with, if we can, of course.  I mean, you're the

24    boss.

25        But we will -- we will try to get into everything having

1  to do with HP -- he is an HP agent who has gotten himself into

2  a jam.  We're in litigation in England, and he has, all of a

3  sudden, changed his attitude and ways after Meg Whitman tells

4  him to.  That is what we are contending with.  And he is facing

5  all of this evidence that his internal people are -- while he

6  says, "Oh, I've given a good, honest look at this and I have

7  restated everything," his internal people or their agents are

8  doing valuations that don't change the valuation at all.  The

9  E&Y people are coming in saying that they disagree with this,

10 that and the other thing.

11     All of the evidence that we want to get in is -- should be

12 admissible if Mr. Yelland does what he does.

13     They want to show Mr. Yelland -- the restatement because

14 it shows materiality.  We want to show immateriality in all the

15 ways we can.  That's why I think -- we don't -- the -- Brice

16 can testify.  He is an expert.  As Mr. Frentzen -- as they all

17 say, it's their -- pick one.  Anyway --

18         **MR. FRENTZEN:**  Antonia Anderson, Your Honor, she

19 already testified.  In other words, she was there for the

20 restatement.  She participated in it.  That's how we introduced

21 it.

22     We elected, at that point in time, not to go through it

23 exhaustively, in part -- I mean, the Court recalls, we were a

24 little jammed up, but this argument that this -- that

25 Mr. Yelland brings in some whole host of horribles, we already

1  heard from Ms. Anderson.  She wasn't very horrible.  We've

2  heard a lot about what's going to happen on cross.  We heard

3  Mr. Apotheker was going to completely abandon that hardware was

4  important to him.  You know, that didn't --

5          THE COURT:  No, no, no.

6          MR. FRENTZEN:  That didn't turn out.

7          THE COURT:  Look, I -- I accept what counsel is saying

8  at face value.  You know, I think that -- I just think I have

9  to apply the same rules across the board; that is, a witness

10  testifies who is an employee of a company and testifies a

11  certain way, and why can't they explore, assuming they have

12  some good-faith reason, any bias or prejudice, especially when

13  he is sitting up there giving his opinion, which isn't like

14  hard -- I mean, it's evidence, but it's not -- he says, "I

15  think this transaction should" -- I guess he's going to say, "I

16  think this transaction, which we -- this -- this valuation is X

17  dollars too high."

18          MR. FRENTZEN:  It's --

19          THE COURT:  "Based upon what I -- based upon my review

20  of the contracts."  Is that it?

21          MR. FRENTZEN:  I think --

22          MR. REEVES:  Can I proffer a little bit about --

23          THE COURT:  What is he going to say?

24          MR. REEVES:  The -- we are at a point now where the

25  restatement is in evidence.  There has been testimony about its

1    creation by Ms. Anderson.

2        My intention with Mr. Yelland would be to have him --

3    essentially the key pieces are "This is the restatement.  Did

4    you undertake an effort to create summaries that correlate the

5    restated revenue in the ASL restatement with the group

6    reporting," and we have a set of summaries that work through

7    the transfer pricing that will take it back to the

8    publicly-reported financial statements for Autonomy in a way

9    that shows the effect of the restatement on the overall

10   reporting of Autonomy.  That's really the deepest purpose of

11   calling Mr. Yelland at this point.

12       He's worked hard on those summaries --

13       **THE COURT:**  This is not a Boy Scout camp.  I don't

14   care whether he worked hard or gets a Merit Badge or spent 20

15   seconds on it.  I mean, that's not the issue.

16       The issue is -- and actually, Mr. Reeves, I don't

17   understand what you have said.  I'm trying to figure this out.

18   Is he saying, "I looked at a category, I looked at a --

19   something called revenues, I looked" -- how does it work?  How

20   did he do it?

21       Did he -- did he do it from -- look, Autonomy, in -- in --

22   was projected to earn X dollars, and after three months or six

23   months or a year or two years, X dollars isn't it -- I mean,

24   it's X minus Y.  So therefore I started looking at the

25   transactions or what?  Or the accounting?  What's he saying?

1      **MR. FRENTZEN:**  As best I understand it, Your Honor, he

2   looks at a transaction, he applies the rules as he understands

3   them to be, and if he thinks that it was mischaracterized,

4   misclassified, then he --

5      **THE COURT:**  Reclassifies.

6      **MR. FRENTZEN:**  -- reclassifies it.

7      **THE COURT:**  Let's take, as an example, all of these

8   end-of-the-quarter transactions.  And is he going to say, "I

9   now look at all of the end-of-the-quarter transactions -- the

10  ones that I've heard evidence about.  And instead of putting

11  them in Q2 -- in Q2, I put them in Q3, because that's when,

12  from an accounting point of view, they should have been in."

13     **MR. LEACH:**  Or they shouldn't have been in any period.

14     **THE COURT:**  Okay.  If he says they shouldn't have been

15  in any period, then that describes, as you've described in your

16  opening -- you said there were, like, four or five different

17  kinds of issues and problems here.  And one was the whole thing

18  about the -- you know, for example, he took a resale in which

19  there was not a designated or committed end user.  Okay?

