Volume 20

Pages 3903 - 4167

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )        NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
                               San Francisco, California
                               Thursday, April 5, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **ROBERT S. LEACH**
                 **ADAM A. REEVES**
                 **WILLIAM FRENTZEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  **JOHN W. KEKER**
                 **JAN NIELSEN LITTLE**
                 **BROOK DOOLEY**
                 **KATE LAZARUS**
                 **NIC MARAIS**
                 **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

<u>**I N D E X**</u>

Thursday, April 5, 2018 - Volume 20

<u>**GOVERNMENT'S WITNESSES**</u>                                  <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**WELHAM, LEE**</u>
(SWORN)                                              3917   20
Direct Examination by Mr. Leach                      3917   20
Cross-Examination by Mr. Dooley                      4049   20
Redirect Examination by Mr. Leach                    4144   20

<u>**E X H I B I T S**</u>

<u>**TRIAL EXHIBITS**</u>                              <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

  40                                                 4040   20

  126                                                4042   20

  230                                                4042   20

  263                                                4058   20

  288                                                4049   20

  486                                                4042   20

  702                                                4086   20

  706                                                4042   20

  933                                                4042   20

  992                                                4049   20

  1114                                               4042   20

  1188                                               4049   20

  1415                                               3972   20

  1416                                               3953   20

  1417                                               3964   20

  1419                                               4042   20

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1464 | | 4119 | 20 |
| 1503 | | 3943 | 20 |
| 1507 | | 3940 | 20 |
| 1508 | | 3941 | 20 |
| 1538 | | 4049 | 20 |
| 1542 | | 4112 | 20 |
| 1561 | | 3956 | 20 |
| 1708 | | 3989 | 20 |
| 1709 | | 3983 | 20 |
| 1709H | | 4127 | 20 |
| 1709L | | 4127 | 20 |
| 1719 | | 4042 | 20 |
| 1762 | | 3979 | 20 |
| 1763 | | 3986 | 20 |
| 1767 | | 3981 | 20 |
| 1778 | | 3977 | 20 |
| 1793 | | 3991 | 20 |
| 1945 | | 4018 | 20 |
| 1947 | | 4018 | 20 |
| 1959 | | 4042 | 20 |
| 2001 | | 4007 | 20 |

## **I N D E X**

### **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2002 | | 4010 | 20 |
| 2003 | | 4013 | 20 |
| 2031 | | 4049 | 20 |
| 2273 | | 4022 | 20 |
| 2986 | | 4024 | 20 |
| 2993 | | 4042 | 20 |
| 5779 | 4133 | | 20 |
| 5781 | | 4139 | 20 |
| 6349 | | 4125 | 20 |
| 6371D | | 4092 | 20 |
| 6420 | | 4069 | 20 |
| 6456 | | 4138 | 20 |
| 6462 | | 4102 | 20 |
| 6482 | | 4075 | 20. |
| 6737 | | 4081 | 20 |
| 6739 | | 4098 | 20 |
| 6742 | | 4114 | 20 |
| 6743 | | 4114 | 20 |
| 6744 | | 4115 | 20 |
| 6745 | | 4116 | 20 |
| 6748 | | 4118 | 20 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 6753 | | 4142 | 20 |
| 6754 | | 4061 | 20 |
| 6756 | | 4135 | 20 |

```
 1   Thursday - April 5, 2018                        8:55 a.m.

 2                        P R O C E E D I N G S

 3                           ---oOo---

 4       (Proceedings were heard out of presence of the jury:)

 5            THE COURT:  Let the record show the jury is not

 6   present.  The parties are present.

 7       Good morning.

 8            MR. LEACH:  Good morning, Your Honor.

 9            MR. KEKER:  Good morning, Your Honor.

10            THE COURT:  So let's get a picture of the case.  Where

11   are we going?  Who's doing what?  What's the schedule like?

12   All of those things.  What are the problems?  What are the

13   answers?

14            MR. LEACH:  Sure, Your Honor.

15       Today the United States intends to call Lee Welham, who is

16   an auditor at Deloitte.

17       Tomorrow the United States intends to call a witness from

18   EMC, which was one of the counter-parties with Autonomy, an

19   individual named Thomas Garner, who was a purchaser of HP

20   shares on August 18, 2011, and Andy Gersh, who was with KPMG

21   and performed some of the due diligence on behalf of --

22   Mr. Gersh was with KPMG working on behalf of HP reviewing the

23   information in the data room, reviewing the contracts.  He'll

24   testify about what he understood about hardware sales.

25       On Monday, the United States intends to call Matt Stephan
```

 1  in Autonomy's finance department, who was there in 2009 and

 2  2010, is familiar with some of the deals the Court has heard

 3  of.  In addition, we intend to call a witness from SHI.

 4      And then on Friday, we intend to call Stephen Brice.  I

 5  anticipate shortly after Mr. Brice's testimony, we will be

 6  close to complete.  I can't say that will happen on the 13th,

 7  but I see the Government's coming in on the 16th or the 17th.

 8      **MR. KEKER:**  We need to know what Governments' case is

 9  before we can make any commitments about the defense case, and

10  if they leave it open-ended -- first of all, I think they

11  shouldn't leave it open-ended.  When we tell them, which we've

12  agreed to do, three days before, three court days before our

13  case is to begin, who we intend to call, they should not be

14  able to react to that in any way by calling new witnesses,

15  changing the order.

16      **THE COURT:**  Well, good luck with that, Mr. Keker.  Do

17  you have another plan?  Let's go to Plan B because Plan A is

18  unacceptable to the Court.

19      Of course they are going to react to the -- you just said

20  "we don't want to make any commitments until we hear exactly

21  what the Government's case is."  You're right.  You don't have

22  to, though I think you've got a pretty good idea.

23      We're now in week number six, so if you don't have any

24  idea what the Government's case is, then you've been paying

25  less attention than I have.  But that's not the issue.

PROCEEDINGS

```
 1        And I appreciate it.  I'm not going to force you, but I'm

 2   not going to at all commit the -- bind the Government that they

 3   can't change the order of witnesses.

 4        For example, let's say the expert that they put on is --

 5   is decimated by your cross-examination, as you -- as your

 6   expectation may be.  I don't know that I would -- I -- if they

 7   were -- if they were motivated to call the restatement guy, I

 8   don't know that I wouldn't let them do that.  Of course I'd let

 9   them do that.

10        I am trying to do a balancing here and especially when I

11   get to 403.  403 is a -- is a balancing at the time -- my

12   understanding of it, at least the way I operate, number one,

13   it's totally discretionary.  I mean, there are bounds to it,

14   but it's basically a discretionary call.  It's not a call of

15   admissibility.  It is a call of discretion.  It's looking at a

16   case at any given moment and saying okay, this is the way the

17   case looks.

18        Through cross-examination -- I have no idea what your

19   cross is going to be, but if, through your cross-examination,

20   you raise a doubt in the Government's mind as to the efficacy

21   of a particular witness from their point of view, they

22   certainly are entitled to bring in, in their case in chief or

23   otherwise -- I mean, to figure out what the "otherwise" means.

24        If what you're saying is once they rest, they rest, I

25   think that's correct.  But I'm not -- I don't want to hear
```

1    foul -- a call of foul from the defense if, in fact, after all

2    of the cross-examination of their witnesses, it then appears to

3    them that they need one, two, or three.

4        So -- and I've always done that.  I've always said that,

5    look, I don't cumulative evidence.  But cumulative evidence is

6    important in areas in which the -- the assertion of the fact is

7    challenged and that's when cumulative evidence becomes very

8    important and that's when I allow it in.

9        And then so that's -- what I looked at for 403 in terms of

10   the restatement guy was that it was some -- it was cumulative

11   with respect to the expert.  That's -- that's a call that I

12   made given -- in -- in advance, but it's not a call that I feel

13   bound by in terms of -- in terms of once I hear the evidence.

14       So --

15           MR. KEKER:  I hear you.

16           THE COURT:  -- I really -- I'm trying to be fair.  I

17   really am trying to be fair.  I'm trying to be fair to both

18   sides here, and I -- and I really appreciate, first of all,

19   it's been a high level of cooperation between counsel.  I

20   know -- I know what trials are like.  But everybody has acted

21   as professionally as they can under the circumstances of the

22   great stress of a trial and an important trial.  And I

23   appreciate that.

24       And they bring to the table a lot of expertise in that

25   area.

1      But trials are changing things --

2          **MR. KEKER:**  And let me just say what I'm talking

3   about.

4      We have -- we are getting into the accounting part of the

5   case.  We're not talking about facts.  What we're talking about

6   is people making statements about what the accounting

7   implication -- the accounting judgments based on whatever

8   they -- they say the evidence is.

9          Depending on how Mr. Brice does, we need to consider

10  calling the EY audit partners and how Mr. Welham does -- the EY

11  audit partners who were lined up and ready to come from

12  England -- I mean -- excuse me -- Deloitte audit partners, and

13  we have an expert of our own.

14     So -- so until -- I mean, the good faith judgment about

15  whether or not those people are going to call -- are going to

16  happen will not be made until after Brice --

17         **THE COURT:**  I agree.

18         **MR. KEKER:**  -- testifies, and certainly if you're

19  going to allow them to call Yelland, that kind of changes the

20  whole perspective.

21         **THE COURT:**  I may or may not.

22         **MR. KEKER:**  I hear you, but until we know -- I mean,

23  we do Brice and then they say "we want to call Yelland" and you

24  say yea or nay, whatever, that's when we're going to make the

25  decision about whether or not we need to call our accounting

 1  people.

 2      **THE COURT:**  And I'm not forcing -- and I'm not even

 3  asking you to do that.  I mean, I appreciate that.  I think

 4  that that's a matter of fairness, yes.

 5      **MR. FRENTZEN:**  Here's the matter of fairness,

 6  Your Honor, and I think the Government has been and especially

 7  Mr. Reeves has been going out of its way to give defense

 8  counsel as best a prognosis of where we're going and who we're

 9  calling, and we've done the three days in advance, which both

10  sides agreed to do.

11      What I hear now is when we get like three days out, the

12  defense is still going to say "well, we don't know," and in a

13  case like this, it's just not going to operate like that.

14      And so what we're saying, as a matter of fairness, we

15  entered into a reciprocal agreement.  If counsel wants to

16  change it now, we don't view that as fairness.  We don't view

17  that as cooperation.

18      **MR. KEKER:**  Stop.  I don't --

19      **MR. FRENTZEN:**  And so we should get our three trial

20  days, as we've been doing for them throughout, and we're asking

21  for a good-faith basis, and if you bring in some audit partners

22  from the UK --

23      **THE COURT:**  Go ahead.  They're just lining up out

24  there.

25      **MR. FRENTZEN:**  We got to get them on the plane.  All

1  we are asking for is what we bargained for and what both sides

2  agreed to do before we got rolling.

3       **THE COURT:**  Mr. Keker is about to say he is not going

4  back on any agreement.  He is simply explaining that they can't

5  make certain decisions until --

6       **MR. KEKER:**  About the accountants.

7       **THE COURT:**  It's quite all right.  We have the time.

8  Everybody calm down.  If we get -- I don't know.  The

9  Government says "look, we can end, we think, Friday or Tuesday

10 or Monday" -- not -- the week after; right?

11      **MR. LEACH:**  The 16th or 17th.

12      **THE COURT:**  Those are the days, the 16th or the 17th.

13      **MR. KEKER:**  The whole trial could be over then.

14      **THE COURT:**  Let's see where we are around the 13th.

15      **MR. FRENTZEN:**  Well, what we would like to have is

16 three trial days of notice, which we all agreed to.  You know,

17 it's --

18      **THE COURT:**  So would I.

19      **MR. FRENTZEN:**  And if it's -- your best good faith

20 basis.  Well, that's what we bargained for.  So he can say he's

21 not changing it, but if we don't get notice until the night

22 before or one day before, then things have changed.

23      **MR. KEKER:**  Why is he talking about this?  This is a

24 complete strawman.  This is not happening.

25      **MR. FRENTZEN:**  So we are going to get three days

 1    notice.

 2            **MR. KEKER:**  They are going to get three days notice.

 3            **THE COURT:**  See, I told you he didn't change his

 4    position.

 5            **MR. FRENTZEN:**  Thank you, Your Honor.

 6            **MR. KEKER:**  My point is this.  We give three days

 7    notice and then all of a sudden, they change -- forget about

 8    the accountant.  They call in some person from --

 9            **THE COURT:**  This is my fault.  This is my fault

10    because I invited this discussion.  I should understand that

11    notwithstanding all the nice things I said about you guys, that

12    it could trigger some deep reflexive action that occurs with

13    trial lawyers.

14       Okay.  That's great.  What I hear through my defective

15    hearing is that there's not a problem here.

16            **MR. FRENTZEN:**  Great.  We will get our three days

17    notice.  Thank you, Your Honor.

18            **THE COURT:**  Thank you very much.  Let's bring in the

19    jury.

20       Yes, Mr. Dooley?

21            **MR. DOOLEY:**  Your Honor, could I raise one issue

22    before?  This is just the work-paper stipulation.  We have a

23    stipulation on the admissibility of certain Deloitte work

24    papers to be entered into evidence, and we prepared a list of

25    the exhibit numbers.

PROCEEDINGS

1          THE COURT:  Oh.

2          MR. DOOLEY:  And I was prepared --

3          THE COURT:  Is this fine?  Do -- can I just -- I mean,

4     I just -- that makes life easier.  Do you want to check it over

5     or something?

6          MR. LEACH:  I'm fine with counsel reading this in the

7     record.

8          THE COURT:  We don't want a big 20 minute --

9          MR. DOOLEY:  It's seven pages.

10         THE COURT:  Seven pages of this dah, dah, dah, dah,

11    dah, dah, dah.  That's not going to be very interesting.  I

12    will check it over and then I will make a statement to the

13    jury.

14         MR. LEACH:  Thank you, Your Honor.

15         THE COURT:  Okay.  Bring in the jury.  I'll be back in

16    a minute.

17              (Recess taken at 9:07 a.m.)

18              (Proceedings resumed at 9:10 a.m.)

19       (Proceedings were heard in the presence of the jury:)

20         THE COURT:  Let the record reflect all jurors are

21    present.

22       Good morning, ladies and gentlemen of the jury.  Thank you

23    again for being so prompt.  And we are commencing.

24       Go ahead, Mr. Leach.

25         MR. LEACH:  Thank you, Your Honor.  The United States

 1  calls Lee Welham.

 2          **THE CLERK:**  Please stand and be sworn.  Please raise

 3  your right hand.

 4                          **LEE WELHAM,**

 5  called as a witness for the Government, having been duly sworn,

 6  testified as follows:

 7          **THE CLERK:**  Thank you.  Please be seated.  Please

 8  state your full name for the record and spell your last name.

 9          **THE WITNESS:**  Lee Peter Welham, W-E-L-H-A-M.

10          **THE CLERK:**  Thank you.

11                      **DIRECT EXAMINATION**

12  BY MR. LEACH:

13  **Q.**   Good morning, Mr. Welham.

14          Good morning, ladies and gentlemen of the jury.

15          Where are you from, sir?

16  **A.**   The UK.

17  **Q.**   I have placed before you what has been marked for

18  identification purposes only as Government's Exhibit 2522.  Do

19  you have that in front of you?

20  **A.**   Yes.

21  **Q.**   And do you recognize this document?

22  **A.**   Yes.

23  **Q.**   On or about April 28th, 2016, did you enter into an

24  agreement with the Government to cooperate with the

25  United States Attorney's Office?

WELHAM - DIRECT / LEACH

1  **A.**  Yes.

2  **Q.**  And as part of that cooperation, did you agree to travel

3  to the United States to appear in these proceedings?

4  **A.**  I did.

5  **Q.**  What does that word "cooperate" mean to you?

6  **A.**  Assist and answer questions as required.

7  **Q.**  Would you please describe for us your educational and

8  professional background.

9  **A.**  So I joined Deloitte in 2002 after graduating from

10  university.  And then I've worked at Deloitte for the last 16

11  years starting as a graduate trainee and then doing my ACA

12  qualification and then progressing through to manager, senior

13  manager and beyond, and I'm now a partner with Deloitte.

14  **Q.**  When did you become a partner of Deloitte?

15  **A.**  In June 2016.

16  **Q.**  And you started with Deloitte in 2002?

17  **A.**  Correct, yes.

18  **Q.**  So you've been there 16 years?

19  **A.**  Yes.

20  **Q.**  And you mentioned something called ACA qualifications.

21  What are those?

22  **A.**  It's the chartered accountancy qualification that some --

23  that I did in the UK.

24  **Q.**  How would that relate to accountants in the United States?

25  **A.**  The CA qualification.

**WELHAM - DIRECT / LEACH**

1  **Q.**   I'm sorry.  The CA?

2  **A.**   It's the accounting exams that we do to become an

3  accountant in the UK.

4  **Q.**   Are you licensed as an accountant in the UK?

5  **A.**   I am, yes.

6  **Q.**   What is that license called?

7  **A.**   ICA qualification.  You are a chartered accountant, and I

8  have a practicing certificate, which means I can sign audit

9  reports as an audit partner.

10  **Q.**   You started with Deloitte in 2002?

11  **A.**   Yes.

12  **Q.**   And would you walk us through the different progressions,

13  the different levels you achieved within Deloitte.

14  **A.**   So when I joined, I was an associate and then senior

15  associate, assistant manager, manager, senior manager, director

16  and now partner.

17  **Q.**   What are the duties of a manager and a senior manager?

18  Can you explain that for us?

19  **A.**   The manager and the senior manager will run an audit.

20  When I say run an audit, they will be typically the people that

21  will be reviewing the work done by the associates, the senior

22  associates and the assistant managers.

23     Where there is more complex matters, then they might also

24  do the work themselves, so they will oversee the audit process,

25  have direct interaction with the clients and report ultimately

1   to the director or the partner on the audit engagement.

2   Q.   Are you familiar with a company called Autonomy?

3   A.   Yes.

4   Q.   How did you become familiar with Autonomy?

5   A.   It was an audit client of Deloitte for many years and was

6   based in Cambridge, which is also the office where I work.

7   Q.   When did you first join the Autonomy engagement?

8   A.   Towards the end of 2005.

9   Q.   When you joined the Autonomy engagement in 2005, can you

10  describe for us some of the names of the other folks you were

11  working with?

12  A.   From the Deloitte side?

13  Q.   Yes, please.

14  A.   So there was -- the audit partner was Richard Knights.

15  Rob Knight was the audit director.  And then myself and various

16  other members of the team.

17  Q.   Are you familiar with someone named Matt Stephan?

18  A.   I am, yes.

19  Q.   Who is he?

20  A.   He was someone who joined Deloitte as a graduate.  I don't

21  know what year he joined.  And he joined the engagement team.

22  I wouldn't know what year he joined the engagement team either,

23  but he was involved as a member of the team doing some of the

24  actual work.

25  Q.   And at some point in time, did he move to Autonomy?

1  **A.**   He did, yes.

2  **Q.**   And are you familiar with someone named Antonia Anderson?

3  **A.**   Yes.

4  **Q.**   Who is she?

5  **A.**   She was also a member of the audit team who worked on the

6  engagement for a number of years and was the manager on the

7  engagement before she left.

8  **Q.**   Left to go to Autonomy?

9  **A.**   Yes.

10  **Q.**   And is she someone you worked closely with?

11  **A.**   Yes.

12  **Q.**   Are there others from the Deloitte engagement team who

13  over time went to work for Autonomy?

14  **A.**   There is one other person that immediately comes to mind,

15  which was Poppy Prentis.

16  **Q.**   When you joined the Autonomy engagement in 2005, who from

17  Autonomy were you working with?

18  **A.**   My key point of contact was Steve Chamberlain and also the

19  person who works -- who was below him was somebody called Lisa

20  Harris.

21  **Q.**   What did you understand about Mr. Chamberlain's

22  background?

23  **A.**   So Steve worked at Deloitte many, many years ago, and he

24  left Deloitte probably about the same time that I started with

25  them.

1    **Q.**    I'd like to move forward in time, Mr. Welham, if you

2    would, to the third quarter of 2009.  Do you have that time

3    period in mind?

4    **A.**    Yes.

5    **Q.**    Okay.  If we could please display what is in evidence as

6    Exhibit 271.

7                        (Exhibit published to jury.)

8    **BY MR. LEACH:**

9    **Q.**    Mr. Welham, this appears to be an email from you to

10   andrewk@autonomy.com with the subject "Deloitte Pack Q3/2009."

11   Do you see that?

12   **A.**    Yes.

13   **Q.**    What is meant by "Deloitte Pack Q3/2009"?

14   **A.**    It's a report to the audit committee.

15   **Q.**    What do you mean by the report to the audit committee?

16   Can you explain what that is?

17   **A.**    Yes.  So -- so we -- we do our work, whether it's a

18   quarterly review or annual audit, and then at the end of that

19   process, we summarize the key findings and results, if you

20   like, of our work in a document which we will share with

21   management.  And then once everyone is comfortable with it, we

22   will then distribute that to the audit committee, which we will

23   then present shortly afterwards, the findings.

24   **Q.**    You say you share Deloitte's report to the audit committee

25   with management before it goes to audit committee.  What do you

1    mean by that?

2    **A.**    We would provide a draft copy to management to check for

3    factual accuracy before we finalize the document and ultimately

4    share with the audit committee.

5    **Q.**    Why does Deloitte do that?

6    **A.**    Well, just to make sure, firstly, that we have all the

7    facts correct because the way that we produce a document is we

8    have some background that describes the various transactions

9    that we're talking about and then some conclusions.  So we want

10   to make sure that management are happy with the facts as set

11   out and that everything is ultimately factually accurate.

12   **Q.**    And from time to time, would Mr. Sushovan Hussain

13   recommend changes to your audit committee reports?

14   **A.**    From time to time, yes.

15   **Q.**    Would Mr. Chamberlain from time to time do the same?

16   **A.**    Yes.

17   **Q.**    Let's please look at page 3 of this exhibit.  Is this the

18   cover page of your report to the audit committee?

19   **A.**    Yes.

20   **Q.**    And the date down at the bottom is 16 October 2009?

21   **A.**    Yes, it is.  Yeah.

22   **Q.**    Okay.  Could we please go to page 17.

23       If we could rotate the document so everybody can read

24   this, please, Ms. Margen.  Perfect.  If we could blow up a

25   little bit the upper two-thirds of the page.  Is that possible?

WELHAM - DIRECT / LEACH

1    Down a little more.  Down a little more.  That will do.

2    Wonderful.  Thank you.

3         Mr. Welham, you're familiar with this report to the audit

4    committee; is that fair?

5    **A.**   I am, yes.

6    **Q.**   Okay.  This is a document you had a hand in reviewing or

7    crafting?

8    **A.**   Yes.

9    **Q.**   Up at the top in Roman Numeral I, it says, "key risks."

10   What is meant by "key risks"?

11   **A.**   So the way that we design our audit and ultimately the

12   audit procedures or in this case the review procedures is we

13   look at the balances in the trial balance and ultimately what

14   go into the condensed financial statements and then we assess

15   risk.  So we will do specific procedures on the areas that we

16   believe are the most risky.

17        And therefore, in this document, we will set out the

18   background and the Deloitte response in relation to those key

19   risk areas.

20   **Q.**   And the risk here to the left is software development

21   costs.  Do you see that?

22   **A.**   Yes.

23   **Q.**   And to the right, it says, "During the quarter, a total of

24   11.7 million of software development costs have been

25   capitalized."

1          Further down below, it says, "A significant amount of

2     costs have been incurred in the quarter in respect of the SPE

3     project in developing the new database product."

4          Do you see that?

5     **A.**    Yes.

6     **Q.**    Were you familiar with something called SPE?

7     **A.**    I was, yes.

8     **Q.**    What did you understand that to be?

9     **A.**    It was a piece of ultimately functionality that Autonomy

10    were developing at this time that ultimately would allow them

11    to -- to use their -- their IDOL software to search

12    structured -- structured databases.

13         So everything before was based on unstructured data like

14    emails, Word documents, etc., but this was moving IDOL into the

15    structured world, which was -- which was seen as quite a big

16    thing.

17    **Q.**    When you say "what we understood," you are talking about

18    Deloitte based on the procedures that you performed?

19    **A.**    Correct.

20    **Q.**    And it says in the first paragraph, "There is a

21    significant increase compared to Q3/2008."  What is the report

22    getting at there?

23    **A.**    So each quarter as part of our review, we would look at

24    costs that had been capitalized, which means ultimately

25    recorded on the balance sheet instead of being recorded as an

WELHAM - DIRECT / LEACH

1    expense in the income statement.

2        And under accounting standards, you have to capitalize

3    development costs that meet certain criteria, so we would go

4    through those.

5        And in this case, we saw the level of costs that were

6    capitalized in Q3 of 2009 was substantially higher than it had

7    been in the previous quarter and in the same quarter for the

8    previous year.

9    **Q.**    And what was the explanation that you were given as the

10   auditor for this increase in software development costs?

11   **A.**    My recollection is that one of the big elements was the --

12   ultimately the development of this SPE product or

13   functionality.

14   **Q.**    And you talked about how -- something called

15   capitalization and moving something from the income statement

16   to the balance sheet.  Can you explain that to us for the

17   non-accountants?

18   **A.**    So each quarter you will incur expenditures which you

19   would normally record as an expense in the income statement

20   which then reduces your profits.  But if you are developing

21   something, in this case software, that you can sell to

22   customers and ultimately it will generate future revenues, then

23   the accounting standards or IFRS accounting standards

24   effectively say if you meet certain criteria, then you have to

25   capitalize those onto the balance sheet.  In other words,

1  remove those costs from the income statement, record them as an

2  asset on your balance sheet, and then you amortize those so

3  depreciate them to the income statement over a period of time.

4  **Q.**   So instead of taking the costs in the current period, it

5  goes on the balance sheet and you recognize expense over time?

6  **A.**   Correct, yes.

7  **Q.**   And does that have the effect of reducing expenses in the

8  current period?

9  **A.**   Yes, it does.

10 **Q.**   Okay.  What is the accounting standard you applied in

11 connection with the software development costs?

12 **A.**   IAS 38.

13 **Q.**   And I draw your attention to the Deloitte response down at

14 the bottom.  It says, "At the time of writing this document, we

15 have yet to complete our full work; however, we've reviewed a

16 sample of these costs and have verified that the criteria of

17 IAS 38 have been satisfied.  We have discussed the forecast

18 revenues from SPE with management and these far exceed the

19 costs capitalized."  Do you see that?

20 **A.**   Yes.

21 **Q.**   Can you describe for us the work that Deloitte did in

22 connection with the software -- testing the software

23 development costs?

24 **A.**   So what we would typically do is we would have a

25 conversation, first of all, with Pete Menell or somebody called

1    Fernando Lucini, who were the chief technical officer and I

2    think the chief research officer or someone in the technical

3    team at Autonomy to understand what these functionalities or

4    products were that were being developed.

5         And then once we understood that, we might involve some of

6    our specialists to help understand the IT side of things in

7    more detail.

8         And then we would physically do some other procedures

9    which might involve looking at time sheets, looking at employee

10   details, salaries, hourly rates, etc.

11   **Q.**   Let me please draw your attention to what is in evidence

12   as Exhibit 229.  Could we please display that.

13                     (Exhibit published to jury.)

14   **BY MR. LEACH:**

15   **Q.**   Mr. Welham, are you familiar with this document?

16   **A.**   Yes.

17   **Q.**   What do you understand this to be?

18   **A.**   I think this is our -- our memo that would be on the audit

19   file that records our work or some of our work around the

20   development costs that were capitalized.

21   **Q.**   This is part of Deloitte's working papers in connection

22   with the Q3/'09 review?

23   **A.**   Correct, yes.

24   **Q.**   What are working papers?

25   **A.**   So when you conduct an audit or if you document that work

WELHAM - DIRECT / LEACH

 1  in ultimately working papers which are held in our audit or

 2  review files and they essentially record the procedures that we

 3  have performed and the conclusions we've reached, and then

 4  those are the record, if you like, of the audit work that we

 5  have done to support our ultimate opinion.

 6  **Q.**   You mentioned you talked to Mr. Menell about some of the

 7  software development costs.  Did you also talk to Autonomy

 8  finance about this issue?

 9  **A.**   Yes.  We would do initially.

10  **Q.**   What do you mean by Autonomy finance?  Who typically would

11  you talk to?

12  **A.**   We'd probably ask questions principally to Steve

13  Chamberlain.

14  **Q.**   So the subject of this memo is to clarify the level of R&D

15  capitalized costs in the quarter.  Do you see that?

16  **A.**   Yes.

17  **Q.**   And it says, "The increase conclusion:  The increase in

18  capitalized R&D in the quarter is reasonable and is the result

19  of the new product launch."

20       Is that a reference to SPE?

21  **A.**   I believe it is, yes.

22  **Q.**   And then there is a row of figures:  3.3M, 4.1M, 11.7M,

23  and 19.1M.  Do you see that?

24  **A.**   Yes.

25  **Q.**   What do those represent?

**WELHAM - DIRECT / LEACH**

1  **A.**   So they are the amounts or the levels of costs that have

2  been capitalized onto the balance sheet as development costs

3  for Q1, Q2, and Q3 of 2009.

4  **Q.**   And if we could please scroll down, please, to the next

5  table.   Perfect.

6        Based on this table, Mr. Welham, what accounts for the

7  increase in R&D -- capitalized R&D for the third quarter of

8  2009?

9  **A.**   Principally it's simulation to the SPE-related product

10  that we've talked about.

11  **Q.**   Is the increase the 2.5M associated with development team

12  additional effort?

13  **A.**   Yes.   And the system engineer cost below as well.

14  **Q.**   That is what is meant by "SEs Q1, Q2, Q3"?

15  **A.**   Yes.

16  **Q.**   If we could please scroll further down to capitalization

17  of SE costs.   In the middle paragraph, it says, "Typically the

18  work of an SE is tailoring of Autonomy software or providing

19  proof of concept to customers to demonstrate that the software

20  meets their requirements."

21        And then it goes on to say that, "The nature of SPE

22  requires interaction with real databases in order to evolve and

23  develop into a more commercial product."

24        Do you see that?

25  **A.**   Yes.

WELHAM - DIRECT / LEACH

1  Q.   What is the memo getting at here?

2  A.   It's a long time ago, so it's -- but my broad

3  understanding from reading this is that in the past or -- when

4  I say in the past, before Q3/2009, system engineered costs were

5  not typically capitalized from an accounting perspective, but

6  they might have been included for the tax credit claim that

7  would be submitted to HMRC, the tax authority in the UK.

8       But with the ongoing development of SPE, I think what the

9  memo is saying that some of those costs are now relevant for

10  the SPE development work and therefore should also be

11  capitalized in accordance with accounting standards.

12  Q.   That is information that was provided to you by folks from

13  Autonomy; is that correct?

14  A.   Yes.

15  Q.   And that would include Mr. Menell?

16  A.   Yes, it would.  Yes.

17  Q.   And validated by finance?

18  A.   Yes.  I believe so.

19  Q.   Let's look at page 2, please.  And I draw your attention

20  to the paragraph beginning "From discussions with Pete Menell,

21  a list was provided showing SEs who spent all of their

22  technical time in Q3/'09 developing SPE through trialing the

23  software with real databases.  75 percent of Q3 SE costs have

24  therefore been capitalized in line with the proportion measured

25  and agreed with HMRC."

1          Do you see that?

2     A.    Yes, I do.

3     Q.    What did you understand that to be getting at?

4     A.    Well, it was similar to what I said before, that the

5     system engineers, as we're told, are doing actually testing of

6     using software with databases, and therefore the conclusion

7     from the technical team, Autonomy, was that 75 percent of those

8     costs were applicable to that exercise and therefore should be

9     capitalized.

10    Q.    If this 75 percent number is not right, does that have an

11    impact on what amount of R&D can be capitalized in this

12    quarter?

13    A.    Yes.  It would change the level, yes.

14    Q.    Explain that, please.

15    A.    Although the capitalization costs that are being

16    capitalized is being calculated by taking 75 percent of the

17    system engineers' costs for the quarter, so if the percentage

18    is a hundred percent or 50 percent or whatever it might be,

19    then that would clearly change the calculation.

20    Q.    Was this 75 percent estimate provided to you by Mr. Menell

21    relevant to the work that Deloitte was doing?

22    A.    Yes, it was.

23    Q.    Thank you, Mr. Welham.  Let's put that to the side.

24          I would like to move forward -- well, before I move

25    forward, in 2009, can you summarize for me who some of the key

 1   members of the Deloitte engagement team were in 2009?  Who were

 2   the folks you were working with?

 3   **A.**   So the audit partner was Richard Knights.  The audit

 4   director was Rob Knight.  Then I was the manager.  And then I

 5   believe in 2009, Antonia was working with me as well and

 6   various other members of the team.

 7   **Q.**   Moving forward through 2010, how did that change?

 8   **A.**   In 2010, the key change was that Richard Knights rotated

 9   off as the audit partner and a new audit partner, Nigel Mercer,

10   came on to the account.

11   **Q.**   Did that happen about the second quarter of 2010?

12   **A.**   Yes, it did.

13   **Q.**   Roughly around that time.

14        But other than Mr. Mercer's addition and Richard Knights'

15   and Rob Knight's departure, the core team stayed in place; is

16   that fair?

17   **A.**   I think so, yes.

18   **Q.**   Let's move forward to the end of 2010, the fourth quarter

19   of 2010.  Do you have that time period in mind?

20   **A.**   Yes.

21   **Q.**   And the team at the time is Mr. Mercer, you, Antonia

22   Anderson?

23   **A.**   Yes.

24   **Q.**   Okay.  Do you know someone named Tom Murray?

25   **A.**   Yes, I do.

1  Q.   Who is he?

2  A.   He was -- I think he was an assistant manager at the time,

3  so he was also a key member of the team.

4  Q.   Let's please look at what has -- I believe this is in

5  evidence, Exhibit 1509.

6          THE COURT:   It is.

7          MR. LEACH:   Thank you, Your Honor.

8                  (Exhibit published to jury.)

9  BY MR. LEACH:

10 Q.   Mr. Welham, I'm displaying for you what appears to be

11 Deloitte's report to the audit committee for the year end 2010.

12 Are you familiar with this document?

13 A.   I am.

14 Q.   Okay.  Could we please look at page 9 -- excuse me.  Page

15 6, please.

16      Is this the portion of the report describing some of the

17 key audit risks?

18 A.   Yes, it is.

19 Q.   And to the left, it says "Revenue Recognition."  Why is

20 revenue recognition listed as a key audit risk?

21 A.   As part of an audit, we, as I said earlier, identify

22 risks, and for almost all companies, revenue recognition will

23 be one of the principal risks, and in particular for a software

24 company, it is the key risk.

25 Q.   When you say in particular for a software company --

1    Autonomy was a software company; right?

2    **A.**    Yes.

3    **Q.**    Why in particular for software companies is this a key

4    risk?

5    **A.**    Because ultimately the amounts that are involved in each

6    individual sale can be quite significant, so therefore cutover

7    revenue is the focused area that we would look at around the

8    period end date.

9    **Q.**    I draw your attention to the second paragraph where it

10    says, "Management continues to apply a consistent policy to

11    recognizing revenues which includes assessing the probability

12    of recoverability, evaluating any ongoing managerial

13    involvement, and discharging obligations, thereby ensuring that

14    all of the provisions of International Accounting Standard

15    Revenue IAS 18 have been satisfied."  Do you see that?

16    **A.**    Yes.

17    **Q.**    What is IAS 18?

18    **A.**    So IAS 18 is the accounting standard under IFRS that deals

19    with how you recognize revenue, so it's very relevant here.

20    **Q.**    And then further below, is there a list of the significant

21    revenue deals in the fourth quarter of 2009 or '10 that

22    Autonomy has recognized?

23    **A.**    Yes.

24    **Q.**    Let me draw your attention to the paragraph under

25    "Discover Technologies, LLC."  Do you see that?

1   **A.**   Yes.

2   **Q.**   At this point in time, fourth quarter of 2010, were you

3   familiar with a company called Discover Technologies?

4   **A.**   I was, yes.

