Volume 21

Pages 4168 - 4346

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
    VS.                            )        NO. CR 16-00462 CRB
                                   )
SUSHOVAN TAREQUE HUSSAIN,          )
                                   )
            Defendant.             )
_____)
                                San Francisco, California
                                Friday, April 6, 2018

**TRANSCRIPT OF PROCEEDINGS**

<u>**APPEARANCES:**</u>
For Plaintiff:

                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **ROBERT S. LEACH**
                 **ADAM A. REEVES**
                 **WILLIAM FRENTZEN**
                 **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
            BY:  **JOHN W. KEKER**
                 **JAN NIELSEN LITTLE**
                 **BROOK DOOLEY**
                 **KATE LAZARUS**
                 **NIC MARAIS**
                 **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

# I N D E X

Friday, April 6, 2018 - Volume 21

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **GARNER, THOMAS WILLIAM** | | |
| (SWORN) | 4171 | 21 |
| Direct Examination by Mr. Frentzen | 4171 | 21 |
| Cross-Examination by Ms. Lazarus | 4181 | 21 |
| Redirect Examination by Mr. Frentzen | 4192 | 21 |
| Recross-Examination by Ms. Lazarus | 4196 | 21 |
| Further Redirect Examination by Mr. Frentzen | 4200 | 21 |
| | | |
| **JULIEN, ROBERT** | | |
| (SWORN) | 4203 | 21 |
| Direct Examination by Mr. Frentzen | 4203 | 21 |
| Cross-Examination by Mr. Marais | 4215 | 21 |
| Redirect Examination by Mr. Frentzen | 4227 | 21 |
| Recross-Examination by Mr. Marais | 4228 | 21 |
| | | |
| **GERSH, ANDREW** | | |
| (SWORN) | 4235 | 21 |
| Direct Examination by Mr. Leach | 4235 | 21 |
| Cross-Examination by Ms. Little | 4317 | 21 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 154 | | 4212 | 21 |
| 607 | | 4298 | 21 |
| 2011 | | 4240 | 21 |
| 2038 | | 4243 | 21 |
| 2053 | | 4249 | 21 |
| 2070 | | 4253 | 21 |
| 2083 | | 4254 | 21 |
| 2110 | | 4328 | 21 |
| 2129 | | 4266 | 21 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2130 | | 4271 | 21 |
| 2134 | | 4268 | 21 |
| 2167 | | 4273 | 21 |
| 2183 | | 4276 | 21 |
| 2215 | | 4304 | 21 |
| 2560 | | 4252 | 21 |
| 2626 | | 4278 | 21 |
| 2643 | 4177 | | 21 |
| 2643, page 30 | | 4182 | 21 |
| 2646 | | 4206 | 21 |
| 3022 | | 4204 | 21 |
| 3025 | 4200 | | 21 |
| 5069 | 4187 | | 21 |
| 6821 | | 4188 | 21 |
| 6822 | | 4185 | 21 |

 1   <u>**Friday - April 6, 2018**</u>                              <u>**9:05 a.m.**</u>

 2                         <u>**P R O C E E D I N G S**</u>

 3                              **---000---**

 4        (Proceedings were heard in the presence of the jury:)

 5             **THE COURT:**  Please be seated.

 6        Let the record reflect all jurors are present, the parties

 7   are present.

 8        You may proceed.

 9             **MR. FRENTZEN:**  Good morning, Your Honor.  The

10   Government calls Thomas Garner.

11             **THE CLERK:**  Good morning.

12             **THE WITNESS:**  Good morning.  Please raise your right

13   hand.

14                       <u>**THOMAS WILLIAM GARNER**</u>,

15   called as a witness for the Government, having been duly sworn,

16   testified as follows:

17             **THE WITNESS:**  I do.

18             **THE CLERK:**  Thank you.  Please be seated.

19        Please state your full name for the record and spell your

20   last name.

21             **THE WITNESS:**  Okay.  My name is Thomas William Garner,

22   and last name is G-A-R-N-E-R.

23             **MR. FRENTZEN:**  Thank you, Your Honor.

24                       <u>**DIRECT EXAMINATION**</u>

25   \\\

1   BY MR. FRENTZEN:

2   Q.   Good morning, Mr. Garner.

3   A.   Good morning.

4   Q.   Where do you live?

5   A.   I live in Detroit -- a suburb of Detroit, Michigan.

6   Q.   What do you currently do for a living?

7   A.   I am retired.

8   Q.   Before you retired, can you give us just a little bit of

9   high-level background on your education and your work

10  experience?

11  A.   Yes.  I have an MBA in finance.  I started working with

12  General Motors about 40 years ago.

13       I spent the majority of my career with EDS working in the

14  controller staff, mostly doing management reporting, capital

15  budgeting, new business modeling, that type of work.

16       And then when EDS was acquired by Hewlett Packard, I moved

17  into project management, installing SAP software within that

18  part of EDS -- or, excuse me -- within that part of HP.  It was

19  on a global basis.

20  Q.   What's EDS?

21  A.   Electronic Data Systems.  It was founded by Ross Perot in

22  the mid-'60s.

23  Q.   And what was the business of EDS?

24  A.   It was IT services.  So they would run payroll, inventory

25  systems.  I was with the General Motors account, so we did

1  everything from running the factory floor systems to their

2  purchasing systems, et cetera.

3  **Q.**   You talked about when Hewlett Packard acquired EDS.  Do

4  you have a recollection around when that was?

5  **A.**   I believe it was in 2008 or so.

6  **Q.**   All right.  And so at that point, just if you could, when

7  Hewlett Packard acquired EDS, just could you describe for us

8  was there much of a shift in EDS in terms of your day-to-day

9  what was going on at EDS?

10 **A.**   Not really.  The part of EDS -- well, EDS was acquired by

11 Hewlett Packard, and then the IT services part of Hewlett

12 Packard kind of merged in with the EDS section.  So it was a

13 large group of 250,000 people worldwide, and it was really set

14 as a separate division within HP so there really wasn't much of

15 a change.

16 **Q.**   Do you have a recollection, while you were employed at EDS

17 owned by Hewlett Packard in around August 18th of 2011,

18 learning that Hewlett Packard was planning to acquire a company

19 called Autonomy?

20 **A.**   Yes, I do.

21 **Q.**   How did that first come to your attention to your

22 recollection?

23 **A.**   The first that I'd heard of it was through a corporate

24 announcement, and then subsequently a public announcement

25 probably at the same time, of this acquisition where it

1   explained big data and how it fit into the corporate strategy,

2   that type of thing.

3   **Q.**   When you first heard about this, what was your reaction to

4   this news?

5   **A.**   The description was very favorable.  Certainly the

6   financial numbers were far above what HP's were as far as

7   growth rate and profitability.  So it looked like a good

8   investment.  EDS -- excuse me -- HP at the time was struggling

9   going through CEOs over a number of years and was really

10  looking to expand and grow again, and so it looked like a good

11  investment for Hewlett Packard.

12  **Q.**   In terms of your own, let's say, investing history --

13  **A.**   Uh-huh.

14  **Q.**   -- were you somebody who purchased particular stock very

15  frequently?

16  **A.**   Not really.  I was more than a little busy with my job and

17  then raising three children, and I felt that individual stocks

18  were a little too risky and that I really didn't have the time

19  to follow them.  So I may have owned four or five stocks in my

20  entire career.  It was mostly mutual funds.

21  **Q.**   Okay.  Is this one of the four or five times that you

22  decided to invest in a particular stock?

23  **A.**   It is, yeah.

24  **Q.**   Did you make purchases of shares of Hewlett Packard?

25  **A.**   Yes.  I bought 100 shares of the stock the day of the

1    announcement, I believe, in an attempt to make some money and

2    see the company grow again.

3    Q.   If we could have what I think is already in evidence as

4    Exhibit 2295.

5          MR. FRENTZEN:  Is that in?  I thought it was through

6    Mr. Upton.

7          THE CLERK:  Yes.

8          MR. FRENTZEN:  Great.

9    Q.   Mr. Garner, do you recognize what's being displayed here,

10   Government's 2295?

11   A.   Yes, I do.

12   Q.   Or Exhibit 2295.

13        All right.  What is this?

14   A.   This looks like it's the external announcement that was

15   made to the press announcing the acquisition of Autonomy.

16   Q.   All right.  Is this something that you -- is this what

17   you're referring to, do you think, that you saw and read around

18   the time that you invested in Hewlett Packard?

19   A.   Yes, it is.

20   Q.   Could we go to the second page, please?

21        Mr. Garner, do you see here -- on the second page was

22   there information on this page that was meaningful to you in

23   terms of your decision to make this investment?

24   A.   Yes.  At the end of the first paragraph it states that

25   over the last five years, Autonomy has growth -- has grown in

**GARNER - DIRECT / FRENTZEN**

1  its revenues compound annual growth rate of 35 -- or, excuse

2  me -- 55 percent and adjusted profit rate of 83 percent.  Those

3  are fantastic numbers.

4  **Q.**   In your past job, were you kind of a numbers guy?

5  **A.**   Yes, very much so.

6  **Q.**   All right.  So was this information -- was this meaningful

7  to you in the decision that you made to invest?

8  **A.**   Very much so.  That would have been the reason I invested

9  in the company.

10  **Q.**   Could we go now to the third page, and can we scroll --

11  keep scrolling up?

12     Okay.  Do you see hear further information that was

13  important to you in deciding to make this investment,

14  Mr. Garner?

15  **A.**   Yes.  It's really a restatement.  At the end there, the

16  last paragraph, it's a restatement of the same numbers.

17  **Q.**   Does that include a consistent track record of

18  double-digit revenue growth?

19  **A.**   Yes.

20  **Q.**   Was this information also important to you in making your

21  decision?

22  **A.**   Yes.  It was the only reason for making the decision.

23  **Q.**   If the numbers in the press release were not accurate,

24  would that have been important to you in coming to make the

25  decision to invest in Hewlett Packard?

GARNER - DIRECT / FRENTZEN

1    **A.**   Very definitely, yeah.

2           **MR. FRENTZEN:**  And I'd like to now -- Your Honor, if I

3    could, I've got Exhibit 2643, and what I'd like to do is not

4    place it into evidence but perhaps just to display it to the

5    witness for some of the information with regard to this

6    particular investment.

7           **THE COURT:**  Okay.  So 2643 is marked for

8    identification.

9        (Trial Exhibit 2643 marked for identification)

10          **THE CLERK:**  Only for the witness?

11          **MR. FRENTZEN:**  I'm sorry?

12          **THE CLERK:**  I can turn their monitors off.

13          **MR. FRENTZEN:**  No, that's okay.  I'm just going to go

14   show it to him and just ask a couple questions off it.

15       It's got PII, Your Honor.

16   **Q.**   Take a look at that, Mr. Garner, and see if you recognize

17   what it is?

18   **A.**   Yes.  It's my investment statement from Raymond James from

19   July 29th to August 31st.

20   **Q.**   Could we go to page 6, Mr. Garner?

21   **A.**   Yes.

22   **Q.**   Okay.  And does this reflect your initial purchase of

23   Hewlett Packard stock?

24   **A.**   (Witness examines document.)  Yes, it does.

25   **Q.**   Okay.  If you could, could you just tell us what's the

1    quantity you purchased and on what date?

2    **A.**    Yes.    It states I purchased 100 shares of Hewlett Packard

3    at a price of $23.43, 44 cents.

4            **THE COURT:**  Per share?

5            **THE WITNESS:**  Per share.

6    **BY MR. FRENTZEN:**

7    **Q.**    And the date?

8    **A.**    This says August 24th.    I think that's the date the

9    purchase was completed.

10   **Q.**    Let me see, are you on page 6?

11   **A.**    I was.    I think the -- if you go to page 4, it lists the

12   date acquired is 8/19.

13   **Q.**    Your numbers are different than mine.

14       Okay.    May I have just a minute -- oh, I see what you're

15   saying.    Okay.    Sorry.

16       Not page 6 of the exhibit but page 4 of the printout?

17   **A.**    Of the statement, yeah.    Sorry if I was --

18   **Q.**    All right.    So, I'm sorry, just to clarify, what was the

19   quantity and the purchase price and the date, if you don't

20   mind?

21   **A.**    The quantity was 100 shares.    I acquired it on 8/19 and

22   the unit cost was $24.08.

23   **Q.**    So total cost to you of a little more than $2,400?

24   **A.**    Yes, it is.

25   **Q.**    And if you could, did you then follow your investment?

1    **A.**    I followed it through the statements fairly passively,

2    though.    It was in an IRA account, and I just kind of let it

3    ride.

4    **Q.**    Okay.    When did you let it ride till?

5    **A.**    Till I retired last February.

6    **Q.**    Okay.    So you just --

7    **A.**    I'm sorry.    A year ago February.

8    **Q.**    So you cashed it out about a year ago?

9    **A.**    Yes.

10    **Q.**    And how did you end up doing?

11    **A.**    Comprehending the split due to the split of HP into two

12    separate parts, I made about $1600.

13    **Q.**    During the course of, in other words, after you made the

14    purchase, were there, let's say, events that took place after

15    your initial investment that caused you concerns about your

16    initial investment?

17    **A.**    Yes.    I think HP had written off I want to say about

18    $8 billion or $5 billion worth of good will associated with the

19    acquisition.

20        **MS. LAZARUS:**    Objection, Your Honor.

21        **THE COURT:**    Yeah.    Ladies and gentlemen, you are to --

22    objection sustained.

23        You are to disregard the figure that was given, not

24    consider it in connection with any of the issues that you have

25    to decide.    The fact that an event occurred is something you

1   can take into consideration.

2        Maybe you can clear that up, Mr. Frentzen.

3            **MR. FRENTZEN:**  Sorry.  Maybe if I could just ask

4   leading questions here, Your Honor.

5            **THE COURT:**  Yeah.

6            **MR. FRENTZEN:**  I apologize.

7            **THE COURT:**  That's all right.

8   **BY MR. FRENTZEN:**

9   **Q.**   Mr. Garner, were there -- within the -- you know,

10  initially after your purchase of the stock --

11           **MR. KEKER:**  Can we approach, Your Honor?  This man

12  made money.  Can we approach?

13           **MR. FRENTZEN:**  Well, he made money because he hung on

14  to it until last year.

15           **THE COURT:**  Yeah, I understand that.  Okay.  I don't

16  see any reason to approach.

17       Go ahead.

18  **BY MR. FRENTZEN:**

19  **Q.**   Did there arise issues, without getting into those issues,

20  that caused you concern about your investment?

21  **A.**   Yes.

22           **MR. FRENTZEN:**  May I have a moment, Your Honor?

23           **THE COURT:**  Yeah.

24                    (Pause in proceedings.)

25           **MR. FRENTZEN:**  That's all I have, Your Honor.

```
 1          Thank you, Mr. Garner.

 2              THE COURT:  Cross.

 3                    CROSS-EXAMINATION

 4   BY MS. LAZARUS:

 5   Q.   Good morning, Mr. Garner.  My name's Kate Lazarus.  I

 6   represent Mr. Hussain.

 7   A.   Good morning.

 8   Q.   You testified that you used to work for HP; is that right?

 9   A.   I'm sorry.  Could you repeat?

10   Q.   You used to work for HP; correct?

11   A.   Yes, uh-huh.

12   Q.   Up until your retirement last year?

13   A.   Uh-huh.

14   Q.   Did you know that HP is suing Mr. Hussain in England for

15   money damages?

16   A.   Yes.

17   Q.   So you're aware that your former employer has a pretty

18   strong interest in the result of this case?

19   A.   Yes.

20              MS. LAZARUS:  Your Honor, I'd like to move in

21   Exhibit 2643, which are the stock statements that the

22   Government showed Mr. Garner.  If there's information that

23   needs to be redacted, we'd be happy to do that, but we would

24   like these in evidence.

25              THE COURT:  Well, I don't have any objection to moving
```

```
 1   it in.  My question is I think there's a lot of information on
 2   there that's what I would call private information.  I don't
 3   know that that should come in.
 4        What is -- why don't you --
 5             MR. FRENTZEN:  That's our only concern, Your Honor.
 6             THE COURT:  I understand that.
 7             MR. FRENTZEN:  If there's particular portions, we
 8   don't have an objection necessarily to inquiry about them.
 9             THE COURT:  Why don't you ask your questions without
10   introducing the document into evidence and see where we go from
11   there.  Is that okay?
12             MS. LAZARUS:  Sure.
13   Q.   If you could take a look at page 30 of Exhibit 2643, which
14   is in the binder we've given you.
15             MS. LAZARUS:  And if we could -- this is the only page
16   we really ask to move in.
17             THE COURT:  Sorry?
18             MS. LAZARUS:  Page 30 of Exhibit 2643.
19             THE COURT:  Wait.  Let me just look at it.  Okay?
20   Page 30.
21                       (Pause in proceedings.)
22             MR. FRENTZEN:  Your Honor, on a quick look on this, I
23   don't have any objection to that.
24             THE COURT:  So page 30 of 2643 admitted.  Okay.
25        (Trial Exhibit 2643, page 30, received in evidence)
```

```
 1              MS. LAZARUS:  Thank you, Your Honor.
 2    Q.   Mr. Garner, do you recognize this as a summary of your
 3    investment in the HP shares?
 4    A.   I'm going to need some help here because I'm looking at
 5    the statement that's numbered and I guess the exhibit that's
 6    numbered, so I don't --
 7    Q.   There's --
 8              THE COURT:  Why don't you just go up to him and show
 9    it to him.
10              THE WITNESS:  Where are the numbers?
11    BY MS. LAZARUS:
12    Q.   The page numbers are in the corner right here
13    (indicating).
14    A.   Oh, that's 13?
15    Q.   Yes.  So let's just go to 30.
16    A.   That's 33.  30.
17    Q.   Thank you.
18    A.   Thank you.
19    Q.   Is that a summary of your HP transaction?
20    A.   Yes, it is.
21    Q.   And so you see that you made a 60.97 percent profit on
22    your HP investment?
23    A.   Yes.
24    Q.   About almost $1500?
25    A.   Yes, over six years.
```

GARNER - CROSS / LAZARUS

1    Q.    You agree that's a pretty good return on your money?

2    A.    It's about 10 percent a year, yeah, 9 percent a year.

3    Q.    Turning to how you got involved in this case, you never

4    contacted the Government about your HP investment, did you?

5    A.    No, I didn't.

6    Q.    The Government approached you; is that right?

7    A.    Yes, they did.

8    Q.    And prior to the Government approaching you, you never

9    felt like you'd been wronged in any way, did you?

10   A.    "Wronged" meaning that I should have made more money, or

11   what do you mean "wronged"?

12   Q.    That you were a victim in any sense.

13   A.    Well, when you buy -- purchase a stock and you find out

14   that there's litigation against it and possible, you know,

15   erroneous statements, yeah, you feel like something's wrong

16   there.

17   Q.    But you never approached any authorities about that;

18   right?

19   A.    No, I didn't.

20   Q.    What happened is in 2015 you got a survey asking, from the

21   Government, about your stock purchase; correct?

22   A.    Yes.

23   Q.    You filled it out and sent it back?

24   A.    Yes, I did.

25   Q.    Let's take a look at your response to the Government

```
 1   survey.  That's Exhibit 6822, please.

 2             MS. LAZARUS:  And we move that in.

 3             MR. FRENTZEN:  No objection.

 4             THE COURT:  Admitted.

 5        (Trial Exhibit 6822 received in evidence)

 6   BY MS. LAZARUS:

 7   Q.   Do you recognize this as your response to the Government

 8   survey?

 9   A.   Yes, I do.

10   Q.   And the redaction at the bottom, that's just your phone

11   number so you know.

12   A.   Uh-huh.

13   Q.   And let's start at the bottom of this survey and look at

14   Question Number 2, which asks if you suffered any losses as a

15   result of your purchase of Hewlett Packard securities on

16   August 19th, 2011.  You responded that you had a total loss of

17   $1200.  That's not correct, is it?

18   A.   No, it's not.

19   Q.   Okay.  And then moving up to Question Number 1 in this

20   survey, the question is (reading):

21             "Was your purchase of HP securities based in any way

22        on the company's announcement on August 18th, 2011, of the

23        acquisition of the software company Autonomy or the

24        RBC Capital Markets price target revision/comment of

25        August 19th?"
```

1          You responded "yes"; right?

2   **A.**   That's correct.

3   **Q.**   And then when you were asked to explain further, you wrote

4   (reading):

5              "I had only been with HP for a few years.  The

6          company had been going through tough times and this looked

7          like a good opportunity for HP.  So I bought the stock to

8          participate in the growth."

9          You didn't see anything in here about reviewing Autonomy's

10  growth numbers; right?

11  **A.**   No.

12  **Q.**   Nothing about Autonomy's margins?

13  **A.**   No.

14  **Q.**   After mailing in this response, you had a call with the

15  Government; correct?

16  **A.**   Yes, I did.

17  **Q.**   Do you recall that was in May of 2017?

18  **A.**   Uh-huh.

19  **Q.**   And on that call, again, you didn't say anything about

20  relying on Autonomy's margins or growth rates, did you?

21  **A.**   I don't recall.

22  **Q.**   We have some notes from that call you could take a look

23  at.

24  **A.**   Thank you.

25              **THE COURT:**  Is there an exhibit number?

1          MS. LAZARUS:  It's 5069, Your Honor.

2          THE COURT:  50?

3          MS. LAZARUS:  '69 marked for identification.

4          THE COURT:  Okay.  Thank you.

5          (Trial Exhibit 5069 marked for identification)

6     BY MS. LAZARUS:

7     Q.   Okay.  Mr. Garner, this is an FBI summary of a call you

8     had with the Government on May 2nd, 2017.  Does this refresh

9     your recollection that you didn't say anything about reliance

10    on Autonomy's margins or growth rates?

11    A.   (Witness examines document.)  It doesn't specifically

12    state that, no.

13         MR. FRENTZEN:  Is it coming into evidence?  I mean, if

14    you're going to read off it --

15         THE COURT:  No, no, no.  It's not --

16         MR. FRENTZEN:  -- that's different than what his prior

17    statement is.

18         THE COURT:  Pardon?

19         MR. FRENTZEN:  I'm sorry.

20         THE COURT:  What?

21         MR. FRENTZEN:  If the document is going to come into

22    evidence, I have no objection to it --

23         MS. LAZARUS:  I'm not moving it in.

24         MR. FRENTZEN:  Well, but my point is, if we're just

25    going to be reading off of it to repeat what's on it, I'd like

1    it to come into evidence.

2             MS. LAZARUS:  I'm not going to read off it.

3             THE COURT:  Move on.

4             MR. FRENTZEN:  Well, okay.

5             THE COURT:  You have the opportunity of redirect.

6             MR. FRENTZEN:  I understand.  Thank you, Your Honor.

7    BY MS. LAZARUS:

8    Q.    Following that call in May of 2017, do you recall that an

9    FBI agent e-mailed you a copy of an HP press release?

10   A.    Yes.

11   Q.    Take a look at Exhibit 6821 in your book.

12            THE COURT:  68?

13            MS. LAZARUS:  '21.

14            THE COURT:  Okay.  6821.

15   BY MS. LAZARUS:

16   Q.    Do you recognize this document as an e-mail from Special

17   Agent John Broderick of the FBI to you?

18   A.    Yes.

19            MS. LAZARUS:  We'd move this e-mail in, Your Honor.

20            MR. FRENTZEN:  No objection.

21            THE COURT:  Admitted.

22        (Trial Exhibit 6821 received in evidence)

23   BY MS. LAZARUS:

24   Q.    This is an e-mail from Mr. Broderick to you dated

25   June 5th, 2017.  And do you see that the attachment is an HP

1  press release?

2  **A.**    Yes.

3  **Q.**    And if we could look at the next page, which is the first

4  page of the press release.

5       This is the press release that you were just shown earlier

6  this morning; correct, Mr. Garner?

7  **A.**    Yes, it is.

8  **Q.**    And you said this morning that you relied on this press

9  release when you bought shares in August 2011?

10  **A.**    Uh-huh.

11  **Q.**    But that's not what you told the Government in June of

12  last year, is it?

13  **A.**    I didn't get into the specifics.  This -- when the press

14  release came out, that was the basis for my acquisition.

15  Filling out the survey and then the discussion, I didn't quote

16  the growth rates or the margin or anything, no, I didn't.

17  **Q.**    But you actually told the Government that this isn't the

18  Government that you reviewed in August 2011, didn't you?

19  **A.**    There was confusion between this document and then the

20  internal e-mail that was sent to all HP employees.

21  **Q.**    You told the Government that you had reviewed an internal

22  HP document that overlapped with this press release by about

23  80 percent; right?

24  **A.**    Yes, uh-huh.

25  **Q.**    And have you seen this internal document that overlaps by

1    80 percent since you got involved in this case?

2    **A.**   I saw it yesterday, yes.

3    **Q.**   What did you see yesterday?

4    **A.**   Looking over the documents with counsel, I advised them to

5    go find the internal document as well as the public release.

6    **Q.**   And you were shown that internal document?

7    **A.**   Yes.

8    **Q.**   And did the internal document overlap by 80 percent with

9    this HP press release?

10   **A.**   Yes.

11   **Q.**   And it had the same growth rate numbers?

12   **A.**   I don't think it quoted the same numbers, no.

13   **Q.**   So the document you read and you reviewed in August 2011

14   did not have the Autonomy growth rate numbers in it?

15   **A.**   I don't believe it did, but I would have seen the external

16   document as well.

17   **Q.**   So your testimony now is that you reviewed the internal

18   document and the external document in August 2011?

19   **A.**   True.

20   **Q.**   But that's not what you told the Government back in June

21   of last year; right?

22   **A.**   That's correct.

23   **Q.**   So your testimony has changed on exactly what you reviewed

24   in August 2011 when you decided to --

25             **MR. FRENTZEN:**  Objection.  Argument.

GARNER - CROSS / LAZARUS

1          THE COURT:  Sustained.

2    BY MS. LAZARUS:

3    Q.    I guess the bottom line at this point is you're not really

4    sure what information you read then versus what you're saying

5    you read now?

6    A.    I'm sure that it was the public information with the

7    numbers we looked at earlier.  There would be no reason for me

8    to make that investment.

