Volume 24

Pages 4826 - 5084

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CR 16-00462 CRB
                               )
SUSHOVAN TAREQUE HUSSAIN,      )
                               )
          Defendant.           )
_____)
                         San Francisco, California
                         Monday, April 16, 2018

                    TRANSCRIPT OF PROCEEDINGS
APPEARANCES:
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
               BY:  ROBERT S. LEACH
                    ADAM A. REEVES
                    WILLIAM FRENTZEN
                    ASSISTANT UNITED STATES ATTORNEYS


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
               BY:  JOHN W. KEKER
                    JAN NIELSEN LITTLE
                    BROOK DOOLEY
                    KATE LAZARUS
                    NIC MARAIS
                    ATTORNEYS AT LAW


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

<u>**I N D E X**</u>

Monday, April 16, 2018 - Volume 24

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **JOHNSON, ANTHONY** | | |
| (SWORN) | 4837 | 24 |
| Direct Examination by Mr. Leach | 4837 | 24 |
| Cross-Examination by Ms. Little | 4874 | 24 |
| Redirect Examination by Mr. Leach | 4907 | 24 |
| | | |
| **LINDSELL, DAVID CLIVE** | | |
| (SWORN) | 4913 | 24 |
| Direct Examination by Mr. Leach | 4913 | 24 |
| Cross-Examination by Mr. Keker | 4952 | 24 |
| Redirect Examination by Mr. Leach | 4979 | 24 |
| | | |
| **MEIERS, JOHN** | | |
| (SWORN) | 4981 | 24 |
| Direct Examination by Mr. Frentzen | 4981 | 24 |
| Cross-Examination by Mr. Marais | 4989 | 24 |
| Redirect Examination by Mr. Frentzen | 5003 | 24 |
| | | |
| **YELLAND, CHRISTOPHER** | | |
| (SWORN) | 5019 | 24 |
| Direct Examination by Mr. Reeves | 5019 | 24 |

<u>**E X H I B I T S**</u>

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 959 | | 4996 | 24 |
| 973 | | 4997 | 24 |
| 1553 | | 4844 | 24 |
| 1570 | | 4847 | 24 |
| 1573 | | 4848 | 24 |
| 1574 | | 4849 | 24 |
| 1579 | | 4853 | 24 |
| 1992 | | 4888 | 24 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2187 | | 4899 | 24 |
| 2306 | | 4861 | 24 |
| 2307 | | 4863 | 24 |
| 2309 | | 4864 | 24 |
| 2329 | | 4900 | 24 |
| 2404 | | 4868 | 24 |
| 2412 | | 4868 | 24 |
| 2426 | | 4871 | 24 |
| 2427 | | 4872 | 24 |
| 2486 | | 5034 | 24 |
| 2635 | | 4873 | 24 |
| 2637 | | 4872 | 24 |
| 2709 | | 4853 | 24 |
| 2710 | | 4841 | 24 |
| 3035 | | 4911 | 24 |
| 3036 | | 5006 | 24 |
| 3037 | | 5006 | 24 |
| 3038 | | 5006 | 24 |
| 3059 | | 4940 | 24 |
| 3060 | | 4930 | 24 |
| 3061 | | 4944 | 24 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 6839 | | 4887 | 24 |
| 6843 | | 4898 | 24 |
| 6845 | | 4905 | 24 |
| 6847 | | 4879 | 24 |
| 6856 | | 4891 | 24 |
| 6857 | | 4893 | 24 |
| 6858 | | 4894 | 24 |
| 6859 | | 4894 | 24 |
| 6860 | | 4895 | 24 |
| 6861 | | 4882 | 24 |
| 6863 | | 4902 | 24 |
| 6972 | | 5000 | 24 |
| 6975 | | 4993 | 24 |
| 6976 | | 4994 | 24 |
| 6977 | | 4995 | 24 |
| 6982 | | 4998 | 24 |
| 7006 | | 4906 | 24 |
| 7007 | | 4896 | 24 |

```
 1   Monday - April 16, 2018                        9:02 a.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4        (Proceedings were heard out of presence of the jury:)

 5             THE COURT:  Let the record reflect the jurors are not

 6   present, but the parties are.

 7        Good morning.

 8        So how are we on scheduling and so forth?

 9             MR. REEVES:  Right on track.

10             THE COURT:  Preview.  Preview.  I need a preview.

11             MR. REEVES:  The Government plans to call Mr. Johnson

12   this morning.

13             THE COURT:  Okay.

14             MR. REEVES:  Followed by Mr. Lindsell, followed by

15   Mr. Meiers, if he is here.  He is traveling this morning, but

16   we expect him to be here this afternoon.  Followed by

17   Mr. Yelland, who has traveled from the UK to San Francisco.

18             THE COURT:  Great.

19             MS. LITTLE:  May I ask, do you --

20             THE COURT:  Yes.  Good morning.

21             MS. LITTLE:  Good morning, Your Honor.

22        Do you plan to put Mr. Yelland on today?  He was disclosed

23   to be for tomorrow.  We were not expecting him to be today.

24             THE COURT:  Well, look, if they get to him, he's going

25   on.
```

PROCEEDINGS

1          **MR. REEVES:**  Right.

2          **THE COURT:**  That's the way it is.  I want to finish.

3  I'm sure he'll be -- while I expect his direct to be one hour,

4  I -- I will certainly, if you wish -- if for some reason he

5  finishes, concludes, you don't have to cross him until

6  tomorrow.

7          **MS. LITTLE:**  Fair enough.

8          **THE COURT:**  Okay.  If that happens, but nothing ever

9  happens on time.

10      The charts?

11          **MR. REEVES:**  Yes.

12          **THE COURT:**  Good morning.

13          **MR. KANIG:**  Good morning, Your Honor.

14          **THE COURT:**  Who might you be?

15          **MR. KANIG:**  I am Ian Kanig for Mr. Hussain.

16          **THE COURT:**  Have you already spoken?

17          **MR. KANIG:**  At the pretrial conference.

18          **THE COURT:**  It's been years.

19          **MR. KEKER:**  He has been working as hard as everybody

20  else.  You just haven't seen him.

21          **THE COURT:**  The people I don't see work harder than

22  the people I see.

23          **MR. KANIG:**  No comment.

24          **THE COURT:**  Much to the regret of families and a

25  person's life.

PROCEEDINGS

```
1        Yes.  Go right ahead.
2            MR. KANIG:  We believe this chart is completely
3    improper under Rule 1006.  There is no proper foundation for
4    the chart.
5        First of all, there are documents that underlie this that
6    total 13,290 pages.  They are assembled into a hundred
7    different exhibits that are really just a Trojan horse, an
8    amalgam of emails --
9            THE COURT:  An amalgam?
10           MR. KANIG:  That's right, Your Honor.
11           THE COURT:  Is that like an amalgam?
12           MR. KANIG:  It would be if I pronounced it correctly.
13           THE COURT:  Well, no, either way, it's -- I think the
14   British pronunciation is "amalgam."
15           MR. KANIG:  Well, that would be appropriate.
16           THE COURT:  Okay.
17           MR. KANIG:  There are documents in here that postdate
18   the relevant period by years:  2015, 2014.  A settlement
19   agreement between HP and Prisa from 2014.  There are documents
20   in here that have nothing to do with this case.  If Mr. Yelland
21   was relying on them, as the Government says he was, the chart
22   is completely improper.
23       We also believe the chart is improperly argumentative under
24   every decision that has ever been decided in the Northern
25   District of California that I have seen.  They all say that it
```

**PROCEEDINGS**

 1   has to be a neutral summary of the record, and these documents

 2   simply are not that.

 3       This is an argument that is disguised as a summary chart,

 4   and it would be completely improper to admit it.

 5           **MR. REEVES:**  Can I please hand up what has been marked

 6   as Exhibit 2749, please.  This is the summary chart.

 7       Although you may need a magnifying glass for portions of

 8   this, I respectfully submit, Your Honor, that there is

 9   nothing --

10           **THE COURT:**  Are you actually going to introduce

11   something that looks like this?

12           **MR. REEVES:**  We are and we are going to enlarge it.

13           **THE COURT:**  Well, that's just useless.  I don't even

14   know -- I mean, this is -- really?  This size?

15           **MR. REEVES:**  Your Honor, may I be heard, please?

16           **THE COURT:**  Well, of course you can be heard, but, I

17   mean, I have to know -- I have to look at something and -- no,

18   I -- I mean, at least the -- these are -- the back pages are --

19   oh, no, not again.  I mean -- this?

20           **MR. REEVES:**  Can I explain, please?

21           **MR. KANIG:**  127 transactions.

22           **THE COURT:**  Let's start at the beginning.

23       Tell me how you are going to explain how a juror who looks

24   at this will possibly be able to read it?  Let's start with

25   that.

1          MR. REEVES:  With the magnifying facility on the

2    computer, Your Honor.

3          THE COURT:  Oh, so in other words, we have all figured

4    out a computer is going back there and --

5          MR. REEVES:  With the enlarging mechanism that we have

6    been using in Court.

7          THE COURT:  We will go beyond that.  Why is it

8    admissible?  All the counsel's arguments are it's -- it really

9    shouldn't come in under 1006.  That's not to say it can't be

10   used as a demonstrative, but if it's used as a demonstrative,

11   it's not going back in the jury room as evidence.

12       So how do you answer his cogent arguments, Mr. Reeves?

13          MR. REEVES:  I answer by saying it is not argumentive.

14   If you simply look at it, it is a summary of the correct

15   accounting for the consolidated group report following the ASL

16   restatement, and it does nothing but get the accounting correct

17   at the group level.

18       Yes, it's difficult to read, but if you look at page 2, it

19   is simply a summary of the correct accounting.

20       It is further broken down by relevant quarters and

21   specific deals that are of great relevance to the case and

22   which I think, based on the amount of evidence and the

23   complexity of the evidence would be difficult for the jury to

24   understand without a summary like this, are reflected on

25   quarterly summaries as, for example, on page 4 of the exhibit.

1          It is incorrect to say that this is a summary that is not

2    based on the business records of HP.

3          **THE COURT:**  Are all the business records supporting

4    this summary in evidence now?

5          **MR. REEVES:**  Not all of them.  Some of them, and all

6    of them that support the summary are identified on a very

7    comprehensive --

8          **THE COURT:**  It can be a demonstrative.  It is not

9    admitted into evidence.  Not admitted into evidence.

10          **MR. KANIG:**  We would ask that the exhibits are not

11    allowed into evidence either, as they are clearly inadmissible

12    documents.

13          **THE COURT:**  I don't know what exhibits we're talking

14    about now.  If an exhibit is given to me, I'll rule as to

15    whether or not it's admissible.  But this is a chart that

16    you're seeking as a summary under 1006.

17          **MR. REEVES:**  That's correct.

18          **THE COURT:**  Right.  Okay.  And the Court is

19    concerned -- a variety of reasons, one of which is I understand

20    from 1006, all the documents have to have been identified, have

21    to --

22          **MR. REEVES:**  They've been identified.

23          **THE COURT:**  They don't all have to be in evidence,

24    because that's the point of the summary, I think.  If you have

25    a hundred thousand pieces of paper, you don't have to put a

**PROCEEDINGS**

1   hundred thousand pieces of paper into evidence in order to get

2   a summary.  But they have to be accurate.  I don't know whether

3   they're accurate or not.

4        They have to be not -- they have to be not susceptible of,

5   quote, an interpretation or technical expertise.  They have to

6   be just, you know --

7            **MR. REEVES:**  Business records.

8            **THE COURT:**  That a lay person -- well, a business

9   record can be very complicated and can be -- to understand it

10  may have required technical expertise.

11       Anyway, that's the ruling.  They are not admissible under

12  1006.  They are admissible for purposes of a demonstrative.

13       You can use it all you want to with a witness.  You can

14  use it all you want to in argument.

15       Thank you.

16           **MR. KANIG:**  Thank you, Your Honor.

17           **THE COURT:**  Okay.  Bring in the jury.

18       (Proceedings were heard in the presence of the jury:)

19           **THE COURT:**  Let the record show all jurors are

20  present, parties are present.

21       Good morning, ladies and gentlemen.  Thank you again for

22  being so prompt.

23       And we are proceeding with the Government.  Mr. Leach,

24  your next witness.

25           **MR. LEACH:**  Thank you, Your Honor.  Good morning.

```
 1        Good morning, ladies and gentlemen.

 2        The United States calls Andy Johnson.

 3            THE CLERK:  Please stand to be sworn.  Please raise

 4   your right hand.

 5                        ANTHONY JOHNSON,

 6   called as a witness for the Government, having been duly sworn,

 7   testified as follows:

 8            THE CLERK:  Thank you.  Please be seated.

 9        Please state your full name for the record and spell your

10   last name.

11            THE WITNESS:  Full name is Anthony Andrew Johnson.

12   Last name is spelled J-O-H-N-S-O-N.

13            THE CLERK:  Thank you.

14                       DIRECT EXAMINATION

15   BY MR. LEACH:

16   Q.   Good morning, Mr. Johnson.

17   A.   Good morning.

18   Q.   Where do you live, sir?

19   A.   I'm sorry?

20   Q.   Where do you live?

21   A.   I live in Burlingame, California.

22   Q.   What do you do for a living?

23   A.   I work for a Silicon Valley startup company called

24   AlienVault in San Mateo, California.

25   Q.   You would please walk us through your educational and
```

1    professional background.

2    **A.**    Yes.

3         Education, I have a computer science degree from the

4    University of Virginia.  I followed that up with an MBA from

5    Stanford.

6         When I left Stanford, I went to work for a company called

7    the Boston Consulting Group, a management consulting firm.

8    Left that company, went to a small startup called Pacific

9    Microsonics.  Was there about five years.  That company was

10   acquired by Microsoft.

11        That took me to about the year 2000, at which point I

12   joined a company called Brocade, which made storage networking

13   equipment for about five years.  And then at that point in

14   2006, early 2006, I joined the corporate development team at

15   Hewlett-Packard, stayed there until about 2013, at which time I

16   left and then joined AlienVault, which is the company I'm at

17   right now in early 2014.

18   **Q.**    You worked for HP from 2006 to 2013?

19   **A.**    That's correct.

20   **Q.**    You were in the corporate development group?

21   **A.**    That's correct.

22   **Q.**    What is the corporate development group?

23   **A.**    Corporate development group works with the different

24   business units on mergers and acquisition strategy and then

25   mergers and acquisition execution.

JOHNSON - DIRECT / LEACH

1    Q.    Let me draw your attention to the time period January

2    2011.  Do you have that time period in mind?

3    A.    Yes.

4    Q.    What was your title at that point?

5    A.    Vice-president of strategy and corporate development.

6    Q.    Who did you report to?

7    A.    At that time, I reported to a person named Brian

8    Humphries.

9    Q.    And who did Mr. Humphries report to?

10   A.    Brian reported to Shane Robison, who I believe his title

11   was executive vice-president of strategy for HP.

12   Q.    And did you supervise people as the vice-president of

13   strategy and corporate development?

14   A.    I did.  I probably had four to five people at that time.

15   Q.    And were you responsible for a particular business unit at

16   that point in time?

17   A.    Yeah.  I believe it was two.  The way the team was

18   structured was each of us worked with different business units.

19   At that time, I had the -- what is called the enterprise group

20   which was the networking, storage, server division, and then I

21   also had the software group as well.

22   Q.    And when you say enterprise and storage, what did that

23   entail?

24   A.    At that point, HP -- they considered their Enterprise

25   product line.  They had two server lines, one based around a

JOHNSON - DIRECT / LEACH

1    software operating system called Unix and one basically around

2    the Microsoft X86.  They had a storage division and then a

3    networking division as well so they called that the Enterprise

4    Group.

5    **Q.**    You said there was a software group.  What did that

6    comprise of?

7    **A.**    The software group comprised of Enterprise software

8    products.  They had some management software, very popular

9    product called OpenView and assorted other products as well.

10   **Q.**    Mr. Johnson, would you mind pulling the microphone just a

11   little bit closer so we can hear you a little better.

12   **A.**    Sure.  Is that better?

13   **Q.**    That's better.  Thank you.

14        Are you familiar with a company called Autonomy?

15   **A.**    I am, yes.

16   **Q.**    How did you become familiar with Autonomy?

17   **A.**    I probably heard about Autonomy back in my Brocade days

18   when I had -- just bankers would come in and talk about

19   different companies, and Autonomy was mentioned at that time

20   and then had subsequently heard their name off and on since

21   that time frame.

22   **Q.**    In the 2010 time period, were there occasions where

23   Autonomy came to your attention as the vice-president of

24   strategy and corporate development?

25   **A.**    It's possible, but not in any kind of serious way.  Yes.

1    I don't remember a specific incidence.

2    **Q.**    Would you please look at what I've placed before you as

3    Exhibit 2710.

4    **A.**    Yep.  Got it.

5    **Q.**    Is this a meeting maker involving you and others for a

6    Halo meeting on or about February 3rd, 2011?

7    **A.**    That's correct.  Yes.

8              **THE COURT:**  Admitted.

9              (Trial Exhibit 2710 received in evidence)

10                  (Exhibit published to jury.)

11   **BY MR. LEACH:**

12   **Q.**    Mr. Johnson, let me just orient you for a moment.  Do you

13   see the name Brian Humphries in the "to" line next to you?

14   **A.**    Yes, I do.

15   **Q.**    He was your boss at the time?

16   **A.**    That's correct.

17   **Q.**    And the subject is "Halo Frank Quattrone meeting."  Do you

18   see that?

19   **A.**    Yes, I do.

20   **Q.**    Who is Frank Quattrone?

21   **A.**    At that time, Frank Quattrone was an investment banker

22   with a company called Qatalyst.

23   **Q.**    What is meant by "Subject:  Halo Frank Quattrone meeting"?

24   **A.**    So Halo is the acronym for HP's -- at that time it was

25   internal video conferencing system, and so we just referred to

1  meetings that we were going to hold in rooms that were --

2  specifically had that equipment set up as Halo meetings.

3  Q.   And did you meet with Mr. Quattrone and others on or about

4  February 3rd, 2011?

5  A.   That's correct, yeah.

6  Q.   What was the meeting about?

7  A.   General -- I would say general overview of Autonomy.  He

8  had, I think -- had contacted Shane Robison about getting

9  together, and so this was what I call a typical first meeting

10  with the company to learn a little bit more about what they do,

11  a little bit about their products, but fairly high level, from

12  what I remember.

13  Q.   Who attended this meeting?

14  A.   So at this meeting, it would have been Shane, myself,

15  Brian Humphries.  Frank Quattrone was there.  Mike Lynch was

16  there.  I believe Mr. Hussain was there on video conference.

17  And then Andy Kanter was there.  I believe he was on video

18  conference as well.

19  Q.   Okay.  So there were some folks in Palo Alto and other

20  folks on video conference.  Where did you understand them to

21  be?

22  A.   I don't remember where Andy Kanter was, but Mr. Hussain

23  was in London.

24  Q.   And you described this as a typical first meeting.  What

25  did you mean by that?

1   **A.**   Well, a company like HP often gets a lot of requests to

2   meet with companies and so will have these meetings, and

3   generally you start at a very high level because we're talking

4   to a lot of companies all the time so it's useful to help

5   orient us to some of the real basics of the company, what they

6   do, what their products are, maybe a little bit about their

7   history sometimes, that sort of thing.

8   **Q.**   Okay.  This document, Exhibit 2710, indicates the meeting

9   was from 9:00 to 10:00.  Is that consistent with your memory?

10  **A.**   I think so.  Typically these meetings would be about an

11  hour, yeah.

12  **Q.**   Who did most of the talking at this meeting?

13  **A.**   It would have been Mike Lynch.

14  **Q.**   And how did it end?

15  **A.**   Generally you get to the end of the meeting and if anybody

16  has any questions, there is a couple of questions, but

17  generally it's "hey, let us think about this and we'll get back

18  to you if there is something else to do here."

19  **Q.**   At this first meeting, Mr. Johnson, was there any

20  discussion of Autonomy's financial performance?

21  **A.**   A little bit.  I think it had been prepared by the

22  Qatalyst team.  Some very high-level financial.  I don't recall

23  anything beyond some basic information.

24  **Q.**   Were there some type of presentation materials?

25  **A.**   I believe there was from Qatalyst, yes.

JOHNSON - DIRECT / LEACH

1    **Q.**    What is Qatalyst?

2    **A.**    The investment bank.

3    **Q.**    Mr. Quattrone's investment bank?

4    **A.**    Yes.  That's correct.

5    **Q.**    Okay.  Would you now please look at what has been marked

6    as Exhibit 1553.  Is this an email from Mr. Humphries to you

7    and Shane Robison relating to Autonomy?

8    **A.**    Yeah.  That's correct.  Yep.

9              **MR. LEACH:**  Your Honor --

10             **THE COURT:**  Admitted.

11             **MR. LEACH:**  Thank you.

12             (Trial Exhibit 1553 received in evidence)

13                    (Exhibit published to jury.)

14   **BY MR. LEACH:**

15   **Q.**    Let me draw your attention to the date, Mr. Johnson.  Do

16   you see the date of February 10, 2011?

17   **A.**    Yes.  Yeah.

18   **Q.**    So this is roughly a week after the Halo meeting we just

19   observed?

20   **A.**    That's correct, yep.

21   **Q.**    The subject is "Project Atlantis."  What that?

22   **A.**    That would have been our code name for Autonomy.

23   **Q.**    And Mr. Humphries wrote to you, "I spoke with Ian MacLeod

24   at Qatalyst concerning Project Atlantis.  Looks like Atlantis

25   is ready to listen to offers."

JOHNSON - DIRECT / LEACH

1        Do you see that?

2   **A.**    Yes.

3   **Q.**    Who is Ian MacLeod?

4   **A.**    Ian was at that time another investment banker at

5   Qatalyst.

6   **Q.**    And Atlantis is a reference to Autonomy?

7   **A.**    Yeah.  It would be pretty typical for us, for even

8   companies we might be thinking about M&A, just to assign a code

9   name just for confidentiality.

10  **Q.**    Mr. Humphries wrote, "Quattrone in contact with CEO for

11  well over a year now."

12        Do you see that?

13  **A.**    Yes, I do.

14  **Q.**    Who did you understand the CEO to be?

15  **A.**    Mike Lynch.

16  **Q.**    Further down below, it says, "CEO suggested willingness to

17  have discussions with potential suitors.  Qatalyst not formally

18  engaged but expect to represent Atlantis.  No formal process

19  initiated."

20        What did that mean?

21  **A.**    I guess at that time we kind of had understood that maybe

22  Autonomy would be interested in M&A discussions.

23  **Q.**    Beneath that it says, "CEO focused on keeping things

24  informal given UK takeover and disclosure laws.  Initial

25  meetings," quote, "with a few industry leaders over the coming

JOHNSON - DIRECT / LEACH

1    weeks."

2         What did you understand that to mean?

3    **A.**   Again, just more data points to suggest they might be open

4    to M&A discussions.

5    **Q.**   After this -- the initial Halo call -- well, withdrawn.

6         At this point in time, February of 2011, were you also

7    engaged with other potential software companies where HP was

8    contemplating an acquisition?

9    **A.**   Yes, we were.  I mean, typically we would -- as part of

10   our general strategy work, we'd think about other targets, and

11   at this time, in this time frame, we were pretty far into an

12   analysis with a co called TIBCO.

13   **Q.**   Further down below in this document it says, "Suggested

14   another Halo meeting by the end of the month and an FTF meeting

15   thereafter."

16        Do you see that?

17   **A.**   Yes.

18   **Q.**   Is FTF meeting face-to-face?

19   **A.**   Face-to-face, yeah.

20   **Q.**   At some point after this, was there another Halo meeting

21   with HP and folks from Autonomy?

22   **A.**   We had a follow-up one in March, yes.

23   **Q.**   Would you please look at what has been parked as Exhibit

24   1570.

25             **THE COURT:**  Admitted.

JOHNSON - DIRECT / LEACH

1              (Trial Exhibit 1570 received in evidence)

2                   (Exhibit published to jury.)

3    BY MR. LEACH:

4    Q.    Is this an email relating to the setup for the next Halo

5    meeting between HP and Autonomy, Mr. Johnson?

6    A.    Yeah.   That's correct, yes.

7    Q.    Can we please look at the bottom portion of this email.

8    Do you see where Mr. Humphries is emailing you on February 28th

9    and two folks named Marge Breya and Sham Chotai.   Am I

10   pronouncing that right?

11   A.    Chotai.

12   Q.    Chotai.   Excuse me.

13         Who are those folks?

14   A.    So Marge was the head of marketing for the software team

15   and Sham was one of the technology people in the software team.

16   Q.    And Mr. Humphries wrote, "I spoke with Quattrone a few

17   minutes ago.   He suggested Atlantis can bring us some slides

18   that show non-public information, but he also asked that we tee

19   up major areas of focus to help orchestrate the discussion.   We

20   have a separate issue now that their CFO will not be in the UK.

21   He will be in SF so I will check with Ashley to see if there is

22   a Halo room we can use in our SF office."

23         Do you see that?

24   A.    Yes.

25   Q.    Is the CFO there a reference to Mr. Hussain?

1    **A.**    That's correct.

2    **Q.**    Is this set up for a further Halo call that you're

3    anticipating having with Autonomy?

4    **A.**    Yeah.

5    **Q.**    Okay.  Please look at what has been marked as Exhibit

6    1573.  Is this another email in this chain setting up the Halo

7    meeting?

8            **THE COURT:**  Admitted.

9            (Trial Exhibit 1573 received in evidence)

10                (Exhibit published to jury.)

11   **BY MR. LEACH:**

12   **Q.**    Thank you, Your Honor.

13        Is this another email setting up the Halo meeting,

14   Mr. Johnson?

15   **A.**    Yeah.  It looks that way, yes.

16   **Q.**    Up at the top, there is an email from you to Frank

17   Quattrone on March 2, 2011.  Do you see that?

18   **A.**    Yeah, Uh-huh.

19   **Q.**    And there is an attachment, "questions for Friday.docx."

20   Do you see that?

21   **A.**    Yes.

22   **Q.**    And in advance of the Halo meeting, did you prepare a list

23   of questions to go through with the folks from Autonomy?

24   **A.**    Yes, we did.  Yeah.

25   **Q.**    Further below that, there is a list of representatives

1  from HP.  Do you see that?

2  **A.**   Where it starts with Shane, yes.

3  **Q.**   Can you please explain for us what their respective roles

4  are?

5  **A.**   Shane Robison was basically the executive in charge of the

6  group I was in.  So he was HP's executive vice-president, chief

7  strategy technology officer.  So he was responsible for a

8  number of the strategic and M&A teams in HP.

9      Brian Humphries was my direct boss.  Brian also managed

10  the strategy team at HP.

11      And then myself.

12      Marge Breya was the head of marketing for HP software.

13      And Sham was one of the technology VPs in the software

14  division.

15  **Q.**   If you could please look at the next document, 1574, which

16  appears to be an email from Mike Lynch to Sushovan Hussain

17  attaching "questions for Friday."

18      I offer it in evidence, Your Honor.

19          **THE COURT:**  Admitted.

20          (Trial Exhibit 1574 received in evidence)

21              (Exhibit published to jury.)

22  **BY MR. LEACH:**

23  **Q.**  Mr. Johnson -- can we scroll down to the bottom, please.

24      Do you see an email from you to Mr. Quattrone, Brian

25  Humphries and Ian MacLeod at Qatalyst?

JOHNSON - DIRECT / LEACH

1   **A.**   Yes, Uh-huh.

2   **Q.**   Does that appear to be a version of the email we just

3   looked at in the prior exhibit?

4   **A.**   Yes.

5   **Q.**   Does this document include the questions that you prepared

6   in advance of the Halo meeting?

7   **A.**   Yeah.   In the last two pages, yeah.

8   **Q.**   If we could please look at the second to the last page of

9   the exhibit.   There we go.

10      Let me draw your attention to the second bold bullet,

11   Mr. Johnson, "line of business review."  Do you see that?

12   **A.**   Yeah.   Right there.   Okay.

13   **Q.**   And then you wrote, "For each line of business, products

14   available today and key elements of the roadmap."

15      What were you getting at there?

16   **A.**   What we'd like to generally understand is hey, what are

17   the products that are sold today and anything interesting

18   coming down the road, again, just to help us get our bearings

19   straight on would the company did and what the company was all

20   about.

21   **Q.**   Is that something you were hoping to learn about in the

22   Halo meeting that you were setting up?

23   **A.**   Yes, uh-huh.

24   **Q.**   Further down there is a bullet, "Company performance,

25   market share over time, historical revenue growth, expected

JOHNSON - DIRECT / LEACH

1    revenue growth."

2        Why were you asking about those topics?

3    A.    Those are generally good business indicators of the

4    history of the company and how it's performed; again, kind of

5    lets us calibrate kind of how the company is doing in a little

6    more detail.

7    Q.    Why did that matter to you?

8    A.    Because generally the financial information might seem to

9    be at a high level and this allows us to dissect the company a

10   little better.  Just understand it.

11   Q.    Beneath that there is a bullet, "go-to-market approach,

12   OEM direct reseller."

13       What did that mean?

14   A.    So go-to-market is another way to say how do you sell your

15   products?  Do you use a direct sales force?  Do you sell them

16   through third parties?  So, again, it's -- while the first part

17   was trying to understand what products were sold, the second

18   part was trying to understand what was the selling motion they

19   went through to sell the products.

20   Q.    And then if you could look at the next page, please, there

21   are some questions touching on financial review.  Do you see

22   that?

23   A.    Yeah, Uh-huh.

24   Q.    "P&L for the next three years."  Is that profit and loss

25   statement?

1   **A.**   Yeah.

2   **Q.**   Is that the income statement?

3   **A.**   Yeah.  Profit and loss, yes.

4   **Q.**   And beneath that, it says "revenue gross margin by major

5   lines of business, product categories and revenue type."  Do

6   you see that?

7   **A.**   Yes.

8   **Q.**   Why were you inquiring about that?

9   **A.**   Again, just another way for us to understand the company

10  in a little more detail, understand which parts of the business

11  might be doing better or worse, general health of the business.

12  These would be pretty standard things that you would want to

13  understand about a company.

14  **Q.**   Why were you interested in gross margin?

15  **A.**   Gross margin is a very good indicator of the profitability

16  of a company.  The higher a gross margin, generally the higher

17  the profitability of the company, and generally a higher gross

18  margin means that the product has more differentiation in the

19  market because you can generally charge more for it.  It's a

20  very good indicator of the quality of the product.

21  **Q.**   And if we could please look at the next exhibit, what's

22  been marked as 1579.  Is this another email relating to the

23  upcoming Halo meeting or another email relating to the upcoming

24  Halo meeting?

25          **THE COURT:**  Admitted.

1           (Trial Exhibit 1579 received in evidence)

2                   (Exhibit published to jury.)

3           **THE WITNESS:**  Yes, uh-huh.

4    **BY MR. LEACH:**

5    **Q.**   Let me draw your attention to the middle portion of the

6    page, Mr. Johnson.  Do you see the email from Frank Quattrone

7    to Mr. Humphries on March 3rd?

8    **A.**   Yes.

9    **Q.**   And he wrote, "Sushovan will join us at your HQ and we can

10   start at 7:00 as planned.  Look forward to seeing you."

11          Sushovan is a reference to Mr. Hussain, the CFO of

12   Autonomy at the time?

13   **A.**   That's correct.

14   **Q.**   Finally, if we could please look at the next document,

15   2709.  Is this a meeting maker for the Halo meeting?

16   **A.**   Yeah.  That's correct.

17          **THE COURT:**  Admitted.

18          (Trial Exhibit 2709 received in evidence)

19                  (Exhibit published to jury.)

20   **BY MR. LEACH:**

21   **Q.**   And looking at the appointment down at the bottom, there

22   is that date March 4th, 2011, 7:00 a.m. to 10:00 a.m.  Do you

23   see that, Mr. Johnson?

24   **A.**   Yeah, uh-huh.

25   **Q.**   Is that consistent with your memory of when the second

JOHNSON - DIRECT / LEACH

1  Halo meeting was?

2  **A.**     Yes.   That's correct.   Yep.

3  **Q.**     Who attended this meeting in California?

4  **A.**     So we had myself, Mr. Humphries.   We added one other

5  person from HP in this meeting, a person named Jerome Levadoux.

6  Marge Breya was there.

7        And then from Autonomy, Mr. Hussain had come in person to

8  the meeting.   I believe Mike -- I don't remember if Mike was

9  there in person or not.   And then Andy Kanter was either on

10  video -- I'm pretty sure Andy wasn't in the room.

11  **Q.**     Were there presentation materials for this meeting?

12  **A.**     Yeah.   There was a pretty long slide deck that was

13  prepared and presented at the meeting.

14  **Q.**     Okay.   Take a moment and describe for us, as best you can,

15  what happened at the meeting.

16  **A.**     This one was longer, more focused on some of the specifics

17  of the product.   A lot of discussion on what the technology

18  did, how it worked, and then went through -- for each of the

19  products, talked about how customers used it, gave some

20  customer examples, and so it was -- it was broken up into those

21  modules.   Each product, here is how customers use it, here is

22  what the technology is about.   And then at the very end, there

23  was a little bit of financial information.

24  **Q.**     What do you mean by "financial information"?

25  **A.**     From what I recall, it was generally what I would think of

JOHNSON - DIRECT / LEACH

1    as close to public information.  I don't remember.  Kind of

2    profit and loss, "here's how we've done historically against

3    our earnings," things like that.

4    **Q.**   Who presented the financial information on behalf of

5    Autonomy?

6    **A.**   That was Mr. Hussain.

7    **Q.**   And at this meeting, was this just to get to know you or

8    was it your impression Autonomy was selling itself?

9    **A.**   I think at the time, you know -- you never know, but it

10   was -- it was more apparent that, yes, this was a process to

11   get us up to speed on the company so we could potentially do

12   our own work behind the scenes to make an assessment if this

13   was interesting to us.

14   **Q.**   How did this meeting end?

15   **A.**   Similar to the last one.  Again, not too unusual for these

16   meetings to end, which is "Hey, thank you for the information.

17   This is helpful.  We'll go off and sort of digest it."  That

18   sort of thing.

19   **Q.**   I'd like to walk through briefly some of the presentation

20   materials from the meeting, Mr. Johnson.  If we could please

21   look at what is in evidence on the screen as Exhibit 1592.

22                     (Exhibit published to jury.)

23   **BY MR. LEACH:**

24   **Q.**   Do you see your name in the "from" line on March 4th,

25   2011, Mr. Johnson?

JOHNSON - DIRECT / LEACH

```
 1   A.    Yes.

 2   Q.    And is that --

 3   A.    Yes.

 4   Q.    That's the date of the Halo meeting?

 5   A.    That's correct.

 6   Q.    Are you forwarding to your team the PowerPoint that had

 7   been presented to you?

 8   A.    Yeah.  I was, in fact -- yeah.  I think it was in four

 9   parts.  I see this is a part B.

10   Q.    Let's please look at page 8 of this exhibit, and it's a

11   little hard to read up there at the top, but do you see the

12   heading "Pure Software Model," Mr. Johnson?

13   A.    Yes, I do.

14   Q.    Okay.  And was there a discussion of Autonomy's pure

15   software model at this March 4th Halo meeting?

16   A.    Yes, there was.  Yes.

17   Q.    What did you understand that to mean?

18   A.    It was -- it was described as we have software products

19   and we have a little bit of professional services, and I would

20   say there was a heavy emphasis on emphasizing how little

21   professional services because in a lot of cases, a software

22   company might have a fairly large component of professional

23   services, and they tend to have much lower margins, so from an

24   overall profitability standpoint, having low professional

25   services would give you higher profitability of the company.
```

JOHNSON - DIRECT / LEACH

1    So it was described to us as "hey, we have these soft

2  products, we have a little bit of professional services, and

3  that's why we're a pure software company."

4  Q.   Was that attractive to you?

5  A.   Yes, it was.  Yeah.

6  Q.   Why is that?

7  A.   Because the, you know, gross margins above 90 percent as a

8  software company is just a very attractive financial model.

9  Q.   Beneath that, there is some boxes, "standard product, IDOL

10  OEM, IDOL Cloud, hybrid model, appliance based."  Do you see

11  that?

12  A.   Yes, I do.

13  Q.   What did you understand this to represent?

14  A.   Basically their different product segments.

15  Q.   The different components of their revenue?

16  A.   Yes.

17  Q.   If we could please now look at another portion of the

18  PowerPoint.  It's Exhibit 1593.

19    Mr. Johnson, is this you forwarding additional portions of

20  the PowerPoint to members of your team at the time?

21  A.   Yeah.  It looks like part C.  Yes, that's correct.

22  Q.   Let's look at page 31, please.  What's represented on this

23  slide, Mr. Johnson?

24  A.   This would be sort of summary information of their --

25  basically their income statement and their cash flow.

JOHNSON - DIRECT / LEACH

1  Q.   Was this information that was discussed at the Halo

2  meeting on March 4th?

3  A.   Yeah.  I'm not sure we went into tremendous detail, but it

4  was reviewed with us, yes.

5  Q.   Were these numbers attractive to you?

6  A.   Yeah.  I would say 43 percent operating margin and that

7  sort of cash flow were very attractive numbers.

8  Q.   Let's, please, look at what has been marked as Exhibit

9  1594 and is in evidence.

10                 (Exhibit published to jury.)

11  BY MR. LEACH:

12  Q.   And is this part D of the PowerPoint that you were

13  presented with at the March 4th Halo meeting?

14  A.   That's correct, yeah.

15  Q.   Let's please look at page 4.

16       What is represented here, Mr. Johnson?

17  A.   This would be the profit and loss statement in a little

18  more detail.

19  Q.   At the time, did you understand that Autonomy was a public

20  company?

21  A.   Yes, I did.

22  Q.   What does that mean?

23  A.   It means they go through auditor processes with an outside

24  auditor to basically verify the financials.

25  Q.   Was that a factor that you considered in your process of

1   evaluating Autonomy?

2   **A.**   Yes.  Definitely.  Yeah.

3   **Q.**   Why is that?

