Volume 25

                              Pages 5085 - 5351

                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )        NO. CR 16-00462 CRB
                                 )
SUSHOVAN TAREQUE HUSSAIN,        )
                                 )
            Defendant.           )
_____)
                              San Francisco, California
                              Tuesday, April 17, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                    ALEX G. TSE
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
               BY:  **ROBERT S. LEACH**
                    **ADAM A. REEVES**
                    **WILLIAM FRENTZEN**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                    KEKER & VAN NEST
                    633 Battery Street
                    San Francisco  CA  94111
               BY:  **JOHN W. KEKER**
                    **JAN NIELSEN LITTLE**
                    **BROOK DOOLEY**
                    **KATE LAZARUS**
                    **NIC MARAIS**
                    **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

<u>**I N D E X**</u>

Tuesday, April 17, 2018 - Volume 25

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|

**YELLAND, CHRISTOPHER (RECALLED)**

| | PAGE | VOL. |
|---|---|---|
| (PREVIOUSLY SWORN) | 5093 | 25 |
| Direct Examination resumed by Mr. Reeves | 5093 | 25 |
| Cross-Examination by Mr. Dooley | 5151 | 25 |
| Redirect Examination by Mr. Reeves | 5237 | 25 |

**TOMS, DAVID**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 5250 | 25 |
| Direct Examination by Mr. Reeves | 5251 | 25 |
| Cross-Examination by Ms. Little | 5272 | 25 |

**BRYANT, ALEXANDRA**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 5280 | 25 |
| Direct Examination by Mr. Frentzen | 5280 | 25 |

<u>**E X H I B I T S**</u>

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 62 | | 5292 | 25 |
| 63 | | 5294 | 25 |
| 121 | | 5289 | 25 |
| 349 | | 5295 | 25 |
| 463 | | 5131 | 25 |
| 774 | | 5276 | 25 |
| 778 | | 5259 | 25 |
| 1301 | | 5290 | 25 |
| 1373 | | 5130 | 25 |
| 2732 | | 5132 | 25 |
| 3040 | | 5284 | 25 |
| 3056 | | 5132 | 25 |

# **I N D E X**

## **E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 3063 | 5137 | 5137 | 25 |
| 3064 | 5137 | 5138 | 25 |
| 6644 | | 5237 | 25 |
| 6794 | | 5229 | 25 |
| 6799 | | 5162 | 25 |
| 6800 | | 5177 | 25 |
| 6902 | | 5186 | 25 |
| 6903 | | 5193 | 25 |
| 6914 | | 5168 | 25 |
| 6935 | | 5188 | 25 |
| 6937 | | 5189 | 25 |
| 6938 | | 5190 | 25 |
| 6940 | | 5191 | 25 |
| 6947.0001 | | 5192 | 25 |
| 6952 | | 5197 | 25 |
| 6953 | | 5219 | 25 |
| 8236 | | 5183 | 25 |
| 8237 | | 5183 | 25 |

PROCEEDINGS

```
 1  Tuesday - April 17, 2018                    8:59 a.m.

 2                  P R O C E E D I N G S

 3                      ---o0o---

 4       (Proceedings were heard out of the presence of the jury:)

 5           THE COURT:  Please be seated.

 6       Okay.  Let the record reflect the parties are present.

 7  The jury is not present.

 8       So last night I sent out -- did anybody get it? -- a

 9  suggestion as to a proposed instruction.

10           MR. FRENTZEN:  We're fine with that, Your Honor.

11           THE COURT:  Okay.  Any comments, Mr. Marais?

12           MR. MARAIS:  Well, yes.

13           THE COURT:  I mean, other than, number one, you object

14  to it.  So, I mean, you're not -- by commenting on it, it's a

15  question of whether you can offer some improvements over that

16  instruction or there are things that I don't understand about

17  it, and so forth.

18           MR. MARAIS:  Your Honor, I think the first thing to

19  note is that the field has shifted a little.  The Government

20  has now sent us an updated version of this list.  So I just

21  wanted to put that on the record by way of instruction.

22       I think, Your Honor, and we can get into the substance of

23  the top 40 and the problems with the list if you want, but I

24  think that the instinct yesterday that was most accurate was

25  the way this should be done is a witness should come in and
```

1  say, "Here's what I did.  Here are the records I examined."

2  And as Your Honor pointed out, you can write down "Number one,

3  X, so much revenue; number two," and so on.

4      I don't think that this should need an instruction from

5  the Court because if a 1006 summary is going to come in, it

6  needs foundation.  These charts are complicated.  I don't know

7  what accounting systems the Government has looked at.

8      As Mr. Frentzen pointed out yesterday, there's a system

9  called ERP.  There's a second system called NIBS.  There's a

10  third called Softrax.  When Ms. Anderson compiled this list --

11  not this list, a list -- my understanding is at first she

12  looked at some of those systems, then she included at others.

13      I mean, the Court and the Defense needs to understand how

14  this list came to be; and if the Government is going to bring a

15  witness in to lay some foundation for it, then we can debate

16  about whether it's accurate or not and at that point I think

17  there wouldn't be any need for an instruction.

18          **MR. FRENTZEN:**  They've got the data.  It came from

19  Ms. Anderson.  They're aware of that.  If they have a problem

20  with it, we can either hear about it now or they'll

21  cross-examine on it.

22          **MR. MARAIS:**  Well, I don't --

23          **MR. FRENTZEN:**  There's no -- excuse me -- there's no

24  requirement under 1006 that we handwrite it and transpose and

25  go back and forth.

PROCEEDINGS

1          The point of the exercise is to get through it quickly

2     and, you know, that's what we've done.  This is not some

3     outrageous summary.  It's actually relatively simple and, you

4     know, we're going to introduce today the data also that came

5     from Steve Chamberlain that was sent to Sushovan Hussain that

6     looks an awful lot like what we have but it's not exactly the

7     same and, you know, it demonstrates that that was the system

8     that they searched as well.

9          THE COURT:  Well, my understanding is this witness

10    could say -- by way of offer of proof he's going to say that

11    looking at this list and this list reflects -- is an accurate

12    reflection, an accurate reflection, of the underlying

13    documentation, which are found in the files of HP.

14         MR. FRENTZEN:  There's an intermediary step,

15    Your Honor, which includes that another witness, who they

16    cross-examined, Ms. Anderson, put the other spreadsheets.  And

17    so from those spreadsheets -- and she testified about the

18    creation of those spreadsheets, and so from those

19    spreadsheets --

20         THE COURT:  He made the list from the spreadsheets?

21         MR. MARAIS:  I don't think he made the list,

22    Your Honor.

23         MR. FRENTZEN:  Excuse me.  It's a she.  She's sitting

24    over there.

25         THE COURT:  She?  Oh.

PROCEEDINGS

1          **MR. FRENTZEN:**  Yeah.  Sorry.  Agent Bryant.

2          **THE COURT:**  Oh, it's the agent made the list.  I don't

3    know who made the list.  I thought the witness made the list.

4          **MR. MARAIS:**  I don't know either, Your Honor, and this

5    list originally was designated for use with Mr. Sarin.  Now

6    it's designated for use with Special Agent Bryant.

7          **THE COURT:**  That doesn't make a difference to me.

8    What makes a difference to me is I'm looking at a list and I'm

9    trying to figure out who made the list and what did they make

10   it from.

11         **MR. FRENTZEN:**  Special Agent Bryant went back,

12   double-checked the list from Antonia Anderson's spreadsheets,

13   which have been admitted into evidence and are voluminous.

14         **THE COURT:**  Okay.  So here's what we're going to do:

15   We're going to continue with the witness.  You can use the list

16   with the witness.  You can use it for demonstrative purposes.

17   If, in fact, when she testifies she lays a sufficient

18   foundation for the document, then I'll consider admitting it

19   under 1006.

20         **MR. FRENTZEN:**  Great.

21         **THE COURT:**  That's easy.

22         **MR. MARAIS:**  I think there --

23         **THE COURT:**  Once again --

24         **MR. MARAIS:**  I think there --

25         **THE COURT:**  Once again I postponed the decision.

1          **MR. MARAIS:**  I think there are some additional issues,

2     Your Honor.  There is some argument in this chart.  You know,

3     for instance, the Government has put in parentheses --

4     Your Honor may not have a copy -- has put in parentheticals

5     that some contracts are hardware and some contracts are

6     software.  There are rows on here, for instance row 14, which

7     is Citigroup.  That's a contract that we've heard testimony

8     about that included hardware.  The Government has decided not

9     to put "hardware" in parentheticals.

10          **THE COURT:**  Yeah, but I almost think that's a matter

11     of cross-examination.

12          **MR. MARAIS:**  I agree with that, Your Honor.  I just

13     wanted to flag it.

14          **THE COURT:**  I think that's a matter of

15     cross-examination.  You know, "You didn't do this.  You didn't

16     do that," and so forth and so on.  That seems to be cross.

17          But I think an adequate foundation has yet to be laid for

18     the admission of it under 1006.

19          **MR. FRENTZEN:**  Agreed.  But if I lay that foundation,

20     then we think it's coming in under 1006.

21          **THE COURT:**  You want me to promise?

22          **MR. FRENTZEN:**  No.  I'm -- as with all evidence,

23     Your Honor, I'm not used to arguing about eight things before

24     we get to it.  I'll lay a foundation and it will come in or it

25     won't.

 1        **THE COURT:**  Okay.  Bring back the witness.

 2        **MR. FRENTZEN:**  Thank you, Your Honor.

 3        **MR. MARAIS:**  Thank you, Your Honor.

 4        **THE COURT:**  Bring in the jury.

 5    (Proceedings were heard in the presence of the jury:)

 6        **THE COURT:**  Please be seated.

 7    Good morning, ladies and gentlemen.  Again, thank you for

 8  being so prompt.

 9    We are continuing with the direct examination of

10  Mr. Yelland, who's on the stand.

11                    <u>CHRISTOPHER YELLAND</u>,

12  called as a witness for the Government, having been previously

13  duly sworn, testified further as follows:

14        **MR. REEVES:**  Thank you, Your Honor.  Good morning.

15    I'd like to pick up where we left off, if I could, please,

16  and ask that Exhibit 2749 please be displayed.  If we could go

17  to page 4.

18                <u>**DIRECT EXAMINATION**</u>  (resumed)

19  BY MR. REEVES:

20  **Q.**  Do you recall your testimony, Mr. Yelland, about the

21  preparation of this summary chart?

22  **A.**  Yes.

23  **Q.**  All right.  And I'd like to go carefully through each of

24  the quarters and have you testify about the findings that you

25  made with regard to the consolidated reporting as a function of

1  the restated statutory accounts in the manner you described

2  yesterday.  Is that clear?

3  **A.**    Yes.

4  **Q.**    All right.  For this first quarter of 2009, what were the

5  originally stated revenues?

6  **A.**    129,780,000.

7  **Q.**    And what was the total restated transactions in Q1 2009?

8  **A.**    14,240,000.

9  **Q.**    And did that include an adjustment for Capax Discovery

10  EDD?

11  **A.**    Yes.

12  **Q.**    Today do you have a recollection of the reason why the

13  adjustment for Capax EDD was necessary?

14  **A.**    Yes, because it was reciprocal with a purchase from

15  Capax Discovery, which on examination we found didn't really

16  have economic substance.

17  **Q.**    As a result of the adjustments set forth in this portion

18  of the summary, what is the restated revenue for Q1 2009?

19  **A.**    115,540,000.

20  **Q.**    And in Q1 2009, what was the hardware revenue?

21  **A.**    Zero.

22  **Q.**    As a result of the restatement, what was the percentage of

23  revenue that was restated?

24  **A.**    11 percent.

25  **Q.**    And what was the percentage of restated revenue that

```
 1    included hardware revenue?

 2            MR. DOOLEY:  Objection.  The question is misleading.

 3    The Autonomy Corporation has --

 4            THE COURT:  I'm sorry.  I can't hear you, Mr. Dooley.

 5            MR. DOOLEY:  I'm sorry.

 6        The question is misleading.  The Autonomy Corporation as

 7    group accounts were not restated.

 8            THE COURT:  Mr. Dooley's point is that you mentioned

 9    the wrong company with respect to the restatement; is that

10    correct?

11            MR. DOOLEY:  That's right.

12            THE COURT:  I don't know the answer to that.  Do you

13    have a response?

14            MR. REEVES:  I think the response is this is a summary

15    that reflects the adjustments in the consolidated reporting

16    based on the restatement.

17            THE COURT:  Then why don't you bring that out.

18            MR. REEVES:  I thought we had done that yesterday, but

19    I'm happy to do that again.

20            THE COURT:  Well, today is a new day.

21            MR. REEVES:  Okay.  All right.

22            THE COURT:  Today is a new day.  I mean, I can

23    appreciate the fact that some of us go home at night and

24    actually forget some of the finer details of the presentations

25    that are made here.  I'm not encouraging you not to remember
```

1    what happened two months ago or yesterday, but sometimes it's a

2    good idea for an advocate to refresh everybody's recollection.

3    I assure you, you will not run afoul of asked and answered.

4         Go right ahead.

5              **MR. REEVES:**  Thank you very much.

6              **THE COURT:**  Okay.

7    **BY MR. REEVES:**

8    **Q.**   Do the summaries endeavor to correlate the restated

9    statutory accounts to the consolidated group reporting?

10   **A.**   Yes.  They show the impact that the restatements in ASL

11   would have had had we restated the group accounts.

12   **Q.**   All right.  And is that what is reflected in the

13   terminology of your summaries, Mr. Yelland?

14   **A.**   Yes.

15   **Q.**   Continuing, what is the percentage restated in Q1 2009

16   including hardware revenue?

17   **A.**   11 percent.

18   **Q.**   Thank you very much.

19        Let's go to page 5.  Is this the summary of revenue

20   adjustments for the second quarter of 2009?

21   **A.**   Yes.

22   **Q.**   For the second quarter of 2009, what was the originally

23   stated revenue?

24   **A.**   195,190,000.

25   **Q.**   And in the second quarter of 2009, what was the total

1    restated transactions?

2    **A.**    24,090,000.

3    **Q.**    And some of those transactions are broken out in this

4    chart, are they not?

5    **A.**    Yes.

6    **Q.**    All right.  And what is the total restated revenue in

7    Q2 2009?

8    **A.**    171,100,000.

9    **Q.**    What was the hardware revenue in Q2 2009?

10    **A.**    6,240,000.

11    **Q.**    There's a transaction broken out underneath "Hardware

12    Revenue" for Morgan Stanley in the amount of $6 million.  Do

13    you see that?

14    **A.**    Yes.

15    **Q.**    Is that hardware revenue that you included in this

16    quarter?

17    **A.**    Yes.

18    **Q.**    All right.  What is the percentage restated for the second

19    quarter of 2009?

20    **A.**    12.3 percent.

21    **Q.**    And what is the percentage restated including hardware

22    revenue for Q2 2009?

23    **A.**    15.5 percent.

24    **Q.**    Thank you very much.

25         Let's go to page 6.  Is this the summary of revenue

1    adjustments for the third quarter of 2009?

2    **A.**    Yes.

3    **Q.**    What was the originally stated revenue in the third

4    quarter of 2009?

5    **A.**    191,610,000.

6    **Q.**    What was the total restated transactions for the third

7    quarter of 2009?

8    **A.**    9,570,000.

9    **Q.**    As a result, what was the restated revenue for the third

10    quarter of 2009?

11    **A.**    182,042,000.

12    **Q.**    192 or 182?

13    **A.**    182, yeah.

14    **Q.**    All right.  182,040,000?

15    **A.**    Yes.

16    **Q.**    Okay.  Thank you.

17        What was the hardware revenue in the third quarter of

18    2009?

19    **A.**    37,640,000.

20    **Q.**    And that hardware revenue is broken into -- four

21    components of that are broken out.  Do you see that?

22    **A.**    Yes.

23    **Q.**    What are the transactions here that are listed here for

24    Citigroup, JP Morgan, Bloomberg, and Morgan Stanley?  What do

25    those mean?

1  **A.**   Well, those are hardware sales either to those customers

2  or to resellers who then sell on to those end users.

3  **Q.**   All right.  What is the percentage restated revenue for

4  this quarter?

5  **A.**   5 percent.

6  **Q.**   And what is the percentage restated including hardware

7  revenue for the third quarter of 2009?

8  **A.**   24.6 percent.

9  **Q.**   Let's go to page 7, Exhibit 2749, page 7, please, the

10 summary adjustments for the -- the summary of revenue

11 adjustments for Q4 2009.  Do you have that?

12 **A.**   Yes.

13 **Q.**   All right.  For the fourth quarter of 2009, what was the

14 originally stated revenue?

15 **A.**   223,110,000.

16 **Q.**   For the fourth quarter of 2009, what was the total

17 restated transactions?

18 **A.**   60,410,000.

19 **Q.**   Let's go through some of these transactions.  Do you see

20 the adjustment for MicroTech/Discover Technologies in the

21 amount of $9,052,000?

22 **A.**   Yes.

23 **Q.**   Do you have a recollection as to the reason for that

24 adjustment?

25 **A.**   Yes.

1    Q.    What is your recollection, please?

2    A.    Our findings were that that deal was connected to the

3    acquisition of another reseller called MicroLink and was

4    wrapped up into the price that was paid for MicroLink; and that

5    the soft -- the price of the software sold to Discover

6    Technologies, actually via MicroTech, another reseller, was

7    inflated.

8    Q.    Let's go to the next entry, please, for FileTek.  There's

9    an adjustment for $8 million.  Do you see that?

10   A.    Yes.

11   Q.    Do you have a recollection as to the reason for that

12   adjustment?

13   A.    Yes.

14   Q.    What is your recollection?

15   A.    The sale to FileTek was connected to a purchase from

16   FileTek of StorHouse software; and after making our inquiries,

17   we determined that the purchase of StorHouse from FileTek did

18   not have real economic substance to Autonomy and that the two

19   transactions should, therefore, be netted against each other.

20   Q.    Let's go to the next one, please.  Capax Discovery/

21   Eli Lilly & Company, there's an adjustment for $5.99 million.

22   Do you see that?

23   A.    Yes.

24   Q.    Do you have a recollection as to the reason for that

25   adjustment?

YELLAND - DIRECT / REEVES

1    **A.**   Yes.

2    **Q.**   What is your understanding of the reason for that

3    adjustment?

4    **A.**   So we found that that was what we term an accelerated VAR

5    deal, so value added reseller deal.  So the -- Autonomy was

6    looking to do a deal with the end user, hadn't closed that deal

7    in this quarter, sold the deal ostensibly to Capax, then

8    continued to pursue the deal directly itself eventually closing

9    the deal as Autonomy and had Eli Lilly route the payment

10   through Capax.

11        And from our inquiries, we concluded that Capax were not

12   actually really involved in that deal with the end user and

13   were not really required to pay for that deal until the end

14   user deal had been done and Autonomy had caused the monies to

15   be routed through Capax to then pay Autonomy.

16   **Q.**   When you use the term by your inquiries, do you mean by

17   your review of the books and records of Autonomy?

18   **A.**   Yes.

19   **Q.**   Let's go to the Capax Discovery EDD transaction in the

20   amount of $4 million that was adjusted.  Do you see that?

21   **A.**   Yes.

22   **Q.**   Do you have a recollection as to the reason for that

23   adjustment?

24   **A.**   Yes.  So that's similar to the deal in the first quarter

25   of 2009 where there is a reciprocal purchase from Capax for

1    services, which from our inquiry -- from our inquiries we

2    determined that those services hadn't actually been used by

3    Autonomy.  So we saw it as a reciprocal deal, again without

4    substance, that should be netted off.

5    **Q.**   Let's drop down to the MicroLink/Discover Technologies

6    transaction in the amount of $2.3 million as an adjustment.  Do

7    you see that?

8    **A.**   Yes.

9    **Q.**   What is your recollection of the reason of this

10   adjustment?

11   **A.**   That was a deal that was sold to MicroLink for

12   Discover Technologies, which formed part of a balance of

13   accounts receivable to Autonomy, which, after MicroLink was

14   acquired by Autonomy, was never paid by MicroLink.  So we saw

15   it as an example of an accelerated VAR deal which ultimately

16   was never paid but was wrapped up into the accounting as

17   MicroLink became part of the Autonomy group.

18   **Q.**   The last specific transaction this quarter there's an

19   entry for Sales Consulting/Poste Italiane in the amount of

20   $2.25 million in the fourth quarter of 2009.  Do you see that?

21   **A.**   Yes.

22   **Q.**   What is your recollection of the reason for that

23   adjustment?

24   **A.**   We reviewed a number of sales by Autonomy in Italy and

25   South America where it wasn't clear at the time of the sale

 1   that the reseller could pay for the deals in question or would

 2   pay for the deals in question.  We saw a pattern there in those

 3   territories, and we saw that ultimately the deal was not paid

 4   for and was either later written off or credited.

 5   **Q.**   There's an entry toward the bottom for hosting

 6   transactions in the amount of $18.05 million as an adjustment.

 7   Do you see that?

 8   **A.**   Yes.

 9   **Q.**   Do you have an understanding, based on the work that you

10   did for the restated statutory accounts, as to the reason for

11   that adjustment?

12   **A.**   Yes.  That's a summary of a number of transactions.

13   Autonomy had principally two types of SAS or service offering

14   to customers related to archiving of company records or

15   eDiscovery within company records.  These had historically

16   been sold as service deals.

17       Autonomy started to either sell to customers or actually

18   take existing customers and reengineer the contract with the

19   customers so as to construct these as to what appeared to be an

20   upfront license followed by a hosting service.

21       We determined for both of those key service offerings that

22   it was in -- that it was wrong to account for the license

23   separately from the ongoing service and that it should still be

24   accounted for as a service delivered to our customer over time.

25   **Q.**   And when you say accounted for as a service over time, are

1    you talking about recognizing the revenue rateably over time?

2    **A.**    Yes.  Broadly it's as the service is consumed, but it has

3    a similar effect to rateably over time.

4    **Q.**    Thank you very much.

5        And so does this adjustment for hosting transactions

6    include a restructuring of a Morgan Stanley hosting deal if you

7    recall?

8    **A.**    I don't recall exactly which transactions are in which

9    quarters.

10   **Q.**    All right.  As a result of these adjustments for the

11   fourth quarter of 2009, what was the total restated revenue in

12   the fourth quarter of 2009?

13   **A.**    162,700,000.

14   **Q.**    In the fourth quarter of 2009, how much hardware revenue

15   was there?

16   **A.**    9,420,000.

17   **Q.**    In the fourth quarter of 2009, what was the total

18   percentage restated revenue?

19   **A.**    27.1 percent.

20   **Q.**    And for the fourth quarter of 2009, what was the total

21   percentage restated including hardware revenue?

22   **A.**    31.3 percent.

23   **Q.**    Let's go to page 8, Exhibit 2749 for identification,

24   page 8.  Is this a summary of the revenue adjustments for the

25   first quarter of 2010?

1  **A.**   Yes.

2  **Q.**   Mr. Yelland, what was the originally stated revenue for

3  the first quarter of 2010?

4  **A.**   194,190,000.

5  **Q.**   And what was the total amount of restated transactions for

6  the first quarter of 2010?

7  **A.**   34,820,000.

8  **Q.**   Let's go to some of those transactions.  First there is an

9  adjusted transaction for MicroTech/Biblioteca Apostolica

10  Vaticana, the Vatican Library.  Are you familiar with that

11  adjustment in the amount of approximately $11 million?

12  **A.**   Yes.

13  **Q.**   What is your recollection of the reason the revenue for

14  the Vatican Library transaction needed to be adjusted in the

15  first quarter of 2010?

16  **A.**   So this we found again as an example of an accelerated VAR

17  deal where Autonomy were trying to close a deal with the

18  Vatican Library to electronically store its records.  Autonomy

19  were unable to close that deal in that quarter and ostensibly

20  sold the deal to MicroTech who hadn't really been involved in

21  the transaction.  They were brought in right towards the end of

22  that period.

23      MicroTech didn't pay for that transaction until around

24  about a year later when Autonomy purchased from MicroTech a

25  sales facility, largely sales training facility, known as

1    ATIC --

2    **Q.**    In America is that also known as the ATIC?

3    **A.**    Yes.

4    **Q.**    Okay.  Good.  Go on.

5    **A.**    -- which was purchased, invoiced, paid for very quickly

6    and then MicroTech started to pay back Autonomy for this deal.

7        So we saw this as an accelerated VAR deal, which

8    ultimately was paid for through a reciprocal transaction that

9    didn't really have substance because we couldn't find any real

10   evidence of the existence or real usage of such a facility; and

11   the fast turnaround in terms of buying, getting invoiced, and

12   paying for this facility appeared very strange.

13   **Q.**    Let's go to the FileTek transaction.  In the first quarter

14   of 2010, there appears to be an adjustment of approximately

15   $8.5 million.  Do you see that?

16   **A.**    Yes.

17   **Q.**    Do you have a recollection today of the reason for the

18   adjustment for FileTek here?

19   **A.**    That was an example of a reciprocal purchase, you know,

20   both happening at the same time, the sale -- the sale and

21   purchase.  It was the purchase of FileTek StorHouse.

22       And, again, in speaking with R&D colleagues in our

23   inquiries, they hadn't used this technology, already sold this

24   technology.  So, again, we saw this as an example of a

25   reciprocal transaction without real substance.

1  Q.   As a result of these adjustments, what was the total

2  restated revenue for the first quarter of 2010?

3  A.   159,360,000.

4  Q.   And in the first quarter of 2010, what was the total

5  hardware revenue?

6  A.   11,840,000.

7  Q.   In the first quarter of 2010, what was the total

8  percentage restated for the revenue?

9  A.   17.9 percent.

10 Q.   And for the first quarter of 2010, what was the total

11 restated revenue including hardware revenue?

12 A.   24 percent.

13 Q.   Let's go to page 9 of Exhibit 2749 for identification.  Is

14 this a summary of revenue adjustments for the second quarter of

15 2010?

16 A.   Yes.

17 Q.   What was the originally stated revenue for the second

18 quarter of 2010?

19 A.   221,130,000.

20 Q.   And what was the total restated transactions and revenue

21 for the second quarter of 2010?

22 A.   31,190,000.

23 Q.   That includes a transaction involving Auxilium Tech, again

24 for the Biblioteca Apostolica Vaticana (Vatican Library) in the

25 amount of $1.9 million, does it not?

1   **A.**   Yes.

2   **Q.**   Today do you have a recollection of the adjustment

3   associated with this transaction involving Auxilium?

4   **A.**   Yes.

5   **Q.**   What is your recollection of the reason for this

6   adjustment?

7   **A.**   This is an example of an accelerated VAR deal.  It's a

8   further -- ostensibly a further sale of software for the

9   Vatican Library to Auxilium.

10      We couldn't find a record of Auxilium being involved in

11   the Vatican Library deal.  Ultimately Auxilium never paid for

12   this transaction, and over time it's then provided for as a

13   doubtful debt, and then ultimately it's ultimately written off.

14   **Q.**   Now, this adjustment is made in the statutory accounts in

15   the second quarter of 2010; is that correct?

16   **A.**   The statutory accounts are only prepared on an annual

17   basis, but it is true that when we were doing the statutory

18   accounts from the invoice that we saw, it appeared to be a

19   Q2 2010 deal.

20   **Q.**   All right.  And the summary correlates to the restated

21   statutory accounts as they were filed in the manner you've

22   described, would you agree?

23   **A.**   Correct.  Yes.

24   **Q.**   So after you filed the restated statutory accounts, did

25   you do further work or give further consideration to which

1  quarter this transaction and this adjustment belonged?

2  **A.**   Yes, we did.

3  **Q.**   And what did you do?

4  **A.**   We found a record that actually either this or the

5  majority of this revenue had actually been accrued by Autonomy

6  in the first quarter of 2010 as opposed to waiting until the

7  invoice had been cut in the second quarter of 2010.

8  **Q.**   And for that reason the adjustment may belong in the first

9  quarter of 2010?

10  **A.**   Correct.

11  **Q.**   All right.  Let me -- let's go to the restated revenue for

12  the second quarter of 2010.  What was the total restated

13  revenue according to the work that you've done in this summary?

14  **A.**   Notwithstanding the conversation we've just had about

15  Auxilium, it's 189,930,000.

16  **Q.**   Okay.  Thank you.

17      And in the second quarter of 2010, what was the total

18  hardware revenue in the quarter?

19  **A.**   31,060,000.

20  **Q.**   In the second quarter of 2010, what was the total

21  percentage of restated revenue?

22  **A.**   14.1 percent.

23  **Q.**   And in the second quarter of 2010, what was the total

24  percentage of restated revenue including hardware revenue?

25  **A.**   28.2 percent.

1                         (Pause in proceedings.)

2              **MR. REEVES:**  It's a team effort.

3    **Q.**   Before we leave Q2 2010, let me direct your attention to

4    the transaction for Capax/Eli Lilly & Company in the amount of

5    $5.99 million that does not have the parentheses around that.

6    Do you see that?

7    **A.**   Yes.

8    **Q.**   Do you have an understanding -- first of all, tell us what

9    the meaning of that entry as it appears here without the

10   parentheses around it means.  What does that mean?

11   **A.**   That means we are adding positive revenue to the revenue

12   originally stated.

13   **Q.**   All right.  And why are you doing that in this summary?

14   Why are you adding positive revenue in this quarter for this

15   transaction?

16   **A.**   Because that is the quarter in which Autonomy actually

17   closed the deal with Eli Lilly directly, so that is -- this is

18   the quarter in which that revenue should be recognized.  If you

19   remember, we had reversed revenue or restated revenue in a

20   negative way in a previous quarter.

21   **Q.**   And then recognized the revenue in a positive way in the

22   correct quarter?

23   **A.**   Correct.

24   **Q.**   And this is an example of that type of transaction?

25   **A.**   Yes.

1  Q.   All right.  Let's go to the third quarter of 2010,

2  Exhibit 2749, page 10.  Is this a summary of revenue

3  adjustments for the third quarter of 2010?

4  A.   Yes.

5  Q.   In the third quarter of 2010, what was the originally

6  stated revenue?

7  A.   210,560,000.

8  Q.   And in the third quarter of 2010, what was the total

9  restated transactions?

10  A.   30,910,000.

11  Q.   Among those transactions, there is a reference to

12  FileTek/United States Veterans Administration Authority,

13  $10 million adjustment.  Do you see that?

14  A.   Yes.

15  Q.   Do you have a recollection as to the reason for that

16  adjustment?

17  A.   Yes.  This is an example of an accelerated VAR deal where,

18  again, Autonomy's looking to make a sale to the DVA but isn't

19  managed -- isn't able to close the deal in the quarter and so

20  then ostensibly sells the deal to FileTek, who haven't really

21  been involved in the transaction.

22       Ultimately Autonomy don't close the deal with the DVA.

23  They make a further purchase of the StorHouse software from

24  FileTek, which then enables FileTek to take the money that's

25  paid by Autonomy and ultimately pay it back to Autonomy to

1  clear what appears to be the debt related to this deal.

2  **Q.**   Okay.  And below that there's a reference to an adjustment

3  for Capax Discovery/Bank of America - Amgen in the amount of a

4  $9 million adjustment.  Do you see that?

5  **A.**   Yes.

6  **Q.**   Today do you have a recollection as to the reason for this

7  adjustment?

8  **A.**   Yes.

9  **Q.**   What is your recollection?

10 **A.**   So this is an example of an accelerated VAR deal with

11 Capax.  So Autonomy are looking to close a deal with Amgen.

12 The deal doesn't close in Q3 '10.  Autonomy then sell the deal

13 to Capax.  Autonomy then close the deal directly with Amgen in

14 Q4 of 2010.  They then allow Capax, even though the deal

15 originally is for end user Amgen, to consider the deal now for

16 end user Bank of America, which is another transaction that

17 Autonomy are pursuing during 2000 -- during 2010.

18 **Q.**   All right.  Thank you.

19      As a result, what is the total restated revenue for the

20 third quarter of 2010?

21 **A.**   179,650,000.

22 **Q.**   And in the third quarter of 2010, what is the total

23 hardware revenue?

24 **A.**   26,800,000.

25 **Q.**   In the third quarter of 2010, what is the total percentage

1    restated revenue?

2    **A.**    14.7 percent.

3    **Q.**    And in the third quarter of 2010, what is the total

4    percentage of restated revenue including hardware revenue?

5    **A.**    27.4 percent.

6    **Q.**    Let's go to the fourth quarter of 2010, please,

7    Exhibit 2749 at page 11.  Is this, Mr. Yelland, a summary of

8    revenue adjustments for the fourth quarter of 2010?

9    **A.**    Yes.

10   **Q.**    And in the fourth quarter of 2010, what was the total

11   originally stated revenue?

12   **A.**    244,510,000.

13   **Q.**    And in the fourth quarter of 2010, what was the total

14   restated transactions?

15   **A.**    59,240,000.

16   **Q.**    Let's go through some of these transactions.

17        Dropping down two there's a reference to

18   Discover Technologies/Bank of America, an adjustment in the

19   amount of approximately $7 million.  Do you see that?

20   **A.**    Yes.

21   **Q.**    Are you familiar with that transaction?

22   **A.**    Yes.

23   **Q.**    What was the reason for that adjustment?

24   **A.**    So as I just mentioned, Autonomy were pursuing a deal with

25   Bank of America.  They were looking to close that in Q4 of

1  2010.  There was a lot of pressure to do so.

2      Autonomy don't close the deal with Bank of America in the

3  Q4 so, again, they ostensibly sell the deal to

4  Discover Technologies as well as allowing the redirection of

5  the deal we mentioned for the Amgen-Bank of America from Q3.

6  **Q.**   For Capax?

7  **A.**   Yes.

8  **Q.**   All right.  Go on.

9  **A.**   Ultimately Autonomy complete the deal with Bank of America

10  during 2011.  They -- they use MicroTech as the reseller as

11  they're completing the deal.  Bank of America then pay

12  MicroTech, who wrote the monies back through Discover Tech and

13  Capax and then through back to Autonomy.

14  **Q.**   Let's go to the next transaction, please.  There's a

15  transaction for Tikit/KPMG with an adjustment of approximately

16  $6.16 million.  Do you see that?

17  **A.**   Yes.

18  **Q.**   What was the reason for that adjustment?

19  **A.**   So Autonomy -- again, it's an accelerated VAR deal.

20  Autonomy were looking to close a deal with KPMG.  It doesn't

21  close in this quarter, so they sell the deal to Tikit.

22  Autonomy then close the deal directly with KPMG.

23      There is a side letter allowing Tikit -- if they don't --

24  if Tikit doesn't close the deal with KPMG, the side letter

25  provides for Tikit to provide some services to Autonomy that

1   Autonomy will pay for, and Autonomy also will allow Tikit to --

2   to effectively use the transaction as a prepayment against

3   other future sales that Tikit might do of Autonomy technology.

4        So it's a little bit complicated, but it ends up as being

5   a kind of -- it has an element of reciprocal deal with the

6   services; and from our inquiries, the services aren't used, and

7   then the remainder of it is considered to be a prepayment

8   against deals that are ultimately done.

9   **Q.**   There is an adjustment for Video Monitoring Services

10  (Hardware) in the amount of $6.05 million.  Do you see that?

11  **A.**   Yes.

12  **Q.**   What was the reason for that adjustment?

13  **A.**   So at the time of both the hardware and the software sale,

14  which you see on the next line, Autonomy also made a purchase

15  from Video Monitoring Services; and from my inquiries, those

16  services, which is provision of certain data feet, were not --

17  were not really used by Autonomy.  They may have done some

18  demos with them, but they were not really used by Autonomy.

19       So there's an element of the combined deals, which we

20  considered to be reciprocal; but also on the hardware deal, the

21  hardware deal was done with very extended payment terms, up to

22  two years to pay for the deal, and we didn't see -- that's

23  unusual, and we would have expected to have seen a lot of

24  analysis of the creditworthiness of Video Monitoring Services

25  to be able to pay the debt off over such a period of time.  We

1  didn't see that.  Video Monitoring Services ultimately go into

2  insolvency during 2011.

3  **Q.**  Let's go to the MicroTech/U.S. Department of the Interior

4  adjustment for approximately $4 million.  Do you see that?

5  **A.**  Yes.

6  **Q.**  What was the reason for that adjustment?

7  **A.**  So the Department of the Interior were an existing

8  customer for SAS services, the ones we mentioned earlier.

9  Autonomy were looking to reengineer that deal to sell to move

10 it into that license-plus-hosting construct.  The DOI had

11 declined to do the deal.  Autonomy still sold the deal into

12 MicroTech.  There would have been no use for MicroTech to use

13 software for end user DOI when Autonomy were in any case

14 providing the services on an ongoing basis.

15     Ultimately the deal is never paid for and it's either

16 credited or written off, I believe, in the dark period in 2011.

17 **Q.**  When you say "the dark period," what do you mean?

18 **A.**  I mean the period between July and September of 2011.

19 It's a period in which the results of Autonomy are not

20 published.  Autonomy publishes its final quarterly results for

21 Q2, which is ending June; but by then, you know, it's -- well,

22 by October it's become part of the HP group and is no longer

23 filing its quarterly statements -- isn't required to file

24 quarterly statements.

25     So this period, the dark period, is not included in any

1  published Autonomy group results and doesn't form part of any

2  HP published results so it's dark to the market.

3  **Q.**   Okay.  And that's a function in some ways of the

4  acquisition that is announced in August and the closing of the

5  acquisition in October 2011?

6  **A.**   Yes.

7  **Q.**   All right.  Let's continue, if we could.

8       Now, let's go to the next entry for Discover Technologies/

9  Bank of America.  There's an adjustment for approximately

10  $3.5 million.  What was the reason for that adjustment?

11  **A.**   So that's connected to the other Bank of America

12  transaction for 7 million here in that it's all part of the

13  deal ultimately that's done directly with Bank of America.

14       The reason why this one is broken out is because the

15  3.5 million is not invoiced to Discover Technologies in this

16  quarter.  The revenue is accrued by Autonomy.  The paperwork

17  behind the deal with Discover Technologies is actually

18  completed in 2011 but it is backdated to Q4 2010.

19  **Q.**   Let's drop down to Capax Discovery/Merrill Lynch -

20  Bank of America.  There's an adjustment for approximately

21  $1.66 million.  Do you see that?

22  **A.**   Yes.

23  **Q.**   What was the reason for that adjustment, if you recall?

24  **A.**   So that's -- Merrill Lynch is another -- is a part of

25  Bank of America.  There was another part of the transaction

1   that Autonomy were pursuing with Bank of America with

2   Merrill Lynch.

3       Again, we found this to be an accelerated VAR deal.  The

4   deal is somewhat separate form the other Bank of America deal

5   because it is with Merrill Lynch, but that deal again is done

6   directly by Autonomy.  And then actually Bank of America pay

7   Autonomy for this one, and then the Merrill Lynch deal is

8   either credited or written off again in the dark period.

9   **Q.**   As a result of these adjustments and the other ones that

10  are listed in this summary, what was the total amount of

11  restated revenue for the fourth quarter of 2010?

12  **A.**   185,270,000.

13  **Q.**   And for the fourth quarter of 2010, what was the total

14  amount of hardware revenue?

15  **A.**   29,380,000.

16  **Q.**   For the fourth quarter of 2010, what was the total

17  percentage restated revenue?

18  **A.**   Can we scroll down, please?

19  **Q.**   Okay.  Yes.

20  **A.**   24.2 percent.

21  **Q.**   And for the fourth quarter of 2010, what was the total

22  percentage of restated revenue including hardware revenue?

23  **A.**   36.2 percent.

24  **Q.**   Let's go to the first quarter of 2011, page 12 of

25  Exhibit 2749.  Is this a summary of revenue adjustments for the

YELLAND - DIRECT / REEVES

1  first quarter of 2011?

2  **A.**   Yes.

3  **Q.**   In the first quarter of 2011, what was the total

4  originally stated revenue?

5  **A.**   219,790,000.

6  **Q.**   In the first quarter of 2011, what was the total restated

7  transactions?

8  **A.**   47,350,000.

9  **Q.**   Let's go through some of those transactions.  There's a

10  transaction here for Capax Discovery/McAfee with a $5 million

11  adjustment.  Do you see that?

12  **A.**   Yes.

13  **Q.**   Do you have a recollection as to the reason for that

14  adjustment?

15  **A.**   It's an example of an accelerated VAR deal where

16  ultimately the debt from Capax Discovery I believe is credited

17  again in the dark period.

18  **Q.**   Let's go to the MicroTech LLC transaction in the amount of

19  $3.86 million as an adjustment.  Do you see that?

20  **A.**   Yes.

21  **Q.**   Do you have an understanding as to the reason for that

22  adjustment?

23  **A.**   Yes.

24  **Q.**   What is your understanding?

25  **A.**   So Autonomy sold to MicroTech software and MicroTech were

1   then to supply support services I think to Bank of America, but

2   we don't see any evidence of MicroTech providing support

3   services to Bank of America.

4       They under the deal appear to have the right to invoice

5   Bank of America but, in fact, the payments -- there are some

6   payments from Autonomy to Capax Discovery supposedly for

7   services provided, but we see no evidence of the services.

8       The -- the deal then in the dark period is canceled by

9   Capax Discovery and Autonomy credit the remainder.

10  Q.  MicroTech?

11  A.  Sorry.  By MicroTech.

12  Q.  All right.

13  A.  And Autonomy then credit the remainder of the balance.

14  Q.  Okay.  Let's go to the Discover Technologies/Prisa deal.

15  There's an adjustment for approximately $3.6 million.  Do you

16  see that?

17  A.  Yes.

18  Q.  What is the reason for that adjustment?

19  A.  So that's an example of an accelerated VAR deal.  So

20  Autonomy were looking to close the deal with Prisa, but they're

21  unable to do that in Q1 '11 so they sell the deal to

22  Discover Technologies.

23      I believe ultimately the route by which

24  Discover Technologies eventually paid for this deal or paid for

25  the majority of this deal is through a purchase by Autonomy of

1    DiscoverPoint Engine, so Discover Technologies software.

2        Again, from our inquiries, Autonomy didn't use or resell

3    that software, but that purchase enabled Discover Technologies

4    to pay for the majority of the Prisa, and if you look lower

5    down, ThinkTech deals, which is a similar example.  The balance

6    of the receivables from Discover Technologies is ultimately

7    written off.

8    **Q.**   So it looks like you drew in a transaction that is

9    indicated here as Discover Technologies/ThinkTech in the amount

10   of $1.8 million as an adjustment.  Is that what you meant by

11   your last answer?

12   **A.**   Yes.

13   **Q.**   And so what was the reason for that adjustment relating to

14   the sale to Discover Tech with the end user ThinkTech?

15   **A.**   Very similar circumstances to Prisa.

16   **Q.**   All right.  And we skipped over MicroTech/Bank of Montreal

17   with an adjustment of approximately $2.88 million.  Do you see

18   that?

19   **A.**   Yes.

20   **Q.**   What was the purpose -- or what was the reason for that

21   adjustment, please, if you recall?

22   **A.**   That's an example of an accelerated VAR deal where

23   Autonomy are looking to close a deal with Bank of Montreal.

24   The deal doesn't close in Q1 '11.  I can't recall whether the

25   deal ultimately closes, but the invoice to MicroTech I believe

1    is credited in the dark period.  It may have been written off.

2    I think it was credited.

3    Q.    All right.  Let's go to the entry for Capax Discovery EDD.

4    In the first quarter of 2009, there's an adjustment in the

5    amount of approximately $1.6 million.  Do you see that?

6    A.    Yes.

7    Q.    What was the reason for that adjustment, if you recall?

8    A.    Well, that's very similar to the earlier Capax EDD deals,

9    which we found to be a reciprocal transaction.  And the EDD

10   services that Capax were supposed to be providing to Autonomy,

11   the leader of the EDD business confirmed that they hadn't used

12   those services.

13   Q.    As a result of these adjustments, what was the total

14   restated revenue in the first quarter of 2011?

15   A.    172,450,000.

16   Q.    And in the first quarter of 2011, what was the total

17   hardware revenue?

18   A.    20,090,000.

19   Q.    In the first quarter of 2011, what was the total

20   percentage of restated revenue?

21   A.    21.5 percent.

22   Q.    And in the first quarter of 2011, what was the total

23   percentage of restated revenue including hardware revenue?

24   A.    30.7 percent.

25   Q.    Let's go to page 13 of Exhibit 2749, the summary of

```
 1   revenue adjustments for the second quarter of 2011.  Do you see
 2   that?
 3   A.   Yes.
 4   Q.   In the second quarter of 2011, what was the total
 5   originally stated revenue?
 6   A.   256,250,000.
 7   Q.   And in the second quarter of 2011, what was the total
 8   restated transactions?
 9   A.   31,670,000.
10   Q.   One of those transactions involves Discover Technologies/
11   Abbott Labs and an adjustment in the amount of approximately
12   $1.8 million.  Do you see that?
13   A.   Yes.
14   Q.   What was the reason for that adjustment?
15   A.   So this is an example of an accelerated VAR deal where
16   Autonomy weren't able to close that deal with Abbott Labs in
17   the quarter and so ostensibly sold it to Discover Technologies.
18   Q.   Dropping down two more, there's a MicroTech/Hewlett
19   Packard adjustment in the amount of $7 million.  Do you see
20   that?
21   A.   Yes.
22   Q.   What was the reason for that adjustment?
23   A.   So that's an example of an accelerated VAR deal where
24   Autonomy were looking to sell a deal to Hewlett Packard I
25   believe for use in services to USPS.
```

YELLAND - DIRECT / REEVES

1    Q.    Is that the Postal Service in the United States?

2    A.    Yes.

3    Q.    Go on.

4    A.    Hewlett Packard confirmed that they didn't want to do this

5    deal, at least not in this quarter.  The deal, however, was

6    still sold to MicroTech.

7          The resolution of that deal was that during the dark

8    period, Autonomy supposedly purchased from MicroTech a federal

9    cloud solution, which we saw being purchased, invoiced, paid

10   within a matter of days; and then MicroTech then paid the money

11   back for this deal to Autonomy the very following day.

12         And we see, even though the cloud solution was meant to

13   be, you know, operational over a period of years, we didn't --

14   it would be very unusual to pay for it all upfront, and you

15   don't normally pay for an invoice the day after it's provided.

16   And we saw no evidence of the cloud solution actually being

17   constructed or provided.

18   Q.    There is an adjustment for a transaction with the name

19   Discover Technologies/Hyatt/Dell in the amount of approximately

20   $5.33 million.  Do you see that?

21   A.    Yes.

22   Q.    If you recall, what was the reason for that adjustment?

23   A.    That's an example of an accelerated VAR deal, which is

24   ultimately either written off or credited later in the dark

25   period.

1    **Q.**   And as a result of these restated transactions, in the

2    second quarter of 2011, what was the total restated revenue?

3    **A.**   224,580,000.

4    **Q.**   And in the second quarter of 2011, what was the total

5    amount of hardware revenue?

6    **A.**   20,850,000.

7    **Q.**   In the second quarter of 2011, what was the total

8    percentage of restated revenue?

9    **A.**   12.4 percent.

10   **Q.**   And in the second quarter of 2011, what was the total

11   percentage of restated revenue including hardware revenue?

12   **A.**   20.5 percent.

13                      (Pause in proceedings.)

14   **BY MR. REEVES:**

15   **Q.**   You might want to put your glasses back on because I'd

16   like to show you page 2 of Exhibit 2749.

17        And we're going to need a little help back here.  Thanks,

18   guys.

19        Are you familiar with page 2 of Exhibit 2749, Mr. Yelland?

20   **A.**   Yes.

21   **Q.**   Let's start on the left-hand side and start with the

22   title.  It says "Summary of Revenue Adjustments (Detailed)-

23   2009 to October 2011."  Do you see that?

24   **A.**   Yes.

25   **Q.**   Are you rolling up in any way the quarterly summaries into

1    an annual summary in this portion of the summary?

2    **A.**    For 2009 and 2010, yes.  For 2011, it's the two quarters

3    plus the dark period.

4    **Q.**    Thank you very much.

5        Okay.  And we have similar type of information but over

6    different time periods arrayed in this summary, would you

7    agree?

8    **A.**    Yes.

9    **Q.**    All right.  Let's go and look at the year-end summaries

10   for 2009.  You have a "Revenue" column and a "Total" for 2009,

11   do you not?

12   **A.**    Yes.

13   **Q.**    Let's go slowly through that.  And if we can maybe move a

14   little bit to the right so that we can see the -- let's get the

15   column -- the row entries.

16       So this top row is -- let's go all the way to the left.

17   Thank you so much.  Thank you, Ms. Margen.

18       So the very top line is the "Original Stated Revenue";

19   correct?

20   **A.**    Yes.

21   **Q.**    And then down below there are a series of the adjustments

22   of the type that we've gone through in your testimony today;

23   right?

24   **A.**    Yes.

25   **Q.**    And if we drop down to the bottom looking at the rows,

YELLAND - DIRECT / REEVES

1   there's then a -- eventually a total adjustments in respect of

2   restated transactions.  You total the total amount of

3   adjustments, do you not?

4   **A.**    Yes.

5   **Q.**    And then below that you have the total amount of restated

6   revenue similar to what you'd done on the quarterly basis

7   before?

8   **A.**    Yes.

9   **Q.**    And then below that you have the notations for the

10  hardware revenue, do you not?

11  **A.**    Yes.

12  **Q.**    And you have percentages of restated revenue and

13  percentages of restated revenue including hardware at the

14  bottom?

15  **A.**    Yes.

16  **Q.**    So the format is similar to the quarterly format, but here

17  we have information on an annualized or year-end basis?

18  **A.**    Yes.

19  **Q.**    All right.  Now let's go to the totals for 2009 back at

20  the top, please.  Slide over to the right if we can.  Okay.

21  Nice.  Great.

22       Okay.  In 2009, year-end 2009, what was the total

23  originally stated revenue?

24  **A.**    739,690,000.

25  **Q.**    Let's drop down.  We're going down the 2009 column to the

1  total restated revenue for 2009.

2  **A.**   The total restated revenue -- the amount of the

3  restatement is 108,310,000.

4  **Q.**   Thank you.

5      And that gave a resulting total restated revenue of what

6  amount?

7  **A.**   631,380,000.

8  **Q.**   All right.  And in year 2009, what was the total hardware

9  revenue?

10  **A.**   53,300,000.

11  **Q.**   We drop down, in 2009 what was the total percentage of

12  restated revenue?

13  **A.**   14.6 percent.

14  **Q.**   And in 2009, what was the total percentage of restated

15  revenue including hardware revenue?

16  **A.**   21.8 percent.

17  **Q.**   All right.  Ready to do the same thing for 2010?

18  **A.**   Yes.

19  **Q.**   Let's slide on over to 2010.

20      In 2010, what was the total originally reported revenue?

21  **A.**   870,370,000.

22  **Q.**   And in 2010, what was the total amount of adjustments to

23  the revenue?

24  **A.**   156,160,000.

25  **Q.**   And as a result, in 2010 what was the total amount of

1  restated revenue?

2  **A.**   714,210,000.

3  **Q.**   What was the total amount of hardware revenue in 2010?

4  **A.**   99,080,000.

5  **Q.**   As a result of the adjustments, what was the total

6  percentage of revenue adjustments in 2010?

7  **A.**   17.9 percent.

8  **Q.**   And in 2010, what was the total amount of revenue

9  adjustments including hardware revenue?

10  **A.**   29.3 percent.

11                      (Pause in proceedings.)

12  **BY MR. REEVES:**

13  **Q.**   Thank you very much.

14       Mr. Yelland, in the year's long work that you devoted to

15  the filing of the 2011 statutory account and the restatement of

16  the 2010 statutory account for ASL, how much do you work -- how

17  closely did you work with Antonia Anderson?

18  **A.**   Very closely.

19  **Q.**   For months would you say?

20  **A.**   Yes, throughout 2013.

21  **Q.**   How closely was Ms. Anderson involved in the calculation

22  and adjustments that we've just gone through as reflected in

23  your summary?

24  **A.**   Very closely.  She was responsible for doing this work

25  along with a couple of other people full-time.

1    Q.   And did you rely on her judgment and expertise in carrying

2    out that responsibility?

3    A.   Yes.

4    Q.   All right.  And did you find her a helpful colleague in

5    working through this issue?

6    A.   I find her very competent.

7    Q.   I'd like to show you what has been marked for

8    identification as Exhibit 1373, please.  With luck, that will

9    be in the stack in front of you.  I believe that this is the

10   Autonomy Systems Limited report and financial statements for

11   31 December 2010.

12        MR. REEVES:  I'd offer it in evidence, please.

13        THE COURT:  Admitted.

14        (Trial Exhibit 1373 received in evidence)

15   BY MR. REEVES:

16   Q.   You can look at it on the screen, Mr. Yelland.

17   A.   I've got it here.

18   Q.   Okay.  Do you recognize this document?

19   A.   Yes.

20   Q.   Is this -- what is this?  Is this -- what is this?

21   A.   This is the financial statements for ASL for the year

22   31st December 2010.

23   Q.   If we could go to page 6 of Exhibit 1373, please, and go

24   to the bottom if you would.

25        Who signed on behalf of ASL for this 2010 statutory

YELLAND - DIRECT / REEVES

1    account?

2    **A.**    (Witness examines document.)  Mr. Hussain.

3    **Q.**    In his capacity as a director of ASL?

4    **A.**    I believe so, yes.

5    **Q.**    All right.  Mr. Hussain was your predecessor as the

6    director of ASL, was he not?

7    **A.**    Yes.

8    **Q.**    I'd like to show you what has been marked for

9    identification, please, as Exhibit 463.  This is the Autonomy

10   Systems Limited report and financial statements for

11   31 December 2009.

12            **MR. REEVES:**  I offer it in evidence, please.

13            **THE COURT:**  Admitted.

14       (Trial Exhibit 463 received in evidence)

15   **BY MR. REEVES:**

16   **Q.**    Is this the statutory account for ASL in the preceding

17   year 2009, Mr. Yelland?

18   **A.**    Yes.

19   **Q.**    And I think I'm done with that.  Thank you.

20       I'd like to show you, if I could, please, what is marked

21   for identification as Exhibit 2732.  That should be in your

22   stack of documents.  I believe this is a series of business

23   records relating to the delivery of hardware in the second

24   quarter of 2009.  Do you have Exhibit 2732, Mr. Yelland?

25   **A.**    Yes.

YELLAND - DIRECT / REEVES

1    Q.    Do you recognize these documents?

2    A.    Yes.

3    Q.    Did you have a chance to look through this in advance of

4    your testimony and familiarize yourself with this exhibit?

5    A.    Yes.

6    Q.    Are you --

7             THE COURT:  Admitted.

8        (Trial Exhibit 2732 received in evidence)

9             MR. REEVES:  Thank you, Your Honor.

10   Q.    Are these business records of Autonomy?

11   A.    Yes.

12   Q.    All right.  And what do they relate to?

13   A.    They relate to the ordering, purchase, and delivery of

14   hardware from Hitachi to Morgan Stanley.

15   Q.    In or around the second quarter of 2009?

16   A.    Yes.

17   Q.    Thank you very much.  I'm done with that.

18        I'd like to show you, please, what has been marked for

19   identification as Exhibit 3056, a portion of the general ledger

20   relating to NA Holdings, Inc.

21            MR. REEVES:  I offer it in evidence, please.

22            THE COURT:  Admitted.

23        (Trial Exhibit 3056 received in evidence)

24   BY MR. REEVES:

25   Q.    Do you have Exhibit 3056 in front of you?

YELLAND - DIRECT / REEVES

1   **A.**    Yes.

2   **Q.**    All right.  Let's go to page 2, please.  And let's

3   highlight, if we can, all of the entries -- well, let's start

4   on the left-hand side.  There's a reference here to

5   NA Holdings.  Let's just highlight one of those entries here.

6       Okay.  Now, Mr. Yelland, as part of your work relating to

7   the statutory accounts for ASL, did you become familiar with

8   MicroLink and the possibility of a write-off of MicroLink debts

9   in the amount of approximately $16 million?

10  **A.**    Yes.

11  **Q.**    You're familiar with that portion of the work that you did

12  with regard to the statutory accounts?

13  **A.**    Yes.

14  **Q.**    Why don't you describe to us, please, what you did with

15  regard to reviewing the books and records of Autonomy with

16  regard to the write-off of $16 million of debt relating to

17  MicroLink and owed to Autonomy.  What did you do?

18  **A.**    So we could -- we -- we reviewed the ledgers of Autonomy,

19  which showed at the time of the acquisition of MicroLink that

20  Autonomy showed a $23 million receivable from MicroLink.  At

21  the time of the acquisition, MicroLink's ledgers showed a

22  payable to Autonomy of 16 million.

23      Subsequent to the acquisition, Autonomy received

24  approximately 6 million payments from customers, not MicroLink,

25  and applied those payments against the MicroLink balance.

YELLAND - DIRECT / REEVES

1   Q.   That brought it from 23 million down to what

2   approximately?

3   A.   Approximately 17.

4   Q.   Go on.

5   A.   There's another million of the debts that were made up of

6   small receivables that do appear over time to have been paid by

7   MicroLink to Autonomy.  So there were smaller deals in there

8   that were being paid.  That left a balance of 16 million.

9   Q.   What happened to that balance of 16 million as --

10  according to the books and records of Autonomy?

11  A.   It was not paid by MicroLink to Autonomy, Inc., or any of

12  the other Autonomy subsidiaries.  Autonomy, Inc., took the

13  trade receivable from MicroLink and Autonomy reclassified that

14  as an intangible investment in the MicroLink subsidiary moving

15  it into another entity called North American Holdings.

16  Q.   And that's what we see in this Exhibit 3056?

17  A.   Yes.  So this is one of the steps by which Autonomy, Inc.,

18  is moving the receivable from MicroLink to North American

19  Holdings.  North American Holdings then subsequently classifies

20  that as an intangible investment.

21  Q.   So what does it mean to reclassify $16 million that's owed

22  by MicroLink to Autonomy as an intangible asset or an

23  investment in another Autonomy company NA Holdings?  What does

24  that mean?

25  A.   So that means to me that Autonomy -- Autonomy did not

1    expect MicroLink to pay off those trade receivables, so North

2    American Holdings is then considering it to be really an

3    investment in its now subsidiary MicroLink.

4    **Q.**    Why would you ever do that kind of maneuver, if you know?

5    **A.**    I don't really know why you would do it other than you're

6    not expecting the monies to be paid, and so they're

7    reclassifying them somehow as an investment rather than --

8    rather than writing them down.

9        But in MicroLink's ledgers we also see that they write off

10   the payable to Autonomy, Inc., and they write off the

11   corresponding inventory of purchased software and a receivable

12   that they had in their books against Autonomy that Autonomy

13   hadn't recognized.  So from a trade point of view all of the

14   debts are written out of all of the ledgers.

15   **Q.**    Written off?

16   **A.**    Yes.

17   **Q.**    And moved over into NA Holdings --

18   **A.**    Yes.

19   **Q.**    -- in the way you've described?

20       Okay.  Thank you very much.

21       A couple more things.  You have described the dark period

22   in the course of your testimony; is that correct?

23   **A.**    Yes.

24   **Q.**    And referred to certain credit memos or write-offs during

25   the dark period.  Do you recall that?

**YELLAND - DIRECT / REEVES**

1   A.   Yes.

2   Q.   What is a credit memo?

3   A.   A credit memo is the reverse of an invoice.

4   Q.   Reverse of an invoice.  What does that mean?

5   A.   If you -- if you write a credit note, you're then saying

6   that the customer no longer has to pay for the associated

7   invoice or whichever part of the invoice the credit note

8   relates to.

9   Q.   All right.  And in addition to credit memos in the dark

10  period, was there -- there were also write-offs that you

11  described in the course of your testimony this morning;

12  correct?

13  A.   Yes.

14  Q.   Do those appear in the general ledger?

15  A.   Yes.

16  Q.   What is the general ledger for those of us who don't get

17  to do what you do, Mr. Yelland?

18  A.   The general ledger is the core accounting system of a

19  company.

20  Q.   I'd like to show you what has been marked for

21  identification as Exhibit 3063.

22       **MR. REEVES:**  This is a compilation of other exhibits

23  that I've conferred with counsel about that are portions of the

24  general ledger and credit memos, and I'd like to show it to

25  Mr. Yelland and then offer it in evidence if I could, please.

1           (Trial Exhibit 3063 marked for identification)

2               **THE WITNESS:**  (Witness examines document.)

3   **BY MR. REEVES:**

4   **Q.**   In your preparation for your testimony, did you have a

5   chance to look through a series of the general ledgers and

6   credit memos relating to some of the write-offs and credit

7   memos that you've described today?

8   **A.**   Yes.

9   **Q.**   Does that appear to be a set of the business records

10  associated with those credit memos and general ledger entries

11  regarding the write-offs?

12  **A.**   Yes.

13              **MR. REEVES:**  I offer it in evidence, please.

14              **THE COURT:**  Admitted.

15          (Trial Exhibit 3063 received in evidence)

16              **MR. REEVES:**  And, finally, a couple last little points

17  but we're getting close, then it might be a good time for a

18  break if you'd like, Your Honor.

19  **Q.**   I'd like to show you another compilation of exhibits from

20  the general ledger that has been marked for identification as

21  Exhibit 3064.  This is a set of general ledger entries relating

22  to hardware broken out by quarters.

23          (Trial Exhibit 3064 marked for identification)

24  **BY MR. REEVES:**

25  **Q.**   In your preparation for your testimony, did you look

1    through general ledger entries relating to hardware,

2    Mr. Yelland?

3    **A.**   Yes.

4    **Q.**   Do you recognize the general ledger entries relating to

5    hardware that have been marked for identification as

6    Exhibit 3064?

7    **A.**   Yes.

8          **MR. REEVES:**  I offer it in evidence, please.

9          **THE COURT:**  Admitted.

10    (Trial Exhibit 3064 received in evidence)

11          **MR. REEVES:**  Thank you very much.

12              (Pause in proceedings.)

13    **BY MR. REEVES:**

14    **Q.**   When you began to work at Autonomy in the manner you've

15    described in or around April, May, June 2012, did you become

16    familiar with the facilities and office space at Autonomy?

17    **A.**   Yes.

18    **Q.**   At Autonomy's offices, were the conference rooms named

19    after James Bond movie villains?

20          **MR. DOOLEY:**  Objection.  Objection, Your Honor.

21    Relevance.  403.

22          **THE COURT:**  Sustained.

23              (Pause in proceedings.)

24          **MR. REEVES:**  Now might be a good time for a break,

25    Your Honor.

1      **THE COURT:**  Well, do you have anything further?  I'd

2  like you to finish with the witness.

3      **MR. REEVES:**  I don't think I have more questions.

4      **THE COURT:**  Okay.  So almost.  Almost.

5      **MR. REEVES:**  I'd like to confer with my --

6      **THE COURT:**  That's all right.  That's all right.

7  Let's take a recess, and you can review your notes.

8      Ladies and gentlemen, we'll be in recess at this time.

9  We'll be in recess until a quarter of 11:00.

10      Remember the admonition given to you:  Don't discuss the

11  case, allow anyone to discuss it with you, form or express an

12  opinion.

13      The witness may step down.

14      **THE WITNESS:**  Thank you, sir.

15      (Proceedings were heard out of the presence of the jury:)

16      **THE COURT:**  Okay.  Let the record reflect that the

17  jurors have left.

18      So there are a couple things that I wanted to raise.  One

19  is the request of the Defense to cross-examine Mr. Yelland on

20  the issue of that statement.  I don't -- I have so many papers

21  up here.  It's the -- it's the statement that was sent to -- it

22  was an e-mail and attachment sent to the defendant by

23  Mr. Chamberlain to which was attached a document.  The document

24  had -- it was a four-page -- three-page document and it had

25  literally hundreds or so entries.  However, it had an amount at

1   the end, which was about 1.4 million, to which the Defense

2   asserts that that amount is consistent with the statement that

3   was given to the federal board -- whatever they're called, the

4   accounting board -- and, therefore, it should be admitted

5   because, one, it is not hearsay.  It's not being offered for

6   the truth of the matter; that is, that there was 1.4 million or

7   that all of those items were paid or not.  So it's not hearsay.

8   It's not introduced for the truth of the matter.

9        Rather, what it's being introduced for is to show, quote,

10  the effect on the listener.  That is to say, there isn't a

11  serious question as to whether or not he received it.  That was

12  the habit and custom of the e-mails as they went through the

13  system.

14       Number two, he requested information; therefore, he

15  inquired I think of Mr. Chamberlain -- I may be wrong in

16  this -- "What about this?"  And this seems to be in response to

17  his inquiry.

18       So, number three, it goes to his state of mind; that is to

19  say, that he was at least told this and, therefore, it would

20  have some relevance as to his response.

21       The Government responds in saying it is inadmissible

22  hearsay.  I don't think it is hearsay because it's not being

23  introduced for the truth of the matter.

24       And it seems to me that the quarrel really between the

25  two, as I understand it from what Mr. Frentzen said yesterday,

1    was not that it -- that the figures are, quote, "inaccurate" in

2    that they don't reflect payments or they don't reflect

3    write-offs or they don't reflect whatever they reflect, and

4    there's no dispute that at the end it's 1.4 million.

5         What the Government says is, yeah, this was all a

6    contrivance of a kind or an accounting fraud of a kind which

7    resulted in 1.4 million.  So nobody disputes that is

8    1.4 million a number that was furnished and it's on the books

9    and records of Autonomy.  It was how they got that number and

10   the improper way they came to that number that is of relevance

11   here.

12        And I looked at it initially, and I think I'm still

13   right -- it's nice for me to say I think I'm still right --

14   that it's a statement in furtherance of the conspiracy, but the

15   Government is not introducing it and they're objecting to it

16   because they say -- well, I think I have to turn to

17   Mr. Frentzen because I don't accept the argument that it's

18   hearsay.  I look upon it as a declaration, as a statement that

19   was being told to a person at or about the time that he signed

20   the document.

21        Then I sort of think in my own mind, well, what if

22   somebody said -- just before you signed something, somebody

23   said, "Hey, the number is 1.4."  The head of the books,

24   whatever Chamberlain did, he says, "Oh, you asked what the

25   number is.  The number is 1.4."

1        Now, let's say somebody -- somebody -- let's say somebody

2   heard that.  Whether it's true or not, it doesn't make any

3   difference.  It's what -- it's what the defendant thought.  And

4   so why couldn't you introduce it as a statement affecting his

5   state of mind?

6        Putting it another way, let's say the statement was not

7   1.4.  Let's say it was 100 million or 50 million, and so forth.

8   Certainly that would come in in some manner I would think.

9        So it seems to me that if it would come in for inculpatory

10  reasons, I don't see why it wouldn't come in for whatever it

11  is.  And I think it's a matter of cross-examination.  I think

12  this is a perfect witness for it, by the way, because to the

13  extent that the witness understands that document, maybe he can

14  explain it.  So I'm inclined to let it in.

15       Okay, Mr. Frentzen, your turn.

16       **MR. FRENTZEN:**  Thank you, Your Honor.

17       With regard to the portion of it that is a rundown of

18  numbers, this may be the appropriate witness.

19       With regard to the e-mail that it is attached to, this is

20  not a good witness.  This is not a witness who knows anything

21  about it.

22       And unlike the situation -- what they want to argue is

23  that, you know, the representations being made in there by

24  Chamberlain is what the jurors should believe, that that is

25  accurate, that what they're telling the FRRP is accurate.

1      And the problem here is that it -- well, it is inaccurate.

2  And unlike *Payne*, the case that they cited, the witnesses who

3  received the communication testified -- and I don't just say

4  that as a -- I mean, this is a tree that falls in the woods; in

5  other words, nobody that's on that e-mail is going to take the

6  stand.  There's one person who could and if he were, then he

7  could describe what the effect was on him.

8      But the notion that we're going to get something out of it

9  about the effect on the listener when the listener is not

10  testifying is not consistent with what happened in *Payne*.

11      We've all been in the situation, Your Honor, where, you

12  know, a cop says:

13      "What did you do next?

14      "I went to the scene.

15      "Why did you go to the scene?

16      "Because I heard on the radio there was a robbery."

17      Whatever.  Okay.  That's not for the truth of the matter

18  asserted.  That's to explain what this witness who's testifying

19  did, why they went there, and that's the situation in *Payne*.

20      That's not the situation here because you have to go to

21  that next step that we're all just going to make assumptions

22  about what impact or what effect this had because we don't have

23  any of the --

24          **THE COURT:**  I agree that that's a difference from

25  *Payne*, but here is the question -- and your analogy is right.

**PROCEEDINGS**

 1  I mean, I understand that.  What I'm trying to figure out is,

 2  obviously, the witness who -- the listener, who is the

 3  defendant in this case, is not required to testify, may not

 4  testify.  I don't know whether he will or not.

 5      Okay.  And that is a distinction because you could ask the

 6  cop who says "I heard this and I went there."  You can ask the

 7  cop all sorts of reasons.  You can cross-examine whether the

 8  information that he got was valid and so forth.

 9      In this case the listener isn't testifying, and the

10  question is:  Because the listener isn't testifying, does that

11  then render the statement inadmissible?  And that -- I haven't

12  found that case that says it's inadmissible.  That's number

13  one.

14      Number two, it does come in.  It is a business record.  It

15  is properly authenticated.  Your argument with it is that you

16  can't -- that you can't cross-examine how the listener reacted,

17  but the listener reacted.  Whether or not that document had

18  anything to do with the witness' reaction is conjecture.  It's

19  conjecture.

20      But then the question is, then the question is:  Would it

21  be reasonable for a jury to draw the inference that, in fact,

22  that statement influenced him, or is it not reasonable?

23      They'll argue it's reasonable.  They'll say, "Here is the

24  chief financial officer in response to a request, and then the

25  defendant took certain -- an action and, therefore, it's

**PROCEEDINGS**

1    reasonable to assume it had some influence on him."

2        The Government, on the other hand, will say, "There's no

3    basis for that.  They were involved in a conspiracy.  These are

4    statements that were made," I think, "by a co-conspirator and,

5    sure, they're covering their tracks."

6        I sort of go back to if you can't show that, you haven't

7    shown any case at all.  So I think that the -- I mean, I'm

8    overstating it, Mr. Frentzen, I'm vastly overstating it; but if

9    your argument is this is not really the witness, I would say

10   that the problem with that -- you know the witness is

11   Mr. Hussain or Mr. Chamberlain, neither of whom is available.

12        But the problem you have is -- or that I have is that

13   cases come in in a particular way, and the Government goes

14   first and the Defense goes afterwards; and if the Defense has

15   to -- we can wait and rest.  I can do this -- you know what?

16   If that's a problem, I can wait till they get up in their case

17   and they offer it.  They say, "Here is the exhibit," which is

18   exactly what they're doing now.  And I can say, "Okay.

19   Admitted."  Because it's a business record, so forth and so on.

20        And then we bring Mr. Yelland back and question him about

21   it, not "Did you know Steve Chamberlain?  Do you know what the

22   process is?"  And so forth.  You look at the document, the

23   figures, and say, "How do you get that?"  This is what they

24   say.

25        **MR. FRENTZEN:**  I think --

1  **THE COURT:**  And I think we're making a big mountain

2  out of something that really is of little consequence as I see

3  it.

4  **MR. FRENTZEN:**  I have some agreement with that,

5  Your Honor, except Mr. Keker made a big point once upon a

6  time -- the Court may or may not recall it -- that, you know,

7  MicroLink did not write this stuff off.  He cross-examined on

8  MicroLink's -- this stuff was not written off and that he was

9  going to prove that through the accountant, which didn't

10  happen.

11  So now to offer this e-mail -- in other words, his

12  position was that the MicroLink stuff was not written off.

13  Maybe only a very small part of it.  I can pull this from the

14  transcript from once upon a time.

15  What this e-mail does -- and I haven't heard them say

16  they're not going to argue that what's represented in that

17  e-mail is what occurred.  They're actually offering it for the

18  truth of the matter asserted, as I understand.

19  If they want to concede that what's in that e-mail is

20  false, then we might be in a different position.

21  **THE COURT:**  Well, that's all a matter of -- well, I

22  mean, I'll tell you --

23  **MR. FRENTZEN:**  Otherwise they're offering it for the

24  truth, Your Honor.

25  **MR. KEKER:**  Can we move on?

1          **THE COURT:**  They're not offering it for the truth.

2          **MR. KANIG:**  That's right.

3          **THE COURT:**  You're ahead, Mr. Keker, so why should you

4    say anything at this point?

5          **MR. KEKER:**  Just because there's a couple of other

6    e-mails that -- not e-mails --

7          **THE COURT:**  Well, I don't know about those.

8          **MR. KEKER:**  There's a couple of other documents, no,

9    separate that will save time in the future.  We have raised

10   with them and asked them and we filed something that maybe you

11   ought to look at, but Sarin and Gersh, we need to call back.

12         **THE COURT:**  I'll get into all of that.

13         **MR. KEKER:**  All right.

14         **THE COURT:**  I'm just -- look, I'm just dealing with

15   exactly what's in front of me, and what is exactly in front of

16   me I'm going to permit.

17       And it seems to me I will give a cautionary instruction

18   and I'll say, "Ladies and gentlemen, what is on this document

19   and so forth is not admitted for the truth of the matter; that

20   these amounts were correct, or these amounts reflect the

21   transactions as they occurred, or that this is in response to

22   the thrust of the inquiry.  It simply is an act that occurred."

23         **MR. KANIG:**  I'm sorry.  Your Honor, may I be heard for

24   a moment?

25         **MR. FRENTZEN:**  One final request.

1          THE COURT:  Pardon?

2          MR. FRENTZEN:  One final request, Your Honor.

3          THE COURT:  Yes, you can be.

4          MR. FRENTZEN:  I understand them questioning

5  Mr. Yelland, which I don't think they actually want to get

6  into, on the numbers attached to the document.

7          THE COURT:  Yeah.

8          MR. FRENTZEN:  I'm asking that Mr. Yelland not be

9  questioned about an e-mail that he never saw and had nothing to

10 do with.

11         THE COURT:  No, you don't have to show him the e-mail.

12 It is the -- it is the attachment to the e-mail that

13 Mr. Yelland would be questioned about, as I understand it.

14         MR. FRENTZEN:  And he may or may not know about that

15 particular document.

16         THE COURT:  I don't know.  You might ask him.  Anybody

17 thought about asking him?  Showing him the e-mail -- showing

18 him the attachment and seeing if he has any information on that

19 subject?  You certainly should do that.

20      Okay.  Yes?

21         MR. KANIG:  Your Honor, the whole document needs to

22 come in.

23         THE COURT:  It's going to come in.

24         MR. KEKER:  It's coming in.

25         THE COURT:  It's going to come in, but I'm going to

1   give a cautionary instruction about it.

2           MR. KANIG:  As to the e-mail but not the business

3   record that's attached to it is the only point of clarification

4   because --

5           THE COURT:  What?

6           MR. KANIG:  -- the business record is being offered

7   for the truth of the matter asserted.  It's a general ledger

8   document, which is precisely what Mr. Yelland has been

9   testifying about, has been introduced for the truth of the

10  matter.  All we're asking is that that business record be

11  admitted for the truth and the e-mail be admitted for the

12  effect on the listener.

13          THE COURT:  I don't understand the business record.

14  No, if the business record -- now I'm completely turned around.

15  If the business record, that is the e-mail, is offered for the

16  truth --

17          MR. KANIG:  No.  The business record is the

18  attachment.

19          MR. KEKER:  No, let's -- we'll take what you said.

20          THE COURT:  I'm totally confused.  If you're drawing a

21  line between the two pieces of paper --

22          MR. KEKER:  We accept the ruling, admitted for state

23  of mind, end of story.

24          THE COURT:  Well, I'm not going to say "state of

25  mind."  All I'm going to say is it is being introduced -- well,

**PROCEEDINGS**

1    I think I have to say something about the state of mind.  No, I

2    think I will simply say it's not being introduced for the truth

3    of the matter.

4            **MR. KEKER:**  Correct.

5            **MR. FRENTZEN:**  Thank you, Your Honor.

6            **THE COURT:**  Okay.

7            **MR. KEKER:**  Thank you.

8            **THE COURT:**  And, I mean, I would just point out that

9    there is no evidence in the record that Mr. Hussain had any

10   reaction to that document at all, and that that would be --

11   that would be a fair comment by the Government in their

12   argument.

13           **MR. FRENTZEN:**  Thank you, Your Honor.

14           **THE COURT:**  So you understand that.

15           **MR. FRENTZEN:**  Thank you, Your Honor.

16           **MR. KEKER:**  You're going to say that to the Government

17   but not to the jury?

18           **THE COURT:**  Exactly.

19           **MR. KEKER:**  All right.  Thank you.

20           **MR. FRENTZEN:**  But the Government can say it.  Thank

21   you, Your Honor.

22           **THE COURT:**  Unless you want me to.

23                     (Recess taken at 10:39 a.m.)

24                  (Proceedings resumed at 10:49 a.m.)

25

 1          (Proceedings were heard out of presence of the jury:)

 2          **THE CLERK:**  Come to order.  Court is now in session.

 3          **THE COURT:**  Bring in the jury.  Mr. Yelland should

 4    come up.

 5          (Proceedings were heard in the presence of the jury:)

 6          **THE COURT:**  Please be seated.  I'm sorry.  I was

 7    distracted.

 8       Okay.  Mr. Yelland is on the stand.  Let the record

 9    reflect all parties are present and the jury is present.

10       Mr. Reeves.

11          **MR. REEVES:**  Thank you, Your Honor.  No further

12    questions.

13          **THE COURT:**  Okay.  Cross-examination.

14                        <u>**CROSS-EXAMINATION**</u>

15    BY MR. DOOLEY:

16    **Q.**   Good morning, Mr. Yelland.  My name is Brook Dooley, and

17    I'm one of the lawyers who represents Sushovan Hussain.

18       And good morning to the ladies and gentlemen of the jury

19    as well.

20       Mr. Yelland, you and I have never met before, have we?

21    **A.**   No.

22    **Q.**   I'm going to briefly talk about your job history,

23    Mr. Yelland.

24       You became a chartered accountant in 1993; correct?

25    **A.**   Or 1994, but it was around that time.

**YELLAND - CROSS / DOOLEY**

1  **Q.** Then you worked a couple years at Arthur Andersen;

2  correct?

3  **A.** I continued to work for Arthur Andersen for a short while

4  after I was qualified, yes.

5  **Q.** Then you taught accounting after that?

6  **A.** Right.

7  **Q.** Then you went to work for Compaq?

8  **A.** No.  I went to work for Rover Group first for

9  approximately three years.  Then I joined Compaq.

10  **Q.** You joined Compaq in 2000?

11  **A.** Yes.

12  **Q.** Then in 2002, HP acquired Compaq; correct?

13  **A.** Correct.

14  **Q.** You have more or less worked for HP ever since 2002;

15  correct?

16  **A.** Until October of last year, yes.

17  **Q.** So you started at Compaq in 2000.  HP acquired Compaq, and

18  then you had various positions within HP between 2002 and then

19  2012; right?

20  **A.** Yes.  That's before the Autonomy -- yes.

21  **Q.** And then in 2012, you became the chief financial officer

22  of the Autonomy business unit within HP; correct?

23  **A.** Yes.

24  **Q.** And then you stayed there until 2016; correct?  You stayed

25  at HP until 2016?

1   **A.**   With HP until October 2017.

2   **Q.**   2017.  Okay.  That's when HP sold a portion of its

3   business to Micro Focus?

4   **A.**   Correct.

5   **Q.**   And then you went to work at Micro Focus?

6   **A.**   Yes.

7   **Q.**   So all told, you spent, what, 15 years working for

8   Hewlett-Packard?

9   **A.**   Yes.

10  **Q.**   You have spent a lot of time over the last few years with

11  the HP lawyers and consultants working on this investigation;

12  correct?

13  **A.**   Yes.

14  **Q.**   Just to highlight some interactions you've had with the

15  different HP lawyers involved, in June of 2013, did you meet

16  with lawyers from the Proskauer Rose firm?

17  **A.**   Yes.

18  **Q.**   You met with them for two days; right?

19  **A.**   Yes.  Approximately.

20  **Q.**   And then you met again with some HP lawyers in June, later

21  in June of 2014?

22  **A.**   I don't recall.  I met with HP lawyers reasonably

23  regularly, yes.

24  **Q.**   Okay.  Well, let's just go through some more.

25        In January of 2015, you met with the Choate Hall law firm;

YELLAND - CROSS / DOOLEY

1  right?

2  **A.**    I can't give you an exact date, but I did meet with

3  Choate.

4  **Q.**    And with a gentleman named Bob Frank, a lawyer from Choate

5  Hall?

6  **A.**    Yes.

7  **Q.**    And you understand Mr. Frank and the Choate Hall law firm

8  are one of the law firms working on HP's civil lawsuit against

9  my client, Mr. Hussain?

10  **A.**    Yes.

11  **Q.**    And is it fair to say that Choate Hall is running that

12  lawsuit, running that litigation?  Do you know?

13  **A.**    I don't know.

14  **Q.**    And at that meeting, there was also a team of people from

15  Price Waterhouse Coopers, do you remember that, at this meeting

16  with Choate Hall?

17  **A.**    I don't recall if PWC were there.

18  **Q.**    Why don't you look in your -- you should have a thin white

19  binder there, and there should be an Exhibit 5276.

20         **THE COURT:**  I'm sorry.  What exhibit is it?

21         **MR. DOOLEY:**  It's Exhibit 5276.  I'm just offering it

22  to refresh recollection.  I'm not offering it.  I'm sorry,

23  Your Honor.

24         **THE COURT:**  Just show it to him.

25         **MR. DOOLEY:**  Showing it to him.

1              THE COURT:  52 --

2              MR. DOOLEY:  76, Your Honor.

3              THE COURT:  5276.  Okay.  And what do you want him to

4    look at?

5    BY MR. DOOLEY:

6    Q.   Just the first page, Mr. Yelland.  Does Exhibit 5276

7    refresh your recollection that in January of 2015 you were at a

8    meeting with lawyers from the Choate Hall law firm and

9    individuals from Price Waterhouse Coopers?

10   A.   I don't specifically recall the exact meeting, but I'm

11   willing to accept what the minutes show on there.

12   Q.   You understand, Mr. Yelland, that HP hired Price

13   Waterhouse Coopers to conduct an investigation of the

14   allegations of accounting irregularities at Autonomy; right?

15   A.   I'm sorry.  Could you repeat the question?

16   Q.   You understand that Hewlett-Packard retained or hired PWC

17   to conduct an investigation of alleged accounting

18   irregularities at Autonomy; right?

19   A.   Yes.  Their investigation ran parallel with my

20   investigation for the stats.

21   Q.   We will come back to how those investigations interact.

22        In May of 2015, you were interviewed by HP's lawyers from

23   the Morgan Lewis firm.  Do you remember that interview?

24   A.   I don't remember specific dates of -- but I did meet with

25   Morgan Lewis.

1    **Q.**   How many times would you estimate that you've met with

2    Morgan Lewis?

3         **MR. REEVES:**  Your Honor, I think he is represented by

4    Morgan Lewis.  I want to clarify that for the record.  I

5    object.

6         **THE COURT:**  Well, I think there's another way of

7    handling it.  Just say "Haven't you -- can you estimate the

8    number of times?  Is it more than five, more than ten," so we

9    can move on because actually there is no substance -- you can

10   ask these questions, but every witness apparently has met

11   multiple times with a number of people.  The jury is very aware

12   of that.

13        I think you can establish it in two questions, three

14   questions, and then we can move on to the substance of his

15   testimony.

16        **MR. DOOLEY:**  I will move on from this question.  But,

17   Your Honor, this witness has interactions --

18        **THE COURT:**  Just ask him questions because a colloquy

19   actually takes more time than the question would.  So just go

20   right ahead, ask him the question.

21   **BY MR. DOOLEY:**

22   **Q.**   Mr. Yelland, you understand that the lawyers from Morgan

23   Lewis have been leading HP's investigation into Mr. Hussain and

24   others from Autonomy; correct?

25        **MR. REEVES:**  I object.  He is represented by that law

 1   firm.  I object, Your Honor.  That's his counsel.

 2   BY MR. DOOLEY:

 3   Q.   Mr. Yelland, are you represented by the Morgan Lewis law

 4   firm?

 5            THE COURT:  Do you have an attorney?  Maybe you don't

 6   think you have an attorney.  A lot of people --

 7            THE WITNESS:  I have been represented by Morgan Lewis.

 8   Currently I have another legal firm representing me.

 9            THE COURT:  Okay.  So not currently represented by

10   Morgan Lewis, but in the past has been represented by Morgan

11   Lewis.

12        And when you were -- during the course of this

13   investigation -- I'll do it.

14        During the course of this entirety from 2012, I guess,

15   '13, to the present time, have you met a number of times with

16   various lawyers?

17            THE WITNESS:  Yes.

18            THE COURT:  Including the Government?

19            THE WITNESS:  Yes.

20            THE COURT:  And can you estimate the number of times

21   you met with attorneys representing Hewlett-Packard or

22   representing different companies or representing the Government

23   or different individuals?  Can you estimate the number of times

24   you've done that?

25            THE WITNESS:  In one capacity or another?

1          THE COURT:  Yes.  About how many?

2          THE WITNESS:  I've probably spoken or met with someone

3   from one of these law firms at least once a month.

4          THE COURT:  At least once a month.

5      You've met with the FBI?

6          THE WITNESS:  Yes.

7          THE COURT:  A number of times?

8          THE WITNESS:  Yes.

9          THE COURT:  You met with the Government a number of

10  times?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.  So you've had quite a few meetings?

13         THE WITNESS:  Yeah.  There's been a lot to talk about.

14         THE COURT:  Okay.  And they've interviewed you and you

15  have -- you've spoken with them; is that correct?

16         THE WITNESS:  Yes.

17         THE COURT:  FBI, United States government, Morgan

18  Lewis.  Who else is out there?  Let's get them altogether.  I

19  don't want to keep doing this.  Get them altogether.

20         MR. DOOLEY:  Your Honor, I believe --

21         THE COURT:  Just get them altogether and tell -- so I

22  can get a question to him.  I'm not testifying.  He is.  I'll

23  do it if you can't do it.

24      Proskauer, have you met with the Proskauer firm?

25         THE WITNESS:  Yes.

1           THE COURT:  You met with the FBI, and you've met with

2  Morgan Lewis?

3           THE WITNESS:  Yes.

4           THE COURT:  Who else, counsel?

5           THE WITNESS:  Travers Smith.

6  BY MR. DOOLEY:

7  Q.   You met with Travers Smith?

8  A.   Yes.

9  Q.   Travers Smith is also working on the civil case against

10 Mr. Hussain in England; correct?

11 A.   Yes.

12 Q.   How many times have you met with Travers Smith?

13 A.   Only a couple.

14          MR. DOOLEY:  If I may, Your Honor, just ask --

15          THE COURT:  Go ahead.  Go ahead.  Just ask.

16 BY MR. DOOLEY:

17 Q.   Mr. Yelland, you testified that you have -- you were --

18 you were for some period of time represented by Morgan Lewis;

19 is that right?

20 A.   Yes.

21 Q.   And you were also represented by another lawyer,

22 Mr. Lusky; is that right?

23 A.   Yes.

24 Q.   You have been interviewed -- you met a number of times

25 with the prosecutors; correct?

**YELLAND - CROSS / DOOLEY**

1  **A.**   Yes.

2  **Q.**   And you met with them in 2015, 2016, numerous occasions,

3  at least eight meetings with the prosecutors; right?

4  **A.**   It may be as many as eight.  Eight sounds -- eight sounds

5  a little high, but I've met with them, yeah, maybe half a dozen

6  times, somewhere in that range.

7  **Q.**   On each of those occasions, you were joined at the meeting

8  by both your lawyer, Mr. Lusky, and also the lawyers from

9  Morgan Lewis for HP; correct?

10 **A.**   Yes.

11 **Q.**   And you know that HP's lawyers are here today in the

12 courtroom; correct?

13 **A.**   Yes.

14 **Q.**   And the HP lawyer who is here in the courtroom is one who

15 has attended your meetings with the Government; right?

16        **MR. REEVES:**  I object, Your Honor.

17        **THE COURT:**  Oh, no.  Let it go.

18        **THE WITNESS:**  They've attended most of them.

19 BY MR. DOOLEY:

20 **Q.**   Okay.  I want to turn to a topic that you testified about

21 yesterday, Mr. Yelland, and that is the rebasing or

22 rebaselining exercise.

23       In June of 2012, you were asked to conduct this review of

24 Autonomy's revenue; correct?

25 **A.**   Yes.

**YELLAND - CROSS / DOOLEY**

1  **Q.**  And that's the exercise that was called rebaselining or

2  rebasing; right?

3  **A.**  Yes.

4  **Q.**  And one of the objectives of the rebasing exercise was to

5  understand better the size of Autonomy's business and, as the

6  name suggests, set a baseline for expectations going forward;

7  correct?

8  **A.**  Yes.

9  **Q.**  And another one of the objectives was to understand

10 whether there were any accounting issues at Autonomy that

11 needed to be addressed; correct?

12 **A.**  Yeah.  The potential scope, prevalence, the types of

13 issues to be investigated further.

14 **Q.**  And the rebasing exercise was not done, I think you said

15 before, in contemplation of any Government investigation; is

16 that right?  It was done for business reasons?

17 **A.**  I didn't know at that point where the investigations might

18 lead to.

19 **Q.**  And as part of this rebasing exercise that you carried out

20 in 2012, you went back and you removed, as it were, or adjusted

21 from Autonomy's 2010 and 2011 revenues, revenue from -- certain

22 categories of revenue; correct?

23 **A.**  Yes.

24 **Q.**  If we could -- if I could direct your attention to Exhibit

25 6799.

YELLAND - CROSS / DOOLEY

1  **A.**    That is in the white folder?

2  **Q.**    That is in the first volume of the black binder.  It's the

3  very last tab in that black binder.

4          **THE COURT:**  6799?

5          **MR. DOOLEY:**  Yes.  This is an email from Antonia

6  Anderson to --

7          **THE COURT:**  Let me get it.  I just don't have it.

8      By the way, so we can move through this, if there's an

9  objection -- if there is an objection, you have to raise it

10  immediately; otherwise, I won't bother looking at the document

11  and it can come in.

12      Is there an objection?

13          **MR. REEVES:**  No, Your Honor.

14          **THE COURT:**  Good.  Okay.  In.

15          (Trial Exhibit 6799 received in evidence)

16                  (Exhibit published to jury.)

17  **BY MR. DOOLEY:**

18  **Q.**    Do you have that -- do you see that, Exhibit 6799,

19  Mr. Yelland?

20  **A.**    Yes.

21  **Q.**    And that's an email to you -- well, from Ms. Anderson to

22  Nigel Curl at PWC, copy to you, "Subject:  Rebasing exercise";

23  right?

24  **A.**    Yes.

25  **Q.**    And if you look back at the last attachment, Attachment D

1  behind the last blue sheet, there is a memo that describes kind

2  of the purpose of the rebasing exercise, right, and what was

3  done?

4  **A.**    The draft memo, yeah, in the back.  Yep.

5  **Q.**    And as part of the rebasing exercise, you removed from

6  Autonomy's 2010 and 2011 accounts revenue from the sale of

7  hardware; right?

8  **A.**    Yes.

9  **Q.**    And the reason that the hardware sales were removed was on

10  the basis that such transactions would not be entered into

11  going forward under HP management; right?

12  **A.**    I don't think that was the only reason why we'd remove

13  them.  I was looking for what the real economic substance of

14  the -- of the Autonomy software business was.  And the

15  standalone hardware transactions were not really part of that

16  business.

17       And so I -- in the rebasing exercise, I effectively

18  disregarded the hardware revenue when I was -- when I was

19  showing what the true economic substance of the Autonomy

20  software business was.

21  **Q.**    You also made adjustments for revenue from so-called

22  hosted-plus-license transactions; right?

23  **A.**    Yes.

24  **Q.**    That's upfront license revenue was removed and replaced

25  with revenue charged ratably over the life of the contract;

1    right?

2    **A.**    Yes.

3    **Q.**    Similar to what you described to Mr. Reeves when you were

4    talking about the summary -- the chart; right?

5    **A.**    Yes.

6    **Q.**    If you look at page 2, the basis for that, there is a

7    heading that reads "adjustment:  Remove upfront hosting

8    revenue."

9        Second paragraph, "The basis for that adjustment is that

10   under HP management, Autonomy will no longer enter into

11   licenses for hosting transactions" and so forth.

12       Do you see that?

13   **A.**    Not just yet.  So we're on page 2, top of page --

14   **Q.**    It's also on the screen.  It's easier if we just call out

15   the language on the screen.

16   **A.**    So what was the question?  Sorry.

17   **Q.**    I'm -- the question is confirming that the basis for the

18   adjustment, for taking out this hosted-plus-license revenue,

19   was that under HP management, Autonomy would not be entering

20   into licenses for hosting transactions, but will bill for the

21   hosting as a service as it is performed.  That was the reason

22   why you took it out; right?

23   **A.**    That's not the -- the whole reason or the -- or the --

24   the -- the reason behind this paragraph and the reason why

25   we're taking it out is because when I'm looking at the Autonomy

1   business in terms of its real economic substance, if you have a

2   service being provided to a customer, particularly if it's an

3   existing service and that has a ratable revenue stream over

4   time, if that is re-engineered to create a short-term boost in

5   license revenue and depresses the future services revenue, to

6   me, that's a one-time artificial transaction and doesn't

7   reflect actual value of the service that's being provided to

8   the customer.

9        So when I'm looking at the economic substance of the

10  business, I'm going to remove that construction and look at

11  the -- the value of what is actually being provided to

12  customers over time.

13       And that same reason is why I proposed and the management

14  agreed going forward for Autonomy -- in HP for the Autonomy

15  business that we wouldn't enter into such transactions going

16  forward.

17  **Q.**   And that's -- excuse me.  That's what is reflected here.

18  Under HP management, Autonomy's not going to enter into those

19  transactions going forward; right?

20  **A.**   Yeah.  And I've been describing why.

21  **Q.**   Okay.  As part of the rebasing exercise, you also removed

22  revenue for what you concluded were barter transactions or

23  reciprocal transactions; correct?

24  **A.**   For those transactions where they were reciprocal and they

25  appeared not to have economic substance.  A reciprocal

**YELLAND - CROSS / DOOLEY**

 1  transaction in its own right is -- is not necessarily a reason

 2  to remove.

 3  **Q.**   The jury has heard that before.

 4      And -- okay.  And in addition, you also removed revenue

 5  where -- from -- derived from deals where you concluded that

 6  the revenue had been accelerated, right?  That is reflected at

 7  the bottom of page 3?

 8  **A.**   I would just say at the moment in this first rebasing

 9  exercise, I would say it always appears as opposed to concluded

10  because it was a preliminary exercise.

11  **Q.**   Okay.  The question is you removed revenue from -- derived

12  from deals where you -- where it appeared that the revenue had

13  been accelerated, right?

14  **A.**   Yes.

15  **Q.**   And that category included revenue from sales to resellers

16  where it appeared that the revenue had been accelerated;

17  correct?

18  **A.**   Yes.

19  **Q.**   And the result of all this that we've been talking about

20  was a proposed adjustment to Autonomy's 2010 and 2011 revenues;

21  correct?

22  **A.**   In the rebasing, yes.

23  **Q.**   And the rebasing exercise was -- it was an important

24  exercise at HP; correct?

25  **A.**   Yes.

YELLAND - CROSS / DOOLEY

1  **Q.**   In fact, in November of 2012, as the jury has heard,

2  Hewlett-Packard announced a writedown of the value of Autonomy;

3  correct?

4  **A.**   Hewlett-Packard did announce a writedown, yes.

5  **Q.**   And the rebasing exercise that you conducted was one of

6  the inputs into the writedown calculation, wasn't it?

7  **A.**   Not directly.

8  **Q.**   Was it indirectly an input into the writedown?

9  **A.**   So the rebasing exercise would help me to understand the

10 real size, the historical size, of the Autonomy business, and

11 that and coupled with our current level of performance in 2012

12 helped me form a view as to what the forecast might be going

13 forward, and that in turn is one of the ingredients into the

14 valuations that then lead or the revised valuations that lead

15 into -- that lead into an impairment or a writedown being

16 recorded against the Autonomy asset.

17 **Q.**   Do you recall that you or people working for you,

18 including Ms. Anderson, prepared more than 17 versions of the

19 spreadsheet that documented the conclusions of the rebasing

20 exercise?

21 **A.**   Yes.

22 **Q.**   Let's -- I'd like to show the witness Exhibit 6914.  It's

23 a spreadsheet.  It's not in evidence and needs to be shown in

24 native format on the screen.

25       **THE COURT:**  Any objection?

1           **MR. REEVES:**  I don't think so, Your Honor.

2           **THE COURT:**  Admitted.

3           (Trial Exhibit 6914 received in evidence)

4               (Exhibit published to jury.)

5    BY MR. DOOLEY:

6    **Q.**   Mr. Yelland, do you recognize Exhibit 6914 as one version

7    of the spreadsheet documenting the results of the rebasing

8    exercise?

9    **A.**   Yes.

10   **Q.**   If we could go up to the file information.

11          Do you see that -- it's showing, Jeff -- let's try that

12   again.  Can we call that back up, Jeff.  There we go.

13          Do you see, Mr. Yelland, here in the file information that

14   this is a document that was last modified in October of 2012

15   and that it indicates that you're the person who last modified

16   it?  Do you see that?

17   **A.**   I see that on the screen, yes.

18   **Q.**   If we could go back to the IFRS summary tab.  If we could

19   look at the bottom of the screen and just focus in on that

20   far -- well, just leave it right there.

21          Mr. Yelland, the table that's reflected here in Exhibit

22   6914 at the bottom of this IFRS summary page -- this table

23   reflects adjustments made to Autonomy's 2010 accounts as a

24   result of the rebasing exercise; correct?

25   **A.**   This isn't the exercise that actually adjusts the account,

1  but it starts with the numbers that were in the accounts, yes.

2  **Q.**    And in the far left box, there is a header that reads

3  "Revenue Base Rebaselining Review of Deals Over a Million

4  Dollars."  Do you see that's in all caps?

5  **A.**    Yes.

6  **Q.**    And underneath that header are rows showing the different

7  categories of adjustments you took out of Autonomy's revenue

8  that we discussed a moment ago; right?

9  **A.**    Yes.

10  **Q.**    So it shows the reduction for hardware sales, reduction

11  for upfront license on hosting deals, for existing customers,

12  new customers, reciprocal deals, accelerated revenue

13  recognition.  Those are the categories -- and then there are a

14  couple others.

15      Those are the categories that you adjusted out in the

16  rebasing exercise; correct?

17  **A.**    Yes.

18  **Q.**    And then the next column to the right shows the financial

19  impact of those adjustments.  That's the amount of revenue

20  removed from the 2010 account for each category of revenue;

21  right?

22  **A.**    Yes.

23  **Q.**    So, for example, you removed 105.6 million in hardware

24  revenue for 2010; right?

25  **A.**    Yes.

1   Q.   Now, if we can scroll over to the right, look at the next

2   three columns, there are three columns to the right of the

3   impact on -- the last couple we looked at.   The first reads

4   "Not IFRS Compliant Confirmed."   Then the next column to the

5   right reads "Not IFRS Compliant Probable."   And then the next

6   column reads "Management Judgment U.S. GAAP Difference"; right?

7   A.   Yes.   That's what they read.

8   Q.   And now if we go back down and look at the line for

9   hardware revenue -- just scroll over so we can see it.

10  Perfect.

11       The hardware revenue of 105.6 million, that is categorized

12  in the "Not IFRS Compliant Probable" column; correct?

13  A.   Yes.

14  Q.   It is not in the "Not IFRS Compliant Confirmed"; correct?

15  A.   Yes.   Because we hadn't conducted the real in-depth

16  investigation to determine whether these -- these adjustments

17  showing the economic size of Autonomy were actually errors,

18  misstatements or not under IFRS.   We hadn't really done that

19  work yet.

20  Q.   My question was just what column the numbers are in.

21       The -- if we go down to the "upfront license on hosting

22  deals," you deducted 14.7 million for existing customers and

23  23.4 million for new customers, and then if we go to the right,

24  neither of those numbers appear in the "Not IFRS Compliant

25  Confirmed"; right?

YELLAND - CROSS / DOOLEY

1   **A.**   Right.  We hadn't done the work yet.

2   **Q.**   And then they don't appear in "Not IFRS Compliant

3   Probable"; right?

4   **A.**   Correct.

5   **Q.**   They're all the way over in the next column for

6   "Management Judgment or U.S. GAAP Difference"; right?

7   **A.**   Correct.

8   **Q.**   And as reflected in this exhibit, the reason, according to

9   the exhibit -- the reason that the hosting revenue was removed

10  was because of managerial judgment or because of differences

11  between U.S. GAAP and IFRS; correct?

12  **A.**   In this column I'm saying that is possibly the reason for

13  it, yes.

14  **Q.**   Now, if we go back over, you see that for both reciprocal

15  deals and accelerated revenue recognition, neither of those

16  deductions are categorized as confirmed to be not IFRS

17  compliant; correct?

18  **A.**   Correct.  Again, we hadn't done the work.

19  **Q.**   And they're in the -- some of it is in the probable

20  category and then some of it is in the management judgment

21  category; correct?

22  **A.**   Yes.

23  **Q.**   And, in fact, after doing this rebasing exercise in 2012

24  that you said was an important exercise, you could only confirm

25  6.4 million, if we look at the bottom -- 6.4 million in

1  confirmed revenue that was not IFRS compliant as reflected in

2  this document; correct?

3  **A.**   Can I clarify the use of one of my previous answers,

4  please?

5       You -- you asked me if the rebasing exercise was

6  important.  The rebasing exercise, the deliverable from that

7  formally was the PowerPoint and the rebasing exercise that were

8  published at the end of June and a little bit in July.

9       This spreadsheet you see here was a follow-up request that

10  I received from the HP controller which stood slightly to one

11  side of the rest of the rebasing exercise.

12       So when you asked me what was important, I've -- I viewed

13  the actual outcome of the rebasing exercise, which is in a

14  PowerPoint at the end of June, as being the core deliverable.

15  **Q.**   You agreed with me, though, that the rebasing exercise was

16  important enough that you did over 17 versions of this

17  spreadsheet; right?

18           **MR. REEVES:**   Object.  I think that misstates the

19  evidence.

20           **THE COURT:**   Well, the witness can answer.  Would he

21  agree with the --

22  **BY MR. DOOLEY:**

23  **Q.**   You prepared over 17 versions of this spreadsheet?

24           **THE COURT:**   You're not saying "would you agree with me

25  that you prepared 17 versions of this?"  Is that the question?

1         **MR. DOOLEY:**  I'm asking him if he prepared more than

2    17 versions.

3         **THE COURT:**  That's already been testified to.  So the

4    question is -- I don't know what the question is.

5         **MR. DOOLEY:**  I'll leave it, Your Honor.  I'll leave

6    it.  I'll move on.

7    **Q.**   Let's scroll up to the 2011 numbers at the top of the

8    page.  If we could zoom out a little bit, Jeff.  There we go.

9         And for 2011, this exhibit reflects the same exercise

10   where the revenue removed is described and then put into

11   columns for "Not IFRS Compliant Confirmed," "Not IFRS Compliant

12   Probable," and "Management Judgment"; correct?

13   **A.**   Yes.

14   **Q.**   And none of the revenue that was removed for hardware

15   resale, hosting licenses, reciprocal deals, or accelerated

16   revenue recognition -- none of that was categorized as

17   confirmed to be IFRS noncompliant; correct?

18   **A.**   At this point in time, no.

19   **Q.**   And in -- for 2011, there was only $2 million in revenue

20   that was confirmed to be IFRS noncompliant; right?

21   **A.**   At this point in time, no.

22   **Q.**   And when you say "at this point in time," this was -- the

23   date on the document we saw was October 3rd, 2012; right?

24   **A.**   This was actually prepared and sent during July and just a

25   couple of days after the -- the main exercise was concluded.

1    This wasn't an exercise that took months.  It was an exercise

2    that was done in a day.

3    **Q.**    Well, the date --

4                **THE COURT:**  I didn't hear.  What did you say?

5                **THE WITNESS:**  So the -- the rebasing exercise was --

6    the first output of that was at the end of June and then there

7    was a follow-up in July and that is a PowerPoint that describes

8    the rebasing exercise.  It doesn't go into IFRS.

9            I was asked to give a view of the IFRS -- of the IFRS

10   conclusions of the rebasing.  I was at that time actually

11   uncomfortable to do that and I communicated that to my

12   colleagues, that I was uncomfortable to do it because we hadn't

13   done the work yet.  But I was required to do it so I gave the

14   best view of how far we'd got in a day or two.

15           And I was quite concerned about this being

16   over-interpreted, so I was very cautious at this point in time

17   to try to say that I was concluding something wasn't accounting

18   compliant, when in the few weeks since we started the rebasing

19   exercise, we clearly had not done the work to that depth to be

20   able to conclude, which is why I said I was looking at the

21   economic substance and the potential areas to investigate.

22           So I was actually uncomfortable to be asked to give

23   conclusions at this point.

24   **BY MR. DOOLEY:**

25   **Q.**    Let me just repeat what I think was my question, which is

1  the last modified date on this document that we looked at was

2  October 3rd, 2012.  "Yes" or "no," Mr. Yelland?

3  **A.**    Yes.

4  **Q.**    And the person identified as having last modified the

5  document is yourself; correct?

6  **A.**    Yes.

7  **Q.**    And as reflected in this exhibit, as of that date,

8  October 3rd, 2012, only $8.4 million in revenue is identified

9  as being confirmed to be noncompliant with IFRS; correct?

10 **A.**    No.

11 **Q.**    That's not what the document says?

12 **A.**    So my conclusions in here are as of really that -- that

13 period in July.  I don't recall between July and October why I

14 was really still -- or what part of this I was -- I was still

15 changing to October, but we never republished the full outcome

16 of the rebasing again after that July period.  I never sent it

17 on to HP's senior management after July.

18     So I wasn't trying to reconfirm to anybody or even myself,

19 really, you know, high-level conclusions about IFRS compliance

20 after July.

21 **Q.**    Setting aside who you sent the document on to or not,

22 Mr. Yelland, a simple question:

23     This exhibit, which is dated October -- which is -- which

24 was last modified on October 3rd, 2012, shows only $8.4 million

25 in the column for "Not IFRS Compliant Confirmed"; correct?

YELLAND - CROSS / DOOLEY

1   A.   That's what the document says.

2   Q.   I want to talk about the restatement.

3        The -- the document that we're calling the restatement,

4   which is Exhibit 2445, contains restated accounts for --

5   Autonomy Systems Limited accounts for 2010 and then accounts

6   for 2011 that had never been filed before; correct?

7   A.   Correct.

8   Q.   And you testified -- and let's just remind the jury that

9   the restatement that we're talking about is not a restatement

10  of Autonomy Corporation, the publicly-traded company that

11  Mr. Hussain was the CFO of; right?

12  A.   So Mr. Hussain was the CFO of the group, so he's the CFO

13  of Autonomy Corporation Limited and all of its subsidiaries,

14  including ASL.

15  Q.   And the restatement -- the point is that the restatement

16  was of a -- the accounts of a subsidiary of Autonomy

17  Corporation; correct?

18  A.   In the ASL accounts, yes.

19  Q.   And ASL is a subsidiary of the group, Autonomy

20  Corporation; correct?

21  A.   Correct.

22  Q.   And you testified yesterday that in the fall of 2000 --

23  summer or fall of 2012, you were working on filing -- trying to

24  file the ASL statutory accounts for 2011; correct?

25  A.   Yes.

1   Q.   And you were working on filing the 2011 ASL statutory

2   accounts with ASL's existing auditors at Deloitte; correct?

3   A.   Yes.

4   Q.   And you were working with people at Deloitte, some of whom

5   the jury knows.  Mr. Welham, for example; correct?

6   A.   Yes.

7   Q.   Can you look at Exhibit 6800 in your binder.  It's in

8   Volume 2 of 3 of the big --

9           MR. REEVES:  No objection, Your Honor.

10           THE COURT:  Admitted.

11           (Trial Exhibit 6800 received in evidence)

12                   (Exhibit published to jury.)

13           THE WITNESS:  Did you say 6800?

14   BY MR. DOOLEY:

15   Q.   6800.  It's the first exhibit in Volume 2.

16   A.   Yes.  I have it.

17   Q.   And this is an agenda for a meeting with Deloitte on

18   October 3rd to discuss the audit update; correct?

19   A.   Yes.

20   Q.   Is that the subject?

21        And that's a reference to the audit of the ASL accounts;

22   correct?

23   A.   Amongst other subsidiaries, yes.  There were other

24   subsidiaries as well, but, yes.

25   Q.   And if you look at the -- just on the first and second

**YELLAND - CROSS / DOOLEY**

1  page of the agenda items, there is no discussion on here of

2  hardware disclosures, is there?

3  **A.**   No.

4  **Q.**   If you look at -- there is no discussion of reciprocal

5  transactions or barter transactions?

6  **A.**   No.

7  **Q.**   If you look at the second page, item 4, there are a couple

8  of resellers identified there.  Tikit, for example.  But there

9  is no mention of Capax on here; right?

10  **A.**   No.

11  **Q.**   And no mention of MicroTech or Discover Tech?

12  **A.**   No.

13  **Q.**   And there is no mention of restating the ASL accounts, is

14  there?

15  **A.**   No.  But I would say this is Deloitte's document, not my

16  document.

17  **Q.**   I understand that.  But the agenda for the meeting where

18  you're discussing filing the ASL accounts, this agenda from

19  October 3rd, 2012, has no discussion of any restatement of the

20  ASL accounts, does it?

21  **A.**   Not in Deloitte's agenda, no.

22  **Q.**   Then on November 20th, HP announced its writedown of

23  Autonomy's value; right?  We've talked about that earlier.

24  Correct?

25  **A.**   I believe so, yes.

1    Q.   And if you look at Exhibit 8237 --

2         THE COURT:  I'm sorry.  What is it?

3         MR. DOOLEY:  8237, Your Honor.

4         THE COURT:  8237.  One moment.  I don't have it on my

5    list.  8237?

6         MR. DOOLEY:  It's at the very --

7         THE COURT:  My list stops at 8092 that I was just

8    handed.

9         MR. DOOLEY:  I apologize.

10        THE COURT:  That's okay.  But I have no idea what it

11   is.

12        MR. DOOLEY:  Do you have the --

13        THE COURT:  I've got a lot up here.  I guarantee you,

14   I must have everything, but I don't have 8207.

15        MR. DOOLEY:  I can hand up my copy.

16        THE COURT:  I don't want to take your copy.  What

17   color binder is it?

18        MR. DOOLEY:  Black binder 3.

19        THE COURT:  Is there an objection or not?

20        MR. REEVES:  I thought there had been rulings.

21        THE COURT:  Just tell me, is there an objection?  If

22   there is an objection, I'll deal with it.  If there is no

23   objection, I'll admit it.

24        MR. REEVES:  I think I object.  I think I object to

25   the extent --

1       **THE COURT:**  You think you object.  That's actually --

2       **MR. REEVES:**  I'll prove on that.

3       **THE COURT:**  -- okay, but it's not terribly helpful.

4       **MR. REEVES:**  I object.

5       **THE COURT:**  Okay.  Now I will look at it.

6       **MR. REEVES:**  I ask to approach, please.

7       **THE COURT:**  Let me look at it first.  82 -- sorry.

8   Which one is it?

9       **MR. DOOLEY:**  8237.  And while you're at it, I intend

10  to do 8236, so we can take them --

11      **THE COURT:**  We can do them both.

12     Ladies and gentlemen, may I suggest you have a little

13  conversation while I work my way through all of this.

14     (The following proceedings were heard at the sidebar:)

15      **THE COURT:**  What's your objection?

16      **MR. REEVES:**  I meant it when I said "I think I object"

17  because this is the --

18      **THE COURT:**  Wait a minute.  Let's stop.  I assume

19  everybody means everything.  All right.  Sometimes even I mean

20  what I say.

21     So just tell me what is your objection?

22      **MR. REEVES:**  This is the announcement of the amount of

23  impairment and I thought that was an area that we were going

24  to --

25      **THE COURT:**  I thought there was an agreement not to do

1    it.

2         MR. DOOLEY:  Well, I mean, it's two things.  One is it

3    goes directly to impeaching the restatement.  I mean, our point

4    is --

5         THE COURT:  Well, my question to you is you want the

6    amount of the impairment in?

7         MR. DOOLEY:  Yes.

8         THE COURT:  So they withdraw their objection.  It

9    comes in.

10        MR. REEVES:  Okay.

11        THE COURT:  As to both.

12        MR. REEVES:  What is the second one?

13        THE COURT:  8236.

14        MR. REEVES:  I don't have that.

15        MR. KEKER:  The one before.

16        MR. REEVES:  Very good.  Thank you.

17        MR. KEKER:  It's before 8237.

18        MR. REEVES:  No objection, Your Honor.

19        THE COURT:  Okay.  8236, 8237 are admitted.

20        MR. DOOLEY:  Your Honor, while we are here --

21        THE COURT:  While we are here, enjoying each other's

22    company.

23        MR. DOOLEY:  I appreciate the Court's desire to move

24    quickly through the general questions about meetings with

25    lawyers and meetings with the Government.  However, I do intend

```
1   to question this witness about specific meetings with lawyers

2   related to the restatement.

3           THE COURT:  Of course you can do that.  Of course you

4   can do that.

5           MR. DOOLEY:  I just wanted to --

6           THE COURT:  Of course you can do that, depending on

7   what it is and the questions and so forth, but, you know, there

8   isn't a witness who hasn't gotten up and met multiple times

9   with the Government, the FBI and everybody else.

10          MR. DOOLEY:  Understood, Your Honor.  I just wanted

11  to --

12          THE COURT:  While we are here, so you can be guided in

13  the cross, there is -- you have submitted a -- on other

14  evidence you've submitted a brief which says, for example, on

15  the Ernst & Young -- the Ernst & Young, Ernst & Whinney --

16          MR. KEKER:  Ernst & Young.

17          MR. DOOLEY:  Right.

18          THE COURT:  -- work you said you could either do it

19  through cross-examination of this witness or another witness.

20  Okay.  I don't know whether I'm going to admit it so I don't

21  want you to ask this witness about it.

22          MR. DOOLEY:  I wasn't planning to do it, before lunch

23  anyway.  I was planning to get to it, but not --

24          MR. REEVES:  How far open is the door now --

25          THE COURT:  I don't know how far open the door is.
```

1   It's open 18 inches.

2    (Sidebar conference ended and proceedings held in open court)

3           **MR. REEVES:**  Your Honor, I withdraw our objection to

4   8236 and 8237.

5           **THE COURT:**  Okay.  They are admitted.  8236, 8237

6   admitted.

7         Go ahead.  Mr. Dooley.

8         (Trial Exhibits 8236 and 8237 received in evidence)

9                    (Exhibit published to jury.)

10  **BY MR. DOOLEY:**

11  **Q.**   With all of that, Mr. Yelland, directing your attention to

12  8237, do you recognize this as an HP press release dated

13  November 20th, 2012?

14  **A.**   Yes.

15  **Q.**   And did you see this at the time, this press release?

16  **A.**   I can't remember whether -- I must have.  I just can't

17  recall.  I must have.

18  **Q.**   And do you see at the bottom, the bottom bullet point

19  reads, "Fourth quarter and full year fiscal 2012 results

20  include a noncash, goodwill and intangible asset impairment

21  charge of 8.8 billion dollars relating to the Autonomy

22  business."

23         Do you see that?

24  **A.**   Yes.

25  **Q.**   That was announced on November 20th; correct?

1  **A.**    Yes.

2  **Q.**    And then in Exhibit 8236, is a -- do you recognize this as

3  a second press release on November 20th, 2012?

4  **A.**    Yes.

5  **Q.**    Regarding Autonomy?

6  **A.**    Yes.

7  **Q.**    And it contains a statement that's being issued by HP,

8  which reads in the second paragraph, "HP's extremely

9  disappointed to find that some former members of Autonomy's

10  management team used accounting improprieties,

11  misrepresentation, and disclosure failures to inflate the

12  underlying" -- and it goes on and on.  Do you see that?

13  **A.**    Yes.

14  **Q.**    That was HP's public statement on November 20th, 2012;

15  right?

16  **A.**    Yes.

17  **Q.**    And then down below, it talks about initiating an intense

18  internal investigation, including a forensic review by Price

19  Waterhouse Coopers; correct?

20  **A.**    Yes.

21  **Q.**    After this -- so we established, before we talked about

22  these exhibits and before the sidebar, that in the fall of

23  2012, prior to November 20th, you were working with Lee Welham

24  and others at Deloitte on preparing the ASL accounts; correct?

25  **A.**    Yes.

**YELLAND - CROSS / DOOLEY**

1  **Q.**   And we looked at the agenda from October 3rd that didn't

2  have any reference to hardware or these resellers or reciprocal

3  transactions or any restatement; correct?

4  **A.**   Correct.  At that point, we hadn't brought to Deloitte the

5  concerns across the wider Autonomy business.  We were only

6  discussing with Deloitte generally the deals where Autonomy

7  Systems Limited was contracting directly with the end user.

8       And so what you see in the agenda there is some of the

9  examples that relate specifically to those deals, but as I

10  said, we hadn't opened up with Deloitte as to the extent of the

11  other issues we were finding.  So you don't see the other

12  issues on their agenda.

13  **Q.**   And yesterday you testified that after this -- the

14  announcement on November 20th, you invited Deloitte to resign.

15  Do you remember that testimony?

16  **A.**   Yes.

17  **Q.**   And what that means is that you terminated them; correct?

18  And by "you," I mean HP terminated Deloitte?

19  **A.**   Yeah.  I think from a technical point of view, we didn't

20  terminate them, but in a sense -- essentially we invited them

21  to resign and they resigned, so it has a -- in practice, a

22  similar outcome that they were no longer the auditors.

23  **Q.**   Okay.  Look at Exhibit 6902, if you can.

24  **A.**   Sorry.  I didn't catch the number.

25  **Q.**   6902 in Volume 2.

```
 1            THE COURT:  Any objection?
 2            MR. REEVES:  I don't think so.
 3            THE COURT:  Nope.  That's actually not good enough.
 4            MR. REEVES:  No, Your Honor.  I'm just looking for it.
 5            THE COURT:  Just say "one moment, please," and look at
 6     it.
 7            MR. REEVES:  6902?
 8            THE COURT:  Right.
 9            MR. REEVES:  No, Your Honor.  There is no objection.
10            THE COURT:  Okay.  Admitted.
11            (Trial Exhibit 6902 received in evidence)
12                   (Exhibit published to jury.)
13     BY MR. DOOLEY:
14     Q.   Mr. Yelland, do you recognize Exhibit 6902 as an email you
15     sent to Betsy Branch, Marc Levine and others?
16     A.   Yes.
17     Q.   If you could flip over to the second page, at the top
18     there is an email from Betsy Branch to you and Michael Flint.
19          Who is Betsy Branch?
20     A.   Betsy Branch at the time was the head of enterprise
21     financial reporting, so it was HP's external reporting
22     function.
23     Q.   And she writes on November 20th -- and that's the same day
24     as the press releases we saw; right, Mr. Yelland?
25     A.   Yes.
```

1  Q.   She writes, "The decision has been made by Cathie Lesjak,

2  John Schultz and Marc Levine to dismiss Deloitte as Autonomy

3  auditor immediately, including for the fiscal year '11

4  statutory audits."

5       Do you see that?

6  A.   Yes.

7  Q.   And Cathie Lesjak is the CFO of HP; correct?

8  A.   Correct.

9  Q.   John Schultz at that time was the general counsel;

10 correct?

11 A.   Yes.

12 Q.   Who was Marc Levine?

13 A.   Marc Levine was the controller.

14 Q.   When you dismissed Deloitte as the auditors, you replaced

15 them with HP's auditors at Ernst & Young; correct?

16 A.   Yes.

17 Q.   And after HP terminated Deloitte in November of 2012, you

18 worked for another 14 months on the ASL accounts before the

19 restatement was filed in January 2014?

20 A.   Yes.

21 Q.   And you worked very closely with Morgan Lewis and with PWC

22 in preparing the restatement, didn't you?

23 A.   I didn't work closely with Morgan Lewis in preparing the

24 financial statement.

25 Q.   Okay.

1    **A.**    The work with PWC -- you know, they were investigating on

2    behalf of the legal teams, and I was doing the investigation

3    for the stats.  We were often, but not always, investigating

4    the same matters.

5         So -- and in their investigation also they needed the

6    cooperation of the Autonomy finance team so, yes, we did a lot

7    of work with PWC.

8    **Q.**    Let's look at Exhibit 6935.  That's in Volume --

9              **THE COURT:**  Sorry.

10             **MR. DOOLEY:**  -- Volume 2.

11             **THE COURT:**  One moment, please.

12             **MR. REEVES:**  No objection, Your Honor.

13             **THE COURT:**  6935, no objection.  Admitted.

14             (Trial Exhibit 6935 received in evidence)

15                  (Exhibit published to jury.)

16   **BY MR. DOOLEY:**

17   **Q.**    Mr. Yelland, this is an email from Nigel Curl at PWC to

18   you, copy to a number of other folks.  Do you see that?

19   **A.**    Yes.

20   **Q.**    And if you look on the second page, there is an email that

21   you're sending out to folks from PWC and Ernst & Young.  Do you

22   see that?

23   **A.**    Yes.

24   **Q.**    And "Project Baron, privileged and confidential."  You

25   write in the second paragraph, "I suggest that PWC and Autonomy

**YELLAND - CROSS / DOOLEY**

1  meet in the morning to discuss the next steps on the

2  investigation."

3      Do you see that?

4  A.   Yes.

5  Q.   And then on the first page, Mr. Curl responds, setting out

6  an agenda.  Do you see that?

7  A.   Yes.

8  Q.   And on the agenda are accounting audit issues, 2011

9  accounts; right?

10 A.   Yes.

11 Q.   And along with an SEC subpoena.  Do you see that?

12 A.   Yes.

13 Q.   Let's look at Exhibit 6937.  And just so -- remind the

14 jury.  PWC was -- we saw it in the press release.  They were

15 hired to do the internal investigation for HP; right?

16 A.   For the HP legal team, yes.

17 Q.   Right.

18 A.   It says in the press release that it's John Schultz.

19 Q.   Let's look at Exhibit 6937.  It's another email.  This one

20 is in April 2013.

21     I would move it in if there is no objection.

22         MR. REEVES:  No objection.

23         THE COURT:  Admitted.

24         (Trial Exhibit 6937 received in evidence)

25             (Exhibit published to jury.)

YELLAND - CROSS / DOOLEY

1   BY MR. DOOLEY:

2   Q.   And the subject of this email is HP Autonomy statutory

3   restatement.  Do you see that?

4   A.   Yes.

5   Q.   And the top email is from Robert Particelli to Leslie

6   Caldwell, Martha Stolley, and then folks from PWC are copied,

7   as are you.  Do you see that?

8   A.   Yes.

9   Q.   This email reflects that arrangements are being made for a

10  conference call with Morgan Lewis lawyers and PWC where the

11  subject is the statutory restatement; correct?

12  A.   Yes.

13  Q.   Let's look at Exhibit 6938.

14       Move it in.

15          MR. REEVES:  No objection, Your Honor.

16          THE COURT:  Admitted.

17          (Trial Exhibit 6938 received in evidence)

18              (Exhibit published to jury.)

19  BY MR. DOOLEY:

20  Q.   And this is an email from Ms. Anderson, who you testified

21  about, worked with you, to Mr. Curl at PWC, copied to Susan

22  Resley at Morgan Lewis and yourself, with the subject

23  "FileTek."  Do you see all that?

24  A.   Yes.

25  Q.   And Ms. Anderson is asking PWC for information about a

1   FileTek transaction; correct?

2   **A.**   Yes.  It's one of the ones we discussed earlier.

3   **Q.**   Okay.  So fair to say that the team at PWC was providing

4   you with information from their investigation?

5   **A.**   Yes.

6   **Q.**   And you're including HP's lawyers at Morgan Lewis in the

7   discussion?

8           **MR. REEVES:**  Objection.  That misstates the evidence

9   about Morgan Lewis.

10          **THE COURT:**  I'm sorry.  The question is you,

11  Mr. Yelland, are including Morgan Lewis?

12  **BY MR. DOOLEY:**

13  **Q.**   I'm sorry.  Ms. Anderson is including Morgan Lewis in this

14  email.

15  **A.**   Yes.

16          **THE COURT:**  Overruled.  Go ahead.

17  **BY MR. DOOLEY:**

18  **Q.**   Let's look at Exhibit 6940.

19          **MR. REEVES:**  No objection.

20          **THE COURT:**  Admitted.

21          (Trial Exhibit 6940 received in evidence)

22                  (Exhibit published to jury.)

23  **BY MR. DOOLEY:**

24  **Q.**   Is this a calendar invitation, Mr. Yelland, for a meeting

25  called "Autonomy, PWC, Morgan Lewis, and EY Catch-Up"?

1    **A.**    Yes.

2    **Q.**    And the agenda is to review transactions -- discuss

3    transactions that were reviewed by PWC?

4    **A.**    Yes.  EY, as the auditors of Autonomy Systems Limited,

5    have the right to understand any investigations that the --

6    that are being conducted into the company, particularly if they

7    relate to accounting misstatements or fraud.

8    **Q.**    Let's look at another one, 6943.  Actually we can skip

9    that one.  Let's do 6947.

10           **THE COURT:**  These are interview memos?

11           **MR. DOOLEY:**  "Subject:  Interview memos."

12           **THE WITNESS:**  Yes.

13           **THE COURT:**  Wait.  Wait.  I need to see whether there

14    is an objection.

15           **MR. REEVES:**  Is the interview memo attached?

16           **MR. DOOLEY:**  No.  I'm just introducing the email.

17           **MR. REEVES:**  The one-page document?

18           **THE COURT:**  I'm sorry.

19           **MR. REEVES:**  I have no objection to 6947.0001, the

20    email.

21           **THE COURT:**  6947.0001 admitted.

22           (Trial Exhibit 6947.0001 received in evidence)

23                  (Exhibit published to jury.)

24    **BY MR. DOOLEY:**

25    **Q.**    Mr. Yelland, this is an email from Mr. Bellacosa at Morgan

 1  Lewis, sending a link to download interview memos; correct?

 2  **A.**   Yes.  I wanted to ensure that the conclusions we'd reached

 3  in the stats were not contradicted by further investigations

 4  that the Autonomy legal -- sorry -- the HP legal team had

 5  conducted.  So I asked for access to some of their

 6  investigation material.

 7  **Q.**   Take a look at Exhibit 6903.  Tell me if you've seen this

 8  document before.

 9  **A.**   (Witness reviews document.)

10      Yeah.  This is E --

11          **THE COURT:**  Wait.  I'm waiting to see whether the

12  Government has an objection.

13          **MR. REEVES:**  I was waiting to see if it was being

14  offered.

15          **MR. DOOLEY:**  The question is has he seen it before?

16          **THE COURT:**  Okay.  I would anticipate -- if he said

17  yes, you would want to introduce it.  Am I a wrong?

18          **MR. REEVES:**  We do not have an objection to Exhibit

19  6903.

20          **THE COURT:**  You are saying you have no objection; is

21  that right?

22          **MR. REEVES:**  Yes, Your Honor.

23          **THE COURT:**  Okay.  6903 admitted.

24          (Trial Exhibit 6903 received in evidence)

25              (Exhibit published to jury.)

BY MR. DOOLEY:

Q.   If you look at -- have you seen this before, Mr. Yelland?

A.   Yes.

Q.   If you look at page 7 of the exhibit, it describes at the top, "Access now given to Chris Y and EY."  Is that "Chris Y" -- is that you?

A.   Sorry.  Which -- top of which -- oh, page 7, yeah.

Q.   Page 7 of the exhibit.

A.   When you say "Chris Y" is that me?  Yes.

Q.   Yes.  That's the question.

     And I should begin by asking, this is an Ernst & Young document, and on the front page, it references the UK statutory audit 2011; right?

A.   Yes.

Q.   So this is a document about the process of preparing the statutory accounts; correct?

A.   Yeah.  This is EY --

Q.   That's my only question.  Is it a document that references the preparation of the statutory accounts?

A.   Yes, it is.

Q.   Okay.  And if you look at page 7, it reads, "Breakthrough on investigation review as access now given to Chris Y and EY to review the revenue investigation, as well as perform a review of other financial-related matters."  And it says "information received to date."

1          And this is information that you were provided while you

2     were preparing your -- preparing the restatement; correct?

3     A.   It was information provided --

4     Q.   To you.  To Chris Y.

5     A.   Yeah.  Just let me check through the individual...

6          (Witness reviews document.)

7          Yes.

8     Q.   And that included reports prepared for presentation

9     purposes to the SEC and DOJ?

10    A.   Yes.

11    Q.   The PWC report with supporting exhibits and appendices, do

12    you see that?

13    A.   Yes.

14    Q.   And then two calls with Morgan Lewis to gain a high-level

15    understanding of the investigation process.  Do you see that?

16    A.   Yes.

17    Q.   And that's all information that you were provided in

18    connection with preparing the restatement; right?

19    A.   Well, in particular, EY were provided because, as I said,

20    as the auditors, they have a right to --

21    Q.   Mr. Yelland, that is not my question.  I'm sorry to

22    interrupt --

23          MR. REEVES:  I object.

24          MR. DOOLEY:  The question was it's information that

25    he's provided.

1          **MR. REEVES:** Let him finish his answer.  We object.

2          **THE COURT:** You may respond.  Go ahead.

3          **THE WITNESS:** So it's information that I and EY were

4   provided.  EY had a right to access this information.

5       It took quite a bit of discussions with HP as to the

6   rights of a UK auditor because HP's a U.S. business, and in the

7   U.S., individual entities don't file statutory accounts.

8       And so there were quite a few conversations with EY as to

9   what their rights as the auditors were and, you know, what

10  information could reasonably be shared with EY around the

11  investigations.

12  **BY MR. DOOLEY:**

13  **Q.**   Okay.  But my question, Mr. Yelland, is this is

14  information that was provided to you in connection with

15  preparing the restatement; isn't that right?

16  **A.**   So part of the information was provided to me with regard

17  to me preparing the restatement, but some of the information in

18  here wasn't important to me in terms of preparing the

19  restatement but it was important to EY for the purposes of

20  their audit.

21  **Q.**   Fair enough.

22      Your Honor, this would be a good --

23          **THE COURT:** I would like to go a few more minutes, if

24  I might.  I would like to resume at 1:15 today so the Court can

25  do some business.  If you could proceed for another five

1    minutes, ten minutes --

2            MR. DOOLEY:  Absolutely, Your Honor.

3            THE COURT:  Thank you.

4    BY MR. DOOLEY:

5    Q.    You filed the ASL restatement on January 31st, 2014;

6    right?

7    A.    I signed it then, yes.  And then shortly after, it's

8    filed.

9    Q.    Okay.  Before filing the restatement, do you recall

10   getting edits to the restatement from PWC?

11   A.    You say "edit to the restatement."  What do you mean?

12   Q.    I mean proposed line edits to the language of the

13   restatement.

14   A.    Do you mean line edits to the language in the account?

15   Q.    I do.  And why don't we just look at Exhibit 6952.

16         I would offer it into evidence.

17            THE COURT:  Pardon me?

18            MR. DOOLEY:  I offer it in.

19            MR. REEVES:  No objection to 6952.

20            THE COURT:  Admitted.

21         (Trial Exhibit 6952 received in evidence)

22                  (Exhibit published to jury.)

23   BY MR. DOOLEY:

24   Q.    Mr. Yelland, do you see that Exhibit 6952 is an email you

25   forwarded to Ms. Anderson, forwarding an email -- you're

1  forwarding an email from John Tracey at PWC.  Do you see that?

2  A.   Yes.

3  Q.   And the subject is "Comments on draft statutory accounts

4  for ACL and ASL"; correct?

5  A.   Yes.

6  Q.   And, first of all, who is John Tracey?  Is he a partner at

7  PWC?

8  A.   Yes.

9  Q.   And who is the "Jonathan" that is addressed here at

10  Proskauer.  Is that another HP lawyer?

11  A.   So, yes, he was with Proskauer.

12  Q.   And Mr. Tracey -- and this is on January 30th, 2014, so a

13  day before the restatement is filed; correct?  Or you signed

14  it?

15  A.   Yes.

16  Q.   And you're copied on this email?

17  A.   Yes.

18  Q.   And Mr. Tracey writes, "Dear Jonathan, further to our call

19  earlier this evening, here are our comments on the draft

20  statutory accounts.  Comments that may have relevance to the

21  future litigation are highlighted below."

22       Do you see that?

23  A.   Yes.

24  Q.   And then he summarizes "some of the more important issues

25  that we noted are."  Do you see that?

**YELLAND - CROSS / DOOLEY**

1  **A.**    Yes.

2  **Q.**    And he notes the absence of any disclosure regarding

3  hardware; right?

4  **A.**    Correct.  Autonomy Systems Limited didn't itself, as a

5  company, sell material amounts of hardware.

6  **Q.**    I'm just asking about what is in the email.  But -- okay.

7      He also notes that "the wording of the EY audit opinion

8  and the possible need to strengthen the wording regarding

9  management's investigation."

10      So he wants stronger language about management's

11  investigation; is that what it appears?

12  **A.**    Yes.

13  **Q.**    And then one of the important issues is the reference to

14  errors rather than misstatements.  Do you see that?

15  **A.**    Yes.  Because the accounting definition of "errors" and

16  "misstatements" is different to the legal definition of

17  "errors" and "misstatements" and so there was a lot of

18  discussion --

19  **Q.**    Mr. Yelland, again --

20          **THE COURT:**  Let him answer.

21          **THE WITNESS:**  So in accounting terms, the word "error"

22  can include both a -- an honest mistake and fraud.  But in

23  legal terms, as I understood it, the word "error" has a

24  somewhat different connotation in that you would normally

25  describe something as an error or a misstatement or a fraud.

1    So there was -- there was quite a few conversations about

2    well, what language should we use as accountants and -- and

3    whether legally they had different meanings than the accounting

4    meanings.

5    So, you know, this is the type of discussion we're having

6    in here.

7    BY MR. DOOLEY:

8    Q.    All right.  Well, let's -- so in his email, his cover

9    email, Mr. Tracey says, "Here are our comments.  Comments that

10   may have relevance to the future litigation are highlighted in

11   yellow."

12   And so let's go look at the attachment.  If we could look

13   at Exhibit 69 -- excuse me.  6952-B.  If we could look at that

14   in the native format.

15   Can we do that, Jeff?  Is that 6952-B?  That looks like A.

16   Great.  If we could scroll down and hopefully we'll see the

17   comments.  Jeff, can you enable it so we can see the line edit

18   comments.

19   Apologies, Your Honor.  If I might have one moment.

20        THE COURT:  Well, so maybe now is a good time to take

21   a break.

22        MR. DOOLEY:  It is.  I apologize for the technology --

23        THE COURT:  Ladies and gentlemen, we will be in recess

24   until 1:15.  Remember the admonition given to you:  Don't

25   discuss the case, allow anyone to discuss it with you, form or

 1    express any opinion.

 2              (Luncheon recess was taken at 12:05 p.m.)

 3    **Afternoon Session**                                    **1:14 p.m.**

 4        (Proceedings were heard out of the presence of the jury:)

 5        **THE COURT:**  Okay.  Let the record reflect that the

 6    jurors are absent but the parties are present.

 7        And my understanding is that the counsel for Hewlett

 8    Packard has a request or wants to make a statement.

 9        Go ahead.

10        **MS. RESLEY:**  Yes, Your Honor.  Susan Resley and Mike

11    Wong on behalf of HP.

12        We wanted to raise two documents that were admitted into

13    evidence, which were privileged, and we believe may have been

14    inadvertently produced maybe in the U.K. action with the

15    millions and millions and millions of documents; and those are

16    what were Exhibit Numbers 6937, and that is an April 22nd,

17    2013, e-mail from Robert Particelli of HP to a number of people

18    from both Morgan Lewis and PWC and Mr. Yelland --

19        **THE COURT:**  Let me just get it.

20        **MS. RESLEY:**  Sure.

21        **THE COURT:**  6937?

22        **MS. RESLEY:**  Correct.

23              (Pause in proceedings.)

24        **THE COURT:**  Are we looking at the same one?  This says

25    "Need to be early.  I need to be there by 1:30."

 1              **MS. RESLEY:**  That one we're probably less concerned

 2    with.  The one that we'd really prefer to discuss is 6952,

 3    which was the last document put into evidence.

 4              **THE COURT:**  Okay.  Let me look at that.

 5         Okay.  I mean, look, 6937 can -- I'll hear from the

 6    parties why it should come in.

 7              **MS. RESLEY:**  We're actually -- Your Honor, we're fine

 8    with that one.

 9              **THE COURT:**  Okay.

10              **MS. RESLEY:**  The main one --

11              **THE COURT:**  It doesn't constitute a waiver.

12         Okay.  So --

13              **MS. RESLEY:**  Yes.  And the main thing that we're

14    concerned with is 6952.

15              **THE COURT:**  Okay.  Let me look at it.

16              **MS. RESLEY:**  Please.

17                        (Pause in proceedings.)

18              **THE COURT:**  Okay.  This goes -- I'm a little -- okay.

19         The top goes from Mr. Yelland to Andrea -- I mean Antonia

20    Anderson, but the body --

21              **MS. RESLEY:**  Yes.

22              **THE COURT:**  -- is a document from John Tracey at

23    PricewaterhouseCoopers to J.E. Richman at Proskauer, Proskauer

24    being an attorney.

25              **MS. RESLEY:**  That's a law firm and they were one of

1   HP's outside counsel.

2       **MR. DOOLEY:**  Doing what in this case?

3       **THE COURT:**  So the content of the letter is -- the

4   content of the memo are all of these terms which we've had some

5   discussion about.

6       **MS. RESLEY:**  Well, and the point is that Mr. Tracey at

7   PWC is sending Mr. Richmond an e-mail saying that he is sending

8   comments.  Comments that may have relevance to the future

9   litigation are highlighted in yellow, and so that is clearly

10  privilege conversation.

11      What Mr. Yelland is doing is conveying that information to

12  Ms. Anderson, so he is conveying -- he is an HP employee

13  conveying to another.

14      **THE COURT:**  So HP's counsel was Proskauer?

15      **MS. RESLEY:**  Yes.  They were representing the Demand

16  Review Committee of HP.

17      **THE COURT:**  Why isn't it privilege?

18      **MR. DOOLEY:**  And why is the Demand Review Committee

19  commenting on a restatement?

20      **THE COURT:**  I don't know who's doing what.  Just tell

21  me why --

22      **MS. RESLEY:**  And in --

23      **THE COURT:**  Wait.  Wait.  Enough.  Excuse me.  I've

24  got a jury and I've got to move.

25      **MS. RESLEY:**  Yes.

1          THE COURT:  So it looks to me like it's a privilege

2   document --

3          MS. RESLEY:  Yes.

4          THE COURT:  -- at least insofar as the comments are

5   concerned.

6       Now, if you have a different view, why, that's what I want

7   to hear.

8          MR. DOOLEY:  Well, Your Honor, it's difficult to

9   understand the exact context in which the comments are provided

10  because I don't understand why --

11         THE COURT:  It says, "These may be relevant to

12  litigation."  They're in anticipation of litigation.

13         MS. RESLEY:  Absolutely, and there's in-house and

14  outside counsel in addition to Jon Richman.

15         THE COURT:  It looks to me like it's privileged.  Is

16  there some argument that it's not privileged?

17         MR. KEKER:  Yes, there is an argument.

18         THE COURT:  Go ahead, Mr. Keker.

19         MR. KEKER:  This witness -- this is from the people

20  doing the restatement to each other --

21         THE COURT:  Yeah.

22         MR. KEKER:  -- and they are providing information.

23  Part of our whole point is what they're doing is being pumped

24  and primed by the people who are doing the litigation, and it

25  is not privileged.  They are not --

PROCEEDINGS

1      **THE COURT:**  Wait.  Is there a crime fraud exception or

2  something?

3      **MR. KEKER:**  They are -- no, no.  They are not

4  communicating for the purposes of seeking legal advice or

5  anything else.

6      **THE COURT:**  This communication was intended to

7  address -- was legal advice.  I'm not saying -- I'm not saying

8  nothing comes in on these subjects and so forth.  As a matter

9  of fact, what I thought I would do is simply strike the yellow

10  comments, any testimony relating to the yellow comments, and

11  leave the body of the document in because that --

12      **MR. KEKER:**  Okay.  That's one way to do it, but we

13  object even to that because this is -- once there's an

14  attorney-client privilege communication and I send it to

15  somebody for purposes that have nothing to do with

16  attorney-client privilege, I send it to -- we're supposed to be

17  doing a good and honest restatement and I send it to you,

18  that's a waiver.  I mean, there is --

19      **THE COURT:**  That's not a waiver --

20      **MS. RESLEY:**  Not within HP.

21      **THE COURT:**  -- not if you send it to a person --

22  number one -- actually, I sort of get to go first even if

23  you're talking.

24      Number one, normally I don't disagree with you depending

25  on how broad it was.  In this case it appears that the

 1   communication was essentially given to the client about what

 2   the lawyer thought was anticipating the litigation.  So it's

 3   not okay -- I don't think a broadcast, quote, whatever that

 4   means, within the client is a waiver of the communication.

 5        So, anyway, what I'm going to do is strike the yellow

 6   portion and admonish the jury to disregard any testimony

 7   related to the yellow comments.  Okay?

 8             **MS. RESLEY:**  Thank you, Your Honor.

 9             **THE COURT:**  And I don't need to say why I'm doing it,

10   but that's what I'm going to do.

11        Okay.  Thank you.

12             **MR. WONG:**  Thank you.

13             **THE COURT:**  Bring in the jury.

14        (Proceedings were heard in the presence of the jury:)

15             **THE COURT:**  Please be seated.

16        Okay.  Let the record reflect all jurors are present, the

17   parties are present.

18        Ladies and gentlemen, there was a document that was

19   admitted into evidence.  It's Exhibit Number 6952.  I don't

20   know whether you kept track, but it was a memorandum that

21   Mr. Yelland forwarded to Ms. Anderson and attached to it was

22   the memo from Mr. Tracey to somebody at the Proskauer law firm.

23        I don't have to go through all the details, but just to

24   tell you there were two parts to the memorandum if you saw it

25   on the screen.  One was the typed regular part of the

1    memorandum, and then to the side were comments and they were

2    highlighted in yellow.  Okay.  I am striking that from the

3    exhibit.  It's not for your consideration.  As to any testimony

4    about those comments, I am striking them from the record and

5    admonishing you to disregard them.

6        Okay.  And we're leaving it at that.

7        Mr. Dooley, you may continue.

8        **MR. DOOLEY:**  Thank you, Your Honor.

9    **Q.**    Mr. Yelland, after the restatement was filed in January of

10   2014, you went on to work on Hewlett Packard's civil litigation

11   against Mr. Hussain and others in London; correct?

12   **A.**    I provided -- I and my team provided support to their

13   investigation when -- as and when requested.

14   **Q.**    And one of the things that you did was after the ASL

15   statements were filed, you performed an additional analysis

16   called the second rebasing exercise; is that right?

17   **A.**    Yeah.  It was begun before the accounts were filed but it

18   continued on through it.

19   **Q.**    And the purpose of that was to apply the same analysis

20   against quarterly consolidated results?

21   **A.**    Yes, similar to the analysis we saw earlier.

22   **Q.**    Okay.  And that analysis was used -- the second rebasing

23   exercise that you performed, the quarterly results analysis,

24   that was used to draft the schedules to the complaint filed in

25   England; right?

1   **A.**   Yes.  I understand that's what the legal team used it for.

2   **Q.**   Okay.  And so the jury understands, in the civil case in

3   England there's a legal complaint and attached to it are

4   various schedules setting out Hewlett Packard's view of the

5   correct or incorrect accounting; correct?

6        **MR. REEVES:**  Objection.  Relevance, Your Honor.

7        **THE COURT:**  Sustained.

8        **MR. DOOLEY:**  Your Honor, I'm trying to get -- I would

9   like the witness to explain the testimony that he gave a moment

10  ago so the jury can understand what the schedules and the

11  particulars are.

12       **THE COURT:**  Okay.  It's sustained because I think it

13  then goes into a whole nother subject matter of what are the

14  schedules, what is the civil litigation.

15       I don't object -- they have not objected and I wouldn't

16  sustain an objection to your pointing out, as you just did,

17  that he offered support for the civil litigation, but it stops

18  there.  It just shows you what he did as distinct from what it

19  was all about.

20       **MR. DOOLEY:**  Got it.  Okay.

21  **Q.**   And you've also testified earlier that you've met with the

22  lawyers from Travers Smith and Choate Hall who are working on

23  the civil case in England; correct?

24  **A.**   Yes.

25  **Q.**   The Autonomy Systems Limited's accounts, their financial

 1  accounts, were prepared under a different accounting standard

 2  from Autonomy Corporation Limited; correct?

 3  **A.**    Correct.

 4  **Q.**    Autonomy Systems Limited, the entity for which the

 5  restatement was prepared, their accounts are prepared under

 6  U.K. GAAP; correct?

 7  **A.**    Yes.

 8  **Q.**    Autonomy Corporation Limited, the group level, their

 9  accounts were prepared under IFRS; correct?

10  **A.**    Yes.

11  **Q.**    And the jury has heard about a number of rules in this

12  case.  Are you familiar with what's called IAS 18?

13  **A.**    Yes.

14  **Q.**    And IAS 18 is an IFRS rule for revenue recognition;

15  correct?

16  **A.**    Yes.

17  **Q.**    And the jury has heard about IFRS 8.  Are you familiar

18  with IFRS 8?

19  **A.**    Less so but to an extent.

20  **Q.**    And that's an IFRS rule that relates to segmental

21  reporting; correct?

22  **A.**    Yes.

23  **Q.**    And IAS 18 and IFRS 8, those are IFRS rules not U.K. GAAP

24  rules; correct?

25  **A.**    Yes.

1   **Q.**   And the U.S. restatement was also done under U.K. GAAP

2   rules; correct?

3   **A.**   Yes.

4   **Q.**   Looking at Exhibit 2445, which is in evidence, which is

5   the restatement --

6           **THE COURT:**  It will be on the -- Mr. Yelland, it will

7   be on the screen.  You'll see it in a minute.

8   **BY MR. DOOLEY:**

9   **Q.**   Ernst & Young began working on the restatement in

10  approximately November of 2012; correct?

11  **A.**   They really -- they started doing their planning, yes, but

12  they really started work in January.

13  **Q.**   Okay.  And the restatement was filed in January 2014?

14  **A.**   Yes.

15  **Q.**   So Ernst & Young spent 14 months working on it, more than

16  a year working on the restatement?

17  **A.**   More than a year, yes, I would say.

18  **Q.**   Do you know how much Ernst & Young was paid for that work?

19  **A.**   I can't recall.  I think it is in the financial

20  statements.

21  **Q.**   Is it more than £1 million?

22  **A.**   I can't recall the value.  It probably -- it probably was

23  more than £1 million.  It will say in the financial statements.

24  **Q.**   Okay.  And after all of that work, Ernst & Young

25  concluded -- and I'm looking at page 12 of Exhibit 245, the

YELLAND - CROSS / DOOLEY

1  disclaimer of opinion -- that (reading):

2          "Because of the significance of matters described in

3      the basis for disclaimer of opinion, we have not been able

4      to obtain sufficient appropriate audit evidence to provide

5      a basis for an audit opinion."

6      That was their disclaimer of opinion; correct,

7  Mr. Yelland?

8  A.    Yes.

9  Q.    And Ernst & Young stated (reading):

10          "We do not express an opinion on the financial

11      statements."

12      Correct?

13  A.    Yes.  And as I testified earlier, they gave reasons for

14  that above.

15  Q.    The restatement, Exhibit 2445, also adjusted -- or

16  adjusted ASL's revenue for reasons that had nothing to do with

17  any of the things that you've testified about here today -- the

18  revenue acceleration, hardware sales, and so forth -- correct?

19  A.    Could you clarify the question?  I think I understand what

20  you're asking, but I'm not 100 percent sure.

21  Q.    Oh, sure.  So to be specific, there were certain

22  accounting policy changes that were applied retroactively in

23  the restatement that had an effect on revenue; correct?

24  A.    Yes.

25  Q.    For example, retroactive application to a change in

**YELLAND - CROSS / DOOLEY**

1  accounting policy regarding R&D expenses?

2  **A.**   Yes, they affected ASL's revenue, not the group revenue.

3  **Q.**   And prior to HP's acquisition, the Autonomy group of

4  companies resold EMC and Dell hardware at a loss; correct?

5  **A.**   Yes, and Hitachi.

6  **Q.**   And Hitachi.

7       And some of that hardware was sold in the U.K.; right?

8  **A.**   Not a significant amount, no.

9  **Q.**   But some of it was; right?

10  **A.**   From memory, I think it was about $300,000 or that order

11  of magnitude, so that's why I say it's not significant to ASL's

12  accounts.

13  **Q.**   But most of the hardware sales were in the United States;

14  right?

15  **A.**   Yes.

16  **Q.**   After HP's acquisition, the Autonomy business unit

17  continued to resell Dell hardware at a loss; right?

18  **A.**   Yes.  The management at the time continued to do that.

19  **Q.**   Okay.  And in your role as CFO of the HP/Autonomy

20  business, you approved the sale of Dell hardware at a loss?

21  **A.**   No.

22  **Q.**   You didn't?  Did you approve the purchase of Dell hardware

23  for resale?

24  **A.**   I approved the payment against purchase orders that had

25  already been sent by the previous management.  I didn't approve

YELLAND - CROSS / DOOLEY

1  the purchasing.

2  **Q.**  But you approved the payment for the hardware?

3  **A.**  Yes.  I -- it had to be paid because legally we were

4  obliged to pay for what the previous management had bought.

5  **Q.**  And HP ultimately made a business decision to stop

6  reselling hardware at a loss.  You testified about that

7  earlier; right?

8  **A.**  I believe that decision was already made by the former

9  Autonomy management as I arrived.

10  **Q.**  Do you recall, Mr. Yelland, that when you restated ASL's

11  accounts, you concluded that it was proper to recognize revenue

12  from hardware sales on a gross basis?

13  **A.**  Yes.  When we looked at the restatement tables earlier, we

14  didn't restate for the recognition of the hardware revenue.

15  The question is whether it should have been separately

16  disclosed.

17  **Q.**  And I want to take that one step at a time.

18      So recognizing revenue on a gross basis means that ASL

19  properly recorded the full sale price as revenue even though

20  the sales were made at a loss; correct?

21  **A.**  The vast majority of the hardware sales were recorded in

22  the U.S. by Autonomy, Inc., and not by ASL.

23  **Q.**  But your conclusion that it was appropriate to recognize

24  on a gross basis means you recognize the full sale price of the

25  hardware even though it's being sold at a loss; correct?

YELLAND - CROSS / DOOLEY

1  **A.**   Well, the Autonomy group did when it had group accounts

2  and Autonomy, Inc., also did and that would also have impacted

3  HP's accounts.  It's not so relevant to ASL itself.

4  **Q.**   Okay.  I think you just testified to this a moment ago but

5  I want to be clear.  When you did the restatement, you did not

6  remove any hardware revenue from ASL's 2010 or 2011 accounts to

7  the extent it was there?

8  **A.**   Correct.  Although we've been talking about it, it wasn't

9  in ASL.  It was -- the vast majority of the hardware was in

10  Autonomy.

11  **Q.**   Right.  My point is, the hardware that was there, you

12  didn't remove it from ASL's accounts when you did the

13  restatement; did you?

14  **A.**   Correct.

15  **Q.**   And, likewise, when you did the restatement, you concluded

16  that ASL's existing practice of declaring that revenue is

17  earned from one operating segment was reasonable; correct?

18  **A.**   Well, for ASL that was reasonable because ASL did not make

19  significant hardware sales.

20  **Q.**   And the restatement does not separately disclose ASL's

21  revenue from hardware sales, does it?

22  **A.**   ASL's hardware sales were insignificant to the company, so

23  they were not required to be disclosed as a separate segment

24  because you only -- you only disclose separate segments if they

25  are a material part of the business.

YELLAND - CROSS / DOOLEY

1   **Q.**   I want to talk about the quarter-by-quarter chart that

2   Mr. Reeves walked through with you earlier today.

3       Do you recall that the prosecutors here reached out to you

4   back in December of 2015 while you were still working at HP

5   about preparing this chart?

6   **A.**   I don't recall the exact date, but they did reach out to

7   me, yes.

8   **Q.**   Okay.  Why don't you see if you can just look at what's

9   been marked as Exhibit 6923.

10  **A.**   (Witness examines document.)

11  **Q.**   It should be in Volume 2.

12          **THE COURT:**  What is the date?  He said he didn't

13  recall the date.  Do you have the date?

14          **MR. DOOLEY:**  The date is on the e-mail.

15          **THE COURT:**  Just tell me what it was.

16          **MR. DOOLEY:**  December 3rd.

17          **THE COURT:**  Okay.  Does that sound right to you?

18  December 3rd what?

19          **MR. DOOLEY:**  2015.

20          **THE COURT:**  Does that sound about the date that the

21  prosecutors reached out to you?

22          **THE WITNESS:**  (Witness examines document.)

23          **THE COURT:**  Mr. Yelland?

24          **THE WITNESS:**  It sounds reasonable.

25          **THE COURT:**  Okay.  So let's move from there.

1          **MR. DOOLEY:**  All right.

2   **Q.**   And do you recall that the prosecutors sent you a version

3   of a chart that Hewlett Packard's lawyers had prepared to look

4   at?

5   **A.**   Sorry.  Could you repeat the question?

6   **Q.**   I said do you recall that the prosecutors sent you a

7   version of a chart that Hewlett Packard's lawyers at

8   Morgan Lewis had prepared to look at as an example?

9   **A.**   I don't -- yes.  Yes, they did.

10  **Q.**   Okay.  Do you recall that the prosecutors suggested that

11  another example you could look at would be the schedules to the

12  particulars of claim in the civil case?

13  **A.**   That I could look at?  I don't specifically recall that.

14  **Q.**   Okay.  And then you had a number of meetings with the

15  prosecutors in January and March of 2016 to talk about this

16  chart.  Do you recall that?

17  **A.**   Yes.

18  **Q.**   And at the same time you were meeting with the prosecutors

19  about preparing this chart, you were also working with Hewlett

20  Packard's hired consultants at PricewaterhouseCoopers; right?

21  **A.**   I was working with PWC, yes.

22  **Q.**   And once you had completed a draft of the chart, you gave

23  it to HP's lawyers and they sent it on to the prosecutors;

24  right?

25  **A.**   Yes.

1    Q.   And then you get further instructions back and you do some

2    more work with PWC; right?

3    A.   Further instructions back from?

4    Q.   Further comments back on the chart.  After you sent them

5    the chart in the beginning of 2016, they came back with

6    comments and asked you to do some more work?

7    A.   Okay.  We're still talking about the charts with the

8    prosecutors?

9    Q.   Yes.

10   A.   Yes.

11   Q.   And then you did a two-day meeting with the prosecutors in

12   June of 2017 and you talked about the charts then; right?

13   A.   Yes.

14   Q.   And you made a bunch of changes based on what the

15   prosecutors told you at that two-day meeting; right?

16   A.   Yes.

17   Q.   And then you sent it off to HP's lawyers at Morgan Lewis

18   once you made the changes; right?

19   A.   Yes.

20   Q.   And at one point at least an HP lawyer edited your chart;

21   right?  Does that sound right?

22   A.   A HP lawyer?

23   Q.   A lawyer for HP at Morgan Lewis edited your chart.

24        MR. REEVES:  I object, Your Honor.  We've had

25   testimony that Morgan Lewis represented Mr. Yelland at the

 1    time.  So objection.  Mischaracterizes the evidence.

 2         **THE COURT:**  Well, I don't know.  I'm going to sustain

 3    the objection subject to an offer of proof.

 4        Okay.

 5         **MR. DOOLEY:**  Okay.  Well, can we look at Exhibit 6953,

 6    which is --

 7         **THE COURT:**  Okay.  6953.

 8         **MR. DOOLEY:**  It's an Excel spreadsheet.  It's a

 9    native.

10         **THE COURT:**  Okay.  Is there any objection?

11         **MR. REEVES:**  I don't have it.

12         **MR. DOOLEY:**  It's in native form.

13         **MR. REEVES:**  I don't know whether I have an objection.

14    I don't have it.

15         **THE COURT:**  Pardon me?

16         **MR. REEVES:**  I do not have the document.

17         **THE COURT:**  Well, there we go.  Could you please give

18    him the document?

19         **MR. DOOLEY:**  It's in native format, Your Honor, so it

20    needs to be -- it's an Excel spreadsheet so it needs to be

21    displayed on the screen.  I can describe for counsel --

22         **THE COURT:**  No, that's okay.  So we can display it on

23    the screen.  The jury doesn't have to see it at this point but

24    the parties do.

25        Okay.  Can you do that, Lashanda?

1          **THE CLERK:**  Yes.  One moment.

2                          (Pause in proceedings.)

3          **THE CLERK:**  Okay.  Can you see it?

4          **THE COURT:**  Okay.  I take it the jury is not seeing

5     it; right?

6          Okay.  The Government is.

7          **MR. DOOLEY:**  I'm not seeing it either, but --

8          **THE COURT:**  Well, go look at Mr. Reeves' copy.

9                          (Pause in proceedings.)

10         **MR. REEVES:**  I object, Your Honor.  I don't object to

11    questions about the creation of the charts but drafts of the

12    charts I object to.

13         **MR. DOOLEY:**  It's relevant, Your Honor, to show --

14         **THE COURT:**  Okay, fine.  On that basis objection,

15    overruled.  You may show it to the jury.

16         **THE CLERK:**  Admitted?

17         **MR. DOOLEY:**  Admitted.

18         **THE COURT:**  That's 6953?  Have I got the right number?

19         **MR. DOOLEY:**  Yes, Your Honor.

20         **THE COURT:**  Okay.  Admitted.

21         (Trial Exhibit 6953 received in evidence)

22    **BY MR. DOOLEY:**

23    **Q.**   Mr. Yelland, does this look like a draft of the chart that

24    we reviewed earlier today?

25    **A.**   Yes.

YELLAND - CROSS / DOOLEY

1   **Q.**   And if we can go up to the file, and do you see this is

2   last modified on November 17th, 2017?  Do you see that?

3   **A.**   (Witness examines document.)  Yes.

4   **Q.**   Okay.  And the author is you?

5   **A.**   Yes.

6   **Q.**   And the last modified is someone named Lauren Nicola

7   Wenner.  Do you see that?

8   **A.**   Yes.

9   **Q.**   All right.  Do you know who that is?

10  **A.**   No.

11  **Q.**   Do you know if that's a lawyer for HP?

12  **A.**   No.

13  **Q.**   That's all.  You can put it down.

14      Mr. Yelland --

15          **MR. REEVES:**  Your Honor --

16          **THE COURT:**  Yes, Mr. Reeves.

17          **MR. REEVES:**  -- I believe if the draft is in evidence,

18  it would --

19          **THE COURT:**  It is.

20          **MR. REEVES:**  -- seem that the summary should come in

21  evidence, too.  I don't know if you want to --

22          **THE COURT:**  That sounds right.  Any objection?

23          **MR. DOOLEY:**  I do have an objection, Your Honor.

24          **THE COURT:**  Well, how can we have the draft in

25  evidence and not the summary?

 1              MR. KEKER:  We'll withdraw it.

 2              MR. DOOLEY:  Fine.  We'll withdraw -- we'll withdraw

 3   the draft.

 4              THE COURT:  Oh, no, no, no.  I'm not going -- I'll

 5   deal with this outside the presence of the jury.

 6              MR. REEVES:  Thank you, Your Honor.

 7              THE COURT:  Okay.

 8   BY MR. DOOLEY:

 9   Q.   All right.  Let's put up what's been marked as

10   Exhibit 2749.  This is the demonstrative that you walked

11   through with Mr. Reeves earlier today.

12        And if we could go to the fourth page, I think, which

13   shows Q1 2009.

14        This is the chart that you prepared, Mr. Yelland, along

15   with others who worked with you?

16   A.   Yes.

17   Q.   And at the top it says "Adjusted Autonomy Group

18   Consolidated Revenue"; right?

19   A.   Yes.

20   Q.   And then there's a line at the bottom that says "Restated

21   Revenue"?

22   A.   Yes.

23   Q.   And just so we're very clear about this, the Autonomy

24   group revenue was never restated?  Those accounts were not, in

25   fact, restated; correct?

**YELLAND - CROSS / DOOLEY**

1    **A.**    At the point that Autonomy group was acquired by HP group,

2    Autonomy group was no longer required to file -- to prepare or

3    file financial statements.  So in effect there was -- we didn't

4    file 2011 group financial statements for Autonomy because by

5    the end of that period, it was part of HP.

6    **Q.**    That's a long way of saying no -- right? -- that the

7    Autonomy group consolidated accounts were not restated;

8    correct?

9    **A.**    So as we -- as we don't prepare the 2011 accounts, there's

10    no 2010 comparatives to restate.  So inevitably there's no

11    restatement because the group accounts aren't prepared.

12    **Q.**    So, again, the answer is no, there's no --

13            **THE COURT:**  Well, he's explaining.  You asked him "You

14    didn't file this," and he says, "No, because we're not required

15    to file it and, by the way, it's a restatement or it's --

16    somehow the entity doesn't go out of existence but it's not

17    reported the same way.  And so, yes, you're right, we didn't

18    file it," and so he explains it.

19            Now, the reason I'm giving witnesses latitude in

20    explaining, which I understand normally can be simply left to

21    the opposing counsel to ask the question why, is to enable the

22    jury as the testimony comes in to gather -- to have a context

23    and an explanation as to these statements because the Court

24    feels that it is essential in this case, which is so -- which

25    is an accounting case in many respects and not necessarily the

1    familiar subject of any of us, that they get evidence in the

2    context so that they can evaluate it properly.

3         So I'm just telling you, Counsel, because I've done this a

4    number of times and you come back and say, "Well, your answer

5    is yes.  Your answer is no."  That may be true -- that is true,

6    not even maybe, it is true -- but I'm allowing witnesses to

7    explain.  Okay?  And so be guided by that.  In other words, if

8    there is a question you're asking, understand that I'm going to

9    give the witness latitude to explain his answer.

10        Okay.  Thank you.  Go ahead.

11            MR. DOOLEY:  Thank you, Your Honor.

12   Q.  Mr. Yelland, so we discussed before the Autonomy group

13   level accounts, the Autonomy Corporation accounts, were

14   prepared under IFRS; right?

15   A.  Yes.

16   Q.  And you are not an expert on IFRS accounting, are you?

17   A.  No, but I make sure on my team they are.

18   Q.  Let's just look at Exhibit 6781, please.

19                      (Pause in proceedings.)

20            MR. DOOLEY:  Your Honor, we can move on actually.

21            THE COURT:  Okay.

22   BY MR. DOOLEY:

23   Q.  Mr. Yelland, your training was not under IFRS; right?

24   Your training was under U.K. GAAP?

25   A.  Correct.

**YELLAND - CROSS / DOOLEY**

1  **Q.**   And when you were at -- when you left Arthur Andersen and

2  you were teaching, you were teaching U.K. GAAP principles?

3  **A.**   Principally, yes.  There was a little bit of IFRS involved

4  but it was principally U.K. GAAP.

5  **Q.**   And then at the Rover Group, you worked under U.K. GAAP;

6  is that right?

7  **A.**   Yes.

8  **Q.**   And then at Compaq, that was -- you didn't use IFRS there

9  either, did you?

10  **A.**   No.  I had to understand a new GAAP to me, U.S. GAAP.

11  **Q.**   U.S. GAAP.  U.S. GAAP but not IFRS?

12  **A.**   Correct.

13  **Q.**   All right.  And then during your time at HP, you were

14  using U.S. GAAP and not IFRS; right?

15  **A.**   Correct.

16  **Q.**   Okay.  And just if we can call up 2749 again, the

17  demonstrative, and if we can look at page 4.

18       Why don't we move ahead, actually, to the next quarter.

19       There's an amount there, a line for hardware revenue;

20  right?

21  **A.**   Yes.

22  **Q.**   Okay.  But that's separate from the restated revenue;

23  right?

24  **A.**   Yes.

25  **Q.**   Separate from the restated line; right?

1    **A.**    Yes.

2    **Q.**    And that reflects the conclusion that the hardware revenue

3    was properly recognized as revenue; correct?

4    **A.**    It was properly recognized, yes, but it's also showing the

5    conclusion that it's not properly disclosed.

6         **MR. DOOLEY:**  Your Honor, I move to strike that.

7    That's nonresponsive and not an explanation for the --

8         **THE COURT:**  Wait.

9         **MR. REEVES:**  It is responsive.

10              (Pause in proceedings.)

11        **THE COURT:**  Overruled.

12   **BY MR. DOOLEY:**

13   **Q.**    Mr. Reeves asked you, Mr. Yelland, about a number of

14   adjustments to the -- a number of adjustments reflected in this

15   exhibit related to license sales.

16       All of the adjustments that are proposed here relate to

17   transactions that were originally booked by Autonomy's

18   management at the relevant time back in -- for example, back in

19   Q2 2009; correct?

20   **A.**    Yes.

21   **Q.**    And the transactions that appear to be adjusted in this

22   demonstrative exhibit were reviewed by Deloitte at the relevant

23   time; correct?

24   **A.**    I'm not really aware of what Deloitte did or didn't do.

25   They were the auditors of the company.

1   Q.   Okay.  Well, that leads me to my next question.  Have you

2   reviewed Deloitte's work papers with respect to the

3   transactions that are reflected in 2749?

4   A.   No, and I wouldn't have the right to do so.

5   Q.   Okay.  So you don't know whether each of --

6        THE COURT:  If he didn't review the papers, I don't

7   know whether you can ask him, and the papers are not in

8   evidence -- or maybe they are.  Are you referring to some paper

9   in evidence?

10       MR. DOOLEY:  Well, the --

11       THE COURT:  If you're not referring to a paper -- if

12  you're not referring to a paper in evidence and he didn't

13  review the paper, you can't ask him any questions about it.  If

14  it is in evidence, you can ask him some questions about it; or

15  if he reviewed it, you can ask some questions about it; but

16  absent that, you can't.

17       MR. DOOLEY:  Fair enough, Your Honor.  The work papers

18  are in evidence, but I'll move on.

19       THE COURT:  Well, if they're in evidence -- if they're

20  in evidence, you can ask him about it, if -- I'm not

21  foreclosing you from asking him about something that's in

22  evidence.  Just point it out to him whatever it is, and he can

23  see it and you can ask him questions about it.

24       MR. DOOLEY:  Thank you, Your Honor.

25  Q.   In any event, Mr. Yelland, you're aware, even though you

1  haven't reviewed the work papers, that Deloitte gave clean

2  audit opinions on Autonomy's quarterly and annual accounts for

3  the time period reflected in the demonstrative exhibit;

4  correct?

5  **A.**    Yes.

6  **Q.**    And what the demonstrative exhibit reflects is your

7  judgment of the correct accounting for these transactions as of

8  2018; correct?

9  **A.**    Yes, mine and my team's, but ultimately I'm responsible.

10  **Q.**    If we could go and look at the 27 -- put the demonstrative

11  back up, Jeff, if we could, 2749 for Q4 2009.

12      You were asked some questions about the Capax/Eli Lilly

13  deal.  Do you remember that, Mr. Yelland?

14  **A.**    Yes.

15  **Q.**    And I think you referred to it as a deal involving

16  acceleration of revenue?

17  **A.**    Yes.

18  **Q.**    You understood -- or you understand, Mr. Yelland, that in

19  Q4 2009 and following quarters, Autonomy recognized revenue on

20  sale to the reseller not on the ultimate sale to the end user;

21  correct?

22  **A.**    I understand, yes.

23  **Q.**    And you understand and you know that in this instance,

24  this transaction, Capax signed a reseller agreement that

25  provided that it owed Autonomy for the license that it bought

1  regardless of whether it could sell the license on; correct?

2  **A.**   I would disagree.

3  **Q.**   Do you know, Mr. Yelland, whether -- well, let me ask you.

4      Have you reviewed the transcripts of testimony in this

5  trial?

6  **A.**   No.

7  **Q.**   Do you know, Mr. Yelland, whether Deloitte at the relevant

8  time was aware that this was a transaction that was sold

9  directly from Autonomy to Eli Lilly?

10      **MR. REEVES:**  Objection.  Foundation.

11      **THE COURT:**  Sustained.

12      **MR. DOOLEY:**  I'm just asking if he does know,

13  Your Honor, but okay.

14  **Q.**   And, again, Mr. Yelland, your adjustment of the

15  Capax/Eli Lilly transaction, that reflects your judgment today

16  in 2018 about the correct accounting back in the fourth quarter

17  of 2009; correct?

18  **A.**   The restatement does, yes.

19  **Q.**   Looking at the first quarter of 2010 that you were asked

20  some questions about the MicroTech/Vatican Library deal.  Have

21  you ever spoken to Mr. Tony Jimenez, Mr. Yelland?

22  **A.**   I haven't, no.

23  **Q.**   So do you know one way or the other whether Mr. Jimenez

24  was excited about the opportunity of selling services to the

25  Vatican Library in connection with this deal?

YELLAND - CROSS / DOOLEY

1          **MR. REEVES:**  Objection, Your Honor.

2          **THE COURT:**  Sustained.

3                              (Pause in proceedings.)

4     BY MR. DOOLEY:

5     **Q.**   And you were asked some questions about the third -- the

6     FileTek transaction with respect to the Veterans Administration

7     in the third quarter of 2010.  You know that FileTek signed a

8     reseller agreement with Autonomy that provided that they were

9     able to sell the software on to a different end user if they

10    were not able to sell it to the Vatican -- I'm sorry -- the

11    Veterans Administration; right, Mr. Yelland?

12    **A.**   Yes.

13    **Q.**   And I think you acknowledged in your testimony that

14    FileTek paid Autonomy for this software that they purchased in

15    Q3 2010; right?

16    **A.**   Yes, shortly after Autonomy had paid them for software

17    that they had purchased from FileTek.

18    **Q.**   Mr. Yelland, I want to switch gears and show you an

19    exhibit marked as TX6794.  It's an e-mail with several

20    attachments that are in Excel format.

21    **A.**   (Witness examines document.)

22          **MR. REEVES:**  No objection, Your Honor.

23          **THE COURT:**  6794 admitted.

24        (Trial Exhibit 6794 received in evidence)

25    \\\

YELLAND - CROSS / DOOLEY

1    BY MR. DOOLEY:

2    Q.   Do you see, Mr. Yelland, this is an e-mail from Rachel

3    Haverfield to yourself attaching various Excel spreadsheets?

4    A.   (Witness examines document.)  Yes.

5    Q.   And I'd like to call your attention to -- there's -- one

6    of the spreadsheets -- do you see in one of the attachments

7    it's called "ERP Billings 2009 to November 16, 2011"?  Do you

8    see that?

9    A.   (Witness examines document.)

10   Q.   It won't be attached, but it's reflected in the e-mail,

11   the subject line of the e-mail, the first.

12   A.   Yeah.  I can see that the e-mail appears to attach the

13   spreadsheets, yeah.

14   Q.   Okay.  And ERP, what is ERP?

15   A.   That was one of the billing systems for Autonomy.

16   Q.   And the ERP system recorded transactions for Autonomy

17   businesses with the exception of MicroLink, Interwoven, Zantaz,

18   and Iron Mountain; is that right?  They had their own systems?

19   A.   I believe so.  That sounds right.

20   Q.   Okay.  And this keeps track of sales transactions;

21   correct?

22   A.   Yes.

23   Q.   If we could look at TX6794A, which is the native version

24   of this.

25        There's a lot here, but do you recognize this as a

1    spreadsheet reflecting the ERP billing?

2    A.    I've not seen it before.

3        (Witness examines document.)  But I don't have any reason

4    to doubt that it may be.

5    Q.    Okay.  And if we could look at the -- we're on the all

6    data and these rows, these are sales transactions recorded by

7    the Autonomy business units other than the four we mentioned?

8    Is that what's reflected on these rows?

9    A.    (Witness examines document.)  Well, I haven't seen this

10   spreadsheet before, but it's likely that it does.

11   Q.    Okay.  And if you -- Jeff, can we highlight one of the

12   columns to see how many rows there are here?

13       Do you see down at the bottom of the page, Mr. Yelland,

14   there's a count and it says 22,442 at the very bottom of the

15   screen?

16   A.    (Witness examines document.)  I see that, yes.

17   Q.    Does that appear to be the count for the number of rows

18   reflecting these transactions?  We could scroll down and count,

19   I suppose, but...

20   A.    (Witness examines document.)  Yes.  I mean, that's what I

21   expect a spreadsheet to show given that information.

22   Q.    Okay.  And looking at the information that's on this ERP

23   billing spreadsheet and the number of rows and the date,

24   Mr. Yelland, does Exhibit 6794A appear to show that between

25   2009 and November 16th, 2011, Autonomy entered into 22,440-plus

1  sales transactions?

2  **A.**  (Witness examines document.)  I'm not sure.  I think the

3  transactions on here may be all of the individual invoices.

4  You may have more than one invoice related to a customer order.

5  It could show credits as well and rebillings.  So I think it's

6  a volume of transactions.  It's not necessarily a volume of

7  actual sales made to customers.

8  **Q.**  And your point is there might be multiple invoices with

9  respect to a particular transaction?

10 **A.**  Yeah.  I just wanted to be clear.

11 **Q.**  Okay.  But you would agree that Exhibit 6794A reflects

12 approximately 22,440 transactions during the time period 2009

13 through November 16th, 2011?

14        **MR. REEVES:**  Objection.  Foundation.  It's in

15 evidence, Your Honor.

16        **THE COURT:**  Sustained.

17 **BY MR. DOOLEY:**

18 **Q.**  Let me direct your attention to Exhibit 6794C, which is a

19 second attachment.  It will pop up.

20        And I'll represent to you that this is the attachment with

21 the title "NIBS EAS Billing 2009-2011."  Do you recognize --

22 what is NIBS?

23 **A.**  It's another one of the billing systems.

24 **Q.**  And does this appear to be a record of the NIBS billing

25 system sales transactions in the NIBS billing system?

1    **A.**    Again, as with the last one, I've not seen it before.  It

2    looks like it likely is.  I'm willing to understand from the

3    e-mails that's probably what it is.  You're representing to me

4    that it is the one from the e-mail, so it would appear to be,

5    yes.

6    **Q.**    Okay.  And then can we -- Jeff, can you select a column so

7    we can see the count number?

8        And, again, do you see it says 1823 at the bottom?

9    **A.**    Yes.

10        **MR. REEVES:**  Objection.  Foundation.  It's in

11    evidence.

12        **THE COURT:**  Wait a minute.

13        **MR. REEVES:**  He's reading from the document that the

14    witness doesn't know anything about.

15        **THE COURT:**  What is your question about this document?

16    He doesn't know anything.

17        Is that correct?  Do you know anything about this

18    document?

19        **THE WITNESS:**  I've not seen it before.  I can see it's

20    attached to an e-mail I've received; but it's sent to me and

21    Antonia, and this is detail work that she would have done and I

22    was uninterested.

23        **THE COURT:**  And what would you like to ask him about

24    it?

25        **MR. DOOLEY:**  Your Honor, I'm just trying -- I'm

1  trying --

2            THE COURT:  Just tell me what your question is.

3            MR. DOOLEY:  The question is whether Exhibit 6794C --

4            THE COURT:  What I'm looking at right now?

5            MR. DOOLEY:  Yes.

6            THE COURT:  Okay.  About what?  Yes, go ahead.

7            MR. DOOLEY:  -- shows approximately 1823 transactions

8  in the NIBS billing system between 2009 and 2011.

9            THE COURT:  He can answer that.

10            THE WITNESS:  I believe it may well be, but I haven't

11  seen it before.  From the e-mail and how it's put together, it

12  most probably is.

13  BY MR. DOOLEY:

14  Q.   Okay.  Thank you.

15       And then one more of these to do, Mr. Yelland.  We'll do

16  Exhibit 6794D.

17       Do you know what the Softrax ledger system is?

18  A.   It's another billing system.

19  Q.   If we could call up that 6794D.  If we could look at --

20  there's a tab labeled "Revenue 2009 through Q2."

21       And, Jeff, could you highlight a column?

22       And same question, Mr. Yelland.  Does Exhibit 6794D appear

23  to show approximately 4,585 transactions in Softrax ledger

24  system from 2009 to Q2 2011?

25  A.   Yes.  Similar to my other answers, I haven't seen it

YELLAND - CROSS / DOOLEY

1    before.  It most probably is.

2              MR. DOOLEY:  Your Honor, may I have a moment?

3              THE COURT:  Sure.

4                       (Pause in proceedings.)

5    BY MR. DOOLEY:

6    Q.   Mr. Yelland, just a couple questions on the MicroLink

7    issue that you testified about on direct.

8         Your testimony was that MicroLink owed approximately

9    $23 million at the time of the acquisition; is that right?

10   A.   That's what the Autonomy ledger said, yes.

11   Q.   And about 6.9 million of that was with respect to a sale

12   of software from Autonomy to MicroLink for MicroLink's internal

13   use?

14   A.   Yes.

15   Q.   And that was the Introspect electronic discovery software?

16   A.   I believe so, yes.

17   Q.   And do you know if that amount that was owed was

18   subsequently reclassified as an intangible asset after the

19   acquisition?

20   A.   That was part of the balance that was moved into North

21   American Holdings and shown as an intangible asset.

22   Q.   Okay.  So it's correct to say that that 6.9 million that

23   was owed from MicroLink to Autonomy was reclassified as an

24   intangible asset and then moved into the Autonomy North

25   American Holdings accounts?

1    **A.**    It was moved into North American Holdings accounts and

2    classified as an intangible.

3    **Q.**    Okay.

4    **A.**    It's just a slightly different order of events.

5    **Q.**    Okay.  And I think you also testified that Autonomy kept

6    collecting payments in connection with some of the transactions

7    that were outstanding with MicroLink, although your testimony

8    was that they were paid by the end customers?

9    **A.**    I testified that there was I think 800K, around about a

10    million, of smaller invoices that I believe MicroLink

11    ultimately paid back to Autonomy, Inc., out of the 23 million.

12    There was a further approximately 6 million that wasn't paid by

13    MicroLink.  It was paid by other end users or other partners

14    who sold to end users and was received by Autonomy, Inc., who

15    didn't record those sales but instead applied those -- that

16    revenue and that cash to the MicroLink balance.  So it wasn't

17    paid by MicroLink.

18    **Q.**    Autonomy received 6.2 million from other customers and

19    applied that to the MicroLink account?

20    **A.**    Yes.  Yeah.

21         **MR. DOOLEY:**  Your Honor, the only other business at

22    this time is I would move in 6644 pursuant to the earlier

23    discussion.

24         **THE COURT:**  That's the -- sorry -- the attachment and

25    the --

1    **MR. DOOLEY:**  And the e-mail that we discussed on the

2    break.

3         **THE COURT:**  -- that we discussed.

4    Admitted.

5    (Trial Exhibit 6644 received in evidence)

6         **MR. DOOLEY:**  If I could have one moment, Your Honor.

7         **THE COURT:**  Of course.

8                    (Pause in proceedings.)

9         **MR. DOOLEY:**  Thank you, Mr. Yelland.  Nothing further

10   right now.

11                  <u>**REDIRECT EXAMINATION**</u>

12   BY MR. REEVES:

13   **Q.**   Three topics.  You were asked some questions about your

14   meeting with Deloitte in or around October 2012 and the agenda

15   that Deloitte had.  Do you recall that part of your

16   cross-examination?

17   **A.**   Yes.

18   **Q.**   I think you testified that the issues that you raised with

19   Deloitte concerned only ASL deals.  Do you recall that?

20   **A.**   It was principally -- yes, principally ASL deals.  I think

21   there were a couple of bad debts that were existing in other

22   companies but which were apparent in working with Deloitte.

23   **Q.**   Okay.  Why did you focus in the manner you've described

24   only on ASL deals with Deloitte in this time period,

25   Mr. Yelland?

**YELLAND - REDIRECT / REEVES**

1  **A.**   Because they were deals that, as they were done directly

2  by ASL with end customers, Deloitte in the U.K. were auditing

3  those specific deals directly; and I believed that the

4  accounting for those deals was wrong.  I still do.  And so in

5  engaging with Deloitte, we had to bring forward to them the

6  previous accounting for those deals was wrong.

7  **Q.**   Okay.  I think in your testimony on this topic in your

8  cross-examination you also said that you hadn't opened up with

9  Deloitte.  Do you remember using those words?

10  **A.**   Yes.

11  **Q.**   What did you mean by that?

12  **A.**   The rebasing exercise, you know, those preliminary

13  investigations, the beginning of the investigations also by the

14  Legal Department using PWC, et cetera, had shown that there

15  were wide-ranging issues; but it was still really very early

16  days to be exposing all of those developments to Deloitte and

17  they -- the rest of the matters were very broad across the

18  Autonomy group but principally in the U.S.

19      And I think HP as a group wanted to spend more time to

20  understand those properly and engage with Deloitte at the right

21  level, not U.K. to U.K. but really at a corporate level to

22  engage fully there.

23      So I just focused with Deloitte U.K. in the meantime on

24  the matters that related to ASL and its direct transactions

25  with end users.

1    **Q.**    In this time period, given the level of possible

2    accounting issues, were you being guarded in any way in the way

3    you were communicating with Deloitte in this October 2012 time

4    period?

5    **A.**    Yes.

6    **Q.**    You were asked some questions about U.K. GAAP and IFRS.

7    Do you recall those questions?

8    **A.**    Yes.

9    **Q.**    When you were restating the transaction for ASL using the

10   MicroLink/Vatican transaction as an example, did IFRS come into

11   play in your evaluation of that possible set of adjustments?

12   **A.**    When we were doing this statutory accounts?

13   **Q.**    Yes.

14   **A.**    Not when we were doing the statutory accounts, no.

15   **Q.**    Why not?

16   **A.**    Because the statutory accounts were prepared under U.K.

17   GAAP.

18   **Q.**    Did you ask yourself does the Vatican transaction, for

19   example, comply with IFRS?

20   **A.**    So at the time with the investigations being led by the

21   legal team or with PWC, they were considering those matters

22   and, yes, I was discussing that type of issue with PWC.    I

23   can't recall exactly which specific deal when, but over time

24   all of the deals.

25   **Q.**    So describe the interplay of the two accounting sets of

1    policies, U.K. GAAP and IFRS, as it related to the statutory

2    accounts for revenue recognition and what difference, if any,

3    the two accounting policies had in your evaluation of the

4    adjustments that you testified about.

5    **A.**    In the vast number of cases, they made no difference at

6    all because the issues were fundamental issues.

7    **Q.**    Okay.  And so explain, if you would, because you were

8    asked questions about it.  What do you mean by that?  Why

9    wouldn't they make a fundamental difference?

10   **A.**    Where we have an accelerated VAR deal and the reseller is

11   not required to pay for the debt in reality, despite what any

12   contract may say but in reality, if they're not required to pay

13   for the debt until such time as Autonomy has closed the final

14   deal with the end user and potentially routed the money through

15   the reseller or Autonomy has purchased something from the

16   reseller which doesn't have economic substance so as to give

17   the reseller the money to pay back, well, all -- all of the

18   different GAAPs really come to the same conclusion.  You

19   haven't made a proper sale.

20   **Q.**    Whether it's under U.K. GAAP or IFRS?

21   **A.**    You haven't earned anything until the true sale where

22   you're really expecting to be able to collect the cash and,

23   et cetera, and the customer's really taken ownership of the

24   asset.  That occurs on the final sale.

25   **Q.**    Last topic.  You were asked a series of questions about

1    changes in the accounting policies.  Do you recall that?

2    A.   Yes.

3    Q.   Did the retroactive changes in the accounting policies

4    have any impact on the summaries that you prepared and you've

5    testified about?

6    A.   No.  And when we saw the -- after we'd finished doing the

7    quarterly pages, when we looked at the overall pages that

8    showed the years, there was actually a row in there that had

9    change in accounting policies and that had zeros across that

10   row.  We didn't focus on it at the time.

11   Q.   It was actually a piece of the summary we didn't look at

12   today; is that correct?

13   A.   Correct.

14   Q.   But it said zero?

15   A.   Yes.

16          MR. REEVES:  Just a moment, please.

17                  (Pause in proceedings.)

18          MR. REEVES:  Thank you, Your Honor.  Nothing further.

19          THE COURT:  Anything further?

20          MR. DOOLEY:  Nothing further.

21          THE COURT:  Thank you very much.  You're excused,

22   Mr. Yelland.  Thank you.

23                  (Witness excused.)

24          THE COURT:  Maybe we'll take a recess now.  Well, what

25   do we have?  We have the agent I know, but do we have anything

**PROCEEDINGS**

1   else other than the agent?

2          **MR. FRENTZEN:**  We have two witnesses.  It may be best

3   to talk about it --

4          **THE COURT:**  Okay.  Best to talk.

5          **MR. FRENTZEN:**  -- if the Court wants to take a short

6   break.

7          **THE COURT:**  Best to talk not with you people, best to

8   talk with me.

9       So, ladies and gentlemen, let's take a recess until 20 to

10  3:00, 20 -- is it 20 to 2:00 or 20 to 3:00?  Fortunately it's

11  20 to 3:00.

12      Okay.  Remember the admonition given to you:  Don't

13  discuss the case, allow anyone to discuss it with you, form or

14  express any opinion.

15      (Proceedings were heard out of the presence of the jury:)

16          **THE COURT:**  Okay.  Let the record reflect all jurors

17  have retired.

18      Yes, who's left?

19          **MR. FRENTZEN:**  I just want to let the Court know where

20  we are.  So we've got the agent, Special Agent Alex Bryant, and

21  we have David Toms, who we expect to be maybe 20, 30 minutes.

22      I'm a little -- I'm concerned that direct and cross of

23  Agent Bryant is not going to occur today.  I'm warning the

24  Court that though we had a drop-dead at the end of the day, we

25  may go into the morning.

 1          **THE COURT:**  No, no.  If it's not, then I'll let you go

 2    tomorrow.  I mean, that's -- tomorrow morning.

 3          **MR. FRENTZEN:**  Right.

 4          **THE COURT:**  I want to get -- I mean, because we have

 5    an hour and 20 minutes.  How long is Mr. Toms going to take?

 6    You say half an hour?

 7          **MR. REEVES:**  About a half an hour.  We'd like to

 8    start --

 9          **THE COURT:**  You've not been great on predictions.  I

10    have you on the record when Mr. Yelland was going to take an

11    hour.  That's what you said.  You weren't under oath, but

12    that's what you said.

13          So I want a realistic idea, not a hope, not a wish.  I

14    want a realistic idea because I think you ought to start with

15    Mr. Toms.  I don't know if there's an objection to Mr. Toms or

16    not.  Have we dealt with that?

17          **MR. REEVES:**  I don't think there's any objection.

18    We'd like to start with Special Agent Bryant, though, because

19    if we were to run up against a deadline, we definitely --

20          **THE COURT:**  You're not going to run up against a

21    deadline.  Okay?

22          **MR. REEVES:**  Okay.

23          **THE COURT:**  I assume you can conclude with Mr. Toms,

24    and the agent you will conclude early tomorrow morning.

25          **MR. FRENTZEN:**  Yes, Your Honor.

1          THE COURT:  Isn't that right?

2          MR. REEVES:  Yes.

3          MR. FRENTZEN:  Yes, Your Honor.

4          THE COURT:  Okay.  All right.  So that's fine.  That's

5     okay.  You know, we knocked off early on the other day because

6     a juror was sick or something, and so that's fine.  That's

7     fine.  They're going to start their case tomorrow in any event,

8     and we'll get going.

9          MR. REEVES:  Okay.

10         THE COURT:  So as to these witnesses, however, I don't

11    want to get embroiled in an evidentiary dispute as to these

12    witnesses.  Is there anything that I have to deal with

13    Mr. Toms?

14         MR. KEKER:  Not Toms.

15         THE COURT:  Okay.

16         MR. KEKER:  But Bryant we have objections to some of

17    the exhibits.

18         MR. FRENTZEN:  I thought we discussed them *ad nauseam*.

19         THE COURT:  Well, no, we have discussed nothing

20    *ad nauseam*.

21         MR. KEKER:  The order says --

22         THE COURT:  I've never felt better.

23      So is there -- have you identified -- this is what I'd

24    like you to do, Mr. Keker:  I'd like you to sit down with

25    Mr. Frentzen and I'd like you -- I'd like you to just say,

1  "Here are the exhibits we object to."

2        MR. KEKER:  I'll give him a list.

3        THE COURT:  And have a little discussion.

4        MR. KEKER:  I'm not going to sit down with him, but

5  I'll give him a list.  That's fine.

6        THE COURT:  Give him a list.

7        MR. KEKER:  Right.

8        THE COURT:  You might also indicate why you are

9  objecting.

10        MR. KEKER:  Hearsay.

11        THE COURT:  Oh, okay.  That's fair enough.

12        MR. FRENTZEN:  I understand that.

13        THE COURT:  Okay.  Give him a list and then if there

14  are -- if they're unresolved, then I'll have to rule on them.

15        MR. FRENTZEN:  And I apologize.  I thought we were

16  back on the two summaries; so if we're not on that, then,

17  great, it's something new.

18        THE COURT:  Okay.  Now, as to what happened during the

19  course of this, I mean, Mr. Dooley introduced the draft to

20  which, properly so, the Government said, "Oh, the draft is in.

21  We might as well have the other in."

22        MR. KEKER:  We withdraw it, Your Honor.

23        THE COURT:  Okay.  And I think -- I'm going to allow

24  that.  I'm actually going to allow you to withdraw it because

25  you didn't have a full appreciation of the consequences of

**PROCEEDINGS**

1    offering it, and I will also -- I don't know what else --

2    whether I need to do anything.

3            **MR. FRENTZEN:**  Strike the testimony.

4            **MR. REEVES:**  Yes.

5            **THE COURT:**  I think I do have to strike the testimony.

6            **MR. DOOLEY:**  That's fine.

7            **THE COURT:**  Okay.  There wasn't much anyway.

8            **MR. FRENTZEN:**  No, but whatever was there, should be

9    stricken.

10           The only other thing was they offered the document that we

11   had argued about before, but they didn't ask any questions,

12   which is fine, but --

13           **THE COURT:**  They didn't.  I did notice that.

14           **MR. KEKER:**  Well, but --

15           **MR. FRENTZEN:**  So at -- excuse me -- at some point, if

16   it reemerges, which I have a feeling it will, the Court should

17   be instructed at that point.

18           **THE COURT:**  I do have to say something to the jury.

19   It hasn't been shown to the jury either.

20           **MR. FRENTZEN:**  Correct.  Whenever they --

21           **THE COURT:**  But it is in evidence subject to, in my

22   view, some connection with something.

23           **MR. FRENTZEN:**  Thank you, Your Honor.

24           **THE COURT:**  It's untethered hanging out there.

25           Okay.  We can all take a break.

1          **MR. REEVES:**  Thank you, Your Honor.

2          **MR. FRENTZEN:**  Thank you, Your Honor.

3          **MR. KEKER:**  I didn't understand the last thing you

4    said.  What do you mean untethered to something?  It is

5    untethered --

6          **THE COURT:**  Untethered to a witness.

7          **MR. KEKER:**  Okay.  Well, so what I guess is our --

8          **THE COURT:**  I guess that's a good point.  You are

9    entitled to bring in documents even if it's not tethered to

10   something; but I don't think you can get up and say, "Here are

11   10 documents we'd like in," even though they do come in.

12         **MR. KEKER:**  Well, we'll see with Agent Bryant.

13         **THE COURT:**  Yes.

14         **MR. KEKER:**  We did it with Mr. Yelland so that if they

15   wanted to ask questions of Mr. Yelland about the chart and so

16   on, that was fine.

17         **THE COURT:**  Actually, you're right.

18         **MR. KEKER:**  We're nice guys.

19         **THE COURT:**  Extremely nice.

20      I let it in for that very reason at that time to give the

21   Government the opportunity if they wanted to examine

22   Mr. Yelland about it.  They chose not to.  That was their

23   decision.

24         **MR. REEVES:**  Thank you, Your Honor.

25                  (Recess taken at 2:28 p.m.)

```
 1                    (Proceedings resumed at 2:40 p.m.)

 2          (Proceedings were heard out of presence of the jury:)

 3               THE CLERK:  Come to order.  Court is now in session.

 4               THE COURT:  Okay.  Bring in the jury.

 5          Before the jury comes back, turning to the Defense, you

 6     believe you will rest sometime next week.  Has that changed?

 7     Or the end of this week?

 8               MR. KEKER:  I think we will probably rest this week.

 9               THE COURT:  Okay.  I will be careful what I say to the

10     jury, but I want to give them some idea.

11               MR. KEKER:  What I was thinking was that if we rest

12     this week, we could argue Monday and that half day that you

13     have on Tuesday, if we can fit it all in.  We want to make sure

14     that it all is of a piece --

15               THE COURT:  That's not a bad idea.

16               MR. KEKER:  And then until 12:30 or 1:00 on Tuesday.

17     We can talk about it later.

18               THE COURT:  One thing I want to do to give some

19     assurance to the Defense, I don't want one side to have the day

20     at the end to argue.  In other words -- in other words, I think

21     the Government will open.  I don't know how long they're going

22     to be.  But then the Defense is going to start.  They're not

23     going to take the full day.  I don't know.  I'm looking at

24     them.  They're not agreeing with me, so I don't know where they

25     are on it.
```

1    But in any event, I will make sure that before -- before

2    the Government gives its rebuttal, the Defense has the

3    opportunity of addressing the jury in some manner for some

4    period of time, so you don't have -- so everybody doesn't sleep

5    on the two arguments and then the Government gets up and gives

6    its argument.

7        **MR. KEKER:**  I think it's just -- what we would like to

8    do is have fairly strict time limits that are equal --

9        **THE COURT:**  I can do that.  But I need to think about

10   it.  I need to hear from the parties and then think about it.

11       **MR. KEKER:**  Then we can figure out how to divide it

12   up.

13       **THE COURT:**  But I need to sort of talk to them about

14   it.  There is just no way I cannot go to this --

15       **MR. KEKER:**  That's fine.  I think --

16       **THE COURT:**  -- meeting on Tuesday.

17       **MR. KEKER:**  If we have five and a half hours or six

18   hours on Monday and another two or three hours -- if we can't

19   get this case argued in eight hours, four hours each --

20       **THE COURT:**  The only problem I have is that I've got

21   to then instruct them before.  I always instruct them before.

22   Maybe I should instruct them afterwards.  I don't care.  I

23   mean, that's one way of dealing with it.  The instructions

24   won't be that long, but we have to have our conference.  We've

25   got the rest of the week to figure out when to have our

**PROCEEDINGS**

 1   conference.

 2       Okay.  Thank you.

 3       **MR. KEKER:**  One thing that could affect us is we have

 4   a motion that we would like to talk about at the end of the day

 5   about admitting a couple of documents that would have been

 6   admitted had Sarin and Gersh been operating under different --

 7       **THE COURT:**  I'll address that.

 8       **MR. KEKER:**  So we don't have to call them back.

 9       **THE COURT:**  I'm not sure I would let them come back.

10   But that's another issue.  We will talk about that at the end

11   of the day.

12       **MR. KEKER:**  Okay.

13       **THE COURT:**  Okay.  Bring in the jury.

14       (Proceedings were heard in the presence of the jury:)

15       **THE COURT:**  Let the record reflect all parties are

16   present, the jury is present.

17       Go ahead, Mr. Reeves.

18       **MR. REEVES:**  Thank you, Your Honor.  At this time, the

19   United States calls Mr. David Toms.

20       **THE CLERK:**  Please rise to be sworn.  Please raise

21   your right hand.

22                           **<u>DAVID TOMS</u>**,

23   called as a witness for the Government, having been duly sworn,

24   testified as follows:

25       **THE WITNESS:**  I do.

1    **THE CLERK:**  Thank you.  Please be seated.

2        Please state your full name for the record and spell your

3    as last name.

4        **THE WITNESS:**  David Ian Toms, T-O-M-S.

5                        **DIRECT EXAMINATION**

6    BY MR. REEVES:

7    **Q.**   Good afternoon, Mr. Toms.  Where are you from?

8    **A.**   I am from England.  Just outside.

9    **Q.**   All right.  What do you do for a living?

10   **A.**   I'm a financial analyst for Numis Securities.

11   **Q.**   How long have you been a financial analyst for Numis

12   Securities?

13   **A.**   Since October 2005.

14   **Q.**   What is your educational background, please, before you

15   started to work at Numis?

16   **A.**   My original educational background is I studied

17   biochemistry at Cambridge University in England.

18   **Q.**   As an analyst at Numis, what kind of companies did you

19   cover?

20   **A.**   Predominantly technology companies and nearly all of them

21   software companies.

22   **Q.**   Are you familiar with a company known as Autonomy?

23   **A.**   I am, yes.

24   **Q.**   Did you cover Autonomy as an analyst at Numis?

25   **A.**   I did.

1    **Q.**    I would like to direct your attention, if I could, to the

2    time period 2009 to 2011 and talk about your coverage of

3    Autonomy in that time.

4        Do you have a recollection of the work that you did

5    relating to Autonomy?

6    **A.**    I do, yes.

7    **Q.**    Maybe at a high level you could describe your perspective

8    on Autonomy during those years, and then we'll go into some of

9    your reports.

10        What do you recall about some of the issues relating to

11    your coverage of Autonomy in the years 2009 through 2011?

12    **A.**    I think in terms of slightly broader background, I had

13    followed the stock since 2005 at Numis.  Structurally it was a

14    stock on which I was quite positive.  It formed a part of our

15    model portfolio of stocks that we thought were good long-term

16    investments for investors.

17        Specifically the period 2008, '9, '10, I was, at times --

18    at times a little more neutral or negative on the company

19    because in particular, I was concerned about the economic

20    backdrop.

21        We saw, as you may recall, 2008, '9, '10 was a pretty deep

22    recession and in addition there was some specifics at that time

23    around the complexities of trying to unpick the numbers from

24    acquisitions and some issues with the numbers that led me to

25    have questions that sometimes were answered and sometimes

**TOMS - DIRECT / REEVES**

1   weren't.

2   **Q.**   All right.  I would like to direct your attention, if I

3   could, to in or around April 2010, on or about April 21st,

4   2010, and Autonomy's first quarter 2010 earnings call.

5   **A.**   Okay.

6   **Q.**   Do you have a recollection of that?

7   **A.**   I do, yes.

8   **Q.**   And did you listen in and ask questions in the call?

9   **A.**   I did, yes.

10  **Q.**   Okay.  Even today, do you have a recollection of some of

11  the issues that arose in -- as it related to your coverage of

12  Autonomy in the earnings call on or around April 21, 2010?

13  **A.**   I do, yes.

14  **Q.**   What do you recall about that earnings call, please?

15  Withdrawn.

16      That was a call that involved Mr. Hussain and Dr. Lynch?

17  **A.**   That's correct.

18  **Q.**   Okay.  Go ahead.  What do you remember about that earnings

19  call, please.

20  **A.**   There was a particular feature in the financial statements

21  that period so it was -- the earnings call took place in April

22  2010.  The financial period was January, February, March 2010,

23  so the first quarter of the year.

24      The -- there was an unusual feature, the numbers that

25  period, which is there was $10 million worth of stock on the

1    balance sheet.  Seeing stock in software companies is quite

2    unusual.  Stock is something more associated with companies

3    that are selling physical items rather intangible things like

4    software.

5        So there was $10 million worth of stock which there was a

6    lot of questioning about on the call, including from me.

7    **Q.**   Why would $10 million of stock -- withdrawn.

8        As you use the word "stock," what would that mean for a

9    company like Autonomy?  What are you referring to?

10   **A.**   Well, initially it was slightly unclear, although what the

11   company explained on the call was that that related to hardware

12   that had been purchased for one of Autonomy's particular

13   products, a product line called Arcpliance, where the product

14   was sold as hardware and software combined.

15       As you're probably aware, software requires hardware to

16   run.  Computer software on its own is no use to anybody.  It

17   needs some kind of hardware to run on.  And customers

18   purchasing Autonomy software would need to run its own

19   hardware.

20       The Arcpliance product line had the software pre-installed

21   on the hardware and was sold as a bundled item with the

22   hardware and the software together.

23   **Q.**   That's what you were told?

24   **A.**   That's what we were told, yes.

25   **Q.**   By whom?

1  **A.**    By Mr. Hussain and Dr. Lynch.

2  **Q.**    All right.  Do you remember Mr. Hussain addressing this

3  $10 million in hardware stock during this earnings call?

4  **A.**    I do, yes.  He identified that the company had taken the

5  option to prepurchase some hardware at attractive prices for

6  use in -- with the Arcpliance product in sales going forward,

7  in particular in sales in the second quarter.

8  **Q.**    Why was that unusual?  Why did the $10 million of hardware

9  stock, as disclosed by Mr. Hussain -- why was that unusual to

10  you?

11  **A.**    The number seemed very large because typically with

12  high-end computer software, the software can be very

13  substantially more valuable than the hardware.  So for every

14  dollar spent on hardware, you might be spending two or three

15  dollars on software.

16      And, indeed, the company identified that as being the case

17  on this -- on this conference call, that the -- that the

18  majority of the revenue related to the software in an

19  Arcpliance sale.

20      So if that were the case, then with $10 million of

21  hardware, that would suggest you would be selling 20 or $30

22  million of software associated with that, which in the context

23  of the amount of software Autonomy was selling was a very large

24  proportion of its software.

25  **Q.**    In this time period is one of the things that you're

1  trying to do is to project future sales and potential future

2  growth by examining disclosures like the existence of

3  $10 million hardware stock?

4  **A.**   Yes.  As part of the role of an analyst, one of the things

5  that I'm trying to do is identify what I think earnings will be

6  in the future, what kind of growth rates I think the company

7  will deliver, and how sustainable the earnings are for the

8  business.

9       And to do that, you also need to know where you are

10  starting from, so what are the numbers for the quarter and then

11  take a view where those will go.  And something like the

12  hardware sales of this nature are the kind of thing I would

13  look at and question the sustainability of, can that be

14  repeated in future quarters or should I take that out of the

15  numbers and work from a lower baseline and grow from there.

16  **Q.**   As a result of your sort of focus on this issue, did you

17  ask questions during the question-and-answer period of the

18  earnings call in or around April 21st, 2010?

19  **A.**   I did, yes.

20  **Q.**   And do you recall asking questions to Dr. Lynch in that

21  time period and getting answers about this subject, about the

22  $10 million in hardware stock?

23  **A.**   Yes.  I mean, I asked a question to the management team

24  which was answered by Dr. Lynch which identified that the

25  hardware sales related purely to sales of a bundled product of

1  software and hardware together as this Arcpliance.

2  **Q.**   I'm sorry to interrupt you, but I prefer if you please

3  cast it as what was your question and what was the answer given

4  to you by Dr. Lynch, if you don't mind.

5  **A.**   Certainly, yes.  Can you remind me of the exhibit number,

6  please, and then I can --

7  **Q.**   Sure.  If it would help you, take a look, please, at what

8  is marked for identification as Exhibit 776.  This is a

9  transcript of the earnings call on or about April 21st, 2010 at

10  page 14.

11      Do you have 776?

12  **A.**   I have that.

13  **Q.**   Take a look at the bottom of page 14.  There appears to be

14  a question by you and an answer by Dr. Lynch.

15  **A.**   Yes.  So my question --

16  **Q.**   Does that refresh your recollection?

17  **A.**   It does refresh my recollection, thank you, yes.

18      So my question was -- do you want me to read it out or try

19  to summarize what I was asking?

20  **Q.**   I think the Court might prefer you to look at it and then

21  tell us your best recollection refreshed by the document.

22  **A.**   Okay.  What I was trying to find out was how Autonomy was

23  going to disclose this hardware revenue going forward because

24  if there was $10 million of stock on the balance sheet at the

25  end of Q1, stock is something that you haven't actually sold

1    yet.  So that means it's going to be sold in future quarters,

2    which means in future quarters, it would be in the revenue

3    line.

4         And I wanted to understand how it would come through to

5    the revenue line and whether the company would explicitly break

6    that number out for us.

7         And so I asked how it would be disclosed going forward.

8    **Q.**   And what was the answer that Dr. Lynch gave, if you

9    recall?

10   **A.**   The answer -- it wasn't so -- it was a response rather

11   than necessarily an answer.  It addressed a slightly different

12   issue, which was to tell me that this wasn't a pure hardware

13   sale.  This was only hardware being sold in the context of a

14   bundle of hardware and software together in an Arcpliance.

15        And in the context of the other answers he had given on

16   the call, that -- he had separately answered questions saying

17   that the majority of the revenue related to the software

18   component and also that this was anomalously high hardware

19   number in the quarter.

20        So the answer that he gave me was that this was not a pure

21   hardware sale; that Autonomy was not in the business of

22   reselling other people's hardware.  He used an analogy of a

23   company called Morse which at that point was a London company

24   that broadly resold other people's hardware.  That was its

25   business.  He said, "We're not in that business."

1 **Q.** As you understood it, was the import that there was

2 something anomalous about this $10 million in hardware?  What

3 did you mean by that word as you used it in your last answer?

4 **A.** Yes.  Well, the -- the overall response from the company

5 or from Dr. Lynch to that question and others was that the

6 hardware sales were only related to a product sale and that

7 this was an anomalous number.  I think at another point the

8 company had mentioned the normal sales would be a fraction of

9 the $10 million number.

10   So that number to me struck me as an anomalous number when

11 I saw it, and the company assured us it was, indeed, an

12 anomalous number.

13 **Q.** All right.  Good.

14   Let me direct your attention to what has been marked for

15 identification as Exhibit 778.  Is this an April 22nd, 2010

16 Numis report that you wrote, Mr. Toms?  Do you recognize this

17 document?

18 **A.** Yes, it is.  I recognize that.

19       **THE COURT:** Admitted.

20   (Government's Exhibit 778 received in evidence)

21          (Exhibit published to jury.)

22 **BY MR. REEVES:**

23 **Q.** This is a report that you wrote immediately following the

24 earnings call, is it not?

25 **A.** That's correct, yes.

TOMS - DIRECT / REEVES

1  Q.   All right.  And what is your position on the stock at this

2  point for Autonomy?

3  A.   I had an add recommendation, which is a positive

4  recommendation, for the stock.

5  Q.   As in add more stock or buy more stock?

6  A.   Add more stock.

7       Brief background, we have a five -- five-stage

8  recommendation system at my firm.  "Sell" is, as it says, we

9  think you should sell all the stock.  "Reduce" is negative but

10  less so, which is we think you should reduce your position.

11  "Hold" is slightly neither here nor there.  "Add" is a positive

12  recommendation, and "buy" is the most positive.

13  Q.   Okay.  So you're at add in this time period for Autonomy.

14       And let's just go through the portion of the top

15  paragraph.  You write, "Operating downgrades, EPS unchanged,

16  etc."

17       What is the overall point that you're making in this

18  report following the earnings announcement by Autonomy the

19  preceding day?  What's your only point that you're trying to

20  make?

21  A.   My overall point is a positive one which is that I think

22  that things are -- that things are going reasonably well for

23  the business.  That I'm -- I'm changing my numbers slightly

24  to -- I'm re-weighting my numbers slightly so I'm changing

25  exactly how they fall during the year, but the overall year

1    number has not changed.

2        And I also make some commentary in here about the extent

3    to which the business has become more seasonal; i.e., more

4    weighted towards the end of the year.

5    **Q.**   What does that mean "seasonality," "product seasonality"

6    as it applies to a company like Autonomy?  What does that mean?

7    **A.**   I mean, software companies are a little bit like car

8    dealerships in that they don't sell stuff evenly during the

9    year.  In particular, software companies tend to be weighted

10   towards certain periods of the year.

11       In Autonomy's case, it tended to have a very strong fourth

12   quarter in the year, the December quarter.

13       And the point I was making here is that the company

14   appeared a little more dependent upon the fourth quarter than

15   it usually was.

16   **Q.**   If we could highlight in the middle of the paragraph that

17   begins "particularly adjusting for hardware-related revenue."

18   Do you see that?

19   **A.**   I do, yes.

20   **Q.**   You write here, "Product seasonality," parentheses,

21   "particularly adjusting for hardware0related revenue, looks

22   extreme; i.e., FY09 levels, although management's upbeat

23   outlook supports a strong H2."

24       Is that second quarter or half quarter?  Half year?

25   **A.**   Second half of the year.

**TOMS - DIRECT / REEVES**

1  **Q.**  All right.  What is the point that you're making here,

2  especially as it relates to the highlighted portion of the

3  sentence, "particularly adjusting for hardware-related

4  revenue"?  What's your point?

5  **A.**  My point there is that because there was $10 million worth

6  of stock at the end of the first quarter, which I expected to

7  convert to revenue largely over the second quarter at this

8  point, if I recall, then that -- that is separate from the

9  normal business of Autonomy.  That this was an unusual thing

10  for Autonomy to do, an unusual chunk of revenue.

11      And so when trying to compare Autonomy to its history,

12  that I was -- I was ignoring that in the analysis.  I was

13  saying let's take out the hardware.  Let's just look at what

14  the sales of Autonomy's own stuff are doing, not what the sales

15  of other people's stuff are doing in the business.  And then

16  look at the seasonality on that basis.

17      Otherwise, Q2 would have this extra $10 million worth of

18  revenue in it which would distort all my calculations because I

19  wasn't aware that such a revenue number would fall in any other

20  year.

21  **Q.**  Is that in part because the 10 million in appliance may be

22  anomalous in the way you described before?  Is that why you're

23  adjusting for it in this way?

24  **A.**  Indeed, yes.  I wouldn't -- I wasn't comfortable that that

25  would be a repeatable number.

**TOMS - DIRECT / REEVES**

1  **Q.**  Let's go to page 3 of Exhibit 778, please.  And if we

2  could highlight the last paragraph above the graph.  Super.

3      This portion of your report, Mr. Toms -- can you see it?

4  **A.**  Yes.

5  **Q.**  Okay.  This portion of your report says -- makes the

6  following point, quote, "The overall result is the profile

7  shown below for 2004 through 2010E."  Is that for "expected"?

8  **A.**  Estimate.

9  **Q.**  Estimated.  Okay.

10     "Note that within this analysis, we have stripped out the

11  potential one-off distortion of the hardware component of the

12  Arcpliance sales estimated at $10 million of," quote, "product,"

13  end quote, "revenue in Q2."

14     Do you see that?

15  **A.**  I do.

16  **Q.**  Are you making the same point there with regard to

17  stripping out this 10 million in appliance sales?

18  **A.**  Yes.

19  **Q.**  Okay.  All right.  Let's move forward, if we could, to

20  year end.  On or around the 1st of February, 2010, did you --

21  withdrawn.

22     On or about the 1st of February 2011, at or about that

23  time, did you listen to and evaluate the year-end financial

24  reporting for Autonomy as part of your work as an analyst at

25  Numis?

1    **A.**    I did, yes.

2    **Q.**    I would like to show you what has been marked for

3    identification as Exhibit 1535, please.  Is this another one of

4    your reports dated February 1, 2011 about Autonomy?  1535.

5            **MS. LITTLE:**  It's already in evidence.

6            **MR. REEVES:**  Excellent.  Okay.

7                    (Exhibit published to jury.)

8            **THE WITNESS:**  Yes.  That's mine.

9    BY MR. REEVES:

10   **Q.**    Do you recognize that?  All right.

11        And now this is approximately nine months or so after the

12   period we've just been looking at; correct?

13   **A.**    Correct.

14   **Q.**    All right.  So by February, 2011, what -- what is your

15   evaluation with regard to Autonomy at that point?

16   **A.**    I was -- I was more negative on the stock at that point,

17   hence the reduced recommendation.

18   **Q.**    And what led you to that conclusion or that recommendation

19   to your clients?

20   **A.**    I felt that the growth overall in the business was slowing

21   and also that the explanation for why the growth was slowing,

22   that there was a transition from one particular way of selling

23   the software to another way, was a little hard to reconcile

24   with the numbers because we were being told that less product

25   was being sold and more Cloud was being sold, but actually

1    within the numbers, there wasn't an acceleration in the Cloud

2    growth.

3         So it seemed a little hard to understand, hence the title

4    "Slow Dark Clouds," why the Cloud revenue wasn't accelerating

5    more if there was a substitution from product revenue.

6    **Q.**   All right.  You write -- withdrawn.

7         Let's, if we could, please, highlight the second full

8    sentence.

9         Thank you very much, Ms. Margen.  Okay.

10        Let's just read down through the highlighted portion.  You

11   write, "Q4 revenue (244 million) looks in line with consensus,

12   Numis (241 million) but is well behind management expectations,

13   (265 million).  Profits are also light," and you give some

14   detail about why.

15        Continuing, "Furthermore, revenue is potentially flattered

16   by, 1, hardware sales, Q4 gross margins, 86.5 percent

17   consistent with Q3/09 and Q2/10, which saw elevated hardware,

18   and, 2, a substantial spike in R&D capitalization (8 million

19   benefit versus 4 million run rate.)"

20        What is the point that you are making there, Mr. Toms?

21   **A.**   My point was that I was trying to discern how good the

22   revenue quality was because with -- revenue growth is an

23   important metric for me.  One of the things that also matters

24   is how you have got the revenue growth and getting revenue

25   growth through selling more of your own high margin product is,

1  from my perspective as an analyst, a good thing.  Getting

2  revenue growth through selling more of somebody else's product

3  at a low margin is not a good thing, as a sort of broad

4  simplification.

5      The point I was making here is that although the revenue

6  looked like it was okay, the gross margin was lower, which

7  suggested that it was possible the revenue included a hardware

8  component.

9  **Q.**  So let's go carefully through that point.  What was it

10  about the reported gross margin being lower that, your word,

11  potentially meant that there were hardware sales?  What did you

12  mean by that?

13  **A.**  Well, hardware -- software, when it's sold, because it's a

14  company's own product, it's own intellectual property, has a

15  very high margin.  Once you have built the software there is

16  not much cost involved in selling it.  So the gross margin on

17  software is very high.  It can be 90, 95, even 98 percent.

18      So for every dollar of software you sell, there is almost

19  no direct cost associated with that software at that point.

20  **Q.**  That would keep the margin very high, the gross margin

21  very high?

22  **A.**  Yes.

23  **Q.**  Go on.

24  **A.**  However, hardware, since Autonomy didn't manufacture its

25  own hardware, was going to be purchased from somebody else,

1   which means that when you sell a hundred dollars of hardware,

2   you have to spend maybe $90, $95, $80, but some decent sum of

3   money buying the hardware from somebody else.

4        So the gross margin on the hardware is going to be very

5   much lower.  It might only be 15 or 20 percent that you make on

6   the hardware.

7        So if your overall gross margin looks unusually low, then

8   it was a potential warning flag to me that there had been more

9   hardware sold in the quarter than was normal.

10  Q.   Is that an inference that you're drawing from simply the

11  reduction in the amount of the gross margin as reported by

12  Autonomy?

13  A.   Correct, yes.  It was an inference.

14  Q.   So that's you being an analyst reading the numbers and

15  trying to, what, think and analyze behind them as to what they

16  may mean?

17  A.   Correct, yes.

18  Q.   And you write that "A possible explanation for the

19  reduction in gross margin is potentially flattered or the

20  revenue is potentially flattered by hardware sales."  Do you

21  see that?

22  A.   Yes.

23  Q.   Is that an inference that you're drawing or is that

24  something that Autonomy told you had actually happened?

25  A.   It's an inference, in particular use of the word

1    "potentially" because I was speculating about this.  I was

2    trying to work out why a number might have moved in the way it

3    moved.

4    Q.    Had Autonomy at any point through this point in time told

5    you about substantial hardware sales besides the one that we

6    went through in the first quarter, the 10 million in stock?

7    A.    No.  To the contrary, it had identified at that time that

8    that was an unusual number.

9    Q.    All right.  And you write down below -- if we drop down a

10    little bit to the second bullet point and highlight that,

11    please.  Let's just highlight the bolded portion.  The whole

12    thing is fine, too.

13        You write "IDOL product benefits from hardware," question

14    mark.

15        What does that mean?

16    A.    The -- the question mark means that I'm asking the

17    question, really.  Does IDOL product benefit from hardware?  If

18    I had known it as a fact, I would have stated "IDOL product

19    benefits from hardware," with a full stop rather than a

20    question mark.

21    Q.    So it's very much a question?

22    A.    Yes.

23    Q.    Through this point in time, through the year-end reporting

24    by Autonomy in or around early February, 2011, at or about the

25    time you're writing this note, did you have any idea that

1   Autonomy had sold hardware acquired from other hardware

2   manufacturers that was not an appliance that was devoid of

3   software in 2010 in an amount that approximated $99 million?

4   **A.**   No.

5   **Q.**   Okay.  If that happened, would that have been relevant to

6   you in your analysis of Autonomy?

7   **A.**   Yes.

8   **Q.**   Why would that be relevant?

9   **A.**   Because the -- the margin attached to hardware is very

10  much lower.  The hardware sales -- selling somebody else's

11  product is very different from selling your own product.  So

12  what I was interested in at Autonomy was how well was their own

13  product, their own valuable intellectual property doing.  Was

14  that being sold -- were they selling more of that each year or

15  less of that each year.

16       And my analysis, based on the information available to me

17  at the time, was that Autonomy was selling more of its own

18  software each year, and that was in the face of a market

19  backdrop that was very, very tough.  Again, switching back to

20  '08, '9, '10, it was a horrible recession in every industry,

21  but in particular, it was a big recession in the software

22  industry.

23  **Q.**   What effect did the 2008 recession have on most other tech

24  stocks that you followed?

25  **A.**   In 2008-2009 period, most of the software companies I

1  looked at showed significant revenue declines, certainly in

2  their software license sales and their product sales.

3  Q.   And was Autonomy's performance different from the other

4  tech companies you were following in any way in this period?

5  A.   Yes.  Autonomy was a standout strong performer through the

6  downturn.  It continued to grow in an environment where many of

7  its peers showed significant declines.

8  Q.   All right.  Everyone else was going down, but Autonomy was

9  doing okay based on what you could see based on its performance

10 as disclosed to you?

11 A.   Correct.

12 Q.   If it were the case that in 2009 Autonomy had resold

13 hardware in an amount approximating $53 million, that, again,

14 is not an appliance, it's not Arcpliance, and it's devoid of

15 Autonomy software, and you look at that amount in comparison

16 with in 2010 the next year, $99 million of sales of hardware of

17 that amount, if you -- did you know those facts, if they were

18 true?

19 A.   I did not, no.

20 Q.   Okay.  I want to -- my question is about that growth

21 pattern or that 53 million in 2009 to 99 million in 2010.

22 Would that be relevant to you in any way in your assessment of

23 Autonomy as a -- as a growth stock with high margin products?

24 A.   Yes.  I mean, from -- from recollection, my -- the product

25 revenue in 2009 was about $230 million and the product revenue

1    in 2010 was about $250 million.  So it grew by about $20

2    million year on year, ignoring currency and other factors.

3          What you've just told me is that of the 20 million of

4    growth, 50 million was explained by selling more hardware.  As

5    I mentioned earlier, I personally wouldn't view hardware as a

6    particularly valuable thing for Autonomy to be doing.  Hardware

7    resell companies don't get good ratings from investors.

8          So what you're telling me is that if I take out the

9    hardware component, then Autonomy's product revenue, rather

10   than growing year on year, shrank quite considerably year on

11   year, and that would mean Autonomy was performing consistent

12   with other software companies.

13   **Q.**   And if that's the case, what effect as an analyst would

14   that have on -- on Autonomy's stock if it was affected by the

15   recession and the way other tech companies were not growing in

16   the way that you've described -- what would be the effect on

17   Autonomy's stock in this 2010, early 2011 time period?

18   **A.**   It would have been significantly negative.

19          (Government counsel confer off the record.)

20              **MR. REEVES:**  No further questions.

21              **THE COURT:**  Cross.

22              **MS. LITTLE:**  May I proceed, Your Honor?

23              **THE COURT:**  Oh, please, yes.  Thank you.

24   \\\

25   \\\

<u>CROSS-EXAMINATION</u>

**BY MS. LITTLE:**

**Q.** Good afternoon, members of the jury.

Good afternoon, Mr. Toms?

**A.** Good afternoon.

**Q.** My name is Jan Little, and I'm one of Sushovan Hussain

attorneys.

You covered Autonomy from at least 2008 until 2011; right?

**A.** From 2005 to 2011, yes.

**Q.** Okay.  And you've written a number of notes and reports

about Autonomy?

**A.** Correct.  142.

**Q.** 142.  My goodness.

And during the time you covered Autonomy, sometimes you

gave it a reduced rating; right?

**A.** That's correct.

**Q.** Sometimes a hold rating?

**A.** Correct.

**Q.** Sometimes an add rating?

**A.** Correct.

**Q.** And since -- Autonomy was acquired in 2012; right?  Or

2011.  Excuse me.

**A.** 2011.

**Q.** In the years since you were covering Autonomy -- well

specifically, starting in about 2015, you've met with the

1    prosecutors and the FBI in this case a number of times; right?

2    **A.**    Correct.

3    **Q.**    Twice they came to visit you in London?

4    **A.**    Correct.

5    **Q.**    And you've had a couple of phone call, video conferences

6    with them?

7    **A.**    No video conferences.

8    **Q.**    No video conference, but a couple of phone calls?

9    **A.**    I think I've had one phone call and I've had a meeting

10    here as well, in addition to the ones you mentioned.

11    **Q.**    I'm sorry?

12    **A.**    I had a meeting in Oakland as well, in addition to the

13    ones you mentioned.

14    **Q.**    A meeting in Oakland.  Was that last night or a different

15    meeting?

16    **A.**    That was a different meeting.

17    **Q.**    And you also met with them last night?

18    **A.**    Correct.

19    **Q.**    You're a UK citizen; right?

20    **A.**    Correct.

21    **Q.**    So you -- the Government doesn't have the power to compel

22    you to come here.  You're here voluntarily; right?

23    **A.**    I was subpoenaed to be here.

24    **Q.**    Okay.  You've been following this trial, haven't you?

25    **A.**    I have.

1  Q.   You've been reading the court filings that you can get

2  online?

3  A.   Correct.

4  Q.   There is a system called PACER where you pay a fee and you

5  can read the pleadings and see what's happening here?

6  A.   Yes.  You can see some of what's happening, yes.

7  Q.   You can see, for example, what witnesses are testifying?

8  A.   Yes.

9  Q.   And are you aware that some of your colleagues in the

10  analyst community -- Mr. Morland and Mr. Khan and Mr. Geall --

11  have all testified.

12  A.   I was aware about Geall and Khan.  I wasn't aware about

13  Morland.  I was aware that Morland was likely to testify but

14  not that he had testified.

15  Q.   Have you learned from any source the substance of those

16  witnesses' testimony?

17  A.   No.

18  Q.   Okay.  Did you read the newspaper article that was

19  published after Mr. Khan testified?

20  A.   No.

21  Q.   Let's talk about hardware.  You understood -- I'm going to

22  focus your attention on Q3 of 2009, which is a little bit

23  earlier than the period Mr. Reeves asked you about.

24       You understood that Autonomy had sold some hardware in Q3

25  of 2009; right?

1  **A.**   I -- I inferred that, yes.

2  **Q.**   You inferred it.  You looked at public documents and you

3  infer things from the public things that you read; right?

4  **A.**   Correct.

5  **Q.**   Or in the case of the Q3/09, I think what happened was

6  there was an analyst call in 2010 where Mr. Morland was asking

7  a question about hardware sales and Dr. Lynch said something

8  like, "Well, you're assuming there were no sales in prior

9  quarters"?

10  **A.**   Correct.

11  **Q.**   Do you recall that?

12       And so from that, you deduced "oh, there were hardware

13  sales in prior quarters"; right?

14  **A.**   There may have been hardware sales in prior quarters,

15  correct.

16  **Q.**   May have been.  Okay.

17       Then you testified that you also saw this $10 million of

18  hardware stock in Q1 of 2010 and you inferred from that that

19  there were some hardware sales; right?

20  **A.**   Correct.

21  **Q.**   And then if you would take a look, sir, at Exhibit 774,

22  which is in the black binder there, this is a note that you

23  wrote in April of 2010.

24       And I would move its admission, Your Honor.

25       **THE COURT:**  774?

1          **MS. LITTLE:**  Uh-huh.

2          **THE COURT:**  Admitted.

3          (Trial Exhibit 774 received in evidence)

4               (Exhibit published to jury.)

5    **BY MS. LITTLE:**

6    **Q.**    If we can put it up on the screen.  Now I need to find it.

7    It's in the white binder, actually, but it's up on the screen.

8          Is this, sir, a note you wrote on April 21st, 2010?

9    **A.**    Yes.  That looks like it.

10   **Q.**    And this is a note that you wrote right before the

11   telephone call, the analyst call, that Mr. Reeves was asking

12   you about; right?

13         Actually, let's look at page 4.  It will be easier to see.

14         Jeff, if we can have page 4.

15         Up at the top the date is April 21st, 2010.  Do you see

16   that?

17   **A.**    Yep.  I see that.

18   **Q.**    On the left-hand side, it has your name, David Toms?

19   **A.**    Yes.  That's correct.

20   **Q.**    Okay.  So this is a report you wrote on April 21st which

21   is the same day as that analyst call that we've been talking

22   about?

23   **A.**    Correct.

24   **Q.**    And looking in the first paragraph, about the middle of

25   the first paragraph, you talk about recognizing that there was

1  a surprising level of potential reselling revenue.  Do you see

2  that?

3  **A.**    Correct.

4  **Q.**    And you're talking about this hardware stock here that

5  we've been talking about?

6  **A.**    Correct.

7  **Q.**    And then in the one, two -- third bullet, bottom of the

8  third bullet, again you're talking about the 10 million of

9  stock purchase and you say, "This latter point is something we

10  will look to understand on the analyst call later."

11         That's the analyst call we've been talking about; right?

12  **A.**    Correct.

13  **Q.**    And you say, "We remain unclear why Autonomy's potentially

14  booking material reselling revenue."  Do you see that?

15  **A.**    Yes.

16  **Q.**    And, again, that's a reference to this hardware, the

17  hardware you've been talking about?

18  **A.**    Correct, yes.

19  **Q.**    And you say that's something you will ask about on the

20  call and, in fact, you did ask about it on the call; right?

21  **A.**    Correct.

22  **Q.**    And then you also published the note that we talked about

23  concerning Q4/10 when you said revenue was potentially

24  flattered by hardware sales; right?

25  **A.**    Yes.

**TOMS - CROSS / LITTLE**

1  Q.   So someone looking at your reports would see that at least

2  you deduced or inferred from public information that Autonomy

3  had some hardware sales; right?

4  A.   Inferred that it was a possibility.

5  Q.   Possibility.  And if someone were interested in finding

6  out more about Autonomy's revenue, that could give them a clue

7  to ask more questions; right?

8  A.   Yes.

9  Q.   And are you aware that other analysts published notes

10  stating that they thought Autonomy revenue also included some

11  hardware?

12  A.   I'm not aware of any specific notes that were published.

13  Q.   Okay.  They're in evidence so I won't burden you with

14  them.

15      Do you recall giving an interview to the *Guardian* about

16  Autonomy in the latter part of 2012?

17  A.   I do, yes.

18  Q.   That was right after HP announced that it was taking a

19  writedown of its investment in Autonomy?

20  A.   Correct.

21  Q.   At that time, you told the newspaper that your

22  relationship with Dr. Lynch had been somewhat fractious over

23  the years?

24  A.   Yes, that's correct.

25  Q.   Fractious means not too happy?

1  **A.**   At times, yes, correct.

2  **Q.**   And you told the newspaper that you thought Autonomy had

3  pushed the envelope on some things?

4  **A.**   Correct.

5  **Q.**   But you didn't think anyone at Autonomy had done anything

6  fraudulent; right?  That's what you told them?

7  **A.**   Correct.

8  **Q.**   You said at that time "I think HP has probably got this

9  one wrong"?

10  **A.**   Correct.

11          **MS. LITTLE:**  Nothing further.

12          **THE COURT:**  Thank you.

13      Anything further?

14          **MR. REEVES:**  Could I have just one second, please.

15          (Government counsel confer off the record.)

16          **MR. REEVES:**  Thank you, Your Honor.  No.  No further

17  questions.

18          **THE COURT:**  Thank you, Mr. Toms.  Thank you for

19  coming.  You're excused.

20      Call your next witness?

21      If you want to stand up, ladies and gentlemen.  Get a

22  little stretch before we  ...

23          **MR. FRENTZEN:**  Your Honor, the Government calls

24  Special Agent Alexandra Bryant.

25  \\\

BRYANT - DIRECT / FRENTZEN

1                          **ALEXANDRA BRYANT**,

2  called as a witness for the Government, having been duly sworn,

3  testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please be seated.

6         Please state your full name for the record and spell your

7  last name.

8              **THE WITNESS:**  Alexandra Elizabeth Bryant, B-R-Y-A-N-T.

9              **MR. FRENTZEN:**  Proceed, Your Honor?

10             **THE COURT:**  Yes.

11                     **DIRECT EXAMINATION**

12  BY MR. FRENTZEN:

13  **Q.**   Good afternoon, Special Agent Bryant.

14  **A.**   Good afternoon.

15  **Q.**   Can you tell us what you do for a living?

16  **A.**   I'm an agent with the FBI here in San Francisco.

17  **Q.**   How long have you been with the FBI?

18  **A.**   A little over a year.

19  **Q.**   And what's your current assignment?

20  **A.**   I'm assigned to a white collar squad in San Francisco

21  since about August of this year -- or 2017.

22  **Q.**   Can you take us back and tell us a little bit about your

23  education, please.

24  **A.**   Yes.  I have a Bachelor's in statistics and economics from

25  the University of Chicago.  And then for five and a half years

BRYANT - DIRECT / FRENTZEN

1    after that, I worked at a financial firm in Chicago.  It was a

2    private asset management firm called Grosvenor Capital

3    Management.  We invested in hedge funds, private equity and

4    real state, and then I decided to switch careers.

5    **Q.**    In your time with the FBI, have you largely been wrapped

6    up working on this case?

7    **A.**    Yes.  I was assigned to be the case agent while this case

8    went to trial.  The original investigating agents have gone on

9    to other opportunities.

10   **Q.**    All right.  And in the course of the investigation, have

11   you tried to familiarize yourself with the facts around this

12   investigation?

13   **A.**    Yes.  I've been part of many of the trial preparations

14   with a number of the witnesses and obviously heavily involved

15   with a lot of the documents we've seen.

16   **Q.**    What I'd like to do is to take you to a few documents and

17   take you through a couple of different areas.

18        One area I'd like to start with is Mr. Hussain's

19   compensation.  Did you look into that area?

20   **A.**    Yes, I did.

21   **Q.**    And in terms of Mr. Hussain's compensation, can you give

22   us some idea of the types of documents that were analyzed?

23   **A.**    Yes.  So Autonomy's annual financial reports include

24   disclosures about management's essentially salary payments and

25   options.  We also have Mr. Hussain's pay stubs over 2009 to

1    2011 and some options information from HP.

2    **Q.**    You mean like stock options information?

3    **A.**    Yes.

4         **MR. FRENTZEN:**    And, Your Honor, I think -- well, let

5    me ask a couple of follow-up questions.

6    **Q.**    In terms of the overall -- all the different areas that

7    you looked into, would you consider that the documents are --

8    in order to reach a picture of Mr. Hussain's compensation, that

9    they are voluminous and cannot conveniently be read in court?

10   **A.**    Yes.

11   **Q.**    Were the originals -- in other words, the documents that

12   you utilized to be able to reach the summary conclusions --

13   were those documents business records?

14   **A.**    Yes.

15   **Q.**    And were those documents available to both sides?

16   **A.**    Yes.

17   **Q.**    All right.

18        And with that, Your Honor, I'd seek to -- may I have one

19   moment?    I'll just approach and do it this way.

20        Special Agent Bryant, if you could, could you take a look

21   at -- let's start with Exhibit 2633.    Do you have that in front

22   of you?

23   **A.**    Yes.

24   **Q.**    And if you could -- I'm not going to offer these into

25   evidence, Your Honor.

1     But, Special Agent Bryant, could you just describe for us

2  what's 2633?

3  **A.**    These are the pay stubs for Mr. Hussain from 2009 to 2011.

4  **Q.**    And do you have in front of you a file with a document

5  marked as Exhibit 2645?

6  **A.**    Yes.

7  **Q.**    Okay.

8     And I'm not going to offer this as well, Your Honor.

9     But Special Agent Bryant, 2645, was that a native file?

10 **A.**    Yes.    It was a spreadsheet with stock option information

11 for Autonomy employees.

12 **Q.**    And then you also made reference to annual reports,

13 those -- 2009-2010, so those are in evidence?

14 **A.**    Yes.

15 **Q.**    And if you could, now, could you take a look at Exhibit

16 3040.

17 **A.**    Yes.

18 **Q.**    And is 3040 the summary prepared from -- and I should add,

19 did you also take a look at bank records of Mr. Hussain?

20 **A.**    Yes.

21 **Q.**    Okay.    Which we're not going to offer, Your Honor.

22     But is 3040 a summary of the information that you reviewed

23 in those other locations?

24 **A.**    Yes.

25         **THE COURT:**    Admitted.

1          **MR. FRENTZEN:**  Thank you, Your Honor.

2          (Trial Exhibit 3040 received in evidence)

3          **MR. FRENTZEN:**  If we could bring up 3040.

4          **MR. KEKER:**  I think this is the wrong one.  This is

5     gross proceeds.

6          **THE COURT:**  Would you discuss it with Mr. Keker,

7     Mr. Frentzen.

8          **MR. FRENTZEN:**  Maybe you could ask Ms. Little.  This

9     is the one we talked about.  Maybe I can confer, Your Honor.

10          **THE COURT:**  Yes.  Go show them what you're doing here.

11          (Mr. Frentzen and Defense counsel confer off the record.)

12          **MR. FRENTZEN:**  May I have one moment, Your Honor?  I

13     apologize.  May I have a moment with the agent?

14          **THE COURT:**  Sure.

15          (Mr. Frentzen and Agent Bryant confer off the record.)

16          (Mr. Frentzen and defense counsel confer off the record.)

17          **MR. FRENTZEN:**  Sorry, Your Honor.  They had an old

18     version.  If we could bring up 3040.

19                    (Exhibit published to jury.)

20     BY MR. FRENTZEN:

21     **Q.**    All right.  Special Agent Bryant, if you could, just take

22     us through this summary.  What are we looking at here?

23     **A.**    So this is our calculation of Mr. Hussain's compensation

24     from 2009 until October 31st, 2011, and we broke it out by the

25     different parts of his compensation.

**BRYANT - DIRECT / FRENTZEN**

1  Q.    Okay.  And so, for example -- so this is the three years

2  at issue?

3  A.    Yes.

4  Q.    Okay.

5         Can we blow this up a little.  I'm just going to kind of

6  move across.  That's a little better.

7         All right.  So the first column here, Special Agent

8  Bryant, what is that?

9  A.    That's Mr. Hussain's gross annualized salary for each

10  year.

11  Q.    All right.  And this is in British pounds?

12  A.    Yes.

13  Q.    Okay.  And what is the next column, Column B?

14  A.    Those are his benefits which were described in the annual

15  report as a car service as well as private healthcare.

16  Q.    And then Column C is what?

17  A.    An annual bonus he received.

18  Q.    It says "prior year bonus."  What is meant by that?

19  A.    So for example in 2009, £270,000, that was paid out for

20  his work done in 2008, but it entered his bank account in 2009.

21  Q.    And Column D, what is that?

22  A.    So that's what Autonomy would have matched, his, like,

23  retirement contributions.

24  Q.    All right.  The next column talks about gross proceeds

25  from exercised options.  What does that mean?

BRYANT - DIRECT / FRENTZEN

1  **A.**    So Mr. Hussain had a number of options with Autonomy.  He

2  would exercise those options at a strike price, which we will

3  get into in the next column, but that's just the total value of

4  those options, excluding the strike price.  So they totaled to

5  about £13 million.

6  **Q.**    Okay.  And the next column over and -- what is that?

7  **A.**    So we essentially added the previous columns and converted

8  them into U.S. dollar based on the average exchange rate for

9  the year.  Again, this is his gross proceeds from exercising

10  his options, so they do not yet include the price of the -- the

11  strike price, how much it cost for him to exercise those

12  options.

13  **Q.**    So what do you mean by that?

14  **A.**    So essentially for him to exercise the options, he has

15  to -- they're at a certain strike price so it might be $2.  If

16  the stock is worth $20, the total cost of exercising that

17  option or the amount he actually gains is 18 because the strike

18  price was $2.

19  **Q.**    So this column here that's converted into dollars would be

20  as if he got everything from the exercising of the options?

21  **A.**    Yes.

22  **Q.**    And that's not how it really works?

23  **A.**    Yes.

24  **Q.**    Okay.  So moving on -- but the total figure there, is that

25  approximately 24 million?

BRYANT - DIRECT / FRENTZEN

1    **A.**    Yes.

2    **Q.**    Now, in this year here, 2011, in terms of the exercised

3    options, that's much larger than the two prior years.  Do you

4    know what that's attributable to?

5    **A.**    Yes.  When HP acquired Autonomy, they essentially bought

6    all of Mr. Hussain's options.

7    **Q.**    So that includes, in other words, this -- the 2011 year

8    includes not just exercising options normally, but also the

9    purchase by Hewlett-Packard of Autonomy?

10   **A.**    Yes.

11   **Q.**    Okay.  All right.  And then let's go on.

12        The -- does it then list gain on the sale of exercised

13   options?

14   **A.**    Yes.  So, again, that is now taking into account the

15   strike price of his options, so this would have been the amount

16   that he actually received into his bank account.

17   **Q.**    Okay.  So then is there -- the next calculation, total

18   gross annual compensation in pounds?

19   **A.**    Yes.  So we're taking his salary, benefits, bonus, pension

20   and the gain on sale of his options.

21   **Q.**    And did you then convert that into U.S. dollars?

22   **A.**    Yes.

23   **Q.**    And that's that column right there?

24   **A.**    Yes.  It's approximately $15.9 million.

25   **Q.**    That's a combining of the three years?

BRYANT - DIRECT / FRENTZEN

1   **A.**   Yes.

2   **Q.**   Can you give us the three years:  2009, 2010, 2011?

3   **A.**   Yes.  He made approximately $2.8 million in 2009;

4   $2.8 million in 2010; and $10.2 million in 2011.

5   **Q.**   All right.  And then you have the -- an approximate

6   exchange rate?

7   **A.**   Yes.

8   **Q.**   Great.

9        I would like to move now, Special Agent Bryant, to going

10  through some emails.

11       Have you reviewed emails -- email communications involving

12  the defendant, Mr. Hussain?

13  **A.**   Yes.

14  **Q.**   I'd like to start with the topic of hardware.

15       Special Agent Bryant, did you review emails involving

16  Mr. Hussain that related to hardware and sales of hardware?

17  **A.**   Yes.

18  **Q.**   And you've got in front of you Exhibits 121 -- well, let's

19  just go through.

20       You can take a look 121 and see if you recognize what that

21  is?

22  **A.**   Yes.  It's an email from Mr. Hussain to Peter Menell.

23           **MR. FRENTZEN:**  Your Honor, I would offer 12 --

24           **THE COURT:**  Admitted.

25           **MR. FRENTZEN:**  Thank you.

1              (Trial Exhibit 121 received in evidence)

2                   (Exhibit published to jury.)

3          **MR. FRENTZEN:**  Great.  Thanks.

4    **Q.**   Okay.  Can we scroll down briefly just to show -- all

5    right.

6          So there is an email here.  What's the date of the

7    original email?

8    **A.**   June 30th, 2009.

9    **Q.**   And from who?

10   **A.**   Peter Menell to Sushovan Hussain.

11   **Q.**   All right.  If we can scroll down and get -- was there

12   then a response from Mr. Hussain?

13   **A.**   Yes.

14   **Q.**   Same date?

15   **A.**   Yes.

16   **Q.**   And what was Mr. Hussain telling Mr. Menell?

17   **A.**   "In regards to MS," which over the course of this

18   investigation I take to mean Morgan Stanley, "we are looking to

19   supply the Morgan Stanley hardware from the EMC hardware that

20   we bought.  Talk to Sullivan.  We have ten minutes."

21   **Q.**   And the time, June 30, 2009, is there a time listed there?

22   **A.**   Yes.  4:25 p.m.

23   **Q.**   Skip a couple of things and move to Exhibit 1301.  Do you

24   have Exhibit 1301 in front of you, Special Agent Bryant?

25   **A.**   Yes, I do.

1    **MR. FRENTZEN:**  I would offer 1301, Your Honor.

2    **THE COURT:**  Admitted.

3    **MR. KEKER:**  Okay.

4    (Trial Exhibit 1301 received in evidence)

5    (Exhibit published to jury.)

6    BY MR. FRENTZEN:

7    **Q.**  Could we go to the bottom.  There we go.

8    Does this appear to be an email from Mr. Hussain?

9    **A.**  Yes.

10   **Q.**  And what's the date on this email?

11   **A.**  December 18, 2010.

12   **Q.**  And who is it to?

13   **A.**  It's to Mr. Scott, Ms. Prentis, Stouffer Egan, Steve

14   Chamberlain, Jim Krakoski.

15   **Q.**  What is it related to?

16   **A.**  An "all hands call today."

17   **Q.**  And if we could, do you see the portion that I've just

18   circled on the screen?

19   **A.**  Yes.

20   **Q.**  What's that a reference to or what does it say?  Sorry.

21   **A.**  "Joel -- speak to Reagan."  I believe, again, this is in

22   regards to Reagan Smith.

23   **MR. KEKER:**  I object, Your Honor, to her believing

24   things if she didn't have firsthand knowledge.  The jury can

25   understand this as well as she can.

1          THE COURT:  You have to lay a foundation.  Objection

2    sustained.

3    BY MR. FRENTZEN:

4    Q.    Are you aware of an individual by the name of Reagan

5    Smith?

6    A.    Yes.

7    Q.    And where did Reagan Smith work?

8    A.    Bank of America.

9    Q.    Can we go to the next page.  Scroll back up to it.

10         In terms of the email that's here, Special Agent Bryant,

11   do you see whether or not Mr. Hussain has written a message

12   here?

13   A.    Yes, he has.

14   Q.    Okay.  And in here, he's indicated "there is absolutely no

15   deal in 2011 in the same form."  Do you see that?

16   A.    Yes.

17   Q.    Moves on to accounting view and discusses the auditors?

18   A.    Yes.

19   Q.    If we can now go back up to the first page.  Go to the

20   top.  Great.  Thank you.

21         Is there then an email from Mr. Hussain?

22   A.    Yes.  To Mr. Lynch.  It says, "Please see accounting

23   reasons.  Does it pass your smell test."

24   Q.    And Mr. Lynch's response in terms of the first line?

25   A.    "I would avoid using words auditor and audit."

 1           MR. FRENTZEN:  One moment, Your Honor.

 2      (Pause in proceedings.)

 3 BY MR. FRENTZEN:

 4 Q.   Could we go to -- Special Agent Bryant, can you take a

 5 quick look at Exhibit 529, please.

 6 A.   I do not have that one in front of me.

 7 Q.   Is 529 in evidence?  If so, I'll skip it.

 8           THE CLERK:  Yes.

 9           THE COURT:  No, it's not -- wait, maybe it is.  It's

10 in evidence.

11           MR. FRENTZEN:  Thank you, Your Honor.  I don't need to

12 spend time on that.

13 Q.   I would like to show you some documents, some emails,

14 Special Agent Bryant, related to Capax.

15      Can you please take a look at Exhibit 62 and see if you

16 recognize what that is.

17 A.   It's an email from Steve Chamberlain with a copy to

18 Mr. Hussain.

19           THE COURT:  Admitted.

20      (Trial Exhibit 62 received in evidence)

21           (Exhibit published to jury.)

22 BY MR. FRENTZEN:

23 Q.   Can we go to the original email.  Do you see -- sorry.

24 Can you go back down.

25      What's the date of this, Special Agent Bryant?

**BRYANT - DIRECT / FRENTZEN**

1  **A.**   May 27th, 2009.

2  **Q.**   And the subject?

3  **A.**   MicroLink and Capax EDD services invoices.

4  **Q.**   All right.  And what is indicated is attached to this?

5  **A.**   Purchase orders from MicroLink and Capax.

6  **Q.**   Is there then a discussion about sign-off, if you will?

7  **A.**   Yes.

8  **Q.**   Can we now go to the top of this document, please.  And do

9  you see that this has been forwarded from -- or by

10  Mr. Chamberlain?

11  **A.**   Yes.

12  **Q.**   What's the date?

13  **A.**   May 27th, 2009.

14  **Q.**   All right.  And is Mr. Hussain a recipient of this email?

15  **A.**   Yes.

16  **Q.**   And what is Mr. Chamberlain relating?  What's he saying?

17  **A.**   You just want me to read it?

18  **Q.**   Sure?

19  **A.**   "These relate to services for EDD provided to Zantaz.

20  Given the amounts, the purchase order should have been approved

21  by both MRL and SH and also had the approval of Richard Eads.

22  Please confirm.  We then need someone from operations to

23  confirm that the service has been provided and the customer is

24  happy.  Given amounts this must be Mike Sullivan as CEO of

25  Zantaz."

1    Q.    All right.  Can you take a look at Exhibit 63, please.

2               THE COURT:  Admitted.

3               MR. FRENTZEN:  Thank you, Your Honor.

4               (Trial Exhibit 63 received in evidence)

5                     (Exhibit published to jury.)

6    BY MR. FRENTZEN:

7    Q.    If we could go to the very top part.  Great.

8          Special Agent Bryant, what's the date on this email?

9    A.    Again, May 27th, 2009.  It's from Mr. Chamberlain replying

10   to the same email to the same individuals.

11   Q.    Mr. Hussain was a recipient on this?

12   A.    Yes.

13   Q.    And Mr. Chamberlain -- what is he saying in this

14   particular email?

15   A.    He goes on to continue "also need to note on the invoice

16   who end customer was and confirm that we have billed them and

17   been paid before we make payments."

18   Q.    Okay.  And this is in relation to what?

19   A.    Again, MicroLink and Capax EDD services invoices.

20   Q.    Would you take a look -- do you have Exhibit -- sorry --

21   310 in front of you.

22   A.    That may be in evidence.

23               MR. FRENTZEN:  Oh, is 310 in?

24               THE COURT:  Yes.

25               MR. FRENTZEN:  I apologize.  Okay.  We can skip it.

1              MR. KEKER:  Your Honor, we can stipulate to a lot of

2     these.  We do not have objections to them.

3              THE COURT:  Go ahead.

4              MR. FRENTZEN:  I mean, that's nice now, but -- okay.

5     Q.    Could we take a look at Exhibit 349, Special Agent Bryant.

6     A.    Yes.

7     Q.    Do you recognize what that is?

8     A.    That's --

9              THE COURT:  Admitted.

10             (Trial Exhibit 349 received in evidence)

11                     (Exhibit published to jury.)

12             THE WITNESS:  An email from Hussain to Phil Smolek.

13    BY MR. FRENTZEN:

14    Q.    What is the date of this email?

15    A.    December 15, 2009.

16    Q.    What is the communication from -- I'm sorry.  Who is

17    Mr. Smolek communicating to?

18    A.    To Mr. Hussain and Andrew Kanter.

19    Q.    And what is Mr. Smolek saying to them?

20    A.    He's asking them "to review the below purchase order for

21    Capax, EDD outsourced services."

22    Q.    All right.  And if you could scroll up a little bit.  All

23    right.

24          What is listed here?

25    A.    Outsourced specialized EDD services.

BRYANT - DIRECT / FRENTZEN

1   **Q.**    For a total amount of how much?

2   **A.**    Half a million dollars.

3   **Q.**    Can we go to the bottom.  I'm sorry.  I meant the top.  I

4   apologize.

5         And did Mr. Hussain respond?

6   **A.**    Yes.  He approved it.

7   **Q.**    All right.  And in the subject, what is the subject here?

8   **A.**    "Capax purchase order payment request, CFO/COO approval

9   needed."

10  **Q.**    I want to show you a stack of emails.

11         **THE CLERK:**  A juror needs a break.

12         **THE COURT:**  You need a break?  Well, let's see.  How

13  much longer do you have, do you think?

14         **MR. FRENTZEN:**  Total?

15         **THE COURT:**  Yes.  More than 15 minutes?

16         **MR. FRENTZEN:**  Yes, Your Honor.

17         **THE COURT:**  Ladies and gentlemen, we are going to take

18  a recess now for the day.  Remember the admonition given to

19  you:  Don't discuss the case, allow anyone to discuss it with

20  you, form or express any opinion.

21         Just while you are all here -- and I know one of the

22  jurors has departed -- but let me just tell you the Government

23  will be resting its case early tomorrow.  Defense will proceed.

24  We believe that the Defense case, all the evidence in the case,

25  will be received this week.  And that would mean next week

1    deliberations, argument and deliberations.

2        So while I'm not promising that, because anything can

3    happen, for planning purposes, that's what we anticipate.  I'll

4    know a bit better tomorrow whether we can keep that schedule or

5    not, but my guess is we can.  Okay.

6        So you're excused for the day.

7        (Proceedings were heard out of presence of the jury:)

8        THE COURT:  Shall we take a ten-minute break?  We need

9    to go into a couple things, I think.

10        MR. FRENTZEN:  I think that's right, Your Honor.

11    We've got a couple of things we are going to want to raise.

12        THE COURT:  Let's be in recess for 10 minutes.  I'll

13    come back out.

14                    (Recess taken at 3:49 p.m.)

15                (Proceedings resumed at 4:02 p.m.)

16        (Proceedings were heard out of the presence of the jury:)

17        MR. KEKER:  I have an agenda, Your Honor.

18        THE COURT:  Is it hidden or do I get to see it?

19        MR. KEKER:  I mean, if you were interested.

20        THE COURT:  I am interested.

21        MR. KEKER:  Yeah, okay.  We've got two stipulations

22    that we need to get in.

23        THE COURT:  Fine.

24        MR. KEKER:  We need -- we want to talk about the

25    Sarin/Gersh problem.

1    We want to talk about Agent Bryant's -- the scope of

2    Agent Bryant's testimony and how long it's going to take.

3    We have the documents that you asked for in your order

4    earlier, and I can pass those up.

5    And we also want to know whether or not there's going to

6    be any more exhibits than the ones we've seen to prepare for

7    tomorrow.

8    And then the final thing is I told our witnesses to come

9    at 9:00 o'clock tomorrow, and it sounds like this is going to

10    go on for quite -- I'd like to get a pretty good idea of when

11    to tell people they should come.

12    **THE COURT:**  Well, I don't know how much -- how much

13    longer do you have on -- let's do the agent -- how much longer

14    do you have on the agent?

15    Is she -- by the way, which I think you're entitled to do

16    and there's a reason to do it, but is she going to do more than

17    just this document, this document, this document?

18    **MR. FRENTZEN:**  Yes, but that's going to be a lot of

19    it.

20    **THE COURT:**  Okay.  And is it your view -- I'm trying

21    to figure out is it your view that it's important to read these

22    documents to the jury?

23    **MR. FRENTZEN:**  Yeah.  I mean, if they were admitted

24    through a stipulation, I would probably read them to them by

25    showing them and reading it into the record so that they can

1    have them.

2        I don't want to spend --

3            THE COURT:  I actually don't understand what you said.

4            MR. FRENTZEN:  Okay.

5            THE COURT:  In other words, would you -- if it's done

6    by stipulation, are you satisfied that you can wait until

7    closing to disclose -- not to enter them but to read it to the

8    jury?

9            MR. FRENTZEN:  No.

10           THE COURT:  You think the jury has to see it tomorrow?

11           MR. FRENTZEN:  Correct, Your Honor.  There's --

12           THE COURT:  Okay.  That's it.

13           MR. FRENTZEN:  There's a lot here.  They're not all

14   going to blend into the -- I know what the Court is going to

15   say, "If you're not going to read them in argument, why are you

16   putting them in?"

17           THE COURT:  No, I wasn't going to say that.

18           MR. FRENTZEN:  Oh, all right.

19           THE COURT:  To the contrary.

20           MR. FRENTZEN:  Oh.

21           THE COURT:  I mean --

22           MR. FRENTZEN:  I've been told that before, that's all.

23   Not by you.

24           THE COURT:  By me?

25           MR. FRENTZEN:  No.  No, Your Honor.

1              **THE COURT:**  I'm not going to say that because I'm

2    taking the other tact.  I'm not going to say it because I think

3    that there is a legitimate purpose served by having a document

4    and reading it to the jury at the time because it makes the

5    document live, especially even if you don't intend to do it for

6    your closing.  They've heard it.  You can remind them of it if

7    you think it's important, and so forth and so on, but they will

8    have heard it.

9         Okay.  But I'm trying to figure out how long that's going

10    to take.

11              **MR. FRENTZEN:**  I think I've got about an hour, maybe a

12    little more than an hour.

13              **THE COURT:**  Goodness.

14              **MR. FRENTZEN:**  Well, just so the Court knows, and

15    counsel already knows, there's e-mails on some other topics.  I

16    think the Court has seen those.  I'm skipping through these.

17    And then there are -- there's a series of e-mails that I

18    understand are the objections; but there's a series of e-mails

19    and documents that lay out basically two discrete deals, and we

20    can argue about the hearsay whenever we argue about the

21    hearsay.  I don't think they're hearsay documents.

22         And then there's some phone records, and I think that's

23    about it.

24              **THE COURT:**  Okay.  Let me go back to the first part.

25              **MR. FRENTZEN:**  Sure.

PROCEEDINGS

1          THE COURT:  I just wonder whether -- let's say you had

2     five e-mails that reflected the defendant's activities with

3     respect to transaction X.  So you say to the agent, "Exhibit

4     Numbers 1, 2, 3, 4, 5, these are e-mails involving -- that

5     Mr. Hussain received.  Do they set forth -- do they -- do they

6     reflect Mr. Hussain's conduct with respect to that

7     transaction?"  Something like that.

8        No, you don't want that.

9          MR. KEKER:  No.  We'll cross -- boy, would we -- ask

10    her.  Do that and see what happens.  There are going to be a

11    lot "Do they reflect Mr. Hussain's conduct towards that

12    transaction?"  Let's get into that.

13         THE COURT:  Okay.  And what about all the other

14    exhibits?

15         MR. FRENTZEN:  I do not fear that, but that's okay.

16         MR. KEKER:  Okay.  He doesn't fear --

17         MR. FRENTZEN:  I don't have to do that.

18         MR. KEKER:  -- but that's what we would do.

19         THE COURT:  Mr. Keker, do you want to know the quality

20    you both share in common?

21         MR. KEKER:  I think I know it.

22         THE COURT:  Do you know what it is?

23         MR. FRENTZEN:  No one likes us.

24         THE COURT:  Fearlessness.

25        Oh, no, I like both of you.

 1          It's fearlessness.  The face of whatever it is, it's

 2   fearlessness.  You can call it courage or you can call it a

 3   lack of reality, but one or the other, it's fearlessness.

 4          Okay.  Look, I'm not going to tell you how to do it.  You

 5   do it the way you want to do it; and if it takes an hour, it

 6   takes an hour.  Listen, in a case that's gone on three months,

 7   that's one hour, but just tell Mr. Keker, you know, when you

 8   expect -- that his witnesses need not be here till 10:00 or

 9   10:30, or something like that, but we'll get to his witnesses

10   because I think we have to talk about it.

11          Let's finish up with the agent.  What do you see

12   objectionable?  I guess I have to ask Mr. Keker.  What do you

13   have that you object to in her presentation?

14          **MR. KEKER:**  There are one, two, three, four, five,

15   six, seven, eight e-mails that we object to.

16          **THE COURT:**  Okay.  Do you have the number?  Are there

17   exhibit numbers?

18          **MR. KEKER:**  Yes.  425.

19          **THE COURT:**  425.

20          **MR. KEKER:**  495.

21          **THE COURT:**  495.

22          **MR. KEKER:**  496.

23          **THE COURT:**  496.

24          **MR. KEKER:**  500, 731, 732, 736, and 2788.

25          And we have two objections.  One is hearsay, but the other

 1   is --

 2           THE COURT:  2788?

 3           MR. KEKER:  Yes, sir.

 4           THE COURT:  Okay.

 5           MR. KEKER:  -- and the other is that these are about

 6   two transactions Poste Italiane and Auxilium that the jury has

 7   heard almost nothing about, and what they're doing -- I mean,

 8   this is basically sort of a data dump at the end of the case

 9   about another transaction that the jury knows nothing about.

10       And why -- and so what we would also say is that this is

11   evidence that's cumulative.  Lord knows we've have got enough

12   transactions now to argue to the jury.  They don't need another

13   one that they never had a sponsoring witness about.  We don't

14   have anybody that we can cross-examine about this, and they're

15   trying to get in documents between people that even they don't

16   allege are co-conspirators.

17       Anyway, we object to all of those.

18           THE COURT:  Okay.  So 425 --

19           MR. KEKER:  It's between Broli -- someone named

20   Corrado Broli and Julie Dolan.  Julie Dolan is a lawyer in --

21           THE COURT:  What does it relate to?

22           MR. FRENTZEN:  This relates --

23           THE COURT:  Why is it being offered?

24           MR. FRENTZEN:  These relate, Your Honor, to the

25   Poste Italiane and Auxilium deals which stem basically from the

1   Vatican.  These are very significant because what they are is

2   they are backdated deals that go nowhere, that Sushovan Hussain

3   attributes to the Vatican and then finds some Italian resellers

4   to basically shove the deals through to try to get another

5   couple million after the quarter has already closed.

6        Now, there --

7             THE COURT:  There was testimony.

8             MR. FRENTZEN:  Correct.

9             THE COURT:  I recall testimony on that.

10            MR. FRENTZEN:  There is.  And there was testimony --

11   Corrado Broli, I mean, it's nice to act like you don't know who

12   it is, but he worked for the defendant and he was a salesman

13   for Autonomy, and he still works for Mike Lynch today.

14            THE COURT:  That transaction is admitted.

15            MR. FRENTZEN:  Thank you, Your Honor.

16            THE COURT:  Okay.  What's the next different

17   transaction?

18            MR. KEKER:  Poste Italiane.  His argument is going to

19   be the same.  All right.

20            THE COURT:  Okay.  So that's admitted too.  Okay.

21            MR. FRENTZEN:  Great.

22            THE COURT:  However, there's more.  Mr. Keker -- or is

23   that -- that takes care of all the ones you've numbered?

24            MR. KEKER:  Yes.

25            THE COURT:  Okay.  So they're in.

1  All right.  What's next?

2    **MR. FRENTZEN:**  I don't think there's anything else

3 from the agent.

4    **THE COURT:**  So other than that, there's no dispute as

5 to what she's going to testify to.  We've dealt with her now.

6    **MR. KEKER:**  Well, if --

7    **MR. FRENTZEN:**  I think so.

8    **THE COURT:**  We've dealt with the agent.  I don't want

9 to --

10    **MR. FRENTZEN:**  There's the top 40 list, Your Honor,

11 but we've already talked about that and I think I'll lay a

12 similar foundation.

13    **THE COURT:**  Yeah, you have to lay a foundation.

14    **MR. FRENTZEN:**  Yeah.  Yes.  Yes, Your Honor.

15    **THE COURT:**  You should look at 1006 carefully.  I'm

16 sure you have studied it carefully.

17    **MR. FRENTZEN:**  Voluminous and inconvenient and --

18    **THE COURT:**  Well, it's more than that.  It's more than

19 that.  I've been sitting here reading about it.  It's all sorts

20 of things.

21  Look at Weinstein.  Look at Weinstein, and I don't mean --

22    **MR. FRENTZEN:**  I was about to say I thought he was --

23    **MR. KEKER:**  Not Danny, Judge Weinstein.

24    **THE COURT:**  Well, other Judge Weinstein.

25    **MR. KEKER:**  The one who knows something about

1    evidence.

2        Can I hand up this?  These are the documents you asked

3    for.

4            **THE COURT:**  Yes.

5            **MR. KEKER:**  They're the exhibit numbers.

6            **THE COURT:**  Yeah, okay.  Wait.  So we're now --

7            **MR. KEKER:**  We're going to file them.

8            **THE COURT:**  -- basically finished on the agent.

9            **MR. FRENTZEN:**  Yes, Your Honor.

10        And there's just one other issue that I think before we

11    close -- we can close out our case.  We can take this up later

12    at some other point.  I think we're going to ask for judicial

13    notice from the Court on a couple of matters, and we'll provide

14    those to the Court.

15            **MR. KEKER:**  Could we --

16            **THE COURT:**  There's a whole -- I mean, I don't know

17    whether we're talking about foreign law or we're talking about

18    standards or are we talking about --

19            **MR. FRENTZEN:**  Standards.

20            **THE COURT:**  Well, there's a whole process for judicial

21    notice.

22            **MR. FRENTZEN:**  Right.

23            **THE COURT:**  And I trust -- and the answer is you have

24    to follow the process.  So you either followed the process or

25    you haven't followed the process, but I'm not on the last day

 1   of the trial for the Government's case going to excuse the
 2   Government from following the process.
 3          **MR. KEKER:**  And I will object.  I mean, what we don't
 4   want to do is start a Defense case until the Government has
 5   rested, and that means put in whatever they think they can put
 6   in or try to put in whatever they try to put in.
 7          **MR. FRENTZEN:**  That's why I brought it up.
 8          **MR. KEKER:**  So what is it?  I mean, let's --
 9          **MR. FRENTZEN:**  SOP 97-2.  Tomorrow I intend to put in
10   at least two or three more statements by the defendant that he
11   and Autonomy followed SOP 97-2 of U.S. GAAP.
12          **THE COURT:**  So you're going -- your intention is to
13   have the Court take judicial notice of SOP --
14          **MR. FRENTZEN:**  97-2, Your Honor.
15          **THE COURT:**  -- 97-2.
16          **MR. FRENTZEN:**  From U.S. GAAP, which the defendant
17   repeatedly told people is what Autonomy was following as its
18   accounting standard for revenue recognition.
19          **MR. KEKER:**  And we object to that unless we have a
20   foundation witness that can put it in so that we can
21   cross-examine him on what it means and what it is.  Just sort
22   of flinging that in, it's an incredibly complicated situation.
23          **THE COURT:**  Well, it may or may not be.
24          **MR. KEKER:**  It is.
25          **THE COURT:**  Well, okay.  I'm sure you're right.  I'm

1    sure it is complicated, but I'm not -- I haven't even reached

2    the complication of it.

3        I'm being asked to take judicial notice of something.

4    SOP.  Okay.  Everybody knows what we're talking about, SOP.

5        Can I take judicial notice?  And the code rules say here's

6    how you take judicial notice.  If you've done that, it comes

7    in, as complicated as it may be.  If you haven't done it, then

8    it doesn't come in.

9        **MR. KEKER:**  Your Honor, not necessarily.  Judicial

10   notice shouldn't be taken of something that will -- that is

11   complicated and the jury has no opportunity to learn about.

12   It's not -- it's something -- SOP 97-2 is something that

13   accountants spend a lot of time working on and thinking about.

14   It's not something that's obvious.  This is like throwing in

15   the first law of thermodynamics as judicial notice in a case

16   where it matters.  You need to explain it.  Somebody's got to

17   be there to be cross-examined or --

18       **THE COURT:**  I don't know whether that's true or not.

19       What is the -- what is that section that deals with

20   judicial notice?

21       **MR. FRENTZEN:**  I think it's the 200 series of Federal

22   Rules of Evidence, Your Honor.  Like 201 or something, if

23   memory serves.

24       **MR. LEACH:**  201.

25       **MR. FRENTZEN:**  201, hey.

1    **THE COURT:**  201.  Okay.  Let me look at it.  Why don't

2    we all look at it?  I'd rather do this now because this is dead

3    time and I don't have somebody sitting in the backroom waiting

4    to go ahead.

5                    (Pause in proceedings.)

6    **MR. KEKER:**  First of all, it's not a fact.  It's far

7    from a fact.

8    **THE COURT:**  Well, the fact is it exists.  I mean, I

9    don't know whether they --

10   **MR. KEKER:**  I agree that that's a fact, but what it

11   deals with, the subject matter of it is not a fact.  It's an

12   interpretive rule.

13   I mean, we can put --

14   **THE COURT:**  I'm trying to think of an analogy.

15   **MR. KEKER:**  An analogy is we'll put in IAS 18, IAS 35,

16   IFRS 8, and so on, and the jury will have all these.  With

17   nobody to educate them, they'll get the accountant -- what a

18   fifth year accountant would still find puzzling, and they'll

19   have that in the jury room and they'll get to decide what the

20   accounting standards are.  No.

21   **MR. FRENTZEN:**  We charged fraud.  Part of the defense,

22   as I understand it, is, "Oh, no, this is all great under IFRS

23   and it would not be okay under U.S. GAAP."

24   We just want to put in now that we've learned that the

25   defendant was repeatedly telling investors, the public --

PROCEEDINGS

1    Gersh? -- anyway, was telling everybody that he followed --

2    including publicly on the website and referring people to the

3    website -- that he followed U.S. GAAP, then I just don't want

4    an argument that strays from what U.S. GAAP and SOP 97-2

5    actually say.

6         MR. KEKER:  First of all, that's not what he said.  He

7    talks about VSOE.  Does anybody in this courtroom know what

8    VSOE is other than Mr. Leach?  I bet Mr. Leach --

9         MR. FRENTZEN:  I've been reading about it.

10        MR. KEKER:  And I'm quite sure Mr. Frentzen doesn't

11   know about it.

12        But, in any event, the VSOE is this -- anyway, it's not --

13   what he said was that "We follow" -- the times that I can

14   remember -- "We volume VSOE."

15        MR. FRENTZEN:  Wrong.  Dead wrong.  I can show it to

16   him right now.

17        MR. KEKER:  Okay.  Show it.  Right now.

18        MR. FRENTZEN:  All right.  Have you read what Special

19   Agent Bryant is going to introduce into evidence?

20                    (Pause in proceedings.)

21        MR. FRENTZEN:  I may need my notes.  I mean, we've

22   already seen on the website, we've already seen him refer

23   people to the website.

24        And give me one second and I will show it to you in black

25   and white.  I thought I had it right at hand.  One moment,

1    Your Honor.

2                    (Pause in proceedings.)

3         **MR. KEKER:**  Okay.  That's my point.  "We adopt a

4    general SOP 97-2 guidelines."  That's not saying "We follow

5    U.S. GAAP."

6         **MR. FRENTZEN:**  97-2 is from U.S. GAAP.

7         **MR. KEKER:**  The general SOP 97-2 guidelines, what are

8    they?

9         **MR. FRENTZEN:**  Those are the guidelines as to software

10   that come from GAAP, U.S. GAAP.

11        **THE COURT:**  How do we know that?

12        **MR. FRENTZEN:**  I've been reading about it.

13        **THE COURT:**  Oh, okay.  Well, why don't we have

14   Mr. Leach testify in this case because he's the only one who

15   understands this.

16        **MR. LEACH:**  I'm not going to testify, Your Honor, but

17   I'll just read from Exhibit 630, which is in evidence, where

18   Autonomy --

19        **THE COURT:**  Okay.  What does it say?

20        **MR. LEACH:**  (reading)

21         "For revenue recognition we voluntarily adhere to the

22        principles set out in U.S. GAAP, SOP 97-2, which is far

23        more detailed, prescriptive, and conservative than IFRS."

24        **THE COURT:**  Stop there.  Let me just think about that,

25   why you then need anything else after that statement.

 1    So you say -- you get up in argument and you say, "This is

 2 what they" -- wait -- "Regardless of what they could have done

 3 or should have -- what they could have done, they represented

 4 to the public this is what they did."

 5    Now, have you had -- are you satisfied, is the Government

 6 satisfied that they've had witnesses come in and say, "If you

 7 apply this standard, you have to restate these -- what the

 8 defendant did is inconsistent with the standards that have

 9 been -- that they say they apply"?

10    **MR. LEACH:**  I can't recall which witnesses said that,

11 but the Defense counsel have said that.  The Defense counsel

12 has said that these were not right under U.S. GAAP.

13    **THE COURT:**  I don't know.  Ultimately I don't know

14 what he's going to argue.  You're anticipating that he's going

15 to argue that -- you're anticipating that he's going to argue

16 that the standards that the defendant applied were -- his

17 conduct was consistent with those standards.

18    **MR. FRENTZEN:**  The difficult -- the sole difficulty,

19 Your Honor, is that we have -- we have called witnesses about

20 IFRS.  We have called witnesses who said this is inappropriate

21 under IFRS.  The Defense has said -- has challenged that, of

22 course, as a factual matter.

23    Implicit in their questions has been that it would not be

24 appropriate under U.S. GAAP but that it was appropriate under

25 IFRS.  That's implicit in their questions.

1              I don't know where they're going in their argument, and

2    that's why if they were to retreat into U.S. GAAP and say, "But

3    nobody knows anything about U.S. GAAP from this trial," I would

4    want a backstop because I think from 97-2 you can tell that

5    these kinds of reseller deals, implicit in their questioning --

6    I think maybe they'd concede this and then we don't need

7    judicial notice of anything -- would be that this was not

8    appropriate under U.S. GAAP; but I don't want to be accused of

9    not having given the jurors any basis to understand what 97-2

10   and U.S. GAAP provide for, if that makes sense.

11             MR. KEKER:  And we would welcome -- if they want to

12   bring a witness to come in and say what 97-2 says and is about

13   and we can cross-examine that witness and get into it and get

14   into the ambiguities, bring it on; but asking for judicial

15   notice of something that is not a fact and leaving that to the

16   jury is improper under the rule because it's not a fact and

17   raises 403 issues.

18             I mean, this is a lot --

19             THE COURT:  Here is the problem I have:  The problem I

20   have is that there's just no way this jury can figure out

21   whether the conduct that occurred in this case followed this

22   GAAP or didn't -- followed this set of instructions or that set

23   of instructions.  I mean, after all, it's extraordinarily -- it

24   is complicated.

25             Now, you've had witnesses who've come in and said, "You

```
 1   apply this set of standards.  They didn't do it.  They didn't
 2   do it."  So the question is:  Is it an issue of fact as to what
 3   standards they followed, or is it an issue of fact of whether
 4   it is" -- it is certainly an issue of fact of whether they
 5   committed fraud.
 6       And I guess as part of that the Government argues that the
 7   fraud that occurred was to say "We followed standards A" and,
 8   in fact, they didn't, and that's an act that was misleading.
 9   That's what some of this is about.
10       So the Government comes in and says, "Now we want to
11   show -- we want you to take judicial notice of what the
12   standard is" so that it's introduced in evidence; right?  So
13   you have the whole thing in evidence.
14           MR. FRENTZEN:  Right.  It gives us a backstop from an
15   argument.
16       So they come in and their defense is IFRS --
17           THE COURT:  Exactly.
18           MR. FRENTZEN:  -- and our contention is --
19           THE COURT:  Do you have some standards you want
20   introduced?  Maybe that's it.  Maybe I just take judicial
21   notice saying "GAAP Standard Number 6 is the following and it's
22   attached to the document."
23           MR. KEKER:  The fact --
24           THE COURT:  "Whatever the standard is is the
25   following."
```

**PROCEEDINGS**

1        **MR. KEKER:**  They need a sponsoring witness who can be

2   cross-examined.  It is not a fact.  What that rule says and

3   means and how it's interpreted is something that accountants go

4   to school for for a long time and have to get certified on.

5   You have to take a test to understand what that rule means.

6   This is not something --

7            **THE COURT:**  That's true.

8        **MR. KEKER:**  -- that can be dropped into the middle of

9   a trial without the ability to cross-examine somebody.

10      If they want to call somebody, and they have plenty -- get

11  Hewlett Packard.  We'll get them a thousand accountants in

12  about two minutes.  Put somebody on the stand and let them try

13  to explain what that rule means and we'll cross-examine.

14       **MR. FRENTZEN:**  I don't think that's required.  I think

15  the jury is perfectly capable of --

16           **THE COURT:**  There's another way of dealing with it --

17           **MR. FRENTZEN:**  What's that?

18           **THE COURT:**  -- which is asking the Defense if they

19  argue that U.S. GAAP didn't apply -- what would be the

20  argument?  That U.S. --

21       **MR. KEKER:**  IFRS applies and what we've been talking

22  about is the sell-in versus sell-through, which seems to us to

23  be undisputed as a difference between U.S. GAAP and IFRS.

24           **MR. FRENTZEN:**  He keeps arguing that.

25           **THE COURT:**  Are you calling a witness on that issue?

1          **MR. KEKER:** Pardon?

2          **THE COURT:** Are you calling a witness on that issue?

3          **MR. KEKER:** We'll see.

4          **THE COURT:** Well, wait a minute.

5          **MR. KEKER:** No, no. We'll see in terms of the

6    witnesses that we're planning to call, and maybe we will call

7    somebody. If we get judicial notice of this, maybe we'll have

8    to get somebody to come in and talk.

9          **THE COURT:** No, I'm not asking that. I understand --

10   I understand your argument about judicial notice, but I go back

11   to trying to figure out:  Well, are you going to argue it?

12   Because if you're going to argue it, then maybe I let the

13   Government bring in in rebuttal an expert who says "This is

14   what the standards are in A and this is what the standards are

15   in B."

16       I mean, I think you have to elect, you don't have to do it

17   right this minute, but I think you have to elect how you're

18   going argue it. If you're going to argue -- if you're going to

19   argue that these standards whatever it is works a particular

20   way, the Government gets to bring in a witness to say it's not

21   even if you don't do anything in your case.

22       In other words, I'm saying to you if you make the

23   argument, if you're going to make the argument -- because

24   you're either going to make the argument, which maybe you can

25   do, I'm not foreclosing you from making the argument, but I

**PROCEEDINGS**

1    want to know before the end of evidence in this case because I

2    want to give the Government the opportunity if you are going to

3    make that argument to call that witness.

4         I think you're right.  I think it shouldn't be dumped in.

5    That part I agree with.

6              **MR. KEKER:**  They should call a witness.

7              **THE COURT:**  Yeah, they can call a witness.

8         Now, you have to make an election.  Are you going to argue

9    the way that Mr. Frentzen anticipates you might argue?  If the

10   answer is yes, I'll let them call a witness; and if the answer

11   is no, you won't argue that way and they won't call in the

12   witness and I won't grant judicial notice.

13             **MR. KEKER:**  We will -- we will point out and argue

14   that both the KPMG due diligence report made it crystal clear

15   that the difference between IFRS, which is what the accounting

16   rules were that applied to these accounts, and U.S. GAAP is the

17   difference between sell-in -- one difference is sell-in versus

18   sell-through.  We are going to argue that.

19        We've got that all over the record.  That's what Deloitte

20   thought, that sell-in versus sell-through is okay.  That's

21   how -- that's the standard they applied to these accounts.  We

22   will be arguing that.

23        If they want to say that that's not the standard under

24   IFRS, if they want to say that the KPMG report is wrong or that

25   Deloitte is wrong about that, then they ought to call a witness

PROCEEDINGS

1   to say why they're wrong and we ought to cross-examine them.

2        THE COURT:  Well, okay.  They're going to make that

3   argument.  You have to decide what you want to do.  I don't

4   think I can --

5        MR. FRENTZEN:  I don't --

6        THE COURT:  I agree with Mr. Keker is I can't dump

7   these standards into the case for the jury to sit there without

8   a witness, without an explanation, and plow their way through

9   Accounting 101A.

10       MR. KEKER:  Although it would be fun to cross-examine

11  Mr. Leach if he chose to testify.

12       THE COURT:  He's very good.

13       MR. KEKER:  He's very good.  He'd be better than

14  anybody they could find, but we'll oppose it because he'd be so

15  good.

16       THE COURT:  So think about how you want to deal with

17  this, all right?  Think about how you want to deal, and I'll

18  let you do it when you need to do it.  I mean, I'm not going to

19  force you to do it at 9:00 o'clock tomorrow morning, you know.

20       MR. FRENTZEN:  Thank you, Your Honor.

21       MR. KEKER:  But could we get some notice so that we

22  can tell our -- we're about to call --

23       THE COURT:  We're going to go ahead now and discuss --

24       MR. FRENTZEN:  Depending on who they call, we may be

25  able to get it tomorrow through their witness --

1          THE COURT:  Well, I want to talk about it.

2          MR. FRENTZEN:  -- but we'll see.

3          THE COURT:  I want to talk about that.

4          MR. KEKER:  We're calling Ms. Lesjak first.

5   Ms. Lesjak is the CFO of Hewlett Packard.

6          MR. FRENTZEN:  She might know something about it.

7          MR. KEKER:  I bet she does know something about it.  I

8   know she knows something about it.

9          MR. FRENTZEN:  Great.

10          THE COURT:  Perfect.

11          MR. KEKER:  Problem solved.

12          THE COURT:  Well, let's not go that far.

13      Okay.  So that -- maybe it's solved.  I mean, that's sort

14   of the way I'd like to deal with it.

15      Okay.  Now, turning to one of the things that keeps coming

16   up is to what extent you can introduce evidence in your case on

17   hardware sales and what does it mean because this is the Gersh

18   stuff.  This is when did Hewlett Packard know about hardware

19   sales.

20      And I sort of spin it out because I think what you're

21   saying is they knew about the hardware -- I'll put it -- I'll

22   use those words because I think they mean very different

23   things.  There's no question they knew there were hardware

24   sales.  The question is:  Did they know the nature of the

25   hardware sales and the volume of the hardware sales?  That, I

1    think, is the issue.

2        Nobody here denies that they -- I mean, the Government

3    doesn't take a position they didn't know anything about

4    hardware sales.  They had no idea of the magnitude of the kind

5    of hardware sales that took place, and that's the argument.

6    It's an underpinning of their case because they argue from that

7    as a springboard since it was a major component, it was

8    significant because, in fact, it has a different kind of return

9    than software sales; and, therefore, you would look at a

10   company differently because they would be not, quote, "pure

11   hardware" but they -- "pure software" but that they would

12   involve this other element.

13       So that's the argument, as I understand it.  And I

14   understand your proposal, because I've read some of the things

15   that you've written, is:  Look, you want to introduce some

16   evidence of what happened after October 13th because it will

17   show that the nature of the hardware sales became known to them

18   and they did nothing about it.  They didn't throw up their

19   hands.

20       **MR. KEKER:**  They never cared about hardware sales

21   until they decided a year later that "What we need to do is

22   come up with some theory of fraud to get ourselves out of

23   this."

24       They didn't care about it before when Mr. Hussain told

25   Mr. Gersh "We sell hardware for convenience" during the due

**PROCEEDINGS**

1    diligence.  That was testimony in this case.

2         They didn't care about it when they read analyst reports

3    like Mr. Toms.  I don't care if Mr. Toms said, "Potentially

4    you're flat."  There were all these analyst reports that said

5    hardware, hardware, hardware.

6         They never asked the question and the reason is very

7    simple.  They didn't care.  Mr. Robison had this huge vision

8    "We're going to transform the world."  He didn't care about it.

9    He said, "Oh, I think it's 5 to 7 percent.  Who cares?"

10        They didn't ask anything about the appliances.  They

11   didn't ask anything basically because they didn't care, and the

12   way we proved they didn't care is the way they acted before and

13   during due diligence not asking questions when it's right in

14   front of them, "Ask this question.  Here's a hardware and

15   software contract."  They said, "No, we're not going to ask

16   it."

17        And then we -- and then after when Ms. Lesjak in November

18   gets an Ernst & Young thing that shows this company has

19   11 percent --

20            **THE COURT:**  Now, here's the problem that I see with it

21   because I think there's a big difference between before and

22   after, and all the evidence of before is in.  So, I mean,

23   everything that you said up to what the witnesses have said,

24   what they knew, what they talked about, and so forth, it's all

25   there all to be argued.

PROCEEDINGS

1        Now you turn to a different aspect of it, which is:  How

2   did Hewlett Packard react when it was clear the nature of the

3   hardware sales?  And you say, you say "They didn't cry fraud or

4   react to it in any particular way, and so forth, because -- and

5   that shows they didn't care."

6        The problem I have with that is it doesn't necessarily --

7   it may show they didn't care, but the problem is whether it

8   does show or not is in the context of everything that was going

9   on in that time.

10        For example, they get some indication that -- they get an

11   indication that hardware sales occur, which would affect -- and

12   maybe they knew at the time $100 million or whatever it is,

13   whatever date they would have done it.  So you say, "Well, why

14   didn't they at that point restate?  Why didn't at that point

15   they impair?"

16        Their answer to that is:  "Look, before we start to do

17   something like that, we're a public company; and before we

18   start to disparage," if that's the right word, "our

19   acquisition, we have to be very sure of our facts and how it

20   plays.  And the reason we have to be very sure is we are a

21   public company and if we operate under a -- if we announce

22   we're now suspicious or we're now a little uneasy with this

23   acquisition to the shareholders, that would be dynamite on the

24   market."  The stock would plummet and maybe it should, maybe it

25   shouldn't.  I don't know.  I'm not here to save Hewlett

1    Packard, for God's sake, but it's a very difficult -- it's a

2    whole set of considerations what happens after the fact.

3        For example, they may think, "Those hardware sales were

4    material, but you know what?  Let's see if we can work around

5    it.  Let's try this.  Let's try that."  Before they throw out

6    the baby, they want to make sure it's basically not even on

7    life support.  They want to make sure that their actions -- and

8    I don't know whether they did it or not.

9        By the way, I'm just simply surmising.

10        **MR. KEKER:**  I think we have a fact for you because you

11    are surmising.

12        In January they got -- Ms. Lesjak -- they got Economic

13    Partners to analyze the whole situation and to value the

14    acquisition.  Economic Partners undeniably had the trial

15    balances, which included the hardware sales, more than

16    $100 million worth of hardware sales.

17        They did their analysis and their analysis was "This

18    acquisition is worth more than what we paid for it.  It's more

19    than $11 billion."

20        Now --

21        **MR. LEACH:**  He's talking about a witness they're not

22    even calling from Economic Partners, Your Honor, and it's a tax

23    valuation.  It's apples and oranges, and it's very confusing.

24    If you think all of this IFRS interpretation is --

25        **THE COURT:**  Well, no, you don't have to go there.  I

1    mean, I don't know that I would -- I mean, I was sort of

2    working my way into these documents that they want to introduce

3    because I have some concerns about all these documents.

4         The concerns I have is that while I'm not saying it's

5    totally irrelevant, I'm saying that I think under -- that it

6    introduces all sorts of things that happened subsequent to

7    October 13th, which to me explain as to why they didn't do what

8    they didn't do would require a number of witnesses to come in

9    and explain the market, the integration, the complexity of

10   where they were at that given time.

11        And the problem you always have and I always have with

12   securities cases, it freezes the moment.  It freezes the

13   moment, which is okay, but when you go the moment plus 10 or

14   the moment plus a year, a hundred different variables are at

15   play, and it's wrong to say, "Ah, look at those -- look at

16   that.  They didn't do that a year afterwards," and that may or

17   may not be -- may or may not have an independent business

18   judgment that actually could or could not be justified, but in

19   their mind was operative that would allow it.

20        So I think it's exactly the sort of thing that 406 -- I do

21   get that right?  403 --

22             MR. LEACH:  403.

23             MR. KEKER:  403.

24             THE COURT:  -- 403 is geared to do, which is post

25   events can come in, provided they really don't open the door to

PROCEEDINGS

1    all sorts of collateral issues.  I think this is exactly the

2    kind of collateral issue that would be introduced.

3          MR. KEKER:  And our position is, Your Honor, that

4    based on your ruling about the restatement, you have opened

5    that door.  We're not planning to do it with a lot of

6    witnesses.  We're planning to do it with Ms. Lesjak.  We're not

7    going to call a thousand witnesses.

8          THE COURT:  No, I know you're not --

9          MR. KEKER:  But you said when we filed that -- that

10   proffer and we said these are the things that we want to get

11   into, you said well, if I -- if -- if the restatement guy comes

12   up and testifies, then these are clearly admissible, this kind

13   of thing that goes to show why HP -- I mean, you saw him.

14   He -- he is an HP --

15         THE COURT:  He is what he is.

16         MR. KEKER:  He is what he is, and he's working on the

17   civil case and all that kind of stuff.

18         THE COURT:  All of which you can argue.

19         MR. KEKER:  Okay.  But what we need to be able to

20   argue is that this didn't start -- I mean, you're speculating

21   about a lot of things.

22         THE COURT:  No.  I'm only saying --

23         MR. KEKER:  Ms. Lesjak learned about it, then they do

24   the economic partners thing, then they write -- then they

25   decide to write off EDS in the summer.  They don't write off

PROCEEDINGS

1    this investment. They write off 8 billion dollars on EDS, and

2    then later Ms. Whitman -- I mean, we need to be able to get

3    into those facts in order to put the restatement into proper

4    perspective.

5         THE COURT:  I don't think so.  To tell you the truth,

6    I don't think so.  I don't understand the nexus between the

7    two.  I understand that their conduct -- you know, they acted a

8    particular way.  I understand that.  But they acted a

9    particular way -- you say they acted that particular way

10   because they didn't care about the hardware.  They come back --

11   and I don't think I'm speculating because we know what happened

12   ultimately.

13        I mean -- but be that as it may, they came --

14   Hewlett-Packard would come in and say well, they're -- look, we

15   wanted to do A, we wanted to do B, we wanted to do C.  There

16   has to be some series -- maybe I'm speculating on this --

17   series of explanations of how Hewlett-Packard moved day by day

18   by day by day, month by month, quarter by quarter.

19        The problem you had was -- and why the restatement is

20   particularly permissible, number one, under *Jasper* I think it

21   is, but, number two, is that he had a statutory duty to take

22   action with respect to these things.

23        And, by the way, I think -- and maybe I'm guessing, that

24   statutory duty may be -- may be independent of whether they

25   cared or not.  Let's say they said we're rolling in dough.

1    What difference does it make whether this was going to cost 11

2    billion, you know.  I don't care.  Doesn't make any difference

3    to me.

4         By the way, if they said that, that was their motivation,

5    fine.  But the fact is that the restatement had to come in

6    because of the investors, because of the public, because of

7    what they thought the -- the value of the company was at that

8    time.

9         So I think it is out, and I wanted to address that because

10   I think that's what you're planning on putting in.  If you want

11   to make a detailed offer of proof -- I think it's detailed

12   enough, but I'm certainly going to allow you to make your

13   record on it.  You want to attach exhibits and so forth that

14   you would -- that you would submit on that issue --

15            MR. KEKER:  We just submitted a lot of them --

16            THE COURT:  I think they ought to be submitted as

17   exhibits in part of your offer of proof.

18            MR. KEKER:  Your Honor, then -- okay.  As a lesser

19   position, we ought to at least be able to show what happened

20   immediately after the acquisition.  The acquisition closed,

21   full access to the books, report to the CFO in November.  EY

22   does an audit and looks at the Deloitte work papers, looks at

23   everything, and comes in and tells the CFO about 11 percent of

24   the revenue being hardware sales.  We ought to at least be able

25   to do that.  That happens -- that happens by middle of

PROCEEDINGS

1    November.

2            THE COURT:  What is your response to that?

3            MR. LEACH:  I don't see why that's the case,

4    Your Honor.  I expect Ms. Lesjak to say -- I don't think

5    Ms. Lesjak is going to say she learned of what was in the

6    Deloitte audit papers, and I think they'll say at the time just

7    looking from the raw document you can't tell all the problems

8    that emerge in May and subsequent to May of 2012.

9        Ms. Lesjak is not going to say she didn't care about the

10   hardware sales.  She's not going to say it was immaterial.

11   This is a way to say that the dog didn't bark because somebody

12   who's running a hundred million dollar organization is shown a

13   PowerPoint with a particular number and, for a host of reasons,

14   doesn't move immediately.  Nothing more than that.

15       I don't see its probative value.  It opens up a number of

16   issues, as the Court has identified, and I don't see how it's

17   different from any of the other types of evidence that

18   they're --

19           MR. KEKER:  Let me say how it's different.  The fact

20   that -- one of our positions is that hardware should have been

21   pretty obvious to anybody checking it out.  The fact that

22   immediately after the transaction that it was so obvious and

23   that it was just there for everybody to see suggests an

24   argument that a reasonable jury could think is how in the world

25   could Mr. Hussain have had some kind of criminal intent with

1    respect to hardware when it was so obvious.  As soon as the

2    stuff gets turned over, everybody's going to know every detail

3    about the hardware, and they did.

4          **THE COURT:**  By the way, do you feel you can't argue

5    that now based upon the record?  Because I think you could.

6          **MR. KEKER:**  No.  Because you haven't let us -- but --

7          **THE COURT:**  Why couldn't you argue it right now?

8          **MR. KEKER:**  Well, we can argue the first part of that,

9    but what we also want to argue is the very powerful evidence

10   that this was -- I mean, it's just there in the books.  What

11   they --

12         **THE COURT:**  I understand that, but it is -- I think

13   that's in.

14         **MR. KEKER:**  And it was immediately apparent to

15   Hewlett-Packard as soon as they looked at the -- at the work

16   papers, they got access to the finances and it was reported to

17   the senior level CFO.  Ernst & Young comes in and says a

18   hundred -- 11 percent is hardware sales, like hello.

19         **THE COURT:**  But the difference is -- the difference is

20   I think while the fact may be immediately apparent and I

21   think -- by the way, that's in.  I mean -- everything, books,

22   records, everything goes over to them.  I mean, they have

23   access to all of these things, I think.  I don't know whether

24   they have the Deloitte papers or not, but they have the

25   contracts, they have all of that.  That's in.

PROCEEDINGS

 1        But what isn't immediately apparent -- what is not

 2    immediately apparent is the impact, and the reason is that, you

 3    know, how is this whole thing going to perform?  How is

 4    Autonomy going to do?  And -- and let's run it out.

 5        I think this last witness said look, there were some -- I

 6    think it was him.  There was, you know, some concern that they

 7    didn't meet expectations in the first quarter and so forth.

 8    Well, then they have to try to figure out why didn't we.  Now,

 9    if you say that it was immediately apparent -- but they say

10    well, we wanted to run it out a bit, and then you get into the

11    issue, well, maybe it was run out negligently.

12        I mean, Hewlett-Packard was in chaos, weren't they?  I

13    mean, they were firing chiefs, they were eavesdropping on each

14    other.  It was a mess over there.  I mean, they were fighting,

15    should Packard -- if he were in the garage today, what would he

16    think.  You know, I mean excuse me, I don't know.  I don't

17    know.  But I know one thing.  I don't want a "what would Jesus

18    do."  I don't want one of these things where you go back and

19    try to reconstruct how people would have behaved if they had

20    all the facts and circumstances known to them and this one fact

21    was disclosed because I think it's -- it's a trial -- it's not

22    even a trial within a trial.  It's a -- it's a show.  It's an

23    unfettered look-back at how a company was operated, which I

24    must say, Mr. Keker, was in part your opening argument, your

25    opening statement, and I tried to say, not interrupting your

1    statement, I don't know whether we are going to get into any of

2    that.  And I've always been suspicious of that evidentiary

3    approach, though I understand it was what you approached.

4        And I'm not going to -- we'll talk about argument later

5    and so forth.  I don't want you to be hung up by the Court.  I

6    mean, every lawyer knows when they make an opening statement

7    that they are, quote, at risk, but I -- I -- I'm -- I'm of the

8    opinion that you shouldn't make too much out of opening

9    statements.  And -- first of all, they're forgotten, and

10   secondly they are expectations, and third, you shouldn't impair

11   the credibility of an advocate by -- at the end of the case

12   by -- by his statements at the beginning of the case.

13       You know, this wasn't an attempt by the defense to -- it

14   wasn't an inappropriate opening, in my view.  It was entirely

15   appropriate.  And it may very well have been based on an

16   expectation that I would let in this kind of evidence.

17           MR. KEKER:  Of course it was.  Of course it was.

18           THE COURT:  I don't want to hear any of that in

19   closing.  It's got to be at a very different level.  But --

20   that's my ruling.  And I don't -- I don't feel it should come

21   in.

22           MR. LEACH:  There is one other matter, Your Honor.

23   The defendant has noticed Lee Welham, the Deloitte auditor who

24   came from England to testify in the Government's case.

25       His counsel is asking me does he really need to come.  I

1    don't see how admission of the restatement somehow opens the

2    door to a whole different source of topics.

3              THE COURT:  It depends on what he is going to say.

4         MR. KEKER:  Well, no, I think we need to reevaluate.

5    In light of your -- we offered Sarin, Gersh, and Lee Welham to

6    talk about things after October 3rd because the new ruling

7    opened the door and we still believe very firmly that it has

8    opened the door to things that we could have gotten out of them

9    on direct.  That's the subject of our motion about Exhibit 2451

10   and 6463.

11             THE COURT:  I appreciate that.

12        MR. KEKER:  If your ruling is going to be that we

13   can't talk about anything that happened after October 3rd, then

14   I guess -- except -- except specifically about this guy and his

15   restatement work, then I guess that's where we are and we have

16   to go back and reevaluate these --

17             THE COURT:  Well, my ruling is, so it's clear, that

18   with respect to your proffer, I'm not going to permit it.  I

19   don't know other things.  I mean, I -- I don't like to make --

20   I don't like to make grander statements than they are.  They

21   are bad enough as they are and you can rely on the fact that

22   what you have given to me I have ruled that I would not permit.

23   And that's -- that's what the record is and there we are and I

24   don't know about anything else, but that's what the record is.

25        MR. KEKER:  Let me just be real -- real clear to make

1    sure that I understand it.  In a case about -- that's partly

2    about disclose of these hardware sales, we are proffering

3    evidence to -- that these people who say that they didn't

4    know -- either didn't care or did know because when they

5    unquestionably just had it put in front of their face, they

6    didn't squeak and nothing happened and they seemed nonplussed

7    or they just ignored it.

8         So you're keeping out all that evidence --

9            THE COURT:  Well, I think I may need a more detailed

10   offer of proof from you.  In other words, if you are saying X

11   witness would come in and say "I did not know about the

12   hardware sales, but when they were disclosed to me, I didn't

13   care about the hardware sales because it wasn't important," if

14   that's what you're saying, you have that witness who will come

15   in and say that, I need to hear that.  I haven't heard that

16   yet.  I haven't heard that any of these three people.

17           MR. LEACH:  The "they" --

18           MR. KEKER:  There is not a chance --

19           MR. LEACH:  The "they" is very important, Your Honor.

20   Manish Sarin testified "I asked questions during the diligence.

21   When I found out about the hardware I was shocked."

22        We didn't get into it with Andy Gersh, but he would have

23   said, "When I found out about the hardware sales, I was

24   shocked."

25           THE COURT:  They have to make an offer of proof.  If

1    the offer of proof is "notwithstanding the fact that you were

2    shocked, you didn't do anything," which is exactly what I think

3    you're saying --

4            MR. KEKER:  Yes.

5            THE COURT:  And therefore you're not really shocked,

6    the reason they didn't do anything, I believe, opens up a whole

7    field of -- of testimony and evidence and conflicting facts.

8    And that's what I'm saying and that's all I'm saying.

9        Now, if you -- if you -- a witness is -- if you have a

10   witness who is going to say, you know, "when I heard about X,

11   the hardware sales, I just didn't care."

12           MR. KEKER:  The chances --

13           THE COURT:  If you have that witness, bring it on.

14   I'll listen to that witness.

15           MR. KEKER:  Of course you will because everybody knows

16   that no such witness could possibly exist because

17   Hewlett-Packard circled the wagons starting in November of 2012

18   and their wagons got circled around this concept that, "oh, my

19   Lord, we didn't know about hardware sales.  This is the most

20   important thing in the world.  It really matters to us.  We

21   really care about the margins," blah, blah, blah.  That's their

22   case.  And our position is that's a made-up fraudulent case.

23   It's completely wrong.

24       They were looking for something to justify this writedown.

25   They got -- they had fouled up this merger to fare-thee-well.

1    Lynch was gone and they decided to make something that is not

2    true -- it was never true that Leo Apotheker and the board

3    cared one bit about whether or not EMC hardware was accounted

4    for in this quarter or that quarter.  They didn't care one bit

5    about whether or not these bar transactions had occurred in

6    some way.  All of this is a Hewlett-Packard effort, now aided

7    and abetted by the Government, in order to make a story that

8    isn't -- to manufacture a case.  It's bureaucrats manufacturing

9    a case.

10          THE COURT:  You're saying look, they never relied on

11   it.

12          MR. KEKER:  Yes.

13          THE COURT:  And reliance is not an element.

14          MR. KEKER:  Well, no, no, no, but it's also -- I'm

15   saying a lot more than that.

16          THE COURT:  Well, I think you are saying that.  At

17   bottom, I think you're saying they didn't rely on it because if

18   they had relied on it, they would have done something about it

19   right away.  They didn't do anything about it right away, and

20   therefore there was no reliance.

21          MR. KEKER:  They knew about hardware.  They knew

22   plenty --

23          THE COURT:  You can argue all that.

24          MR. KEKER:  They knew about hardware and they didn't

25   pursue it because they didn't care about it.  That's different

1    from reliance.

2         THE COURT:  And they didn't care about it is a

3    complicated -- the reasons why they didn't care about it may be

4    a very -- if they didn't -- I don't know whether they did or

5    not.  If they didn't, accepting your offer -- if they didn't

6    can be a whole range of reasons.

7         And, you know, I think you made a good record.  And I'm

8    not -- I'm not being condescending.  I think it is a good

9    record.  I will let you supplement it any way you want to

10   supplement it.  And there it is if the case goes -- if the case

11   resolves.  You know, if it goes -- if there's -- if there is a

12   conviction.  I have no -- and on that subject, of course I have

13   no idea.

14        MR. KEKER:  Okay.

15        THE COURT:  So where are we --

16        MR. KEKER:  Your Honor, can we get formally our motion

17   about the Sarin and Gersh exhibits -- can we get that formally

18   denied?  I take it you're denying that motion.

19        THE COURT:  Yes.

20        MR. KEKER:  Okay.

21        THE COURT:  I better look at it again, but --

22        MR. KEKER:  No, it's --

23        THE COURT:  -- I believe I am.

24        MR. KEKER:  What it is, is post October 3rd exhibits

25   that we would ask -- that Sarin and Gersh are on and we would

**PROCEEDINGS**

1    ask them about it, but now we can't.

2         And as I understand with respect to our witness, I can't

3    ask her anything after October 3rd, and I'm accepting your

4    ruling, but that's what I understand.  We'll call Ms. Lesjak

5    and I can't ask her anything that happened after that.

6         So if --

7              **THE COURT:**  I don't know -- I don't know whether

8    that -- I mean, I think you have to make -- when you say ask

9    her anything after that, I have to have a better idea of like a

10   question and an -- a question and what you think her answer

11   would be.

12             **MR. KEKER:**  "When you're presented by Ernst & Young

13   with their report and it tells you 11 percent of the revenue is

14   hardware and you're told this and that, did you do anything?  I

15   mean, what did you do?  What did you think when you were told

16   that?  What was the problem?  You're the one who has been

17   through -- you knew that they sold appliances.  You knew they

18   had been through due diligence.  You knew this thing was sold

19   by Mr. Apotheker because of the software component and here you

20   find out there is some -- there is some 10 percent of the

21   revenues are hardware.  Like what did you do?"

22             **THE COURT:**  Mr. Leach.

23             **MR. LEACH:**  I thought that is exactly what we just

24   talked about, Your Honor.

25             **THE COURT:**  I thought so.  But maybe Mr. Keker said it

**PROCEEDINGS**

1  better this time than he said it last time.

2      **MR. KEKER:**  If you say it over and over again,

3  eventually --

4      **THE COURT:**  You start to believe it.  That's what

5  happens with me.  Okay.  You have your rulings.

6      **MR. KEKER:**  Okay.  All right.

7      **THE COURT:**  I think you have your rulings.

8      So where does this leave us?

9      **MR. KEKER:**  It leaves us -- we've got a stipulation

10 about stock prices and -- Hewlett-Packard stock prices and

11 Autonomy stock prices which are filed, but we would like to

12 present them to the jury.

13      **THE COURT:**  Of course.

14      **MR. KEKER:**  And then we've got -- we talked about this

15 before.  We have John Cronin phone records.  We've marked them

16 as 5685-A.

17      **MR. LEACH:**  We intend to offer them through Special

18 Agent Bryant, Your Honor, the phone records Mr. Keker is

19 talking about.  There is no objection to them.

20      **MR. FRENTZEN:**  We've marked them and they know we

21 marked them and we are going to put them in tomorrow.

22      **MR. KEKER:**  Well, we marked them and we would like to

23 put them in.  So --

24      **MR. FRENTZEN:**  We're putting them in tomorrow.

25      **THE COURT:**  Here is the problem.  Going back to your

1    point, Mr. Keker, about Ms. Lesjak, when you say you can't --

2    she got all these documents -- it's not your proposal just to

3    ask her the question, "Well, what did you think?"  Your

4    proposal is to ask her the question, "In light of what you

5    thought" -- you expect her to say, "I was shocked" or you

6    expect her to say, "I didn't realize that there were these

7    sales" or you expect her to somehow corroborate the

8    Government's theory?

9        **MR. KEKER:**  Absolutely.  There is no question.

10       **THE COURT:**  Okay.  Then you have the follow-up

11   question.  That's the thing I'm concerned about.  "Well, what

12   did you do, thinking that it was so horrible?"

13       **MR. KEKER:**  I can stop -- that's my offer before.  I

14   can stop after getting out this --

15       **THE COURT:**  Well, "After you were told" -- I'm not

16   sure I give the reports -- the reports go into evidence, but I

17   think you could say "After" -- "After you were told or at some

18   point you were told that the hardware sales were a hundred --

19   were of the type that the Government says they were" or

20   whatever that amount is, 100 million, 50 million.  You know,

21   "What did you think?"

22       I mean, obviously if she thought "Well, you know, that

23   didn't surprise me at all.  As a matter of fact, I thought" --

24       **MR. KEKER:**  She will say she thought they were

25   appliances.

1      **THE COURT:**  Of course she is not going to say that.

2    She is going to say "I was shocked."

3      **MR. KEKER:**  Or she is going to say "I thought they

4    were appliances" or "I didn't notice it."

5      **THE COURT:**  She will say, "I was devastated."  Okay.

6    Now, at that point -- and this is why you don't want to do it,

7    I think.  At that point, the questioning stops; that is, I

8    wouldn't allow the question about, "Well, being devastated or

9    surprised or shocked or -- what did you do about it," because

10   actually what you want to do is impeach the veracity of her

11   statement that she was shocked.  That's the whole point of it.

12   I understand that because your contention is they knew it all

13   along and this simply confirmed either that -- that she knew it

14   all along or it didn't make any difference.

15      **MR. KEKER:**  Didn't care.  They didn't care.

16      **THE COURT:**  Didn't make any difference.

17      Okay.  And that's where I'm drawing the line because it

18   seems to me what she did afterwards is a complicated -- it's a

19   very complicated subject, and it opens the door to all sorts of

20   other evidence.

21      And it -- by the way, it's evidence that goes back and

22   forth and back and forth and back and forth, "Well, I didn't do

23   it because of X."  So then in comes X, and they say, "Well, X,

24   no, that wasn't all that important."  And she says, "Well, I

25   thought maybe Y would occur, or then I had responsibilities to

1    the board, or I had this or that and a thousand things."

2        So that's where I am drawing the line.  You want a nice

3    line?  That's where I'm drawing the line.  You want to ask her

4    "When did you find out and what was your reaction when you

5    found out," have at it; but the next part, no.

6        Okay.  So is that clear?  I don't --

7            MR. KEKER:  I think it's clear.

8            THE COURT:  I don't think I'm doing you necessarily

9    any favors.

10           MR. KEKER:  I don't think you are either, but I can

11   ask her -- and we do have an exhibit.  She was -- it's a

12   PowerPoint that EY gave to the CFO that -- and we'd like -- we

13   would offer that exhibit into evidence.

14           THE COURT:  Have you seen it?

15           MR. KEKER:  You've got it in that pile.  That's one of

16   the --

17           MR. LEACH:  I've seen the exhibit, Your Honor.  It's a

18   PowerPoint from Ernst & Young to Ms. Lesjak in November of

19   2011.

20           MR. KEKER:  It's one of the exhibits that you asked us

21   to gather up.

22           THE COURT:  Right.  Do you know what number it is?

23           MR. KEKER:  It is 8234 and it's page 7 -- I mean, the

24   thing we would show her is look at page 7 of that exhibit.

25   This was presented by E & Y to the -- the cover email talks

 1    about "We completed the review of the" --

 2            **THE COURT:**  I just don't seem to have 8234.  Do I have

 3    it?

 4            **MR. KEKER:**  We -- can I --

 5            **MS. LAZARUS:**  Which exhibit are you looking for?

 6            **MR. KEKER:**  We are looking at the Betsy Branch, Brian

 7    Outland 11/9/11.

 8            **THE COURT:**  I don't have 8234.

 9            **MS. LAZARUS:**  I don't think it's in the file.

10            **MS. LITTLE:**  It's not one of the ones he asked for.

11            **MR. KEKER:**  Oh, okay.  I can hand -- here it is.

12            **THE COURT:**  Show it to the Government.

13        Have you seen it?

14            **MR. KEKER:**  I know they've seen it.

15            **MR. LEACH:**  I think I have, but if I could just look

16    at it briefly.

17                        (Pause in proceedings.)

18            **MR. KEKER:**  There are other similar ones right around

19    the same time, but the cover --

20            **THE COURT:**  It's your idea to show this to her?

21            **MR. KEKER:**  Yes.  The cover email and then the --

22            **THE COURT:**  Let me see it.

23            **MR. KEKER:**  -- red tab page.

24                        (Pause in proceedings.)

25            **MR. KEKER:**  The red tab is part of the PowerPoint that

 1    they got, and there is a bar chart that shows hardware.  It's

 2    hard to read but it says 11 percent hardware.  It's the revenue

 3    allocation.  This was after looking at the Deloitte work

 4    papers.

 5             THE COURT:  This was a document she received when?

 6             MR. KEKER:  November of 2011.  It's about a month

 7    after the closure.

 8             THE COURT:  Okay.  And you're not -- you're not

 9    representing to me that you would argue that having been told

10    that on -- whatever date this is.  What date did we say it was?

11             MR. KEKER:  November.

12             THE COURT:  November 11th.  It took them a year to

13    restate, or whatever they did, a year, year and a half but the

14    timing is not relevant.  It's the fact --

15             MR. KEKER:  I won't argue whatever you tell me I can't

16    argue.  We will --

17             THE COURT:  Well, I want to ask you whether you

18    intended to argue it.

19             MR. KEKER:  Well, no, I mean, if you say we can't

20    argue --

21             THE COURT:  I think you can't.  I think that would be

22    inconsistent with the Court's ruling because that would allow

23    the jury to speculate on the very thing that actually you think

24    is important --

25             MR. KEKER:  Right.

1    **THE COURT:**  -- I give you that, and which I think

2    ought not to be considered by the jury.  That's -- that's where

3    we vary.  So if you want to -- yes, you could certainly ask her

4    about this, when she got this, what was her reaction, period.

5    **MR. KEKER:**  And then not argue that it took them a

6    year to do anything.  I get it.  Okay.  That's fine.

7    Can I have that back?

8    **THE COURT:**  When you say you get it, that means you

9    agree with me.  No.  I'm being facetious.

10    **MR. KEKER:**  I understand you and will obey the rules.

11    **THE COURT:**  No, of course you will.  I mean, I

12    appreciate that.  I understand that.  I mean, nobody --

13    that's --

14    **MR. KEKER:**  Okay.  Well, we'll see --

15    **THE COURT:**  But I will say, Mr. Keker, I think that

16    looking at that document, I don't know that it particularly in

17    that context will help, but that's up to you.  You have to make

18    a trial decision on that.

19    **MR. KEKER:**  Okay.

20    **THE COURT:**  Okay.  So where are we at 5:00?

21    **MR. KEKER:**  We're I think we have -- we have these

22    Cronin records that we want to put in that we'd agreed to, and

23    so we just need you to say they're in.  5685A --

24    **MR. FRENTZEN:**  No, Your Honor.  We're introducing

25    them -- we talked about this -- we're introducing them in our

**PROCEEDINGS**

1    case tomorrow through the agent.

2         MR. KEKER:  They don't have -- their records look

3    different than these, and they don't have the --

4         THE COURT:  Look, you know what?

5         MR. KEKER:  -- chart.

6         THE COURT:  Okay.  Now, Mr. Keker, of the three

7    Government lawyers, which do you get along the best with?

8         MR. KEKER:  I get along with Mr. Frentzen the best.

9    The other two are brutes, Your Honor.

10        THE COURT:  Okay.  That's what I thought.  So I would

11   like you --

12        MR. LEACH:  Crude and aiding and abetting of fraud all

13   in one day.  Thank you, Mr. Keker.

14        THE COURT:  -- I would like you to meet and see if you

15   can arrive at an agreement because apparently they're going in;

16   and if you want to say they're going in jointly, I don't care.

17   You know, I mean, I don't care.

18        MR. FRENTZEN:  I plan on introducing them tomorrow

19   through the agent's testimony, and I will introduce them in any

20   form that they want.

21        THE COURT:  Okay.

22        MR. KEKER:  And then we have these two stipulations

23   about --

24        THE COURT:  You can read that.

25        MR. KEKER:  -- stock prices, which are -- which are

PROCEEDINGS

 1    filed.  I mean, they are court filed.

 2         **THE COURT:**  They have to be read to the jury in some

 3    form.

 4         **MR. KEKER:**  Okay.

 5         **THE COURT:**  I always want a stipulation to be read to

 6    the jury in some form, abbreviated, summarized --

 7         **MR. KEKER:**  Just stand up and tell them?

 8         **THE COURT:**  Yes.  Just tell them and that shows them

 9    how everybody gets along.

10         Okay.  So if, under my restrictive rules, if in fact it

11    goes that way, do we anticipate that all the evidence will be

12    in tomorrow?  Am I -- am I --

13         **MR. KEKER:**  Let me think about it.

14         **THE COURT:**  Okay.  Tomorrow or Thursday morning, or

15    something like that.

16         **MR. KEKER:**  Yes.  I think tomorrow or Thursday is a

17    safe bet.

18         **THE COURT:**  Yeah.

19         Okay.  So now --

20         **MR. KEKER:**  Can we talk now about how long the

21    Government wants to argue the case?

22         **THE COURT:**  Okay.  Let's talk a little bit -- let's

23    just talk a little bit about instructions.

24         I'll go through them tonight -- I have the objections, and

25    so forth and so on -- and try to come up tonight with what the

1    Court thinks are the appropriate instructions and give them to

2    you as proposed jury instructions.

3        But they're important as we all know, and so I want you to

4    take some time and look at it and then give me your comments,

5    which can be orally.  They don't have to be in writing.  But we

6    should have a conference -- try to have a conference, if we

7    can, tomorrow and I guess at the latest Thursday, so that the

8    parties can have it, have it in mind, and over the weekend

9    prepare their closings.

10           MR. KEKER:  Thursday would be better --

11           THE COURT:  That's fine.

12           MR. KEKER:  -- because we'll be in court tomorrow.

13           THE COURT:  That's fine.

14           MR. LEACH:  That's fine with the Government,

15    Your Honor.

16           THE COURT:  So what is it you want to know about --

17           MR. KEKER:  I want to know how -- what -- I've gotten

18    your ruling that we're going to have equal time.  I want to

19    know how much the Government wants.  We're probably willing to

20    do it on the shorter side, but I have a feeling they're on the

21    longer side so we'll go longer.

22           THE COURT:  Well, this is the way I look at it:  The

23    Government has the burden but, of course, they get the

24    rebuttal.  And just have operated on the procedure the

25    Government says "I want three hours for my argument," they have

1    to divide it in some manner that leaves them time to argue at

2    the end.

3        Now, if they say four hours, that's easier for them.  And

4    the only understanding -- a couple things.  Number one,

5    basically I'll give the Government the amount of time it

6    needs -- it says it needs; two, I'll give the Defense the same

7    amount of time; and, three, the Defense will not be placed in a

8    position where the Government, given the last word, gets to

9    address the jury on a day separate from what the Defense said.

10       So those are sort of the guidelines.  I think the only

11   situation we're going to run into is the juror who has to leave

12   and I think she probably does have to leave.  So I would --

13   whatever that day comes, wherever we are in the case, assuming

14   I still have three, I'll substitute her out and put in one of

15   the three.

16           **MR. KEKER:**  We -- I mean, so can we just get from the

17   Government what they -- what --

18           **THE COURT:**  I think they don't know right now.  They

19   want to talk about how they'll allocate.  Again, you can

20   allocate any way you want to argue.  Somebody can do ten

21   minutes, somebody can do an hour.  Any way you want to do it.

22           **MR. KEKER:**  Could we get the number tomorrow, though?

23           **THE COURT:**  Is Cody going to argue this?

24           **MR. KEKER:**  Cody is going to argue the meat.  I'm

25   going to take some of the fluff.

**PROCEEDINGS**

1          **THE COURT:**  There you go.

2      Okay.  All right.  Anyway, that's fine.

3          **MR. KEKER:**  Can we get the number tomorrow?  I mean,

4   ask them to tell us tomorrow?

5          **THE COURT:**  Well, I don't know tomorrow.  You'll get

6   it -- I think you have to get it by Thursday.  I think you have

7   to --

8          **MR. KEKER:**  That's good.

9          **THE COURT:**  -- so you can sit down and plan your

10  argument.  You may have exhibits.  You may have PowerPoints.

11  You can do anything.  You could have any type of arrangement

12  you like.  You know, a day in the life of the trial, that would

13  be fascinating.  You can do any of those things, anything that

14  would be appropriate.

15      Have we worked out the question, I don't know why this is

16  bugging me, but the question about how we're going to deal with

17  all these exhibits?

18          **MR. KEKER:**  We have worked out an index, and our

19  problem we've been slowed down because Ms. Bringola is in such

20  bad shape, but we can get -- I think we all know what we're

21  going to try to do, which is get an index.

22          **THE COURT:**  Okay.  So how are you going to argue to

23  the jury?  Are you going to say to the jury, "On point number

24  one or on this particular point that I'm arguing, please make a

25  note that it's Exhibit No. 28, 29, 30 and 31"?

1          I just think -- and I'm not telling you how to do it,

2     though that sounds like I am.  I've seen so many arguments in

3     the last 21 years where lawyers get up and they talk about,

4     especially in long cases, they talk about the case and there

5     are a hundred exhibits or 50 exhibits or a thousand exhibits

6     and there's no way in the jury room they could possibly find

7     the exhibit.  And what happens is I get a letter from the

8     jury -- a note from the jury that says "Could we please see the

9     PowerPoint that was given to us in closing arguments that

10    listed all of those exhibits?"

11         Now, I can tell the jury before argument that it may be

12    useful in this case when an attorney argues a particular point,

13    cites a particular exhibit, please make a note because if it

14    becomes relevant to your discussions, determinations, the

15    exhibits will be there.

16         We're giving them the hard copies; right?  Is anybody

17    thinking we have to give them the electronics?

18         **MR. LEACH:**  We do need to get them electronic copies,

19    Your Honor.  There have been a number of native files.  I think

20    Mr. Dooley was working from some today.  I think the plan is to

21    put them all on one CD or media that can be reviewed by a

22    computer.

23         **THE COURT:**  Okay.  We can say that.  And I think -- is

24    the process where we -- I mean, I don't know how advanced we

25    are in there.  Do we send in a -- what do we do, Lashanda?

**PROCEEDINGS**

1          **THE CLERK:**  I ordered the jury cart to be delivered

2 here.

3          **THE COURT:**  The jury cart.

4          **THE CLERK:**  Yes.  For Friday.  It will be here 1:00 on

5 Friday.

6          **THE COURT:**  Okay.  So why don't you sit down.  I

7 really think you want this to go smoothly, and so Friday

8 afternoon when I won't be here why don't you take a look and

9 see if you can all agree on the electronics, and so forth, and

10 that will be fine.

11          **MR. LEACH:**  We will, Your Honor.

12          **MR. KEKER:**  Okay.  Thank you.

13          **MR. LEACH:**  Thank you.

14          **MR. REEVES:**  Thank you, Your Honor.

15          **MR. KEKER:**  See you tomorrow.

16          (Proceedings adjourned at 5:13 p.m.)

17          ---oOo---

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTERS

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Tuesday, April 17, 2018

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter