**Volume 27**

**Pages 5596 - 5690**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
    VS.                            )          **NO. CR 16-00462 CRB**
                                   )
SUSHOVAN TAREQUE HUSSAIN,          )
                                   )
            Defendant.             )
_____   )
                            San Francisco, California
                            Thursday, April 19, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

           ALEX G. TSE
           Acting United States Attorney
           450 Golden Gate Avenue
           San Francisco, California  94102
      BY:  **ROBERT S. LEACH**
           **ADAM A. REEVES**
           **WILLIAM FRENTZEN**
           **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

           KEKER & VAN NEST
           633 Battery Street
           San Francisco  CA  94111
      BY:  **JOHN W. KEKER**
           **JAN NIELSEN LITTLE**
           **BROOK DOOLEY**
           **KATE LAZARUS**
           **NIC MARAIS**
           **CODY GRAY**
           **IAN KANIG**
           **ATTORNEYS AT LAW**

Reported By:  Pamela Batalo, CSR No. 3593, FCRR, RMR
                Official Reporter

# **I N D E X**

Thursday, April 19, 2018 - Volume 27

|                       | PAGE | VOL. |
|-----------------------|------|------|
| Offer of Proof        | 5598 | 27   |
| Charging Conference   | 5627 | 27   |

| | |
|---|---|
| 1 | **Thursday - April 19, 2018** **9:34 A.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:** Okay. Let the record show -- be seated -- |
| 6 | that all parties are present. Of course the jury is not |
| 7 | present. |
| 8 | There are two things I wanted to deal with -- maybe |
| 9 | they're more. I don't know. Obviously a discussion -- oh, I |
| 10 | see, Cody, they gave you a prominent seat here. |
| 11 | **MR. GRAY:** Moving up in the world, Your Honor. |
| 12 | **THE COURT:** Right there. Right there. You couldn't |
| 13 | get any closer. |
| 14 | So I want to deal with the offer of proof and then I want |
| 15 | to deal with jury instructions and some discussion about |
| 16 | argument. |
| 17 | So I have in mind the submission that was filed by |
| 18 | Mr. Hussain on behalf of Mr. Hussain, but the Government, as I |
| 19 | indicated, could answer orally, need not file a brief. |
| 20 | So, Mr. Leach, there you are. |
| 21 | **MR. LEACH:** Thank you very much, Your Honor. |
| 22 | **THE COURT:** The most reasonable member of the |
| 23 | prosecution team, as designated by the Defense. Okay. |
| 24 | And we have Mr. Marais -- |
| 25 | **MR. LEACH:** I think I was designated a brute, |

**PROCEEDINGS**

1   Your Honor.

2           **THE COURT:**  -- who is the hero of the truth and

3   reconciliation process that exists here in our courtroom;

4   right?

5           **MR. MARAIS:**  I'm zero for one, Your Honor.

6           **THE COURT:**  Okay.  Mr. Leach, go ahead.

7           **MR. LEACH:**  Your Honor, this is essentially a wire

8   fraud case, and one of the elements of wire fraud is

9   materiality.  That is an objective test, whether the statements

10  or omissions in furtherance of the scheme had a tendency to

11  cause somebody to part with money or property.

12      The subjective views of one victim or one employee or one

13  service provider of the victim, particularly one with tens of

14  thousands of employees, simply is not the test.

15      The folks in the due diligence here -- Sarin, Johnson,

16  Apotheker and Robison -- the claim is that these folks did not

17  care about Autonomy's false financial statements or the nature

18  and extent of Autonomy's pure hardware sales.

19      And the proffered evidence from the defense in their offer

20  of proof, particularly the exhibits that the Court has

21  identified in its order inviting oral argument, are not

22  relevant to the element of materiality, and to the extent they

23  have some marginal relevance, the probative value of those

24  exhibits is vastly outweighed by the 403 factors.

25      And it would result in a mini trial, dissecting the

PROCEEDINGS

1    year-long chain of events after HP acquired Autonomy, going

2    into what employee learned exactly what at what time, what that

3    person's role was at the time, what that person had to do with

4    the diligence, what Hussain and Chamberlain said in response to

5    them, and ultimately why, in a public company with thousands of

6    employees and a host of differing motivations, that person

7    didn't immediately accuse Dr. Lynch and Mr. Hussain in the UK

8    with a massive fraud in the context of a public company, in the

9    context of an organization who had recently lost its CEO, and

10   it just results in a mini trial about why they didn't act

11   sooner.  It's not relevant and it's appropriately excluded

12   under 403.

13       With respect to some of the individual E&Y documents,

14   those purport to show that -- and first you need to understand

15   E&Y's role in this.

16       E&Y was not involved in the diligence.  They were not

17   involved in the diligence.  They learned about the acquisition

18   maybe a day or two before.  They were HP's auditors.  They

19   never talked to Hussain, they never talked to Dr. Lynch in

20   connection with the diligence, and they're not in a position to

21   say what was or was not material to anybody in the context of

22   making the decision to acquire Autonomy.

23       Now, it's undisputed that once Autonomy is bought by HP,

24   HP gets access to the books.  That happens in every

25   acquisition, and as the Court has remarked, that's not a

1    remarkable proposition.

2        And in the course of E&Y doing its audit of HP's financial

3    statements, they get access to the Deloitte work papers.  They

4    see a hundred million dollars in hardware sales.  They don't

5    know whether that was or wasn't disclosed in the diligence, but

6    what they do know is they have to conduct an audit going

7    forward.  And they put that issue in a 50- to 75-page

8    PowerPoint as one of many, many, many items to be considered in

9    connection with HP's audit of Autonomy, and it just doesn't go

10   to show -- and that PowerPoint goes to Cathie Lesjak.  Others

11   within the finance department get bits and pieces, but the

12   context matters.  Do they know about the appliance sales?  What

13   are they looking for here?  And then it just raises a whole

14   host of questions about -- that the Court has identified of why

15   in the context of a public company what do they know, what did

16   they learn in the diligence.  It really has very little to show

17   about whether the statements that the defendant made were

18   material.

19       So the Court has identified -- and I can go through

20   exhibit by exhibit, but I put them into three buckets.

21       One is the evidence of E&Y learning about the hardware

22   sales and escalating it to Cathie Lesjak and others.  That's

23   precisely the type of "why the dog didn't bark" evidence that

24   the Court was alluding to yesterday.

25       The second category of documents are an email to Manish

1    Sarin in November of 2011.  I think it's Exhibit 2451.  And the

2    Defense loves this exhibit because there are individuals within

3    HP who are attempting to do something called "purchase price

4    accounting," which is not how do we -- what price do we decide

5    to pay for Autonomy, what do we think is -- matters in terms of

6    making an offer to buy Autonomy.  They're essentially taking

7    the price that was agreed to, $11.7 billion, and putting it

8    into various buckets.

9        You have the tangible assets, which are tangible.

10   Everybody knows what they are; the intangible assets, which are

11   a little harder to value; and anything that doesn't go into

12   those two buckets goes into goodwill, and it adds up to

13   $11.7 billion.

14       And Manish Sarin gets an email from the purchase price

15   accounting folks who had a marginal, if no role, in the

16   diligence that says hardware sales won't affect this purchase

17   price evaluation.  It is deeply misleading in the context of

18   this case where the question is what was told to the due

19   diligence team and what was told to the market and whether

20   those statements mattered, and Manish Sarin's reaction to it

21   which they did get into with Manish Sarin was telling.  He

22   said, "I thought they were wrong.  I couldn't believe it.  I

23   didn't think what they were saying was right.  And I didn't cry

24   foul then because I just thought they were wrong."

25       And they got into that.  And that's what Sarin has

1    testified, and they have had a chance to cross-examine him on

2    that point, and I think this illustrates there are lots of

3    complicated reasons why different people with different roles,

4    with different knowledges, with different quanta of information

5    about what they're learning -- is it an amount of hardware

6    sales, is it appliance, is it the Deloitte work papers which

7    don't of themselves reveal a fraud because Deloitte was lied

8    to, and so it's wholly unremarkable that Ernst & Young would

9    look at the work papers in November of 2011 and essentially

10   read what Deloitte had been told and say "these are the audit

11   issues that we have to look at going forward."

12        Another category that they have is Andy Gersh.  Andy

13   Gersh, you will recall, worked at KPMG, testified under oath he

14   didn't know about the nature and extent of the hardware sales.

15   He continues to do work on behalf of HP.  He learns in what's

16   called the closing balance sheet or the opening balance sheet

17   for Autonomy review -- in the course of that, he learns about

18   the hardware sales.  He learns about the size.  And he would

19   testify, if we had gotten into it, "I was shocked.  I felt like

20   the information we had gotten in the diligence was wrong and

21   that something was amiss here."  And that he escalated it to

22   people and that he continued to try to get an answer to this

23   all the way through June -- or January because he recognized

24   its importance.

25        And, again, it's the context, it's the -- what the

PROCEEDINGS

1    person's role in the diligence was, what the quantum of

2    information was, and how it is they're getting that.

3        Mr. Gersh would also say he tried to get answers from

4    Steve Chamberlain and Chamberlain was evasive in trying to

5    answer his questions.

6        So it also opens up a whole nother array of what the

7    Autonomy folks are saying and providing in response to all of

8    this.

9        The final two documents that the Court identified -- and I

10   don't have the exhibits in my notes -- are from December of

11   2012, a year after the acquisition was announced.  They are

12   Ernst & Young documents relating to the impairment.

13       The impairment has nothing to do with this case.  It is a

14   one-year-later judgment by HP based on the information it knows

15   then about the future value of Autonomy, and if it's less than

16   what they paid for, they have to record a charge.  And I just

17   don't see how it has anything to do with learning about the

18   hardware sales --

19       **THE COURT:**  Well, it has something to do with the

20   case.  I mean -- but let me -- let me tell you what I

21   understand it has to do with the case.

22       Number one, it doesn't have to do with the case, as far as

23   the Court is concerned, is whether the impairment was improper

24   or not or the extent of the impairment.  I don't know about the

25   extent.  I have to think about that for a minute.

PROCEEDINGS

1        But -- but what was significant, as it was presented to

2    the Court or as the Court recollects, was that it -- the

3    announcement of the impairment had an impact on -- on the

4    individual who testified as to a member of the public, I think.

5    I don't quite remember what he did.  But he sold his shares.  I

6    think that's what happened.

7            **MR. LEACH:**  That's correct.

8            **THE COURT:**  So it was the event of the impairment, not

9    the degree -- not the correctness of the impairment that --

10   that had some impact.  And that's what I thought -- I thought

11   that that was what -- what the -- what the relevance of the

12   evidence was.

13       But I'll -- was it more than that or less than that or

14   what?  I mean, you offered it.  The Government offered it, so

15   what did you offer it for?  Because I understood, as I've

16   just -- as I've just set forth on the record -- that was my

17   understanding of it.  Now, was it offered for some other

18   purpose or what?

19           **MR. LEACH:**  I think it was offered just to fix the

20   date when Mr. Upton sold his shares and to quantify his loss --

21           **THE COURT:**  But that would be -- that would be easy.

22   There is a record that says "on X date" -- "X date I sold my

23   shares."  By the way, they wouldn't dispute it at all.  They're

24   not saying he didn't sell it on X date.  And it wasn't, "Oh,

25   how do you remember that date?"

**PROCEEDINGS**

1    I mean, yes, but how he remembers that date is only

2    relevant because it had -- because that's why he did what he

3    did.

4        But it wasn't introduced -- I thought -- you know, look,

5    the trial has gone on for three months so I don't know to what

6    extent I gave a cautionary instruction or so forth -- and, by

7    the way, I'm not precluded from commenting on any bit of

8    evidence if it's warranted in my instructions.  If it's

9    warranted, I'll do it.

10       But my recollection is that it was to -- it was sort of

11   the pure case of how did it -- how did it affect the listener,

12   how did it affect the doer.  It went to the -- it explained the

13   witness' action in selling it, but are you saying no, that's

14   not why it was introduced?

15       **MR. LEACH:**  Mr. Reeves is reminding me it was -- we

16   asked the question "when you sold" and it was the witness who

17   said "I sold on the day the impairment was announced."  It was

18   not our intention --

19       **THE COURT:**  I see.

20       **MR. LEACH:**  -- to get into that level of detail.

21   If the Court thinks an instruction is appropriate --

22       **THE COURT:**  Maybe I should.

23       **MR. LEACH:**  -- the only relevance is to establish his

24   state of mind to when he's selling.  We are fine with that.

25       We avoided getting into the amount of the impairment.  We

PROCEEDINGS

1    don't think it is relevant.  We think it is different from the

2    restatement.  It has nothing to do with what -- what was told

3    to HP during the diligence and --

4         THE COURT:  Well, I think then if I didn't give a

5    cautionary instruction, I'm inclined to do so in my -- in my

6    jury instructions.

7         "Ladies and gentlemen of the jury, you've heard evidence

8    that there was a -- an event called an impairment, which means

9    that Hewlett-Packard believed that the value of the asset which

10   they carried on their books and records was less than

11   originally stated.  You are not to consider that for the truth

12   of matter; that is, it was less, but only that it -- that the

13   fact of the impairment may have, if you believe the witness,

14   had an impact on -- on that witness' action."

15        MR. KEKER:  Your Honor --

16        THE COURT:  Let me -- one thing at a time.

17        MR. KEKER:  We object to that.

18        THE COURT:  I just want to finish it.

19        This is -- a lot of this is to make sure that there is a

20   clear -- whichever way I come out, I want there to be a clear,

21   unambiguous record of what I've done and why I've done it, and

22   so in the event -- and I have no idea, but in the event there

23   is an appeal in this case, the Defense will have the advantage

24   or opportunity to present -- and both sides will, to have a

25   clear record of -- you know a judge can be right, a judge can

PROCEEDINGS

1    be wrong, but I want -- I want an appellate court to be able at

2    least to have the benefit of -- to the extent I can bring

3    clarity to the situation, which is always more of an

4    aspirational goal than an experience, I want to be able to do

5    so.

6        So I just feel we have the whole morning and let's just

7    take our time.  I'll hear everybody until they're finished

8    talking to their satisfaction on these issues.

9        So I go back to you, Mr. Leach.  And then I want you to --

10   I want you to say whatever you need to say about it.  But

11   that's a possibility, and I'll explore that with the Defense.

12       **MR. LEACH:**  I think that's a fair summary of the

13   Government's position with respect to these particular

14   exhibits.  If the Court has further questions --

15       **THE COURT:**  Why don't you talk to Mr. Frentzen.  I

16   think he wants to say something.

17       **MR. LEACH:**  Mr. Frentzen is reminding me they put in

18   the impairment through Yelland.  The fact is in the record.

