**Volume 28**

**Pages 5691 - 5900**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )          **NO. CR 16-00462 CRB**
                                )
SUSHOVAN TAREQUE HUSSAIN,       )
                                )
            Defendant.          )
_____)
                                San Francisco, California
                                Monday, April 23, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                ALEX G. TSE
                Acting United States Attorney
                450 Golden Gate Avenue
                San Francisco, California  94102
          BY:   **ROBERT S. LEACH**
                **ADAM A. REEVES**
                **WILLIAM FRENTZEN**
                **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:

                KEKER & VAN NEST
                633 Battery Street
                San Francisco  CA  94111
          BY:   **JOHN W. KEKER**
                **JAN NIELSEN LITTLE**
                **BROOK DOOLEY**
                **KATE LAZARUS**
                **NIC MARAIS**
                **ATTORNEYS AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Pamela Batalo, CSR No. 3593, FCRR
              Official Reporters

**I N D E X**

Monday, April 23, 2018 - Volume 28

|  | **PAGE** | **VOL.** |
|---|---|---|
| Defense Rests | 5701 | 28 |
| Jury Instructions | 5701 | 28 |
| Closing Argument by Mr. Reeves | 5719 | 28 |
| Closing Argument by Mr. Keker | 5844 | 28 |

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2687 | | 5695 | 28 |
| 6990 | | 5701 | 28 |

PROCEEDINGS

| | |
|---|---|
| 1 | <u>**Monday - April 23, 2018**</u>                    <u>**8:34 a.m.**</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---000--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  Let the record show the parties are |
| 6 | present, but the jury is not. |
| 7 | So there are some other -- a couple unfinished matters to |
| 8 | deal with before the Defense rests. |
| 9 | First, it is my understanding that the defendant does not |
| 10 | wish to testify.  Is that correct, Mr. Keker? |
| 11 | **MR. KEKER:**  That's correct, Your Honor. |
| 12 | **THE COURT:**  Mr. Hussain, do you understand you do have |
| 13 | the right to testify?  You have the right not to testify, and |
| 14 | if you choose not to testify, I need to have your consent that |
| 15 | you are giving up your right to testify. |
| 16 | Is that correct? |
| 17 | **THE DEFENDANT:**  Yes. |
| 18 | **THE COURT:**  Okay.  And even though your counsel -- |
| 19 | your counsel's advice, I'm sure, is very sound, you have to |
| 20 | exercise your own judgment, and you understand that you have |
| 21 | the right to testify, but you choose not to; is that correct. |
| 22 | **THE DEFENDANT:**  Yes. |
| 23 | **THE COURT:**  Okay.  Thank you. |
| 24 | So the other matters are the Court issued an order |
| 25 | indicating what it was doing with respect to offers of proof |

PROCEEDINGS

 1  and so forth and what other evidence.  Do we have some type of

 2  stipulation on that issue?

 3       Ms. Little?

 4            MS. LITTLE:  Yes, Your Honor.  We have a stipulation

 5  which we filed on April 21st.  I've given a copy to Ms. Scott

 6  and we would like to read it to the jury --

 7            THE COURT:  You may.

 8            MS. LITTLE:  -- and then enter it into evidence.

 9            THE COURT:  Yes.  You may do so when the jury returns.

10       And then the Defense intends to rest; is that correct?

11            MS. LITTLE:  Yes, Your Honor.

12            THE COURT:  Okay.  Is there anything else?

13            MR. LEACH:  One matter very briefly, Your Honor.

14       During the testimony of Daud Khan, the Government

15  endeavored to play an audio of one of the analyst calls.  It is

16  the audio of the February 3rd, 2010 call.

17       It was offered.  I think the Court ruled that it could be

18  received in evidence.  For whatever reason, it didn't make its

19  way on to the Admitted Exhibit List.  We showed him a

20  transcript of the audio call as an aid, and for whatever

21  reason, the audio that was offered is not on the exhibit list.

22       I would ask to offer it now and ask that it be admitted.

23  It's Exhibit 2687.

24            THE COURT:  Is that the audio?

25            MR. LEACH:  It's the audio, not the transcript.  The

```
1   transcript was shown to the jury.

2          THE COURT:  Right.

3      Any objection?

4          MS. LITTLE:  No objection.

5          THE COURT:  Okay.

6      (Trial Exhibit 2687 received in evidence)

7          THE COURT:  The audios can come in.  The transcripts

8   cannot.

9          MR. LEACH:  Thank you, Your Honor.

10         THE COURT:  That's it.  So we'll go at 9:00 when the

11  jury comes.  Sorry to get you all here so early, but I'm sure

12  you had a very pleasant weekend, and the sun was out, just

13  lovely.  It was great.  I relaxed.  I'm sure you all relaxed.

14     Did you relax, Mr. Reeves?  First of all, do you know how

15  to relax?  I know that assumes a fact not in evidence, so --

16  but did you relax?

17         MR. REEVES:  I did not relax, but I'm feeling

18  relaxed --

19         THE COURT:  You feel relaxed now?

20         MR. REEVES:  Yes, I do.

21         THE COURT:  Good.  Just don't exceed too much -- two

22  and a half hours.  You get two and a half hours this morning.

23  I -- and I'm concerned about that.  I'll just tell you why.

24     You can go a little over, but I'm concerned that the jury

25  gets tired after a certain part and then the Defense has to
```

PROCEEDINGS

```
1   argue, and it's not quite even.  Do you understand?  It's not

2   that -- that's the way it is, but don't exhaust them.

3            MR. REEVES:  I hear you loud and clearly, Your Honor.

4            THE COURT:  Okay.  Now everybody relax and I'll be

5   back.

6            MR. REEVES:  Can I talk a little bit about the

7   sequencing and exhaustion for the jury?

8            THE COURT:  Of course.

9            MR. REEVES:  I would be grateful if the Court took a

10  brief break after the jury instructions just so that we can

11  transition, get the podium up and get started.  Maybe 10

12  minutes.

13           THE COURT:  Sure.

14           MR. REEVES:  I have planned a recess, I hope, about an

15  hour and a half into the first --

16           THE COURT:  I will let you decide when you want to do

17  it.  If you feel there is a natural -- you feel we need a, we

18  will take a break.  It's up to your argument.

19           MR. REEVES:  Thank you very much, Your Honor.

20           MR. KEKER:  As long as we're talking about that,

21  Your Honor, I would like them to finish their two and a half

22  hours before the jury goes to lunch and then come back and

23  listen to us, but -- and the way it's set up, it seems like --

24           THE COURT:  That's going to be tough, isn't it?  I

25  mean -- I think my instructions -- we will start right at 9:00.
```

PROCEEDINGS

```
 1   I can't start before they get here.  It may work itself out,
 2   but -- and I may delay the jurors taking lunch.
 3           MR. KEKER:  That is what I was wondering.
 4           THE COURT:  I may delay the jurors taking lunch.
 5           MR. KEKER:  He has talked for two hours.  If he has a
 6   half hour to go, if the jury could wait for a half hour and
 7   then relax for an hour.
 8           THE COURT:  I will instruct and then send them out to
 9   take a little break.  Your time won't commence running until
10   you start to argue.
11           MR. REEVES:  Your Honor, there is a lot to cover, and
12   we've worked very hard to keep it compact and keep it moving,
13   but we are relying on the Court's overall estimation of a
14   four-hour time period for the Government's --
15           THE COURT:  That was an estimate.  That was an
16   estimate.
17           MR. REEVES:  We planned accordingly.  I would like a
18   little flexibility, please.
19           THE COURT:  That's fine.  Let me make sure I
20   understand it all.
21      You want to save -- is it correct you want to save an hour
22   and a half for tomorrow?  Well, Mr. Frentzen is rising.
23      How much time do you want tomorrow?
24           MR. FRENTZEN:  I think --
25           THE COURT:  Look, it's up to you.
```

PROCEEDINGS

1        **MR. FRENTZEN:**  I mean -- well, we'll see.  I am saying

2   I would gladly surrender, you know, like a half hour to

3   Mr. Reeves if he needs it at the tail end.

4        **THE COURT:**  Okay.  I said in the order up to an hour

5   and a half, so if it's less than, it's less.  Then I won't --

6   well, but then that impinges on the -- on the Defense.  I

7   have -- I'll listen to it.  I know there is a lot to cover.

8        **MR. REEVES:**  There is a lot to cover, Your Honor.

9        **THE COURT:**  I also know there are ways to do it

10  that -- it's not necessary to cover everything, you see.  You

11  see, it's not -- just because it got into evidence doesn't mean

12  that it's necessary to discuss it.

13       **MR. REEVES:**  I understand, Your Honor.  This is not my

14  first trial, not my first summation, and I understand the

15  balance here, but we will need a little flexibility, and we've

16  thought carefully about this, and all I'm asking is that the

17  Court consider that in imposing any kind of deadline on us,

18  please.

19       **THE COURT:**  That seems fair.

20       **MR. REEVES:**  Thank you.

21       **THE COURT:**  And so it will all be aided by -- on both

22  sides -- very few objections, if any, to -- I mean, the common

23  things are the objection that it misstates the evidence or it's

24  not in the record and so forth.

25      Let's talk about that since we have a few minutes.

1       I almost always give the same instruction to the jury

2  which is, you know, this is argument, this is not evidence.  If

3  their recollection differs from the way that the attorneys have

4  recited it, it's their recollection that counts.

5       I mean, if something is so far off the -- off the trail

6  but there is no way it could have come into evidence, sure, I

7  expect an objection or you can object.  You may just choose not

8  to.

9       But if it's just a different take or something on it, you

10 know, please, let's just go ahead and get this over with.

11 Those objections don't make any difference.

12      Now, I know that the defense is in a difficult situation;

13 difficult in the sense that if they don't object to something,

14 possibly it's a waiver, but let's make sure that -- and I rely

15 on their judgment to make sure that it's -- it's really

16 significant that they, number one, feel that there is just no

17 evidence to support -- it's not a reasonable inference from the

18 evidence and therefore they're compelled to say something.

19 Okay?

20           MR. REEVES:  Thank you, Your Honor.

21           MR. KEKER:  Yes, Your Honor.  Got it.

22           THE COURT:  I'm looking forward to this.

23           MR. KEKER:  I'm not.

24           THE COURT:  Well, once you get into arguing, it's sort

25 of fun.

 1          **MR. KEKER:**  I'm looking forward to my argument,

 2  but ...

 3          **THE COURT:**  Oh.

 4                     (Recess taken at 8:53 a.m.)

 5                  (Proceedings resumed at 9:14 a.m.)

 6          **THE CLERK:**  Come to order.  Court is now in session.

 7      (Proceedings were heard in the presence of the jury:)

 8          **THE COURT:**  Let the record reflect all jurors are

 9  present, parties are present.

10      Does the Defense have other matters?

11          **MS. LITTLE:**  Thank you, Your Honor.  We have a

12  stipulation that we'd like to read to the jury.

13          **THE COURT:**  Yes.  Please do.

14          **MS. LITTLE:**  Good morning, members of the jury.  I'm

15  going to read you a stipulation regarding Autonomy books and

16  records and Deloitte work papers.

17      This is Exhibit 6990.

18      "Defendant Sushovan Hussain and the United States hereby

19  stipulate that Hewlett-Packard had access to Autonomy's books

20  and records, as well as Deloitte's work papers, shortly after

21  the acquisition closed on October 3rd, 2011.

22      "Dr. Michael Lynch and Sushovan Hussain continued to

23  manage the Autonomy division of HP after the acquisition until

24  approximately May 2012.  It is so stipulated."

25      And, Your Honor, I would move Exhibit 6990 into evidence.

1    **THE COURT:**  Admitted.

2    (Trial Exhibit 6990 received in evidence)

3    **MS. LITTLE:**  Thank you.

4    **THE COURT:**  Anything further from the Defense?

5    **MR. KEKER:**  No.  With that, Your Honor, the Defense

6    rests.

7    (Defense rests.)

8    **THE COURT:**  The Defense has rested.  There was one

9    other document, but we received that in evidence already.  That

10   was -- I don't know whether it has to be done in front of the

11   jury.  What exhibit number is it?

12   **MR. LEACH:**  The United States offers 2687, Your Honor.

13   **THE COURT:**  Okay.  And that's an audio of a

14   conversation.  And that's admitted as well.

15   So, ladies and gentlemen -- anything further from the

16   prosecution?

17   **MR. LEACH:**  No, Your Honor.  Thank you.

18   **JURY INSTRUCTIONS**

19   **THE COURT:**  So all the evidence is in.  The parties

20   have rested.  And it is now my obligation to instruct you as to

21   the law of the case.

22   "A copy of these instructions will be available to the

23   jury for you to consult.

24   "It is your duty to weigh and to evaluate all the evidence

25   received in the case, and in that process, to decide the facts.

1    It is also your duty to apply the law, as I give it to you, to

2    the facts, as you find them, whether you agree with the law or

3    not.

4        "You must not decide the case solely" -- pardon me -- "you

5    must decide the case solely on the evidence and the law.  Do

6    not allow personal likes or dislikes, sympathy, prejudice,

7    fear, or public opinion to influence you.  You should also not

8    be influenced by any person's race, color, religion, national

9    ancestry, gender, profession, occupation, economic

10   circumstances or position in life or in the community.  You

11   will recall that you took an oath promising to do so at the

12   beginning of the case.

13       "You must follow all these instructions and not single out

14   some and ignore others.  They are all important.  Please do not

15   read into these instructions or into anything I may have said

16   or done any suggestion as to what verdict you should return.

17   That is a matter entirely up to you.

18       "The Indictment is not evidence.  The defendant has

19   pleaded not guilty to the charges.  The defendant is presumed

20   to be innocent and unless -- to be innocent unless and until

21   the Government proves the defendant guilty beyond a reasonable

22   doubt.

23       "In addition, the defendant does not have to testify or

24   present any evidence.  The defendant does not have the burden

25   to prove innocence.  The Government has the burden of proving

1   every element of the charges beyond a reasonable doubt.  A

2   defendant in a criminal case has a constitutional right not to

3   testify.  In arriving at your verdict, the law prohibits you

4   from considering in any manner that the defendant did not

5   testify.

6        "Proof beyond a reasonable doubt is proof that leaves you

7   firmly convinced that the defendant is guilty.  It is not

8   required that the Government prove guilt beyond all possible

9   doubt.  A reasonable doubt is a doubt based upon reason and

10  common sense and is not based purely on speculation.  It may

11  arise from a careful and impartial consideration of all the

12  evidence or from lack of evidence.

13       "If, after a careful and impartial consideration of all

14  the evidence, you are not convinced beyond a reasonable doubt

15  that the defendant is guilty, it is your duty to find the

16  defendant not guilty.  On the other hand, if, after a careful

17  and impartial consideration of all the evidence, you are

18  convinced beyond a reasonable doubt that the defendant is

19  guilty, it is your duty to find the defendant guilty.

20       "The evidence you are to consider in deciding what the

21  facts are consists of the sworn testimony of any witness, the

22  exhibits which have been received in evidence, and any facts to

23  which the parties have agreed.  In reaching your verdict, you

24  may consider only the testimony and exhibits received in

25  evidence.

1    "The following things are not evidence and you may not

2  consider them in deciding what the facts are:

3    "Questions, statements, objections, by the lawyers are not

4  evidence.  The lawyers are not witnesses.  Although you must

5  consider a lawyer's questions to understand the answers of a

6  witness, the lawyer's questions are not evidence.  Similarly,

7  what the lawyers have said in their opening statements, what

8  they will say in their closing arguments, and at other times is

9  intended to help you interpret the evidence, but it is not

10 evidence.  If the facts, as you remember, them differ from the

11 way the lawyers state them, your memory of them controls.

12   "Any testimony that I have excluded, stricken or

13 instructed you to disregard is not evidence.  Anything you may

14 have seen or heard when the Court was not in session is not

15 evidence.  You are to decide the case solely on the evidence

16 received in trial.

17   "Evidence may be direct or circumstantial.  You are to

18 consider both direct and circumstantial evidence.  Either can

19 be used to prove any fact.

20   "The law makes no distinction between the weight to be

21 given to either direct or circumstantial evidence.  It is for

22 you to decide how much weight to give to any evidence.

23   "In deciding the facts in this case, you may have to

24 decide which testimony to believe and which testimony not to

25 believe.  You may believe everything a witness says or part of

it or none of it.  In considering the testimony of any witness, you may take into account the witness' opportunity and ability to see or hear or know the things testified to, the witness' memory, the witness' manner while testifying, the witness' interest in the outcome of the case, if any, the witness' bias or prejudice, if any, whether other evidence contradicted the witness' testimony, the reasonableness of the witness' testimony in light of all the evidence, and any other factors that bear on believability.

"The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

"You are here to determine only whether the defendant is guilty or not guilty of the charges in the Indictment.  The defendant is not on trial for any conduct or offense not charged in the Indictment.

"A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

"The Indictment charges that the offenses alleged in Counts 1 through 16 were committed on or about a certain date. Although it is necessary for the Government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in the Indictment, it is not

1   necessary for the Government to prove that the offense was

2   committed precisely on the date charged.

3        "You have heard testimony from Alan Rizek, Joel Scott and

4   Steven Truitt, witnesses who received immunity.  The testimony

5   was compelled and given pursuant to court orders requested by

6   the Government which state that the testimony will not be used

7   in any case against these witnesses.

8        "You have heard testimony from Antonia Anderson, a witness

9   who received immunity.  That testimony was given in exchange

10  for a promise by the Government that the statements or other

11  information will not be used in any case against the witness.

12       "You have heard testimony from Christopher Stouffer Egan,

13  a witness who entered into a deferred prosecution agreement for

14  conduct arising out of the same events for which the defendant

15  is on trial.  This deferred prosecution agreement is not

16  evidence against the defendant and you may consider it only in

17  determining the witness' believability.

18       "For these reasons, in evaluating the testimony of Alan

19  Rizek, Joel Scott, Steven Truitt, Antonia Anderson and

20  Christopher Stouffer Egan, you should consider the extent to

21  which or whether his or her testimony may have been influenced

22  by any of these factors.  In addition, you should examine the

23  testimony of these witnesses with greater caution than that of

24  other witnesses.

25       "During the trial, certain charts and summaries were shown

1    to you in order to explain the evidence in the case.  These

2    charts and summaries were not admitted in evidence and will not

3    go into the jury room with you.  They are not themselves

4    evidence or proof of any facts.  If they do not correctly

5    reflect the facts or figures shown by the evidence in this

6    case, you should disregard these charts and summaries and

7    determine the facts from the underlying evidence.

8         "Certain charts and summaries have been admitted in

9    evidence.  Charts and summaries are only as good as the

10   underlying supporting material.  You should therefore give them

11   only such weight as you think the underlying material

12   deserves."

13        Now I'll turn to the charges.

14        "The defendant is charged in Count 1 of the Indictment

15   with conspiring to commit wire fraud in violation of Section

16   1349 of Title 18 of the United States Code.

17        In order for the defendant to be found guilty of that

18   charge, the Government must prove each of the following

19   elements beyond a reasonable doubt:

20        "First, beginning in or about Autonomy's first quarter,

21   2009, which began in January of 2009, and continuing until in

22   or about October 2011, there was an agreement between two or

23   more persons to commit wire fraud; and second, the defendant

24   became a member of the conspiracy knowing of at least one of

25   its objects and intending to help accomplish it.

1          "A conspiracy is a kind of criminal partnership, an

2     agreement of two or more persons to commit one or more crimes.

3     The crime of conspiracy is the agreement to do something

4     unlawful.  It does not matter whether the crime agreed upon was

5     committed.

6          "I shall discuss with you now briefly the law relating to

7     each of these elements.

8          "For a conspiracy to have existed, it is not necessary

9     that the conspirators made a formal agreement or that they

10    agreed on every detail of the conspiracy.  It is not enough,

11    however, that they simply met and discussed matters of common

12    interest, acted in similar ways or perhaps helped one another.

13    You must find that there was a plan to commit at least one of

14    the crimes of wire fraud alleged in the Indictment as an object

15    of the conspiracy, with all of you agreeing as to the

16    particular crime which the conspirators agreed to commit.

17         "One becomes a member of a conspiracy by willfully

18    participating in the unlawful plan with the intent to advance

19    or further some object or purpose of the conspiracy, even

20    though the person does not have the full knowledge of all the

21    details of the conspiracy.  Furthermore, one who willfully

22    joins an existing conspiracy is responsible for it as the

23    originators.  On the other hand, one who has no knowledge of a

24    conspiracy but happens to act in a way which furthers some

25    object or purpose of the conspiracy does not thereby become a

conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

"A conspiracy may continue for a long period of time and may include the performance of many transactions.  It is not necessary that all the members of the conspiracy joined it at the same time.  And one may become a member of the conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

"Even though a defendant did not directly conspire with other conspirators in the overall scheme, the defendant has in effect agreed to participate in the conspiracy if the Government proves each of the following beyond a reasonable doubt:

"That, one, the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy; two, the defendant knew or had reason to know that the other conspirators were involved with those with whom the defendant directly conspired; and three, the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.  It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

1   "Each member of the conspiracy is responsible for the

2   actions of the other conspirators performed during the course

3   and in furtherance of the conspiracy.  If one member of a

4   conspiracy commits a crime in furtherance of a conspiracy, the

5   other members have also, under the law, committed that crime.

6   Therefore, you may find a defendant guilty of wire fraud as

7   charged in Counts 2 through 15 of the Indictment if the

8   Government has proved each of the following elements beyond a

9   reasonable doubt:

10   "First, a co-conspirator committed the crime of wire fraud

11   as alleged in that count; second, the person was a member of

12   the conspiracy charged in Count 1 of the Indictment; third, the

13   person committed the crime of wire fraud in furtherance of the

14   conspiracy; fourth, a defendant was a member of the same

15   conspiracy at the time the offense charged in Counts 2 through

16   15 was committed; and, fifth, the offense fell within the scope

17   of the unlawful agreement and could reasonably have been

18   foreseen by defendant based on what he knew at the time to be

19   necessary" -- "to be a necessary or natural consequence of the

20   unlawful agreement.

21   "The defendant is charged in Counts 2, 3, 4, 5, 6, 7, 8,

22   9, 10, 11, 12, 13, 14, and 15 of the Indictment with wire fraud

23   in violation of Section 1343 of Title 18 of the United States

24   Code.

25   "In order for the defendant to be found guilty of that

1   charge, the Government must prove each of the following

2   elements beyond a reasonable doubt:

3       "First, the defendant knowingly participated in, devised

4   or intended to device a scheme or plan to defraud or a scheme

5   or plan for obtaining money or property by means of false or

6   fraudulent pretenses, representations or promises.  Deceitful

7   statements or half-truths may constitute false or fraudulent

8   representations.

9       "Second, the statements made or the facts omitted as part

10  of the scheme was material; that is, they had a natural

11  tendency to influence or were capable of influencing a person

12  to part with money or property.

13      "Third, the defendant acted with the intent to defraud,

14  that is, the intent to deceive or cheat.

15      "And fourth, the defendant used or caused to be used an

16  interstate or foreign wire communication to carry out or

17  attempt to carry out the essential part of the scheme.

18      "In determining whether a scheme to defraud exists, you

19  may consider not only the defendant's words and statements, but

20  also the circumstances in which they are used as a whole.

21      "A wiring is caused when one knows that a wire will be

22  used in the ordinary course of business or where" -- "or when

23  one can reasonably foresee such use.  It does not matter

24  whether the material transmitted by the wire was itself false

25  or deceptive, so long as the wire communication was used as

1   part of the scheme, nor does it matter whether the scheme or

2   plan was successful or that any money or property was obtained.

3   It need not have been reasonably foreseeable to the defendant

4   that a wire communication would be interstate or foreign in

5   nature; rather, it must have been reasonably foreseeable to the

6   defendant that some wire communication would occur in

7   furtherance of the scheme and an interstate or foreign wire

8   communication must have actually occurred in the furtherance of

9   the scheme.

10      "To convict the defendant of wire fraud based upon an

11  omission of a material fact, you must find that the defendant

12  had a duty to disclose the omitted fact arising out of a

13  relationship of trust.  That duty can arise either out of a

14  formal fiduciary relationship or an informal, trusting

15  relationship in which one party acts for the benefit of another

16  and induces the trusting party to relax the care and vigilance

17  which would ordinarily exercise.

18      "An act is done knowingly if the defendant is aware of the

19  act and does not act through ignorance, mistake, or accident.

20  The Government is not required to prove that the defendant knew

21  that his acts or omissions were unlawful.  You may consider

22  evidence of the defendant's words, acts or omission, along with

23  all the other evidence, in deciding whether the defendant acted

24  knowingly.

25      "An intent to defraud is an intent to deceive or cheat.

1    If you decide that the defendant was a member of a scheme to

2    defraud and that the defendant had the intent to defraud, the

3    defendant may be responsible for other co-schemers' actions

4    during the course of and in the furtherance of the scheme, even

5    if the defendant did not know what they said or did.

6        "For the defendant to be guilty of an offense committed by

7    a co-schemer in furtherance of the scheme, the defendant must

8    be" -- pardon me -- "the offense must be one that took place

9    during the life of the scheme and that the defendant could

10   reasonably foresee as a necessary and natural consequence of

11   the scheme to defraud.  You need not find that a conspiracy

12   existed to find that the defendant is vicariously liable for

13   actions of the co-schemers.

14       "You have heard evidence regarding Hewlett-Packard's

15   process for deciding whether to purchase Autonomy.  You are to

16   consider this evidence to the extent that it helps you

17   determine whether the defendant made false or fraudulent

18   pretenses, representations or promises as part of a scheme or

19   plan to defraud.  You may also consider this evidence, to the

20   extent that it helps you, to determine whether the statements

21   or facts omitted as part of the alleged scheme were material;

22   that is, whether they had a natural tendency to influence or

23   were capable of influencing a person to part with money or

24   property.  If you find that this element has been met, then

25   whether there were additional things Hewlett-Packard could have

1    done to avoid being impacted by the alleged misstatements

2    and/or omissions is irrelevant to your verdict.

3        "The defendant is charged in Count 16 of the Indictment

4    with securities fraud in violation of 1348 of Title 18 of the

5    United States Code.  In order for the defendant to be found

6    guilty of that charge, the Government must prove each of the

7    following elements beyond a reasonable doubt:

8        "First, the defendant knowingly executed or attempted to

9    execute a scheme or plan to defraud or a scheme or plan for

10   obtaining money or property by means of false or fraudulent

11   pretenses, representations, or promises.

12       "Second, the statements made or facts omitted as part of

13   the scheme were material, that is, they had a natural tendency

14   to influence or were capable of influencing a person to part

15   with money or property.

16       "Third, the defendant acted with the intent to defraud,

17   that is, the intent to deceive or cheat.

18       "And fourth, that the scheme was in connection with the

19   purchase or sale of securities of Hewlett-Packard company.  In

20   determining whether a scheme to defraud exists, you may

21   consider not only the defendant's words and statements, but

22   also the circumstances in which they are used as a whole.

23       "A defendant may be found guilty of the crimes charged in

24   Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16

25   even if the defendant personally did not commit the act or acts

1  constituting the crime but aided and abetted in the commission

2  of the crime.

3      "To prove a defendant guilty of a crime by aiding and

4  abetting, the Government must prove each of the following

5  beyond a reasonable doubt.

6      "First, that the crime was committed by someone; second,

7  the defendant aided, counseled, commanded, induced, or procured

8  that person with respect to at least one element of the crime

9  charged; third, a defendant acted with the intent to facilitate

10  the crime; and, fourth, a defendant acted before the crime was

11  completed.

12      "It is not enough that the defendant merely associated

13  with the person committing the crime or unknowingly or

14  unintentionally did things that were helpful to that person or

15  was present at the scene of the crime.  The evidence must show

16  beyond a reasonable doubt that the defendant acted with the

17  knowledge and intention of helping that person commit the crime

18  charged.

19      "A defendant acts with the intent to facilitate the crime

20  when the defendant actively participates in a criminal venture

21  with advance knowledge of the crime and having acquired that

22  knowledge when the defendant still had a realistic opportunity

23  to withdraw from the crime.

24      "A defendant may be found guilty of wire fraud or

25  securities fraud even if the defendant personally did not

1  commit the act or acts constituting the crime but willfully

2  caused an act to be done which, if directly performed by him or

3  another, would be an offense against the United States.

4      "To prove a defendant guilty of wire fraud or securities

5  fraud by willfully causing, the defendant must" -- pardon me --

6  "the Government must prove beyond a reasonable doubt that the

7  defendant willfully caused an act to be done which, if directly

8  performed by him or another, would be an offense against the

9  United States.  The Government need not prove that someone

10 other than the defendant was guilty of the substantive crime.

11     "A person who causes a commission of an offense is

12 punishable as a principal even though the person who completes

13 the wrongful act violates no criminal statute because of lack

14 of criminal intent or capacity.  One who puts in motion or

15 causes the commission of an indispensable element of an offense

16 by an innocent agent or instrumentality is guilty as a

17 principal.

18     "The Indictment presents the Government's theory of the

19 case.  The Defense theory of the case is as follows:

20     "Mr. Hussain contends that he and others prepared

21 Autonomy's financial statements and disclosures in a way that

22 provided a true and fair view of Autonomy's affairs in

23 accordance with what Mr. Hussain understood to be the

24 applicable accounting standards.

25     "Mr. Hussain further contends that he relied in good

1    faith, as defined herein" -- I will tell you about that -- "on

2    Deloitte's reviews, audits and opinions regarding Autonomy's

3    accounting judgments and that this reliance is inconsistent

4    with the intent on his part to defraud.

5        "Mr. Hussain contends that he did not knowingly or

6    intentionally falsify Autonomy's financial records or

7    disclosures or make false or misleading statements.

8        "Mr. Hussain further contends that he did not participate

9    in any scheme to defraud and did not conspire with anyone to

10   commit fraud.  To the extent that Autonomy employees may have

11   agreed to sales deals that were in some way improper,

12   Mr. Hussain contends he did not agree to or participate in the

13   impropriety.

14       "Finally, Mr. Hussain contends that he did not intend to

15   defraud Hewlett-Packard in connection with the disclosures made

16   or not made during the due diligence process.  Mr. Hussain

17   contends that he and others at Autonomy provided to

18   Hewlett-Packard the information that he understood

19   Hewlett-Packard and Autonomy had agreed would be provided.

20       "In and of itself, a violation of accounting principles,

21   opinions, standards or guidelines does not establish a

22   violation of criminal law.  However, evidence of such

23   accounting violations may be considered by you, along with

24   other evidence, in connection with the crimes charged in the

25   Indictment.

1    "With respect to Counts 2 through 16, one element that the

2   Government must prove beyond a reasonable doubt is that the

3   defendant acted with the intent to defraud.  Evidence that the

4   defendant in good faith followed the advice of Autonomy's

5   auditing firm, Deloitte, may be inconsistent with the intent to

6   defraud.

7    "For there to be good-faith reliance on Deloitte's advice,

8   the defendant, before acting, must have made full and truthful

9   disclosures of all material facts to Deloitte and received

10  Deloitte's advice as to the specific course of conduct that was

11  followed.

12   "In addition, the defendant's reliance on Deloitte's

13  recommended course of conduct or advice must have been

14  reasonable given the defendant's education, experience, and

15  knowledge."

16   So, ladies and gentlemen, those are the instructions.  I

17  will have some further instructions at the end of the case.

18   And let me just remind you, you will, each of you, get a

19  copy of these instructions because they're not simple.  They're

20  lengthy, and -- and hopefully they will be helpful.

21   So we can do this.  We're about to start the argument.

22  If -- maybe you would like to take a little break before the

23  argument.  We can do that and resume here at 5 to 10:00, 5 to

24  10:00.  Remember the admonition given to you.

25   (Proceedings were heard out of presence of the jury:)

1          **MR. KEKER:**  Your Honor, I don't know when we will do

2     it.  We want to reserve all the objections we made to the

3     instructions before.  We don't have anything new.

4          **THE COURT:**  The record should note that you have

5     timely raised that --

6          **MR. KEKER:**  Thank you.

7          **THE COURT:**  -- issue.

8          **MR. KEKER:**  Thank you.