20     And did Mr. Yelland say, "Well, there is no end user

21  there; therefore, it wasn't a bona fide transaction generating

22  any revenue, so I took it out."  He is going to say "I did

23  that"?

24     **MR. LEACH:**  He will, Your Honor.

25     **THE COURT:**  Okay.  So, again, I have to come to, I

1  guess, what my -- what I don't understand -- and the expert is

2  going to do the same thing.  He's going to do exactly the same

3  thing, isn't he?  "I looked at 26 transactions and I -- I

4  applied what I thought were the appropriate accounting rules,

5  and in that case, I disregarded or struck revenues because they

6  weren't revenues."

7           MR. LEACH:  Essentially, yes, Your Honor.  It's a

8  little more nuanced than that, but the expert will say "I

9  looked at this quantum of information.  I considered this

10  statement from this witness.  I considered this, and my opinion

11  is this should not have been recognized under IFRS."

12      Steve Brice will do that for 67 transactions.  Mr. Yelland

13  did that under a legal obligation through the ASL restatement.

14           THE COURT:  Your expert did it for 67 transactions?

15           MR. LEACH:  Yes.

16           THE COURT:  You are saying that's not enough?

17           MR. LEACH:  I'm not saying that's not enough,

18  Your Honor.  I'm saying the Government should have a choice

19  about its proof.

20           THE COURT:  Life is filled with choices.  I have a

21  choice, too, see.  And, unfortunately, you have to follow my

22  choice.

23      But I'm trying -- I'm not trying to cut you off.  I'm

24  trying to figure out if -- whether this is a question of "gee,

25  I would rather have A rather than B," and it seemed to me

**PROCEEDINGS**

1    basically the same thing, and I think -- of course you can have

2    it.  I know you need A or B.  I'm not saying you can't put it

3    in.  You certainly need A or B.  But B is going to carry a host

4    of problems that I anticipate.

5         I mean, from -- we're going to go through two and a half

6    years of problems.  So that's an issue that we avoid totally,

7    in my view, pretty much, if we get Mr. Expert in and he said,

8    "I came in, I was hired, I got, you know, $50 and I went in and

9    I looked at all of the -- I looked at 67 transactions.  Here is

10   what I concluded."

11        Then he goes on to say, "And, by the way, it's perfectly

12   acceptable and a matter of logistics or accounting or

13   probabilities" or whatever that you could extrapolate, and you

14   could say if it happened in -- if I took 67 cases, I can then

15   extrapolate it out and it -- and it spells fraud.  Because --

16   and he may even be able to give an opinion.  He may even be

17   able to say, "And I think the fraud was $3 billion."

18        I haven't read this thing so I don't know what he's going

19   to say.  But he can give an opinion based upon an

20   extrapolation.  He is going to say, "I saw X.  I can

21   extrapolate to Y and why it is."

22        But you are telling me that Steve, whatever his name is,

23   is going to say, "I looked at twice the number of transactions

24   or three times the number of transactions."

25             **MR. LEACH:**  He did not look at everything Chris

PROCEEDINGS

1    Yelland looked at, Your Honor.  It's a sample.  It's 67.  I

2    think that is the universe.

3        Did I misunderstand the Court's question?

4            **THE COURT:**  No, I don't think so.

5            **MR. FRENTZEN:**  The expert, as I understand it, looked

6    at a select number of transactions but also considered the

7    restatement.

8            **THE COURT:**  I understand that.

9            **MR. FRENTZEN:**  The restatement considered -- looked at

10   every transaction.

11           **THE COURT:**  The restatement looked at every

12   transaction.

13           **MR. FRENTZEN:**  Every transaction.  That's the

14   important distinction for us.

15           **THE COURT:**  So an expert can base his opinion on

16   anything.  And he can base it on that.

17       I guess I have another question, now this time to the

18   defense.

19       Let's say they don't call this guy and they put on the

20   expert.  Are you going to argue that they should have?  Are you

21   going to argue that this was a small number and the person --

22   and why doesn't Hewlett-Packard bring in the person that

23   conducted the complete audit?

24           **MR. KEKER:**  No, definitely not going to argue that.  I

25   mean, when the expert testifies, we are going to find out what

1  he did, what he -- what he based his opinion on, and then

2  attack him for why he's wrong.

3      We are not going -- certainly if you say that

4  Hewlett-Packard -- that they can't call a certain witness, we

5  are not going to say, "Where is he?  He should have been here."

6  Of course not.

7          MR. FRENTZEN:  Your Honor, we have -- and I'm

8  currently rethinking this and trying to tactfully -- but if the

9  expert testifies and relies on the restatement and describes

10  what the restatement is and what he understood the restatement

11  to be and he can rely on that, then that may get us where we

12  need to be.