5   **Q.**   And what does -- what is reflected here?  What is being

6   described in this report to the audit committee with respect to

7   Discover Technologies?

8   **A.**   I just need to read that, if that's okay.

9   **Q.**   Please read it and then tell us what it means?

10   **A.**   (Witness reviews document.)

11         So it's just detailing a sale to Discover Technologies

12   where the end user is Bank of America.

13   **Q.**   And the size of the license deal as reported to the audit

14   committee was $7 million?

15   **A.**   Correct.

16   **Q.**   That was consistent with your understanding at the time?

17   **A.**   Yes.  It would have been, yes.

18   **Q.**   Okay.  Further on, it says, "MicroTechnologies, LLC is the

19   lead reseller who has the overall contract with Bank of

20   America, but no sales on this deal have been recognized between

21   Autonomy and this reseller in this quarter because purchase

22   orders have not yet been received."

23         What was Deloitte getting at there?

24   **A.**   I can't remember all the details of the transaction, but

25   just from reading this, it's just making the point that

1  MicroTechnologies, LLC was the principal reseller that was

2  working with Bank of America, but the purchase orders on this

3  particular deal had not yet been received, so there was no

4  revenue recognized with MicroTechnologies with end user Bank of

5  America in this particular period.

6  **Q.**   Okay.  And was it your understanding that MicroTech had

7  the overall contract with Bank of America or was going to have?

8  **A.**   Yes.

9  **Q.**   Let's keep this $7 million transaction with Discover

10  Technologies in mind, Mr. Welham, and I'd like to draw your

11  attention to what is in evidence as Exhibit 1493.

12                   (Exhibit published to jury.)

13           **MR. LEACH:**  Thank you, Ms. Margen.

14  **Q.**   Mr. Welham, this appears to be an email from Antonia

15  Anderson to Steve Chamberlain with something called a request

16  list including value of OS items.  Do you see that?

17  **A.**   Yes.

18  **Q.**   What is that?

19  **A.**   During the audit process or review process, we would send

20  the list of requests to the finance team each day for things

21  that we had asked for but not yet received.  So it was just a

22  way of tracking progress on the audit or the review.

23  **Q.**   Let's please look at the list on page 5, and I draw your

24  attention to row 20.

25           If we could move to the left just a little bit, please.

1   Wonderful.

2       Under the request, there is something called "supporting

3   documentation for 3.5m revenue consolidation adjustment."  Do

4   you see that, Mr. Welham?

5   **A.**   Yes.

6   **Q.**   What is a consolidation adjustment?

7   **A.**   It's -- it's an amount that is put through as, if you like

8   it, a top-side adjustment so you -- it's part of the

9   consolidation process.  So after you've got the results for

10  the -- the trial balances of each of the various entities, then

11  some adjustments can be made to ultimately consolidate or put

12  the results together, and this was one of those adjustments

13  that was put through.

14  **Q.**   Say you've got the trial balances for a bunch of entities,

15  can you put a little color on that, please?

16  **A.**   So each of the companies within the Autonomy group would

17  maintain their financial records and record those and

18  ultimately that then produces their trial balance which would

19  be at the period end date.

20      You then take those trial balances for each of those

21  companies, if you like, at the central level and then you add

22  all those together to get your consolidated results.

23      When you do that, you have to make adjustments to

24  consolidate out things that don't quite work when you bring

25  them all together.

**WELHAM - DIRECT / LEACH**

1          And then also where you've got transactions that might

2     have been recorded that haven't necessarily gone into the

3     underlying books and records, then they would be added at this

4     point in time.

5     **Q.**    So Autonomy Corporation had subsidiaries like Zantaz,

6     Autonomy, Inc., ASL.  You would get the trial balances for

7     those and all of those roll up into the parent company;

8     correct?

9     **A.**    Correct, yes.

10    **Q.**    And a consolidation adjustment is part of that roll-up

11    process; is that fair?

12    **A.**    Yes.

13    **Q.**    Okay.  Deloitte is asking here for supporting

14    documentation for 3.5m revenue consolidation, and it relates to

15    customer Bank of America.  Do you see that?

16    **A.**    Yes.

17    **Q.**    What was Deloitte asking for here?

18    **A.**    From memory, as we are going through the consolidation, we

19    saw this adjustment, so we needed to do some work on it to find

20    out what it related to.  And I think we were told it related to

21    a sale to Bank of America.  So we then asked for the

22    documentation and paperwork to support that.

23    **Q.**    Okay.  While we are on this, slightly different topic, but

24    if we could move up to just below row 10, there is an entry for

25    VMS hardware deal.  And the request is "confirmation of

 1   delivery from VMS."  Do you see that?

 2   A.   Yes.

 3   Q.   If we could, please, circle that for the jury or highlight

 4   that.  Wonderful.

 5        What was Deloitte asking for here?

 6   A.   I think this relates to a hardware transaction, and we're

 7   asking for evidence of delivery from VMS, it says, so evidence

 8   to see that hardware has been delivered from VMS.

 9   Q.   Okay.

10        I'd like to focus on this $3.5 million consolidation

11   adjustment relating to Bank of America, and if you could please

12   look at what I've placed before you as Exhibit 1507.

13        Is this a true and correct copy of an email from Steve

14   Chamberlain to you on or about January 26, 2011?

15             THE COURT:  Admitted.

16        (Trial Exhibit 1507 received in evidence)

17             (Exhibit published to jury.)

18             THE WITNESS:  Yes.

19   BY MR. LEACH:

20   Q.   I draw your attention, Mr. Welham, to the subject of the

21   email.  Do you see where it says "audit"?

22   A.   I do, yes.

23   Q.   Okay.  And I assume that's a reference to the ongoing

24   audit of Autonomy's financial statements; is that correct?

25   A.   Yes.

1   **Q.**   Okay.  Mr. Chamberlain is writing to you, "Just to let you

2   know, I have the 3.5m paperwork and will send when back

3   online."  Do you see that?

4   **A.**   Yes.

5   **Q.**   What did you understand him to be saying here?

6   **A.**   I think this is a response to the request that we just

7   looked at before, so he's now got the actual paperwork.

8   **Q.**   Could you please now look at what has been marked as

9   Exhibit 1508.  Is this another email exchange between you and

10  Mr. Chamberlain on the 26th?

11          **THE COURT:**  Admitted.

12          (Trial Exhibit 1508 received in evidence)

13                  (Exhibit published to jury.)

14  **BY MR. LEACH:**

15  **Q.**   Are you familiar with this document, Mr. Welham?

16  **A.**   Yes.

17  **Q.**   Okay.  The subject is AUTN underscore BOA.  Do you see

18  that?

19  **A.**   Yes.

20  **Q.**   And does the attachment appear to be a signed agreement

21  between Autonomy and Discover Technologies?

22  **A.**   Yes, but without Autonomy's signature.

23  **Q.**   Okay.  Let's look at that first.  If we could please look

24  at page 2.  And let's start at the top.

25       What is the date of the agreement?

**WELHAM - DIRECT / LEACH**

1   **A.**   The 31st of December, 2010.

2   **Q.**   And what are the fees in paragraph 2?

3   **A.**   Three-point -- 3,675,000.

4   **Q.**   If we could please look at page 3, the signature block

5   that Mr. Welham was referring to.  Do you see the signature

6   attributed to Malcolm Hyson?

7   **A.**   Yes, I do.

8   **Q.**   Okay.  And what is the date listed underneath?

9   **A.**   The 31st of December, 2010.

10  **Q.**   If we could now please go back to page 1.  Mr. Chamberlain

11  is writing to you, "Lee, before you ask, I have already told

12  them to send me the version that has been executed by Autonomy.

13  Muppets sent me the wrong version.  Will send you other one

14  when I have it."

15      Do you see that?

16  **A.**   Yes.

17  **Q.**   What did you understand Mr. Chamberlain to mean by

18  "muppets"?

19  **A.**   It's an English colloquialism.  I guess the nearest

20  equivalent might be idiots.

21  **Q.**   Thank you.

22      And what did you understand Mr. Chamberlain to be sending

23  to you here?  What is the -- why is he sending this to you?

24  **A.**   It relates to previous emails.  This is the actual

25  document itself, but he's saying that it's the wrong version.

1  **Q.**   So this is the audit evidence you're looking for for the

2  $3.5 million consolidation adjustment?

3  **A.**   Yes.

4  **Q.**   Okay.  Would you please look at what has been placed

5  before you as Exhibit 1503.

6         **THE COURT:**  Admitted.

7         (Trial Exhibit 1503 received in evidence)

8               (Exhibit published to jury.)

9  **BY MR. LEACH:**

10  **Q.**   I draw -- is this another email between you and

11  Mr. Chamberlain on the 26th of January, Mr. Welham?

12  **A.**   Yes.

13  **Q.**   Okay.  And what is the attachment that Mr. Chamberlain is

14  sending you here?  If we could look at page 2.

15  **A.**   It's a signed confirmation from Discover Tech.

16  **Q.**   What is a confirmation?

17  **A.**   It's a third-party confirmation or request for

18  confirmation that we would send out to some of Autonomy's

19  customers for them to ultimately confirm a transaction.

20  **Q.**   Is that another piece of the audit evidence that you rely

21  on in the course of your audit?

22  **A.**   It is, yes.

23  **Q.**   If we could please go back to the first page.  Let's focus

24  on what Mr. Chamberlain said.

25         "Took the liberty of getting this signed.  Since we had

1    not invoiced at year end, was not on debtors' confirmation and

2    so this covers the contract."  Do you see that language?

3    **A.**    I do, yes.

4    **Q.**    When he says "took the liberty of getting this signed,"

5    what did you understand that to mean?

6    **A.**    He is saying that he's issued the letter and got the third

7    party, in this case Discover Tech, to sign this.

8    **Q.**    When he is saying taking liberties doing that, what did

9    you interpret that to mean?

10   **A.**    I can't speak for him, but I suspect he knows that we will

11   ask for this, so he's doing it in advance of that request.

12   **Q.**    Okay.

13       And then he says, "Since we had not invoiced at year end,

14   was not on debtors' confirmation and so this covers the

15   contract."

16       What did you understand that to mean?

17   **A.**    It means that they have in this case, I would imagine,

18   delivered the software and they have a signed agreement so

19   they've transferred the risks and rewards of ownership, but the

20   administrative task of, if you like, issuing the invoice to the

21   customer has not happened by the year-end date, and when that

22   happens, under accounting standards, you record the asset,

23   which would normally be a trade receivable, as accrued income.

24   **Q.**    Okay.  Does the date of an invoice matter for revenue

25   recognition purposes?

WELHAM - DIRECT / LEACH

1  **A.**   The invoice itself is not so relevant.  It's more have you

2  delivered the actual product and do you have a signed agreement

3  in place.

4  **Q.**   Okay.  So does the date of the agreement or the -- does

5  the date of the agreement matter for revenue recognition

6  purposes?

7  **A.**   It does, yes.

8  **Q.**   Explain that for us.

9  **A.**   Well, when -- it relates to cutoff ultimately, so you have

10 your financial period which has an end date, and you can

11 include all transactions in that period up to the very last day

12 of that period.

13       So in this case, I think we're looking at 2010, so the

14 31st of December, 2010 is the last day that you record the

15 transactions, and then any transactions that happen after that

16 date would go into the next financial year, being 2011.

17 **Q.**   Let me please display what has been marked as Exhibit --

18 and in evidence as Exhibit 2539.

19                  (Exhibit published to jury.)

20 **BY MR. LEACH:**

21 **Q.**   If we could scroll up to the top, please, so we can see

22 the entire row.  Wonderful.  Thank you.

23       Up at the top, Mr. Welham, it says "Objective:  To

24 summarize and test consolidation adjustments."

25       Do you see that?

**WELHAM - DIRECT / LEACH**

1    **A.**    Yes.

2    **Q.**    Are you familiar -- is this one of Deloitte's working

3    papers relating to its testing for the consolidation

4    adjustments for the year-end audit?

5    **A.**    It is, yes.

6    **Q.**    And are you familiar with this document?

7    **A.**    To some degree, yes.

8    **Q.**    Let's please look at page 4, please -- excuse me.  Page 2.

9    And if we could scroll down to the second row from the bottom.

10    Right there.  Perfect.

11        Does this appear to be a summary of Deloitte's testing for

12    the $3.5 million consolidation adjustment, Mr. Welham?

13    **A.**    Yes.  It's part of the work, yes.

14    **Q.**    Okay.  And the amounts there are 3500 and negative 3500.

15    Can you explain what those mean?

16    **A.**    This relates to double entry, so to account for something,

17    you have to book two sides of a transaction, so when you record

18    revenue, you credit revenue, which is what the "CR revenue"

19    means, and then because this has not been invoiced, it's in

20    accrued income or "other debtors," as it's called here, so you

21    debit, which is the DR -- debit other debtors for the same

22    value.

23    **Q.**    Is the result of this Autonomy is recognizing 3.5 million

24    in revenue for the fourth quarter of 2010?

25    **A.**    Correct.

**WELHAM - DIRECT / LEACH**

1  **Q.**   Does this paragraph describe Deloitte reviewing and

2  analyzing the contract with Discover Tech and the audit

3  confirmation that it received from Mr. Chamberlain?

4  **A.**   Yes.

5  **Q.**   Okay.  Could we please look at page 6 of this exhibit.

6  And is the -- do you see the date at the top, Mr. Welham,

7  December 31st, 2010?

8  **A.**   Yes.

9  **Q.**   And do you see the amount of 3.675 million?

10  **A.**   Yes.

11  **Q.**   There's a difference between the 3.5 and the

12  3.675 million.  Can you explain what's going on there?

13  **A.**   I think it relates to something called support and

14  maintenance, so when Autonomy would sell software, typically

15  as well as the license, there will be something called support

16  and maintenance which is the support that you -- or they

17  provide to the customer over a period of time, typically a

18  year.

19      So the difference in the two numbers is the difference

20  between just having the license revenue, which is 3.5 million,

21  and license revenue and support and maintenance, which is in

22  total 3.675, is my recollection.

23  **Q.**   Okay.  And is this agreement linked to the consolidation

24  work paper that we've been looking at?

25  **A.**   Yes.  I believe it is, yes.

**WELHAM - DIRECT / LEACH**

1  **Q.**   Okay.  If this agreement were -- did Deloitte rely on the

2  date December 31, 2010?  Was that relevant to your audit work?

3  **A.**   Yes.

4  **Q.**   Why is that?

5  **A.**   Well, it goes to the counterpoint that I was making

6  before, that you need to have the agreement signed and

7  everything delivered in the period in question, so this is the

8  last day of the year, so because it's signed on the 31st of

9  December, 2010 and in this case I assume the software is being

10  delivered, then you have to then recognize the revenue in 2010.

11  **Q.**   If this agreement were reached in January of 2011, would

12  that be relevant to you?

13  **A.**   Yes, it would.

14  **Q.**   Why?

15  **A.**   Well, if it's reached in January, then that's January

16  2011, so it's a 2011 transaction.

17  **Q.**   If the agreement were executed in late January 2011, would

18  that be relevant to you?

19  **A.**   Yes.

20  **Q.**   Why is that?

21  **A.**   Well, first, it would be relevant because this document

22  says 31st of December, 2010.

23  **Q.**   Let me please show you what is in evidence as Exhibit

24  2948.

25                  (Exhibit published to jury.)

BY MR. LEACH:

Q.   And when you say "relevant," Mr. Welham, does that mean if this agreement is reached in January of 2011, it's not appropriate to recognize it in the fourth quarter of 2010?

A.   Yes.

Q.   I've placed before you what is in evidence, Mr. Welham, which appears to be an email from Livius Guiao to Steve Chamberlain on January 18th, 2011.  Do you see that at the top?

A.   Yes.

Q.   And if we could go to the back portion of this exhibit, do you see the date of January 18th on this purchase order -- agreement, Mr. Welham?

A.   January 18th, 2010?

Q.   Yes.

A.   Yes.

Q.   And do you see the amount in page 2, 3.675 million/US 13 125?

A.   Yes.

Q.   If we could go to the signature page.  Do you see how it's not executed?

A.   Yes.

Q.   Was this information available to you during the course of your audit?

A.   I've not seen this before, no.

Q.   Was it responsive to your request for supporting

1   documentation for the support for the $3.5 million

2   consolidation adjustment?

3   **A.**    If it relates to the same transaction, yes.

4   **Q.**    I'd like to go back to Exhibit 1503 and focus on -- if we

5   could go back to 1503, please.

6                    (Exhibit published to jury.)

7   **BY MR. LEACH:**

8   **Q.**    I want to focus on that language, "Since we've not

9   invoiced at year end and was not on debtors' confirmation."  Do

10  you see that?

11  **A.**    Yes.

12  **Q.**    If the agreement was not reached until January of 2011,

13  does that cause you to question what Mr. Chamberlain has

14  written here?

15  **A.**    Yes.

16  **Q.**    Can you explain that for us.

17  **A.**    Well, again, it relates to cutoff and what you record in

18  one period versus what you record in another, so if the

19  agreement is reached after the year-end date, then that's

20  relevant, yes.

21  **Q.**    Let's please go back, Mr. Welham, and if we could display

22  again the audit committee report, Exhibit 1509, page 6.

23                    (Exhibit published to jury.)

24  **BY MR. LEACH:**

25  **Q.**    And if we could scroll down to the bottom, there is an

1   entry for Tikit Limited.  Do you see that?

2   **A.**   Yes.

3   **Q.**   And this says this is a 6-million license deal sold to the

4   value added reseller Tikit for end user KPMG for WorkSite

5   software.  Support and maintenance was carved out at the fair

6   value of 5 percent.  Do you see that?

7   **A.**   Yes.

8   **Q.**   Is this another transaction that Deloitte tested for the

9   year-end audit of 2010?

10  **A.**   Yes, it was.

11  **Q.**   Okay.  Further down below, there's a paragraph, "In

12  addition to us receiving third-party confirmations, management

13  has confirmed that no revenue deals contained side letters or

14  ongoing Autonomy performance requirements that were excluded

15  from the signed sales contracts."

16       Do you see that?

17  **A.**   I do, yes.

18  **Q.**   Why is this included in the audit committee report?

19  **A.**   It's just basically making clear that management has

20  confirmed or represented that there are no signed letters or,

21  as it says, ongoing performance requirements that were excluded

22  from the signed sales agreements.

23  **Q.**   What is a side letter?

24  **A.**   A side letter would be, if you like, another -- another

25  agreement or something that relates to a signed agreement but

1   not actually in the agreement itself.

2   **Q.**   And what is meant by "ongoing Autonomy performance

3   requirements"?

4   **A.**   It essentially covers anything further that Autonomy would

5   be required to do.

6   **Q.**   And are these representations that Mr. Hussain made to you

7   in the course of your audit for Q4/2010?

8   **A.**   Can you repeat the question, please?

9   **Q.**   Were these -- did Mr. Hussain make these representations

10  to you in the course of your audit?

11  **A.**   I don't know if I specifically discussed this with him

12  personally, no.

13  **Q.**   Okay.  Did you give him a copy of this audit committee

14  report?

15  **A.**   Yes.  I did, yes.

16  **Q.**   And did you request his comments on it?

17  **A.**   Yes.

18  **Q.**   And did you expect if this portion were in any way

19  inaccurate, he would bring that to your attention?

20  **A.**   Yes.

21  **Q.**   Let's please look at what is in evidence as Exhibit 1416,

22  and I draw your attention to page 6, Mr. Welham.

23       Does this appear to be Deloitte's testing of the Tikit

24  transaction at the end of 2010?

25           **THE CLERK:**  I don't show 1416 in.

1           **MR. LEACH:**  Your Honor, I don't believe this is in

2     evidence yet.  I offer it.

3           **THE COURT:**  Admitted.

4           (Trial Exhibit 1416 received in evidence)

5               (Exhibit published to jury.)

6     BY MR. LEACH:

7     **Q.**   You have a hard copy in front of you or on the screen,

8     Mr. Welham, whichever you're comfortable with.  We're on page

9     6.

10          Are you familiar with this form of work paper?

11    **A.**   I am, yes.

12    **Q.**   Can you explain what this is, please.

13    **A.**   This is an example of our revenue testing.

14    **Q.**   What do you mean by "revenue testing"?

15    **A.**   As part of our audit or our review, we would do revenue

16    testing, which is essentially performing procedures on the

17    amounts that have been recorded as revenue.

18    **Q.**   Okay.  If we look, these first three blocks, if you will,

19    can you explain what those are?

20    **A.**   So the first three blocks are essentially trying to just

21    document some of the key -- key elements of the transaction

22    from the documents that we've looked at, so we just explain the

23    split between license revenue and maintenance revenue and then

24    other salient points like the invoice details, the date of

25    invoice, the PO details, or the agreement details and the dates

1    of those.

2    **Q.**    And all of this is drawn from the contracts that Autonomy

3    provides to Deloitte; is that fair?

4    **A.**    That's correct, yes.

5    **Q.**    If we could look down further beneath "details," what

6    is -- what is summarized here?  If we could go further down

7    right to the word "satisfactory."  Up a little more, please.

8    Perfect.  Thank you, Ms. Margen.  And if we could expand

9    everything above "maintenance element."

10        Generally, Mr. Welham -- I don't need you to read every

11    word, but generally what's being described here?

12    **A.**    So under "details," it essentially does exactly that.  It

13    just provides the details of the transaction itself.  And

14    obviously talking about the fees, license fees, maintenance

15    fees, and if there are knowledgeable payment dates in the

16    payment schedule as well, which is the case here.

17    **Q.**    Is this where the Deloitte team summarizes the key

18    provisions of the contracts?

19    **A.**    Yes, it is.  Yes.

20    **Q.**    All of the elements that might impact revenue recognition?

21    **A.**    Yes.

22    **Q.**    Okay.  Let's look at page 7, please.  And the -- right

23    there.  And the top line is cut off a little bit, but it

24    appears to say "revenue recognition" and below there are A, B,

25    C, D and E.  Do you see that, Mr. Welham?

WELHAM - DIRECT / LEACH

```
1    A.    I do, yes.

2    Q.    What is described here?

3    A.    So this is just going through the five criteria of IAS 18,

4    which, as we mentioned earlier, is the revenue standard under

5    IFRS.

6    Q.    A is "The risks and rewards of ownership passed to the

7    customer."  What does that mean?

8    A.    So the key part or one of the elements of IAS 18 is that

9    the notion that risks and rewards must transfer to the

10   customer.  So that's just talking about that particular element

11   of the standard and ensuring that those risks and rewards have

12   passed.

13   Q.    In B it says "Autonomy has not retained any managerial

14   control."  What's that getting at?

15   A.    So just essentially documenting that there is no further

16   requirements for Autonomy to perform in relation to this

17   transaction.

18   Q.    Okay.  If Autonomy has retained effective control of the

19   goods, does that have an impact on revenue recognition?

20   A.    Yes.  If you retain control, then you haven't passed the

21   risks and rewards of ownership.

22   Q.    In C, "The revenue can be measured effectively."  What's

23   that standard getting at there?

24   A.    This is -- this is essentially getting to the amount that

25   you recognize, so it's saying can the amount that you're going
```

1    to recognize be measured effectively.

2    **Q.**   D, "It is probable that economic benefits will flow to

3    Autonomy."  What's that?

4    **A.**   So you have to assess whether it's likely that you will

5    get paid the amounts that you're selling the goods for.  And if

6    you believe, in your judgment, that you -- it is likely that

7    you will get paid, then you tick that box.

8    **Q.**   Is that essentially collectibility?

9    **A.**   Yes.

10   **Q.**   And then E, "There are no costs incurred in this

11   transaction."  What is that getting at?

12   **A.**   Just confirming that there are no other costs that need to

13   be considered when actually recognizing this particular

14   revenue.

15   **Q.**   I've placed before you what has been marked as Exhibit

16   1561.  Is this a true and correct copy of a letter signed by

17   Sushovan Hussain to Deloitte?

18          **THE COURT:**  Admitted.

19       (Trial Exhibit 1561 received in evidence)

20                (Exhibit published to jury.)

21          **THE WITNESS:**  I believe it is, yes.

22   **BY MR. LEACH:**

23   **Q.**   What is this document, Mr. Welham?

24   **A.**   This is what we call the management representation letter.

25   **Q.**   What is a management representation letter?

1   **A.**    It's a document that we issue at the very end of the audit

2   or the review process that just is essentially management

3   confirming to us or representing, as we say, the various

4   elements within here have been -- have been done.  So that all

5   information is being shared, etc.

6   **Q.**    Is this an important part of your work?

7   **A.**    Yes.

8   **Q.**    Why is that?

9   **A.**    It's a document that we always issue as part of the audit

10  process.  It links into auditing standards and it's a document

11  that we have to have before we sign the audit or review

12  opinion.

13  **Q.**    Will Deloitte sign an audit or review opinion without

14  this?

15  **A.**    No.

16  **Q.**    If one of the representations in here is not true, is that

17  relevant?

18  **A.**    Yes, it is.  Yes.

19  **Q.**    Why is that?

20  **A.**    Well, if it's not true, then it should not be signed.

21  **Q.**    Let me draw your attention to the first paragraph.  Down

22  at the bottom, it says, "We are aware that under Section 501 of

23  the Companies Act 2006 it is an offense to mislead a company

24  auditor."  Do you see that?

25  **A.**    I do, yes.

**WELHAM - DIRECT / LEACH**

1  Q.   What is the Companies Act?

2  A.   The Companies Act is essentially UK law in relation to

3  corporates or companies.

4  Q.   And what is meant by "an offense"?

5  A.   Wrongdoing, I guess.

6  Q.   Is that a crime?

7  A.   Yes.

8  Q.   Why does Deloitte include this line in the management rep

9  letter?

10  A.   It's part of the standard wording that we would always use

11  because it's very relevant in relation to this document.

12  Q.   Why does Deloitte always use this?

13  A.   Because ultimately this is driven by the facts that you're

14  representing that you're not misleading the auditor.

15  Q.   Further below, it says, "We confirm to the best of our

16  knowledge and belief the following representations."  Do you

17  see that?

18  A.   Yes.

19  Q.   And then there's something called "general

20  representations."  What does that mean?

21  A.   So the general representations are paragraphs or points

22  that we would have on all representation letters.

23  Q.   And does that contrast with something called "specific

24  representations"?

25  A.   Yes.

WELHAM - DIRECT / LEACH

1  Q.   What are those?

2  A.   Those are the ones that are more tailored, if you like, to

3  the company.

4  Q.   The first representation here under financial statements,

5  it says, "We understand and have fulfilled our responsibilities

6  for the preparation of the financial statements in accordance

7  with applicable financial reporting framework."  Do you see

8  that?

9  A.   Yes.

10  Q.   What is meant by this representation?

11  A.    It's essentially saying that management have fulfilled all

12  their responsibilities and have prepared the financial

13  statements in accordance with the relevant accounting standards

14  which for this company is IFRS, but they've also complied with

15  UK law and here that's Companies Act 2006.

16  Q.   Is it Deloitte's responsibility to prepare the financial

17  statements?

18  A.   No, it's not.

19  Q.   Whose responsibility is that?

20  A.   That's the responsibility of management.

21  Q.   Would you say management is entitled to rely on Deloitte?

22  A.   No.  Not -- not as part of their internal control, no.

23  Q.   On page -- if we could please look at page 6 -- I'm sorry.

24  Page 2, paragraph 6.

25       There's the heading "Information Provided."  Do you see

1  that?

2  **A.**   Yes.

3  **Q.**   And in paragraph 6, it reads, "We have provided you with

4  all relevant information and access as agreed in the terms of

5  the engagement letter and required by Sections 499 and 500 of

6  the Companies Act 2006."

7      What is this language getting at?

8  **A.**   Well those sections of the Companies Act essentially

9  require us to be given all information that's relevant for the

10  purposes of completing the audit.

11  **Q.**   And in paragraph 7, it says, "All transactions have been

12  recorded and are reflected in the financial statements and the

13  underlying accounting records."

14      What is that getting at?

15  **A.**   It's essentially completeness, so it's confirming that all

16  the transactions that have taken place in the company have been

17  accurately recorded.

18  **Q.**   Are you able to do your job, Mr. Welham, without complete

19  information?

20  **A.**   No, we're not.

21  **Q.**   Okay.  Let me draw your attention to some of the specific

22  representations down below.

23      In paragraph 16, do you see where it says, "No revenue

24  deals containing side letters of ongoing Autonomy performance

25  requirements that were excluded from the signed sales

1    contracts."

2         Do you see that?

3    **A.**    Yes, I do.

4    **Q.**    Okay.  Was this an important representation to you?

5    **A.**    Yes.

6    **Q.**    Sitting here today, do you think there's a typo in this

7    particular line?

8    **A.**    Yes.  I think it probably should say "or."

9    **Q.**    Okay.

10   **A.**    "Containing side letters or ongoing Autonomy performance."

11   **Q.**    Was this the representation that you were getting at in

12   the audit committee report that we looked at?

13   **A.**    Yes.

14   **Q.**    And why is it important for Deloitte to be assured that

15   there are no side letters or ongoing Autonomy performance

16   requirements?

17   **A.**    As we've talked about before, because it might be further

18   information that we need to be aware of that could impact

19   revenue.

20   **Q.**    Let me show you what is in evidence as Exhibit 1361.

21                    (Exhibit published to jury.)

22   **BY MR. LEACH:**

23   **Q.**    Do you see at the top the date December 31st, 2010?

24   **A.**    Yes.

25   **Q.**    And do you see the addressee is Tikit Limited?

**WELHAM - DIRECT / LEACH**

1   **A.**   Yes.

2   **Q.**   And the subject is "Letter confirming certain details

3   regarding KPMG International cooperative Tikit purchase order"?

4   **A.**   Yes.

5   **Q.**   Do you believe that to be a reference to the purchase

6   order that Deloitte tested?

7   **A.**   I believe it is, yes.

8   **Q.**   If we could please zoom out, please, and go to page 2.

9        Do you see the signature block for Sushovan Hussain?

10  **A.**   I do, yes.

11  **Q.**   Okay.  And do you see the initial "A" something after that

12  in the actual signature line?  Do you know whose signature that

13  is?

14  **A.**   I don't know.

15  **Q.**   Okay.  At the time of your year-end 2010 audit,

16  Mr. Welham, were you aware of this letter between Tikit and

17  Autonomy?

18  **A.**   No.

19  **Q.**   Do you consider this to be a side letter?

20  **A.**   Yes, I would.

21  **Q.**   Is this something that should have been disclosed to you

22  during the course of your audit?

23  **A.**   Yes, it is.

24  **Q.**   Is this letter relevant to your assessment of whether

25  revenue was appropriately recognized on the Tikit transaction?

WELHAM - DIRECT / LEACH

1    **A.**    It is relevant, yes.

2    **Q.**    Why is that?

3    **A.**    Well, we would need to assess what this -- what this --

4    impact this has on the revenue.

5    **Q.**    How would you go about doing that?

6    **A.**    We would go through the relevant paragraphs here and

7    consider what this means for the revenue, whether there's

8    changes to the actual revenue recognition that need to take

9    place.

10    **Q.**    If there are questions about what this means, do you

11    inquire of management?

12    **A.**    Yes.

13    **Q.**    Is that something you had the opportunity to do in your

14    audit for 2010?

15    **A.**    No, because we didn't see this letter.

16    **Q.**    If we could please go back to the audit committee report,

17    Exhibit 1509, page 6.

18                        (Exhibit published to jury.)

19    **BY MR. LEACH:**

20    **Q.**    Do you see at the bottom, there's a transaction relating

21    to VMS?

22    **A.**    Yes.

23    **Q.**    And do you see where it says, "In conjunction with this

24    deal, Autonomy has also sold 6 million of infrastructure

25    hardware to this customer."  Do you see that language?

1    **A.**    Yes.

2    **Q.**    And is this a transaction that Deloitte tested in the

3    course of its audit for 2010?

4    **A.**    Yes.

5    **Q.**    I've placed before you what has been marked as Exhibit

6    1417.

7         And I believe we've stipulated this is in evidence or can

8    come into evidence.

9              **THE COURT:**  Admitted.

10             (Trial Exhibit 1417 received in evidence)

11                  (Exhibit published to jury.)

12   **BY MR. LEACH:**

13   **Q.**    If I could please draw your attention, Mr. Welham, to page

14   22.  Does this appear to be Deloitte's testing of the VMS

15   hardware transaction?

16   **A.**    Yes, it does.

17   **Q.**    Let me draw your attention to the boxes at the top first.

18   Do you see the amount of 6 million, approximately 6 million?

19   **A.**    Yes.

20   **Q.**    Okay.  And if we could scroll down, please, to the

21   paragraph at the bottom, "hardware costs and shipping."

22        It's a little hard to read, Mr. Welham, but it appears to

23   say, "Autonomy did not have all the hardware specified" --

24   strike that.

25        As a general matter, what is Deloitte testing for here

**WELHAM - DIRECT / LEACH**

1  with respect to this hardware sale?

2  **A.**    So we're doing the various procedures to make sure that

3  the revenue can be recognized, so we'll look at the contract,

4  we'll look at delivery to ensure that there is a signed

5  agreement and that ultimately the product has been delivered.

6  **Q.**    Okay.  And did the Deloitte team at this time period

7  understand that some of the hardware for this transaction was

8  going to be purchased from a third party and some of it was

9  going to be from Autonomy's fixed assets?

10  **A.**    Yes.  I believe so.

11  **Q.**    Okay.  What are fixed assets?

12  **A.**    Those are your things that you have on your balance sheet,

13  so it could be proxy plant equipment or computers or etc.

14  **Q.**    Things you own and have on your balance sheet?

15  **A.**    Yes.

16  **Q.**    If we could please look at the next page, page 23, and if

17  we could please expand the paragraph "The remaining hardware

18  were taken from Autonomy warehouse."

19      Mr. Welham, could you please take a moment to read this

20  and then explain what this is getting at.

21  **A.**    (Witness reviews document.)

22      So essentially this deal was satisfied by new third-party

23  hardware that was purchased but also some hardware that

24  Autonomy already owned as part of -- within their warehouse,

25  and this paragraph is essentially talking through that and then

WELHAM - DIRECT / LEACH

1    talking through the procedures that had been done on that to

2    recognize those assets being sold from Autonomy's own premises,

3    if you like, as part of this transaction.

4    Q.    Okay.  So in the second line where it says, "Per

5    Autonomy's schedule, the gross cost was 3.5 million with NBV of

6    497,000."  What is that getting at there?

7    A.    So in relation to fixed assets, you'll buy a fixed asset

8    for a certain amount of money and then you have to depreciate

9    that to the P&L, to the profit and loss account, over a period

10   of time its useful economic life.

11         So it's saying that the gross cost of those assets, so

12   when they're originally purchased, was $3.5 million, and now

13   the remaining value, if you like, that sits on the balance

14   sheet after depreciation is just below $500,000.

15   Q.    Is this a reference to used hardware?

16   A.    I would imagine so, yes.

17   Q.    And it's used hardware that was once worth 3.5 million but

18   now worth 497,000?  Is that your understanding?

19   A.    That's what it says, yes.

20   Q.    Further on, it says, "Deloitte has reviewed confirmation

21   from Peter Menell, CTO, independent of finance that has -- that

22   at 31/12/2010, these hardware were assigned to VMS and VMS has

23   acknowledged the passing of hardware title."  And then it says

24   "see Q4-1830a2."  What do you understand that to be?

25   A.    So we needed to test that the actual hardware had been

1  assigned to VMS, and Pete Menell or Peter Menell, as it says

2  here, who was the chief technical officer, he was independent

3  of finance and had knowledge of this transaction, so we had

4  discussions with him and then we did some further procedures by

5  picking a sample of five items.

6  Q.   Why was this information relevant to you?

7  A.   To ensure that the transaction was accounted for

8  correctly.

9  Q.   Okay.  And the -- my other question there is a reference

10 to something in red on the screen, Q4-813O.  Can you explain to

11 the jury what that is?

12 A.   That's another one of our revenue testing working papers.

13 Q.   Let's look at what is marked as Exhibit 1530 -- in

14 evidence as 1530.

15                   (Exhibit published to jury.)

16 BY MR. LEACH:

17 Q.   Mr. Welham, do you believe this to be the confirmation

18 that is linked in the work paper we just observed?