9    Q.    Didn't you tell the Government that you made the

10   investment because you liked that HP was getting into the big

11   data space?

12          MR. FRENTZEN:  Objection.  Vague as to time and

13   misstates what happened.

14          THE COURT:  Well, at what time?

15          MS. LAZARUS:  In May of 2017.

16          THE WITNESS:  I'm sorry.  Could you repeat?

17   BY MS. LAZARUS:

18   Q.    In May of 2017, you told the Government that you bought HP

19   shares because you liked that HP was going into the big data

20   space; right?

21   A.    Correct.

22   Q.    So wasn't that the reason that you bought the shares?

23   A.    And the growth rates of Autonomy, yeah.

24   Q.    You don't think anybody from Autonomy drafted any of the

25   documents that you read in August of 2011, do you?

1           MR. FRENTZEN:  Objection.  Foundation.

2           THE COURT:  Sustained.

3   BY MS. LAZARUS:

4   Q.   You didn't read any statements that were issued by

5   Autonomy in August 2011; right?

6   A.   No.

7   Q.   You didn't consider any statements from Mr. Hussain when

8   you decided to buy the shares in August 2011?

9           MR. FRENTZEN:  Objection.

10          THE COURT:  Sustained.

11  BY MS. LAZARUS:

12  Q.   You didn't know who Mr. Hussain was when you bought the

13  shares, did you?

14  A.   No.

15          MS. LAZARUS:  Nothing further.

16          THE COURT:  Thank you.

17          MS. LAZARUS:  Thank you, Mr. Garner.

18          THE WITNESS:  Uh-huh.

19                      REDIRECT EXAMINATION

20  BY MR. FRENTZEN:

21  Q.   Mr. Garner, do you have any personal interest in this

22  litigation?

23  A.   No, I don't.

24  Q.   Mr. Garner, you were asked about whether or not you felt

25  wronged as a result of this investment.  Although you hung on

1    long enough to make some money, did you feel wronged at a

2    certain point during the course of this investment?

3    **A.**    Yes, especially when questions came up as to the accuracy

4    of some of the financial information.

5    **Q.**    All right.  And did you --

6            **MS. LAZARUS:**  Your Honor, objection.  Motion to

7    strike.  I'm not sure what we're doing here with going into

8    post-acquisition feelings of the witness.

9            **MR. FRENTZEN:**  She asked him the question.

10           **THE COURT:**  Okay.  Objection overruled.

11       Okay.

12   **BY MR. FRENTZEN:**

13   **Q.**    In what way did you feel wronged, Mr. Garner?

14   **A.**    Well, when you make an investment, you're relying on the

15   information as being accurate, and it was anticipating that HP

16   would continue -- well, would start to grow again with the

17   acquisitions, you know, from a basis where they were struggling

18   in the early 2000s, mid-2000s.

19   **Q.**    And as a result of this, did this cause you any change in

20   your own investing habits?

21   **A.**    No.

22   **Q.**    Did you -- in terms of you kind of making money on the

23   deal, do you attribute that to a split that occurred in the

24   stock?  Does that make sense?

25   **A.**    Uh-huh.  Uh-huh.

GARNER - REDIRECT / FRENTZEN

1    **Q.**    Could you just describe that briefly for us?

2    **A.**    I believe in 2015 maybe HP split into two pieces, and it

3    has subsequently split again, and the strategy that Meg Whitman

4    had employed was that there was more value with the company

5    broken into pieces so that they could focus on their specific

6    markets and activities.  It has proven to be profitable.

7    **Q.**    Let me ask it this way:  Do you attribute any of your --

8    because you hung on for a long time, do you attribute any of

9    your profit -- the interest that you made on the stock to the

10    purchase of Autonomy?

11    **A.**    Do I attribute the profit I made on the stock to Autonomy?

12    **Q.**    Right --

13    **A.**    No.

14    **Q.**    -- that acquisition.

15            You were asked questions about what you didn't -- or prior

16    statements with the Government.  That initial in May 2017, that

17    was basically a phone call?

18    **A.**    Yes.

19    **Q.**    Did you have a whole lot of time to talk?

20    **A.**    No, not really.

21    **Q.**    Did you have the benefit of being able to see any

22    documents to try to help refresh your recollection?

23    **A.**    No.  We were in the process of moving.  I had recently

24    retired and was in the process of selling our house and buying

25    a new one; and if you've been through that, it's not pleasant.

GARNER - REDIRECT / FRENTZEN

1    Q.   Okay.  In terms of the second conversation that you had

2    with the FBI, did you at that time specifically discuss the

3    numbers from the press release?

4    A.   And this was later in that summer?

5    Q.   I'm sorry, June, about a month later.

6    A.   Oh, yeah.

7    Q.   After you had the opportunity to review the information?

8    A.   Yes.

9    Q.   And did you recall that the numbers, however you got the

10   numbers, that the numbers were what contributed to your

11   decision to purchase Hewlett Packard stock?

12   A.   Yes, they were.

13   Q.   And did you tell that to the Government?

14   A.   Yes.

15   Q.   Back in June?

16   A.   Uh-huh.

17   Q.   Just, incidentally, if you can recall, why was it that you

18   thought you had lost some money on this investment?

19   A.   I didn't do my homework.

20   Q.   Okay.

21   A.   I don't think I comprehended the split correctly and

22   didn't really do a thorough job.

23   Q.   Okay.  When you initially filled out the form?

24   A.   (Nods head.)

25        MR. FRENTZEN:  May I have one moment, Your Honor?

1                    (Pause in proceedings.)

2   BY MR. FRENTZEN:

3   Q.   All right.  As you sit here today, Mr. Garner, did you

4   read that external release?  Did you get those numbers before

5   you made the purchase of Hewlett Packard stock?

6   A.   Yes, definitely.

7            MR. FRENTZEN:  That's all I have.  Thank you,

8   Mr. Garner.

9            THE COURT:  Ms. Lazarus.

10                   RECROSS-EXAMINATION

11  BY MS. LAZARUS:

12  Q.   Mr. Garner, just to recap, you didn't say anything about

13  Autonomy's numbers when you responded to the Government's

14  survey; right?

15  A.   That's correct.

16  Q.   And you didn't say anything about Autonomy's --

17           MR. FRENTZEN:  Objection.  This has all been asked and

18  answered, Your Honor.

19           MS. LAZARUS:  I'm just going to quickly recap.

20           THE COURT:  Well, quick or not, I'll allow it.

21           MR. FRENTZEN:  Well, I'd offer the 302s into evidence

22  then, Your Honor.  The jurors can look at them themselves.

23           MS. LAZARUS:  No objection.

24           THE COURT:  Oh, okay.  What's coming in?

25           MR. FRENTZEN:  We'll mark them as our two last

 1   numbers, Your Honor.

 2           **THE COURT:**  Sorry?

 3           **MR. FRENTZEN:**  We will mark them as our two last

 4   exhibits, Your Honor.  They will be two 302s.  One is a FBI

 5   302 --

 6           **THE COURT:**  I'm sorry.  What are the -- so, in other

 7   words, I have to -- we'll have to figure out what the exhibit

 8   numbers are.  Well, we can do that a little later.  I don't

 9   want to --

10       Ms. Lazarus, you may proceed.  Okay?  Go right ahead.

11           **MS. LAZARUS:**  Thank you, Your Honor.

12   **Q.**   You said nothing about relying on Autonomy's numbers in

13   your survey response; right?

14   **A.**   That's correct.

15   **Q.**   You said nothing about Autonomy's numbers in your first

16   call with the Government; right?

17   **A.**   Yes.

18   **Q.**   It wasn't until after an FBI agent sent you a copy of HP's

19   press release that you said anything about relying on

20   Autonomy's numbers; correct?

21   **A.**   That's correct.

22   **Q.**   And then since your 302s are in evidence, in the May 2017

23   302, you said you'd lost approximately $1200?

24   **A.**   In the survey I did.

25   **Q.**   And then in your first call with the Government in May of

1    2017?

2    **A.**    Okay, yeah.

3    **Q.**    And then in your June call with the Government, you

4    thought you lost about $100?  Does that sound familiar?

5    **A.**    Yes.

6    **Q.**    So you hadn't really been tracking this investment very

7    closely, had you?

8    **A.**    No, not with the split.  It made it very complicated.

9    **Q.**    Speaking of the split, Mr. Frentzen asked you some

10   questions about HP's strategy after you purchased the shares.

11   Do you recall that?

12   **A.**    Uh-huh.

13        **MR. FRENTZEN:**  That's actually not what I asked him.

14        **MS. LAZARUS:**  Well, you asked about the split and --

15        **MR. FRENTZEN:**  I don't think that was the question.

16        **THE COURT:**  I think there was a question about the

17   strategy, so let's not go into the reasons for the split or

18   anything about the split.  Okay?

19        **MS. LAZARUS:**  Well, there were some questions about

20   the performance of the stock.

21        **THE COURT:**  Well, he said -- all he said about the

22   split was that -- he said -- no, I think that he said, if I

23   recall, that he didn't get the figures right on whether he made

24   or lost money because he didn't properly calculate the effect

25   of a split with respect to his investment.

1          MS. LAZARUS:  Mr. Frentzen also asked if the witness

2    attributed any amount of his gain to the Autonomy acquisition;

3    correct?

4          THE COURT:  Quite right.  Go ahead.

5          MS. LAZARUS:  Okay.

6    Q.   Do you have any information about the success of the

7    integration of Autonomy into HP?

8    A.   No, I don't.

9    Q.   Do you have any information about the success of the

10   integration of EDS into HP since that was your former employer?

11         MR. FRENTZEN:  Objection.

12         THE WITNESS:  "Success" being --

13         MR. FRENTZEN:  Sorry, Your Honor.  Objection.

14   Relevance.

15         THE COURT:  Sustained.

16         MR. FRENTZEN:  What time?

17         MS. LAZARUS:  Well, Mr. Frentzen asked the witness how

18   he perceived the performance of his HP shares after he bought

19   in 2011 until he sold in 2017, so I think we can ask a little

20   bit about --

21         THE COURT:  I don't think you can ask about EDS.  I

22   don't want to get into any of these other transactions.  Okay?

23   We have -- our plates are sort of full at this point with what

24   we have.  Okay?

25         MS. LAZARUS:  Okay.  Nothing further.  Thank you.

PROCEEDINGS

```
 1          THE COURT:  All right.  Okay.  Thank you.

 2       Really?  I mean, here is this guy --

 3          MR. FRENTZEN:  It's been --

 4          THE COURT:  -- who's been pulled in to talk about one

 5   investment he made.

 6          MR. FRENTZEN:  It's now in evidence, Your Honor.

 7                FURTHER REDIRECT EXAMINATION

 8   BY MR. FRENTZEN:

 9   Q.   Mr. Garner, could you see -- this will now be

10   Exhibit 3025.

11       (Trial Exhibit 3025 marked for identification)

12   BY MR. FRENTZEN:

13   Q.   Did you refer to the -- in that interview to the numbers

14   that were important to you in making this investment?

15   A.   (Witness examines document.)  Yes, I did.

16          MR. FRENTZEN:  That's all I have.  Thank you,

17   Mr. Garner.

18          THE COURT:  Ms. Lazarus, do you have anything?

19          MS. LAZARUS:  Nothing further.

20          THE COURT:  Okay.  I'd leave if I were you.

21          THE WITNESS:  Thank you.

22          THE COURT:  Just get up and leave.  You're excused.

23   Thank you very much for coming.

24                      (Witness excused.)

25          MR. KEKER:  Now may we approach?
```

```
 1              THE COURT:  Sure.  Ladies and gentlemen, why don't you

 2     have a little conversation, and I'll talk to the lawyers.

 3          (The following proceedings were heard at the sidebar:)

 4              MR. KEKER:  Mr. Frentzen asked this witness what

 5     happened after October 3rd that caused the stock to do whatever

 6     and asked him -- and got into -- first of all, he asked him

 7     about the write-down.  He was just woodshedding him out in the

 8     hall, and then he brings him in here and the guy starts talking

 9     about the write-down and says it's $8 billion.  That's

10     outrageous.

11              MR. FRENTZEN:  Well --

12              MR. KEKER:  Let me just finish.

13          And then the next thing is he gets up and says "Did

14     anything happen to this stock between the time you bought it

15     and the time you sold it that affected it?"  And he starts

16     talking about Meg Whitman's brilliance.

17          What happened to this stock in between was the failure of

18     Autonomy's integration, the EDS write-down of $8 billion during

19     this period, the Palm write-down of $1.2 billion, the various

20     things that Meg Whitman screwed up at --

21              MR. FRENTZEN:  I'm pretty sure Mr. Keker is trying to

22     be heard by the jurors at this point.

23              THE COURT:  No, he's not.

24              MR. KEKER:  I'm not.  I'm not.

25              THE COURT:  He's not.  He's not.
```

**SIDEBAR**

1      Go ahead.

2      He's recognizing the fact that I'm partially deaf and out

3  of deference to my age, he is making sure that not only is this

4  good for the record, that I actually hear him.

5          **MR. KEKER:**  I'd really like you to hear it.  But,

6  anyway, and I'm almost finished.

7      So he got into all of this.

8          **THE COURT:**  Take your time.  It's actually pretty

9  entertaining.

10          **MR. KEKER:**  Wait till you hear the closing.

11      In any event, he got into, first of all, in violation of

12  your order yesterday, the amount of the write-down.

13          **THE COURT:**  Okay.  Actually, I think this can be done

14  during a recess if you want to do it.

15          **MR. KEKER:**  Okay.

16          **THE COURT:**  Okay.  And I'll allow you to respond to

17  everything he said.

18          **MR. FRENTZEN:**  I just want to say the woodshedding

19  comment is a bald-faced lie, and I'll leave it at that.

20          **THE COURT:**  Okay.  That's a good place to leave it.

21      Okay.  So let's go.

22          **(The following proceedings were heard in open court:)**

23          **THE COURT:**  Okay.  Mr. Frentzen.

24          **MR. FRENTZEN:**  Oh.  Thank you, Your Honor.  The

25  Government calls Robert Julien.

JULIEN - DIRECT / FRENTZEN

```
 1              THE CLERK:  Please stand to be sworn.  Please raise
 2     your right hand.
 3                          ROBERT JULIEN,
 4     called as a witness for the Government, having been duly sworn,
 5     testified as follows:
 6              THE WITNESS:  I do.
 7              THE CLERK:  Thank you.
 8          MR. FRENTZEN:  May I proceed, Your Honor?
 9                      DIRECT EXAMINATION
10     BY MR. FRENTZEN:
11     Q.    Could you state your name?
12           Or did he already do that?
13              THE CLERK:  No.  Please state --
14              THE WITNESS:  My name is Robert Julian, J-U-L-I-E-N.
15     BY MR. FRENTZEN:
16     Q.    Okay.  Thank you, sir.
17           What do you do for a living?
18     A.    I'm an attorney at Dell EMC.
19     Q.    And how long have you been an attorney?
20     A.    Since 1994.
21     Q.    And where do you currently -- or what area -- where do you
22     work out of?
23     A.    I work in the South Bay out of Santa Clara.
24     Q.    In connection with your testimony here today, were you
25     asked to review some records from EMC?
```

```
 1   A.    Yes, I was.

 2   Q.    And to sort of familiarize yourself about where the

 3   records came from and how they were kept?

 4   A.    That's correct.

 5   Q.    All right.  And I'd like to now show you a series of

 6   documents.

 7         All right.  Mr. Julien, can we start with Exhibit 3022?

 8   Do you have that in front of you?  Sorry.  That's probably the

 9   last number.  Do you have a 3022?

10   A.    One moment, Counsel.

11   Q.    It may be the one that's not in a folder there.

12   A.    Is that a letter dated June 29, 2009?

13   Q.    It is.

14   A.    Okay.

15   Q.    Yeah.  You got it there?

16   A.    Yes, sir.

17   Q.    Okay.  Do you recognize what that is?

18   A.    (Witness examines document.)  Yes, I do.

19   Q.    What is it generally?

20   A.    This is a letter agreement between EMC Corporation and I

21   believe it's Zantaz is the name of the other party.

22         MR. FRENTZEN:  Okay.  Your Honor, I'd offer 3022 into

23   evidence.

24         THE COURT:  Admitted.

25         (Trial Exhibit 3022 received in evidence)
```

1      **MR. FRENTZEN:**  Can we pull it up, please?

2   **Q.**   And, Mr. Julien, was this a document that was maintained

3   in EMC's files?

4   **A.**   Yes.  This document was maintained in the legal document

5   management system -- or, rather, the contract document

6   management system, called a DMS, at EMC.

7   **Q.**   All right.  And, generally speaking, what is this -- what

8   is the nature of this agreement?

9   **A.**   Well, Counsel, this is a -- this is an agreement between

10  EMC and its customer.

11  **Q.**   To sell $9 million worth of hardware?

12  **A.**   That appears to be the case.  I haven't reviewed it for

13  its content in that way.

14  **Q.**   All right.  I'd like to go to a portion of its content, if

15  we could.  Could we go to page 2, please?

16      Mr. Julien, there is an indication here that delivery of

17  equipment and software shall be FOB EMC's shipping location.

18  What does that mean, "FOB EMC's shipping location"?

19  **A.**   Based on my knowledge of EMC's practices in 2009, "FOB

20  shipping location" would mean that title and risk of loss of

21  the subject shipment would pass at EMC's loading dock.

22  **Q.**   Is the loading dock something different than the

23  warehouse?

24  **A.**   I can't really speak to where equipment is warehoused, but

25  typically the dock is where a delivery vehicle -- a carrier

JULIEN - DIRECT / FRENTZEN

1    would come to pick up a shipment, so it's usually adjacent to a

2    warehouse.

3    **Q.**    Does this mean that this -- that until the departure

4    date -- in other words, until the hardware is set to be picked

5    up -- that it remains in EMC's -- it has not yet been delivered

6    by EMC's policies?

7    **A.**    That's correct.

8    **Q.**    Okay.  I'd like to move now to a -- well, actually, if we

9    could just -- never mind.

10        You see there's a signature here on behalf of Zantaz?

11    **A.**    Yes, sir.

12    **Q.**    Could we go now to Exhibit 2646, please?  If you could --

13    I'm sorry.  Don't pull it up yet because it's not in yet I

14    don't think.

15        Could you take a look at that, Mr. Julien?

16            **THE COURT:**  Admitted.

17        (Trial Exhibit 2646 received in evidence)

18            **THE WITNESS:**  Yes.  I have it in front of me.

19    **BY MR. FRENTZEN:**

20    **Q.**    All right.  And what we're looking at now is the first

21    page of 2646.

22        Mr. Julien, what -- first of all, was this a document that

23    was made and kept in the ordinary course of business at EMC?

24    **A.**    Yes, it is.  This is a screen shot from the Oracle system.

25    **Q.**    And in terms of the Oracle system, what do you mean by

1    that?

2    **A.**    Well, in this case Oracle software is used to track and

3    manage shipments.

4    **Q.**    All right.  Can you interpret some of this for us in terms

5    of what this means?  First of all, does this appear to relate

6    to the same order number and letter that we had looked at

7    that's Exhibit 3022?

8    **A.**    Just a moment, Counsel.

9         (Witness examines documents.)  It occurs in approximately

10   the same time period.  I'm looking for the delivery name and

11   number where it might appear on the letter agreement.

12   **Q.**    Sure.

13   **A.**    (Witness examines document.)  Sorry, Counsel.  I'm not

14   sure where that is.

15   **Q.**    Do you see a customer there, Zantaz?

16   **A.**    Yes.

17   **Q.**    And you see Order Letter Number 3 dated 6/29/09?

18   **A.**    Correct.

19   **Q.**    All right.  So does this appear to relate to the same

20   order that we just talked about?

21   **A.**    This one is for Zantaz and it's per order letter number

22   6/29/09.  So they do appear to relate to each other.

23   **Q.**    All right.  So the status here, what does the status mean?

24   **A.**    The status here indicates that the matter is closed.  In

25   EMC parlance in 2009, that meant that a shipment had been

1    completed.

2    **Q.**   The next entry is "Departure Date."  Do you see that?

3    **A.**   Yes, sir.

4    **Q.**   What departure date is listed for this delivery?

5    **A.**   16 July 2009.

6    **Q.**   What does that mean, departure date?

7    **A.**   Based on my knowledge of EMC's processes at the time, the

8    departure date would mean the actual date on which the shipment

9    was made ready for pickup and generally picked up.

10        There are occasions where it would be picked up the

11   following day if the carrier was notified late in the day, but

12   the departure date is either the actual transfer to the carrier

13   or the following day is the actual date of the transfer to the

14   carrier.

15   **Q.**   And does that -- so, then, that departure date means that

16   it would leave on either that date or the following date?

17   **A.**   That's correct.

18   **Q.**   And so does that relate to what you talked about before in

19   terms of the delivery, meaning the loading dock?

20   **A.**   It does, Counsel.  It means that delivery has occurred as

21   of that date or the following date.

22   **Q.**   July 16 or July 17 of 2009?

23   **A.**   That's correct.

24   **Q.**   Okay.  All right.

25        And if we could, could we then go to the second page of

JULIEN - DIRECT / FRENTZEN

1    this?

2        And, similarly, do you see on page 2 the customer Zantaz?

3    A.    Yes, I do, Counsel.

4    Q.    All right.  And in terms of the departure dates on -- in

5    other words, these deliveries, are those all in the either July

6    or August of 2009 time frame?

7    A.    That's correct.

8    Q.    So does that also indicate delivery on those dates or the

9    following date?

10   A.    That's correct as well.

11   Q.    Could we go to page 3?

12       And on page 3 do you see the delivery dates all being in

13   July of 2009?

14   A.    Yes, sir.

15   Q.    And these relate also to this Order Letter Number 3 dated

16   6/29/09?

17   A.    Yes, they do.

18   Q.    All right.  If we could go to the last page here.

19       And on the last page, page 4, in terms of the departure

20   dates, are they all in July of 2009?

21   A.    Yes, they are.

22   Q.    I'd like to turn now to two exhibits.  Let's start with

23   151.  Could you take a quick look at 151?

24   A.    (Witness examines document.)

25   Q.    Do you recognize what 151 is?

1    **A.**    A moment, Counsel.  Do you have a Bates number for 151?

2    **Q.**    It should end in 4622.

3              **THE COURT:**  Well, you can --

4              **MR. FRENTZEN:**  Let me just step up and see.

5              **SPECIAL AGENT BRYANT:**  It's in evidence.

6              **MR. FRENTZEN:**  What's that?

7              **SPECIAL AGENT BRYANT:**  It's in evidence.

8    **BY MR. FRENTZEN:**

9    **Q.**    Was that a document that was made and kept in the ordinary

10   course of business at EMC in terms of -- in other words, that

11   you were able to locate the documents here?

12   **A.**    Yes, it was.

13             **MR. FRENTZEN:**  It may already be in evidence.  If not,

14   I offer it, Your Honor.

15             **THE CLERK:**  It's in.

16             **MR. FRENTZEN:**  Okay.  Great.

17        Could we just go to the top part of the e-mail, page 1,

18   please?

19   **Q.**    Okay.  Mr. Julien, do you see what this appears to be on

20   page 1?

21   **A.**    (Witness examines document.)  This is -- appears to be

22   correspondence with respect to an EMC hardware purchase made by

23   Zantaz.

24   **Q.**    If we could scroll down.

25        All right.  And does it state here (reading):

1          "Here are the invoices we received.  As you can see,

2     they say 'proforma' invoices and 'Invoices will be revised

3     once order has shipped.'

4          "We would like final invoices that don't have that

5     language.  As you know, we have already paid for the

6     equipment and there should be no further changes to the

7     invoice."

8     Do you see that?

9  A.  Yes, I do see that.

10 Q.  Okay.  Could we go to page 3 of this document?  And can

11 you -- well, go to the top, please.

12     What is this document, Mr. Julien?

13 A.  This document is a proforma invoice for a hardware

14 shipment.

15 Q.  What does that mean, "proforma invoice"?

16 A.  Well, a proforma invoice was customarily used by EMC in

17 2009 as indication of a shipment.  It's usually part of the

18 shipping documentation package.

19 Q.  And if we could scroll up just a little bit.  I'm sorry,

20 down.  And back to where we -- yeah.  Great.

21     Can you blow up this bottom left portion in the

22 "Comments"?

23     All right.  Mr. Julien, do you see in here where the

24 document says "Invoices will be revised once order is shipped"?

25 A.  Yes, I do, Counsel.

JULIEN - DIRECT / FRENTZEN

1   Q.   And if we could, could we scroll through to the next page,

2   please, page 4?

3        And do you see the same language in the "Comments" there?

4   A.   Yes.  It appears here as well.

5   Q.   And on page 6?

6   A.   (Witness examines document.)

7   Q.   Same comments?

8   A.   Yes.

9   Q.   All right.  And can we go back to page 1 just briefly?

10       At the top the date on this document is what, Mr. Julien?

11  A.   7/13/2009.

12  Q.   And if we could, let's take a look at Exhibit 154, please.

13  And I think -- could you take a look at -- do you have 154,

14  Mr. Julien?  Maybe it's already in evidence also.

15          THE COURT:  It's not.

16          MR. FRENTZEN:  It is not?

17          THE COURT:  154 admitted.

18       (Trial Exhibit 154 received in evidence)

19          MR. FRENTZEN:  Thank you, Your Honor.

20       Could we pull up 154?

21  Q.   All right.  Mr. Julien, 154, was this a document that was

22  made and kept in the ordinary course of business at EMC?

23  A.   (Witness examines document.)  Yes, it was, Counsel.

24  Q.   Could we take a look at the first part of the e-mail; in

25  other words, down here (indicating)?  Great.  Thanks.

1          Okay.  Who is this an e-mail from?

2    **A.**   From Mike Sullivan.

3    **Q.**   And was Kevin Scannell somebody -- do you have any idea

4    who that was or is?

5    **A.**   I do not, sir.

6    **Q.**   Okay.  Do you know whether or not it was somebody employed

7    at EMC?

8    **A.**   I believe Kevin Scannell was employed by EMC.

9    **Q.**   All right.  And what's the question that Mr. Sullivan is

10   asking here?  And this is what date?  Sorry.

11   **A.**   The date of the e-mail?