4   **A.**   Because it gives us assurance that somebody else has

5   looked at the financials in a very detailed way and they

6   conformed to the right accounting standards.

7   **Q.**   In or around this time, did HP -- did you continue to work

8   on a potential acquisition of TIBCO?

9   **A.**   Yes, we did.  Yep.

10  **Q.**   And can you describe for us at this point in time, March

11  2011, which company was more in the forefront of your mind?

12  **A.**   It was definitely TIBCO, yes.

13  **Q.**   Why do you say that?

14  **A.**   We had done some work in looking across the spectrum at

15  companies, and TIBCO had bubbled up to the top, and, you know,

16  this isn't -- the way this works, it isn't the M&A team sort of

17  mandating we do X, Y and Z.  It's a discussion of the

18  leadership of the software team and also with the executive

19  management team, and TIBCO was determined to be kind of the

20  first priority from that standpoint.

21  **Q.**   What happened vis-à-vis TIBCO?

22  **A.**   We went probably into, say, early April with negotiations

23  and working with them, and the deal broke down over price.

24  **Q.**   What do you mean it broke down over price?

25  **A.**   We essentially got to the point where we submitted, I

1    think, what we considered our best and final, and they said

2    that wasn't good enough.  So we essentially walked away from

3    the deal.

4    **Q.**    Moving forward in time, Mr. Johnson, did there come a

5    point in time when you and your team became more focused on

6    Autonomy?

7    **A.**    Yes.  After the TIBCO deal kind of broke down.

8    **Q.**    Okay.  And in or around July 2011, did members of your

9    team travel to London to meet with folks from Autonomy?

10   **A.**    That's correct, yes.

11   **Q.**    Did you go on that trip?

12   **A.**    I did not go on that trip.

13   **Q.**    Why did you not go to London with your colleagues?

14   **A.**    I believe on that trip, I -- I guess I should be proud to

15   say I took a family vacation.

16   **Q.**    Okay.  Were there other circumstances in your personal

17   life in or around this time that prevented you from traveling?

18   **A.**    Later in the deal, yes.  My younger sister had a

19   reoccurrence of breast cancer, so my wife and I were trying to

20   help her family out.

21   **Q.**    At some point in time, did you ask Mr. Robison if Manish

22   Sarin could take a larger role in the diligence process?

23   **A.**    That's correct.  I probably said more sternly that I could

24   not travel and I needed someone else to help out.

25   **Q.**    What did you say to Mr. Robison?

JOHNSON - DIRECT / LEACH

1    **A.**    I just told him that with my sister's situation, that I

2    couldn't travel, so there was another trip, I think, coming up

3    to the UK for diligence and that I was basically going to have

4    to spend some of my time helping out my sister or my wife was

5    going to be traveling so I needed to be home to take care of my

6    kids.

7    **Q.**    At some point in August of 2011, did HP announce an offer

8    for Autonomy?

9    **A.**    Yes.  I believe it was the 19th of August.

10   **Q.**    Okay.  Would you please look at what has been placed

11   before you as Exhibit 2306.

12   **A.**    Yep.

13   **Q.**    Are you familiar with this document?

14   **A.**    Yeah.  It looks like the offer -- the announcement of the

15   deal.

16              **THE COURT:**  Admitted.

17              (Trial Exhibit 2306 received in evidence)

18                    (Exhibit published to jury.)

19   **BY MR. LEACH:**

20   **Q.**    Mr. Johnson, I draw your attention to the date, 18 August,

21   2011.  Do you see that?

22   **A.**    Yep, uh-huh.

23   **Q.**    And this says "Recommended cash offer by Hewlett-Packard

24   Vision BV."  Do you see that?

25   **A.**    Yes, I do.

JOHNSON - DIRECT / LEACH

1    Q.    What is that?

2    A.    So that was the Hewlett-Packard subsidiary that was set up

3    to kind of handle the transaction.

4    Q.    That's a company owned indirectly by HP, the parent

5    company?

6    A.    Yeah.  That's correct.

7    Q.    Further down below, there is a bullet, "Under the terms of

8    the offer, Autonomy shareholders will be entitled to receive 25

9    pounds" -- I think that's 50 pence -- "in cash per Autonomy's

10    share."

11        Do you see that?

12    A.    Yes.

13    Q.    Is that the offer that HP, through HP Vision, made in or

14    around this time for Autonomy shares?

15    A.    Yes.  That's correct.

16    Q.    Could we please go to page 15.

17        What is the general purpose of this document, Mr. Johnson?

18    A.    It's basically to inform shareholders of why this is a

19    fair price and why they should tender their shares because

20    ultimately we had to buy the shares from the shareholders.  So

21    this was an information document to provide people with that

22    background.

23    Q.    And this is something distributed to the public?

24    A.    Yes.

25    Q.    Let me draw your attention to the number beginning

1    "Background to and reasons for recommendation."

2        Do you have that page in front of you?

3    **A.**   Yes.  Section 6.

4    **Q.**   What is being described here?

5    **A.**   Basically a lot of the financial information about the

6    offer, what it was relative to the previous stock price, things

7    like that, to help people be able to make a decision as to why

8    Autonomy was recommending the share price.

9    **Q.**   Okay.  And do you see where it says "Autonomy's recent

10   operating and financial performance has been strong, including

11   its most recent results for the quarter ending 30 June 2011."

12       Is this language that was included in the offer

13   announcement announcing HP's offer for Autonomy?

14   **A.**   Correct, yeah.

15   **Q.**   Okay.  Can we please look at the next exhibit, 2307.  It's

16   titled "Recommended Cash Offer for Autonomy Corporation by

17   Hewlett-Packard Vision BV."

18       I offer it into evidence.

19           **THE COURT:**  Admitted.

20           (Trial Exhibit 2307 received in evidence)

21               (Exhibit published to jury.)

22   **BY MR. LEACH:**

23   **Q.**   Is this a copy of the formal offer for Autonomy's shares,

24   Mr. Johnson?

25   **A.**   Yes.  That's what it looks like, yes.

1    Q.    Is this one of the legal documents in connection with the

2    acquisition of Autonomy?

3    A.    Yeah.  That's correct, yes.

4    Q.    Okay.  Would you please look at page 58.  And is this an

5    appendix to the offer for Autonomy shares, Mr. Johnson?

6    A.    That's correct, yes.

7    Q.    Okay.  And does this describe various or -- various

8    documents relating to Autonomy's financial performance for

9    2010, 2011, and other periods?

10   A.    Yes, it does.  Yep.

11   Q.    Okay.  Can we please look at what has been marked as

12   Exhibit 2309.

13         Is this another one of the legal documents in connection

14   with HP's offer for Autonomy?  2309, Mr. Johnson?

15             THE COURT:  Admitted.

16         (Trial Exhibit 2309 received in evidence)

17               (Exhibit published to jury.)

18             THE WITNESS:  Yes, uh-huh.

19   BY MR. LEACH:

20   Q.    Let me draw your attention to the top.  Do you see where

21   it says "from Sushovan Hussain"?

22   A.    Yes, uh-huh.

23   Q.    And do you see the date to the right, 18 August 2011?

24   A.    Yes, uh-huh.

25   Q.    Let's look briefly at the signature page, please.  That's

1   on page 9.

2        Do you see Mr. Hussain's signature there?

3   **A.**   I do, yes.

4   **Q.**   And does it appear to have been signed in the presence of

5   somebody in San Francisco, California, at One Market Spear

6   Tower?

7   **A.**   Yeah.  It says Nicole Eagan, yes.

8   **Q.**   Let's go back to the first page, please.  Do you see in

9   the first paragraph it says, "In consideration of your agreeing

10  to make an offer to acquire the whole of the issued ordinary

11  share capital of the company substantially on the terms and

12  subject to the conditions set out in the attached draft press

13  announcement, I agree with you as follows."

14       Do you see that language?

15  **A.**   Yeah, uh-huh.

16  **Q.**   And then there is something called "irrevocable

17  undertakings."

18       What is the general purpose of this document, Mr. Johnson?

19  **A.**   It -- pretty typical where the goal is for us to acquire

20  all the shares and there was a -- the information put out, so

21  often what happens is we go to the key executives, ask them to

22  support the deal by doing some kind of -- they call it

23  irrevocable offering where they pledge to basically sell their

24  shares, which shows support for the deal.

25  **Q.**   Why did HP insist on that?

JOHNSON - DIRECT / LEACH

1   **A.**    Just -- it's -- it's a very strong statement if we get the

2   key executives to put these in place to signal to the other

3   shareholders it's a good deal.

4   **Q.**    Okay.  Can we please look at page 4 of the exhibit.

5       Do you see where it says "warranties and undertakings,"

6   Mr. Johnson, in 2?

7   **A.**    Yes.

8   **Q.**    Do you see where it says, "I warrant and undertake to the

9   offeror that."  The offeror is the HP subsidiary?

10  **A.**    That's correct, yes.

11  **Q.**    Could I please draw your attention to 2.15.  Do you see

12  where it says, "I warrant and undertake to the offeror that to

13  the best of my knowledge, information, and belief, having made

14  all reasonable inquiries, any information provided by me for

15  inclusion in the press announcement, the offer document, and

16  any other announcement made or document issued in connection to

17  the offer is and will be true and accurate in all respects and

18  not misleading in any respect."

19      What's your understanding of the thrust of that warranty,

20  Mr. Johnson?

21  **A.**    Essentially that any of the information that has been

22  provided to us would be true.

23  **Q.**    Okay.  And was this an important warranty to you in

24  connection with the offer for Autonomy shares?

25  **A.**    Yeah.  As any of them would be, yes.

JOHNSON - DIRECT / LEACH

1   Q.   Let me draw your attention to page 10 of this document.

2   Do you see title "Schedule" at the top?

3   A.   Yes, uh-huh.

4   Q.   And if we could zoom out just a little, please.

5        What is represented here?

6   A.   It looks like basically the schedule of shares.

7   Q.   Schedule of what shares?

8   A.   Oh, of Mr. Hussain's shares.

9   Q.   These are the shares that Mr. Hussain is promising to sell

10  to HP Vision at the price being offered?

11  A.   That's correct, yeah.

12  Q.   Okay.  And do you see that the number of ordinary shares

13  is 9,978?

14  A.   Yes, I do.  Yeah.

15  Q.   And do you see that there are 345,000 options for ordinary

16  shares --

17  A.   Yes.

18  Q.   -- in part 3?  What are options for ordinary shares?

19  A.   They would be the right to purchase shares at a

20  predetermined price.

21  Q.   Okay.  And there's something called 40,296 bonus share

22  awards.  What did you understand those to be?

23  A.   Often companies will have bonus plans where part of the

24  bonus payment will be in company shares.

25  Q.   I draw to your attention, Mr. Johnson, to what has been

 1  marked for identification as Exhibit 2404.  It should be in

 2  front of you.

 3       Is this another one of the legal documents in connection

 4  with the HP acquisition of Autonomy?

 5  A.   Yes, it is.  Yeah.

 6            THE COURT:  Admitted.

 7            (Trial Exhibit 2404 received in evidence)

 8                 (Exhibit published to jury.)

 9  BY MR. LEACH:

10  Q.   Mr. Johnson, I draw your attention to the date, 3 October

11  2011.  Do you see that at the top?

12  A.   Yep, uh-huh.

13  Q.   And then further below in bold -- if we could scroll down

14  a little bit, please -- "offer declared wholly unconditional."

15  Do you see that?

16  A.   Yes.

17  Q.   What did that mean?

18  A.   At some point once HP had acquired enough shares, that

19  essentially we had acquired the company.

20  Q.   Did that kick in HP's obligation to pay for the shares?

21  A.   Yeah.  That's correct, yeah.

22  Q.   Would you please look at what has been marked for

23  identification as Exhibit 2412.

24            THE COURT:  Admitted.

25            (Trial Exhibit 2412 received in evidence)

```
 1                    (Exhibit  published to jury.)

 2   BY MR. LEACH:

 3   Q.    Are do you see the date of this email, Mr. Johnson,

 4   October 4th, 2011?

 5   A.    Yes, uh-huh.

 6   Q.    And is this an email from a company called Capita?

 7   A.    That's correct.

 8   Q.    What is Capita?

 9   A.    They were the third party, I guess, clearinghouse to kind

10   of handle the transactions of shares coming in from

11   shareholders and the payments from HP to their shareholders.

12   Q.    This time period, October 4th, 2011, were you in the

13   Palo Alto area at this time?

14   A.    Yes, I was.  Yes.

15   Q.    How were you able to remember that?

16   A.    We were going up to Alaska on the 6th for my sister's

17   memorial, so I remember this time very well.

18   Q.    Okay.  And let me draw to your attention what is in

19   evidence as Exhibit 2414.

20   A.    I have 13.

21   Q.    2414.  It's already in evidence.  It should be on the

22   screen.

23         Is this a copy of the letter that was linked to the email

24   that we just observed in 2412?

25   A.    Yes, it is.
```

JOHNSON - DIRECT / LEACH

1   **Q.**   Okay.  What is the purpose of this letter?

2   **A.**   So the -- as the shares would be tendered by shareholders,

3   we would get these emails saying here is how many shares have

4   been tendered and here's how much money should be wired for

5   these shares.

6   **Q.**   Let's look at page 2, please.

7         And do you see the name "Capita Registrars" at the top?

8   **A.**   Yes.

9   **Q.**   That is essentially the escrow agent in the UK?

10  **A.**   Yes.

11  **Q.**   And further below, it says payment details, 5 million --

12  excuse me -- 5,445,493,678 pounds and 35 pence.  Do you see

13  that?

14  **A.**   Yes.

15  **Q.**   Is that the amount that Capita is saying HP now needs to

16  pay for the Autonomy shares?

17  **A.**   That's correct.  And somewhere in here, I think there was

18  a number of shares that went to that, but, yeah, that's

19  correct.

20  **Q.**   And the bank up at the top, Royal Bank of Scotland PLC, is

21  that the bank Capita was using to receive payment?

22  **A.**   That's correct, yeah.

23  **Q.**   Did you have a role in approving the payments going out

24  from -- from HP for the Autonomy shares?

25  **A.**   Yeah.  In my role, I would give one approval and then

JOHNSON - DIRECT / LEACH

1   someone on our legal team would give the second approval.

2   **Q.**   Would you please look at what has been marked as Exhibit

3   2426.

4        This is an example of one of your approvals?

5            **THE COURT:**   Admitted.

6        (Trial Exhibit 2426 received in evidence)

7                (Exhibit published to jury.)

8            **THE WITNESS:**   Yes.   That's correct.

9   **BY MR. LEACH:**

10  **Q.**   Let me draw your attention to the middle portion of the

11  page.   This is sent from something called TPRUKTSC.   What is

12  that?

13  **A.**   It probably was our treasury organization.

14  **Q.**   I'm sorry?

15  **A.**   Probably our treasury organization.

16  **Q.**   Okay.   And it says, "Cash offer for Autonomy external

17  payments, others, action required."   And do you see it

18  addressed to you?

19  **A.**   Yes, I do.   Yeah.

20  **Q.**   If we could look at the next page, please.   There's an

21  amount at the top in pounds.   What's being represented there?

22  **A.**   That's the amount of the transfer that I was being asked

23  to approve.

24  **Q.**   And did you approve this?

25  **A.**   Yes, I did.

1   **Q.**   Can we please look at Exhibit 2427.

2          **THE COURT:**  Admitted.

3          (Trial Exhibit 2427 received in evidence)

4                (Exhibit published to jury.)

5   **BY MR. LEACH:**

6   **Q.**   Is this another example of you approving payment of money

7   to be used to acquire the Autonomy shares?

8   **A.**   That's correct, yes.

9   **Q.**   And if we could look at page 2, please.  A little bit up.

10      Is that the amount beginning 439 million?

11  **A.**   That's correct.  Yeah.

12  **Q.**   And were -- other than these two, are there other

13  instances where you were asked to approve payments going for

14  Autonomy shares?

15  **A.**   Yeah.  I believe five to seven.  Maybe more.  Yeah.  They

16  would kind of trickle in in bunches.

17  **Q.**   Two more documents Mr. Johnson.

18      I have placed before you what has been marked as Exhibit

19  2637, which appears to be a schedule of payments to -- relating

20  to the acquisition of Autonomy.

21      I offer it into evidence.

22          **THE COURT:**  Admitted.

23          (Trial Exhibit 2637 received in evidence)

24                (Exhibit published to jury.)

25  \\\

JOHNSON - DIRECT / LEACH

1    BY MR. LEACH:

2    Q.    And if we could please start up at the -- start up at the

3    top, please.

4         Do you see the dates to the left, October 3rd, October

5    6th, October 7th, Mr. Johnson?

6    A.    Yes, I do.  Yeah.

7    Q.    Okay.  Is this schedule consistent with your memory of

8    payments going to -- from HP Vision to acquire the shares of

9    Autonomy Corporation?

10   A.    Yes.  Yeah.  That is correct.

11   Q.    Okay.  And the -- if I could draw your attention to

12   Exhibit 2635.

13            THE COURT:  Admitted.

14         (Trial Exhibit 2635 received in evidence)

15                 (Exhibit published to jury.)

16   BY MR. LEACH:

17   Q.    Do you understand this to be a schedule representing the

18   acceptances of the offer by certain Autonomy shareholders,

19   Mr. Johnson?

20   A.    Yeah.  That's correct.

21   Q.    This is something that came from Capita?

22   A.    Yeah, uh-huh.

23   Q.    Do you see Sushovan Hussain's name in the middle of the

24   first page?

25   A.    Yes, I do.  Uh-huh.

JOHNSON - CROSS / LITTLE

1  Q.   And if we could look at page 2, do you see where it says

2  "number of shares accepted"?

3  A.   Yes, uh-huh.

4  Q.   And do you see the amounts 435,000 -- excuse me --

5  345,000.  Is that consistent with the irrevocable undertaking

6  that we saw in a prior exhibit?

7  A.   Yes.  That's correct.

8          (Government counsel confer off the record.)

9  BY MR. LEACH:

10 Q.   In U.S. dollars, Mr. Johnson, what was the rough size of

11 the Autonomy acquisition?

12 A.   Approximately 11 billion, I guess.  Yeah.

13 Q.   And if we could please look at page 3 of this document, do

14 you see the amount in pounds associated with the date

15 10/18/2011?

16 A.   Yes, uh-huh.

17 Q.   Does that correspond to the 345,000 shares that

18 Mr. Hussain tendered to the HP subsidiary?

19 A.   Yeah.  Without doing the math in my head, but, yeah, that

20 seems about right.

21      MR. LEACH:  Thank you, Mr. Johnson.

22      Thank you, Your Honor.  I have nothing further.

23                      **CROSS-EXAMINATION**

24 BY MS. LITTLE:

25 Q.   Good morning, Mr. Johnson.

1    **A.**    Good morning.

2    **Q.**    Good morning, members of the jury.

3        Mr. Johnson, my name is Jan Little, and I'm one of

4    Mr. Hussain's attorneys.

5        We haven't met before; right?

6    **A.**    That's correct.

7    **Q.**    I think you testified on direct that you were employed by

8    Hewlett-Packard for about seven years from 2006 to 2013?

9    **A.**    That's correct, yes.

10   **Q.**    And you've spoken with attorneys for Hewlett-Packard

11   and/or the Government many times before today; correct?

12   **A.**    I have definitely been interviewed, yes.

13   **Q.**    You spoke to Hewlett-Packard's lawyers in 2012?

14   **A.**    I think so, yeah.

15   **Q.**    And again three times -- four times -- five times in 2013?

16   **A.**    I have not kept a record.

17   **Q.**    Does that sound about right?

18   **A.**    Sounds right, yeah.

19   **Q.**    And then you spoke with the FBI and the SEC in 2014?

20   **A.**    That sounds right, yes.

21   **Q.**    And to the FBI again a couple of times in 2016?

22   **A.**    Yeah.  That sounds right.

23   **Q.**    And to the FBI and the prosecutors here in -- well, in

24   2016 and then again in January of this year, 2018?

25   **A.**    Yeah.

JOHNSON - CROSS / LITTLE

1   **Q.**   And again a week or so ago?

2   **A.**   That's correct, yeah.

3   **Q.**   Before the Autonomy acquisition -- you were working in

4   sort of the M&A group at Hewlett-Packard?

5   **A.**   That's correct.

6   **Q.**   Before the Autonomy acquisition, you handled dozens of

7   other acquisitions for HP; right?

8   **A.**   As far as completed acquisitions?

9   **Q.**   Well, either completed or not.

10  **A.**   Yeah.  I -- yeah.  I've -- I'm not sure I would call it in

11  the dozens, but certainly very many, yeah.

12  **Q.**   But the Autonomy acquisition was your first cross-border

13  acquisition; right?

14  **A.**   Correct.

15  **Q.**   And tell the jury, what does that mean, a cross-border

16  acquisition?

17  **A.**   In this case, Autonomy was listed on the London Stock

18  Exchange as opposed to the U.S.  I'm not sure I understand --

19  **Q.**   Well, so HP is in the U.S. and Autonomy was a British

20  company; right?

21  **A.**   Right.

22  **Q.**   And so you're operating under British merger and

23  acquisition rules; right?

24  **A.**   That's correct.

25  **Q.**   The UK takeover code?

1    **A.**    Right.

2    **Q.**    This was first time you had operated in --

3    **A.**    Yes.

4    **Q.**    -- UK takeover code?

5    **A.**    That's correct.

6    **Q.**    Okay.

7         And it's good if you let me finish my question before you

8    answer it because otherwise the court reporter will get really

9    upset at both of us.

10   **A.**    My first time.

11   **Q.**    Okay.  When Mr. Apotheker joined Hewlett-Packard in 2010,

12   he wanted to reposition Hewlett-Packard to focus on software

13   and information; right?

14   **A.**    That's correct.

15   **Q.**    You recall the catch phrase that was used, "look the I in

16   IT"?

17   **A.**    Yes, I do.  Yes.  Yes.

18   **Q.**    Mr. Apotheker saw a market opportunity in unstructured --

19   the analysis of unstructured -- or excuse me -- structured data

20   as well as unstructured data; correct?

21   **A.**    That is correct, yes.

22   **Q.**    What Autonomy brought to the table was the analysis of

23   unstructured data?

24   **A.**    Correct.

25   **Q.**    If we could take a look at Exhibit 2306, which is in

JOHNSON - CROSS / LITTLE

1  evidence.  This is one of the offer documents.

2                    (Exhibit published to jury.)

3  BY MS. LITTLE:

4  Q.    Look up on the screen.  Let's take a look at page 3.  If I

5  could just find my copy.

6       The section that says, "Commenting on the offer, HP

7  president and CEO Leo Apotheker."

8       And what Mr. Apotheker says is, "Autonomy presents an

9  opportunity to accelerate our strategic vision to decisively

10  and profitably lead a large and growing space.  Autonomy brings

11  to HP higher value business solutions that will help customers

12  manage the explosion of information.  Together with Autonomy,

13  we plan to reinvent how both structured and unstructured data

14  is processed, analyzed, optimized, automated and protected."

15       Was that your understanding of sort of the thrust and

16  purpose of this acquisition?

17  A.    Yeah.  I think so, yeah.

18  Q.    And then down at the bottom of the next paragraph, it

19  says, "I am particularly pleased that Dr. Mike Lynch, who heads

20  up a team of brilliant scientists and employees, will continue

21  to lead Autonomy.  I look forward to our collaboration as we

22  focus on creating maximum value for the combined company, its

23  customers, and employees."

24       And was that also part of Mr. Apotheker's vision, that

25  Dr. Lynch would carry on with the company and take Autonomy

1    through at Hewlett-Packard?

2    **A.**   That's correct, yes.

3    **Q.**   HP was interested in Autonomy even before Mr. Apotheker

4    arrived, wasn't it?

5    **A.**   It's possible.  I had not been involved in any reasonably

6    serious acquisition discussions.

7    **Q.**   But you looked at, for example, analyst reports in the

8    summer of 2010.  You looked at analyst reports for TIBCO and

9    Autonomy and a company called Indica.  Do you recall that?

10   **A.**   Sounds familiar, yes.

11   **Q.**   And do you recall a presentation about something called

12   Project Aggie, A-G-G-I-E?

13   **A.**   I don't.  I'm guessing Aggie was a code name for Autonomy

14   at the time.

15   **Q.**   Okay.  And would it be consistent with your memory that in

16   August of 2010, there was a presentation looking at Project

17   Aggie, which was Autonomy?

18   **A.**   It could be.  I don't remember.

19   **Q.**   Well, let's take a look at Exhibit 6847, which will be in

20   your -- it's not in evidence yet, so it's going to be in your

21   black binder toward the back.  6847.

22            **THE COURT:**  Admitted.

23            (Trial Exhibit 6847 received in evidence)

24                 (Exhibit published to jury.)

25   \\\

1    BY MS. LITTLE:

2    Q.   This is an email to a number of people at HP, and you're

3    copied on it, "cc Andy Johnson"; correct?

4    A.   That's correct, yeah.

5    Q.   On Monday, August 23rd.

6         And it says, "Here's Aggie material for tomorrow's working

7    session."

8         And if you just take a look at the attachment, let me

9    know, is this a presentation about Autonomy, code name Aggie?

10   A.   Yeah.  That's correct.

11   Q.   On page -- well, the second page, it says "Founded in 1996

12   in the UK, 1800 employees," etc.

13   A.   Yes.  That's correct, yeah.

14   Q.   Okay.  We talked about -- you talked on direct about the

15   February 3rd, 2011 Halo video conference, and that was a video

16   conference that was arranged by Qatalyst; correct?

17   A.   That's correct, yes.

18   Q.   And you testified that Mr. Hussain joined, and it was, I

19   think you said, a high-level general meeting right?

20   A.   Yes.  That's correct.

21   Q.   And high-level financials were discussed?

22   A.   I believe so.  I think they were -- my recollection is

23   that materials were prepared by Qatalyst and did have some

24   financial information.

25   Q.   And Mr. Leach showed you an email, Exhibit 1553.  Maybe we

1    can just put that up on the screen.  Blow it up.

2                   (Exhibit published to jury.)

3    **BY MS. LITTLE:**

4    **Q.**   And it says in here that Mr. Quattrone had not yet been

5    formally engaged by Autonomy; correct?

6    **A.**   That's correct, yeah.

7    **Q.**   Right here.  It's Qatalyst.  "Qatalyst not formally

8    engaged but expect to represent Atlantis"; correct?

9    **A.**   Correct.

10   **Q.**   So at this point, Hewlett-Packard is still looking at

11   TIBCO and is primarily focused on TIBCO, and Qatalyst is not

12   formally engaged by Autonomy.

13        So this really is a very preliminary discussion; right?

14   **A.**   I would call it more midway.  I mean, certainly it's not

15   uncommon for an investment bank to not be engaged until the

16   process gets very serious.

17   **Q.**   Okay.  Then you testified about a March 4th telephone

18   call.  Do you recall that?

19   **A.**   The -- the video conference.

20   **Q.**   Another Halo -- right.

21        Before the March 4th call, HP and Autonomy entered into a

22   nondisclosure agreement; correct?

23   **A.**   I do not remember.

24   **Q.**   Okay.  Would you look in your book, please, at Exhibit

25   6861.  That should be toward the back.

1           **THE COURT:**  Admitted.

2           (Trial Exhibit 6861 received in evidence)

3              (Exhibit published to jury.)

4           **THE WITNESS:**  Yes, I see it.

5    **BY MS. LITTLE:**

6    **Q.**   Is this the nondisclosure agreement that was entered into

7    between HP and Autonomy on March 3rd, 2011?

8    **A.**   I'm sorry -- yeah.

9    **Q.**   Take a look at the last page, if we could.

10          Is that your signature?

11   **A.**   Yes, it is, correct.

12   **Q.**   Okay.  And what's the purpose of a nondisclosure agreement

13   as you're a starting to talk with potential merger target?

14   **A.**   It's pretty typical so that if either side wants to share

15   anything nonconfidential, we're covered by an NDA.

16   **Q.**   Okay.  And both sides want to keep it confidential; right?

17   **A.**   That's correct, yes.

18   **Q.**   Are you familiar -- I know it was your first UK takeover

19   merger, but did you become familiar with the UK takeover rules

20   that if one acquiring company gets inquiring, that other

21   bidders could get the same confidential information?

22   **A.**   I don't think at this time I was sort of -- understood

23   those rules like that.

24   **Q.**   But you came to understand that?

25   **A.**   Yeah.  That's correct, yeah.

JOHNSON - CROSS / LITTLE

1    Q.    If we could take a look at paragraph 5 of this document,

2    which is at page 3 of the document.  And it says, "No

3    representation of accuracy.  Each party acknowledges that

4    neither the other party nor any of its associates has made any

5    representation or warranty, express or implied, as to the

6    accuracy or completeness of the confidential information made

7    available by the other party or its associates."

8        Correct?

9    A.    Correct, yeah.

10   Q.    And what that means is that no one, neither side, is

11   warranting that all the information provided is complete;

12   right?

13   A.    Yes.

14   Q.    There may be some information that hasn't been provided?

15   A.    Correct, yeah.

16   Q.    The burden is on each side to ask for the information it

17   wants; right?

18   A.    Correct, yeah.

19   Q.    And in particular, it's the burden of the acquiring

20   company to ask for information from the target; right?

21   A.    The only thing I'm struggling with the answer is I don't

22   know if there was subsequently another agreement put in place

23   after this one.

24   Q.    There is, and we'll talk about it.

25        But as a general principle, in mergers, a target company

1    doesn't just open its files and say "hey, come on in and look

2    at whatever you want"?

3    **A.**    That's correct.

4    **Q.**    The burden is on the company that is buying it to say

5    "here is the information we want; please give it to us"?

6    **A.**    Correct, yes.

7    **Q.**    Normally there is kind of a negotiation between the

8    acquiring company and the target as to what information will or

9    will not be provided; right?

10    **A.**    Yes.    Generally a request is made, and then it's possible

11    sometimes the target doesn't have the information exactly in

12    that way, or as you get later in the process, you say hey,

13    that's not as important as it was.

14    **Q.**    And it's the responsibility of the target company to

15    answer questions.    They're not expected to volunteer

16    information; correct?

17    **A.**    That's correct, yeah.

18    **Q.**    And for the acquiring company, the company that is buying,

19    if they don't get the information that they think they need,

20    they can walk away; right?

21    **A.**    That's correct, yeah.

22    **Q.**    Let's talk now about that March 4th Halo call and Exhibit

23    1574, which is in evidence.

24                        (Exhibit published to jury.)

25    \\\

1    BY MS. LITTLE:

2    Q.   So there were a list of questions that were posed, and I

3    want to take a look at page 6 in particular.  Mr. Leach asked

4    you about this.

5         And you see it says in the list of information that you're

6    seeking, "Revenue, gross margin by major lines of business,

7    product categories, and revenue type, license, maintenance,

8    service, Cloud, Software as a Service"; right?

9    A.   Correct.

10   Q.   And that's the way that you phrased the request for what

11   you wanted; right?

12   A.   Correct, yeah.

13   Q.   At this time, Autonomy was not -- you can take that down,

14   Jeff.

15        Autonomy was not presenting itself as somehow, you know,

16   desperate to be acquired, right, in this early 2011 time

17   period?

18   A.   Not that I remember.

19   Q.   In fact, it was your view that Dr. Lynch would have walked

20   away if he couldn't get the price he wanted?

21   A.   I don't think I had a personal view at that time.

22   Q.   Well, if you would take a look in your thin white binder

23   at Exhibit 5097.  This is a report of an interview you gave to

24   the FBI.  And take a look at page 8, if you would.

25        Let me see -- just read it to yourself starting at the

1    one, two -- third paragraph that begins "There was a

2    discussion."  Do you have that on page 8?

3    **A.**   I'm sorry.  Is there exhibit -- is there --

4        **THE COURT:**  At the bottom on the right-hand side, it

5    says 0008.  Do you see that?  On the bottom of the page?

6        **THE WITNESS:**  Yeah.

7        **THE COURT:**  Okay.  So it's -- look at the paragraph

8    that is under 816 --

9        **THE WITNESS:**  Okay.  Correct.

10   **BY MS. LITTLE:**

11   **Q.**   Got it?

12   **A.**   Right.  I got it.

13   **Q.**   So let me just ask again, was it your feeling at the time

14   that Dr. Lynch was willing to walk away if HP tried to

15   negotiate the price down?

16   **A.**   I'm sorry.  I thought you were asking me the March time

17   frame.

18      But this would be correct, yes.

19   **Q.**   So even as late as August 16th, 2011, Dr. Lynch was

20   willing to walk away if the price went down?

21       **MR. LEACH:**  Objection.  Foundation.

22       **THE COURT:**  Overruled.

23      Go ahead.

24       **THE WITNESS:**  I'm sorry.  Can you repeat the question?

25   \\\

1    BY MS. LITTLE:

2    Q.   As late as August 16 of 2011, is it your recollection that

3    as of that time, you felt that Dr. Lynch was willing to walk

4    away if HP tried to negotiate the price down?

5    A.   Yeah.  That's correct, yeah.

6    Q.   There were a number of HP folks that worked on the due

7    diligence for this merger; correct?

8    A.   That's correct, yeah.

9    Q.   If we could take a look in your binder at Exhibit 6839, in

10   the black binder, which is not yet in evidence.

11           THE COURT:  Admitted.

12        (Trial Exhibit 6839 received in evidence)

13               (Exhibit published to jury.)

14   BY MS. LITTLE:

15   Q.   This is an email from Mr. Sarin to Mr. Bischoff with a

16   copy to you; correct?

17   A.   That's correct.

18   Q.   And it's "Subject:  Tesla DD WGL."

19        Tesla means Autonomy; right?

20   A.   Right.  We had changed the code name by then.

21   Q.   And DD means?

22   A.   Due diligence.

23   Q.   And what does WGL mean?

24   A.   Working group list, I believe.

25   Q.   Okay.  And so Mr. Sarin is sending around a working group

JOHNSON - CROSS / LITTLE

1    list of people that are involved, and if we take a look at the

2    list on the next page, we've got, under "business" -- under

3    "products," Ms. Breya and Mr. Levadoux; under "sales," there is

4    a couple of people; "marketing," Marge Breya; "sales," Rob

5    Binns; various legal people, tax people, finance people, a

6    number of external advisers at the bottom from law firms,

7    Gibson Dunn, Freshfield, Drinker Biddle, and then also folks

8    from KPMG.

9         Is this a fair description of the HP folks that were

10   involved in the due diligence process?

11   **A.**   At this point.  It probably expanded.

12   **Q.**   It expanded from this?

13   **A.**   Probably over time, yeah.

14   **Q.**   So it was at least this many, if not more?

15   **A.**   Uh-huh.

16   **Q.**   Okay.  Let me show you what is -- what has been marked as

17   Exhibit 1992, which is an email dated July 15, 2011.  It should

18   be in your black binder, I hope.

19             **THE COURT:**  1992?

20             **MS. LITTLE:**  Uh-huh.

21             **MR. LEACH:**  No objection.

22             **THE COURT:**  Admitted.

23        (Trial Exhibit 1992 received in evidence)

24             (Exhibit  published to jury.)

25             **THE WITNESS:**  I'm sorry.  What was the number again?

1   BY MS. LITTLE:

2   Q.   1992.

3            THE COURT:  I think it's in evidence anyway.

4            MS. LITTLE:  Is it?  Okay.

5            THE WITNESS:  I don't see it in the book.

6            THE COURT:  You will see it right there.

7   BY MS. LITTLE:

8   Q.   Okay.  And the second email down, this is from Shane

9   Robison.  That's your boss; right?  To Ms. Breya with a copy to

10  you?

11  A.   Yes.  That's correct.

12  Q.   And Mr. Robison says, "At this point because of the UK

13  laws, we don't want to see any non-public information.  We can

14  talk live, if necessary.  Hopefully it will be a one-week delay

15  for the next visit."

16       Does that remind you about the need for secrecy or the

17  desire for secrecy because of the UK takeover laws?  Yes?

18  A.   That's correct, yes.

19  Q.   And then going back to page 3 where this email trail

20  begins, the first email from Ms. Breya to Shane Robison talking

21  about "very exciting and aggressive business case boundary

22  conditions of yesterday."

23       And then she says, "Of course we saw new and very

24  aggressive business analytics numbers predicated on our

25  development effort with respect to SPE and our ability to

1    deliver the unified access layer."

2        Is this a reference to expected synergies between

3    Autonomy's products that deal with structured information and

4    HP's products?

5    **A.**    I -- I'm sorry.

6    **Q.**    Do you remember?

7    **A.**    I'm struggling with the acronyms.  I'm sorry.

8    **Q.**    SPE is Structured Probabilistic Engine?

9    **A.**    I don't know.

10   **Q.**    So you don't remember this?

11   **A.**    No.

12   **Q.**    Okay.  That's fine.

13       Do you recall that in late July, early August of 2011, HP

14   and Autonomy entered into what's called an exclusivity

15   agreement?

16   **A.**    That's correct, yes.

17   **Q.**    What is an exclusivity agreement?

18   **A.**    Typically an exclusivity agreement would say the target

19   company at that point would not shop itself around to other

20   companies to allow the buyer to give it some time to finish its

21   work.

22   **Q.**    Okay.  If you would take a look in your binder, sir, at

23   Exhibit 6856, which is in the black binder toward the back.

24   **A.**    Yes.  I see it.

25           **THE COURT:**  Admitted.

1                  (Trial Exhibit 6856 received in evidence)

2              **MS. LITTLE:**  Thank you.

3                      (Exhibit published to jury.)

4   **BY MS. LITTLE:**

5   **Q.**   6856 is -- begins with an email from Mr. Letelie to

6   Mr. Porrini, with a copy to you.  Who was Sergio Letelie?

7   **A.**   He was an HP lawyer.

8   **Q.**   An HP lawyer in Europe?

9   **A.**   I believe he was in Europe at the time.

10  **Q.**   With a name like that, he ought to be in Europe; right?

11          So he writes to Mr. Porrini, "Paul Manish, please find

12  attached as discussed for Shane's review the latest LOI

13  drafts."

14          "LOI" means what?

15  **A.**   Letter of intent.