19   They put in the press releases.  We're not moving to strike

20   them at this point, but if it's the fact of the impairment they

21   want, they've got it.

22       I don't see any need to go further into Ernst & Young's

23   descriptions about the impairment and the reasons and -- or

24   understanding of the reasons in the context of a year and a

25   half after the acquisition.

PROCEEDINGS

1    But we don't think the impairment is relevant.  We didn't

2  intend to put it into evidence.  It came out through the one

3  witness.  I think they have what they need to make their

4  arguments.  I don't see the relevance of the particular exhibit

5  that they've --

6            **THE COURT:**  So you're not asking for that instruction?

7  So maybe I should turn now to Mr. Marais.  Are you finished?

8            **MR. LEACH:**  Yes, Your Honor.

9            **THE COURT:**  Okay.  Don't stray too far.

10    Let me address the last thing first.

11            **MR. MARAIS:**  Sure.

12            **THE COURT:**  Do you want such an instruction?

13            **MR. MARAIS:**  No.

14            **THE COURT:**  Okay.  All right.  "No" is "no."  You

15  don't have to say anything more.

16            **MR. MARAIS:**  Well, Your Honor, I do --

17            **THE COURT:**  You don't have to say anything more on

18  that issue.  Obviously you have a lot to say, but you don't

19  have to explain why you do want it or don't -- I mean, why you

20  don't want it.  If you don't want it, the Government doesn't

21  want to it, and the Court is not inclined to give it.

22    So moving ahead.

23            **MR. MARAIS:**  Thank you, Your Honor.

24    Mr. Leach acts as if there has been no evidence in this

25  trial by HP witnesses about how they felt or how they reacted.

PROCEEDINGS

1   I have lost count of the number of times witnesses have been

2   asked "Would you have been surprised if I represented these

3   facts to you?  Would you have been shocked?"

4       Mr. Sarin took the stand and said he would have been

5   shocked to learn that Autonomy was selling hardware.  And given

6   that this isn't some invisible objective party, given that the

7   Government has brought HP witness after HP witness in here to

8   testify about how they would have reacted, the defense should

9   be afforded an opportunity to clarify how in fact HP did react.

10      Chris Yelland was on the stand for a day --

11      **THE COURT:**  Yeah, but -- I'm going to engage in a

12  back-and-forth with you.

13      The issue is when we asked how would HP react, it turns on

14  the question of would they have -- would they have purchased

15  Autonomy?  Would -- or Autonomy at that price.

16      Now, that's the question.  After having purchased

17  Autonomy, it's not like, "Oh, let's -- let's -- let's -- hey,

18  restitution.  Give it back.  Let's undo the deal.  No problem

19  at all."  That's not -- that was not a -- as I understand it,

20  a -- a legal, viable opportunity that the parties had to simply

21  just say the Roseanne Roseannadanna, you know, approach to it.

22  You know, "Never mind.  Let's just go back to day one."

23  That -- that wasn't a viable option.

24      They had acquired it, announced it, the market had relied

25  on it, and now the question was what are they going to do with

PROCEEDINGS

1    it?  And what do they know about it?

2        And that's why I find everything that -- that has been

3    proffered by you sort of by the by.  In other words, it is --

4    it is -- I'm not saying it didn't happen and I'm not saying it

5    wasn't significant to how it was treated in an ongoing basis.

6    I'm just saying that its relevance, if it is relevant, is

7    marginally relevant and introduces a host of issues.

8        For example, let's say -- and I'm reminded of the

9    Winklevoss case where the Winklevoss twins acquired -- or they

10   sort of settled something with -- with Facebook, and this was

11   in a Ninth Circuit case.  And it turned out that the shares

12   that they got in exchange for release of their claims was far

13   more valuable, far more valuable than -- in a settlement than

14   it was -- than they had anticipated, than anybody had

15   anticipated.

16       But the question wasn't did they get a better settlement

17   than they thought they had gotten.  The question was whether

18   they were properly -- whether facts were properly disclosed at

19   the time that they had entered into the settlement.

20       And in a sense -- and I know there are differences and I'm

21   not -- you know, I'm just reaching out to what is operating in

22   my mind at the time -- at this time, and I'm just saying -- I'm

23   just saying to you that settlements -- purchases and so forth

24   can turn out very, very differently, and it can then be a

25   question of accommodation, how you're going to integrate

PROCEEDINGS

1    something.  There are a whole host of issues.  And it doesn't

2    affect the basic fraud, if there was a basic fraud, is what I'm

3    saying.

4        Now, I thought your point was, look, it wasn't really

5    material.

6            MR. MARAIS:  Well, certainly that is one -- that is

7    one of my points, Your Honor, and I'm happy to address exactly

8    this question.

9        If I could hand this exhibit up --

10           THE COURT:  Sure.

11           MR. MARAIS:  I think I omitted this from the offer of

12   proof, but we have given a copy of this to the Government so

13   they are aware of it.

14           THE COURT:  This is -- this is -- it's the Exhibit No.

15   8228.

16           MR. MARAIS:  Yes, sir.  This is a report prepared by

17   Ernst & Young, one of the reports that Mr. Leach was just

18   discussing, in January 2013.  This is 15 months after the

19   acquisition closed.

20       And if I could direct Your Honor to page 18 of the

21   exhibit, which is page 16 of the report, and I think the

22   question you just asked is whether any of this information

23   would have impacted the decision to purchase.  E&Y writes in

24   this report, "Given the wide range of valuations" --

25           THE COURT:  Where -- let me just follow.  What

PROCEEDINGS

1    paragraph?

2           MR. MARAIS:   Towards the bottom where the flag is,

3    Your Honor.

4           THE COURT:   Okay.  Okay.  Go ahead.

5           MR. MARAIS:   "Given the wide range of valuations at

6    the time of the acquisition, the $300 million change in

7    valuation is not expected to have altered the company's

8    purchasing decision or the overall amount paid."

9        And then skipping a sentence, they go on, "The timing

10   adjustments only impact the timing of the recognition of

11   revenue, not the timing of cash flows, and the hardware

12   transactions have no impact on the overall cash flows as they

13   were accounted for as gross instead of net."

14       These are HP's auditors 15 months after HP had full access

15   to Autonomy's books saying that the alleged fraud that HP has

16   now uncovered would have no impact on the company's purchasing

17   decision or the overall amount paid.

18       This is evidence of whether or not any of these

19   allegations were material to Hewlett-Packard, Your Honor.

20          THE COURT:   Material what?  Do you mean material in

21   the acquisition?

22          MR. MARAIS:   Correct.  Material to its valuations or

23   the decision to proceed with the deal and the price that it

24   paid.

25          MR. LEACH:   This is Ernst & Young, Your Honor, not HP.

PROCEEDINGS

1   This is Ernst & Young 15 months later talking about whether or

2   not we should have taken an impairment charge earlier than the

3   impairment charge that they took in November of 2012.

4       I believe these words are taken out of context.  I believe

5   it's based on partial information, and it's not the people who

6   are making the decision at the time.  Ernst & Young was not

7   involved in the diligence.

8       Ernst & Young -- the question it's trying to analyze right

9   here is whether the impairment charge in November of 2012 --

10  "whether our current valuation of this based on what we think

11  this company is going to do over the lifetime of the company is

12  less or more than the purchase price."  That's what Ernst &

13  Young is talking about here.

14      THE COURT:  Why doesn't -- I mean, again, going back

15  to my stock analogy, I buy stock or I buy X or I buy Y and it's

16  represented to be -- it's represented that it will be this

17  particular value.  And then I get it and -- and circumstances

18  change and it turns out I bought something different from what

19  it was represented to be, but it turns out to be more valuable

20  than I originally anticipated.

21      Question:  Did a fraud occur?  Because I think the answer

22  is yeah.

23      MR. LEACH:  Yes.

24      THE COURT:  Question:  What are my damages?  Oh, zero.

25  My damages may be zero.  As a matter of fact, maybe I should

PROCEEDINGS

1    give it back.

2        But putting that aside, that's a question, I think, of

3    damages, not of whether or not the transaction would have gone

4    forward at the time -- at the time the transaction was

5    anticipated.

6        Sure, a year or two later your asset may turn out to be

7    more valuable rather than less valuable through any variety of

8    circumstances:  Changes in the market, changes in -- in laws,

9    changes in tax laws, changes in -- in demand, changes -- all

10   sorts of things can happen in a market, in a business,

11   especially the size of Hewlett-Packard that makes an asset more

12   or less valuable.

13       As a matter of fact, Mr. Marais, you are arguing that

14   case.  You are saying that what happened in this case was that

15   Hewlett-Packard destroyed the value of the asset.  That's --

16   that's -- I've heard that nonstop.  And maybe they did.  Maybe

17   they destroyed it.  But that doesn't mean that they weren't --

18   if proven, they weren't lied to and misrepresented as to

19   what -- what the past was, past or present, up to a particular

20   time.

21       And that they didn't -- and there's no evidence that --

22   well, I think that's really the point.  I mean, that's the way

23   I look at it.  And that became more valuable, less valuable.

24   All these activities certainly could have some bearing, and I'm

25   not saying it doesn't.  I'm just saying that under -- under

PROCEEDINGS

1    403 -- did I get that right?  I always get that wrong.  403,

2    that is the sideshow.  That is the -- that is the -- that's --

3    that's exactly what is meant by keeping it out, I think.  I

4    mean, I think it meets almost all of the criteria under 403.

5         MR. MARAIS:  Your Honor, I think we need to add just a

6    touch of nuance to the hypothetical.

7         If you had bought the stock and the Government brought you

8    in and asked you questions about why you bought that stock, and

9    you said, "Mr. Keker told me it was a great deal, that was the

10   reason I bought the stock based on that representation," if it

11   turns out that there are emails exchanged after the fact in

12   which you say "I bought this stock, I would have bought it

13   irrespective of any representations Mr. Keker made, I knew

14   Mr. Keker was wrong at the time" --

15        THE COURT:  By the way, if you have a witness who will

16   come in and say, "Oh, by the way, even though these things

17   happened, we would have bought it anyway" --

18        MR. MARAIS:  Well, Your Honor, that's exactly what

19   Exhibit 8228 says.

20        THE COURT:  No, it doesn't say that.  It says that --

21   it says that the asset is as valuable -- it says -- it

22   discusses the impairment.

23        But that, by the way -- that's Ernst & Young.  I need a

24   Hewlett-Packard person or somebody who participated in the

25   transaction who would have said -- and you have had plenty of

**PROCEEDINGS**

1   opportunity to say to the due diligence people who were -- and

2   Mr. Apotheker, which -- to say "Look, would you have bought it

3   anyway?  If you had known the things that were -- the truth

4   of" -- I'll call it the truth of the matter, without

5   characterizing it necessarily as true, but, I mean, "If you had

6   known the truth of the matter as depicted by the Government or

7   if you had known what the Government says is the truth of the

8   matter, would you have bought it anyway?"  "No."

9        Is there a witness who would have said who was in

10   connection with the decision-making process "I would have

11   bought it anyway?" Even then, I'm not all that comfortable that

12   that comes in, but at least that's the kind of evidence --

13             **MR. MARAIS:**  Your Honor --

14             **THE COURT:**  -- that I think you would have to proffer

15   to me in terms of materiality.  That somebody came along.  They

16   hired -- their accounts or whoever Ernst & Young -- they were

17   Hewlett-Packard's accountants, saying "Oh, look, don't" -- you

18   know, "it's just as valuable as initially represented" and so

19   forth, isn't the kind of evidence.

20        Now, what you want to do, fair enough, is say "well, since

21   they said that, isn't it a reasonable inference that they would

22   have bought it anyway." And the answer is not necessarily.  I

23   don't know.  It has to be put in a whole context of what they

24   were doing, what was going on, what was happening.

25        And as to that, that's the sideshow, you see.  That's --

PROCEEDINGS

1    that's the thing that I think 403 is designed to keep out, in

2    the Court's view.

3              **MR. MARAIS:**  Your Honor, when Mr. Sarin was here, one

4    of the lines of questions I had hoped to explore was the

5    November 2011 email that Mr. Leach has referenced.  It's

6    Exhibit 2451.  We had a sidebar about it after Mr. Sarin

7    himself mentioned it, and I was instructed not to discuss it.

8    Mr. Reeves objected when I got anywhere near this email.

9        This is an email from Mr. Sarin in the wake of the close

10   of the deal in which he is informed of $100 million worth of

11   revenue sales, and his response is, in part, "I suspect this is

12   sell-through revenue where they are getting a margin as they

13   sell Dell appliances."

14       Now, Mr. Leach will stand here and say he was mistaken, he

15   didn't mean what these words on the page appear to say, but we

16   were not allowed to ask him questions about it, and -- and

17   Mr. Sarin testified at some length that he had no idea about

18   the hardware sales, that he would have been shocked to learn

19   about the hardware sales.  Emails exchanged six weeks later

20   suggest that he was well aware that these were pass-through

21   revenues.

22             **THE COURT:**  Mr. Leach?

23             **MR. LEACH:**  They asked him about the email,

24   Your Honor.  They asked the question, "Isn't it true you went

25   to Dr. Lynch for a job after learning about the hundred million

PROCEEDINGS

1    in hardware sales?"

2         Mr. Sarin testified about this.  He said, "No."  He said,

3    "I recall an email from Catherine Harvey.  They were talking

4    about valuations.  I thought her number was wrong.  And as I

5    sit here today, I" --

6              THE COURT:  I thought that's what his answer was.

7         Let me ask you another question, if I might.

8         Do you have an Ernst & Young witness who will come in

9    and -- and -- and say that the hardware sales in -- didn't

10   affect the decision as to whether to acquire the company?  Do

11   you have that person?

12             MR. MARAIS:  Well, Your Honor, yes, we have -- I don't

13   know exactly what Kevin Asher would say until he takes the

14   stand, but he is under subpoena, and we have a series of

15   documents that we've submitted in which Ernst & Young explains

16   that because the valuation was based on a discounted cash flow

17   analysis and the hardware sales have no bearing on the cash

18   flow, because of those facts, the hardware sales wouldn't have

19   affected HP's valuation of the company.

20        So I don't know what Mr. Asher will say, but, yes, there

21   is a witness and certainly there are exhibits.

22             MR. LEACH:  Mr. Asher was not involved in the due

23   diligence, Your Honor.  He was not involved in the decision to

24   buy Autonomy.  They have 302s from Kevin Asher.  They have

25   Morgan Lewis -- or Proskauer Rose interviews from Mr. Asher

**PROCEEDINGS**

1    where he will say "The hardware sales seemed unusual to me.  I

2    questioned the accounting when I saw them.  I elevated them to

3    HP."  But he will not say that it did not affect HP's decision

4    to purchase Autonomy.  He just won't say that.