9                    (Recess taken at 9:48 a.m.)

10                   (Proceedings resumed at 9:56 a.m.)

11         **THE CLERK:**  Come to order.  Court is now in session.

12     (Proceedings were heard in the presence of the jury:)

13         **THE COURT:**  Let the record reflect all parties are

14     present, the jury is present.

15     Mr. Reeves, you may proceed.

16                    <u>**CLOSING ARGUMENT**</u>

17         **MR. REEVES:**  Thank you, Your Honor.

18     May it please the Court, ladies and gentlemen of the jury,

19     good morning.  I suggest that we start where we began, back in

20     February.

21     Each of you was selected as a juror in this case for

22     largely two reasons.  First, you were each willing, some

23     perhaps a little bit more eagerly than others, to serve on a

24     complex case like this one.  Every day you have made good on

25     that promise by arriving early and by your attention to the

1   evidence throughout this trial.  I know some days that was hard

2   to do.

3        Thank you for your service and especially thank you for

4   the personal sacrifices it entailed and thank you for the deep

5   commitment that each of you have shown to this case.

6        Second, each of you was chosen for your common sense.

7   None of you are here today because you're an accountant.  All

8   of you are here today because you have life experiences on

9   which you can draw to work through the issues of this

10  particular case.  Using common sense to answer the basic

11  questions in this case will help you more than anything else to

12  see the evidence that proves the defendant's guilt beyond a

13  reasonable doubt.

14       Why would Sushovan Hussain pay Capax millions for EDD

15  services in advance, especially when, at a minimum, it would be

16  months before Capax could perform those services?  Why pay

17  millions before you have to?  Why would Sushovan Hussain pay

18  $11.5 million to buy more FileTek software when Autonomy had

19  not even used the 10 million in software it had already bought

20  from them the quarter before?  Why do it again?

21       Why would Sushovan Hussain pay MicroTech $9.6 million for

22  an advanced technology center that Autonomy doesn't need or

23  $2.8 million for a federal Cloud facility that was never even

24  built?  Why pay so much for so little?

25       Common sense alone suggests that these kinds of deals make

 1   no business sense, except when you follow the money.

 2        Sushovan Hussain used millions in Autonomy money to pay

 3   Autonomy customers to buy millions in Autonomy products.  The

 4   evidence in this case leaves no doubt that Autonomy was buying

 5   its own revenue.  Strip away the pretext, and what you see is

 6   money flowing in a circle again and again and again.

 7        Common sense alone tells you that sounds wrong.  Please,

 8   trust your intuition.  Do not let the layers of corporate

 9   detail obscure your ability to detect a bad business deal when

10   you see it.  Again and again, Sushovan Hussain engaged in

11   noneconomic deals that made no basic business sense.  Why?  To

12   prop up Autonomy and make it appear to be growing when it

13   really wasn't.

14        At one level, this case is quite straightforward.  Between

15   2009 and 2011, Sushovan Hussain engaged in roundtrips,

16   backdated deals, channel-stuffing in order to falsely inflate

17   Autonomy's quarterly revenues by about 10 to 25 percent each

18   quarter.  If this scheme doesn't sound sustainable, that's

19   because it wasn't.

20        But Mr. Hussain could do this for so long because he was

21   adept, adept at lying to his auditors at Deloitte about the

22   status of these and other bad deals.

23        It is true that it took some skill to cook the books for

24   so long, but, after all, Sushovan Hussain was a CFO's CFO.

25        The only thing that makes this case difficult is that it

1   played out in the context of massive corporations with millions

2   of documents.  But do not let the corporate veneer or the

3   quantity of paper obscure the basic truth that Sushovan Hussain

4   sold HP a company that he knew was worth far less than he said

5   it was.  And, ladies and gentlemen, that was fraud.

6        Every case comes down to a series of basic questions:

7   What really happened?  What did the defendant know?  And the

8   all important question, when did he know it?

9        I plan to walk through the evidence that answers these key

10  questions.  Some are quite easy; others require a careful

11  sequencing of the documents.

12       What you will see is that three types of evidence are more

13  important to your clearest understanding of the facts than

14  anything else:  Dollars, dates, and the documents that prove

15  them.  Follow the money.  There is a constant circularity to

16  the flow of the money in this case.  If you're asking how in

17  the world does that make sense, you are asking the right

18  question.

19       Please pay close attention to the dates.  Often the most

20  important and the most fraudulent part of the document is the

21  date.  Multiple deals in this case were backdated to cram

22  revenue into the quarter after it was over.  Sometimes the

23  defendant had others do the backdating, sometimes the defendant

24  rolled up his sleeves and did it himself.  Every time the

25  backdating was an obvious fraud.

1       I have a timeline for each of the relevant deals in this

2   case.  As much as possible, I plan to walk through the key

3   documents chronologically.  When I do that, I will cite to the

4   admitted exhibits by number.  All of these exhibit citations

5   are for your benefit.  If you find them persuasive or helpful,

6   please write the numbers down.

7       As the judge has instructed, the arguments of counsel are

8   not evidence.  The timelines I'm about to go through will not

9   be available to you during your deliberation, so if you find

10  them helpful, you may want to write down the deal name and just

11  the exhibit numbers because I plan to move quickly.

12      Ready to go?

13      Let's start with the first quarter 2009, the $7.5 million

14  Capax EDD I deal.  This first document in the timeline is

15  Mr. Hussain reporting to his boss, Mr. Lynch, about his

16  estimates of the projections for the revenue for the quarter.

17  And what you see is that by mid March, just a couple weeks

18  before the quarter closes, that they are currently at 139

19  million, when the consensus and what their target is 127 to 128

20  million.  That picture will get worse over time.  These

21  documents are recurrent and it's often where the timelines

22  begin.

23      On or around March 31st at the end of the quarter,

24  Autonomy and Capax entered into this roundtrip transaction for

25  $7.5 million.  Mr. Baiocco testified about that deal.  He said

 1   that he negotiated it with Mr. Egan.  Specifically he said that

 2   Egan proposed that "they would give us the software and, well,

 3   give us the software for a price that then they would make sure

 4   on the back end that we got taken care of to pay until we're

 5   running -- we're up and running and able to do the actual work

 6   ourselves."

 7        "So what was the price that you were -- you were -- that

 8   Capax was supposed to pay?"

 9        Answer:  "7.5 million plus support and maintenance."

10        He continues down below, "Well, he was proposing -- he,

11   Mr. Egan, was proposing that it was because we weren't going to

12   have to write a check for it."

13        They're not going to have to pay for it, according to

14   Mr. Baiocco.

15        "They were going to actually, you know, give us the EDD

16   sort of processing money to give us the ability to make the

17   payments to them for the software."

18        Question:  "So was the proposed deal that Autonomy would

19   give you the money to pay for them, for the licensing of the

20   software?

21        Answer:  "Yes."

22        Right away, Autonomy is paying Mr. Baiocco, according to

23   Mr. Baiocco, for Mr. Baiocco to -- and Capax to buy the

24   license.

25        Now, in this early 2009 period, Mr. Baiocco explained that

1    Capax was not in a position to do any of the eDiscovery work.

2    He said, "No.  We couldn't have been able to do it until we had

3    the software, and we didn't even have the software prior to

4    that."  So he's, at the beginning of working on these -- on

5    this whole eDiscovery platform that he wants to build.

6         Mr. Egan gave the other side of the conversation and

7    introduced Mr. Hussain to the negotiation.  Specifically, Mr.

8    Egan said that they did the deal for two reasons.  "One, we

9    had, as a company, outsourced EDD prior to other vendors in the

10   past so it looked like it was a precedent and I looked at it as

11   the concept of a retainer, as a concept where you could pay

12   even if the service wasn't being fulfilled."  That's what

13   Mr. Egan said.

14        "In your discussions with Mr. Hussain, did you discuss not

15   putting the agreement to pay Capax in writing?"

16        Answer by Mr. Egan:  "We did."

17        Question:  "Did you and he discuss just what -- what did

18   you and he discuss?"

19        Answer:  "Just that.  Specifically that he didn't want it

20   in writing and that it was something that we would do month to

21   month at our will."

22        "Whose idea was it to not put it in writing?"

23        Answer by Mr. Egan:  "That was Sushovan's."

24        So what happens next?  In this time period, on or about

25   April 1st, after the quarter has ended, Mr. Hussain says that,

1    "Stouff and I were all over the big deals."  I submit to you

2    that that's corroboration that what Mr. Egan said and what

3    Mr. Egan described with regard to his conversation is borne out

4    by Mr. Hussain's email.

5        Next in time, a little bit later in April, there is this

6    false confirmation by Mr. Baiocco as part of this conspiracy in

7    which he's denying the existence of any side letters to -- in

8    the confirmation to Deloitte.

9        On April 16th, 16 days after the close of the quarter,

10    Mr. Hussain wrote this email that I submit to you is important.

11    Specifically Mr. Hussain is directing people within Autonomy to

12    create a PO for outsourcing EDD and et cetera.  Why, I ask you,

13    would Mr. Hussain want to pay Capax in advance for services

14    that, 16 days after they got the software, it would be

15    impossible for them to perform?  Why pay in advance?

16        Mr. Hussain would know that, he would know that it was

17    impossible, because it's really immediately after he's just

18    sold the software.  This is further corroboration, I submit to

19    you, that Mr. Hussain knew perfectly well that this was a

20    quid pro quo roundtrip deal and an oral promise to Capax to pay

21    them, to pay for the license.

22        What happens next?  What happens next is a series -- this

23    is another example of a recurrent document that is important in

24    this case.  This is an example of Mr. Hussain's management rep

25    letter in which he insists to Deloitte as part of the audit

1    that Autonomy has properly prepared the books and records of

2    Autonomy.

3        Antonia Anderson explains why that was not necessarily the

4    case.  Specifically Ms. Anderson testified:

5        Question:  "If Capax had a handshake agreement for

6    Autonomy that Autonomy was going to make sure Capax got the

7    money to make the EDD software payments to Autonomy, would that

8    be relevant to your assessment of whether revenue was

9    appropriately recognized?"

10        Answer by Ms. Anderson:  "The Deloitte auditor, yes."

11        Question: "Why is that?"

12        "Because if there was such an agreement, it would mean

13    that the risks and rewards haven't transferred to Capax."

14        Question:  "Were you aware at this time of your review of

15    the Capax transaction -- Capax transaction in the audit

16    committee report?"

17        Answer:  "No."

18        She's being asked about the question of the possibility of

19    the false invoices.  Did she know about the false invoices that

20    you heard testimony about?  She said she did not know.

21        "Does this have relevance to whether revenue was

22    appropriately recognized?"

23        Answer:  "Yes."

24        "Why is that?"

25        Answer:  "Because if a sale and a purchase are happening,

1    then we would need to understand both sides, both of those

2    transactions, and we need to look at both transactions to

3    determine whether the revenue recognition criteria had passed

4    on the sale."

5         The side letter, the side agreement was withheld from

6    Deloitte.

7         What happens next?  Autonomy announces its quarterly

8    results.  They claim to be ahead of consensus.  This was false

9    because it included the Capax roundtrip revenue.

10        On or about July 16th, Mr. Hussain told analysts that "we

11   don't do barter deals."  You know that that's not true because

12   this Capax deal was a barter deal.

13        Specifically this is the Q2 earnings presentation that

14   Autonomy did in or around July in which Mr. Hussain or Autonomy

15   people working with him at Autonomy are being asked by analysts

16   "Do you do barter deals, and if so could you quantify them?"

17        Answer:  "No, we do not do barter deals."

18        That was false.

19        Let's -- we need to jump ahead approximately six months

20   later to a pattern that begins to emerge.  Okay?  In or around

21   September 25th, 2009, Sushovan Hussain himself suggests

22   Autonomy pay Capax even more money so Capax could afford to do

23   another VAR deal.  This is an important email in the sense that

24   in this next time frame, in September, they're considering

25   doing another deal with Capax for the Eli Lilly deal, and it

1  shows that the defendant knows that Capax cannot pay for a new

2  deal if Autonomy does not pay Capax for the EDD services.  This

3  is clear evidence that the defendant knew debts from Capax were

4  not collectible and revenue from Capax should not be

5  recognized.

6      And that makes sense because over the course of Capax'

7  relationship with Autonomy, Autonomy winds up paying nearly $15

8  million to Capax for services that were not performed.

9      I propose that we keep track of the deals in which

10  Autonomy effectively paid for its own revenue, and I plan to

11  call this the "Balance Sheet of Fraud."

12      And the first entry is for Capax EDD I which was paid for

13  using the fake invoices for EDD services that were never really

14  performed.

15      At the end of the quarters, we're going to go through the

16  amount of revenue that the fraudulent revenue allowed Autonomy

17  to use to hit its consensus estimates.  The bar chart on the

18  left is the market's expectations for Autonomy, in this case,

19  $127 million, and the bar chart on the right is what Autonomy

20  actually reported.

21      The fraudulent revenue from Capax enabled Sushovan Hussain

22  to meet the market's consensus projections for the quarter.

23      This is a summary for the first quarter of 2009 based on

24  the restatement.  You heard testimony about these summaries.

25  And it shows, based on the calculations that Mr. Yelland

1   described, that the revenue for quarter was falsely inflated by

2   11 percent.  You're going to see that number go up.

3       In Q2/2009, there was a $6 million sale of hardware to

4   Morgan Stanley.  This is the first of the hardware deals.

5   Before I plunge into this particular fraudulent deal, I'd like

6   to say a few things about Autonomy's hardware sales.

7       For the record, there is nothing wrong with reselling

8   somebody else's hardware at a loss as Autonomy was routinely

9   doing.  And there is nothing wrong with the way the defendant

10  accounted for the revenue generated by the hardware Autonomy

11  resold.

12      But you'll see the defendant did lie to Deloitte about

13  whether the hardware was properly delivered, as he did in this

14  quarter, and about accounting issues relating to the expenses

15  for hardware, as he did in the next quarter.

16      This timeline begins with Mr. Hussain reaching out to his

17  top salesperson, Mr. Egan, on or around June 18th, 2009, and

18  saying, "Bad news.  Really need to pull Morgan Stanley hardware

19  this quarter," etc.  Again, this is recurring.  You'll see

20  Mr. Hussain constantly anguishing and looking for revenue.

21      What happens next?  On June 25th, 2009, Morgan Stanley

22  wanted Hitachi hardware, but there was a problem with Hitachi

23  hardware and that was, as Mr. Egan explains to Dr. Lynch and

24  Mr. Hussain on June 25th, that Autonomy was only able to locate

25  75 percent of the order in the inventory at that moment.  So

1    they couldn't even deliver all the hardware that Morgan Stanley

2    had ordered and there is only five days left in the quarter.

3         As Mr. Egan explained, Morgan Stanley was expecting

4    Hitachi hardware and he encountered problems.

5         Answer by Mr. Egan:  "We didn't think we were going to

6    have enough Hitachi hardware in a status called 'deliverable'."

7         They were having problems actually delivering the whole

8    order.  Mr. Egan explained that he talked about this problem

9    ad nauseam with Mr. Hussain.

10        So Mr. Hussain suggested that Autonomy supply the hardware

11   to Morgan Stanley from -- ready -- EMC hardware that Autonomy

12   had bought for its own Digital Safe, even though that's not

13   what Morgan Stanley wanted and that's not what EMS would allow

14   Autonomy to do.

15        Mr. Hussain suggested -- I think we need to go to the last

16   one.  Mr. Hussain says, "We're looking to supply the Morgan

17   Stanley hardware from the EMC hardware that we bought, but

18   there are problems with that strategy."

19        Mr. Sullivan, in his testimony, explained that 9 million

20   worth of EMC hardware should not have gone to Morgan Stanley.

21   He did not expect it to.  And that there were no discussions

22   with Morgan Stanley, and EMC would have to authorize them to

23   use the EMC hardware to give to Morgan Stanley, none of which

24   happened.

25        Nevertheless, Mr. Hussain persists and has Mr. Egan modify

1    the Morgan Stanley invoice.  And specifically, they put in this

2    ambiguous language about bulk premium mass storage devices.

3    Now, the invoice can support revenue recognition in a sense

4    because it's ambiguous about what the type of hardware is that

5    that's actually being delivered.

6        But there's another bigger problem that is a real problem

7    to the revenue recognition here and that is that the hardware

8    was not delivered.

9        In or around this time period, they modify --

10   Mr. Sullivan -- Mr. Hussain asks Mr. Sullivan to modify the

11   invoices, the pro forma invoices, with regard to the language

12   that suggested that the hardware has not been shipped.  You'll

13   see in the lower right-hand corner, it says, "Invoices will be

14   revised -- will be revised once order is shipped."  Okay.

15   Watch that language.

16       Mr. Sullivan testified that he was modifying these

17   pro forma invoices at Mr. Hussain's request.

18       Okay.  The problem is that the hardware hadn't shipped and

19   Mr. Hussain knew that.  If we look at this email on July 13th,

20   this is 13 days after the close of the quarter.

21   Mr. Chamberlain is looking for a confirmation that the hardware

22   was shipped, and Mr. Sullivan is writing back to Mr. Hussain,

23   and Mr. Chamberlain saying, "No, hardware has not been

24   shipped."

25       And so as a result, they have to falsify the pro forma

1   invoices and remove the language about how it will be shipped,

2   and now Mr. Hussain has something that he can use to say that

3   the hardware was shipped, even when it wasn't.

4        This is the first of the audit committee reports.  It

5   describes this transaction, which Deloitte looked at carefully.

6   Specifically the audit committee report says -- represents that

7   shortly before the quarter ended, Morgan Stanley purchased

8   6 million of hardware from Autonomy, which Autonomy sourced

9   through EMC.  That is misleading because Morgan Stanley bought

10  Hitachi hardware and not EMC hardware.

11       In the management rep letter, Mr. Hussain confirms that

12  the hardware has been dispatched or delivered.  That, as you

13  can see, was false.  He's lying to his auditors about this key

14  component of revenue recognition around delivery.

15       Antonia Anderson said as much in her testimony when she

16  said -- is the representation about the dispatch of the -- of

17  the hardware relevant?

18       "Yes," she said.  "This was a significant transaction for

19  the quarter.  Approximately the materiality level that we had

20  not been able to obtain, the third party evidence, such

21  document from EMC or from the customer confirming delivery had

22  been made, so we, Deloitte, were relying on management

23  representing that the dispatch had happened."

24       "If it hadn't happened, would this be relevant," she was

25  asked.

1    Answer:  "Yes.  If the hardware hadn't been dispatched by

2    that date, the revenue criteria wouldn't have been that, so the

3    revenue on the deal shouldn't have been in the quarter."

4    You need to deliver the hardware in order to recognize the

5    revenue.  That did not happen here.  Mr. Hussain knew it and he

6    lied to Deloitte about it.

7    As a result, he was able to claim record quarterly and

8    half-year results.  That was a false earnings announcement

9    because it falsely included the Morgan Stanley revenue.

10   And if you look further in the evidence, you'll see clear

11   evidence that the hardware doesn't really ship until weeks

12   later.  The EMC hardware ships in or around late July and early

13   August.  And the Hitachi hardware ships in or around mid

14   August.

15   As a result, that revenue was bogus, and it should not

16   have been recognized, and Mr. Hussain knew it.

17   We've put it on the bar chart here in orange because it is

18   both a form of hardware revenue that is depicted elsewhere in

19   yellow and it should not have been -- it should have been

20   adjusted, but, in fact, it wasn't because the delivery failed.

21   The reason it wasn't adjusted, well, I think at this point

22   the jury in this case has gone a little deeper than even the

23   restatement accounting.  There is clear evidence that this deal

24   should not have been counted because the hardware was never

25   delivered.

1    As a result, Autonomy's financial reporting for the

2 quarter was falsely inflated by about 12.3 percent, and if you

3 include the resold hardware, by about 15.5 percent.

4    Let's go to now Q3, Q3/2009, and the $37.6 million sale of

5 hardware and the way it was a form of managed earnings by

6 Mr. Hussain in order to meet his revenue targets.  Let's begin

7 with a baseline about trade payables.  This is the Q2 figure

8 that Autonomy announced with regard to its trade payables, and

9 you're going to see that that number is going to jump way up in

10 this third quarter 2009.

11    The evidence in this case shows that Mr. Hussain needed

12 lots of hardware revenue in Q3/2009 basically because of the

13 economic downturn and the reduction in demand and that

14 Mr. Sullivan was very confident he could help Mr. Hussain get

15 in it.

16    In this email, Mr. Sullivan is saying that "I am confident

17 that I can deliver all the revenue you need per our discussion

18 at Loudham.  I have verbal commitments for 20 million and could

19 probably get twice that if you want it."

20    The problem with the hardware is not the revenue.  The

21 problem with the hardware sales is what it costs.  And this

22 email makes it clear that as early as mid August, Mr. Hussain

23 is working closely with Mr. Chamberlain about these cost issues

24 around cost of goods sold, COGS, versus sales and marketing.

25    Hardware revenue is fine if you don't mind losing a ton of

money to sell it, but properly accounting for the hardware

expense would reveal what they were doing, so they falsified

the accounting for the expenses.  They tell the auditors that

it was all for marketing.  They tell the market that it was all

for this SPE launch.  Neither of that was true.

    And as a result, what you begin to see is sort of a -- a

hurried-up effort with regard to this new SPE launch that you

heard about from Mr. Lucini and Mr. Blanchflower.  In or around

late September, Mr. Hussain is again concerned about the

revenue.  He says to his boss, Mike Lynch, "Yesterday was very

bad," etc.  "Am at 189 million to 190 million with 30.7 million

of EMC stuff."  He is really banking on the ability to sell all

this EMC hardware.

    Couple days later, Mr. Hussain basically says the same

thing.  He says to Mike Lynch, "With 41 million from EMC

related, I'm at 20 million plus," but at the bottom, "U.S. IDOL

is weak."  The demand for their top product is weak.  And

that -- that becomes a real source of -- of concern and a

problem for Mr. Hussain.

    Let's take a look at the explanation that Mr. Hussain

gives to Deloitte for the hardware sales.  At the top, he says

in the part of the -- the work papers for Deloitte that the

hardware sales in the current quarter are $36.6 million in

revenue.  And down below, consideration of the treatment of the

costs relating to the hardware sales, "The hardware-related

1    element in the current quarter, cost of goods sold balance, is

2    17.1 million.  There has also been a contribution to sales and

3    marketing of 28.4 million."  So for this deal alone,

4    36.6 million in revenue comes at a $45.5 million expense.

5        This is causing Mr, Hussain some anxiety and concern about

6    how he's going to manage the disclosures of these costs to the

7    marketplace.  He says to Mike Lynch in or around October 2009,

8    "Mike, I'm burnt out.  Given my anal nature, I'm spending all

9    my time awake and asleep worrying about the 10 minutes on

10   Tuesday where I have to answer the analyst questions and I'm

11   not doing anything else.  I need you to take the questions this

12   time around unless they are really easy.  I don't want to deal

13   with the analysts anymore."

14       Dr. Lynch says, "Relax, it will be fine."

15       Okay.  So of course he's worried.  Autonomy was getting

16   ready to be quite deceptive about its disclosures to the

17   analysts, as you will see.

18       In the meantime, they announce their revenues.  They lay

19   claim to all the revenue that came from those hardware sales.

20   And this earnings announcement is not false because of the

21   revenue, it's false because of what is said later about the

22   expenses.

23       That begins in or around the presentation to the analysts

24   in this PowerPoint.  There's the claim that the new product,

25   the SPE launch, had a related spend of $20 million.  That's

 1  false because the expense came from the hardware, not from the

 2  SPE launch.  And how do you know that?  We'll get to that in a

 3  minute when we talk about Mr. Lucini and what he had to say

 4  about the SPE launch.

 5      Sushovan Hussain, in answering the analysts' questions,

 6  had Marc Geall, another witness in this case, tell the analysts

 7  that the expenses had to do with SPE, which was not true.  And

 8  eventually, as you may remember, that made Mr. Geall quite

 9  uncomfortable.

10      Mr. Geall's now put in the position involving -- by

11  Mr. Hussain that he needs to follow up with the analysts about

12  their questions.  Analysts ask, "Why was there such a large

13  jump in trade and other creditors from 80 million to 110

14  million?" Mr. Geall writes, "To do with SPE costs incurred late

15  in the quarter accrued in Q3, paid in Q4."

16      That worried Mr. Geall.  He testified that in or around

17  this time period, he learned about a large hardware contract

18  that caused him concern.

19      Answer:  "It did.  It was -- it was unusual as to why that

20  would have been there and that it was a large amount of money."

21      "What do you mean it was unusual?"

22      "Well, Autonomy had built an equity story around the

23  purity of its business model.  It was a business based -- it

24  was a software-based business modeled.  It had started to build

25  a Cloud subscription-based business which would have led to

1   some investment in capital expenditure around data centers, but

2   that wasn't significant.  It wasn't a huge amount.  So, you

3   know, I wouldn't have expected Autonomy to be doing large deals

4   with hardware manufacturers."

5       "Why wouldn't you expect that?"

6       "Because it wasn't a common part of the business."

7       "And what about the nature of the contract, this large

8   hardware contract, and the amount, if anything, caused you

9   concern?"

10      "I mean, the concern to me was the quantum, the sort of

11  the 45 million, the reason being that it was similar to the

12  amount of additional costs that Autonomy had in Q3/2009 which

13  had been basically credited to the launch of IDOL SPE."

14      "Why was that of note to you?"

15      "Well, as I mentioned before, IDOL SPE to me didn't feel

16  like a new product.  I thought it was a set of capabilities

17  that IDOL already had.  There was a significant amount of

18  significant costs in Q3, so in this financial statement, the

19  aggregate was around 45, 46 million, and over time, the

20  similarity between those two numbers, you know, I thought was

21  unusual and, you know, questioned whether they were related."

22      Question:  "Mr. Geall, you testified that you were

23  uncomfortable that the hardware sales were being -- SPE was

24  being used to mask the hardware sales; is that fair?"

25      Answer by Mr. Geall:  "Yes.  That was the conclusion I was

1    coming to, yes."

2        "What do you mean by that?""

3        "Well," according to Mr. Geall, "there was, if you -- if

4    you're recognizing the revenues at a loss, then there's a lot

5    of cost that needs to be accounted for.  You know, if this was

6    a general course of business and it was a cost of goods sold,

7    then that would all have gone to the cost of goods sold line,

8    which it clearly wasn't."

9        So the deceptions by Autonomy directed by Mr. Hussain

10   continue in other responses to other analysts about the nature

11   of these costs.  There's a claim at the bottom that the costs

12   were purely to do with SPE.  That was not true.

13       Antonia Anderson testified that this was important for her

14   to know.  Her understanding, she said, was that the costs had

15   to do with the amounts owed to EMC.  That has to do with the

16   marketing.

17       "Not relating to SPE?" she was asked.

18       Answer:  "No, not relating to SPE."

19       So there are a series of deceptions that are going on with

20   regard to the accounting for the expenses of the hardware.  And

21   they belong on the Balance Sheet of Fraud.  Bottom line is

22   Autonomy is paying $45.5 million in order to get $37 million of

23   hardware revenue.

24       In this quarter, the deceptions don't end there, though.

25   There was a further form of fraud associated with the R&D

1    expenses that Autonomy claimed to have incurred.  Again, we go

2    back to the evidence that shows that in this time period, there

3    was a big rush in order to do the SPE launch.

4         You heard some testimony about that from Mr. Lucini and

5    Dr. Blanchflower.  And in this time period, Mr. Hussain is

6    claiming that the R&D associated with this new product, which

7    Mr. Geall called an old product, was approximately

8    $7.3 million.  That was false.

9         How do you know that Mr. Hussain's representation about

10   R&D were false?  Dr. Lucini said -- testified as follows:

11        "There is a statement at the bottom of the summary, which

12   was the summary we just looked at, that says that the

13   development of SPE costs approximately 7.3 million.  Do you see

14   that?"

15        "I do."

16        "Is that figure consistent with your recollection of the

17   costs associated with the SPE launch, Mr. Lucini?"

18        Answer:  "It is not."

19        "Okay.  Is it too large?"

20        Answer:  "It is."

21        Question:  "How much larger than that -- how much larger

22   than what you observed is the $7.3 million figure?"

23        Answer by Mr. Lucini:  "My observation is, as we said,

24   maybe a hundred thousand dollars.  Maybe $70,000 was what we

25   spent in pure costs just looking at the amount of people that

1   worked on it, so it feels very, very large compared to that."

2       We went through the math with Mr. Lucini that went all in

3   the costs associated with R&D.  He over-included and calculated

4   at a hundred thousand dollars.  Mr. Hussain is saying that they

5   really were $7.3 million.  Why would he do that?  He would do

6   that because of earnings per share.

7       This is a chart that we prepared with regard to the claims

8   about R&D capitalization.  So Mr. Hussain -- Mr. Hussain tells

9   Deloitte that the -- he calculates the operating expenses, he

10  calculates the net profit based on the false figure of

11  $7.3 million.  Okay?

12      The reason he does that is the resulting earnings per

13  share are better, 15 cents per share.  If he had used the

14  correct figures, that earnings per share figure would be much

15  lower, 12 cents per share.

16      As a result, the Q3 earnings announcement is falsified.

17  You see that here.  Because it falsely depicts the correct

18  earnings per share.  And in the earnings call that Mr. Hussain

19  was so worried about, you see a false claim here that the

20  increased R&D increased sharply in Q3/2009 to 11.7 million as

21  the new product reached commercial exploitation phase and so

22  we're required to capitalize it more.  He's saying that the

23  costs came from the new product, SPE, and that was false.

24      As a result, all this hardware is -- is passed off as

25  proper revenue and Autonomy is in a position to claim that it's

1    actually met its consensus estimates for the quarter.

2        If you work through the full amount of the adjustments in

3    the quarter, that revenue was inflated by 5 percent, and if you

4    include the hardware, it was inflated by nearly 25 percent.

5        That brings us to Q4/2009.  That was a busy quarter.

6    There are a lot of deals that have a lot of problems with them,

7    beginning with this Morgan Stanley restructuring deal which was

8    basically a form of a roundtrip.  Mr. Egan testified about the

9    basics of the deal when he put in the summary chart -- this is

10   just a demonstrative.  I don't believe this is in evidence.

11   But it gives a clear picture that Autonomy took an existing

12   deal of 34 million in revenue over time and they accelerated it

13   so that they could recognize 12 million up front, but they

14   reduced the total amount Morgan Stanley had to pay by just less

15   than $5 million.  All of that just to recognize a little bit

16   more revenue up front.

17       Mr. Hussain, when he's selling this deal -- this is a deal

18   he was directly involved in trying to negotiate with Morgan

19   Stanley -- makes it pretty simple what he's doing is quite

20   simply "sign and save."  That's his pitch to Morgan Stanley.

21       And what gets circulated to Morgan Stanley is this

22   restructured Digital Safe deal, and the key point about this

23   document is that -- two key points.  First, the price is fixed.

24   It's a $12 million deal.  They've settled on the price.  But

25   when they describe the software and what's being sold, there is

1    no mention of SPE.  This is all the way -- two days, three days

2    before the end of the quarter on December 28th.  No mention of

3    SPE.

4        What happens next?  In this time period, Mr. Crumbacher is

5    circulating within Autonomy the following direction.  Autonomy

6    has just launched the SPE product and Crumbacher tells

7    everybody the following:

8        "For IDOL deals for over a quarter million dollars in

9    license fee, regardless of whether the rep asks for it in the

10    request or not, please include SPE Basic as part of the

11    software product or description."  Regardless if the customer

12    asks for it, put SPE into the deal.  Why would he do that?

13    Let's take a look.

14        This is the first of Mr. Hussain's spreadsheets.  I submit

15    to you that's an important piece of evidence to show exactly

16    what Mr. Hussain knew and when he knew it.  At this point, he's

17    tracking this deal and he says that "the Morgan Stanley deal is

18    coming in at $12 million, but it's risky," according to his

19    notes.

20        What happens next?  What happens next is that at the very

21    bottom, you'll see a listing of the -- of the hardware.  On --

22    excuse me.  Of the software.  On December 31st, it now includes

23    for the first time, including SPE Basic.  Same price, $12

24    million, but now it has SPE in it.  Hmmm.