13      The restatement will be in evidence.  And Ms. Anderson

14  already testified about the creation of the restatement, and

15  maybe there we go and there's no bias issue.  They'll just be

16  the usual did --

17          THE COURT:  Well, I think they can ask -- I think they

18  can say to the expert, "Well, you don't know what motivated the

19  person.  A person at Hewlett-Packard made the restatement.  He

20  did it two and a half years later; right?"  You know, and --

21  and you were -- Hewlett-Packard was preparing for litigation.

22          MR. KEKER:  All that's true.

23          THE COURT:  All that comes in.

24          MR. KEKER:  All that's true.  It's not our

25  understanding that -- I think they're exaggerating how much

1   Brice relied on the restatement.  That's not the way we read

2   his report.

3       We may -- if he says, "I relied on the restatement, that's

4   the basis of my opinion," we're going to move to strike him

5   because that's not what his report says.

6           **THE COURT:**  Okay.

7           **MR. FRENTZEN:**  Well --

8           **THE COURT:**  Well, you know what I sort of think

9   tentatively?  Since I've gone through about eight tentatives in

10  this case.  I think call your expert.  Don't call Steve.  Let's

11  see how it goes.

12          **MR. FRENTZEN:**  Steve is the expert.

13          **THE COURT:**  Don't call Hewlett-Packard.  Call the

14  expert.  Let's see how the evidence comes in and what the cross

15  is, and then I'll make some determination whether I think -- I

16  know the order is not the order you want, but that's too bad.

17  Life has its disappointments.

18      So -- but that -- that seems to me a -- an approach.  So

19  why don't we try it at that level.

20          **MR. FRENTZEN:**  We may have some difficulty on

21  Thursday, Your Honor, since --

22          **THE COURT:**  That's tomorrow.

23          **MR. FRENTZEN:**  Sorry.  Friday.

24          **THE COURT:**  I thought you had Mr. Worth or somebody.

25          **MR. REEVES:**  Well, almost.

PROCEEDINGS

```
 1            THE COURT:  You have Mr. Worth tomorrow.

 2            MR. LEACH:  We have Mr. Welham tomorrow.

 3            THE COURT:  Who?

 4            MR. DOOLEY:  Lee Welham from Deloitte they are calling

 5    tomorrow.

 6            THE COURT:  Worth.  Well almost.  What's the

 7    difference?

 8            MR. LEACH:  I think Friday is the issue.

 9            THE COURT:  We may -- we may -- it won't be an issue

10    because -- when is the expert, your expert?  Who is your

11    expert?

12            MR. LEACH:  Steve Brice, Your Honor.  He is in the UK.

13            THE COURT:  He won't be here until Monday?

14            MR. LEACH:  He will not be here until -- we had been

15    planning not to call him, Your Honor, so I need to re-engage.

16    I don't know when he can be here.

17            THE COURT:  Where is he now?

18            MR. LEACH:  He is in the United Kingdom.

19            THE COURT:  He can come.  Get him on a plane.  Fly

20    him.  Put him on Air Force 2.  I don't know.  Get him here.

21            MR. LEACH:  That might be taken, Your Honor, but I

22    hear the Court's comments.

23            THE COURT:  We've got to finish this case.

24        Anyway, I'm prepared to go like a half a day on Friday.

25        And, by the way, if we're that close to things, I don't
```

**PROCEEDINGS**

1  know what the defense is going to do.  They won't say what

2  they're going to do.  And they don't know what they're going to

3  do.

4      **MR. KEKER:**  I mean, we haven't seen Mr. Welham, who is

5  the Deloitte witness.  We haven't --

6      **THE COURT:**  Well, Mr. Welham is going to take some

7  time, isn't he?

8      **MR. KEKER:**  Absolutely.  He is going to take all day

9  tomorrow.

10      **THE COURT:**  Well, that's just fine.  It would be

11  okay -- it's all right if we either don't go on Friday or go a

12  half a day on Friday.  It's okay.

13      **MR. LEACH:**  Okay.

14      **THE COURT:**  Get Mr. UK here.  Tell him once again the

15  judge can't make up his mind and now he wants him here.  Okay.

16      **MR. KEKER:**  Mr. Leach looks forward to talking to

17  Mr. Brice, Your Honor.  I can tell.

18      **MR. LEACH:**  He might be asleep right now, Your Honor,

19  but we will call Mr. Brice.

20      **MR. KEKER:**  Thank you, Your Honor.

21      **THE COURT:**  Yeah.  I mean, if he is going to go to

22  the, you know -- the dog show or something, he just has to --

23  Westminster is coming up.  Or maybe it happened already.  The

24  dog show.  The dog show.

25      **MR. KEKER:**  That's in New York.

1          THE COURT:  It's in New York anyway.

2      Yes, Mr. Leach?

3          MR. LEACH:  Thank you, Your Honor.

4          MR. KEKER:  Thank you, Your Honor.  See you tomorrow.

5          MR. REEVES:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7              (Proceedings adjourned at 4:26 p.m.)

8                     ---oOo---

9

10

11              **CERTIFICATE OF REPORTERS**

12      I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15  DATE:  Wednesday, April 4, 2018

16

17

18

19  _____

20      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              U.S. Court Reporter

21

22

23  _____

24      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              U.S. Court Reporter

25