19 A.   Yes.  It appears to be.

20 Q.   Okay.  Let's please look at page 2.  Up at the top, do you

21 see an email from Steve Chamberlain to Peter Menell with a copy

22 to Mr. Hussain and Poppy Prentis?

23 A.   Yes.

24 Q.   Okay.  Poppy Prentis was somebody who came from Deloitte

25 but is now at Autonomy?

1   **A.**   I believe she is, yes.

2   **Q.**   And the subject is "VMS, Amgen and BofA."  Do you see

3   that?

4   **A.**   Yes.

5   **Q.**   And Mr. Chamberlain wrote, "Pete, apparently auditors

6   still need confirmation from you or one of your team that

7   assets had been assigned to the above customers as at 31

8   December 2010."

9        What did you understand that to mean?

10  **A.**   It means that we still haven't had confirmation as yet and

11  we're asking for it because it's additional evidence that

12  supports the accounting.

13  **Q.**   Okay.  Please go back to page 1.  And down at the bottom,

14  do you see where Mr. Menell writes, "Yes, I can confirm the

15  assets were assigned as described" -- "below," I think is

16  misspelled.  "The logistics of the assignment were also covered

17  in audit review with myself and DT staff a week or so back.  On

18  ferry, but any issues, give me a bell."

19        Do you see that?

20  **A.**   I do, yes.

21  **Q.**   And do you forward this on to Ms. Anderson and Tom Murray

22  from Deloitte?

23  **A.**   Yes.

24  **Q.**   And if -- and you're doing that because they're members of

25  your team at the time interested in this transaction?

WELHAM - DIRECT / LEACH

1  **A.**   Correct, yes.

2  **Q.**   Okay.  If it were not true that the assets were assigned

3  to VMS, would that be relevant to your assessment for the --

4  recognizing $6 million in revenue on this transaction?

5  **A.**   Yes, it would be.

6  **Q.**   Why is that?

7  **A.**   Because the transaction has been accounted for in that

8  way, so if that's not correct, then the accounting would not be

9  correct.

10  **Q.**   If VMS bargained for new hardware, not used hardware,

11  would that be relevant to you?

12  **A.**   Yes.

13  **Q.**   Why is that?

14  **A.**   Well, because that's different to what has been shown

15  here.

16  **Q.**   If Autonomy continued to use these assets that had

17  purportedly been assigned to VMS, would that be relevant to

18  you?

19  **A.**   Yes.

20  **Q.**   Why is that?

21  **A.**   Because we're told that they have transferred ownership

22  and title to VMS.

23  **Q.**   And if Autonomy is using this used hardware, does that

24  call into question whether the risks and rewards have been

25  transferred?

1    **A.**   It does, yes.

2         **MR. LEACH:**  Your Honor, this might be a convenient

3    stopping point.

4         **THE COURT:**  Ladies and gentlemen, we are going to take

5    our recess.  Remember the admonition given to you:  Don't

6    discuss the case, allow anyone to discuss it with you, form or

7    express any opinion.

8         Quarter of 11:00.

9         (Proceedings were heard out of presence of the jury:)

10        **THE COURT:**  The jury has retired.

11        About where are we in this examination?

12        **MR. LEACH:**  I have about another hour, Your Honor,

13    hour and fifteen.

14        **THE COURT:**  Okay.  Thank you.

15                    (Recess taken at 10:28 a.m.)

16              (Proceedings resumed at 10:43 a.m.)

17        (Proceedings were heard out of the presence of the jury:)

18        **THE COURT:**  So for scheduling purposes, I have a

19    hearing at 2:00 o'clock tomorrow, and I just have to do it so I

20    was going to go until 2:00 o'clock tomorrow with this jury

21    depending on where you are, and so we might give them a half an

22    hour for lunch, or something like that.  I don't know where you

23    are and you don't know where you're necessarily going to be.

24        Okay.  But I'm going to tell them they'll be excused at

25    2:00 tomorrow because I have to do my criminal matter.

 1          **MR. LEACH:**  Okay.  Your Honor, thank you.

 2          **THE COURT:**  Everybody seems to be terribly

 3    disappointed with that.

 4          **MR. KEKER:**  I'm crushed, Your Honor.

 5          **THE COURT:**  Crushed.  Crushed.

 6      Okay.  Bring in the jury.

 7          **THE CLERK:**  Okay.

 8      (Proceedings were heard in the presence of the jury:)

 9          **THE COURT:**  Okay.  Please be seated.

10      Let the record reflect all jurors are present, the parties

11    are present.

12      Ladies and gentlemen of the jury, for scheduling purposes,

13    tomorrow, as you know, we're meeting.  However, we will adjourn

14    tomorrow not later than 2:00 p.m.  We may take a shorter lunch

15    hour depending on where we are with witnesses and so forth.

16      But, in any event, I have a criminal matter at 2:00, and

17    so we will just make sure that you're out of here by

18    2:00 tomorrow afternoon for planning purposes.

19      Okay.  You may proceed.

20          **MR. LEACH:**  Thank you, Your Honor.

21    **Q.**  If we could -- Mr. Welham, one more transaction in the

22    fourth quarter of 2010 before I move forward.

23      Could we please display what is in evidence as

24    Exhibit 1415?  And if we could please go --

25          **MR. LEACH:**  Oh.  I think this is covered by our

 1  stipulation?

 2          **THE COURT:**  Okay.  Admitted.

 3      (Trial Exhibit 1415 received in evidence)

 4          **MR. LEACH:**  And if we could please go to page 25.

 5  **Q.**  Mr. Welham, is this Deloitte's revenue testing for a

 6  transaction involving MicroTech and the Department of the

 7  Interior?

 8  **A.**  (Witness examines document.)  Yes, it looks like it.

 9  **Q.**  Okay.  And were you familiar with MicroTech in this time

10  period?

11  **A.**  Yes.

12  **Q.**  Okay.  I draw your attention to the paragraph beginning

13  "We have reviewed the original VAR agreement."  And do you see

14  where it says (reading):

15          "The purchase order contains a clause that is, as of

16      Q4, common to almost all VAR purchase orders that is

17      reviewed in," there's a link to the work papers, "and is

18      deemed not to restrict the upfront recognition of

19      revenue."

20      Do you see that language?

21  **A.**  Yes, I do.

22  **Q.**  And is that consistent with your memory that there was a

23  change at some point to the wording of some of the agreements

24  between Autonomy and the value-added resellers?

25  **A.**  Yes.

WELHAM - DIRECT / LEACH

1   **Q.**   Okay.  I'd like to display for you what is in evidence as
2   Exhibit 1359.
3       Does this appear to be the purchase order between
4   MicroTech and Autonomy with the Department of Interior as the
5   end user?
6   **A.**   (Witness examines document.)  Yes.
7   **Q.**   Okay.  I draw your attention to the bottom portion of the
8   document where it says (reading):
9           "Although end user and VAR currently anticipate
10          entering into such a license agreement, in the unlikely
11          event end user instead enters into a direct agreement with
12          Autonomy, then VAR shall distribute the software to end
13          user upon receipt of a distribution notice."
14      Do you see that?
15  **A.**   I do, yes.
16  **Q.**   And is that part of the language that Deloitte considered
17  at the end of the fourth quarter of 2010?
18  **A.**   Yes, it is.
19  **Q.**   If it were untrue that end user and VAR currently
20  anticipate entering into such a license agreement, would that
21  be relevant to your assessment of whether it's appropriate to
22  recognize revenue?
23  **A.**   Yes, it would.
24  **Q.**   Why is that?
25  **A.**   Because it's different than what we were told and

 1  understood at the time.

 2  **Q.**   What elements of IAS 18 does that potentially impact?

 3  **A.**   Well, it would essentially mean that the risks and rewards

 4  have not necessarily passed.

 5  **Q.**   Would you please look at what is in evidence as

 6  Exhibit 1501, which is in evidence as an e-mail from Leo He

 7  with a copy to you and others at Deloitte.  Do you see that at

 8  the top?

 9  **A.**   (Witness examines document.)  Yes.

10  **Q.**   And do you see Mr. He is writing "Confirmation from

11  Microtect"?

12  **A.**   Yes.

13  **Q.**   Okay.  I draw your attention to the confirmation on

14  page 4.  What's this document again?

15  **A.**   This is a confirmation from MicroTech, which is a customer

16  of Autonomy, confirming that certain invoices are valid and

17  unpaid.

18  **Q.**   And do you see the invoices dated December 31st, 2010, in

19  amounts of $1,050,000?

20  **A.**   Yes, I do.

21  **Q.**   And is that $4 million total consistent with the

22  Department of Interior transaction, the MicroTech-Department of

23  Interior transaction that we looked at?

24  **A.**   Yes.  I assume so, yes.

25  **Q.**   Okay.  Please look at page 2.

**WELHAM - DIRECT / LEACH**

1   A.    (Witness examines document.)

2   Q.    Do you see where it says (reading):

3         "The items listed above were properly charged to our

4         account and were unpaid and there are no side letters or

5         other agreements in respect of the subject matter of this

6         request"?

7         Do you see that?

8   A.    I do, yes.

9   Q.    We talked a little bit about side letters.  Are you

10  familiar with side agreements?

11  A.    It's essentially the same thing.  So anything that's

12  outside of the usual agreement.

13  Q.    Okay.  Can it be oral?

14  A.    It could well be, yes.

15  Q.    And why are side agreements relevant to you?

16  A.    Because it might impact the actual agreements that the

17  revenue recognition is based upon.

18  Q.    Okay.  If there is a side agreement in respect of this

19  transaction, is that relevant to your assessment of revenue?

20  A.    Yes, it would be.

21  Q.    Further down below it says (reading):

22        "We acknowledge that Autonomy Corporation retains no

23        continuing managerial involvement in the delivery of this

24        product or service other than stipulated in the license

25        agreement."

1        Do you see that?

2   A.   Yes.

3   Q.   Why did Deloitte add this language to the confirmation?

4   A.   Just to confirm that there were no further requirements,

5   if you like, for Autonomy to complete in order to deliver and

6   recognize revenue on the products.

7   Q.   If that statement is untrue, is that relevant to your

8   assessment of whether revenue is appropriately recognized?

9   A.   It is, yes.

10  Q.   Okay.  If Autonomy still has to sell this software, is

11  that relevant to you?

12  A.   Yes.

13  Q.   Why is that?

14  A.   Well, if they still have to sell it, they haven't yet sold

15  it.

16  Q.   Okay.  If Autonomy has got to complete this deal to the

17  Department of Interior, is that relevant to you?

18  A.   Yes, it is.

19  Q.   Let's move forward in time, Mr. Welham, to the first

20  quarter of 2010.

21       And I've placed before you what has been marked as

22  Exhibit 1778.  Is this a copy of Deloitte's report to the Audit

23  Committee for the first quarter of 2011?

24  A.   (Witness examines document.)

25            THE COURT:  Admitted.

1              (Trial Exhibit 1778 received in evidence)

2              **THE WITNESS:**  Yes, it would appear to be.

3    **BY MR. LEACH:**

4    **Q.**   Okay.  Please look at page 4.

5    **A.**   (Witness examines document.)

6    **Q.**   Do you see the row "Potential Adjustments"?

7    **A.**   Yes.

8    **Q.**   And it says (reading):

9              "We have used materiality of 5.5 million for the

10        quarterly income statement."

11        What does that mean?

12   **A.**   So when you conduct an audit or review, we set what we

13   call a materiality, so that's a monetary threshold that we use

14   effectively to calculate things like sample sizes, but it also

15   means that we consider potentially adjustments.  So anything

16   that is creating materiality we believe would change the user's

17   view of the accounts.

18   **Q.**   Okay.  And below that it says (reading):

19             "Known adjustments for Q1 2011 reduce profit for tax

20        by 1.8 million."

21        Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   What does that mean?

24   **A.**   So it's saying that the adjustments that we have

25   identified in Q1 2011, which are not judgmental, they're known

1  adjustments, so that means factual adjustments, reduce profit

2  before tax by 1.8 million.

3  **Q.**    So if you've got 5.5 million for materiality, you've

4  already identified 1.8 million in adjustments that Deloitte

5  would make to these financial statements?

6  **A.**    Yes.

7  **Q.**    Okay.  Let's look at page 3.  Do you see down at the

8  bottom the language about side letters or ongoing Autonomy

9  performance requirements?

10  **A.**    Yes, I do.

11  **Q.**    Is this another example where you are confirming with

12  management there are no side agreements relating to revenue

13  recognition?

14  **A.**    Yes.

15  **Q.**    Okay.  During this 2009-2011 time period, did you interact

16  with Sushovan Hussain, the defendant?

17  **A.**    I did, yes.

18  **Q.**    Okay.  Can you quantify for us the level of interaction

19  you had with Mr. Hussain?

20  **A.**    When you say "quantify," you mean a percentage of my time

21  or --

22  **Q.**    Give us a sense of your level of direct interaction with

23  Mr. Hussain.

24  **A.**    I would speak to Mr. Hussain during the course of the

25  reviews and the audit as and when required, but he wasn't my

1  key point of contact.  My key point of contact was Steve

2  Chamberlain.

3  **Q.**  Okay.  Did you attend Audit Committee meetings?

4  **A.**  I did, yes.

5  **Q.**  Where Mr. Hussain was presenting?

6  **A.**  Yes.

7  **Q.**  Where this report is -- would -- this and reports like it

8  would be gone over?

9  **A.**  Yes.

10  **Q.**  Okay.  I've placed before you what has been marked as

11  Exhibit 1762.  Is this a true and correct copy of an e-mail

12  between you and Mr. Hussain dated April 12th, 2011?

13          **THE COURT:**  Admitted.

14      (Trial Exhibit 1762 received in evidence)

15          **THE WITNESS:**  (Witness examines document.)

16  **BY MR. LEACH:**

17  **Q.**  Are you familiar with this, Mr. Welham?

18  **A.**  Can I just read it for a minute?

19  **Q.**  Yes, please.

20  **A.**  Sorry.

21      (Witness examines document.)  Yes.

22  **Q.**  Okay.  Is this an example of -- is this a typical example

23  of you interacting with Mr. Hussain during the course of your

24  reviews and audits?

25  **A.**  Yes.  It's an example, yes.

1  **Q.**   Okay.  Let me focus on the second bullet in your e-mail to

2  Mr. Hussain (reading):

3         "Total sales through resellers this quarter circa

4      30 million.  We are working through these.  We have an

5      issue with the deals signed with Discover Tech for end

6      user FINRA and end user Prisa."

7      Do you see that?

8  **A.**   Yes.

9  **Q.**   And are the Discover Tech, FINRA, and Prisa deals two

10  transactions that Deloitte was testing in and around this time

11  period?

12  **A.**   They were, yes.

13  **Q.**   You wrote (reading):

14         "These are identical, i.e., products sold, number of

15      users, et cetera, but the purchase price is 1.1M versus

16      3.8M.  We need help understanding how this works from a

17      fair value and arm's length perspective."

18      Do you see that?

19  **A.**   I do, yes.

20  **Q.**   What were you getting at there, Mr. Welham?

21  **A.**   We became aware when going through the revenue or for

22  these two particular transactions, as it says here, the product

23  being sold and the number of users was the same for the two end

24  users but with the same VAR but the price paid was quite

25  different.

1   **Q.**   And when you say "We need help understanding how this

2   works," were you essentially asking Mr. Hussain what's going on

3   with these two transactions?

4   **A.**   Yes.  We needed to understand the background for these two

5   transactions, yes.

6   **Q.**   Why did you need to understand the background for these

7   two transactions?

8   **A.**   Just because it looked odd.  The two amounts were not so

9   different.

10  **Q.**   Please look at what has been marked as Exhibit 1767.

11         **MR. LEACH:**   I offer this into evidence as an e-mail

12  between Mr. Welham and Mr. Chamberlain and Hussain.

13         **THE COURT:**   Admitted.

14  (Trial Exhibit 1767 received in evidence)

15  **BY MR. LEACH:**

16  **Q.**   Does this appear to be Mr. Chamberlain's response to your

17  inquiry about FINRA and Prisa with a copy to Mr. Hussain?

18  **A.**   (Witness examines document.)  Yes, it does.  Yes.

19  **Q.**   What is the date of this e-mail?

20  **A.**   The 13th of April 2011.

21  **Q.**   Okay.  Mr. Chamberlain writes to you (reading):

22         "Lee -

23         "It is not uncommon for the same software to be sold

24   to different customers for very different prices.  The

25   buying decision is all around ROI."

What is ROI?

**A.**    Return on investment.

**Q.**    He then wrote (reading):

"I would also expect that the resale by reseller to end user to involve different software ultimately. They've acquired effectively a job lot from us to make sure they have everything they need but would expect that in each end sale they sell a different set of the software we have delivered to them."

What did you understand that to mean?

**A.**    That they had all the software that they might need but that the sale to the end user may well be different elements of that.  They're all part of the package that's being sold.  So, in other words, he's saying to me that the two deals will not ultimately end up being the same when sold to the end user.

**Q.**    But it would still involve the same software that had been delivered to Discover Tech?

**A.**    Yes.

**Q.**    So if Discover Tech got 100 widgets, they might sell some smaller combination of that to Prisa or FINRA?

**A.**    Yes.

**Q.**    And did this make sense to you at the time?

**A.**    Yes, it did.  Yes.

**Q.**    Okay.  And was this important information for your understanding about the Prisa transaction?

1    **A.**    Yes.

2    **Q.**    Why is that?

3    **A.**    Well, because it gave a reason for the question that we

4    raised, "Why were the amounts different?"  So it was just

5    helping us understand the commercial background for the

6    transactions and, yes, that made sense.

7    **Q.**    Why do you need to understand the commercial background

8    behind this transaction?

9    **A.**    We go through the revenue transactions and perform various

10   procedures; and in this case because something stood out that

11   was unusual, then we asked further questions about the

12   commercial reason for that.

13            **MR. LEACH:**  Your Honor, I offer into evidence

14   Exhibit 1709, which is Deloitte's revenue testing for the

15   fourth quarter -- or first quarter of 2011.

16            **THE COURT:**  Admitted.

17       (Trial Exhibit 1709 received in evidence)

18   **BY MR. LEACH:**

19   **Q.**    Mr. Welham, could you please look at what is at page 26?

20   **A.**    (Witness examines document.)

21   **Q.**    Does this appear to be Deloitte's revenue testing for the

22   Prisa transaction involving Discover Technologies?

23   **A.**    Yes.

24   **Q.**    And to the right there's a contract date, March 11, 31.

25   Why does -- if we could move to the right, please, on the

1   screen.

2       Why does Deloitte record the contract date?

3   **A.**   For a couple of reasons we talked about earlier on.  So

4   making sure that this contract had been signed in the quarter

5   in question.

6   **Q.**   Further down below there's some details and this appears

7   to involve software called Introspect Discovery Solution.  Do

8   you see that?

9   **A.**   Yes.

10  **Q.**   And this is the software that Mr. Chamberlain and Hussain

11  were representing would ultimately be on-sold to Prisa; is

12  that --

13          **MR. DOOLEY:**  Objection.  Mischaracterizes the e-mail

14  from Mr. Chamberlain.

15  **BY MR. LEACH:**

16  **Q.**   The e-mail involving Mr. Chamberlain with a copy to

17  Mr. Hussain, they were essentially saying that Discover Tech

18  would be on-selling Introspect software to Prisa; is that fair?

19  **A.**   Did it mention -- I didn't read all of the e-mail, so I

20  don't know if it did mention Introspect, but I would imagine it

21  would be the same because this is the audit of that particular

22  transaction.

23  **Q.**   This is the transaction they're talking about?

24  **A.**   Yes, I believe so.

25  **Q.**   Okay.  At the time Deloitte was conducting its testing of

1    this transaction, did you have any reason to believe that the

2    agreement between Prisa and Discover Technologies was

3    backdated?

4    A.   No.

5    Q.   Would you please -- could we please display for Mr. Welham

6    what is in evidence as Exhibit 1725?

7         I'm showing you, Mr. Welham, an e-mail of an instant

8    message involving Malcolm Hyson and David Truitt.  Are you

9    familiar with David Truitt?

10   A.   I'm aware of his name, yes.

11   Q.   Okay.  And I draw your attention to the line where

12   Mr. Truitt appears to write (reading):

13            "Autonomy wants me to PDF an order and said that it

14        will not change the date on the document."

15        Do you see that?

16   A.   Yes, I do.

17   Q.   Was this information you were aware of at the time of your

18   audit or review?

19   A.   No.

20   Q.   If this Discover Tech/Prisa transaction were agreed to in

21   April of 2011, would it be appropriate to recognize revenue?

22   A.   No.

23   Q.   Okay.  If the agreement were executed in April of 2011,

24   would it be appropriate to recognize revenue?

25   A.   No.

WELHAM - DIRECT / LEACH

1   **Q.**   Why is that?

2   **A.**   Because as we said earlier on, if it's a transaction

3   that's happened in April 2011, then it's not part of that

4   quarter which ended on the 31st of March 2011.

5          **MR. LEACH:**   Your Honor, I offer into evidence

6   Exhibit 1763, which is an e-mail from Mr. Chamberlain to

7   Mr. Hussain on April 12th, 2011.

8          **THE COURT:**   Admitted.

9          (Trial Exhibit 1763 received in evidence)

10  **BY MR. LEACH:**

11  **Q.**   Mr. Welham, do you see the "From" and "To" line up at the

12  top between Mr. Chamberlain and Mr. Hussain?

13  **A.**   Yes, I do.

14  **Q.**   And the date of this is April 12th, 2011?  Do you see

15  that?

16  **A.**   Yes.

17  **Q.**   Is that roughly the date where you are asking Mr. Hussain

18  about the commercial rationale for the Prisa transaction that

19  we observed in Exhibit 1762?

20  **A.**   Yes.  I see that's an American date.  Yes.  Yeah.  Yes.

21  **Q.**   Okay.  This reads (reading):

22          "Three options:

23          "Recognize Prisa, defer 3.6M hardware."

24      And then there's some numbers to the right.  Do you see

25  that in the first line?

1  **A.**   Yes.  Yes, I do.

2  **Q.**   And in line 2 do you see where it says (reading):

3        "Defer Prisa, recognize 3.6M HW"?

4       And then some numbers to the right.  Do you see that?

5  **A.**   Yes.

6  **Q.**   And do you see a third option of recognizing something

7  called BBC, deferring Prisa, and recognizing 2M HW?  Do you see

8  that?  And do you see the numbers to the right?

9  **A.**   I do, yes.

10  **Q.**   Okay.  And the 218.1M, I recognize you're not on this,

11  Mr. Welham, but is that roughly consistent or in the ballpark

12  for Autonomy's revenues for this quarter?

13  **A.**   I would imagine so, but I don't know the revenue number

14  off the top of my head, no.

15  **Q.**   Okay.  Do you interpret the numbers to the right -- the

16  88, 86, and 87 percents -- to be a reference to gross margin?

17  **A.**   I would expect so.

18  **Q.**   And then the numbers to the right, do those appear to be

19  references to earnings per share?

20  **A.**   Most likely, yes.

21  **Q.**   Okay.  Was this information that you had at the time of

22  your review, Mr. Welham?

23  **A.**   No, it was not.  No.

24  **Q.**   Okay.  Are you troubled by this e-mail?

25  **A.**   Yes, I am.

1    **Q.**    Why?

2    **A.**    Because it's dated sometime after the period ends but

3    there's still debates about what is going to be recognized,

4    which shouldn't really be a matter of judgment because these

5    items would either be delivered and recognized in the quarter

6    or not.  It's quite a binary item.

7    **Q.**    When you say it's a binary item, what do you mean?

8    **A.**    Well, when you deliver software and have a signed

9    contract, then you do it on a date and you deliver it, and the

10   date that you do that is the date that you recognize the

11   revenue.  So it would be -- I couldn't think of a reason why 12

12   days after the quarter ends you would still be debating how to

13   recognize that revenue and when to recognize it.

14   **Q.**    And with respect to the options of deferring hardware or

15   recognizing hardware, does that also trouble you?

16   **A.**    Yes, it does.

17   **Q.**    Why is that?

18   **A.**    Because, again, hardware is a good that you deliver at a

19   point in time.  So, once again, if you're 12 days after your

20   quarter ends and you're debating whether you should have

21   recognized or deferred, that would seem very unusual to me.

22   **Q.**    Are you familiar with the term "managed earnings,"

23   Mr. Welham?

24   **A.**    I am, yes.

25   **Q.**    What does that mean?

1  **A.**  It means doing things to ultimately book things in a

2  particular period to meet expectations.

3  **Q.**  At the time of your audits and reviews, did you have any

4  sense that hardware sales were being used to manage earnings?

5  **A.**  No.

6  **Q.**  And does that raise any issues to you from an accounting

7  perspective?

8  **A.**  Well, this is -- this more generally raises an issue

9  around what we're being told versus what we're seeing in the

10  books and records.

11  **Q.**  I'd like to focus on a different transaction in this

12  quarter, Mr. Welham, involving Capax.  And if you could please

13  look at what has been marked --

14      **MR. LEACH:**  Well, I offer into evidence Exhibit 1708,

15  Deloitte's revenue testing for additional transactions in this

16  quarter?

17      **THE COURT:**  Admitted.

18      (Trial Exhibit 1708 received in evidence)

19      **MR. LEACH:**  And if we could please look at page 22.

20  **Q.**  Mr. Welham, does this appear to be Deloitte's testing for

21  a $1.6 million transaction with Capax recognized in the first

22  quarter of 2011?

23  **A.**  (Witness examines document.)  Yes.

24  **Q.**  And I draw your attention to the contract details.  Do you

25  see where it says (reading):

1              "Second amendment to the original dated 31/3/2009 was

2         signed between Autonomy and Capax Discovery"?

3         Is that the U.K. convention for the date March 31st, 2009?

4    A.   It is, yes.

5    Q.   Okay.  So this $1.6 million transaction is an amendment to

6    a 2009 deal between Capax and Autonomy; is that what's being

7    described here?

8    A.   I believe so, yes.

9    Q.   Okay.  And the software relates to EDD; is that correct?

10   A.   (Witness examines document.)  Yes.  That's listed below.

11   Q.   Mr. Welham, I draw your attention to the paragraph below

12   where it says (reading):

13             "It is noted that in Q1 2009 a 7.5 million revenue

14        deal was signed with Capax for the above license."

15        Do you see that?

16   A.   Yes.

17   Q.   And then (reading):

18             "PDW Steve Chamberlain" --

19        Does "PDW" mean per discussion with?

20   A.   Yes.

21   Q.   (reading)

22        -- "the current Autonomy amendment allows the Capax

23        U.K. data center to connect to the described software;

24        whereas, the previous deal was allowing the U.S. data

25        center to do so and, therefore, it represents

 1          additional rights to Capax and, therefore, can be

 2          recognized as revenue."

 3          Is that a fair summary of Deloitte's understanding of the

 4     details of this transaction and the commercial rationale?

 5     **A.**   Yes.  That's our description of it, yes.

 6     **Q.**   Okay.  And this was revenue taken in the first quarter of

 7     2000 -- first quarter of 2011, this 1.6 million?

 8     **A.**   Yes.

 9               **MR. LEACH:**  Okay.  I offer into evidence Exhibit 1793.

10               **THE COURT:**  Admitted.

11          (Trial Exhibit 1793 received in evidence)

12     **BY MR. LEACH:**

13     **Q.**   Mr. Welham, does this appear to be the management

14     representation letter for the first quarter of 2011?

15     **A.**   (Witness examines document.)  Yes.

16     **Q.**   And is that Mr. Hussain's signature on page 3?

17     **A.**   I believe it is, yes.

18     **Q.**   Okay.  And up at the top there's some language (reading):

19               "We confirm that the above representations are made

20          on the basis of adequate inquiries of management and staff

21          (and where appropriate, inspection of evidence) sufficient

22          to satisfy ourselves that we can properly make each of the

23          above representations to you."

24          Why does Deloitte require that?

25     **A.**   (Witness examines document.)  So it's -- it's just

1  confirming that all the representations that have been made

2  above on the basis of, as it says, adequate inquiries of

3  management and staff so that they're essentially saying they

4  can make those representations.

5  **Q.**   Okay.  If we could go back to page 2, paragraph 16.

6       Do you see the representation relating to side letters and

7  ongoing Autonomy performance requirements?

8  **A.**   I do, yes.

9  **Q.**   And is this consistent with you seeking assurance from

10  management that there are no side agreements with respect to

11  the contracts Autonomy is recognizing revenue on?

12  **A.**   It is, yes.

13  **Q.**   Please look at what is in evidence as Exhibit 1731.

14  **A.**   (Witness examines document.)

15  **Q.**   Are you familiar with this form of document, Mr. Welham?

16  **A.**   I am, yes.

17  **Q.**   Okay.  Is this another example of the confirmation letters

18  that Deloitte sends to some of Autonomy's counterparties?

19  **A.**   Yes.

20  **Q.**   Okay.  And I draw your attention to the top portion of

21  the -- and is this a confirm from Capax?

22  **A.**   It is, yes.

23  **Q.**   I draw your attention to the invoices, the first two at

24  the top.  Do you see the invoice date March 31st, 2009, and the

25  amounts of 968,750?

1    **A.**    I do, yes.

2    **Q.**    Okay.  And is March 31st, 2009, the date of the initial

3    agreement related to EDD referenced in the work papers we just

4    saw?

5    **A.**    I would imagine so, yes.

6    **Q.**    Okay.  Please look at the second page.

7    **A.**    (Witness examines document.)

8    **Q.**    Do you see the last two entries dated March 31st, 2011, in

9    the amount of 840,000 each?

10    **A.**    I do, yes.

11    **Q.**    And do those two add up to 1.6 million?

12    **A.**    Yes.

13    **Q.**    And that's the amount of the new transaction with Capax

14    relating to EDD; is that fair?

15    **A.**    It would appear to be, yes.

16    **Q.**    Okay.  And further below it says (reading):

17              "There are no side letters or other agreements in

18        respect of the subject matter of this request."

19        Do you see that?

20    **A.**    Yes.

21    **Q.**    Is the fact that no side letters or other agreements were

22    listed in here important to you in the course of your review?

23    **A.**    Yes, it is.

24    **Q.**    Further below it says (reading):

25              "We acknowledge that Autonomy Corporation retains no

WELHAM - DIRECT / LEACH

1          continuing managerial involvement in the delivery of this

2          product or service other than stipulated in the license

3          agreement."

4          Do you see that?

5   **A.**   I do.

6   **Q.**   Was that language important to you?

7   **A.**   Yes, it was.

8   **Q.**   Why?

9   **A.**   Once again, it just goes back to IAS 18, the revenue

10  standard.   It just confirms that Autonomy don't have to do

11  anything more.   Ultimately they've sold this license and

12  they've transferred the risks and rewards of ownership.

13  **Q.**   So if Autonomy still had to sell the licenses, that would

14  be relevant to you?

15  **A.**   Yes, it would.

16  **Q.**   I'd like to show you what is in evidence as Exhibit 1733.

17  Do you see up at the top this appears to be an e-mail from Joel

18  Scott to John Baiocco?

19  **A.**   Yes.

20  **Q.**   And do you see the attachment is "Capax Amend 2 to License

21  and Distribution Agreement"?   Do you see that reference?

22  **A.**   Yes, I do.

23  **Q.**   Okay.   I draw your attention to page 2.

24          If we could please put that on the screen.

25          And do you see the absence of the date up at the top

1    before 2011?

2    A.    Yes.

3    Q.    Okay.  And the payment schedule for c, do you see the

4    payments, $840,000, consistent with the audit confirm in the

5    work papers that we saw?

6    A.    Yes.

7    Q.    And I draw your attention to page 3.

8    A.    (Witness examines document.)

9    Q.    Am I right this appears to be unsigned?

10   A.    It's not signed, no.

11   Q.    Okay.  If you could now please look at what is in evidence

12   as Exhibit 1750.

13        Do you see the e-mail from Mr. Baiocco to Mr. Hussain at

14   the top?

15   A.    (Witness examines document.)  Yes.

16   Q.    And if we look at pages 2 and 3, does this appear to

17   include an executed version of the agreement?

18   A.    (Witness examines document.)  It would appear so, yes.

19   Q.    Okay.  At the time of your review, Mr. Welham, did you

20   have any reason to believe that this agreement was reached at

21   some point in April of 2011?

22   A.    No.

23   Q.    Did you have any reason to believe it was executed in

24   April of 2011?

25   A.    No.

WELHAM - DIRECT / LEACH

1   Q.   Would that have mattered to you?

2   A.   Yes.

3   Q.   Why is that?

4   A.   Again, because it goes to the cutoff point in that revenue

5   needs to be recognized in the correct period.

6   Q.   And if Capax already had the right to use EDD software in

7   the U.K., would that have been relevant to you?

8   A.   Yes, because I thought this was selling that right.

9   Q.   Why would that matter?

10  A.   Well, because it would appear they're buying something

11  they already have, so we'd need to understand why that would

12  be.

13  Q.   And would it be appropriate to recognize license revenue

14  if they already had that right?

15  A.   I'd need to know the background to it.

16  Q.   That's not something you had the opportunity to ask

17  questions about at the time?

18  A.   No.

19  Q.   Two more transactions in the first quarter of 2011,

20  Mr. Welham.

21       Could I please -- let's go back to what is in evidence,

22  1709.  If we could please look at page 8.

23       Do you have that in front of you, sir?

24  A.   Yes.

25  Q.   Okay.  And does this summarize a license agreement where

1    Autonomy purports to be licensing $3.8 million worth of

2    software to MicroTech for its own internal use?

3    **A.**    (Witness examines document.)  I haven't read the section

4    below, so I don't know if it's for their use or for someone

5    else's.

6    **Q.**    Okay.  Well, let's scroll down.  Do you see where it says

7    (reading):

8              "The deal is direct with MicroTech who are the end

9         user for the software.  The software purchased is as

10        follows..."?

11        And if we could continue to the next page.

12        There's a description of some Interwoven software.  Do you

13   see that?

14   **A.**    Yes.

15   **Q.**    Okay.  And as part of your review, did you test whether it

16   was appropriate to recognize $3.8 million worth of revenue on a

17   software sale to MicroTech for its own internal use?

18   **A.**    We did, yes.

19   **Q.**    And did you endeavor to include all of the relevant

20   details relating to the contract as you have before in the

21   section described as "Details"?

22   **A.**    We would do the usual work on this, yes.

23   **Q.**    Okay.  And does this reflect Deloitte's understanding of

24   the commercial rationale and the terms of the arrangement

25   between MicroTech and Autonomy?

1    **A.**    It will do, yes.

2    **Q.**    Okay.  I'd like to show you what is in evidence as

3    Exhibit 1694.

4         Do you see up at the top, Mr. Welham, the e-mail exchange

5    between Steve Truitt and Joel Scott?

6    **A.**    Yes.

7    **Q.**    And do you see that there are two attachments to this, one

8    entitled "MicroTech - Maintenance Support Services Agreement"

9    and one "MicroTech EULA"?  Do you see that?

10   **A.**    Yes.

11   **Q.**    Could we please go to page 10 -- excuse me -- page 6.

12        Does this appear to be a form of Autonomy's end user

13   software license agreements, EUSLA?

14   **A.**    Yes.

15   **Q.**    Okay.  And if we could look at page 13.

16        Do you see the amount of 3.8 million in paragraph 9?

17   **A.**    I do, yes.

18   **Q.**    Is that consistent with the transaction that was tested in

19   the Deloitte work paper that we just looked at?

20   **A.**    I believe it is.

21   **Q.**    Now, if we could please go to page 2.

22        There's something called "Autonomy Maintenance and Support

23   Services Agreement."  Do you see that?

24   **A.**    Yes.

25   **Q.**    At the time of your review, had you seen this agreement?

1    **A.**    I don't believe so, no.

2    **Q.**    Okay.  Is this agreement unusual to you in any way?

3    **A.**    I'd need to read the full agreement, but --

4    **Q.**    Let me give you the hard copy, Mr. Welham, so you can look

5    at it.

6    **A.**    (Witness examines document.)  It's not a usual style of

7    arrangement, but I haven't read the whole thing.  I was just

8    looking at what was actually point one, what they're actually

9    assigning.

10    **Q.**    Okay.  Up at the top it says, Mr. Welham, "Assignment of

11    rights to invoice."  Do you see that?