12   **Q.**   Yeah.

13   **A.**   July 13, 2009.

14   **Q.**   What is the initial question here from -- or request from

15   Mr. Sullivan?

16   **A.**   In the first sentence it says (reading):

17          "As you can see, they say proforma and," quote,

18          "'Invoices will be revised once order is shipped,'" close

19          quote."

20   **Q.**   And the request from Mr. Sullivan?

21   **A.**   (reading)

22          "We would like final invoices that don't have that

23          language."

24   **Q.**   (reading)

25          "As you know, we have already paid for the equipment

JULIEN - DIRECT / FRENTZEN

```
 1          and there should be no further changes to the invoice"?
 2   A.    Correct.
 3   Q.    All right.  And then is there then response -- and then
 4   let's go ahead and scroll up -- from somebody named Liz Madden?
 5   A.    Yes.  I see a response from Liz Madden.
 6   Q.    Do you know who -- was Liz Madden employed at EMC?
 7   A.    I cannot tell you.  I don't know.
 8   Q.    All right.  In any event, Liz Madden is saying (reading):
 9              "Mike -
10              "Please see the attached invoices that have the
11          language regarding the invoices being revised removed."
12          Do you see that?
13   A.    Counsel, I apologize.  My memory has been refreshed.
14   Liz Madden, I believe, was the -- was an employee of EMC, and I
15   believe that Kevin Scannell worked for Liz Madden.
16   Q.    Great.  Thanks.
17          And Liz Madden is saying (reading):
18              "Please see the attached invoices that have the
19          language regarding the invoices being revised removed."
20          Do you see that?
21   A.    That's correct.
22   Q.    Okay.  Let's go to the attachment there, and can we spin
23   that?  Thanks.
24          Do you see the document here on page 2 as still a proforma
25   invoice from EMC?
```

JULIEN - CROSS / MARAIS

1  A.   Yes.

2  Q.   And could we blow up the "Comments" section?

3       Does there appear to have been a change made to the

4  proforma invoices that we saw in Exhibit 151?

5  A.   Yes.  It no longer contains the language that the invoices

6  will be revised once the order has been shipped.

7  Q.   And can we go to page 3, please?

8       Similar alteration of the document here, Mr. Julien?

9  A.   That's correct.

10 Q.   And then if you could just take a look at page 4 and 5.

11 Does page 4 and 5 have the same similar redactions or change?

12 A.   Yes, that's right.

13           MR. FRENTZEN:  May I have one moment, Your Honor?

14           THE COURT:  Yes.

15                       (Pause in proceedings.)

16           MR. FRENTZEN:  That's all I have.  Thank you very

17 much, Mr. Julien.

18           THE COURT:  Thank you.

19           MR. MARAIS:  Thank you, Your Honor.

20      Ladies and gentlemen, good morning.

21                  **CROSS-EXAMINATION**

22 BY MR. MARAIS:

23 Q.   Mr. Julien, good morning.

24 A.   Good morning.

25 Q.   We've never met.  My name is Nic Marais.  I'm one of the

1   lawyers representing Mr. Hussain.

2   **A.**   Hello.

3   **Q.**   You are a lawyer; right?

4   **A.**   That's correct.

5   **Q.**   And you understand that all of the documents that were

6   just shown to you date back to June or July of 2009?

7   **A.**   That's right.

8   **Q.**   And at that time you were working at a company called

9   Force10?

10  **A.**   That's correct.

11  **Q.**   And then in August 2011, a month coincidentally that the

12  jury is very familiar with, your company Force10 was acquired

13  by Dell; right?

14  **A.**   That's correct.

15  **Q.**   And then you went to work for Dell?

16  **A.**   I did.

17  **Q.**   And at that time Dell was a competitor to EMC?

18  **A.**   Yes.

19  **Q.**   And then at some point in 2016, EMC acquired Dell?

20  **A.**   Well, Counsel, there's an oversimplification if you don't

21  mind.

22          **MR. FRENTZEN:**  Objection.  Relevance.

23          **THE WITNESS:**  The --

24          **MR. FRENTZEN:**  I'm sorry.

25          **THE COURT:**  Wait.  Wait.  This is going pretty

1  quickly, so I'm trying to keep up with it.

2          MR. FRENTZEN:  Sorry, Your Honor.  Relevance and

3  scope.

4          MR. MARAIS:  Well, I'm just trying to establish

5  Mr. Julien's background so we know where he was at the time of

6  the documents that he's been asked to testify about.

7          MR. FRENTZEN:  He's a custodian.

8          THE COURT:  I'll allow it.  I'll allow some of this.

9  I mean, go ahead.

10  **BY MR. MARAIS:**

11  **Q.**   The ultimate conclusion here, though, is that you had

12  joined EMC in 2016; is that right?

13  **A.**   It's more correct to say that EMC and Dell merged in 2016.

14  **Q.**   But 2016 is the first time that you started working at

15  EMC; right?

16  **A.**   It's more correct to say that Dell and EMC merged at that

17  time.  I worked for Dell.

18  **Q.**   Okay.

19  **A.**   EMC is now part of Dell.

20  **Q.**   Okay.  You were not at EMC in 2009 at the time that the

21  e-mails and contracts that we've been looking at were

22  circulated; right?

23  **A.**   That's correct.

24  **Q.**   Do you understand, though, that the deal that Mr. Frentzen

25  has been asking you about closed near the end of the second

1  quarter of 2009?

2  **A.**   I can't really speak to when the deal closed.

3  **Q.**   Let's take a look at Exhibit 3022.

4          **MR. FRENTZEN:**  What's 3022?  Oh.  Sorry.  My bad.

5          **MR. MARAIS:**  If we could go to page 2, Jeff.

6  **Q.**   Do you see that this agreement was signed by Mr. Hussain

7  for Zantaz and by someone named Chantal Leon for EMC?

8  **A.**   That's correct.

9  **Q.**   So this is what we would call a fully executed agreement;

10  correct?

11  **A.**   Yes.

12  **Q.**   And if you scroll up a little, Jeff, you see the fax

13  headers on this document.

14      You'll see that somebody faxed it out of EMC at

15  6:30 p.m. -- a little further to the right -- on June 30th.  Do

16  you see that?

17  **A.**   Yes, I do.

18  **Q.**   So all these signatures were on the document, this

19  agreement was finalized by June 30; correct?

20  **A.**   That's a reasonable conclusion.

21  **Q.**   Does EMC have quarterly sales targets that it tries to

22  hit?

23  **A.**   Yes.

24  **Q.**   And typically is there an increase in activity as you get

25  closer to the end of the quarter?

1              MR. FRENTZEN:  Objection.  Scope.  Relevance.

2              THE COURT:  I'll allow it.

3              THE WITNESS:  I think that's typical in the current

4     period.  I couldn't speak to 2009, sir.

5     BY MR. MARAIS:

6     Q.   And in your experience, does EMC offer bigger discounts at

7     times to close deals as they approach the end of the quarter?

8              THE COURT:  Are you asking him -- in what time period?

9     I mean, he doesn't have -- are you asking him now as of -- or

10    2000 what?  What year?

11             MR. MARAIS:  Fair point.

12    Q.   Let's focus on this time, the middle of 2009 when this

13    agreement was finalized.  Do you know whether EMC recognized

14    revenue on this deal in the second quarter of 2009?

15    A.   I do not.

16    Q.   Let's look at Exhibit 151, and if we could go to page 3.

17             And in the top right-hand corner you see the invoice date

18    is June 30, 2009?

19    A.   That's correct.

20    Q.   And, again, that's consistent with the fax header we

21    looked at, and a reasonable conclusion here would be that this

22    deal was finalized at the end of the second quarter of 2009;

23    right?

24             MR. FRENTZEN:  Objection.  It actually -- objection.

25    Calls for a legal conclusion probably and --

```
 1          THE COURT:  Sustained.
 2          MR. FRENTZEN:  -- there's no delivery.
 3   BY MR. MARAIS:
 4   Q.  Do you see --
 5          THE COURT:  Okay.  We'll stop for a moment.  Okay.
 6      All right.  You're asking this witness as to what he would
 7   conclude by virtue of this document with respect to the effect
 8   of the document.  I mean, you're saying:  By looking at this
 9   document, can you conclude that the deal was done?  Something
10   like that?
11          MR. MARAIS:  Yeah.  I'm asking if --
12          THE COURT:  And I don't -- and the objection is that
13   he's not qualified to give that opinion.  He's qualified, I
14   think, to give an opinion as to what the facts are with respect
15   to the documents that he has introduced, if he's aware of the
16   facts.  So I'm sustaining the objection.
17   BY MR. MARAIS:
18   Q.  Does the invoice date of June 30, 2009, highlighted here
19   in Exhibit 151, mean that EMC had issued an invoice to Autonomy
20   by the end of the second quarter of 2009?
21   A.  The invoice date would suggest that they issued an invoice
22   on this date, Counsel.
23   Q.  And, Jeff, if we could just go back to the full page.
24      The word "proforma" here, that's just lawyer-speak for
25   standard form invoice; correct?
```

**JULIEN - CROSS / MARAIS**

1   **A.**   So the word "proforma," as it's used in English, would

2   indicate that it's a standard form.

3   **Q.**   Jeff, if we could go back to page 1.

4        Mr. Julien, obviously you're not anywhere on this e-mail

5   and Mr. Hussain is not anywhere on this e-mail.  This is

6   correspondence from Mike Sullivan to Kevin Scannell; correct?

7   **A.**   Yes, it is, Counsel.

8   **Q.**   And Mr. Sullivan writes, a little further down (reading):

9        "We would like final invoices that don't have

10       language indicating that the invoices will be revised once

11       order is shipped."

12   And he goes on (reading):

13       "As you know, we have already paid for the equipment

14       and there should be no further changes to the invoice."

15   Do you see that?

16   **A.**   Yeah.  I believe you quoted the second sentence verbatim,

17   Counsel, but not the first.

18   **Q.**   Fair point.

19        Was it your understanding -- do you have any understanding

20   as to whether Autonomy had already paid for this equipment at

21   this point?

22   **A.**   I have no understanding of that.

23   **Q.**   Do you have any understanding as to whether there were

24   going to be any further changes to the invoice?

25   **A.**   I have no understanding of that.

**Q.**   Where does EMC -- at this time in June or July of 2009,
where did EMC make its hardware?

**A.**   My understanding is that EMC made its hardware in a couple
of locations.  At least the ones that are germane to the
documents that I've reviewed for this matter seem to have
occurred in Massachusetts and in North Carolina.

**Q.**   But there's a factory where they build the computers; is
that right?

**A.**   That's my belief, yes.

**Q.**   And then those computers are transferred to a shipping
facility; is that right?

**A.**   I can't speak to that process.

**Q.**   Okay.  Let's look at Exhibit 2646.  Did you prepare this
document, sir?

**A.**   I did not.

**Q.**   Do you know who prepared it?

**A.**   Someone in the EMC Shipping Department prepared this.  I
don't recall the gentleman's name.

**Q.**   Do you know when it was prepared?

**A.**   No, I do not.

**Q.**   And this is a report, as I understand it, that shows when
hardware left EMC's shipping facility; correct?

**A.**   That's correct.

**Q.**   It doesn't show when the hardware was transferred from
where it was manufactured to EMC's shipping facility?

1    **A.**   Again, Counsel, I can't speak to whether they were the

2    same thing or different things.

3    **Q.**   You just don't know?

4    **A.**   I just don't know.  So if they were shipping, for example,

5    from the manufacturer --

6            **THE COURT:**  Well, I think you've answered the

7    question.  Thank you.

8            **THE WITNESS:**  Okay.

9    **BY MR. MARAIS:**

10   **Q.**   Could we turn back, quickly, to Exhibit 3022?

11   **A.**   (Witness examines document.)

12   **Q.**   And on page 2, you were asked a couple of questions about

13   the term "FOB."

14       Jeff, if we could highlight the first sentence (reading):

15           "Delivery of equipment and software shall be FOB

16       EMC's shipping location."

17       Do you see that?

18   **A.**   Yes, I do.

19   **Q.**   And "FOB" stands for freight on board or free on board?

20   **A.**   That's correct.

21   **Q.**   And that's a term that means once the product reaches the

22   location described, that's the point at which ownership of that

23   product transfers; right?

24   **A.**   That's correct.

25   **Q.**   So what this sentence means is that when the hardware in

1    this agreement reached EMC's shipping location, ownership and

2    title of that hardware transferred to Autonomy; right?

3    **A.**    It would mean that.  That's the point where title transfer

4    and risk of loss change.

5    **Q.**    And, again, we couldn't tell from Exhibit 2646 the date on

6    which the hardware reached EMC's shipping facility?

7              **MR. FRENTZEN:**  Objection.  That misstates it.

8              **THE COURT:**  I think the -- overruled.

9         Go ahead.

10             **MR. MARAIS:**  Thank you.

11             **THE COURT:**  Put the document up.

12             **MR. MARAIS:**  All right.  Let's put Exhibit 2646 back

13   up.

14   **Q.**    There's no way of telling from this document the date on

15   which the hardware reached EMC's shipping facility; correct?

16   **A.**    Again, Counsel, this indicates when a shipment occurred

17   and it indicates when it occurred at the shipping dock.

18   **Q.**    Well, this indicates when the product left EMC's shipping

19   facility; right?

20   **A.**    So you appear to be drawing a distinction between a

21   shipping facility and someplace else, and I can't comment as to

22   that.

23   **Q.**    You can't comment because you don't know if there's a

24   distinction between the factory and the shipping facility?

25   Have I got that right?

**JULIEN - CROSS / MARAIS**

1  **A.**   That's correct.

2  **Q.**   All right.  Just a couple more questions about the

3  agreement 3022.

4       Actually, I'm sorry, one more thing on 2646.  This is an

5  internal system at EMC; right?

6  **A.**   That's correct.  This is the Oracle database.

7  **Q.**   This would only be visible to EMC employees; right?

8  **A.**   I can't speak to that, Counsel.

9  **Q.**   Well, no one from Autonomy would have access to this

10  database; right?

11  **A.**   I can't speak to that either, Counsel.

12  **Q.**   You don't know whether people from outside EMC have access

13  to EMC's databases?

14  **A.**   I don't know whether in 2009 anyone from outside EMC had

15  access to this database.

16  **Q.**   All right.  Let's turn back to 3022, and if we could blow

17  up this page and highlight the language that says "Total Amount

18  Due:  $9 million."  And the next sentence, which reads

19  (reading):

20       "EMC shall ship the Products on or about June 29,

21       2009, to the following location:"

22       Do you see that?

23  **A.**   I do see that.

24  **Q.**   And this is the signed agreement that we looked at earlier

25  fully executed by both parties, and EMC is promising in this

JULIEN - REDIRECT / FRENTZEN

1  agreement that it will ship the products on or about June 29,

2  2009; right?

3  **A.**   It says that, Counsel.

4  **Q.**   And it appears from your research that there was some

5  delays and the hardware was only shipped in the next month.

6  **A.**   Based on the shipping documents that we've looked at, it

7  appears that the shipments were made on different dates.

8  **Q.**   And do you know why there were delays?

9  **A.**   I do not.

10  **Q.**   Do you know whether anyone ever called Mr. Hussain to say,

11  "We have some delays delivering the hardware"?

12          **MR. FRENTZEN:**  Objection.  Foundation.  Speculation.

13          **THE COURT:**  Sustained.  Sustained.  I don't think he

14  was there in June.

15          **MR. MARAIS:**  That's sort of my point, Your Honor.

16          **THE COURT:**  Well, it's a good point.  There it is.  So

17  you can't really ask him what happened on June 29th or what

18  Mr. Hussain did or didn't do on June 29th because he doesn't

19  know.

20          **MR. MARAIS:**  If he doesn't know, I have no further

21  questions.

22          **THE COURT:**  Okay.

23          **MR. MARAIS:**  Thank you.

24          **THE COURT:**  Okay.  All right.  Thank you.

25  \\\

1          <u>REDIRECT EXAMINATION</u>

2     BY MR. FRENTZEN:

3     Q.   You were asked about Mr. Hussain.

4          Could we see Exhibit 152, please?  I think it's in

5     evidence.

6               THE CLERK:  It's in.

7               MR. FRENTZEN:  It's in?  Great.  Thank you.

8          Bring up 152.

9     Q.   Mr. Julien, I just want to ask you, do you see

10    Mr. Hussain's name on this string of e-mails, Sushovan Hussain?

11    A.   I do, sir.

12    Q.   And this is in July of 2009?

13    A.   Correct.

14    Q.   Can we scroll up some?

15         And does this appear to relate to EMC about confirming

16    shipment?

17              MR. MARAIS:  Your Honor, objection to foundation.

18    This is an internal Autonomy e-mail.

19              MR. FRENTZEN:  He asked him what Sushovan Hussain did

20    or didn't know at this time period.

21              THE COURT:  Overruled.

22              MR. FRENTZEN:  And could we see 152, please -- I'm

23    sorry -- 155.

24         Is that in evidence?

25              THE CLERK:  Yes.

1              MR. FRENTZEN:  Great.  Thank you.

2       155.

3   Q.   And do you see Mr. Hussain's name on this string of

4   e-mails, Mr. Julien?

5   A.   Yes, I do.

6   Q.   And do you also see that it says (reading):

7              "Proforma is still on, but the other language is

8       removed.  Hopefully this works"?

9   A.   Yes, I see that.

10  Q.   In July of 2009?

11  A.   That's correct.

12             MR. FRENTZEN:  Thank you, Mr. Julien.  I have nothing

13  further.

14             THE COURT:  Go ahead.

15             MR. MARAIS:  Thank you, Your Honor.

16      Could we get that last exhibit back up, 155?

17                        RECROSS-EXAMINATION

18  BY MR. MARAIS:

19  Q.   We are far afield now, Mr. Julien, but just to confirm.

20  You didn't see any language on here that has anything to do

21  with shipping or delivery of hardware; right?

22  A.   (Witness examines document.)  Can you repeat the question,

23  Counsel?

24  Q.   You don't see any language in this exhibit that

25  Mr. Frentzen just showed you that has anything to do with

1    delivery or shipping; correct?

2    **A.**    Counsel, the words "proforma" and "invoice" refer

3    frequently to shipping.

4    **Q.**    There's nothing in here discussing the delivery of EMC

5    hardware; correct?

6              **MR. FRENTZEN:**   Objection.

7              **THE COURT:**   Overruled.

8              **MR. FRENTZEN:**   Are we going to go through the whole

9    thing?

10             **THE WITNESS:**   There's nothing that explicitly refers

11   to delivery, Counsel.

12             **MR. MARAIS:**   Thank you.   Nothing further, Your Honor.

13             **MR. FRENTZEN:**   Nothing further.

14             **THE COURT:**   Thank you.

15        So maybe we should -- we've had a spirited morning.   Let's

16   take a recess, and we will be in recess until 20 to 11:00 by

17   this clock, which who knows what that means.

18        Don't discuss the case, allow anyone to discuss it with

19   you, form or express any opinion.

20        (Proceedings were heard out of the presence of the jury:)

21             **THE COURT:**   Okay.   Let the record reflect the jurors

22   have left.   Now we're turning to any unfinished business.

23             **MR. FRENTZEN:**   Your Honor, I'd like to start by, on

24   the record, you know, comment about woodshed is just a

25   bald-faced lie.   I'm happy to put Mr. Garner on the stand to

1  prove that, and --

2          **THE COURT:**  Well, I don't --

3          **MR. FRENTZEN:**  I don't know.  I mean, if we're going

4  to do that, at least try to stick to the truth.

5      So --

6          **THE COURT:**  Wait.  Wait.  Just stop a minute.

7      I don't really understand that "woodshedding" is

8  necessarily a pejorative term.  That is to say, I think that

9  it's recognized that all witnesses before they're placed on the

10 stand are, one, examined; two, frequently told to avoid areas

11 or avoid statements that normally they might give in the course

12 of their testimony in order to be complete, or whatever, which

13 have been ruled inadmissible.

14     So I don't see -- I took Mr. Keker's description in a

15 benign sense.

16         **MR. KEKER:**  And I apologize to Mr. Frentzen --

17         **MR. FRENTZEN:**  But it's just not true.

18         **MR. KEKER:**  -- if he took -- can I just finish? -- if

19 he took offense.

20     What I saw --

21         **THE COURT:**  So let's --

22         **MR. KEKER:**  What I saw is him take the witness into

23 the witness room before court, and then the witness comes back

24 in here and starts talking about the impairment charge and the

25 $8 billion.  I shouldn't have said "woodshed," but that's what

PROCEEDINGS

1    I saw.

2              THE COURT:  Okay.  All right.  Anyway --

3         MR. FRENTZEN:  I'm more than happy to inform the Court

4    about what my conversation was with Mr. Garner.  It had nothing

5    to do with that.

6              THE COURT:  In fairness, maybe you should.

7         MR. FRENTZEN:  It had nothing to do with that.  I

8    asked him a quick question about the materiality, if you will,

9    of the numbers that he had read on the press release.  That was

10   it.  It was a very pleasant conversation.  I think it took all

11   of about 30 seconds.

12        I'm glad Mr. Keker is watching my every move.  It

13   wasn't -- there's absolutely not one aspect of it -- sorry --

14   that you could refer to it as -- I know what a woodshedding is.

15   I've done many a woodshedding during the course of my career,

16   and I'm more than happy to step up and take it for woodshedding

17   a witness.

18        This was a very pleasant conversation with a very nice man

19   who has now been accused of being a liar; and it had absolutely

20   nothing to do with what -- you know, these ghosts that

21   Mr. Keker is how apparently seeing.

22             MR. KEKER:  So if he's proud of woodshedding, I don't

23   feel badly anymore.

24             THE COURT:  Withdraw the apology.

25        Okay.  Fine.

PROCEEDINGS

1          **MR. FRENTZEN:**  Keep making stuff up, that's great.

2      So, in any event, back to the subject matter --

3          **THE COURT:**  I was wondering whether there's some way

4  to make this case really interesting.

5          **MR. FRENTZEN:**  I'm trying, Your Honor.  I am trying.

6          **THE COURT:**  I think we have now embarked on that path,

7  but it's interesting enough even without it.

8      Okay.

9          **MR. FRENTZEN:**  I'm going to put on more victims and

10 custodians of record because apparently that's what's getting

11 them really going.  I thought this was going to be a really

12 dull morning.

13      In any event, and so --

14          **THE COURT:**  So I think the question -- the substantive

15 question is:  To what extent did his responses open the door or

16 introduced or caused the Court or should cause the Court to

17 give some type of limiting or cautionary instruction in light

18 of what we have arrived at as a matter of accommodation to the

19 Court's concern -- I suppose, more than counsel's concern -- as

20 to how to move forward?  And I think that's actually a serious

21 issue.

22      To say you take all the motives and you take all that and

23 just put it to the side, because I don't find anything improper

24 in what was done, and let's just go on and see is there

25 something that either side thinks that the Court has to say or

PROCEEDINGS

1    do.

2          **MR. FRENTZEN:**  I believe the Court already admonished

3    the jurors with respect to the write-down, so I think that was

4    handled.

5          I don't know to what other extent Mr. Garner went astray

6    of anything other than -- you know, Mr. Keker wants to say

7    that, you know, this was somehow -- I knew they were going to

8    get into the fact that Mr. Garner had made money.  Mr. Keker

9    got into it, even though it wasn't his witness, by proclaiming

10   from Defense table during the beginning of my examination "This

11   man made money."  And so to the extent that he attributed it to

12   a split in the stock I thought was a relatively benign fact.

13         Now, I will grant you that the witness went a little

14   astray into some other stuff that, quite frankly, we had never

15   discussed before other than the stock split, "And I think

16   that's why I made some money off of it."  And, you know, the

17   Court can do with that whatever.  I don't have a --

18         We're not wedded to it.  We're not relying on it.  We

19   didn't want to argue it.  It was the witness' description that,

20   "Yes, I made money but only because I hung on to it for six

21   years and I don't attribute that to the purchase of Autonomy.

22   I attribute it to other things going on."

23         And I'm happy to -- you know, if the Court wants to limit

24   that in any particular way, we're not going to argue it unless

25   somehow the defense is they made money for Tom Garner at the

1    end of the day, which I don't think it's going to be.  And so

2    that's where we're at.

3         MR. KEKER:  I don't know what kind of instruction at

4    this point is going to improve the situation.  I was -- the

5    reason that I interrupted and I shouldn't, it was Ms. Lazarus'

6    witness, is I thought we'd spent a lot of time working on this

7    post-October 3 business, and that everybody was going to be

8    fairly careful and follow the those rules; and here we have a

9    witness who's being asked "Why did you -- well, what happened

10   to the stock?"  And he talks about it and then was asked about

11   "Did the Autonomy acquisition help you at all?"  "Oh, no."  I

12   mean, it was, like, why are we going there?

13        But I don't know what we can -- I don't know what a

14   limiting instruction could say at this point, so I'm not asking

15   for one.

16        THE COURT:  Okay.

17        MR. KEKER:  I think we should forget it and move on.

18        THE COURT:  Okay.  So we'll stop right there.  That's

19   fine.  Let's take a recess.

20        MR. FRENTZEN:  Great.  Thank you.

21        MR. KEKER:  Yes, sir.

22             (Recess taken at 10:27 a.m.)

23           (Proceedings resumed at 10:45 a.m.)

24        THE CLERK:  Come to order.  Court is now in session.

25      (Proceedings were heard in the presence of the jury:)

1          THE COURT:  Please be seated.  Let the record reflect

2    all jurors are present.

3        You may proceed.

4          MR. LEACH:  Thank you, Your Honor.  The United States

5    calls Andy Gersh.

6                        ANDREW GERSH,

7    called as a witness for the Government, having been duly sworn,

8    testified as follows:

9          THE CLERK:  Please be seated.  Please state your full

10   name for the record and spell your last name.

11         THE WITNESS:  Certainly.  Andrew Gersh, G-E-R-S-H.

12                    DIRECT EXAMINATION

13   BY MR. LEACH:

14   Q.   Good morning, Mr. Gersh.

15        Good morning, ladies and gentlemen.

16        Where do you work, sir?

17   A.   I work at KPMG.  It's a public accounting firm.

18   Q.   Are you familiar with a company called Autonomy?

19   A.   Yes, I am.

20   Q.   How did you become familiar with Autonomy?

21   A.   I performed due diligence or financial due diligence on

22   Autonomy for Hewlett-Packard in connection with its acquisition

23   of Autonomy in 2011.