16  **Q.**   "And it has the fully executed NDA and the latest

17  exclusivity draft," and we've attached in here the exclusivity

18  agreement draft.  If you take a look, starting at page -- I'm

19  not sure what page of the exhibit it is, but it's the "Dear

20  Sir" letter, "strictly private and confidential."

21  **A.**   Yes.  I see it, yes.

22  **Q.**   Is this a draft of the exclusivity letter?

23  **A.**   At least the -- the thing I'm looking at looks like a

24  proposal.

25  **Q.**   Okay.

1    **A.**    Or the LOI.

2    **Q.**    Well -- and then looking at paragraph 3, if we could, on

3    the next page -- no.  No.  I'm sorry.  That's -- this is on the

4    page that is at the bottom.  It's 2571, Jeff.  There we go.

5    Paragraph 3.

6        It says, "Tesla agrees that until noon on, 10 weeks from

7    signature of this letter, neither it nor any member of its

8    group," etc., "shall directly or indirectly," and then it talks

9    about solicitation of other proposals, enter into discussions

10   with other people.

11       So this is the exclusivity agreement; right?

12   **A.**    It looks that way, yes.

13   **Q.**    Okay.  And in this draft, if you would take a look at the

14   next page, paragraph 8.1, so the draft that was being proposed

15   by Hewlett-Packard said that Autonomy would give Hercules --

16   who is Hercules?

17   **A.**    That would be HP.

18   **Q.**    HP.

19       So what HP was proposing is that Autonomy would give HP

20   and its representatives all reasonable assess to all

21   information in their possession relating to Tesla and its

22   group, etc.

23       So that's what Mr. Robison was proposing should go in this

24   agreement; correct?

25   **A.**    Yeah.  It looks like that, yes.

1    **Q.**   And then let's take a look at Exhibit 6857, which is the

2    next document in your binder.

3              **THE COURT:**  Admitted.

4              (Trial Exhibit 6857 received in evidence)

5                   (Exhibit published to jury.)

6    **BY MS. LITTLE:**

7    **Q.**   So up at the top, Mr. Letelie writes, "Paul Andy, please

8    find attached Tesla's counterproposal to our exclusivity

9    request."

10        Do you see that?

11   **A.**   Yes, uh-huh.

12   **Q.**   So this is now Autonomy's counterproposal to the draft

13   that we just looked at; right?

14   **A.**   Yeah.  It looks like that, yeah.

15   **Q.**   And if we go to the next page where this email chain

16   begins, there is an email from Sally Wokes to various folks at

17   Autonomy, which then gets forwarded on, and Sally Wokes is

18   giving the draft that Autonomy is going to propose; correct?

19   **A.**   That's correct, yes.

20   **Q.**   And then let's take a look at the letter.  The next page

21   is the beginning of the letter.

22        So this is the counterproposal; right?

23   **A.**   Yeah.  It looks like that, yes.

24   **Q.**   And if we look at the next page where there is items 5, 6,

25   7, 8, 9, that paragraph that had been in the prior agreement

1    about Autonomy's going to disclose everything it has is gone;

2    right?

3    **A.**    It looks that way, yep.

4    **Q.**    And if we could take a look at 6858.

5            **THE COURT:**  Admitted.

6            (Trial Exhibit 6858 received in evidence)

7                    (Exhibit published to jury.)

8    **BY MS. LITTLE:**

9    **Q.**    This is an email that goes from you to Mr. Robison.  This

10   is the version of the exclusivity for your signature.  And you

11   forward on the second draft, the Autonomy draft, if you will;

12   right?

13   **A.**    Yeah.  Uh-huh.

14   **Q.**    And it doesn't have that first paragraph that we looked at

15   about Autonomy has to disclose all this information; right?

16   **A.**    Correct, yeah.

17   **Q.**    And then looking at 6859.

18           **THE COURT:**  Admitted.

19           (Trial Exhibit 6859 received in evidence)

20                   (Exhibit published to jury.)

21   **BY MS. LITTLE:**

22   **Q.**    This is the letter being forwarded on, and it has at the

23   last page Mr. Robison's signature; correct?

24   **A.**    Yeah.  I see that, yes.

25   **Q.**    And then looking at 6860.

1          THE COURT:  Admitted.

2          (Trial Exhibit 6860 received in evidence)

3               (Exhibit published to jury.)

4    BY MS. LITTLE:

5    Q.   This is the final version.  If we look at the last page

6    dated August 3rd, it's signed by Mr. Robison, countersigned by

7    Mr. Kanter; correct?

8    A.   That's correct, yes.

9          THE COURT:  Is now a good time to take a recess?

10         MS. LITTLE:  Yes.  I don't have much left, but it

11   probably would go faster if I could have a minute to gather my

12   thoughts.  Let's take a break.

13         THE COURT:  Okay -- oh, take a break.  Great.

14      Ladies and gentlemen, we will be in recess until quarter

15   to 11:00.  Remember the admonition given to you:  Don't discuss

16   the case, allow anyone to discuss it with you, form or express

17   any opinion.

18              (Recess taken at 10:26 a.m.)

19            (Proceedings resumed at 10:45 a.m.)

20      (Proceedings were heard in the presence of the jury:)

21         THE COURT:  Please be seated.

22                 (Pause in proceedings.)

23         MS. LITTLE:  May I proceed?

24         THE COURT:  Oh, yes.  Please.  Sorry.

25         MS. LITTLE:  Thank you.

1           **THE COURT:**  The parties are present, the jurors are

2    present.  Thank you.

3           **MS. LITTLE:**  Thanks.

4    **Q.**   Mr. Johnson, if you could take a look in your black binder

5    book at the very, very back, Exhibit 7007, which is not yet in

6    evidence.  It's an e-mail that you were copied on.

7    **A.**   (Witness examines document.)

8           **MS. LITTLE:**  Move it in, Your Honor.

9           **THE COURT:**  Admitted.

10   (Trial Exhibit 7007 received in evidence)

11   **BY MS. LITTLE:**

12   **Q.**   Okay.  If we can take a look at the bottom e-mail, which

13   the jury has seen before.  This is from Mr. Gersh to Mr. Sarin

14   and others saying (reading):

15           "Manish -

16           "Attached are questions for management around their

17           contracts and revenue recognition.  It would be helpful if

18           we could discuss with management; however, please feel

19           free to defer our questions if there are other items of

20           higher priority/Target does not have time."

21           And I just wanted to ask you whether this is

22   representative of how the sort of requests and response would

23   work during due diligence:  Mr. Gersh from KPMG would propose

24   some questions to Mr. Sarin, and then Mr. Sarin would decide

25   what questions would then be passed on to Autonomy; is that

1  fair to say?

2  **A.**   It was -- that could be one element of it.  It could be

3  that questions went directly to Autonomy without a third

4  party's request; but often when we were dealing with experts,

5  we would rely on the experts to help us with our questioning.

6  **Q.**   And did you rely on Mr. Sarin to sort of make the call as

7  to what questions would or would not be passed on?

8  **A.**   In this particular case?

9  **Q.**   Well, yeah, let's start with this particular case.

10  **A.**   Yeah, in this case I would have relied on Mr. Sarin.

11  **Q.**   Okay.  And then you're copied in the top e-mail where

12  Mr. Sarin responds to Mr. Gersh (reading):

13          "Andy" --

14      That's the other Andy; right?  Andy Gersh?

15  **A.**   That's correct, yeah.

16  **Q.**   Okay.  (reading)

17          "Andy -

18          "These are very specific questions, and while I do

19      not doubt that having a contracts-related conversation

20      would be helpful, we'll need to find the right way to

21      accomplish our goal of getting more comfort around revenue

22      recognition."

23      Correct?

24  **A.**   Yeah.  I see that, yeah.

25  **Q.**   So Mr. Sarin is saying, "These are very specific

1    questions.  Let's talk about it"?

2    **A.**    That's correct, yeah.

3    **Q.**    And then if you would take a look at Exhibit 2183, which

4    is in evidence.  We'll put that up on the screen.

5        You're not copied on this, but this is a document that's

6    in evidence where Mr. Gersh then sends to Mr. Sarin (reading):

7            "Attached is the revised question list.  If it is

8        still too long, then we will delete contract 4 and some of

9        the questions on 2 and 3."

10       So, again, is this an example of Mr. Gersh and Mr. Sarin

11   working out what questions would be posed to Autonomy?

12   **A.**    That's correct, yeah.

13   **Q.**    Okay.  If you would take a look in your black binder at

14   Exhibit 6843 at the back.

15   **A.**    (Witness examines document.)

16   **Q.**    This is an e-mail from you to Mr. Sarin.

17           **THE COURT:**  Admitted.

18       (Trial Exhibit 6843 received in evidence)

19   **BY MS. LITTLE:**

20   **Q.**    And, Mr. Johnson, this is an example of e-mail

21   correspondence again involving you and Mr. Sarin and Mr. Gersh

22   about the due diligence and various requests that are being

23   made; correct?

24   **A.**    (Witness examines document.)  Yeah.  Correct.  Yeah,

25   uh-huh.

1  Q.    And if I could direct your attention to page 4 of the

2  exhibit, up at the top it says "Revenue Recognition."

3  A.    (Witness examines document.)  Yeah, uh-huh.

4  Q.    And, Jeff, can we get that up on the screen?  There we go.

5        And the second item says (reading):

6            "Customer contracts split by major line of business

7        (Licensing, OEM, Hosted, SAS, etc)."

8        Do you see that?

9  A.    Yeah, uh-huh.

10  Q.    And this is Mr. Gersh's request for revenue by these

11  various lines of business; correct?

12  A.    Correct.

13  Q.    And then if we could take a look at Exhibit 2187, which

14  I'm not sure is in evidence or not.

15        MS. LITTLE:  But if it's not, I'd move it in.

16        THE COURT:  Admitted.

17        (Trial Exhibit 2187 received in evidence)

18  BY MS. LITTLE:

19  Q.    This is an e-mail from Mr. Bhagat at HP to various other

20  folks at HP concerning "Tesla's responses to our follow-up due

21  diligence request."  Do you see that?

22  A.    Yes, uh-huh.

23  Q.    And then if you take a look at page 3 of the exhibit at

24  the bottom, Item Number 3, the request that was put to Autonomy

25  is (reading):

1              "Please provide a historical revenue split by

2         license, support, and services."

3         Do you see that?

4    A.   Yes, I do.

5    Q.   And this is now HP's question that its posing; right?

6    A.   That's correct, yeah.

7    Q.   So KPMG and HP are using similar language here; correct?

8    A.   It looks that way, yes.  That's correct, yeah.

9    Q.   And then if you would take a look at Exhibit 2329, which I

10   don't think is in evidence, but I'd move it in.

11             THE COURT:  23?

12             MS. LITTLE:  2329.

13                    (Pause in proceedings.)

14             MS. LITTLE:  It's an e-mail from Mr. Johnson to

15   Ms. Lesjak and various folks.

16             THE COURT:  Admitted.

17        (Trial Exhibit 2329 received in evidence)

18   BY MS. LITTLE:

19   Q.   And down at the bottom there's an e-mail from you to

20   Ms. Lesjak.  Who's Ms. Lesjak?  Is that -- am I pronouncing it

21   right?  Is it Lesjak or Lesiak?

22   A.   Lesjak.

23   Q.   Lesjak.  Okay, thank you.

24        There's an e-mail from you to Ms. Lesjak.  Who is

25   Ms. Lesjak?

1  **A.**   She's the CFO of HP at this point.

2  **Q.**   And in this e-mail you say to Ms. Lesjak (reading):

3      "We've been digging through their presentations and

4    scripts and the cleanest compare is 1H 11 over 1H 10 since

5    they did not do any major M&A in 2010.  They focus on what

6    they call 'Core Revenue,' which is product licenses, cloud

7    and OEM revenue."

8    So this is your description of how Autonomy defines its

9  core revenue; correct?

10  **A.**   That's what we were told, yes.

11  **Q.**   You can put that away.

12    We mentioned Andy Gersh and KPMG.  KPMG was principally

13  responsible for reviewing documents in the data room; right?

14  **A.**   Accounting related, yes.

15  **Q.**   And then did you also have access to the data room?

16  **A.**   I did, yes.

17  **Q.**   And did you occasionally enter the data room and take a

18  look at things?

19  **A.**   I'd probably characterize it as much as any other deal.  I

20  can't tell you specifically which ones I looked at and which

21  ones I didn't, but --

22  **Q.**   But you did have access and were able to go in if you

23  wanted to?

24  **A.**   I did have access, that's correct, yeah.

25  **Q.**   Okay.  And then Mr. Johnson -- not Mr. Johnson.  You're

1    Mr. Johnson.

2        Mr. Gersh prepared a report on behalf of KPMG; right?

3    **A.**  That's correct, yeah.

4    **Q.**  And that report was sent to you?

5    **A.**  That's correct, yeah.

6    **Q.**  And you reviewed it?

7    **A.**  That's correct, yeah.

8    **Q.**  If we could take a look at Exhibit 6863, which is not in

9    evidence, but it's in the back of your binder.

10        **THE COURT:**  Admitted.

11        (Trial Exhibit 6863 received in evidence)

12        **THE WITNESS:**  (Witness examines document.)

13   **BY MS. LITTLE:**

14   **Q.**  6863, let's take a look at the bottom e-mail from Tim

15   Carley to you.  It says "Tesla Signed to Close."  So this is

16   August 22nd after the deal has been announced but before it's

17   closed; correct?

18   **A.**  Correct, yeah.

19   **Q.**  And Mr. Carley is sending you various materials.  Well,

20   actually he's raising the question about Tesla is getting ready

21   to close soon.  And then moving up there's an e-mail from

22   Mr. Bhagat to you?

23   **A.**  Correct, yeah.

24   **Q.**  It says (reading):

25        "Please find attached the consolidated list of DD

1          reports, which includes the following functions."

2          And lists product, R&D, sales, legal, and HR; correct?

3    **A.**    Correct, yeah.

4    **Q.**    And then if you just kind of flip and take a quick look at

5    the attachments.  Are these the list of due diligence reports

6    that you received on August 22nd?

7    **A.**    (Witness examines document.)  Yeah.  It looks like it.

8    Yeah.

9    **Q.**    Okay.  Then I direct your attention to -- it's going to be

10   toward the back -- it's Section C.  If you look at the bottom,

11   there's -- it will say 6863A and then B and then C.  So if you

12   can flip back to the one that's C.

13   **A.**    Right.

14   **Q.**    Due Diligence Report Legal?

15   **A.**    Correct.  Yeah, I see it.

16   **Q.**    And taking a look at the next page, if you would, it says

17   (reading):

18          "We have reviewed a number of documents contained in

19          the virtual data room and participated in a number of Q&A

20          sessions with Mr. Kanter, and the information was reviewed

21          for any issues likely to be of material significance to

22          Hercules as a prospective acquirer of Tesla."

23          Now, if we go down to the one, two, three, fourth

24   bullet -- you can look at it on the screen.  That might be

25   easier.

1            There we go.

2            So in talking about some of the documents in the data

3   room, it says that (reading):

4            "The legal folks have looked at change of control,

5        assignment, term and termination, indemnity, 'most favored

6        customer,' and source code escrow provisions relating to

7        customer and supplier agreements contained in the data

8        room."

9            Do you see that?

10  A.    Yeah, uh-huh.

11  Q.    And is that a fair description of what the legal folks

12  were looking at for the contracts in the data room?

13            MR. LEACH:  Objection.  Vague.  Foundation.

14            THE COURT:  Sustained.

15            MS. LITTLE:  Okay.  We can put that away.

16  Q.    After the deal was announced but before it closed, there

17  was still some due diligence going on; right?

18  A.    I'm not sure.

19  Q.    Take a look at Exhibit 6845 in your book, the black book.

20  A.    (Witness examines document.)  I see a '43, but -- and then

21  it jumps to '54.

22  Q.    Oh, my.  Well, I thought it was 6845, but I can give you

23  my copy.

24            It's an e-mail -- actually, it's an e-mail from

25  Mr. Bischoff to a number of people at HP including you.

1              MS. LITTLE:  So I would move it in.

2              THE COURT:  Admitted.

3         (Trial Exhibit 6845 received in evidence)

4    BY MS. LITTLE:

5    Q.   Okay.  So we can just look at it on the screen.  That's

6    easier.

7         So this is an e-mail dated August 24th of 2011.  And

8    that's, of course, after the deal has been announced but before

9    it closed; right?

10   A.   (Witness examines document.)  That's correct, yeah.

11   Q.   And just looking at the first bullet, Mr. Bischoff says --

12   he's made some edits to this attached document.  Then he wants

13   to more clearly delineate between further diligence and

14   integration planning activities.  This is necessary because

15   there is a lot of diligence left to be done that is not

16   primarily driven by integration planning.

17        First of all, what's integration planning?

18   A.   It would be the aspect of how to bring the company inside

19   HP and how to operate it.

20   Q.   So Mr. Bischoff is here saying that there's kind of two

21   tasks that still need to be done:  There's the starting to plan

22   for the integration, but there's also some due diligence work

23   that still needs to be done; right?

24   A.   Yeah, that's correct.

25   Q.   And then if we could take a look at Exhibit 7006 -- this

1  is the last one I'm going to ask you about -- an e-mail --

2          **THE COURT:**  Admitted.

3          (Trial Exhibit 7006 received in evidence)

4          **MS. LITTLE:**  Thank you, Your Honor.

5  **Q.**   This is an e-mail in September 2nd, 2011, to you and

6  others, "Autonomy Integration Update."  Do you see that?

7  **A.**   Yes, I do.

8  **Q.**   And if we just take a look at the -- I think it's the

9  third or fourth page, the one that begins "Autonomy Workstreams

10 and Governance Structure."

11         Keep going, Jeff.  It's like two more pages.  There we go.

12 **A.**   Yeah, I got it.

13 **Q.**   And up at the top it has the Steering Committee, including

14 Leo Apotheker, Shane Robison, and some other folks.  Do you see

15 that?

16 **A.**   Yes, I do.

17 **Q.**   Did Mr. Apotheker and Mr. Robison stay around to help see

18 this integration through?

19 **A.**   What's the date of this again?  I'm sorry.

20 **Q.**   Well, the date of this is September 2nd of 2011.  And my

21 question is:  After September of 2011, were Mr. Apotheker and

22 Mr. Robison gone?

23 **A.**   That's Shane -- Shane left, I believe, in October and Leo

24 was sometime in that time period as well.

25         **MS. LITTLE:**  Okay.  Nothing further.

1      **THE COURT:**  Thank you.

2      **MR. LEACH:**  May I inquire, Your Honor?

3      **THE COURT:**  Yes, please.

4      **MR. LEACH:**  Thank you.

5                      **REDIRECT EXAMINATION**

6   BY MR. LEACH:

7   **Q.**   Mr. Johnson, you were asked some questions about Catalyst

8   in connection with the Halo calls.  Do you remember questioning

9   about Catalyst?

10  **A.**   Correct, yeah.

11  **Q.**   What is Catalyst?

12  **A.**   Catalyst is an investment bank.

13  **Q.**   And what did you understand Catalyst's reputation to be?

14  **A.**   Quite good.  They had been on the other side of some deals

15  with us and a good company.

16  **Q.**   Okay.  And the February 2011 Halo call and the March 2011

17  Halo call, did you understand these were done for the purpose

18  of moving forward with a possible acquisition of Autonomy?

19  **A.**   Certainly by the second one, yes.

20  **Q.**   The financial statements -- in connection with acquiring

21  Autonomy, did you rely on Autonomy's financial statements?

22  **A.**   Very much so.

23  **Q.**   Okay.  Are those public or nonpublic?

24  **A.**   Those would be public, yes.

25  **Q.**   And with respect to the information you received from

JOHNSON - REDIRECT / LEACH

1    Autonomy in the course of diligence, did you expect it to be

2    truthful?

3    **A.**    That's correct, yes.

4    **Q.**    Okay.  You were shown an Exhibit 1992.

5         If we could please display that on the screen.

6         And I draw your attention to the date July 15th, 2011.  Do

7    you see that?

8    **A.**    Yeah.

9    **Q.**    And there's a reference to at this point in time HP not

10   wanting to see any public information.  Do you see that

11   language from Mr. Robison?

12   **A.**    Yeah.  At the bottom there, yeah.

13   **Q.**    Was this before or after the folks under you went to

14   London to start due diligence in earnest?

15   **A.**    I believe this was right before.

16   **Q.**    Was this before or after a series of daily diligence calls

17   with Mr. Hussain and others from Autonomy?

18   **A.**    This would be before.

19   **Q.**    You were also shown a list of some folks who worked on the

20   due diligence in Exhibit 6839A.

21        And if I could indulge the Defense to please display that.

22        Do you recall some questioning about the diligence team,

23   Mr. Johnson?

24   **A.**    Yes, uh-huh.

25   **Q.**    Okay.  I'd like to display for you what is in evidence as

1    Exhibit 5962.

2         And I think I might need, if the Defense could, please,

3    display this.  Thank you so much.

4         Mr. Johnson, do you see the name "Chris Goodfellow" up

5    there at the top associated with Autonomy?

6    **A.**    Yes, I do.

7    **Q.**    Do you know who he is?

8    **A.**    No, I don't believe I've ever met him.

9    **Q.**    Okay.

10            **MS. LITTLE:**  Objection.  This is beyond the scope of

11   my cross-examination.

12            **THE COURT:**  Overruled.

13   **BY MR. LEACH:**

14   **Q.**    There's some HP individuals listed on this e-mail:  Tim

15   McClay, Greg Smith, Tim Thomson, Keith Winstead, Mark Rice.  Do

16   you know who those folks are?

17   **A.**    No, I don't.

18   **Q.**    Were they involved at all in the due diligence process

19   that you were involved with?

20   **A.**    No.

21   **Q.**    Okay.  And how about someone named Richard Maxim?  Do you

22   know who he is?

23   **A.**    No.

24   **Q.**    Was he involved at all in the diligence process?

25   **A.**    No.

PROCEEDINGS.

1          **MR. LEACH:**  Thank you, Your Honor.

2     Thank you, Mr. Johnson.

3     I have nothing further.

4          **MS. LITTLE:**  I have nothing further.

5          **THE COURT:**  Thank you, Mr. Johnson.  You're excused.

6                    (Witness excused.)

7          **THE COURT:**  Call your next witness.

8     If you want to stand up, ladies and gentlemen, stretch a

9     little bit.

10          **MR. LEACH:**  Your Honor, before our next witness, we

11     have a stipulation which we would like to read to the jury, and

12     I think this might be an appropriate time.

13          **THE COURT:**  Well, let's wait till...

14                    (Pause in proceedings.)

15          **THE COURT:**  Okay.  Please be seated.

16     Ladies and gentlemen, a stipulation is -- and there have

17     been some, I think, already, but let me refresh your

18     recollection -- it's an agreement between the parties as to a

19     fact or a series of facts, and what it does is it eliminates

20     the necessity of calling a witness or witnesses who would

21     testify.  So you are to accept a stipulation as a proven fact.

22     Go ahead.

23          **MR. LEACH:**  And if I may offer the stipulation into

24     evidence, Your Honor, as Exhibit 3035.  I'll only read portions

25     of it.

PROCEEDINGS.

1          **THE COURT:**  Okay.  And it's received in evidence --

2          **MR. LEACH:**  Okay.

3          **THE COURT:**  -- as exhibit what?

4          **MR. LEACH:**  3035.

5          **THE COURT:**  Pardon?

6          **MR. LEACH:**  3035.  Excuse me.

7          **THE COURT:**  Okay.  Admitted.

8     (Trial Exhibit 3035 received in evidence)

9          **MR. LEACH:**  This is titled "Stipulation Regarding Halo

10    Videoconferencing."

11         The United States and Defendant Sushovan Hussain hereby

12    stipulate as follows:

13         1.  Halo was HP's proprietary videoconferencing system

14    that allowed users to meet in realtime through the data network

15    utilizing the videoconferencing technologies.

16         2.  Halo conferencing was accessible from specific Halo

17    rooms.  The Halo rooms were customized spaces which allowed

18    realtime meetings through technology.  Each Halo room's

19    outfitted with several cameras, which could pan the room and

20    move to capture the speaker at any point in time, a video

21    screen and monitors, speakers, and table microphones.

22         In 2011, HP had Halo rooms in the following locations:

23    Six in Palo Alto, California; three in Cupertino, California;

24    one in London, England; and two in Bracknell, England.

25         Moving forward:

**PROCEEDINGS.**

1      6.   Whether point to point between two Halo rooms or

2   multiple rooms through a hosted virtual bridge, the audio and

3   video traveled over an interstate wire from the organizer of

4   the Halo session to the recipients.

5      7.   In February 2011, Halo 20C was HP's Palo Alto Halo

6   room Cannes 20C located in Palo Alto, California; and Halo

7   London was HP's London Halo room located in London, England.

8   The audio and video feed for Halo conferences between Palo Alto

9   Halo room Cannes 20C and HP's London Halo room traveled through

10  an interstate wire to HP's on-site network which then routed

11  the audio and video again via interstate wire ultimately to

12  HP's London Halo room.   The point-to-point connection between

13  Palo Alto and London was established through the HP network and

14  via interstate wire.

15     8.   In March 2011, Halo Birmingham was an HP Halo room in

16  Palo Alto, California.   Halo Cupertino 44 was an HP Halo room

17  in Cupertino, California, and Halo London was HP's London Halo

18  room located in London, England.

19     The audio and video feed for Halo conferences between

20  Palo Alto room Cannes 20C and HP's London Halo room traveled

21  through an interstate wire to HP's on-site network which then

22  routed the audio and video again via interstate wire ultimately

23  to HP's London Halo room.

24     There are additional portions of this stipulation, but

25  that's the portion we wanted to read into the record,

LINDSELL - DIRECT / LEACH

1      Your Honor.

2                THE COURT:  Stipulated, Counsel?

3                MR. KEKER:  Yes, Your Honor.

4                THE COURT:  Okay.  Go ahead.  Yes.

5                MR. LEACH:  The United States calls David Lindsell.

6                THE COURT:  David Lindsell, thank you.

7                          (Pause in proceedings.)

8                THE CLERK:  Please raise your right hand.

9                          DAVID CLIVE LINDSELL,

10     called as a witness for the Government, having been duly sworn,

11     testified as follows:

12                THE WITNESS:  I do.

13                THE CLERK:  Thank you.  Please be seated.

14        Please state your full name for the record and spell your

15     last name.

16                THE WITNESS:  Yeah.  My full name is David Clive

17     Lindsell, L-I-N-D-S-E-L-L.

18                THE COURT:  You may proceed.

19                MR. LEACH:  Thank you, Your Honor.

20                          DIRECT EXAMINATION

21     BY MR. LEACH:

22     Q.   Good morning, Mr. Lindsell.  Am I pronouncing that

23     correctly?

24                THE COURT:  Not quite.

25     \\\

LINDSELL - DIRECT / LEACH

1    BY MR. LEACH:

2    Q.   Close enough?

3    A.   Lindsell.  It's more like Lindsell in the U.K.

4    Q.   Excuse me.  I was distracted while you were pronouncing

5    it, sir.

6         Where are you from?

7    A.   I am from the U.K. and I live in London.

8    Q.   Okay.  Would you please briefly describe your educational

9    and professional background for us?

10   A.   Certainly.  I graduated from University of -- Cambridge

11   University with an honors degree more years ago than I care to

12   remember, and I then went straight into the accounting

13   profession and studied to become a qualified accountant in the

14   U.K., which I think I achieved in about 1971.

15        I stayed with the firm that I had joined and I became a

16   partner in that firm in 1978.  It was a firm whose name was

17   Whinney Murray & Co. and it was linked with a U.S. firm called

18   Ernst & Ernst at the time; and I stayed as a partner with the

19   firm, I believe, for 29 years.

20        During the 1980s -- I've gone beyond my education.  I'm

21   sorry.  Should I just continue with my personal background?

22   Q.   Continue, sir.  You're doing great.

23   A.   During the 1980s, I lived in New York for three years with

24   Ernst & Whinney global organization reporting to the global

25   senior partner of the firm.

LINDSELL - DIRECT / LEACH

1        And on my return to London in 1988, I took over the reins,

2   I ran the accounting technical group in London, which gave

3   advice on accounting issues to members of the firm.

4        I then started to take on some very significant audit and

5   assurance responsibilities and gave up the accounting technical

6   role.  I was the lead audit partner for a maximum period of

7   seven years as an auditor at that time on such companies as BP;

8   British Airways; a company called Smith & Nephew, which is a

9   FTSE 100 major U.K. international company; and also worked on

10  the U.K. Postal Service and Hilton Hotels, as it were, through

11  the '90s.

12       And in the middle 2000s, before I retired, in fact in

13  2000, I think, '13, I took on a role of global coordination of

14  all the accountants in Ernst & Young -- as it was then known --

15  Ernst & Young involved in what was called International

16  Accounting Standards.

17       The whole of Europe and many countries of the world

18  switched from their national accounting to International

19  Financial Reporting Standards in 2015, and my job was to

20  coordinate that activity, so far as the firm was concerned,

21  across the world.

22       I was also in the firm -- on the board of the U.K. firm of

23  Ernst & Young for about 15 years and chaired its own Audit

24  Committee before I retired from the firm in 2007.

25       In 2007 I moved on into -- back to the -- into the

1    commercial world by becoming a director of a number of listed

2    companies and took on some other roles, listed companies where

3    I became actually the chair of their audit committee because,

4    as you can imagine, that's my natural background.

5         And then I also did some not-for-profit work and I still

6    do that.  I'm a trustee for an organization called Cancer

7    Research U.K., which is the largest U.K. donor-funded charity,

8    and I'm the deputy chair of one of the London University

9    boards.

10        I also had -- and this is why I'm here -- in 2008 became

11   the deputy chair of something called the Review Panel.  I'm

12   sure we'll come back to that.

13        So that's my background.

14   **Q.**    Thank you.  Let me see if I can summarize some of that.

15        So you were a partner with Ernst & Young and its

16   predecessors for approximately 30 years?

17   **A.**    Correct.

18   **Q.**    That's one of the Big 4 accounting firms in the world?

19   **A.**    Yep, uh-huh.

20   **Q.**    And you were at one point the chair of Ernst & Young's

21   Audit Committee?

22   **A.**    I was, yes.

23   **Q.**    And some of the audits that you conducted on behalf of

24   Ernst & Young included BP?  That's the big oil company?

25   **A.**    Oil company, yeah.

LINDSELL - DIRECT / LEACH

1   **Q.**   And British Airways, the airline?

2   **A.**   Uh-huh.

3   **Q.**   Okay.  And you retired at some point or became

4   semi-retired in the early 2000s?

5   **A.**   2007, yeah.

6   **Q.**   And you serve as a director of certain listed companies in

7   the U.K.?

8   **A.**   Yeah.  Yeah.

9   **Q.**   You mentioned something called FTSE.  What's that?

10  **A.**   Yes.  I'm sorry.  The FTSE, it stands for Financial Times

11  Stock Exchange.  It's an index.  So the FTSE 100 is an index of

12  the largest 100 firms that are listed on the London Stock

13  Exchange.

14  **Q.**   Are you familiar with something called the F.R.C.?

15  **A.**   Yes, I am.

16  **Q.**   What is the F.R.C.?

17  **A.**   It stands for Financial Reporting Council, F.R.C., and it

18  is the U.K. regulator of accountants, of auditors, and of

19  actuaries.  So there's three professional bodies.

20       It is an independent body in its own right, but -- so it's

21  independent of government I mean -- but the government

22  delegates to it certain statutory powers of regulation.  They

23  include -- those powers and the areas of regulation include the

24  setting of accounting standards, the regulation of auditors,

25  and the need to ensure that publicly issued reports by

LINDSELL - DIRECT / LEACH

1   companies comply with statutory requirements; that's to say,

2   the financial statements, annual reports comply with legal

3   requirements.

4   **Q.**   How would you compare the F.R.C. to the U.S. equivalent

5   regulators here?

6   **A.**   I think it's very -- the Review Panel's function, which

7   we'll come to, is quite analogous to the U.S. SEC's Corporate

8   Finance Division, as I know from my own experience, because

9   when I was an audit partner on the companies like BP and

10  British Airways, we would occasionally receive letters of

11  inquiry from the SEC -- or the companies would -- from the SEC

12  raising questions about disclosures or explanations in their

13  annual reports.  And that in essence is exactly what the

14  Review Panel, which was an arm of the Financial Reporting -- is

15  an arm of the Financial Reporting Council, that is what the

16  Review Panel does.

17  **Q.**   Okay.  And is there an acronym for this Review Panel?

18  **A.**   Well, yes.  The whole -- the whole term -- the whole name

19  is Financial Reporting Review Panel, which is a hell of a

20  mouthful, so we always describe it as the FRRP.

21  **Q.**   Okay.  In or around 2008, did you become a member of the

22  Financial Reporting Review Panel, the FRRP?

23  **A.**   Yes.  Actually I became a member of that Panel in 2007

24  before I retired from Ernst & Young and during the course of

25  2008 was asked if I would wish to become a deputy chair of that

LINDSELL - DIRECT / LEACH

1  Panel, which is a quite different matter actually in terms of

2  role and responsibility.

3  **Q.**  And did you serve as a member or the deputy chair of the

4  FRRP from approximately 2008 through 2012?

5  **A.**  Oh, yes.

6  **Q.**  Were you paid for this?

7  **A.**  Yes.  Yes.  The Panel, which we come back to the Panel, is

8  an unpaid role.  It's a very consultive occasional role.  But

9  the deputy chair is quite a serious, quite time-consuming role

10  part time; but, yes, I was paid for it.

11  **Q.**  And what, again, was the purpose or the function of the

12  FRRP, the Financial Reporting Review Panel?

13  **A.**  The -- as I mentioned, one of the delegated

14  responsibilities to the Financial Reporting Council was

15  ensuring that financial annual reports published by listed

16  companies complied with legal requirements, and that activity

17  was what the Review Panel -- the FRRP -- that's what the

18  activity of the Panel was all about.

19       The Panel would, therefore, on a cyclical basis review the

20  annual reports of particularly large listed companies.  I

21  should point out that when you talk about the analogy with the

22  SEC, it's a relatively small regulator.  The FRRP has no more

23  than -- or had in 2011 at the time we're talking about -- no

24  more than eight or nine full-time case officers.  And so,

25  therefore -- and there are more than 2,000 listed companies on

1    the London Stock Exchange.

2        So we clearly could not deal with the whole population

3    very frequently, and so the Review Panel would every year look

4    at the sectors in the economy where it felt there might be --

5    there might be some strain, some stress and, therefore, focus

6    more of its attention on certain sectors.  For example, when

7    the oil price collapsed in 2014, not surprisingly the

8    Review Panel started looking more heavily at oil company

9    accounts because of the sort of dangers, the financial dangers,

10    that might have given rise to.

11        So in addition to reviewing accounts on a periodic basis,

12    the Review Panel would also investigate -- review accounts

13    which were the subject of some -- any complaint from a member

14    of the public or any source and that, of course, is what

15    happened in this particular case.

16    Q.    Let me draw your attention, please, Mr. Lindsell, to what

17    has been admitted in evidence as Exhibit 1542.  It should be

18    the first document in front of you.

19    A.    Excuse me.  I need, I'm afraid, my glasses now.

20        (Witness examines document.)  Yes.

21            THE COURT:  It's also on the screen.

22            THE WITNESS:  Ah, the screen, too.  Thank you.

23    BY MR. LEACH:

24    Q.    You can work from whatever you're more comfortable, sir.

25        Do you see the title "Financial Reporting Review Panel" at

LINDSELL - DIRECT / LEACH

1    the top?

2    **A.**    I do.

3    **Q.**    That's the entity you were the deputy chair of in or

4    around February 2011?

5    **A.**    Correct.

6    **Q.**    Okay.  And this appears to be a letter addressed to

7    R.S. Webb, Chairman Autonomy Corporation, with a cc to

8    S. Hussain, Chief Financial Officer, February 2nd, 2011.  Do

9    you see that?

10   **A.**    Yes.

11   **Q.**    And if we could please scroll down to paragraph 1.

12        Do you see where it says (reading):

13            "Dear Mr. Webb:

14            "As you know, the Financial Reporting Review Panel is

15        a body authorized under the Companies Act to review and

16        investigate the annual accounts and directors' reports of

17        public and large private companies"?

18        Do you see that language?

19   **A.**    Yes.

20   **Q.**    And is that a fair characterization of what the FRRP was?

21   **A.**    It is, yeah.

22   **Q.**    Does the FRRP conduct investigations?

23   **A.**    I think the word "investigation" needs to be interpreted

24   very -- very carefully.  The remit of the Review Panel was to

25   review published reports.  It was not as such an investigatory

1    body.  It wasn't like an auditor.  It was -- it normally

2    would -- in fact, in all cases it would use only as a source

3    document the financial statements and surrounding information

4    in annual reports of companies.  That is not the same as being,

5    as it were, a real forensic investigator.  That's all.

6    **Q.**    Okay.  When you say it's not like an auditor and that it

7    uses as source documents the accounts, what do you mean by

8    that?

9    **A.**    Well, it is -- I mean, that's a good question because

10   regulatory activities of this nature in Europe vary quite

11   significantly; and if you go to Germany, for example, you find

12   that the equivalent body to this Review Panel is much more --

13   much more a re-auditing of company accounts.  The Financial

14   Reporting Review Panel only raised issues that were apparent to

15   it from a review of the annual reports.

16        It's worth saying that, as well, that the Panel always

17   sought -- always seeks currently as well -- to work in

18   cooperation with the company's whose accounts it's reviewing;

19   and actually, conversely, always, unless it has very good

20   reason, will accept what it is told by companies as truthful.

21   So it's not a real -- it's not like a policeman.  It's a bit of

22   a watchdog rather than a policeman I would say.

23   **Q.**    Thank you.

24        Let me draw your attention to paragraph 3.  This says

25   (reading):

1          "The report and accounts of Autonomy Corporation have

2      recently come to the Panel's attention in connection with

3      the following issues.  The Panel is considering whether to

4      open a formal inquiry in respect of these matters."