5            **THE COURT:**  I don't think -- I mean, you're not

6    representing he'd say that?

7            **MR. MARAIS:**  Your Honor, I'm representing that there

8    are documents that say that.  I haven't spoken to Mr. Asher.

9            **THE COURT:**  You are representing that there are

10   documents which say that a year and a half or so forth or

11   whenever Ernst & Young did it, that in their view, the

12   valuations are a particular thing.  That's what you are saying.

13           **MR. MARAIS:**  A year and a half after HP had full

14   access to information --

15           **THE COURT:**  Oh, yeah.  There is no question about the

16   access.

17       By the way, I would certainly expect a stipulation by the

18   Government that as of October, whatever date it was, all the

19   books and records, including the Deloitte work papers, if true,

20   were made available to -- to Hewlett-Packard.  Isn't that

21   correct?

22           **MR. LEACH:**  I think it's correct that they had access

23   to them, Your Honor.  I pause on the words "made available."

24   It's not like there is a hand off --

25           **THE COURT:**  Okay.  But I think that that -- that ought

1   to be -- that's easy enough to get into evidence.  I think

2   that -- that point -- so if the Defense wants to argue they had

3   the papers right there as of a particular date, they can --

4   their -- it's in the record they had it there.  That's all that

5   one would expect out of a stipulation.

6          MR. MARAIS:  Your Honor, one of the first documents

7   that we moved to admit into evidence was Exhibit 6463, which is

8   an email from approximately one week after the close, in which

9   Autonomy is transmitting its trial balances to KPMG, and KPMG

10  passes those trial balances on to HP.  If you expect that the

11  Government would stipulate to that, I see no reason why that

12  document shouldn't come into evidence.

13         And on a similar note, Your Honor, Exhibit 2451 is this

14  Manish Sarin/Catherine Harvey email that Mr. Leach said I asked

15  Mr. Sarin questions about.  We've also asked that that exhibit

16  be moved into evidence.

17         THE COURT:  Well, okay.  I don't know where we are on

18  that issue.

19         MR. LEACH:  We oppose.  It raises exactly the type of

20  "why didn't you act sooner" or "why you didn't something more"

21  type inquiry that the Court identified yesterday and that we've

22  been talking about all this morning.

23         It certainly shouldn't come into evidence, and if it is

24  going to come into evidence, we need Manish Sarin back here to

25  give his explanation of it.

PROCEEDINGS

1    But we oppose that.

2         THE COURT:  Mr. Marais, if I were to allow this into

3    evidence, the Ernst & Young and so forth, would you concede

4    that the Government then is entitled to bring in any evidence

5    that they have to establish, one, that Ernst & Young wasn't

6    involved in the acquisition and that the decisions that were

7    made at a particular time did not involve the analysis that

8    Ernst & Young had -- had prepared?

9         Two, that between the time that Ernst & Young had

10   conducted their analysis and -- and the transaction had taken

11   place, that there were a number of changes in the market, in

12   the operation of Hewlett-Packard, in their views of -- of the

13   business that may have contributed to their decision -- that

14   were post -- that were post acquisition and they have

15   influenced their decision as to whether or not they -- they

16   would have purchased the company?

17        MR. MARAIS:  Yeah.  I think the Government should get

18   to cross-examine a witness, Your Honor --

19        THE COURT:  No, no, not cross-examine.  I'm saying

20   bringing in all the evidence.  Bringing in witnesses to say

21   what happened.

22        MR. MARAIS:  Well, I don't know that you would need

23   that many witnesses, Your Honor.

24        THE COURT:  Oh, I think you might need a lot of

25   witnesses from the Government's point of view.  I mean, I think

1    they would have to show how the market operated, they would

2    have to show how do -- how does the market -- how do you deal

3    with particular types of disclosures from a public point of

4    view, how do you -- how do you integrate a company, what were

5    their plans for integration.

6        There are -- I foresee, if this -- that this phase of the

7    case would involve a great deal of -- of testimony, which, by

8    the way, is particularly ill-suited for a jury to make some

9    determination about.  It's particularly ill-suited because it

10   is -- because it invites tremendous speculation, tremendous

11   speculation as to -- as to the significance of events.

12       It is -- and then, of course, I'd -- the Defense would be

13   entitled to rebut any of the evidence that came in on these

14   issues.  You would be entitled not just to cross-examination,

15   you would be entitled to bring in witnesses.  It is exactly the

16   sort of thing that 403 is designed to prevent.

17       Anyway, does anyone -- I'm going to take it under

18   submission.  I want to think about it a bit more.  Obviously I

19   have to come to a decision sooner rather than later, but is

20   there anything else I need to consider before making a

21   decision?

22       **MR. MARAIS:**  Your Honor, if I could, one more -- one

23   more category --

24       **THE COURT:**  Sure.

25       **MR. MARAIS:**  -- of evidence.

PROCEEDINGS

1       As I mentioned a minute ago, the Government had

2   Mr. Yelland on the stand for a day.  Every word he said

3   postdated the acquisition.  I appreciate that some of that was

4   a retrospective view of the accounts, but a lot of it wasn't.

5   A lot of it was "What happened in May 2012?  Where did you meet

6   with Mr. Hussain?  What did Mr. Hussain say about the quarterly

7   earnings for May of 2012?"

8           **THE COURT:**  That's different, by the way.  I mean,

9   that falls into a totally different category.  That's the

10  category of "what did the defendant say about what he had

11  done," and that's generally called admissions or confessions or

12  he so forth.  That fits a totally different category.

13      That's not, oh --you know, now we're a year away or six

14  months away or three months away, what's the present operation

15  of it.  I think that's in a different category anyway.

16      And I also think that Yelland was explaining, yes, he

17  did -- the restatement of course was done afterwards, but he

18  was explaining how he did it.  And he was explaining the number

19  of transactions he looked at, who looked at what, and how they

20  came to the conclusions they came.  While it happened after the

21  acquisition, it related to what happened before the

22  acquisition.  And so that's called an autopsy or an analysis

23  and so I -- that's in a different category.

24          **MR. MARAIS:**  Your Honor, I don't dispute that aspect

25  of the analysis at all.  My point is this:  There were

PROCEEDINGS

1    questions about Mr. Yelland's interactions with Mr. Hussain

2    after the close.  If Mr. Hussain had quit on day one and -- and

3    fled the company, rest assured, we would have heard about that

4    from Mr. Yelland.

5         So evidence that shows that Mr. Hussain stayed around,

6    that he turned all of the books and records over, that they

7    sent the trial balances to KPMG, that they signed --

8              THE COURT:  All of it's in.

9              MR. MARAIS:  Your Honor, it isn't all in, and there

10   are --

11             THE COURT:  Well, I don't know what's not in.  What's

12   in is, number one, they have the books and records, and if it's

13   not, I'll want to make sure it is in.  And number two, I

14   thought it's in that Mr. Hussain was there.  And number three,

15   I thought it was in that people had conversations with him, all

16   of which, by the way, may be indications of -- of the lack of

17   criminal intent.

18             MR. MARAIS:  Exactly.

19             THE COURT:  You can argue that.

20             MR. MARAIS:  Well, Your Honor --

21             THE COURT:  You can argue that.

22             MR. MARAIS:  I keep coming back to Exhibit 6463, which

23   is the transmission of the trial balances and --

24             THE COURT:  I don't know.  6463?

25             MR. MARAIS:  Yes, sir.

PROCEEDINGS

1          THE COURT:  That's not the one we just talked about?

2          MR. MARAIS:  I have --

3          THE COURT:  I'll look at 6463.  I don't know.  I have

4     to look at it.

5          MR. MARAIS:  We had separately moved to admit this

6     exhibit because I think it falls into exactly the category that

7     Your Honor is describing.  That it demonstrates --

8          THE COURT:  I'll look at it.  What about 6463?  I just

9     don't -- I know I asked about it.  I'm going to look at it.

10         MR. MARAIS:  I have a copy if you would like.

11         MR. LEACH:  It's an email to a whole host of HP people

12    honestly I've never heard of and who haven't --

13         THE COURT:  I'll look at 6463.  Okay.

14    Anything else, gentlemen?

15         MR. LEACH:  I just want to add one small point,

16    Your Honor --

17         THE COURT:  A small point.

18         MR. LEACH:  A small point.

19    You were asking wouldn't the Government want to test what

20    Mr. Marais said in the sense of -- of after-the-fact events.

21    We did have questions for Ms. Lesjak, Meg Whitman, Kevin Asher,

22    the HP analyst, and I do agree it would entail a great number

23    of witnesses on the Government's point to respond to any of

24    that.

25         THE COURT:  I think it would, in fairness to what is.

1    Being shown -- what is proposed to be shown.  Okay.  Thank you

2    very much.

3         Let me move to a second issue, the second issue being jury

4    instructions.  Okay.

5         So let me just tell you what I do that may be different

6    from what other people do.

7              MR. GRAY:  Sure.

8              THE COURT:  I don't think Judge Seeborg, as an

9    example, does this.

10             MR. GRAY:  No.

11             THE COURT:  No.  He's not -- that's only because he's

12   lower on the letterhead than I am.

13        But I've taken 3.8, direct and circumstantial evidence,

14   and modified it by taking out the nearly-incomprehensible Ninth

15   Circuit language of -- of the explanation of the difference

16   between direct and circumstantial because it doesn't make any

17   difference.  It's hardly illuminating, and I think all I'm

18   saying here is both kinds of evidence are entitled to whatever

19   weight the -- the jury assigns it.  Okay.

20             MR. GRAY:  Your Honor, on that issue, just briefly, we

21   prefer our instruction, but we understand you have ruled on

22   that, and that's fine with us.

23             THE COURT:  You prefer the regular Model Ninth

24   Circuit.

25             MR. GRAY:  That's right.

**CHARGING CONFERENCE**

1       **THE COURT:**  I understand that.  Well, you know, that's

2   the way life is.  Okay.

3       So turning to -- and we'll sort of go through mine first

4   because I want to try to make sure that I cover it.

5       You see that I took 4.3, "other crimes, wrongs or acts of

6   the defendant" -- by the way, I could take out the language

7   "other crimes" because I don't know that there is any evidence

8   of any other crime.  So I can take that out of the heading --

9       **MR. GRAY:**  Your Honor --

10      **THE COURT:**  -- and say "other acts of defendant."

11      **MR. GRAY:**  Your Honor, can I be heard on this briefly?

12      **THE COURT:**  Yes.

13      **MR. GRAY:**  We actually oppose that this instruction be

14  issued at all.  The only reason we agreed to propose it in the

15  first instance is because the Government disclosed to us in

16  advance of trial that they were going to be offering evidence

17  about Daud Khan and --

18      **THE COURT:**  Can I take it out?

19      **MR. LEACH:**  Yes.

20      **THE COURT:**  Out.

21      **MR. GRAY:**  Thank you.

22      **THE COURT:**  Then we go to 4.9.  Okay.  It says, "You

23  have heard testimony from" -- and -- oh, this is a tag team.

24      **MR. KANIG:**  Yes, Your Honor.

25      **THE COURT:**  Oh, a tag team.  Okay.  Great.

1          MR. LEACH:  I'm out-numbered.

2          THE COURT:  I'm obviously going to give 4.9.

3          MR. KANIG:  Yes, Your Honor.

4          THE COURT:  Who are the witnesses?

5          MR. KANIG:  Mr. Rizek, Mr. Scott --

6          THE COURT:  Rizek, Scott.

7          MR. KANIG:  Ms Anderson.

8          THE COURT:  Anderson.

9          MR. KANIG:  Mr. Egan.

10         THE COURT:  Egan.

11         MR. KANIG:  And Mr. Steven Truitt.  And Mr. Lee Welham

12  as well.

13         THE COURT:  And who?

14         MR. KANIG:  Lee Welham.

15         THE COURT:  And Welham?

16         MR. KANIG:  Yes, Your Honor.

17         MR. LEACH:  May we be heard on this point, Your Honor?

18         THE COURT:  Yes.

19         MR. LEACH:  Lee Welham did not receive immunity from

20  the Government.  He did not receive any benefits.  He's not an

21  accomplice.

22      He did enter into -- he's a foreign witness.  He entered

23  into an agreement with the Government to come here and testify.

24      I don't think the fact that he did that warrants holding

25  him out before the jury as somebody who they should take extra

1    care in considering his testimony.  This isn't as if he was

2    excused from a crime or anything like that.  He -- he -- not

3    immunized at all.  Never invoked the Fifth.  He agreed to come

4    to the United states to testify, nothing more.  The Government

5    hasn't conferred a benefit on him.

6          THE COURT:  Okay.  We'll get to Welham in a minute.

7    All the others --

8          MR. LEACH:  Rizek, Scott, and Steve Truitt testified

9    pursuant to court-ordered immunity.

10         THE COURT:  So it's immunity.

11         MR. LEACH:  Ms. Anderson testified pursuant to a

12   cooperation agreement with the Government where she -- we

13   agreed not to use the statements --

14         THE COURT:  Okay.

15         MR. LEACH:  -- she made, and Christopher Egan had a

16   deferred prosecution agreement with the Government --

17         THE COURT:  They all got benefits?

18         MR. LEACH:  Yes.

19         MR. KANIG:  Yes, Your Honor.  We submitted last night

20   a proposed instruction on this.

21         THE COURT:  Have you looked at theirs?

22         MR. LEACH:  I have looked at theirs.

23         THE COURT:  Let's just go through theirs then.

24         MR. LEACH:  I do have some problems with some of the

25   language of their proposed instruction, and we object to Lee

1 | Welham being included in this list at all.

2 |      The Government -- does the Court have the draft in front

3 | of it?

4 |           **THE COURT:**  Yes.

5 |           **MR. LEACH:**  Okay.

6 |      First of all, it says in paragraph 1, line 4, that

7 | "Testimony was given in exchange for a promise by the

8 | Government."  That's not accurate.  The Government moved for

9 | court-ordered immunity and they testified pursuant to a court

10 | order, not a promise by the Government.

11 |      I think it's more appropriate to say that "Testimony was

12 | given pursuant to a court order that the testimony will not be

13 | used in a case against the witness."

14 |      We also think it would be --

15 |           **THE COURT:**  Let me ask about that.  I mean, because

16 | there is no question I ordered it.  But I ordered it at the

17 | request of the Government.  Wasn't there -- was -- and I

18 | don't -- I actually don't remember whether you have to go to

19 | the Attorney General and get consent.

20 |           **MR. LEACH:**  We're required to get --

21 |           **THE COURT:**  Okay.

22 |           **MR. LEACH:**  -- DOJ approval.