25        Deloitte is told that the SPE justified the $12 million

1    price, when it didn't and the documents show you that it

2    didn't.  Morgan Stanley had basically agreed on that price

3    without SPE.  And yet that's not what Deloitte was told.

4         Ms. Anderson was asked questions about this, about --

5    specifically about Mr. Crumbacher's email and about giving away

6    SPE gratuitously.

7         Question:  "Was this information that was made available

8    to you during the course of your audit?"

9          Answer:  No."

10        "Was it relevant?"

11        Answer:  "Yes."

12        "Why?"

13        "So in the Morgan Stanley deal, it was described to us at

14   Deloitte that the value of the software is in the SPE product.

15   But this email indicates that it's being included in contracts

16   even though the customer doesn't want it or know about it."

17        Question:  "If Autonomy is injecting SPE into a contract

18   gratuitously, why does that matter?"

19        Answer:  "So it wasn't our understanding that that was the

20   way the contracts were being structured."

21        "What was your understanding?

22        Answer by Ms. Anderson:  "That SPE was a product that

23   customers were valuing and paying for.  That would justify it,

24   but that's not what happened."

25        This is the -- the year-end earnings announcement.  It's

1    false because it includes the revenue from Morgan Stanley based

2    on that deception to Deloitte.  And the deception is compounded

3    by Dr. Lynch in his statements in the earnings call with

4    analysts in which he says one of the aspects of SPE is that it

5    was the key winning differentiator in a $12 million deal.  He's

6    talking about the Morgan Stanley deal, and that's not true.

7    That's not what happened.  That was a lie.

8        So the Morgan Stanley deal goes on the Balance Sheet of

9    Fraud.

10       How much did Autonomy pay?  They originally had 34 million

11   from the deal.  And how much did they get?  They got 29 million

12   instead.

13       Let's go to the $10 million MicroTech/Discover Tech

14   roundtrip.  This all happens in the context of the acquisition

15   of MicroLink that is happening in or around this time period.

16       I think in order to understand all the relevant pieces of

17   this, we have to go way back in time to 2004.  At that time,

18   Sushovan Hussain clearly knew that MicroTech and MicroLink were

19   related.  Down below, Mr. Cronin is writing that the company is

20   partially owned and is sponsored by MicroLink.  He is talking

21   about MicroTech.  And "Dave Truitt has requested that we allow

22   MicroTech to become a reseller and I think it is a good idea,"

23   etc.

24       Up above there, Mr. Hussain is learning from this person,

25   Jody Irwin, "Tiny reseller MicroTech, who wants to be our

CLOSING ARGUMENT / REEVES

1    partner, has no D&B report relating to their creditworthiness

2    on which to base credit evaluation.  John seems to think that

3    MicroLink would be willing to provide a guarantee," etc.

4         The key piece is that Mr. Hussain knows early on that

5    Mr. Truitt is the link between MicroTech and MicroLink.  These

6    are related businesses.  And he does not disclose what he knows

7    later in time, as we'll see.

8         So in this -- in November, 2009, Mr. Hussain is

9    negotiating with Mr. Truitt about the acquisition of MicroLink,

10   and it's clear, based on their discussions, that they're

11   contemplating what does eventually happen, a $55 million

12   acquisition, 10 million of which is used to pay for software

13   sold by Autonomy to Discover Tech.  So the $10 million part of

14   the deal is part of the $55 million that Autonomy is paying for

15   MicroLink, and Dave Truitt made that abundantly clear in his

16   testimony.

17        Mr. Truitt said, "We settled on a number of 55 million

18   with an agreement that the new entity was going to purchase

19   some Autonomy technology that we could utilize within our

20   product at Discover."  That's the new business he is starting,

21   Technologies.

22        "Did you settle on an amount for that product that new

23   company would acquire?"

24        "We did."

25        He's talking about his negotiation with Mr. Hussain.  It

1    was a $10 million order.

2         "So explain to me how that related to the $55 million

3    purchase price from MicroLink?"

4         "Well, if we didn't do the first deal, then I wouldn't

5    have had the money to buy the software."

6         So these two deals are related and the money for the 10

7    million is coming from the $55 million acquisition paid by

8    Autonomy.

9         One of the reasons Autonomy might consider doing this is

10   to wipe off or write off the debts that MicroLink owed to

11   Autonomy at this time, and you see emails emerging in this

12   early December time period about the need to write off some of

13   these MicroLink debts.

14        Mr. Hussain knows that because of emails like this on

15   December 16th in which the full amount that MicroLink owes to

16   Autonomy is being disclosed.  Sushovan Hussain knew how much

17   MicroLink owed and it matters because Autonomy is effectively

18   buying its old revenue by acquiring MicroLink.

19        What happens next is they close the deal at $10 million at

20   the end of the quarter.  And what happens after that is that

21   Autonomy buys MicroLink for $55 million and the defendant

22   conceals from the auditors that some of the $55 million is

23   going to be used by Dave Truitt in order to pay for the $10

24   million VAR deal.

25        Antonia Anderson testified about how she did not know

1    about this as follows:

2        Question:  "Why would it matter if Discover Tech was

3    paying for the 10 million in software from the proceeds of the

4    acquisition?"

5        Answer:  "So it would, depending on the circumstances,

6    that the accounting for the sale to MicroTech and the

7    acquisition would be treated as separate transactions.  Or if

8    they were connected, this would be treated as just the net

9    amount so the revenue wouldn't be recognized and the

10   acquisition costs would be lower."

11       If they knew about the connection, they, Deloitte, knew

12   about the connection between the 10 million would have to be

13   netted and it would not be recognized.

14       That's why Mr. Hussain is careful to lie to Deloitte about

15   the relationship between Discover Tech and MicroLink.  In this

16   audit committee report, he claims, falsely, "Management is not

17   aware of any related connection between Autonomy, MicroLink and

18   MicroTech."  There was a relationship and Mr. Hussain knew it.

19   And he doesn't disclose it to the auditors.  He deceives them.

20       Ms. Anderson is asked, "If there was a connection between

21   MicroLink and MicroTech, what difference would it make?"

22       Answer:  "Because it would have changed the circumstances

23   that we were aware of.  We would have had to re-review the

24   revenue criteria on the sale of MicroTech and understand more

25   details about how that could be standalone transactions given

1    the common ownership and how they negotiated."

2         There could have been a netting of the revenue and the
3    revenue would fail.

4         As a result of this, Autonomy is able, Mr. Hussain is able
5    to falsify its revenues to the tune of $10 million in this
6    press release which otherwise would have represented a miss for
7    Autonomy if they had not included that revenue.

8         What happens after this is important to what happens later
9    on and that is the MicroLink debts are written off.  In or
10   around this May time period, a little bit further along, you'll
11   recall the testimony about the dummy cash that Mr. Rizek
12   testified about in terms of MicroLink's books, and what's
13   happening is that the MicroLink debts are being written off by
14   Autonomy.

15        Mr. Rizek testified that he said he wouldn't -- that
16   Mr. Chamberlain told him that he couldn't keep the Autonomy
17   assets "on our books" and that they had to be written off.

18        Describing this posting of dummy cash, Mr. Rizek said, "My
19   understanding is that their accounting system would allow
20   either writeoffs or posting of cash and they chose to post the
21   dummy cash as a way to write off these debts."

22        Mr. Yelland, when he testified, verified the same thing.
23   Years later when he's looking through the general ledger, he
24   found clear evidence that the $16 million had been written off
25   by Autonomy.

1      So this $10 million roundtrip also belongs in the Balance

2  Sheet of Fraud.  Autonomy is basically paying an extra $10

3  million to Mr. Truitt in order for -- to receive $10 million in

4  revenue as a result of the roundtrip.

5      What else belongs on the Balance Sheet of Fraud is that

6  15.9 million of MicroLink's debts are being written off.

7  That's essentially Autonomy buying $15.9 million of deals that

8  should have been paid to Autonomy but weren't.

9      In Q4/2009, there was an $8 million FileTek deal involving

10  the roundtripping sale of StorHouse in exchange for Autonomy's

11  software sale to FileTek.  You see Mr. Hussain calculating what

12  he can get from Mr. Hussain -- excuse me -- from Mr. Loomis and

13  FileTek in a spreadsheet.  He's planning on recognizing

14  8 million on December 29th.

15      Let's take a look at what happens next.  I submit to you

16  this exhibit, 2928, is an important email that shows you

17  exactly what Mr. Hussain knows is going on.  In this email on

18  December 29th, both the price of the purchase of FileTek

19  software by Autonomy and the collectibility of the sale of

20  Autonomy software by FileTek are being discussed in the same

21  email.  This is evidence that Mr. Hussain knows perfectly well

22  that these two deals, these reciprocal deals, are in fact

23  related.

24      Mr. Egan said in his discussions with Mr. Hussain he made

25  that clear.

1      "What type of deal did you think this was?"

2      Answer:  "A quid pro quo deal," said Mr. Egan, "and a deal

3   where FileTek got enhanced a big OEM license from Autonomy and

4   Autonomy bought a big chunk of FileTek's software to use in

5   Digital Safe."

6      According to Mr. Egan, these deals were definitely

7   related.

8      "Would one deal have happened without the other, do you

9   think," he was asked.

10     Answer:  "No."

11     "Were the deals related?"

12     "Yes," according to Mr. Egan.

13     And as a result, the deals go through.  Autonomy sells $8

14  million to FileTek of its software, and at the same time, right

15  around the same time, Autonomy buys $10.3 million from FileTek.

16  I'd say that's a pretty good deal.  A $2 million profit for

17  Bill Loomis at FileTek.

18     The problem is that Mr. Hussain knew that these deals were

19  linked and he did not tell Deloitte that.  In the audit report

20  down below, he says, "We involved a member of our IT

21  specialists to ensure that the software purchased" -- that

22  would be from FileTek -- "made commercial sense and was not in

23  any way linked to the sale of Autonomy product to FileTek."

24  That was false and Mr. Hussain knew that it was false and he

25  lied to Deloitte about that.

1        Ms. Anderson was asked if the deals were related, what

2    difference it would make, and she says that (reading):

3            "It was our understanding at Deloitte that Autonomy

4        had gone through a process to purchase the FileTek

5        software and that the quotes they received demonstrated

6        value associated to the purchase.  If there were different

7        circumstances, then that could have resulted in different

8        accounting."

9        As a result, again, the press release is falsified in the

10    amounts that included the FileTek revenue and the balance sheet

11    of fraud goes up further now including the $10.3 million that

12    Autonomy is paying for $8 million of revenue from FileTek.

13        In the fourth quarter of 2009, there was a $10 million

14    deal with Capax.  Again, this is the EDD II deal and there's a

15    related Capax VAR deal involving Eli Lilly that emerges in this

16    sequence of events here.

17        On December 29th, 2009, Mr. Hussain is banking on

18    approximately $6.5 million from Capax.  I think that's

19    important because that's not what winds up happening, but

20    that's what he's expecting on December 29th.

21        Mr. Hussain writes on December 29th that he needs -- he's

22    directing that Autonomy add 250,000 to the further EDD

23    invoices.  These e-mails, I submit to you, are pretty important

24    in the sense that Mr. Hussain needs to reload Capax so it can

25    pay for another deal.  You see this bumping up of the EDD

1    services at exactly the same time that Capax is being asked to

2    take another deal.

3          Again, Sushovan Hussain knew that Capax could not pay and,

4    therefore, he has to pump money to Capax for them to pay for

5    the Autonomy software.  That is a roundtrip and that is buying

6    your own revenue.

7          So Mr. Baiocco said that at this point he didn't really

8    need any more of the EDD software, but he did the deal anyway;

9    and he also emphasized that at this point he was still not able

10   to do any of the eDiscovery services but, nonetheless,

11   Autonomy continues to pay Capax for services that are not being

12   performed.  Mr. Hussain would know this because he's raising

13   that amount in order for Capax to be able to pay for a new

14   license.

15         This is the related Eli Lilly VAR deal for $6 million.

16   We'll see why that comes into the picture in just a second.

17         This is the $4 million sale of the EDD to Capax.

18         So now the figure is up to around $10 million, and you see

19   that emerge on Mr. Hussain's spreadsheet.  Now on January 1st,

20   in order to make his quarter, he's listing both deals for a

21   total to Capax of 10 million bucks.

22         As a result of this, Autonomy again announces its

23   revenues.  The announcement of the revenues is false because it

24   included Capax revenue that Sushovan Hussain knew he could not

25   collect from Capax without actually paying for it.

1    He, Mr. Hussain, then writes the management rep letter,

2    which is false, because he's assuring that (reading):

3        "All accounting records have been made available to

4        you for the purposes of your audit and all transactions

5        undertaken by the group have been properly reflected and

6        recorded in the accounting records."

7    That's not true because there was essentially an oral

8    promise to Mr. Baiocco that Autonomy would pay for products

9    acquired by Capax.  Mr. Hussain knew that.  This was a

10   roundtrip.  That statement was false.

11       And Ms. Anderson drives that point home in her testimony

12   when she's asked (reading):

13       "Q.  Were you aware of any of the side agreements with

14       Capax?

15       "A.  No.

16       "Q.  If there was a side agreement, would that matter?

17       "A.  Yes.

18       "Q.  Why?

19       "A.  Because it would have changed the subject of the

20       agreement as we understood it.

21       "Q.  Does it have a bearing on the transfer of the risks

22       and rewards?

23       "A.  Yes.

24       "Q.  Does it have a bearing on collectibility?

25       "A.  Yes."

1    If the auditors had known all of what Mr. Hussain knew,

2    this revenue would not have been recognized.

3    E-mails like this you could reasonably infer corroborate

4    that Mr. Baiocco really was expecting to be paid by Autonomy

5    for what he needed to pay for the revenues.

6    Here he's complaining to Mr. Kanter that he'd been

7    promised a dollar-for-dollar for any of the deals that he

8    bought.  He's expecting Autonomy to pay Capax so Capax can pay

9    Autonomy, and that's why this deal also belongs on the balance

10   sheet of fraud.

11   Let's go to the Q4 2009 $2.2 million Sales Consulting

12   deal, end user Poste Italiane.

13   What you see, pay attention to these, if you would, these

14   Italian VAR deals involving Corrado Broli.  There's some very

15   interesting things that are happening at the very end of the

16   quarter with these deals and this is an example of that.

17   On the last day of the quarter, Mr. Broli is informing

18   people within Autonomy that he doesn't even have a VAR for the

19   deal that he would like to include in the revenue.  In the VAR

20   agreement at the bottom there isn't even the name of a VAR.

21   Nonetheless, this deal is on the spreadsheet for

22   Mr. Hussain on January 1st, but it's listed as not being closed

23   and Mr. Hussain knows it's not closed on January 1st.  On

24   January 1st, Mr. Hussain knows this deal is not closed.  You

25   would expect it not to be recognized as revenue and, yet,

CLOSING ARGUMENT / REEVES

 1    that's exactly not what happened.  This deal gets recognized as

 2    revenue.  Let me show you how.

 3         Mr. Hussain has a problem on January 4th.  He needs to get

 4    his revenue up to 223 million even though it's four days after

 5    the quarter.  You would think that would already be done one

 6    way or another.  It hadn't.

 7         And so if you look closely at the spreadsheets, you see

 8    Poste is finally now closed on January 4th four days after the

 9    close of the quarter.  Why would that happen?

10         Okay.  One of the reasons is that Mr. Hussain still needs

11    more revenue, and you know that from an e-mail like 519, which

12    on January 5th shows that Mr. Hussain is at nearly 222 million

13    but looking for an extra 1 million in revenue.

14         On or around January 5th, Sales Consulting is finally

15    listed as the VAR -- on the VAR deal five days after the cutoff

16    is concluded.

17         And in the Audit Committee report, Mr. Hussain claims that

18    it's good revenue when it wasn't.  It was backdated and packed

19    into the prior quarter.  Mr. Hussain included Sales Consulting

20    in Autonomy's revenue for the quarter, but Deloitte -- and this

21    is an important point with regard to this claim of reliance by

22    Mr. Hussain on Deloitte.

23         This is a situation in which Deloitte did not agree that

24    this Italian VAR Sales Consulting was creditworthy enough,

25    could in fact pay the amounts of money associated with the

1  deal.  So Deloitte is disagreeing with Mr. Hussain because of

2  the uncertainty of collectibility for this new Italian VAR but,

3  importantly, Mr. Hussain recognized the revenue anyway.

4  Mr. Hussain did not rely on Deloitte's advice here.

5      We go to the press release announcing earnings.  Again,

6  it's falsified because it includes this revenue.

7      And if you take a close look at the management rep letter,

8  Mr. Hussain is falsely claiming that all of the statements that

9  he's given to Deloitte are true and accurate through the 31st

10  of December 2009.  That was false because it was backdated and

11  it was backdated within Autonomy.  This is a deal that you

12  can't blame on Stouffer Egan, that's for sure.

13      And what happens with Sales Consulting -- this is going to

14  be a common theme too -- it gets written off during the dark

15  period after the HP acquisition and before the HP deal closes.

16  This deal never gets paid and belongs on the balance sheet of

17  fraud.

18      And that brings us to the MicroLink/Discover Tech deal.

19  There's been a lot of testimony about this $2.3 million deal.

20  I think this timeline really begins with the fact that

21  Mr. Hussain at the end of the quarter -- excuse me -- now on

22  January 1st, the day after the quarter, is obviously looking to

23  get $2 million more.  He still needs more revenue even though

24  the quarter has already ended.

25      What happens next?  Mr. Hussain claims that he forgot to

1    add a $2 million deal that was closed but the paperwork's

2    outstanding.  Sorry.  That's what he says to Mr. Chamberlain.

3         As you'll see, that statement within this e-mail was not

4    true and Mr. Hussain knew it.  Why would Mr. Hussain write an

5    e-mail that is misleading like this?  I submit to you that this

6    is an example of Mr. Hussain writing his own false pretextual

7    e-mails.

8         Why is that the case?  Well, this takes us into some of

9    the phone records and the dialogue he had with Alan Rizek.

10   That's happening on or around 9:30 on January 1st in London.

11   Mr. Rizek testified about how he was in his home in Virginia

12   when he had a conversation with Mr. Hussain, and Mr. Hussain

13   asked him (reading):

14        "A.  I was directly asked could we take another deal at

15        risk.

16        "Q.  Who asked you?

17        "A.  Mr. Hussain.

18        "Q.  Can you recall for us as best you can, first of all,

19        what date it is?

20        "A.  This was January 1st.

21        "Q.  When does the quarter end?

22        "A.  December 31st.

23        "Q.  Was Mr. Hussain asking you to take another deal in Q1

24        or Q4 2009?

25        "A.  My assumption" -- according to Mr. Rizek -- "Q4 2009.

1          "Q.  When he asked you whether or not you would take

2          another at-risk deal, was that something that came to you

3          unexpected during the course of the call?

4          "A.  Yes.

5          "Q.  Why is that?"

6          Mr. Rizek made it crystal clear the quarter was done.

7     They shouldn't be talking about doing a deal after the fact and

8     backdating it, and yet that's exactly what happened.

9          As a result, then, you see the MicroLink paperwork is

10    being put together but it's being put together on January 4th,

11    2010, four days after the cutoff.  The paperwork wasn't done as

12    Mr. Hussain claimed.  Nonetheless, Mr. Hussain goes to Deloitte

13    and says that Autonomy should recognize the revenue.  Revenue

14    should never have been recognized because it was backdated.

15         Mr. Hussain claims falsely in the Audit Committee report

16    that there was a second deal for 2.3 million that was sold to

17    Discover via MicroLink shortly before year-end.  You know based

18    on the documents alone that that is not true.  (reading)

19          "Management is not aware of any related party

20          connection between Autonomy, MicroLink, and MicroTech."

21         Again, that is not true and Mr. Hussain knew it was not

22    true.  Mr. Hussain is lying to Deloitte in order to recognize

23    this revenue.

24         Ms. Anderson explained why this is a problem (reading):

25          "Q.  And is that what Autonomy management told Deloitte

1          with respect to the 2.3 million?

2          "A.  Yes.

3          "Q.  If the deal was reached after year-end, would that

4          make a difference to revenue recognition?

5          "A.  Yes.

6          "Q.  Why is that?

7          "A.  The revenue criteria wouldn't have been met and the

8          revenue might not be recognized in that period."

9          The press release is false because this revenue didn't

10  belong in there, and the statements to the outside world and to

11  the analysts who read the website for Autonomy are also false.

12  Here there's a false claim that (reading):

13          "Did Autonomy make sales to MicroLink in Q4 2009?

14          "No, not true."

15          You just saw one.  And the answer given by Autonomy and

16  Mr. Hussain in his meetings with the analysts is constantly

17  referring them to the website, Autonomy says (reading):

18          "No.  There were no Q4 2009 revenues from MicroLink."

19          That was not a true statement.

20          What happens to MicroLink?  You already know what happens

21  to MicroLink and all of its debts.  They're written off.  Okay?

22  They were part of the big write-off that included the dummy

23  cash entries and the write-off with all of MicroLink's debts.

24          And as a result, if we step back and look at all that

25  happened in Q4 2009, you see a massive amount of fraudulent

1   revenue that takes a quarter that would have been a clear miss

2   and just allows Autonomy to eke out just above the consensus

3   estimates for the year all based on fraud.

4        According to the restatement, the percentage of fraudulent

5   revenue in this quarter was 27.1 percent; and if you add in the

6   concealed hardware, it's up to 31.3 percent.

7        Now, let's pause for a second and let me ask you to

8   remember the testimony of Matt Stephan.  Mr. Stephan had a lot

9   of problems with these VAR deals.  He testified as follows

10  (reading):

11       "Q.  Based on what you're seeing without these reseller

12       deals, what kind of miss, if you will, would Autonomy have

13       had at the end of 2009?

14       "A.  It would have been at least 10 percent, upwards of

15       20 percent I think.

16       "Q.  What sort of concerns did that cause for you?

17       "A.  It was a concern that these deals were only being

18       done to get to that revenue figure" --

19       I think that's a pretty astute point based on the evidence

20  we've seen.  Continuing (reading):

21       -- "that they were a problem on many fronts from an

22       audit perspective, from ongoing credit collection

23       perspective, so we wouldn't want to have anything to

24       do with them if we didn't need to hit the number.

25       "Q.  Mr. Stephan, do you have a recollection of your

1    conversation with Mr. Chamberlain?"  Where he starts

2    complaining to Mr. Chamberlain about these VAR deals.

3         "A.  It was the same, the same as the conversation we had

4    previously, that these deals were, you know, garbage.

5    They were not worth the paper they were written on, and I

6    wasn't happy to front them up as a good -- as good deals

7    to our auditors."

8         He was embarrassed to go to his prior employer Deloitte

9    and front up or advocate for these bad deals that he knew

10   should not have been recognized.  (reading)

11        "Q.  What did Mr. Chamberlain say in response to you?

12        "A.  He said that it's not his -- it's not our call" --

13   meaning him and Mr. Stephan -- "It's Mr. Hussain's call

14   and we just need to do our job and put it to the auditors.

15        "Q.  Did he say anything about Mr. Hussain ordering this

16   to happen and Mr. Hussain being responsible?

17        "A.  That was always his -- always his stance.  Like,

18   troops in an Army, the general says what to do and we have

19   to follow our orders.  So, yes."

20        I submit to you that's exactly how it worked at Autonomy,

21   and the direction is to pump this revenue in even though it is

22   bad revenue.

23        Let's go to Q1 2010 and the Vatican deal.  This is a

24   pretty straightforward deal that is a problem in terms of the

25   revenue.  It begins with Mr. Hussain saying in March (reading):

1          "Stouff and I spoke - he understands now.  To get to

2      195 and 25 cents earnings per share we need VAT" -- short

3      for Vatican -- "and Stouffer's deals."

4      And what you have -- what's interesting, is that after the

5  quarter is closed on April 1st, 2010, you have a listing of the

6  reseller deals and you don't see any reseller deal for

7  MicroTech/Vatican and, yet, that's what winds up happening.

8  Mr. Hussain would know based on an e-mail like this that

9  MicroTech/Vatican was backdated.

10     They agree to circulate the Vatican deal.  This is -- it's

11 being circulated on April 1st.  It's for a whopping

12 $11.5 million.  And when it gets circulated on or around

13 April 1st, you know from the evidence that it was not signed.

14 It is still waiting for a signature after the cutoff.

15     What happens next is it gets signed by Mr. Steve Truitt

16 who told you about why he signed it (reading):

17     "Q.  When was the deal -- when did MicroTech actually

18     enter into this deal, Mr. Truitt?"

19     Answer by Steve Truitt (reading):

20     "A.  April 1st, 2010.

21     "Q.  All right.  Had MicroTech agreed to do this when

22     MicroTech -- when did MicroTech agree to do this?"

23     Answer by Steve Truitt (reading):

24     "A.  I expressed a willingness to do it to John Cronin

25     that week.  I put my signature on April 1st."

1      Answer by Mr. Truitt (reading):

2           "I mean, I was no longer feeling like if these deals

3      didn't close that provenance wasn't going to be made and

4      make it so that we could pay these debts.

5      "Q.  Meaning that you were really on the hook for the

6      debts to Autonomy?"

7      Answer, tellingly by Mr. Truitt (reading):

8      "A.  No.

9      "Q.  Why not?"

10     Answer by Steve Truitt (reading):

11     "A.  Because Autonomy was going to work with us to make

12     arrangements to pay these debts with money that we didn't

13     have to go -- we didn't have to go make elsewhere."

14         Again, that's a piece of testimony that I think is very

15     clarifying with regard to the extent to which MicroTech and

16     Steve Truitt does not think he's going to have to pay Autonomy,

17     doesn't have to pay for these debts and, nonetheless, is taking

18     an $11 million deal.

19         Here's the paperwork that Mr. Hussain submits to Deloitte.

20     It is not true in the sense that MicroTech will be working

21     directly with another third party with respect to this deal.

22     MicroTech had no involvement in the Vatican deal, and that's

23     exactly what Steve Truitt said (reading):

24     "Q.  In terms of the Vatican" -- he testified -- "was

25     MicroTech making any effort to sell to the Vatican?

1       "A.  No.

2       "Q.  Who was going to sell the software to the Vatican?

3       "A.  Autonomy.

4       "Q.  Did the Vatican deal to your knowledge ever close

5       with Autonomy?

6       "A.  Not to my knowledge."

7           The Vatican deal, based on the trial record, is it never

8       closed.  It went to somebody else.

9           The earnings results for Q1 are false because they include

10      the Vatican revenue.

11          And what's interesting is that nine months later at the

12      end of December when they need more revenue from MicroTech,

13      they engage in this ATIC deal to pay MicroTech $9.6 million

14      because some of which gets used to pay the Vatican debt.  And

15      this is an example of Autonomy again paying for its own

16      revenue, this time through MicroTech.

17          Okay.  About this ATIC deal that was used in that way,

18      Mr. Truitt said (reading):

19          "Q.  Was the ATIC worth it?

20          "A.  It's hard to say.  It was not -- it was worth more

21      than zero."

22          But then he equivocates about whether it's worth anywhere

23      close to $9.6 million.

24          Okay.  It was clear to Mr. Hussain that the ATIC money was

25      being used by MicroTech in order to pay for the Vatican based

1    on e-mails like this where Mr. Egan is telling Mr. Hussain on

2    January 1st, 2011, that some of the money -- "MicroTech should

3    pay us the 6 million against the Vatican deal."

4        Again, Mr. Truitt's testimony that MicroTech was never

5    going to pay because Autonomy was going to make him whole is

6    borne out in the evidence here.  This is a constant

7    roundtripping with Autonomy money to pay VARS to pay Autonomy

8    debts.

9        And what you see again and again and again is that this

10   deal was written off in the dark period, and those debts were

11   never -- were either written off or not collected, and that's

12   why the Vatican deal also belongs in the balance sheet of

13   fraud.

14       There's another little deal involving the Vatican Library

15   that happens based on the evidence in Europe.  This is, again,

16   another Corrado Broli Italian VAR deal.  You see that on

17   March 29th, Mr. Broli is putting together a piece of the

18   Vatican deal, but he says (reading):

19            "The partner you mentioned last night is too small."

20       So he's, again, having problems finding a VAR in Italy.

21   So what happens?  First they consider this Italia Brokers SPA,

22   and you see that in the paperwork around this Auxilium deal.

23   That's not what winds up happening.

24       What's essential here is that Mr. Hussain provide

25   Dr. Lynch 22.5 million in Vatican revenue.  That's what

1  everyone's banking on at the end of the quarter; and in order

2  to hit that, they have to keep substituting VARS in Italy in

3  order to close this deal, but the problem is it's happening six

4  days after the close of the quarter.

5      Here, six days after the close of the quarter, they have

6  another VAR.  It's this B.E.E. Team Spa and as you'll find out,

7  that's not what winds up happening.

8      On April 11th finally they settle on using a different

9  VAR, this Auxilium Group.  That's 11 days after the quarter has

10  ended they finally settle on the VAR.  There's been no deal.

11  And this deal gets backdated into the quarter, and you see that

12  in the reseller agreement that says March 31st.  It didn't

13  happen on March 31st.  It maybe happened on April 11th.

14      Nevertheless, Mr. Hussain is making false representations

15  to Deloitte about this.  He's claiming that (reading):

16          "We know they were expecting to receive payment from

17      the Vatican on May 15th."

18      That's a reason why Auxilium would be able to actually pay

19  the debt.  That's not true.  You-all know that that's not true

20  because the Vatican never committed to pay anyone in any of

21  these deals.  They never closed the deal.

22      If you look at Mr. Hussain's spreadsheet, as late as

23  April 20th -- this is the first appearance for Auxilium BAV --

24  $1.7 million is finally appearing way after the fact on his

25  spreadsheet.

CLOSING ARGUMENT / REEVES

1      And Deloitte -- so let's take a look at exactly what's

2  said to Deloitte here.  This is another example in which

3  Deloitte will not recognize this revenue for some unknown

4  Italian VAR but, importantly, Mr. Hussain did.  He has to have

5  this revenue to hit his numbers.  This is a clear example of

6  Mr. Hussain not relying on Deloitte's advice.

7      The press release is falsified because it includes the

8  backdated revenue; and as you are beginning to, I hope, piece

9  together and remember, the deal is then written off in the dark

10 period.

11     Mr. Yelland explained that ultimately Auxilium never paid

12 for this transaction, and over time it's then provided for as a

13 doubtful debt and then ultimately written off.  It belongs in

14 the balance sheet of fraud.

15     There is a second deal in Q1 2010 involving FileTek, a

16 second purchase of StorHouse.  It's also another roundtrip and

17 an oral side deal.

18     In the first quarter of 2010, Mr. Hussain gets an e-mail

19 from Mr. Egan says (reading):

20         "I am okay with you pitching the deal."

21     Mr. Hussain definitely knows what Mr. Egan is doing with

22 regard to FileTek, and Egan says that he had a specific

23 conversation with Mr. Hussain that he -- about whether or not

24 the deal should be put into writing (reading):

25     "Q.  Did you discuss with Mr. Hussain in this time period

CLOSING ARGUMENT / REEVES

1          not putting your promise to buy more StorHouse in writing?

2          "A.  Yes, I did.

3          "Q.  What did Mr. Hussain say in the topic of not putting

4          your promise in writing, et cetera?

5          "A.  He said we would agree to do it but not until later

6          in the next quarter.

7          "Q.  Was it somehow important not to put that agreement in

8          writing, Mr. Egan?

9          "A.  It was important not to put anything to do with

10         linking the agreements in writing.

11         "Q.  Why?

12         "A.  Because it might sabotage the revenue recognition,"

13         Mr. Egan said, and it would have.

14         There's no question about what the deal really was.

15  Mr. Loomis' notes back at FileTek make it crystal clear that

16  Autonomy gets 9 million in exchange for an $11.5 million payout

17  to FileTek.

18         The deal gets done.  This is the sale to FileTek,

19  8.5 million bucks.

20         Mr. Hussain is all over this by talking to Mr. Egan about

21  the update, and it's evidence that Mr. Hussain is paying

22  attention to the deal.  Nonetheless, he is recognizing the deal

23  in the Deloitte work papers that include the 8.5 million in

24  revenue for the quarter.