12    **A.**    Yes.

13    **Q.**    And do you see where it says (reading):

14            "Autonomy grants MicroTech the rights to issue

15        invoices to Autonomy's end user customer Bank of America

16        for the following maintenance and support fees..."?

17        Do you see that?

18    **A.**    Yes.

19    **Q.**    And if we scroll further down, there's a list of

20    particular invoices that are assigned.  And do you see those

21    numbers in column 2?

22    **A.**    Yes.

23    **Q.**    Okay.  And does this appear to assign over $4 million

24    worth of invoices to MicroTech the right to invoice

25    Bank of America for these maintenance and support payments?

1    **A.**    It appears to do so, yes.

2    **Q.**    And is this an agreement you were familiar with at the

3    time you were conducting your review?

4    **A.**    Not to my knowledge, no.

5    **Q.**    Okay.  Had you ever seen Autonomy do something like this?

6    **A.**    Not that I can remember.

7    **Q.**    Okay.  Is this the type of agreement you would expect

8    management to bring to your attention?

9    **A.**    Yes.

10    **Q.**    And if this were negotiated at or around the same time as

11    the license agreements, the $3.8 million license agreement, by

12    the same parties at the same time, would that have been

13    relevant to you?

14    **A.**    Yes.

15    **Q.**    Why?

16    **A.**    Because when that happens, we would normally consider fair

17    value of the transactions to make sure both -- both

18    transactions are being recognized appropriately.

19    **Q.**    And you didn't have an opportunity to do that here, did

20    you, Mr. Welham?

21    **A.**    Not that I recall, no.

22    **Q.**    I'd like to go back to Exhibit 1709 and draw your

23    attention to page 19.  You should have a hard copy in front of

24    you, Mr. Welham, if you're more comfortable with the hard copy.

25    **A.**    No, this is fine.

1  **Q.**   Okay.  Does this appear to be Deloitte's revenue testing

2  for a first quarter of 2011 transaction between Autonomy and

3  MicroTech with Bank of Montreal as the end user?

4  **A.**   Yes, it does.

5  **Q.**   And do you see the license revenue recognized at the top

6  of 2.88 million?

7  **A.**   Yes.

8  **Q.**   And if we could scroll down below under the details, what

9  is the software that Autonomy is licensing to MicroTech with

10  Bank of Montreal as the end user?

11  **A.**   So what's listed here is Autonomy Consolidated Archive, or

12  ACA for short, Autonomy Anywhere Access Module, ACA Mail and

13  Supervisor.

14  **Q.**   Okay.  And if we look at the next line, it says (reading):

15          "The license term for the above software is

16          perpetual.  A total of 48,300 client access licenses for

17          ACA are provided."

18          Do you see that?

19  **A.**   Yes.

20  **Q.**   And what is a client access license?

21  **A.**   I'm not totally sure, but I imagine it means number of

22  uses.

23  **Q.**   Okay.  If we could go to page 2, there's your description

24  of the revenue recognition criteria.

25          Perfect.

1    And was it Deloitte's conclusion at the time that the

2  risks and rewards of ownership had passed to the customer?

3  **A.**   Yes, it was.

4  **Q.**   That's MicroTech?

5  **A.**   Yes.

6  **Q.**   And then it said (reading):

7        "b.  Autonomy has not retained any managerial

8     control."

9    Was that your conclusion at the time?

10  **A.**   Yes, it is.

11  **Q.**   What was that based on?

12  **A.**   Based on our understanding of the arrangements and the

13  confirmations received.

14  **Q.**   Okay.  And information provided to you by management, is

15  that fair?

16  **A.**   Yes.

17  **Q.**   I'd like to draw your attention to what is in evidence as

18  Exhibit 1921.

19    Do you see the date at the top, Mr. Welham, June 30th,

20  2011?

21  **A.**   Yes.

22  **Q.**   And does this appear to be a software license schedule

23  directly between Autonomy and Bank of Montreal?

24  **A.**   It would appear to be, yes.

25  **Q.**   Okay.  Further below in Number 1 there's some license

1  software.  Do you see the reference to Autonomy Consolidated

2  Archive?

3  **A.**   Yes.

4  **Q.**   And is that the same software we saw in the MicroTech/Bank

5  of Montreal transaction we just looked at, the same type of

6  software?

7  **A.**   The first four look the same, yes.

8  **Q.**   Okay.  And if we could scroll down further below to the

9  client access licenses.

10       In Number 7, is that the same amount that was being

11  licensed direct -- or to MicroTech?

12  **A.**   I've forgotten the number actually but I think it is, yes.

13  **Q.**   Okay.  Did this direct deal with Bank of Montreal come to

14  your attention at any point in time in the second quarter of

15  2011?

16  **A.**   Not to my knowledge, no.

17  **Q.**   If it did, would you expect it to be reflected in

18  Deloitte's working papers?

19  **A.**   Yes.

20  **Q.**   Why is that?

21  **A.**   Because it would be an example of a deal that's gone

22  direct and, therefore, we should be told about that.

23  **Q.**   Well, did you routinely make requests of Autonomy for any

24  license agreements over a certain threshold?

25  **A.**   Yes.  So we did our work and all agreements essentially

1  over $100,000 were filed in a folder or various folders, which

2  we would then be given access to.

3  **Q.**   Okay.  And if Autonomy has done a direct deal with Bank of

4  Montreal one quarter after selling 48,300 client access

5  licenses to MicroTech for the same or similar software, does

6  that raise issues for you?

7  **A.**   I would expect it to be in the folder, yes.

8  **Q.**   And what issues does that raise for you?

9  **A.**   Well, if the agreement is not in the folder, then

10  that's -- that would be troubling.

11  **Q.**   And if Autonomy has done a direct deal with Bank of

12  Montreal, what accounting implications are there for the

13  MicroTech transaction?

14  **A.**   Well, it raises questions about the initial transaction

15  that we would then have to ask further questions on.

16  **Q.**   Had that issue arisen before, before 2011?

17  **A.**   Yes, it had.

18  **Q.**   How so?

19  **A.**   It arose in Q4 2009 and then Q1 2010 when we raised it to

20  the Audit Committee.

21  **Q.**   And if Autonomy has done a direct deal with Bank of

22  Montreal one quarter after selling the software to MicroTech,

23  does that call into question whether Autonomy appropriately

24  recognized revenue in the first quarter of 2011?

25  **A.**   It may well do, yes.

1   **Q.**   Why is that?

2   **A.**   Well, if they've sold the same thing, then it sounds like

3   the original deal is being reversed essentially.

4   **Q.**   Let me move forward in time, Mr. Welham, to your work in

5   the second quarter of 2011, and I would like to display what is

6   in evidence as Exhibit 2013.

7        Mr. Welham, does this appear to be a copy of your report

8   to the Audit Committee for the second quarter of 2011?

9   **A.**   Yes.

10  **Q.**   Okay.  Was this the last quarter where you were doing, as

11  it turns out, work for Autonomy Corporation PLC?

12  **A.**   It was, yes.

13  **Q.**   Let me please draw your attention to page -- well, first,

14  let's start with your reference to materiality.  If we could

15  look at page 4.

16       Do you see where it says (reading):

17            "For our Q2 2011 review, our materiality was

18       5.5 million"?

19  **A.**   Yes.

20  **Q.**   What, again, does that mean?

21  **A.**   It's the level that we believe the financial statements

22  could be misstated by before it would impact the users of the

23  account's view.

24  **Q.**   Okay.  So if there's an error above 5.5 million,

25  Deloitte's not going to issue an opinion; is that right?

1    **A.**    Correct, yes.

2    **Q.**    Please look at page 7.

3    **A.**    (Witness examines document.)

4    **Q.**    Do you see the description "Sales to Discover Technologies

5    LLC of IMD Software"?

6    **A.**    Yes.

7    **Q.**    And do you have a memory that Autonomy acquired a company

8    called Iron Mountain -- or the assets of Iron Mountain Digital

9    in or around this quarter?

10    **A.**    I do, yes.

11    **Q.**    Okay.  Is "IMD" an acronym for Iron Mountain Digital?

12    **A.**    I believe it is, yes.

13    **Q.**    And it says here (reading):

14          "The first was a 9 million, two and a half year term

15          license for the Stratify legal discovery product allowing

16          the end user Abbott laboratories to store up to 10TBs of

17          data."

18          Do you see that language?

19    **A.**    Yes.

20    **Q.**    Is this one of the transactions that Deloitte tested in

21    the second quarter of 2011?

22    **A.**    Yes, it is.

23    **Q.**    Okay.  Please look at what has been placed before you as

24    Exhibit 2001.

25          **MR. LEACH:**  I offer it in evidence.

1        **THE COURT:**  Admitted.

2        (Trial Exhibit 2001 received in evidence)

3    **BY MR. LEACH:**

4    **Q.**   Mr. Welham, do you see the date 19/7/11?

5    **A.**   I can see the date, yes.

6    **Q.**   Okay.  And is that the U.K. version for July 19th?

7    **A.**   It is, yes.

8    **Q.**   That's when you're conducting your Q2 review?

9    **A.**   Yes.

10   **Q.**   And the subject do you see "Outstanding List"?  That's a

11   routine thing for Deloitte to request information of its

12   client?

13   **A.**   It is, yes.

14   **Q.**   Okay.  Let's look at the outstanding list, please, page 2.

15        (Pause in proceedings.)

16        **MR. LEACH:**  Shall I work from the Elmo?

17        (Pause in proceedings.)

18        **MR. LEACH:**  Thank you so much, Ms. Margen and Special

19   Agent Bryant.

20   **Q.**   Let's look at row 2.  Do you recognize this form of

21   document, Mr. Welham?

22   **A.**   Yes.

23   **Q.**   Okay.  And there's a column for "Deal" and then the number

24   "65."  What do you interpret that to mean?

25   **A.**   I think that's the number the deal is in the revenue

1    folders.

2    **Q.**    What do you mean by "revenue folders"?

3    **A.**    So all the agreements, sales invoices, et cetera, were

4    held in files for all deals over $800,000.

5    **Q.**    And it says "Customer Discover Tech/Abbott."  Do you see

6    that?

7    **A.**    Yes.

8    **Q.**    Do you believe that to be a reference to the $9 million

9    transaction?

10   **A.**    I believe it is, yeah.

11   **Q.**    To the right Deloitte is asking (reading):

12           "Can we have a summary of how the overall agreement

13        is to be structured and how DT's involvement fits in?

14           "2.  Has Autonomy signed either direct with Abbott or

15        via DT an agreement for the hosting on this contract?"

16        Why was Deloitte asking for this information?

17   **A.**    So point one is I was just trying to get an understanding

18   of the overall agreement, why it's being structured in this

19   way.  And I can't remember the specifics were, but I suspect

20   there's a hosting element in here and typically Autonomy would

21   do the hosting.  So point two is asking whether Autonomy

22   already signed the hosting arrangement directly with the end

23   user or not.

24   **Q.**    Is this an example of Deloitte trying to understand the

25   commercial rationale for a deal?

1   **A.**   It is, yes.

2   **Q.**   And why do you inquire about that?

3   **A.**   Where it's not straightforward in the agreement, then we'd

4   look to just understand further why the agreement is structured

5   in the way it is.

6   **Q.**   Okay.  And when you're inquiring about the commercial

7   rationale for a deal, do you expect truthful answers from

8   management?

9   **A.**   Always, yes.

10  **Q.**   If you're not getting truthful information from

11  management, is that a problem?

12  **A.**   Yes.

13  **Q.**   Why?

14  **A.**   Well, it goes against everything we're doing if the

15  information we're given is not truthful.

16  **Q.**   Further down there in Deal Number 10, there's a reference

17  to Hewlett Packard.  Do you see that?

18  **A.**   Yes.

19  **Q.**   And to the right (reading):

20          "Deloitte is requesting details on the business

21      rationale for the deal, specifically why has this deal

22      gone through a VAR?  Will MicroTech be hosting the data?

23      Or are HP intending to sell the Autonomy software to their

24      customers and host the data themselves?"

25      Does this appear to be inquiring about why Autonomy has

1  sold software to MicroTech with HP as the end user?

2  **A.**   Yes, it is.

3  **Q.**   Is this consistent with your memory that there was an

4  approximately $7 million sale to MicroTech with HP listed as

5  the end user?

6  **A.**   I can't remember the precise amount, but I remember it

7  broadly, yes.

8  **Q.**   Okay.  And why was Deloitte asking for this information?

9  **A.**   Again, similar to row 2 above, the Discover Tech/

10  Abbott Labs item.  We're just trying to understand why in

11  particular this deal has gone through a VAR.

12  **Q.**   Why does that matter?

13  **A.**   To help us understand the commercial rationale for the

14  transaction.

15  **Q.**   Please look at what has been marked and I offer into

16  evidence Exhibit 2002, an e-mail from Alex Jackson to you on

17  July 19th, 2011.

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 2002 received in evidence)

20          **THE WITNESS:**  (Witness examines document.)

21  **BY MR. LEACH:**

22  **Q.**   Who is Alex Jackson, Mr. Welham?

23  **A.**   At this time I think he's an assistant manager who's

24  working on the review.

25  **Q.**   Okay.  And Tom Murray was a manager at the time?

1    **A.**    I think so, yes.

2    **Q.**    Someone you worked with closely?

3    **A.**    Yes.

4    **Q.**    In the subject line it says "Sushovan Revenue Plus Other

5    Qs."  Do you see that?

6    **A.**    I do, yes.

7    **Q.**    What did that mean?

8    **A.**    I think it's -- well, let me just read the e-mail first

9    before I answer.

10         (Witness examines document.)  Yes, so I think it's

11    referring to a previous request for information of the items

12    that other members of the finance team couldn't answer, and I

13    think it's saying that these items are being directed to

14    Mr. Hussain.

15    **Q.**    Mr. Jackson wrote (reading):

16            "My review Qs" --

17         That's questions; right?

18    **A.**    Questions, yes.

19    **Q.**    Okay.  (reading)

20         -- "have been directed to Sushovan."

21         Was it ordinary within the course of your reviews and

22    audits that sometimes questions that couldn't be fielded by

23    Mr. Chamberlain and others would get elevated, so to say, to

24    Mr. Hussain?

25    **A.**    Yes.  It did happen, yes.

1  **Q.**   Okay.  And the first question (reading):

2         "Rationale/structure for Discover Tech deals (Abbott

3      and Hyatt/Dell)."

4      Do you see that?

5  **A.**   I do.

6  **Q.**   And is this an example of Deloitte inquiring about the

7  commercial rationale for why this software is being sold to a

8  reseller rather than direct to Abbott?

9  **A.**   It is, yes.

10  **Q.**   Further down below it says (reading):

11         "Other items to bring up, Discover Tech 4.4M license

12      purchase.  What deals is this going in/why the purchase

13      now?"

14      What was Deloitte getting at there?

15  **A.**   My recollection is that there was a purchase of software

16  from Discover Tech in Q2 2011.  So we're just looking to

17  understand what was being bought, why it was being bought, and

18  also just to ensure that the fair value had been recognized

19  both from a purchase perspective and also considering the fair

20  value of the sale, the revenue.

21  **Q.**   You wanted to make sure Autonomy really needed to buy

22  this?

23  **A.**   Yes, understanding why it had been purchased and checking

24  the fair value.

25  **Q.**   Please look at what has been marked as Exhibit 2003, an

1    e-mail from Steve Chamberlain to you and Mr. Hussain dated

2    July 20th, 2011.

3              **MR. LEACH:**  I offer it in evidence.

4              **THE COURT:**  Admitted.

5         (Trial Exhibit 2003 received in evidence)

6    **BY MR. LEACH:**

7    **Q.**   Are you familiar with this document, Mr. Welham?

8    **A.**   Yes.  I've seen this before, yes.

9    **Q.**   Okay.  And does this appear to be Mr. Chamberlain

10   interlineating some comments to questions that you had relating

11   to certain key outstanding items?

12   **A.**   It would appear to be, yes.

13   **Q.**   Okay.  Let's look at the bottom, and do you see where you

14   wrote "Sushovan/Steve"?

15   **A.**   Yes.

16   **Q.**   (reading)

17            "We have a number of items at the moment which we

18        need to resolve very quickly given their significance.

19        These are as follows:"

20        First bullet (reading):

21            "Update on all large outstanding debtors (as per

22        previous e-mail)."

23        Why were you inquiring about that?

24   **A.**   One of the areas that we focused on was debtors or trade

25   receivables.  This is where you have amounts due from customers

1  which have yet to be collected and in this case quite are long

2  overdue, so we're looking to understand what the position is on

3  each of those larger balances that are overdue.

4  **Q.**    And do understand that, you would ask questions of

5  Mr. Chamberlain and Hussain about the status of particular

6  debtors; is that correct?

7  **A.**    Yes, that's correct.

8  **Q.**    And Mr. Chamberlain's comments here after the "SC" in

9  brackets "Still working through these," do you see that?

10 **A.**    Yes.

11 **Q.**    Let's look at the next page.  You wrote (reading):

12           "Rationale for sales to Discover Tech as reseller on

13      Abbott and Hyatt - i.e., why would these companies buy

14      through DT when they could deal direct with Autonomy?"

15      Is that you asking essentially the same question that

16 Mr. Jackson was asking earlier?

17 **A.**    It is, yes.

18 **Q.**    And what was Mr. Chamberlain's comment?

19 **A.**    It says (reading):

20           "Sushovan to walk through on call this morning."

21 **Q.**    The next bullet is (reading):

22           "Update on management position with regards total

23      debtors due from MicroTech/DT/Capax which at Q2 end

24      totaled 75 million."

25      Do you see that?

1    **A.**    Yes.

2    **Q.**    What were you asking there?

3    **A.**    We'd noticed in Q2 that the total value of debtors due

4    from those three resellers -- MicroTech, Discover Tech, and

5    Capax -- had grown quite significantly, so we just wanted to

6    understand what management's view was on that.

7    **Q.**    And did you ask them a lot of questions about how these

8    debts are going to be paid?

9    **A.**    Say that again.   Sorry.

10    **Q.**    Did you ask Mr. Hussain and Mr. Chamberlain a lot of

11    questions about how are those debts going to be paid?

12    **A.**    We would have done, yes.

13    **Q.**    Further down below there's a reference to "Purchase of DT

14    software."   Do you see that?

15    **A.**    Yes.

16    **Q.**    And is that asking about the $4.4 million purchase that

17    Mr. Jackson was raising to you?

18    **A.**    I believe it is, yes.

19    **Q.**    Okay.   You wrote (reading):

20        "We talked to Pete M." --

21        Is that Mr. Menell?

22    **A.**    Yes.

23    **Q.**    (reading)

24        -- "about this today, but he was not aware of the

25        technical/commercial rationale for the purchase.   We

1          need to understand this so we can be sure that it

2          makes commercial and technical sense and is at fair

3          value."

4          What were you getting at there, Mr. Welham?

5   A.    We're just linking back to what I said earlier.  We need

6   to understand the rationale for this transaction and to make

7   sure that it's at fair value.

8          And I can't remember the conversation, but based on what

9   it says here, I don't think Pete was able to give us a full

10  understanding of the sort of technical and commercial rationale

11  for the purchase.

12  Q.    Why do you need to understand that?  Why is that

13  important?

14  A.    Because it's -- because ultimately this transaction is

15  being done at the same time there's revenue being recorded with

16  this particular reseller.  So I wanted to make sure there's no

17  risk of a barter transaction.  So, in other words, to make sure

18  the two transactions are valid and that they're recorded as a

19  separate and fair value.

20  Q.    When you say "fair value," what do you mean?

21  A.    On an arm's length basis.

22  Q.    And what does "arm's length" mean?

23  A.    It means at a rate or price which a reasonable third party

24  would be prepared to pay.

25  Q.    Are you familiar with the term "roundtrip"?

1  **A.**   Yes.

2  **Q.**   What is that?

3  **A.**   I believe it's where you are effectively moving monies

4  around for the sake of manipulating your financial results.

5  **Q.**   Is that part of the reason you're asking questions about

6  fair value and arm's length and those types of questions?

7  **A.**   Yes.

8  **Q.**   And Mr. Chamberlain appears to write (reading):

9          "Pete may not be the best person to talk to about

10         this.  This related to the DiscoverPoint engine which was

11         included in sales to Bloomberg, National Bank of Canada,

12         and Met Life.  Sushovan can provide more background on the

13         call."

14     Is that what Mr. Chamberlain told you?

15  **A.**   I can't remember what he said, but I can just read the

16  e-mail here.

17  **Q.**   Okay.  Do you know why he was directing this to Sushovan

18  rather than handling it himself?

19  **A.**   I don't know.

20         **MR. LEACH:**  I'd like to offer into evidence

21  Exhibit 1945 and 1947 --

22         **THE COURT:**  Admitted.

23         **MR. LEACH:**  -- Deloitte's revenue testing for the

24  quarter.

25         **THE COURT:**  1945, 1947, admitted.

1          (Trial Exhibits 1945 and 1947 received in evidence)

2     **BY MR. LEACH:**

3     **Q.**   And if we could, please, look at page 7, Mr. Welham.

4          Is this Deloitte's testing for the $9 million

5     Discover Tech/Abbott Labs deal.

6     **A.**   Yes, I believe it is.

7     **Q.**   Okay.  And under the "Details," is this a fair recitation

8     of Deloitte's understanding of what this transaction was about?

9     **A.**   It will be, yes.

10    **Q.**   Further down below in the section for "Collectibility,"

11    there's a paragraph that reads (reading):

12              "For additional assurances, we consider the

13          commercial rationale for a deal with the specified end

14          user.  We note that Abbott Labs are a large listed Pharma

15          and Healthcare company.  The purchase of a legal discovery

16          solution appears to be a rational purchase for an entity

17          of this size and by using Discover Tech, they're able to

18          satisfy the U.S. Government requirement to trade with S

19          8(a) Veteran-Owned Businesses."

20          Do you see that?

21    **A.**   I do, yes.

22    **Q.**   And is this a summary of the commercial rationale that

23    Deloitte was given for this transaction?

24    **A.**   It is, yes.

25    **Q.**   At the time did you have any understanding that

1   Discover Tech was not an S 8(a) veteran-owned business?

2   **A.**   No, we did not.

3   **Q.**   Would that have been relevant to you?

4   **A.**   It would, yes.

5   **Q.**   Why?

6   **A.**   Well, because if they weren't, then they couldn't do what

7   it says here.

8   **Q.**   Okay.  And it would question the veracity of what you're

9   being told by management?

10  **A.**   Yes.

11  **Q.**   I'd like to show you what is in evidence as Exhibit 1840.

12  **A.**   (Witness examines document.)

13  **Q.**   Do you see at the top the e-mail from Mike Sullivan to

14  Sushovan Hussain, Mr. Welham?

15  **A.**   Yes.

16  **Q.**   And do you see the "Subject:  Abbott"?

17  **A.**   Yes.

18  **Q.**   And do you see where it says (reading):

19          "Senior attorney vetoed by GC, who says (and has said

20      in the past) that they will never authorize

21      forward-looking commitment levels.  Nothing left to be

22      done"?

23      At the time you were reviewing this transaction between

24  Autonomy and Discover Tech, did you have any understanding that

25  Abbott had declined to do the $9 million deal?

WELHAM - DIRECT / LEACH

1   **A.**   No.

2   **Q.**   Did you have any of the information that was in this

3   e-mail?

4   **A.**   No.

5   **Q.**   Is this -- assuming we're talking about the same deal

6   here, is that relevant when you're inquiring about the

7   commercial rationale for the Autonomy/Discover Tech deal?

8   **A.**   If we're talking about the same transaction, then, yes.

9   **Q.**   How so?

10  **A.**   Because it calls into question the transaction that we've

11  just been talking about with the value-added reseller.

12  **Q.**   How does it call it into question?

13  **A.**   Well, I can't understand how you could sell something to a

14  VAR with an end user where this looks like if it's the same

15  deal that the end user has said no.  So that just feels very

16  odd.

17  **Q.**   Let me show you what is in evidence as Exhibit 1912.  And

18  if we could go to the second page.

19      Do you see up at the top, Mr. Welham, that this appears to

20  be a purchase order dated June 30th, 2011, from MicroTech to

21  Autonomy with HP as the end user?

22  **A.**   Yes.

23  **Q.**   And do you see the amount of $7 million?

24  **A.**   Yes.

25  **Q.**   And is this consistent with your memory of a transaction

**WELHAM - DIRECT / LEACH**

1  that Deloitte tested relating to MicroTech with HP as the end

2  user?

3  **A.**    Yes.  To MicroTech, yes.

4  **Q.**    Okay.  If we could scroll down further below.

5       Do you see that language "End user and VAR currently

6  anticipate entering into such a license transaction"?

7  **A.**    Yes, I do.

8  **Q.**    Is that similar language to what was included in previous

9  purchase orders that we looked at?

10  **A.**    Yes, it is.

11  **Q.**    If that language is untrue, is that relevant to you?

12  **A.**    Yes, it is.  Yeah.

13  **Q.**    Why?

14  **A.**    Well, if it's untrue, it's very troubling and calls into

15  question what we're being provided with.

16  **Q.**    Your work for the second quarter of 2011 ends in or around

17  late July 2011?

18  **A.**    Yes.

19  **Q.**    At any point in time did you learn that Autonomy and

20  MicroTech had entered into an $8.2 million transaction relating

21  to a FISMA cloud proposal?

22  **A.**    Not to my knowledge, no.

23  **Q.**    If that were designed to get MicroTech the money to pay

24  down this purchase order, would that have been relevant to you?

25  **A.**    Yes.

1  Q.  Two more brief documents, Mr. Welham.

2      At some point in time did you learn that HP was

3  contemplating making an offer to buy Autonomy?

4  A.  Shortly before it happened, yes.

5  Q.  Okay.  Shortly before?  What does that mean?

6  A.  I think it was about 48 hours before.

7  Q.  And this was before the announcement?

8  A.  Before the announcement, yes.

9  Q.  And were you asked to do anything in relation to HP's

10 potential acquisition of Autonomy?

11 A.  We were asked to take part in a diligence call.

12 Q.  And did that happen?

13 A.  It did, yes.

14 Q.  Do you recognize what has been marked and placed before

15 you as Exhibit 2273?

16         THE COURT:  Admitted.

17     (Trial Exhibit 2273 received in evidence)

18         THE WITNESS:  (Witness examines document.)

19 BY MR. LEACH:

20 Q.  Do you recognize this document, Mr. Welham?

21 A.  I do, yes.

22 Q.  What are these?  What is this?

23 A.  These are the questions that KPMG, I think it was, wanted

24 to ask us as part of the diligence call.

25 Q.  And Mr. Hussain writes in this e-mail, "My updated

1  comments."  Do you see that?

2  **A.**  I do, yes.

3  **Q.**  And if we could go to the next page.

4      Is this a list of KPMG's questions with Mr. Hussain's

5  proposed comments interlineated after the questions?

6  **A.**  Yes.

7  **Q.**  Okay.  Why was he giving this to you?

8  **A.**  We had just been given the questions and I think he was

9  just giving his thoughts on the questions themselves.

10  **Q.**  Why did you want his thoughts on the questions?

11  **A.**  Well, we didn't particularly need them but he chose to

12  give us his thoughts.

13  **Q.**  Okay.  In Number 3, it says (reading):

14          "Did you identify any instances of fraud,

15      irrespective of the amount, during your audit?  If so,

16      describe cases management have uncovered."

17      And what's the comment that Mr. Hussain interlineated

18  there?

19  **A.**  You want me to read it?

20  **Q.**  Yes, please.

21  **A.**  (reading)

22          "One case in 2010, payroll in SF," San Fran,

23      "2 million over five years, recovered 1 million for

24      insurance.  Two payroll clerks currently in jail.  Have

25      offered to return monies.  One case in 2008, insurance

 1    fraud, Sunnyvale office, $0.5 million.  Have recovered all

 2    monies."

 3 **Q.**    Okay.  And after you participated in this call with KPMG,

 4 was the acquisition of Autonomy announced shortly thereafter?

 5 **A.**    It was, yes.

 6 **Q.**    Okay.  Would you please look at what has been marked as

 7 Exhibit 2986?

 8         **THE COURT:**  Admitted.

 9         (Trial Exhibit 2986 received in evidence)

10 **BY MR. LEACH:**

11 **Q.**    Are you familiar with this document, Mr. Welham?

12 **A.**    Yes.

13 **Q.**    Okay.  This is an e-mail from Nigel Mercer to U.K.

14 Cambridge A&A, U.K. Cambridge Businesses Tax.  Do you see that?

15 What are those?

16 **A.**    They're e-mail groups.  It's essentially an e-mail being

17 sent to the Deloitte Cambridge office.

18 **Q.**    And the subject is "Autonomy - Proposed Takeover by HP" --

19 or "Hewlett Packard"?

20 **A.**    Yes.

21 **Q.**    Okay.  The date is -- is that September 6, 2011?

22 **A.**    Yes, 6th of September.

23 **Q.**    Nigel Mercer at the time, what was his role?

24 **A.**    He'd been the lead partner throughout the course of 2011.

25 **Q.**    And Mr. Mercer wrote (reading):

WELHAM - DIRECT / LEACH

1          "You will have seen the news the other week about

2     HP's $11 billion proposed takeover.  I want to give you a

3     little more information on what this might mean for our

4     relationship going forward and provide some reassurance

5     that, assuming it goes ahead, it is something we can take

6     in our stride."

7     What was Mr. Mercer getting at there?

8  A.  He's just providing some background to the staff in the

9  Cambridge office about the transaction and the implications and

10 what it means going forward.

11 Q.  What it means for Deloitte and its client Autonomy?

12 A.  Yes.

13 Q.  Okay.  Mr. Mercer wrote (reading):

14         "Autonomy is one of the Cambridge office's largest

15     and most important audit and tax clients."

16     Did you agree with that?

17 A.  I do, yes.

18 Q.  Okay.  And how was it one of the largest and most

19 important audit and tax clients for the Cambridge office?

20 A.  Because of its size.

21 Q.  Can you give us a rough sense of the size?

22 A.  Well, at the time it was a FTSE 100 company.

23 Q.  Okay.  Let's scroll down.  I think there's a reference to

24 that (reading):

25         "Whilst it seems likely that we will lose a FTSE 100

 1          audit" --

 2          That's FTSE?

 3    A.    FTSE, yes.

 4    Q.    And what's that a reference to?

 5    A.    The Stock Exchange in the U.K.

 6    Q.    Okay.  And was it a source of pride for you to be auditing

 7    a FTSE 100 company?

 8    A.    Yes.

 9    Q.    (reading)

10          -- "we are confident we will be able to replace the

11          bulk of the revenues lost from HP/Autonomy going

12          forwards."

13          What did that mean?

14    A.    Well, obviously the first three quarters of HP were EY so

15    it was highly likely that we would lose the audit of Autonomy

16    following the transaction with HP.

17    Q.    And is this Mr. Mercer in some sense reassuring the

18    Cambridge office that Deloitte Cambridge is going to be okay?

19    A.    Yes.

20    Q.    Okay.

21                        (Pause in proceedings.)

22          **MR. LEACH:**  Your Honor, I have a few more exhibits I

23    want to enter into evidence, but this would be -- it will

24    take -- it won't take long, and I think this is a convenient

25    stopping point for lunch.

1          **THE COURT:**  Okay.  Ladies and gentlemen, we'll take

2    our recess.  We'll resume at 1:00 o'clock.

3        Remember the admonition given to you:  Don't discuss the

4    case, allow anyone to discuss it with you, form or express any

5    opinion.

6        (Proceedings were heard out of the presence of the jury:)

7          **THE COURT:**  The jury has retired.

8        By my count -- have a seat.

9        By my count, we have over 1,000 and perhaps 2,000 pages of

10   evidence -- of documents in evidence.  So I'd like the parties

11   to give some thought as to how those materials are to be

12   collected and produced for the jury during their deliberations.

13       I'm not terribly -- I would not like a system, I don't

14   think, but, I mean -- I've been sitting up here trying to think

15   of different sort of creative ways to do it.  I haven't come up

16   with any that don't smack of being an argument; that is, you

17   take a transaction, you put all those exhibits together, and so

18   forth.  Well, I know that if one side likes it, the other side

19   won't, even if there's cross-documentation and so forth.  So I

20   don't think that's going to work.

21       That doesn't mean that we just throw up our hands.  It

22   means that we just try to figure out some system.  What I was

23   thinking about saying was that I don't think I just want to

24   rely on technology in terms of the documentation; that is, oh,

25   we'll give them a disk, or we'll give them, you know, 100 disks

1   or 50 disks or 30 disks.

2       We might want to do that, but the very least I think we

3   ought to take all those documents that have been received in

4   evidence and perhaps chronologically, or any other way that the

5   parties can agree, if there is some other way that the parties

6   can agree -- and if not, it will be done chronologically or by

7   exhibit number -- bind them in some folder -- you know, in some

8   plastic thing, like these transcripts, and give them to the

9   jury.

10      I just think that what I would like to encourage you to do

11  is to talk between yourselves, the parties between yourselves,

12  see if you can come up with some agreement that's satisfactory

13  to the parties.

14      If you're unable to do so, then, of course, I'll weigh in

15  on it because I think it is my obligation to make sure that the

16  jury, when they go into their deliberations, have some -- I'm

17  not suggesting a road map.  Rather, what I'm suggesting is

18  access, meaningful access to the documents.

19      **MR. KEKER:**  Your Honor, I couldn't agree more about

20  meaningful access, but we will be --

21      **THE COURT:**  Do you want to stand in front of the

22  microphone, Mr. Keker?

23      **MR. KEKER:**  -- we will be organizing the, at least I

24  will be, the closing around exhibit numbers.  I mean, if you

25  come to something for the note takers, here is a demonstrative

1    or something, I've got these exhibits are the ones, this is the

2    testimony, I mean, that's what I want to say about that.  Now

3    let's move on to the next.

4        So if they can't -- I mean, they're going to have -- if

5    they take notes, they'll have the exhibit numbers and the

6    subject, and so whatever we do has got to allow them to get to

7    exhibit numbers.  That's --

8        THE COURT:  I agree with that.  That's absolutely

9    right.  The problem is that your demonstratives can't go into

10    the jury room.  So in your closing argument if you say

11    "Transaction X, here are the 12 documents" --

12        MR. KEKER:  Right.

13        THE COURT:  -- "by exhibit number," if they don't take

14    a note on that, that's lost.

15        MR. KEKER:  But there's a lot of note takers here.

16        THE COURT:  Yeah.  I mean, I think -- I always when I

17    did it, I haven't done it in 25 years, but I assume you say to

18    the jury, "Now, ladies and gentlemen, you look at" --

19        MR. KEKER:  When you did it, they didn't have Elmos.

20        THE COURT:  Pardon?

21        MR. KEKER:  I said when you did it, they didn't have

22    Elmos.

23        THE COURT:  They had nothing.  They had no documents.

24    It was before the creation of writing so it was easy, "Remember

25    what so and so said."

PROCEEDINGS

1          Anyway, talk amongst yourselves.  Of course, I don't want

2    to restrict argument and I want you to do the argument the way

3    you feel comfortable doing your argument; but I'm really

4    focusing on access to documents, meaningful access to

5    documents, during deliberations.  So just give it some thought.

6    I've been sitting up here and about to throw up my hands

7    because I can't figure out a way to do it.

8          **MR. KEKER:**  Throw away half the exhibits.  That's a

9    start.

10         **THE COURT:**  Well, that was my idea about

11   simplification of the Sentencing Guidelines was to remove every

12   other page.

13         Okay.  Thank you.

14         **MR. REEVES:**  Thank you.

15              (Luncheon recess taken at 12:08 p.m.)

1    <u>Afternoon Session</u>                                    <u>1:02 p.m.</u>

2          **THE CLERK:**  Come to order.  Court is now in session.

3       (Proceedings were heard in the presence of the jury:)

4          **THE COURT:**  Let the record reflect all jurors are

5    present, parties are present.

6       You may proceed.

7          **MR. LEACH:**  Thank you, Your Honor.

8    **Q.**  Good afternoon, Mr. Welham.

9       Good afternoon, ladies and gentlemen.

10      Just a few more topics, Mr. Welham.

11      Could we please go back to what is in evidence as Exhibit

12   2273.