24   Q.   And were you the lead partner on the KPMG engagement on

25   behalf of HP?

GERSH - DIRECT / LEACH

1    **A.**    I was a managing director at the time, and, yes, I was the

2    lead on the engagement.

3    **Q.**    Would you please tell us a little bit about your

4    educational and professional background, please.

5    **A.**    Certainly.  I studied for an accounting degree at the

6    University of Glasgow in Scotland.  Following graduation, I

7    studied for the UK -- the Scottish Chartered Accountancy Exam.

8    I became a Scottish Chartered Accountant.

9         When I immigrated to the U.S., I studied for the U.S. CPA,

10   and I'm a licensed CPA in California and Massachusetts, and

11   I've passed the exams for insolvency and restructuring

12   advisers.

13   **Q.**    So you are a licensed accountant in the UK?

14   **A.**    Yes, I am.

15   **Q.**    And as a licensed accountant in the UK, what does that

16   entitle you to do?  What does the license cover?

17   **A.**    It entitles me to use the designation of CA and to hold

18   myself out as an accountant in the UK.

19   **Q.**    Are you familiar with something called IFRS?

20   **A.**    Yes, I am familiar with IFRS.

21   **Q.**    How did you become familiar with IFRS?

22   **A.**    IFRS are the accounting regulations that -- they stand for

23   the International Financial Reporting Standards, and it's the

24   accounting guidance that most companies and public companies in

25   the UK currently use to report their financial results.

GERSH - DIRECT / LEACH

1  **Q.**   And prior to performing due diligence for HP in connection

2  with the Autonomy acquisition, did you have familiarity

3  applying and working with IFRS?

4  **A.**   I have had familiarity looking at companies that utilize

5  IFRS as their financial reporting standard.

6  **Q.**   You also said you're a licensed accountant in

7  Massachusetts and California?

8  **A.**   That is correct.

9  **Q.**   So you are a CPA?

10  **A.**   That's correct.

11  **Q.**   What is a CPA?

12  **A.**   A CPA is a Certified Public Accountant in the U.S.  It is

13  the designation for individuals who hold themselves out to be

14  Certified Public Accountants in the U.S., depending on which --

15  and it's a state-by-state authorization and regulation and

16  certification.

17  **Q.**   So did you start your career in the UK?

18  **A.**   Yes, I did.

19  **Q.**   And did you immigrate to the United States at some point?

20  **A.**   Yes, I did.

21  **Q.**   How did that come about?

22  **A.**   I had an opportunity to -- I worked for KPMG in the UK

23  from -- I started working with them in 1992.  I requested a

24  transfer to the U.S. and I moved over permanently in 1999.

25  **Q.**   And at some point, did you begin working out of the

1   Mountain View office of KPMG?

2   **A.**   Yes, I did.

3   **Q.**   Roughly when did that happen?

4   **A.**   In March 2004.

5   **Q.**   How did that come about?

6   **A.**   In 2003, the lead partner performing financial due

7   diligence in the Mountain View office requested or asked me

8   about relocating to California to help support him on the HP

9   account and supporting HP with financial due diligence and M&A

10  activity.

11  **Q.**   You use -- you've used that term, "financial due

12  diligence," a couple times.  What is that?

13  **A.**   Financial due diligence is when we help companies -- if a

14  client is considering acquiring another company, they'll engage

15  us or they might engage KPMG and myself to look at the finances

16  and the accounting and the accounts of the company they intend

17  to acquire.

18       So financial due diligence in that case will involve

19  analyzing the -- say, the underlying revenues, costs, income

20  statement and balance sheet and cash flows of the entity that

21  may be acquired.

22  **Q.**   So when you moved to Mountain View in 2004, HP was already

23  a client of yours?

24  **A.**   They were a client of KPMG.  I -- either -- I had a very

25  small involvement with them prior to March 2004, but from March

1    2004, I performed a significant amount of work for them.

2    Q.    Between 2004 and 2011, can you quantify in any way the

3    number of engagements you've done for HP?

4    A.    I probably worked on in excess of 50 engagements for HP

5    over that time.

6    Q.    What types of engagements?  Do you recall?

7    A.    They were all financial due diligence engagements.  The

8    majority of them were pre-acquisition where we would help HP as

9    they considered whether to acquire a company, and a few of them

10   were what I call post-acquisition engagements where once HP had

11   acquired a company, we would assist HP in understanding the

12   balance sheet that they had acquired to help them with their --

13   comply with their own SEC and U.S. GAAP financial reporting

14   requirements.

15   Q.    Do you have other clients besides HP?

16   A.    Yes, I do.

17   Q.    Can you give us a sense of the number of other clients you

18   have besides HP?

19   A.    I may -- over the last 15 years, I've probably worked for

20   50 or 60 different clients.

21   Q.    Doing financial due diligence in connection with M&A?

22   A.    Yes.

23   Q.    I've placed before you -- I'd like to draw your attention,

24   Mr. Gersh, to the time period late July 2011.  Do you have that

25   time period in mind?

GERSH - DIRECT / LEACH

1    A.    Yes, I do.

2    Q.    I've placed before you what has been marked as Exhibit

3    2011, an email from you to others at KPMG, which I offer into

4    evidence.

5              THE COURT:    Admitted.

6              (Trial Exhibit 2011 received in evidence)

7                    (Exhibit published to jury.)

8    BY MR. LEACH:

9    Q.    Do you recognize this, Mr. Gersh?

10   A.    Yes, I do.

11   Q.    What is the date of this email?

12   A.    It is Saturday, July 23rd.

13   Q.    Is this roughly the time that you learned that HP was

14   contemplating an acquisition of Autonomy?

15   A.    Yes.  I learned the day before this email.

16   Q.    Okay.  If you're comfortable with the screen, we can use

17   that, too, or you're welcome to work from the document,

18   whatever makes you comfortable, sir.

19         You wrote here, "John Blank called me yesterday.  HP is

20   considering the acquisition of a UK company."

21         Do you see that?

22   A.    Yes, I do.

23   Q.    Who is John Blank?

24   A.    John Blank is an employee of HP.  He's -- he's part of

25   their M&A team within their enterprise and financial reporting

1    team.

2    **Q.**    You then wrote, "The project name is Atlantis, but this

3    may change.   HP still to agree price, but it looks to be in the

4    10 billion-dollar range."

5         Where did you get that information?

6    **A.**    I learned that from John Blank.

7    **Q.**    Okay.   And then you wrote, "HP hopes to announce the deal

8    with Q3 earnings on August 18th which means work would need to

9    be completed around August" -- "Aug 15."   Do you see that?

10   **A.**    Yes, I do.

11   **Q.**    What were you planning for there?

12   **A.**    I was just alerting the individuals on the email to the

13   potential timeline of the transaction, which was -- really

14   reflected the amount of time we had to perform our work and

15   report our findings to HP.

16   **Q.**    Who are the folks on this email, Mr. Hanley and Mr. Thomas

17   and Mr. Boggs?

18   **A.**    Richard Hanley is a principal at HP who is the individual

19   who asked me to relocate to Mountain View to work on HP.   He

20   and I had worked together for about 20 years on various -- or

21   have worked together for about 20 years on mergers and

22   acquisitions, financial diligence.

23        Rusty Thomas was the lead tax partner for HP and also

24   assisted HP with due diligence in the tax -- or tax due

25   diligence.

1    And Jamie Boggs was a director in our group who assisted

2    me on the HP account.

3    **Q.**    Further down below, you wrote, "John stressed a number of

4    times how the transaction is very confidential within HP, and

5    until it is confirmed, we should keep it within this group for

6    now."

7    What were you getting at there?

8    **A.**    $10 billion is a very large transaction.  I wanted to

9    ensure that there was no risk of potential -- potential leaks

10    which could impact the share price.

11    The more people who know, the more risk of leaks, so until

12    we got confirmation we were going to be engaged or the

13    transaction was going to move forward, I wanted to ensure that

14    only the four of us knew about the particular -- the particular

15    deal.

16    **Q.**    And then further down below, you wrote, "Thanks for your

17    help with this deal.  It gives us an opportunity to demonstrate

18    our ability to the new leadership team and the software

19    division, where we have had significantly less exposure than

20    our competitors."

21    Do you see that?

22    **A.**    Yes, I do.

23    **Q.**    What were you getting at there?

24    **A.**    HP had just appointed a new CEO.  We hadn't -- and I think

25    in the time since his appointment, we hadn't assisted HP on

1    any -- on any M&A transactions, and the M&A transactions we had

2    done most recently were for a different division within HP,

3    weren't for the software division within HP.

4        So our competitors had been supporting the software

5    division.  This gave us an opportunity to demonstrate our --

6    our services and our expertise to the people around the

7    software division at HP.

8    Q.    Your competitors were some of the other Big Four firms?

9    A.    That's correct.

10    Q.    I'd like to draw your attention to Exhibit 2038,

11    Mr. Gersh, an email dated July 29th, 2011 from you to others at

12    KPMG.

13        I offer it in evidence.

14            **THE COURT:**  Admitted.

15            (Trial Exhibit 2038 received in evidence)

16                (Exhibit published to jury.)

17    **BY MR. LEACH:**

18    Q.    This is about a week later, Mr. Gersh.  Is this another

19    email dialogue between you and your colleagues at KPMG about

20    the status of diligence for the Autonomy acquisition?

21    A.    Yes, it is.

22    Q.    Okay.  You write here, "HP has agreed pricing for Project

23    Atlantis."

24        That's a code name for the Autonomy acquisition?

25    A.    Yes.  It was at that time, correct.

1   Q.   And you wrote, "Please start reviewing the public

2   information."

3        What were you encouraging your team to do there?

4   A.   I want them to review the public filings so that they

5   would be familiar with Autonomy and they could start, for

6   instance, drafting questions that we would use for management

7   interviews and start thinking about what the key issues could

8   be from a diligence perspective that we would need to -- we

9   would need to spend more time exploring and examining.

10  Q.   And by "public filings," what do you mean?

11  A.   I meant the publicly-available audited financial

12  statements of Autonomy.

13  Q.   Why do you go to those?

14  A.   Because they -- when we start -- when we perform due

15  diligence, we always start with the -- where they are

16  available, the audited financial statements so we can

17  understand the revenue, profitability and balance sheet of a

18  company that we're looking at.

19  Q.   Okay.  You write in the second paragraph, "I'm waiting for

20  confirmation regarding who in HP knows when the data room opens

21  and where diligence will take place."

22       Do you see that?

23  A.   Yes, I do.

24  Q.   What did you mean by "data room"?

25  A.   So in -- in a typical M&A transaction, there might be an

1    electronic data room, something similar to Box.dom or Dropbox

2    or Google Docs where the company that is being acquired may put

3    documents that can then be accessed by numerous different

4    parties rather than documents being emailed around.  It just

5    provides a more efficient -- efficient means for people to

6    access information about the company that the company is

7    willing to share.

8    Q.    And in or around this time, late July, 2009, did you

9    personally begin to review some of the public filings of

10   Autonomy?

11   A.    Yes, I did.  I started to review it actually on July 22nd.

12   Q.    I'd like to show you what is in evidence as Exhibit 428,

13   the 2009 annual report.  If we could please display that.  It's

14   not in front of you, sir; it's on the screen.

15                    (Exhibit published to jury.)

16   BY MR. LEACH:

17   Q.    This is titled "Annual Report" and accounts for the year

18   end 31 December 2009.  Do you see that, Mr. Gersh?

19   A.    Yes, I do.

20   Q.    Is this a document that you read carefully in connection

21   with the due diligence?

22   A.    Yes.

23   Q.    Why did you go to the 2009 annual report?

24   A.    I started with the 2010 report that I also looked -- I

25   also reviewed the 2009 report because there were disclosures in

1    the 2009 report that -- particularly around the performance of

2    some of the businesses that I couldn't identify in the 2010

3    report.

4    **Q.**    Okay.  Well, let's look at the 2010 report, too.  That's

5    in evidence as Exhibit 1352.  If we could please display that.

6                        (Exhibit published to jury.)

7    **BY MR. LEACH:**

8    **Q.**    And before I ask about 2010, did you rely on the accuracy

9    of the 2009 annual report of Autonomy?

10   **A.**    Yes.

11   **Q.**    Very well.

12        I've placed -- we have put on the screen what is marked as

13   Exhibit 1352.  Is this a copy of the annual report that you

14   read in or around late July, 2011?

15   **A.**    Yes, it is.

16   **Q.**    And did you read it carefully?

17   **A.**    Yes, I did.

18   **Q.**    Did you rely on it in the course of your work performing

19   due diligence on behalf of HP?

20   **A.**    Yes, I did.

21   **Q.**    Could we please look at page 14 of the exhibit.

22        And I draw your attention to the bottom portion.  Do you

23   see where it says "appliance"?

24   **A.**    Yes, I do.

25   **Q.**    Okay.  And this says, "This is currently a small part of

GERSH - DIRECT / LEACH

1    Autonomy's business, focused on quick time-to-value and high

2    return.  Where customers have an urgent need to deploy IDOL

3    either for regulatory or commercial imperatives, we are able to

4    provide a pre-installed license on appropriate hardware to

5    start generating an immediate return.  The value of these

6    solutions is attributable almost entirely to the functions

7    offered by the license, so although there are some hardware

8    costs involved, the margin profile is not widely dissimilar to

9    our traditional license business."

10        Is this language that you focused on in your review of the

11   annual report, sir?

12   **A.**   Yes, I did.

13   **Q.**   What did you understand this to mean?

14   **A.**   I understood it to mean that they -- in some cases,

15   clients needed the solution very quickly.  The software that

16   Autonomy was selling is very complex software that needs to run

17   on -- on larger sort of computers and servers than a home

18   computer.

19        So rather than the -- the company going out and buying

20   the -- the computer to run the software, Autonomy would sell

21   them the entire, you could say, solution of hardware and

22   software so they could just plug and play the software.

23        The point that we took away from this is that just given

24   the value of the software and the significance of the software,

25   the margin that they generated from the sale of these

1   appliances was the same as the -- as the margin they generated

2   just from the sale of the software, so we interpreted that to

3   mean that there really wasn't a whole lot of hardware in the

4   overall solution or the value of the hardware wasn't

5   significant to the overall solution.

6   **Q.**    Would you please look at page 15, and I draw your

7   attention -- if we could go down below, please.

8         Excuse me, Mr. Gersh.  I meant page 17.

9         If we could please go there.  If we could scroll down

10  under the "operating results," do you see where it says "IDOL

11  Product, IDOL Cloud, IDOL OEM, Deferred Revenue Release," and

12  if we could continue to the next page, a section on "Services."

13  Do you see that?

14  **A.**    Yes, I do.

15  **Q.**    Did you review this portion of the annual report

16  carefully?

17  **A.**    Yes, I did.

18  **Q.**    What were you looking for in this breakout of IDOL

19  License, IDOL Cloud, IDOL OEM, Deferred Revenue Release and

20  Services?

21  **A.**    I wanted to know the exact composition of revenue that --

22  or the exact composition of revenue, so what was Autonomy

23  selling by type of product and service.

24  **Q.**    As part of your due diligence, was it important to know

25  what Autonomy was selling and how?

1   **A.**    Yes.

2   **Q.**    And if we could please go back to page 17.    Scroll up a

3   little, please, Ms. Margen.    Further down.

4        Who signs the review described here on behalf of Autonomy

5   to the left?

6   **A.**    Mr. Sushovan Hussain.

7   **Q.**    I'd like to draw your attention, Mr. Gersh, to what has

8   been marked as Exhibit 2053, an email from you to others on the

9   KPMG dated July 30th, 2011.

10       I offer it in evidence.

11            **THE COURT:**    Admitted.

12            (Trial Exhibit 2053 received in evidence)

13                 (Exhibit published to jury.)

14  **BY MR. LEACH:**

15  **Q.**    What is the date of this document, Mr. Gersh?

16  **A.**    It's Saturday, July 30th, 2011.

17  **Q.**    And you're writing, "I spoke to Andy Johnson and Manish

18  Sarin from HP Corp. Dev about logistics and timing."

19       Who is Mr. Johnson?

20  **A.**    Mr. Johnson was a vice-president in Hewlett-Packard's

21  corporate development team.

22  **Q.**    How do you relate to the corporate development team?    Help

23  us understand their role and your role and others you work with

24  within HP.

25  **A.**    Certainly.

1        So the corporate development team at HP leads the

2    execution of the transaction.  So they're -- they're doing a

3    lot of the coordination, the logistics.  They'll also -- from

4    HP, they will build a financial model which helps HP determine

5    what the value of the company is, what the price they should be

6    paying for the business is, and they coordinate all the

7    different specialists, whether it's internal or external, that

8    are involved in due diligence.

9        So when I'm working with HP, I have a relationship -- I

10   work with the enterprise financial reporting team, which are

11   the -- essentially the accountants who are doing the financial

12   and the accounting due diligence, but some of my findings are

13   relevant to both the financial reporting team plus the

14   corporate development team, so on occasions, the corporate

15   development team would call me directly to advice me of

16   logistics and also to hear some of our findings on what we had

17   seen to date.

18   Q.   In bullet 1, you wrote, "There is a call with the CFO on

19   Monday at 8/9 a.m. Pacific Time."

20        By "CFO," you meant Mr. Hussain?

21   A.   That's correct.

22   Q.   You said, "The CFO will provide an overview of Q2 results

23   and rev rec.  He supposedly has a very good understanding of

24   rev rec and is able to speak in depth on the subject."

25        Do you see that language?

GERSH - DIRECT / LEACH

1    **A.**    Yes, I do.

2    **Q.**    On that Monday, August 1, did you participate in a due

3    diligence call on behalf -- in connection with the diligence?

4    **A.**    Yes, I did.

5    **Q.**    Where were you?

6    **A.**    I was in Florida.

7    **Q.**    Okay.  And who else participated in that call, to your

8    knowledge?

9    **A.**    Sorry?

10   **Q.**    To your knowledge.

11   **A.**    Mr. Hussain and there was, I think, Mr. Andy Kanter from

12   Autonomy as well.  On the HP side, Andy Johnson, Manish Sarin,

13   and that's all I can remember.

14   **Q.**    That's fine.

15        Take a moment and describe the substance of the phone call

16   on August 1, 2011.

17   **A.**    So the call on Monday, Mr. Hussain presented the investor

18   presentation that they'd -- I think they'd issued on the

19   Thursday or Friday of the prior week and just described the --

20   the first-half results for 2011.

21   **Q.**    And were those first-half results favorable?

22   **A.**    They showed a growth in revenue and profitability for

23   Autonomy.

24   **Q.**    What else do you remember Mr. Hussain saying?

25   **A.**    That's it on that call.

GERSH - DIRECT / LEACH

1    Q.    Okay.  And this was focused on the first two quarters of

2    2011, the performance?

3    A.    That is correct.

4    Q.    Okay.  If we could please go to what has been marked as

5    Exhibit 2560, please.  It should be the next document in front

6    of you.

7         I offer it in evidence.

8              THE COURT:  Admitted.

9              (Trial Exhibit 2560 received in evidence)

10                  (Exhibit published to jury.)

11   BY MR. LEACH:

12   Q.    Let me draw your attention, Mr. Gersh, to page 3 of this.

13   Down at the bottom, Mr. Sarin writes to you on August 1st,

14   "Andy, hopefully the call today provided the team with a

15   baseline view on Tesla."

16        Do you see that?

17   A.    Yes, I do.

18   Q.    Do you believe that to be a reference to the August 1st,

19   2011 call where Mr. Hussain went over the results for the first

20   two quarters?

21   A.    Yes, it was.

22   Q.    Okay.  He then writes, "Can you (a) send us a list of

23   questions that you'd like answered and (b) let me know times

24   tomorrow that we can schedule another call with Tesla CFO to

25   dig in some more."

1          Do you see that?

2  **A.**    Yes, I do.

3  **Q.**    What was Mr. Sarin asking you to do there?

4  **A.**    He was asking us to prepare a list of questions covering

5  the -- what we believed were the key topics or key diligence

6  topics that we needed to complete to perform our work.

7  **Q.**    And we talked earlier about something called "the data

8  room."  This was a virtual room where you can review documents?

9  **A.**    That is correct.

10 **Q.**    Okay.  Will you please look at what has been marked as

11 Exhibit 2070.

12         And I offer it into evidence.

13         **THE COURT:**  Admitted.

14         (Trial Exhibit 2070 received in evidence)

15              (Exhibit published to jury.)

16 **BY MR. LEACH:**

17 **Q.**    What is this document, Mr. Gersh?

18 **A.**    This is an email from Autonomy's attorneys, Slaughter and

19 May, providing us access to the electronic data room.

20 **Q.**    So the subject of this is "Project Daniel 1 Room."  Do you

21 see that?

22 **A.**    Yes, I do.

23 **Q.**    What is that a reference to?

24 **A.**    That is a reference to the data room that Autonomy had

25 established.  I think at that time, HP was calling the project

GERSH - DIRECT / LEACH

1   Atlantis, but Autonomy may have been calling the project

2   Project Daniel.

3   **Q.**    Okay.  Down below, it says, "To access the Project Daniel

4   1 Room, please click on the following link."

5        Do you see that?

6   **A.**    Yes, I do.

7   **Q.**    And is that an internet link that you would use in order

8   to access documents?

9   **A.**    Yes, it is.

10  **Q.**    Please look at page 2.  This email is from someone named

11  Sally Wokes, Associate, Slaughter and May in London.  Do you

12  see that?

13  **A.**    Yes, I do.

14  **Q.**    What was Slaughter and May?

15  **A.**    Slaughter and May is a UK law firm that was advising

16  Autonomy in connection with the transaction.

17  **Q.**    And after August 1st, 2011, did you continue to

18  participate in due diligence calls between HP and Autonomy

19  relating to a potential acquisition?

20  **A.**    Yes, I did.

21  **Q.**    Okay.  I draw your attention to what has been marked as

22  Exhibit 2083, an email from Manish Sarin to you and others.

23       I offer it in evidence.

24            **THE COURT:**  Admitted.

25            (Trial Exhibit 2083 received in evidence)

1              (Exhibit published to jury.)

2    BY MR. LEACH:

3    Q.    Do you have that in front of you, sir?

4    A.    Yes, I do.

5    Q.    Okay.  In the bottom portion of this, Mr. Sarin is sending

6    to you and others, with the subject "Tesla daily finance calls"

7    some dial information.  Is that the phone information you would

8    use in order to dial in to the diligence calls?

9    A.    Yes, it was.

10   Q.    And beginning on August 2nd, 2011, where were you?  Were

11   you still in Florida?

12   A.    No.  I was in Mountain View.

13   Q.    Mountain View --

14   A.    California.

15   Q.    In the Bay Area?

16   A.    Correct.

17   Q.    There is an attachment, "Project Tesla Financial DD

18   follow-up."  Do you see that?

19   A.    Yes, I do.

20   Q.    Okay.  And are those questions in the attached exhibit for

21   2083?

22   A.    Yep.

23   Q.    Okay.  Let's look at page 3, please.  Do you recognize

24   these questions?

25   A.    Yes, I do.

GERSH - DIRECT / LEACH

1    **Q.**    Are these questions that you drafted?

2    **A.**    Yes, they are.

3    **Q.**    How did you go about doing that?

4    **A.**    So I and my team read the financial statements that

5    Autonomy had published.  We looked at the materials they had

6    sent us on the Monday, and just by reading their website and

7    trying to look at their marketing materials, we then drafted

8    questions based on what we understood the -- the -- what we

9    understood they were selling, and these are very sort of common

10   questions around -- particularly for a software company, and

11   there is a certain issue -- there is some common issues we see

12   with software companies, so we -- it was a combination of both

13   what we thought were Autonomy-specific questions and then

14   common issues that we see in software diligence.

15   **Q.**    And did you, on August 2nd, 2011 -- did you participate in

16   a due diligence call where you went over these questions with

17   folks from Autonomy?

18   **A.**    Yes, I did.

19   **Q.**    Okay.  Who participated in that call, to best of your

20   knowledge?

21   **A.**    I was on it from HP.  There was Andy Johnson, Manish

22   Sarin, Varoon Bhaggat and I think Emily Hsiao.  And from

23   Autonomy, there was Mr. Hussain, Mr. Kanter, and

24   Mr. Chamberlain.

25   **Q.**    And did you walk through the questions as you've lined

GERSH - DIRECT / LEACH

1   them out here in this document?

2   **A.**   Yes, we did.

3   **Q.**   In No. 1, you wrote, "Describe your sales model by product

4   or vertical, i.e., hosted versus SaaS versus on-premise license

5   versus OEM versus appliance."

6       Do you see that?

7   **A.**   Yes, I do.

8   **Q.**   Why were you asking that?

9   **A.**   Autonomy was selling very complex products and even --

10  even though we'd -- we'd done a lot of work in software, we

11  couldn't really understand what they were selling.

12      And part of the reason for that was they -- they would

13  present this -- they presented a position in their financial

14  statements that when they acquired a company, everything got

15  combined into this IDOL platform, which we'd never really seen

16  that before because to combine numerous acquisitions into one

17  platform was extremely difficult.  And it just -- it didn't

18  intuitively make sense to us that they could sell just one

19  product to -- with many different features, albeit to their

20  customers.

21      So we -- we wanted to know what they were selling and how

22  they were selling it because revenue recognition under U.S.

23  GAAP is very complicated and you need to understand what is

24  being sold, when it is being sold, and how it's being priced to

25  be able to get a -- to be able to get a clear view as to what

1  the revenue recognition implications could be.

2  **Q.**   Okay.  Were you in any way trying to limit the products

3  that you were asking about by this question?

4  **A.**   No.

5  **Q.**   Okay.  You make a reference to "appliance."  Why did you

6  refer to -- well, you make reference to hosted, SaaS,

7  on-premise, OEM, appliance.  Why did you do that?

8  **A.**   We made those references because to my earlier point, we

9  didn't understand what they were selling and how they were

10  selling it.  And the only reference we had was the audited

11  financial statements where they described the different

12  products they're selling.