5      How did the issues described in this letter come to the

6  Panel's attention?

7  **A.**   The Review Panel, or the F.R.C., but the Review Panel

8  received a letter forwarded to it by another U.K. regulator

9  called the Financial Services Authority, a letter from an

10  employee or -- it depends on the timing -- former employee of

11  Autonomy making certain allegations about accounting-related

12  matters; and that was forwarded to, at sometime between the

13  middle of 2010 and the end of 2010 I imagine, forwarded to the

14  Review Panel, yeah.

15  **Q.**   And then you say (reading):

16          "The Panel is" -- or this letter says, "The Panel is

17      considering whether to open a formal inquiry in respect of

18      these matters."

19      What is a formal inquiry?

20  **A.**   Yes.  This is a standard -- this is standard rubric in all

21  opening letters from the Panel.  I should -- I should just

22  explain very quickly the operating procedures of the Panel

23  because formal inquiry has certain connotations.

24      When a case is sort of opened by the Panel, the first

25  thing that always happens is correspondence making inquiries of

1    one type or another.

2         This is not in the nature of a formal inquiry.  It is

3    asking questions about the matters that have appeared to the

4    Panel from its review of the annual report or audited reports.

5         More often than not, the cases are resolved -- actually, a

6    number of reviews are done by the Panel that don't result in

7    any correspondence because the Panel is happy.  It hasn't -- it

8    doesn't find anything to question in relation to the financial

9    statements or the annual report.

10        But where it does find matters that it wishes to raise, it

11   typically will write and have correspondence with companies;

12   and the normal outcome, the majority -- in much the majority of

13   cases is for the company and the Panel to agree to make -- that

14   certain improvements of disclosure or explanations should be

15   made in future annual reports.  That is the typical outcome.

16   In that sort of case, that is not a formal inquiry.

17        When on some occasions, and it's quite unusual, where

18   there are significant issues that cannot be resolved in that

19   manner, either because the company concerned disagrees or --

20   with the Panel staff or because it is a genuinely complicated

21   issue that no one's quite sure how to really handle, in that

22   case a formal inquiry is opened and what is called a group of

23   Panel members, members of the Panel, is convened to address the

24   issue, a group of five -- five Panel members.

25        Those Panel members, unpaid people, are drawn from

LINDSELL - DIRECT / LEACH

1   commerce and the professions.  It includes accountants, finance

2   directors, lawyers, actually I think one or two analysts on the

3   Panel.  There's a Panel of about 30 people from whom five are

4   selected to pursue the formal inquiry.

5   **Q.**   Okay.  Let me draw your attention to -- so this letter was

6   sent as a result of a complaint that --

7   **A.**   Yes.

8   **Q.**   -- another regulator forwarded to the FRRP?

9   **A.**   Right.

10  **Q.**   Could we please look at page 2 of this exhibit?

11  **A.**   Uh-huh.

12  **Q.**   Do you see up at the top where it says "Transactions Via

13  Value Added Resellers"?

14  **A.**   Uh-huh.

15  **Q.**   And in paragraph 6 do you see a reference to Eli Lilly and

16  a company called Capax?

17  **A.**   Yes.

18  **Q.**   And I draw your attention to paragraph 9.

19  **A.**   Uh-huh.

20  **Q.**   Do you see where the letter references a company called

21  Kraft and that value added reseller Capax?

22  **A.**   Yes.

23  **Q.**   And were these the subject of the complaint that was

24  forwarded -- part of the subjects of the complaint that was

25  forwarded to the FRRP in or around the beginning -- 2010 or the

1    beginning of 2011?

2    **A.**    Yes.  Yes.

3    **Q.**    Okay.  Let me draw your attention to page 4.  Do you see

4    the heading at the top "MicroLink"?

5    **A.**    Yes.

6    **Q.**    Was that another one of the value added resellers that was

7    brought to the Panel's attention in or around this time frame?

8    **A.**    Yes, it was.

9    **Q.**    Okay.  In paragraph 18 it says (reading):

10             "It has been alleged to the Panel that MicroLink owed

11        one of the company's U.S. subsidiaries some 16M at the

12        time of the acquisition and that the great majority of

13        this receivable was more than six months overdue as at

14        that date."

15        Was this one of the allegations that was raised to the

16    FRRP in this time frame?

17    **A.**    Yes.  It was exactly, yeah.

18    **Q.**    Okay.  And this letter reads in paragraph 19 (reading):

19             "The Panel would be grateful for the company's

20        comments as to why any such amounts had not been settled."

21        Do you see that?

22    **A.**    Yes.

23    **Q.**    Is this what is being requested here?

24    **A.**    It is exactly what's being requested, yeah.

25    **Q.**    And is that normal for the Panel to request a company to

LINDSELL - DIRECT / LEACH

1  provide information?

2  **A.**    Certainly to provide information, and this is slightly

3  unusual because these questions would not be immediately

4  apparent from a review of a set of financial statements or

5  annual report; but these inquiries were driven entirely by the

6  letter that we'd received, and we obviously are duty bound to

7  pursue -- to pursue those allegations to assess whether -- what

8  the outcome should be, yeah.

9  **Q.**    Okay.  And if we scroll down further, there's a bold

10  heading "MicroTech LLC and Discover Technologies."  Do you see

11  that?

12  **A.**    Yes.

13  **Q.**    And do you see in paragraph 20 where it says (reading):

14        "It has been alleged to the Panel that significant

15        receivables were outstanding at 30 June 2010 from these

16        two companies"?

17        Do you see that language?

18  **A.**    Yes.

19  **Q.**    Was that one of the allegations that was brought to your

20  attention in this time frame?

21  **A.**    Yes, correct.

22  **Q.**    Okay.  In paragraph 21 is this the Panel's request for

23  information relating to that allegation?

24  **A.**    Yes.  It is exactly that, yeah.

25  **Q.**    And this says (reading):

1          "The Panel would be grateful for information enabling

2      it to understand the connections between MicroLink,

3      MicroTech, and Discover Technologies and the extent to

4      which these companies are or were related to each other."

5      Why was the Panel asking for that?

6  **A.**   I think these flowed -- these flowed directly from

7  allegations in the letter that was received.  For example,

8  there was a question about the sharing of the same address and

9  some things that might -- might have indicated a connection

10 between these companies.  That was why we were asking, yeah.

11 **Q.**   Okay.  And then in paragraph 22 do you request Autonomy

12 provide details of amounts owing by MicroTech and

13 Discover Technologies at 30 June 2010?

14 **A.**   Yes.

15 **Q.**   Okay.  Let me draw your attention to what has been marked

16 as Exhibit 3060.

17 **A.**   (Witness examines document.)

18 **Q.**   Is this a true and correct copy of the letter the FRRP

19 received in response to the exhibit we just observed?

20 **A.**   Yes, it is.  Yeah.  Yeah.

21          **MR. KEKER:**  Excuse me, Your Honor.  It's not.

22          **THE WITNESS:**  Oh.

23          **MR. KEKER:**  It doesn't have the attachments.

24          **THE WITNESS:**  Yeah, I was going to say that.

25          **MR. KEKER:**  It would be really helpful if we got the

 1    whole letter, which includes the --

 2            THE COURT:  Oh, okay.  The first page.

 3            MR. KEKER:  This is not what they got.

 4            THE WITNESS:  That's correct.  We had asked actually

 5    in our -- oh, I don't know.  At some stage we did ask for the

 6    cite of the Deloitte report.  I don't know which --

 7            MR. KEKER:  This letter refers to --

 8            THE COURT:  Wait.  Wait.  Wait.

 9            THE WITNESS:  It's the 2nd of February letter that was

10    written by the Panel requested cite of the Deloitte report in

11    the response and it received -- and that was received as an

12    adjunct or an annex to the 3rd of March letter that you just

13    referred to.

14            MR. LEACH:  I'm happy to track down the attachment,

15    Your Honor.  I'd ask that the exhibit be received so we can ask

16    questions about it.

17            MR. KEKER:  Well, I object.  The attachment is the

18    Deloitte investigation of Hogenson's complaint and Hogenson's

19    complaint.  It's a huge amount of information which was

20    provided.

21            MR. LEACH:  It's in evidence and we can show it to the

22    witness, Your Honor.

23            MR. KEKER:  Well, then let's put it -- let's not --

24            THE COURT:  Okay.  I think he can conduct his inquiry

25    the way he'd like to conduct his inquiry as I would let

```
 1    counsel.
 2         Okay.  3062, is that the exhibit number?
 3             MR. LEACH:  3060, Your Honor.
 4             THE COURT:  3060.  3060 is admitted with the
 5    understanding that there is an attachment to 3060 and we'll get
 6    to the attachment.  Okay?
 7         (Trial Exhibit 3060 received in evidence)
 8    BY MR. LEACH:
 9    Q.   Is this the body of the letter that the FRRP received,
10    Mr. Lindsell?
11    A.   Yes, it is.
12    Q.   Okay.  Let me direct your attention to page 7 of the
13    exhibit.
14    A.   Uh-huh.
15    Q.   Do you see the signature line "Sushovan Hussain"?
16    A.   Yes.
17    Q.   Okay.  Let's go back to the body, the first page.  This is
18    addressed to someone named Carol Page.  Who is she?
19    A.   Carol Page is the senior organizer or administrator of
20    the -- at the Review Panel.  She effectively runs the whole
21    secretariat, and all letters that are issued and reviewed by
22    the Review Panel go out over her name.
23    Q.   Okay.  And do you see in the first paragraph the letter
24    reads (reading):
25             "We write in reply to your letter dated 2nd February
```

LINDSELL - DIRECT / LEACH

1          2011.  A copy of your letter and reply have been provided

2          to Autonomy's auditors, Deloitte LLP"?

3          Do you see that language?

4   **A.**    Yes.

5   **Q.**    Okay.  And can I draw your attention, please, to the

6   fourth paragraph from the bottom.  Do you see where it says

7   (reading):

8              "It appears to us that a former Autonomy employee

9          sought to leverage regulatory and oversight bodies for his

10         own gain.  The employee's department was under

11         investigation following the discovery of a significant

12         payroll fraud.  The individual's employment was terminated

13         as part of a reorganization of the department to ensure

14         proper controls"?

15         Do you see that language?

16  **A.**    Yes, I do.

17  **Q.**    Did you review this letter at the time it came in?

18  **A.**    Yes.

19  **Q.**    Okay.  And what did you understand Autonomy to be saying

20  there?

21  **A.**    I understood them to be --

22         **MR. KEKER:**  Objection, Your Honor.

23         **THE WITNESS:**  Sorry?

24         **MR. KEKER:**  His understanding, other than the words on

25  the page, is irrelevant.

LINDSELL - DIRECT / LEACH

1          THE COURT:  Overruled.

2      What's your understanding?

3          THE WITNESS:  The -- it is of interest because there

4  is a slight -- somewhat of a contrast between this paragraph

5  and the similar discussion, the discussion of similar territory

6  in the letter that the Panel received from, as you say,

7  Mr. Hogenson.

8      This is -- this paragraph is clearly -- I mean, there's no

9  doubt about it -- is basically very critical of the employee

10 concerned, and I imagine -- I mean, that's -- that presumably

11 is the view of the company.  There's always two sides to every

12 story but this is really, I think, suggesting that the employee

13 concerned -- ex-employee concerned is not really a credible --

14 a credible person, but that's what I read from this.

15 BY MR. LEACH:

16 Q.  That's what you took from that; is that fair?

17 A.  It's what I took.  I'm not saying that's what I believe.

18 That's what I took from reading the words on the page, yes.

19 Q.  Okay.  If we could please look at page 2.

20 A.  (Witness examines document.)  Uh-huh.

21 Q.  Let's start at the second paragraph from the top.  Do you

22 see where it says (reading):

23          "A copy of the 19 July 2010 Appendix to the Deloitte

24      report on the 2010 Interim Results to Autonomy's Audit

25      Committee on these matters is attached"?

LINDSELL - DIRECT / LEACH

```
 1          Is that consistent with your memory that you saw part of
 2   the report that went to Deloitte or was from Deloitte?
 3   A.   Exactly, yes.
 4   Q.   And do you see the heading "Eli Lilly"?
 5   A.   Uh-huh.
 6   Q.   And are paragraphs 7 and 8 essentially a repeat of what
 7   the Panel was requesting information in respect of in its prior
 8   letter?
 9   A.   Exactly, yes.
10   Q.   And I draw your attention to the third paragraph where it
11   says (reading):
12          "It was expected that VAR, an end user, would be in
13          contract as at 31 December 2009."
14   Q.   Did you see the VAR there to be Capax?
15   A.   Yes.
16   Q.   Okay.  And was this a representation to you that it was
17   expected that Capax and Eli Lilly would be in contract as at
18   31 December 2009?
19   A.   Yes.
20   Q.   Let's look at page 3, please.  And do you see the heading
21   "Kraft" at the top?
22   A.   Uh-huh, yes.
23   Q.   And are these paragraphs 10 through 12 a repeat of the
24   request from the Panel?
25   A.   Yes.
```

1  Q.   And is, the body below, that your understanding of

2  Autonomy's response?

3  A.   Yes.

4  Q.   I draw your attention to the line where it says (reading):

5        "In an almost unique series of events, Kraft sought

6        to enter into a different agreement directly with Autonomy

7        in a subsequent quarter."

8        Do you see that language?

9  A.   Yes, I do.

10  Q.   What did you understand that to mean?

11  A.   Well, I'm not sure what we did understand.  In fact, we

12  didn't understand it because I think in a subsequent letter we

13  asked them to explain further.  The outline in substance looks

14  rather -- it's quite similar to Eli Lilly.  But that's what I

15  remember myself saying.  We just asked them to explain what

16  this unique set of events was.

17  Q.   Okay.  I'll come to that.

18        If we could please look at page 5.  Do you see where it

19  says "MicroLink" at the top?

20  A.   Yes.

21  Q.   And is this the company's -- beneath paragraph 19 -- the

22  company's response to the Panel's questions about MicroLink?

23  A.   Yes, it is.

24  Q.   I draw your attention to the third paragraph from the

25  bottom of 19.  It says (reading):

1              "At 31 December 2009, 23 million of receivables were

2       outstanding from MicroLink."

3       And then it says (reading):

4              "MicroLink continues to receive payment from its

5       customers and as a consequence, the outstanding balance of

6       the items at 31 December 2010 was less than $1.4 million."

7       Do you see that?

8   A.   Yes.

9   Q.   What do you understand that to mean?

10  A.   Well, I take -- I take it to mean that MicroLink had been

11  in receipt of sufficient funds from its customers to enable it

12  to reduce the indebtedness to Autonomy down to a very

13  relatively small amount of 1.4 million.

14  Q.   And was this information relevant to the Panel's inquiry

15  in or around this time?

16  A.   We -- yeah.  We indeed had asked for this, the real --

17  because by the time this -- this is December 2009.  After the

18  acquisition of the company, of MicroLink, the real issue was

19  the extent to which MicroLink was collecting money from its own

20  customers rather than the -- rather than how much it owed

21  Autonomy since they were under common ownership by that stage.

22  But this was responsive to our question.

23  Q.   Well, was -- this information, whether MicroLink was

24  receiving money from its customers to pay down the 16 million,

25  was that relevant to the Panel's inquiry?

1   A.   It was relevant, but I must just reemphasize that what we

2   were doing was not -- as a Panel was actually picking up the

3   allegations that had been made.  We were not opening a

4   widespread -- a wider investigation into the affairs of

5   Autonomy; and I think that -- I think it was because the letter

6   we had focused on this aspect that we inquired into the level

7   of receivables due between MicroLink -- from MicroLink to

8   Autonomy.

9   Q.   Okay.  Further below there's paragraphs 21 and 22 relating

10  to MicroTech LLC and Discover Technologies.  Do you see that?

11  A.   Yes.  Yes.

12  Q.   And your question was you wanted information to understand

13  the connection between MicroLink, MicroTech, and

14  Discover Technologies and whether they were related?

15  A.   Yes.

16  Q.   Is that a fair summary of the Panel's question?

17  A.   Yes.

18  Q.   Okay.  Please look at the next page, page 6.

19  A.   (Witness examines document.)  Uh-huh.

20  Q.   Do you see where it says (reading):

21          "Discover Technologies is now an independent

22      company"?

23  A.   Yes.

24  Q.   (reading)

25          "MicroLink and Discover Technologies briefly shared

1          office space following the spinout during a normal

2          post-spinout transmission period."

3          Is that part of the company's response to your question?

4    A.    Yes, it is.

5    Q.    Then it says (reading):

6               "Nothing should be inferred from seeing the same

7          address for both companies at the same time other than the

8          two companies share an address because they used to be

9          related."

10   A.    Yeah.

11   Q.    Is that responsive to the Panel's question?

12   A.    Yes, it is responsive.  Yeah, uh-huh.

13   Q.    And then it says (reading):

14              "MicroTech LLC is completely separate 10-year-old

15         company doing government work.  MicroTech has separate

16         staff, offices, shareholders, customers, lines of

17         business, et cetera."

18         Do you see that language?

19   A.    I do, yeah.

20   Q.    And is that relevant to the Panel's question in or around

21   this time period?

22   A.    It was responsive, directly responsive, to the question of

23   whether they were associated companies in any way.  Yes, so

24   it's basically saying it was completely independent or

25   separate, yes.  Responsive, yeah.

**LINDSELL - DIRECT / LEACH**

1  **Q.**   At any point in time were you told that an individual

2  named Dave Truitt was an owner of MicroLink,

3  Discover Technologies, and MicroTech?

4  **A.**   I'm absolutely certain that is not a name the Panel was

5  ever aware of or, therefore, not aware of any relationship he

6  might or might not have had with any company.

7  **Q.**   Was that relevant to your inquiry?

8  **A.**   Well, that depends on the underlying -- what the actual

9  underlying facts were, which I sort of have no direct knowledge

10  of.

11       We -- we accepted, because, as I said right in my

12  introduction, we worked on the premise that the information we

13  were being given by companies -- Autonomy no different from any

14  other company -- was fundamentally truthful, and so we -- but

15  this is a pretty categoric statement and we would have accepted

16  it.

17  **Q.**   When you say you accepted the information coming from the

18  companies being truthful, what do you mean by that?

19  **A.**   Well, obviously as a regulator you are somewhat skeptical,

20  you are, because -- and particularly in this sort of area

21  because we know that companies in telling what is ultimately

22  really the truth, they tend to put the best gloss on things.

23       But when you are being presented with a series of specific

24  facts, I think we and our stance was always that unless we had

25  very, very good evidence to question it, we would accept that

LINDSELL - DIRECT / LEACH

1    because that, as I've also explained, is in the nature of the

2    activity that we ran with a relatively small regulator and

3    dealing with companies with very strong reputations, and so on.

4        And we also, as I said, tried to work in cooperation

5    rather than adversarially with companies.

6    **Q.**   Okay.  Does your nonadversarial process work if you don't

7    get truthful information from companies?

8    **A.**   No, clearly it doesn't.  No, clearly it doesn't.  It all

9    depends on -- it's all about credibility, yeah, clearly.

10   **Q.**   I've placed before you what has been marked as

11   Exhibit 3050.  Do you recognize this document?

12             **MR. KEKER:**  30 what?

13             **MR. LEACH:**  Excuse me.  3059.

14             **THE WITNESS:**  '59, yeah.

15        (Witness examines document.)  Yes, I do recognize it.

16   **BY MR. LEACH:**

17   **Q.**   What is this?

18   **A.**   This is a follow-up letter.  The Panel's stance was

19   obviously having raised initial inquiries with companies, to

20   the extent the company responded fully and we all understood

21   what the response was and were happy with it, we would then say

22   "Thank you.  We're happy with that aspect.  We don't wish to

23   pursue that any further."

24        Subsequent correspondence of this nature often, though,

25   would raise issues that we didn't feel had been fully addressed

1    in the previous correspondence, and that is an example here.

2    **Q.**    So this is your follow-up to the letter we just observed?

3    **A.**    Absolutely.

4             **MR. LEACH:**    Okay.  I offer Exhibit 3059.

5             **THE COURT:**    Admitted.

6         (Trial Exhibit 3059 received in evidence)

7    **BY MR. LEACH:**

8    **Q.**    Do you see the date of April 5th, 2011, to the right,

9    Mr. Lindsell?

10   **A.**    Yes, I do.

11   **Q.**    And I draw your attention to page 2.

12   **A.**    Yeah.

13   **Q.**    Is this further questions relating to the Capax/Eli Lilly

14   transaction?

15   **A.**    Yes.  Yes, they are.  That's right, yeah.

16   **Q.**    Okay.  And in paragraph 5 I direct your attention to

17   the -- excuse me, paragraph 8 --

18   **A.**    Yes.

19   **Q.**    -- the Panel wrote (reading):

20            "The Panel would be grateful for information enabling

21        it to understand the extent to which there were other

22        contracts at 31 December 2009 in respect of which revenue

23        had been recognized and where an agreement had been signed

24        between the company and a value added reseller without the

25        VAR having as yet contracted with the corresponding end

LINDSELL - DIRECT / LEACH

1      user."

2          What was the Panel asking for there?

3  **A.**    The Panel wished to -- to be sure, it was really

4  represented -- as you remember in relation to the Kraft deal,

5  there was this reference to an almost unique series of events.

6  We were -- the Panel was -- wished to know whether it was a

7  widespread practice to recognize revenue on agreements with the

8  VAR, with the reseller, without the -- without the reseller

9  having contracted with the corresponding end user.

10         This is -- the company did assure us several times that

11  all appropriate revenue recognition criteria had been met, but

12  there are -- there are -- it was slightly puzzling to us as a

13  regulator.

14         For example, it wasn't clear to us why a company like

15  Capax would actually contract with Autonomy and take on an

16  obligation to Autonomy without having secured a sort of

17  back-to-back contract with the end user.  That would put Capax

18  at considerable financial risk.

19         So we really wanted to understand, you know -- none of

20  us -- we were not on the Panel experts in accounting by

21  software companies but, you know, these are sort of rather

22  basic questions.  We wanted to just sort of understand whether

23  this was a widespread practice rather than just limited to this

24  transaction.  And, in fact, the Kraft transaction had some

25  similarities.

1   Q.   Okay.  Let me draw your attention to page 4 of the letter.

2   A.   Uh-huh.

3   Q.   And in paragraphs 23 and 24 it reads (reading):

4        "The Panel notes that Discover Technologies was a

5        former business of MicroLink, which was spun out of that

6        company prior to the acquisition of MicroLink by Autonomy

7        and which is now an independent company.  The Panel notes

8        that the two entities shared office space for a short

9        period following the spinoff.

10       "The Panel also notes that MicroTech was a completely

11       separate business also involved in U.S. government work."

12       Is this essentially reiterating your understanding of what

13  you'd been told by Autonomy?

14  A.   Yes, exactly.  It was our practice always to sort of play

15  back to the company in summary what it was telling us to make

16  sure there was no misunderstanding, yeah.

17  Q.   Okay.  And you accept the truth of what you're being told;

18  is that right?

19  A.   Yes.  It's the truth, yes, it's the fact.  Absolutely,

20  yes, we do.

21  Q.   In paragraph 25 what are you asking for here?

22  A.   (Witness examines document.)  Well, this goes back to the

23  question of -- well, the fact is -- may I just read the

24  paragraph again to be sure?

25  Q.   Yes, please.

LINDSELL - DIRECT / LEACH

**A.**  (Witness examines document.)  Yes.  This was picking up a
point which had not been addressed in the previous response
from Autonomy, which you can -- which is the typical
formulation we used, the Panel would now be grateful for this
information where a company hasn't actually provided exactly
what was asked for previously.  Not unusual.

**Q.**  And exactly what you were asking for was what MicroTech
and Discover Tech owed at June 30th, 2010?

**A.**  Yes.  And it's actually any amounts written off as well in
the period if you see the second half of that paragraph, yeah.

**Q.**  Okay.  I've placed before you what has been marked as
Exhibit 3061.  Do you recognize this document?

**A.**  (Witness examines document.)  Yes, I do.  It is the --
yes, I do.  Absolutely, uh-huh.

**Q.**  Is this a true and correct copy of the response the Panel
received from Autonomy on or about June 9th, 2011?

**A.**  Yes.

        **MR. KEKER:**  Same objection, Your Honor.  It's not.

        **THE WITNESS:**  9th of June.  Sorry.

        **MR. KEKER:**  It references an attachment.  The
attachment is not here.

        **THE COURT:**  It may be incomplete if it had an
attachment, but --

        **MR. LEACH:**  I'll go through the attachment.

        **THE COURT:**  -- we'll get to that.

LINDSELL - DIRECT / LEACH

1           THE WITNESS:  Yes, there aren't any attachments.

2           MR. KEKER:  He asked "Is this a true and correct copy

3    of what you received?"  And I object to that.  It's not.

4           THE WITNESS:  Yeah.

5           MR. LEACH:  This is what I got from them, Your Honor.

6           MR. KEKER:  We have it.

7           THE COURT:  Well, okay, at any rate --

8           MR. LEACH:  No.  This is what I got from the FRRP,

9    Your Honor.

10          THE COURT:  Right.  Admitted And subject to

11   cross-examination.

12       (Trial Exhibit 3061 received in evidence)

13          THE COURT:  And what is the number of it?

14          MR. LEACH:  3061.

15   Q.   Do you see the date at the top June 8th, Mr. Lindsell?

16   A.   Yes, I do.

17   Q.   And I draw your attention to page 2.

18   A.   Yeah.

19   Q.   Is there a further response in respect of the Eli Lilly

20   and Kraft -- Eli Lilly/Capax transaction here?

21   A.   There is in paragraph -- yes, in the first half of the

22   second page, yes.

23   Q.   Okay.  And just above that -- or if we could scroll down

24   to the bottom.

25   A.    Yep.

LINDSELL - DIRECT / LEACH

1  Q.   Do you see where it says (reading):

2          "Autonomy started to do business with Capax in early

3       2009.  At that time we obtained financial statements from

4       Capax (Attachment 1)"?

5       Do you see that?

6  A.   Yes.

7  Q.   And you believe that's the attachment that's referenced --

8  one of the attachments referenced here?

9  A.   Yes.

10  Q.   Okay.

11  A.   I believe it was.

12  Q.   Then it says (reading):

13          "Capax have had an excellent payment record since

14       that date."

15       Do you see that?

16  A.   Yes, I do.

17  Q.   Was that information responsive to some of the Panel's

18  questions?

19  A.   Yes, it was.  I mean, obviously our background concern was

20  that if, to the extent that there is any transaction between

21  Autonomy and a reseller without there being a signed-up

22  contract that the reseller has with the end user, then the

23  questions -- one would expect to be confident that the reseller

24  was able to meet its obligations, and that was what we were

25  sort of -- so this is responsive to that question by saying

LINDSELL - DIRECT / LEACH

1   Capax have had an excellent payment record, et cetera,

2   et cetera.

3   **Q.**   And was Capax's payment record relevant to your review

4   here?

5   **A.**   The answer to that is, yes, because we were told that, as

6   I say, revenue recognition criteria, all the circumstances had

7   been met in order to recognize revenue; but one of those is

8   about the probability of obtaining the income arising from the

9   transaction.  Therefore, the question is:  How -- what is the

10  creditworthiness of the purchaser?  So that is responsive to

11  the question.

12  **Q.**   Okay.  Let's look at page 3.  Do you see the question at

13  the top, Number 8?  That's the question whether there were any

14  more instances of selling to a VAR without a committed end

15  user?

16  **A.**   Yes.  I see that, yeah.

17  **Q.**   And is this Autonomy's response in paragraph -- in the two

18  paragraphs beneath that?

19  **A.**   Yes.  Yes, indeed, it is, but -- it is the response, yeah.

20  **Q.**   Okay.  At any point in time were you told that in addition

21  to the Capax, Eli Lilly, and Kraft transactions, there were

22  eight transactions with MicroTech at the end of 2009 between

23  MicroTech and Autonomy without a committed end user?

24  **A.**   No.  We certainly weren't told, no.

25  **Q.**   Were you ever told that those eight transactions consisted

LINDSELL - DIRECT / LEACH

1    of approximately $9.6 million in revenue to Autonomy?

2    **A.**    No.   No.

3    **Q.**    Was that information relevant to your questions?

4    **A.**    Well, it is, yes.  I mean, the response here is

5    essentially saying that we don't actually -- that Autonomy

6    didn't actually necessarily know what the outcome was in terms

7    of any -- whether or not its resellers had actually secured

8    contracts with end users.  That seems to be what it's basically

9    saying, and they couldn't find out.

10        It slightly surprised me because in every case we were

11   told in another letter from Autonomy that -- well, it's

12   actually this one, isn't it?  It says (reading):

13             "The software sold to the VAR is only licensed to a

14        named end user."

15       So the analogy with Microsoft in the next paragraph

16   doesn't look particularly relevant, but -- so we had no

17   knowledge of those facts.

18   **Q.**    Okay.  If Autonomy knew of these eight transactions, did

19   you expect to be told about that?

20   **A.**    Yes, because that would have been responsive to our

21   question.

22   **Q.**    Further below there's a paragraph entitled "Kraft."

23   **A.**    Yes.

24   **Q.**    And it says (reading):

25             "This is a series of events that virtually never

**LINDSELL - DIRECT / LEACH**

1          happens; in fact, management struggles to recall any prior

2          time that this happened."

3          Do you see that language?

4    **A.**    Yes, I do.

5    **Q.**    And is that in response to your inquiry about how Kraft

6    was an almost unique series of events?

7    **A.**    Yes, that is the response.  Yeah, uh-huh.

8    **Q.**    Okay.  Can you please look at page 7 of the letter?

9    **A.**    (Witness examines document.)

10   **Q.**    Is this Autonomy's response to your question about how

11   much MicroTech and Discover Technologies owed at particular

12   time periods?

13   **A.**    Yes, it is.

14   **Q.**    Okay.  And what is the amount listed as being owed by

15   Discover Tech as of June 30th, 2010?

16   **A.**    Nil, zero, yeah.

17   **Q.**    Okay.  If Discover Tech owed $4,620,000 to Autonomy on

18   June 30th, 2010, would that have been relevant information to

19   you?

20   **A.**    Yes.  Yes.  Of course it would, yes.

21   **Q.**    It then says (reading):

22          "The entire balance due from MicroTech at

23          31 December 2009 has been paid.  6.7 million of the

24          balance due and payable at 30 June 2010 remains unpaid."

25          Was it your understanding that's the amount owed by

1    MicroTech at June 30th, 2010?

2    A.    Yes, exactly.

3    Q.    Based on what the company's telling you?

4    A.    Yes.  Yes.  Uh-huh.

5    Q.    Okay.  And then it says (reading):

6            "No provision has been recorded against this amount

7         as full payment is expected to be made.  This relates to

8         one government end user who has delayed payment to

9         MicroTech.  Whilst payment from MicroTech to Autonomy is

10        not contingent upon the end user making payment to

11        MicroTech, we have allowed them to delay payment given the

12        financial capacity of the end user concerned and the

13        certainty of collection."

14        Do you see that language, Mr. Lindsell?

15   A.    Yes, uh-huh.

16   Q.    And the government end user referenced there -- well,

17   first of all, what did you understand this to mean?

18   A.    We understood that MicroTech had made a sale to a certain

19   government end user, which -- but was unable to, you know,

20   receive the income to settle that transaction very quickly, and

21   so it was along as deferred terms.  Not of itself necessarily

22   unusual actually, so it looked fairly -- it's a fairly

23   plausible statement.

24   Q.    So you thought MicroTech had an agreement with a

25   government end user and just wasn't being paid?

1    **A.**    Oh, yes.  That's what it says.  That's what it actually

2    says, yeah.

3    **Q.**    Okay.  At any point in time did Autonomy tell you that

4    so-called government end user was the Vatican?

5    **A.**    No, no.  No, of course not.  No.

6    **Q.**    At any point did Autonomy tell you that MicroTech had no

7    agreement with the Vatican or another government end user in

8    respect of this 6.7 million?

9    **A.**    No.  No.  Of course not, no.

10   **Q.**    Would that have been relevant to you?

11   **A.**    Yes.  Yes, of course.  It definitely would have been

12   relevant.  Well, it would have -- it would have to be a

13   different answer from the one we were given, that's the thing.

14   **Q.**    Let's please look at the last page, page 8.  I draw your

15   attention to the signature line.

16   **A.**    Yes.

17   **Q.**    Is this signed by -- does it appear to be signed by

18   Mr. Hussain?

19   **A.**    Yes it does.  It does, yes.

20   **Q.**    Okay.  At some point in time did the Panel close its

21   inquiry?

22   **A.**    Yes.  The Panel did close its inquiry because it did not

23   feel that it -- although, as I say, as regulators we're

24   professionally skeptical, but we could have -- we could have

25   gone on to try and get more specific information behind some of

1  the things, but we didn't feel we were going to learn anything

2  substantially different; and we concluded that we did not have

3  any cause to keep the case open, as I say, on the basis that we

4  felt we thought we were being given answers on which we could

5  rely.

6              (Pause in proceedings.)

7         **MR. LEACH:**  Thank you, Mr. Lindsell.

8     Nothing further, Your Honor.

9         **THE COURT:**  Okay, ladies and gentlemen, we're going to

10 take our noon recess.  We'll be in recess until 1:00 p.m.

11    Remember the admonition given to you:  Don't discuss the

12 case, allow anyone to discuss it with you, form or express any

13 opinion.

14    We'll resume at 1:00.

15              (Luncheon recess taken at 11:59 a.m.)

16

17

18

19

20

21

22

23

24

25

 1   <u>**Afternoon Session**</u>                                    <u>**1:02 p.m.**</u>

 2        (Proceedings were heard out of presence of the jury:)

 3            **THE CLERK:**  Come to order.  Court is now in session.

 4            **THE COURT:**  Bring in the jurors.

 5        (Proceedings were heard in the presence of the jury:)

 6            **THE COURT:**  Please be seated.  Okay.  Let the record

 7   reflect that all jurors are present.  The parties are present.

 8        You may proceed.

 9            **MR. KEKER:**  Thank you, Your Honor.

10                       <u>**CROSS-EXAMINATION**</u>

11   **BY MR. KEKER:**

12   **Q.**   Good afternoon, Mr. Lindel.

13   **A.**   Lindsell.  Good afternoon.

14   **Q.**   Mr. Lindsell, you worked 29 years for Ernst & Young and

15   its predecessors?

16   **A.**   Yes.  Yes.

17   **Q.**   One of the big clients of Ernst & Young during that period

18   was Hewlett-Packard of course?

19   **A.**   I -- I think you're right, but I had no direct contact

20   with Hewlett-Packard myself.

21   **Q.**   You said -- and I think you got the date wrong, but you

22   became the first global director of the International Financial

23   Reporting Standards for Ernst & Young --

24   **A.**   Yes.

25   **Q.**   And when was that?

**LINDSELL - CROSS / KEKER**

1   **A.**   Right.  I thought it was about 2013.

2   **Q.**   How about 2003?

3   **A.**   No, no, no, no, certainly.

4   **Q.**   Pardon?

5   **A.**   No.  That's not correct.

6   **Q.**   Your bio is wrong?

7   **A.**   Must by a typo in the bio.  I apologize.

8   **Q.**   I get it.  People make mistakes, but your bio says you

9   became the expert in IFRS in 2003.

10  **A.**   No.  I apologize.  2013.  During 2003 I was effectively a

11  full-time audit partner.

12  **Q.**   Okay.  Why did Ernst -- well, when did these international

13  financial accounting standards come into play?

14  **A.**   2015 in Europe.

15  **Q.**   Not before?

16  **A.**   Well, they existed before, but each country in Europe, for

17  example, and Australia and Hong Kong and so on, applied its own

18  local accounting rules, local GAAP, as you would say.  UK GAAP.

19  **Q.**   When did IFRS become the accounting standard for public

20  companies in England?

21  **A.**   I'm -- I'm really sorry.  I'm completely -- you are

22  absolutely -- absolutely right. 2013 was only three years ago.

23  I do apologize.

24      I should have said 2005, shouldn't I, rather than 2000 --

25  you're quite right.  I became the global director in 2003.  I'm

LINDSELL - CROSS / KEKER

1    ten years out.  I do apologize.

2    **Q.**    Okay.  It's all right.

3    **A.**    Absolutely.

4    **Q.**    So in 2003, you became the global director of -- or 2005?

5    **A.**    2003.

6    **Q.**    2003?

7    **A.**    It was the run up to the introduction of International

8    Accounting Standards in 2015.  So I had to get things organized

9    as best possible in the two-year interval before we started.

10   **Q.**    And why did Ernst & Young need a global director of IFRS

11   services or its accounting firm?

12   **A.**    In common with all the large accounting firms, we all

13   faced the same challenges, and all the accounting firms formed

14   networks of people within their organizations to address what

15   was effectively a new body of accounting standards.

16        And Ernst & Young in that respect was no different from

17   others and asked me if I would do that -- play that role.

18   **Q.**    Fair enough.

19        And that's because this new IFRS standards were going --

20   or ISR standards --

21   **A.**    No.  You're right.  IFRS.  You're right.

22   **Q.**    Let me finish.

23        -- were different than what had gone before and different

24   from U.S. GAAP and different from UK GAAP; right?

25   **A.**    There were differences, yes.

LINDSELL - CROSS / KEKER

1    **Q.**    Right.

2        One huge difference is recognizing sales, software sales

3    to value-added resellers on sell-in as opposed to sell-through;

4    right?

5    **A.**    No -- well, I -- I am aware that there was more detailed

6    guidance, I think, in U.S. GAAP than was the case in

7    International Accounting Standards.

8        International Accounting Standards, which were matters

9    more of principle than detail -- than detailed rules, laid down

10   criteria for recognition of revenue, but it did not have in

11   mind any particular type of industrial or commercial activity.

12       The -- the accounting standard, or I think it was ISA-18,

13   laid down the principles under which revenue should be

14   recognized or not recognized.

15       I think the U.S. -- there was an SOP -- there was a

16   Statement of Position which I think was more detailed.

17   **Q.**    You are talking very quickly.

18   **A.**    I'm so sorry.

19   **Q.**    You said the standard that lays down when revenue can be

20   recognized or not recognized is IAS-18?