23 |           **THE COURT:**  So why then draw the distinction between

24 | that kind of immunity and any other kind of immunity?  I mean,

25 | that gets into -- it really does get into the bureaucracy of

1    how -- how the -- the procedure is actually --

2           MR. LEACH:  It is suggestive of an agreement between

3    us --

4           THE COURT:  But it is.

5           MR. LEACH:  -- and these witnesses.

6           THE COURT:  But it is.  It's absolutely an agreement.

7           MR. LEACH:  No.  It's these people won't talk to us

8    and it's compulsion.  We forced them up there, Your Honor.

9           THE COURT:  I see.

10          MR. LEACH:  They were not necessarily our witnesses.

11          THE COURT:  I see what you're saying.  So you're

12   saying they were compelled to testify.

13          MR. LEACH:  Yes.  We subpoenaed them.  They were

14   prepared to invoke the Fifth.  We got an order compelling them

15   to testify.  That's not a promise by the Government.

16          THE COURT:  Well, that's a different case.

17          MR. KANIG:  Mr. Keker is correctly pointing out to me

18   that these witnesses all went through an extended process of

19   interviewing with the Government subject to proffer agreements

20   that were identical in the use immunity nature as the ultimate

21   compulsion order that the Court required them to testify.

22       So it's a little bit of a bait and switch to say these

23   witnesses were compelled to testify at the last minute when in

24   reality they were cooperating pursuant to agreements with the

25   Government the entire time.

1    THE COURT:  I don't know that it's a bait and switch,

2    but I think it's a mixed situation; that is to say, they --

3    they initially were interviewed, taking Mr. Keker's point --

4    they were initially interviewed or over a series of interviews,

5    they said, "Sure, I'll talk to you, but I -- but I want use

6    immunity," you know --

7        MR. LEACH:  Queen for a day.

8        THE COURT:  Queen for a day.  "I don't want anything I

9    say be used against me."  And the Government says "yes,"

10   because that's -- that's a normal prosecutorial function of how

11   do you move ahead.  You don't necessarily haul everybody in an

12   investigation in before a judge to compel testimony.  It may be

13   the case and it always arises or frequently arises in the

14   context of grand jury testimony.

15       But the last thing you want, any judge wants, is a parade

16   of witnesses who would be pleased to come in and -- and -- and

17   talk to the Government provided that nothing they said would be

18   used against them.  Then you move to another level, which is

19   either grand jury testimony or court testimony, and at that

20   point -- at that point if they say to the Government, "By the

21   way, I won't testify unless I'm given court-ordered immunity,"

22   I think they are being compelled to testify.

23       MR. KANIG:  Well, first of all --

24       THE COURT:  Because they know they have an option.

25   Isn't the option -- couldn't they come in and say, "Well, look,

1    as far as I'm concerned, do I have -- do I have your word that

2    you won't -- that anything I say in my -- in the stand won't be

3    used against me?"  I don't see why the Government couldn't

4    agree to that as well.  Couldn't they?  Couldn't they come in

5    and they say, "Well, I know it's public and so forth, but

6    here's a letter.  We won't -- we won't use anything that you

7    say against you."

8           MR. LEACH:  We did do exactly that with Ms. Anderson,

9    Your Honor.  We have no problem with that language with respect

10   to Ms. Anderson.

11          MR. KANIG:  And Mr. Egan.

12          MR. LEACH:  It's the court-ordered compulsion that we

13   take issue with.  The Court has it exactly right.

14          MR. KANIG:  If Mr. Leach wants to give an instruction

15   that says that these witnesses would have invoked their Fifth

16   Amendment privilege against self-incrimination because they

17   committed a criminal act instead of saying it's a promise from

18   the Government --

19          THE COURT:  By the way, they don't have to say that,

20   do they?  They don't have to say "because I committed a

21   criminal act."  What they have to say is that "I'd be placed in

22   jeopardy and I may be prosecuted."  That's the test.  The test

23   isn't whether you're guilty.  The test is whether or not you

24   are subjected to a prosecution.

25          MR. KANIG:  Fair --

1          **THE COURT:**  I think what I need is a

2   Government-proposed instruction.  Did you give me one?

3          **MR. LEACH:**  I can, Your Honor.  I haven't had time --

4          **THE COURT:**  Well, what are you guys doing?

5          **MR. KANIG:**  Your Honor, just to be clear,

6   Ms. Anderson --

7          **MR. LEACH:**  I can do that later today.

8          **MR. KANIG:**  Ms. Anderson and Mr. Egan undisputedly

9   testified pursuant to a promise from the Government.  Both of

10  those witnesses had agreements with the Government.

11     So we're really only talking about Joel Scott and Steven

12  Truitt right now that would fall in this different bucket, and

13  we would propose that if we are not going to be able to say

14  "promise," we would be able to say they were "compelled"

15  because they would have invoked their Fifth Amendment right

16  against self-incrimination.

17         **THE COURT:**  I think I need the dueling instruction

18  from the Government as to what you propose and I'll -- I'll

19  take the two and sort it out.  If you want to say something

20  about it in a couple of pages, please feel free to do that.

21         **MR. KANIG:**  Thank you, Your Honor.

22         **THE COURT:**  I don't think this is going to be that

23  crucial to the outcome of the case, but, hey, who am I to say

24  that?  So we'll go through that and figure that one out.

25         Opinion evidence.  Who -- who is the -- did anybody

**CHARGING CONFERENCE**

1    testify as an expert in this case?

2          **MR. GRAY:**  No, Your Honor.

3          **THE COURT:**  I thought everybody was an expert in this

4    case.  So I'd have to list them all, but putting that aside,

5    did anybody give their opinion in that -- as it's defined?

6          **MR. LEACH:**  No.

7          **THE COURT:**  They say no, no.  It's out.

8          **MR. GRAY:**  Great.

9          **THE COURT:**  Hey, maybe we can get this down to like

10   four instructions.  Okay.

11        Now we have both 4.15 and 4.16 because I have, over

12   objection, admitted a chart and summary in evidence.  Okay.

13   And I've also not admitted others.

14        And I think in argument, please be clear with the jury as

15   to what is in evidence and what is not in evidence.

16        **MR. KEKER:**  And with regard --

17        **THE COURT:**  And, Mr. Keker, yes?  Go ahead.

18        **MR. KEKER:**  With regard to that, what we have not

19   done, 2984 is the summary of the Top 40 and -- that we've

20   argued about a lot.  You let it in subject to a motion to

21   strike.

22        We are now making a motion to strike, and our position is

23   it shouldn't be in evidence.

24        **THE COURT:**  Right.

25        **MR. KEKER:**  It can be a demonstrative.

**CHARGING CONFERENCE**

1    **THE COURT:**  Right.  Denied.

2       Okay.  So I'm going to just go through it and -- my list

3  and stop me where you want to say something.  Okay?

4       8.20, conspiracy to commit wire fraud.

5       **MR. GRAY:**  Your Honor, we prefer our version of that

6  instruction, but we understand the Court has ruled.

7       **THE COURT:**  Okay.

8       **MR. LEACH:**  Your Honor, we have one issue with line --

9  it's between lines 5 and 7.  It says, "First beginning on or

10 about January 2009 and ending on or about October 2011."

11      The language of the Indictment reads, "Beginning in or

12 about Autonomy's first quarter of 2009 beginning January 2009,

13 the conspiracy began."

14      That covers a three-month period that isn't captured by

15 this instruction, and I think --

16      **THE COURT:**  Okay.  Well, I have to do it in terms of

17 what the Indictment says.

18      **MR. LEACH:**  The Indictment says "Beginning in or about

19 Autonomy's first quarter of 2009."

20      **THE COURT:**  "Beginning in or about Autonomy's first

21 quarter of 2009."  Why isn't that January?

22      **MR. GRAY:**  Your Honor, it's not clear.  Why don't we

23 just say "January 2009 and ending on or about October 2011"?

24      **THE COURT:**  What am I not covering?

25      **MR. LEACH:**  One moment, Your Honor.

1    **MR. REEVES:**  We are just looking for the Indictment.

2    **THE COURT:**  Whatever the Indictment says, for the

3    moment -- I mean, I could use the words of the Indictment, but

4    I don't -- but I'm not so inclined to just use the words of the

5    Indictment if they talk about quarters and so forth, unless

6    there is a difference.  If this instruction doesn't cover it,

7    then of course I think I have to change it.

8        But why doesn't January 2009 cover it?

9    **MR. REEVES:**  The language is right here, Bob.

10   **MR. LEACH:**  The Indictment reads, Your Honor, "In or

11   about Autonomy's first quarter 2009, which began in January of

12   2009."

13   **THE COURT:**  So why isn't --

14   **MR. LEACH:**  The issue I'm worried about, Your Honor,

15   is what if the jury finds the conspiracy began in March and not

16   January?  That's what the Indictment --

17   **THE COURT:**  Okay.  So what?  We're not going to ask

18   them when did the conspiracy start.  But what are you concerned

19   about?  You're concerned that --

20   **MR. LEACH:**  I'm concerned reading just what the Court

21   has written, a juror could think that if the conspiracy began

22   in March, but not January, that this element is not satisfied.

23   **THE COURT:**  So your language is "Beginning" --

24   again --

25   **MR. LEACH:**  -- "In or about the" --

CHARGING CONFERENCE

1    **THE COURT:**  "In or about" --

2    **MR. LEACH:**  -- "the first quarter of 2009."

3    **THE COURT:**  "The first quarter of" -- what?

4    **MR. LEACH:**  2009.

5    **THE COURT:**  2009.  Go ahead.

6    **MR. LEACH:**  That's what we propose.

7    **THE COURT:**  Well, that's about -- that's awful.

8    **MR. LEACH:**  Or "which began" --

9    **THE COURT:**  I mean, maybe they are all accountants.

10    **MR. GRAY:**  Your Honor --

11    **MR. LEACH:**  I'm fine with adding the clause "which

12    began in January of 2009."

13    **THE COURT:**  Pardon?

14    **MR. LEACH:**  "Which began in January of 2009."

15    **THE COURT:**  Oh, "which began in January 2009."

16    And is that the way the Indictment reads?

17    **MR. LEACH:**  Yes, Your Honor.

18    **THE COURT:**  Okay.  Then that's what I'm going to give.

19    **MR. GRAY:**  We oppose --

20    **THE COURT:**  So I don't have listen to --

21    **MR. KEKER:**  We --

22    **THE COURT:**  Well, wait a minute.  You've got a problem

23    with my putting in this instruction the words of the

24    Indictment?

25    **MR. GRAY:**  We prefer our version, yeah.

CHARGING CONFERENCE

1          THE COURT:  Well, I think you prefer not having an

2    Indictment.

3          MR. GRAY:  Sure.  Let's do --

4          THE COURT:  Okay.  But life has its disappointments

5    and that's one of them.

6          MR. GRAY:  Okay.  Thank you, Your Honor.

7          THE COURT:  Moving ahead, anything else?

8          MR. LEACH:  Nothing on 8.2.

9          THE COURT:  Okay.  8.23.

10         MR. LEACH:  Nothing from the Government.

11         MR. GRAY:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MR. GRAY:  We object to this instruction being given.

14   We think it's duplicative of the language in the conspiracy

15   instruction.

16       We think that if you're going to include it, you should

17   add the additional accurate details about conspiracy law that

18   we proposed as part of our instruction.

19         THE COURT:  Okay.  So this is the Model Instruction

20   8.23, "conspiracy, knowledge and association with other

21   conspirators."  I'm going to give it as indicated over your

22   objection.

23         MR. GRAY:  Okay.

24         THE COURT:  So moving ahead, we have now 8.25.

25         MR. LEACH:  Nothing from the Government.

1        **MR. GRAY:**  Your Honor, we object to this instruction

2    being given as well.  A couple of points here.

3        This is the *Pinkerton* instruction, Your Honor.

4        **THE COURT:**  Right.

5        **MR. GRAY:**  This isn't a drug or mafia case involving

6    obviously criminal conduct.  It's a case involving the ordinary

7    business activities of a software company.

8        Moreover, the Government's witnesses repeatedly testified

9    that they did not intend or agree to do anything wrong, much

10   less illegal.

11       We don't think the jurors should be instructed that they

12   can convict Mr. Hussain for the innocuous business activities

13   of purported co-conspirators whose own testimony disproved the

14   existence of the over-arching conspiracy alleged in the

15   Indictment.

16       So what they are trying to do is treat this like this is

17   some massive criminal enterprise and that all of Autonomy's

18   business activities amount to some massive conspiracy.  We

19   don't think a *Pinkerton* instruction is warranted in this case

20   and we object.

21       **THE COURT:**  Of course the Government believes it is a

22   conspiracy.  The Government believes it is larger than this

23   defendant.  And the Government has introduced a fair amount of

24   evidence relating to Mr. Chamberlain, Dr. Lynch, and maybe

25   others.

1    The Government has also introduced evidence of -- repeated

2  evidence of customers who falsified declarations to -- you

3  know, to Deloitte.

4    So, I mean, I think there is plenty of evidence.

5  Admittedly it's from the Government.  I'm not crediting it or

6  not crediting it.  But to suggest that there is a much larger

7  conspiracy than -- than the defendant who is on trial here.

8  And that's what I think -- that's why I think -- and activities

9  by a lot of those people.  And that's why I think 8.25 is

10  warranted.  However, it is over objection.

11        MR. GRAY:  Over our objection.

12        THE COURT:  Over your vehement objection.

13    Now we go to 8.25, wire fraud.  Any problem with that?

14        MR. LEACH:  One point from the Government, Your Honor.

15  We're fine with the language of the instruction.  We had

16  proposed some language from the mail fraud instruction, which

17  says, "It does not matter whether the material transmitted by

18  wire was itself false or deceptive so long as the wire

19  communication was used as part of the scheme, nor does it

20  matter whether the scheme or plan was successful or that any

21  money or property was obtained."

22    This is language from the Ninth Circuit Model Instruction

23  for mail fraud.  For the life of me, I don't understand why

24  it's not in the Model Instruction for wire fraud, but it's an

25  accurate statement of the law.  I think it helps illustrate

1   that the wire itself doesn't have to be a false statement.  And

2   we request that the Court include it.  It was included on lines

3   23 through 26, page 70, of the joint submission.

4         MR. GRAY:  Your Honor, we oppose.  We think the

5   Government's proposed additions -- well, as Mr. Leach just

6   stated, they don't appear in the Model Instruction.  They are

7   unnecessary.  We believe they would cause needless confusion.

8   They should be excluded.

9         THE COURT:  So I'd like to ask the Government a

10  question.  Do you have a case which says that I should put this

11  in the Model Instruction?

12        MR. LEACH:  First, I want to be clear, it is in the

13  Model Instructions --

14        THE COURT:  For wire fraud.

15        MR. GRAY:  Not for wire fraud.

16        THE COURT:  So my question is clear, do you have a

17  wire fraud case which says that yes, it should be in?