25         And Ms. Anderson says she was not aware of any agreement

CLOSING ARGUMENT / REEVES

1  by Autonomy to purchase approximately 11.5 million worth of

2  software from FileTek (reading):

3       "Q.  Would that have been relevant?

4       "A.  Yes.

5       "Q.  Why?

6       "A.  If there had been a purchase, we would have needed to

7       understand the value that both sides of the arrangement

8       need to be included in order to understand the

9       accounting."

10      Again, this could have a netting effect.  It could change

11  the accounting.  It was not disclosed to Deloitte and it was

12  not disclosed by the defendant.

13      The revenue is packed into the quarter.  The earnings

14  announcement is false, and five weeks later what had been

15  promised is exactly what happens.  Autonomy did the promised

16  deal with FileTek.  That was for $11.5 million.

17      In the Audit Committee report, there's a suggestion that

18  somehow the StorHouse subsequent sales have been strong

19  (reading):

20           "The first OEM purchase of FileTek StorHouse product

21       in Q4 was limited to data volume in Q2 2010.  Our CTO

22       confirmed that data volumes were going to be executed and

23       we negotiated an unlimited data volume OEM."

24      That's misleading by Mr. Hussain because it suggests that

25  StorHouse had anything to do with the subsequent sales of

 1   Digital Safe.

 2       And you know that that's misleading because of testimony

 3   by Mr. Goodfellow.  Mr. Goodfellow was asked about the second

 4   acquisition of StorHouse software.  He was asked (reading):

 5       "Q.  Is there any doubt in your mind that when the second

 6       deal was done, there was absolutely positively no use for

 7       any additional volume on StorHouse?"

 8       Answer by Mr. Goodfellow, "Yes."

 9       And then he compared buying more StorHouse software to

10   putting a second engine in the trunk of a car?  Do you remember

11   that testimony?  He said (reading):

12           "Buying the software was like sticking the engine in

13       the boot" -- that's what he called the boot -- "but it's

14       not connected particularly and we've still got the other

15       engine.  So, yes, we've got two engines but the car is

16       probably slower because now we're having to carry around

17       two engines and we don't have the extra horsepower.  The

18       StorHouse software might be okay, but it's not making any

19       difference to Digital Safe and it's not helping us, like

20       having two engines in one car.

21       "Q.  You're saying that you drop another engine into the

22       trunk of the car but it's not giving you any extra power?

23       "A.  Correct.

24       "Q.  So that's what you were able to do with StorHouse?

25       "A.  Correct."

1        This was a -- they didn't need the software.  They bought

2    it in order to pay for FileTek's acquisition of their software,

3    and it belongs in the balance sheet of fraud.

4        In this quarter, again, Mr. Hussain is able to meet

5    consensus estimates because of the fraud that we've described

6    and without it, he would have had a substantial miss.  The

7    actual amounts of the restated revenue are in this quarter

8    17.9 percent, and the percentage including the hardware is

9    24 percent.

10       Let's talk a little bit more about the hardware at this

11   point.  There were a series of lies to the market about

12   hardware, and I'd like to pause and sort of focus on some of

13   those.

14       The defendant and his co-conspirators carefully concealed

15   the scale of Autonomy's hardware sales from the market.  They

16   made false and misleading statements to market analysts about

17   the nature of Autonomy's revenues and whether Autonomy really

18   was a pure software company as it claimed.

19       As the defendant intended, the effect of this deceptive

20   plan was to suggest that Autonomy was a high-margin,

21   high-growth company that defied the 2008 financial crisis when,

22   in fact, Autonomy really was flatlining like most other tech

23   companies in the recession.

24       Part of this scheme to defraud involved postings on

25   Autonomy's website like this one in which they claimed to have

1    a pure software model, and they're quite repetitious about

2    their claims to have a pure software model and their disdain

3    for selling any kind of hardware (reading):

4              "Historically companies that have achieved these

5         levels often diversify into hardware."

6         They're saying Autonomy won't do that.

7         Mr. Hussain contributed to these fallacies and this

8    deceptive practice with regard to claims of software in his own

9    statements in the earnings announcements with the analysts

10   where he's talking about Autonomy as a pure software company.

11        You'll remember the testimony about the 10 million in

12   hardware inventory that's happening in the first quarter of

13   2010.  Right at that very time within Autonomy, unknown to the

14   outside, they're actually planning to sell as much as

15   82 million in hardware revenue in order to hit their

16   projections.  This is what's happening within Autonomy.

17        You add up the amount of revenue for the second quarter,

18   15.4 million, to the additional pipeline that Mr. Sullivan is

19   putting together of 67 million, and you get projections in the

20   quarter -- or in the year of 82 million in hardware revenue.

21   That's exactly not what Mr. Hussain and others in this

22   conspiracy were telling to the outside world.

23        And Mr. Lynch drives this point home when he says that --

24   very emphatically in response to David Toms' question.  He

25   makes the following statement about the 10 million in hardware

1    revenue which he describes as pipelines, and then he goes

2    further.  He says (reading):

3              "David, I think you have misunderstood what that

4        revenue is.  It's not hardware revenue.  What it is is the

5        selling of an appliance.  So you may be familiar with the

6        Google appliance or the Barracuda appliances.  We have

7        very little interest in just selling hardware, and

8        consequently the revenue that goes for it is not related

9        to the hardware cost.  It's solely a component of the

10       sale.  So what we are not doing here is acting as a

11       generic company that resells hardware, like Morse or

12       something like that."

13       That is 100 percent completely untrue, and it is exactly

14   the opposite of what was really happening within Autonomy and

15   it's exactly what Mr. Hussain knew.

16       Mr. Morland and Mr. Toms both testified about the

17   importance of this information.  Mr. Morland said that if he'd

18   known about the scale of the hardware sales, that would have

19   had a massive impact -- negative impact on his evaluation of

20   the company.

21       And he goes a little bit further and says that -- and he

22   starts to calculate the amount of the hardware revenue and what

23   it really means for the growth potential for Autonomy, and he

24   says the following, this is Paul Morland (reading):

25              "So the 20 -- 57 million that you suggested that I

 1      think was in 2009, if they hadn't sold any hardware in

 2      2008, then all of that 57 million would have contributed

 3      to growth; and if you subtracted that from the software

 4      growth that they reported, you would probably reach the

 5      conclusion that the actual software business itself was

 6      not growing at all."

 7          That's an important point.  You strip out the hardware,

 8  Autonomy would not be growing at all.  This is exactly what

 9  analysts do.  That's exactly what analysts were not told.

10          Mr. Toms makes a similar point, asks some of the same

11  kinds of questions.  He says as follows (reading):

12          "What you're telling me is that if I take out the

13      hardware component, then Autonomy's product revenue,

14      rather than growing year on year, shrank quite

15      considerably year on year and that would mean that

16      Autonomy was performing consistent with other software

17      companies."

18          If you strip out the hardware revenue, you strip out the

19  fraudulent revenue, Autonomy is performing like the other tech

20  companies that were hurting in the economy.  It is not the

21  exception that it seems to defy gravity and grow in the --

22  during the recession years.

23          Let's -- there has been a lot of testimony about Brent

24  Hogenson and I'd like to cover that.  I propose covering that

25  and two more quick deals, and then we'll take a break, with the

1    Court's permission.

2         Let's go through this Brent Hogenson timeline carefully.

3    There's an intertwining of events relating to allegations and

4    whistleblower allegations made by Mr. Hogenson that go directly

5    to the heart of this case.  Those allegations are precisely the

6    same kinds of issues that you're hearing in the trial evidence

7    in this case; and Mr. Hogenson was elevating them first within

8    Autonomy, then with Deloitte, then eventually with U.K.

9    regulators, and at each point Mr. Hussain is lying in order to

10   get past this.

11        At the same time there is a so-called payroll fraud that

12   is happening within Mr. Hogenson's business here -- or business

13   component here in the United States, and you see the

14   interweaving of these two things in what I submit to you is a

15   form of retaliation against Mr. Hogenson for raising these

16   allegations.

17        The first thing that happens is this hardware revenue is

18   going on just as we've talked about, and that becomes important

19   for how Autonomy performs in this quarter.  Mr. Sullivan says

20   he is selling 30 million in hardware in the quarter and Mr.

21   Hussain is going to need that revenue.

22        The next thing that happens is on or around June 22nd,

23   Mr. Hogenson raised allegations of accounting fraud with Mike

24   Lynch.  He writes the CEO and says there are serious accounting

25   issues relating to Capax, relating to MicroLink, relating to

1    FileTek, all of which you now know all about.

2         What happens next?  On June 23rd, Joel Scott testifies

3    that he learned separately about this payroll fraud.  Okay?  So

4    here in California Mr. Scott is learning about this payroll

5    fraud.  These two events are not yet connected but they soon

6    will be.

7         On June 25th, Mr. Scott tells his boss Andrew Kanter about

8    the payroll fraud, and he testified that that was the first

9    thing he did as soon as he learned, was to tell Andy Kanter

10   about the payroll fraud.

11        What happens after that is in time but not yet connected,

12   on or around June 26th, Mr. Hogenson makes some very serious

13   whistleblower allegations directly to Deloitte.  This is a very

14   serious matter and, again, if you look closely at the Audit

15   Committee report that has the entirety of Mr. Hogenson's

16   complaints and allegations, Capax, FileTek, and the MicroLink

17   acquisition are all there.

18        What happens next?  On June 28th, Andy Kanter told Joel

19   Scott to investigate the payroll fraud in Hogenson's Finance

20   Department without disclosing that Hogenson had made serious

21   whistleblower allegations.

22        Two days after Hogenson goes to the auditors with his

23   complaints, Andy Kanter is telling Joel Scott to investigate

24   Brent Hogenson on this payroll fraud issue?

25             THE COURT:  Excuse me, Mr. Reeves.  We actually do

1    have to take a recess right now because we've been going quite

2    a while.

3         So we will take a 15-minute recess to five to 12:00.

4         Remember the admonition given to you.

5                    (Recess taken at 11:40 a.m.)

6                (Proceedings resumed at 11:54 a.m.)

7         (Proceedings were heard in the presence of the jury:)

8         **THE COURT:**  Please be seated.

9         Let the record reflect all jurors are present, the parties

10   are present.

11        You may proceed.

12        **MR. REEVES:**  Thank you, Your Honor.

13        So we left off that on or around June 28th Andy Kanter

14   told Joel Scott to investigate Brent Hogenson, but he did not

15   tell Mr. Scott that Mr. Hogenson had made serious allegations

16   of accounting fraud back with Deloitte.

17        I submit to you that the sequencing of that and the

18   failure to disclose that is probative of the extent to which

19   this investigation of Hogenson was really a form of retaliation

20   against him for whistleblowing.

21        In this time period, Mr. Hussain has to field and address

22   the issues of accounting fraud that Mr. Hogenson has raised

23   with Deloitte and he does that by lying to Deloitte.

24        On July 20th, 2010, in this Audit Committee report, he

25   makes the following statements (reading):

1              "At no stage whatsoever was the rationale for this

2          acquisition" -- talking about the MicroLink acquisition --

3          "to provide a vehicle to write off outstanding invoices as

4          speculated by Brent Hogenson.  This is wholly incorrect."

5          All of you know based on this evidence that that's exactly

6      what did happen.  All of those MicroLink debts were written

7      off.  Here Mr. Hussain is lying to Deloitte about that.

8          Down below that he continues (reading):

9              "Brent's e-mail makes reference to a number of

10          transactions with Microtechnology (MicroTech).  Management

11          are not aware of any related party, in the accounting

12          sense, connection between this business and MicroLink."

13          Again, that is absolutely false, and Mr. Hussain knows

14      it's false.  Mr. Hussain knows perfectly well that there's a

15      direct connection between MicroLink and MicroTech and, yet, in

16      order to get through the Hogenson allegations he lies to

17      Deloitte about that.

18          So we move along.  What's interesting -- what's

19      interesting about this quarter is what happens in terms of a

20      hit or a miss in the quarter.

21          In this e-mail -- or in this portion of the Audit

22      Committee report, Mr. Hussain says that (reading):

23              "Management acknowledges this position and further

24          highlights that there have been no significant software

25          sales to resellers in Q2 2010."

1    So Mr. Hussain is saying that in this quarter --

2  Mr. Hogenson raised issues about VARS.  Mr. Hussain is

3  reassuring, I submit to you, based on this evidence, that

4  Deloitte -- that Autonomy is not doing VAR deals.  And what's

5  interesting is that as a result, this is one of the few

6  quarters in which they miss earnings without VAR deals.  Let's

7  see how that happens.

8    In this portion of the Audit Committee report, Autonomy

9  reports that its estimation of consensus estimates for the

10 quarter is 222 million but they are reporting only 221 million.

11    You see that they puff it up a little bit in their

12 earnings announcement when they say 221 million is in line with

13 six-month expectations, but it's not in line with Mr. Hussain's

14 own calculation of what the consensus estimates were.  It's a

15 miss and it's a miss because they're not able to use the VAR

16 revenue that Mr. Hogenson has raised issues with while looking

17 at it.

18    What happens is a series of accusations that directly

19 involve the defendant.  First, Mr. Hussain accuses Mr. Hogenson

20 on or around July 27th of having insufficient internal controls

21 with regard to the payroll fraud.  And Mr. Hogenson chimes

22 right back to Mr. Hussain and accuses Mr. Hussain and all of

23 Autonomy of retaliating against him for the whistleblower

24 allegations effectively trumping up this payroll fraud in order

25 to retaliate.

1          And what happens next on July 28th is that in the manner

2     that Joel Scott described, management -- including

3     conversations that Mr. Scott attributed to Mr. Hussain, but

4     primarily to Dr. Lynch but also other conversations including

5     Mr. Hussain -- management tells Joel Scott that Hogenson needs

6     to be fired, and that's what happens.

7          Let's go to this document and pause for a second.  This

8     happens in November of 2010, a few months after all of the

9     activity in June and July 2010.  Take a close look at this.

10    This is a settlement agreement between Autonomy and

11    Mr. Hogenson.  This is a settlement agreement in which Autonomy

12    is paying Mr. Hogenson $750,000.

13         Ladies and gentlemen, you do not pay that kind of money to

14    someone who has made false accusations.  Okay?  You know that

15    that didn't happen.  This $750,000 was hush money to Brent

16    Hogenson.

17         This whole thing when it's disclosed to Mr. Scott makes

18    him very, very concerned when he realizes that he's just fired

19    Mr. Hogenson at or around the time period Mr. Hogenson is

20    raising serious questions about accounting concerns.  He said

21    that his concerns, Mr. Scott's concerns, were heightened

22    because of the details of the allegations made by Mr. Hogenson,

23    and it made him concerned that Autonomy could potentially be

24    doing something illegal.  Okay?  I think that was a very valid

25    concern.

1    Mr. Scott went further and offered the following about the

2    other people who got fired as a result of this alleged payroll

3    fraud (reading):

4        "Q.  After you fired Mr. Hogenson, did you fire any

5        additional people within Autonomy's Finance Department

6        related to Mr. Hogenson?

7        "A.  Yes.

8        "Q.  Who?

9        "A.  Percy Tejada and Reema Prasad.

10       "Q.  Why did you do that?

11       "A.  Sushovan did not want them at the company anymore.

12       "Q.  How do you know that?"

13   Answer by Mr. Scott (reading):

14       "A.  Because he said so.

15       "Q.  As best you can recall, what were his words?

16       "A.  I recall his words with respect to -- with respect to

17       Reema that she had raised her head above the parapet and

18       that he wanted her gone.

19       "Q.  Gone because of some affiliation with Mr. Hogenson?

20       Answer by Mr. Scott, "Yes."

21   Further evidence of the type of place Autonomy was to work

22   at in these years.

23       And that brings us to Mr. Lindsell, the person from the

24   FRRP who testified.  He testified -- if we go out a little

25   further -- he testified about how the allegations that were

1    raised by Mr. Hogenson made their way up to eventually U.K.

2    regulators like the FRRP, and this is part of the defendant's

3    and Autonomy's response to the FRRP about those allegations.  I

4    submit to you that the answers that the defendant and his

5    co-conspirators are giving the FRRP are false and misleading.

6         First with regard to Capax, they say (reading):

7              "Capax have an excellent payment record since that

8         date."

9         You know that that's misleading because you've seen clear

10   evidence that the only way Capax can pay its debts is when

11   Autonomy pays Capax.

12        You see down here there's the claim that (reading):

13             "As a result" -- relating to the MicroLink

14        acquisition -- "As a result, there was no impact on the

15        16.25 million."

16        You know that that is false.  You know those MicroLink

17   debts were, in fact, written off.

18        And then down below there's a further discussion about the

19   Vatican deal that suggests that the amounts to be paid by

20   MicroTech, that they relate to one government and user who has

21   delayed payment.

22        I submit to you when you look at that carefully, that's a

23   description of the status of the Vatican deal.  They're

24   suggesting that MicroTech is about to be paid by the Vatican,

25   and you know that's not true.

1    So in this quarter, this is a rare example of Autonomy

2    actually missing because it's not able to do enough VAR deals,

3    and it's sort of making up for the amount of hardware revenue

4    that it -- that Mr. Sullivan was helping Mr. Hussain obtain.

5        Let's go to Q3 2010, and I think we can do some of these

6    deals a little bit more quickly.  This is the $10 million

7    FileTek/Vatican -- excuse me -- Veterans Administration deal.

8    In or around September it's already becoming clear that the VA

9    deal is not going to close.  You already know what happens when

10   a customer of Autonomy says that it can't close.  Right away

11   Mr. Hussain, working with Mr. Egan, has to go to a VAR.

12       Here they can't use the usual VARS, MicroTech or

13   MicroLink, and so they have to go to FileTek as a new possible

14   VAR, and that's because they know they need the revenue in the

15   quarter and they need a VAR to do it and the other VARS already

16   have too much debt.

17       It becomes clear that at the end of the quarter that

18   Mr. Hussain is desperate for this VA revenue, which he writes

19   to Mr. Egan about, about how badly he really needs VA and the

20   other deals.

21       And all during this time period, as you know from the

22   evidence, Mr. Hussain continues to sell this low-margin

23   hardware, but here's an example of an e-mail in this quarter

24   where he's using that low-margin hardware in order to manage

25   his earnings and get to a certain revenue amount probably

1    involving 2 million more of the low-margin hardware sales.

2         FileTek signs the reseller agreement.  And in the Audit

3    Committee report they talk -- Mr. Hussain essentially says that

4    FileTek has a good payment history as a reseller.  I submit to

5    you that's misleading because you've seen that FileTek can only

6    pay because Autonomy is buying products from FileTek in the two

7    related deals that we already went through.

8         What happens with FileTek?  Again, you know the answer.

9    It's all -- it all gets written off.  The VA deal never closed.

10   FileTek got angry and never paid.  Sushovan Hussain bought even

11   more StorHouse -- that might be a third engine in the back of

12   the trunk -- from FileTek so that FileTek could pay the debt;

13   and he does that, interestingly enough, one day before the

14   announcement of the HP acquisition.

15        You know what he's doing.  He's cleaning up the books, and

16   there is a ton of evidence here to show that he's sweeping bad

17   deals under the rug right at the time of the acquisition to

18   essentially cover his tracks and cover up the fraud.

19        The balance sheet of fraud grows longer with this deal

20   involving FileTek.

21        Capax in the third quarter of 2010, another Capax deal.

22   It's basically the same story.  Amgen says, "No, we can't do

23   it," on September 30th.  That creates an immediate need to go

24   to the VAR.

25        But, critically -- and please pay attention to these

 1   e-mails -- before you can go to a VAR like Capax, what do you

 2   have to do?  What does Mr. Hussain have to do?  He has to

 3   reload.  He has to buy something from Capax in order for Capax

 4   to be able to pay for this new reseller deal.  He has to

 5   reload, using the terminology that Mr. Egan mentioned.

 6       Amgen says no.  That's okay.  They go to Capax, and at

 7   this point they agree to buy more stuff from Capax so Capax has

 8   more money to pay Autonomy.  Again, the money is constantly

 9   flowing in a circular way.  And the reason for this is that

10   Capax appear to be able to pay for the new deal when, in fact,

11   it really couldn't.

12       Mr. Egan described these deals as being correlative

13   because they were.  They sign the VAR deal, and he goes to --

14   Mr. Hussain goes to the Audit Committee, and he says the

15   following (reading):

16           "Capax are up-to-date with their payments on the

17       majority of the Eli Lilly sale discussed in Q2.

18       Management has concluded that there are no concerns over

19       recoverability that would impact revenue recognition."

20       That is misleading, ladies and gentlemen.  It's misleading

21   to say Capax is up-to-date with its payments when it's Autonomy

22   that has been paying Capax so that Capax can pay Autonomy.

23       All right.  They use the Capax revenue to recognize

24   revenue and included in their quarterly earnings release.  That

25   was fraudulent for those reasons.

1        What's interesting and a little bit different is that in

2    November, the sales force at Autonomy has to keep selling

3    Amgen.  They don't stop just because the deal has been sold to

4    a reseller even though the deal to the reseller is supposed to

5    be a final deal.

6        All these guys in the sales force are still working so

7    hard and Mr. Egan in this e-mail is having to report up about

8    all the problems he's having getting Amgen closed.

9        Well, Amgen was supposed to be a deal that had been sold

10   to Capax, but that's exactly not what's happening within

11   Autonomy.  Okay?

12       And Mr. Egan described this as part of the hole that he

13   felt sometimes when he described grabbing revenue out of future

14   quarters, grabbing the Amgen revenue out of a future quarter,

15   recognizing it in the third quarter, puts him, as he goes into

16   the fourth quarter, into a deeper hole and he has to keep

17   working to sell to Amgen on the last quarter's deal.  Okay?

18   This creates an extreme problem for him.  I'm going to come

19   back to that, but this is a great example of exactly that

20   phenomenon.

21       Mr. Hussain recognizes the revenue -- excuse me.

22   Withdrawn.

23       This is an example of the work paper in December in which

24   Autonomy finally closes the deal directly with Amgen but it's

25   for noticeably less money.  So the sales guys finally are able

1    to sell the deal but it's for a lot less money.

2        So what happens to Capax when the deal goes direct with

3    Amgen?  I think you already know the answer to that.  The deal

4    gets canceled.  They cancel the deal.  And how do they make

5    Capax whole for sitting on the revenue for about six months?

6    Well, by March, about six months later, they pay Capax nearly

7    $945,000 for doing basically nothing except allowing Autonomy

8    to recognize the revenue earlier.

9        This is fraudulent revenue that's packed into the third

10   quarter of 2010.  The amounts of the revenue are 14, nearly

11   15 percent in terms of what was adjusted; and if you include

12   the hardware, the amount of falsified revenue or concealed

13   revenue at this point is 27 percent.  They're painting a false

14   story.

15       We were going to have a recess here.  I will move on.

16       Let's go on to the fourth quarter, another pretty

17   straightforward deal.  We had the MicroTech/DOI deal.  It has

18   the same pattern that we've been talking about.  It begins with

19   the fact that Mr. Hussain is desperate for the DOI deal to

20   close.  You already know what happens.  The DOI deal does not

21   close.

22       And he's talking at this point in around late December

23   that they -- he's telling Dr. Lynch that they're having a very

24   difficult quarter.

25       If you write any document down, please write down

1    Exhibit 1274.  I'm going to come back to that, and this is an
2    important exhibit that really I think takes you into the mind
3    of Mr. Hussain at a key time.
4         In this context relating to MicroTech/DOI he's saying, "We
5    have to have MicroTech/DOI in order to hit our quarter," but
6    DOI doesn't happen.  So what is he going to do?
7         DOI says no, so all of a sudden you-all know what
8    Mr. Hussain does next.  He turns to a VAR.  This time he turns
9    to MicroTech and Steve Truitt.
10        And, again, you know exactly what needs to happen.  Before
11   you can get the VAR to buy a new license, you have to do what?
12   You have to pay them some money so that they can pay for the
13   old licenses that they've already bought.
14        That's exactly what happens with the ATIC deal for the
15   enormous sum of $9.6 million.  This is basically money that is
16   being used to fund these new MicroTech deals and to pay some of
17   the old Vatican debt.
18        And in or around the end of the quarter when they give
19   this reseller deal to Deloitte, they again suggest falsely that
20   the end user and the VAR currently anticipate entering into
21   such a license agreement.  Well, that can't be true because DOI
22   said no.  So how is MicroTech going to get DOI to say yes?
23   It's another deception by Mr. Hussain.
24        Nonetheless, despite all this, Mr. Hussain packs the
25   revenue into the quarter.  This is the Deloitte work paper in

1   which Autonomy is claiming the revenue in the quarter.

2       And in the Audit Committee report, Mr. Hussain makes the

3   following false statement (reading):

4           "Management is confident that payment will be

5           received on the remaining amount in due course given its

6           knowledge of the deal with the end user and its ongoing

7           involvement with MicroTech on other new deals."

8       They're confident that MicroTech will repay because

9   Mr. Hussain is confident he will be paying MicroTech and

10  MicroTech will have the money to repay.  I submit to you that

11  that is misleading.

12      And, again, what always happens with these deals?  They

13  are written off, and this one is written off just before the

14  deal closes with HP.  It belongs on the balance sheet of fraud

15  with the other bad deals.

16      Let's go to VMS in the fourth quarter.  This is the deal

17  with the -- in which Autonomy is selling some of the hardware

18  that it had plugged into its own wall and which its own people

19  were using.  You can't sell hardware that's being used by your

20  own people.  VMS certainly didn't contract for that in this

21  contract here.

22      Mr. Hussain is the one who's responsible for the

23  suggestion to, quote, "repurpose" existing hardware that

24  Autonomy is already using because, again, he has delivery

25  problems.  They can't get the stuff to VMS in time.  They're

 1   right at the end of the quarter.  They need the revenue so

 2   they're going to, quote, "repurpose" computers that are sitting

 3   and plugged into the wall.  That's not the way you run a major

 4   business.  It's certainly not the way you recognize revenue on

 5   a hardware sale.

 6        So Mr. Goodfellow testified about how he had to, then,

 7   figure out about the Fixed Asset Register, all the computers

 8   that Autonomy had in its stock, some in boxes, others plugged

 9   into the wall.

10        And what happens next is that Autonomy, Mr. Hussain,

11   nonetheless, recognizes the revenue, says that the delivery's

12   actually been made when that's false because much of the

13   hardware is still plugged in back at Autonomy.  It wasn't

14   delivered.  He says specifically that in this representation to

15   the Audit Committee when he says (reading):

16             "Autonomy has also sold 6 million of infrastructure

17        hardware to this customer."

18        That's not true.  They hadn't and they hadn't delivered

19   the computers.

20        So Ms. Anderson was asked questions about this VMS deal

21   (reading):

22        "Q.  If Autonomy were still using this hardware, would

23        that be relevant to Deloitte's assessment about whether

24        the delivery criteria was met?

25        "A.  Yes.

1    "Q.   Why?

2    "A.   As it wouldn't be available to the customer."

3    Yeah, exactly that.  You know, you can't pretend to sell

4    hardware to someone when you haven't given it to them and

5    you're still using it and, yet, that's exactly what the

6    evidence shows.

7    Was the -- Mr. Goodfellow was asked whether any of the

8    hardware was ever delivered.  He said no, he didn't believe

9    about 4 million of it was ever delivered.

10   And then what happens?  Again, you know what happens.  In

11   this case slightly a little bit different but the result is the

12   same.  VMS goes bankrupt, these debts go unpaid, but the

13   revenue was recognized.  It belongs on the balance sheet of

14   fraud.

15   This is a $6 million deal involving Tikit.  This is the

16   one with the side letter.  Okay?  And what's interesting is

17   Mr. Hussain knows all about the side letter, as the evidence

18   will show.

19   Again, sort of the sequence begins with he needs -- "he,"

20   Mr. Hussain -- needs revenue.  It's important that we have

21   9 million, not 5 million from Tikit because he's desperate for

22   revenue in one of these last quarters for Autonomy.

23   So this Tikit/KPMG deal.  KPMG and Tikit or certainly

24   Tikit is a little reluctant without reassurances in a side

25   letter.  And Mr. Hussain specifically says when he's talking to

1    Neil Araujo he's going to disclose the letter.

2        Okay.  All of you already know that didn't happen.  That's

3    exactly not what happened.  When he says the side letter will

4    be disclosed, two things are going on, I submit to you.  One,

5    it's an admission by Mr. Hussain he knows that it should be

6    disclosed.  That's absolutely true.  And, second, it's

7    pretextual.  It's misleading.  It's papering his file.  It's

8    him suggesting something will happen.  "Oops, it didn't happen.

9    Oh, that must have been a mistake because I really meant to

10   disclose it."  No, that's not what happened.

11       You have the side letter.  What's interesting about the

12   side letter -- we have the purchase order first.  I'm sorry.

13   We've got the purchase order.  Then we've got the side letter.

14   The signature block for Mr. Hussain.  It's definitely a side

15   letter.  Mr. Hussain has his confederate Mr. Kanter sign it for

16   him.

17       All right.  Antonia Anderson made it clear that side

18   agreements need to be disclosed, they can't get the accounting

19   right without them, and they weren't disclosed in this case.

20       Mr. Hussain falsely represents in the Audit Committee

21   report that no revenue deals containing side letters of ongoing

22   Autonomy performance requirements were excluded from the sales

23   contracts.  That's simply false, not true, didn't happen, and

24   Mr. Hussain knew it.

25       Nonetheless, the revenue's recognized.  This is a portion

1   of the work paper for Deloitte showing that Autonomy has

2   claimed the revenue.  It should not have been claimed in the

3   quarter.

4        And you have a management rep letter.  This is another lie

5   about the same topic.  At this point Deloitte is probably

6   learning enough.  You could infer from the evidence that they

7   need to ask more specific questions about side letters, and

8   Mr. Hussain is falsely representing that there were no side

9   letters.  It's all part of his scheme to defraud and make

10  Autonomy look bigger than -- like it was growing bigger than it

11  really was by lying to Deloitte along the way.

12       The Tikit deal is slightly different in that this e-mail

13  in April shows that Tikit started to offset other orders

14  against the existing balance.  So it's not like Tikit is going

15  to actually repay these sums.  And that's where that deal ends.

16       Let's go slowly through this $3.6 million Discover Tech

17  deal.  I suggest to you that this is one of the most corrupt

18  deals at Autonomy in this time period.

19       It, again, begins with this Exhibit 1274.  It's crystal

20  clear that Mr. Hussain is desperate for revenue; and at this

21  point on December 10th he thinks he can cover with this massive

22  B of A transaction that Mr. Egan and he had been working on in

23  the quarter.  Hmm, but you already know what happened.  B of A

24  doesn't close, and that makes any anguish or upset he feels in

25  this moment even greater when that fails to come through.

1    And you see some of this in the next e-mail.  On or around

2    December 31st, Mr. Hussain is learning that B of A has said no.

3    This is an absolute disaster for their quarter.  You know what

4    they did.  Go straight to -- this time they go to a VAR, they

5    go to Discover Tech, and they pack in 7 million with

6    Discover Tech.  Now, pay attention to that $7 million figure

7    because that changes a little bit as we go along.

8        The quarter ends, they've got 7 million, and you see in

9    the spreadsheet that is dated right at the close of the quarter

10   that Sushovan Hussain thought Discover Tech had only

11   $7.5 million of the B of A deal.  Okay?  That's where we are at

12   the end of the quarter.

13       What happens next?  We go to 18 days later, way later, you

14   go to the spreadsheet and all of a sudden 18 days later BAML

15   Extra, Bank of America Merrill Lynch Extra, pops up to the tune

16   of $3.5 million.  The first time it shows up on the spreadsheet

17   is there, and this is Mr. Hussain packing in another revenue

18   increment way after the end of the quarter.

19       You know this is entirely corroborated by the documents

20   that show that in this time period they're circulating unsigned

21   versions of the VAR contract.  The contract is blank.

22       Now, Mr. Scott testified about this particular deal, and

23   I'd like to take a moment and go through his testimony on this

24   point (reading):

25       "Q.  At some point in this time period did you note that

1      change in the date from January to December 31st of 2010

2      as a result of your conversation with Mr. Chamberlain?"