13                    (Exhibit published to jury.)

14   **BY MR. LEACH:**

15   **Q.**  And if we could look at Mr. Hussain's comments to the

16   Deloitte auditors, in Question No. 2, Mr. Welham, it says, "Do

17   the lead and concurring audit partner" -- do you recall this

18   list of questions in connection with the due diligence call

19   with KPMG?

20   **A.**  I do, yes.

21   **Q.**  Okay.  And No. 2 says, "Do the lead and concurring audit

22   partner and audit software companies" -- "Do the lead and

23   concurring audit partner and audit software companies which

24   recognize revenue in accordance with U.S. GAAP."  Do you see

25   that question?

1   **A.**   I do, yes.

2   **Q.**   And the answer is, "No IFRS but U.S. GAAP rules."  Do you

3   know what Mr. Hussain meant by that?

4   **A.**   I don't, no.

5   **Q.**   Did you ever hear Mr. Hussain say publicly that Autonomy

6   complied with U.S. GAAP rules?

7   **A.**   No.

8   **Q.**   If we could please go back to Exhibit 2013.

9                    (Exhibit published to jury.)

10  **BY MR. LEACH:**

11  **Q.**   Mr. Welham, I draw your attention to page 15 of this

12  exhibit.  Does this involve a discussion of a purchase by

13  Autonomy of Discover Technologies software for $4.4 million at

14  the end of the second quarter of 2011?

15  **A.**   It would appear to, yes.

16  **Q.**   Okay.  And this says, "This purchase was made such that

17  Autonomy could complete a number of IDOL-based license revenue

18  sales with Bloomberg, National Bank of Canada, and MetLife, who

19  all required the advanced Microsoft SharePoint connectivity

20  provided by the DiscoverPoint product and not currently offered

21  by Autonomy products."

22        Do you see that?

23  **A.**   I do, yes.

24  **Q.**   If that statement were untrue, would that be relevant to

25  you?

**WELHAM - DIRECT / LEACH**

1   **A.**   Yes.

2   **Q.**   Okay.  If Autonomy inserted these discover engine products

3   gratuitously into these license agreements, would that be

4   relevant to you?

5   **A.**   Yes.

6   **Q.**   Why is that?

7   **A.**   Because it would mean what we've been told here is not

8   correct.

9   **Q.**   At the time of your review in Q2/2011, did you have any

10   understanding that Discover Tech used a portion of the

11   4.4 million to transfer to MicroTechnologies to pay down the

12   Vatican debt?

13   **A.**   No, I did not.

14   **Q.**   Was that relevant information to you?

15   **A.**   Yes.

16   **Q.**   Was that responsive to your inquiries to Mr. Hussain about

17   the collectibility of the MicroTech Vatican deal?

18   **A.**   Yes, it would have been.

19   **Q.**   I want to talk about -- we've talked a lot about audits

20   and a little bit about reviews.  What is the difference between

21   an audit and a review?

22   **A.**   An audit is -- it's very different to review.  So review,

23   first of all, is much more high level.  We're doing more

24   analytical-based procedures so we're not doing lots of detail

25   testing across all the balances and therefore we give a

1   negative assurance opinion at the review opinion.

2       And the work we do is in accordance with a standard called

3   ISRE 2410 and it's essentially ensuring that the condensed

4   financial statements that you produce each quarter are in

5   compliance with a particular accounting standard called IAS 34.

6       An audit, on the other hand, is much more full in nature.

7   We're doing detailed procedures, giving an actual true and fair

8   audit opinion, and using materiality, which we discussed

9   already.

10  Q.   Now, the audit opinion, that's based on procedures that

11  you perform; correct?

12  A.   Yes.

13  Q.   And it remains management's responsibility to prepare

14  truthful financial statements?

15  A.   Correct, yes.

16  Q.   Is that Deloitte's responsibility?

17  A.   Our responsibility is to do the audit, yes.  It is

18  management's responsibility to prepare the financial

19  statements.

20  Q.   How are those two responsibilities distinct?

21  A.   We're ultimately testing and looking for a reasonable

22  assurance that the balances are in accordance with IFRS and in

23  accordance with the Companies Act 2006 as well.

24  Q.   And when you say you give an audit opinion on the year-end

25  financial statements, exactly what are you opining on and what

1    are you not opining on?

2    **A.**    So we're opining on the financial statements themselves,

3    which is essentially the numbers in what we call the back half.

4    So anything from the audit opinion onwards is what we're giving

5    our true and fair opinion on.

6         And then in relation to the front end, our responsibility

7    there is to read the front end so that all the words that come

8    before the audit opinion and ensure consistency with the

9    financial statements.  There are --

10   **Q.**    Did -- I'm sorry.  I didn't mean to interrupt you.

11   **A.**    And there's a few other sort of smaller points around

12   compliance of the Companies Act, but that's essentially the

13   difference between the two statements.

14   **Q.**    Are you wordsmithing the front end of the report?

15   **A.**    We read to ensure consistency with the financial

16   statements.

17   **Q.**    Consistency with the numbers?

18   **A.**    Yes.

19   **Q.**    And the review opinion you described, those are for the

20   quarters?

21   **A.**    Yes.

22   **Q.**    And you used the term "negative assurance."  What does

23   that mean?

24   **A.**    You can look at the wording that we used in the opinion,

25   but it's -- we're not doing the same level of procedures that

1   we do, so we say that we haven't found anything that's -- that

2   would suggest that the statements are not true and fair.

3   **Q.**   Is it fair to say it's not an opinion that the financial

4   statements are correct; it's an opinion that nothing has come

5   to your attention --

6   **A.**   Correct, yes.

7   **Q.**   -- that they're incorrect?

8   **A.**   Yes.

9   **Q.**   I'd like to talk briefly about Autonomy's sales of

10   hardware.  Do you have that topic in mind?

11   **A.**   Yes.

12   **Q.**   And I'd like to display for you what is in evidence as

13   Exhibits 271, page 11.

14                     (Exhibit published to jury.)

15   **BY MR. LEACH:**

16   **Q.**   271, page 11, please.  My apologies.

17        Mr. Welham, I'm showing you a portion of the -- we had it

18   there.

19        Before we get to the document, Mr. Welham, did you

20   understand that in the third quarter of 2009, Autonomy began to

21   sell large volumes of stand-alone hardware?

22   **A.**   I was aware that there was some larger transactions in

23   Q3/2009, yes, in hardware.

24   **Q.**   Those were issues that Deloitte reviewed and considered at

25   the time?

1    **A.**   Yes.  As part of the review, we did.

2    **Q.**   And I'm drawing your attention to the portion of the

3    report to the audit committee down at the bottom.  Deloitte

4    wrote, "In the event that hardware sales in the year are

5    significant, there may be a requirement to disclose the quantum

6    and nature of these sales in the year-end financial statements.

7    Given the size and nature of these transactions, the directors

8    will need to consider carefully the narrative disclosures in

9    the Q3 earnings release.  This may be of particular relevance

10   to discussion of key customers, sales, and gross margins."

11        Do you see that?

12   **A.**   I do, yes.

13   **Q.**   What were you getting at there?

14   **A.**   So in Q3/2009, there were many more sales or hardware

15   sales, as you've alluded to, and therefore it was something new

16   to an extent, and we were just preparing management for the

17   fact that there might need to be further disclosures

18   considered, depending on how these sales transpired going

19   forward.

20   **Q.**   And is this in some way Deloitte encouraging disclosures

21   about it?

22   **A.**   Yes.

23   **Q.**   Can we please look at the audit committee report for

24   Q2/2010, Exhibit 979 at page 8.

25              (Exhibit published to jury.)

BY MR. LEACH:

Q.   Mr. Welham, I'm showing you a portion of what is in
evidence as Deloitte's report to the audit committee for the
second quarter of 2010.  Do you have that time period in mind?

A.   Yes.

Q.   And do you see the language "presentation and costs
associated with hardware sales"?

A.   I do, yes.

Q.   And in the Deloitte response down below, do you see where
it says, "Given the increasing significance of hardware sales
to the group's revenues and the resulting impact on the gross
margin and operating margin in the quarter and half-year
results, we would expect appropriate explanations be given in
the Q2/2010 press release."

     Do you see that language?

A.   I do, yes.

Q.   Is this another example of Deloitte encouraging greater
disclosure about the hardware sales?

A.   Yes.

Q.   Can we please look at the report for the third quarter of
2010, Exhibiter 1183, page 9.

                    (Exhibit published to jury.)

BY MR. LEACH:

Q.   And I draw your attention to the -- do you see the heading
"Presentation and Costs Associated with Hardware Sales"?

1    **A.**    Yes.

2    **Q.**    Do you see the Deloitte response down at the bottom?

3    **A.**    Yes, I do.

4    **Q.**    And do you see where it says, "Given the increasing

5    significance of hardware sales to the group's revenues and the

6    resultant impact on the gross and operating margin in the

7    quarter and half-year results, we would expect appropriate

8    explanation to be given in the Q3/2010 press release.  It is

9    likely that the questions raised in the Q2/2010 press

10   conference are raised again at the Q3/2010 press conference and

11   therefore suggest it would be helpful to include narrative

12   regarding the nature of these revenues in the quarterly

13   report."

14        Do you see that language?

15   **A.**    Yes.

16   **Q.**    Is this another example of Deloitte encouraging greater

17   disclosure about the hardware sales?

18   **A.**    Yes.

19   **Q.**    And finally, could we please look at Exhibit 1509, page

20   10.  This is an excerpt from the -- your report for the fourth

21   quarter of 2010, Mr. Welham.

22                     (Exhibit published to jury.)

23   **BY MR. LEACH:**

24   **Q.**    And I may have the wrong page.  Could we go to the

25   previous page.  One more.  Actually, let's try page 11, please.

1    There we go.  And could we scroll down to the bottom.  And down

2    a little further, please.  More.  Thank you.

3        Do you see the Deloitte response relating to presentation

4    and costs of goods sold and operating expenses?

5    A.   Yes.

6    Q.   And do you see at the bottom where it says, "Given the

7    increasing significance of hardware sales to the group's

8    revenues and the resultant impact on the gross margin and

9    operating margin in the quarter and full year results, we

10   expect appropriate explanation to be given in the annual

11   report."

12       Do you see that?

13   A.   Yes.

14   Q.   Is this another example of Deloitte encouraging greater

15   disclosure about the hardware sales?

16   A.   Yes.

17   Q.   Okay.  And am I right, all of the accounting relating to

18   the hardware sales was based on the premise provided to you

19   that this was for sales and marketing purposes?  Is that fair?

20   A.   That's correct, yes.

21   Q.   I've placed before you, Mr. Welham, what has been marked

22   for identification purposes as Exhibit 40.

23       Are you familiar with this?

24           THE COURT:  Admitted.

25           (Trial Exhibit 40 received in evidence)

```
 1                    (Exhibit published to jury.)

 2            THE WITNESS:  It looks like it's Mr. Hussain's report

 3   to the audit committee for Q1/2009.

 4   BY MR. LEACH:

 5   Q.   When you say Mr. Hussain's report to the audit committee,

 6   what do you mean?

 7   A.   Each quarter, Mr. Hussain would prepare a report that he

 8   would issue to the audit committee.

 9   Q.   And would this also go to Deloitte?

10   A.   Yes.

11   Q.   And was this part of what you would consider -- part of

12   what you would consider in connection with the audit committee

13   meetings?

14   A.   Yes.  We would read it beforehand, yeah.

15            MR. LEACH:  Your Honor, I don't intend to show all of

16   these, but I'm offering into evidence Exhibits 126 --

17            THE COURT:  Wait.  Wait.  Okay.  126.

18            MR. LEACH:  230.

19            THE COURT:  230.

20            MR. LEACH:  486.

21            THE COURT:  486.

22            MR. LEACH:  706.

23            THE COURT:  706.

24            MR. LEACH:  933.

25            THE COURT:  933.
```

1          **MR. LEACH:**  1114.

2          **THE COURT:**  1114.

3          **MR. LEACH:**  1419.

4          **THE COURT:**  1419.

5          **MR. LEACH:**  1719.

6          **THE COURT:**  1719.

7          **MR. LEACH:**  And 1959, all of which I think are

8    Mr. Hussain's notes to the audit committee for different

9    quarters, and I don't anticipate there is an objection to.

10         **THE COURT:**  Admitted.

11         (Trial Exhibits 126, 230, 486, 706, 933, 1114, 1419,

12          1719 and 1959 received in evidence)

13   **BY MR. LEACH:**

14   **Q.**   Mr. Welham, I've placed before you what has been marked

15   for identification purposes as Exhibit 2993.  Do you recognize

16   this is an email from Mr. Hussain to you, Richard Knights and

17   Steve Chamberlain and Rob Knight on or about July 8, 2010?

18   **A.**   Yes.

19         **THE COURT:**  Admitted.

20         (Trial Exhibit 2993 received in evidence)

21              (Exhibit published to jury.)

22   **BY MR. LEACH:**

23   **Q.**   What is this document, Mr. Welham?

24   **A.**   Can I just have time to read it, please?

25   **Q.**   Yes, please.

WELHAM - DIRECT / LEACH

1   **A.**    (Witness reviews document.)

2   **Q.**    If we could please scroll down a little bit, please.

3   **A.**    Do you want me to comment on the first email?

4   **Q.**    My question is going to be largely on the first email, but

5   if you need more time at any point, just let me know,

6   Mr. Welham.

7        Do you remember in July of 2010 issues relating to Brent

8   Hogenson coming to Deloitte's attention?

9   **A.**    Yes, I do.

10  **Q.**    What do you understand happened?

11  **A.**    Brent raised some questions directly to ourselves as

12  auditors and I believe to the audit committee as well, some

13  questions around accounting for certain transactions within

14  Autonomy.

15  **Q.**    And in the course of -- and did you read those

16  allegations?

17  **A.**    I did, yes.

18  **Q.**    And in the course of that, did you solicit responses from

19  management about what had happened and what their position on

20  certain matters were?

21  **A.**    As a team we did, yes.

22  **Q.**    And did you rely on the representations that you obtained

23  from management in evaluating what Mr. Hogenson was raising?

24  **A.**    Yes.

25  **Q.**    If we could briefly look at page 6 of Mr. Hogenson's email

WELHAM - DIRECT / LEACH

1    and the paragraph beginning "in February 2010."  Do you see

2    that -- do you see some reference to "EDD processing

3    activities"?

4    A.    Yes.

5    Q.    Okay.  And if we could please go back to page 1, the email

6    from Mr. Hussain relating to Capax, EAS, and EDD.  Do you see

7    that?

8    A.    Point 4, yes.

9    Q.    Do you see where he wrote, "Generally each quarter, we

10   announce on the quarterly calls that we have removed services.

11   Our relationship with Capax as a trusted partner is good and so

12   we will subcontract to them when necessary EDD overflow

13   services."

14        Do you see that?

15   A.    Yes.

16   Q.    "This is a normal part of our business."

17        Is that what Mr. Hussain wrote to you?

18   A.    I can't remember the email, but, yes, it's on here.

19   Q.    If Capax had a handshake agreement from Autonomy that

20   Autonomy was going to make sure Capax got the money to be able

21   to make the EDD software payments, would that have been

22   relevant to your assessment of what Mr. Hogenson was raising

23   with you?

24   A.    Yes.

25   Q.    Is that something you would have expected Mr. Hussain to

1  bring to your attention?

2  **A.**   If he was aware, yes.

3  **Q.**   If there was a side agreement in respect of the EDD

4  transactions, is that something you needed to know about?

5  **A.**   Yes.

6  **Q.**   In your discussions with Mr. Hussain, did he ever tell you

7  that every deal with MicroTech still had to be sold by Autonomy

8  to an end user?

9  **A.**   Would you say that last part again?

10  **Q.**   In your discussions with Mr. Hussain, did he ever tell

11  that you every deal with MicroTech still had to be sold by

12  Autonomy to an end user?

13  **A.**   No.

14  **Q.**   Did Sushovan Hussain -- in your discussions with

15  Mr. Hussain, did he tell you that every deal with Capax still

16  had to be sold by Autonomy to the end user?

17  **A.**   No.

18  **Q.**   In your discussions with Mr. Hussain, did he ever tell you

19  that every deal with Discover Tech had to be sold by Autonomy

20  to an end user?

21  **A.**   No.

22  **Q.**   In your discussions with Mr. Hussain, did he ever tell you

23  that Autonomy made MicroLink whole on deals that didn't sell

24  through to an end user?

25  **A.**   No.

1  **Q.**   In your discussions with Mr. Hussain, did he tell you that

2  Autonomy made Capax whole on any deal that didn't sell through

3  to an end user?

4  **A.**   No.

5  **Q.**   By the end of 2011, the end of the Q2/2011, did you have

6  any idea that Autonomy had paid $15 million for EDD services to

7  Capax that it hadn't performed?

8  **A.**   No.

9  **Q.**   Is that information surprising to you?

10  **A.**   It is very surprising, yes.

11  **Q.**   Why is that?

12  **A.**   Because if you're paying for things, you would expect

13  there to be a service, so it just -- yeah, very surprising.

14  **Q.**   In your discussions with Mr. Hussain, did he ever tell you

15  that Autonomy had counted revenue in earlier quarters by

16  backdating agreements?

17  **A.**   No.

18  **Q.**   Was that relevant to you?

19  **A.**   Yes.

20  **Q.**   Was that something that you needed to know about?

21  **A.**   Yes.

22  **Q.**   Why is that?

23  **A.**   Because it goes to cutoff again.

24  **Q.**   And as an auditor, is this -- is it a situation where you

25  just ask questions and get responses or is it your expectation

1  that Mr. Hussain would bring issues to your attention?

2  **A.**   No.  We would expect all information to be provided to us.

3  **Q.**   What do you mean by "all information to be provided to

4  us"?

5  **A.**   All relevant information.

6  **Q.**   And if Autonomy management purposely made a false

7  statement to Deloitte, would that be material to you?

8  **A.**   Yes.

9  **Q.**   Why is that?

10  **A.**   Because it goes against what the -- what UK law and

11  therefore the Companies Act says.

12  **Q.**   We've looked at a number of management rep letters.  Do

13  those management rep letters require Mr. Hussain to make proper

14  inquiry of the folks in his finance department and elsewhere

15  within Autonomy?

16  **A.**   Yes.

17  **Q.**   Why do you make Mr. Hussain do that?

18  **A.**   So that he can sign the letter.

19  **Q.**   So that you can be assured that somebody has looked into

20  this?

21  **A.**   Yes.

22  **Q.**   Is that fair?

23  **A.**   Yes.

24  **Q.**   And we've looked at a number of audit confirms where this

25  language about "ongoing continuing" -- "ongoing managerial

1    involvement" is inserted into some of the rep letters.  Do you

2    recall looking -- or the audit confirmations.  Do you recall

3    that?

4    **A.**    Yes.

5    **Q.**    Did that become an element just because of the

6    confirmation letter or was that always an IAS 18 requirement?

7    **A.**    It's always part of IAS 18.  That hasn't changed.

8    **Q.**    In your discussions with Mr.-- going back to the third

9    quarter of 2009, our first discussion about SPE and your

10   discussion with Mr. Hussain, did he disclose to you that the

11   R&D costs for SPE were not $11 million but were well below $1

12   million?

13   **A.**    No.

14   **Q.**    A few more documents I want to offer, Mr. Welham, an I

15   don't think we need to display this and I believe there is no

16   objection.

17        Exhibits 288 --

18              **THE COURT:**  288.

19              **MR. LEACH:**  992.

20              **THE COURT:**  992.

21              **MR. LEACH:**  1188.

22              **THE COURT:**  1188.

23              **MR. LEACH:**  1538.

24              **THE COURT:**  1538.

25              **MR. LEACH:**  And 2031, which are additional management

1    representation letters to Deloitte.

2           THE COURT:  2031.

3        All exhibits to be admitted.

4        (Trial Exhibits 288, 992, 1188, 1538 and 2031 received

5         in evidence)

6           MR. LEACH:  Thank you, Mr. Welham.

7        Thank you, Your Honor.  I have nothing further.

8           THE COURT:  Cross.

9                        CROSS-EXAMINATION

10   BY MR. DOOLEY:

11   Q.   Good afternoon, Mr. Welham.  My --

12   A.   Good afternoon.

13   Q.   My name is Brook Dooley, I represent Mr. Hussain.

14        And good afternoon to the jury.

15        You and I have never met before, have we, Mr. Welham?

16   A.   We have not, no.

17   Q.   In your role as a manager and a senior manager at Deloitte

18   working on the Autonomy audit, I take it you had a good

19   opportunity to view the relationship between the Deloitte audit

20   team and the Autonomy management?

21   A.   Yes.

22   Q.   And would you describe the relationship as an independent

23   one, Deloitte was independent from Autonomy?

24   A.   Yes.

25   Q.   Would you agree that Deloitte exercised professional

**WELHAM - CROSS / DOOLEY**

skepticism when it came to reviewing Autonomy's accounts?

**A.**   Yes.

**Q.**   Is professional skepticism -- is that a term of art in the accounting business?

**A.**   It's specifically prescribed in the auditing standards, yes.

**Q.**   Why don't you tell the jury what professional skepticism is.

**A.**   It means not just taking management's word for things; actually doing physical testing and have a skeptical mind at all times, so to look for risks within the financials and to do specific procedures on those risks and to always have a skeptical mind.

**Q.**   Did you and your colleagues at Deloitte always have a skeptical mind when you were carrying out the quarterly reviews and the annual audits at Autonomy?

**A.**   We did, yes.

**Q.**   And in carrying forward this professional skepticism, did you challenge management's accounting approach when it was appropriate to do so?

**A.**   We did, yes.

**Q.**   Did you and your colleagues at Deloitte tell Autonomy management when you disagreed with their proposed accounting treatment?

**A.**   Yes.  We would have discussions around it, yes.

1    **Q.**    Were there occasions when you would disagree with

2    Autonomy's accounting approach and they would change their

3    approach as a result of your guidance?

4    **A.**    Yes.

5    **Q.**    There was some questions asked on your direct examination

6    about the size of Autonomy and perhaps the significance to your

7    office.

8         Do you remember that question about an email in September

9    of 2011?

10   **A.**    I do, yes.

11   **Q.**    Did the size of the Autonomy account affect your judgment

12   as an auditor?

13   **A.**    No.

14   **Q.**    Do you believe that it affected the judgment of anybody

15   else on the audit team?

16   **A.**    No.

17   **Q.**    In your role as a -- first a manager and then a senior

18   manager, did you also have an opportunity to observe the level

19   of assistance and cooperation provided by Autonomy management?

20   **A.**    Yes.

21   **Q.**    And were you satisfied by the level of assistance that

22   Autonomy provided?

23   **A.**    Yes.

24   **Q.**    Did they answer your questions?

25   **A.**    Yes.

1    Q.    Did they provide you the information you asked for?

2    A.    Yes.

3    Q.    You've testified and others have testified about the audit

4    process and the difference between quarterly reviews and annual

5    audits, and I think we've covered a lot of that, but there is

6    one piece of it that I do want to focus on, Mr. Welham.

7         In your role as a manager and senior manager between 2009

8    and 2011, did you have an opportunity to interact with the

9    audit committee of Autonomy's board of directors?

10   A.    Yes.

11   Q.    Take a minute to just remind the jury what the audit

12   committee of the board of directors is.

13   A.    It's a collection of board members, so most notably,

14   non-executive directors in the UK who are independent from the

15   executive directors, and they oversee the audit process.  They

16   oversee things around risk and control.  And therefore the work

17   we do is reported to the audit committee and it's their job to

18   challenge management and also look at the work we've done.

19   Q.    And at the end of your quarterly review and annual audit

20   processes, Deloitte provided a report to Autonomy's audit

21   committee; correct?

22   A.    They did, yes.

23   Q.    The jury is now familiar with these audit committee

24   reports.  That is the document that gets sent to the audit

25   committee; correct?

1    **A.**   Correct.

2    **Q.**   And along with -- during your quarterly reviews, along

3    with the audit committee report, Deloitte also provided the

4    audit committee with a draft press release; correct?

5    **A.**   That was also provided.  I don't think we provided the

6    draft press release, but management provided that, but, yes,

7    that was also available for the audit committee.

8    **Q.**   Got it.

9        So that was provided by management, but it was provided in

10   conjunction with the audit committee report?

11   **A.**   Correct, yes.

12   **Q.**   And similarly, at the end of the annual audit, Deloitte

13   provided the audit committee report to the board and then a

14   draft of the annual report was provided as well?

15   **A.**   Yes.

16   **Q.**   And then after those documents had been provided, did

17   Deloitte hold a meeting with the audit committee every quarter

18   to discuss the audit committee report and the draft press

19   releases and the draft annual reports?

20   **A.**   Yes.

21   **Q.**   And who attended those meetings?

22   **A.**   From the Deloitte side, it would be myself and the

23   partners, so in 2009, Richard Knights, and for 2010, most of,

24   Nigel Mercer and '11 as well.

25   **Q.**   That was on the Deloitte side.  Who else attended the

**WELHAM - CROSS / DOOLEY**

1   meeting?

2   **A.**   So it would be other members of the audit committee, so I

3   can't remember every single member, but Mr. Hussain would be

4   there, the audit committee chair in 2010, his name was Jonathan

5   Bloomer, I think, and then I can't remember the -- but the

6   non-executive directors would attend.

7   **Q.**   When you say "non-executive director," you're talking

8   about somebody who doesn't work for the company, not the CEO or

9   the CFO, but somebody who is -- works someplace else or is a

10  professor or retired, independent of the company?

11  **A.**   Correct, yes.

12  **Q.**   And those are the folks who were reviewing the audit

13  committee reports and reviewing the draft press releases and

14  reviewing the annual reports?

15  **A.**   Correct.

16  **Q.**   And what was the purpose of this meeting with the audit

17  committee?

18  **A.**   So it's a fairly standard thing in the UK for listed

19  companies, you have to have an audit committee as part of the

20  corporate governance code, and we would run through our report

21  that you've seen and take any questions on that, essentially.

22  **Q.**   So this group of independent directors had an opportunity

23  to ask questions about all the things that we've seen in these

24  audit committee reports; correct?

25  **A.**   Yes.

**WELHAM - CROSS / DOOLEY**

1    **Q.**   The hardware, the resellers, so forth?

2    **A.**   Yes.

3    **Q.**   And at these audit committee meetings, you mentioned that

4    Mr. Hussain would attend.  Did you also have an opportunity to

5    meet with the audit committee without anybody from the company

6    there?

7    **A.**   We did, yes.

8    **Q.**   And describe that for the jury.

9    **A.**   So, again, that's another standard feature of an audit

10   committee meeting in the UK.  So typically at the end of the

11   meeting, there will be a separate session where the auditors

12   will meet with the -- the audit committee members, which are

13   the non-executive directors, alone where you can discuss

14   anything that you feel you can't discuss with management

15   present.

16   **Q.**   So they have an opportunity to talk about the accounts,

17   the financial statements, without Mr. Hussain there or

18   anybody -- anybody else from the company?

19   **A.**   Correct.

20   **Q.**   Okay.  And after this meeting, is it your understanding

21   that the audit committee would vote to approve the press

22   release, the quarterly accounts, and the annual accounts?

23   **A.**   That's my understanding, yes.

24   **Q.**   And then would the full board of Autonomy approve those

25   accounts as well?

1  **A.**   I would assume so, yes.

2  **Q.**   I want to pick up where -- one of the topics that

3  Mr. Leach raised after the break, and that's Autonomy's

4  hardware sales, and the jury has heard a fair amount about

5  this.

6      From 2009, 2010, and 2011, Deloitte knew that Autonomy was

7  reselling EMC and Dell hardware; correct?

8  **A.**   Correct.

9  **Q.**   And Deloitte, the Deloitte audit team, knew how much

10  hardware Autonomy was reselling; correct?

11  **A.**   Yes.

12  **Q.**   Probably down to the penny?  I mean, did you know exactly

13  how much hardware was being sold?

14  **A.**   We would test the majority of the hardware transactions.

15  They would have good -- good level of understanding, yes.

16  **Q.**   And Deloitte knew that Autonomy was reselling the hardware

17  at a loss; correct?

18  **A.**   Yes.  For the most part.

19  **Q.**   And Deloitte also knew that some of the hardware that

20  Autonomy was reselling was sold without adding any software to

21  it?

22  **A.**   Correct.

23  **Q.**   Deloitte knew that Autonomy was reselling hardware through

24  hardware resellers as well; correct?

25  **A.**   Correct.

1   **Q.**   And all of this was known to and discussed, not only with

2   the Deloitte audit team, but also the audit committee and the

3   board as well?

4   **A.**   Correct.

5   **Q.**   Deloitte, the Deloitte audit team, understood Autonomy's

6   strategic rationale for selling this hardware at a loss;

7   correct?

8   **A.**   Yes.

9   **Q.**   And is it fair to say that in the third quarter of 2009,

10  management explained that Autonomy wanted to meet existing and

11  potential customers' demand for one-stop shopping?

12  **A.**   Yes.

13  **Q.**   In other words, to be able to supply hardware along with

14  software?

15  **A.**   Yes.

16  **Q.**   To big customers?

17  **A.**   Yes.

18  **Q.**   Like the banks?

19  **A.**   Yes.

20  **Q.**   And Autonomy also wanted to develop a relationship in

21  Q3/2009 with a particular hardware supplier, EMC; correct?

22  **A.**   Yes.

23  **Q.**   And Autonomy management prepared a memo setting forth that

24  strategy; correct?

25  **A.**   Yes.

1    Q.    If we could look at Exhibit 263.  I don't think -- I don't

2    think this is in evidence.

3              MR. LEACH:  263?

4              THE COURT:  Admitted.

5              (Trial Exhibit 263 received in evidence)

6                     (Exhibit published to jury.)

7    BY MR. DOOLEY:

8    Q.    It's in one of those black binders on your left or perhaps

9    easier on the screen.

10          Mr. Welham, do you see that this is an email sent -- I

11   don't think you're on the top email, but the bottom email from

12   Steve Chamberlain to you on October 14th, 2009?  Do you see

13   that?

14   A.    Yes, I see that.

15   Q.    And he says, "Here is our paper updated for additional

16   items received from EMC last night."

17          Do you see that?

18   A.    Yes.

19   Q.    And this is a memo prepared by Autonomy management

20   regarding the rationale for selling hardware; correct?

21   A.    Correct.  In Q3/2009.

22   Q.    And if we look at page 3 of the exhibit, which is the

23   first page of the attachment to the email, you see at the top,

24   "as part of the directors' continual assessment" -- do you see

25   that --

1    **A.**    Yes.

2    **Q.**    -- paragraph?  "Executive management recognized an

3    opportunity to develop an application-based sales and marketing

4    initiative.  The background to this position was the

5    recognition that there was likely to be continuing

6    rationalization of IT suppliers to major financial institutions

7    or institution customers resulting from both the impact of the

8    global credit crisis" and so forth.

9         This was referring to the demand from customers for

10   one-stop shopping; is that right?

11   **A.**    I would say so, yes.

12   **Q.**    And then further down in the memo, there is a paragraph

13   that begins, "It was noted that IBM, EMC, HP, amongst others,

14   were increasingly going to market with combined

15   hardware/software application offerings in the compliance

16   space," and then in the next paragraph, "Autonomy recognized

17   the importance of being able to demonstrate to substantial

18   multinational organizations that they could deliver a combined

19   application solution."

20        So this is about demonstrating the ability to sell

21   software and hardware to big customers; correct?

22   **A.**    Yes.

23   **Q.**    And then the memo continues on to the next page

24   describing -- there's a description in the -- it says Q3 --

25   excuse me.  In the paragraph above that, it talks -- the two

1  paragraphs above that, it talks about developing a relationship

2  with EMC.  In the top paragraph, "through Mike Sullivan,

3  worldwide head of Zantaz, we've begun to develop a relationship

4  with this business."  Do you see that?

5  **A.**   Yes.

6  **Q.**   And that's part of the rationale -- part of the rationale

7  of these hardware sales was both to be able to sell more

8  software, but also to develop a relationship with EMC.  That

9  was in Q3/2009; right?

10 **A.**   That's what we're told, yes.

11 **Q.**   And then in -- under the Q3 transaction, it describes the

12 $45 million purchase of hardware and additional sales and

13 marketing support.

14      And in the next paragraph, it says -- in the last

15 sentence, "Our intention is to use this opportunity to

16 aggressively further exploit software opportunities with these

17 types of organizations."

18      Do you see that?

19 **A.**   Yes.

20 **Q.**   And in sum, you understood that big picture, Autonomy was

21 selling hardware at a loss to increase its software sales down

22 the road; correct?

23 **A.**   Correct.

24 **Q.**   And the audit team, applying your professional skepticism,

25 you considered and you challenged Autonomy on that rationale;

1   right?

2   **A.**   Yes.

3   **Q.**   But in the end, you weren't aware of any evidence

4   contradicting management's explanation for the reason for why

5   they were doing these sales; right?

6   **A.**   Correct.

7   **Q.**   There's a reference in that -- in that memorandum to

8   building a relationship with EMC.  On that topic, do you

9   remember something called Project Dynamo at Autonomy?

10  **A.**   I do, yes.

11  **Q.**   What was that?

12  **A.**   I think Project Dynamo was the potential acquisition of an

13  element of EMC, from memory.

14  **Q.**   Was it perhaps the acquisition of a business unit called

15  Documentum?

16  **A.**   Yes.  I believe so.

17  **Q.**   If you could look at Exhibit 6754, please.  It's in

18  your -- it should be in binder 2 of 2 there on the top.

19          **MR. LEACH:**  No objection.

20          **THE COURT:**  Admitted.

21          (Trial Exhibit 6754 received in evidence)

22                (Exhibit published to jury.)

23  **BY MR. DOOLEY:**

24  **Q.**   We can just put it on the screen.  Once it's admitted, it

25  can go on the screen.

1        Do you see this is an email that you're copied on in

2   November of 2010, Project Dynamo draft report, draft due

3   diligence report?

4   **A.**    Yes.

5   **Q.**    Were you part of the team that inquired -- looked into the

6   possibility of Autonomy acquiring this Documentum division from

7   EMC?

8   **A.**    I was involved in the diligence work, yes.

9   **Q.**    And do you recall this was approximately a two-and-a-half

10  billion dollar transaction?

11  **A.**    Yes.

12  **Q.**    And did you understand that to be part of or an example of

13  the close connections between EMC and Autonomy?

14  **A.**    Would you say that question again?  Sorry.

15  **Q.**    Well, there was discussion about strategic relationships

16  with EMC in Mr. Hussain's memorandum.  And I'm wondering

17  whether you thought of the Documentum acquisition as another

18  example of strategic connections between the two companies.

19          **MR. LEACH:**  Objection.  Vague.

20          **MR. DOOLEY:**  I'll withdraw it, Your Honor.

21  **Q.**    In Q3/2009 and then rolling forward, there was a question

22  at Autonomy about how to account for the costs of Autonomy's

23  hardware sales; right?

24  **A.**    Yes.

25  **Q.**    In other words, where on Autonomy's income statement the

1  hardware costs should be reported, either cost of goods sold or

2  sales and marketing?

3  **A.**   Yes.

4  **Q.**   And there's no accounting rule under IFRS which specifies

5  how costs should be divided between cost of goods sold and

6  operating expenses; correct?

7  **A.**   That's correct, yes.

8  **Q.**   It's a matter of judgment whether you divide it between

9  costs of goods sold or sales and marketing?

10  **A.**   Yes.

11  **Q.**   And before I get too far ahead, maybe you could explain

12  the difference between cost of goods sold and sales and

13  marketing, just briefly for the jury.

14  **A.**   So cost of goods sold is the first line of expenses below

15  revenue and therefore that is the expenditure that gets taken

16  off revenue and gives you your gross profit and therefore your

17  gross margin.

18      And then sales and marketing expenses are below gross

19  margin and therefore impact your operating profit margin.

20  **Q.**   And Autonomy made the judgment that a portion, not all,

21  but a portion of the costs of the hardware that they were

22  reselling should be put to sales and marketing; correct?

23  **A.**   Correct.

24  **Q.**   And the reason, as you understood it and it was explained

25  to you, was that the hardware sales were being used to drive

1  software sales?