13      So we interpret that to mean that those are the products

14  they're selling.  Tell us what you're selling within each of

15  the categories because we still couldn't -- we couldn't

16  understand what they were selling, even based on the

17  descriptions in the audited financial statements.

18  **Q.**   You then ask, "Do all or only certain arrangements include

19  license, maintenance, professional services, or hosting

20  subscription."

21      Do you see that in one 1-A?

22  **A.**   Yes, I do.

23  **Q.**   What were you getting at there?

24  **A.**   We wanted to know what do you sell and does everything you

25  sell -- does it also include license and maintenance or would

1   it just include license or would there just be some instances

2   where it would be professional services.

3       So we still didn't understand the -- you could say the

4   bundle of products that were being sold.

5   **Q.**   Okay.  Were you in any way attempting to limit the product

6   categories that you were asking about with respect to that

7   question?

8   **A.**   No.

9   **Q.**   Okay.  And on this August 2nd, 2011 call, did Mr. Hussain

10  respond to these and other questions about revenue detail?

11  **A.**   Yes, he did respond.

12  **Q.**   Okay.  Take a moment and describe what Mr. Hussain said.

13  **A.**   He described -- he described their go-to-market approach,

14  he described certain arrangements that were sort of license

15  sales and the majority of it was -- he described certain

16  instances where there were license sales.

17      He described the pricing and the types of maintenance that

18  they also offered with the license sales, because if a company

19  sells a license -- a software license, typically there is --

20  maintenance is also sold with it.

21      He described the pricing for -- for the maintenance and

22  the actual professional services because that's a very key

23  element of the U.S. accounting and for U.S. GAAP to understand

24  the pricing on each of the components within the bundle, so he

25  spent quite a bit of time on that.

1        And then we walked down the rest of the questions where

2   Mr. Hussain provided somewhat yes/no comments or elaborated

3   on -- so a specific question would be -- I'm trying to think.

4        So, for instance, on question 8, it describes unusual and

5   nonstandard terms, one of them being MFN, which is most favored

6   nation or preferred pricing, and his answer to that question

7   was he believed there was one arrangement with MFN pricing.

8        So once we got through the general description of the IDOL

9   platform and the maintenance that was being sold with that and

10  the pricing of the maintenance, it was very much a sort of

11  yes/no and here are the -- this could be part of an arrangement

12  or we don't sell something in that form.

13  **Q.**   Thank you.

14       If we could please scroll back up, and, Mr. Gersh, with

15  reference to question 1, did Mr. Hussain say that Autonomy sold

16  standalone hardware without any Autonomy software?

17  **A.**   No.

18  **Q.**   Did he tell you that Autonomy sold approximately

19  $53 million of hardware in 2009?

20  **A.**   No.

21  **Q.**   Did he tell you that Autonomy sold approximately 100

22  million worth of hardware in 2010?

23  **A.**   No.

24  **Q.**   If Autonomy sold hardware in that level, was that

25  responsive to your questions?

GERSH - DIRECT / LEACH

1    **A.**    If they sold that much hardware, I would have expected

2    them to tell me that in response to question 1.

3    **Q.**    With respect to question 2, "Do all or only certain

4    arrangements include license, maintenance, professional

5    services or hosting subscription," did Mr. Hussain say that

6    certain of their arrangements do not include licenses?

7    **A.**    So in some cases, they sell -- well, we were -- he told us

8    that they sold standalone professional services in very small

9    quantities, so that might be some training services where they

10    need somebody to come for a few days.  But other than some of

11    these sort of very minor standalone training services,

12    everything else either had license or it was a hosting service.

13    **Q.**    In response to question 1-A, did Mr. Hussain say that

14    Autonomy sold hardware on a standalone basis?

15    **A.**    No, he did not.

16    **Q.**    Was that responsive to your question, if that happened?

17    **A.**    If he had told us that, it would have been responsive, but

18    he did not tell us that they sold hardware on a standalone

19    basis.

20    **Q.**    If Autonomy sold approximately $100 million of hardware in

21    2010, was that relevant to the work you were doing?

22    **A.**    Yes.  It was very relevant.

23    **Q.**    Why is that?

24    **A.**    Because HP and ourselves -- and we believed that they were

25    buying a software company and I think -- I believe the revenue

GERSH - DIRECT / LEACH

1   is about $900 million and I think it was about $870 million.

2        We were under the impression that -- that virtually all of

3   that was software revenue or software-related revenue.  If we

4   knew there was a hundred million dollars of hardware, then it

5   was a significantly different business than the one that HP

6   thought it was buying.

7   Q.   How is it a significantly different business?

8   A.   Because the profitability of software is significantly

9   different than the profitability of hardware.  And if you're --

10  if you're reselling hardware -- so if you buy hardware from HP

11  and Dell -- or Dell and you sell it to -- to a third party, you

12  make almost zero profit on that, and in many cases, you might

13  make a loss on that.

14       Whereas software, you'll see instances where software

15  companies might make a profit margin of in excess of 90 percent

16  on the sale of -- this is gross profit margin -- on the sale of

17  software.

18       So they're vastly different -- different profitability

19  profiles.

20  Q.   After this August 2nd, 2011 due diligence call where

21  Mr. Hussain responded to questions about revenue detail, did

22  you continue to have due diligence calls with him and others

23  from Autonomy?

24  A.   Yes, we did.

25  Q.   Can we please display what is in evidence as Exhibit 2099.

1                    (Exhibit published to jury.)

2    **BY MR. LEACH:**

3    **Q.**   If we could scroll a little bit down so we can see the

4    bottom portion of the email.

5         Mr. Gersh, is this another email arranging a finance call

6    for Wednesday, August 3rd, 2011?

7    **A.**   Yes, it is.

8    **Q.**   Okay.  Is this the phone information that you used to

9    participate in the call?

10   **A.**   Yes, it is.

11   **Q.**   Okay.  And are the questions for that call attached in the

12   exhibit up at the top, "Project Tesla financial DD"?  Or do you

13   see the link beneath "subject" that says "Project Tesla

14   financial DD"?

15   **A.**   Yes.  Those would be the questions.

16   **Q.**   Okay.  And if we could please display for Mr. Gersh page

17   2.  And now page 3.

18        Are these questions that you put together for the due

19   diligence call?

20   **A.**   I didn't draft the cash flow questions, but I drafted the

21   balance sheet questions on the next page.

22   **Q.**   Okay.  And is it your understanding these were circulated

23   to Autonomy in advance of the -- of the call?

24   **A.**   Yes, they were.

25   **Q.**   And who participated on the August 3rd, 2011 call?

1   **A.**    From KPMG, it was myself.  From HP, Andy Johnson, Manish

2   Sarin, Varoon Bhaggat and Emily Hsiao.  And from Autonomy,

3   Mr. Hussain, Mr. Kanter and Mr. Chamberlain.

4   **Q.**   As best you can, take a moment and describe what was said

5   on this August 3rd call.

6   **A.**   I can't recall the exact details of the call, but we

7   didn't learn anything on this call that wasn't already in the

8   public statements.

9   **Q.**   Okay.  Did you go through your questions as you've listed

10  here?

11  **A.**   Yes, I did.

12  **Q.**   Okay.  If we could please go to page 6.  Do you see some

13  questions -- if you could scroll down a little -- there we go.

14      Do you see the reference to "payables"?

15  **A.**   Yes, I do.

16  **Q.**   What are payables?

17  **A.**   That's where if you -- if you purchase product or services

18  from a company and they send you an invoice, you may not pay

19  that invoice immediately.  You'll -- you'll -- you may wait 30

20  days or whatever time period to pay the invoice.

21      And the period between receiving the invoice and when you

22  pay it, you record it as a liability on your balance sheet

23  within the category of a payable.

24  **Q.**   And why were you asking about payables?

25  **A.**   We wanted to know the composition of payables, who they

1    typically owed money to and -- so we could understand what they

2    were typically purchasing.

3    **Q.**    Okay.  And as best you can recall, what did Mr. Hussain

4    say with respect to payables?

5    **A.**    I can't recall him saying anything that wasn't in the

6    public statement.

7    **Q.**    Okay.  Did you participate on a due diligence call on the

8    next day, August 4th, 2011?

9    **A.**    Yes, I did.

10    **Q.**    If we could please display what is in evidence as Exhibit

11    2112.

12                     (Exhibit published to jury.)

13    **BY MR. LEACH:**

14    **Q.**    Do you see the meeting maker for August 4th, Mr. Gersh?

15    **A.**    Yes.

16    **Q.**    And the subject is "Tesla discuss financial model."  Do

17    you see that?

18    **A.**    Yes.

19    **Q.**    What was the purpose of this August 4th, 2011 call?

20    **A.**    This was a call between Autonomy and HP and its bankers to

21    sort of discuss the -- some of the assumptions that HP was --

22    was making in its financial model.

23    **Q.**    Who participated in this call?

24    **A.**    There were bankers from -- from Barclays.  I can't recall

25    their names.  From HP, Andy Johnson, Manish Sarin, Varoon

1  Bhaggat and Emily Hsiao.  I was on the call.  And from

2  Autonomy, Mr. Hussain, Mr. Kanter and Mr. Chamberlain.

3  **Q.**   Who did most of the talking from the Autonomy side with

4  respect to the financial model?

5  **A.**   It would be Mr. Hussain and Mr. Kanter.

6  **Q.**   I draw your attention to what has been marked as Exhibit

7  2129, another meeting maker relating to a call.

8       I offer it into evidence.

9            **THE COURT:**  Admitted.

10           (Trial Exhibit 2129 received in evidence)

11                (Exhibit published to jury.)

12 **BY MR. LEACH:**

13 **Q.**   Is this a meeting maker for an August 4th due diligence

14 call relating to "sales/GTM overview"?

15 **A.**   Yes.

16 **Q.**   What does "GTM" stand for?

17 **A.**   It stands for "go-to-market."  It was the -- go-to-market

18 is the -- how companies sell products, so do they sell product

19 directly, do they sell through resellers, just the approach to

20 sales.

21      It could cover such things as how do you -- how do you --

22 how do you calculate commissions that you pay to -- to the

23 sales folk who sell the products.  Do you pay it upon signing

24 of an order or when cash is collected.  So it can cover the

25 whole -- the whole gambit of -- of sales -- of how you sell

1  products and how you recognize -- and how you sell products.

2  **Q.**   Okay.  And are the questions that were asked during this

3  call attached as pages 3 through 5 of this exhibit?

4  **A.**   Yes, they are.

5  **Q.**   Okay.  If I could draw your attention to question No. 7 on

6  page 4, "Please describe your pricing and discounting model and

7  strategy by region, industry, segment and product category."

8       Do you see that?

9  **A.**   Yes, I do.

10 **Q.**   And what do you recall the folks from Autonomy saying with

11 respect to this?

12 **A.**   I can't recall what they said.

13 **Q.**   Okay.  Anything other than what's in the public domain?

14 **A.**   I -- I just can't recall what was said on this call.

15 **Q.**   Okay.  And if I could draw your attention to question 19

16 on page 5, do you see where it says, "marketing strategy and

17 summary of activities undertaken, types of marketing spend,

18 where and why spent, assessment of effectiveness"?  Do you see

19 that?

20 **A.**   Yes, I do.

21 **Q.**   Do you have a memory at any point of anyone from Autonomy

22 telling you that Autonomy was reselling hardware as part of

23 some marketing strategy?

24 **A.**   No, I do not.

25 **Q.**   I draw your attention to what has been marked as Exhibit

1    2134.

2                    **THE COURT:**  Admitted.

3              (Trial Exhibit 2134 received in evidence)

4                    (Exhibit published to jury.)

5    **BY MR. LEACH:**

6    **Q.**    Are you familiar with this document, Mr. Gersh?

7    **A.**    Yes, I am.

8    **Q.**    What is this?

9    **A.**    This is an email from myself to Manish Sarin with a

10   summary of our findings to date.

11   **Q.**    Why were you sending this to Mr. Sarin?

12   **A.**    Just to provide him the -- a summary of what we had been

13   able to perform to date and some of the observations that --

14   that we felt were important that were coming out about

15   diligence at that point in time.

16   **Q.**    Let's please look at page 4.  And to the left, there is a

17   column that says "objective revenue recognition" and to the

18   right, "request."  Do you see that?

19   **A.**    Yes, I do.

20   **Q.**    And what were you getting at here?

21   **A.**    HP had asked us to list our top three questions in

22   diligence at this point, but there were so many questions

23   that -- three questions weren't sufficient to -- to really

24   answer -- to really cover anything that we wanted to know.

25        So we were trying to find an approach to maybe ask more

1  questions but try and stay within the spirit of asking three

2  questions.

3       So the objectives were we -- it was unsuccessful, but we

4  felt if we had three objectives, that might cover -- cover the

5  criteria of three questions, and then within the objectives, we

6  could list what we felt were the -- the critical questions.

7  **Q.**   Okay.  In No. 1, you were asking, "Access to auditor work

8  papers and internal audit reports."

9       What are auditor work papers?

10 **A.**   So these are the work papers that an auditor will prepare

11 and gather as it performs its audit work, and once it signs its

12 audit opinion, then it retains these audit work papers.

13      So in a diligence context, a buyer can request and can

14 gain access to these auditor work papers which sometimes can be

15 helpful in their evaluation.

16 **Q.**   Okay.  Do you know whether it's common or uncommon to

17 obtain auditor work papers in a UK acquisition?

18 **A.**   It depends on the situation and the circumstances as to

19 whether you get access or not.

20 **Q.**   Sometimes it happens; sometimes it doesn't?

21 **A.**   That is correct.

22 **Q.**   Okay.  And you also asked for a list of contracts with

23 extended payment terms greater than 90 days and customer

24 contracts split by major line of business.  What were you

25 getting at there?

1   **A.**   Sorry.  Where -- so HP's accounting policy was if a -- if

2   you provided payment terms more than 90 days, then you couldn't

3   recognize revenue until the payment was due.  So it was a

4   specific accounting policy that HP -- HP implemented.

5   And -- sorry.  What was your other question?

6   **Q.**   Why were you asking for customer contracts?

7   **A.**   It's very important -- in diligence, particularly in

8   software diligence, it's very important that we understand what

9   is being sold and what terms are being provided to customers

10  because they can have a very significant impact on -- on

11  when -- when -- when -- under U.S. GAAP whether you are

12  eligible to recognize revenue or not.

13  So if -- if there's a contingency in the contract such

14  that, for instance, if -- if -- if you promise to deliver

15  another element, so if you promise to deliver a future product,

16  that can have an implication for revenue recognition.

17  So without seeing the contracts and without understanding

18  the terms in the contracts, we -- we couldn't -- we couldn't

19  sort of give a view as to the comments and the representations

20  that Autonomy management had made around their revenue

21  recognition.

22  **Q.**   At some point, did you obtain access to contracts,

23  Autonomy's contracts, some of them?

24  **A.**   We did obtain access to some of their contracts, yes.

25  **Q.**   Please look at what has been marked as Exhibit 2130.

1          I offer it into evidence.

2               **THE COURT:**  Admitted.

3          (Trial Exhibit 2130 received in evidence)

4               (Exhibit published to jury.)

5  **BY MR. LEACH:**

6  **Q.**   This is an email, Mr. Gersh, from someone named Anthony

7  Hartley with Slaughter and May.  Do you see that?

8  **A.**   Yes, I do.

9  **Q.**   Do you see Sally Wokes from Slaughter and May in the "cc"

10  line?

11  **A.**   Yes, I do.

12  **Q.**   There is nobody in the "to" line.  Do you believe you

13  received a copy of this email?

14  **A.**   Yes.  This would have been -- it would have been blind

15  carbon copied to individuals who were listed as -- as being

16  provided with access to the data room.

17  **Q.**   Okay.  And is this email alerting you and others at KPMG

18  that information has been loaded into the data room for review?

19  **A.**   Yes, it is.

20  **Q.**   Let me draw your attention to page 2.  Do you see at the

21  top, it says, "On 4 August 2011, the following new documents

22  were added to the Project Daniel 1 Room"?  That's the data

23  room?

24  **A.**   That is correct, yes.

25  **Q.**   Okay.  And under Section 1, it says, "Copy of Top 40

GERSH - DIRECT / LEACH

1   contracts, 2010/11, final."  And "Top 40 customer analysis,

2   2010 final."

3        Do you see that?

4   A.   Yes, I do.

5   Q.   As a general matter, did you review the data room

6   regularly for information?

7   A.   Yes, I did.

8   Q.   Were you somewhat hungry to get information from the data

9   room?

10  A.   Yes, I was.

11  Q.   Tell us about that.

12  A.   So we -- we -- I kept the data room open whenever I was

13  logged into my computer and I would check it continuously

14  throughout the day, as would members of my team.

15       We -- we hadn't received a lot of information, so we were

16  always hopeful that more information would be provided and that

17  we would get access to information to allow us to -- to perform

18  our work.

19  Q.   Okay.  And beneath the top 40 contracts and top 40

20  customer analysis under Section 4, there is some -- there is a

21  numbering scheme and then some agreements.  Do you see those?

22  A.   Yes, I do.

23  Q.   Do you have an understanding of what those are?

24  A.   So Section 4, "legal," those are the redacted copies of --

25  those are redacted copies of customer contracts.

GERSH - DIRECT / LEACH

1    Q.    And did you understand these to be the contracts that were

2    referenced in the top 40 contracts 2010 to '11?

3    A.    That is what we believed at the time, yes.

4    Q.    And did you and your team review the contracts that were

5    put into the data room?

6    A.    Yes.  I did and my team did as well.

7    Q.    Would you please look at what has been marked as Exhibit

8    2167.

9              THE COURT:  Admitted.

10             (Trial Exhibit 2167 received in evidence)

11                  (Exhibit published to jury.)

12   BY MR. LEACH:

13   Q.    What is this, Mr. Gersh?

14   A.    This is an email from one of my colleagues, Mr. Tim

15   Lashua, to myself providing a status of the contracts that he

16   and his team had read Pams.

17   Q.    Can we please look at page 3.  And -- perfect.  Up a

18   little bit, please.  Thank you, Ms. Margen.

19        Can you walk us through this -- it's a little hard to read

20   in printed form, Mr. Gersh, but can you walk us through this

21   Excel spreadsheet and explain to us what is this?

22   A.    So this is Excel spreadsheet was our -- the inventory of

23   the contracts that we'd been provided, the contracts we'd read,

24   and what we -- what we tried to do is we listed the contracts

25   by number that were coming out of the data room.

1        We then tried to identify what we thought each category --

2   where the contracts fell within the product category that

3   Autonomy had -- had come up with.  So IDOL product or OEM or

4   Cloud or Services.

5        We then -- Column C is had we -- was the review completed,

6   and the sort of cross there was somebody had looked at it, Tim

7   Lashua had then reviewed their work and then I had reviewed it

8   on top.

9        And then Columns E through, I think -- E through V --

10  maybe it goes to a couple more columns.  These are the -- these

11  are the revenue recognition areas that we -- that are important

12  from a U.S. accounting perspective and that we were trying to

13  see if they applied to the contracts that we read.

14       So to give you an example, under U.S. GAAP, it's -- if you

15  got extended payment terms or not is an important issue in

16  determining when you can recognize revenue.

17       So we felt that we could -- in the contracts we did

18  review, we could see there were extended payment terms in a

19  number of those contracts.

20       The next column is VSOE.  This is a specific U.S.

21  requirement as to if you have something called VSOE, then it --

22  if you have it or you don't have it can determine when and how

23  much revenue you can recognize each period.  So where we saw

24  contracts that we knew VSOE would be important to, we marked

25  those as well.

1   Q.   And then you have a row for "sell-through."  What were you

2   getting at there?

3   A.   So on sell-through, a significant portion of Autonomy's

4   business was sales to third parties who would then sell on to a

5   final end customer.  And this is fairly common in software

6   companies because you -- you might have a limited sales force

7   and so you use resellers and third parties to -- to sort of

8   expand the number of customers you might be able to sell

9   products to.

10      Under U.S. -- and when we say sell-through, these are the

11  contracts we could identify where we could see there was a -- a

12  reseller between Autonomy and the final end customer.

13      We knew that Autonomy's practice was sell-in, and by that

14  I mean you recognize the revenue when you sell it to the

15  reseller, whereas HP's standard policy was sell-through, where

16  it would recognize revenue, not when it sold it to the

17  reseller, but when the reseller sold it to the third party.

18      So we were trying to identify which agreements we could

19  from the population that we were provided where this sell-in or

20  sell-through could be an issue.

21  Q.   Let me draw your attention to page 7 of this exhibit.

22  What is this, Mr. Gersh?

23  A.   This is a very -- this is a short summary of the issues

24  that we could see in the contracts we read that we thought were

25  significant questions that we -- that we would like addressed.

1    And they were significant because of the -- depending on the

2    response to each of these questions, could have a significant

3    implication for when revenue should be recognized on the

4    particular sale.

5    **Q.**    So you went through each of the contracts in the data room

6    and prepared questions about how revenue would be recognized on

7    these?

8    **A.**    We -- we read the contracts in the data room.  We -- this

9    isn't a comprehensive list of every question we would have

10   liked answered on the contracts, but it was the -- it was the

11   very -- it was the critical elements we could see from our

12   review -- the critical questions coming out of our review of

13   the contracts at the time.

14   **Q.**    Let's look at what has been marked as Exhibit 2183.

15            **THE COURT:**  Admitted.

16            (Trial Exhibit 2183 received in evidence)

17                    (Exhibit published to jury.)

18   **BY MR. LEACH:**

19   **Q.**    Is this an email from you to folks on the HP team

20   attaching some of your contract review questions?

21   **A.**    Yes, it is.

22   **Q.**    Okay.  And I draw your attention to pages 2 and 3.  Why

23   did you prepare this?

24   **A.**    Mr. Sarin had asked us -- we'd read the contracts.  We had

25   numerous questions.  Mr. Sarin thought we might have an

1   opportunity to ask Autonomy management about these contracts

2   and these questions, so we prepared the more detailed list

3   covering all the contracts that we'd read.

4        Mr. Sarin provided guidance that we wouldn't be able to

5   ask about all of them, but we could ask about maybe three of

6   them.

7        So we selected the three that we felt were most critical

8   or most unusual that we wanted more information on.

9   **Q.**   Okay.  And I'd like to go back to the top 40 list that we

10  saw in the prior exhibit.

11       And I offer into evidence Exhibit 2626, which should be in

12  front of you.

13            **THE COURT:**  Admitted.

14            **MS. LITTLE:**  Objection.  Lacks foundation.  I'm not

15  sure this witness saw 2626.

16            **MR. LEACH:**  I will lay a foundation, Your Honor.

17            **THE COURT:**  Go ahead.

18  **BY MR. LEACH:**

19  **Q.**   Do you recognize Exhibit 2626?

20  **A.**   Yes, I do.

21  **Q.**   What is it?

22  **A.**   It's what we think is the summary of the revenue for the

23  top -- top 40 customers in the period 2010 to the end of the

24  first half in 2011.

25            **MR. LEACH:**  I offer 2626, Your Honor.

1              **THE COURT:**  Admitted.

2           (Trial Exhibit 2626 received in evidence)

3                  (Exhibit published to jury.)

4   **BY MR. LEACH:**

5   **Q.**   This is something you believe you saw in the course of

6   your diligence, Mr. Gersh?

7   **A.**   Yes, it is.

8   **Q.**   Did you review this carefully?

9   **A.**   Yes, I did.

10  **Q.**   Was this an important part of your work in trying to

11  understand what Autonomy sold and how?

12  **A.**   It was important for us to try and understand who their

13  customers were and what they were selling, but it didn't -- the

14  actual document didn't -- didn't give us any -- didn't help us

15  in our findings.

16  **Q.**   Okay.  Did -- did this come from the data room?

17  **A.**   Yes.

18  **Q.**   Okay.

19          And what did you understand this to be?

20  **A.**   We understood this to be the revenue that was recognized

21  by Autonomy in the period January 1, 2010, through June 30th,

22  2011 for these specific customers.

23  **Q.**   Okay.  And was this referred to as "The Top 40 Contracts

24  List"?

25  **A.**   I believe it was on the data room list that came through.

1    I believe it was the second file, because the other one was the

2    total contract value.  This was the revenue for -- this was the

3    revenue recognized for these customers in that period.

4    **Q.**    Okay.  And when you say top 40 contracts -- can we please

5    go back to 2130, please.  Page 2, please.

6                        (Exhibit published to jury.)

7    **BY MR. LEACH:**

8    **Q.**    Mr. Gersh, do you see the reference to "Top 40 Contracts,

9    2010 to '11"?

10    **A.**    Yes, I do.

11    **Q.**    Do you see the reference to "Top 40 Customer Analyses 2010

12    to 2011"?

13    **A.**    Yes, I do.

14    **Q.**    What did you understand the difference between those two

15    things to be?

16    **A.**    So the top 40 contracts was the total value of the

17    contract.  So that you would have a -- I think, for instance,

18    the -- the number one contract value was about $43 million.

19        Whereas the customer analysis was how much revenue was

20    being recognized for the top 40 customers in that specific

21    period.  So you might have a contract that could be

22    $40 million, but it could be a five-year contract, so you might

23    only recognize $8 million a year for that -- for that contract

24    if it was being recognized ratably, or depending on what was

25    being sold, there might be a different revenue pattern, too.

GERSH - DIRECT / LEACH

1    **Q.**    Why were you interested in those two things?

2    **A.**    Because the -- the -- it's a similar purpose.  You're

3    trying to understand what the -- you're trying to understand

4    who their customers are and the size of the overall

5    arrangements with their customers.

6         So we want to know do you have customers of 10 million --

7    are you signing contracts of $10 million for multi years or is

8    it greater or is it less.

9         And then we want to understand of the contracts that

10   you've signed, how much revenue for those contracts are you

11   recognizing in this year.  So we wanted to understand if there

12   were situations -- let's say you signed a $10 million contract

13   for five years.  We wanted to understand was $9 million of

14   revenue being recognized the day they signed the contract and

15   then 1 million over five years or were they recognizing

16   2 million a year for the five-year period.