21   **A.**    I think it's 18, yeah.

22   **Q.**    Different from the standards in the United States?

23   **A.**    As you can see, I'm not an expert on U.S. accounting at

24   all.

25   **Q.**    That's fine.  That's fine.  Let me go on.

LINDSELL - CROSS / KEKER

1          This exhibit 3060, the first letter that was sent from the

2     FRRP, was addressed to a man named Rob Webb; right?

3     **A.**    So the chairman of the company.

4     **Q.**    And he was -- Rob Webb was the chairman of Autonomy at the

5     time that the letter was sent?

6     **A.**    Correct.

7     **Q.**    And Rob Webb is a person that you knew from your days

8     at -- working as an audit -- as the head of audit for British

9     Airways; right?

10    **A.**    That is true.  He was general counsel of British Airways

11    during part or all of the time that I was the lead audit

12    partner.

13    **Q.**    And you knew him?

14    **A.**    In that regard, yes.

15    **Q.**    Did you discuss these letters with him to say they're

16    coming --

17    **A.**    Oh, certainly not.  I've had no contact whatever with

18    Mr. Webb since my last time I did an audit of British Airways

19    which I guess was around 2002.

20    **Q.**    Okay.  Now, did you expect Mr. Webb -- Mr. Webb is quite a

21    distinguished gentleman in England, isn't he?

22    **A.**    He is a QC.  He is a barrister.

23    **Q.**    QC.  Very accomplished.

24          Did you expect him to do the research to answer all these

25    questions that the FRRP was asking?

LINDSELL - CROSS / KEKER

1   **A.**   No.   The -- no.   The standard procedure for the FRRP was

2   to write -- the initial letter was always written to --

3   addressed to the chairman of the company concerned.

4        Usually subsequent correspondence was with the finance

5   director because the chairman would pass that initial letter to

6   the finance director.

7   **Q.**   Would you expect, in the normal course, that research

8   would -- in order to answer an FRRP letter like the one we've

9   seen -- would be done by a lot of people at the company?

10           **MR. LEACH:**   Objection.   Foundation.

11   **BY MR. KEKER:**

12   **Q.**   The controller, the CFO, the COO, whatever?

13           **MR. LEACH:**   Objection.   Foundation.

14           **THE COURT:**   Overruled.

15           **THE WITNESS:**   Well, I -- I think quite honestly it

16   varies.   I have -- because, one, I was chairman of the --

17   deputy chair of the Review Panel, I frequently met with

18   companies, and there is a very good examples there.   Sometimes

19   the chairman of the company would come, sometimes the -- always

20   the CFO would come.   Sometimes they would bring a controller

21   with them.

22        I can't possibly comment on exactly what processes or any

23   processes that Autonomy might have gone through.   I can tell

24   you my own experience because I was -- as the recipient of

25   letters from the Review Panel in my capacity as audit committee

1    chair of companies, I would certainly do some due diligence

2    myself, but how the finance director went about formulating the

3    response was really his affair rather than mine.

4    **BY MR. KEKER:**

5    **Q.**    When you were the head of the audit committee at some

6    company and you got a letter from the FRRP, you passed it on

7    and said "you all draft a response"?

8    **A.**    It would have gone to the chairman of the company

9    initially, who would have pretty well -- always pass it to the

10   finance director since it relates to financial reporting

11   matters.

12        But as chairman of the audit committee, I was always

13   intensely interested when this -- to understand what was going

14   on in formulating a response, yes.

15   **Q.**    Would you expect such a response to be edited by a lot of

16   people at the company?

17            **MR. LEACH:**  Objection.  Foundation.

18            **THE WITNESS:**  I think that is -- that is not a

19   question I can really answer.

20   **BY MR. KEKER:**

21   **Q.**    Okay.  Then you can't.  I get it.

22        Would you expect the auditors of the company to be

23   involved in answering such a letter?

24   **A.**    Again, the -- I know that the practice varied enormously.

25   In some cases, auditors were consulted by the company.  In some

LINDSELL - CROSS / KEKER

1    cases, the auditors actually might have helped quite

2    considerably in drafting the response.  In other cases,

3    companies did not do -- involve their auditors.

4    **Q.**   Let's talk about this case --

5    **A.**   So, again --

6    **Q.**   Look at 6743 in this black binder.  This is in evidence.

7    **A.**   In the dark colored -- the black --

8    **Q.**   Yeah.  And the tab will say 6743.

9    **A.**   Yes.  I found it.

10                     (Exhibit published to jury.)

11   **BY MR. KEKER:**

12   **Q.**   This is in evidence.  And this -- let's look at the bottom

13   email.  This is from Lee Welham dated February 17, 2011 to

14   Andrew Kanter, with copies to Sushovan Hussain, Steve

15   Chamberlain, and Nigel Mercer.

16        Do you know any of those people?

17   **A.**   I think I -- I'm not -- no.  I know none of them.

18   **Q.**   And he is saying, "Andy following on our call today, I

19   thought it would be worthwhile recapping on our key thoughts at

20   this stage with regards to your response to the FRRP letter."

21        And then if you go up, Kanter thanks him for it.

22        So would that -- would it surprise you that this letter

23   would be worked on by the auditors and others at the company

24   besides Mr. Webb?

25   **A.**   It wouldn't surprise me.  It wouldn't surprise me.

LINDSELL - CROSS / KEKER

1    **Q.**    Wouldn't surprise you.  Okay.

2        Let's look at -- well, let's look at 6744, which is also

3    in evidence.

4            **MR. LEACH:**  Is it in evidence?

5            **THE CLERK:**  Yes.

6            **MR. KEKER:**  6744 is in evidence.  Through Mr. Welham.

7    **Q.**    Look at the bottom one down here.  It says to Steve from

8    Lee.  This is from Steve Chamberlain -- excuse me -- Lee Welham

9    is sending Steve Chamberlain -- do you know who Steve

10   Chamberlain is?

11   **A.**    No, I don't actually.

12   **Q.**    Do you know who wrote this letter -- who actually drafted

13   the letter?

14   **A.**    No, I don't.

15   **Q.**    It says, "Steve, comments attached following our internal

16   reviews.  In addition, we suggest that you remove exclamation

17   point on page 6.  Have a look through and give me a call."

18       And then if you turn it, you see a -- what appears to be a

19   draft letter --

20   **A.**    Yes.

21   **Q.**    -- and it's got little scribbles.  The jury is not going

22   to be able to see it.  It's got little scribbles all over it

23   that appear to be the comments that the auditors made; right?

24   **A.**    Yeah.

25   **Q.**    Would that surprise you that --

LINDSELL - CROSS / KEKER

1    A.   No, no, it wouldn't.

2    Q.   And then, for example, look at page 6744-07 where a very

3    specific statement is being made in the paragraph that begins

4    31 December here in the middle.  This is about MicroLink.

5    A.   Yes.

6    Q.   And it says, "31 December, 2009, 23 million of receivables

7    were outstanding for MicroLink."

8         And then there is a little line that says "correct,"

9    question mark.  "As of that date, 16.25 million was not yet due

10   and 6.76 million was between two days and four days overdue."

11   And they put little circle there.

12        And if we go back to the first page, what Chamberlain --

13   the top one is stephenc@autonomy.  No.  The first page of this

14   exhibit.  I'm sorry.  6744.  The email.

15   A.   The email.  Yep.

16   Q.   So after getting -- after getting these comments -- the

17   top email, please, Jeff.

18        Chamberlain is writing to Kanter and to Mr. Hussain saying

19   "Sending immediately.  Reviewing myself now."

20        So somebody was fact-checking; right?

21   A.   Yes.  The question is there was -- yeah.  The question is

22   how much.  The annotations -- most of them look as if they're

23   bits of English, really.

24   Q.   Well, that is the question, "how much?"  How much fact

25   checking.

LINDSELL - CROSS / KEKER

1        Look at 6748, please.

2   A.   6748, yes.

3           THE COURT:  Admitted.  Is it in?

4           MR. KEKER:  It's admitted, are Your Honor.  It's in

5   evidence.  Sorry.

6                   (Exhibit published to jury.)

7   BY MR. KEKER:

8   Q.   And this is Welham writing to Kanter saying, "Response to

9   point 8, you should remove the reference to Microsoft."

10       Remember, you were saying Microsoft, that seemed

11   irrelevant to you.  Welham seems to agree with you.

12       He says, "I don't see how this is relevant.  The argument

13   could be used for any industry selling through retail outlets.

14   I would talk instead about the fact that it is common in the

15   software industry when selling to enterprise customers in a

16   variety of jurisdictions across the globe to use resellers and

17   would be impracticable for software companies to be involved in

18   the transaction with the end user because it is not

19   commercially sensible or cost effective.  I have no further

20   comments."

21       Does it surprise you at all that Deloitte was going over

22   and making suggestions and trying to help get a letter together

23   to go back to FRRP?

24   A.   That doesn't surprise me.

25   Q.   And then if we could look at 6644.

LINDSELL - CROSS / KEKER

```
 1        This is not in evidence, but this is Mr.-- Mr. Chamberlain
 2   to Kanter and Mr. Hussain.
 3        I move it in, Your Honor.
 4            MR. LEACH:  Objection.  Hearsay.
 5            THE COURT:  Okay.  Wait a minute.
 6            MR. KEKER:  It at least goes to Mr. Hussain's state of
 7   mind, Your Honor, about this letter.
 8            THE COURT:  It still may be hearsay.
 9        (The Court reviews the document.)
10            THE COURT:  Okay.  I'm not going to admit it.  This
11   witness hasn't seen this letter or anything about it, has he?
12            MR. LEACH:  No.
13            THE COURT:  Okay.  It's not admitted at this time.
14            MR. KEKER:  Your Honor, there is -- could I be heard
15   someplace?
16            THE COURT:  Sure.  But if you want to introduce a
17   series of letters similar to this one, we'll have to do so
18   outside the presence of the jury.  I don't know how it would
19   affect this witness' testimony in that I don't believe he saw
20   any of this.
21            MR. KEKER:  Okay.  My --
22            THE COURT:  And I think it is a matter to take outside
23   the presence of the jury.  If you want to do it now, I will.
24            MR. KEKER:  I'd like to do it now --
25            THE COURT:  Though I think you --
```

1              MR. KEKER:  The issue -- I would like to do it now.

2              THE COURT:  Do you have any other questions of the

3      witness?

4              MR. KEKER:  I do, yes.

5              THE COURT:  Pardon?

6              MR. KEKER:  I do.  But I would like do this now.

7              THE COURT:  Okay.

8          Well, ladies and gentlemen -- no, no.  You can all just

9      talk and stand up and so forth.

10         (The following proceedings were heard at the sidebar:)

11             MR. KEKER:  This is 6644.  We're talking about.  And

12     one of the issues that was raised -- 66 -- one of the issues

13     that was raised was how can they possibly say that Discover

14     Tech -- excuse me -- yeah -- no -- MicroLink owed $1.4 million.

15         This is Mr. Chamberlain reporting and attaching business

16     records -- if you look at the exhibit, these are the accounts

17     of the company back here that shows all the transactions with

18     MicroLink over a several-year period, and at the time at the

19     end, it shows 1 point -- are you looking -- we're looking at

20     different things.

21             THE COURT:  No.  No.  I see what you're referring to.

22     I'm just trying to figure out how a communication that's

23     attorney-client privilege without -- number one, waiving the

24     privilege and number two, he is not here.

25             MR. KEKER:  This isn't attorney-client.  This is --

1   Chamberlain is the controller.

2          THE COURT:  It says "Subject:  Attorney-client,

3   confidential."

4          MR. KEKER:  All right.  Okay.

5          THE COURT:  So, I mean, even, number one, you can't

6   just bring in statements of the defendant.

7          MR. KEKER:  This isn't --

8          THE COURT:  So it doesn't go the defendant's state of

9   mind.

10         MR. KEKER:  It certainly does.  Where did he get this

11   1 point --

12         THE COURT:  Who?

13         MR. KEKER:  When he reads this letter --

14         THE COURT:  When who?

15         MR. KEKER:  When Sushovan Hussain.

16         MR. LEACH:  What is the evidence of that?

17         MR. KEKER:  He signed the letter.  The letters says,

18   "They owe us 1.4," and what I'm saying is Chamberlain is

19   writing the letter.  Chamberlain says, "They owe us 1.4."

20      Sushovan Hussain reads this and where his controller is

21   telling him 1.4 and they want to make it out to be a lie.  This

22   is his state of mind.  He is being told with business records

23   attached that it's $1.4 million.  That should come in.

24         THE COURT:  Why doesn't it?

25         MR. LEACH:  First of all, there is no one here to

```
1   authenticate it.
2           THE COURT:  I'm not going to go there.  Let's move
3   past that.
4           MR. LEACH:  The record, Your Honor, is -- includes
5   the --
6           THE COURT:  Okay.  But that is a subject of argument.
7           MR. LEACH:  But it includes the writeoff.  He wants --
8           THE COURT:  That is the subject of writeoff.
9       I do think this is not the witness for it.  I'm sorry.  I
10  do think this is not the witness for it.
11          MR. LEACH:  How can I effectively cross-examine him on
12  a document that he has --
13          THE COURT:  You can't.
14          MR. KEKER:  They're about --
15          THE COURT:  You cannot cross-examine him on that.  You
16  can't cross-examine him on it.
17          MR. KEKER:  So what?  This is his state of mind and I
18  want to show it to him, get it into evidence as -- showing him
19  that there was a reason why 1.4 appears in his letter.
20          THE COURT:  That's not -- this is not the witness for
21  it.  He has no idea of the truth of the matter of anything that
22  is asserted in the letter.  He is simply saying, "This is what
23  I was told."  That's what he is saying.
24          MR. KEKER:  Right.
25          THE COURT:  "This is what I was told."
```

1          Now, what you want to say is yes, "that's what -- you were

2     told that because somebody told you to tell that," which may be

3     true.  It may be true.  But he's not the witness on that

4     subject.

5          And so I'm going -- I'm sustaining the objection at this

6     point, but I will hear later on -- there may be other ways to

7     get it in.

8               MR. LEACH:  Okay.  My point --

9               THE COURT:  You don't need a point.

10     (Sidebar conference ended and proceedings held in open court)

11    BY MR. KEKER:

12    Q.   The correspondence with the FRRP, whatever else went on,

13    made it very clear that Autonomy recognized revenue on the sale

14    to a value-added reseller; right?

15    A.   Yes.

16    Q.   If there was no sale to an end user, they said the

17    reseller is still on the hook, they owe them money, that's it?

18    A.   That's what they said, yes, correct.

19    Q.   And we recognize that revenue?

20    A.   Uh-huh.  Yes.

21    Q.   And the FRRP didn't have any problem with that?

22    A.   No -- umm, it's quite complicated at the FRRP.  We

23    haven't -- you will no doubt refer to the Deloitte review which

24    weighed in our minds in terms of supporting -- effectively

25    supporting what we were being told by the company.

LINDSELL - CROSS / KEKER

1    I do think the Review Panel -- the Review Panel --

2        **THE COURT:**  You have to speak up.

3        **THE WITNESS:**  I'm sorry.  I'm so sorry.

4    The Review Panel was -- had a certain unease about the

5    practice of recognizing sales to an intermediary if that

6    intermediary was not well enough capitalized and

7    creditworthy -- creditworthy, I think is probably the issue.

8        That's why we asked those questions, although it was on

9    the back, of course, of the Hogenson letter.

10       But we did have -- not concern, but we were sort of uneasy

11   about it.

12       I have to tell you that I -- and I said in my own evidence

13   earlier the term -- I'm not an expert in -- in software

14   industry accounting.  And when we're told, for example, that

15   this is in accordance with industry practice, it does tend to

16   have some influence on us as the Review Panel.

17   **BY MR. KEKER:**

18   **Q.**   You mentioned that I was probably going to take you to the

19   audit -- the Deloitte report?

20   **A.**   Sure, yeah.

21   **Q.**   What wasn't in 3060 when you saw it was the entire -- was

22   attached, though, and sent to you was Deloitte's entire

23   analysis and report to the audit committee about the Brent

24   Hogenson allegations?

25   **A.**   That's correct.  As we had requested.

1    Q.   And they also sent the Brent Hogenson emails and

2    allegations.  So they showed you what Mr. Hogenson said.  You

3    don't remember that?

4    A.   I don't remember that personally, no.

5    Q.   Let's show --

6    A.   Sorry.

7    Q.   -- the part that should have been in the exhibit but

8    wasn't.

9         Jeff, can we get up the appendix.  If you go to the

10   back -- let me see how far back this is.

11            THE CLERK:  This is 3060?

12            MR. KEKER:  This is 3060 with the appendix added.

13            THE WITNESS:  I apologize.  Yes.  I see what you mean.

14   The Appendix A document.

15   BY MR. KEKER:

16   Q.   Appendix A, email correspondence from Brent Hogenson.

17   A.   Yes.  I do remember.

18   Q.   And it goes on for several pages.

19   A.   It does.

20   Q.   The jury can review it.

21        So they showed you his allegations, they showed you

22   management's response, they showed you the Deloitte response;

23   right?

24   A.   Yes.

25   Q.   And in the Deloitte -- what you were referring to is that

LINDSELL - CROSS / KEKER

1    at page 3 of the appendix, which is attached to their response

2    to your letter, they -- in -- in answering your questions about

3    Eli Lilly up at the top, "Although Eli Lilly have subsequently

4    chosen to transact directly with Autonomy in June 2010 does not

5    detract from the fact that Autonomy contracted directly with

6    Capax in December 2009.  Autonomy delivered the product,

7    transferred all risks and rewards of ownership by December 31.

8    An Autonomy salesperson has continued to stay involved with the

9    transaction between Capax and the end user because it is in

10   Autonomy's interest to stay close to the end user from a

11   commercial perspective.  Capax remains fully liable to Autonomy

12   for the obligation under the purchase order signed in December

13   2009."

14       That makes it pretty clear what that -- that -- their

15   recollect -- revenue recognition practice was.  They're taking

16   the revenue in December of 2009?

17   A.   Yes.

18   Q.   And they are continuing to deal with the end user because

19   their commercial interests are working with their long-time

20   software customers; right?

21   A.   Yes.

22   Q.   Okay.  And then under Deloitte's response, they say, the

23   second sentence, "The determination of the revenue recognition

24   on the Capax sale as of 31 December 2009 is consistent with our

25   understanding in this transaction at that time.  As part of our

LINDSELL - CROSS / KEKER

1    audit for the year ended, we performed audit procedures on the

2    revenue contract with the reseller to ensure that all criteria

3    within International Accounting Standard 18 Revenue, IAS-18,

4    paragraph 14 were met.  Given that all risks and rewards of the

5    contract had been transferred to Capax by the year date and

6    that it was probable that economic benefits would transfer to

7    Autonomy, we concurred with management that it was appropriate

8    to recognize the revenue on the contract."  Right?

9    **A.**    Yep.

10   **Q.**    Not -- not ambiguous; right?

11   **A.**    Absolutely it's not ambiguous, yeah.

12   **Q.**    Now, let me talk to you about Kraft, this almost -- almost

13   unique language.

14        First of all, "almost unique" means -- is different from

15   "unique."  "Unique" means one and only.  "Almost unique" means

16   not one and only.  And I guess you could -- it's a few, a few

17   more.

18        Do you know how many reseller partners Autonomy had?

19   **A.**    No.

20   **Q.**    Do you know in their annual report they report 400

21   reseller partners?

22   **A.**    No.  I might have read that, but --

23   **Q.**    Do you know how many transactions are done through those

24   partners over a two-year period or were at that time?

25   **A.**    No, I don't know.

**LINDSELL - CROSS / KEKER**

1   Q.   If I told you more than 10,000 transactions through

2   resellers had been done over a couple year period, would you

3   agree with me that almost unique -- if it were two, three,

4   four, it would still be almost unique?

5           MR. LEACH:   Objection.   Foundation.

6           THE WITNESS:   It would be unusual.

7           THE COURT:   I'll allow it.

8           THE WITNESS:   It would certainly be unusual.

9   BY MR. KEKER:

10  Q.   Do you know how many -- first of all, what was unique --

11  what did you understand the "almost unique" meant?

12  A.   Well, that the -- the respondent could not guarantee it

13  was the only such instance that had ever occurred; therefore,

14  there might be -- there might have been -- but it was rare or

15  unusual.

16  Q.   Okay.   And do you know if there were any direct

17  transactions that had gone directly to Autonomy from a reseller

18  where they had sold to the reseller and then the transaction

19  went directly to Autonomy before the Kraft deal in Q3/'09?

20  A.   No.   Of course -- of course -- the knowledge at the Review

21  Panel was limited and the inquiries were limited to the matters

22  that had been brought to our attention by Mr. Hogenson in his

23  letter to the --

24  Q.   If -- okay.   If there were no direct sales following sale

25  to a reseller before Kraft in Q3/'09, this statement that it's

LINDSELL - CROSS / KEKER

1  almost unique would be completely true, wouldn't it?

2  **A.**    Uh-huh.

3  **Q.**    Okay.  So -- and then you asked again in your April 5th

4  letter -- which is the 3059 and the response there is 1828, is

5  what I have.

6       And if you look at the Kraft question, where -- you asked

7  another question about it, "What do you mean by almost unique?"

8  **A.**    Yeah.

9  **Q.**    And the response on page 3 at the bottom -- bottom

10  paragraph --

11  **A.**    I'm sorry.  I'm a bit at sea on the documents.  You have

12  to point --

13  **Q.**    3061 is in the black binder.

14       Just put it up on the screen.  We'll put it up here.

15       No.  This is page 3 of 3061.  The bottom.  Yeah.

16       You've asked again about Kraft -- they say, "This is a

17  series of events that virtually never happens."  Do you know

18  what -- the series of events they're referring to?

19  **A.**    I imagine the fact that the contract -- a contract was

20  signed with a reseller and then subsequently the contract for

21  the same -- the same underlying goods or services was then

22  signed directly with Kraft.

23  **Q.**    Okay.  "In fact, management struggles to recall any prior

24  time that this happened."  Does the "any prior time" mean

25  before Kraft?

LINDSELL - CROSS / KEKER

1    A.    Yes.

2    Q.    Before the Kraft deal.  So management is struggling to try

3    to figure out if there is anything before Kraft that was like

4    this, and they're saying "we can't remember one"?

5    A.    Yes.  That's --

6    Q.    And do you know that that's absolutely true?

7    A.    No.  Of course I don't know that that's true.

8    Q.    Okay.

9          Let's talk about this MicroTech/Discover Tech business.

10   At page 6 of 3060 -- first, let's go to page 5 of 3060, please,

11   and start at the bottom.  The bottom paragraph in January 2010,

12   "Autonomy."

13   A.    Yeah.

14   Q.    So you've asked a question about what's the relationship

15   between all these companies, and they say, "In January 2010,

16   Autonomy announced the acquisition of MicroLink after disposal

17   of a portion of the MicroLink business prior to the

18   transaction.  Discover Technologies was the business that was

19   spun out of MicroLink, which was a different line of software

20   independently developed by MicroLink's founders and not a value

21   to Autonomy."

22          Does that tell you that Discover Technologies was set up

23   by the founders of MicroLink?

24   A.    Yes.  It does imply that.

25   Q.    It doesn't mention the name Dave Truitt, but it tells you

1    that Discover Technologies was set up by the founders of

2    MicroLink, using software -- with software that the founders

3    had developed?

4        The jury knows that is Discover Engine --

5    **A.**   If that's the case.  That's not what -- it's not as

6    specific as that, is it?

7    **Q.**   Let's turn over to the next page, page 6.  It goes on to

8    say -- again, this is in response to your question about these

9    companies -- "Discover Technologies is now an independent

10    company.  MicroLink and Discover Technologies briefly shared

11    office space following the spinout during a normal post-spinout

12    transition period.  An arms' length transition services

13    agreement was negotiated between Autonomy and the external

14    lawyers for Discovery Technologies at the time.  Nothing should

15    be inferred from seeing the same address for both companies at

16    the time, other than these two companies share an address

17    because they used to be related."

18        Right?

19    **A.**   Yes.

20    **Q.**   And they're no longer related.  This -- that's what that's

21    saying.  MicroLink is owned by Autonomy --

22    **A.**   Uh-huh.

23    **Q.**   And Discover Tech is owned by whoever -- the founder.

24        And then it goes on to say, "MicroTech is completely

25    separate.  Ten-year old company doing government work.

1    MicroTech has separate staff, offices, shareholders, customers,

2    lines of business, etc.  They're tenants on different floors of

3    the same" -- MicroTech and MicroLink -- "tenants on the same

4    floors -- different floors of the same multistory building in

5    Virginia, together with about 40 other companies.  More about

6    MicroTech can be found at www.microtech.net; right?

7    **A.**    Yes.

8    **Q.**    Do you know if anybody went to www.microtech.net?

9    **A.**    Actually I think somebody did.  In fact, I might have had

10   a look, but that's all.  It's a long time ago.  I can't --

11   **Q.**    Do you remember that MicroTech is heavily identified in

12   all its publicity with a man named Tony Jimenez, a former

13   veteran, disabled veteran; right?

14   **A.**    No, I don't -- didn't know.

15   **Q.**    Do you know if the website or anything that MicroTech puts

16   out identifies any minority shareholders in MicroTech?

17   **A.**    I have no knowledge of that, no.  No.

18        We were asking the question and expected an answer from

19   the company without having to do our own research.  It wasn't

20   our business to do our research in the sense of we asked

21   questions and expected the company to tell us -- to give us the

22   answers.

23        The question, which is in paragraph 21, was to -- the

24   Panel was seeking to understand the connections and the extent

25   to which these companies are or were related to each other;

1  that is to say, was there any relationship between MicroTech

2  and Discover Technologies and MicroLink.

3  **Q.**   Do you know if anyone in London knew who the minority

4  shareholders in MicroTech were?

5           **MR. LEACH:**  Objection.

6           **THE COURT:**  I don't think -- I think we're going far

7  afield.

8  **BY MR. KEKER:**

9  **Q.**   Do you know if Chamberlain, Kanter, Hussain, people in the

10 London office of Autonomy, knew that David Truitt was a

11 minority shareholder in MicroTech?

12          **MR. LEACH:**  Objection.

13          **THE WITNESS:**  You are asking questions that are way

14 beyond the scope of the work that the Review Panel carried.

15          **THE COURT:**  Sustained.

16 **BY MR. KEKER:**

17 **Q.**   Do you know if anybody at Deloitte knew that David

18 Truitt --

19          **THE COURT:**  Wait, Mr. Keker.  Actually these are not

20 proper questions.  These are not proper questions.  So maybe

21 another witness can testify to that, but this witness cannot.

22 And I'm interested in moving ahead on this witness.

23          **MR. KEKER:**  Yes, sir.

24          **THE COURT:**  Okay.

25 \\\

1  BY MR. KEKER:

2  Q.   Okay.  If the facts were that there was a minority

3  shareholder in MicroTech with no managerial control, no ability

4  to make decisions, no ability to bind MicroTech, but he was a

5  minority shareholder, would that have made a bit of difference

6  to your analysis?

7  A.   The answer to that is yes --

8         MR. LEACH:  Objection.

9         THE WITNESS:  -- depending, I imagine -- sort of

10 depending on what financial interests the person concerned had.

11      The minority is the point.  Actually, even under

12 accounting standards, the related party test cuts in at a 20

13 percent equity, sort of in holding, for example.  But we

14 would -- if there had been any relationship of that nature, we

15 would -- I mean, in answer to our question, we would expected

16 to be told.

17 BY MR. KEKER:

18 Q.   What would -- if they knew.  If they knew it, you would --

19 A.   If they knew it.  If they were aware of it.  Clearly you

20 can only say what you're aware of.  On the other hand, I

21 suppose if you're not aware, you say "we're not aware."

22 Q.   Well -- okay.

23      Do you know if -- if MicroTech held itself -- held itself

24 out as owned by Tony Jimenez?

25 A.   I have no knowledge.

```
 1              MR. LEACH:  Objection.  Foundation.  Argument.

 2   BY MR. KEKER:

 3   Q.   Well, I have some questions about the -- the MicroLink

 4   acquisition audited by Deloitte and responded to by management

 5   and Deloitte in response to Hogenson's allegations was -- is

 6   all there in the appendix that they sent you; right?

 7   A.   Yes.  I think so.

 8              MR. KEKER:  And then, Your Honor, except for the 6644,

 9   which I talked about, I have no further questions.

10              THE COURT:  Okay.  Thank you.

11        Anything further?  Redirect?

12              MR. LEACH:  Very briefly, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MR. LEACH:

15   Q.   The Panel asked some questions about -- you testified on

16   cross about how Capax's ability to pay weighed in your

17   evaluations of some of the comments about Eli Lilly and Kraft?

18   A.   Uh-huh.

19   Q.   In any of the responses from Autonomy, did anybody tell

20   you that Autonomy was purchasing product from Capax?

21   A.   I think the answer to that is no.

22              MR. KEKER:  Just if I --

23              THE WITNESS:  Because it's not in any of the

24   correspondence.

25              MR. KEKER:  The document speaks for itself.  The
```

1  letter speaks for itself.  He is asking rhetorical questions.

2  I object.

3          THE COURT:  I don't think he is asking a rhetorical

4  question.  He is just asking him "did somebody say this to

5  you?"

6          MR. LEACH:  Yes, Your Honor.

7          THE COURT:  Okay.  The answer is "yes" or "no" or "I

8  don't recall."

9          THE WITNESS:  We had no contact of any type with

10  Autonomy in the Review Panel other than through the mechanism

11  of the correspondence; therefore, all we knew about the facts

12  in response to our questions were what was in the

13  correspondence.

14          MR. LEACH:  Very well.

15      I have nothing further, Your Honor.

16          THE COURT:  Anything further?

17          MR. KEKER:  No, Your Honor.

18          THE COURT:  No.  Okay.

19      Thank you.

20          THE WITNESS:  Thank you very much.

21          THE COURT:  You may return.  Thank you very much for

22  coming.

23          MR. FRENTZEN:  Your Honor, the Government calls John

24  Meiers.

25          THE CLERK:  Please raise your right hand.

MEIERS - DIRECT / FRENTZEN

```
 1                          JOHN MEIERS,

 2    called as a witness for the Government, having been duly sworn,

 3    testified as follows:

 4              THE CLERK:  Thank you.  Please be seated.

 5         Please state your full name for the record and spell your

 6    last name.

 7              THE WITNESS:  John Meiers, M-E-I-E-R-S.

 8                       DIRECT EXAMINATION

 9    BY MR. FRENTZEN:

10    Q.   Good afternoon, Mr. Meiers.

11    A.   Hello.

12    Q.   Mr. Meiers, where do you live?

13    A.   I live in Lenexa, Kansas, outside of Kansas City.

14    Q.   What do you currently do for a living?

15    A.   I manage a procurement system for DST Systems in Kansas

16    City.

17    Q.   What is DST Systems?

18    A.   It's a mutual fund processing company.

19    Q.   At some point in time, did you work at H&R Block?

20    A.   I worked at H&R Block from August of 2007 to January of

21    2015.

22    Q.   And what was your job at H&R Block, if you could relate --

23    if it changed during the years or not?

24    A.   So I started as an IT contracts manager and then became a

25    procurement professional with control of all software licensing
```

MEIERS - DIRECT / FRENTZEN

1   agreements.

2   **Q.**   And what does that mean, doing procurement?

3   **A.**   It meant that I negotiated all software deals for the

4   company.

5   **Q.**   Did you work, let's say, hand-in-hand or near the folks

6   doing hardware procurement at H&R Block?

7   **A.**   There was a separate team that handled hardware

8   procurement.   They were colleagues of mine.

9   **Q.**   You knew them?

10  **A.**   Absolutely.

11  **Q.**   Okay.   Did you know an individual by the name of Aaron

12  Curtis?

13  **A.**   He sat next to me.

14  **Q.**   Who was Mr. Curtis?

15  **A.**   He had the similar job to me except he handled all

16  hardware deals.   I handled all software deals.

17  **Q.**   I'd like to direct your attention, if I could, to the year

18  2010.

19      In or around September of 2010, were you involved in

20  negotiating a purchase of software from Autonomy?

21  **A.**   Yes.   I led the RFP that eventually led to the decision to

22  buy Autonomy software and I also negotiated the deal.

23  **Q.**   Could you tell us what sort of deal was it; in other

24  words, what were you looking to try to achieve at H&R Block

25  through the software?

MEIERS - DIRECT / FRENTZEN

1   **A.**   We were in the market for an email archive solution.

2   **Q.**   All right.  And in the course of setting out to obtain the

3   software to do this email archiving solution, did you look at a

4   number of different possible vendors?

5   **A.**   Our incumbent supplier was IBM FileNet, and we did look at

6   other suppliers, but the final two, decision point, was between

7   IBM and Autonomy.

8   **Q.**   Did you eventually go with Autonomy?

9   **A.**   We did select Autonomy, yes.

10  **Q.**   And do you have a recollection of that being in or around

11  September of 2010?

12  **A.**   Yeah.  It was a little over $2 million.  We closed the

13  deal, I believe, in September of -- 30th of 2010.

14  **Q.**   I want to ask you now a slightly different question.

15      Were you aware of a relationship that H&R Block had with a

16  reseller by the name of Zones?

17  **A.**   Yes, I did.

18  **Q.**   And just to your understanding, what was Zones?

19  **A.**   Zones was our hardware reseller, and on an annual basis,

20  we would purchase computers and monitors to deploy to our

21  retail tax operations.

22  **Q.**   I would like to pull up, if I could, what I believe is in

23  evidence as Exhibit 863.

24              (Exhibit published to jury.)

25  \\\

BY MR. FRENTZEN:

Q.   All right.  Do you see what this is, 863, Mr. Meiers?

A.   Yeah.  This was a statement of work that we did on an annual basis.  We would buy Dell computers and run it through a resale relationship with Zones.

Q.   There is a discussion here about the project scope -- except it just moved on me -- project scope.  Does that generally describe what the purchases from Zones were intended for?

A.   Yes.  We would refresh about 10 percent of our computers in the H&R Block tax offices on an annual basis.  Zones was our reseller.  They gave a 2.5 percent discount to buy Dell computers through them.

Q.   And is there -- dose it actually indicate what is being purchased in accordance with this statement of work, work stations and monitors?

A.   Yes.  So that -- what that says is that we had one server work station per tax office.  We had about 7,000 offices at the time.  And then we were refreshing, you know, not all of our monitors, but, you know, 16,000 is probably about 10 percent of our monitors.

Q.   In terms of these annual refreshes and specifically dealing with -- owe a deal with Zones in 2010, in or around July of 2010, did you have any information or knowledge that Autonomy was in some way involved in supplying the computers

1    and monitors to H&R Block?

2    **A.**    No.

3    **Q.**    Would that -- were that true, were that the case, would

4    that have surprised you at the time?

5    **A.**    I would be astonished if that were the case.

6    **Q.**    Why is that?

7    **A.**    Because we had a three -- we call it the three-way deal.

8    It was H&R Block, Zones, and Dell, so we procured the hardware

9    from Dell.  Zones provided the services to distribute to our

10   field locations, but that's -- that was the value chain that we

11   had.  To my knowledge, no one else was involved with that.

12   **Q.**    And did there come a time several years later, actually,

13   when you had an inquiry with Mr. Curtis about whether or not

14   Autonomy was in any way related to the relationship between H&R

15   Block, Zones, and Dell?

16   **A.**    Yes.  As part -- when we bought the Autonomy software in

17   2010, that was a software that was housed in our corporate

18   location to support corporate operations.  But there was a

19   component.  I negotiated the software deal, but they did

20   purchase some hardware appliances to actually power the

21   software solution.  And I was not involved in that purchase,

22   but I did have a question about the nature of that purchase.

23   **Q.**    And based on your question to Mr. Curtis, did he indicate

24   whether or not Autonomy was involved in the relationship that

25   existed between H&R Block, Zones, and Dell?

1          **MR. MARAIS:**  Objection.  Hearsay.

2          **MR. FRENTZEN:**  It's not offered for the truth.  It's

3    actually false, but it's what their understanding was.

4          **THE COURT:**  It's admitted to show the state of mind of

5    the witness.  For that purpose, it's limited.

6          **MR. FRENTZEN:**  Thank you, Your Honor.

7    **Q.**    What did Mr. Curtis inform you, if anything, about

8    Autonomy's relationship to the -- or their involvement in the

9    relationship between H&R Block, Zones, and Dell?

10   **A.**    He said they had nothing to do with it.

11   **Q.**    And he was the guy procuring hardware at H&R Block?

12   **A.**    Correct.

13   **Q.**    And I now want to turn back to shortly after the hardware

14   refresh in July of 2010 to ask you about the software deal that

15   you eventually negotiated with Autonomy.

16         And with a little help from the defense table, if we could

17   get -- Exhibit 6292 I understand is in evidence?  Yes?

18         **THE CLERK:**  Yes.

19         **MR. FRENTZEN:**  Great.  Thank you.  This is 6292-D.

20         **THE CLERK:**  The whole thing.

21         **MR. FRENTZEN:**  Page 1.  Great.  Much appreciated.

22              (Exhibit published to jury.)

23   BY MR. FRENTZEN:

24   **Q.**    Does this appear to be the deal that was negotiated

25   between H&R Block and Autonomy by you?

MEIERS - DIRECT / FRENTZEN

1    **A.**    Yes.

2    **Q.**    Do you have any recollection who you dealt with at

3    Autonomy in negotiating this deal?

4    **A.**    I dealt with a gentleman by the name of Dipan Patel and

5    also a gentleman by the name of Rob Sass.

6    **Q.**    Do you see there is some software listed here, EAS

7    software?

8    **A.**    Correct.

9    **Q.**    If we could scroll down all the way.

10    And ALH software?

11    **A.**    Uh-huh.  Correct.

12    **Q.**    If we could go to the next page, page 2.

13    More software and so on.  Was this, if you will, a

14    software deal?

15    **A.**    It was an enterprise software deal so we were buying a

16    variety of software to use in our enterprise location.

17    **Q.**    If we could please go to page 5 of this part D, I guess.