18        MR. LEACH:  I do.  *United States vs. Halali*, a case

19  from this district presided over by Judge Illston.

20        *United States vs. Woods*, 355 F.3d --

21        THE COURT:  Give me the cites.  I'm going to go look

22  at it.  The cite -- cites -- citations.

23        MR. GRAY:  Your Honor, they're in the Government's

24  brief --

25        THE COURT:  I don't -- there are 50 million pieces of

CHARGING CONFERENCE

1    paper in this case.  Just give it to me.  Do you want an answer

2    today or do you want it next week?

3            MR. LEACH:  I want an answer today, Your Honor.

4            THE COURT:  Then give it to me.

5            MR. LEACH:  It's *United States vs. Woods*, 355 F.3d 993

6    at pages 997 to 98.  It's a Ninth Circuit 2000 --

7            THE COURT:  Okay.  Any other case, or I guess I'm

8    capable of Shepardizing or at least somebody in my chambers is

9    capable of Shepardizing.

10            MR. LEACH:  One more, Your Honor.  *United States vs.*

11    *Rude*, R-U-D-E, 88 F.3d 1538.  Pincite is 1547.

12            MR. GRAY:  Your Honor, I will just say also we have

13    proposed accurate statements of conspiracy law to a number of

14    these constructions, so if you're going to include what they're

15    representing to you are additional accurate details about

16    conspiracy law here, there is no reason to have excluded them

17    from the instruction that we just talked about.

18            THE COURT:  Well, yeah.  I mean, I don't like to -- my

19    general approach to this, which the Government is well aware

20    of, is that I don't sort of like pick and choose nice little

21    things to put in because they happen to be in some case and --

22    but I do -- the distinction between wire fraud and mail

23    fraud -- and I've never quite understood why both are charged.

24    I'm sure there is some reason out there.  They can't be -- if

25    convicted of both, they -- I don't think they enhance a

1   penalty, though I haven't looked at that, so I just -- I don't

2   really get it.

3        But anyway, that's the way it's presented, and I'll look

4   at that.  Okay.

5            MR. LEACH:  Thank you, Your Honor.

6            THE COURT:  So moving right along.

7            MR. GRAY:  Your Honor, one more note on 8.124, we

8   oppose the inclusion of the phrase "participated in" in the

9   Court's proposal.  That language does not appear in the

10  Indictment.  We -- we don't think that that language should

11  make it into the jury instruction.

12           THE COURT:  You're referring to line 20 or 19?

13           MR. GRAY:  I'm sorry.  In your -- in the Court's

14  proposal, this is -- it looks like line 7.

15           THE COURT:  Line 7?

16           MR. GRAY:  "First, the defendant knowingly

17  participated in, devised or intended to devise."

18       And the phrase "participated" in does not appear in the

19  Indictment.  We don't think they should be able --

20           THE COURT:  I must be looking at the wrong -- I'm

21  looking at my instruction, page 18.

22           MR. GRAY:  It's page 21, Your Honor, wire fraud.

23  That's what we're talking about.

24           THE COURT:  8.20.  My instruction, 8.20 --

25           MR. GRAY:  No.  8.12 --

1          THE COURT:  I was looking at the wrong one.  My law

2     clerk -- "First, the defendant knowingly participated in,

3     devised or intended to devise."  8.124.  Is it in here or some

4     other book?  I'll take a look at it.

5          MR. LEACH:  It's the language from the Model

6     Instruction, Your Honor.

7          THE COURT:  I think it is, but I'll take a look at it.

8          MR. LEACH:  And the Indictment charges the exact

9     language of the wire fraud statute.  So I don't think there's

10    any magic to that word not being in the -- in the Indictment.

11    We charged the statute word-for-word and --

12         THE COURT:  See, the problem you have here, as I

13    understand it -- and I think it's of some significance -- is I

14    don't know that there is evidence that Mr. Hussain devised it.

15    It may be, for example, that somebody said to Mr. Hussain,

16    "Hey, here's -- here's a good idea."  No -- the Government

17    didn't say he devised it.  He -- the Government's view is he

18    participated in it.

19         And so I think it would be misleading -- if the statute

20    provides -- and if I have -- I have to take a look, but I think

21    it is -- it is warranted that a person who participates in a

22    wire fraud or mail fraud is as guilty as somebody who thought

23    it up.

24         MR. KEKER:  Your Honor, if I --

25         THE COURT:  Well, yes, Mr. Keker, go ahead.

1      I'm letting everybody talk, everybody talk.  So that's

2    perfect.

3          MR. KEKER:  The Indictment couldn't be more plain that

4    the charge the grand jury returned is that Mr. Hussain "devised

5    and intended to devise a scheme or artifice."  It doesn't say

6    he participated in.  It says what it says.

7      It would be an extremely prejudicial variance to now put

8    into the jury instruction something that the grand jury did not

9    charge him with.

10         MR. LEACH:  It's not --

11         MR. KEKER:  And we would object to it.

12         THE COURT:  Mr. Leach?

13         MR. LEACH:  It's not a variance, Your Honor.  The

14   Indictment charges the exact language of 18 U.S.C. 1343, which

15   I'm happy to read, if I can --

16         THE COURT:  I better look at the Indictment.

17         MR. GRAY:  Your Honor, I would also say if we are

18   going to use the language from the Indictment about the first

19   quarter of 2009, I don't know why we aren't using the exact

20   language from the Indictment as to this issue.

21         THE COURT:  Because consistency is the hobgoblin of

22   small minds.

23      Go ahead.

24         MR. KEKER:  Who said that?  Somebody said that was

25   Ralph Waldo Emerson.

1          **THE COURT:**  Yeah.  Right.

2          **MR. LEACH:**  I thought it was Thoreau.

3          **MR. KEKER:**  I thought it was Oliver Wendell Holmes,

4    and this is now the big thing in my mind.

5          **THE COURT:**  We can -- we can search that.  I mean, I

6    was told it was Emerson, but that was before Holmes' career.

7          **MR. HOWELL:**  Or is it The Dude?

8          **MR. KEKER:**  I'm sure The Dude said it.

9          **THE COURT:**  We have everybody -- now we have

10   Ms. Little in the game.

11         **MS. LITTLE:**  Mr. Dooley pointed out that --

12         **THE COURT:**  Now we have Mr. Dooley.  Of course.

13         **MS. LITTLE:**  -- that 1343 does not say "participated."

14   It says, "whoever having devised or intending to devise," which

15   is what the Indictment says, which is what the jury instruction

16   should say.

17         **THE COURT:**  It would be news to me, after 21 years,

18   that a person -- that the Government has to prove who devised

19   it.  I mean, I -- I --

20         **MR. GRAY:**  They could have put the word "participated"

21   in the Indictment; they didn't.

22         **THE COURT:**  They didn't what?

23         **MR. GRAY:**  They didn't put the word "participated" in

24   the Indictment.

25         **THE COURT:**  No, but I mean, I'm -- I'm trying to think

```
1    of whether the scope of the statute reasonably interpreted

2    involves a person who participates in it because it seems to me

3    there are thousands and thousands of wire fraud convictions in

4    which the Government failed to show that the -- that the

5    defendant devised it.

6         MR. HOWELL:  The Ninth Circuit says "participated."

7    That's how the Ninth Circuit says --

8         THE COURT:  Okay.  Well, I will take a look at it.

9    I'm getting advice from everybody.  That's great.

10        Anyway, I think I have the arguments.

11        MR. LEACH:  We charge the full scope of 1343,

12   Your Honor.  We use the language of the statute.

13        MS. LITTLE:  No, you didn't.

14        THE COURT:  Okay.

15        MR. LEACH:  The Ninth Circuit has interpreted that to

16   include "participated in."  This is the Model language of the

17   statute.  It should be included.

18        THE COURT:  You know what?  I'm going to go look at

19   it.  I'm going to start with Holmes --

20        MS. LITTLE:  Do you want the Indictment?  I've got it

21   here if you want it.

22        THE COURT:  Yes.  I think the Indictment would be

23   useful.  Okay.  There we go.  Okay.  Thank you very much.

24        This isn't your only copy, is it?

25        MR. GRAY:  I have a copy.
```

1              THE COURT:  I don't want to deprive the Defense --

2              MS. LITTLE:  I can get another one.

3              THE COURT:  You can get another one?  Okay.

4         Going right ahead.

5         So that's your objection and I'll deal with that.

6         I will, by the way, send out today a final copy of the

7    instructions.  Okay?  So you can prepare your argument along

8    those lines.

9         Okay.  "Knowingly," 5.6, any problems?

10             MR. LEACH:  No.

11             THE COURT:  3.16, "intent to defraud."

12             MR. LEACH:  No objection.

13             MR. GRAY:  No.

14             THE COURT:  Now, here in this "scheme to defraud,

15   vicarious liability" and so forth -- well, I think I need --

16   I'm trying to figure out why the *Pinkerton* instruction isn't

17   good enough to cover this whole question of vicarious

18   liability.  "Vicarious liability" means X does something, the

19   defendant may be responsible for it.  That's what *Pinkerton* is

20   about, isn't it?

21             MR. GRAY:  Your Honor, that is exactly our position on

22   this.  If you look at the language of 8.122, "the defendant may

23   be responsible for other co-schemer's actions during the course

24   of and in furtherance of the scheme.  For the defendant to be

25   guilty of an offense committed by a co-schemer in furtherance

1   of the scheme, the offense must be one that the defendant could

2   reasonably foresee as a necessary and natural consequence."

3       Then look at *Pinkerton* which says, "If one member of a

4   conspiracy commits a crime in furtherance of the conspiracy,

5   the other members have also, under the law, committed that

6   crime.  The offense must be one that could reasonably have been

7   foreseen by the defendant based on what he knew at the time to

8   be a necessary and natural consequence of the unlawful

9   agreement."

10      It's entirely duplicative.  8.122 should be struck.

11          **MR. LEACH:**  The concern from the Government,

12   Your Honor, is -- and this may be somewhat academic -- I think

13   it's possible -- I think it's possible that a juror could find

14   there is no conspiracy.  There is no agreement.  And yet two

15   people are members of a scheme.  And I don't want there to be a

16   situation where --

17          **THE COURT:**  I see.

18          **MR. LEACH:**  -- they acquit on the conspiracy charge

19   but feel if Mr. Hussain didn't devise the scheme or was

20   merely --

21          **THE COURT:**  So maybe it should be -- that is a

22   possibility.  I think -- I don't even understand how it's -- I

23   mean, I don't believe that the Defense is going to argue that.

24   But be that as it may, I -- I think then you give 8.122.  Isn't

25   that it?

1        **MR. LEACH:**  Yes.

2        **THE COURT:**  I think you start out by saying, "In the

3   event, ladies and gentlemen, you do not find a conspiracy,

4   nevertheless," bop, bop, bop, bop, bop, bop, bop, what it says.

5   I mean, that's the way to deal with that possibility.

6        So I'll take a look at it and see -- well, you can't aid

7   and abet a conspiracy.  Okay.  So that's -- that's different

8   from aiding and abetting.  We all know that.

9        **MR. LEACH:**  Correct.

10        **THE COURT:**  Okay.  Okay.  That's fine.

11        **MR. GRAY:**  We have --

12        **THE COURT:**  And you object.

13        **MR. GRAY:**  We object.  You will take it under

14   submission.

15        **THE COURT:**  All right.  I just need to see whether I

16   can tailor -- tailor that to it.  Okay.

17        Now, what are we doing about negligence?  We're not

18   doing -- I'm not going to give any instruction on negligence,

19   am I?

20        **MR. LEACH:**  Oh, I think this instruction is entirely

21   appropriate, Your Honor.

22        **THE COURT:**  Don't you think all yours are entirely

23   appropriate?

24        **MR. LEACH:**  Yes.

25        **THE COURT:**  So how do I distinguish this one from all

1    the others that you want me to give?  Is this more appropriate

2    than like the presumption of innocence?

3         MR. LEACH:  No, Your Honor.  They're all equally

4    important.

5         THE COURT:  Okay.

6         MR. LEACH:  The defense in this case has been to blame

7    the victim, much as the Government predicted.  They've asked

8    question after question why didn't HP do this, why didn't HP do

9    that.  They are trying to suggest that because HP is a big

10   company, that it's not deserving of the protection of the law.

11       This is an accurate statement of the law, Your Honor.  The

12   negligence of the victim is not a defense to fraud.

13        THE COURT:  I see.  It's the victim's negligence.

14        MR. LEACH:  Yes.  We are not arguing Mr. Hussain can

15   be convicted on a negligence theory.  We think, given the way

16   the case was tried, given the amount of innuendo about HP and

17   their dysfunction, which the Court identified yesterday, this

18   is an appropriate instruction.

19        THE COURT:  Okay.  Now --

20        MR. GRAY:  Your Honor --

21        THE COURT:  Before we get to you --

22        MR. GRAY:  Sure.

23        THE COURT:  -- let me just ask, of course "negligence"

24   hasn't been defined, so I would have to define it, wouldn't I?

25        MR. LEACH:  That would be fine.

1      **MR. GRAY:**  Your Honor --

2      **THE COURT:**  And -- and then you start to define it --

3  go ahead.

4      **MR. GRAY:**  We vigorously oppose the inclusion of this

5  instruction.  The instruction is confusing and misleading

6  because it completely mischaracterizes our defense.

7      Now, I want to emphasize there is an important distinction

8  between carelessness and not caring.  We are not saying that HP

9  was careless.  We are saying that HP didn't care about some

10  information.  We are not advancing any argument or theory that

11  HP acted negligently.

12      Your Honor, what HP did and said during due diligence is

13  also necessary to understanding whether the statements made by

14  Mr. Hussain or by Autonomy were false or misleading.  But this

15  instruction suggests that that information should be written

16  off because it goes to, quote -- you know, the negligence of

17  the victim.  That's -- that's confusing, that's misleading.  It

18  does not belong in the jury instructions.

19      Your Honor, what HP cared about and didn't care about also

20  goes to materiality and this --

21      **THE COURT:**  Well, clearly what they cared about, what

22  they didn't care about is significant.

23      **MR. GRAY:**  Yes.

24      **THE COURT:**  That's clear, isn't it?  I mean, nobody

25  disputes that.  And your argument, as I understand it -- and it

1    makes sense -- is that, look, you start talking about care

2    and -- and you --

3         **MR. GRAY:**  Well, you start talking about carelessness

4    and that's not what we're talking about.  The whole point is

5    that we are not talking about negligence.  This information is

6    not evidence of negligence.  It goes to what HP cared about,

7    and that's an important issue that speaks to whether

8    Mr. Hussain's representation were false, whether they were made

9    in good faith, whether they were material.