3      Answer by Mr. Scott (reading):

4      "A.  Yes.

5      "Q.  Were you concerned about that?

6      "A.  Yes.

7      "Q.  Why?

8      "A.  Because it was January 18th, 2011.

9      "Q.  And what concern was in your mind?

10     "A.  The fact that this agreement would be signed and

11     dated December 31st yet actually entered into in January.

12     My concern was about revenue recognitions and what the

13     intentions were in terms of taking the deal."

14          So what does he do?  He goes and has conversations about

15     his concern about this, and those conversations include a

16     conversation with Mr. Hussain.

17          He described in some detail Mr. Scott's meeting with

18     Mr. Hussain in which he shows him the lateness of these

19     contracts, asks him, "Is this revenue going to be recognized?"

20          And Mr. Hussain essentially says to him, "I'm going to be

21     fully transparent with the auditors about what happened here."

22     Okay?  That's what he says to Mr. Scott.  That's exactly not

23     what winds up happening.

24          The contract gets signed.  The people at Discover Tech put

25     the correct date.  They know how to keep their records

1    accurately, but that was unhelpful for the type of fraud that

2    Mr. Hussain was trying to engage in so it has to be rewritten

3    and redone with the backdated December 31 date even though we

4    are nearly three weeks -- going on four weeks after the close

5    of the quarter.

6         In this e-mail on or around January 26, Mr. Chamberlain

7    offers Mr. Welham a misleading explanation for why this revenue

8    is being accounted for in this period of time, and he says that

9    "We had not invoiced at year-end."  Based on these records,

10   based on this sequence, that was a lie by Mr. Chamberlain,

11   Mr. Hussain's co-conspirator.

12        And Mr. Welham testified about the impact the unexecuted

13   contract would have had on him and his accounting.  He was

14   shown the unexecuted contract (reading):

15        "Q.  Do you see how it's not executed?"

16        Answer by Mr. Welham (reading):

17        "A.  Yes.

18        "Q.  Was this information available to you during the

19        course of your audit?

20        "A.  I had not seen this before, no."

21        That would be a big problem if the deal isn't executed in

22   the quarter and it would affect revenue recognition.

23   Nonetheless, they go ahead and recognize the quarter.  It's

24   millions of bogus revenue packed into the year-end.

25        If we go to the bar charts, we see that the total amount

1   of fraudulent revenue at year-end in the fourth quarter of 2010

2   almost comes pretty close to the quarterly -- withdrawn -- the

3   total amount of falsified revenue in the quarter, 19.8 million,

4   almost comes close to the total year materiality threshold that

5   is identified by Deloitte.

6        The point is, the revenue -- the amount of revenue is

7   staggering in terms of materiality for Deloitte's accounting

8   and in terms of hitting or missing the consensus numbers for

9   the quarter.

10       We come to the Prisa deal in the first quarter of 2011.

11  The fraud continues.  We get to the end of the quarter and at

12  the very end of the quarter in Mr. Hussain's spreadsheet, a

13  great, great piece of evidence showing you what's going on in

14  realtime in Mr. Hussain's mind, Prisa is listed as out at the

15  end of the quarter.  Okay?  All of you know what happens.  It

16  gets included anyway and here's why.

17       You see in this document that there's a list of the

18  resellers.  Discover Tech/Prisa is not on here.  This deal --

19  no one had figured out to do this deal when the quarter had

20  closed.

21       So what happens?  We get to the very beginning of the

22  quarter, another one of Mr. Hussain's spreadsheets, and early

23  on April 1st it's still out.  So what does he do?  He calls

24  Stouffer Egan.  Mr. Egan testified that (reading):

25       "Q.  In or around early April 2011, after the cutoff of

1    the first quarter, were you involved in a deal involving

2    Discover Tech/Prisa?

3    "A.  I was.

4    "Q.  What happened?

5    "A.  I asked Discover Tech to backdate a deal.

6    "Q.  Okay.  Prior to doing that, did you talk to

7    Mr. Hussain?

8    "A.  I did.

9    "Q.  What happened?"

10   Answer by Mr. Egan (reading):

11   "A.  He" -- meaning Mr. Hussain -- "called me shortly

12   after the quarter ended and said he had to ask me to do

13   something that we didn't really want to do" -- no, they

14   didn't want to backdate the deal but they needed to, and

15   that's what Hussain asked Egan to do -- "we didn't really

16   want to do, which was to ask one of the resellers if they

17   would take another deal.

18   "Q.  To backdate a deal?

19   "A.  That was implicit, yeah, take a deal for the quarter.

20   "Q.  And who did that request come from?

21   "A.  Mr. Hussain.

22   "Q.  And did you do that?"

23   Yes, he did, that's exactly what Mr. Egan did.  He reached

24   out to Dave Truitt.  They put together the backdated contract.

25   It's four days after the cutoff.  And they get Discover Tech

1    to -- they get Discover Tech to sign it.

2        Mr. Leach points out to me that this is one of the wires

3    that we will come back to, the circulation of this contract by

4    wires as part of the wire fraud that's charged in this case.

5        And this is another fraudulent deal.  Mr. Welham makes

6    crystal clear why.  He was asked (reading):

7        "Q.  If it was agreed to after the quarter, would it be

8        appropriate to recognize revenue?"

9        Answer by Mr. Welham, "No."

10       And I think all of you understand why.  You can't

11   recognize backdated revenue in the earlier quarter.

12       Now let's take a close look at this e-mail.  This is an

13   excellent example of a sophisticated finance person managing

14   earnings, I submit to you, in an illegal way.  Okay?

15       Well after the quarter Mr. Hussain is crafting, "If we do

16   this, then we get that.  If we do another version of this, then

17   we get that."  This should already have happened.  It's

18   historical at this point and, yet, Mr. Hussain and

19   Mr. Chamberlain are tinkering with the revenue recognition in

20   order to hit certain targets.

21       This was very troubling to Mr. Welham.  Mr. Welham, the

22   auditor who testified in this case, was asked (reading):

23       "Q.  Are you troubled by this e-mail?

24       "A.  Yes, I am.

25       "Q.  Why?

1    "A.  Because it's dated sometime after the period ends,

2    but there's still debates about what is going to be

3    recognized, which shouldn't really be a matter of judgment

4    because these items would either be delivered and

5    recognized in the quarter or not.  It's quite binary."

6    Which means it either happened in the quarter or it

7    didn't.  You can't debate it and tinker with it and toy with it

8    afterward in order to hit certain figures.

9    He was asked (reading):

10    "Q.  Are you familiar with the term 'managed earnings'?

11    "A.  Yes, I am.

12    "Q.  What does it mean?"

13    Mr. Welham said (reading):

14    "It means doing things, ultimately book things, in a

15    particular period to meet expectations.

16    "Q.  At the time of your audits, did you have any sense of

17    the hardware sales being used to manage earnings?

18    "A.  No.

19    "Q.  And does that raise any issues from an accounting

20    perspective?

21    "A.  Well, this is -- this more generally raises an issue

22    around what we're being told versus what we're seeing in

23    the books and records."

24    Yeah, you bet it does.  This is exactly not what

25    Mr. Hussain is telling Deloitte and, yet, this is exactly what

1   the evidence shows he was doing, quite assiduously, back at

2   Autonomy with Mr. Chamberlain.

3        This whole deal upsets Dave Truitt.  He doesn't want to

4   have to do these backdated deals so he comes into San Francisco

5   and asks for a meeting with Mr. Hussain in order to confront

6   him about being asked to backdate, which he did, but he was

7   concerned and bothered about it.

8        Let's go to Mr. Truitt's description of what Mr. Hussain

9   says in that meeting.  Mr. Truitt (reading):

10            "Well, I started out simply saying that I was

11       concerned, that, you know, what I experienced -- what I

12       was asked to do with this order seemed to be out of the

13       normal, et cetera, so I put that question to Mr. Hussain.

14       The answer was, first of all, that Autonomy" -- this is

15       Mr. Hussain speaking according to Mr. Truitt -- "that

16       Autonomy was not traded in the U.S. exchange.  It was

17       traded out of the U.K.  They were under international

18       accounting rules.  It was really the first time that IFRS

19       had been brought up to me and, you know, potential

20       differences in accounting between IFRS and GAAP."

21       That's what Mr. Hussain is giving to Mr. Truitt as an

22   excuse for backdating.  IFRS, interesting.  We'll come back to

23   that.

24       Mr. Hussain, according to Mr. Truitt, also indicated that,

25   you know, being on U.K. exchange, that really wasn't under the

 1   purview of the SEC.  This was an international accounting and

 2   that there was some flexibility there that could account for

 3   this properly.

 4        I submit to you, no, there's no flexibility.  Antonia

 5   Anderson, Lee Welham, both came in and told you that there was

 6   no flexibility for backdating here.  This is Mr. Hussain

 7   blowing it passed Dave Truitt and trying to reassure him about

 8   a dirty deal.

 9        They recognized the backdated revenue.  Mr. Hussain lies

10   in a management rep letter that all of the revenue was done

11   through 31 March 2011.  That was not true.  They recognize it

12   in the quarter.  It's part of what falsifies their earnings

13   release because it includes this revenue.

14        And, again, you know what happens.  Autonomy basically has

15   to pay for this revenue, and it does it through this deal

16   involving Discover Tech in or about June 30th, the next

17   quarter.  Right when they need Discover Tech to take more

18   deals, they have to pay Discover Tech first in order to pay for

19   the old deals, including Prisa.

20        Okay.  Mr. Truitt testified that when he got the

21   additional -- sold the additional software to Autonomy in or

22   around June, that he understood that some of it would be used

23   to pay Discover Tech's old debts.  It's the same story.  It

24   belongs on the balance sheet of fraud.

25        There's another deal involving MicroTech.  This is for the

1   acquisition by MicroTech of software known as Team Site, but

2   there's a side deal, a clear side deal here.  Let's go through

3   this e-mail a little bit more carefully.

4       Mr. Hussain is saying he's desperate for more revenue.

5   He's asking Mr. Sullivan, his hardware sales guy, to help him

6   with that.  As usual, he needs more revenue, even low-margin

7   revenue.

8       So what do they do when they have trouble getting there?

9   They have to go to a VAR.  They have to go to MicroTech.  They

10  have to go to Steve Truitt.  But you know already what do they

11  have to do first?  Mr. Hussain has to pay MicroTech.  He has to

12  reload MicroTech, and that's exactly what happens here.

13      This time they sign over -- they grant services of revenue

14  that Autonomy was entitled to and they just give it over to

15  MicroTech so that MicroTech has money in order to pay Autonomy

16  for the deal.  It's a side deal and it's what supports the

17  whole transaction.

18      And you know enough already from Steve Truitt to know that

19  he couldn't pay for it without that.  Nonetheless, he does the

20  deal.  It's a $3.8 million deal.  That's sent over.

21      This whole thing, again, worried Joel Scott.  He was the

22  one who was involved in negotiating and getting the side deal

23  put together, and Mr. Scott testified that in his view, from

24  what he could see, the deals were definitely linked (reading):

25      "Q.  Is this the amount of the assigned maintenance fees

1    somewhere north of 3.5 million?"

2         That's the services fees and maintenance fees that are

3    being assigned to MicroTech.  (reading)

4         "Q.  Does this amount exceed the amount of the software

5         deal?

6         "A.  It does.

7         "Q.  And were the payment terms structured so that

8         MicroTech would receive the maintenance payments before

9         they needed to pay for the software?

10        "A.  Yes, it was.

11        "Q.  Are the two deals linked?

12        "A.  Yes, they were."

13        Okay.  They actually structure the payments to MicroTech

14   so that MicroTech has enough money to pay Autonomy, and the one

15   is getting the money first before it pays the other.  It's a

16   big circle every time.

17        Mr. Hussain recognizes the revenue.  He lies in the

18   management rep letter about the existence of side deals, and

19   the deal is terminated in the dark period.  Same story.

20        And at the very end, whatever's left over is written off

21   again during the dark period in a credit memo.  This deal

22   belongs in the balance sheet of fraud.

23        Another Capax EDD III deal.  This one very directly

24   involved Mr. Hussain.  Remember Mr. Baiocco's testimony about

25   the third time he is asked to buy EDD software from Autonomy?

1   Let's go through the sequence slowly.

2       According to Mr. Hussain's spreadsheet, right at the end

3   of the quarter they're missing a lot of revenue; and one of the

4   reasons the first quarter contains so many fraudulent deals,

5   you might conclude, is because according to the defendant's

6   spreadsheet on the last day of the quarter, they're off by

7   nearly 50 million.  Okay?  So a lot of things are happening.

8   The fraud is really getting bigger, and so there are a lot of

9   fraudulent deals in the first quarter.

10      Again, by the first day of 2011, Capax is not listed as a

11  reseller on the list of resellers.  So that's not there yet.

12      In this spreadsheet on April 1st, 2011, even with Prisa,

13  which we've gone through, and even with the MicroTech

14  internal-use deal, they're still short of the $220 million

15  revenue target and they're still clamoring for revenue.  You've

16  seen this in the other two deals that we've gone through in

17  this quarter.

18      So what is Mr. Hussain going to do in order to get more

19  revenue?  Well, he directly deals with John Baiocco.  Let's go

20  to what happens here.

21      They have a conversation in London or Cambridge and they

22  actually meet, and Mr. Baiocco is there to talk about other

23  parts of the European eDiscovery services he wants to do when

24  Mr. Hussain asks him to take a backdated deal.  Let's read what

25  Mr. Baiocco said (reading):

1      **"Q.**  Did you, in fact, have a meeting with Mr. Hussain?

2      **"A.**  Yes.

3      **"Q.**  Did Mr. Hussain bring up anything with you outside of

4      the cloud deal?"

5      That's the other deal they were there to talk about.

6  (reading)

7      **"A.**  Yeah" -- by Mr. Baiocco -- "at that meeting at

8      Cambridge he brought up that he had said Stouffer was

9      supposed to be chasing at the end of the quarter for one

10     of the VAR deals" -- do you see Mr. Hussain blaming

11     Stouffer Egan? -- "and somehow he let it slip through the

12     cracks" -- that's what Mr. Hussain said to Mr. Baiocco --

13     "and I denied it because we had just signed the first half

14     of another VAR deal and our partners were" -- oh, I'm

15     sorry.  "Somehow he let it through the cracks."

16     That's what Mr. Hussain says about Mr. Egan.  And

17  Mr. Hussain asked Mr. Baiocco (reading):

18         "Would I -- you know, would I do a deal?"

19     Okay.  This is happening on or around April 6th, well

20  after the quarter ends, Mr. Hussain directly to Mr. Baiocco

21  would he do another deal and backdate it into the prior

22  quarter, which is winds up happening.

23     And Mr. Baiocco says (reading):

24         "I denied it because we had just signed the first

25         half of another VAR deal and our partners were getting a

1    little edgy because they hadn't closed -- they hadn't

2    closed out some of what -- and it started to feel like it

3    was too much.

4    "Q.   So Mr. Hussain proposed a VAR deal with you?

5    "A.   He proposed it, yes.

6    "Q.   Now, when you said 'end of the quarter,' do you know

7    this date, the date of this meeting, April 6, 2011?  What

8    would have been the end of the quarter?

9    "A.   March 31st."

10   And what's waiting for Mr. Baiocco when he gets back to

11   his hotel in England?  What's waiting for him is the unsigned

12   contract, the EDD contract, that Mr. Hussain has arranged to

13   get to Mr. Baiocco in his hotel room because he needs the

14   revenue.  Okay.  You know what happens.  Mr. Baiocco signs the

15   deal.  The deal gets recognized.

16   Okay.  This is a -- let's pause on this e-mail because

17   it's clear that Mr. Hussain on April 7th is writing to

18   Mr. Baiocco and offering to send someone over to collect the

19   signed purchase order that has now been backdated.  All right?

20   Mr. Hussain would know that because he arranged to do this.

21   The backdated revenue gets recognized in the -- by

22   Autonomy in the quarter.  Mr. Hussain again lies in the

23   management rep letter about whether the financial statements

24   are fair and true as of 31 March 2011.  This deal wasn't even

25   in existence during the quarter.

1    Mr. Welham testified that if it had been backdated, that

2    would have been a problem -- probably not a surprise at this

3    point -- and it gets included in the revenue in the earnings

4    announcement.

5    And let's pause.  This is a part of the staggering amount

6    of money that Autonomy has to pay Capax over time, which equals

7    in full scope of time approximately $15 million.  Autonomy is

8    paying Capax that amount of money to pay for all these deals

9    Autonomy is buying its revenue.  Mr. Hussain is directly

10   steering and making that happen.  It belongs on the balance

11   sheet of fraud.

12   This is how they hit their numbers for this quarter, well

13   in excess of the consensus, all based on fraud.  Based on the

14   restatement, the amount of falsified revenue is approximately

15   21 percent.  Things are getting worse and growing, and the

16   total amount of revenue, including the concealed hardware, is

17   30 percent.

18   Last quarter, 2/2/2011, there are two deals, one involving

19   Discover Tech/Abbott and the other one involving MicroTech/HP.

20   Both Mr. Hussain is desperate for.  It starts with the Abbott

21   deal.  He's really urging Mr. Sullivan to get more hardware

22   revenue going, and he makes it clear in the e-mail that he

23   needs Abbott at $15 million.  You already know what happens.

24   Abbott said, "No, not going to do the deal."

25   It doesn't end there, though, does it?  They come to

1    Mr. Truitt, ask him to take the deal.  He has -- he says he

2    doesn't really have the money to pay for it.  No problem.

3    Again, you know what happens.  They do -- they essentially

4    reload here for Discover Tech by buying DiscoverPoint Engine in

5    the amount of $4.4 million.

6        What happens with that money is especially interesting.

7    Take a look at the checks that are in evidence that show that

8    Discover Tech is using the money to repay debts it owes to

9    Autonomy.  This is Autonomy money going to Discover Tech and

10   making it's way back to Autonomy.  Again, they execute the

11   reseller deal in the amount of approximately $9 million.  Once

12   Autonomy has paid Discover Tech and Discover Tech has paid

13   Autonomy, now Autonomy can sell the reseller deal.

14       What's interesting about this deal is that in order to

15   accomplish that, Mr. Hussain had to even lie to Dave Truitt,

16   who's been so helpful in so many of these deals, and he lies

17   about the status of the reseller deal involving Abbott.

18       Mr. Truitt testified (reading):

19       "Q.  Were you told that Abbott had said no?

20       "A.  No, I was not told.

21       "Q.  Would this information have been relevant to you

22   about deciding whether to do the reseller deal?

23       "A.  Yes.  If I'd been presented it in that manner, I

24   would not have been interested in doing the deal."

25       Okay.  That makes sense.  Then we go to the Audit

 1    Committee report.  It's misleading.  Abbott said no -- it's

 2    misleading because it says these Iron Mountain products have

 3    been fully integrated into Autonomy's core IDOL platform,

 4    et cetera.

 5         Abbott had said no, and the truth was that it had been

 6    sold to a reseller and after paying the reseller, so the

 7    reseller could buy it.  There's really no real demand.  There's

 8    a suggestion here that there is demand.  There's really no real

 9    demand amongst large multinational organizations as Mr. Hussain

10    is falsely suggesting.

11         Lee Welham testified about the problems associated with

12    this when he had -- was asked about the realities of the deal

13    (reading):

14         "Q.  Did you have an understanding that Abbott had been

15         denied -- declined the deal?"

16         Mr. Welham said, no, he didn't know that.  (reading)

17         "Q.  Did that matter?  Did you have any of the information

18         indicated in the e-mail where they said no?"

19         No, he didn't.  (reading)

20         "Q.  Would it matter?

21         "A.  Yes, it would matter because it calls into question

22         the transaction that we've just been talking about with

23         the value added reseller.

24         "Q.  How does it call into question?

25         "A.  Well, I can't understand how you could sell something

1          that -- to a VAR with an end user where this looks like

2          it's the same deal that the end user said no.  It just

3          feels very odd."

4      I think that's British for it feels very phony, it feels

5  very fraudulent, I submit to you.

6      They recognize the revenue.  They suggest the deal is an

7  appropriate deal, and Mr. Hussain makes another complete

8  falsification about the reasons for using Discover Tech as a

9  reseller.  He tells Deloitte that they are an 8(a).  That's the

10  service disabled veterans group, and Mr. Truitt specifically

11  testified that Discover Tech was not an 8(a).  MicroTech was an

12  8(a) but Discover Tech was not an 8(a).  This is Mr. Hussain

13  hiding the ball yet again from Deloitte.

14      They recognize the revenue and include it in the quarter.

15  It helps them hit analyst expectations.

16      And then, again, you know what happens.  Autonomy cancels

17  the deal during the dark period and eventually writes off all

18  of it before the deal actually closes with HP in or around late

19  September.  Another great example of cleaning up the books.

20      The balance sheet of fraud grows with this deal.

21      I think we come to the last of these VAR deals that I want

22  to cover today.  This is the Q2 2011 $7,000,000 MicroTech/HP

23  deal.  Again, same pattern, every time for all these.

24  Mr. Hussain is desperate for the revenue, needs 10 million from

25  HP.

1    The only problem with HP at this point vis-a-vis a sale of

2  Autonomy software to HP is that they're not interested.

3  Mr. Egan made it crystal clear that they had a strategy where

4  Mr. Hussain and Mr. Egan thought that maybe HP needed the

5  software in order to solve an issue relating to the U.S. Postal

6  Service; but when you -- when Mr. Egan testified about the

7  status of the sale to the end user, he specifically said "it

8  was not in good shape."  Those were his words.

9    There was a theory that HP needed it, but they're not even

10  out negotiating directly with HP on the software sale.  They're

11  just theorizing that maybe HP is going to need it.

12  Nonetheless, they sell it as a reseller deal to MicroTech with

13  HP as the end user.

14    When Mr. Egan testified about this, he acknowledged that

15  Mr. Hussain and he thought there was a lot of risk around this

16  (reading):

17    "Q.  What, if anything, did Mr. Hussain have to say about

18      the possibility of actually selling to Hewlett Packard in

19      this reseller deal?

20    "A.  He agreed it was risky."

21    Yeah, of course it's risky.  They're just theorizing that

22  HP had this need.

23    HP was not going to do the deal.  So you know what

24  happens.  Mr. Hussain and Mr. Egan go to Discover Tech of

25  course, but Discover Tech doesn't have enough money of course,

1    so Autonomy bought stuff from Discover Tech first of course.

2    The same pattern again and again and again.

3        What's interesting about these bank records is that some

4    of the $4.4 million that Autonomy is paying for stuff from

5    Discover Tech are making their way over to MicroTech so that

6    MicroTech can then pay down some of its debts.

7        First you have the purchase order recognizing the revenue.

8    Then you have the wire showing how it's going from

9    Discover Tech to MicroTech.  They're moving all this money

10   around.  It's going in a big circle.  It starts at Autonomy,

11   goes to Discover Tech, goes to MicroTech, and then it goes back

12   to Autonomy.  All the bank records show the same thing, which

13   this is a big circle.

14       Mr. Hussain in the Audit Committee report makes the

15   following misleading statement.  It's misleading because the

16   money MicroTech paid actually came from Autonomy via Discover

17   Technologies.  So the suggestion that MicroTech was collectible

18   and a good risk, again, is being twisted by Mr. Hussain because

19   he's fully aware that the money is passing through the VARS --

20   from Autonomy through the VARS and then back to Autonomy again.

21       This brings us to the FISMA-compliant FedKloud proposal.

22   This is the $8.2 million.  Steve Truitt testified about how

23   essentially that he could offer anything to Autonomy in his

24   proposal.  He said it wasn't a Pulitzer prize-winning proposal,

25   but he didn't even have to really negotiate the price very

 1  much, and all of a sudden Autonomy is paying him for this FISMA
 2  cloud proposal.  We see that in or around August 2015.  This is
 3  exactly when all the negotiations with HP are going on, and
 4  this is a perfect example of Autonomy and Mr. Hussain buying
 5  things he doesn't need in order for MicroTech to be able to pay
 6  off its debts.

 7      There is an urgency around these deals that's reflected in
 8  the e-mails.  Mr. Hussain is exhorting Mr. Scott to get the
 9  paperwork done right away.  What Mr. Truitt will not know is
10  that there's some intense negotiation going on between Autonomy
11  and HP, but Mr. Hussain knows that and he knows that time's
12  running out and he needs to get this done quickly, he needs to
13  clean up his books quickly, and that's exactly what you see
14  play out in the e-mails.

15      All right.  On August 18th, HP announces the acquisition
16  of Autonomy.  That's a pretty important line of demarcation in
17  this case, and both Mr. Truitt and Mr. Loomis remarked on the
18  extent to which, once they learned about the announcement of
19  the HP's acquisition of Autonomy, it suddenly made sense why
20  Autonomy was cleaning up its books or eager to do these deals
21  that didn't necessarily have business sense.  Both of them made
22  suggestions, Mr. Loomis specifically, that it felt like they
23  were cleaning up their books.

24      That deal belongs on the balance sheet of fraud.  It's
25  another example of basically Autonomy buying its revenue.

1    In this quarter, again, there's the amount of the fraud

2  and inflated revenue is in excess of 10 percent.  When you pack

3  in the hardware, it's around 20 percent.

4    That brings us to sort of where we are in the balance

5  sheet of fraud.  There are two additional deals that I want to

6  talk quickly about, which are the Capax/FSA deal and the

7  Capax/McAfee deal.  Both of them belong on the balance sheet of

8  fraud because Mr. Baiocco testified about both of them as being

9  unusual, couldn't pay, had to work it out with Autonomy.

10    Autonomy was buying its staging tools and buying the

11  NearPoint software for excessive amounts in ways that when you

12  get to the bottom of it with Mr. Baiocco, at least as to

13  McAfee, quote, "didn't smell right," and it didn't smell right

14  because it wasn't right.  They were cleaning up their books,

15  packing it in right at the time of the acquisition.

16    **THE COURT:**  Maybe we should take our recess now.

17    Ladies and gentlemen of the jury, we're going to be in

18  recess.  We're going to take a short recess so we can plow

19  ahead, but a half an hour.

20    So remember the admonition given to you.  We will resume

21  at 1:30.

22    (Proceedings were heard out of the presence of the jury:)

23    **THE COURT:**  Mr. Reeves, 163 minutes, Mr. Reeves.

24    Thank you.  We're in recess.

25    That's what you've used.

1         MR. REEVES:  Yes.  Okay.

2         THE COURT:  Thank you.

3         MR. REEVES:  I think I have --

4         THE COURT:  No.

5         MR. REEVES:  Okay.

6             (Luncheon recess taken at 1:00 p.m.)

7    **Afternoon Session**                               **1:34 p.m.**

8         THE CLERK:  Come to order.  Court is now in session.

9      (Proceedings were heard in the presence of the jury:)

10        THE COURT:  Let the record reflect all jurors are

11   present, the parties are present.

12     You may proceed.

13        MR. REEVES:  Thank you, Your Honor.

14     Balance Sheet of Fraud represented an awful lot of work,

15   ladies and gentlemen, over a long period of time for fraud.

16   This was a conspiracy and it involved people in addition to

17   Mr. Hussain, including Mike Lynch, Peter Menell, Andy Kanter,

18   Steve Chamberlain and Stouffer Egan, and you've heard an

19   abundance of testimony and evidence about their respective

20   roles.

21        At the end of the day, I submit to you that this Balance

22   Sheet of Fraud shows the lack of economic substance associated

23   with so much of Autonomy's business and revenues.  When you add

24   it up, just for these deals alone, Autonomy has paid over $200

25   million in order to obtain $190 million of revenue.  That is

1  Autonomy buying its own revenue.  That is the defendant buying

2  Autonomy's revenue in order to meet revenue projections through

3  fraud.  That is a scheme to defraud.

4      Let's take a look at this in aggregate, step back and look

5  at the big picture.

6      This is an accumulation of all the bar charts that we've

7  been going through today, and I submit to you that -- let me

8  step back.  The gray is revenue that appears to be valid and

9  we're not here to say otherwise.

10     The yellow is the amount of the hardware revenue that was

11 recognized.  It was the -- the existence of those sales were

12 concealed from the market, from the analysts, in the way we've

13 gone through today, and it was used to pad and inflate the

14 overall revenue without disclosing exactly what it was for

15 Autonomy.

16     And the red are adjustments, the full amount of the

17 adjustments, that are reflected in the restatement and

18 Mr. Yelland's testimony, portion of which are the deals that

19 we've covered with you today.

20     Let's go to this chart.  Do you remember this chart?  This

21 was Mr. Egan's chart about where problems began for Autonomy.

22 He described the yellow line as the beginning, as the point in

23 time when Mr. Hussain told him it would be okay to do a VAR

24 deal where the end user had not agreed to the sale, which put

25 the VAR at risk.  It created this opening where the deal

1  wouldn't necessarily sell through or might not sell through,

2  and it became the opening that Mr. Hussain, working with the

3  others at Autonomy, crammed tons and tons of this fraudulent

4  revenue.

5      That had the following effect.  This is the second chart

6  that Mr. Egan testified about.  It has the effect of when you

7  do that, grabbing future revenue, an Amgen or DOI or HP or any

8  of the deals that we've gone through today, and pulling it from

9  the future into the current quarter, selling it to the VAR --

10  that had two effects that Mr. Egan described.

11      One, it created a bigger hole for him in the sales process

12  in the following quarter.  You start at a lower place.  He

13  described it as starting in the basement rather than starting

14  at the first floor because, just as you saw in Amgen, the sales

15  force still has to sell last quarter's deal.  They can't move

16  on to this quarter's deal.

17      That's bad enough.  But it also, by grabbing the future

18  revenue improperly in this way, it elevates the growth arc in

19  the expectation of what your next quarter's growth target is

20  going to be.  So it's a double whammy, essentially, and that's

21  exactly how Mr. Egan described it.

22      And bottom line is conceptually, look at this.  You cannot

23  continue to do business this way, and that was precisely what

24  Mr. Egan said.  Is this type of phenomenon -- is it

25  sustainable, I asked him.  Answer, "no."  You can't continue to

1   do business this way.

2        So now let's go back and look at those aggregated charts

3   again in slightly different form.  If you are to strip out the

4   adjusted revenue and you strip out the hardware revenue and you

5   just look at the revenue that was properly recognized by

6   Autonomy, what do you see?  What you see is that basically

7   between the second quarter of 2009 and the first quarter of

8   2011, Autonomy was flatlining.  It was not growing.  It was

9   like the other tech companies.  It was -- that were suffering

10  in the recession and the market downturn.  It was exactly what

11  the analysts, who you heard from, said would happen.

12       This whole fraud is about pretending that Autonomy was

13  growing when it really wasn't growing, certainly not at the

14  rate that they insisted.

15       Just as Mr. Egan described in 2008 and 2009, what you see

16  in the evidence is that the defendant began to pull big deals

17  from future quarters and sell them to VARs in the current

18  quarter to meet his revenue projections, and while the VARs

19  were required to pay, the defendant clearly knew that they

20  probably would not pay unless and until the deal sold through

21  to the end user or until Autonomy paid them.  Okay?

22  Collectibility for those deals was not assured, as the

23  accountants like to say.

24       Quarter after quarter, Autonomy's financial statements

25  were falsely inflated by 10, 15, 20, 25 percent.  A

1    middle-of-the-pack tech company with a decent piece of search

2    software was falsely made to appear to be a market defying

3    growth story during the rescission.  It was built on a lie, and

4    that lie was built on bogus VAR deals and millions and millions

5    of concealed low-margin hardware sales.

6        Early on, the defendant started small, but by late 2010

7    and early 2011, his scheme snowballed and it snowballed out of

8    control.  Each quarter the hole grew bigger and bigger.  And at

9    bottom, Autonomy was an unsustainable corporate Ponzi scheme.

10       Even by the end, Sushovan Hussain knew he could not keep

11   his scheme going and that it required radical action, and you

12   are going to see the email in which he says exactly that, and

13   that's the point at which Autonomy begins to negotiate with HP.