2  **A.**    Yes.

3  **Q.**    So a portion of "we're buying this computer and then we're

4  reselling it and then a portion of why we're doing that is

5  to -- is marketing and so therefore we'll put it to marketing

6  expenses."  That was about the explanation; correct?

7  **A.**    That was the concept, yes.

8  **Q.**    And you were satisfied, Deloitte, the audit team was

9  satisfied with Autonomy's judgment and explanation for how it

10  accounted for these costs?

11  **A.**    We had some debates around it and we were comfortable with

12  where they ended up, yes.

13  **Q.**    And we won't go through it, but Deloitte reviewed

14  Autonomy's allocation of hardware costs every quarter; correct?

15  **A.**    Correct, yes.

16  **Q.**    If one sat down and read all the audit committee reports,

17  one would see a discussion of these hardware costs in every

18  audit committee report after Q3/2009; correct?

19  **A.**    Correct, yes.

20  **Q.**    That was an issue you guys paid close attention to?

21  **A.**    Yes.

22  **Q.**    And in the course of preparing the -- your quarterly

23  reviews and audits and preparing these audit committee reports,

24  Deloitte, the audit team, saw evidence that supported

25  Autonomy's rationale and accounting treatment; right?

1    **A.**    Yes.

2    **Q.**    And one piece of evidence that you saw was evidence of a

3    linkage between Autonomy's hardware sales and software sales;

4    correct?

5    **A.**    Correct.

6    **Q.**    Can you explain to the jury what the evidence of this

7    linkage was between hardware and software sales?

8    **A.**    So over the course of -- I think it starts in 2010 --

9    management would prepare an analysis which looked at the

10   companies they were selling hardware to and the level of

11   software sales with those companies as well, and therefore

12   showing the linkage that if they sell hardware, they sell high

13   margin software as a result.

14   **Q.**    So the linkage analysis showed "we're selling hardware at

15   a ten percent loss to Company A, but we're selling them a bunch

16   of software at a really high margin"; is that right?

17   **A.**    Yes.

18   **Q.**    Okay.  And is it your recollection that Autonomy's

19   software sales to customers who also bought hardware generated

20   profits in excess of the loss relating to the hardware sale?

21   **A.**    Yes.

22   **Q.**    In other words, you were making -- Autonomy was making

23   more money on selling the software to these customers than it

24   was losing selling the hardware?  Is that a capsule summary?

25   **A.**    That's what the spreadsheet showed, yes.

1  **Q.**   And those were spreadsheets that you considered and

2  management provided to you?

3  **A.**   We would review them, yes, as part of our work.

4  **Q.**   I want to talk about another topic, accounting topic,

5  related to Autonomy's hardware sales, and this is IFRS 8 and

6  segmental analysis.  I know everybody is excited to hear this,

7  but the jury has heard about this and I think it will be

8  helpful to have you explain it.

9       This is an accounting issue that came up in 2009 due to a

10  rule change in IFRS.  Do I have that right?

11  **A.**   Yes.

12  **Q.**   Okay.  And the question was Autonomy needed to figure out

13  how many operating segments it had in its business; is that

14  right?

15  **A.**   Broadly, yes.

16  **Q.**   Can you explain to the jury what an operating segment is?

17  **A.**   So you have to look at how your business is ultimately run

18  and how decisions are made, and the standard encourages or

19  requires you to look at how financial information is prepared

20  internally and how that is then used to make decisions, and who

21  makes those decisions is the chief operating decision-maker, is

22  how it's termed in the standard, and they -- and that flow of

23  information is how you then reflect what you disclose in your

24  financial statements.

25       So it's all about how management views financial

1  information internally and how many segments or elements they

2  break that down into.

3  **Q.**   Okay.  Your answer anticipated my next question, which is

4  how do operating segments relate to disclosures, but maybe you

5  could just describe that again.

6  **A.**   So once you've worked out what your operating segments

7  are, then you have to provide required disclosures around those

8  segments, or one segment as is the case here, in the notes to

9  your financial statements.

10  **Q.**   And so the operating segment analysis determines how a

11  company discloses its revenue, broadly speaking; correct?

12         **MR. LEACH:**  Objection.  Vague as to "determine."  Is

13  ti discretionary?  Is it required?

14         **MR. DOOLEY:**  That's the question.

15         **THE COURT:**  Go ahead.  Overruled.

16         **THE WITNESS:**  Just ask the question again.  Sorry.

17  **BY MR. DOOLEY:**

18  **Q.**   Broadly speaking, is it fair to say that the operating

19  segment analysis under IFRS 8 determines how revenue

20  information is disclosed in the accounts?

21  **A.**   Not just revenue.  It's other things as well.  So you --

22  you give a lot more information than just revenue to the

23  balance sheet as well, and then there is another standard, IAS

24  18, which requires you to give some additional information in

25  relation to revenue.

1  **Q.**  Okay.  We will come on to the relationship with IAS 18.

2       But Autonomy's management determined that revenue -- its

3  revenue should be reported in a single operating segment;

4  correct?

5  **A.**  Correct.

6  **Q.**  In other words, Autonomy's management determined that

7  there should be one line for revenue from sale of goods rather

8  than a separate line for separate products or business units;

9  correct?

10 **A.**  Correct, yes.

11 **Q.**  And similarly, one line for revenue from services;

12 correct?

13 **A.**  Correct.

14 **Q.**  And the Deloitte audit team carefully evaluated

15 management's conclusion; right?

16 **A.**  We did.

17 **Q.**  And you considered whether any further disclosures were

18 required under IFRS 8; right?

19 **A.**  We did.

20 **Q.**  And Deloitte prepared a memorandum describing its

21 analysis; correct?

22 **A.**  Yes.

23 **Q.**  Let's look at that, 6420.

24      I move it into evidence.  It may be covered by a

25 stipulation.

1          **THE COURT:**  Admitted.

2          **MR. DOOLEY:**  But if not, I move it in.

3          **THE COURT:**  Admitted.

4          (Trial Exhibit 6420 received in evidence)

5               (Exhibit published to jury.)

6    **BY MR. DOOLEY:**

7    **Q.**   If we could flip back to page 3.  At the top it says,

8    "Objective:  To document the" -- sorry.  Let me back up.

9          This is a work paper prepared by the Deloitte audit team;

10   correct?

11   **A.**   Yes.

12   **Q.**   And it says, "The objective is to document the adoption of

13   IFRS 8 and the impact on the notes disclosures on segments in

14   the 2009 financial statement"; correct?

15   **A.**   Yes.

16   **Q.**   And then it goes on to describe IFRS 8, and at the bottom

17   of the page, it says, "The panel encourages board of directors

18   to test their initial conclusions by considering the following

19   questions," and then it goes to the next page, and there is a

20   list of questions:  "What are the key operating decisions made

21   in running the business?  Who makes these key operating

22   decisions?"  And so forth and so on.

23         Do you see that?

24   **A.**   Yes.

25   **Q.**   And is that what you were describing earlier when you said

1  that the determination of whether you have one operating

2  segment depends on how information in the company is reported

3  up to the chief decision-maker?

4  **A.**   Yes.

5  **Q.**   And at page 5 of this memorandum, there is a conclusion

6  that Dr. Lynch, Mike Lynch, is the chief operating

7  decision-maker of Autonomy.  Do you see that?  Just under the

8  bullet point.

9  **A.**   Yes.

10  **Q.**   And then in the next couple paragraphs, it talks about --

11  the memo talks about how information is reported up.  "The

12  group reported under single segment as the nature of all the

13  group's core operations are comparable because the core

14  technology is a generic piece of technology which may be used

15  in a number of manners."

16      And then it goes on in the next paragraph, "The company

17  does not maintain distinct business lines such as manufacturing

18  and advertising" and so forth.

19      So this is the analysis of how the information is provided

20  up within the company; correct?

21  **A.**   Yes.  Some of the information, yes.

22  **Q.**   And then if you go to page 10, the conclusion is

23  "Management has demonstrated that it has one segment per IFRS

24  on the basis that Mike Lynch is the chief operating

25  decision-maker and that he does not make decisions based on

1   divisions or disaggregated data relating to the business

2   activities of the group.  Management has complied with the

3   disclosure requirements of the standard."

4       Do you see that?

5   A.   Yes.

6   Q.   There is also -- if you go back just to page -- page 9 of

7   the exhibit, there is a -- it's paragraph -- there is a

8   paragraph in italics that begins 32.  Do you see that?

9   A.   Yes.  Yes.

10  Q.   Can you describe what paragraph 32 says generally?

11  A.   Well, I might just read it out, actually.  I don't

12  remember each paragraph.

13      "An entity shall report the revenues from external

14  customers for each product and service or each group of similar

15  products and services unless the necessary information is not

16  available and the cost to develop it would be excessive in,

17  which case that fact shall be disclosed.  The amounts of

18  revenues reported shall be based on the financial information

19  used to produce the entities' financial statements."

20  Q.   And that was -- that was an additional rule under IFRS 8,

21  a subparagraph that Deloitte considered and decided didn't

22  require separate disclosures; is that correct?

23  A.   Correct, yes.

24  Q.   And then there is -- in that paragraph, there is also --

25  I'm sorry.  In the next paragraph, the last sentence reads,

1  "However, the split between product sales and provisions of

2  services will be disclosed as per IAS 18."

3       What does that mean?

4  A.   Sorry.  I'm just trying to find the sentence.  I found it

5  now.

6       Yes.  So there are additional requirements in IAS 18 with

7  regards to revenue and what you should disclose and that

8  requires you to split revenues between sale of goods and

9  rendering of services and then interest and a few other things.

10 So you have to give that disclosure as well.

11 Q.   So the split between sale of goods and services, that's

12 required.  You have to do those two?

13 A.   Yes.

14 Q.   It's not like if -- you're disclosing services because you

15 think it's important.  You have to disclose services and you

16 have to disclose sale of goods; right?

17 A.   Yes.  It's a specific requirement, yes.

18 Q.   And then the question is whether you are required to

19 disclose separate segments within each of those, separate

20 segments for sale of goods and separate segments for sale of

21 services?

22 A.   Not really, no.  So that -- that is separate to IFRS 8.

23 So then within that, if you had more than one segment, then

24 you'd have to think about what you disclose within those.  But

25 the two are not quite related.

1  Q.   Okay.  And this conclusion -- just to finish with this

2  document, this conclusion regarding Autonomy's segmental

3  analysis, if you look at the front page of this document, it

4  says "consultation on difficult or contentious matters."  Do

5  you see that?

6  A.   Yes.

7  Q.   So this was an issue that the audit team took up to senior

8  people at Deloitte to get their analysis; correct?

9  A.   It goes to our technical team, yes.

10 Q.   And Autonomy -- Autonomy and Deloitte also discussed this

11 approach with the FRRP; correct?

12 A.   Yes.

13 Q.   And can you tell the jury just what is the FRRP, briefly?

14 A.   It's otherwise known as the review panel which is some

15 part of the FRC regulatory body in the UK that reviews

16 companies' financial statements and financial reporting.

17 Q.   And this FRRP, this regulatory body, also approved of --

18 was satisfied with Autonomy's approach to reporting one

19 segment; correct?

20      MR. LEACH:  Objection.  Vague as to time and

21 foundation.

22 BY MR. DOOLEY:

23 Q.   Well, did you participate in discussions with the FRRP in

24 2009 and 2010 --

25 A.   I did not, no.

1  **Q.**   You did not.  Okay.

2      Let's look at Exhibit 428, which is in evidence, which is

3  the 2009 annual report.

4                   (Exhibit published to jury.)

5  **BY MR. DOOLEY:**

6  **Q.**   And if we could look at page 50.  And page 50 at the top,

7  it says "segmental analysis."  And that's the discussion that

8  we were just having.  This is where it describes why Autonomy

9  has a single operating segment; correct?

10 **A.**   Yes.

11 **Q.**   And then if you flip the page onto page 49, at the bottom,

12 there is the disclosure -- this is of Autonomy's revenue broken

13 out into sale of goods and rendering of services; correct?

14 **A.**   Yes.

15 **Q.**   And the -- do you see that the sale of goods is not

16 divided up into separate product lines or business units?

17 Correct?  It's just one line?

18 **A.**   Yes.

19 **Q.**   And that's a result of the fact that Autonomy has one

20 operating segment; correct?

21 **A.**   Correct.

22 **Q.**   Okay.  And given the determination that Autonomy had one

23 operating segment, would you agree that it would have been

24 inconsistent with IFRS 8 for Autonomy to separately disclose

25 business units or products under sale of goods in the financial

1  statements?

2  **A.**    You can voluntarily disclose more, but it's not required

3  by the standard.

4  **Q.**    In 2010, the audit team revisited this issue of segmental

5  disclosure; correct?

6  **A.**    Yes.

7  **Q.**    And considered whether any changes to the business in --

8  that had taken place in 2010 might change the conclusion about

9  one operating segment; correct?

10  **A.**    Yes.

11  **Q.**    And among other changes, the audit team considered whether

12  the increased level of hardware sales that they had seen

13  throughout 2010 constituted a separate operating segment;

14  correct?

15  **A.**    Yes.

16  **Q.**    And the audit team's conclusion was that the hardware

17  sales did not constitute a separate operating segment requiring

18  disclosure?

19  **A.**    Correct.

20  **Q.**    If we could look at Exhibit 6482.

21          **MR. LEACH:**  No objection.

22          **THE COURT:**  Admitted.

23      (Trial Exhibit 6482 received in evidence)

24              (Exhibit published to jury.)

25  \\\

1    BY MR. DOOLEY:

2    **Q.**   We will put it on the screen.

3         We won't go through all the details, but this is a

4    memorandum prepared at the -- in connection with the 2010

5    audit, and the conclusion was that Deloitte reached the same

6    conclusion, that Autonomy -- Autonomy's -- Autonomy had one

7    operating segment.  That was the conclusion?

8    **A.**   That's correct, yes.

9    **Q.**   If you look at page 6 of the exhibit, there is a

10   discussion of hardware sales and whether hardware sales

11   constitute a separate operating segment; correct?

12   **A.**   Correct.

13   **Q.**   And then if we look at page 9, I think the conclusion down

14   at the bottom -- I'm sorry:  "We concur with management's

15   conclusion that in accordance with the guidance provided by

16   IFRS 8, Autonomy continues to have a single operating segment."

17        And that's reflected in the 2010 annual report, if we look

18   at Exhibit 1352, which is in evidence, I believe, already.  If

19   we look at page 60, you see the segmental analysis, and then on

20   the prior page, you see the division between, at the bottom, a

21   single line item for sale of goods; correct?

22   **A.**   Yes.

23   **Q.**   In your role as an auditor, a member of Autonomy's audit

24   team, in addition to reviewing and auditing the financial

25   statements of Autonomy, you also reviewed the narrative

1  portions of Autonomy's press releases and annual reports;

2  correct?

3  **A.**    We read them, yes.

4  **Q.**    Okay.  And if you saw something -- and just so we're

5  clear, the narrative portion, sometimes it's referred to as the

6  front half and the back half; is that correct?

7  **A.**    That's correct, yes.

8  **Q.**    So in the back of the annual report, you have the numbers,

9  the financial statements, and in the front, you have the words,

10  the narrative, "here is what our business is about" and so

11  forth; right?

12  **A.**    Correct.

13  **Q.**    And Deloitte, the audit team, is responsible for auditing

14  the financial statements, but you also read the narrative

15  section; correct?

16  **A.**    Correct.

17  **Q.**    And if you saw something in the narrative portion of

18  either a press release or an annual report that was

19  inconsistent with the financial statements or was misleading in

20  any way, you certainly would have said something; correct?

21  **A.**    Correct.

22  **Q.**    And did you -- I assume you did.  You reviewed the

23  narrative portion of Autonomy's 2010 financial statements?

24  **A.**    Yes.

25  **Q.**    Let's look at page 15 of Exhibit 1352, which is the 2010

1    financial statement.  Just directing your attention to the top

2    left-hand part of the page where it says "financial model,"

3    just read that paragraph to yourself.

4    **A.**    (Witness reviews document.)

5        Okay.

6    **Q.**    Mr. Welham, do you see the reference to "pure software

7    model" there?

8    **A.**    Yes.

9    **Q.**    And you understood the reference to "pure software model"

10    to be -- to distinguish Autonomy from companies that have a

11    large percentage of their revenues that stem from professional;

12    services; correct?

13    **A.**    Yes.

14    **Q.**    You didn't understand that sentence to mean that Autonomy

15    only sold software; correct?

16    **A.**    Correct.

17    **Q.**    The point was to distinguish -- the point of the language

18    in the first sentence, the "pure software model," is to

19    distinguish Autonomy from companies described in the second

20    sentence; correct?

21        **MR. LEACH:**  Objection.  Foundation.

22        **THE COURT:**  Sustained.

23        Did he write this?

24        **MR. DOOLEY:**  No.  I'm asking his understanding.  I'm

25    sorry, Your Honor.

1    **Q.**    Was it --

2            **THE COURT:**  Go ahead.

3    **BY MR. DOOLEY:**

4    **Q.**    Was it your understanding, Mr. Welham, that the reference

5    to "pure software model" was to distinguish Autonomy from the

6    companies that are described in the second sentence that have a

7    large percentage of revenue that stem from professional

8    services?

9    **A.**    Yes.

10    **Q.**    And when you reviewed this 2010 annual report, Autonomy

11    had been reselling hardware from EMC and Dell for some time;

12    correct?

13    **A.**    Correct.

14    **Q.**    And I think the numbers are close to perhaps a hundred

15    million dollars in hardware sales in 2010; correct?

16    **A.**    Yes.

17    **Q.**    And you didn't believe that this reference to "pure

18    software model" was in any way inconsistent with your

19    understanding of Autonomy's business, did you?

20    **A.**    No.

21    **Q.**    And you didn't believe that this statement was misleading

22    in any way in light of Autonomy's hardware sales, did you?

23    **A.**    I did not, no.

24    **Q.**    You certainly would have said something if you did?

25    **A.**    Yes.

1  **Q.**  You reviewed a lot of, in your role as one of the lead

2  people on the audit team -- you reviewed a lot of quarterly

3  press releases and a couple of annual reports at Autonomy;

4  correct?

5  **A.**  Yes.

6  **Q.**  Did you see any statements in Autonomy's quarterly press

7  releases or annual reports that you thought were inconsistent

8  with Autonomy's hardware sales?

9  **A.**  No.

10  **Q.**  Did you see any statements in any of Autonomy's quarterly

11  press releases or annual reports that you thought were

12  misleading in light of Autonomy's hardware sales?

13  **A.**  No.

14  **Q.**  You were asked some questions by Mr. Leach about

15  references in the audit committee reports to disclosure of

16  hardware.

17       Was the Deloitte audit team comfortable with the level of

18  disclosure made by Autonomy with respect to its hardware sales?

19  **A.**  Yes.  We could accept the level of disclosure provided.

20  **Q.**  And if you weren't, you certainly would have said

21  something; right?

22  **A.**  Correct.

23  **Q.**  I want to switch gears, Mr. Welham, and talk about revenue

24  recognition on the sales to these resellers.

25       Revenue recognition for sale of goods is governed by the

1  rule IAS 18.14; is that right?

2  **A.**   I can't remember the specific paragraph numbers, but I'll

3  take your word for it.

4  **Q.**   Okay.  Spending too much time with these rules.

5       Well, let's look at it.  Let's -- if we can call up

6  Exhibit 6737.  I would move this in.

7            **THE COURT:**  Admitted.

8            (Trial Exhibit 6737 received in evidence)

9                 (Exhibit published to jury.)

10  **BY MR. DOOLEY:**

11  **Q.**   Mr. Welham, do you recognize Exhibit 6737 as International

12  Accounting Standard 18?

13  **A.**   Yes.

14  **Q.**   And this International Accounting Standard is part of what

15  we've been referring to as the IFRS rules; is that right?

16  **A.**   Yes.  It's part of IFRS.

17  **Q.**   And if you -- the title is "Revenue," and if you look at

18  page 8 of the exhibit, it refers to sale of goods.  Do you see

19  that?

20  **A.**   Yes.

21  **Q.**   And Rule 14 there says, "Revenue from sale of goods shall

22  be recognized when all of the following conditions have been

23  satisfied."  And it lists -- and the jury has seen these rules

24  now, but first is that "The entity has transferred to the buyer

25  the significant risks and rewards of ownership.  The entity

1    retains neither continuing managerial involvement to the degree

2    usually associated with ownership nor effective control over

3    the goods sold.  The amount of revenue can be measured

4    reliably.  It's probable that the economic benefits associated

5    with the transaction will flow to the entity and then the costs

6    incurred or to be incurred in respect to the transaction can be

7    measured reliably."

8         Those are kind of the touchstones for revenue recognition

9    'correct?

10   **A.**   Correct.

11   **Q.**   And then in Rule 18.15, it says, "In most case" -- in the

12   middle there, "In most cases, the transfer of risk and rewards

13   of ownership coincides with the transfer of the legal title or

14   the passing of possession to the buyer."  Do you see that?

15   **A.**   Yes.

16   **Q.**   In other words, in most cases, risks and rewards of

17   ownership pass with delivery of the item you're selling.  Once

18   you've handed the thing over, then that's when risks and

19   rewards pass, in most cases.  Is that a fair summary?

20   **A.**   That's what it says, yes.

21   **Q.**   And then there are some examples of where the entity, the

22   seller, retains the significant risks of ownership and says

23   that if they do retain the significant risk of ownership, the

24   transaction is not a sale and revenue can't by recognized.

25        So one example is "if the entity that is selling retains

1    an obligation for unsatisfactory performance not covered by

2    normal warranty provisions."  Do you see that?

3    **A.**    Yes.

4    **Q.**    And then the next one is "when the receipt of the revenue

5    from a particular sale is contingent on the derivation of

6    revenue by the buyer from its sale of goods."  Do you see that?

7    **A.**    Yes.

8    **Q.**    And then it goes on.

9          Those are examples of where risk hasn't passed in

10   paragraph 16; correct?

11   **A.**    They are examples, yes.

12   **Q.**    And -- we can leave those up just for a second there.

13         These rules, IAS 18.14 and the following paragraphs, these

14   are the rules that apply to the sales to end users, to VARs

15   alike; correct?

16   **A.**    Correct.

17   **Q.**    So these are the rules, and when we're talking about these

18   sales to resellers, these are the rules that apply; correct?

19   **A.**    Yes.

20   **Q.**    And when applying these rules in the case of a sale to a

21   reseller, you'd agree that the relevant agreement for revenue

22   recognition purposes is the agreement between, in the case of

23   Autonomy, Autonomy and the reseller; correct?

24   **A.**    Yes.

25   **Q.**    So for applying -- if you want to know if you can

1  recognize revenue when you're selling to a reseller, the

2  relevant agreement you look at is the agreement between the

3  seller and the reseller; correct?

4  **A.**   Yes.

5  **Q.**   It's not relevant for the purposes of revenue recognition

6  whether the party with whom the seller, in this case

7  Autonomy -- it's not relevant for the purposes of revenue

8  recognition whether the party with whom Autonomy has contracted

9  is a VAR or an end user; right?  The same rules apply?

10  **A.**   Same rules, yes.

11  **Q.**   And when you're selling to a reseller, it's not even a

12  requirement that you identified an end user; correct?

13  **A.**   Correct.

14  **Q.**   You could just sell to a reseller without listing an end

15  user; correct?

16  **A.**   Yes.

17  **Q.**   And this -- this rule that allows recognition of revenue

18  to -- on sale to the reseller, sometimes that's called

19  "recognizing revenue on sell-in."  Have you heard that phrase?

20  **A.**   I have, yes.

21  **Q.**   And recognizing revenue on sell-in means selling to the

22  reseller?

23  **A.**   Yes.

24  **Q.**   And if you recognize revenue on sell-through, it means

25  when the reseller sells it on; correct?

1   **A.**   Correct.

2   **Q.**   And that's a difference between U.S. accounting, the U.S.

3   GAAP rules and IFRS; correct?

4   **A.**   It's one of the differences, yes.

5   **Q.**   One of the differences.

6        U.S. GAAP rules require a sale by the end user to the

7   customer before he can recognize revenue; correct?

8   **A.**   I believe so, yes.

9   **Q.**   When -- in 2009, 2010, 2011 when the audit team was

10  evaluating Autonomy's accounts, you prepared -- and we've seen

11  some of them -- detailed memorandum regarding the large deals

12  that came in in a quarter, deals over a million dollars; is

13  that right?

14  **A.**   Yes.

15  **Q.**   Let's -- if we could look at Exhibit 702J just as an

16  example of how this works.

17        **THE COURT:**  Is 702 in?

18        **MR. DOOLEY:**  I think it's part of the stipulation.

19        **THE COURT:**  So 702 admitted.  The whole thing or J or

20  what?

21        **MR. DOOLEY:**  702J is the specific exhibit that is the

22  work paper for transactions --

23        **THE COURT:**  So 702J is admitted.

24        **MR. DOOLEY:**  I think all of 702 is admitted and I'm

25  just referring to J.

1          **THE COURT:**  702 is admitted in its entirety.

2          (Trial Exhibit 702 received in evidence)

3                  (Exhibit published to jury.)

4  BY MR. DOOLEY:

5  **Q.**   If you could blow up the upper left-hand corner, this is

6  the sale in Q1/2010 -- the jury has heard about this -- to

7  MicroTech for the end user the Vatican; right?

8  **A.**   Yes.

9  **Q.**   And if we scroll down to line 21/22, it says, "This deal

10 provides the end user, the Vatican Library" -- sorry.  Let's

11 let Jeff get caught up -- "for the following software," and

12 then it lists a bunch of software; correct?

13 **A.**   Yes.

14 **Q.**   And then if we go down to line 51, you write, "We have

15 reviewed the signed PO from MicroTech and the original VAR" --

16 I'm sorry.

17      Deloitte wrote -- I don't know if you prepared this, but

18 it was prepared by Deloitte.

19      Deloitte writes, "We have reviewed the signed PO from

20 MicroTech and the original VAR agreement between Autonomy and

21 MicroTech.  This was done to identify any terms which might

22 restrict recognition of revenue.  No such terms were noted."

23      And that's -- again, you're examining the contract between

24 Autonomy and MicroTech here; correct?

25 **A.**   Correct, yes.

1  **Q.**  And then in the next sentence, it says, "We've also

2  obtained a revenue confirmation from the customer which

3  confirms the above invoice is valid and that there are no side

4  agreements and this is documented in the file."

5      Do you see that?

6  **A.**  I can see that.

7  **Q.**  That's a revenue confirmation from MicroTech; correct?

8  **A.**  Yes.

9  **Q.**  Not in this instance the Vatican?

10  **A.**  Correct.

11  **Q.**  And then there is -- and then it says, "satisfactory" and

12  then there is a discussion of something called "maintenance

13  element" and then "collectibility" and that's just an

14  assessment of whether Autonomy or, rather, whether MicroTech --

15  it's probable that MicroTech could pay for this invoice;

16  correct?

17  **A.**  Correct, yes.

18  **Q.**  And what -- and "probable" is the right standard; right?

19  When you're evaluating collectibility, it's whether it's

20  probable that the customer will pay?

21  **A.**  Yes.  I think it uses the phrase "reasonably possible,"

22  but, yes.

23  **Q.**  Okay.  Not a certainty, but it's reasonably probable that

24  they will pay?

25  **A.**  Yes.

1    **Q.**    And then there is various testing here that Deloitte did

2    with respect to MicroTech.

3        "MicroTech are a large VAR that has done a number of

4    significant deals with Autonomy in previous quarters.  During

5    Q1, Autonomy received a total of 10.7 million from MicroTech in

6    settlement of previous deals.  This was in line with the

7    payment terms on those deals."

8        Why is that relevant to collectibility?

9    **A.**    We look at various things, but a good piece of evidence is

10    looking at previous cash collection.  So if you've seen cash

11    coming in in previous quarters, then that's good evidence that

12    they are able to pay.

13    **Q.**    Got it.

14        And then we've -- the next line, "We reviewed the debtors'

15    ledger and note that MicroTech is current."

16        Again, why is that relevant to collectibility?

17    **A.**    We're just making sure there that there are no long

18    overdue debts.

19    **Q.**    And then in the next paragraph, "MicroTech is a non-listed

20    U.S. company.  There is little financial information in the

21    public domain.  As such, management has facilitated the

22    collection of some recent financial data from the CFO of

23    MicroTech.  This was in the form of a written letter to Steve

24    Chamberlain.  This has been documented on the file."

25        What's that about?

1  **A.**   So I'm just trying to remember.  I think that MicroTech

2  actually issued a letter just confirming their financial

3  position because they're a U.S. private company, and as it says

4  there, there is very little data available.

5  **Q.**   Again, that's in furtherance of determining whether it's

6  probable that MicroTech can pay, you look at their financial

7  statements?

8  **A.**   Yes.  As one of the factors we consider.

9  **Q.**   Let's look at Exhibit 1709C, which is also in evidence

10  pursuant to a stipulation.

11                    (Exhibit published to jury.)

12  **BY MR. DOOLEY:**

13  **Q.**   Do you see that this is a work paper for sale in Q1/2011

14  to Discover Tech for the end user ThinkTech?

15  **A.**   Yes.

16  **Q.**   Do you see that?

17       And, again, there's a discussion of the deal at the top,

18  and then starting at line 50, "We have reviewed the agreement

19  for any terms that would restrict upfront recognition of

20  revenue.  None were noted."

21       And then in the next line down, line 55, "We've also

22  obtained a revenue confirmation from the customer which

23  confirms that the above invoice is valid; that there are no

24  side agreements."

25       Do you see that?

1    **A.**    Yes.

2    **Q.**    And that's a confirmation from Discover Technologies;

3    right?

4    **A.**    Yes.

5    **Q.**    And then down on collectibility, "When considering

6    deal" -- this is line 70.

7        "When considering deals done through a VAR, the primary

8    concern over collectibility is over the VAR.  Should they fail

9    to collect the amounts owed from the end user, they are still

10   contractually obliged to pay Autonomy for the software

11   purchased."

12       Do you see that?

13   **A.**    Yes.

14   **Q.**    And was that a standard provision in Autonomy's agreements

15   with the resellers?

16   **A.**    I can't remember all the words, but, yes, ultimately when

17   they sold to the VAR, the VAR had to pay them, irrespective of

18   when the end user pays the VAR.

19   **Q.**    So whatever happens -- when the reseller buys from

20   Autonomy, whatever happens with the end user, the reseller

21   remains on the hook to Autonomy?

22   **A.**    Yes.  That was what the contract said.

23   **Q.**    Okay.  And the Deloitte audit team again completed one of

24   these, and we're not going to look at all of them, but

25   completed a work paper like that for every sale to a reseller

1   over a million dollars; correct?

2   A.   Correct.

3   Q.   And also other sales over a million dollars, but every

4   sale to a reseller over a million dollars got one of these

5   worksheets; correct?

6   A.   Yes.  As long as we were aware of it, then we looked at

7   it, yes.

8   Q.   And Deloitte also tested a sample of deals under a million

9   dollars; right?

10  A.   Correct.

11  Q.   How did you do that?

12  A.   We would calculate a sample size using our materiality and

13  then we would spread that sample size over the course of the

14  reviews throughout the year.

15  Q.   So as long as these five IAS 18 criteria are met on the

16  sale to the VAR, then the revenue can be recognized; right?

17  A.   Yes.

18  Q.   And as long as the criteria are met, there is no reason to

19  consider the commercial rationale or substance of any onward

20  sale by the reseller; correct?

21  A.   Correct.  It's just based on the agreement that we have.

22  Clearly if there are other agreements, that's a separate issue.

23  Q.   And as long as the criteria in IAS 18 are met, it's okay

24  if the sale -- if the purpose of the sale to the reseller is to

25  get revenue in a particular period; right?

1    **A.**    Just say the question again.  Sorry.

2    **Q.**    I said as long as the criteria of IAS 18 are met, it's

3    okay if the purpose for the sale to the reseller is to get

4    revenue in that period?

5    **A.**    As long as there is a genuine sale and the risks and

6    rewards are transferred, so meaning the criteria would be met,

7    so then yes.

8    **Q.**    And as long as the criteria are met, there is nothing

9    wrong with making a sale at the last minute; right?

10   **A.**    Correct.  As long as it's in the quarter.

11   **Q.**    If we could look at Exhibit 6371D.  This is the --

12          **THE COURT:**  Admitted.

13          (Trial Exhibit 6371D received in evidence)

14          **THE COURT:**  We are going into a specific transaction.

15   Maybe now is a good time for a recess.

16       Ladies and gentlemen of the jury, remember the admonition:

17   Don't discuss the case, allow anyone to discuss it with you,

18   form or express any we will resume at a quarter of 3:00.

19       (Proceedings were heard out of presence of the jury:)

20          **THE COURT:**  So where are we in the examination?

21          **MR. DOOLEY:**  Certainly another -- certainly another

22   hour, but I'll --

23          **THE COURT:**  Certainly another what?

24          **MR. DOOLEY:**  I said certainly another hour, hour and a

25   half.

1          THE COURT:  Oh, okay.  So we are not finishing with

2     this witness today?

3          MR. DOOLEY:  Your Honor, I think we agreed to make all

4     efforts to finish with the witness because he has travel, and

5     so --

6          THE COURT:  Okay.  How are we going to do that?

7          MR. DOOLEY:  Well, we'll --

8          THE COURT:  I can't keep the jury here.

9          MR. DOOLEY:  Well, we'll --

10         THE COURT:  So figure it out.

11         MR. KEKER:  Can we keep them until 4:15 or 4:30?  That

12     is something that we had talked to them about before.  We

13     hadn't talked to the jury about it.

14         THE COURT:  We didn't warn the jury or anything.

15     Usually I warn them.

16       I'll keep them here until 4:15 and either we are finished

17     with the witness or we're not.

18         MR. KEKER:  Your Honor, there are a couple of matters

19     we want to raise before we leave for the weekend.  They are

20     unrelated to this.  We can do them anytime, at the end of the

21     day, whenever you want to.

22         THE COURT:  Let's do them at the end of the day.

23     Okay.

24                   (Recess taken at 2:30 p.m.)

25                   (Proceedings resumed at 2:52 p.m.)

1    (Proceedings were heard in the presence of the jury:)

2    **THE COURT:**  Please be seated.

3    Let the record reflect all jurors are present, the parties

4    are present.

5    You may continue.

6    **MR. DOOLEY:**  Thank you, Your Honor.

7  **Q.**  Mr. Welham, if you could look at Exhibit 6371D, which is

8    in evidence.  This is a work paper for the Q3 2009 sale to

9    Capax for Kraft.

10    I just want to call your attention to line 51 (reading):

11        "Just per discussion with Steve Chamberlain, we note

12        that the background to this deal was that Autonomy was

13        initially dealing directly with Kraft to secure the deal.

14        However, due to internal procedures at Kraft, it meant

15        that this deal could not be signed until the October 2009

16        board meeting.  As such, an order to secure the deal

17        during Q3 2009, Autonomy used the VAR Capax to sell the

18        license to Kraft, thus allowing Autonomy to secure the

19        deal with Capax and recognize the revenue" -- "albeit at a

20        lower value, and recognize the revenue."

21    Do you see that?

22  **A.**  Yes.

23  **Q.**  So this is an example where Autonomy sold to -- was

24    negotiating with Kraft and then sold to Capax in order to

25    recognize the revenue in the period and Deloitte found the

 1  accounting satisfactory; correct?

 2        MR. LEACH:  Objection.  Foundation.

 3  BY MR. DOOLEY:

 4  Q.   That's what's reflected here?

 5        THE COURT:  I don't know what -- what is it?  I don't

 6  understand the foundational objection.

 7        MR. LEACH:  Is this what he knows or what he was told?

 8        THE COURT:  Well, I assume -- well, I have operated on

 9  the assumption that you are asking him all of these questions

10  based upon what he was told at the time; is that right?  Not

11  what he's -- you're not asking him what is his present state of

12  mind as to --

13        MR. DOOLEY:  Correct.  Correct.

14        THE COURT:  You're asking:  What was -- going back to

15  that transaction, at the time of that transaction or at the

16  time he reviewed that transaction during the course of his

17  audit, did he understand X, did he understand Y?  That's the

18  question; right?