17        Because the -- it -- in -- there's very complex rules

18   about when you can recognize revenue, depending on what you've

19   sold and what your obligations are under U.S. GAAP, and we

20   wanted to understand did -- was Autonomy following -- were its

21   policies similar to U.S. GAAP as it had claimed or were

22   there -- were there significant differences that could impact

23   how HP would be recognizing revenue post acquisition and how it

24   should think about revenue in its existing -- in its valuation

25   model based on the historical results.

GERSH - DIRECT / LEACH

1   Q.   So we have before you in evidence Exhibit 2626.  And I'd

2   like to place before you what is already in evidence as 2627.

3                    (Exhibit published to jury.)

4   BY MR. LEACH:

5   Q.   Do you have those two documents in front of you?

6   A.   Yes, I do.

7   Q.   What did you -- I draw your attention to Exhibit 2627.  Up

8   at the top -- we can display that, too, or if we could display

9   both at the same time, that would be helpful.

10                   (Exhibit published to jury.)

11       MR. LEACH:  Wonderful.  Thank you so much.

12  Q.   Mr. Gersh, on the left side, we have 2627 and the number

13  at the top is 45,825,685.  Do you see that?

14  A.   Yes, I do.

15  Q.   And in 2626, we have another document with "confidential"

16  written across it with the number at the top 22,509.  Do you

17  see that?  2626?

18  A.   Yes, I do.

19  Q.   Do you believe 2627 to have come from the data room?

20  A.   Yes, I do.

21  Q.   And provided by Autonomy?

22  A.   Yes, I do.

23  Q.   And what did you understand it to be?  What did you think

24  you were reviewing?

25  A.   I thought I was reviewing the total value of contracts

**GERSH - DIRECT / LEACH**

1  signed in the period 2000 -- January 1, 2010 to June 30th,

2  2011.

3  **Q.**   So the top 40 customers?

4  **A.**   Top 40 customers, yes.

5  **Q.**   Okay.  And why did you want to know the top 40 customers?

6  **A.**   Because we wanted to know what was the concentration of

7  customers.  So was -- was there a customer dependency issue, so

8  was Autonomy dependent on 10 customers or did it have -- and so

9  would there be a significant impact to its results if it lost

10  one of those customers or was it -- was it not dependent on a

11  customer so no one customer had that significant an impact on

12  its business.

13  **Q.**   And the top customer listed here is "45 Million Bank."

14  Was that reassuring to you in the sense that there wasn't too

15  much concentration with one customer?

16  **A.**   It was a very significant contract.  What we -- what we

17  wanted to know was was customer 1 on 2627 the same as customer

18  1 on 2626 because 45 million would equate to approximately

19  5 percent of the revenue and if it was all recognized in that

20  period, which is a reasonable amount of customer concentration.

21     The thing that would have surprised us more is --

22  $45 million is a huge software contract for a company such as

23  Autonomy.  So what were they selling for $45 million if it was

24  all being recognized in one year.

25     If it was being recognized over multi years, then it would

1    therefore have less impact on the results if they lost that

2    customer, and it would make more sense from an economic

3    perspective that it would be, let's say, a four- or five-year

4    contract at approximately 10 million a year.

5    **Q.**   So 45 million was already a large number for one customer,

6    but -- is that what I hear you saying?

7    **A.**   Yes.  It's a very significant contract.

8    **Q.**   Okay.  If you were to add 57 million -- not as adept as

9    Mr. Frentzen at this -- 57 million to that 45, would that have

10   been relevant to you?

11   **A.**   Yes.

12   **Q.**   Why is that?

13   **A.**   That's an enormous contract.  It's just an extraordinary

14   amount of -- it's an extraordinary contract for a company such

15   as Autonomy.

16   **Q.**   Did you have any reason to believe that Autonomy had sold

17   $57 million worth of hardware to a company called SHI for

18   resale to Bank of America in 2010 and 2011?

19   **A.**   No.  I had no idea.

20   **Q.**   Going back to the -- we can -- going back to 2626, was

21   this the top 40 contracts list?

22   **A.**   No.  This was -- we thought this was the top -- the

23   revenue that -- it was revenue recognized by customer in that

24   18-month period.  So -- so it might be more than one contract,

25   but it was the amount of revenue that was -- that Autonomy

GERSH - DIRECT / LEACH

1  recognized associated with customer 1, customer 2.

2  **Q.**   Okay.  I want to be clear, Mr. Gersh:  What's the

3  difference between the contracts and the customer list?

4  **A.**   So the -- so 2627, we believe that is the value of the

5  contract that was signed for those customers, whereas 2626 we

6  believe is the amount of revenue that was recognized for -- for

7  that specific customer in that period.

8  **Q.**   And did you believe you were getting the top 40 contracts?

9  **A.**   Yes.  That's what we believed at the time.

10 **Q.**   Did you believe that any of the top 40 contracts were

11 being omitted?

12 **A.**   We had no reason to believe that the top 40 contracts were

13 being omitted.

14 **Q.**   Did you somehow limit the request to only a certain subset

15 of contracts?

16 **A.**   No.  We wanted the largest customers by revenue and by

17 value in the period.

18 **Q.**   Let me show you what is in evidence as Exhibit 963.

19                    (Exhibit published to jury.)

20 **BY MR. LEACH:**

21 **Q.**   If we could please look at pages 2 and 3.  The next page,

22 please.  Further down.  Next page, please.

23     I'm drawing your attention, Mr. Gersh, to a contract dated

24 July 7, 2010.  Do you see that?

25 **A.**   Yes, I do.

1    Q.    And does this relate to the purchase of Dell products?

2    A.    Yes, it does.

3    Q.    Does it -- is it addressed to Zones, Inc.?

4    A.    Yes, it is.

5    Q.    And if we could go to the signature page on page 2.

6          Is this one of the contracts that you reviewed in the data

7    room?

8    A.    No, it is not.

9    Q.    Could he would please display what is in evidence as

10   Exhibit 973.

11                    (Exhibit published to jury.)

12   BY MR. LEACH:

13   Q.    And do you see the title "Purchase Order" at the top?

14   A.    Yes, I do.

15   Q.    And do you see the date to the left of July 9th, 2010?

16   A.    Yes, I do.

17   Q.    And if we scroll down, do you see the amount of

18   $7 million?

19   A.    Yes, I do.

20   Q.    Okay.  Was this a purchase order that was among the

21   contracts that you reviewed in the data room?

22   A.    No.  It was not in the data room.

23   Q.    In the purchase order, there is a description of HR Block

24   server, 780 mini tower base stands, and beneath that it's Dell

25   19-inch professional.  Do you see that?

GERSH - DIRECT / LEACH

1    A.    Yes.

2    Q.    Sitting here today, are you familiar with those products?

3    A.    Yes, I am.

4    Q.    What do you understand them to be?

5    A.    The top product is a -- just a computer, a desktop

6    computer.  And the bottom product are monitors for -- just like

7    a regular monitor.

8    Q.    If you had seen a contract like this in the data room,

9    would that have raised questions for you?

10   A.    Yes, it would have.

11   Q.    Why?

12   A.    Autonomy is a software company.  It sells software.  This

13   is -- this type of sale and Zones are hardware resellers, so

14   it's not even -- you have companies that are software resellers

15   who will sell sort of Autonomy products, but this is a hardware

16   reseller.  This is somebody who is really just -- is almost

17   acting as a shipping agent between a big company such as Dell

18   and I think it's Intuit or whoever -- or H&R Block, whoever

19   purchased these things.

20        This is a completely different business from -- from what

21   Autonomy is in.  It's -- it's almost the same as if Autonomy

22   was selling motor cars.  It's that unusual.

23   Q.    Okay.  Would this have caused you to raise questions in

24   the diligence?

25   A.    Yes.

1    Q.    Was this $7 million Zones contract, assuming it's within

2    the top 40 contracts by revenue -- was that responsive to the

3    request for the top 40 contracts?

4    A.    They did not provide this when we requested the top 40

5    contracts, no.

6    Q.    Assuming it's within the top 40, would that have been

7    responsive?

8    A.    It would have been responsive if they provided it, yes,

9    but they did not provide it.

10   Q.    Did you in any way intend to exclude this?

11   A.    No, we did not intend to exclude it.

12   Q.    I'd like to show you what is in evidence as Exhibit 1382.

13                  (Exhibit published to jury.)

14   BY MR. LEACH:

15   Q.    Do you see the title "Purchase Order" up at the top,

16   Mr. Gersh?

17   A.    Yes, I do.

18   Q.    Do you see that it appears to be from a company called

19   Tikit?

20   A.    Yes, I see that.

21   Q.    Did you have an opportunity to review this prior to your

22   testimony?

23   A.    I saw a copy of this last night.

24   Q.    Okay.  And was this responsive to -- was this a document

25   that was in the data room?  Was this one of the contracts that

1    you reviewed?

2    **A.**    No.  This was not in the data room.

3    **Q.**    Could we please show Mr. Gersh what is in evidence as

4    Exhibit 1361.

5                         (Exhibit published to jury.)

6    **BY MR. LEACH:**

7    **Q.**    And is this another document that appears to relate to

8    Tikit Limited dated December 31st, 2010?

9    **A.**    Yes, it is.

10    **Q.**    Was this letter among the documents that were -- contracts

11    that were in the data room?

12    **A.**    No, it was not in the data room.

13    **Q.**    If we could scroll down a little bit, please.

14        Does a letter agreement like this -- if you had seen this

15    in the data room, would this have raised questions in your

16    mind?

17    **A.**    Yes, it would have.

18    **Q.**    Why is that?

19    **A.**    There is two implications or two revenue implications

20    here.

21        First of all, why is -- why are they trying to sell

22    licenses on December 31st for a contract that they hoped to be

23    signed in March.  So it's not clear if -- there doesn't seem to

24    be an economic purpose for the sale of these -- these licenses

25    to the extent revenue is being recognized on them.

1          If they're selling them for the purpose of collecting

2     cash, which I don't believe they are based on the prior

3     invoice, then I could understand it's a sort of financing

4     transaction, but, again, it's very unusual.  Why would Autonomy

5     need to -- need to sort of receive 3 million -- 3 million

6     pounds, about $5 million.

7          And then the second point from a U.S. GAAP perspective,

8     you can only recognize revenue when the price of a transaction

9     is something called "fixed and determinable," which means that

10    you know what the price is going to be.

11         In this case, there's a contingency in there that if

12    something doesn't happen by a particular date, then Tikit is

13    going to get a credit for or it's going to be offered the

14    opportunity to get the revenue for a service that is going to

15    be performed in the future.

16         So the inclusion of that means that the overall

17    transaction or the overall price is not fixed and determinable

18    because you don't know how much revenue should be recognizing

19    because you don't know what the -- you don't know how much cash

20    you're going to get from this sale.

21         So it's just a -- it's just -- it's a strange transaction

22    and -- it's just a strange transaction that I -- to be honest,

23    I haven't seen in practice.  I haven't seen something like this

24    in the past.

25    Q.   And if this had been in the data room, would it have

**GERSH - DIRECT / LEACH**

1    raised questions in your mind?

2    **A.**    Yes, it would have.

3    **Q.**    And if this was among the top 40 contracts for the period

4    2010 to 2011, was it your expectation that it would be in the

5    data room?

6    **A.**    Yes, it would be.

7    **Q.**    Okay.  Are you familiar with the term "side agreement"?

8    **A.**    Yes, I am.

9    **Q.**    What is a side agreement?

10   **A.**    So a side agreement, you might have a master -- a master

11   server -- a master agreement or master contract which

12   determines the terms of trade between -- between two companies.

13   Depending on -- you might -- companies might enter something

14   called a side agreement, which is -- might vary the terms of

15   the -- the standard terms of the trade.

16       Sometimes there's -- there's -- when you see a side

17   agreement in normal business, it may be for a special promotion

18   or a special concession for a particular sale.

19       So an example might be if you got an agreement of the

20   reseller, the reseller thinks it can -- the reseller might have

21   standard pricing, but the reseller says, "If you give me a

22   five-percent discount, I may be able to sell X million dollars

23   of something."  You might enter into an agreement which says

24   "We will give you a discount for this particular -- particular

25   sale."  So it does happen in business.

1    Q.    If you had seen side agreements in the data room, would

2    that have been a concern?

3    A.    It depends on the content of the side agreements as to

4    whether it -- it would be a concern or not.

5              MR. LEACH:    Your Honor, this may be a convenient time

6    to break.

7              THE COURT:    Okay.  Ladies and gentlemen, we are going

8    to take our noon recess.  We will take a shorter one because

9    we're going to terminate at 2:00.

10        So please come back at quarter of 1:00.  Remember the

11   admonition given to you:  Don't discuss the case, allow anyone

12   to discuss it with you, form or express any opinion.

13              (Luncheon recess was taken at 12:05 p.m.)

14   **Afternoon Session**                          **12:48 p.m.**

15        (Proceedings were heard out of the presence of the jury:)

16              THE COURT:    Okay.  Let the record show that the jury

17   is not here.

18        Ms. Little?

19              MS. LITTLE:    Thank you, Your Honor.  And also we've

20   excused Mr. Gersh for this discussion.

21        On February 6th when we were before the Court for our

22   pretrial conference, the issue came up about whether Government

23   counsel could speak to a witness during the course of their

24   testimony during a break, and you'll recall that Mr. Reeves

25   said (reading):

1    "Once the witness hits the stand, I will not be

2    talking to them directly.  The Government will not talk to

3    them directly."

4    You said, "What does directly mean?"

5    There was some back and forth.  You said (reading):

6        "What are you going to do, Mr. Reeves?  Which way are

7    you going on this issue?"

8        Mr. Reeves said (reading):

9        "I agree not to talk to the witness once they hit the

10   stand, Your Honor."

11       "THE COURT:  Okay.  There we are."

12   Mr. Leach has just informed me that over the lunch break

13   he met with this witness, showed him a document, and is going

14   to try to get him to correct his testimony.  That's a violation

15   of the agreement, it's wrong, and he should not be allowed now

16   to change his testimony from whatever he said earlier.

17       **MR. LEACH:**  May I respond, Your Honor?

18       **THE COURT:**  Well, of course.  I'm not going to say,

19   "No, you can't respond."  Yeah, go ahead.

20       **MR. LEACH:**  I was surprised by something Mr. Gersh

21   said during his testimony.  I didn't think it was right.  I met

22   with him for two minutes.  I showed him a document to see --

23       **THE COURT:**  That wasn't Mr. Reeves; it was you?

24       **MR. LEACH:**  It was me who met with Mr. Gersh.

25       **THE COURT:**  I understand it was binding on everybody.

1          MR. LEACH:  Yeah.

2          THE COURT:  No, that's not the issue.

3          MR. REEVES:  I knew about it, so --

4          THE COURT:  Well, look, look --

5          MR. LEACH:  And for the record, I don't think it

6    refreshed his recollection; and if counsel wants to inquire

7    about it, I'm totally fine.

8          THE COURT:  Okay.

9          MR. LEACH:  I reported it to them.

10         THE COURT:  I have to tell you, okay, number one,

11   you're right.

12       Number two, the remedy here is not that he can't change

13   his testimony if he's going to change his testimony.  The

14   remedy isn't let's have wrong testimony.  The remedy is you can

15   explore that on your cross-examination whatever, that he met

16   with the Government counsel and what they said, and so forth.

17       And I have to tell you, I thought that was one of the more

18   ridiculous things that the Government has said in this case.  I

19   put that -- I mean, it's a ridiculous thing to say, "I will not

20   talk to anybody."  I mean, what does that sound like?  I mean,

21   it sounds like some higher -- wonderful thing to say.  It makes

22   no sense at all.

23       Of course, witnesses say -- all the time they say things

24   that, oh, you're surprised they say it.  I didn't understand

25   it.  You didn't understand it.  The idea is to try to get

1    clarity in testimony.

2        I agree if a person changes his testimony or what he or

3    she is told during a recess is all discoverable to the jury for

4    weight, but the Court is concerned that testimony be accurate.

5    Now, there are limits to that.  I don't go around and look for

6    witnesses to refresh recollections or change anything.

7        Anyway, I appreciate what you're saying.  You are

8    absolutely right but not the remedy.  Not the remedy.

9        Okay.  Bring in the jury.

10        **MR. LEACH:**  Thank you, Your Honor.

11    (Proceedings were heard in the presence of the jury:)

12        **THE COURT:**  Please be seated.

13    Let the record reflect all parties are present, all jurors

14    are present.

15        You may proceed.

16        **MR. LEACH:**  Thank you, Your Honor.

17    **Q.**   Good afternoon, Mr. Gersh.

18        Good afternoon, ladies and gentlemen.

19        When we broke, Mr. Gersh, we were talking about the Tikit

20    order and the Tikit letter, and your testimony was that was not

21    among the documents in the data room that you observed at the

22    time back in 2011?

23    **A.**   Yep, that is correct.

24    **Q.**   And if that agreement was among Autonomy's top 40

25    contracts for the period 2010 to 2011, do you believe that was

1    responsive to the request?

2    **A.**    It would have been responsive to the request, yes.

3    **Q.**    Okay.  I'd like to show for you what is in evidence as

4    Exhibit 1345.

5         Do you see the heading at the top "Second Amendment to

6    Software License Agreement," Mr. Gersh?

7    **A.**    Yes, I do.

8    **Q.**    And do you see that this is between Autonomy, Inc., and

9    Video Monitoring Services of America, VMS, with a date of

10   December 31st, 2010?

11   **A.**    Yes, I do.

12   **Q.**    And could we please scroll down to the terms?  A little

13   bit more.  A little bit more, please.  Next page.

14        Do you see the amount of $6 million?

15   **A.**    Yes, I do.

16   **Q.**    Okay.  And if we could please go to the schedule of what's

17   being sold here.  Keep going down.  There we go.

18        Do you see "Exhibit A to Second Amendment Hardware" and

19   there's a list of Type 1 Servers, Type 3 Servers?  Do you see

20   that?

21   **A.**    Yes, I do.

22   **Q.**    Okay.  Was this among the contracts that you observed in

23   the data room back in 2011?

24   **A.**    No, it was not in the data room.

25   **Q.**    Okay.  If this contract had been in the data room, would

1   it have raised questions in your mind?

2   **A.**   Yes, it would have.

3   **Q.**   Why is that?

4   **A.**   Because it's a contract to sell hardware, which is

5   unrelated to what we believe the Autonomy business is, which is

6   the sale of software.  And the hardware they're selling,

7   it's -- we're not even -- just by the description of the

8   products, it's not even clear that it would be used to host or

9   to be used with the Autonomy software.

10  **Q.**   Okay.  And if this was among Autonomy's top 40 contracts

11  for 2010 to 2011, it was your expectation that this would have

12  been made available in the data room?

13  **A.**   Yes.  It would have been my expectation, yes.

14  **Q.**   Can we please look at what's in evidence as Exhibit 1272,

15  page 2?

16      Do you see the title "Purchase Order" at the top right,

17  Mr. Gersh?

18  **A.**   Yes, I do.

19  **Q.**   And do you see the date to the left of December 9th, 2010?

20  **A.**   Yes, I do.

21  **Q.**   And does this appear to relate to a $4,136,067 sale of

22  Dell OptiPlex 780 Desktop Small Form Factor?

23  **A.**   Yes, that's what it appears to relate to.

24  **Q.**   Okay.  Was this among the contracts that you reviewed in

25  the data room?

1    **A.**    No, it was not in the data room.

2    **Q.**    And if this had been in the data room, would it have

3    raised questions in your mind?

4    **A.**    Yes, it would have raised questions.

5    **Q.**    Why is that?

6    **A.**    Because it's, again, unrelated to what Autonomy is

7    claiming is its business of the sale of software.  This is the

8    sale of desktop computers that a reseller, a hardware reseller,

9    might sell but not a company such as Autonomy.

10    **Q.**    Why does that matter, Mr. Gersh?  Explain.  Why would

11    selling desktops in the manner that appears here be of note to

12    you?

13    **A.**    Because, firstly, it's unrelated to what Autonomy claims

14    its business is, which is the sale of software and it's a

15    software company.

16        This type of transaction is what you'd expect a computer

17    reseller, such as an Avnet or a Synnex to be making.  It's just

18    a very different business from the one Autonomy claims to be

19    in.

20        And, secondly, the profitability of such sales to Zones is

21    significantly less than the profitability of software sales.

22    So I suspect that Zones is making a 10 percent profit on the

23    sale at best of this product; whereas, Autonomy was claiming to

24    make a 90 percent sale on the sale of software.

25    **Q.**    Would this have raised questions in your mind about the

GERSH - DIRECT / LEACH

1  composition of Autonomy's revenue?

2  **A.**    Yes, it would have.

3  **Q.**    Would have raised questions in your mind about the gross

4  margin that Autonomy was claiming to have?

5  **A.**    Yes, it would have.

6  **Q.**    I'd like to -- I've placed before you, Mr. Gersh, what has

7  been marked as Exhibit 607.

8        **MR. LEACH:**  I offer this into evidence.

9        **THE COURT:**  Admitted.

10    (Trial Exhibit 607 received in evidence)

11 **BY MR. LEACH:**

12 **Q.**    Mr. Gersh, if we could scroll below, please, this appears

13 to be a purchase order between Autonomy and Morgan Stanley.  Do

14 you see that?

15 **A.**    Yes, I do.

16 **Q.**    Okay.  And if we could scroll down further to the amount.

17 Next page, please.

18    Does this appear to relate to the sale of $5 million worth

19 of "Autonomy/Dell Server Promotion, 1,920 Servers Firmware"?

20 Do you see that?

21 **A.**    Yes, I see that.

22 **Q.**    Was this among the contracts that you reviewed in the data

23 room?

24 **A.**    No, it was not among the contracts.

25 **Q.**    Okay.  If this had been in the data room, would it have

GERSH - DIRECT / LEACH

1    raised questions in your mind?

2    A.    Yes, it would have raised questions.

3    Q.    Why is that?

4    A.    For the same reason as the Zones order.  This is the sale

5    of servers which don't seem to be related in any way to the

6    sale of Autonomy software.

7            Secondly, the nature of the actual transaction coming

8    through the Ariba network is just very odd because the Ariba

9    network is used by resellers and it's used by companies to

10   procure just a range of products, almost on a commodity basis;

11   whereas, Autonomy's -- if Autonomy was selling software to

12   Morgan Stanley, it wouldn't have been through Ariba.  It would

13   have been a direct sale or through a reseller, but it would

14   have been a negotiated contract, not almost a form purchase

15   order.

16   Q.    And was it your expectation that you were reviewing

17   Autonomy's top 40 contracts by revenue for the period?

18   A.    Yes, it was.

19   Q.    Did you in any way mean to exclude hardware contracts?

20   A.    No.  There was no -- no -- we had no exclusions.  We

21   wanted to see the top 40 by revenue.

22   Q.    I'd like to move forward, Mr. -- or while we're on the

23   subject of the data room and the contracts, I'd like to show

24   you what -- or I've placed before you Exhibit 2561.

25           MR. LEACH:  If this isn't in evidence, Your Honor, I

1    move it in.

2         **THE COURT:**  It is in evidence.

3         **MR. LEACH:**  Okay.  Wonderful.

4    **Q.**   Are you familiar with this document, Mr. Gersh?

5    **A.**   Yes, I am.

6    **Q.**   Okay.  Was this one of the contracts that was in the data

7    room that you did review?

8    **A.**   Yes, it was.

9    **Q.**   And did you look at this carefully?

10   **A.**   Yes, I did.

11   **Q.**   Let me direct your attention to page 3.  Do you see

12   there's a definition for "Developed Software" and "Licensed

13   Software" in this contract?

14   **A.**   Yes, I do.

15   **Q.**   And if we look at page 4, do you see in paragraph 3

16   there's a reference to "Provision of Software and/or Services"

17   down at the bottom?

18   **A.**   Yes, I do.

19   **Q.**   Let's get it on the screen so everybody can see it.

20   Wonderful.  Thank you.

21        And then if we could go to page 5, do you see a

22   description of supply of hardware, delivery, installation of

23   hardware in paragraph 6?

24   **A.**   Yes, I do.

25   **Q.**   Okay.  This was a contract that you did review in the data

GERSH - DIRECT / LEACH

1    room?

2    **A.**    Yes, it is.

3    **Q.**    And what did you think was being sold here?

4    **A.**    What we thought was that Autonomy had won a contract to

5    supply an entire solution.  So we didn't know what the solution

6    was, but it would be relating to sort of indexing of data or

7    the indexing of information that was Autonomy's business.

8        And we interpreted this contract to be not just Autonomy

9    supplying the software and a third party then integrating it

10    into the customer's sort of business environment, we understood

11    that Autonomy would be acting as, you could say, the prime

12    integrator here.  So it would have to be responsible not just

13    for the software but all the components to make sure the

14    solution worked.

15        So the best analogy is a contractor on a building, they

16    might not do the electrical but they might get a third party to

17    do the electrical but they're responsible for delivering a

18    building to the developer; and it was the same situation here.

19    **Q.**    Did this in any way raise any alarm bells in your mind

20    that Autonomy was selling significant amounts of hardware?

21    **A.**    Not at the time because we didn't -- we didn't know how

22    much hardware was with this contract, but we didn't think it

23    was a significant amount of hardware relative to the overall

24    value of the contract because hardware is just not -- hardware

25    is a component of the solution but it's not a -- it shouldn't

1    be a significant component to the solution because you don't

2    need -- we didn't imagine they would need that much hardware

3    relative to the size of the contract.

4        This is a very complex contract with a lot of obligations

5    around the software and around the functionality, so we

6    could -- based on our experience, it looked as if it was a

7    significant effort for developing and implementing the

8    software, and that's what Autonomy was getting paid for.

9    **Q.**   Did you believe this was software, hardware, and services

10   being sold together as a solution?

11   **A.**   Yes.

12                        (Pause in proceedings.)

13        **MR. LEACH:**   Could we please display what is in

14   evidence as Exhibit 1041?

15        Thank you, Ms. Little.

16   **Q.**   Mr. Gersh, up at the top it says "Purchase Order, Date

17   August 10, 2010."  Do you see that?

18   **A.**   Yes, I do.

19   **Q.**   And does this appear to be a contract with the vendor

20   Zantaz?

21   **A.**   Yes.

22   **Q.**   And if we could scroll down, please, down to the bottom

23   right corner.  Down at the bottom right corner.  Let's look at

24   the Bates numbers.