18    Great.  Thanks.  And if we could blow up that part.  Great.

19    All right.  Do you see the license fee there, Mr. Meiers?

20    **A.**    Yes, I do.

21    **Q.**    And then a support fee?

22    **A.**    Correct.

23    **Q.**    So this is a little over a $2 million deal for H&R Block?

24    **A.**    Correct.

25    **Q.**    All right.

MEIERS - DIRECT / FRENTZEN

1    And if we could go to the last page, which is page 7,

2    please.  Or I don't know if it's last, but page 7, if you don't

3    mind.  Thank you.

4    Do you see at the bottom a date for the deal or a

5    signature, in any event?

6    **A.**    Correct.

7    **Q.**    And just, if we could -- do you see where there is a

8    discussion about servers here?

9    **A.**    Correct.

10   **Q.**    Okay.  What was the situation going to be in terms of the

11   servers for this deal, for the software deal?

12   **A.**    We were negotiating the software in this agreement with

13   the understanding that at some point in time, H&R Block would

14   have to size and procure either appliances or hardware

15   appliances or servers to support the implementation.  The

16   implementation would be hosted by H&R Block on its corporate

17   headquarters location.

18   **Q.**    And you see it says "All servers shall be owned and/or

19   leased and controlled by licensee."  Who was the licensee?

20   **A.**    H&R Block.

21   **Q.**    In terms of negotiating this software deal, Mr. Meiers, at

22   any point in time, did anyone from Autonomy bring to your

23   attention that Autonomy had been involved as a -- in some way

24   in the reseller arrangement for the refresh for H&R Block for

25   that year?

MEIERS - CROSS / MARAIS

1   **A.**   No.

2   **Q.**   And did anyone else, during the course of your

3   negotiations or otherwise, bring to your attention that

4   Autonomy had had this role in the refresh?

5   **A.**   No.

6   **Q.**   As a result, since you didn't know it, did that play any

7   role at all in your negotiation with the software deal?  In

8   other words, whether or not they had been part of a hardware

9   deal?

10  **A.**   It had nothing to do with the software decision.

11          **MR. FRENTZEN:**  May I have one moment, Your Honor?

12          **THE COURT:**  Yes.

13          (Government counsel confer off the record.)

14          **MR. FRENTZEN:**  That's all I have.  Thank you very

15  much, Mr. Meiers.

16                          **<u>CROSS-EXAMINATION</u>**

17  BY MR. MARAIS:

18  **Q.**   Ladies and gentlemen, good afternoon.

19          Mr. Meiers, good afternoon.

20  **A.**   Hello.

21  **Q.**   We've never met.  My name is Nic Marais.  I'm one of

22  Mr. Hussain's attorneys.

23          When did you learn that the Government wanted you to

24  testify here at this trial?

25  **A.**   I got a call last Tuesday from the FBI.

**MEIERS - CROSS / MARAIS**

1    Q.    That was the first time you learned of it?

2    A.    Yes.

3    Q.    Okay.  And in getting ready to testify today, did you talk

4    to the prosecutors?

5    A.    I did.

6    Q.    Which of the prosecutors did you talk to?

7    A.    The gentleman that was just speaking to me.

8    Q.    Mr. Frentzen?

9          And in getting ready for your testimony today, did you

10   speak to anybody else?

11   A.    No.

12   Q.    You didn't speak to any of your former colleagues at H&R

13   Block?

14   A.    No, I did not.

15   Q.    Did you look at any documents?

16   A.    Only what the FBI sent me.  It was one email they sent to

17   me.

18   Q.    That was the only document you looked at, a document

19   chosen by the prosecutors for you to review?

20   A.    Correct.

21   Q.    Okay.  Back in 2010 when you worked at H&R Block, your

22   title was sourcing manager?

23   A.    Sourcing leader.  I was not in a management role at that

24   time.

25   Q.    And is sourcing another word for procurement?

1  **A.**   It is.

2  **Q.**   Can you explain to the jury what "procurement" means?

3  **A.**   It was my job to -- in this case with Autonomy was to

4  negotiate with Autonomy to purchase the software, purchase the

5  services, and make sure that it was implemented to our

6  satisfaction.

7  **Q.**   So would someone from inside H&R Block come to you and

8  say, "Here's what we need.  Can you go out and negotiate the

9  terms?"

10  **A.**   That is correct.

11  **Q.**   And who typically were the sorts of people who would come

12  to you from H&R Block to say "here's what we need"?

13  **A.**   The chief -- the chief information officer did that.

14  **Q.**   Is that Rich Agar?

15  **A.**   Richard Agar, yes, sir.

16  **Q.**   When was the last time you spoke to Mr. Agar?

17  **A.**   On my last day at H&R Block in 2015.

18  **Q.**   When you say "we selected Autonomy" -- I think that was a

19  phrase you used when Mr. Frentzen was asking you questions --

20  who is the "we" in "we selected Autonomy"?

21  **A.**   It's always a group decision, so it was the CEO, the CIO,

22  and there was a VP of information technology.  My job is I

23  represented them back to Autonomy.

24  **Q.**   I think the prosecutor asked you a question about a

25  conversation you had with a Mr. Curtis in 2013.

1    **A.**    Correct.

2    **Q.**    Do you remember how that conversation came about?  Did

3    somebody come to you with questions about your dealings with

4    Autonomy?

5    **A.**    Someone came to me and asked a question about the

6    hardware.  They were trying to find out if any of the hardware

7    was Dell components, and I didn't know the answer to that so I

8    asked my colleague, you know, is -- it was Dell -- were any of

9    those components Dell components.

10    **Q.**    So who came to you with that question?

11    **A.**    I believe it was a -- a gentleman by the name of Scott

12    Danner, who was an IT manager.

13    **Q.**    Was part of his question to you "was Autonomy involved in

14    the Zones/Dell transaction?"

15    **A.**    No.  It was -- he was trying to get to the bottom of was

16    any Dell computing hardware part of the deal.

17    **Q.**    I take it you don't know anything about Autonomy's

18    relationship with Dell; right?

19    **A.**    Not at all.

20    **Q.**    You don't know that they were working on a joint appliance

21    together?

22    **A.**    I did not know that, no.

23    **Q.**    There were a number of people involved in different pieces

24    of the H&R Block/Autonomy relationship; right?

25    **A.**    That is correct.

1  **Q.**   If we could turn your attention to Exhibit 6975, which is

2  in your binder.  This is an Autonomy invoice to H&R Block.

3       I would move it in.

4            **THE COURT:**  Sorry.  Which one is it?

5            **MR. MARAIS:**  6975, Your Honor.

6            **THE COURT:**  Admitted.

7            (Trial Exhibit 6975 received in evidence)

8                 (Exhibit published to jury.)

9  **BY MR. MARAIS:**

10 **Q.**   Up in the top right under "ship to," it's got your name

11 there, "H&R Block, attention John Meiers"; right?

12 **A.**   Right.

13 **Q.**   Does that mean you were handling this piece of the

14 invoice?

15 **A.**   You know, a lot of time my name would be put on invoices

16 simply because I had Autonomy -- like on the software deal I

17 had a lot of knowledge, but in this case, my name -- they must

18 have put my name on there, but I wasn't directly involved in

19 this purchase.

20 **Q.**   And the line items in this invoice are all for hardware.

21 Do you have an understanding of what H&R Block was buying from

22 Autonomy here?

23 **A.**   No, not really.  I did didn't handle hardware orders.

24 That was done by the -- the IT hardware managers through my

25 colleague, Aaron Curtis.

1  Q.   But you do understand that sometimes H&R Block bought

2  hardware directly from Autonomy?

3  A.   I was aware that we -- what I was aware of was that we

4  made a hardware appliance purchase to support the Autonomy

5  software, but that was the limit of my understanding.

6  Q.   If I could turn your attention to Exhibit 6976.

7       Again, Your Honor, this is an invoice from Autonomy to H&R

8  Block, and I would move it in.

9            THE COURT:   Admitted.

10           (Trial Exhibit 6976 received in evidence)

11                (Exhibit published to jury.)

12 BY MR. MARAIS:

13 Q.   This is an invoice to H&R Block for some consulting work

14 that Autonomy was doing; right?

15 A.   Correct.

16 Q.   And the total amount here for the consulting work is

17 $247,000.  Do you see that?

18 A.   I'm not looking at the right one.  Which one is it?

19 Q.   Well, in the middle --

20 A.   Oh, okay.  I see it.  247.  I see it.

21 Q.   Do you know who at H&R Block was dealing with Autonomy on

22 the consulting services?

23 A.   That was me.

24           MR. MARAIS:   And Exhibit 6977, which is another

25 invoice, Your Honor.  I would move it in.

 1              **THE COURT:**  Admitted.

 2         (Trial Exhibit 6977 received in evidence)

 3                   (Exhibit published to jury.)

 4    BY MR. MARAIS:

 5    **Q.**   This is an invoice for training services that Autonomy was

 6    providing to H&R Block.  Do you see that?

 7    **A.**   Yes, I do.

 8    **Q.**   And now the name in the middle of the page is "T. Derr"?

 9    **A.**   That was Tyler Derr.

10    **Q.**   Was he one of your colleagues at H&R Block?

11    **A.**   No.  He was a vice-president of IT at H&R Block.

12    **Q.**   But another person at H&R Block who was dealing with

13    Autonomy as part of the relationship?

14    **A.**   Correct.

15    **Q.**   And fair to say there were meetings that took place

16    between H&R Block and Autonomy that you weren't involved in;

17    right?

18    **A.**   After the implementation, that's fair.

19    **Q.**   Can we turn to Exhibit 959, which is in evidence.  This is

20    an agreement between H&R Block and Zones that you looked at a

21    few minutes ago on direct.

22                   (Exhibit published to jury.)

23    BY MR. MARAIS:

24    **Q.**   Do you recognize this?

25    **A.**   Yes.

MEIERS - CROSS / MARAIS

1    Q.    And if we could go to page 4, Jeff.

2         Is it your understanding that this is the agreement

3    related to the hardware refresh that H&R Block did through

4    Zones that you now understand Autonomy had some involvement in?

5    A.    This is the hardware refresh, but I did not have --

6              MR. MARAIS:  It's not in evidence?

7              MR. FRENTZEN:  Yes, it's not, but I don't have any

8    objection to it coming in.

9              THE COURT:  What number is it?

10             MR. FRENTZEN:  959, Your Honor.

11             THE COURT:  959?

12             MR. MARAIS:  Yes, sir.

13             THE COURT:  Admitted.

14         (Trial Exhibit 959 received in evidence)

15                  (Exhibit published to jury.)

16   BY MR. MARAIS:

17   Q.    You understand this contract relates to the hardware that

18   H&R Block was purchasing from Zones?

19   A.    Not in support of the Autonomy software deal.

20   Q.    I'm just trying to clarify.  You were talking earlier

21   about a hardware refresh that H&R Block did with Zones in July

22   of 2010.

23   A.    Correct.

24   Q.    And this contract relates to that?

25   A.    Correct.

MEIERS - CROSS / MARAIS

1   Q.   Okay.  And it's signed by Mr. Agar, the CIO?

2   A.   Correct.

3   Q.   The date on this is July 8, 2010.  Do you see that?

4   A.   Yes, I do.

5   Q.   That was a Thursday.  I don't expect you to remember that,

6   but you can take my word for it.

7   A.   Okay.

8   Q.   Let's take a look at Exhibit 973, which hopefully is in

9   evidence.

10        THE COURT:  Well, it's admitted if it isn't.

11        (Trial Exhibit 973 received in evidence)

12             (Exhibit published to jury.)

13  BY MR. MARAIS:

14  Q.   I take it you've not seen this document before?

15  A.   No.

16  Q.   This is an invoice between Zones and Autonomy related to

17  the same hardware.  Do you see that the date is July 9th of

18  2010, the next day?  Do you see the date on this invoice is

19  July 9th?

20  A.   Yes, sir.

21  Q.   Was it your understanding that this time, July 9th, was

22  when this Zones deal for the H&R Block hardware refresh closed?

23        MR. FRENTZEN:  I'm going to object at this point.

24  Calls for speculation and this is a document he has never seen.

25        MR. MARAIS:  Well, we can go back to the previous

1    document, if that would be easier.

2    **Q.**    All I'm asking is if this is consistent with your memory

3    of roughly when the hardware transaction between H&R Block and

4    Zones concluded.

5    **A.**    So there was an annual refresh.  I was not involved with

6    that; my colleague, Aaron Curtis, was.  But this happened every

7    summer about this time to get ready for the next tax season.

8    **Q.**    Let's move from July 9th, which is a Friday, to July 13th,

9    which is two business days later, and look at Exhibit 6982.

10          This is an email exchange that Mr. Meiers was on.  I would

11   move it in.

12               **THE COURT:**  Admitted.

13               (Trial Exhibit 6982 received in evidence)

14                     (Exhibit published to jury.)

15   **BY MR. MARAIS:**

16   **Q.**    If we could go to page 2 of this, Jeff.

17          Do you see the date here is the Tuesday, July 13th, just

18   two days after -- two business days after the contract that we

19   looked at.  This is an email from Rob Sass.  Know who Mr. Sass

20   was?

21   **A.**    Yes.

22   **Q.**    He was at Autonomy?

23   **A.**    He was a sales director at Autonomy.

24   **Q.**    He is emailing Rich Agar, who was the CIO of H&R Block;

25   correct?

tanta

1    **A.**    Correct.

2    **Q.**    And at this time, on July 13th, just two days after the

3    Zones deal closes, Mr. Sass writes, "The significance of

4    earning HRB's business is recognized by Autonomy's senior

5    leadership, and in an effort to foster relationships, alignment

6    and dialogue on the executive level, we'd welcome the

7    opportunity of arranging a meeting with you and Stouffer Egan,

8    CEO of Autonomy in North America, to learn more about HRB, as

9    well as share insight into Autonomy."

10        Do you understand that at this time Autonomy was trying to

11    arrange a meeting with your CIO to discuss the Autonomy

12    relationship with H&R Block?

13    **A.**    Yes.  This was brought to my attention.

14    **Q.**    And you were upset that somebody had tried to arrange a

15    meeting without looping you in?

16    **A.**    Yes.  Because I had been clear to Rob Sass that those sort

17    of requests need to come to me because we were an active RFP

18    for the software deal.

19    **Q.**    Do you know whether Mr. Egan and Mr. Agar spoke at all?

20    **A.**    We did facilitate a meeting with Stouffer Egan and Rich

21    Agar to talk about the software deal.

22    **Q.**    Okay.  And when was that meeting?

23    **A.**    You know, I don't recall.  It was sometime between this

24    email and when we closed the agreement in September of 2010.

25    **Q.**    And were you at that meeting?

MEIERS - CROSS / MARAIS

1    **A.**    I did attend that meeting.

2    **Q.**    Okay.  And you don't recall -- do you recall whether

3    Mr. Egan talked at all about the hardware relationship with

4    Zones?

5    **A.**    We did not talk about that.  It was at a higher level

6    about the software deal.

7    **Q.**    Are you aware of any other conversations that Mr. Egan may

8    have had with Mr. Agar subsequent to that meeting?

9    **A.**    It's possible.

10              **MR. FRENTZEN:**  Objection.

11              **THE WITNESS:**  But I was not aware of it.

12              **MR. MARAIS:**  I have one more document.  Exhibit 6972.

13              **THE COURT:**  Admitted.

14              **MR. MARAIS:**  Thank you, Your Honor.

15              (Trial Exhibit 6972 received in evidence)

16                   (Exhibit published to jury.)

17   BY MR. MARAIS:

18   **Q.**    This is the invoice from Autonomy to H&R Block for the

19   software deal?

20   **A.**    Yes.

21   **Q.**    Do you see that this closed in September of 2010?

22   **A.**    That's correct.

23   **Q.**    Roughly two months after Mr. Egan was trying to get a

24   meeting with your boss, Rich Agar?

25   **A.**    Correct.

MEIERS - CROSS / MARAIS

1   **Q.**   And if you look at page 3 of this deal, towards the

2   bottom, there are a set of signatures.  Are these people who

3   needed to approve the contract?

4   **A.**   Correct.

5   **Q.**   And that bottom signature, is that Mr. Agar?

6   **A.**   Correct.

7   **Q.**   And if we could go back to page 2, under the "product

8   schedule details," do you see that one of the products H&R

9   Block was buying was called Autonomy Legal Hold?  Do you

10  remember that?

11  **A.**   What page?

12  **Q.**   Page 2.  You can see it on you your screen.  Under the

13  "product schedule details."  Autonomy Legal Hold?

14  **A.**   Yes.  Autonomy Legal Hold.

15  **Q.**   Do you remember buying that product?

16  **A.**   Software product, yes.

17  **Q.**   And can you tell us what Legal Hold does, just at a very

18  high level?

19  **A.**   The problem H&R Block had was that we had retained every

20  email since inception of the email system in 1993, and so this

21  was a way to better manage that we could respond to legal

22  requests for -- like producing documentation for court cases.

23  **Q.**   Legal Hold is software that can freeze individuals'

24  computers to make sure that you retain documents for court

25  cases, for example?

MEIERS - CROSS / MARAIS

1    **A.**    Yes.  And it's also at the server level where we can

2    quickly identify to, you know, generate documentation for

3    subpoenas.

4    **Q.**    Did you install Legal Hold on all computers at H&R Block?

5    **A.**    No.  Just -- just corporate computers for corporate

6    workers like myself.

7    **Q.**    Do you know whether it was installed on the computers that

8    you bought from Zones?

9    **A.**    No.  We did not install Autonomy in our field tax

10   locations, only in our corporate tax locations -- our corporate

11   office in Kansas City.

12   **Q.**    It's fair to say, isn't it, that for whatever reasons

13   known to you or not, two months after the Zones hardware deal

14   we're talking about, Autonomy was able to sell more than

15   $2 million worth of software to H&R Block; right?

16   **A.**    They were.  But it was -- the decision point was between

17   IBM and Autonomy and the merits of the software of Autonomy.

18   That's what drove the decision.

19   **Q.**    And if Autonomy's goal was to follow these hardware sales

20   with sales of software to the same companies, you'd agree that

21   in the case of H&R Block, they managed to do that; right?

22   **A.**    Not to my knowledge.

23        **MR. FRENTZEN:**  Objection.  That assumes facts not in

24   evidence.

25        **THE COURT:**  Well, he said no.  He said not to his

MEIERS - REDIRECT / FRENTZEN

1    knowledge.

2            MR. MARAIS:  I have nothing further.  Thank you.

3    Thank you.

4                    <u>**REDIRECT EXAMINATION**</u>

5    **BY MR. FRENTZEN:**

6    **Q.**    Could we get Exhibit -- let me ask you a question first.

7            Mr. Meiers, if Autonomy, selling $7 million worth of -- or

8    somehow being involved in the reseller chain to the tune of

9    $7 million and if -- let's assume for a minute Autonomy took a

10   loss in that relationship.  If that was a valuable -- or going

11   to be valuable to Autonomy in its relationship with H&R Block,

12   wouldn't they have told you that?

13           **MR. MARAIS:**  Objection.  Calls for speculation.

14           **MR. FRENTZEN:**  That was long.  I'll give you that.

15           **THE COURT:**  Overruled.

16           **THE WITNESS:**  Can you repeat the question?

17           **THE COURT:**  This time make it shorter.

18           **MR. FRENTZEN:**  All right.

19   **Q.**    If Autonomy had a role in this reseller arrangement that

20   was going to be a pitch that they were taking a loss for H&R

21   Block, don't you expect they would have told you that when they

22   were negotiating with you?

23   **A.**    That was not disclosed to me at any time in the

24   negotiation.

25   **Q.**    All right.  Great.

1    Can we get 6892, please.  I'm sorry.  If you guys --

2         **MS. MARGEN:**  6982.

3         **MR. FRENTZEN:**  I said the wrong number.  6982.  I

4    apologize.  Can we get that up, please.

5                   (Exhibit published to jury.)

6    **BY MR. FRENTZEN:**

7    **Q.**   Mr. Meiers -- if we could go to page 2 -- part of what you

8    were you upset here was -- at this time in July of 2010, were

9    you negotiating or looking for somebody to purchase software

10   from to deal with the email archiving problem you had?

11   **A.**   I was in negotiation with Autonomy on the software deal.

12   **Q.**   And Mr. Sass, it looks like -- sorry.  Mr. Sass bothered

13   to sort of go around you?

14   **A.**   Well, we had -- in any RFP when we were negotiating with

15   the final supplier, we said that it was an unfriendly act to go

16   around the negotiator and try to go higher in the food chain

17   like to the CIO because the CIO gets besieged with several

18   requests, so our general policy was we did not like

19   reach-around activity.

20   **Q.**   So would you describe this -- when you saw this, was this

21   basically a pitch by Autonomy?

22   **A.**   They were trying to go around the negotiation process to

23   appeal -- to short circuit our negotiation process.

24   **Q.**   And anywhere in this pitch where they bother to go around,

25   if it was such a key component, did they pitch and say "And by

MEIERS - REDIRECT / FRENTZEN

1    the way, we were involved in the hardware refresh for

2    7 million"?  Is that anywhere in here?

3    **A.**   I do not see it here, but it was never part of our

4    negotiations at any point.

5    **Q.**   Okay.  What they talk about is email management, Legal

6    Hold, eDiscovery, discussions surrounding client services

7    organization and quality monitoring.  None of it is the

8    refresh; right?

9    **A.**   Correct.  This is the software deal I was negotiating.

10   **Q.**   And you said this led to a sit-down with Autonomy; is that

11   right?

12   **A.**   That is correct.

13   **Q.**   And during the course of that sit-down, at any point in

14   time, did anyone from Autonomy say, "Oh, and by the way, we

15   took a loss selling you the $7 million worth of hardware on the

16   refresh, even though our name wasn't in the contract anywhere"?

17   **A.**   That never came up.

18        **MR. FRENTZEN:**  Nothing further.  Thank you Mr. Meiers.

19   Appreciate your time.

20        **MR. MARAIS:**  Thank you, Your Honor.

21        **THE COURT:**  Thank you.  You're excused.

22   So who is the next witness that the Government has?

23        **MR. LEACH:**  Your Honor, the next witness is Chris

24   Yelland.

25   We also have three stipulations we would like to admit and

MEIERS - REDIRECT / FRENTZEN

1    read into the record.

2         THE COURT:  Why don't we do the stipulations and then

3    we'll take a recess.

4         MR. LEACH:  Wonderful.

5         Your Honor, I've tendered to the Court three stipulations.

6         The first is a stipulation regarding PR Newswire, and it's

7    labeled Exhibit 3036.

8         The second is titled "Stipulation Regarding Certain

9    Servers and Trial Exhibits," and it's labeled Exhibit 3037.

10        And the third is titled "Stipulation Regarding West

11   Corporation," and it's Exhibit 3038.

12        I offer these into evidence.

13        THE COURT:  Admitted.  No objection?

14        MR. KEKER:  No objection, Your Honor.

15        (Trial Exhibits 3036, 3037 and 3038 received in

16         evidence)

17        MR. LEACH:  Exhibit 3036, Stipulation Regarding PR

18   Newswire.

19        "The United States and defendant Sushovan Hussain hereby

20   stipulate as follows:

21        "One, between March 2009 and August 2011, PR Newswire,

22   based in New York, was engaged in the business of distributing

23   news releases.  PR Newswire distributed Autonomy Corporation,

24   PLC, press releases during this period, including a release

25   dated February 1st, 2011 titled *Autonomy Corporation, PLC,*

1    *announce results for the year ended December 31, 2010* and a

2    release dated April 21, 2011 titled *Autonomy Corporation, PLC,*

3    *trading update for the quarter ended March 31, 2011.*

4        "Autonomy releases were sent from PR Newswire servers in

5    Hempstead, United Kingdom, to servers in New Jersey in the

6    United States and distributed to PR Newswire's U.S. 1 Network,

7    which included media outlets in the Northern District of

8    California, such as the *San Francisco Chronicle, San Jose*

9    *Mercury News, Silicon Valley San Jose Business Journal* and the

10   San Francisco bureaus of the *New York Times*, *The Wall Street*

11   *Journal*, *Dow Jones*, *Reuters*, and *Bloomberg News*.

12       It is so stipulated and agreed."

13       The second stipulation is titled "Stipulation Regarding

14   Certain Servers and Trial Exhibits."  It's Exhibit 3037.

15       "The United States and Defendant Sushovan Hussain hereby

16   stipulate as follows:

17       "One, during the period 2009 to 2012, Hewlett-Packard

18   company hosted Microsoft exchange user accounts for all

19   entities and individuals using the @hp.com email domain.

20   Exchange accounts.  Each employee had at the relevant time an

21   exchange account.

22       "Two, during this time frame, HP operated three HP

23   exchange servers for its exchange accounts in the

24   United States:  Atlanta -- Atlanta, Georgia; Houston, Texas;

25   and Austin Texas.  Each server group was an identical current

1   replica of the other servers, meaning an exchange account on

2   the server existed live in three places at any given point in

3   time.  Therefore, at any given point in time, any user with an

4   @hp.com account could access and retrieve his or her account

5   because it existed in triplicate on three separate servers.  An

6   email that was sent to an exchange account from anywhere in the

7   world to the exchange account of an HP employee from Palo Alto,

8   California, would first travel via wires and through the

9   internet to all of the exchange servers.  That email would then

10  be transferred from the Palo Alto recipient's exchange account

11  primary exchange server to the device where the employee read

12  their email such as an HP laptop.

13       "Trial Exhibit 2027 is a true and correct copy of an email

14  and an attachment sent on or about July 27, 2011, from a

15  Barclays' employee in London, England, Jonathan Mitchell, to

16  recipients at Barclays, HP, and Perella Weinberg Partners.  The

17  email and attachment were sent from and resided on a server

18  located in the UK.  The email and attachment were received by

19  several Barclays' employees on Barclays' email servers located

20  in New York and/or New Jersey.  The email and attachment are

21  authentic for purposes of Federal Rules of Evidence 901 and

22  1003.

23       "Trial Exhibit 2130 is a true and correct copy of an email

24  and attachment sent to former KPMG employee Farhad Merchant on

25  August 4th, 2011.  In August 2011, KPMG's email servers were

MEIERS - REDIRECT / FRENTZEN

1  located in Montvale, New Jersey.  The email and attachment were

2  downloaded to Mr. Merchant's computer via the KPMG email

3  servers in Montvale, New Jersey.  The email and attachment are

4  authentic for purposes of Federal Rules of Evidence 901 and

5  1003.

6      "Four" -- excuse me -- "five, in August 2011, emails sent

7  to and received from andrewk@autonomy.com passed through an

8  email server located in the United Kingdom.  It is so

9  stipulated and agreed."

10     Finally, the last stipulation, five paragraphs.  It's

11 titled "Stipulation Regarding West Corporation."  It's Exhibit

12 3038.

13     "The United States and Defendant Sushovan Hussain hereby

14 stipulate as follows:

15     "One, in August 2011, West Corporation or West provided

16 conference call phone services to Hewlett-Packard Company, HP,

17 including U.S. toll free phone number 866-409-2889 and UK phone

18 number 145-25-55574.  All West conference calls for HP during

19 August 2011 were routed to West's Phoenix, Arizona conferencing

20 bridge located at 211 West Monroe, Phoenix, Arizona, regardless

21 as to whether the caller dialed a U.S. or an international toll

22 free number.  All of West's conferencing bridges in August 2011

23 were located in Georgia, Colorado, and Arizona.  West had no

24 bridging capabilities in California at the time.

25     "Two, on August 1, 2011, West hosted a conference call for

1    HP at approximately 8:00 a.m. Pacific Time involving

2    participants in the U.S. and UK using a pass code" -- "using a

3    pass code and phone number as described in the stipulation.  On

4    August 2nd --

5        "Third, on August 2, 2011, West hosted a conference call

6    for HP at approximately 9:00 a.m. Pacific Time involving

7    participants in the U.S. and the UK."  And it provides the pass

8    codes and phone numbers.

9        "Four, on August 3, 2011, West hosted a conference call

10   for HP at approximately 9:00 a.m. Pacific Time involving

11   participants in the U.S. and the UK using certain pass codes

12   and phone numbers.

13       "Five, on August 4th, 2011, West hosted a conference call

14   for HP at approximately 8:00 a.m. Pacific Time involving

15   participants in the U.S. and the UK," using a pass code and

16   phone numbers described in the stipulation.

17       "It is so stipulated and agreed."

18       Thank you, Your Honor.

19         THE COURT:  Okay.  Thank you.

20       Ladies and gentlemen, again, stipulations are accepted --

21   to be accepted by you for the truth.

22       And we will be in recess now until 20 -- 20 to 3:00.

23   Remember the admonition given to you.

24       (Proceedings were heard out of presence of the jury:)

25         THE COURT:  Okay.  Let the record reflect the jurors

1    have left.

2        Okay.  So, Mr. Yelland, who I assume is your last witness;

3    is that correct?

4            **MR. REEVES:**  Yes, Your Honor.

5            **THE COURT:**  Okay.  And I wanted to make sure that we

6    are clear -- have a seat -- we are clear as to what extent

7    certain types of documents, which like -- which -- these

8    summaries can be received because we not only have the summary

9    of the restatement, if I recall correctly, we also have, quote,

10   the summary of the top 40.  And I would think that that runs

11   afoul of the same problem that the restatement does.

12       In other words, what it is -- assuming that I would -- it

13   would be less so obviously for 40 rather than for all the rest

14   of the stuff.  But assuming that it meets a voluminous test --

15   I don't want to get into that -- as I understand the document,

16   it actually makes an argument, and the argument it makes is

17   that this witness, if he's the one who did it, concluded that

18   in his analysis of revenue, it would be -- he would restructure

19   the 40 -- top 40 or whatever it is based upon -- putting it

20   another way, his understanding of accounting rules and his

21   preparation of the exhibit, which was based on his

22   understanding of the revenue rules and then his examination of

23   the books and records, which is what it is, I think -- is that

24   not, Mr. Reeves?

25       It's not a list compiled by him -- I don't mean --

1  compiled by him based upon his understanding of what properly

2  should have been done?  Because I -- I'm operating on that

3  assumption.

4      MR. REEVES:  I don't -- I'm not sure that's correct,

5  Your Honor.

6      THE COURT:  Well, then what is it?

7      MR. REEVES:  Let me separate the two summaries, if I

8  could, please.

9      THE COURT:  Which two are we talking about?

10     MR. REEVES:  The top 40 list is something different

11 that will not pertain directly to Mr. Yelland.

12     THE COURT:  You're not even going to offer it with

13 Mr. Yelland?

14     MR. REEVES:  No, I'm not.

15     THE COURT:  Okay.  Then we can get into that -- I

16 don't know when we are going to get into that, but we can get

17 into that at some other time.

18     MR. REEVES:  That will be tomorrow.

19     THE COURT:  I'll look forward to it, as I look forward

20 to almost every encounter I have in this case.

21     But let me tell you what I think the problem is so you can

22 think about it.

23     And I think the problem is to the extent it is a construct

24 of -- based upon an analysis of records that are in the case

25 and assuming further it's voluminous, so it deals with that,

**PROCEEDINGS**

1    the reason it creates a problem is because it is based upon the

2    witness' analysis of what is appropriate revenue and what is

3    not appropriate revenue, how you recognize it, how you don't.

4    It doesn't?  Okay.  If I'm wrong in that, then -- then I'm

5    operating under the wrong --

6            MR. REEVES:  With the greatest respect, I think you

7    are.

8            THE COURT:  You don't have to have any respect.  I'm

9    so tired for people having respect.  You have respect until

10   there is an appeal.  That's the way those things work.  Then

11   there's a little less respect.  Then it's like, "Oh, you should

12   have seen the judge that day."

13       Well, okay.  All right.  I know the Government can't

14   appeal, but I'm just saying that you don't to say that.  I want

15   to try to get to -- I want to first make sure I understand the

16   facts and then -- and then try to apply the law to it.

17           MR. REEVES:  I will say it without respect then.  I

18   think the Court has it wrong.

19           THE COURT:  Yes.

20           MR. REEVES:  Wrong in the following sense.  And this

21   is the relationship between the restatement, which has now been

22   received in evidence and speaks for itself, and the group

23   accounting.

24       The restatement pertains to the subsidiary that owned the

25   intellectual property, ASL.  Once it is restated, then in order

**PROCEEDINGS**

1   to correlate the evidence that is reflected in the restatement

2   to the publicly-disclosed financial reporting of the group,

3   which is what the public got and what HP got, you need -- all

4   that's being done -- there is no judgment at that point beyond

5   the work in the restatement.  You are simply working through

6   transfer pricing issues, subsidiary issues, in order to reflect

7   the adjustments in the restatement in the group accounting.

8        **THE COURT:**  And doesn't it depend then on the accuracy

9   of the restatement?

10       **MR. REEVES:**  It does depend on --

11       **THE COURT:**  And that depends in turn on the analysis

12  given to all of these transactions by the person who created

13  the restatement.

14      So the problem the Court has is I have to -- for summary

15  purposes in evidence -- believe me, it's argument.  I mean, I

16  understand that.  I mean, I'm not saying you can't mention it,

17  you can't do it, you can't show it and so forth.  We're just

18  arguing does the piece of paper come into evidence.

19       **MR. REEVES:**  Understood.

20       **THE COURT:**  And in order to do that, I think it has

21  to -- the Court has to be satisfied that the restatement was

22  accurate because unless I find that the restatement was

23  accurate, a summary of the restatement couldn't come in under

24  1006.

25      In other words, the Court -- the concern I have is am I

1  usurping the jurors' function in a finding of fact that

2  something happened, something didn't happen?  The Court can't

3  say it.  It has to be the jury.  And I think I am intruding on

4  the province of the jury in doing that.

5      Anyway, that's my concern.  But I really don't want to do

6  it right now because it's not even coming in this afternoon,

7  but I want you to know what I'm saying.

8      **MR. REEVES:**  The summaries about the group accounting

9  I will use this afternoon.

10     **THE COURT:**  Okay.  But not in evidence.

11     **MR. REEVES:**  I will use them consistent with the

12 Court's ruling as a demonstrative.

13     **THE COURT:**  You can use them for demonstrative

14 purposes.

15     Now, I also want a discussion of Mr. Keker's point, which

16 is whether or not the document which -- which Mr. Hussain

17 received on or about the time in response to preparing the

18 response to the FR, whatever it is -- whether that comes in.

19     Mr. Keker argues that it goes to Mr. Hussain's state of

20 mind.

21     It seems to me, number one, it is a statement by a

22 co-conspirator in the furtherance of a conspiracy; that is, the

23 conspiracy is to hide the true nature of these transactions.

24     So Mr. Chamberlain writes to Mr. Hussain and said, "Here

25 is a list of 1.4 million."  Of course it contains, as I

PROCEEDINGS

1    understand it, represented to me -- it contains a number of

2    false statements in it in order to get to the 1.4.  That's what

3    I heard Mr. Leach say in our brief colloquy.

4        That doesn't mean it's inadmissible.  I simply have to

5    figure out whether or not a statement made in the furtherance

6    of a conspiracy offered by the defense, not by the Government,

7    still would come in because it reflects the defendant's state

8    of mind.  That's what I have to figure out.

9        I don't know the answer to that, to tell you the truth --

10           MR. KEKER:  Can I say why I think the analysis is

11   wrong?

12           THE COURT:  You think my analysis is wrong?

13           MR. KEKER:  That it's a co-conspirator statement.

14           THE COURT:  Are you saying this with respect?

15           MR. KEKER:  I'm saying it with total respect.

16           THE COURT:  Okay.  Go ahead.

17           MR. KEKER:  As always.  Everything I say is with

18   respect.

19       First of all, what Mr. Leach is complaining about is he

20   didn't say it's false.  He said that there is some writeoffs

21   and so on in the books.  But my point is the book -- whether or

22   not people have lust in their heart, Mr. Hussain is being told

23   by his controller that what the books show is $1.4 million.

24       They want to argue that Mr. Hussain, who signed the

25   letter, made a false statement with the intent to defraud.

1      What I want to say is wait a minute, consider his state of

2  mind.  He's told by his controller that the number is the

3  number, and --

4          **THE COURT:**  Well, that's the argument.

5          **MR. KEKER:**  They can argue about it.  They can argue

6  whatever they want --

7          **THE COURT:**  I don't know whether this is an operative

8  statement in the -- that it was an attempt to defraud.  It may

9  have been an attempt to conceal.  I don't know how to deal with

10  that.

11      Anyway, let's talk about it later because we don't have to

12  talk about it now.  Is that okay?

13          **MR. LEACH:**  That's fine, Your Honor.  Thank you.

14                  (Recess taken at 2:30 p.m.)

15                  (Proceedings resumed at 2:45 p.m.)

16      (Proceedings were heard out of the presence of the jury:)

17          **THE COURT:**  Before we bring out the jury, at the end

18  of today, I'm going to tell the jury that the Government will

19  rest tomorrow.  Is there any reason why the Defense can't

20  proceed tomorrow?

21          **MR. KEKER:**  We don't have any witnesses for tomorrow.

22          **THE COURT:**  I mean other than that?

23          **MR. KEKER:**  Other than that, we told them Wednesday.

24          **THE COURT:**  Well, I'm just wondering.  I mean, I

25  don't -- there's no way for me to anticipate how long the cross

PROCEEDINGS

1    of this person will go, and I'm not trying to encourage length

2    but, you know, we've got --

3              MR. FRENTZEN:  Your Honor, you said earlier that's the

4    Government's last witness.  I thought you meant for today.  We

5    have two additional witnesses for tomorrow.

6              THE COURT:  Oh.

7              MR. KEKER:  Yeah.

8              THE COURT:  Oh.  No, no, no.  I misunderstood then.

9              MR. KEKER:  They've got Mr. Toms and --

10             THE COURT:  You feel tomorrow you'll take up the whole

11   day?

12             MR. FRENTZEN:  I don't know about the whole day --

13             THE COURT:  I can simply say that the Government will

14   rest at some point tomorrow?

15             MR. FRENTZEN:  Yeah.  A good port of tomorrow but,

16   yeah.

17             THE COURT:  Okay.  That's fine.  I mean, there are a

18   lot of things to talk about and so forth.