10        This instruction is confusing.  I would also add,

11   Your Honor, it's argumentive.  HP is only a, quote, victim, if

12   you believe the Government's case.  And this -- this

13   instruction is certainly no more -- our proposed instructions

14   were certainly no more argumentive than this one is.  If you

15   are going to add this one, you should certainly add ours about

16   the conduct that is not illegal.

17        Setting all of that aside, we just think this instruction

18   does not belong in the jury instructions.

19        **MR. LEACH:**  This is an accurate statement of recent

20   Ninth Circuit law, *united States vs. Lindsey*.

21        I agree with the Defense.  Some of their evidence can be

22   interpreted as evidence of materiality.  That makes the

23   instruction even more important, not less important because a

24   juror could think well -- listening to the same evidence, could

25   think, "Well, HP was just sloppy, they spent four phone calls

1    on diligence.  Why should I -- why should we convict here?"

2        It's exactly correct --

3        **THE COURT:**  So why not give exactly the instruction

4    that you're proposing?  Why not -- why not say just what you

5    said, which is while evidence of -- of care or lack of care may

6    be material, evidence of carelessness is not.  Is not -- I

7    paraphrased what you said.  But why not just say it just the

8    way you said it?

9        **MR. GRAY:**  Your Honor, we just think that confuses the

10   issues.  I can represent to you that we are not going to argue

11   that HP was negligent.  Okay.  That's not what we're doing

12   here.

13       **THE COURT:**  Yeah.  But I have to go beyond an

14   argument.  In other words, I have to instruct the jury as to

15   what issues I think that the jury may be -- they come to their

16   own conclusions.  Their deliberations are their own.  Somebody

17   suggests something and it then -- they then look at the law.

18   They then look at the instructions and say, "Well, what about

19   this," and somebody says, "Well, did the Court instruct us on

20   that?"  And maybe I've idealized it.

21       But I think the parties are entitled to not just tailoring

22   instructions to what is going to be argued, but also having a

23   set of instructions that encompass potential conduct.  So I'm

24   sitting here thinking why not give it just the way you said it?

25   I mean, in so many words.

1          Anyway, I'll consider this as well.  Okay.

2               **MR. LEACH:**  Thank you, Your Honor.

3               **THE COURT:**  Okay.  Moving ahead.  Anything with

4     securities fraud?

5               **MR. GRAY:**  Not from us, Your Honor.

6               **THE COURT:**  "Aiding and abetting," everybody agree you

7     can't aid and abet a conspiracy?

8               **MR. GRAY:**  Your Honor, we -- on "aiding and abetting,"

9     we prefer our version.  We understand the Court has ruled.

10              **THE COURT:**  Okay.

11              **MR. LEACH:**  Your Honor --

12              **THE COURT:**  Here we go.  Defense theory about the

13    case.

14              **MR. LEACH:**  Your Honor, I should probably raise this

15    now with the "aiding and abetting" argument.

16         The current draft -- the Government proposed an

17    instruction for "willfully causing," which is drawn from the

18    language of 18 U.S.C. Section 2(b), which provides, quote,

19    "Whoever willfully causes an act to be done, which if directly

20    performed by him or another, would be an offense against the

21    United States" -- I'm sorry.  I misread that.

22         "Whoever willfully causes an act to be done, which if

23    directly performed by him or another, would be an offense

24    against the United States as a principal."  This language from

25    18 U.S.C. Section 2(b) is not covered by the Model "aiding and

1  abetting" instruction in the Ninth Circuit, but it is addressed

2  by some of the commentary to the Model Instruction.

3      And it's particularly important here because part of the

4  Government's theory on the securities fraud charge is that

5  Mr. Hussain caused HP to issue a press release to the market

6  that was false.  It's not our contention that HP was guilty of

7  a crime by doing that.  So they're not a principal.

8      But the Government's theory is that Mr. Hussain willfully

9  caused HP to do that.  They're essentially an innocent

10  intermediary in the language of Section 2(b) in the Ninth

11  Circuit case *United States vs. Ubaldo*.  I don't know if it has

12  to be an "aiding and abetting" instruction, but I think this --

13  this principle of "willfully causing" needs to be encompassed

14  in the instructions.

15      **THE COURT:**  Why isn't it covered by the lines 15 and

16  16 of the proposed instruction?  "The evidence must show beyond

17  a reasonable doubt that the defendant acted with the knowledge

18  and intention of helping that person commit the crime charged."

19  Why isn't that what you've just discussed?

20      **MR. LEACH:**  I'm -- I'm concerned because it still lays

21  out four elements for aiding and abetting, and the first

22  element is that the crime --

23      **THE COURT:**  The crime was committed by someone.  Okay.

24  What does that mean?  Who committed the crime?  For instance,

25  the crime -- I understand that it's your view that the

1  defendant was the principal, but -- but we're going on an

2  aiding-and-abetting theory so how are you arguing the aiding

3  and abetting?

4          MR. LEACH:  We are going under the "willfully causing"

5  language of 18 U.S.C. Section 2(b) which says that if you --

6  if -- if the person whom you are aiding and abetting is not

7  guilty of a crime, he can't be an aider and abettor.  The

8  "willfully causing" language says if you cause an innocent

9  person, which if you had done it directly would be a crime, you

10 are guilty.  So this -- this doesn't cover that.

11         THE COURT:  I recently had that in a case where they

12 couldn't show that the person who put the gun in the -- in the

13 trashcan had committed a crime, but the fact of the matter is

14 the defendant on trial had directed somebody to go pick up the

15 gun.

16         MR. LEACH:  Exactly.

17         THE COURT:  And that was a proper, in my -- I think I

18 gave that "aiding and abetting" instruction as modified.  Okay.

19 Well, I'll think about that.

20         MR. GRAY:  Your Honor, we --

21         THE COURT:  Vigorously --

22         MR. GRAY:  -- oppose the instruction.  We think the

23 Government's proposal is also extremely confusing.

24     If the Court is inclined to issue such an instruction, it

25 should look to ours.  It's far more clear.

1    We oppose the inclusion of the instruction.

2    **THE COURT:**  All right.  Fair enough.  And I'll look at

3    that, too.  Okay.

4    Do we get to go to the Defense theory of the case?  All

5    right.  And you gave it to me.  So I haven't looked at it yet.

6    **MR. KANIG:**  Yes, Your Honor.  We filed it last night.

7    **THE COURT:**  All right.  Well, that was last night.

8    Hopefully it's here somewhere.  Here it is.  Okay.  Let me look

9    at it.

10    (The Court reviews the document.)

11    **THE COURT:**  I can tell you right now I'm not going to

12    give examples, so -- I don't do that.  You say, "For example,

13    Mr. Hussain understood that it was appropriate" and so forth.

14    I just don't single out any evidence.

15    **MR. KANIG:**  Your Honor, the Ninth Circuit has very --

16    **THE COURT:**  You get -- you get a theory of the case.

17    You don't get an argument as to how it applies given a

18    particular bit of evidence, do you?

19    **MR. KANIG:**  I think so.  I mean, that is our theory of

20    the case.

21    Our theory of the case is that Mr. Hussain understood that

22    it was appropriate under IFRS-8 that they did not need to

23    separately disclose hardware sales and that their recognition

24    of revenue and the reseller transactions under IAS-18 was also

25    appropriate.  That is, at the highest level, our theory of the

1    case.  And I think that the Ninth Circuit has said that if

2    there is in foundation in the evidence for --

3         THE COURT:  There may be a foundation in the evidence

4    to give a theory of the case, but you're asking me to give an

5    example of the evidence in the case, which would be consistent

6    with the Defense theory.

7         And I -- I'll go look at the case -- but am I not

8    communicating?  In other words, I don't give an instruction

9    that says, "It is the Government's view that the following

10   statements were false because" or -- "because they had

11   understood" or "that it was communicated a particular way" or

12   "it meant a particular thing" and so forth, "that revenues were

13   this and hardware sales were that" and so forth.  I don't go

14   into a discussion of the Government's case.

15        This suggests to me that I do enter into discussion and

16   tell the jury what the -- I comment on the evidence.  I don't

17   comment on whether it's believable or not.  I comment on the

18   fact that this is an example -- as you say, "for example."

19   It's an example of the evidence in the case, your

20   interpretation of the evidence of the case.

21        Now, if you're saying to me, "Well, that's what the

22   Defense theory is," I don't know -- again, I have to take a

23   look at it.

24        Anyway, let me read the whole thing.  Okay?  So I'll get

25   it.  Because I'm just taking a piece of it.

1    **MR. KANIG:**  Your Honor, if the issue is the phrase

2    "for example," we are happy to take that out.  I mean, if that

3    phrase wasn't there, I think --

4            **THE COURT:**  No, no, no.

5            **MR. LEACH:**  I think that would be instructing them on

6    a fact that Mr. Hussain understood something.  That makes it

7    worse.

8            **THE COURT:**  Okay.  Well -- okay.  Let me read it.

9    Okay.  In fairness to you.

10           **MR. KANIG:**  Okay.

11       (Whereupon, the Court reads the document.)

12           **THE COURT:**  Well, okay.  Okay.

13       Now, let me turn to the Government.  I think I have a

14   better understanding -- I think, by the way, that can be

15   cleared up by some language changes.  I mean, it would be -- it

16   would be -- it would be, "The Defense contends that Mr. Hussain

17   understood that.  It is their contention that."  And that's

18   probably a better way of phrasing it.

19           **MR. KANIG:**  That would be fine.

20           **THE COURT:**  Okay.  All right.  I just got off on a

21   tangent.  Okay.

22       I now want to address the whole question of the

23   instruction and what the Government's view is.

24           **MR. LEACH:**  Our view is this is argument.  Our view is

25   this --

CHARGING CONFERENCE

1    THE COURT:  Well, first of all, let's start at the

2    beginning.  You don't quarrel with the proposition that they

3    are entitled to an instruction on their theory of the case, or

4    do you?

5    MR. LEACH:  Only if it's not covered by the other

6    instructions, and the other instructions I hear make perfectly

7    clear the defendant needed to act with the intent to defraud,

8    he needed to agree to enter into a conspiracy --

9    THE COURT:  Well, are you saying that -- are you

10   saying that -- that the defendant's theory of the case is that

11   he's not guilty of the charges because in fact the elements

12   haven't been proven?  That's true.  That is their -- that's the

13   defense.  I don't know that that's the theory of the case.

14   MR. KANIG:  Yeah --

15   THE COURT:  By the Ninth Circuit I'm required to --

16   otherwise, I'd say I said it already.  I said it in Instruction

17   No. 1.  The defendant has entered a plea of not guilty and --

18   and it is to be presumed to be innocent and does -- you know, I

19   don't elaborate, but the elements of the offense have not been

20   proven.  Okay.  But that's not the defense theory of the

21   case --

22   MR. KANIG:  No, Your Honor.

23   THE COURT:  -- as I understand the Ninth Circuit.

24   So let's assume for the moment that I have to say more

25   than just he pled not guilty and there's -- and we have a trial

1    and here are the elements of the offense.  Let's say I say

2    more.

3         Now, tell me what's wrong with this instruction in saying

4    more.

5              MR. LEACH:  I think it's argument.  I think it singles

6    out particular auditing standards that may or may not be

7    significant to the jury.  I think it's use of, you know,

8    employees in the United States, why not just say "employees."

9              THE COURT:  Why don't you give me a -- why don't you

10   give your proposed --

11             MR. KANIG:  Your Honor, I don't think the Government

12   should be allowed to write our Defense theory of the case.  I

13   take their point that it's argumentive, but to some degree,

14   this will always be a little bit argumentative in their eyes.

15   It's a question of degree.

16        This is a very high-level analysis of our Defense theory

17   of the case.  It doesn't reference any specific evidence or

18   testimony by witnesses.  This is the highest level that we can

19   do with -- with, you know -- and still have a Defense theory of

20   the case.

21             THE COURT:  You may be right, but I think they are

22   entitled to comment on the instruction and they are entitled to

23   say why they think anything in it is impermissibly

24   argumentative, and that's what they're saying.

25        No.  I think you're right that they can't write the

**CHARGING CONFERENCE**

1    instruction, but they can comment on the proposed instruction,

2    and that's what I'm asking them to do.

3            **MR. KANIG:**  Fair enough, Your Honor.

4            **THE COURT:**  All right.

5            **MR. LEACH:**  Thank you, Your Honor.

6            **THE COURT:**  So rather than go through line after line,

7    just give it to me as quickly as possible and I'll -- I'll look

8    at it.  And I think I have it in mind.

9        And, again, you want to say something about it, it's

10   called writing a -- two pages, which I think would be a record

11   in this case; that is to say, anything confined to two pages

12   would be unprecedented.

13       Okay.  Anything else?

14           **MR. KANIG:**  Nothing --

15           **THE COURT:**  Good.  Hearing nothing else --

16           **MR. KANIG:**  Well, I'm sorry --

17           **MR. GRAY:**  We do --

18           **THE COURT:**  What?  I don't mean anything else on this

19   instruction. I mean --

20           **MR. KANIG:**  Generally anything else?

21           **THE COURT:**  Generally.

22           **MR. KANIG:**  Yes, Your Honor.  There are --

23           **THE COURT:**  Well, other than -- other than the -- I

24   have in mind -- and you're not waiving any objections you have

25   raised as to the instructions we've already discussed and you

1  have filed, so you don't have to repeat those.

2           MR. KANIG:  Yes, Your Honor.  I understand.

3      I just wanted to flag three of the remaining instructions

4  that we have not discussed of the Defense instructions that I

5  think --

6           THE COURT:  Go ahead.

7           MR. KANIG:  -- are absolutely critical in this case.

8           THE COURT:  Go ahead.  I know these are more important

9  than even the presumption of innocence.  Go right ahead.

10          MR. KANIG:  Thank you, Your Honor.

11     Like I said, I think there are three remaining

12 instructions --

13          THE COURT:  What are they?

14          MR. KANIG:  The first is that accounting violations

15 are not a criminal act in and of themselves.

16          THE COURT:  Oh.

17          MR. KANIG:  This has been an extraordinarily long

18 trial in which I guarantee the jury is confused about what is

19 and isn't a crime in the context of a violation of an

20 accounting standard.

21          THE COURT:  I did this in the *Reyes* case.

22          MR. KANIG:  That is exactly right, Your Honor, and we

23 think that --

24          THE COURT:  And I think it is warranted.  And what I

25 said -- I think it's warranted.  I think it's warranted because

1    a juror sits there and says, "Hey, this is the way revenues

2    should have been reported under this structure -- stricture.