14       Before I plunge into of the last chapter of the evidence

15   here, let's talk quickly about the elements in this case.  For

16   a complex case, with the judge's assistance, the elements are

17   not really that difficult, and you are going to have the jury

18   instructions with you back in your deliberations.

19       The key elements of the offenses are scheme to defraud.

20   The entirety of this argument so far has really been centered

21   around the evidence of a scheme to defraud.

22       A scheme to defraud is really nothing more than a plan or

23   scheme to obtain money by fraud using false and misleading

24   statements, half-truths, and material omissions.  The record is

25   replete with Mr. Hussain's multiple lies in order to carry out

PROCEEDINGS

1    his scheme to defraud.  And he did it with an intent to

2    deceive.  That's why people lie.  That's why he lied.

3        Wire fraud is simply carrying out a scheme to defraud

4    using interstate wires.  You're about to see the wires, the

5    emails, the phone calls that Mr. Hussain and his

6    co-conspirators used in order to carry out their wire fraud

7    scheme.

8        Securities fraud is simply a scheme to defraud involving

9    and in connection with the purchase and sale of HP securities.

10    And for the little piece of the puzzle related to securities

11    fraud, there is no question that the same scheme to defraud was

12    used to defraud HP shareholders.

13        A conspiracy, read the instruction carefully, really

14    nothing more than an agreement between people like Dr. Lynch,

15    like Peter Menell, like Andy Kanter, like the other

16    co-conspirators in this case to commit these crimes.

17        Let's talk about the HP acquisition.  But let's begin with

18    Sushovan Hussain's mindset going in to the key months of 2011

19    when it really begins to take momentum.

20        I already emphasized to you Exhibit 1274.  I've already

21    shown it to you a couple of times so I don't have it here, but

22    there's a key piece -- if you look at that email, this is an

23    email from Mr. Hussain in December of 2010 to his boss, Mike

24    Lynch, subject, "U.S. IDOL."  This is what he says:

25        "Really don't know what to do, Mike.  Revenue fell away

**PROCEEDINGS**

1    completely."

2        Moving on, he ends by saying, "So radical action is

3    required.  Really radical.  We can't wait anymore."

4        What do you think he's talking about?  He's talking about

5    selling the company.  That's exactly what happened.

6        In or around the spring of 2011, Sushovan Hussain came

7    into Palo Alto, California, and touted Autonomy's performance

8    to HP using financial statements he knew were false and

9    misleading.  He conspired with people like Mike Lynch to paint

10   a false picture of Autonomy's growth story, and he used

11   interstate wires in the United States to circulate his false

12   and misleading financial statements and ultimately to obtain

13   billions of dollars from HP.

14        Let's go through some of the ways they did that.

15        They retained an investment banker, well-known investment

16   banker here in Silicon Valley, Frank Quattrone.  Mr. Quattrone,

17   in or around this January time period, is circulating

18   information touting his client, Autonomy, about their success,

19   about their financial success.  You know what Mr. Quattrone

20   would not have known, that that success is based on lies and

21   deceit by the defendant.

22        This is the first of our wires.  Count 2, there are going

23   to be a series of wire fraud counts in our timeline here.  This

24   is one that relates to the BofA deal that we have already

25   covered and in or around this December 2010 time period.

PROCEEDINGS

 1   They're are circulating portions of the BofA deal to Joel Scott

 2   and others here in California from London.  That is part of the

 3   scheme.  That's one of the alleged wire fraud counts.

 4        We already went through the falsity of this document, and,

 5   again, it's one of the only ones of the counts that don't

 6   relate directly to HP, but it's still a charged wire fraud

 7   count, and there is abundant evidence for you to see it.  It's

 8   a wire in furtherance of Mr. Hussain's scheme.

 9        Let's go back one second.  On February 1st, they had the

10   first of those so-called Halo meetings.  That's the special

11   video device that allowed the Autonomy team, including

12   Mr. Hussain and Dr. Lynch and the HP team, including

13   Mr. Johnson and Mr. Robison and other people to meet and talk

14   about the possibility of HP acquiring Autonomy.  The wire

15   setting this up with the knowledge that Mr. Hussain had with

16   his intention to sell the company based on false and misleading

17   financial statements are appropriately charged as one of the

18   wire frauds in this case.

19        There were stipulations about the use of interstate wires

20   that we read into the record and of course into the trial.

21   Fill in some of those details.

22        Count 4 is the actual Halo meeting.  This is the first

23   Halo meeting itself.  The other was a sort of setup email for

24   it, and this is the meeting in which they begin to tout the

25   Autonomy story.  The defendant and Dr. Lynch are suggesting

1    that Autonomy is really performing well, when based on the

2    evidence in the record, it was not.

3        The next document is an example of one of the emails

4    supporting the existence of the wires and the phone call in

5    this time period.

6        There's a second and somewhat more meaningful or more

7    in-depth Halo conference in or around early March, in which

8    again Autonomy's financial is talked about at a high level, but

9    the suggestion is one of growth and success, which is really

10   built on a lie in the manner that we've gone through in some

11   detail today.

12       There are additional emails that leave zero doubt that the

13   meeting actually happened and used our wires, used the

14   United States wires, in order to carry out the scheme to

15   defraud.

16       Mr. Johnson came in here and testified that among the

17   other topics that were covered in the second Halo meeting was

18   the financial information at Autonomy and its performance over

19   years.  In that meeting, you could reasonably infer it's

20   consistent with what Autonomy has said publicly about its

21   performance, which is inconsistent with what the evidence

22   actually shows in this case, which is that performance was

23   built on a lie and a series of lies.

24       We go a little bit later on in the narrative.

25   Mr. Apotheker testified about HP's interest in possibly

1    acquiring another software company, TIBCO.  The simple fact is

2    in March, 2011, Autonomy was coming in second, maybe even third

3    with the other possible deals that they were thinking about

4    doing, and HP, at that point, was much more interested in

5    acquiring TIBCO, which I think from that you can reasonably

6    infer that HP was not necessarily going to buy Autonomy no

7    matter what.

8        Now, this is one of the press releases that we've gone

9    through at some length in the course of the evidence so far.

10   It's disseminated from London, but it's using the PR Newswire

11   facility in the United States to distribute it in the

12   United States, including into the Northern District of

13   California, right here.  This is another properly-charged wire

14   fraud count.

15       During this time period, as you would expect, the

16   corporate development team at HP led by -- on a day-to-day way

17   by Mr. Sarin is reviewing all the information they can get

18   their hands on about Autonomy, including all of the analyst

19   reports that -- from some of the banks that were covering

20   Autonomy and would be of the same caliber as the type of

21   reports that you've heard from some of the analysts who have

22   testified in this case.  HP is certainly doing everything it

23   can to acquire its best understanding of Autonomy starting in

24   this early time period, and that has to be based at this point

25   on the public record.

1    One of the most important things you heard that the HP

2  people are doing is reading very carefully the financial

3  statements prepared by Mr. Hussain and disseminated publicly,

4  and that included the lengthy piece of testimony that

5  Mr. Apotheker offered about the 2010 financial report.

6    Mr. Apotheker read this with great care.  He testified

7  specifically that he spent a lot of time reading it and read it

8  carefully, as well he should.  He's a very astute consumer of

9  software companies' annual reports.  He read this carefully,

10  and he was impressed by the pure play software company.  That

11  was very important to him because of the margins.

12    If he had known anything about the fact that they were

13  not -- they were selling somebody else's hardware that was not

14  an appliance, he said in his judgment that would fundamentally

15  change his consideration relating to Autonomy in the sense that

16  it would have raised a lot of questions for him with regard to

17  Autonomy's real growth potential and desirability as an

18  acquisition for HP.

19    Count 8 is another dissemination of the same fraudulent

20  press release that we've already gone through.  This one

21  happens to actually use the wires to go straight to HP because

22  they are a receiver of the newswire services that distribute

23  it.  That's Count 8.

24    Count -- next in time, we have -- this is an example of

25  Mr. Johnson working with his team, including Mr. Sarin, reading

1    through Autonomy's earnings transcripts, so attached to this

2    email is the fact -- is the -- an example of the transcript, so

3    all the statements that Mr. Hussain and Dr. Lynch are making in

4    the analyst calls, those are devoured by the corporate

5    development team at HP in order to get to the bottom of what

6    Autonomy might be worth and whether they really want to acquire

7    it.  They're relying on all those types of documents, the

8    financial statements, the earnings call transcripts, and the

9    lies and deceptions that are contained in those documents are

10   part of the scheme to defraud and are being distributed to HP

11   and relied on by HP in order to make its judgment about whether

12   to acquire Autonomy.

13       You know at this point that many of those statements were

14   false and misleading and were very much a part of Mr. Hussain's

15   scheme to make Autonomy appear to be something that it really

16   wasn't, certainly growing as a company when it really wasn't.

17       Go to Count 9.  This is a -- this takes us into the time

18   period in which there are a series of meetings, regular

19   meetings in the period where HP is actively doing due

20   diligence, and this first email here, Count 9, is a wire

21   between Mr. Sarin to Sushovan Hussain, setting up the first

22   diligence call.

23       You heard testimony about this call, that Mr. Sarin

24   described the extent to which there was a high-level

25   description by Mr. Hussain of the Autonomy financial

PROCEEDINGS

1   performance.  I submit to you that would be false and

2   misleading because it would be consistent with and was

3   consistent with the publicly-disclosed financial performance

4   for Autonomy which you know, based on this record, was itself

5   false and misleading.

6        That gets us into sort of the detailed calls with

7   Mr. Sarin, Mr. Gersh, Mr. Hussain, and the other people that

8   you've heard were participating in these -- the nitty-gritty

9   really of the diligence calls.

10       On or around August 2nd in Count 9, you have a very

11  detailed description of sales model by product.  I do think

12  that's an important thing for to you really look at.  This is

13  precisely what Mr. Sarin/Mr. Gersh was asking about.  They're

14  asking about "your sales model by product."  Please focus on

15  that word "product."  That word is not the same as "revenue."

16  Okay?  There was a lot of testimony about Mr. Sarin's effort to

17  identify the revenue that came from one hundred percent of

18  Autonomy's products.  That was the question that was asked.

19       Sushovan Hussain knew that Autonomy resold tons of

20  hardware as a product.  Okay?  And yet Sushovan Hussain did not

21  disclose that.  Okay?  Why -- why not?  Why wouldn't he simply

22  say, "Last year, we sold roughly 100 million in EMC and Dell

23  hardware"?  Why would he not do that?

24       Well, if he said that, he would essentially be undoing his

25  years-long scheme to make Autonomy appear to be something that

PROCEEDINGS

1    it really wasn't.  Okay.  He's not going to do that.  He

2    perpetuated the myth that it was a pure software company in

3    these calls, and it is the question that's asked, "tell us

4    about your products," that creates the false answers that

5    Mr. Hussain gave and others gave in that time period.

6        And I submit to you that both Mr. Gersh and Mr. Sarin

7    worked earnestly to try to understand 100 percent of the

8    revenue-generating products that Autonomy had.  And that

9    Mr. Hussain essentially deceived them, misled them about the

10   truth of that.

11       Let's go to Count 11.  This is the second one of the due

12   diligence calls.  In this call, you heard testimony about the

13   extent to which there were -- was a discussion about writeoffs,

14   and you have Mr. Sarin's handwriting about what was said in the

15   course of that call.

16       Answer:  "About the subject of bad-debt writeoffs, v

17   small," very small.  "One percent of receivables outstanding."

18   That is his -- Mr. Sarin's notes of what Mr. Hussain said.

19       That was not true.  That was not true.  And that was a

20   direct question put to Mr. Hussain and answered by him in this

21   call.  You know that it is not true because you've seen an

22   avalanche of writeoffs and bad debt in this case.

23       Mr. Hussain is using these wires in this call to execute

24   his scheme to defraud, misleading HP and Mr. Sarin and

25   Mr. Gersh and the others representing HP.

PROCEEDINGS

 1    There was -- if the first two calls weren't enough, there

 2  was an elaborate call on or around August 4th, I believe, in

 3  which Mr. Sarin carefully went through the projections that he

 4  had for revenue and all the products that generated revenue.

 5  Again, it was another detailed opportunity for Mr. Hussain to

 6  tell the truth, which he did not do.

 7    You've seen abundant evidence of how much revenue came

 8  from hardware by Autonomy over these years, none of which is

 9  disclosed in this call.  If he was acting in good faith, how

10  could that not have happened would be a reasonable question for

11  you to ask.  It didn't happen.  The words were not used.  The

12  hardware was not disclosed because Mr. Hussain did not want it

13  to happen because it would undercut his whole effort to inflate

14  Autonomy into something that it really wasn't.

15    Mr. Gersh asked in these calls -- asked an important

16  question about marketing.  And let's just pause for one moment

17  on that.

18    Question to Mr. Gersh:  "If I could draw your attention to

19  question 19 on page 5, do you see where it says marketing

20  strategy and activities undertaken, types of marketing spent,

21  where and why spent, assessment of effectiveness?  Do you see

22  that?"

23    Answer:  "Yes, I do."

24    Question:  "Do you have a memory at any point of anyone

25  from Autonomy telling you that Autonomy was reselling hardware

**PROCEEDINGS**

1    as part of some marketing strategy?"

2         "No, I do not."

3         Another direct question that Mr. Hussain was given an

4    opportunity for him to tell what he had told others in

5    different contexts that we've covered today about hardware was

6    a loss leader and being used to market future software sales.

7    Did not happen because it would have undercut this whole false

8    narrative that Mr. Hussain and his co-conspirators were

9    perpetuating.

10        Let's go to the Top 40 contracts and the Top 40 customer

11   list.

12        A lot of things in this case are not that simple.  Okay?

13   We need to spend a little time looking at the evidence.  I

14   submit to you Top 40, that's pretty simple.  That means the Top

15   40.  That doesn't mean something else.  That doesn't mean the

16   Top 40 we get to select.  That doesn't mean the Top 40 software

17   contracts.  It means the Top 40.  And I think if you really

18   center on what's being asked for, that's precisely what the

19   evidence shows is being asked for.  The Top 40 is not

20   ambiguous.  It means the Top 40.

21        And there was a reason why they wanted the Top 40

22   contracts and Top 40 customers, regardless of what they were.

23   There were lots of important business reasons in terms of, you

24   know, if there's a customer that is disproportionate, that

25   creates risk.  If there is a customer that HP can't do business

1    with, like a Dell, that creates other kinds of risks.  There

2    are reasons you've heard in the testimony why you would want

3    the Top 40 exactly as the Top 40.

4        And Mr. Gersh explained that.  We wanted to know what they

5    were selling and how they were selling it because revenue

6    recognition under GAAP is very complicated and you need to

7    understand what is being sold and when it's being sold and how

8    it's being priced to be able to get to -- to be able to get a

9    clear view of what the revenue recognition implications could

10   be.

11       "Okay.  So were you trying to limit the products that you

12   were asking about by this question?"

13       Answer:  "No.  No way."

14       They want the Top 40 contracts for their own business

15   purposes.  They want the Top 40 customers for those same

16   reasons.  That's what was asked for.

17       Let's take a look at what happened and what was given to

18   them.  First, let's start with this exhibit, which is -- within

19   Autonomy in preparation for the response about the question

20   about the Top 40 contracts, you see a circulation between

21   Mr. Kanter and Mr. Chamberlain and Mr. Hussain, who are working

22   on all this at this time.  And in this version, we've

23   highlighted the VAR deals in -- and that's what the highlighted

24   deals are.

25       Now, as you already know, none of these VAR deals that are

1   highlighted here ever actually sold through to the end user.

2   Didn't happen.  That created some of the problems that we've

3   talked about this morning.

4        Let's take a look at what happens next.  All right.  This

5   is the version of the Top 40 contracts list that gets put into

6   the data room and actually given to HP and relied on by

7   Mr. Gersh.  This is -- what you'll see here is two things:

8   One, the hardware deals are missing in the manner that are set

9   forth on the left.  Zones and the other $4 million Zones

10  contract, two big hardware deals, Top 40 deals, Top 40

11  contracts, should have been on the list, pulled out for no --

12  no reason consistent with good faith; a reason consistent with

13  perpetuating the scheme to defraud that Mr. Hussain had worked

14  so hard to carry out for years.

15       What also happens is there is the false suggestion that

16  the VAR deals actually sold through to a European government or

17  to the U.S. government.  The European government I think is a

18  reference to the Vatican deal.  The number is exactly the same.

19  Did the Vatican deal ever close through?  Did the Vatican ever

20  actually buy any Autonomy software?  No.  There is no evidence

21  that that happened.  And yet that is a false and misleading

22  statement suggesting that it did.

23       Let's go to the Top 40 customers list.  Similarly, within

24  Autonomy, you see the circulation of a correct list.  It has

25  the VARs on it.  They're all highlighted in here just so you

**PROCEEDINGS**

1    can see exactly where they are.  So it's not like Autonomy and

2    Mr. Hussain didn't have this information, had the wherewithal

3    to provide it in some appropriate way consistent with the

4    disclosure obligations.  They had the correct information.  But

5    let's see what happens.

6        If we go to -- the list on the left is what was put into

7    the data room.  The highlighted deals, again, in the Top 40

8    customer list suggests that they're actually sales to the U.S.

9    government, European government, pharmaceuticals.  You know,

10   those sales didn't really happen because they were done to VARs

11   that never sold through to the end user.

12       And the hardware is stripped away.  How do you know that?

13   One of the reasons is the summary that Special Agent Bryant put

14   in identifies who the top customers by dollars are based on the

15   spreadsheet that Antonia Anderson prepared, and SHI, who you've

16   heard a lot about, missing from this list.  Okay?  There was no

17   reason to strip out SHI.  Why wouldn't Mr. Hussain be proud of

18   the fact that he has sold so much to SHI, which is essentially

19   a provider to BofA.  Why wouldn't he don't that?  The answer is

20   it would undercut his whole scheme to defraud based on the

21   false story of growth and high margin that he had worked so

22   long to cultivate.

23       Let's go to the next email.  I think this is the -- one of

24   the emails that shows that Autonomy is actually putting the Top

25   40 customer contracts and revenue listings into the data room.

PROCEEDINGS

1          Then we have -- if we go to the next email that we have

2     during this time period, this is an interesting email.

3     Mr. Kanter is complaining to the folks at HP about the amount

4     of time and effort he and others at Autonomy have had to put

5     into the due diligence.  Twenty-eight group calls covering at

6     least as many hours.

7          So now the defendant in this trial at points in the

8     cross-examination has seemed to suggest that HP was asking too

9     many questions -- I'm sorry -- asking too few questions.  It

10    didn't care enough about the diligence.  Okay.  I submit to you

11    that is not supported by the record.

12         But what is interesting, you go back in time, you look at

13    what Mr. Kanter is doing, who is it that is really complaining

14    about the amount of time and effort going into this diligence?

15    It's Autonomy.  It's Mr. Kanter who is complaining.

16         HP was pushing hard and going deep, and it's Autonomy

17    that's pushing back about the quantum, about the depth of the

18    diligence.

19         I think I have a series of exhibits that I can scoot

20    through kind of quickly because they are the whole writeoff

21    that is happening at this time.  I think the importance is

22    there is a series of writeoffs, as you already know, happening

23    at precisely this time.  One of the things I'd like you to

24    please consider is why would so much be swept under the rug at

25    the very time when the deal is coming together?  I think all of

1    you know the answer to that.  It is to make this business look

2    better than it really was.  Okay.

3        If we could go to the next slide.  We have in or around

4    August 14th.  According to the testimony of Mr. Apotheker,

5    that's when the final actual price for the acquisition was set.

6    It was set on August 14th.  There had been a range before.

7    They had the diligence.  They set the price a couple of days

8    before they announced the deal and not earlier than that.

9        This is the FileTek writeoffs.  I think we can skip

10   through that.  A couple more points here.  This is an important

11   document relating to the securities fraud count.  Sushovan

12   Hussain in this exhibit, 2309, is attesting to HP, to the

13   truthfulness of HP's press release.  HP is announcing in its

14   press release Autonomy's financial performance.  And when

15   Mr. Hussain attests that all the information about Autonomy

16   that HP is getting and disseminating to its shareholders --

17   Mr. Hussain says it's all true when, in fact, he knew full well

18   that Autonomy's financial statements were false and misleading.

19   This is a false statement carried out as part of his scheme.

20       And that -- if we go to the announcement and talk a little

21   bit about the HP shareholders in this case.  You heard from two

22   shareholders, Mr. Upton and Mr. Garner, both of whom told you

23   in various ways how important Autonomy's growth story was, its

24   financial strength and how much that was an important factor in

25   their decision to buy HP shares.  I submit to you that they

1    relied on a press release that Mr. Hussain caused to be issued

2    that was, as to Autonomy's financial performance, false and

3    misleading.  And that as shareholders, they were entitled to

4    accurate information.

5        Mr. Hussain, in the manner I've described, misled them,

6    defrauded them, caused them to buy shares that they would --

7    that were relevant to their investment decision and may not

8    have otherwise bought if they had had the truth.

9        By lying to HP about the alleged strength of Autonomy's

10    financial statement, the defendant caused HP to issue a false

11    and misleading press release and defrauded everyday investors,

12    like Nigel Upton and Thomas Garner, into buying HP shares based

13    on the fiction of Autonomy's alleged growth story.

14        HP the corporation, I submit to you, was not the only

15    victim here.  And shareholders, like these shareholders, were

16    other victims of the scheme to defraud that the defendant

17    carried out.

18        We have more of the writeoffs going on during the dark

19    period.  The dark period, the period of time between the

20    announcement of the acquisition and the closing of the deal

21    between August 18th, 2011 and October 3rd, 2011 is important.

22    It's important because that's where all the writeoffs are

23    happening, all the credit memos are happening, where all the

24    bodies are being buried in order to cover up what has actually

25    happened.

**PROCEEDINGS**

1          Let's go to this document.  That's one of the writeoffs.

2     Let's go one further.

3          Finally we get to the end of the deal, October 4th, 2011.

4     This is the actual purchasing of the Autonomy shares by HP in

5     the open market using this Capita Registrars as essentially a

6     broker to facilitate the acquisition of all these outstanding

7     shares.

8          On October 4th, the money actually changes hand and HP

9     actually bought Autonomy shares from its shareholders and there

10    was no going back.

11         A couple last points and then I'm going to wrap it up.

12    Right in this time period is this concept of integration:  What

13    is Autonomy going to be within HP as a business unit?  And I

14    think importantly, Mr. Apotheker testified about his

15    aspiration, his intention that Autonomy function autonomously

16    within HP.  Those were the words that he used.  And the idea

17    being that Autonomy would have a lot of independence and it

18    would be a coordinated arms' length relationship, he said in

19    his testimony, between HP back in California and Autonomy being

20    managed by Mr. Hussain and Dr. Lynch in London.  That

21    independence, I think, is very important to what happened and

22    why this happened the way it did.

23         Let's go to the next slide, please.

24         Let's talk a little bit about why Mr. Hussain would do

25    this.  Why did the defendant commit these crimes?  Okay.  The

1    why question is really not an element of any of the offenses,

2    but understanding why something happened is important because

3    it takes us closer to the truth.  It takes us to the truth of

4    the matter.

5        So there's no question that at Autonomy, there was extreme

6    pressure on Sushovan Hussain and everybody else in the business

7    to deliver Autonomy's quarterly revenue projections on a

8    regular basis, and you see that time and time again in his

9    anguished emails to his boss and co-conspirator, Mike Lynch,

10   about hitting his targets.

11       At some point, probably sometime in late 2008, the record

12   is not exactly clear when, Sushovan Hussain began to cut

13   corners by recognizing VAR deals before there was actually a

14   sale to the end user.  Okay.  Stouffer Egan said as much in his

15   description of the problem and what happened when they started

16   to grab future revenue and pull it into the current quarter.

17   Once you cross that line, it is hard to stop.

18       Now, every one of you know in your everyday lives people

19   who have lied.  All of you know once you start lying, for some

20   people, it's hard to stop.  For the defendant, it was even

21   worse.  Cheating in one quarter only led to more cheating in

22   the next.  And you know what happened.  It snowballed.

23       But the prospect of selling Autonomy to HP was a way out

24   for Sushovan Hussain.

25       Mr. Hussain could clean up the books before HP took over.

**PROCEEDINGS**

1   He could function with Autonomy within a massive corporation

2   and corporate world like HP, and he could certainly hide out

3   for a while, and the evidence supports that's what basically

4   happened.

5         Once the deal closed, there was no going back for HP.  And

6   once the deal closed, that meant one thing for Sushovan

7   Hussain.  A $16 million payday.

8         That brings us to the end of the case or the end of my

9   argument.

10        Ladies and gentlemen, when you peel back the details and

11  when you strip out the jargon, the evidence of the defendant's

12  guilt in this case is clear and it is overwhelming.

13        All morning, I have not really mentioned or only touched

14  on IFRS.  That's because this case is really not about IFRS.

15  Amazingly, even Mr. Hussain said Autonomy followed U.S. GAAP

16  and SOP 97-2 when it served his purposes to do so.

17        But the alleged complexities of European accounting

18  standards was another part of the defendant's shtick.  Sushovan

19  Hussain used the mysteriousness of IFRS as a screen, as a dodge

20  to carry out his scheme like when he suggested to Dave Truitt

21  that IFRS somehow made it okay to backdate Prisa.  Nonsense.

22  It was not okay to backdate under IFRS, U.S. GAAP, or any other

23  accounting standard anywhere in the world where you're hiding

24  what really happened and the defendant knew that.

25        After two months of testimony in this case, all of you are

1    now experts on the accounting issues that really matter in this

2    case.  You can't book revenue on sales if you cannot collect

3    the money.  You can't book revenue on sales if you have to pay

4    for them yourself.  You can't book revenue on deals that make

5    no business sense.  And you can't book revenue in the last

6    quarter for deals you closed this quarter without properly

7    disclosing it, which didn't happen here.  You can't do that.

8        It is not more complicated than that, really.  If you use

9    your common sense and if you follow the money, the accounting

10   in this case is a snap.  The defendant falsified Autonomy's

11   financial statements again and again and again.  No doubt about

12   it.

13       He acted with criminal intent because he lied again and

14   again and again to the auditors, to the market analysts, to the

15   HP executives.  No doubt about it.

16       And in 2011, he came into the Northern District of

17   California and he flaunted Autonomy's false growth story, their

18   financial statements, and in doing so, he walked away with

19   millions of dollars.  No doubt about it.

20       In a few hours, this case will finally be yours.  I want

21   all of you to enjoy the great sense of release that must come

22   when you finally get to begin your deliberations and can

23   discuss the case as a group.

24       Work together.  Give and share your views of the evidence

25   freely and openly with your fellow jurors.  Use your common

1    sense and use your life perspective, the life perspective that

2    each of you brings to your jury service to form a collective

3    judgment about what really happened in this case.  If you do,

4    we are confident you will return a verdict of guilty on all

5    counts.

6         Thank you.

7              THE COURT:  Ladies and gentlemen, do you want to stand

8    up, stretch a bit, and then we'll start with the closing.

9              (Pause in proceedings.)

10             MR. KEKER:  Ready?

11             THE COURT:  Ready.  Okay.

12                          **CLOSING ARGUMENT**

13             MR. KEKER:  I just wanted Mr. Hussain to keep standing

14   up.  What we have as a defendant in this case is a human being,

15   not some construct that's been put together by prosecutors who

16   see the world through dirty windows.

17        The attack that you've heard all morning for more than

18   three hours on Mr. Hussain was an attack.  It used hindsight

19   improperly.  It completely ignored the evidence that they

20   didn't like.  He was just talking about hardware.  Remember,

21   Mr. Hussain said to Andy Gersh, "You know, we sell hardware for

22   the convenience of our customers."  They ignore it and tell you

23   that people are defrauded.

24        They ignore false testimony which has happened in front of

25   you from Egan, from Scott, from Rizek, from Dave Truitt, from

1    Baiocco.  I'm going to go over that in just a second.

2        They ignore -- I mean, he just said somehow in 2008, they

3    went south because they began selling to VARs.  You've seen

4    over and over -- and I'm going to show you this again.  It is

5    completely revenue recognition on the sale to the VAR.  The VAR

6    is the customer.  The reseller is the customer.  That's what

7    they did.

8        This is a company with 25,000 transactions during the

9    period that we're talking about.  If you look at the same

10   charts that we got the 25,000 transactions from, you'll see

11   10,000 of them are through resellers.

12       It ignores -- they completely ignore the fact that the

13   resellers came in here and told you -- Baiocco, Dave Truitt,

14   Steve Truitt, Loomis, that they were on risk.  They understood

15   they were on risk.  They had to pay the money.  That meant that

16   the revenue recognition was proper.

17       They ignore -- just gets up and just blithely tells you

18   that selling things to your customer is wrong and that

19   Mr. Yelland has disallowed all those -- all those sales.

20       Selling things to your customer, according to the evidence

21   that's been presented in this case, is something that has to be

22   analyzed at fair value.  The transactions linked doesn't mean

23   linked in some existential sense.  Linked means that one

24   depends on the other.  So what you have to do is look and see

25   if they each stand on their own two feet, if they make sense on

1    their own two feet.

2         And what they ignore is that that's exactly what Deloitte

3    did over and over and over and over, and I'm going to show you

4    a list of their audit reports, and there's -- I don't know if

5    there's hundreds, but there is probably a hundred work papers

6    where Deloitte -- you can go look at them and see what Deloitte

7    considered when they were deciding whether or not these sales

8    and purchases between FileTek and Autonomy or between MicroTech

9    or DiscoverPoint -- Discover Tech and Autonomy, whether or not

10   they were properly accounted for.

11        So -- and most important of what they ignored, they

12   ignored completely why we're here.  HP -- Hewlett-Packard

13   bought Autonomy, you've heard, because Apotheker had this grand

14   vision.  Are they suggesting -- it wasn't the books and

15   records.  It was the IDOL software.  Are they suggesting that

16   Hewlett-Packard didn't understand what it was buying when it

17   got the IDOL software?  IDOL software was going to combined

18   with Vertica, with its structured capabilities and other HP

19   software, and they were going to make $46 billion out of this

20   little company or $17 billion out this little company.  That's

21   what it's about.

22        They got rid of the visionary, fired him.  The vision went

23   away, and a year later, Hewlett-Packard, with its army of

24   lawyers, consultants, and so on, began working on this case.

25   They produced a restatement that I'll talk about some more, but

1    they produced a restatement that was designed to support their

2    civil case and support this prosecution, and this machine went

3    to work and has supported the Department of Justice in bringing

4    this case against an English citizen who is the CFO of an

5    English company who was applying English rules of accounting,

6    who was audited thoroughly, according to the English rules, by

7    an English accounting firm, and they have brought this almost

8    incomprehensible accounting dispute between Hewlett-Packard and

9    Autonomy into a U.S. courtroom where they're trying to make

10   this English man, Sushovan Hussain, into a criminal, when

11   committing a crime was the farthest thing from his mind when he

12   was working and it was the farthest thing from the people

13   around him.  I'll show you some of that in a minute.

14       Everybody in this case gets a pass, everybody that you

15   have heard about, all the immunized witness, everybody that

16   they mentioned.  There were days sometimes when we didn't even

17   hear his name.  There were lots of other people.  Everybody

18   gets a pass, but he's supposed to become a criminal.

19       And you know why he's here?  Hewlett-Packard wants him

20   convicted.  It's going to help them in the civil case for money

21   damages.  This case belongs in a civil court in London where it

22   already is.

23       And this, what you just went through for three hours,

24   talking fast, flashing stuff across the screen, is assertion,

25   not proof.

1    The evidence, I hope I'm not offending anybody by saying,

2    has been boring, tedious.  I'm tired.  I'm sure you're tired.

3    But now you have to deal with it and thank God for that.

4    You've seen how invested Hewlett-Packard and the Government is

5    in winning this case.  You know what Mr. Hussain and his family

6    have at stake, so it's very important to all of us.  That's why

7    a fair, neutral look at the evidence by people who don't have a

8    stake in the outcome is so important.

9        He greatly appreciates, as do all of his lawyers, the

10   attention that you've paid to it, the fact that you stayed

11   awake, the fact that you've been so punctual, and the fact that

12   you've been such a great jury.