19        MR. DOOLEY:  That's correct.

20        THE COURT:  As to all these questions?

21        MR. DOOLEY:  As summarized in this document, yes,

22  Your Honor.

23        THE COURT:  Okay.  All right.

24     So with that understanding, you can answer.

25        THE WITNESS:  Can you just repeat it again, please?

1        MR. DOOLEY:  Sure.

2        THE COURT:  Okay.  Go ahead.

3   BY MR. DOOLEY:

4   Q.    That happens all the time.

5        The question is:  Autonomy -- as reflected in

6   Exhibit 6371, Autonomy was negotiating with Kraft directly,

7   sold -- couldn't close the deal, sold the license to the end

8   user Capax for the purpose of recognizing revenue in the

9   period, and the Deloitte audit team concluded that revenue

10  recognition was satisfactory.  That's what's reflected here in

11  this exhibit; correct?

12  A.    That's correct.  And as you said before, it says "albeit

13  to the lower value," and the key point is that it's for Capax

14  then to close the deal.

15  Q.    In the next -- in the paragraph two paragraphs down, it

16  reads (reading):

17        "In order to support the above rationale, we've

18        viewed the customer relationship management software used

19        by Autonomy sales staff to evidence the fact that Autonomy

20        were dealing directly with Kraft.  We note there were

21        meetings between Kraft and Autonomy dating back from

22        July 2009 to the end of Q3 2009.  Note that we have also

23        seen an e-mail from Joel Scott that contained draft

24        professional service contracts between Autonomy and Kraft;

25        thus, evidencing that the two parties continue to

1           negotiate in good faith and that the deal is progressing."

2       So as reflected in this exhibit, Autonomy was continuing

3   to negotiate with Kraft; is that correct?

4   **A.**   At which point?  Sorry.

5   **Q.**   At the point at which the deal was sold to Kraft -- to

6   Capax.

7   **A.**   I'm just going to read that again.

8       (Witness examines document.)

9   **Q.**   Well, maybe the next sentence makes it clearer,

10  Mr. Welham, time-wise.

11  **A.**   (Witness examines document.)  Do you want to read the next

12  sentence?

13  **Q.**   Yeah.  I think it makes it clearer.  (reading)

14          "Given that we have seen evidence that directly links

15      Autonomy and Kraft, both pre and post the deal with Capax,

16      we conclude that there is satisfactory evidence to support

17      the fact that Kraft are the end user."

18      Do you see that sentence?

19  **A.**   Yes.

20  **Q.**   Okay.  And so as reflected in this exhibit, the Deloitte

21  audit team was aware that Autonomy was negotiating directly

22  with Kraft before the sale to Capax and post the deal with

23  Capax, and the accounting -- the revenue recognition was judged

24  to be satisfactory; is that correct?

25  **A.**   Yes.  That's what the document says.

1  Q.   Okay.  Now, as it turns out, the -- if you look at

2  Exhibit 6739, please.

3       MR. DOOLEY:  And if it's not in evidence, I move it

4  in, Your Honor.  It's an e-mail --

5       THE COURT:  Admitted.

6       (Trial Exhibit 6739 received in evidence)

7       MR. DOOLEY:  -- from Steve Chamberlain to Tom Murray.

8  Q.   Who's a colleague of yours at Deloitte?

9  A.   He is, yes.

10  Q.   Okay.  And if you look at the attachment to this e-mail,

11  it's a letter between Autonomy and John Baiocco of

12  Capax Discovery.  Do you see that?

13  A.   Yes.

14  Q.   Okay.  Do you recall this letter?

15  A.   (Witness examines document.)  I'm just reading it.

16       (Witness examines document.)  Yes.  I have a recollection

17  of this, yes.

18  Q.   Okay.  And at the beginning it says (reading):

19            "As you know, Capax and Autonomy are parties to the

20       certain value-added reseller agreement for resale to

21       Kraft."

22       And then it says (reading):

23            "However, Kraft has indicated to Autonomy that it

24       shall pay to Autonomy directly the license fee due for the

25       software to be licensed to Kraft in connection with the

1           PO.  Accordingly, Autonomy shall cancel the license fees

2       due from Capax pursuant to the purchase order."

3           So subsequent to the deal with the sale to Capax, Autonomy

4   made a deal with Kraft directly; correct?

5   **A.**   That's correct.

6   **Q.**   And that resulted in a cancellation of the contract with

7   Capax; correct?

8   **A.**   Correct.

9   **Q.**   Okay.  And then further on down in Bullet Point Number

10  3 it says (reading):

11          "Upon execution hereof, Autonomy shall pay to Capax a

12      one-time fee of $400,000."

13      Do you see that?

14  **A.**   Yes.

15  **Q.**   Okay.  And this was a $4 million deal?  The license fee

16  was $4 million?  Do you recall that?

17  **A.**   It was, yes.

18  **Q.**   So Autonomy was telling Deloitte in this -- well, Autonomy

19  was telling Capax and then this was forwarded to Deloitte that

20  they made a direct deal with Kraft, they were canceling the

21  deal with Capax, and they were paying a 10 percent fee to

22  Capax; correct?

23  **A.**   Yes.

24  **Q.**   Okay.  And that did not result in a restatement of the

25  revenue from Q3 2009 when Autonomy had recognized the revenue

1  on the sale to Capax; correct?

2  **A.**   It did not, but the important point is that some revenue

3  was recognized twice so that's one thing that we looked at very

4  closely to make sure that revenue wasn't recognized again to

5  the end user in Q4 2009.

6  **Q.**   Fair enough.  Zero revenue is -- the deal with -- the

7  direct deal with Kraft was at the end of Q4 and that

8  essentially replaced the sale to Capax in Q3; right?

9  **A.**   Correct.

10  **Q.**   And you don't get to recognize the revenue on the sale

11  twice.  So no revenue is recognized in Q4 but the Capax revenue

12  stayed on the books in Q3; is that right?

13  **A.**   That's correct.

14  **Q.**   And the reason the Capax revenue stayed on the books is

15  the fact that that earlier transaction was ultimately canceled,

16  that doesn't change the fact that it was appropriate to

17  recognize the revenue to Capax at the time the sale was made;

18  right?

19  **A.**   It doesn't, but you need to be careful because obviously

20  this is the first time this happens.  And I'm sure you're aware

21  what happened subsequently as we go through to into 2010; but

22  clearly if this is a pattern of events that happens more, then

23  it begins to impact your revenue recognition policy.

24  **Q.**   My question, though, Mr. Welham, was a simple one, which

25  is:  You didn't -- it was appropriate to recognize the revenue

1   at the time on the sale to Capax and the fact that something

2   changed later didn't change the fact that it had been

3   appropriate at the time to recognize the revenue to Capax?

4   Yes?

5   **A.**   That's correct, because when the first deal was

6   recognized, it was expected that it would close between Capax

7   and Kraft in good faith.

8   **Q.**   And we don't need to go through all the documents to show

9   this, but -- well, actually, we'll look at one more.  Look at

10  Exhibit 558, which is in evidence so we can just put it on the

11  screen.

12      This is an e-mail from you to Richard Knights in January

13  of 2010 describing the Capax deal going direct -- the Kraft

14  deal going direct; is that right?

15  **A.**   Yes.

16  **Q.**   And you're expressing the concern that this might happen

17  again, and you note down at the bottom that Steve Chamberlain

18  told you that what you described may well happen; is that

19  right?

20  **A.**   That's correct, yes.

21  **Q.**   So in January of 2010, you saw more of these coming;

22  correct?

23  **A.**   There was some more of these in Q1 2010.

24  **Q.**   And, in fact, in Q1 2010, the MicroTech/Morgan Stanley

25  deal went direct; right?

1    **A.**    Yes.

2    **Q.**    And then in the same quarter, the MicroTech/Manufacturers

3    Life deal went direct; correct?

4    **A.**    Yes.

5    **Q.**    And those, you didn't go back and -- those were deals that

6    had closed in Q4 but you didn't go back and restate the revenue

7    or reverse the revenue in Q4; right?

8    **A.**    We didn't, but we did make a clear point to the Audit

9    Committee that further evidence of this would cause problems in

10    relation to the revenue recognition policy.

11    **Q.**    Okay.  And then it happened again in Q2 2010; right?

12    **A.**    Correct.

13    **Q.**    The Capax/Eli Lilly deal from Q4 2009, that went direct;

14    and the Discover Tech/Philip Morris deal from Q1 2010, that

15    also went direct?  Right?

16    **A.**    I believe so.

17    **Q.**    And then, again, you didn't restate or reverse out the

18    prior revenue; right?

19    **A.**    No, but we advised the Audit Committee again; and then

20    subsequent to Q2 2010, we saw no more evidence of deals with

21    value-added resellers going direct.

22    **Q.**    Well, look at 6462.  I think this is in evidence.  This is

23    from April 2011, an e-mail from a Ms. Lu to Mr. Murray.

24            **THE COURT:**  Admitted.

25        (Trial Exhibit 6462 received in evidence)

1    **MR. DOOLEY:**  I apologize, Your Honor.  I thought it

2    was in evidence.

3    **Q.**   And Ms. Lu writes (reading):

4           "It was noted in Q4 2010 a £4 million license was

5           signed with KPMG via the VAR Tikit."

6           And then it goes on (reading):

7           "A direct sale by Autonomy, therefore, replaces the

8           sale previously being made by Tikit to KPMG."

9           Do you see that?  I know you're not on the e-mail, but do

10   you recall the Tikit/KPMG deal went direct in Q -- in 2011?

11   **A.**   Not immediately, no.

12   **Q.**   That's what it looks like from this e-mail; right?

13   **A.**   I'm just reading it.

14           **MR. LEACH:**  Objection.  Foundation.

15           **THE WITNESS:**  (Witness examines document.)  I think

16   what this is saying here is that the reseller, Tikit in this

17   case, still has -- still has the software and they're still

18   required to pay for that software.

19   **BY MR. DOOLEY:**

20   **Q.**   Okay.  But there's a reference to a direct sale by

21   Autonomy replaces the sale previously being made by Tikit to

22   KPMG.  Do you see that?

23   **A.**   Yes.  Now I see that, but I'm just reading the second

24   paragraph, which says that the VAR may resell the software to

25   another end user and it has the legal obligation to pay for the

1  license fee.  So the deal still stands with the VAR and they

2  still have to pay Autonomy for that deal.

3  **Q.**  Okay.  Well, that's right.  Even though there's a direct

4  deal with Tikit -- or, I'm sorry -- with KPMG, Tikit signed a

5  deal at the end of the fourth quarter 2010, things changed, but

6  they're still on the hook; right?

7  **A.**  That's what this says, yes.

8  **Q.**  Okay.  While we're on that subject of Tikit, you were

9  asked some questions about a so-called side letter with respect

10  to Tikit.  Do you recall that line of question?

11  **A.**  Yes.

12  **Q.**  Can we just call up that letter, 1361, so we can see it?

13      Do you recall this is the letter that you were asked

14  about?

15  **A.**  Yes.

16  **Q.**  You know that this letter was eventually disclosed in an

17  audit confirm to Deloitte in the summer of 2011; right?

18  **A.**  Yes.  I'm now aware of that.

19  **Q.**  Okay.  And was this letter in Deloitte's files someplace

20  during the Q4 2010 audit?  Do you know?

21  **A.**  It was not, no.

22  **Q.**  And you don't know why that is?  You don't know -- you

23  don't know how it came to be that it wasn't in your files if it

24  wasn't in your files?

25  **A.**  We were not provided with this letter nor told about it.

1  Q.    Okay.  If you look at the middle of the first paragraph of

2  this letter, it says (reading):

3         "In the event that Tikit does not consummate the

4     original transaction to at least the value set forth in

5     the PO by March 30th, then such PO shall be deemed a

6     binding prepurchase obligation and Tikit shall be

7     permitted to utilize prepurchased software under the PO

8     and offset amounts due to Autonomy."

9     Do you see that?

10 A.    Yes.

11 Q.    Okay.  And this letter provides that Tikit can, if it

12 doesn't close the deal with KPMG, can use the software they've

13 already purchased and resell it to a different end user;

14 correct?

15         MR. LEACH:  Objection.  Foundation.  Calls for a legal

16 conclusion.

17         MR. DOOLEY:  I'm asking for his understanding of the

18 letter.

19         MR. LEACH:  That he didn't get?

20         THE COURT:  Well, I'll allow it.

21     You're asking him what is his present understanding of the

22 letter?

23         MR. DOOLEY:  I am.

24         THE COURT:  What do you understand the letter to mean?

25         THE WITNESS:  I'd have to do various procedures around

1    this, so I'm not going to speculate as to what it might mean

2    now.

3            THE COURT:  Okay.

4    BY MR. DOOLEY:

5    Q.   Well, there's nothing in this paragraph just looking at

6    it, Mr. Welham, that guarantees Tikit an onward sale or a

7    profit on their sale -- on their purchase of the software, is

8    there?

9            MR. LEACH:  Objection.  Foundation.

10           THE COURT:  Well, he's now asking him:  Reading the

11   letter, do you see anything that suggests to you that there's a

12   guarantee of a profit?

13       Is that it?

14           MR. DOOLEY:  Correct.

15           THE COURT:  You can ask him that.

16           THE WITNESS:  Would you ask the question again?

17   BY MR. DOOLEY:

18   Q.   I'll withdraw it.  I'll withdraw it.

19       You were asked some questions about Brent Hogenson.  Do

20   you recall that, Mr. Welham?

21   A.   I do, yes.

22   Q.   Mr. Hogenson was the CFO of the Autonomy U.S. operation;

23   is that right?

24   A.   I believe so.

25   Q.   And in mid-2010, he made some allegations about Autonomy's

1  accounting practices to the board and also to Deloitte; is that

2  right?

3  **A.**  Yes.

4  **Q.**  And he sent those concerns directly to members of the

5  Deloitte audit team?

6  **A.**  He did, yes.

7  **Q.**  Okay.  And you and your colleagues undertook a very

8  detailed review of Mr. Hogenson's allegations, didn't you?

9  **A.**  We did.

10 **Q.**  Nigel Mercer was the new audit partner at that point;

11 right?

12 **A.**  He was, yes.

13 **Q.**  He had just come on.  He hadn't -- he wasn't involved --

14 the allegations in Mr. Hogenson's e-mail related to stuff in

15 2009, and Mr. Mercer had just come on as the audit partner so

16 he was tasked with leading the investigation; is that right?

17 **A.**  Yes.  He came on in Q2 2010.

18 **Q.**  Okay.  So he was independent from the allegations and so

19 he worked on investigating them?

20 **A.**  He was part of the team that investigated it, yes.

21 **Q.**  Okay.  And in addition to Mr. Mercer, there was an EQAR

22 partner who was assigned; is that right?

23 **A.**  Yes.

24 **Q.**  And the jury has heard this before, but remind them.  EQAR

25 is like an independent partner who's not part of the audit

1   team; is that right?

2   **A.**   No.   So the EQAR is part of the team.   It's the IRP that's

3   the independent part.

4   **Q.**   Okay.   But it's another partner in addition to Mr. Mercer?

5   **A.**   Correct.

6   **Q.**   And then there was also the independent review partner;

7   correct?

8   **A.**   Correct, yes.

9   **Q.**   And there was someone from Deloitte's Professional

10  Standards Review Group involved as well?

11  **A.**   Yes.

12  **Q.**   All right.   And you wanted to understand Mr. Hogenson's

13  allegations to make sure there was no impact on the financial

14  statement?

15  **A.**   Yes.

16  **Q.**   And as it turned out, the issues that Mr. Hogenson raised

17  involved areas that the Deloitte audit team had already looked

18  at fairly closely as part of its audit work; right?

19  **A.**   That's a fair assessment, yes.

20  **Q.**   All right.   And is it a fair assessment that in your --

21  that there wasn't anything new to the Deloitte audit team in

22  what Mr. Hogenson raised?

23  **A.**   Based on what we saw at the time and what we were told,

24  no, there was virtually no new information.

25  **Q.**   And based on the work that you did at the time, you were

1    satisfied by the end of the process that Mr. Hogenson's

2    allegations were without merit?

3    **A.**    Correct.  We were comfortable with the conclusions we

4    reached.

5    **Q.**    And you concluded that he was making accusations based on

6    limited information and was drawing conclusions that were not

7    accurate?

8    **A.**    Correct.

9    **Q.**    And you conclude -- Deloitte concluded that no material

10   facts emerged -- no new material facts emerged from the

11   investigation?

12   **A.**    Correct.

13   **Q.**    And that the matters had no material impact on the group's

14   financial statements?

15   **A.**    Correct.

16   **Q.**    And if we can look at Exhibit 979.  That's the Q2 2010

17   Audit Committee report.

18       If you look at page 20 of the exhibit.  This is Appendix 3

19   to the Audit Committee report.  The introduction says

20   (reading):

21            "We have pleasure in setting out in this document our

22        status report to the Audit Committee and its subsidiaries

23        for the matters relating to the e-mail correspondence from

24        Brent Hogenson."

25       And then set forth here in Appendix 3 are management's

1  responses and Deloitte's responses to Mr. Hogenson's

2  allegations; correct?

3  **A.**  Yes.

4  **Q.**  And set forth in Appendix A to Appendix 3 is the actual

5  e-mail from Mr. Hogenson.  That starts at page 28 -- right? --

6  of the exhibit?  That's the e-mail right there; right?

7  **A.**  Yes.

8  **Q.**  And at page 33 of the exhibit, the fourth question that

9  Mr. Hogenson raised related to barter transactions with

10  FileTek; correct?

11  **A.**  I can't remember it by number, unfortunately.  You'll have

12  to show it to me.

13  **Q.**  Sorry.  Page 33.  It should be on there.

14  **A.**  (Witness examines document.)  Yes, okay.

15  **Q.**  And management and Deloitte investigated those

16  allegations, and at page 26 of the exhibit you see the results;

17  correct?

18  **A.**  Correct.

19  **Q.**  And Mr. Hogenson also, if you look at page 32, raised

20  allegations -- page 32 of the exhibit -- I apologize.  I've got

21  my pages wrong.

22      Well, Mr. -- without hunting for it, Mr. Hogenson raised

23  certain allegations related to the acquisition of MicroLink --

24  correct? -- and MicroLink's debts to Autonomy?

25  **A.**  He did, yes.

1    Q.   And management and Deloitte investigated those and

2    concluded that they were unfounded; correct?

3    A.   Based on information we saw, yes.

4    Q.   And Mr. Hogenson also raised issues related to sales to

5    resellers where there was no end user signed up; correct?

6    A.   I'm not sure I remember that where there was no end user

7    signed up, no.

8    Q.   Well, if you look at page 31 of the exhibit, Question 3,

9    and down below the chart it says (reading):

10        "I've been told by the finance team in San Francisco

11        that transactions without a sales rep identified are

12        transactions where the end user has not completed the

13        agreement by the end of the quarter in which Autonomy

14        recognizes revenue."

15        Do you see that?

16   A.   Yes.

17   Q.   (reading)

18        "End user identified above may be a placeholder for

19        an agreement to be negotiated subsequent to the invoice

20        date."

21        Right?

22   A.   (Witness examines document.)  Yes, but we looked at each

23   of those as part of the audit process and clearly there was an

24   end user and, therefore, there was a sale to a VAR.

25   Q.   So, again, you looked at these allegations and found them

1    without merit?

2    **A.**    Based on information we had, yes.

3    **Q.**    All right.  Do you recall that in February of 2011,

4    Autonomy received a letter from the FRRP that we were talking

5    about earlier?

6    **A.**    Yes.

7    **Q.**    And the FRRP, to remind the jury, is the regulatory body

8    that investigates -- that has -- well, why don't you just

9    remind the jury.  The regulatory body that has oversight over

10   what?

11   **A.**    Over financial auditing in the U.K.

12   **Q.**    Okay.  And let's look at Exhibit 1542.

13           **THE COURT:**  Admitted.

14   (Trial Exhibit 1542 received in evidence)

15   **BY MR. DOOLEY:**

16   **Q.**    Do you see that this is a February 2nd, 2011, letter from

17   the Financial Reporting Review Panel?

18   **A.**    Yes.

19   **Q.**    And the FRRP had learned of Mr. Hogenson's concerns and

20   wrote to Autonomy to ask a few follow-up questions; right?

21   **A.**    Yes.

22   **Q.**    Mr. Hogenson, in addition to raising these concerns within

23   Autonomy, had gone to the regulatory authorities in the U.K.;

24   correct?

25   **A.**    I don't know about that.

1   Q.   Well, they're writing you a letter asking you questions

2   about his concerns, so can you conclude that he had gone to the

3   FRRP with his concerns?

4           MR. LEACH:  Objection.  Foundation.

5           THE WITNESS:  I don't understand that.

6   BY MR. DOOLEY:

7   Q.   Well, in any event, the FRRP was writing to Autonomy about

8   Mr. Hogenson's concerns; correct?

9   A.   Correct.

10  Q.   Okay.  And Deloitte, the audit team, worked closely with

11  Autonomy's management to respond to the FRRP's inquiry;

12  correct?

13          MR. LEACH:  Objection.  Vague.

14  BY MR. DOOLEY:

15  Q.   Well, you worked with -- well, you worked closely with

16  Autonomy's management to respond to the FRRP's inquiry, didn't

17  you?

18  A.   No.  I wouldn't say that at all actually, no.  Management

19  responded to it and we reviewed their drafts.  We worked with

20  them to respond to this letter, no.

21  Q.   Okay.  Well, you did review and comment on the draft

22  letters that Autonomy wrote to respond to the FRRP; correct?

23  A.   As we were required to do, yes.

24  Q.   Okay.  So if you look at 6742 --

25          THE COURT:  Admitted.

1           (Trial Exhibit 6742 received in evidence)

2    BY MR. DOOLEY:

3    Q.    -- this is an e-mail from you, Mr. Welham, to Mr. Hussain,

4    Mr. Kanter, Mr. Chamberlain, dated February 14th.  So two weeks

5    after the letter from the FRRP (reading):

6              "Please find below our initial thoughts on your draft

7          letter to the FRRP.  We shall be discussing the letter

8          with our internal team which specializes in dealing with

9          these matters over the course of tomorrow," so forth and

10         so on.

11    Do you see that?

12    A.    I do, yes.

13    Q.    Okay.  And then if you look at 6743, please.

14              THE COURT:  Admitted.

15         (Trial Exhibit 6743 received in evidence)

16    BY MR. DOOLEY:

17    Q.    This is two, three days later (reading):

18              "Andy -

19              "Following up on our call today, I thought it would

20         be worthwhile recapping on our key thoughts at this stage

21         with regards to your response to the FRRP letter."

22    Do you see that?

23    A.    I see that.

24    Q.    More responses.

25         Look at 6744.

 1  **A.**  Just to clarify, though, that's a style of responding.  We

 2  had to respond to the letter.  We're not doing an

 3  investigation.  I just want to clarify that.

 4  **Q.**  Okay.  But you're reviewing and commenting on the letters;

 5  is that fair?

 6  **A.**  Yes.

 7  **Q.**  Okay.  Look at 6744.

 8          **MR. DOOLEY:**  Move it in.

 9          **THE COURT:**  Admitted.

10      (Trial Exhibit 6744 received in evidence)

11  **BY MR. DOOLEY:**

12  **Q.**  And as you said, this is something that was required of

13  you to review these letters?

14  **A.**  Yes.  Whenever a client receives a letter from the review

15  panel, then we do review those.

16  **Q.**  And that's something you take seriously, reviewing the

17  letters and fulfilling that duty; right?

18  **A.**  Yes.

19  **Q.**  And so if you look at 6744, this is an e-mail from you to

20  Mr. Chamberlain on March 2nd, "Comments attached following our

21  internal reviews."  And you see attached there's -- it's a

22  little hard to read on the copy, but there's handwritten edits

23  to the letter?

24  **A.**  I can't see those.  Sorry.

25      (Witness examines document.)  Yes, I can see some

1    handwritten comments.

2    **Q.**    Okay.  If we can move -- look at 6745.

3          **THE COURT:**  Admitted.

4    (Trial Exhibit 6745 received in evidence)

5    **BY MR. DOOLEY:**

6    **Q.**    This is a copy of the final letter being sent to you;

7    correct?  It says (reading):

8          "Final attached which will go in the post today."

9    Do you see that?

10   **A.**    (Witness examines document.)  Yes, I can see the e-mail.

11   **Q.**    And based on the review that you performed pursuant to

12   this obligation, you didn't believe that Autonomy's response to

13   the FRRP was misleading in any way, did you?

14         **MR. LEACH:**  Objection.  Vague as to "review."  Can you

15   be clear what letter we're talking about?

16         **MR. DOOLEY:**  This first letter.  This one we were just

17   talking about, the one that was put in the post on March 3rd,

18   2011.

19   **Q.**    Based on the review that you did, did you believe that the

20   letter was misleading in any way?

21   **A.**    We did not, no, based on the information we had.

22   **Q.**    And obviously if -- well, not obviously -- but if you had

23   believed it was misleading, you would have said something;

24   right?

25   **A.**    Correct.

1          THE COURT:  I actually think that's the whole

2    testimony -- isn't it? -- that we've elicited for the last

3    hour, is that what he did he thought was accurate.  He thought

4    it was accurate at the time.

5          That's -- I mean, we can go on but, I mean, I just think

6    that, yes, he did think --

7          As I understand it, you thought that the information you

8    were given at the time was accurate; and based upon the

9    information that you were given at the time, you did certain

10   things, you came to certain conclusions?

11          THE WITNESS:  That's correct, yes.

12          THE COURT:  Okay.

13          MR. DOOLEY:  May I proceed, Your Honor?

14          THE COURT:  Sure, but I think we ought to go into

15   something other than just have him reinforce the fact that he

16   thought -- what he did at the time he thought was accurate.  I

17   just think that -- you know, I'm trying to move things ahead,

18   and I think that would be helpful.

19          MR. DOOLEY:  All right.  Let me ask one more question

20   on this topic --

21          THE COURT:  Go right ahead.

22          MR. DOOLEY:  -- and then I will take the Court's

23   guidance.

24   Q.   Let me just -- if you could just look at 6748.  I just --

25          THE COURT:  Admitted.

1              (Trial Exhibit 6748 received in evidence)

2    **BY MR. DOOLEY:**

3    **Q.**   It comments on a second letter that -- let me back up.

4         Autonomy received a second letter from the FRRP relating

5    to Mr. Hogenson's allegations; correct?

6    **A.**   A follow-up letter, yes.

7    **Q.**   And did Deloitte review that and send comments on that

8    letter as well?

9    **A.**   Yes.  As I said, all correspondence with the review panel

10   we would expect to review.

11   **Q.**   Okay.  And ultimately the FRRP took no action in

12   connection with Mr. Hogenson's allegations; correct?

13   **A.**   I don't believe they did, no.

14   **Q.**   I want to talk about the Q4 2010 hardware sale to VMS.  Do

15   you remember that testimony -- questions about the delivery of

16   hardware?

17   **A.**   Yes.

18   **Q.**   -- to VMS in the fourth quarter of 2010?

19        Deloitte knew -- the audit team knew that the delivery for

20   purposes of the contract occurred by allocating existing

21   hardware at Autonomy's facilities; correct?

22   **A.**   Yes.

23   **Q.**   Okay.  If you look at Exhibit 1464.

24              **MR. DOOLEY:**  I move that in.

25              **THE COURT:**  Admitted.

1          (Trial Exhibit 1464 received in evidence)

2    **BY MR. DOOLEY:**

3    **Q.**   And if you look at -- there's an e-mail trail involving

4    Leo He and Mr. Stephan.  If you look at page 3, Mr. He is

5    writing in point two (reading):

6              "We also need to test the delivery from Autonomy for

7         the remaining portion of the hardware delivered to VMS."

8         Do you see that?

9    **A.**   I see that.

10   **Q.**   And then at the top of the page Mr. Stephan writes back

11   that (reading):

12             "The delivery," in quotation, "i.e., the transfer of

13        title and risk of loss, passes to VMS at an

14        Autonomy-designated bonded warehouse."

15        This occurred on December 31st per the confirmations

16   you've seen; correct?  That's what you wrote?

17   **A.**   That's what's written there, yes.

18   **Q.**   And then there's further questions from Mr. He.  And if

19   you look at the e-mail that starts on the first page from

20   Mr. Stephan and then the text is on the top of the second page,

21   Mr. Stephan writes (reading):

22             "The delivery was simply a matter of allocating it to

23        VMS rather than using it on other customers."

24        Do you see that?

25   **A.**   I see that, yes.

1   Q.   And at the top of the first page Mr. Stephan writes again

2   (reading):

3            "You need to understand what a bonded warehouse

4        actually means in practice.  We can designate whatever we

5        like to be the bonded warehouse.  Autonomy designated per

6        the contract, so in this case we designate our own

7        facility to be the warehouse for the reallocated stock."

8        And that was your understanding -- that was the Deloitte

9   audit team's understanding at the time, that that's how the

10  hardware was -- or that's how a portion of the hardware was

11  delivered --

12            MR. LEACH:  Objection.  Foundation.

13  BY MR. DOOLEY:

14  Q.   -- it was delivered -- let me finish the question -- it

15  was delivered by being allocated within Autonomy's facilities?

16            MR. LEACH:  Same objection.

17            THE COURT:  The objection is what?

18            MR. LEACH:  Foundation.  He's just reading the e-mail.

19            MR. DOOLEY:  I'm asking if Mr. -- if that was

20  Mr. Welham's understanding.

21            THE COURT:  Well, as of, I guess, January 20th, 2011,

22  did you have an understanding that the delivery of some of the

23  hardware was effectuated by placement in a bonded warehouse,

24  which could be simply a facility designated by Autonomy as a

25  bonded warehouse?  Was that your understanding at the time?

1        **THE WITNESS:**  I'm not on this e-mail, but I believe

2   that's -- that was what's on the audit file, yes.

3        **THE COURT:**  Okay.

4   BY MR. DOOLEY:

5   **Q.**   Okay.  And we looked at -- we don't have to look at it

6   again -- we looked at Mr. Menell's confirmation e-mail where he

7   confirms that.

8        And then if we can look at Exhibit 1417K.  This is the

9   work paper on this transaction.

10       Oops.  That's not the right one.

11       If you can scroll down to the "Assessment of Cost and Fair

12  Value of the Hardware Sold," there's a paragraph -- the first

13  paragraph begins (reading):

14           "Autonomy did not have all the hardware specified in

15       the contract in-house.  Therefore, external hardware

16       purchases were made from Insight to meet the required

17       hardware."

18       That was the portion of the deal they bought from Insight;

19  right?  They bought some of the hardware from Insight to sell

20  to VMS?

21  **A.**   That was my understanding, yes.

22  **Q.**   And then (reading):

23           "The remaining hardware were taken from Autonomy's

24       warehouse, which were recognized as fixed assets."

25       That's the next paragraph.  Do you see that?

1   **A.**   I can't see that yet, no.

2   **Q.**   I'm sorry.  The next -- "The remaining" -- the sentence

3   that begins "The remaining hardware."

4   **A.**   (Witness examines document.)  I'm just reading the full

5   paragraph.

6       (Witness examines document.)  Yes, I can see that.

7   **Q.**   And I think you testified earlier that it was your

8   understanding that this hardware that was allocated was

9   hardware that was used, that was -- it was not sitting in a box

10  but it was used hardware?  That was your understanding, it was

11  in use?

12  **A.**   Not in use, no; but clearly if it's allocated to VMS, it

13  can no longer be used because it's their goods now.

14  **Q.**   But it was used hardware, that's what you said before?

15  That was your testimony?

16  **A.**   It was used in the past, yes.

17  **Q.**   Okay.  And the confirmation that Mr. Menell gives here as

18  reflected in this document in the paragraph that -- same

19  paragraph, next-to-the-last sentence (reading):

20          "Deloitte has reviewed confirmation from Mr. Menell

21      independent of finance that these hardware were assigned

22      to VMS and VMS has acknowledged the passing of hardware

23      title."

24      Do you see that?

25  **A.**   I do, yes.

1   **Q.**   So what Mr. Menell is confirming is the assignment of the

2   hardware, not the physical shipment of it; correct?

3   **A.**   Correct.  So it's now assigned to VMS and can no longer be

4   used and it's taken out of fixed assets.

5   **Q.**   We looked previously at IAS 18 point -- or IAS 18, the

6   rule governing recognition of revenue; right?

7   **A.**   We talked about it, yes.

8   **Q.**   And we looked at IAS 18.14, which is the rule that governs

9   the sale of goods; right?

10  **A.**   Yes.

11  **Q.**   All right.  And IAS 18.14 doesn't require a written sales

12  agreement, does it?

13  **A.**   I don't think it specifically mentions written, no.

14  **Q.**   Okay.  So it's possible to recognize revenue without a

15  signed written sales agreement; correct?

16  **A.**   I wouldn't expect that to happen very often, no.

17  **Q.**   But the rule doesn't specifically require a signed written

18  agreement; right?

19  **A.**   It doesn't but it requires the risks and rewards are being

20  transferred and the various criteria to be met, so it's hard to

21  see how you could end up in a situation where you wouldn't have

22  a signed agreement.

23  **Q.**   Well, if you had an oral agreement; right?

24  **A.**   Yes.  But I wouldn't expect organizations to have oral

25  agreements for millions of dollars of deals, no.

1    Q.    You were asked specifically about a transaction that

2    Autonomy sold to Discover Tech for the end user Prisa in the

3    first quarter of 2011.  Do you remember that line of questions?

4    A.    Yes.  It would be helpful to have the working paper up

5    again just to remind me of the facts.

6    Q.    Sure.  Look at Exhibit 1709L.  If we could call that up,

7    that's the...

8         Does this look like the revenue testing worksheet for the

9    Discover Tech/Prisa?

10   A.    Yes, it does.

11   Q.    And if you look at lines 45 and 46, it says (reading):

12            "We've reviewed the agreement for any terms that

13            would restrict the recognition of revenue and none were

14            noted."

15        Do you see that?

16   A.    I see that, yes.

17   Q.    And if you could look at Exhibit -- so you reviewed the --

18   or someone from the Deloitte audit team reviewed the written

19   agreement between Autonomy and Discover Tech for this deal;

20   right?

21   A.    We would have done, yes.

22   Q.    Okay.  And if you look at -- if you could look at

23   Exhibit 6349.  It's a copy of this.

24            MR. DOOLEY:  I move it into evidence if it's not

25   already in.  This is a --

1          **THE COURT:**  Admitted.

2      (Trial Exhibit 6349 received in evidence)

3  **BY MR. DOOLEY:**

4  **Q.**   If we could look at the attachment to the e-mail.  This is

5  a -- if you look on the first page (reading):

6          "This letter sets forth the terms of the agreement

7      between Autonomy and Discover Technologies under which

8      Autonomy will grant VAR the right to sublicense," so forth

9      and so on, "to Prisa."

10      Do you see that?

11  **A.**   Yes.

12  **Q.**   And does this look like the -- and it's dated -- the date

13  on here is March 31st, 2011.  Does this look like the Q1 -- the

14  agreement that Deloitte reviewed in connection with this deal?

15  **A.**   Can we go down to the signed page, please?

16  **Q.**   Sorry?

17  **A.**   Can we go down to the signed page?

18  **Q.**   Sure.  Yeah.  Flip it over.

19  **A.**   (Witness examines document.)  Yes.  So without reading

20  every word, I would imagine that is the agreement that we saw.

21  **Q.**   Okay.  And you see that it's dated March 31st on the top

22  and it's dated March 31st on the bottom; right?

23  **A.**   Yes.

24  **Q.**   And you can't tell from looking at the agreement whether

25  it was signed on a date other than March 31st just from looking

1    at the document, can you?

2    **A.**    It looks like it was signed on March 31st.

3    **Q.**    Okay.  And so when Deloitte reviewed the agreement in

4    Cambridge during its Q1 2011 review, it didn't see anything

5    about the agreement that made it conclude that it might be

6    backdated; right?

7    **A.**    Well, no, because it's signed 31st March 2011.

8    **Q.**    And if it was backdated, you can't tell by looking at it;

9    right?

10    **A.**    No.