25        Do you see the Bates range beginning "KPMG"?

1  **A.**    Yes, I do.

2  **Q.**    Okay.  Do you believe this to be another one of the

3  agreements that you observed in the data room?

4  **A.**    Yes, I do.

5  **Q.**    Could we please scroll down to page 3?

6       By the way, there's redactions on this document.  Did

7  that -- was that the -- do you know why there's redactions on

8  these?

9  **A.**    At the time we were led to -- my understanding was that

10  Autonomy wasn't prepared to share customer names with HP so,

11  therefore, they deleted all the customer names from the

12  contracts they provided us.

13  **Q.**    Okay.  And if we could scroll to page 4, please, and

14  rotate the document so we can read it.  Wonderful.  Thank you.

15       There's something being described here as "First Archive

16  Systems, TB Archive Storage Cells."  Do you see that,

17  Mr. Gersh, to the left?

18  **A.**    Yes, I see that.

19  **Q.**    Okay.  What did you understand this contract to relate to?

20  **A.**    We thought this was the sale of additional -- so this is

21  additional storage.  So Autonomy's solution is very -- requires

22  a lot of storage in certain instances, and we thought this was

23  just an extension or an expansion of an existing license so

24  that the customer required additional -- additional product.

25       But when we saw "storage cells," our understanding was

GERSH - DIRECT / LEACH

 1   that it was -- the storage cells were just the means of

 2   delivering the software or the additional seats that the

 3   customer acquired; but that, again, the bulk of the value in

 4   the contract was on the software side.

 5   **Q.**   Did this in any way raise for you a red flag that Autonomy

 6   was selling significant amounts of hardware?

 7   **A.**   No, it did not.

 8   **Q.**   Explain that.  Why not?

 9   **A.**   We knew they were selling some hardware.  They disclosed

10   that.  And of the top 40 contracts we saw, I believe there's

11   only two that are -- there's only this one and one other one

12   that we saw that were -- had this type of deliverable in it.

13   So we didn't -- while we didn't know the amount, the fact that

14   it was only a three- or four-page document referencing sort of

15   an addendum just led us to believe there wasn't that much being

16   sold here.

17   **Q.**   I'd like to move to another document, Mr. Gersh.  It's

18   been marked as Exhibit 2215.  It's an e-mail from you to folks

19   at HP dated August 10th, 2011.

20          **MR. LEACH:**  I move it in evidence.

21          **THE COURT:**  Admitted.

22       (Trial Exhibit 2215 received in evidence)

23   **BY MR. LEACH:**

24   **Q.**   Would you like to look at the hard copy, Mr. Gersh, in

25   front of you?

GERSH - DIRECT / LEACH

1    **A.**    Sorry.  Which number is it?

2    **Q.**    2215.

3    **A.**    Yep.  I've got it.

4    **Q.**    And the subject of this is "Projects Tesla - Draft

5    Report."  Do you see that?

6    **A.**    Yes, I do.

7    **Q.**    And what have you attached to this e-mail to the folks at

8    HP?

9    **A.**    This is our due diligence report containing a summary of

10    our analysis and findings for the work through that specific

11    date.

12    **Q.**    Is this in some sense the culmination of the work you've

13    been doing up through August 10th, 2011?

14    **A.**    Correct.

15    **Q.**    Okay.  Can we please look at page 9 of your report?  And

16    do you see the title "Executive Summary"?

17    **A.**    Yes, I do.

18    **Q.**    What is this page?

19    **A.**    This is what we -- this is what we considered to be the

20    key findings that HP should focus on.

21    **Q.**    Let me draw your attention to the first row, "Due

22    Diligence Process."  Do you see where it says (reading):

23            "Due diligence comprised telephone discussions with

24        management and access to very limited proprietary

25        financial and tax information.  The majority of findings

1           and observations are based on oral representations from

2           management and reading published financial information"?

3           Was that statement true at the time?

4     A.    Yes, it was.

5     Q.    Okay.  You then wrote (reading):

6               "This acquisition is under the remit of the U.K. City

7           Code on takeovers.  The rules in their Code regarding

8           treatment of bidders frequently results in very limited

9           information being provided prior to a transaction

10          closing."

11          Did you believe that to be true at the time?

12    A.    Yes, I did.

13    Q.    And then you wrote (reading):

14              "The data and access provided to us during due

15          diligence was very limited but was comparable with other

16          acquisitions involving large U.K. publicly traded

17          companies."

18          Did you believe that to be true at the time?

19    A.    Yes, I did.

20    Q.    Okay.  Can we look at page 8, another portion of your

21    overview?  And if we could scroll down, please.  I'm sorry.

22    It's page 8 of the report but page 10 of the exhibit.  There we

23    go.

24          Up at the top you have a circle "Target Revenue FY10

25    870M."  It's a little hard to read on the screen, but -- there

1   we go.

2       Is that you summarizing Autonomy's reported revenues for

3   2010?

4   A.   Yes, it is.

5   Q.   Okay.  And then beneath that you break it out into

6   license, cloud, OEM, services, and deferred revenue release.

7   Why did you do that?

8   A.   This is just a summary of the types of revenue that

9   Autonomy was claiming it generated.  This was an extract from

10  the public filings because we weren't provided with any other

11  breakdown of revenue information.

12  Q.   What was the amount of services revenue for fiscal year

13  2010?

14  A.   It was $41 million.

15  Q.   Okay.  And is this breakout of revenue part of what caused

16  you to believe that Autonomy did not have significant hardware

17  sales?

18  A.   Yes, plus the numerous representations on calls and also

19  the commentary in the public filings that it was a software

20  company.  I think Autonomy used the term it was a "pure

21  software company," so...

22  Q.   Let's look at page 11, please, and if we could focus on

23  the third box to the right.  You wrote (reading):

24          "Target has maintained a consistent gross margin

25      since 2009.  Target expects the gross margin to decline

GERSH - DIRECT / LEACH

1          slightly in the future with the growth in the hosting

2          business."

3          Why were you highlighting this information to HP?

4     A.   We were highlighting it so -- because as their business

5     model sort of evolved from selling term and perpetual licenses

6     to selling a cloud or a hosted solution, there's typically more

7     costs with a cloud and a hosted solution, so over time you

8     would expect a slight -- slight decline in margins and we

9     wanted to make clear to HP that in their valuation model when

10    they're forecasting revenue and profitability in the future,

11    they should be anticipating a slight decline.

12    Q.   And was gross margin an important metric in your mind in

13    evaluating Autonomy?

14    A.   Yes.  It's a very important metric.

15    Q.   How so?

16    A.   Because it -- it's an indication of the profitability of

17    the business.  So if they're -- Autonomy's claiming, I think it

18    was, an 87 or 88 percent gross margin.  That's a very

19    profitable business and as revenue increases, the amount of

20    contribution or profit that's going to generate at that margin

21    is significant.

22    Q.   I draw your attention to page 15 of the report.  Do you

23    see the topic "Revenue Recognition"?

24    A.   (Witness examines document.)

25    Q.   15 of the exhibit --

GERSH - DIRECT / LEACH

```
 1   A.    Yes.

 2   Q.    -- page 13 of the report.  Perfect.  Thank you.

 3         You wrote (reading):

 4             "Target records revenue in accordance with IFRS.

 5         Management represented that this is generally consistent

 6         with U.S. GAAP."

 7         Why did you write that?

 8   A.    We wrote it for two reasons.  One, management had made

 9   that representation to us on the call; and, secondly, when

10   you -- when we read the footnote in -- when we read the

11   accounting policy disclosure around revenue recognition, while

12   they state that it's in accordance with IFRS, they make

13   reference to the guidance in U.S. GAAP or the basis for -- the

14   criteria for recognizing revenue under U.S. GAAP.  So we

15   were -- the combination of the two we were led to believe that

16   it wasn't too dissimilar from U.S. GAAP.

17         We asked numerous questions around this because of the

18   sensitivity on the topic, particularly around how you allocate

19   revenue between periods.

20   Q.    Who from Autonomy management represented that this is

21   generally consistent with U.S. GAAP?

22   A.    Mr. Hussain.

23   Q.    And if we could briefly look at page 53 of Exhibit 1352,

24   the annual report.

25             SPECIAL AGENT BRYANT:  What page?
```

1          **MR. LEACH:**  1352, page 53.  And if we could highlight

2    the top.  Back out a little.  Perfect.

3    **Q.**    Mr. Gersh, you said there was something in a footnote to

4    Autonomy's financial statements that caused you to believe that

5    they were following GAAP.  Is this a reference to that

6    footnote?

7    **A.**    Yes, it is.

8    **Q.**    Okay.  This says (reading):

9              "Revenues from software license agreements are

10             recognized where there is persuasive evidence of an

11             agreement with a customer, contract and/or binding

12             purchase order, delivery of the software has taken place,

13             collectibility is probable, and the fee has been

14             contractually agreed and is not subject to adjustment or

15             refund; i.e., is fixed and determinable."

16             You're a CPA in the United States; right?

17   **A.**    I am, yes.

18   **Q.**    And is that the language of GAAP?

19   **A.**    That is the language that is in SAB 104, correct.

20   **Q.**    Thank you.

21             And could we please go back to the due diligence report,

22   page 26, Exhibit 2215.  Page 26 of the exhibit, please.

23             Thank you so much.

24                          (Pause in proceedings.)

25   \\\

1    BY MR. LEACH:

2    Q.    Mr. Reeves reminded me, Mr. Gersh, you used a reference to

3    an acronym in GAAP we might not all be familiar with.  What is

4    the term you used?

5    A.    So SAB stands for Staff Accounting Bulletin 104.  It is a

6    guidance that the SEC staff has issued to public filers in the

7    U.S. giving them some guidance on how to recognize revenue.  It

8    is now part of what is called Accounting Standards

9    Certification Number 605.

10    Q.    Thank you.

11          We're on page 26 of the due diligence report, and I draw

12    your attention to the column in the middle.  There's delivery

13    models down at the bottom.  It says "On-premise and appliance."

14    Do you see that?

15    A.    Yes, I do.

16    Q.    And you wrote(reading):

17          "Target sells its software as a license, which is

18          installed on-premise and runs on hardware owned by its

19          customers."

20          Do you see that language?

21    A.    Yes, I do.

22    Q.    And then -- and what was the basis for you writing that

23    there?

24    A.    That was -- the basis was the description in the audited

25    financial statements and representations that Mr. Hussain had

1    made.

2    **Q.**    And if we could please back out and look at the next

3    column to the right.  You wrote (reading):

4            "In limited situations target will ship its software

5        preinstalled on hardware to customers.  Target recognizes

6        revenue for the hardware in conjunction with the software

7        license when it is delivered."

8        Where did you get that information, Mr. Gersh?

9    **A.**    From the audited financial statements and representations

10    that Mr. Hussain had made.

11    **Q.**    And are you referencing appliances here in some sense?

12    **A.**    Yes, that is appliances.

13    **Q.**    Okay.  And you understood that Autonomy sold appliances?

14    **A.**    Yes, we did.

15    **Q.**    You thought it was a small part of their business?

16    **A.**    We did.

17    **Q.**    Why did you think that?

18    **A.**    Because that's -- that was the language used in the

19    audited financial statements, that in very limited situations

20    they sold -- they sold hardware; and they made the comment that

21    the margin profile on those sales was essentially the same as

22    the margin profile on sales of licenses, which meant that they

23    couldn't be a significant amount of hardware, otherwise the

24    margin profile would be significantly different.

25    **Q.**    I'd like to move forward in time, Mr. Gersh, to

1  August 17th, 2011, the day before the acquisition.  At or

2  around that time, did you participate in a phone call with

3  individuals from Deloitte?

4  **A.**    Yes, I did.

5  **Q.**    How did that come about?

6  **A.**    We'd requested access to the Deloitte audit work papers

7  and Deloitte from the start of diligence.  We were led to

8  believe we wouldn't get access.  I think then on August 15th or

9  16th we were told we would get access and a call was arranged

10  for an hour between ourselves, Deloitte, Autonomy, and HP.

11  **Q.**    Is this in some way meant to be a substitute for the audit

12  work papers?

13  **A.**    I think so, yes.

14  **Q.**    And take a moment and describe what happened on the call.

15  **A.**    So on the call we were -- we were instructed that we had

16  to give a list of questions which are along the lines of

17  yes-no.  So we drafted those questions with sort of slightly

18  open-ended so we could get more commentary.

19        On the call from Deloitte, there were two partners.  One

20  was Nigel Mercer, I can't recall the name of the other

21  individual, and a senior manager called Lee Welham.

22        The first question was really around the experience of the

23  Deloitte team and their -- particularly their experience in

24  auditing software companies.  Their response was that this was

25  essentially their only large software company.  They were more

1  familiar with auditing aerospace and defense companies.

2      Secondly, as we got into the call, they informed us of a

3  situation where somebody -- there was an allegation of

4  accounting -- there was an allegation of inappropriate

5  accounting.  Deloitte said they'd investigated with management.

6  They believed that it was due to a difference between IFRS and

7  U.S. GAAP.  At the time I was left with the impression that it

8  wasn't a significant issue.

9      And then the final thing is there is some specific

10  accounting.  It's the same under U.S. GAAP and IFRS.  In this

11  case, there's no difference in the accounting.  When you

12  acquire a company, you have to -- you have to fair value it,

13  fair value the assets and the liabilities.

14      In this case Autonomy wasn't fair valuing certain of its

15  liabilities which had the -- meant that the revenue it

16  recognized after the acquisition was higher than if it had fair

17  valued this particular liability.

18      And it just seemed -- it was odd to us that Deloitte

19  hadn't and management hadn't looked at this issue just given

20  it -- just given how well known it is to anyone who's familiar

21  with merger and acquisition accounting.

22      That's about all I can recall from the call.  The rest

23  just -- I can't recall anything else.

24  Q.  Well, did you ask questions about whether Deloitte -- the

25  Deloitte audit team had consulted its national office with

**GERSH - DIRECT / LEACH**

1    respect to any matters?

2    **A.**    I remember we asked all the questions on the question

3    list.  I can't remember the response to that one.

4    **Q.**    Okay.  If it had been something significant, would that

5    stand out in your mind?

6    **A.**    I believe it would have, yes.

7    **Q.**    After this call, what did you do?

8    **A.**    Straight after the call we had a call with the HP

9    corporate development team of Andy Johnson, Manish Sarin,

10   Varoon Bhagat, and Emily Hsiao.  On that call we -- I can't

11   recall exactly what was said, but the conclusion was they

12   didn't need us to do any more work on it.

13   **Q.**    I'd like to move forward in time, Mr. Gersh, to

14   October 3rd, 2011, the date of the closing of HP's acquisition

15   of Autonomy.  Do you have that time period in mind?

16   **A.**    Yes, I do.

17   **Q.**    Okay.  In this time period, you had been a chartered

18   accountant for how long?

19   **A.**    16 years.

20   **Q.**    And you'd been a U.S. accountant for how long?

21   **A.**    Nine years.

22   **Q.**    Okay.  And you'd been working on mergers and acquisition

23   deals for a long time; is that fair?

24   **A.**    Yes, that is fair.

25   **Q.**    And can you quantify in any sense how many hours you put

1    into the due diligence you were doing on behalf of HP for KPMG?

2    **A.**    And is this the due diligence through to just the

3    Autonomy?

4    **Q.**    Just the Autonomy due diligence.  No other work.

5    **A.**    My personal hours or the team's hours?

6    **Q.**    How about the team's hours?

7    **A.**    On the financial side, somewhere between I would think

8    around 5- to 600 hours.  On the tax side, I believe through the

9    end of October, it might have been slightly higher but roughly

10    about the same.  Roughly about the same or slightly higher.

11    **Q.**    As of October 3rd, 2011, did you have any idea that

12    Autonomy sold $53 million of hardware in 2009?

13    **A.**    No.

14    **Q.**    Did you have any idea that Autonomy had sold approximately

15    $100 million of hardware in 2010?

16    **A.**    No.

17    **Q.**    Did you have any idea that Autonomy had sold $20 million

18    of hardware -- approximately 20 million in the first quarter of

19    2011?

20    **A.**    No.

21    **Q.**    Did you have any idea that Autonomy had sold $20 million

22    worth of hardware in the second quarter of 2011?

23    **A.**    No.

24    **Q.**    And if I had asked you on October 3rd, 2011, that those

25    were the numbers, would that have surprised you?

1    **A.**    Yes.

2    **Q.**    Why is that?

3    **A.**    I would have been shocked, to be honest.  It would have

4    meant that the basis of HP's valuation would have been flawed,

5    and they would have -- it would clearly have meant they would

6    have overpaid for the transaction.

7                          (Pause in proceedings.)

8              **MR. LEACH:**  Thank you, Your Honor.

9         Thank you, Mr. Gersh.  I have nothing further.

10             **THE COURT:**  Cross.

11                        **CROSS-EXAMINATION**

12   BY MS. LITTLE:

13   **Q.**    Good afternoon, Mr. Gersh.

14        Good afternoon, ladies and gentlemen.

15        My name is Jan Little, and I'm one of Mr. Hussain's

16   attorneys.

17   **A.**    Hello.

18   **Q.**    And we've not met before, have we?

19   **A.**    No, we have not.

20   **Q.**    Mr. Gersh, you worked for KPMG, I think you said, since

21   1992?

22   **A.**    That's correct.

23   **Q.**    So about 26 years?

24   **A.**    Correct.

25   **Q.**    And HP has used KPMG as its auditors for many years;

1    right?

2    **A.**    That is not correct.

3    **Q.**    Okay.  How long has KPMG -- excuse me.

4         How long has HP been using KPMG as its auditors?

5    **A.**    We are not HP's auditor.

6    **Q.**    Okay.  How long has KPMG done work for HP?

7    **A.**    I don't know KPMG.  I know how long I've worked with HP.

8    **Q.**    Okay.  Well, you've worked with HP you said since 2004?

9    **A.**    Correct.

10    **Q.**    And you personally worked on, I think you said, more than

11    50 HP acquisitions?

12    **A.**    That's correct, yes.

13    **Q.**    Do you still do work for HP?

14    **A.**    Yes, I still do some work for HP.

15    **Q.**    You've been interviewed about this matter by HP's lawyers,

16    haven't you?

17    **A.**    Yes, I have.

18    **Q.**    You were interviewed by an HP attorney in 2012?

19    **A.**    Yes, that's correct.

20    **Q.**    And then you were interviewed by another HP-hired attorney

21    in 2013?

22    **A.**    Correct, yes.

23    **Q.**    And then you were interviewed by the Government in 2014?

24    **A.**    Yes, correct.

25    **Q.**    And again in 2016?

1   **A.**    Yes, correct.

2   **Q.**    And then you testified before the Grand Jury in 2016?

3   **A.**    Yes, correct.

4   **Q.**    And then you were interviewed again by the FBI just a

5   couple months ago in February of this year?

6   **A.**    Yes, that's correct.

7   **Q.**    And I believe you testified that you met with the

8   Government last night?

9   **A.**    No, I didn't meet with the Government last night.  I read

10  some documents last night.

11  **Q.**    Okay.  You didn't meet with the Government?

12  **A.**    No.

13  **Q.**    Okay.  So you just read documents?

14  **A.**    Correct, I read documents.

15  **Q.**    Were you given instructions by the Government what

16  documents to read?

17  **A.**    No.  The Government didn't instruct me last night.

18  **Q.**    Did the Government select the documents that you were to

19  look at?

20  **A.**    I don't know.

21  **Q.**    How long did you spend reviewing documents last night?

22  **A.**    20 minutes maybe.

23  **Q.**    You've testified that you're a chartered accountant in the

24  U.K.; correct?

25  **A.**    Correct.

1  Q.   So you're very familiar with IFRS; right?

2  A.   No, I'm not very familiar with IFRS.  I am familiar with

3  certain aspects of IFRS, but I haven't -- IFRS was introduced

4  after I came to the U.S., so the majority of my knowledge is

5  around U.S. GAAP.

6  Q.   Okay.  So you're not very familiar with IFRS?

7  A.   No, no, that's not what I said.  I said I'm familiar with

8  certain aspects of IFRS, but IFRS was introduced after I left

9  the U.K. so I'm not familiar with -- I'm more familiar with

10  U.S. GAAP and I'm not familiar with the entire sort of, I

11  guess, population of -- or the entire sort of IFRS guidance.

12  Q.   Okay.  So let me make sure I understand the extent of your

13  knowledge.

14       You're very familiar with U.S. GAAP; right?

15  A.   I'm very familiar with certain aspects of U.S. GAAP that

16  are pertinent to diligence that I do.

17  Q.   Okay.  And you have limited familiarity with IFRS it

18  sounds like?

19  A.   And I have familiarity with certain of the aspects of IFRS

20  that are, again, pertinent to the types of companies that I

21  typically perform due diligence on.  So an example might be

22  accounting for business combinations and under U.S. GAAP, it is

23  accounting -- it is referred to as ASC 805.  Under IFRS, it is

24  IFRS 3 and the guidance is the same.  So I'm familiar with IFRS

25  and requirements for business combinations under IFRS.

**GERSH - CROSS / LITTLE**

1          And then revenue recognition is different between the two,

2    but I am -- I have performed a number of engagements, in excess

3    of 20, on companies that apply IFRS.  So I'm familiar with the

4    requirements and the application of IFRS and revenue

5    recognition.  Beyond those two areas, I don't have as much

6    familiarity with IFRS.

7    **Q.**    And you certainly are familiar in the field of revenue

8    recognition that there are differences between IFRS and U.S.

9    GAAP; correct?

10   **A.**    Yes, I am, correct.

11   **Q.**    And you're familiar with those differences?

12   **A.**    Yes.

13   **Q.**    Okay.  And you have had experience with what we call

14   cross-border acquisitions before; right?

15   **A.**    Yes, that's correct.

16   **Q.**    What does that phrase mean, "cross-border acquisition"?

17   **A.**    So what "cross-border acquisition" means is, let's say a

18   U.S. entity is acquiring a company in the U.K. such as Autonomy

19   or somewhere internationally where you're working across a

20   border.

21   **Q.**    And you've worked on cross-border acquisitions for HP;

22   correct?

23   **A.**    Yes, I have.

24   **Q.**    And you've worked on acquisitions involving British

25   companies before?

**GERSH - CROSS / LITTLE**

1   **A.**    Yes, I have.

2   **Q.**    Okay.  Are you familiar with the U.K. -- the British

3   takeover rules, the merger rules?

4   **A.**    I have a -- I have some knowledge of the rules, but I'm

5   not -- I'm not familiar with all aspects.

6   **Q.**    Okay.  Are you familiar with, it's Rule 20-2, that has to

7   do with information that is provided -- if it's provided to one

8   bidder, it has to be provided to other bidders?

9   **A.**    I'm -- I'm aware of the rule.  My understanding of the

10  rule is that if you provide information to one bidder, you have

11  to share the same information with other credible bidders.

12  **Q.**    What does it take to be a credible bidder?

13  **A.**    I don't know.  I think that's a legal question.

14  **Q.**    I mean, if another company comes along and says, "I'm

15  interested in bidding too," they get access to the information,

16  don't they?

17  **A.**    I think it would depend who the bidder is.  If it -- I

18  think if it was concerned by both parties if Oracle came along,

19  then Oracle could be the definition of a credible bidder,

20  but...

21  **Q.**    And you said that there was concern by both parties.  By

22  that you mean HP was concerned about a competitor coming in to

23  get access to information and Autonomy was concerned about a

24  competitor coming in to get access to information; correct?

25  **A.**    That was -- that was my impression at the time from

 1    discussions with HP.

 2    **Q.**    And as a general rule, with British acquisitions as

 3    opposed to acquisitions in the U.S., there tends to be less

 4    information disclosed because of that British takeover rule;

 5    right?

 6    **A.**    I don't know.

 7    **Q.**    Well, is there a comparable rule in the U.S. that if one

 8    bidder is engaged in negotiations and another bidder says, "I

 9    want to see the information," that's not allowed in the U.S.,

10    is it?

11    **A.**    I don't know.    I don't know the specific U.S. sort of

12    state-by-state law on that question.

13    **Q.**    Well, you've worked on a lot of U.S. acquisitions, haven't

14    you?

15    **A.**    Yes, I have.

16    **Q.**    Have you ever seen a situation where a second bidder came

17    along and had access to the information that the first bidder

18    was being provided?

19    **A.**    Yes, I have.    I've seen situations where the board has

20    decided to share the same information with two bidders, and

21    I've seen other situations where a board has decided to give

22    one bidder specific information and another bidder different

23    information.

24    **Q.**    Okay.    You've seen situations where a board has decided

25    voluntarily to do it, but it's not like under the U.K. where

1    it's required by the takeover code; right?

2    **A.**    I don't know if it's required by some state legislation or

3    not.

4    **Q.**    Okay.  It's also true, sir, is it not, that during due

5    diligence, either in a cross-border acquisition or in a purely

6    domestic acquisition, there's kind of a tug-of-war, a

7    back-and-forth negotiation about what information is going to

8    be provided; correct?

9    **A.**    Yes, that's correct.

10    **Q.**    And the target may want information that the -- excuse

11    me -- the buyer may want information that the target is

12    unwilling to provide; correct?

13    **A.**    That is correct, yes.

14    **Q.**    And that's standard?

15    **A.**    I wouldn't call it standard.  I'd call it -- it depends on

16    every situation.  If bidders are competitors in the same field,

17    then there's more of a reluctance -- or my experience is

18    there's more of a reluctance to share data; but if they're in

19    different businesses or different -- they're selling different

20    products so there's no competitive situation, then there can be

21    a much freer sort of sharing of information.

22        There's also other methods.  You can use a clean room

23    team.  So in competitive situations I've seen where advisers

24    are provided with access to information but maybe the company

25    isn't provided with access to information.

1    Q.    In your experience working on mergers and acquisitions,

2    you said you worked in a number of fields.  Describe that for

3    us.  You've worked with software companies, I take it?

4    A.    Yes, that's correct.

5    Q.    What other kinds of companies?

6    A.    I have experience with -- across many industries, but

7    particularly consumer products, aerospace and defense, and

8    software and technology clients.

9    Q.    And is it fair to say that with software companies, there

10   can be special confidentiality issues concerning code, for

11   example, source code?

12   A.    I think there's confidentiality issues with all types of

13   industry.  So that the one that is probably of most concern in

14   software is the confidentiality around the code; but, let's

15   say, on a beverage company, it might be confidentiality around

16   the composition of the liquid; in aerospace and defense, around

17   the product they're developing.  So there's confidentiality in

18   each one.  It just applies to different -- different elements.

19   Q.    We all want to know the formula for Coca-Cola; right?

20   A.    We certainly do.

21   Q.    In your experience working on due diligence for mergers

22   and acquisitions, it's fairly standard for the buyer to sort of

23   drive the process and define what information it wants;

24   correct?

25   A.    Yes.

GERSH - CROSS / LITTLE

1   **Q.**   And it's standard for the buyer to ask questions and for

2   the target to provide answers to the questions; right?

3   **A.**   That's correct.

4   **Q.**   And there's no general duty of the target to sort of open

5   its files and open its file drawers and say, "Come on in and

6   look at whatever you want"; right?

7   **A.**   That's correct.

8   **Q.**   Again, the information that's provided is a subject of

9   negotiation; correct?

10  **A.**   Correct.

11  **Q.**   And if the target decides not to provide information, the

12  buyer can choose to walk away if they want, right, if they feel

13  they're not getting enough information?

14  **A.**   That's correct, yes.

15  **Q.**   And that's especially so in the United Kingdom; correct?

16  Because there are rules about once a deal is announced, it's

17  hard to get out of the deal; right?

18  **A.**   I'm not familiar with the rules about whether you can --

19  when you can terminate a transaction or not.

20  **Q.**   Okay.  Well, generally speaking, once a deal is made, it's

21  difficult to get out of it; right?

22  **A.**   I don't know.  If you -- I don't know.  Is it?

23  **Q.**   Well, it's important for the buyer to make sure it gets

24  all the information it needs before it makes a final closing

25  decision; right?

1  **A.**   Sorry.  Is that a question?

2  **Q.**   Well, never mind.  That's all right.

3        And it's your understanding, sir, isn't it, that it's the

4  choice of the company that's being acquired as to what

5  information they'll share; right?

6  **A.**   That's correct, yes.

7  **Q.**   Okay.  So, sir, the work that was conducted by KPMG in

8  connection with this due diligence, that was determined by HP

9  and put into a written document that's called a Statement of

10 Work; is that correct?

11 **A.**   That's correct.  That describes the procedures that we had

12 agreed with HP that we would try and perform.

13 **Q.**   Okay.  And that's a negotiation that you have with HP as

14 to what you are going to be doing; right?

15 **A.**   That is correct.

16 **Q.**   And I take it that KPMG has kind of a standard template

17 that it uses for a Statement of Work and then the client --

18 you'll work with the client to kind of adjust it to fit the

19 particular transaction?

20 **A.**   Yes, that's correct.  We have a standard template and then

21 the procedures and the fee get amended depending on the type of

22 company and the type of work that HP would like us to perform.

23 **Q.**   And then you also negotiate the price, which you're going

24 to be paid; right?

25 **A.**   Correct.

1    **Q.**    Okay.  If you would take a look, sir, in your book, the

2    big black book, at Exhibit 2110, which is the Statement of Work

3    for this transaction.

4           **THE COURT:**  Admitted.

5           (Trial Exhibit 2110 received in evidence)

6    **BY MS. LITTLE:**

7    **Q.**    Rather than me say it, is this the Statement of Work for

8    the work that KPMG did on the HP acquisition of Autonomy?

9    **A.**    Yes, it is.

10   **Q.**    Okay.  And looking at page 1 -- the date in the middle of

11   the page, Jeff -- under "Period of Performance," it says

12   (reading):

13          "The period of performance for this SOW" -- Statement

14          of Work -- "shall commence on August 3rd, 2011."

15          Is that right?

16   **A.**    That's correct, yes.

17   **Q.**    And I think you testified you start some phone calls on

18   August 1st, but basically beginning of August is when the

19   project started; right?

20   **A.**    That's right.

21   **Q.**    And it says it goes through December 31, 2011; but then if

22   we look down at the bottom box on the right-hand side, it says

23   "Due date, if applicable, August 15th, 2011"; correct?

24   **A.**    Correct, yes.

25   **Q.**    And it was your understanding, was it not, that you had to

**GERSH - CROSS / LITTLE**

1  be done by August 15th?

2  **A.**    That's correct, yes.

3  **Q.**    And if we take a look at page 2 of this document, the

4  chart up at the top, this lists the various people that are

5  going to be working on this transaction, and the total budget

6  is $650,000; is that right?

7  **A.**    That's correct, yes.

8  **Q.**    Was there initially a larger budget for this project?

9  **A.**    Yes, there was a larger budget.

10  **Q.**    What was the larger budget?

11  **A.**    The larger budget anticipated us getting access to

12  Autonomy, being able to hold much more detailed diligence

13  discussions, and potentially field work in the U.K.

14  **Q.**    And it was reduced down to $650,000?

15  **A.**    That's correct, yes.

16  **Q.**    It was HP that made that reduction; right?

17  **A.**    No, it was not.

18  **Q.**    Are you saying that Autonomy changed the Statement of

19  Work?

20  **A.**    No.    It was a mutually agreed reduction by us to reflect

21  what we thought and what we knew could be performed based on

22  the date of the Statement of Work.

23        So by August 3rd, it was apparent to us that we would --

24  it was unlikely we would get access to Autonomy in the U.K. and

25  that diligence was essentially telephone calls and whatever

**GERSH - CROSS / LITTLE**

1  data was being provided in the data room plus public

2  information.

3      So we -- we just couldn't have reached, I think it was,

4  1.2 million or thereabouts was the initial forecast, and 650

5  was a more -- was a realistic fee for the time scale and the

6  work that we were going to perform.

7  **Q.**   And that's what HP decided; right?  I mean, HP told you

8  that we're going to be doing $650,000 worth of work, not

9  $1 million; right?

10 **A.**   No, it wasn't HP that decided.  HP and ourselves came

11 to -- I -- we told HP for a full diligence in the time frame if

12 we had access to the U.K. or if we had access to Autonomy in

13 the U.K. and it was what we would expect to be a detailed

14 diligence for this size of target, it would be 1.2.

15     Once we got into diligence and we could see that we

16 weren't going to get access to Autonomy in the U.K., there was

17 only limited calls and there was very limited information, we

18 realized the fee probably wouldn't get -- we would get nowhere

19 near 1.2 million, and we told HP we thought a realistic fee was

20 probably 650,000, and they said fine.

21     They didn't -- they didn't tell us to -- we could only do

22 $650,000 of work.  We told them that's what we thought was

23 reasonable, and they agreed to it.

24 **Q.**   That's what would be reasonable to get done between

25 August 3rd and August 15th, right, 12 days?

1    **A.**    Yes.  Based on what we knew of the logistics and the

2    structure of diligence, yes.  If we'd -- if Autonomy had

3    suddenly said, "Come and sit with us in the U.K. and we'll give

4    you much more information than we're providing," then we could

5    have changed the fee.  So it wasn't -- it wasn't a cap.  It was

6    just this was the fee that we felt reflected the amount of work

7    that we could do in the time frame.

8    **Q.**    And that's what HP understood; right?

9    **A.**    Yes.  We'd -- there was many instances where we'd -- if

10   diligence went longer, we could -- we would increase the fee in

11   the original Statement of Work.

12   **Q.**    And it was HP's decision that the diligence not go longer;

13   correct?

14          **THE COURT:**  You mean as distinct from KPMG?

15          **MS. LITTLE:**  As distinct from Autonomy.

16   **Q.**    It was HP's decision that this needed to be done by

17   August 15th; right?

18   **A.**    Well, HP and Autonomy had --

19   **Q.**    Can you answer my question, sir?  Was it HP's decision

20   that this needed to be done by August 15th?

21   **A.**    So HP informed me that they were having a board meeting

22   on --

23   **Q.**    Can you answer my question?

24          **MR. LEACH:**  He's trying.  Objection.

25          **THE WITNESS:**  Can you repeat the question?  Was it

1    HP's decision?  Sorry.

2    **BY MS. LITTLE:**

3    **Q.**   Was it HP's directive to you and its decision that this

4    needed to be done by August 15th?

5    **A.**   Yes.

6    **Q.**   If you take a look in the middle of page 2 under

7    "Additional Terms, Due Diligence," paragraph (a).  Do you see

8    there, sir, it says (reading):

9             "The procedures that Supplier will perform" --

10           "Supplier" is KPMG; right?

11   **A.**   Yes, that's correct.

12   **Q.**   (reading)

13           "The procedures Supplier will perform are limited to

14           those referred to in the applicable Statement of Work and

15           are limited in nature and extent to those that HP has

16           determined meets its needs and, as such, will not

17           necessarily disclose all significant matters about

18           Target."

19           Do you see that?

20   **A.**   Yes, I do.

21   **Q.**   And that's language that HP agreed to; correct?

22   **A.**   This is standard -- this is language that -- this is KPMG

23   language that is used for all our due diligence engagements.

24   It is standard form KPMG language.

25   **Q.**   And I'll ask again.  This is language that HP agreed to;

1    correct?

2    **A.**    Yes.   It is in their Statement of Work that they signed,

3    correct.

4    **Q.**    And it goes on to say that the due diligence may not

5    reveal errors in the underlying information, instances of fraud

6    or illegal acts, et cetera, et cetera.   So there are

7    limitations to what due diligence is going to be able to

8    provide; correct?

9    **A.**    That's correct.

10    **Q.**    And HP knew that?

11    **A.**    HP did know that, correct.

12    **Q.**    You signed -- or KPMG signed this Statement of Work on

13    August 2nd, I believe.   If we look at page 7.

14        Oh, excuse me.   August 3rd.   I'm corrected.   It was signed

15    on August 3rd.   Is that when you signed it?

16    **A.**    Yes, that's correct.

17    **Q.**    And if I could direct your attention, please, to page 9 of

18    this agreement, item 7, Bullet Number 7.   This is a list of

19    various tasks -- well, excuse me.   Let me go back.

20        Let's go back to page 8.   It says "Project Tesla - Due

21    Diligence Assistance"; correct?

22    **A.**    Correct.

23    **Q.**    And then over the next several pages -- you can look in

24    your book or we can look at it on the screen -- these are

25    basically lists of items that KPMG is prepared to try to

1    address; correct?

2    **A.**   That is correct, yes.

3    **Q.**   And we've got, I guess, six items on page 8.  If we look

4    at page 9, it goes to Number 10.  Keep going through several

5    pages.  Let's just keep going all the way to page -- this is

6    page 6 of the agreement, item 52.

7         You've got 52 things that you say are going to be

8    addressed in due diligence?

9    **A.**   That is correct, yes.

10   **Q.**   Did you actually expect you were going to be able to

11   address all 52 of these tasks in 12 days?

12   **A.**   If we were given data, then, yes.

13   **Q.**   In 12 days you were going to do all these things?

14   **A.**   Yes.

15   **Q.**   Okay.  Did you?

16   **A.**   No.

17   **Q.**   Going back, then, to page 9, Item Number 7, is this also

18   part of a standard KPMG template?

19   **A.**   It's derived from -- there's a standard set of procedures

20   that we start from, but each of them are tailored to the

21   specific engagement and the specific company we're looking at.

22   So this was -- this was heavily modified to reflect -- reflect

23   the fact that we were doing due diligence on Autonomy.

24   **Q.**   And was this particular paragraph, paragraph 7, one of the

25   paragraphs that was modified?

1  A.   Yes.

2  Q.   And this paragraph reads (reading):

3            "At your request, KPMG will read the financial terms

4       of the 20 largest customer contracts and 20 largest

5       partner and VAR contracts by value in each of 2010 and

6       2011 and comment on standard and nonstandard contract

7       terms and issues having a potential revenue recognition

8       impact."

9       Do you see that?

10  A.   Yes, I do.

11  Q.   And that's the language that KPMG and HP worked out?

12  A.   Yes, it is.

13  Q.   And the point, according to this, of looking at these

14  contracts is to read their financial terms and comment on

15  nonstandard contract terms; correct?

16  A.   That is correct, yes.

17  Q.   And there's nothing in here about creating any kind of

18  list of contracts or list of customers; correct?  It's just

19  talking about reading the financial terms of the contracts?

20  A.   Sorry.  What is your reference to list of customers?

21  Q.   Well, there's -- that's my point, is there is no reference

22  in here to making a list of customers; right?

23  A.   No, there isn't.  This is a specific reference to us

24  reading the terms of the 20 largest customer contracts.

25  Q.   And the purpose -- I think you've testified about this on

1    direct -- the purpose of your having access to these contracts

2    is to read the terms of the contract and understand whether --

3    you know, what the terms are, how things are going to change

4    after the acquisition.  It's sort of the substance of the

5    contract terms; correct?

6    **A.**   It's to read the contract terms and give a perspective on

7    what we think the revenue recognition would be under U.S. GAAP

8    for those specific contracts.  It's not the post-acquisition

9    implication because you've already signed the contracts.  It

10   was to give HP a sense as to if they had these contracts, what

11   would -- how would the revenue have looked under their

12   accounting policies.

13   **Q.**   Okay.  In the course of this due diligence, you worked

14   with a number of people at HP, didn't you?

15   **A.**   Yes, I did.

16   **Q.**   And you've mentioned Mr. Johnson?

17   **A.**   Uh-huh.

18   **Q.**   And you've mentioned Mr. Sarin?

19   **A.**   Uh-huh.

20   **Q.**   You've mentioned Ms. Hsiao?

21   **A.**   Uh-huh.

22   **Q.**   What other people at HP did KPMG work with on the due

23   diligence?

24   **A.**   John Blank and Katherine Harvey, Allison Strathmeier and

25   Meeta Sunderwala, Steve Messier.  Those are the ones I can

GERSH - CROSS / LITTLE

1  recall.

2  Q.   Did you work with people from what's called MADO, mergers,

3  acquisitions --

4  A.   MADO, yes.  I can't recall if they were involved in

5  diligence.  They were definitely involved from September

6  onwards.

7  Q.   You testified on direct about first learning about this

8  transaction in July of 2011, and you were shown Exhibit 2011,

9  which is in evidence.

10      Why don't we pull that up.

11      This is the e-mail where you're first learning -- you said

12  you learned the day before about the merger?  Potential merger

13  I should say.  (reading)

14          "John Blank called me yesterday.  HP's considering

15      the acquisition."

16      Do you recall this?

17  A.   Yes, I do.

18  Q.   Okay.  And you understood at this point that there was an

19  agreement in principle between HP and Autonomy; correct?

20          MR. LEACH:  Objection.  Vague.  Foundation.

21  BY MS. LITTLE:

22  Q.   Did you understand on July 23rd, 2011, that there was an

23  agreement in principle between HP and Autonomy?

24  A.   I knew they were trying to reach an agreement.  I didn't

25  know they had an agreement in principle.

1    **Q.**    Okay.  Would you take a look, please, sir, in your other

2    binder, the white binder, at Exhibit 5078?  This is notes of an

3    interview you gave to the FBI in 2016.  It's 5078 and take a

4    look at page 3, please.

5    **A.**    (Witness examines document.)

6            **THE COURT:**  What number is it?

7            **MS. LITTLE:**  5078 at page 3.  And let me find it.

8                        (Pause in proceedings.)

9    **BY MS. LITTLE:**

10   **Q.**    Well, actually, so I'm looking under where it says "Tab

11   2."  You understood there was an agreement on the price,

12   correct?

13           **MR. LEACH:**  Objection, Your Honor.  This relates to a

14   different document with a different date.

15           **MS. LITTLE:**  Well, let me --

16           **THE COURT:**  Sustained.

17   **BY MS. LITTLE:**

18   **Q.**    Did you understand that there was an agreement on price as

19   of the time you were having this e-mail correspondence about a

20   deal?

21   **A.**    The e-mail of the 23rd or the one that's referenced here

22   on the 29th?

23   **Q.**    The e-mail on the 23rd, did you understand there was an

24   agreement on price?

25   **A.**    Well, John Blank had told me there was no agreement on

GERSH - CROSS / LITTLE

1    price.

2    **Q.**    Okay.  But he said that the price looks to be in about the

3    $10 billion range?

4    **A.**    Yes, that's correct.

5    **Q.**    You understood that; right?

6    **A.**    Yes.

7    **Q.**    And you also understood that HP hoped to announce this

8    deal on August 18th; correct?

9    **A.**    That's correct, yes.

10    **Q.**    And that's why the due diligence had to be done by

11    August 15th?

12    **A.**    That's correct.

13    **Q.**    And you were planning to be on vacation for the next two

14    weeks; right?

15    **A.**    That's correct, yes.

16    **Q.**    And you reference that down in the second-to-the-last

17    paragraph of this e-mail.  You say (reading):

18         "Both Jamie and I" --

19    Jamie is who?

20    **A.**    Jamie is Jamie Boggs, who's one of the directors on my

21    team who supports me on HP engagements.

22    **Q.**    Okay.  So (reading):

23         "Both Jamie and I are scheduled to be on vacation for

24    the next two weeks."

25    And I think you testified you were in Florida for the

1   first call?

2   **A.**   That's correct, yes.

3   **Q.**   So you didn't -- you weren't able to really start in

4   earnest on this until August 1st?

5   **A.**   Well, I don't want to confuse the vacation with starting.

6   We weren't able to start in earnest because the only

7   information we had up through August 1st was the public

8   filings.  So I'd read those on the weekend of the 23rd when

9   John Blank had told me about the transaction, but there wasn't

10  a whole lot we could do.

11  **Q.**   Okay.  And then let's take a look at Exhibit 2038, which

12  is also in evidence.  And this is the e-mail that Mr. Leach was

13  just asking me about.

14       This is the July 29th e-mail.  And you say in here, "HP

15  has agreed pricing for project Atlantis"; correct?

16  **A.**   That's correct, yes.

17  **Q.**   So as of July 29th, it was your understanding that there

18  was an agreed price?

19  **A.**   Yes.

20  **Q.**   Okay.  And then, I guess, you had to come back from

21  vacation early?

22  **A.**   Yes.

23  **Q.**   Okay.  And you worked on due diligence for the next couple

24  of weeks; right?

25  **A.**   Yes.  We really worked in earnest through to the date of

1  the report.  Then there was miscellaneous e-mails from then

2  till the Deloitte call, but there wasn't -- it was really

3  through to August 9th or 10th was when we were able to work in

4  earnest I'd say.

5  **Q.**    Okay.  And the date of the report that we've seen was

6  August 9th?

7  **A.**    I'm forgetting.  9th or 10th, yeah.

8  **Q.**    So the bulk of your work really was conducted that first

9  week of August?

10  **A.**    Yes, correct.

11  **Q.**    Okay.  You and your team never went to Autonomy in the

12  U.K.; correct?

13  **A.**    That is correct, yes.

14  **Q.**    And that was because of a fear of -- it was because of the

15  confidentiality concerns; correct?

16  **A.**    I don't know.  We just -- we were told we just couldn't go

17  to Autonomy.

18  **Q.**    And that was HP that told you that?

19  **A.**    HP told us but I don't know who made the decision.

20  **Q.**    Okay.  And it's fair to assume that if a bunch of HP and

21  KPMG showed up in Cambridge, England, that might be a tip-off

22  to somebody; correct?

23  **A.**    It depends.  It depends on the number.  It depends on --

24  it's often the case where you'll visit a target during a due

25  diligence, so I think it's a facts and circumstances and how

1   people are presented or introduced or the number of them.

2   **Q.**   But there was great concern about confidentiality here;

3   correct?

4   **A.**   Yes, correct.

5   **Q.**   You've seen a number of documents in your direct testimony

6   about concern about confidentiality?

7   **A.**   Yes.  That was a big concern.

8   **Q.**   There were limitations on the number of people to

9   participate in phone calls because of that concern?

10  **A.**   Yes.

11  **Q.**   Limitations on the number of HP people on calls; correct?

12  **A.**   Correct.

13  **Q.**   Limitations on the number of Autonomy people on calls?

14  **A.**   Correct.

15  **Q.**   Limitations on the number of KPMG people on calls?

16  **A.**   Correct.

17           **THE COURT:**  Is now a good time?

18           **MS. LITTLE:**  Now is a good time.

19           **THE COURT:**  Okay.  Ladies and gentlemen, we're going

20  to take our recess.

21      Remember the admonition given to you:  Don't discuss the

22  case, allow anyone to discuss it with you, form or express any

23  opinion.

24      I will see you 9:00 o'clock on Monday.  Remember Monday

25  and Friday of next week.

1        Thank you.

2        (Proceedings were heard out of the presence of the jury:)

3        **THE COURT:**  Okay.  Let the record show the jury has

4    left.

5        So we have the cross-examination of the witness, and then

6    who -- and then we have one more witness; is that right?

7        **MR. FRENTZEN:**  Matt Stephan on Monday and then

8    probably a custodian from SHI.

9        **THE COURT:**  A custodian?  I mean, really, we can't

10   stipulate?

11       **MR. FRENTZEN:**  Oh, he's not a custodian.  I'm sorry,

12   Your Honor.  I apologize.

13       **MR. REEVES:**  He's a short witness, though.

14       **MR. FRENTZEN:**  He's not a custodian.

15       **THE COURT:**  He's not a custodian.  Okay.  So we

16   have --

17       **MR. FRENTZEN:**  SHI.

18       **THE COURT:**  -- SHI.

19       **MS. LITTLE:**  Mr. Johnson?  Is Mr. Johnson here on

20   Monday?

21       **MR. FRENTZEN:**  I don't know because I don't know how

22   much more you have with Gersh.  I mean -- yeah, Gersh.

23       **THE COURT:**  Well, let me ask that.

24       How much longer do you have?  And I'm not suggesting you

25   don't have -- I'm not suggesting you shouldn't take the time

**PROCEEDINGS**

1    necessary.

2              MS. LITTLE:  Having the weekend will likely make it

3    shorter, so --

4              THE COURT:  Okay.  There we go.  Well, shorter.  Now,

5    do you care to give an estimate?

6              MS. LITTLE:  I don't know.

7              THE COURT:  Maybe it was three days and now you're

8    down to two.

9              MS. LITTLE:  I don't know.  45 minutes to an hour.

10             THE COURT:  Okay.  All right.  That's helpful.

11        All right.  Now, given that -- and then you have who on

12   Monday?

13        MR. FRENTZEN:  Stephan, SHI, maybe Johnson but we've

14   got to talk about Johnson.  So he's a possible.  We've got to

15   go back and sort out where we're at.

16             THE COURT:  All right.  So, anyway, Monday will be

17   filled?

18        MR. FRENTZEN:  Oh, yeah.

19             THE COURT:  Oh, okay.  That's nice.

20        Then we get to Friday.

21        MR. FRENTZEN:  The expert, Your Honor.

22             THE COURT:  The expert on Friday.  Okay.  And that

23   will be the day -- or that will be a full day.

24        MR. FRENTZEN:  Yeah.  I think we may have somebody

25   else on deck too, but I can't remember who.

1      **THE COURT:**  All right.

2      **MR. FRENTZEN:**  Oh, yeah, possibly Moreland, Paul

3  Moreland, on Friday.  We'll see how Friday goes.

4      **THE COURT:**  Okay.  So then we get to the following

5  Monday -- okay.  So Friday is the 13th.  So when we get to the

6  16th, and that's the day you promised to rest.

7      **MR. FRENTZEN:**  Well, Your Honor, that's the day we

8  promised to rest when we were putting on Yelland; and Brice is

9  going to be, I think, substantially more time as we talked

10  about when we had that discussion.  And so I think we've got to

11  go back and take a look, but I think Tuesday is a little more

12  realistic at this point because the --

13      **THE COURT:**  Tuesday the 17th?

14      **MR. FRENTZEN:**  Correct.

15      **THE COURT:**  Okay.  All right.  Well, that's what you

16  represented.

17      **MR. FRENTZEN:**  Brice has added a fair amount of time

18  over Yelland.  That's all.

19      **MS. LITTLE:**  Do you have anyone after Brice or you

20  have Mr. Lindsell?

21      **SPECIAL AGENT BRYANT:**  We still have Mr. Lindsell.

22      **MR. FRENTZEN:**  Yeah, we've got the guy coming from the

23  U.K. from the F.R.C. and we've got the agent.

24      **THE COURT:**  Next week we'll have a better idea.

25      **MR. FRENTZEN:**  Yeah.

1        **THE COURT:**  Thank you.

2        Well, now, let me -- okay.  So you're not in any position

3    yet to say anything about your case?

4        **MR. KEKER:**  No.  We -- no, we're not, but we need to

5    know what the -- we'd like a proffer of what the agent is going

6    to testify about.  That could lead to a real can of worms.

7        **THE COURT:**  Well, the agent is not going to testify --

8    if you called the agent, when would the agent testify?

9        **MR. FRENTZEN:**  16th or 17th.

10       **THE COURT:**  Okay.

11       **MR. FRENTZEN:**  At this point it looks more like the

12   17th.

13       **THE COURT:**  All right.  Okay.  We'll see.

14       **MR. FRENTZEN:**  In five seconds, if you believe what's

15   on the Internet, I don't really understand -- or I didn't

16   understand the exact meaning of "woodshedding."  So let's say

17   vigorously pursued witnesses telling the truth rather than

18   "woodshedding" if there's a different term for that, which is

19   what I thought "woodshedding" was, Your Honor.

20       **THE COURT:**  Thank you.

21       **MR. FRENTZEN:**  Have a good weekend.

22       **MR. KEKER:**  This is really not my deal here.

23       **THE COURT:**  Okay.  Thank you, everybody.

24       **MR. LEACH:**  Thank you, Your Honor.

25            (Proceedings adjourned at 2:03 p.m.)

1

2

3                    **CERTIFICATE OF REPORTERS**

4         I certify that the foregoing is a correct transcript

5 from the record of proceedings in the above-entitled matter.

6

7 DATE:   Friday, April 6, 2018

8

9

10

11    _____

12    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
               U.S. Court Reporter

13

14

15

16    _____

17    Pamela A. Batalo, CSR No. 3593, RMR, FCRR
               U.S. Court Reporter

18

19

20

21

22

23

24

25