19        Okay.  Bring in the jury.

20        (Proceedings were heard in the presence of the jury:)

21             THE COURT:  Please be seated.

22        Okay.  Let the record reflect all jurors are present, the

23   parties are present.

24        You may call your next witness.

25             MR. REEVES:  Thank you, Your Honor.  At this time the

 1  United States calls Mr. Chris Yelland.

 2          **THE CLERK:**  Please raise your right hand.

 3                  **CHRISTOPHER YELLAND**,

 4  called as a witness for the Government, having been duly sworn,

 5  testified as follows:

 6          **THE WITNESS:**  I do.

 7          **THE CLERK:**  Thank you.  Please be seated.

 8      Please state your full name for the record and spell your

 9  last name.

10          **THE WITNESS:**  Christopher Henry Yelland.  That's

11  Y-E-L-L-A-N-D.

12                  **DIRECT EXAMINATION**

13  **BY MR. REEVES:**

14  **Q.**   Good afternoon, Mr. Yelland.

15      Where are you from, sir?

16  **A.**   United Kingdom.

17  **Q.**   All right.  And what is your educational background?

18  **A.**   I'm a chartered accountant.

19  **Q.**   And after you became a chartered accountant, could you

20  please describe your career?

21  **A.**   I spent -- whilst I was qualifying to becoming a chartered

22  accountant, I spent time in private practice with

23  Arthur Andersen.  Following that, I spent three or four years

24  as a lecturer of accountancy teaching the trainee chartered

25  accountants.

**YELLAND - DIRECT / REEVES**

1    I then moved into an internal audit role with an

2  automotive company, Rover Group, and then was their U.K.

3  accounting manager.

4  **Q.**   Are you familiar with the public accounting firm Arthur

5  Andersen?

6  **A.**   Yes.

7  **Q.**   At any point, did you work for Arthur Andersen?

8  **A.**   Yes.

9  **Q.**   When was that?

10 **A.**   So for the first approximately four years of my career.

11 **Q.**   Is it at or around that time that you went through the

12 licensing and training associated with becoming a chartered

13 accountant?

14 **A.**   Yes.

15 **Q.**   All right.  And so for how long have you been a chartered

16 accountant in the United Kingdom?

17 **A.**   14 years.

18 **Q.**   And today are you in good standing, so to speak, as a

19 chartered accountant?

20 **A.**   I almost corrected myself.  It's 20 -- 24 years.

21 **Q.**   24 years.  Okay.  Well, congratulations on that.

22    Are you a good -- a chartered accountant in good standing

23 in the U.K. today?

24 **A.**   Yes.

25 **Q.**   All right.  Let me direct your attention to in or around

1  2002.  At or about that time, where were you working, sir?

2  A.    That's when I started working for Hewlett Packard.

3  Q.    All right.  And what were the circumstances under which

4  you started to work at Hewlett Packard?

5  A.    I joined Compaq during the year 2000, and there was a

6  merger between Compaq and Hewlett Packard in 2002.

7  Q.    All right.  And after HP merged with Compaq, what effect

8  did that have on the position you had now at Hewlett Packard?

9  What were you doing at that time period, 2002?

10  A.    At that time, I was the U.K. finance manager for our

11  consulting and integration business, IT consulting and

12  integration business; and that didn't change immediately

13  through the merger.

14  Q.    All right.  Over time, did your career within HP begin to

15  change in certain ways?  Did it take on different roles, for

16  example?

17  A.    Yes.  I had a number of different roles.

18      I was normally the business finance manager for various

19  business units in the U.K. or EMEA or I was an FBNA, which is

20  financial planning and analysis director for our enterprise in

21  EMEA.

22  Q.    What's EMEA?

23  A.    Europe, Middle East and Africa.

24  Q.    If you could, please, walk us through your career at HP

25  between 2002 and in or around the spring of 2012.  Tell us the

YELLAND - DIRECT / REEVES

1    roles that you had within HP over that approximately 10-year

2    time period, please.

3    **A.**    So I started at that time period as the finance manager

4    for the U.K., consulting integration business, as I mentioned.

5         My next role was the U.K. finance manager for our

6    enterprise product and software business.  So that's servers,

7    storage, software, et cetera.

8         My next role was the financial planning and analysis

9    director for all of our enterprise businesses for EMEA, so that

10   was the hardware businesses, the support business, software,

11   and the consulting business.

12   **Q.**    And what were your duties and responsibilities as finance

13   director for EMEA for HP's software business in or around this,

14   you know, 2010-2011 time period?

15   **A.**    So I would -- was supporting the CFO for EMEA for that

16   business in bringing together the forecasts, the budget, the

17   financial analysis, coordinating with the finance manager for

18   each of those divisions under her remit.  Also responsible for

19   assisting with finance systems implementation.  We had SOX

20   implementation, the SOX controls --

21   **Q.**    Sarbanes-Oxley?

22   **A.**    Yes.

23   **Q.**    Go on.

24   **A.**    -- to implement.  I was also responsible for guidance on

25   accounting policies.

YELLAND - DIRECT / REEVES

1   Q.   Let me direct your attention, if I could, to in or around

2   August 2011.  At or about that time, did you learn about HP's

3   intention to acquire a company known as Autonomy?

4   A.   Yes.

5   Q.   Okay.  And how did you learn about the acquisition by HP

6   of Autonomy in the summer of 2011?

7   A.   Through the internal announcement.

8   Q.   Okay.  And did you have any role in that transaction

9   through that point in time?

10  A.   No.

11  Q.   All right.  Let's move forward, if we could, to early in

12  2012.  Are you still at HP in early 2012?

13  A.   Yes.

14  Q.   At that time, are you contemplating another move, another

15  role within HP that relates to Autonomy?

16  A.   When -- when I'm asked to -- if I would consider applying

17  for the Autonomy role, yes.  Up until then, I wasn't.

18  Q.   Okay.  So when did that happen?

19  A.   So that was during January of 2012.

20  Q.   And so someone asked you about a possible role within the

21  Autonomy unit of HP in January 2012?

22  A.   Yes.

23  Q.   What role were you talking -- were they talking to you

24  about?

25  A.   About the Autonomy CFO role.

YELLAND - DIRECT / REEVES

1    Q.    Okay.  And was that replacing someone who had previously

2    had that position?

3    A.    Yes.

4    Q.    Who was that person?

5    A.    At the time it was Steve Chamberlain.

6    Q.    All right.  And what did you think of the idea in

7    January 2012 of possibly taking the position of CFO within the

8    Autonomy unit of HP and replacing Mr. Chamberlain?  What did

9    you think of that idea?

10   A.    I was excited about it.

11   Q.    Why were you excited?

12   A.    It was a promotion and also it was an opportunity to see

13   something a little bit different because I'd been with HP for a

14   long time, I'd seen HP's ways of working, so it was something

15   fresh.

16   Q.    All right.  So you're interested in the job.  What do you

17   do next?

18   A.    So I interviewed with Mr. Hussain and Dr. Lynch.

19   Q.    All right.  Approximately when did you interview with

20   Mr. Hussain about this possible new position within the

21   Autonomy unit of HP?  When did that happen?

22   A.    During February.

23   Q.    In February?

24   A.    (Nods head.)

25   Q.    February 2012?

YELLAND - DIRECT / REEVES

1   **A.**    Yes.

2   **Q.**    Okay.  Today do you recall your interview with Mr. Hussain

3   for this position as CFO?

4   **A.**    Yes.

5   **Q.**    Take your time -- was anyone else present for the

6   interview or was it just you and Mr. Hussain?

7   **A.**    It was just me and Mr. Hussain.

8   **Q.**    And where was this conversation or interview happening?

9   **A.**    In Autonomy's London offices.

10  **Q.**    All right.  And take your time, tell us what you recall

11  about the substance of your interview with Mr. Hussain for this

12  new possible role.

13  **A.**    Mr. Hussain described how Autonomy was very successful, a

14  very successful software company, had grown significantly over

15  time, was very much a market leader in its field; that

16  obviously it had been acquired by HP and it had great

17  prospects, you know, within HP and would remain semiautonomous

18  within HP.  So it would be its own business unit.

19  **Q.**    What did Mr. Hussain say on the topic of Autonomy's

20  semiautonomousness, if that's a word?  What did he say about

21  that?

22  **A.**    Well, just the term -- Autonomy would remain

23  semiautonomous within HP.  It wasn't becoming part of the

24  software business unit so that it could continue to grow and be

25  managed, you know, more as it had been and could still

1    potentially acquire, but that it would also be working with a

2    wider HP to generate the synergies that were part of the deal.

3    **Q.**    All right.  So after the interview, what happened next?

4    **A.**    I met briefly with Dr. Lynch, and then -- well, it was

5    made clear to me at the time that I was the preferred

6    candidate, which was then, you know, confirmed by Jim Murray,

7    who was HP's controller at the time and the person I would

8    formally report to.  So it was his role to formally give me the

9    job offer.

10   **Q.**    Okay.  So did you get the job?

11   **A.**    Yes.

12   **Q.**    All right.  I think before we move past the hiring process

13   for this new role, what, if anything, do you recall about your

14   conversation with Dr. Lynch about an interview or you taking

15   this new job?

16   **A.**    It was very brief.  He described again the strength of the

17   Autonomy technology and its potential and, you know, the

18   strength of the management team.

19   **Q.**    Okay.  Did there come a time when you started as the CFO

20   of the Autonomy unit within HP sometime in the spring of 2012?

21   **A.**    Formally on the 1st of April, although I was on vacation

22   for a week, so effectively it was 10th of April.

23   **Q.**    So day one for you in the new job was April 1, 2012,

24   approximately?

25   **A.**    Correct.

1  **Q.**   All right.  Why don't you describe your work within -- in

2  this new role in the first couple of weeks, you know, maybe the

3  first two weeks of April.  What was that like for you?

4  **A.**   Well, I think like anybody starting a role, you're getting

5  to know the people.  Also, we were only a few weeks away from a

6  quarter end, which is very important to a software company.  So

7  I was starting to engage particularly with the revenue team and

8  also discuss the forecast with Mr. Hussain.

9  **Q.**   Okay.  Who were some of the members of the revenue team at

10  this point in time?

11  **A.**   The direct -- the person reporting to me as the director

12  of that team was Antonia Anderson.

13  **Q.**   Okay.  In these first two weeks of April 2012, did you

14  have conversations with Mr. Hussain about finance issues and a

15  forecast and the business of Autonomy?

16  **A.**   So Mr. Hussain was bullish about the forecast, about

17  meeting the forecast for the quarter to the end of April; was

18  pushing to be able to recognize revenue on deals that were

19  license plus hosting, as we described them, which wasn't --

20  hadn't been confirmed for most of those parts of the businesses

21  at the time; was also looking for my help on a couple of

22  specific deals that were internal deals with another division

23  of HP.

24  **Q.**   When you say that Mr. Hussain was bullish about Autonomy

25  in this time period, the first two weeks of April 2012, what do

1    you mean?

2    A.    Just we would go through the forecast and Mr. Hussain

3    would take the formal forecast spreadsheet but also, you know,

4    whiteboard the size of the potential deals and mention some of

5    the bigger deals that were being closed, and the big deal he

6    was working on, and show, you know, how the forecast would be

7    delivered and Autonomy had a track record of delivering its

8    numbers.

9    Q.    According to Mr. Hussain in your conversations with him?

10   A.    Yes.

11   Q.    All right.  And the forecast relates to a forecasting of

12   deals that Autonomy's expecting or hoping to close in this

13   second quarter 2012?

14   A.    Yes.

15   Q.    All right.  Through that point in time, through

16   approximately April 15, 2012, in your conversations with

17   Mr. Hussain, in the interview process and the initiation for

18   you in your job and role as CFO of Autonomy, do you recall at

19   any point Mr. Hussain complaining about Autonomy's integration

20   into HP?

21   A.    Only really on the matter of the license plus hosting, you

22   know, ability to recognize revenue on the upfront license

23   element of those deals.  I think that was the major concern.

24   Q.    What did he say about that?

25   A.    It had been possible before acquisition, but that it

1   wasn't possible at the moment under U.S. GAAP, and we had to

2   take steps to enable that.

3   Q.   Okay.  Other than that one transaction and that one

4   revenue recognition issue, do you recall Mr. Hussain

5   complaining or expressing concern in any way about the manner

6   in which HP had integrated Autonomy into HP by mid-April 2012?

7   A.   Not -- nothing general.  There was only those couple of

8   deals with another business unit where Mr. Hussain was looking

9   for my help to navigate HP's internal processes to get those

10  deals done.

11  Q.   All right.  Going forward, take us forward into April 2012

12  into the third and the fourth week.  So that's a busy time for

13  a software unit like Autonomy within HP, is it not?

14  A.   Yes.

15  Q.   Tell us what happened.

16  A.   As we're going through into the third and fourth week,

17  most of the focus then is on the deals and are they closing,

18  and they were appearing to come down to the wire, but that

19  isn't particularly unusual for a quarter end.  So really it's

20  that and trying to help work on any of the big deals, which for

21  me was those deals with the other divisions.

22  Q.   Okay.  And as you came down to the wire, so to speak, as

23  the days for HP's second quarter 2012 are coming to a

24  conclusion -- the end of April, are they not?

25  A.   Yes.

YELLAND - DIRECT / REEVES

1  Q.    And as you're approaching that deadline, that cutoff

2  period, how did Autonomy's quarter take shape?  What happened?

3  A.    Well, in the last couple of days, it became apparent that

4  Autonomy was not going to meet forecast.

5  Q.    How did that become apparent to you?

6  A.    You could see that the rate of closure in the deals wasn't

7  sufficient.  And then I think on the last day or so of the

8  quarter, I learned that there was a meeting between

9  Mr. Hussain, Dr. Lynch, and the senior HP management where they

10  had called down the outlook for the quarter.

11  Q.    And what -- do you recall conversations with Mr. Hussain

12  about a possible miss or problems in hitting the forecast for

13  the second quarter in these last days of April 2012?

14  A.    In the last few days.

15  Q.    What do you recall discussing with Mr. Hussain about that?

16  A.    Only that we were about to miss the forecast by a long way

17  and that this was going to require explanation, but we didn't

18  have a clear explanation for it at the time.

19  Q.    Is that what Mr. Hussain said to you?

20  A.    Yes.

21  Q.    All right.  So you get to the end of the quarter.  What

22  happens?  How did you do?

23  A.    So we missed the forecast by a long way, particularly on

24  the new license business.

25  Q.    What does "a long way" mean?  What do you mean?

1  **A.**    I think it was over $100 million, those sorts of figures.

2  **Q.**    So how big a miss is that?

3  **A.**    That's very substantial.

4  **Q.**    All right.  What happened next as a result of the miss?

5  **A.**    So we were asked to provide explanations.  In the first

6  few days we don't really have clear explanations for it.

7  **Q.**    Did you talk to -- withdrawn.

8       Who's asking for explanations?  What do you mean by that?

9  **A.**    So the senior HP management understandably want to know

10  why -- why the forecast has been missed.

11  **Q.**    Okay.

12  **A.**    So, you know, to the CFO of HP.

13  **Q.**    And did you discuss what, if anything, you would say in

14  response to these questions being raised by senior HP

15  management with Mr. Hussain?

16  **A.**    Yes.

17  **Q.**    What did you and Mr. Hussain discuss?

18  **A.**    That -- well, it was both with Mr. Hussain and

19  Dr. Lynch -- that there wasn't -- we didn't want to use easy

20  excuses.  The miss was everywhere in licenses.  It was across

21  the board.

22       The -- we would need to provide -- you know, I provided an

23  e-mail back to HP really to say that and also to say that, you

24  know, logically after being acquired, you know, there is a

25  change to the sales model in Autonomy's part of the wider HP,

YELLAND - DIRECT / REEVES

1    although actually Autonomy's own sales model itself and the way

2    that it ran its business hadn't really changed.

3    **Q.**    This is your -- are you recounting the conversations you

4    had in this time period with Mr. Hussain and Dr. Lynch?

5    **A.**    Yeah.  They were the conversations, which also were

6    included in the e-mail.  Also in the e-mail I mentioned that,

7    you know, many of the HP controls hadn't been applied to

8    Autonomy, but there were one or two that had been applied and

9    that may slow things down a little bit; but actually, in my

10   view, having operated with those controls, they didn't have a

11   significant effect on the outcome.

12   **Q.**    So as we move into May 2012 after the missing by a long

13   way, as you said, what happened in May 2012 as part of your job

14   as the CFO of Autonomy?

15   **A.**    Well, we had -- we had reviews with the senior HP

16   management as to what we were going to do better in the next

17   quarter.

18         I also, through closing the books and talking with my

19   team, became concerned about some of the accounting practices

20   in Autonomy.

21         The other major thing in May was I looked to review

22   further whether it was appropriate and whether we could

23   recognize revenue in these license-plus-hosting deals.

24   **Q.**    In or around this time period, did any of the then

25   existing senior managers within the Autonomy unit leave HP?

1  **A.**   Yes.   During May.

2  **Q.**   And in May 2012, who left?

3  **A.**   So Mr. Hussain and Dr. Lynch and a few more of the

4  directors.

5  **Q.**   All right.   And where did that leave you?

6  **A.**   So that left me with working with a new management team

7  that was quite a disparate management team.   It was largely the

8  next layer of Autonomy management buddied up with senior HP

9  management and really being led by Bill Veghte, and he also

10 brought some senior HP sales managers to help as well.   So

11 there was quite a lot of turmoil in sorting out the new

12 management practices, new way of working, new financial

13 practices.

14     You know, so, for example, we had to redesign all of the

15 purchase authorities, just as a small example, as to who was

16 allowed to sign for what, et cetera.

17 **Q.**   Before Mr. Hussain left, did he discuss his decision to

18 leave Autonomy and leave the Autonomy group within HP with you

19 in May 2012?

20 **A.**   Yes.   Mr. Hussain told me he'd resigned and was taking

21 responsibility for the Q2 miss.

22 **Q.**   All right.   And after Dr. Lynch, Mr. Hussain, Mr. Kanter

23 leaves, are you one of the last senior members of the

24 management team that had been in place through that point in

25 time that is still there?

YELLAND - DIRECT / REEVES

1    **A.**    Yes.

2    **Q.**    All right.  And now you're getting -- you said a new

3    management team is being put in place sometime in late

4    May 2012?

5    **A.**    Yes.

6    **Q.**    All right.  I'd like to show you what has been marked for

7    identification, please, as Exhibit 2486.  There should be a set

8    of exhibits up there.  This is an e-mail from Mr. Yelland to

9    Lisa Harris, Antonia Anderson, and others on or about May 30th,

10    2012.

11    **A.**    Sorry.  I haven't found this yet.

12        **MR. REEVES:**    I'm going to offer it in evidence, if I

13    could, Your Honor.

14        **THE COURT:**    2486?

15        **MR. REEVES:**    2486, please.

16        **THE COURT:**    Admitted.

17        (Trial Exhibit 2486 received in evidence)

18        **MR. REEVES:**    Thank you, Your Honor.

19    **Q.**    If you're comfortable using the screen, Mr. Yelland, we

20    can look at it on the screen.

21    **A.**    Yes.

22    **Q.**    All right.  And are you familiar with this e-mail?

23    **A.**    Yes.

24    **Q.**    All right.  So it looks like in or around the end of

25    May -- withdrawn.

1      Is this the time period of the turmoil that you talked

2  about a little bit?

3  **A.**  Yes.  It's ongoing at this point.

4  **Q.**  So by late May, there's a lot of turmoil and it's ongoing

5  and you're dealing with it, fair to say?

6  **A.**  Yes.

7  **Q.**  Okay.  And did you indicate that part of the issues that

8  you're dealing with in late May 2012 related to concerns you

9  had about Autonomy's accounting?

10  **A.**  Yes.

11  **Q.**  What did you mean by that?

12  **A.**  So the treatment of costs and lack of -- lack of accruals

13  for costs that should be there.  The fact that the Autonomy

14  team were identifying that some costs that they had related to

15  the pre-acquisition period, which under the accounting rules HP

16  is allowed to adjust for in the opening balance sheet, but that

17  would be a HP corporate decision to do; whereas, the Autonomy

18  team had put them on the balance sheet without discussing them

19  with HP, HP's central accounting team, which concerned me.

20      I was concerned about the accounts receivable ledger and

21  the bad debts position and concerned that there appeared to be

22  old debts that may have to be written off that I wouldn't

23  expect to be carried on the ledger at this point.

24      There was discussions around a couple of deals, UBS and

25  BP, that had concerned me during the close.

1          Could we scroll down just a little bit?

2    **Q.**   I'm going to go through a couple of the your top e-mail to

3    your team in just a moment, but I just wanted to get some of

4    the issues that you were working through at this point in time.

5          So if we could go back to the top, you write in here, the

6    second sentence -- withdrawn.

7          Who are Lisa Harris and Antonia Anderson in this time

8    period?

9    **A.**   So they both report to me.  Lisa is the financial

10   controller for the Autonomy business and Antonia is the

11   director of revenue.  So revenue accounting, audit booking,

12   invoicing, et cetera.  They're the most -- they're the two-most

13   senior people on my team.

14   **Q.**   It looks like you write to them in the second sentence

15   (reading):

16          "Given all the changes in management, we will be held

17       accountable not for how the issues occurred but how we

18       have gone about fixing them from this point on."

19          What do you mean by that?  What's the point you're making

20   here?

21   **A.**   On the -- I'm still a new manager really to the team, so I

22   want them to be open with me, bring out the problems, clear the

23   slate, draw the line under the past, and work with me to fix

24   the problems on a go-forward basis.

25   **Q.**   When you started at Autonomy on April 1st, 2012, did you

1    have any expectation or anticipation that you'd be dealing with

2    the problems that you found by May 30th, 2012?

3    **A.**    No.

4    **Q.**    Now I would like to move forward, if I could, please, into

5    the summer of 2012.  In or around that time period, are you

6    working closely with Antonia Anderson?

7    **A.**    Yes.

8    **Q.**    Please describe some of the things that you would work

9    with Antonia Anderson on in the June-July 2012 time period.

10   What were you doing with Ms. Anderson?

11   **A.**    Oh, there were two main activities.  One was the day job,

12   continuing to manage the orders, invoicing, revenue

13   recognition, et cetera; and the second key area of work was the

14   rebasing exercise.

15   **Q.**    Okay.  I think we have a sense of the day job.  What do

16   you mean by the "rebasing exercise"?

17   **A.**    Well, the rebasing exercise was started in the second week

18   of June to take a preliminary view on the large deals, so the

19   large revenue deals for the Autonomy business in the 2011 and

20   2010 financial years.

21       And there were two purposes to this.  One was to

22   understand what the real economic substance of the Autonomy

23   business was so that I could help the business management with

24   the decisions we needed to make.  So understanding what the

25   true size of the business was would help us to understand where

1    the -- you know, perhaps FY12 was a complete anomaly, Q2 was a

2    complete anomaly, and we should expect a quick bounce-back to

3    normal levels of business or perhaps the levels of business we

4    were seeing at that time were more consistent with the past

5    levels of business, in which case it was far less likely that

6    we would see a bounce-back.

7        And that would affect our business management decisions,

8    so that was one purpose.

9    **Q.**   All right.

10   **A.**   The other purpose to it -- I wouldn't put them in an

11   order; I would say they were equally important -- was to have a

12   preliminary view as to whether issues that either I had seen or

13   had been brought forward by a whistleblower were really very

14   prevalent or appeared to be prevalent across the business, both

15   for those types of activities that had been called out and

16   perhaps other activities as well.

17       So we went quickly across, I think, all of the deals over

18   a million dollars.

19   **Q.**   Okay.  And did Ms. Anderson help you with that?

20   **A.**   Yes.  So I was responsible for that, but Ms. Anderson was

21   the actual operational leader and doer, along with another

22   member of her team and some help from some others, for that

23   exercise.

24   **Q.**   All right.  Now, as we go through the June, July, August,

25   into September 2012, that four-month time period, are you

1    looking more and more closely at the accounting at Autonomy?

2    A.    Yes.

3    Q.    All right.  Let me direct your attention to in or around

4    late August-September 2012.  At or about that time, were you --

5    did you hold a position as a director in one of the Autonomy

6    subsidiary companies known as ASL?

7    A.    Yes.

8    Q.    Okay.  And what is ASL?

9    A.    So Autonomy Systems Limited is one of the subsidiaries

10   within the group, so the Autonomy group, like many groups, has

11   a holding company and then many subsidiaries.  A lot of those

12   subsidiaries are the sales companies in each country, which

13   will actually make the sales to the customers, but there's

14   often, as there was in Autonomy, a company at the heart of the

15   group that owns all or, in this case, the majority of the

16   technology IP.  So, in other words, owns the rights to the

17   software.

18        So although the sales subsidiaries sell to the end users,

19   they send back most of that revenue -- not all, but most of

20   that revenue back to the central company, in this case ASL, who

21   owns the rights to the software.

22   Q.    And was ASL a company registered with the Companies House

23   in the U.K.?

24   A.    Yes.

25   Q.    Did you have reporting obligations pursuant to the

1    Companies Act in the U.K. with regard to ASL statutory

2    accounts?

3    **A.**    Yes.   In the U.K., regardless of whether a company is part

4    of a group or standalone, every company has to file its

5    statutory accounts with Companies House on an annual basis.

6    **Q.**    Is "statutory account" the term that's used in the United

7    Kingdom for "financial statement," as that's used in the

8    United States?

9    **A.**    Yes.

10   **Q.**    All right.   So in or around this time period, by late

11   August, early September 2012, were you considering whether ASL

12   had any type of obligation with regard to its compliance with

13   its filing requirements with Companies House?

14   **A.**    Yes.   For the period ended October 2011, the accounts were

15   due at the end of July 2012.

16   **Q.**    All right.   And so if we're in August and September, have

17   you missed that deadline, that filing deadline?

18   **A.**    Yes.

19   **Q.**    All right.   Does that -- and as a director, do you have

20   responsibilities with regard to the compliance with the United

21   Kingdom laws and statutes for companies covered by the

22   Companies Act?

23   **A.**    Yes.   If I fail to file the accounts or fail to file them

24   within a reasonable time, I can be prosecuted in the U.K. and

25   suffer professional sanctions.

**Q.**   All right.  So were you worried about those sanctions in this time period after the deadline for the filing?

**A.**   I was beginning to become worried about them because --

**Q.**   All right.

**A.**   -- the prospects of receiving sanctions continued to ramp up over time.

**Q.**   All right.  What was the problem in filing ASL's statutory accounts in compliance with the deadline?

**A.**   As a result of the rebasing exercise, I had very significant concerns about the accounting in 2011 and in prior years, and these financial statements would be filed for 2011 but would also include prior years -- prior year within them because you always include the two years within the financial statements; and I was -- I wouldn't have been able to file the financial statements as they'd been drafted because I have a responsibility to ensure that they show a true and fair view and comply with the Companies Act.

**Q.**   And that responsibility flows from what role that you're serving with regard to ASL?  Where does that responsibility come from?

**A.**   Legally it's my responsibility as a director, but also as the CFO for the Autonomy business as a whole.  You know, I'm effectively the chief accountant for these companies.

**Q.**   All right.  So in or around this time period after the filing deadline has passed in late August 2012, early

1  September 2012, are you -- did there come a time when you were

2  contemplating whether there was a possible need to restate the

3  earlier statutory accounts for ASL?

4  **A.**   Yes, because of the volume of issues we'd found in the

5  rebasing exercise, which at that point not all had been fully

6  investigated, but some of the deals that had been investigated

7  further had confirmed to me that there were errors in previous

8  years.

9  **Q.**   All right.  And what is a restatement?  What does it mean

10  to file a restated statutory account?

11  **A.**   So we were due to file the 2011 period accounts.  They

12  would include as comparatives within them the 2010 financial

13  results that had previously been filed.

14      Ultimately the accounts we prepared, we've made many

15  adjustments to the 2011 financial results as compared to what

16  were in the ledgers, but those accounts were filing for the

17  first time; but we also, in those accounts, restate the 2010

18  comparatives.  So we formally restate them in the accounts.  In

19  the accounts, we have to disclose that we have formally

20  restated the prior year.

21  **Q.**   Let me direct your attention to in or around more than a

22  year later, in or around January 2014.  At or about that time,

23  do you finally file restated statutory accounts for ASL for the

24  year 2010?

25  **A.**   Yes.  We signed them on the last day of January '14.

YELLAND - DIRECT / REEVES

1    **Q.**   All right.  Does it take you a long period of time to work

2    through what you considered necessary in order to file the

3    statutory accounts for ASL?

4    **A.**   Yes.  It takes over a year.

5    **Q.**   Let me show you what has been marked for identification --

6    withdrawn.

7          Let me show you what has been received in evidence as

8    Exhibit 2445, please.

9          If I can please have that displayed.

10         Do you recognize this documents, Mr. Yelland?

11   **A.**   Yes.

12   **Q.**   Okay.  What is this?

13   **A.**   These are the financial statements for Autonomy Systems

14   Limited for the period to October 2011.

15   **Q.**   Do they include a restatement of the prior year 2010?

16   **A.**   Yes.

17   **Q.**   I'd like to show you page 9 of Exhibit 2445, please.

18         If we could go up just a little bit.  Right there and --

19   great.  And highlight the signature block.

20         Do you recognize your signature here, Mr. Yelland?

21   **A.**   Yes.

22   **Q.**   And is that your signature?

23   **A.**   Yes.

24   **Q.**   Okay.  So why don't you describe the work, if you would.

25   I'm going to go through this document with some care with you,

1    but why don't you describe, please, some of the work that you

2    undertook in this intervening year-plus to prepare this

3    statutory accounting, including the restated 2010 statutory

4    account.  Tell us some of the work you did, please.

5    A.    So as I was aware from the rebasing exercise, there were

6    many issues or potential issues in the 2011 and prior periods.

7    I had a legal responsibility to review really all of the

8    material transactions and the balance sheet position that was

9    contained within both the 2011 and prior years so as to satisfy

10   myself that these accounts in the end would show a true and

11   fair view of the balance sheet and profit and loss account of

12   the company.

13   Q.    What do you mean that you had a legal responsibility that

14   the statutory accounts were true and fair?  What do you mean by

15   that?

16   A.    Well, that's a U.K. Companies Act requirement on the

17   directors.

18   Q.    Okay.  And is that a personal responsibility that you bear

19   when you sign this?

20   A.    Yes.

21   Q.    All right.

22         Okay.  Is it the care that you took in exercising that

23   legal responsibility that contributed to the amount of time it

24   took to file the statutory accounts in January 2014?

25   A.    Yes, because it was necessary for us to review the -- all

1    of the material transactions of Autonomy Systems Limited but

2    also all of the transactions in the other sales subsidiaries

3    because, as I said, the majority of their revenue gets returned

4    back to Autonomy Systems Limited.  So we have to really look at

5    all of the material transactions for the Autonomy group.

6    **Q.**    How big a job was that?

7    **A.**    It was a big job.  I had a team of around about 10

8    people -- I'd say it varied a little bit up and down -- but

9    around about 10 people working on this flat out for a year or

10   more.

11   **Q.**    Did that include Ms. Anderson?

12   **A.**    Yes.

13   **Q.**    Was she heavily involved in the work associated with the

14   filing of the statutory account for 2011 and the restatement

15   for 2010?

16   **A.**    Yes.

17   **Q.**    All right.  Did you rely on her judgment and expertise in

18   preparing these statutory accounts?

19   **A.**    Yes.

20   **Q.**    I'd like to show you page 4 of Exhibit 2445, please, and

21   the paragraph underneath "business review and future

22   developments."

23        **MR. DOOLEY:**  Your Honor, objection to showing certain

24   parts of this page that previously agreed to be redacted.

25        **MR. REEVES:**  Okay.

1      **MR. DOOLEY:**  It should come down.

2                          (Pause in proceedings.)

3      **MR. REEVES:**  I'd like to go to page 4 of Exhibit 2445

4  and show that paragraph immediately underneath "business review

5  and future developments" and just blow up that one paragraph,

6  please, if we can do that.  Right there.  That's excellent.

7  Thank you very much.

8  **Q.**  Okay.  Let's just talk about this.  Are you familiar with

9  this portion of the statutory account, Mr. Yelland?

10 **A.**  Yes.

11 **Q.**  I'm going to read it and ask for your understanding of

12 what it means.  Okay?

13     It says (reading):

14         "Revenue for the period has decreased from

15     £81,000,293" --

16     **THE COURT:**  Thousand.  Thousand.

17 BY MR. REEVES:

18 **Q.**  What figure is that?

19 **A.**  £81,293,000.

20 **Q.**  (reading)

21         "£81,293,000 (restated) to £73,482,000 and profit

22     before tax has decreased from £43,110,000 (restated) to

23     £11,579,000.  At the balance sheet date, Autonomy Systems

24     Limited had net assets of £146,781,000 (year ended

25     31 December 2010, £129,515,000 (restated))."

1    Can you please explain what that portion of the statutory

2    accounts means?

3    **A.**    Well, under the business review, you know, it's normal to

4    compare this year's revenue and profits and assets to the prior

5    year.  The prior year in here is always described with the

6    brackets as restated because, you know, as I said, we did

7    restate the prior year numbers throughout the accounts.

8    **Q.**    All right.  Let's go to page 10, if we could, please, of

9    Exhibit 2445, the statement of directors responsibilities.  Are

10   you familiar with that portion of the statutory account?

11   **A.**    Yes.

12   **Q.**    All right.  And does this touch on the personal

13   responsibility you had as a director of ASL that you described

14   earlier, Mr. Yelland?

15   **A.**    Yes.

16   **Q.**    Let's go through this, if we could, please.

17        If we could highlight the portion of the second paragraph

18   that begins "under company law," et cetera, and go down through

19   the bullet points.  Great.

20        Let's talk a little bit about this.  It says (reading):

21            "Under Company law, the directors must not approve

22        the financial statements unless they are satisfied that

23        they give a true and fair view of the state of affairs of

24        the Company and of the profit or loss of the Company for

25        that period."

1      Is that the obligation that you addressed earlier in your

2  testimony?

3  **A.**    Yes.  And the state of affairs of the company is largely

4  referring to the balance sheets, and the profit and loss is

5  self-explanatory.

6  **Q.**    All right.

7      (reading)

8          "In preparing these financial statements, the

9  directors" --

10      That's a reference to you as a director of ASL, is it not?

11 **A.**    Yes.

12 **Q.**    The directors are required to, subparagraph one, select

13 suitable accounting policies and then apply them consistently;

14 two, make judgments and accounting estimates that are

15 reasonable and prudent; third bullet point, state whether

16 applicable U.K. accounting standards have been followed subject

17 to any material departures disclosed and explained in the

18 financial statements; and, lastly, prepare the financial

19 statements on the ongoing concern basis unless it is

20 inappropriate to presume that the Company will continue in

21 business.

22      Do you see that?  What is your understanding of these

23 obligations that were imposed on you, Mr. Yelland, as a

24 director of ASL?

25 **A.**    Well, I think the key one, as accountants understand it,

1    is to ensure that the accounts show a true and fair view of the

2    balance sheet and profit and loss account.

3    Q.   All right.

4    A.   And really the rest of them are explaining some of the

5    steps you have to do to do that, but also it's -- it's -- it's

6    making the reader aware that, you know, you have to have

7    suitable account policies and you have to be consistent with

8    them, for example.

9    Q.   Okay.  Now, were the statutory accounts audited in any

10   sense by outside independent auditors?

11   A.   Yes.

12   Q.   I'd like to show you what has been -- the portion of

13   Exhibit 2145 that begins at page 11.

14        Is this the portion that reflects the independent auditors

15   report to the members of Autonomy Systems Limited?

16   A.   Yes.

17   Q.   All right.  We're going to go through portions of this

18   with a little bit of care, but first let's back up just a bit.

19        In or around the summer of 2012, were you familiar with

20   the then-existing outside auditor for Autonomy, Deloitte?

21   A.   Yes.

22   Q.   And as part of the work that you did with regard to the

23   filing of the statutory account for 2011 for ASL and the issues

24   around possibly restating 2010 in the way you've described, did

25   you have discussions with Deloitte about whether they would or

1    could continue as the auditor with regard to those statutory

2    accounts?

3    **A.**    I didn't have formal discussions with Deloitte until, I

4    think, the November time.

5    **Q.**    November 2012?

6    **A.**    Yes.

7    **Q.**    All right.  And if you --

8    **A.**    About their continuing as auditors.

9    **Q.**    Tell us what happened with regard to the continuation of

10    Deloitte with regard to the ASL statutory accounts.

11    **A.**    Well, ultimately we invited Deloitte to resign, which they

12    did.

13    **Q.**    By the point of time that you filed the statutory account

14    for 2011 and the restated 2010 in or around January of 2014,

15    who were the new auditors for the statutory accounts?

16    **A.**    Ernst & Young.

17    **Q.**    All right.  And so for what length of period of time had

18    you been working with the new auditors Ernst & Young to file

19    the statutory accounts?

20    **A.**    Just over a year since the beginning of 2013.

21    **Q.**    And were these statutory accounts required to be audited

22    or reviewed and audited by an outside auditor like

23    Ernst & Young?

24    **A.**    Yes.

25    **Q.**    All right.  That was a requirement of the filing of the

1    statutory account, was it not?

2    **A.**    Yes.

3    **Q.**    All right.  Now, what type of audit opinion does

4    Ernst & Young provide in the filed statutory accounts?

5    **A.**    They provide a disclaimer of opinion.

6    **Q.**    What does a "disclaimer of opinion" mean?

7    **A.**    It means that they are unable to form a positive view as

8    to whether or not the accounts do show a true and fair view

9    or -- and also that they are unable to form an opinion that the

10   accounts definitely don't show a true and fair view.  So there

11   is uncertainty.

12   **Q.**    If we go down below here, there's a -- in the portion of

13   the statutory account that reflects the auditors views, that's

14   the portion that we're looking at, is it not?

15   **A.**    Yes.

16   **Q.**    All right.  There's a -- if we could highlight the "Basis

17   for Disclaimer of Opinion on Financial Statements."

18        Do you see that?

19   **A.**    Yes.

20   **Q.**    And I'd like to -- if we go on the first bullet point, if

21   you'd be kind enough to highlight the words "further

22   adjustments might have been required."  Just those words in the

23   second line to the end.  Yeah.  That's great.  Thank you.

24        Are you familiar with this part of the statutory account,

25   Mr. Yelland?

1    **A.**    Yes.

2    **Q.**    Do you have an understanding as to what the auditor means

3    when they write (reading):

4              "If additional information had been available to

5         Directors, including information that might be identified

6         from ongoing investigations, further adjustments might

7         have been required," et cetera?

8         Do you see that?

9    **A.**    Yes.

10   **Q.**    What is your understanding of the point that the auditors

11   at Ernst & Young are making in this portion of their

12   disclaimer?

13             **MR. DOOLEY:**  Objection to foundation and hearsay.

14             **THE COURT:**  I think he can say what he understood it

15   to mean.

16   **BY MR. REEVES:**

17   **Q.**    Tell us your understanding, please.

18   **A.**    So my understanding of this is that because investigations

19   were ongoing, it's possible that we would find more

20   misstatements and that further adjustments, therefore, might

21   have been required that we hadn't found whilst we were

22   preparing these financial statements.

23   **Q.**    Is that a topic that you discussed at some length with

24   Ernst & Young and the auditors with whom you were working?

25   **A.**    Yes.

1                          (Pause in proceedings.)

2       **BY MR. REEVES:**

3       **Q.**   A couple more questions on the auditors opinion, and then

4       I want to push into the last topic for the day.

5            If we go to the next page, please, on page 12 and we go to

6       the bottom.

7            This is the signature block for Ernst & Young, is it not,

8       for the statutory account?

9       **A.**   Yes.

10      **Q.**   All right.  And let's go to the last paragraph.  Highlight

11      the words that begin "We have nothing to report except,"

12      et cetera, that portion, and the middle bullet period.  Right

13      in there.  Okay.  Great.  Thank you very much.

14           Are you familiar with this part of the auditors

15      disclaimer?

16      **A.**   Yes.

17      **Q.**   All right.  It reads (reading):

18               "We have nothing further to report in respect of the

19               following matters where the Companies Act 2006 requires us

20               to report to you if, in our opinion:

21               "The financial statements are not in agreement with

22               the accounting records and returns."

23           Do you see that?

24      **A.**   Yes.

25      **Q.**   Are you familiar with this language, Mr. Yelland?

**YELLAND - DIRECT / REEVES**

1    **A.**    Yes.

2    **Q.**    What is your understanding of the point that the auditors

3    are making in this portion of their disclaimer?

4    **A.**    So my understanding there is that if the auditors believe

5    that the decisions we've made in the financial statements and

6    the conclusions we've reached are inconsistent with the

7    accounting and company records or if we have done insufficient

8    work to draw reasonable conclusions as directors, they are

9    required to comment on that in their audit opinion and we would

10   also likely get an adverse audit opinion as opposed to a

11   disclaimed audit opinion.

12   **Q.**    And that did not happen?

13   **A.**    Correct.

14   **Q.**    Okay.  Thank you.  I'm done with that.

15          I'd like to show you what has been marked for

16   identification purposes only as Exhibit 2749.

17          **MR. REEVES:**  Pursuant to the direction of the Court,

18   I'd like to display it.

19          **THE COURT:**  You may.

20          **MR. REEVES:**  Thank you, Your Honor.

21          And specifically I'd like to display page 4 of

22   Exhibit 2749.  Page 4, please.

23          **THE COURT:**  Ladies and gentlemen, let's just stand up

24   a moment and stretch, and then we'll resume.

25                    (Pause in proceedings.)

1      **MR. REEVES:**  Another 15 minutes, Your Honor?

2      **THE COURT:**  Okay.

3      **MR. DOOLEY:**  Your Honor, before we proceed with this

4  exhibit --

5      **THE COURT:**  I'm sorry?

6      **MR. DOOLEY:**  Before we proceed with this

7  demonstrative, would the Court instruct the jury it is a

8  demonstrative?

9      **THE COURT:**  Yes.

10     Ladies and gentlemen, some exhibits are shown to you

11 because they are in evidence.  Other exhibits are shown to you

12 because they demonstrate a point that the witness is making.

13 As to that which demonstrates a point that the witness is

14 making, it in and of itself is not evidence.  It's simply a

15 pictorial representation of opinions or conclusions or findings

16 or whatever the testimony may be at any given time.

17     So this document itself won't be received in evidence but

18 you can, when you hear the witness testify about it, you can

19 follow with I hope greater ease by virtue of the fact that

20 there's a document that portrays it.

21     Go ahead.

22     **MR. REEVES:**  Thank you, Your Honor.

23 **Q.**  Mr. Yelland, are you familiar with what's marked for

24 identification as Exhibit 2749?

25 **A.**  Yes.

1    Q.    Is this a set of summaries that you prepared in the course

2    of your cooperation with this investigation?

3    A.    Yes.  I was responsible for these and they were prepared

4    by myself and the team.

5    Q.    All right.  So are you familiar with this document?

6    A.    Yes.

7    Q.    Because you prepared it and your team prepared it?

8    A.    Yes.

9    Q.    All right.  Let's -- we've been talking today about the

10    statutory account for ASL.  Does the accounting for ASL roll up

11    in any way into the Autonomy Corporation PLC group accounting

12    that Autonomy issued publicly when it filed its financial

13    statements publicly?

14    A.    Yes.  ASL is one of the subsidiaries.

15    Q.    So what is the relationship between ASL and the

16    Autonomy Corporation also known as the group or the

17    consolidated company?

18    A.    So Autonomy Corporation PLC was always required, when it

19    was a standalone group, to prepare group financial statements

20    that included the results of all of the subsidiaries and

21    brought in all of their revenue and their costs, et cetera.

22         Autonomy Systems Limited, as I said before, actually

23    receives a lot of the revenue from those subsidiaries directly

24    to itself.  So an error or misstatement in one of the sales

25    company's books would affect both the group accounts and it

1    would also affect the Autonomy Systems Limited accounts.

2    **Q.**    So following up on that last answer, if you had to restate

3    the 2010 statutory account for ASL, does that have any effect

4    on the disclosures made in the group accounting for 2010, for

5    example?

6    **A.**    Well, if we -- if we are, as we were, restating the 2010

7    and adjusting the 2011 accounts for misstatements, those

8    misstatements would have had an impact on the group accounts at

9    that time.

10   **Q.**    And is the purpose of the summary marked for

11   identification as Exhibit 2749 to create a record of what

12   effects there may have been on the group accounting?

13   **A.**    Yes.  On the page we're looking at here, yes.

14   **Q.**    All right.  And did the Government ask that you prepare a

15   summary for each of the quarters that included all of 2009,

16   2010, and two quarters in 2011?

17   **A.**    Yes.

18   **Q.**    Okay.  And are we looking at the first of those 10

19   quarterly summaries?

20   **A.**    Yes.

21   **Q.**    Now, to do that, did you review voluminous business

22   records within HP as a successor to Autonomy?

23   **A.**    I and my team did, yes.

24   **Q.**    All right.  Are you familiar with the underlying records

25   that you used in order to prepare these summaries?

1    **A.**    Yes.

2    **Q.**    All right.  And were those all records that were kept in

3    the regular course of Autonomy's and Hewlett Packard's regular

4    business, if you know?

5    **A.**    Yes.

6         **MR. DOOLEY:**  Objection, Your Honor.  What documents

7    are we talking about here?  Are we talking about a specific

8    document?

9         **MR. REEVES:**  Oh, we know.  For the record I'll say

10    these have been marked for identification as Exhibits 2800

11    through 2926 and 2995 through 3018, and they are on that blue

12    cart right back there as we discussed.

13         **THE COURT:**  Okay.

14    **BY MR. REEVES:**

15    **Q.**    Are you familiar with the business records that are on

16    that cart, Mr. Yelland?

17    **A.**    Yes.

18    **Q.**    Did you spend some time looking through those marked

19    exhibits?

20    **A.**    Yes.

21    **Q.**    Are you satisfied that they are business records of

22    Autonomy and HP?

23    **A.**    Yes.

24    **Q.**    Did you rely on them in order to prepare this summary?

25    **A.**    Yes.

1    **Q.**    Okay.  To your knowledge are those records kept and

2    maintained by HP as a successor to Autonomy in the regular

3    course of its business?

4    **A.**    Yes.

5            **MR. DOOLEY:**  Your Honor, object again.  The documents

6    that he's referring to here, it's literally thousands of

7    documents, some of which are newspaper articles.

8            **THE COURT:**  Okay.  So you say the documents should

9    come in?

10           **MR. DOOLEY:**  I'm saying he should ask about specific

11   documents.

12           **THE COURT:**  No.  He doesn't have to do that.  Do you

13   want the documents to come in?  I'll admit them.

14           **MR. DOOLEY:**  I don't want the documents to come in;

15   but if the Government wants the documents to come in, he should

16   ask about the specific documents.  These aren't business

17   records.

18           **MR. REEVES:**  I offer the documents all in evidence.

19           **THE COURT:**  Okay.  Wait.  Wait.  Wait.  Wait.

20       Anyway, the witness has testified -- we've got quite a few

21   documents in this case.  The witness has testified that he

22   reviewed those documents in coming to his conclusion.  If you

23   want to -- if you want to cross-examine him on it, you can

24   cross-examine him on it.

25       He's identified the documents, he said he reviewed the

 1   documents, and he came to conclusions.  He is able to state

 2   what his findings are.  He is subject to cross-examination.  If

 3   you question his findings because of the underlying

 4   documentation, you are free to examine him.

 5            MR. DOOLEY:  Your Honor --

 6            THE COURT:  That's what cross-examination is.

 7            MR. DOOLEY:  Your Honor, the objection is that they're

 8   not business records.

 9            THE COURT:  Pardon?

10            MR. DOOLEY:  The objection is that they're not

11   business records and, therefore, aren't admissible as such, and

12   that's how they're being offered.

13            THE COURT:  Well, they're not being admitted.  They're

14   not being admitted.

15            MR. DOOLEY:  Okay.

16            THE COURT:  They are -- however, they form the basis

17   of his conclusion; and if you believe that there is a piece of

18   paper there that is an error that forms the basis of his

19   conclusion, you can question him on it.  You can cross-examine

20   him.

21       My understanding is you have all of these pieces of paper;

22   is that right?

23            MR. DOOLEY:  That's right.  And if they're not --

24            THE COURT:  Okay.

25            MR. DOOLEY:  If the exhibits aren't being admitted,

```
 1   then fine.
 2            THE COURT:  Okay.  They're not being admitted because
 3   you're objecting.
 4        Okay.  Go ahead.
 5   BY MR. REEVES:
 6   Q.   All of the records that you used to prepare the summary
 7   marked for identification as Exhibit 2749, were all of those
 8   records the records that have been marked for identification on
 9   the records on the blue cart in the back of the courtroom?
10   A.   Yes.
11   Q.   All right.  And you've spent some time with those
12   documents, have you not?
13   A.   Yes.
14   Q.   Are you satisfied that those are all documents that are
15   kept in the regular course of HP's business?
16   A.   Yes.
17   Q.   Did you find that stuff over there in HP's files?
18   A.   Yes.
19   Q.   Did you use it to prepare this summary?
20   A.   Yes.
21   Q.   All right.  Would you agree that those records are
22   voluminous?
23   A.   Yes.
24   Q.   Do you think that it is beyond the ability of you to
25   conveniently examine them on a document-by-document basis here
```

YELLAND - DIRECT / REEVES

1  today?

2  A.    Yes.

3  Q.    That would be difficult for the jurors to do and you to do

4  in an examination, would you agree?

5  A.    Yes.

6  Q.    All right.  Are you satisfied that this summary or this

7  page of the summary, the whole summary marked as Exhibit 2749,

8  accurately summarizes the contents of those underlying business

9  records?

10  A.    Yes.

11        MR. DOOLEY:  Objection.  Objection to the relevance of

12  the question and mischaracterizes the --

13        THE COURT:  I would say take out the word "business."

14  Are you satisfied that this summary reflects your

15  examination of the documents on the blue cart?  Let's start

16  with that.

17  BY MR. REEVES:

18  Q.    Did you hear the judge's question?

19  A.    Yes.  The answer is yes.

20  Q.    All right.  Good.

21  Last question on this topic.  Are you satisfied that the

22  summary marked for identification Exhibit 2749 accurately

23  summarizes the content of these underlying records?

24  A.    Yes.

25  Q.    Okay.  Let's go through one of these slides and talk about

YELLAND - DIRECT / REEVES

1  how it's formatted, and then I'll propose that we end for the

2  day and continue tomorrow, please.

3       So walk us through the formatting of this summary of

4  revenue adjustments for Q1 2009.  What do you mean by that?

5  **A.**  So the summary starts with the originally stated revenue

6  as contained in Autonomy group's quarterly report.

7  **Q.**  Is that the first line here, "Originally Stated Revenue"?

8  **A.**  Yes.

9  **Q.**  In Q1 2009?

10 **A.**  Yes.

11 **Q.**  What is that figure, please?

12 **A.**  129,780,000.

13 **Q.**  So the numbers have been abbreviated for convenience and

14 formatting; is that correct?

15 **A.**  Yes.

16 **Q.**  But that's 129,780,000 in originally stated revenue by

17 Autonomy for Q1 2009?

18 **A.**  Correct.

19 **Q.**  And then there's the second row below that that reads

20 "Total Restated Transactions."  What is that figure?

21 **A.**  So that's the sum of the impact of all of the

22 restatements, the impact that they would have had on the group

23 accounts.

24 **Q.**  And when you say "restated," what do you mean?  What does

25 that term mean as you use it?

YELLAND - DIRECT / REEVES

1   A.   So they were restated as part of preparing the ASL

2   accounts.

3   Q.   Okay.  I think earlier you used the term "misstated"

4   before.

5   A.   Yes.

6   Q.   Do you remember using that term?  What did you mean by the

7   term "misstated"?

8   A.   It means that they were not properly accounted for.

9   Q.   And this reflects the changes in the accounting to make it

10  proper in your judgment?

11  A.   Yes.

12  Q.   Okay.  And when we drop -- then there's some specified

13  deals there.  What criteria did you use to -- for the deals

14  that are broken out in this portion of Exhibit 2749?

15  A.   The Government asked me to break out certain specific

16  deals, generally the larger ones.

17  Q.   All right.  And did that include the Capax Discovery EDD

18  deal for Q1 2009?

19  A.   Yes.

20  Q.   And after you prepared the statutory accounts and worked

21  through the effect on the group accounting, what was the

22  correct accounting for Capax Discovery EDD in Q1 2009?

23  A.   The correct accounting was not to recognize the revenue in

24  the group financial statements.

25  Q.   And so how much was adjusted for Capax EDD in Q1 2009?

1    **A.**    The equivalent of $7.5 million.

2    **Q.**    Subtracted?

3    **A.**    Correct.

4    **Q.**    Is that what the parentheses mean?

5    **A.**    Correct, yes.

6    **Q.**    Okay.  And when you work through the adjustments, you get

7    down to a figure that you've identified as the restated

8    revenue.  Do you see that?

9    **A.**    Yes.

10    **Q.**    And how much is the restated revenue for Q1 2009?

11    **A.**    115,540,000.

12    **Q.**    Is that the correct accounting in your judgment?

13    **A.**    Yes.

14    **Q.**    Do you stand behind that figure?

15    **A.**    Yes.

16    **Q.**    All right.  And then down below there's an entry here for

17    hardware revenue.  Do you see that?

18    **A.**    Yes.

19    **Q.**    And in this particular quarter how much so-called hardware

20    revenue was there?

21    **A.**    None.

22    **Q.**    None.  Did the Government ask you to identify hardware

23    revenue on a quarterly basis?

24    **A.**    Yes.

25    **Q.**    And does that appear in the subsequent quarterly

1  summaries?

2  **A.**    Yes.

3  **Q.**    All right.  And if we drop down, there's a "Percentage

4  Restated."  What does that figure mean?

5  **A.**    That's the proportion of the originally recognized revenue

6  that was effectively restated.

7  **Q.**    All right.  So how much did the -- as a percentage did the

8  originally stated revenue have to be reduced when you calculate

9  the properly restated revenue?

10  **A.**    11 percent.

11  **Q.**    11 percent less, agreed?

12  **A.**    Yes.

13  **Q.**    Is that the purpose of the minus sign?

14  **A.**    Yes.

15  **Q.**    And then, lastly, there's an entry here for "Percentage

16  Restated Including Hardware Revenue."  Do you see that?

17  **A.**    Yes.

18  **Q.**    Did the Government ask you to also calculate the

19  percentage of the adjustments including the hardware?

20  **A.**    Yes.

21  **Q.**    Okay.  And for this particular quarter, there was no

22  hardware revenue, so what was the resulting percentage of

23  restated revenue including hardware revenue?

24  **A.**    11 percent or less.

25  **Q.**    Same figure?

1  **A.**    Yes.

2        **MR. REEVES:**  Your Honor, this might be a good place to

3  stop for the day.

4        **THE COURT:**  Okay.  Ladies and gentlemen, we'll take a

5  recess.  I promised you a schedule and an update.

6        So, number one, the Government intends to rest its case

7  tomorrow.  It will have this witness obviously as further

8  direct, we'll have cross-examination, and I think they may have

9  one other witness or so and they will then rest their case.  It

10 will take most of tomorrow.  And the Defense, then, should they

11 so choose, can start with witnesses on Wednesday.

12       Now, I don't know, because I haven't had a conversation

13 with them yet, exactly or approximately how long the Defense

14 case is going to be.  I feel that by tomorrow I'll have an idea

15 about that and be able to give that to you.

16       Obviously because the Government's case included extensive

17 cross-examination, the cross-examination is a manner in which

18 the Defense can introduce evidence that they believe is

19 important for you to consider with respect to their case.

20       And when I say "their case," I'm saying the case because

21 it's not really one person's case.  It's a case in which you

22 are to consider both the direct testimony and the

23 cross-examination, you are to consider both the exhibits

24 offered by the Government and the exhibits offered by the

25 Defense.

1    So you have heard a lot of testimony from the Government

2  and from the Defense in connection with this case, but I think

3  you want me to be more concrete and I can do that, I hope,

4  tomorrow.

5    So that's the admonition.  The admonition is don't form or

6  express any opinion, keep an open mind, and don't discuss the

7  case.

8    And I'll see you tomorrow at 9:00.

9    (Proceedings were heard out of the presence of the jury:)

10    **THE COURT:**  Okay.  Let the record reflect the jury has

11  retired.

12    So, let's see, what do we -- how do we -- there are some

13  unaddressed evidentiary issues maybe.  I don't know.  There is

14  from the Defense.  I don't know whether there is from the

15  Government.  How do you want to proceed?

16    **MR. REEVES:**  Which issues do you have in mind,

17  Your Honor?

18    **THE COURT:**  Well, I have in mind in particular the

19  Exhibit --

20    **MR. KEKER:**  6644.  We'd like to brief it, Your Honor.

21    **THE COURT:**  Would you?

22    **MR. KEKER:**  We can do it tonight.

23    **THE COURT:**  6644.

24    **MR. KEKER:**  We can do it tonight.

25    **MR. REEVES:**  Is that the --

1      **THE COURT:**  That's the e-mail from Mr. Chamberlain

2  to -- oh, I don't know whether --

3      **MR. KEKER:**  To Mr. Hussain.

4      **THE COURT:**  Yeah.

5   -- to the defendant and others in which is attached a

6  listing of -- I don't know what to call them -- purchase

7  orders.

8      **MR. KEKER:**  It's a business record but the e-mail, we

9  want the whole thing in.

10     **MR. FRENTZEN:**  And for the -- there was an argument,

11 then we took a break, and so we'll get some kind of a brief, I

12 guess, tonight.

13     Just so the Court knows the Government's initial view, the

14 argument from the other side was state of mind.  I believe

15 state of mind is a then existing -- the declarant's then

16 existing state of mind, not just any document which might have

17 an impact on an individual's state of mind.

18     **MR. KEKER:**  He says that over and over and he's wrong.

19 I mean, let's all go look at the rules.  We'll write tonight --

20     **MR. FRENTZEN:**  Look at the rules --

21     **MR. KEKER:**  -- but he's said that five times, and it's

22 wrong.

23     **THE COURT:**  Wait.  Let me make sure I understand.

24     Here we have a statement that is made by

25 Mr. Chamberlain -- right? -- who's not a witness.

PROCEEDINGS

1          MR. FRENTZEN:  Correct.

2          THE COURT:  And Mr. Chamberlain's state of mind, by

3    the way, isn't relevant.  What is relevant is Mr. Hussain's

4    state of mind, and so it's being offered -- since, in fact,

5    from the appearance of the document it went to Mr. Hussain --

6    it's being offered to see the impact on the listener as to the

7    document, and that's why it's being offered.  That's why it's

8    being offered.

9          And the state -- the reason it's relevant is because the

10   listener made a statement.  In this case, he said revenues are

11   1.4 million or whatever it was, and so that statement has

12   been -- that statement is purportedly a false statement.

13         MR. FRENTZEN:  No.

14         THE COURT:  It's not?

15         MR. FRENTZEN:  The falsity in the statement,

16   Your Honor, just -- in other words, there's a little bit of

17   sleight of hand -- I don't want to say "sleight of hand" --

18   misdirection.

19         The falsity in the statement is that the reason why the

20   debts have dropped is because they've been collecting from the

21   end users and, therefore, they've gone from 20-some-odd million

22   to 1.4 million.

23         I don't think there's a dispute with the 1.4 million.  The

24   issue is actually that it's because they wrote it off.  In

25   other words, MicroLink was not -- they collected on a few of

1    them, then they wrote the rest of it off.

2        So this -- to get into this to begin with is sort of

3    like -- it's not the -- it's not the number, it's the how they

4    got there that's the falsity in the letter, as I -- you know,

5    as I best understand it.

6        And I think the Court has captured the rest of it, which

7    is to say -- you know, and, again, I'll go back and read the

8    rule.  As I said, I'm shooting from the hip here because this

9    just came up today.

10        **THE COURT:**  I don't think it's a business record

11    necessarily but, I mean, I wondered --

12        **MR. KEKER:**  The accounts are a business record.

13        **THE COURT:**  -- why it isn't -- I'm sorry?

14        **MR. KEKER:**  The accounts are a business record.  I

15    wouldn't say that the e-mail is, but the accounts that are

16    attached are a business record.

17        But if they will stipulate that the business records of

18    Autonomy at the time that letter was written showed that there

19    was 1.4 million owed by Discover Tech, which is what is in the

20    letter and what Mr. Leach suggested was false, if they want

21    to -- if they want to --

22        **MR. FRENTZEN:**  It's MicroLink.

23        **MR. KEKER:**  Or, excuse me, MicroLink.

24        -- 1.4 million owed by MicroLink at that time, then that's

25    fine.  We'll accept a stipulation.

PROCEEDINGS

```
1            THE COURT:  I have a feeling they don't.

2            MR. KEKER:  I have a feeling too.  Anyway, we'd like

3   to brief it tonight, Your Honor.

4            THE COURT:  Okay.  All right.  We'll brief it.

5            MR. FRENTZEN:  Great.

6            THE COURT:  Anything -- oh, now, yeah.  Right.  Okay.

7   So let's talk about the Defense case.

8            MR. KEKER:  Based --

9            THE COURT:  We know -- we've already heard -- we know

10  this person.

11           MR. KEKER:  If things don't change --

12           THE COURT:  And who is the person, the other person?

13           MR. FRENTZEN:  Your Honor, we've got --

14           THE COURT:  Oh, the agent.

15           MR. FRENTZEN:  -- Special Agent Bryant to do sort of a

16  catchall and there's a number of documents, and then we have --

17  we may have David Toms.

18           THE COURT:  Okay.  All right.  And how long will he be

19  if he does testify?

20           MR. FRENTZEN:  Adam?

21           MR. REEVES:  Oh, David Toms?

22           THE COURT:  Yes.

23           MR. REEVES:  Half an hour.

24           MR. KEKER:  He'll be cross-examined, so --

25           THE COURT:  Well, I do want to finish tomorrow, but
```

1   there's no reason why we wouldn't finish.  I mean, you're not

2   going to cross the agent.  She's going to say "Here are, you

3   know, 5,000 documents" --

4           **MR. KEKER:**  It depends what she says.

5           **THE COURT:**  -- "in this dump and here it is."  Okay.

6   Right?  You're not going to say they're not there.

7       Okay.  Are you?

8           **MR. KEKER:**  No, I mean, if that's all she does.  It

9   depends.  I still can't figure out and I haven't had a chance

10  to read your order, which we just got, but I saw you opined

11  about it --

12          **THE COURT:**  It will all --

13          **MR. KEKER:**  -- so with all respect, I'll read it

14  tonight.

15          **THE COURT:**  Yeah, well, only if you have insomnia

16  would I recommend that you read the order.

17      Okay.  Now, on to your case.

18          **MR. KEKER:**  In our case we've sent them a list of

19  people.  I know for certain that we will be calling one who

20  will take --

21          **THE COURT:**  Who?

22          **MR. KEKER:**  Catherine Lesjak, the CFO of HP; and the

23  rest of them sort of we need to evaluate tonight.

24          **THE COURT:**  Okay.  All right.  Fair enough.

25          **MR. KEKER:**  But it depends on Welham -- I mean, excuse

PROCEEDINGS

1    me, Yelland and --

2        THE COURT:  But I do want -- this is what I want to

3    do -- that's fine.  I'm not going to ask you any more

4    questions, but I do tomorrow want to be able to tell the jury,

5    you know, really where we are, practically speaking where we

6    are.  So I think you have to make some elections tonight.

7        MR. KEKER:  Agreed.

8        THE COURT:  And you know you have to do it anyway,

9    so --

10        MR. KEKER:  We think that the evidence will be done

11    this week.  I mean, whether or not it's done late Thursday or

12    sometime in between, but it should be done this week.

13        THE COURT:  Okay.  But don't -- evaluate it and then

14    let me know tomorrow --

15        MR. KEKER:  Yes, sir, we will.

16        THE COURT:  -- so you don't walk down an alley.

17    Okay.

18        MR. FRENTZEN:  I hesitate to get into anything more,

19    Your Honor, but --

20        THE COURT:  No, I wouldn't get into anything more.

21    I'd hesitate.

22        MR. FRENTZEN:  I'll leave it till tomorrow, then, if

23    need be, but if there's any confusion -- the top 40 summary

24    that we thought yesterday if we take the color out, we're good,

25    I just want to make sure we're still good because I didn't know

1  that the Court was there.

2      And if there's any -- there's --

3      **THE COURT:**  Well, I think we have to have a further

4  discussion about that.

5      **MR. FRENTZEN:**  I can do it today or tomorrow.

6      **THE COURT:**  Look, I appreciate that, and I think I was

7  thinking when I focused on it, which I didn't focus on it with

8  the clarity I should have focused on it, just this was the list

9  that Autonomy had provided and then you put in the numbers that

10  were particular numbers.

11      Now, I understand it's not quite that.  It's a

12  rearrangement of a list based --

13      **MR. KEKER:**  No.  No.  It is --

14      **THE COURT:**  It is the list.

15      **MR. KEKER:**  -- their theory --

16      **THE COURT:**  Go ahead.  I'll listen to both.  I'll

17  listen to both.  Okay?

18      **MR. KEKER:**  Lists were exchanged.  Their theory is

19  that the list was supposed to be X.  Our theory is, no, the

20  list was supposed to be Y.  What they want to do is put in what

21  they call a summary to show if we're right and if the list was

22  supposed to --

23      **THE COURT:**  If who is right?  If the Government's

24  right?

25      **MR. KEKER:**  If the Government is right and it was

1    supposed to be X, then it should have looked like this.  And

2    what we say is that that's a completely argumentative list.

3         We say if we're right, it should look like that; but they

4    don't -- they don't get a summary into evidence of 40 things,

5    45 things, that simply is their argumentative version of this

6    top 40 list.

7              MR. FRENTZEN:  May I be heard?

8              THE COURT:  Yes.

9              MR. FRENTZEN:  Thank you, Your Honor.

10        What it is is a summary and as we discussed -- nothing --

11   as we discussed, I think, yesterday -- wait -- anyway, the top

12   40 list is a summary and, again, Antonia Anderson testified --

13             THE COURT:  Which one are you talking about?

14             MR. FRENTZEN:  That one (indicating).

15             THE COURT:  This one (indicating)?  It's 45 items on

16   it.

17             MR. FRENTZEN:  Correct.

18             THE COURT:  Okay.

19             MR. FRENTZEN:  Antonia Anderson testified and when she

20   testified, among the things that were admitted through

21   Ms. Anderson, were several very lengthy spreadsheets.  Those

22   spreadsheets were Ms. Anderson running the revenue numbers on

23   this revenue program that they have -- that they had at

24   Autonomy, which would have been the program that Chamberlain

25   and Hussain ran for their top 40, although then they modify it

1    obviously, and we're going to get into a lot of the evidence

2    about the modification tomorrow.

3         What we have done is to take from Antonia Anderson's

4    spreadsheet the numbers that kicked out for revenue.  So it's a

5    number but from very voluminous, long -- I mean, you've seen

6    some of these spreadsheets are huge -- from those spreadsheets

7    the numbers that say revenue, and we've listed that on there

8    and that should have given a top 40.

9         The only other thing we've done is, to the extent that

10   there was hardware, is to indicate and remove or to indicate

11   aspects of it that were hardware and then to integrate that

12   with the top 40 list that was actually turned over.

13        And so what that shows in a snapshot is revenues coming

14   from Antonia Anderson's spreadsheet in total.  That's what the

15   system spit out.  That's what Chamberlain and Hussain and

16   Kanter and all them would have been looking at.  They went a

17   different direction and they did something different.

18        But all that does is summarize numbers off of that

19   spreadsheet and then information from the contracts, et cetera,

20   that were also generated about hardware.

21        And so it really is a summary.  The agent can explain how

22   it was reached, where it came from, why it's a summary, and we

23   think it should come into evidence.  It's not argument.  It's

24   not a judgment call.  For example, it's not a "How was the

25   accounting done?"  It's what numbers got spit out by Autonomy's

PROCEEDINGS

1    own system, the same thing that Chamberlain used and then

2    Chamberlain, Hussain, Kanter, Lynch worked off of to modify and

3    then display the top 40.

4         What he says is argument is because the numbers are very

5    damaging to his client but they're just numbers.

6              MR. KEKER:  Oh, let's stop.  Let's stop things like

7    that.

8              MR. FRENTZEN:  I don't --

9              THE COURT:  They are what they are.  Whether they're

10   damaging or innocuous, that doesn't advance the argument.  So

11   let's just look at number one for a minute.  I've got to make

12   sure I understand this thing.

13             MR. FRENTZEN:  I actually don't have it in front of

14   me.

15             THE COURT:  "SHI International," okay, "(hardware)."

16   then it says "Revenue based on books and records."  It has

17   $56 million.  Then it says "Revenue as provided by Autonomy to

18   HP, zero."

19             MR. FRENTZEN:  That's the top -- sorry.

20             THE COURT:  Then it says "Hardware revenue per" -- I

21   don't know.  It says "ERP."  What is that?

22             MR. FRENTZEN:  That's the system.

23             THE COURT:  Oh, the system.  Okay.  The spin-out

24   system, and it's again 56 million.

25             MR. FRENTZEN:  It's all hardware.

1          **THE COURT:**  All hardware.

2      So the point you are making is if hardware sales were

3  listed, then SHI would have been the number one on the hit

4  parade, on the top 40.  And if you go look at the real top 40,

5  it's not going to be there is my guess because it's zero.  So

6  it's not going to be there.

7          **MR. FRENTZEN:**  We're saying if any -- we're saying if

8  the top revenue numbers are listed period.  It just so happens

9  the top revenue number was, in fact, hardware but, yes.

10         **THE COURT:**  Okay.  But the interesting thing is, okay,

11  I sort of -- I think I understand that.

12      Then what you're saying is that this is a summary of in

13  this case, number one, the hardware sales.  That's what it

14  represents for -- I mean, it represents the largest producer or

15  largest revenue producer of hardware sales.

16         **MR. FRENTZEN:**  It's the largest revenue producers, and

17  we then also dealt with hardware within that.

18         **MR. KEKER:**  Your Honor, could I -- just I want to say

19  one thing and then I'm going to shut up.

20         **THE COURT:**  You don't have to do that.

21         **MR. KEKER:**  The re-key has admitted what's wrong with

22  it.  This is argumentative in the sense that they stand in

23  front of the jury and say "What these people wanted was

24  revenue -- contracts by revenue whatever the revenue was."

25  What we say is, "No, that's not what these people wanted.  They

1  wanted the software contracts and so on."

2      What they're trying to do is make gospel their argument --

3      **THE COURT:**  No, I don't know that that's true.  I

4  mean, let me ask you this, Mr. Keker:  Witness Mr. Yelland is

5  on the stand.  You say to Mr. Yelland, "Look, you've looked at

6  all of these books and records," whatever that means.  "Let me

7  ask you, do you have an opinion, did you make a finding, can

8  you -- do you know," however you want to word it, "do you know

9  what the largest producer of revenue was for hardware sales?"

10      He'll say, "Yes."

11      You'll say, "Okay.  What was it?"

12      He'll say, "SHI International."

13      You'll say, "How much was it?"

14      "$56 million."

15      So Mr. Reeves goes and writes on a piece of paper

16  "$56 million."  Okay.  Now, he can do that.

17      **MR. KEKER:**  That's a demonstrative.

18      **THE COURT:**  Okay.  He can do that.  What you're saying

19  is that what he can't do is offer in evidence a summary of what

20  the records show is a compilation of the biggest hardware

21  sales.  Now, as to that, I have some difficulty because it

22  seems to me that that's exactly what a summary is.

23      **MR. KEKER:**  But that's not what they're doing.

24  That's -- if --

25      **THE COURT:**  Why are they not doing that?

**PROCEEDINGS**

1          **MR. KEKER:**  -- Mr. Reeves goes and writes it up there,

2     then it's a demonstrative.  That's fine.

3          **THE COURT:**  Then it doesn't go to the jury.

4          **MR. KEKER:**  And what this is, what this is, is their

5     argument that what should have been provided is the top revenue

6     things and we've listed 45.

7          **THE COURT:**  No, no, no.  He's not going to ask him the

8     question what should have been provided.  He's not going to say

9     right or wrong.  What he's going to say is, "Did you look at

10    the" -- he's going to say what I just said he's going to say:

11         "Did you look at the books and records?

12         "Yeah.

13         "Do you know what the largest hardware sales was?

14         "Yes.

15         "What was it?

16         "56 million.

17         "Who did it?

18         "SHI."

19         Now, let's stop right there for a minute.  There is no way

20    a jury can do that.  Zero.  Zippo.  I mean, I -- you know, you

21    look at those documents and you're going to be here till next

22    Shavous if you require them to figure out how much each thing

23    was.

24         **MR. KEKER:**  If they want to put in a list of the

25    largest hardware sales, we have no objection whatsoever.  You

PROCEEDINGS

1  are misunderstanding what they're trying to do.

2      What they're trying to do is, we asked -- they'll say

3  Hewlett Packard asked for the largest revenue numbers and what

4  they got is this, and what we say is the software contracts.

5      But what they say is that should have looked like this,

6  and, therefore, that's what that is.  That's not hardware only.

7  That is here are the top 40 by revenue, which is their

8  argument, not their -- it's not a fact.  It's their argument.

9  Those are --

10      MR. FRENTZEN:  Of course, it's a fact.  It's obviously

11  a fact.  The list is top revenue period.

12      MR. KEKER:  Well, that's what he says.  He's wrong.

13  He's going to argue that.  We're going to argue the opposite.

14  We're going to say, "These are software contracts and that's

15  what was worked out," and we've got evidence to show that.

16      MR. FRENTZEN:  That's the argument.  My question is

17  simple:  Did you review the spreadsheets?  Does that represent

18  the top revenue?  Did you then also deal with the just

19  splitting out aspects that were hardware?

20      That's not argument.  Those are the numbers from the

21  spreadsheets, from the contracts.  It's very simple.  It is a

22  summary.  The spreadsheets are voluminous.  There you are.

23  It's 1006.

24      THE COURT:  Okay.  Let's argue it again tomorrow.

25      MR. KEKER:  Mr. Marais is going to argue it again

PROCEEDINGS

1    tomorrow.

2            THE COURT:  Oh, you picked him out because he's the

3    guy who went through 4,000 pieces of paper and I saw the

4    result.

5            MR. KEKER:  Exactly.

6            THE COURT:  It was devastating.

7            MR. KEKER:  I told him --

8            MR. FRENTZEN:  Devastatingly misleading, and then --

9            THE COURT:  No, it was fine.  It was a very good --

10           MR. KEKER:  I told him not do all 4,000.  He wanted to

11   do all 4,000.

12           THE COURT:  It was not misleading.  Everybody has a

13   different perspective on life that's what I'm saying.

14           MR. FRENTZEN:  See you tomorrow.

15           MR. REEVES:  Your Honor, before we leave for the day,

16   can I just make a record about one thing?

17       Based on the Court's ruling with regard to the underlying

18   records, there are certain portions of that that we'd like to

19   introduce as business records.

20           THE COURT:  Well, it's up to you.

21           MR. REEVES:  Okay.  And I will be conferring tonight

22   with counsel for Mr. Yelland in order to identify those records

23   and see if we can put them in through Mr. --

24           THE COURT:  Okay, look, do me a favor.  Whatever you

25   decide you're going to introduce into evidence, please send

PROCEEDINGS

1  them an e-mail listing your proposal to introduce those

2  documents.

3          **MR. REEVES:**  Thank you.  I'll do that.  Thank you very

4  much.

5              (Proceedings adjourned at 4:20 p.m.)

6                      ---oOo---

7

8

9              <u>**CERTIFICATE OF REPORTERS**</u>

10      I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  DATE:   Monday, April 16, 2018

14

15

16

17  _____

18      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter
19

20

21  _____

22      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                U.S. Court Reporter
23

24

25