3    Now, he said he did, but did he do so with the intent?  But

4    it's clear he didn't and therefore it in and of itself -- in

5    and of itself" -- so what I said in *Reyes* was -- which

6    ultimately was affirmed -- is as follows:

7         "You have heard references during the trial to the

8    United States generally-accepted accounting principles, U.S.

9    GAAP, and the United Kingdom generally-accepted practice, UK

10   GAAP, and the International Financial Reporting Standards,

11   IFRS.  You are instructed that the accounting principles that

12   govern Autonomy Limited were the International Financial

13   Reporting Standards."

14        Any problem -- I will read the whole thing.

15        "In and of itself, a violation of accounting principles,

16   opinions, standards or guidelines does not establish a

17   violation of the criminal law.  However, evidence of such

18   accounting violations may be considered by you, along with all

19   the other evidence, in connection with the crimes charged in

20   the Indictment."

21        **MR. KANIG:**  Exactly, Your Honor.  And there is no

22   reason why those last two sentences that you read won't address

23   all the concerns that they're about to raise about --

24        **THE COURT:**  Well, we'll see.

25        **MR. KANIG:**  Well, I hope so, Your Honor.

CHARGING CONFERENCE

1          **THE COURT:**  Well, we'll see something.

2          **MR. LEACH:**  First, Your Honor, the line "You are

3    instructed that the accounting principles that governed

4    Autonomy Limited were the International Financial Reporting

5    Standards" --

6          **THE COURT:**  I don't know that I would say that.

7          **MR. LEACH:**  That is not appropriate.

8          **THE COURT:**  Okay.

9          **MR. LEACH:**  That's a disputed fact.  And whatever it

10   is, it's a fact.

11         **THE COURT:**  And it's not necessary to the instruction.

12         **MR. KANIG:**  I'm sorry --

13         **THE COURT:**  It's actually not necessary to the

14   instruction.

15         **MR. KANIG:**  I apologize, Your Honor.  That was the

16   "you are instructed," that sentence?  "The accounting

17   principles that governed Autonomy were the IFRS."  Is that what

18   he objected to?

19         **THE COURT:**  That's what I struck, but that's over your

20   objection.

21         **MR. KANIG:**  That's fine with us, if that sentence

22   comes out.

23         **THE COURT:**  No objection.  There we go.  Okay.  So it

24   would just be just as I've said, with the exception of that.

25         **MR. LEACH:**  The United States recommends if this

**CHARGING CONFERENCE**

1  instruction is to be given, it read, "In and of itself, a

2  violation of accounting principles, opinions, standards or

3  guidelines does not necessarily establish a violation of the

4  criminal" --

5        **MR. KANIG:**  Your Honor, that undoes the instruction.

6        **THE COURT:**  Nice try.

7    Next?

8        **MR. LEACH:**  Thank you, Your Honor.

9        **MR. KANIG:**  Thank you, Your Honor.

10        **THE COURT:**  I mean, it does not necessarily -- but --

11  but -- well --

12        **MR. LEACH:**  There is a way to read this, Your Honor,

13  that says they proved a violation of the accounting standards,

14  so what?  I can't even consider that.  I just --

15        **THE COURT:**  Well, I think I have -- I think -- well,

16  maybe I should change it to say -- because I think this is a

17  bit perhaps fairer to say -- starting the paragraph, "A

18  violation of accounting principles, opinions, standards or

19  guidelines in and of itself does not establish a violation of

20  the criminal law."

21        **MR. KANIG:**  That's fine with us, Your Honor.

22        **THE COURT:**  Rather than just say "necessarily."  I

23  know that they're different concepts, but I'm just trying to

24  figure out --

25        **MR. REEVES:**  No problem.

1    **MR. LEACH:**  That's fine, Your Honor.

2        **THE COURT:**  Okay.  So I'll change --

3        **MR. KANIG:**  And, Your Honor, just going off of that, I

4    would also ask that you give the same instruction that you gave

5    in *Reyes* with regard to backdating, which is just a subset of

6    this instruction which is that backdating a contract --

7        **THE COURT:**  Backdating, of course, was the whole thing

8    in *Reyes*.  This is just one aspect of it.

9        **MR. KANIG:**  It's one aspect of it, but it's an aspect

10   that they have spent a tremendous amount of time during this

11   trial focusing on and I don't think there is any principal

12   distinction --

13       **THE COURT:**  Tell me about backdating for a moment.

14       **MR. LEACH:**  I think the context in *Reyes* is

15   important --

16       **THE COURT:**  Pardon?

17       **MR. LEACH:**  I think the context of *Reyes* is important,

18   Your Honor.  There the Defense theory was this was some new

19   type of accounting fraud and it was unfair to hold the CEO or

20   the vice-president of human resources responsible for some new

21   type of accounting fraud that no one had ever prosecuted

22   before.

23       Auditor after auditor who took the stand here said --

24       **THE COURT:**  I think backdating here is of course

25   crucial.  This whole thing is about -- putting the hardware

1    sales aside, everything else is backdating.  Everything else is

2    changing it in different quarters and so forth.  Backdating may

3    in and of itself support a conviction, if the other elements

4    are proven.

5              MR. KANIG:  That's --

6              THE COURT:  But that's the problem.  If I say Element

7    No. 6 or piece of Evidence No. 7 in and of itself doesn't do

8    anything, that's right.  Nothing in and of itself does -- I

9    think I have to say something about accounting standards

10   because people think accounting standards are the law or don't

11   think that, but it carries enormous weight.

12       What the -- what the particular *modus operandi* is in a --

13   in a -- of the -- as shown by the evidence doesn't -- doesn't

14   really warrant, in the Court's view, a separate instruction

15   pointing out, you know, nothing -- because -- in and of itself,

16   you know.

17       No, I'm not going to give a backdating instruction.

18       What's next?

19             MR. KANIG:  I only have two more.  The second one is

20   the hindsight instruction.  I think it is extraordinarily

21   important --

22             THE COURT:  More than the last one your raised?

23             MR. KANIG:  Every one I have is more important,

24   Your Honor.

25             THE COURT:  I can't wait until we get to the end.

**CHARGING CONFERENCE**

1        **MR. KANIG:**  We are almost there.

2        **THE COURT:**  What is that, this one?  Where do I find -

3   what is this called?

4        **MR. KANIG:**  This is the "hindsight" instruction.

5        **THE COURT:**  Hindsight.  Here we go.

6        "In your deliberations, you are instructed to consider

7   only what Mr. Hussain knew, believed or understood at the time

8   of the alleged conduct and not what may be apparent to him or

9   to others with the benefit of hindsight."

10       **MR. KANIG:**  In light of the restatement, Your Honor,

11  we think this is a critical instruction.  This has -- the jury

12  has to know that they are --

13       **THE COURT:**  When does hindsight -- by the way, when

14  does hindsight kick in?  When is the 20/20 day?  It seems to me

15  that the 20/20 day that is relevant is -- is -- that your

16  instruction would go to is what happened on October 3rd.  Is

17  that right?

18       **MR. KANIG:**  I would submit that it's whenever

19  Mr. Hussain took an action the Government is alleging was in

20  furtherance of the conspiracy.

21       **THE COURT:**  Wow.  Really?  I mean --

22       **MR. KANIG:**  Sure.

23       **THE COURT:**  I think -- I think -- I think that an

24  ongoing conspiracy with a number of crimes over a period of

25  time, it's highly relevant what he thought on day 2 and what he

1    thought on day 10 and that's -- they're all hindsight because

2    he took the action and then something happened.  Then he took

3    another action and something happened.

4             **MR. KANIG:**  Well, let me --

5             **THE COURT:**  And the repeated -- the fact that things

6    are repeated is -- is evidence of the lack of mistake, the

7    intention, the plan.  It's highly relevant.

8         Now, it's hindsight.  There is no question about it.

9    Event 2 occurred after Event 1.  He had a view as to the day

10   No. 2.

11        Okay.  So I'm really anxious to get to your last one

12   because this one is not going to be given.

13        What's the most important one?

14            **MR. KANIG:**  The last instruction that we have is with

15   regard to good faith and professional reliance.  Reliance on

16   Deloitte, Your Honor.  And --

17            **THE COURT:**  Okay.  So let's think about that for a

18   moment.  Because usually this comes up on an "advice of

19   counsel" defense and it could be maybe an "advice of

20   accountants."  I'm trying to remember cases where that is.

21   Okay.

22        So your -- now, of course we know that in good faith --

23   that the defense of good faith requires that all of the facts,

24   the true facts and circumstances, be given to the individual

25   who then renders an opinion it's fine.  And in this case, there

1   is ample evidence that that was not the case.

2       So I'm now trying to figure out how I would give this

3   instruction.

4           MR. KANIG:  Well --

5           MR. LEACH:  Not only --

6           MR. KANIG:  If you look on the --

7           THE COURT:  I will listen to the Defense.  It's their

8   instruction.

9           MR. KANIG:  Thank you, Your Honor.

10      If you look at the specific language of 5.9, it actually

11  takes that precisely into account.  The last sentence says,

12  "Unlawful intent has not been proved if the defendant, before

13  acting, made full disclosure of all material facts to an

14  accountant, received the accountant's advice as to the specific

15  course of conduct" --

16          THE COURT:  Can I ask you this?

17          MR. KANIG:  I'm sorry?

18          THE COURT:  Can I ask you this?

19          MR. KANIG:  Please.

20          THE COURT:  Are you really going to argue that?  You

21  are going to argue that Deloitte knew everything that was

22  relevant?  Just tell me, are you going to argue it?

23          MR. KANIG:  At a bare minimum, the hardware case

24  certainly falls within that ambit.

25          THE COURT:  You are going to argue it?

1          **MR. KANIG:**  Lee Welham testified repeatedly that they

2    were fully aware of all the hardware sales, they were done at a

3    loss, that they were aware of all the hardware accounting that

4    went into that.  That is precisely what he testified --

5          **THE COURT:**  They are relying on the fact for the

6    hardware sales.

7          **MR. KANIG:**  At a minimum, Your Honor.

8          **THE COURT:**  I'm just trying to figure it out because

9    I'm not quite sure we can draw lines in -- on this issue.  But

10   you might be entitled to it, even as to a part, if it's a part

11   of the fraud, so I don't know that you're not.  And I don't

12   know that I ought to -- well, I mean, they're entitled to --

13   if -- let's assume for the moment that Deloitte was told

14   everything that was relevant.  And Deloitte comes back to

15   Autonomy and says, "Go ahead.  This is -- this is appropriate,

16   this is how you ought to state it."

17        Is that a defense?  If the charge were X and Deloitte

18   reviewed X and reviewed all the facts and circumstances --

19   well -- the issue was Deloitte said "X is fine, state it the

20   way you've stated it," because actually that's exactly what

21   happened here.  They -- they rendered an opinion that it was

22   fine as it what told to them.  That would be a defense,

23   wouldn't it?

24         **MR. LEACH:**  I think that would be evidence supporting

25   a lack of intent, Your Honor --

CHARGING CONFERENCE

1      **THE COURT:**  But the jury would not have any idea.

2   That's the point.

3      **MR. LEACH:**  I don't think it's a complete defense,

4   Your Honor.

5      **THE COURT:**  It may not be.  They say it is -- they

6   say -- well, wait a minute, why isn't it a complete defense if

7   I -- let's say they went and they said, "Look, we want to tell

8   you a couple of things here.  We want to tell you we -- we --

9   we engineered these dates on -- on the -- on the VAR

10  agreements.  Now, why did we do it?  Because, you know, it was

11  within a day or so, and by the way, whether they recognized the

12  revenue in point A is not so important because it will come in

13  the next month."  You know, I mean, this is just -- this is

14  just timing, timing, timing.  And they said all that to

15  Deloitte.  And Deloitte came back and said, "That's fine.

16  That's fine.  Just do it the way you did it.  That's fine."

17  That's a defense, isn't it?

18      **MR. KANIG:**  We certainly think so, Your Honor.

19      **THE COURT:**  I thought you thought so because that's

20  why you submitted the instruction.

21      **MR. KANIG:**  Yes, Your Honor.

22      **MR. LEACH:**  The financial statements that Sushovan

23  Hussain signs says those financial statements are "my

24  responsibility," not Deloitte's, not the audit committees, not

25  somebody else's --

1      **THE COURT:**  You are saying he can't rely -- when he

2   says "they are my responsibility," he can't rely on what

3   Deloitte tells him?

4      **MR. LEACH:**  I'm saying I know of no case involving

5   wire fraud or securities fraud where the CFO of a public

6   company got an instruction that says "reliance on my auditor is

7   a complete defense to the offense."

8      The cases they are citing are tax cases where willfulness

9   is an element, where you have a disparity between the one

10   seeking the advice and getting the advice.

11      Sushovan Hussain is a chartered accountant.  He knows the

12   rules.  The mere fact that Deloitte says "yes" or "no" on

13   something might be evidence of a lack of intent and they can

14   argue that based on the instructions, but I don't think it's a

15   complete defense.

16      **MR. KANIG:**  Your Honor, there is no principal

17   distinction between a willfulness standard and a knowing

18   standard here.  There really isn't.  If Mr. Hussain, in good

19   faith, relied on his auditors, Deloitte, one of the Big Four

20   auditing --

21      **THE COURT:**  What is the Model Instruction here, by the

22   way?

23      **MR. KANIG:**  5.9.

24      **THE COURT:**  That is "advice of counsel."  You are

25   saying it's the same.

**CHARGING CONFERENCE**

1          **MR. KANIG:**  I'm saying our tailored to say "auditors"

2     is the exact same thing in principle.  There really is no

3     difference.  It's just a good-faith defense.

4          **MR. LEACH:**  This instruction, Your Honor, is intended

5     when there is a disparity between, you know, the lawyer and the

6     client or the tax preparer and the ordinary citizen who is

7     trying to file his taxes.

8          **THE COURT:**  I don't know.  And I don't know what we

9     mean by "ordinary citizen."  I don't know.

10          **MR. KANIG:**  There is no special wire fraud statute for

11     accountants, Your Honor.

12          **THE COURT:**  Is there?  I don't think so.  Right.  I

13     don't know.

14          I'd like to see from the Government a -- their

15     suggested -- in fact, I think they are entitled to some

16     good-faith argument and I think they are entitled to some

17     instruction in that regard.

18          If you think it should be tailored, because as they say

19     well, that's the hardware sales, you -- but you want it across

20     the board, don't you?  You don't want me to distinguish

21     hardware sales from anything else?  That would be --

22          **MR. KANIG:**  No, Your Honor.  That was just

23     illustrative.

24          **THE COURT:**  Illustrative.

25          Mr. Frentzen.

1          **MR. FRENTZEN:**  Sorry.

2          **THE COURT:**  Does Mr. Leach want to say something?

3          **MR. LEACH:**  My friend and colleague is making the

4    point that the Government is -- the Government is arguing the

5    hardware piece vis-à-vis Autonomy -- or vis-à-vis HP and the

6    market, less so vis-à-vis the accounting of that.  So to have

7    an instruction --

8          **THE COURT:**  No.  But they want to do the whole thing.

9    I mean, they want to do the whole thing.

10         And, by the way, I think it would be somewhat prejudicial

11   if I single out a piece of evidence to which I think the

12   defense may apply and not the other.

13         Anyway, I'm inclined to give it.  If you want to tailor

14   it --

15         **MR. LEACH:**  We will, Your Honor.

16         **THE COURT:**  -- before -- before midnight tonight,

17   please do so.  Okay.

18         **MR. KANIG:**  Thank you, Your Honor.

19         **THE COURT:**  When I say midnight tonight, I'm actually

20   talking about 2:00 or 3:00 in the afternoon.  That's what I

21   mean by mid entitlement.

22         **MR. KEKER:**  It depends on the timestamp.  We have the

23   witness.

24         **THE COURT:**  Because I know this group and you will go

25   to midnight and then some.

**CHARGING CONFERENCE**

1    What you will do is you will look and see what is the

2  Greenwich Mean Time that you can then apply to midnight; right?

3  Right.  Okay.

4        Anything else?

5            **MR. GRAY:**  Yes, Your Honor.  Just briefly --

6            **THE COURT:**  We just heard the most important thing.

7  So you have something less important?

8            **MR. GRAY:**  No.  They are all important, but that was

9  the last of his presentations.

10            **THE COURT:**  In his mind it was the most important.

11  What is most important in your mind?

12            **MR. GRAY:**  Couple of quick instructions.

13        We proposed an instruction for 4.8 impeachment.

14            **THE COURT:**  4.8 what?

15            **MR. GRAY:**  4.8, the impeachment evidence.

16            **THE COURT:**  The impeachment evidence -- my

17  understanding, the impeachment evidence deals with a crime

18  whether they deal with a conviction.

19            **MR. LEACH:**  Agreed.

20            **THE COURT:**  What is the impeachment evidence?

21            **MR. GRAY:**  Well, Your Honor, there is a Model

22  Instruction that relates to individual impeachment evidence

23  that goes to particular witnesses so, for example, in this case

24  if we were to say "You have heard from a witness, Alan Rizek

25  who," you know, and then it says "specify the basis for

1  impeachment," in his case potentially admitted or I think the

2  Government stipulated to committing bank fraud, "you may

3  consider that as evidence of whether or not you want to believe

4  him or not."  That's essentially what the instruction advises

5  us to do.

6      We've sort of simplified it by saying "You have heard

7  evidence in a couple of different categories.  You can consider

8  this impeachment evidence when deciding whether or not to

9  believe various witnesses."

10         **MR. FRENTZEN:**  This is actually simplified -- sorry,

11  Your Honor.

12         **THE COURT:**  Go ahead.

13         **MR. FRENTZEN:**  I am addressing this because as the

14  Court recalls, there was a lot of discussion about efforts to

15  impeach witnesses with supposedly prior inconsistent

16  statements, and as the Court saw, they called no witnesses to

17  close the loop on impeachment, which the jurors are not going

18  to understand.

19      All those times they got up and tried to read something to

20  a witness most of the time was not inconsistent, to begin with.

21  And then they never closed the loop on the impeachment.

22      What they're trying to do here is to boil it down to a

23  point where then they can argue they impeached all these

24  people, which they did not do.

25         **THE COURT:**  I'm not going to give it.  I don't think

1    it's warranted in this case.

2        What is next?

3            MR. GRAY:  Two more issues, Your Honor.

4        We submitted specific issue unanimity instructions for

5    wire fraud, securities fraud, and conspiracy.  We think those

6    instructions are warranted, along with an instruction on

7    multiple conspiracies.

8        Your Honor, in this case, the Government is advancing some

9    theory that Mr. Hussain either defrauded HP or HP's

10   shareholders or Autonomy's shareholders.  The jury could be

11   thinking the conspiracy was just -- is there a conspiracy to

12   backdate Prisa, is there a conspiracy to hide EDD processing

13   payments, is there a conspiracy to steal $2.3 million of

14   software from Autonomy with the DiscoverTech/Truitt whole

15   fiasco.

16       There are multiple conspiracies at issue in this case.

17           THE COURT:  Not really.  I think there is one scheme

18   to defraud.  I mean, that's what I would find.  I don't think

19   there are multiple conspiracies.

20       Okay.  Thank you.

21       What's next?

22           MR. LEACH:  Nothing from the Government, Your Honor.

23           MR. GRAY:  The last thing, Your Honor, we prefer our

24   version of 4.1.  We understand the Court has ruled.

25           THE COURT:  Okay.  Thank you.

1      **MR. KEKER:**  Your Honor, before you leave --

2      **THE COURT:**  I'm not going anywhere.

3      **MR. KEKER:**  Okay.  Good.  Could we get some finality

4  from the Government on how long --

5      **THE COURT:**  That's what I'm turning to now.  That's

6  the third thing I want to turn to is argument.

7      **MR. KEKER:**  And then also Juror No. 10, how you're

8  going to handle that, we would like -- because the idea of

9  starting and then starting over is not attractive.

10     **THE COURT:**  Well, here is -- here is -- that's a good

11  question.  Lets talk about that first.

12     Obviously the Court has the power to order her to remain.

13  I don't know that anybody wants that; is that correct?

14     **MR. FRENTZEN:**  No, Your Honor.  The Government doesn't

15  want that.

16     **THE COURT:**  And you don't want that?

17     **MR. KEKER:**  We don't want that.

18     **THE COURT:**  What I would propose to do -- and, again,

19  it depends on the -- I propose to let her go if she still wants

20  to go at the end of Tuesday or middle Tuesday or whenever we

21  finish.  That would be my proposal, provided that I have the

22  alternate show up on Monday and Tuesday.  I mean, I'll see

23  that, but if suddenly there is a, you know -- yeah, right --

24  epidemic, I'm going -- I won't feel guilty about telling her

25  "I'm very sorry, but you have to remain" if she is going to

1    constitute the jury.

2         So I would excuse her, and I think that's the answer to

3    the question.  Obviously I want her to listen to what happens

4    on Monday, listen to what happens on Tuesday, but after that,

5    she would go and I -- I would take whoever the next alternate

6    is in line, put that person in, and I might or might not say

7    something to the jury -- is that this juror has been excused

8    for personal reasons, not make a big thing about it.

9         Okay.  So that answers that question.

10        Now, turning to argument and asking Mr. Frentzen or who --

11   who is speaking on behalf of the team here?

12        You are, Mr. Reeves.

13        **MR. REEVES:**  I will be giving the Government's

14   summation and Mr. Frentzen will be giving the rebuttal.

15        **THE COURT:**  Okay.  Well, I'm actually not interested

16   in who's doing what because I assume that you're all fungible.

17   I'm interested in time.  You know, time, time, time.

18        So how are we on that one?

19        **MR. REEVES:**  I think about three hours for the

20   Government's closing argument.

21        **THE COURT:**  Three hours.  And that would include

22   rebuttal and --

23        **MR. REEVES:**  No.  I'm sorry.  That does not include

24   rebuttal.  I would like to reserve about an hour to hour and a

25   half for the rebuttal argument.  So --

**CHARGING CONFERENCE**

1          **THE COURT:**  By the way, "abouts" aren't going to work.

2          **MR. REEVES:**  Four and a half hours, Your Honor.

3          **THE COURT:**  Four and a half hours.

4          **MR. KEKER:**  Too much.  That's ridiculous.  I mean, I

5     could live with four hours.

6          **THE COURT:**  Good.  It is four hours.  That's it.  Four

7     hours.

8          I'll let you chop it up the way you want to chop it up,

9     provided that you use at least two hours in your opening, so, I

10    mean, I do not want a situation where -- and that won't happen

11    anyway.  You've got -- and I'm not asking you to divide it up

12    now.  Because I think that the hardest thing is to -- to say

13    exactly what you're -- how long you're going to take.  I mean,

14    you'll take what you take in your opening.

15         The rule is that you have to use at least two hours.  If

16    it ends up you use four hours in your opening, there is no

17    rebuttal.  So that's easy.  So you know that.  It has its

18    consequences and so forth.

19         If, again, as I say -- I mean, I really want to start --

20    assuming I deny the Defense motions on the exhibits and so

21    forth -- assuming the case is submitted under protest, as it

22    is, on Monday morning, then the first thing is the Defense will

23    get up, they'll rest, and I'll instruct the jury.  I see no

24    reason why I shouldn't do it first.  That should take about a

25    half an hour.  That's until 9:30.  And then we go into

1    argument.  So the Government starts at 9:30 or thereabouts and

2    goes for the length of time, and we may take a recess during it

3    or not.  But I would very much -- if -- I need to have some

4    idea come 11:30 or noon as to how much more you have in your

5    opening.  Okay?

6            MR. REEVES:  Can I --

7            THE COURT:  And I'll either -- because I've got to be

8    concerned about, you know, the welfare of the jury.  I may take

9    a lunch break at that time or not.  And then you can address

10   them after lunch when they'll all be asleep.  Okay.

11       So -- and then -- and then the Defense will give their

12   argument.  They can give an argument up to four hours.

13       And the situation I will follow, I think, because I -- I

14   promised the Defense that they will not have to conclude their

15   argument that night and -- or that I wouldn't force the

16   Defense, I think -- that's what I said -- I wouldn't force the

17   Defense to conclude their argument that night -- is that if

18   they want to reserve an argument for an hour, I think that's

19   fair for the next day.  That's Tuesday morning.  They can argue

20   Tuesday morning at 9:00 for an hour and the Government then can

21   close, depending on how much they have left in their engine at

22   that point.

23       I'm not going to say that the argument on Tuesday has to

24   be of equal length because there is just no way to fine tune

25   it, but I think it would be unfair to the defense not to let

1   them argue an argue on Tuesday.

2           MR. KEKER:  Appreciate that, Your Honor.  But we --

3           THE COURT:  I think that's fair.

4           MR. KEKER:  When the jury has heard two or

5   two-and-a-half hours from the Government and we've gotten up

6   and then talked to them for two hours and they have listened to

7   four or five hours of argument in a day, we're going to ask

8   that we recess after I've talked for two hours and come back

9   and I'll talk for two hours or less and we'll -- the next day

10  and there will be plenty of time for the Government to

11  finish --

12          THE COURT:  I don't know.  I'm -- I don't know that I

13  would give you two hours on Tuesday.  I mean, I'll have -- I --

14          MR. KEKER:  That's going to be the request.  Because I

15  think there is time before you have to leave -- if they're

16  there from 9:00 to 1:00 --

17          THE COURT:  Well, they have a couple of recesses.

18          MR. KEKER:  I will take an hour and three quarters and

19  then they can have a recess and they can have however much time

20  they want for rebuttal.

21      The other part about rebuttal is I want to alert the

22  Government through the Court that my understanding of opening

23  is that they are supposed open and tell us all the theories and

24  evidence that we have to rebut, and that if we start getting

25  new theories or new ideas about why Mr. Hussain is liable in

1    the rebuttal, then that's what I call sandbagging, and I will

2    be objecting to that and I will be objecting, if necessary, in

3    front of the jury and I will be asking for time to deal with

4    this new material because we're not going to get sandbagged in

5    this case without protest.

6          THE COURT:  Okay.  Well, that's a position.  The real

7    question -- sandbagging, I think -- my understanding of

8    sandbagging is that oh, look at all the evidence that they now

9    say rebuts X.  I don't think that's sandbagging.  In other

10   words, I think what sandbagging is is some new theory of -- of

11   evidence that hasn't been presented in their opening and you

12   haven't had a fair opportunity to address.

13         MR. KEKER:  I agree.

14         THE COURT:  But I don't think they have to say, "Here

15   is all the evidence, A, B, C, D, and E."  You give your

16   argument, whatever that may be -- because you are not

17   previewing your argument.  You are not saying, "I'm going to

18   say this and I'm going to say that."  They say, "Oh, Mr. Keker

19   said X, well, here is Y, which in the Government's view

20   disapproves X, and Y, a series of evidence, a series of

21   testimony" -- never been -- never been addressed by the

22   Government in its -- in its opening.  That is truly appropriate

23   rebuttal.  That's why there is rebuttal, actually, to be able

24   to have the opportunity to address an argument that they've

25   never heard.

1        So maybe you and I have different views of what rebuttal

2   is.  I think -- that's my view of rebuttal.

3        MR. KEKER:  Very specifically in this case, what about

4   transactions.  If --

5        THE COURT:  What if a transaction -- if a transaction

6   disproves, in the Government's view, something you have said in

7   your opening or your argument, they get to do it.  They get to

8   do it.

9        MR. KEKER:  And without them saying in their opening

10  what the -- their theory about the particular transaction is.

11  One of the problems is this:  We have, through Mr. Yelland,

12  many transactions in his summary charts that the jury didn't

13  hear a word about and -- and we -- and then we began to get

14  through these -- the agent -- we began to get these new

15  summaries that you let in about Poste Italiane -- so all I'm

16  saying in their opening is they've got to say what is wrong,

17  "we say this is a backdated transaction, we say this is" -- so

18  that I can rebut that.

19        THE COURT:  I would be with you if you had told them

20  exactly what your argument is going to be.  If you said that,

21  "Look, I'm going to say and here it is, here are the

22  transactions I'm going to point to and here it all is," telling

23  them in advance, then I think you can make an argument that

24  they should address that that in their opening.  But that's not

25  the way it goes.

CHARGING CONFERENCE

1    **MR. KEKER:**  I'm going to respond -- I'm going to talk

2    about every transaction that they think they've proved is

3    backdated.  I will talk about each one of those and rebut it.

4    If they don't mention it in the opening, they shouldn't be able

5    to --

6          **THE COURT:**  I disagree with that.  I think that

7    they -- I'm not restricting argument.  I'm not restricting

8    argument on any side.  You know, I'm not saying you make your

9    argument, you say that this is what the evidence shows and they

10   get up and say no, the evidence shows something else.  They are

11   entitled to do that.  They're entitled to do that in light of

12   the fact that -- that -- that your argument is not previewed

13   in -- in a very concrete way.

14       Of course -- and it shouldn't be.  I've never heard of

15   that.  But that's the rationale, in the Court's view.

16         **MR. REEVES:**  Your Honor, one little detail.  At least

17   in the initial summation, I'm going to plan a break and have

18   a -- you know, a point in time that makes sense --

19         **THE COURT:**  You do it as you want.  I'm not telling

20   people how to argue.

21       Okay.  Thank you.

22             (Proceedings adjourned at 11:39 a.m.)

23

24

25

1

2

3                        <u>CERTIFICATE OF REPORTER</u>

4              I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Thursday, April 19, 2018

8

9     *Pamela A. Batalo*

10    _____
      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25