13       He came from England with great faith in the American jury

14   system.  He doesn't have a lot of great faith in the

15   prosecutorial system, but you, the jury, are the only ones that

16   can protect him from a prosecution that is trying to crush him.

17   That's what juries do.  That's why juries have to be counted on

18   to require the Government to prove their case beyond a

19   reasonable doubt.

20       As Mr. Reeves was talking, there were so many -- I sort of

21   rejected the way I was going to do it before.  There were so

22   many times where I wanted to say, "Wait a minute.  Wait a

23   minute."

24       For example, Capax EDD -- let me start where he started.

25   Capax eDiscovery, if you'll remember, Egan came up with this

1    idea and look at what he says.  "I simply recognized the

2    opportunity to do this.  We had been winning a lot of EDD

3    deals.  We had delays in our ability to satisfy contracts.  In

4    my mind, that registered as a rationale for effectively doing

5    another transaction giving more volume and more rights to a

6    partner like Capax that was going to, in the future, be a

7    source of extra capacity in that sense."

8         So they sold them software.  Later on they sold them

9    hardware.  Everybody knew it was going to take them a time to

10   get up and running, but at the same time, everybody knew that

11   they were doing eDiscovery work -- let me see the next slide,

12   Jeff.

13        They were -- you've seen evidence they were doing

14   eDiscovery for all of these people.  They were having -- next

15   slide -- having people trained in Boston.  Joel Scott was

16   talking about people going up to Boston, and the people that

17   were saying that the work was getting done and that these bills

18   ought to be paid included Mike Sullivan, Phil Smolek, who you

19   heard about earlier.  Mike Sullivan says, "We'll Egan told me

20   that it was okay."  But in any event, Andy Kanter -- I mean,

21   all these people seemed to think that EDD work was being done,

22   and it was being done.

23        Next slide.

24        And Mr. Egan lied about it.  He said that he told

25   Mr. Hussain -- you've heard that.  That's supposed to be the

1   side agreement that he's hiding when he reports to Deloitte

2   that there is no side agreement.  He says he told Mr. Hussain,

3   he told Mr. Scott.  He told Mr. Sullivan that they weren't

4   doing any work.

5       You know from the testimony that both Sullivan and Scott

6   say that's nonsense.  That's wrong.

7       And you know that Egan -- this is why I'm saying "wait a

8   minute."  The whole premise is that Mr. Hussain was hiding

9   something from other people that he knew about.  Well, Mr. Egan

10  is sending misleading emails about Capax and about the need --

11  sending it to Phil Smolek and Pete Menell and Mike Sullivan.

12  "We have a large volume of EDD processing at the moment.  Be

13  subbing quite a bit of it" and so on.  You've seen a number of

14  these emails.

15      Next.

16      "Phil, can you" -- this is Mr. Egan -- "process some more

17  EDD work through Capax."

18      These -- I mean, are these people co-conspirators?  This

19  is Egan doing whatever Egan is doing, and I'm not still sure

20  what Egan was doing because we know that Baiocco getting the

21  money was also complaining that he was doing an awful lot of

22  work he wasn't getting paid for.

23      Next slide.

24      And he -- and Egan was saying -- in this case, it's the

25  British Petroleum.

1    "British Petroleum backlog has been causing me a lot of

2    grief in the market."

3        Why is he writing these, quote, pretextual emails to

4    London if London knows what he's up to?  And I'm not sure what

5    he was up to because Sullivan is saying performance issues have

6    had a critical level -- Sullivan is the one who is signing off

7    on this Capax EDD contracts.

8        So if you think the Government has proved something that

9    is clear and certain in this -- well, I leave that to you.

10       Next.

11       Here is what Mr. Hussain is doing.  He is trying from

12   London, three thousand miles away from Boston, to make sure

13   that somebody is monitoring this.  He's -- he is repeatedly

14   asking them this -- like they, I have put exhibit numbers on

15   here -- we have put exhibit numbers, I didn't do it -- on here

16   so that if you're taking notes and you want to go back and try

17   to find, out of these 1300 exhibits that they have put in --

18   that we have put in in this case, if you want to find them,

19   we've got exhibit numbers on them.

20       So Mr. Hussain is asking Kanter, he is asking Egan, he is

21   asking the finance employees to check and make sure that the

22   work is being done, the payments are appropriate.

23       Next.

24       And he's pushing back sometimes.  They says, "Will you

25   sign off on this," and he says "no, I have many questions."

1        And 6115 we just looked at.  He's calling all the time.

2   He's writing to Kanter and Menell re the EDD, "Stouff, please

3   get Andy Kanter and Pete Menell's approval and then they can be

4   processed."

5        Next.

6        And, remember, this is -- at some point somebody says to

7   Joel Scott, "make sure that we've got good records on this."

8   There is an email about that.

9        Here, this one, Philip Smolek and Joel Scott is then,

10  having been asked -- is saying, "Phil, please confirm that you

11  are tracking all expenses with Capax.  Important that we have a

12  closed loop process."

13       Next.

14       And Deloitte is all over it.  They're sending confirmation

15  notices, they're getting confirmation notices back that the

16  money is owed and the money on the EDD licenses is owed.  They

17  determine that the accounting is satisfactory.

18       That's what -- I mean, they present that to you, the Capax

19  EDD, which strikes me as very, very mysterious, lots of people

20  signing off on things and Mr. Hussain being far away from it

21  and accepting the word of people who are saying "yeah, they've

22  done the work."

23       Remember, Mike Sullivan, there is one email that says

24  "yes, the work has been completed."

25       So they're acting like that doesn't exist when they turn

1    and tell you that this side agreement that Egan says he has

2    with Baiocco -- who, by the way, please remember, is an HP

3    valued partner and on the preferred list and is a big pal of HP

4    where he has made millions of dollars through this eDiscovery

5    work.

6        But in any event, they act like it's perfectly obvious

7    that Mr. Hussain is hiding some side agreement because Stouffer

8    Egan tells you there is a side agreement.  And we don't see the

9    evidence the same way.

10       Let me take another example.  Prisa.  Can we see -- yeah.

11   All right.  Prisa is in 2011, and, remember, Dave Truitt

12   testified that Prisa might have been part of the slate of deals

13   that was discussed in the quarter.  That was FINRA, ThinkTech,

14   and he thought Prisa might have been.

15       You know Egan cared about -- Egan had sales targets.  Egan

16   had bonuses.  This is at a time when Egan is fighting like mad

17   to get a big bonus and eventually gets $460,000.

18       This is the one where Hyson sends a backdated purchase

19   order to Egan's personal email address.  Dave Truitt testified

20   that Scott prepared the purchase order, but Scott says there

21   was no backdating.

22       Discover Tech confirmed this debt to Deloitte.

23       Next.

24       And before we get to that, before we get to this meeting,

25   so what happened was Egan arranged a backdated contract with --

1  for Prisa.  He asked Truitt to do it.  Truitt said he would do
2  it.  They figured out the backdating so that Egan -- so that
3  Egan wouldn't put a timestamp on it, and all of that sort of
4  worked, and the contract ends up being dated in the previous
5  quarter.
6      Now, the issue is what does he know about it?  I mean,
7  this is Egan meeting his targets, caring about his bonus and so
8  on.  So Egan, who has testified five -- not testified, but
9  talked five times to HP lawyers -- you know about that where he
10  calls Mr. Hussain very ethical, and then he's talked at least
11  five times to the prosecutors, all of a sudden he remembers
12  that, "oh, Hussain told me to do it."  This is one month after
13  Truitt, Dave Truitt, tells the prosecutors that Egan asked him
14  to backdate the Prisa contract.  Okay.  And you also know that
15  their lawyers -- I'm talking too loud and putting people to
16  sleep, I'm afraid.  It's a tough time.  Tough time in the day
17  to be talking about this.
18      But in any event, back to Prisa.  So Truitt tells the
19  prosecutors that Egan asked him to backdate.  Egan's lawyers
20  and Truitt's lawyers are talking to each other.  That's what
21  Truitt said.  They're going back and forth.  Egan then all of a
22  sudden after ten interviews remembers he was involved in
23  backdating the Prisa deal and says Sushovan Hussain told him to
24  do it.  We say that's not proof of anything.  You can't believe
25  it.

1    And then what they say, Egan and Truitt say, "oh, well, we

2    talked about it two weeks later on April 14th when there was a

3    meeting."  In fact, that meeting was a sales meeting.  And look

4    at Exhibit 1769.  This is what Truitt, who's trying to sell his

5    software to Mr. Hussain, writes after this meeting.  You can't

6    read this and believe that Dave Truitt came in and upbraided

7    Mr. Hussain about something Mr. Hussain had done or whatever.

8    This conversation just doesn't make a bit of sense when you

9    read him -- his sales pitch here.

10    And what was Egan thinking on April 14?

11    Next one.

12    Egan is worried about his bonus, and he is pushing

13    Mr. Hussain, whom he is counting on, to get his bonus in this

14    Exhibit 6146.  So look at those two things and say to yourself,

15    just as people, are these emails that are written that day to

16    Mr. Hussain consistent with this idea that Egan and Truitt went

17    in and said "Oh, we don't like backdating.  You shouldn't

18    backdate" and all that business.  Our position is it didn't

19    happen, Mr. Hussain didn't even know about it.

20    I want to remind you about Stouffer Egan because he didn't

21    play much of an part in what you've been hearing for three

22    hours.  He was the CEO of the Americas.  He was operating

23    fairly autonomously.  When they talk about all these reseller

24    deals, remember, he's the guy that's saying it's "99 percent

25    done," "it's very close to closing," "you got to take it,"

1   "you're going to get paid" and all the resellers that are his

2   friends and that he had the relationship with said they

3   wouldn't have done these -- these deals if he didn't assure

4   them that they were going to happen.

5       Joel Scott reported to him.  Joel Scott did the paperwork

6   for him, including the backdating paperwork.  He, as I said,

7   sold the deals, told them that they were on risk.  He was

8   clearly motivated by meeting his targets, by getting money, and

9   so on.

10      After the acquisition, Mr.-- Dr. Lynch was fired eight

11  months later in May.  Mr. Hussain left HP around that time.

12  Egan remained.  When he was first interviewed by the

13  Hewlett-Packard lawyers, he was still an employee, but he was

14  on his way out the door.  He said very nice things about

15  Mr. Hussain, as you'll recall, and I'm going to show you some

16  of those.

17      But then later, the Hewlett-Packard lawyers and the

18  Government put tremendous pressure on him.  It was "you or" --

19  well, put tremendous pressure on him.  He began cooperating

20  with the Government in order to help Hewlett-Packard.  The

21  threat of criminal proceedings was hanging over his head.  It

22  remained hanging over his head through the 21 interviews that

23  he had.  And that's why he did things like remember when he'd

24  done something wrong, he remembered well a good way to deal

25  with that was to say, "Well, Mr. Hussain told me to do it."

1    There is not an ounce of proof that Mr. Hussain was involved in

2    any Prisa backdating, except Egan's testimony.  And he is a

3    thoroughly corrupted witness.  By the end of the ordeal, he

4    would say what they -- what he thought they wanted to hear.

5         Okay.  Let's talk about what Mr. Reeves told you was the

6    most corrupt deal, the one involving the Bank of America and

7    Discover Tech.

8         What Egan said about this -- this is the one where there

9    was -- $19.5 million Vatican transaction.  The idea behind it

10   was that it was going to close in the last quarter of 2010.

11   When it didn't close, they broke it up, again because of the

12   collectibility issue.  Part of it went to Discover Tech.  Part

13   of it went to Capax.  We contend completely legally.

14        The Capax piece was $9 million.  The -- the Discover Tech

15   piece was supposed to be $10.5 million.  Mr. Egan testified

16   that when they were doing this paperwork in late January, he

17   was amending the contract, the same -- the same contract, the

18   same software.  The only thing that changed was the number of

19   users.  It went from 25,000 to unlimited.

20        Mr. Egan testified that Mr. Hussain thought the

21   modification to the number of users was a valid amendment of

22   the Q4/2010 deal.  He testified that for amendments, backdating

23   happens a lot in the sales industry.  That's fine.  He thought

24   it was perfectly legal.  Whether or not it was, Mr. Hussain

25   thought the same thing that Mr. Egan did.

1         Let's talk about the 2.3.  This is one of my favorites.

2         Slide 111, Jeff.

3         This MicroLink/Discover Tech transaction I think you'll

4    remember because Dave Truitt -- we had some fun with Dave

5    Truitt about it and other witnesses.  This is the one where in

6    connection with the MicroLink acquisition, Dave Truitt said,

7    "Okay, I'll agree to a different price if I can take out my

8    control point" -- excuse me -- "my DiscoverPoint software that

9    I've been developing in MicroLink and put it into a new company

10   called Discover Tech, and I'm going to start this new company,

11   but I need IDOL software to work with DiscoverPoint so that

12   I'll have something to sell."  And so the agreement was "I'll

13   buy $10 million worth of -- of software in order to start my

14   new company."

15        Autonomy, because they were trying to follow the rules

16   about collectibility, said, "Well, we can't sell it to you

17   because you don't have any kind of track record, but we could

18   sell it to MicroTech if you can get MicroTech to buy it and

19   then resell it to you," and so they said, "Fine, we'll use

20   MicroTech," and MicroTech agreed to the transaction for a

21   price.

22        And what they got at the end was -- and you'll remember

23   some of the emails -- Joel Scott saying, "This is the best I

24   can do."  They got -- they didn't get full-blown IDOL.  He

25   didn't get his profiling software, and he was mad.  And he

1    really needed his profiling software because it was very, very

2    important to him -- to the future of the company.

3         So he -- he came up basically with a scheme.  He talked to

4    Egan.  Egan tells Mr. Hussain that there is another deal.  He's

5    talking to him.  490 shows he was talking to him, the phone

6    records.  So there was a lot of back and forth and eventually

7    it led to Cronin backdating some paperwork and coming up with

8    this -- all of this paperwork for the purchase of the

9    $2.3 million.

10        Truitt says he has no idea about it, he doesn't know where

11   it came from, he's not involved.  What is this?  And then we

12   showed him the purchase order that came from his own files and

13   we showed him that the profiling was delivered to Discover Tech

14   and by -- by MicroLink.  MicroLink buys it from Autonomy, sells

15   it to Discover Tech.  This is right before the merger.

16        And then Rizek gets into the action.  He confirms that

17   debt.  He says -- he tells Autonomy that the deal will close

18   after the acquisition happens.  He sort of hides behind this

19   firewall between the two companies.  Then he says that, "Oh,

20   the deal with Discover Tech is not going to close," and so they

21   write it off, but in the meantime, they have sold -- MicroLink

22   has sold the $2.3 million of software that is bought from

23   Autonomy to Discover Tech for $1,000 per instance.  So

24   basically they ripped off Autonomy.

25        They then created a phony trail about it for their own

1    auditors, the "build versus buy" memo which is there at 5575.

2    Cronin comes up with a phony agreement about it and Dave Truitt

3    lies to his accountants about it.  Again, Sushovan Hussain had

4    nothing to do with that except be informed by Egan and Rizek

5    that there was another deal for 2.3 that had been done in the

6    quarter.

7         The next one I want to talk about to juxtapose from what

8    you just heard is Vatican.  The Vatican, the claim was it was

9    backdated.  Steve Truitt testified otherwise.  He said he

10   understood -- this is the one, remember -- Dave Truitt came in

11   and said, "I'm lying on the beach in West Palm Beach.  It's

12   after the quarter ended.  It's April 1st.  I get a call and

13   it's Egan who says, 'we want you to take a deal for the

14   Vatican,' and I then call my brother Steve and he went back to

15   Tony Jimenez, who runs MicroTech, and back and forth and this

16   is the first time that anybody heard about us taking the

17   Vatican deal."  Wrong.  And even Egan doesn't say that

18   happened.

19        Brother Steve says he had heard about the Vatican deal.

20   Cronin had been working on it for quite a while.  They were

21   working on it the end of the quarter.  He was very excited

22   because it would be a chance for MicroTech to do services --

23   that's another thing they left out.  All of these resellers

24   were hoping for services contracts and a way to grow their

25   company by getting a connection with the people that they hoped

 1    would be the end user.  That was one of the motivations.  So he

 2    was very excited about potential services that would go on, and

 3    he expressed a willingness to do the deal to Cronin.

 4        They reached an agreement in principle.  Cronin had the

 5    power to bind MicroTech, and Steve Truitt thought that the

 6    agreement had been made timely in the quarter.

 7        Next slide.

 8        And I already said -- I mean, nobody agrees with Dave

 9    Truitt's story about backdating.  The only thing that is true

10    is that the paperwork was signed the next day, but, again, this

11    is not -- this is happening in the United States.  This is not

12    Mr. Hussain's -- within his knowledge.  These are things going

13    on between Egan and the people that he is working with.

14        Egan in this case testified that he had no recollection of

15    speaking to Dave Truitt after the end of the quarter.  He

16    denied any backdating here.

17        So, I mean, those are just some examples of what I thought

18    when I was listening and wanted to say wait a minute, there's a

19    lot more to the story than this simple flashing of slides

20    across the screen and argument by assertion.

21        This case is sort of a monster.  It's impossible to sum

22    up.  There are 1300 exhibits, I've already told you.  There

23    have been 37 witnesses, each of them or most of them with

24    various motivations to help Hewlett-Packard or themselves.

25        We could have had a trial on every one of these

1  transactions.  That way maybe I'd understand them and it would

2  be a lot easier for you to understand them.  We've just been

3  throwing transactions past you.

4      The Government has chosen to do that without kind of

5  admitting and dealing with the fact that these are transactions

6  that Deloitte, the auditors in England, studied and spent time

7  on.  They constantly used the word "oh, this is misleading" or

8  they didn't tell Deloitte something.

9      Well, there are work papers that are in the case that show

10  exactly what Deloitte knew about the transaction, how they

11  evaluated it.  One example will be you'll see the FileTek

12  transactions.  They knew that FileTek was selling and buying in

13  near-time and they evaluated them, both sides of the

14  transaction, for fair value and decided it was properly

15  accounted for.  Mr. Hussain relied on that.

16      Instead, the Government has chosen to rely on a man named

17  Yelland who the HP machine fed -- after the announcement of the

18  "oh, we've been defrauded" a year later, they fed transactions

19  to him, and Mr. Yelland, what a surprise, came up with a

20  different conclusion from Deloitte.  He said "these should have

21  been accounted for a different way" or "I don't like the" -- "I

22  don't like the accounting, so therefore I'm going to take them

23  out," and that's what they've been using to put these big

24  numbers up in front of you.  They've been using

25  Hewlett-Packard's Yelland who has been working with

 1    Hewlett-Packard's lawyers and accountants and people that are

 2    doing their civil case to come up with those numbers.

 3         And with all of this conflicting -- a combination of

 4    conflicting evidence and dueling accountants, you can't

 5    possibly decide which accountant is right and you can't decide

 6    based on, quote, common sense -- "common sense" is a term

 7    that -- I mean, I love common sense.  Everybody loves common

 8    sense, but common sense is also a trap.  When somebody starts

 9    talking about common sense, they are often trying to cover up a

10    hole in the evidence.  It's like saying clearly "of course" and

11    just acting like there is nothing to talk to about, and I told

12    you don't fall for that.

13         Deloitte was trying to get the accounting right at the

14    time it was being done and Yelland and the people working with

15    him was trying to prove it wrong for the HP machine's own

16    purposes.

17         I know you are sick --

18              THE COURT:  Well, shall we take a recess now for 10

19    minutes?

20              MR. KEKER:  Sure.

21              THE COURT:  Ladies and gentlemen, we are going to

22    recess for 10 minutes.  Remember the admonition:  Don't discuss

23    the case, allow anyone to discuss it with you, form or express

24    any opinion.  Go ahead.

25         (Proceedings were heard out of presence of the jury:)

1          THE COURT:  The jury has --

2          MR. FRENTZEN:  May I just ask one quick question,

3    Your Honor?  I've never seen these --

4          THE COURT:  What?

5          MR. FRENTZEN:  Exhibits turned into something else

6    that are not the exhibits.

7          THE COURT:  I don't know what that means.

8          MR. FRENTZEN:  So the things that we've been seeing on

9    the screen, like emails and stuff, are not the emails.  They're

10   put in a different form.

11       I just want to know if there are redactions in the email,

12   is that noted in the email?  I'm trying to keep up with what it

13   actually says and what is being shown and represented to be

14   that exhibit.  But if there is holes in them, I think we ought

15   to know that.

16         THE COURT:  Well, Mr. President, do your best.

17       Well, I -- look, look, this is argument.  I don't know --

18         MR. FRENTZEN:  Okay.

19         THE COURT:  I think a lawyer -- I mean, I don't think

20   he is showing -- I don't know.  Is he showing something that is

21   not in evidence?  I don't know.

22       No.  Okay.

23       So any way he wants to slice and dice it is a matter of

24   advocacy.  That's just the way it is.  And we're all very --

25   you know, you'll be able to handle it because if you have one

 1  example or two examples -- or one is enough -- you can make it

 2  in your closing, your rebuttal.

 3          MR. FRENTZEN:  I'll deal with it in my own way.

 4          MR. KEKER:  Your Honor, Mr. Reeves went quite a while,

 5  more than three hours, I think, and that leaves me in something

 6  of a bind --

 7          THE COURT:  What would you like to do?

 8          MR. KEKER:  What I would like to do is stop at 4:00

 9  and pick up and finish my time tomorrow since the Government

10  will have much less than an hour and a half to go.

11          THE COURT:  Here is the thing.  I mean, I think you

12  are at a disadvantage talking to them after five hours --

13          MR. KEKER:  Three of them are having trouble staying

14  awake.

15          THE COURT:  That may have been true during the trial

16  as well.  Not that it's not fascinating, but let's try to

17  figure out a fair way to do it.  I don't want you to have to

18  talk your way into exhaustion.  This is an important part of

19  the case, a very important part of the case.

20      I don't know where you are in your argument.  Give me an

21  idea.

22          MR. KEKER:  I'm just at the beginning.  I've talked

23  about a half an hour.  By the end of today, I will have talked

24  an hour and a half.  And so what I would request is at least

25  two hours tomorrow, not an hour and a half.

1      **THE COURT:**  I'll give you two hours tomorrow and I'm

2   going to give the Government 45 minutes tomorrow because I

3   think we're in a different balance.

4      Can you do it in 45 minutes?  Actually, you are only

5   entitled to 22 minutes on my calculation, but I'll give you 45

6   minutes.  I want it to be fair on both sides.

7      And, by the way, nobody is being unfair.  I don't want

8   to -- by saying "fair," it's not to correct an unfairness.

9   It's just correcting -- there is a tremendous amount of

10  material for the Government to cover in their opening.  And

11  especially, in fairness to the Government, your argument was

12  before the argument "look, if they don't mention it, I don't

13  want to greet it for the first time," so I think that the

14  Government, out of abundance of caution, wanted to put in as

15  much as they could.  Great.  Okay.

16     So I'll give you two hours, I'll give you 45 minutes, if

17  you can do it in 45 minutes.

18     **MR. FRENTZEN:**  I will take whatever the Court can give

19  me and I can do something in the amount of time you give me.

20     **THE COURT:**  You know, after some point people stop

21  listening.  I think 45 minutes is an effective rebuttal.

22     Mr. Keker, you quit whenever you want today.

23     **MR. KEKER:**  4:00, Your Honor.

24     **THE COURT:**  Well, it's up to you.  I leave it up to

25  you.  You're making an argument, so I don't want you to look at

1  the clock and say, "It's 4:00.  I'll finish the sentence

2  tomorrow morning."

3          **MR. KEKER:**  Sure.

4          **THE COURT:**  Just do it.  I'm going to give you two

5  hours, no matter what you use today.

6          **MR. KEKER:**  Good.  Thank you.

7          **THE COURT:**  Okay.  All right.

8                    (Recess taken at 2:58 p.m.)

9                  (Proceedings resumed at 3:11 p.m.)

10      (Proceedings were heard in the presence of the jury:)

11          **THE COURT:**  Please be seated.

12          **MR. KEKER:**  May I proceed, Your Honor?

13          **THE COURT:**  Yes, please do.

14      Let the record reflect all parties are present.

15          **MR. KEKER:**  Going down the stretch.  I'm going to stop

16  around 4:00 o'clock.

17      One thing you know from this evidence, and that is there's

18  a huge amount of evidence -- e-mails, conversations between

19  people -- about Mr. Hussain trying very hard to follow the IFRS

20  revenue recognition standards that Autonomy was bound by.  He

21  was the one who had Deloitte come into the office and spend the

22  first week or 10 days at the end of the quarter going over the

23  transactions, any transaction of substance.

24      He was the one who caused his finance team to work closely

25  with the Deloitte auditors -- it wasn't just him; it was the

1    whole finance team -- and received their blessing for the

2    financial statements and the revenue recognition.

3         He was the one that the independent Audit Committee of the

4    Board of Directors had access -- made sure that they had access

5    to Deloitte as well as management so that they could make the

6    accounting right.

7         The Government has spent a lot of time talking about

8    Mr. Hussain caring about sales targets, analyst expectations

9    and so on.  That's what a chief financial officer is supposed

10   to do and has to do.  That's why he was the London Stock

11   Exchange FTSE CFO of the year in 2010.

12        Even Mr. Egan, who was trying to throw Sushovan under the

13   bus to save his own skin, got it right in his testimony.

14   You'll recall (reading):

15        "Q.  Okay.  You said yesterday several times that

16        Mr. Hussain -- you thought of him as ethical?

17        "A.  Correct.

18        "Q.  And you've said you thought of him as highly ethical?

19        "A.  Correct.

20        "Q.  What did you mean by that?

21        "A.  It sure looked like it to me, yes."

22        I think maybe Mr. Egan had some psychological thing going

23   on where he felt bad about what he was doing, and -- anyway.

24   (reading)

25        "Q.  Did he make sure at Autonomy that the revenue

1    recognition was done right?

2    "A.  I thought so, yes."

3    Next.  (reading)

4    "Q.  Okay.  And one of the things that he insisted on was

5    that the reseller understand that they were on risk, there

6    was no return, no cancellation, no side agreements; right?

7    "A.  That's correct.

8    "Q.  It was a firing offense to not follow that rule;

9    right?

10   "A.  That's correct.

11   "Q.  And another thing he insisted on was analyzing the

12   collectibility, which you told us is the probability that

13   the reseller is going to be able to pay you; and he was a

14   stickler on that, wasn't he?

15   "A.  He was.

16   "Q.  All right.  And sometimes he'd have Mr. Chamberlain

17   or Mr. Chamberlain would on his own ask for information to

18   assure the collectibility part of the equation for revenue

19   recognition?

20   "A.  That is correct.

21   "Q.  All right.  And sometimes a reseller deal would have

22   to be downsized because it would -- if it were bigger, the

23   collectibility issue would raise its ugly head?

24   "A.  Absolutely."

25   Next one.  (reading)

1      "Q.  Mr. Hussain emphasized the payment terms had to be

2      fixed and the contract had to be signed before the end of

3      the quarter?

4      "A.  Correct.

5      "Q.  He was -- those were the rules.  He wanted everybody

6      to play by them; right?

7      "A.  Correct."

8      And then finally (reading):

9      "Q.  Did he say that what you needed to do was to show

10     fair value for what you're selling or buying?

11     "A.  He made that very clear."

12     And he was backed up by this by dozens of other people in

13     the Finance Department, at Deloitte, on the Audit Committee.

14     It's interesting and revealing that in a case where the

15     Government prosecutors have gone all over the world to

16     interview people, they've collected millions of documents,

17     they've gotten all this assistance from Hewlett Packard,

18     there's thousands and thousands of e-mails, there's not one

19     e-mail that shows Mr. Hussain saying, "I want to do" -- I mean,

20     or saying that, "Let's do something illegal," or that "I intend

21     to violate the law."  There are plenty showing otherwise.

22     Most of the e-mail traffic shows scrupulous attention to

23     the revenue recognition criteria, making sure that the risks

24     and rewards pass with a final deal before the end of the

25     quarter, making sure the collectibility was probable.  That's

 1    all it is.  It doesn't have to be certain.  Probable at the

 2    time of the sale.  Making sure that delivery has occurred.

 3         Not only did he think he was following the IFRS rules of

 4    revenue recognition, everybody around him did too.  Deloitte

 5    studied the accounting every single quarter.  They signed off

 6    satisfactory.  Virtually every witness told you that they

 7    thought what they were doing wasn't illegal or a crime.

 8         Can we see Slide 6?

 9         No.  Slide 6.  6 through 11, Jeff.  There you go.

10    Mike Sullivan on the hardware sales says (reading):

11    "Q.  Is there anything wrong with it?"

12    He says (reading):

13         "I don't know why you would do it any other way."

14    Next.

15    Mr. Baiocco (reading):

16    "Q.  You've said back there when you were doing these

17    things, doing these deals, you didn't think you were doing

18    anything wrong back then.  Is that true?

19    "A.  Uh-huh," says Mr. Baiocco.

20    Steve Truitt (reading):

21    "Q.  When you were doing this, did you think you were

22    doing something wrong?

23    "A.  No.

24    "Q.  Did you think you were committing a crime?

25    "A.  I did not."

1          Steve Truitt is the MicroTech guy who did all those

2    reseller deals for MicroTech.

3          Scott, who's the general counsel and later the COO and did

4    most of the paperwork (reading):

5          "Q.  You didn't want to do anything illegal?

6          "A.  Correct.

7          "Q.  And you made sure that you didn't do anything illegal

8          after that?

9          "A.  I did the best I could consistently from the day I

10         was at Autonomy till the day I left."

11         And I don't know how -- oh, Egan.  Excuse me.  Egan

12    (reading):

13         "Q.  Did you think that you were committing a crime in

14         working with resellers or selling as you were doing?

15         "A.  I didn't think of it that way, no."

16         Egan, you'll recall, said that the only thing that he

17    thought he did that was a crime was Prisa and that Prisa crime

18    is what led him into implicating Mr. Hussain as we've

19    discussed.  (reading)

20         "Q.  You thought that the sales through resellers were

21         perfectly legal?

22         "A.  I did think that.

23         "Q.  And you thought that hardware sales were perfectly

24         legal?

25         "A.  I did think that.

1      "Q.  You thought that the goal of getting more revenue in

2      a quarter was completely proper and common?

3      "A.  To have the goal, of course, yeah.

4      "Q.  You thought that the -- this idea of selling to

5      people who were also your customers was perfectly legal?

6      "A.  I did.

7      "Q.  Did you think there was anything wrong with giving

8      Capax a retainer to get their platform up and running?

9      "A.  At the time I did not."

10     Remember, what they did with Capax is they gave them some

11     money.  Later on they helped them buy hardware, and the

12     expectation was that they would be there for overcapacity as

13     things like the British Petroleum case came along.

14     They were paying them for work that everybody except Egan

15     thought was happening.  It was -- there was eDiscovery work

16     going on like mad, they were a major partner, and eventually

17     Capax got rich in the Hewlett Packard days doing eDiscovery

18     work.

19     Okay.  The IFRS, I don't think we need to go through this.

20     So the annual report says they followed IFRS.

21     The earnings releases -- we don't need to put them up,

22     Jeff.

23     The annual report that Mr. Apotheker says he reviewed, the

24     website, let's put up Slide 15.

25     This is what they're telling people on their website is

 1    the criteria.  That's IFRS criteria:  Persuasive evidence of an

 2    arrangement, delivery has occurred, the vendor's fee is fixed,

 3    collectibility is probable.  Nothing to do with the end user.

 4         Their contracts make absolutely plain "We don't -- if you

 5    don't sell through to an end user, you're still on the hook."

 6    That's what all the resellers testified.

 7         You've heard allusions to this SOP 97-2, which is in

 8    evidence.  Under that standard, the revenue recognition

 9    criteria are the same as IFRS.  Let's look at that.

10         On the left is IFRS and it's got the five items that I

11    showed you in the opening statement.  And under this portion of

12    GAAP -- there's more to GAAP than this -- but SOP 97-2 has the

13    four items:  Persuasive evidence, delivery, vendor's fee is

14    fixed, and collectibility is probable as the proper way to

15    recognize revenue on a sale to, among other things, a reseller.

16         And these are the criteria that Autonomy, Mr. Scott in

17    particular -- let's look at the next one -- taught the staff.

18    And he says, "Historically" -- remember, this was part of the

19    sales presentation -- not sales presentation but training

20    material to the salespeople -- "U.S. GAAP, now IFRS, is what

21    governs us."

22         The four elements are the ones that you've seen 15 times

23    already.

24         And what do you need to establish it for purposes of

25    making this right?  You need a contract, proof of delivery,

1    proof we'll get paid, PO -- purchase order is generally not

2    required so if one comes in later, that's okay.  An oral

3    agreement is all right as long as it is a fixed deal.

4    Ms. Anderson testified to that.  Others testified to that.

5         And indirect agreement would be the VAR agreement, the VAR

6    PO, proof we'll get paid.

7         Evidence of sell-through to an end user is not required.

8    No revenue recognition.  No commission.  That's what they

9    taught.

10        And the revenue recognition is determined at the time of

11   the sale.  That's what the problem with this hindsight is.

12   They're going way into the future and then coming back and

13   saying, "Oh, you shouldn't have recognized that sale to a

14   reseller because of something that happened six months, eight

15   months, ten months later because you entered into a deal with

16   the reseller and you bought something from them," which I would

17   argue you needed and that the accounting shows that you needed,

18   "and then they used some of that money to pay back for a deal

19   that they had done before."

20        That's not the way you're supposed to look at it in

21   accounting.  You're supposed to look at it at the time the deal

22   is made in the quarter can you recognize revenue in the

23   quarter.

24        Mr. Welham made that plain.  The relevant agreement for

25   revenue recognition purposes is the agreement with the

1    reseller.  As long as the five criteria of IAS 18 are met, the

2    revenue can be recognized at the time.  As long as the criteria

3    are met, there's no reason to consider the commercial rationale

4    or substance of any onward sale by the reseller.

5         So if somebody says, "Yes, I own it, I will pay for it,

6    I'm stuck with it no matter what happens," you can recognize

7    the sale.  You don't have to worry about what happens

8    eventually with the reseller.

9         And he says it's okay if the purpose for the sale to the

10   reseller is to get revenue in that period, which Deloitte knew

11   perfectly well was happening.  You've seen evidence that it was

12   happening.  They wanted to get a sale in the quarter.  They did

13   it through a -- to a reseller.

14        It is sell-in, not sell-through.

15        Next slide.

16        And Matt Stephan testified that (reading):

17        "Q.  Under IFRS rules, Autonomy can recognize revenue

18        based on the sale to a reseller without a requirement that

19        there is a sale on to the end user?

20        "A.  Correct."

21        And then U.S. GAAP, not SOP 97-2 but another part, has a

22   different rule where if you're operating in the U.S. -- and

23   this is what got confused when Hewlett Packard bought them --

24   there you have to have a sale to the end user under U.S. GAAP

25   to be able to recognize the revenue.

1    There can't be a dispute that the rules were followed in

2    connection with almost all of these sales to resellers.  I'm

3    not talking about the backdated ones, which I just mentioned,

4    but virtually all of them.

5        The resellers at Capax, MicroTech, MicroLink, FileTek all

6    testified that they understood they were on risk.  Let's look

7    at that.

8        Mr. Baiocco said he understood that he was on the hook for

9    the deal, as Mr. Baiocco put it.  He's Mr. Eyes of the Law if

10   you'll remember.  When you ask him a question, he goes, "Well,

11   in the eyes of the law."  But he was on the hook for the deal

12   in the eyes of the law.

13       Mr. Loomis, he understood that in this FileTek/VA reseller

14   arrangement, FileTek was -- the full risk was with FileTek.  If

15   it didn't close with the VA, which it didn't, FileTek still

16   owed the money and had to figure out a way to pay back

17   Autonomy, which they did.

18       Next.

19       Steve Truitt of MicroTech, the reason that they were

20   concerned, he got upset because these deals weren't closing and

21   they didn't work out very well for him, his brother had done

22   very well at MicroLink with reseller deals.  He wasn't doing so

23   well at MicroTech.  And the reason he was concerned and felt

24   agitated was that he knew he was on the hook for the money.

25   MicroTech owed the money.

1      And then finally Dave Truitt at Discover Tech understood

2   that when he did these reseller transactions, when he bought

3   software from Autonomy, he was at risk; and it means if the

4   deal doesn't happen, we still have to pay for the software that

5   we've agreed to purchase.

6      And they all testified that they could pay.  This is the

7   probability, collectibility piece.

8      Truitt, Steve Truitt of MicroTech, they had a $10 million

9   line of credit.  It might have been higher later.  (reading)

10      "Q.  Okay.  But at least a 10 million line of credit with

11      the bank to pay debts if you need to?

12      "A.  Yes.  At some point in time it was 10 million."

13      Dave Truitt who had gotten $55 million from the sale of

14   MicroLink to Autonomy, he had plenty of money to fund his

15   business and did.  When he needed to put up down payments, he

16   and his fellow owner Wharton would put their open money into

17   the business.  He could fund Discover Tech and pay its debts to

18   the extent that was necessary.

19      Next.

20      Baiocco thought that he had a bunch of partners, remember,

21   up in Buffalo, and he had a line of credit.  He said it would

22   have been painful to pay but he could pay for it.

23      And then Joel Scott, we asked (reading):

24      "Q.  Did any of the resellers express to you that they

25      couldn't afford to pay some of the balances that they had

1          on their account?"

2          And he didn't remember anybody specifically saying that.

3     So the resellers all testified that they were at risk and they

4     all testified that they could pay.

5          And you've seen a lot of e-mail establish about delivery,

6     checking delivery.  It shows great attention by Mr. Chamberlain

7     and his finance team working with him about collectibility:

8     Can you send us some financial statements?  Can you send us

9     information about your company?

10         For example, and I've mentioned this already, when

11    Discover Tech was spun out from MicroLink, it needed that

12    $10 million but Autonomy wasn't about to sell Discover Tech a

13    brand new company $10 million worth of software because

14    Discover Tech didn't have a track record of being able to pay

15    or anything else.

16         So the deal was done through MicroTech.  MicroTech and

17    Discover Tech made a deal so that MicroTech got money for it,

18    but MicroTech met the collectibility requirement and

19    Discover Tech didn't.

20         The PMI/Citi transactions with Discover Tech, which you've

21    heard about, required large down payments of 1 million each.

22    The reason for these large down payments is to establish

23    collectibility, "Look, so and so has put down a million dollars

24    in advance and here's their credit history and they can pay."

25    All of that scrupulous attention was paid to establishing that

1    they could pay and collect.

2        The Kraft transaction, which you've heard about, Autonomy

3    required a $400,000 down payment.

4        And then, as I said, the sales were followed every

5    quarter, careful scrutiny by the auditors.  Their team was

6    huge.  The Government has chosen to bring in some junior

7    members of the team, but let's look at the size of the team.

8        You saw this before.  It's Exhibit 6425.  There were

9    senior partners, there were specialists, there were people

10    who -- technical people who got demonstrations made to them.

11    It's a big team, and the Government for whatever their reason,

12    has chosen to bring in a couple of junior members.

13        Deloitte audited each sale that was over $1 million.  It

14    sampled the others.  I've mentioned already that this is a

15    company with 25,000 transactions during this period, 10,000 of

16    them through resellers.  Deloitte was all over it.  Anything

17    over 1 million, they looked at closely.  Anything under

18    1 million, they sampled.

19        If you have questions about Deloitte's scrutiny or whether

20    or not they had a thorough understanding of these transactions,

21    particularly the ones where the Government says, "Oh, we

22    didn't -- they didn't understand -- they're reciprocal

23    transactions or *quid pro quo*," Deloitte understood that both

24    sides of those transactions were going on at the same time and

25    they analyzed them separately for fair value.

1       And the way you find that is looking at the Audit

2  Committee reports, Slide 184, which this is just a list of

3  them.

4       And then the audit work papers are like 100 of them; and

5  I'm sure if you decide you want to look at the audit work

6  papers and you ask the judge if there's some way that they can

7  be organized better for you, that we can probably -- he would

8  probably let you do that, but we'll see.

9       Now, you've heard from some witnesses, they've been cited,

10  who didn't like these reseller deals -- Antonia Anderson, Matt

11  Stephan, according to him, Joel Scott -- but not one of them

12  said that they thought they were illegal or that the accounting

13  was improper.  And, in fact, they did them.  Remember, Joel

14  Scott did 15 reseller deals after saying how uncomfortable he

15  was because of Mr. Hogenson's allegations.

16       And let me talk a second about Mr. Hogenson.  Mr. Hogenson

17  was a whistleblower.  He wrote to Dr. Lynch and said, "Hey,

18  what about Capax?  What about sales of hardware?  What about

19  whatever he said?"  You've got the exhibit and you can read it.

20  And Deloitte ended up analyzing it and writing a response to

21  it, which you can also read, and they concluded that this guy

22  doesn't know what he's talking about.

23       Now, the fact that he ended up getting fired because his

24  payroll fraud in his office and lots of problems in his office

25  we think is separate; but whether or not it's separate, it

 1  doesn't answer the question of whether or not what Mr. Hogenson

 2  was complaining about and sending letters to regulators about

 3  was right or wrong.

 4       The answer to that question is in the files.  You can find

 5  the response to Mr. Hogenson.  You can find his complaint.  You

 6  can find the response to it, and you can decide for yourself if

 7  he had found anything that had merit.

 8       And then remember that the Deloitte folks when they were

 9  talking to Hewlett Packard due diligence people right before

10  the acquisition told them about Mr. Hogenson, told them that

11  Mr. Hogenson had made this complaint, that there was a report;

12  and nobody, not Deloitte, not Hewlett Packard, KPMG auditors,

13  seemed to be concerned about it.

14       It was disclosed to HP and if HP was concerned about it,

15  they could have done something.  Nobody seemed to think that

16  his complaint about recognizing revenues in reseller

17  transactions was correct.

18       From Mr. Hussain's vantage point, he's over in England,

19  he's receiving signed contracts, he's receiving proof of

20  delivery -- to the extent he looks at it, but his department

21  is -- his team is analyzing collectibility, and he also knows

22  that all this information is put together in a packet and given

23  to Deloitte and the Deloitte auditors who were sitting in his

24  office say, "This is proper revenue recognition."

25       Again, from his point of view, he doesn't read them I

1    suppose, but he knows that all of the people who are on risk

2    are signing confirmation letters and saying, "There's no

3    exceptions.  There's no side letters.  Everything's fine."

4        So what are they saying Mr. Hussain did wrong?  They're

5    basically asserting that the resellers, as I understand it --

6    and this is Mr. Yelland too -- weren't really on risk, which

7    is -- and they're also saying there's something wrong with

8    continuing to negotiate with the end user after the sale to a

9    reseller.  But there isn't anything wrong with that, and

10   Deloitte knew about it.

11       Can we see Slide 168?

12       Here's the Vatican.  This is a Deloitte work paper,

13   Exhibit 1290, where somebody's written in (reading):

14           "MicroTech - medieval library deal.  Still ongoing.

15       Something meeting with MRL" -- that's Mike Lynch's

16       initials -- SH and V."  I don't know who V is.  "Nothing

17       signed that we something MicroTech gets paid."

18       In short, this is a recognition that -- and Ms. Anderson

19   testified the same way -- that Deloitte fully understood that

20   there was further transaction with the potential end user who

21   in this case both MicroTech and Autonomy had an interest in

22   seeing close the deal, the Vatican deal, which was going to go

23   on for years and be worth a really lot of money.  It didn't

24   bother Deloitte.

25       Can we see the next one here?

1    Same thing with Kraft and Capax.  This is Deloitte work

2    paper 6371.  There were meetings pre-Kraft and Autonomy dating

3    back to July.  The two parties continued to negotiate in good

4    faith.  The deal is progressing.  We have seen evidence that

5    directly links Autonomy and Kraft, both pre and post the deal

6    with Capax, and they stamp it satisfactory.  This is not

7    something that in their mind vitiates the deal or makes it

8    improper or anything else.

9        And it is completely logical from a business point of view

10   that if you have a big customer, be it a bank or the Vatican or

11   something else, and you've been working with that customer and

12   you sell a piece of the software that that customer might want

13   to a reseller, you're still interested in having the end user

14   do the deal and you're still interested in working with the end

15   user to make it work.

16       And that's what Stouffer Egan was complaining about it

17   because it was more work for him.  He didn't want to have to

18   deal with the end user.  He wished that they would just cut out

19   this stuff, but that doesn't make it illegal or improper.

20       And then there's the issue that has been raised a million

21   times about the deals going direct.  Again, Deloitte understood

22   that some of these sales with the reseller ended up being

23   converted into a direct deal between the potential end user and

24   Autonomy.

25       And let's look at -- yeah, for example, Kraft again

CLOSING ARGUMENT / KEKER

1    (reading):

2            "A deal is done through Capax in Q3 with end user

3        Kraft, which was then subsequently reversed in Q4 and done

4        directly with Kraft instead."

5        What that says is revenue was recognized in Q3 because of

6    the sale to Capax, the end user, the customer; and then in Q4,

7    fourth quarter, Autonomy and Kraft made a direct deal.  But the

8    point is -- and you'll look through the work papers and see

9    this -- they didn't recognize revenue in the fourth quarter.

10   They've already recognized the revenue in the third quarter so

11   they didn't recognize the revenue twice, and that's something

12   that Deloitte checked to make sure didn't happen.

13       Another one, the direct sales to Morgan Stanley and

14   Manufacturers Life (reading):

15           "Management alerted us to the fact that the two deals

16       sold to MicroTech in Q4 '09 have been credited in this

17       quarter and resold directly to the two end users."

18       Two direct transactions after a sale to MicroTech, and

19   what they did is credit MicroTech for the sale.  But, again,

20   the revenue was reported when they sold to MicroTech and wasn't

21   double-counted when they made the sale again in the future

22   quarter.  Deloitte knew all about it, didn't have a problem

23   with it, said that the accounting was proper.

24       So I hate to do this to you, but I think because of the

25   level of detail that Mr. Reeves went into, I've got to go

 1   through these reseller deals and these reciprocal deals, and so

 2   hold on to your hats at 20 to 4:00 and I'll do it for 20

 3   minutes and then we'll come back tomorrow.

 4       So let's start with the Capax reseller deals.  Capax was

 5   at risk.  There's about seven of them.  They were at risk for

 6   all of them.  There's the reseller agreement that you have seen

 7   (reading):

 8            "VAR shall not be relieved of its obligations to pay

 9        fees owed to Autonomy hereunder by the nonpayment of fees

10        by an end user."

11       Next.

12       Egan sold these deals.  Egan is the one who would come to

13   his friend Baiocco, say, "Take this deal.  I need it for my

14   targets.  I need it for the end of the quarter.  It's about to

15   close.  It's 99 percent sure.  Don't worry about it."  And

16   Baiocco would say yes.

17       Next.

18       And it wasn't like Capax and Baiocco were not important

19   people or companies to Autonomy.  It was a major provider of

20   support and maintenance.  You've heard about NearPoint.  You

21   heard about EAS.  They would provide services that Mr. Baiocco

22   would complain about not getting paid for for these areas where

23   Autonomy didn't want to be in a service business but needed

24   somebody to help the customers.  Capax would do that.  Capax

25   also provided eDiscovery at least -- I mean, people that went

1    to Boston and got trained and so on.

2        Baiocco testified that they wanted these reseller deals to

3    develop relationships with the customers so that Capax could

4    get professional services work, which eventually it did, and he

5    said they made millions.

6        And examples of Capax seeking services work from reseller

7    customers, all of those reseller deals had some element --

8    remember TXU was the one where they acted as the payment agent.

9    TXU didn't want to pay in one year.  They want to pay over

10   three years, and so they basically were the financing for them.

11   But all of those people there were relationships with.

12       MicroTech.  Let's go to -- excuse me.

13       And then, of course, there's Capax confirming all of its

14   debts to Deloitte saying, "No side letters, we owe the money,

15   and the debts are correctly accounted for."

16       And then here's a list in the work papers of Deloitte

17   reviewing and testing all of those deals over $1 million where

18   Capax was the reseller, and each one of those exhibits is in

19   this pile of 1300 that you're going to get and shows Deloitte

20   checking out to make sure that the Capax revenue was properly

21   recorded.

22       Let's go to MicroTech.

23       The first one I want to talk about is the

24   MicroTech/Discover Tech transaction where Autonomy sold to

25   MicroTech the $10 million worth of software and then MicroTech

1    sold it on to Discover Tech for $10 million, and the testimony

2    was the reason it went that way is because Discover Tech didn't

3    have the collectibility requirements and MicroTech did.

4        The fact of the matter is that Discover Tech paid

5    MicroTech, MicroTech paid Autonomy, Deloitte reviewed and

6    approved the transaction, and there's the work paper to prove

7    it.

8        Let's go to the next one.

9        He didn't -- let's skip over this one and go to Slide 32.

10       He mentioned the Department of the Interior but, again,

11   the Department of the Interior is a -- Egan went to Dave Truitt

12   and persuaded him to buy the Department of Interior deal, what

13   they hoped would be the Department of Interior deal, and Dave

14   Truitt agreed to do it.

15       We don't know what Egan told him, but we do know that

16   Discover Tech bought it.  Discover Tech could pay for it.  It

17   was a valid reseller deal.  The fact that the Department of

18   Interior didn't go forward with it or didn't do anything

19   doesn't affect the revenue recognition.  Same for all of these

20   others with Discover Tech -- excuse me -- with MicroTech.

21       Let's go to the MicroTech/Hewlett Packard deal, Slide 33.

22       You've heard a lot about this one.  This is the one where

23   the Postal Service was very dissatisfied with what they were

24   getting from Hewlett Packard and they were interested in

25   getting Autonomy software in there.  The question was:  Is

1    Autonomy going to do it in kind of in partnership with Hewlett
2    Packard or how is this going to work?

3        It was Egan's idea.  We cite the e-mails that you can find
4    this in.  He talks to the head of HP software, and they're
5    interested in trying to work something out.

6        Egan tells Mr. Hussain that selling to Hewlett Packard was
7    a possibility so that Hewlett Packard would buy the deal and
8    then use -- buy the software and then use it with the Postal
9    Service.

10       Egan testified it was a real deal with real possibilities.
11   He thought he had a breakthrough with the negotiations, and the
12   exhibits show that Hewlett Packard was looking forward to
13   hearing more about the deal notwithstanding the fact that they
14   didn't end up doing it and decided -- and that the Postal
15   Service didn't work with them.

16       So as a reseller deal, it was perfectly proper to
17   recognize the revenue by -- from selling the software to
18   Hewlett -- to MicroTech.

19       Let's go to the Discover Tech reseller deals.

20       All of these were at risk.  Dave Truitt testified he was
21   always on risk for these reseller deals.  "We took the risk by
22   issuing the order."  In Q4 '10 he talks about (reading):

23       "Q.  Discover Tech was at risk?

24       "A.  Yes, sir.

25       "Q.  What does it mean?

1      "A.  It means if the deal doesn't happen, we still have to

2      pay for the software that we've agreed to purchase."

3      Q2 '11, when they were still doing them (reading):

4      "Q.  These were deals that you accepted the risk on and

5      you owed the money on?

6      "A.  Yes, sir.  We figured out ways to meet our

7      obligations."

8          Among the ways to meet their obligations is they figured

9      out valuable things that they had that Autonomy could use and

10     persuaded Autonomy to buy them, but that doesn't mean that --

11     I'm going to go over that in a moment -- but that certainly

12     doesn't mean that the sale to the reseller was not properly

13     recognized.  It was on risk, collectible, and delivered.

14         You've heard a lot about this Abbott deal.

15         Could we look at 36, which is the Discover Tech/Abbott

16     deal?

17         I mean, here, this one, as you know, I mean, Discover Tech

18     was the customer.  Truitt testified that they were on risk.

19     The deal was collectible.  Truitt had the money because he'd

20     sold MicroLink.  Autonomy tried to get Discover Tech involved

21     with Abbott Labs, and Deloitte reviewed both the deals and

22     approved Autonomy's revenue recognition.

23         They make this sound like this is some pie-in-the-sky,

24     nutty thing.  Let's remember Jane Snider's testimony.

25         Can we go to the next slide?

1    Jane Snider was the Autonomy salesperson on the account,

2    and remember they needed a very large amount of eDiscovery

3    software.  Autonomy was already working with Abbott Labs to

4    handle its eDiscovery work.  It was pitching to get a new job

5    by offering Abbott a discount.

6    And the idea was instead of just paying over time for

7    this eDiscovery software, why don't you buy it upfront and

8    then we will help -- we'll lower your payments as we go

9    forward.  And that's the slide that you saw before 34 million

10   versus 29 million.

11   Again, Stouffer Egan didn't like these deals, but there's

12   absolutely nothing illegal about them and in some ways they

13   make a lot of sense.  Rather than charge for services over

14   time -- this year you pay me this much, next year you pay me

15   that much and so on -- what you end up with is a customer that

16   can at any time say, "I'm not dealing with you anymore.  I'm

17   going to go elsewhere."

18   If you take that same customer and get a big upfront

19   payment and tell them it's not going to cost them as much for

20   services over time and overall they will save money, then

21   you've got a customer locked in.  That's why they did it.

22   That's why they did it on all these deals where they tried to

23   move up the hosting.

24   Abbott Labs was on the verge of agreeing, and this is the

25   one where all of a sudden the general counsel, I think he was,

1    says, "No way.  We're not doing it because, you know, I don't

2    like to recognize -- to pay money up front."

3         Well, from a business point of view, that is a standard

4    negotiating tactic.  A person comes back, he gives you a better

5    deal.  And, in fact, it's a different deal, but this same

6    general counsel approved a little bit later exactly that, an

7    upfront -- a different upfront deal for a short time -- a short

8    time later.  So there was no hard rule against this upfront

9    deal.  Again, this sale to Discover Tech was properly

10   recognized and correct.

11        Quickly, the FileTek/VA.  This is another -- you heard

12   about this from Mr. Reeves.  It's a reseller deal that was

13   properly recognized.  It didn't go through to the Veterans

14   Affairs, but Mr. Loomis was on the hook, testified he was on

15   the hook.  It was properly recognized.

16        They gave them the right if the VA fails to execute an

17   agreement for the software, FileTek shall have the right to

18   license the software to an alternative user; and FileTek's

19   failure to find another customer, will not relieve it of its

20   obligations to pay.  And they repeatedly confirmed to Deloitte

21   that they were on the hook for this deal and it was properly

22   attributed to them.

23        And then, finally, in this series the VMS hardware.  This

24   is the video people.  They sold in Q4 '10, Autonomy sold

25   5 million of software and 6 million in hardware to VMS, and

1   they -- this is the one where to fulfill the order, they had

2   $2.5 million worth of hardware and they were planning to

3   repurpose 3.5 million from inventory.  And Mr. Hussain said,

4   "Is there any hardware we can repurpose?"

5        Mr. Goodfellow explained what that meant to him is, "Do we

6   have anything that we've purchased we aren't currently using

7   that we can use instead of buying new?"

8        Next.

9        And in their Fixed Asset Registry, they had $53 million

10  worth of hardware inventory.  And Mr. Goodfellow said

11  (reading):

12            "It was both things that were, as you saw, sitting in

13       boxes as well as things that were being used for internal

14       purposes or for delivery to customer."

15       They reassigned stock that was going to be given to

16  another customer.  There was no unplugging of computers from

17  the walls or any of that business.  It was a straight hardware

18  sale.

19       This concept of the bonded warehouse is simply a guarantee

20  that the product that is designated will be available for the

21  customer.  A bond is a promise.  It's a guarantee.

22       VMS wanted its hardware over time.  They wanted staggered

23  delivery so they -- but what Autonomy did properly is designate

24  hardware that they had in stock and say, "This is assigned to

25  VMS."  And the fact that they delivered it over time based on

1    the FOB issues, as soon as they designated it, the title

2    switched so it became VMS hardware and it was delivered.

3        And VMS accepted title to the repurposed hardware.  And,

4    unfortunately for Autonomy, VMS went out of business before

5    they paid for this hardware, but that's not anything that

6    affects the revenue recognition when it occurred.

7        Deloitte reviewed and approved the transaction.  If you

8    have any doubt about it, go look at that work paper, 1417-K.

9    It knew that -- and you'll see that they knew that the

10   repurposed hardware was used and that it had previously been

11   purchased.

12       They tested the value of the assets on the Fixed Asset

13   Register.  They tested Autonomy's delivery, and they signed

14   off.  So this charge -- or this attributing something to

15   Mr. Hussain that he did something wrong is just plain wrong.

16       So in sum, Mr. Hussain followed the rules.  He told the

17   world what the rules were that Autonomy was following.

18   Certainly Hewlett Packard when they came around knew that they

19   were getting a company with 400 resellers.  It's right there in

20   the annual report.  You can read it.

21       They knew that Autonomy was recognizing sales --

22   recognizing sales on sell-in not sell-through because it's

23   right there in the annual report.

24       This is from the KPMG due diligence report (reading):

25           "Target recognizes revenue in accordance with IFRS."

1    Some policy differences relate and one of them is sell-in

2    v. sell-through (reading):

3        "Target recognizes revenues for license sales upon

4        sell-in to the VARS rather than a sell-through basis to

5        end customers."

6    KPMG understood that.  They reported that to Hewlett

7    Packard.

8    Next slide.

9    And it was among their key findings, and you can look at

10    that Exhibit 2004, which is the KPMG report on due diligence,

11    which they did right in the middle of due diligence.  There

12    can't be any question that Hewlett Packard understood how

13    Autonomy was dealing with resellers.

14    So that brings me to a year after the acquisition.  That

15    brings me to Mr. Yelland, and let me do this and then we'll

16    stop for the day, I think.

17    A year after the acquisition closed, after HP bought them,

18    it closed in October 2011, in November 2012, a year and a month

19    later, Hewlett Packard stands up, Ms. Whitman the CEO, and

20    screams fraud, that Mr. Apotheker is fired, Mr. Robison is

21    fired.

22    Until then, Mr. Yelland, who was -- at that point had

23    replaced Steve Chamberlain as the CFO of Autonomy within HP,

24    until then Mr. Yelland and Deloitte had been working together

25    on the books.  There had been no mention of fraud.  There had

1    been no mention of any problem with the hardware sales, which

2    are just sitting there in the books for anybody to see.

3          Can we see slide -- yeah, this one.

4          And this is a summary of sort of where they were.  They

5    were about to do the ASL accounting and the audits were pretty

6    far along.  There was no discussion of a restatement.

7          Mr. Yelland told you that he wasn't forthcoming with

8    Deloitte and that he had suspicions and doubts about the

9    previous accounting.  And I suggest to you that that testimony

10   is simply absurd.  Why wouldn't he bring his issues -- it's one

11   thing -- maybe he's not going to bring his issues to the

12   public, but why wouldn't he bring his issues to the attention

13   of the auditors that he's working closely with and that he's

14   about to audit the books with?

15         It was only after Hewlett Packard's CEO cried fraud that

16   the Hewlett Packard machine went into action, and the first

17   thing that happened is that -- this is the day of the

18   announcement -- the decision was made to dismiss Deloitte,

19   "Let's get rid of them because they're not going to help us say

20   that HP has been defrauded."

21         And then this litigation-driven process involving lots of

22   law firms.  I mean, Morgan Lewis, Choate, Travers Smith is over

23   in London, PWC is the accounting firm, this machine went into

24   action, and Mr. Yelland was very much part of that machine.

25         At the prompting of these lawyers and accountants who were

1   working on the civil case in England against Dr. Lynch and

2   Mr. Hussain, Mr. Yelland began this restatement, which

3   disallowed all of the reseller deals we've been talking about.

4   He just said, "They never should have been -- never should have

5   been in the books."  Anything with Capax, MicroTech,

6   Discover Tech, MicroLink, he just took out of revenue and said,

7   "See, this proves we've been defrauded."

8       His judgments were after the fact.  They were in aid of

9   litigation, and they were based on different standards and

10  rules.  He never really explained to you why these reseller

11  deals weren't properly accounted for except that he said -- I

12  think at some point he said, "Well, I don't think the risk

13  passed."

14      As I've shown, that is counterfactual.  It's just plain

15  wrong.  The people who took the deals, the resellers, said that

16  the risk did pass.

17      They showed you summary charts that challenged revenue

18  recognition on deals that we haven't even heard about in the

19  evidence of this case.

20      I mean, these are -- the summary charts included these

21  transactions, which you haven't heard a word about, but they're

22  part of what goes into these totals that they put at the bottom

23  of their demonstratives.

24      And, most importantly, the Hewlett Packard auditors

25  refused to approve Mr. Yelland's work on this restatement

1   (reading):

2           "We have not been able to obtain sufficient

3       appropriate audit evidence to provide a basis for an audit

4       opinion.  Accordingly, we do not express an opinion on the

5       financial statements."

6       That's the restatement.  So he did all this work,

7   litigation-driven work, came up with this thing that they're

8   showing you like it's the gospel truth, and the auditors didn't

9   sign off on it.

10      And I just want to leave you with this:  How in the world

11  can you be expected to know who is right in this auditing

12  fight?  How do you choose between Deloitte, who are the

13  auditors trying to get it right at the time when there wasn't

14  all this pressure, or Mr. Yelland who's working for the HP

15  machine and is coming up with different conclusions based on

16  hindsight much later when you haven't even heard about a lot of

17  the sales that he is basing it on?

18      And with that, you've been listening to a lot of talking

19  today, and I will thank you very much for your attention and

20  look forward to talking to you again tomorrow with the Court's

21  permission.

22          THE COURT:  Yeah.  Ladies and gentlemen, we're going

23  to take our recess.

24      Just so you know the schedule, we will start at

25  9:00 o'clock sharp.  We will hear -- Mr. Keker will give the

1    remainder of his closing.  We will then listen to -- hear

2    Mr. Frentzen on rebuttal, and then the case will be given to

3    you for your deliberation.

4        So I would anticipate that will be somewhere late morning

5    that the case will be given to you.  At that point it really is

6    in your hands how long you meet in any given day or time.  It's

7    up to you.

8        So it's a particularly crucial time now, please don't

9    think about the case, maybe that's easy, but don't think about

10   it, don't form or express any opinion.

11       Leave your notebooks in the jury room, and I'll see you

12   all tomorrow.

13       (Proceedings were heard out of the presence of the jury:)

14       **THE COURT:**  The jury has left.

15       Yes, Mr. Keker?

16       **MR. KEKER:**  I wanted to double-check.  You are going

17   to send them out for deliberation when you're not going to be

18   here tomorrow afternoon?

19       **THE COURT:**  That's right.  I'll be -- I'll be over at

20   the Ninth Circuit.  I'll have my --

21       **MR. KEKER:**  Okay.  So if something comes up, you

22   can --

23       **THE COURT:**  -- telephone.

24       If something comes up, I'm quite sure that both sides will

25   agree on whatever should be --

**PROCEEDINGS**

1              MR. FRENTZEN:  Sounds good.

2              THE COURT:  -- what the appropriate response is, and I

3    don't foresee any disagreements.

4              MR. KEKER:  We don't the judge.

5              THE COURT:  You know, this part of the proceedings

6    isn't really that sensitive; right?

7              MR. KEKER:  Okay.  I'm just checking.

8              THE COURT:  No, I'll be available.

9              MR. FRENTZEN:  We'll just advise them to get back to

10   work, Your Honor.

11             THE COURT:  Yeah.  You have everything.

12             MR. KEKER:  We'll give them the Allen Charge.

13             THE COURT:  The Allen Charge.

14        Okay.  See you tomorrow.

15                  (Proceedings adjourned at 4:02 p.m.)

16                          ---oOo---

17

18

19

20

21

22

23

24

25

1
2
3                     **CERTIFICATE OF REPORTERS**
4            I certify that the foregoing is a correct transcript
5     from the record of proceedings in the above-entitled matter.
6
7     DATE:    Monday, April 23, 2018
8
9
10
11     _____
12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                     U.S. Court Reporter
13
14
15     _____
16          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                     U.S. Court Reporter
17
18
19
20
21
22
23
24
25