11    **Q.**    You were shown an e-mail, Mr. Welham, that related to

12    software for Prisa and software for FINRA being sold to

13    Discover Tech.  Do you remember that?

14    **A.**    Yes.

15    **Q.**    Okay.  If you go back and look at the work paper on this

16    deal, 1709.

17        And get that exhibit back up.

18        If you look down under --

19        **MR. LEACH:**  Which number?

20        **MR. DOOLEY:**  I'm sorry.  1709L.  This is the Prisa --

21    Discover Tech/Prisa work paper.

22        And if we could just scroll down to where it's for

23    delivery.

24    **Q.**    It says (reading):

25            "The VAR already has the software shipped as part of

1          Deal 6.  Therefore, no delivery was required for this

2          deal."

3          Do you see that?

4     A.   Yes, I see that.

5     Q.   Okay.  And then if we could look at 1709H.

6          THE COURT:  Admitted.

7          (Trial Exhibit 1709H received in evidence)

8     BY MR. DOOLEY:

9     Q.   And do you see at the top --

10         THE COURT:  1709L is also admitted.

11         (Trial Exhibit 1709L received in evidence)

12         MR. DOOLEY:  I think all of the 17 -- yes, I think all

13    the 1709s are admitted.

14         THE COURT:  Oh, okay.

15    BY MR. DOOLEY:

16    Q.   Do you see at the top there's a number 6?

17    A.   I don't see that, no.

18    Q.   Just at the very top of the page.

19         Jeff, maybe you could highlight the...

20    A.   (Witness examines document.)  Okay.

21    Q.   And this work paper reads (reading):

22              "This deal has been deferred by management due to

23         their doubts over Discover Tech's ability to sign a deal

24         with the end user.  Management considered recognizing a

25         deal where they're supplying a license that is limited to

1          use by FINRA be overly aggressive, especially with respect

2          to recoverability considerations.  We consider this

3          approach appropriate and, hence, no further testing is

4          required."

5          Does this, the statement in the work paper for Prisa,

6     reflect that Deloitte was informed that the software that was

7     being sold to Discover Tech for Prisa had previously been sold

8     for Discover Tech to sell on to FINRA?

9               MR. LEACH:  I object.  I think we're talking about

10    FINRA work papers.

11              THE COURT:  Sorry.

12              MR. DOOLEY:  I'm connecting the two work papers

13    together.

14              THE WITNESS:  What's the question?  Sorry.

15    BY MR. DOOLEY:

16    Q.   The question is:  In the Discover Tech/Prisa work paper

17    under "Delivery," it says (reading):

18              "The VAR already has the software shipped as part of

19         Deal 6.  Therefore, no delivery was required for this

20         deal."

21    A.   I can't see that now, but that was on the screen before I

22    think, wasn't it?

23    Q.   Jeff, could we put 1709L up?

24    A.   Yes.  I've seen that, yes.

25    Q.   Okay.  And that reflects that Autonomy informed Deloitte

**WELHAM - CROSS / DOOLEY**

1  that the software being sold to Discover Tech for the end user

2  Prisa had originally been shipped as part of Deal 6, the FINRA

3  deal; correct?

4  **A.**   That looks likely, yes.

5  **Q.**   Okay.  That was something that Autonomy disclosed to

6  Deloitte --

7  **A.**   It looks likely, yes.

8  **Q.**   -- correct?

9       Okay.  Mr. Welham, you were asked some questions about

10  Exhibit 1763.

11       Would you put that up?

12       This is the e-mail about three options.  All accounting

13  decisions with respect to a given quarter are -- the accounting

14  decisions with respect to a given quarter are made after the

15  quarter end; correct, Mr. Welham?

16  **A.**   I'm not sure I agree with that.  Say that again.  Sorry.

17  **Q.**   The accounting decisions, the books are closed on

18  Quarter 1 at the beginning of Quarter 2; correct?

19  **A.**   All the transactions are booked at the quarter end and

20  then they close within the first few days of the following

21  quarter, yes.

22  **Q.**   They close the books in the first part of the following

23  quarter; correct?

24  **A.**   Yes.

25  **Q.**   Okay.  And that's when Deloitte comes in and does its

1  audit -- right? -- in the first two weeks of the following

2  quarter; correct?

3  **A.**  Or review, yes.

4  **Q.**  Or review; right?

5  **A.**  Yes.

6  **Q.**  And the audit actually takes longer; right?  That takes a

7  month or so?

8  **A.**  Yes.

9  **Q.**  And certainly during the process, the review process and

10 the audit process, there's back and forth between the auditors

11 and the management, correct, over accounting determinations?

12 **A.**  Yes.  If we have a question that might lead to something,

13 then there might be back and forth, yes.

14 **Q.**  I think we talked about it at the outset.  Sometimes

15 Deloitte would make recommendations to the management that they

16 should account for a transaction in a different way, and then

17 management would make that change; right?

18 **A.**  That can happen, yes.

19 **Q.**  And that all happens in the first couple weeks of the

20 following quarter; right?

21 **A.**  That would happen through the review or audit process.

22 **Q.**  Which takes place in the first couple of weeks after the

23 end of the quarter; right?

24 **A.**  It can go through the whole month.  It depends when the

25 reporting date is.

**WELHAM - CROSS / DOOLEY**

1  **Q.**   Okay.  And it's certainly true that audit evidence

2  continues to come in after the quarter closes; correct?

3  **A.**   Yes.

4  **Q.**   So, for example, audit confirmation letters are an

5  important part of making a determination over revenue

6  recognition?  You'd agree with that?

7  **A.**   Well, I think you need to be careful because that's

8  something we're issuing, not what management is using.  So

9  management would not be using confirmation letters to confirm

10  whether they recognize revenue or not, no.

11  **Q.**   Well, let me just -- just answer the question.  Audit

12  confirmation letters come in after the -- during the first

13  couple weeks after the end of the quarter; right?

14  **A.**   I think you're confusing audit evidence with information

15  that management would use to prepare the financial statements,

16  and things that we ask for as part of the audit processes are

17  not things that management are using necessarily to prepare the

18  financial statements.

19  **Q.**   Okay.  Well, evidence of collectibility can come in after

20  the end of the quarter, correct, in the first couple weeks of

21  the following quarter?

22  **A.**   You should make your determination of revenue at the point

23  you make the transaction.

24  **Q.**   How about information about delivery and whether delivery

25  has occurred?  That happens sometimes after the end of the

1    quarter; correct?

2    **A.**    The delivery must happen at the quarter end, but I accept

3    the information supporting that might follow.

4    **Q.**    And certainly delivery is an important piece of

5    recognizing revenue?  It's in the -- isn't it?

6    **A.**    Yes.

7    **Q.**    Just a couple more topics.

8         You were asked some questions about the R&D capitalization

9    in the third quarter of 2009.  Do you remember those questions?

10   **A.**    I do, yes.

11   **Q.**    Do you recall that around that time in September 2009

12   there was a policy change by the U.K. tax officials, the HMRC,

13   which expanded which R&D expenses could be capitalized?

14   **A.**    No.

15   **Q.**    Well, why don't you look at Exhibit 5779.

16        **THE COURT:**  5779.  Any objection?

17        **MR. LEACH:**  He's not on the e-mail, Your Honor, so I'm

18   not positive about foundation.

19        **THE COURT:**  I haven't seen it yet.

20        **MR. DOOLEY:**  Oh.  Sorry, Your Honor.  Here you go.

21             (Pause in proceedings.)

22        **THE COURT:**  Thank you.  Let's see...

23             (Pause in proceedings.)

24   **BY MR. DOOLEY:**

25   **Q.**    Mr. Welham, Exhibit 5779, the e-mail on the bottom to U.K.

1    Cambridge Corporate Tax, U.K. Cambridge EB Portfolio Managers,

2    does this look like a -- do you recognize this as a blast

3    e-mail, as it were, within Deloitte about a change in the

4    HMRC's policy?

5    **A.**    I'm not on the e-mail so I don't know really.

6    **Q.**    Does this e-mail refresh your recollection about a change

7    in R&D policy by the HMRC in September of 2009?

8    **A.**    Not really, no.

9            **MR. DOOLEY:**  Your Honor, I would move it in as a

10   business record.

11           **THE COURT:**  No, no, no, no.  It doesn't come in.

12   Okay.  Marked for identification.

13       (Trial Exhibit 5779 marked for identification)

14   **BY MR. DOOLEY:**

15   **Q.**    Well, in any event, let's look at Exhibit 229, which is in

16   evidence, and you were asked about it earlier.

17       You have seen this document before, Mr. Welham; correct?

18   **A.**    I have, yes.

19   **Q.**    And this is the work paper prepared by Deloitte regarding

20   capitalization of R&D expenses by Autonomy in the third quarter

21   of 2009; correct?

22   **A.**    Correct, yes.

23   **Q.**    Okay.  And if you look at the second page, at the top it

24   says, the second paragraph (reading):

25           "It was through meetings with HMRC that Autonomy

**WELHAM - CROSS / DOOLEY**

1   became aware that as a consequence of the unique nature of

2   the SPE product, all work that SEs have been carrying out

3   in developing the SPE product should be capitalized."

4   Do you see that?

5   A.  I do, yes.

6   Q.  Okay.  And then down below there's a paragraph that reads

7   (reading):

8       "From discussions with Pete Menell, a list was

9   provided showing SEs who spent all their technical time in

10  Q3 '09 developing SPE through trialing the software with

11  real databases.  75 percent of Q3 SE costs have therefore

12  been capitalized in line with the proportion measured and

13  agreed with the HMRC."

14  Do you see that?

15  A.  I do, yes.

16  Q.  And so there's -- the paragraph at the top references a

17  meeting that Autonomy had with the HMRC and an agreement with

18  the HMRC that 75 percent of the costs -- the R&D costs could be

19  capitalized.  Do you see that?

20  A.  I see that, yes.

21  Q.  And is that -- do you recall discussions regarding these

22  meetings and the decision of the HMRC allowing capitalization

23  of 75 percent of these costs?

24  A.  I don't recall that and I wasn't part of those meetings,

25  no.

1  **Q.**  And if you look on the first page of Exhibit 229, you were

2  directed to the chart in the middle, which reflects the SEs and

3  the development team numbers.  Do you see that?

4  **A.**  I do, yes.

5  **Q.**  Okay.  And what is your understanding of the development

6  team?

7  **A.**  That's the team that develops new products and

8  functionality.

9  **Q.**  Okay.  And the SEs, that's -- what? -- systems engineers

10  or sales engineers?

11  **A.**  I think it says system -- systems engineers below.

12  **Q.**  Okay.  And those aren't developers but they're engineers

13  working with the customers testing the product; right?

14  **A.**  That's what it says, yes.

15  **Q.**  And fair to say that Deloitte looked carefully at this R&D

16  issue and what costs could be capitalized and for what time

17  period; correct?

18  **A.**  We did, yes.

19  **Q.**  Okay.  If I could show you what's been marked as

20  Exhibit 6756.

21      **THE COURT:**  Admitted.

22      (Trial Exhibit 6756 received in evidence)

23  **BY MR. DOOLEY:**

24  **Q.**  Exhibit 6756.  And this is a work paper from -- I'll

25  represent to you that it's a work paper from the Deloitte

1   files.  Do you recognize this exhibit, Mr. Welham?

2   **A.**   (Witness examines document.)  It looks like one of our

3   working papers, yes.

4   **Q.**   And if we could go to Tab 1.

5   **A.**   I don't know which tab?  Is it the first?

6         **THE COURT:**  Well, look on the screen.

7         **THE WITNESS:**  Oh, sorry.

8   **BY MR. DOOLEY:**

9   **Q.**   It should be a yellow box at the top.

10        If we could scroll up, Jeff.  There we go.

11        And the text reads:

12           "Deloitte selected a sample of employees from the

13        capitalized cost schedule and agreed the salary figures

14        through the prior quarter schedule to ensure capitalized

15        costs are not being altered by manipulating salaries.  The

16        samples selected have been agreed through to pay slips

17        through the relevant period to verify salary amounts."

18        And the whole issue here is what portion of the work of

19   these sales engineers can be capitalized; correct?

20   **A.**   Yes.

21   **Q.**   And Exhibit 6756 reflects that Deloitte looked at a sample

22   of employees in order to assess what costs could be

23   capitalized; correct?

24   **A.**   Yes.  So we have held discussions with Pete Menell to

25   understand the products, and then this is another test that we

1  do.

2  **Q.**   This is a test conducted by Deloitte; right?

3  **A.**   It is.

4  **Q.**   And then if you look at Tab 2, this is a reference to

5  another bit of sampling.  It says (reading):

6         "The objective is to confirm the SEs were working on

7     SPE work and, therefore, that 75 percent of their costs

8     should be capitalized.  Conclusion satisfactory."

9     And it says (reading):

10        "We selected a sample of companies where SE costs

11    have been capitalized for each of Q3 and Q2," and so

12    forth.

13    Then it stays (reading):

14        "In conclusion, we identified 76 percent of the

15    individuals whose time was capitalized on the list of

16    individuals involved in SPE across the two quarters," and

17    so forth.

18    And then if you go to Tab 3, what is the -- just remind us

19  what the NAA is?

20  **A.**   That's our technical team.

21  **Q.**   That's the people you go to with the difficult questions

22  or challenging questions?

23  **A.**   Yes.

24  **Q.**   Or if you want a second opinion?

25  **A.**   Yes.

1  Q.   Okay.  And this says (reading):

2          "Per discussion with NAA on October 15th, it was

3      concluded the prior quarter amounts which were not

4      capitalized in error should not be adjusted as a prior

5      period adjustment because the amounts of 2.1 million were

6      not material to the prior quarters nor were they material;

7      and as a result, should be adjusted in the current quarter

8      to correct an error so that the annual results are

9      correct."

10 So the conclusion was that there was work done that was --

11 expenses that should have been capitalized in Q1 and Q2 that

12 were not and, therefore, they should be capitalized in Q3?

13 That was per the discussion with this NAA; correct?

14 A.   That's correct.

15 Q.   Okay.  And then if we could look at 6456, please.  I think

16 that should be in the binder.

17          MR. DOOLEY:  I move that into evidence.

18          MR. LEACH:  I'm sorry.  What exhibit?

19          MR. DOOLEY:  I think it's 6456.

20          THE COURT:  Admitted.

21 (Trial Exhibit 6456 received in evidence)

22 BY MR. DOOLEY:

23 Q.   And this is an e-mail from Mr. Knight to Mr. Knights, copy

24 to you, October 15th, and point two (reading):

25          "Development costs on exploring with NAA the points

1          on our prior quarter capitalization."

2          That's Mr. Knight informing you that this NAA consultation

3    had happened; correct?

4    A.    It is happening, yes.

5    Q.    Yeah.  And then if we can look at Exhibit 5781.  This is

6    the last one on this topic.

7              THE COURT:  5781 admitted.

8          (Trial Exhibit 5781 received in evidence)

9    BY MR. DOOLEY:

10   Q.    It's an e-mail from Mr. Knight to you, Mr. Welham, with a

11   final note regarding the conclusions on the R&D capitalization.

12   Do you see that relating to prior quarters 2.1 million and

13   relating to Q3 9.6 million?

14   A.    Yes.

15   Q.    And that was a result of the discussion with the NAA?

16   A.    Yes.

17   Q.    Last topic, Mr. Welham.

18         You were asked some questions about when Deloitte became

19   aware that Hewlett Packard was going to acquire -- was going to

20   announce an acquisition of Autonomy.  Do you remember that

21   topic?

22   A.    I do, yes.

23   Q.    And is it correct that Deloitte became aware of the

24   potential acquisition of Autonomy by Hewlett Packard on or

25   about August 16th of 2011?

1           **THE COURT:**  Well, you're asking -- wait.  You're

2     asking him what he knows -- when he became aware of it?

3           **MR. DOOLEY:**  Correct.  Yes.  Actually, I'll rephrase

4     it and ask --

5           **THE COURT:**  You're asking about Deloitte.  Well,

6     Deloitte is a big organization.  So I think he's testified what

7     he can testify as to when did he learn something about it.

8           **MR. DOOLEY:**  I'll rephrase it, Your Honor.

9     **Q.**   Mr. Welham, do you recall that you became aware of the

10    potential acquisition of Autonomy by Hewlett Packard shortly

11    before it was announced on or around August 16th-17th of 2011?

12    Does that sound right?

13    **A.**   Yes.  It was approximately two days before it was

14    announced.

15    **Q.**   Okay.  And you and the Deloitte audit team for Autonomy

16    were asked to participate in a call with Hewlett Packard and

17    its advisers; correct?

18    **A.**   With KPMG, yes.

19    **Q.**   Okay.  And KPMG -- the jury knows this now -- KPMG was

20    advising Hewlett Packard on the acquisition; right?

21    **A.**   That's my understanding, yes.

22    **Q.**   And you understood that this call was going to be -- was

23    part of the ongoing due diligence process in connection with

24    this potential acquisition; correct?

25    **A.**   Yes.

1   **Q.**   And the call -- you received -- or, rather, KPMG sent you

2   a list of questions to be covered during the call the night

3   before the call; is that right?

4   **A.**   Yes.

5   **Q.**   And the questions came in fairly late in the evening; is

6   that right?

7   **A.**   I believe so, yes.

8   **Q.**   The call was early in the morning and the questions came

9   in late at night?

10  **A.**   Yes.

11  **Q.**   And the jury has already seen a copy of the questions that

12  Mr. Leach asked you about.

13         And to your recollection, who was on this call, this due

14  diligence call, with KPMG for Hewlett Packard?  Rather, I'm

15  sorry.  Who was on the call with KPMG?

16  **A.**   I don't remember the names of the KPMG people.

17  **Q.**   Okay.  Well, who was on for the Deloitte audit team?

18  **A.**   It was myself, Nigel Mercer, and Richard Knights.

19  **Q.**   And was there anyone other than the KPMG team, or do you

20  know whether there were other people other than KPMG people?

21  Were there HP people on the phone?

22  **A.**   I don't know who was on the phone at all, if any.

23  **Q.**   And there were -- you'd been sent a series of questions,

24  and did you and Mr. Mercer and the folks from KPMG kind of

25  talked through those questions on the call?

1    **A.**    Yes.

2    **Q.**    To your recollection, Mr. Welham, how long did that call

3    last?

4    **A.**    I think it was less than an hour.

5    **Q.**    And at the end of that call, Mr. Mercer raised the issue

6    of Brent Hogenson's whistleblower letter with KPMG; correct?

7    **A.**    He did, yes.

8    **Q.**    Could you look at Exhibit 6753, please.

9    **A.**    (Witness examines document.)

10        **THE COURT:**  Admitted.

11        (Trial Exhibit 6753 received in evidence)

12    **BY MR. DOOLEY:**

13    **Q.**    Mr. Welham, are these your notes from the due diligence

14    call with KPMG on August 17th, 2011?

15    **A.**    I believe they are, yes.

16    **Q.**    You typed them up after the call?

17        **MR. LEACH:**  Objection.  Vague as to time.

18        **MR. DOOLEY:**  I'll withdraw it.

19    **Q.**    At the end of the call --

20    **Q.**    You typed them up after the call?

21        **MR. LEACH:**  Objection.  Vague as to time.

22        **MR. DOOLEY:**  I will withdraw the question.

23    **Q.**    Go to the third page of the exhibit.  There is a question

24    14 about significant changes in accounting policy, and it says,

25    "NM explained that he was not aware of any policy changes."

1    That is a reference to Nigel Mercer; right?

2    **A.**    Yes.

3    **Q.**    And then can you read the paragraph that follows that.

4    Out loud, please.

5    **A.**    "This was the end of the call.  However, NM," Nigel

6    Mercer, "added that although not a specific question, he would

7    like to flag that there was a whistleblower in the U.S. during

8    course of FY10.  NM explained that the whistleblower was the

9    former CFO of the U.S. operations who had come across to

10   Autonomy with the acquisition of Interwoven.  NM added that the

11   whistleblower sent comments directly to the audit committee and

12   to us as auditors, and management had instructed us to perform

13   a review to confirm that no issues were present.  We performed

14   a review of the queries made and provided a document to the

15   audit committee detailing the work we had performed and the

16   fact that no new information had come to light which would lead

17   us to believe that any new material issues exist."

18   **Q.**    And after Mr. Mercer made that remark, KPMG thanked

19   Mr. Mercer for the information and ended the call; correct?

20   **A.**    I believe so, yes.

21   **Q.**    KPMG -- the KPMG individuals who were on the call did not

22   ask you or Mr. Mercer to elaborate, did they?

23   **A.**    I don't believe they did, no.

24   **Q.**    And KPMG did not subsequently ask any follow-up questions

25   of you or Mr. Mercer, did they?

 1   **A.**   No, they did not, no.

 2   **Q.**   And between August 17th, the day of this call, and

 3   October 3rd, 2011, when the acquisition of Autonomy closed, did

 4   anyone from HP or KPMG follow up with you or Mr. Mercer, to

 5   your knowledge, about Mr. Hogenson's whistleblower complaint?

 6   **A.**   Not with me certainly, no.

 7          **MR. DOOLEY:**   May I have just a moment, Your Honor?

 8      No further questions, Mr. Welham.   Thank you for your

 9   time.

10          **THE COURT:**   Thank you.

11      Anything further?

12          **MR. LEACH:**   Your Honor, I'm very mindful of the time.

13   May I inquire?

14          **THE COURT:**   Well, you are mindful of the time.   So is

15   the jury mindful of the time.   Everybody in the courtroom is

16   mindful of the time.   So proceed at your own risk.

17          **MR. LEACH:**   Thank you, Your Honor.

18                   <u>**REDIRECT EXAMINATION**</u>

19   **BY MR. LEACH:**

20   **Q.**   Mr. Welham, you were asked some questions about the annual

21   report relating to the terms "pure software."   Do you remember

22   that?

23   **A.**   Yes.

24   **Q.**   Do you -- in reviewing front end of the annual report, are

25   you wordsmithing the language of the annual report?

WELHAM - REDIRECT / LEACH

1   A.   When you say "wordsmithing," what do you mean?

2   Q.   What are you reviewing for?  What are you doing when you

3   review the front end?

4   A.   We read for consistency with the financial statements.

5   Q.   With the numbers?

6   A.   Yes.  With the financial statements.

7   Q.   That's what you're looking for; is that fair?

8   A.   Yes.

9   Q.   Are you in the software business?

10  A.   Sorry?

11  Q.   Are you in the software business?  Do you work for a

12  software company?

13  A.   No.  I'm an auditor working for Deloitte.

14  Q.   Are you in the hardware business?

15  A.   I am not, no.

16  Q.   Do you know someone named Leo Apotheker?

17  A.   I'm aware of Leo Apotheker, yes.

18  Q.   How would you compare your experience in the software

19  business with Mr. Apotheker's?

20          MR. DOOLEY:  Objection, Your Honor.

21          THE COURT:  Sustained.

22  BY MR. LEACH:

23  Q.   You mentioned something called the NAA.

24  A.   NAA.

25  Q.   What does that stand for?

1   **A.**   That's our technical team.

2   **Q.**   What are the initials?

3   **A.**   I don't know.  National Audit -- I don't know.

4   **Q.**   So it's the national office of Deloitte?

5   **A.**   It is.  It's our central tentacle team in the UK, yes.

6   **Q.**   You went to the national office of Deloitte on several

7   issues in the course of your review; is that correct?

8   **A.**   That's correct.

9   **Q.**   Okay.  Can we please show Mr. Welham what is in evidence

10  as Exhibit 1153.

11      We talked a little bit about your understanding of the

12  purposes of the hardware sales.  Is this an email that you saw

13  during the course of your review?

14  **A.**   No, it is not, no.

15  **Q.**   Do you know what the words "low margin" mean?

16  **A.**   I know what "low margin" means effectively, but in this

17  context, I wouldn't like to say.

18  **Q.**   This says, "Need 30m this Q as it's a big Q.  Can you get

19  EMC to do some?"

20      Did Mr. Hussain ever disclose to you that he was providing

21  revenue targets to Mike Sullivan for revenue periodically?

22  **A.**   We did not specifically discuss that, no.

23  **Q.**   Is this relevant information to you with respect to the

24  purpose behind Autonomy's hardware sales?

25          **MR. DOOLEY:**  Your Honor, objection.  This is outside

 1    the scope.

 2                **THE COURT:**  I'll allow it.

 3                **THE WITNESS:**  Yes.  I would say it's relevant, yes.

 4    BY MR. LEACH:

 5    **Q.**   Did you ever talk to Brent Hogenson?

 6    **A.**   Yes.

 7    **Q.**   When did you talk -- I'm sorry.

 8         After he raised allegations with the audit committee, did

 9    you interview him?

10    **A.**   No.

11    **Q.**   And Mr. Hogenson raised issues, or I think on page 31 of

12    your report, you wrote that he raised concerns that end users

13    may be a placeholder for particular deals.  Do you recall that

14    language?

15    **A.**   I think I've seen it, yes.

16    **Q.**   And was the thrust of what Autonomy management told you is

17    no, that's not happening?

18    **A.**   Correct.

19    **Q.**   And you kept saying, in response to many of those

20    questions, based on information you had, the information you

21    had came from management; is that fair?

22    **A.**   Yes.

23    **Q.**   Okay.  With respect to the Kraft deal that we discussed in

24    Q3 of 2009, were you told that the expectation at the time of

25    the VAR deal with Capax, that it was expected the deal would

1   close between Capax and Kraft?

2   **A.**   Yes.  We expected them to close the deal.

3   **Q.**   And that's information you got from management?

4   **A.**   Yes.

5   **Q.**   And that was relevant to your assessment of whether

6   reversing it out was appropriate or not?

7   **A.**   Yes.

8   **Q.**   Okay.

9        You were asked some questions about professional

10  skepticism, Deloitte's independence.  You remember those

11  questions at the outset of the examination; correct?

12  **A.**   Yes.

13  **Q.**   Deloitte got paid; right?

14  **A.**   Yes.

15  **Q.**   You weren't doing this for free?

16  **A.**   Correct.  We wouldn't be allowed to do it for free.

17  **Q.**   How much was Deloitte paid in 2010?

18  **A.**   I can't remember the specific amounts.

19  **Q.**   More than a million?

20  **A.**   For the group audit, I would imagine so, yes.

21  **Q.**   More than five million?

22  **A.**   No.

23  **Q.**   How about for 2009, how much was Deloitte paid?

24  **A.**   Again, I can't remember.

25  **Q.**   Okay.  And you were asked some questions about the call

1    with Hogenson and the HP acquisition.

2        Did there come a point in time when a dispute arose

3    between HP and Deloitte relating to some of these accounting

4    matters?

5            MR. DOOLEY:  Objection.  This is well beyond the

6    scope --

7            THE COURT:  Sustained.  Sustained.

8    BY MR. LEACH:

9    Q.   If we could please look at Exhibit 1788, page 2.

10       You were asked some questions about segment reporting,

11   Mr. Welham.  Do you remember that?

12   A.   I do, yes.

13   Q.   In this press release, down at the bottom, Autonomy is

14   breaking out revenue for IDOL product, IDOL Cloud, IDOL OEM,

15   and services.  Do you see that?

16   A.   I do, yes.

17   Q.   Did segment reporting require that?

18   A.   No.

19   Q.   So they're voluntarily listing their IDOL product, IDOL

20   Cloud, IDOL OEM, and services; is that right?

21   A.   That's correct.

22   Q.   And they're not listing the hardware here; is that

23   correct?

24   A.   Correct.

25           MR. LEACH:  Thank you, Your Honor.

1    Thank you, ladies and gentlemen, for your indulgence.

2    I have no further questions.

3         **THE COURT:**  Mr. Dooley?

4         **MR. DOOLEY:**  Nothing further.  Sorry.

5         **THE COURT:**  Okay.  You're excused.

6    Ladies and gentlemen, we are taking our recess.  I will

7    see you at 9:00 tomorrow.  Remember, we have a day tomorrow

8    until 2:00 at the latest.  Thank you very much.

9         Remember the admonition given to you:  Don't discuss the

10   case, allow anyone to discuss it with you, form or express any

11   opinion.  See you tomorrow.

12        (Proceedings were heard out of presence of the jury:)

13        **THE COURT:**  That was one of the faster exits I've seen

14   a jury execute.

15        **MR. DOOLEY:**  It's hard to imagine accounting would

16   make them run.

17        **THE COURT:**  Well, there you are.

18   So there are some things we want to take up briefly?

19        **MR. KEKER:**  Yes, Your Honor.

20        **THE COURT:**  Okay.  Mr. Keker.

21        **MR. KEKER:**  Two things.  We filed a brief regarding

22   some Cronin records.  What happened is that -- well,

23   actually -- let me do the other one first.  And I think we

24   should either clear the courtroom or approach the bench.  It

25   deals with a grand jury matter.

PROCEEDINGS

1          MR. FRENTZEN:  I know what this is.  I'm happy to

2    approach.

3          THE COURT:  Do you want it on the record, though?

4          MR. KEKER:  Yes, absolutely.

5          THE COURT:  Let's do the other one first and then I

6    can get everyone out of here.

7          MR. KEKER:  That's fine.

8       This deals with -- everybody has filed a brief on this.

9       We received several weeks -- two weeks at least after the

10   prosecutors subpoenaed them and got them, John Cronin's phone

11   records -- john Cronin's phone records.  John Cronin is the

12   backdating assistant to Dave Truitt.  It's been established

13   that he did some backdating.  Mr. Scott said he had no idea

14   about anything until four days later.

15      These records show that Mr. Scott and Mr. Cronin were

16   talking, including long conversations late the day that we --

17   that everybody was interested in, January 1st, 2010.  This

18   deals with the $2.3 million deal where Mr. Truitt is very

19   unhappy about not getting profiling software.  They chatter all

20   day.

21      Mr. Rizek comes in and tells the grand jury and everybody

22   that he got a call from Mr. Hussain out of the blue.  After

23   about five interviews, he finally is pointed out by the

24   prosecutors that he didn't get a call from Mr. Hussain.  He

25   called him later in the afternoon.  We pointed out that -- this

1    is after a lot of conversations between Cronin, Egan -- you

2    remember all this.

3        Anyway, the -- the phone calls between Scott, who says he

4    knew nothing about it, and Cronin that day are very relevant

5    and would have been used in the cross-examination of Rizek, who

6    was, I guess, testifying at the time, but certainly Egan, who

7    testified afterwards, Scott, who testified afterwards, and they

8    don't give us these records until after these people are gone.

9        So we consider it a -- a *Brady* violation.  We consider it

10   a problem.  And I don't know what the remedy is except to ask

11   for a mistrial based on it.

12           **THE COURT:**  Are you asking for a mistrial?

13           **MR. KEKER:**  Sure.

14           **THE COURT:**  Okay.

15           **MR. KEKER:**  This is a Government-induced mistrial, as

16   far as we're concerned.

17       But in any event, at a minimum -- at a minimum we want as

18   a sanction those records to go into evidence.  We don't need

19   the witness.  Just put the evidence in -- put the records into

20   evidence, and we will use them as we see fit in closing

21   argument.

22           **MR. FRENTZEN:**  Your Honor, first of all, we did -- I

23   issued a trial subpoena.  I wasn't looking for Cronin or Scott.

24   I was looking to see if Cronin had talked to anybody else.

25       We issued the trial subpoena.  It came in, unlike some of

1   the other ones -- it came in directly to the case agent.  She

2   didn't notice that it had not also gone to the U.S. Attorney's

3   Office.

4        It's our mistake.  It's a mistake.  When we figured it

5   out, we turned it over.  We weren't sitting on them, we weren't

6   trying to play hide the ball.  We didn't use them for anything.

7        So we were a little tardy in turning them over, but the

8   point here is -- and I say that freely.  We had a lot of stuff

9   going on.  I think I was in the middle of Rizek.

10       The point being they are telephone records.  They had

11  Cronin's identity; they had Cronin's number.  They had Scott's

12  identity; they had Scott's telephone number.  They had all of

13  this.  They put together their own little demonstratives

14  already with who called who.

15       This easily could have been obtained through a trial

16  subpoena by counsel.  I cited, I think, three or four cases for

17  that proposition.  It's not a *Brady* violation --

18            **THE COURT:**  It's not a *Brady* violation, but let me ask

19  defense, did you subpoena them?

20            **MR. KEKER:**  No.

21            **THE COURT:**  Well, all right.  You could have, is their

22  point.  Their point is you could have.

23            **MR. FRENTZEN:**  Absolutely, Your Honor.

24            **THE COURT:**  And you've subpoenaed a lot in this case.

25            **MR. KEKER:**  Not phone records.  All these phone

1   records we got through discovery.  But we have subpoena power.

2   I'm not denying that.

3        THE COURT:  I'm not going to -- as far as the mistrial

4   is concerned, it's denied.

5        As far as a *Brady* violation, it's denied.

6        Now, but you're asking for something else.  You are asking

7   two things, as I understand it.  Maybe a missing witness

8   instruction.  I haven't quite figured about that.  I'm not

9   giving that.

10       The question is do they come into evidence without -- just

11   into evidence.

12       MR. FRENTZEN:  I don't care one way or the other,

13   Your Honor.  We're happy to put them in.

14       THE COURT:  He doesn't care one way or the other.

15   Admitted.

16       MR. FRENTZEN:  But without this instruction from the

17   Court --

18       THE COURT:  No, no, there is not going to be any

19   instruction.  They're admitted like any other exhibit.

20       MR. KEKER:  And the other matter -- oh, yeah.  Wait a

21   minute --

22       THE COURT:  Ms. Little?

23       MR. FRENTZEN:  I'm certainly not going to require

24   somebody to come from AT&T.

25       THE COURT:  They are admitted.  Just give me the

 1   numbers and I will deal with it.

 2          MR. KEKER:  We can stipulate to it.  Put a number on

 3   it and put it in.

 4          THE COURT:  That's fine.  Problem solved.

 5          MR. KEKER:  Well, not solved --

 6          THE COURT:  Problem solved to my satisfaction.

 7   Everything is to my satisfaction.  Solved to my satisfaction.

 8   I have no idea whether it's to the satisfaction of the parties.

 9   I assume it's not.

10      Okay.  So go ahead, Ms. Little.

11          MR. FRENTZEN:  Are we on to the sealed --

12          MS. LITTLE:  No.  Very briefly, this pertains to

13   Mr. Gersh, who is testifying tomorrow.  Mr. Leach and I have

14   had a conversation.  There were about a dozen exhibits that

15   they disclosed that were post October 3rd.  I think we've

16   agreed that the Government is not going to go after October

17   3rd; we're not going to go after October 3rd.

18          THE COURT:  Is that an agreement?

19          MR. LEACH:  I'm going to honor -- I understand the

20   Court's --

21          THE COURT:  Leave me out of it for a moment.

22      Have you reached an agreement that the documentation,

23   the -- the exhibits with respect to documents, will be up

24   through October 3rd?

25          MR. LEACH:  Yes.

PROCEEDINGS

1        **THE COURT:**  Thank you.  So that's solved.

2        **MS. LITTLE:**  I would want to say I would ask that the

3   witness be subject to recall if this Pandora's Box ever gets

4   opened.

5        **THE COURT:**  I think that's fair.  If the case changes

6   in some way, I'm certainly going to be -- not going to say,

7   "Oh, it's too late to do X, Y or Z."  That would be unfair.

8   It's unfair to both sides.  Okay.  So --

9        **MS. LITTLE:**  Okay.

10       **MR. KEKER:**  So if we could either clear the courtroom.

11       **THE COURT:**  So ladies and gentlemen, I'm sorry, but

12   unless you are an attorney with either the Government or the

13   defense, you should leave.

14      If you are a paralegal or an employee of the firm, you can

15   stay, either the firm or the Government.

16       **MR. KEKER:**  Poppy, you should leave.

17       **THE COURT:**  Why is she leaving?

18       **MS. LITTLE:**  She is not a lawyer.  She's not a

19   paralegal.

20       **THE COURT:**  You mean she has a life ahead of her?

21       **MS. LITTLE:**  Yes.

22       **THE COURT:**  Okay.  I got that.  That's great.  You

23   should go as quickly as you can.

24   **(Pages 4157 through 4167 placed under seal by Order of the
     Court.)**

25               (Proceedings adjourned at 4:36 p.m.)

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, April 5, 2018

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter


_____

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter